Nick J. Brustin*
  Email: nick@nsbcivilrights.com
Anna Benvenutti Hoffmann*
  Email: anna@nsbcivilrights.com
Farhang Heydari*
  Email: farhang@nsbcivilrights.com
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 965-9081
Facsimile: (212) 965-9084
*Attorneys awaiting admission pro hac vice*

Michael D. Kimerer (SBN 002492)
  Email: MDK@Kimerer.com
Rhonda Elaine Neff (SBN 029773)
  Email: rneff@kimerer.com
KIMERER & DERRICK, P.C.
1313 E. Osborn Road, Suite 100
Phoenix, Arizona 85014
Telephone: (602) 279-5900
Facsimile: (602) 264-5566

Marvel Eugene "Buddy" Rake, Jr. (SBN 003452)
  Email: brake@aztriallaw.com
Daniel T. Benchoff (SBN 021672)
  Email: dbenchoff@aztriallaw.com
RAKE LAW GROUP, P.C.
2701 E. Camelback Road, Suite 160
Phoenix, AZ 85016
Telephone: (602) 264-9081
Facsimile: (602) 265-2628

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Jean Milke, | CASE NO.: |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| City of Phoenix; Maricopa County; Maricopa County Attorney William Montgomery, in his official capacity; and | **AND** **JURY TRIAL DEMAND** |

Detective Armando Saldate, Jr.;
Detective Robert Mills; Detective Jim
House; Detective Russell Davis;
Detective Charles Masino; Detective
Judy Townsend; Detective Harvey Ernie
Hamrick; Detective Frank DiModica;
Sergeant Silverio Ontiveros; Lieutenant
Michael Jahn; Walter E. Birkby; Phillip
Wolslagel; and George Bolduc, in their
individual capacities,

Defendants.

Plaintiff DEBRA JEAN MILKE, by and through her attorneys, the law firms of

NEUFELD SCHECK & BRUSTIN, LLP, the RAKE LAW GROUP, P.C., and KIMERER &

DERRICK, P.C., hereby alleges as follows:

**<u>INTRODUCTION</u>**

1.      On December 2, 1989, Plaintiff Debra Jean Milke suffered any parent's worst

nightmare. Her four-year-old son, C.M., disappeared. The next day his body was found; he

had been shot in the head, his body left in the desert. For Ms. Milke, however, this

unspeakable tragedy was only the first tragedy in the story of this case. After spending over

thirty hours frantically waiting for any word on her son's fate, Ms. Milke was brought down

to the local police precinct to be interviewed by Detective Armando Saldate, a Phoenix Police

Department detective with a long history of lying under oath and coercing confessions. In one

breath, Detective Saldate took Ms. Milke's nightmare from one level to the next—"We found

your son. He was murdered. And you're under arrest."

2.      In the next thirty minutes, Detective Saldate, through his own egregious

misconduct, would set in motion the second tragedy in the story of this case: an innocent,

mother would spend the next twenty-three years of her life on death row, falsely convicted of the capital murder of her four-year-old child, never allowed to properly mourn his death, and coming within days of her own execution.

3.     Exploiting the shock and horror that this news of C.M.'s death caused, Detective Saldate attempted to use his unwitnessed, unrecorded interrogation to coerce a confession. But there was nothing for Ms. Milke to confess—she had nothing to do with her son's murder and did not know anything about it. Rather than document Ms. Milke's actual statement—that she was innocent—Saldate instead fabricated a confession. He falsely reported that Ms. Milke had confessed to arranging for her son's brutal murder. In reality, Ms. Milke said nothing of the sort; Saldate made up the inculpatory statements out of whole cloth.

4.     Saldate and other detectives from the PPD then manipulated the evidence to "fit" the fabricated confession. They fabricated additional evidence falsely indicating Ms. Milke was cavalier and uninterested about her son's disappearance, and they used impermissible tactics to cajole witnesses into falsely reporting that Ms. Milke was a bad mother.

5.     In reality, two men—Jim Styers and Roger Scott—were involved in C.M.'s murder, and either one or both of them actually murdered C.M.. Styers and Scott would each eventually make statements implicating themselves and each other; their statements, however, directly contradicted each other regarding how exactly C.M. was murdered and which of the two had been the trigger man. Because of the Phoenix Police Department's misconduct and inadequate investigation, not only was Debra Milke robbed of 23 years of her life, she and her family also have never learned the truth about what exactly happened to C.M. or why.

3

6.      Saldate's fabricated confession became the centerpiece of Ms. Milke's trial. There were no other witnesses or direct evidence linking the innocent Ms. Milke to the crime. Ms. Milke testified, repeatedly protesting that she had not confessed and that she had nothing to do with the murder. But the jury—which never knew about Saldate's long history of lying under oath and other misconduct, because the PPD and Maricopa County Attorney's office buried it—credited Saldate's lies instead. Based on this fabricated confession, and the other misconduct by the PPD and the Maricopa County Attorney's Office, Ms. Milke was wrongly convicted of the capital murder of her own son. Following her conviction, she was sent to Arizona's death row, where she would spend the next 23 years of her life.

7.      During the course of her post-conviction proceedings, however, Ms. Milke and her counsel unearthed a mountain of evidence that had been suppressed at the time of her trial. In particular, Ms. Milke learned that Saldate had a long and documented history of violating suspects' constitutional rights, fabricating evidence and blatant perjuring himself in order to secure convictions, and engaging in sexual misconduct with women under his control. Indeed, Saldate had been repeatedly found by Arizona courts to have lied on the stand about witness statements and suspect confessions—precisely what happened in this case.

8.      Both the PPD and the Maricopa County Attorney's Office were aware of this mile-long history of misconduct but did nothing to investigate or discipline Saldate in any way, or to ensure disclosure of this history to the defense attorneys in cases Saldate investigated, including in capital cases. Indeed the PPD continued to promote and support Saldate, and even brought him in to handle their most important cases (like this one). The County Attorney's Office continued to rely on Saldate's testimony and to make him the star

4

of their cases. Indeed, both the Office and the prosecutor assigned to Ms. Milke's case, Noel Levy, won personal accolades for convictions obtained based on Saldate's work.

9.      When this long record finally came before the U.S. Court of Appeals for the Ninth Circuit, the panel issued a unanimous decision chastising Saldate for his egregious misconduct, and the PPD and the Maricopa County Attorney's Office for their roles in covering up the crucial evidence of Saldate's history. In a separate concurring opinion, Chief Judge Kozinksi wrote:

> "No civilized system of justice should have to depend on such flimsy evidence, quite possibly tainted by dishonesty or overzealousness, to decide whether to take someone's life or liberty. The Phoenix Police Department and Saldate's supervisors there should be ashamed of having given free rein to a lawless cop to misbehave again and again, undermining the integrity of the system of justice they were sworn to uphold. As should the Maricopa County Attorney's Office, which continued to prosecute Saldate's cases without bothering to disclose his pattern of misconduct."

10.     After over twenty-three years on death row, wrongly imprisoned for the murder of her four year-old son, Ms. Milke's conviction was ordered vacated on March 14, 2013 and she was released on September 6, 2013. But her incarceration should never have occurred in the first place. Were it not for the flagrant misconduct of the Officer Defendants in this case, and the pattern and practice of unchecked misconduct both in the Police Department and in the County Attorney's Office, it never would have.

## JURISDICTION AND VENUE

11.     Ms. Milke brings this action pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of her rights as secured by the United States Constitution.

5

12.     Jurisdiction is conferred by 28 U.S.C. § 1331 and 28 U.S.C. § 1343, which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. § 1983 to redress the deprivation (under color of state law, statute, ordinance, regulation, custom, or usage) of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens of all persons within the jurisdiction of the United States.

13.     Under 28 U.S.C. § 1391(b), venue is proper in this judicial district because the events giving rise to the claims asserted herein occurred within this judicial district.

## JURY TRIAL DEMAND

14.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

15.     **Plaintiff Debra Jean Milke** is and was at all relevant times, a resident of Maricopa County, Arizona.

16.     **Defendant City of Phoenix** is a municipal entity duly organized under the laws of the State of Arizona, was the employer of the individual defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices and customs of the Phoenix Police Department and the City of Phoenix Crime Laboratory. **The Phoenix Police Department** ("PPD") is a department of the City of Phoenix.

17.     **Defendant Maricopa County** is a municipal entity duly organized under the laws of the State of Arizona. Maricopa County owns, operates, manages, directs and controls the **Maricopa County Attorney's Office**, and is and was at all times relevant to this

Complaint responsible for the Maricopa County Attorney's Office's policies, practices and customs.

18.     **Defendant William Montgomery** is the current Maricopa County Attorney, the chief prosecutor for Defendant Maricopa County, and the head of the Maricopa County Attorney's Office. Defendant Montgomery is named in his official capacity only.

19.     **Defendant Detective Armando Saldate, Jr.** (#1875) at all times relevant to this Complaint was a duly appointed and acting Detective of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

20.     **Defendant Detective Robert Mills** (#2781) at all times relevant to this Complaint was a duly appointed and acting Detective of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

21.     **Defendant Detective Jim House** (#2250) at all times relevant to this Complaint was a duly appointed and acting Detective of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

22.     **Defendant Detective Russell Davis** (#2181) at all times relevant to this Complaint was a duly appointed and acting Detective of the PPD, acting under color of law

and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

23.     **Defendant Detective Charles Masino** (#2836) at all times relevant to this Complaint was a duly appointed and acting Detective of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

24.     **Defendant Detective Judy Townsend** (#3933) at all times relevant to this Complaint was a duly appointed and acting Detective of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. She participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

25.     **Defendant Detective Harvey Ernie Hamrick** (#1739) at all times relevant to this Complaint was a duly appointed and acting Detective of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

26.     **Defendant Detective Frank DiModica** (#4384) at all times relevant to this Complaint was a duly appointed and acting Detective of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies,

customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

27.    **Defendant Sergeant Silverio Ontiveros** (#3038) at all times relevant to this Complaint was a duly appointed and acting Sergeant of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

28.    **Defendant Lieutenant Michael Jahn** at all times relevant to this Complaint was a duly appointed and acting Lieutenant of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction.

29.    **Defendant Dr. Walter E. Birkby** at all times relevant to this Complaint was a forensic anthropologist jointly engaged with state officials in a concerted effort to prosecute and convict Ms. Milke.

30.    **Defendant Phillip Wolslagel** at all times relevant to this Complaint was a duly appointed and acting Criminalist in the City of Phoenix Crime Laboratory, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. He participated in the investigation that resulted in Ms. Milke's prosecution and conviction.

31.    **Defendant Dr. George Bolduc** at all times relevant to this Complaint was a duly appointed and acting Assistant Chief Medical Examiner for the Maricopa County

Medical Examiner's Office, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Maricopa County. He participated in the investigation that resulted in Ms. Milke's prosecution and conviction.

32.     Defendants Saldate, Mills, House, Davis, Masino, Townsend, Hamrick, DiModica, Ontiveros, Jahn, Birkby, Wolslagel, and Bolduc, were employed by the City of Phoenix or by Maricopa County, and were acting under color of law within the scope of their employment at all times relevant herein.

33.     Defendants Saldate, Mills, House, Davis, Masino, Townsend, Hamrick, DiModica, Ontiveros, Jahn, Birkby, Wolslagel, and Bolduc are sued in their individual capacities.

## **FACTUAL ALLEGATIONS**

### **Debra Milke is told that C.M. is missing**

34.     On Saturday, December 2, 1989, Ms. Milke had the day off after working a full week. A single mother who struggled to make ends meet, Ms. Milke was saving up for a new apartment for her and her son. She was temporarily staying, along with four-year-old C.M., in the spare bedroom of Jim Styers, a family friend and single father of a two-year-old daughter.

35.     That morning Styers, whose car was not working, asked whether he could borrow Ms. Milke's car to run some errands and go to the mall. C.M. had been at the mall the day before to see Santa Claus; C.M. asked if he could go with Styers to see Santa again. When Styers confirmed that he did not mind taking C.M., and given that Styers had routinely

babysat C.M. in the past, Ms. Milke permitted C.M. to go. Ms. Milke stayed home to do laundry and clean the apartment.

36.     At around 2:45 p.m., Ms. Milke received a call from Styers. Styers said that he had lost C.M. at the mall. Styers told Ms. Milke that he was working with a security guard to locate C.M. and would call the police.

37.     Hysterical, Ms. Milke called her father, who lived in Florence, Arizona. Ms. Milke, who had taught C.M. the phone number at the apartment, refused to leave the apartment's phone in case C.M. tried to call her there. Her father agreed with her plan. In the age before cell phones and text messages, Ms. Milke was at the mercy of others for updates about the search. When another hour passed without an update from Styers, Ms. Milke herself called the police.

