Nick J. Brustin*
  Email: nick@nsbcivilrights.com
Anna Benvenutti Hoffmann*
  Email: anna@nsbcivilrights.com
Farhang Heydari*
  Email: farhang@nsbcivilrights.com
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 965-9081  Fax: (212) 965-9084
*Admitted pro hac vice*

Michael D. Kimerer (SBN 002492)
  Email: MDK@Kimerer.com
Rhonda Elaine Neff (SBN 029773)
  Email: rneff@kimerer.com
KIMERER & DERRICK, P.C.
1313 E. Osborn Road, Suite 100
Phoenix, Arizona 85014
Tel: (602) 279-5900  Fax: (602) 264-5566

Marvel Eugene "Buddy" Rake, Jr. (SBN 003452)
  Email: brake@aztriallaw.com
Daniel T. Benchoff (SBN 021672)
  Email: dbenchoff@aztriallaw.com
RAKE LAW GROUP, P.C.
2701 E. Camelback Road, Suite 160
Phoenix, AZ 85016
Tel: (602) 264-9081  Fax: (602) 265-2628

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Jean Milke,<br><br>        Plaintiff,<br><br>vs.<br><br>City of Phoenix; Maricopa County; and Detective Armando Saldate, Jr. and Sergeant Silverio Ontiveros, in their individual capacities,<br><br>        Defendants. | No. 15 Civ. 462-PHX-ROS<br><br>**SECOND AMENDED COMPLAINT**<br><br>**AND**<br><br>**JURY TRIAL DEMAND** |

Plaintiff DEBRA JEAN MILKE, by and through her attorneys, the law firms of NEUFELD SCHECK & BRUSTIN, LLP, the RAKE LAW GROUP, P.C., and KIMERER & DERRICK, P.C., hereby alleges as follows:

## **INTRODUCTION**

1. On December 2, 1989, Plaintiff Debra Jean Milke suffered any parent's worst nightmare. Her four-year-old son, Christopher, disappeared. The next day his body was found; he had been shot in the head, his body left in the desert. For Ms. Milke, however, this unspeakable tragedy was only the first tragedy in the story of this case. After spending over thirty hours frantically waiting for any word on her son's fate, Ms. Milke was brought down to the local police precinct to be interviewed by Detective Armando Saldate, a Phoenix Police Department ("PPD") detective with a long history of lying under oath and coercing confessions. In one breath, Detective Saldate took Ms. Milke's nightmare from one level to the next—"We found your son. He was murdered. And you're under arrest."

2. In the next thirty minutes, Detective Saldate, through his own egregious misconduct, would set in motion the second tragedy in the story of this case: an innocent, mother would spend the next twenty-three years of her life on death row, falsely convicted of the capital murder of her four-year-old child, never allowed to properly mourn his death, and coming within days of her own execution.

3. Exploiting the shock and horror that this news of Christopher's death caused, Detective Saldate attempted to use his unwitnessed, unrecorded interrogation to coerce a confession. But there was nothing for Ms. Milke to confess—she had nothing to do with her son's murder and did not know anything about it. Rather than document Ms. Milke's actual

statement—that she was innocent—Saldate instead fabricated a confession. He falsely reported that Ms. Milke had confessed to arranging for her son's brutal murder. In reality, Ms. Milke said nothing of the sort; Saldate made up the inculpatory statements out of whole cloth.

4. Saldate and other detectives from the PPD then manipulated the evidence to "fit" the fabricated confession. They fabricated additional evidence falsely indicating Ms. Milke was cavalier and uninterested about her son's disappearance, and they used impermissible tactics to cajole witnesses into falsely reporting that Ms. Milke was a bad mother.

5. In reality, two men—Jim Styers and Roger Scott—were involved in Christopher's murder, and either one or both of them actually murdered Christopher. Styers and Scott would each eventually make statements implicating themselves and each other; their statements, however, directly contradicted each other regarding how exactly Christopher was murdered and which of the two had been the trigger man. Because of the PPD's misconduct and inadequate investigation, not only was Debra Milke robbed of 23 years of her life, she and her family also have never learned the truth about what exactly happened to Christopher or why.

6. Saldate's fabricated confession became the centerpiece of Ms. Milke's trial. There were no other witnesses or direct evidence linking the innocent Ms. Milke to the crime. Ms. Milke testified, repeatedly protesting that she had not confessed and that she had nothing to do with the murder. But the jury—which never knew about Saldate's long history of lying under oath and other misconduct, because the PPD and the Maricopa County Attorney's Office ("MCAO") buried it—credited Saldate's lies instead. Based on this fabricated

confession, and the other misconduct by the PPD and the MCAO, Ms. Milke was wrongly convicted of the capital murder of her own son. Following her conviction, she was sent to Arizona's death row, where she would spend the next 23 years of her life.

7.     During the course of her post-conviction proceedings, however, Ms. Milke and her counsel unearthed a mountain of evidence that had been suppressed at the time of her trial. In particular, Ms. Milke learned that Saldate had a long and documented history of violating suspects' constitutional rights, fabricating evidence and blatant perjuring himself in order to secure convictions, and engaging in sexual misconduct with women under his control. Indeed, Saldate had been repeatedly found by Arizona courts to have lied on the stand about witness statements and suspect confessions—precisely what happened in this case.

8.     Both the PPD and the MCAO were aware of this mile-long history of misconduct but did nothing to investigate or discipline Saldate in any way, or to ensure disclosure of this history to the defense attorneys in cases Saldate investigated, including in capital cases. Indeed the PPD continued to promote and support Saldate, and even brought him in to handle their most important cases (like this one). The MCAO continued to rely on Saldate's testimony and to make him the star of their cases. Indeed, both the MCAO and the prosecutor assigned to Ms. Milke's case, Noel Levy, won personal accolades for convictions obtained based on Saldate's work.

9.     When this long record finally came before the U.S. Court of Appeals for the Ninth Circuit, the panel issued a unanimous decision chastising Saldate for his egregious misconduct, and the PPD and the MCAO for their roles in covering up the crucial evidence of Saldate's history. In a separate concurring opinion, Chief Judge Kozinksi wrote:

"No civilized system of justice should have to depend on such flimsy evidence, quite possibly tainted by dishonesty or overzealousness, to decide whether to take someone's life or liberty. The Phoenix Police Department and Saldate's supervisors there should be ashamed of having given free rein to a lawless cop to misbehave again and again, undermining the integrity of the system of justice they were sworn to uphold. As should the Maricopa County Attorney's Office, which continued to prosecute Saldate's cases without bothering to disclose his pattern of misconduct."

10.     After over twenty-three years on death row, wrongly imprisoned for the murder of her four year-old son, Ms. Milke's conviction was ordered vacated on March 14, 2013 and she was released on September 6, 2013. But her incarceration should never have occurred in the first place. Were it not for the flagrant misconduct of the PPD officers and detectives in this case, and the pattern and practice of unchecked misconduct within the PPD and the MCAO, it never would have.

## **JURISDICTION AND VENUE**

11.     Ms. Milke brings this action pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of her rights as secured by the United States Constitution.

12.     Jurisdiction is conferred by 28 U.S.C. § 1331 and 28 U.S.C. § 1343, which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. § 1983 to redress the deprivation (under color of state law, statute, ordinance, regulation, custom, or usage) of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens of all persons within the jurisdiction of the United States.

13.     Under 28 U.S.C. § 1391(b), venue is proper in this judicial district because the events giving rise to the claims asserted herein occurred within this judicial district.

**JURY TRIAL DEMAND**

14.      Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

**PARTIES**

15.      **Plaintiff Debra Jean Milke** is and was at all relevant times, a resident of Maricopa County, Arizona.

16.      **Defendant City of Phoenix** is a municipal entity duly organized under the laws of the State of Arizona, was the employer of the individual Defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Phoenix Police Department ("PPD") and the City of Phoenix Crime Laboratory. The PPD is a department of the City of Phoenix.

17.      **Defendant Maricopa County** is a municipal entity duly organized under the laws of the State of Arizona. Maricopa County owns, operates, manages, directs, and controls the Maricopa County Attorney's Office ("MCAO"), and is and was at all times relevant to this Complaint responsible for the MCAO's policies, practices, and customs.

18.      **Defendant Detective Armando Saldate, Jr.** (#1875) at all times relevant to this Complaint was a duly appointed and acting Detective of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. Defendant Saldate joined the PPD around 1970. He participated in the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction. Defendant Saldate is named in his individual capacity.

19. **Defendant Sergeant Silverio Ontiveros** (#3038) at all times relevant to this Complaint was a duly appointed and acting Sergeant of the PPD, acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Phoenix and the PPD. Defendant Ontiveros was a Sergeant assigned to the PPD Homicide Detail no later than April 1988. By 1990, Ontiveros had at least 10 years of experience with the PPD. Ontiveros would rise to the rank of Assistant Police Chief prior to his retirement from the PPD. He served as the case supervisor for the investigation that resulted in Ms. Milke's arrest, prosecution, and conviction. Defendant Ontiveros is named in his individual capacity.

20. Defendants Saldate and Ontiveros were employed by the City of Phoenix and the PPD, and, at all relevant times, were acting under color of law and within the scope of their employment.

## FACTUAL ALLEGATIONS

### Debra Milke is told that Christopher is missing

21. On Saturday, December 2, 1989, Ms. Milke had the day off after working a full week. A single mother who struggled to make ends meet, Ms. Milke was saving up for a new apartment for her and her son. She was temporarily staying, along with four-year-old Christopher, in the spare bedroom of Jim Styers, a family friend and single father of a two-year-old daughter.

22. That morning Styers, whose car was not working, asked whether he could borrow Ms. Milke's car to run some errands and go to the mall. Christopher had been at the mall the day before to see Santa Claus; Christopher asked if he could go with Styers to see

7

Santa again. When Styers confirmed that he did not mind taking Christopher, and given that Styers had routinely babysat Christopher in the past, Ms. Milke permitted Christopher to go. Ms. Milke stayed home to do laundry and clean the apartment.

23.     At around 2:45 p.m., Ms. Milke received a call from Styers. Styers said that he had lost Christopher at the mall. Styers told Ms. Milke that he was working with a security guard to locate Christopher and would call the police.

24.     Hysterical, Ms. Milke called her father, who lived in Florence, Arizona. Ms. Milke, who had taught Christopher the phone number at the apartment, refused to leave the apartment's phone in case Christopher tried to call her there. Her father agreed with her plan. In the age before cell phones and text messages, Ms. Milke was at the mercy of others for updates about the search. When another hour passed without an update from Styers, Ms. Milke herself called the police.

25.     Numerous police officers, including PPD Detective Charles Masino, responded to the mall to search for Christopher and to interview Styers. Masino walked around the mall, including the parking lot searching for Christopher.

26.     As the afternoon and evening wore on, Ms. Milke's neighbors and friends came by the apartment, trying to comfort her. She remained distraught, crying, and, as any mother would be, unable to process what was happening.

27.     By that night, multiple PPD officers came to the apartment in person or had called the apartment. The officers, including Masino, asked Ms. Milke questions about Christopher—such as what clothing he was last wearing—in an attempt to aid in the search.

Ms. Milke cooperated with the officers, although she became frustrated when she did not think they were working hard enough to locate her missing son.

28.     These officers, including Masino, subsequently misrepresented Ms. Milke's statements and demeanor during these interviews. For example, Masino falsely reported that Ms. Milke appeared unconcerned about her son's disappearance and was instead more concerned with Styers; Masino further suggested that she was uninterested in coming to the mall to assist in the search for her son.

29.     That night, Ms. Milke's stepmother and stepsister drove up from Florence to be with Ms. Milke at her apartment. Ms. Milke was unable to sleep or eat throughout the night. By early the next morning (Sunday), Ms. Milke's stepmother gave Ms. Milke medication in an effort to try and calm her down and have her rest. Even with the medicine, Ms. Milke was unable to sleep.

30.     The next morning, Ms. Milke's stepmother suggested that they take Ms. Milke back to her father's house in Florence. As Ms. Milke's mother lived in Germany and her only sister in Wyoming, her father in Florence was the closest relative. By that point, the PPD, and specifically Detective Judy Townsend, had begun monitoring Ms. Milke's home phone, and had arranged for a trap and trace to be placed on the line. The PPD officers present knew and approved of the decision for Ms. Milke to travel to Florence to be with her family. The officers assured Ms. Milke that they would monitor and answer her Phoenix telephone line.

31.     Before leaving, Ms. Milke again spoke to the officers in the apartment, including PPD Detectives Jim House and Russell Davis. The detectives asked Ms. Milke questions about Mr. Styers, his friend Roger Scott, and her ex-husband, Mark Milke. Ms.

Milke truthfully answered their questions. House and Davis would later falsely report Ms.

Milke's statements and demeanor during these interviews.

**PPD Detectives investigate Christopher's disappearance and develop suspicions about Styers and Scott.**

32. While Ms. Milke was waiting, distraught, at the apartment for news of her son, PPD officers and detectives had repeatedly interviewed Styers and his friend, Roger Scott, who had showed up at the mall during the search. The PPD officers found Styers's and Scott's statements suspicious, but had not yet developed evidence implicating them in Christopher's disappearance. The next morning, on Sunday, December 3, PPD supervisors, including Sergeant Ontiveros, the case supervisor assigned to this investigation from the Homicide Detail, made the decision to call in Detective Saldate, who was scheduled to be off from work.

33. It was no accident that Ontiveros called upon Saldate to lead this investigation. Saldate had a reputation within the PPD and the Homicide Detail for being able to obtain incriminating evidence when no one else could. At the same time, however, it was well-known that Saldate was able to obtain such evidence because he was willing to conduct illegal interrogations, lie under oath, and otherwise ignore the constitutional limits on police investigations.

34. PPD supervisors, including Sergeant Ontiveros, knew or should have known that Saldate's reputation was built directly on his history of unconstitutional misconduct in interrogations, not on quality police work. But these supervisors, including Sergeant Ontiveros, continued to bring Saldate in to lead important investigations, failed to discipline

him for his misconduct, and, knowing the risk to suspects' and witnesses' constitutional rights, failed to appropriately supervise him.

