# Exhibit 2

```
                    UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF ARIZONA

                    _____
```

| | | |
|---|---|---|
| **Debra Jean Milke,** | ) | |
| | ) | No. **CV-15-462-PHX-ROS** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 19, 2018 |
| **City of Phoenix, et al.,** | ) | 1:31 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


    **BEFORE:   THE HONORABLE ROSLYN R. SILVER, JUDGE**


    <u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>


    <u>STATUS CONFERENCE</u>


Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1      MS. MCCARTHY:  Yes, Your Honor.

2      THE COURT:  Okay.  You can take that back.

3      MS. RETTS:  Your Honor, we'd also ask, because it is
4 our understanding that we're here today exactly on that issue,
5 that you've issued that ruling on, and it relates also to the
6 request for production responses.

7      Two years ago almost now we sent requests for
8 productions for documents.  That's what the privilege log issue
9 relates to.  So it's not just Ken Ray, we have asked them to go
10 through the entire file and to identify what is privileged and
11 what isn't related to specific RFPs that we're asking for
12 information on.

13      THE COURT:  So what's the problem, Miss McCarthy?

14      MS. MCCARTHY:  Your Honor, we have, in fact -- so
15 there is this room full of documents.  We have -- hundreds and
16 hundreds of hours have been expended organizing this room,
17 scanning it.

18      THE COURT:  No.  You should have had this done a long
19 time ago.  I'm not going to give you anymore time, otherwise
20 I'm not going to let you continue with this case.

21      As you know, this is the first time I've heard a
22 request for sanctions.  And this is a discovery dispute.  So I
23 want it in writing.  That's how I resolve these disputes.  I've
24 extended the discovery time until the end of, I believe,
25 November.  This dispute needs to be put to me.

| | | |
|---|---|---|
| 1 |        And, Miss McCarthy, you need to take that bad news | |
| 2 | back to the other lawyers on your team.  And you need to | |
| 3 | respond to these requests for production.  I don't care, as I | |
| 4 | said, and once again repeating myself, if it fills this entire | |
| 5 | courtroom.  It's your obligation. | 13:58:34 |
| 6 |        MS. MCCARTHY:  Understood. | |
| 7 |        THE COURT:  You filed this lawsuit. | |
| 8 |        And frankly, I'm surprised, in view of the quality of | |
| 9 | the lawyers involved in this litigation for you, that that | |
| 10 | organization didn't occur before the lawsuit was filed. | 13:58:49 |
| 11 |        Anything else? | |
| 12 |        MS. RETTS:  Your Honor, just with respect to | |
| 13 | scheduling.  I know we had proposed a briefing schedule for | |
| 14 | moving the deadline for the summary judgment briefing.  But in | |
| 15 | our view this information is critical to -- | 13:59:01 |
| 16 |        THE COURT:  I know it is.  So we'll push back the | |
| 17 | summary judgment, of course.  I need another stipulated Rule 16 | |
| 18 | order.  And, of course, we always move everything back. | |
| 19 |        But, of course, as you know, there also has to be an | |
| 20 | interim conference before any motions are filed.  And usually | 13:59:20 |
| 21 | they're filed by the defense.  And the interim conference is | |
| 22 | ordinarily -- we're just projecting right now -- a couple of | |
| 23 | weeks after the close of all discovery. | |
| 24 |        And one week prior to that you're to file with me a | |
| 25 | very simple notice telling me whether the case is going to | 13:59:43 |

1  settle.  And I understand from the outset this case will never
2  settle, so fine.  But you try to work on it.
3           If you can't settle it, then you tell me whether or
4  not you agree or disagree that dispositive motions can be
5  filed.
6           Ordinarily, as I said, they're filed -- they're hoped
7  to be filed by the defense.  This is a very fact intensive
8  case.  Perhaps there are legal issues.  But you are to confer
9  and try to persuade each other that there are legal issues, no
10 disputed facts on the legal issues.  And try to persuade
11 Miss McCarthy and the other plaintiff's attorneys.
12          And if you agree it is a legal issue, there's no
13 problem, I will allow a legal issue to be filed.  But if there
14 are disputed issues of fact, don't waste your time and
15 certainly not mine.  Okay.
16          MS. RETTS:  Thank you, Your Honor.
17          THE COURT:  All right.  So I'm going to let you work
18 on the date for filing dispositive motions and everything else
19 beyond that to place in the Rule 16 order.
20          And then call my office and let's set an interim
21 conference.  And we will order also the date -- it's usually
22 seven days prior.  And it will be seven days prior to the
23 interim conference your notice addressing both those issues.
24          And you're not used to this, Miss McCarthy.  I'm
25 getting a lot of nods over here because they've been in front

