Lori V. Berke (#015628)
Jody C. Corbett (#019718)
Whitney M. Harvey (#027974)
**BERKE LAW FIRM, PLLC**
1601 N. 7th Street, Suite 360
Phoenix, AZ 85006
Phone: (602) 254-8800
Fax: (602) 254-8808
lori@berkelawfirm.com
jody@berkelawfirm.com
whitney@berkelawfirm.com

Attorneys for Defendant Armando Saldate, Jr.

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Debra Jean Milke<br><br>                    Plaintiff,<br><br>    vs.<br><br>City of Phoenix; Maricopa County; and Detective Armando Saldate, Jr. and Silverio Ontiveros, in their individual capacities,<br>                    Defendants. | Case No. 2:15-cv-00462-ROS<br><br>**CITY OF PHOENIX, ARMANDO SALDATE AND SILVERIO ONTIVEROS' MOTION FOR SANCTIONS** |

Defendants City of Phoenix, Armando Saldate and Silverio Ontiveros (collectively "Defendants"), pursuant to Fed. R. Civ. P. 37(b)(2), move this Court to impose sanctions against Plaintiff Debra Milke ("Milke") for discovery violations she has committed throughout this litigation. The violations are so egregious and so prejudicial to Defendants that the stiffest sanction available under the Federal Rules of Civil Procedure is warranted here – dismissal of Milke's lawsuit in its entirety. Milke's discovery violations consist of intentional destruction and concealment of evidence, improper assertion of the attorney-client and work product privileges, and untimely and disorganized production of documents

1

and disclosures, including "document dumping" aimed at preventing Defendants from easily identifying key documents in the case that prove Milke's claims are meritless. Indeed, through this misconduct, Milke has successfully prevented Defendants from being able to properly and adequately defend themselves against Milke's claims and have caused Defendants to incur tens of thousands of dollars in costs and attorneys' fees that they should not have had to incur.  This Motion is supported by the following Memorandum of Points and Authorities, the attached exhibits and the Court's entire record of the case, which is incorporated herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   Legal Standard

Pursuant to Fed. R. Civ. P. 37(b)(2)(A), where a party "fails to obey an order to provide or permit discovery," the court may sanction the party through any one of the following means:

i.   Directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

ii.   Prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

iii.   Striking pleadings in whole or in part;

iv.   Staying further proceedings until the order is obeyed;

v.   Dismissing the action or proceeding in whole or in part;

vi.   Rendering a default judgment against the disobedient party; or

vii.   Treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

"Instead of or in addition to" these sanctions, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).  Federal

judges have inherent power to sanction parties and attorneys appearing before them for actions taken "in bad faith, vexatiously, wantonly, or for oppressive reasons."  *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1183–84 (2017); *Chambers v. NASCO Inc.*, 501 U.S. 32, 45–46 (1991).  Pursuant to 28 U.S.C. § 1927, "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  Failure to produce documents responsive to discovery requests by claiming they did not exist or by improperly asserting that the documents were privileged is grounds for a district court to sanction a party's attorneys pursuant to 28 U.S.C. § 1927.  *See Martinez v. City of Chicago*, 823 F.3d 1050, 1052 (7th Cir. 2016).

## II.   Milke has Repeatedly Failed to Produce and/or Failed to Timely Produce Documents Responsive to Discovery Requests.

The multitude of abuses of the judicial system engaged in by Milke has been ongoing since the inception of this lawsuit, as detailed in Defendants' briefing regarding privilege issues in dispute.  First, Milke frequently produced documents on the eve of depositions, even though those documents were directly responsive to earlier Requests for Production ("RFP").  Moreover, these poorly organized documents were produced referring to massive bates ranges of documents that were not itemized, contained misleading descriptions of witnesses, and failed to indicate what was being withheld, if anything.  An overview of Milke's untimely productions is discussed below.  Further details regarding these productions are attached as Exhibit 1 (table showing dates of documents produced by Milke in this case).

Milke initiated this lawsuit in 2015 and the parties exchanged their initial disclosures on September 14, 2016.  On November 23, 2016, Defendant City of Phoenix ("COP")

propounded its First RFP to Milke.  Defendant Saldate propounded his First RFP to Milke on June 20, 2017.

COP's RFP Nos. 4 and 5 stated as follows:

RFP No. 4: Produce all <u>letters, emails, correspondence</u>, cards, memos <u>or any other form of written communication</u>—regarding the death of C.M., Detective Saldate, your criminal charges, your civil lawsuit—and/or any other communication with Jim Styers, Roger Scott, <u>friends, witnesses, investigators, journalists</u>, media outlets and/or family members during your incarceration at Maricopa County Jail and Arizona Department of Corrections up to your response date. This request is intended to exclude all attorney-client communications, <u>provided that they were not shared with a third-party who was not acting as a legal representative for the Plaintiff</u>.

RFP No. 5: Produce any and all news articles, <u>interviews, interview transcripts</u>, <u>audio files</u>, movie files, broadcasts and/or any other form of media documenting your conversations with and/or your criminal prosecution and civil lawsuit with <u>journalists</u>, press, news media, press corps, reporters, investigators, commentators and/or any other news medium in your possession or your representative's possession.

(Emphasis added).  (See <u>Exhibit 2</u>, Defendant COP's Request For Production to Plaintiff).

Milke responded to the COP's RFP on January 20, 2017, without producing any privilege log.  Milke's response primarily included criminal case records such as police reports, and court documents and news articles.  It did <u>not</u> include the extensive correspondence Defendants have uncovered that Milke exchanged with third parties regarding her criminal case which is instrumental in demonstrating her involvement in the murder of her four-year-old son and defeating her claim that she was subjected to <u>Miranda</u> violations at the hands of Defendant Armando Saldate.  Furthermore, Milke's RFP responses were silent as to her communications with journalist Jana Bommersbach, the thousands of documents Milke gave to her, and the fact that Bommersbach wrote a book on Milke's behalf (the information of which was all known to Milke years prior to the filing of suit).  (See <u>Exhibit 1</u>).

On April 7, 2017, four months after the COP's RFP and <u>seven</u> months after the parties' initial disclosures, Milke provided her Supplemental Disclosure and First

4

Supplemental Response to the COP's First RFP, which consisted of 11,629 pages of documents. (See Exhibit 1). She included no privilege log. These documents included various police and criminal records, briefing in Milke's criminal case, Milke's records from the Arizona Department of Corrections, correspondence exchanged between Milke and her co-conspirator James Styers, between Milke and Vince Felix, as well as audio and video recordings of police and attorney interviews case. All of these documents are believed to have been in Milke's and/or her attorneys' possession at the time the lawsuit was commenced. Thus, they should have been produced with Milke's original Response to RFP. Not coincidentally, Milke noticed the depositions of Armando Saldate, Maureen Sadeik (Milke's stepmother) and Susan Stinson (Milke's former friend and landlord) to take place very shortly after this voluminous production of documents. (Id.).

On July 11, 2017, Milke noticed the depositions of Dorothy Markwell (who Milke resided with on two occasions), Karen Smith (Milke's step-sister) and Antonio Morales (retired Phoenix police detective). (See Exhibit 1). The depositions were scheduled for July 17, 2017, July 19, 2017 and July 20, 2017 respectively. (Id.). On July 13, 2017, just four days prior to Markwell's deposition, Milke produced her Second Supplemental Response to the COP's RFP, which contained 1,148 pages of documents and included a lengthy audio recording of Anders Rosenquist's (Milke's appellate attorney) interview of Markwell.[1] (Id.). Milke provided no explanation as to why these items were not produced with her original Response to RFP. All of these items are believed to have been in Milke's and/or her attorneys' possession at the time the lawsuit was commenced. Thus, they should have been produced with Milke's original Response to RFP.

On October 26, 2017, Milke noticed Day 3 of the deposition of Saldate, which was to take place on November 15, 2017. (See Exhibit 1). A mere week prior to Saldate's

---

[1] Milke selectively produced work-product during discovery when it suited her, using the privilege as a sword and shield. This also included producing, during Stinson's deposition, emails exchanged between habeas counsel and Stinson. A privilege log still was not produced.

deposition, Milke produced her Supplemental Response to Saldate's 1st RFP and Third Supplemental Response to the COP's 1st RFP.  (Id.).  The production contained 1,329 pages of documents, which included transcripts from various criminal trials, interviews and recordings by Rosenquist and others, such as Renata Janka (Milke's mother), as well as the subpoena response regarding Belinda Reynolds which had been received more than a month earlier on September 22, 2017.  (Id.; see also Exhibit 3, correspondence from SRP regarding Belinda Reynolds Subpoena Duces Tecum).  These documents were highly relevant to Saldate's deposition.  These items, except for the Belinda Reynolds documents, are believed to have been in Milke's and/or her attorneys' possession at the time the lawsuit was commenced.  Thus, they should have been produced with Milke's original Response to RFP. Milke provided no explanation as to why these items were not produced with her original Response, nine months earlier.

