# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Jean Milke, | No. CV-15-00462-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

The parties in this case should be preparing for trial. Instead, they remain mired in disputes involved past discovery behavior and the discoverability of allegedly privileged documents. This Order resolves the following:

1. Whether Defendants are entitled to sanctions and, if so, the form of those sanctions; and

2. Whether Milke has appropriately asserted privilege regarding documents in possession of her habeas counsel.

As explained in more detail below, Defendants are entitled to sanctions but this case will not be dismissed at this time. In addition, some of the documents in possession of Milke's habeas counsel must be produced.

## BACKGROUND

Debra Milke was convicted and sentenced to death in 1990. On March 14, 2013, the Ninth Circuit granted Milke "a conditional writ of habeas corpus setting aside her convictions and sentences." *Milke v. Ryan*, 711 F.3d 998, 1019 (9th Cir. 2013). The state

attempted to retry her but, on December 11, 2014, the Arizona Court of Appeals concluded "double jeopardy bars retrial of Milke under our Arizona Constitution and Arizona Supreme Court precedent." *Milke v. Mroz*, 339 P.3d 659, 668 (Ariz. Ct. App. 2014).  On March 13, 2015, Milke filed the present suit.

Milke's initial complaint alleged many claims against a wide variety of defendants. (Doc. 1).  Those defendants filed motions to dismiss which were granted, in large part, on January 8, 2016.  (Doc. 73).  Milke then filed an amended complaint, substantially narrowing the claims and defendants.  (Doc. 74).  Some of the defendants moved to dismiss the amended complaint but those motions were denied on July 6, 2016.  (Doc. 97).  For present purposes, it is important to highlight that, regardless of the time Milke should have had prior to filing this suit to prepare and organize her documents, she had sixteen months after filing her original complaint before the Court concluded she had stated valid claims such that discovery could commence.

As set forth in the amended complaint, Milke is currently pursuing five claims against Defendants Armando Saldate, Silverio Ontiveros, the City of Phoenix, and Maricopa County (collectively, "Defendants").  Simplified, those five claims are:

- Count 1: a claim that Saldate and Ontiveros "fabricated false evidence of Ms. Milke's guilt."   In particular, Saldate and Ontiveros fabricated a false confession that caused Milke "to be deprived of her liberty without due process of law."

- Count 2: a claim that Saldate and Ontiveros violated Milke's "right against self-incrimination in violation of the Fifth, Sixth, and Fourteenth Amendments" by engaging in "coercive interrogation techniques."

- Count 3: a claim that Ontiveros created "the conditions by which Saldate was able to fabricate Ms. Milke's confession."

- Count 4: a claim that the City of Phoenix had a policy or practice of allowing the presentation of fabricated evidence and the use of coercive interrogation techniques by its police officers.

- Count 5: a claim that Maricopa county had a policy or practice of not disclosing "exculpatory and impeachment information" such as evidence impacting Saldate's credibility.

(Doc. 74 at 70-74). Given these claims, there are two crucial factual disputes between the parties: What occurred during Saldate's interrogation of Milke and whether Milke or her counsel knew of Saldate's other alleged instances of misconduct at the time of her criminal trial.

After denying the second round of motions to dismiss, the Court set the Rule 16 Scheduling Conference for September 9, 2016. (Doc. 98). That conference was subsequently continued but the original date prompted the parties to exchange their initial disclosures on September 14, 2016. (Doc. 106-110). By the time she made her initial disclosures, over three years had passed since the Ninth Circuit set aside her convictions and approximately eighteen months had passed since she filed her complaint. Given those time periods, Milke had more than ample time to organize her files before any production was necessary.[1]

On November 23, 2016, Defendants propounded Requests for Production of Documents. Three of those requests are relevant now. Request No. 4 stated:

> Produce all letters, emails, correspondence, cards, memos or any other form of written communication—regarding the death of C.M., Detective Saldate, your criminal charges, your civil lawsuit—and/or any other communication with Jim Styers, Roger Scott, friends, witnesses, investigators, journalists, media outlets and/or family members during your incarceration at Maricopa County Jail and Arizona Department of Corrections up to your response date.

---

[1] Once a complaint is filed, a plaintiff should expect that initial disclosures will be due very soon thereafter. The initial disclosures must identify the documents the plaintiff will "use to support [her] claims" and must be "based on the information then reasonably available to [the plaintiff]." Fed. R. Civ. P. 26(a)(1)(A), (E). Thus, it should be obvious that a plaintiff should not file a complaint before conducting a meaningful review of her own documents and actions. At the very least, a plaintiff must conduct such a review shortly after filing her complaint. The failure to do so makes it likely the initial disclosures, as well as responses to early discovery requests, will be inadequate. In short, a plaintiff should not file a complaint if she is not, in fact, prepared to litigate her claims. *See WRB, Inc. v. Vision Mktg., LLC*, No. 2:16-CV-436-RMP, 2018 WL 3259754, at *4 (E.D. Wash. Feb. 23, 2018) ("As the party initiating this lawsuit, Plaintiff had ample opportunity and time to prepare documents for disclosure."). Here, Milke's failure to review her own documents and actions either before or immediately after filing her complaint is unacceptable.

This request is intended to exclude all attorney-client communications, provided that they were not shared with a third-party who was not acting as a legal representative for the Plaintiff.

Request No. 5 stated:

Produce any and all news articles, interview, interview transcripts, audio files, movie files, broadcasts and/or any other form of media documenting your conversations with and/or your criminal prosecution and civil lawsuit with journalists, press, news media, press corps, reporters, investigators, commentators and/or any other news medium in your possession or your representative's possession.

And Request No. 12 stated:

Produce any and all document, materials, files exhibits, transcripts, photographs, psychological reports and records, interviews, audio and/or any other materials that were provided to Attorney Gary L. Stuart, who wrote the book: Anatomy of a Confession.

(Doc. 466-2 at 30-34).

While those requests were pending, the Court held the Scheduling Conference and set January 31, 2018, as the deadline for completion of all discovery.  (Doc. 144).  On January 20, 2017, Milke responded to the Requests for Production by producing only some documents.  In doing so, Milke did not produce a privilege log.  According to Milke, a privilege log was not necessary because of the language in Request No. 4 indicating Defendants were not seeking "attorney-client communications."  That limitation, however, had an important caveat that Milke *was* required to produce "attorney-client communications" that had been shared with a third-party.  Thus, any attorney-client communications that had been provided to a third-party should have been produced on January 20, 2017.  It is now undisputed that, prior to January 20, 2017, Milke had indeed given numerous attorney-client communications to third parties.  Those communications should have been produced on time.  They were not.  It is also undisputed that Milke did not produce certain audio recordings in her possession that were responsive to Request No. 5.

As for Request No. 12 involving the documents provided to Gary Stuart, Milke

- 4 -

unacceptably responded by stating it would be "unduly burdensome" for her to "specifically identify all the documents and materials that Mr. Stuart reviewed." The information Stuart had been allowed to review had been "intermingled with thousands of other records over the years." Milke stated it would be better for Defendants to seek discovery straight from Stuart. (Doc. 169 at 3).

In a May 3, 2017, status report, the parties explained they had a number of discovery disputes. (Doc. 169). Of relevance now, the status report discussed their ongoing disagreement regarding the Stuart materials. Again, Milke believed the responsibility was on Defendants to subpoena Stuart to determine what documents he had been allowed to review. Defendants took the position that Milke should be required to identify what she had given Stuart. In addition to that dispute, the parties also had a dispute involving a statement Milke had made in a letter to Ken Ray, her criminal attorney.

As explained in their status report, Milke had disclosed a letter to Ray where she had written Saldate "should be reprimanded for what he did" and she did not "understand how [Saldate] got away with it before." The City of Phoenix had sought documents related to this statement. Milke had objected to providing such documents based on the attorney-client privilege but also represented no such documents existed. The City of Phoenix, however, believed Milke had waived any privilege on that subject matter and she should be required to produce responsive documents. Because neither party specifically sought Court assistance regarding their disputes, the Court took no action. (Doc. 172).

