**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2        FOR THE CENTRAL DISTRICT OF ARIZONA
 3
 4   Debra Jean Milke,        ) No. 2:15-cv-00462-ROS
                              )
 5           Plaintiff,       )
         V.                   )
 6                            )
     City of Phoenix; Maricopa County;)
 7   Maricopa County Attorney William )
     Montgomery, in his official       )
 8   capacity; and Detective Armando   )
     Saldate, Jr.; Detective Robert    )
 9   Mills; Detective Jim House;       )
     Detective Russell Davis;          )
10   Detective Charles Masino;         )
     Detective Judy Townsend;          )
11   Detective Harvey Ernie Hamrick;   )
     Detective Frank DiModica;         )
12   Sergeant Silverado Ontiveros;     )
     Lieutenant Michael John; Walter   )
13   E. Barky; Phillip Wolslagel; and  )
     George Bolduc, in their           )
14   individual capacities,            )
                                       )
15           Defendants.               )
                                       )
16
17           DEPOSITION OF EXPERT
18               RICHARD DROOYAN
19
20             SEPTEMBER 12, 2018
21                10:09 A.M.
22
23       633 West 5th Street, 50th Floor
24           Los Angeles, California
25
         Alicia Santana, CSR#12824
```

**Page 2**

```
 1           APPEARANCES OF COUNSEL
 2
     For Plaintiff:
 3
         NAUFELD SCHECK & BRUSTIN, LLP
 4       AMELIA GREEN, ESQ.
                  &
 5       NICK BRUSTIN, ESQ., (TELEPHONICALLY)
                  &
 6       KATIE MCCARTHY, ESQ., (TELEPHONICALLY)
         99 Hudson Street, 8th Floor
 7       New York, New York 10013
         212.965.9084
 8       Amelia@nsbcivilrights.com
         Nick@nsbcivilrights.com
 9       Katie@nsbcivilrights.com
10
11   For Defendant MARICOPA COUNTY:
12
         SANDERS & PARKS, P.C.
13       J. ARTHUR EAVES, ESQ.
                  &
14       ROBIN E. BURGESS, ESQ.
         3030 North Third Street, Suite 1300
15       Phoenix, Arizona 85012
         602.532.5730
16       Artie.Eaves@SandersParks.com
         602.532.5783
17       Robin.Burgess@SandersParks.com
18
19   CLATSOP COUNTY DISTRICT ATTORNEY'S OFFICE
         JOSHUA K. MARQUIS
         DISTRICT ATTORNEY
20       Clatsop County Courthouse
         749 Commercial Street
21       Post Office Box 149
         Astoria, Oregon 97103
22       503.325.8581
         Jmarquis@co.clatsop.or.us
23
24
25
```

**Page 3**

```
 1          APPEARANCES OF COUNSEL(CONT'D)
 2
 3   For Defendant CITY OF PHOENIX:
 4       WIENEKE LAW GROUP
         CHRISTINA RETTS, ESQ.
 5       1095 West Rio Salado Parkway, Suite 209
         Tempe, Arizona 85281
 6       602.715.1868
         Cretts@wienekelawgroup.com
 7
 8
 9   For Defendant DETECTIVE ARMANDO SALDANTE, JR.:
10       BERKE LAW FIRM, PLLC
         LORI V. BERKE, ESQ.
11       1601 North 7th Street, Suite 360
         Phoenix, Arizona 85006
12       602.254.8800
         Lori@berkelawfirm.com
13
14
15   For Defendant SERGEANT SILVERADO ONTIVEROS:
16       HOLLOWAY, ODEGARD & KELLY, P.C.
         SALLY A. ODEGARD, ESQ
17       3020 East Camelback Road, Suite 201
         Phoenix, Arizona 85016
18       602.240.6670
         Sodegard@hoklaw.com
19
20
21
22   Also Present:
23       Ed Mertz, Videographer
24
25
```

**Page 4**

```
 1           INDEX OF EXAMINATION
 2   WITNESS:  RICHARD DROOYAN
 3   EXAMINATION                          PAGE
 4   By Mr. Eaves                            7
 5   By Ms. Retts                          158
 6   By Ms. Berke                     225, 354
 7   By Ms. Green                          334
 8
 9
10           INDEX TO EXHIBITS
11   DEFENDANTS'   DESCRIPTION             PAGE
12   Exhibit 249  Curriculum Vitae          35
13   Exhibit 250  NSB Email Re:  Milke:  Materials
                  Dated Wed, Feb 21, 2018
14                From katie McCarthy to
                  Richard Drooyan           162
15
     Exhibit 251  LexisNexis
16                Tina Retts, Tuesday,
                  September 11, 2018        183
17
     Exhibit 252  State of Arizona vs. Debra Jean Milke
18                Reporter's Transcript of Proceedings
                  September 13, 1990        198
19
20
21     QUESTIONS INSTRUCTED NOT TO ANSWER
            PAGE            LINE
22           273             19
             275              2
23           276             18
             300             25
24           305             14
             306           2, 19
25           310             16
             316             11
```



Page 5

1          DEPOSITION OF RICHARD DROOYAN
2                SEPTEMBER 12, 2018
3
4          THE VIDEOGRAPHER:  Good morning.  This is
5   Tape Number 1 to the videotaped deposition of Richard
6   Drooyan in the matter of Debra Jean Milke V. City of
7   Phoenix, et al., being heard before the United States
8   District Court, District of Arizona, Case Number
9   2:15-CV-00462-ROS.  This deposition is being held at
10  Esquire Reporting Solutions, 633 West Fifth Street, 50th
11  Floor, Los Angeles, California 90071, on September 12th,
12  2018, at 10:09 a.m.
13          My name is Ed Mertz and I am the
14  videographer.  The court reporter is Alicia Santana.
15          Counsel, will you please introduce
16  yourselves and affiliations, and the witness will be
17  sworn.
18          MR. EAVES:  My name is Artie Eaves.  I'm
19  here with Robin Burgess on behalf of Maricopa County.
20  Present with us as well is Josh Marquis, the county's
21  prosecutorial expert.
22          MS. BERKE:  Lori Berke on behalf of Armando
23  Saldate.
24          MS. RETTS:  Christina Retts of behalf of the
25  City of Phoenix.

Page 6

1          MS. ODEGARD:  Sally Odegard on behalf of
2   Silvario [sic] Ontiveros.
3          MS. GREEN:  Amelia Green on behalf of
4   plaintiff Debra Milke.  And co-counsel Nick Brustin and
5   Katie McCarthy are also on the line telephonically.
6          Before we get started, I just wanted to note
7   for the purposes of the record, I understand that there
8   were some parking and issues getting into the building,
9   but that Mr. Drooyan has been here since 9:30 a.m.
10          MR. EAVES:  Yeah.  And it is 10:13 by my
11  watch.  And I'm sorry for that, Mr. Drooyan.
12          THE WITNESS:  No problem.
13          MS. BURGESS:  Your watch is fast.
14          MR. EAVES:  Is it?
15          MS. GREEN:  It's 10:10.
16          MR. EAVES:  10:10.
17          MS. BURGESS:  10:10.
18          MS. GREEN:  The video will have it.
19
20          RICHARD DROOYAN,
21      called as a witness by and on behalf of
22      the Defendant, being first duly sworn,
23      was examined and testified as follows:
24  ///
25  ///

Page 7

1                  EXAMINATION
2   BY MR. EAVES:
3     Q.  Good morning, Mr. Drooyan.
4         As you heard, my name is Artie Eaves.  I
5   represent Maricopa County in the present lawsuit.
6     A.  Morning.
7     Q.  Have you ever been deposed before?
8     A.  Yes.
9     Q.  All right.  In what context have you been
10  deposed, sir?
11    A.  I was deposed in two civil lawsuits; one lawsuit
12  was against Skadden Arps and the other lawsuit was
13  against the City of Los Angeles, and probably also the
14  City of Los Angeles Police Department.
15    Q.  All right.  Let's talk about the lawsuit against
16  Skadden Arps.  Did that relate to any prosecutorial
17  issues?
18    A.  No.
19    Q.  Did that relate to the conflict of interest case
20  that you had -- no, that was Munger.  All right.  We
21  probably don't need to talk about the Skadden Arps case.
22        What issues did you testify regarding in the City
23  of L.A. case?
24    A.  The case arose out of the Rampart scandal.  And I
25  had been the general counsel and in charge of the

Page 8

1   Rampart Independent Review Panel, and so it was a civil
2   rights lawsuit brought against the city and the police
3   department claiming excessive force by L.A.P.D.
4   officers.  And I basically testified about the results
5   of our investigation.  I didn't testify about any of the
6   facts in the case itself.  I wasn't aware of any of the
7   facts in the case itself.
8     Q.  All right.  As part of your testimony in the City
9   of L.A. case, did you provide any opinions regarding
10  police conduct or prosecutor conduct?
11    A.  Nothing more than what was written in the report
12  that we did, the Rampart Independent Review Panel
13  report.  So I do think they -- they asked some questions
14  that probably touched on opinions that I had regarding
15  the conduct of L.A.P.D. -- P.D. officers generally, but
16  nothing regarding that specific case.
17    Q.  All right.  Approximately when did you give that
18  deposition, sir?
19    A.  I would say it would have been in approximately
20  2003 to 2005.
21    Q.  Do you have a copy of the transcript, by any
22  chance?
23    A.  No.
24    Q.  Do you remember the names of the attorneys who
25  deposed you?



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
9–12

Page 9

1    A. I don't.
2    Q. Do you remember the names of the attorney with
3  whom you worked on the side of the case for which you
4  were testifying?
5    A. I don't think there were any attorneys I worked
6  with. I was just simply subpoenaed by the plaintiff's
7  lawyer to testify about what we did in the Rampart
8  investigation, and I don't think I worked at all with
9  the lawyers for the City of Los Angeles --
10   Q. All right.
11   A. -- or the police department.
12   Q. Was that case filed here in L.A.?
13   A. I believe so, yes.
14   Q. Okay. Do you remember the name of the plaintiff,
15  by any chance?
16   A. I don't.
17   Q. Any other depositions that you've given other
18  than the two you've discussed?
19   A. No other depositions.
20   Q. All right. Have you testified in trials?
21   A. Yes.
22   Q. How many?
23   A. Approximately half a dozen.
24   Q. Okay. And is there a category or class of cases
25  in which you've testified we can -- that you can sort of

Page 10

1  describe for us or have these been all different types
2  of testimony?
3    A. State civil, state criminal, federal pretrial,
4  federal criminal trial, federal civil.
5    Q. All right. Let's go through them, if you can
6  remember.
7    A. The. . .
8    Q. What was the first one that you recall?
9    A. It was a case in state court in California,
10  somewhere in the Sacramento area. It was a state
11  criminal case. The defendant had been a witness in a
12  murder trial that I had. We had -- it had been a murder
13  trial at the Lompoc federal penitentiary. And this
14  witness inmate had testified on behalf of the
15  prosecution in that case. And I was called as a witness
16  for the defense in the state criminal prosecution to
17  basically describe the threats to this witness as an
18  inmate testifying and cooperating with the prosecution.
19   Q. All right. What's next?
20   A. I'm not a hundred percent sure these are in
21  order. It was a federal pretrial hearing claiming
22  misconduct. And I testified, and the motion was denied.
23   Q. Misconduct of what type?
24   A. I think it was a testimony that -- testimony.
25     I think the allegation was that -- in essence,

Page 11

1  that we had called a witness who was charged with --
2  ultimately with -- with perjury for the purposes of, in
3  effect, entrapping her into perjury.
4    Q. When you say "we," do you mean the U.S.
5  Attorney's Office?
6    A. Yes.
7    Q. And that's for the Central District of
8  California?
9    A. Correct.
10   Q. When you testified, were you -- what role were
11  you filling in the U.S. Attorney's Office for the
12  Central District of California?
13   A. I -- I think I was the prosecutor who asked her
14  questions in the grand jury.
15   Q. All right. So tell me more. Was this pretrial
16  hearing in her perjury case?
17   A. I think so, yes. I -- my recollection is she was
18  charged with the underlying offense, and I also think
19  perjury, but I'm not a hundred percent sure exactly what
20  the charges were. This would have been sometime in 1980
21  or '81.
22   Q. All right.
23   A. Or '79, actually, possibly.
24   Q. And what was the subject matter of your testimony
25  in the case?

Page 12

1    A. Why I subpoenaed her to the grand jury.
2    Q. Was there allegations of misconduct on your part?
3    A. Yes.
4    Q. All right. And what was the outcome of that
5  hearing?
6    A. Court denied the motion.
7    Q. Okay. So no finding of misconduct by the court?
8    A. Correct.
9    Q. Was that ruling ever appealed?
10   A. Not -- not to my knowledge.
11   Q. Okay. Were you the one that charged her with
12  perjury?
13   A. I was the one who presented the -- the -- the
14  indictment to the grand jury. And so whatever the
15  charges were was as a result of a charging decision that
16  would have been made by the criminal complaints unit,
17  but I -- I was actually the person who handled the case
18  and presented it to the grand jury.
19   Q. All right. So --
20   A. But if you would have been authorized by the
21  criminal complaints unit.
22   Q. Okay. So let me see if I understand some facts
23  about this. This woman obviously testified in a trial
24  or a grand jury hearing of some kind?
25   A. Grand jury.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
13–16

Page 13

1    Q.  Okay.  And you were the one who presented that
2  grand jury?
3    A.  I was the one who called her as a witness and
4  presented her testimony to the grand jury, yes.
5    Q.  Right.
6        And did you, as a prosecutor, feel like she had
7  perjured herself during that grand jury proceeding?
8    A.  Yes.
9    Q.  All right.  And then were you the one who
10  presented a perjury complaint to the complaints
11  department?
12    A.  Whatever the charges were, I presented it to the
13  complaints unit, yes.
14    Q.  All right.  And what -- was perjury among those
15  charges that you presented?
16    A.  That's my recollection.  I'm not a hundred
17  percent sure about that.
18    Q.  That's okay.  And I understand, it's been a lot
19  of years so you may not be exactly right on the details.
20        Do you remember the nature of the perjury that
21  you were pursuing against her?
22    A.  What I recall was that we were investigating
23  somebody else for a crime, and I don't remember what the
24  crime was.  And this individual, who was a woman, was
25  somebody who we wanted to have cooperate against this

Page 14

1  other person that we were investigating.  And we -- she
2  was interviewed by the FBI, and she basically failed to
3  cooperate, to put it sort of colloquially.
4        And so we thought by putting her in the grand
5  jury and putting her under oath, we were hopeful to get
6  testimony that would be favorable that we could use
7  against this other person.
8    Q.  And what testimony did she give that you felt
9  like was perjurious?
10    A.  I don't remember.  I -- other than I think a
11  general denial of the information that we thought was
12  true against the other person.
13    Q.  So putting aside the perjury charge, perhaps,
14  against this woman, have you ever charged anyone else
15  with perjury or pursued any other witness for perjury as
16  a prosecutor?
17    A.  I don't think so.  I think there were cases where
18  we pursued and brought charges against individuals for
19  counseling somebody else to commit perjury or
20  obstructing justice.  I remember at least two cases in
21  which I was significantly involved in those kind of
22  charges.  But those two individuals that I'm thinking
23  of, I don't -- they were not charged with perjury, and I
24  don't recall another case where it presented with
25  perjury charges.

Page 15

1    Q.  All right.  As a prosecutor, do you recognize
2  that perjury involves an element of knowing conduct?
3    A.  Yes.
4    Q.  All right.  So in order to prove perjury against
5  someone, you must prove that they knowingly or
6  intentionally lied under oath?
7    A.  Correct.
8    Q.  In your experience as a prosecutor, is that a
9  very common charge that gets filed?
10    A.  No.
11    Q.  Why not?
12    A.  Good question.  Because most of the time when
13  witnesses have lied, they get charged with lying to a
14  federal agent and it doesn't happen in front of the
15  grand jury.  And by the time witnesses who may have made
16  false statements to the agents get in front of the grand
17  jury, they've often corrected their testimony.  I've had
18  very few instances where I thought the witness was lying
19  in front of the grand jury.
20    Q.  All right.  You have had instances where you
21  thought witnesses made misstates or were inaccurate in
22  front of grand juries?
23    A.  I'm certain that's the case.  I don't recall
24  anything specific at this time.
25    Q.  Right.

Page 16

1        As a prosecutor, you understand that when someone
2  makes a misstates or inaccurate statement in front of a
3  jury, that does not necessarily equate to perjury?
4    A.  Correct.
5    Q.  And, in fact, in proving a perjury case, it's
6  often difficult to prove that a witness intended to lie
7  rather than just making a -- a misrepresentation -- I'm
8  sorry, a misstatement of fact?
9    A.  If it were -- certainly, any time we've charged
10  perjury, we certainly thought the evidence was more than
11  sufficient to convict the person of that charge.  Or
12  whether it was counseling a witness to commit perjury.
13  And if we didn't think we could prove it, we wouldn't
14  charge it.
15    Q.  And it's charged rarely?
16    A.  I would say that's correct.
17    Q.  Let's talk about the next case.  I think you've
18  given me a description of two of what you described as
19  maybe a half-dozen case where you testified in trial?
20    A.  Right.
21        Okay.  So the next case, which I do remember
22  the -- the name of it, it was United States versus
23  Barbara Mouzin, M-O-U-Z-I-N.  It had a -- it was called
24  the "Grandma Mafia" case.  And I testified in a pretrial
25  hearing, and then I testified at trial.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
17–20

Page 17

1        And the background of that case is that it was a
2    money laundering narcotics case that our narcotics unit
3    was handling.  And during the course of the underlying
4    investigation of the Grandma Mafia, there were a series
5    of incidents involving corruption by federal agents.
6    And so that -- in -- the corruption investigation was
7    handled by what was then known as our special
8    prosecutions unit.  And I inherited that investigation
9    when I became the -- chief of that unit, which was
10   then known as the major frauds unit.
11        So I was called as a defense witness in the
12   pretrial hearing in an attempt to cause the claims
13   against the defendants to be dismissed for outrageous
14   government misconduct by the corrupt agents that I had
15   been investigating.
16       Q.  And what was the gist of your testimony, if you
17   remember?
18       A.  I just described the three or four areas that we
19   were investigating.
20       Q.  Was there a finding of misconduct on behalf of
21   the government in that case?
22       A.  By the court, you mean in the case that I
23   testified?
24       Q.  Yes, sir.
25       A.  The court denied the motion.

Page 18

1    Q.  All right.  So that's a "no"?
2    A.  Well, the court really wasn't looking at the
3    issue of whether or not there was corruption by the
4    federal agents.  Ultimately, I think the court concluded
5    that there was no basis to dismiss the indictment
6    because of corruption by that federal agents that didn't
7    have any impact on the charges that were brought against
8    the defendants.
9    Q.  All right.
10   A.  But he -- and he certainly did not make a finding
11   that there was no corruption by federal agents, because
12   there was.
13   Q.  Approximately when did you give that testimony?
14   A.  That would have been sometime between 1984 and
15   1987.
16   Q.  So that was during your first tenure as Chief
17   Assistant U.S. Attorney?
18   A.  I believe that's when the testimony was.  The
19   investigation that I had conducted was when I was chief
20   of the major frauds unit.  And I don't recall if I
21   testified in the pretrial hearing when I was still chief
22   of that unit or whether I had been chief assistant
23   there.
24   Q.  Fair enough.
25   A.  It's sometime in that period.

Page 19

1    Q.  So the investigation occurred between '82 and '84
2    when you were the chief of major frauds?
3    A.  Correct.
4    Q.  And then you may have testified sometime during
5    that period or during '84 to '87 when you were chief
6    assistant?
7    A.  Correct.  And then I testified again in -- at the
8    trial.
9    Q.  All right.  And tell me about the trial
10   testimony.  Was it any different in nature than what
11   you've already described?
12   A.  No.  It was the same.  There really was no
13   defense in the case so they called me as a witness.
14   Q.  They to call somebody, huh?
15   A.  They had to call somebody.
16   Q.  All right.
17   A.  And they were all convicted.
18   Q.  Okay.  Let's keep going down the list here.
19   A.  Okay.  I have a very, very vague recollection of
20   testifying as a witness in an immigration case.  And I
21   can't -- in federal court.  I have vague recollection it
22   was in front of Judge Gadbois, and I can't tell you
23   anything about the testimony.
24   Q.  All right.  I've had days like that too.
25   A.  I've been -- I've been racking my brain trying to

Page 20

1    remember, but that one I don't remember anything more
2    about.
3    Q.  Hold on.
4    A.  Okay.
5    Q.  All right.  So by my count, we are up to number
6    4.
7        What would be the fifth one?
8    A.  I testified as a witness in a federal civil
9    rights case brought against the County of Los Angeles
10   relating to excessive force in the L.A. County jails.
11   Q.  All right.  And was that related to your service
12   on the Christopher Commission -- or no, I'm sorry,
13   the...
14   A.  It was on the jail commission, the Citizens'
15   Commission on Jail Violence.
16   Q.  All right.  So when did that testimony take
17   place?
18   A.  That testimony was 2013 or 2014.
19   Q.  All right.  And was that a one-day testimony or
20   did that span over several?
21   A.  One day.
22   Q.  All right.  And what was the gist of your
23   testimony in that case?
24   A.  To basically summarize the results of the
25   investigation that we conducted for the jail commission.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
21–24

Page 21

1   Q. Did you testify about police misconduct in that
2   case?
3   A. I testified that basically summarized what we had
4   reported in the -- the report that we did on behalf of
5   the jail commission.
6   Q. And that would included opinions that there was
7   misconduct by police officers working within the jail?
8   A. That there was excessive force, correct.
9   Q. All right. Did you -- did that case involve any
10  allegations of prosecutorial misconduct of any kind?
11  A. No.
12  Q. Do you remember the name of the plaintiff who
13  brought the case?
14  A. I don't.
15  Q. Where was that case filed? You might have said,
16  but I --
17  A. It was filed in the Central District of
18  California. And judge was Pregerson.
19  Q. All right. So I think we're up to six here.
20  A. All right. The next case was a wrongful
21  termination case filed by two -- actually, not wrongful
22  termination, that's not right. A -- I guess it was more
23  of a discrimination case filed by two Los Angeles police
24  officers against the City of Los Angeles, the police
25  department, and probably the chief of police as well.

Page 22

1   Q. And what was your role in that case, as you
2   understood it?
3   A. So the case arose out of a fatal shooting of an
4   unarmed African-American man late one evening along
5   Vermont Avenue. And the -- I was on the L.A. police
6   commission at the time. And the police commission found
7   the shooting to be out of policy and unreasonable.
8   Q. All right. The L.A. police commission is a group
9   of citizens to oversee some aspects of the conduct of
10  the L.A.P.D.?
11  A. Under the charter, everything except for
12  disciplines is under the purview of the Los Angeles
13  police commission.
14  Q. And would the Los Angeles police commission
15  review incidents to determine whether or not excessive
16  force had been used?
17  A. Yeah. When I was on the police commission, we
18  had the final review of all officer-involved shootings.
19  Q. All right. So what was the gist of your
20  testimony in the case?
21  A. The gist of my testimony was that the commission
22  found the shooting to be out of policy, and that
23  ultimately was the reason for the chief police to impose
24  some level of discipline on these officers.
25  Q. All right. And when did that testimony take

Page 23

1   place?
2   A. That testimony took place three or four years
3   ago, roughly.
4   Q. All right. Any other incidents of testimony that
5   you can remember giving, in trial, deposition, as part
6   of the commissions on which you participated?
7   A. I -- I did testify in an arbitration one time.
8   That's the only other matter that I can recall
9   testifying in.
10  Q. And what was the arbitration about?
11  A. I think it was a -- a fee dispute between a -- a
12  law firm and a client.
13  Q. What firm was it?
14  A. Corbin & Fitzgerald.
15  Q. Not your firm?
16  A. No.
17  Q. Did you testify as an expert?
18  A. Yes.
19  Q. Did the underlying case which the fees related to
20  have anything to do with prosecution or criminal
21  defense?
22  A. It had something to do with criminal defense.
23  Q. Okay. And were you testifying about the
24  reasonableness of the attorney's conduct in that case?
25  A. Not exactly. My recollection, I was testifying

Page 24

1   about the level of expertise and sophistication
2   attorneys have to have in complex white collar matters
3   where there are what's known as parallel proceedings,
4   both a civil and a criminal case or administrative and a
5   criminal case.
6   Q. All right. Is that the only time other than in
7   the Milke case when you've been retained as an expert
8   witness?
9   A. I was retained as an expert in a case that,
10  frankly, I couldn't tell you any of the facts about.
11  And I think it settled before I was ever called as a
12  witness.
13  Q. What type of case was it, if you remember?
14  A. It had something to do with the roles and
15  responsibilities of attorneys, I think white collar
16  attorneys, but I couldn't tell you anything more about
17  it than that.
18  Q. All right. Prior to this case, have you ever
19  worked with any lawyers from the firm of Brustin
20  Neufeld --
21      MR. EAVES: What is it?
22      MS. GREEN: Neufeld Scheck & Brustin.
23  BY MR. EAVES:
24  Q. Neufeld Scheck & Brustin?
25  A. No.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
25—28

Page 25

1     MS. GREEN:  I was just going to --

2     MR. BRUSTIN:  Come on, Artie.

3     MR. EAVES:  Sorry -- sorry, Nick.  No

4  offense.

5     MS. BURGESS:  He was -- I think he was

6  putting you in the beginning, though.

7     MR. EAVES:  Yeah, I was.

8     MS. BURGESS:  So he gave you a. . .

9     (Simultaneous discussion.)

10 BY MR. EAVES:

11   Q.  All right.  Do you know how Nick Brustin and his

12  team found you as an expert in this case?

13   A.  I think so.

14   Q.  How -- how's that?

15   A.  I think that they contacted Professor Laurie

16  Levenson of the Loyola Law School, who is running -- who

17  runs their innocence project.  And they may have asked

18  her about whether she could serve as an expert witness

19  or -- I'm not a hundred percent sure, but she referred

20  them to me.

21   Q.  All right.  Do you have any relationship with the

22  innocence project?

23   A.  I guess I'm nominally on a board of directors,

24  which has never really met.

25   Q.  All right.  Tell me about that.  What's the

Page 26

1  board?

2   A.  Professor Levenson put -- had this -- planned to

3  put together a -- a board of very prominent lawyers in

4  Los Angeles to serve on the board of directors of the --

5  the innocence project, but she never really followed

6  through on that, although she's trying to now reform it

7  and start it up again.

8   Q.  All right.  So you -- you have been named as a

9  director on the board of directors for this innocence

10  project, though I understand it hasn't been very active?

11   A.  Correct.

12   Q.  All right.  Did Ms. Levenson ask you to be a

13  board member?

14   A.  Yes.

15   Q.  All right.  Do you have any idea why she asked

16  you to participate?

17   A.  I think based upon the positions that I've held

18  and the work I've done, but we're also very close

19  personal friends.

20   Q.  All right.  You said based on the work that

21  you've done, the positions that you've held.  What do

22  you mean by that?

23   A.  Well, I've served in the highest positions in the

24  U.S. Attorney's Office.  I -- I was a supervisor 11

25  years, eight years in the most senior positions as

Page 27

1  president of the Los Angeles police commission.  I was

2  on the Christopher Commission.  I was on the Rampart

3  panel.  I was on the Citizens' Commission on Jail

4  Violence.

5     Los Angeles is a big city.  It's -- the legal

6  community is still relatively small, and I'm reasonably

7  well-known in the community.

8   Q.  All right.  How do you know Lori Levenson?

9   A.  She joined the U.S. Attorney's Office a couple

10  years after I did.  I was the chief of the criminal

11  complaints unit, and she was one of the Assistant

12  U.S. Attorneys in the unit, so I was her supervisor.

13   Q.  All right.  And that was a small unit, about six

14  people?

15   A.  Correct.  And that would have been around 1981,

16  '82.

17   Q.  Okay.  Any other relationship with the innocence

18  project?

19     MR. BRUSTIN:  Artie, I'm sorry.  I -- I just

20  want to interpret that I -- I don't want you to be

21  confused.  Loyola, what he's talking about is Loyola Law

22  School's innocence project.

23     MR. EAVES:  I get it.

24     THE WITNESS:  Right.

25     MR. BRUSTIN:  Okay.  I just wanted to make

Page 28

1  sure.

2     MR. EAVES:  I understand.

3     MR. BRUSTIN:  Okay.  Thanks.

4     THE WITNESS:  There were a -- a few years

5  ago before the board was formed, I devoted some pro bono

6  time to helping out in reviewing some of the work of

7  some of the people -- some of the students who were in

8  the -- the innocence project.

9  BY MR. EAVES:

10   Q.  That's the Loyola program?

11   A.  Yes.

12   Q.  And what type of work were you reviewing?

13   A.  Oh.  I think I was reviewing some letters and

14  petitions that were coming in from prisoners asking for

15  the innocence project to -- to represent them in

16  collateral attacks.

17   Q.  So were the -- what do you mean by "collateral

18  attack"?  What does that term mean?

19   A.  Meaning they had been convicted of crimes and now

20  they were seeking to have their criminal convictions

21  overturned.

22   Q.  Well, you use the term "collateral attacks," not

23  the -- not the term "appeal," and I'm just curious as to

24  what the difference would be in your mind as to this?

25   A.  A collateral attacks would be after the



Page 29

1 conviction had been affirmed on direct appeal.
2    Q. All right. So appellate remedies have been
3 exhausted?
4    A. Correct.
5    Q. And then a different type of attack is planned?
6    A. Correct.
7    Q. All right. And were you reviewing essentially
8 intake decisions where students had looked at these and
9 said either yes, we'll pursue it or no, we won't?
10    A. In essence, that's what I was doing. I don't --
11 I don't think it was quite as formal as that. I was
12 looking through some of the materials that they had
13 reviewed, but I don't recall having formally said, oh,
14 yes, you should take this case or you should not take
15 that case or anything like that.
16    Q. All right. What other involvement have you had
17 with the innocent project?
18    A. That's it.
19    Q. All right. Have you made any contributions to
20 the innocent project?
21    A. Yes.
22    Q. How much?
23    A. $250.
24    Q. All right. One-time deal?
25    A. Yes.

Page 30

1    Q. Anything else that would stand as a relationship
2 to you and the innocence project other than this case
3 and the things that we talked about?
4        MS. GREEN: Objection to form.
5        THE WITNESS: I don't think so.
6 BY MR. EAVES:
7    Q. All right. Okay. Have we exhausted all of your
8 experience as an expert witness?
9    A. Yes.
10    Q. Okay. All right. Have you ever been sued,
11 Mr. Drooyan?
12    A. Yes.
13    Q. All right. And how many times?
14    A. Once.
15    Q. Okay. And what was the context of that lawsuit?
16    A. When I was at Skadden Arps, I represented
17 somebody who had been convicted and was up in federal
18 prison up in Lompoc and was in the process -- he was
19 basically trying get his conviction overturned.
20        And after I left Skadden and went back to the
21 U.S. Attorney's Office, this individual sued me, Skadden
22 Arps, several other prominent lawyers in Los Angeles,
23 alleging malpractice in connection -- primarily in
24 connection with an appeal that had been filed on his
25 behalf that I had nothing to do with.

Page 31

1    Q. And what was the outcome of that case?
2    A. It was dismissed.
3    Q. Was there an expert against you who said you had
4 committed some sort of malpractice?
5    A. No.
6    Q. All right. You've not been a party to any other
7 lawsuits than that one?
8    A. That's correct.
9    Q. Have you ever been the subject of a bar
10 investigation or complaint?
11    A. No. The only thing that -- it's not a bar
12 investigation or complaint. A IRS agent complained
13 about a decision I made, and I'd referred that to the
14 Office of Professional Responsibility in Washington,
15 D.C., and wrote a seven-page single space letter
16 explaining the basis of my decision.
17    Q. So you were the complainant?
18    A. No. I was not the complainant. I was the
19 referring party, but the complainant was the IRS agent.
20    Q. All right. So were you having to respond to the
21 complaint filed by the IRS agent?
22    A. Well, as I said, he didn't really file it with
23 the Office of Professional Responsibility. I don't
24 remember who he made the complain to, whether it was to
25 his office or whether it was to me. But whatever it

Page 32

1 was, I became aware of the complaint. And when I became
2 aware of the complaint, I referred it to the Office of
3 Professional Responsibility in Washington, D.C.
4    Q. All right. And is that a unit within the
5 Department of Justice?
6    A. Yes.
7    Q. All right. Tell me about why you reported this
8 to the Office of Professional Responsibility?
9    A. Because the agent was complaining that I engaged
10 in misconduct.
11    Q. All right. And as a U.S. Attorney, are you
12 expected to report any instances where you have been
13 alleged to have committed miscount to the Office of
14 Professional Responsibility?
15    A. I certainly think so.
16    Q. All right. What was the outcome of that issue?
17    A. They found no misconduct.
18    Q. All right. All right. And you've never been the
19 subject of a complaint, not even by a prisoner you put
20 away or anything like that?
21        MS. GREEN: Objection to form.
22 BY MR. EAVES:
23    Q. A bar complaint? Sorry.
24    A. The answer to that question is no. The reason I
25 hesitate, the -- when I was at Munger Tolles, I handled



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
33–36

Page 33

1  a case for TRW.  It was a False Claims Act case.  The
2  qui tam plaintiff was a woman who -- let's just say she
3  had her issues.  And after we successfully defended
4  the -- the case, we got a jury trial -- a jury verdict
5  in favor of TRW, she made a complaint to the state bar.
6  But it was primarily about an associate who worked on
7  the case and later on went to the U.S. Attorney's
8  Office.  And it was sort of a ridiculous complaint.
9      I don't think she mentioned me in that because I
10  don't -- I certainly never had to respond to anything.
11      Q.  All right.  Fair enough.  Thanks for disclosing
12  that.
13      All right.  Have you ever been subject to
14  discipline within the U.S. Attorney's Office?
15      A.  No.
16      Q.  All right.  Let's move on to talking about your
17  background, Mr. Drooyan.
18      A.  Okay.
19      Q.  I see you graduated law school in 1975; is that
20  correct?
21      A.  Yes.
22      Q.  All right.  It looks like you went to work for a
23  few years for a company called Kadison Pfaelzer?
24      A.  Kadison, Pfaelzer, Woodard, Quinn & Rossi.  It
25  was a law firm here in Los Angeles.

Page 34

1      Q.  All right.  What type of work did you do for them
2  between the years of '75 and '78?
3      A.  You know, I did civil litigation.  But the first
4  year, I was number 50 on a 50-person anti-trust lawsuit
5  against IBM, and then I did some other civil litigation.
6  But I was pretty junior --
7      Q.  Lot of doc -- lot of document review in basements
8  or something like that?
9      A.  Yeah, pretty much.
10      Q.  After three years of Kadi- -- Kadison Pfaelzer,
11  you went to the U.S. Attorney's Office; correct?
12      A.  Correct.
13      Q.  Why?
14      A.  Because that's where I always wanted to be.  I
15  wanted the -- the experience.  I wanted the -- the
16  public's service component.  And I had a, you know, just
17  very strong desire to be a prosecutor.
18      Q.  Okay.  Did you get hired the first time you
19  tried?
20      A.  No.
21      Q.  Tell me about that.
22      A.  I sent in a letter probably after I had been at
23  Kadison Pfaelzer for a year working on that IBM
24  anti-trust lawsuit, and I didn't get hired.
25      Q.  All right.  So was it your second try that you

Page 35

1  got hired?
2      A.  Yes.
3      Q.  Okay.  Your CV, which I have put in front of you
4  as Exhibit 249 there.  We'll take a look at it.
5          (Defendants' Exhibit 249 was marked for
6          identification by the court reporter and is
7          attached hereto.)
8  BY MR. EAVES:
9      Q.  Under the time frame from '78 to '84, it says you
10  were an Assistant U.S. Attorney in the Criminal
11  Division?
12      A.  Correct.
13      Q.  Can you tell me how the U.S. Attorney's Office
14  was set up at that time in terms of divisions?
15      A.  So in that time period, there were three
16  divisions.  There was the Criminal Division.  There was
17  the Civil Division.  And then there was a Tax Division.
18  That -- and there were two other, if I remember
19  correctly, entities that were part of the Department of
20  Justice that were not part of the U.S. Attorney's
21  Office.  There was the anti-trust division and the
22  organized crime strike force, both of which later become
23  part of the U.S. Attorney's Office.  But at that time,
24  there were those three divisions.
25      And then within the Criminal Division, there was

Page 36

1  a criminal complaints unit of about six lawyers that was
2  responsible for intake of the vast majority of cases
3  prosecuted by the U.S. Attorney's Office.
4      Q.  Can I ask you about a question about that?
5      A.  Sure.
6      Q.  When you're saying "complaints," does that mean
7  submittals from law enforcement agencies?
8      A.  Yes.  Among other things.
9      Q.  All right.
10      A.  Reviewing and proving and submitting applications
11  for search warrants, arrest warrants; presenting cases
12  to the grand jury based upon reports that you got from
13  the police agencies.
14      Q.  Okay.  Fair enough.
15      Go ahead.  You were going to tell me about the
16  other -- are they called divisions under criminal?  Or
17  are they called --
18      A.  Sections --
19      Q.  Sections?
20      A.  -- or units, they were.
21      So there was a criminal complaint unit, and --
22  and there was the special prosecutions unit, which later
23  became the major frauds unit.  It was six or seven more
24  senior lawyers who handled the most complex white collar
25  cases.



Page 37

1    And then there was a narcotics unit.  And I don't
2  remember how large the narcotics unit was, because I was
3  never in it.  And then the rest of the Assistant U.S.
4  Attorneys in the Criminal Division, which is part of the
5  Criminal Division.  There were supervisors who reported
6  up to the chief of the Criminal Division.
7    Q.  All right.  So you sort of had a group of lawyers
8  who were prosecutors in general cases and then you
9  had -- it sounds like you had three specialized groups?
10   A.  Correct.
11   Q.  And those specialized groups would have been
12  called units.  There was complaints, special
13  prosecution, and narcotics?
14   A.  Correct.
15   Q.  All right.  I would like to talk about the
16  hierarchy of that division a little bit with you at this
17  point.
18   A.  Okay.
19   Q.  I'm assuming that each of these prosecution
20  units -- and is it fair to say there were four of them?
21   A.  Well, there were three units and then there was
22  the general major crime section of the Criminal
23  Division.
24   Q.  All right.  So the three units and the general
25  major crimes section, did those each have a supervisor

Page 38

1  at the top of the group?
2    A.  Each of the units has a supervisor, and then
3  there were roughly three, what were called assistant
4  division chiefs in the major crimes section.
5    Q.  All right.  So there were essentially three
6  supervisors over the line attorneys in the general
7  criminal section?
8    A.  Correct.
9    Q.  And then one each to the specialized divisions?
10   A.  Correct.
11   Q.  I'm sorry, the specialized units or sections?
12   A.  Correct.  And then I think there was also a -- an
13  assistant division chief who was basically in charge of
14  the newer attorneys and -- and had some responsibility
15  for training.
16   Q.  All right.  And then who did each the section,
17  what they called section chiefs?
18   A.  Yes, section chiefs.
19   Q.  Who did --
20   A.  Unit chiefs.
21   Q.  Who did each of the section chiefs report to?
22   A.  We all reported to the chief of the Criminal
23  Division.  Then was also -- there was also one other
24  person who was an assistant division chief/unit chief,
25  and she was the head of the appeals.  But at that time,

Page 39

1  she was the only person in the appeals section.
2    Q.  Okay.
3    A.  But she was head of the -- all appeals had to run
4  through her.
5    Q.  All right.
6    A.  But she reported to the chief of Criminal
7  Division as well.
8    Q.  Okay.  And then who did the chief of the Criminal
9  Division report to?
10   A.  U.S. Attorney.
11   Q.  All right.  Was there a chief assistant at that
12  time?
13   A.  Yes.
14   Q.  And did the chief assistant fall anywhere in that
15  hierarchy between chief of Criminal Division and U.S.
16  Attorney?
17   A.  Different U.S. attorneys have had -- have
18  basically assigned different roles to their chief
19  assistants.  When Bob Brosio was the chief of the
20  Criminal Division, the chief assistants were not in the
21  line of -- chain of command, but were -- had oversight
22  responsibility, were the primary advisor to the U.S.
23  Attorney, and had a variety of different roles.
24   Q.  All right.  Who -- you said Bob?
25   A.  Robert Brosio.

Page 40

1    Q.  Brosio, is that B-R-O-S-I-O?
2    A.  Yes.
3    Q.  All right.  And he was chief of the Criminal
4  Division?
5    A.  Correct.
6    Q.  And is he the one that determined what the roles
7  of the chief assistants would be?
8    A.  No, no.  The U.S. Attorney made that -- that
9  decision.
10   Q.  Oh.  I was just curious as to why you mentioned
11  his name when we were talking about chief assistants?
12   A.  Oh.  Because after -- so when he was the -- the
13  chief of the Criminal Division, he had direct line to
14  the U.S. Attorney, as did I when I replaced him as chief
15  of the Criminal Division.  But when I became the chief
16  assistant, the -- in the first time around, I had
17  responsibility for a -- a significant corruption
18  investigation.
19        And when I was chief assistant the second time
20  around, I had responsibility for supervising most of the
21  major cases that the office was prosecuting.  So I had
22  more of a -- a role -- chain of command as chief
23  assistant the second time around.
24   Q.  Okay.  So am I understanding correctly then that
25  the chief assistants' roles could change based on



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018

41—44

Page 41

1 circumstances or needs within the office and other
2 factors?
3    A.  Correct.  Primarily the -- the -- whatever the
4 U.S. Attorney wanted to make of that position, he
5 could -- he or she could.  So the roles were different
6 when I was chief assistant under Rob Bonner as opposed
7 to when I was chief assistant under Nora Manella.
8    Q.  All right.  What was the second name that you
9 said?
10    A.  Nora Manella.
11    Q.  And was Rob Bonner the U.S. Attorney when you
12 first became chief assistant?
13    A.  Yes.
14    Q.  All right.  We can come back to that a little bit
15 in a minute.
16       So in '78 to '84, when you were a Assistant
17 U.S. Attorney, it sound like the hierarchy was you, then
18 a section chief; above the section chief, chief of the
19 Criminal Division; and then above the chief of the
20 Criminal Division, the U.S. Attorney?
21       MS. GREEN:  Objection to form.
22       THE WITNESS:  That's correct.
23 BY MR. EAVES:
24    Q.  That's correct?
25    A.  Yes.

Page 42

1    Q.  All right.  In your CV for that time period, it
2 says during those six years, you -- you personally tried
3 over 20 cases.
4       It says over 20.  Can we assume that's less than
5 25?
6    A.  No.  I think it's closer to between 25 and 30.
7 But I don't have a precise count.
8    Q.  I understand.
9       So you tried 25 to 30 cases, you think, during
10 that time period?
11    A.  Correct.
12    Q.  All right.  And you say -- you -- you gave us
13 some example of the types of cases that you tried.  The
14 first example you give in your CV there is that -- it
15 included murder cases.
16       How many murder cases did you try during that
17 time period?
18    A.  One.
19    Q.  Okay.  Tell me about that case.
20    A.  It was a prison murder that occurred sometime in
21 the early 1980s at the Lompoc peniten- -- penitentiary
22 up in Lompoc, California.  And I was the only prosecutor
23 on the case.
24    Q.  All right.  And that was you -- you anticipated
25 my next question.

Page 43

1    Q.  So you were the lead lawyer on that case?
2    A.  I was the only lawyer.
3    Q.  All right.  Did that case go -- and I guess it
4 went to trial?
5    A.  Correct.
6    Q.  Was that a capital case?
7    A.  No.
8    Q.  Have you ever tried a capital murder case?
9    A.  No.
10    Q.  Have you had any other murder cases other than
11 that one in your career as a prosecutor?
12    A.  Not as the trial lawyer.
13    Q.  And so in what capacity have you served on other
14 murder cases?
15    A.  When the U.S. Attorney's Office here made death
16 penalty recommendations to the Attorney General, I was
17 involved in reviewing those cases and on -- on phone
18 calls with the Attorney General regarding those
19 decisions.
20    Q.  All right.  So you served in some sort of a death
21 penalty review panel?
22    A.  Correct.
23    Q.  All right.  So you weren't really ever assigned
24 to those case, those were just homicides that came
25 across your desk in your capacity as a member of a death

Page 44

1 penalty review panel?
2       MS. GREEN:  Objection to form.
3       THE WITNESS:  Correct.
4       MR. EAVES:  All right.
5       MS. GREEN:  Just give me a minute to object.
6 BY MR. EAVES:
7    Q.  Yeah, Amelia is just saying --
8    A.  I understand.
9    Q.  If we just pause for a second, it will make the
10 record clearer.
11       All right.  I'm curious as to what types of
12 criminal trials you did at the U.S. Attorney's Office.
13 My sense is that it's a little bit different than maybe
14 being a prosecutor at a -- a local prosecutor's office.
15       Is -- do you find that to be true?
16       MS. GREEN:  Objection to form.
17       THE WITNESS:  That's sort of a broad
18 question.  I think it depends on individual experiences.
19 I've -- I've known some D.A.s who prosecuted a lot of
20 cases that were similar to the cases that I prosecuted
21 in the U.S. Attorney's Office.  There were -- I
22 prosecuted a wide variety of cases in the U.S.
23 Attorney's Office.  A lot of robberies, a -- a murder
24 case, an extortion case, a -- cases like that, you would
25 expect to be prosecuted by local D.A.s as well.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
45—48

Page 45

1     MR. EAVES:  You know what, I think we're
2  going to take a break.  Mr. Drooyan, you're -- you're
3  bleeding --
4     THE WITNESS:  Oh.
5     MR. EAVES:  -- on your hand.
6     THE WITNESS:  Okay.
7     MR. EAVES:  Let's take a little break so you
8  can address that.
9     THE WITNESS:  Oh, yeah.  Okay.
10     THE VIDEOGRAPHER:  Counsel, you want to go
11  off the record?
12     MR. EAVES:  Yes, please.
13     THE VIDEOGRAPHER:  We are off the record.
14  The time is 10:59 a.m.
15     (Recess.)
16     THE VIDEOGRAPHER:  We are on the record.
17  The time is 11:08 a.m.
18     THE REPORTER:  Last question?
19     MR. EAVES:  Yes, please.
20     (The previous question was read back by the
21     court reporter as follows:
22     "QUESTION:  All right.  I'm curious as to
23     what type of criminal trials you get the --
24     at the U.S. Attorney's Office.  My sense is
25     it's a little bit different than maybe being

Page 46

1     a prosecutor at a local prosecutor's office.
2     Do you find that to be true?")
3  BY MR. EAVES:
4     Q.  Yes, I think the question was at U.S. Attorney's
5  Offices.  I think you were in the middle of answering
6  that when we took a break.
7     A.  Yeah.  And again, as I said, I think it depends
8  on the individual, what kind of experience you might
9  have.  I prosecuted serious cases -- a series of cases
10  with the Orange County District Attorney's Office.  And
11  they brought that case to the U.S. Attorney's Office.
12  Similarly, I prosecuted a racketeering extortion case
13  with a Deputy D.A. from Los Angeles County, and -- and
14  they brought that case to the U.S. Attorney's Office.
15  So in -- in those cases, those were cases, those were
16  cases that were similar to cases that were being
17  prosecuted by local offices as well.
18     I mean there are -- there certainly are
19  differences between the offices, and -- and the U.S.
20  Attorney's Office tend to be vertically integrated in
21  the sense that you do your investigation, you do your
22  prosecution, you do your appeals.  There tends to be --
23  there tends to be more writing in the U.S. Attorney's
24  Office than there is in the D.A.'s Office.
25     And there -- there tended to be fewer trials in

Page 47

1  the U.S. Attorney's Office.  Deputy D.A., I -- my
2  impression was we get many more trials, smaller cases
3  than you might get in the U.S. Attorney's Office.
4     Q.  All right.  And do you feel like there were fewer
5  murder trials in the U.S. Attorney's Office than there
6  were in the local D.A.'s Office?
7     MS. GREEN:  Objection to form.
8     THE WITNESS:  Yeah.  No question about it,
9  yes.
10  BY MR. EAVES:
11     Q.  And why is that?
12     A.  Federal jurisdiction over murder cases was pretty
13  limited.  Had to be on a -- call it a federal
14  reservation like a federal prison or had to be a -- a --
15  a federal official victim of a murder.  Or it could be
16  combined in a RICO case or racketeering case where you
17  could bring in state murders into a -- a RICO type of
18  case.
19     But, you know, those were significant cases when
20  they were prosecuted by the U.S. Attorney's Office, but
21  they weren't as often as a -- state murder cases.
22     Q.  All right.  You mention RICO cases.  And what
23  does RICO stand for?
24     A.  Racketeering Influenced Corrupt --
25     Q.  Organization?

Page 48

1     A.  -- Organizations.
2     Q.  Okay.  And tell me, generally, what is a RICO
3  prosecution?
4     A.  A RICO prosecution is a prosecution of a series
5  of related offenses -- offenses committed by an --
6  what's known as an enterprise.  It can be a formal
7  enterprise or it can be an association-in-fact among
8  individuals.
9     So an example was the racketeering case I
10  prosecuted with somebody from the L.A. County District
11  Attorney's Office.  It involved three individuals, two
12  former death row inmates and a woman who was the owner
13  of a gold refining business.  That was the enterprise.
14  And they committed a series of extortions and robberies,
15  robberies of gold from postal vehicles.
16     Amazingly enough, gold was transported through
17  the United States mails back then.  And they would steal
18  the gold out of the trucks.  And they also committed
19  robberies of gold refining -- gold refining businesses,
20  as I recall.
21     Q.  So is it true that a RICO prosecution involves a
22  few of several offenses that have to be mixed together
23  in order to establish the conviction?
24     MS. GREEN:  Objection to form.
25     THE WITNESS:  You have to have more than one



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
49–52

1  offense, and it has to be of -- particular types of
2  offenses, murder, robbery, extortion, and serious
3  narcotics violations.  And it has to be committed by
4  this enterprise for the benefit of the enterprise or
5  through the enterprise.  There are various different
6  permeations under the RICO statute.
7  BY MR. EAVES:
8    Q.  All right.  And so did any of the RICO -- and I
9  assume when you say "racketeering," you're referring to
10  RICO cases?
11    A.  Correct.
12    Q.  Did any of those cases involve murders that
13  you've prosecuted?
14    A.  No.
15    Q.  And that's true of the cases that were brought to
16  you by the L.A. District Attorney's Office?
17      MS. GREEN:  Objection to form.
18      THE WITNESS:  Correct.
19  BY MR. EAVES:
20    Q.  So in your six years as an Assistant
21  U.S. Attorney before becoming the chief of criminal
22  complaints --
23    A.  No.
24    Q.  I'm sorry?
25    A.  You're misreading it.  I was -- I became chief of

1  criminal complaints after I had been in the U.S.
2  Attorney's Office for about three-and-a-half years.
3    Q.  I see that.  You're correct.  And I apologize for
4  the oversight.
5      You became chief of criminal complaints,
6  according to your CV, in 1982; right?
7    A.  Correct.
8    Q.  All right.  So you became chief assistant in
9  1984?
10    A.  Correct.
11    Q.  All right.  So before you became chief assistant
12  during those years, from '78 to '84, you describe
13  murder, robbery, racketeering, mail and securities
14  fraud.  You've told me none of your racketeering cases
15  involved homicide.  So it looks like of this list,
16  you've got listed two violent crimes, murder and
17  robbery --
18      MS. GREEN:  Objection --
19  BY MR. EAVES:
20    Q.  -- is that right?
21      MS. GREEN:  Objection to form.
22      THE WITNESS:  There were a number of
23  robberies, but yes.  In terms of categories, no, I would
24  also include the extortion -- I mean it was threat of,
25  you know, bodily injury.  So I would consider that to be

1  a violent crime as well.
2  BY MR. EAVES:
3    Q.  That would come under the racketeering cases?
4    A.  The extortion cases, yes, there were -- that was
5  a racketeering case.
6    Q.  All right.  And how many extortion cases did you
7  have involving threat of bodily harm?
8    A.  The one racketeering case.
9    Q.  All right.  Have you only ever tried one
10  racketeering case?
11    A.  No.  I've tried two.
12    Q.  Two.
13      And when did you try those?
14    A.  The first one was -- I was chief of the fraud
15  section when the -- I tried the first case with the
16  Deputy D.A. from Los Angeles County.
17    Q.  Were you lead counsel?
18    A.  We divided the case along the following lines.
19  There were 35 witnesses.  I took 34 of the witnesses and
20  he took the informant.  And I would say we divided it
21  equally.
22    Q.  Who did openings?
23      MS. GREEN:  Objection to form.
24      THE WITNESS:  I think I did the opening
25  statement.

1  BY MR. EAVES:
2    Q.  All right.  Who did closings?
3    A.  I think -- I think he did the closing argument
4  and I did the rebuttal.
5    Q.  All right.  How about the second racketeering
6  case that you tried, when was that?
7    A.  That would have been in '86, I would say,
8  approximately.
9    Q.  All right.  And were you lead counsel in that
10  one?
11      MS. GREEN:  Objection to form.
12      THE WITNESS:  Well, I was trying the case
13  with the District Attorney of Orange County himself.  So
14  I don't think we designated either of us as lead
15  counsel.  I did most of the work putting the case
16  together.  I was much more familiar with federal law, so
17  I was responsible for drafting the indictment and
18  shaping the charges.  And I did the opening in the case,
19  and I think I did the rebuttal and he did the closing,
20  but I -- I could have those two flipped, but I did two
21  of the three --
22  BY MR. EAVES:
23    Q.  All right.
24    A.  -- arguments.
25    Q.  How many robbery cases did you try?

ESQUIRE
DEPOSITION SOLUTIONS

Page 53

1        MS. GREEN:  Objection to form.
2        THE WITNESS:  Four or five.  Maybe a little
3   bit more than that.
4   BY MR. EAVES:
5     Q.  All right.  And the rest would been mail or
6   securities fraud, the rest of your 20 cases?
7        MS. GREEN:  Objection to form.
8        THE WITNESS:  Of the significant cases, yes.
9   BY MR. EAVES:
10    Q.  And did you carry what I would call a regular
11  trial caseload any time after 1984 as a prosecutor?
12       MS. GREEN:  Objection to form.
13       THE WITNESS:  Yes.
14  BY MR. EAVES:
15    Q.  I see that --
16    A.  And I say yes.  I had -- from '84 to '87, I had a
17  corruption investigation involving various city councils
18  in Los Angeles County and the state legislature.  And
19  there were -- there were five different cases that were
20  brought as a result of that investigation with the
21  Orange County D.A.'s Office.
22    Q.  So the Orange County D.A.'s Office prosecuted
23  those cases to trial?
24    A.  With me, yes.  I tried each of the cases with
25  either the chief assistant in the Orange County D.A.'s

Page 54

1   Office or with the Orange County District Attorney
2   himself.
3     Q.  All right.  And so when you were chief assistant
4   between '84 -- was it '84 and '87?
5     A.  Correct.
6     Q.  Was that your primary duty --
7        MS. GREEN:  Objection to form.
8   BY MR. EAVES:
9     Q.  -- handling those cases?
10    A.  No.  It was one of my duties.  My primary duties
11  were to be the adviser to the United States Attorney to
12  be the -- in effect, the acting U.S. Attorney while the
13  U.S. Attorney was either away from the office or in
14  trial.  And he was in trial -- trial for over a year.
15       I was also responsible for reorganizing the
16  Criminal Division, so I had a lot of other
17  responsibilities.  One of -- and I interviewed every
18  applicant for a -- a job for -- as an Assistant
19  U.S. Attorney.  So I had some administrative
20  responsibilities.  So there were -- there were a variety
21  of responsibilities --
22    Q.  Okay.
23    A.  -- with that.
24    Q.  That's fair.
25       Did you take on any cases other than the cases

Page 55

1   related to the situation that you just described when
2   you were chief assistant between '84 and '87?
3        MS. GREEN:  Objection to form.
4        THE WITNESS:  No.  I think the only cases
5   that I handled and prosecuted during that period of time
6   were the -- what I will call the Moriarty cases.
7   BY MR. EAVES:
8     Q.  And those were the cases that involved some kind
9   of widespread fraud that you prosecuted in conjunction
10  with the local District Attorney's Office?
11    A.  Orange County District Attorney's Office.
12    Q.  Orange County?
13    A.  Yeah.
14    Q.  Okay.
15    A.  I also -- probably during that period of time,
16  I -- I also was -- handled some appeals from cases that
17  I'd previously prosecuted.
18    Q.  Understood.
19       All right.  We jumped ahead a little bit talking
20  about your -- your stint -- your first stint as chief
21  assistant.  Let's back up a little bit.
22    A.  Okay.
23    Q.  In '82, you became chief of the criminal
24  complaints section.  We talked about what that section
25  was.

Page 56

1        How is it that you became chief?
2     A.  The person who was the interim U.S. Attorney at
3   that time, Alex Williams, called me into his office,
4   asked me what my future plans were.  I think he assumed
5   that I was going to leave since my -- all my best
6   friends were leaving.  And I told him I had no plans to
7   leave, that I was -- loved being an Assistant
8   U.S. Attorney.
9        And he said they want to make me a supervisor,
10  and he offered me chief of appeals, chief of training or
11  chief of complaints, and I took chief of complaints.
12    Q.  Why did you chose that one?
13    A.  Because it was a -- a -- really a self-contained
14  unit that handled a high volume and there was a lot of
15  activity in the -- in that unit.
16    Q.  All right.  That's not a unit that does trial
17  work, though, is it?
18    A.  Correct, it was not a trial unit.  It was a
19  intake unit.
20    Q.  All right.  So it's a pretrial unit that
21  evaluates cases for charging?
22       MS. GREEN:  Objection --
23       THE WITNESS:  Correct.
24       MS. GREEN:  -- to form.
25  ///

RICHARD DROOYAN                                      September 12, 2018
MILKE vs CITY of PHOENIX                             57—60

Page 57

BY MR. EAVES:

2   Q. All right. Does that department take care of
3 anything else other than charging decisions?
4        MS. GREEN: Objection to form.
5        THE WITNESS: Yes.
6 BY MR. EAVES:
7   Q. What?
8   A. It would review search warrant applications. It
9 would review requests for arrest warrants. There
10 were -- it would provide advice to law enforcement
11 officials. Assistant U.S. Attorney would -- one
12 Assistant U.S. Attorney would be on duty 24 hours a day.
13 So you had day duty. You -- you might -- or desk duty,
14 whatever you want to call it. You might get a call in
15 the middle of the night about an arrest or about a
16 question that a federal agent might have.
17        So it -- it -- it had a -- a variety of things,
18 and things were constantly coming up like that.
19   Q. All right. When you were supervisor of the
20 complaints section, did different law enforcement
21 agencies submit paperwork to you and say here's our
22 investigation, please have your department evaluate this
23 for charging?
24   A. Yes.
25        MS. GREEN: Objection to form.

Page 58

1        THE WITNESS: I'm sorry.
2 BY MR. EAVES:
3   Q. Is that essentially how the system worked?
4        MS. GREEN: Objection to form.
5        THE WITNESS: For the significant portion of
6 the cases that were prosecuted by the U.S. Attorney's
7 Office at that time, agencies would submit reports on
8 investigations that they were working. Or if they had
9 arrested somebody, and let's say it was a bank robbery
10 that had happened and the -- the person was arrested
11 outside the bank, they would present that case for an
12 arrest warrant and then they would present it for a
13 complaint and then ultimately for an eval.
14 BY MR. EAVES:
15   Q. All right.
16   A. So it came -- they came in in sort of what I
17 would call reactive case and -- and cases where they
18 were actually, you know, an ongoing investigation. But
19 those type of -- those were the type of cases that were
20 presented to the U.S. Attorney's Office in the criminal
21 complaints unit.
22   Q. All right. And what choices did the attorneys in
23 your unit have when they were presented with a case --
24 one of these reactive cases from a police agency?
25        MS. GREEN: Objection to form.

Page 59

1        THE WITNESS: They could say that there's
2 lack of probable cause and you can't get an arrest
3 warrant. But usually, in a reactive cases, there was
4 more than sufficient probable cause and -- and they
5 would authorize an arrest warrant and a -- and a
6 complaint.
7 BY MR. EAVES:
8   Q. All right. So one of there choices is there is
9 enough evidence to create probable cause here, we're
10 going to charge this case?
11   A. Charge it -- individual Assistant U.S. Attorneys
12 had the ability to authorize an arrest warrant and a
13 complaint. They did not have the authority to, by
14 themselves, authorize seeking an indictment.
15   Q. How would that happen?
16   A. After somebody had been arrested on a complaint
17 or if it was a report from a federal agency on a
18 nonreacted type of case, the criminal complaints unit
19 would get together in the afternoon and cases would be
20 presented to the complaints unit, and the complaints
21 unit would then authorize the filing of an indictment.
22   Q. And as the supervisor of that unit, were you the
23 one that had the discretion to say whether or not an
24 indictment would be filed or was it a group decision?
25   A. It was a group decision, but I had veto power.

Page 60

1   Q. Okay. So individual Assistant U.S. Attorneys did
2 not have the power to say, yes, we'll file an indictment
3 here, but they would staff the cases with the group and
4 the group would make a decision as to whether or not an
5 indictment should be filed?
6   A. Those kind of cases that came through the
7 criminal complaints unit, yes.
8   Q. All right. I'm assuming another choice they
9 could have made is we don't see probable cause, we're
10 rejecting this case?
11        MS. GREEN: Objection to form.
12        THE WITNESS: Correct.
13 BY MR. EAVES:
14   Q. Did that happen very often?
15        MS. GREEN: Objection to form.
16        THE WITNESS: Occasionally.
17 BY MR. EAVES:
18   Q. Okay. Was there a third choice whereby people in
19 the complaint section could say I don't think you got --
20 you have probable cause yet, Agent So-and-so, I'd like
21 to see the following evidence developed?
22        MS. GREEN: Objection to form.
23        THE WITNESS: There were instances in which
24 a Assistant U.S. Attorney would say to an agent, I don't
25 think you have probable cause, you need to get more



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
61–64

Page 61

1  evidence.
2  BY MR. EAVES:
3    Q.  And would they sometimes be specific and say
4  here's what I'd like to see?
5        MS. GREEN:  Form.
6        THE WITNESS:  I assume that happened on
7  occasion.
8  BY MR. EAVES:
9    Q.  All right.  The majority of the time, though,
10  were the reactive cases charged were they were
11  submitted?
12    A.  Yes.
13    Q.  All right.  It looks like you only spent a year,
14  maybe less than a year as chief of the criminal
15  complaints section; is that accurate?
16    A.  Six months.
17    Q.  Okay.  And then you became the chief of major
18  frauds?
19    A.  Correct.
20    Q.  How did that come about?
21    A.  United States Attorney Stephen Trout called me
22  into his office and said, I want you to be the chief of
23  major frauds unit.
24    Q.  All right.  During the six months that you were
25  chief of criminal complaints, you weren't handling a

Page 62

1  trial caseload?
2    A.  That --
3        MS. GREEN:  Form.
4        THE WITNESS:  That's correct, I don't think
5  I had any cases that I was -- that were set for trial or
6  that I was handling as a potential trial.  I certainly
7  did not have a trial during that six-month period of
8  time.
9  BY MR. EAVES:
10    Q.  All right.  And then what were your duties of
11  chief of major frauds when you took over that job in
12  '82?
13    A.  That was an oversight of the six senior Assistant
14  U.S. Attorneys who were handling the most significant
15  white collar cases prosecuted by the U.S. Attorney's
16  Office.
17    Q.  And if you remember, what was the -- what number
18  of cases, on average, did the members -- did the
19  prosecutor members of the -- the major fraud section
20  handle at one time?
21        MS. GREEN:  Objection to form.
22        THE WITNESS:  Hard to say there's an
23  average.  They might have one or two cases that were
24  indicted and set for trial.  They might have one or two
25  cases that were pending appeal, and that they might have

Page 63

1  then a half-dozen cases that were under investigation.
2  BY MR. EAVES:
3    Q.  Was that a relatively low caseload compared to
4  attorneys who would have been in the general prosecution
5  division under -- or in the general prosecution section
6  under the Criminal Division?
7        MS. GREEN:  Objection to form.
8        THE WITNESS:  I -- I can't say.  I'm not
9  sure.
10  BY MR. EAVES:
11    Q.  Okay.  You said you never worked in narcotics?
12    A.  Correct.
13    Q.  You did work in the general prosecution section?
14    A.  Correct.
15    Q.  How many cases did you carry when you were in the
16  general prosecution section --
17        MS. GREEN:  Objection to form.
18  BY MR. EAVES:
19    Q.  -- at that time?  On average?
20    A.  That would have been from October of 1979 until I
21  went into the special prosecutions unit, so it was
22  roughly a year, year and a half.  Maybe as many as a
23  dozen cases.
24        What happened was, when you left the complaints
25  unit, there was a -- you -- you took with you a certain

Page 64

1  number of cases that were under investigation that --
2  and then, you then presented those cases over time to
3  the grand jury for an indictment.  And you then --
4  agents who work with you would come back to you with new
5  cases, so that's how you got your cases.  And that's --
6        The caseload sort of probably started at -- at a
7  dozen, and maybe worked its way down to a half dozen
8  as your cases became bigger and more complex.
9    Q.  Right.
10        Did you carry an active caseload when you were a
11  chief of major frauds?
12    A.  Yes.
13    Q.  How many cases did you carry while you were
14  there?
15        MS. GREEN:  Form.
16        THE WITNESS:  I had two major investigations
17  that I recall that ultimately resulted in charges being
18  filed.  Oh.  I may have had a couple of other trials
19  during that period of time too.  I don't recall, but
20  I -- I have a vague recollection that one case may have
21  spilled over into that period of time as well.
22  BY MR. EAVES:
23    Q.  All right.  So during that two-year period, you
24  said you had a couple of cases that were indicted.  You
25  didn't say tried.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
65—68

1    A.  The case involving the racketeering case with the
2    Los Angeles County D.A.'s Office, I was -- that was
3    tried when I was the chief of major frauds unit.  I also
4    tried a -- an assault case on an Assistant U.S. Attorney
5    when I was chief of the major frauds unit.  And I think
6    all of the Moriarty corruption cases were tried when I
7    was chief assistant, although it's possible that the
8    first case was tried when I was still chief of major
9    frauds.
10   Q.  Okay.  As chief of major frauds, was it part of
11   your duty to mentor or train the attorneys in that
12   section?
13   A.  No.
14   Q.  Why not?
15   A.  They didn't need mentoring or training.  They
16   were pretty experienced prosecutors and they were people
17   I had worked with for several years, and we were in each
18   other's office constantly talking about their cases.
19   But I didn't have to mentor or train any of them.
20   Q.  Okay.  So it looks like you spent two years with
21   direct supervisory duty over frontline prosecutors from
22   '82 to '84; is that fair?
23   A.  Yes.
24   Q.  All right.  Did you ever serve in sort of a
25   frontline supervisory capacity like that again at the

1    U.S. Attorney's Office?
2        MS. GREEN:  Objection to form.
3        THE WITNESS:  Yes.  When I came back to the
4    U.S. Attorney's Office, I -- as chief of Criminal
5    Division and then again as chief assistant.  There were
6    a number of cases where I was directly supervising the
7    assistants who were conducting very significant criminal
8    investigations.
9    BY MR. EAVES:
10   Q.  Okay.  During the six months that you were chief
11   of the criminal complaints division or section, would
12   you expect the attorneys who worked for you to come and
13   report to you any time they saw officer misconduct that
14   they believed rose to the level of exculpatory evidence?
15   A.  Yes.
16   Q.  Did that ever happen in those six months?
17   A.  I believe there were instances in which Assistant
18   U.S. Attorneys advised me of problems with officer
19   testimony or problems with the cases.  I don't have a
20   specific recollection.
21   Q.  All right.  And I'm assuming that if someone told
22   you that an officer lied in a case, that would be a
23   significant event?
24       MS. GREEN:  Form.
25       THE WITNESS:  Yes.

1    BY MR. EAVES:
2    Q.  Did that happen, let's just open it up, at any
3    time that you recall specifically from '82 to '84 when
4    you were chief of complaint and chief of major frauds?
5    A.  Not that I recall.
6        MR. EAVES:  I think they said they were
7    bringing something for us at 11:30.  You guys want to
8    take a break now and come back?
9        THE WITNESS:  It's up to you.  I can keep
10   going.  I'm fine.
11       MS. BURGESS:  It's up to you.
12       THE WITNESS:  We only started -- we started
13   at 10:15, so if you want --
14       MR. EAVES:  Yeah.
15       THE WITNESS:  -- to keep going, I'm fine
16   with that.
17       MR. EAVES:  Okay.  Is everybody else okay
18   with that?  All right.  All right.  Then we'll keep
19   going.
20   BY MR. EAVES:
21   Q.  All right.  After you were chief of major frauds,
22   you became the Chief Assistant U.S. Attorney in 1984.
23   You remained in that position to '87; true?
24   A.  Correct.
25   Q.  Okay.  Did you carry an active caseload in that

1    position?
2        MS. GREEN:  Form.
3    BY MR. EAVES:
4    Q.  Other than the Moriarty cases?
5    A.  No.  Only the Moriarty cases.
6    Q.  Okay.  I want to talk a little bit more about
7    your duties other than the -- the active case duties.
8        You said you filled in for the U.S. Attorney when
9    he was in trial or out of the office.  What do you mean
10   when you say you filled in?
11   A.  I was the acting U.S. Attorney.
12   Q.  What would have you to do in that capacity?
13   A.  I appeared in court when an Assistant U.S.
14   Attorney was accused of misconduct by Judge Keller.  I
15   chaired a -- monthly luncheons with the heads of the
16   federal agency.  Issues that came up that required the
17   attention of the U.S. Attorney, I would be the person
18   who would be responsible for whatever decisions had to
19   be made.  Most of the cases that were prosecuted in the
20   office were prosecuted with the approval of the chief of
21   that Criminal Division at that point in time and didn't
22   always go to the level of the U.S. Attorney.
23   Q.  All right.  So would it be fair to say that,
24   other than your participation in the Moriarty cases and
25   the -- and the related cases, that your duties as Chief



Page 69

1  Assistant U.S. Attorney were administrative versus the
2  duties of a trial lawyer?
3        MS. GREEN:  Form.
4        THE WITNESS:  No.
5  BY MR. EAVES:
6    Q.  Why not?
7    A.  Because I would be reviewing cases that came to
8  the attention of the U.S. Attorney and would be
9  providing my advice to the U.S. Attorney regarding
10  decisions that had to be made with respect to those
11  cases.
12    Q.  What types of cases do you mean?  Can you give me
13  an example?
14    A.  Well, there were -- there was the espionage
15  prosecution.  Actually, there were several espionage
16  prosecutions, but one of which was prosecuted by
17  Mr. Bonner himself.  Then there was second espionage
18  case that I was responsible for assigning to now
19  District Judge Percy Anderson, was U.S. Attorney at the
20  time.
21        And I had some limited input into a decision --
22  or into an investigation involving General Dynamics that
23  I remember giving some input to the U.S. Attorney, but I
24  was largely tied up with the Moriarty case so I didn't
25  have huge involvement in that case.

Page 70

1        Those are the ones I remember.  But on a regular
2  basis, I would be talking to the U.S. Attorney about
3  matters pertaining to cases that were being prosecuted
4  or investigated by the office.
5    Q.  Just day-to-day issues that would came up that
6  needed the U.S. Attorney's attention or something like
7  that?
8        MS. GREEN:  Form.
9        THE WITNESS:  Correct.
10  BY MR. EAVES:
11    Q.  All right.  So, and this is something that would
12  happen when he was in trial or he was out of state?
13    A.  Well, then I had the -- the actual responsibility
14  of making the decision and for handling the matters.
15    Q.  Okay.  All right.  And then you left the office
16  in 1987 and went into private practice.
17        Why did you do that?
18    A.  Well, the primary reason was I wanted to sort of
19  enhance my qualifications to ultimately be the
20  U.S. Attorney, which was a goal of mine.  And I was also
21  interested in making some more money.
22    Q.  Fair enough.
23        You went to work for a firm called Skadden Arps?
24    A.  Correct.
25    Q.  And what did you do for that firm?  What type

Page 71

1  of -- let me ask a better question.
2        Were you hired on as an associate attorney?
3    A.  No.
4    Q.  Partner?
5    A.  Yes.
6    Q.  Okay.  And what type of work did you do while you
7  were at Skadden Arps?
8    A.  I did some white collar criminal defense work,
9  not a lot, but some.  Mostly civil litigation, several
10  years where I was handling entertainment litigation, and
11  then for several years I handled a very complex case
12  involving 10 international banks that were suing Bank of
13  America.
14    Q.  So was -- would it be fair to say you were doing
15  mostly business litigation?
16        MS. GREEN:  Form.
17        THE WITNESS:  Yes.
18  BY MR. EAVES:
19    Q.  Did any of the cases that you handled that were
20  commercial litigation cases go to trial while you were
21  at Skadden Arps?
22    A.  There was one entertainment case that went to
23  trial in federal court, and there were several
24  entertainment cases that were tried, in effect, in
25  arbitration.  That's what I recall.

Page 72

1    Q.  Okay.  And were you lead trial counsel in any of
2  those cases?
3        MS. GREEN:  Form.
4        THE WITNESS:  I was lead trial counsel in
5  all those cases.
6  BY MR. EAVES:
7    Q.  All right.
8    A.  Oh, excuse me.  With one exception.  There was
9  one -- there was an arbitration involving -- it was a
10  securities arbitration, and Frank Rothman was the lead
11  lawyer on that arbitration and I was second chair.
12    Q.  All right.  And then you left Skadden Arps after
13  five years in 1993?
14    A.  Six years, actually.
15    Q.  Okay.  And why did you leave?
16    A.  Because I really wanted to go back to the U.S.
17  Attorney's Office.
18    Q.  Okay.  Did someone from the U.S. Attorney's
19  Office call you and lure you back with a position?  Or
20  how did that work?
21    A.  The person who became the U.S. Attorney, Nora
22  Manella, is a close personal friend of mine.  And I
23  called her up one day and I told her I wanted to come
24  back to the U.S. Attorney's Office.
25    Q.  All right.  And did she tell you -- did she take



Page 73

1  you back as chief of -- chief of the Criminal Division?
2     A.  Yes.
3     Q.  All right.  One of the things that I tracked
4  through your CV is that -- it's a little bit difficult
5  to track the number of attorneys that were working for
6  you or working for the office.  So I hope maybe you
7  could give me some insight into that.
8     A.  Okay.
9     Q.  So at the time that you came back as chief of the
10  Criminal Division, you said you supervised 160
11  prosecutors?
12     A.  Correct.
13     Q.  Were those all of the --
14        MS. GREEN:  Object --
15  BY MR. EAVES:
16     Q.  -- frontline prosecutors that were working in the
17  Criminal Division at that time?
18     A.  Yes.
19     Q.  Okay.
20        MS. GREEN:  He says 160 prosecutors and
21  support staff.
22        THE REPORTER:  I'm sorry?
23        MR. EAVES:  I'm sorry, Amelia, what was
24  that?
25        MS. GREEN:  I said, I believe the CV says,

Page 74

1  just to correct the record of the exhibit we're looking
2  at, 160 prosecutors and support staff.
3  BY MR. EAVES:
4     Q.  Was it 160 prosecutors?
5     A.  Yes.
6     Q.  All right.  So support staff was in addition to
7  the 160?
8     A.  Correct.
9     Q.  All right.  And that number seemed a lot higher
10  than a brief time before that in your CV.
11     A.  Yes.
12     Q.  Give me just a second.
13     A.  Down at the bottom of the first page.
14     Q.  Yeah.  It says that there were 150 --
15     A.  100 --
16     Q.  I'm sorry, 105 Assistant U.S. Attorneys in all
17  divisions.  And that was 1984 to '87.  And now as of '94
18  to '96 we've got, just in the Criminal Division alone,
19  160 attorneys; is that right?
20     A.  Yeah, it grew --
21        MS. GREEN:  Form.
22        THE WITNESS:  It grew significantly.  In the
23  time that I was gone from the office was the time of
24  the -- one of the things that happened was the savings
25  and loan crisis, and there were a lot of additional

Page 75

1  prosecutors that were allocated to the U.S. Attorney's
2  Office to handle those cases.  And then beyond that,
3  generally, the office just grew significantly.
4  BY MR. EAVES:
5     Q.  All right.  Any other reason for the growth?
6     A.  Well, I think during that period of time you also
7  had the war on -- on drugs under the George H.W. Bush
8  administration.  So I think there were significant
9  enhancement of the narcotics prosecutors.
10     Q.  Okay.  Tell me what your responsibilities were as
11  chief of the Criminal Division at that time, between '94
12  and '96?
13     A.  I had oversight responsibility for all of the
14  cases that were -- all of the Assistant U.S. Attorneys
15  in the Criminal Division.  I made the prosecutive
16  decisions in all of the significant cases that were
17  prosecuted by the office.
18     Q.  Did you carry an active caseload?
19        MS. GREEN:  Objection to form.
20        THE WITNESS:  I tried two cases when I was
21  chief of the Criminal Division, and I think I argued an
22  appeal or two.
23  BY MR. EAVES:
24     Q.  And what were the cases that you tried as chief
25  of the Criminal Division?

Page 76

1     A.  The first case was a -- a failure to declare
2  currency by an individual who was leaving the United
3  States.  And the second case was a civil rights
4  violation against an individual who assaulted a Hispanic
5  person in the park in -- out in the desert area.
6     Q.  Was that a criminal prosecution?
7     A.  Yes.
8     Q.  For a civil rights violation?
9     A.  Yes.
10     Q.  How does that work?
11        MS. GREEN:  Form.
12        THE WITNESS:  There are two kinds of cases
13  that can be prosecuted criminally.  One are against law
14  enforcement officials who misuse their position.  We
15  can -- in various different ways.  And also individuals
16  who commit crimes as a result of racial or ethnic
17  animus.
18  BY MR. EAVES:
19     Q.  Okay.  That's kind of what we generally call hate
20  crimes?
21     A.  Yes.
22     Q.  All right.  And do you remember what the
23  sentences were for those two cases -- first of all, I
24  guess I shouldn't presume that there were convictions.
25     A.  There were.



RICHARD DROOYAN                                    September 12, 2018
MILKE vs CITY of PHOENIX                           77–80

Page 77

1    Q.  Okay.  What was the sentence for the failure to
2    declare currency?
3    A.  Probably probation.
4    Q.  Okay.  How about for the civil rights violation?
5    A.  Less than a year, but I don't remember.
6    Q.  All right.  So those aren't the biggest cases
7    going on in the U.S. Attorneys Office during those
8    years?
9        MS. GREEN:  Form.
10       THE WITNESS:  That's correct, absolutely.
11   BY MR. EAVES:
12   Q.  Why is that?
13   A.  Because I couldn't try a case that was going to
14   take more than a few days and still do all of my
15   responsibilities as chief of the Criminal Division so I
16   selected cases that looked to me like they were one- or
17   two-day trials.
18   Q.  All right.  And you did two of those during your
19   stint as chief of the Criminal Division?
20   A.  Correct.
21   Q.  Okay.  How did your supervisory duties over the
22   prosecutors differ when you were chief of the Criminal
23   Division when -- than what they would have been when you
24   were chief of major frauds?  Obviously, it's a larger
25   division, but is there a layer of removal in that

Page 78

1    supervision as well?
2        MS. GREEN:  Form.
3        THE WITNESS:  Yes.  You're not as close to
4    it, so the cases that came up to the chief of the
5    Criminal Division were more significant cases.  But I
6    had the final say-so authority to authorize prosecution
7    in those cases.  Whereas when I was chief of major
8    frauds, although I probably technically had the
9    authority, I would usually run it by the chief of the
10   Criminal Division.
11   BY MR. EAVES:
12   Q.  All right.  So in terms issues that would come up
13   in cases, is it fair to say that frontline attorney
14   experiences an issue in a case, whether it's in court or
15   during an investigation, they would go to their section
16   chief first?
17       MS. GREEN:  Form.
18   BY MR. EAVES:
19   Q.  Yes?
20   A.  Correct.
21   Q.  If the section chief couldn't resolve the issue
22   and needed to go a step, they would come to the Criminal
23   Division chief?
24       MS. GREEN:  Form.
25       THE WITNESS:  Correct.

Page 79

1    BY MR. EAVES:
2    Q.  All right.  And then if the Criminal Division
3    chief couldn't resolve it at that time, who would you go
4    to?
5    A.  When I was chief of Criminal Division?
6    Q.  Yes, sir.
7    A.  I almost always resolved it.  The U.S. Attorney
8    delegated to me all the responsibility for making
9    prosecutive decisions in the Criminal Division.
10   Q.  So did you answer directly to the U.S. Attorney
11   when you were chief of Criminal Division?
12   A.  Yes.
13   Q.  All right.  During '94 and '96 when you were
14   chief of the Criminal Division, did anyone ever report
15   to you a significant incident involving police
16   misconduct that would rise to the level of exculpatory
17   impeachment evidence?
18       MS. GREEN:  Form.
19       THE WITNESS:  The only issue I remember was
20   involving that IRS agent that I told you about.  And
21   there was an incident in trial that caused me to take
22   the -- one of the two prosecutors off of the case when
23   it was in trial.  And then after I did further
24   investigation, I concluded that there was some
25   significant issues with respect to the credibility of

Page 80

1    this IRS agent generally.  And I called the chief of the
2    criminal investigation division over at the IRS and told
3    him that we wouldn't prosecute cases involving this IRS
4    agent anymore.
5    BY MR. EAVES:
6    Q.  All right.  Did that happen when you were chief
7    of the Criminal Division?
8    A.  Yes.
9    Q.  Okay.  Let's talk about that case in a little
10   more detail.  I know you told me a little bit about it
11   before in the context of you had to answer -- or you had
12   to refer yourself essentially to the Office of
13   Professional Responsibility in D.C. --
14       MS. GREEN:  Form.
15   BY MR. EAVES:
16   Q.  -- is that right?
17   A.  That's the case.
18   Q.  And so, let's talk about the facts of that case a
19   little bit more so I can understand the testimony you
20   just gave.
21   A.  Okay.
22   Q.  What was the charge in the case where you became
23   concerned about this IR agent -- this IRS agent's
24   testimony?
25   A.  It was a -- it was a tax fraud case.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
81–84

Page 81

1    Q. Okay.

2         THE REPORTER:  Sorry?

3         THE WITNESS:  Tax fraud.

4   BY MR. EAVES:

5    Q. And can you give me the relevant facts to help me
6   understand what the concerning statement was or the
7   concerning conduct was by this IRS agent?

8    A. So what happened was that during the course of
9   his testimony during the trial, he disclosed that the
10  prosecutor who happened to be from the Tax Division in
11  Washington, D.C., not the Assistant U.S. Attorney, had
12  given him a script on what he was supposed to say in
13  the -- in his testimony.

14       And that was then brought to my attention.  I
15  don't remember, it may have come to me from the judge
16  himself, but in one way or the other, it was brought to
17  my attention.  And I -- as a result, I took the attorney
18  off of the case for the balance of the trial.  And it
19  resulted in a conviction.

20       And then when I started to do a little bit
21  further investigation because I had a little more time,
22  a number of Assistant U.S. Attorneys told me that they
23  had had significant problems with this IRS agent as a
24  witness, and they basically didn't trust him.

25   Q. All right.  And when you conducted that

Page 82

1   investigation after the trial that you mentioned, that's
2   the first you heard about the significant problems that
3   other U.S. Attorney's Office had had with this IRS
4   agent?

5         MS. GREEN:  Form.

6         THE WITNESS:  Correct.  I did not know about
7   that when I took the Tax Division lawyer off the case
8   because I thought she had shown poor judgment in
9   providing this witness with a script.

10  BY MR. EAVES:

11   Q. All right.  Did you determine that she had
12  actually provided him with a script?

13   A. Yes.

14   Q. All right.  And so what was it about his conduct
15  that you found objectionable?  From -- from what you
16  just described, it sounds like he said or maybe
17  testified that the tax lawyer had given him a script.
18  It sound like you said she did give him a script.

19       What did he do that was concerning to you?

20   A. In that particular situation right there,
21  nothing.  And I -- it was only after other Assistant
22  U.S. Attorneys came to me and started to relate their
23  own experiences with him that I had cause for concern
24  about his general credibility as a witness.

25   Q. What kinds of incidents did the other U.S.

Page 83

1   Attorneys relate to you that gave you concerns about his
2   credibility?

3    A. I don't recall specifics, but in effect, he was
4   trying to run their cases for them.

5    Q. All right.  So that tells me that he was maybe
6   aggressive and pushy, but I don't see how that relates
7   to credibility.

8         MS. GREEN:  Form.

9         THE WITNESS:  Because when they tried to
10  tell him to focus on the area of his expertise, he just
11  ignored them.  And they just basically didn't trust him
12  and didn't want him as a witness in their cases anymore.

13  BY MR. EAVES:

14   Q. All right.  Did you talk to anyone at the IRS
15  other than his supervisor about his behavior?

16   A. I didn't talk to his direct supervisor.  I talked
17  to the chief of the criminal investigations division who
18  was the head of that office.

19   Q. All right.  Other than talking to -- to -- well,
20  let me ask you this.  Were the U.S. Attorneys who came
21  to you after that trial and complained about this IRS
22  agent, did they seem to be allied with the Tax Division
23  attorney who had been pulled off the case?

24       MS. GREEN:  Form.

25       THE WITNESS:  In the sense that they were

Page 84

1   giving sort of background that caused her to do what she
2   did.

3   BY MR. EAVES:

4    Q. Did you make an attempt to talk to anyone other
5   than U.S. Attorneys who were allied with her about the
6   allegations against this IRS agent?

7         MS. GREEN:  Form.

8         THE WITNESS:  I'm not sure they were allied
9   with her.  They -- they had experiences in dealing with
10  this IRS agent.  And as I started to hear some stories
11  and ask around, this is what I learned.  They weren't --
12  I mean, they were providing information to put some
13  context, but the decision to take her off the trial I
14  had already made.

15  BY MR. EAVES:

16   Q. Did you find as a result of your, let's call it
17  investigation here, that you had concerns about
18  instances where this IR agent -- IRS agent had been
19  untruthful?

20   A. Specifically, no.

21   Q. All right.  What was the specific grounds which
22  you cited to whomever it was at the IRS for the reason
23  that you were not going to take anymore cases from this
24  agent?

25       MS. GREEN:  Form.



RICHARD DROOYAN                                   September 12, 2018
MILKE vs CITY of PHOENIX                          85—88

Page 85

1    THE WITNESS:  He had been a difficult
2  witness for Assistant U.S. Attorneys who had bad
3  experiences with him, and I didn't -- they didn't trust
4  him and I didn't trust him and I didn't want him on our
5  cases anymore.
6  BY MR. EAVES:
7    Q.  All right.  And I understand the difficulty.  It
8  sound like you found that he was not a person who played
9  well with others?
10     MS. GREEN:  Form.
11     THE WITNESS:  Unfortunately.
12  BY MR. EAVES:
13    Q.  And so I can understand you don't want to work
14  with a guy who doesn't work well with others; right?
15     MS. GREEN:  Form.
16     THE WITNESS:  I don't want to work with
17  somebody who I don't trust to provide me with the
18  information I need and who basically wouldn't listen to
19  anybody.
20  BY MR. EAVES:
21    Q.  All right.  And the issue I'm getting at here is
22  the trust part.  What did you find that caused you not
23  to trust this agent?  I understand he was pushy.  I
24  understand he didn't respond well when people told him
25  to -- you know, to do certain things.

Page 86

1    What did you find to cause you to think you
2  couldn't trust him?
3     MS. GREEN:  Form.
4     THE WITNESS:  I don't recall specifics
5  beyond what I just indicated to you.
6  BY MR. EAVES:
7    Q.  Okay.  That's fair.
8    Did the IRS agent in question, did his conduct
9  rise to the level of what you would consider misconduct?
10     MS. GREEN:  Form.
11     THE WITNESS:  No.
12  BY MR. EAVES:
13    Q.  Why not?
14    A.  I don't recall anybody saying he had specifically
15  misrepresented anything or specifically testified
16  falsely in any case.
17    Q.  All right.  Other than contacting one of the
18  higher-ups at the IRS, what action did you take in
19  regard to this IRS agent?
20    A.  Nothing.  I called the IRS -- the chief of
21  Criminal Division for the IRS and told him that I -- we
22  wouldn't prosecute any cases in which this agent was
23  involved as a witness.
24    Q.  All right.  As a prosecutor, did you understand
25  that making a decision like that could have a

Page 87

1  significant impact on the career of an IRS agent?
2     MS. GREEN:  Form.
3     THE WITNESS:  It would certainly have an
4  impact, yes.
5  BY MR. EAVES:
6    Q.  How so?
7    A.  It caused him to be transferred from the Criminal
8  Division to another division in the IRS.
9    Q.  What division was he transferred to; do you know?
10    A.  I don't know.
11    Q.  Did he remain in a role as an investigative
12  agent?
13    A.  He was a revenue agent as -- in the Criminal
14  Division, you have revenue agents and you have special
15  agents.  And he remained as -- in effect, he had the
16  same duties, but not in criminal cases.
17    Q.  So he was taken off of all criminal cases as a
18  result of -- of the action that you took?
19    A.  At least in our district, yes.
20    Q.  All right.  And do you understand the complaint
21  that he raised against you to be related to his feeling
22  that it was unfair?
23    A.  Yes.
24    Q.  Okay.  What did he say specifically about that,
25  if you remember?

Page 88

1    A.  I don't remember.
2    Q.  Okay.  But your recollection is that he took some
3  action against you because he felt that your
4  blackballing him from participation in any criminal
5  cases in your office was unfair?
6     MS. GREEN:  Form.
7     THE WITNESS:  I don't think he took any
8  action against me.  I think he -- he complained, and I
9  think he may have complained to me.  And when I got the
10  complaint, I viewed it as a complaint that I had
11  retaliated against him for his testimony in the trial.
12  And that's a complaint of misconduct, and I referred the
13  complaint to the Office of Professional Responsibility.
14  And I wrote a -- as I said, a seven-page single space
15  letter explaining my decision.
16  BY MR. EAVES:
17    Q.  All right.  Did you take any action to keep a
18  file on this agent within the U.S. Attorney's Office or
19  Department of Justice regarding your concerns about his
20  trustworthiness?
21     MS. GREEN:  Form.
22     THE WITNESS:  No, because the chief of
23  criminal investigations division said he was going to
24  transfer him out of the division and he wouldn't be
25  involved in any of our cases.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
89—92

Page 89

1 BY MR. EAVES:
2    Q.  Even on the day of his transfer there would have
3 been cases which came after that which could have
4 required him to testify; correct?
5       MS. GREEN:  Form.
6       THE WITNESS:  No, I don't think so.  I think
7 once that he was taken off the -- the cases, they would
8 just substitute a different revenue agent.
9 BY MR. EAVES:
10    Q.  All right.  So your answer is that you took no
11 action to put him on a list or to create a file about
12 concerns about his trustworthiness within DOJ?
13       MS. GREEN:  Form.
14       THE WITNESS:  I removed him from our cases
15 so I didn't think it was necessary to do anything more
16 than that.
17       MR. EAVES:  Okay.  All right.  This is
18 probably a pretty good chance to take a break here.
19 Let's -- let's try to make it quick.  They brought some
20 lunch.
21       THE WITNESS:  Okay.
22       THE VIDEOGRAPHER:  This marks the end of
23 Media Unit 1.  We are off the record at 12:01 p.m.
24       (Recess.)
25       THE VIDEOGRAPHER:  This marks the start of

Page 90

1 Media Unit 2.  We are on the record at 12:47 p.m.
2 BY MR. EAVES:
3    Q.  All right.  Mr. Drooyan, we took a break.
4       Did you have a chance to speak with counsel while
5 we were on the break?
6    A.  Yeah, I guess.
7    Q.  After speaking with counsel, did you want to
8 change any of your answers?
9    A.  No.
10    Q.  All right.  Let me ask you one -- jump back a
11 little bit.  The perjury prosecution that you did of the
12 woman who -- you felt like lied in -- in the grand jury,
13 was she convicted for perjury?
14    A.  She was convicted of whatever we charged her
15 with.
16    Q.  That's right, you said you weren't sure if it was
17 perjury or not?
18    A.  Correct.
19    Q.  Yeah.
20    A.  I think it was, but I'm not a hundred percent
21 sure.
22    Q.  All right.  I think we're up to '97/'98 when you
23 went from Criminal Division chief to Chief Assistant
24 U.S.A. again.
25    A.  Right.

Page 91

1    Q.  So I'm just saying that as kind of a marker for
2 you.
3    A.  Okay.
4    Q.  All right.  So tell me the circumstances as to
5 how you became Chief Assistant U.S.A. in 97.
6    A.  The then existing -- then chief assistant left
7 the office, and the United States Attorney and I
8 discussed whether I should stay as chief of Criminal
9 Division or whether I should become chief assistant
10 again.
11    Q.  And how did that discussion go?
12    A.  She said whatever you want to do, and I said I
13 want to be chief assistant.
14    Q.  All right.  You said that the responsibilities of
15 Chief Assistant U.S.A. changed that second time you took
16 the position?
17    A.  A little bit, yes.
18    Q.  How so?
19    A.  I was heavily involved in continuing to supervise
20 the most significant cases being prosecuted in the
21 office.  And the chief of the Criminal Division who
22 replaced me basically was responsible for all the other
23 cases.  But I sort of had a group of cases that I had
24 been supervising, and so I continued to supervise those
25 cases.  Supervising meaning supervising the people who

Page 92

1 were running the investigations of those cases.
2       And then also occasionally I would get directly
3 involved in supervising an -- a case where we should
4 some issues or problems where we needed to have some
5 direct supervision on it, so. . .
6    Q.  All right.  So -- so tell me, which cases were
7 you heavily involved in in '97/'98 when you were chief
8 assistant?  What types of cases?
9       MS. GREEN:  Form.
10       THE WITNESS:  What types of cases?  Well, we
11 had -- at one point we had investigated and indicted the
12 governor of Arizona.  I was heavily involved in the
13 supervision of the Assistant U.S. Attorneys who were
14 handling that case.  And I think that spilled over into
15 the time that I was chief assistant as well, they
16 were -- even when they were trying the case in Arizona.
17       I had been heavily involved in the Mexican
18 Mafia prosecution we did as chief assistant.  I was
19 heavily involved in supervising the Assistant U.S.
20 Attorneys who were handling a Mexican bank money
21 laundering case.
22       I was heavily involved in supervising the
23 assistants who were handling a public corruption case
24 involving Congressman Tucker and councilwoman or
25 assemblywoman -- I'm not quite sure -- Patricia Moore.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
93–96

Page 93

1     I was heavily involved in an investigation
2  of a federal judge in Alabama for mail fraud.  And some
3  of those cases sort of spilled into when I became chief
4  assistant.
5  BY MR. EAVES:
6     Q.  All right.  So the cases that you were heavily
7  involved in supervising as chief assistant were cases
8  that you had been supervising on a more direct level as
9  criminal chief?
10    A.  Some of them --
11        MS. GREEN:  Form.
12        THE WITNESS:  Some of those.  I -- the
13  Mexican bank case was a case that I supervised first
14  when I was a chief assistant.
15  BY MR. EAVES:
16    Q.  All right.  So --
17    A.  And there were others, but I just don't remember
18  all of them.
19    Q.  Was the role of the chief assistant at that time
20  to sort of have a supervisory role over the higher
21  profile cases that were in the office?
22        MS. GREEN:  Form.
23        THE WITNESS:  That's the way that evolved,
24  yes.
25

Page 94

1  BY MR. EAVES:
2     Q.  All right.  And so was that the primary focus of
3  your position when you were Chief Assistant U.S.A. in
4  '97 and '98?
5        MS. GREEN:  Form.
6        THE WITNESS:  In terms of substantive
7  matters, yes.  But I also would advise the U.S. Attorney
8  in any matters that came to her attention.  She and I
9  were very close.  And there were very few things that
10  she decided without at least talking to me about.
11        I also interviewed all new applicants for
12  the job and, you know, I dealt with various different,
13  miscellaneous matters as well.
14  BY MR. EAVES:
15    Q.  All right.  To the extent that you were
16  supervising cases as Chief Assistant U.S.A., there were
17  several levels of supervision between you as chief
18  assistant and the frontline prosecutors?
19        MS. GREEN:  Form.
20        THE WITNESS:  There was at least one level
21  of supervision.
22  BY MR. EAVES:
23    Q.  Right.  So you were doing the day-to-day
24  prosecutorial duties of appearing in court or filing
25  motions and those sort of things; correct?

Page 95

1        MS. GREEN:  Form.
2        THE WITNESS:  Correct.
3  BY MR. EAVES:
4     Q.  Okay.  You were checking in and maybe getting
5  reports on a regular basis as to where are we with the
6  such-and-such case?
7        MS. GREEN:  Form.
8        THE WITNESS:  Yes, but I've been -- I
9  neglected to say I also did get very heavily involved in
10  and ultimately wound up trying a case that arose out of
11  the investigation of Congressman Kim.  So that was a
12  case where I had more than just a supervisory role.  I
13  was really intimately involved in decision-making.  And,
14  ultimately, as chief of Criminal Division, I had
15  authorized the prosecution of Congressman Kim's
16  treasurer.  And it was a tough case.  Nobody wanted to
17  try it, so I wound up trying it.
18  BY MR. EAVES:
19    Q.  All right.  What was the -- well, did you get a
20  conviction?
21    A.  Yes.
22    Q.  What was the penalty?
23    A.  A year or less.
24    Q.  Okay.  Did you try any other cases as Chief
25  Assistant U.S.A. from '97 to '98?

Page 96

1     A.  '97 to '98, no.  If you broaden the time period,
2  the answer is yes.
3     Q.  How so?  How should I broaden it to change your
4  answer?
5     A.  I tried a case in early 1999.
6     Q.  All right.  As a U.S. Attorney?
7     A.  As chief assistant.
8     Q.  So that was before you left to go to Munger
9  Tolles?
10    A.  Correct.
11    Q.  All right.  What was the case that you tried in
12  '99 as chief assistant?
13    A.  It was a -- a theft from the mail case.
14    Q.  All right.  And what was the object that was
15  stolen?
16    A.  Credit cards.
17    Q.  All right.  And what was the sentence in that
18  one?
19        Was there a conviction?
20    A.  Yes.
21        I don't recall.  I remember that the defendant
22  was remanded to custody for the -- which was one of the
23  few times that happened in my experience as -- with the
24  U.S. Attorney's Office.  This was his second conviction
25  for doing virtually the exact same thing.  So I think he



Page 97

1   wound up getting a couple years in jail.
2   Q.   All right.
3   A.   But I don't -- I don't specifically recall that.
4   Q.   Okay.  Then in 1999 you left the U.S. Attorney's
5   Office again to go into private practice.
6       What was your thought process at that time?
7   A.   I --
8       MS. GREEN:  Form.
9       Sorry.
10      THE WITNESS:  I had been a candidate to be
11  the U.S. Attorney to replace Nora Manella, and I was, as
12  I understood it, one of the two finalists for that
13  position.  And a younger Assistant U.S. Attorney in the
14  Criminal Division got the job, and I thought it was best
15  for everybody if I left and went become to private
16  practice.
17  BY MR. EAVES:
18  Q.   So were you worried that there would be bad blood
19  between you and the person who got the appointment?
20      MS. GREEN:  Form.
21      THE WITNESS:  Not so much bad blood, but
22  the -- the process has gone for a long period of time,
23  and I think most people in the office had wanted me to
24  be the U.S. Attorneys and expected I was going to be the
25  U.S. Attorney.  And I think it was not a good thing to

Page 98

1   have sort of two -- the two finalists in the office at
2   the same time and it would undercut his ability to lead
3   the office.
4   BY MR. EAVES:
5   Q.   All right.  And you've never returned since then?
6   A.   Correct.
7   Q.   All right.  What kind of -- well, did you go to
8   Munger Toll -- Tolles as a partner?
9   A.   Yes.
10  Q.   And then it says you were of counsel for 2012 and
11  2013.  First of all, what does that mean?
12  A.   It means that, you know, in -- in effect, I
13  didn't have an equity interest in the firm.
14  Q.   Okay.
15  A.   My duties and -- and responsibilities didn't
16  change very much from going to partner to of counsel.
17  Q.   Had you much an equity interest prior to becoming
18  of counsel?
19  A.   Yes.
20  Q.   Okay.  Why did you give that up?
21  A.   You know, I was sort of transitioning to sort of
22  a different level of practice and different -- and I was
23  doing different things.
24  Q.   How so?
25  A.   Well, I wasn't out there hustling for business.

Page 99

1   I was doing -- I was on the police commission.  I was
2   doing pro bono the jail commission.  And so although I
3   was still practicing law, I was doing a fair amount of
4   stuff that wasn't directly law related.  And -- and the
5   firm was great and they said you go do whatever you want
6   to do, and they basically paid me whatever they felt
7   like paying me.
8   Q.   So it took you out of the position of feeling the
9   pressure to bill hours and create profit and allowed you
10  to do some of -- some of the more community-based
11  activities that you were doing?
12  A.   Yes, I'd say that --
13      MS. GREEN:  Form.
14      THE WITNESS:  Yes, I would say that's true
15  to a large extent, yes.
16  BY MR. EAVES:
17  Q.   All right.  For -- from 1999 through '11, it
18  looks like you were a litigation partner.
19      What types of cases were handling as a litigation
20  partner at Munger Tolles?
21  A.   Mostly civil litigation.  I did some employment
22  cases, wrongful termination type cases.  I did some
23  legal malpractice cases.  I did some False Claims Act
24  cases.  And, you know, sort of anything that might come
25  in the door that looked interesting.

Page 100

1   Q.   Any criminal defense?
2   A.   Yes.
3   Q.   All right.  How much of your practice was
4   dedicated to doing criminal defense from 1999 to '11?
5   A.   Over -- if you take the entire period of time, I
6   would say 10 percent.
7   Q.   Okay.
8   A.   There was one year where it was more than that
9   because I was working particularly on out of -- one
10  matter.
11  Q.   All right.  Did you try any significant criminal
12  cases between '99 and -- well, let's just say '99 and
13  '13?
14  A.   No.
15  Q.   Other than the one you tried as a U.S. Attorney?
16  A.   Other -- yeah, other than --
17  Q.   In '99?
18  A.   Well, that -- and that was not -- I would not
19  have -- I would not deem that as a particularly
20  significant case, but --
21  Q.   Okay.
22  A.   No, I didn't try the criminal cases when I was at
23  Munger Tolles or at Scheper Kim.
24  Q.   All right.  Did you try any civil case at Munger
25  Tolles?



Page 101

1  A. Yes.
2  Q. How many?
3  A. One federal civil trial that went to verdict. I
4  think there was an arbitration in there somewhere -- oh,
5  a -- no, that was. . .
6      I think there was an arbitration in there
7  somewhere, but I don't have a specific recollection of
8  that.
9  Q. Okay. And how about at Scheper Kim & Harris, did
10  you try any civil cases there.
11  A. No, I have not tried a case since I've been at
12  the firm.
13  Q. Okay. What kind of work are you doing at Scheper
14  Kim & Harris?
15  A. An occasional white collar case, not that much;
16  civil litigation cases. I serve as general counsel to
17  the firm, meaning I advice other lawyers in the firm
18  on -- particularly on ethical issues, but sometimes more
19  substantive issues beyond that.
20      I serve as a monitor for the Los Angeles County
21  jails in -- pursuant to two court -- two consent
22  decrees. And so I regularly file reports with the
23  federal court concerning my activities as a monitor.
24  Q. All right. Would you say you're in sort of a
25  managing partner position at Scheper Kim?

Page 102

1      MS. GREEN: Form.
2      THE WITNESS: No.
3  BY MR. EAVES:
4  Q. No?
5  A. No. I'm -- I'm -- my role as -- in terms of
6  management is -- is a role as general counsel. So if
7  there are legal issues pertaining to the firm, such as
8  ethical issues, I give the lawyers advice and so I give
9  them privileged advice, but I'm not a manager of -- I'm
10  not one of the managing partners of the firm.
11  Q. Okay. In doing a little research online, I saw
12  that there was a case when you were at Munger Tolles
13  where the firm got involved in a conflict of interest
14  relating to California Earthquake Authority?
15  A. Yes.
16  Q. Do you remember that case?
17  A. Yes.
18  Q. What happened?
19  A. I represented the Earthquake Authority on some
20  minor matters in -- early on when I was at Munger
21  Tolles. And later on, some years later, five, six,
22  seven, eight years later, if not more, the firm
23  represented a client adverse to the earth -- Earthquake
24  Authority, and the firm had to be disqualified from
25  representing the party adverse to the earthquake

Page 103

1  authority.
2  Q. All right. And the firm fought against that
3  disqualification; correct?
4  A. Correct.
5  Q. And so it had to be taken to court?
6  A. Yes.
7  Q. And the court found that there was an actual
8  conflict of interest?
9  A. Yes.
10      MS. GREEN: Form.
11      THE WITNESS: I think the court found that
12  there was -- we were -- they were a continuing client,
13  even though we had not done any work for them for eight
14  years.
15  BY MR. EAVES:
16  Q. All right. And the court disqualified your firm
17  from that case?
18      MS. GREEN: Form.
19      THE WITNESS: Correct. Right.
20  BY MR. EAVES:
21  Q. Was there any ethical fallout for -- I know not
22  for you because you said you've never been subject to a
23  bar complaint, but for anybody in the form?
24  A. No.
25      MS. GREEN: Form.

Page 104

1      THE WITNESS: No.
2  BY MR. EAVES:
3  Q. Okay. Which governor's prosecution did you help
4  supervise?
5  A. Governor of -- prosecution of Symington.
6  Q. Okay. Was that -- was his conviction overturned?
7  A. Yes.
8  Q. On what -- do you remember the basis?
9  A. Yes. The -- during the course of the trial, the
10  jurors -- actually, it was during the course of -- I
11  think during -- I think it was during jury
12  deliberations, the jurors complained about one juror, if
13  I remember correctly, either not being able to
14  deliberate or refusing to deliberate or -- or something
15  or failing -- refusing to communicate.
16      And ultimately, if I remember correctly, the
17  district judge re- -- excused that juror. And so there
18  were -- Symington was convicted. And it -- I believe
19  the conviction was overturned on the grounds that the
20  judge should have done more before excusing that juror
21  or shouldn't have excused that juror or something to
22  that effect.
23  Q. All right. Let's talk a little bit about some of
24  the different times when you were working at the U.S.
25  Attorney's Office and the way things worked when you



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
105–108

Page 105

1 were there.
2        First of all, the U.S. Attorney's Office works
3 primarily with federal investigative agencies; correct?
4        MS. GREEN:  Form.
5        THE WITNESS:  Primarily, yes.
6 BY MR. EAVES:
7   Q.  All right.  I know there are instances where you
8 may work with local authorities, but for the most part,
9 you're working with FBI, DEA, some of those other types
10 of agencies; right?
11        MS. GREEN:  Form.
12        THE WITNESS:  Yes, I would say more often
13 than not, we're working with federal agencies.
14 BY MR. EAVES:
15   Q.  All right.  And that's a little bit different
16 than a large metropolitan prosecutor's office that's
17 dealing with maybe 20 different local law enforcement
18 agencies; right?
19        MS. GREEN:  Form.
20        THE WITNESS:  Well, yes, in the sense
21 that -- that, as I understand it, a District Attorney's
22 Office is going to be countywide and there may be
23 different municipalities within that county, each which
24 has their own police department, plus you also have the
25 L.A. County Sheriff's Department.  So they would be

Page 106

1 dealing with those different police agencies on the
2 local level.
3        I think where it's -- it's county District
4 Attorney's Offices don't often deal with federal
5 agencies.  The U.S. Attorney's Office does deal with
6 state and local agencies much more often than the
7 reverse being true at the county level.
8 BY MR. EAVES:
9   Q.  All right.  But you're still dealing mostly with
10 federal agencies at the U.S. Attorney's Office?
11   A.  Yeah, more often than not.  But -- but there,
12 certainly I had my share of cases that there was a --
13 some local police department involved in or county
14 department involved in.
15   Q.  And that can happen sometimes when there are
16 joint task forces where part of the investigation is
17 done by the FBI or the DEA, but it also involves local
18 law enforcement to some level as well --
19        MS. GREEN:  For --
20 BY MR. EAVES:
21   Q.  -- correct?
22        MS. GREEN:  Form.
23        THE WITNESS:  Particularly beginning, I
24 would say, under H.W. -- President H.W. Bush.  You saw
25 more and more federal-state task forces, violent crime

Page 107

1 task forces.  Under the Clinton administration, there
2 was a major initiative to -- to attack violent crime.
3 And -- and the result was we worked very closely with
4 local -- "we" meaning the federal agencies worked very
5 closely with the state in developing a strategy to
6 combat violent crime in the county.
7   Q.  Right.  So when you started as an Assistant U.S.
8 Attorney was 1978; right?
9   A.  Correct.
10   Q.  And the Brady case came out in 1963, I believe;
11 is that right?
12   A.  Sometime well before, that's true.
13   Q.  So it was in effect well before you became a --
14 an Assistant U.S. Attorney?
15   A.  Correct.
16   Q.  Is that something that you were made aware of law
17 school and maybe even after you went to work as a U.S.
18 Attorney?
19   A.  Yeah, probably covered it in law school and
20 certainly covered it when I was an Assistant U.S.
21 Attorney.
22   Q.  All right.  And from the years '78 to 1984 when
23 you went from being from frontline prosecutor all the
24 way up to being -- well, I guess in '84 you became Chief
25 Assistant U.S. Attorney, were there changes in how

Page 108

1 exculpatory evidence was tracked and disclosed within
2 the U.S. Attorney's Office?
3        MS. GREEN:  Form.
4        THE WITNESS:  No, in the sense that
5 certainly in every case, Assistant U.S. Attorneys had
6 the responsibility to turn over any potential
7 exculpatory evidence or evidence that bore on the
8 credibility of any witnesses in those cases.  And we
9 would compile that information on an individual
10 case-by-case basis and -- and turn it over.  So I mean
11 that was the fundamental way in which you addressed your
12 Brady/Giglio allegations.
13 BY MR. EAVES:
14   Q.  All right.  And that's true for the entire time
15 that you were at the U.S. Attorney's Office?
16   A.  In terms of the primary responsibility was on a
17 case-by-case basis, yes.  But any time there was an
18 issue -- a major issue with respect to credibility of a
19 law enforcement official, for example, it would come to
20 the attention of the chief of the Criminal Division.  If
21 it resulted in the dismissal of a case or suppression of
22 evidence, it would also go to the chief of the appellate
23 section.
24   Q.  All right.
25   A.  And I would say that was the practice that I was



Page 109

1  aware of during the entire time I was in the U.S.
2  Attorney's Office.
3    Q. We can talk more about that.
4        Did I understand your testimony correctly earlier
5  when you said the only person that you had been aware of
6  who had a significant issue relating -- made you
7  concerned about their trustworthiness was this IRS
8  agent?
9    A. When I --
10       MS. GREEN:  Form.
11       THE WITNESS:  When I was chief of Criminal
12  Division.
13  BY MR. EAVES:
14    Q. That -- so that only -- that's the only officer
15  you became aware of when you were chief of the Criminal
16  Division?
17       MS. GREEN:  Form.
18       THE WITNESS:  Correct.
19  BY MR. EAVES:
20    Q. Were there other officers or agents that you
21  became aware of at other times when you were employed at
22  the U.S. Attorney's Office?
23    A. I was aware of at least one, if not more than one
24  instance, where there were issues that were brought to
25  my predecessor, Robert Brosio, concerning the

Page 110

1  credibility of -- of law enforcement officials.  And my
2  understanding what happened was is that basically the
3  agency, whatever it was, was directed that this person
4  couldn't present cases to our office anymore.
5    Q. All right.  Kind of similar to what happened with
6  the IRS agent?
7    A. Correct.  But --
8    Q. All right.  So you were aware of, did you say two
9  cases that were brought to Brosio's attention?
10       MS. GREEN:  Form.
11       THE WITNESS:  One or two.
12  BY MR. EAVES:
13    Q. All right.  Any case brought to your attention at
14  any of your times at the U.S. Attorney's Office?
15       MS. GREEN:  Form.
16  BY MR. EAVES:
17    Q. Other than the IRS agent and -- and -- that's it?
18       MS. GREEN:  Form.
19       THE WITNESS:  Meaning where there was a -- a
20  issue of credibility of a law enforcement official?
21  BY MR. EAVES:
22    Q. Yes.
23    A. That's all I can recall.
24    Q. All right.  What system was in place at the U.S.
25  Attorney's Office in '78 to '84 to track exculpatory or

Page 111

1  impeachment evidence relating to law enforcement
2  officers?
3    A. Went through the chief of the Criminal Division
4  who would track that information.  He had a -- he --
5  he -- he basically was able to track everything in the
6  office, and he also had the backup of information going
7  through the appellate section of the U.S. Attorney's
8  Office.  So if there were issues with respect to a law
9  enforcement agency officer, it would be tracked by the
10  chief of Criminal Division.
11    Q. All right.  And so when you were chief of
12  Criminal Division, did you keep a file and said, here's
13  all the issues that are going on with all the agents
14  that we need to know about?
15       MS. GREEN:  Form.
16       THE WITNESS:  The only one that I became
17  aware of was the IRS agent, and I dealt with it by
18  removing him from the -- the cases that our office
19  handled.
20  BY MR. EAVES:
21    Q. And how about the ones that had been brought to
22  the attention to your predecessor as the Criminal
23  Division chief, Brosio, did you have them in a file
24  marked that said, hey, if these guys come up in any
25  future prosecutions, we need to know this stuff we have

Page 112

1  to disclose about them?
2       MS. GREEN:  Form.
3       THE WITNESS:  No, I don't recall receiving a
4  file for him.
5  BY MR. EAVES:
6    Q. Okay.  You said that primarily Assistant U.S.
7  Attorneys dealt with obtaining and disclosing
8  impeachment evidence on a case-by-case basis.
9        What do you mean by that?
10    A. Well, you had to identify who your witnesses
11  were, you had to determine whether or not there was any
12  Giglio material about those witnesses --
13    Q. When you say "Giglio," do you mean Brady as well?
14    A. Yes, but I mean, when we're talking about --
15  Brady is -- is substantive exculpatory evidence.  Giglio
16  is evidence that bears on the credibility of the
17  witnesses you expect to call in your case.
18    Q. Fair enough.
19        Is there any difference, though, in the way that
20  Brady and Giglio material was treated, tracked and
21  disclosed in the U.S. Attorney's Office during your
22  tenure there?
23       MS. GREEN:  Form.
24       THE WITNESS:  Yes, in the sense that Brady
25  is very case specific whereas Giglio follows the



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
113–116

**Page 113**

1  witness. So if you had a -- let's say an informant or I
2  had a witness who testified in multiple cases, you had
3  any Giglio material that you became aware of in the
4  first case had to be turned over in all the substantive
5  cases.
6      But Brady was really case specific. What is
7  the charges being brought against the defendant and what
8  evidence is there that's out there that might tend to
9  exculpate that defendant, meaning that he's not guilty.
10 BY MR. EAVES:
11  Q. So if I understand you correctly, what you're
12 saying is you have to know the facts of the case and the
13 issues in the case to make a determination whether a
14 piece of evidence might be Brady as to a particular
15 case?
16      MS. GREEN: Form.
17      THE WITNESS: Brady as opposed Giglio, yes.
18 BY MR. EAVES:
19  Q. Yes.
20      Whereas Giglio is impeachment evidence that tends
21 to follow a witness in every case in which that witness
22 might appear?
23  A. Correct.
24      MS. GREEN: Form.
25 ///

**Page 114**

1  BY MR. EAVES:
2   Q. All right. You said that Giglio was treated
3  differently than Brady, somewhat, within the attorney --
4  within the U.S. Attorney's Office during your tenure
5  there. You said that the information followed the
6  witness and was tracked.
7      How so?
8      MS. GREEN: Form.
9      THE WITNESS: Well, if you -- if you used
10 a -- for example, I had a case, the Moriarty cases. We
11 used Mr. Moriarty to testify in multiple cases. So
12 he -- impeachment evidence, prior inconsistent
13 statements that he might have made, any deals that he
14 had, any immunity offers or any of that stuff would have
15 to be turned over about him every single time that he
16 testified.
17      But the Brady material as to whether or not
18 the particular political figures who were named as
19 defendants in the case, whether there was exculpatory
20 evidence as to those individual would depend on what the
21 facts were in the particular case.
22 BY MR. EAVES:
23  Q. Did -- I'm assuming Moriarty is not a law
24 enforcement officer?
25  A. He was not.

**Page 115**

1   Q. All right. So in cases where you had --
2      Were you ever aware of a case where there was
3  Giglio material that followed a law enforcement officer
4  while you were at the U.S. Attorney's Office?
5      MS. GREEN: Form.
6      THE WITNESS: I couldn't give you a specific
7  example of it, but I believe there were instances in
8  which Giglio materials would be turned over with respect
9  to law enforcement officers.
10 BY MR. EAVES:
11  Q. Did the U.S. Attorney's Office, during your
12 tenure at that office, ever take responsibility for
13 being the agency which managed a list of officers who
14 had impeachment issues that needed to be tracked and
15 disclosed?
16  A. There was -- there was no particular list during
17 the time I was there.
18  Q. All right. And to your knowledge, have they
19 started doing that at any since then --
20  A. I don't know.
21  Q. -- since you were there?
22  A. I don't know one way or the other.
23  Q. All right. When you were -- during your tenure
24 at the U.S. Attorney's Office, was there a process by
25 which, as a prosecutor, you would send a letter to the

**Page 116**

1  agencies which had investigated your case and say, for
2  example, FBI, this case is going to trial, I plan on
3  calling the following agents as witnesses in the case,
4  please provide me with any information that might relate
5  to their impeachment?
6      MS. GREEN: Form.
7      THE WITNESS: I don't recall it being a
8  letter, but we would check -- I mean, my understanding
9  was we were supposed to be checking with the agency to
10 see if there was any Giglio material about any officer
11 that was going to testify in our case. I will say --
12 let me just back up.
13 BY MR. EAVES:
14  Q. Yeah, sure.
15  A. It didn't happen that often because we -- we
16 didn't have law enforcements testify that frequently as
17 witnesses or even as key witnesses in our cases. But we
18 were supposed to check to see if there was any Giglio
19 material bearing on the credibility of a law enforcement
20 officer.
21  Q. All right. Why didn't you have law enforcement
22 officers testify in your cases regularly?
23      MS. GREEN: Form.
24      THE WITNESS: Because most of our cases
25 were -- didn't depend upon confessions or admissions.



RICHARD DROOYAN                                       September 12, 2018
MILKE vs CITY of PHOENIX                                        117–120

Page 117

1  Most of our cases were -- they were -- there was
2  documentary evidence.  There was corroborating evidence.
3  There were cooperating witnesses.  So the cases didn't
4  often depend upon the testimony of the law enforcement
5  officer.
6          It's not that we didn't call them
7  occasionally, but we -- but they were -- it was not as
8  often, I think, as you might see in a District
9  Attorney's Office.
10 BY MR. EAVES:
11    Q.  Now, it sounds like you're describing to me the
12 case with matters involving fraud where the evidence is
13 largely documentary; is that fair?
14        MS. GREEN:  Form.
15        THE WITNESS:  No.  For example, in the --
16 the robbery cases, you know, we would have surveillance
17 photographs.  We would have physical evidence.  We would
18 have co-defendant testimony.  I mean, in federal court,
19 when a defendant confessed to an FBI agent, that was
20 usually the end of it.  They pled guilty.  And so the
21 cases that usually went to trial or were -- went away
22 before the person eventually pled guilty were cases
23 where you didn't have confessions.
24 BY MR. EAVES:
25    Q.  All right.  So now let me back up a little bit.

Page 118

1          You said that in cases where you had to call law
2  enforcement officers, you would rely on the agencies to
3  provide you with the information -- any impeachment
4  information that would be relevant under Giglio?
5          MS. GREEN:  Form.
6          THE WITNESS:  We would -- when I was there,
7  the -- well, when I was there the first time, that was
8  the practice, would be to check with the agency to see
9  if there was any Giglio material bearing on the
10 credibility of the law enforcement officials.
11 BY MR. EAVES:
12    Q.  And -- and that was true all the times you were
13 there?
14        MS. GREEN:  Form.
15        THE WITNESS:  The Henthorn case I think
16 caused prosecutors to periodically review -- actually
17 ask for the review of files of critical witnesses.
18 BY MR. EAVES:
19    Q.  Explain that to me.
20    A.  Henthorn case came down into 1991.  And although
21 it referred back to the Cadet case in 1984, both of
22 which said it's a prosecutor's responsibility to obtain
23 Giglio material from the law enforcement agencies,
24 Henthorn --
25    Q.  Can you spell that for the court reporter, by the

Page 119

1  way?
2    A.  It's in my report.  I think it's H-E-N-T-H-O-R-N.
3  It --
4    Q.  I'm just making sure she's got it.
5    A.  Okay.  So it -- it did what I thought was always
6  our obligation, which was to -- to make sure that you
7  check with the law enforcement agency and found out if
8  there was anything that was in the -- the files to
9  satisfy yourself that there was no Giglio material.
10        And Henthorn seemed to suggest that law
11 enforcement officials actually had to personally look --
12 excuse me, prosecutors had to personally look at the
13 file.
14    Q.  When you say "the file," what are you talking
15 about?
16    A.  The personnel file of the -- the agent.
17    Q.  All right.  In your experience, was the FBI very
18 friendly about handing over personnel files of FBA --
19 FBI agents when you started there in '78 into the mid
20 '80s?
21        MS. GREEN:  Form.
22        THE WITNESS:  Law enforcement is always
23 reluctant to turn over the personnel files of their
24 agents and employees to anybody.
25

Page 120

1  BY MR. EAVES:
2    Q.  And that was true of law enforcement to
3  prosecutors?
4          MS. GREEN:  Form.
5          THE WITNESS:  Yes.
6  BY MR. EAVES:
7    Q.  All right.  And did the Attorney General adopt a
8  policy at some point which required the federal agencies
9  to turn over personnel files to prosecutors when
10 prosecutors requested those?
11        MS. GREEN:  Form.
12        THE WITNESS:  I don't recall if that
13 happened or not.
14 BY MR. EAVES:
15    Q.  All right.  Do you remember there being a change
16 at any time where it suddenly became easier to get
17 personnel files from the FBI?
18        MS. GREEN:  Form.
19        THE WITNESS:  You know, just over time I
20 think the agencies recognized that this information was
21 going to have to be disclosed, and it was going to have
22 to be disclosed to prosecutors.  So I can't sort of say,
23 oh, all of a sudden it became easier to get it.  But I
24 mean, I never had any agency say to me, we're not going
25 to tell you if there is Giglio material in this agent's



Page 121

1  personnel file, so you're just going to have to go
2  prosecute this without knowing that information.  I -- I
3  never had that happen.
4  BY MR. EAVES:
5     Q.  All right.
6     A.  So I mean, if there was a -- they would say no,
7  there is nothing, there's no problem, and we would then
8  prosecute.
9     Q.  All right.  So you would take their word for it?
10       MS. GREEN:  Form.
11       THE WITNESS:  Yeah, pretty much.
12  BY MR. EAVES:
13     Q.  All right.
14     A.  But I mean, we would check and we would rely on
15  the integrity of the people that we were talking to to
16  tell us whether or not there was information that was
17  bearing on the credibility of the law enforcement
18  officials, certainly the initial practice.
19     Q.  And is that something that you did in advance
20  with every case that you tried as a U.S. Attorney,
21  requested the agency to provide you with Giglio material
22  relating to the agents you were going to call?
23       MS. GREEN:  Form.
24       THE WITNESS:  If I were going to call an
25  agent?

Page 122

1  BY MR. EAVES:
2     Q.  Yes, sir.
3     A.  Yes.  But I -- as I said, we didn't call agents
4  that often.
5     Q.  All right.  How many times did you personally ask
6  an agency to turn over a personnel file from a -- an
7  agent?
8       MS. GREEN:  Form.
9       THE WITNESS:  I don't know that I -- as I
10  said, I asked them whether there was information bearing
11  on the credibility of -- of witnesses, but I don't
12  remember asking them to turn over the file.
13  BY MR. EAVES:
14     Q.  You said at some point -- the Henthorn case came
15  out in '91, and that somehow changed the way that the
16  U.S. Attorney's Office perceived its responsibility to
17  more often ask for these personnel files.
18       How -- how -- explain that to me.
19     A.  Well --
20       MS. GREEN:  Form.
21       THE WITNESS:  That -- that was the -- the
22  way, I think, people read the Henthorn case is that it
23  was a responsibility of the prosecutor to ensure that
24  there was no Giglio material in the personnel file, and
25  if there was, to turn it over.

Page 123

1  BY MR. EAVES:
2     Q.  All right.  And so was there a change in the
3  policies or procedures in the way the U.S. Attorney's
4  Office handled that issue going forward?
5     A.  Yes.  I believe that they -- they basically asked
6  for more information from the agency to satisfy
7  themselves that there was no Giglio material in the
8  agent's file.
9     Q.  All right.  So is it fair to say then Henthorn
10  was a change in how the U.S. Attorneys perceived their
11  role in the process?
12       MS. GREEN:  Form.
13       THE WITNESS:  In -- in terms of how they
14  perceived their role to actually get access to the
15  agent's file, yes.
16  BY MR. EAVES:
17     Q.  All right.  Have you seen over the years, as a
18  U.S. Attorney, a change or a shift in attitudes where
19  law enforcement has become more cooperative with the
20  U.S. Attorney's Office in terms of turning these
21  materials over?
22       MS. GREEN:  Form.
23       THE WITNESS:  Law enforcement, over the
24  years, has recognized that there is a -- an obligation
25  on the part of the law enforcement and the prosecutors

Page 124

1  to turn over this information and that, therefore,
2  prosecutors have to have access to the information to be
3  able to evaluate it and make a determination as to
4  whether or not it is Giglio material.
5  BY MR. EAVES:
6     Q.  All right.
7     A.  I think law enforcement probably, when I started
8  in 1978, was reluctant to turn information over.  And
9  over time, as prosecutors said we have to have this
10  information, they turned it over.  And then, ultimately,
11  I think they became more and more cognizant of the
12  obligation of prosecutors to make the determination as
13  to what constitutes Giglio.
14     Q.  And did case law that was being handed down in --
15  in the early '90s, mid '90s have an effect on that as
16  well?
17       MS. GREEN:  Form.
18       THE WITNESS:  Well, I think -- I think the
19  Henthorn case had an impact on how people saw the
20  obligation of prosecutors to have access to the
21  personnel files of the law enforcement agents, although
22  Henthorn cites back to a 1984 case.  And -- and
23  certainly, it was my understanding when I came back to
24  the U.S. Attorney's Office in 1990 -- January 1994, in
25  fact, that all -- all Henthorn was doing was confirming



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
125–128

Page 125

1  what I always understood, is that we had to find out
2  whether there was Giglio material in law enforcement
3  personnel's files.
4  BY MR. EAVES:
5    Q.  And again, the way that you did that was by
6  asking the law enforcement agency?
7    A.  Correct.
8    Q.  And then taking their word for it as long as it
9  looked like they were being honest?
10       MS. GREEN:  Form.
11       THE WITNESS:  As long as there was no
12  information to suggest that there was any reason to
13  disbelieve what we were being told or that the agent had
14  any credibility issues.
15  BY MR. EAVES:
16    Q.  All right.  And I think Henthorn was actually
17  handed down in 1993.
18       Does that sound right?
19    A.  May, I thought it was in '92 or '91.
20    Q.  Well, it will say on the document, but --
21    A.  Yeah.
22    Q.  All right.  Did anybody ever hand you a list when
23  you were in any capacity -- serving in any capacity at
24  the U.S. Attorney's Office and say, here's our Giglio
25  list --

Page 126

1       MS. GREEN:  Form.
2  BY MR. EAVES:
3    Q.  -- keep track of this?
4    A.  No.
5    Q.  All right.  When you -- you left the U.S.
6  Attorney's Office in -- from '88 to '93, which is the
7  time period when Ms. Milke was arrested and tried in
8  this case.
9       Are you aware of that?
10    A.  Correct.
11    Q.  Were there significant changes in the U.S.
12  Attorney's Office in the way that Giglio material was
13  handled or Brady material was handled during those year
14  from '88 to '93?
15       MS. GREEN:  Form.
16       THE WITNESS:  Not really.  In terms of the
17  obligations of prosecutors to turn over all evidence
18  that might tend to impeach a -- a government witness and
19  the obligation of prosecutors to do that, in '98 and
20  '94, I don't think there was any difference at all.  I
21  think everybody understood those obligations, and that
22  they were important obligations the prosecutors had.
23       The only thing that I think changed was the
24  extent to which prosecutors would seek access to
25  personnel files in specific cases.  They could go to the

Page 127

1  agency and say Henthorn requires me to take a look at it
2  and -- and in which case the -- the agencies would say
3  okay.
4  BY MR. EAVES:
5    Q.  All right.
6    A.  But, ultimately, the obligation to turn over
7  information that had -- like tend to impeach or that had
8  bearing on the credibility of the law enforcement
9  officials or witnesses, or any other witnesses, I think
10  were imbedded in the mindset of all Assistant U.S.
11  Attorneys in 1988 and 1994.
12    Q.  All right.  Move to strike as nonresponsive.
13       The -- are you aware of the Pitchess case in
14  California?
15    A.  Yes.
16    Q.  Is that something that you had to deal with as a
17  U.S. Attorney?
18    A.  No.
19    Q.  Even in the cases where you were working with the
20  local prosecutors?
21    A.  No.  If they didn't turn over that information
22  and provide that information to us, we could make the
23  determination not to prosecute the case.  But I -- I
24  know what Pitchess is and -- and I know what the process
25  is in -- in state court, but it was never an issue for

Page 128

1  us in the federal court.
2    Q.  All right.  There are some differences, though,
3  in the way that the federal system approached Brady and
4  Giglio material and the way that the local California
5  prosecutors approached it; correct?
6       MS. GREEN:  Form.
7       THE WITNESS:  Only insofar as it had bear --
8  what was in a -- a -- a personnel file of a -- the law
9  enforcement witness.
10  BY MR. EAVES:
11    Q.  And that's the Pitchess case we were talking
12  about?
13    A.  Right.
14    Q.  All right.  And what is the Pitchess case say
15  or -- say or require, if you know?
16       MS. GREEN:  Fact.  Form.
17       THE WITNESS:  You have to make a certain
18  showing, and then you get in camera inspection of the
19  personnel file by the superior court judge.
20  BY MR. EAVES:
21    Q.  And is that still in effect today?
22    A.  Yes.
23    Q.  And that's something you had to deal with in the
24  criminal defense cases that you took when you were in
25  private practice; correct?



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
129–132

Page 129

1  A.  No.

2  Q.  You never made a -- you never filed a Pitchess

3  motion?

4  A.  No.

5  Q.  All right.  So you never saw it -- Giglio

6  material on law enforcement agents in any of the

7  criminal defense cases you handled?

8      MS. GREEN:  Form.

9      THE WITNESS:  The criminal cases that I

10  handled resulted in one of two things, either a

11  declination of prosecution or a guilty plea by a client

12  pursuant to a plea agreement.

13  BY MR. EAVES:

14  Q.  So you never got to the charging phase?

15      MS. GREEN:  Form.

16      THE WITNESS:  Well, I guess the charge --

17  the charging phase in a -- in the cases where my clients

18  pled guilty, but I never got to a case where we were

19  going to trial in a case.

20  BY MR. EAVES:

21  Q.  Okay.  So you never got far enough along in a

22  Criminal Division case that you needed to file a

23  Pitchess motion; is that what you're telling me?

24      MS. GREEN:  Form.

25      THE WITNESS:  Well, if -- if -- if it were

Page 130

1  state -- first of all, I did -- I will say I did not

2  handle -- I don't want to say any, but I really had very

3  limited experience as a criminal defense lawyer in state

4  court cases.  As I sit here today, I don't recall

5  specifically ever handling a case, although I think

6  there were probably some that were in an investigation

7  stage on the state side.  The cases that primarily I

8  handled as a criminal defense lawyer were federal cases.

9  BY MR. EAVES:

10  Q.  All right.  So do you acknowledge, though, that

11  there's a difference between the -- the way the federal

12  system handles Giglio material and the way that the

13  California state courts handle it?

14      MS. GREEN:  Form.

15      THE WITNESS:  Insofar as we're talking about

16  the information that might be in a law enforcement

17  witness's personnel file, yes.

18  BY MR. EAVES:

19  Q.  All right.  And in the case of California state

20  court, if a defendant wants the information from a

21  police officer's file, personnel file, it's incumbent

22  upon them to file a motion with the court expressing

23  that they are seeking that material?

24  A.  I can't give you chapter and verse exactly how it

25  works, but there is a process that you have to go

Page 131

1  through in order to get the file -- information in the

2  file after everything can be reviewed by the court.

3  Q.  And they have to make certain demonstrations

4  which the court then makes the determination whether

5  they'll do an in camera inspection of the material;

6  correct?

7  A.  That's my understanding.

8  Q.  All right.  And then if the court thinks that

9  there's anything relevant or admissible in there, the

10  court then orders the material turned over to the

11  defense?

12      MS. GREEN:  Form.

13      THE WITNESS:  That is -- that's my

14  understanding.

15  BY MR. EAVES:

16  Q.  All right.  And again, does that kind of harken

17  back to what we were talking about law enforcement being

18  very -- very protective about those personnel files?

19      MS. GREEN:  Form.

20      THE WITNESS:  Yes.  I mean, law enforcement

21  is got a -- a strong lobby in the -- the state

22  legislature, and they are able to get the legislature to

23  pass legislation that provides a great deal of

24  protection for the privacy of law enforcement personnel

25  files.

Page 132

1  BY MR. EAVES:

2  Q.  All right.

3  A.  Not just Pitchess, the -- it's the Police

4  Officers Bill of Rights in California that -- that

5  guards the confidentiality of information in -- in

6  police personnel files.

7  Q.  All right.  And are there issues pending in

8  California right now about some people being on Brady

9  lists that haven't been disclosed for many years?

10      MS. GREEN:  Form.

11      THE WITNESS:  The -- well, the -- the

12  sheriff, Jim McDonnell, has tried to create a Brady list

13  in California and the -- the police officers union is

14  opposed it and fought it.

15  BY MR. EAVES:

16  Q.  All right.  And so --

17  A.  Actually, that -- that would be the Sheriff's

18  Office's deputies' union has fought it.

19  Q.  So the sheriff is trying to create a Brady list

20  and the police -- the sheriff's deputies' union is

21  opposing the creation of such a list?

22  A.  Right, they're fighting it.

23  Q.  All right.  Do you know anything about the system

24  that's in place in Maricopa County for tracking Brady

25  and Giglio material?



Page 133

1    A.  Just what I've read in Mr. Manning's deposition
2  in this case.
3    Q.  All right.  So do -- so -- so from reading that
4  deposition, you're aware that the Maricopa County
5  Attorney's Office is taking the leading role in being
6  the agency which is the clearinghouse for the
7  information for Brady and Giglio material relating to
8  officers?
9        MS. GREEN:  Form.
10        THE WITNESS:  I'm not quite sure what you
11  mean by leading, but they have -- they have been engaged
12  in discussions and task forces that resulted in the
13  creation of -- of a way to deal with this issue.
14  BY MR. EAVES:
15    Q.  And you saw that the Maricopa County Attorney's
16  Office reached out to the law enforcement agencies in
17  the mid '90s and sort of created an environment and
18  said, we need to work together to -- to keep this
19  information?
20        MS. GREEN:  Form.
21        THE WITNESS:  I think that's what
22  Mr. Manning testified to.
23  BY MR. EAVES:
24    Q.  All right.  So to the extent that those efforts
25  began in the 1990s and the Maricopa Attorney's Office

Page 134

1  began keeping a -- a Giglio list, for lack of a better
2  term, that's something which puts them way ahead of the
3  California state court system?
4        MS. GREEN:  Form.
5  BY MR. EAVES:
6    Q.  Would you agree?
7    A.  Yes.  I guess in the sense that, as I understand
8  it, at least, there is nothing in Arizona law that
9  precludes the disclosure of information like you have
10  under the Police Officer Bill of Rights in California.
11    Q.  But even so, the same federal case law applies to
12  California prosecutors, state -- state prosecutors?
13  Brady applies to them?  Giglio applies to them?  Kyles
14  versus Whitley applies to them?  They all apply to the
15  state law prosecutors in California, don't they?
16    A.  Absolute --
17        MS. GREEN:  Form.
18        THE WITNESS:  Absolutely.
19  BY MR. EAVES:
20    Q.  Okay.  And those aren't trumped by state law?
21        MS. GREEN:  Form.
22        THE WITNESS:  That's correct.
23  BY MR. EAVES:
24    Q.  Those duties still exist for prosecutors and for
25  law enforcement in California?

Page 135

1        MS. GREEN:  Form.
2        THE WITNESS:  Absolutely.
3  BY MR. EAVES:
4    Q.  All right.  So as we sit here today, there's no
5  agency responsible for keeping a Brady or Giglio list in
6  California, as you know it?
7        MS. GREEN:  Form.
8        THE WITNESS:  As far as I know in
9  California, yes.
10  BY MR. EAVES:
11    Q.  All right.  So what's happening in California and
12  what's happening, as far as you know, in prosecutors'
13  offices here is every time a case looks like it's going
14  to trial, a prosecutor reaches out to the agency and
15  said, hey, I'm thinking about calling Agent Smith in
16  this case, can you let me know what impeachment evidence
17  there might be about Agent Smith?
18    A.  If we're talking about information that is in the
19  personnel file, that's the -- that's the way you would
20  have to get it.  If you're talking about information
21  that might be in the prosecutor's own files, such as
22  findings by courts of misconduct or suppressing evidence
23  or dismissing cases or stuff like that, that's
24  information that should be in the prosecutor's files,
25  and that they don't need to go to the state agency or

Page 136

1  the law enforcement agency to get them.
2    Q.  All right.  And now we're talking about Brady
3  evidence, not Giglio, right?
4    A.  No.  I think if a -- if an officer -- let's take
5  an extreme.  An officer testifies falsely under oath in
6  a -- in a case prosecuted by the U.S. Attorney's Office
7  or the Los Angeles County District Attorney's Office and
8  you're going to call that officer in some subsequent
9  case, that false testimony is Giglio material bearing on
10  the credibility of that officer.  It's not -- doesn't
11  necessarily go to the charges in the subsequent case.
12    Q.  All right.  Who tracks that information in
13  California?
14    A.  I can't --
15        MS. GREEN:  Form.
16        THE WITNESS:  I don't know.
17  BY MR. EAVES:
18    Q.  When you were at the U.S. Attorney's Office, U.S.
19  Attorney's Office didn't track that?
20        MS. GREEN:  Form.
21        THE WITNESS:  I disagree with that.  I think
22  we certainly -- the chief of the Criminal Division would
23  be well aware of any type of instance in which a law
24  enforcement agent had engaged in that -- that kind of
25  misconduct and we would be able to track it that way.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
137–140

Page 137

BY MR. EAVES:

2　Q.　Yet when you were Criminal Division chief or
3　criminal -- what's it -- what was it called?
4　A.　I was chief of the Criminal Division.
5　Q.　Chief of the Criminal Division?
6　A.　Right.
7　Q.　You weren't aware of any such officers?
8　　　MS. GREEN:　Form.
9　　　THE WITNESS:　No.　The only one I was aware
10　of was somebody that I -- I basically said couldn't
11　testify in our cases.
12　BY MR. EAVES:
13　Q.　And no one handed you a list and said, here's a
14　list of people who provided -- who have been found to
15　have provided dishonest testimony in court in the past?
16　　　MS. GREEN:　Form.
17　　　THE WITNESS:　In the -- in the time that I
18　was chief of the Criminal Division those three years,
19　there was not one case that I recall in which the
20　charges were dismissed or evidence suppressed as a
21　result of false testimony by an -- an agent.
22　BY MR. EAVES:
23　Q.　But -- but --
24　A.　That -- that I can recall.
25　Q.　That you know of; right?

Page 138

1　A.　Correct.
2　Q.　But the only way you would know of it is if
3　somebody came and told you?
4　A.　Correct.
5　Q.　All right.　And no one ever did?
6　　　MS. GREEN:　Form.
7　　　THE WITNESS:　No one ever did.
8　BY MR. EAVES:
9　Q.　All right.
10　A.　I certainly became aware of any significant
11　developments in the cases in the Criminal Division when
12　I was chief, and so I don't believe that ever happened.
13　Q.　Okay.　You mentioned minute entries and findings
14　of misconduct.　To the extent those are minute entries
15　or they're embodied in orders of the court, those
16　documents would be public records, would they not?
17　A.　Yes.
18　Q.　And is it your opinion that a prosecutor has a
19　duty to turn over information which is embodied in
20　public records to the defense?
21　A.　Absolutely.
22　　　MS. GREEN:　Can we take a five-minute break
23　whenever --
24　　　MR. EAVES:　Sure.
25　　　MS. GREEN:　-- it makes sense for you?

Page 139

1　　　MR. EAVES:　Yeah, we can take one now.
2　　　MS. GREEN:　Okay.
3　　　THE VIDEOGRAPHER:　Off the record, Counsel?
4　　　MR. EAVES:　Yes.
5　　　THE VIDEOGRAPHER:　We're off the record.
6　The time is 1:40 p.m.
7　　　(Recess.)
8　　　THE VIDEOGRAPHER:　We are on the record.
9　The time is 1:52 p.m.
10　BY MR. EAVES:
11　Q.　All right, Mr. Drooyan.　Now that you had a
12　chance to speak with counsel, do you have anything you
13　want to change?
14　A.　No.
15　Q.　All right.　How long has it been since you've
16　been a prosecutor, sir?
17　A.　I left the U.S. Attorney's Office in
18　February/March of 1999.
19　Q.　Okay.　At this point, based on what you're
20　telling me, it sounds like in the federal system, the
21　determination as to what gets placed on a law
22　enforcement integrity list or a Giglio list is made by
23　the various agencies?
24　　　MS. GREEN:　Form.
25

Page 140

1　BY MR. EAVES:
2　Q.　Is that fair?
3　A.　No, I don't think that's fair.　I think in the
4　U.S. Attorney's Office, it would be decisions by the
5　chief of the Criminal Division.　If information came to
6　the chief of the Criminal Division that an officer had
7　testified falsely or had omitted material information or
8　whatever, resulting in, let's say, a dismissal or a
9　suppression of evidence, that chief of the Criminal
10　Division would have to decide, first of all, is that
11　officer so disabled that we can't use him again as a
12　witness.
13　　　And if the decision was, no, he could still
14　testify as a witness, then it would be centralized in
15　the U.S. Attorney's Office and the chief of the Criminal
16　Division to ensure that that information was
17　disseminated to prosecutors -- line prosecutors in the
18　future.
19　Q.　But that's completely speculative, isn't it?
20　　　MS. GREEN:　Form.
21　　　THE WITNESS:　No, I don't think so.
22　BY MR. EAVES:
23　Q.　That never happened in the course of your tenure
24　at the U.S. Attorney's Office?
25　　　MS. GREEN:　Argumentative.　Form.



Page 141

1    THE WITNESS:  No.  I -- in -- when Bob
2  Brosio was the chief of the Criminal Division, my
3  understanding was, on more than one occasion,
4  information bearing on the credibility of law
5  enforcement officials came to his attention and
6  decisions were made about what to do with a particular
7  case.
8         And he then was in a position to track the
9  information about that law enforcement official,
10  assuming that a decision had been made that that -- that
11  officer could continue to be a witness in cases
12  prosecuted by our office.
13  BY MR. EAVES:
14    Q.  All right.  Is it your opinion that any time
15  evidence is suppressed as a result of something relating
16  to an officer's conduct in a case, that that's
17  misconduct?
18         MS. GREEN:  Form.
19         THE WITNESS:  If evidence is suppressed as a
20  result of conduct by an officer, in my mind, that is
21  a -- that -- that raises a presumption that it was
22  misconduct by the officer.  I'd have to look at a lot of
23  different cases to see whether there are situations in
24  which a suppression of evidence as a result of the
25  conduct of the officer would not, in my judgment, be

Page 142

1  misconduct.
2         Now, look, there are cases in which evidence
3  is suppressed because there is a lack of probable cause.
4  You put in whatever evidence you can and the court
5  concludes there is not enough evidence to support a
6  search warrant.  I had a case years ago where the --
7  there was a gap in our evidence that was presented in a
8  search warrant, and the court concluded that there
9  wasn't enough to connection A to B and, therefore, she
10  suppressed all the evidence.
11         It wasn't a misconduct by any law
12  enforcement official.  It wasn't a misstatement by a law
13  enforcement official.  So under those circumstances, I
14  certainly would not have considered that to be Giglio
15  material.  But there have been instances in which courts
16  have suppressed evidence because of a material
17  misstatement in a Franks hearing in a -- in a search
18  warrant application.  That has a direct bearing on the
19  conduct of the law enforcement official.
20         The reason why it's being suppressed is
21  because that law enforcement official either misstated
22  information or omitted to provide material information,
23  and I would consider that to be misconduct.  Certainly,
24  even if it didn't fall technically within the definition
25  of misconduct, it was information that bear on the

Page 143

1  credibility of that law enforcement official.
2  BY MR. EAVES:
3    Q.  All right.  Can a law enforcement official make a
4  mistake of fact on the stand without it being
5  misconduct?
6         MS. GREEN:  Form.
7         THE WITNESS:  I -- I want to separate just,
8  in answering your question, what constitutes misconduct
9  and what constitutes Giglio.
10         It -- it doesn't have to be misconduct in
11  order for evidence to be Giglio.  A prior inconsistent
12  statement by an officer, even if it's simply mistaken --
13  he said one thing on one occasion and then said another
14  thing on a different occasion -- in my judgment, those
15  inconsistent statements are Giglio material that have a
16  bearing on the credibility of that officer, even if it
17  was just a mistake.
18         Prior inconsistent statements are the
19  classic kinds of information that have to be turned
20  over, that are Giglio material.  Defense lawyers will
21  likely argue in those situations that it was
22  intentional.  But as a prosecutor, you might then try to
23  rehabilitate your witness by saying it was an innocent
24  mistake and the jury may very well conclude it was an
25  innocent mistake and -- and, therefore, believe the

Page 144

1  officer in the current case.
2         But an innocent mistake that results in a
3  prior inconsistent statement, in my judgment, is still
4  Giglio material, even if it's not misconduct by the
5  officer.
6  BY MR. EAVES:
7    Q.  All right.  So I just want to make sure I
8  understand your opinion.
9         Your opinion is that every officer who ever made
10  a mistaken statement on the stand, that incident belongs
11  on a Giglio list somewhere?
12         MS. GREEN:  Form.
13         THE WITNESS:  If it is a --
14         MS. GREEN:  Misstates testimony.
15         THE WITNESS:  If it is material information,
16  I mean if he misstated the date, something like, you
17  know, I -- I had it down as April 10th and it was
18  actually April 12th and I wrote it down wrong, I don't
19  consider that to be Giglio material that bears on the
20  credibility of the officer.
21         But any time they make a statement and then
22  later on they retract that statement and said, oh, I
23  made a mistake about something that's important, that's
24  Giglio material, even if it was an innocent mistake and
25  it's not misconduct by the prosecutor --



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
145–148

Page 145

1 BY MR. EAVES:
2   Q. All right. And --
3   A. -- by a witness.
4   Q. And that's never happened to you in a case;
5 right?
6       MS. GREEN: Form.
7 BY MR. EAVES:
8   Q. You've never had an officer make a mistake in
9 statement of fact which they then retracted or
10 corrected?
11      MS. GREEN: Form.
12 BY MR. EAVES:
13  Q. On a material issue?
14  A. Not that I can recall.
15  Q. And we know that because you've never put anybody
16 on a Giglio list or a Brady list; right?
17      MS. GREEN: Form.
18      THE WITNESS: That's true.
19 BY MR. EAVES:
20  Q. All right. We do know that you -- you at least
21 handled the appeal of a -- of a case where Brady
22 material was not turned over by the FDS; right?
23      MS. GREEN: Form.
24      THE WITNESS: You have to refresh my
25 recollection. Not --

Page 146

1       MR. EAVES: Okay.
2       THE WITNESS: That's not -- it's not ringing
3 a bell.
4       MR. EAVES: All right. Tina, do you have
5 that case, by any chance?
6       MS. RETTS: I don't have it printed.
7       MR. EAVES: I can tell you the name of it,
8 if you give me just a second.
9       THE WITNESS: Okay.
10      MR. EAVES: I think I've got it easily
11 marked here.
12      MS. RETTS: United States versus Wood.
13 BY MR. EAVES:
14  Q. United States versus Wood, does that case name
15 ring a bell with you as an appeal that you handled?
16  A. No.
17  Q. Okay.
18  A. When -- when was it?
19  Q. Hold on. I'm going to pull it up and I'll tell
20 you.
21      MS. GREEN: If you want to give -- if you
22 would --
23      MR. EAVES: I don't have a copy, Amelia, so
24 I can't give you a copy.
25      MS. GREEN: I mean, sorry, the --

Page 147

1       MS. BERKE: They can print it for you.
2       MS. GREEN: Or even just the --
3       MS. RETTS: 57 --
4       MS. GREEN: Me searching United States
5 versus Wood in the computer isn't going to help me too
6 much.
7       MS. RETTS: 57 F.3d 733. It's Ninth Circuit
8 case in 1995. And the suspect was Lawrence E. Wood.
9 BY MR. EAVES:
10  Q. Here you go. "Overview: Defendant was convicted
11 of conspiracy to defraud the Food and Drug
12 Administration by illegally dispensing an unapproved
13 drug. When it sought review of the district court
14 denials of his motion for a new trial or dismissal of
15 the charges against him, defendant had alleged the
16 existence of newly discovered evidence favorable to him
17 that the government had failed to previously disclose.
18 Defendant contended that the FDA had a responsibility to
19 disclose in a criminal trial the content of
20 investigational new drug applications that bore on the
21 safety of the drug that the defendant was charged with
22 unlawfully dispensing."
23      Is this ringing a bell?
24  A. I suspect my name was on the brief because
25 pertain -- possibly chief of Criminal Division, but I

Page 148

1 didn't handle that.
2   Q. Yeah, I mean your name is bold at the beginning
3 there. I'm just showing you on my phone. Sorry to do
4 it that way, but do you see -- take a look at that.
5   A. Yeah, that would been Mark Burns' case.
6   Q. Okay. So this is not a case that you were
7 intimately involved with?
8   A. Right. My name as -- the chief of the criminal
9 division's name was on, I think, every brief that was
10 filed to the Ninth Circuit.
11  Q. Okay. This case was, I think, 1995. Yeah, it's
12 dated 1995.
13      You weren't chief of the Criminal Division then,
14 were you?
15  A. Yes, I was.
16  Q. Okay. All right. So you -- so this is not a
17 case that you're familiar with? You don't have any
18 independent recollection of it at all?
19  A. Correct.
20  Q. All right. Fair enough.
21      As a prosecutor, have you had a cases where you
22 argued to federal court that statements should come in
23 when defense counsel were claiming they were made after
24 an invocation of some kind of right?
25      MS. GREEN: Form.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
149–152

Page 149

1    THE WITNESS:  Say -- say that again.
2  BY MR. EAVES:
3    Q.  As a prosecutor, have you ever been in a position
4  where you argued to a federal court that statements
5  should be admissible where the defense was claiming that
6  the statements were made after the invocation of a
7  Miranda right?
8    MS. GREEN:  Same objection.
9    THE WITNESS:  No, I don't recall any case
10  where I tried to get evidence in, the statements that
11  were made after the invocation of Miranda.
12  BY MR. EAVES:
13    Q.  And with all due respect, that's not what I
14  asked.
15    A.  Okay.  I misunderstood your question.
16    Q.  What -- what I asked was:  Think of a case where
17  the defense is claiming that a statement should be
18  suppressed --
19    A.  Okay.
20    Q.  -- because it was given after an invocation of a
21  right.
22    A.  Right.
23    Q.  As a prosecutor, you disagreed and took the
24  contrary position.  Has that ever happened?
25    MS. GREEN:  Form.

Page 150

1    THE WITNESS:  I don't think so.
2  BY MR. EAVES:
3    Q.  Okay.
4    A.  That's what I'm saying, I don't think that ever
5  happened where I -- where there was an invocation,
6  statements were made and I was, nevertheless, thinking
7  that they were admissible.
8    Q.  All right.  Is a Miranda violation -- the finding
9  of a Miranda violation by a court something that should
10  be on a Giglio list for an officer?
11    MS. GREEN:  Form.
12    THE WITNESS:  I think that a finding of a
13  Miranda violation has a bearing on the credibility of an
14  officer.  And if I were aware of a finding of a Miranda
15  violation by an officer, I would disclose that in any
16  subsequent case that I was handling.
17  BY MR. EAVES:
18    Q.  Is that something that's being tracked by the FBI
19  right now for their agents?
20    MS. GREEN:  Form.
21    THE WITNESS:  I have no -- no knowledge.
22  BY MR. EAVES:
23    Q.  All right.  When you were an Assistant U.S.
24  Attorney, would you have expected the FBI to give you
25  evidence that an officer had violated someone's Miranda

Page 151

1  rights if you asked them to provide you with all Giglio
2  material relating to that agent?
3    MS. GREEN:  Form.
4    THE WITNESS:  I don't know as I sit here
5  today that I had an expectation that that kind of
6  information would have gotten into the personnel file of
7  a -- of an agent.  So I -- I'm not sure I can answer
8  your question any better than that.
9    As I think about it, it's not clear to me
10  the fact that an FBI agent violated a suspect's Miranda
11  rights, that that information, a court finding to that
12  effect would have been in an agent's personnel file.
13  BY MR. EAVES:
14    Q.  All right.  Are you aware of any case law
15  controlling the Ninth Circuit for Arizona which required
16  that findings of violations of Miranda rights be kept as
17  part of a Brady or Giglio list --
18    MS. GREEN:  Form.
19  BY MR. EAVES:
20    Q.  -- for any officer?
21    A.  I don't think there's a law that requires it.
22    Q.  Any case law?
23    A.  The only case law is that the prosecutors are
24  obligated to disclose information bearing on the
25  credibility of their witnesses that are known to anybody

Page 152

1  in the office.  So if Amelia and I are both prosecutors
2  and she's aware that the court has suppressed evidence
3  because of a Miranda violation by an agent or an
4  officer, I'm charged with that knowledge even if I don't
5  actually know it myself.
6    Q.  What cases is it that says that that's -- that's
7  true when -- when it comes to a finding of a Miranda
8  violation?  That's what I'm asking.
9    A.  Well, I'm --
10    Q.  I understand the principle of she knows
11  something, you're charged with the knowledge.
12    What I'm asking you is, what specific case says
13  that a Miranda violation is something that needs to be
14  tracked under Giglio or Brady?
15    MS. GREEN:  Form.
16  BY MR. EAVES:
17    Q.  Prior to the Debra Milke case?
18    MS. GREEN:  Yeah.
19    THE WITNESS:  I don't know that there is a
20  case that says that that needs to be tracked.
21    In my opinion, information -- if evidence is
22  suppressed as a result of a Miranda violation, that has
23  a bearing on the credibility of an officer.  I don't see
24  how you can come to a different view.  It goes to the
25  integrity of the officer, the officer's willingness to

Page 153

1  abide by the dictates of the Supreme Court in Miranda,
2  and -- and in this case, the policy of the Phoenix
3  Police Department.  So it -- and a knowing violation of
4  Miranda is a -- in my judgment is Giglio material.
5  BY MR. EAVES:
6     Q.  All right.  You acknowledge that people disagree
7  on whether or not a Miranda violation occurred many
8  times; right?
9        MS. GREEN:  Form.
10        THE WITNESS:  I'm not sure how to answer
11  your -- your question.
12        Could there be a situation in one -- which
13  one person thinks there's a Miranda violation and
14  another person doesn't think there's a Miranda
15  violation?  Yeah, I guess that's true.
16  BY MR. EAVES:
17     Q.  Well, we don't --
18     A.  I'm talking about situations, though, when the
19  court has made a finding that there's a Miranda
20  violation.  And -- and as a prosecutor, I can disagree
21  with that court's finding, but the court has made a
22  finding that there was a Miranda violation by this
23  officer.  And that court finding, I think, has a bearing
24  on the credibility of that officer.
25     Q.  How's that affected when the appellate court

Page 154

1  comes to the opposite conclusion?
2        MS. GREEN:  Form.
3        THE WITNESS:  If the appellate court comes
4  to the opposite conclusion, then it would wipe out the
5  trial court's determination.  But while that decision is
6  out there, while that decision has been appealed
7  and overturned, that is a finding by a court that this
8  officer violated a suspect's Miranda rights.
9        And that court's findings, it seems to me,
10  has a bearing on the credibility of the officer.  I
11  think many courts would agree with that.  And every
12  defense lawyer in the world would want that information
13  to be able cross-examine that officer regarding the
14  Brady violation.
15  BY MR. EAVES:
16     Q.  How many officers --
17     A.  Excuse me, the Miranda violation.
18     Q.  How many agents or officers were tracked by the
19  U.S. Attorney's Office in your -- any of your times
20  there because they were found by a court to have
21  committed a Miranda violation?
22        MS. GREEN:  Form.
23        THE WITNESS:  I couldn't tell you that
24  information.  I don't know.
25

Page 155

1  BY MR. EAVES:
2     Q.  Do you remember any?
3        MS. GREEN:  Form.
4        THE WITNESS:  As I sit here today, do I have
5  a specific -- no.
6  BY MR. EAVES:
7     Q.  All right.
8     A.  I am just -- I am confident that that kind of
9  information was brought to the chief of the Criminal
10  Division, and then I'm confident that he was aware of
11  that information and that it was tracked in that way.
12     Q.  You've never served on any kind of a
13  decision-making committee for what should or should not
14  be treated as Giglio; right?
15        MS. GREEN:  Form.
16        THE WITNESS:  Correct.
17  BY MR. EAVES:
18     Q.  All right.  So wouldn't you agree with me that
19  it's probably fair to have a group of people making that
20  decision rather than one person?
21        MS. GREEN:  Form.
22  BY MR. EAVES:
23     Q.  If you're going to put an officer on a list and
24  say this officer has impeachment material that -- that
25  we're going to produce in every case in which he

Page 156

1  testifies, wouldn't you agree there's some -- almost a
2  due process right for that officer?
3        MS. GREEN:  Form.  Objection to the repeated
4  use of "a list."
5        THE WITNESS:  No, I don't believe an officer
6  has a due process right to a committee to decide whether
7  or not the conduct that is at issue constitutes a Giglio
8  material that has to be disclosed over -- to a defense
9  counsel.
10  BY MR. EAVES:
11     Q.  So you think that should just be decided by one
12  person sitting in their office reading a transcript or
13  reading a -- a court opinion?
14        MS. GREEN:  Form.
15        THE WITNESS:  Certainly if -- if I am a
16  prosecutor and I am aware that this officer has violated
17  a suspect's Miranda rights in another case, in my
18  judgment, it is my obligation to turn that information
19  over as Brady or Giglio.  I don't need go to the chief
20  of the Criminal Division or go to the criminal
21  complaints unit say, hey, I need you guys to look at
22  this and tell me whether I have an obligation to turn
23  that information over because of some officer's due
24  process rights.
25        My view is I have an obligation as a



Page 157

1   prosecutor.  And if I make the determination as a
2   prosecutor that that information has a bearing on the
3   credibility of the officer, I have to turn it over.
4   BY MR. EAVES:
5       Q.  Thanks.
6           In this case -- I'm sorry.
7           In this case, you reviewed several summaries of
8   cases involving Detective Saldate that were provided to
9   you by plaintiff's counsel; correct?
10      A.  Yeah.
11      Q.  Did you review the course documents themselves or
12  did you just review those summaries?
13      A.  Oh, I reviewed the -- the police reports.  I
14  reviewed the -- the deposition testimony and the
15  testimony -- some of the testimony that was given in the
16  underlying cases as well.
17          MR. EAVES:  Okay.  All right.  Thanks.  I
18  don't think I have anything else.
19          THE WITNESS:  Okay.
20          MS. BERKE:  Can we take a short break?
21          MR. EAVES:  Sure.
22          THE VIDEOGRAPHER:  We are off the record.
23  The time is 2:13 p.m.
24          (Recess.)
25          THE VIDEOGRAPHER:  This marks -- this marks

Page 158

1   the start of Media Unit 3.  We are on the record at
2   2:26 p.m.
3
4               EXAMINATION
5   BY MS. RETTS:
6       Q.  Mr. Drooyan, my name is Christina Retts, and I
7   represent the City of Phoenix.
8           I'm going to jump around a little bit and cover
9   some of the areas, follow-up to some of the areas you
10  testified to today, so I apologize if I'm kind of all
11  over the place, but I just want to touch on a few
12  pieces.
13      A.  No problem.  Go ahead.
14      Q.  My office sent a subpoena to you for file
15  materials.
16          Do you recall getting that?
17      A.  Yes.
18      Q.  And Ms. Milke's counsel assisted in facilitating
19  getting your file materials to us?
20      A.  That's my understanding.
21      Q.  Did you review the letter that was prepared to us
22  that transmitted the file materials to us?
23      A.  I don't think so.
24      Q.  And can you verify for me that you did not review
25  any case law, treatises, articles, scholarly materials

Page 159

1   or anything that was not identified within your report
2   or rebuttal report --
3           MS. GREEN:  Objection --
4   BY MS. RETTS:
5       Q.  -- as the basis for your opinions?
6           MS. GREEN:  Objection.  The -- I believe the
7   subpoena was what he relied on for the basis of his
8   opinions, not review -- not review.  Just for the
9   purpose of clarity, the agreement we reached.
10  BY MS. RETTS:
11      Q.  Did you -- did you review any materials in
12  conjunction with rendering your opinions in this case
13  that you reviewed and rejected?
14      A.  No.
15      Q.  So everything that you relied upon in forming the
16  basis of your report, whether it be case law, materials
17  that you reviewed or standards, did you delineate that
18  in your expert report?
19      A.  I -- I believe so.  And the only reason I'm
20  hesitating is anything that I relied on or reviewed was
21  either in my report or was in the materials that were
22  produced to you pursuant to the subpoena.
23      Q.  Great.  That's just what I needed you to confirm,
24  that there wasn't anything out there that I was missing
25  or that maybe was forgotten along the way that you had

Page 160

1   looked at, but wasn't provided either listing in your
2   report or provided in response to the subpoena?
3       A.  The only thing that I've looked at -- which I
4   looked at after the subpoena, I looked at yesterday, was
5   the Arizona Court of Appeals decision -- I think it's
6   the Court of Appeals decision, and I may have the -- the
7   name of the court wrong -- preventing the retrial of
8   Ms. Milke on double jeopardy grounds.
9           I didn't review that before and I didn't rely on
10  that in reaching my opinion, but I looked at that
11  yesterday and it frankly reconfirms my opinion.
12      Q.  When you were reading the Arizona Court of
13  Appeals decision relating to Ms. Milke -- Milke's
14  retrial, did you have an understanding that the court's
15  ruling was based upon a unique provision of Arizona law
16  and not constitutional -- U.S. constitutional double
17  jeopardy?
18      A.  I -- yes, I think that's right.
19      Q.  And you understand that, in this case, Ms. Milke
20  is only bringing claims pursuant to the U.S.
21  Constitution and not under Arizona law?
22      A.  I haven't looked at the complaint so I can't tell
23  you specifically what her claims are in this case, but I
24  certainly -- I'm under the opinion that there are at
25  least some U.S. Constitution claims.



Page 161

1    Q.  For -- for material to be -- necessary to be
2  disclosed under Brady, there is a materiality component;
3  would you agree?
4    A.  Yes.
5    Q.  And as part of an analysis of materiality in a
6  given case, you would go through and look what the
7  charges were against the defendant and what the unique
8  facts of the case were; would you agree?
9        MS. GREEN:  Objection to form.
10        THE WITNESS:  Yes.  I assume we're talking
11  about Brady material -- material other than Giglio
12  material.
13  BY MS. RETTS:
14    Q.  Correct.
15    A.  Yeah, you -- you need to look at what the
16  information is, what the charges are and how the
17  information relates to the charges.
18    Q.  In conjunction with rendering your opinions in
19  this case, did you look at any of the underlying
20  materials from Ms. Milke's criminal prosecution in terms
21  of police reports, supplements, criminal trial
22  testimony, anything of that nature?
23        MS. GREEN:  Form.
24        THE WITNESS:  No, I did not.
25  ///

Page 162

1  BY MS. RETTS:
2    Q.  I just --
3    A.  I'm just -- the only reason I'm hesitating, I've
4  looked at testimony from Officer Saldate in several
5  different proceedings, but I don't think any of that was
6  testimony in the trial.  I may be wrong on that, but I
7  don't think I looked at his -- his trial testimony.
8    Q.  Did you review Detective Saldate's deposition
9  testimony in this case?
10    A.  Yes.
11    Q.  Thank you.
12        I want to mark this as an exhibit and have you
13  take a look at this.
14        THE REPORTER:  I'm sorry, what number is
15  that?
16        THE WITNESS:  That's 249, so that's 250.
17        (Defendants' Exhibit 250 was marked for
18        identification by the court reporter and is
19        attached hereto.)
20        MS. RETTS:  I'm sorry.  Thank you.
21  BY MS. RETTS:
22    Q.  Do you recognize this document as email
23  correspondence that you received from plaintiff's
24  counsel?
25    A.  That's what it appears to be.  I don't have a

Page 163

1  reason to doubt it.  I just don't recognize it in
2  particular.
3    Q.  Can you take a -- a quick look and read through
4  that for me.  This was produced as part of your file
5  materials.
6    A.  Okay.
7    Q.  Having looked at that, does that help you with
8  any more specificity as to what of Saldate's testimony
9  you specifically reviewed?
10        MS. GREEN:  Form.
11        THE WITNESS:  I think I read the first two
12  days and then I think I read the third day.  And I
13  probably, I don't know, skimmed through the last 70
14  pages or so.  I don't recall specifically --
15  BY MS. RETTS:
16    Q.  And would the reason --
17    A.  -- whether I did or not.
18    Q.  -- have been that you skimmed through the last 70
19  pages was that you were given instruction by plaintiff's
20  counsel that that wasn't necessarily an important
21  portion of the testimony to review?
22        MS. GREEN:  Form.
23        THE WITNESS:  If that's the reason why I
24  didn't read it in detail --
25        MR. BRUSTIN:  You should -- guys --

Page 164

1        MS. GREEN:  Form.  Oh, yeah.  Oh.
2  Objection.
3        MS. RETTS:  Form is the appropriate
4  objection.
5        MS. GREEN:  Yeah.  No --
6        MR. BRUSTIN:  It's not --
7        MS. GREEN:  It's not the appropriate
8  objection to the extent you're asking about any work
9  product communications or communications that we had
10  that are not subject to disclosure -- let -- just let me
11  finish -- subject to disclosure pursuant to Rule 26.
12        This is an email we turned over.  We're fine
13  with him asking -- answering questions about the
14  documents that he reviewed, but we're not going to get
15  into the substance of plaintiff's communications and --
16  with Mr. Drooyan beyond what is permitted by the rule,
17  which we provided to you.
18        MS. RETTS:  Right.  Which is what -- I'm
19  asking him specifically about what was written and his
20  mental process and why he didn't review and skimmed the
21  last 70 pages, so --
22        MS. GREEN:  And he, in fact, said he did
23  review and skim the last 70 pages.  I -- I believe
24  that's what he just said.
25        MS. BURGESS:  Well, he could testify, not



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
165–168

Page 165

1  you.

2          MS. RETTS:  He could -- yes.

3          MS. GREEN:  Well, again, if it's an

4  objection that goes to privileged material, I'm allowed

5  to say something more than form --

6          MS. RETTS:  And you can say "privileged

7  material" that, you know, in those words --

8          MS. GREEN:  Yeah, and I have -- and I have

9  done so, but --

10         MS. RETTS:  -- without coaching of witness.

11         MS. GREEN:  But if the -- if the witness is

12  not to answer the question because it's privileged, I'm

13  allowed to state that on the record, as I've done.

14  BY MS. RETTS:

15     Q.  Did you read the last 70 pages of Detective

16  Saldate's deposition with the same level of detail that

17  you had read the previous portions of his deposition?

18     A.  I don't think so.

19     Q.  Have you heard the phrase that cross-examination

20  is the searchlight for truth?

21         MS. GREEN:  Form.

22         THE WITNESS:  Some variation of that,

23  probably, yes.

24  BY MS. RETTS:

25     Q.  And that's included often times in court

Page 166

1  decisions where courts are speaking about the importance

2  of cross-examination; would you agree?

3     A.  Phrased a little bit differently, but yes.

4     Q.  And those 70 pages that you did not review were

5  the cross-examination of Saldate?

6         MS. GREEN:  Objection.  Misstates testimony.

7         THE WITNESS:  I --

8         MS. GREEN:  And argumentative.

9         THE WITNESS:  Okay.

10         MS. GREEN:  Not a question.

11         MS. RETTS:  Please state form.

12         THE WITNESS:  I don't think it would -- I

13  would characterize it as the cross-examination of

14  Saldate.  If I recall correctly, it was some questions

15  that were asked to sort of cleanup the deposition

16  testimony.  And I -- as I said, I -- I did skimmed

17  through it.  I didn't see anything of particular note

18  that affected or changed my opinion.

19  BY MS. RETTS:

20     Q.  Now, when you were a prosecutor and went through

21  a case to determine what charges you were going to bring

22  and/or how you were going to prosecute the case, did you

23  go through a thorough review of all the case materials,

24  such as the police reports, any witness statements that

25  were available, all of the evidence that might be

Page 167

1  available to you at the time?

2     A.  Yes.

3     Q.  And you considered that as part of your

4  obligations as a diligent prosecutor; would you agree?

5     A.  I had to review all the material information in

6  the -- that was gathered during the course of the

7  investigation to determine whether or not to bring

8  charges, yes.

9     Q.  And in the course of your work on civil cases,

10  you are familiar with a disclosure statement; true?

11     A.  Yes.

12     Q.  And have you had the opportunity to prepare

13  disclosure statements yourself, or at least sign off on

14  them?

15         MS. GREEN:  Form.

16         THE WITNESS:  Probably -- I'd probably

17  prepare them at one point in time and more recently

18  would have signed off on them.

19  BY MS. RETTS:

20     Q.  And you understand that a disclosure statement

21  from a party is generally where they list all the

22  evidence that they believe to be relevant to their

23  claims or defenses, especially if the case is brought in

24  federal court?

25         MS. GREEN:  Form.

Page 168

1          THE WITNESS:  I couldn't give you chapter

2  and verse what is required under the Federal Rules of

3  Civil Procedure right now, but it is a disclosure of a

4  party's evidence.

5  BY MS. RETTS:

6     Q.  And in this case, did you ask to see any of the

7  disclosure statements from any of the parties to go

8  through and determine whether you thought there were

9  additional materials that you should review that might

10  be relevant to your analysis?

11         MS. GREEN:  Form.

12         THE WITNESS:  No.

13  BY MS. RETTS:

14     Q.  You relied exclusively on the plaintiff to select

15  the records for your review; would you agree?

16         MS. GREEN:  Form.

17         THE WITNESS:  Yes.

18  BY MS. RETTS:

19     Q.  The materials that you related -- reviewed

20  related to the other cases, such as the Running Eagle

21  case, the Reynolds case, the Rodriguez case, those were

22  not the entire criminal prosecution files for those

23  cases; would you agree?

24     A.  Yes.

25     Q.  And you also relied -- in forming your opinions

Page 169

1  in this case, you relied upon the summaries of those
2  cases that were prepared by plaintiff's counsel?
3       MS. GREEN:  Form.
4       THE WITNESS:  No, I would not say that's
5  correct.  I looked at the summaries to give me the basic
6  information about the case, but I looked at the
7  deposition testimony.  I looked at the police reports.
8  I looked at information that had a direct bearing on the
9  underlying cases, sort of more firsthand information.  I
10 did not rely on the summaries in reaching my opinions.
11 BY MS. RETTS:
12    Q.  Do you know whether or not you had the full
13 police reports for each of those cases?
14       MS. GREEN:  Form.
15       THE WITNESS:  I don't know for certain.  I
16 had a deposition -- I had the deposition exhibits, and I
17 think those -- some of those deposition exhibit were
18 police reports.  I don't think they were the entire
19 police reports for the underlying cases.
20 BY MS. RETTS:
21    Q.  Do you remember reading grand jury testimony?
22    A.  I don't recall if I did or not.
23    Q.  You cite to a case that Detective Saldate was
24 involved in, the Rodriguez case.
25       Does that name sound familiar to you?

Page 170

1     A.  Oh, right.  Now -- yes, now I'm -- okay.  Yes.
2     Q.  And there was a allegation in that case relating
3  to whether there was four shots or one shot.
4        Does that sound --
5        MS. GREEN:  Form.
6  BY MS. RETTS:
7     Q.  -- familiar to you?
8     A.  Yes, that's correct.
9     Q.  Did you review the grand jury testimony in the
10 Rodriguez ready matter to determine what the context was
11 for the court's determination on the remand and did you
12 look at the entirety of it to determine what Saldate's
13 testimony had been in other instances where he was
14 questioned about the shot?
15       MS. GREEN:  Form.
16       THE WITNESS:  No.
17 BY MS. RETTS:
18    Q.  If Saldate had testified in the Rodriguez case
19 multiple times that there was a shot, a casing, a shell,
20 would that have been important to your analysis and in
21 determining whether the court reporter had been mistaken
22 in writing one shot versus four shots?
23       MS. GREEN:  Form.
24       THE WITNESS:  No.  And -- and the reason why
25 I say "no" is if -- if the question is ultimately a

Page 171

1  court made a determination that she -- or the court
2  reporter transcribed it correctly and he testified
3  erroneously and, therefore, it had to go be remanded to
4  the grand jury for a redetermination, so there is a
5  finding that he testified in a manner that was
6  inconsistent with the, I guess, agreed-upon facts as to
7  the number of shots.
8        I mean, it -- if the court made a
9  determination that it wasn't a full and fair
10 presentation of the evidence to the grand jury, it seems
11 to me that's sufficient to at least say that it has a
12 bearing on his credibility as a witness.  There may be
13 explanations.  There may be a basis to either preclude
14 cross-examination at trial or to rehabilitate him as a
15 witness, but it doesn't go to the issue of whether or
16 not a prosecutor has an obligation to turn over his
17 Giglio material.
18 BY MS. RETTS:
19    Q.  Have you ever had an instance where you've
20 received a transcript and the court reporter has made an
21 error?
22    A.  Yes.
23    Q.  And you have had opportunities where you have had
24 a deposition that you've reviewed of a witness in one of
25 your cases where there have been errors?

Page 172

1        MS. GREEN:  Form.
2        THE WITNESS:  Yes.
3  BY MS. RETTS:
4     Q.  And the court reporter stenographic notes may
5  note something that the witness didn't actually testify
6  to; true?
7        MS. GREEN:  Form.
8        THE WITNESS:  How do I answer that?
9        There -- there was an error in the
10 transcript -- I can recall instances where there was an
11 error in the transcripts.  Doesn't happen very often.
12 And we went back to the court reporter, who then, after
13 having looked at whatever stenographic records he or she
14 may have had, made a determination that there was an
15 error and it was corrected.  So that's one kind of
16 situation.
17       Another kind of situation is there is an
18 error because the witness made a mistake, but the court
19 reporter took it down correct.  I don't recall any
20 instance where -- where, as a -- you know, a lawyer in
21 civil practice that I ever saw the -- or review with a
22 court reporter the underlying stenographic information.
23 BY MS. RETTS:
24    Q.  Court reporter can make mistakes?
25    A.  Certainly.



Page 173

1    Q. That doesn't mean that the witness necessarily
2   made a mistake and made a misstatement; would you agree?
3        MS. GREEN:  Form.
4        THE WITNESS:  Correct.
5   BY MS. RETTS:
6    Q. And part of the way you could determine that
7   would be to look at the entire context of the testimony.
8   So if the witness had been asked about whether it was a
9   shot before and on multiple occasions said a shot, a
10  shell casing, and then later there seemed to be a
11  discrepancy and the witness said I never said that, that
12  would be something you would want to look at; would you
13  agree?
14   A. I would want to look at it, and you could
15  certainly make an argument that the court reporter was
16  mistaken.
17       I do want to -- you know, one of the things that
18  has changed over the 40-some-odd years that I have been
19  practicing is that when I first started out and I took a
20  deposition, we didn't have a video, you know, a video.
21  So it's -- it is another way of going back and checking
22  to see exactly what the witness said.
23   Q. Exactly.  And sometimes, if you -- I've had the
24  experience of going back and looking at the video and
25  finding that it was clear that the witness said

Page 174

1   something on the video that the court reporter got down
2   wrong.
3    A. Yeah.
4        MS. GREEN:  Form.
5        THE WITNESS:  I haven't had that experience,
6   but it's certainly a possibility.
7   BY MS. RETTS:
8    Q. In a grand jury proceeding, the witness who
9   testifies doesn't have an opportunity to review the
10  transcript and make any correction; would you agree?
11       MS. GREEN:  Form.
12       THE WITNESS:  A federal grand jury, that's
13  correct.
14  BY MS. RETTS:
15   Q. Do you know about a state grand jury?
16   A. I don't know the practices --
17       MS. GREEN:  Form.
18       THE WITNESS:  -- in every state.
19  BY MS. RETTS:
20   Q. Do you know what the practice is in Arizona
21  related to witness review of grand jury testimony?
22   A. I don't know that.
23   Q. Do you know what Arizona law is as it relates to
24  the secrecy of grand jury proceedings?
25   A. I don't know.

Page 175

1    Q. In California federal proceedings, are grand
2   juries generally secret?
3    A. There is a -- Rule 60 is a general rule of grand
4   jury secrecy in federal criminal cases.
5    Q. So in your experience in prac-- -- practicing as a
6   prosecutor in California in the federal system, were
7   grand jury transcripts provided to police departments?
8    A. Grand jury transcripts would be provided to the
9   police witness who was going to testify so that he would
10  have access to his prior statement before he testified
11  at trial.  But would it be turned over to the law
12  enforcement agency?  No.
13   Q. Have you ever seen a grand jury transcript in a
14  law enforcement officer's personnel file?
15       MS. GREEN:  Form.
16       THE WITNESS:  No.
17  BY MS. RETTS:
18   Q. Do you agree that police departments are not
19  custodians of records for grand jury transcripts?
20       MS. GREEN:  Form.
21       THE WITNESS:  Yes.  As a -- I would say that
22  the custodian of records for grand jury transcripts
23  which have not been disclosed in one way or the other
24  would be the United States Attorney's Office.
25

Page 176

1   BY MS. RETTS:
2    Q. Have you ever seen criminal trial testimony from
3   an officer in an officer's personnel file?
4        MS. GREEN:  Form.
5        THE WITNESS:  No.
6   BY MS. RETTS:
7    Q. So when earlier you were testifying about the
8   ability for a prosecutor to go to the police department
9   and ask to see a personnel file, you would agree that
10  you would not expect to be found within that personnel
11  file grand jury transcripts or criminal trial testimony?
12   A. Correct.
13   Q. And you agree that you wouldn't expect minute
14  entries from courts to be found within an officer's
15  personnel file?
16   A. Not so sure I agree with that.
17   Q. Have you ever seen a minute entry from a court
18  proceeding in an officer's personnel file?
19   A. I have not seen it, but I would expect that if
20  there was, let's say a -- let's make it the clearest
21  case, court finding that an officer lied in trial
22  testimony, I would expect that that information would
23  find its way into that officer's personnel file one way
24  or the other.
25   Q. But you have never actually seen that to be the



Page 177

1  case?
2      A.  Correct.
3      Q.  You have never actually seen any court decision
4  in an officer's personnel file; would you agree?
5      A.  I would agree.
6      Q.  Have you ever contacted any law enforcement
7  agency in the State of California and made a complaint
8  about an officer's testimony?
9      A.  Are we talking about --
10     Q.  State agency?
11     A.  No.
12     Q.  Have you ever made a complaint to any state
13  agency in the state [sic] of Los Angeles that suggested
14  that a state employee should be placed on a Brady list?
15         MS. GREEN:  Form.
16         THE WITNESS:  No.
17  BY MS. RETTS:
18     Q.  Now, I understand that you were involved in the
19  independent review board -- I don't know if that's
20  exactly what they called it -- for the Rampart scandals.
21         Was that the technical name?
22     A.  They called it the Rampart Independent Review
23  Panel.
24     Q.  And there were approximately around 190 folks who
25  were also on that panel?

Page 178

1      A.  There were a lot of -- I was the general counsel,
2  and I was in charge of the entire operation.  We had a
3  number two, then we had eight deputy general counsels,
4  and then -- from various different law firms in
5  Los Angeles, and then the partners and associates who
6  were working under each of those partners, I think we
7  had six or seven groups in the end.  But I was in charge
8  of it.
9      Q.  And the Rampart scandal came out -- I don't know
10  if he was a detective.  Was he a Detective Perez?
11  Rafael Perez?
12     A.  I don't know if he was detective or just an
13  officer.  But it -- it surrounded Perez and there were
14  other officers in the Rampart Division who engaged in
15  corrupt -- illegal activities.
16     Q.  And it's called the Rampart Division because it's
17  a geographical area that those specific officers would
18  patrol or respond for calls for service in; correct?
19     A.  Correct.  You can see the Rampart station from
20  here.
21     Q.  And the -- there was a -- name of their unit
22  was the CRASH unit, C-R-A-S-H?
23     A.  Correct.
24     Q.  And these officers were some of them were
25  gang-related detectives, officers?

Page 179

1      A.  Yeah, I think it was an anti-gang unit or
2  something along those lines, if I remember correctly.
3      Q.  Was there a RICO case that came out of that
4  investigation with the U.S. Attorney's Office against
5  the officers?
6      A.  I don't believe so.
7      Q.  As part of the independent review panel, did you
8  make a recommendation to the City of Los Angeles
9  relating to placing any of those officers on a Brady
10  list?
11     A.  I don't recall.
12     Q.  If you had made that recommendation, would it
13  have been included within that -- I think it's about
14  298-page report of the independent review panel?
15     A.  In the -- all the recommendations we made were in
16  that one report.
17     Q.  Did you make a recommendation to the D.A. in
18  Los Angeles or the A.U.S.A. in the L.A. area after your
19  independent review in the Rampart investigation to go
20  back and look at all cases where any of those officers
21  or detectives had testified to determine if there was
22  Brady material that should be -- that should be turned
23  over?
24         MS. GREEN:  Form.
25         THE WITNESS:  I don't think we made that

Page 180

1  recommendation.  But I will say I don't specifically
2  recall all of the recommendations that were made.
3  BY MS. RETTS:
4      Q.  As part of that independent review panel, did you
5  look at any specific allegations against specific
6  officers?
7      A.  No.  And let me explain.  There were criminal
8  investigations going on, and so we were a independent
9  pro bono review panel.  And -- and one of the things
10  that we had to be careful about was making sure that we
11  didn't interfere with any ongoing criminal
12  investigations by the U.S. Attorney's Office or the
13  District Attorney's Office, nor were we in a position
14  to -- to -- to duplicate their efforts.  I mean, we
15  didn't have subpoena power and were dependant upon
16  getting access to records voluntarily from the -- the
17  police department.
18         So the -- I think the -- everybody sort of
19  envisioned when we started this that we were going to
20  somehow be investigating the officers who were engaged
21  in Rampart and we would be doing -- what's the case in
22  New York?  Mercado or something like that we would have
23  public testimony and -- and cross-examining those
24  officers about all their corrupt activity.  But that was
25  not the case and was never the case.



Page 181

1    We -- ultimately, the focus on Rampart was really
2  on -- on structural issues relating to the management of
3  the police department, the discipline, issues like that.
4    Q.  So it was systemic issues that you were looking
5  at?
6    A.  Much more than individual issues.
7    Q.  Changes in policies and procedures?
8    A.  Recommendations, identify problems and -- and
9  making recommendations to address those problems.
10    Q.  And you don't remember any specific
11  recommendations as part of that systemic review that
12  related to Brady material or Giglio material?
13    A.  Not that I recall.
14    Q.  Would you agree that the allegations in the
15  Rampart scandal would have potentially invoked Brady and
16  Giglio?
17        MS. GREEN:  Form.
18        THE WITNESS:  About those officers, yes,
19  absolutely.  My recollection is that one of those
20  officers was ultimately prosecuted for robbery.  I think
21  his name is Mac something.  I think that's the name.  So
22  clearly that would have bearing on his testimony if he
23  were, after having been convicted, had to have been
24  called as a witness in a -- a trial, yes.
25

Page 182

1  BY MS. RETTS:
2    Q.  There were allegations in Rampart that some of
3  the officers engaged in perjured testimony?
4    A.  I believe that's right.
5    Q.  As it related to any of the allegations of
6  perjury, did your independent review include anything
7  that touched upon Brady or Giglio?
8    A.  No.  As I said, we -- we just didn't get into the
9  specific evidence of THE possible misconduct by L.A.P.D.
10  officers.  We -- we just weren't in the position to get
11  the evidence and we didn't want to interfere with the
12  ongoing investigations.
13    Q.  As it relates to, going back to Brady and
14  materiality, what did you do in this case to determine
15  materiality as it related to the specifics of the Milke
16  case if you didn't review any of the underlying criminal
17  case documents?
18        MS. GREEN:  Form.
19        THE WITNESS:  Well, I think the only thing
20  that I did was look at information that had bearing on
21  the credibility of Officer Saldate, in effect, Gigli- --
22  the Giglio subset of -- of Brady.  I -- I didn't look to
23  see if there was other exculpatory evidence bearing upon
24  her guilt or innocence that should have been disclosed.
25        But I looked at a series of cases in which

Page 183

1  it appeared to me that an officer had testified on a
2  number of different occasions falsely, that on occasions
3  had lied, that had made multiple violations of --
4  intentional violations of Miranda.  And I looked at that
5  complete package and -- and to me, that Giglio material
6  that had to have been disclosed to the defense in the
7  Milke case.
8        And I -- and -- and then I looked at the
9  testimony of Mr. Manning, the testimony of
10  Mr. Rude (phonetic) and others who -- who, in many
11  instances, confirmed my view, that this was a Miranda
12  violation or this was Brady material that had to be
13  disclosed.
14        So I was focused on the Giglio component of
15  Brady as it bear -- as it bore on the credibility of
16  Officer Saldate.
17  BY MS. RETTS:
18    Q.  Thank you for that clarification.
19        MS. RETTS:  Mark this.  We're up to 251 now.
20        (Defendants' Exhibit 251 was marked for
21        identification by the court reporter and is
22        attached hereto.)
23        THE WITNESS:  Let -- let me just add one
24  more thing to that last answer.  I did read --
25        THE REPORTER:  Just one second, please.

Page 184

1        THE WITNESS:  I'm sorry.
2        THE REPORTER:  Sorry.
3        THE WITNESS:  Maybe that's what you're about
4  to show me.
5        MS. GREEN:  This one?
6        THE WITNESS:  No.
7        What I was going to say is, I -- I did read
8  the Ninth Circuit's decision in the Milke case.  And I
9  didn't see anything in there that -- with respect to the
10  nondisclosure that was other than the Giglio material
11  that related to the credibility of Officer Saldate.
12  BY MS. RETTS:
13    Q.  Did you rely upon Ninth Circuit's decision in
14  formulating your decisions in the case?
15    A.  No.
16    Q.  Okay.  Did your opinions related to what would
17  constitute Giglio material require you to make a
18  determination in some of the instances that you believe
19  Detective Saldate was lying?
20        MS. GREEN:  Form.
21        THE WITNESS:  No.  If you're saying "lying"
22  meaning knowingly and intentionally making a false
23  statement, it did not necessarily require me to make
24  that determination.  Although, there were some instances
25  in which I did believe that it was intentionally a lie.



RICHARD DROOYAN                                September 12, 2018
MILKE vs CITY of PHOENIX                        185–188

Page 185

1   But --
2   BY MS. RETTS:
3      Q. So in -- in some instances, you did come to the
4   conclusion that Detective Saldate was intentionally
5   lying?
6      A. Yes.
7      Q. Do you have any training as a psychologist?
8      A. No.
9      Q. Do you have any training as a psychiatrist?
10     A. No.
11     Q. Have you ever performed any polygraph testing on
12  somebody before?
13     A. I have not personally performed a polygraphic
14  exam.
15     Q. Have you been trained as a polygrapher?
16     A. No.
17     Q. Do you have any specialized training that relates
18  to human lie detection?
19     A. Other than --
20        MS. GREEN:  Form.
21        THE WITNESS:  Other than spending 14 years
22  as a prosecutor examining numerous witnesses,
23  cross-examining witnesses, making assessments as to
24  whether witnesses are testifying truthfully or not, and
25  even beyond 14 years as a prosecutor, I've got 40-plus

Page 186

1   years as a lawyer in which, you know, even in civil
2   cases you have to examine witnesses, you take
3   depositions and -- and you argue credibility of -- of
4   the witnesses and you make -- you form opinions as to
5   whether or not they're telling the truth or not.
6   BY MS. RETTS:
7      Q. Have you ever been able successfully to put on a
8   witness in any of your prosecutions that testified that
9   another witness was lying?
10        MS. GREEN:  Form.
11        THE WITNESS:  I have put on witnesses who
12  have contradict -- contradicted the testimony of
13  witnesses called by the defense.  My experience over
14  time was that most federal judges would not let you ask
15  the witness whether the other witness was lying or not.
16  So having had the experience, I usually didn't ask that
17  question.
18        But if a witness -- if a defense witness
19  testified that X, I'm -- there were certainly exam- --
20  instances which I would call a rebuttal witness to -- to
21  say it wasn't X.
22  BY MS. RETTS:
23     Q. Right, to the factual material.  You would have
24  one witness testify to the factual material, another
25  testify to the other factual material, but you've never

Page 187

1   had a judge actually allow one witness to call the other
2   a liar?
3         MS. GREEN:  Form.
4         THE WITNESS:  As a general matter, the
5   judges frowned on that practice.  You could then, in
6   your closing argument, say that their witness was lying.
7   And if -- if the -- the evidence warranted it, the jury
8   might very well reach that conclusion.
9   BY MS. RETTS:
10     Q. I want to have you take a look at what has been
11  marked in front of you as Exhibit 251.
12     A. Okay.
13     Q. And if you'll turn to Page 21.
14        First of all, this is a case Mays (phonetic)
15  versus Clark out of the United States District Court for
16  the Eastern District of California.
17        Do you remember ever reading this case or are you
18  familiar with it?
19     A. I don't recall ever reading it.
20     Q. And on Page 21, on the left-hand side, there is a
21  discussion about Brady information, about the third --
22  looks like the third paragraph down.
23        And if you'll read that through the next page to
24  where it says "Conclusion."
25     A. So where do you want -- the paragraph that starts

Page 188

1   with "Moreover"?
2      Q. Yeah.
3      A. Okay.
4        (Witness complies.)
5        Okay.
6      Q. From reading that portion, do you see that the
7   court is recognizing the proposition that there's not a
8   Brady violation if the defendant knew or should have
9   known of the essential facts permitting him to take
10  advantage of any exculpatory evidence?
11        MS. GREEN:  Form.
12  BY MS. RETTS:
13     Q. Would you agree with that?
14     A. I see that, yes.
15     Q. And was that the understanding -- your
16  understanding of how Brady worked when you were a
17  prosecutor?
18        MS. GREEN:  Form.
19        THE WITNESS:  So when I was a young
20  prosecutor and I read these cases, I was always under
21  this understanding exactly, that if you told the defense
22  that this witness has exculpatory evidence relating to a
23  subject, that you didn't necessarily have to tell the
24  defense what that witness actually said.
25        In practice, you get in front of federal



Page 189

1  judges in the Central District of California and most of
2  them, if not all of them, would have told you turn over
3  the exact statement of the witness and would have had a
4  broader view of the prosecutor's Brady obligations, in
5  part sort of -- in some ways, sort of a practical view
6  as well.  Don't just point them to the witness.  Give
7  them the information that you have and, therefore, you
8  make full disclosure.
9       So ultimately, as I got some experience as a
10  prosecutor, I didn't draw those lines of, well, tell
11  them where the evidence is and how to go find it.  I
12  just gave them -- I just gave them the evidence because
13  my experience had been that's what the federal judges
14  expected you to do.
15  BY MS. RETTS:
16  Q.  Which was broader than what the case law said?
17  A.  Yes.
18  Q.  And the case law also said that there wasn't an
19  obligation to produce evidence that was already known to
20  the defendant.
21       Do you agree with that?
22  A.  Correct.
23  Q.  As part of your review of this case, you looked
24  at the Running Eagle materials?
25  A.  I did.

Page 190

1  Q.  And is it your understanding that Ms. Milke did
2  not have any knowledge of Running Eagle?
3  A.  I think that there was the one case that there
4  was some evidence that they did have some knowledge of
5  it.  It was either Running Eagle or King, but I think it
6  was Running Eagle.  And they didn't -- the defense
7  lawyer -- Ms. Milke's defense lawyer didn't do anything
8  with it.  At least there's some evidence in the
9  materials that I saw that suggested that she had -- her
10  attorney had that material.
11  Q.  Did you undertake any additional exploration to
12  determine what the extent of Ms. Milke's lawyer's
13  knowledge of Saldate's background was?
14  A.  No.  The only thing -- my understanding was is
15  that -- that her lawyer was aware of the Running Eagle
16  testimony that was inconsistent with the police report,
17  but not aware of any of the other Brady/Giglio material
18  that we've been talking about.
19  Q.  And how do you know that?  Where do you get that
20  from?
21       MS. GREEN:  Form.
22       THE WITNESS:  It's just that in -- I haven't
23  seen any evidence that he was aware of it in any of the
24  other cases, but I do recall seeing a reference to him
25  being aware of the Running Eagle matter.  So I think I

Page 191

1  just drew that conclusion that -- that he wasn't aware
2  of any -- it -- aware of it -- any of it in any of the
3  other cases.
4  BY MS. RETTS:
5  Q.  Did you review Mr. Ray's deposition testimony?
6  A.  Who?
7  Q.  Ken Ray, Ms. Milke's criminal lawyer, did you
8  review -- criminal trial lawyer.  Did you review his
9  deposition testimony?
10  A.  No, I did not.
11  Q.  Did you review Ms. Milke's background private
12  investigator Kirk Fowler, his deposition testimony?
13  A.  No.
14  Q.  Did you review her appellate counsel,
15  Mr. Rosenquist's deposition testimony?
16  A.  No.
17  Q.  Do you recall reviewing any of the testimony from
18  the voluntariness hearing that addressed Ms. Milke's
19  confession and the voluntariness of it?
20       MS. GREEN:  Form.
21       THE WITNESS:  I would have to go back and
22  look at my report.  I -- I remember reading a number of
23  different statements from Saldate, and I can't remember
24  if that was one of them the ones that I reviewed or not.
25

Page 192

1  BY MS. RETTS:
2  Q.  If Ms. Milke's lawyer's possessed the
3  Running Eagle, then there would not have been obligation
4  to disclose it back to the defense because he already
5  had it; correct?
6       MS. GREEN:  Form.
7       THE WITNESS:  Based upon the Mays versus
8  Clark case, and -- and basically my understanding is if
9  the defense lawyer has it, then it's not a Brady
10  violation because they already have the exculpatory
11  information.
12  BY MS. RETTS:
13  Q.  If Detective Saldate had been cross-examined
14  during the voluntariness hearing and admitted that he
15  engaged in Miranda violations in other cases, that would
16  have been material also known to the defense; true?
17       MS. GREEN:  Form.
18       THE WITNESS:  If it -- if that was
19  information that came out during the voluntariness
20  hearing, yes.
21  BY MS. RETTS:
22  Q.  And do you believe that a diligent defense
23  attorney should have followed up on that information?
24       MS. GREEN:  Form.
25       THE WITNESS:  In what -- in what sense?  Do



Page 193

1   an investigation of every case that he's ever handled
2   and ever testified; is that what you're saying?
3   BY MS. RETTS:
4      Q. He could ask the question, what cases?
5          MS. GREEN: Form.
6          THE WITNESS: Certainly, he could have done
7   that.
8   BY MS. RETTS:
9      Q. And that would be a simple way to determine what
10  other cases where there might have been a Miranda
11  violation?
12         MS. GREEN: Form.
13         THE WITNESS: That would be one way of doing
14  it if Saldate remembered what cases there were, yes.
15  BY MS. RETTS:
16     Q. And he could have also -- the lawyer could have
17  also, after the voluntariness hearing, asked for a list
18  of cases from the police department?
19         MS. GREEN: Form.
20         THE WITNESS: He could have asked for a list
21  of cases -- he could have asked the prosecutor to get a
22  list of the cases from the police department.  I'm not
23  sure that he could have gotten it from the police
24  department directly.
25  ///

Page 194

1   BY MS. RETTS:
2      Q. So several different avenues by which there could
3   have been a request for follow-up on that information?
4          MS. GREEN: Form.
5          THE WITNESS: Certainly a possibility.
6   BY MS. RETTS:
7      Q. And if --
8          MS. GREEN: Whenever -- whenever it's a
9   convenient time in terms of your line of questioning,
10  can we take a brief restroom break?
11         MS. RETTS: Yes.  Just to -- I'm -- I'm just
12  going to finish this up real quickly.
13  BY MS. RETTS:
14     Q. If Detective Saldate also had testified that he
15  did not always scrupulously honor a right to remain
16  silent and the defendant -- in response to the defense
17  attorney's questioning, that would be something that was
18  known to the defense attorney; true?
19         MS. GREEN: Form.
20         THE WITNESS: If it came out during the
21  voluntariness hearing, sure.
22  BY MS. RETTS:
23     Q. And then a very simple follow-up question to that
24  could have been by the defense attorney, well, in what
25  instances did that happen?

Page 195

1          MS. GREEN: Form.
2          THE WITNESS: Certainly he could have asked
3   that question.
4   BY MS. RETTS:
5      Q. And then there could have been various other
6   means which we already touched on, perhaps asking the
7   prosecutor for a list of those other instances?
8          MS. GREEN: Form.
9          THE WITNESS: There are things that a
10  defense lawyer could have done to follow it up.  But I
11  will say, in my judgment, the obligation to start with
12  the prosecutor and it's -- it's not the same obligation
13  on the part of the defense lawyer as there is on the
14  part of a prosecutor.
15  BY MS. RETTS:
16     Q. Under this case law, though, if Detective Saldate
17  had testified in that manner, it would have been known
18  to the defense and the factual basis would have been
19  known for him to do further investigation; would you
20  agree?
21         MS. GREEN: Form.
22         THE WITNESS: He could have done further
23  investigation.  I -- I -- I don't think it excuses the
24  obligation of the prosecutor to disclose the information
25  that the prosecutor knows and is in the prosecutor's

Page 196

1   files.
2   BY MS. RETTS:
3      Q. And if defendant -- strike that.
4          If Detective Saldate had testified that he had,
5   in the past, not scrupulously honored a suspect's rights
6   to remain silent, and he admitted that fact, would you
7   agree that, in your experience as a prosecutor, federal
8   court judge or a state court judge, under the Rules of
9   Evidence, will not allowed the defense attorney to
10  collaterally impeach that statement because it's been an
11  admission?
12         In other words, if he admitted to it, you can't
13  pull out this case over here and say, well, yes, in
14  fact, you did do that very thing in this case?
15         MS. GREEN: Form.
16         THE WITNESS: If you're asking me whether in
17  a -- in a federal criminal trial, when an officer admits
18  that he has violated a suspect's or suspects', plural,
19  Miranda rights on a number of different occasions,
20  whether a federal judge would then allow a defense
21  lawyer to ask some follow-up questions about, and isn't
22  it true you did it in this case and isn't it true you
23  did it in this case and isn't it true you did it in that
24  case, in -- in my experience, federal judges in the
25  Central District of California would provide -- would



RICHARD DROOYAN                                    September 12, 2018
MILKE vs CITY of PHOENIX                                    197—200

Page 197

1  give defense lawyers wide latitude in the
2  cross-examination of critical prosecution witnesses,
3  particularly critical law enforcement witnesses.  So I
4  don't -- I don't agree.
5        In my experience, the federal judges
6  provo- -- gave defense attorneys plenty of opportunity
7  to sort of pound it into the ground when they were
8  dealing with a -- a -- a key witness, and -- and even
9  more so when it was a key law enforcement witness.
10 BY MS. RETTS:
11    Q.  So that would be within the sound discretion of
12 the trial court to determine how far the court was going
13 to let any cross-examination occur?
14        MS. GREEN:  Form.
15        THE WITNESS:  It would be within the
16 discretion whether or not it could be subject to an
17 abuse of discretion.  I sort of haven't really done that
18 analysis.  But it -- as I said, in -- in my experiences,
19 the courts exercise their discretion or their authority
20 over the Rules of Evidence to allow that
21 cross-examination to go on for some period of time
22 before they eventually put a stop to it.
23        MS. GREEN:  Would it be possible to please
24 take a break?
25        MS. RETTS:  Yeah.

Page 198

1        MS. GREEN:  Thank you.
2        THE VIDEOGRAPHER:  We are off the record.
3  The time is 3:15 p.m.
4        (Recess.)
5        THE VIDEOGRAPHER:  We are on the record.
6  The time is 3:23 p.m.
7        (Defendants' Exhibit 252 was marked for
8        identification by the court reporter and is
9        attached hereto.)
10 BY MS. RETTS:
11    Q.  You have in front of you what is marked as 252.
12    A.  Okay.
13    Q.  This is from Ms. Milke's criminal trial testimony
14 of Detective Saldate from September 13th, 1990?
15    A.  Okay.
16    Q.  And if you'll turn to Page 39.  Or if you're
17 using the Bates labels, it's Transcript 808.
18    A.  Okay.
19    Q.  And do you see in that testimony where the
20 question was asked -- to orient you, this is
21 cross-examination by Ms. Milke's counsel, Mr. Ray.  His
22 cross-examination begins several pages back on 786, if
23 you need to look at that, but this is continued
24 cross-examination.
25    A.  Okay.

Page 199

1    Q.  And the question was asked, "Is your" -- "Is it
2  your understanding that if an individual who is being
3  interrogated by you would like to speak to an attorney
4  before answering any questions, or words to that effect,
5  is it your understanding that you cease questioning?"
6        And Detective Saldate responded, "No."
7        Do you see that?
8    A.  I see it.
9    Q.  And the questioning went on.  "In the past,
10 people that you have interviewed have requested counsel
11 and requested to remain silent and you have continued to
12 interrogate and state your position on things?"
13        And his answer was, "I have duly noted it and
14 continued my interview, yes."
15        Do you see that?
16    A.  Yes.
17    Q.  And then it appears that Mr. Ray then tried to
18 use a collateral matter when he asked, "Question:  When
19 did that -- that happened on December 22nd of 19 --
20 strike that.  December 19th of 1987 at approximately
21 3:40 in the afternoon; isn't that right?"
22        And then Mr. Levy objects to the relevancy and
23 the court sustained the objection.
24        Do you see that?
25    A.  Yes.

Page 200

1    Q.  From reading that transcript, does it appear that
2  the court made a determination that after Saldate made
3  that admission in his testimony, that Ken Ray could not
4  get into any further details about what had occurred?
5        MS. GREEN:  Form.
6        THE WITNESS:  The court sustained the
7  objection, but it's not clear to me how this might have
8  come out if the defense had information that there were
9  court findings in which courts had found it was a
10 Miranda violation and suppressed evidence, whether the
11 court might have allowed further cross-examination.
12        So on the basis of that limited information,
13 I don't think we know what would have happened if the
14 Arizona -- Maricopa County Attorney's Office had turned
15 over all of those cases in which he violated Mirandas
16 and -- and courts found there was a violation and
17 suppressed evidence.
18 BY MS. RETTS:
19    Q.  Now, for that to have been the case, the court --
20 any court orders would have had to have been in
21 existence at the time of Ms. Milke's trial; would you
22 agree?
23        MS. GREEN:  Form.
24        THE WITNESS:  In order for there to be an
25 obligation in part -- for what I'm saying about court



Page 201

1  findings, yes, I would agree that the court findings
2  would have had to predate the -- the Milke trial.
3  BY MS. RETTS:
4      Q.  When you went through and conducted your analysis
5  in this case, did you develop a timeline to ensure that
6  the court decisions you were looking at occurred before
7  Ms. Milke's trial?
8      A.  I created a timeline.
9      Q.  And in that timeline, did you see that there were
10  some court decisions that happened after the fact?
11      A.  There was the -- the Moller (phonetic) case,
12  which happened -- the court appeals decision in the
13  Moller case happened after the fact.  And I think the
14  trial court decision happened after the fact as well.
15          The Jones case, if I remember correctly, the --
16  the finding that it was an illegal arrest without
17  probable cause, I believe occurred certainly before the
18  sentencing, and I think that the Court of Appeals
19  decision happened after.
20          And I think all the others predated the -- the
21  Milke trial.
22      Q.  So all of those decisions that occurred after
23  Ms. Milke's criminal trial, those would not have been
24  materials that would have been turned over because they
25  weren't in existence; agree?

Page 202

1      A.  I agree.
2      Q.  Did you look through the post-conviction relief
3  filing to Judge Hendrix, the trial court judge, by
4  Ms. Milke's appellate counsel?
5      A.  No.
6      Q.  Were you aware that Ms. Milke's appellate counsel
7  submitted the same information that you were provided
8  about these other cases to Judge Hendrix for her review?
9      A.  I --
10          MS. GREEN:  Form.
11          THE WITNESS:  -- don't recall -- I mean
12  there is a -- there is reference to information that was
13  presented to Judge Hendrix in the Ninth Circuit's
14  decision, but I don't recall how much detail it went
15  into.
16  BY MS. RETTS:
17      Q.  So you don't know whether or not Judge Hendrix
18  reviewed each of the same cases that you reviewed, such
19  as Running Eagle or Moller or Jones, as part of the
20  post-conviction review process and undertook an analysis
21  of whether she would have allowed them to be admissible
22  in the criminal case --
23          MS. GREEN:  Form.
24  BY MS. RETTS:
25      Q.  -- for cross-examination?

Page 203

1      A.  I believe that judge -- that she -- there is a
2  reference that she basically would not have allowed it,
3  but I don't recall specifically.
4      Q.  You didn't review her ruling, though, to look at
5  the specific reasoning outlying that, such as the Rules
6  of Evidence and their application, or any case law;
7  would you agree?
8          MS. GREEN:  Form.
9          THE WITNESS:  I only -- looked at the
10  Ninth Circuit opinion, which is the reference to the
11  procedural history, including the decision before by
12  Judge Hendrix.  I didn't look beyond that.
13  BY MS. RETTS:
14      Q.  Do you know what the Ninth Circuit was provided
15  for the basis of its review?  Did you look at all of the
16  underlying pleadings to determine whether the Ninth
17  Circuit was provided a complete record?
18      A.  No.  I looked at whatever the Ninth Circuit
19  opinion was and -- and that was all I looked at.
20      Q.  Do you know Ms. Milke's counsel in that case
21  admitted that they possessed the Running Eagle case or
22  whether that was never brought up to the Ninth Circuit?
23      A.  I don't know one --
24          MS. GREEN:  Form.
25          THE WITNESS:  I don't know one way or the

Page 204

1  other.
2  BY MS. RETTS:
3      Q.  Do you agree that the existence of the
4  Running Eagle case and Ms. Milke's possession of that
5  case is pertinent information?
6      A.  Well, it -- it certainly would not be a Brady
7  violation if they already had the specific information
8  about the Running Eagle case.  So in that sense it's --
9          MS. GREEN:  Form.
10          THE WITNESS:  -- pertinent.
11          MS. RETTS:  This was previously marked at
12  another deposition as Exhibit 202.  I don't have other
13  copies.
14          Is everybody able to pull it up.
15          MR. EAVES:  Yes.
16          MS. GREEN:  If you just give me one moment,
17  I think I -- I think I can.
18          MS. RETTS:  It is the transcript of
19  proceedings from the voluntariness hearing from
20  September 10th, 1990.
21          MS. GREEN:  Huh.  I apologize.  I have
22  something marked as 202 that might -- is it a brief?
23          MS. RETTS:  Do I have a wrong number?
24          MS. GREEN:  I think --
25          MS. RETTS:  Is it 252 maybe?



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
205–208

Page 205

1          MS. GREEN:  Sorry.  Is it Chris Landry --
2          THE WITNESS:  It can't be 252 because we
3   just marked 252.
4          MS. RETTS:  Yeah.  Do you know what it was
5   marked as?
6          MS. GREEN:  Yeah, 202 I have a Chris
7   Landry --
8          MS. RETTS:  Is it 210?  Because there's 210
9   written on that too.
10          MS. GREEN:  210.
11          THE WITNESS:  Yeah, there's 201.
12          MS. GREEN:  Oh.  Yes --
13          MS. RETTS:  Okay.
14          MS. GREEN:  -- I think that's --
15          MS. RETTS:  It's 210.  Sorry.  So underneath
16   it, if you pull the sticky tag off --
17          MS. GREEN:  Oh, got it.
18          THE WITNESS:  It's 210.
19          MS. RETTS:  -- it -- it's probably 210 then.
20          Do you have it, Amelia?
21          MS. GREEN:  Yes, I have it.  Thank you.
22   BY MS. RETTS:
23   Q.  And if you could turn to Page 4.  And actually,
24   to orient you, if you go back to Page 2, you'll see at
25   the top, the court calls the Milke case.  "And this is

Page 206

1   the time set for evidentiary hearing, oral argument on
2   the motion to suppress and any other pretrial matters."
3          And then you see Armando Saldate is sworn as a
4   witness and it's the direct examination by Mr. Ray?
5   A.  Yes.
6   Q.  Then turning back to Page 4?
7   A.  (Witness complies.)
8   Q.  And if you start at line 18, Detective Saldate
9   was asked the question, "Do you have any experience or
10   training, either on the job or through seminary --
11   seminars, dealing with whether or not an individual can
12   continue to be interrogated once they have invoked their
13   right to remain silent?"
14          And his answer was, "Certainly.  I understand
15   that cannot happen."
16          The question was then asked, "And can you say
17   that you have abided by that rule on all occasions or
18   interviews that you have been involved in?"
19          And his answer was "No.
20          "You have not?  No.
21          "Question:  And there are occasions where you
22   would wilfully violate that rule?"
23          And his answer was, "There are occasions that a
24   person may ask for an attorney.  I note it in my
25   supplement.  I note in my notes.  However, if that

Page 207

1   person continues to talk, I will continue to listen and
2   that has happened.
3          "Question:  Will you continue to ask questions?
4          "Answer:  If a question does come up in my mind
5   during her conversation or their conversation, sure, I
6   will ask a question."
7          See where in that testimony to Mr. Ray, Detective
8   Saldate admitted to continuing to question suspects
9   after Miranda rights were given?
10   A.  That's not exactly what he says here.
11   Q.  Okay.  How do you interpret that?
12   A.  He says that if the person continues to talk, I
13   will continue to listen.  And then if a question comes
14   up in my mind after listening to the suspect, then I
15   will ask a question.  That, to me, is different from
16   doing things to initiate further discussion or question
17   a suspect.
18          I don't think it is a violation of Miranda if an
19   officer having -- if an officer does not ask any further
20   questions after -- after a suspect invokes, but the
21   suspect then makes statements and the officer writes
22   down those statements, that's not a Miranda violation.
23   It's only if the officer continues to question the
24   witness or does things to induce the witness to continue
25   to -- to talk that it becomes Miranda violation.

Page 208

1          So at least here, as I read this, it would be --
2   there's nothing wrong with continuing to listen if
3   somebody continues to talk after they've invoked.  What
4   the problem becomes is when they start asking questions.
5   And that's what it appears to me happened in a number of
6   the cases that I looked at.
7   Q.  And then earlier, though, in the -- on the page
8   before, Detective Saldate, starting at line 23, was
9   asked if he abided by the rule that suspects can't be
10   interrogated once they have invoked their right to
11   remain silent, and he indicated that he has not on all
12   occasions?
13   A.  Right.  Then he goes on to give an explanation
14   that is, frankly, not a Miranda violation.  He -- he
15   says I just listen when they talk.  Well, that's not a
16   Miranda violation.
17   Q.  Do you see anything --
18   A.  And if -- if -- let me just say, if the suspect
19   initiates further conversation without being prompted
20   whatsoever by the officer, then I think the officer can
21   ask some questions.  But if the -- but I think the case
22   law is pretty clear that the officer can't do anything
23   by way of statement, by way of question, by way of
24   engaging the person in conversation that is intended to
25   elicit further statements from a witness after the



Page 209

1  witness has invoked.
2    Q.  You would agree that officers continue -- can
3  continue to question suspects if there's been an
4  ambiguous invocation --
5       MS. GREEN:  Form.
6  BY MS. RETTS:
7    Q.  -- of a right to silent or to an attorney?
8    A.  I would not agree with that.  I think the only
9  thing they can do is clarify whether or not the
10  individual is invoking the right to remain silent or to
11  ask for an attorney.  And if the person then clarifies
12  and indicates that they are, the questioning has to
13  cease.  If the person says, no, I'm not, then the person
14  can ask the questions.
15      But the only -- the only question that -- that
16  the officer can ask when there is an ambiguous statement
17  is to clarify whether it is an invocation of the right
18  to remain silent or the right to an attorney.
19    Q.  Did -- in conjunction with rendering your
20  opinions in this case, did you review United States
21  Supreme Court precedent to determine whether your
22  understanding of Miranda was consistent with current
23  U.S. law?
24      MS. GREEN:  Form.
25      THE WITNESS:  I looked at the cases that I

Page 210

1  cited in my report.  I didn't look at cases beyond that.
2  BY MS. RETTS:
3    Q.  The cases cited in your report were provided to
4  you by plaintiff's counsel; would you agree?
5       MS. GREEN:  Form.
6       THE WITNESS:  Well, I mean, Brady and Giglio
7  are cases that everybody knows about, so I -- I wouldn't
8  say that they provided those to me.
9       Kyles was provided by you, your side.  So in
10  that sense, I don't know that they provided me with the
11  cases.
12  BY MS. RETTS:
13    Q.  Did they provide you with any cases?
14    A.  They provided me with the Butts case.
15      MS. GREEN:  And again, I'll just --
16      THE WITNESS:  I'm sorry.
17      MS. GREEN:  -- interject here.  Pursuant to
18  Rule 26, you can talk about the documents he reviewed
19  and relied upon and received, but we're not getting into
20  any of the substance of conversations or communications.
21  I'm just clarifying that also for the witness.
22      THE WITNESS:  Okay.  Thank you.
23  BY MS. RETTS:
24    Q.  Did you do any of your own independent research
25  on Westlaw or any legal books to find any cases to

Page 211

1  determine the status of the law on Miranda?
2    A.  Not on the Miranda, no.
3    Q.  Does the case of United States versus Davis sound
4  familiar to you?
5       MS. GREEN:  Form.
6       THE WITNESS:  I -- I may have come across it
7  somewhere along the line, but it doesn't ring a bell as
8  I sit here today.
9  BY MS. RETTS:
10    Q.  Do you disagree with the Supreme Court's ruling
11  that officers can continue to -- can continue to
12  question suspects after they ambiguously invoke their
13  Miranda rights?
14      MS. GREEN:  Form.
15      THE WITNESS:  I mean, I think they can ask
16  the witness do you intended to invoke or are you willing
17  to talk, and that's -- that can be the next question.
18  And depending what the answer is, then they can go on.
19  BY MS. RETTS:
20    Q.  Are you aware of any United States court --
21  United States Supreme Court case name that you can cite
22  to me that says that an officer must cease questioning
23  and the only thing they can do is what you stated to
24  clarify when there is an ambiguous invocation?
25      MS. GREEN:  Form.

Page 212

1       THE WITNESS:  No, I'm not.
2  BY MS. RETTS:
3    Q.  Turning back to what was Exhibit 210.  And
4  turning to Page 17.  Do you see on line 17 where Mr. Ray
5  questions Detective Saldate about the Running Eagle
6  case?
7    A.  Yes.
8    Q.  And that continues, if you look, through --
9  through Page 18.
10    A.  Okay.
11    Q.  Page 19.
12    A.  You want me to read all that?
13      MS. GREEN:  And if the witness --
14      If you'd like to read it to answer
15  questions, feel free to do so.
16      THE WITNESS:  Okay.
17  BY MS. RETTS:
18    Q.  Through Page 22.
19    A.  Okay.
20    Q.  And I -- and I'm going to ask you after that, if
21  it's clear to you from that, that there are questions
22  being asked about specifics of the Running Eagle
23  interrogation.
24    A.  Okay.
25      MS. GREEN:  I'm sorry, what were the page



Page 213

1  numbers we settled on --
2      MS. RETTS:  Through 22.
3      MS. GREEN:  10 through 22?
4      THE WITNESS:  17 through 22.
5      MS. GREEN:  Oh, 17 through 22.
6      THE WITNESS:  Okay.  You want me to go all
7  the way through 22?
8  BY MS. RETTS:
9    Q.  Yeah.  Or if -- you can -- from what you have
10  read, can you tell that Mr. Ray did clearly possess
11  information about the Running Eagle interrogation?
12      MS. GREEN:  Form.
13      THE WITNESS:  It appears he did.
14  BY MS. RETTS:
15    Q.  And asked questions of Detective Saldate about
16  specifics of that interrogation?
17      MS. GREEN:  Form.
18      THE WITNESS:  Appears he did, yes.
19  BY MS. RETTS:
20    Q.  And as a result, there was no obligation to turn
21  over Running Eagle to the defense because it was already
22  in their possession?
23      MS. GREEN:  Form.
24      THE WITNESS:  If you look at from sort of
25  hindsight in the sense of we're looking -- from the

Page 214

1  perspective of looking backwards, yes.  If you're the
2  prosecutor and you have that information, you don't know
3  whether the defense has it or not.  And if you don't
4  know whether the defense has it or not, then you've got
5  to turn it over if you're looking at it from
6  prospectively as opposed to retrospectively.
7  BY MS. RETTS:
8    Q.  So when Detective Saldate testified at trial and
9  was cross-examined on Running Eagle, the prosecutor
10  sitting there clearly had an understanding that Mr. Ray
11  must have possession of documents related to the
12  Running Eagle case?
13    A.  As of that point --
14      MS. GREEN:  Form.
15      THE WITNESS:  -- yes.
16  BY MS. RETTS:
17    Q.  Did you review any of the court filings related
18  to the subpoena issued to the police department for
19  Detective Saldate's personnel file?
20    A.  I reviewed some materials relating to that, yes.
21    Q.  What do you remember reviewing?
22    A.  I recall being aware that there was a subpoena
23  that was issued to the Phoenix Police Department for his
24  personnel file; that the City of Phoenix moved to quash
25  the subpoena; that ultimately the court did what I

Page 215

1  believe was an in camera review of those provisions
2  relating to his training and Phoenix department
3  policies, but didn't look at the entire personnel file
4  and ordered that that information to be turned over, but
5  did not order that the entire personnel file be turned
6  over.
7    Q.  And we don't have a record of what exactly the
8  court was provided; would you agree?
9      MS. GREEN:  Form.
10      THE WITNESS:  Yeah, I don't -- I don't know
11  what evidence Ms. Milke's lawyer was able to provide to
12  the court as to the reasons for reviewing the entire
13  personnel file.
14  BY MS. RETTS:
15    Q.  Were you aware that there was an objection to the
16  subpoena based upon lack of service on the internal
17  affair -- Internal Affairs Division?
18      MS. GREEN:  Form.
19      THE WITNESS:  I'm not sure I was aware of
20  that.
21  BY MS. RETTS:
22    Q.  Okay.  And you understand that for subpoenas to
23  be valid, there needs to be valid service?
24      MS. GREEN:  Form.
25      THE WITNESS:  Yes.  But it -- I will say,

Page 216

1  in -- in my experience, government agencies, law
2  enforcement agencies who have notice of a subpoena
3  are -- are obligated to respond and courts are not going
4  to simply quash a subpoena on the -- on the basis of --
5  of lack of service when a law enforcement agency has the
6  information.
7  BY MS. RETTS:
8    Q.  Did you review the transcript of the oral
9  argument on the motion to quash to see if Mr. Ray
10  limited in any way the materials that he was requesting
11  while in oral argument?
12    A.  I did not.
13      MS. GREEN:  Form.
14  BY MS. RETTS:
15    Q.  And based upon your experience as a practicing
16  lawyer, you know that that can happen, that when there
17  is a hearing on a motion to quash, you can make
18  concessions and limit that which you are seeking, and
19  limit it from what the subpoena originally was?
20      MS. GREEN:  Form.
21      THE WITNESS:  That happens.
22  BY MS. RETTS:
23    Q.  And you've had the occasion to do that in the
24  course of your experience?
25    A.  I certainly had the occasion to tailor my



Page 217

1  argument to comments that the court is making.
2     Q.  The motion to quash procedure that was used by
3  the City of Phoenix is in some respects similar to the
4  Pitchess procedure; would you agree?
5     A.  I -- yes, it -- to the extent I understand it, I
6  would say it's, in a broad sense, yes, it's similar.
7     Q.  Not something that's unusual?
8     A.  At least not in California or -- or Arizona.
9     Q.  In the Pitchess procedure, there's a five-year
10 limitation for disciplinary records; correct?
11       MS. GREEN:  Form.
12       THE WITNESS:  I -- I don't know specifically
13 what the limitation is.
14 BY MS. RETTS:
15    Q.  And the Pitchess procedure came out of the
16 Pitchess case; correct?
17       MS. GREEN:  Form.
18       THE WITNESS:  Yeah, it came out of a case in
19 which it was a -- I guess a suit against the sheriff who
20 was Peter Pitchess, seeking evidence from police files.
21 BY MS. RETTS:
22    Q.  And then after that, the legislature actually
23 codified portions of the Pitchess decision into state
24 law; true?
25    A.  That's my understanding.

Page 218

1     Q.  So it's not just case law, it is actual state law
2  that relates to categories of information that's
3  available for a law enforcement officer?
4     A.  That's my understanding.
5     Q.  And there is a specific procedure whereby the
6  defense attorney has to file a Pitchess motion and
7  establish relevance to the specific case, and the court
8  then conducted in camera review to determine whether
9  there is responsive information; true?
10       MS. GREEN:  Form.
11       THE WITNESS:  In a broad sense, that's
12 correct.
13 BY MS. RETTS:
14    Q.  So using that discussion and what you know about
15 the motion to quash, very similar process, just
16 initiated in different ways?
17       MS. GREEN:  Form.
18       THE WITNESS:  In a broad sense, yes.
19 BY MS. RETTS:
20    Q.  The voluntariness hearing transcript that you
21 just received, Exhibit 210, is this the first time that
22 you've ever seen that?
23    A.  I just have to -- I would have to go back and
24 look at my report.  As I said, I -- I looked at a number
25 of different instances in which Saldate testified and I

Page 219

1  don't specifically recall if this was one of them or
2  not.  If -- if I listed it in my report, it would have
3  been.
4     Q.  Okay.  As you went through and read it, did it
5  seem familiar to you or did it seem as if you -- this
6  was the first time you were looking at it?
7     A.  It did not seem familiar.  I don't recall anyway.
8     Q.  Did you ever ask if you could speak to or
9  interview anyone on Ms. Milke's criminal defense team to
10 determine what information they possessed about
11 Detective Saldate prior to the criminal trial?
12    A.  No.
13    Q.  You have been an expert in a case before;
14 correct?
15    A.  One time.
16    Q.  In that occasion, did you conduct interviews of
17 witnesses?
18    A.  No.
19    Q.  That's something in this case, if you had asked
20 to interview those witnesses, do you feel like that's
21 something you could have asked?
22    A.  I could have asked.
23       MS. GREEN:  Form.
24 BY MS. RETTS:
25    Q.  Did you ask?

Page 220

1     A.  You can always ask.  No, I didn't.
2     Q.  Did you ask for any materials other than that
3  which was provided to you by plaintiff's counsel?  For
4  example, if you looked through the materials, did you
5  say I want to also look at this?
6       MS. GREEN:  Form.
7       THE WITNESS:  I don't recall.
8  BY MS. RETTS:
9     Q.  Why didn't you ask to conduct any interviews of
10 Ms. Milke's criminal defense team?
11    A.  Because my focus was on the obligations of
12 prosecutors and what prosecutors need to do to be able
13 to comply with the mandates of Brady and Giglio, and in
14 particular, what to do in order to comply with the
15 obligation to disclose all information known to
16 prosecuting offices or the prosecution team, which is
17 now defined to include the law enforcement agency.  And
18 so that was my mandate, and that's what I focused on.
19       And the issue of what Ms. Milke's lawyer might
20 have known at some point in time just wasn't an issue
21 that I was focused on.  I was much more focused on what
22 the prosecutor's obligations are to disclose information
23 to the defense counsel.
24    Q.  Now, as we've discussed through some of the
25 questions, the prosecutor's obligation is dependent in



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
221–224

Page 221

1  part upon what is known to Ms. Milke's defense team?
2      MS. GREEN:  Form.
3      THE WITNESS:  If you are a prosecutor and if
4  you know, in fact, that Ms. Milke's defense team has X,
5  then you can safely not turn over X.  But unless you
6  know that, you can't make your decision on what to
7  disclose based upon information that -- based upon what
8  information Ms. Milke's lawyer has.
9      So you look at these cases that are
10 appellate cases or post-trial cases that are backward
11 looking and the court says, oh, well, you had that
12 information so, therefore, there's no Brady violation.
13 You can't, as a prosecutor, make that determination
14 advance -- in advance of the trial unless you know what,
15 in fact, her lawyer has.
16 BY MS. RETTS:
17    Q.  It relates to causation, though; wouldn't you
18 agree?  If she had it, regardless of whether the
19 prosecutor knew if she had or not, there is a -- there
20 is a causation problem?
21     MS. GREEN:  Form.
22     THE WITNESS:  I -- I'm not -- I -- I have
23 not been asked to opine, nor have I focused on the
24 question of causation, nor do I as somebody who spent 14
25 years in a -- a prosecutor's office particularly care

Page 222

1  about what causation when I'm trying to analyze what my
2  obligations are to disclose information to a defense
3  counsel.  Unless I know that that person has the Brady
4  material, I think I am obligated to -- to turn it over.
5  And I do.
6  BY MS. RETTS:
7    Q.  Right.  So you're -- in issuing your opinions in
8  this report, you did not include any opinions that
9  relate to causation for the turning over of these cases?
10   A.  No, I'm -- my opinions were what I, in my
11 judgment, prosecutors were obligated to do with respect
12 to the information about Officer Saldate with respect to
13 those cases where he had testified falsely and those
14 cases where courts had found that he had violated
15 Miranda.
16   Q.  And if, in fact, Milke's defense team knew about
17 the other cases, there would not be a Brady violation?
18     MS. GREEN:  Form.
19     THE WITNESS:  There would not be grounds for
20 overturning her conviction under Brady.  If the State of
21 Arizona had presented to the Ninth Circuit evidence that
22 the defense was aware of all of those things referenced
23 in the court's opinion in the Milke case, then there
24 would not be a basis for reversing the conviction or
25 vacating the conviction on the grounds of Brady

Page 223

1  violations, or Giglio violations.
2      But I presume that information was not --
3  and this is a presumption, that all of that information
4  was not presented to the Ninth Circuit that, hey, they
5  had all this information about Saldate's testimony and
6  Reynolds and Rodriguez and -- and all of these instances
7  in which he violated Miranda in King and other cases.
8  That was all Ninth Circuit.  We presented all that
9  information to him.  He had all that information.
10     I presume if that were the case, the Ninth
11 Circuit decision would have come out differently.
12 BY MS. RETTS:
13   Q.  Without talking to Ms. Milke's defense team, we
14 don't know what all she had; agreed?
15     MS. GREEN:  Form.
16     THE WITNESS:  I presume the State of Arizona
17 would know what it was that was turned over to her
18 counsel prior to her trial as Brady and Giglio
19 information about Detective Saldate.
20 BY MS. RETTS:
21   Q.  But they wouldn't have information about his
22 independent efforts or the information that Mr. Ray had
23 independently obtained on his own?
24     MS. GREEN:  Form.
25     THE WITNESS:  Unless it came out during the

Page 224

1  course of the trial.
2  BY MS. RETTS:
3    Q.  So if he made a tactical decision to hold back
4  information about other cases, then no one would know
5  about that because it would be protected by
6  attorney-client privilege; true?
7      MS. GREEN:  Form.
8      THE WITNESS:  I think you're raising a very
9  good point.  And this is why prosecutors have to turn
10 over the information and can't rely on hoping that a
11 defense counsel has this information because they may
12 never find out about that and they then may have
13 completely jeopardized their prosecution.
14     So you -- when you're making a decision as
15 to whether or not to disclose this information about
16 Saldate, you don't say, well, you know, I think defense
17 lawyer probably has it so I'm not going to turn it over.
18 And even if he has it and you never find out about it,
19 you may have just blown your prosecution.  So you -- you
20 just can't do that do that.
21     You don't make decisions on disclosure based
22 upon the hope that defense counsel already has the
23 information and, therefore, as a matter of causation,
24 there won't be a Brady violation.
25     And -- and as we sit here today, if -- if



Page 225

1  her lawyer was sandbagging us and she spent 23 years on
2  death row while he was sandbagging us, and it was only
3  when you got to the Ninth Circuit and you didn't have a
4  record of what was disclosed that you wound up having
5  these Brady violations, that's why prosecutors have to
6  turn this information over.
7         MS. RETTS:  I don't have anything further.
8         MS. GREEN:  Lori, you have questions?
9         MS. BERKE:  Yeah.
10        MS. GREEN:  Okay.
11        MS. BERKE:  I'll move down there.
12
13              EXAMINATION
14  BY MS. BERKE:
15    Q.  As a reminder, I'm Lori Berke, and I represent
16  Armando Saldate.
17      Do you understand that?
18    A.  I do.  Thank you.
19    Q.  All right.  You would agree that in the Reynolds
20  case that was discussed in your report, the court made
21  no determination that Armando Saldate engaged in any
22  kind of misconduct; correct?
23    A.  If I recall correctly, the court made a finding
24  that the presentation to the grand jury, which was
25  almost entirely based upon his testimony, was not a fair

Page 226

1  and full representation of the evidence.
2    Q.  Right.  And the prosecutor's responsible for
3  providing a full and fair presentation of the evidence
4  in a grand jury proceeding; correct?
5         MS. BURGESS:  Object to form.
6         THE WITNESS:  I would not agree with that.
7  I would -- I think the prosecutor and the law
8  enforcement official both have that obligation.
9  BY MS. BERKE:
10    Q.  So --
11    A.  I mean he has an obligation to testify truthfully
12  and accurately, and a prosecutor has the obligation to
13  make sure that the presentation is correct.
14    Q.  And if the detective testifying at a grand jury
15  proceeding offers testimony that's inconsistent with his
16  report, it's incumbent upon the prosecutor who's
17  conducting that grand jury proceeding to direct the
18  detective to that portion of his report so he can
19  correct his testimony; correct?
20        MS. GREEN:  Form.
21        THE WITNESS:  If I'm a prosecutor presenting
22  evidence to the grand jury, I want to make sure that
23  that information is accurate so that I don't get this
24  case dismissed for, you know, misconduct before a grand
25  jury or because the evidence was not fairly presented to

Page 227

1  the grand jury.  So I would correct any errors by any
2  witnesses in order to make sure that the testimony was
3  presented was as accurate as possible.
4  BY MS. BERKE:
5    Q.  A prosecutor has an obligation to be fully
6  familiar with the police report for the case that's at
7  issue in a grand jury proceeding; correct?
8         MS. GREEN:  Form.
9         THE WITNESS:  I'm not sure I would define it
10  as an obligation, but if you are a -- a careful
11  prosecutor, you want to make sure that you are familiar
12  with all of the evidence that you're presenting to the
13  grand jury.  I don't think it is necessarily an
14  obligation to have read all of the police reports before
15  presenting a witness, a police officer to testify before
16  a grand jury.
17      As a matter of practice, most of the time
18  you are familiar with those police reports because
19  that's how you know what questions to ask the police
20  officer.  So between the practicality of knowing what to
21  ask and wanting to be careful to protect the record, you
22  should be familiar with the police reports.
23  BY MS. BERKE:
24    Q.  So is it your testimony that a prosecutor does
25  not have any obligation to have reviewed police reports

Page 228

1  that the detective -- or summarizing interviews that the
2  detective conducted that the detective is being asked
3  about in a grand jury proceeding?
4         MS. GREEN:  Form.
5         THE WITNESS:  I mean, listen, I think the
6  prosecutor could -- a -- a -- a busy prosecutor could
7  decide to just rely on the integrity of the law
8  enforcement official to testify accurately, and -- and
9  I'm sure that -- that that does happen.  A careful
10  prosecutor should be familiar with the reports before
11  asking the -- each and any questions or the officer any
12  questions in the grand jury.
13  BY MS. BERKE:
14    Q.  And just like prosecutors are busy, homicide
15  detectives are very busy as well; correct?
16        MS. GREEN:  Form.
17        THE WITNESS:  I presume they have a
18  caseload.  I don't know what the caseload is in
19  particular jurisdictions and -- and how busy particular
20  departments are.
21  BY MS. BERKE:
22    Q.  Have you been provided with any depositions where
23  witnesses have testified about Detective Saldate's
24  caseload when he was employed as a homicide detective
25  with the City of Phoenix?



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
229–232

Page 229

1    A.  I'm not sure.  I just don't -- I don't recall if
2  I saw that or not.
3    Q.  Have you read any testimony or -- strike that.
4       Have you been provided with any testimony from
5  Ms. Milke's attorneys addressing Detective Saldate's
6  workload compared to the workload of other homicide
7  detectives?
8    A.  I don't remember seeing --
9       MS. GREEN:  Form.
10      THE WITNESS:  I don't remember seeing that.
11  BY MS. BERKE:
12    Q.  You would agree that there are occasions where a
13  homicide detective is out investigate -- investigating a
14  homicide all night and then has to testify in an
15  unrelated proceeding the following morning; correct?
16      MS. GREEN:  Form.
17      THE WITNESS:  I assume that happens.
18  BY MS. BERKE:
19    Q.  But you don't know that to be the case?
20    A.  I -- I don't know specific case in which that's
21  happened, but that -- that would not surprise me if --
22  if something like that happens.
23    Q.  Have you been provided with any deposition
24  testimony in this case addressing that issue as to
25  whether there are occasions where homicide detectives

Page 230

1  have been working all night and then had to testify in
2  an unrelated proceeding first thing in the morning?
3       MS. GREEN:  Form.
4       THE WITNESS:  There may have been testimony
5  in that re- -- res- -- regard.  I don't specifically
6  recall it, but it wouldn't surprise me if that happens
7  sometimes.
8  BY MS. BERKE:
9    Q.  And -- and you would agree that if that happens,
10  a detective may be more likely to inadvertently make
11  misstatements about the case due to exhaustion; correct?
12    A.  I would think that's correct.  If somebody's
13  exhausted --
14      MS. GREEN:  Form.
15      THE WITNESS:  -- they're more likely to make
16  mistakes.
17  BY MS. BERKE:
18    Q.  And did you take that into consideration in
19  rendering your opinion that Detective Saldate lied in
20  portions of testimony?
21      MS. GREEN:  Form.  Misstates report.
22      THE WITNESS:  Not in the three cases where
23  he testified what I thought was falsely, Reynolds, King
24  and Running Eagle.
25  ///

Page 231

1  BY MS. BERKE:
2    Q.  You made no assessment of the facts and
3  circumstances surrounding his testimony in those cases?
4       MS. GREEN:  Form.
5       THE WITNESS:  I did not have any
6  information, at least known to me, that he was
7  testifying after pulling an all-nighter and was
8  exhausted and make a mistake.
9       MS. GREEN:  Form.
10      THE WITNESS:  I didn't have any evidence to
11  that effect.
12  BY MS. BERKE:
13    Q.  Did you actually review any of the transcripts of
14  his testimony in those three cases?
15      MS. GREEN:  Form.
16      THE WITNESS:  I think I saw his -- portions
17  of his testimony in the cases.
18  BY MS. BERKE:
19    Q.  In all of those cases?
20    A.  Those three cases.
21    Q.  The actual transcripts of his testimony?
22    A.  I mean, I certainly became aware of what his
23  testimony was regarding the description of the suspect
24  in Reynolds, the little boy's statement as to when he
25  saw the suspect and the testimony regarding whether the

Page 232

1  defendant was drunk in Reynolds.  I -- I certainly was
2  aware of his testimony with those three points.
3    Q.  I understand that, but that's not my question.
4       Because you could become aware of testimony
5  through reviewing documents other than a transcript;
6  correct?
7    A.  Correct.
8    Q.  So my question is, did you review the transcript
9  of the grand jury proceeding, and specifically Armando
10  Saldate's testimony from the Reynolds case?
11    A.  I don't recall.  I'd have to look at my report to
12  be able to tell you that --
13    Q.  Do you have your report with you?
14    A.  I don't.
15    Q.  So you came to your deposition about this matter
16  and didn't bring a copy of your report?
17    A.  Correct.
18    Q.  Okay.  Well, we'll find one for you because I'd
19  like to know if you reviewed that transcript.
20    A.  Okay.
21    Q.  Did you just forget your report or did you
22  intentionally not bring it with you to the deposition?
23    A.  I decided not to bring anything with me to the
24  deposition.  I figured anything I needed, you would show
25  me.



Page 233

1    Q. Well, you knew that you would probably have to
2 reference your report to give certain answers, didn't
3 you?
4        MS. GREEN: Argumentative.
5        THE WITNESS: I knew it was a possibility, I
6 guess.
7 BY MS. BERKE:
8    Q. So take a look at your report and let us know if
9 you reviewed the transcript of Armando Saldate's
10 testimony in the Reynolds case.
11    A. It doesn't appear that I did.
12    Q. And so you arrived at a conclusion that Armando
13 Saldate lied in his testimony in the Reynolds case
14 without having reviewed his testimony in the Reynolds
15 case?
16    A. Correct.
17    Q. And what were the other two cases you said he
18 lied in?
19    A. King and Running Eagle.
20    Q. Did you review the transcript of Armando
21 Saldate's testimony in the King case?
22    A. I became aware of those portions of his testimony
23 in which he continued to ask King questions after King
24 had invoked. And similarly in Running Eagle.
25    Q. I'm going to move to strike as nonresponsive.

Page 234

1        You understand that my question was, did you
2 review the transcript?
3        MS. GREEN: Argumentative.
4 BY MS. BERKE:
5    Q. Did you review the transcript of Armando
6 Saldate's testimony in the King case?
7    A. I don't believe I looked at the actual trial
8 transcript in the King case.
9    Q. And so you arrived at the opinion that Armando
10 Saldate lied in his testimony in the King case without
11 having reviewed the transcript of his testimony;
12 correct?
13        MS. GREEN: Form.
14        THE WITNESS: Correct.
15 BY MS. BERKE:
16    Q. Did you review the transcript of Detective
17 Saldate's testimony in the Running Eagle case?
18    A. Again, I did not review the actual transcript. I
19 became aware of the testimony in which he said that
20 Running Eagle invoked after Running Eagle had made the
21 admission that was used at trial.
22    Q. I'm going to move to strike everything after your
23 answer that you didn't review the transcript.
24        So you arrived at the conclusion that Armando
25 Saldate lied in his testimony in the Running Eagle case

Page 235

1 without having reviewed the transcript of his testimony;
2 correct?
3    A. I did not look at the actual trial transcript.
4        MS. GREEN: Form.
5 BY MS. BERKE:
6    Q. So I am correct?
7    A. Correct.
8    Q. Now I'm going to show you the court's order from
9 the Reynolds case, which is Exhibit 14. And I'm going
10 have you look through that. It's on my iPad.
11    A. Okay.
12    Q. And you know how to scroll on an iPad; right?
13    A. Yeah.
14    Q. Okay. So take a look at that. And I'd like you
15 to point us to where in the order the court concluded
16 that Detective Saldate engaged in misconduct?
17        MS. GREEN: Sorry, this is exhibit -- can
18 you just repeat for me the exhibit number, or scroll up.
19 Sorry.
20        THE WITNESS: I got it --
21 BY MS. BERKE:
22    Q. Yeah, if you could just scroll up to --
23        MS. GREEN: Mr. Drooyan, would you mind
24 scrolling up, just so I can see the number.
25        THE WITNESS: It's -- it's 14.

Page 236

1        MS. GREEN: Okay. Thank you.
2        MS. BERKE: From Hamrick's deposition.
3        THE WITNESS: Yeah, the court says on -- on,
4 I guess -- it looks like it's Reynolds 082, that the
5 court is of the opinion that the evidence was not fully
6 and fairly presented with regard to defendant's possible
7 intoxication as outlined in that portion of the motion
8 labeled Roman numeral 5 at Page 15.
9        And I -- the previous page, "The court is of
10 the opinion that a fair presentation was not made in
11 connection with the evidence concerning the
12 identification of the defendant by the victim's son as
13 more fully outlined in that portion of defendant's
14 motion under the heading of Roman" -- "of 1 contained in
15 Pages 8 through 11. Likewise, the evidence with respect
16 to Christian" -- actually, strike that because that --
17 the second part, I'm not sure it relates to Saldate.
18 The first part does relate to Saldate.
19        And this is incorporating by reference the
20 defendant's motion for dismissal or redetermination of
21 grand jury which quotes verbatim his testimony from the
22 trial. So although I didn't look at the trial
23 transcript, I looked at the motion which quoted the
24 trial transcript.
25 ///



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
237–240

Page 237

1  BY MS. BERKE:
2      Q.  And is it your testimony that, in the motion, the
3  defendant argued to the court that Detective Saldate
4  engaged in misconduct?
5          MS. GREEN:  Form.
6          THE WITNESS:  I think he argued that the
7  evidence that he presented wasn't true, wasn't correct.
8  I don't know whether it was a motion that specifically
9  labeled it as misconduct as opposed to a motion that
10  said, based upon this testimony of Saldate in the
11  Reynolds grand jury, this was not a fair and full
12  presentation of the evidence because it misstated what
13  the description of the defen- -- suspect was.  It
14  misstated what time the little boy supposedly saw the
15  suspect, and it misstated the extent of the defendant's
16  drunkenness.
17          So it quoted those provisions which, to me,
18  are pretty self-evident and argued that the case had to
19  be dismissed or remanded for a new determination of
20  probable cause.
21  BY MS. BERKE:
22      Q.  You would agree that a court can conclude that
23  there wasn't a full and fair presentation of evidence
24  without there being misconduct by the officer; correct?
25          MS. GREEN:  Form.

Page 238

1          THE WITNESS:  Not in this context.
2  BY MS. BERKE:
3      Q.  Well, where -- I just gave you the order, and I
4  didn't see Detective Saldate's name mentioned anywhere
5  and I didn't see any conclusion by the court that there
6  was misconduct.  Did you?
7      A.  You have to read the entire motion and you have
8  to then look at that -- the court's order adopting those
9  provisions of the motion which focused on the erroneous
10  testimony that Saldate gave before the grand jury.
11      Q.  I have looked at those and I didn't see anywhere
12  in them that it was being alleged that Armando Saldate
13  engaged in misconduct.
14          So my question to you is, what can you point us
15  to where it is alleged or determined by the court that
16  Detective Saldate engaged in the misconduct in the
17  Reynolds case?
18          MS. GREEN:  Argumentative.  Form.
19          THE WITNESS:  My view is that the defense
20  was seeking a dismissal based upon testimony before --
21  by Saldate that was demonstratively not true on at least
22  three different occasions.  In my view, that was false
23  testimony -- it was intentionally false testimony.
24  BY MS. BERKE:
25      Q.  I understand that --

Page 239

1      A.  Wait, I haven't finished.
2      Q.  Okay.
3      A.  Let me finish; okay?
4      Q.  Okay.
5      A.  And then you can argue with me all you want.
6      Q.  Sure.
7      A.  And the -- and defense seeking a dismissal, the
8  court deciding it didn't need to call it misconduct,
9  dismisses the case or remands it for a new presentation
10  before the grand jury based upon the defense arguments
11  that those instances of his testimony were false.  And I
12  read those instances of his testimony, and I think they
13  were intentionally false.  And I think the court was
14  being careful to do what it needed to do to cause the
15  case to be remanded without more.
16      Q.  I understand it's your opinion that Detective
17  Saldate engaged in misconduct in the Reynolds case, but
18  my question --
19      A.  That's why -- that's why I'm here, to give my
20  opinion.
21      Q.  Pardon me?
22      A.  That's why I'm here, to give my opinion.
23      Q.  Okay.  But my question is, where did the court --
24  can you point us to something where the court made a
25  determination that Detective Saldate engaged in

Page 240

1  misconduct of any type in the Reynolds case?
2      A.  The most I can point to you is the court's
3  conclusion that it was not a full and fair -- fair --
4  and I'm going to use that term in quotes --
5  presentation.
6          If an officer does not present a fair
7  presentation to the grand jury, what is it other than
8  misconduct by the officer?
9      Q.  So you would agree then that there is no mention
10  in the court's order in the Reynolds case that the court
11  determined Detective Saldate engaged in misconduct;
12  correct?
13      A.  The court does not use the term "misconduct."
14      Q.  And --
15      A.  This court says it was not a fair presentation by
16  Saldate.
17      Q.  Where does the court in Exhibit 14, its order --
18          MS. GREEN:  Sorry.  If you want to show it
19  to him again --
20          MS. BERKE:  I will show it to him again.
21          MS. GREEN:  Okay.  Because I don't want him
22  to. . .
23  BY MS. BERKE:
24      Q.  And I will give it to you again, sir.
25          Where in Exhibit 14 does the court say that



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
241–244

Page 241

1  Detective Saldate didn't give a fair -- strike that.
2  Let me -- hang on, let me find the court's language.
3          MS. GREEN:  Also, in fairness --
4          MS. BERKE:  If you have an objection -- let
5  me ask my question.  And if you have an objection, you
6  can make your objection.
7          MS. GREEN:  Okay.  That wasn't your
8  question?  You -- you hadn't completed the question?
9          MS. BERKE:  I'm asking my question right
10  now.
11  BY MS. BERKE:
12    Q.  Who decides the manner in which a grand jury
13  proceeding is conducted?
14    A.  I mean, the prosecutor decides what witnesses to
15  call before the grand jury and what questions to ask the
16  witnesses.
17    Q.  Right.  So the prosecutor is in charge of how the
18  proceeding is conducted; correct?
19          MR. EAVES:  Form.
20          MS. GREEN:  Form.
21          THE WITNESS:  I -- I would say generally
22  that's yes, correct.
23  BY MS. BERKE:
24    Q.  Okay.  And what the court concluded -- and I'll
25  show you Exhibit 14 -- is that the defendant was denied

Page 242

1  his right to due process and a fair and impartial
2  presentation of the evidence by the manner in which the
3  proceeding was conducted; correct?
4    A.  Correct.
5    Q.  And you would agree that nowhere in that order
6  does the court conclude that it was Detective Saldate
7  who deprived the defendant of his right to due process
8  in a fair and impartial presentation of the evidence by
9  the manner in which the proceeding was conducted; right?
10          MS. GREEN:  Form.
11          THE WITNESS:  I -- I would agree that the
12  court order doesn't single out anybody with respect to
13  the responsibility for the failure of this state to make
14  a fair and impartial and full presentation of the
15  evidence.
16  BY MS. BERKE:
17    Q.  And you understand that in the second interview
18  that Detective Saldate conducted of Mr. Reynolds, he
19  told Detective Saldate that he wasn't intoxicated;
20  correct?
21          MS. GREEN:  Form.
22          THE WITNESS:  That's my understanding.
23  BY MS. BERKE:
24    Q.  Why is there no mention in your report of the
25  second interview that Detective Saldate conducted where

Page 243

1  Mr. Reynolds told him that he didn't believe he was
2  drunk?
3          MS. GREEN:  Form.
4          THE WITNESS:  I'm -- I don't think that was
5  an important part of the court's order in the case
6  remanding it for a determination of probable cause, and
7  so I was focused on the evidence that what he said in
8  the grand jury as quoted by the defense counsel in the
9  Reynolds case regarding the three areas and the court's
10  conclusion adopting sections of the defense brief that,
11  in essence, found that his testimony with respect to
12  these three areas, the identification, the time of
13  the -- the little boy saw the suspect and the
14  drunkenness were not true.
15  BY MS. BERKE:
16    Q.  Well, but you're accusing Detective Saldate of
17  having lied in his testimony in the Reynolds case;
18  correct?
19    A.  If you're asking me for my opinion as to whether
20  or not he lied, I think he lied.
21    Q.  Well, that is your conclusion that you rendered
22  in your report; correct?
23          MS. GREEN:  Form.
24          THE WITNESS:  That's my opinion, that's
25  correct.

Page 244

1  BY MS. BERKE:
2    Q.  And yet you didn't read the transcript of his
3  testimony to know what questions he was asked; correct?
4          MS. GREEN:  Form.
5          THE WITNESS:  I looked at the testimony that
6  was quoted in the defense motion for redetermination of
7  probable cause that the court relied upon in granting
8  the motion.
9  BY MS. BERKE:
10    Q.  Why didn't you ask Ms. Milke's attorneys for the
11  transcripts of Detective Saldate's testimony in the
12  Reynolds, Running Eagle and King cases?
13    A.  Because of those -- because the sections --
14          MS. GREEN:  Form.
15          THE WITNESS:  Okay.  Because of the sections
16  of the testimony that I had I thought were sufficient
17  for me to reach my conclusions.
18  BY MS. BERKE:
19    Q.  So when Detective Saldate testified in the
20  Reynolds case that Mr. Reynolds was drinking, but was
21  not drunk, if he had been referring to what Mr. Reynolds
22  told him in his second interview, which was that he
23  wasn't drink, you would agree that Detective Saldate
24  wasn't lying; correct?
25          MS. GREEN:  Form.



RICHARD DROOYAN                                   September 12, 2018
MILKE vs CITY of PHOENIX                           245–248

Page 245

1      THE WITNESS:  He was misleading the jury as
2   to what Mr. Reynolds said regarding the subject of him
3   drinking and being drunk.  Because on one occasion he
4   says he's drunk, on another occasion he says he's -- he
5   says he's not drunk.  And by only providing the second
6   interview, he's misleading the grand jury.
7   BY MS. BERKE:
8      Q.  Well, if Detective Saldate had concluded that
9   Mr. Reynolds was clarifying and correcting information
10  in his second interview when he told Detective Saldate
11  that he was drinking, but not drunk, then Detective
12  Saldate wasn't lying; correct?
13     A.  Could you have that question read back again.
14     Q.  Sure.
15     A.  I'm sorry.
16        MS. GREEN:  Form.
17        THE WITNESS:  Because I missed first part of
18  it.
19        MS. BERKE:  We're out of -- we have change
20  the videotape, so I'll have - --
21        THE WITNESS:  I'll take --
22        MS. BERKE:  -- I'll have the court reporter
23  read it to you as soon as we go back on.
24        THE WITNESS:  Oh.  She can read it to me
25  during the break, while we're waiting --

Page 246

1         MS. BERKE:  Okay.
2         THE WITNESS:  -- for the -- the change in
3   tape.
4         THE VIDEOGRAPHER:  This marks the end of
5   Media Unit 3.  We are off the record at 4:28 p.m.
6         (Recess.)
7         THE VIDEOGRAPHER:  This marks the start of
8   Media Unit 4.  We are on the record at 4:36 p.m.
9   BY MS. BERKE:
10     Q.  During the break, you had the court reporter read
11  my last question back to you?
12     A.  Yes, I -- I read it.
13     Q.  Okay.  And are you prepared to answer my
14  question?
15     A.  I am.
16     Q.  Okay.
17     A.  If -- if Detective Saldate thought that he was
18  just getting a clarifying question and answer from
19  Mr. Reynolds, then he should have explained to the grand
20  jury what Reynolds said the first time and that he then
21  went and got clarification from Reynolds and this is
22  what Reynolds said the second time.
23     Q.  Did you read the supplement Detective Saldate
24  report -- or strike that.
25        Did you read the supplement that Detective

Page 247

1   Saldate prepared following his second interview of
2   Mr. Reynolds?
3         MS. GREEN:  Form.
4         THE WITNESS:  I don't remember if I did or
5   not.
6   BY MS. BERKE:
7      Q.  Would you need to reference your report to tell
8   us whether you did or not?
9      A.  I'm not a hundred percent sure it's going to tell
10  me because a lot of things that I looked at were the
11  exhibits to various depositions.  So this is not going
12  to necessarily tell me if that was one of the exhibits
13  that I looked at.
14     Q.  Well, certainly you know that Mr. Reynolds
15  disavowed his first interview when he participated in
16  his second interview with Detective Saldate; correct?
17     A.  In the second interview he said something
18  different than he said in the first interview.
19     Q.  Well, he -- he specifically disavowed what he had
20  said to Detective Saldate in his first interview;
21  correct?
22        MS. GREEN:  Form.
23        THE WITNESS:  I -- I don't remember that.
24  BY MS. BERKE:
25     Q.  Okay.  Well, let me show you his second

Page 248

1   interview; okay?
2      A.  Okay.
3      Q.  Or the supplement that Detective Saldate prepared
4   of his second interview.  I'll show it to you in a
5   moment, but I'm going to read some portions from it.
6      A.  Okay.
7         MS. GREEN:  I think someone accidentally
8   unmuted on the phone.  We're getting a lot of feedback.
9         THE WITNESS:  If you're on the phone, can
10  you mute again, please.  Thank you.
11        MR. BRUSTIN:  Sorry about that.
12        MS. GREEN:  Thank you.
13  BY MS. BERKE:
14     Q.  At -- so this is exhibit -- this is part of the
15  Reynolds exhibit.  And now I lost my place.
16        MS. GREEN:  You're on Exhibit 23, is that
17  the one?
18        MS. BERKE:  I don't have the exhibit number
19  here.
20        MS. GREEN:  So it's the one Bates stamped --
21  stamped Reynolds?
22        MS. BERKE:  It's the Bates stamps Reynolds.
23        MS. GREEN:  Okay.  That -- for the record,
24  that's exhibit -- Deposition Exhibit 23.
25        MS. BERKE:  Okay.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
249–252

Page 249

BY MS. BERKE:

2    Q.  And what he said at Reynolds 52, which I'll show
3  you in a moment, Detective Saldate advises Mr. Reynolds
4  that what he was telling him wasn't like anything he had
5  told him previously.  And Mr. Reynolds stated, "I just
6  told you anything the last time."

7       And according to Detective Saldate's report, he
8  had then asked him if he had made it up, and he
9  responded "Yeah."

10   A.  Okay.

11   Q.  And then he said to Detective Saldate, quote,
12  "Man, I already told you that I said a bunch of stuff
13  the last time," end quote.

14      So I'm going to show you this paragraph from the
15  report.  It starts with "At this point."

16   A.  Okay.

17      This is what you just read to me?

18   Q.  Yes.

19   A.  Okay.

20   Q.  So you would agree that, according to the report,
21  Mr. Reynolds disavowed what he had told Detective
22  Saldate in his first interview; correct?

23   A.  Maybe I'm not looking at exactly -- "At this
24  point, I advised Lamont that this was not anything like
25  he had told me earlier and he appeared frustrated and

Page 250

1  told me that I was just trying to confuse him," is that
2  where --

3    Q.  Yeah.  Keep reading.

4    A.  Okay.

5       MR. BRUSTIN:  (Inaudible.)

6       MS. GREEN:  So I can still -- sorry.  I'm
7  sorry to interpret the deposition.

8       MS. BERKE:  That's okay.

9       MS. GREEN:  Nick, I think we can still hear
10  you.

11      MR. BRUSTIN:  I don't know why that
12  happened.  Sorry.  I -- I meant to hang up.  Sorry about
13  that.

14  BY MS. BERKE:

15   Q.  I can also --

16   A.  Okay.  I see what you're saying.

17      "I then told Lamont that the last time we spoke,
18  Lamont then quickly interrupted me and said angrily,
19  "Man, I already told you that I said a bunch of stuff
20  the last time."  Okay.

21   Q.  And he is disavowing what he had told Detective
22  Saldate during the first interview; correct?

23   A.  Yes.

24      MS. GREEN:  Form.

25      THE WITNESS:  I think it can be interpreted

Page 251

1  that way, sure.

2  BY MS. BERKE:

3    Q.  Right.  So when Detective Saldate testified at
4  the grand jury proceeding that Mr. Reynolds told him
5  that he was not drunk, because that's what Mr. Reynolds
6  had told him during the second interview, that was
7  accurate testimony by Detective Saldate; correct?

8       MS. GREEN:  Form.

9       THE WITNESS:  That's what Mr. Reynolds told
10  him the second time.  And the court concluded, as I read
11  the court's order remanding the case for a new probable
12  cause determination, that it was not a full and fair
13  presentation because he didn't present the first
14  statement by Mr. Reynolds that he was drunk.

15  BY MS. BERKE:

16   Q.  Okay.  But you went well beyond what the court's
17  ruling was.  You went so far as to say that Detective
18  Saldate lied in his testimony; correct?

19      MS. GREEN:  Form.

20      THE WITNESS:  I certainly think he lied in
21  his testimony, yes.

22  BY MS. BERKE:

23   Q.  And you would agree that what he said about
24  Mr. Reynolds telling him he wasn't drunk was not a lie;
25  correct?

Page 252

1       MS. GREEN:  Form.

2       THE WITNESS:  The way it -- if it's a
3  reference to the second interview by Mr. Saldate -- or
4  Officer Saldate of Mr. Reynolds, yes, that's correct.

5  BY MS. BERKE:

6    Q.  And the only portions of the police report in the
7  Reynolds case that you reviewed are the select portions
8  that were provided to you by Ms. Milke's attorneys;
9  correct?

10      MS. GREEN:  Form.

11      THE WITNESS:  I -- I believe they were
12  exhibits to the deposition is where I saw them.  I don't
13  remember if they provided them to me separately.

14  BY MS. BERKE:

15   Q.  Whatever you reviewed from the Reynolds case is
16  docu-- or the documents you reviewed from the Reynolds
17  case are what plaintiff's counsel provided to you;
18  correct?

19   A.  Correct.

20   Q.  And you did not ask to see the entire police
21  report from the Reynolds case before you arrived at your
22  conclusion that Detective Saldate had lied in his
23  testimony; correct?

24   A.  Correct.

25   Q.  In order to conclude that Detective Saldate lied



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
253–256

Page 253

1  in his testimony, wouldn't it be important to read all
2  of the reports of the various witness interviews so that
3  you can determine whether there was support in portions
4  of the police report?
5       MS. GREEN: Form.
6  BY MS. BERKE:
7    Q. That would support -- strike that.
8       Wouldn't it be important before arriving at a
9  conclusion that Detective Saldate lied in his testimony
10  to know what other witnesses had said about these
11  topics?
12       MS. GREEN: Form.
13       THE WITNESS: Not necessarily. I thought I
14  had enough information about the little boy's statement
15  as to the timing juxtaposed to what Saldate said, the
16  little boy's description of the suspect juxtaposed as to
17  what Saldate said to reach conclusions that he was
18  testifying falsely about these matters. These being the
19  most critical -- some of the most critical testimony in
20  the grand jury implicating Reynolds in the murder.
21       And for him to testify that the little boy
22  said it was late at night when, in fact, he said it was
23  a -- a much different time, much earlier in the evening,
24  in my judgment, was a knowing false statement by
25  Detective Saldate.

Page 254

1  BY MS. BERKE:
2    Q. Well, you knew you were being held out as an
3  expert in this case; correct?
4    A. That's true.
5    Q. And isn't important for an expert to have a
6  complete file to review before rendering opinions?
7    A. Not necessarily.
8    Q. Okay. Wouldn't it be important to at least have
9  reviewed all of the summaries that were prepared by
10  various police officers of the little boy's statements
11  before rendering the opinion that Detective Saldate lied
12  about what the boy said?
13    A. Not necessarily. I thought I had enough
14  information based upon what was presented to the court
15  in the motion to dismiss/remand to reach that
16  conclusion.
17    Q. Okay. So it wasn't important to you to review a
18  summary that another officer prepared as to what the
19  little boy had told that officer in the Reynolds
20  investigation?
21    A. I -- I concluded that I had enough information to
22  reach the conclusion that I did.
23    Q. If you had prosecuted Detective Saldate for
24  perjury, you wouldn't review only portions of the file;
25  correct?

Page 255

1       MS. GREEN: Form.
2       THE WITNESS: Probably not.
3  BY MS. BERKE:
4    Q. You would review the entire police report;
5  correct?
6    A. If I were in the role of making a determination
7  as to whether or not to prosecute him for knowingly
8  committing perjury, I would probably look at more than
9  just simply that portion of his testimony.
10    Q. Well, you're accusing him of having committed
11  perjury, aren't you?
12       MS. GREEN: Form. Argumentative.
13       THE WITNESS: I am giving my opinion that I
14  think he lied to the grand jury when he told the grand
15  jury the time that the little boy saw the suspect and
16  the description of the suspect.
17  BY MS. BERKE:
18    Q. Right. And so what you're accusing him of is
19  having committed perjury; correct?
20       MS. GREEN: Form.
21       THE WITNESS: In essence, I guess you're
22  right.
23  BY MS. BERKE:
24    Q. And as a prosecutor, you wouldn't meet your
25  ethical or competency requirements in prosecuting an

Page 256

1  individual for perjury or a police officer for -- for
2  perjury by only reviewing select portions of the
3  criminal case file; correct?
4       MS. GREEN: Form.
5       THE WITNESS: I would say that I would
6  review whatever information was available before making
7  any final prosecutive decision.
8  BY MS. BERKE:
9    Q. But as an expert witness, you don't feel that
10  that's necessary to do?
11       MS. GREEN: Form.
12       THE WITNESS: In my judgment, this
13  information should have been turned over to Ms. Milke's
14  attorney. It was clearly Brady material.
15  BY MS. BERKE:
16    Q. That's not my question.
17    A. Let me just finish and then you can strike and
18  you can ask another question. You can do whatever you
19  want to do.
20       So I rendered an opinion that this is
21  Brady/Giglio material that should have been turned over.
22  If you want to know whether I thought he was lying or
23  not, I think he was lying. His testimony is clearly not
24  accurate. It's clearly false.
25       I personally think that a police officer who is



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

Page 257

1  being asked a critical question as to the timing of
2  events going into a grand jury knows exactly what he's
3  saying, and I think he knew exactly what he was saying.
4  But ultimately, my conclusion that I rendered in this
5  case was that this is Giglio material that was required
6  to be disclosed to the defense in the Milke case.
7      Q. I move to strike as nonresponsive.
8         You would agree that if Detective Saldate gave
9  testimony in the Reynolds grand jury proceeding that was
10  inconsistent with his report, it was incumbent upon the
11  prosecutor to point him to the portion of his report
12  that had that information so that he could correct his
13  testimony; correct?
14      A. I --
15         MS. GREEN: Form.
16         THE WITNESS: I think a good prosecutor
17  certainly should have done that. I thought the
18  prosecutor as well as Detective Saldate.
19  BY MS. BERKE:
20      Q. In your report, you state, quote, "During his
21  grand jury testimony, Saldate testified that Patrick had
22  described the perpetrator as a large black male, but he
23  left out all parts of Patrick's description that did not
24  match Mr. Reynolds," end quote.
25         You say that in your report; correct?

Page 258

1      A. I believe so.
2      Q. And you understand that it is the prosecutor who
3  asks the questions in conducting the grand jury
4  proceeding; correct?
5         MS. BURGESS: Form.
6         MS. GREEN: Form.
7         THE WITNESS: It's the prosecutor asks the
8  questions and it's the detective's obligation to -- to
9  testify truthfully.
10  BY MS. BERKE:
11      Q. Well, what was the question that was asked of
12  Detective Saldate when he was provided that description
13  to the grand jury?
14      A. As I sit here today, I can't tell you
15  specifically.
16      Q. And that's because you never reviewed the
17  transcript of his testimony; correct?
18         MS. GREEN: Form.
19         THE WITNESS: We -- I reviewed the
20  transcript of his testimony to the extent that it was
21  quoted verbatim in the -- quoted in the motion to
22  dismiss and/or remand for a grand jury -- to the grand
23  jury.
24  BY MS. BERKE:
25      Q. And -- and if there was additional information in

Page 259

1  the police report that provided further details of the
2  description of Mr. Reynolds, it was incumbent upon the
3  prosecutor, if the prosecutor felt that that was
4  important, to ask additional questions of Detective
5  Saldate to elicit that additional information; correct?
6         MS. GREEN: Form.
7         THE WITNESS: If I were a prosecutor and I
8  thought that testimony was incomplete, misleading,
9  false, in error, I would have asked further questions.
10  I think a good prosecutor should have done that.
11  BY MS. BERKE:
12      Q. Now, you're critical of Detective Saldate in the
13  Running Eagle case of having testified contrary to his
14  written report that Mr. Running Eagle made incriminating
15  statements before invoking his right to counsel;
16  correct?
17      A. Correct.
18      Q. And you understand that both the prosecutor and
19  Mr. Running Eagle's defense attorney were present at
20  that hearing where that testimony was given; correct?
21      A. That's my understanding.
22      Q. And you know that neither the prosecutor nor the
23  defense attorney directed Detective Saldate to his
24  report and contended that his testimony was inconsistent
25  with his report; correct?

Page 260

1         MS. GREEN: Form.
2         THE WITNESS: That's my understanding.
3  BY MS. BERKE:
4      Q. And so you would agree that, based on everything
5  you reviewed, the defense attorney believed that
6  Detective Saldate's testimony was accurate as to the
7  timing; correct?
8         MS. GREEN: Form.
9         THE WITNESS: No.
10  BY MS. BERKE:
11      Q. Why do you disagree with that?
12      A. I have no basis to reach that conclusion. Merely
13  because he didn't cross-examine or ask any questions
14  about that area doesn't tell me whatever was in his
15  state of mind at the time of the case. I don't know
16  what the defense lawyer was thinking or what tactical
17  decision he might have made or why he didn't think it
18  was necessary to cross-examine him.
19      Q. Did you seek to interview the defense attorney
20  to -- to ascertain that information?
21      A. No.
22      Q. Why not?
23      A. Because I didn't think it was necessary to reach
24  the conclusion as to whether or not this was information
25  that the prosecution was obligated to turn over to



Page 261

1  Ms. Milke or any other defense lawyers who represented
2  defendants in cases investigated by Detective Saldate.
3    Q.  So you didn't think it was important before you
4  accused Detective Saldate have -- of having committed
5  perjury in the Running Eagle case to discuss that
6  suspicion with the defense attorney who was present
7  and/or the prosecutor who was present?
8        MS. GREEN:  Form.  Argumentative.
9        THE WITNESS:  I did not -- let me say it.  I
10 rendered an opinion that this evidence should have been
11 disclosed and that it was Giglio material and that, as a
12 prosecutor, I think you have to disclose this
13 information upfront because you don't know whether or
14 not defense counsel may have it or not.
15       You asked me whether I thought he lied.  I
16 think he lied.  That's not what I specifically opined in
17 my report, and that was not the basis of the opinions
18 that I offered in my report, but I do think he was
19 testifying falsely when he said that Running Eagle's
20 statement was made before he invoked.
21 BY MS. BERKE:
22   Q.  Well, you do accuse Detective Saldate of having
23 lied in his testimony in your report, don't you?
24       MS. GREEN:  Form.
25       THE WITNESS:  I don't recall if I used that

Page 262

1  specific term or not.  I mean, it's possible.
2  BY MS. BERKE:
3    Q.  Did you write your report or did somebody write
4  it for you?
5        MS. GREEN:  I am going to object to the
6  extent this calls for information about discussions or
7  privileged work product.  The witness can answer with
8  respect to the drafting process generally, but we object
9  and I'm instructing the witness not to answer regarding
10 the content of any discussions he had with plaintiff's
11 counsel.
12       THE WITNESS:  The answer is, there were
13 portions of it that were initially drafted by
14 Ms. Milke's counsel.  There were -- of which I did
15 substantial edits and rewrites and there were portions
16 that I wrote in the first instance, and I had the final
17 editing of the report.
18 BY MS. BERKE:
19   Q.  Which portions of your report were initially
20 drafted by Ms. Milke's attorneys?
21   A.  I wouldn't be able to tell you without spending a
22 lot of time going through and looking at the 41 pages.
23 There were some portions where they wrote the initial
24 part and I substantially rewrote it, and there were
25 other portions where I wrote the first part of it

Page 263

1  myself.  There is very little in this 41 pages that
2  doesn't represent substantial writing or rewriting by
3  me.
4    Q.  The portions of your report that were initially
5  drafted by Ms. Milke's attorney, were those emailed to
6  you?
7    A.  Yes.
8    Q.  Who were they emailed to you from or by?
9        MS. GREEN:  And again, I'm going to object.
10 There are communications -- we produced the
11 communications that we've agreed, including email
12 communications.  We made clear all drafts of the report.
13 We are saying that they're privileged.  So to the extent
14 that there are emails regarding the drafting process and
15 things of that nature, we've made this perfect -- very
16 clear in meet-and-confer calls and in writing on what we
17 think we're required to produce and what's privilege,
18 and we produced the emails that we believe we're
19 required to produce and that we agreed upon.
20       So we're not going to go into -- and I'm
21 instructing the witness not to answer questions
22 regarding email communications that we have held back as
23 privileged.
24       MS. BERKE:  Well, we are entitled to see the
25 initial draft of any portions of the report that were

Page 264

1  not prepared by the expert.
2        MS. GREEN:  And we dispute that.  We've made
3  it very clear a number of times, any drafts are
4  privileged work product.  And so that's our position.
5        MS. BERKE:  Okay.  So just so I understand
6  you correctly, you are refusing to permit your expert
7  from telling us which portions of his report were
8  initially drafted by your law firm.
9        MS. GREEN:  No.  You actually, in fact,
10 asked the expert that question and he answered it to the
11 best of his ability.  You then started asking about
12 email communications we have had, I mean I think an
13 hourlong discussion about the email communications and
14 the subpoenas that have been provided.  And we reached
15 an agreement on what email communications we would
16 provide, and that agreement was reached based off our
17 understanding of the law and what is privileged and what
18 is not.
19       And so to the extent you're seeking to get
20 information beyond email communications that were
21 provided, I'm objecting to that as privileged.  And if
22 you'd like to, you know, make a joint statement or
23 something like that, we're happy to do that.  But we
24 made that very clear that that's been our position for
25 quite some time now, and it's reflected in email.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
265–268

Page 265

1    MS. BERKE:  Well, I'd also note that at the
2  time that the discussion occurred, there was no
3  understanding that not all portions of the report were
4  drafted by the witness.  That's only come out through
5  the deposition testimony.  So I would add that, in
6  addition to that, it evidences the witness's bias,
7  motivation, et cetera, if it was originally written by
8  plaintiff's counsel and goes to the Daubert factors.  So
9  that would be our additional basis now that this new
10  information has come out about the fact that the entire
11  report was not written by Mr. Drooyan.
12       MS. GREEN:  And I don't think that's proper
13  representation of Mr. Drooyan's testimony.  But if you
14  want to meet and confer about it or do something beyond
15  that, but that's our position.  It's been our position
16  for quite some time.  It's been reflected in the
17  writing.  And to the extent -- yeah, he's not going to
18  answer questions about that today beyond, as I said, the
19  general drafting process.
20       And if you want to take it further, you
21  know, I think -- yeah, it's just not going to -- yeah,
22  we'd have to -- again, I don't know what Daubert factors
23  you're talking about or what your arguments are, but
24  this is my understanding of the law.  And it's a
25  position we've articulated very clearly, including with

Page 266

1  my co-counsel.  And so that's the position we're taking
2  at this deposition.
3       MS. BERKE:  But it has not been previously
4  disclosed that there was any involvement in drafting of
5  the report by plaintiff's counsel.  So I'm -- it's
6  5 o'clock.  We're not going to be able to call the
7  judge.  So if we have to present this to a joint
8  discovery dispute before the court, it's going to be my
9  position that any -- if the court orders his testimony
10  to continue and that we're allowed to explore it, we are
11  going to ask for the costs of our -- our costs and our
12  fees in coming back out to further go through this.
13       MS. GREEN:  Again --
14       MS. BERKE:  So I'm just going to state it
15  for the record.
16       MS. GREEN:  -- to the extent you want to
17  explore the general drafting process, that's fine.  But
18  communications that are not provided for pursuant to
19  Rule 26, we have taken the position, we made it
20  incredibly clear that it's our position those are
21  privileges.  And so we're not going to get into
22  communications beyond what we've disclosed which we
23  believe is what we're required to disclose under law.
24       MS. BERKE:  Again, it's our position that we
25  are entitled to know which portions of his report he

Page 267

1  drafted and which portions of the report Mr. Milke's
2  counsel drafted.
3       THE WITNESS:  And I -- I just couldn't tell
4  you from looking at this report to be -- I don't know
5  the answer to your question.
6  BY MS. BERKE:
7    Q.  Do you know why it is that you were presented
8  portions of your report from Ms. Milke's counsel?
9    A.  Because it was just easier for them to sort of
10  summarize the information that was in the summaries and
11  put that information into the initial draft.  You know,
12  I then looked at it.  I edited it.  I reviewed it to
13  make sure I thought was accurate.  I changed whatever I
14  felt was necessary.  And that was the process.
15       It was a -- it certainly, I think, expedited the
16  process to have them draft sort of, you know, factual
17  provisions based upon the documents in evidence that
18  they presented to me.
19    Q.  Did the draft that they initially presented to
20  you contain any opinions?
21       MS. GREEN:  I'm -- at this point, I think
22  we've testified enough about the general drafting
23  process.  If you want to take a break, I'm happy to
24  confer with my co-counsel to see if we feel comfortable
25  with any other deposition testimony being given right

Page 268

1  here right now.  But at this point in time, I'm going to
2  say he's answered your questions about the general
3  drafting process, and we're not getting beyond that as
4  we have made it perfectly clear all drafts are
5  privileged.  And that's our position, so --
6       MS. BERKE:  We are entitled to know if he
7  was presented a report containing opinions, a report
8  that he did not prepare.
9       MS. GREEN:  We are not going to talk about
10  what was in X draft, what was in Y draft, what was in
11  this draft, what was in that draft, what in this draft.
12  We have taken the position that drafts are privileged.
13  We've made that very clear to you and in writing.  I
14  have simply just offered to confer -- that's been our
15  position this whole litigation.  I'm not going to take a
16  different position now without conferring with my
17  co-counsel.
18       If you'd like to take a brief break, I'm
19  happy to confer and see if we can go any further to
20  avoid any additional burden or expense.
21       MS. RETTS:  Let's do it.
22       MS. GREEN:  But at this point I feel like he
23  has answered it as far as we believe is what's required
24  under the rules.
25       MS. BERKE:  And just to be clear, I'm not



Page 269

1  asking about drafts going back and forth.  What I'm
2  asking about is the initial draft of his report.
3        MS. GREEN:  And again, the contents of
4  whether it's initial, the third one, the fourth, the
5  fifth, we've taken the position in this litigation, and
6  we believe that's the appropriate position under the
7  law, that that information is privileged.  So, you know,
8  I don't have anything that beyond -- I think it's
9  documented on the record perfectly well.  I -- I
10  understand what you're saying, but I just have to
11  articulate our position.
12        MS. BERKE:  Do you want to confer with your
13  co-counsel?
14        MS. GREEN:  If -- if you think it -- I'm
15  happy to do so in an attempt to try and meet your
16  concerns.  This is a position I've reached with my
17  co-counsel so I'm not going to --
18        MS. RETTS:  Let's do that --
19        MS. GREEN:  -- you know
20        MS. RETTS:  -- since they're not open to --
21        MS. BERKE:  Yeah, let's -- let's --
22        MS. GREEN:  Yeah.
23        MS. BERKE:  -- go ahead and do that, just --
24        MS. GREEN:  Yeah.
25        MS. BERKE:  And then we'll confirm what

Page 270

1  your --
2        MS. GREEN:  Right.
3        MS. BERKE:  -- position is after you do
4  that.
5        MS. GREEN:  Okay.
6        MS. BERKE:  Okay.
7        THE VIDEOGRAPHER:  Off the record?
8        We are off the record.  The time is 5:08
9  p.m.
10        (Recess.)
11        THE VIDEOGRAPHER:  We are on the record.
12  The time is 5:16 p.m.
13        MS. GREEN:  Okay.  I think we took a quick
14  break for me to confer with my co-counsel, so I'm just
15  going to state my position on the record and you guys
16  can state yours for the record.
17        So as I've stated, we object to any further
18  questioning regarding drafts of the report.  Rule 26
19  specifically protects drafts of a report.  And it was,
20  in fact, amended for that purpose because, when you
21  start asking questions about drafts, you're getting into
22  work product, privilege work product.  We've made this
23  position clear verbally to all defense counsel and also
24  in writing.  And we think any further questioning on
25  this is impermissible.

Page 271

1        We allowed the witness to answer questions
2  generally about the drafting process, but I think
3  anything further -- and he's answered multiple questions
4  on that.  I think anything further is getting into
5  impermissible questioning that's getting into privilege
6  territory and also work product.
7        I will note that you have Mr. Drooyan's
8  report, which reflects his opinion in this matter.  To
9  the extent you want to ask him any questions about his
10  opinions this in matter, including the basis for those
11  opinions, that's what this deposition is for.  So you're
12  free to do that, obviously.
13        But to the extent you're getting into any
14  more communications or the contents of draft A, draft B,
15  draft C, it remains our position, as it has been for
16  now -- I've communicated to you now for a considerable
17  period of time that that is privilege information and,
18  actually, specifically protected by the rule, including
19  after the recent amendments which were made for this
20  very purpose.
21        MS. RETTS:  All right.  And I just like to
22  note our position for the record, that this information
23  goes to credibility of the witness, that it was
24  addressed in Gerke versus Travelers Casualty Insurance
25  Company, District Court of the District of Oregon, 2013,

Page 272

1  where the defense counsel, it appears, I'm not sure if
2  it was plaintiff's or defense counsel, asked if the
3  witness wrote all the portions of his reports.  There is
4  an objection by plaintiff's counsel specifically that,
5  under Rule 26(b)(4), drafts are strictly protected from
6  production.
7        And the court in oral argument stated that
8  drafts are, but if you wrote a paragraph or a section of
9  his report, sent it to him and told him to include it,
10  that goes directly to the expert's credibility.  It's
11  one thing to talk to the expert about the topics
12  covered, any gaps, holes or lack of clarity in an
13  expert's report.
14        But if you write portions and he adopts them
15  or incorporates them in their entirety or in substantial
16  form, then that goes to Mr. Painter's credibility
17  because the lawyer is not the expert, the expert is.
18  It's supposed to be his opinion, not the expert of the
19  lawyer or his client.  And that it went at least to the
20  credibility of the expert's testimony and very may well
21  go to the admissibility at trial or motion of the
22  expert's opinion because then you have a Daubert issue.
23        So based upon what the court specifically
24  stated in -- in ruling on an objection on drafts, the
25  court indicated that that's a Daubert issue as we



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
273–276

Page 273

1  indicated, and also a credibility issue.
2       So, you know, we can hash this out at a
3  later date, but that is our position and we believe that
4  it's not work product.
5       MS. BURGESS:  What you said.
6  BY MS. BERKE:
7    Q.  Mr. Drooyan, you knew Ms. Milke's theory of the
8  case before you came to your own independent opinions;
9  correct?
10      MS. GREEN:  Form.
11      THE WITNESS:  The theory of the civil rights
12  claim, you mean?  Is that what you're asking?
13  BY MS. BERKE:
14   Q.  The theorys that you expressed opinions on.
15      MS. GREEN:  Form.
16      THE WITNESS:  No, these were opinions that I
17  expressed to them, not what they expressed to me.
18  BY MS. BERKE:
19   Q.  So there were no opinions in the initial draft
20  then that they presented to you; correct?
21      MS. GREEN:  Objection.
22      We've made it perfectly clear that we're not
23  going to have any more questions about the drafts.  We
24  put a dispute -- I mean the dispute on the record.
25      I'm instructing the witness not to answer, I

Page 274

1  thought we reached that agreement.
2       So I would respectfully request that
3  Ms. Berke refrain from asking further questions
4  because -- on draft -- the contents of drafts of the
5  report because I've already stated multiple times, the
6  witness is not going to be answering any more questions
7  about that here today.
8       MS. RETTS:  Well, I think the appropriate
9  thing is, if she has a question, to ask the question,
10  and you just instruct him not to answer.  That way the
11  court has a record of what the specific questions are
12  and can issue an order that he has to answer those
13  specific questions.  I mean, the court otherwise isn't
14  going to exactly know and dealing with an amorphous idea
15  about what the question was is just something we would
16  like to avoid.
17      You can instruct him not to answer.  I don't
18  think we don't need to just instruct him not to answer.
19  We can state that your objections and what you've put on
20  the record applies to every instruction you give him not
21  to answer.
22      MS. GREEN:  I'll continue to state what I
23  need to state to defend the deposition with respect to
24  privilege material.  Thank you.
25  ///

Page 275

1  BY MS. BERKE:
2    Q.  Certainly when you were provided the initial
3  draft of your report by plaintiff's counsel, you
4  reviewed and relied upon that in preparing your report;
5  correct?
6    A.  No --
7       MS. GREEN:  I'm instructing the witness not
8  to answer any further questions about the contents of
9  drafts.
10      I would also note pursuant to subpoena and
11  representations, the information that Mr. Drooyan relied
12  upon in the report and is required to be disclosed is
13  listed in his report.  And we've also made
14  representations in response to subpoenas from defendants
15  after conferring with Mr. Drooyan about that topic as
16  well.
17      MS. RETTS:  But you also object on the basis
18  of privilege and blocked our access to certain things.
19  So if he --
20      MS. GREEN:  About --
21      MS. RETTS:  -- relied upon a certain portion
22  of the draft and adopted that as his opinion or adopted
23  in substantial form as notes in Gerke, then that's not
24  information you would have ever provided to us based
25  upon the objection.  So we can't rest completely on what

Page 276

1  was provided --
2       MS. GREEN:  We did not object to providing
3  any information that he relied upon.  I think that's --
4  in forming his opinions, and I think that's reflected in
5  our email correspondence.
6       MS. RETTS:  So then why not ask him -- why
7  are you --
8       MS. GREEN:  Because I'm not having him
9  answer questions about drafts.  I don't want to get back
10  and forth into this.  I don't think it's necessary.  We
11  can have a dispute and raise it to the court.  It's --
12  it's not necessary.  We're wasting the witness's time,
13  everyone's time.
14      MS. BURGESS:  I don't think it's a waste of
15  time trying to establish a genuine dispute, make a
16  record so we can have it addressed by the court.
17  BY MS. BERKE:
18   Q.  Okay.  I'm going to turn back to -- I'm going to
19  ask one more question about what we were just
20  discussing.
21      Were there opinions written by plaintiff's
22  counsel in the initial draft they provided to you or in
23  any later draft that you adopted in any form?
24      MS. GREEN:  I'm instructing -- objecting and
25  instructing the witness not to answer the question.



Page 277

1  BY MS. BERKE:
2    Q.  All right.  Let's turn back to the Running Eagle
3  case.  In your report at Page 22, you state that, "At
4  the suppression hearing, Saldate testified" --
5        MS. GREEN:  Could --
6  BY MS. BERKE:
7    Q.  -- contrary to his written report that
8  Mr. Running Eagle made incriminating statements before
9  invoking his right to counsel; correct?
10   A.  That's what my report says, yes.
11   Q.  And the incriminate -- the incriminating
12  statement that you're referring to is his statement,
13  quote, "just let me fall, it must be my destiny I must
14  fall," end quote; correct?
15   A.  I think that's correct, yes.
16   Q.  And Detective Saldate had testified at the
17  hearing that he made that statement before he invoked
18  his right to counsel; correct?
19   A.  I believe that's what he testified to.  The -- he
20  was asked whether he had made the statement before or
21  after he invoked, and he said it was after.
22        Actually, it was -- it was before.  Sorry for
23  that misstatement.
24   Q.  Well, so you just made a misstatement on the same
25  topic that Detective Saldate did; correct?

Page 278

1    A.  Correct.
2    Q.  And Ms. Milke's attorney who's sitting to your
3  left corrected you and got you to correct yourself;
4  right?
5        MS. GREEN:  Objection.  I -- I actually
6  didn't make a correction.
7        THE WITNESS:  I don't think she said
8  anything.  But in any case, I corrected myself, that's
9  correct.
10  BY MS. BERKE:
11   Q.  Are -- are you saying that Ms. Green didn't say
12  anything to cause you to correct your testimony on that
13  issue?
14   A.  I believe that as I realized I was juxtaposing
15  the after and before that I corrected it.  If she said
16  something, I didn't hear her say something.
17        MS. GREEN:  Also, I know defense counsel
18  requested this in email.  If you're going to be
19  questioning the witness extensively about documents,
20  providing those documents might be helpful.
21        Also, are we marking his report as an
22  exhibit?  I don't know if it was marked, but I know he
23  is referring to it.
24        MS. BERKE:  No, we're not.
25  ///

Page 279

1  BY MS. BERKE:
2    Q.  I'm going to show you the interview summary that
3  Detective Saldate prepared.  And it's RUN 014 through
4  016.
5        MS. GREEN:  Any clue what exhibit number
6  this is?
7        MS. BERKE:  Yeah, I think I do have that.
8        MS. RETTS:  Either 63 or 64, I think.
9        MS. GREEN:  I will check both.
10        MS. BERKE:  Okay.
11        MS. GREEN:  Yep, it's 64.
12        MS. BERKE:  Okay.
13        MS. GREEN:  Okay.
14        MS. BERKE:  Thank you.
15        MS. GREEN:  So 0 -- I'm sorry?
16        MS. BERKE:  So I'll -- I'll clarify.
17  BY MS. BERKE:
18   Q.  I'm going to show you Exhibit 64, Pages RUN 014
19  through 016.  And that is Detective Saldate's supplement
20  that he prepared summarizing his interview of
21  Mr. Running Eagle; okay?
22   A.  Okay.
23   Q.  And look at the underlined portion of RUN 015.
24        And what does that say?
25   A.  Oh, I'm sorry.

Page 280

1    "I again told him that I would try to understand,
2  but he replied that he wanted to remain silent."
3    Q.  And then a little bit below that is where
4  Mr. Running Eagle makes the statement "Just let me
5  fall"; correct?  The statement that you are referring to
6  in your report where you say that Mr. Running Eagle made
7  an incriminating statement?
8    A.  I -- I think that's right.  I'm just --
9    Q.  Yeah, just take your time to find that.
10   A.  Yes.
11   Q.  Okay.  And then go to the last page of the report
12  Detective Saldate prepared concerning his interview of
13  Mr. Running Eagle.
14   A.  Okay.
15   Q.  And look at, I think it's the second-to-last
16  paragraph.
17   A.  All right.
18   Q.  And why don't you read us that paragraph.
19   A.  "At approximately 1625 hours, Sean told me that
20  he wanted an attorney and a psychiatrist and he wanted
21  to remain silent.  I continued to explain to him my
22  position, but finally at 1632 he again asked for his
23  attorney and I then terminated the interview."
24   Q.  So you would agree that the incriminating
25  statement that you claim Mr. Running Eagle made was made



Page 281

1 before invoking his right to counsel; correct?
2      MS. GREEN: Form.
3      THE WITNESS: It was before that statement
4 in -- in Detective Saldate's report, yes.
5 BY MS. BERKE:
6   Q. And so testimony by Detective Saldate that
7 Mr. Running Eagle made this "just let me fall" statement
8 before invoking his right to counsel was accurate
9 testimony; correct?
10      MS. GREEN: Form.
11      THE WITNESS: I -- I think it is somewhat
12 misleading, but as a technical matter it is before he
13 invokes his right to counsel, but after he invokes his
14 right to remain silent.
15 BY MS. BERKE:
16   Q. Okay.
17   A. Which are both Miranda rights.
18   Q. So based on that -- but -- but what -- you don't
19 talk about invoking the right to remain silent in your
20 report. What you say in your report is that, "At the
21 suppression hearing, Detective Saldate testified
22 contrary to his written report that Mr. Running Eagle
23 made incriminating statements before invoking his right
24 to counsel," end quote; correct?
25   A. Correct.

Page 282

1   Q. And you would agree that your statement in your
2 report is inaccurate; correct?
3   A. I --
4      MS. GREEN: Form.
5      THE WITNESS: Technically, it should be
6 right to remain silent.
7 BY MS. BERKE:
8   Q. So the statement in your report is inaccurate;
9 correct?
10      MS. GREEN: Form.
11      THE WITNESS: In that respect, I would agree
12 with you.
13 BY MS. BERKE:
14   Q. So if the question -- or strike that.
15      So let's replace "right to remain silent" with --
16 or I'm sorry.
17      Let's replace "right to counsel" with "right to
18 remain silent." If we changed your report to say
19 Saldate testified contrary to his written report that
20 Mr. Running Eagle made incriminating -- incriminating
21 statements before invoking his right to remain silent,"
22 if Detective Saldate responded that the "just let me
23 fall" statement was made before Mr. Running Eagle
24 invoked his right to remain silent, and Detective
25 Saldate was referring to the final pages -- page of his

Page 283

1 report when he made that statement?
2   A. I think you lost me in your question.
3   Q. Okay. I'll rephrase it. I know. I lost myself,
4 to be perfectly honest.
5      It sounds like what you want to do to correct
6 your report is to say that, at the suppression hearing,
7 Saldate testified contrary to his written report that
8 Mr. Running Eagle made incriminating statements before
9 invoking his right to remain silent; correct?
10   A. Correct.
11   Q. And if when Detective Saldate gave that
12 testimony, he was referring to the last page of his
13 report and saying that "just let me fall" statement was
14 made before Mr. Running Eagle invoked his right to
15 remain silent, he was simply mistaken on that issue;
16 correct?
17      MS. GREEN: Form.
18      THE WITNESS: That would be an argument that
19 could be made, yes.
20 BY MS. BERKE:
21   Q. And isn't it plausible, based on the fact that
22 neither the prosecutor nor the defense attorney acted to
23 correct Detective Saldate's testimony on that issue,
24 that all three of them, Detective Saldate, the defense
25 attorney and the prosecutor, were focused on that last

Page 284

1 page of Detective Saldate's report and believed his
2 testimony to be accurate?
3   A. That's --
4      MS. GREEN: Form.
5      THE WITNESS: It's possible.
6 BY MS. BERKE:
7   Q. In fact, it's plausible; correct?
8      MS. GREEN: Form.
9      THE WITNESS: I'm not willing to go that --
10 far, but I'm certainly willing to acknowledge that it is
11 possible and that would be an argument that could be
12 made for why it wasn't impeachment evidence that should
13 be offered at trial in Ms. Milke's trial. But that's an
14 argument that should be made. It doesn't go to whether
15 or not the evidence should be turned over as Brady or
16 Giglio material.
17 BY MS. BERKE:
18   Q. So would you agree that your opinion that
19 Detective Saldate lied in his testimony in the Running
20 Eagle case has no basis?
21      MS. GREEN: Form. Argumentative.
22      THE WITNESS: I read his testimony that I
23 think it's misleading. I understand an argument could
24 be made that it was merely a mistake or it was -- that
25 he was focusing on something different. But in my



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
285–288

Page 285

1  judgment, it had to be turned over as Giglio material
2  and then you make that argument in a motion to try to --
3  motion in limine to limit cross-examination.
4  BY MS. BERKE:
5     Q.  Okay.  Setting aside the Giglio and Brady issue,
6  I just want to focus on your opinion that Mr. Saldate
7  committed perjury in the Running Eagle case, because
8  that's what you're alleging today; correct?
9        MS. GREEN:  Form.
10        THE WITNESS:  I think he was misleading in
11  his testimony.  That's how I interpreted it.  I'm not
12  saying that he committed perjury, but I think his
13  testimony was misleading.  The critical question was
14  whether or not, in a voluntariness hearing, the
15  statement that Running Eagle made was properly
16  admissible.  And it wasn't properly admissible because
17  it was after he invoked his Miranda right.  And I think
18  that the testimony was misleading in that respect.
19        I understand your argument as to why people
20  could think that he was focused on something different.
21  But by the time that that happens, it's well after he's
22  invoked his Miranda rights and well after the
23  examination should have stopped.  And certainly, that's
24  the whole purpose of a voluntariness hearing.  And
25  presumably, an experienced detective like Detective

Page 286

1  Saldate would have understood that.
2  BY MS. BERKE:
3     Q.  I'm -- I'm going to move to strike as
4  nonresponsive.
5        You would agree that you're not aware of any
6  evidence that Detective Saldate intentionally provided
7  false testimony in the Running Eagle case, are you?
8        MS. GREEN:  Form.
9        THE WITNESS:  All can I tell you is what I
10  looked at the transcript, and I think that it was a
11  misleading in order to try to get a statement into
12  evidence that was inadmissible based upon Miranda
13  violations.
14  BY MS. BERKE:
15     Q.  And what is your -- what is the support for your
16  opinion that Detective Saldate intentionally provided
17  misleading information?
18        MS. GREEN:  Form.
19        THE WITNESS:  It was a voluntariness
20  hearing.  He understood the purpose of the hearing.  The
21  statement that he wanted to get in occurred after the
22  defendant had invoked his right; therefore, it was
23  inadmissible.  But nevertheless, he was able to get the
24  testimony in by misleading the trial court as to when
25  certain things happened.

Page 287

1  BY MS. BERKE:
2     Q.  Okay.  But what is the basis for your concluding
3  that it was intentional on his part?
4     A.  Counsel, I don't have any more than what I just
5  told you.
6     Q.  And you would agree that the prosecutor decides
7  what statements to offer, not the police officer;
8  correct?
9        MS. GREEN:  Form.
10        MS. BURGESS:  Object to form and foundation.
11        THE WITNESS:  Prosecutor asked the
12  questions, and the witness is supposed to answer the
13  questions truthfully.
14  BY MS. BERKE:
15     Q.  You would agree that the prosecutor looks at the
16  law to determine if he or she is going to offer certain
17  statements; correct?
18        MS. BURGESS:  Form.
19        MS. GREEN:  Form.
20        THE WITNESS:  Yes, I would say the
21  prosecutor has to make a determination as to whether he
22  or she believes the evidence is admissible before asking
23  the question to try to elicit the admissible -- the
24  admission of the evidence.
25  ///

Page 288

1  BY MS. BERKE:
2     Q.  And you would agree that if the prosecutor
3  determines that certain information under the law is not
4  admissible and instructs the detective not to go into
5  certain areas, that it is reasonable for the detective
6  to follow those instructions; correct?
7        MS. GREEN:  Form.
8        MS. BURGESS:  Form.  Foundation.
9        THE WITNESS:  I would expect that if I told
10  a witness not to go into certain areas because either
11  the court had ruled they were inadmissible or because
12  the court had ruled that they were taken in violation of
13  a constitutional right, I would expect the witness to
14  follow my instructions.
15  BY MS. BERKE:
16     Q.  But even absent a court ruling, if the prosecutor
17  determined that statements were taken in violation of
18  Miranda and instructed the detective that they couldn't
19  go into information that was provided after that Miranda
20  violation, you would expect the detective to follow
21  those instructions; correct?
22        MS. GREEN:  Form.
23        THE WITNESS:  I thought that's what I just
24  said.  If the prosecutor concluded that the evidence
25  couldn't come in because it was a Miranda violation or



RICHARD DROOYAN                                    September 12, 2018
MILKE vs CITY of PHOENIX                                      289–292

Page 289
1  because the court had ruled it was a Miranda violation,
2  or for whatever reason, I -- I would expect the agent or
3  the officer to follow the prosecutor's instructions.
4  BY MS. BERKE:
5     Q.  And you would agree that by following those
6  instructions and not providing testimony about
7  information obtained following what the prosecutor
8  viewed as a Miranda violation, the officer wouldn't be
9  lying by following those instructions?
10       MS. GREEN:  Form.
11       THE WITNESS:  As a general matter, I expect
12  a witness to follow the directions of the prosecutor as
13  to what evidence the witness can testify about or not
14  testify about.  I don't think a witness can simply flat
15  out falsely testify about something in the grand jury
16  based upon purported instructions from the prosecutor
17  because that would implicate both of them in potential
18  obstruction and potential jury and potentially
19  supporting perjury.  So I'm not quite sure how to answer
20  your question.
21       If your question is, as a general matter, do
22  prosecutors make a determination as to what questions to
23  ask and what evidence is admissible, yes.  And do they
24  on occasion instruct a witness that they should not go
25  into a certain area because, usually, in my experience,

Page 290
1  the court has ruled it to be inadmissible or the court
2  has determined that there is a constitutional violation,
3  I expect the witness to follow that.
4       I also expect the prosecutor not to be
5  asking questions that elicits a half-answer that's false
6  in the absence of the additional information.  So I -- I
7  put a large portion of the responsibility on the
8  prosecutor, but you can't have a witness testify halfway
9  in a way that's simply false and then say the prosecutor
10  made me do it.
11  BY MS. BERKE:
12     Q.  Well, you agree that it's appropriate for the
13  detective to follow whatever the prosecutor's
14  instructions are with respect to the detective's
15  testimony; correct?
16       MS. BURGESS:  Form.
17       MS. GREEN:  Form.
18       MR. BURGESS:  Foundation.
19       THE WITNESS:  Not completely.  I give you
20  the most extreme.  If a prosecutor told a -- a detective
21  or an agent or officer that he wanted him to testify
22  falsely in front of a grand jury, that it's the
23  obligation of that witness to say, that's not true, and
24  then to say, and I'm not going to testify that way.  And
25  if the prosecutor insists, that just simply goes up to

Page 291
1  the superiors in the office to deal with it.
2       But if -- if an agent thinks he's being
3  asked to testify in a way that is not true, it's
4  incumbent upon agent to say so.
5  BY MS. BERKE:
6     Q.  Okay.  So let me be more specific then.
7       If the prosecutor's instructions to the detective
8  were, any information you obtained from the suspect
9  after the suspect made this statement invoking his right
10  to remain silent or his right to counsel -- strike that.
11  I got to start over.  I'm -- ah.
12     A.  We're all getting tired.
13       MS. GREEN:  Are you okay?  Do you need a
14  break?
15       THE WITNESS:  I'm fine.  I'm fine.
16       MS. GREEN:  I know it's been a long day.
17  BY MS. BERKE:
18     Q.  So you would agree that if the prosecutor's
19  instructions to the detective were, you cannot testify
20  regarding any statements that were made after the
21  suspect invoked his right to remain silent or his right
22  to counsel, it would be reasonable for the detective to
23  follow those instructions?
24     A.  I would --
25       MS. GREEN:  Form.

Page 292
1       THE WITNESS:  I'm sorry.
2       I would agree with that.
3  BY MS. BERKE:
4     Q.  And by following those instructions and omitting
5  information that was obtained by the detective following
6  that invocation of the right to remain silent or the
7  right to counsel, the detective would not be lying;
8  correct?
9       MS. GREEN:  Form.
10       THE WITNESS:  I hesitate -- I -- I don't
11  think the detective would be lying unless the detective
12  said something false before cutting off the testimony.
13  But the presumption that everything the detective has
14  said up until the invocation -- until he relates about
15  the invocation is truthful testimony, then I agree with
16  you.
17  BY MS. BERKE:
18     Q.  Okay.  Earlier you testified that you didn't
19  believe that in your report you accused Detective
20  Saldate of lying; correct?
21     A.  I didn't recall specifically using that term, no.
22     Q.  So -- my microphone fell off.
23       Take a look at Page 25 of your report.
24       MS. GREEN:  Just give me a moment, I just
25  have to get to a different folder to pull it up.

Page 293

1        MS. BERKE:  Sure.
2        MS. GREEN:  All right.  Sorry about that.
3  I've -- I've got it.
4        MS. BERKE:  Okay.
5  BY MS. BERKE:
6    Q.  Looking at Page 25 of your report, the second
7  full -- well, the paragraph that starts out "As in."
8        Do you see that?
9    A.  Yes.
10   Q.  You state, quote, "As in Running Eagle, there is
11  evidence that Saldate lied under oath regarding
12  Mr. King's invocation," end quote.
13       Did I read that correctly?
14   A.  You did.
15   Q.  So you would agree that in your report you are
16  accusing Detective Saldate of having lied in both his
17  testimony in Running Eagle and in King; correct?
18       MS. GREEN:  Form.
19       THE WITNESS:  I -- I think what I am saying
20  here is that there is evidence that he lied, that that
21  is what a defense counsel would certainly argue.  As you
22  look down in that paragraph, Mr. Rude is the -- from the
23  Maricopa County Attorney General's -- Maricopa County
24  Attorney's Office is -- acknowledges that that's one
25  possible explanation for his testimony, and that another

Page 294

1  that it was a mistake.  And then -- and then I point out
2  that defense counsel in future cases would undoubtedly
3  try to show through cross-examination of him that it was
4  intentional lie.
5        So there is evidence from which one could
6  draw that conclusion and that I would expect a defense
7  attorney in other cases to try to draw that conclusion
8  and make that argument through cross-examination.  And I
9  would expect a prosecutor such as Mr. Rude to try just
10  argue that it was a mistake.
11  BY MS. BERKE:
12   Q.  Is it your opinion that Detective Saldate lied in
13  his testimony in the Running Eagle case?
14       MS. GREEN:  Form.
15       THE WITNESS:  He testified falsely, and I
16  think he was trying to testify so that he could get the
17  evidence -- get the statements into evidence.  So
18  certainly I would make that argument that he was lying
19  when he said -- when he testified as to when the
20  statement was made.
21  BY MS. BERKE:
22   Q.  What is your basis for concluding that he lied to
23  get the statement in?
24   A.  Because that was the only reason to try to -- to
25  make the statement that he made was so that he could get

Page 295

1  the -- the evidence in.  Remember it's -- it's an
2  invocation.  Once you invocate -- once you -- once you
3  assert your right to remain silent and right to an
4  attorney, the questioning has to cease.  Any statements
5  that are made as a result of the questioning that occurs
6  afterwards is not admissible.  So the whole purpose of
7  the voluntariness hearing is to determine what
8  statements could come into evidence.  And he made
9  that -- his testimony about when the invocation occurred
10  in order to get the statements that were made afterwards
11  into evidence.
12   Q.  But what's -- what evidence do you have of that?
13   A.  To me, it's just a conclusion that you draw from
14  the purpose of the hearing and the purpose of the
15  testimony.
16   Q.  And would that be sufficient to convict of
17  perjury?
18       MS. GREEN:  Form.
19       THE WITNESS:  I wouldn't charge him based
20  upon that, if that's what your question is.
21  BY MS. BERKE:
22   Q.  Why wouldn't you charge him with this?
23   A.  In isolation.  If I had a series of those kinds
24  of incidents over time, I might very well think about
25  filing a perjury charge.  But in and of itself, I

Page 296

1  wouldn't -- I wouldn't do it.
2    Q.  Well, you would agree that there isn't sufficient
3  evidence to charge Detective Saldate with perjury in the
4  Running Eagle case; correct?
5        MS. GREEN:  Form.
6        THE WITNESS:  Just on the base on that,
7  yeah.  On the basis of what you seen, I agree.  Just the
8  basis on that case, yes.
9  BY MS. BERKE:
10   Q.  Did -- and you -- strike that.
11       In your opinion, did the prosecutor fail to
12  direct Detective Saldate to the other portion of his
13  report where he recites that Mr. Running Eagle invoked
14  his right to remain silent before the "just let me fall"
15  statement intending to get a statement in that shouldn't
16  come in?
17       MS. GREEN:  Form.
18       MS. BURGESS:  Form.  Foundation.
19       THE WITNESS:  If I understand your question,
20  I think the prosecutor should have put the report in
21  front of him and had him explain the basis of his -- of
22  his testimony.  And -- and I think a prosecutor should
23  have done the same thing in the King case.  But the
24  prosecutor didn't do it in -- in either case.
25  ///



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
297–300

Page 297

1  BY MS. BERKE:
2     Q.  Right.  But with respect to Detective Saldate,
3  have you testified that it's your opinion that that was
4  intentional on his part; correct?
5           MS. GREEN:  Form.
6           THE WITNESS:  I think he -- let's take this
7  King testimony.
8  BY MS. BERKE:
9     Q.  No, let's talk about Running Eagle.
10    A.  I think Running Eagle was the same thing.  I
11  think he testified and I think he intended to mislead in
12  order to get that statement into evidence even though it
13  was clearly after Running Eagle had invoked.
14    Q.  And so my question is, was it intentional on the
15  part of the prosecutor in not directing Detective
16  Saldate to the portion of his report where
17  Mr. Running Eagle initially invoked his right to remain
18  silent to get statement into evidence?
19           MS. BURGESS:  Foundation.
20           THE WITNESS:  I -- I don't know what the
21  prosecutor was thinking when he -- when the testimony
22  came in.
23  BY MS. BERKE:
24    Q.  But you don't know what Detective Saldate was
25  thinking either, do you?

Page 298

1     A.  Based upon what I saw in the record and what he
2  testified to, and that's my opinion.
3     Q.  Right.  But you don't know what Detective Saldate
4  was thinking just like you didn't know what the
5  prosecutor was thinking; correct?
6     A.  Other than the fact that I've seen half a dozen
7  cases in which I found what I believed to be some
8  misconduct on the part of Detective Sal- -- Saldate.  So
9  I guess my opinion is based upon the cumulative record
10  of what I've seen, and I'm not sure that the prosecutor
11  in that case necessarily saw everything that I've seen.
12        So I guess I'm not looking just in isolation --
13  isolation.  I've seen what I think is false testimony in
14  several cases.  I've seen an officer who has repeatedly
15  violated suspects' Miranda rights and then has done so
16  knowingly and intentionally.  And so I guess it's the
17  cumulative effect of everything that I've seen that
18  has -- leads me to the conclusion that I've given you.
19    Q.  In each and every instance where you have
20  concluded that Detective Saldate violated a suspect's
21  Miranda rights, he was truthful about his conduct;
22  correct?
23           MS. GREEN:  Form.
24           THE WITNESS:  In some cases he was truthful.
25  And then certainly I don't think he was necessarily

Page 299

1  truthful in -- and certainly not in King, and I don't
2  think he was necessarily truthful in Running Eagle.
3  BY MS. BERKE:
4     Q.  In terms the suspect invoking his right to remain
5  silent?
6     A.  I think maybe -- if you're asking me did he write
7  it down in his report, the answer is yes, he wrote it
8  down in his report.
9     Q.  Right.
10    A.  I misunderstood your question.
11    Q.  Okay.  So let me reask.  You would agree that in
12  every instance where you have concluded that Detective
13  Saldate violated a suspect's Miranda rights, Detective
14  Saldate truthfully recorded what his actions were --
15           MS. GREEN:  Form.
16  BY MS. BERKE:
17    Q.  -- correct?
18    A.  He wrote it down in his report as to what -- what
19  occurred and that the -- the -- and I believe that he
20  wrote it down truthfully because I believe that when he
21  testified, his testimony was not truthful.
22    Q.  And would you agree that you haven't seen any
23  evidence of Detective Saldate violating a suspect's
24  Miranda rights where he lied about that in his report?
25           MS. GREEN:  Form.

Page 300

1           THE WITNESS:  I think there is some evidence
2  in the, I think it's the Gallegos case in which Gallegos
3  claimed that he invoked and Saldate I don't think wrote
4  that down.  Now, so there's at least some evidence, but
5  it's a -- not a swearing contest, but there -- there are
6  different versions as to what had occurred, at least in
7  the Gallegos case that I'm aware.
8  BY MS. BERKE:
9     Q.  And you would agree that there was no court
10  determination or jury determination that Detective
11  Saldate testified falsely on that issue; correct?
12           MS. GREEN:  Form.
13           THE WITNESS:  I -- I believe that's correct.
14  BY MS. BERKE:
15    Q.  And there's no court finding or jury finding that
16  Detective Saldate falsely recited anything on that
17  subject in his report concerning his interview of
18  Mr. Gallegos; correct?
19           MS. GREEN:  Form.
20           THE WITNESS:  There is no court finding, if
21  that's what your question is.  I think that's right.
22  BY MS. BERKE:
23    Q.  Or jury finding?
24    A.  Or jury finding.
25    Q.  Did Ms. Milke's attorneys draft this paragraph at



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018

301–304

Page 301

1  Page 25 of your report that starts out, "As in
2  Running Eagle"?
3        MS. GREEN:  I am instructing the witness not
4  to answer questions regarding drafts as they're
5  privileged under Rule 26.
6  BY MS. BERKE:
7    Q.  How many cases total did Detective Saldate
8  testify in over the course of his career?
9    A.  I don't know.
10   Q.  How many homicide cases did Detective Saldate
11  testify in over the course of his career?
12   A.  I don't know.
13   Q.  You have no idea whatsoever?
14   A.  I have no idea.
15   Q.  Do you agree that reasonable legal minds can
16  differ as to whether a particular statement is
17  invocation of the right to remain silent or the right to
18  counsel?
19       MS. GREEN:  Form.
20       THE WITNESS:  What's a legal mind?
21  BY MS. BERKE:
22   Q.  Judges, attorneys.
23   A.  Okay.  I think different lawyers coming at
24  something from different perspectives and different
25  perspective from the judge, they could see things

Page 302

1  differently.
2    Q.  And different judges see things differently in
3  terms of whether a particular statement constitutes an
4  invocation of the right to remain silent or the right to
5  counsel; correct?
6        MS. GREEN:  Form.
7        THE WITNESS:  I mean, I guess most courts
8  are going to find a -- any statement that is reasonably
9  susceptible to an interpretation that the suspect is
10  invoking to be an invocation of the right to remain
11  silent and the right to attorney.  So I think that's how
12  most courts come to it.  And -- and I think a prosecutor
13  has to understand how courts are going to look at it in
14  making the determination as to whether or not there was
15  an invocation of the right to remain silent.
16       But my experience has been that most of the
17  time, unless it's really so ambiguous and convoluted
18  that you don't know what the person is saying, that
19  courts find, if it's reasonably susceptible to a -- an
20  invocation, that they find it an invocation.
21  BY MS. BERKE:
22   Q.  But you would agree that there are instances
23  where judges disagree as to whether a particular
24  statement constitutes an invocation of the right to
25  remain silent or the right to counsel; correct?

Page 303

1    A.  I'm sure -- I'm sure there are some instances in
2  which -- well, I -- I -- I'm sure that there are
3  instances in which judges disagree with prosecutors
4  and -- and instances in which judges disagree with
5  defense counsel.  So in -- in that sense, the answer is
6  yes, judges don't necessarily agree with the litigants
7  with respect to issues such as invocation.
8    Q.  You would agree that are also instances where
9  judges don't agree with other judges as to whether a
10  particular statement constitutes invocation of the right
11  to remain silent or the right to counsel; correct?
12       MS. GREEN:  Form.
13       THE WITNESS:  You know, without having
14  something specifically in mind, I -- I presume that if
15  we do -- did enough research we would find some cases in
16  which courts of appeals have reversed trial courts on
17  these issues.  I -- I -- I don't know that it happens
18  that often, but I presume that there are some times
19  where the judges, I'd say, on the Ninth Circuit overrule
20  a -- a district court judge that has held that the
21  statements are admissible.
22  BY MS. BERKE:
23   Q.  I don't think we have to go any further than your
24  report.  So let's to Page 28 of your report where you
25  talk about the Moller case.

Page 304

1        You remember that case?
2    A.  Right.
3    Q.  And in that case, the trial court denied
4  Mr. Moller -- Mr. Moller's motion to suppress, finding
5  that Detective Saldate did not violate Miranda; correct?
6    A.  Trial court found that he didn't and the Court of
7  Appeals found that he did.
8    Q.  Right.  So that's an instance where you have
9  judges disagreeing as to whether a particular statement
10  made by a suspect constitutes an invocation of the right
11  to remain silent or the right to counsel; correct?
12   A.  That's what I just said.  It -- that would be an
13  example of a Court of Appeals overruling the district
14  court's determination or the trial court's determination
15  as the invocation and the admissibility of the
16  testimony.
17   Q.  Right.  And to make it in simpler terms, judges
18  disagreeing on that issue; correct?
19       MS. GREEN:  Form.
20       THE WITNESS:  In that case, they certainly
21  did.
22  BY MS. BERKE:
23   Q.  And so whatever -- or strike that.
24       So the fact that Detective Saldate continued
25  questioning Mr. Moller after Mr. Moller made the



RICHARD DROOYAN
September 12, 2018
MILKE vs CITY of PHOENIX
305–308

Page 305

1  statement that was the subject of that motion to
2  suppress wouldn't be misconduct if the trial judge
3  believed that the statement wasn't an invocation of the
4  right to remain silent or the right to counsel; correct?
5      MS. GREEN:  Form.
6      THE WITNESS:  I'd have to look at the
7  evidence and how clear the invocation was and what
8  statements came before and after ultimately to reach
9  that conclusion.  But the fact that a trial court did
10 not find there to be a Miranda violation would certainly
11 be supportive of an argument that he didn't
12 intentionally violate Miranda in that situation.
13 BY MS. BERKE:
14   Q.  The section of your report starting at Page 28
15 and ending at Page 29 on the Moller case, did
16 plaintiff's counsel draft that?
17     MS. GREEN:  I'm instructing the witness not
18 to answer the questions regarding drafts.  He's already
19 answered multiple questions regarding the drafting
20 process, and I believe defense counsel have indicated
21 that they wish to take the matter to the court.
22     MS. RETTS:  And I would also add that
23 United States Wall versus Vista Hospice Care supports
24 our position.
25 ///

Page 306

1  BY MS. BERKE:
2    Q.  Going back to Pages 22 through 24, the section on
3  the Running Eagle case, did plaintiff's counsel draft
4  that section?
5      MS. GREEN:  Instructing the witness not to
6  answer --
7  BY MS. BERKE:
8    Q.  Going to --
9      MS. GREEN:  -- from previous discussions and
10 the dispute that's been stated on the record --
11 BY MS. BERKE:
12   Q.  Going to --
13     MS. GREEN:  -- multiple times.
14     MS. BERKE:  Sorry.  I keep thinking you're
15 finished.
16     MS. GREEN:  Sorry, no.  I'm talking very
17 calmly and slowly.
18 BY MS. BERKE:
19   Q.  Page 24 through 25, the section on the King case,
20 did plaintiff's counsel draft that section?
21     MS. GREEN:  I'm instructing the witness not
22 to answer, given the impermissible -- that the question
23 calls for protected testimony.
24     MS. RETTS:  I would also add that in
25 addition to the other cases, MD versus United States,

Page 307

1  2010, U.S. District Lexis 148312 supports our position.
2      MS. GREEN:  Because we're in the midsts of a
3  deposition, I'm not going to be searching Westlaw right
4  now to look at the cases Tina read out.  But feel free
5  to -- I'm going to be continuing to object and listen to
6  the testimony.
7      MS. BERKE:  Okay.  So once I finish my
8  questioning, if you want to take a break and review the
9  cases that Ms. Retts has identified to reassess your
10 position, I'd encourage you to do that because, as
11 Ms. Retts said earlier, if we go before the court on
12 this issue and the court agrees with our position, we're
13 going to ask the court to order plaintiff, or
14 plaintiff's counsel to pay the expense for us to come
15 back and finish this deposition.
16     MS. GREEN:  I have heard what you've just
17 said, and I'm encouraging you to continue asking the
18 witness questions as I think -- I think I'm actually
19 going to request a time check pretty soon.  I think
20 we're within the last hour of the deposition.  And I
21 believe we've gone over six -- certainly over six hours
22 at this point.  We can take a break -- break to check
23 it, but we are going to stopping the dep at seven hours.
24     MS. RETTS:  So it is your position that a --
25 a deposition is only seven hours total; is that your

Page 308

1  position?
2      MS. GREEN:  Seven.
3      MS. RETTS:  Versus seven hours per side?
4  Because --
5      MS. GREEN:  Seven hours on the record.  We
6  can check the record, if you want, for how long.  But as
7  we've been going through these deps, both, we've been --
8  yes, it's our position you have seven hours on the
9  record, all defense counsel.  And, in fact, it was
10 represented to us before that the city wasn't taking his
11 deposition, so, and that the county was, but here we
12 are.
13     MS. BURGESS:  All counsel get to ask
14 questions in the course of the deposition.  That doesn't
15 mean they are taking the deposition.  It just means that
16 they're addressing issues that came up.
17     MS. RETTS:  I just want to clarify
18 because --
19     MS. GREEN:  Respectfully, I don't want to
20 get into an argument with you guys on the record.
21     MS. RETTS:  Yeah, I just --
22     MS. GREEN:  My position is after we're seven
23 hours on the record, it's plaintiff's position that
24 the -- under the rules, the deposition is complete.  And
25 I think that's consistent with the position we've taken



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
309–312

Page 309

1  this entire litigation and there have been many, I mean,
2  I think now over 30 depositions.
3       So in any -- for the purposes of this
4  deposition -- for the purposes of this deposition, after
5  seven hours, we are going to object to further
6  questions.  Okay.
7       MS. RETTS:  And it's -- I just want to, just
8  for point of clarification, just for the record, is that
9  your seven hours you're interpreting as the entire
10  defense side, regardless of who initiated the
11  questioning.
12       MS. GREEN:  For the purposes of this
13  deposition, we object to further questioning by any
14  defense counsel beyond seven hours on the record.
15       And if it's okay for us to take a brief
16  30-second break right now for the time to be checked, I
17  would appreciate that courtesy.
18       MS. BERKE:  Okay.  And just for the record,
19  there has been a substantial amount of discussion
20  regarding objections and that kind of thing, and it's
21  our position that that does not count toward our
22  questioning --
23       MS. GREEN:  It's our position that it does.
24       MS. BERKE:  Okay.
25       MS. GREEN:  And again, I've asked for a

Page 310

1  30-second break to check the time, and I would like, if
2  you would, please respond and --
3       MS. RETTS:  Yes.
4       MS. GREEN:  -- see if we -- and we can go
5  off record for the purpose of that.
6       MS. BERKE:  Yes, that's fine.
7       THE VIDEOGRAPHER:  Off the record then,
8  Counsel?
9       MS. BERKE:  Yes.
10       THE VIDEOGRAPHER:  We're off the record.
11  The time is 6:12 p.m.
12       (Recess.)
13       THE VIDEOGRAPHER:  This marks the start of
14  Media Unit 5.  We are on the record at 6:17 p.m.
15  BY MS. BERKE:
16    Q.  Section -- the section of your report starting at
17  Page 29 and ending on Page 30 regarding the Sherman
18  case, did plaintiff's counsel draft that section?
19       MS. GREEN:  Instructing the witness not to
20  answer.  Objecting on privilege grounds for the reasons
21  previously discussed.
22  BY MS. BERKE:
23    Q.  With respect to the Sherman case, you recall what
24  case that is?
25    A.  Yes, generally.

Page 311

1    Q.  Do you have any basis for concluding that this
2  matter would not have been turned down for prosecution
3  had Detective Saldate not conducted an interview of
4  Mr. Sherman?
5       MS. GREEN:  Form.
6       THE WITNESS:  Can you point me what page
7  you're quoting from?
8  BY MS. BERKE:
9    Q.  Pages 29 and 30 of your report, you address the
10  Sherman case.
11    A.  Okay.  And your question is now?
12    Q.  You read that turn down memo; correct?
13    A.  Yes.
14    Q.  And do you have any basis for concluding that
15  Sherman would not have been turned down for prosecution
16  had -- had Detective Saldate not conducted an interview
17  of Mr. Sherman?
18       MS. GREEN:  Form.
19       THE WITNESS:  I'm not sure I reached that
20  conclusion, but -- I guess I'm not sure I understand
21  your question.
22  BY MS. BERKE:
23    Q.  You understand that there was a -- what -- well,
24  tell us what you recall about the turn down memo from
25  Sherman.

Page 312

1    A.  I recall there was a turn down memo and I -- when
2  I went through it, I thought there were five and
3  possibly even six factors that were directly tied to the
4  interview of Sherman by Saldate.
5    Q.  Let me show it to you.
6       So this is Exhibit Number 62.  I'm going to show
7  you the page that is Bates marked C_026025.  And that
8  lists the reasons for the turn-down; correct?
9    A.  Yes, I believe so.
10    Q.  And my question is, well, how many of those
11  relate to Detective Saldate's interview of Mr. Sherman?
12    A.  Defendant said he had not understood his Miranda
13  rights; that's one.  Defendant highly intoxicated with
14  interview; that's two.  Defendant crawled under a table
15  to get out of the light.  Arguably that relates to his
16  condition at the time he was being interviewed.
17       The next one is the victim's blood alcohol is --
18  the way I read this is victim's blood alcohol content of
19  .27, so that was not the defendant, that was the victim.
20       Defendant's statements are inconsistent with how
21  crime occurred.  Blah, blah, blah.  And so I think that
22  relates to the interview.
23       No likelihood of conviction, that's not correctly
24  related to the interview.  It's basically related to the
25  absence of sufficient evidence, I presume, to sustain a



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
313—316

Page 313

1  conviction.
2      Good possibility that defendant's -- something
3  inadmissible. I think that's his -- defendant's
4  statements are inadmissible. And that -- that relates
5  to the interview.
6      And that insufficient evidence to prove -- I
7  think that's the word -- defendant's guilt beyond a
8  reasonable doubt. That's sort similar to no likelihood
9  of conviction. So I -- I -- that's not directly
10 relate -- related to the interview.
11     So I have one, two, three, four, five of the
12 eight I think are related to the interview.
13   Q. Okay. You would agree that if there was
14 sufficient evidence for there to be a likelihood of
15 conviction of Mr. Sherman, separate and distinct from
16 anything he said to Detective Saldate during his
17 interview, the prosecution could go forward; correct?
18   A. Yes. If they had enough evidence from which a
19 prosecutor was able to conclude that they had a
20 reasonable chance of conviction, they -- apart from any
21 statements that Mr. Sherman would make or made, then
22 they could prosecute the case.
23   Q. Right. So anything detective -- any statements
24 that Detective Saldate elicited from Mr. Sherman during
25 his questioning of him did not place the state in any

Page 314

1  different position than it would have been had Detective
2  Saldate not spoken with Mr. Sherman at all; correct?
3    A. In the sense of looking at how much evidence they
4  had to be able to prosecute Mr. Sherman, I would agree
5  with you.
6       MS. GREEN: And, Lori, I'm sorry to
7  interject, but just in case this affects your line of
8  questioning, I'm happy to allow a 10 additional extra
9  minutes beyond seven hours on the record to account for
10 any discussions among counsel where you weren't able to
11 question the witness --
12      MS. BERKE: Okay.
13      MS. GREEN: -- during that time.
14      MS. BERKE: Thank you.
15 BY MS. BERKE:
16   Q. You would agree that you're not aware of a single
17 case where a court has determined that Armando Saldate
18 knowingly or intentionally made a false statement under
19 oath; correct?
20      MS. GREEN: Form.
21      THE WITNESS: I -- I think the Ninth Circuit
22 decision in the Milke case reaches that conclusion. If
23 you're saying apart from that, I would agree with you.
24 ///
25 ///

Page 315

1  BY MS. BERKE:
2    Q. Let me rephrase my question.
3      You're not aware of a single case in which
4  Detective Saldate testified -- let me start that over.
5      Let's set aside the Milke case --
6    A. Okay.
7    Q. -- where we have the Ninth Circuit decision;
8  okay?
9    A. Okay.
10   Q. You would agree that you're not aware of a single
11 case where a court has determined that Detective Saldate
12 knowingly or intentionally made a false statement under
13 oath; correct?
14      MS. GREEN: Form.
15      THE WITNESS: I would say that not in so
16 many words. I think the Reynolds decision by the trial
17 court finding that there was not a fair presentation
18 certainly relates to his testimony, which I think was
19 false, regarding the description of the suspect and the
20 time that the little boy saw the suspect. But apart
21 from that, I'm unaware of any case that -- in which a
22 court had specifically found that he intentionally lied.
23 BY MS. BERKE:
24   Q. And you would agree that in the court's decision
25 in the Reynolds case, the court didn't state that

Page 316

1  Detective Saldate knowingly and intentionally made a
2  false statement under oath; correct?
3      MS. GREEN: Form.
4      THE WITNESS: I would agree with you that
5  the court did not use those words.
6  BY MS. BERKE:
7    Q. Let's talk about the Jones case. That case is
8  addressed in -- or at Pages 31 and 32 of your report;
9  correct?
10   A. Correct.
11   Q. Did plaintiff's counsel draft that portion of
12 your report?
13      MS. GREEN: Objection. I'm instructing the
14 witness not to answer that question.
15 BY MS. BERKE:
16   Q. You would agree that Detective Saldate had no
17 involvement in Mr. Jones being handcuffed to a table;
18 correct?
19   A. He didn't order him to be handcuffed, as far as I
20 know.
21   Q. And you would agree that Detective Saldate did
22 not instruct anyone to place Mr. Jones in a room that
23 that was locked; correct?
24      MS. GREEN: Form.
25      THE WITNESS: I'm not aware of him directing



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
317–320

Page 317

1 that the door be locked.
2 BY MS. BERKE:
3   Q. You would agree that -- strike that.
4     Do you know what Detective Saldate's involvement
5 was in having Mr. Jones placed in a room?
6   A. I believe he directed another officer to place --
7 to separate him from the other suspect and place him in
8 an interview room.
9   Q. Right. And you would agree that that, in and of
10 itself, is not an arrest; correct?
11   A. If --
12     MS. GREEN: Form.
13     THE WITNESS: If he wasn't free to leave, it
14 constitutes an arrest.
15 BY MS. BERKE:
16   Q. Well, what are the fact in what you just stated
17 where he was not free to leave?
18   A. As I understand from the Court of Appeals, they
19 found that he was under arrest. I'm just saying that if
20 you place him in an interview room and that -- and he's
21 not free to leave, it constitutes an arrest. Whether or
22 not the door is locked, whether or not he's handcuffed,
23 if he's not free to leave, under the -- the law, it
24 constitutes an arrest.
25   Q. Okay. But just with the facts that Detective

Page 318

1 Saldate communicated to another officer that he wanted
2 Mr. Jones separated from the suspect and other witnesses
3 and placed in an interview room, just those facts, you
4 would agree that that, in and of itself, without more,
5 does not constitute an arrest?
6     MS. GREEN: Form.
7     THE WITNESS: Unless he told the suspect
8 that he was free to leave, I would not necessarily agree
9 with your conclusion.
10 BY MS. BERKE:
11   Q. So it's your testimony that a police officer has
12 to expressly state to an individual that they are free
13 to leave, otherwise they are not free leave and it's an
14 arrest?
15   A. If --
16     MS. GREEN: Form.
17     THE WITNESS: If you want to be careful and
18 make sure that the defendant or the suspect doesn't
19 think that he's under arrest, you better tell him that
20 he's free to leave. If you place him in an interview
21 room, you close the door on him, I think most suspects
22 are going to conclude that they're not free to leave,
23 which, therefore, constitutes an arrest for purpose of
24 his Fourth Amendment, Fifth Amendment -- I'm getting
25 tired, but one of those amendments --

Page 319

1     THE REPORTER: I'm sorry, I can't hear you.
2     THE WITNESS: It's either Fourth Amendment,
3 Fifth Amendment, but I'm -- as I said, I'm getting a
4 little tired on that. But I think it -- I think --
5 and -- and this is what I think the courts concluded,
6 was you -- you put him in that room and you have a -- a
7 department policy that requires him to be handcuffed and
8 you lock the door on him. And you're the lead detective
9 and you're directing all of this, that constitutes an
10 arrest.
11     And I think both of the courts were critical
12 of the department, and the second court in particular
13 was critical of him by name.
14 BY MS. BERKE:
15   Q. You would agree that neither the trial court nor
16 the Court of Appeals concluded that Detective Saldate
17 himself engaged in any misconduct; correct?
18     MS. GREEN: Form.
19     THE WITNESS: I would need to look at the
20 Court of Appeals decision in particular before I can
21 answer that yes or no.
22 BY MS. BERKE:
23   Q. Okay. Let me pull it up for you, if you could
24 hand me my iPad.
25     MS. GREEN: I'm just going to pass that over

Page 320

1 to you.
2     MS. BERKE: Sure. Thanks.
3     THE WITNESS: Hold on a second, I might be
4 able to answer it by looking at this report.
5     I think the Court of Appeals -- and I -- and
6 I'll just read it to you because I -- I found it. It's
7 at Footnote 4 of my report.
8     "Defendant was not isolated and detained by
9 accident. Detective Saldate admits not only to
10 directing placement of defendant in the room, but also
11 to having absolutely no information linking him to any
12 crime at that time. The police conduct did not involve
13 an arguable mistake. This was purposeful arrest lacking
14 in probable cause for the improper motive of
15 investigation. Manner of detention, handcuffing alone
16 increased the flagrancy and the coercive nature."
17     To me, I mean, that seems to me to be
18 directed at Saldate and -- and nobody else, frankly.
19 BY MS. BERKE:
20   Q. You -- you would agree that it's appropriate to
21 separate suspects and witnesses to a crime; correct?
22     MS. GREEN: Form.
23     THE WITNESS: If you're -- let's -- let's
24 break this apart. It's -- it is -- there's nothing
25 improper in -- in taking witnesses and separating them



Page 321

1  from suspects and other witnesses, for that matter, and
2  there's nothing improper in separating suspects.  The
3  issue is, is whether by separating suspects and placing
4  them in particular circumstances you have placed them
5  under arrest.  And -- and there -- there's nothing
6  improper in doing that as long as you have probable
7  cause.
8          And what the Court of Appeals found is that
9  it was misconduct, and it was flagrant misconduct to
10  separate them, to put him in that room, isolate him
11  without having any probable cause for the purposes of
12  trying to elicit a confession.  That's what the Court of
13  Appeals is saying in the Jones case, and it is directed
14  at Saldate.  It isn't directed at any of the other
15  officers who were involved in this.
16  BY MS. BERKE:
17    Q.  You would agree there is no express finding by
18  the court that Detective Saldate engaged in misconduct;
19  correct?
20        MS. GREEN:  Form.
21        THE WITNESS:  I guess I disagree with you.
22  I -- I read the court's comments in singling out him by
23  name as a statement that he engaged in misconduct.
24  BY MS. BERKE:
25    Q.  Okay.  Do you have -- do you have any other basis

Page 322

1  other than what is stated in the Court of Appeals
2  decision?
3    A.  No.  I don't think I need any other basis other
4  than what the court wrote and who -- who the court
5  identified in the police department as being responsible
6  for the illegal arrest.
7    Q.  Going to the Rodriguez case, the case in which
8  the transcript stated that -- the transcript from the
9  grand jury proceeding stated that the deceased was shot
10  four times.
11        Do you recall that case?
12    A.  Correct.  Right.
13    Q.  You would agree that what the court stated in its
14  order granting the motion for redetermination of
15  probable cause is that the court reporter's notes
16  matched the transcript; correct?
17        MS. GREEN:  Form.
18        THE WITNESS:  I think that's what the court
19  said.  The -- the court -- there was an argument that
20  the court reporter got it wrong.  And the -- the court,
21  I -- as I read it, directed the court reporter to check
22  her notes, and her notes were consistent with the
23  transcript.  And that was the -- and the court said --
24  and then basically, therefore, the court found that he
25  testified as to one shot and -- and there were four

Page 323

1  shots, or the other way around.  But basically his
2  testimony was inconsistent with the undisputed evidence
3  as to the number of shots.
4  BY MS. BERKE:
5    Q.  You would agree that the court's order does not
6  state that Armando Saldate testified incorrectly; right?
7    A.  I -- I don't know how you can reach any
8  conclusion other than the court finding that the
9  transcript -- that this is what the court reporter said
10  he -- he testified to.  They double-checked to see if
11  the notes were consistent with the transcript.  They
12  matched.  And they -- therefore, in my judgment, the
13  court is concluding that's what he testified to and
14  that's inconsistent with the undisputed facts.  That's
15  why we're sending it back.
16    Q.  Okay.  But you would agree that if the court
17  reporter made an error -- you testified earlier that
18  court reporters make errors on occasion; correct?
19        MS. GREEN:  Form.
20        THE WITNESS:  It's not un- -- unknown for
21  court reporter to make an error.
22  BY MS. BERKE:
23    Q.  And if the court reporter makes an error --
24    A.  Except for our court reporter.
25    Q.  -- that error is going to be in the court

Page 324

1  reporter's notes; correct?
2        MS. GREEN:  Form.
3        THE WITNESS:  It could be.
4  BY MS. BERKE:
5    Q.  And then the transcript -- or the error is going
6  to carry over onto the transcript; correct?
7    A.  If the court reporter got the testimony wrong in
8  the first place, then I would expect it to be in the
9  notes and carried over into the transcript.
10    Q.  Right.  So if the court reporter made an error in
11  typing the number four, four shots or shot four times,
12  then that error carried over to the transcript; correct?
13        MS. GREEN:  Form.
14        THE WITNESS:  If the court reporter made an
15  initial error in the taking it down, then I would agree
16  with you that then it would have been carried over into
17  the transcript.
18  BY MS. BERKE:
19    Q.  Right.  So the fact that the court is stating
20  that the court reporter's notes matched the transcript
21  simply means that the transcript accurately reflects
22  what the court reporter typed; correct?
23        MS. GREEN:  Form.
24        THE WITNESS:  As I understood it, this is
25  what the court reporter saying occurred in the grand



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
325–328

Page 325

1  jury, and the -- the court had to resolve that issue.
2  And -- and in trying to resolve that issue, the court
3  decided I'm going to go double-check to see whether or
4  not the mistake was there was a mistake between the
5  transcription and the -- the transcript. And there
6  wasn't.
7         And so, as I read it, the court is, in
8  effect, saying, okay, I accept the testimony of the
9  court reporter that this is what he said and, therefore,
10  send it back and do it over again.
11  BY MS. BERKE:
12    Q. But the -- the court didn't render a conclusion
13  that the court reporter heard Detective Saldate's
14  testimony correctly; right?
15    A. I assume, such as I understand it, they were
16  making the argument that the court reporter got it
17  wrong. If the court agreed with that, then the court
18  would not have sent it back for a redetermination of
19  probable cause. But as I understand the record in that
20  case, the court rejected the argument that it was just a
21  mistake by the court reporter and, therefore, ordered it
22  to be redone.
23       That -- that's my understanding of the record in
24  that case, that the prosecution argued that she got it
25  wrong and she -- the court had to resolve that and

Page 326

1  rejected the prosecution's argument and ordered them to
2  redo it.
3    Q. How would one prove that a court reporter made an
4  error in this instance?
5       MS. GREEN: Form.
6       THE WITNESS: I guess I would have to know
7  what other evidence might be out there, what evidence
8  that they tried to rely on to prove that the court
9  reporter made an error and were unsuccessfully [sic] in
10  proving it. So I'm not sure that I can answer the
11  question as a -- as a hypothetical. But my
12  understanding is that, in this case, the District
13  Attorney's Office, the prosecutors tried to convince the
14  court that the court reporter made an error and offered
15  whatever proof they may have offered, and the court
16  rejected that.
17  BY MS. BERKE:
18    Q. You testified a little while ago that the court
19  reporter testified; correct?
20       MS. GREEN: Form.
21       THE WITNESS: I -- I think I did say that.
22  BY MS. BERKE:
23    Q. Where -- where did you get that from?
24    A. It was at least my impression that this was
25  offered into evidence as to what the court reporter

Page 327

1  wrote down and took it down and the basis for a -- the
2  conclusion that she got it right. It is possible that
3  they just authenticated the transcript without the
4  testimony of the court reporter.
5    Q. Well, according to your report at Page 33, you --
6  you quote the court's ruling. And what it states is,
7  quote, "The court having been informed that the
8  reporter's notes and the transcript of the grand jury
9  both reflect that the testimony of the state's witness
10  was that the deceased was shot four times. And the
11  court, having been advised by the state and the defense
12  counsel in the hearing of this matter, that the facts in
13  this case are undisputed, that the deceased was shot
14  only one time, it is order granting the motion for
15  redetermination of probable cause," end quote.
16       Did I read that correctly?
17    A. You did.
18    Q. And so all the court is saying is that the court
19  reporter's notes match the transcript in stating that
20  the testimony was that the deceased was shot four times.
21  The court isn't saying that the court -- that the court
22  reporter didn't make an error; correct?
23       MS. GREEN: Form.
24       THE WITNESS: Let me back up for a second.
25  What -- it's my understanding --

Page 328

1       (Telephonic interruption.)
2       MS. GREEN: I apologize.
3       MS. BERKE: That's okay.
4       THE WITNESS: What I understand is the
5  defense made a motion based upon the reporter's
6  transcript of the grand jury proceedings in which the
7  reporter is certifying that the transcript is a true and
8  correct statement of the proceedings before the grand
9  jury. That is, in effect, the court reporter's
10  certification or testimony.
11       The -- the prosecution then comes in and
12  say, no, no, no, the court reporter got it wrong. He
13  didn't make an error. The court says, okay,
14  notwithstanding that the court reporter has certified it
15  as true and correct, I'm going to go double-check to see
16  whether the transcript matches the transcript. The
17  transcription, the -- the notes, let's just call it the
18  notes, matches the transcript.
19       The court did that, more likely the parties
20  to do that. And the parties then informed the court
21  that the notes matched the transcript. So you had a
22  certification from the court reporter double-checked by
23  the court, and the court's concluding that the testimony
24  that was before the grand jury is inconsistent with the
25  undisputed facts. Therefore, you got to do it again.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
329–332

Page 329

1 Because if the court concluded that the court reporter
2 just got it wrong, there wouldn't [sic] be no reason to
3 do it over again.
4 BY MS. BERKE:
5    Q.  But the court wouldn't have any way to know
6 whether the court reporter had it right or wrong;
7 correct?
8    A.  The court reporter -- the court has the court
9 reporter's certification saying this is a true and
10 correct -- correct transcript of the grand jury
11 proceedings, and then matches that with what is in the
12 notes.  And the court then reaches the conclusion that
13 the court reporter's -- that is what the court reporter
14 wrote down and -- and the court reporter got it correct.
15 So that's what the court bases its ruling on and,
16 therefore, orders that it to be done over again because
17 the information presented to the grand jury was not
18 accurate.
19    Q.  Did you review the certification you just
20 referenced?
21    A.  No, I did not.
22    Q.  Well, how do you know it exists?
23    A.  Certainly every transcript I've ever seen has a
24 certification from the reporter that it's true and
25 accurate, and it is -- if it's not in that case, then

Page 330

1 that would be the -- an exception.
2    Q.  Okay.  So every transcript prepared by a court
3 reporter has the certification that it's true and
4 accurate; correct?
5        MS. GREEN:  Form.
6        THE WITNESS:  It -- right.  It's a --
7 there's a form certificate that -- that -- that the
8 court reporter took it down and this accurately
9 represents what the court reporter heard in the
10 proceeding or the trial or whatever.
11 BY MS. BERKE:
12    Q.  But you also testified a little while ago that
13 court reporters make errors; correct?
14    A.  Sure.
15        MS. GREEN:  Form.
16 BY MS. BERKE:
17    Q.  And so even when a court reporter has made
18 errors, they're certifying that the transcript is true
19 and accurate; correct?
20    A.  Correct.
21        MS. GREEN:  Argumentative.
22        THE WITNESS:  Correct.
23        THE REPORTER:  Sorry, Ms. Green?
24        MS. GREEN:  Argumentative.
25        THE WITNESS:  Correct.

Page 331

1 BY MS. BERKE:
2    Q.  So even when you have that certification, it
3 doesn't necessarily mean that the transcript is a
4 hundred percent accurate; right?
5    A.  It's --
6        MS. GREEN:  Form.  Argumentative.
7        THE WITNESS:  It's -- I would agree you,
8 it's not a guarantee.
9 BY MS. BERKE:
10    Q.  Right.  So on what basis are you concluding that
11 that certification establishes that the court reporter's
12 having typed that the decedent was shot four times was
13 accurate?
14    A.  Based upon the court then ordering the parties to
15 check the notes to see whether the notes are consistent
16 with the transcript.  And based upon that, that
17 certainly, in my judgment, eliminates one possible
18 source of error.  Not 100 percent.  I -- it's not a
19 guarantee, I would agree with you.  But based upon the
20 court reporter's transcript certification and checking
21 it up against the notes, I think the court concluded
22 that that was what the testimony that was presented to
23 the grand jury.
24    Q.  Isn't the court simply doing the safest thing to
25 prevent a basis for appeal by ordering probable cause be

Page 332

1 redetermined by the grand jury?
2    A.  I would -- I would certainly agree with you, it's
3 one possible interpretation --
4    Q.  Okay.
5    A.  -- of it.
6    Q.  And so you just testified that it's not a hundred
7 percent certain that the court reporter got it right;
8 correct?
9    A.  There's no guarantee.
10    Q.  And so it's possible, isn't it, that Detective
11 Saldate didn't testify incorrectly on that issue?
12    A.  There's a possibility of that, I agree.
13    Q.  And if Detective Saldate testified at his
14 deposition in this case that the court reporter got it
15 wrong and that he testified that the decedent was shot
16 only one time, you don't have any basis for disputing
17 that testimony, do you?
18        MS. GREEN:  Form.
19        THE WITNESS:  Other than based upon all of
20 the evidence that I reviewed and seen, I don't find
21 Detective Saldate to be a particularly creditable
22 witness.
23 BY MS. BERKE:
24    Q.  So your opinion that Detective Saldate's
25 testimony in the Rodriguez case was false is based on a



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
333—336

Page 333

1  credibility assessment that you made of Detective
2  Saldate?
3      A.  It -- it --
4          MS. GREEN:  Form.
5          THE WITNESS:  It is certainly influenced by
6  my overall impression of Detective Saldate's credibility
7  based upon all of the evidence I've seen about him.
8  BY MS. BERKE:
9      Q.  Setting aside your view as to his credibility,
10  you would agree that you don't have any evidence to
11  refute his testimony that he testified at that grand
12  jury proceeding that the decedent was shot one time;
13  correct?
14          MS. GREEN:  Form.
15          THE WITNESS:  Other than the court
16  reporter's notes and -- and certification of the grand
17  jury transcript, yeah, I don't know of any other
18  evidence that exists.
19  BY MS. BERKE:
20      Q.  You testified earlier that the court found in
21  Rodriguez that the court reporter transcribed the
22  testimony correctly.
23          Where is that finding in the court's order?
24      A.  I think what I said was the court found that the
25  transcript matched the notes and, therefore, that she --

Page 334

1  in preparing the transcript, it was based upon what
2  was -- it was accurately based upon what was in the
3  notes.
4      Q.  Okay.  So you would agree that the notes may be
5  incorrect?
6          MS. GREEN:  Form.
7          THE WITNESS:  I -- I won't agree that the
8  notes are incorrect.  It is possible that the notes were
9  not correct.
10  BY MS. BERKE:
11      Q.  And if the poss- -- and if the notes were not
12  correct, then the transcript would not be correct?
13      A.  I would agree with you.
14          MS. BERKE:  That's all I have.  Thank you.
15          MS. ODEGARD:  No questions.
16          MS. GREEN:  Okay.  I have very limited
17  follow-up.
18
19              EXAMINATION
20  BY MS. GREEN:
21      Q.  Mr. Drooyan, I know it's now been some hours ago,
22  but I want to take you back to some questioning from
23  attorneys for Maricopa County where they -- where you
24  were asked questions about mechanisms for tracking
25  Giglio and Brady material when you were a prosecutor;

Page 335

1  okay?
2      A.  Okay.
3      Q.  And you will recall that many of the questions
4  from the attorneys for -- withdrawn.
5          For Mr. Eaves, the -- one of the attorneys from
6  the county, presumed that a list must be created to
7  track Giglio or Brady material.
8      A.  Okay.
9      Q.  Do you -- do you recall those questionings for --
10  which included the word "list," Brady list, Giglio list,
11  in it?
12      A.  I recall a --
13          MS. BURGESS:  Foundation.
14          THE WITNESS:  I recall a series of questions
15  in which the word "list" was included in the question.
16  BY MS. GREEN:
17      Q.  Right.  And -- and you would agree that creating
18  a list of Giglio officers is certainly not the only
19  mechanism that a prosecutor's office can use to track
20  Giglio or Brady material; correct?
21      A.  Back in the time period that we were talking
22  about, yes, I would agree with that.
23      Q.  And, in fact, from when -- to your knowledge,
24  from, for example, when you became a prosecutor in 1978
25  through 1994, there was always an obligation to turn

Page 336

1  over Giglio material to defense; correct?
2          MS. BURGESS:  Foundation.
3          THE WITNESS:  Correct.
4          MS. BERKE:  Form.
5  BY MS. GREEN:
6      Q.  And your office did have a mechanism in place to
7  track that information and ensure it was disseminated
8  appropriately; correct?
9      A.  Information was --
10          MS. RETTS:  Foundation.
11          THE WITNESS:  -- reported to the chief of
12  the criminal division, who would look at any cases
13  involving allegations of misconduct, dismissals because
14  of misconduct, suppression of evidence, things like
15  that.  And -- and that information was always reported
16  to the chief of the Criminal Division, my predecessor,
17  Robert Brosio.
18  BY MS. BERKE:
19      Q.  And it was your understanding as a prosecutor
20  that that was the mechanism in place?
21      A.  That was the way we --
22          MS. BERKE:  Form.
23          THE WITNESS:  -- would identify and track
24  Giglio material regarding law enforcement officers if we
25  made a determination that they were not otherwise



Page 337

1 disqualified from testifying in our cases.
2 BY MS. GREEN:
3   Q. And that was true from the time you became a
4 prosecutor in 1978 up through the early 1990s at least,
5 that mechanism was in place; correct?
6   A. My predecessor was in that position from the time
7 I joined in 1978 until he retired in the end of 1993.
8 Including a period of time when I was not in the U.S.
9 Attorney's Office.
10   Q. And it was your understanding that prosecutors
11 were using that mechanism to report Giglio information
12 bearing on witness credibility, even if it wasn't
13 information rising to the level such that an officer was
14 totally compromised; correct?
15       MR. EAVES: Foundation.
16       THE WITNESS: Well, you had to report the
17 information in order to make the determination whether
18 or not the officer was so compromised. So you first
19 have to report the information, and then a determination
20 is made as to whether or not the officer is compromised.
21 And if a determination that he's not compromised, the
22 chief of the Criminal Division has that information.
23 BY MS. GREEN:
24   Q. And it's your understanding and experience that
25 it was the responsibility of the -- under this mechanism

Page 338

1 that you just described, that was the responsibility of
2 the chief to disseminate that information as needed if
3 that witness was called again to testify in a subsequent
4 matter?
5       MS. RETTS: Form.
6       MS. BERKE: Join.
7       THE WITNESS: To the extent that -- that
8 cases were going to involve that police officer or
9 federal agent to testify in the future, the person who
10 had that information was the chief of the Criminal
11 Division. And he would have to make sure that that
12 information was disseminated as necessary and
13 appropriate in the future.
14 BY MS. GREEN:
15   Q. It was your understanding he did that; correct?
16       MS. BURGESS: Foundation.
17       THE WITNESS: Assume -- it was my
18 understanding as -- as to how we -- we handled the
19 situation, and that was the mechanism for disseminating
20 Giglio material.
21 BY MS. GREEN:
22   Q. And as has been discussed, you've reviewed a
23 number of documents pertaining to Saldate's conduct and
24 other cases, including court orders and findings and --
25 as well as testimony from Saldate, both in cases other

Page 339

1 than the Milke case and his deposition testimony in this
2 case; correct?
3       MS. BERKE: Form.
4       THE WITNESS: I'm sorry. Could you repeat
5 the question.
6       MS. GREEN: Strike that.
7 BY MS. GREEN:
8   Q. Yes, absolutely.
9       You've reviewed a number of document -- documents
10 in this case; correct?
11   A. Yes.
12   Q. And those documents pertain to multiple other
13 cases, criminal prosecutions in which Saldate was a
14 witness; correct?
15       MR. RETTS: Form.
16       MS. BERKE: Vague.
17       THE WITNESS: There were -- there were a --
18 a number of different cases in which he had testified as
19 a witness.
20 BY MS. GREEN:
21   Q. Right. Or -- and as your report reflects,
22 reviewing these documents, you found a number of
23 instances where there was evidence that tended to impugn
24 Saldate's credibility as a witness; correct?
25       MS. BERKE: Objection --

Page 340

1       MS. RETTS: Form. Foundation.
2       MS. BERKE: -- foundation.
3       THE WITNESS: Yes.
4 BY MS. GREEN:
5   Q. Including court findings; correct?
6       MS. BERKE: Objection; foundation.
7       THE WITNESS: There were court findings.
8 BY MS. GREEN:
9   Q. Police reports indicating that he intentionally
10 violated a suspect's Miranda rights; correct?
11       MS. BERKE: Objection; foundation.
12       MS. BURGESS: Form. Foundation.
13       MS. BERKE: Misstates evidence.
14       THE WITNESS: There were police reports that
15 were evidence of him intentionally violating suspects'
16 Miranda rights, that's correct.
17 BY MS. GREEN:
18   Q. And just want to ask you if you were in
19 possession of this information as a prosecutor, what --
20 when you were acting as a prosecutor, what would you
21 have done with that information?
22       MS. BERKE: Objection; vague.
23       MS. BURGESS: Objection; form, foundation.
24       MS. BERKE: Speculation. Foundation.
25       THE WITNESS: If we're talking about the



Page 341

1 cumulative effect of all of this information, if I were
2 going to go forward -- well, I -- I -- I personally
3 would have a discussion about -- with the police
4 department about whether or not we could have -- we can
5 be prosecuting any cases based upon the testimony of
6 this officer. And if a decision was made that we were
7 going to go forward and continue to prosecute based upon
8 the testimony of this officer, I would make sure that
9 the evidence was turned over to defense counsel to make
10 sure that we'd satisfied our Brady/Giglio obligations.
11 BY MS. GREEN:
12    Q. And I'll just take a specific example.
13       If you were in -- if you were the line
14 prosecutor -- if you were line prosecutor, and in the
15 course of a case, you became aware of the court order in
16 Reynolds that has been discussed at length today, under
17 the mechanisms that you've discussed, what -- what would
18 you have done with that court order in terms of --
19    A. If I were a prosecutor --
20    Q. -- reporting?
21       MS. BURGESS: Form. Foundation.
22       MS. BERKE: Objection; speculation.
23 Foundation. Vague.
24       MS. BURGESS: Join.
25       THE WITNESS: Okay. Is --

Page 342

1 BY MS. GREEN:
2    Q. In terms of the mechanism you've --
3    A. Well, if I understood your question correctly,
4 if -- if I were prosecuting a case depending upon the
5 testimony of Detective Saldate and I became aware of the
6 court's finding in the Reynolds case, I would disclose
7 that information to the attorney for the defendant in
8 the case that I was prosecuting based upon his
9 testimony.
10    Q. And would you also have made efforts to make the
11 chief aware pursuant to the mechanisms in place so that
12 he could disseminate that information as needed in the
13 future?
14       MS. BERKE: Objection; vague. Speculation.
15 Foundation.
16       THE WITNESS: If I were aware in case
17 Number 2 about problems with Saldate's testimony in case
18 Number 1 in which there had been a finding by a court
19 that there was not a full, fair, impartial presentation
20 of the evidence, I would have brought that to the
21 attention to the chief of Criminal Division. Even if
22 the Reynolds wasn't a case that I had been handling.
23       But when I became aware of that evidence, I
24 would have told the chief of the Criminal Division, and
25 I would have told him about the problems that we would

Page 343

1 have that -- relying on the detective's testimony.
2       MS. BURGESS: Sir, if you don't mind, the
3 court reporter is having a hard time --
4       THE WITNESS: Oh, I'm sorry. I'm sorry.
5 Thank you.
6       MS. BURGESS: -- understanding what you're
7 saying because your head is turned.
8       THE WITNESS: Getting late now. Thank you.
9 Thank you.
10 BY MS. GREEN:
11    Q. You've been asked a lot of questions today about
12 your opinions as to whether or not Saldate lied.
13       Would you agree the ultimate determination in
14 this civil matter as to whether or not Saldate lied
15 is -- in a particular instance or not is a determination
16 for the jury?
17       MS. BURGESS: Form. Foundation.
18       MS. BERKE: Join.
19       THE WITNESS: To the extent that a witness's
20 credibility is in issue that -- the question of whether
21 or not that witness has lied either on the stand in that
22 case or on prior occasions, I think would be ultimately
23 a determination for the jury in the absence of a perjury
24 conviction.
25 ///

Page 344

1 BY MS. GREEN:
2    Q. And whether or not someone, in fact, told a lie
3 is a factual question; correct?
4    A. Yes, I would say that's usually the case.
5    Q. Now, your report does outline evidence that
6 you've seen in the record here that supports the
7 conclusion that Saldate lied in a number of cases;
8 correct?
9       MS. BERKE: Objection; foundation.
10       MS. RETTS: Form.
11       MS. BERKE: Vague.
12       THE WITNESS: So if you're in a --
13       MS. BERKE: Misstates evidence.
14       THE WITNESS: If you're in a trial, and
15 you're the prosecutor, and you have all of this evidence
16 about Saldate, you try to argue these were mistakes,
17 they were not intentional, they would still have some
18 bearing on his credibility if there were repeated
19 instances in which the testimony was wrong.
20       And if you're the defense attorney in that
21 case, you are going to argue that this is a pattern of
22 intentional lies and false statements and that he should
23 not be believed under any circumstances. Ultimately,
24 the jury will reach that conclusion.
25       But prosecutors will make a preliminary



Page 345

1  determination as to how bad the evidence might be.  And
2  if the evidence is bad enough, they won't bring the case
3  based upon that testimony of that officer.  But they're
4  going to bring -- they're going to make their arguments
5  from one perspective.  Defense lawyers are going to make
6  their arguments from a different perspective.
7        But Brady and Giglio says the prosecutor has
8  to turn over all that information so the defense
9  attorney has it, and the defense attorney can then
10 attack the credibility of the witness based upon those
11 prior instances of testimony.
12 BY MS. GREEN:
13   Q.  In other words, you're not here today to testify
14 as a fact witness as to whether or not Saldate lied in
15 this specific instance?  You're here to testify as an
16 expert regarding the evidence you see here bearing on
17 his credibility?
18        MS. BURGESS:  Objection; form and
19 foundation.
20 BY MS. GREEN:
21   Q.  This needed to be tracked and disclosed; correct?
22        MS. BERKE:  Objection; vague.  Foundation.
23 Speculation.
24        THE WITNESS:  I would say, ultimately, I am
25 testifying that the information that I am aware of with

Page 346

1  respect to Saldate's prior testimony in these various
2  different cases had to have been turned over.  I -- I
3  tend to view it in light more favorable to how defense
4  attorneys might view it, given the pattern that I see
5  here.
6        But ultimately it has to be turned over.
7  Whether it's a mistake, whether it's unintentional,
8  whether it's intentional, whether it's misleading, it
9  all has to be turned over because it all bears on his
10 credibility as a witness.  And then, ultimately, it is
11 for the jury to make that determination, having a full
12 presentation of the evidence by both the prosecutor and
13 the defense counsel.
14        But it's the prosecutor's obligation to make
15 sure that there is that obligation for a full and fair
16 presentation of the evidence to the jury.
17 BY MS. GREEN:
18   Q.  I want to take you back very quickly to -- you
19 were questioned, I believe by Ms. Retts, about -- and
20 shown, I believe, a 2012 case -- withdrawn.
21        You were questioned by Ms. Retts regarding the
22 law on Miranda and your current understanding of the law
23 on Miranda.
24        Do you recall that questioning?
25   A.  Yes.

Page 347

1    Q.  Now, when you wrote your report and -- for the
2  purposes of evaluating whether something constituted a
3  Miranda violation in the records relating to Saldate,
4  the key issue is the law on Miranda in place at the time
5  of the alleged violation?
6        MS. BURGESS:  Object to the form of the
7  question.
8        MS. RETTS:  Form.  Foundation.
9        MS. BERKE:  Join.
10        THE WITNESS:  I actually -- excuse me.
11 Excuse me.  I think you're confusing two things.  I
12 thought the question was related to Brady and what the
13 law was with respect to Brady.
14 BY MS. GREEN:
15   Q.  Actually --
16   A.  And maybe I misunderstood.
17   Q.  And -- and -- withdrawn.  I think I'm not --
18        To clarify, you were asked some questions about
19 the law on Brady and shown a 2012 case?
20   A.  Right.
21   Q.  And you were -- and I apologize, I referenced a
22 case, but I didn't intend to reference that case.
23        And then you were also asked some questions about
24 the law on Miranda and whether you know a Davis Supreme
25 Court case.  I don't believe she showed it to you,

Page 348

1  which --
2    A.  Oh.
3    Q.  -- a Davis Supreme Court case and what the case
4  says.  And so I, in fact, want to talk to you a little
5  bit about the law on Miranda, not the law on Brady --
6    A.  Okay.
7    Q.  -- though you were questioned about both.
8    A.  Okay.  Now I understand.
9    Q.  And so, again, for the purposes of your
10 evaluating whether or not Saldate engaged in the Miranda
11 violations, in the documents you -- and evidence you
12 reviewed, the key question is the law at the time of the
13 alleged misconduct; correct?
14        MS. RETTS:  Form.  Foundation.
15        MS. BERKE:  Join.
16        THE WITNESS:  Yeah, in order to determine
17 whether or not he engaged in a violation, you have to
18 know what the law is at the time that he engaged in the
19 conduct.
20 BY MS. GREEN:
21   Q.  Now, are you aware of any case that says an agent
22 or officer intentionally violating a Miran- -- a
23 suspect's Miranda rights during interrogation is okay?
24        MS. BURGESS:  Form.
25        MS. RETTS:  Form.  Foundation.



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
349–352

Page 349

1    MS. BERKE:  Vague.
2    THE WITNESS:  I'm not aware of any case that
3  holds that or says that.
4  BY MS. GREEN:
5    Q.  Now, you were asked some questions and, in fact,
6  showed some transcripts of Saldate's testimony during
7  Mr. Milke's criminal proceedings regarding the Running
8  Eagle case.
9    Do you recall that?
10   A.  Right.
11   Q.  Now, based on the transcript that you reviewed
12 and your knowledge of the Running Eagle case, does what
13 Saldate disclosed during his testimony constitute full
14 disclosure of the conduct impugning his credibility that
15 he engaged in in that case?
16   MS. RETTS:  Form.  Foundation.
17   THE WITNESS:  Well, I think it's misleading
18 in the sense that it's intended to suggest that the
19 incriminating statement was made before there was any
20 invocation of rights, and he's drawing a distinction
21 between the right to remain silent and the right to an
22 attorney.  The key issue is once there is an invocation
23 of either right, the questioning is supposed to stop,
24 and any statements made after that are inadmissible.
25   So I think that his testimony is intended to

Page 350

1  enable the -- the -- what purports to be the
2  incriminating statement to get into evidence.
3  BY MS. GREEN:
4    Q.  And to clarify, because I think my previous
5  question wasn't clear, and I apologize for that, I'm
6  actually talking about the testimony, I believe
7  Ms. Retts showed you from the Milke matter in which --
8    A.  Oh.
9    Q.  -- Ms. Retts asked questions to you as to whether
10 or not Saldate on the stand admitted to having engaged
11 in a Miranda violation --
12   A.  Oh, I'm sorry.
13   Q.  -- in the --
14   A.  I see.  I mis- --
15   Q.  -- Running Eagle case.
16   A.  I misunderstood your question.  Okay.  So why
17 don't you re- -- reask your question.
18   Q.  Sure.
19     And so my question is, that testimony that you
20 read from the Milke criminal proceedings where Saldate
21 indicated that he has engaged in a Miranda violation,
22 does that come close to the proper disclosure of what is
23 needed with respect to the evidence impugning Saldate's
24 credibility, that you know of, in the Running Eagle
25 case?

Page 351

1    MS. BERKE:  Objection; form.
2    MS. BURGESS:  Form.  Foundation.
3    MS. BERKE:  Foundation.  Speculation.
4    THE WITNESS:  Yeah, I'm not sure that I
5  completely understand the question.
6  BY MS. GREEN:
7    Q.  Then -- then I'll -- then I'll rephrase.  Then
8  I'll rephrase.
9    You recall that you were asked some questions
10 about Saldate's testimony during Ms. Milke's trial?
11 Criminal proceedings?
12   MS. BURGESS:  Is that a question?
13   MS. GREEN:  Yes.
14   THE WITNESS:  Saldate -- Saldate's
15 testimony --
16   MS. RETTS:  Objection; form of the question.
17   THE WITNESS:  You're asking about Saldate's
18 testimony in the Milke trial?
19 BY MS. GREEN:
20   Q.  Yes.
21   A.  Okay.
22   Q.  That was shown to you as an exhibit today.
23   A.  Okay.  And then his -- the -- where he testifies
24 about the asking witness -- asking suspects questions
25 after they invoke their rights?

Page 352

1    Q.  Yes, sir.
2    A.  Okay.  All right.  Now I think I've got -- I'm
3  oriented.
4    Q.  And you were also shown some testimony in
5  Ms. Milke's trial where Ms. Milke's defense counsel, Ken
6  Ray, was asking questions about the Running Eagle case.
7    A.  Right.  Okay.  Now I -- I'm -- I understand.
8  Okay.
9    Q.  And the suggestion to you from Ms. Retts was that
10 Ken Ray knew all about the Running Eagle case.
11     Do you recall that?
12   A.  Okay.
13   Q.  And I'm asking you if the testimony that you read
14 in Ms. Milke's case from Saldate amounts to the complete
15 disclosure that is required under Brady with regard to
16 evidence of misconduct that you've seen in the Running
17 Eagle case?
18   MS. BURGESS:  Form and foundation.
19   THE WITNESS:  If we're only talking about
20 the Running Eagle case, and we are doing the causation
21 analysis and looking backwards, it -- it would appear to
22 me that the -- Milke's lawyer had the information about
23 Running Eagle and, therefore, Running Eagle alone, there
24 would not be a Brady violation.
25     But the fact that the testimony came out



RICHARD DROOYAN                          September 12, 2018
MILKE vs CITY of PHOENIX                        353—356

Page 353

1   about Running Eagle, I -- I would make two points about
2   it.  One, I -- I remain of the view that the prosecutor
3   has to make the disclosure upfront and cannot just
4   simply rely on the possibility that the defense lawyer
5   has that information.
6           And two, I don't view that the testimony in
7   the Running Eagle was sufficient to satisfy the
8   prosecutor's obligations with respect to the multiple
9   instances in which there were Brady violations, not just
10  in the Running -- not Brady violations, excuse me --
11  Miranda violations, not just in the Running Eagle case.
12          And so if -- if -- if your question is, does
13  the fact that the lawyer for Ms. Milke was aware of the
14  Running Eagle case satisfy the prosecutor's obligations
15  to turn over all of what I consider to be the Giglio
16  material about Officer Saldate, the answer is no, it
17  doesn't.
18          Does that answer your question?
19          MS. GREEN:  Yes.
20          I don't think I have any further questions.
21  I'm not sure if defense counsel has redirect.
22          MS. BERKE:  I just have one follow-up --
23          THE WITNESS:  Okay.
24          MS. RETTS:  I have one.  Sorry.  You want me
25  to go --

Page 354

1           (Simultaneous discussion.)
2           MS. RETTS:  You want to go first?
3           MS. BERKE:  Yeah.
4           MS. RETTS:  Okay.
5
6           FURTHER EXAMINATION
7   BY MS. BERKE:
8     Q.  Would you agree that Detective Saldate's
9   testimony in the voluntariness hearing on the Running
10  Eagle case put Ms. Milke's defense counsel on notice as
11  to Detective Saldate's stated interrogation practices?
12          MS. GREEN:  Form.
13          THE WITNESS:  Yeah.
14  BY MS. BERKE:
15    Q.  Did plaintiff's counsel provide you with a list
16  of cases in which Detective Saldate testified -- or
17  strike that.
18          Did -- did Ms. Milke's attorneys provide you with
19  a list of the cases that were identified during the
20  7,000 hours of research in which Detective Saldate
21  testified that they identified no misconduct on the part
22  of Detective Saldate?
23          MS. GREEN:  Form.
24          And again, we've provided all the documents
25  plaintiff has provided.  I'm going to object to

Page 355

1   testimony about communications beyond the documents that
2   we have provided.
3           MS. BERKE:  I'm asking if you provided that
4   to him.
5           MS. GREEN:  Right.  And I'm just saying it's
6   been provided pursuant to subpoena, but we're not going
7   to get into, you know, phone calls and conversations and
8   things like that.
9           If your question is limited to a list or a
10  document, he can answer the document question.  I'm just
11  trying to get out of communication --
12          THE WITNESS:  Let me see if I can answer
13  your question.
14          I'm not aware of any cases in which
15  Detective Saldate testified that are not either
16  identified in the Ninth Circuit's decision in the Milke
17  case or in my report.  But there are two other cases.
18  There is the Condi (phonetic) case and the Yanez case
19  that I don't think I specifically referenced here.  I
20  think they were referenced in the Ninth Circuit opinion,
21  but I'd have to look.  If they weren't, those are the
22  only two other cases that I'm aware of.
23  BY MS. BERKE:
24    Q.  And why were those cases not addressed in your
25  report?

Page 356

1     A.  I don't recall why I did not address those two
2   cases.  As I sit here right now, I -- I can't tell.  I
3   don't remember.
4     Q.  Okay.  And so you know that Ms. Milke claims that
5   her attorney had researchers participate in
6   approximately 7,000 hours of research looking at cases
7   that Detective Saldate testified in; correct?
8           MS. GREEN:  Form.
9           THE WITNESS:  I -- I've certainly seen a
10  reference to that in -- in -- in either the Ninth
11  Circuit's opinion or -- and/or materials that were
12  provided to me by the -- Ms. Milke's counsel.
13  BY MS. BERKE:
14    Q.  And so my understanding from your -- the
15  testimony you just gave is that you were not provided
16  with a list of those cases in which Detective Saldate
17  testified where Ms. Milke's attorneys concluded there
18  was no misconduct by Detective Saldate; correct?
19          MS. GREEN:  Form.
20          THE WITNESS:  As I said, the only cases that
21  I was provided were the cases that are listed in my
22  report, the Yanez case and the Condi case, if I have
23  those -- if I'm pronouncing those correctly, and any
24  cases that might have been referenced in the Ninth
25  Circuit --



Page 357

BY MS. BERKE:

2    Q. So my statement is correct?

3    A. That's -- yes, I would say your statement is
4 correct.

5        MS. BERKE: Okay. That's all I have.

6        MS. GREEN: Does -- does anyone else have
7 anything?

8        MS. RETTS: No.

9        MS. GREEN: Okay. One thing I do want to
10 just put on the record is I notice Mr. Marquis here, the
11 county's expert has been taking notes throughout the
12 deposition. I would ask that those notes, pursuant to
13 our verbal agreement on a meet-and-confer call and our
14 email agreement relating to the subpoena response be
15 produced with the county's subpoena response tomorrow.

16        MR. EAVES: Well --

17        MS. BURGESS: You're making an assumption
18 that they're notes.

19        MR. EAVES: Provided that the notes apply to
20 what's happening here today --

21        MS. BURGESS: Yeah.

22        MR. EAVES: -- sure.

23        MS. BURGESS: Yeah. And you're making
24 assumptions they're notes and not conversation with
25 counsel, which would obviously be protected.

Page 358

1        MS. GREEN: To the extent they are notes,
2 we're asking that they be produced pursuant to our
3 agreement.

4        I think it's the agreement had the notes on
5 this matter or notes they made in relation to this
6 matter, it's -- it's in writing.

7        MS. RETTS: Yeah, we need your notes.

8        THE REPORTER: Does any counsel need a copy?

9        MR. EAVES: Please.

10        MS. BURGESS: Yes.

11        MR. EAVES: Yes.

12        MS. GREEN: Was that -- that was on the --

13        THE VIDEOGRAPHER: We're still on the record
14 until I'm told to go off.

15        MS. GREEN: Oh. You can --

16        MR. EAVES: You can go off.

17        MS. GREEN: We're off.

18        THE VIDEOGRAPHER: Okay. This concludes
19 today's video deposition of Richard Drooyan. The number
20 of media used was five. We are off the record at 7:20
21 p.m.

22        (Videotaped deposition concluded at 7:20 p.m.)

23

24

25

Page 359

1                    REPORTER'S CERTIFICATION

2

3    I, Alicia Santana, a Certified Shorthand Reporter in
4 and for the State of California, do hereby certify:

5

6    That the foregoing witness was by me duly sworn;
7 that the deposition was then taken before me at the time
8 and place herein set forth; that the testimony and
9 proceedings were reported stenographically by me and
10 later transcribed into typewriting under my direction;
11 that the foregoing is a true record of the testimony and
12 proceedings taken at that time.

13

14    That before the conclusion of the deposition, the
15 witness has requested a review of this transcript
16 pursuant to Rule 30(e)(1).

17

18    IN WITNESS WHEREOF, I have subscribed my name this
19 23rd day of September, 2018.

20

21

22                    _Alicia Santana_

23                    Alicia Santana, CSR NO. 12824

24

25

Page 360

1                    DEPOSITION ERRATA SHEET

2

3

4 Our Assignment No.  J2419084

5 Case Caption: Debra Jean Milke vs. City of Phoenix;
6 Maricopa County, et al.

7

8        DECLARATION UNDER PENALTY OF PERJURY

9        I declare under penalty of perjury that I
10 have read the entire transcript of my Deposition taken
11 in the above captioned matter or the same has been read
12 to me, and the same is true and accurate, save and
13 except for changes and/or corrections, if any, as
14 indicated by me on the DEPOSITION ERRATA SHEET hereof,
15 with the understanding that I offer these changes as if
16 still under oath.

17    Signed on the _____ day of_____,

18 20___ ,

19

20 _____

21 RICHARD DROOYAN

22

23

24

25



RICHARD DROOYAN
MILKE vs CITY of PHOENIX

September 12, 2018
361–362

Page 361

```
 1              DEPOSITION ERRATA SHEET
 2      Page No._____Line No._____Change to:_____
 3      _____
 4      Reason for change: _____
 5      Page No._____Line No._____Change to:_____
 6      _____
 7      Reason for change: _____
 8      Page No._____Line No._____Change to:_____
 9      _____
10      Reason for change: _____
11      Page No._____Line No._____Change to:_____
12      _____
13      Reason for change: _____
14      Page No._____Line No._____Change to:_____
15      _____
16      Reason for change: _____
17      Page No._____Line No._____Change to:_____
18      _____
19      Reason for change: _____
20      Page No._____Line No._____Change to:_____
21      _____
22      Reason for change: _____
23
24      SIGNATURE:_____DATE_____
25              RICHARD DROOYAN
```

Page 362

```
 1              DEPOSITION ERRATA SHEET
 2      Page No._____Line No._____Change to:_____
 3      _____
 4      Reason for change: _____
 5      Page No._____Line No._____Change to:_____
 6      _____
 7      Reason for change: _____
 8      Page No._____Line No._____Change to:_____
 9      _____
10      Reason for change: _____
11      Page No._____Line No._____Change to:_____
12      _____
13      Reason for change: _____
14      Page No._____Line No._____Change to:_____
15      _____
16      Reason for change: _____
17      Page No._____Line No._____Change to:_____
18      _____
19      Reason for change: _____
20      Page No._____Line No._____Change to:_____
21      _____
22      Reason for change: _____
23
24      SIGNATURE:_____DATE_____
25              RICHARD DROOYAN
```

