**Page 1**

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF ARIZONA
 2   ------------------------------------------
 3   DEBRA JEAN MILKE,
 4                  Plaintiff,
 5          -v-     No. 2:15-cv-00462-ROS
 6   CITY OF PHOENIX, MARICOPA COUNTY; and DETECTIVE
     ARMANDO SALDATE, JR.; and SERGEANT SILVERIO
 7   ONTIVEROS, in their individual capacities,
 8                  Defendants.
 9   ------------------------------------------
10
11           DEPOSITION OF BHUSHAN S. AGHARKAR,
12   M.D., a Witness herein, taken by the Defendant, at
13   the offices of NEUFELD SCHECK & BRUSTIN LLP, 99
14   Hudson Street, 8th Floor, New York, New York 10013,
15   on Tuesday, September 25, 2018, at 8:00 a.m.,
16   before Jeffrey Shapiro, a Shorthand Reporter and
17   notary public, within and for the State of New
18   York.
19
20
21
22
23
24
25
```

**Page 2**

```
 1   A P P E A R A N C E S :
 2   SANDERS & PARKS
     Attorneys for MARICOPA COUNTY
 3   3030 North Third Street, Suite 1300
     Phoenix, Arizona 85012-3099
 4   602-532-5783
     Robin.Burgess@SandersParks.com
 5
     BY:  ROBIN E. BURGESS, ESQ.
 6
 7
     NEUFELD SCHECK & BRUSTIN, LLP
 8   Attorneys for the Plaintiff
     99 Hudson Street, 8th Floor
 9   New York, New York 10013
     212-965-9081
10   Katie@nsbcivilrights.com
11   BY:  NICK BRUSTIN, ESQ.
          KATIE MCCARTHY, ESQ.
12
13
     HOLLOWAY ODEGARD & KELLY, P.C.
14   Attorneys for SILVERIO ONTIVEROS
     3020 East Camelback Road, Suite 201
15   Phoenix, Arizona 85016
     602-240-6670
16
     BY:  SALLY A. ODEGARD, ESQ.
17
18
     WIENEKE LAW GROUP
19   Attorneys for THE CITY OF PHOENIX
     1095 West Rio Salado Parkway, Suite 209
20   Tempe, Arizona 85281
     480-715-1868
21   Crett@swlfirm.com
22   BY:  CHRISTINA RETTS, ESQ.
23
24
25
```

**Page 3**

```
 1
     BERKE LAW FIRM
 2   Attorneys for ARMANDO SALDATE
     1601 North 7th Street, Suite 360
 3   Phoenix, Arizona 85006
     602-254-8800
 4   Lori@berkelawfirm.com
 5   BY: LORI V. BERKE, ESQ.
 6
 7   MORRIS RHODES, Videographer
 8
 9                  ***
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2        (Time noted:  8:12 a.m.)
 3
 4     THE VIDEOGRAPHER:  This is Tape
 5   Number 1 of the videotaped deposition of
 6   Bhushan S. Agharkar, M.D., in the matter
 7   of Debra Jean Milke versus the City of
 8   Phoenix, et al, being heard before the
 9   U.S. District Court District of Arizona,
10   File Number 2:15-CV-00462.
11     This deposition is being held at
12   Neufeld Scheck & Brustin LLP, at 99 Hudson
13   Street, in New York City, on September
14   25th, 2018, at approximately 8:13 a.m.
15     My name is Morris Rhodes, I'm the
16   videographer.  The court reporter is Jeff
17   Shapiro.
18     Will Counsel please introduce
19   themselves.
20     MR. BRUSTIN:  Nick Brustin, Neufeld
21   Scheck & Brustin for the plaintiff.
22     MS. RETTS:  Christina Retts from the
23   City of Phoenix.
24     MS. BURKE:  Lori Burke for Armando
25   Saldate.
```



Exhibit 2

Page 5

1                    Agharkar
2      MS. ODEGARD:  Sally Odegard on behalf
3  of Silverio Ontiveros.
4      MS. BURGESS:  Robin Burgess on behalf
5  of Maricopa County.
6      MS. McCARTHY:  Katie McCarthy for the
7  Plaintiff.
8      THE VIDEOGRAPHER:  Would the reporter
9  please swear in the witness.
10     THE REPORTER:  Would you raise your
11  right hand.
12     (The witness complied.)
13     Do you solemnly swear or affirm that
14  the testimony you're about to give shall
15  be the truth, the whole truth, nothing but
16  the truth?
17     THE WITNESS:  I do.
18     THE REPORTER:  State your name and
19  address for the record.
20     THE WITNESS:  Full name is Bhushan;
21  B-H-U-S-H-A-N, middle initial is "S" as in
22  "Sam," and Agharkar; A-G-H-A-R-K-A-R.  My
23  address is 4062 Peachtree Road Northwest,
24  Suite A203, Atlanta, Georgia 30319.
25

Page 6

1                    Agharkar
2             DIRECT EXAMINATION
3  BY MS. RETTS:
4      Q.   Good morning, Doctor.
5      A.   Good morning.
6      Q.   I'm sure you've had your deposition
7  before, true?
8      A.   I have.
9      Q.   So, I'm just going to short circuit
10  the rules and hit the highlights.
11     A.   Sounds good.
12     Q.   Give a pause before you answer,
13  please, because I'm sure you'll probably hear some
14  objections from Counsel, so we're not speaking
15  over one another.  It happens quite a bit in
16  depositions.  So, if I remind you, I'm not
17  intending to be rude, I just want to make sure we
18  have a clear record.
19     A.   Sure.
20     Q.   You understand you're under oath as
21  if you were testifying at trial before a judge?
22     MR. BRUSTIN:  Objection.
23     THE WITNESS:  Yes.
24  BY MS. RETTS:
25     Q.   Have you taken any medications today

Page 7

1                    Agharkar
2  that would impact your ability to testify
3  truthfully and honestly?
4      A.   No.
5      Q.   Can you tell me what you did to
6  prepare for your deposition today?
7      A.   Reviewed --
8      MR. BRUSTIN:  Objection to form,
9  sorry.
10     THE WITNESS:  Reviewed my reports, I
11  reviewed my notes, reviewed some of the --
12  the file, you know, so some of the
13  materials in the file.  And then we had a
14  meeting yesterday for a couple of hours.
15  BY MS. RETTS:
16     Q.   Do you have your reports with you
17  today, those sitting in front of you?
18     A.   That's correct, yes, this is a copy
19  of both of my reports.
20     Q.   And that would be your initial report
21  and your rebuttal report?
22     A.   That's correct.
23     Q.   Do you remember what specific
24  documents that you did review to help you prepare
25  for today?

Page 8

1                    Agharkar
2      MR. BRUSTIN:  Objection to form.
3      THE WITNESS:  I looked at some of her
4  prison -- Ms. Milke's, some of her prison
5  medical records, so that includes some of
6  the health records, as well as
7  psychological counseling records.  I
8  reviewed -- I will say I received her
9  deposition, I did not look at those
10  yesterday or anything, but I did -- I have
11  read those since my rebuttal report.  I'm
12  trying to think.  Briefly some of the
13  discovery materials, they're, you know --
14  the volume is humongous, so it's really
15  mostly my own stuff is what I did to
16  prepare for today.
17  BY MS. RETTS:
18     Q.   Now, you mentioned that you had read
19  Ms. Milke's deposition after issuing your rebuttal
20  report; true?
21     A.   That's right.
22     Q.   Did you read it or did you review the
23  video, as well?
24     A.   No, I read it.  I didn't -- I don't
25  have video of it.



Page 9

1              Agharkar
2      Q.   Were you aware that there was a video
3   taken?
4      A.   That was probably on the transcript,
5   and so I think I knew that, but other than that, I
6   don't have video.
7      Q.   Is the video something that you would
8   have been interested in seeing to gauge Ms.
9   Milke's emotional reaction to certain questions?
10     A.   Yes.  Although some of that comes
11  ^through, you know, on the transcript.
12     Q.   Did reviewing the deposition
13  transcript that you reviewed change your opinions
14  in any way?
15     A.   Not at all.
16     Q.   Can you tell me what your hourly rate
17  for this case is?
18     A.   My deeply discounted rate here is
19  $400 an hour, that was -- that was my old state
20  and federal rate that I billed for those cases,
21  but this case is three years old at least for me.
22  My rate has since gone up.
23     Q.   What is your rate now?
24     A.   Currently, my discounted state and
25  federal rate is $500 an hour.  My typical rate is

Page 10

1              Agharkar
2   $700 an hour.
3      Q.   When you say your typical rate, is
4   that for litigation cases, whether it be criminal,
5   civil, et cetera?
6      A.   That's correct.  Assuming they're
7   private civil -- sorry, private criminal cases,
8   which is rare.  Most of the time it's state and
9   federal that I'm involved in.
10     Q.   Do you see patients in a setting that
11  is not related to litigation?
12     A.   The last -- the last word, sorry?
13     Q.   Do you see patients in a setting
14  that's not related to litigation, so do you treat
15  current patients?
16     A.   Yes, I do.
17     Q.   And what is your hourly rate for
18  patients that you treat outside of the litigation
19  context?
20     A.   $400 an hour for the initial
21  evaluation section.
22     Q.   Do you take any insurance?
23     A.   No.
24     Q.   About what is your current patient
25  case load that is not related to litigation?

Page 11

1              Agharkar
2      A.   Somewhere around maybe 75 to 100
3   patients.  I don't really keep track of that
4   number.
5      Q.   Of those patients, what is the
6   longest standing patient in that group?  The one
7   you've been treating the longest?
8      A.   Thirteen years.
9      Q.   So, that would have been someone that
10  you started treating right at the outset of your
11  practice?
12     A.   Correct, or -- or at least shortly
13  thereafter.
14     Q.   You were licensed in 2002, but when
15  did you actually start practicing and receiving
16  patients?
17     A.   2005.  We get licensed during our
18  residency.
19     Q.   From 2002 to 2005, you were in your
20  residency?
21     A.   From 2000 to 2005.
22     Q.   It looks like from your case list,
23  that you've handled a significant number of
24  tobacco litigation cases?
25     A.   Yes.

Page 12

1              Agharkar
2      Q.   About probably half of the cases
3   listed on your case list, is that about what you
4   remember being correct?
5      A.   That probably is right, those people
6   ^didn't want to take a lot of depositions.  I --
7   most of my -- the vast, vast majority of my work
8   is criminal.  I, you know -- maybe 20 percent of
9   my caseload is civil, but I find -- we don't
10  really get deposed in criminal cases.  So, the
11  civil -- take a lot of depositions, so I've been
12  sitting for them.
13     Q.   So, the tobacco litigation cases,
14  tell me what your opinion -- just broadly the
15  scope of your opinions would be in those.
16     MR. BRUSTIN:  Objection to form.
17     THE WITNESS:  So, in those cases, I
18     was retained and have been retained by RJ
19     Reynolds or Phillip Morris, but typically
20     it's RJ Reynolds.  I'm reviewing medical
21     records and deposition testimony to
22     determine -- or make a determination of
23     whether the plaintiff was addicted to
24     cigarettes, and then whether the
25     cigarettes would have been the -- an



Page 13

1           Agharkar
2           addiction to cigarettes would have caused
3           their disease.  So, those are typically
4           the two areas that I focus on.
5   BY MS. RETTS:
6       Q.   For the causation opinions, caused
7   their disease in terms of medical opinion,
8   addiction or -- so you're looking at psychological
9   addiction versus actual medical issues such as
10  cancer, lung disease?
11      A.   That's correct.  I don't offer any
12  sort of cancer COPD type opinions or anything.
13  It's about whether they met an addiction by the
14  DSM5 criteria.
15      Q.   For the tobacco litigation cases, are
16  you actually interviewing any of the plaintiffs?
17      A.   When they're alive, yes.  Always when
18  they're alive.  If they passed, you can't
19  interview anybody.
20      Q.   What's the percentage of cases that
21  you have done where they've been deceased?
22      A.   The majority, I would probably say 75
23  percent.
24      Q.   So, you're offering forensic
25  psychiatric opinions?

Page 14

1           Agharkar
2       A.   That's correct, based on the
3   available information, noting, of course,
4   limitation because the person has passed, I can't
5   interview them.
6       Q.   So, the 20 percent civil cases, would
7   those be largely tobacco, and then it's a
8   smattering these other cases?
9       A.   You know, they've been more tobacco
10  cases in the last couple of years.  Typically,
11  though, my typical civil cases are malpractice
12  cases, disability cases, Workers' Comp -- there's
13  one missing, but fitness evaluations, things like
14  that.  So, those -- that typically comprise the
15  civil work that I would do.  But the tobacco
16  stuff, again, they seem to take a lot of
17  depositions.
18      Q.   How many cases have you handled over
19  the course of your career that have dealt in a
20  civil context with an incarcerated individual?
21      A.   I don't think any.  Let me just make
22  sure about --
23          MR. BRUSTIN:  Objection to form.  I'm
24      sorry.  You mean formerly incarcerated?
25          MS. RETTS:  I will clarify.

Page 15

1           Agharkar
2   BY MS. RETTS:
3       Q.   Someone -- I know you have some cases
4   where you dealt with folks you had been
5   incarcerated, and you issued opinions related to
6   dangerousness; correct?
7       A.   Dangerousness if I'm asked.  But
8   typically, I don't do a lot of future
9   dangerousness assessments.
10      Q.   Past?
11      A.   Past dangerousness?  Oh, sure.
12      Q.   Yes.  And you were hired in the --
13  case?
14      A.   Yes.
15      Q.   And in that instance, it was an
16  individual who -- there had been an incident in an
17  incarceration setting with an incident of violence
18  between two inmates?
19      A.   That's correct.
20      Q.   And you issued a rebuttal opinion
21  about dangerousness?
22      A.   I'd have to look at my report again.
23  My recollection of that case is the -- the one
24  person died, the other one did the attacking.  I
25  had to interview and assess the person who did the

Page 16

1           Agharkar
2   attacking.  The person, the rebuttal expert for
3   the plaintiff was saying that the person I
4   evaluated was malingering and didn't have mental
5   illness, which was nuts.  I saw the guy, and I
6   could tell you that he wasn't malingering and he
7   was mentally.  So, that was actually the focus of
8   my report that I can recall.
9       Q.   Did you happen to have just done a
10  Rule 11 of that individual?
11      A.   Yes, that's right.  I've already done
12  Rule 11, and had seen him multiple times, maybe
13  four times, perhaps, five at that point.  And then
14  I think through the criminal attorney, came the
15  civil, they -- she asked me if would be willing to
16  do that, and I said if you clear that in terms of
17  ethics, if there's no issue, sure.  I'm not
18  opining about doctors -- the person that died.
19      Q.   Going back to the civil cases that
20  you've handled, specifically related to someone
21  who has been in jail or prison at some point in
22  their lifetime, how many of those cases have you
23  handled in --
24      A.   Look, I'd have to estimate less than
25  ten -- less than five, rather.  Just nothing is



Page 17

1                Agharkar
2  coming to mind, I'm fairly certain I never
3  testified until today about -- in that sort of
4  setting.
5        Q.   Is this the first case that you've
6  handled that had dealt with someone who's claimed
7  wrongful incarceration and had been released?
8        A.   No.
9        Q.   How many cases have you handled that
10 fit that category?
11       A.   So, I would probably say maybe three
12 to five, something like that.
13       Q.   Can you remember the names of the
14 plaintiffs in those cases?
15       A.   I can't.
16       Q.   Do you remember the jurisdictions?
17       A.   Several were in Louisiana.  So, they
18 were -- I believe they were held in Angola, which
19 is the death row there.  I want to say one was in
20 New York.  But frankly, I'm guessing.  I never
21 testified in any of them.
22       Q.   Did you offer opinions?
23       A.   Yes, at least in one or two of them I
24 issued reports, but the others I don't think got
25 to that stage.

Page 18

1                Agharkar
2        Q.   Were they for the law firm that we're
3  here with today who's representing Ms. Milke?
4        A.   No, I have never worked with this law
5  firm before.
6        Q.   Do you remember the names of the
7  lawyers in the Louisiana cases?
8        A.   I do not.
9        Q.   In your current private practice,
10 have you treated anybody who has made a claim of
11 wrongful incarceration?
12       A.   No.
13       Q.   In the context of the Rule 11
14 evaluations that you performed, are you aware if
15 any of those folks going on to make a wrongful
16 incarceration claim?
17       A.   Not to my knowledge.
18       Q.   What percentage of time do you spend
19 on a weekly basis in working with private patients
20 versus working litigation clients?
21       A.   So, it varies week-to-week.
22 Obviously, like I'm here, usually in the beginning
23 part of the week I'm seeing patients, so I had to
24 cancel my patients this week.  So, typically,
25 though, it's about 30 percent of my time.

Page 19

1                Agharkar
2        Q.   Thirty percent for patients?
3        A.   Correct.
4        Q.   And the rest is litigation?
5        A.   Ten percent is teaching and
6  administrative work, and then 60 percent is
7  forensics.
8        Q.   I'm going to the makeup of your
9  private practice patients over the course of the
10 years.  How many of those patients would you say
11 that you have treated that have had a past
12 incident of rape?
13       A.   In terms of raw numbers?  I see a
14 variety of traumas, but in terms of rape, I would
15 probably say anywhere from 25 to 50, maybe, over
16 the years.
17       Q.   And would those have all been
18 stranger rape or a combination of strangers and
19 intimate partners?
20       A.   Both, yes.
21       Q.   Are you able to break out those
22 categories at all and give an estimate of what the
23 percentage is?
24       A.   I would probably -- well, I mean,
25 again, these are all estimates, so I'm somewhat

Page 20

1                Agharkar
2  guessing because I don't keep numbers on these
3  sort of things.  But my gut tells me it's maybe
4  about 25 percent stranger, 75 percent were
5  intimate, they knew them, date rape situation or
6  something like that.
7        Q.   What would you estimate the number of
8  patients that you've treated who has had past
9  childhood sexual abuse?
10       A.   Probably the percentage is something
11 like 10 to 15 percent.  I see it far more often in
12 my forensic work than in my private practice, but
13 that's also just because of the type of patients I
14 see in my private work.
15       Q.   In the litigation context, what
16 percentage of your clients in that arena are male?
17       A.   95 percent plus.
18       Q.   How many Rule 11 evaluations would
19 you estimate that you have completed on a female?
20       A.   It's -- Rule 11 is an Arizona term,
21 so I'll broaden it to competency --
22       Q.   Competency, correct.
23       A.   I had to learn that doing work in
24 Phoenix.  But in terms of -- well, less than a
25 hundred.  I've done a lot of -- assessments that



Page 21

Agharkar

1  women typically don't comprise as large a
2  population in the criminal arena.
3
4       Q.    Do you have an estimate on the total
5  number of competency evaluations you've done?
6       A.    Estimate, it would probably be 1,100.
7       Q.    In all of those competency
8  evaluations, has that been pretty much the only
9  interaction you've had with a client, you haven't
10 gone to offering them any treatment, for example?
11      A.    Oh, I would never offer them any
12 treatment, that's, you know -- those are ethical
13 roles we don't cross, so I don't do that.  But --
14 but I do want to clarify that competency is
15 usually just one of the issues that I'm asked to
16 address.  Typically, there's also criminal
17 responsibility.
18      In death penalty cases, it may be for
19 mitigation, sentencing phase, so they may ask me
20 to look at all those things and tell us what your
21 opinion is in those areas.  I can't say that's
22 true for all 1,100, but I would say that that's
23 quite often what I'm asked.
24      Q.    How many death penalty cases have you
25 been involved in?

Page 22

Agharkar

1
2       A.    That's pretty much the majority of
3  what I do, and have been doing since 2006, so I
4  would probably say over -- over 800 or over 900
5  capital cases, probably, in some stage, pretrial,
6  habeus, that kind of thing.
7       Q.    Do you have a more consistent
8  practice in a given state?
9       A.    No, it's really varied over the
10 years.  In the beginning, of course, it's mostly
11 Georgia, then I did some of the work in Arkansas
12 for a while, then Arizona.  Quite a bit back in
13 something like '07 to '08, and then now again
14 since the last three years, it's been quite a bit
15 there.  I have done work -- I counted up at one
16 point, I've done work in 26 states, I think,
17 consulted on cases.
18      Q.    Of the death penalty cases that
19 you've been involved in, how many have involved
20 women?
21      A.    Very few.  Certainly less than ten
22 percent.
23      Q.    Do you remember any names in
24 particular of the women?
25      A.    I don't.  I can -- I know some of

Page 23

Agharkar

1  them were in Georgia, I can picture them, Texas,
2  but I can't say for sure.  I also am not sure it
3  would be violating privilege, because it has a
4  consultant and never disclosed and we couldn't
5  talk about it.  But your answer is I still can't
6  remember (laughter), regardless.
7       Q.    Of the cases that you worked on with
8  the death penalty involving women, do you recall
9  testifying in any of them?
10      A.    I don't.  Nothing comes to mind as I
11 sit here.
12      Q.    Going back to the patients that you
13 have treated during the course of your career, in
14 that context, setting aside litigation context,
15 how many of those -- what percentage of your
16 practice is women versus men?
17      A.    Obviously there's some variation, I
18 would typically tell you about more women than men
19 in my practice.  And that's often because men
20 don't admit they have problems and won't seek
21 help, but women will.  So, I think over the years,
22 that's probably accurate.  I would say it's got to
23 be greater than 50 percent women.  I can tell you
24 right now -- certainly 70 percent women, 30

Page 24

Agharkar

1
2  percent men, but that's, you know -- that's just
3  somewhat --
4       Q.    Of that portion of women that you've
5  treated, how many have had abortions?
6            MR. BRUSTIN:  Objection to form.
7            THE WITNESS:  At least one I can
8       think of, off the top of my head.  But I'm
9       sure there are more, but I don't know.
10 BY MS. RETTS:
11      Q.    So, one that had reported to you?
12      A.    That's right, that's correct.
13      Q.    Going back to the documents that
14 you've reviewed, more in formulation for your
15 report, did you review everything that was sent to
16 you page by page?
17      A.    I tried.
18            MR. BRUSTIN:  Objection to form.
19            THE WITNESS:  I made my best effort
20       there, even what I was sent was just a
21       tremendous volume, so I did have to kind
22       of skip through to get the flavor for it,
23       but not necessarily read every single page
24       of everything.
25 BY MS. RETTS:



Page 25

1             Agharkar
2       Q.   Of the letters that you were sent, do
3   you remember the letters exchanged between Ms.
4   Milke and Joe Marino?
5       A.   I remember them, yes.
6       Q.   Do you read all of those page by
7   page?
8       A.   No, I did -- I probably read more
9   than 50 percent, but they're repetitive after a
10  while.  I understand what's in them, so -- and
11  that's what I -- that's what's been represented to
12  me, as well, but in terms of what I understand it
13  to be is in there, is in there.
14      Q.   Just so I understand you correctly.
15  You -- reading about 50 percent, you then sought
16  some assurances from plaintiff's counsel about
17  what you believed to be the remainder of the 50
18  percent was, in fact, what was in there?
19          MR. BRUSTIN:  Objection to form.
20          THE WITNESS:  Yes.
21  BY MS. RETTS:
22      Q.   And you relied upon that and didn't
23  continue further in your review of that 50
24  percent?
25      A.   I did rely upon that, I will say I

Page 26

1             Agharkar
2   did read -- continued to read a few more, you
3   know, as time goes by, I would sort of look at it
4   again and say, okay, here's a new one that I
5   haven't seen, but not the same thing again that
6   I'm reading.  So, it just, for me, confirmed what
7   I was told.
8       Q.   The Vince Felix letters, do you
9   remember seeing those letters?
10      A.   Yes.
11      Q.   Did you read all of those letters
12  page-by-page?
13      A.   Not all of them, but a good portion
14  of them, probably, again, 50 to 70 percent.
15      Q.   What about the letters exchanged
16  between Ms. Milke and Mr. Styers, did you read
17  those letters?
18      A.   I did.
19      Q.   Did you those page-by-page or did you
20  employ the same --
21      A.   I believe I read those all, but I
22  haven't looked at those in a while.  Those were
23  sent to me pretty early on, so I do remember
24  reading through them all.
25      Q.   What about the letters that Ms. Milke

Page 27

1             Agharkar
2   exchanged with Mark Milke?
3       A.   I've only -- only read a few of
4   those.  Maybe five or so.
5       Q.   Did you review all of the letters
6   that Ms. Milke exchanged with her mother?
7       A.   I remember reading them, I don't
8   remember how many.
9       Q.   There were audio tapes in the file
10  that Ms. Milke basically just kind of dictated her
11  life story into those audio tapes.
12      Do you recall listening to those audio
13  tapes?
14      A.   No, I never received such tapes.
15      Q.   At any point in the case, did you
16  get -- do you know what a disclosure statement is?
17      A.   Yes.
18      Q.   Okay.  Listing basically everything
19  that each party claims to use in this case?
20      A.   Yes.
21      Q.   Do you recall getting one from the
22  plaintiff in looking through the documents, to see
23  if there's anything else that you wanted to look
24  at?
25      A.   I did receive it and I don't -- well,

Page 28

1             Agharkar
2   it accurately conveyed what I reviewed and what my
3   opinions were.
4       Q.   Did you review a disclosure statement
5   from the defense and look through, see if there's
6   anything else in there that you wished to look at?
7          MR. BRUSTIN:  Objection to form.  I
8          think he's -- I think he thinks you're
9          talking about something else.
10         MS. RETTS:  Okay.
11         THE WITNESS:  You might be right.
12  BY MS. RETTS:
13      Q.   All right.  A disclosure statement
14  would basically be a listing of documents versus
15  any summary of documents.
16         MR. BRUSTIN:  Just so I'm -- I'm
17         sorry, if you don't mind.
18         MS. RETTS:  Yeah.
19         MR. BRUSTIN:  She's not talking about
20         what you did on your report, she's talking
21         about what the litigants did filed with
22         the court.
23         THE WITNESS:  Okay.  Got you, I see.
24         All right.
25  BY MS. RETTS:



Page 29

1                      Agharkar
2        Q.   Yes.  So, essentially it would be
3   kind of an unformal pleading paper, you would see
4   it from the plaintiff's counsel, it would have a
5   listing of witnesses and a listing of documents.
6   And that would be what they would send to us, to
7   tell us, hey, here are the witnesses we think have
8   information, here are the documents.
9        Do you recall seeing anything like that in
10  this case?
11       A.   No.
12            MR. BRUSTIN:  And I can represent we
13       didn't send it to him.
14            MS. RETTS:  Okay.  The same true with
15       our --
16            MR. BRUSTIN:  That is also true.
17            MS. RETTS:  Okay.
18            THE WITNESS:  Yeah, I apologize.
19       Disclosure, that's -- I've always known it
20       you're disclosing what I'm going to say --
21            MS. RETTS:  Right.  Got it.
22            THE WITNESS:  I understand that.
23  BY MS. RETTS:
24       Q.   Did you rely upon any summaries that
25  were provided to you by plaintiff's counsel in

Page 30

1   formulating your opinions?
2        A.   No.
3        Q.   Did you write the entirety of your
4   first draft of your report?
5            MR. BRUSTIN:  Objection to the form.
6       You can answer that "yes" or "no."
7            THE WITNESS:  Yes.
8   BY MS. RETTS:
9        Q.   Did you write the entirety of your
10  first draft of your rebuttal report?
11           MR. BRUSTIN:  Objection to form.
12      You can answer that "yes" or "no."
13           THE WITNESS:  Yes.
14  BY MS. RETTS:
15       Q.   Did you do any independent research
16  before you drafted your opinions?
17       A.   Can you clarify what "independent
18  research" means.
19       Q.   So, you got the assignment of the
20  case, my understanding from the first page of your
21  report as your purpose, was to assess the
22  existence and extent of Ms. Milke's psychiatric
23  difficulties as it relates to possible damages in
24  a legal proceeding, as well as for psychiatric

Page 31

1   function during the investigation or some criminal
2   proceedings.  And you understand -- understood
3   that was your charge before you went and wrote
4   your report; true?
5        A.   Correct.
6        Q.   And in the context of developing your
7   opinions for that purpose, did you go out and do
8   any type of research on PubMed, or any type of
9   service to find any scholarly articles?
10           MR. BRUSTIN:  Objection to form.
11           THE WITNESS:  No, not at all.
12  BY MS. RETTS:
13       Q.   At any time during your formulation
14  of opinions for this case, for either your initial
15  report or your rebuttal report, did you do any of
16  your own independent research into peer-reviewed
17  sources?
18           MR. BRUSTIN:  Objection to form.
19           THE WITNESS:  In my first report, no,
20      I was already familiar with that literate.
21      So, no, I didn't go out and look for it.
22      In rebuttal, yes, they're -- because I
23      think just to put this nicely, I guess, I
24      guess just to make sure the positions were

Page 32

1   clear and to make sure it was obvious
2       that, in fact, what I said was accurate, I
3       went and found more.  I researched
4       articles to -- to confirm that, and I put
5       them out and I disclosed that in the
6       report.
7   BY MS. RETTS:
8        Q.   All right.  One of the research
9   articles that you cited was from Mr. Haney?
10       A.   Yes, Dr. Haney, yes.
11       Q.   Dr. Haney.  Were you aware of that
12  study before you wrote your opinions in the
13  report?
14       A.   Yes.  And I was aware generally of
15  his work, so --
16       Q.   Were you provided research studies
17  from plaintiff's counsel that you relied upon?
18       A.   No.
19       Q.   In your file materials, there was a
20  section of research studies that appears to have
21  come from plaintiff's counsel, do you have no
22  recollection of that?
23       A.   That may be true.  I'm -- and that
24  sounds familiar, but I've -- I've actually been



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                     33—36

Page 33

1            Agharkar
2  familiar with the majority of them already, so I
3  don't think I haven't looked at it.
4       Q.    Before this case, have you had an
5  opportunity to cite to Dr. Haney's research
6  before?
7       A.    I may have.  If solitary confinement
8  was an issue in a report, then I may have.  But I
9  don't explicitly recall that.
10      Q.    In addressing solitary confinement,
11 do you make a distinction between disciplinary
12 solitary confinement and administrative
13 confinement?
14      MR. BRUSTIN:  Objection to form.
15      THE WITNESS:  I think it depends on
16      the prison, and it just depends on -- I
17      don't even care about name.  I mean, the
18      name is not important.  What is important
19      is what are the housing environments like,
20      what is the social contact like, what is
21      the opportunities for being out of the
22      cell, that's what's important.
23      So, you know, some -- some prisons I've
24      been to -- it's almost like general
25      population just for them, you know, for

Page 34

1            Agharkar
2  protective population, so that's not
3  solitary, you know.  But for others, it
4  is, you know, smaller jails don't have
5  that.  So, it really depends on the
6  incarcerated setting.
7  BY MS. RETTS:
8       Q.    So, it is the environment and what is
9  afforded to the inmates versus the technical name
10 of where they are housed; true?
11      A.    That's correct.
12      Q.    What did you do in this case to
13 determine what the environment was for Ms. Milke's
14 housing?
15      A.    I only listened to her descriptions.
16 And of course, just what I generally know of
17 prisons, having been to many of them.  But -- but
18 I didn't do any independent research into the
19 prison facility that she was housed in.
20      Q.    Have you ever been to that prison
21 facility?
22      A.    Yes.
23      Q.    When?
24      A.    Sometime in the last year, I have a
25 couple of women defendants that I had to evaluate.

Page 35

1            Agharkar
2       Q.    Have you been there into the death
3  penalty ward?
4       A.    For one of them, definitely not.  I
5  know we saw -- I saw her in kind of a day room.  I
6  don't believe so.
7       Q.    For what you relied upon from Ms.
8  Milke's descriptions, were those her written
9  descriptions or what she orally told you during
10 the interview process?
11      A.    Both.  But primarily, I think what
12 she -- what we discussed in our interview.
13      Q.    And it's true that you did not have
14 any type of schedule, official schedule from the
15 Perryville Prison as to what recreation was like
16 or any other type of programming?
17      A.    That's true.
18      Q.    You didn't have any information
19 regarding what library access or other resources
20 that the death penalty women may have had access
21 to?
22      A.    That's true.
23      Q.    Do you have any understanding as what
24 the physical layout is of the Perryville Prison in
25 terms of whether there is access to the outside

Page 36

1            Agharkar
2  via window that opens or closes or any of that?
3       A.    I don't.  I only know what she
4  described, that rec was in a cage, at least it was
5  at that time when she was housed there.  And
6  that's something I have seen in a number of
7  prisons.
8       Q.    Do you have any idea of what the size
9  recognize of the rec pen was?
10      A.    I don't, off the top of my head, I
11 couldn't say for sure.
12      Q.    Do you know what things Ms. Milke had
13 available to her in her cell in terms of
14 television, radio, anything like that?
15      A.    I believe she had a radio, and I know
16 she had a fan for a while, but then they took away
17 the fan.  So, I know that she's had it for, I
18 think, quite a period of time.  It was very hot,
19 there was no way to cool down in that room.  But
20 as I recall, there was a radio or a stereo that
21 she had.  I don't recall television.
22      Q.    She may have had a TV or may not, you
23 are not sure?
24      A.    I would have to consult my notes
25 again.



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
37–40

Page 37

Agharkar

2    Q.   Do you know what personal property
3  she was allowed to have within her cell?
4    A.   I do not know specifically.  I do
5  know that because of frequent shakedowns of the
6  cells, she got rid of any reminders of her son
7  because she didn't want those damaged and
8  destroyed, they were her only copy, so -- but she
9  had to be without pictures of Christopher, for
10  example, I recall her telling me about that.
11    Q.   And did you have an understanding in
12  whether that was in the jail setting or whether
13  that was also in the prison setting?
14    A.   It was the prison.
15    Q.   Did you talk to any personnel at the
16  Perryville Prison to verify anything that Ms.
17  Milke told you about the conditions of Perryville?
18    MR. BRUSTIN:  Objection to form.
19    THE WITNESS:  No.
20    MR. BRUSTIN:  Foundation.
21  BY MS. RETTS:
22    Q.   When you went to Perryville in the
23  last year, were you just in the visitation area or
24  did you go back and do any type of tour of the
25  facility?

Page 38

Agharkar

2    A.   No, they typically don't want me to
3  tour the facilities.  I -- it was a visitation
4  area.  But see, sometimes based on room
5  availability, I will go deeper into the prison,
6  you know, and sometimes I've gone to the cell, or
7  sometimes I've gone, you know, back farther we'll
8  see things.  But I don't recall that happening at
9  Perryville.
10    Q.   Have you ever visited the Durango
11  jail where Ms. Milke was housed pretrial?
12    A.   So, the name Durango sounds very
13  familiar to me.  So, I feel like I have been
14  there.  But I can't recall specifically when that
15  would have been, and I certainly didn't do it for
16  this case.
17    Q.   And did you have an understanding
18  that Ms. Milke was housed in the psychiatric
19  portion of the Durango jail during the time she
20  was pretrial?
21    A.   Yes, I think I knew that.
22    Q.   Have you been to LBJ?
23    A.   Lower Buckeye?
24    Q.   Yes.
25    A.   Yeah, many times.

Page 39

Agharkar

2    Q.   Do you have an understanding that
3  that is the now psychiatric unit of the Maricopa
4  County jails?
5    A.   Yes, I'm aware of that now.
6    Q.   Have you conducted interviews of
7  individuals within that setting?
8    A.   Yes.
9    Q.   Turning back again to research, did
10  you look for any sources in conjunction with
11  writing your opinions and preparing for this case,
12  any ^learned treatises, peer-reviewed articles,
13  things of that nature related to abortion?
14    MR. BRUSTIN:  Objection to form.
15    THE WITNESS:  No.
16  BY MS. RETTS:
17    Q.   Were you aware that Ms. Milke had had
18  two abortions?
19    MR. BRUSTIN:  Objection to form.
20    THE WITNESS:  I was aware of at least
21    one, yes.
22  BY MS. RETTS:
23    Q.   How did you become aware of that
24  abortion, through the letters or through your
25  clinical interview?

Page 40

Agharkar

2    A.   Through the letters.
3    Q.   What is your understanding of whose
4  child that was?
5    A.   A Mr. Ernie Sweat.
6    Q.   As part of your clinical interview,
7  did you explore that abortion with Ms. Milke?
8    A.   No.  There's a lot of trauma to
9  cover.  It took quite a while to get the
10  information -- we'll come to it, but I couldn't
11  cover everything.
12    Q.   Are you aware of any of the literate
13  that relates to trauma and abortion in psychiatric
14  symptoms?
15    A.   Generally.  I haven't looked at them
16  in a while.
17    Q.   And you didn't look it up in
18  conjunction with your opinions in this case.
19    Objection to form.
20    THE WITNESS:  I did not -- I didn't
21    feel it was relevant, given the
22    symptomology that I was -- I was seeing.
23  BY MS. RETTS:
24    Q.   Were you aware that Ms. Milke
25  reported an abortion following a rape from Mark



Page 41

1                  Agharkar
2  Milke?
3       A.   I'm not -- I don't have -- I don't
4  have the timing quite well in terms of when the --
5  that abortion would happen.  I'm aware generally,
6  yes, of another abortion with her ex-husband, but
7  I couldn't say now when I -- when that happened.
8       Q.   Are you aware of that through the
9  letters?
10      A.   Yes.
11      Q.   Did you question her about that
12 during your interview process?
13      A.   No.
14      Q.   Did you explore with her any symptoms
15 that she may have had following the abortion, any
16 depression, psychological symptoms, anything of
17 that nature?
18      A.   Yes.  I mean, generally speaking, I
19 take a longitudinal history of mood and anxiety
20 symptoms, as well as trauma history, and that was
21 not something that she brought up with me in terms
22 of being a traumatic incident.  Or more
23 importantly, I think having psychiatric sequela
24 that are serious as a result of either
25 relationship with Mark or what's happened in her

Page 42

1  childhood past.
2       Q.   And do you agree that sometimes
3  patients aren't the best at identifying what is
4  the cause of their psychiatric symptoms?
5       A.   Sure, I would agree with that.
6  That's not what I asked, though.  I ask about
7  symptoms, I don't ask about the cause.  We get
8  there, I mean, I will talk about it with them, but
9  I still have to make that determination.
10      Q.   Did you conduct any type of
11 psychological testing such as an MMPI?
12      A.   No, I'm a psychiatrist, not a
13 psychologist, we don't do that.
14      Q.   Have you ever worked with anybody to
15 do that?
16      A.   I will on occasion refer -- I assume
17 you mean, the forensic setting, as well the
18 clinical?
19      Q.   Yes.
20      A.   Okay.  So, for the most part, the
21 testing that I order is our neuro-psychological
22 testing batteries, those are far more reliable,
23 far more objective, far more based in brain
24 behavior, not things like the MMPI or these other

Page 43

1  things.  These -- those tests that I find not to
2  be as helpful and particularly here, not useful.
3       Q.   Were you aware that Ms. Milke had an
4  MMPI while she was in jail?
5       A.   I'm aware of -- yes.  I don't -- I
6  don't know that it was a full MMPI, it was some
7  kind of -- that I'm aware of, some sort of
8  personality inventory or testing in the jail
9  prison setting, yes.
10      Q.   Did you ever look at that data?
11      A.   I looked at the report.  So, whatever
12 is in there, I looked at, I guess.
13      Q.   The MMPI report?
14      A.   See, I don't recall it being a
15 specific MMPI, I do recall there were -- she was
16 administered the culture fair IQ test at some
17 point, which is not a valid IQ measure, it was
18 also given a WRAT; W-R-A-T.  And then there was
19 also some sort of personality measure they gave,
20 which gets scales, it didn't look like an MMPI
21 scoring, but I know what that looks like.  But it
22 did have some personality disorder.  So, we may be
23 talking about different things, I'm not sure.
24      Q.   Do you have an understanding that

Page 44

1  that was administered by Dr. Castle?
2       A.   I can't recall.
3       Q.   Do you have a recollection of what
4  date was on those documents?
5       A.   I feel like it was '91.
6           MS. RETTS:  Okay.  Have you guys
7      produced that?  I've never seen any of
8      that.
9           MS. McCARTHY:  I'd have to check --
10          MR. BRUSTIN:  Take a minute and
11     check.
12          THE VIDEOGRAPHER:  We're going off
13     the record at 8:52 a.m.
14          (Discussion off the record.)
15          (Recess taken.)
16          THE VIDEOGRAPHER:  We are now back on
17     the record at 8:53 a.m.
18 BY MS. RETTS:
19      Q.   So, before we took a break, we were
20 talking about some documents that you reviewed
21 that looks to be some sort of a testing, and you
22 said that it was the culture fair, the WRAT, some
23 personality measures in there, with some scales?
24      A.   Right.



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
45–48

Page 45

Agharkar

1
2      Q.    What else do you recall there being
3   in there, if anything?
4      A.    Well, it was maybe a five-page
5   report, perhaps, it looked to me like it was part
6   of the intake process when she went from jail to
7   prison.  That's what it looked like to me, so I
8   have seen that before.  And there were no -- other
9   than a report, there was frankly no other
10  interpretation.  There was a clinician's name
11  somewhere in there, but I just don't remember what
12  the name was.
13     Q.    Did you have an awareness that Ms.
14  Milke also had an expert hired by her criminal
15  defense psychiatric expert?
16     A.    That wouldn't surprise me, but I'm
17  not aware of it.
18     Q.    Have you reviewed any types of
19  reports from any psychiatric experts, who did not
20  appear to be associated with the prison?
21        MR. BRUSTIN:  Objection to form.
22        THE WITNESS:  No, nothing that I can
23     recall.
24  BY MS. RETTS:
25     Q.    Do you remember reviewing anything

Page 46

Agharkar

1
2   from a Dr. Castle?
3      A.    I don't think so.  See, the only
4   reference I remember is, I think, in one of the
5   letters, Ms. Milke writes that some people saw her
6   for competency, and she is not crazy and she is
7   competent.  So, the doctors must have looked at
8   her probably Rule 11, but that's all I know.
9      Q.    After reviewing that reference in the
10  letters, did you ever request from plaintiff to
11  see the documents that had been generated as a
12  result of that?
13     A.    I did not.  Competency was not the
14  referral question for me.
15     Q.    Whether there was a Rule 11 or some
16  type of other evaluation that occurred in 1991, it
17  would have provided some contemporaneous
18  psychiatric data for you; true?
19        MR. BRUSTIN:  Objection to form.
20        THE WITNESS:  It could.  Those -- in
21     my experience, those prison testing
22     materials are typically not helpful,
23     they're typically not accurate, they're
24     typically not even administrative --
25     administered by a licensed psychologist.

Page 47

Agharkar

1
2      So, I would look at it, but I typically
3      don't find them helpful.
4   BY MS. RETTS:
5      Q.    Well, that's a little different from
6   someone who Ms. Milke may have hired specifically
7   at defense expert; true?
8      A.    True.
9      Q.    Would you find those sources in your
10  opinion to be a little more reliable?
11        MR. BRUSTIN:  Objection to form.
12        THE WITNESS:  Without knowing who and
13     what was exactly done, I couldn't really
14     say.  But I certainly would look at such a
15     thing, yes, I just -- I'm not aware of it.
16  BY MS. RETTS:
17     Q.    And that could be information that
18  could provide you with the source of
19  contemporaneous data during the timeline that she
20  was incarcerated, related to her psychiatric
21  functioning at that time?
22        MR. BRUSTIN:  Objection to form.
23        THE WITNESS:  Sure.  Depending on the
24     scope of what the evaluation is, yes.
25  BY MS. RETTS:

Page 48

Agharkar

1
2      Q.    Do you have any conversations with
3   any of the providers at the Perryville prison in
4   conjunction for rendering your opinions?
5      A.    No.
6      Q.    My understanding is that you spoke to
7   two childhood friends of Ms. Milke, and Ms. Milke
8   and her treating provider, is that the extent of
9   the interviews that you had individuals related to
10  the case?
11     A.    Yes.
12     Q.    In your file, I didn't see any notes
13  from your interviews with Ms. Milke, did you take
14  any notes?
15     A.    Yes.  I provided -- he gave it to
16  you.
17        MS. McCARTHY:  They were provided.
18        MS. RETTS:  Okay.  We found none in
19     there from her interview.
20        MS. McCARTHY:  But they're in a
21     folder --
22        MS. RETTS:  They're in a folder with
23     various notes from Robin, and there's
24     notes from Robin Swerland.
25        MR. BRUSTIN:  We should print them

Page 49

Agharkar

1
2    for you.  Do you want to do that now or
3    you want to wait?
4         MS. RETTS:  No, we can have someone
5    print it while I'm questioning him, that's
6    fine.
7         MS. BURKE:  Can you print them now?
8         MR. BRUSTIN:  Yes.
9    BY MS. RETTS:
10        Q.    You conducted three interviews of Ms.
11   Milke; true?
12        A.    Correct.
13        Q.    And those interviews ranged in time
14   with the longest being around two and a half
15   hours -- 2.75, around there?
16        A.    It's almost 3, so, yes, I think -- I
17   think in total, it's around eight hours, but
18   that's correct, it's between 2.3 to 2.75 hours.
19        Q.    Where did those interviews take
20   place?
21        A.    At the law firm that has our -- that
22   she works at --
23        Q.    Do you have an understanding that
24   those lawyers were also her criminal defense
25   attorneys for a period of time?

Page 50

Agharkar

1
2         A.    Yes.
3         Q.    Did that factor into your opinions at
4    all in terms of her daily exposure to the same
5    type of materials about criminal cases that she
6    experienced in hers?
7         MR. BRUSTIN:  Objection to form.
8         THE WITNESS:  We talked about it.
9    And in fact, she finds it very distressing
10   to hear about or see things gone in the
11   criminal justice system, so she actually
12   tries to avoid hearing it or dealing with
13   it as much as possible.  She also noted
14   there's a room, apparently, that contains
15   her files, her boxes, and she tries to
16   avoid that room as much as possible.
17   BY MS. RETTS:
18        Q.    Did you speak to her about whether or
19   not she tried, at any point in time, to obtain any
20   other employment in any other field?
21        A.    Not -- not since her incarceration,
22   if that's what you mean.  Since she's been
23   released, my understanding this is where she's
24   worked, that firm.
25        Q.    In conjunction with her reporting

Page 51

Agharkar

1
2    that it was distressing to hear and see about
3    things in the criminal justice system, did she
4    mention that she ever sought to find different
5    employment to avoid that?
6         A.    No, I think she recognizes that other
7    employment would be very difficult.  Her work
8    environment is extremely flexible and
9    understanding about her condition, so she can take
10   days off when she's having a particularly tough
11   time with anxiety or depression, so she can take
12   three days.
13        But sometimes she would just call in and
14   say, "I'm sorry, I just can't do it today," and
15   they're totally understanding, they never stress
16   her about it, and they let her do it.  She's aware
17   that that's not the real world, and that she would
18   not be able to find that probably with another
19   employer.
20        Q.    Do you have an understanding whether
21   she has tried to find any other employment other
22   than what she currently has?
23        MR. BRUSTIN:  Objection to form.
24        THE WITNESS:  Not to my knowledge.
25   BY MS. RETTS:

Page 52

Agharkar

1
2         Q.    Do you ever audio record or video
3    record the interview process?
4         MR. BRUSTIN:  Objection to form.
5         THE WITNESS:  No, I've never done
6    that.
7    BY MS. RETTS:
8         Q.    The interviews that you conducted, is
9    it Swerland, Robin Swerland?
10        A.    I don't know.  I think that's a
11   Ms. Robin.
12        Q.    Okay.  Ms. Robin, how long do you
13   remember talking to her?
14        A.    So, I produced those notes, too.  Oh,
15   I'm sorry -- yes, I produced those notes, but
16   they're in this report because they're not on the
17   notes themselves, because I typed those quickly.
18   And so, for her it's .6 hours.
19        Q.    Did you conduct that interview on the
20   telephone or in-person?
21        A.    Telephone, both, her and this other
22   childhood friend, Ms. Patty Bacon.
23        Q.    Ms. Milke's treating provider here,
24   was that a telephonic interview, as well?
25        A.    Yes.



Page 53

1           Agharkar
2       Q.   What is the last date of records that
3   you can recall reviewing from Ms. Milke's treating
4   provider?
5       A.   I feel like a late -- a late 2017
6   date comes to mind.  I don't -- I don't recall an
7   early 2018, so I think it's somewhere in the fall
8   of 2017 --
9           MS. RETTS:  Let's take a quick break.
10          THE VIDEOGRAPHER:  We are now going
11      off the record at 9:02 a.m.
12          (Exhibit 261 was so marked for
13      identification.)
14          THE VIDEOGRAPHER:  We are now back on
15      the record at 9:16 a.m., this begins Tape
16      2 of the deposition of Bhushan S.
17      Agharkar.
18  BY MS. RETTS:
19      Q.   Doctor, if you look at what has been
20  marked in front of you as Exhibit 261, can you
21  confirm for me that these are the notes you wrote
22  for the interviews of Ms. Milke?
23      A.   They are.  We're missing one from
24  2018.
25          MS. McCARTHY:  You mean the typed

Page 54

1           Agharkar
2   one?
3           THE WITNESS:  No, there's one more
4   from my interview of her in 2018.
5   BY MS. RETTS:
6       Q.   All right.  So, let's go through
7   those when we get the next piece.  I have some
8   questions on your handwriting.
9       A.   I want on the record that I have very
10  good handwriting for a doctor.
11      Q.   You do, it's just some of the --
12  that's the important part, that's right.
13  BY MS. RETTS:
14      Q.   Some of the abbreviations I just want
15  to confirm that -- second line on the first page,
16  this is from your interview 5/24/61; is that
17  correct?
18      A.   Yes.
19      Q.   And have had MDDs since all of this
20  started?
21      A.   Major depressive disorder.  She would
22  have just said depression, but I put in MDD.
23      Q.   Okay.  All right.  And then the end
24  of that sentence, it says --
25      A.   "Positive sign crying spells,

Page 55

1           Agharkar
2   apathy."
3       Q.   Next, "Discontinued Zoloft 12/15"; is
4   that correct?
5       A.   Yes.
6       Q.   Then MDD is major depressive disorder
7   surrounding son's murder?
8       A.   Before son's murder.
9       Q.   Before.  No major depressive disorder
10  before?
11      A.   Correct.  That's right, no -- no
12  prior history of anxiety or depression prior to
13  the son's murder.
14      Q.   What tool did you use to determine
15  whether Ms. Milke's self-reports were capturing
16  all of her pre-incarceration events?
17          MR. BRUSTIN:  Objection to form.
18          THE WITNESS:  I'm not sure I
19      understand the question.
20  BY MS. RETTS:
21      Q.   All right.  So, when you do a
22  clinical interview of someone, there's a specific
23  format that you follow?
24          MR. BRUSTIN:  Objection to form.
25          THE WITNESS:  I follow a

Page 56

1           Agharkar
2   semistructured interview setting form, so
3   to speak -- not form, I mean, it's in my
4   head at this point.  There are various
5   topic areas that I want to cover.  I ask
6   open-ended questions to try ^to elicit the
7   symptoms, then I follow up on those
8   symptoms when -- and if they come out, or
9   I'll ask clarifying questions and try to
10  get a better story, so to speak, to -- in
11  more detail in what I'm being told.
12      So, that's my typical style.  But
13  there's a semi-structure to it in the
14  sense that there's -- there are things
15  that I want to make sure get covered in
16  the evaluation process.
17  BY MS. RETTS:
18      Q.   Do you have a list of written
19  questions that you maintain, that you follow in
20  every case, or it's just all in your head?
21      A.   So, I do have one that I primarily
22  use it for criminal cases.  At this point -- but I
23  never fill it out.  I produce notes exactly just
24  like this.  I use it as a guide, I page through
25  it.  I'm almost positive I did not do that here

BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              57—60

Page 57

Agharkar

1
2  because it's in my head, and frankly -- especially
3  when you're interviewing for trauma, it's far more
4  important to look at the person, assess the
5  person, follow up and stay engaged with the person
6  in real-time, rather than, you know, copiously
7  taking notes, that's actually counterproductive to
8  what you're trying to do.
9      So, here, I don't think I would have looked
10  at other pages and such, so I would not have
11  followed a structured interview paper, so to
12  speak.  I think I just asked her questions and we
13  continued down with that process.  Having
14  conducted as many evaluations I've conducted, at
15  this point it's in my head.
16      Q.   Are you able to recite back for us
17  the questions that you ask, or is that just really
18  kind of impossible?
19          MR. BRUSTIN:  Objection to form.
20          THE WITNESS:  Right.  They're not,
21      you know -- that's the kind of thing a
22      medical student does, or a resident who's
23      learning how to ask questions.  I don't
24      have specific questions, it's topic areas,
25      you know.  So, under past psychiatric

Page 58

Agharkar

1
2      history, for example, I always ask, "Have
3      you been hospitalized?  Have you ever
4      attempted suicide?  Have you -- is there
5      any history of outpatient psychiatric
6      treatment?  Any outpatient psychiatric
7      medications?"  So, I ask the same things
8      every time.  All I have to add on there is
9      PTH, which is past psyche history, and I
10      know what I'm going to ask.
11  BY MS. RETTS:
12      Q.   There are certain structured
13  interviews for trauma that are used within the
14  field; true?
15      A.   Yes, that's right.
16      Q.   And could you list out a few of those
17  for me.
18      A.   I think those -- I've never used one,
19  first of all, I would say that I don't find them
20  necessary, they ask the same types of questions I
21  would ask anyway in my interviews.  So, I will
22  also say to you that those types of structured
23  interviews are most often, in my experience, used
24  for research purposes because they are -- the idea
25  is that they are standardized, and that way,

Page 59

Agharkar

1
2  you're taking the clinician out of it.
3      In other words, somebody with less training
4  could do it, and get the same types of answers
5  because then the doctor can make sense of it and
6  figure out, okay, do we include it or exclude it
7  from research study?
8      But there are things -- I think it's called
9  CPTSD, which is sort of like history -- I think
10  they call it comprehensive trauma interview or
11  something like that.  That's the one that comes to
12  my mind.
13      There's other things like the trauma symptom
14  inventory, I think it is, the TSI.  But again,
15  I've looked at those kinds of things, those kinds
16  of tests, it asks the same kind of questions I
17  would ask and do ask in any interviews, so I've
18  never seen a need to do them.
19      Q.   One of the reasons for using the
20  standardized questions you mentioned with research
21  is so that it can be replicated throughout a
22  research program; true?
23      A.   Yes, that's one of the reasons.  And
24  again, like I said, that way -- that way, a
25  master's level person can administer it.  And it's

Page 60

Agharkar

1
2  not administer, it's literally just reading
3  questions, and then recording the answers, but
4  you're not making any sort of clinical assessment,
5  and that's not what doctors do.  Doctors make
6  clinical assessments as we get the information in
7  real-time, and make determinations, do we think
8  it's valid, is there something to follow up on,
9  what's the affect look like?  I mean, there's a
10  lot of things that go along with doing an
11  interview.
12      So, that maybe one reason why people do it,
13  yes, but again, I don't.  A rote style of
14  interviewing I think is poor technique, it's not
15  something I teach, it's not something I advocate
16  for.  I think you have to start there as a student
17  or as a resident, when you're trying to understand
18  the process.  But once you kind of know what you
19  are doing, so to speak, there's really no reason
20  to do that, that way.
21      Q.   Do you understand that those trauma
22  symptom inventories or the PTSDs are designed to
23  make sure that the person being questioned thinks
24  ^that there's information that they might not
25  otherwise have thought of?



Page 61

1                    Agharkar
2         MR. BRUSTIN:  Objection to form.
3         THE WITNESS:  That can be true.  I
4    have actually seen it work the other way
5    because many of those inventories states
6    them, "Thinking about the last six months,
7    tell me about the most traumatic
8    experience you have had."  Or, In the last
9    six months, have you ever experienced X, Y
10   and Z thing?
11        In this case, we have a 25-year history
12   of trauma, six months misses the picture,
13   that's totally useless in this sitting,
14   additionally, asking somebody like this
15   who's experienced multiple traumas,
16   multiple ways over a longitudinal time
17   like this, if you ask her what's the one
18   thing, you missed the picture.
19        So, I find those -- that's another
20   reason why I don't think, in this case,
21   those types of inventories would have been
22   of value.
23   BY MS. RETTS:
24        Q.   Did you use the life events checklist
25   for the DSM-5?

Page 62

1                    Agharkar
2         A.   I've never used that.
3         Q.   You understand that that goes through
4    a person's entire life to identify trauma
5    longitudinally across their life?
6         A.   Sure, which I was able to accomplish
7    through interviewing without using an inventory.
8         Q.   Did Ms. Milke report to you that she
9    had had an instance of sexual abuse during your
10   interview with her?
11        A.   By her ex-husband, yes.
12        Q.   Did she report sexual abuse as a
13   child?
14        A.   She did not.
15        Q.   Are you aware from reading the
16   letters to Mr. Felix that she reported sexual
17   abuse?
18        A.   I'm not aware of that.  In fact, I --
19   I recall a letter to, I think, her mother ^or some
20   other folks, where she denied sexual abuse.  So, I
21   don't -- I don't have information on that.
22        Q.   So, you didn't explore with her
23   whether or not she had been sexually abused as a
24   child?
25        A.   I did.  I asked generally speaking, I

Page 63

1                    Agharkar
2    asked have you been physically abused, sexually
3    abused, emotionally abused as a child, that sort
4    of thing.  The answers were no.  Other than some
5    emotional abuse -- the relation with her father is
6    difficult, I understand he was an alcoholic, they
7    had a conflicted type of relationship, but it
8    never reached the level of abuse, and certainly
9    not too pervasive trauma in her life.
10        Q.   Did she ever report to you that her
11   father had sexually abused her at age 12?
12        A.   She did not.
13        Q.   Is that something, having heard it
14   right now, that you would want to explore with
15   her?
16        A.   Sure.  It would not make sense --
17   okay.  So, yes, absolutely, I would want to
18   explore that, but her symptom presentation and the
19   types of symptoms she's experiencing would not
20   relate to childhood sexual abuse.
21        Q.   How do you know that?
22        A.   Well, certainly some of the
23   nightmares she's experienced about seeing an
24   inmate set on fire, people slicing their throats
25   and wrists, of course, nightmares about her son's

Page 64

1                    Agharkar
2    murder have nothing to do with childhood sexual
3    abuse.  Similarly, some of her avoiding symptoms
4    and running symptoms, you know, having to watch
5    exits or hypervigilant stuff, these things all
6    relate to her prison time, so it wouldn't be
7    related to a childhood sexual abuse issue.
8         Q.   I'm not going to mark it, but I'm
9    going to have you look at it really quickly.
10   These are letters that we received from your file
11   (indicating), that were produced back to us.  It's
12   the letter 003116, and then the Bates is also
13   MSB027921.
14        Q.   Take a look at that (indicating).  If
15   you'll read just the highlighted part out loud.
16        A.   "Then my dad had the gall to go to my
17   train, and act like he just loved Chris so much.
18   He is the most phoney person I know.  I truly hate
19   him, I always have.  That bastard sexually abused
20   me when I was 12 years old."
21        Q.   Do you recall reading that in the
22   file?
23        A.   I do not.
24        Q.   Had you read that, is that something
25   that you would have asked Ms. Milke about during



Page 65

Agharkar

2  your interview of her?
3      A.   I would have.  There's, you know, a
4  tremendously large file, so it's really not
5  possible for me to ask her about everything in it;
6  but sure, I would ask her about it.
7      Q.   Did she report having a difficult
8  relationship with her father to you?
9      A.   Yes.
10     Q.   What did she describe about that
11 relationship?
12     A.   Well, that he was a disciplinarian,
13 very military-oriented, kind of cold, and again,
14 had a serious alcohol problem, and so she did her
15 best to kind of stay away from him, and she
16 followed the rules so as to not get into trouble.
17     Q.   Did she explain to you why, given
18 that history, she wanted to leave Phoenix,
19 Florence, to go see him the day that -- the day
20 after Christopher disappeared?
21     A.   No, I'm not clear on that.  I think
22 that's just -- it's a conflicted relationship, you
23 know, there's both, you know, discomfort or anger
24 and love, I mean, that's still your father.  And
25 so, that's what she said before to me, as well,

Page 66

Agharkar

2  that, you know, he wasn't a good person or he
3  didn't want -- she didn't -- they didn't get
4  along, but he's still my dad, and so that's --
5  that all I can say about that.
6      Q.   Turning back to your notes about one,
7  two, three, four -- five lines down.
8      A.   First page?
9      Q.   First page, ID?
10     A.   "I don't" --
11     Q.   "I don't keep up with Jim and Rogers
12 cases"?
13     A.   Correct.
14     Q.   "No priors," what's that?
15     A.   No prior legal history, no prior
16 arrests, no criminal charges, prison time, no --
17     Q.   Did Ms. Milke ever report to you
18 anything about having a license suspended, or
19 losing her license or anything like that?
20     A.   I don't think so, and I don't think I
21 would have asked about that anyway.
22     Q.   As part of legal history, would you
23 have explored whether she had any criminal
24 proceedings or any proceedings related to a
25 license or anything like that?

Page 67

Agharkar

2      MR. BRUSTIN:  Objection to form.
3      THE WITNESS:  I wouldn't have cared,
4      honestly, about her driver's license.  So,
5      I think -- typically the way I ask a
6      question, I'm interested in serious
7      offenses, so any violent offenses, any
8      past prison time, things like that.
9      Prior -- yeah, so it probably didn't come
10     up --
11 BY MS. RETTS:
12     Q.   Going down to about the middle, it
13 says, "Taught myself algebra and improved my
14 Spanish," is that in prison?
15     A.   Yes.
16     Q.   "Witnessed many, many fights between
17 inmates, as well as guards, saw someone light
18 herself on fire -- slice throats, wrists"?
19     A.   Yes.
20     Q.   Did you explore with Ms. Milke how it
21 was possible that she could have seen those things
22 given her placement in a solitary cell?
23     A.   She said there is a window, she's
24 able to look out the window.  She would hear a
25 commotion sometimes, so she would look out and

Page 68

Agharkar

2  see.
3      Q.   And these were people that she
4  reported that she saw then in the dayroom doing
5  these things?
6      A.   So, at least for -- she's seen the
7  aftereffects, so like a woman on fire, for
8  example, she see -- she's told me that she's able
9  to see the person.  She's aware of the commotion,
10 she was aware of what was going on in the cell,
11 and she's able to see the person extracted and on
12 fire.
13     Q.   She saw inmates sliced their throats,
14 wrists, did she explain how she could have seen
15 those things?
16     A.   No.  My understanding of it was that
17 she saw the -- she didn't see the physical act,
18 but rather the after, you know -- to them being
19 bandaged or being taken away, that kind of thing.
20     Q.   So, not as it was actively occurring?
21     A.   Correct.
22     Q.   But as the medical response was
23 happening?
24     A.   Right, yeah, because she would be in
25 her cell.

Page 69

Agharkar

1
2    Q.    "SOB"?
3    A.    Shortness of breath.
4    Q.    Okay.  Short of breath, put on
5    Zoloft, is that what that says?
6    A.    Yes, that's correct.
7    Q.    Okay.  Wakes at 2:00, 3:00 a.m. BD?
8    A.    QD, every day.
9    Q.    QD, okay.  So, this is --
10   A.    Present.
11   Q.    Present.  Okay.  She can't relax,
12   can't sit through a movie, just get antsy?
13   A.    Yes.
14   Q.    Did you explore with Ms. Milke what
15   her social activities are?
16   A.    Well, typically she stays very
17   isolated, that she has friends who call her, this
18   tend to be old friends, she's not really making
19   new friends.  They would call her and ask her to
20   go out.  She will often decline, but I think it's
21   part of therapy, she knows she's supposed to be
22   trying to do that more, get out more.  So, she
23   will sometimes do it, but makes her very
24   uncomfortable.
25        So, she will sometimes have people over to

Page 70

Agharkar

1
2    her house.  But otherwise, in terms of activities,
3    I -- in my recollection, there's something about
4    hiking, she has a dog and I think she likes to go
5    out, kind of nature, be solitary, but with the
6    dog, and she finds that helpful.  But otherwise,
7    no, there's not a lot of social life for her.
8    Q.    Okay.  So, she reported that in terms
9    of social activities, usually people were coming
10   to her versus her going out?
11       MR. BRUSTIN:  Objection to form.
12       THE WITNESS:  Yes.  And it didn't
13       sound to me that that was happening often,
14       it was just that that would be -- that's
15       her strong preference to be in.  And her
16       friends corroborated that, we call her,
17       you want to go out with me, and she will
18       turn us down a lot, but we try to be
19       insistent and try to keep showing up and
20       sometimes we'll be able to do something
21       with her.
22   BY MS. RETTS:
23   Q.    Do you know whether or not she
24   travels?
25   A.    She has travelled, yes.  She's been

Page 71

Agharkar

1
2    to Germany, and I know she's given some speeches.
3    Q.    How many times did she report she's
4    been to Germany?
5    A.    There's one I know for sure, I
6    just -- I can't recall if there's more than one.
7    Q.    What about speaking engagements in
8    terms of traveling, how frequently was she
9    travelling?
10   A.    I don't recall the specifics, I would
11   say, you know -- somehow in my gut, I recall maybe
12   a couple of times a year, at these sort of
13   conferences.
14   Q.    Does she travel alone?
15   A.    I'm not sure I asked her that, I
16   don't recall.
17   Q.    Did you ask her what she does during
18   her travels, whether she goes out and sightsees,
19   any of that?
20   A.    No, I didn't ask her that.
21   Q.    When she's travelled internationally,
22   did you ask her whether she travelled alone or
23   with someone?
24   A.    I just can't recall.  I know that
25   there are friends involved, but I can't be sure if

Page 72

Agharkar

1
2    the friends were already there that she was
3    meeting, or if they went with her.
4    Q.    Did you ask her where she stays when
5    she goes on these travels?  Does she stay in a
6    hotel, does she stay in Airbnb?
7    A.    I didn't ask that with specifically.
8    Q.    What about in terms of daily
9    activities, what does she report to you about her
10   daily activities?
11   A.    Well --
12       MR. BRUSTIN:  Objection to form.
13       THE WITNESS:  Crowds still scare her
14       quite a bit, she gets very nervous and
15       very unsure just with her environment and
16       surroundings.  So, she will typically --
17       and her friends corroborate this, too,
18       that she'll shop at like store open, you
19       know, so 5:00 in the morning at Publix or
20       something because the crowds are a lot
21       less then, less people there.
22        So, that's typically when she'll get
23       her shopping done.  Importantly, although
24       she does these things, there's a great
25       deal of distress when she's doing it, and



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                                      73–76

Page 73
Agharkar
1
2     she's quite anxious, but she knows, and I
3     think enough people have told her that you
4     need to be doing this, that she forces
5     herself to do it.  It's the same thing I
6     would do with a patient in my practice, as
7     well, I mean, someone who's got panic or
8     anxiety, I would still tell them you got
9     to still try because you're not going to
10    get any better if all you do is stay
11    inside.
12       So, I know she does some of those
13    things in terms of her daily living.  I
14    mean, I know that she told me she removed
15    all the locks in the house, because she
16    can't even stand the thought of being
17    locked behind a door.
18       As far as I'm aware, she can handle
19    activities of daily living as a general
20    matter, you know, as far as I'm aware.
21    And again, we talked about she'll go to
22    work when she's able to.  And otherwise,
23    she stays home pretty much.
24       Q.   What's your understanding of what her
25    position is at the firm?

Page 74
Agharkar
1
2     A.   The way I understand it, it's kind of
3     like a paralegal.  I mean, she's just kind of
4     doing administrative type work.
5     Q.   Did she report to you that she ever
6     served as a receptionist in front of the office?
7     A.   I can't recall that she may at some
8     times.  They've had different people there, I know
9     when I've been there.  So, they have different
10    receptionists.
11    Q.   In terms of her daily activities with
12    her shopping, she reported to you that she would
13    typically go to a small store when it opened,
14    rather than something like a big box store like a
15    Costco?
16    A.   Yes.  She will go to Costco, but she
17    leaves quickly, apparently.  It panics her very
18    often, she does not like Costco.  And in my
19    recollection, one of her friends said that, too,
20    that I took her there and she really freaked out.
21    So, at any rate, it typically tends to be the
22    smaller grocery stores.
23    Q.   Did she speak to you about traveling
24    here to New York as part of this litigation, to
25    prepare for her deposition?

Page 75
Agharkar
1
2     A.   No.  I'm not sure if she had made any
3     trips here during the time that I interviewed her.
4     But I don't know if I would have asked her about
5     that specifically.
6     Q.   On your notes again, the "SH"?
7     A.   Social history.
8     Q.   Social history.  No drugs?
9     A.   Correct.
10    Q.   So, Ms. Milke reported to you that
11    she had no history using drugs in the past?
12    A.   Presently.
13    Q.   What about past?
14    A.   I don't recall any.  Alcohol, I do
15    know that.  But I can't recall.
16    Q.   Did she report having a problem with
17    alcohol in the past?
18    A.   She did not, no.
19    Q.   Did she ever report to you that she
20    drank to the point of blacking out in the past?
21    A.   She did not, no.
22    Q.   Would that have been something
23    relevant to your opinions?
24    A.   Not presently, no.  She doesn't have
25    a present -- what I'm particularly interested

Page 76
Agharkar
1
2     there is -- is self-medication now, you know.  Is
3     she doing things to numb herself or using drugs to
4     somehow quell anxiety or depressive symptoms.  And
5     she is actually saying that that's why she drinks
6     a couple of beers a day.  But certainly any
7     substance abuse history is interesting.  I don't
8     know if that's necessarily relevant to current
9     trauma, however.
10    Q.   So, she had a piror history of having
11    a problem with drinking, but now doesn't drink to
12    excess and doesn't have a problem with it,
13    wouldn't you agree that's significant in terms of
14    her functioning and avoiding self-medication?
15       MR. BRUSTIN:  Objection to form.
16       THE WITNESS:  Yes.  Although you have
17    to consider she's been sober for 25-plus
18    years, forced sobriety, which for -- and
19    especially now she's much older.  I mean,
20    drinking often goes with younger people,
21    it tends burns out as you get older,
22    unless you've got very serious problems
23    with it.  So, I do agree with what you're
24    saying.  On the other hand, too, she is --
25    she is treated to some degree, I don't



Page 77

1              Agharkar
2       think a very good degree, but she is
3       treated to some degree with
4       anti-depressants, therefore there would be
5       less motivation or drive to use substances
6       to treat herself.
7   BY MS. RETTS:
8       Q.    Do you know what black beauties are?
9       A.    Yes, Quaaludes, I think.  I think
10  they're barbiturates, they're sedatives.
11      Q.    Did Ms. Milke report to you that in
12  past she had been a, quote, back beauty eater?
13      A.    She did not report it, I don't think
14  I would have asked it either.  That's an old drug,
15  '70s.
16      Q.    Do you recall seeing that referenced
17  in the letters?
18      A.    No, I don't.
19      Q.    Would that have been something that
20  you would want to explore with her if you knew
21  about it?
22      A.    Sure.  I'd be happy to explore any
23  number of things, but again, there's only so much
24  you can cover.  And again, the interviews
25  themselves were traumatizing to her, so I had

Page 78

1              Agharkar
2   to -- they're tricky because can you see her
3   getting worse as the interview proceeds, she
4   actually gets re-traumatized by reliving a lot of
5   these things, so you had to be careful.
6       After a while, the interviews don't
7   yield truthful information, because she's so
8   emotional, or so difficult to talk about some of
9   these things.
10      So, at any rate, my point in saying that is
11  to try to cover as much ground as you can in the
12  time you have.
13      Q.    Did Ms. Milke ever report an incident
14  where Mark Milke injected her with cocaine, and
15  she had to be hospitalized?
16      A.    No.
17      Q.    Was that something that you would
18  consider to be a traumatic incident if it were
19  true?
20      MR. BRUSTIN:  Objection to form.
21      THE WITNESS:  It could be, it depends
22  on the context; if they were both high
23  both, if they were both on drugs, if there
24  was an accident, I don't know.  But
25  there's a lot of context we have to find

Page 79

1              Agharkar
2       out about that to determine whether or not
3       it was traumatic.
4   BY MS. RETTS:
5       Q.    Is that something that if you had
6   known about, you would have wanted to question Ms.
7   Milke about?
8       A.    Yes.
9       Q.    That could be something that could be
10  traumatizing?
11      A.    It could be, it depends on the
12  context and the reaction to the -- to the event.
13      Q.    For example, if it was unwanted?
14      MR. BRUSTIN:  Objection to form.
15      THE WITNESS:  That could be true,
16      yes, that could be traumatic.
17  BY MS. RETTS:
18      Q.    Without consent?
19      A.    Sure.
20      Q.    And you would have to look at it in
21  the context of their overall relationship; true?
22      A.    Yes, but I was thinking of the
23  context of what were they doing at the time, you
24  know.  A lot of unintended things happen when
25  people are drunk or high, so we want -- I do need

Page 80

1              Agharkar
2   more information about all those things.  Again,
3   that wouldn't explain the trauma symptoms I'm
4   seeing now, but certainly that's a historical
5   piece of information I would like to know more
6   about, sure.
7       Q.    How did Ms. Milke describe her
8   relationship with Mark Milke?
9       A.    Initially, good.  But that, you know,
10  he had a very serious substance abuse problem, and
11  so it became -- although never violent, became
12  abusive in a sense that he wasn't responsible, he
13  couldn't be entrusted with their child.  She often
14  had to be wary about that, you know.  He would --
15  he would go out, you know, she's taking care of
16  the child and he is out partying and getting
17  drunk, he comes back drunk, he comes back with
18  other women.  So, it sounds like a very bad
19  marriage.
20      Q.    Did she report emotional abuse?
21      A.    She did.
22      Q.    Longstanding during the course of
23  their rim?
24      A.    I think that's fair.
25      Q.    She denied any physical abuse?



Page 81

1                        Agharkar
2             MR. BRUSTIN:  Objection to form.
3             THE WITNESS:  Correct.
4   BY MS. RETTS:
5        Q.   Were you ever aware that -- from her,
6   that Mark Milke had been arrested for a domestic
7   violence incident, where she had alleged that she
8   had been hit by him?
9        A.   No.
10       Q.   Is that something you would have
11  wanted to explore with her?
12       A.   Sure.
13       Q.   Did Ms. Milke report that she was
14  sexually assaulted by Mark Milke on more than one
15  occasion?
16       A.   No, there's only one I'm aware of.
17       Q.   What did she tell you about that?
18       A.   That he came over, I believe they
19  were either separated or divorced at the time, but
20  obviously they're coparenting Christopher, and so
21  she asked to see him.  And I can't recall if he
22  was intoxicated or not, I believe that he was, and
23  that he wanted to have sex with her, and she did
24  not want to have sex with him, but then he
25  basically forced himself upon her.

Page 82

1                        Agharkar
2        And she said, she said, you know, I know
3   these days that would be considered rape, I didn't
4   consider it rape back then -- and I recall this in
5   the news myself, I was much younger obviously,
6   but, you know, could, you know -- can a man rape
7   his spouse, that was something that was coming out
8   of the news a lot, and that's what she talked
9   about.
10       Actually, she said back then if you're
11  married, you just -- you had sex with your
12  husband.  So, she didn't view as a trauma, she
13  understands now that it was wrong, I mean, you
14  know, but she wouldn't have viewed it that way
15  back then.
16       Q.   So, back then, she reported to you
17  that she did not consider it rape?
18       A.   Correct.
19       Q.   Down a couple of lines in your notes,
20  it says that Ms. Milke can't have children, can't
21  have kids?
22       A.   Correct.
23       Q.   Did you explore with her whether or
24  not she had a desire to have children?
25       A.   Yes, in fact, she -- well, she said

Page 83

1                        Agharkar
2   -- yes, that that was important to her, you know,
3   it comes up obviously where she's seeing -- see,
4   people see her and assumes she's a grandmother, so
5   she's not even a grandmother, so that it's very
6   difficult for her to even be able to talk about
7   why she doesn't have a family, kids and -- but,
8   yes, she said that that's something that she would
9   have liked to have had, and, you know -- I don't
10  know if it would have happened or not, but
11  that's -- this is a possibility that's foreclosed
12  to her now, at least, let's put it that way.  And
13  so, we talked about it more in that way.
14       Q.   So, she reported that she did at some
15  point wish to have more children?
16             MR. BRUSTIN:  Objection to form.
17             THE WITNESS:  Yes.
18             MR. BRUSTIN:  Is this a good place
19  for a minute break?
20             MS. RETTS:  Go ahead.
21             THE VIDEOGRAPHER:  We are now going
22  off the record at 9:46 a.m.
23             (Recess taken.)
24             (Exhibit 262 was so marked for
25  identification.)

Page 84

1                        Agharkar
2             THE VIDEOGRAPHER:  We are now back on
3   the record at 9:53 a.m.
4   BY MS. RETTS:
5        Q.   Before we broke, we were having a
6   discussion about the notation that Ms. Milke can't
7   have kids.  Do you recall reading through letters
8   that Ms. Milke exchanged with Mr. Marino, where
9   she indicated that she wanted to have her tubes
10  tied?
11       A.   Yes.
12       Q.   Did you question her about those
13  statements that she had made in the past about not
14  wanting children in conjunction with her report
15  that she did want children?
16             MR. BRUSTIN:  Objection to form.
17             THE WITNESS:  I don't think I did,
18  no.  She said a lot of things in these
19  letters, but often conflict with each
20  other.
21  BY MS. RETTS:
22       Q.   So, what did you do to resolve those
23  conflicts?
24             MR. BRUSTIN:  Objection to form.
25             THE WITNESS:  Well, you know, I think



Page 85

1              Agharkar
2        if they were -- I didn't see them relevant
3        to my referral question.  If they were
4        relevant to an assessment of the referral
5        question, then I would have sought
6        clarification on some of those things.
7        But some of the things we're talking about
8        are historical issues or, you know,
9        personal matters that I don't know bear
10       necessarily on the question at hand.
11   BY MS. RETTS:
12       Q.   Right.  If you have conflicting
13   information about two subjects, that could cause
14   you some concern about the reliability of the
15   information that's being provided in the
16   self-report; true?
17           MR. BRUSTIN:  Objection to form.
18           THE WITNESS:  It could be.  Or
19       actually that's how you would clarify by
20       interviewing her and asking her about the
21       differences, and seeing what answer you
22       get.
23   BY MS. RETTS:
24       Q.   That requires the person you are
25   interviewing to provide truthful and accurate

Page 86

1              Agharkar
2    information true?
3           MR. BRUSTIN:  Objection to form.
4           THE WITNESS:  Yes, as best as she's
5       able to do that, yes.
6    BY MS. RETTS:
7        Q.   Because in a clinical interview, you
8    are relying upon self-report of the individual you
9    are interviewing?
10       A.   That is true.  I'm also, however,
11   notating -- or noting in my mind at least,
12   although I actually do physically notate it here
13   sometimes, it's about the affect that I see when I
14   ask her questions, the types of responses that I
15   get.  If those are consistent with what I know to
16   be a true psychiatric illness, you know, we've
17   seen people who are traumatized, et cetera.
18       So, you -- so, yes, in part you're right,
19   but there's that other part, as well, as to why
20   clinical examination is important.
21       Q.   The more discrepancies you would see
22   about two given things, wouldn't that cause you
23   concern for the reliability of the history?
24           MR. BRUSTIN:  Objection to form.
25           THE WITNESS:  Maybe, maybe not.  I

Page 87

1              Agharkar
2        mean, you have to look at -- and really --
3        it really depends, I mean, people in
4        writing may say things and look a certain
5        way because it's in writing.  I mean, so
6        it looks very calm or emotionless, but it
7        may not be.  You don't know about the
8        stressors at the time or the circumstances
9        under which certain things were said,
10       those things matter.  So, it could, but
11       certainly possible what you are saying,
12       but not necessarily.
13   BY MS. RETTS:
14       Q.   Well -- and if Ms. Milke had a
15   relationship with someone that she was writing
16   back and forth, those letters could be -- strike
17   that.
18       Ms. Milke might be more open in letters that
19   she's exchanging with someone she had a
20   relationship with; true?
21           MR. BRUSTIN:  Objection to form.
22           THE WITNESS:  It's possible, or she
23       could be presenting herself in a certain
24       way to a certain person.  You know, there
25       can be a lot of different possibilities

Page 88

1              Agharkar
2        there.
3    BY MS. RETTS:
4        Q.   You are someone that Ms. Milke had
5    just met as part of the litigation; true?
6        A.   True.
7        Q.   You didn't have a longstanding
8    relationship with her as a therapist; true?
9        A.   Correct.
10       Q.   Do you have any concerns about the
11   information that the person provides to you when
12   it's done in a litigation context in terms of
13   reliability?
14           MR. BRUSTIN:  Objection to form.
15           THE WITNESS:  I think one always has
16       to be concerned about any information
17       gathered in litigation, in a sense of, you
18       know, verifying it.  And also, again,
19       assessing whether or not it's what's -- is
20       consistent what's known with true
21       psychiatric illness.  People, certainly in
22       litigation, could be motivated to say
23       certain things or others, but that's part
24       of my job is to try to assess that as best
25       I can.



Page 89

1                        Agharkar
2  BY MS. RETTS:
3       Q.   And part of the way to sort through
4  whether someone is motivated by litigation is to
5  look at documents that were generated
6  contemporaneous with the events, and not related
7  to litigation; true?
8       MR. BRUSTIN:  Objection to form.
9       THE WITNESS:  It depends on the
10      records, but could be; true.
11  BY MS. RETTS:
12      Q.   And if those documents from
13  contemporaneous with the event conflict with
14  what's being told to you 20-plus years later as
15  part of litigation, what methodology do you use to
16  resolve the conflict?
17      MR. BRUSTIN:  Objection to form.
18      THE WITNESS:  Well, you ask about it,
19      you interview about it, you know, find
20      out, you know -- you don't want it to be a
21      cross-examination, that's not helpful.
22      But you -- you may point out
23      inconsistencies or I heard this statement
24      or this was said at that this point, and I
25      did do some of that with her, provided I

Page 90

1                        Agharkar
2       was aware of the information, of course,
3       to ask her about, and then we talked about
4       those things.
5  BY MS. RETTS:
6       Q.   Before you interviewed Ms. Milke, had
7  you reviewed the letters that come up with any
8  type of list of information that you wanted more
9  clarification on, for example, you go through
10  saying I saw this, this and this, and follow up
11  with her on that?
12      MR. BRUSTIN:  Objection to form.
13      THE WITNESS:  No, I don't create a
14      list like that.  The things I had read
15      kind of were in my mind, and so as we
16      talked about things, I would bring them up
17      or ask more about this, you know, based on
18      what I read.
19  BY MS. RETTS:
20      Q.   Between the different interviews, did
21  you go back and look at more documents?  So, you
22  have the -- I think we've marked it now as 262,
23  this is your next page of notes; true?
24      A.   Yes, the next set of notes.
25      Q.   The next set of notes.  So, all

Page 91

1                        Agharkar
2  together, 261 and 262 comprise the entirety of
3  your notes?
4       A.   The handwritten notes from my
5  interviews with her, there's typewritten notes of
6  the interviews of the two lay witnesses and my one
7  telephonic interview with her, as well, is on
8  there.
9       Q.   Those, though, are the handwritten
10  notes for Ms. Milke?
11      A.   Correct.
12      Q.   The complete set of handwritten
13  notes?
14      A.   Yes (indicating).
15      Q.   And between the various dates of
16  those handwritten notes, had you been reviewing
17  additional documents?  So, let's say between
18  5/24/16 and 10/25/17, over a year later, had you
19  reviewed more documents?
20      A.   Yes.
21      Q.   And in the course of reviewing those
22  additional documents, did you note specific things
23  within those, that you then generated any kind of
24  list to follow up with Ms. Milke and resolve any
25  conflicting information or find supplemental

Page 92

1                        Agharkar
2  information?
3       A.   Nothing that I wrote down.
4       Q.   Did you take any mental notes, that
5  you can remember, of certain topic areas that you
6  wanted to follow up with her?
7       A.   I can't say specifically between
8  Interview 1 and Interview 2, but things I'm
9  thinking of, for example, would be about jail
10  mental health, okay -- or prison mental health, I
11  should say, you know, the lack of treatment notes
12  that are in there, you know, I want to talk to her
13  about that, some.  I'm trying to think.
14      I know that, you know, things that were in
15  Detective Saldate's report, I wanted to ask her
16  about.  You know, there are maybe some witness
17  statements, things like that, that I recall
18  reading, I would ask her about those, as well.
19  So, those are things that immediately come to
20  mind, I imagine there were more.
21      Q.   What do you remember specifically
22  wanting to ask her about Detective Saldate's
23  report?
24      A.   What happened?  What is your version?
25  What was the experience like?  And then I -- I



Page 93

Agharkar
1
2  made -- I think I may have had a few quotes in my
3  head, just paraphrasing them, which she denied,
4  you know, to ever saying to him or, you know, that
5  kind of thing, whether he twisted it or turned it,
6  that sort of thing, so that's what I asked her
7  about.
8       Q.   Did you then cross-check what she
9  said with any of the information that she had
10  written in the contemporaneously written letters
11  in 1991?
12      A.   I don't recall doing that.  There's
13  such a volume of handwritten letters that I don't
14  show -- I don't know how I would have done that in
15  an expeditious way.
16      Q.   Did you ever go through and summarize
17  any of the letters that she wrote?
18      A.   No.
19      Q.   Did you ever receive any summaries or
20  letters that she wrote from plaintiff's counsel
21  that you relied upon?
22      A.   No.
23      Q.   After reviewing Ms. Milke's
24  deposition testimony, where she went through some
25  of the letters, do you recall seeing that

Page 94

Agharkar
1
2  testimony?
3      A.   I do.
4      Q.   Did you go back and pull those
5  specific letters and look at the content of those?
6      A.   I don't think so.  I think I was
7  already aware of whatever was asked about her --
8  of her in the deposition.
9      Q.   Was there anything in her deposition
10  testimony that you recall learning that you
11  thought that was new and you wanted to follow up
12  on it?
13      A.   Not that I can recall.
14      Q.   Were you aware that Ms. Milke had not
15  done any type of memorial service for Christopher
16  as of the present?
17      A.   I was aware because of the
18  deposition, and I was aware that that was -- I was
19  aware that there were ways in which she was trying
20  to remember him, I think releasing balloons in her
21  backyard, for example, which was on the advise of
22  her therapist.  But I think I knew that there was
23  not -- there had not been a formal memorial, yes.
24      Q.   Do you remember specifically
25  questioning her about that topic, funeral,

Page 95

Agharkar
1
2  memorial, anything related to Christopher in your
3  interview or interviews?
4      A.   I don't think I would have gone that
5  specific about it.  We did talk about that she --
6  she feels like she's only just starting to grieve
7  that, and so -- and it's still so painful for her
8  and so difficult that it's a very, very difficult
9  topic for her to do something more formal about it
10  or kind of get into it deeply.
11      Q.   In Christopher's murder, she reported
12  to you was traumatic, separate and apart from
13  being incarcerated; true?
14          MR. BRUSTIN:  Objection to form.
15          THE WITNESS:  Yes, that's true.
16      All -- the events are bang, bang, bang, I
17      mean, no pun intended, I'm sorry about
18      that.  But the events happened quickly
19      after one another, right, so you've got
20      her son's murder, she gets wrongly
21      accused, wrongly arrested and
22      incarcerated, and it goes on.  So, it all
23      happened together, but, yes, they are
24      specific -- she views them as separate
25      instances.

Page 96

Agharkar
1
2  BY MS. RETTS:
3      Q.   In your statement that she was
4  wrongly arrested and incarcerated, you're not
5  offering any opinion as to her actual innocence;
6  true?
7      A.   That's correct, I am not.
8      Q.   And your information on wrongful
9  arrest and incarceration comes from the fact that
10  she was released from prison; is that true?
11      A.   Correct, and my understanding is that
12  she won't be retried.
13      Q.   Do you understand that no court has
14  determined that she's been actually innocent?
15      A.   Correct.  Other than the presumption
16  of innocence if not, you know -- until proven
17  guilty, I guess, you know, but you're right, I
18  don't think I saw court opinion about innocence.
19      Q.   The last line of your first page of
20  notes -- "had to compartmentalize the grief at
21  Christopher, and only now grieving"?
22      A.   Yes.
23      Q.   So, she reported to you that she --
24  through the period of time that she was
25  incarcerated, she was -- she essentially put the



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
97–100

Page 97

1                    Agharkar
2    grief away into a box?
3        A.   Yeah.
4            MR. BRUSTIN:  Objection to form.
5            THE WITNESS:  Yeah, I mean, because
6        it doesn't really happen like that.  So,
7        you know, she says that she -- essentially
8        what she's saying is she had to suppress
9        it, because she had to be able to get out
10       of prison, and it overwhelmed her to
11       really truly feel, and I think that that
12       was probably the start of having to numb
13       herself and avoid the symptoms you see in
14       trauma.  But, yes, I do think that that
15       happened.  That's her way of coping.
16   BY MS. RETTS:
17       Q.   And that compartmentalization would
18   have occurred even if she had not been
19   incarcerated; true?
20       A.   Well, yes, I mean, anything is
21   possible.  That would be a maladaptive way of
22   coping, and I think the reason why she had it
23   compartmentalized is because of the amount of
24   stress and new trauma that she's experiencing and
25   going through.  So, assuming that didn't happen,

Page 98

1                    Agharkar
2    if there were not major stressors or traumas in
3    her life, then I would expect that she would have
4    been able to grieve in a more reasonable way.
5        Q.   People often don't grieve in
6    reasonable ways; true?
7        A.   I don't know about often, but you are
8    absolutely right, that's certainly true, that not
9    everyone grieves in an appropriate fashion.
10       Q.   And in the course of your practice
11   treating patients who were not part of litigation,
12   you have seen that before, people who have spent
13   years compartmentalizing issues that they should
14   have dealt with in the past?
15       A.   I agree.
16       Q.   That's something very common that you
17   see in your practice?
18           MR. BRUSTIN:  Objection to form.
19           THE WITNESS:  It is something that
20       commonly happens, that's true.  And
21       that -- whether it's traumatic or not,
22       people do that.
23   BY MS. RETTS:
24       Q.   People commonly have maladaptive ways
25   of dealing with psychological trauma; true?

Page 99

1                    Agharkar
2        A.   That's why there's no shortage of
3    work for me, that's right.
4        Q.   And that's the case with your
5    forensic work, too, you see that, as well?
6        A.   Yes.
7        Q.   Probably to a heightened degree?
8        A.   Unfortunately, yes, that's right.
9        Q.   And some of the work that you see in
10   the forensic capacity, those maladaptive behaviors
11   lead to worse things like criminal conduct; true?
12       A.   Yes, they can.  Not a direct link,
13   but, yeah, sure, that's a factor.
14       Q.   When you conducted your interviews
15   with Ms. Milke, did you explore who Joe Marino was
16   to her?
17       A.   Yes.
18       Q.   What did she tell you?
19       A.   Unfortunately, she could remember him
20   in a vague sense, but could not provide any
21   information about the content of the letters, the
22   nature of the relationship, anything like that at
23   all.  And, in fact, I feel like in -- I've read in
24   one of the letters something that she couldn't
25   even remember what he looked.  It's not even clear

Page 100

1                    Agharkar
2    to me how much time these two could have ever
3    spent together in a jail setting, fraternizations
4    frowned upon between male and female detainees.
5    So, I don't think that they would have had very
6    much contact, but she -- she can't provide details
7    about it.  I think it was a very stressful time
8    for her, and so that's all I know.
9        Q.   Do you know whether or not he was a
10   male inmate who was also incarcerated within the
11   Durango psych unit?
12       A.   No, I don't know that specifically.
13   I could infer from the letters that he was
14   incarcerated, but I don't know where and I don't
15   know in what unit.
16       Q.   Did you go through and try to
17   determine how many letters there were in total
18   that Ms. Milke exchanged with Mr. Marino?
19       A.   I mean, I can picture my file, there
20   may be -- I can only guess, I don't think I ever
21   counted it, but I would say more than 60, more
22   than 50.  There's quite a lot.
23       Q.   Did you explore who Vince Felix was
24   to Ms. Milke?
25       A.   Yes.

BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
101–104

Page 101

Agharkar

1
2    Q.    What did she tell you?
3    A.    Well, there, again, she -- she has a
4  little better recollection of him because I guess
5  he came to visit her.  But this was somebody who
6  approached her, somebody who wrote, I guess wanted
7  to be a pen pal, and that they began writing each
8  other.  And that there were some -- I'm hesitant
9  to really call it a relationship since obviously
10  she's, you know -- she's detained, locked up where
11  she was.
12      But, yes, at least that one she remembers a
13  little more clearly.  And that did happen later
14  away from the trial and everything else, that
15  would be so stressful.  So, that makes some sense
16  to me.
17    Q.    The second page of your notes?
18      MR. BRUSTIN:  The second page is 261?
19      MS. RETTS:  Yes.
20  BY MS. RETTS:
21    Q.    All the letters together?
22    A.    Yes.
23    Q.    IGECAPS, is there any significance in
24  the fact that some are dashes and some are plus
25  signs?

Page 102

Agharkar

1
2    A.    That's the diagnostic criteria for
3  depression.  And so, I'm going through and noting
4  currently which symptoms does she have.  And so,
5  those are the plus signs that you see there.
6  There are actually -- there's two more.  The G
7  would stand for helplessness or worthlessness,
8  guiltiness, guilty feelings, and E is for energy.
9  Those two things are improved now, but they were
10  worse in the past.
11      So, she had them in the past.  I'm just
12  telling you that, but I -- this question here
13  refers to currently, what kind of problems are you
14  having in these areas?  Do you want to go through
15  each one.
16    Q.    Yes, go through each one --
17      (Talking over each other.)
18      Positive sign --
19    A.    That is for sleep disturbances, so
20  either you're sleeping too much or too little, and
21  she has that, she's waking up at 2:00 or 3:00 in
22  the morning, not able to sleep.
23    Q.    And her sleep disturbances, did she
24  report that she was having nightmares of
25  Christopher?

Page 103

Agharkar

1
2    A.    Sometimes, yes, there's nightmares of
3  several things, but not always was she having
4  nightmares.
5    Q.    So, the nightmares of other things
6  other than Christopher, what are they?
7    A.    Well, that's, again, the visuals of
8  seeing a person on fire and, you know, in the
9  prison.  And also, just the -- I think the fear of
10  being trapped, as I recall talking to her about.
11  So, those two things.  And Christopher also, of
12  course.
13    Q.    What is predominantly the theme of
14  the nightmares?
15    A.    Helplessness, fear, powerlessness.
16  Those are -- those are typically the nightmare
17  things.  Now, I will say she has dreams, and I
18  don't know that I would call them nightmares
19  because they are rather -- I mean, she obviously
20  wakes up crying from them, they're very emotional
21  for her, but they are things of Christopher
22  playing and leaving, and then he is gone, you
23  know.  That's not a nightmare, because,  but I
24  think it's one where she's looking for him, where
25  is he, and then, you know, she wakes up crying.

Page 104

Agharkar

1
2  Or, you know, her saying, you know, come on, you
3  know, come follow me, that kind of thing and gone.
4    So, those aren't nightmares, but I think
5  those are grief reactions and I think she's still
6  processing those things.
7    So, those things certainly disturb her
8  sleep, as well, but that's not why she's waking up
9  every night at -- every morning at 3:00, she's
10  saying that she got used to that in prison,
11  essentially, but it's -- her sleep is not of good
12  quality.
13    Q.    So, part of that is routine, waking
14  up -- her routine was to wake up at that time in
15  prison, so that routine has continued on?
16    A.    Correct, when it doesn't need to.
17    Q.    The nightmares that she's having, are
18  those predominantly of Christopher?
19    A.    Well, I just described it.  So,
20  sometimes yes, but no, not necessarily always.
21  And like I said, the dreams about Christopher are
22  not -- I would not characterize those as
23  nightmares, not always, let's put it that way.
24  But I think the other ones are nightmares.
25    Q.    You would expect that if she had not



Page 105

Agharkar

1
2  been incarcerated, she would still have dreams of
3  Christopher in this manner and potentially
4  nightmares based upon the traumatic way in which
5  Christopher was killed?
6        MR. BRUSTIN:  Objection to form.
7        THE WITNESS:  Yes, I think that's
8     probable.  I don't know for sure
9     obviously, but yes.
10 BY MS. RETTS:
11    Q.   And that crime for her, she reports
12 that it would have involved the significant amount
13 of betrayal; true?
14       MR. BRUSTIN:  Objection to form.
15       THE WITNESS:  Yes.
16 BY MS. RETTS:
17    Q.   Based upon your clinical experience
18 and your forensic experience, you would expect
19 that with a crime of that type involving a
20 roommate that somebody knew and the murder, that
21 someone would experience nightmares continuing on
22 in the future?
23    A.   Yes.  I don't know in perpetuity,
24 but, yes, I would expect them to have some
25 reaction to that, and nightmares would be a common

Page 106

Agharkar

1
2  reaction to that.
3    Q.   Do you have any current patients in
4  your practice that you have treated, that have
5  been mothers who have had their children -- strike
6  that.
7        Do you have any current patients in your
8  clinical practice who have had children murdered?
9    A.   No.
10   Q.   Have you ever had patients in your
11 clinical practice who have had children who have
12 been murdered?
13   A.   Male or female?
14   Q.   Yes.
15   A.   No, I've had people who had their
16 children die, but not from murder.
17   Q.   How many patients have you treated
18 who have had their children die?
19   A.   Very few.  Less than -- I mean, all
20 in, I don't know, maybe less than -- less than ten
21 in my private practice.  In my residency training,
22 of course, where I've seen lots of patients, there
23 may have had been more, but I couldn't put a
24 number on that.  But it wouldn't be a high number.
25   Q.   The children who have died for the

Page 107

Agharkar

1
2  private patients, about the ten, would that have
3  been from traumatic incidents like car accidents
4  or illness?
5    A.   Yes, I make sure both, I was thinking
6  about the accidents, there's a couple I can think
7  of, car accidents.  They died in sort of freak
8  drownings, you know, in swimming pools kind of
9  thing, but a couple by illness.  But, yes, the
10 rest by accidents.
11   Q.   Have you ever had any patients that
12 you've treated who have had their children die and
13 it's been their only child who died?
14   A.   I just can't recall that.  Certainly
15 not current.
16   Q.   In your forensic practice, have you
17 evaluated anybody who has killed a child?
18   A.   Yes.
19   Q.   How many?
20   A.   Unfortunately, maybe as many as a
21 hundred, maybe.  I'm guessing, I mean, we're
22 talking about 12, 13 years, but maybe not, maybe
23 not a hundred.  Maybe somewhere between 50 and a
24 hundred, that's -- that would probably be fair.
25   Q.   Have they all been men?

Page 108

Agharkar

1
2    A.   Vast majority, yes, I'm almost
3  positive I have seen women who have also killed
4  their kids, yes.
5    Q.   Of the hundred or so -- somewhere
6  between the 50 and a hundred that you, in your
7  forensic practice, have evaluated for killing a
8  child, have those been their own children or other
9  children?
10   A.   Mostly their own.  Sometimes --
11 sometimes not.  Sometimes it's somebody else's,
12 but mostly who are theirs.
13   Q.   What is the most recent criminal case
14 that you can recall doing forensic interview where
15 someone killed their own child?
16   A.   Well, I just testified in State v.
17 Mohammed, in Texas, and I think that was a couple
18 of months ago, and he drowned his two children.  I
19 did not conduct a personal examination of him, I
20 wasn't asked to opine about specific diagnoses
21 or -- but I was more of a teaching expert in that
22 case.
23       The last time I -- but your question,
24 specifically interviewed, I would probably say in
25 the last year, but I can't exactly be sure, but I



Page 109

Agharkar

1 can tell you I testified in a case very recently.
2     Q.   How many clinical patients have you
3 treated that had postpartum depression?
4     A.   Raw numbers are very difficult, so I
5 would estimate maybe around 50. I definitely have
6 seen that at the community health centers I've
7 worked at, as well as in my trainings, I'm sure.
8     Q.   Did you identify or look for any
9 research that related to abortion in postpartum
10 depression?
11     A.   No, I didn't look at any research for
12 that.
13     Q.   What is your of understanding of how
14 close in time to Christopher's murder that Ms.
15 Milke had an abortion?
16     A.   I can only time it by this
17 relationship with Mr. Sweat, so whenever that was,
18 and I think it wasn't that long after. But I
19 don't have exact dates.
20     Q.   If Ms. Milke reported that that
21 abortion occurred sometime in September of 1989
22 and Christopher was killed in December of 1989,
23 would you have any reason to dispute that timing?
24     MR. BRUSTIN:  Objection to form.

Page 110

Agharkar

1     THE WITNESS:  I would have no other
2     information to contradict that.
3 BY MS. RETTS:
4     Q.   Did you look for any literature that
5 related to abortion, postpartum depression, any
6 psychological symptoms relating to those subjects
7 as part of writing your opinions in this case?
8     MR. BRUSTIN:  Objection to form.
9     THE WITNESS:  No. And again, there
10     was no history of depression following
11     Christopher's birth, nor a history of
12     depression that I was able to elicit or
13     see from any collateral sources predating
14     the murder.
15 BY MS. RETTS:
16     Q.   Do you recall reading in the letters
17 that Ms. Milke wrote that she became very
18 depressed when her mother left?
19     A.   Yes.
20     Q.   Did you explore that with her?
21     A.   Not specifically, just been taking
22 sort of her mood history and how it was going on
23 in her life and things likes that. Just because
24 somebody says depressed doesn't make them

Page 111

Agharkar

1 depressed; right?  So, I'm sure she did feel
2 feelings of sadness, and I think she was closer to
3 her mother, much closer than to her father, so I
4 imagine that was a big deal for her.
5     Q.   Now, in the last 27 years, there's
6 been a significant increase and awareness about
7 depression; true?
8     A.   True.
9     Q.   Back in the late 1980s, it was not
10 something that was openly discussed?
11     A.   I think that's fair.
12     Q.   So, the fact that Ms. Milke did not
13 have any previous psychiatric treatment doesn't
14 necessarily mean that she did not suffer from
15 depression beforehand; true?
16     A.   That's -- that's certainly possible,
17 yes. I mean, I tried as best I could to ask, you
18 know -- her mother is dead, her father is dead, I
19 tried to ask her -- I did ask her friend about
20 that just in terms of, you know, did you see any
21 problems, any issues. I don't ask them do you
22 think she was depressed, what do they know,
23 they're lay people at the end of the day. So, did
24 you notice, you know, feeling -- like did she look

Page 112

Agharkar

1 sad to you, was there a lot of crying, she
2 wouldn't socialize. I ask around things that were
3 showing, and they denied any of those kind of
4 things.
5     So, yeah, as best I could gather the
6 history, that I did not see evidence to suggest
7 that she had problems psychiatrically prior to
8 this. But to your question, it's possible, sure.
9     Q.   What is your understanding of Robin
10 Swerland's daily contact with Ms. Milke in 1989?
11     A.   I'm not sure I asked her that
12 specifically, and I can't remember which friend
13 would have been, but I do know that they did
14 socialize, I don't think it was on a day-to-day
15 basis, but I think they may have socialized,
16 perhaps, on a -- I'm speculating maybe a week, on
17 a weekly basis kind of thing, like go out on the
18 weekends sort of thing, that's the impression I
19 got from one of them, I don't remember which one,
20 but I didn't ask did you see her every day, did
21 you follow her around, did you note her moods, I
22 didn't ask that.
23     Q.   Did you confirm with them that, in
24 fact, they were still in touch with Ms. Milke in



Page 113

Agharkar

1 1989?
2 3    A.   Maybe not specifically 1989, but
4 certainly, yes, during the marriage, with
5 Christopher, yes, they were in touch with all
6 that.
7    Q.   Part of your interview of them, did
8 you ask for specific dates and times to nail that
9 down as to what contact they had?
10    A.   No.  I mean, that's like a police
11 interview.  I'm asking -- no, I'm getting general
12 time frame, I'm not trying to pin down years and
13 exact months or anything like that.
14    Q.   Did you ask Ms. Milke, as part of
15 your clinical interview of her, who her closest
16 friends were in the 1989 time period?
17    A.   No.
18    Q.   Did you make any attempts to speak to
19 Mark Milke?
20    A.   I did not make an attempt to do that.
21    Q.   Did you make any attempts to speak to
22 Mr. Sweat?
23    A.   No.
24    Q.   Did you read Mr. Sweat's deposition
25 testimony?

Page 114

Agharkar

1 2    A.   No.  And by the way, I do want to go
3 back to that question about her friends.  I may
4 have asked her are there people I could talk to,
5 you know, who knew you around that time, and
6 she -- I don't think she would have given me the
7 names, otherwise I would have written them down,
8 but I do remember asking the attorneys, which is
9 how I got the names.  So, I just want to clarify
10 that.
11    Q.   Did you speak to Ms. Markle?
12    A.   Ms.?
13    Q.   Dorothy Markle?
14    A.   No.
15    Q.   You understand that Ms. Milke lived
16 with Ms. Markle in Colorado for a period of time?
17    A.   I know she lived with somebody, I
18 didn't know the name.
19    Q.   Do you remember reviewing
20 Ms. Markle's deposition?
21    A.   Never received it, as far as I know.
22    Q.   Did you speak with Ms. Pickinpaugh
23 Smith, Ms. Milke's sister?
24    A.   No.
25    Q.   Ms. Milke reported to you that she

Page 115

Agharkar

1 2 had made contact with Jason, her nephew, and was
3 establishing a relationship with him?
4    A.   Yes.
5    Q.   Did you speak to him?
6    A.   No.
7    Q.   Tell me what she told you about the
8 relationship that she was establishing with Jason?
9    A.   That it was, I think, somewhat
10 tentative in the beginning because she has a hard
11 time being able to socially connect with people,
12 so she feels very awkward and she doesn't know
13 quite how to talk to people anymore, but that this
14 was also her sister's son.  And apparently, these
15 two did not get along, the sisters did not get
16 along.
17    And so, she may have said, probably did, it
18 sounds like, the sister said things to the son
19 about Debra, Ms. Milke, that were negative.  And
20 so -- but apparently, my recollection of it is
21 that he contacted her once he's of age, you know,
22 and was able to say, you know, I want to know you
23 or something of that nature.
24    And so, they began visiting, and I think
25 she -- for her, it's very bittersweet because she

Page 116

Agharkar

1 2 remembers him, you know -- she -- he is the age
3 that her son would have been had he lived.  So,
4 that's very difficult for her to see because she
5 wishes that with her own son.
6    But she also is really proud of her nephew
7 and what kind of man he's become.  And I think he
8 recently got married.  And so -- so, it's a very
9 bittersweet and positive relationship for her.
10    Q.   Did she report to you that she was
11 involved in the wedding?
12    A.   She attended the wedding, I can't
13 recall if I asked her if she was involved in the
14 wedding, but I know she was there.
15    Q.   Do you know whether or not she was
16 involved in walking him down the aisle or doing
17 any type of mother-son dance with him?
18    A.   That sounds familiar, the mother-son
19 dance.  I don't know about the walking down the
20 aisle thing, I don't know that.  I wouldn't ask a
21 lot of details about a wedding, frankly.  But I do
22 remember her saying she was bawling her eyes out,
23 crying all the time during the wedding, it was
24 such a beautiful thing.
25    Q.   And a wedding would be a place where



Page 117

Agharkar

1       Agharkar
2   you would expect a crowd, a lot of people to be
3   present, usually?
4       A.   I would, yes, I think that's right, I
5   don't know the size of this wedding, but
6   generally.
7       Q.   And that would be a social setting
8   that could be stressful for somebody?
9       A.   Yes.
10      Q.   Did you explore any of that with her
11  in terms of how her psychological functioning was
12  at that wedding?
13      A.   Other than, again, she was very, very
14  emotional, and I think she recalled -- sorry.  I
15  think I recall her saying that she was anxious,
16  that she -- she's pushing through it, she's trying
17  her best to -- to attend because of the higher
18  purpose, and I mean, it's more important to be
19  there than to cower in fear.
20      And I think she told me, you know -- she's
21  told me before, I can't be a hermit, I can't -- I
22  got to try to reclaim my life here, and so I got
23  to do these things, even though I don't want to,
24  like in my mind, it's like -- it's freaking out
25  all the time saying don't do this, don't do this,

Page 118

Agharkar

1       Agharkar
2   though I'm trying to do it.  So, that's as much as
3   I could say, I think.
4       MS. RETTS:  Recess.
5       THE VIDEOGRAPHER:  We are now going
6   off the record at 10:27 a.m.
7       (Recess taken.)
8       THE VIDEOGRAPHER:  We are now back on
9   the record at 10:37 a.m., this begins Tape
10  3 of the deposition of Bhushan Agharkar.
11      (Discussion off the record.)
12      THE VIDEOGRAPHER:  Off the record.
13      (Recess taken.)
14      THE VIDEOGRAPHER:  We are now back on
15  the record at 10:39 a.m., this begins Tape
16  3.
17  BY MS. RETTS:
18      Q.   Doctor, I'm going to have you go back
19  to all those letters, and what I'm going to have
20  you do this time is just run through them, with
21  the positives and negatives, and then I will ask
22  follow-up questions because I think we got one,
23  and they're all over the place.  So, let's try it
24  that way.
25      A.   Sure.  So, as I said, the first is

Page 119

Agharkar

1       Agharkar
2   for sleep, the second is for interest, diminished
3   interest in things, that's anhedonia.  And so, I
4   gave her positive on that one because she does
5   have that.  The G stands for feelings of guilt,
6   worthlessness, hopelessness or helplessness, and
7   currently she does not feel like that, but has in
8   the past.
9       Energy, typically low energy is what you're
10  looking for in depression, and she does not
11  endorse that now, but she has in the past.
12      C stands for concentration, she does have
13  concentration difficulties, so I gave her that.  A
14  is for appetite changes, either eating too much or
15  too little, and that's a change from her baseline,
16  but she does not have that.
17      P is for psychomotor agitation or
18  retardation, and she did not have that.
19      And S is for suicidality, which she did not
20  have either.  And so, that's how you -- we
21  diagnose depression, criteria for depression.
22      Q.   Did you go through all those criteria
23  each time that you interviewed her at the various
24  points in time?
25      A.   Yes.  I may not ask every single

Page 120

Agharkar

1       Agharkar
2   question, but it depends on what I've learned in
3   the past that will provide that information or --
4   but, yes, at least at certain points in time in
5   the past, I would go through, similarly when you
6   have these kinds of difficulties, what was her
7   sleep like back then, what was her concentration
8   like back then, you know, so, sure.
9       Q.   What about between the interviews?
10  So, you have your first one, 5/24/16, the next one
11  is 10/25/17.  Did you go back through that list
12  with her to see if there had been any changes in
13  the approximate year and a half between the time
14  you had seen her?
15      A.   No, I don't know if that's -- a
16  couple of things, I think when you do it that way,
17  you set -- you set up then that somehow there's a
18  special importance for these questions, or it sets
19  up what to answer for these questions, you know,
20  because why does he keep asking the same
21  questions?
22      And again, I think that's to be avoided, you
23  don't want necessarily have them understand what
24  you are asking and why.  However, clinically,
25  looking at her, she remains the same, and she's



BHUSHAN S. AGHARKAR, M.D.                                    September 25, 2018
MILKE vs CITY OF PHOENIX                                              121–124

Page 121

Agharkar

1
2  very cheerful, very emotional at times, she --
3  it's not like -- I know what people who are
4  depressed look like versus not.  I mean, it's not
5  like all of a sudden she was just looking like
6  euphoric in any kind of way.
7      So, a presentation was very similar across
8  all three interviews, which was important
9  information as it relates to a mood disorder.
10 Plus I saw her in her therapist notes references
11 to poor mood, so I had a reason to think it has
12 continued.
13     Q.   Did you develop some questions, maybe
14 not the same as the first time, between May 24th,
15 '16 and the October 25th, '17 interview to assess
16 the changes?
17         MR. BRUSTIN:  Objection to form.
18 BY MS. RETTS:
19     Q.   If any?
20     A.   Well, yeah.  So, it comes up in the
21 interviews.  I mean, you will see in the
22 interviews she still talks about poor sleep, she
23 will still talk about anhedonia, "anhedonia," she
24 doesn't say that, of course.  So, through our
25 discussions about her current life, and just

Page 122

Agharkar

1
2  through discussions, the symptoms will come
3  through, and that's why you conduct a clinical
4  interview.  And that's, again, another reason not
5  to do rote question interview styles, so --
6  because the material will come out depending on
7  the subject and the way you ask the questions.
8      Q.   You did not review the video of Ms.
9  Milke's deposition to see if she presented in the
10 deposition the same way she presented to you;
11 true?
12         MR. BRUSTIN:  Objection to form.
13         THE WITNESS:  That is true.  Now, of
14     course, the psychiatrist is not the one
15     asking her the questions, but, yes, I did
16     not -- I did not view the videotape of her
17     deposition.
18 BY MS. RETTS:
19     Q.   Are you able to tell me what specific
20 questions you asked her in that first interview?
21         MR. BRUSTIN:  Objection to form.
22         THE WITNESS:  No.  We can talk about
23     the topic areas because the notes will
24     obviously follow that -- those topics
25     asked.  But, no, I couldn't -- unless

Page 123

Agharkar

1
2  we -- even if we literally looked at the
3  answer, I'm not sure I could tell you the
4  exact question I asked, because this was
5  almost a three-hour interview, and there
6  was actually a fair bit of notes for me to
7  take, but I'm listening for a lot of it,
8  and I'm asking questions and continuing
9  the evaluation, so, no.
10 BY MS. RETTS:
11     Q.   For the second interview?
12     A.   Correct.
13     Q.   The same for the third interview?
14     A.   Yes.
15     Q.   And you don't ever video record or
16 audio record; true?
17     A.   I never have.
18     Q.   Is that something that other folks in
19 your field, are those methods they do employ?
20         MR. BRUSTIN:  Objection to form.
21         THE WITNESS:  I have seen people do
22     it, yes.  I don't -- typically speaking,
23     those are experts for the prosecution, so
24     for whom -- but that's why I have seen
25     videotape there interviews.  I believe

Page 124

Agharkar

1
2  that it can be inhibiting, especially
3  somebody who has anxiety and trauma, et
4  cetera, is put in front of a camera is not
5  typically the best way to get information
6  out.
7  BY MS. RETTS:
8      Q.   What audio recording, you feel the
9  same way about audio recording, that it's
10 inhibiting?
11     A.   I do, I mean, I -- because I've seen
12 this happened before.  People will look at the
13 device, and it's distracting, it puts them off a
14 little bit, I feel like they forget it's a
15 conversation.  It's better for me if it's a
16 conversation because I can follow with them, I can
17 take them where I want to go and go deeper.  So, I
18 find it -- yes.  So, as a practice, I don't like
19 it, I don't think it's a good idea for a
20 psychiatrist to do.  Police, different matter,
21 obviously.
22     Q.   You don't have any police training;
23 true?
24     A.   I do not.
25     Q.   I think you said a couple of times



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                     125–128

Page 125

Agharkar

1  that you -- the way you do an interview is not the
2  way that a detective does, in terms of trying to
3  sort through and reconcile conflicting
4  information?
5      MR. BRUSTIN:  Objection to form.
6      THE WITNESS:  Well, there are some
7      similarities, but a detective or police
8      interview's job is to get a confession or
9      to get a statement from a person; right?
10     And they may ask them, they may,
11     quote/unquote, cross-examine them, and
12     then they try and get them to resolve
13     facts as they see it.  But that's the
14     purpose of it, is to get a statement.  I'm
15     looking to try to understand their
16     pathology, so that's a very different type
17     of interview, and that's a different
18     interview style.
19 BY MS. RETTS:
20     Q.   What do you do to look for
21 malingering?
22     A.   So, obviously that's -- in any
23 assessment that I'm doing, forensic interview or
24 not, you got to consider malingering, which is, of

Page 126

Agharkar

1  course, the intentional production of psychiatric
2  symptoms for secondary gain.
3      And so, I'm looking for evasiveness in
4  answers, I'm looking for the way in which a person
5  answers, do they react or respond in ways in which
6  I expect people who have gone through certain
7  things to respond?  Is that in keeping with my
8  training and experience in terms of what I'm
9  seeing clinically happened before me, is that
10 something I know to be true?
11     I've had people say to me before, "I'm
12 hallucinating right now, Doctor."  What am I
13 supposed to do, just believe them their
14 hallucinating?  They don't look like they're
15 hallucinating, they don't look distracted, they
16 don't look like they're responding to internal
17 stimuli.  They don't give the outward appearances
18 of manifestations of someone who's actively
19 hallucinating, which they wouldn't know what that
20 looks like, unless you've seen a lot of people who
21 are psychotic; right?
22     So, that's one way in which I'm assessing
23 them.  I will -- although didn't here because
24 cognitive issues were not at play, but I'll often

Page 127

Agharkar

1  ask bait questions, so these are very simple
2  standard questions to detect over-malingering of
3  intellectual problems.
4      So, how many legs does a dog have, what are
5  the colors of the United States flag?  These are
6  questions that even the most mentally impaired
7  people can get right.
8      I did not ask that of her here because it
9  would be a complete non-sequitur to the interview,
10 it would make no sense.  It would be obvious like
11 why this guy is even asking me this; okay?  So,
12 typically when I'm doing -- conducting
13 neurocognitive screenings, test for brain damage,
14 I'm asking 30 different kinds of questions, throw
15 those in there, as well, to see if they're trying
16 to fool me or what; okay?
17     And so, those are the various ways that I
18 can assess malingering.  And again, my training
19 and experience, having seen malingerers, having
20 seen true psychiatric illness and having conducted
21 evaluations.  I'm obviously not a human lie
22 detector, I never -- and no psychiatrist would
23 claim to be, but I certainly had no concerns about
24 malingering in my examination with her.

Page 128

Agharkar

1      Q.   Do you ever rely upon an MMPI for
2  your forensic interviews?
3      A.   Never.
4      Q.   Did you ever analyze MMPI data?
5      A.   I'm not qualified.  A psychologist is
6  the one who would be qualified to analyze data and
7  score it.  I could obviously look at the
8  interpreter's summary and tell you whether or not
9  that makes sense clinically.
10     But I'm going to say this about any test,
11 okay, any psychological test measure, I don't care
12 what it is, no test will ever diagnose somebody, a
13 doctor does that, I do that, not a test.  So, I
14 don't care, frankly, what's on an MMPI versus
15 another test versus another test.  I mean, I'm
16 happy to look at information.
17     But ultimately, my clinical examination
18 trumps any of that; okay?  Because -- this is why,
19 because especially with people who have been
20 traumatized, take a personality inventory like an
21 MMPI, they come out looking like they're
22 sociopaths on this thing; okay?  Because there
23 will often be a lack of empathy, there will often
24 be anger issues, irritability, these kinds of



Page 129

Agharkar

1
2  things, and the test will say, oh, that's a
3  sociopath, and it's misunderstanding trauma.
4      I have seen MMPI, it's another test like
5  that, misunderstanding head injuries, that a
6  person has a brain injury -- syndrome, and that's
7  why they're irritable and impulsive and aggressive
8  and agitated, and maybe sometimes violent.
9      What do you think that person looks like on
10  a test; right?  They're going to score very poorly
11  on it in terms of pathology, but that's not
12  accurate, it's because they have a brain injury.
13  And so, that's why I rely on things like
14  neuropsychological tests.  Those are IQ tests,
15  assessment batteries, things of that nature, that
16  actually assess brain functioning, not these
17  personality instruments and some of these other
18  things.  Because ultimately, a clinician still
19  needs to decide what is really going on with this
20  person, and a test doesn't do that, ultimately.
21  You have to do it.
22      Q.   The test identified symptoms; true?
23      A.   They can, yes.  It depends on -- and
24  that's the other thing, too, I think.  These kinds
25  of tests that we're talking about are good for

Page 130

Agharkar

1
2  acute trauma, or can be good for acute PTSD type
3  symptoms.  So, if a war veteran sees his buddy
4  killed right in front of him, that can show up on
5  that kind of test.  Longitudinal complex trauma,
6  multiple stretchers, et cetera, those things
7  become more amorphous.  It's harder to quantify,
8  and those questions, no, do not necessarily get to
9  them, and that's why these sort of trauma tests or
10  trauma instruments, as well as personality
11  inventories and such don't really get at what's
12  going on with the person.
13      Q.   Those tests have -- like the MMPI,
14  have a built-in validity scale; true?
15      A.   Sure.
16      Q.   The clinical interview, other than
17  your own personal assessment, doesn't have any
18  type of validity scale that's built into it?
19      A.   Of course not.  I'm not a test, I'm
20  human.
21      Q.   The report of diminished interest
22  that Ms. Milke gave to you, explain what
23  specifically she told you about the diminished
24  interest.
25      A.   Well, I think the way in which I

Page 131

Agharkar

1
2  typically ask the question are -- well, actually,
3  let me -- tell me about you day, tell me what you
4  do, how you spend your time, what you think
5  about, what do you like doing?
6      And although she can talk about things that
7  she can find relaxing or can find helpful, she
8  notices that there's distance and numbing between
9  them.  You can see that with the trauma, of
10  course, but she just doesn't derive the pleasure
11  from things that she used to, nor that she sees
12  other people kind of doing.  Like people like
13  enjoy socializing, she can enjoy some aspects of
14  that, but she's also terrified of that, too.  So,
15  it's a real mixture.
16      Q.   She did not currently endorse any
17  guilt, but did she report she had in the past?
18      A.   Well, she -- so, yes, to that
19  question.  But she did -- the guilt that she
20  endorsed presently is the same as before, which is
21  she entrusted her son to the care of his murderer,
22  unknowingly; okay?  She feels guilt about that,
23  still, so -- but that's not -- that would be a
24  different symptom than what you would look at for
25  depression.  Depression, the guiltiness feeling is

Page 132

Agharkar

1
2  just for no reason do you feel guilty; okay?
3  There isn't an external kind of reason for it.
4      And so, for that, that's why I didn't give
5  it to her at this time.  And again, the G stands
6  for guilt, but it also means guilt, hopelessness
7  or worthlessness, and she has had that in the
8  past, where she felt hopeless about life, hopeless
9  about her condition, you know.  And so, I do
10  believe she had in the past.  She doesn't feel
11  that way now, she's out after all.  So, her
12  circumstances are different.
13      Q.   The hopelessness has resolved as of
14  the time that you saw her in 2016?
15          MR. BRUSTIN:  Objection to form.
16          THE WITNESS:  I wouldn't say
17  resolved.  I would say just not active.
18  But the other thing, of course, I
19  understand about psychiatric illnesses is
20  they wax and wane.  People have good days
21  and bad days, you have that whether or not
22  you have a psychiatric condition.  And so,
23  that's why multiple interviews is helpful,
24  but, yes, she did not strike me as being
25  overwhelmed with hopelessness during the



Page 133

1            Agharkar
2       times I saw her.  I will say I'm sure --
3       I'm sure at times she has that still, but
4       I don't think it's nearly as prominent as
5       it once was.
6   BY MS. RETTS:
7       Q.   So, in your interview in 2006, in
8   your interview in 2017, in your interview in 2018,
9   you did not see hopelessness?
10      A.   Correct, that's right.
11      Q.   Would that be the same with lack of
12  energy?
13      A.   Yes.
14      Q.   She did not report lack of energy
15  over the three times that you saw her over the
16  course of about two years?
17      A.   Correct.
18      Q.   And over the course of that two-year
19  period where you conducted those three interviews,
20  you did also not see any concentration difficulty
21  that she reported?
22      A.   Right -- well, no.  Wait a minute.  I
23  think I gave that to her.  I did.  Concentration,
24  yes (indicating).  Yeah, I did see that.  Or
25  rather, I mean, it's really her report, right, I

Page 134

1            Agharkar
2   mean, she's -- so, yes, she did -- she did
3   continue to report having problems in that area.
4       Q.   What do you remember her reporting
5   specifically on that?
6       A.   Well, just being able to focus on
7   something for an extended period of time, her
8   thoughts go either to her past or that she tries
9   to actively stay busy to avoid thinking about
10  things, but she'll -- it'll impair concentration
11  sense of getting a task done and the time away.
12      Q.   No psychomotor agitation?
13      A.   Correct, I did not see that, or
14  retardation in either interviews -- all three
15  interviews.
16      Q.   No problems with appetite?
17      A.   That she reported, correct.
18      Q.   And no problems with suicidality?
19      A.   Correct, that's right.  I did not
20  cross-reference for each symptom in her therapist
21  notes.  I do know that there are some -- some of
22  the same symptoms reported in her therapist notes,
23  and I wouldn't expect someone to have these
24  problems every day all the time.  So, there will
25  be some -- you're looking for not consistency in

Page 135

1            Agharkar
2   every single report, you're looking at sort of
3   consistency over time, you know.  Generally
4   speaking, are these the type of problems that
5   people are having?  That's how we make our
6   diagnoses.
7       Q.   Now, guilt, she reported to you that
8   she felt some guilt from entrusting her son to the
9   care of whoever murdered him; true?
10      A.   That's right.
11      Q.   Did she say who she believed murdered
12  him?
13      A.   No.  I asked her that, and she said
14  she just does not know if it was Roger or Jim
15  Styers.  And she said she doesn't keep up with
16  either of their cases, she can't deal with it.
17      Q.   If Jim did not kill her son, did you
18  explore with her how her feelings of guilt would
19  have been related to that?
20          MR. BRUSTIN:  Objection to form.
21          THE WITNESS:  I did not.  I don't
22      think it would really matter because
23      either way, she let her son out of her
24      care to one of the two people that was
25      involved in what happened.

Page 136

1            Agharkar
2   BY MS. RETTS:
3       Q.   And that guiltiness is something that
4   she would feel regardless of incarceration, it
5   surrounds the nature of the crime at issue?
6       A.   I would expect that, yes.
7       Q.   And the nature of the crime at issue
8   could also relate to her feeling that she can't
9   trust people?
10      A.   You know, it could, it could, but Jim
11  and her were not so close.  I mean, it was -- they
12  were living together, as I understand, for
13  monetary reasons, just for split expenses and
14  such.  What you're saying is true, it's possible,
15  yes, but that's not the only reason.
16      Q.   Even if they were living together
17  only for monetary reasons, it would have been a
18  significant betrayal for him to have killed her
19  son?
20          MR. BRUSTIN:  Objection to form.
21          THE WITNESS:  A significant betrayal
22      whether or not you know the person or not,
23      right; you've entrusted the care of the
24      child to somebody?  So, sure.
25          But, again, you can't paint them --



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              137–140

Page 137

1                    Agharkar
2        every relationship that she has as being
3        untrusting solely because of that one
4        person, that's not how it works, you know.
5        Because frankly, there's been a lot of
6        intervening issues in terms of guards and
7        being other inmates and what happens to
8        you in prison, yeah.
9           Those things also contribute,
10         certainly, to feelings of betrayal or
11         being able to trust people.
12  BY MS. RETTS:
13       Q.   And Ms. Milke's relationship with
14  Mark Milke could relate to her ability to trust
15  people, as well?
16       A.   It could, although it seemed to me --
17  the impression I got from her is that that
18  relationship is pretty burned out.  I mean, she --
19  it may have been great in the very beginning, but
20  as his substance abuse problems became worse and
21  worse, and he -- she saw that he just wasn't going
22  to be a good husband, he was not going to fill
23  that role, that she kind of had to learn to -- she
24  had to take her son and move on, we got to find a
25  life and if this guy, he is still her -- he's

Page 138

1                    Agharkar
2  still his father, so he has to be in his life,
3  that's the right thing to do, but that he can't be
4  really a part of our future, we got to move on
5  without him, he's not getting it together.
6        Q.   And did Ms. Milke relay that she
7  believed that she had suffered domestic violence?
8        A.   She did not give me that impression,
9  no.
10       Q.   Did you review the letters to
11  cross-check for contemporaneous reports of
12  domestic violence?
13           MR. BRUSTIN:  Objection to form.
14           THE WITNESS:  The only letters I can
15        recall do not describe abuse with him.  I
16        mean, it talked about him being a jerk and
17        how difficult it was, but not domestic
18        violence.  Because, again, I recall her
19        writing to my mother saying I've never
20        been abused or violent -- people violent
21        toward me, thankful -- thank God, that
22        kind of thing, so --
23  BY MS. RETTS:
24       Q.   Do you recall Ms. Milke writing that
25  she was terrified of Mark?

Page 139

1                    Agharkar
2        A.   Yes.
3        Q.   And she was terrified that if she got
4  out of jail, that he would come and find her?
5        A.   I think I read something to that
6  effect, sure.
7        Q.   Did you explore that with her?
8        A.   Not specifically.  Again, the
9  relationship was chaotic as it is with
10  substance-abusing people.
11       Q.   Did you explore with her whether or
12  not she believed that Mark was somehow involved
13  with the murder of Christopher?
14       A.   That came up, I do believe, I know I
15  saw that somewhere, and I think I asked her about
16  that.  And -- but she said it was something I
17  thought at the time, I don't -- I don't really
18  think that now, I don't know, I mean, I don't
19  know, but I don't think so.
20       Q.   On the second page of your notes from
21  May 24th, 2016 --
22           MR. BRUSTIN:  Is this the new
23        exhibit?
24           MS. RETTS:  No.
25  BY MS. RETTS:

Page 140

1                    Agharkar
2        Q.   It's written, "Had a dog that helps
3  with anxiety, had to give it to a friend at 9/5,
4  going to get her back," is that what that says?
5        A.   So, it -- had a dog that helped
6  decrease her anxiety, that's the down arrow.  Had
7  to give her to a friend, I don't know why I said
8  "at," but it's September 2015, and she's going to
9  get her back.  And I believe that was because she
10  was going to be out of the country for -- I think
11  somebody needed to take care of the dog.
12       Q.   So, it wasn't a permanent situation
13  where she had to give the dog away, it was a
14  caretaking --
15       A.   Right, right.  And really, it was
16  very difficult for her to do that, but she knew
17  someone had to take care of the dog.  So, no, I
18  was never -- yeah, she always intended to get the
19  dog back.
20       Q.   And she had gotten the dog back, as
21  far as you know?
22       A.   That's correct, in my understanding,
23  yes.
24       Q.   And walking the dog, being with the
25  dog, it's something that helps with her anxiety?

 

BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
141–144

Page 141

Agharkar

2    A.    Yes.

3    Q.    Do you recall seeing in the records
4  or reference to -- kicking a dog and breaking her
5  foot when she was a teenager?

6    A.    No, I don't recall seeing that.

7    Q.    Did you ask her anything that brought
8  that up at all?

9    A.    No.

10    Q.    Is that something that you explore
11  usually in the context of a forensic interview is
12  any violence to animals?

13    A.    I think what you're getting at is if
14  there was a conduct disorder.  And so -- but the
15  way -- so, one -- kicking a dog is obviously bad.
16  But a one-off event does not make a pattern, and
17  that's what you're looking for.  You're looking
18  for a pattern of behavior of cruelty to animals,
19  and that typically doesn't mean kicking a dog, it
20  means torturing a dog.

21    I mean, I'm talking about doing some really
22  gruesome things to an animal and deriving pleasure
23  in that, that's what's important, it's not a
24  matter of -- I've seen mentally impaired people or
25  mentally retarded folks -- disabled folks who may

Page 142

Agharkar

2  be violent toward an animal because it was bit,
3  because it snapped at it, or because -- had people
4  say they thought it was like a toy, you know what
5  I mean?  They're intellectually not there.

6    So, you -- context is very important.  So,
7  one event doesn't particularly trouble me
8  necessarily, if that's all there was to it.  What
9  I'm looking at typically or what I'm talking about
10  with a history is, you know, bullying, stealing,
11  lying, cheating, running away from home, those are
12  the types of behaviors, troubled behaviors, things
13  that imply some sort of criminality or potential
14  for that.

15    It needs more exploration, but those are the
16  types of areas, and I did not get that history
17  from her.

18    Q.    Did you review with Ms. Milke whether
19  she had any problems with writing a bad check
20  before the incident?

21    A.    Yes.  I don't think I explored that
22  with her, but I think I'm aware that there was
23  some problem with that.

24    Q.    And would that, for you, fall within
25  lying or cheating or stealing?

Page 143

Agharkar

2    A.    Depends on the context, I suppose.  I
3  mean, if it's required to get food or shelter or
4  something important, you know, if there's a
5  pattern.  It's not a smart crime, I mean, you get
6  caught fairly easily, I think.  I mean, I'm not a
7  cop, but, you know -- it seems to me like you got
8  to show ID and get it cashed and whatever else.
9  So, it's not a smart thing to do.  So, I need to
10  know more about it, but it certainly is illegal
11  and it's not the conduct that I would ever
12  condone.

13    Q.    It's not something that you, had you
14  known, would have explored with her?

15    A.    I might have, sure.  I don't think
16  it's really relevant to the issue of PTSD, but,
17  yeah.

18    Q.    Could be relevant to the issue
19  whether she has some underlying personality
20  disorder?

21    MR. BRUSTIN:  Objection to form.

22    THE WITNESS:  You think that would
23    come up in some other ways than writing a
24    bad check.

25  BY MS. RETTS:

Page 144

Agharkar

2    Q.    Are you aware of anyone close to Ms.
3  Milke reporting that she was manipulative?

4    A.    I think I saw that in -- it might
5  have been her mother's report to the police.  I
6  think I saw that.  That's what I can recall, sure.

7    Q.    Did you look for any evidence of that
8  within the letters that you reviewed?

9    A.    It was certainly something I was
10  thinking about, and whether there was an element
11  of trying to get information, perhaps, I know some
12  of the letters to Styers seemed that way, tell me
13  what happened and hey, I'm here for you, what's
14  going on, kind of get information from that person
15  -- is there a manipulative element?  Sure, in
16  various letters I saw.

17    Q.    You interviewed Ms. Milke for a
18  fourth time after your original report; true?

19    A.    That's right.

20    Q.    And the purpose of that, was that to
21  explore the notations in her records relating to
22  rape?

23    A.    That was one of the reasons.  There
24  are a couple of other things, photographs that I
25  wasn't aware of Dr. Metz put in his report, just



Page 145

Agharkar

1
2   some things that I wasn't aware of.  The rape was
3   obviously the most important thing, because that
4   was confusing and it didn't happen.
5       So, that's why I didn't know what he was
6   talking about, and so I said -- let me call and
7   find out exactly, let me just ask again about this
8   particular issue.  So, yeah, that would ^prompt on
9   my mind, but then there were a few other questions
10  I had, I think, about some of the pictures and
11  some of the other things.  It's in the notes,
12  obviously, whatever I have.
13          (Discussion off the record.)
14          MS. RETTS:  Can I have those exhibits
15      (indicating)?
16          (Exhibit 263 was so marked for
17      identification.)
18  BY MS. RETTS:
19      Q.   I'm going to have you look at Exhibit
20  263.  Do you recognize this?
21      A.   Yes.
22      Q.   Is this one of the documents that you
23  looked at as part of your process of writing your
24  rebuttal report?
25      A.   Yes.

Page 146

Agharkar

1
2       Q.   And in this document on the first
3   page, toward the end, Ms. Milke reports that, "I
4   am a victim of rape.  I was sexually assaulted
5   during the summer of 1988 by a stranger, and it
6   was a horrifying and painful attack.  I will spare
7   you the graphic details, but I was bound to the
8   wrists so I couldn't fight back and defend
9   myself."
10      Do you see that?
11      A.   Correct, I see it.
12      Q.   And this was something that appears
13  to have been written to Dr. Wooten?
14      A.   Yes.
15      Q.   And the date is 9/24/01?
16      A.   Yes.
17      Q.   Then she goes onto the next page, "A
18  natural reaction from a victim of sexual abuse or
19  rape to being touched -- immediately jerked away
20  and -- out."
21      Do you see that?
22      A.   I see it.
23      Q.   And she reports later on " -- touched
24  as my wrists are bound, I immediately feel an
25  increased heart rate and tightening of the chest"?

Page 147

Agharkar

1
2       A.   Yes.
3       Q.   "I have to ^crunch my teeth and
4   concentrate on my breathing while flashbacks are
5   flooding my mind.  I have tried very hard to just
6   deal with it, but this is something that is
7   serious and can't be blown off or swept aside"?
8       A.   Yes.
9       Q.   And those are -- what she is
10  reporting in this is consistent with what
11  psychological symptoms could be from a victim of
12  rape; true?
13      A.   True.
14      Q.   And Ms. Milke is using those symptoms
15  in this to try to manipulate the system to obtain
16  an independent result; true, of not being
17  handcuffed?
18      A.   Sure, totally understandable, because
19  she finds that she -- not just handcuffs, but I
20  mean, being touched and held onto by these people
21  who have sexually harassed her, and she wants no
22  contact with them whatsoever.  And so, that's
23  really what she's trying accomplish.  And, yes, so
24  she's -- she's lying to make that happen.
25      Q.   And where does she say here that

Page 148

Agharkar

1
2   she's been sexually harassed by a guard?
3       A.   She doesn't say that there.  She told
4   me that.
5       Q.   And that she lied about being raped
6   then, according to what she told you, she lied
7   about being raped?
8       A.   That's right.
9       Q.   She lied about being bound at the
10  wrists?
11      A.   Yes.
12      Q.   She lied about not being able to
13  fight back and defend herself?
14      A.   Yes.
15      Q.   She lied about feeling an increased
16  heart rate and tightening of the chest?
17          MR. BRUSTIN:  Objection to form.
18          THE WITNESS:  No, it's possible that
19      that's not a lie.  I mean, she may very
20      well experienced that when handcuffed or
21      when they come to get her.  I mean, she --
22      she writes to her mother about that, that
23      it's extremely anxiety-provoking for her
24      whenever they open her cell.  So, it's
25      very possible she's drawing on some of her



Page 149

Agharkar

2    own experiences in describing these
3    things.
4  BY MS. RETTS:
5        Q.   To exaggerate, to get an intended
6    result; true?
7        A.   Yes, right, to get them not to touch
8    her.
9        Q.   And she goes on and lies about
10   flashbacks that are flooding into her mind; true?
11       MR. BRUSTIN:  Objection to form.
12       THE WITNESS:  That may or may not be
13       true, I don't know.  Look, what is the lie
14       is the rape, as far as my understanding.
15       The other symptoms may very well be things
16       either she -- that she's experienced in
17       one form or another, and may have
18       experienced there, and she's melding the
19       two together because she believes that
20       this will achieve the purpose of having
21       them not handcuff me or not touch me.
22   BY MS. RETTS:
23       Q.   In your reading, Dr. Wooten, is that
24   she's having a flashback because she was raped?
25       MR. BRUSTIN:  Objection to form.

Page 150

Agharkar

2        THE WITNESS:  No doubt.  If I didn't
3        know differently, I would have said the
4        same thing.
5  BY MS. RETTS:
6        Q.   How did you factor this into your
7    evaluation of Ms. Milke, and how she used
8    psychological symptoms to try to manipulate, in
9    this case, Dr. Wooten, how did you factor that
10   into your analysis?
11       A.   I viewed this as entirely consistent
12   with what I see prisoners do.  We are in a trapped
13   environment with very little power, you are
14   totally beholden to officers and to the prison for
15   your own safety and security.  And so, by any
16   means you can, if you can try to get something you
17   want, if you can try to get something -- a better
18   environment for yourself -- you find very
19   distressing or difficult, but you do it -- or you
20   try to do it.  And so, that's how I viewed this
21   here, this is survival.
22       Q.   And this is fairly sophisticated in
23   terms of linking up the psychological symptoms to
24   a reported incident of rape; true?
25       A.   No, I don't think it's all that

Page 151

Agharkar

2    sophisticated.  Well, first of all, she's not a
3    stupid person, but I would say to you, too, that I
4    don't know is that -- hard to fathom that -- don't
5    touch me.  Why not?  Well, because in the past
6    I've been touched and it's been, you know -- I
7    mean, it's not that -- it's not something -- it's
8    not some crazy story.  I mean, it's plausible, so,
9    sure.
10       Q.   So, going back to your interview of
11   her, knowing that she has a history of trying to
12   manipulate a psychological provider in what
13   appears to be a fairly sophisticated way, what did
14   you employ, the measure, to determine that she
15   wasn't trying to manipulate you?
16       MR. BRUSTIN:  Objection to form.
17       THE WITNESS:  Again, I'm looking for
18       a consistency over my interviews with her.
19       I'm watching her affect as she describes
20       certain things to me, and there are
21       certain times where tears come to her no
22       matter what.
23       And there's other times when she's
24       describing things and I'm watching her, I
25       wouldn't say disassociate, but it's

Page 152

Agharkar

2    getting that where there's a real distance
3    between her and what she's telling me.
4    It's almost like a newscaster telling the
5    story, as if it happened to somebody else,
6    that's what you see a lot in people who
7    had been traumatized; okay?  The other
8    thing is, she actually minimizes a fair
9    bit.
10       There are things I saw in the letters
11   or saw in the records, that I had to go
12   back to her and say, wait a minute, what
13   about this?  For example, the strip search
14   when she was on her period, and she was
15   forced to have soiled pants.  I learned
16   that from her therapist, not from her.
17       Now, that's a very graphic story,
18   obviously, a very humiliating one.  So,
19   there are probably reasons why she
20   wouldn't feel comfortable talking about
21   it.  But she kind of glosses over some of
22   those things, like strip searches were
23   bad, those kind of things, and strip
24   searches were humiliating, I didn't like
25   it.  But you didn't get to that history



BHUSHAN S. AGHARKAR, M.D.                              September 25, 2018
MILKE vs CITY OF PHOENIX                                        153–156

Page 153

1              Agharkar
2      until some prompting.
3         So, I got more out of her as visits
4      continued.  That's when the ^report was
5      developed and that sort of thing, which is
6      typically what you see with people who
7      have been victims of trauma.  I'm not
8      believing what she says wholesale, I'm
9      looking for, again, does this match with
10     what I know clinically, and is it
11     consistent with other records reviewed?
12        So, to me, it makes sense.
13  BY MS. RETTS:
14        Q.   Now, the report of the strip search
15     when she was on her period, that's not something
16     she came out and told you; true?
17        A.   That's correct.  She did, I think, in
18     the third interview, at that point that I had to
19     basically say to her, I learned of this, let's
20     talk about that, which was not a comfortable
21     conversation, but she had --
22        Q.   Is that one of those inconsistencies
23     that you would look for, the fact that she
24     reported it to one person, but not to you?
25             MR. BRUSTIN:  Objection to form.

Page 154

1              Agharkar
2         THE WITNESS:  I wouldn't label it an
3      inconsistency.  That's completely
4      consistent with trauma, actually, that you
5      would minimize or try to avoid talking
6      about it or you would be ashamed, and
7      would not necessarily give a lot of
8      details.  And that with time or, you know,
9      for all your information to be prompted to
10     discuss it more freely or more openly.
11  BY MS. RETTS:
12        Q.   And another potential, though, is
13     that the story is not accurate, in that a person
14     doesn't remember it because the story told wasn't
15     true in the first instance, but when prompted,
16     they can remember the story?
17             MR. BRUSTIN:  Objection to form.
18             THE WITNESS:  What you're saying is
19     certainly possible.  That's not at all how
20     I would characterize it with her.  And, in
21     fact, talking to therapists, she had
22     exactly the same sort of response as I
23     think I put in my report, where it's very
24     difficult to engage her in therapy because
25     of trust issues, and because there's just

Page 155

1              Agharkar
2      so many layers of trauma to work through,
3      and that with additional time they'd been
4      getting at things, but it's coming
5      piecemeal and it's taking a lot of time to
6      kind of get to, so -- and that's exactly
7      what I expect with someone who's been
8      traumatized.
9  BY MS. RETTS:
10        Q.   Do you see -- I would classify
11     almost -- Exhibit 263 is somewhat of a grievance,
12     similar to form of the grievance that you see from
13     inmates?
14             MR. BRUSTIN:  Objection to form.
15             THE WITNESS:  Sure, it's similar.
16  BY MS. RETTS:
17        Q.   Did you see any grievances in the
18     files from Ms. Milke relating to this incident
19     that she reported about being stripped search
20     while on her period?
21        A.   No, I did not see that.
22        Q.   And, in fact, from this, which is
23     263, we know that Ms. Milke is capable of writing
24     a grievance, and in some detail has shared some
25     very specific incidents about what occurred?

Page 156

1              Agharkar
2         MR. BRUSTIN:  Objection to form.
3         THE WITNESS:  Sure.  Well, she's
4      certainly capable of it.  I guess the
5      question is if she felt it would be -- if
6      it would fall into her fears, if it would
7      actually be helpful in any way, because
8      what she described was the guards don't
9      care, they would laugh at her or they
10     would just -- just not show any kind of
11     regard at all.
12        She could tell that by their attitudes,
13     you know, an inmate might commit suicide,
14     she'll say -- she would overhear them
15     joking about it, well, one less mouth to
16     feed, you know.
17        So, if that's the environment, you're
18     not going to expect for very much help
19     from those folks; right?  And so, she may
20     not think that's going to work, she
21     might have thought this was going to work.
22     I do know that she started refusing
23     visitations and refusing to go see mental
24     health to avoid the strip searches, and to
25     avoid being handled by the guards.



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
157–160

Page 157

Agharkar

1
2      So, that tells you, oh, a coping
3   mechanism she employed, she had to give up
4   something that was really important, but
5   she did it because she couldn't stand --
6   being handled in the way she was being
7   handled.
8   BY MS. RETTS:
9      Q.   Do you see any grievances in her file
10  relating to anything that she witnessed other
11  inmates go through?
12     A.   No, I don't think so.  Again, I think
13  she said she feared retribution, which is also a
14  very common concern in prison.  But, by reporting
15  the behavior -- she's relying on these folks for
16  everything, so she's just trying to be quiet and
17  get along.
18     Q.   Did you see any evidence in the
19  records that you've reviewed of any retribution to
20  her?
21     A.   I did not.
22     Q.   Did you see anything or have her
23  report anything about any retribution that she
24  received following the letter to Dr. Wooten where
25  she talked about the rape experience?

Page 158

Agharkar

1
2      A.   No.  I don't know that she would ever
3   expect any kind of retribution from this because
4   if you think about it, she made this just about
5   her, as opposed to the way that they handled me
6   and this kind of thing, you know.  She just tried
7   to make it more about just, okay, I'm having all
8   these problems as a result, so that's why, it's
9   not like you did something bad.
10     Q.   Did you see anything from her in the
11  file such as I'm having a lot of these problems
12  from seeing an inmate set on fire, can you help me
13  with this?
14     A.   No.  And, in fact, she explicitly
15  told me, she's like the guards don't care, she's
16  like they, you know -- even -- they just walk by
17  the door like hey, are you okay today?  Like,
18  yeah, I'm okay today.  And that's it.  She's like,
19  they don't care.
20     And so, you don't even try to engage them,
21  and she goes, I don't want anything to do with
22  them, I would just wave and say I'm fine and
23  that's it, and walk away, so --
24     Q.   Ms. Milke had a good relationship
25  with Dr. Garcia?

Page 159

Agharkar

1
2      A.   Yes.  I think that was the jail
3   doctor.
4      Q.   Yes.
5      A.   Not the prison, that's right.  She --
6   she -- she did tell me that, yes.
7      Q.   And Dr. Garcia acted as an advocate
8   for her; true?
9      A.   I don't know that specifically.  But
10  if you represent that, I don't -- I have no reason
11  to doubt that or disagree with that.
12     Q.   Did you know that he was willing to
13  testify for her at the criminal trial?
14     A.   No, I did not know that.
15     Q.   Did she report to you that Dr. Garcia
16  was a provider that she felt comfortable with, and
17  who helped her with her psychiatric symptoms?
18     A.   Yes.
19     Q.   Were you aware that the inmate
20  setting themselves on fire, that issue happened
21  within the jail?
22     A.   No.  It may well have happened in
23  jail, but I -- my recollection of her telling me
24  about it was prison.  It's possible I mixed up,
25  but either way, she's incarcerated, I may -- and

Page 160

Agharkar

1
2   maybe I didn't ask the question specifically of
3   what year -- I certainly would have asked what
4   year to delineate that.  But my understanding was
5   at the prison.
6      Q.   Did you recall seeing any reference
7   in the letters to Joe Marino about that incident?
8      A.   Not that I can specifically tell you.
9      Q.   Did you see anything in the records
10  from the jail where Ms. Milke reported seeing that
11  incident of the inmate sitting herself on fire,
12  and talking through with Dr. Garcia?
13     A.   No, not sitting here, I couldn't.  I
14  know I've reviewed the medical records, but I
15  can't remember.
16     Q.   Same with the inmate attempting to
17  commit suicide, do you know whether that happened
18  in the jail or the prison?
19     A.   Again, my understanding was it was
20  the prison.
21     Q.   Did you ask questions specific to
22  clarifying that?
23     A.   Well, I know, for example, she told
24  me, and I'm positive it was at the prison, that a
25  woman three doors down hung herself in her room,



Page 161

1              Agharkar
2  and that they waited almost all day before the ME
3  was able to come and pronounce her and that kind
4  of thing, and she paced the cell the whole day,
5  she knew there was a dead body nearby, and just
6  how everyone was just sort of cavalier about it
7  and just didn't seem to care.
8      So, I do know about that particular suicide,
9  at least.  She also mentioned seeing people leave
10 in body bags before, but I don't have details as
11 to why, what exactly transpired, why they died.
12     Q.   It could have been natural deaths?
13     A.   That's certainly possible.  It's
14 disconcerting to say, at least, to -- to see
15 people leave in body bags.  I think the other
16 thing, though, too, you know, with some of these
17 women, obviously I think where she's being housed,
18 they have psychiatric issues.
19     And I think that for some of them who has
20 attempted or committed suicide, there's depression
21 involved.  And I think for her, this really
22 concerned her because she felt depressed and she
23 felt like, oh God, is this what's going to happen
24 to me, am I going to head down the same kind of
25 road?  It didn't, thankfully, but that was a

Page 162

1              Agharkar
2  concern.  So, that just hit -- it really hit home
3  for her about where she was at and what was
4  happening.
5      Q.   Did she report ever having any
6  suicidal ideation during the time that she was
7  housed in jail or prison?
8      A.   No, she did not.  And actually, I was
9  surprised by that, I would have expected that to
10 be more.  And she said I had to try to stay
11 positive, I had to try to focus on my case because
12 I had to free myself, I had to prove my innocence,
13 so I couldn't even entertain that sort of thing.
14 I'm not saying she couldn't have had transient
15 suicide ideation, it wouldn't surprise me at all
16 if she did.  But to my knowledge, there was no
17 attempts.
18     Q.   Have you, in the course of your
19 treatment of patients not in the forensic context,
20 had anyone involuntarily committed?
21     A.   Oh, yes, yeah, quite a few.  Now, not
22 in my private practice, thankfully.  I've been
23 able to avoid that.  But as a resident, yeah, I
24 mean, I've committed many, many people.
25     Q.   And usually in those situations where

Page 163

1              Agharkar
2  people are involuntarily committed, how are they
3  housed?
4      A.   Well, they're sent to an inpatient
5  psychiatric facility, or potentially crisis
6  stabilization unit, but either way, it's
7  inpatient.
8      Q.   And those inpatient facilities, are
9  those locked units?
10     A.   Yes, that's right, because they're
11 there against their will.
12     Q.   And are those patients usually housed
13 solitarily in their own room?
14     MR. BRUSTIN:  Objection to form.
15     THE WITNESS:  Probably, yes.
16     Certainly, and I'm thinking of our units
17     on -- where I work, yes, we did.
18 BY MS. RETTS:
19     Q.   In those units that you worked on
20 that were involuntarily commitment units, where
21 someone was inpatient, what was the recreation
22 scenario?
23     MR. BRUSTIN:  Objection to form.
24     THE WITNESS:  They were still able to
25     come out of their rooms, they were able to

Page 164

1              Agharkar
2      engage in group therapies, they were able
3      to attend -- I'm laughing because there
4      were exercise groups, but it was like the
5      most sort of horrifying cardio you could
6      ever imagine in your life, people with
7      dystonias and all.  So, it's a problem
8      trying to get exercise.
9      But the point is, they were -- there
10     were these recreational type groups that
11     were available.  Certainly we don't let
12     them out of the hospital, okay, so they're
13     not getting out.  But they are able to
14     walk fully around the unit, and they're --
15     it's programming for them that can help
16     them pass the time and hopefully learn
17     some skills and maybe at least do
18     something other than just watch TV all day
19     or stay in their cells.
20 BY MS. RETTS:
21     Q.   They don't go outside, though; right?
22     A.   No, definitely not.  I will say at
23 some of the forensic hospitals I've worked at,
24 there will be a yard they can go out on.  But
25 that's because they're there for -- these are all



BHUSHAN S. AGHARKAR, M.D.                          September 25, 2018
MILKE vs CITY OF PHOENIX                                        165–168

Page 165

Agharkar

1
2  like NGRI employees, so these are people that
3  are -- they're going to live the rest of their
4  life in the hospitals, so they might have a rec
5  yard, but it's fenced and there's barbed wire and
6  all that stuff.  But, no, certainly not the
7  hospitals, we didn't have any outside place for
8  them to go to.  But they don't stay with us for
9  any longer than a couple of weeks, you know.
10     Q.   Their rooms are locked at night?
11     A.   Yes.  Typically, yes.  I'm not
12  exactly sure, I wasn't on every unit every night,
13  but typically, yeah.
14     Q.   Are they allowed visitors?
15         MR. BRUSTIN:  Objection to form.
16         THE WITNESS:  Yes.
17  BY MS. RETTS:
18     Q.   How frequently?
19     A.   I can't recall.  But we may have had
20  days that they could visit, I don't know.  Those
21  are the hospital policies.
22     Q.   Are they allowed access to a phone?
23         MR. BRUSTIN:  Objection to form.
24         THE WITNESS:  Yes, from what I can
25     recall.

Page 166

Agharkar

1
2  BY MS. RETTS:
3     Q.   In the rooms or in like a day room?
4         MR. BRUSTIN:  Objection to form.
5         THE WITNESS:  Some units had them in
6     the rooms, others only had them in the day
7     room.
8  BY MS. RETTS:
9     Q.   In those psychiatric facilities, are
10  there restrictions on how much phone access they
11  could have?
12         MR. BRUSTIN:  Objection to form.
13         THE WITNESS:  Probably.  But that's a
14     nursing issue, I didn't get involved in
15     that.
16  BY MS. RETTS:
17     Q.   And those psychiatric inpatient
18  hospitals were designed to help people with their
19  mental illness; true?
20         MR. BRUSTIN:  Objection to form.
21         THE WITNESS:  That is correct because
22     it's not just locking them up, it's
23     treating them, it's actually giving them
24     medication and have them go to group
25     therapy and that sort of thing, to get

Page 167

Agharkar

1
2     them stabilized to be discharged.
3  BY MS. RETTS:
4     Q.   Some of those patients don't
5  participate in group therapy; true?
6         MR. BRUSTIN:  Objection to form.
7         THE WITNESS:  True.
8  BY MS. RETTS:
9     Q.   Going back to your notes on the
10  5/24/16 session, there is a circle with maybe an
11  outline or two for the end, "Easily startled since
12  prison" -- what's before that (indicating)?
13     A.   Oh, okay.  Oh, yes, okay.  Yes.
14     Q.   What is that?
15     A.   So, it's a positive sign.  So,
16  meaning, yes, she has been -- she is more easily
17  startled since being in prison.
18     Q.   And then, "Guard used to sneak up on
19  you"?
20     A.   Yes.
21     Q.   Did she explain how that would happen
22  in a solitary cell?
23     A.   Well, not specifically.  I think she
24  was just saying that they -- she meant this as not
25  like I wouldn't hear them coming, it's like they

Page 168

Agharkar

1
2  would purposely play games with you just to try to
3  scare you.  So, whether they might bang on her
4  door without alerting you, that they were walking
5  out to the door.  It might have been when she was
6  out, I don't know.  But the point is, it was a
7  malicious way, as opposed to just I didn't hear
8  them coming.
9     Q.   Did she ever tell you that she served
10  any grievances about that?
11     A.   No, to my knowledge, she didn't,
12  but --
13     Q.   Did you ask her whether she had a
14  good relationship with the warden?
15     A.   Yes.  She did have a good
16  relationship with the warden.  This was a female
17  warden.  And, yes, I think, this woman sounds like
18  she was pretty compassionate and caring towards at
19  least her and her situation.  I don't know how she
20  was for others, but Ms. Milke described her that
21  way, that she -- whenever there was some issue, I
22  think certainly as her execution date was set,
23  and, you know, there were some things --
24  procedures and things that had to be followed.
25  Apparently, she seemed very sort of motionless,



BHUSHAN S. AGHARKAR, M.D.                                      September 25, 2018
MILKE vs CITY OF PHOENIX                                                  169–172

Page 169

Agharkar

1
2    very -- very much like she wasn't getting it.  And
3    so, this warden came to talk to her and kind of
4    say to her are you doing okay?  To kind of help
5    her through the process.
6        And so, that's what's immediately coming to
7    mind, I think there may have been some other
8    interactions, as well.  But either way, she did
9    view that as a positive, like she was a nice
10   person and actually tried to help her.
11       Q.   And she felt comfortable providing
12   information to the warden?
13           MR. BRUSTIN:  Objection to form.
14           THE WITNESS:  I don't know for sure.
15       I don't know what information she would
16       have provided.  I just know that the
17       warden was there to listen and help her.
18   BY MS. RETTS:
19       Q.   Did you ever explore with her whether
20   she spoke to the warden about any of the
21   conditions of the confinement, and made any
22   complaints about that?
23       A.   To my knowledge, she did not.  But
24   I'm not sure I asked her specifically about that
25   because -- because I believe the issue was around

Page 170

Agharkar

1
2    her execution.  So, I think my question was more
3    focused to that, tell me about the process, tell
4    me about what it is you got to do to get ready to
5    be executed and those kind of things.
6        Q.   Have you treated anybody in your
7    private practice who you diagnosed with PTSD, as a
8    result of them becoming aware of another person
9    committing suicide?
10           MR. BRUSTIN:  Objection to form.
11   BY MS. RETTS:
12       Q.   Personally witnessing?
13       A.   No.  In the past, I have -- no.  So,
14   in the past, where I have seen PTSD and treated it
15   for someone who did not directly experience the
16   trauma, but heard about it, was a woman whose
17   close family member was a Holocaust survivor, and
18   heard about the trauma of the Holocaust and the
19   horrors there, and so that deeply traumatized my
20   patient.
21       And the other was a woman who turned down a
22   homeless man when he asked her for money, and
23   later then found out the homeless man killed the
24   next woman who did give him money, that terror --
25   I mean, that traumatized her deeply because she

Page 171

Agharkar

1
2    realized that could have been her, had she been
3    digging in her purse -- he might stab her.  So,
4    those are the two that immediately come to mind.
5    There might be some others, but those are the more
6    salient stories I can remember.
7        Q.   The next page of your notes, the
8    10/25/2017, the first, to avoid anything of the
9    case?
10       A.   "TH" is my shorthand for thoughts.
11       Q.   Any thoughts of the case.  Avoid -- C
12   is with?
13       A.   Right, C is with, line over.  Because
14   that interview -- that interview actually took
15   place in the room with the boxes, and I said why
16   are we in here, because it's a smaller room, we
17   had usually sat in a conference room for the
18   front, which has more space.
19       And she said this is the room with all my --
20   this is my case in here, I didn't know that.  But
21   as I looked around the room, then I started seeing
22   her name on it.  And she said I tried -- this is
23   where she told me, I try to stay out of here, I
24   never go by here, but I thought maybe sitting
25   here, it might prompt me a little more, jog my

Page 172

Agharkar

1
2    memory of things.
3        Q.   So, for this second interview, you
4    were actually sitting in a room with the boxes
5    while the interview was conducted?
6        A.   That's correct.  We didn't go through
7    the boxes, they were all closed and sealed --
8        Q.   Right.
9        A.   Yeah.  But that's right, we're
10   sitting in the room with her case evidence.  I
11   don't know why it is, but --
12       Q.   And prior to that, she reported that
13   she would try to avoid the room with the boxes?
14       A.   Oh, yeah, yeah.  And she didn't like
15   being in there, she just thought maybe this would
16   be good for me.  Again, she's doing what's -- what
17   makes her very uncomfortable, but she's trying.
18       Q.   How did you factor that into your
19   assessment of her in how she reported things in
20   that interview, given the fact that now she's
21   sitting in the room with the boxes?
22           MR. BRUSTIN:  Objection to form.
23           THE WITNESS:  She -- initially, I
24       thought it was a distraction because her
25       eyes kept darting about the room to the



Page 173

Agharkar
1
2    different boxes.  I'm actually not
3    convinced it actually helped, and I don't
4    know if it was maybe a hindrance or not.
5    But at any rate, I mean, she wanted to be
6    there, so I respected that.
7         But we really -- actually, I think
8    once -- maybe an hour or so went by, maybe
9    30 minutes, she stopped looking at the
10    boxes and just started talking to me
11    again, and that was more useful.
12   BY MS. RETTS:
13        Q.   So, she went back on meds in 2016?
14        A.   Correct.
15        Q.   So, there's a period of time for
16   about a year when she was off of medication?
17        A.   Yeah.  I don't know if it was a full
18   year, but at least a substantial amount of time
19   that she stopped taking it.  I think she didn't
20   like how she felt.
21        Q.   And that's the Zoloft?
22        A.   That's right.
23        Q.   Do you know what her current dose is
24   on Zoloft?
25        A.   As far as I know, it's -- as far as

Page 174

Agharkar
1
2    I'm aware, it's 25 milligrams of Zoloft.
3         Q.   And did that change over time?
4         A.   No, that's been the dose she's been
5    on since -- no, she's on 200 in the prison, which
6    is -- that's an adequate dose.  25 is a low dose,
7    I don't think it's adequate.  But she, I think,
8    had side effects at a higher dose, and ^she maybe
9    was reluctant to do that.  So, anyway, from my
10   understanding, because my interview was in April
11   and she's on this -- on this dose, that's my
12   understanding of her current dose.
13        Q.   And your belief is that for her,
14   given the fact that she was on 25 milligrams
15   before now is -- strike that.
16        In the prison, she's on 200 milligrams;
17   true?
18        A.   Correct.
19        Q.   She's now on 25 milligrams?
20        A.   Correct.
21        Q.   And you do not believe that's an
22   adequate dose?
23        A.   Correct.
24        Q.   Do you believe that she would have
25   reduced symptoms if she was on a higher dose in

Page 175

Agharkar
1
2    terms of psychiatric symptoms?
3         A.   Probably.  But, of course, as you
4    measured against side effects, in which case, they
5    should try another medicine, but I'm not the
6    treating doctor, so --
7         Q.   And another medication may have less
8    side effects and better ability to control her
9    psychiatric functions?
10        A.   Yes, possibly.  Or at the very least,
11   dampen her anxiety to where it's not limiting her,
12   you know, help her moods more than they've been
13   helped, so that she has a better quality of life,
14   sure.  Medicine is not -- I'm sure as you're
15   well-aware, but they do help people.  And so, yes,
16   it would be better to be on a higher dose.
17        Q.   What is your understanding of what
18   the adverse symptom that she was experiencing from
19   the Zoloft?
20        A.   I think she felt foggy-headed, which
21   is a common side effect, antidepressants.  And
22   she -- she just felt that she was having a hard
23   time feeling things.  I'm not convinced that
24   that's actually a medication side effect as much
25   as a trauma symptom.  But those are the two I can

Page 176

Agharkar
1
2    remember.  I feel like there might have been some
3    stomach upset, possibly, but I don't exactly
4    remember.
5         Q.   So, she sees Dr. Potts for medication
6    and sees her psychologist, Emily?
7         A.   Every other week.
8         Q.   Every other week.  For slightly under
9    a year?
10        A.   Slightly more than a year.
11        Q.   More than.  She just lost a father
12   figure in June of 2017?
13        A.   Yes.
14        Q.   Who was that?
15        A.   I don't know.  I didn't write down
16   the name.  She may have said the name, but it went
17   too fast by me, but I just caught the importance
18   of the -- I don't really care about the name.  I
19   care about who the person was in her life, and so
20   that's why I was able -- I got down father figure.
21   And this was when she really started -- she
22   started crying.
23        Q.   She had a grief reaction to that?
24        A.   She did.
25        Q.   Did you explore with her what the



BHUSHAN S. AGHARKAR, M.D.                                September 25, 2018
MILKE vs CITY OF PHOENIX                                          177–180

Page 177

Agharkar

1
2  nature of the relationship was with this person?
3      A.   I think just in the sense that this
4  was a stable person in her life, I -- he's an
5  older man, obviously, and I think just a positive
6  figure, at least, that's been helpful and kind to
7  her.  That's really what she's reacting to, I
8  think, more than anything else when she says
9  father figure.
10     Q.   Is this the person that had been in
11  her life through childhood, someone new in her
12  life?
13     A.   I don't -- I did not get the
14  impression it was from childhood, it seemed that
15  it was somebody kind of more newer in her life.
16     Q.   Did you ask her that specifically?
17     A.   No, I just feel like that's -- that
18  that's where the discussion took us, that it
19  wasn't -- this isn't somebody from a young age,
20  this is like when she's an adult, this is somebody
21  who kind of helped her out and may have helped
22  her.  I think she may have known him earlier in
23  her life, but I don't think he took on this kind
24  of role with her until she's out and she needs
25  help, a place to live and -- and how to pay bills

Page 178

Agharkar

1
2  and some of that stuff, and I think that he helped
3  her, provide her some advice or guidance on those
4  things.
5      Q.   Other than working, do you know how
6  Ms. Milke is supporting herself?
7      A.   That's as far as I'm aware --
8      Q.   Do you know who owns the house she
9  lives in?
10     A.   Now that we're talking about it, I'm
11  actually wondering if it was this father figure.
12  It's a friend, it's somebody -- it's a friend
13  who -- I think it's a rental house, I think.  And
14  he was allowing her to stay there for free,
15  essentially.  That's my best recollection sitting
16  here.
17     Q.   Did her living situation change at
18  all in the time period that you interviewed her?
19     A.   Not that I'm aware of, but honestly,
20  I wouldn't have taken a history really on, you
21  know, tell me all the places you lived, that kind
22  of stuff, it wouldn't really be important.
23     Q.   And you have private patients come in
24  to your practice, do you have a standardized form
25  that you have them fill out for past history?

Page 179

Agharkar

1
2      A.   No.
3      Q.   Do you ever request past records from
4  providers?
5      A.   I do.
6      Q.   Do you have them fill out any records
7  at all?
8      A.   No, I take my notes and -- yeah.
9      Q.   What is after that -- it says "tears"
10  and then?
11     A.   Huge sense of loss in life, my mother
12  died in August of 2014, then this person has died
13  a little more recently, you know, so that's what I
14  was talking about.
15     Q.   She goes on to say that she would
16  rather stay at home, isolate her to go out, lots
17  of friends, but does not go out?
18     A.   Correct.
19     Q.   No motivation to socialize?
20     A.   Yeah, yeah, much reduced motivation
21  to socialize, it's hard to do that.
22     Q.   Housed in, and then there's a
23  little --
24     A.   Female.
25     Q.   Female prison?

Page 180

Agharkar

1
2      A.   There was no death row at this
3  prison, so they put her in the hole.
4      Q.   Because they had no place for her?
5      A.   Correct.
6      Q.   They're in general population now,
7  would not have liked that?
8      A.   Correct.
9      Q.   Did you have a discussion with Ms.
10  Milke about the differences between general
11  population and where she was placed?
12     A.   Yeah.  Well, she's saying she
13  wouldn't have liked that because -- because of her
14  experience?  So, meaning, meaning this is not
15  prospective, this is not looking forward of
16  what -- okay if I were to be housing anywhere, I
17  would not like to be -- she's saying because I was
18  housed and isolated and restricted to myself, that
19  is all I know, that's how -- that's all I became
20  comfortable with, like you should learned to deal
21  with that there, I would have freaked out had I
22  been in general population, like if they had
23  transferred her out from that situation, if that
24  makes sense.
25     Q.   Did Ms. Milke talk about whether she



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
181–184

Page 181

1              Agharkar
2 was able to communicate with inmates through the
3 prison venting or through the windows or passing
4 letters?
5         A.    Yeah, I asked her about that, and she
6 said -- the best that I can understand it was I --
7 I don't think -- vents are common, but apparently
8 it wasn't that, it was through the window, that
9 everybody's window opens just a little bit, we can
10 kind of talk to each other that way.
11        That's -- I'm fairly certain about that, but
12 it wasn't like through the door, that kind of
13 thing.  But she would pass, you know -- you could
14 get papers to one another if you needed it,
15 through the guards or whatever to get it pass
16 outside.
17        Q.    She was able to have some verbal
18 contact with inmates who were on the side of her?
19        A.    Some.  Obviously, I don't know what
20 they look like, but, yeah.
21        Q.    At the very bottom, it states, "Jim
22 is 15 to 20 years older than me, never knew
23 his" --
24        A.    "Psyche history."
25        Q.    "Psyche history."

Page 182

1              Agharkar
2        A.    But he told me that was for seizures.
3        Q.    "Knew he had some sleeping problems,
4 lived together three months, had known him two
5 years" --
6        A.    "Before that."
7        Q.    "Before that."  Is that the extent of
8 what you covered with her about Jim and his
9 history?
10        MR. BRUSTIN:  Objection to form.
11        THE WITNESS:  I'm sure there was
12    more, I think those were just the salient
13    parts, because I wanted to know how he --
14    how she would have known this person, how
15    did he come into her life, why were they
16    living together, that kind of stuff, just
17    who this person was.
18        But again, this was not a criminal
19    responsibility evaluation, so that's a
20    different focus.  I would have really gone
21    into a lot of detail with those things,
22    but that's not the focus here.  So, I
23    mean -- I mean, ^fine, but I think those
24    were salient things that I noted.
25 BY MS. RETTS:

Page 183

1              Agharkar
2        Q.    Tell me about you -- you mentioned
3 this is not a criminal responsibility focus.  So,
4 if it had been a criminal responsibility focus,
5 what would you be looking at in terms of that
6 analysis?
7        MR. BRUSTIN:  Objection to form.
8        THE WITNESS:  Obviously here, when
9    somebody denies committing a crime, you
10    can't really do an evaluation of the
11    person, because they have to admit they
12    did it, and then take it through the steps
13    that that happened, so you can assess
14    their knowledge of right and wrong and
15    whether there were delusions affecting
16    their behavior, et cetera.
17        And so, what I meant by that is then I
18    would have taken -- we would have --
19    probably the majority of the interview
20    would have been spent talking about the
21    incident, and then how did it happen, what
22    were the steps involved, what happened,
23    who are these people, what was the
24    relationship like with these two, and kind
25    of go through in greater detail about all

Page 184

1              Agharkar
2    those things.
3        I before spent an hour and a half just
4    literally talking about two hours of when
5    a crime occurred with people.  It's just
6    that level of detail you have to get into
7    sometimes, that's not the focus here and
8    there's no way I could have spent that
9    kind of time on that issue.
10 BY MS. RETTS:
11        Q.    You mentioned there's no way you
12 could have spent that amount of time, is that
13 because you had any type of imposed restriction or
14 just --
15        MR. BRUSTIN:  Objection to form.
16        THE WITNESS:  Correct, there was no
17    restrictions that were placed on me, I did
18    what I felt I needed to do in order to
19    accurately answer their referral question.
20    But logistically, just being in Phoenix
21    and how often can I be there.
22        Also, again, like I mentioned before,
23    how long she can really tell I'm being
24    interviewed, frankly, and before you start
25    seeing things, it's just not productive.



BHUSHAN S. AGHARKAR, M.D.                                    September 25, 2018
MILKE vs CITY OF PHOENIX                                                 185–188

Page 185

1                 Agharkar
2        When someone is a mess, a ball of tears is
3    not helpful.  You're not doing that person
4    any favors, and you're also not getting a
5    lot of good information at that point
6    anyway.  So, that's the clinical
7    experience, you have to decide when is the
8    right time, what information can I get in
9    what time and when you need to stop the
10       interview.
11   BY MS. RETTS:
12       Q.   So, how much time do you think that
13   you spent in total speaking to Ms. Milke about her
14   relationship with Jim Styers, Roger Scott and the
15   crime?
16           MR. BRUSTIN:  Objection to form.
17           THE WITNESS:  Out of the eight hours,
18       I would probably say 30 minutes to an
19       hour, maybe.  I really don't have a way of
20       judging that, but that's kind of my best
21       guess.
22   BY MS. RETTS:
23       Q.   Would you say that was more of asking
24   for a generalized overview or going through
25   step-by-step and getting into specific details?

Page 186

1                 Agharkar
2        A.   Both to some degree, but I would say
3    one is generally kind of what happened.  But the
4    others I'm kind of going through what was like to
5    get that phone call from him.  Just take me
6    through kind of what was happening, the steps and
7    the police coming, and then what would happen
8    next, and then how you ended up with Detective
9    Saldate, those kind of things.  So, those are
10   sorts of discussions that she kind of -- she told
11   me her version of events.
12       Q.   Is it your understanding that -- how
13   long did she tell you the interview with Detective
14   Saldate was?
15       A.   I don't even know that I got that
16   level of detail.  Not that I can speak here on
17   that.  I don't want to say something that's -- I
18   just cannot remember, frankly, so I'm sorry.
19       Q.   Did you read through in detail Ms.
20   Milke's criminal trial testimony?
21       A.   No, I had her testimony and I skimmed
22   it, it's just such a huge volume of records, so,
23   no, I did not spend a lot of time on that.  And
24   again, for a criminal responsibility evaluation,
25   sure, that's the kind of thing I would have spent

Page 187

1                 Agharkar
2    a lot of time doing, but not for here.
3           MS. RETTS:  I will mark this.
4           (Exhibit 264 was so marked for
5           identification.)
6    BY MS. RETTS:
7        Q.   If you'll turn to the very back page,
8    I want to go through this line-by-line, and
9    basically have you explain to me whether you
10   skimmed it, whether you read it in part or whether
11   you have it and didn't review it.  So, the second
12   amended number 1 --
13           MR. BRUSTIN:  I apologize --
14           MS. RETTS:  The very last page.
15           MR. BRUSTIN:  Of the report, not the
16       exhibit?
17           MS. RETTS:  Now on the exhibit,
18       Exhibit C, the very last page.
19   BY MS. RETTS:
20       Q.   Did you go through in detail Item
21   Number 1, the second amended complaint?
22       A.   Yes.  At one point, I mean, I
23   definitely read it.
24       Q.   Did you go through in detail all of
25   what is itemized in Number 2?

Page 188

1                 Agharkar
2           MR. BRUSTIN:  Objection to form.
3           THE WITNESS:  I did.
4    BY MS. RETTS:
5        Q.   Did you review everything that is
6    itemized in Number 3?
7           MR. BRUSTIN:  Objection to form.
8           THE WITNESS:  Yes.
9    BY MS. RETTS:
10       Q.   Did you review in detail everything
11   itemized in Number 4?
12       A.   Yes.
13           MR. BRUSTIN:  Objection to form.
14   BY MS. RETTS:
15       Q.   And I'm going to go through these,
16   listed in some parts.  Did you go in detail
17   through 5A, which is the grand jury proceeding of
18   Debra Milke, Jim Styers and Roger Scott?
19           MR. BRUSTIN:  Objection to form.
20           THE WITNESS:  I feel like I read it,
21       but I couldn't tell you what's in it right
22       now.  So, I wouldn't have looked at it in
23       a long time.
24   BY MS. RETTS:
25       Q.   All of it?  So, do you remember



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              189–192

Page 189

1                   Agharkar
2    reviewing Grand Jury proceedings for Ms. Milke,
3    for Mr. Styers and for Mr. Scott all separately?
4         MR. BRUSTIN:  Objection to form.
5         THE WITNESS:  All of that -- if I was
6       provided it, I would have read it.  But
7       that may have been several years ago now,
8       I certainly didn't do it for today.
9    BY MS. RETTS:
10        Q.   The voluntary material, 5B?
11        A.   I can't recall sitting here reading
12    that.
13        Q.   5C, Debra Milke criminal trial 9/12
14    to 10/12/1990.
15        A.   Best I can recall, I would have
16    skimmed that.
17        Q.   And it's not clear from here whether
18    this was just her testimony or whether it's the
19    entire criminal trial testimony?
20        A.   It would be her testimony.
21        Q.   So, if you had had the entire
22    criminal trial testimony, would you only have
23    skimmed her trial testimony?
24        A.   Yeah, there's no way I would have
25    spent time reading about the whole trial.

Page 190

1                   Agharkar
2         Q.   Do you have a recollection of
3    reviewing any of the criminal trial testimony from
4    any of Ms. Milke's family members?
5         A.   No.  I'm aware they testified, I
6    am -- just sitting here, I can't remember.  I may
7    have looked at it, that's possible, but I will
8    tell you I certainly -- to get the lay of the land
9    or to understand it, I know I read a lot of these
10    things that you are asking me back in 2016.
11       But I would not have done it in this past
12    year, or certainly not to prepare for today
13    because, again, the focus becomes more narrow as
14    you understand the question before you, and either
15    go back and look at all these things again.
16        Q.   Do you remember relying upon anything
17    specific in Item 5C for rendering your opinions in
18    this case?
19        A.   No.
20        Q.   Do you think you relied upon anything
21    in the 5C for rendering your opinions?
22        A.   I don't think that I did.
23        Q.   5D, the pre-sentence hearing, and
24    that's -- did you review all of that?
25        A.   Again, honestly, I would have to look

Page 191

1                   Agharkar
2    at it all again to see, but I can't remember right
3    now sitting here what that is.
4         Q.   Did you rely upon anything in 5D for
5    rendering your opinion?
6         MR. BRUSTIN:  Objection to form.
7         THE WITNESS:  Not that I can recall
8       doing so, no.
9    BY MS. RETTS:
10        Q.   5E, Debra Milke evidentiary hearing,
11    do you remember reviewing that?
12        A.   I don't know what -- sitting here, I
13    can't remember what even was discussed at this
14    hearing.
15        Q.   Did you rely upon 5E in rendering
16    your opinions in this case?
17        MR. BRUSTIN:  Objection to form.
18        THE WITNESS:  No.
19    BY MS. RETTS:
20        Q.   5F is James Styers' criminal trial
21    from 10/16/90 to 11/2/1990, do you have a
22    recollection of reading through the trial
23    transcripts from Mr. Styers' criminal trial?
24        A.   I think I skimmed that, yes, but I
25    can't remember it.

Page 192

1                   Agharkar
2         Q.   Did you rely upon 5F in rendering
3    your opinions in this case?
4         A.   No.
5         Q.   5G, excerpts James Styers'
6    sentencing, do you recall reviewing that?
7         A.   I have a vague recollection, but
8    again, I could not tell you the details.
9         Q.   Did you rely upon anything in 5G in
10    rendering your opinions?
11        A.   No.
12        Q.   5H, Roger Scott voluntary hearing, do
13    you remember reviewing that?
14        A.   I don't remember reviewing that, I
15    may have.
16        Q.   Did you rely upon anything in 5H in
17    rendering your opinions?
18        MR. BRUSTIN:  Objection to form.
19        THE WITNESS:  No.
20    BY MS. RETTS:
21        Q.   5I, Roger Scott's criminal trial, I
22    think there's only one date there, 1/15/1991, do
23    you remember reviewing that?
24        A.   Sitting here, I can't remember that,
25    no.



Page 193

1            Agharkar
2       Q.   Did you rely upon anything in 5I in
3   rendering your opinions in this case?
4       A.   No.
5       Q.   5J, excerpts of Roger Scott's special
6   verdict sentencing from 4/11/91, to you remember
7   reviewing that?
8       A.   I don't remember that.
9       Q.   Did you rely upon anything in 5J in
10  rendering your opinions in this case?
11       MR. BRUSTIN:  Objection to form.
12       THE WITNESS:  No.
13  BY MS. RETTS:
14       Q.   Do remember reviewing the transcript
15  of the deposition of Karen Rash or Karen Smith,
16  who was the stepsister of Ms. Milke?
17       A.   Yes, I do recall -- I have a vague
18  recollection of this, yes.
19       Q.   Did you rely upon anything in Number
20  6 in rendering your opinions in this case?
21       A.   Not particularly.  Again, I think --
22  I think if there's anything, I just learned about
23  their relationship, and that's really what I was
24  interested in more than anything else.  And that's
25  consistent with what I learned about from her

Page 194

1            Agharkar
2   friends, as well as from her and Ms. Milke
3   herself, so --
4   BY MS. RETTS:
5       Q.   7 is the transcript of the deposition
6   of Maureen Sadic.  Do you have a recollection of
7   reviewing that?
8       A.   I think so, yes.  I will tell you for
9   sure, these transcripts I have a practice of, I
10  would have read these.  I just can't tell you
11  right now what was contained in them.
12       Q.   When you read through transcripts, do
13  you highlight or make notes or do anything of that
14  sort?
15       A.   No, my copies are clean.  I simply
16  read them for the information and just to kind of
17  get a better understanding of the case.
18       Q.   Did you rely upon anything in Number
19  7 in rendering your opinions in this case?
20       MR. BRUSTIN:  Objection to form.
21       THE WITNESS:  Nothing that I can
22  point to.
23       Q.   Number 8, the transcript of the
24  deposition of Susan ^Simpson, do you remember who
25  she is?

Page 195

1            Agharkar
2       A.   No, I can't remember.
3       Q.   Did you rely upon anything in Number
4   8 in rendering your opinions in this case?
5       A.   No.
6       Q.   Number 9, transcript of Dorothy
7   Markwell, do you remember who Dorothy Markwell is?
8       A.   I don't.  The name is familiar, as is
9   Susan Simpson, but, no, I can't remember.
10       Q.   Did you rely upon anything in Number
11  9 in rendering your opinions in this case?
12       MR. BRUSTIN:  Objection to form.
13       THE WITNESS:  No.
14  BY MS. RETTS:
15       Q.   Number 10 is a digest prepared by
16  plaintiff's counsel of Debra Milke's past
17  testimony, do you remember reviewing that?
18       A.   No, I really don't.
19       Q.   Did you rely upon anything in Number
20  10 in rendering your opinions in this case?
21       MR. BRUSTIN:  Objection to form.
22       THE WITNESS:  No.
23       Q.   Number 11, correspondence between
24  Debra Milke and friends, family members and other
25  third-parties during Ms. Milke's incarceration?

Page 196

1            Agharkar
2       A.   Yes.  Those are letters that we've
3   been discussing.
4       Q.   Are there any people that Ms. Milke
5   wrote to of letters that you reviewed that we
6   haven't talked about today?
7       A.   No, those are the -- I think there
8   are others, but I -- those are the major ones that
9   stay on my mind, the ones we've talked about.
10       Q.   And potentially others, do you
11  remember anybody specifically that Ms. Milke wrote
12  to?
13       A.   I don't.  See, I can just see in my
14  head.  I keep everything electronic, I don't print
15  anything out.  I can see in my head the
16  correspondence folder, about six -- and we've
17  talked about three or four people, that just makes
18  me think there's a couple of others, but I'm not
19  exactly sure.
20       Q.   So, those letters, if my
21  understanding is correct, that you did not read
22  all of those letters word-for-word, except for the
23  letters between Ms. Milke and Mr. Styers?
24       A.   Correct, that's right.  Not all of
25  them, that's right.  Because the ^themes come out



Page 197

1              Agharkar
2    pretty clearly after reading several.
3        Q.    What letters, if any, did you rely
4    upon in rendering your opinions in this case?
5            MR. BRUSTIN:  Objection to form.
6            THE WITNESS:  I didn't.  Again, I
7        found -- I think it came up.  The way I
8        looked at it is that a traumatized person
9        who has lost a lot of support, so she
10       doesn't have anybody, and so she's writing
11       people and -- sort of lifelines for her.
12       But I didn't rely upon them in forming her
13       opinions as stated in my reports.
14   BY MS. RETTS:
15       Q.    Number 12, the Phoenix Police
16   Department investigative report regarding Ms.
17   Milke's interrogation, was that just one
18   supplement, the report involving Detective
19   Saldate's interview of Ms. Milke?
20       A.    Yes, that's right.
21       Q.    Did you review any other portions of
22   the police report?
23           MR. BRUSTIN:  You mean the police
24       file?
25           MS. RETTS:  Just the actual -- some

Page 198

1              Agharkar
2    of these are --
3            MR. BRUSTIN:  Objection to form.
4            (Talking over each other.)
5    BY MS. RETTS:
6        Q.    12 and 13 together?
7        A.    Yeah.  So, I could say, because this
8    is fresh in my mind because I looked at it
9    yesterday, there's one other police report that
10   seems to be like a summary police report, like
11   sort of summarizing their investigation.
12   Saldate's stuff is not in it, that's separate.
13   So, he's just sort of saying -- so, maybe it's a
14   summary of all these things, perhaps, but there's
15   another police report, it's a different author
16   than Detective Saldate, for example.
17       Q.    You found that police form, though?
18       A.    Yes.
19       Q.    It's the standard --
20       A.    It is, that's right.  And, yes, of
21   course, I read Detective Saldate's interview
22   report.
23       Q.    Did you review any of the photographs
24   of any of the physical evidence?
25       A.    No.

Page 199

1              Agharkar
2        Q.    Did you review any of the evidence
3    that might not have been in photographic form, but
4    another form?
5        A.    No.
6        Q.    Did you rely upon Number 12 in
7    formulating the opinions in your report?
8            MR. BRUSTIN:  Objection to form.
9            THE WITNESS:  No, not in the sense
10       of -- again, that form -- my understanding
11       of the case and the history, and I
12       interviewed about it, but I didn't, you
13       know -- not from my opinions, ultimately.
14   BY MS. RETTS:
15       Q.    Same with 13, anything in 13 that you
16   specifically relied upon, other than using it for
17   history in forming your understanding of the case?
18           MR. BRUSTIN:  Objection to form.
19           THE WITNESS:  No, but that -- that's
20       right.
21   BY MS. RETTS:
22       Q.    Number 14, the affidavit of Kirk
23   Skyler --
24       A.    So, this I believe is -- was her
25   investigator --

Page 200

1              Agharkar
2        Q.    Yes.
3        A.    -- I think at the time.  And so,
4    again, I -- that was just -- I'm sorry --
5    interesting information about her demeanor during
6    the time of the trial, and so that's what I've
7    looked at.
8        Q.    Were you ever aware of Ms. Milke
9    taking a polygraph examination?
10       A.    I saw that referenced somewhere, but
11   otherwise I don't know about any -- anything more
12   about that.
13       Q.    Did you ask her at all about whether
14   she had taken the polygraph?
15       A.    I don't think that I did.
16       Q.    Did you ever see any type of
17   polygraph report in the file or in the materials
18   you reviewed?
19       A.    No.
20       Q.    And number 15, the social history of
21   Debra Milke, do you have an understanding of who
22   wrote that?
23       A.    Well, it says here Elizabeth ^Hurley.
24       Q.    Do you know who that is?
25       A.    I -- I do not know.  I can hazard to



Page 201
1            Agharkar
2  guess that would be a person at trial, but I don't
3  know.
4        MR. BRUSTIN:  Do you mind if we --
5     why don't we take 15 minutes or so now.
6     The food is here.  We want you guys to
7     keep the room, and we'll leave.
8        THE VIDEOGRAPHER:  We are now going
9     off the record at 12:00 p.m.
10       (Recess taken.)
11       THE VIDEOGRAPHER:  We are now back on
12    the record at 12:34 p.m., this begins Tape
13    4 of the deposition of Bhushan S.
14    Agharkar.
15 BY MS. RETTS:
16    Q.   Let's go back to your notes real
17  quick, which is 261, and then we'll go to 262
18  after that.  Page -- the last, which is page 2
19  of --
20    A.   Yes.
21    Q.   Under the notation that police told
22  me they had been covered, I should go to Florence,
23  i reluctantly left.  Tell me what you remember
24  about Ms. Milke describing that to you.
25    A.   So, that's, for example, her

Page 202
1            Agharkar
2  description of what was going on that day; right?
3  And so, I was talking to her about the police, who
4  came to interview her, and she said, you know, it
5  was a number of officers, they kept asking the
6  same questions, she was getting very frustrated,
7  she was scared out of her mind about what had
8  happened to Christopher, where was he, what was
9  going on?  So, all those things are going on
10  together.
11       And I said -- I'm sure I may have -- I can't
12  recall if I said it to her or she just went ahead
13  and just told me, but I think I said something
14  like my understanding is you left Phoenix and you
15  went to Florence, tell me about that.
16       And she said, yeah, she goes they make a big
17  deal out of that, but the police are the ones who
18  told me to go, she said.  They thought they had
19  everything covered here, that it might be better
20  for me to get some rest, I think she haven't been
21  sleeping, and so it might be better to be with
22  family or be somewhere away.  And so, she
23  left.  So, she said -- she's not the one who came
24  up with it, it was their idea, but that she
25  eventually agreed and she went, because she wanted

Page 203
1            Agharkar
2  to stay by the phone in case he called,
3  Christopher.
4    Q.   So, your understanding from your
5  interview with her that it was the idea of the
6  police for her to go down to Florence?
7        MR. BRUSTIN:  Objection to form.
8        THE WITNESS:  That is my
9     understanding.
10 BY MS. RETTS:
11    Q.   Did she ever tell you who
12  specifically proposed that to her?
13    A.   No, other than an officer, but I
14  don't know which one.
15    Q.   Was it a male or female?
16    A.   I don't think I asked in specificity
17  like that.
18    Q.   Did you discuss with her Metrocenter
19  Mall and why she didn't go down there?
20    A.   Yes.  I didn't know the name of the
21  mall specifically, but I knew there was a mall
22  where this allegedly took place.  So, I did ask
23  her, you know, why didn't you go?  And she said,
24  you know, she goes -- she had reminded me that, in
25  fact, cell phones were not in use back then, she's

Page 204
1            Agharkar
2  like it's not so easy like it is now, we have a
3  landline, and she said that she had taught
4  Christopher the number so that he could call her,
5  you know, if an emergency or if he was out.
6        And so, she said -- number one, receive a
7  call, and two, be her voice to comfort him.  And
8  so, she was -- she felt chained there, like she
9  had to be there, she had to be there in order to
10  receive that call, and that's why she didn't go to
11  the mall.  But then inside, of course, it's
12  driving her crazy.
13    Q.   Did you cover with her why she didn't
14  go down and put her voice on the bullhorn to be a
15  comforting voice in case he was hiding?
16       MR. BRUSTIN:  Objection to form.
17       THE WITNESS:  I don't think I knew
18    that in specificity, that such thing was
19    happening, you know, that they might be
20    playing a voice or a police voice.  No, I
21    mean, I simply asked something like, you
22    know, why didn't you go down there to aid
23    and to search?  And that's when she said,
24    you know, Jim said that he called the cops
25    or called security, and that people were



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
205—208

Page 205

Agharkar

1
2     looking for him, and so -- I want to be
3     home, I want to make sure that
4     Christopher, in case he calls me here,
5     he's going to reach me.
6  BY MS. RETTS:
7      Q.   Have you ever treated anyone in your
8  private practice who's had a child kidnapped?
9      A.   No, never.
10     Q.   There's a notation further on in the
11 note that she was on Buspar, imipramine and
12 Ativan; is that correct?
13     A.   Yes, imipramine and Ativan.
14     Q.   And that was at the time of the
15 trial?
16     A.   Yes, and that they were increased at
17 the time of the trial to reduce her stress.
18     Q.   Did she tell you what dosage she was
19 on for each of those medications?
20     A.   She could not remember that.
21     Q.   Were you able to cross-check that
22 with any of her medical records to see what dosage
23 she was on?
24     A.   Yes.  At least for the Ativan, I --
25 asked me that, I'm not sure.  I can -- I feel like

Page 206

Agharkar

1
2  2 milligrams three times a day is the dose I saw,
3  but don't hold me to that.  But that's it, and
4  that's a high dose, by the way.  So, that actually
5  would corroborate that if that were true, that
6  could increase then.
7      I think in the jail discharge summary, I did
8  see imipramine, but I -- 50 milligrams, maybe, but
9  I'm not entirely sure on that.  And then -- which I
10 memorize the record, obviously.  And then Buspar I
11 don't recall seeing, but it might have been there.
12 Buspar really is a -- we joke that it's like
13 water, we know it does nothing good, nothing bad,
14 it just is.
15     But for some people it does help, but for me
16 it's not like a major focus.  Imipramine and
17 Ativan, those are -- those are more heavy-duty, so
18 I paid more attention to those.
19     Q.   In your experience, the Buspar, you
20 wouldn't really expect to have a significant
21 impact on her emotional state?
22     MR. BRUSTIN:  Objection to form.
23     THE WITNESS:  Correct.  Maybe it may
24     have helped some with the anxiety.  And I
25     should qualify that, Buspar by itself

Page 207

Agharkar

1
2     wouldn't have, but Buspar plus imipramine
3     might.  That's typically where I see
4     people get more benefits when you combine
5     it with an antidepressant.  But it's --
6     it's a mild anxiolytic.  And the reason
7     why jails like it is because it's not
8     addictive, which is odd given that they
9     gave her Ativan, which is known to be
10     addictive, but this is what they had then.
11 BY MS. RETTS:
12     Q.   You mentioned that "This is what they
13 had then."  Referring to the fact that back in
14 1989, there were less choices for psychiatric
15 medication than there are now?
16     A.   That's correct, and I think there's
17 also now a greater appreciation for the addiction
18 and dependence potential of benzodiazepines like
19 Ativan.  So, what I mean by that is jail policy
20 back then may very well have been to give people
21 benzos, I know today it definitely is not.
22     Q.   Do you know for how long a period of
23 time Ms. Milke was prescribed Ativan?
24     A.   I don't specifically, no.
25     Q.   Do you know for how long a period of

Page 208

Agharkar

1
2  time she was prescribed imipramine?
3      A.   My recollection is several months,
4  but I couldn't be more specific than that.
5      Q.   Did you see in the records that those
6  medications continued when she was transferred
7  over to the prison?
8      A.   Yes.  Not the Ativan, but the
9  imipramine.  I just don't remember about Buspar.
10     Q.   Almost at the end, it says,
11 "Counselor called me delusional because I said I
12 was innocent and would get out."
13     Do you know who that was?
14     A.   I don't know the name of the
15 counselor.  I don't think she knows either,
16 because she -- because she knew Dr. Garcia's name,
17 for example, but she didn't know some of the other
18 ones.  But she said exactly -- that -- because I
19 was asking, why didn't you get help in prison, why
20 didn't you go talk to the doctors, tell them what
21 you were experiencing so you can try and get some
22 help?  Not that -- not that people necessarily do
23 that, but at least I want to know from her why she
24 didn't, and that's -- that's what she said.
25     She said they didn't -- it was two things,



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
209–212

Page 209

Agharkar

1
2    of course.  I mean, one is that her past
3    experience with the detective was that he lied, he
4    made up this story, so she was very, very
5    concerned that if she goes and tells the state
6    actor something, the state doctor or guard
7    something, they could twist it and turn it, and
8    all of a sudden, there's going to be this and that
9    on her record that she didn't say.  That's one
10   concern.
11       The second concern is this:  That she kept
12   insisting that she was innocent and was called
13   delusional instead -- again she's like, "They're
14   not going to help me, they're not here -- they
15   don't believe me, so there's no point in trying to
16   get help from these people."
17       Q.   That counselor was in jail or prison?
18       A.   I believe it was in prison.  Because
19   in jail, at least, it sounds like she had a better
20   experience with those doctors, there was a little
21   more trust there, perhaps.
22       Q.   And Dr. Garcia was someone that she
23   was actively treating with in jail, regardless of
24   what had happened during her interrogation?
25       A.   Yes.

Page 210

Agharkar

1
2    Q.   Did you cross-check her statement
3    that there was a counselor who called her
4    delusional with any of the records from the
5    prison, see if that appeared anywhere?
6       A.   I scoured the record for that, and I
7    could not find it.  So, it's possible I missed it,
8    but I didn't find it.
9       Q.   Your opinions in your report rely
10   upon Ms. Milke to be an accurate history; true?
11      A.   To some degree, yes, of course,
12   that's true.  Any psychiatric interview relies
13   upon the person being interviewed to be honest.
14      Q.   And your opinions rely upon Ms. Milke
15   being honest with her current psychiatric
16   symptoms; true?
17          MR. BRUSTIN:  Objection to form.
18          THE WITNESS:  Yes, as best as she's
19   able to talk about it, yeah, that's right.
20   BY MS. RETTS:
21      Q.   If Ms. Milke is not being honest
22   about certain things in her history or her current
23   level of functioning, that would affect the things
24   in your report?
25          MR. BRUSTIN:  Objection to form.

Page 211

Agharkar

1
2        THE WITNESS:  I think it depends on
3    which opinions and it depends to what
4    extent.  I mean, some -- and I want to be
5    clear, as well, because inconsistencies,
6    that's part of life, but that's also part
7    of treating mentally ill people.  If I
8    expected to go through -- in any forensic
9    examination or clinical examination expect
10   every mentally ill person to be 100
11   percent consistent, we wouldn't be
12   treating anybody ever; okay?
13       So, in trauma itself affects memory, it
14   affects your ability to verbalize things,
15   to be able to relate your story.  And so,
16   it's not uncommon to see things like this,
17   to see inconsistencies.
18       So, my job as a clinician, of course,
19   is to make sense of that, integrate that
20   as best I can to get to ultimate
21   conclusions and see kind of which way the
22   data points; okay?  So, certainly, garbage
23   in is garbage out, we try to do that as I
24   did here, by doing multiple interviews,
25   spending as much time as I thought needed

Page 212

Agharkar

1
2    to.  This was actually quite a bit more
3    time than I usually ever spend in forensic
4    examinations, as well as just trying to
5    get through as many records as I can, as
6    well as her therapist's notes, to try to
7    get the most cohesive story I can.
8    BY MS. RETTS:
9       Q.   When you say trauma affects memory,
10   tell me how?
11      A.   I mean, a well-known symptom of
12   trauma is the inability to remember or recall
13   important aspects of the trauma itself.  So, right
14   there, that's a memory -- a traumatic memory
15   that's not getting coded, so to speak, because
16   it's so impossible to deal with.
17       You know, trauma can affect people in all
18   kinds of different ways, particularly -- well,
19   in -- for example, people will have physical
20   symptoms -- easy way to explain it.  A kid is
21   going to kindergarten, he's been home the whole
22   time for the five years and now he's about to go
23   to kindergarten, we call it separation anxiety;
24   right?  When a kid has a lot of anxiety and
25   difficulty going to school.



Page 213

1         Agharkar
2     He doesn't say, you know, I'm feeling very
3 scared right now, I'm feeling very helpless, I
4 don't know, this is a new situation, what am I
5 going to find?  What does he say, my tummy hurts,
6 and that's all he says, my tummy hurts, my tummy
7 hurts.  So, he's internalizing that anxiety,
8 describing it as a physical symptom, but really we
9 understand that to be anxiety.
10     Same thing happens to people who are
11 traumatized.  So, they'll develop somatic
12 symptoms, it will come out in other way, so with
13 nightmares, for example, you know, intrusive
14 memories when it's not expected or wanted.
15 Misinterpretation of stimuli, a woman who was
16 raped in an alley now fears any man who she sees,
17 who sneaks up on her, so to speak, or is
18 unexpected, she has the same sort of traumatic
19 response as she had then.
20     So, it can affect memory in a number of
21 ways, but the encoding of memory, meaning it never
22 gets stored properly.  Two, traumatic retrieval,
23 you know, in other words the memory was there at
24 one point, but due to the trama where she -- a
25 person can't access it anymore, it's too

Page 214

1         Agharkar
2 difficult, it's -- the mind essentially is trying
3 to protect itself.
4     So, traumatic memory is a very well-known
5 phenomenon.
6     Q.   How do you, in your evaluation,
7 ferret out whether there are problems with a
8 person's memory because of trauma?
9         MR. BRUSTIN:  Objection to form.
10        THE WITNESS:  Her inability to recall
11     details about these letters to Joe Marino
12     I think is the best example of this that I
13     saw here; right?  Because she can
14     remember, generally speaking, the
15     situation she's in, she understands court,
16     she understands where she was.
17        But this is -- she's on trial for her
18     life, it's a great deal of high stress,
19     high anxiety, she obviously -- the stuff
20     in the letters is fantastical, meaning
21     it's a fantasy, it's stuff that clearly is
22     not based in a real relationship.  It's --
23     there's all kinds of things, it almost
24     feels like diary entries in some ways.
25     But she now can't recall details about it

Page 215

1         Agharkar
2 whatsoever, and I think that has to do
3 with the amount of stress and trauma that
4 she has had experienced and did experience
5 at the time of trial.  That's an example
6 of a memory, sort of it's blank, okay,
7 that she's just not able to get at.
8     So, again, so you look for gaps like
9 that, you try to explore it as best you
10 can, and try to understand, you know, what
11 else going is on during that time.
12 BY MS. RETTS:
13     Q.   How are you able to tell whether Ms.
14 Milke is being honest about not remembering
15 Mr. Marino?
16     A.   The amount of severe distress that I
17 saw and panic that I saw in her, about why can't I
18 remember this, I know these things exist, I see
19 this is my handwriting, why can't I figure this
20 out, why -- how on Earth can I not remember?
21 Obviously as I said before, I'm not a human lie
22 detector, but what I am saying is that, that level
23 of distress that I'm seeing in her, unless she's
24 an academy award winning address, which she's not,
25 shows me that this is bothersome to her, that she

Page 216

1         Agharkar
2 wants to be able to remember it.
3     And there -- and again, like I told you in
4 the first, you know -- first really two
5 interviews, and even to some extent, the third,
6 she's minimizing things, I mean, she's really --
7 she's able to tell you sort of the story in
8 general terms, but the details take a lot of time
9 to be able to get to.  And so, that's -- again,
10 that's why I don't think she's lying.
11     Q.   So, when you asked her about the Joe
12 Marino letters, she seemed panicked?
13     A.   Distressed.
14     Q.   Distressed?
15     A.   Yes.
16     Q.   You would agree that the panic could
17 be about the content of what's in the letters?
18     A.   I would tell you, I guess, I would
19 view it -- the reaction I would expect would be
20 embarrassment, you know.  And because there's some
21 stuff in there that I wouldn't want coming out
22 anywhere; right?  I wouldn't certainly want people
23 to know if I wrote something like that.  I
24 would -- so, I would expect to see embarrassment,
25 maybe some shame.  I see a great distress over not



Page 217

1            Agharkar
2   being able to remember, and then what the
3   implications of that are.
4       That's what she's saying, she's like what
5   else do I don't remember and what else is there
6   going on?  Not remember things, what does this
7   mean?  And I told her that's kind of something you
8   got to work on with your therapist.  But that's
9   the level of distress the person is having of --
10  because she said I want to be able to explain
11  this, I want to be able to remember this, and I
12  just can't.
13      Q.   Did she express to you any concern or
14  distress over not remembering the possibility that
15  she may not be remembering being involved in
16  Christopher's murder?
17          MR. BRUSTIN:  Objection to form.
18          THE WITNESS:  Well, see there, I
19      think -- no, she didn't bring that up.
20      And from my standpoint, where I have seen
21      sort of traumatic disassociation occurs is
22      an acute episode, so meaning there would
23      be hour, maybe two where a person can't
24      account for their behaviors, but then
25      there's, you know, you're able to explain

Page 218

1            Agharkar
2      it later, you're able to remember things
3      after that.  From my understanding here,
4      though, and this is -- some allegations
5      were about planning and about being
6      involved and that kind of stuff is a much
7      longer period of time, that wouldn't be
8      consistent with somebody who's got memory
9      lapses; okay?  So, it's a no, I wouldn't
10      expect that.
11  BY MS. RETTS:
12      Q.   Did you see in the letters where
13  there's some reference to Ms. Milke being
14  concerned that she was possibly involved in the
15  murder and didn't remember?
16      A.   Yes.
17          MR. BRUSTIN:  Objection to form.
18          THE WITNESS:  I did see that, a
19      reference -- I hope there isn't a tape,
20      something of that nature, with regard to
21      Detective Saldate.  I viewed this very
22      much as a woman, again, under great
23      stress, who is on trial for her life for
24      something she did not commit -- believes
25      she did not commit; okay?

Page 219

1            Agharkar
2       And to me, when you got the world
3       telling you you did this, you did this,
4       and everybody is acting like you did this,
5       and the media and everybody else, it's
6       natural, I think.  Just question yourself,
7       you say, my God, I don't remember, and oh,
8       no, I meant -- because later on, I think
9       in that same letter she says, but I know I
10      didn't do this.  So, that's how I viewed
11      it.
12  BY MS. RETTS:
13      Q.   Do you know how it came to be that
14  these letters were found or were available, the
15  Joe Marino letters?
16      A.   I can only surmise that he must have
17  turned them in, but I honestly don't know.
18      Q.   Do you remember seeing letters --
19  strike that.
20      Do you remember seeing references to letters
21  to Joe Marino asking him to destroy the letters,
22  to get rid of the letters, to lie about knowing
23  her?
24      A.   Yes, I saw those toward the end.
25  There were a couple of letters.

Page 220

1            Agharkar
2       Q.   Did you explore with her whether her
3   panic revolves around the fact that she thought
4   that the letters had been destroyed, and they were
5   still available?
6           MR. BRUSTIN:  Objection to form.
7           THE WITNESS:  No, not specifically.
8       Again, she couldn't tell me about the
9       content of these letters.  So, no, my
10      opinion about the panic was not -- but,
11      again, the panic was about the inability
12      to remember, it was not that they were
13      written.  She was saying, it ws clearly my
14      handwriting, you know.  So it's not like
15      she's trying to say, I don't know how this
16      happened, who could have written this?
17      She's not doing that, she's saying I know
18      I wrote this, I must have written them,
19      they're in my writing, but she can't --
20      she cannot remember what's going on with
21      them.
22      So, honestly, look, I think that any --
23      I've done plenty of criminal cases, she is
24      correct what she wrote in the letters,
25      that they could be twisted or turned or



Page 221

1              Agharkar
2       used as evidence against her, she is right
3       about that.  I mean, people -- prosecution
4       will use whatever available to implicate
5       or imply and to do whatever.  So, I
6       understand the concern in the letter, but
7       I did not get the feeling that -- that was
8       not the issue in her distress with me.
9   BY MS. RETTS:
10      Q.   Can you think of a reason why Ms.
11   Milke would write in those letters and hope that
12   there wasn't a recording of her interview with
13   Detective Saldate, other than that it would
14   substantiate what she said occurred in the
15   interview?
16          MR. BRUSTIN:  Objection to form.
17          THE WITNESS:  Well, that's what I
18       answered earlier.  So, my earlier answer
19       is what I would stand with, that I think
20       she gets -- after being told -- when a
21       hundred people tell you you did this,
22       this, this, this, and you are like
23       no, no, no, but it's one against a
24       hundred, you start doubting yourself,
25       you're like did I say something, you know,

Page 222

1              Agharkar
2       you don't know, and that's how I
3       understood that.
4   BY MS. RETTS:
5       Q.   So, she's doubting herself then, you
6   would agree, the fact that there might have been a
7   tape would have been something that would have
8   helped her?
9          MR. BRUSTIN:  Objection to form.
10          THE WITNESS:  Ostensibly, yes.
11   BY MS. RETTS:
12      Q.   If things occurred the way that she
13   reports that they occurred, you wouldn't find it
14   unusual for her to be excited about the fact that
15   such a recording did exist, because it could
16   potentially substantiate what she was saying?
17          MR. BRUSTIN:  Objection to form.
18          THE WITNESS:  That's true, that's one
19       possibility.  Another possibility could
20       be, though, there may be some other things
21       on the tape that maybe wouldn't look good
22       for her, I don't know.  I don't know
23       what -- exactly what was going through her
24       mind, she can't tell me either.  But,
25       again, I think you would begin to just

Page 223

1              Agharkar
2       doubt yourself when you're in that much
3       stress and that much, you know -- when
4       you're being charged the way you're being
5       charged.
6   BY MS. RETTS:
7       Q.   Did you go through with her
8   step-by-step the interviews with Detective Saldate
9   and have her recount everything that's occurred?
10      A.   Obviously, I'm only limited to her
11   memory, so I don't know if that's everything that
12   occurred.  But, yes, I can't -- I don't know that
13   I could recite it for you, but, yes.  I mean, in
14   terms of where they were sitting, how close he
15   came to her, you know, just kind of how he really
16   implicated -- he made strong assumptions or
17   implications, and she kept denying, denying,
18   denying, I had nothing to do with this, that kind
19   of thing.  So, yes, we did talk about it in some
20   detail.
21      Q.   Did she tell you those parts of the
22   interview that she did agree with things that she
23   did admit to saying?
24          MR. BRUSTIN:  Objection to form.
25          THE WITNESS:  In a way, yes.  I was

Page 224

1              Agharkar
2       saying that certain things that she said
3       were twisted.  Something about like, oh,
4       God, I just want to take care of him or
5       something like that, talking about
6       Christopher.  But the way that Saldate
7       wrote it down, it was like -- twisted it,
8       what she said, that she didn't say it the
9       way that that was.  So, there were some
10       instances like that.
11       Again, frankly, that's -- that really
12       wasn't the source of -- it's not the focus
13       of my interview, so I'm not -- I'm not at
14       all concerned about that stuff, but I do
15       recall her saying some of those things.
16   BY MS. RETTS:
17      Q.   So, to clarify or just to confirm, so
18   the focus of your analysis was not looking at the
19   interview Detective Saldate and Ms. Milke going
20   through and trying to sort through that process
21   and come to any conclusions about that?
22      A.   That's correct.  That would be more
23   in line with the criminal responsibility
24   evaluation.
25      Q.   This is 262, I think, they're notes



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              225–228

Page 225

Agharkar

1
2  from the 4/18 interview (indicating).
3      A.   Yes.
4      Q.   Did you ask Ms. Milke whether she's
5  had romantic relationships?
6      A.   Yes, post-release, yes.
7      Q.   What did she report to you?
8      A.   She denied it.  She said she --
9  there's part of her -- well, she's really not
10  interested in it, but she says -- I'm fairly
11  certain there's a note on here somewhere.  She
12  doesn't know how to react, she doesn't know how to
13  relate to people, that she -- she has not had any
14  romantic relationships and just doesn't think she
15  can get close to people anymore.  That's my
16  recollection.  I know there's a note in here
17  somewhere, but I can't quite find it.
18      Q.   Did you ask her whether she dated at
19  all?
20      A.   It's possible she could have gone on
21  a date or two, maybe that's what she was talking
22  about, some of the difficulties she found.  But in
23  my mind, I'm thinking about relationships, so I
24  just don't know.  To me, a date is not a
25  relationship, so --

Page 226

Agharkar

1
2      Q.   Did you ask her whether she was
3  sexually active?
4      A.   Not in great detail, but I did -- I
5  mean, it's implied in a relationship any physical
6  closeness, and that she denies.
7      Q.   Did you see anything in the records
8  that you reviewed that had contrary evidence?
9      A.   About dating?
10      Q.   Yes, or sexual activity?
11      A.   Nothing comes to mind.
12      Q.   All right.  So, "Do groceries at 5:30
13  a.m."?
14      A.   Yes.
15      Q.   "Eats dinner out at 4:00 p.m. to
16  avoid crowds"?
17      A.   Yes.
18      Q.   So, she was reporting that she was
19  eating out?
20      A.   Right, at 4:00.
21      Q.   Said, "Costco freaked me out"?
22      A.   Yes.
23      Q.   She specifically said she doesn't go
24  there?
25      A.   She -- well, she had gone.  She's

Page 227

Agharkar

1
2  gone, I think, with a friend, maybe a couple of
3  times, and it's just very, very difficult for her
4  and it did freak her out.  And I think they left
5  early.
6      Q.   What does it say, is that one year so
7  after release?
8      A.   "Before release."  "I'm used to small
9  confined spaces" -- oh, okay.  Yes.  So, "One year
10  or so before release, they changed the door to a
11  big window" -- this is in her prison cell -- "and
12  so there's no privacy at all."  So, she's told me
13  she's had to change like in a corner and just
14  hoped nobody was looking kind of thing.  So, she
15  literally has no privacy now.
16      Q.   So, she preferred what her cell had
17  been like before the change to the window?
18      A.   Right.  Yeah, you get used to even
19  the worse conditions, it seems.
20      Q.   It says, "Horrible past experience
21  never allowed those exams again," what did she
22  tell you about that?
23      A.   So, here, I was interested in why she
24  was refusing medical care, why she wasn't talking
25  to the doctors.  And she said that she had a pap

Page 228

Agharkar

1
2  exam upon entry in the prison, within the first
3  whatever year or two, whenever she might get an
4  annual.  And that apparently the doctor was
5  extremely rough, it was a very bad exam, she was
6  bleeding afterward, and she -- two issues, I think
7  one is she questioned the medical care that you
8  would get in a prison, which is understandable.
9      And then the second is, again, just like I'm
10  not going to let these people touch me, I'm not
11  going to let them manhandle me and just do
12  whatever they want, I'm going to at least try to
13  have some autonomy over my body.
14      Q.   Have you treated patients who had had
15  similar reports of issues relating to female
16  examinations?
17      A.   Had I --
18      Q.   Who had reported something similar?
19      A.   Like a bad pap?
20      Q.   Yes.
21      A.   Oh, yeah, sure.
22      Q.   Not something you ^need at prison?
23      A.   That's true, it's not.
24      Q.   It can happen at any doctor's office,
25  any examination --



BHUSHAN S. AGHARKAR, M.D.                                    September 25, 2018
MILKE vs CITY OF PHOENIX                                                229–232

Page 229

Agharkar

1
2        MR. BRUSTIN:  Objection to form.
3        THE WITNESS:  It certainly could.
4     Again, I think for it's a consistency -- a
5     consistent pattern of disregard in the
6     prison, as far as she is concerned.  But I
7     understand your point, bad pap exams are
8     not unique to a prison environment.
9  BY MS. RETTS:
10       Q.   She reported that the strip searches
11    were a visual rape?
12       A.   Yes.
13       Q.   What specifically did she tell you
14    about that?
15       A.   Well, she said anytime -- there are,
16    I think, a couple of things with her.  Because of
17    her status, they had to lock down the whole
18    prison, and people would yell at her, jeer at her,
19    comment about, oh, what a big pain this is, the
20    guards would, because they've got a two-guard
21    escort her anywhere in the prison.
22       So, that she did not like, she did not like
23    being singled out, having that attention drawn to
24    her.  She, of course, did not like the shackles
25    and did not like being touched while they're being

Page 230

Agharkar

1
2  walked down the hall.  And then before any
3  visitation or medical visit, she has to get strip
4  searched.
5       And she says that now -- they typically were
6  female guards, at least they didn't have male
7  guards doing it, that would have been much worse.
8  But they, you know -- they would not avert their
9  eyes, they were very clearly exerting their power.
10 I mean, she's having a body cavity search in front
11 of these people, and she just found that demeaning
12 and humiliating.  And so, that was her experience
13 of the strip searches.
14      Q.   While on a strip search, you would
15 agree that averting your eyes kind of defeats the
16 purpose of a strip search?
17      A.   Yeah.  And so, what I meant by
18 that -- because as soon as I said it, I realized,
19 of course, that that would make sense.  But the
20 point I'm trying to convey, I think, is that
21 they -- how do I say this?  They kind of look --
22 they would not acquiesce to any sort of form --
23 just human decency, you know, being able to say,
24 you know, would you mind, like being on her
25 period, things of this nature, you don't make me

Page 231

Agharkar

1
2  squat, do all these things when I've got my
3  period, they're like, no, no emotion, like do it,
4  that kind of thing, like that's what's going to
5  happen.  So, that's kind of what I meant with
6  that.
7       Q.   So, she felt that the female guards
8  were visually raping her?
9       A.   Yes.  Like a visual rape, I mean,
10 she's obviously not saying it's rape, but --
11      Q.   And she -- she described that as
12 being more difficult than the sexual assault by
13 Mark?
14       MR. BRUSTIN:  Objection to form.
15       THE WITNESS:  It's not a fair
16    comparison, I think.  So, I really
17    couldn't draw that distinction, and I
18    certainly didn't ask her that distinction.
19 BY MS. RETTS:
20      Q.   You write that she was sexually
21 harassed by guards?
22      A.   Yes.
23      Q.   When did that occur?
24      A.   I don't have the years, certainly,
25 but it was in the prison.  There were at least two

Page 232

Agharkar

1
2  instances that she was able to recall and tell me
3  about.  I don't know if there were more, but there
4  were two that she could tell me.
5       Q.   Did you see anything in the file that
6  evidence of grievance so that she reported it?
7       A.   No.  That's where I asked her about
8  that, and that's where she said she would fear
9  retaliation, so she just -- she didn't bring it
10 up.  Because, again, these people are in charge of
11 her.
12      Q.   Did you ask her whether she reported
13 it to the warden, who she had a good relationship
14 with?
15      A.   I don't recall asking her because
16 that -- I think -- like I say, I'm fairly certain
17 the warden was about her execution, and so at that
18 point, sexual harassment sort of takes the back
19 seat.
20      Q.   Did she communicate to you that the
21 only nature of the relationship was surrounding
22 the execution, or that she had a good relationship
23 with the warden throughout?
24       MR. BRUSTIN:  Objection to form.
25       THE WITNESS:  I can't say for certain



Page 233

1              Agharkar
2        it was throughout, but I think -- my
3        memory is that there were at least a few
4        times where there were some issues that
5        the warden was able to help resolve.  And
6        some of them might have been around
7        consistency and shake-down procedures, for
8        example, she would say that different
9        guards would have different rules and it
10       was sort of arbitrary and people are just
11       doing what they wanted to do.  So, how can
12       you live in that environment when you just
13       don't know what's going to happen next?
14       And I think, perhaps, the warden may have
15       intervened in that saying this is the
16       policy or this is how it's going to be
17       carried out.  So, I recall something like
18       that.  So, there may be a few instances,
19       but it's not like they had a frequent
20       ongoing relationship.
21  BY MS. RETTS:
22       Q.    Did you look through the prison
23  records to look for any type of a property
24  inventory?
25       A.    I wouldn't have looked through that.

Page 234

1              Agharkar
2  I wouldn't have paid attention to that.
3        Q.    You know what those are?
4        A.    I do.
5        Q.    Checklist of the property that an
6  inmate is allowed to keep in their cell?
7        A.    Yes.
8        Q.    And those inventories exist, when a
9  shake-down happens, they go through a note what
10  property was in a cell; true?
11       A.    Typically, that's correct, or at
12  least what shouldn't have been in the cell.
13       Q.    And then when a person is released,
14  those inventories also indicate what property is
15  being turned over?
16       A.    Yes.
17       Q.    And what the inmate is taking with
18  them upon release?
19       A.    Right.
20       Q.    Did you look at those at all or look
21  for those to see if those confirmed what Ms. Milke
22  said about being -- the things that she was
23  allowed to keep in her cell?
24       A.    I did not look for it specifically.
25  And again, the volume of prison records is so

Page 235

1              Agharkar
2  large, I'm looking for grievances and I'm looking
3  for medical records, primarily.  So, I'm not -- I
4  did not look for that.
5        Q.    So, for example, she says they took
6  my fan, that it's hot as hell in her cell, you
7  didn't go and cross-check that with her inventory
8  to see whether the inventory shows that she had a
9  fan throughout?
10       A.    No, I did not do that.
11       Q.    Ms. Milke reported to you that there
12  was a house fire when she was 13 years old, and
13  she had to run to a neighbor's house?
14       A.    Yes.
15       Q.    Tell me about that.
16       A.    That's almost about what I know about
17  it, frankly.  I think that there -- she just
18  remembers being scared as a teenager.  I don't
19  know how much damage there was to the house.  I'm
20  not sure that there was a lot of damage, but she
21  just remembers that.  Because she said, for her,
22  the smoke was particularly bothersome, not being
23  able to breathe and the smoke coming through the
24  vents because of the fire that was in the jail --
25  or the prison.

Page 236

1              Agharkar
2        The big issue was the -- she would feel
3  singled out again because of her status, they
4  would not let her out.  They would free everybody
5  else, and then her, because officers required, et
6  cetera.
7        So, meanwhile, she's feeling -- she's
8  breathing the fumes, she's suffocating.  And she
9  just says she's terrified the fire because of what
10  happened when she was young.
11       Q.    So, she had a trauma at 13 years old
12  that involved a fire in her house?
13       A.    Yes.
14       Q.    You don't know whether or not she was
15  in close proximity to the fire?
16       A.    I don't.  I mean, obviously, she was
17  able to run free.  She wasn't trapped, she was
18  able to run free and get help.
19       Q.    Do you know if the fire was in the
20  middle of the night?
21       A.    I don't know that.
22       Q.    That fire in a house at age 13 could
23  qualify as a traumatic event that could trigger
24  PTSD; true?
25       A.    Sure, but the PTSD symptoms would



Page 237

1              Agharkar
2  then have to be related to a fire, which none of
3  her PTSD symptoms are.
4       Q.   Now, for what she reported about a
5  fire in her cell, she reports triggering that back
6  to the fire at 13 years old; true?
7       A.   No, she didn't have a flashback.  She
8  said she doesn't -- it can remind you of.  And
9  she's saying I don't -- I am particularly anxious
10  about fire because of what happened before.  But
11  it's not like she has nightmares about fire or
12  being burned.  And frankly, that's called a
13  trigger; right?
14       In lay person parlance, I smell fumes, I
15  smell smoke, it reminds of what happened at 13,
16  there's a fire, I got to get out of here, that's
17  also what you do when there is a fire.  And she's
18  trapped, she can't get out, so, yeah, I would
19  expect her to be panicked.
20       Q.   Did you talk to Ms. Milke's friends
21  about this fire that occurred when she was 13, her
22  childhood friends?
23       A.   I did not.  I did ask in general,
24  which was were they aware of serious traumas,
25  significant problems of mood, anxiety, did you

Page 238

1              Agharkar
2  ever notice anything unusual going on, that kind
3  of stuff.  And they did not tell me that, but I
4  did not specifically, are you aware of a house
5  fire when she was 13?
6       Q.   Did you look at any of Ms. Milke's
7  scrapbooks that she kept from the time that she
8  was a child?
9       A.   No.
10       Q.   Ms. Milke told you that one of her
11  relaxation techniques in prison was to meditate?
12       A.   Yes.  I think I saw that in the
13  record somewhere, as well, that they were teaching
14  her coping methods.  That is a common coping
15  method that psychologist or mental health
16  counselors will teach, relaxation, breathing
17  techniques, meditation, sure.
18       Q.   So, she was, at least, obtaining some
19  treatment in prison for her mental health
20  symptoms?
21       MR. BRUSTIN:  Objection to form.
22       THE WITNESS:  Some.  In the sense
23       that she may have learned or heard about
24       some of these things, because there's
25       plenty of these records actually around

Page 239

1              Agharkar
2  that, that say inmate refused, inmate
3  doesn't want to have treatment, come back
4  in 180 days, check in, that kind of thing.
5  I think -- from what I'm understanding
6  from her is, you know, I realized that --
7  since I wasn't going to go to mental
8  health to get the medication, wasn't going
9  to go through the strip searches and the
10  humiliation, but I had to somehow figure
11  out how to treat this on my own to get
12  through this.
13       And these are some of the things that
14  she did to try to help her.  It didn't
15  work a hundred percent of the time, but I
16  think it was helpful to some extent.
17  BY MS. RETTS:
18       Q.   Did you ever explore with Ms. Milke
19  whether she had the option of requesting that a
20  mental health provider come to her at her cell?
21       A.   So, I don't know that she -- I don't
22  think I explored that specifically in terms of
23  requesting, and -- but what I know from personal
24  experience, but also from what she descried,
25  mental health counselors will walk by cells, there

Page 240

1              Agharkar
2  were a number of entries that I saw counselors --
3  cell site visits, I think is what they're called
4  in there, which corroborated what she is saying
5  and what I know to be true anyway from prisons.
6  But she says, literally, they just look at you
7  and, "Hey, you doing okay?"  "Yeah, I'm okay," and
8  they walk on, which is also what I know to be true
9  about prison mental healthcare.
10       So, what she's saying is accurate, I think,
11  it's what's reported.  But, again, I think she --
12  she had felt like, you know, they just weren't
13  going to be helpful to her, and she wasn't going
14  to go out and get the medication, so that there's
15  just no point, leave me alone.
16       Q.   And during the time period that Ms.
17  Milke was housed in the Perryville Prison, did you
18  have familiarity with the medical care and mental
19  healthcare at Perryville Prison?
20       A.   No, I would not have been -- 1991 or
21  so, no, I was not doing evaluations at that time.
22       Q.   So, what you -- when you mentioned
23  what you've known to be true about mental
24  healthcare in prison or jail, that's not
25  specifically as it relates to Perryville Prison?



Page 241

Agharkar

2    A.   Correct, it is consistent with every
3  prison I visited.  And myself, I provided jail
4  treatment, and we would do cell site visits, which
5  could be that brief sometimes.  That was during my
6  fellowship year in training.  What I'm saying is
7  that's not an outrageous story, that is actually
8  how oftentimes cell site visits go.  It's
9  literally a screening, like, hey, any problems?
10  Oh, yeah, I got big problems -- I got big
11  problems, I need help.  Okay.  We'll get you on
12  the list to be seen by the doctor, those are the
13  kinds of interactions.  They're not long I think
14  is my point.
15    Q.   Did you explore with Ms. Milke
16  whether or not she ever asked for cell visits that
17  would have been more comprehensive, so she didn't
18  have to be stripped searched -- letter that she's
19  advocating for herself to not be stripped
20  searched?
21    A.   Sure.
22    Q.   Did you explore with her that
23  proposition?
24        MR. BRUSTIN:  Objection to form.
25        THE WITNESS:  You know, I did not.

Page 242

Agharkar

2       Again, I think maybe at this point, she's
3       gotten concerned about what might be used
4       against her, what might be written down,
5       and the fact that they called her
6       delusional, supposedly, for saying she's
7       innocent.  So, her trust is not great in
8       the mental health system there, but I did
9       not ask her specifically, did you try to
10       get the doctor to come see you and do
11       visits -- oh, you know what, wait, no, no,
12       no, wait, no, I'm wrong.  She did ask.
13       She was told no, that's not going to
14       happen, you have to come to the mental
15       health clinic.  And she said, well, I'm
16       not going to do it, and I'm not going to
17       be seen by the doctor.  So, my apologies,
18       that is something that came up.
19  BY MS. RETTS:
20    Q.   Did she report that to you or did
21  you --
22    A.   No, no, she reported to me.
23    Q.   Did you try to reach out to anybody
24  at the prison to confirm whether or not Ms. Milke
25  said about her access to mental health treatment

Page 243

Agharkar

2  would have been correct?
3    A.   No, I did not.  I will tell you my
4  past experience in reaching out to prisons is they
5  won't talk to me.  The doctors won't talk to me,
6  counsel gets involved and says no, you can't talk
7  to our doctor.  That's been my past experience,
8  but I did not attempt that in this case.
9    Q.   But it's an assumption that they
10  would not talk to you?
11        MR. BRUSTIN:  Objection to form.
12        THE WITNESS:  I suppose.  But to me,
13        it's this matter of did she get treatment
14        or not, it's not really a big point in my
15        mind of like, oh, why didn't you come --
16        have him come to your cell?  I don't
17        particularly care.  The issue is what
18        happened, why weren't you getting
19        treatment and that is the reason.
20  BY MS. RETTS:
21    Q.   Last paragraph, it appears on page 2,
22  there's a circle "M"?
23    A.   Mother.
24    Q.   Mother-in-law two rows down?
25    A.   Died.  These are all the people who

Page 244

Agharkar

2  have died since the time she was in prison.
3    Q.   And that would have been Elsa Milke?
4    A.   I'll take your word for it.
5    Q.   Okay.  So, you didn't specifically
6  explore with her who the mother-in-law was?
7    A.   Correct.
8    Q.   Grandmother?
9    A.   Meaning, I'll take your word for it
10  that's the name.  My understand is it's Mark's
11  mother, I just don't know what her name is.  Her
12  grandmother died, I don't know if that's paternal
13  or maternal.  But she found out that after she got
14  released.  Her grandmother had died while she was
15  prison and no one told her --
16    Q.   What is the next --
17    A.   Her father died after the -- her
18  father died, she learned that from an officer
19  while she was in prison, her stepfather has died,
20  her mother has died.  That happened just after her
21  release because she was diagnosed with ovarian
22  cancer in 2010.  And that's when she really felt
23  the urgency that she had to get out because I
24  think she was on house arrest for some period of
25  time, maybe some months, something like this, and



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              245–248

Page 245

1                    Agharkar
2    she said, "I will do it, anything because I got to
3    see my mother before she dies because I know she's
4    got this terminal illness."
5        Because I questioned her about that, I said,
6    you know, why would you agree to any sort of --
7    any sort of term, since you're innocent, then go.
8    She's like, I couldn't, you know, she's like, you
9    don't understand, I've been fighting this for
10   20-some-odd years, I could -- I could be out now
11   and I can see my mother, so that's a big thing.
12   If I -- she's like, I just don't know what would
13   happen if my mother died and I was in prison and I
14   never got to see her.  Because she had stopped
15   seeing her because of visits and such because of
16   the strip searches, so it was important for her to
17   get out.
18       Q.    It says she was close to all of these
19   people, except for her father?
20       A.    Yes, but then said, you know, "But he
21   is still my father."
22       Q.    It goes on to say, "I'm only recently
23   grieving son's death, never even saw the pictures
24   of his death"?
25       A.    Yes.

Page 246

1                    Agharkar
2        Q.    "Really hit me when I got out that he
3    is not here"?
4        A.    Yes.
5        Q.    "Each person passing brings me back
6    to my son's death"?
7        A.    "Can only do it in small doses,"
8    right.
9        Q.    Did you -- in her statement that she
10   never saw pictures of his death, was it your
11   understanding that this was not a part of the
12   criminal trial?
13           MR. BRUSTIN:  Objection to form.
14           THE WITNESS:  No.  You know, I'm
15       trying to remember if -- if what she meant
16       by that is she could not look, you know,
17       that's -- that's my recollection, it was
18       so traumatic, obviously, when she let it
19       all go by her like she wasn't there.
20   BY MS. RETTS:
21       Q.    I'm going to switch back to your
22   report.  And on page 3, "History of presenting
23   problem," second paragraph, you state that Ms.
24   Milke had not experienced psychiatric symptoms
25   prior to her incarceration?

Page 247

1                    Agharkar
2        A.    Yes.
3        Q.    And that was verified through your
4    interview of Ms. Milke?
5        A.    My interview with her, my interview
6    with her friends, and the lack of any psychiatric
7    records, yes.
8        Q.    You indicated that she had guilt
9    relating to placing Christopher unknowingly in the
10   care of the murderer?
11       A.    Yes.
12       Q.    And that would have existed, again,
13   regardless of whether she was incarcerated?
14           MR. BRUSTIN:  Objection to form.
15           THE WITNESS:  Yes.
16   BY MS. RETTS:
17       Q.    How -- or did you -- or can you parse
18   out how much of Ms. Milke's psychiatric
19   functioning today relates to her son's murder
20   versus from the incarceration?
21       A.    Yeah -- no, I think that's difficult;
22   okay?  Both are very, very serious, very major
23   traumas in a person's life.  Again, the prison
24   experience is longitudinal one in the sense that
25   there's repeated traumas over time.  Can you

Page 248

1                    Agharkar
2    imagine being innocent and held as hostage,
3    essentially, against your will, and -- and all the
4    things that come with that.  She obviously was
5    traumatized by her son's murder, of course.
6     .  And so -- but the two things happened so
7    quickly, right, where you're not only murder --
8    that you are the one arrested for doing it, and
9    then you were convicted of it, and then you're
10   sentenced to death; okay?
11       So, it all kind of wraps together, but I
12   think that certainly there are some symptoms that
13   go along with the son's murder being the cause of
14   her PTSD, such as the nightmares.  But the other
15   types of symptoms like the hypervigilance, the
16   avoidance, the numbing, those tie more directly to
17   the prison experience.
18       And there were nightmares of that, as well,
19   and that's where I do think she had PTSD from
20   that.  And that has over time attenuated, I mean,
21   it's over time become more and more, become more
22   pervasive, which is what you see in a complex
23   trauma picture.  But I do think it's both and,
24   yeah, I couldn't put a percentage on it, I
25   couldn't divvy it up, but I think both are very,



BHUSHAN S. AGHARKAR, M.D.                                    September 25, 2018
MILKE vs CITY OF PHOENIX                                                  249–252

Page 249

1           Agharkar
2   very serious and significant stressors.
3       Q.   Now, hypervigilance can happen from a
4   rape experience; true?
5       A.   Sure.
6       Q.   Domestic violence?
7       A.   Yes.  But keep in mind,
8   hypervigilance is not just always being on edge
9   for anything.  Typically, one feels on edge, one
10  feels -- one can notice an increased -- and that
11  is true that you can have that in -- in any of
12  those conditions that we've just discussed.  But,
13  typically, there will be reminders or things that
14  will trigger that, you know, they would be far
15  more heightened on edge in places where you don't
16  need to be.
17      Whereas, she's talking about things like
18  I've got to sit with my back to the wall, I've got
19  to see the exits at all times, that's a prison
20  experience.  That is not being raped, that's not
21  her son's murder.
22      That's exactly what I see a lot of times
23  with people who have been incarcerated and who
24  have been traumatized in these settings where
25  they're locked up; okay?  Because they're

Page 250

1           Agharkar
2   constantly scanning for visual threats, for -- and
3   assessing the environment for what's going to come
4   at me next.  You see that a little less, you see
5   that less often with rape victims, necessarily.
6   You see it more with combat, stress, you see it
7   more with people like this, incarcerated.
8       So, there are some symptoms that would not
9   go with those.
10      Q.   And agree that it would depend upon
11  the circumstances of the rape if you were attacked
12  from behind?
13      A.   Sure.
14          MR. BRUSTIN:  Objection to form.
15  BY MS. RETTS:
16      Q.   It would also depend upon the
17  circumstances of domestic violence, if it was just
18  surprise attacks that would happen to you,
19  uncertainty, that could result in someone being
20  afraid anywhere, circumstances?
21      A.   That's fair.
22          MR. BRUSTIN:  Objection to form.
23          THE WITNESS:  And to your point,
24      that's right, and that's why I didn't want
25      label the thing hypervigilance and assume

Page 251

1           Agharkar
2   that there's, affects everybody the same
3   way, it certainly does not.  Your point is
4   well-taken.
5   BY MS. RETTS:
6       Q.   Numbing, same thing, numbing could be
7   a result of domestic violence?
8       A.   Could be.
9       Q.   Could be a result of rape?
10      A.   Could be, sure.
11      Q.   Could be a result of sexual abuse as
12  a child?
13      A.   I mean, it could be.  I think it
14  really depends on the nature of the sexual abuse,
15  how pervasive was it, how often was it?  It's
16  possible.
17      Q.   Agree that sexual abuse by a parent
18  is in a different degree than sexual abuse by
19  somebody else?
20      A.   Yes.
21      Q.   Because that parent is in the
22  ultimate position of trust with a child?
23      A.   Sure, and the one who's got to take
24  care of them.
25      Q.   And Ms. Milke reported sexual abuse

Page 252

1           Agharkar
2   by her father?
3           MR. BRUSTIN:  Objection to form.
4           THE WITNESS:  Well, in this letter,
5       and that's only one instance I'm aware of
6       that being read.  And, again, I just want
7       to point out, there's a lot of things she
8       writes in letters that aren't true, and
9       there are some things that are true.
10      So, until I would know more about that
11      specific issue, then I wouldn't want to
12      characterize it a certain way.  But
13      certainly as it's written, yeah, it's
14      certainly -- it's one thing to explore
15      that it could be important.
16  BY MS. RETTS:
17      Q.   Ms. Milke, in your experience, wrote
18  letters that aren't true.  How did you, in your
19  interviewing her, determine what was or wasn't
20  true?
21          MR. BRUSTIN:  Objection to form.
22          THE WITNESS:  Well, because, again,
23      I'm not -- I'm not assessing whether
24      historical information is 100 percent
25      accurate.  I mean, if you do this kind of



Page 253

1          Agharkar
2    work, if you treat patients who understand
3    the subjective reality, it's very
4    important; right?  To the trauma
5    experience to whatever the person's
6    experience is like.  So -- and, again, I'm
7    not a detective, I'm not a factfinder, I'm
8    not here trying to say, you know, oh, wait
9    a minute, you said you were here on X day,
10   that's not my job.
11       What I'm trying to assess for is the
12   types of symptoms that she's having and
13   where I think those originated from, and
14   are they consistent with what I know of
15   psychiatric illness from my training and
16   my experience.
17       So, to the extent that I am able to
18   resolve an inconsistency, I've certainly
19   tried, but the volume is huge.  And,
20   again, I would have expected there to be
21   inconsistencies, it would be bizarre if
22   there wouldn't be; right?  So, you do the
23   best you can with the time you have.  And
24   so, again, her presentation, her clinical
25   presentation to me is absolutely

Page 254

1          Agharkar
2    consistent with what I would expect
3    traumatized people to look like, and the
4    types of symptoms that she has, I am able
5    to tie back to her experiences in prison
6    and, of course, some related to her son's
7    murder.
8        I do not believe it has anything to do
9        with the house fire, I do not believe it
10       has anything to do with any alleged sexual
11       abuse incident that might have occurred at
12       the age of 12.  That's the best I could
13       say.
14   BY MS. RETTS:
15       Q.   Ms. Milke reported to somebody else
16   that she also had been sexually abused, is that
17   something that you would want to look at?
18       A.   Of course, I would always want to
19   look at as much as I could.  But, again, I need to
20   interview her about it and try to get as many more
21   details as possible, and what types of problems,
22   if any did she have from it?  Because sexual abuse
23   is bad, doesn't always lead to PTSD; right?  So --
24   and any trauma is bad, doesn't always lead to a
25   syndrome.

Page 255

1          Agharkar
2        So, you have to do that kind of assessment
3    to determine did you have problems from it or not.
4        Q.   Now, in assessing malingering, isn't
5    it essential to know what information in the
6    letters is true that contradicts what she is
7    saying now?
8        A.   If there were a purpose to it, that's
9    potentially accurate.  Ultimately, again, the
10   clinician has to determine whether or not there's
11   a -- so, I guess what I'm thinking about is, let's
12   say there's some fact in that record -- in the
13   letter, that's -- that's false, that's not true at
14   all.  But it doesn't -- if it's not propagating
15   any sort of psychiatric condition that she is
16   trying to say, hey, look at me because of this
17   problem, I don't care.
18       I don't even care that she makes up
19   something to some guy, what difference does any of
20   that make to me?  You're doing a trauma assessment
21   here, or you're trying to get some flavor of that.
22   So, to your point earlier about malingering,
23   why -- if she were malingering, let's say, or
24   let's say she wanted to play up her symptomology,
25   she could have talked about the -- because the

Page 256

1          Agharkar
2    fire is one thing we mentioned, but pepper spray
3    is another.  Pepper spray comes to the vent, and
4    that's incredibly -- she can't breathe, she
5    panics, closed in, freaks out.
6        She could have fabricated nightmares about
7    that to me, she didn't.  She could have fabricated
8    flashbacks to me about that, you know, if I smell
9    pepper, if it's too hot -- you know, oh, I -- I
10   feel those things all happening again.  She didn't
11   say any of those things to me; right.
12       That's an example of somebody who could have
13   played up symptoms and potentially could have been
14   plausible, maybe, I mean, I would have had to
15   assess it, but she doesn't do that, you know,
16   that's not what she talks about.
17       She could easily -- instead, she talks about
18   in terms of anxiety, I'm trapped in a room,
19   there's smoke or the pepper spray coming in the
20   room, I can't breathe, I start having a panic
21   attack.
22       That is absolutely consistent with panic
23   attacks and panic disorder, that's exactly what
24   happens to people.  You don't even have to have
25   panic disorder, any of us in this room right now,



Page 257

Agharkar

2  we could experience those things.  So, yeah, I
3  found it to be very consistent of what we know
4  about clinical medicine.
5      Q.   Would you want to go look and analyze
6  whether she was over-reporting what was occurring
7  to her that related to the lawsuit, versus
8  underreporting the other pre-existing stressors
9  that she had, so underreporting sexual abuse,
10 underreporting rape, underreporting the abortion,
11 all those prior traumas that could explain her
12 current psychiatric functioning?
13      MR. BRUSTIN:  Objection to form.
14      THE WITNESS:  You know, I mean, such
15      a thing is possible.  I think that would
16      have required a great deal of
17      sophistication, I'm not sure that she has
18      that, I'm not sure the health
19      professionals would have that level of
20      sophistication.  But certain -- that's
21      potentially possible.  Again, though, my
22      interview style, and this is why I think
23      it's a mistake to use structured
24      interviews or use rote questions.  My
25      interview style is to ask open-ended

Page 258

Agharkar

2  questions, meaning you tell me your
3  symptoms, I'm not going to tell you or
4  prompt you for your symptoms.  And then
5  once you tell me those things, then we
6  start exploring it more further; okay?
7      So, you brought up the tobacco cases
8  earlier, that's actually the way I assess
9  for withdrawal.  They all want to say I
10 withdraw, I withdraw, I withdraw.  I say
11 tell me your symptoms when you don't
12 smoke.  I'm not going to tell you what
13 they are.  Tell me, tell me the
14 experience, I mean, if you experience
15 withdrawal, just go ahead and tell me
16 that; okay?
17      And then they may start listing off
18 things, some may be accurate and some may
19 be not accurate; okay?  And they make that
20 assessment.  I did the same thing here,
21 tell me about your poor sleep, what gets
22 in the way of that?  Bad dreams.  What is
23 that about?  How often does that happen?
24 I mean, that's when you start following up
25 with these things, and then you focus it

Page 259

Agharkar

2      down.  So, it does have to do with how you
3      interview, as well.
4  BY MS. RETTS:
5      Q.   Which could lead to how you're
6  reporting, if you're looking at prominent --
7  what's prominent in her mind is what occurred to
8  her -- prominent is -- strike that.
9      You understand the issue of prominence?
10     A.   Sure.
11     Q.   People are more likely to speak about
12 those things that are in the forefront of their
13 mind.  And so prominent to Ms. Milke in the case
14 about her incarceration would be her
15 incarceration?
16     MR. BRUSTIN:  Objection to form.
17     THE WITNESS:  I think that's fair,
18     that's certainly a possibility, and a
19     concern.  And so, then again, though, when
20     we talk about past things like the fire,
21     for example, I would ask things like how
22     did that affect you, what problems did you
23     have afterwards, the sexual assault by her
24     husband, how did that affect you, did you
25     have problems sleeping as a result of

Page 260

Agharkar

2      that, were there constant reminders, what
3      was your experience after that?
4      And she was like, you know --
5      especially with the husband, she's like,
6      well, our relationship wasn't a good
7      relationship, and she's like I know how
8      this is going to sound, but you just kind
9      of get used to this stuff, like he just
10     wasn't nice because he was drunk and he
11     was -- he uses drugs and whatever else,
12     and he wasn't a reliable person and you
13     just get burned out from the relationship.
14     So, she's not reporting other problems,
15     and I'm not seeing it anywhere else
16     either, so I can't say that they exist.
17     But you're right, there's -- that can
18     occur and there can be in the reporting.
19 BY MS. RETTS:
20     Q.   Well, in the interview style that you
21 employ requires the person to volunteer it, so
22 unless she volunteers it, you're not going to know
23 about it.  So, she didn't volunteer to you that
24 she had reported to someone that she was sexually
25 abused by her father?



Page 261

1              Agharkar
2         MR. BRUSTIN:  Objection to form.
3         THE WITNESS:  That's true.  That, I
4    directly asked about, you know, were you
5    ever sexually, physically abused, and she
6    said no.
7  BY MS. RETTS:
8    Q.   And she denied it?
9    A.   Correct.
10    Q.   And she didn't volunteer to you more
11  than one abortion?
12         MR. BRUSTIN:  Objection to form.
13         THE WITNESS:  That's true, she
14    didn't.
15  BY MS. RETTS:
16    Q.   Did she volunteer you any abortion or
17  did you learn that only from the letters?
18    A.   I'm fairly certain I learned that
19  from the letters.
20    Q.   So, that was not something she even
21  volunteered to you, the abortion?
22    A.   Right, that's correct.  But I mean,
23  I'm not even sure how that comes up, unless you
24  specifically know to ask about it.
25    Q.   Did you cover her relationship with

Page 262

1              Agharkar
2  Ernie Sweat?
3    A.   You know, not in great detail, no.
4  Only -- and I was aware that there was some
5  relationship that was sort of, kind of starting.
6  I think that -- at least the way she was reporting
7  it to me, it wasn't -- it wasn't very serious,
8  maybe she played that up a little bit, it sounds
9  like it was pretty serious.
10    Apparently, this guy -- this was not really
11  going anywhere, it didn't seem like.
12    Q.   Did you see references in the letters
13  to where she said that Ernie had proposed to her?
14    A.   I did see that.
15    Q.   Did you question her about that?
16    A.   That's why I think it came up, and
17  that's why she -- that's an example of -- we
18  talked earlier about distress and panic, that's
19  where I saw some embarrassment, and she was like
20  yeah, it wasn't that -- it wasn't serious -- go
21  that route.  She couldn't explain why she said it,
22  but she knew it was -- she knew it was wrong.
23  That, I could say there was embarrassment there
24  with that.
25    Q.   So, she -- when questioned about

Page 263

1              Agharkar
2  that, she told you that she had exaggerated
3  that --
4    A.   Yes, that's my recollection.
5    Q.   Were there other things that you
6  confronted her within the letters that she
7  admitted to exaggerating?
8    A.   Not that I recall because, again, of
9  course, the majority of the letters seemed to be
10  with this Joe Marino person, and she can't provide
11  any information about it, so I couldn't -- there's
12  nowhere to go with that.  But I don't recall other
13  letters questioning her about it.
14    Q.   She was able to specifically recall
15  exaggerating, though, when you confronted her with
16  the statement in the letter about Ernie and him
17  proposing she did remember that she exaggerated
18  that?
19         MR. BRUSTIN:  Objection to form.
20         THE WITNESS:  That's my recollection,
21    yes.
22  BY MS. RETTS:
23    Q.   Does any portion of your opinion
24  relating to Ms. Milke's trauma and incarceration
25  require her to be innocent?

Page 264

1         Agharkar
2    MR. BRUSTIN:  Objection to form.
3    THE WITNESS:  Interesting question.
4  No.  I think that it does make it worse, I
5  think in terms of severity.  Coming to
6  your execution, being held prisoner when
7  you are innocent.  Because, look, I've
8  interviewed a lot of prisoners, and they
9  can say, this place is horrible, but I did
10  this.  In other words, the punishment I
11  accept, I know I have to be here because
12  of what I did, and this is the situation I
13  put myself in.
14    So, you have that way of explaining it
15  to yourself, rationalizing it or just sort
16  of justifying it, if you will; okay?  When
17  you're innocent, that's not -- not only is
18  this place horrible, not only is this
19  place harmful, I should not even be here,
20  the system is supposed to protect people
21  like me, it's not supposed to put people
22  like me here; okay?
23    So, you have that -- that is another
24  layer of severity, I think, being
25  innocent.  But, no, my opinion in terms of



Page 265

1              Agharkar
2    her psychiatric diagnoses do not require
3    her to be innocent.
4         MR. BRUSTIN:  When you're ready, can
5    we take two minutes?
6         MS. RETTS:  Yeah, let me just ask one
7    more question, and then we can take a
8    break.
9  BY MS. RETTS:
10        Q.   Do you -- so, would it be your
11   opinion that the degree of Ms. Milke's
12   psychological functioning -- strike that.
13        The severity of Ms. Milke's psychological
14   damage, in your opinion, would be less if she was
15   guilty?
16        MR. BRUSTIN:  Objection to form.
17        THE WITNESS:  Psychiatric diagnoses
18   run a spectrum; right?  So, you can have
19   mild, moderate or severe problems.  And I
20   do see her on the more severe end of it,
21   and I do think the innocence part of it is
22   probably a major factor as to why.
23        So -- so, yes, I suppose -- moderate to
24   severe because she's innocent, but if
25   she's not innocent, maybe it's moderate.

Page 266

1              Agharkar
2    She still has what she has, it's still a
3    significant -- it still impairs her
4    greatly, regardless of what name we call
5    it and how severe we say it is, but I
6    think that the severity is worsened
7    because of being innocent.
8  BY MS. RETTS:
9         Q.   If that's --
10        A.   Of course, I'm not making a
11   determination --
12        THE VIDEOGRAPHER:  We are now going
13   off the record at 1:36 p.m.
14        (Recess taken.)
15        THE VIDEOGRAPHER:  We are now back on
16   the record at 1:47 p.m., this begins Tape
17   5.
18  BY MS. RETTS:
19        Q.   I want to go back just to your
20   testifying experience real quickly.  The cases
21   where you testified for the cigarette companies?
22        A.   Yes.
23        Q.   Is it correct that you were looking
24   for medical records to determine whether the
25   individuals were addicted or not, and in some

Page 267

1              Agharkar
2    cases, you offered opinions that individuals who
3    are smokers were not addicted?
4         A.   Yes, I have offered that opinion in
5    some cases.  In other cases, I've said that they
6    had a moderate use disorder, but not necessarily
7    an addiction.  So, it just depended on the case.
8    But that's right, medical records with also
9    deposition testimony, either they themselves while
10   living gave the depositions, or their family
11   members once they were deceased gave depositions.
12        Q.   How many total cases have you been
13   involved in that involved addiction to cigarettes?
14        A.   Probably 55, 60, maybe, by now that
15   I've consulted in.
16        Q.   And how many in those cases did you
17   determine that the person was not addicted to
18   cigarettes?
19        A.   Not addicted, approximately half.
20        Q.   And turning back to your report on
21   page 3, you said that Ms. Milke witnessed many,
22   many fights between inmates, as well as guards,
23   was this in prison or jail?
24        A.   Prison.
25        Q.   And how did she explain to you that

Page 268

1              Agharkar
2    this could have occurred, given the lockdown unit
3    that she was housed in?
4         A.   So, I guess -- I, perhaps,
5    misunderstood her, maybe it was the jail, but she
6    was obviously incarcerated, and that's what my
7    question was really about.  But my recollection is
8    that it was a lockdown unit, but people were
9    allowed -- I'm fairly certain she said people were
10   allowed out, because she was only there because of
11   her charges, so she couldn't -- they had to put
12   her there for other reasons, I think other people,
13   perhaps, had more freedom than she did, but that's
14   my sense of it.
15        But that she was able -- she witnessed
16   people getting into fights in this incarcerated
17   setting.
18        Q.   Have you ever worked in a prison
19   setting?
20        A.   No.  Only -- again, I provided
21   psychiatric treatment in a jail in Atlanta during
22   my fellowship year.  Since I went into practice,
23   no.  I provided treatment in a number of settings,
24   but never in a correctional setting.
25        Q.   So, your fellowship year was 2004



BHUSHAN S. AGHARKAR, M.D.                                  September 25, 2018
MILKE vs CITY OF PHOENIX                                              269—272

Page 269

1                          Agharkar
2   through '05?
3       A.   Correct.
4       Q.   And during that year, how many times
5   did you visit the jail?
6       A.   Once a week.  I think it was a day or
7   a half day every week.
8       Q.   What jail was it?
9       A.   Atlanta City Jail.
10      Q.   Was it male and female population?
11      A.   Yes, as best I can remember.
12      Q.   What was the average length of stay
13  there?
14      A.   I don't know.  I don't think it was
15  long because they have other jails for that, but I
16  don't know.
17      Q.   Did you have a specific set of
18  patients that you follow, or were you doing more
19  intake?
20      A.   No.  It was essentially whoever
21  needed to be seen that week.  So, there could have
22  been some acute people, but otherwise they were
23  just on the schedule that we saw them, kind of
24  like a clinic, almost.
25      Q.   2005 was the last time that you have

Page 270

1                          Agharkar
2   ever provided any kind of psychiatric care within
3   a jail facility?
4       A.   That's correct.  Now, of course, I've
5   reviewed hundreds of thousands of pages of medical
6   records about prisons, but delivering care, yes,
7   that's correct.
8       Q.   And you have never delivered care
9   within a prison facility?
10      A.   Never.
11      Q.   And you have never been trained or
12  worked as correctional officer; true?
13      A.   No, I've never worked as a
14  correctional officer.
15      Q.   Sometimes it's actually kind of
16  common, you see that happen and they decide to
17  switch over.  I've seen it a lot.  So, I just
18  wanted to check.
19           MR. BRUSTIN:  To become a
20      psychiatrist?
21           MS. RETTS:  Then back to work in
22      prison healthcare.
23  BY MS. RETTS:
24      Q.   Never worked with a police officer?
25      A.   Never did.

Page 271

1                          Agharkar
2       Q.   Have you ever done psychiatric
3   evaluations for police officers for the hiring
4   process?
5       A.   Not for the hiring process.  As part
6   of the fitness for duty, yes.  I continued to do
7   that now, police officers, firemen, there's
8   another type, I'm missing it, but somebody --
9   anytime there's a fitness for duty issue, to carry
10  a gun, to go back to work, whatever it may be,
11  yes, I do those evaluations.
12      Q.   Those are usually after shootings?
13      A.   After shooting or some misconduct or
14  some substance abuse problem brought to somebody's
15  attention, some reason for impairment or concern
16  about the mental state of the person, they will
17  put them on administrative leave, and send them to
18  me before they go back to work.
19      Q.   When did you start doing that and for
20  what agencies?
21      A.   It's for Fulton County, and I think
22  it's on my CV -- no, maybe it's not.  I've
23  probably been doing it for ten years, roughly.
24  And it just depends on how often a case is.  Some
25  cases have ten a year and sometimes 20 a year.

Page 272

1                          Agharkar
2       Q.   Is that Fulton County Sheriff's
3   Department or is it a city police department?
4       A.   That's right, it's the Fulton County
5   Sheriff's Department, but like I say, I definitely
6   have seen -- oh, and Dekalb, Dekalb County, too,
7   so they have sent me firemen and that kind of
8   thing.
9       Q.   Dekalb, any city police officers or
10  is that county, too?
11      A.   It's county.  There's obviously
12  correctional officers, as well, I do their
13  evaluations for them.
14      Q.   I don't recall if I asked you, but
15  did I ask you the percentage of the patients that
16  you see who are female and have been victims of
17  domestic violence?
18           MR. BRUSTIN:  Objection to form.
19           THE WITNESS:  I'm not sure you asked
20      me that specific question.  And I don't
21      know, I can't estimate, really, I don't
22      know.  I've certainly seen it, I could --
23      in certainly my practice right now, I
24      don't think I have anybody, but I have in
25      the past, so it ranges, ten percent, 20



BHUSHAN S. AGHARKAR, M.D.                                    September 25, 2018
MILKE vs CITY OF PHOENIX                                                273–276

Page 273

1              Agharkar
2        percent, just depending.
3    BY MS. RETTS:
4        Q.    Do you say -- if you were to put a
5    number on it, how many patients total do you think
6    you've treated who have been women involved in
7    domestic violence?
8        A.    I've got to imagine it's at least a
9    hundred by now, it could be more, I don't know.
10    For obviously confidential and other reasons, I
11    don't keep demographic information, I try not
12    to -- I wouldn't keep those kind of records.
13        Q.    Have you diagnosed complex PTSD
14    before in a patient you're seeing in your clinical
15    practice?
16        A.    Yes.
17        Q.    How many occasions?
18        A.    Well, it can mix with PTSD, but
19    complex trauma, I don't know if I give you raw
20    numbers, you know, again, I have to think at least
21    a hundred people by now.  I see it commonly in
22    forensic cases, maybe a little more, you know --
23    higher percentage, but in my practice, usually
24    about that, maybe a hundred.
25              MR. BRUSTIN:  You're asking about his

Page 274

1              Agharkar
2    private practice or --
3              MS. RETTS:  Clinical, yeah, clinical
4        practice --
5              THE WITNESS:  Forensics would be much
6        higher.
7    BY MS. RETTS:
8        Q.    And how many in your forensic
9    practice?
10        A.    I mean, it could be -- it could be as
11    high as 25 percent, it just depends on, you
12    know -- what have I done?  I said about 1,100, so
13    that tells you something like 250 or 300 times I
14    would have seen it.  And usually, you know, people
15    have more than one thing, so it could be complex
16    trauma, plus anxiety, plus depression, plus
17    schizophrenia, I mean, there's a number of
18    permutations that it could have, but complex
19    trauma would be one of the things.
20        Q.    Have you ever been excluded as an
21    expert before?
22        A.    Never.
23        Q.    Have any of your opinions been
24    subject to challenge that you are aware of?
25              MR. BRUSTIN:  Objection to form.

Page 275

1              Agharkar
2              THE WITNESS:  An attorney asked me
3        that once, and I thought it was my
4        cross-examination, so that's not what you
5        mean?
6    BY MS. RETTS:
7        Q.    No, Daubert challenge.
8        A.    All right.  Because he kind of yelled
9    at me about that for some reason, that's probably
10    his own issues.  I have never been Daubert
11    challenged.
12              MR. BRUSTIN:  I'm sorry, same
13        objection.
14    BY MS. RETTS:
15        Q.    That you know?
16        A.    Right, yeah.  I certainly was never
17    told I had been --
18        Q.    Did you have an understanding -- did
19    you testify in the -- case?
20        A.    No.
21        Q.    Do you know why?
22        A.    No.  They just told me -- I wrote a
23    report, but I think we were -- it was headed to
24    trial, and I think somewhere of maybe a couple of
25    weeks to a month, because I think I checked in

Page 276

1              Agharkar
2    with them on my calendar, and I said what's the
3    deal because I travel a lot, I got to make space
4    for this, what's going on?  And I got an e-mail
5    back saying we -- we're not going to call you and
6    just send us a bill.  I said okay.
7        Q.    Do you know what the outcome of that
8    case was?
9        A.    I don't.
10        Q.    And you didn't hear the defense
11    verdict?
12        A.    No.  No, I don't care who wins,
13    that's not my problem.  So, I never ask about
14    those things.
15        Q.    Have you ever written any
16    peer-reviewed articles -- and you understand what
17    peer review is, let's start with that threshold,
18    make sure --
19        A.    I do know.
20        Q.    And if you'll just do a little
21    summary of what peer-review is?
22        A.    Sure, because I act as a peer
23    reviewer.  So, it's when somebody writes a paper,
24    and then you submit it to a journal, and then it's
25    reviewed by three -- usually three reviewers.



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                                  277–280

Page 277

Agharkar

1
2  Those are your peers, and they give feedback and
3  either ask you to make changes or accept the
4  paper.
5       Q.   Have you ever written any
6  peer-reviewed articles yourself, whether you have
7  written it or been a coauthor, on rape?
8       A.   No.
9       Q.   Any peer-reviewed articles, same
10  thing, all of these questions are going to be that
11  you've written yourself or been a coauthor on a
12  peer-reviewed article about abortion?
13      A.   No.
14      Q.   A peer-reviewed article about
15  domestic violence?
16      A.   No.
17      Q.   Peer-reviewed article about
18  confinements of an inmate in solitary confinement?
19      A.   No.
20      Q.   Peer-reviewed article about parent of
21  a murdered child?
22      A.   No.
23      Q.   Peer-reviewed article about complex
24  PTSD?
25      A.   No.

Page 278

Agharkar

1
2       Q.   Peer-reviewed article about grief as
3  it relates to someone who has suffered being a
4  victim, or related to someone who was murdered?
5       A.   No.
6       Q.   Have you done any independent
7  research in any of those arenas?
8       A.   Research with the intent to publish
9  or something like that, no.
10      Q.   You did not do your own literature
11  search in this case for any specific peer-reviewed
12  articles; true?
13          MR. BRUSTIN:  Objection to form.
14          THE WITNESS:  Other than what I
15      mentioned that, you know -- from my
16      rebuttal report, I went and looked at some
17      other things.  No, I wrote my report based
18      on training and experience and what my
19      present knowledge was of the literature,
20      and how it related to my opinions.
21  BY MS. RETTS:
22      Q.   You are not relying upon any
23  literature specific not cited one of your reports
24  true?
25      A.   Correct, that's right.  And I will

Page 279

Agharkar

1
2  say this probably goes without saying, but just so
3  you know, of course, the DSM file was something I
4  would have relied upon, but I didn't cite any --
5  that is clear -- that's how we make our diagnoses.
6  So, I just want to make sure you knew that, but,
7  no, there's not like a -- some secret paper out
8  there -- hiding and saying, oh, this is where it's
9  all coming from, no, there's nothing like that.
10      Q.   Did you speak to any colleagues about
11  this case or your opinions, and rely upon any
12  information that they provided to you to render
13  your opinions?
14      A.   No.
15      Q.   The report that -- strike that.
16      The material you referenced that relate to
17  Dr. Haney, have you gone back ever and looked at
18  Dr. Haney's methodology that he employed to come
19  to the conclusions in his article?
20      A.   No.  No, I wouldn't have reviewed any
21  authors' methodology or anything like that.  I'm
22  assuming that -- obviously, I take whatever is
23  written and I think about that and I integrate
24  that into what I know clinically, and what I've
25  seen myself.  But it's not like I go and reanalyze

Page 280

Agharkar

1
2  anybody's data or -- I have to take it on face
3  value that if it got published, that it's got to
4  be ^sound in the way it's been done.  And people
5  can critique these things, I understand that.
6  But, no, I don't personally go back and look at
7  the data sets or that kind of stuff.
8       Q.   And there's different ways that,
9  especially in a psychiatric setting, that research
10  can be done, it can be done with randomized double
11  ^blind studies; true?
12      A.   True.
13      Q.   And that's kind of the gold standard
14  if you can do it; would you agree?
15          MR. BRUSTIN:  Objection to form.
16          THE WITNESS:  If you can do it, and
17      so much of what is true in our field,
18      that's not applicable, too.  But, sure, if
19      you can do it, drug studies immediately
20      come to mind, those have to be and ought
21      to be, you know, but some of these other
22      phenomenologies that we see, you can't do
23      that.
24  BY MS. RETTS:
25      Q.   The next level down, and maybe even a



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              281–284

Page 281
Agharkar

1                        Agharkar
2   couple of levels below, randomized trials would be
3   case studies?
4        A.   Sure.
5        Q.   Anecdotal evidence?
6        A.   Right.
7        Q.   And a case study would be -- the
8   strength of that, you would agree, would relate to
9   the sample size?
10       A.   Sure; one of the strengths.
11       Q.   So, if you're using a very small
12  sample, in other words, then the conclusions you
13  reached might not be reliable or replicatable?
14       A.   Sure, that's possible.  If you were
15  to solely use that study to justify your
16  conclusions, sure, but I don't know who would do
17  that, but --
18       Q.   Do you have an understanding of what
19  the sample size was in Dr. Haney's research?
20       A.   No, I don't, not that I could recall.
21  I know he's written on subjects, and I studied
22  some.  I will tell you generally speaking, the
23  sample sizes are small because it's a very small
24  population when you're thinking about the larger
25  prison population, and what can reasonably be

Page 282
Agharkar

1                        Agharkar
2   studied.  But I haven't looked at his stuff
3   specifically in that way.
4        Q.   Did you ask for any records in this
5   case and were not permitted to review them?
6        A.   No, everything I asked for, I
7   received to review.  I think, you know, it
8   certainly came up about, you know -- all the
9   letters, for example, I was provided quite a lot
10  of them, but I was told, look, certainly, there's
11  a lot here to read, whatever you think you need
12  more, we're happy to provide, if you tell us.
13       And I'm like, is there, are they all like
14  this?  And they're like, yeah, pretty much.  I
15  don't need to see more of this, if this is what it
16  is, it's what it is, so -- but, no, no, I've got
17  everything I asked for.
18       Q.   Were you ever -- strike that.
19       Did you ever request to interview someone
20  and you were not permitted to do that?
21       A.   No, I interviewed the people I wanted
22  to.  Like I said, I didn't know people's names, so
23  they had to provide me the names and numbers of
24  those two friends.  And I think they actually gave
25  me a third name, who I think may have been an

Page 283
Agharkar

1                        Agharkar
2   investigator or somebody at the trial level, and I
3   just ran out of time, I just did not have time to
4   talk to this person, the third person.
5        Q.   And tell me again how you went about
6   deciding who would be the individuals that you
7   interview?
8        A.   Oh, I just asked really who could
9   talk to me about what she was like or people --
10  then I asked her, who did you know or was around.
11  Because, again, after 25 years, I don't know that
12  you could find people who knew me 25 years ago.
13  So, there's some of those things that you have to
14  consider.
15       So, I just asked -- and this is always what
16  I ask in any case when I'm looking to interview
17  collateral sources, I'm looking for people who
18  know you, you know, who would be the best person I
19  can talk to who could tell me about what you were
20  like when you were growing up, or when this was
21  happening or that was happening.  And people would
22  tell me my mother would know me or people would
23  tell me my neighbor would know me, you know.  And
24  so, then I'm like, okay, who is that person and
25  what's their number and that kind of thing.

Page 284
Agharkar

1                        Agharkar
2        Q.   Did you review any materials from Ms.
3   Milke's divorce file?
4        A.   I don't recall doing so.
5        Q.   Did you review anything from the
6   order of protection hearing that involved Mark
7   Milke that occurred in like the October time frame
8   of 1989?
9        A.   So, I'm aware of a restraining order,
10  I'm not sure I ever read the hearing.  I just
11  don't know.  I don't think I did.  But the
12  difficult part, of course, you have to understand
13  is, if I had the record for three years, I may
14  have read things early on and not looked at them
15  again, I certainly wouldn't have read it to
16  prepare for today, and I'm only going to
17  remember what is most fresh in my mind, I hope
18  that's clear.
19       Q.   If you did read the documents that
20  were part of the restraining order, did you rely
21  upon anything in there to form your opinions in
22  the case?
23       A.   No.  Certainly if I can't remember
24  it, I didn't rely on it.
25       Q.   Did Ms. Milke ever report to you that



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
285–288

Page 285

1          Agharkar
2  Mark Milke had threatened her life immediately
3  after that hearing?
4      A.   I can't recall specifically.  I think
5  that he did make some sort of threat at some
6  point, but I just don't know the timing of it, if
7  it was after that hearing or not.  And I'm also
8  not sure of how serious she would have taken it
9  because the relationship was highly --
10     Q.   Did you talk to any of Ms. Milke's
11 criminal defense attorneys about their evaluation
12 of how Ms. Milke reacts to Mark Milke?
13     A.   No.
14     Q.   If she hyperventilates when she had
15 seen him recently, is that something that would be
16 important for you to know?
17     A.   Sure, that's a piece of information
18 that I certainly would want to consider.
19     Q.   And that would be something that
20 would contradict what she reports to you about her
21 relationship with him and domestic violence really
22 not being a big deal?
23     A.   You know, it could.  I'd have to
24 interview her more about what was she thinking and
25 feeling when she started hyperventilating, or what

Page 286

1          Agharkar
2  was it about that, that was particularly
3  anxiety-provoking for her.
4      Q.   And you do not use the life events
5  checklist for the DSM 5; true?
6      A.   Correct, I never have.
7      Q.   And you do not use the CAPS 5?
8      A.   For the reasons I've stated earlier,
9  that's correct, I don't think that that would be
10 helpful -- it would not be helpful here.  One has
11 to pick and choose what -- what things would be
12 useful.  In my opinion, it would not be.
13     Q.   And you do not use the trauma symptom
14 inventory; true?
15         MR. BRUSTIN:  Objection to form.
16         THE WITNESS:  Right.  For the reasons
17     I mentioned, I'm already asking the
18     questions that are basically on these
19     forms as it is, so I don't see any reason
20     to use forms.
21 BY MS. RETTS:
22     Q.   Do you know whether Robin, Ms.
23 Milke's friend ever visited her in jail?
24     A.   I'm not for sure -- I'm not for
25 certain on that.  I feel like one of them, I just

Page 287

1          Agharkar
2  don't remember which one, may have or may have
3  attempted to, but I'm actually really just not
4  sure.
5      Q.   Do you know whether Robin visited Ms.
6  Milke in prison?
7      A.   Again, same answer.
8      Q.   Do you know whether Ms. Milke had any
9  contact with Robin from the date of her arrest in
10 December 3rd, 1989 until the date of her release
11 in 2013?
12     A.   I don't know for sure.  I do know
13 that she felt abandoned by everyone who knew her,
14 and I don't know if that would include these
15 people or not, I'm not exactly sure.  Because my
16 recollection is there was some contact with
17 friends at least in the beginning, but I don't
18 exactly know, and I'm not sure if they were these
19 friends.
20     Q.   So, for these friends, fair to say
21 that the two friends you interviewed, you do not
22 know whether or not they had any contact with Ms.
23 Milke between December 3rd, 1989 and the date of
24 her release?
25     A.   Correct, I do not know because I

Page 288

1          Agharkar
2  interviewed them around -- what was she like
3  before, when you were growing up together, what
4  did you know about her then, how is she different
5  now, what are you seeing now?  Because these are
6  two periods of time that she -- that they seem to
7  have experienced with her, so I'm not sure that
8  she -- they would have had any kind of experience
9  with her during her prison years.
10     Q.   And do you know when the last time
11 Robin had had contact with Ms. Milke before she
12 was arrested?
13     A.   I don't know specifically.  I don't
14 think it was -- I think it wasn't as long as a
15 year, but I don't know if it was a week before
16 either, you know.  But I do know that they were in
17 touch because -- and, again, because I know you're
18 mentioning Robin, and I really -- I legitimately
19 cannot distinguish between the two people because
20 I just don't remember.
21     But one of them, and possibly both of them
22 told me she bought Christopher around, she said,
23 there are kids around, she was with our kids,
24 Christopher was around.  So, therefore, I know
25 that they had to have been the more recent friends



BHUSHAN S. AGHARKAR, M.D.                                      September 25, 2018
MILKE vs CITY OF PHOENIX                                                289—292

Page 289

Agharkar
1
2  before the incident occurred, meaning they -- they
3  were around each other recently.
4      Q.  Do you know how regular their contact
5  was with the two friends, how regularly they were
6  in contact with one another?
7      A.  No.  I mean, again, I gathered that
8  it was on a regular basis, but I don't know how
9  frequently -- I don't know -- once a week or once
10  a month, but, again, enough to know her and to
11  know what her life was like.
12     Q.  Do you know whether either one of
13  them has ever met Jim Styers?
14     A.  I don't.  I don't know, I don't know.
15  I know that they knew Mark.
16     Q.  Robin was friends with Mark before
17  Debbie knew them; true?
18     MR. BRUSTIN:  Objection to form.
19     THE WITNESS:  One of them introduced
20        the two of them, so if that's Robin, then
21        I will agree with you.  And maybe they're
22        in my notes, but I can't see them here.
23        So, again, I have no reason to think
24        you're not representing it properly.
25  BY MS. RETTS:

Page 290

Agharkar
1
2      Q.  Did either one of them, Robin and
3  Patty -- Patty?  I'm having a hard time with her
4  name, too.  I can remember Robin, I can't
5  remember --
6      A.  Patty, yes.
7      Q.  Patty, yes.  Robin and Patty, have
8  they ever visited Ms. Milke at the apartment that
9  she shared with Mr. Styers?
10     A.  I don't know.
11     Q.  Did you discuss with Ms. Milke the
12  period of time that Christopher was hospitalized
13  and anything surrounding that?
14     A.  No, I don't think that I did.
15     Q.  Did you know that Christopher had
16  been hospitalized for surgery?
17     A.  There's something in the back of my
18  mind, but, no, I don't have specifics.
19     Q.  Did you discuss with Ms. Milke the
20  trip that she took where she got stranded on the
21  way to Colorado and went with a trucker?
22     A.  Yes, but I think that's all I know.
23  I don't have details about that.
24     Q.  Did you review the Colorado police
25  report when Christopher had gone missing on his

Page 291

Agharkar
1
2  big wheel?
3      A.  No, I don't believe I have that
4  police report, but I've only seen that story
5  referenced.
6      Q.  Is that something that you talked to
7  Ms. Milke about in your clinical interviews with
8  her?
9      A.  No.
10     Q.  Did you explore with Ms. Milke any
11  discipline that she used with Christopher or how
12  she would go about controlling his behavior?
13     A.  I think she did tell me that she
14  would spank him to discipline him, and that he,
15  you know -- he was, I think, what sounded like a
16  pretty normal two or three-year-old, somewhat
17  willful.  But beyond that, no, not specifically.
18     Q.  For the -- you met with Ms. Milke
19  over that period of time for a total of about
20  eight hours?
21     A.  Correct.
22     Q.  And during that eight-hour time
23  frame, how much of that time was spent speaking
24  about Christopher?
25     A.  It's very difficult to quantify

Page 292

Agharkar
1
2  because he comes up periodically through all of
3  them.  And so -- but it's not like we spent like
4  30 minutes -- Christopher and something else.  So,
5  you know, I mean, I really couldn't say, but he
6  comes up fairly often.
7      Q.  Did Ms. Milke share with you any
8  favorite memory that she had about Christopher?
9      MR. BRUSTIN:  Objection to form.
10     THE WITNESS:  You know, things like
11        what he was wearing, I think, when she
12        last saw him, waking her up in the
13        morning.  She gets very, very emotional
14        very quickly, so it's -- again, I can't
15        have her kind of deteriorating on me in
16        the session when I -- to get my
17        information out of her.  So, I have to be
18        careful with sort of how deep I go and
19        when I do it.  So -- but, yes, she shares
20        some memories with me that were very
21        positive.
22  BY MS. RETTS:
23     Q.  What memories do you remember
24  specifically her sharing?
25     A.  Well, I think more just about his



BHUSHAN S. AGHARKAR, M.D.                              September 25, 2018
MILKE vs CITY OF PHOENIX                               293–296

Page 293

1              Agharkar
2  personality and how sort of energetic he was and
3  how happy he was and, you know -- again, I'm just
4  remembering things about hugging him, holding him
5  and missing him, just, you know, very brief
6  related types of memories that you would expect
7  someone to have.
8      Q.   When Ms. Milke would become upset
9  during your interviews, would you try to shift
10  over to a different topic?
11     A.   So, it depended.  Sometimes I
12  wanted -- I kind of let her cry, and I just try to
13  wait and see when she composed herself, if we can
14  continue in that topic.  And sometimes I would
15  move from the topic, and then kind of come back to
16  it again, you know, later on in some other way,
17  maybe give her time to come back to herself, and
18  then go back in again.
19     I kind of -- I liken it to -- Star Wars
20  fan -- it's sort of like a Death Star interview,
21  you know, there's only one way to get sort of into
22  the deep part, but you don't know, she got to keep
23  testing the surface, testing the surface, and then
24  once she finally do, you're able to get in deeper
25  to it and you come back out again.  And that's

Page 294

1              Agharkar
2  sort of the way I try to interview -- when you're
3  interviewing folks with trauma particularly, you
4  got to be careful and you have to be nimble in the
5  way you go in and out of a question and topics.
6      Q.   Did you audio record the interview
7  with Robin?
8      A.   No.
9      Q.   Did you audio record the interview
10  with Patty?
11     A.   No.  I took notes as I was talking to
12  her.
13     Q.   And why didn't you audio record
14  either one of those interviews?
15     A.   It's not my practice to do so.
16     Q.   For witnesses who was not the person
17  that you're evaluating directly, why not interview
18  them --
19     A.   You mean record?
20     Q.   Record, yes.
21     A.   Honestly, it never occurred to me,
22  until now you just asked it.  It's just never been
23  my practice to do it.  I'm actually not sure how
24  to record somebody over the phone.  Also, frankly,
25  I just never even looked into doing that, so I

Page 295

1  just never done it.
2      Q.   Have you ever audio recorded a
3  therapist who was treating this person?
4      A.   I never have done that.  I probably
5  -- and I wouldn't do that, I think, because for
6  confidentiality reasons and such.  I want to try
7  to be careful about that, even though they
8  understand that the person has waived, perhaps, to
9  talk to me, but you still want to be careful.
10     Q.   Did you ever review any e-mails or
11  text messages that Ms. Milke's treating provider
12  exchanged with her?
13     A.   No, I'm not aware of those --
14     Q.   Have you ever text messaged a client?
15     A.   Yes.  I don't -- so, my patients,
16  because I travel so much, they have my e-mail,
17  they have my phone, which is my office line, but
18  it's my cell, so they know they can reach me.  We
19  never discussed therapy or anything like that.
20  It's always administrative, hey, Doc, I got to
21  change my appointment, hey, Doc, I'm running out
22  of meds, can you call it in?
23     So, that's what I get.  And typically,
24  that's -- an e-mail, I don't like being text

Page 296

1              Agharkar
2  messaged with that kind of information, so I tell
3  them that.  But I also tell them if there's an
4  issue, we talk about it on the phone, we're not
5  going to do it by e-mail.  So, they're also aware.
6  My patients know the deal after being with me for
7  so long.
8      Q.   Is there a specific reason that you
9  decided that you didn't want to interview Mark
10  Milke and get a sense of what he was like?
11     A.   There was not a specific reason.  I
12  think that, number one, of course, in Arizona
13  there's this issue about victims contacting
14  victims, and so I always want to be cognizant of
15  that.  I don't do anything without the attorney's
16  permission, I always go through that saying, okay,
17  here's who I would like to talk to, and then let
18  them be the ones to arrange it, not me.
19     So, that's one thing.  I know Arizona has a
20  peculiar law, so to speak, where you can't contact
21  victims.  And so, certainly, I wouldn't want to
22  run afoul of anything like that.
23     I think also, you know, I'm just not sure
24  what kind of information -- how reliable his
25  information would be.  He's a substance abuser



BHUSHAN S. AGHARKAR, M.D.                                  September 25, 2018
MILKE vs CITY OF PHOENIX                                              297-300

Page 297

Agharkar

1
2  who, you know -- and I just don't know, I just --
3  who has reason to portray himself a different way
4  maybe than what the record says.  And so, I didn't
5  make a conscious effort not to, but as I thought
6  about it -- as I was thinking about it sitting
7  here, probably why I didn't.
8      Q.   Did you rule out borderline
9  personality disorder for Ms. Milke?
10     A.   I can't say that I ruled it out.  I
11  would say to you that I do not see symptoms that
12  are consistent with it.  I did not get that
13  impression from meeting with her and from the
14  records from that matter that would lead me to
15  think that.
16     The other major issue is that it would be
17  clinically incorrect, inaccurate and frankly bad
18  practice to diagnose a personality disorder under
19  these conditions.  Reason being she's very
20  symptomatic, still.  When somebody is having acute
21  symptoms of PTSD or depression or anxiety, you're
22  not seeing the person as they truly are, you're
23  seeing -- there's all that -- because personality
24  disorder is a character problem; right.
25     Q.   Right.

Page 298

Agharkar

1
2      A.   I mean, that's ultimately what you're
3  saying, that person's character has some issue,
4  and that's a pervasive problem leading to these
5  difficulties in life; okay?
6      The problem with that is when you assess
7  somebody who is access 1 condition, whose PTSD is
8  a problem that is not under good control, you
9  can't really make that determination whether this
10  is character or whether this is a psychiatric
11  issue, because -- and I've gotten burned by this
12  before as a resident, and I made that
13  determination saying, oh, this person is
14  borderline, and they're bipolar, actually.  And if
15  they were medicated properly, which once we did,
16  they were totally different people, and you get a
17  totally different response.
18     And that was very telling to me, I said,
19  Wow, you cannot make these kind of judgment calls
20  when they're having active symptomatology.  That's
21  certainly what I was taught and that is what I
22  teach in my residents at Morehouse as well.
23     Q.   So, for Ms. Milke, we cannot rule out
24  or rule in any personality disorder at this stage
25  because of the condition of PTSD?

Page 299

Agharkar

1
2      MR. BRUSTIN:  Objection to form.
3      THE WITNESS:  I think that's fair.  I
4      think I would defer that at this point,
5      but I would say it would be bad practice
6      to diagnose her at this time with a
7      personality disorder.
8  BY MS. RETTS:
9      Q.   And your diagnosis is the complex
10  PTSD, not traditional PTSD; true?
11     A.   That is correct.  That is based on
12  what I'm seeing presently, and -- but it's the
13  most conservative kind of diagnosis actually about
14  it, because just -- because there's such a mixture
15  of symptoms and there were so many traumas that
16  you can't directly tie -- and this is -- there's
17  not a direct correlation, one to one between every
18  symptom, that's just not life, that's not what you
19  see in trauma.
20     So, out of caution -- complex PTSD --
21  diagnosis.  I do think she had PTSD at one point
22  earlier, but I don't see every symptom now.
23     Q.   You say she had PTSD at one point
24  earlier, you mean before her arrest?
25     A.   No.  I mean, during her

Page 300

Agharkar

1
2  incarceration.
3      Q.   So, Ms. Milke's trauma within the
4  complex PTSD umbrella can include -- it could
5  include sexual abuse as a child?
6      MR. BRUSTIN:  Objection to form.
7      THE WITNESS:  It could, but then
8      you'd expect to see symptoms earlier.  So,
9      no.  Sexual abuse as a child can be a
10     cause of complex PTSD, but not here.
11  BY MS. RETTS:
12     Q.   What symptoms would expect to see
13  earlier?
14     A.   Well, I mean -- I'm hesitating
15  because sexual abuse, it comes as a whole bunch of
16  things, and so I just don't know what we're
17  talking about, frankly, because it's just one
18  sentence in a letter.  So -- but that's where you
19  can start seeing a lot of mood vacillations.
20     Again, you have to interview her somewhat
21  about this.  But in terms of just being -- a sense
22  of being broken of the world not being secure,
23  authority figures not being able to be trusted,
24  important people in her life.  Example of a young
25  man I once saw with complex PTSD who was being



BHUSHAN S. AGHARKAR, M.D.                                September 25, 2018
MILKE vs CITY OF PHOENIX                                         301–304

Page 301

Agharkar

1    raped by his older brother from the ages of like 8
2    to 12, went and told the principal about it, and
3    the next day was being called a faggot at school;
4    okay?
5        So, that's a great example of how somebody
6    who's being traumatized badly goes to authority,
7    and this is what winds up happening.  He learns I
8    can't trust people, I can't trust my family, I
9    can't trust authority to help me.  This kid grew
10   up very anxious, he grew up very difficult, he
11   didn't have relationships, he was constantly
12   socially isolated.  That's not what I'm hearing in
13   Ms. Milke's history pre-arrest.
14       So, that's, again, not what I would see --
15   so, that's why I don't think it's sexual abuse
16   related.
17       Q.   Sexual abuse as a child can lead to
18   promiscuity?
19       A.   Yes.
20       Q.   Did you see that in Ms. Milke's
21   history?
22           MR. BRUSTIN:  Objection to form.
23           THE WITNESS:  I saw some references
24       or some allusions to that.  A friend --

Page 302

Agharkar

1        I'm sorry, her friend is saying that she
2        was a modest person, she was not known to
3        really be promiscuous.  So, I don't know.
4        I don't know if that happened later on, I
5        don't think -- certainly not as a young
6        child at 12 years old when this would have
7        happened, no.
8    BY MS. RETTS:
9        Q.   Did you see references in her letters
10   to self-admitted promiscuity?
11           MR. BRUSTIN:  Objection to form.
12           THE WITNESS:  I'm not recalling that
13       specifically.
14   BY MS. RETTS:
15       Q.   Is that something that you would want
16   to look at to rule in or out sexual abuse as a
17   child, as to potentially being a trauma falling in
18   the complex PTSD umbrella?
19           MR. BRUSTIN:  Objection to form.
20           THE WITNESS:  It could, but, I mean,
21       you know, there's a lot of promiscuous
22       people out there who were not sexually
23       abused.  There's a lot of promiscuous
24       teenagers that can be regular sexual

Page 303

Agharkar

1    experimentations or sexual identity
2    growth, frankly.  So, just because that
3    happened doesn't make sexual abuse to be a
4    likely cause or even an occurrence.  I
5    would have to know more.
6    BY MS. RETTS:
7        Q.   So, without knowing more about the
8    sexual abuse issue with Ms. Milke and what she
9    reported in the letter, you can't rule it out or
10   rule it in to be complex PTSD?
11           MR. BRUSTIN:  Objection to form.
12           THE WITNESS:  I'm saying based on
13       what I know now, currently, it's not the
14       cause.  And even if it did occur, which,
15       again, I'm not saying it did occur, but
16       I -- I want to find out more.  Then you
17       should see complex PTSD type symptoms that
18       we're talking about earlier.  It's not
19       going to present at the age of 50 now, I
20       mean, that's ridiculous, so --
21   BY MS. RETTS:
22       Q.   Ms. Milke was relatively young at the
23   time of her arrest; true?
24       A.   She was 25, I think.

Page 304

Agharkar

1        Q.   People can have psychiatric
2    diagnoses -- strike that.
3        People can have psychiatric conditions and
4    not obtain psychiatric counseling?
5        A.   I agree.
6        Q.   We can also repress memories; true?
7        A.   True.
8        Q.   And repressing and downgrading,
9    stuffing incidents that occurred to you can cause
10   greater psychological trauma later?
11       A.   Yes.
12       Q.   The fact that Ms. Milke did not
13   receive any type of counseling for this reported
14   sexual molestation is not equivalent to the fact
15   that she didn't have any psychological damage;
16   agree?
17           MR. BRUSTIN:  Objection to form.
18           THE WITNESS:  I agree.
19   BY MS. RETTS:
20       Q.   Would you put her two abortions under
21   the trauma umbrella of your complex PTSD
22   diagnosis?
23       A.   No.
24       Q.   Why not?



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
305–308

Page 305

Agharkar

1
2    A.   I have to know her reaction and what
3    the situations were from having an abortion.  I
4    mean, I've known people personally who had
5    abortions, but I also, again, treated women who
6    had abortions, they wouldn't necessarily look at
7    it as a trauma.  For some it's a relief, for some
8    it's taking control of their life, for some it's
9    empowering almost in a way; okay?  So, it
10   really -- I just think it's too broad, I could not
11   possibly say that, on the basis of two abortions
12   that those are traumas that then caused complex
13   PTSD, no.
14       Q.   Do you need to explore that more with
15   Ms. Milke?
16       A.   Sure, I could, yes.  But, again, I
17   keep coming back to the fact that there's no --
18   so, not only are there no records of psychiatric
19   treatment, which I completely agree with you, does
20   not mean there weren't psychiatric problems.
21   There's also no, either by self-report or by her
22   friends, there's no contemporaneous records to
23   suggest there were psychiatric problems, even
24   symptoms that would then, you know -- because then
25   we could argue, well, maybe she could have gone

Page 306

Agharkar

1
2    seen a doctor, you know, and then you got a stigma
3    and -- and all that business, but that's not even
4    there.  So, literally, it's like you're saying
5    there's been some events, couldn't that cause
6    problems?  Well, yeah, sure, but then -- but we
7    didn't see any problems, so -- so no.
8        So, that's -- again, that's why I thought
9    about those things, and that's why I don't think
10   that they started pre-arrest.
11       Q.   So, Ms. Milke's abortion for the
12   child involving Ernie Sweat occurred sometime in
13   September of 1989, which is approximately three
14   months before she was arrested, are you contending
15   that that's enough period of time within which you
16   would have seen symptoms?
17       MR. BRUSTIN:  Objection to form.
18       THE WITNESS:  Could be, sure.  I
19       mean, you could certainly see something
20       yeah.
21   BY MS. RETTS:
22       Q.   And her symptoms could have shown at
23   the time that she was incarcerated, especially
24   having had her son murdered, and then in
25   conjunction with the choices -- looking back and

Page 307

Agharkar

1
2    having made a choice to terminate her pregnancy?
3        MR. BRUSTIN:  Objection to form.
4        THE WITNESS:  She could have had
5        symptoms that developed later, that's
6        possible, again, if the abortion was
7        traumatizing.  But I'm just not following
8        the logic as to then what symptoms would
9        you have seen based on abortion that was
10       voluntary.  I'm just not following that
11       because I don't see any.
12   BY MS. RETTS:
13       Q.   Have you read scientific literature
14   about abortions and psychological trauma as a
15   result?
16       A.   I mean, I'm aware only generally
17   speaking, it's not something I had looked up for
18   this because, again, the trauma symptoms that I'm
19   seeing here so clearly relate to events and other
20   things that, you know, it has nothing to do with
21   the abortion.
22       Q.   In the week before the murder of
23   Christopher, Ms. Milke went and saw a doctor, do
24   you know what she went for?
25       A.   In the week before?

Page 308

Agharkar

1
2        Q.   Mm-hmm.
3        A.   No.
4        Q.   Do you know what diagnostic code 14
5    is?  Do you know what 14 is?
6        A.   No.
7        Q.   Did Ms. Milke -- did you talk to her
8    about whether she had been to the doctor in the
9    months before?
10       A.   No.
11       Q.   Did you look through photographs of
12   her purse showing a payment to a doctor?
13       A.   No.
14       Q.   Would those records be interesting to
15   review to see what treatment she was receiving?
16       MR. BRUSTIN:  Objection to form.
17       THE WITNESS:  Sure, I'd be happy to
18       look at any records.
19   BY MS. RETTS:
20       Q.   We don't have them?
21       A.   I have no help for you then, I'm
22   sorry.
23       Q.   Would you -- if you had known Ms.
24   Milke had gone to see a doctor, would you have
25   questioned her about what she was going for?

BHUSHAN S. AGHARKAR, M.D.                      September 25, 2018
MILKE vs CITY OF PHOENIX                        309—312

Page 309

1              Agharkar
2          MR. BRUSTIN:  Objection to form.
3          THE WITNESS:  Sure, yeah.  I mean,
4      I'll be honest with you, there's no way I
5      have time to interview anybody about every
6      medical visit they ever have, because,
7      first of all, who remembers those things,
8      and unless there's some urgent problem
9      going on.  But had I known about it, sure,
10      I might have asked about it.  And that
11      code 14, is that procedure code or a
12      diagnosis code?
13  BY MS. RETTS:
14      Q.   The -- I can't find what it stands
15  for, but my understanding is there is a Medicaid
16  set of codes that are used, and maybe they've
17  changed them?
18      A.   That's possible, but I also don't
19  take Medicare or Medicaid, so I don't --
20      Q.   The writing might be hard to -- could
21  it be a 17, does that make sense?
22          MR. BRUSTIN:  Objection to form.
23  BY MS. RETTS:
24      Q.   Would 11 make sense to you?
25          MR. BRUSTIN:  Objection to form.

Page 310

1              Agharkar
2          THE WITNESS:  No, I can't help.
3  BY MS. RETTS:
4      Q.   Did you ask Ms. Milke to provide a
5  list of any medical providers that she had seen
6  prior to her incarceration?
7      A.   No.
8      Q.   So, in terms of her having no
9  psychological treatment prior to her
10  incarceration, you are relying solely upon her
11  self-report?
12      A.   Yes, that's correct.  And, of course,
13  typically -- and the fact that there are no
14  records produced.  I mean, typically, my
15  experience in a capital crime, we get records --
16  you get records, as many records that you can get
17  of medical records of all kinds, including
18  psychiatric records, and then that usually becomes
19  part of the file.  I guess I'm sort of assuming
20  that that would have carried on, and I would have
21  seen that if it existed, but that is an assumption
22  on my part.
23      Q.   And you did not read Ernie Sweat's
24  deposition; true?
25      A.   No.  That is right, I was not

Page 311

1              Agharkar
2  provided that.  That happened more recently in
3  these proceedings?
4      Q.   About June, July?
5      A.   Okay.  Yes, so that's
6  these proceedings.  No, I wasn't provided it, I
7  did not review it.
8      Q.   You were not aware that Mr. Sweat
9  denies being aware that Ms. Milke had an abortion?
10      A.   I was not aware of that.
11      Q.   Do you recall reading Ms. Milke's
12  portion of her deposition testimony where she
13  contended that she had a conversation with Mr.
14  Sweat about the abortion?
15      A.   That sounds familiar, but I didn't
16  study that.
17      Q.   Is it significant to you that there
18  is a difference between what Mr. Sweat reports,
19  that there was never a conversation about an
20  abortion and what Ms. Milke reports that there was
21  a conversation about an abortion?
22          MR. BRUSTIN:  Objection to form.
23          THE WITNESS:  Other than they have
24      different stories, and I don't know, you
25      know -- I don't know what Mr. Sweat's

Page 312

1              Agharkar
2      situation is now versus what it was then,
3      if that's something he wants to admit or
4      not knowing about; right?  So, I don't
5      know, there could be a number of things.
6      It could be that she's being -- I don't
7      know.  But either way, that doesn't affect
8      my opinion, so it's not relevant to the
9      inquiry as I see it, for me, my --
10  BY MS. RETTS:
11      Q.   The more time as a clinician that you
12  see or find one of your patients being dishonest
13  with you, does that cause you greater concern
14  about the accuracy of the information that they're
15  reporting to you?
16          MR. BRUSTIN:  Objection to form.
17          THE WITNESS:  I think it depends on
18      what they're being dishonest about, and
19      whether or not that's important, you know,
20      you want to explore it, try to figure out
21      what's going on.  I would fire people from
22      my practice from -- if they lied to me
23      about filling a medication, for example, I
24      view that as a non-starter.
25          I'll give you an example, a guy gave an



Page 313

Agharkar

1
2    antidepressant to -- a sedative, he only
3    filled the sedative, not te
4    antidepressant, even though I explained to
5    him that the sedative was short-term and
6    right now -- he was having problems.
7        So that's it, that's it, we're
8    obviously not going to continue treatment
9    because I can't trust you.  And that's the
10   reality, if I can't, then I can't.  So, I
11   think it really just depends.
12       And, again, you have to have an
13   understanding of why there may be
14   inconsistencies, because you have to
15   understand that in treating mentally ill
16   people, you should expect inconsistencies.
17 BY MS. RETTS:
18       Q.   If someone -- if you felt that
19   someone was actively trying to hide information
20   from you or be dishonest, that would a concern for
21   are as a clinician?
22       A.   Of course.  By the way, it actually
23   can go both ways; right?  Because I've
24   hospitalized people for declaring that they were
25   not suicidal, but I suspected they were hiding

Page 314

Agharkar

1
2    information from me.  And based on the information
3    I was unable to find from collateral records, I
4    put them in the hospital, because I -- they
5    realized they were lying to me because they wanted
6    to die or they want to kill themselves.  So, I
7    actually forced treatment upon them essentially
8    because they were hiding information.  So, it can
9    actually go both ways, right.  It could lead to --
10   say don't treat or I could say, oh, you really
11   need to be treated; okay?
12       Q.   So, in that circumstance, you -- that
13   you are referring to, you went back and you looked
14   at another source to determine whether that was
15   corroborating what the person was saying?
16       A.   That's correct.  And not just that
17   then, I have to integrate, well, then why would
18   this person have told me what they told me?  It's
19   because they want to be successful in killing
20   themselves, that's why.
21       And so, I now know this person is sick and
22   they need to be hospitalized for their own health,
23   and I had to do that.
24       Q.   So, did you do that here?  Did you
25   look through records to try to corroborate what

Page 315

Agharkar

1
2    Ms. Milke was saying to you?
3        A.   Well, as I -- yeah, you know, as I've
4    discussed, wherever possible I tried to do that,
5    you know, the volume is huge and I certainly can't
6    cross-examine her with every detail.  So, those
7    records that I could remember I did talk to her
8    about it.  And really, frankly, in terms of
9    psychiatric symptoms, what we have to discuss
10   essentially is, well, then, you know -- why wasn't
11   there treatment records, why wasn't there this and
12   that?
13       So, that -- so, it's actually the lack of
14   records that we have to talk about, as opposed to
15   records that say other things as I see it from a
16   psychiatric standpoint.
17       Q.   And in 1989, there was a different
18   sort of stigma that really surrounded mental
19   health treatment?
20       MR. BRUSTIN:  Objection to form.
21       THE WITNESS:  And that continues to
22   this day, and I agree that it was worse
23   then.
24 BY MS. RETTS:
25       Q.   And that can be an explanation for

Page 316

Agharkar

1
2    why someone may not seek out mental health
3    treatment?
4        MR. BRUSTIN:  Objection to form.
5        THE WITNESS:  I agree.  But, again,
6    as I say, I'm not even so much hooked up
7    on the fact that there's no medical
8    records, it's that we're not seeing a
9    constellation of symptoms that would
10   require treatment.  Because, look, so many
11   of my death penalty cases, these guys come
12   from poor impoverished backgrounds, stigma
13   associated with mental illness, they
14   don't -- they're not going to go see
15   doctors.
16       But when you interview people, they
17   will describe symptoms that are clearly
18   consistent with schizophrenia, bipolar
19   disorder, PTSD, whatever; okay?  And when
20   you see that, one can say, okay, so very
21   likely, in fact, they did that have it at
22   that, even though there isn't a diagnosis
23   or records.  So, that is what I was
24   looking for here, and I didn't find it.
25   So, I can't -- you cannot then assume, oh,



Page 317

1                    Agharkar
2         she must have had psychiatric problems as
3         a result, there's not data to suggest
4         that.
5    BY MS. RETTS:
6         Q.   When you looked through the letters
7    that Ms. Milke sent to Joe Marino, did you see
8    multiple references in there to civil litigation?
9         A.   Yes, I did.
10        Q.   Did you see references to Ms. Milke
11   filing $150 million lawsuit?
12        A.   That is her idea.  She -- I don't
13   think she filed anything, but that was sort of the
14   thing she was talking about, yes.
15        Q.   She has filed something, this
16   lawsuit.
17        A.   Yeah, but not that.  Not at the time
18   she wrote the letter, no, so that's what I meant
19   by that.
20        Q.   How did you assess her statements
21   about litigation and making money in terms of
22   trying to determine whether she knew you had a
23   financial motivation for claiming damages?
24             MR. BRUSTIN:  Objection to form.
25             THE WITNESS:  Well, if you are

Page 318

1                    Agharkar
2         innocent and you're wrongly arrested and
3         incarcerated or on trial, that -- that's a
4         pretty natural first thought, I think,
5         that I'm going to sue you for this, I'm
6         going to sue you and I'm going to make a
7         lot of money because of this, because you
8         have, you really messed up.
9         I think that's a totally appropriate
10        reaction, frankly, when somebody's civil
11        rights have been violated, when somebody's
12        been accused of something they didn't do,
13        especially like this.
14        So, I view that as actually completely
15        appropriate.  I don't know about $150
16        million, you know, that's just throwing a
17        number out it all seems to me, but I
18        totally think it's appropriate for
19        somebody to say I would file suit for this
20        or I want to file suit.
21   BY MS. RETTS:
22        Q.   What if Ms. Milke was not innocent?
23             MR. BRUSTIN:  Objection to form.
24   BY MS. RETTS:
25        Q.   How would you assess the statements

Page 319

1                    Agharkar
2    in terms of monetary gain, and how that relates to
3    her claiming damages?
4         A.   Well, I mean, the only explanation
5    maybe then is that -- if you can't prove that I'm
6    guilty or something, so I'll sue.  I certainly
7    don't think -- being incarcerated for 25 years,
8    and then, hey, let me go ahead and sue then.
9         It's very clear that the letter's context is
10   this is a short-term thing.  I'm going to be found
11   innocent, and when I get found innocent, which
12   means at the trial, right, I'm going to sue you
13   guys, that's what it is.  It's not like this is
14   some long-term gain she's been planning for --
15   she's what?  54 now and she's plotting this at 25,
16   no way.
17        So, that would be bizarre, honestly, it
18   would be inconsistent with somebody who is guilty,
19   then saying I'm going to sue for this money, it
20   just doesn't make sense.  It's very consistent
21   with somebody who is innocent saying that.
22        Q.   Have you ever seen any other letters
23   where someone made those statements, where they
24   later were released from prison and found to be
25   wrongfully incarcerated?

Page 320

1                    Agharkar
2         A.   Well, no, I mean, I've only done a
3    handful of these, and I don't recall any of those
4    cases that they said they were going to sue at the
5    time of trial.  I've talked to plenty of guys,
6    though, at the trial level who have said very
7    similar things.
8         So, I mean, again, I think it's a natural
9    reaction, I've been wronged, this isn't right, and
10   I'm going to make sure you're going to make me
11   whole after this.
12        Q.   You've seen through the course of
13   your forensic interviews of inmates, that they
14   frequently say they're going to sue all the time?
15        A.   Oh, sure, of course.
16        Q.   That's something that they say a lot?
17        A.   Sure.
18        Q.   Doesn't require their innocence;
19   true?
20        A.   True.
21             THE VIDEOGRAPHER:  Five hours 12
22   minutes.  We are now going off the record
23   at 2:43 p.m.
24             (Recess taken.)
25             THE VIDEOGRAPHER:  We are now back on



Page 321

1               Agharkar
2        the record at 2:53 p.m., this begins Tape
3        6.
4    BY MS. RETTS:
5        Q.   Going back to the complex PTSD
6    diagnosis.  Can you list for me everything that
7    you put under that umbrella as a trauma?
8           MR. BRUSTIN:  Objection to form.
9           THE WITNESS:  So, it was being
10          wrongly arrested and incarcerated, the
11          things that she witnessed while in the
12          prison system that we've touched on
13          already, that primarily what you are
14          seeing now and what we typically see in
15          people with complex trauma is this, again,
16          sense of lack of security in the world, a
17          feeling -- a sense of being broken,
18          something is wrong, you're damaged in some
19          manner, and you see primarily a lot of
20          avoidance kind of symptoms.
21             Those are the primary types of problems
22          that she struggles with now.  That's what
23          you typically see in complex PTSD.  And
24          those, in my opinion, stem from her
25          experiences under the control of the

Page 322

1               Agharkar
2    prison system, through the guards, through
3    being aware that it's an inherently
4    dangerous environment, that you are not in
5    control of yourself, that somebody else is
6    in control of you.  And essentially,
7    having to live under those circumstances
8    and all things that go with that for 20
9    years.
10   BY MS. RETTS:
11       Q.   Do you include the murder of
12   Christopher in that?
13       A.   So, that certainly is a major trauma,
14   and I think it's -- it's -- so, it's certainly a
15   major trauma, and I do think that it contributes
16   to some -- to PTSD symptoms, and I think that it
17   was probably more acute back then, it's less acute
18   now.
19          Now it's more grief, you know, she grieves.
20   And then although she still has some symptomology
21   of nightmares, primarily, again, tend to be more
22   along what I would consider age as -- reactions.
23          So, I don't -- I guess the way I
24   differentiate the two is I was thinking of that as
25   more of the acute PTSD trauma, okay, to whatever

Page 323

1               Agharkar
2    extent there was back then.  And we just don't
3    have records on it, and she's just not able to
4    access a lot of things there.  As opposed to --
5    but the prison, the symptoms that I'm seeing now
6    more directly relate and tie to that, but I do
7    think obviously that was an important trauma that
8    contributed.
9        Q.   You are not including as trauma her
10   relationship, emotional abuse, physical abuse,
11   verbal abuse, anything that falls on the domestic
12   violence with Mark Milke?
13       A.   As far as I'm aware of, there was no
14   physical abuse.  There was obviously emotional
15   abuse.  But that's correct, I am not -- I do not
16   consider that to be -- although stressful, okay, I
17   don't consider that to be a source of PTSD for
18   her.
19       Q.   You do not consider Mark Milke's rape
20   of Ms. Milke to be a source of PTSD for her?
21       A.   That's correct, because she described
22   it, again, as an assault or an unwanted sexual
23   act, okay, but she didn't characterize or think
24   about it as rape, and she has had no sequela, no
25   nightmares, no flashbacks, no problems when you

Page 324

1               Agharkar
2    look for PTSD as it relates to the sexual assault
3    by her ex-husband.
4        Q.   Now, in her letter to the prison
5    staff, she did report symptoms?
6           MR. BRUSTIN:  Objection to form.
7    BY MS. RETTS:
8        Q.   The flashbacks?
9        A.   She did, but she was -- the flashback
10   were actually specifically being bound and tied,
11   which she says never happened, what did happen in
12   the prison, and was an expression of how she felt
13   by being bound -- that it was being bound,
14   essentially -- by being handcuffed, by being
15   manhandled the way she is in prison, that was her
16   experience, like being bound and tied and
17   kidnapped.  So, that's how she described it, but
18   that never actually happened with Mark.
19   BY MS. RETTS:
20       Q.   According to her.  So, now, today,
21   she has explained to you what she meant behind the
22   plain words of the ADOC record; true?
23          MR. BRUSTIN:  Objection to form.
24          THE WITNESS:  Yes.
25   BY MS. RETTS:



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
325—328

Page 325

1              Agharkar
2      Q.    And that explanation is different
3  than the plain words on the paper on that ADOC
4  record; true?
5      A.    Sure.
6      Q.    And so, you -- in rejecting the rape,
7  you are expecting Ms. Milke's explanation for why
8  she wrote what she did on the ADOC record?
9      A.    I am.
10     Q.    I'm going to have you look at what's
11  been previously marked -- those are the letters to
12  Joe Marino.  And if you will turn to -- it is
13  Exhibit 214 (indicating).  If you'll turn to
14  what's Bates labeled Milke NSD 003222, and you
15  indicated previously that Ms. Milke did not
16  describe the sexual assault as a rape when she was
17  speaking to you; correct?
18     A.    That's right.
19     Q.    And said it wasn't rape; true?
20     A.    Correct.
21           MR. BRUSTIN:  Objection to form.
22  BY MS. RETTS:
23     Q.    And if you go down about halfway
24  down, it says, "My marriage to Mark was pure hell,
25  I know I was a good wife, but he was always too

Page 326

1              Agharkar
2  fucked up to realize, and when I left, he begged
3  me to come back.  And I couldn't handle his drug
4  abuse.  He raped me once in the summer of 1988,
5  but that's another story."
6     Do you see that?
7     A.    Yes, I see it.
8     Q.    So, Ms. Milke reported to somebody
9  else, Joe Marino, in the 1991 time period that
10  Mark Milke did, in fact, rape her?
11     A.    Yes.  And she does -- and she uses
12  the word "rape," that's right.  But, again, it is
13  consistent with saying it's an unwanted sexual
14  act.  But you are right, she told me that she
15  didn't consider it rape back then.
16     Additionally in here, and especially, as you
17  know, through these letters, I don't know
18  specifically in this letter, she talks about how
19  she's looking forward to having sex, sex is not a
20  hangup for her.  That would not be consistent,
21  right, if rape was some big trauma for her in her
22  life, that she has PTSD from it.
23     Furthermore, just even in that jail letter
24  that you're describing, all she talks about is
25  flashbacks of, oh, this is what happened, I

Page 327

1              Agharkar
2  remember and I feel this way.  But she's not
3  describing anything else other than that because,
4  of course, the purpose is to have them not be
5  handcuffing her and touching her as she walks
6  around.
7     So, even if rape occurred that resulted in
8  some trauma sequela, it certainly don't meet all
9  the PTSD criteria, at least based on that letter,
10  and this -- and the content of these letters would
11  be inconsistent with rape being a major source of
12  PTSD.
13     Q.    Now, if you'll turn to Milke NSD
14  003305 (indicating).  Actually, if you look on the
15  page, a couple of references, NSD 003304, about
16  halfway down the page?
17     A.    I'm sorry?
18     Q.    3304, the NSD, sorry, there's two
19  numbers.  It's the Milke NSD numbers I'm
20  referencing.
21     A.    Okay.  So, 3304?
22     Q.    Yes.
23     A.    Okay.  I'm here.
24     Q.    And about halfway down on 3304, it
25  states, "He made me quit school, there are times

Page 328

1              Agharkar
2  when he was very loving, and then times when he
3  was violent.  I didn't know what was wrong with
4  him, I was so depressed all the time."
5     Do you see that?
6     A.    Yes.
7     Q.    Is that consistent with what Ms.
8  Milke reported to you?
9     A.    Certainly that -- I mean, periods of
10  sadness.  Again, if somebody is saying depression,
11  she does reference depression a number of times,
12  but doesn't mean clinical depression necessarily.
13  I have no doubt that she was sad, I have no doubt
14  that she would have been anxious because of the
15  stressful environment and the relationship --
16     Q.    Mark violent?
17     A.    Right.  So, I believe, if I recall
18  correctly, he threw something at a wall, I think.
19  It didn't hit her, but threatened her.  But -- so,
20  that was my -- that's how I read this.  Because
21  violence doesn't necessarily mean you hit
22  somebody; right?  I have no doubt he probably did
23  throw things around the house, that is described.
24  But, again, she -- this wasn't a good
25  relationship, and she got out of it.



BHUSHAN S. AGHARKAR, M.D.                                          September 25, 2018
MILKE vs CITY OF PHOENIX                                                      329–332

Page 329

Agharkar

1
2    Q.   Were you aware of the domestic
3  violence case that was initiated against Mark
4  Milke, a police officer testified that after Ms.
5  Milke told him that Mark Milke hit her, he saw a
6  red mark on her face?
7    A.   No, I was not aware.
8    Q.   Did you question her in detail about
9  that domestic violence incident and whether she
10 was actually hit?
11   A.   I did not.  Again, I asked the
12 general question, did he ever get physical with
13 you, did he ever hit you, and she said no.
14   Q.   On 3305, at the very bottom, it says,
15 "Mark begged" -- no.  Right after "-- but no dice,
16 he was so obsessed with me, there are many more
17 stories to tell, but they are too involved and
18 long, all I can say, Joe, to make you understand
19 is that Mark was very abusive verbally,
20 emotionally and mentally.  He used to punch holes
21 in the walls and shove my face, and then will say,
22 'This will be your face next, cunt.'  It was
23 awful.  Since I left Mark, I was too scared to be
24 around men."
25      Do you see that?

Page 330

Agharkar

1
2    A.   Yes.  Although, again -- yes, I read
3  this before.  And, in fact, the next thing says to
4  me they all played head games, and it goes on to
5  say, "I want to be upfront with you, you need to
6  be upfront with me, we need to have an honest
7  relationship."
8       That's different than I'm terrified of men
9  and you can't be touched, I'm scared.  So, the
10 context is important in terms of relationship,
11 and, yes, it sounds like their marriage is awful.
12   Q.   And is that consistent with what she
13 reported to you, that he was verbally, emotionally
14 and mentally abusive and would punch holes in the
15 wall and shove her face --
16      MR. BRUSTIN:  Objection to form.
17      THE WITNESS:  That -- up until the
18   details, yes, I was aware of the emotional
19   and verbal abuse; okay?  I wasn't aware in
20   this level of detail of what was happening
21   that he did.  It sounds like a one
22   instance, but obviously it's bad.
23 BY MS. RETTS:
24   Q.   And that type of an instance could
25 cause someone a PTSD reaction?

Page 331

Agharkar

1
2    A.   Sure, it could.  But then the person
3  has to still present the symptoms of having the
4  nightmares, slash, avoidance and hypervigilance
5  symptoms as it relates to domestic violence, which
6  she does not.
7    Q.   Did Ms. Milke ever relate to you an
8  instance where she was out with Ernie Sweat, and
9  became angry because he was possessive and hit
10 him?
11   A.   No, I don't think -- I don't think I
12 asked her about that, but I don't think she told
13 me.
14   Q.   Did she ever report using physical
15 violence against anyone to you?
16   A.   Other than spanking her son, no, not
17 that I recall.
18   Q.   Did she ever report to you having
19 anger issues?
20   A.   I don't know that she would have
21 framed it that way.  I think I have seen reference
22 to that, and she was young and a single mother
23 struggling, I have no doubt, she probably did have
24 some -- anger issues is a broad term.  So, I
25 imagine that that was -- that's true, but I don't

Page 332

Agharkar

1
2  think she described herself that way, as an angry
3  person.
4    Q.   Other than spanking Christopher just
5  for discipline, were there any specifics that Ms.
6  Milke told you about those incidents?
7    A.   Not that I can recall sitting here.
8    Q.   Ms. Milke had a long-term boyfriend
9  before Mark Milke, were you aware of that?
10   A.   Not specifically.
11   Q.   Did you ever see any affidavits from
12 his parents about her, in conjunction with your
13 review of the file?
14   A.   I don't recall reviewing such an
15 affidavit.
16   Q.   Is that someone that you would have
17 wanted to talk to, to get information about how
18 Ms. Milke was before her arrest?
19   A.   Possibly.  I don't know how much
20 contact or how long these two may have been
21 together, I don't know.  So, yeah, sure, that's
22 another potential source of information.  But
23 typically and actually, this is -- these are
24 actually more people than I've already interviewed
25 typically in a case, to do not only interview the



Page 333

Agharkar

1
2  person, but then three other people, you know, the
3  therapist and two other lay witnesses is more than
4  I usually do.
5      Q.   Can you turn to Milke NSB 003653
6  (indicating).  And there is a star at the top, and
7  it says, "What my relationship with Mark was like,
8  pretty sad, warning signs," and there's a list of
9  things that go on for two pages.
10     If you turn to the next page, from a book on
11  relationships, "Now I can see clearly what my
12  marriage was like, also understandable why I don't
13  want to repeat it, I must be fucking blind, but at
14  least now I know the warning signs."
15     Do you see that?
16     A.   Yes.
17     Q.   Go through and look at all those
18  things that she writes as applying to her
19  relationship with Mark.
20     A.   Okay.
21     Q.   These are pretty significant issues,
22  you would agree?
23     A.   He does not sound like a good person
24  based on this.
25     Q.   And she is endorsing that these are

Page 334

Agharkar

1
2  things that occurred in their marriage?
3      A.   Yeah, I, you know -- look, this is
4  not that different from a Cosmo quiz.  For
5  example, one of the things -- and what I mean by
6  that, to clarify, sort of like astrology, this
7  broad statement such as becomes angry when you
8  don't take his advice, and then you're like, yeah,
9  he didn't listen to me, at that time I told him he
10  should buy X, instead he bought Y, and then he
11  blamed me.
12     Yeah, that's exactly, she's thinking about
13  one instance, okay, and then saying that's a
14  relationship pattern, it's not.  So, people can
15  read a lot into these kinds of things.  This is
16  actually probably the problem with one of these
17  personality inventories, as well.
18     But, you know, one of these things that has
19  a dual personality, that's not a thing.  I mean,
20  that's -- again, that's a lay thing, that's not a
21  psychiatric thing.  So, what does that mean?  That
22  means that sometimes you vacillate, you see one
23  person and another person later.  I mean, okay,
24  but what does that really mean, that particular
25  disorder?

Page 335

Agharkar

1
2      It's hard to put too much stock in these
3  things, other than in the sense of, again, it
4  doesn't sound like they had a good relationship,
5  it doesn't sound like he was a nice guy.  But I do
6  noticed here there's nothing at all about being
7  physically violent or, you know, he's a jerk.
8      And, again, substance abuse actually could
9  probably be an explanation for 50 percent or more
10  of these things.  So, anyway, sure, she read it in
11  a book, she wrote it out and applied it to her
12  husband -- ex-husband.
13     Q.   Did you go through and ask her to
14  clarify any of these things in your interview of
15  her, so Number 2, displays violence against other
16  people and things, when you have questioned her,
17  did you ask her to give specifics about what
18  occurred?
19     A.   No.  These things -- because, again,
20  I'm interested in what her experience was in terms
21  of was she ever abused, that kind of thing.
22  Asking her questions about Mark isn't relevant to
23  the issue at hand, I don't care about Mark,
24  honestly.  He's not a nice person, somebody she
25  shouldn't have been married to, but she was, so

Page 336

Agharkar

1
2  this is the situation she got herself into.
3      Q.   So, if Ms. Milke could potentially
4  have experienced trauma by viewing a non-related
5  person in prison harm themselves, why not consider
6  the person she was married to and what she had to
7  witness during the course of that marriage, and
8  why not consider that relevant?
9      MR. BRUSTIN:  Objection to form.
10     THE WITNESS:  Of course.  I didn't
11  say he's not relevant, I don't care about
12  him; okay?  I'm interested in her symptoms
13  and her sequela.  So, yes, of course, so
14  if there had been a deeply abusive
15  relationship in which the man was
16  physically violent toward her, which he
17  wasn't, as far as I can see, right, and
18  that's what she's saying.  Then -- okay.
19  Then that's fine.
20     So, then what are the symptoms of PTSD?
21  So, nightmares about her child, that's not
22  going to be it.  Nightmares about seeing
23  somebody who hurt themselves in prison,
24  that's not going to have anything to do
25  with Mark.  What about, you know,



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
337–340

Page 337

1           Agharkar
2  avoidance of the time, you know -- not
3  being want to be touched by the guards, it
4  just doesn't have to do with Mark, this
5  has to do with what's going on in the
6  prison setting.  So, that's what I mean.
7     Again, it doesn't correlate.  So, sure,
8  is it a positive relationship, in no way
9  -- no bones about it, this is not a good
10  relationship, this is not healthy, and has
11  the potential to cause trauma, sure.
12     But when I talked to her about it,
13  again, this is something you see in
14  relationships, you get used to each
15  other's pathology in a sense; okay?  And
16  so, this is shocking to you and I,
17  obviously, as objective observers, but
18  we're not in the relationship.
19     And so, obviously, there had to have
20  been something positive at least in the
21  beginning of the relationship that brought
22  these two together; right?  And then
23  things obviously didn't work out.  So,
24  again, I think we have to look at what
25  about her, and she, you know -- she made

Page 338

1           Agharkar
2     the choice for herself to get out and to
3     try to better her life for herself and her
4     son, ultimately.  And that was, you
5     know -- she was trying, but this man is
6     still in her life and, you know, I guess
7     to her credit, look at it either way, but
8     to her credit, she didn't cut him out, she
9     said he is the boy's father, so he has
10     some place in my life.  I don't know that
11     I would have made the same choice if I
12     were in her place, but --
13  BY MS. RETTS:
14     Q.   Is a person who has these problems
15  that she lists out here positive role model for a
16  child?
17           MR. BRUSTIN:  Objection to form.
18           THE WITNESS:  I don't know Mark.  It
19     just doesn't sound positive at all.  I
20     also don't know how representative this is
21     of him truly; okay?  These are just
22     statements on -- literally one sentence, I
23     don't think any of us would want ourselves
24     reduced to one sentence, or even 50
25     sentences that are rather broad and don't

Page 339

1           Agharkar
2     provide context.
3  BY MS. RETTS:
4     Q.   And you don't know the context
5  because you did not question Ms. Milke about these
6  items; true?
7           MR. BRUSTIN:  Objection to form.
8           THE WITNESS:  Yeah, that's right, I
9     certainly didn't go through 30 descriptors
10     or statements of a person, and tell me
11     specifically about how often this was
12     occurring.  That would have been -- this
13     would be relevant to a child custody case
14     or parental fitness case, in trying to
15     assess where the child should go and that
16     sort of thing, but not to the question at
17     hand, no.
18  BY MS. RETTS:
19     Q.   Did Ms. Milke tell you that she knew
20  Jim Styers to be a military veteran?
21     A.   Yes.
22     Q.   And she knew him to be disabled?
23     A.   Yes.
24     Q.   She believed him to be manicky before
25  the murder?

Page 340

1           Agharkar
2     A.   I don't recall that specifically, but
3  if she said it, then I won't dispute it.
4     Q.   Did she say it to you?
5     A.   Oh, no, I don't think so.
6     Q.   Do you recall reading that in the
7  letters?
8     A.   I can't place that, I don't recall.
9     Q.   What did she describe her
10  relationship with Jim to be, romantic, platonic,
11  did you get into that?
12     A.   Totally platonic, because I asked
13  about that.  And actually, that's why she said
14  he's ten, 15 years older than me, and goes to say,
15  I would not be romantically interested in somebody
16  like that, that's how that came up, you know.
17     So, he's quite a bit older, apparently, than
18  her, but that it was -- it was a friendship and he
19  seemed nice.  He certainly -- I think he has his
20  own daughter, a young daughter, and so I think the
21  kids played together.
22     But it was a platonic thing, and I said, you
23  know -- because I assumed, she moved in with the
24  guy, maybe there's some romantic thing happening,
25  and she was like, no, no, no, it's, again, I'm on



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                                   341–344

Page 341

Agharkar

2 my own here, so I'm trying to make ends meet. It
3 was a way -- I think he may have offered you can
4 stay with me, and that would be just a way of
5 sharing expenses, and that's what it was.
6      Q.   Do you recall reading in the letters
7 that Ms. Milke told Joe Marino that she always
8 thought she'd end up with an older man?
9      A.   I think I did see that.
10     Q.   Did you question her about that
11 discrepancy?
12          MR. BRUSTIN:  Objection to form.
13          THE WITNESS:  I didn't -- I didn't.
14     I mean, she writes a lot of things in
15     these letters, and some of them are just
16     so -- they're false or they're just
17     fantastical, it's really hard to believe a
18     lot of what's written in here to Marino, I
19     mean.
20 BY MS. RETTS:
21     Q.   So, did you then determine that the
22 letters that she wrote were not believable, and
23 that her interview was --
24          MR. BRUSTIN:  Objection to form.
25          THE WITNESS:  I viewed -- and I

Page 342

Agharkar

2 can't -- I can't whole cloth say, oh,
3 these -- all of these letters to Marino
4 are unbelievable, but a lot of them are.
5 I mean, a lot of them are very -- again,
6 there's -- there's simply no way given the
7 lack of a personal relationship, in terms
8 of just even being around this person that
9 she can, you know -- she -- she's --
10 basically it's all fantasy, the guy is a
11 blank page, so to speak, so she's just
12 talking about how she can be all these
13 things and how their life can be so
14 perfect and we're going to get married and
15 decorate the house a certain way and all
16 those kind of stuff.
17     Again, it's somebody who's so -- almost
18 divorced from the situation.
19     And granted, I'm reading this with
20 hindsight, right, realizing you don't know
21 what's about to go down, like it's going
22 to be -- it's going to be really bad, and
23 I can't believe what you're thinking here,
24 or writing.  But there's truth in that in
25 the sense of saying it that, you know,

Page 343

Agharkar

2 look, you really don't appreciate your
3 circumstance, you know, you really don't
4 appreciate the amount of trouble that you
5 are facing, to be writing all these things
6 to somebody you don't even know, you know.
7 And so, that's why I don't find it
8 believable.  I don't think the
9 relationship is real.  I mean, I believe
10 the man exists.  But I'm just saying that
11 the relationship is not one that's a real
12 relationship.
13 BY MS. RETTS:
14     Q.   Do you believe that she wrote false
15 things --
16          MR. BRUSTIN:  Objection to form.
17          THE WITNESS:  No, I'm not saying that
18     she's knowingly lying in these letters to
19     him.  I think she maybe believes it or
20     wants to believe it, but it's a fantasy is
21     what I'm saying, that's very clear from
22     these letters.
23 BY MS. RETTS:
24     Q.   A fantasy relating to their
25 relationship?

Page 344

Agharkar

2     A.   Yes.
3     Q.   Or -- fantasy versus the
4 relationship, you think yes.  So, what about the
5 actual things that she writes in the letters about
6 her life events, what did you -- how did you deal
7 with those?
8          MR. BRUSTIN:  Objection to form.
9          THE WITNESS:  You know, all I know --
10     we've talked earlier about when you make a
11     diagnosis of a personality disorder.  This
12     is a time of great stress, probably,
13     really next to the child's murder, I mean,
14     I don't know if there can be any more
15     imaginable stress of being charged with
16     the murder and on trial for your life;
17     okay?  And that's the context in which
18     these letters are written, that's about te
19     year or so, it's pretrial, to right around
20     the time of the trial; okay?
21     So, you know -- and, again, of course,
22     she has no memory, I can't -- I can't ask
23     her about these things, there's no --
24     there's nothing there to explore with her.
25     So, I just -- I don't know what's reality



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              345–348

Page 345

1            Agharkar
2      and what's not in this, but I would just
3      tell you that there's a lot of fantasy in
4      here.
5  BY MS. RETTS:
6      Q.   How do you know that the relationship
7  with Joe Marino wasn't real --
8          MR. BRUSTIN:  Objection to form.
9          THE WITNESS:  Common sense.  So, it
10     may be -- people can have imaginary
11     relationships in their mind and think
12     they're real, but they're not.  Because of
13     several things, right, knowing what I know
14     about jails, prisons, I don't know how
15     much time these two could ever possibly or
16     spend around each other to have gotten to
17     know each other very much; okay?  There
18     may very well have been men and women
19     around each other, but they -- unless
20     things are changed drastically, they do
21     try to separate men and women in jail
22     settings; okay?
23         Secondly, again, because the -- the --
24     there's a statement, I believe, in a
25     letter somewhere of I don't really

Page 346

1            Agharkar
2  remember what you look like.  And you
3  could say that's a passage of time, but
4  it's not that much time, I mean, we're
5  talking about here.  These letters all
6  happened in a year, so we're talking about
7  a matter of months, but they wouldn't have
8  seen each other and she doesn't remember
9  him.
10     And then, again, like I say, I mean,
11  all of these things -- I think, honestly,
12  what came across to me was a woman who's
13  drowning, and this man is a lifeline;
14  okay?  And the idea of the man as a
15  lifeline, that's the more important part,
16  because -- so, she's just like we're going
17  to have this perfect life, it can be
18  wonderful, I can get out of this whole
19  situation, and this is how our life will
20  be -- view, you know, the white picket
21  fence, and all of a sudden, nonsense.
22     But clearly, it's not going to happen;
23  right?  But that's what comes across these
24  letters, and that's why, again, in her
25  mind, maybe this was real, I don't know,

Page 347

1            Agharkar
2      but I can't say.  But I know she was under
3      a great deal of stress, and I think this
4      provided at least some outlet for her in
5      some way that she could grasp onto, that
6      she may believe could be a way out.
7  BY MS. RETTS:
8      Q.   Do you think Ms. Milke had a problem
9  with discerning reality from fiction?
10         MR. BRUSTIN:  Objection to form.
11         THE WITNESS:  So, if you're asking me
12     if she has a psychotic disorder, no, I
13     don't believe she has a psychotic
14     disorder.  I would say that under stress
15     and people who are under -- who have been
16     traumatized can disassociate.  I don't
17     know if that's what happened here, and I'm
18     not saying she has a hard time
19     distinguishing fact from reality.
20     I think that due to the trauma, she
21     can't remember certain things, that's
22     normal.  So, no, I don't think she's
23     reality-impaired, I'm just saying that in
24     looking at these letters, that's what
25     certainly comes across to me as a

Page 348

1            Agharkar
2  clinician, these are fantastical.
3  BY MS. RETTS:
4      Q.   You don't hold the same opinion as
5  the letters from Felix?
6      A.   I do not.  Those happened later.
7  There are elements in there that are more real, I
8  mean, because they're actually arguing in there.
9  There's actually conflict, there's actually -- so,
10  there, there seems to be something more, something
11  even more actually reality-based.  And it's not
12  like she's just making diary entries necessarily,
13  whereas some of these cases -- some of these
14  letters, that's what they seemed like.
15     Q.   Did you cross-check the historical
16  information she provided in the Joe Marino
17  letters, to the historical information she
18  provided in the Felix letters to determine if they
19  were consistent?
20     A.   Well, no since didn't read every
21  Marino letter also time intensive answer is no as
22  a psychiatrist I would not do that.
23     Q.   Consistency between the information
24  now would be important to you to determining
25  validity; true?



BHUSHAN S. AGHARKAR, M.D.                                    September 25, 2018
MILKE vs CITY OF PHOENIX                                              349–352

Page 349

Agharkar

1
2     MR. BRUSTIN:  Objection to form.
3     THE WITNESS:  Validity of what,
4     though?  That's what I'm saying.
5     historical information, okay, maybe, it
6     could.  Does that necessarily play a role,
7     though, in the diagnosis of PTSD or
8     complex trauma?  Maybe, maybe not.  It
9     depends on what the historical information
10    is.  Like I said, if she says where she
11    was on April 14th of 1990, I don't care,
12    it's not relevant to the inquiry at hand,
13    that's some different information
14    somewhere, as well.
15 BY MS. RETTS:
16    Q.   Right.  If she is reporting something
17 about her childhood sexual abuse seems consistent,
18 perhaps something later, that would be something
19 important to you?
20    A.   Yes, that's right.  If I saw a
21 sequela of that, that would make me suspect.
22 Because I'm always suspecting in my head, I'm
23 always having to figure out where could these
24 symptoms possibly be coming from; right?  And so,
25 I'm looking at various sources of trauma and I

Page 350

Agharkar

1
2 have to decide what I think that's likely going to
3 be using clinical judgment and, of course, my
4 experience.
5     And that's how I determine -- that's how my
6 determination is, it's more got to do with the
7 prison experience, as well as the trauma of her
8 son's murder.
9     Q.   From what you observed, do you see
10 that Ms. Milke has a difficult time in dealing
11 with stress?
12    MR. BRUSTIN:  Objection to form.
13 BY MS. RETTS:
14    Q.   Life stressors?
15    A.   She does now, yes.  Definitely yes
16 now.  Back then, this is hard to know necessarily,
17 she was young, she was 25, I think all of us would
18 have difficulty with life stressors when you're at
19 that age, particularly when you have a young child
20 and you're on your own.
21    But I think that she was resilient in a
22 sense that I think she had -- she maybe had some
23 changes of jobs at that time.  There was a job, I
24 think, with an insurance company, perhaps, that
25 she was doing, and it seemed to be going

Page 351

Agharkar

1
2 somewhere, seemed to be stable.  And that she was
3 trying to make decisions that were healthier and
4 better for her; okay?
5     And so, it seemed like from what I've been
6 able to review, she dealt with stress reasonably
7 well then, you know, for a 25-year-old.  I think
8 now, I think it overwhelms her, I think that
9 because of both depression and anxiety, as well as
10 trauma symptoms, I mean, again, the way I look at
11 it is -- the way I teach people about it, really,
12 is water in a glass; right?
13    And so, the trauma and the stress and the
14 bag that you come with, that means that your glass
15 level already has this much water in it, maybe 80
16 percent full.
17    Whereas for me, maybe it's 40 percent full
18 is what I've been through in my life, right, it's
19 not nearly that same amount.  So, you get a new
20 stressor that involves -- that can be little or it
21 can be a series of little stressors.
22    Well, somebody who comes in with a lot of
23 bags and a lot of trauma, that glass is already
24 full and it overflows, it's too much for that
25 person that he can't deal with it.  Whereas me, I

Page 352

Agharkar

1
2 can handle more stress, I have more reserve; okay.
3    So, that's an example how I think, yes, she
4 does have a hard time with stressors now.
5    Q.   And your testimony is that the Joe
6 Marino letters are evidence of difficulty in
7 dealing with stress at the time of her trial?
8    A.   No, I don't think I said that.  I
9 said that what that is an indication of is why she
10 can't remember it now, I think because it was such
11 a stressful time, that's why she can't remember it
12 now; okay?  I think at that particular time, what
13 I'm saying is the thing she was writing and maybe
14 the kinds of ways in which she believed what she
15 was saying is because of what she was going
16 through.
17    In other words, these letters are more of a
18 factor of her situation than it has anything to do
19 with Marino, it could have been some other guy,
20 because it's really a blank slate.  She doesn't
21 know anything about him, he doesn't know anything
22 about her, it's not a real relationship.
23    Q.   Did you go back and see whether Ms.
24 Milke has a history of interacting with men in
25 this manner?



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
353–356

Page 353

Agharkar

2    A.   I think I need clarification.  In
3  what manner?
4    Q.   In that kind of obsessive and
5  ruminating manner.
6        MR. BRUSTIN:  Objection to form.
7        THE WITNESS:  I wouldn't characterize
8    what she's writing here as obsessive and
9    ruminating, I just think that it's a
10   fantasy.  I think there's been some -- I
11   think the relationship with Ernie Sweat
12   may fall in that category, perhaps, these
13   are difficult, I mean, because you got to
14   hear this guy's version of it, too, and
15   there may be motivation as to why he may
16   want to talk about it or not, I don't
17   know, you know.  So, again, it gets tricky
18   fast.
19      So, there may be elements, yes, in the
20   past where I've seen things like that, but
21   I don't know that she just has this
22   relationship with men where everything
23   becomes an obsessed, she wasn't obsessed
24   with Mark, I mean, so -- and so, no, I
25   didn't see that necessarily other than

Page 354

Agharkar

2  what happened with Mr. Sweat.
3  BY MS. RETTS:
4    Q.   Would you agree that she had some
5  fantastical thinking about her relationship with
6  Mark Milke, in terms of whether he was ever going
7  to be a responsible father?
8        MR. BRUSTIN:  Objection to form.
9        THE WITNESS:  Maybe, I wouldn't quite
10   put it that way.  I think the way I would
11   characterize that is, this is a bad
12   situation, but this person has a hold on
13   me now because this is the father of my
14   child, so I've got to try to make this
15   work in whatever way I can make it work,
16   that's different and that's trying to work
17   it out for the sake of the child, and I
18   think that's different than being obsessed
19   with somebody.
20  BY MS. RETTS:
21    Q.   Fantastical?
22    A.   Fantastical, I'm sorry, I missed the
23  term.  And so, I don't -- so, I'm not sure that
24  she had that fantasy that, oh, everything is going
25  to be hunky-dory, this guy is going to get clean

Page 355

Agharkar

2  and he's going to all of a sudden become a great
3  guy.  And maybe she harbored that idea; okay?  But
4  I don't know that she thought, okay, we're
5  definitely going to be great and fine, and we're
6  going to get remarried or whatever, come back
7  together.  I think, frankly, this is, you know --
8  in domestic disputes, this is what you see with
9  people, you know, where people will stay in
10  relationships maybe longer than they should, and
11  they try to make things better, it doesn't work
12  out a lot of times.
13    Q.   Now, Ms. Milke testified that she
14  believed that having a child, Christopher, would
15  cure Mark Milke's drug abuse, and that once he had
16  a child, that those problems would go away, would
17  you agree that --
18        MR. BRUSTIN:  Objection to form.
19        THE WITNESS:  I totally agree with
20   that.  Other than to say that that's a
21   very common fantasy.  And that's a
22   different fantasy than what I'm referring
23   to in these letters with this Marino guy;
24   okay?
25      I think that is -- it's an

Page 356

Agharkar

2  idealization, I might call that -- and the
3  hope.  I mean, my God, how many women have
4  thought like that, or expressed thoughts
5  like that, okay, the man will change if he
6  has a child, if we have a child together,
7  this will fix our problems.  Very common
8  thought, very common mistake.  And I'd
9  like to say, actually, that that's better
10  now than maybe it was in '88, but I
11  definitely know it was prevalent -- that
12  was a prevalent way of thinking certainly
13  in the '90s.
14    I'm hoping it's less so now, I hope
15  people are waking up when they're waking
16  up, that ain't going to happen, you can't
17  do that, you can't hope to change your
18  life or make it better by having a kid
19  with a man.
20  BY MS. RETTS:
21    Q.   So, as part of your analysis and your
22  opinions in this case, did you go back and do any
23  type of retrospective analysis of Ms. Milke's
24  relationship with men to see if a kind of
25  fantastical notion existed in her other



Page 357

1              Agharkar
2   relationships?
3          MR. BRUSTIN:  Objection to form.
4          THE WITNESS:  I don't think I -- I
5      didn't do an explicit analysis for that.
6      It was just a matter of what came through
7      as I'm reviewing the materials.  I don't
8      have this kind of letters in the volume
9      that we're talking about here with Mark,
10     you know, predating incarceration.  So,
11     the same kind of data, that just doesn't
12     exist, so I really couldn't have an
13     opinion about that, that's firm.  I don't
14     see data suggesting that's true, let's put
15     it that way.
16  BY MS. RETTS:
17     Q.   It could be there, you just don't
18  have it?
19     A.   It's possible, but I don't have it,
20  that's right.
21     Q.   And you did not go through Ms.
22  Milke's criminal trial testimony specifically
23  looking for that?
24     A.   That's true.
25     Q.   Did you review any photographs of

Page 358

1              Agharkar
2   Perryville Prison or Ms. Milke's prison cell?
3          MR. BRUSTIN:  Objection to form.
4          THE WITNESS:  No.
5   BY MS. RETTS:
6      Q.   Did Ms. Milke discuss with you the
7   first arrest that Mark had when the police came in
8   to their home?
9      A.   I know he had been arrested, I do not
10  know the details that I can recall here about how
11  he got arrested or what happened.
12     Q.   He was suspected of dealing cocaine,
13  do you have a recollection of that?
14         MR. BRUSTIN:  Objection to form.
15  BY MS. RETTS:
16     Q.   Before they were married?
17     A.   I think I knew that, but I don't -- I
18  didn't know he was arrested for that, not that I
19  can remember, anyway.
20     Q.   Did Ms. Milke discuss with you an
21  incident where she was alerted that Mark Milke
22  took Christopher to a house that was believed to
23  be a drug house?
24     A.   I think I knew that, yes.
25     Q.   What do you remember?

Page 359

1              Agharkar
2      A.   But we didn't really discuss it, I
3   don't think, I think that maybe -- maybe that was
4   an example of bad behavior, that couldn't be
5   trusted, a kind of drug problem, maybe that's how
6   it came up.
7      Q.   Did you talk to Ms. Milke about what
8   she's done to go through efforts to grieve for her
9   son?
10     A.   Other than she says that's what we
11  are starting to work on in therapy, of course, I
12  have the ability to talk to her therapist about it
13  too, who says we are a long way away from being
14  able to get into any of this stuff in any detail.
15  There's just so many layers, it's so difficult,
16  she breaks down so often, that it's going to be a
17  long process to be able to uncover these things.
18  So, again, other than what I think I mentioned
19  earlier about releasing balloons in the backyard
20  and -- the things we talked about were some of the
21  reminders she sees, you know, typically when she's
22  around children that are young as Christopher was,
23  or when she spends time with her nephew who is
24  like Christopher's age would have been had he been
25  alive today.

Page 360

1              Agharkar
2      Those are ways in which -- it just reminds
3   her of what she's lost, and of course, that goes
4   to also how much time she's lost in her life.
5      Q.   Did she speak with you of any type of
6   positive thing that she wanted to do to remember
7   Christopher, such as a scholarship or a park bench
8   or a piece of playground equipment, anything like
9   that?
10         MR. BRUSTIN:  Objection to form.
11         THE WITNESS:  I don't recall asking
12     her about that, I don't think we
13     discussed --
14  BY MS. RETTS:
15     Q.   Did she tell you where Christopher's
16  ashes are?
17     A.   I can't recall that.  She -- she may
18  have, I don't remember.
19     Q.   Has she been to visit them?
20     A.   I don't know.
21     Q.   As far as the nightmares with
22  Christopher, she had nightmares of losing him,
23  that he was abducted and having to search for him?
24         MR. BRUSTIN:  Objection to form.
25         THE WITNESS:  Yes, sir, also some



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              361–364

Page 361

1                 Agharkar
2         other deem talk not consider nightmare as
3         much as drive or wistful dreams.
4    BY MS. RETTS:
5         Q.    No other specific nightmares that she
6    reported relating to Christopher?
7              MR. BRUSTIN:  Objection to form.
8              THE WITNESS:  Not that I can recall,
9         that's right.
10   BY MS. RETTS:
11        Q.    Did she report any nightmares related
12   to Mark Milke?
13        A.    No.
14        Q.    When Ms. Milke talked about waking up
15   at 3:00 a.m. because this was her routine in
16   prison, did she talk to you about wanting to
17   change that, and that distressed her anyway?
18        A.    Yes.  She knows it's messed up.
19   She -- she's tired a lot, but -- and she wishes
20   it wasn't the case, but -- there's two things that
21   happened, one is that she wakes up from dreams or
22   from the nightmares, and then the others are just
23   that is also when she'll wake up.
24        So, it can happen both ways that she would
25   wake up early in the morning, but she definitely

Page 362

1                 Agharkar
2    wakes up early and it bothers her, yes.
3         Q.    What time does she go to bed?
4         A.    Typically, if I'm remembering right,
5    around 10:00 or so.  I could be mistaken, but I
6    feel like that's what she told me.
7         Q.    Did she explain to you why it was
8    that she had the 3:00 wake-up time?
9         A.    Well, I think breakfast comes fairly
10   early at the jail -- at the prison, I mean, and
11   that is typically, that's accurate, I mean, they
12   typically do come very early.  But I think one of
13   the reasons why she was getting up is because it
14   was quiet, and that was good, there was -- maybe
15   that felt safer I don't know, but it was quiet on
16   the unit at that time, so she could have sort of
17   at least some quiet time.
18        Q.    It was your understanding that would
19   have been a personal choice of hers?
20             MR. BRUSTIN:  Objection to form.
21             THE WITNESS:  In part, it's a
22        reaction to the environment she is in.
23   BY MS. RETTS:
24        Q.    The PTSD criteria of exposure to
25   actual or threatened death or serious injury,

Page 363

1                 Agharkar
2    other than the potential for an execution date,
3    what do you contend meets that criteria?
4         A.    Prison is a violent place, prison is
5    a dangerous place, you are at the mercy of guards
6    who can abuse you, who can take advantage of you.
7    You are also at the mercy of inmates, essentially,
8    who can do something to you.  Even if they don't
9    do anything to you, you're aware that they do
10   things to each other, and can do things to each
11   other.  You have to always be watching your back,
12   you have to be always aware that there's a threat
13   at any time.  That would be the criterion A.
14   Being sentenced to death, having to live in that
15   situation, over your head, knowing that you are to
16   be executed or whatever, that is a trauma, that is
17   an event that would lead to death; okay?  So, that
18   would be a criterion A in this instance.  So --
19   so, that's what I was thinking of as it relates to
20   her imprisonment.
21        Q.    And for the threat from other
22   inmates, is it your understanding that Ms. Milke
23   was ever exposed to any other inmates when she
24   wasn't escorted by guards?
25        A.    As far I know, no.

Page 364

1                 Agharkar
2         Q.    Your understanding Ms. Milke was in
3    fact when transported only inmate present corridor
4    outside everybody else was locked down?
5         A.    Yes, that's correct.  Now, of course,
6    these inmates do not have to be going at her,
7    right, I mean, she could be witnessing, and she
8    did witness self-harm or potentially harm among
9    these other folks.  I do want to -- keep in mind
10   because I think this is important, the guards were
11   in control of her, and so she was able to tall me
12   about two instances that she can recall, and she
13   was very, very distressed recalling them because
14   of panic type symptoms.
15        One of them we have discussed already about
16   the fire and being trapped in her cell, and other
17   was a time in the showers, where, for whatever
18   reason, there was some disturbance, something
19   happened outside, so everyone's on lockdown, and
20   they wouldn't get her out of the shower.
21        And so, again, the steam built up, it was
22   extremely hot, she couldn't breathe, again, she
23   started getting very anxious, having a panic
24   attack and she couldn't get out, they wouldn't let
25   her out.  And so, again, these are two examples,



BHUSHAN S. AGHARKAR, M.D.

MILKE vs CITY OF PHOENIX

September 25, 2018

365—368

Page 365

Agharkar

1
2  but I think they're representative of what can
3  happen and what she is aware of happening, is that
4  she's not in control of her circumstance.
5      And she also knows that it was up to them,
6  they'll just let her die, they don't care what
7  happens to her, that's what she would be thinking;
8  right?  Because I'm going through all this panic,
9  I'm yelling for help, I'm saying "get me out, get
10  me out, get me out," and they don't do anything,
11  and they keep blaming the rules or the
12  regulations, handle the other people first,
13  meanwhile I'm in here feeling like I'm about to
14  die.  So, again, that is the trauma of being
15  imprisoned for her.
16      Q.    Have you seen a shower in prison
17  before?
18      A.    I have.
19      Q.    Were those controlled by the inmates,
20  the water, on and off?
21      A.    So, I think it's going to depend.
22  I've only seen some of the male showers, and I
23  actually do not know the answer to that.  I've
24  never had to observe or witness a prisoner shower.
25      Q.    So, when Ms. Milke reports that the

Page 366

Agharkar

1
2  shower was extremely hot and there was steam, you
3  don't know whether or not she could have just
4  turned the shower off?
5      A.    I'm assuming that she could not have,
6  I mean, otherwise she would have.
7      Q.    You're assuming that that report is
8  accurate; true?
9      A.    Yes.
10      Q.    And you didn't do anything to test
11  whether that was, in fact, the case, such as
12  asking to see pictures of the shower to see if it
13  could be turned off by the inmate?
14      A.    Right.  You know, in her -- this is
15  hard to describe to you -- see it, but as I'm
16  talking to her about it, she's reliving it.  You
17  can see the breathing get faster, you can see her
18  getting kind of more and more upset and more
19  anxious, and just having, you know -- about
20  recounting -- not there was a trauma that she's
21  now living with forever, it's that the -- it's the
22  panic.
23      And like I said, you know, the panic
24  attacks, she's almost having one in front of me,
25  thinking about this happening again.  It's hard to

Page 367

Agharkar

1
2  take.
3      Q.    And you don't know whether she had
4  any ability to control the temperature of the
5  water in that shower; true?
6      A.    That's true.  I have to assume this
7  was not self-inflicted, I mean, it just wouldn't
8  make sense based on the sorry she's telling.  If
9  she could have just reached up and shut the water
10  off, she would have done it.
11      Q.    What did you do to try to test
12  whether she was exaggerating?
13      A.    It's really -- I certainly -- there's
14  no one to interview about a shower incident that
15  occurred 20 years ago.  I'm not sure how I would
16  go about doing such a thing.  I can only go on her
17  self-report, and on her description to me, and my
18  visually seeing what's happening to her as she's
19  describing it.
20      And, again, I'm not saying she has PTSD for
21  being stuck in a shower.  I'm saying that is a
22  concrete example of how you are not in control of
23  your environment, it's real to her, that she's at
24  the mercy of these guards, guards who have
25  sexually harassed her, guards who are watching

Page 368

Agharkar

1
2  them just not care about other inmates who might
3  say comments like, you know, "One less mouth to
4  feed" when somebody dies in the unit; okay?
5      So, in the context of that environment, she
6  understands that her life is forfeit, right, it's
7  completely built upon their ability to help her.
8  That's what I'm talking about, that's the
9  traumatizing environment.
10      Q.    Again, based upon her self-report;
11  true?
12      MR. BRUSTIN:  Objection to form.
13  BY MS. RETTS:
14      Q.    You did not interview any guards?
15      A.    I did not.
16      Q.    Did you not look at any other source
17  of data to confirm any of the information that she
18  had told to you?
19      MR. BRUSTIN:  Objection to form.
20      THE WITNESS:  I did not.
21  BY MS. RETTS:
22      Q.    And is it your testimony that
23  witnessing a trauma that somebody else
24  experiences, such as the other inmate inflicting
25  harm upon themselves meets criterion A for PTSD?



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                                  369–372

Page 369

Agharkar

1
2      A.    Yes.  That's not the only way,
3    obviously, but sure.
4      Q.    In every instance?
5      A.    No, that's not what I'm saying.  I'm
6    saying it does meet the criteria, but not in every
7    instance.
8      Q.    Was there a specific scholarly
9    article that you relied upon, or treatise that
10   you're aware of that endorses a view that
11   witnessing somebody else and not actually commit
12   the act, but to my understanding, she did not see
13   anybody actually try themselves, she saw the
14   medical response afterwards?
15     A.    Well, yes, but -- and she also saw
16   the inmate on fire, she said she saw it, you know,
17   not actually setting herself on fire, but being
18   pulled from the cell on fire.
19     Q.    So, what scholarly article or
20   treatise are you aware of that would classify that
21   as something within criteria A?
22         MR. BRUSTIN:  Objection to form.
23         THE WITNESS:  Does the DSM not say
24         it?  I don't have the DSM in front of me,
25         I haven't memorized it, but witnessing

Page 370

Agharkar

1
2         another traumatic event such as somebody
3         killing themselves would meet criteria.
4         Again, you have to do an assessment
5         further about the effects of that on a
6         person.  But, sure, witnessing something
7         bad happening to somebody else, you can
8         have PTSD from witnessing a terrible car
9         accident.
10   BY MS. RETTS:
11     Q.    Did Ms. Milke believe in that
12   instance, did she report to you that she believed
13   that she was personally in danger of serious
14   injury or death as a result of what she witnessed
15   happening to somebody else?
16     A.    I mean, obviously, she's not at risk
17   for setting herself on fire by watching somebody
18   else set on fire.  It's rather -- it's the
19   knowledge that this is going around -- going on
20   around her, and that bad things could happen to
21   her.  She's at risk of serious bodily harm, again,
22   through her having a panic attack, which, you
23   know, it feels like you're about to die, I mean,
24   it feels like you're having a heart attack, you're
25   not, but it feels that way, and help won't come.

Page 371

Agharkar

1
2         And so, you are in this environment in which
3    you know that's what's going on.  So, again,
4    that's why complex trauma, I think, is a better
5    descriptor than sort of the acute PTSD because
6    it's these multiple traumas that are happening
7    longitudinal over time that purveyed everything in
8    terms of your understanding of your world and your
9    beliefs.
10     Q.    Did I understand correctly that if
11   someone believes that they were having a panic
12   attack, that could lead to PTSD?
13         MR. BRUSTIN:  Objection to form.
14         THE WITNESS:  No.  No, that's not
15         what I'm saying.  I'm saying if there's a
16         panic attack and you feel like you're
17         about to die, and people won't let you
18         out, people won't help you, then you are
19         aware that you are in a circumstance in
20         which serious bodily harm could occur to
21         you, and help won't come, and you can't
22         help yourself either.
23         And, again, also, if you're surrounded
24         by people who, you know, have psychiatric
25         conditions or violent or there's fights,

Page 372

Agharkar

1
2         all these things going on around you,
3         you're certainly well-aware, while it's
4         not happening to you right now, it could
5         happen to you, potentially.
6    BY MS. RETTS:
7      Q.    Do you believe that all inmates
8    incarcerated in the prison setting have PTSD as a
9    result of being in prison?
10     A.    No.  I do believe that prison is a
11   traumatizing environment, but, no, certainly not
12   all the prisoners have PTSD or complex trauma.
13     Q.    That would be true for all prisoners,
14   though, what you said, that if any prisoner could
15   feel like if they were having a panic attack,
16   people come to help them and serious bodily harm
17   occur to them?
18         MR. BRUSTIN:  Objection to form.
19         THE WITNESS:  If they experienced it
20         themselves, I suppose they could, sure,
21         they wouldn't necessarily have.  And,
22         again, I'm not saying she has
23         nightmares -- full PTSD symptoms from --
24         from having a panic attack and nobody
25         helping her.  Because we were talking



BHUSHAN S. AGHARKAR, M.D.                                    September 25, 2018
MILKE vs CITY OF PHOENIX                                              373–376

Page 373

Agharkar

1
2      about how does this meet criterion A, and
3      I'm saying the environment is one in which
4      serious bodily harm can occur, and that's
5      what it is to be in prison.
6          And for her, she's seeing it and she's
7      experiencing it, but help doesn't come
8      when she needs it.  So, that's what I'm
9      saying about her.  Another prisoner could
10        experience something similar, it may not
11        have sequela --
12    BY MS. RETTS:
13        Q.    Did she report ever personally
14    experiencing something that she needed help for,
15    and help did not come?
16        A.    The two that I just talked about, I
17    mean, the shower and being in the cell -- pepper
18    spray that's coming in there, but particularly the
19    fire, the inhalation of smoke, and help eventually
20    came, but she was the last one.
21        From what I understood, she was the last
22    person that they were going to be able to let out
23    because they had to make sure everyone else is
24    secure first because of her charges.
25        Q.    And that was something that was being

Page 374

Agharkar

1
2    experienced by other people, what about something
3    specific to her that she was experiencing a unique
4    event, only to her, not other things going around,
5    like the panic attacks and help not coming,
6    anything like that?
7        A.    Well, wait a minute, as I said,
8    the -- well, I don't know about the shower, there
9    may be other people, that may have been just
10    unique to her, I don't know.  The fire may have --
11    other people may have experienced, but they were
12    being let out sooner than she was.  They were
13    getting out first because they didn't have her
14    seriousness of charges.  See what I'm saying?  She
15    was isolated because of being on death row.  So,
16    that was the problem, the problem is they wouldn't
17    get her out.  And I'm not sure, by the way, that
18    everybody was experiencing -- I just don't know
19    the vent system.
20        Q.    Right.  And you understand that to be
21    a secondary issue, though, because there was a
22    fire involving somebody else, and the secondary
23    issue was really to Ms. Milke.  And then there was
24    some other issue, and the secondary issue was
25    related to Ms. Milke being in the shower; right?

Page 375

Agharkar

1
2        A.    Right.  We may be talking about two
3    different fires now.  I'm not talking about the
4    inmate who set herself on fire, I'm talking about
5    the fire in the prison that she was inhaling
6    smoke.
7        Q.    But her cell was not on fire?
8        A.    Correct, her cell was not on fire.
9        Q.    So, anything where the primary events
10    was related to her that she was experiencing the
11    primary event is someone did not come to her
12    aid --
13        MR. BRUSTIN:  Objection to form.
14    BY MS. RETTS:
15        Q.    So, an example, the primary events to
16    her might be trying to hang herself in her cell
17    and nobody came?
18        A.    Right.
19        Q.    So, was there a scenario that she
20    reported to you where she had a primary event or
21    circumstance happen to her and people did not
22    come?
23        A.    Other than what I described in the
24    shower, no.  Again, we've talked about the sexual
25    harassment issues, we've talked about the stripped

Page 376

Agharkar

1
2    searches, we've talked about all that in the sense
3    that that is the milieu and that's context of the
4    environment in which all these things are
5    happening, which cannot be ignored.  But to drill
6    down specifically on what you're talking about,
7    the only thing I can think of is the shower.
8        Q.    And the shower, there was something
9    else going on, like a disturbance in the pod?
10        A.    Correct.
11        Q.    And so, Ms. Milke wasn't causing a
12    disturbance?
13        A.    Correct.
14        Q.    Ms. Milke was in the shower while
15    they were dealing with the disturbance or a riot
16    or something like that?
17        A.    That's right.
18        Q.    Did she see the disturbance?
19        A.    No, I think that that -- that was the
20    explanation she was being given as to why they
21    weren't getting her out, there was something going
22    on.  I don't know what it was exactly, but --
23        Q.    So, she did not have any visual
24    understanding of what was going on in the prison
25    that led to her being in the shower?



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              377–380

Page 377

Agharkar

1   
2     A.   Correct.
3     Q.   In your report on page 7, in the
4   footnotes -- and there are some citations in those
5   footnotes?
6     A.   Yes.
7     Q.   Did you go out and obtain those
8   yourself or were those provided to you by
9   Plaintiff's counsel?
10    A.   I would have -- I think I already had
11  them from either prior searches, or had been
12  provided to me in the other cases I had done.  But
13  I don't recall reading them from them -- I looked
14  at that.
15    Q.   Footnote 3, Craig -- solitary
16  confinement -- torture device, the citation is to
17  PBS.org?
18    A.   Yes.
19    Q.   That is not a scholarly research
20  publication; true?
21    A.   I agree.
22    Q.   The second reference -- or
23  Plaintiff's Number 4, the second reference below
24  that is American Civil Liberty Union, the
25  dangerous overuse of solitary confinement in the

Page 378

Agharkar

1   
2   United States, that is a publication put out by
3   the ACLU; true?
4     A.   Yes.
5     Q.   That is not a peer-reviewed article?
6     A.   Well, no, it's not a scientific
7   journal, certainly, back then.  That's right, I'm
8   not claiming it is.
9     Q.   Is anything cited within Number 5 a
10  scientific journal?
11    A.   Well, ostensibly, the Canadian
12  Journal of Criminology and Criminal Justices,
13  sure, that sounds like a journal.  You know,
14  again, these are things I've read over time.  And
15  the point is, is that there -- we're talking
16  about -- because specifically we're talking about
17  solitary confinement, and then wrongful
18  conviction, you're not going to ever have a
19  perfectly controlled trial in either subject.
20    So, you have to look at literature, case
21  reports, descriptions, and whether that jives with
22  clinical experience and what we see, and it does.
23  So, that's why I'm referencing it there.
24    Q.   And I asked my question a little
25  different.  I'm interested in whether any of those

Page 379

Agharkar

1   
2   you know to be scholarly sources?
3     A.   I don't regularly read the Canadian
4   Journal of Criminology and Criminal Justice, but
5   that certainly, to my knowledge, is -- would be a
6   peer-reviewed journal.  But I'm not a regular
7   reader of it; okay?  And so, at some point, I
8   would have looked it up and that would have been
9   the source.
10    Q.   Are you certain that that is a
11  peer-reviewed journal, or that's just your best
12  understanding?
13    A.   That's my best understanding, I don't
14  have personal knowledge about that.
15    Q.   And as we sit here today, can you
16  tell me what the methodology of any of these
17  articles was?  Was it a case study, anecdotal?
18    A.   Yeah, some of them are going to be
19  case studies and some of them are going to be
20  interviews of people who were wrongfully convicted
21  and freed, which is useful information, though not
22  obviously a controlled trial.
23    Q.   And interview the people who were
24  released, that's self-report?
25    A.   Of course, sure, that's how you're

Page 380

Agharkar

1   
2   going to get the information.
3     MR. BRUSTIN:  Do you mind if we just
4     get a time on the record?
5     THE VIDEOGRAPHER:  Six hours, 11
6     minutes.
7   BY MS. RETTS:
8     Q.   I just want to confirm, I have it all
9   in one place.  You did not use the MMPI; true?
10    A.   Correct.
11    Q.   Did not use the data ^symptom scale;
12  true?
13    MR. BRUSTIN:  Objection to form.
14    THE WITNESS:  Correct.
15  BY MS. RETTS:
16    Q.   Did not use the distressing events
17  questionnaire; true?
18    MR. BRUSTIN:  Objection to form.
19    THE WITNESS:  Correct.
20  BY MS. RETTS:
21    Q.   You did not use the impact of events
22  scale revised; true?
23    MR. BRUSTIN:  Objection to form.
24    THE WITNESS:  Correct.
25  BY MS. RETTS:



BHUSHAN S. AGHARKAR, M.D.                          September 25, 2018
MILKE vs CITY OF PHOENIX                            381–384

Page 381

1              Agharkar
2        Q.   You did not use the trauma symptom
3    checklist Number 40; true?
4              MR. BRUSTIN:  Objection to form.
5              THE WITNESS:  Correct.
6    BY MS. RETTS:
7        Q.   You did not use the PTSD checklist
8    civilian version; true?
9              MR. BRUSTIN:  Objection to form.
10             THE WITNESS:  Correct.
11   BY MS. RETTS:
12       Q.   You did not use the revised civilian
13   Mississippi scale for PTSD; true?
14             MR. BRUSTIN:  Objection to form.
15             THE WITNESS:  Correct.
16   BY MS. RETTS:
17       Q.   You did not use the PTSD diagnostic
18   scale; true?
19             MR. BRUSTIN:  Objection.
20             THE WITNESS:  Correct.
21   BY MS. RETTS:
22       Q.   You did not use the trauma symptom
23   inventory; true?
24             MR. BRUSTIN:  Objection.
25             THE WITNESS:  That's right.

Page 382

1              Agharkar
2    BY MS. RETTS:
3        Q.   You did not use the Los Angeles
4    symptom inventory; true?
5              MR. BRUSTIN:  Objection.
6              THE WITNESS:  Correct.
7    BY MS. RETTS:
8        Q.   You did not use the clinician
9    administered PTSD scale, otherwise sometimes
10   called CAPS; true?
11             MR. BRUSTIN:  Objection.
12             THE WITNESS:  Correct.
13   BY MS. RETTS:
14       Q.   And you did not use the life events
15   checklist for DSM 5; true?
16             MR. BRUSTIN:  Objection.
17             THE WITNESS:  That's correct.
18   BY MS. RETTS:
19       Q.   You did not use the life events
20   structure to interview; true?
21             MR. BRUSTIN:  Objection.
22             THE WITNESS:  That's right.
23   BY MS. RETTS:
24       Q.   Do you have any patients that you're
25   currently treating in your clinical practice who

Page 383

1    spent more than ten years in solitary confinement?
2        A.   No.
3        Q.   Have you ever treated anyone in your
4    clinical practice who spent more than ten years in
5    solitary confinement?
6        A.   No.  Keep in mind, most of those
7    people are going to be indigent, and I don't have
8    a private practice where I'm able to take in
9    indigent patients.
10       Q.   Have you treated anyone in your
11   clinical practice who spent more than a year in
12   solitary confinement?
13       A.   No.  In my -- again, in my private
14   practice, I'm not treating prisoners or former
15   prisoners.
16       Q.   In your clinical practice, have you
17   ever treated a former prisoner?
18       A.   I can't say for certain if they
19   haven't been to jail at some point, that probably
20   has happened -- here.  But I'm almost -- almost
21   certain I've never treated anyone who's been in
22   prison -- no, you know what, I'll take that back.
23   Definitely the first couple of years in my
24   practice when I'm working at a community mental

Page 384

1              Agharkar
2    health center, I know I saw people there who would
3    have been in prison.  But I'm thinking private
4    practice in my office, I haven't seen a person who
5    had been to prison.
6        Q.   The first few years when you worked
7    in the community mental health center, can you
8    give a time frame of the last time you worked
9    there?
10       A.   It will be on my CV, so -- but it'll
11   probably be 2007 or '08, I was building my private
12   practice.  I've always had my practice since 2005,
13   but we don't take insurance, it takes a while to
14   build, so I worked at other places like George
15   Tech Student Health and that sort of place, as
16   well as community health centers in providing care
17   in addition to my practice.
18       Q.   Do you do any pro bono work in
19   clinical practice?
20       A.   I don't.  I do greatly reduce my
21   fees, however, because therapy -- I do therapy
22   with my patients, I don't just do medication and
23   treatment, I actually talk to my patients and work
24   with them, which unfortunately other psychiatrists
25   these days don't.  Therapy has to cost something

BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              385–388

Page 385

Agharkar

1  in order for it to be valued, so I don't believe
2  in doing free therapy, I don't think that's
3  appropriate, I don't think that's helpful.  People
4  won't value and get as much out of it, so for that
5  reason.
6        But I really scale -- I can go pretty low
7  the scale sometimes, if I want to be helpful or
8  try to treat somebody.  Or somebody who's been in
9  my practice for a while who has a financial
10 downturn, I'm not going to kick him out of my
11 practice, you know, I will see them, still.
12       Q.   Is it fair to say that most of the
13 patients that you see in your clinical practice
14 are from a relatively high socioeconomic status?
15       A.   Yes.  Either they are or they have
16 family members who are -- who are paying for the
17 treatment, but they themselves are not.  That's
18 generally true.  I will say there's probably maybe
19 about 15 to 20 percent of my patients who file
20 with insurance, I don't take insurance, I never
21 have.  Most of them I bill and file, but the rest
22 of them are private pay and probably don't see
23 reimbursement.
24       Q.   Do you do any type of intake that

Page 386

Agharkar

1  tracks how much money most -- like your average --
2        A.   No, I have no way of doing that.
3            THE VIDEOGRAPHER:  We are now going
4        off the record at 4:01 p.m.
5            (Recess taken.)
6            THE VIDEOGRAPHER:  We are now back on
7        the record at 4:09 p.m., this begins Tape
8        7.
9  BY MS. RETTS:
10       Q.   Exhibit 8 to your report is your CV?
11       A.   Yes.  Let me get to it, but, yes.
12       Q.   And page 3 through 4, it lists your
13 research experience and publications and
14 presentations?
15       A.   Yes.
16       Q.   Can you look through those and tell
17 me whether any of those -- first, we will do
18 research experience and publication, just anything
19 in that list relate specifically to your opinions
20 in this case?
21       A.   No.
22       Q.   In other words, did you rely upon it
23 at all?
24       A.   No.

Page 387

Agharkar

1        Q.   Presentation in that category, is
2  anything within that list of presentations did you
3  rely upon as it related to your opinions in this
4  case?
5        A.   Well, the continued medical education
6  seminar I gave on update on posttraumatic stress
7  disorder was a review of PTSD, complex PTSD, et
8  cetera.  I didn't rely on it for this, but it's
9  something I did in the past.
10       And, of course, I teach the residents at
11 Morehouse.  I used to teach sort of an
12 introductory class called patient evaluation and
13 treatment, which is kind of a psych 101, if you
14 will, for residents who are learning to become
15 psychiatrists and, of course, we talked about PTSD
16 there.  But over the years, I now instead teach
17 psychopharmacology and forensic psychiatry to the
18 residents, and they moved that basic class into
19 the rotations.
20       So, we talked about it before, but I
21 wouldn't have relied upon it in this.
22       Q.   Your leadership teaching and
23 volunteer activities, is there anything specific
24 in there that relates to your opinions in this

Page 388

Agharkar

1  case?
2            MR. BRUSTIN:  Objection to form.
3            THE WITNESS:  No, not specifically.
4  BY MS. RETTS:
5        Q.   Can you think of any case where
6  you -- any other case where you've been retained
7  as an expert over the course of your career, and
8  you have provided a disclosed report dealing with
9  issues similar to those that you have provided in
10 this case?
11           MR. BRUSTIN:  Objection to form.
12           THE WITNESS:  I certainly testified
13       about complex trauma before.  I cannot
14       recall if I have ever written a report,
15       though, about that.  I certainly had also
16       written reports about PTSD, but I'm not
17       sure, I must have testified of PTSD at
18       least a few times, usually in conjunction
19       with other illnesses, but I can't
20       specifically remember which ones now.
21 BY MS. RETTS:
22       Q.   Do you have any names of cases that
23 you can give that address those issues?
24       A.   There's a South Carolina case I

ESQUIRE
DEPOSITION SOLUTIONS

Page 389

Agharkar

1
2  testified in, I think it's -- I think Daise is the
3  last name, D-A-I-S-E, perhaps, I think that's --
4  and I think there, my diagnosis of him was complex
5  trauma or complex PTSD.  So, that's what I was
6  thinking of, thinking about my testimony.
7      Q.   Is that a forensic case?
8      A.   Yes.  It was a death penalty case.
9      Q.   What about cases that were civil
10 litigation?
11     A.   Oh, no, that's never happened, where
12 I -- certainly, where I've testified in either
13 deposition or trial, that's not happened yet
14 before today.  And I just cannot remember the
15 reports well enough, you know -- I can remember
16 the report, at least one of them involved PTSD,
17 but I don't remember what the person's name was,
18 unfortunately.
19     Q.   Was it a woman?
20     A.   No, it was a man.
21     Q.   Was it a tobacco case or some
22 other --
23     A.   No, no.  He witnessed -- he was
24 wrongfully imprisoned and witnessed someone in the
25 bunk next to him get stabbed to death.

Page 390

Agharkar

1
2      Q.   What jurisdiction was that?
3      A.   That was in Louisiana.  But I don't
4  remember if it was New Orleans or Baton Rouge or
5  I'm not sure.
6      Q.   Do you remember the name of the
7  correctional facility?
8      A.   I thought that it happened in Angola.
9  I think that's right, but I'm not 100 percent on
10 that.
11     Q.   Not a win?
12     A.   No, that doesn't sound familiar.
13     Q.   Going back to your notes on 261, I
14 believe, where you list out the S, I, G, E, C, A,
15 C, S?
16     A.   Yes.
17     Q.   And before we go through this, can
18 you define for me what a subjective complaint is?
19     A.   It means what is the person telling
20 you their problem is?
21     Q.   Versus something that's objective,
22 what's something that's objective?
23     A.   What is their blood pressure?
24     Q.   In that acronym, the "I," sleep,
25 requires subjective information from the person

Page 391

Agharkar

1
2  who's making a report to you; true?
3      A.   That's true.  Because you said "I,"
4  that's anhedonia, did you mean --
5      Q.   S for sleep?
6      A.   Yes, that's correct, I -- yes, we
7  rely on self-report.  That's how we make our
8  diagnoses in psychiatry.
9      Q.   And objective -- when we go back to
10 subjective versus objective, for subjective,
11 you're relying upon the self-report from someone;
12 true?
13     A.   For the subjective, that's right.
14     Q.   And for objective, it's something
15 that is verifiable through a something like a
16 scientific measurement; true?
17     A.   Sure.
18     Q.   Whereas, a subjective complaint you
19 cannot verify objectively?
20         MR. BRUSTIN:  Objection.
21         THE WITNESS:  I mean, unless I gave
22     her a sleep study, and we did that every
23     night, but nobody does, you cannot assess
24     this other than somebody's self-report and
25     whether it's something that's known to be

Page 392

Agharkar

1
2  part of the illness.
3  BY MS. RETTS:
4      Q.   I for interest --
5      A.   Yes.
6      Q.   -- is also something that you rely
7  upon self-report for?
8      A.   That's true, yes.  The person has to
9  tell you subjectively that they do not take
10 pleasure in previously pleasurable activities.
11     Q.   G for guilt, you have to rely upon
12 self-report?
13     A.   Yes.
14     Q.   E for energy, you have to rely upon
15 self-report?
16     A.   Yes.
17     Q.   C is for concentration, you have to
18 rely upon self-report?
19     A.   Yes.  You may sometimes be able to
20 see impairments in work evaluations, perhaps, or
21 maybe other people would notice, you know, oh, she
22 can't finish a book chapter, for example, but I
23 don't get that all that often.  Yes, in making a
24 depression diagnosis, that's correct, you are
25 taking the subjective data from a person



BHUSHAN S. AGHARKAR, M.D.                         September 25, 2018
MILKE vs CITY OF PHOENIX                           393–396

Page 393

1                    Agharkar
2    interviewed, and fitting that into the criteria of
3    what you know depression to be.
4         Q.   For concentration, do you ever employ
5    any neuro-psyche testing to ^look through that, in
6    other words, recitation of numbers backwards and
7    forwards, asking people to identify a certain
8    number of animals within the categories, do you do
9    that?
10        A.   Yes.  Though that's a verbal fluency
11   measure, that's actually a ^frontal screen, not a
12   concentration measure.  Concentration measures
13   could be things like the Connors -- I'm forgetting
14   the name of it fully, but the Connors test.
15        So, yes, sure, there are attention and
16   concentration type tests, but in the context of --
17   well, first of all, what they would tell you --
18   what the neuro-psyche people will tell you is if
19   somebody is depressed, that can very much affect
20   concentration scores on neuro-psyche batteries, so
21   we don't know what the cause of that would be,
22   whether that's organic or if that's depression, so
23   to speak.  So, that's the first thing.
24        But I think the second thing is, neuro
25   psyche testing I didn't feel was indicated here

Page 394

1                    Agharkar
2    and she didn't give me enough of a history or
3    there were not enough red flags for me to consider
4    whether she was brain damaged.  I didn't think
5    that that was the case, so I did not recommend
6    further testing.
7         Q.   So, for C, you relied upon
8    self-report?
9         A.   Yes.
10        Q.   A, appetite is self-report, as well?
11        A.   That is correct, yes, that's right.
12        Q.   Psychomotor, whether you have any
13   type of --
14        A.   Agitation or retardation.  Now,
15   that's visual.  I mean, that's objective in a
16   sense that she doesn't have to tell me that, it's
17   my observations of her, and she didn't have it.
18        Q.   And suicidology, that would be
19   self-report?
20        A.   Unless there was an objective suicide
21   attempt, but, yes, ideation is what you're testing
22   for.  And in that case, yes, that's self-report,
23   which she's denying.
24        Q.   So, all of the criteria, other than
25   psychomotor retardation, are criteria that you

Page 395

1                    Agharkar
2    look at self-report?
3         A.   Yes, that's how you make the
4    diagnosis.
5         Q.   And they rely upon the person to get
6    back ^with information?
7             MR. BRUSTIN:  Objection to form.
8             THE WITNESS:  Yes, to those
9         questions, that's right.
10   BY MS. RETTS:
11        Q.   Inaccurate information can result in
12   an inaccurate diagnosis in some cases?
13            MR. BRUSTIN:  Objection to form.
14            THE WITNESS:  It could.  And I just
15        want to point out that she actually -- you
16        didn't ask me this, but she needs to have
17        five out of nine of this criteria, she has
18        three.
19        So, actually, on the face of it, what
20        she's telling me on that day does not meet
21        criteria fully for major depression.  Now,
22        my clinical judgment is, in fact, she has
23        these other two when we start looking
24        longitudinally back, and she's also being
25        treated, and that's why I think there's

Page 396

1                    Agharkar
2        some partial improvement in some symptoms.
3        But it seems to me that if she wanted to
4        play things up, she should have told me
5        she's actively suicidal, that she's got
6        all of them, you know what I mean?  She
7        should have been nine out of nine if
8        you're really trying to play thing up.
9        Not to actually come short, and then
10       actually I'm one who's -- who's using my
11       clinical judgment in seeing, you know,
12       does this fit or not, does she meet
13       depression or not.
14   BY MS. RETTS:
15        Q.   I would assume, though, that she
16   understands the criteria?
17            MR. BRUSTIN:  Objection.
18            THE WITNESS:  Sure, I would assume
19        that.  And you're right, the way I ask my
20        questions, I don't ask them in a row like
21        this.  I wrote them down like this, but
22        that's just -- I mixed it in, in my
23        interview, so I never just go down a list,
24        I think that's poor technique.  I really
25        try to blend it into the interview, so



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                                397–400

Page 397

1            Agharkar
2       people don't really know what I'm asking
3       when we're talking.  But in my head, I'm
4       keeping track, and so I'll make notes for
5       myself as we go in that way.
6   BY MS. RETTS:
7       Q.   Did Ms. Milke describe what her
8   relationship with her mother was like?
9           MR. BRUSTIN:  Objection to form.
10          THE WITNESS:  My understanding is
11      that it was -- it was difficult growing
12      up.  I mean, I think there were ups and
13      downs with it.  But then as they got
14      older, they got closer.
15          I mean, that's where the mother was
16      coming to visit her, and she felt really
17      bad, she had to tell her stop coming here
18      because of the strip searches, which was
19      very painful for her to do.  And it sound
20      likes they had a more -- much more
21      positive relationship as they became
22      adults.
23  BY MS. RETTS:
24      Q.   Do you know whether or not Ms.
25  Milke's mother came to any portions of her trial?

Page 398

1            Agharkar
2       A.   I don't think I asked her that.  I
3   can't recall if she testified or not, which would
4   answer that she did.  But I just can't recall.
5       Q.   Did Ms. Milke report to you feeling
6   abandoned by her family in terms of how they
7   treated her, up to her criminal trial and after?
8       A.   Yes.
9       Q.   Do you have an understanding of
10  whether Ms. Milke had a period of time where she
11  had no contact with her mother?
12      A.   Other than what I mentioned where she
13  was not accepting visits and that kind of thing,
14  I'm not aware of other times.  There may have
15  been.
16      Q.   Do you know whether there was any
17  period of years where her mother would not accept
18  phone calls or letters from her?
19      A.   I can't specifically speak to it.  I
20  think I may have heard something like that, but I
21  don't know for sure about it.
22      Q.   Do you know whether Ms. Milke's
23  father ever visited her in prison?
24      A.   To my knowledge, he did not.
25      Q.   What did she tell you specifically

Page 399

1            Agharkar
2   about their relationship before she went in
3   prison?
4           MR. BRUSTIN:  Objection to form.
5           THE WITNESS:  I think I mentioned
6       that earlier.  I don't know a lot about
7       it, other than he was an alcoholic, that
8       he was in the military, he was very
9       strict, very hard on them, she was very
10      careful about obeying rules because she
11      did not want to get in trouble with him.
12      But that they didn't get along, it wasn't
13      a good relationship.
14  BY MS. RETTS:
15      Q.   Do you know whether or not he would
16  come to visit her and Christopher or anything like
17  that?
18      A.   I know that at least there were some
19  times when she brought him -- brought Christopher
20  to visit him, father.  But I don't know how often
21  he would have visited them --
22      Q.   And you did not issue any opinions in
23  your report about what specific treatment Ms.
24  Milke should be receiving in the future; true?
25      A.   I may not have been specific.  I

Page 400

1            Agharkar
2   think I said that medication and therapy ^ UNCLEAR
3   treatment modalities and that's what I would
4   recommend for her, yes.
5       Q.   But no specifics in terms of how much
6   therapy, for how long?
7       A.   No, that's true, I wasn't asked to
8   provide that level of detail.  I certainly can.
9       Q.   Did you make a specific conclusion
10  that psychological testing in this case would not
11  be helpful?
12      A.   I would have ordered it if I thought
13  it would have been helpful.  In my opinion, it
14  would not have added to my diagnosis.  The reason
15  why you get psychological testing measures is if
16  there's diagnostic uncertainty, meaning you're not
17  sure what's going on.  Or if somebody is not
18  responding to treatment the way you think they
19  ought to be responding, you may get psychological
20  testing to help clarify, say, is there something
21  I'm missing here?
22      But in this case, it's absolutely not
23  required for a psychiatrist to ever get
24  psychological testing measures done, I never do it
25  in my practice -- I shouldn't say never.  I've



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                              401–404

Page 401

Agharkar

1 done it occasionally, in the circumstances in
2 which I have just mentioned; okay?  But it is not
3 at all required in order to render a diagnosis as
4 I originally said six hours ago.  A piece of paper
5 doesn't diagnose somebody, I do.
6     So, in making the diagnoses that I did, I
7 did it in a way psychiatrists do it, I feel
8 confident in those diagnoses, I did not feel
9 psychological testing would be a further benefit
10 for it to just say the same thing as me, there's
11 no point in that.
12     Q.    Psychological testing can also be
13 used to assess malingering; true?
14     A.    There is no test that can assess
15 malingering, it can assess effort.  There are
16 specific effort tests that can be given, and then
17 the clinician must determine whether or not this
18 is malingering.  Because, again, this is a piece
19 of paper.  A clinician has to decide is this
20 person's poor effort an attempt to fake something
21 for some secondary gain.  Paper has no idea what
22 secondary gain is.
23     But furthermore, effort testing in this
24 instance would not be so helpful because, again,

Page 402

Agharkar

1 all it tells you is whether the person gave
2 appropriate effort on that particular measure.  It
3 doesn't tell you anything about whether or not
4 they have PTSD or they have depression or anxiety.
5     Q.    There's a PTSD inventory that's built
6 into the MMPI; true?
7     A.    There is.  The MMPI is not meant to
8 diagnose PTSD.  In fact, the army does not
9 use the MMPI in diagnosing veterans with PTSD
10 because it misapprehends trauma symptoms as
11 sociopathy and borderline personality disorder.
12     So, we don't use it.  So, that's what I
13 mean, that kind of information, that's what I
14 mean.  Somebody who's been traumatized, an MMPI is
15 not necessarily going to be helpful.
16     And although, there are validity scales
17 embedded in it, one can fake good or fake bad, so
18 there is -- so, no, I don't feel that an MMPI in
19 any way would have benefitted us here.
20     Q.    Now, the army, the VA, in fact,
21 advocates for you use of the life and defense
22 checklist from the DSM 5; true?
23     A.    They may, I don't know, I don't work
24 for the VA.  And again, it wouldn't surprise me

Page 403

Agharkar

1 because clinicians who are taking intake
2 appointments are not necessarily psychiatrists.
3 So, again, if the goal is to just gather as
4 many -- as much pieces of information as you can,
5 that may be fine, but that's not what we do when
6 we're trying to actively drill down and figure out
7 what's going on with somebody.
8     Q.    If you had an MMPI from 1991 and you
9 did an MMPI now, would you agree that there would
10 be some use in that in trying to see if there was
11 consistency between the two, worsening, getting
12 better, you would be able to have almost some
13 baseline within which to compare those two things?
14     MR. BRUSTIN:  Objection.
15     THE WITNESS:  To think of the MMPI as
16 any way definitive about character
17 pathology or saying for sure this tells us
18 about a person's psychopathology is
19 frankly a mistake.  I mean, it's 567 true,
20 false questions.
21     And I understand it's certainly
22 utilized in a number of ways, and there
23 are certainly uses for it.  But to say
24 that it sets a baseline -- tells some

Page 404

Agharkar

1 change from it, no, not necessarily,
2 because it's state-dependent.  Meaning if
3 someone is going through a horrible
4 stressor at a time, they'll look a certain
5 way at MMPI, you get them later when
6 they're not under stress, they look
7 different and you don't -- and how do you
8 know what's what.
9 BY MS. RETTS:
10     Q.    If Ms. Milke had been given an MMPI
11 in 1991 and given one today, would you expect them
12 to be consistent?
13     MR. BRUSTIN:  Objection to form.
14     THE WITNESS:  That's a very
15 interesting question.  You can't really --
16 I don't know what "consistent" means in
17 this context.  There's a lot of scales on
18 there, I don't -- you would never expect
19 anyone, I think, to have exactly the same
20 scale scores, if that's what you mean.
21 So, I just don't know what would happen if
22 we give her an MMPI today.
23 BY MS. RETTS:
24     Q.    A MMPI diagnosis of personality



BHUSHAN S. AGHARKAR, M.D.                                    September 25, 2018
MILKE vs CITY OF PHOENIX                                              405–408

Page 405

Agharkar

1
2  disorder, you wouldn't, for example, expect that
3  it would have disappeared in an MMPI 20 years
4  later?
5      A.    Right, but you don't use an MMPI to
6  diagnose personality disorders.  It can only
7  provide you information that the clinician has to
8  determine and integrate it into their
9  history-taking, and their knowledge of the person
10  in arriving at a personality disorder diagnosis.
11      Q.    Do you know what Dr. Beckson's
12  clinical experience is?
13      A.    No, and it doesn't come through in
14  his report.
15      Q.    Did you look at his CV?
16      A.    I skimmed it.
17      Q.    Do you have an understanding where he
18  works?
19      A.    I think he's on the clinical faculty
20  at UCLA.  I'm not sure if he does some work
21  outside of that.  It sounds like he does, but I'm
22  not sure that's faculty position, meaning a paid
23  position.
24      Q.    You don't have any personal knowledge
25  of Dr. Beckson real-world experience; true?

Page 406

Agharkar

1
2      A.    I've never heard of him before.
3      Q.    Having not heard of him doesn't
4  really have anything to do with his real-world
5  experience; true?  Like you cannot hear of someone
6  and they can have plenty of experience?
7      A.    Sure, but I wouldn't know about it.
8      Q.    You wouldn't?
9      A.    Right, I wouldn't know about it,
10  right.
11          (Talking over each other.)
12      My comment on that is simply, you know, the
13  way that he analyzed things and the way he
14  described things does not speak to a person who
15  has clinical experience in these areas.
16      Q.    That's your assumption?
17      MR. BRUSTIN:  Objection to form.
18      THE WITNESS:  I can only go by what
19  he wrote.
20  BY MS. RETTS:
21      Q.    Did you review Dr. Beckson's
22  criticisms of the literature that you relied upon,
23  go back and look at that literature to see if his
24  criticisms were valid?
25      MR. BRUSTIN:  Objection to form.

Page 407

Agharkar

1
2      THE WITNESS:  No, I agree with him in
3  terms of the -- because what his criticism
4  is, is essentially the level of
5  reliability, I should say, or scientific
6  validity, whatever you want to call it, I
7  guess.  And he's got to know very well
8  that the things we're talking about here
9  could not be done in a randomized control
10  trial, and you have to rely on whatever
11  information you get.
12      Furthermore, I'm not actually drawing
13  conclusions, if you read it carefully, I'm
14  not actually -- I'm not relying on
15  literature to say, oh, because of that,
16  this is why she ended up the way she does.
17  It's doing based on my clinical
18  examination.
19      And I'm seeing these other factors play
20  a role in a sense that they make things
21  worse, or can make things worse.  I never
22  said solitary confinement was the cause of
23  things, I never said that they wrongfully
24  convicted the cause of these things.
25      But to discount people's real-world

Page 408

Agharkar

1
2      experience about having gone through these
3      things, frankly, you know, it's odd.
4  BY MS. RETTS:
5      Q.    The real-world experience requires an
6  acceptance of self-report?
7      A.    Well, sure.  How else will you get to
8  know what people's experiences were in solitary
9  confinement?  But that's -- there is literature
10  out there about solitary confinement to suggest
11  that there is -- but, of course, there's not going
12  to be controlled trials of these things,
13  naturally.
14      But in my rebuttal, I do point out some of
15  the things that Applebaum has written about, or
16  just, you know, other things about it, where
17  pretty clearly it affects people, it affects
18  people on a bad way.  And I think that's common
19  sense, I don't think you have to have a medical
20  degree to know that, I think the news about people
21  locked in a closet for years and how they turned
22  out, you know.
23      So, to suggest that there could be any sort
24  of positive or neutral result from solitary
25  confinement frankly defends common sense.



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                                409–412

Page 409
```
1                    Agharkar
2       Q.   So, your opinion on solitary
3  confinement rests upon common sense?
4            MR. BRUSTIN:  Objection to form.
5            THE WITNESS:  In part, sure, but in
6        my clinical experience of actually having
7        seen people in solitary confinement,
8        spending time in prisons, as well as
9        what's been written down in the
10       literature, all of those things make sense
11       in terms of what happens to people when
12       you reduce stimuli in their environment.
13  BY MS. RETTS:
14       Q.   You have used the term "natural
15  reaction" during the course of your testimony
16  today, is that a psychiatric term of art?
17       A.   No, it's common sense, or it's just
18  human experience.
19            MS. RETTS:  I'm going to take a quick
20       break.
21            THE VIDEOGRAPHER:  We are now going
22       off the record at 4:36 p.m.
23            (Recess taken.)
24            THE VIDEOGRAPHER:  We are now back on
25       the record at 4:39 p.m.
```

Page 410
```
1                    Agharkar
2            MS. RETTS:  I'm going to go ahead and
3        reserve my time after you're done, Nick.
4
5                 CROSS EXAMINATION
6  BY MR. BRUSTIN:
7       Q.   Just a couple of questions, Dr.
8  Agharkar.  First of all, did you review some of
9  the literature cited by Dr. Beckson?
10       A.   Yes.
11       Q.   And did the literature, did Dr.
12  Beckson correctly cite the literature in his
13  report, did he accurately describe what it said?
14       A.   No.
15            MS. ODEGARD:  Foundation.
16            MS. RETTS:  Objection to form.
17  BY MR. BRUSTIN:
18       Q.   Can you give an example?
19       A.   Well, the Kane article that he cites
20  to some chapter by a psychologist, again, that's
21  not applicable to a psychiatrist practice, in
22  which Kane actually says in there about using
23  psychological tests.
24       Dr. Beckson quotes that section, and then
25  right underneath it, it says "Actuarial methods
```

Page 411
```
1                    Agharkar
2  are useful in about 50 percent of cases."  Half
3  the time, it won't have anything, half the time,
4  it may be helpful.  He doesn't put that in his
5  report, as an example, and I found quite a number
6  of examples like that.
7       Q.   And you talked about your decision
8  not to do any psychological testing in this case,
9  not to order any psychological testing?
10       A.   Yes.
11       Q.   And are there affirmative reasons not
12  to give psychological testing in a case like this?
13            MS. RETTS:  Form.
14            THE WITNESS:  It misapprehends trauma
15       symptoms, and so you get wrong results
16       when somebody's been badly traumatized.
17       It won't necessarily be accurate.
18       Additionally, those trauma inventory and
19       scales are based on DSM.  DSM doesn't have
20       complex trauma as part of its diagnosis.
21       So, naturally, that's not going to be
22       something that would come out on a trauma
23       inventory.
24            Additionally, trauma inventory scales
25       ask the same questions that a clinician
```

Page 412
```
1                    Agharkar
2        would ask.  So, for all those types of
3        reasons, I did not see a reason to have to
4        get psychological testing done in this
5        case.
6  BY MR. BRUSTIN:
7       Q.   And I think you've answered it
8  already, but just to be clear, is psychological
9  testing also subjective?
10       A.   Yes, if is.  I mean, it requires
11  self-report by the person.  In these trauma
12  inventories, you are asking them to answer the
13  question, it's their experience.  And so, yes.
14  And then, of course, it requires the clinician to
15  interpret and make sense of these findings based
16  on using their clinical judgment.  The tests never
17  are to be diagnostic or used in isolation.
18       Q.   Now, as you told us today and in your
19  report, you've given a broad diagnosis in this
20  case, but is the diagnoses actually important in
21  assessing psychological damages in this case?
22            MS. RETTS:  Foundation.
23            MR. BALIN:  Form.
24            THE WITNESS:  No, diagnoses are not
25       what impairs, it's just a name, it's just
```



BHUSHAN S. AGHARKAR, M.D.                           September 25, 2018
MILKE vs CITY OF PHOENIX                                        413–416

Page 413

Agharkar

1
2    a name you give a constellation of
3    symptoms, the symptoms that actually
4    impair.
5        So, it's the symptoms of her not being
6    able to go out and be among people and be
7    comfortable in that, it's her depression,
8    it's all the things we've talked about
9    here.  Those are what impair you, the
10      symptoms that you have, the name itself is
11      not the thing to get hung up on.
12 BY MR. BRUSTIN:
13      Q.   Now, in Dr. Beckson's report, and I
14   just did this broadly because we don't have much
15   time, in Dr. Beckson's report, you saw that he was
16   critical of you -- of your report both in terms of
17   what you considered and ruling out other
18   diagnoses; did you see that?
19      A.   Yes.
20      Q.   And first of all, did you consider in
21   your analysis the other diagnoses that he claimed
22   you did not?
23      A.   Of course I did.  As a psychiatrist
24   who's trained in assessing and diagnosing and
25   treating people, one always is in one's head

Page 414

Agharkar

1
2    considering what these symptoms mean.  So, you're
3    running through differential in your mind, I
4    considered even ones that he put in his report,
5    which actually he's in no position, frankly, to
6    offer an opinion on since he didn't do an
7    interview.
8        But I considered those, I considered many,
9    many other ones that he doesn't mention, and these
10   are the ones that I arrived at because this is
11   where the symptoms point to.
12      Q.   Did you write down all of the
13   relevant factors that you considered and all the
14   diagnoses that you ruled out?
15      A.   Of course not, I'm not a student, I'm
16   not a resident, I don't need to do that anymore.
17   I did that at one point in my career when you're
18   learning how to do this.
19      Once you know how to, that would be
20   time-consuming and ineffective.  I mean, I could
21   write a page on why she doesn't have
22   schizophrenia, and another page on why she doesn't
23   have bipolar disorder, there's no point in that.
24   I wrote about what she did have.
25      Q.   Now, you mentioned earlier that you

Page 415

Agharkar

1
2    have some questions about Dr. Beckson's relevant
3    experience.  Did the factor she just described
4    play into that?
5        MS. RETTS:  Form; foundation.
6        MS. ODEGARD:  Join.
7        THE WITNESS:  That's one of them,
8    yes.  I was thinking about it.  Honestly,
9    it looked like a student -- I'm not
10      calling it a student, but I'm saying you
11      could have had a college student write a
12      term paper about PTSD and gotten this
13      result.  This did not have -- I mean,
14      literally, he gets it out of a book, he
15      writes the definition down and says, okay,
16      she doesn't meet this specific definition
17      or this particular sample size.
18      That's not how we practice clinical
19      psychiatry.  We don't consult a research,
20      look at a paper or textbook, look at a
21      person and say, oh, you don't fit, there's
22      no direct fit here, you don't have it.
23      That's not medicine.  Medicine is both
24      science and art.
25        So, there are a lot of things in there

Page 416

Agharkar

1
2    with a very, very peculiar, I frankly have
3    never seen anything like it in my career.
4 BY MR. BRUSTIN:
5        Q.   Did you consider the ICD11 definition
6    of complex PTSD?
7        A.   I did.
8        Q.   And how did that factor into your
9    analysis?
10      A.   Well, it's consistent with what I
11   know about complex trauma or complex PTSD.  I -- I
12   put it in the rebuttal report more explicitly, and
13   she meets these criteria if we want to be sort of,
14   you know, slavishly about going through criteria,
15   she would meet that by the ICD11.
16      Q.   By the way, have the criterion A
17   definition -- has the definition of what
18   constitutes criterion A changed recently in regard
19   to veterans?
20      A.   Well, not just to veterans, but,
21   yeah, the major revision and change from ^DSM 4 to
22   5 on criterion A for PTSD.  Number 1, you no
23   longer had to have witnessed a traumatic event or
24   experienced it yourself, you could have just heard
25   about it from somebody else, that's one.  And you



BHUSHAN S. AGHARKAR, M.D.                    September 25, 2018
MILKE vs CITY OF PHOENIX                                417—420

Page 417
Agharkar
1
2   can -- that can meet criterion A.
3      The second thing is that you no longer have
4   to have experienced it with horror, helplessness,
5   fear, that kind of thing, you don't have to have
6   had that kind of reaction in order for it to meet
7   criterion A.
8      Lastly as it regards to veterans, it used to
9   be that -- so, the new guidance is, if you have
10  been deployed to a war zone, doesn't matter if you
11  saw combat, doesn't matter if you were in combat,
12  you could be a cook who never saw combat, if
13  you're deployed to a war zone, you meet criterion
14  A automatically.
15      MR. BRUSTIN:  That's all I have.
16  Thanks.
17      MS. RETTS:  I have just a couple of
18  follow-ups.
19
20      REDIRECT EXAMINATION
21  BY MS. RETTS:
22      Q.   So, if I understand correctly, your
23  testimony in response to Mr. Brustin's questions,
24  the damages in this case are based upon symptoms
25  that self-reported; true?

Page 418
Agharkar
1
2      MR. BRUSTIN:  Objection to form.
3      THE WITNESS:  I mean, in part.
4      Obviously, self-report, but we would spend
5      a lot of time talking about this.  It's
6      also about how she's presenting, do I
7      think their valid, et cetera?  But, sure,
8      they've got to come from her, that's
9      right.
10  BY MS. RETTS:
11      Q.   And self-reported symptoms are
12  subjective complaints?
13      A.   By definition, yes.  Of course, the
14  physician's job is to understand that and see
15  whether or not that's valid and reliable and
16  consistent with what one knows about illness.
17      Q.   And none of these things are
18  measurable with an objective criterion; true?
19      MR. BRUSTIN:  Objection to form.
20      THE WITNESS:  No psychiatric
21      diagnosis can be diagnosed through a test
22      or imaging, it is always through
23      interviewing, through review of collateral
24      information as appropriate, and the
25      clinician's judgment, that's how we make

Page 419
Agharkar
1
2   every diagnosis.
3      MS. RETTS:  I don't have anything
4   further.
5      MR. BRUSTIN:  Okay.  We're good.
6      THE VIDEOGRAPHER:  We are now going
7   off the record at 4:47 p.m.)
8
9
                _____
10              BHUSHAN S. AGHARKAR, M.D.
11
12  Subscribed and sworn to before me
     this _____ day of _____, 20___.
13  _____
        NOTARY PUBLIC
14
15
16
17
18
19
20
21
22
23
24
25

Page 420
1              Agharkar
2              I N D E X
3

| WITNESS | EXAMINATION BY | | PAGE |
|---|---|---|---|
| DR. AGHARKAR | DIRECT / RETTS | | 6 |
| | CROSS / BRUSTIN | | 410 |
| | REDIRECT / RETTS | | 417 |

EXHIBITS

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| 261 | Milke Interview notes | 53 |
| 262 | Continuation of interview notes | 82 |
| 263 | Grievance | 155 |
| 264 | Trial testimony | 187 |



BHUSHAN S. AGHARKAR, M.D.
MILKE vs CITY OF PHOENIX

September 25, 2018
421–424

---

Page 421

```
1              C E R T I F I C A T I O N
2
3            I, Jeffrey Shapiro, a Shorthand
4   Reporter and notary public, within and for the
5   State of New York, do hereby certify:
6            That BHUSHAN S. AGHARKAR, M.D., the
7   witness whose examination is hereinbefore set
8   forth, was first duly sworn by me, and that
9   transcript of said testimony is a true record of
10  the testimony given by said witness.
11           I further certify that I am not
12  related to any of the parties to this action by
13  blood or marriage, and that I am in no way
14  interested in the outcome of this matter.
15
16           IN WITNESS WHEREOF, I have hereunto
17  set my hand this 8th day of October, 2018.
18
19
20
21
22       _____
23              JEFFREY SHAPIRO
24
25
```

---

Page 422

```
1        DEPOSITION ERRATA SHEET
2
3   Our Assignment No. J2593866
4   Case Caption:  Milke vs. Phoenix
5
6   DECLARATION UNDER PENALTY OF PERJURY
7            I declare under penalty of perjury
8        that I have read the entire transcript of
9        my Deposition taken in the captioned
10       matter or the same has been read to me,
11       and the same is true and accurate, save
12       and except for changes and/or corrections,
13       if any, as indicated by me on the
14       DEPOSITION ERRATA SHEET hereof, with the
15       understanding that I offer these changes
16       as if still under oath.
17
18
19       _____
20           Bhushan S. Agharkar, M.D.
21
22  Subscribed and sworn to on the _____ day of
    _____, 20____ before me,
23  _____
24  Notary Public,
    In and for the State of _____
25
```

---

Page 423

```
1           DEPOSITION ERRATA SHEET
2
3   Page No._____Line No._____Change to: _____
4   _____
5   Reason for change: _____
6   Page No._____Line No._____Change to: _____
7   _____
8   Reason for change: _____
9   _____
10  Page No._____Line No._____Change to: _____
11  _____
12  Reason for change: _____
13  Page No._____Line No._____Change to: _____
14  _____
15  Reason for change: _____
16  Page No._____Line No._____Change to: _____
17  _____
18  Reason for change: _____
19  _____
20  Page No._____Line No._____Change to: _____
21  _____
22  Reason for change: _____
23
24  SIGNATURE:_____DATE:_____
25        Bhushan S. Agharkar, M.D.
```

---

Page 424

```
1           DEPOSITION ERRATA SHEET
2
3   Page No._____Line No._____Change to: _____
4   _____
5   Reason for change: _____
6   Page No._____Line No._____Change to: _____
7   _____
8   Reason for change: _____
9   _____
10  Page No._____Line No._____Change to: _____
11  _____
12  Reason for change: _____
13  Page No._____Line No._____Change to: _____
14  _____
15  Reason for change: _____
16  Page No._____Line No._____Change to: _____
17  _____
18  Reason for change: _____
19  _____
20  Page No._____Line No._____Change to: _____
21  _____
22  Reason for change: _____
23
24  SIGNATURE:_____DATE:_____
25        Bhushan S. Agharkar, M.D.
```