38.     As the afternoon and evening wore on, Ms. Milke's neighbors and friends came by the apartment, trying to comfort her. She remained distraught, crying, and, as any mother would be, unable to process what was happening.

39.     By approximately 9:00 p.m. that night, multiple PPD officers came to the apartment. The officers asked Ms. Milke questions about C.M.—such as what clothing he was last wearing—in an attempt to aid in the search. Ms. Milke cooperated with the officers, although she became frustrated when she did not think they were working hard enough to locate her missing son.

40.     That night, Ms. Milke's stepmother and stepsister drove up from Florence to be with Ms. Milke at her apartment. Ms. Milke was unable to sleep or eat throughout the night. By early the next morning (Sunday), Ms. Milke's stepmother gave Ms. Milke medication in

an effort to try and calm her down and have her rest. Even with the medicine, Ms. Milke was unable to sleep.

41.     The next morning, Ms. Milke's stepmother suggested that they take Ms. Milke back to her father's house in Florence. As Ms. Milke's mother lived in Germany and her only sister in Wyoming, her father in Florence was the closest relative. By that point, the PPD, and specifically Detective Judy Townsend, had begun monitoring Ms. Milke's home phone, and had arranged for a trap and trace to be placed on the line. The PPD officers present knew and approved of the decision for Ms. Milke to travel to Florence to be with her family. The officers assured Ms. Milke that they would monitor and answer her Phoenix telephone line.

42.     Before leaving, Ms. Milke again spoke to the officers in the apartment, including Detectives House and Davis. The detectives asked Ms. Milke questions about Mr. Styers, his friend Roger Scott, and her ex-husband, Mark Milke. Ms. Milke truthfully answered their questions.

**PPD Detectives investigate C.M.'s disappearance and develop suspicions about Styers and Scott.**

43.     While Ms. Milke was waiting, distraught, at the apartment for news of her son, PPD officers and detectives had repeatedly interviewed Styers and his friend, Roger Scott, who had showed up at the mall during the search. The PPD officers found Styers's and Scott's statements suspicious, but had not yet developed evidence implicating them in C.M.'s disappearance. The next morning, on Sunday, December 3, PPD supervisors, including Sergeant Ontiveros, made the decision to call in Detectives Saldate and Mills, homicide detectives who were scheduled to be off from work.

12

44.     It was no accident that these detectives were called in to lead this investigation. Saldate, in particular, had a reputation within the PPD for being able to obtain incriminating evidence when no one else could—in reality, this was because he was willing to conduct illegal interrogations, lie under oath, and otherwise ignore the constitutional limits on police investigations. PPD supervisors, including but not limited to Sergeant Ontiveros, knew or should have known that Saldate's reputation was built directly on his history of unconstitutional misconduct in interrogations, not on quality police work. But these supervisors, including Sergeant Ontiveros in this case, continued to bring Saldate in to lead important investigations, failed to discipline him for his misconduct, and, knowing the risk to suspects and witnesses' constitutional rights, failed to appropriately supervise him.

45.     As detailed in the Ninth Circuit's decision resulting in the vacatur of Ms. Milke's conviction, in the years before and after his fabrication of Ms. Milke's confession, Detective Saldate had been found by the Arizona state courts to have lied or misrepresented facts under oath to grand juries, coerced confessions, and/or violated *Miranda* rights in order to obtain convictions in *eight separate cases*. Five of those cases resulted in suppression (*Conde*, *Yanes*, *Jones*, *Mahler*, and *King*), and three others resulted in remands because Saldate lied or omitted material evidence in testimony before the grand jury (*Rangel*, *Rodriguez*, and *Reynolds*). The Ninth Circuit offered the following summaries of these cases:

      a.  June 22, 1990: In *State* v. *King*, Saldate told Maricopa County prosecutor Paul Rood that the defendant had not been unwilling to answer questions during the interrogation. On cross, the defense counsel read back Saldate's own report showing that the defendant had, in fact, said he wasn't going to answer any more questions. The trial judge threw out the portion of the confession that followed the suspect's request to end the interview: "[T]he statements made up

to the time when the defendant advised the detective he no longer wished to answer his questions are admissible. Thereafter they're not admissible."

b. February 27, 1989: In *State* v. *Reynolds*, the judge found that Saldate's false statements to the grand jury "denied [the defendant] his right to due process and a fair and impartial presentation of the evidence." Two false statements particularly worried the judge: Saldate told the grand jury that the victim's son couldn't remember at what time he saw defendant enter the house, drag the victim upstairs and then leave; the son could say only that it was late at night, according to Saldate. That statement was false. In fact, the son told detectives that the defendant left the apartment about 8 p.m.; the son knew this because defendant turned off the Garry Shandling Show on the way out. Saldate's omission was critical because other witnesses had seen the victim alive after midnight; if the defendant left around 8 p.m., it proved he hadn't killed the victim in their fight. The Judge ultimately found that "a fair presentation was not made in connection with the evidence concerning the identification of the defendant by the victim's son," and that "the evidence was not fully and fairly presented with regard to defendant's possible intoxication." Based largely on Saldate's two false statements, the judge threw out the finding of probable cause.

c. November 20, 1986: In *State* v. *Rodriguez.* Saldate told a grand jury that the murder victim had been shot four times, even though it was, as the judge wrote, "undisputed" that the victim was shot only once. The Maricopa County Attorney's Office said it had never intended to claim there was more than one shot. Instead of blaming Saldate for the false statement, the prosecution "[took] issue with the transcription of the grand jury proceeding, for surely the testifying detective, Armando Saldate, of the PPD, and/or this State's attorney would have caught and corrected such an incorrect representation." The trial judge rejected this, finding that the "reporter's notes and the transcript of the Grand Jury" were accurate and that Saldate had, in fact, said there were four shots. As a result of this false statement, the judge ordered a redetermination of probable cause.

d. October 16, 1989: In *State* v. *Rangel*, a judge agreed with defendant's claim that Saldate misled a grand jury by selectively recounting defendant's statements. The judge held that Saldate's statements had materially affected the grand jury's deliberation and remanded the case for a new finding of probable cause.

e. 1989: In *State* v. *Conde*, Saldate interrogated a suspect in intensive care who was intubated and connected to intravenous lines. Saldate testified that the suspect was drifting "in and out" of consciousness; several times, Saldate had to shake him "to get his attention." Nonetheless, Saldate read him the *Miranda*

14

warnings and went on with the interrogation. "I really don't know whether he wasn't responding because he didn't understand his rights or wasn't responding because of the medication he was on," Saldate testified. By Saldate's own admission, "it was obvious that [the defendant] was in pain." The nurse told the suspect that she couldn't give him more pain medicine until after he finished talking to Saldate. When the case came to trial in 1989, the court held the statement from this interrogation "involuntary and inadmissible," as the Arizona Court of Appeals noted in a published opinion three years later.

f.  November 26, 1984: In *State* v. *Yanes*, Saldate admitted interrogating a suspect who was strapped to a hospital bed, incoherent after apparently suffering a skull fracture. When interviewed by doctors, the suspect didn't know his own name, the current year or the name of the president, but the prosecutor nonetheless presented the suspect's statement to Saldate at trial. The court vacated the conviction and ordered a new trial. At the suppression hearing for the new trial, the court suppressed "those statements made by the defendant to Armando Saldate."

g.  November 29, 1990: In *State* v. *Jones*, during the course of a murder investigation, Saldate directed an officer to place a juvenile by himself in an interrogation room, where the juvenile was handcuffed to a table. This, despite the fact that, in the trial court's view, "the police clearly had no information linking the Defendant to the murder or disappearance of [the victim]," and even the Maricopa County Attorney's Office conceded that it had no probable cause for the detention. The court suppressed the murder confession as "the fruit of the illegal arrest" and condemned the juvenile's illegal detention and the interrogation that followed as "a show of flagrant misconduct."

46.  Upon information and belief, despite these numerous judicial findings that Saldate has lied, had violated suspect's constitutional rights, and had otherwise engaged in misconduct, the PPD failed to conduct any adequate internal investigations into the proven misconduct and Saldate was never disciplined for his actions.

47.  This extensive list includes only cases in which there was a *judicial finding* that Saldate had engaged in such egregious misconduct. Upon information and belief, Saldate's misconduct was far more widespread than even this extensive list suggests. For example, the following cases involve allegations by criminal defendants that Saldate engaged in similar

15

misconduct, some of which Saldate has acknowledged occurred. Based on Saldate's

documented history, the remaining allegations are plausible:

a. In *State v. Running Eagle*, Saldate ignored Running Eagle's assertion of his right to remain silent. While continuing questioning, Saldate held his face 6 to 12 inches from Running Eagle's and repeatedly poked him in the chest while Running Eagle cried. Saldate also admitted that although he had the equipment to do so, he did not tape record Running Eagle's interrogation saying, "I don't believe it's very good, a taped confession or an interview with someone, especially since it involves such a serious crime. Because I think it hinders that person from coming out, discussing what he really wants to say. I think that maybe that tape kind of keeps them from wanting to talk to us." More information on this case was uncovered in post-conviction proceedings, including Saldate's interrogation of a highly intoxicated witness whose rendition of events he admits he refused to accept. When the witness said he was "too drunk to remember," Sal date continually said, "This is too important of a case. We can't have an answer like that in a case like this. This is too serious. You got to do better than that." This continued for several days, with Saldate saying, "I don't believe that, you got to do better," and the witness "would keep doing better." The intoxicated witness did recall Saldate mentioning the gas chamber, which is highly improper in an interrogation.

b. Claims that Saldate had fabricated several witnesses' statements. *State v. Fraser*, CR 89-09277.

c. Saldate's interrogation of witnesses notwithstanding their incapacity due to intoxication. *State v. Salas*, CR 89-03252; *State v. Kelley* & *State v. Moynihan*, CR 87-00882 (consolidated).

d. Saldate ignoring repeated requests for counsel during interrogation, and only providing *Miranda* warnings after the suspect admitted involvement. *State v. Gallegos*, 90-03339.

e. Saldate's improper interrogation of a minor suspect with a known history of mental impairment and psychological problems. *State v. Blackerby*, CR 88-07047.

f. Saldate's interrogation of suspect without reading him his *Miranda* rights, and threatening to arrest suspect's girlfriend unless he confessed. *State v. Stark*, CR 130819.

g. In violation of *Miranda*, Saldate informing a suspect who had denied participation in a crime that it was "necessary" for the suspect to talk to him about the crime. *State v. Biggica*, CR 90-00715.

h. Saldate's misrepresentation of witness statements. *State v. Webster*, CR 143926.

48.     Upon information and belief, there was no adequate internal investigation of these allegations by either Saldate's supervisors at the PPD or by PPD internal affairs, and Saldate was never disciplined.

49.     Saldate also had a documented history of engaging in sexual misconduct on the job, harassing young women with whom he interacted, and lying to his superiors. This went back at least to 1973 when Saldate, then a patrol officer with the PPD, attempted to extort and coerce sexual favors from a female motorist whom Saldate had stopped for having a faulty taillight. After stopping the motorist and learning she had an outstanding warrant, instead of arresting the woman, Saldate suggested they move to a less conspicuous spot and then followed her to it. Once there, he leaned into her car, and took liberties with her. She offered to meet him somewhere later to have sex with him. Saldate showed up for the rendezvous, but the woman did not. Instead, someone—perhaps the woman, once she got free of Saldate— reported Saldate's misconduct to the police. When this misconduct came to the PPD's attention, officials opened an investigation. When questioned by investigators, Saldate steadfastly lied about the incident until he failed a polygraph test. In the resulting disciplinary write-up, signed by the police chief and the city manager, Saldate was told that "because of this incident, your image of honesty, competency, and overall reliability must be questioned." Saldate's personnel file contained a PPD internal investigation report showing these conclusions and that Saldate had been suspended for five days.

50.     Saldate then engaged in a similar sexual misconduct in 2009, while Ms. Milke's habeas claims were being litigated. In 2009, Saldate extorted a woman, Belinda Reynolds, for sex in exchange for letting her avoid eviction. Ms. Reynolds reported the incident to Saldate's supervisor, who in turn advised her to contact the PPD, which she did. The subsequent police department report states that on or around April 30, 2009, Saldate "committed bribery and theft by extortion when he suggested that . . . Belinda Reynolds have sexual intercourse with him to keep him from locking her out of her apartment after she was evicted."[1]

51.     No evidence of Saldate's striking pattern of serious misconduct was ever disclosed to Ms. Milke before her trial. Instead, the vast majority of this evidence was uncovered through thousands of hours of meticulous research by her post-conviction counsel combing through public records. By the time the PPD finally was ordered to produce Saldate's personnel file, years after the conviction, they reported that almost all of that file had been destroyed.