35. As detailed in the Ninth Circuit's decision vacating Ms. Milke's conviction, in the years before and after his fabrication of Ms. Milke's confession, Detective Saldate had been found by the Arizona state courts to have lied or misrepresented facts under oath to grand juries, coerced confessions, and/or violated *Miranda* rights in order to obtain convictions in *eight separate cases*. Five of those cases resulted in suppression (*Conde*, *Yanes*, *Jones*, *Mahler*, and *King*), and three others resulted in remands because Saldate lied or omitted material evidence in testimony before the grand jury (*Rangel*, *Rodriguez*, and *Reynolds*). The Ninth Circuit offered the following summaries of these cases:

a. June 22, 1990: In *State* v. *King*, Saldate told Maricopa County prosecutor Paul Rood that the defendant had not been unwilling to answer questions during the interrogation. On cross, the defense counsel read back Saldate's own report showing that the defendant had, in fact, said he wasn't going to answer any more questions. The trial judge threw out the portion of the confession that followed the suspect's request to end the interview: "[T]he statements made up to the time when the defendant advised the detective he no longer wished to answer his questions are admissible. Thereafter they're not admissible."

b. February 27, 1989: In *State* v. *Reynolds*, the judge found that Saldate's false statements to the grand jury "denied [the defendant] his right to due process and a fair and impartial presentation of the evidence." Two false statements particularly worried the judge: Saldate told the grand jury that the victim's son couldn't remember at what time he saw defendant enter the house, drag the victim upstairs and then leave; the son could say only that it was late at night, according to Saldate. That statement was false. In fact, the son told detectives that the defendant left the apartment about 8 p.m.; the son knew this because defendant turned off the Garry Shandling Show on the way out. Saldate's omission was critical because other witnesses had seen the victim alive after midnight; if the defendant left around 8 p.m., it proved he hadn't killed the victim in their fight. The Judge ultimately found that "a fair presentation was not made in connection with the evidence concerning the identification of the defendant by the victim's son," and that "the evidence was not fully and fairly

presented with regard to defendant's possible intoxication." Based largely on Saldate's two false statements, the judge threw out the finding of probable cause.

c. November 20, 1986: In *State* v. *Rodriguez.* Saldate told a grand jury that the murder victim had been shot four times, even though it was, as the judge wrote, "undisputed" that the victim was shot only once. The MCAO said it had never intended to claim there was more than one shot. Instead of blaming Saldate for the false statement, the prosecution "[took] issue with the transcription of the grand jury proceeding, for surely the testifying detective, Armando Saldate, of the PPD, and/or this State's attorney would have caught and corrected such an incorrect representation." The trial judge rejected this, finding that the "reporter's notes and the transcript of the Grand Jury" were accurate and that Saldate had, in fact, said there were four shots. As a result of this false statement, the judge ordered a redetermination of probable cause.

d. October 16, 1989: In *State* v. *Rangel*, a judge agreed with defendant's claim that Saldate misled a grand jury by selectively recounting defendant's statements. The judge held that Saldate's statements had materially affected the grand jury's deliberation and remanded the case for a new finding of probable cause.

e. 1989: In *State* v. *Conde*, Saldate interrogated a suspect in intensive care who was intubated and connected to intravenous lines. Saldate testified that the suspect was drifting "in and out" of consciousness; several times, Saldate had to shake him "to get his attention." Nonetheless, Saldate read him the *Miranda* warnings and went on with the interrogation. "I really don't know whether he wasn't responding because he didn't understand his rights or wasn't responding because of the medication he was on," Saldate testified. By Saldate's own admission, "it was obvious that [the defendant] was in pain." The nurse told the suspect that she couldn't give him more pain medicine until after he finished talking to Saldate. When the case came to trial in 1989, the court held the statement from this interrogation "involuntary and inadmissible," as the Arizona Court of Appeals noted in a published opinion three years later.

f. November 26, 1984: In *State* v. *Yanes*, Saldate admitted interrogating a suspect who was strapped to a hospital bed, incoherent after apparently suffering a skull fracture. When interviewed by doctors, the suspect didn't know his own name, the current year or the name of the president, but the prosecutor nonetheless presented the suspect's statement to Saldate at trial. The court vacated the conviction and ordered a new trial. At the suppression hearing for the new trial, the court suppressed "those statements made by the defendant to Armando Saldate."

g. November 29, 1990: In *State* v. *Jones*, during the course of a murder investigation, Saldate directed an officer to place a juvenile by himself in an interrogation room, where the juvenile was handcuffed to a table. This, despite the fact that, in the trial court's view, "the police clearly had no information linking the Defendant to the murder or disappearance of [the victim]," and even the MCAO conceded that it had no probable cause for the detention. The court suppressed the murder confession as "the fruit of the illegal arrest" and condemned the juvenile's illegal detention and the interrogation that followed as "a show of flagrant misconduct."

h. In *State v. Mahler*, No. 1 CA–CR 90–1890, the defendant "made an unequivocal invocation to remain silent," yet Saldate pushed on with the interrogation, insisting he only wanted the defendant's "side of the story." The trial court did not suppress the confession, but the Arizona Court of Appeals held that "Officer Saldate's intent was clear . . . he wanted additional statements from Mahler. This conduct violated Mahler's right to remain silent."

36. Upon information and belief, despite these numerous judicial findings that Saldate has lied, had violated suspect's constitutional rights, and had otherwise engaged in misconduct, the PPD failed to conduct any adequate internal investigations into the proven misconduct, and Saldate was never disciplined for his actions.

37. This extensive list includes only cases in which there was a *judicial finding* that Saldate had engaged in such egregious misconduct. Upon information and belief, Saldate's misconduct was far more widespread than even this extensive list suggests. For example, the following cases involve allegations by criminal defendants that Saldate engaged in similar misconduct, some of which Saldate has acknowledged occurred. Based on Saldate's documented history, the remaining allegations are plausible:

a. In *State v. Running Eagle*, Saldate ignored Running Eagle's assertion of his right to remain silent. While continuing questioning, Saldate held his face 6 to 12 inches from Running Eagle's and repeatedly poked him in the chest while Running Eagle cried. Saldate also admitted that although he had the equipment to do so, he did not tape record Running Eagle's interrogation saying, "I don't believe it's very good, a taped confession or an interview with someone,

especially since it involves such a serious crime. Because I think it hinders that person from coming out, discussing what he really wants to say. I think that maybe that tape kind of keeps them from wanting to talk to us." More information on this case was uncovered in post-conviction proceedings, including Saldate's interrogation of a highly intoxicated witness whose rendition of events he admits he refused to accept. When the witness said he was "too drunk to remember," Saldate continually said, "This is too important of a case. We can't have an answer like that in a case like this. This is too serious. You got to do better than that." This continued for several days, with Saldate saying, "I don't believe that, you got to do better," and the witness "would keep doing better." The intoxicated witness did recall Saldate mentioning the gas chamber, which is highly improper in an interrogation.

b.  Claims that Saldate had fabricated several witnesses' statements. *State v. Fraser*, CR 89-09277.

c.  Saldate's interrogation of witnesses notwithstanding their incapacity due to intoxication. *State v. Salas*, CR 89-03252; *State v. Kelley* & *State v. Moynihan*, CR 87-00882 (consolidated).

d.  Saldate ignoring repeated requests for counsel during interrogation, and only providing *Miranda* warnings after the suspect admitted involvement. *State v. Gallegos*, 90-03339.

e.  Saldate's improper interrogation of a minor suspect with a known history of mental impairment and psychological problems. *State v. Blackerby*, CR 88-07047.

f.  Saldate's interrogation of suspect without reading him his *Miranda* rights, and threatening to arrest suspect's girlfriend unless he confessed. *State v. Stark*, CR 130819.

g.  In violation of *Miranda*, Saldate informing a suspect who had denied participation in a crime that it was "necessary" for the suspect to talk to him about the crime. *State v. Biggica*, CR 90-00715.

h.  Saldate's misrepresentation of witness statements. *State v. Webster*, CR 143926.

38.  Upon information and belief, there was no adequate internal investigation of these allegations by either Saldate's supervisors at the PPD or by PPD internal affairs, and Saldate was never disciplined.

39.     The vast majority, if not all, of the above-mentioned misconduct occurred while Saldate was assigned to the PPD's Homicide Detail.

40.     During this period, upon information and belief, the Homicide Detail consisted of approximately 20 detectives and approximately 3 sergeants. These sergeants were responsible for directly supervising the Homicide detectives in the conduct of their investigations.

41.     Upon information and belief, Homicide sergeants, including Ontiveros, were evaluated (for purposes of job retention, promotions, and career advancement within the PPD) at least in part based on the rate at which their detectives, like Saldate, were able to close cases by making arrests.

42.     Saldate's unconstitutional tactics during suspect and witness interviews were notorious and well-known to others in the Homicide Detail, including, for example, Detective Antonio Morales Jr., who overlapped with Saldate as a Homicide detective during the 1980s up through this case. Morales and Saldate were, for example, both involved in the investigation of the December 1987 homicide of Herbert Williams.

43.     According to Detective Morales, Homicide detectives during this period brought Saldate's unconstitutional tactics to the attention of Homicide supervisors. These detectives "were met with disdain and angrily told that if they couldn't be a team player, they could find another place to work. Nothing else was said for fear of retaliation, and no corrective steps were taken."[1]

_____

[1] *See* Antonio Morales Jr., Editorial, *Milke Doesn't Deserve Her Freedom*, *The Arizona Republic*, Mar. 20, 2015, *available at:*

44.     Defendant Ontiveros had been assigned to the PPD's Homicide Detail no later than April 1988 (and likely well before that date). As a sergeant, Ontiveros had supervisory responsibilities over Homicide detectives, including Saldate. At a minimum, Ontiveros was in this supervisory role during the period of time that Saldate was found to have engaged in misconduct in *King*, *Reynolds*, *Rangle*, *Conde*, and *Jones*, discussed *supra*.

45.     In fact, Ontiveros was personally involved in the September 1988 investigation of the homicide of Deborah McKee. That investigation ultimately led to the prosecution of Lamont Reynolds, during which a judge found that Saldate lied to the grand jury (*see State v. Reynolds*, discussed *supra*).

46.     Ontiveros was also personally involved in the April 1988 investigation of the homicide of Lawrence Young, for which Kevin Blackerby was a suspect. That investigation led to the prosecution of Mr. Blackerby, in which Saldate was accused of conducting an improper interrogation of a minor suspect with a known history of mental impairment and psychological problems (*see State v. Blackerby*, discussed *supra*).

47.     Ontiveros and Saldate were also both personally involved in the investigation into the August 1989 homicide of Edward Wade.

48.     Saldate also had a documented history of engaging in sexual misconduct on the job, harassing young women with whom he interacted, and lying to his superiors. This went back at least to 1973 when Saldate, then a patrol officer with the PPD, attempted to extort and coerce sexual favors from a female motorist whom Saldate had stopped for having a faulty

http://www.azcentral.com/story/opinion/letters/2015/03/19/milke-deserve-freedom/25057361/.

16

taillight. After stopping the motorist and learning she had an outstanding warrant, instead of arresting the woman, Saldate suggested they move to a less conspicuous spot and then followed her to it. Once there, he leaned into her car, and took liberties with her. She offered to meet him somewhere later to have sex with him. Saldate showed up for the rendezvous, but the woman did not. Instead, someone—perhaps the woman, once she got free of Saldate— reported Saldate's misconduct to the police. When this misconduct came to the PPD's attention, officials opened an investigation. When questioned by investigators, Saldate steadfastly lied about the incident until he failed a polygraph test. In the resulting disciplinary write-up, signed by the police chief and the city manager, Saldate was told that "because of this incident, your image of honesty, competency, and overall reliability must be questioned." Saldate's personnel file contained a PPD internal investigation report showing these conclusions and that Saldate had been suspended for five days.

49.    Saldate then engaged in a similar sexual misconduct in 2009, while Ms. Milke's habeas claims were being litigated. In 2009, Saldate extorted a woman, Belinda Reynolds, for sex in exchange for letting her avoid eviction. Ms. Reynolds reported the incident to Saldate's supervisor, who in turn advised her to contact the PPD, which she did. The subsequent police department report states that on or around April 30, 2009, Saldate "committed bribery and theft by extortion when he suggested that . . . Belinda Reynolds have sexual intercourse with him to keep him from locking her out of her apartment after she was evicted."[2]

---

[2] The matter was eventually referred to the Arizona Attorney General's Office, which conducted an investigation into Ms. Reynolds' claims in July and August 2010. It is not clear how far the investigation was taken, but it is notable that the Attorney General's investigation into Ms. Reynolds' allegations occurred around the same period that Ms. Milke was engaged

50.     No evidence of Saldate's striking pattern of serious misconduct was ever disclosed to Ms. Milke before her trial. Instead, the vast majority of this evidence was uncovered through thousands of hours of meticulous research by her post-conviction counsel combing through public records. By the time the PPD finally was ordered to produce Saldate's personnel file, years after the conviction, they reported that almost all of that file had been destroyed.

51.     Given the astonishing pattern of *judicial findings of misconduct*, as well as the difficulty and rarity of a criminal defendant obtaining such a finding against a police officer, and the destruction of Saldate's personnel file before it could be examined by Ms. Milke, it is likely that the pattern of misconduct recounted above is just the tip of the iceberg of the misconduct Saldate actually engaged in while a PPD detective.

**Saldate and Mills fabricate and coerce false evidence implicating Ms. Milke**

52.     On the morning of Sunday, December 3, after being called in by Sergeant Ontiveros, Saldate and Detective Robert Mills participated in a meeting with the officers and detectives involved in the investigation at that point. Supervisors, including Ontiveros, and detectives, including Masino, were present at this meeting and briefed Saldate and Mills.

53.     Saldate and Mills subsequently took over the primary responsibilities for interrogating Styers and Scott. Defendant Saldate began with Styers, while Mills worked on Scott. At first, neither had any success.

---

in an evidentiary hearing and briefing regard her habeas petition before the Honorable Robert C. Broomfield, U.S. District Judge for the District of Arizona. Despite its clear relevance to Saldate's credibility, no one from the Attorney General's Office ever reported this incident to Ms. Milke's counsel, to the district court, or to the Ninth Circuit.

54. Saldate then decided to try his turn with Scott. A chronic alcoholic who had multiple head injuries, brain damage and suffered frontal lobe seizures, Scott had a passive dependent personality and was, by his nature, highly suggestible, submissive, and compliant. By the time Saldate interrogated him, Scott had also had no sleep, no food and none of his medications for nearly two days while in the custody of the PPD. He had nevertheless been interviewed repeatedly by other officers without confessing.