1   perhaps even oral argument on it.  Although oral argument on
2   privilege issues are sometimes worthless.  So they're usually
3   left to the judge.
4           Okay.  So that's the -- that is as of the 31st.
5           Now let me back up now.  And Miss McCarthy, you know,    14:07:16
6   you are -- you may or may not be in hot water here and your
7   other lawyers.  But if there have been outstanding requests for
8   production of documents, you need to get on it now and respond
9   to those requests for production of documents.  There is no
10  excuse, since this case has been around since 2015, no excuse   14:07:39
11  that we can't produce these documents.
12          If it's a privileged issue, that's different.  But
13  you've got to get them organized, you have to respond by,
14  again, the witching day, the 31st.  Okay?
15          And if there's still a discovery dispute about that,    14:08:03
16  then you all know how to handle discovery disputes.  Right?
17  It's my practice, you put it in writing, no more than two
18  pages.  And I will resolve it.
19          MS. RETTS:  And, Your Honor, just to clarify, so for
20  October 31st, is that the deadline whereby plaintiff needs to   14:08:21
21  produce those materials that they agree there has been an
22  implicit waiver?
23          Because we're going to go back through and do a
24  look --
25          THE COURT:  Yeah.  Implicit -- there's two things.      14:08:32

1  Okay.  Implicit waiver is a good -- yes, that.

2      But the second thing is, she needs to say not only
3  implicit waiver, but Miss McCarthy -- not she.  Miss McCarthy
4  and the plaintiff's attorneys needs to say, we now know what is
5  Mr. Ray's file.  He has now reviewed that file.  He now knows
6  what the questions are.  He now knows what the answers would be
7  with respect to those questions.  So that his answers may be, I
8  don't -- she didn't say this to me.  Because you proposed some
9  very specific questions.  And that may never have -- those
10 questions may never have been asked by him, or he has no
11 knowledge of it.  So that's the second aspect.

12     Is that clear?

13     MS. RETTS:  Yes, Your Honor.

14     And one of the issues that we had been looking at is
15 we know that there are two letters that were attached to the
16 habeas proceedings that were between Mr. Ray and Miss Milke,
17 and there was express waiver for those because they were placed
18 into the public sphere.

19     Now what we have also asked plaintiff to go back
20 through the file and look and see if, as they have agreed
21 should be disclosed, is there anything else that references
22 Saldate, the interrogation practices or any other *Monell*
23 questions.

24     So separate and apart from any questions that might be
25 asked of Mr. Ray, they need to do that production because that

```
 1   may generate more questions to Mr. Ray.
 2              THE COURT:  Yes.  That's right.
 3              And you've already made that production, you just
 4   haven't gotten a response?
 5              MS. RETTS:  Yes.                                           14:10:11
 6              THE COURT:  And how long ago was that?
 7              MS. RETTS:  We made the initial request in 2016 of
 8   November.  And a privilege log was produced to us for that in
 9   this year, the Summer of this year.  That started the discovery
10   dispute process, the meet and confer in September.  As part of      14:10:23
11   that process, plaintiff agreed to go back and look through
12   Mr. Ray's correspondence.
13              THE COURT:  Okay.  So by the 31st.
14              MS. RETTS:  So we've been waiting for that.
15              THE COURT:  Are there any other issues though on terms    14:10:35
16   of production that are unrelated to the privilege issue?
17              MS. RETTS:  Well, we have asked for production of what
18   was given to Mr. Stuart in --
19              THE COURT:  Yes.
20              MS. RETTS:  -- what he was provided access to.            14:10:46
21              THE COURT:  For his book.
22              MS. RETTS:  Yes.
23              Because that could relate to an express waiver of
24   everything.
25              THE COURT:  Exactly.                                      14:10:52
```