In June of 2018, Defendant Saldate noticed a series of depositions including the depositions of Anders Rosenquist, Jr., Kenneth Ray (Milke's attorney in her criminal trial), Kirk Fowler (Kenneth Ray's and later Anders Rosenquist's private investigator) and Chris Erhart (a fellow inmate at jail while Milke was awaiting trial), to take place in July and August of 2018. (See Exhibit 1).  On July 12, 2018, Milke produced her Third Supplemental Disclosure Statement, which contained *some* records pertaining to Ms. Erhart which Milke disclosed she intends to use at trial in this case.  (Id.).  On August 3, 2018, just four days prior to Ms. Erhart's deposition, Milke produced her Fourth Supplemental Disclosure Statement, which contained additional records regarding Ms. Erhart. (Id.).  It is unknown whether Milke had these documents earlier than August 3, 2018; however, the timing of Milke's production does not seem coincidental especially because—on the privilege log that was ultimately produced on October 31, 2018—there are witness binders for Ms. Erhart listed.

At a hearing that took place in this case on October 19, 2018 over a discovery dispute concerning the issue of whether Milke had waived her attorney-client privilege with

Kenneth Ray, the Court ordered Milke and her counsel in this case to review the entirety of her file and produce all documents responsive to Defendants' outstanding RFP.  The Court's directive was not limited to documents related to Kenneth Ray.  The Court directed Milke to organize her file and ensure complete responses to Defendants' outstanding discovery by October 31, 2018, which she and her attorneys did not do:

> Court: And Miss McCarthy, you know, you are—you may or may not be in hot water here and your other lawyers.  But if there have been outstanding requests for production of documents, you need to get on it now and respond to those requests for production of documents.  There is no excuse, since this case has been around since 2015, no excuse that we can't produce these documents.  If it's a privileged issue, that's different.  But you've got to get them organized, you have to respond by, again, the witching day, the 31st.

(See Exhibit 4, Transcript of October 19, 2018 Hearing, p. 26).

On October 31, 2018, Milke produced her Fifth Supplemental Response to the COP's RFP.  (See Exhibit 1).  This disclosure included Milke's original Maricopa County Jail medical file, Milke's employment records, as well as purported "non-privileged" communications between Milke and third-parties. (Id.). The jail documents contain information that belies Milke's claim that when she left her purse behind at her father's home when she went to the Pinal County jail to meet with detectives on the date of her arrest, she had "forgotten" she had bullets in her purse identical to those used to kill C.M.  Even the packaging was identical, down to the Kmart price tag.  Defendants did not have the benefit of the information contained in those documents when they took Milke's deposition on August 15, 2018 and August 16, 2018.  Had they had those documents, defense counsel would have framed a number of their questions differently.

Despite the Court's crystal-clear October 31, 2018 Order, Milke's rolling disclosures persisted.  Milke's continued deposition was noticed for November 14, 2018 and November 15, 2018 respectively. (See Exhibit 1).   On November 14, 2018, while Milke's deposition was underway, Milke's counsel produced her Sixth Supplemental Response to the City's RFP and her Seventh Supplemental Disclosure.  (Id.).   This production of 628 pages

included redacted letters from Milke to Kirk Fowler, articles enclosed in letters from Milke to Kenneth Ray, Milke's 1985 medical records, and photos of banker's boxes containing raw research on Detective Saldate's cases, all of which was pertinent to Milke's deposition. (Id.).  The next day, following the fourth day of Milke's deposition, Milke produced for the very first time, the English version of a book entitled "The Debra Jean Milke Story," written by Jana Bommersbach.[2]   (Id.).   The book was directly responsive to discovery requests and should have been produced with Milke's original Response to RFP back in January 2017.  According to an email between Bommersbach and Mike Kimmerer, one of Milke's attorneys in this case who also represented her in the criminal case and for the entirety of this lawsuit, this book was in Milke's and her lawyer's possession since February of 2016, just prior to publication.  Thus, this transcript was in existence and known to Milke and her counsel when Milke responded to Defendants' discovery requests. Indeed, Milke's counsel expressed that he read it and, as a result, was aware of the materials cited.  (See Exhibit 5, E-mail Exchange between Voepel/Kimmerer and Bommersbach).

The book is teeming with quotes from communications Milke had with her legal team in her criminal case that Milke had shared with Bommersbach thereby voluntarily waiving her attorney-client privilege as to all communications with Kenneth Ray and Kirk Fowler.  Thus, Milke never had a valid basis during this lawsuit for asserting the attorney-client privilege as to Kenneth Ray, Kirk Fowler and Anders Rosenquist.  Yet, Milke withheld from production thousands of documents based on her wrongful assertion of this privilege, and only recently produced those documents—after all but two depositions had

[2]Notably, Milke did not immediately produce this transcript when Defendants requested it. Instead, she argued with Defendants claiming that Bommersbach was not a journalist. Milke ultimately relented, but only after Defendants proved the same with Bommersbach's web-page identifying her as such. While New York counsel may not have known of Bommersbach and her occupation, Milke's local counsel certainly did. This Court may also recall the obstreperous conduct Defendants have endured throughout the course of the litigation related to deposition conduct, which resulted in the Court granting Defendants a Protective Order.

been completed.  There is information in those documents that is pertinent to nearly every deposition Defendants took in this case that is damaging to Milke and favorable to Defendants.  Even when the depositions are re-opened, the prejudice resulting from not having those documents when the witnesses were originally questioned cannot be cured.

On January 29, 2019, long after Milke's deposition had concluded, Milke produced her Eighth Supplemental Disclosure and Seventh Supplemental Response to the COP's First RFP.  (See Exhibit 1).  The production, which contained 1,087 pages of documents, included Renate Janka's book, letters exchanged between Milke and Kenneth Ray, letters exchanged between Milke and Kirk Fowler, and letters exchanged between Milke and Rosenquist.  (Id.).  On February 1, 2019, just two days after that disclosure, Milke produced yet another 1,787 pages of documents.  (Id.).  This production included multiple letters to/from Milke, to/from Renate Janka, Fowler and Rosenquist.  (Id.).  Again, these documents were pertinent to the previous depositions thereby resulting in prejudice to Defendants and were available to Milke and believed to have been in her and her attorneys' possession at this case's inception.

On February 28, 2019, Milke disclosed "Habeas Counsel Correspondence with Supplemental Privilege Log" (later received in Plaintiff's Tenth Supplemental Disclosure Statement on March 1, 2019). (See Exhibit 1).  One of the PDFs contained in this production was **7,317** pages!  (Id.).  The documents that are bates labeled 3115-10431 include hundreds of pages of emails, attachments to emails, faxes, letters, and other documents, none of which are individually identified.  The 7,317 pages comprising this "document dump" should have been produced at the outset of discovery and should have been produced in an organized and decipherable manner.

Even though discovery was set to close on March 1, 2019, on March 29, 2019, Milke served yet another disclosure statement – her Eleventh Supplemental Disclosure Statement. Milke's Eleventh Supplemental Disclosure Statement, which consisted of 514 pages, included another set of poorly identified and labeled documents that were improperly

withheld on the basis of privilege/work-product.   (See Exhibit 1).   These documents included a spreadsheet of all the media contacts during the criminal case, which was directly responsive to Defendants' RFP and relevant to the issues concerning waiver of privilege.   The documents also included witnesses for the criminal trial, who were not timely identified in response to discovery even though they are identified as persons with knowledge.[3]   Since then, Milke has produced over 1,000 additional pages of documents in supplemental disclosures produced on April 8, 12, and 17.   Defendants anticipate Milke has additional documents in her and/or her attorneys' possession that are required to be produced.

Since the Court's January 11, 2019 hearing and setting of trial, Milke has produced **12,960** pages of documents, all of which should have been produced at the very outset of discovery.   Throughout the duration of this litigation, Milke has cherry-picked the information to produce to Defendants; she has produced what she has wanted to produce when she has wanted to produce it, without any regard for her discovery obligations and the October 31, 2018 Order of this Court.   Moreover, she only produced these documents after defense counsel, through their tenacious diligence, uncovered that Milke had waived her attorney-client privilege long before this lawsuit was ever filed.   As alluded to above, the information, documents, and witnesses uncovered by Milke's untimely disclosures are directly relevant to many of the depositions which have already occurred, including Carmen Santana, Gail Lipshultz, Ken Ray, Kirk Fowler, Anders Rosenquist, Karen Smith, Sandra Pickenpaugh Debra Milke and Maureen Sadeik. These documents are also relevant to the parties' expert witnesses' opinions – experts who have also already been deposed.

Milke has been planning to file this lawsuit since shortly after her arrest.   Thus, her files should have been reviewed for content and for analysis of the privilege issue prior to

---

[3]The specific deficiencies regarding Milke's recent disclosures are discussed in greater detail in Defendants' Reply in Support of their Motion to Vacate Dispositive Motion Deadline and Trial (Doc. 452), the arguments of which are incorporated herein by reference.

the commencement of this lawsuit, at the latest, during the two years between Milke's release from prison and the filing of the Complaint. That it apparently was not is inexcusable. The fact that Milke served <u>seven</u> supplemental responses to the COP's First RFP when most, if not all, of the documents were in her or her attorney's possession all along, evidences a complete disregard for the discovery rules, is unconscionable and is deserving of the stiffest sanction of dismissal.

**III.** **Milke Has Intentionally Concealed/Destroyed Evidence Essential to the Defense.**

Even more unconscionable and egregious than her untimely production of documents and document dumps is Milke's intentional concealment and destruction of evidence. She claims that there was no evidence in her criminal case, other than Saldate's word, tying her to the murder of her son. First, that is not true. But even if it was, it was of her own design. Milke's untimely disclosures have revealed countless examples of the extent of her efforts to hide and destroy evidence that implicates her in C.M.'s murder.