On July 27, 2017, the parties jointly moved for a four-month extension of the case management deadlines. (Doc. 200). Based on their joint motion, it appeared the parties were working together to complete discovery but were having difficulty scheduling depositions. The Court granted the requested extension as well as a few subsequent ones. Eventually, the new deadline for final supplementation of all discovery was November 2, 2018. (Doc. 306).

On September 28, 2018, the parties filed a notice of discovery dispute. This appears to have been the first time Defendants sought Court assistance regarding Milke's alleged

waiver of the attorney-client privilege.  The parties' discovery dispute submission centered on the deposition of Ken Ray.  At that time, Milke conceded she had waived the attorney-client privilege or work-product protection regarding the contents of "the few letters between Plaintiff and Mr. Ray that were attached as exhibits to Plaintiff's habeas pleading and/or the limited contents of their communications that were disclosed by Plaintiff to third parties."  (Doc. 358 at 3).  But Milke believed all other communications and documents remained privileged.  Pursuant to that waiver, Milke had sent Ray a letter instructing him that she was not waiving the attorney-client or work-product doctrine in general but he could answer questions regarding "any public actions" he took as her attorney or "any *Brady* or *Giglio* material" he was aware of at the time he represented her.  (Doc. 358-1 at 49).  Defendants believed Milke had adopted an inappropriately narrow view of the scope of her waiver.  Defendants also complained Milke had not provided a proper privilege log.

On October 9, 2018, the Court issued an order noting Milke likely had waived the attorney-client privilege on a broader basis than she believed.  (Doc. 362).  Because it was undisputed Milke had disclosed many privileged communications between her and Ray, the Court called for additional briefing about the proper scope of her waiver.  The Court also explained that a very detailed privilege log might be unduly burdensome but Milke's present privilege log was too vague.  The parties were directed to confer about the additional information Defendants needed on a revised privilege log.

On October 15, 2018, the parties submitted more detailed statements regarding their privilege disputes.  Milke conceded she had waived the attorney-client privilege with Ray regarding a few topics (again, such as his knowledge of *Brady*/*Giglio* material).  (Doc. 370 at 2).  But Milke argued Defendants had "not come close to establishing a basis to pierce attorney-client privilege over the vast majority of [her] correspondence with her attorneys."  (Doc. 368 at 6).  Milke did agree, however, to produce a more detailed privilege log.  As for Defendants, they were adamant Milke had waived the attorney-client privilege entirely by repeatedly disclosing privileged communications to third parties.  Defendants also complained that author Gary Stuart appeared to have been provided access to Milke's entire

legal file.  If true, that meant Milke had waived the attorney-client privilege regarding "all areas about which Defendants propose[d] to question Ray."  (Doc. 369 at 9).  The Court ordered the parties to be prepared to discuss their disputes at an upcoming status hearing.

At the status hearing on October 19, 2018, the Court discussed whether Milke had put communications with Ray "at issue" by filing this suit such that she could not invoke the attorney-client privilege to avoid discovery regarding the content of those communications.  That discussion got sidetracked when defense counsel explained "Ray has no memory in large part" of what occurred during his representation of Milke and he was not presently in possession of his file materials so he was unable to refresh his recollection.  Milke's counsel explained there was no underlying "Ray file" such that Ray could review it.  Unfortunately, instead of keeping Ray's file separate, Milke and her subsequent counsel had commingled all the documents during the ensuing years.  The Court instructed Milke's counsel to make every attempt to recreate the "Ray file" because it was crucial to determine what Ray knew and what communications were in his file when determining the proper scope of Milke's waiver.  Defense counsel then pointed out they were still waiting for complete responses to their November 2016 requests for production.  Defense counsel explained Milke had not been able to provide complete responses because she could not identify "what is privileged and what isn't" given the clear disorganization of the file.  (Doc. 383 at 20).  That prompted the Court to make the following statement to Milke's counsel:

> You should have [organized the file] a long time ago.  I'm not going to give you anymore time . . . And you need to respond to these requests for production.  I don't care . . . and once again repeating myself, if [the file] fills this entire courtroom.  It's your obligation.

The Court gave Milke's counsel until October 31st

> to go through the file, organize the file, define exactly what is Mr. Ray's file, and take a look at the questions that were asked and tell defense counsel, I'm prepared now. . . .  And Miss McCarthy [Milke's counsel] . . . you may or may not be in hot water here and your other lawyers.  But if there have been outstanding requests for production of documents, you need to get on it now and respond to those requests for production of documents.  There is no

excuse, since this case has been around since 2015, no excuse that we can't produce these documents.

(Doc. 383 at 26).  Finally, on the topic of Stuart, Milke's counsel stated "[h]e did not look at any privileged materials."  (Doc. 383 at 29).  Based on that representation, the Court instructed defense counsel to seek discovery directly from Stuart.

After that conference, Milke's counsel attempted to review and organize the file.  In a report filed on October 31, 2018, Milke's attorneys stated they had "made every conceivable effort" to reconstruct Ray's file and ensure they had produced all responsive documents.  (Doc. 380 at 2).  As a result of those efforts, Milke's counsel had "identified only two communications for which privilege [had] been implicitly waived."  Milke reiterated her position "that there [was] no legal basis" to conclude there had been a broad waiver of the privilege.  Milke went so far as to forcefully claim that if the Court were to conclude she had broadly waived the attorney-client privilege, Milke "would have no choice but to seek a writ of mandamus from the Ninth Circuit."  (Doc. 380 at 6).  In other words, Milke and her attorneys were so certain no broad waiver had occurred, any contrary conclusion would prompt them to seek emergency appellate review.

The Court subsequently issued an Order requiring Ray answer the questions where the parties agreed a waiver had occurred.  The Court then instructed the parties to file yet more briefing if disputes remained.  (Doc. 384).  The parties did not file additional briefing.  Instead, on December 6, 2018, the parties filed a stipulation to stay discovery.  That stipulation was again meant to give Milke's counsel time to "investigate and address issues raised by Defendants."  (Doc. 391 at 2).  The stipulation was granted and the parties filed a status report a month later.

The January 4, 2019, status report indicated Milke had agreed to produce "all attorney-client privileged communications between Plaintiff and Ken Ray, Kirk Fowler, and Anders Rosenquist."  (Fowler was an investigator who had worked with Milke's counsel while Anders Rosenquist was another attorney who represented her in her criminal proceedings.)  (Doc. 395 at 2).  The waiver of privilege regarding those communications left disputes involving "work-product waiver" for those individuals as well the

discoverability of documents involving Milke's habeas counsel (Michael Kimerer and Lori Voepel). (Doc. 395 at 2). Shortly after that, Milke's counsel withdrew and new counsel appeared. (Doc. 396). The Court then called for briefing on the remaining privilege disputes. (Doc. 399).

In her brief submitted on March 1, 2019, Milke stated she was willing to produce the work product of Ray, Fowler, and Rosenquist "in the spirit of compromise and an effort to minimize discovery disputes." (Doc. 421 at 2). That meant the only remaining disputes were "the extent to which [Milke's] communications with her habeas counsel . . . are protected from disclosure" and "the extent to which habeas counsel's work product are protected from disclosure." (Doc. 421 at 2). Defendants seemed to agree. (Doc. 427 at 4). Before the Court could rule on that latest round of briefing, Defendants began filing motions seeking sanctions.

On March 27, 2019, Defendants filed a "Motion to Vacate Dispositive Motion Deadline and Trial and to Set Culprit Hearing." (Doc. 435). According to that document, Milke had engaged in years of "discovery violations [and] improper assertions of privilege" as well as multiple acts of "spoliation of evidence." Defendants argued Milke's behavior merited vacating all the case management deadlines and convening an evidentiary hearing to determine whether Milke or her counsel were responsible for the misconduct. Shortly after that motion was fully briefed, Defendants filed a comprehensive motion for sanctions. (Doc. 466). That motion goes through Milke's alleged instances of misconduct in detail. The comprehensive motion is now fully briefed, including a supplement, a response to the supplement, and a surreply. (Doc. 468, 476, 486, 491, 493). The topics and actions that form the basis for Defendants' request for sanctions are, as much as feasible, described one-by-one.