52.     Given the astonishing pattern of *judicial findings of misconduct*, as well as the difficulty and rarity of a criminal defendant obtaining such a finding against a police officer, and the destruction of Saldate's personnel file before it could be examined by Ms. Milke, it is

---

[1] The matter was eventually referred to the Arizona Attorney General's Office, which conducted an investigation into Ms. Reynolds' claims in July and August 2010. It is not clear how far the investigation was taken, but it is notable that the Attorney General's investigation into Ms. Reynolds' allegations occurred around the same period that Ms. Milke was engaged in an evidentiary hearing and briefing regard her habeas petition before the Honorable Robert C. Broomfield, U.S. District Judge for the District of Arizona. Despite its clear relevance to Saldate's credibility, no one from the Attorney General's Office ever reported this incident to Ms. Milke's counsel, to the district court, or to the Ninth Circuit.

likely that the pattern of misconduct recounted above is just the tip of the iceberg of the misconduct Saldate actually engaged in while a PPD detective.

**Saldate and Mills fabricate and coerce false evidence implicating Ms. Milke**

53.     On the morning of Sunday, December 3, after being called in by Sergeant Ontiveros, Saldate and Mills took over the primary responsibilities for interrogating Styers and Scott. Defendant Saldate began with Styers, while Defendant Mills worked on Scott. At first, neither had any success.

54.     Saldate then decided to try his turn with Scott. A chronic alcoholic who had multiple head injuries, brain damage and suffered frontal lobe seizures, Scott had a passive dependent personality and was, by his nature, highly suggestible, submissive, and compliant. By the time Saldate interrogated him, Scott had also had no sleep, no food and none of his medications for nearly two days while in the custody of the PPD. He had nevertheless been interviewed repeatedly by other officers without confessing.

55.     In fact, either Styers, Scott, or both actually murdered C.M.. However, Saldate and the PPD's misconduct has made it impossible to know what precisely happened and why.

56.     In an unwitnessed, unrecorded interrogation, Saldate, however, was able to obtain a confession from Scott when no one else had. Getting between six and twelve inches from Scott's face, Saldate told Scott that if he did not tell Saldate what he wanted to hear, Saldate would obtain a search warrant for the home Scott shared with his elderly mother and threatened to send officers to interview her as well. When Scott expressed concern that this tactic would give his mother a heart attack, Saldate did not relent. Eventually, under Saldate's

pressure, Scott confessed that both he and Styers had been involved in C.M.'s murder, and told Saldate he could take police to the body.

57.     Scott did not implicate the innocent Ms. Milke in any way. Scott did, however, implicate Styers. Unbeknownst to Ms. Milke, who knew Styers as a mild mannered single father who went to church three times a week, at the time of the murder, Styers was suffering from severe post-traumatic stress disorder based on his military service in Vietnam; he often heard voices and children crying and was receiving regular treatment and medication.

58.     Defendants Saldate and Mills then put Scott in a police cruiser so Scott could direct them to C.M.'s body. Defendant Detectives Scott and Townsend followed Saldate and Mills in a separate vehicle. At approximately 4:00 p.m., the officers found C.M. where he had been left in a dry desert wash, about twenty miles from the mall. He had been shot three times in the back of the head.

59.     By directing the police to C.M.'s body, Scott proved he had guilty knowledge about the crime. He also implicated his friend Styers, who had falsely reported that C.M. had disappeared from the mall. Subsequent evidence would corroborate that both Styers and Scott had been involved in the murder, including statements from both men and evidence that Styers had recently purchased a gun, later found in Scott's home, of the same caliber as the one that killed C.M.. However, because the PPD officers and detectives involved in this investigation conducted a shockingly inadequate investigation, driven by their inaccurate hunches rather than the evidence, there are no clear answers as to what precipitated the murder and which of the two men shot C.M. or why.

60.     Instead, although there was no evidence implicating Ms. Milke in the murder of her son—and even though Saldate had never so much as spoken to Ms. Milke before—Saldate decided based on a hunch that she must have been involved in the crime as well.

61.     Saldate later fabricated evidence that, at some point that afternoon, Scott implicated Ms. Milke in the crimes. This was a fabrication. Saldate's own accounts of how and when Scott implicated Ms. Milke are contradictory. In his report, Saldate claimed that Scott implicated Ms. Milke during the interview at the police station, right after admitting his own participation in the murder and telling police he could take them to C.M.'s body. In later testimony, however, Saldate claimed that Scott first implicated Ms. Milke after the interview, during the drive to locate C.M.'s body. But Mills, the only other person in the car, never reported hearing an incriminating statement about Ms. Milke. In fact, both of Saldate's accounts are fabrications. While Mills stayed behind to continue interrogating Scott and take a full confession from him, Saldate traveled to Florence to interrogate Debra Milke.

**Saldate attempts to coerce a confession from Ms. Milke**

62.     While the PPD was interrogating Scott and Styers in Phoenix, Ms. Milke was in Florence, still exhausted and waiting anxiously for any news of her son. After having been up all night, she finally fell asleep.

63.     But after only a few hours of sleep, Ms. Milke was shaken awake by her stepsister, who informed her that a Pinal County sheriff's deputy was at the front door. The deputy cryptically informed Ms. Milke that detectives from the PPD were on their way to Florence and that they needed to talk to Ms. Milke at the Pinal County precinct. A family friend drove her there. Ms. Milke still had not been given any news about her son.

21

64.     After arriving at the local precinct, Ms. Milke was escorted to a room and asked to wait. Over an hour passed with no word and no information about C.M.. Ms. Milke was mentally and emotionally exhausted.

65.     Shortly after C.M.'s body was found, Lieutenant Jahn had instructed PPD Detectives Hamrick and DiModica to make the hour-and-a-half drive to Florence and make contact with Ms. Milke. When they arrived at the Pinal County precinct, however, Detectives Hamrick and DiModica did not speak to Ms. Milke, who was waiting in a nearby room anxious to hear news about her son. Instead, Detective Hamrick and DiModica were instructed, by Lieutenant Jahn and/or Sergeant Ontiveros, to guard Ms. Milke so that she would not leave, but not to talk to her. They were told that Detective Saldate was being sent by helicopter from Phoenix to Florence in order to interrogate Ms. Milke.

66.     Ms. Milke's first interaction with an officer at the station was with Detective Saldate, whom she had never met before.

67.     Before even beginning his interrogation of Ms. Milke, and although there was no evidence linking Ms. Milke to the crime, Saldate decided that he was going to arrest Ms. Milke.

68.     Prior to boarding the helicopter from Phoenix to Florence, Sergeant Ontiveros had ordered Saldate to tape his interrogation of Ms. Milke.

69.     Although Saldate had been specifically instructed by a superior to record the interrogation, Saldate did not bring any audio or video recording devices with him. It was Saldate's practice to conduct his interrogations alone, without any witnesses, and without

22

creating any recording. Saldate claimed recordings interfered with his ability to obtain confessions.

70.    Despite disobeying Ontiveros' direct order to record his interview of Ms. Milke, upon information and belief, Saldate suffered no consequences and was not disciplined in any manner. Furthermore, the confession Saldate claimed to have obtained from Ms. Milke, but which Saldate failed to record, was never seriously questioned, scrutinized, or investigated by Saldate's supervisors, specifically including, but not limited to Ontiveros.

71.    Saldate entered the room and told Ms. Milke's friend, who had accompanied her to the station, to leave the room. He shut the door behind her, leaving Ms. Milke alone with him.

72.    Ms. Milke asked if Saldate had any news about her son. Eventually, Saldate looked up and said "We found your son. He was murdered. And you're under arrest."

73.    The news that her son was dead and that she was being accused of the murder caused Ms. Milke to become hysterical, crying uncontrollably. She was in shock. But Saldate told her he would not "tolerate" her crying and that she needed to be quiet. Saldate then read Ms. Milke her *Miranda* rights from a rights card, including that she had a right to remain silent and a right to an attorney.

74.    When Saldate asked if Ms. Milke understood her rights, she replied that she didn't, that she'd never been in trouble before and never had her rights read to her. Saldate ignored this and continued. Dismayed by Saldate's accusations and still in shock about the death of her son, Ms. Milke told Saldate she wanted a lawyer.

23

75.     Saldate simply ignored Ms. Milke's request for an attorney and did not stop his questioning—as he was legally required to do when a suspect requests an attorney. Ignoring Ms. Milke's request was completely consistent with Saldate's personal practices, as evidenced by the judicial findings discussed above he often continued to question suspects following their invocation of their rights to be silent or to have an attorney.

76.     Instead, Saldate began his interrogation, confident that one way or another he would obtain a confession. The twenty-five-year-old Ms. Milke was sitting in a chair with her back to the wall. Saldate pulled his chair up in front of her so that their knees were touching and he was about six to twelve inches from her face. Saldate then leaned in, putting his hands on Ms. Milke's knees. Saldate was a large and imposing man, especially when compared to petite Ms. Milke.

77.     Saldate's actions with regard to Ms. Milke—closing the door while he was alone in a room with a twenty-five year old woman, pulling up his chair so that their knees were touching, putting his hands on both of her knees, and coming within six to twelve inches of her face—was inappropriate sexual behavior. Saldate would later falsely claim that Ms. Milke had flashed her breasts at him and offered sex to drop the charges. These claims were completely false; Ms. Milke never did any such thing. In fact, Saldate did not include these incredible events in his report of Ms. Milke's interrogation. But consistent with his prior predatory behavior with female suspects, Saldate created this false story about Ms. Milke's alleged sexual conduct when attempting to coerce the testimony of another female witness—Sandra Pickenpaugh, Ms. Milke's sister. Especially given Saldate's known history of sexual

24

impropriety, he never should have been permitted to be in that position. And he never would have been, but for the blatantly inadequate supervision and discipline of his PPD supervisors.

78.     Saldate indicated to Ms. Milke that he was there for a confession and accused Ms. Milke of complicity in her son's death. Every time that Ms. Milke denied any involvement whatsoever in the crime, Saldate would emphatically state that she was lying and that he would not tolerate her lies. Saldate remained in Ms. Milke's face, badgering her, demanding that she confess.

79.     Despite Saldate's tactics, Ms. Milke never wavered. She was innocent and she was not going to falsely confess to the murder of her own son. She repeatedly denied any involvement in C.M.'s murder. She told Saldate she would not do anything to hurt anybody, especially her own child. At no point during the interrogation did Ms. Milke ever confess to Detective Saldate, nor did she make any statements indicating that she was involved in any way with a conspiracy to have her son murdered.

80.     Ms. Milke did not know who was responsible for C.M.'s death, and did not guess as to who was responsible.

81.     In response to Saldate's hostile questions, and still in shock and distraught, Ms. Milke did provide information about her background, her ex-husband Mark Milke, her knowledge of Styers and Scott, and her relationship with C.M.. Saldate later twisted some of these answers to falsely make them seem incriminating.

82.     After about thirty minutes alone with Ms. Milke, Saldate stopped the interrogation.

## Defendants fabricate Ms. Milke's confession

83.     After he left the interrogation room, Saldate fabricated and falsely reported to other officers, his supervisors, and prosecutors that Ms. Milke had confessed to arranging the murder of her son.

84.     On the basis of this fabrication, Ms. Milke was transported in a waiting police car back to Phoenix, booked into jail, and ultimately charged with the first degree murder of C.M..

85.     Nothing corroborated the alleged confession but Saldate's own word. By Saldate's design, no one but him had been present to observe the interrogation of Ms. Milke. Contrary to direct instruction, Saldate had not recorded the interview. In addition, Saldate never asked Ms. Milke to sign or write a statement, to be reinterviewed on tape, or even to sign a *Miranda* waiver form.

86.     Pursuant to standard police policies and procedures at the time of Ms. Milke's interrogation, any minimally competent officer, let alone a detective of Saldate's experience, would have, if acting in good faith, attempted to obtain some additional documentation of the statement, either through another officer witness or a written or recorded statement. For example, Saldate could have asked another officer to witness the interrogation, asked Ms. Milke to record the statement in writing, or asked Ms. Milke to repeat her statements on tape— as he had been ordered to do—or to another officer.

87.     Saldate's failure to obtain any documentation or corroboration of Ms. Milke's supposed confession is all the more egregious given that Arizona courts had repeatedly suppressed information obtained by Saldate. Given his history of having statements

26

suppressed by the courts, Saldate, if acting in good faith, also would have been highly likely to ensure proper documentation and corroboration of this "confession."

88.     When she left the interrogation, Ms. Milke had no idea that Saldate would claim she had confessed during the interrogation.

89.     Shortly after she was booked in Phoenix, Ms. Milke was interviewed on tape by a former-police-officer-turned-private-investigator who was working for a news organization; based on the report from the PPD that Ms. Milke had confessed, the investigator thought he could get additional incriminating statements from Ms. Milke for the evening news. Instead, when the investigator asked about the confession, Ms. Milke was shocked to hear that the PPD was claiming she had confessed, and denied making any kind of confession to Saldate or having anything to do with C.M.'s murder.