55. In fact, either Styers, Scott, or both actually murdered Christopher. However, the official misconduct in this case has made it impossible to know what precisely happened and why.

56. In an unwitnessed, unrecorded interrogation, Saldate, however, was able to obtain a confession from Scott when no one else had. Getting between six and twelve inches from Scott's face, Saldate told Scott that if he did not tell Saldate what he wanted to hear, Saldate would obtain a search warrant for the home Scott shared with his elderly mother and threatened to send officers to interview her as well. When Scott expressed concern that this tactic would give his mother a heart attack, Saldate did not relent. Eventually, under Saldate's pressure, Scott confessed that both he and Styers had been involved in Christopher's murder, and told Saldate he could take police to the body.

57. Scott did not implicate the innocent Ms. Milke in any way. Scott did, however, implicate Styers. Unbeknownst to Ms. Milke, who knew Styers as a mild mannered single father who went to church three times a week, at the time of the murder, Styers was suffering from severe post-traumatic stress disorder based on his military service in Vietnam; he often heard voices and children crying and was receiving regular treatment and medication.

58.     Defendant Saldate and Detective Mills then put Scott in a police cruiser so Scott could direct them to Christopher's body. PPD Detectives Scott and Townsend followed Saldate and Mills in a separate vehicle. At approximately 4:00 p.m., the officers found Christopher where he had been left in a dry desert wash, about twenty miles from the mall. He had been shot three times in the back of the head.

59.     By directing the police to Christopher's body, Scott proved he had guilty knowledge about the crime. He also implicated his friend Styers, who had falsely reported that Christopher had disappeared from the mall. Subsequent evidence would corroborate that both Styers and Scott had been involved in the murder, including statements from both men and evidence that Styers had recently purchased a gun, later found in Scott's home, of the same caliber as the one that killed Christopher. However, because the PPD officers and detectives involved in this investigation conducted a shockingly inadequate investigation, driven by their inaccurate hunches rather than the evidence, there are no clear answers as to what precipitated the murder and which of the two men shot Christopher or why.

60.     Instead, although there was no evidence implicating Ms. Milke in the murder of her son—and even though Saldate had never so much as spoken to Ms. Milke before—Saldate decided based on a hunch that she must have been involved in the crime as well.

61.     Saldate later fabricated evidence that, at some point that afternoon, Scott implicated Ms. Milke in the crimes. This was a fabrication. Saldate's own accounts of how and when Scott implicated Ms. Milke are contradictory. In his report, Saldate claimed that Scott implicated Ms. Milke during the interview at the police station, right after admitting his own participation in the murder and telling police he could take them to Christopher's body.

In later testimony, however, Saldate claimed that Scott first implicated Ms. Milke after the interview, during the drive to locate Christopher's body. But Mills, the only other person in the car, never reported hearing an incriminating statement about Ms. Milke. In fact, both of Saldate's accounts are fabrications. While Mills stayed behind to continue interrogating Scott and take a full confession from him, Saldate traveled to Florence to interrogate Debra Milke.

**Saldate attempts to coerce a confession from Ms. Milke**

62.     While PPD detectives were interrogating Scott and Styers in Phoenix, Ms. Milke was in Florence, still exhausted and waiting anxiously for any news of her son. After having been up all night, she finally fell asleep.

63.     But after only a few hours of sleep, Ms. Milke was shaken awake by her stepsister, who informed her that a Pinal County sheriff's deputy was at the front door. The deputy cryptically informed Ms. Milke that detectives from the PPD were on their way to Florence and that they needed to talk to Ms. Milke at the Pinal County precinct. A family friend drove her there. Ms. Milke still had not been given any news about her son.

64.     After arriving at the local precinct, Ms. Milke was escorted to a room and asked to wait. Over an hour passed with no word and no information about Christopher. Ms. Milke was mentally and emotionally exhausted.

65.     Shortly after Christopher's body was found, a PPD supervisor had instructed two PPD detectives to make the hour-and-a-half drive to Florence and make contact with Ms. Milke. When they arrived at the Pinal County precinct, these detectives did not speak to Ms. Milke, who was waiting in a nearby room anxious to hear news about her son. Instead, these detectives were instructed to guard Ms. Milke so that she would not leave, but not to talk to

her. They were told that Detective Saldate was being sent from Phoenix to Florence in order to interrogate Ms. Milke.

66.     Defendant Ontiveros arranged for Saldate to travel to Florence by helicopter in order to interrogate Ms. Milke.

67.     Ms. Milke's first interaction with an officer at the station was with Detective Saldate, whom she had never met before.

68.     Before even beginning his interrogation of Ms. Milke, and although there was no evidence linking Ms. Milke to the crime, Saldate decided that he was going to arrest Ms. Milke.

69.     Prior to boarding the helicopter from Phoenix to Florence, Sergeant Ontiveros had ordered Saldate to tape his interrogation of Ms. Milke, but Ontiveros did not ensure that Saldate had any means of doing so.

70.     In fact, although Saldate had been specifically instructed by a superior to record the interrogation, Saldate did not bring any audio or video recording devices with him.

71.     It was Saldate's practice to conduct his interrogations alone, without any witnesses, and without creating any recording. Saldate claimed recordings interfered with his ability to obtain confessions. Saldate's fellow detectives and supervisors, including Ontiveros, knew or should have known that Saldate chose not to record because of his unconstitutional practices during interrogations.

72.     Despite disobeying Ontiveros's order to record his interview of Ms. Milke, upon information and belief, Saldate suffered no consequences and was not disciplined in any manner. Furthermore, the confession Saldate claimed to have obtained from Ms. Milke, but

which Saldate failed to record, was never seriously questioned, scrutinized, or investigated by Saldate's supervisors, specifically including, but not limited to, Ontiveros.

73. Saldate entered the room and told Ms. Milke's friend, who had accompanied her to the station, to leave. He shut the door behind her, leaving Ms. Milke alone with him.

74. Ms. Milke asked if Saldate had any news about her son. Eventually, Saldate looked up and said "We found your son. He was murdered. And you're under arrest."

75. The news that her son was dead and that she was being accused of the murder caused Ms. Milke to become hysterical, crying uncontrollably. She was in shock. But Saldate told her he would not "tolerate" her crying and that she needed to be quiet. Saldate then read Ms. Milke her *Miranda* rights from a rights card, including that she had a right to remain silent and a right to an attorney.

76. When Saldate asked if Ms. Milke understood her rights, she replied that she didn't, that she'd never been in trouble before and never had her rights read to her. Saldate ignored this and continued. Dismayed by Saldate's accusations and still in shock about the death of her son, Ms. Milke told Saldate she wanted a lawyer.

77. Saldate simply ignored Ms. Milke's request for an attorney and did not stop his questioning—as he was legally required to do when a suspect requests an attorney. Ignoring Ms. Milke's request was completely consistent with Saldate's personal practices, as evidenced by the judicial findings discussed above he often continued to question suspects following their invocation of their rights to be silent or to have an attorney.

78. Instead, Saldate began his interrogation, confident that one way or another he would obtain a confession. The twenty-five-year-old Ms. Milke was sitting in a chair with her

back to the wall. Saldate pulled his chair up in front of her so that their knees were touching and he was about six to twelve inches from her face. Saldate then leaned in, putting his hands on Ms. Milke's knees. Saldate was a large and imposing man, especially when compared to petite Ms. Milke.

79. Saldate's actions with regard to Ms. Milke—closing the door while he was alone in a room with a twenty-five year old woman, pulling up his chair so that their knees were touching, putting his hands on both of her knees, and coming within six to twelve inches of her face—was inappropriate sexual behavior. Saldate would later falsely claim that Ms. Milke had flashed her breasts at him and offered sex to drop the charges. These claims were completely false; Ms. Milke never did any such thing. In fact, Saldate did not include these incredible events in his report of Ms. Milke's interrogation. But consistent with his prior predatory behavior with female suspects, Saldate created this false story about Ms. Milke's alleged sexual conduct when attempting to coerce the testimony of another female witness—Sandra Pickenpaugh, Ms. Milke's sister. Especially given Saldate's known history of sexual impropriety, he never should have been permitted to be in that position. And he never would have been, but for the blatantly inadequate supervision and discipline of his PPD supervisors, including Ontiveros.

80. Saldate indicated to Ms. Milke that he was there for a confession and accused Ms. Milke of complicity in her son's death. Every time that Ms. Milke denied any involvement whatsoever in the crime, Saldate would emphatically state that she was lying and that he would not tolerate her lies. Saldate remained in Ms. Milke's face, badgering her, demanding that she confess.

81.     Despite Saldate's tactics, Ms. Milke never wavered. She was innocent and she was not going to falsely confess to the murder of her own son. She repeatedly denied any involvement in Christopher's murder. She told Saldate she would not do anything to hurt anybody, especially her own child. At no point during the interrogation did Ms. Milke ever confess to Detective Saldate, nor did she make any statements indicating that she was involved in any way with a conspiracy to have her son murdered.

82.     Ms. Milke did not know who was responsible for Christopher's death, and did not guess as to who was responsible.

83.     In response to Saldate's hostile questions, and still in shock and distraught, Ms. Milke did provide information about her background, her ex-husband Mark Milke, her knowledge of Styers and Scott, and her relationship with Christopher. Saldate later twisted some of these answers to falsely make them seem incriminating.

84.     After about thirty minutes alone with Ms. Milke, Saldate stopped the interrogation.

**Saldate fabricates Ms. Milke's confession**

85.     After he left the interrogation room, Saldate fabricated and falsely reported to other officers, his supervisors, and prosecutors that Ms. Milke had confessed to arranging the murder of her son.

86.     On the basis of this fabrication, Ms. Milke was transported in a waiting police car back to Phoenix, booked into jail, and ultimately charged with the first degree murder of Christopher.

87.     Nothing corroborated the alleged confession but Saldate's own word. By Saldate's design, no one but him had been present to observe the interrogation of Ms. Milke. Contrary to direct instruction, Saldate had not recorded the interview. In addition, Saldate never asked Ms. Milke to sign or write a statement, to be reinterviewed on tape, or even to sign a *Miranda* waiver form.

88.     Pursuant to standard police policies and procedures at the time of Ms. Milke's interrogation, any minimally competent officer, let alone a detective of Saldate's experience, would have, if acting in good faith, attempted to obtain some additional documentation of the statement, either through another officer witness or a written or recorded statement. For example, Saldate could have asked another officer to witness the interrogation, asked Ms. Milke to record the statement in writing, or asked Ms. Milke to repeat her statements on tape— as he had been ordered to do—or to another officer.

89.     Saldate's failure to obtain any documentation or corroboration of Ms. Milke's supposed confession is all the more egregious given that Arizona courts had repeatedly suppressed information obtained by Saldate. Given his history of having statements suppressed by the courts, Saldate, if acting in good faith, also would have been highly likely to ensure proper documentation and corroboration of this "confession."

90.     When she left the interrogation, Ms. Milke had no idea that Saldate would claim she had confessed during the interrogation.

91.     Shortly after she was booked in Phoenix, Ms. Milke was interviewed on tape by a former-police-officer-turned-private-investigator who was working for a news organization; based on the report from the PPD that Ms. Milke had confessed, the investigator thought he

could get additional incriminating statements from Ms. Milke for the evening news. Instead, when the investigator asked about the confession, Ms. Milke was shocked to hear that the PPD was claiming she had confessed, and denied making any kind of confession to Saldate or having anything to do with Christopher's murder.

92.     But for the broken supervision and internal affairs system of the PPD, which failed to hold Saldate accountable for any of the numerous instances where he was found to have engaged in misconduct, Ms. Milke never would have been in this position—in a position where it was her word against the word of an officer with a long (but buried) history of fabricating evidence and ignoring assertions of *Miranda* rights.

93.     At the same time that Saldate was interrogating Ms. Milke, Detective Mills was continuing the interrogation of Scott. Consistent with the PPD's theory, Mills pressured Scott to implicate Ms. Milke. Upon information and belief, Mills and others fed Scott a story implicating Ms. Milke before or during his tape recorded interrogation. Although much of the interview was not taped, Mill eventually obtained a taped statement from Scott, who regurgitated some vague accusations that Ms. Milke was involved in the murder.

94.     Scott's statements implicating Ms. Milke were false, fabricated and coerced. Scott refused to subsequently testify against Ms. Milke—even when offered a deal that would spare him the death penalty—because he stated the requested testimony was not true.

95.     There are no contemporaneous reports of Ms. Milke's alleged confession. Saldate first wrote up his account of the fabricated confession three days later on December 6, 1989. By that point, Saldate had access to a number of other reports regarding the investigation, including reports of the interviews of Scott and Styers. Although Saldate

claimed he took contemporaneous notes of his interrogation of Milke, he testified that he destroyed those notes when he drafted his formal report.

96.     Saldate's report of the alleged confession is a fabrication. Many of the statements—including all alleged admissions by Ms. Milke of any knowledge or participation in Christopher's murder—were made up out of whole cloth. Ms. Milke had nothing to do with the murder of her son and never told Saldate or anyone else that she did.

97.     The report also fabricated other details of the interrogation, including, for example, that when Saldate told Ms. Milke that her son was found murdered, she appeared to attempt to cry, but that no tears came out.

98.     Saldate also twisted a number of statements Ms. Milke had made, to make them falsely appear incriminating. For example, during the interrogation Ms. Milke had mentioned her difficult relationship with her ex-husband and Christopher's father, Mark Milke. Mark had been abusive to her, in and out of prison and had trouble with alcohol and drugs. As a result, Ms. Milke had fought for sole custody of Christopher. Saldate used this information to create an apparent motive for Ms. Milke to arrange her own son's murder: Saldate falsely claimed that Ms. Milke had confessed she had killed Christopher because she hated her ex-husband and was concerned Christopher would grow up to be like him. Like all other incriminating parts of the "confession," this was a fabrication.

99.     Saldate's report also omits a number of essential, truthful statements made by Ms. Milke, including her demand for an attorney and her repeated protestations of innocence.

100.     Saldate's report, supposedly created based on his handwritten notes of the just thirty minute interrogation, is about five pages, single-spaced. The report suggests that Ms.