1        So --

2        MS. RETTS:  So our request would be --

3        THE COURT:  But what was, I'm sorry, remind me, the
4    response?

5        MS. MCCARTHY:  Your Honor, we -- the issue of
6    Mr. Stuart has been around since the beginning of the
7    litigation.  We have conferred with defendants, and we spoke to
8    Mr. Stuart, as well as Mr. Kimerer who was one of plaintiff's
9    attorneys and was her criminal attorney.  He is the one who
10   interacted with Mr. Stuart.

11       And Mr. Stuart has told us he did not review any
12   privileged documents when he went through the documents in the
13   file.  So that is what we responded to the defendants' request
14   for production.  We told them it is our information and belief
15   that that's the case.

16       We had a meet and confer call.  We told them that
17   they're free to depose him, they're free to subpoena his file.
18   They never took his deposition.  They didn't subpoena any
19   documents from him.  They're free to call him if they'd like to
20   do that.

21       But our understanding is that he reviewed filings from
22   the trial transcripts, post-conviction, habeas.  He did not
23   look at any privileged materials.

24       MS. RETTS:  And our response to that would be that the
25   plaintiff's position had been that the documents in this case

1  aren't very well organized.  So how do we know, in fact, that
2  Mr. Stuart didn't review privileged materials?  We don't have
3  an affidavit from him stating that he didn't.
4          THE COURT:  Well, can't you take his deposition though
5  as she's proposed?
6          MS. RETTS:  Well, I mean, we have --
7          THE COURT:  He's a third-party witness, you can take
8  his deposition under Rule 45.
9          MS. RETTS:  We could, but I think that's an expense we
10 should not have to incur to get a full response.  He is an
11 agent of Miss Milke for writing of this book that relates --
12         THE COURT:  He's not an agent of hers, is he?  Did she
13 authorize him to write this book?
14         MS. RETTS:  That is my understanding, yes.
15         THE COURT:  Is that right?
16         MS. MCCARTHY:  I believe she consented to him writing
17 the book.  But he was the author of the book, had the idea for
18 the book.
19         THE COURT:  I'm not sure there's an agency
20 relationship there.
21         But she's given you the answer.  She says that none of
22 it was privileged.  So what else?  Is that not acceptable?
23         MS. RETTS:  Just based upon the representations of how
24 this file is maintained, it's difficult to understand how that
25 can be the case.

# Exhibit 3

— Saldate hired an atty? This doesn't sound good. They are trying anything to convict me. I need Saldate to testify in my defense.

This doesn't look too good. This blows my whole defense.

9-24-90  Vincent Libbon — divorce lawyer.

I was ordered to maintain health insurance, but not life insurance. I always insured Chris all the way around — through my employment.

Do it yourself divorce packet April 1988

After the drug situation in June 1988 I told Mark no way would he have custody of Chris because of his drug use.

— Was that ok? —

Det. Swearingin — I don't remember him. None of these det's look familiar to me.

L&L00497

# Exhibit 4

November 14

Hi Anders,

As of today I still have not received the legal mail you sent to me.

One of the officers told me the other day that he inquired about my mail and was told by Barbara Daniels that nobody at Santa Maria was investigating my mail. She suggested that it could be the central office downtown that is doing the investigating.

Even if that's true they still have some mail of mine and they should give it to me. I would like to have the letter you sent. I hope you were able to find something out.

I think this "investigation" is over because I am starting to receive mail in a timely manner and it's being opened by the mailroom officers like it's supposed to be.

I enclosed a small article I read in the paper the other day. Maybe you will find it interesting. I would love to go after Saldate in a civil action and have him exposed.

The memories of that night, Dec. 3, in that small room are so vivid and I will never forget how I asked

L&L00690

over and over to be allowed to use the phone on the wall in the supply closet so I could call my dad about a lawyer. Saldate sat so close to me and told me it was too late at night to call about a lawyer but that I could tell him anything because he was a friend and there to get the truth. Anything I tell a lawyer I could tell him, he said.