**A.** **Admissions in Attorney Letters That Leave Milke with No Claims.**

As set forth in the Reply to the Motion to Vacate (Doc. 452), incorporated herein, and discussed further below in section related to public policy, Milke's new productions included admissions that are fatal and contrary to her claims in this litigation and establish that she never should have been released from prison. Milke's *habeas* relief and claims in this case center around whether she received her Miranda rights, she asked for a lawyer, and whether she told Detective Saldate that she had a prior conversation with Jim Styers where it was expressed that she wanted God to take care of Christopher. In newly produced letters, Milke admits, multiple times, that she was read her Miranda rights and stated that "yes," she understood them. (See <u>e.g.</u> <u>Exhibit 51</u>, Memo for retrial to Kimerer from Milke, L&L3102). She admits that she did not ask Detective Saldate for a lawyer, instead she asked if she could use the phone on the wall to call her dad about hiring a lawyer. (See <u>Exhibit 53</u>, Milke's letter to Anders Rosenquist, dated November 14 (unknown year), L&L002100).

This is not an invocation. Then, she admitted to having a conversation with Jim Styers, on October 11, 1989, where she told him she wanted God wave a wand and take it away. The content is the same as what Detective Saldate testified that she told him.  (See Exhibit 54, Detective Saldate's testimony at Milke's criminal trial, September 12, 1990, pp. 69-70). Defendants not only did not have the opportunity to question Milke and other witnesses about these admissions, but these admissions establish that her lawsuit is a sham.

### B. Bullets in Milke's Purse

Rather than going to Metrocenter Mall to search for her missing son, Milke fled to Florence with a box of bullets—of the same caliber used to kill her son—tucked away in her purse.  Milke unconvincingly claims she forgot about them; that she found them in Styers' jeans pocket while doing laundry in their shared apartment and placed them in her purse to keep them away from C.M.  However, jail records that Milke produced on October 31, 2018 (almost two years after a RFP was served seeking these very records), reveal that Milke's story about forgetting about the bullets is not accurate.  Indeed, those records reveal that Milke had taken her birth control pills, which were in her purse, the day before her arrest and the day of her arrest.   Thus, she had gone into her purse, where she was concealing the box of bullets, at least twice since putting them in her purse, most recently, on the day of her arrest.  Documents that were only very recently produced also reveal that while she was in jail, she was asking Kirk Fowler to find her purse.  (See Exhibit 6, Letter to Ken Ray from Milke, March 28, 1990). She obviously did not want anyone to discover that the bullets were in the purse.  The criminal jury did not get to hear about the bullets that were stashed in Milke's purse, which were identical to those found in her glove box and used to kill Christopher.  Instead, the jury got to hear Milke lie about never having seen them:

> Q: Look at the next photograph. Do you recognize any of those items?
>
> A: I recognize the box of Kleenex, but I don't recognize this box. It says "Stinger" on it.

Q: Do you know what that is?

A: Well, it says ".22 long rifle Stinger."

Q: Had you ever seen within the apartment any boxes of ammunition such as these?

A: No.

(See Exhibit 7, excerpt of Milke's trial testimony dated October 2, 1990; Exhibit 8, photographs of bullets from Milke's purse; Exhibit 9, photographs of bullets from glove box). Milke had, in fact, seen an identical box of ammunition in her apartment and zipped it into her purse—a purse she intentionally did not take with her to the Sheriff's Office when she was interviewed.

### C.     Marino Letters- Milke's Admissions and Call for Destruction of Evidence

Before her criminal trial, Milke repeatedly directed witnesses to lie about her and destroy evidence.[4]  Her efforts to keep vital evidence from the prosecution and the Ninth Circuit worked, until a woman holding onto that evidence came forward as part of the retrial process and handed over hundreds of letters Milke wrote to her jailhouse fiancé, Joe Marino.  (See Exhibit 10, Marino letters referenced in Milke's deposition).  Milke repeatedly instructed Marino to destroy the letters—to burn or bury them—and to lie about their plans for marriage and even knowing her.  Her letters to Marino, and her relationship with him, would look bad for her case; and winning was everything to her.  She was planning on getting out of jail before Christmas, marrying Marino, and spending the holidays in Boston.  Milke's call for destruction of the Marino letters is evident:  She did not just tell Marino to lie or destroy evidence once; she repeatedly instructed him to lie to help her cause.  (See Exhibit 11, Marino Letters referencing destroying letters).

Milke cannot claim ignorance of the importance of the Marino letters to her criminal case or, to this civil lawsuit either.  Indeed, one of the letters contains a clear admission by

---

[4]This history is directly relevant to Defendants' substantial need for information and inability to obtain it from other sources (implicit waiver).

her that what Detective Saldate contends Milke said during his interview (interrogation) of her is true.  In the letter, she expressed grave concern over the possibility that Detective Saldate's interrogation of her was recorded.  She stated:

> Also, my atty showed me a list of all the physical evidence and on that list it said audio tapes of Roger, Jim and Debra.  I freaked.  I asked my atty what audio tapes and he didn't know.  The only thing I can think of is if the cop recorded everything I said the night I was arrested.  But even if he did it can't be used because in his police report he stated I didn't want it recorded . . . But there was a time while I was in Madison [jail] a man came to me and said he was an investigator for Channel 10 news and he was asking me questions.  I was so out of it I don't know what I said.  Anyhow - I later found out he had a tape recorder and recorded what I had said without my knowing.  It was a trick.  **That must be the audio tape they are talking about.  I hope so.**"

(See Exhibit 12, July 28, 1990 letter from Milke to Marino).  The one and only plausible reason for Milke "hoping" her interrogation was not recorded is that she knew the recording would substantiate what Saldate wrote in his report.

Additionally, while sitting in jail awaiting her criminal trial, she wrote about the $150 million-dollar lawsuit she was planning to file and what she would buy: "When I win my lawsuit, I'm going to buy a White Corvette with T-tops and it's going to have a kick ass stereo in it;" "I want a 3 bedroom house with a 3 car garage.  Upstairs downstairs too…Pretty fancy huh? Shit! If I get a lot of money I might as well do something with it." (See Exhibit 13, excerpt of Milke's letters to Marino).

On June 29, 1990, Milke became even more calculating in her destruction efforts when she went to Court and heard Prosecutor Levy tell the Court that he was going to issue a subpoena for Milke's stashed letters, to use in her criminal trial.  Witness Chris Landry (a.k.a. Erhart) had just been interviewed by Detective Saldate and she knew about Marino and the letters that Milke had been writing to him.  Defendants know this only because Milke wrote to lawyer Kenneth Ray about it, and later attached that letter to her *habeas* petition. (See Exhibit 14, July 1, 1990 letter to Ken Ray)  After hearing this in court, Milke immediately returned to her jail cell and penned a letter to Marino:

14

. . . you need to get rid of all the letters and kites I wrote to you because I have this gut feeling that the state is going to find out you and I have been writing. If they do, they may do a search warrant and try to get all those letters I wrote you and try and use them against me in court. I can't afford to have our friendship used against me and especially because of your background. . . If anyone asks you about us—we met here and just became friends, that's all. . . Please just burn my letters or bury them somewhere so the state can't have access to them. They are looking for anything to bust me with. . . I don't need our relationship coming up in my trial because it won't look good at all for me. . . Don't say anything about love or marriage, etc. My trial is extremely important to me and I can't afford any fuck ups. . . I'm going to mail all of your letters you wrote to me to you so you can hide them. That way if the state comes here with a search warrant—I don't have anything. Ok? . . . From now on when I write to you and after you read my letters-do something with the letters. I'm just scared of the prosecutor sending out one of his goons with search warrant and trying to use my letters or our relationship against me.

(See Exhibit 15, June 30, 1990/July 1, 1990 letter from Milke to Marino).

Perhaps for good measure and to seal the deal, days later her next correspondence to Marino was a pair of her panties with lipstick kisses that read "Joe Marino loves Debra Marino." (See Exhibit 16). The next day, she wrote Marino telling him: "I packed up all your letters and gave them to my attorney to hold on to. Don't worry he won't read them. I just wanted him to hold them so no one can get to them." (See Exhibit 17, excerpt of July 5, 1990 letter from Milke to Marino). The letters Milke packed up for Kenneth Ray have never been produced in this litigation. If they do not exist, Defendants can only assume they have been destroyed.

It is ironic that Milke holds up the written word as the Gold Standard, claiming that Detective Saldate should have gotten her to sign her confession. Yet, she did not want the State to have the letters she wrote in her own hand, because they would hurt her case and would have rendered superfluous nearly all of Saldate's testimony. They would also have provided an avenue for Prosecutor Levy to request and obtain Milke's letters with attorney Kenneth Ray based upon explicit waiver—because Milke told Marino all about her conversations with Ray. Although Milke claims that Saldate fabricated statements she

made, her own admissions in the letters show otherwise.  They are powerful corroboration of Saldate's testimony and also impeach her criminal defense and claims in this lawsuit.[5]

A central theme of Milke's criminal defense, and lawsuit, is that she never would have made admissions to Saldate after knowing him for only thirty minutes. Yet, she did the same with Marino—a criminal and a drug addict, locked up with her in Durango Psych Ward, who would later die underneath a freeway overpass from a drug overdose.  She opened up and told Marino all sorts of details about her case, and critically, about conversations with her lawyer.