### A. Marino Letters

While Milke was in custody awaiting trial, she fell in love with Joe Marino, a fellow inmate. She then exchanged lengthy, often sexually explicit, letters with Marino. Some of the letters included information regarding what Milke's criminal counsel (*i.e.*, Ken Ray) told her and what she told her counsel. For example, in one letter she relayed to Marino

that other attorneys had told Ray "that Saldate (cop) must be stopped" because the other attorneys "had similar experiences with him lying on police reports." (Doc. 360 at 19). According to Defendants, there are many instances of Milke relaying privileged communications to Marino.[2]

When another inmate informed the authorities about Milke exchanging letters with Marino, Milke sent a letter to Marino asking him to destroy all of her letters. Marino did not do so. Instead, Marino saved the letters and eventually gave them to a third party. As for Milke, she gave her attorney all of the letters she had received from Marino. Those letters from Marino to Milke have never been located.

Milke did not know her letters to Marino still existed until after the Ninth Circuit granted her habeas relief and the state initiated retrial proceedings. During those proceedings, a woman came forward with the letters from Milke to Marino.[3] Milke received copies of the Marino letters during the attempted retrial. (Doc. 468 at 30). To be clear, Milke received the Marino letters long before she filed the present suit. Despite having possession of the letters at the time she filed this suit, it appears Milke did not timely review the letters to determine whether they contained instances of her revealing privileged

---

[2] Milke's letters to Marino also contain repeated references to her plan to file a lawsuit similar to the present one. For example, Milke wrote:

- "When I win my lawsuit, I'm going to buy a white corvette with t-tops and it's going to have a kick ass stereo in it." (Doc. 466-3 at 10).
- "But because the state fucked me I am making sure I'll be set for life. Since I can't have my son. My lawyer has a list of different people and organizations to sue. I think I told you before but we're going for $150 mil. I doubt I will get that much but it's a start." (Doc. 466-3 at 14).
- "My lawyer is going to loan me money so I can get started until I get some sort of settlement." (Doc. 466-3 at 34).
- "Once I get my money, we can leave and start somewhere else. I'm filing a $150 million lawsuit here. But that may take a long time to get." (Doc. 466-3 at 35).
- "I've been told I have a major lawsuit coming." (Doc. 466-3 at 48).
- "If I get my money from my lawsuit, I want to go to Hawaii too." (Doc. 466-4 at 5).
- [Speaking of debts] "Sure would make it easier if I had my lawsuit money. Huh?"

[3] It is unclear what relationship this woman had with Marino. Defendants merely describe her as a woman who had held onto the letters. (Doc. 466 at 13).

communications.  Milke has not explained her failure to do so.

**B.  Gary Stuart**

As mentioned earlier, Defendants' Requests for Production of Documents in November 2016 sought copies of the documents Milke had allowed Gary Stuart to review. After hearing from the parties at the hearing on October 19, 2018, the Court felt comfortable concluding Milke's counsel had a sufficient factual basis for stating Stuart had not been provided any privileged materials.  Thus, Defendants were instructed to seek discovery directly from Stuart instead of through Milke.

Shortly after that hearing, Milke provided a formal response to the City of Phoenix's request regarding Stuart.  On October 31, 2018, Milke responded as follows:

> [U]pon information and belief, Gary Stuart was permitted to review materials from the trial, appeal, post-conviction, and federal habeas proceedings, but he did not review files containing documents or things that are protected under the attorney work-product doctrine, the attorney-client privilege, and/or any other applicable privileges.  It would be unduly burdensome for Plaintiff to determine and specifically identify all the documents and materials that Mr. Stuart reviewed, as the records that Mr. Stuart was permitted to access have been intermingled with other records and are no longer maintained in the same form.  The information Defendant seeks regarding the material Mr. Stuart reviewed would be more appropriately addressed by taking his deposition.

(Doc. 427-12 at 21).

On October 26, 2018, Defense counsel sent a subpoena to Stuart seeking documents. (Doc. 378).  When he responded to that subpoena, Stuart produced "transcripts with handwritten notes, witness binders for Milke including new jail records responsive to prior RFPs; [and] internal work product communications from Milke's habeas counsel containing mental impressions relating to the admissibility of evidence in a retrial pertaining to Saldate."  (Doc. 427 at 4-5).  Defense counsel noted the binders that had been provided to Stuart were listed on Milke's privilege log.  Milke subsequently removed the binders from the privilege log.

Milke disputes Defendants' description of the material produced by Stuart.  Milke points to a statement by Stuart that he did not receive "any information or documents

[habeas counsel] considered confidential . . . or any work product privilege." (Doc. 433 at 6). In addition, Milke states Stuart did not produce "new jail records" because those records had already been produced. Milke admits, however, that Stuart received "handwritten notes" but explains those were not "substantive notes containing any kind of mental impressions." Milke further admits Stuart received a communication that "could be considered work product" but that was merely one document in a total of over 3,000 pages. (Doc. 433 at 8). Milke has not addressed the allegedly privileged "binders." At this point, it appears obvious that neither Milke nor her counsel kept a record of what Stuart was allowed to review. Therefore, it is quite possible Stuart had access to a great deal of privileged information. At the very least, it is undisputed Stuart had access to a few privileged documents.

### C. Jana Bommersbach

While Milke was on death row, author and journalist Jana Bommersbach began working on a book about Milke. According to Bommersbach, she interviewed Milke multiple times, spoke with Milke's attorneys, and also spoke with Frankie Aue, a German citizen discussed in more detail below. Milke or her representatives gave Bommersbach a huge amount of written material from Milke's files, including multiple attorney-client communications. It also appears either Milke or Ray shared the contents of attorney-client communications. For example, the book recounts the first conversation between Ray and Milke. (Doc. 427-15 at 59).

On February 21, 2016, Bommersbach sent an email to Voepel and Kimerer. At that time, Milke had filed the present case but discovery had not yet commenced. Bommersbach's email stated "It struck me that there's no reason for you and Debra to wait to read my book, so I'm attaching the English manuscript I submitted to Germany." (Doc. 466-2 at 56). Voepel responded the next day "Thank you, Jana!" (Doc. 466-2 at 56). Kimerer responded on March 8, 2016, "Your book on Debra is fantastic. Once I got into it I couldn't put it down. Thank you again for sharing." (Doc. 466-2 at 57). There is no evidence the manuscript was forwarded to Milke although it seems likely either Voepel or Kimerer would have done so. At the very least, it is undisputed Kimerer had the manuscript

as of February 21, 2016.  As of that date, Kimerer was serving as counsel of record for Milke in the present case.

Despite Kimerer undoubtedly having the manuscript as of February 2016, neither Milke nor her other attorneys included the manuscript when responding to Defendants' Requests for Production in January 2017.  Milke's only attempt at explaining this failure appears to be that she, personally, did not have possession of the book until March 9, 2017.  On that date, Aue sent her an email attaching the English version of the book.  (Doc. 468-37).  That email read:

> Hi Debchen
>
> this is the (original) English version of Jana's book to foward [sic] to your attys.  You should be able to open it with Word.  I don't think I'd have to ask Jana for permission if used among your legal staff.

(Doc. 468-37).  Milke waited until July 12, 2017, to produce that email in a supplemental response to the requests for production.  That production did not include the book.  According to Milke's counsel, the failure to include the book was a mere "oversight."  (Doc. 468-38 at 5).

At her deposition on November 14, 2018, Milke was asked about her interactions with Bommersbach and what materials she provided to Bommersbach.

**Question**: When did Jana . . . Bommersbach write her book?

**Answer**: Um, I think she wrote it in 2015.  I'm not positive.

**Question**: Did you give her permission to write the book?

**Answer**: I did.

**Question**: And the book is about you.  True?

**Answer**: I have not read it.  So I -- I don't know what the book is fully about.

**Question**: What did you provide to Jana in order for her to be able to write the book?

**Answer**: Um, I just -- I -- I had an interview with her.  You have to ask her what she got.  I don't know.

**Question**: What do you remember telling her?

**Answer**: Um, well, just basically about my case.

***

- 13 -

**Question**: Did you provide Jana with any written materials?  Any notes, any memos?

**Answer**: I only recall --I only recall having an interview with her.  I was still in prison.  So she came to see me at the prison.