90.     But for the broken supervision and internal affairs system of the PPD, which failed to hold Saldate accountable for any of the numerous instances where he was found to have engaged in misconduct, Ms. Milke never would have been in this position—in a position where it was her word against the word of an officer with a long (but buried) history of fabricating evidence and ignoring assertions of *Miranda* rights.

91.     At the same time that Saldate was interrogating Ms. Milke, Detective Mills was continuing the interrogation of Scott. Consistent with the PPD's theory, Mills pressured Scott to implicate Ms. Milke. Upon information and belief, Mills and others fed Scott a story implicating Ms. Milke before or during his tape recorded interrogation. Although much of the interview was not taped, Mill eventually obtained a taped statement from Scott, who regurgitated some vague accusations that Ms. Milke was involved in the murder.

27

92.     Scott's statements implicating Ms. Milke were false, fabricated and coerced. Scott refused to subsequently testify against Ms. Milke—even when offered a deal that would spare him the death penalty—because he stated the requested testimony was not true.

93.     There are no contemporaneous reports of Ms. Milke's alleged confession. Saldate first wrote up his account of the fabricated confession three days later on December 6, 1989. By that point, Saldate had access to a number of other reports regarding the investigation, including reports of the interviews of Scott and Styers. Although Saldate claimed he took contemporaneous notes of his interrogation of Milke, he testified that he destroyed those notes when he drafted his formal report.

94.     Saldate's report of the alleged confession is a fabrication. Many of the statements—including all alleged admissions by Ms. Milke of any knowledge or participation in C.M.'s murder—were made up out of whole cloth. Ms. Milke had nothing to do with the murder of her son and never told Saldate or anyone else that she did.

95.     The report also fabricated other details of the interrogation, including, for example, that when Saldate told Ms. Milke that her son was found murdered, she appeared to attempt to cry, but that no tears came out.

96.     Saldate also twisted a number of statements Ms. Milke had made, to make them falsely appear incriminating. For example, during the interrogation Ms. Milke had mentioned her difficult relationship with her ex-husband and C.M.'s father, Mark Milke. Mark had been abusive to her, in and out of prison and had trouble with alcohol and drugs. As a result, Ms. Milke had fought for sole custody of C.M.. Saldate used this information to create an apparent motive for Ms. Milke to arrange her own son's murder: Saldate falsely claimed that Ms.

28

Milke had confessed she had killed C.M. because she hated her ex-husband and was concerned C.M. would grow up to be like him. Like all other incriminating parts of the "confession," this was a fabrication.

97.     Saldate's report also omits a number of essential, truthful statements made by Ms. Milke, including her demand for an attorney and her repeated protestations of innocence.

98.     Saldate's report, supposedly created based on his handwritten notes of the just thirty minute interrogation, is about five pages, single-spaced. The report suggests that Ms. Milke, after initially feigning shock at the news of her son's murder, quickly confessed with no improper pressure from Saldate, and discussed her involvement, her motivation, her childhood, her life with her husband, the planning involved in the murder, her family's likely reaction, that she was not insane, and Saldate's feelings about her, all in about half an hour. In the end, Saldate reported, that Ms. Milke told him that after confessing to Saldate, she was starting to feel better and thought that she was now getting her self-esteem back.

99.     If Saldate and Ms. Milke had actually had such a good rapport, as Saldate claimed, Saldate would have no reason not to ask Ms. Milke to provide him with a written or recorded statement, or at least to repeat her confession to another officer. Pursuant to standard police policies and procedures at the time of Ms. Milke's interrogation, in light of the interrogation that Saldate described, no minimally competent officer acting in good faith, let alone a detective of Saldate's experience, would have failed to obtain some additional documentation of the supposed confession.

100.    Similarly, there would have been no reason for Saldate not to continue the interrogation in order to attempt to obtain specific details that could have been later used to corroborate the confession or to support the case against Styers or Scott.

101.    Obtaining such corroborative evidence would have been all the more important for an officer like Saldate, who had seen evidence and statements he had obtained repeatedly thrown out of court based on judicial findings that he had lied and fabricated evidence and ignored *Miranda* assertions.

102.    Like Saldate, none of the PPD supervisors, including Sergeant Ontiveros or Lieutenant Jahn, took any action to ensure documentation or corroboration of Ms. Milke's statement. In light of Saldate's history of misconduct and judicial findings that he had lied and fabricated evidence, no minimally competent supervisor acting in good faith would have permitted Saldate to be in that situation with Ms. Milke on his own in the first place, nor would a supervisor acting in good faith have failed to follow up with Ms. Milke in an attempt to obtain further corroborating evidence. The only reason not to follow up would have been if the supervisors knew what they would find: that Ms. Milke had not made the statement at all.

103.    If Ms. Milke had confessed in the manner reported by Saldate, there is no explanation consistent with good faith police work for Saldate and his supervisors' failures to obtain documentation and corroboration. In reality, the reason that no one attempted to obtain documentation or corroboration of Ms. Milke's statement is that everyone involved knew or had reason to know that it was yet another fabrication by Saldate.

**Defendants conspire to fabricate additional evidence supporting Saldate's fabricated**

**confession**

104.    As Maricopa County Assistant Attorney Levy eventually told the jury, Saldate's fabricated confession was the "keystone" of the eventual case against Ms. Milke. Without the fabricated confession, the prosecution had no case against her. The confession was not, however, the only fabrication used to wrongfully convict Ms. Milke.

105.    Following Ms. Milke's interrogation, various Defendant officers of the PPD fabricated evidence to support the fake confession, including but not limited to:

    a.  *Jean Pugh (witness)* - Ms. Pugh lived near the area where C.M. was shot, and came forward with information that on the day of the murder she heard two series of shots--not the three uniform shots reported by Mr. Scott. Ms. Pugh came forward to the PPD and was referred to Defendant Saldate. Rather than properly investigate, record, and report this information, Saldate called Ms. Pugh a bold-faced liar and told her that her description was impossible.

    b.  *Ernie Sweat (former boyfriend)* - Saldate also misrepresented a number of statements made by Ms. Milke's former boyfriend, Mr. Sweat. For example, Saldate fabricated a report indicating that Sweat had told Ms. Milke that he was not ready for marriage and that Ms. Milke had been neglecting C.M.. Mr. Sweat never made such statements, but they were used to portray Ms. Milke's supposed selfish motivation to have her son killed.

106.    One of the most egregious examples of Saldate's witness-related misconduct in this case involves Sandra Pickenpaugh (now Smith), Ms. Milke's sister. Prior to Ms. Milke's trial, Saldate repeatedly attempted to arrange an interview of Ms. Pickenpaugh. Ms. Pickenpaugh, who was seven months pregnant at the time that Saldate contacted her, resisted the interview. Saldate then simply told her that he had made reservations to see her in Wyoming and that if she did not cooperate he would subpoena her and she was "just going to have to deliver [her] baby early." Saldate knew that Ms. Pickenpaugh had a combative and

jealous history with her sister. During the interview he attempted to seize on this history and turn Ms. Pickenpaugh against her sister. Ms. Pickenpaugh taped portions of the interview. Saldate, himself, made no efforts to tape his questioning of her.

107.    In addition to falsely informing Ms. Pickenpaugh that Ms. Milke had confessed, Saldate told Ms. Pickenpaugh a number of additional outrageous lies about Ms. Milke, including that: (1) during her interview, Ms. Milke had tried to seduce him by flashing her breasts at him, (2) on the ride back to Phoenix, Ms. Milke wanted to exchange a sexual favor in return for her freedom, (3) Ms. Milke had twice previously attempted to kill C.M. (including once by putting cyanide in his cereal), and (4) that Ms. Milke had told other jail inmates that she had committed the crime and would do it again. These statements were all lies and fabrications by Saldate, but convinced Ms. Pickenpaugh at the time that Ms. Milke was guilty.

108.    Ultimately, Ms. Pickenpaugh was subpoenaed to testify at trial and induced labor one week early in order to attend.[1] At trial, as a result of Saldate's inappropriate tactics, Ms. Pickenpaugh offered false evidence again Ms. Milke, painting her as a bad mother with a motive to kill her son.

---

[1] Official misconduct relating to Ms. Pickenpaugh continued beyond Ms. Milke's trial. During Ms. Milke's post-conviction proceedings, investigators contacted Ms. Pickenpaugh to obtain information regarding Defendant Saldate's conduct during his interview of Ms. Pickenpaugh. After contacting Ms. Pickenpaugh, Ms. Milke's representatives were contacted by an Arizona Assistant Attorney General, who informed them that Ms. Pickenpaugh had been designated a "victim" in Ms. Milke's case (along with C.M. and C.M.'s father), and that all victim's rights applied to her. This designation was an attempt to prevent further contact with Ms. Pickenpaugh, although she was an important witness.

109.   In addition to Saldate and Mills, the remaining individual Defendants were also involved in fabricating inculpatory evidence as part of a conspiracy to ensure Ms. Milke's conviction. This included fabricating inculpatory evidence regarding Ms. Milke's demeanor, witness statements, and forensic evidence.

110.   For example, Defendant Detective Davis fabricated or embellished evidence regarding many of his interactions with Ms. Milke prior to her departure to Florence. In particular, Detective Davis noted that when he came to Ms. Milke's home to question her, Ms. Milke put her feet up on the chair, appeared to make herself comfortable, indicated she was in a hurry to get to Florence, and immediately following the interview got up right away and left for Florence. Defendant Davis used these statements to suggest, falsely, that Ms. Milke was uninterested in the search for her son. Nothing could have been further from the truth.

111.   Defendant Townsend also suggested that Ms. Milke appeared very calm, was in a hurry to go to Florence, and did not ask anyone to stay by the phone in her home when she left—insinuating that Ms. Milke was again unconcerned with C.M.. This evidence, too, was false.

112.   Defendant Walter Birkby, a forensic anthropologist who was hired as an expert for the prosecution, falsely reported to prosecutors that he was able to scientifically discern, by examining inked impressions and plaster casts taken from potential suspects, that Styers habitually wore a pair of black-and-gray Nike sneakers the PPD claimed to have recovered from Metrocenter Mall. Defendants used Birkby's fabrication to corroborate Scott's statements to police. But Birkby's examinations and conclusions were nothing more than junk

33

science. The truth indicates that although Scott had guilty knowledge, the account that the PPD took from him was unreliable.

113.    Concerned primarily with obtaining additional evidence to corroborate Saldate's fabricated confession, the Defendant officers failed to take a number of basic investigative steps and disregarded evidence that pointed away from Ms. Milke.

114.    The fabrication of evidence and failure to conduct basic investigative steps by these officers and detectives is further evidence of their role in the conspiracy that resulted in Ms. Milke's wrongful conviction.

**Ms. Milke, Mr. Styers, and Mr. Scott have repeatedly denied that Ms. Milke was involved in the crime**

115.    Ms. Milke never confessed to Detective Saldate. Her repeated denials despite Saldate's coercive tactics were the truth—Ms. Milke had nothing to do with C.M.'s murder.

116.    Shortly after Ms. Milke was booked in Phoenix, she was interviewed by a private investigator working for a news organization. After hearing from the PPD that Ms. Milke had confessed, the investigator hoped to get additional incriminating statements for the evening news. When he asked Ms. Milke about the confession, however, Ms. Milke was shocked to hear that the PPD was claiming she had confessed. Ms. Milke vehemently denied making any kind of confession to Saldate and denied having anything to do with C.M.'s murder.

117.    About three months after Ms. Milke's arrest, Ms. Milke was interviewed by a prison psychiatrist who was treating her. On this occasion, the psychiatrist and Ms. Milke began discussing Saldate's interrogation. Ms. Milke once again made clear that she did not

confess to Saldate, and that he ignored her request for an attorney. The psychiatrist was so struck by Ms. Milke's account that he felt compelled to record his interview of her.

118.    At his trial, Styers admitted being in the dessert with C.M. and Scott at the time C.M. was murdered. By Styers' account, Scott shot C.M., and the two of them attempted to cover up the murder, initially lying to police about what happened. Despite these admissions, however, Styers has repeatedly denied that Ms. Milke had anything to do with C.M.'s murder. At his trial, Styers testified that Ms. Milke never mentioned anything about wanting to get rid of C.M., about not wanting C.M. around, or about wanting C.M. dead. In letters sent from prison to third parties unrelated to the case years after his conviction, Styers also maintained Ms. Milke's innocence. Styers yet again made similar statements to another death row inmate around 2004.

119.    Scott has also denied offers from the Maricopa County Attorney's Office to testify against Ms. Milke in exchange for leniency. Prior to Mr. Scott's trial, he was offered the opportunity to plead to second-degree murder in exchange for testimony implicating Ms. Milke. Scott refused the offer, indicating that he felt his testimony would not be what he felt was the truth.