1 Milke, after initially feigning shock at the news of her son's murder, quickly confessed with

2 no improper pressure from Saldate, and discussed her involvement, her motivation, her

3 childhood, her life with her husband, the planning involved in the murder, her family's likely

4 reaction, that she was not insane, and Saldate's feelings about her, all in about half an hour. In

5 the end, Saldate reported, that Ms. Milke told him that after confessing to Saldate, she was

6 starting to feel better and thought that she was now getting her self-esteem back.

7       101.   If Saldate and Ms. Milke had actually had such a good rapport, as Saldate

8 claimed, Saldate would have no reason not to ask Ms. Milke to provide him with a written or

9 recorded statement, or at least to repeat her confession to another officer. Pursuant to standard

10 police policies and procedures at the time of Ms. Milke's interrogation, in light of the

11 interrogation that Saldate described, no minimally competent officer acting in good faith, let

12 alone a detective of Saldate's experience, would have failed to obtain some additional

13 documentation of the supposed confession.

14       102.   Similarly, there would have been no reason for Saldate not to continue the

15 interrogation in order to attempt to obtain specific details that could have been later used to

16 corroborate the confession or to support the case against Styers or Scott.

17       103.   Obtaining such corroborative evidence would have been all the more important

18 for an officer like Saldate, who had seen evidence and statements he had obtained repeatedly

19 thrown out of court based on judicial findings that he had lied and fabricated evidence and

20 ignored *Miranda* assertions.

21       104.   Like Saldate, none of the PPD supervisors, including Sergeant Ontiveros, took

22 any action to ensure documentation or corroboration of Ms. Milke's statement.

105.    Although Ontiveros told Saldate to tape his interrogation, Saldate made no attempt to do so and did not hide this fact from Ontiveros. Having previously been personally involved in cases in which Saldate was accused of or found to have committed misconduct, and knowing Saldate's reputation and history as an officer who conducted illegal/coercive interrogations, once Ontiveros learned that Saldate did not even attempt to tape the interrogation, Ontiveros immediately knew or should have known that Saldate had engaged in unconstitutional conduct during Ms. Milke's interrogation.

106.    Despite this knowledge, Ontiveros did nothing. In light of Saldate's history of misconduct and judicial findings that he had lied and fabricated evidence, no minimally competent supervisor acting in good faith should have put Saldate alone in the interrogation with Ms. Milke in the first place. Nor is there any reasonable explanation for Ontiveros, if acting in good faith, to have failed to follow up with Ms. Milke in an attempt to obtain further corroborating evidence, such as a written statement or waiver of rights.

107.    Ontiveros deliberately failed to conduct any follow-up or to even attempt to obtain any corroboration because he *knew* that Saldate had engaged in an unconstitutional interrogation, either by coercing Ms. Milke or by fabricating her statement. In other words, the only reason Ontiveros would have failed to take any action after Saldate did not even attempt to tape the interrogation is if Ontiveros *knew* that any attempt at corroboration would be futile because Saldate had already violated Ms. Milke's rights.

108.    If Ms. Milke had confessed in the manner reported by Saldate, there is no explanation consistent with good faith police work for Saldate's and Ontiveros's' failure to obtain documentation and corroboration. In reality, the reason that no one attempted to obtain

documentation or corroboration of Ms. Milke's statement is that everyone involved knew or had reason to know that it was yet another fabrication by Saldate.

**Defendant Saldate and others conspire to fabricate additional evidence supporting**

**Saldate's fabricated confession**

109. As Maricopa County Deputy County Attorney Noel Levy eventually told the jury, Saldate's fabricated confession was the "keystone" of the eventual case against Ms. Milke. Without the fabricated confession, the prosecution had no case against her. The confession was not, however, the only fabrication used to wrongfully convict Ms. Milke.

110. Following Ms. Milke's interrogation, Defendant Saldate fabricated evidence to support the fake confession, including but not limited to:

   a. *Jean Pugh (witness)* - Ms. Pugh lived near the area where Christopher was shot, and came forward with information that on the day of the murder she heard two series of shots--not the three uniform shots reported by Mr. Scott. Ms. Pugh came forward to the PPD and was referred to Defendant Saldate. Rather than properly investigate, record, and report this information, Saldate called Ms. Pugh a bold-faced liar and told her that her description was impossible.

   b. *Ernie Sweat (former boyfriend)* - Saldate also misrepresented a number of statements made by Ms. Milke's former boyfriend, Mr. Sweat. For example, Saldate fabricated a report indicating that Sweat had told Ms. Milke that he was not ready for marriage and that Ms. Milke had been neglecting Christopher. Mr. Sweat never made such statements, but they were used to portray Ms. Milke's supposed selfish motivation to have her son killed.

111. One of the most egregious examples of Saldate's witness-related misconduct in this case involves Sandra Pickenpaugh (now Smith), Ms. Milke's sister. Prior to Ms. Milke's trial, Saldate repeatedly attempted to arrange an interview of Ms. Pickenpaugh. Ms. Pickenpaugh, who was seven months pregnant at the time that Saldate contacted her, resisted the interview. Saldate then simply told her that he had made reservations to see her in

Wyoming and that if she did not cooperate he would subpoena her and she was "just going to have to deliver [her] baby early." Saldate knew that Ms. Pickenpaugh had a combative and jealous history with her sister. During the interview he attempted to seize on this history and turn Ms. Pickenpaugh against her sister. Ms. Pickenpaugh taped portions of the interview. Saldate, himself, made no efforts to tape his questioning of her.

112.    In addition to falsely informing Ms. Pickenpaugh that Ms. Milke had confessed, Saldate told Ms. Pickenpaugh a number of additional outrageous lies about Ms. Milke, including that: (1) during her interview, Ms. Milke had tried to seduce him by flashing her breasts at him, (2) on the ride back to Phoenix, Ms. Milke wanted to exchange a sexual favor in return for her freedom, (3) Ms. Milke had twice previously attempted to kill Christopher (including once by putting cyanide in his cereal), and (4) that Ms. Milke had told other jail inmates that she had committed the crime and would do it again. These statements were all lies and fabrications by Saldate, but convinced Ms. Pickenpaugh at the time that Ms. Milke was guilty.

113.    Ultimately, Ms. Pickenpaugh was subpoenaed to testify at trial and induced labor one week early in order to attend.[3] At trial, as a result of Saldate's inappropriate tactics,

---

[3] Official misconduct relating to Ms. Pickenpaugh continued beyond Ms. Milke's trial. During Ms. Milke's post-conviction proceedings, investigators contacted Ms. Pickenpaugh to obtain information regarding Defendant Saldate's conduct during his interview of Ms. Pickenpaugh. After contacting Ms. Pickenpaugh, Ms. Milke's representatives were contacted by an Arizona Assistant Attorney General, who informed them that Ms. Pickenpaugh had been designated a "victim" in Ms. Milke's case (along with Christopher and Christopher's father), and that all victim's rights applied to her. This designation was an attempt to prevent further contact with Ms. Pickenpaugh, although she was an important witness.

Ms. Pickenpaugh offered false evidence again Ms. Milke, painting her as a bad mother with a motive to kill her son.

114. In addition to Saldate and Mills, other PPD detectives were also involved in fabricating inculpatory evidence as part of a conspiracy to ensure Ms. Milke's conviction. This included fabricating inculpatory evidence regarding Ms. Milke's demeanor, witness statements, and forensic evidence.

115. For example, Detective Davis fabricated or embellished evidence regarding many of his interactions with Ms. Milke prior to her departure to Florence. In particular, Detective Davis noted that when he came to Ms. Milke's home to question her, Ms. Milke put her feet up on the chair, appeared to make herself comfortable, indicated she was in a hurry to get to Florence, and immediately following the interview got up right away and left for Florence. Davis used these statements to suggest, falsely, that Ms. Milke was uninterested in the search for her son. Nothing could have been further from the truth.

116. Although Detective House was present for the conversation between Ms. Milke and Davis, and knew or should have known that Davis had fabricated or embellished evidence against Ms. Milke, House took no corrective action.

117. Detective Townsend also suggested that Ms. Milke appeared very calm, was in a hurry to go to Florence, and did not ask anyone to stay by the phone in her home when she left—insinuating that Ms. Milke was again unconcerned with Christopher. This evidence, too, was false.

118. The entire case against Ms. Milke relied on a theory that Ms. Milke had arranged Christopher's murder and had solicited Styers and Scott to commit the crime. As

detailed below, however, both Scott and Styers refused to testify against Ms. Milke. Unable to present Scott's fabricated statement against her, Saldate and Mills knew that they would need other corroborative evidence of Scott and Styers' guilt to shore up the case against Ms. Milke. To manufacture that corroborative evidence, Saldate and others turned to forensic "science":

119. As an example, upon information and belief, Saldate, Mills, and Philip Wolslagel (a criminalist in the City of Phoenix Crime Laboratory), along with prosecution expert Dr. Walter Birkby, together and separately, each participated in the fabrication of inculpatory shoeprint evidence in order to tie Jim Styers to the murder scene and thereby corroborate their theory of Ms. Milke's guilt.

120. On Sunday, December 3, 1989, at 5:10 p.m., House reported that he arrived at the desert scene where Christopher's body was found. House had been assigned to lead the murder scene investigation.

121. As part of the crime scene investigation, PPD Detective House reported that a search of the area revealed a set of partial shoeprints in the sand near where the body of Christopher was found. The shoeprints were located between approximately 2'10" and 7' from Christopher's body. House numbered the shoeprints "A" through "E," and had them photographed. House did not, however, have casts made of the shoeprint impressions.

122. Defendant Saldate and Detective Mills then submitted the shoeprint photographs for forensic analysis.

123. On December 2, 1989, PPD officers investigating Christopher's disappearance had extensively and exhaustively searched the Metrocenter parking lot, including checking inside vehicles, and around all bushes, planters, buildings, and trash areas.

124.    The next day, Saldate and Mills reported taking Roger Scott to the Metrocenter Mall, and recovering a pair of black-and-gray Nike tennis shoes in a planter in the Metrocenter parking lot. Saldate and Mills claimed that Scott independently directed them to the tennis shoes, and informed them that Styers had worn those shoes when he shot Christopher.

125.    Saldate and Mills then set about trying to connect Styers to the Nikes from the Metrocenter planter, and then the Nikes to the shoeprints found at the scene of Christopher's murder.

126.    Saldate and Mills requested that the Nike tennis shoes reportedly recovered from the Metrocenter planter be forensically examined. In addition, Mills arranged for casts and prints to be taken of the feet of both Styers and Scott.

127.    Saldate and Mills then arranged for Dr. Walter Birkby, a forensic anthropologist who was hired as an expert for the prosecution, to examine the Nikes and Styers' and Scott's foot casts and prints. To make the first corroborative link between Styers and the Nikes, Birkby ultimately falsely reported to prosecutors that he was able to scientifically discern—by examining only 1) inked impressions and plaster foot casts taken from Styers and Scott, and 2) the inner sole of the Nikes—that Jim Styers specifically had habitually worn the black-and-gray Nikes. Birkby's fabricated conclusion that he could uniquely identify Jim Styers as the wearer of the Nikes is completely unsupported by either science or logic.

128.    Next, Saldate and Mills requested that the Phoenix Crime Detection Laboratory examine the outsole pattern of the Nikes and compare it to the footwear impressions allegedly depicted in the photographs House had reported taking at the murder scene.

129. Criminalist Wolslagel conducted this comparison. He compared a blown-up photograph of one of the partial shoeprint impressions from the scene to one impression he made of the Nike left shoe's outsole pattern. Wolslagel reported to the detectives and the prosecutor that although the Nikes could not be identified or excluded as the source of the alleged partial shoeprints from the murder scene, there were no relevant differences between the two impressions. Wolslagel's conclusions do not comport with minimally accepted practices for an analyst trained in footwear impression comparison. Wolslagel used comparison photographs that he reported were of poor quality to conduct his comparison, and by emphasizing the lack of "relevant" differences significantly overstated the import of his conclusions.

130. Upon information and belief, Wolslagel fabricated the strength of his scientific conclusions about the shoeprints to comport with the detectives' fabricated theory of the crime.

131. In addition to examining the shoeprints, Wolslagel examined Christopher's sweatshirt for gunpowder residue in an effort to determine the distance from which Christopher had been shot.

132. Wolslagel identified smokeless gunpowder residue on Christopher's sweatshirt, and reported that he was unable to determine the muzzle-to-target distance. Despite his accurate inconclusive determination, however, Wolslagel went on to report that he would expect the muzzle-to-target distance to be approximately five feet or less. Science, in fact, indicates that the estimated range of distance was eighteen inches or less. Wolslagel's fabricated approximation of the range from which Christopher was shot as five feet or less,

however, connected Christopher's shooter to the shoeprints located by House less than five feet but more than two feet from Christopher's body, and reinforced the fabricated forensic evidence from Wolslagel and Birkby connecting Jim Styers to those shoeprints.

133. Upon information and belief, Wolslagel fabricated his muzzle-to-target range approximation to comport with the detectives' fabricated theory of the crime.

134. Finally, Wolslagel—a forensic generalist who conducted forensic testing across at least four disciplines in this case—examined several firearms and conducted ballistics comparisons among 1) the three bullets found in Christopher's skull, 2) the three shell casings recovered from a roadside miles from the scene, and 3) test-fired bullets and casings from a firearm recovered from Scott's home and linked to Styers.

135. Based on this ballistic comparison, Wolslagel admitted that he could neither include nor exclude the Scott/Styers revolver. But then went on to report that it was possible to identify "unique and characteristic" markings left on shell casings by the revolver chamber from which those bullets were fired, and that he found scientifically-significant similarities between one of the shell casings recovered from the roadside and one of the chambers of the Scott/Styers revolver. In fact, the "similarities" Wolslagel identified was only a *single* point of comparison between a single casing and a single chamber of the revolver. Wolslagel neither tested the ability of this similarity to be replicated by repeatedly firing the revolver and then examining other casings discharged from that particular chamber, nor corroborated this "similarity" with other points of comparison between the revolver and the casings. A minimally-trained ballistics examiner, like Wolslagel, knew or should have known that a

*single* point of possible similarity between a single chamber of a revolver and an expended shell casing was scientifically meaningless.