He would not let me use that phone and he would not let me use the phone at the main police station in Phx when I asked to use that one also to call my dad about a lawyer.

Saldate was so slick. He wanted me secured in jail first before making contact with anyone. He probably didn't want his conduct questioned.

That woman who escaped and got caught is now my neighbor. She has been in isolation for a week and is expected to come to lockdown tomorrow. My room was searched the other night and I knew it was in connection with my impending neighbor. I wouldn't give her anything even if I could.

She is now so, so high profile and it sucks that she has to live next to me. At least I'll be able to tell her what an idiot she was.

L&L00691

If I don't receive that letter from you I never got, I'll let you know. If it doesn't arrive this week, can you remail it if you have a copy stored in your computer? I'm anxious to know the answers to my questions.

I'll write again.

Debbie

L&L00692

# Exhibit 5

to Mark, even though he didn't deserve it at times. But my son was important to me and a relationship with his father is what I tried to encourage.

The reason why I said in court that Christopher was an accidental pregnancy is because I was too ashamed to reveal the real reason why I wanted him. Number 1, it sounds incredibly selfish and, Number 2, I knew that if I revealed the real reason, Charles' name would come up and I didn't want him or his family to be a part of this whole tragedy. The subject of Charles was painful enough as it was and I didn't want to go there, and I didn't want to impose on his life by having him dragged into my case. This is why I never mentioned Charles or his parents to Ken Ray. I didn't want that door to be opened. I still wouldn't have mentioned anything about him or his parents but Holly pried it out of me when she came here and asked me all of those questions about my past. That was a very difficult meeting with her because what I had buried came back to life. This is when you found out about Charles and his parents and got those affidavits.

So, in my testimony, the only thing I "lied" about in court was when I said Christopher was an accidental pregnancy. He was not an accident at all. He was very much wanted by me. I loved my son more than anything.

It is true that my parents scared me with their comments about getting some tests done while I was pregnant. I had never been pregnant before and they were telling me that my baby could be deformed because Mark was a drug abuser and alcoholic. I was scared at that thought and did consider termination for a second until I confirmed things with my doctor.

It is true that I had problems with birth control but that wasn't until later on when Chris was about 2 or 3. At one time I did inquire about getting my tubes tied because of the problems I was having but I was told I was too young. I knew that Chris was all I wanted. Like I had said, he was the center of my life. These particular comments that were made when I was in that room with Saldate were made because I was

# Exhibit 6

2

③

in my heart. I could never hurt anyone with that kind of ignorance. I have a lot of compassion for people. By the way, I got a letter from my atty and a new trial is very possible. I can tell you this because I trust you. Our biggest ammunition is what we have against the cop who arrested me. In fact, we had the evidence for my trial but the judge wouldn't allow it in.

When I went to Florence, it was to be with my family because the Phx police told me I needed to go. I left them with my dad's phone # and address in case they needed me. I hadn't slept in 2 days plus I didn't eat for 2 days. Once I got to my dad's house, my grandmother forced me to eat a sandwich and my dad made me take a nap. I fell into such a deep sleep and when I woke up (after 2 hours of sleep) I didn't know where I was and what was going on. My step sister woke me up abruptly telling me the sheriff wanted me. I couldn't understand why the sheriff wanted me because I was dealing with Phx police officers. Then the sheriff said "some" Phx police officers were at the town jail and wanted to see me. OK - no problem. A family friend and me drive to town to the jail where we waited for almost 2 hours. I was confused because the sheriff told me they were already there. Now remember - we are at a jail where there are lots of police and sheriffs. Jan and I wait in this medical room - I'll draw it so you can visualize this. It's important.

He claims I shed no tears but he gets me paper towels to wipe my face and blow my nose. Then he says in court "I know nothing about a storage room." The storage room had the paper towels.

[diagram: MEDICAL SUPPLIES / STORAGE ROOM / DESK / COP / me / BED / door — "cop moves his chair to me" "oh I'm your friend" "NO DOOR BUT OPEN"]

Saldate didn't even get a witness in the room. With all of those cops around! We were in a jail for crying out loud! This 80 yr. veteran did not do his job right at all! He is a sneaky, unscrupulous character if you ask me.