If Marino had not dutifully complied with Milke's instruction to hide the letters, they would have been critical and damning evidence used by the prosecution.  The course of Milke's trial and *habeas* proceedings would have been different (the outcome of the trial– guilty verdict– would have been the same). They would have been critical evidence of her knowledge of Saldate's interrogation practices when the Ninth Circuit was evaluating the case. Not only that, but they would have furnished her own admissions about critical facets of the case.

### D.    **Bommersbach Materials**

A clear example of Milke's concealment of evidence is demonstrated by her failure to disclose Bommersbach and the materials that she provided to Bommersbach while being interviewed for the book.  Pursuant to a subpoena, Defendants obtained **6,682** pages of documents from Bommersbach that were directly responsive to written discovery requests and which should have been produced by Milke in response to COP's RFP, in January of 2017.  The materials are critical because, as Bommersbach writes, Milke either gave away

---

[5]For example, Milke disputes the theory of the crime—that she was desperate for a relationship with boyfriend Ernie Sweat who did not want children—testifying that she and Ernie were never serious. She wrote to Marino that Ernie proposed marriage. She claims she was pregnant with his baby months before the murder but had an abortion. She didn't tell any of this to the criminal jury and Prosecutor Levy did not have Milke's letters to Marino to impeach her testimony.

documents related to her case or shredded them after her release from prison.  (See Exhibit 18, excerpts of Bommersbach book).

Milke blames Defendants for failing to bring to her attention the fact that she did not produce the Bommersbach book.  However, it is Milke's responsibility to ensure full and complete disclosure and production, particularly after the Court's October 31, 2018 Order.  As a result of the Bommersbach production, Defendants have identified numerous individuals who were interviewed by Bommersbach, none of whom were disclosed by Milke in her discovery responses, even though the information was directly responsive.[6]  To date, Milke has not provided an explanation for her failure to disclose these individuals.

### E.    Frankie Aue – Shredding Party and Failure to Preserve Website

When Milke was released from prison, she and her boyfriend (German National Frank Aue)—who was also her website administrator, de facto investigator, and a man who "showed up at Mike's [Kimerer's] firm every morning and sorted through the seventeen boxes for weeks" cataloging and organizing them—had a shredding party to destroy documents related to her criminal case.  (See Exhibit 19, Excerpt from Bommersbach book).  Notably, Aue, who was privy to all information in the Milke Room, including work product and attorney-client materials, was never disclosed in Milke's discovery responses.  Because Aue is a foreign national, he is not subject to Defendants' subpoena powers.

Hundreds of pages of documents were uploaded to a website for Milke, which she contributed content to and controlled from prison.  She even penned a rebuttal to Saldate's report (with handwritten purple ink notes only recently disclosed to Defendants on March 29, 2019).  (See Exhibit 20).  This website was taken down sometime after her release from prison.  Milke has not produced it in its entirety and, in response to Defendants' Interrogatory No. 6, inaccurately claimed: "Plaintiff is aware of certain social

---

[6]Those individuals include Billy Gumm, Linda Thompson, Richard de Uriate, Susan Smith, Pete Aleshire, Dr. Leonardo Garcia-Bunuel, Paul Huebl, Gary Bowen, Frankie Aue, Katrina Bland, Michael Fox, Ariane Milke, Mike Kiefer, Michael Burke, Randy Sukor, Irmy Richardson, and Stephanie Thompson.

media accounts that were created in her name by other people, but she has never maintained them or had any involvement in them." (See Exhibit 21, Plaintiff's Answers to COP's Interrogatories).  In her own letters, however, Milke says it's "my website" and she directs others to control the content. (See Exhibit 22, excerpts of correspondence asking Aue to remove content from the website).  Milke's perfectionism and control of the website is also detailed in Bommersbach's book: "Do you remember telling me that my website is my business card? Well, my business card must not have any misspelled words at all.  If you are a detail freak, you must also be very conscientious of the correct spelling." (See Exhibit 19).

Defendants are left to speculate about what happened to the hundreds of pages of documents and other content that had been uploaded to the website.  Nevertheless, Milke has been planning lawsuit for thirty years; she has had ample time and opportunity to make sure the records related to the website were preserved and produced.   Her failure to do so is tantamount to intentional spoliation of evidence.

### F.   Shredding Party at Renate's Home

In December of 2017, in the midst of this litigation, Milke had another mass shredding party at her deceased mother's home in Germany where she shredded containers of documents related to her case that her mother had saved. Despite her discovery obligations, including the obligation to preserve evidence, Milke failed to index the documents, compare them to documents disclosed, take photographs, or otherwise ascertain if they had been produced to Defendants.  This spoliation of evidence is critical, as Milke's letters to her mother, Renata, reveal Renata's unfettered access to Milke's legal materials and communications with Milke's legal team.  (See Exhibit 23, June 11, 1998 letter from Milke to Renata Janka).

Even Milke knows how wrong her conduct was.   During her deposition, she admitted that destroying documents and evidence that are relevant to a legal case is not the right thing to do.  (See Exhibit 24, excerpt of Milke's deposition testimony, dated

November 14, 2018, 448:9 - 449:14).   This intentional destruction by Milke severely prejudices Defendants' ability to determine what was included in those materials.

### G.   Piggy Backing Letters and Violation of Prison Rules

While in jail and prison, Milke sent out numerous documents to third-parties for safe keeping, because in her words, she had limits on the property she could keep. (See Exhibit 25, excerpt of Milke's deposition testimony, dated November 14, 2018). She "piggy-backed" letters—a violation of jail and prison policies—a process whereby she would send letters enclosed with other letters to be sent out by third-parties (usually enclosed with letters to her attorneys) to other third-parties. She sent non-legal mail through her lawyer, Rosenquist, for him to forward to others because she knew that legal mail was off limits for searches.  (See Exhibit 26, December 12, 1999 letter to Rosenquist). She wrote to her boyfriend and journalist, Ingo Hasselback—who she believed prison officials did not want her writing to because of his own incarceration for involvement in a fire-bombing when he was a Neo-Nazi—through family friend Pat Gailbraith using a pre-planned code. (See Exhibit 27, February 24, 2000 letter to Gailbraith).  At one point, Milke planned to marry Hasselback, because she had been told that would enable her to become a German citizen and get extradited to avoid her criminal penalty.  Milke also sent letters through her lawyer asking for money to be put on other inmates' prison accounts.  (See Exhibit 28, September 14, 1998 letter to Rosenquist).  She continued this practice with Gailbraith, who was sending hundreds of dollars a month to Milke and her inmate friends, while at the same time Milke received financial support for her criminal case for indigency. (See Exhibit 29, Milke's letters to Gailbraith).  Milke failed to disclose these individuals in her discovery responses.  This information is directly relevant to Milke's damages; namely her claims that she was isolated in prison and that she could not maintain friendships; all of which was necessary to impeach Milke's damages experts' testimony during their previous depositions.

. . .

**H.**    <u>Other Evidence That Was Never Produced to Defendants</u>

Throughout discovery, Defendants have identified additional evidence that may have been concealed or destroyed by Milke.  For example, the Carolyn Imhoff letters Defendants subpoenaed indicate that Milke sent tapes to Imhoff; however, Defendants were never provided with these recordings: "Thanks for praying for Rosenquist. Once I get the recorder, I will tell you everything so you will have the scoop.  There are things I found out that I couldn't say in visitation & I won't dare write out in a letter." (<u>See</u> <u>Exhibit 30</u>, Letter from Milke to Imhoff, July 28, 1992, IMHOFF405).  Milke also told Imhoff that she was writing an autobiography and that she already had 300 pages written.  (<u>See</u> <u>Exhibit 31</u>, Letter from Milke to Imhoff, dated June 11, 1991, IMHOFF165).  Yet these pages were never produced.  Given Milke's history of obstructing and destroying evidence, Defendants can only surmise that the documents were destroyed or shredded.

**IV.**    <u>Milke Improperly Claimed Privilege Where Privilege Had Been Waived.</u>

Milke has been withholding documents from production based on assertion of attorney-client and work product privilege since the commencement of discovery.  Yet, the first time she ever provided a privilege log was on July 12, <u>2018</u>.  The privilege log was paltry at best.  (<u>See</u> <u>Exhibit 32</u>, Milke's Initial Privilege Log).  The log did not provide sufficient notice for Defendants to make challenges to, or to support, Milke's claim of privilege as to the listed documents.  Moreover, the privilege log <u>did not</u> provide any information regarding the volume of material deemed by Milke to be privileged and did not provide any estimate of time that it would take to review the documents to prepare a comprehensive privilege log.

Further, Milke's use and assertion of privilege was improper.  As the Court may recall, the privilege issues started with Milke's claim that the <u>only</u> waiver of privilege involved <u>two letters</u> from Milke to Kenneth Ray that were attached to her habeas filings.  Through Defendants' painstaking efforts, no less, it was discovered that Milke's explicit waivers were wholly more voluminous and extensive than claimed.