(Doc. 468-6 at 31).  According to information in the Bommersbach book, this deposition testimony was either false or, at the very least, misleading.

According to Bommersbach, she interviewed Milke four times while she was in the Perryville prison, once while she was in the county jail, and "a dozen times" after Milke was released.  (Doc. 427-15 at 66).  Thus, if Bommersbach is believed, Milke's statement that she had "an interview" with Bommersbach was incorrect.  As for Milke's statement that she did not provide Bommersbach any written materials, that may have been technically accurate in that Milke herself may not have provided Bommersbach with written materials.  But someone, acting on Milke's behalf, provided thousands of pages of material to Bommersbach.

On November 15, 2018—the day after Milke's deposition—Milke produced Bommersbach's book to Defendants.  (Doc. 468-38).  That production date meant Kimerer (and likely Milke) had the book as of March 8, 2016, Milke definitely had the book as of March 9, 2017, but the book was not produced until November 2018.  On the same date Milke produced the book, defense counsel provided notice they intended to serve Bommersbach with a subpoena.  (Doc. 387).  That subpoena resulted in Bommersbach producing 6,682 pages of documents she had received from Milke or her representatives.  (Doc. 466 at 16).  Included in those documents were eleven letters between Milke and her counsel.  (Doc. 468 at 14).  Milke had not produced those letters to Defendants previously, claiming they were privileged.  Milke now "agrees" providing those letters to Bommersbach waived the privilege.  (Doc. 468 at 14).  Milke explains she simply did not recall what she had provided to Bommersbach.  (Doc. 468 at 15).

Finally, the Bommersbach book describes Milke's destruction of documents potentially related to this case.  Bommersbach describes a scene of Milke sorting through old files shortly after being released from prison:

She gave herself jobs.  Go through every one of these boxes from prison,

> pulling out letters and essays and records for [Bommersbach].   Shred everything else.  'This is not my life anymore,' she kept telling herself as she fed the shredding machine.

(Doc. 466-10 at 58).  When asked at her deposition about shredding files, Milke explained she had only shredded "copies of [her] legal case."  (Doc. 468-6 at 33).  When asked if any of the documents she shredded had her own "handwritten notes," Milke respond "Oh, I don't know.  I mean, I don't -- I didn't really -- I didn't really take notes.  I didn't journal. I just had copies of my transcripts and briefs, all that stuff."  (Doc. 468-6 at 33).  It is now impossible to determine what documents were shredded.

### D.  Frankie Aue

Frankie Aue is a German citizen who became interested in Milke's case and became a close confidant of Milke and her habeas counsel.  In 2001, Milke changed her post-conviction counsel from Anders Rosenquist to Kimerer.  Because of that transition, Rosenquist dropped off the entire legal file at Kimerer's firm.  According to the Bommersbach book, that file consisted of seventeen boxes.  Aue went to Kimerer's office and "sorted through the seventeen boxes for weeks."  (Doc. 466-10 at 61).  He apparently looked through and organized all the documents.  Based on the description in the Bommersbach book, it appears Aue had access to the entire file, including privileged documents.

As part of his efforts to free Milke, Aue maintained a website proclaiming her innocence.  Milke's habeas counsel allegedly gave Aue "permission to expand the website" around the time Aue reviewed Milke's file.  Habeas counsel allegedly told him "to keep things factual" and Aue might have posted only "public document[s]" to the site.  (Doc. 466-10 at 61).  But given the surrounding circumstances, it is likely Aue had access to attorney-client privileged or work-product communications even if he did not post them to the website.

In November 2012, Kimerer sent a letter to Milke's trial attorney, Ken Ray, regarding Aue.  That letter stated:

> Dear Ken,
>
>       It was good talking with you again.  This letter is to confirm that I am

> giving you permission if you so choose, to interview with Frankie Aue, a journalist who has been covering Debra Milke's case for years. He is close to Debra and her family. Debra is aware of this request and will waive the attorney-client privilege so you can freely discuss the case with Frankie Aue. We do not waive the privilege for any other persons.

(Doc. 452-1 at 59). It is important to highlight that Milke's own attorney stated Aue was a "journalist" and that Milke wished to waive the attorney-client privilege in its entirety. Unfortunately, the present record does not disclose whether Aue and Ray ever met pursuant to the 2012 letter.[4] Based on Ninth Circuit law, "a mere intention to waive the privilege . . . does not waive the privilege." *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996). Thus, if Aue and Ray never spoke, the privilege might not have been waived. It is clear, however, that Milke was not taking steps to ensure the continued confidentiality of attorney-client communications. In fact, Milke was affirmatively attempting to have Ray disclose such communications.

After Milke was released, the website maintained by Aue was taken down. While Milke claims Aue was solely responsible for the site, underlying documents show she exercised control over the contents on the site. For example, in one letter Milke objected to a particular piece of information on the website. She told the letter's recipient to instruct Aue "to remove [the objectional material] from *my site*. It's nothing the world needs to know." (Doc. 466-10 at 135) (emphasis added). She also described the website as "*my* business card." (Doc. 466-10 at 62). Milke did not preserve the website and there is no way of obtaining a complete record of what was on the website.

Finally, during her incarceration, Milke kept up written correspondence with Aue. She kept his letters but, after she was released from prison, she shredded "all his letters."

---

[4] The record also contains an email from a film company to Kimerer. That email states the company had interviewed Kimerer and planned to interview Rosenquist, Fowler, and Ray. The film company wished to speak to Ray because it believed Ray could offer "valuable insight into the events and issues of [Milke's] trial." (Doc. 466-11 at 68). The email stated "just as Mr. Rosenquist and Mr. Fowler requested, [Ray would] like a notarized statement" from Milke "granting him permission to speak with" the film company. (Doc. 466-11 at 68). The present record does not disclose whether Milke signed such statements, whether the statements waived the attorney-client privilege, or if the interviews with Rosenquist, Fowler, or Ray took place. The present record also does not disclose whether Kimerer disclosed privileged material during his interview with the film company.

(Doc. 468-6 at 33).  Milke has never asked Aue whether he still has the letters that she sent to him.  (Doc. 468-6 at 33).

### E.  Additional Destruction of Documents

In December 2017, long after this case was filed, Milke traveled to Germany to clean out her mother's home.  While there, Milke gathered "some letters [and] e-mails" in her mother's files and brought those documents back to give to her attorneys.  But Milke shredded the contents of multiple boxes her mother had kept regarding the criminal and habeas proceedings.  (Doc. 468-6 at 30).  Milke did not photograph the boxes or make any record of what was in the boxes.  Milke claims she only shredded things she "thought [her] attorneys had," such as "transcripts and briefs and newspaper articles and magazine articles."  (Doc. 468-6 at 30).  Defendants are skeptical Milke did not shred material that should have been produced in this case.  In particular, Defendants believe Milke's mother might have had "six legal pads of handwritten notes that [Milke] wrote while composing [her] book in prison."  At her deposition, Milke stated those notes were not among her mother's items.  The notes have never been found.[5]  (Doc. 468-6 at 30).

### F.  Aleshire Tapes

In April 1998, a journalist named Peter Aleshire sent Milke a letter describing how he would like to write an article "re-examin[ing]" Milke's case for Phoenix Magazine.  (Doc. 486-1 at 8).  Aleshire provided a list of almost fifty questions for Milke to answer.  The questions were about Milke's life in prison, her relationship with her son, her trial, and the possibility of her execution.  (Doc. 486-1 at 11, 12).  Milke responded to those questions by making audio recordings.  At the start of those recordings, Milke explained she "thought it would be a little bit easier to [make audio recordings] than writing."  (Doc. 486 at 2).

---

[5] The record contains references to multiple documents that, at least at some point in time, were in the possession of Milke's mother.  In a fax dated June 6, 1998, Milke's mother referenced "30 pages of . . . recollections" she had received from Milke as well as "a journal written by [Milke] during her imprisonment."  (Doc. 466-2 at 59).  It appears the pages of recollections and the journal are no longer available.  In addition, in a letter to a friend in 1991, Milke stated she had "decided to write an autobiography" and she had already written "about 300 pages."  (Doc. 466-11 at 26).  It is unclear whether the "recollections" and "journal" Milke's mother referenced are distinct from the "autobiography."  But like the "recollections" and "journal," the "autobiography" is also missing.