### Ms. Milke's Trial and Wrongful Conviction

120.    On December 9, 1989, Ms. Milke (as well as Mr. Styers and Mr. Scott), was indicted by a grand jury on four counts: murder in the first degree, conspiracy to commit murder, child abuse, and kidnapping.

121.    Prosecutors from the Maricopa County Attorney's Office ("MCAO") sought the death penalty against Ms. Milke.

122.   On August 15, 1990, Ms. Milke's defense counsel moved to suppress the statements obtained by Saldate as obtained in violation of her *Miranda* rights, specifically, her right to counsel. Saldate falsely denied that Ms. Milke had requested an attorney; as a result, the court denied her motion to suppress.

123.   On trial for capital murder, Ms. Milke's guilt-phase trial commenced on September 12, 1990.

124.   During trial, Ms. Milke's defense attorney subpoenaed Saldate's PPD personnel files. Both the PPD and the MCAO opposed this request, and ultimately Ms. Milke was not provided any information about the many prior findings that Saldate had lied under oath and conducted coercive interrogations, or other evidence of his history of misconduct that would have been in his personnel file, including the 1973 incident involving the female motorist.

125.   While opposing defense counsel's attempt to discover the contents of the personnel files, Deputy County Attorney Noel Levy gained actual knowledge of the contents of Saldate's personnel files while preparing the *in camera* submission in response to a defense subpoena, after which he joined in PPD's motion to quash. The Ninth Circuit would ultimately find Mr. Levy's failure to turn over the contents of Saldate's personnel files to the defense to be a violation of Ms. Milke's *Brady* rights.

126.   Ms. Milke was tried separately from Mr. Styers and Mr. Scott, neither of whom testified against Ms. Milke. After Ms. Milke's trial and conviction, both Mr. Styers and Mr. Scott were separately found guilty of capital murder and sentenced to death.

127.   The key evidence against Ms. Milke was the confession fabricated by Saldate. No other evidence—no witnesses, no physical evidence—directly implicated her in the crime.

128.   Ms. Milke testified and truthfully denied any part in her son's murder or ever confessing to Saldate. But in the face of the fabricated confession—and in the absence of the evidence of Saldate's history of extensive misconduct, including lying under oath and coercing confessions—Ms. Milke's testimony was not believed. At the same time, the PPD and prosecution did its best to impugn Ms. Milke's character, using witnesses that Saldate and other PPD officers had manipulated into providing unreliable evidence.

129.   Assistant County Attorney Noel Levy emphasized the importance of the fabricated confession, telling the jury in closing argument: "To analyze this case, first of all, what is the keystone of the State's case, really? It's the confession of Debra Milke."

130.   On October 12, 1990, the jury found Ms. Milke guilty of first degree murder, conspiracy to commit murder, child abuse, and kidnapping.

131.   On July 18, 1991, after a sentencing hearing, Judge Cheryl K. Hendrix of the Maricopa County Superior Court entered a judgment against Ms. Milke and sentenced her to death. She was imprisoned pursuant to this sentence and placed on death row.

**Saldate's history is revealed and Ms. Milke wins her release**

132.   Ms. Milke never ceased fighting for her freedom. She exhausted her state court remedies, including a November 1995 request for a post-conviction evidentiary hearing and discovery regarding Saldate's personnel file. On August 31, 1998, Plaintiff filed a Petition for Writ of Habeas Corpus.

133.   In connection with the state post-conviction process, a team of ten researchers organized by Plaintiff's defense counsel spent nearly 7,000 hours over three-and-a-half

months sifting through criminal court records on microfiche from 1982 through 1990 searching for Saldate's name.

134.   As discussed in greater detail above, this research revealed an array of potential impeachment evidence against Saldate, including state court findings of Saldate's misconduct in eight cases—four involved false or misleading testimony under oath (*Rangel*, *Rodriguez*, *Reynolds*, and *King*), and five involved court-ordered suppressions of evidence due to *Miranda* and other constitutional violations (*Conde*, *Yanes*, *Jones*, *Mahler*, and *King*).

135.   Armed with this new information, Ms. Milke filed for federal habeas relief in the United States District Court for the District of Arizona. In 2001, pursuant to an order by the district court in response to Ms. Milke's repeated discovery motions seeking Saldate's personnel file, Ms. Milke's defense was provided with a disciplinary order in Saldate's personnel file involving the 1973 "sexual quid pro quo" with a female motorist, about which Saldate lied to supervisors, until finally confessing after he failed a polygraph test. The written reprimand to Saldate stated that "because of this incident, your image of honesty, competency, and overall reliability must be questioned."

136.   On December 11, 2007, Plaintiff filed an appeal of the district court's denial of her habeas corpus petition with the Ninth Circuit.

137.   On March 14, 2013, the Ninth Circuit overturned and set aside Ms. Milke's convictions and sentences. The Ninth Circuit succinctly summarized Ms. Milke's case: "The judge and jury believed Saldate, but they didn't know about Saldate's long history of lying under oath and other misconduct. The state knew about this misconduct but didn't disclose it, despite the requirements of *Brady*. . . and *Giglio* . . . . Some of the misconduct wasn't

disclosed until the case came to federal court and, even today, some evidence relevant to Saldate's credibility hasn't been produced, perhaps because it's been destroyed."

138.   After conducting a careful and thorough review of the evidence, the Ninth Circuit determined that the evidence relating to Saldate's history of misconduct was plainly favorable to Ms. Milke's defense, found that the evidence was suppressed by the state, and that Ms. Milke was prejudiced as a result. The court went as far to say "It's hard to imagine anything more relevant to the jury's—or the judge's—determination whether to believe Saldate than evidence that Saldate lied under oath and trampled the constitutional rights of suspects in discharging his official duties."

139.   In his concurring opinion also finding a *Miranda* violation, Ninth Circuit Chief Judge Alex Kozinski observed that:

> "No civilized system of justice should have to depend on such flimsy evidence, quite possibly tainted by dishonesty or overzealousness, to decide whether to take someone's life or liberty. The Phoenix Police Department and Saldate's supervisors should be ashamed of having given free rein to a lawless cop to misbehave again and again, undermining the integrity of the system of justice they were sworn to uphold. As should the Maricopa County Attorney's Office, which continued to prosecute Saldate's cases without bothering to disclose his pattern of misconduct."

140.   Following the Ninth Circuit's decision, the Maricopa County Attorney's Office refused to drop the charges against Ms. Milke. When the Office noticed Saldate as a potential witness in an upcoming retrial, Saldate sought to invoke his Fifth Amendment privilege, refusing to answer questions about his involvement in Ms. Milke's case on the grounds that his answers might incriminate him. In particular, Saldate's refused to answer questions, asserting his Fifth Amendment privilege, because of the Ninth Circuit's finding that he

engaged in a pattern of *Miranda* and other constitutional violations while interrogating criminal suspects and the Circuit's referral of this case to federal authorities for possible investigation into whether Saldate's conduct, and that of his supervisors and other state and local officials, amounts to a pattern of violating the federally protected rights of Arizona residents.

**The PPD's pattern and practice of obtaining coerced statements, violating suspect's rights to counsel, and fabricating evidence in order to secure convictions.**

141. The unconstitutional and tortious acts of the Defendant officers and detectives in Ms. Milke's case were not isolated incidents.

142. There was a custom, policy, pattern, and practice in the City of Phoenix beginning years before Ms. Milke's unjust conviction and continuing throughout her incarceration, of condoning, encouraging, ratifying, and acquiescing in the practice of fabricating evidence, coercing statements of suspects, manipulating witnesses, violating suspects' rights to counsel, committing perjury, failing to disclose material exculpatory and impeachment evidence, and covering up this unconstitutional misconduct.

143. This custom, police, pattern, and practice existed by virtue of the City of Phoenix's failure to supervise and discipline PPD officers and detectives who engaged in this type of misconduct, and also through the direct encouragement and acquiescence of this type of misconduct in order to secure convictions.

144. Policymakers in the City of Phoenix and the PPD were on actual or constructive notice of, but deliberately indifferent to, these unconstitutional customs, policies, patterns, and practices.

40

145.    The egregious misconduct in Ms. Milke's case alone would not have occurred, or at a minimum would not have persisted for decades, if the City of Phoenix and the PPD had a functioning supervisory and internal affairs system.

146.    Absent such policies of internal review, supervision, or discipline, Saldate was put in a position where he was able to fabricate Ms. Milke's confession, and none of the evidence concerning Saldate's numerous judicial findings of misconduct or his practice of manipulating witnesses was ever revealed to Ms. Milke's defense.

147.    As the Ninth Circuit explained in vacating Ms. Milke's conviction, there was "no mention of any of this evidence, even though (or perhaps because) a critical question in Milke's case was whether Saldate ignored Milke's request for an attorney."

148.    Saldate also has a known history of sexual impropriety with vulnerable females, including both the 1973 and 2009 incidents in which he coerced women into bartering sexual favors to get Saldate to give them favorable treatment. As the Ninth Circuit noted, this evidence demonstrates that "Saldate had no compunction about abusing his authority with a member of the public, a vulnerable woman who, like [Ms.] Milke, found herself alone with him and under his control."

149.    In fact, Saldate engaged in such sexual impropriety at multiple stages in Ms. Milke's case—first, by placing Ms. Milke in a highly vulnerable situation during the interrogation, and second by falsely suggesting to Ms. Pickenpaugh that Ms. Milke had sought to escape liability by exchanging sexual favors. The fact that Saldate was permitted to engage in misconduct of this nature, despite his record from 1973, is further evidence of the extensive pattern of lack of supervision at the PPD.

150.    Ms. Milke's trial counsel had no knowledge of the 1973 incident because he was blocked from obtaining Saldate's personnel file during trial. The Ninth Circuit determined that the report of the 1973 incident unquestionably constituted *Brady* and *Giglio* evidence "of the most egregious kind," and yet was suppressed from Ms. Milke until it was finally disclosed in federal court in 2002. The Ninth Circuit explained that "the facts of Saldate's misconduct, his lies to the investigators and this assessment by his supervisor would certainly have been useful to a jury trying to decide whether Saldate or Milke was telling the truth." The court also explained that the report showed that "Saldate has no compunction about lying during the course of his official duties, it discloses a misogynistic attitude toward female civilians and a willingness to abuse his authority to get what he wants. All of this is highly consistent with Milke's account of the interrogation."

151.    Indeed, as the Ninth Circuit noted in its decision, Ms. Milke has *still* not obtained Saldate's complete personnel files—because, according to the PPD, they were destroyed.

152.    The PPD was on notice of the importance of Saldate's personnel files to Ms. Milke's case. In addition to the 1990 subpoena, Ms. Milke's post-conviction and habeas counsel filed motions for discovery of the files, which was finally granted by the district court in 2001. The PPD was under court order to produce Saldate's personnel files to Ms. Milke's habeas counsel. Despite these orders, the PPD produced only the documents relating to the 1973 complaint and two annual reviews, reporting that the remainder of the files had been destroyed. As the Court explained, "[a]ll of Saldate's annual reviews should have been produced as they all apparently contained assessments of Saldate's job performance that bore

on his credibility." This was in fact true of the entirety of Saldate's personnel files, which would have been known to the PPD at the time it purportedly destroyed the files.

153.   If the files were indeed destroyed, this intentional destruction constitutes blatant spoliation of evidence.

154.   Absent the PPD's misconduct in continuing to withhold this documentation from Ms. Milke's post-conviction and habeas counsel, despite court orders and discovery motions, Ms. Milke would likely have uncovered additional evidence of misconduct and may have obtained her release earlier.

155.   These and other incidents were known or should have been known to members of the PPD, including Detective Saldate's supervisors, whose responsibility it was to train, monitor, and discipline detectives in the course of their investigations.

156.   Rather than discipline Saldate for this pattern of misconduct, however, Saldate was promoted to homicide detective just years after the 1973 incident and continued to receive accolades. He was even used by his supervisors at the PPD in a manner similar to this case—brought in to interrogate suspects and obtain confessions, despite (and perhaps because of) his tactics.

157.   Saldate's tactics were encouraged by the PPD prior to Ms. Milke's interrogation, creating the circumstances by which Saldate and the rest of the defendant officers were able to obtain her wrongful conviction.