136. Upon information and belief, Wolslagel fabricated this finding of scientifically-significant similarity to comport with the detectives' fabricated theory of the crime.

137. Saldate and Mills used Birkby's and Wolslagel's fabricated conclusions about the shoeprints, the Nikes, the gunpowder residue, and the Scott/Styers revolver in their reports and conversations with the prosecutor to corroborate the fabricated confession created by Saldate and their theory of Ms. Milke's involvement in the murder of her son. But these forensic conclusions were nothing more than junk science.

138. Both Wolslagel and Birkby testified at Debra Milke's trial, repeating the fabrications and false scientific conclusions they had previously reported to prosecutors. Their forensic conclusions were used at the trial as corroborative evidence supporting Saldate's fabricated report of Ms. Milke's alleged confession and the detectives' fabricated theory of Ms. Milke's guilt.

139. Concerned primarily with obtaining additional evidence to corroborate Saldate's fabricated confession, the PPD officers, detectives, and agents failed to take a number of basic investigative steps and disregarded evidence that pointed away from Ms. Milke.

140. The fabrication of evidence and failure to conduct basic investigative steps by these officers and detectives is further evidence of their role in the conspiracy that resulted in Ms. Milke's wrongful conviction.

**Ms. Milke, Mr. Styers, and Mr. Scott have repeatedly denied that Ms. Milke was involved in the crime**

141.     Ms. Milke never confessed to Saldate. Her repeated denials despite Saldate's coercive tactics were the truth—Ms. Milke had nothing to do with Christopher's murder.

142.     Shortly after Ms. Milke was booked in Phoenix, she was interviewed by a private investigator working for a news organization. After hearing from the PPD that Ms. Milke had confessed, the investigator hoped to get additional incriminating statements for the evening news. When he asked Ms. Milke about the confession, however, Ms. Milke was shocked to hear that the PPD was claiming she had confessed. Ms. Milke vehemently denied making any kind of confession to Saldate and denied having anything to do with Christopher's murder.

143.     About three months after Ms. Milke's arrest, Ms. Milke was interviewed by a prison psychiatrist who was treating her. On this occasion, the psychiatrist and Ms. Milke began discussing Saldate's interrogation. Ms. Milke once again made clear that she did not confess to Saldate, and that he ignored her request for an attorney. The psychiatrist was so struck by Ms. Milke's account that he felt compelled to record his interview of her.

144.     At his trial, Styers admitted being in the desert with Christopher and Scott at the time Christopher was murdered. By Styers' account, Scott shot Christopher, and the two of them attempted to cover up the murder, initially lying to police about what happened. Despite these admissions, however, Styers has repeatedly denied that Ms. Milke had anything to do with Christopher's murder. At his trial, Styers testified that Ms. Milke never mentioned anything about wanting to get rid of Christopher, about not wanting Christopher around, or

about wanting Christopher dead. In letters sent from prison to third parties unrelated to the case years after his conviction, Styers also maintained Ms. Milke's innocence. Styers yet again made similar statements to another death row inmate around 2004.

145. Scott has also denied offers from the MCAO to testify against Ms. Milke in exchange for leniency. Prior to Mr. Scott's trial, he was offered the opportunity to plead to second-degree murder in exchange for testimony implicating Ms. Milke. Scott refused the offer, indicating that he felt his testimony would not be what he felt was the truth.

### Ms. Milke's Trial and Wrongful Conviction

146. On December 8, 1989, Ms. Milke (as well as Mr. Styers and Mr. Scott), was indicted by a grand jury on four counts: murder in the first degree, conspiracy to commit murder, child abuse, and kidnapping.

147. Prosecutors from the MCAO sought the death penalty against Ms. Milke.

148. On August 15, 1990, Ms. Milke's defense counsel moved to suppress the statements obtained by Saldate as obtained in violation of her *Miranda* rights, specifically, her right to counsel. Saldate falsely denied that Ms. Milke had requested an attorney; as a result, the court denied her motion to suppress.

149. On trial for capital murder, Ms. Milke's guilt-phase trial commenced on September 12, 1990.

150. During trial, Ms. Milke's defense attorney subpoenaed Saldate's PPD personnel files. Both the PPD and the MCAO opposed this request, and ultimately Ms. Milke was not provided any information about the many prior findings that Saldate had lied under oath and

conducted coercive interrogations, or other evidence of his history of misconduct that would have been in his personnel file, including the 1973 incident involving the female motorist.

151. While opposing defense counsel's attempt to discover the contents of the personnel files, Deputy County Attorney Noel Levy gained actual knowledge of the contents of Saldate's personnel files while preparing the *in camera* submission in response to a defense subpoena, after which he joined in PPD's motion to quash. The Ninth Circuit would ultimately find Mr. Levy's failure to turn over the contents of Saldate's personnel files to the defense to be a violation of Ms. Milke's *Brady* rights.

152. Ms. Milke was tried separately from Mr. Styers and Mr. Scott, neither of whom testified against Ms. Milke. After Ms. Milke's trial and conviction, both Mr. Styers and Mr. Scott were separately found guilty of capital murder and sentenced to death.

153. The key evidence against Ms. Milke was the confession fabricated by Saldate. No other evidence—no witnesses, no physical evidence—directly implicated her in the crime.

154. Ms. Milke testified and truthfully denied any part in her son's murder or ever confessing to Saldate. But in the face of the fabricated confession—and in the absence of the evidence of Saldate's history of extensive misconduct, including lying under oath and coercing confessions—Ms. Milke's testimony was not believed. At the same time, the PPD and prosecution did its best to impugn Ms. Milke's character, using witnesses that Saldate and other PPD officers had manipulated into providing unreliable evidence.

155. Deputy County Attorney Noel Levy emphasized the importance of the fabricated confession, telling the jury in closing argument: "To analyze this case, first of all, what is the keystone of the State's case, really? It's the confession of Debra Milke."

156. The only evidence of Ms. Milke's confession was Detective Saldate's police report and testimony consistent with that report. Saldate had not contemporaneously recorded his interrogation of Ms. Milke; there were no audio or videotape, no written and signed statements, and no witnesses to the alleged confession other than Saldate. As corroboration of Saldate's story, Deputy County Attorney Noel Levy pointed to the forensic evidence, telling the jury in closing argument: "Now, her confession isn't all that exists here. The confession is fully corroborated by all of the physical evidence . . . ." Levy specifically emphasized the Nikes and the shoeprint as corroborative support for a finding of Ms. Milke's guilt.

157. On October 12, 1990, the jury found Ms. Milke guilty of first degree murder, conspiracy to commit murder, child abuse, and kidnapping.

158. On July 18, 1991, after a sentencing hearing, Judge Cheryl K. Hendrix of the Maricopa County Superior Court entered a judgment against Ms. Milke and sentenced her to death. She was imprisoned pursuant to this sentence and placed on death row.

**Saldate's history is revealed and Ms. Milke wins her release**

159. Ms. Milke never ceased fighting for her freedom. She exhausted her state court remedies, including a November 1995 request for a post-conviction evidentiary hearing and discovery regarding Saldate's personnel file. On August 31, 1998, Plaintiff filed a Petition for Writ of Habeas Corpus.

160. In connection with the state post-conviction process, a team of ten researchers organized by Plaintiff's defense counsel spent nearly 7,000 hours over three-and-a-half months sifting through criminal court records on microfiche from 1982 through 1990 searching for Saldate's name.

161. As discussed in greater detail above, this research revealed an array of impeachment evidence against Saldate, including state court findings of Saldate's misconduct in eight cases—four involved false or misleading testimony under oath (*Rangel*, *Rodriguez*, *Reynolds*, and *King*), and five involved court-ordered suppressions of evidence due to Miranda and other constitutional violations (*Conde*, *Yanes*, *Jones*, *Mahler*, and *King*).

162. Armed with this new information, Ms. Milke filed for federal habeas relief in the United States District Court for the District of Arizona. In 2001, pursuant to an order by the district court in response to Ms. Milke's repeated discovery motions seeking Saldate's personnel file, Ms. Milke's defense was provided with a disciplinary order in Saldate's personnel file involving the 1973 "sexual quid pro quo" with a female motorist, about which Saldate lied to supervisors, until finally confessing after he failed a polygraph test. The written reprimand to Saldate stated that "because of this incident, your image of honesty, competency, and overall reliability must be questioned."

163. On December 11, 2007, Plaintiff filed an appeal of the district court's denial of her habeas corpus petition with the Ninth Circuit.

164. On March 14, 2013, the Ninth Circuit overturned and set aside Ms. Milke's convictions and sentences. The Ninth Circuit succinctly summarized Ms. Milke's case: "The judge and jury believed Saldate, but they didn't know about Saldate's long history of lying under oath and other misconduct. The state knew about this misconduct but didn't disclose it, despite the requirements of *Brady*. . . and *Giglio* . . . . Some of the misconduct wasn't disclosed until the case came to federal court and, even today, some evidence relevant to Saldate's credibility hasn't been produced, perhaps because it's been destroyed."

165. After conducting a careful and thorough review of the evidence, the Ninth Circuit determined that the evidence relating to Saldate's history of misconduct was plainly favorable to Ms. Milke's defense, found that the evidence was suppressed by the state, and that Ms. Milke was prejudiced as a result. The court went as far to say "It's hard to imagine anything more relevant to the jury's—or the judge's—determination whether to believe Saldate than evidence that Saldate lied under oath and trampled the constitutional rights of suspects in discharging his official duties."

166. In his concurring opinion also finding a *Miranda* violation, Ninth Circuit Chief Judge Alex Kozinski observed that:

> "No civilized system of justice should have to depend on such flimsy evidence, quite possibly tainted by dishonesty or overzealousness, to decide whether to take someone's life or liberty. The Phoenix Police Department and Saldate's supervisors should be ashamed of having given free rein to a lawless cop to misbehave again and again, undermining the integrity of the system of justice they were sworn to uphold. As should the Maricopa County Attorney's Office, which continued to prosecute Saldate's cases without bothering to disclose his pattern of misconduct."

167. Following the Ninth Circuit's decision, the MCAO refused to drop the charges against Ms. Milke. When the MCAO noticed Saldate as a potential witness in an upcoming retrial, Saldate sought to invoke his Fifth Amendment privilege, refusing to answer questions about his involvement in Ms. Milke's case on the grounds that his answers might incriminate him. In particular, Saldate's refused to answer questions, asserting his Fifth Amendment privilege, because of the Ninth Circuit's finding that he engaged in a pattern of *Miranda* and other constitutional violations while interrogating criminal suspects and the Circuit's referral of this case to federal authorities for possible investigation into whether Saldate's conduct,

and that of his supervisors and other state and local officials, amounts to a pattern of violating

the federally protected rights of Arizona residents.

**The PPD's pattern and practice of obtaining coerced statements, violating suspect's rights to counsel, and fabricating evidence in order to secure convictions.**

168. The unconstitutional and tortious acts of Defendant Saldate and others in Ms. Milke's case were not isolated incidents.

169. There was a custom, policy, pattern, and practice in the City of Phoenix, beginning years before Ms. Milke's unjust conviction and continuing throughout her incarceration, of condoning, encouraging, ratifying, and acquiescing in the practice of fabricating evidence, coercing statements of suspects, manipulating witnesses, violating suspects' rights to counsel, committing perjury, failing to disclose material exculpatory and impeachment evidence, and covering up this unconstitutional misconduct.

170. This custom, police, pattern, and practice existed by virtue of the City of Phoenix's failure to supervise and discipline PPD officers and detectives who engaged in this type of misconduct, and also through the direct encouragement and acquiescence of this type of misconduct in order to secure convictions.

171. Policymakers in the City of Phoenix and the PPD were on actual or constructive notice of, but deliberately indifferent to, these unconstitutional customs, policies, patterns, and practices.

172. The egregious misconduct in Ms. Milke's case would not have occurred, or at a minimum would not have persisted for decades, if the City of Phoenix and the PPD had a functioning supervisory and internal affairs system.

173.    Absent such policies of internal review, supervision, or discipline, Saldate was put in a position where he was able to fabricate Ms. Milke's confession, and none of the evidence concerning Saldate's numerous judicial findings of misconduct or his practice of manipulating witnesses was ever revealed to Ms. Milke's defense.

174.    As the Ninth Circuit explained in vacating Ms. Milke's conviction, there was "no mention of any of this evidence, even though (or perhaps because) a critical question in Milke's case was whether Saldate ignored Milke's request for an attorney."

175.    Saldate also has a known history of sexual impropriety with vulnerable females, including both the 1973 and 2009 incidents in which he coerced women into bartering sexual favors to get Saldate to give them favorable treatment. As the Ninth Circuit noted, this evidence demonstrates that "Saldate had no compunction about abusing his authority with a member of the public, a vulnerable woman who, like [Ms.] Milke, found herself alone with him and under his control."

176.    In fact, Saldate engaged in such sexual impropriety at multiple stages in Ms. Milke's case—first, by placing Ms. Milke in a highly vulnerable situation during the interrogation, and second by falsely suggesting to Ms. Pickenpaugh that Ms. Milke had sought to escape liability by exchanging sexual favors. The fact that Saldate was permitted to engage in misconduct of this nature, despite his record from 1973, is further evidence of the extensive pattern of lack of supervision at the PPD.

177.    Ms. Milke's trial counsel had no knowledge of the 1973 incident because he was blocked from obtaining Saldate's personnel file during trial. The Ninth Circuit determined that the report of the 1973 incident unquestionably constituted *Brady* and *Giglio*

evidence "of the most egregious kind," and yet was suppressed from Ms. Milke until it was finally disclosed in federal court in 2002. The Ninth Circuit explained that "the facts of Saldate's misconduct, his lies to the investigators and this assessment by his supervisor would certainly have been useful to a jury trying to decide whether Saldate or Milke was telling the truth." The court also explained that the report showed that "Saldate has no compunction about lying during the course of his official duties, it discloses a misogynistic attitude toward female civilians and a willingness to abuse his authority to get what he wants. All of this is highly consistent with Milke's account of the interrogation."

178.    Indeed, as the Ninth Circuit noted in its decision, Ms. Milke has *still* not obtained Saldate's complete personnel files—because, according to the PPD, they were destroyed.