Milke initially said her communications with Kenneth Ray were privileged and authorized Ray to answer questions at his deposition on limited issues.  Defendants took Ray's  deposition on August 13, 2018.  Prior to and at his deposition, citing Arizona ethical rules 1.6(A) and 1.9(C)(2), Ray refused to answer any questions regarding his communications with Milke, his interview of Detective Saldate in 1990, his knowledge of any *Brady* or *Giglio* material during  his representation of Milke, his strategic decisions made while representing Milke, and his withdrawal as Milke's attorney.  (See Exhibit 33, Ray letter; Exhibit 34, excerpts of Ray Deposition, pp. 64-66).  Ray has stated that he will not testify on these issues without a Court order.  (See Exhibit 34).

It was Defendants' position that Milke had waived her attorney-client privilege regarding her communications with Ray and his actions as her attorney because she had disclosed numerous documents that are communications between her and Ray and had also disclosed the contents of her communications with Ray to third parties.  Milke disagreed. However, what and when Milke knew about Detective Saldate's alleged unconstitutional interrogation techniques was critical to the case.  Because the knowledge of Ray, Anders Rosenquist, and Kirk Fowler, regarding Detective Saldate's other investigations was critical, the parties had to do a substantial amount of briefing regarding this issue.[7]

After the extensive briefing and Milke's firm stance on waiver wherein she fought tooth and nail to retain/resurrect her waived privilege, nearly six months after the privilege dispute arose, Milke finally conceded that there was waiver, and agreed to produce all attorney-client and work-product from Ray (as well as Fowler and Rosenquist).  Had Milke

---

[7]The initial privilege logs related to Ken Ray and Kirk Fowler contained scant detail, far less than what is included in the habeas privilege log.  (See Exhibit 35, Privilege Log - Ray & Fowler_110118).  Even though the Ray/Fowler information remains the most critical and Defendants agreed to a far less detailed privilege log for habeas counsel, Milke did exactly the opposite. Defense counsel wrote lengthy correspondence to Milke's counsel about these deficiencies, which were not cured.  (See, e.g., Exhibit 36, November 6, 2018 email to counsel).

made these concessions, months ago, the parties would not have had to expend a significant amount of time and resources briefing this issue.  The subsequent briefing was simply a waste of the time and resources of the Court and created considerable delay in the discovery process.  Additionally, these delays have prejudiced the Defendants, who face an impending summary judgment deadline even though additional, pertinent discovery remains.

Notably, Milke recently produced an email from Tracy Johnson (associated with a film company) to Kimerer, wherein Ms. Johnson documents the fact that she interviewed Mr. Kimerer for a documentary production about Milke's case.  Ms. Johnson further states: "Debbie's defense counsel from her 1990 trial, Ken Ray, has agreed to talk to us.  However, just as Mr. Rosenquist and Mr. Fowler requested, he'd like a notarized statement from you and from Debbie granting him permission to speak with us…Tracy in your office has volunteered to handle the approval documentation for us to expedite things." (See Exhibit 37, E-mail to Kimmerer from Tracey Johnson, L&L10958).  In conjunction with the privilege briefing that has occurred over the past several months, Milke has not produced to this Court these affidavits that permitted media contact, or even acknowledged the fact of this production company's work.  Defendants have not located these affidavits in the file either. The contact with this production company and associated notarized statements granting permission to speak with the media are directly relevant to waiver.  That Milke gave Ray access to the media was never mentioned during the Ray briefing, to either Defendants or the Court.

During months of briefing from September to December, Milke continued to claim that there had been no waiver at all related to Voepel/Kimerer.  However, Milke has conceded that there were several letters provided to Bommersbach that resulted in explicit waiver.  Had Milke acted in fairness to Defendants, the materials that she now agrees were explicitly waived for Voepel/Kimerer would have been produced years ago and would have afforded Defendants the opportunity to use them in depositions that have already occurred, and would have resulted in Defendants' decision to depose Voepel/Kimerer.

Another obvious failure of the privilege log is that it failed to identify whether information claimed on the logs was disclosed to third parties.  Throughout the litigation, Defendants learned that Milke shared confidential information about her case with Marino, Felix, Gailbraith, Aue, Imhoff, Bommersbach and likely many others.  The privilege issues associated with such disclosures have been addressed extensively in prior briefing, (Docs. 368, 369, 395, 427, 430) which are incorporated by reference.

Milke cannot avoid discovery by stating that documents she sent to third-parties for storage are not within her "custody and control," given that she had a legal right to obtain these documents upon demand.  *See A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186 (C.D. Cal. 2006) ("[A] party has an obligation to conduct a reasonably inquiry into the factual basis of his responses to discovery, and, based on that inquiry, a party responding to a Rule 34 production request is under an affirmative duty to seek that information reasonably available to it from its employees, agents, or others subject to its control."); *see also  United States v. Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("Control is defined as the legal right to obtain documents upon demand.")

From the time she reasonably anticipated this litigation, which was shortly after her arrest in 1990, Milke had an obligation to preserve potentially relevant documents, and once served with Defendants' discovery, she had an obligation to contact every third party she sent material to in order to inquire whether they had responsive information and if so, produce the information—especially since she specifically sent out documents for the purpose of storing them.  As a result of Milke's failure to timely produce such information, Defendants have been deprived of the opportunity to conduct discovery specifically directed towards those third parties that have knowledge of Milke's admissions and information known by her and her attorneys during her criminal proceedings.

In that same vein, Milke improperly asserted privilege over her correspondence with Aue regarding the website.  Emails with a webmaster of Milke's website are not privileged.

23

The fact that Milke's lawyers regularly communicated with Aue, knowing that he operated a website for Milke, undoubtedly increased the risk that such communications would be used and disclosed on the website.  Nevertheless, Milke has not produced all letters to/from Aue, some of which likely were shredded by her at Aue's residence, and/or at her mother's residence in Germany.  Given the wide scope of disclosures of confidential attorney-client information and documents accessible to Aue to publish on the website, the website and any behind the scenes messaging and emails relating to it are directly relevant to waiver. Defendants do not have access to the entirety of Aue's communications with Kimmerer, Voepel, and Milke—although some were located within the Bommersbach file materials. This material evidences a widespread sharing of attorney-client/work product information/documents with third-parties.  (See Exhibit 38, excerpt of March 10, 2009 letter to Gailbraith).

Milke's attorneys have selectively chosen to waive work product throughout this case to Milke's benefit.  In Ms. Stinson's deposition, Milke's counsel used email correspondence between Ms. Voepel and Ms. Stinson that had not previously been disclosed to substantively question Ms. Stinson.  (See Exhibit 39, emails produced in Stinson deposition; Exhibit 40, excerpt of Stinson Deposition).  This is evidence of Milke using work product privilege as a sword and a shield by selectively using that which benefits her and waiving the privilege but withholding what does not and preventing Defendants' access to the same.

Even more troubling is Milke's inclusion of documents, on her privilege log that were clearly not privileged.  One blatant example of such conduct is evidenced by Milke's erroneous inclusion of Gary Stuart's file on her privilege log.  Milke's counsel avowed to the Court at the hearing on October 19, 2018 that Mr. Stuart did not possess any privileged information, but according to Milke's privilege log that was subsequently produced, he did. When Mr. Stuart responded to Defendants' subpoena, eight binders were produced that included: transcripts with handwritten notes, witness binders for Milke including new jail

records responsive to prior RFPs; internal work product communications from Milke's *habeas* counsel containing mental impressions relating to the admissibility of evidence in a retrial pertaining to Saldate.  (See Exhibit 41, photographs of Gary Stuart Binders; Exhibit 42, index of Milke witness binder; Exhibit 43, November 12, 2009 email from Voepel to Gerber; Exhibit 44, excerpt of trial transcript referencing Running Eagle, with handwritten notes).[8]  Then, on April 17, 2019, Milke produced another 95 emails exchanged between Stuart and Voepel/Kimmerer, which include *habeas* counsel's mental impressions about the case.

Milke's counsel at the time understood from Defendants' filings that Mr. Stuart's materials were of critical importance to the resolution of this issue, yet they did not take the appropriate steps to ensure that the avowal to the Court was accurate.  Whether by mistake, because of a witness's poor memory, failure to adequately investigate the contents of their own files, negligence or otherwise, the reason behind the failure is irrelevant.  What is demonstrated is that proper care was not taken to investigate the scope of the third-party disclosure to Mr. Stuart, making suspect Milke's entire privilege log.  Defendants did not force Milke's counsel into making any avowal to the Court and instead pursued an entirely different course of requesting that Milke undertake more diligence to search for materials.  Milke refused and required Defendants to subpoena Mr. Stuart.  But for the subpoena, eight binders on the initial privilege log would still be listed.  And, but for Defendants' dogged persistence, Milke would not have produced the new 95 pages of emails that should have been produced, at the latest, by this Court's October 31, 2018 deadline.

Minimal efforts would have uncovered these materials that are Milke's own file materials.  These are critical records relating to key issues in the case—such as the existence of bullets in Milke's purse, which at her deposition she originally denied going

---

[8]The notes relate to the RunningEagle case.  All of Milke's claims fail because of this notice. *See* Section V(B), *supra*.

into her purse, then equivocated about whether she took her birth control that was in her purse.  The jail records clearly establish that she did take her birth control on Sunday and thus, went into her purse where the bullets were.  The employment records impeach other areas of her testimony.  It is only because the Court ordered Milke to go back and review the file that Milke "found" these materials.