Milke then read each question and provided answers, in her own words.  Milke stated she would send the recordings through the "legal mail" to her investigator, Kirk Fowler.  Sending them in that manner was meant to avoid possible review of the recordings by prison staff.  Milke sent the recordings to Fowler but it is unknown whether Fowler forwarded them to Aleshire.  It is undisputed, however, that the recordings were intended for Aleshire.

In February 2017, Milke's prior counsel "informed Defendants that they had 86 audio recordings in their possession which they were working to digitize and review for responsiveness."   Milke's prior counsel provided a list of those recordings and the recordings for Aleshire were on that list.  (Doc. 468-13 at 1).  Milke's prior counsel chose not to produce the Aleshire recordings because counsel concluded the recordings were "privileged since Plaintiff sent it only to Fowler."  (Doc. 491 at 2).  Defense counsel did not question the failure to produce the tapes.

In December 2018, Milke decided to waive the attorney-client privilege regarding certain individuals, including Fowler.  When Milke's current counsel reviewed the file shortly after that waiver, they tried to determine what should be turned over in light of that waiver.   Milke's current counsel "unintentionally failed to produce the [Aleshire recordings]" in early 2019 when other previously-privileged documents were produced.  (Doc. 491 at 3).  The recordings were eventually produced in May 2019.

### G.  Miscellaneous "Inadvertent" Failures to Disclose

Milke's current counsel has identified a variety of other documents that were "inadvertent[ly]" not produced earlier.  (Doc. 491 at 6).  While the Court appreciates the willingness of Milke's current counsel to review the file and produce responsive documents, the continued dribbling of documents indicates the unfortunate and delinquent way in which Milke (and her prior counsel) litigated this case.  There is no excuse in this document-intensive case for such behavior.  Complete and accurate discovery responses are necessary and required.  The number of documents that have been "inadvertently" withheld establish that Milke's approach to her disclosure obligations left much to be desired.

### H.   Summary of Inappropriate Behavior

Having reviewed the parties' briefing and the supporting documentation, the Court makes the following factual determinations.  *Cf. Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1408 (9th Cir. 1990) ("Findings of fact related to a motion for discovery sanctions are reviewed under the clearly erroneous standard.").  Milke or her attorneys engaged in the following behavior and misbehavior.

- In 2001, Milke gave Frankie Aue access to her entire criminal file.  Providing access to a "journalist" destroyed any applicable privilege, meaning Milke had no basis for asserting the attorney-client or work-product doctrine regarding that file in these proceedings.

- In 2012, Milke waived the attorney-client privilege so Ray could talk to Aue.  If a conversation between Ray and Aue occurred, Milke could not reassert the attorney-client privilege and doing so in this case was improper.

- Milke had possession of her letters to Marino for years prior to the commencement of discovery in this case.  Given her statements in those letters, Milke waived the attorney-client privilege regarding numerous subjects and Milke had no factual basis for asserting the privilege on those subjects in this case.[6]

- Milke did not detail what documents she allowed Stuart to access, meaning she could not provide a meaningful discovery response when asked.  Despite not knowing what Stuart had accessed, Milke and her attorneys repeatedly represented Stuart did not have access to privileged communications.  That was inaccurate in that Stuart was given access to documents that Milke would later claim to be privileged.

---

[6] Defendants argue Milke acted inappropriately by imploring Marino to destroy her letters to him.  In Defendants' view, Milke was attempting to destroy evidence that would be relevant for her future claims.  While it is true Milke explicitly contemplated litigation in her letters to Marino, *see* note 1, she did not have an obligation to preserve evidence at that time.  When Milke sent her letters to Marino, civil litigation was a very remote possibility.  The duty to preserve evidence is triggered only when litigation becomes likely.  *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 991 (N.D. Cal. 2012) ("[A]s soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.").  Here, litigation became likely in March 2013 when the Ninth Circuit granted habeas relief.

- Frankie Aue maintained a website but Milke had control over its contents. Milke's failure to preserve the website constituted intentional destruction of documents.

- After Milke was released, Milke shredded all letters she had received from Aue. That constituted intentional destruction of documents.

- After Milke was released, Milke shredded her "prison boxes" containing an unknown number and type of documents. That constituted intentional destruction of documents.

- In 2017, Milke shredded documents in the files kept by her mother regarding Milke's criminal and habeas proceedings. Milke kept no record of what she destroyed. That constituted intentional destruction of documents.

- Milke provided Bommersbach access to many attorney-client communications. Given that access, Milke had no good faith basis for asserting attorney-client or work product doctrine over the subjects covered in those communications in this case.

- Milke or her present counsel (Kimerer) received the Bommersbach book on February 21, 2016. Milke did not produce the book in her first responses to the request for production on January 20, 2017. Milke and Kimerer had no good faith basis for failing to include the book in that production.

- Milke personally received the Bommersbach book on March 9, 2017, as an attachment to an email. Milke waited four months, until July 12, 2017, to produce the email. That was not a timely supplement.

- Milke did not produce the Bommersbach book until November 15, 2018. Milke claims the failure to produce the book earlier was "inadvertent" but that is not convincing. The more plausible explanation is that Milke was intentionally delaying the production of the book because it contained damaging information regarding Milke's treatment of the attorney-client privilege and Milke's destruction of documents.

- If Bommersbach is correct that she interviewed Milke sixteen times, Milke's

deposition testimony that she had "an interview" with Bommersbach was false or misleading.  Similarly, Milke's statement that she did not provide Bommersbach any written materials was misleading.[7]

- Milke prepared multiple audio recordings for journalist Peter Aleshire.  She sent those recordings to her investigator, but only to avoid prison officials reviewing them.  The recordings were not confidential communications by Milke seeking legal advice and there was no good faith basis for claiming the recordings need not be produced under the attorney-client privilege.

- Milke did not immediately produce the Aleshire recordings upon deciding to waive the privilege she had erroneously asserted in the past.  Milke waited five months after her waiver before producing the recordings.  That was not a timely supplement.

- Milke failed to produce a variety of responsive documents, allegedly due to "inadvertence."  The number of such "inadvertent" acts establish Milke has not approached her discovery obligations diligently as required by the Federal Rules and Court orders.

## ANALYSIS

Defendants seek sanctions for Milke's behavior, primarily her failure to produce documents earlier and for her intentional destruction of documents.  Defendants believe the Court should impose case-terminating sanctions.  Alternatively, Defendants seek sanctions in the form of "their attorneys' fees and costs incurred as a result of Milke's and her attorneys' failure to timely produce documents."  Defendants also request the Court deem certain facts established.  (Doc. 466 at 39).  Milke argues no sanctions are appropriate.  According to Milke, she adopted reasonable positions regarding privilege and all of her discovery failures were inadvertent.

Beyond the issue of sanctions, the parties also have disputes regarding "the extent to which habeas counsel's work product are protected from disclosure" and the appropriate case management deadlines, should this case not be dismissed.  (Doc. 421 at 2).

---

[7] Defendants' briefing does not focus on this behavior and the Court notes it here only because of its connection to the way Milke handled the Bommersbach issue in general.

**I. Rule 37 Sanctions**

Defendants seek sanctions pursuant to Federal Rule of Civil Procedure 37 and 28 U.S.C. § 1927.  For purposes of this Order, the Court will address only Rule 37.  It appears it was Milke's previous counsel who engaged in almost all of the inappropriate behavior of adopting unreasonable positions regarding privilege and withholding responsive documents.  Those attorneys have not submitted briefing regarding their behavior and the Court will require those attorneys submit such briefing before considering the suitability of sanctions pursuant to 28 U.S.C. § 1927.

**A.  Litigation of Privilege Issues**

Much of the misconduct at issue stems from the way in which Milke claimed alleged privileges and handled her privilege assertions.   Milke and her counsel adopted unreasonable positions regarding privilege from the beginning of this case.  Those positions resulted in Milke and her counsel not providing complete and accurate responses to Requests for Production.  And the failure to provide accurate responses led to Defendants expending an inordinate amount of effort proving Milke had waived the privileges she was asserting.  Defendants also had to complete most of their discovery with only partial information.