158.   The incidents of misconduct were hardly limited to Detective Saldate. For example, the Maricopa County Attorney's Office has compiled a "*Brady* List" or a "Law Enforcement Integrity List" identifying PPD officers with incidents of misconduct. Although

43

the list includes numerous retired PPD officers, Detective Saldate is not on the list. The *Brady*

list, updated on September 13, 2010, includes several PPD officers with incidents of

misconduct occurring *before* Ms. Milke's fabricated confession:

    a.  Saul Ayala (#4269); incident date 11/23/1983; listed as active;

    b.  Troy Bartlett (#5026); incident date 2/1/1989; listed as active;

    c.  Forrest Conner (#4434); incident date 1/1/1987; listed as active;

    d.  Salvador Salazar Garcia (#1959); incident date 5/22/1974; listed as active;

    e.  Ronnie Hawthorne (#1745); incident date 6/23/1982; listed as active;

    f.  Juan Hernandez (#4551); incident date 1/1986; listed as active;

    g.  Joseph Kalisak (#4394); incident date 10/11/1987; listed as active;

    h.  Roger Ketelaar (#2382); incident date 3/1983; listed as active;

    i.  Paul Kleppan (#4172); incident date 7/14/1986; listed as active;

    j.  Jerry Laird (#3880); incident date 10/26/1984; retired from the PPD, listed as active with the El Mirage Police Department; and

    k.  William Niles (#4228); incident date 9/28/1986; listed as active;

159.    The *Brady* list also includes approximately 94 officers with incidents after Ms.

Milke's fabricated confession (between 1990 and 2009), and 138 additional officers with

"various dates" of incidents of misconduct.

160.    Additional examples of official misconduct, particularly in the context of

suspect statements and interrogations are replete in public documents:

    a.  In *State v. Dalglish*, 131 Ariz. 133 (1982), after the trial court granted the defendant's motion to suppress statements made after his arrest, the State sought reconsideration when PPD Officer Oviedo testified he had been mistaken in his previous testimony. The court stated: "Frankly, I am concerned that an

44

experienced police officer like Oviedo could take the stand and testify as he did with respect to a pertinent and material issue in the case, as it might deal with probable cause, and then later under the guise of a Motion to Reconsider, change that testimony. His testimony became diametrically opposed to what he testified to before, at least in the court, on a very material issue in this case, that dealing specifically with probable cause."

    i.  Officer Oviedo was later promoted by the PPD to a homicide detective.

b.  The Supreme Court of Arizona found that the juvenile court erred in denying the motion to suppress the defendant's confession, concluding that "from the totality of the circumstances, we conclude that the decision to confess was not voluntary." *In re Appeal in Maricopa County,* 139 Ariz. 260 (1984). There the juvenile was never furnished counsel, and, when he claimed his right to remain silent at the juvenile parole hearing, a convenient recess was taken. The juvenile's parole officer then talked to him. *In re Appeal*, 139 Ariz. at 263. Noted the court: "The juvenile's requests for an attorney were never honored. His right to remain silent was not taken as final. The hearing board recessed when the juvenile sought to remain silent, and his parole officer entered the scene. It strains belief to maintain that the subsequent giving of a confession was a free and voluntary act as has been defined in Miranda and Edwards." *Id.* at 263.

c.  The Arizona Court of Appeals reversed defendant's convictions for robbery and the theft, vacated the sentences, and remanded those charges to the trial court for further proceedings where the state did not meet its burden of showing that the confessions were voluntary. *State v. Strayhand*, 184 Ariz. 571 (1995). The court found that the detectives' promises and threats to defendant caused him to confess and the trial judge, in considering the evidence, failed to draw a clear distinction between permissible discussion of the possibility of leniency in return for cooperation and impermissible threats. Three times the detectives told the Defendant that if he cooperated they would tell the county attorney, the judge, and the parole officer that he had been cooperative. They told him that his cooperation "matters on the amount of time you get," and that "we can hopefully limit some of that time." *Strayhand*, 184 Ariz. at 579.

45

**The Maricopa County Attorney's Office's pattern and practice of using fabricated evidence, ignoring unconstitutional interrogation techniques, and failing to disclose material exculpatory and impeachment evidence in order to secure convictions.**

161.   Like the PPD, the Maricopa County Attorney's Office also operated with unconstitutional customs, policies, patterns, and practices that facilitated and exacerbated the unconstitutional misconduct in the PPD. The Office failed to discipline its attorneys when they engaged in a pattern and practice of constitutional violations in the prosecution of their cases, including capital cases like Ms. Milke's. As a result, prosecutors in Maricopa County routinely withheld material exculpatory and impeachment evidence of vital importance to criminal defendants. This failure was amplified by a further failure to create a system to appropriately document and produce material exculpatory and impeachment evidence demonstrating that witnesses, particularly PPD officers, had engaged in prior misconduct.

162.   Ms. Milke's case proves a *Monell* pattern, practice, or procedure by itself, for the decades of misconduct in her case would not have been possible if not in conformity with the policy and practices of the PPD and the MCAO. As noted above, Ms. Milke's post-conviction and habeas teams uncovered state court findings of Saldate's misconduct in eight cases involving either false or misleading testimony under oath or where suppression was ordered due to *Miranda* and other constitutional violations, as well as a disciplinary order in Saldate's personnel file involving a "sexual quid pro quo" with a female motorist, about which Saldate lied to supervisors, until finally confessing after he failed a polygraph test. None of this impeachment evidence was produced to Ms. Milke's counsel although it was either explicitly requested or within the State's duty to disclose.

163.     In vacating Ms. Milke's conviction, the Ninth Circuit severely rebuked the Maricopa County Attorney's Office, finding it knew about Saldate's practices because its prosecutors were litigating claims of misconduct in the foregoing cases around the same time period as Milke's, and because Saldate's misconduct had harmed prosecutions through suppression of evidence or dismissal of charges. Because of the singular importance of this impeachment evidence in a capital case that hinged on a "swearing contest" between Saldate and Milke, the Ninth Circuit found that the Maricopa County Attorney's Office's suppression of this evidence was not merely an oversight, but was "more akin to active concealment."

164.     The Ninth Circuit's opinion laid out a particularly troubling series of events that "underscores the cavalier attitude of the Maricopa County Attorney's Office toward its constitutional duty to disclose impeachment evidence."

   a.   On May 30, 1990, Maricopa County prosecutor Paul Rood received a suppression motion in *State v. Mahler*, a Saldate case in which the defendant made what the Arizona Court of Appeals called "an unequivocal invocation to remain silent." In that case, Saldate kept speaking with the defendant after the invocation, claiming that "he [Saldate] did not want an admission but that he just wanted Mahler's side of the story." On appeal, the Arizona Court of Appeals held that "Officer Saldate's intent was clear . . . he wanted additional statements from Mahler. This conduct violated Mahler's right to remain silent."

   b.   On June 22, 1990, in *State* v. *King*, in another pretrial hearing, Saldate told prosecutor Rood that the defendant had not been unwilling to answer questions during the interrogation. On cross, the defense counsel read back Saldate's own report showing that the defendant had, in fact, said he wasn't going to answer any more questions. The trial judge threw out the portion of the confession.

   c.   On November 16, 1990, prosecutor Rood argued against yet another suppression motion in *State v. Jones* and lost, resulting in the suppression of the murder confession. In that case Saldate directed an officer to place a juvenile by himself in an interrogation room, where the juvenile was handcuffed to a table. Even the Maricopa County Attorney's Office conceded that it had no probable cause for the detention. The court condemned the juvenile's illegal detention

and the interrogation that followed as "a show of flagrant misconduct." The prosecutor's office then began preparing for a second hearing, which would determine whether key physical evidence—the body, shell casings, and shovel—would also be suppressed.

d. The Ninth Circuit noted that all of this was happening while Ms. Milke's case was pending, both before trial and between Ms. Milke's conviction and her sentencing. The Court stated that "it must have occurred to Rood or *someone* in the prosecutor's office or the police department (or both) that Saldate was also the key witness in the high-profile case against Debra Milke—a case where the defendant was still at trial, actively fighting for her life. Yet no one saw fit to disclose this or any of the other instances of Saldate's misconduct to Milke's lawyer.

165.   The prosecutor directly responsible for Ms. Milke's case, Noel Levy, also played a particularly salient role in the pattern of misconduct at the Maricopa County Attorney's Office.

166.   Just one day before Ms. Milke's wrongful arrest, Saldate arrested Eldon Schurz for murder; Noel Levy was the assigned prosecutor. Saldate and Levy secured Mr. Schurz's conviction a few months before Ms. Milke's. Just as in Ms. Milke's case, Schurz has alleged that Saldate and Levy intentionally presented fabricated evidence, including faulty forensic evidence, in order to secure his conviction.

167.   After securing Ms. Milke's conviction based on fabricated evidence, Levy was named Arizona Prosecutor of the Year in 1990.

168.   Levy's pattern continued after Ms. Milke's conviction as well. In 1992, Levy secured the convictions of two more innocent individuals. In the first case—that of David Hyde—although there was no scientific evidence to support his claim, Levy told the jury that blood found on Hyde's jacket belonged to one or both of the murder victims. This false forensic evidence was supported by another supposed "confession" from Hyde, again taken

48

by Saldate, after Saldate spent six hours in a room alone with Hyde. Again, the interrogation was unrecorded and unwitnessed. Based on this evidence, the jury convicted, and Hyde was sentenced to death. His conviction was vacated a decade later based on DNA evidence that proved that the blood on the jacket belonged to Hyde's brother and not either of the victims. After repeated delays of the possible retrial, Levy offered Hyde a no-contest plea with time served.

169.    That same year, Levy also prosecuted Ray Krone, obtaining a capital conviction against him. Like Milke and Hyde, Ray Krone was also innocent. Krone was convicted based on "expert" evidence presented by Levy that bite-marks found on the victim's body matched a comparison-sample bite-mark impression taken from Krone by law enforcement. In order to secure this false expert opinion, Levy ignored and suppressed from the defense the opinion of a more qualified expert who had excluded Krone as a source of the bite-marks on the victim's body, and instead shopped for an expert who would say what Levy wanted to hear. Finding such an "expert," Levy presented the bite-mark evidence at trial, enhancing the "expert's" presentation by showing a misleading video of the comparison of Krone's dental mold to the bite marks on the victim. But Levy did not make the video available to the defense until the eve of his chosen "expert's" testimony. The jury convicted and it was not until 2002, after Krone had served more than 10 years in prison, that DNA testing proved his innocence. The DNA testing conducted on the saliva and blood found on the victim excluded Krone as the source and instead matched another man, and proved that the bite-mark evidence was fabricated junk science—which Levy knew or should have known all along.

170.   In 2002, Levy secured the murder conviction of Robert Ortloff for a crime committed in 1984. In that case too Levy was accused of misconduct. After scientific evidence demonstrated that Ortloff could not have left a shoeprint found near the scene of the murder, Levy was accused of materially manipulating witnesses into altering their testimony to minimize the important of the shoeprint.

171.   Levy continued to handle high-profile murder cases for the Maricopa County Attorney's Office through his retirement in 2009. In fact, Levy retired from the Maricopa County Attorney's Office in 2009 for medical reasons while in the middle of another capital murder trial with accusations of prosecutorial misconduct. That was the trial of Marjorie Orbin, who was charged with killing her husband and cutting his body into pieces, one of which was found in a giant plastic storage tub left in a desert lot in north Phoenix. During Orbin's trial, Levy was twice accused of misconduct by Orbin's defense attorneys. The first allegation was for denying Levy had spoken at the sentencing hearing of a jailhouse snitch who testified against Orbin, when he had. Then, Levy was accused of threatening with prosecution of another snitch who had recanted her story.

172.   Since 1990, six different prosecutors who were named prosecutor of the year by the Arizona Prosecuting Attorneys Advisory Committee also were later found by appeals courts to have engaged in misconduct or inappropriate behavior during death-penalty trials.

173.   Even prior to Ms. Milke's case, the Arizona courts had sustained a number of claims of prosecutorial misconduct in a variety of contexts relating to the Maricopa County Attorney's Office.

a. On December 24, 1982 a jury found defendant, William Bracy guilty of murder. The case was prosecuted by Maricopa County prosecutors Joseph L. Brownlee and Michael D. Jones. On appeal to the Arizona Supreme Court, the Court concluded that Brownlee made improper opening statements concerning pretrial identifications that were ultimately suppressed by the trial court, and that the prosecutors had allowed their investigator to permit the key witness to go free of custody in violation of Maricopa County Jail regulations to privately visit his wife.

b. On April 28, 1982, a jury found James Fisher guilty of first degree murder. The Arizona Supreme Court concluded that the plea agreement offered to a witness was "unusual, if not unethical" by conditioning the plea not on the witness's promise to tell the truth, but on a promise to be consistent. By doing so, the Arizona Supreme Court explained, "the prosecution may have overstepped the bounds of the law and its ethical responsibility to 'scrupulously avoid any suggestion calculated to induce the witness to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness stand.'" The Court felt it necessary to "remind the prosecution that a public prosecutor's duty is 'to seek justice, not merely to convict' and that a public prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage his case or aid the accused."