179.    The PPD was on notice of the importance of Saldate's personnel files to Ms. Milke's case. In addition to the 1990 subpoena, Ms. Milke's post-conviction and habeas counsel filed motions for discovery of the files, which was finally granted by the district court in 2001. The PPD was under court order to produce Saldate's personnel files to Ms. Milke's habeas counsel. Despite these orders, the PPD produced only the documents relating to the 1973 complaint and two annual reviews, reporting that the remainder of the files had been destroyed. As the Court explained, "[a]ll of Saldate's annual reviews should have been produced as they all apparently contained assessments of Saldate's job performance that bore on his credibility." This was in fact true of the entirety of Saldate's personnel files, which would have been known to the PPD at the time it purportedly destroyed the files.

180.     If the files were indeed destroyed, this intentional destruction constitutes blatant spoliation of evidence.

181.     Absent the PPD's misconduct in continuing to withhold this documentation from Ms. Milke's post-conviction and habeas counsel, despite court orders and discovery motions, Ms. Milke would likely have uncovered additional evidence of misconduct and may have obtained her release earlier.

182.     These and other incidents were known or should have been known to members of the PPD, including Detective Saldate's supervisors, whose responsibility it was to train, monitor, and discipline detectives in the course of their investigations.

183.     Rather than discipline Saldate for this pattern of misconduct, however, Saldate was promoted to homicide detective just years after the 1973 incident and continued to receive accolades. He was even used by his supervisors at the PPD in a manner similar  to this case—brought in to interrogate suspects and obtain confessions, despite (and perhaps because of) his tactics.

184.     Saldate's tactics were encouraged by the PPD prior to Ms. Milke's interrogation, creating the circumstances by which Saldate and the rest of the defendant officers were able to obtain her wrongful conviction.

185.     The incidents of misconduct were hardly limited to Detective Saldate. For example, the MCAO has compiled a "*Brady* List" or a "Law Enforcement Integrity List" identifying PPD officers with incidents of misconduct. Although the list includes numerous retired PPD officers, Detective Saldate is not on the list. The *Brady* list, updated on

September 13, 2010, includes several PPD officers with incidents of misconduct occurring

*before* Ms. Milke's fabricated confession:

      a.  Saul Ayala (#4269); incident date 11/23/1983; listed as active;

      b.  Troy Bartlett (#5026); incident date 2/1/1989; listed as active;

      c.  Forrest Conner (#4434); incident date 1/1/1987; listed as active;

      d.  Salvador Salazar Garcia (#1959); incident date 5/22/1974; listed as active;

      e.  Ronnie Hawthorne (#1745); incident date 6/23/1982; listed as active;

      f.  Juan Hernandez (#4551); incident date 1/1986; listed as active;

      g.  Joseph Kalisak (#4394); incident date 10/11/1987; listed as active;

      h.  Roger Ketelaar (#2382); incident date 3/1983; listed as active;

      i.  Paul Kleppan (#4172); incident date 7/14/1986; listed as active;

      j.  Jerry Laird (#3880); incident date 10/26/1984; retired from the PPD, listed as active with the El Mirage Police Department; and

      k.  William Niles (#4228); incident date 9/28/1986; listed as active;

186.    The *Brady* list also includes approximately 94 officers with incidents after Ms. Milke's fabricated confession (between 1990 and 2009), and 138 additional officers with "various dates" of incidents of misconduct.

187.    Additional examples of official misconduct, particularly in the context of suspect statements and interrogations are replete in public documents:

      a.  In *State v. Dalglish*, 131 Ariz. 133 (1982), after the trial court granted the defendant's motion to suppress statements made after his arrest, the State sought reconsideration when PPD Officer Oviedo testified he had been mistaken in his previous testimony. The court stated: "Frankly, I am concerned that an experienced police officer like Oviedo could take the stand and testify as he did with respect to a pertinent and material issue in the case, as it might deal with

probable cause, and then later under the guise of a Motion to Reconsider, change that testimony. His testimony became diametrically opposed to what he testified to before, at least in the court, on a very material issue in this case, that dealing specifically with probable cause."

       i.  Officer Oviedo was later promoted by the PPD to a homicide detective.

    b.  The Supreme Court of Arizona found that the juvenile court erred in denying the motion to suppress the defendant's confession, concluding that "from the totality of the circumstances, we conclude that the decision to confess was not voluntary." *In re Appeal in Maricopa County,* 139 Ariz. 260 (1984). There the juvenile was never furnished counsel, and, when he claimed his right to remain silent at the juvenile parole hearing, a convenient recess was taken. The juvenile's parole officer then talked to him. *In re Appeal,* 139 Ariz. at 263. Noted the court: "The juvenile's requests for an attorney were never honored. His right to remain silent was not taken as final. The hearing board recessed when the juvenile sought to remain silent, and his parole officer entered the scene. It strains belief to maintain that the subsequent giving of a confession was a free and voluntary act as has been defined in Miranda and Edwards." *Id.* at 263.

    c.  The Arizona Court of Appeals reversed defendant's convictions for robbery and the theft, vacated the sentences, and remanded those charges to the trial court for further proceedings where the state did not meet its burden of showing that the confessions were voluntary. *State v. Strayhand*, 184 Ariz. 571 (1995). The court found that the detectives' promises and threats to defendant caused him to confess and the trial judge, in considering the evidence, failed to draw a clear distinction between permissible discussion of the possibility of leniency in return for cooperation and impermissible threats. Three times the detectives told the Defendant that if he cooperated they would tell the county attorney, the judge, and the parole officer that he had been cooperative. They told him that his cooperation "matters on the amount of time you get," and that "we can hopefully limit some of that time." *Strayhand*, 184 Ariz. at 579.

**The MCAO's pattern and practice of using fabricated evidence, ignoring**

**unconstitutional interrogation techniques, and failing to disclose material exculpatory**

**and impeachment evidence in order to secure convictions.**

    188.  Like the PPD, the MCAO also operated with unconstitutional customs, policies, patterns, and practices that facilitated and exacerbated the unconstitutional misconduct in the

PPD. The MCAO failed to supervise or discipline its attorneys when they engaged in a pattern and practice of constitutional violations in the prosecution of their cases, including capital cases like Ms. Milke's.

189.    As a result, prosecutors in Maricopa County routinely withheld material exculpatory and impeachment evidence from criminal defendants.

190.    This failure was amplified by a further failure to create a system to appropriately document and produce material exculpatory and impeachment evidence demonstrating that witnesses, particularly PPD officers, had engaged in misconduct in prior cases prosecuted by the MCAO.

191.    Ms. Milke's case proves a *Monell* pattern, practice, or procedure by itself, for the decades of misconduct in her case would not have been possible if not in conformity with the policy and practices of the PPD and the MCAO. As noted above, Ms. Milke's post-conviction and habeas teams uncovered state court findings of Saldate's misconduct in eight cases involving either false or misleading testimony under oath or where suppression was ordered due to *Miranda* and other constitutional violations, as well as a disciplinary order in Saldate's personnel file involving a "sexual quid pro quo" with a female motorist, about which Saldate lied to supervisors, until finally confessing after he failed a polygraph test. None of this impeachment evidence was produced to Ms. Milke's counsel although it was either explicitly requested or within the MCAO's duty to disclose.

192.    In vacating Ms. Milke's conviction, the Ninth Circuit severely rebuked the MCAO, finding it knew about Saldate's practices because its prosecutors were litigating claims of misconduct in the foregoing cases around the same time period as Milke's, and

because Saldate's misconduct had harmed prosecutions through suppression of evidence or dismissal of charges. Because of the singular importance of this impeachment evidence in a capital case that hinged on a "swearing contest" between Saldate and Milke, the Ninth Circuit found that the MCAO's suppression of this evidence was not merely an oversight, but was "more akin to active concealment."

193.    The Ninth Circuit's opinion laid out a particularly troubling series of events that "underscores the cavalier attitude of the [MCAO] toward its constitutional duty to disclose impeachment evidence."

a.    On May 30, 1990, Maricopa County prosecutor Paul Rood received a suppression motion in *State v. Mahler*, a Saldate case in which the defendant made what the Arizona Court of Appeals called "an unequivocal invocation to remain silent." In that case, Saldate kept speaking with the defendant after the invocation, claiming that "he [Saldate] did not want an admission but that he just wanted Mahler's side of the story." On appeal, the Arizona Court of Appeals held that "Officer Saldate's intent was clear . . . he wanted additional statements from Mahler. This conduct violated Mahler's right to remain silent."

b.    On June 22, 1990, in *State* v. *King*, in another pretrial hearing, Saldate told prosecutor Rood that the defendant had not been unwilling to answer questions during the interrogation. On cross, the defense counsel read back Saldate's own report showing that the defendant had, in fact, said he wasn't going to answer any more questions. The trial judge threw out the portion of the confession.

c.    On November 16, 1990, prosecutor Rood argued against yet another suppression motion in *State v. Jones* and lost, resulting in the suppression of the murder confession. In that case Saldate directed an officer to place a juvenile by himself in an interrogation room, where the juvenile was handcuffed to a table. Even the MCAO conceded that it had no probable cause for the detention. The court condemned the juvenile's illegal detention and the interrogation that followed as "a show of flagrant misconduct." The prosecutor's office then began preparing for a second hearing, which would determine whether key physical evidence—the body, shell casings, and shovel—would also be suppressed.

d. The Ninth Circuit noted that all of this was happening while Ms. Milke's case was pending, both before trial and between Ms. Milke's conviction and her sentencing. The Court stated that "it must have occurred to Rood or *someone* in the prosecutor's office or the police department (or both) that Saldate was also the key witness in the high-profile case against Debra Milke—a case where the defendant was still at trial, actively fighting for her life. Yet no one saw fit to disclose this or any of the other instances of Saldate's misconduct to Milke's lawyer.

194. The prosecutor directly responsible for Ms. Milke's case, Noel Levy, played a particularly salient role in the pattern of misconduct at the MCAO.

195. Just one day before Ms. Milke's wrongful arrest, Saldate arrested Eldon Schurz for murder; Levy was the assigned prosecutor. Saldate and Levy secured Mr. Schurz's conviction a few months before Ms. Milke's. Just as in Ms. Milke's case, Schurz has alleged that Saldate and Levy intentionally presented fabricated evidence, including faulty forensic evidence, in order to secure his conviction. Despite Saldate's prominent role in the case, Levy again failed to disclose the judicial findings of Saldate's misconduct to defense counsel.

196. After securing Ms. Milke's conviction based on fabricated evidence, Levy was named Arizona Prosecutor of the Year in 1990.

197. Levy's pattern continued after Ms. Milke's conviction as well. In 1992, Levy secured the convictions of two more innocent individuals. In the first case—that of David Hyde—although there was no scientific evidence to support his claim, Levy told the jury that blood found on Hyde's jacket belonged to one or both of the murder victims. This false forensic evidence was supported by another supposed "confession" from Hyde, again taken by Saldate, after Saldate spent six hours in a room alone with Hyde. Again, the interrogation

1 was unrecorded and unwitnessed. Based on this evidence, the jury convicted, and Hyde was

2 sentenced to death.

3     198. Mr. Hyde's conviction was vacated a decade later based on DNA evidence that

4 proved that the blood on the jacket belonged to Hyde's brother and not either of the victims.

5 After repeated delays of the possible retrial, Levy offered Hyde a no-contest plea with time

6 served. Despite the importance of the supposed "confession" obtained by Saldate in this case,

7 Mr. Hyde's post-conviction counsel has no recollection of ever being provided the judicial

8 findings of Saldate's misconduct discussed in this Complaint.

9     199. That same year, Levy also prosecuted Ray Krone, obtaining a capital conviction

10 against him. Like Ms. Milke and Mr. Hyde, Ray Krone was also innocent of the crimes for

11 which he was convicted. Krone was convicted based on "expert" evidence presented by Levy

12 that bite-marks found on the victim's body matched a comparison-sample bite-mark

13 impression taken from Krone by law enforcement. In order to secure this false expert opinion,

14 Levy ignored and suppressed from the defense the opinion of a more qualified expert who had

15 excluded Krone as a source of the bite-marks on the victim's body, and instead shopped for

16 an expert who would say what Levy wanted to hear. Finding such an "expert," Levy

17 presented the bite-mark evidence at trial, enhancing the "expert's" presentation by showing a

18 misleading video of the comparison of Krone's dental mold to the bite marks on the victim.

19 But Levy did not make the video available to the defense until the eve of his chosen

20 "expert's" testimony. The jury convicted and it was not until 2002, after Krone had served

21 more than 10 years in prison, that DNA testing proved his innocence. Although the MCAO's

22 strong opposition to testing would delay Krone's release, DNA testing conducted on the

saliva and blood found on the victim excluded Krone as the source and instead matched another man, and proved that the bite-mark evidence was fabricated junk science—which Levy knew or should have known all along.

200.     In 2002, Levy secured the murder conviction of Robert Ortloff for a crime committed in 1984. In that case too Levy was accused of misconduct. After scientific evidence demonstrated that Ortloff could not have left a shoeprint found near the scene of the murder, Levy was accused of materially manipulating witnesses into altering their testimony to minimize the important of the shoeprint.

201.     Levy continued to handle high-profile murder cases for the MCAO through his retirement in 2009. In fact, Levy retired for medical reasons while in the middle of another capital murder trial with accusations of prosecutorial misconduct. During that trial, Levy was twice accused of misconduct by defense attorneys. The first allegation was for denying Levy had spoken at the sentencing hearing of a jailhouse snitch who testified against the defendant, when he had. Then, Levy was accused of threatening with prosecution of another snitch who had recanted her story.

202.     Ms. Milke does not have access to MCAO's records for most of Saldate's prosecutions. However, despite the thousands of hours of research conducted by Ms. Milke's post-conviction team, Ms. Milke's counsel has not uncovered a *single* case in which MCAO prosecutors disclosed *any* of the judicial findings of Saldate's misconduct to another criminal defendant.

203. Upon information and belief, this exculpatory/impeachment evidence was not disclosed by MCAO prosecutors to *any* criminal defendant investigated by Saldate and prosecuted by the MCAO.