It is also worth noting that the privilege log was the first time Defendants learned of the Milke Room.  On November 26, 2018, after conducting a meet and confer with Milke's counsel, Defendants were finally given access to copy (at their expense) the Milke Room boxes, which to date total 21,879 pages.  These documents should have been available to Defendants at the outset of the case.  It should not have taken the November 2018 meet and confer to gain access to the Milke Room.  Of note, Milke agreed to allow Defendants access to the 31 boxes that remain in the Milke Room once the work product documentation had been removed.  Milke nevertheless represented to Defendants, that the correspondence would be easy to identify and produce within a week.  And it was Defendants' understanding that the Milke boxes could be made available shortly thereafter.  Yet it took several weeks to produce these materials, which are still being reviewed by Defendants.

Unbelievably, Milke is unwilling to take steps to mitigate the prejudice Defendants have encountered as a result of her improper use of privilege and failure to admit waiver.  Defendants are too far down the road to cure everything caused by Milke's obstructionist behaviors; they cannot simply go back and depose everyone that that was untimely disclosed by Milke, regarding all undisclosed material that was subsequently produced to Defendants.  Furthermore, Defendants should not be forced to test the evidence, for the very first time, during trial.   Milke's persistent efforts to eliminate and hide evidence demonstrate that she acted in "bad faith, vexatiously, wantonly, or for oppressive reasons," subjecting her case to dismissal.

. . .

26

**V.      Milke's Untimely Disclosures Have Prejudiced Defendants' Ability to Conduct Expert Discovery.**

**A.      Dr. Agharkar**

Milke's psychiatric expert, Dr. Agharkar, has offered the following opinions:

- Milke had not experienced psychiatric symptoms prior to her incarceration but has developed them since that time.

- Milke was kept in isolation through the majority of her prison term, with 23 hours in the cell and 1 hour out. Most days she would refuse recreation time because she did not like "being put in a cage" outside.

- Milke described being sexually harassed on two occasions by male guards. These experiences only served to isolate her further in prison.

- Milke recalls feeling ongoing desperation and anxiety while in prison.

- Milke remains depressed and anxious to this day.  She constantly feels "on edge" and startles very easily.

- Milke remains hypervigilant and has an extremely difficult time developing intimacy and trust with others in her life.

- To a reasonable degree of medical certainty, Milke suffers from complex Post-Traumatic Stress Disorder (PTSD), Panic Disorder, and Major Depressive Disorder.

-  Milke's trauma resulted from her alleged wrongful incarceration; this trauma was heightened because Milke was isolated for the majority of her confinement.

(See Exhibit 45, Report of Dr. Agharkar, pp. 3-4, 6).

Contrary to Dr. Agharkar's opinions, the evidence recently uncovered by Defendants indicates that Milke had extensive social interaction while in prison.  Specifically, it was revealed that Milke sent several notes to inmates and had regular frequent contact with the outside world while incarcerated.  Pursuant to subpoena, Defendants obtained 1,220 pages of letters from Carolyn Imhoff, who Milke was writing to for years while in prison.  (Of

27

note, Milke's discovery responses failed to identify Imhoff as someone Milke wrote to regularly, while in prison, and Milke concealed the very same information during her deposition).  This information is directly relevant to Dr. Agharkar's opinions regarding Milke's isolation and lack of human contact.  Yet Milke did not disclose to Dr. Agharkar that she had extensive contact with the outside world; nor did she provide these letters to Dr. Agharkar.

Additionally, Milke did not reveal to Dr. Agharkar that she had been sexually assaulted by her father.  During her deposition, Milke testified that she had <u>not</u> been sexually assaulted by her father and that she lied to Vince Felix about that.  (<u>See</u> <u>Exhibit 46</u>, excerpts of Milke's deposition testimony dated November 15, 2018, 696:12-698:19).  However, a recently produced letter from Milke to Kenneth Ray states: "Ken there is something I need to say that I have been keeping inside for years and years.  It should explain why I always kept my distance from my dad because he is so sick.  He sexually abused me when I was 11 almost 12.  I hate him for it and always despised him.  My whole teenager years—I rarely ever saw him.  After my mom left when I was 19—I was devastated because I really felt alone—even though my dad was 60 miles away. I hardly know my dad like children should know their parents.  My dad is an alcoholic and he's sick. He's a hypocrite and a wimp.  He could never look someone in the face and tell the truth." (<u>See</u> <u>Exhibit 47</u>, Letter from Milke to Ray, March 5, 1991, L&L00202).  This letter was <u>not</u> provided to Dr. Agharkar before he prepared his expert report and rebuttal.

This information was nevertheless critical to Dr. Agharkar's opinions, as evidenced by his August 16, 2018 rebuttal report.  In that report, Dr. Agharkar explicitly addressed the opinions of Defendants' psychiatric functioning expert, Dr. Mace Beckson, that Milke's alleged rape by a stranger, pre-dating prison, was the reason for any related PTSD symptoms.  Dr. Agharkar's rebuttal report indicates that he investigated these claims of the alleged rape through an interview with Ms. Milke, wherein she claimed that no such rape occurred, but was fabricated to get prison guards to stop manhandling her.  (<u>See</u> <u>Exhibit 48</u>,

rebuttal report of Dr. Agharkar.)  Dr. Agharkar also interviewed Milke regarding a sexual assault purportedly committed by her ex-husband in 1988.  However, he stated that she had "no sequelae from this incident" as she was 'used' to the conflicts in the relationship." (Id.) Had Dr. Agharkar been provided with evidence of Milke's father allegedly sexually assaulting her, he would have been obligated to address the same in his expert opinions.

Unfortunately, Defendants did not get the opportunity to impeach Milke with this information during her deposition.  Defendants would have certainly questioned Milke about these admissions and would have questioned Dr. Agharkar and Kenneth Ray about it, as it directly impacts Milke's claimed damages.

### B.   Richard Drooyan

Milke and her defense team also concealed material related to her *Brady/Giglio* claims. This directly impacts the opinions of Milke's expert, Richard Drooyan, who has offered opinions regarding the Maricopa County Attorney's Office's approach to documenting, tracking and disclosing exculpatory and impeachment material relating to law enforcement witnesses from 1982 to 1995.  Milke intends to rely upon the Ninth Circuit decision in the habeas case in order to bolster her *Brady/Giglio* claims.  While Defendants dispute that the Ninth Circuit's decision is binding in this case, the Ninth Circuit did not have the benefit of knowing that Milke had knowledge about Detective Saldate's actions in other investigations, namely the RunningEagle case.  At the Voluntariness Hearing in Milke's criminal case, Detective Saldate was questioned extensively about the RunningEagle case (with a claimed Miranda violation) and he provided specific information about his methods of interrogation and style.

Milke's very own expert, Richard Drooyan, has conceded that Saldate's testimony in the Voluntariness Hearing—in 1990—put Ray on notice of Saldate's interrogation practices.  (See Exhibit 49, Report of Drooyan, p. 23).  This includes both pre-conviction and post-conviction information as both are relevant to damages.  However, Milke failed to conduct any public records requests or research Saldate's cases.  She could have, at a

minimum, conducted a search comparable to the search conducted by Rosenquist, which consisted of pulling documents from the docket based upon what her former attorney Ken Ray started.  (See Exhibit 50, excerpts of deposition testimony of Rosenquist dated July 23, 2018, 121:4 – 123:25).  Milke failed to do so.  Because Milke had sufficient notice, her failure to investigate/present evidence at trial operates as an intervening superseding cause breaking causation as well.

Defendants were also prevented from questioning Drooyan about Milke's new admissions about *Miranda* and her confession. Indeed, the entire foundation for Drooyan's opinions are that Miranda was not given appropriately and Milke invoked her right to a lawyer. None of the "other" Detective Saldate cases are even relevant or admissible because there is no dispute about *Miranda* now. Similarly, Drooyan did not have the over 12,000 pages of materials that have now been disclosed—garbage in, garbage out.[9]

Had the Ninth Circuit known the full extent of Milke's knowledge/notice and been aware of her admissions that there was no *Miranda* violation—which is also documented in the Marino letters and other newly obtained documents—Milke's conviction would not have been vacated.  Milke has acted with unclean hands.  If the *Brady/Giglio* claim fails, all claims fail because of inability to prove causation and damages.  *See Tennison v. City & County of San Francisco*, 226 F.R.D. 615 (N.D.Cal. 2005) (plaintiff and his counsel's knowledge, in a lawsuit involving claims of fabrication and suppression of exculpatory evidence, was relevant to the substance of the claim as well as causation of damages in his civil action).

Furthermore, had Milke agreed to waive privilege regarding Ray, back in August of 2018, Defendants could have asked Ray about this very topic, during his deposition. Defendants were nevertheless foreclosed from conducting this additional discovery.

---

[9]Defendants did not depose Milke's police procedures expert, whose opinions are now also suspect.

Because of Milke's continuous failure to obey the Court's Order to comply with pending discovery requests, sanctions are warranted.