The Ninth Circuit long ago made clear "the burden of proving that the attorney-client privilege applies rests not with the party contesting the privilege, but with the party asserting it."  *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981).  Of special importance to the present case, "[o]ne of the elements that the asserting party must prove is that it *has not* waived the privilege."  *Id.* (Emphasis added).  As recognized by a leading treatise, however, placing the burden on the party asserting the privilege does not require that party "discount all possibilities of waiver in order to establish the privilege claim."  *Attorney-Client Privilege in the U.S.* § 9:22.  Instead, the party asserting the privilege must "provide assurances that the confidentiality . . . has been maintained."  *Id.*  Once the party has made such assurances, the party opposing the privilege must make a minimal showing of waiver.  If that showing can be made, the burden returns to the privilege holder to demonstrate the privilege was not, in fact, waived.  *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Applying this framework here, the ultimate burden of proving the privilege and that it had not been waived, rested with Milke.  Had Milke and her counsel first marshalled all documents and evidence and then conducted even a cursory review of the underlying documents and events, they would have realized there had been substantial privilege waivers regarding Ray, Fowler, and Rosenquist.  Such a review would have revealed five crucial facts.  First, Aue had access to Milke's entire legal file in 2001.  Giving a journalist complete access to the file destroyed the attorney-client privilege and also waived any work-product protection.  *See In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012) (disclosure to third party destroy attorney-client privilege); *see also In re Horowitz*, 482 F.2d 72, 82 (2d Cir. 1973) (attorney-client privilege waived by giving third party "free run to look at what he pleased"); *Anderson v. SeaWorld Parks & Entm't, Inc.*, 329 F.R.D. 628, 635 (N.D. Cal. 2019) (noting work-product protection is waived by disclosures that substantially increase likelihood of disclosure to adversary).  Second, Milke may have waived the privilege entirely regarding Ray in 2012 by waiving the privilege so he could speak with Aue.  Third, had Milke reviewed the Marino letters, she would have discovered instances of waiver on a wide variety of subjects.  Fourth, Gary Stuart appears to have had access to some privileged materials (or at least materials that Milke would later claim were privileged.)  If Milke had reviewed and discovered what Stuart had been allowed to access, she would not have been able to assert privilege regarding the information disclosed to Stuart.  And fifth, Milke gave Jana Bommersbach access to privileged materials.  If Milke had reviewed what she gave Bommersbach, she would discovered yet more instances of waiver.  In short, had Milke done basic due diligence prior to the commencement of discovery, or after receiving the discovery requests, she would have discovered her invocation of the attorney-client privilege and work-product protection regarding Ray, Fowler, and Rosenquist had been seriously compromised.

Even if the Court were to excuse Milke's initial failure to review the file and her actions, once Defendants pointed out instances where Milke had waived the privilege, the burden certainly returned to Milke to review her files and actions to determine the extent of that waiver.  Milke did not do so.  Instead, Milke's practice was to invoke the privilege

broadly and grudgingly retreat only when Defendants pointed to explicit instances of waiver.  A privilege holder cannot adopt such a lackadaisical approach once it is clear she has repeatedly and intentionally waived the privilege.

Milke's failure to handle the privilege issues appropriately meant she consistently withheld responsive documents.  Given the true scope of her waiver, Milke's initial responses to the requests for production were woefully incomplete.  Milke then failed to timely supplement those responses during this case as it became clear she had waived the privilege on more and more subjects.  The fact that Milke did, eventually, produce all the withheld documents does not cure her failure to produce them earlier and on time.  *See N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) ("Belated compliance with discovery orders does not preclude the imposition of sanctions.").  As noted by the Ninth Circuit, "[l]ast-minute tender of documents does not cure the prejudice to opponents."  *Id.*  Milke's behavior violated Federal Rule of Civil Procedure 37(c) and forced Defendants to conduct much of the discovery in this case without crucial documents.

Having concluded Milke violated Rule 37(c), the burden is on Milke to prove her failures were substantially justified or harmless.  *R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1246 (9th Cir. 2012) ("The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless.").  Milke has not offered *any* plausible explanation for her frailties on the privilege issues.  Thus, her approach was not substantially justified.  In addition, Defendants conducted most of the discovery in this case, including multiple depositions, without crucial information that should have been disclosed.  Defendants were prejudiced by Milke's behavior.

### B.  Withholding of Bommersbach Book

Beyond the privilege issues, Milke also failed to produce the Bommersbach book in a timely manner.  Milke's current counsel, Kimerer, had the book as of February 21, 2016.  The book was directly responsive to a request for production served in November 2016 but Milke did not produce the book in her original responses in January 2017 nor did she produce it in an early supplement to those responses.  Milke did not produce the book until

November 2018.  Those actions violated Federal Rule of Civil Procedure 37(c).

Milke has not offered any defense for her failure to produce the book once it was in the possession of her counsel in 2016.  Milke's only attempted explanation is that she meant to produce it in July 2017 but she "inadvertently" did not include it in that production. Even the July 2017 production, however, was untimely given that Milke undoubtedly received the book four months earlier.  And the Court is skeptical that her counsel could have "inadvertently" failed to include a book consisting of hundreds of pages.  Milke's failure to produce the book earlier was not substantially justified.  Moreover, the contents of the book would have been useful to guide Defendants' discovery.  Therefore, the failure was not harmless.

## C.  Withholding of Aleshire Recordings

Milke should have produced the Aleshire recordings in her initial responses to Defendants' request for production.  Given the content of the recordings, they never qualified as attorney-client privileged.  In fact, it is difficult to see how Milke's prior counsel could have concluded they were privileged.  The most basic elements for privileged communications were not present.  *See United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (holding attorney-client privilege applies when "legal advice of any kind is sought . . . from a professionally legal adviser in his capacity as such").  That is, the recordings were meant as communications between Milke and a journalist, not communications between Milke and her counsel.  And given that the recordings were Milke responding to a journalist's questions, it should have been obvious she was not seeking legal advice.  The decision to identify the recordings as privileged had neither a legal nor factual basis.

Even if there had been some plausible basis for deeming the recordings privileged, Milke decided to waive that privilege in December 2018.  The recordings should have been produced shortly after that waiver.  Instead, they were not produced until May 2019.  While new counsel faced a significant task in reviewing the file and determining what should be produced, waiting five months to produce responsive materials is inappropriate.  Milke's failure to produce the Aleshire recordings earlier was not substantially justified and the

recordings would have been useful, at the very least, in conducting Milke's deposition. Therefore, the failure to produce the recordings earlier was not harmless.

### D. Appropriate Sanctions

In sum, Milke and her attorneys' chronic discovery abuses stretched and far exceeded the already elastic bounds of acceptable advocacy which warrant the imposition of severe sanctions.  It is noteworthy that during the relevant time, Milke was represented by seasoned attorneys which only serves to exacerbate the misbehavior.

In determining what sanctions to impose pursuant to Rule 37, the Court has "particularly wide latitude."  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Rule 37 authorizes preclusion of the withheld evidence, an award of "reasonable expenses, including attorneys' fees," directing that certain "facts be taken as established for purposes of the action," or even dismissal of the action.  The sanction of dismissal, however, requires a showing of "willfulness, fault, or bad faith" as well as an explanation why lesser sanctions were not appropriate.  *R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1247 (9th Cir. 2012).

At the present time, dismissal, in fact, would be merited.[8]  Milke waited years to produce obviously responsive documents and never had a plausible basis for most of her privilege assertions.  Litigation cannot work if a party is free to withhold responsive documents, force opposing parties to exhaustively research and litigate privilege disputes, and once it becomes obvious the privilege assertions lack merit, simply state additional discovery can cure any prejudice.

---

[8] Before imposing the harsh sanction of dismissal, a court must consider "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).  Milke's behavior has resulted in this case being over three years old without being ready for trial.  Milke's behavior has also required substantial Court involvement in disputes that never should have existed and imposed prejudice on Defendants in the form of requiring them to conduct discovery with partial and inaccurate information.  Thus, the first three factors strongly support dismissal. The fourth factor weighs against dismissal as does the fifth factor, assuming Milke has the ability to compensate Defendants for the costs and fees they have incurred as a result of her behavior.  The fourth and fifth factors, however, are insufficient to establish dismissal would be inappropriate given the full scope of Milke's behavior.