174. This pattern of misconduct was particularly evident in death-penalty cases, where internal and public pressure for a conviction is highest. For example, among the 82 death-penalty cases that underwent direct review by the Arizona Supreme Court from 2002 to 2013, 42 involved allegations of prosecutorial misconduct, 33 of them from Maricopa County. The allegations ranged from being overly emotional before the jury to encouraging perjury. Nearly 40% of those allegations were validated by the Arizona Supreme Court.

175. Maricopa County Attorney Ted Duffy was suspended from practicing law for 30 days in 2009 after being referred to the Bar by a Superior Court judge for disobeying a judge's orders in a capital murder case and presenting evidence that had been precluded from trial.

51

176.     Maricopa County Attorney Juan Martinez was named Prosecutor of the Year in 1999. Overall, Martinez helped send seven to death row since he was hired at the Maricopa County Attorney's Office in 1988. He was accused of misconduct by defense attorneys in all but one of those cases.

177.     But misconduct by the Maricopa County Attorney's Office is not limited to death penalty cases. The Maricopa County Attorney's Office is responsible for prosecuting all cases brought by the PPD. In each case where a court makes a finding of officer misconduct, including perjury, improper interrogation techniques, or withholding of material exculpatory or impeachment evidence, the Maricopa County Attorney's Office prosecutors assigned to the case are aware of those findings. Thus Maricopa County Attorney's Office officials were aware of the allegations and findings of misconduct in Saldate's previous cases and cases involving other officers. Moreover, the Maricopa County Attorney's Office is aware of the hundreds of cases of misconduct as compiled in their *Brady* list.

178.     The Maricopa County Attorney's Office failed to supervise and/or discipline its employees and agents, including Deputy County Attorneys, regarding their duty to disclose material exculpatory and impeachment evidence, and thereby encouraged and facilitated violations of defendants' constitutional rights by employees and agents of Maricopa County and the City of Phoenix. In so doing, Maricopa County was at a minimum recklessly indifferent to the pattern of misconduct by the PPD officers and detectives, upon whom the County Attorney's Office relied, directly resulting in repeated and flagrant violations of suspect's constitutional rights, including their right to due process and a fair trial.

## **DAMAGES**

179.    Defendants' actions deprived Ms. Milke of her civil rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

180.    This action seeks damages for the period from December 3, 1989, through each and every year to the present. Ms. Milke's liberty was curtailed upon her unlawful arrest on December 3, 1989 for the murder of her own son. She remained incarcerated until September 6, 2013, much of that time under sentence of death. Despite the Ninth Circuit's opinion, Ms. Milke remains under ankle monitoring and under threat of retrial even after the filing of this Complaint. Accordingly, the damages suffered by Ms. Milke began in 1989 and continue to the present.

181.    Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Ms. Milke to be wrongfully arrested, tried, convicted, and incarcerated for over twenty-three years for a crime that she did not commit.

182.    Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Ms. Milke the following injuries and damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; damage to business and property; legal expenses; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment,

sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which she is entitled monetary relief.

183.   Ms. Milke was also robbed of the opportunity to properly grieve for the loss of her son, C.M..

184.   Ms. Milke suffered physical illness and injury related to her confinement and physical symptoms of anxiety and depression such as headaches, restricted breathing, uncontrolled sweats, difficulty sleeping and nightmares, and other harms.

185.   Ms. Milke spent approximately twenty-two years on Arizona's death row. As a result, her harm went beyond that of even a "typical" wrongfully convicted individual. For example, Ms. Milke was forced to meet with the prison warden to fill out paperwork addressing topics such as her last meal and how to dispose of her body. A doctor came to examine Ms. Milke's veins and to draw blood. Ms. Milke's room was searched every day to ensure there was nothing with which she could harm herself. These injuries and damages to Ms. Milke were foreseeable to Defendants at the time of their acts and omissions.

186.   Pursuant to the City of Phoenix Municipal Code 42-16, Defendants are entitled to indemnification because their individual liability and acts of misconduct arose from acts and omissions within the course and scope of their employment with the City.

187.   All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## PLAINTIFF'S CLAIMS

### COUNT I

**42 U.S.C. § 1983 claim for deprivation of liberty without due process of law and violation of right to a fair trial, under the Fourteenth Amendment**

*Against Defendants Saldate, Mills, House, Davis, Masino, Townsend, Hamrick, DiModica, Ontiveros, Jahn, Birkby, Wolslagel, and Bolduc*

188.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

189.    Saldate and the other Defendants fabricated false evidence of Ms. Milke's guilt and suppressed material exculpatory and impeachment evidence of her innocence, thereby violating Ms. Milke's right to a fair trial and causing her to be deprived of her liberty without due process of law.

190.    Rather than conduct an adequate and unbiased investigation, Defendants, individually and in concert, acted in a manner that shocks the conscience and followed through with Ms. Milke's unlawful prosecution, thereby depriving Ms. Milke of her right not to be deprived of liberty without due process of law.

191.    As described in greater detail above, Saldate and the other Defendants fabricated evidence in a number of ways, prior to trial, and they did so knowingly or in reckless disregard for the truth. The fabricated evidence was used to arrest Ms. Milke, to prosecute her, and was the basis for the jury's guilty verdict.

192.     Saldate and the other Defendants, individually and in concert, fabricated evidence, including but not limited to the alleged "confession" and forensic evidence.

193.     Defendants, individually and in concert, continued their investigation of Ms. Milke despite the fact that they knew or should have known that she was innocent. In particular, in addition to ignoring the lack of any physical evidence tying Ms. Milke to the crime, Defendants ignored Ms. Milke's repeated protestations of innocence.

194.     Defendants, individually and in concert, used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. For example, Saldate ignored Ms. Milke's requests for an attorney and attempted to physically coerce her into providing a confession. Saldate similarly attempted to turn other witnesses against Ms. Milke by flagrantly lying to them about Ms. Milke's conduct.

195.     Defendants, individually and in concert, deliberately and in bad faith destroyed exculpatory and favorable impeachment evidence, including but not limited to Saldate's personnel file.

196.     Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Ms. Milke's defense. Had Defendants' misconduct been disclosed, the evidence would have proved Ms. Milke's innocence, cast doubt on the entire police investigation and prosecution, and created a different result at trial.

197.     The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to

56

Ms. Milke's federally protected rights. These acts were perpetrated while Officer Defendants were acting in their capacities as employees or agents of the City of Phoenix and Maricopa County and under color of state law.

198.    As a direct and proximate result of Defendants' actions, Ms. Milke was wrongly arrested, detained, charged with murder, informed she might face the death penalty, prosecuted, convicted, sentenced to death, and incarcerated for over 23 years and suffered the other grievous injuries and damages set forth above.

## COUNT II

**42 U.S.C. § 1983 claim for malicious prosecution and violation of the Fourth and Fourteenth Amendments**

*Against Defendants Saldate, Mills, House, Davis, Masino, Townsend, Hamrick, DiModica, Ontiveros, Jahn, Birkby, Wolslagel, and Bolduc*

199.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

200.    On December 11, 2014, following the Ninth Circuit vacatur of Ms. Milke's conviction, the Court of Appeals of Arizona, Division 1, determined that "[b]ecause of the State's severe, egregious prosecutorial misconduct in failing to disclose impeachment evidence prior to and during trial and for years thereafter, double jeopardy bars retrial of [Ms.] Milke under our Arizona Constitution and Arizona Supreme Court precedent." The Court of Appeals remanded to the trial court for "dismissal with prejudice of the pending

charges against [Ms.] Milke." The State has sought review of this decision by the Arizona Supreme Court, which has not yet ruled on the State's request.

201.    As described in greater detail above, the criminal proceedings initiated against Ms. Milke in December 1989 were brought without probable cause and without any reasonable belief in her guilt. Ms. Milke was completely innocent of any involvement with C.M.'s death.

202.    Defendants were aware of this fact but nonetheless caused Ms. Milke to be charged, and subsequently, Defendants intentionally continued the prosecution against Ms. Milke on the basis of fabricated inculpatory evidence and suppressed material exculpatory and impeachment evidence, thereby effecting a continuing seizure of Ms. Milke in violation of her Fourth and Fourteenth Amendment rights.

203.    In maliciously prosecuting her despite the absence of probable cause or existence of other evidence linking Ms. Milke to the crimes, Defendants caused Ms. Milke to suffer the indignity of public trial over the murder of her own son, the severe continuing deprivation of liberty, over 23 years of emotional distress while serving prison time, including 22 years on death row, for a crime that she did not commit, and the other injuries as set forth above.

204.    The criminal proceedings against Ms. Milke were initiated with malice in that Defendants caused the charges against Ms. Milke to be filed by knowingly providing the prosecution misinformation, concealing exculpatory and impeachment evidence, and otherwise engaging in wrongful and bad faith conduct that was actively instrumental in causing the initiation of the legal proceedings against Ms. Milke.

205.   As a direct and proximate result of Defendants' actions, Ms. Milke was wrongly prosecuted, detained, and incarcerated for over 23 years and suffered the other grievous injuries and damages set forth above.

## COUNT III

### 42 U.S.C. § 1983 claim for violation of Plaintiff's right against self-incrimination in violation of the Fifth, Sixth, and Fourteenth Amendments

### *Against Defendants Saldate, Mills, House, Davis, Masino, Townsend, Hamrick, DiModica, Ontiveros, and Jahn*

206.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

207.   Although Ms. Milke never confessed to the murder of her son—a horrific crime that she had nothing to do with—the statements she made to Saldate during her interrogation were obtained, twisted, and manipulated against her in violation of Ms. Milke's Fifth, Sixth, and Fourteenth Amendment rights.

208.   In particular, as described in detail above, the circumstances of Saldate's interrogation were highly coercive, including but not limited to the fact that: Ms. Milke had barely eaten or slept since the previous day and was hysterical and anxious in awaiting news about her son; Saldate isolated Ms. Milke; when Ms. Milke asked if Saldate had heard anything about her son, he ignored her and then, in one breath, told Ms. Milke: "we found your son. He was murdered and you're under arrest;" Saldate immediately began reading Ms. Milke her rights and then ignored Ms. Milke's statement that she did not fully understand her

rights; Saldate ignored Ms. Milke's demand for an attorney; Saldate failed to tape, record, or

have a witness present for the interrogation; Saldate pulled his chair up in front of Ms.

Milke—whose own chair had its back to the wall—so that their knees were touching and he

was about six to twelve inches from her face; Saldate leaned in, putting his hands on Ms.

Milke's knees; Saldate was a large an imposing man, especially when compared to petite

twenty-five year old Milke; Saldate repeatedly refused to accept Ms. Milke's denials and

protestations of innocence; Saldate emphatically stated that Ms. Milke was lying and that he

would not tolerate her lies; and Saldate remained in Ms. Milke's face, badgering her,

demanding she confess.

209.   These coercive interrogation techniques, including Saldate's calculated plan to

ignore Ms. Milke's request for counsel and to extract a confession through psychologically

coercive methods, shock the conscience and violate the decencies of civilized conduct,

thereby violating Ms. Milke's Fourteenth Amendment substantive due process rights.

210.   As described in detail above, Ms. Milke never confessed to C.M.'s murder and

did not make any inculpatory statements. But even the non-inculpatory, truthful statements

that she did make to Saldate were coerced and involuntarily obtained. The coercion and

involuntary statements were reasonably foreseeable consequences of Saldate's decision to

interrogate Ms. Milke in the manner he did and to file a report detailing her coerced

statements.

211.   As described in detail above, PPD detectives and supervisors, including the

individual defendants in this case, were familiar with Saldate's interrogation practices and his

history of coercive interrogations, ignoring suspect's invocations of their right to counsel, and

outright fabrications. Given Saldate's role in this case and his history, the other individual defendants knew or should have known that Saldate would attempt to coerce Ms. Milke.

212.    By interrogating Ms. Milke in this manner and doing nothing subsequent to stop the violation, Defendants set in motion a series of acts by others which they knew or reasonably should have known would cause these statements to be used against Ms. Milke at the grand jury and trial, thereby inflicting constitutional injury. Ultimately, these coerced statements were used against Ms. Milke at the grand jury stage and at her trial, thereby violating her rights under the Fifth, Sixth, and Fourteenth Amendments.

213.    As a direct and proximate result of Defendants' actions, Ms. Milke was wrongly prosecuted, detained, and incarcerated for over 23 years and suffered the other grievous injuries and damages set forth above.

**COUNT IV**

**42 U.S.C. § 1983 Civil Rights Conspiracy Claim**

***Against Defendants Saldate, Mills, House, Davis, Masino, Townsend, Hamrick, DiModica,***

***Ontiveros, Jahn, Birkby, Wolslagel, and Bolduc***

214.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

215.    Defendants and others yet unknown agreed among themselves and others to act in concert to deprive Ms. Milke of her clearly established constitutional rights as protected by the Fourth, Fifth, Sixth, and Fourteenth Amendments, including her right not to be deprived of liberty without due process of law, to a fair trial, and against self-incrimination.