204. In addition to Ms. Milke's, Mr. Scott's, Mr. Styers's, and Mr. Hyde's cases, the judicial findings of Saldate's unconstitutional conduct were not disclosed by MCAO prosecutors to criminal defendants in the following trials in which Defendant Saldate was a key investigator and/or obtained key witness or suspect statements:

    a. *State v. Conde*, No. 1 CA–CR 90–0475;

    b. *State v. Gallegos*, No. CR–91–0149 AP;

    c. *State v. King*, No. CR–91–0084 AP;

    d. *State v. Rivas*, No. S-0700-CR-1995011372, discussed at *Rivas v. Schriro*, No. CV 05434, 2006 WL 987990, at *4 (D. Ariz. Apr. 13, 2006).

    e. *State v. Runningeagle*, Nos. CR-89-0046-AP/PC, CR-89-0048-AP;

    f. *State v. Schurz*, Nos. CR–90–0283–AP, CR–92–0109–PC;

205. Although Noel Levy prosecuted a number of cases investigated by Saldate (including Ms. Milke, Mr. Scott, Mr. Styers, Mr. Schurz, and Mr. Hyde), he was by no means the only MCAO prosecutor to handle Saldate's cases.

206. The MCAO has represented that Levy was not the prosecutor on any of the eight cases resulting in judicial findings of misconduct. The MCAO has further represented that prosecutor Paul Rood handled three of those eight cases (*Mahler*, *King*, and *Jones*), and the remaining five were assigned to different prosecutors within the MCAO.

1     207.    Since 1990, six different prosecutors who were named prosecutor of the year by

2 the Arizona Prosecuting Attorneys Advisory Committee also were later found by appeals

3 courts to have engaged in misconduct or inappropriate behavior during death-penalty trials.

4 For example, Maricopa County prosecutor Juan Martinez was named Prosecutor of the Year

5 in 1999. Overall, Martinez helped send seven to death row since he was hired at the MCAO in

6 1988. He was accused of misconduct by defense attorneys in all but one of those cases.

7     208.    The MCAO's suppression of exculpatory and impeachment evidence are by no

8 means limited to cases involving Detective Saldate. In addition to Ray Krone's wrongful

9 conviction, discussed above, MCAO prosecutors failed to disclose exculpatory or

10 impeachment evidence in numerous other cases.

11    209.    In 1976, following J.W. Lippard's conviction for bribery, the Arizona Court of

12 Appeals affirmed the trial court's decision to grant a new trial based on the MCAO's failure

13 to disclose material exculpatory evidence. The Court of Appeals explained that MCAO

14 prosecutors had "clearly violated Rule 15.1 and the spirit of the *Brady* and *Fowler* decisions.

15 It is difficult to imagine any testimony that would be more material or helpful to a defendant

16 on a bribery charge than the testimony which was withheld from the defendant in this case. At

17 the trial where the defendant was convicted of bribery the state's chief witness, Cornwall,

18 testified that the defendant made the bribe. At the earlier hearing before the Arizona Real

19 Estate Commission the same state's witness gives sworn testimony that the bribe was made by

20 Ned Warren, Sr." *State v. Lippard*, 553 P.2d 1254, 1254 (Ariz. Ct. App. 1976).

21    210.    In 1977, following Jeannie Louise Holsinger's murder conviction, the Arizona

22 Supreme Court determined that MCAO prosecutors had violated their constitutional

violations by failing to disclose a key witness's immunity agreement. The Court wrote: "The fact of immunity was '*Brady* material' and the prosecution was obligated to provide it. It was error not to disclose this information and we cannot say that it was not prejudicial." *State v. Holsinger*, 564 P.2d 1238, 1241 (Ariz. 1977).

211.    In 1978, following James G. Jones' convictions for bribery, forgery, and other theft crimes, the Arizona Supreme Court determined that MCAO prosecutors had failed to disclose several hand-written notes and several witness statements. Although the Supreme Court declined to grant a new trial because the exculpatory evidence related to only some of the counts for which the defendant was convicted, the Court issued the following warning: "As a caveat to prosecutors, we wish to indicate that if you are in doubt as to whether or not a defendant knows of certain exculpatory evidence already known to the state, reveal it." *State v. Jones*, 587 P.2d 742, 746 (Ariz. 1978).

212.    In 1984, following Joyce Lukezic's murder conviction, the Arizona Supreme Court affirmed the grant of a new trial based on evidence that MCAO prosecutors had provided benefits (including monetary payments, daily doses of prescription drugs, and fabricated/favorable presentence reports) to two witnesses, but had failed to disclose those benefits to the defense. The Court concluded: "In affirming this order for a new trial, we feel compelled to express our disapproval of the conduct of the prosecution in this case. Whether these witnesses received benefits due to prosecutorial design or inexcusable neglect is immaterial, because the prosecution is to blame in either case. We certainly do not subscribe to the cavalier philosophy that the state can do no evil when acting in the name of the good." *State v. Lukezic*, 691 P.2d 1088, 1096 (Ariz. 1984).

213.    In 1985, following William Bracy's murder conviction, the Arizona Supreme Court found that MCAO prosecutors had violated their *Brady*/*Giglio* violations by failing to disclose exculpatory evidence in the form of monetary payments and free long-distance phone calls provided to a witness. *State v. Bracy*, 703 P.2d 464, 472 (Ariz. 1985) ("As to the benefits Arnold Merrill received, we find that they were exculpatory in nature and were never disclosed to defendant."). The Court ultimately declined to order a new trial because it found the suppression was not prejudicial.

214.    In 1996, a jury convicted Timothy Ring of first-degree, felony murder, conspiracy to commit armed robbery, armed robbery, first-degree burglary, and theft. During post-conviction proceedings, both the trial court and the Arizona Court of Appeals found that the MCAO had failed to disclose that a prosecution witness was a prior informant and rejected the MCAO's characterization of funds paid to the witness as "reimbursement for lost wages and living expenses and not compensation." The Court of Appeals wrote: "Like the trial court, we disapprove the state's lack of disclosure regarding [the witness]." *State v. Ring*, No. 2 CA-CR 2014-0318-PR, 2015 WL 1285785, at *6 (Ariz. Ct. App. Mar. 23, 2015). The trial court, however, found insufficient prejudice, and the Court of Appeals did not disturb that decision.

215.    In 1999, Henry William Hall was convicted of felony murder, armed robbery, kidnapping, and theft. He was sentenced to death for the murder charge. On direct appeal, the Arizona Supreme Court ruled that juror misconduct warranted reversal of all but the theft conviction, and remanded the case for a new trial. In a motion to dismiss all charges, Hall alleged that during his 1999 trial MCAO prosecutors failed to disclose motel check-in

documents, a disciplinary report indicating intentional falsification of documents by the detective who had visited the motel and had been responsible for gathering most of the documents associated a credit card. Finding that this evidence had been suppressed, the trial court issued an "intermediate sanction" precluding the MCAO from using any evidence relating to the credit card transactions at any future retrial. *See State ex rel. Thomas v. Steinle*, No. 1 CA-SA 10-0001, 2010 WL 2643309, at *2 (Ariz. Ct. App. July 1, 2010).

216. In a 2003 trial, MCAO prosecutors failed to disclose the scope of expert testimony that they offered at the penalty phase of Frank Silva Roque's murder trial. Although not finding sufficient prejudice to warrant reversal, the Arizona Supreme Court held: "The prosecutors had an obligation to disclose, which they did not fulfill. Although the trial court found that the prosecution did not intend to mislead the defense, the prosecutors conceded that they knew they had not disclosed the extent of Dr. Ben–Porath's testimony. Because the prosecutors should have known that their failure to disclose was improper and was likely to prejudice the defendant, we consider the failure to disclose in our analysis of cumulative prosecutorial misconduct." *State v. Roque*, 141 P.3d 368, 405 (2006).

217. Given the clandestine nature of prosecutorial *Brady/Giglio* violations, these examples are likely a small sample of the violations that actually occurred within the MCAO.

218. The MCAO's pattern of misconduct was particularly evident in (but not limited to) death-penalty cases, where internal and public pressure for a conviction is highest. For example, among the 82 death-penalty cases that underwent direct review by the Arizona Supreme Court from 2002 to 2013, 42 involved allegations of prosecutorial misconduct, 33 of them from Maricopa County. The allegations ranged from being overly emotional before the

jury to encouraging perjury. Nearly 40% of those allegations were validated by the Arizona Supreme Court.

219.    As the Ninth Circuit explained in its opinion, the MCAO's failure to disclose evidence to Ms. Milke's defense counsel appears akin to active concealment. That is, it is likely that Levy deliberately failed to disclose the evidence about Saldate's misconduct. This is plausible given Levy's professional history with Saldate, the timing of the numerous findings of judicial misconduct against Saldate, and Levy's personal knowledge of the contents of Saldate's personnel file.

220.    The fact that Levy was able to engage in deliberate misconduct in so many cases, and the fact that Saldate's misconduct appears not to have been disclosed by *any* deputy county attorney prosecuting a Saldate case demonstrates that these failures are the direct result of a pattern, practice, or custom within the MCAO of failing to adequately supervise and discipline MCAO attorneys regarding their duty to disclose material exculpatory and impeachment evidence.

221.    In the alternative, if Levy's failure to produce the exculpatory/impeachment evidence in this case was not deliberate—that is, if Levy did not have personal knowledge of the numerous judicial findings of Saldate's misconduct—then his failure to disclose this information is the direct result of the MCAO's administrative failure to create a system for tracking and disseminating obvious *Brady/Giglio* material of this type.[4]

_____

[4] Ms. Milke asserts this alternative theory in part because the MCAO has repeatedly represented and argued that there is no evidence that Levy's failures to disclose were deliberate—that because Levy was not personally assigned to any of Saldate's eight exculpatory/impeachment cases, he did not have personal knowledge of that evidence.

222. In each case where a court made a finding of Saldate's misconduct, including perjury, improper interrogation techniques, or withholding of material exculpatory or impeachment evidence, the MCAO prosecutors assigned to that case were aware of those findings. If Levy was never made aware of such findings, his lack of knowledge is attributable an official deliberate indifference to the need to track and disseminate such information between deputy county attorneys.

223. Although the MCAO was, at all relevant times, under a constitutional obligation to disclose this exculpatory/impeachment evidence, upon information and belief, the MCAO had no system in place to track such information.

224. The MCAO's *Brady* List, discussed *supra*, was not in place in 1990. More importantly, the MCAO has publicly represented that it *still* does not track judicial determinations that an officer violated an individual's constitutional rights. In fact, Saldate himself is not on the MCAO's *Brady* List.

225. Accordingly, even if the MCAO's *Brady* List had it existed in 1990, it would not have tracked the numerous pieces of *Brady*/*Giglio* evidence uncovered by Ms. Milke's post-conviction counsel.

226. The MCAO therefore was, and remains, deliberately indifferent to its constitutional obligations to track and disseminate such evidence. MCAO policymakers were at a minimum recklessly indifferent to the pattern of misconduct by the PPD officers and detectives, upon whom the MCAO relied, directly resulting in repeated and flagrant violations of suspect's constitutional rights, including their right to due process and a fair trial.

**DAMAGES**

227. Defendants' actions deprived Ms. Milke of her civil rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

228. This action seeks damages for the period from December 3, 1989, through each and every year to the present. Ms. Milke's liberty was curtailed upon her unlawful arrest on December 3, 1989 for the murder of her own son. She remained incarcerated until September 6, 2013, much of that time under sentence of death. Despite the Ninth Circuit's opinion, Ms. Milke remains under ankle monitoring and under threat of retrial even after the filing of this Complaint. Accordingly, the damages suffered by Ms. Milke began in 1989 and continue to the present.

229. Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Ms. Milke to be wrongfully arrested, tried, convicted, and incarcerated for over twenty-three years for a crime that she did not commit.

230. Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Ms. Milke the following injuries and damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; damage to business and property; legal expenses; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment,

sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which she is entitled monetary relief.

231.     Ms. Milke was also robbed of the opportunity to properly grieve for the loss of her son, Christopher.

232.     Ms. Milke suffered physical illness and injury related to her confinement and physical symptoms of anxiety and depression such as headaches, restricted breathing, uncontrolled sweats, difficulty sleeping and nightmares, and other harms.

233.     Ms. Milke spent approximately twenty-two years on Arizona's death row. As a result, her harm went beyond that of even a "typical" wrongfully convicted individual. For example, Ms. Milke was forced to meet with the prison warden to fill out paperwork addressing topics such as her last meal and how to dispose of her body. A doctor came to examine Ms. Milke's veins and to draw blood. Ms. Milke's room was searched every day to ensure there was nothing with which she could harm herself. These injuries and damages to Ms. Milke were foreseeable to Defendants at the time of their acts and omissions.

234.     Pursuant to the City of Phoenix Municipal Code 42-16, Defendants Saldate and Ontiveros are entitled to indemnification because their individual liability and acts of misconduct arose from acts and omissions within the course and scope of their employment with the City.

235.     As a result of the conduct of Maricopa County Attorney William Montgomery, Ms. Milke's injuries have continued well beyond her release. Since the Ninth Circuit's decision chastising the MCAO for its misconduct, Mr. Montgomery has conducted numerous press conferences and interviews in an effort influence public perception regarding Ms.

Milke's guilt or innocence. Mr. Montgomery's public endorsement of Defendant Saldate and his attempts to prosecute Ms. Milke in the press are irresponsible and were patently inappropriate while her criminal case was still pending. In taking these actions, Mr. Montgomery deliberately or recklessly caused Ms. Milke to suffer additional emotional harm.

236. All of the acts and omissions committed by the individual Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## PLAINTIFF'S CLAIMS

### COUNT I

**42 U.S.C. § 1983 claim for deprivation of liberty without due process of law and violation of right to a fair trial, under the Fourteenth Amendment**

*Against Defendants Saldate and Ontiveros*

237. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

238. Saldate, Ontiveros, and others fabricated false evidence of Ms. Milke's guilt, thereby violating Ms. Milke's right to a fair trial and causing her to be deprived of her liberty without due process of law.

239. Rather than conduct an adequate and unbiased investigation, Defendants Saldate and Ontiveros, individually and in concert, acted in a manner that shocks the conscience and followed through with Ms. Milke's unlawful prosecution, thereby depriving Ms. Milke of her right not to be deprived of liberty without due process of law.

240.    As described in greater detail above, Saldate, Ontiveros, and others fabricated evidence in a number of ways, prior to trial, and they did so knowingly or in reckless disregard for the truth. The fabricated evidence was used to arrest Ms. Milke, to prosecute her, and was the basis for the jury's guilty verdict.