**VI.** **Request for Relief**

**A.** **The Sanction of Dismissal is Appropriate in This Case.**

The sanction of dismissal of the action in whole or in part under Fed. R. Civ. P. 37(b)(2)(A)(v) is warranted when a party's violations of the Court's order are due to "wilfulness [sic] or bad faith." *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 788 (9th Cir. 2011), *citing Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 589 (9th Cir. 1983). The Ninth Circuit also requires a district court to weigh the following factors when considering whether to award the sanction of dismissal:

(1) the public's interest in expeditious resolution of litigation;

(2) the court's need to manage its docket;

(3) the risk of prejudice to the other party;

(4) the public policy favoring the disposition of cases on their merits; and

(5) the availability of less drastic sanctions.

*Id.*, *quoting Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990) and *Malone v. United States Postal Service*, 833 F.2d 128, 130 (9th Cir. 1987). If "at least four factors support dismissal, or . . . at least three factors strongly support dismissal," then it is not an abuse of discretion for the district court to dismiss the case. *Id., quoting Yourish v. Cal. Amplifier*, 191 F.3d 983, 990 (9th Cir. 1999). In this case, Milke and her counsel acted willfully and in bad faith to hold back relevant documents from Defendants for the past two and a half years. Because at least four of the factors support dismissal, as set forth in detail below, the sanction of dismissal is appropriate in this case.

**B.** **Public's Interest in Expeditious Resolution of Litigation and the Court's Need to Manage Its Docket**

Considering the first two factors, Milke filed her lawsuit on March 13, 2015. She and her attorneys did not begin producing documents until over a year later on September

14, 2016, and even then, she did not produce even close to all of the responsive documents that were in her possession, but simply produced documents in batches over the course of the next two and a half years.  In fact, since the close of discovery on March 1, 2019, she has produced 2,588 pages of documents, producing 154 pages just two weeks ago on April 12, 2019.  Further, despite having produced thousands of pages of documents prior to July 12, 2018, Milke did not provide a proper privilege log to Defendants showing which documents had been withheld from production until that date.  This privilege log was woefully inadequate, and Defendants had to go to the Court to obtain an Order requiring Milke to provide more detailed privilege logs to Defendants.  The log contained only broad categories of documents without any dates and it failed to give the number of pages for each category of documents.  Defendants had no way of knowing whether they had a basis to challenge Milke's claim of privilege for any of the documents.  After bringing this issue to the Court and Milke being ordered to get her file in order and produce all relevant and responsive documents by October 31, 2018, Milke still wrongfully held documents back on the basis of privilege and then finally conceded that there was no basis to assert privilege. Now, nearly nine months later, Milke is still producing documents that should have been produced at the beginning of discovery two and a half years ago.  This delay by Milke goes against the public interest in the expeditious resolution of litigation and interferes with the Court's management of its docket.  Therefore, both factors weigh in favor of the sanction of dismissal.

**C.**     <u>**Risk of Prejudice to Defendants**</u>

In determining whether a defendant has been prejudiced, a district court must examine whether the plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case. *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 131 (9th Cir. 1987), *citing Rubin v. Belo Broadcasting Corp. (In re Rubin)*, 769 F.2d 611, 618 (9th Cir. 1985).  In this case the prejudice to Defendants is severe. Milke's letters to her counsel, in her own hand, establish that she has no case. Milke's and her

counsel's behavior have impaired Defendants' ability to defend against her claims and have interfered with the rightful decisions of this case. Given her admissions, Milke should not have filed this lawsuit. However, early production of the documents withheld would have given the Defendants the opportunity to bring these admissions to the Court's attention years ago, before undertaking any depositions. Defendants have gone through the entire discovery period, including taking every deposition, without all of the relevant documents in this case.[10] Now, with discovery closed and the dispositive motion deadline less than sixty days away, and the trial set to take place in four months, Milke has produced thousands of pages of new documents. Many of these documents were being withheld, but Defendants uncovered that they were never privileged to begin with and should have never been withheld, including handwritten letters to individuals other than her lawyers. Reopening discovery, allowing Defendants to re-depose witnesses, including Milke, her criminal lawyers and investigators and the experts disclosed in this civil case, and extending deadlines will not cure the prejudice. It is too systemic and permeates every part of this case. Milke's improper assertions of privilege have nothing to do with her false allegations of Defendants' diligence in discovery. She has placed Defendants at a distinct and wholly unfair disadvantage by withholding these documents.

In a similar case to this one, *Bortex Indus. Co. v. Fiber Optic Designs, Inc.*, 296 F.R.D. 373, 385–86 (E.D. Pa. 2013), another district court held that "while it is possible that additional discovery and further postponement could alleviate some of the prejudice to [the defendant]," the sanction of dismissal was still appropriate. In that case, the plaintiff had caused significant delays, requiring the Court to micromanage the discovery process, and

---

[10] The depositions of Armando Saldate and Noel Levy have not been completed. Defendants previously reserved the right to complete these depositions after the Court has ruled on the privilege issues and Defendants have received all information to which they are entitled as to what Milke has told various people with respect to statements she made during Detective Saldate's interview of her, and what information she was aware of during her criminal case regarding other investigations Detective Saldate was involved in.

ultimately resulting in a delay in completing discovery of more than six months.  *Id.* at 386. Like the documents withheld in this case, "much of the discovery wrongfully withheld by [the plaintiff] pertained to a critical issue in the resolution of this case, as opposed to secondary or general information."  *Id.*  Finally, the court held, "We cannot ignore the fact that counsel continually failed to work with his client to ensure that responsive documents had been searched for, located and produced."  *Id.* at 387.

Therefore, just as the court found in *Bortex*, Milke and her attorneys have failed, since the beginning of this case, to provide Defendants with all relevant evidence and not to wait until the eleventh hour to produce thousands of pages of documents.  If Defendants had possessed these documents at the start of discovery, they would have made different decisions about who to depose and when, what third parties to subpoena documents from, and would have significantly changed the strategy for defending this case.  Now, they are left playing catch up at a severe disadvantage.   Therefore, the factor of prejudice to Defendants weighs in favor of dismissal.

### D.   Public Policy of Disposition of Cases on the Merits

While the factor of disposition of this case on the merits normally weighs against dismissal of the case as a sanction, in this case, many of Milke's recently disclosed letters to her lawyers contain admissions that completely undermine the only issues that are really in dispute in this case—namely whether Detective Saldate violated Milke's Miranda rights and whether Detective Saldate fabricated Milke's confession.  For example, in these newly disclosed letters, Milke told her lawyer that Detective Saldate read her Miranda not once, but twice.  And the second time, she told him she understood her rights.  (See Exhibit 51, Memo for retrial to Kimerer from Milke, L&L3102; Milke's narrative from her website, L&L4570).  She claims in this lawsuit that he never read her rights twice and that she was in so much shock she did not ever understand.  She also told her lawyers—multiple times— that she asked Detective Saldate to "use the phone on the wall to call her dad about calling a lawyer."  Yet, in this lawsuit, she claims that she told Detective Saldate "No, I want a

lawyer."  Asking to use the phone on the wall is not an invocation of her right to a lawyer. *See Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (If an accused makes a statement during an interrogation concerning the right to counsel that is ambiguous or equivocal, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.)

Finally, most damaging, in handwritten notes that seem to be a factual chronology (which Defendants cannot understand how they would be privileged), Milke recounts a conversation with Jim Styers, before the murder, where she told him that she wished that God could wave a magic wand and take it all away because she was frustrated with her ex-husband and didn't want him to influence her son.  (See Exhibit 52, Milke's handwritten notes with dated October 11, 1989 written next to them, L&L005042). Based upon Milke's own words, this conversation happened, despite Milke's claim that Detective Saldate fabricated her making these same statements during her confession.[11]  If the evidence demonstrates that Detective Saldate did not fabricate Milke's confession, then all of the other criminal cases Milke brought to the Ninth Circuit and that she alleges in her Second Amended Complaint demonstrate a pattern of wrongful conduct by Detective Saldate are irrelevant.  There is now no way for this case to be decided on the merits because Milke has prevented that from happening.  She and her lawyers have willfully withheld relevant crucial evidence damaging to Milke's claim in order to protect her fragile claims from crumbling.  Defendants did not have the opportunity to conduct a proper defense of this case and cannot do so now.  Therefore, the factor of cases being decided on the merits should also weigh in favor of dismissal.

### E.    Availability of Less Drastic Sanctions

Finally, in the Ninth Circuit, a district court properly considers the adequacy of less drastic sanctions if it (1) considers and explicitly discusses the feasibility of less drastic

---

[11]Milke's testimony regarding these topics has varied greatly over the years.  A chart reflecting these inconsistencies is attached as Exhibit 55.

sanctions and explains why alternative sanctions would be inappropriate, (2) implements alternative sanctions before ordering dismissal, and (3) warns the party of the possibility of dismissal before actually ordering dismissal. *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412–13 (9th Cir. 1990). In this case, less drastic sanctions are not appropriate because, as set forth above, there is no way at this point to cure the prejudice that Milke and her attorneys have caused to Defendants by merely awarding them attorneys' fees and costs for re-reviewing duplicate documents and re-opening many of the depositions in the case, staying the case or extending the dispositive motion deadline and trial date until Milke has complied with all Court orders and defense counsel have completed their review of untimely disclosed documents and re-taken depositions. Indeed, Milke has admitted to shredding numerous documents related to her criminal case since she filed this lawsuit that Defendants will now never have the opportunity to obtain or use in their defense of this case. Further, as this Court has made clear, it was Milke's obligation to have her file in order before she filed this lawsuit, including determining what documents might potentially be privileged and if that privilege had been waived. This Court ordered Milke to produce all remaining relevant documents and twice gave her additional time to do so—first on October 19, 2018, and again on January 11, 2019. Yet she continues to produce huge batches of documents to Defendants and has still not produced all her correspondence with her habeas counsel. Her destruction and concealment of relevant, non-privileged documents has put Defendants at a great disadvantage in defending themselves in this case and that cannot be fixed. Milke is now requiring the Court to review her correspondence with her habeas counsel *in camera* to determine if she is still properly claiming privilege over them. The Court previously warned Milke and her counsel that if she did not get her file in order and produce all responsive and relevant documents to Defendants, she could be sanctioned. (See Exhibit 4). Therefore, the factor of availability of less drastic sanctions also weighs in favor of dismissal.