- 26 -

Despite the fact that dismissal would be merited, the Court is hesitant at this time to impose that ultimate sanction. In light of the claims at issue and the extent of the harm Milke allegedly suffered, extra caution is appropriate. Therefore, the Court will pursue lesser sanctions first in the form of attorneys' fees.[9]

Milke will be required to bear the cost and attorneys' fees Defendants incurred as a result of her misconduct. That is, Milke must pay the costs and attorneys' fees Defendants incurred because of Milke's failure to acknowledge the scope of her privilege waiver, her failure to timely produce the materials she gave Bommersbach, her failure to timely produce the Bommersbach book, and her failure to timely produce the Aleshire recordings. At present, it appears the costs and attorneys' fees will consist of the amounts incurred in briefing the privilege disputes, filing the various sanctions motions, and the additional discovery Defendants will now conduct to address information that was not timely produced. Defendants will be required to file a motion identifying the reasonable amounts they have incurred, and will incur, as a result of Milke's misconduct.

It appears sanctions pursuant to Federal Rule of Civil Procedure 37(c) must be assessed against the party, not against her counsel.[10] After the Court determines the fair and reasonable amount of attorneys fees and costs, Milke will be required to deposit an appropriate amount with the Clerk of Court.[11] That amount might be less than the total costs and fees Defendants are entitled to recover but it will ensure at least partial

---

[9] Defendants propose an alternative sanction of the Court deeming certain facts established. In this case, however, deeming facts established might be the functional equivalent of dismissing Milke's claims. For example, it would likely be fatal to one of Milke's claims if the Court were to rule that Saldate read Milke her *Miranda* rights twice and Milke responded "yes" when asked if she understood them. This option may, however, be open to reconsideration later.

[10] The Court has not located Ninth Circuit authority addressing this point but three other circuits have concluded an attorney cannot be liable pursuant to Rule 37(c). *See Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1224 (10th Cir. 2015) (agreeing with Third and Seventh Circuits that attorneys cannot be held liable pursuant to Rule 37(c)). Milke's counsel might be liable pursuant to Federal Rule of Civil Procedure 26(g)(3) for signing certain disclosures but the parties' briefing does not address that provision.

[11] Milke has stated she does not have the financial ability to pay any sanctions. Thus, the Court's attempt at imposing lesser sanctions may be futile. Assuming Milke's representations regarding her finances are accurate, any monetary sanctions against her likely would never be paid should she not prevail in this suit. In effect, that would mean Milke would suffer no penalty for her misconduct. That is not reasonable.

satisfaction of the sanctions award in the event Milke's claims fail. Should Milke be unable to deposit that amount, she must identify an appropriate and legally acceptable alternative sanction. The Court notes, however, that if the lesser sanction of a monetary award is not available, the Court will be required to revisit whether dismissal of this case is merited.

## II. Spoliation Sanctions

Milke engaged in repeated acts of intentional destruction of documents both shortly before and even after this case was filed. While Milke argues she did not destroy any documents of importance, the duty to preserve documents cannot be evaded merely because a party is willing to represent that it only destroyed documents with no value.

"A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were potentially relevant to the litigation before they were destroyed. Moreover, because the relevance of [destroyed] documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006). As Milke testified at her deposition, she knew she should not destroy documents. And as of the various dates Milke destroyed documents, she either knew or should have known "the documents were *potentially* relevant to the litigation." *Id.* Thus, her destruction of documents was "willful spoliation." *Id.*

It is undisputed Milke did not preserve her website, shredded all the letters she received from Aue, shredded documents in her prison boxes, and shredded documents in her mother's files.[12] Milke argues, with the exception of Aue's letters, she only destroyed copies of public documents. But there is no way for Defendants to verify that. A party cannot destroy whatever documents it wishes and avoid any repercussions by claiming none of the destroyed documents were important. *See id.* (rejecting claim by plaintiff that

---

[12] The website qualified as "electronically stored information" such that the failure to preserve it could justify sanctions under Rule 37(e). The parties have not briefed sanctions under that provision and the Court will focus on its inherent power to sanction given that the bulk of destruction involved non-electronic information. *See Best Payphones, Inc. v. City of New York*, No. 1-CV-3924 (JG) (VMS), 2016 WL 792396, at *3 (E.D.N.Y. Feb. 26, 2016) (noting passage of Rule 37(e) means "there are separate legal analyses governing the spoliation of tangible evidence versus electronic evidence").

he only destroyed documents "to protect his privacy"). *See also Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 993 (N.D. Cal. 2012) ("In the Ninth Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it.").

In the context of spoliation, the non-spoiling party has been prejudiced if "the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959. Put differently, a party has been prejudiced if it must "rely on incomplete and spotty evidence at trial." *Id.* Because no one knows what documents were destroyed, the Court is left to deal with probabilities instead of certainties.

The record in this case shows Milke was willing to recount some version of the relevant events to anyone who would listen. The record also establishes Milke carried on voluminous written correspondence with her mother and Milke also sent her mother "recollections" and a journal. It is more likely than not that Milke's mother's files contained those "recollections" and journal and that those documents contained versions of Milke's interrogation and included Milke's knowledge regarding Saldate's history of misconduct. Having that information would be helpful for Defendants in this case. In fact, such information is "at the heart of [Defendants'] defense." *Id.* Destruction of those documents "threatens to interfere with the rightful decision of [this] case." *Id.* Therefore, spoliation sanctions are appropriate.

As with the Rule 37 violations, dismissal would be merited based on Milke's conduct. *See Leon*, 464 F.3d at 960-61 (discussing how destruction of documents might merit dismissal). There simply is no reasonable explanation for a litigant involved in a case of this type to destroy files from her time in prison or to destroy the files maintained by her mother regarding her case. Of particular importance, Milke destroyed her mother's files long after filing this case. There can be no dispute that she had a duty to preserve those files. Milke does not cite, and the Court has not located, any case involving similar behavior by a plaintiff.

Solely because of the extra caution appropriate in this case, the Court will not

dismiss Milke's claims at this time.  Instead, the Court will determine the appropriate spoliation sanction at a later date.  *See Pettit v. Smith*, 45 F. Supp. 3d 1099, 1114 (D. Ariz. 2014) (holding jury would be instructed that defendant "had a duty to preserve evidence, [defendant] did not preserve the evidence, and the jurors may, but are not required to, infer that the lost evidence would have been favorable to Plaintiff").  Defendants should identify the specific spoliation sanction they seek either through a separate motion or in the parties' pretrial filings.

## III. Remaining Privilege Disputes

Based on the parties' briefing, the only remaining privilege disputes are "the extent to which Plaintiff's communications with her habeas counsel . . . are protected from disclosure" and "the extent to which habeas counsel's work product are protected from disclosure." (Doc. 421 at 2).

### A. Milke's Communications with Habeas Counsel

The Court has reviewed Milke's communications with her habeas counsel *in camera* and has returned those communications to Milke's counsel for production in part.  The Court's rulings on those communications, however, are subject to the following that may apply to other communications as well.

As explained by the Ninth Circuit, "voluntarily disclosing privileged documents to third parties will generally destroy the [attorney-client] privilege."  *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012).  Throughout the long history of Milke's criminal and habeas cases, multiple third parties had access to Milke's privileged communications.  It is possible those individuals were given access to the communications between habeas counsel and Milke.  That is, Frankie Aue, Gary Stuart, and Jana Bommersbach all had some amount of access to the files maintained by Milke's habeas counsel.  If any of those individuals had access to the communications Milke produced for *in camera* review, those communications cannot be withheld under the attorney-client privilege.