216.   As described in detail above, in furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to the following:

a.   Acting in concert to suggest, coerce, and/or fabricate Mr. Scott's statements to Mills and Saldate;

b.   Acting in concert to fabricate Ms. Milke's confession, including by having Saldate conduct the interrogation;

c.   Acting in concert to fabricate other statements from Ms. Milke made prior to her fabricated confession;

d.   Acting in concert to conceal, suggest, coerce, and/or fabricate statements of other witnesses, including Jean Pugh, Ernie Sweat, and Sandra Pickenpaugh; and

e.   Acting in concert to conceal and/or fabricate forensic evidence.

217.   As evidenced by the previous allegations of this Complaint, defendants had a general conspiratorial objective and a unity of purpose and understanding regarding bringing fabricated and false murder charges against Plaintiff and deliberately withholding evidence which would have exonerated her.

218.   As a direct and proximate result of Defendants' conspiratorial actions, Ms. Milke was wrongly prosecuted, detained, and incarcerated for over 23 years and suffered the other grievous injuries and damages set forth above.

**COUNT V**

**42 U.S.C. § 1983 duty to intervene and failure to intercede claim**

*Against Defendants Saldate, Mills, House, Davis, Masino, Townsend, Hamrick, DiModica,*

*Ontiveros, and Jahn*

219.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

220.    Defendants Saldate, Mills, House, Davis, Masino, Townsend, Hamrick, DiModica, Ontiveros, and Jahn, as officers in the PPD, had a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen.

221.    This duty was applicable at all relevant times in Ms. Milke's case because the conduct of each of the officer defendants in this case was done under the color of state law.

222.    As detailed above, each of the defendant officers in this case knew, or had reason to know, that the investigative detectives assigned to Ms. Milke's case, including Saldate, had a long history of violating suspect's constitutional rights, including during interrogations, and lying in police documents and under oath.

223.    As a result of this history, and as a result of Ms. Milke's strident defense that Saldate had fabricated the confession, Defendants were on notice and should have known that Saldate was yet again violating a suspect's constitutional rights.

224.    Defendants had numerous opportunities to intervene at each stage of the proceedings against Ms. Milke—from before her interrogation when Saldate went in to interrogate Ms. Milke on his own, through trial—and yet repeatedly failed to do so.

225.    Had they complied with their duty to intervene, Defendants likely would have impacted the outcome of the proceedings against Ms. Milke.

226.    As a direct and proximate result of Defendants' unconstitutional choice not to intervene, Ms. Milke was wrongly prosecuted, detained, and incarcerated for over 23 years and suffered the other grievous injuries and damages set forth above.

**COUNT VI**

**42 U.S.C. § 1983 Supervisory Liability Claim**

***Against Defendants Ontiveros and Jahn***

227.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

228.    Ms. Milke's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional action and inaction of Defendants Ontiveros and Jahn, acting in their individual capacities and under color of law as supervisors of the detectives assigned to investigate C.M.'s disappearance and murder.

229.    Defendants Ontiveros and Jahn directly participated in the misconduct that resulted in Ms. Milke's wrongful conviction, including but not limited to creating the conditions by which Saldate was able to fabricate Ms. Milke's confession and permitting the suppression of material exculpatory and impeachment evidence.

230.    Defendants Ontiveros and Jahn knowingly refused to terminate the wrongful prosecution of Ms. Milke, which they had reason to know was based on fabricated evidence and in violation of Ms. Milke's right against self-incrimination.

231. Defendants Ontiveros and Jahn culpably failed to adequately discipline, train, supervise, and/or control their subordinates, including Saldate and Mills, who obtained coerced, fabricated, or tainted suspect and witness statements, and suppressed material exculpatory and impeachment information.

232. Defendants Ontiveros and Jahn violated Ms. Milke's constitutional rights by acquiescing in the deprivation of Ms. Milke's constitutional rights by their subordinates, including Saldate and Mills, and by generally showing a reckless or callous indifference to Ms. Milke's rights.

233. Defendants Ontiveros and Jahn failure to train, supervise, and/or control their subordinates, their indifference to the actions of their subordinates, and their indifference to Ms. Milke's rights, encouraged and permitted their subordinates to fabricate evidence and to fail to document and to disclose material exculpatory and impeachment evidence.

234. As detailed above, it was reasonably foreseeable, especially in light of Saldate's known history of misconduct, that Ontiveros's and Jahn's misconduct in this case would likely result in a deprivation of Ms. Milke's constitutional rights, including her wrongful conviction based on fabricated evidence.

235. The actions and omissions of Defendants Ontiveros and Jahn, in their individual capacities, caused Ms. Milke to suffer the constitutional deprivations and grievous personal injuries and damages described above.

**COUNT VII**

**42 U.S.C. § 1983 *Monell* claim against the City Phoenix for failing to supervise, failing to discipline, ratifying, and acquiescing in unconstitutional conduct, including but not limited to the presentation of fabricated evidence and the use of coercive interrogation and interview techniques**

*Against Defendant City of Phoenix*

236.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

237.    There was a custom, policy, pattern, and practice in the City of Phoenix beginning years before Ms. Milke's unjust conviction and continuing throughout her incarceration, of condoning, encouraging, ratifying, and acquiescing in the practice of fabricating evidence, coercing statements of suspects, manipulating witnesses, violating suspects' rights to counsel, committing perjury, failing to disclose exculpatory and impeachment evidence, and covering up this unconstitutional misconduct.

238.    The City of Phoenix, by and through its policymakers, created and maintained a custom, policy, practice, and/or usage of failing to supervise, and/or discipline its employees and agents, including Defendants, regarding the fabrication of evidence and regarding the use of constitutionally adequate, non-coercive interrogation and interview techniques.

239.    Although much of the information is within the possession of the City of Phoenix, as detailed above, there are numerous documented instances of misconduct by PPD officers and detectives prior to the acts giving rise to this case, which are already known to

Ms. Milke. This misconduct was so persistent and widespread that it constitutes a well settled municipal policy.

240.     Accordingly, the City of Phoenix was on notice, prior to Ms. Milke's arrest, that officers and detectives within the PPD were engaged in routine and widespread fabrication of evidence and use of constitutionally adequate, non-coercive interrogation and interview techniques.

241.     The City of Phoenix did nothing to address the pattern of misconduct and instead encouraged and facilitated violations of constitutional rights by its officers and continued to rely on and promote officers who engaged in such misconduct, thereby condoning and ratifying their unconstitutional misconduct.

242.     By its actions and inaction the City of Phoenix showed its deliberate indifference to Ms. Milke's rights and the rights of other suspects.

243.     To the extent that the PPD and City of Phoenix had written policies which accurately reflected the constitutional obligations of officers who conduct custodial interrogations, the PPD and City of Phoenix, through the decision and policymakers identified above, knew or should have known that those policies were consistently disregarded by Saldate and other employees.

244.     These unconstitutional customs, policies, practices, and usages of the City of Phoenix proximately and directly caused Ms. Milke's injuries, including her illegal confinement, unfair trial, wrongful conviction, and other damages described above. But for the City's failure to supervise and discipline Saldate and other PPD officers, the individual

Defendants never would have been able to engage in the unconstitutional acts described above, including the fabrication of evidence and coercion of Ms. Milke.

## COUNT VIII

**Claim pursuant to 42 U.S.C. § 1983 and _Goldstein v. City of Long Beach_ for failure to supervise and/or discipline regarding non-disclosure of exculpatory and impeachment information and presentation of fabricated evidence, and for failure to create an administrative system for accessing exculpatory and impeachment information**

_**Against Defendants Maricopa County and William Montgomery**_

245.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

246.    Maricopa County, by and through its policymakers, created and maintained a custom, policy, practice, and/or usage of failing to supervise and/or discipline its employees and agents, including Deputy County Attorneys, regarding their duty to disclose exculpatory and impeachment evidence.

247.    As detailed above, Maricopa County policymakers were on notice, prior to C.M.'s disappearance and Ms. Milke's arrest, that Deputy County Attorneys were engaged in routine and widespread intentional and reckless failures to disclose exculpatory and impeachment evidence in criminal prosecutions, including capital cases. This misconduct was so persistent and widespread that it constitutes a well-settled municipal policy.

248.    Although much of the information regarding this widespread pattern and practice is within the possession of Maricopa County, numerous instances of such misconduct are known to Ms. Milke.

68

249.     As described above, Ms. Milke's case itself demonstrates a long history of failures to disclose exculpatory and impeachment evidence by the Maricopa County Attorney's Office. Each of these numerous findings by Arizona court that Saldate had engaged in misconduct qualified as exculpatory and impeachment evidence, should have been disclosed in each subsequent criminal prosecution, and was buried by the County Attorney's Office.

250.     In fact, the record reveals that *numerous* MCAO prosecutors knew about Saldate's misconduct prior to and during Mike's 1990 trial, and that every prosecutor handling this case from 1989 – 2013 knowingly suppressed this evidence, while arguing for Milke's execution. After reviewing the record before it, the Ninth Circuit granted habeas relief in March 2013, holding that the prosecution had committed egregious *Brady/Giglio* violations for failing to turn over this critical impeachment evidence. The Court rebuked MCAO prosecutors at length, detailing why they "no doubt knew" about and actively concealed Saldate's practices.

251.     Although particularly egregious, the MCAO's violations of Ms. Milke's rights are hardly an isolated incident. As detailed in this complaint, there are numerous similar incidents of prosecutorial misconduct, including by prosecutor Noel Levy who also suppressed evidence directly leading to Ray Krone's wrongful capital conviction, and by other prosecutors throughout the MCAO.

252.     By its repeated failure to supervise and/or discipline its employees and agents, Maricopa County showed its deliberate indifference to Ms. Milke's rights and the rights of other suspects.

253. These unconstitutional customs, policies, practices, and usages of Maricopa County proximately and directly caused Ms. Milke's injuries, including her illegal confinement, unfair trial, wrongful conviction, and other damages described above. But for the City's failure to supervise and discipline its employees, the exculpatory and impeachment evidence that was unconstitutionally suppressed from Ms. Milke would have been appropriately disclosed.

254. Furthermore, pursuant to *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) *cert. denied sub nom. Cnty. of Los Angeles, Cal. v. Goldstein*, 134 S. Ct. 906 (2014), Maricopa County, by and through its policymakers, failed to create any administrative system or internal policies and procedures for the deputy county attorneys handling criminal cases to access exculpatory and impeachment information pertaining to prior findings of misconduct by police officer witnesses, and failed to train deputy district attorneys to disseminate this information.

255. This failure in administrative policy and accompanying administrative training created an environment where exculpatory and impeachment evidence was not gathered, thereby facilitating violations of defendants' constitutional rights.

256. At the time of Ms. Milke's wrongful conviction, the Maricopa County Attorney was Rick Romley. The Maricopa County Attorney is a county officer, acting as a policymaker for Maricopa County.

257. But for Maricopa County's failures, the exculpatory and impeachment evidence that was unconstitutionally suppressed from Ms. Milke would have been appropriately disclosed.

258.   Maricopa County's unconstitutional failure to create an administrative system or internal policies and procedures for the Deputy County Attorneys handling criminal cases to access exculpatory and impeachment information (in particular, prior findings of misconduct by police officer witnesses), and Maricopa County's related failure to train Deputy County Attorneys to disseminate this information proximately and directly caused Ms. Milke's injuries, including her illegal confinement, unfair trial, wrongful conviction, and other damages described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Debra Jean Milke respectfully request:

 A.  A trial by jury on each of Plaintiff's claims;

 B.  Compensatory damages as to all defendants, jointly and severally, in an amount to be determined at trial;

 C.  Punitive damages as to all individual defendants, jointly and severally, in an amount to be determined at trial in order to deter such conduct in the future;

 D.  For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

 E.  Such other relief as may appear just and appropriate.

71

1

**DATED** this 13th day of March, 2015.

2

**RAKE LAW GROUP, P.C.**

3

4

s/ Daniel Benchoff

5

M.E. "Buddy" Rake, Jr.
Daniel T. Benchoff
RAKE LAW GROUP, P.C.

6

2701 E. Camelback Road, Suite 160
Phoenix, Arizona 85016

7

8

Nick J. Brustin*
Anna Benvenutti Hoffmann*
Farhang Heydari*

9

NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor

10

New York, NY 10013
*Attorneys awaiting admission pro hac vice*

11

12

Michael D. Kimerer
Rhonda Elaine Neff
KIMERER & DERRICK, P.C.

13

1313 E. Osborn Road, Suite 100
Phoenix, Arizona 85014

14

15

Attorneys for Plaintiff Debra Jean Milke

16

17

18

19

20

21

22

23

24

25

26

27