241.    Saldate, Ontiveros, and others, individually and in concert, fabricated evidence, including but not limited to the alleged "confession."

242.    Defendants Saldate and Ontiveros, individually and in concert, continued their investigation of Ms. Milke despite the fact that they knew or should have known that she was innocent. In particular, in addition to ignoring the lack of any physical evidence tying Ms. Milke to the crime, Defendants ignored Ms. Milke's repeated protestations of innocence.

243.    Defendants Saldate and Ontiveros, individually and in concert, used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. For example, Saldate ignored Ms. Milke's requests for an attorney and attempted to physically coerce her into providing a confession. Saldate similarly attempted to turn other witnesses against Ms. Milke by flagrantly lying to them about Ms. Milke's conduct.

244.    Defendants Saldate and Ontiveros' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Ms. Milke's defense. Had Defendants' misconduct been disclosed, the evidence would have proved Ms. Milke's innocence, cast doubt on the entire police investigation and prosecution, and created a different result at trial.

245.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Ms. Milke's federally protected rights. These acts were perpetrated while Defendants Saldate and Ontiveros were acting in their capacities as employees or agents of the City of Phoenix and under color of state law.

246.    As a direct and proximate result of these Defendants' actions, Ms. Milke was wrongly arrested, detained, charged with murder, informed she might face the death penalty, prosecuted, convicted, sentenced to death, and incarcerated for over 23 years and suffered the other grievous injuries and damages set forth above.

## COUNT II

**42 U.S.C. § 1983 claim for violation of Plaintiff's right against self-incrimination in violation of the Fifth, Sixth, and Fourteenth Amendments**

***Against Defendants Saldate and Ontiveros***

247.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

248.    Although Ms. Milke never confessed to the murder of her son—a horrific crime that she had nothing to do with—the statements she made to Saldate during her interrogation were obtained, twisted, and manipulated against her in violation of Ms. Milke's Fifth, Sixth, and Fourteenth Amendment rights.

249.    In particular, as described in detail above, the circumstances of Saldate's interrogation were highly coercive, including but not limited to the fact that: Ms. Milke had barely eaten or slept since the previous day and was hysterical and anxious in awaiting news

about her son; Saldate isolated Ms. Milke; when Ms. Milke asked if Saldate had heard anything about her son, he ignored her and then, in one breath, told Ms. Milke: "we found your son. He was murdered and you're under arrest;" Saldate immediately began reading Ms. Milke her rights and then ignored Ms. Milke's statement that she did not fully understand her rights; Saldate ignored Ms. Milke's demand for an attorney; Saldate failed to tape, record, or have a witness present for the interrogation; Saldate pulled his chair up in front of Ms. Milke—whose own chair had its back to the wall—so that their knees were touching and he was about six to twelve inches from her face; Saldate leaned in, putting his hands on Ms. Milke's knees; Saldate was a large an imposing man, especially when compared to petite twenty-five year old Milke; Saldate repeatedly refused to accept Ms. Milke's denials and protestations of innocence; Saldate emphatically stated that Ms. Milke was lying and that he would not tolerate her lies; and Saldate remained in Ms. Milke's face, badgering her, demanding she confess.

250.    These coercive interrogation techniques, including Saldate's calculated plan to ignore Ms. Milke's request for counsel and to extract a confession through psychologically coercive methods, shock the conscience and violate the decencies of civilized conduct, thereby violating Ms. Milke's Fourteenth Amendment substantive due process rights.

251.    As described in detail above, Ms. Milke never confessed to Christopher's murder and did not make any inculpatory statements. But even the non-inculpatory, truthful statements that she did make to Saldate were coerced and involuntarily obtained. The coercion and involuntary statements were reasonably foreseeable consequences of Saldate's

decision to interrogate Ms. Milke in the manner he did and to file a report detailing her coerced statements.

252. As described in detail above, PPD detectives and supervisors, including Defendant Ontiveros, were familiar with Saldate's interrogation practices and his history of coercive interrogations, ignoring suspect's invocations of their right to counsel, and outright fabrications. Given Saldate's role in this case and his history, Defendant Ontiveros knew or should have known that Saldate would attempt to coerce Ms. Milke.

253. By interrogating Ms. Milke in this manner and doing nothing subsequent to stop the violation, Defendant Saldate set in motion a series of acts by others which they knew or reasonably should have known would cause these statements to be used against Ms. Milke at the grand jury and trial, thereby inflicting constitutional injury. Ultimately, these coerced statements were used against Ms. Milke at the grand jury stage and at her trial, thereby violating her rights under the Fifth, Sixth, and Fourteenth Amendments.

254. As a direct and proximate result of Defendants' actions, Ms. Milke was wrongly prosecuted, detained, and incarcerated for over 23 years and suffered the other grievous injuries and damages set forth above.

## COUNT III

## 42 U.S.C. § 1983 Supervisory Liability Claim

### *Against Defendant Ontiveros*

255. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

256.    Ms. Milke's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional action and inaction of Defendant Ontiveros, acting in his individual capacity and under color of law as a Homicide Sergeant and supervisor of the Homicide detectives assigned to investigate Christopher's disappearance and murder, including Saldate.

257.    Ontiveros directly participated in the misconduct that resulted in Ms. Milke's wrongful conviction, including but not limited to creating the conditions by which Saldate was able to fabricate Ms. Milke's confession.

258.    Ontiveros knowingly refused to terminate the wrongful prosecution of Ms. Milke, which he had reason to know was based on fabricated evidence and in violation of Ms. Milke's right against self-incrimination.

259.    Ontiveros violated Ms. Milke's constitutional rights by acquiescing in the deprivation of Ms. Milke's constitutional rights by his subordinates, including Saldate and Mills, and by generally showing a reckless or callous indifference to Ms. Milke's rights.

260.    Ontiveros' culpable failure to train, supervise, and/or control his subordinates, his indifference to the actions of their subordinates, and his indifference to Ms. Milke's rights, encouraged and permitted his subordinates, including Saldate, to fabricate evidence, to coerce Ms. Milke, and to fail to document and disclose material exculpatory and impeachment evidence.

261.    As detailed above, it was reasonably foreseeable, especially in light of Saldate's known history of misconduct, that Ontiveros's misconduct in this case would likely result in a

deprivation of Ms. Milke's constitutional rights, including her wrongful conviction based on fabricated evidence.

262.    The actions and omissions of Defendants Ontiveros, in his individual capacities, caused Ms. Milke to suffer the constitutional deprivations and grievous personal injuries and damages described above.

**COUNT IV**

**42 U.S.C. § 1983 *Monell* claim against the City Phoenix for failing to supervise, failing to discipline, ratifying, and acquiescing in unconstitutional conduct, including but not limited to the presentation of fabricated evidence and the use of coercive interrogation and interview techniques**

***Against Defendant City of Phoenix***

263.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

264.    There was a custom, policy, pattern, and practice in the City of Phoenix beginning years before Ms. Milke's unjust conviction and continuing throughout her incarceration, of condoning, encouraging, ratifying, and acquiescing in the practice of fabricating evidence, coercing statements of suspects, manipulating witnesses, violating suspects' rights to counsel, committing perjury, failing to disclose exculpatory and impeachment evidence, and covering up this unconstitutional misconduct.

265.    The City of Phoenix, by and through its policymakers, created and maintained a custom, policy, practice, and/or usage of failing to supervise, and/or discipline its employees and agents, including Defendants Saldate and Ontiveros, regarding the fabrication of evidence

and regarding the use of constitutionally adequate, non-coercive interrogation and interview techniques.

266.    Although much of the information is within the possession of the City of Phoenix, as detailed above, there are numerous documented instances of misconduct by PPD officers and detectives prior to the acts giving rise to this case, which are already known to Ms. Milke. This misconduct was so persistent and widespread that it constitutes a well settled municipal policy.

267.    Accordingly, the City of Phoenix was on notice, prior to Ms. Milke's arrest, that officers and detectives within the PPD were engaged in routine and widespread fabrication of evidence and use of constitutionally adequate, non-coercive interrogation and interview techniques.

268.    The City of Phoenix did nothing to address the pattern of misconduct and instead encouraged and facilitated violations of constitutional rights by its officers and continued to rely on and promote officers who engaged in such misconduct, thereby condoning and ratifying their unconstitutional misconduct.

269.    By its actions and inaction the City of Phoenix showed its deliberate indifference to Ms. Milke's rights and the rights of other suspects.

270.    To the extent that the PPD and City of Phoenix had written policies which accurately reflected the constitutional obligations of officers who conduct custodial interrogations, the PPD and City of Phoenix, through the decision and policymakers identified above, knew or should have known that those policies were consistently disregarded by Saldate and other employees.

271.     These unconstitutional customs, policies, practices, and usages of the City of Phoenix proximately and directly caused Ms. Milke's injuries, including her illegal confinement, unfair trial, wrongful conviction, and other damages described above. But for the City's failure to supervise and discipline Saldate and other PPD officers, the individual Defendants never would have been able to engage in the unconstitutional acts described above, including the fabrication of evidence and coercion of Ms. Milke.

**COUNT V**

**Claim pursuant to 42 U.S.C. § 1983 and _Goldstein v. City of Long Beach_ for failure to supervise and/or discipline regarding non-disclosure of exculpatory and impeachment information and presentation of fabricated evidence, and for failure to create an administrative system for accessing exculpatory and impeachment information**

_Against Defendant Maricopa County_

272.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

273.     Maricopa County, by and through its policymakers, created and maintained a custom, policy, practice, and/or usage of failing to supervise and/or discipline its employees and agents, including Deputy County Attorneys, regarding their duty to disclose exculpatory and impeachment evidence.

274.     As detailed above, Maricopa County policymakers were on notice, prior to Christopher's disappearance and Ms. Milke's conviction, that Deputy County Attorneys were engaged in routine and widespread intentional and reckless failures to disclose exculpatory

and impeachment evidence in criminal prosecutions, including capital cases. This misconduct was so persistent and widespread that it constitutes a well-settled municipal policy.

275. Although much of the information regarding this widespread pattern and practice is within the possession of Maricopa County, numerous instances of such misconduct are known to Ms. Milke and are detailed in this Complaint.

276. As described above, Ms. Milke's case itself demonstrates a long history of failures to disclose exculpatory and impeachment evidence by the Maricopa County Attorney's Office. Each of these numerous judicial findings that Saldate had engaged in misconduct qualified as exculpatory and impeachment evidence, should have been disclosed in each subsequent criminal prosecution, and were repeatedly buried by MCAO prosecutors. After reviewing the record before it, the Ninth Circuit determined that MCAO prosecutors had committed egregious *Brady/Giglio* violations. The Court rebuked the MCAO prosecutors at length, detailing why they "no doubt knew" about and actively concealed Saldate's practices.

277. Although particularly egregious, the MCAO's violations in Ms. Milke's case are hardly an isolated incident. As described above, various MCAO prosecutors failed to disclose evidence of Saldate's misconduct, not only in Ms. Milke's case, but in numerous other prosecutions involving Saldate (if not *all* of them). These failures were not limited to prosecutor Levy, but involved numerous MCAO prosecutors..

278. By its repeated failure to supervise and/or discipline its employees and agents, Maricopa County showed its deliberate indifference to Ms. Milke's rights and the rights of other suspects.

279.     These unconstitutional customs, policies, practices, and usages of Maricopa County proximately and directly caused Ms. Milke's injuries, including her illegal confinement, unfair trial, wrongful conviction, and other damages described above. But for the City's failure to supervise and discipline its employees, the exculpatory and impeachment evidence that was unconstitutionally suppressed from Ms. Milke would have been appropriately disclosed.

280.     Furthermore, pursuant to *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) *cert. denied sub nom. Cnty. of Los Angeles, Cal. v. Goldstein*, 134 S. Ct. 906 (2014), Maricopa County, by and through its policymakers, failed to create any administrative system or internal policies and procedures for the deputy county attorneys handling criminal cases to access exculpatory and impeachment information pertaining to prior judicial findings of misconduct by police officer witnesses, and failed to train deputy district attorneys to disseminate this information.

281.     In criminal filings in Ms. Milke's case, Maricopa County, through Maricopa County Attorney William Montgomery, has disputed the fact that MCAO prosecutor Noel Levy had actual knowledge of the judicial findings of misconduct by Saldate.

282.     Under that scenario, Levy's failure to disclose this evidence is attributable to Maricopa County's administrative failures, which created an environment where exculpatory and impeachment evidence was not gathered, thereby facilitating violations of criminal defendants' constitutional rights.

283. At the time of Ms. Milke's wrongful conviction, the Maricopa County Attorney was Rick Romley. The Maricopa County Attorney is a county officer, acting as a policymaker for Maricopa County.

284. But for Maricopa County's failures, the exculpatory and impeachment evidence that was unconstitutionally suppressed from Ms. Milke would have been appropriately disclosed.

285. Maricopa County's unconstitutional failure to create an administrative system or internal policies and procedures for the Deputy County Attorneys handling criminal cases to access exculpatory and impeachment information (in particular, prior findings of misconduct by police officer witnesses), and Maricopa County's related failure to train Deputy County Attorneys to disseminate this information proximately and directly caused Ms. Milke's injuries, including her illegal confinement, unfair trial, wrongful conviction, and other damages described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Debra Jean Milke respectfully request:

A. A trial by jury on each of Plaintiff's claims;

B. Compensatory damages as to all defendants, jointly and severally, in an amount to be determined at trial;

C. Punitive damages as to all individual defendants, jointly and severally, in an amount to be determined at trial in order to deter such conduct in the future;

D. For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E. Such other relief as may appear just and appropriate.

**DATED** this 22nd day of January, 2016.

**NEUFELD SCHECK & BRUSTIN, LLP**

/s/ Nick J. Brustin

Nick J. Brustin
Anna Benvenutti Hoffmann
Farhang Heydari
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
*Admitted pro hac vice*

M.E. "Buddy" Rake, Jr.
Daniel T. Benchoff
RAKE LAW GROUP, P.C.
2701 E. Camelback Road, Suite 160
Phoenix, Arizona 85016

Michael D. Kimerer
Rhonda Elaine Neff
KIMERER & DERRICK, P.C.
1313 E. Osborn Road, Suite 100
Phoenix, Arizona 85014

*Attorneys for Plaintiff Debra Jean Milke*