**F.** **An Award of Attorneys' Fees and Costs Incurred as a Result of Milke's and Her Counsel's Willful and Vexatious Conduct is Also Warranted.**

In addition to the sanction of dismissal, Defendants request that the Court award them the attorneys' fees and costs they incurred in this case from the date of Milke's response to Defendants' Request for Production in 2017 to the present, pursuant to both Fed. R. Civ. P. 37(b)(2)(C) and 28 U.S.C. § 1927. This is when the discovery violations began that set in motion the chain of events that led the case to where it is now. Defendants did not have the benefit of any of the thousands of pages of documents that have now been disclosed during any of the depositions they took. While many of the depositions that initially occurred were noticed by Milke, Defendants did not have the opportunity to rehabilitate or cross-examine the witnesses with the new information. Not one witness deposition is unaffected by the content of the new information.

It is Milke who also chose, when responding to discovery, to ignore the requirement for providing a privilege log. Milke also did not identify, when she responded to written discovery and supplemented her discovery responses, the volume of documents she was withholding because she had not spent the time to review them. Defendants proceeded with the case having no concept of the volume of material that Milke still possessed and was not timely producing. This was designed to keep Defendants from demanding documents and approaching this issue with the Court. This Court already recognized that the entire file should have been organized before Milke filed suit so that she could properly and timely respond to discovery when it was sent and provide a proper privilege log. Depositions have been conducted of witnesses and Milke's experts, Defendants retained and paid experts for opinions, and Defendants made discovery and strategy decisions all without the benefit of having reviewed numerous key documents that were only just produced by Milke in the past month.

It is clear from the record that Milke has been intimately involved in these discovery failures. She knew each and every person she sent documents to for safe keeping; with whom she voluntarily shared attorney-client and work-product information; that she gave

Bommersbach thousands of pages of documents; directed witnesses to hide evidence and lie about her existence; shredded documents knowing that she was going to file a lawsuit and also shredded documents while the lawsuit was pending; and that she made admissions undermining her case.

In the event that it is not clear to the Court that Milke is to blame for these failures, Defendants further request that the Court conduct a fact-finding or culprit hearing to determine whether and the extent to which it was Milke, her present counsel, and/or her former counsel who are responsible for the discovery violations. *See*, *e.g.*, *In re Tutu Wells Contamination Litig.*, 162 F.R.D. 46, 53 (D.V.I.), *opinion clarified*, 162 F.R.D. 81 (D.V.I. 1995) (the court conducted a four-day fact-finding hearing on one of the parties' motions for contempt and/or sanctions to determine the relative responsibility of the party or its attorneys for "the dilatory tactics calculated to burden and frustrate the opposition in this litigation"). Therefore, in addition to the sanction of dismissal, Defendants are entitled to reimbursement of their attorneys' fees and costs due to Milke's and her counsel's vexatious behavior and this Court should conduct a hearing to determine the relative fault of Milke and her attorneys for the discovery violations.

As set forth above, at least four, if not all, of the factors weigh in favor of the sanction of dismissal in this case. Therefore, Defendants request that the Court also dismiss Milke's Complaint against them with prejudice.

### G.    <u>Alternative Sanctions</u>

If the Court does not find that dismissal is an appropriate sanction in this case, Defendants request that the Court still award their attorneys' fees and costs incurred as a result of Milke's and her attorneys' failure to timely produce documents. Further, the Court should impose one of the less drastic sanctions from Fed. R. Civ. P. 37(b)(2)(A) on Milke, such as ordering that certain facts are established for purposes of this case. Rule 37(b)(2)(A)(i); *see*, *e.g.*, *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee (Compagnie des Bauxites)*, 456 U.S. 694, 695 (1982) (holding that a district court did

not abuse its discretion in finding personal jurisdiction as a sanction, where the plaintiff repeatedly attempted to use discovery to establish jurisdictional facts, only to be obstructed by defendant's refusal to produce the requested information). In this case, the Court should find that it is established that (1) Milke was properly read her Miranda rights by Detective Saldate and that she understood them; (2) Milke never invoked the right to counsel during her interview with Detective Saldate; (3) the statements attributed to Milke that are contained in Detective Saldate's report are in fact statements she made during Detective Saldate's interview of her; and (4) Milke had a conversation with Jim Styers before the murder during which she told him that she wished that God could wave a magic wand and take it all away because she was frustrated with her ex-husband and didn't want him to influence her son.

Another possible sanction is to hold Milke in civil contempt, imposing a monetary sanction (known as a coercive civil contempt sanction) that would accumulate daily until Milke fully complies with the Court's order to produce and disclose all relevant and responsive documents. *See*, *e.g.*, *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1481 (9th Cir. 1992) (upholding the district court's civil contempt sanction of $10,000 per day against a party until the party complied with the court's order to comply with discovery requests).[12] If the Court does not dismiss this case and allows the case to proceed, Milke must be given an incentive to produce the relevant and responsive documents as soon as possible, such as through daily monetary sanctions.

Finally, Defendants must be given sufficient time to review all newly produced responsive documents and to conduct additional discovery, complete the depositions of Armando Saldate and Noel Levy and re-open at Milke's expense the following depositions: Kenneth Ray, Anders Rosenquist, Kirk Fowler, Carmen Santana, Maureen Sadeik, Susan

---

[12]In the event the Court does not dismiss the case, Milke should also be required to post a cost bond to ensure that Defendants have an avenue to recover their costs at the conclusion of this litigation.

Stinson, Karen Smith, Sandra Pickenpaugh, Gail Lipshultz, Debra Milke, Richard Drooyan, Dr. Bhushan Agharkar, Stephanie Rizzardi (Milke's economic damages expert), Lou Reiter (Milke's police practices and law enforcement expert), and to supplement Defendants' experts' opinions before having to file dispositive motions and before participating in a trial. Milke should bear the burden of paying for the costs and fees associated with these depositions.  Likewise, the current trial date should be vacated.

## VII.   __Conclusion__

Based upon the foregoing, Defendants respectfully request that the Court dismiss Milke's Complaint with prejudice and award the attorneys' fees and costs incurred as a result of Milke's and her counsel's numerous discovery and disclosure violations.    A proposed form of Order is attached hereto.

DATED this 30th day of April, 2019.

BERKE LAW FIRM, PLLC


By___s/ Whitney M. Harvey_____
Lori V. Berke
Jody C. Corbett
Whitney M. Harvey
Attorneys for Defendant Armando Saldate, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of Electronic Filing to the following CM/ECF registrants:

Amy Beth Krauss          abkrauss@comcast.net
Christina Gail Retts       cretts@wienekelawgroup.com
                         kpenny@wienekelawgroup.com
                         lpiasecki@wienekelawgroup.com
Daniel J O'Connor        caseadmin@occlaw.com
Elizabeth Wang           elizabethw@loevy.com
                         brians@loevy.com
James A Eaves            artie.eaves@sandersparks.com
                         michele.logan@sandersparks.com

| | |
|---|---|
| James Edward Doman , Jr | caseadmin@occlaw.com |
| Jon Loevy | jon@loevy.com |
| | troyer@loevy.com |
| Joshua Dubin | jdubin@dubinconsulting.com |
| | dubin.joshua@gmail.com |
| Julie Singleton Hall | julieshall@hotmail.com |
| Kathleen L Wieneke | kwieneke@wienekelawgroup.com |
| | kpenny@wienekelawgroup.com |
| | lpiasecki@wienekelawgroup.com |
| Kelly Elaine Gillilan-Gibson | adminlaw@azag.gov |
| | Kelly.Gillilan-Gibson@azag.gov |
| Michael D Kimerer | MDK@kimerer.com |
| | jpak@kimerer.com |
| | mwallingsford@kimerer.com |
| Rachel Brady | brady@loevy.com |
| | abraham@loevy.com |
| | troyer@loevy.com |
| Rhonda Elaine Neff | rneff@kimerer.com |
| | mwallingsford@kimerer.com |
| Robin Elyce Burgess | robin.burgess@sandersparks.com |
| | michele.logan@sandersparks.com |
| Sally Ann Odegard | sodegard@hoklaw.com |
| | gzappia@hoklaw.com |
| Shane Paul Dyet | Shane.Dyet@occlaw.com |
| | erica.meany@occlaw.com |

 s/ Laine M. Roberts