Similarly, the communications cannot be withheld under the work-product doctrine if Aue, Stuart, or Bommersbach had access to them.  Milke argues disclosure to third parties

does not necessarily result in a waiver of the work-product doctrine.  It is true that disclosure of a document to a third person does not automatically waive work-product immunity.  But such disclosure does waive immunity if "it has substantially increased the opportunity for the adverse party to obtain the information."  *Anderson v. SeaWorld Parks & Entm't, Inc.*, 329 F.R.D. 628, 635 (N.D. Cal. 2019).  Disclosure of communications to journalists or authors such as Aue, Stuart, or Bommersbach substantially "increased the likelihood that a current or potential opponent in litigation would gain access to the disputed documents."  *U.S. E.E.O.C. v. ABM Indus. Inc.*, 261 F.R.D. 503, 512 (E.D. Cal. 2009).  Therefore, Milke might have waived the work-product doctrine regarding the communications with her habeas counsel.

## B.  Habeas Counsel's Documents

The only other remaining privilege dispute involves documents in the possession of Milke's habeas counsel.  According to the privilege log, almost all of the documents are being withheld pursuant to the work product doctrine.[13]  At least some of the documents do not qualify as work-product or, if originally work-product, any work-product protection has been waived.[14]

---

[13]  The parties disagree whether Defendants properly requested all documents in the possession of habeas counsel and whether Milke should have prepared a privilege log regarding those documents.  It appears the current privilege log may only cover "the hard copy emails that were in print form in Mr. Kimerer's office."  (Doc. 462 at 8).  Given that discovery has been reopened, Defendants will likely seek the additional documents that are in electronic form only.  Should that occur, Milke must produce responsive documents guided by the discussion in this section.  Moreover, the present privilege log does not comply with the requirement found in Federal Rule of Civil Procedure 26(b)(5)(A)(ii) to describe the withheld documents with sufficient detail to enable Defendants "to assess the claim" that the documents need not be produced.  Any future privilege log must do so.  *See Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1147 (9th Cir. 2005) ("[A] proper assertion of privilege must be more specific than a generalized, boilerplate objection.").

[14]  Defendants argue Milke's failure to produce a privilege log earlier than she did should be viewed as a waiver of the work-product doctrine.  *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1147 (9th Cir. 2005) (recognizing failure to produce privilege log can result in waiver).  Here, however, the parties disagree whether Defendants sought the production of material in the possession of habeas counsel early in the case or if, during a meet-and-confer, the parties reached a compromise regarding the scope of Defendants' discovery demands.  On the present record, the Court cannot determine precisely when the privilege log should have been produced.  Thus, the Court cannot conclude Milke's delayed production of the privilege log was a waiver.

"The attorney work-product privilege protects from discovery in litigation 'mental impressions, conclusions, opinions, or legal theories of a party's attorney' that were 'prepared in anticipation of litigation or for trial.'"   *Am. Civil Liberties Union of N. California v. United States Dep't of Justice*, 880 F.3d 473, 483 (9th Cir. 2018) (quoting Fed. R. Civ. P. 26(b)(3)).  A document qualifies for work-product protection only if it was 1) "prepared in anticipation of litigation or for trial" and 2) it was "prepared by or for another party or by or for that other party's representative."  *Id.*  It is Milke's burden to establish the withheld documents qualify for protection under the work product doctrine. *S. Union Co. v. Sw. Gas Corp.*, 205 F.R.D. 542, 549 (D. Ariz. 2002) (holding "[t]he burden of establishing protection of materials as work product is on the proponent").

Some of the documents on the privilege log easily satisfy both elements.  For example, there are emails between Milke's counsel with no other recipients.  There are also "notes" and "legal research" prepared by Milke's counsel for use in Milke's retrial.  While the privilege log does not include the required descriptions, it is safe to assume the emails and documents were prepared in anticipation of litigation by Milke's counsel and contain counsel's mental impressions.  Documents of that type can be withheld.  The bulk of the documents on the privilege log, however, are quite different.

The privilege log is replete with emails and other communications between habeas counsel and third parties, such as Aue, Milke's mother, and other friends of Milke.  In her briefing, Milke explains those communications contained the third parties' "mental impressions, potential avenues of investigation, thoughts about the case and Plaintiff, ideas for what arguments to include or exclude in a legal brief, and other such opinions."  (Doc. 462 at 5).  But Milke also concedes "many of the emails simply involved Plaintiff's mother and friends expressing frustration over how long it was taking for court rulings to occur and for briefings to be complete."  The briefing also states that some of the communications involving Aue were because of "inquiries or messages from members of the public."  Aue forwarded those messages to Voepel for her "advice about if and how to respond."  (Doc. 462 at 5).  Milke's own representations indicate she has adopted an inappropriately broad view of the work-product doctrine.

- 32 -

It may be possible for communications by an attorney with a client's friends and families to qualify for protection under the work-product doctrine.  While Milke has not cited authority exploring this proposition, it stands to reason that *some* such communications could qualify for protection.  But Milke's argument that even emails complaining about the delay in proceedings qualify for protection is not convincing.  The doctrine is meant to "provide a zone of privacy for strategizing about the conduct of litigation itself" and "to shield litigation strategy from disclosure to a litigation adversary." *Anderson v. SeaWorld Parks & Entm't, Inc.*, 329 F.R.D. 628, 635 (N.D. Cal. 2019).  There is no basis for extending the doctrine to cover *all* communications between counsel and a client's friends and family.  For example, an unsolicited email from Milke's mother to Milke's habeas counsel, complaining about the pace of litigation, is unlikely to contain any of counsel's "litigation strategy." *Id.*

Based on the present record, it appears many of the communications between habeas counsel and the third parties were not sufficiently related to the underlying litigation to qualify for protection under the work-product doctrine.  To qualify, the communications must contain some confidential information about counsel's strategy or efforts.  At present, Milke has not carried her burden of establishing *all* the communications with third parties listed on her privilege loge qualify under the work-product doctrine.  Milke will be required to more carefully review the documents she wishes to withhold.

Finally, even if the Court were to assume that some of the communications could qualify for protection under the work-product doctrine, that doctrine does not protect any communications between counsel and Aue.  Despite Aue being Milke's friend, he was described as a "journalist" by habeas counsel.  Assuming counsel chose to communicate confidential strategy to Aue, doing so substantially "increased the likelihood that a current or potential opponent in litigation would gain access to the [communications]." *U.S. E.E.O.C. v. ABM Indus. Inc.*, 261 F.R.D. 503, 512 (E.D. Cal. 2009).  Any work-product claims were waived by disclosing that work product to Aue.  All communications where Aue was one of the recipients must be disclosed.

## IV.  Remaining Case Management Deadlines

1

2         Defendants have been given until September 27, 2019, to complete all additional

3  discovery.  The parties will be required to file a status report on October 4, 2019, stating

   whether discovery has been completed and whether the parties are prepared for trial.

4         Accordingly,

5         **IT IS ORDERED** the Motion to Vacate Dispositive Motion Deadline and Trial

6  (Doc. 435) is **GRANTED IN PART** and **DENIED IN PART**.

7         **IT IS FURTHER ORDERED** the Motion for Sanctions (Doc. 466) is **GRANTED**

8  **IN PART** and **DENIED IN PART**.

9         **IT IS FURTHER ORDERED** the Motion to Strike or Motion for Leave to File

10 Surreply (Doc. 492) is **GRANTED IN PART**.  The Clerk shall file the lodged Surreply.

11 (Doc. 493).

12        **IT IS FURTHER ORDERED** no later than **August 16, 2019**, Defendants shall file

13 a motion for costs and fees caused by Plaintiff's misconduct.  Plaintiff shall file her

14 response no later than **August 30, 2019**.  Defendants' reply shall be filed no later than

   **September 6, 2019.**

15

16        **IT IS FURTHER ORDERED** Plaintiff's current counsel shall serve a copy of this

17 Order on Plaintiff's previous counsel.  No later than **August 9, 2019**, Plaintiff's previous

18 counsel shall file a response addressing whether sanctions pursuant to 28 U.S.C. § 1927

19 are merited based on the manner in which privilege issues were handled, including the

20 handling of the Aleshire recordings, and the delay in producing the Bommersbach book.

21 No later than **August 23, 2019**, Defendants shall file their opposition.  Plaintiff's previous

22 counsel shall file their reply no later than **September 3, 2019**.

23        Dated this 18th day of July, 2019.

24

25

26                                        Honorable Roslyn O. Silver
                                          Senior United States District Judge
27

28