## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF ARIZONA
 3
     Debra Jean Milke,              )
 4                                  )
            Plaintiff,              )
 5                                  )
     vs.                            ) No.
 6                                  ) 2:15-cv-00462-ROS
     City of Phoenix; Maricopa      )
 7   County; and Detective Armando  )
     Saldate, Jr.; and Sergeant     )
 8   Silverio Ontiveros, in their   )
     individual capacities,         )
 9                                  )
            Defendants.             )
10   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ )
11
12
13
        HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF
14
15
                  C. KENNETH RAY II
16
                  AUGUST 13, 2018
17
                    10:16 A.M.
18
19
               200 East Sheldon Street
20
                  Prescott, Arizona
21
22
        SOMMER E. GREENE, CSR, RPR, CR No. 50622
23
24
25
```

## Page 2

```
 1   APPEARANCES OF COUNSEL
 2
          For Plaintiff:
 3
              NEUFELD SCHECK & BRUSTIN, LLP
 4            ANNA BENVENUTTI HOFFMANN, ESQ.
              (Via videoconferencing)
 5            KATIE MCCARTHY, ESQ.
              99 Hudson Street, 8th Floor
 6            New York, New York 10013
              212.965.9081
 7
 8
          For Defendant Silverio Ontiveros:
 9
              HOLLOWAY ODEGARD & KELLY, P.C.
10            SALLY A. ODEGARD, ESQ.
              3020 East Camelback Road, Suite 201
11            Phoenix, Arizona 85016
              602.240.6670
12            sodegard@hoklaw.com
13
14        For Maricopa County:
15            SANDERS & PARKS
              NICOLE STEWART, ESQ.
16            3030 North Third Street, Suite 1300
              Phoenix, Arizona 85012
17            602.532.5783
              nicole.stewart@sandersparks.com
18
19        For Defendant City of Phoenix:
20            WIENEKE LAW GROUP
              CHRISTINA RETTS, ESQ.
21            1095 West Rio Salado Parkway, Suite 209
              Tempe, Arizona 85281
22            480.715.1868
              cretts@swlfirm.com
23
24
25
```

## Page 3

```
 1   APPEARANCES CONTINUED:
 2
 3        FOR DEFENDANT ARMANDO SALDATE:
 4            BERKE LAW FIRM
              LORI V. BERKE, ESQ.
 5            1601 North 7th Street, Suite 360
              Phoenix, Arizona 85006
 6            602.254.8800
              lori@berkelawfirm.com
 7
 8        Also Present:
 9            Barb Del've, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                    I N D E X
 2
 3   WITNESS: C. KENNETH RAY II
 4
 5   EXAMINATION                              PAGE
 6
 7   MS. BERKE.......................................7
 8   MS. RETTS.....................................170
 9   MS. BURGESS...................................195
10   MS. HOFFMAN...................................207
11
12                *      *      *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

                    INDEX TO EXHIBITS

    EXHIBIT                                                  MARKED

Exhibit 206 Affidavit                                          24
Exhibit 207 Subpoena                                          35
Exhibit 208 Letter From Mr. Kenneth Ray, to                  49
            Attorneys in Milke Case, July 11,
            2018
Exhibit 209 Letter to Kenneth Ray, From Debra                50
            Milke, August 10, 2018

Exhibit 210 Reporter's Transcript of                         60
            Proceedings, September 10, 1990,
            State of Arizona v. Debra Jean
            Milke
Exhibit 211 Letter to Joe Marino From Debra                  100
            Milke
Exhibit 212 Letter to Vince Felix From Debra                 110
            Milke
Exhibit 213 Letter to Noel Levy From Kenneth                 161
            Ray, Re: State v. Milke, December
            14, 1989

Page 6

                    PRESCOTT, ARIZONA
                    AUGUST 13, 2018


         THE VIDEOGRAPHER:  Good morning.  This is
tape number 1 to the videotaped deposition of C. Kenneth
Ray in the matter of Milke versus the City of Phoenix,
et al., being heard before the United States District
Court, District of Arizona, Case No. 2:15-cv-00462-ROS.
         This deposition is being held at 200 East
Sheldon Street, Prescott, Arizona, on August 13th, 2018,
at 10:16 a.m.  My name is Barb Del'Ve, certified
video specialist.  Our court reporter is Sommer Greene.
         Counsel, if you'll introduce yourselves and
affiliations, the witness will be sworn.
         MS. BURCH:  Vanessa Burch for plaintiff,
Debra Milke.
         MS. HOFFMANN:  Anna Benvenutti Hoffman by
video conference, also for the plaintiff, Debra Milke.
         MS. BERKE:  Lori Berke for Armando Saldate.
         MS. RETTS:  Christina Retts for the City of
Phoenix.
         MS. ODEGARD:  Sally Odegard on behalf of
Silverio Ontiveros.
         MS. BURGESS:  Robin Burgess on behalf of

Page 7

Maricopa County.


              C. KENNETH RAY II
called as a witness herein, having been first duly sworn
by the Certified Reporter to speak the whole truth and
nothing but the truth, was examined and testified as
follows:


                 EXAMINATION
BY MS. BERKE:
     Q.   Would you please state your full name?
     A.   Carl Kenneth Ray, the 2nd.
     Q.   And you are an attorney?
     A.   I am.
     Q.   You're licensed to practice in Arizona?
     A.   I am.
     Q.   And you represented Debra Milke in the criminal
trial back in 1990.  Correct?
     A.   Can't remember the date, but I did represent
her in the trial, yes.
     Q.   And have you -- are you an attorney in good
standing?
     A.   Was there more to the question?
     Q.   No.
     A.   Oh.  The answer is yes.

Page 8

     Q.   And has that been the case consistently since
you started practicing law?
     A.   It has.
     Q.   When were you licensed?
     A.   1984, October.
     Q.   Have you -- well, do you practice both criminal
law and civil or just criminal or other areas?
     A.   Mostly criminal.  I do some civil litigation.
I have done a divorce or two.
     Q.   Okay.
     A.   A bankruptcy or two.
     Q.   Okay.  And you practice in Prescott, Arizona?
     A.   I do.
     Q.   Has that always been the case?
     A.   No.
     Q.   Okay.  Let's -- let's just kind of get your
history a little bit.
          And, first of all, I assume you've taken
depositions on numerous occasions?
     A.   I have.
     Q.   And do you need me to go over the ground rules
of the deposition with you?
     A.   I do not.
     Q.   Okay.  Just know that any time you need to take
a break, just let me know, we'll take a break.  Okay?



Page 9

1    A.    Thank you.
2    Q.    Where did you graduate law school?
3    A.    California Western, San Diego.
4    Q.    In what year?
5    1983.
6    Q.    Are you from Arizona?
7    A.    Originally, no.
8    Q.    Where did you grow up?
9    A.    Illinois.
10   Q.    And then after Cal -- after you graduated law
11   school at Cal Western, where did you go?
12   A.    Phoenix.
13   Q.    And what brought you to Phoenix?
14   A.    My roommate in law school set up his practice
15   here, so I came over here.
16   Q.    And did you go to work with your roommate?
17   A.    I did.
18   Q.    So you started practicing on your own
19   immediately after law school?
20   A.    I was associated with him as an associate
21   attorney in his firm and then stayed with him for a year
22   and then went out on my own.
23   Q.    And where did -- so in that first year, was it
24   just the two of you?
25   A.    Yes.

Page 10

1    Q.    And what kind of law did you practice at that
2    point?
3    A.    Plaintiff's personal injury.
4    Q.    Okay.  You're answering my questions really
5    quickly.
6    A.    Okay.
7    Q.    And I'm -- they're almost getting cut off, and
8    I just want to make sure that the court reporter gets
9    down everything we're both saying.  So I would just ask
10   that you pause briefly, and plaintiff's counsel may have
11   some objections at some point in time as well, so that
12   will give them an opportunity to object.  Okay?
13   A.    Very well.
14   Q.    And so you stayed with your -- or I'm sorry.
15   What kind -- what area of law did you practice with your
16   roommate?
17   A.    To begin with?
18   Q.    Yes.
19   A.    Plaintiff's personal injury and some criminal
20   defense.
21   Q.    And then where did you go a year later when you
22   left your roommate's practice?
23   A.    Same building, just different office suite.
24   Q.    Did you open your own practice?
25   A.    I did.

Page 11

1    Q.    And, again, were you doing personal injury with
2    some criminal?
3    A.    Very little personal injury.  It mostly
4    developed into criminal defense.
5    Q.    Do you hold --
6    A.    There's a story behind that if you want to
7    know --
8    Q.    Sure.
9    A.    -- how it happened.
10   Q.    Yes.
11   A.    Cecil Patterson was the presiding judge at the
12   time.  He needed some help with respect to some conflict
13   cases.  He asked if I would be interested.  I was and I
14   did.
15   Q.    He was the presiding judge of what court?
16   A.    Superior Court, Maricopa County.
17   Q.    Did you also practice in federal court?
18   A.    I did.
19   Q.    Criminal?
20   A.    Yes.  I was part of a Criminal Justice Act
21   panel.
22   Q.    Also known as the CJA panel?
23   A.    Yes.
24   Q.    And how -- what was the name of your firm at
25   that time?

Page 12

1    A.    C. Kenneth Ray, the 2nd, PC.
2    Q.    And how long did you have that firm?
3    A.    Well, I've been in private practice ever since.
4    It may have changed -- I had some partners at one point
5    in time after moving to Prescott.  Then went back -- that
6    dissolved.  And then went back, you know, just continued
7    to practice, private practice.
8    Q.    Okay.  So you've really been on your own since
9    you graduated law school in terms of your practice?
10   A.    Well, yeah.  I have.
11   Q.    Um --
12   A.    When computers became appropriate, I fired
13   everybody and just hired a computer.  So it's just been
14   me and my wife, and that's it.
15   Q.    What does your wife do for the firm?
16   A.    She runs the business.  Business side of it,
17   financial side.  She second chairs from time to time.
18   Q.    Meaning she does paralegal work for you?
19   A.    Yes.
20   Q.    How long did you practice in Phoenix?
21   A.    I moved up here in 1993, took about a year to
22   two years to transition, so I was going back and forth
23   almost daily until got fully situated here.  So I've been
24   in practice, Prescott, since 1993.
25   Q.    Okay.  Do you hold any specialist



Page 13

1  certifications?
2  A.  I used to.
3  Q.  What specialist certification?
4  A.  Criminal law certification, state bar.  I gave
5  that up a long time ago, though.
6  Q.  And why did you give that up?
7  A.  It was $400 a year that didn't generate a whole
8  lot of anything.  So...
9  Q.  When did you become a certified specialist in
10  criminal law?
11  A.  Oh, geez.  I couldn't tell you the year.  It
12  was before moving up here.
13  Q.  Was it after the Debra Milke trial?
14  A.  Probably.
15  Q.  When you say that Cecil Patterson requested
16  that you do conflict work, what kind of conflict work --
17  A.  Indigent defense.
18  Q.  -- did he ask you to do?
19  A.  Indigent defense.  The case --
20  Q.  So help the defender --
21  A.  -- that he -- the case that he asked me to
22  participate in, I think, if my memory is right, is a ten-
23  or 11-defendant case.  They didn't have enough attorneys.
24  So he asked me if I would do it.  I did.
25      And then from then on, I did get a contract

Page 14

1  for indigent defense services with the -- or with
2  Maricopa County.
3  Q.  And so was that with the public defender's
4  office?
5  A.  You know, I don't remember how it got -- was
6  administered back then.  I don't think it was -- I think
7  it was through court administration.
8  Q.  And between -- well, 1984 is when you started
9  your own firm when you left your roommate?
10  A.  No.  That would have been '85.
11  Q.  '85.  So from 1985 through 1990, tell us what
12  your practice primarily consisted of, what types of
13  cases.
14  A.  I would have to say 98 percent criminal
15  defense.
16  Q.  And then if you had to break it down between
17  misdemeanor cases and felony cases, what would you say
18  the percentage of each was during that period of time,
19  1985 to 1990?
20  A.  Probably 75 percent felony.
21  Q.  25 percent misdemeanor?
22  A.  Yes.  And that's just a guess.
23  Q.  Right.
24  A.  I've never been one to keep track of things
25  like that.

Page 15

1  Q.  Okay.  And what percentage of your practice
2  between 1985 and 1990 was through the indigent services,
3  as opposed to a private retention?
4  A.  You're only asking for a guess, I assume.
5  Q.  Sure, yeah.  Just your best estimate.
6  A.  Probably 90 percent was indigent defense.
7  Q.  So 90 percent of your workload was through a
8  contract with the Superior Court?
9  A.  Yes.
10  Q.  Did -- does that 90 percent of the --
11  approximate 90 percent also include your CJA work?
12  A.  I'm trying to remember when I went on to the
13  CJA panel.  I honestly don't remember.  I know when I
14  re- -- when I resigned was when I moved up here.  I went
15  into Steve McNamee's office and I said, I can't be
16  running back to Phoenix on short notice.  So -- so if
17  that gives you a clue as to when I stopped CJA was after
18  Judge McNamee was appointed.
19  Q.  After he was appointed chief judge or --
20  A.  No, after he was appointed to the bench.
21  Q.  Okay.
22  A.  He was a former U.S. attorney, I believe.
23  And --
24  Q.  I see.  So it was when he was the U.S. attorney
25  you told him you needed to resign?

Page 16

1  A.  No, no.  No.  After he became a judge.
2  Q.  Okay.
3  A.  So he may have been the presiding judge at the
4  time.  Probably was.
5  Q.  And when you applied for a contract with the
6  Superior Court, were there any qualification requirements
7  other than simply being a licensed attorney in good
8  standing?
9  A.  I don't remember.  I honestly don't remember
10  what the qualifications were.  I guess Cecil Patterson
11  thought I could do it, then it was good enough for
12  everybody else.
13  Q.  Did you have any mentors who taught you how to
14  practice criminal law?
15  A.  No.  Well, yes and no.  Mentor by -- what you
16  mean, somebody that I went to all the time?
17  Q.  Sure.
18  A.  I mean, there were a lot of mentors, if you
19  will, the court staff, the judges.  J.D. Howe was a
20  wonderful mentor.
21  Q.  And who was that?
22  A.  He was a Superior Court judge.
23      Allen Bickart was down there practicing.
24  He's retired now here in Prescott.
25      Just a variety of colleagues that I worked



Page 17

1  with. Larry Kazan. Larry Debus.
2     Q.   So if you had questions about how to deal with
3  a particular situation, you would call on those
4  individuals --
5     A.   I could call on them or see them in the hallway
6  during a court proceeding, asking how -- their opinion of
7  things.
8     Q.   How many death penalty cases have you handled?
9     A.   In the state court system, I would say three,
10  including Ms. Milke's.
11    Q.   What about federal?
12    A.   Federal, there was a number of homicide cases I
13  handled, but there was no death penalty on the table for
14  those.
15    Q.   And how many homicide cases have you handled in
16  federal court?
17    A.   Federal court?
18    Q.   Yes.
19    A.   I would say three, if my memory's correct.
20    Q.   How many of those were before the Debra Milke
21  case?
22    A.   I don't think any.
23    Q.   What about the death penalty cases you handled
24  in state court, the two other ones, other than the Debra
25  Milke case, were those before or after her case?

Page 18

1     A.   And I couldn't tell you honestly.  I don't
2  know.  I just remember -- and I don't even remember their
3  names.  I just remember one was a death penalty case and
4  it was dismissed before trial.
5         Another was -- memory tells me his last name
6  was Jimenez.  And that was before Judge O'Melia.  And his
7  death penalty was overturned by the Supreme Court --
8     Q.   So he was convicted?
9     A.   Yes.
10    Q.   Prior to the Debra Milke case, did you have any
11  specific training on how to handle a death penalty case?
12    A.   I'm sure that I did.  I just can't imagine --
13  you know, I can't pinpoint what it was.  But I --
14    Q.   Well, then how are you sure that you had
15  training on that?
16    A.   Well, you don't jump into something without
17  trying to get as much education as you can in this area.
18    Q.   So is there -- or strike that.
19         Back in the 1989 time frame --
20    A.   Uh-huh.
21    Q.   -- was there specific training available to
22  attorneys who practice criminal law who are assigned or
23  retained to handle a death penalty case?
24    A.   My recollection is, no, there was not.  Not
25  like the system that they have in place now where you

Page 19

1  have to be death-qualified.
2     Q.   And tell us what that means.
3     A.   Well, you have to go through X number of hours
4  and training.  You have to second chair.  You cannot be
5  first chair until you've done -- I don't know how many it
6  is now, of those cases.
7         Specific seminars dealing with death penalty
8  work.  That's my understanding of it at the present time.
9  I don't think I've ever been death-qualified since the
10  Milke case.
11    Q.   Okay.  And so when you handled the Milke case
12  and the two other death penalty cases, there was no
13  requirement that you be death-certified?
14    A.   That's my recollection.
15    Q.   And --
16         MS. HOFFMANN:  Lori, sorry.  I don't mean to
17  interrupt.  I'm having a little bit of trouble hearing
18  the witness.  Is it possible to move the microphone --
19  whichever one is picking up for the video conference, a
20  little closer to him?
21         THE WITNESS:  And I can probably speak up
22  too.
23         MS. HOFFMANN:  That would help.  Thank you
24  very much.
25         THE WITNESS:  All right.  Great.

Page 20

1         MS. BERKE:  Yeah, maybe just move the
2  microphone up --
3         UNIDENTIFIED SPEAKER:  Yeah.
4         MS. BERKE:  -- a little bit.  No?
5         MS. HOFFMANN:  I think that's a different
6  mic.  I don't know if that's the same mic.
7         MS. BURGESS:  This is for the video only.
8         COURT REPORTER:  He's only --
9         THE WITNESS:  That's the video.
10         COURT REPORTER:  -- picking up audio through
11  the mic.
12         MS. HOFFMANN:  Thank -- thank you very much.
13         MS. BERKE:  Oh, gotcha.  Okay.
14    Q.   BY MS. BERKE:  And so I think you testified a
15  moment ago that you believe you had training on how to
16  handle a death penalty case prior to handling the Debra
17  Milke case.  Is that accurate?
18    A.   That's accurate.
19    Q.   And so if there weren't these death
20  qualification requirements back then, what kind of
21  training was available to attorneys to teach them how to
22  handle death penalty cases?
23    A.   Whatever's available through the seminars at
24  the state bar.
25    Q.   And so it would be purely on a voluntary basis



Page 21

1 that you would attend that?
2    A.   Correct.
3    Q.   You weren't required to attend that training
4 before handling a death penalty case?
5    A.   No.
6    Q.   And so how is it that you know you attended any
7 training on -- specific to death penalty cases prior to
8 the Debra Milke case?
9    A.   Because I told you I did.  To -- to say
10 specifically what it was, I cannot recall.  I do not
11 know.
12    Q.   What is it that you recall about this training
13 that leads you to respond that you know you did attend
14 some kind of training to that effect?
15    A.   I don't recall the training.  I don't recall
16 the seminars or anything of that nature.
17    Q.   And tell us in your view, is it important for
18 an attorney prior to handling a death penalty case to
19 have training specific to handling death penalty cases?
20    A.   Today, yes.
21    Q.   What about back in 1989?
22    A.   It would have been nice.
23    Q.   But why wouldn't it have been important?
24    A.   It was important.
25    Q.   And -- okay.

Page 22

1         How is it that you came to represent Debra
2 Milke?
3    A.   Appointed.
4    Q.   By who?
5    A.   Superior Court indigent defense contract.
6    Q.   How long after her arrest were you appointed to
7 represent her, if you recall?
8    A.   Within days.
9    Q.   Do you recall what your hourly rate was that
10 you were being paid for that work?
11    A.   No, I do not.
12    Q.   Not even generally?
13    A.   No, I don't.  I don't remember what it was.
14    Q.   Do you recall what your workload was like at
15 the time you were appointed to represent Debra Milke?
16    A.   I don't.
17    Q.   Do you know how it is that it was decided that
18 you would be representing Ms. Milke?
19    A.   I received the phone call assigning me the
20 case.
21    Q.   At -- in those days, were assignments
22 completely random, if you know?
23    A.   Well, it's my recollection that they had a
24 panel of conflict attorneys, if the public defenders
25 couldn't handle for some reason.  And when your name came

Page 23

1 up, you took the case.  If you didn't take the case, you
2 didn't have the contract.
3    Q.   So, as far as you knew, it was just whenever
4 your name came up next on the list that you would get the
5 next case regardless of what kind of case it was?
6    A.   Correct.
7    Q.   And when you accepted the assignment to
8 represent Debra Milke, did you feel qualified to handle
9 that case and competent to handle that case?
10    A.   Yes.
11    Q.   Did you have any concerns about your competency
12 at that time to handle a death penalty case?
13    A.   No.
14    Q.   And, again, you -- do you know whether you had
15 handled any death penalty cases prior to hers?
16    A.   It seems that I did.  The other -- you know, as
17 we think back on things, it seems that the other two
18 cases I had handled prior to her.  I could be mistaken,
19 but I -- I think that I'm right.
20    Q.   I'm going to show you an affidavit that you
21 prepared that might help refresh your recollection --
22    A.   All right.
23    Q.   -- as to some of these facts because I
24 understand it was quite a while ago.
25         MS. BURCH:  Lori, can you tell me --

Page 24

1    Q.   BY MS. BERKE:  So --
2         MS. BURCH:  -- what the Bates numbers are?
3    Q.   BY MS. BERKE:  I'm going to show you an
4 affidavit that starts at Bates number MILKE_NSB017495,
5 and this is going to be marked as Exhibit Number 206.
6         (Exhibit 206 was marked for identification.)
7    Q.   BY MS. BERKE:  And you can just go ahead and
8 review that to yourself.
9    A.   All right.
10    Q.   Do you -- this is an affidavit that you
11 prepared?
12    A.   It was prepared for my review and I signed it.
13    Q.   Who prepared it?
14    A.   I believe Anders Rosenquist did.
15    Q.   And that was Ms. Milke's appellate attorney?
16    A.   I believe he was -- yes, he was the appellate
17 attorney.
18    Q.   And you signed -- or you verified this
19 affidavit under penalty of perjury on September 30th of
20 1995.  Correct?
21    A.   Yes.
22    Q.   And does this help refresh your recollection as
23 to when you handled the other death penalty cases?
24    A.   Yes.  Paragraph 5.
25    Q.   Okay.  And tell us now when you handled the



Page 25

1 other death penalty cases.

2    A.   Well, it would have been -- the other death

3 penalty cases would have been one that was dismissed. I

4 can't remember when in the process it was dismissed. And

5 then the other one was the -- what I believe to be the

6 Jimenez case. I may have the name wrong. I certainly

7 remember the facts but not the...

8    Q.   Right. And according to paragraph 5, you tried

9 one death penalty case prior to representing Debra Milke.

10 Correct?

11    A.   That would be correct.

12    Q.   So do you know which case you handled before

13 Debra Milke's case, whether it was the one that got

14 dismissed or the one where your client was convicted?

15    A.   The -- tried, meaning taken to trial, and

16 convicted was -- the case that was before Judge Michael

17 O'Melia and I believe the last name was Jimenez.

18    Q.   And is that the one that took place before

19 Debra Milke's --

20    A.   Yes.

21    Q.   -- case?

22    A.   Yes.

23    Q.   We're obviously going to talk quite a bit about

24 the Milke case, but I'm going to ask you some other

25 details first.

Page 26

1        Ms. Milke was convicted at the conclusion of

2 the trial that you represented her on. Correct?

3    A.   Yes.

4    Q.   And then your representation of Ms. Milke

5 concluded when?

6    A.   When she was sentenced.

7    Q.   Shortly after she was sentenced?

8    A.   I assume, yes. I --

9    Q.   Well, take a look at paragraph 4 of Exhibit

10 206. Does that help refresh your recollection as to when

11 your representation of her concluded?

12    A.   Correct.

13    Q.   And after refreshing your recollection, when

14 did your representation of her conclude?

15    A.   As stated in the affidavit, shortly after

16 sentencing.

17    Q.   Why did you not represent her on appeal?

18    A.   That's malpractice.

19    Q.   So it's -- a criminal attorney who represents a

20 client at trial can never --

21    A.   Not really.

22    Q.   -- represent --

23    A.   No, let's put it this -- let me put it this

24 way: It's not -- presently there's -- that's the subject

25 of some discussion.

Page 27

1        I recall a case in federal court before

2 Judge Broomfield when he was a district judge that I

3 tried, and he says that I would need to do the appeal.

4 And I said, well, I'm not certified before the Ninth

5 Circuit. And I wasn't at the time. He says, Well,

6 you're going to have to get certified and you're going to

7 have to do the appeal. So I did and I did.

8        I have handled appeals of cases that I've

9 lost. Still do. I still have the opinion that you can.

10 But there are others in the -- in the practice of

11 criminal defense that believe otherwise. They believe

12 it's not appropriate.

13        So I don't know the honest answer to that

14 question.

15        For Ms. Milke's case, I can tell you that I

16 did not do the appeal because I did not have a contract

17 to do appeals. So it would not have been something that

18 would have been assigned to me to do.

19    Q.   Would there have been a conflict of interest in

20 your handling Debra Milke's appeal?

21    A.   Well, that gets into the area that I just was

22 talking about. I don't think so.

23    Q.   Well, one of the arguments she raised on appeal

24 and in her postconviction pleadings was that she had

25 ineffective assistance of counsel. Correct?

Page 28

1    A.   She may have -- I don't know what she raised in

2 terms of the postconviction relief.

3        My view is this: In a case that you handle

4 as a defense lawyer, to trial and are convicted,

5 ineffective assistance of counsel in my opinion is not a

6 subject of the appeal. Rather, that is subject of

7 postconviction relief proceedings. You cannot represent

8 an individual in postconviction relief proceedings that

9 you have represented at trial. Supreme Court's very

10 clear about that. But I don't --

11    Q.   Because there's a conflict?

12    A.   Yeah.

13    Q.   An inherent conflict?

14    A.   You -- you cannot raise ineffective assistance

15 of counsel yourself.

16        In this affidavit, which maybe I'm

17 anticipating your question, is why did I say that I was

18 ineffective. Randall Howe said the same thing out of the

19 AG's office when he handled this case, and I pointed out

20 to the state bar when they -- cuz he turned me over to

21 the state bar saying I admitted ineffective assistance of

22 counsel.

23        I said, If you read the affidavit, it said I

24 was rendered ineffective.

25    Q.   Where does it say that?



Page 29

1    A.   Well, it doesn't say the word "rendered."
2    Paragraph 10, "It's my opinion that my representation of
3    defendant in this case was ineffective based on the
4    holding and reasons for the holding Strickland versus
5    Washington.  It's my opinion" -- "position that my
6    ineffective representation of Milke was caused by the
7    separate and joint conduct of the judge and the
8    prosecutor in the case."
9         That is what rendered me, in my opinion,
10   ineffective.
11   Q.   Right.  So in this affidavit, you are admitting
12   that your representation of Ms. Milke was ineffective.
13   Correct?
14   A.   Because of the actions of the judge and the
15   prosecutor.
16   Q.   What were the actions of the judge that
17   rendered you ineffective in your representation of Debra
18   Milke?
19   A.   I don't remember, honest to God.
20   Q.   What was the conduct of the prosecutor that
21   rendered your representation of Debra Milke to be
22   ineffective?
23   A.   I don't remember.  I do recall that I was
24   trying to get information concerning Mr. Saldate.  I do
25   recall issuing subpoenas to try to get those records.  I

Page 30

1    do recall Mr. Levy objecting to the disclosure of those
2    records.
3         I recall Judge Hendrix quashing the subpoena
4    or doing something to stop me from getting the records.
5    I recall that she looked at -- supposedly looked at the
6    records in -- in camera and determined there was nothing
7    there.
8         So that may be part of it, but I'm sure
9    there's a whole lot of other things that -- that I can't
10   articulate for you.
11   Q.   You would agree that Detective Saldate never
12   opposed your subpoena for any records related to him.
13   Correct?
14   A.   I would have no knowledge as to whether he did
15   or didn't.
16   Q.   So you're not aware of any -- as you sit here
17   today, any objection he made to production of any records
18   related to him?
19   A.   I'm not aware one way or the other.  My only
20   contact with Mr. Saldate was either on the stand or in
21   pretrial interviews.
22   Q.   If you look at paragraph 11 of your
23   affidavit -- that's Exhibit Number 206 -- you state that
24   if certain things had happened, the outcome of her trial
25   would have been different.  Correct?

Page 31

1    A.   That was my opinion, yes.
2    Q.   And you list seven different circumstances
3    that, if different, would have led to a different
4    outcome.  Correct?
5    A.   I did.
6    Q.   And the first one you list is that if you had
7    been given sufficient money to investigate the case
8    properly.  What -- what's that issue?  Explain that to
9    us.
10   A.   My recollection -- and it's very vague at this
11   point in time, but the funds that were available to
12   contract attorneys for investigation was limited.  It was
13   governed by the assigned trial judge, if my memory is
14   correct.  And so there must have been something in the
15   course of the trial that I was complaining about not
16   having enough money to do the investigation.
17   Q.   Do you recall what it is you needed money for
18   to do further investigation that you were not provided?
19   A.   Today, no, I do not recall.
20   Q.   And then you also state that you were not
21   allowed to fully cross-examine the State's witnesses in
22   the case.  Do you know what that's about or do you
23   recall?
24   A.   I do not recall.
25   Q.   You also state that you were not allowed to

Page 32

1    obtain and call the witnesses you wanted to call.
2    Correct?
3    A.   That's what's stated, ma'am.
4    Q.   And do you remember what witnesses you weren't
5    able to call that you had wanted to call?
6    A.   No, I do not recall.
7    Q.   And how did -- how were you prevented from
8    obtaining and calling any witnesses?
9    A.   I -- I don't even recall that, ma'am.  I mean,
10   if I were provided the entire trial transcripts, all the
11   records again to review and you give me about a month to
12   go through all of that, I could probably answer it.  But
13   today I cannot.
14   Q.   And the next letter is D, had you been provided
15   critical discovery in a timely manner, the outcome would
16   have been different.  What critical discovery were you
17   not provided in a timely manner?
18   A.   Can I preface my answer?
19        I am privileged to having reviewed the Ninth
20   Circuit opinion, and so I think that if I had what the
21   Ninth Circuit said that I should have had, the outcome
22   would have been different.
23   Q.   Well, is it --
24   A.   Whether that is something I requested back
25   then, I think that had I been granted the information



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
33–36

Page 33

1  that I was requesting through a subpoena and had benefit
2  of that, it may well have led to additional research and
3  investigation on my part that would have disclosed all of
4  those things that were borne out in the Ninth Circuit
5  opinion.
6      Q.   Are you saying that the -- and are you
7  referring to the other cases in which Detective Saldate
8  was involved in investigating?
9      A.   I think it would have led to that, yes.
10     Q.   No, I -- I -- when you talk about the Ninth
11  Circuit decision --
12     A.   Yes.
13     Q.   -- are you referring to the Ninth Circuit's
14  discussion of other cases in which Detective Saldate had
15  been involved as a --
16     A.   Yes.
17     Q.   -- detective?
18     A.   Yes.
19     Q.   And are you -- is it your position that you
20  requested that information during Ms. Milke's case?
21     A.   No.  I don't think -- no.  What I subpoenaed
22  was the records from Mr. Saldate's employer, if my memory
23  is right.  And had we been provided that information, it
24  may well have led to additional information or at least
25  request to get the information.

Page 34

1      Q.   How so?
2      A.   Well, either through motion to the Court,
3  having conversation with Mr. Levy to remind him that he
4  needed to disclose this material to me.  Go find it
5  myself one way or the other.
6      Q.   Well, in the subpoena that you issued to the
7  City of Phoenix, you did not request any documents
8  related to other cases in which Detective Saldate was
9  involved as an investigating detective.  Correct?
10     A.   I don't know.  I just --
11          MS. HOFFMANN:  Object to asking -- sorry.
12  Objection to asking questions about a document he doesn't
13  have in front of him.
14          MS. BERKE:  Okay.  Can you just limit your
15  objections to evidentiary objections, please?
16          MS. HOFFMANN:  Yes, I'm objecting that he
17  doesn't have it in front of him.
18          MS. BERKE:  It's --
19          MS. BURGESS:  It's either a form or a
20  foundation.
21          MS. BERKE:  Right.  I -- that's not an
22  evidentiary objection.  Let's go off the record for one
23  second.
24          THE VIDEOGRAPHER:  We're off the record at
25  10:54.

Page 35

1          (A discussion was held off the record.)
2          THE VIDEOGRAPHER:  We're back on the record
3  at 11:06.
4          (Exhibit 207 was marked for identification.)
5      Q.   BY MS. BERKE:  All right.  Mr. Ray, I've placed
6  before you what's going to be marked as Exhibit Number
7  207 to your deposition.  And the first two pages of it
8  are the subpoena that you had served in connection -- or
9  served on the Phoenix Police Department for records
10  related to Armando Saldate.  Correct?
11     A.   Correct.
12     Q.   And so what you requested was the personnel
13  file to include records and materials reflecting training
14  he received, training seminars he attended and/or taught
15  and any and all records of any internal affairs
16  investigations of Detective Saldate, if any, relating to
17  his technique or methods of interrogation, violations of
18  Miranda rights and/or improprieties during the course of
19  interrogation, if any.  Correct?
20     A.   Yes.
21     Q.   And so you did not request a list of cases in
22  which he was involved as a homicide detective.  Correct?
23     A.   Subpoena does not say that.
24     Q.   So I'm correct that you did not request such a
25  list?

Page 36

1      A.   Not in that subpoena, no.
2      Q.   Did you --
3      A.   You are correct.
4      Q.   Did you request a list in some other context?
5      A.   Not that I recall.
6      Q.   Did you serve any other subpoenas on the City
7  of Phoenix or the Phoenix Police Department in connection
8  with Detective Saldate?
9      A.   I do not recall.
10     Q.   And if you look at the third page of Exhibit
11  207, that's the start of a motion to quash subpoena that
12  was filed by the Phoenix Police Department.  Correct?
13     A.   Yes.
14     Q.   And just for the record, that document has also
15  been marked as Exhibit Number 104 in this case.
16          Following the motion to quash, I have the
17  transcript setting forth the discussion that took place
18  in Court on September 24th, 1990, regarding the motion to
19  quash.  Okay?
20     A.   I see that.
21     Q.   And why don't you take a look at it and review
22  that testimony -- or review that discussion.
23     A.   Okay.  I read that.
24     Q.   So the basis -- well, strike that.
25          So the basis on which the Phoenix Police



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018

37–40

Page 37

1 Department was seeking to quash your subpoena was that
2 your request was vague and overbroad and lacked
3 specificity as to what documents you were requesting.
4 Correct?
5     A.   That's their position as stated in -- in
6 argument and in the motion.
7     Q.   Right.  And the Phoenix Police Department also
8 took the position that the subpoena failed to meet the
9 requirements as set forth in State v. -- is it Cano?
10     A.   I don't remember.
11     Q.   Okay.
12     A.   I mean, that's what's written.
13     Q.   And that the law in Arizona was that limited
14 access to internal affairs records is allowed after an in
15 camera inspection and after -- and only after a specific
16 showing of relevance.  That was the argument made by the
17 Phoenix Police Department.  Correct?
18     A.   That appears to be what they said.
19     Q.   And that then the Phoenix Police Department
20 also took the position that the custodian of records for
21 the internal affairs bureau had not been properly served
22 with the subpoena duces tecum and that the subpoena
23 requesting internal affairs records should be quashed on
24 that basis as well.  Correct?
25     A.   That's what they argued.

Page 38

1     Q.   And the Phoenix Police Department also
2 contended that the subpoena constituted a fishing
3 expedition.  Correct?
4     A.   I don't see that word.  Is that in here
5 somewhere?
6     Q.   It's in the second-to-last paragraph of the --
7     A.   Of the motion?
8     Q.   -- the motion to quash.
9     A.   Is it?  Okay.
10     Q.   Do you see that?
11     A.   That's -- those words are there.
12     Q.   Okay.  And what you argued to the Court with
13 respect to this motion to quash was that you simply
14 wanted information regarding Detective Saldate's training
15 that he may have received with respect to interrogation
16 or interviewing of witnesses.  Correct?
17     A.   The document speaks as to what I argued, ma'am.
18     Q.   Are you objecting to my question?
19     A.   No, I'm not objecting.  I'm just telling you
20 it's whatever you're -- you're regurgitating that which
21 is written.  I can't have anything further to add to
22 that.
23     Q.   Well, so either agree with me or disagree with
24 me that that's what your argument was.
25     A.   The argument is as stated in the transcript,

Page 39

1 ma'am.  I have no --
2     Q.   Well, if --
3     A.   -- issue with the transcript.
4     Q.   If -- if you look at MILKE_AZAG007220, of
5 Exhibit 207 --
6     A.   Where are you?
7     Q.   -- starting at line 12 -- or let's start at
8 line 11, the Court asks you if there's anything you wish
9 to say about the motion to quash.
10     A.   Yes.
11     Q.   Correct?
12     A.   Yes.
13     Q.   And what you tell the Court in summary fashion
14 is that Detective Saldate had indicated during his
15 testimony that he was unaware of any guidelines that
16 apply to the interrogation or interviewing of witnesses
17 and any training that he may have received, and that's
18 what you wanted the Court to order be produced.  Correct?
19       If you go down to --
20     A.   I -- I perceive two questions there.
21       One, did I state that, yes.
22       And do I recall what it was I was looking
23 for, I just have to defer to the document itself as to
24 what I was saying, ma'am.  I don't have a present
25 recollection --

Page 40

1     Q.   Okay.
2     A.   -- of any of this.
3     Q.   So if you go down to line 22, you state, "It is
4 the defense's desire for the guidelines to be produced so
5 that we can analyze those guidelines against the
6 testimony that has been offered by Detective Saldate."
7       Did I read that correctly?
8     A.   You did.
9     Q.   So really what you were pushing the Court to
10 order was the production of guidelines of the Phoenix
11 Police Department.  Correct?
12     A.   That appears to be what I was doing.
13     Q.   And you would agree, having read this entire
14 argument regarding the motion to quash, that you did not
15 push the Court for production of any internal affairs
16 records.  Correct?
17       In other words, you did not argue to the
18 Court in connection with this motion to quash that the
19 Phoenix Police Department should be required to produce
20 any internal affairs investigations of Detective Saldate.
21 Correct?
22     A.   I did not make that argument apparently --
23     Q.   Well --
24     A.   -- in the transcript.
25     Q.   Right.  And you've read the full argument --



Page 41

1     A.   I read the full transcript.

2     Q.   -- on the motion to quash?

3     A.   However, the subpoena itself spells out what it

4   was that I wanted.

5     Q.   Well, right.  But you clarified for the Court

6   that what you really were looking for was the guidelines

7   and you made no mention of the internal affairs records.

8     A.   In the argument.  That's correct.

9     Q.   And you did not dispute that service on the

10   internal affairs department had been improper.  Correct?

11     A.   I did not.  That's not a concession that I

12   agreed with it; it's just that I did not make the

13   argument.

14     Q.   And you did not contend during your argument

15   that the police department was incorrect in its argument

16   that your subpoena failed to meet the requirements set

17   forth in State v. Cano, C-a-n-o.  Correct?

18     A.   I'm sorry.  Could you say that again?  I

19   didn't -- I wasn't tracking.

20     Q.   That's okay.  We'll just have the court

21   reporter read it back.

22          (The last question was read back by the

23   court reporter.)

24          THE WITNESS:  Now?

25          COURT REPORTER:  Go ahead.

Page 42

1          THE WITNESS:  Correct.

2     Q.   BY MS. BERKE:  And, in fact, what Mr. Richard

3   told the Court was now that you had clarified for him

4   what specifically you were looking for, he agreed that

5   the police department would check for policies related to

6   interrogations and Miranda and present them to Mr. Ray,

7   to you, if the Court so ordered or provide them for in

8   camera review.  Correct?

9     A.   That's what he said.

10     Q.   And that's what he did.  The Court ordered that

11   he present those policies to the Court for an in camera

12   review.  Correct?

13     A.   I believe that's what the Court ordered in the

14   transcript.  If you're asking me if I have a personal

15   recollection of it today as to that's what happened, I

16   couldn't tell you.

17     Q.   Right.  But having reviewed the transcript,

18   that refreshed your recollection as to what positions the

19   police department took and what arguments were made.

20   Correct?

21     A.   Correct.

22     Q.   And you specifically told the Court that you

23   weren't making a claim that you had been surprised by

24   anything in Detective Saldate's testimony; you simply

25   were taking the position that you had good cause for

Page 43

1   having not previously requested those policies and

2   guidelines and you were asking the Court during trial to

3   order their production.  Correct?

4     A.   I think that's the gist of what I argued.

5     Q.   And one of the primary things you were looking

6   for was whether there were any guidelines as to any

7   requirements to tape-record interrogations.  Correct?

8     A.   Correct.

9     Q.   That was the main thing you were looking for.

10   Correct?

11     A.   Yes.  That was one of the things I was looking

12   for.  The subpoena spells out everything else I was

13   looking for.

14     Q.   And during this entire argument that's part of

15   Exhibit 207 -- strike that.

16          And so during the argument on the motion to

17   quash, the only documents that were the subject of your

18   subpoena that you asked the Court to order be produced

19   are guidelines and procedures related to interrogations.

20   Correct?

21     A.   What I argued is what I argued, ma'am.

22     Q.   Am I correct?

23     A.   Well, hold on.  The -- the transcript says that

24   that's what I did.  And I -- I don't dispute the

25   transcript.  What I have -- I'm having an issue with is

Page 44

1   that there was some kind of implied waiver or abandonment

2   of the remainder of the materials that I was looking for.

3   And that's -- would be an infair -- unfair and improper

4   characterization, in my opinion.

5     Q.   Well, you understand that when a party files a

6   motion to quash a subpoena, if the opposing party fails

7   to oppose some or all of that motion to quash, that would

8   be a concession that the movant is correct in the

9   movant's argument.  Right?

10     A.   You're asking my opinion?

11     Q.   Yes.

12     A.   Not necessarily.

13     Q.   But you --

14     A.   So, no, I don't share your opinion.

15     Q.   Okay.  Well, how does one -- how does an

16   attorney --

17     A.   Uh-huh.

18     Q.   -- properly respond to a motion to quash in a

19   criminal case?

20          MS. HOFFMANN:  Object.  Vague.

21          You can answer.

22          THE WITNESS:  I -- I couldn't hear her.

23          MS. BERKE:  That's okay.  It's for the

24   record.

25          THE WITNESS:  I don't -- what did you --



Page 45

1    MS. HOFFMANN:  I -- I said I object.  It's
2  vague.
3        You can answer.
4        THE WITNESS:  Okay.  In a perfect world, I
5  would have had time to have researched the -- the
6  response, prepared a written response and filed that
7  response.  This motion to quash didn't -- didn't afford
8  that opportunity to do that.
9    Q.  BY MS. BERKE:  Okay.  You didn't ask the Court
10  for additional time to --
11    A.  No, I did not.
12    Q.  -- brief the issue?
13    A.  No, I did not.
14    Q.  And you could have done that.  Correct?
15    A.  I could have asked.
16    Q.  And you understand that the only way to oppose
17  a motion is to file an opposition or argue an opposition
18  on the record.  Correct?
19    A.  Agreed.
20    Q.  And so you would agree that you never opposed
21  and Ms. Milke never opposed the portion of the motion to
22  quash related to the request for internal affairs
23  records?
24    A.  I will agree that I did not argue it.  I will
25  not agree that I abandoned my request in the original

Page 46

1  subpoena.
2    Q.  Okay.  That wasn't my question.
3    A.  Okay.
4    Q.  My question was, you would agree that Ms. Milke
5  never opposed the portion of the motion to quash related
6  to the request in your subpoena for internal affairs
7  records?
8    A.  I will agree that I did not address that in
9  oral argument before the Court.
10    Q.  Okay.  So are you -- is it your position that
11  Ms. Milke did oppose that portion of the motion to quash?
12    A.  It is my opinion and position that what she
13  wanted was that which was spelled out in the -- in the
14  subpoena.
15    Q.  I understand that.  But you understand when
16  someone files a motion, the opposing party -- or the
17  other side has an opportunity to oppose that motion?
18    A.  Correct.
19    Q.  And the opposition would happen after the
20  filing of the motion.  Correct?
21    A.  Correct.
22    Q.  Did Ms. Milke ever oppose the portion of the
23  motion to quash related to the request for internal
24  affairs records contained in your subpoena?
25    A.  I did not make that argument.

Page 47

1    Q.  Did you ever oppose the motion?
2    A.  In -- whatever I said in the response is my
3  efforts at opposing the motion to quash.
4    Q.  Okay.  But I -- you understand I -- I -- I'm
5  asking you to agree that Ms. Milke never opposed the
6  portion of the motion to quash that related to the
7  request in the subpoena for internal affairs records.
8  You would agree with that.  Right?
9    A.  Ma'am, I can't agree to something that I don't
10  agree with.
11    Q.  Well --
12    A.  And I don't know how I can be more clear with
13  you.  And --
14    Q.  Well --
15    A.  And I respect what you're doing and how you're
16  doing it.  My point is -- is that what I wanted was what
17  was in the subpoena.  The State or through the City
18  attorney or I guess whoever was that wrote the --
19  Mr. Richards, didn't want to provide it.  He filed a
20  motion to quash.  We had argument before the judge.  The
21  arguments that I made are the arguments that I made.
22  Were they incomplete?  Probably so.
23    Q.  Okay.  Can you point me to anywhere in the
24  transcript of the argument on the motion to quash where
25  Ms. Milke opposed that portion of the motion related to

Page 48

1  the request for internal affairs records?
2    A.  I cannot.  Because it's not there.
3    Q.  Right.  And did you file any opposition to the
4  motion to quash related to the request for internal
5  affairs records?
6    A.  I do not recall whether I did or didn't.
7    Q.  You know that you didn't.  Correct?
8    A.  I don't know that I did or didn't.  This is how
9  many years ago?
10    Q.  And certainly receiving policies and guidelines
11  concerning how to conduct interrogations would not have
12  led you to any of the information or cases addressed in
13  the Ninth Circuit's opinion.  Correct?
14    A.  I can't think that it would have.
15    Q.  What, if anything, did you do to prepare for
16  your deposition today?
17    A.  I prepared -- did the research and prepared the
18  letter to you and other counsel dated July 11th
19  indicating to you my position with respect to certain
20  ethical rules and matters that I felt that I could not
21  talk about.
22        I've had conversations with Katie --
23  what's -- McCarthy, is that her name -- Katie McCarthy on
24  two occasions.
25        I had a conversation with Richard Palmatier,



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
49–52

Page 49

1  bar counsel to the state bar.  And I can share the file
2  number, he says that's fine.
3    Q.   Okay.
4    A.   EH181554.  His telephone number is
5  (602)340-7301.  I had a lengthy conversation with him
6  about this subject.
7    Q.   About what you could and could not testify
8  about?
9    A.   Yeah.  I mean, whether -- whether I could
10  answer anything, honestly.
11        The last conversation I had with
12  Ms. McCarthy, I related the fact that I had no signed
13  authorization from Ms. Milke to talk about anything, and
14  subsequent to that, I did receive via e-mail dated
15  August 10th a consent -- limited consent.
16    Q.   Okay.  And I'm going to just go ahead and mark
17  those documents as exhibits.  I didn't bring extra
18  copies, but since he mentioned them, I'm going to mark
19  them.  I'm going to have the July 11th -- I'm going to
20  have the July 11th -- I think that's going to be 208.
21        (A discussion was held off the record.)
22        (Exhibit 208 was marked for identification.)
23    Q.   BY MS. BERKE:  I'm showing you what's been
24  marked as Exhibit Number 208.  And is that the first
25  document you mentioned?

Page 50

1    A.   Yes.
2    Q.   That's a letter from you to all of the
3  attorneys on the case?
4    A.   Yes.
5    Q.   Setting forth your position in terms of today's
6  deposition and --
7    A.   Yes.
8    Q.   -- whether you could ethically answer
9  questions?
10    A.   Yes.
11    Q.   And then you subsequently received a letter
12  from Ms. Milke authorizing you to provide testimony
13  today.  Correct?
14    A.   Limited.
15        MS. BERKE:  Let me have that marked.
16        (Exhibit 209 was marked for identification.)
17    Q.   BY MS. BERKE:  I'm showing you what's been
18  marked Exhibit 209.  And is that the letter you mentioned
19  that you received from Ms. Milke the other day?
20    A.   Yes.
21    Q.   And --
22    A.   I should say it appears to be Ms. Milke.  I
23  haven't seen her signature in 25 years, maybe.
24    Q.   But you received it from her attorneys
25  representing it to be her signature and --

Page 51

1    A.   Yes.
2    Q.   -- you trust that to be the case.  Correct?
3    A.   Right.  I trust it on that basis.
4    Q.   Okay.  And in that letter, Ms. Milke authorizes
5  you to be here today and to provide some testimony.
6  Correct?
7    A.   Yes.  As -- as outlined in the letter, yes.
8    Q.   And did Exhibit Number 209, the letter from
9  Ms. Milke, come about as a result of your having shared
10  with Ms. McCarthy advice you received from Richard
11  Palmatier at the state bar?
12    A.   No.  That conversation happened afterwards.
13  Palmatier's conversation happened after I had the
14  conversation that led to the creation of 209.
15    Q.   Oh, okay.  So you've talked to Ms. McCarthy a
16  total of two times?
17    A.   Correct.
18    Q.   When was the first time?
19    A.   I don't remember the date.
20    Q.   Approximate.
21    A.   Shortly after I received notification from you
22  that I was going to be deposed.
23    Q.   And did you discuss the substance of the case
24  with her?
25    A.   Let me take that back.  I think I may have had

Page 52

1  a conver-- -- a call from her before talking with you.  I
2  think that's the order.
3    Q.   Okay.
4    A.   I received a call.  Then I -- I think I got a
5  call from you.  Wasn't it -- it was a phone call, I
6  believe.  And based upon that, I created the letter,
7  Exhibit 208, after I did some research.
8        Ms. McCarthy indicated in the -- in the
9  first conversation that she would be calling me again
10  later in -- in the context of preparing for the
11  deposition.  And then I had the conversation with the
12  state bar counsel.
13    Q.   Okay.  And that first conversation you had with
14  Ms. McCarthy before you and I spoke --
15    A.   Uh-huh.
16    Q.   -- how long did that conversation last?
17    A.   Maybe 10, 15 minutes maybe.
18    Q.   And did you discuss the substance of the case
19  at all?
20    A.   It was shared with me something -- I don't know
21  it was so much in that conversation.  No.  The gist of
22  what I remember the first conversation is how anybody in
23  their right mind could think that I could remember stuff
24  from 25 years ago without reviewing the entire record and
25  file.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
53–56

Page 53

1   Q.   It's a very --
2   A.   But --
3   Q.   It's a very difficult thing to do.  Right?
4   A.   Being in this position, you bet.
5   Q.   To remember your specific involvement in
6   certain aspects of --
7   A.   Sure.
8   Q.   -- the case?
9   A.   Sure.  But that was really the gist of the
10  first conversation.  I don't recall we -- getting into
11  any particulars.
12        The second conversation, she shared with me
13  some things that you might want to get into.  I
14  reiterated the fact that I needed to have some
15  authorization and that I didn't feel comfortable even
16  talking with her about it, let alone anyone else.
17  Q.   What did she tell you I might want to get into
18  with you?
19  A.   Things that you've been getting into so far.
20  Q.   So she was spot on?
21  A.   So far.
22  Q.   What things did she tell you I might ask you
23  about that we haven't discussed yet?
24  A.   Can we go off the record for a moment?
25  Q.   I --

Page 54

1   A.   Please.
2   Q.   Sure.
3        THE VIDEOGRAPHER:  We're off the record at
4   11:40.
5        (A recess was held off the record.)
6        THE VIDEOGRAPHER:  We're back on the record
7   at 11:42.
8   Q.   BY MS. BERKE:  So setting aside what we
9   discussed off the record, what types of things did
10  Ms. McCarthy say might be covered today?
11  A.   Well, like I say, most of what you've talked
12  about today so far.  Things that I may have written,
13  pleadings and documents and -- and arguments that have
14  been made in the course of -- of litigation.
15  Q.   Did she discuss specific pleadings that might
16  be discussed?
17  A.   No, she did not.
18  Q.   Okay.
19  A.   Not that I recall anyway.  And I didn't -- I
20  didn't take notes of the conversation.  I didn't think it
21  was necessary.
22  Q.   Did she tell you I might ask you about the
23  subpoena that you had served on the Phoenix Police
24  Department and the motion to quash that was filed?
25  A.   Honest to God, I don't remember if that was one

Page 55

1   of them or not.  I sort of lost it when we went off on
2   some other tangents that we talked about off the record.
3   Q.   Can you think of anything else that she said
4   might be covered today?
5   A.   Not that I can think of, ma'am.
6   Q.   Did she send you any documents to review?
7   A.   She sent me the affidavit for the -- the
8   postconviction relief affidavit.
9   Q.   The one we had marked as an exhibit --
10  A.   That you --
11  Q.   -- today?
12  A.   -- already talked about, yeah.  She sent that
13  early on after the first conversation.  Primarily I think
14  to try and say, you know, I don't remember about it, so I
15  think she sent that to try to refresh my memory.
16  Q.   And is the reason it's difficult for you to
17  remember many details of your representation of Debra
18  Milke because it happened so many years ago?
19  A.   That's part of it.
20  Q.   Do you have any physical conditions that affect
21  your memory?
22  A.   No, not at all.
23  Q.   And so when you say passage of time is just
24  part of it, what else explains your inability to remember
25  things?

Page 56

1   A.   You remember when you were in law school and
2   you would study for your exam and then you'd flush it.
3   Q.   Kind of purge it?
4   A.   Just purge it.  This was a painful trial,
5   painful.
6   Q.   Why was it painful?
7   A.   Is that an area that I am covered by?
8        MS. HOFFMANN:  Why it's painful?
9        THE WITNESS:  Yeah.
10       MS. HOFFMANN:  It -- you can't answer
11  anything that divulges attorney/client conferences.  Um,
12  but if it's -- if it's -- so -- so I don't know.  That's
13  the best instruction I can give you.
14       THE WITNESS:  All right.  Thank you.
15       Everything about this trial, the preparation
16  of it clear up to the day that she was sentenced and
17  there was certain things that happened in the course of
18  sentencing that I became aware of that all it did was
19  make it even more painful.  And this is not
20  communications that's protected by privilege.
21       For example, do you know Jay Andrews?  You
22  don't know Jay?  Jay was a prominent lawyer in Phoenix at
23  the time.  As a matter of fact, he was part of the
24  committee that conducted interviews in connection with
25  the seat that Judge McNamee received.  I know because I



Page 57

1 was there. I was one of the applicants.

2         And, anyway, he calls me up the day of
3 sentencing and he says, Ken, you won't believe what's
4 going on over here. I said, Where are you, Jay? He
5 said, I'm in Judge Hendrix's courtroom. I said, What's
6 happening?

7         The in-custody defendants are being
8 subjected to a violin solo. I said, What's -- what's
9 that all about? He says that she apparently said from
10 the bench -- don't know if it's on the record or not, but
11 since she was going to be putting someone to death today,
12 it seemed appropriate. It just -- that kind of thing
13 colored what I had to go through --

14     Q.   BY MS. BERKE: So are you --

15     A.   -- the context of this trial.

16     Q.   -- saying that there was a violinist in the
17 courtroom?

18     A.   Yes. According to Jay Andrews, and I would
19 trust him with my life.

20     Q.   You don't have any personal knowledge of that?

21     A.   I do not. I was in my office when I got the
22 call. And -- and -- but I learned -- and it's just
23 hearsay, but I just learned that the court clerk or the
24 court staff of Judge Hendrix had earlier in the day been
25 in domestic relations court seeking to get more child

Page 58

1 support because her son was wanting to go to Julliard or
2 somewhere, and so he was there to play, but the judge
3 wouldn't hear it.

4         And so she thought it appropriate to have
5 him just come down in open court and play the violin
6 because -- and, again, it's just hearsay, I don't know
7 the truth, I wasn't there.

8     Q.   So it was the son of one of her court staff who
9 was playing the violin --

10     A.   Yes.

11     Q.   -- according to Mr. Andrews?

12     A.   According to Mr. Andrews. So that's just an
13 example of how difficult this whole case has been -- was
14 from the start.

15         I was having to deal with a judge who I
16 disagreed with her rulings but, you know, you got to do
17 the best you can with what you're given.

18         You've got Mr. Levy. That was my one and
19 only experience with Mr. Levy. And he has retired.
20 Right?

21     Q.   He has retired.

22     A.   Thankfully. He's a strong adversary, but given
23 what I read in the Ninth Circuit opinion, I'm
24 disappointed in the man. That's -- I'll just leave it at
25 that.

Page 59

1     Q.   So you assume that what is in the Ninth Circuit
2 opinion about him is true?

3     A.   Well, it's -- it's not -- what I understand
4 from the Ninth Circuit opinion is -- is that he should
5 have turned over stuff and knew about it and didn't. I'm
6 just going by what Kozinski said. That's all I know.

7     Q.   Was the trial painful in other ways?

8     A.   Any time you have a death penalty case, it's
9 painful. That's why I stopped doing them. Too painful.
10 I've done murder cases but -- long as they're not death
11 penalty.

12     Q.   Do you feel that you did a good job for Debra
13 Milke?

14     A.   I did the best that I could. Other than that,
15 I'm not one who toots their own horn.

16     Q.   When you and I spoke, it was purely about
17 logistics for your deposition. Correct?

18     A.   I believe so.

19     Q.   We did not discuss anything substantive about
20 the case?

21     A.   No. The only substantive conversation we've
22 had was your letter to me of August, and, candidly, I was
23 hoping that my letter would prompt you to go get Judge
24 Silver to give me some guidance. I was disappointed that
25 you didn't.

Page 60

1     Q.   And you're referring to a letter I sent you
2 where we were responding to your letter of July 11th --

3     A.   Correct.

4     Q.   -- of what defendant's position is?

5     A.   Correct. Candidly, I was shocked that you
6 didn't respond to me more quickly, but that's neither
7 here nor there.

8         MS. BERKE: Can we take a short break? I
9 just need to use the ladies' room.

10         THE VIDEOGRAPHER: We're off the record at
11 11:50.

12         (A recess was held off the record.)

13         (Exhibit 210 was marked for identification.)

14         THE VIDEOGRAPHER: Stand by.

15         We're back on the record at 12:05.

16     Q.   BY MS. BERKE: Mr. Ray, I have placed in front
17 of you Exhibit Number 210, and this is a transcript of
18 your interview of Detective Armando Saldate that took
19 place in -- on June 26th, 1990. Okay?

20     A.   Yes.

21     Q.   And you've read the beginning of it, and can
22 verify for us that that is from your defense interview
23 you took of him?

24     A.   It appears to be, ma'am.

25     Q.   And, in fact, it -- the beginning refreshed



Page 61

1  your recollection that Jimenez was the name of another
2  death penalty case that you had handled.  Correct?
3      A.   Yes.
4      Q.   And, in fact --
5          MS. HOFFMANN:  I'm sorry, Lori.  Just that
6  this is something -- this is not one of the things you
7  sent around before.  You're just identifying this right
8  now?
9          MS. BERKE:  Yes.
10         MS. HOFFMANN:  This is not --
11         MS. BERKE:  I'm just identifying it now, and
12  I'll tell you what the Bates number -- the first Bates
13  number is MILKE_NSB030516.
14         MS. HOFFMANN:  Okay.  It's just going to
15  take me a second to find it because I didn't have --
16         MS. BURCH:  Anna, I just e-mailed it to
17  Langston too, the number.
18         MS. BERKE:  Oh, you know --
19         MS. BURCH:  It's not --
20         MS. BERKE:  -- what, it was double-sided and
21  I didn't copy it double-sided, but that's okay.  So we
22  have Exhibit Number --
23         MS. BURCH:  Get half of it.
24         MS. BERKE:  -- 1.  We have Exhibit Number 1
25  that was marked by plaintiffs -- plaintiff that's also a

Page 62

1  transcript.  It's just not a court reporter transcript of
2  it.  So we'll use -- I'll have the witness refer to
3  Exhibit Number 1 instead.
4          MS. HOFFMANN:  Okay.  Deposition Exhibit 1
5  is the same document?
6          MS. BERKE:  Well, I think what happened is
7  Exhibit 1 is a transcript that was prepared by somebody
8  during the criminal case.  And then I think your group
9  had a new transcript prepared from the recording by a
10  court reporter.
11         MS. HOFFMANN:  Okay.
12         MS. BERKE:  And that's what I was going to
13  have marked, but we can just look at Exhibit Number 1.
14  It's close enough.
15         MS. BURCH:  So are we not doing 210?
16         MS. BERKE:  It's not copied double-sided, so
17  I really --
18         MS. BURCH:  I mean, are we taking 210 off?
19         MS. BERKE:  What would you do?  I mean, I
20  can --
21         MS. BURGESS:  I mean, if you're going to
22  use -- if you're going to use pages that are the other
23  side.
24         MS. BERKE:  Well, I could show it to him on
25  an iPad again, but I don't really --

Page 63

1          MS. BURGESS:  It's your call, obviously.
2          MS. BERKE:  Okay.  You know what, I'll just
3  give him my copy.  But nobody -- I can have my office
4  e-mail it.
5          MS. RETTS:  You can (inaudible).
6          (A discussion was held off the record.)
7          MS. ODEGARD:  I have a copy here.
8          MS. BERKE:  You do?
9          MS. ODEGARD:  We can switch exhibits.
10         MS. BERKE:  Oh, 8?  Do you have a
11  double-sided one?  Oh, you have an extra one.
12         (A discussion was held off the record.)
13         MS. BERKE:  I'll just use Exhibit Number 1,
14  and if I -- Tina's going to follow along with it, and if
15  I ask him anything that's...
16         (A discussion was held off the record.)
17         MS. BERKE:  That's Exhibit 1.
18         MS. ODEGARD:  Okay.  (Inaudible).
19         MS. BURCH:  Is 210 still going to be a dep
20  exhibit?
21         MS. BERKE:  No.  We'll just use Exhibit 1.
22         (Exhibit 210 was redacted.)
23         MS. BURCH:  Did you get that, Anna?
24         MS. HOFFMANN:  Yeah, I did.  Thank you.
25         MS. BERKE:  Sally, can I borrow your Exhibit

Page 64

1  1?
2      Q.   BY MS. BERKE:  So I'm going to withdraw Exhibit
3  210.  We'll mark something else as 210 as we go along.
4  So instead, I'm placing before you Exhibit Number 1,
5  which is the transcript of your interview with Armando
6  Saldate that took place on June 26th, 1990.  I'm not sure
7  why the date in the upper right-hand corner says May 3rd,
8  1990.
9          But take a look at that and tell us if you
10  agree that that is the transcript of the defense
11  interview you conducted of Armando Saldate.
12     A.   I need to get some clarification first --
13     Q.   Sure.
14     A.   -- if I may, referring back to Exhibit 209 and
15  my letter and my concerns under the ethical rules that
16  I've outlined.  This letter indicates, "I consent to my
17  answering questions about any public actions you took as
18  my attorney that are not covered by any privilege."
19         This interview would not be a public action.
20  So I feel constrained not to be able to respond to any of
21  these -- any questions relating to this document.
22     Q.   Well, this document isn't a privileged
23  document.
24     A.   I understand.  You've got to understand my
25  position, though.  My position is, you know, it's my bar



Page 65

1 license that's on the line here.  So I don't see this as
2 a public document in the context of my representation of
3 Ms. Milke in the criminal trial.  This was apparently an
4 interview that was done in preparation for trial perhaps.
5 But it was not a public document that was filed with the
6 Court.
7          So inasmuch as it's not a public document,
8 the concerns that I have concerning ER 1.6A and ER 1.9C2
9 as well as the limitations set forth in Exhibit Number
10 209, I would decline to answer any questions concerning
11 this --
12    Q.    Okay.  In --
13    A.    -- at this time.
14    Q.    In your letter that is Exhibit Number 209,
15 Ms. Milke authorized you to discuss with us today at your
16 deposition anything having to do with Brady or Giglio
17 material that may have been known to you while acting as
18 my attorney, and that is the context in which I plan to
19 question you about Exhibit Number 1.
20          MS. HOFFMANN:  And to -- to be clear, we --
21 on behalf of Ms. Milke, we do not object to your
22 answering questions about this interview with Saldate.
23          THE WITNESS:  I appreciate that.  However,
24 that is not what is stated in Ms. Milke's communication
25 to me on your letterhead of Exhibit Number 209.  It says,

Page 66

1 "Questions about any public actions you took as my
2 attorney that are not covered by any privilege."
3          As I read these ethical rules, number one,
4 this is not a public document.
5          Number two, it falls squarely within the
6 confines of -- of the ethical rules that I've cited and I
7 would appreciate the courtesy of counsel in respecting my
8 position understanding that you may well get a court
9 order.  But until I have that comfort level, I'm
10 declining to respond.
11    Q.    BY MS. BERKE:  Well, you do understand from
12 Exhibit 209 that Ms. Milke did authorize you to provide
13 testimony about any Brady or Giglio material that may
14 have been known to you while you were acting as her
15 attorney.  And if my questions pertain to that topic,
16 then she has expressly authorized you to testify in that
17 regard.
18    A.    Then we'll -- then we'll see what your
19 questions are, ma'am.
20    Q.    Okay.  Tell us what Brady and Giglio material
21 is.
22    A.    Well, Brady material is material that is either
23 exculpatory or impeachment that can be used.  It must be
24 disclosed by the State pursuant to the rules and as a
25 matter of due process.

Page 67

1          Giglio I think --
2    Q.    Giglio.
3    A.    -- speaks strictly to -- or speaks mostly to
4 impeachment, I believe.  But Brady is all matters
5 relating to guilt and also any evidence that relates to
6 exculpatory evidence.
7    Q.    And is it your practice as a criminal defense
8 attorney to send a written request to the prosecutor in
9 your criminal cases requesting Brady material?
10    A.    Presently?
11    Q.    Yes.
12    A.    No.
13    Q.    And why not?
14    A.    Because I have great faith and trust in the
15 people that I work with now.
16    Q.    Has it --
17    A.    And they -- they -- and they routinely share
18 Brady material with me.  So it's -- it's never been an
19 issue.  They follow the rules.
20    Q.    Has it ever been your practice to request Brady
21 material?
22    A.    It has.
23    Q.    When was that?
24    A.    Most generally in federal court.
25    Q.    Why in federal court?

Page 68

1    A.    I don't know.  It's just I have -- I had a form
2 letter years and years ago that identified Brady and
3 Giglio material that needed to be -- you know, just
4 reminding them to provide it.
5    Q.    When did you come up with that form letter?
6    A.    I think I borrowed it from someone else.
7    Q.    And when was that?
8    A.    Probably when I was practicing in Phoenix.
9    Q.    Prior to the Milke case?
10    A.    I don't know the date of origin, ma'am.  I
11 can't recall.
12    Q.    Did -- did you ever request Brady or Giglio
13 material from Mr. Levy in the Milke case?
14    A.    I don't recall.
15    Q.    Would it have been your standard practice to do
16 that at the time?
17    A.    I can't say that it was or it wasn't.  I
18 don't -- I don't recall, ma'am.
19    Q.    Is it your practice when doing a defense
20 interview of a detective involved in the criminal
21 investigation that resulted in your client being charged
22 with a crime to inquire into that detective's
23 disciplinary history?
24    A.    Is it presently?
25    Q.    Yes.



Page 69

1    A.    Presently sometimes.  You got to understand
2    we're a small community here.  I know everybody.
3    Everybody knows me.  Police officers -- just everybody
4    does and we have comradery and respect for each other.
5    And sometimes when I get wind of something, I'll go pull
6    a public records request for -- for human resources
7    information.  You bet.
8        Q.    Was it your practice back in 1990 to inquire
9    with detectives you were doing defense interviews of in
10   Phoenix and the communities surrounding Phoenix --
11       A.    Uh-huh.
12       Q.    -- to inquire into that detective's
13   disciplinary history?
14       A.    I don't have a specific recollection of -- of
15   that.  I mean, have I ever in the thousands of cases I
16   have done?  Maybe I have.  I just -- I don't recall.
17       Q.    Why wouldn't you do that on a routine basis?
18       A.    I do it if it's necessary.
19       Q.    When does it become necessary?
20       A.    Generally, if I find out other information
21   in -- perhaps in the course of an interview that leads me
22   to believe that there's something else out there that I
23   need to find out about.  I'll go to the prosecutor.  If
24   they say they don't know anything about it and they won't
25   produce it for me, I'll go get it myself.

Page 70

1        Q.    Through a public records request?
2        A.    Sure.
3        Q.    And was that your practice in 1990?
4        A.    No.
5        Q.    When did that become your practice?
6        A.    Up here, after '93.
7        Q.    Why wasn't that your practice in 1990?
8        A.    I haven't a clue.
9        Q.    How did it become your practice?
10       A.    Just evol-- the evolution of my practice.
11   Every day I learn something new.  I'm learning more today
12   than I've learned in years.  So...
13       Q.    Have you ever had a prosecutor disclose to you
14   as Brady material cases in which a detective has
15   continued to question a suspect after that suspect
16   invoked their right to main -- remain silent or requested
17   an attorney and as a result a motion to suppress was
18   granted?
19       A.    I don't think in that precise context that
20   you've outlined, no.  I haven't had that experience.
21       Q.    Without there being any finding of misconduct
22   on the part of the det- -- the part of the detective in
23   the situation I just described to you, do you consider
24   that to be Brady material?
25       A.    Yes.

Page 71

1        Q.    And why is that?
2        A.    Because it's potentially impeachment.  If they
3    have said something falsely in the past, it's been
4    adjudicated or a -- or Miranda issue, for example.
5        Q.    I'm not talking about false statements.
6        A.    Okay.
7        Q.    I'm talking about continuing to question a
8    suspect after that suspect has invoked their right to
9    remain silent or requested an attorney.
10       A.    Okay.
11       Q.    And, as a result, a motion to suppress is
12   granted.  But there's no dishonesty.  There's no --
13       A.    Uh-huh.
14       Q.    -- hiding of that information by the detective.
15       A.    And the question -- all right.  So I understand
16   the context now.  What's --
17       Q.    Okay.  Do you consider that to be Brady
18   material, the fact that a motion to suppress was granted?
19       A.    I believe so.  That's my opinion.  I may be
20   wrong.
21       Q.    And did you believe that back in 1990?
22       A.    I can't tell you what I believed back then.  I
23   don't recall.
24       Q.    So you can't say, as you sit here today, that
25   you believed that back in --

Page 72

1        A.    I can't.
2        Q.    -- 1990?
3        A.    I can't.
4        Q.    Do you believe that in a situation where a
5    motion to suppress is granted because the Court finds the
6    defendant did not understand his Miranda rights, but
7    there's no finding of misconduct on the part of the
8    police officer, he accurately and honestly stated
9    everything in his report, that that would be Brady
10   material?
11       A.    I don't think so.  That's -- that's different.
12   That's not -- that doesn't turn on the police officer.
13   That turns on the individual being questioned.
14       Q.    And so are you saying that whether the suspect
15   understood his rights is -- can be argued either way and
16   it just requires a finding by the Court one way or the
17   other?
18       A.    I think that's a fair statement.
19       Q.    And so, for instance, if a suspect has a
20   physical injury of some sort but the detective doesn't
21   know the extent of that injury and questions the suspect
22   and accurately documents what took place and it is later
23   determined that the suspect's injuries were severe and he
24   probably couldn't understand his rights and so a motion
25   to suppress is granted, you don't believe that's Brady



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
73–76

Page 73

1  material that would need to be disclosed?

2    A.   You're getting -- your hypothetical sounds a

3  lot like what was in the Kozinski opinion.  And I think

4  the opinion said that it was Brady material.

5    Q.   But I'm asking for your opinion, not Judge

6  Kozinski's.

7    A.   But why -- why would my opinion make any

8  difference?

9    Q.   Because I -- I want to know what your thinking

10  was back when you were interviewing --

11    A.   Well --

12    Q.   -- Detective Saldate.

13    A.   Then we're getting beyond Brady/Giglio, are we

14  not?

15    Q.   No, I'm asking --

16    A.   We're not?

17    Q.   -- for your opinion, setting aside the Ninth

18  Circuit decision.

19    A.   Uh-huh.

20    Q.   Pretend --

21    A.   All right.

22    Q.   Having never read the Ninth Circuit decision --

23    A.   That's hard -- hard to unforget [sic] that.

24  But it's going to depend upon the totality of the

25  circumstances that the officer has presented at the time.

Page 74

1  If the totality of the facts indicate that any reasonable

2  officer being objective could see that the individual is

3  impaired by some -- something -- injury, drugs, whatever,

4  such that it calls into a -- an officer's reasonable --

5  into question the officer's reasonable conclusion that

6  the answer is voluntary, then I think it is something

7  that needs to be disclosed.

8        And if the officer is being completely

9  candid and forthright in his reports about that

10  circumstance, then that's going to be a subject that's

11  going to be discussed with him during interview before

12  you file the motion to suppress.  You're going to want to

13  figure out, all right, what's this all about?  What

14  happened?  What were the circumstances?

15        If it gives rise to a colorable claim for

16  Fourth Amendment or Sixth Amendment or whatever

17  violation -- constitutional violation, then it is the

18  defense attorney's obligation to bring that in the form

19  of a motion to suppress or for some other kind of relief.

20  That's my opinion.

21    Q.   You would agree that sometimes it's arguable --

22  I mean, you would agree that reasonable legal minds could

23  differ --

24    A.   They always do.

25    Q.   -- as to whether there was a violation of

Page 75

1  Miranda or whether a criminal defendant understood his

2  Miranda rights.  Correct?

3    A.   Right.

4    Q.   In fact, sometimes the trial court will find

5  that there was no Miranda violation and the Court of

6  Appeals will reverse that decision?

7    A.   Of course.

8    Q.   And so understand that police detectives are

9  not attorneys.  Right?

10    A.   They're trained in their field.

11    Q.   Correct.

12    A.   And they're supposed to know the law that

13  applies to their field.

14    Q.   But they don't know more than judges sitting at

15  the trial court and the Court of Appeals in terms of the

16  law on Miranda.  Correct?

17    A.   That would call for an unfair comment upon the

18  judiciary that I don't wish to make.

19    Q.   Okay.  Do you expect a police detective to know

20  more than a trial judge sitting on the criminal bench in

21  terms of the law on Miranda?

22    A.   Let me give you an example.

23    Q.   Can -- well, can you answer that question

24  first?

25    A.   I can, but -- but the answer is I think it can

Page 76

1  be both ways.  Not two weeks ago on a motion to suppress

2  that I had in a case, the police officer under oath said

3  that he did not have probable cause to arrest.  The judge

4  says, I find that he did.  The officer -- this is what he

5  does for a living -- he has to be -- he has to be trained

6  in what he can do and what he cannot do.  And if in his

7  opinion he did not have probable cause to arrest, how is

8  a judge in a better position to second-guess what the

9  officer admitted?

10    Q.   Okay.  I'm not talking --

11    A.   Do you see what I'm saying?

12    Q.   Yeah.  I'm not talking about probable cause to

13  arrest.  I'm saying is it your position that a police

14  detective should be as knowledgeable about the body of

15  case law interpreting Miranda as a trial judge sitting on

16  the criminal bench?

17    A.   I think they should.

18    Q.   And --

19    A.   I do.  I think that's their obligation.

20    Q.   So if you believe that simply by virtue of

21  having a motion to suppress granted in an unrelated case,

22  as a result of having violated Miranda is Brady material,

23  why wouldn't it be part of your routine practice to ask

24  police detectives when you're doing defense interviews if

25  they've ever had statements suppressed due to Miranda



C. KENNETH RAY, II  Highly Confidential

August 13, 2018

Milke vs City of Phoenix

77–80

Page 77

1 violations?

2    A.   Why wouldn't it be?

3    Q.   Yeah.  Why wouldn't that be part of your

4 standard practice?

5    A.   I don't have an answer.  I don't know.  Maybe

6 it should be.

7    Q.   You had -- according to the transcript that is

8 Exhibit 1, you had worked with -- or on a cause called

9 Jimenez where Armando Saldate was the detective -- or a

10 detective.  Correct?

11    A.   He was apparently involved in it from what I

12 read in -- in his response.  He said he worked it a

13 little bit.

14    Q.   Okay.

15    A.   I don't -- I just don't recall him being the

16 lead detective in that case.  I don't recall whether he

17 testified in any respect.  I -- I don't -- I don't

18 recall.

19    Q.   Okay.  What, if anything, did you know about

20 Armando Saldate before being assigned to handle the Debra

21 Milke case?

22    A.   The honest answer is I don't remember what I

23 knew, if I knew anything, about him.

24    Q.   You remember a case called Runningeagle.

25 Correct?

Page 78

1    A.   I'm familiar with the name.  I haven't read it

2 in years.

3    Q.   And during the voluntariness hearing that took

4 place in the Milke case, you questioned Detective Saldate

5 about the Runningeagle case.  Do you recall that?

6    A.   No.  Being in candor, I've been told that I

7 did, but I don't remember.

8    Q.   Pardon me?

9    A.   I've been told that I apparently did, but I

10 don't remember.

11    Q.   Who told you that?

12    A.   I believe that was, again, part of the

13 discussion with Ms. McCarthy.

14    Q.   Well, what specifically did she tell you about

15 that?

16    A.   She made reference that you may be asking

17 something about the Runningeagle case.

18    Q.   What did she tell you I would ask you about

19 that case?

20    A.   She didn't tell me that.

21    Q.   Did you have a conversation with her about the

22 Runningeagle case?

23    A.   No.

24         (Exhibit 210 was marked for identification.)

25    Q.   BY MS. BERKE:  I'm showing you what's been

Page 79

1 marked as Exhibit Number 210.  And this is the transcript

2 from September 10th, 1990, the voluntariness hearing that

3 took place in the Debra Milke case.  If you'd go to the

4 fourth page, you'll see that the Court calls the case.

5         Do you see that?

6    A.   Fourth page of the document?

7    Q.   Yes.

8    A.   Yes.

9    Q.   And you'll see that Mr. Levy, the prosecutor,

10 says, "The State is ready," and he announces his

11 appearance and then you announce your appearance with

12 Ms. Milke, who was present in the courtroom.  Correct?

13    A.   Yes.

14    Q.   And you state at line 19, quote, I believe,

15 Your Honor, that as I indicated in my motion, it would be

16 my burden to -- my burden at least to establish a prima

17 facie basis for this motion to suppress.  I'm prepared to

18 proceed, end quote.

19         Did I read that correctly?

20    A.   You did.

21    Q.   So you understand this is the transcript of the

22 motion to suppress hearing?

23    A.   Yes.

24    Q.   And what were you seeking to suppress?

25    A.   I have no memory.

Page 80

1    Q.   No memory at all?

2    A.   None.

3    Q.   You called Detective Saldate as your witness in

4 this matter.  Correct?

5    A.   It appears so.

6    Q.   In fact, at line 23 on page 2, you state,

7 quote, I will call to the stand Armando Saldate, end

8 quote.

9         Do you see that?

10    A.   Yes, I do.

11    Q.   And then on page 2A, you see that he's sworn

12 in.  Correct?

13    A.   Yes.

14    Q.   And --

15    A.   Do you have the -- may I inquire, do you have

16 the associated motion that I filed?

17    Q.   I don't have that here --

18    A.   Oh, okay.

19    Q.   -- right now.

20    A.   Because that would aid greatly.

21    Q.   Okay.  At page 4, I think for the questions I

22 have, you don't need to have --

23    A.   Okay.  All right.

24    Q.   Page 4, line 18 -- go ahead and read to

25 yourself page 4, line 18, through page 5, line 13.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
81–84

Page 81

1    A.   Through line what?

2    Q.   Through line 13.

3    A.   Okay.  Okay.

4    Q.   So you see you're asking Detective Saldate if

5  he has any experience or training dealing with the issue

6  as to whether an individual can continue to be

7  interrogated once they have invoked their right to remain

8  silent after being read their Miranda rights.  Correct?

9    A.   Correct.

10   Q.   And he responds to your questions and tells you

11  that there are occasions that a person may ask for an

12  attorney and he will note that in his supplement or in

13  his notes, and then if the person continues to talk,

14  he'll continue to listen.  Right?

15   A.   That's what it says.

16   Q.   And then you ask, "Well, will you continue to

17  ask questions?"  And his response was, quote, If a

18  question comes come up in my mind during her conversation

19  or their conversations, sure, I will ask the question,

20  end quote.

21       Did I read that correctly?

22   A.   You did.

23   Q.   And then if you go to page 17, line 17, you ask

24  him, quote, Do you recall the name Sean Bernard

25  Runningeagle, end quote?  And he answers yes.  Correct?

Page 82

1    A.   Yes.

2    Q.   So you obviously knew about the Runningeagle

3  investigation at that time.  Correct?

4    A.   Apparently.

5    Q.   Do you recall how you knew about the

6  Runningeagle case?

7    A.   I do not.

8    Q.   And you knew that Detective Saldate had

9  interviewed Mr. Runningeagle.  Correct?

10   A.   Apparently.

11   Q.   According to the transcript, you knew that?

12   A.   According -- according to the transcript, yes.

13   Q.   And you asked some very specific questions

14  which would lead one to conclude that you had read the

15  report and you knew what Detective Saldate had recited in

16  his report in terms of what was asked and what was said

17  by Mr. Runningeagle.  Correct?

18   A.   Appears so, ma'am.

19   Q.   And then at -- on page 18, at line 18, you

20  asked the question, quote, And at one point in time, he

21  told you that -- you told him, rather, you would try to

22  understand what he is saying, but Mr. Runningeagle

23  immediately said he wanted to remain silent, didn't he,

24  end quote?  And Detective Saldate responded, "That is

25  correct."  Correct?

Page 83

1    A.   That's a correct reading.

2    Q.   And then you asked the question, quote, And

3  then from your report, you continued to ask him

4  questions.  Isn't that right, end quote?  And Detective

5  Saldate responded, "That is correct"?

6    A.   That's correct.  You've read it --

7    Q.   And so it's clear from this question that you

8  had Detective Saldate's report of his interview of

9  Mr. Runningeagle because you're referring to it.

10  Correct?

11   A.   Indeed.

12   Q.   Yes?

13   A.   Yes.

14   Q.   And then you go on to ask him, at line 16,

15  quote, He indicated that he wanted to speak to an

16  attorney later on after you continued asking questions,

17  end quote.  And he responded, "That is correct."  Right?

18   A.   Right.

19   Q.   And then you asked, quote, And you continued to

20  interrogate him without counsel.  Isn't that right, end

21  quote.  And he responded, quote, To interview him, yes.

22  And it's so noted in my supplemental and later in court

23  under testimony, end quote.

24       Did I read that correctly?

25   A.   You did.

Page 84

1    Q.   And so what he's telling you is that, yes, he

2  did continue to do some questioning of Mr. Runningeagle

3  after he had asked for an attorney.  Correct?

4    A.   I'm sorry.  I was sidetracked reading his next

5  statement.  Go ahead.  Say it again, please.  I

6  apologize.

7    Q.   I'll have the court reporter read it back.

8       (The last question was read back by the

9  court reporter.)

10      THE WITNESS:  Correct.

11   Q.   BY MS. BERKE:  And then you asked him to agree

12  that that's not acceptable police procedure.  Correct?

13   A.   Correct.

14   Q.   And then you ask him, on page 19, line 7, that

15  as an officer with 20-plus years of experience, quote,

16  You know when a suspect invokes his right to remain

17  silent, especially after you have read him his Miranda

18  rights, that you are to break the interview off

19  immediately, end quote.

20      That's what you asked him.  Correct?

21   A.   Correct.

22   Q.   And his response was that he didn't believe

23  that there were any policy manuals in the police

24  department or discussions in the police department where

25  that was absolutely required.  Correct?



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
85–88

1    A.   You --
2    Q.   That he needed to stop listening or asking
3   questions.  Right?
4    A.   You've paraphrased his answer correctly.
5    Q.   And you go on through page 20, line 20,
6   discussing that topic.  Correct?
7    A.   Actually, the entire page.
8    Q.   The entire page 20?
9    A.   Yes.
10   Q.   Okay.  And then go to page 23 of the
11  transcript, Exhibit 210, line 13.  You asked the
12  question, "If that person doesn't want to talk, you will
13  keep talking, though, won't you?  That's what happened
14  with Runningeagle."  And he responded, "At times, yes."
15  Correct?
16   A.   You read it correctly.
17   Q.   And so you clearly had familiarity with this
18  Runningeagle case?
19   A.   Sounds like it.
20   Q.   Do you have any explanation as to why you
21  didn't ask Detective Saldate about the Runningeagle case
22  during your interview of him on June 26th, 1990?
23   A.   I have no answer -- no explanation.
24   Q.   And you don't know how you learned about the
25  Runningeagle case?

1    A.   Re- -- reviewing through this, I remember
2   having the report but how I got it, I -- I honest to God
3   don't recall.  I mean, I could speculate, but that
4   doesn't mean anything.
5    Q.   Well, how would you normally go about getting a
6   report like that involving an investigation unrelated to
7   a case you're defending?
8    A.   Again, just speculating here on -- in the
9   context of this case, I may well --
10        Do you recall who Runningeagle's trial
11  attorney was?  That may help me.
12   Q.   We can get that for you, so let's --
13   A.   If -- if it was somebody that I've known and
14  worked with, I may well have talked to him for ideas and
15  thoughts, and he may well have shared the report with me.
16   Q.   Okay.  I'm going to try to get that information
17  for you.
18        MS. BERKE:  Ms. Retts is pulling that
19  information up off the court docket.
20        THE WITNESS:  Thank you.
21        MS. RETTS:  At some point, it was Jim
22  Bellinger.
23        MS. BERKE:  Are you able to pull up a
24  minute --
25        MS. RETTS:  That's who's listed on the --

1        MS. BERKE:  Can you pull the minute entry
2   from 1989?
3        (A discussion was held off the record.)
4        THE WITNESS:  If I may, the -- another
5   possibility is did Runningeagle's case predate
6   Ms. Milke's?
7        MS. RETTS:  1985.
8        THE WITNESS:  In other words, the opinion,
9   but the -- the appellate opinion?
10       MS. BURGESS:  There was no appeal.
11       THE WITNESS:  There was no appeal in
12  Runningeagle?  Okay.
13       MS. BURGESS:  He was convicted and sentenced
14  February 1989 and there were no appeals.
15       THE WITNESS:  Say -- February when?
16       MS. BERKE:  1989.
17       THE WITNESS:  1989.  Jim Ballinger, isn't he
18  the gentleman that became a federal judge?
19       MS. RETTS:  No.
20       THE WITNESS:  No?  Did he ever become a
21  judge?
22       MS. RETTS:  No.
23       THE WITNESS:  No?
24       MS. RETTS:  So that's --
25       THE WITNESS:  Because he is a -- I mean, I

1   know the name, but he's not one that I would have
2   consulted with.
3        MS. BERKE:  Let's go off the record just for
4   a --
5        THE WITNESS:  Sure.
6        MS. BERKE:  -- moment while we track that
7   information down.
8        THE WITNESS:  All right.
9        THE VIDEOGRAPHER:  We're off the record at
10  12:46.
11       (A recess was held off the record.)
12       THE VIDEOGRAPHER:  Stand by.
13       We're back on the record at 12:48.
14   Q.   BY MS. BERKE:  All right.  Mr. Ray, we
15  determined that it was Baltazar Iniguez who was counsel
16  for Mr. Runningeagle.
17   A.   Yeah.  I think he -- it's pronounced Iniguez.
18   Q.   Iniguez.  I apologize.
19   A.   No, not --
20   Q.   And so when we were off the record, you
21  indicated that you probably would have consulted with him
22  as a man --
23   A.   Oh, yeah.  He was a good friend and colleague,
24  yeah.
25   Q.   And when you say you would have consulted with



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
89—92

Page 89

1  him, what -- what would have been the nature of that
2  consultation?
3     A.  Oh, if issues come up or -- you know, have you
4  ever heard of -- anything about this, that or the other
5  and he said -- you know, he might say, Yeah, I've got a
6  case just like that or just had one.  We share
7  information like that all the time.
8     Q.  So you think you may have asked Mr. Iniguez
9  about Armando Saldate?
10    A.  Prob-- it would be a fair possibility that I
11  did.
12    Q.  And --
13    A.  I certainly got his -- got the report from
14  somewhere.  I mean, that's obvious from the -- from the
15  transcripts.  Would he have been a source of getting it?
16  Indeed.
17    Q.  Okay.  And so let's continue on page 52 of
18  Exhibit 210.  You asked Detective Saldate -- at line 18,
19  you asked him to agree with you that Debra Milke said
20  that she didn't want her interview recorded but she
21  wanted a lawyer and he said, "Absolutely not."  Correct?
22    A.  So it says.
23    Q.  And you then asked him, "Others that you have
24  investigated have said they wanted lawyers.  Isn't that
25  right, sir?"  And he responded, "I'm sure they have."

Page 90

1         And your next question was, "And you have
2  continued to interrogate them.  Isn't that true?"  He
3  says, "And I have put that on the report."
4         And you then asked, "Have you put it on the
5  report each and every time you violated their right to
6  counsel?"  And he says, "Yes, I have."  Correct?
7     A.  That's what it says, ma'am.
8     Q.  And so what he's telling you is that he --
9  there have been a number of investigations in which he
10  continued to question suspects after they have either
11  invoked their right to remain silent or asked for -- or
12  invoked their right to counsel and what he was telling
13  you is that he always documents that in his report.
14  Correct?
15    A.  That's what he says, ma'am.
16    Q.  And after receiving that information, you did
17  not request any of those reports.  Correct?
18    A.  I have no memory whether I did or didn't,
19  ma'am.
20    Q.  Well, if I represent to you that there's no
21  record -- no document anywhere in the case file that I've
22  seen that you requested those reports, do you have
23  anything to suggest that you did?
24    A.  I have nothing, ma'am.  I have no documents.
25  You have all that exists.  I haven't seen it in 23 years

Page 91

1  or more.  I can't speak to phone calls.  I don't think I
2  kept a phone log either, so...
3     Q.  And --
4     A.  I don't know.  I just -- I don't know.
5     Q.  And you didn't ask -- and I'll -- I'll give you
6  time to review the transcript if you'd like, but I'll
7  represent to you that you did not ask Detective Saldate
8  to list any of those other cases in which he continued to
9  question subjects -- suspects after they've invoked their
10  right to remain silent or their right to counsel.
11    A.  During this --
12    Q.  Correct.  During --
13    A.  During this hearing?
14    Q.  During that hearing.
15    A.  I accept your representation.  I haven't read
16  it all.
17    Q.  Why wouldn't you have asked him that question?
18    A.  I don't know.  I don't know.
19    Q.  Would you agree that in order to fulfill your
20  obligations as a competent attorney representing
21  Ms. Milke, you were required to ask him for a list of
22  those cases?
23    A.  I'm not conceding to that.
24    Q.  Why not?
25    A.  No.  Because there may be other reasons you

Page 92

1  don't ask for it.  There may be reasons you find out
2  something later, you hold it back, you leave it later.
3  You don't show all of your cards all of the time.  That's
4  not good strategy in criminal defense.
5     Q.  Is that why you wouldn't have sent a letter to
6  the prosecutor asking for a list of those cases?
7     A.  I don't know that I did or didn't, ma'am.
8     Q.  If you believe that kind of information to be
9  Brady and Giglio material, why would it not be automatic
10  that if you learned this type of information existed, you
11  wouldn't immediately request it?  What could the strategy
12  possibly be?
13    A.  Good point.  On the other hand, why didn't
14  Mr. Levy disclose it?  He knew it.
15    Q.  But that's not my --
16       MS. BURGESS:  Objection.  Form and
17  foundation.  Move to strike.  States facts not in
18  evidence and that are incorrect.
19    Q.  BY MS. BERKE:  That's not my question.  You
20  testified earlier that you believed that type of
21  information to be Brady or Giglio material.  Correct?
22    A.  Yes, ma'am.
23    Q.  So what possible reason could there be if you
24  learned of the existence of such material during a
25  detective's testimony at a suppression hearing not to



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
93–96

Page 93

1 request that information from either the detective or the
2 prosecutor?
3    A.  No reason.  There's no good reason.
4    Q.  So --
5    A.  But I can't say that I didn't do it either.
6 That assumes that I didn't.
7    Q.  If you didn't request that information after
8 obtaining the testimony that I just read to you from
9 Detective Saldate, do you believe you did not carry out
10 your obligations to your client as competent criminal
11 defense counsel?
12    A.  I don't know.
13    Q.  Is it possible that you knew about other cases
14 in which Armando Saldate continued to question suspects
15 after they invoked their right to remain silent or their
16 right to counsel and for some strategic reason you held
17 that back?
18    A.  I don't know.
19    Q.  Is it possible?
20    A.  Anything is possible, ma'am.  I just don't have
21 a memory of -- of it.  I mean, it could well be that's
22 what prompted me to ultimately issue the subpoena.
23    Q.  But in the subpoena, you did not request --
24    A.  Yeah, you're correct.  I understand what your
25 question is.

Page 94

1    Q.  Yeah, let me just -- just so that --
2    A.  Yeah, so --
3    Q.  -- we have a clear record --
4    A.  Yeah, okay.
5    Q.  -- let me finish asking the question.
6       But in your subpoena, you did not request
7 any documents for other cases in which Armando Saldate
8 was involved as a detective.  Correct?
9    A.  Correct.
10    Q.  And the subpoena that you had issued was issued
11 three months after -- or I'm sorry.  The subpoena that
12 you had issued --
13    A.  Was during the course of trial.
14    Q.  Was issued eight days after you obtained that
15 testimony from Detective Saldate at the suppression
16 hearing.  Correct?
17    A.  If that's what the dates say, then --
18    Q.  Well --
19    A.  -- I stand by them.
20    Q.  Yeah, let's just get you to confirm that.  So
21 I'm going to show you, again, the subpoena.  You'll see
22 it was filed on September 18th of 1990.
23    A.  Correct.
24    Q.  And if you look at the transcript from the
25 suppression hearing, that took place on September 10th of

Page 95

1 1990.  Correct?
2    A.  Yes, September 10th.
3    Q.  And so you issued a subpoena on September 18th,
4 1990, eight days after you obtained that testimony about
5 what Armando Saldate did in other cases that you
6 considered to be Brady and Giglio material, yet you
7 didn't request those materials in the subpoena that you
8 had served on the Phoenix Police Department.  Correct?
9    A.  Correct.
10    Q.  Do you have any explanation --
11    A.  No.
12    Q.  Do you believe that as a result of having not
13 included that information in your subpoena, you fell
14 below the standard of care applicable to your duties as
15 Ms. Milke's attorney?
16    A.  I don't know, ma'am.
17    Q.  Do you think it's possible that you were aware
18 of the other cases addressed by the Ninth Circuit and
19 that's why you didn't ask about it during Armando
20 Saldate's testimony?
21    A.  I don't understand your question.
22       Again, ma'am, it was --
23    Q.  Is it possible that you knew about --
24    A.  All the cases --
25    Q.  Strike that.

Page 96

1    A.  -- that were -- as cited by the Ninth Circuit?
2    Q.  But, sir -- let me rephrase my question.  I
3 apologize.
4       Is it possible that at the time you issued
5 the subpoena on September 18th of 1990, you already had
6 information about the other cases in which Armando
7 Saldate had continued to question suspects after they
8 invoked their right to remain silent --
9    A.  I don't believe I --
10    Q.  -- or they -- their right to an attorney?
11    A.  I don't believe that --
12       MS. HOFFMANN:  Objection.  Vague.
13       Which cases?
14    Q.  BY MS. BERKE:  How -- and the cases I'm
15 referring to are the cases addressed by the Ninth
16 Circuit.
17    A.  Right.  And my answer to your question would be
18 I doubt seriously that I had that.  Matter of fact, I'm
19 very comfortable in saying I did not have those -- those
20 cases.
21    Q.  Well, you certainly -- you certainly knew about
22 other cases in which that happened --
23    A.  Yes.  Runningeagle.
24    Q.  -- other than Runningeagle?
25    A.  I did?



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
97—100

Page 97

1    Q.   Didn't you?

2    A.   For example?

3    Q.   This was the last exhibit I was trying to print
4  yesterday, and due to printer issues, I wasn't able to do
5  it. So I'm happy to pass this around to people, but I'll
6  read a sentence from a letter that Debra Milke wrote to
7  somebody named Joe Marino.  Do you know the name Joe
8  Marino?

9    A.   No.

10        MS. HOFFMANN:  I'm sorry, Lori.  Can you
11  identify that Bates stamp number?

12        MS. BERKE:  Yeah, yeah.  Let me give that to
13  you.

14        MS. HOFFMANN:  Is this (inaudible) the
15  e-mail around -- or that Vanessa sent earlier?

16        MS. BERKE:  No, it's not.  So it's a letter
17  dated May 17th, 1990.  And it starts at MILKE_NSB003376.
18  And the page I'm reading from is MILKE_NSB003390.

19        MS. HOFFMANN:  Okay.

20    Q.   BY MS. BERKE:  And at the bottom of this
21  letter, Debra Milke writes, quote, There's no way a
22  made-up confession could stand in court.  Besides, the
23  cop that did this to me has done shitty police work on
24  other people and we have an attorney to prove that, end
25  quote.

Page 98

1        Do you know what she's referring to?

2    A.   Me?

3    Q.   Yes.

4    A.   I have no idea.

5    Q.   And then there's another letter that Ms. Milke
6  sent to Joe Marino dated June 3rd of 1990, and that
7  starts at Bates-stamped page MILKE_NSB003567.  And the
8  page I'm referencing is MILKE_NSB003575.  She states,
9  quote, Plus we have an attorney who can testify to the
10  fact that this cop has done this before to someone else,
11  end quote.

12        Do you know what she's referring to when she
13  says you have an attorney who can testify to the fact
14  that he had done this before?

15    A.   No.

16    Q.   Then she states in a letter dated July 31st,
17  1990, to Joe Marino at Bates page MILKE_NSB003823, she
18  says, quote, If I do go to trial, my attorney has -- has
19  and knows ways to discredit that cop's testimony, which
20  eliminates my police report.

21        Do you know what she's referring to there?

22    A.   Whatever she says is what she's referring to.
23  Whether I know about it, I have no memory.

24    Q.   In a letter she sends to Joe Marino dated
25  August 30th of 1990, which starts at Bates page

Page 99

1  MILKE_NSB004031 and the part I'm referencing is on
2  MILKE_NSB004032, she states, quote, My attorney has found
3  out some other, quote, shit, end quote, on this cop,
4  which will help a lot in my case, end quote.

5        Do you know what she's referring to?

6    A.   No.

7        MS. HOFFMANN:  Lori, sorry, are you making
8  these deposition exhibits or -- or what are you doing?
9  Are you marking these all?

10        MS. BERKE:  No, not today.

11    Q.   BY MS. BERKE:  Then in a letter dated --

12        MS. HOFFMANN:  I'm sorry.  And just to be
13  clear for the record, you're not showing anything to
14  Mr. Ray.  You're just reading from them?

15        MS. BERKE:  Yes.

16        MS. HOFFMANN:  Okay.

17    Q.   BY MS. BERKE:  Then in a letter dated
18  September 17th of 1990, a letter that Ms. Milke sent to
19  Joe Marino which starts at MILKE_NSB004095 and the part
20  I'm reading from is on MILKE_NSB004096, she states,
21  quote, I just did some work for my attorney.  He wanted
22  me --

23        Oh, wait, sorry.  I'm reading from the wrong
24  part.

25        It's the correct letter, but the part I'm

Page 100

1  going to read from is on MILKE_NSB004097.  She states,
2  quote, The cop is a very vindictive man.  Two attorneys
3  my attorney knows said that Saldate, parenthesis, cop,
4  closed parenthesis, must be stopped because they had
5  similar experiences with him lying on police reports.
6  Hopefully they will come and testify to that, end quote.

7        I'm going to show you that letter that's
8  dated September 17th of 1990.

9        MS. BURCH:  Are you marking it?

10        MS. BERKE:  Yeah.  It has my highlighting on
11  it, but we can mark it.

12        MS. BURCH:  Okay.

13        MS. BERKE:  I don't have copies.  We'll mark
14  that as the next exhibit.

15        THE WITNESS:  Are you wanting me to read the
16  whole thing or --

17    Q.   BY MS. BERKE:  You're welcome to.  Let's get it
18  marked first.

19        (Exhibit 211 was marked for identification.)

20    Q.   BY MS. BERKE:  So I've placed before you
21  Exhibit 211, which is the letter I just read to you from.
22  And you're welcome to read the entire thing, if you'd
23  like, but I'm just asking you about that one portion.

24        MS. HOFFMANN:  I'm sorry.  Lori, can you
25  give the Bates stamp again?  We -- we -- you -- whatever



1  you sent in terms of (inaudible) does not include these
2  letters you're reading from, so I don't have it in front
3  of me.
4          MS. BERKE:  Sure.
5          It's MILKE_NSB004095.  And the portion I
6  read to him and asked him to confirm was on
7  MILKE_NSB004097.
8          MS. HOFFMANN:  Okay.  So you've got to wait
9  a second so I could get it as --
10         MS. BERKE:  Sure.
11         MS. HOFFMANN:  -- (inaudible) to get
12 anything identified at the beginning of the deposition
13 (inaudible) this letter.
14         THE WITNESS:  Did you understand that?  I
15 don't understand what -- I didn't understand a word
16 you --
17         I'm sorry.  Where'd she go.
18         MS. BURCH:  Anna, can you repeat that?
19         THE WITNESS:  Yeah, she ran out the room.
20         MS. BERKE:  I think she was going to get the
21 letter.
22         MS. HOFFMANN:  Sorry.  I'm trying -- I'm
23 trying to get a copy of the document, Lori, the ones that
24 you identified and sent us to pull at the beginning of
25 deposition don't include this letter, I believe.

1          MS. BERKE:  I'm not understanding her.  Oh,
2  right.
3          MS. BURCH:  I think it's that -- that I sent
4  her the list of things that you were going to introduce
5  as an exhibit and she --
6          MS. BERKE:  Oh, yeah, it's not on there.
7          MS. BURCH:  -- (inaudible) for her.  It's
8  not on that list.
9          MS. HOFFMANN:  Right.  So (inaudible) it is
10 going to take me a second to get a copy of it so that I
11 can look while you're questioning the witness on that.
12 So if you can wait a minute.
13         MS. BERKE:  Okay.
14         MS. HOFFMANN:  I pulled everything you
15 identified earlier, but I don't have that statement.  And
16 then if -- if there are any other special ones you want
17 to -- give us -- give me the Bates stamp now.  I can have
18 a paralegal print them, and then I won't delay anything.
19 But I need to be able to look at the document.
20         MS. BERKE:  What is she asking?
21         MS. BURCH:  She needs to be able to see
22 what -- what you're questioning the witness about.  So if
23 you know there's other things you're going to be asking,
24 that she can go ahead so she -- we're not stopping your
25 deposition.

1          MS. BERKE:  Oh, yeah.  There's just one
2  other.  MILKE_AZAG001663, it's a letter to Vince Felix.
3  Everything else we have copies for people of, and Vanessa
4  would have already e-mailed them to you.
5          MS. BURCH:  I'll e-mail Langston that one,
6  Anna.
7          MS. HOFFMANN:  Okay.  Thank you.
8  (Inaudible) Thank you.
9     Q.   BY MS. BERKE:  So did I read that correctly?
10    A.   I believe you did.
11    Q.   And who were the two attorneys --
12         MS. HOFFMANN:  Wait.  Lori, you've got to
13 wait until I have the document (inaudible) but -- thank
14 you.  You can go ahead now.
15         MS. BERKE:  Okay.
16    Q.   BY MS. BERKE:  Clearly, Debra Milke would have
17 gotten this information from you.  Correct?
18    A.   I'd have no idea, ma'am, where she got her
19 information from.
20         Secondly, I don't think this is public, and
21 I think that I'm bound not to answer.
22    Q.   This is public information, and this does go to
23 the Brady/Giglio issue.  So she's authorized you to
24 testify on this topic.
25         So who were the two attorneys that you told

1  her you knew that had similar experiences with Detective
2  Saldate?
3     A.   As best I can remember, it must have been
4  Mr. Baltazar Iniguez with respect to Runningeagle
5  perhaps.  Other than that, I would have no clue and it's
6  only a guess with respect to Zar.
7     Q.   Okay.  Well, let me tell you who the criminal
8  defense attorneys were in the other cases discussed by
9  the Ninth Circuit and you can tell us --
10    A.   Okay.
11    Q.   -- if they're attorneys that you would --
12    A.   All right.
13    Q.   -- consult with.
14    A.   All right.
15    Q.   Denise Jones?
16    A.   Don't know her.
17    Q.   Kathryn Wisdom?
18    A.   Is that Wisdom, Logan & McNulty?
19    Q.   I don't know.
20    A.   I didn't -- can't remember if that was her
21 first name.  Mary Wisdom was her name, no, so it's not
22 Kathryn, unless it's Mary Kathryn.
23    Q.   And is that -- if it's Mary Kathryn, is that
24 somebody you would have consulted with?
25    A.   I don't have a recollection of ever talking to



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
105–108

Page 105

1  Mary Wisdom about this case.

2  Q.  Is it possible you did?

3  A.  I mean, it's possible, but I'm trying to think
4  where Mary -- where -- where her office was at that time.

5  Q.  I mean, once you learned about the Runningeagle
6  case and --

7  A.  Uh-huh.

8  Q.  -- and this information -- well, strike that.

9       Once you knew about the Runningeagle case,
10  was information about other cases in which Detective
11  Saldate continued to question suspects after they had
12  invoked their Miranda rights important to you?

13  A.  Yes.

14  Q.  And so --

15  A.  So I may well have inquired of other counsel.
16  I mean, I'm not saying I didn't.  I'm just saying I don't
17  remember, ma'am, whether I did or -- but, again, if you
18  give me the names, keep going.

19       UNIDENTIFIED SPEAKER:  It's Mary -- it's
20  Mary Kathryn.

21  Q.  BY MS. BERKE:  It is Mary Kathryn.

22  A.  Right?  Because Mary was -- I believe that she
23  had --

24       Does that show what her office address was.

25       MS. RETTS:  Wisdom, Logan & McNulty.

Page 106

1       THE WITNESS:  I'm thinking they were in the
2  Luhrs Tower as well.

3  Q.  BY MS. BERKE:  Is that where your office was?

4  A.  Yeah.  45 West Jefferson.

5  Q.  According to Exhibit 67, it's Mary Kathryn
6  Wisdan -- Wisdom.  And the firm is Wisdom, Logan &
7  McNulty.

8  A.  Yeah, but I -- what I'm saying is I don't
9  remember whether they were in the same building at that
10  time or not.  I don't remember.  I know they moved down
11  to -- well, two or three blocks up the street off of 1st
12  Avenue.

13  Q.  If Ms. Milke is telling her significant other
14  that two attorneys who you know have said that Saldate
15  had engaged in similar conduct and lied on police reports
16  in other cases --

17  A.  Uh-huh.

18  Q.  -- the only person she would have gotten that
19  information from is you.  Correct?

20  A.  I don't know, ma'am.  I have no idea who she
21  could have gotten it from.  She could have got it from
22  other inmates.  I don't know.

23  Q.  Well, it says, "Two attorneys my attorney
24  knows."

25  A.  Well --

Page 107

1  Q.  The only way she would --

2  A.  -- then it should -- it may have been me.

3  Q.  The only way she would know that information is
4  from you?

5  A.  But I got a -- I can't speak for her.  Only she
6  would know what she's talking about.  Giving it what
7  credence it may deserve, I'm fine with -- you got more
8  lists there.

9  Q.  Sure.  Let me finish --

10  A.  Mary Wisdom may well have been one.  I don't
11  know.  I can't remember.

12  Q.  Ben Salazar is another one?

13  A.  I don't know Ben.

14  Q.  Richard Gierloff?

15  A.  I know Richard.  Late Richard Gierloff.  He's
16  dead.

17  Q.  Is he one of the attorneys you would have
18  conducted with about --

19  A.  I could easily have.

20  Q.  -- Detective Saldate?

21  A.  Easily.

22  Q.  Larry Debus?

23  A.  Yes.

24  Q.  You would have con- --

25  A.  Although I don't recall talking to Larry about

Page 108

1  this particular case.

2  Q.  But you do recall talking to Richard about this
3  case?

4  A.  Richard?

5  Q.  Gierloff?

6  A.  Like I say, I would -- I could have.  I might
7  have.  Do I have the specific recollection of doing so?
8  No.

9  Q.  Larry Kazan?

10  A.  Of course.

11  Q.  Would you have consulted with him about this
12  case?

13  A.  Well, he's partners with Larry Debus.  If I
14  didn't talk to Larry, I probably didn't talk to the other
15  Larry, so...

16  Q.  But wasn't Larry Kazan one of your mentors?

17  A.  He's a person that -- what I consider a mentor
18  is people that I learned from by watching, by talking.
19  So, yeah.

20  Q.  Okay.  And is it possible you consulted with
21  him about this topic?

22  A.  It could be, ma'am.  I just don't have a memory
23  of it.

24  Q.  And then what about Dean Trebesch?

25  A.  Dean Trebesch.  He was the public defender of



Page 109

1  Maricopa County.  I don't believe so.
2     Q.    What about Lawrence Matthew?
3     A.    Larry Matthews [sic]?  I think he was with the
4  public defender's office, if my memory is right.  I can't
5  remember whether I did or not, ma'am.
6     Q.    But it's possible?
7     A.    It's -- it's possible.
8     Q.    How about Louis Salzer?
9     A.    Who?
10    Q.    Louis Salzer?
11    A.    Spell it.
12    Q.    L-o-u-i-s.
13    A.    Yes.
14    Q.    S-a-l-z-e-r.
15    A.    I don't recall that name.
16    Q.    Lastly, we have a May 1st, 1991, letter that
17  Debra Milke wrote to somebody named Vince Felix.  Do you
18  know who Vince Felix is?
19    A.    The name sounds familiar, but I can't recall
20  other than familiarity of name.
21    Q.    And it starts at Bates page MILKE_AZAG001663,
22  and the page I'm going to read from -- and I'm going to
23  show this to you -- is page number MILKE_AZAG001668.  And
24  she states, quote, My appellate attorney doesn't have
25  proof of Saldate previously false -- falsifying police

Page 110

1  reports, but Ken does.  Ken also has attorneys that can
2  testify to Saldate's falsifying police reports.  We tried
3  to get it in during my trial, but Hendrix said no.  I
4  mean, we had proof about Saldate, but Hendrix said no.
5  So maybe in a new trial it will come out.
6           And I'm going to have this marked and it's
7  highlighted, and you can take a look at it and just
8  confirm that I read that correctly, and then I'll ask you
9  some questions about it.
10          (Exhibit 212 was marked for identification.)
11    Q.    BY MS. BERKE:  So I've placed before you
12  Exhibit Number 212.  And do you see that small
13  highlighted part?
14    A.    I do.
15    Q.    And did I read that correctly?
16    A.    Let me read it.
17          Okay.  You did read it correct.
18    Q.    And what Ms. Milke is telling Mr. Felix is that
19  you had specific information about other cases that
20  Detective Saldate was involved in where he allegedly
21  falsified a police report.  Correct?
22    A.    That's what she said.
23    Q.    And do you have any knowledge as to what she's
24  referring to?
25    A.    I don't, ma'am.

Page 111

1     Q.    But certainly that information would have come
2  from you.  Correct?
3     A.    She says it did.  I don't have a recollection
4  of what it is that she is speaking of.  So I -- I can't
5  say that that's true.  I don't know.
6     Q.    Okay.  If she testifies that you, in fact, told
7  her that, would you have any reason to dispute that?
8     A.    I wouldn't.  But, on the other hand, I wouldn't
9  have a memory of it either.
10    Q.    Okay.  And so is it possible that you did have
11  knowledge about some or all of the cases discussed by the
12  Ninth Circuit at the time you were representing
13  Ms. Milke?
14    A.    I don't have a memory of having that -- that
15  information that's mentioned in the --
16    Q.    Right.
17    A.    -- Ninth Circuit case.
18    Q.    Is it possible that you had knowledge regarding
19  some of those cases?
20    A.    Well, it would seem to me that if I did, I
21  would have used it going beyond just Runningeagle.  So
22  that leaves me to believe that I didn't have it.
23    Q.    But you can't say, as you sit here today,
24  whether you did or you didn't because you don't have a
25  memory of that?

Page 112

1     A.    That's correct.
2     Q.    Did you ever tell Debra Milke that there was no
3  way in a million years she would get convicted?
4     A.    No.  You don't tell any client that.
5     Q.    Did you ever guarantee Ms. Milke that she'll be
6  free?
7     A.    Nope.
8     Q.    So if she told somebody that you told her that
9  there was no way in a million years she would get
10  convicted and that you guaranteed she would be free, that
11  would be an untruthful statement by her?
12    A.    Again, I think that that is getting beyond
13  what's allowed here by this -- by this consent.  So I
14  decline to answer.
15    Q.    Did you ever agree to loan her money?
16    A.    No.
17    Q.    Do you recall ever having conversations with
18  Noel Levy about the case?
19    A.    Once.  And I remember it only because I
20  remember being in his office.  And that's when his office
21  was -- you know, where the bankruptcy court is downtown,
22  the tall building across the street from it?
23    Q.    The old bankruptcy court?
24    A.    Yeah, the -- well, no, the present bankruptcy
25  court isn't there.  They moved already.  Used to be the



Page 113

1  old federal court.
2      Q.   Okay.
3      A.   It's now the bankruptcy court.
4      Q.   Okay.  You're right.
5      A.   And the building just to the south, his office
6  was in that office.  And I remember going up to his
7  office and having a conversation with him about the Milke
8  case.
9      Q.   And what do you remember the substance of that
10  conversation being?
11     A.   I remember nothing of the substance.  I just
12  remember his desk had all kinds of Marine Corps
13  memorabilia on it.  So that's -- as far as what we talked
14  about, I have no memory.
15     Q.   Did you ever have a conversation with Noel Levy
16  in the hallway of the courthouse about the case?
17     A.   It would surprise me if I didn't.
18     Q.   Did he ever tell you that he -- did Noel Levy
19  ever tell you that he believes Ms. Milke is innocent?
20     A.   I have no memory of him saying that.  That
21  would not be consistent with the Noel Levy I know or
22  knew.
23     Q.   Did you ever tell Ms. Milke that you were going
24  to win her case?
25     A.   Ma'am, again, I am going to decline to answer

Page 114

1  any further discussions concerning my conversations with
2  Ms. Milke.  I believe that's covered -- I believe it's
3  untoward of you to try to keep piercing through what is
4  an ethical obligation that I have.
5      Q.   Did you ever tell Ms. Milke that you would risk
6  going to jail for contempt of court in order to prove her
7  innocent?
8      A.   I'm declining to answer for the reasons --
9      Q.   On what basis?
10     A.   The reasons previously stated, Exhibit Number
11  208.
12     Q.   If Debra Milke revealed communications that the
13  two of you had with one another to a third party not
14  involved in the case, what is your position with respect
15  to whether there's been a waiver of the attorney/client
16  privilege as to that subject matter?
17     A.   My position is -- is that my opinion is not
18  relevant to the call.  My opinion is that it's an answer
19  that needs to be made by Judge Silver or the magistrate.
20     Q.   Okay.  So maybe we'll try to get her on the
21  phone.
22     A.   Sure.  I mean, I'm fine with that.
23     Q.   Sure.
24     A.   You've just got to appreciate and understand
25  that I consent to your answering questions about any

Page 115

1  public actions, consent except for the deposition you
2  took as my attorney and are not -- that are not covered
3  by a privilege.  That sounds like you're asking me what I
4  said to my client or to acknowledge that I did or didn't
5  say things to my client, and I think that that is
6  communications that I'm prohibited under the ethical
7  rules from providing.
8      MS. BERKE:  What is plaintiff's counsel's
9  position on that?  Is it Anna or is it Amelia?
10     MS. BURCH:  Anna is defending.
11     MS. BERKE:  Anna?
12     MS. HOFFMANN:  Yes.
13     MS. BERKE:  What is plain- -- what is
14  plaintiff's position on that?
15     MS. HOFFMANN:  We are not waiving anything.
16  We're not waiving any attorney/client privilege that has
17  not already been waived.  So -- so (inaudible) --
18     MS. BERKE:  So if it's -- so if we're
19  questioning him about statements -- about conversations
20  she claims to have had with Mr. Ray in letters she wrote
21  to Joe Marino, what is your position?
22     MS. HOFFMANN:  I think our -- our position
23  is we object to that because unless the Court says that
24  he has to answer those --
25     I mean, first of all, I don't -- I'm not

Page 116

1  sure why any of this is relevant to anything for this
2  lawsuit, but I can't voluntarily consent to his answering
3  those questions without risks being further waivered to
4  attorney/client privilege we're not doing.
5      So I -- I -- our position is he can't answer
6  questions about his conversations with Debra Milke
7  (inaudible) attorney/client privilege unless there's a
8  Court ruling that there's been a prior waiver to that
9  extent.
10     MS. BERKE:  Okay.  So why don't we try to
11  get the judge on the phone so that she can rule on that
12  issue.
13     THE WITNESS:  Are there -- may I inquire?
14     MS. BERKE:  But we can --
15     THE WITNESS:  May I inquire?
16     Q.   BY MS. BERKE:  Oh, sure, sure.
17     A.   Because only you know what the questions are.
18  Are there going to be other areas that's going to be
19  addressed in this kind of framework?  Because, again, my
20  point is -- is not to be obstructionist.
21     Q.   Oh, I understand.  And I'm not saying it is --
22     A.   I just would like to do another eight or ten
23  more years of practicing law, if you don't mind.
24     Q.   Yeah, I understand that and that's fair.
25     A.   Yeah.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
117–120

Page 117

1    Q.    And so I think we do need to get a judge --
2    A.    Okay.
3    Q.    -- the judge's ruling on that issue.
4    A.    All right.
5         MS. BERKE:  Do you want to break for lunch
6    and then maybe call her?
7         MS. BURGESS:  Yeah.  I mean, it might be
8    best if we can set up a conference line and Anna can call
9    in so we're not trying to do --
10        MS. BERKE:  Why don't we try to get the
11   judge --
12        Let's go off the record.
13        THE VIDEOGRAPHER:  We're off the record at
14   1:30.
15        (A recess was held off the record.)
16        THE VIDEOGRAPHER:  Stand by.
17        We're back on the record at 2:14.
18   Q.    BY MS. BERKE:  All right.  Mr. Ray, as you
19   know, before we broke for lunch, we agreed that we would
20   try to get a ruling from Judge Silver on the issue of
21   whether Ms. Milke has waived her privilege as to
22   statements she made in letters to a third party
23   concerning conversations she had with you.  We've been
24   instructed by the Court to put the dispute in writing and
25   file something with the Court, so we're working on that

Page 118

1    now.
2         And so I'll move on to something else, and
3    we'll either get it resolved later today or on another
4    day and we may have to reconvene.  Okay?
5    A.    All right.
6    Q.    I'm going to show you what has been marked as
7    Exhibit Number 202.  That's a document you filed seeking
8    to withdraw from your representation of Ms. Milke.  You
9    filed that on July 6th of 1990.  Correct?
10   A.    Appears that's correct.
11   Q.    And what precipitated that was a report that
12   you came into possession of wherein Detective Saldate
13   reported on a discussion he had with a fellow inmate of
14   Ms. Milke's named Chris Landry.  Correct?
15   A.    Ma'am, I'd have to read this.  I haven't seen
16   this in --
17   Q.    Okay.  Sure.
18   A.    -- 25 years.
19   Q.    Fair enough.  Take some time and read the
20   entire thing, and then I'll ask you some questions about
21   it.
22   A.    Okay.  Thank you.
23   Q.    Uh-huh.
24   A.    Thank you.
25   Q.    Okay.  You've had an opportunity to review

Page 119

1    that?
2    A.    Yes.
3    Q.    And so you recall filing the motion to
4    withdraw?
5    A.    No.
6    Q.    Did --
7    A.    But I acknowledge that it was filed.
8    Q.    Okay.  Did reviewing it help refresh your
9    recollection?
10   A.    What was stated is what happened.
11   Q.    Okay.
12   A.    But today I don't have an independent memory of
13   this at all.
14   Q.    So what happened is that Detective Saldate
15   interviewed a fellow inmate of Debra Milke's and then
16   prepared a report which was provided to you by Noel Levy.
17   Correct?
18   A.    That's what it states, yes.
19   Q.    Do you know Chris Landry's attorney at the
20   time, Dan --
21   A.    Dan Roth.
22   Q.    -- Roth?
23   A.    I knew him.  I haven't seen him since this.
24   Q.    When you received this report --
25   A.    Uh-huh.

Page 120

1    Q.    -- about the interview, did you call Dan?
2    A.    I don't remember.  I -- you would have thought
3    that I would have.  I probably did, but I have no memory
4    of it.
5    Q.    Would that -- is that something you think you
6    would have done, though?
7    A.    Most likely.
8    Q.    Do you still keep in contact with him?
9    A.    I haven't talked to him in -- ever since --
10   since this case.  And I knew him only in passing.  I
11   didn't know him very well.
12   Q.    And in the report -- or according to the
13   report, Chris Landry told Detective Saldate and the
14   others present for the interview that Debra Milke had
15   told her that you had told Debra Milke that you were
16   going to do things that might get you disbarred if anyone
17   found out but that you were only going to do it for one
18   reason and that was to win the case.
19        You remember reading that?
20   A.    I read it.
21   Q.    Did --
22   A.    And it writes like I wrote it too.  So -- and I
23   certainly signed it.
24   Q.    And is that something you said to Debra Milke?
25   A.    Ma'am, that gets into the areas of things that



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
121–124

Page 121

1  I said to her or didn't say to her, and I believe that we
2  need the guidance of the Court on that.
3       If you wanted to ask me if what Chris says I
4  said was true, I can answer that, I think.  But I think
5  the pleading itself gives you what my position was at the
6  time, including my impressions of it.
7    Q.  So you're not -- as you sit here today, you're
8  not able to tell us whether, in fact, you made that
9  statement to Debra Milke.  Correct?
10    A.  Am I able to, yes, but am I legally or
11  ethically bound to -- barred from doing so, that's my --
12  that's my problem.
13    Q.  Do you know who Chris Landry is?
14    A.  I do not.
15    Q.  Did you ever interview her?
16    A.  Never.  Not that I know of.
17    Q.  Is what Chris Landry says true?
18    A.  No.
19    Q.  Did you -- could you have said -- well, strike
20  that.
21       I'm trying to ask it in a way that you won't
22  be uncomfortable answering it.
23    A.  Oh.
24    Q.  If Chris Landry had reported that Debra Milke
25  told her anything about you suggesting you would risk

Page 122

1  getting disbarred for any purpose related to this case,
2  would that be untrue?
3    A.  Absolutely untrue.  Not a chance in hell would
4  I do anything to compromise my ethics.
5    Q.  Or to risk getting disbarred?
6    A.  Or risk getting disbarred.  I don't play this
7  game.
8    Q.  You know that -- well, strike that.
9       Where was Debra Milke being housed at the
10  jail pretrial?
11    A.  My recollection is the Durango facility.  I
12  don't know whether it exists anymore or not.
13    Q.  Was it in the psych ward?
14    A.  No, I don't think so.  I know -- God, what was
15  the M.D.'s name, the psychiatrist?  It was my
16  understanding or impression that he was able to do his
17  psychological work where she was housed at the Durango
18  facility.  I cannot remember his name right now.
19    Q.  So then she could have been in the psych ward?
20    A.  She could have been or she -- at least under
21  psycho- -- it just struck me -- the Durango building at
22  the time that I remember it was -- it had all of the
23  cells around the perimeter of the building and then the
24  general common area looked like -- about like a
25  basketball court in the center with a bunch of tables and

Page 123

1  so forth.  And that was what was made available to us for
2  our conversations.
3    Q.  Would you ever offer to loan money to a client?
4    A.  Never.  May advance costs from time to time,
5  but that's -- I think that's permitted.
6    Q.  Right.  And that would be costs related to the
7  case?
8    A.  Uh-huh.
9    Q.  Yes?
10    A.  Yes.
11    Q.  Like court reporters, documents being copied,
12  that type of thing?
13    A.  Correct.
14    Q.  Experts?
15    A.  Yes.
16    Q.  But something case-related?
17    A.  Right.  Correct.
18    Q.  Have you ever been threatened by Mark Milke?
19    A.  I perceive it as such.  I mean, I recall that
20  it was taken seriously enough that I did hire a private
21  investigator, a bodyguard for I and my family.
22    Q.  Tell us what that situation involved.
23    A.  What it amounted to, I don't remember.  It's
24  one of those things that I was glad to purge when it was
25  all over.  But at the time, I took the threat as serious,

Page 124

1  and I hired Steve Blakely to -- to act as a bodyguard for
2  us.
3    Q.  But you don't remember what the threat
4  entailed?
5    A.  I don't, ma'am.  I've had a lot of threats in
6  my career.  So...
7    Q.  Would you ever tell a client in a criminal case
8  that they're going to win?
9    A.  No.  The best I'll tell them is 50/50, either
10  win or you lose.  It's going to be the other.
11    Q.  It's a coin toss?
12    A.  It's a coin toss.
13       If I could predict what a jury would do, I
14  would give up my bar card and sit out on the plaza and
15  make a whole lot more money.
16    Q.  Did you ever receive book rights or movie
17  rights in connection with this case?
18    A.  Never.  I recall this.  I can't even remember
19  what her name is now.  But after Debra was released
20  through the Ninth Circuit opinion, some crime story
21  author, well-known, contacted me and wanted me to -- you
22  know, to speak to me about it, and I never returned the
23  call.  She called several times.
24       But no, no -- no rights to anything.  Don't
25  want anything.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
125–128

Page 125

1    Q.    When is the last time you spoke with Debra
2  Milke?
3    A.    I've only talked to her once, and that was
4  after she was released.  I was down at Judge Skelly's
5  office.
6         You know Judge Skelly?
7    Q.    Yes.
8    A.    He's an arbitrator or --
9    Q.    Mediator.
10   A.    -- mediator.
11   Q.    Uh-huh.  Both actually.
12   A.    And we were -- were mediating a legal
13  malpractice case.  And I was representing the plaintiff
14  in the case.  So you're aware.  It wasn't my legal
15  malpractice.  And I just happened to see in his office
16  that Mike Kimerer's office was in that same building.
17         And so an opportunity that I had to go
18  and -- I was going to say hi to Mike because I knew --
19  had known Mike for years, and I knew that he was involved
20  in this case.  And so I was going to stop in and say hi.
21  So I went to the front desk and I said:  My name is Ken
22  Ray, I'd like to see Mike Kimerer.
23         She says -- lady at the desk says, Hi, how
24  are you?  I says, I'm fine.  She said, You don't remember
25  me, do you?  And I says, No.  She says, I'm Debra Milke.

Page 126

1  Didn't recognize her.  She'd changed so much.  And so
2  that was the only time that I've talked to her since
3  conviction.
4    Q.    Have you had any involvement in the civil case?
5    A.    None whatsoever.
6    Q.    Did you have any involvement in selecting her
7  counsel prior to her criminal case being over?
8    A.    Selecting her counsel for which purpose?
9    Q.    Well, there -- you were aware prior to her
10  criminal case concluding that she was planning to file a
11  civil lawsuit.  Correct?
12   A.    I wasn't aware of that.
13   Q.    You weren't?
14   A.    No.  I learned about it in the newspapers or
15  from some --
16   Q.    All right.
17   A.    -- kind of publication somewhere.  And then
18  when I learned about it, I did pull down the -- the
19  complaint to see what it was all about.  And -- but, no,
20  I had no involvement with any lawyer after me.
21   Q.    And you had no knowledge prior to learning she
22  had actually filed a lawsuit that that was her intention?
23   A.    No, I had no knowledge.
24   Q.    Would you ever tell a client that you would
25  risk going to jail for contempt of court if something

Page 127

1  blew up to make sure the client was proven innocent?
2    A.    Say that one more time.
3    Q.    Sure.
4    A.    I know you --
5    Q.    I know.
6    A.    I hope you don't need to read it back.  Just
7  tell me again.
8    Q.    No, just -- would you ever tell a client that
9  you would risk going to jail for contempt of court to
10  help prove them innocent?
11   A.    No, I would never do that.  Never.  No.  This
12  thing kind of bothers me, though, this ethical thing
13  because my view of this is my communications with my
14  client is to go to the grave with me.  And so that's why
15  I'm being very cautious and very nervous in this whole
16  process.
17   Q.    I understand.
18        Did you ever interview Mark Milke?
19   A.    I don't think so.
20   Q.    Did you ever interview his parents?
21   A.    No.
22   Q.    Did Ms. Milke ever undergo a polygraph
23  examination?
24   A.    Not on my direction.
25   Q.    To your knowledge, did she?

Page 128

1    A.    To my knowledge, she didn't.
2    Q.    Do you know of a former inmate and friend of
3  Debra Milke's named Tina?  Does that name ring a bell?
4    A.    No.  No.  Sorry.  No.
5    Q.    Have you ever been in possession of any letters
6  that Joe Marino wrote to Debbie Milke, Debra Milke?
7    A.    I don't believe so.
8    Q.    And, again, you don't know the name Joe Marino?
9    A.    No.
10   Q.    Did you ever have discussions with James
11  Styers' attorney or Roger Scott's attorney?
12   A.    A Roland Steinle, if I remember correctly, was
13  Styres' attorney.  And I probably did speak with him on
14  one or more occasions concerning the case, basically just
15  see what I could learn that would either help or help how
16  things were going to play out.
17        I don't remember Roger Scott's attorney's
18  name.  Do you --
19   Q.    I am not remembering right now.  Roger Scott's
20  attorney's name?  What was it?
21        UNIDENTIFIED SPEAKER:  (Inaudible.)
22        MS. BERKE:  That was Styers' --
23        THE WITNESS:  That was Styers' attorney.  He
24  came up to Prescott after he became judge and tried a
25  case that I was involved in.  But we didn't talk about



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
129–132

Page 129

1  that case either -- at that time either, so...
2      Q.   BY MS. BERKE:  I'm just flipping through my
3  notes, and I'm trying to avoid those questions that we're
4  waiting for a ruling from the judge on.
5      A.   I appreciate that.
6      Q.   Do you know who Dr. Kassell is, K-a-s-s-e-l
7  [sic]?
8      A.   I'm thinking that he may have been one of the
9  psychiatrists, maybe.
10     Q.   Why didn't Debra Milke testify at the
11  voluntariness -- I'm sorry -- at the motion to suppress
12  hearing?
13     A.   I think that would be covered by where I have
14  concerns.
15     Q.   Well, it goes to the issue -- let me look at
16  the letter again.  Could I -- where's the exhibit?  Is it
17  in front of me maybe?  Do you have that letter?
18     A.   Which -- which letter are you -- the -- this
19  one?
20     Q.   Your -- I'm sorry.  Debra Milke's letter.
21     A.   That's my copy.
22     Q.   Right.
23          Okay.  Let me ask you a question more
24  generally.
25          When you have a situation where it is a

Page 130

1  defendant's word against a police officer's word in terms
2  of what was said during an interview, and the detective
3  is claiming that -- or I'm sorry -- and the defendant is
4  claiming that they requested an attorney --
5      A.   Uh-huh.
6      Q.   -- and the detective is denying that, what
7  would be the reason for not having a criminal defendant
8  testify when it's a he said/she said situation?
9      A.   That could depend upon the individual client
10  themselves.
11     Q.   What are -- can you give me some reasons why
12  you wouldn't put the client on the stand?
13     A.   I mean, ordinarily you would.
14     Q.   Okay.
15     A.   Either that or you have them fill out an
16  affidavit.  The -- the concern that I have many times is,
17  you know, we're not in the federal system of criminal
18  justice; we're in the state system.  So any time you put
19  a client on the stand for one particular purpose, that
20  opens them up wide open for anything else that the
21  prosecutor might want to ask them.  And I have a great
22  deal of difficulty keeping that from happening.  So...
23     Q.   But if you know that your client is going to
24  testify at the criminal trial --
25     A.   Well, you never know that until the State rests

Page 131

1  its case.
2      Q.   That's a decision that's made after the State
3  rests --
4      A.   Correct.  You don't know.
5      Q.   -- every time?
6      A.   You just don't know.  And so you always have a
7  concern that if, in the suppression hearing, you have
8  your client testify and then they do testify at trial,
9  they testify differently, then -- then you've got a
10  problem.  Because that can -- obviously, their prior
11  sworn statement's going to be used against them on the
12  cross-examination by the State.
13          So it's -- it's case-specific in my opinion.
14  It's the individual.  There may be circumstances where
15  you'd like them to testify and they don't want to.  You
16  can't make them.
17     Q.   Uh-huh.
18     A.   So there's any variety of things that's -- a
19  lot of it's tactical and strategic, and -- and then you
20  just kind of look ahead to see what might happen down the
21  road.
22          Do we know who Scott's attorney is yet?
23     Q.   Oh, we don't.
24     A.   Okay.
25     Q.   Ernie Sweat was interviewed by you right before

Page 132

1  trial started.  Correct?
2      A.   Can you refresh my memory as to who he is?
3      Q.   Sure.
4          Ernie Sweat was the man that Debra Milke was
5  in a relationship with --
6      A.   Oh, okay.
7      Q.   -- at the time --
8      A.   All right.
9      Q.   -- of Christopher's death.
10     A.   And if your records show that I interviewed
11  him --
12     Q.   I'll tell you the date.
13     A.   Yeah.
14          -- then I have no dispute with it.
15     Q.   Ernie Sweat was interviewed on September 10th
16  of 1990.
17     A.   Okay.
18     Q.   Do you know why he would have been -- why you
19  would have waited to interview him until so close to
20  trial?
21     A.   I have no memory --
22     Q.   Actually, trial had started.
23     A.   Yes, trial started.  I presume that something
24  during the course of the trial came up that I believed he
25  may have some relevant information.  That's the only



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
133—136

Page 133

1  thing -- that's just an assumption on my part.  Before
2  then I didn't think he had anything of value to -- to add
3  to the equation just from what I knew.
4      Q.   Did you ever have any interactions with Debra
5  Milke's mother, Renate?
6      A.   I'm trying to think of an instance where I
7  would have been in her company.  It seemed to me that she
8  was in Germany most of the time or somewhere in Europe.
9  So I -- I -- I can't say one way or the other, ma'am.
10     Q.   Would you ever tell a client they're going to
11 win their appeal?
12     A.   No.
13     Q.   Did you or your wife buy Debra Milke clothes
14 for her criminal trial?
15     A.   We did.
16     Q.   Did you attend Roger Scott's trial?
17     A.   No.
18     Q.   No portion of it?
19     A.   I can't say that I didn't peek my head in, but
20 I have no memory of sitting through anything of any
21 substance.
22     Q.   Do you believe that Mark Milke had any
23 involvement in Christopher's death?
24     A.   That's quite a broad question.  I don't know
25 how I can answer that without getting into client

Page 134

1  communications.
2      Q.   I'm going to show you what's been previously
3  marked as Exhibit Number 158.  And this is the amended
4  petition for postconviction relief and incorporated
5  memorandum of points and authorities.
6          Do you see that?
7      A.   I do.
8      Q.   And this is a document that was filed by Anders
9  Rosenquist.
10         Do you see that?
11     A.   I do.
12     Q.   Tell us what a petition for postconviction
13 relief is.
14     A.   After all appeals have been exhausted, Rule 32
15 of Rules of Criminal Procedure authorize a review of the
16 proceedings that led to the trial, any errors or mistakes
17 that are not otherwise covered by the appeal.  If there's
18 an error or mistake in the handling of the case, then
19 you're entitled to Rule 32 processes.
20     Q.   I'm going to turn your attention to -- if I can
21 find it -- if you would go to page 35, which is Bates
22 page MILKE_AZAG002768.  You see that Ms. Milke has taken
23 the position that her defense counsel was so deficient in
24 his representation of her during her trial and sentencing
25 as to deny her constitutional right to effective

Page 135

1  assistance of counsel.
2          Do you see that?
3      A.   I see that.
4      Q.   And that defense counsel would be you.
5  Correct?
6      A.   I would assume so.
7      Q.   And citing the Strickland case that we talked
8  about earlier that's cited in your affidavit, she
9  contends that -- or she states here that in determining
10 whether trial counsel was ineffective, it is necessary to
11 examine first if counsel's performance was deficient and,
12 second, if the petitioner was prejudiced by this
13 performance.  Is that an accurate statement of the law?
14     A.   That's my understanding of Strickland, yes,
15 which I think was adopted in Arizona under State v. Nash.
16     Q.   And according to paragraph 90 of this amended
17 petition, the test for prejudice is whether there's a
18 reasonable probability that but for counsel's
19 unprofessional errors, the result of the proceeding would
20 have been different.  Correct?
21     A.   Correct.
22     Q.   In paragraph 93, she states that she was denied
23 effective assistance of counsel in violation of the 6th
24 and 14th Amendments because the performance of her
25 Court-appointed counsel, which is you, fell below

Page 136

1  reasonable standards of representation.
2          Do you see that?
3      A.   I see it.
4      Q.   She contends in this motion that you failed to
5  exercise the skill, judgment and diligence expected of
6  reasonably competent criminal defense lawyers in
7  investigating the case, preparing the guilt-phase trial
8  and presenting evidence and a defense at trial.
9          She goes on to say there was no tactical or
10 strategic decision for your failure to investigate and
11 prepare adequately for trial or for your performance at
12 trial.
13         She then states that but for the performance
14 of you, the result at trial would have been different for
15 Ms. Milke.
16         Do you see that?
17     A.   I see it.
18     Q.   Do you agree with that?
19     A.   No.
20     Q.   What part of that do you disagree with?
21     A.   Look, I can't tell you how many hundreds of PCR
22 petitions I've written.  And any time that there is what
23 is perceived as a mistake, you raise the issue of
24 ineffective assistance of counsel.  It's just an
25 obligation that you have as a PCR lawyer.



Page 137

1      What I find notable, at least unless
2  there's -- this is the incomplete document.  I don't
3  know -- but I don't see any expert opinion affidavit.
4      Was there ever one?  And if there wasn't,
5  what is being recited I've probably cited myself just as
6  many times as Anders has.
7      Q.   So are you saying that normally when a criminal
8  defendant alleges ineffective assistance of counsel, they
9  have an expert affidavit to support that position?
10     A.   Absolutely.
11     Q.   She alleges that your overall investigation was
12  so deficient that she was prejudiced by your performance.
13  She calls it substandard performance.
14      Do you see that heading on page 37, letter
15  A?
16     A.   I see that.
17     Q.   And she gave a number of examples of your
18  ineffectiveness.
19      One of them was, paragraph 97, that you
20  failed to conduct any independent investigation of her
21  residence, the scene of the purported conspiracy, until
22  December 29th, 1989, over three weeks after her arrest.
23  She goes on to say that by the time you investigated the
24  scene where she, Jim Styers -- where she and Jim Styers
25  had lived, the apartment was completely empty.  Is that

Page 138

1  accurate?
2      A.   I can't swear to the date and I can't swear to
3  what was or wasn't in the apartment because I don't
4  remember.
5      Q.   Do you remember that being an issue?  Because
6  we -- Kirk Fowler talked about this in --
7      A.   Uh-huh.
8      Q.   -- his deposition, that he had asked you
9  immediately after the retention -- that's -- he's the
10  investigator who was assigned to assist you.  Correct?
11     A.   Right.
12     Q.   And he testified at his deposition that
13  immediately after his retention, he had asked you for
14  permission to go to the apartment and look at the
15  apartment, and apparently you didn't authorize that.
16     A.   Okay.
17     Q.   Does that ring a bell to you?
18     A.   No, it doesn't.
19     Q.   Do you think it was important in your
20  representation to do a prompt inspection of the apartment
21  once you were retained?
22     A.   In this particular case, my opinion is no.
23     Q.   And why is that?
24     A.   Because the boy was shot out in the desert.  I
25  went there.  I thoroughly examined that scene.  That's

Page 139

1  where the crime occurred.
2      Q.   Well, but part of the crime was the alleged
3  conspiracy between Debra Milke --
4      A.   So the --
5      Q.   -- and Jim Styers.  Right?
6      A.   And a conspiracy is what, an agreement between
7  one or more persons that one of them or another person
8  will commit a crime.
9      Q.   Right.
10     A.   What about an apartment is going to tell me
11  that?
12     Q.   There could be written documents, couldn't
13  there?
14     A.   I would suppose, but I don't think so.  I don't
15  think so.
16     Q.   And so to this day, you don't think it was
17  necessary to inspect the apartment at the outset of your
18  representation of Ms. Milke?
19     A.   Other than to just get a feel for what the
20  place looked like and events that happened, you know,
21  that were reported to have happened, that she stayed at
22  the apartment before she went down to Florence, and the
23  police were there, just to get a grasp of the scene so
24  that you can visualize what it is that people are talking
25  about.  Other than that, I saw no value and still don't

Page 140

1  see any value of going inside the residence.
2      Q.   Do you remember there being an issue regarding
3  Dr. Otto Bendheim?
4      A.   He was the medical examiner, if I remember
5  right.  Is that correct?
6      Q.   Well, it states here that defense counsel
7  wanted to retain Dr. Otto Bendheim --
8      A.   Oh.
9      Q.   -- but by the time he made the request to the
10  Court three months into the case, the State had already
11  hired Dr. Bendheim.
12     A.   Oh.
13     Q.   Does that ring a bell?
14     A.   Not particularly.
15     Q.   And then it states in paragraph 99 that in May
16  1990, Ms. Milke informed you that Rosemary Houston would
17  be a good witness on her behalf and you failed to
18  follow-up on that information and to not have her
19  testify.
20      Who's Rosemary Houston?
21     A.   I have no memory of who she is.
22     Q.   It says that you also failed to independently
23  investigate her past, Ms. Milke's past.  As a result, you
24  failed to uncover witnesses who had known her for a long
25  time, had observed her interactions with her son and were



Page 141

1  willing to testify on her behalf.
2     A.   That's Anders' point of view.  I understand it.
3  I don't have to agree with it.
4     Q.   And why wouldn't it be important to have those
5  types of witnesses?
6     A.   Well, you want to undercover -- uncover as much
7  as you can about your particular client.
8     Q.   Uh-huh.
9     A.   But I don't know that I didn't do that or do an
10 adequate job of doing that.
11    Q.   What witnesses did you put on the stand to talk
12 about her background other than Ms. Milke herself?
13    A.   None.
14    Q.   Why is that?  So when you say you adequately
15 covered her in that regard, how did you adequately cover
16 her?
17    A.   God, I wish I could remember.  I really do.
18 But I -- I just don't have an answer for you.
19    Q.   She's critical of you for failing to make any
20 efforts to uncover Roger Scott's medical or military
21 history.
22         Do you see that?
23    A.   What paragraph are you on?
24    Q.   Paragraph 100.  It says, "The State released
25 codefendant Styers' military records on June 25, 1990.

Page 142

1  In the records was information regarding a head injury
2  and potentially permanent disability suffered by Styers.
3  Defense counsel failed to make any efforts to uncover
4  Roger Scott's medical or military history either.  With
5  the records he did have, defense counsel neglected to
6  follow up on those records or utilize them in any way to
7  assist his client."
8         Would you have had access to Roger Scott's
9  medical records?
10    A.   Only upon court order and showing a need.
11    Q.   And did you feel it was necessary to get his
12 medical records --
13    A.   No.
14    Q.   -- or think that would be important?
15    A.   I didn't at the time, I'm sure.
16    Q.   What did you know about Jim Styers' military
17 past?
18    A.   It was my understanding he was -- my memory
19 is -- is that he was a Vietnam veteran.  May have been a
20 victim of Agent Orange, I think, or some kind of chemical
21 warfare and witnessed a number of atrocities, including
22 atrocities to children.
23    Q.   Had witnessed them or had participated in those
24 atrocities?
25    A.   That I don't know that for certain.  I mean, I

Page 143

1  say that as of today, I don't know that for certain,
2  ma'am.
3         I apologize my voice is giving out.
4     Q.   Do you want to take a break and get some water?
5     A.   That -- that's fine.  I don't know it will ever
6  come back but...
7     Q.   Okay.  Paragraph 101 says that on July 1st,
8  Ms. Milke suggested that she be allowed to undergo a
9  polygraph examination and that you never followed through
10 with that.
11    A.   What admissibility would it be?
12    Q.   Right.  So --
13    A.   Yeah.  So...
14    Q.   Do you normally have clients undergo polygraph
15 examinations?
16    A.   Not in these types of cases, no.
17    Q.   What kinds of cases would you use a polygraph?
18    A.   I would use it in accusations of child
19 molesting or sexual assault.
20    Q.   And why not in a case like this?
21    A.   To request a polygraph would suggest that I
22 didn't believe my client.
23    Q.   In paragraph 102, it says that during the
24 normal -- or I'm sorry.  It says that during the course
25 of pretrial, defense counsel failed to interview a number

Page 144

1  of Debbie's other family members such as her
2  half-brother, mother or her stepfather.  He did not make
3  any effort to secure the presence of her mother until
4  after petitioner had already been convicted.
5         Yet both her mother and stepfather had
6  occasion to spend time with petitioner and the victim a
7  scant three months before the murder.
8     A.   The information that I had is from a source
9  that I can't disclose.  But that impacts why that may
10 well be an accurate statement.
11    Q.   An accurate statement or an inaccurate
12 statement?
13    A.   An accurate statement.  Not to secure the
14 presence of the mother or the others.  There was
15 additional information secured outside of my
16 communications with Ms. Milke that led me to believe that
17 they would not be helpful.
18    Q.   Without violating your ethical constraints that
19 you researched, are you able to tell us what those are?
20    A.   No.
21         MS. HOFFMANN:  I'm sorry, Lori.  I can't
22 hear what you're saying.
23         THE WITNESS:  She asked if I could --
24 without violating my ethical concerns, whether I could
25 explain what that's all about, but I just answered and I



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
145–148

Page 145

1  said no.
2        MS. HOFFMANN:  Okay.
3    Q.   BY MS. BERKE:  And then in paragraph 103, it
4  states, "Defense counsel also made only cursory efforts
5  to secure impeachment information regarding any of
6  petitioner's family members who were witnesses and
7  therefore had little means by which to explain their
8  testimony.  Sandy Pickinpaugh's" --
9    A.   Antipathy.
10   Q.   -- "antipathy towards her sister, the
11  petitioner was only superficially challenged.  Richard
12  Sadeik's perspective of his daughter was also essentially
13  unimpeached.  Had defense counsel taken the time to
14  contact Renate Janka, the jury would have been given full
15  exposure to the dynamics of petitioner's family.  Only
16  then could the jury have given the testimony of the
17  State's witnesses the proper weight and consideration."
18       Do you agree that Sandy Pickinpaugh's
19  testimony was very damaging to Debra Milke at trial?
20   A.   If I could remember what her testimony was.
21  But as a general statement, it wasn't helpful.
22   Q.   In fact, it was harmful?
23   A.   Yeah, I would imagine that it was.  Of course,
24  I think that was the lady that was sort of sprung on me
25  at the last minute, if my memory's not --

Page 146

1    Q.   I think that was Dorothy Markwell.
2    A.   Oh, that may have been Markwell, all right.
3  Remember --
4    Q.   Sandy Pickinpaugh is Debra Milke's sister.
5    A.   Right.
6    Q.   And do you remember -- she lived in Wyoming?
7    A.   Right.
8    Q.   Do you remember her testimony being very
9  damaging to Debra Milke?
10   A.   As a collective -- as a general statement, yes.
11  What she said, I don't remember.  You know -- and, again,
12  I'm walking this tightrope again.
13       But when you conduct interviews of
14  potentially hostile witnesses, State's counsel is going
15  to be present.  Sometimes you don't want to give them
16  more ammunition to do more damage to you.  So I hope you
17  can appreciate my oblique statement.
18   Q.   So when you're doing interviews of potential
19  witnesses, the State always has the right to be present?
20   A.   Absolutely.
21   Q.   What if the --
22   A.   Of State's witnesses, yes.
23   Q.   Okay.  So --
24   A.   If it's a person that -- that my own
25  investigation finds, no, but then they have a right to do

Page 147

1  the interview of them if I list them as a witness, and
2  then they're going to find out everything we talked about
3  in the interview to begin with.
4    Q.   So if the State provides a disclosure of the
5  witnesses it intends to call at trial, if you want to
6  interview any of them, regardless of what the
7  relationship is between that witness and the criminal
8  defendant, the State has a right to be present?
9    A.   That was certainly my view back then.  It's
10  still my view now.  Any time the State, in their
11  disclosure statement, the Rule 15.1 disclosure statement
12  lists -- they list everybody.  They don't whittle it down
13  to the final list until prior to trial.
14       But the protocol is -- whether it's required
15  or not is -- is that if I want to interview a witness
16  listed by the State, I go to the state first.
17   Q.   Even if --
18   A.   And then they say, I don't need to be present
19  but record her or I don't need to be present, you don't
20  need to record her.  But you go to them first.  And I
21  think the Courts think that's the appropriate way to do
22  it as well.
23   Q.   Okay.
24   A.   But if I have a witness that I interview to
25  make a decision as to whether or not I want to call them

Page 148

1  or use them as a witness, that's -- that's work product
2  privilege.  It's protected.  I don't have to disclose it
3  to anybody unless I intend to offer them as a witness at
4  trial.  And then the State can say, All right, produce
5  them for -- for an interview.  So sometimes you don't
6  want to learn too much.
7    Q.   But you don't have to turn information over to
8  the State in terms of what that person will testify
9  about, do you?
10   A.   If you list them as a witness, the answer is
11  yes.
12   Q.   So there's a disclosure obligation in terms of
13  the substance of the information they'll be providing or
14  that they have?
15   A.   Well, the guidelines is -- is what's spelled
16  out under Rule 15.2, the Rules of Criminal Procedure.
17  You list them as a witness.  They may call you up and ask
18  you, Well, what's this witness going to testify to?
19  Well, you have an obligation to disclose.  And if you
20  don't disclose, then they're going to run off -- into the
21  Court and say, Move to strike the witness.  Counsel's not
22  giving disclosure.
23   Q.   Do you have to disclose any relevant
24  information they have, even if you don't intend to
25  explore that with them at trial?



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
149–152

Page 149

1    A.   In my view, you have to disclose all that you
2  know if you're going to -- the good, the bad and the
3  indifferent.
4    Q.   Okay.
5    A.   That's my opinion.
6    Q.   That -- is that your reading of the rules?
7    A.   It is.  And it's just as a matter of practice
8  and a matter of professional courtesy.
9    Q.   In paragraph 105, she's critical of you for
10 waiting until the day before trial commenced to interview
11 Ernie Sweat.  So she claims it didn't give you any time
12 to capitalize on or prepare for the information learned
13 in the interview.  And, again, you don't have any
14 recollection as to why you waited to interview him?
15   A.   It would only be speculation on my part why I
16 waited.  And if it had been something revealing, I
17 probably would have gotten him on to the witness list
18 somehow or tried to get him in there.
19   Q.   Were you aware of Dorothy Markwell, who's
20 discussed in paragraph 106 of Exhibit 158, prior to the
21 State listing her as a witness?
22   A.   And see, your question -- the premise again
23 was?
24   Q.   Were you even aware of Dorothy Markwell's
25 existence?

Page 150

1    A.   I can't tell you --
2    Q.   You don't know?
3    A.   -- if I was or I wasn't.  No.  I just know that
4  we had some go-arounds about that at trial.
5    Q.   The next section, section B starting at
6  paragraph 108, this section contains criticisms on your
7  investigation and cross-examination of Armando Saldate.
8        Do you see that?
9    A.   I see that.
10   Q.   And Ms. Milke is critical of you for waiting
11 until September 18th of 1990, a full week after he had
12 testified at the voluntariness hearing.  I think I called
13 it a suppression hearing earlier.  Is it -- are they one
14 and the same, suppression hearing --
15   A.   They're usually to --
16   Q.   -- and voluntariness hearing?
17   A.   -- suppress the -- the statement.
18   Q.   Right.
19   A.   So it's the same thing.
20   Q.   Okay.  And she's critical of waiting for you --
21 she's critical of you for waiting so long to subpoena the
22 personnel records.  How do you respond to that criticism?
23   A.   Well, I appreciate Anders.  He's -- he's a good
24 man, and he tries hard, but I don't agree with everything
25 that he has said.  If -- if my understanding is correct

Page 151

1  from reading the -- the opinion -- Ninth Circuit opinion,
2  he had how many people working how many thousands of
3  hours to uncover this stuff?  I would never have been
4  given that permission.
5    Q.   Okay.  But you can have easily asked the City
6  of Phoenix Police Department for a list --
7    A.   Uh-huh.
8    Q.   -- of the cases that Detective Saldate had been
9  assigned to?
10   A.   And would they have given it to me or would
11 they have gotten Mr. Richards in there to tell me to go
12 pound sand?
13   Q.   Well, you don't know unless you ask.  Right?
14   A.   That's right.
15   Q.   And you could have easily asked for that
16 information from the police department through a public
17 records request early on in the case.
18   A.   Okay.
19   Q.   Correct?
20   A.   I'm not going to challenge you on this.
21   Q.   You agree with that?
22   A.   A lot of things could be done.
23   Q.   Have you submitted public records requests in
24 the past?
25   A.   Since I've been up here.  Never down there.

Page 152

1    Q.   Why didn't you ever --
2    A.   And why, I have no clue.  I just didn't.
3    Q.   You don't know why?
4    A.   No.
5    Q.   And certainly if you had received a list of the
6  cases on which Detective Saldate had served as a
7  detective, it would have been a simple matter to go look
8  those cases up at the courthouse.  Correct?
9    A.   That's correct.
10   Q.   And you could have certainly asked Detective
11 Saldate -- once you learned that there were other cases
12 where he had continued to question suspects after they
13 invoked their right to remain silent or their right to
14 counsel, you could have asked him for the names of those
15 investigations.  Correct?
16   A.   Could have.  It wouldn't have yielded any
17 results.
18   Q.   How do you know that?
19   A.   Well, I -- I don't know of any police officer
20 yet that keeps track of all those things.
21   Q.   Well, you never know until you ask.
22   A.   Correct.
23   Q.   Right?
24   A.   Correct.
25   Q.   And he remembered the Runningeagle case.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
153–156

Page 153

1  Correct?
2     A.   Yes.
3     Q.   And you would agree that Detective Saldate was
4  very forthcoming when you asked him questions about
5  whether he continued to question suspects after their
6  Miranda rights had been read to them.  Right?
7     A.   You're asking me to characterize my impressions
8  of Saldate, and that's -- I wouldn't be joining you in
9  that -- in that description of --
10    Q.   Well --
11    A.   -- of Mr. Saldate.
12    Q.   -- he didn't hide that information.  Right?
13 When you asked him, he provided it?
14    A.   Well, I think the answers that he gave are the
15 answers that he gave, and how you choose to characterize
16 them may be different than mine were.  I respect yours.
17 I hope you respect mine.
18    Q.   Did you take any action whatsoever to follow-up
19 on the information that Detective Saldate provided to you
20 at the voluntariness hearing that there were times that
21 he continued to question suspects after their -- they
22 invoked their right to remain silent or --
23    A.   My answer --
24    Q.   -- their right to counsel?
25    A.   My answer to that question is the same to the

Page 154

1  question that you asked previously.  I mean, you've asked
2  that already.
3     Q.   I -- I don't think I asked that question.
4     A.   All right.
5     Q.   Did you do anything to follow-up on that?
6     A.   The answer is no.  Not with the police
7  department.  Not with the City officials or the
8  government.  I may have made inquiry of other counsel.
9     Q.   But whatever information you obtained from
10 other counsel, other than the Runningeagle case, you
11 didn't utilize any of that information at trial.
12 Correct?
13    A.   Well, you're assuming that they had information
14 that I could use.  I don't know that that's so.
15    Q.   Going to section C, page 43, Ms. Milke's also
16 critical of you for waiving her right to change of venue
17 based on prejudicial -- prejudicial pretrial publicity.
18 Do you know what that's about?
19    A.   No.
20    Q.   Do you recall filing a motion for change of
21 venue?
22    A.   No.
23    Q.   She claims that you filed a motion for change
24 of venue but then withdrew it a month and a half later,
25 almost two months later.  Do you know why you would

Page 155

1  withdraw a motion for change of venue?
2     A.   I have no recollection of anything about venue.
3     Q.   Do you remember an issue with respect to an
4  expert witness named Dr. Fritz?
5     A.   The name is familiar, but I don't remember him.
6     Q.   Do you recall ever using Dr. Fritz on any other
7  cases?
8     A.   I said the name is familiar, but I do not
9  remember him.  I don't know what his expertise is in.  I
10 just -- I don't recall.
11    Q.   Do you remember Debra Milke undergoing the
12 MMPI?
13    A.   No, I don't remember.  It was Dr. Bunuel --
14 wasn't it Dr. Bunuel who was her psychiatrist?  Am I
15 remembering that correctly?
16    Q.   I think that was somebody involved as well.
17    A.   Yeah.
18    Q.   What do you remember about Dr. Bunuel?
19    A.   Just that he was a psychiatrist that did an
20 evaluation on her of some sort.
21    Q.   But --
22    A.   I don't remember what his opinions were.
23    Q.   So did you retain Dr. Bunuel and Dr. Fritz?
24    A.   Again, ma'am, I don't -- I only remember the
25 name Fritz.  I don't know what his -- whether he's a

Page 156

1  psychiatrist, a forensic expert of some sort, who he is.
2  I just don't remember.  Garcia-Bunuel I believe was the
3  doctor's name.
4     Q.   I think you're correct.
5     A.   And it's my -- I believe my memory is correct
6  on this, that he was a -- I don't remember.  Was he
7  appointed or not?  I don't remember if he was appointed
8  as a psychiatrist.  We didn't -- I don't recall if we did
9  any Rule 11 proceedings, so I think he may have just been
10 involved and worked for the County in the -- in the jail
11 system and provided his expertise in that regard.  Again,
12 I may be wrong.
13    Q.   In section E, Ms. Milke is critical of you for
14 the manner in which you sought to suppress her statements
15 and for your conduct at the voluntariness hearing.
16      Do you see that?
17    A.   I see it.
18    Q.   And --
19    A.   I see at paragraph 125 it identifies Fritz
20 apparently has something to do with psychiatry or
21 psychology.  Anyway...
22    Q.   Do you remember Dr. Kassell?
23    A.   I don't.
24    Q.   Do you remember having issues with experts in
25 this case?



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
157—160

Page 157

1   A.   No.
2   Q.   If you look at paragraph 20 -- I'm sorry, 124,
3   Ms. Milke states, "Worse, defense counsel did not have
4   petitioner testify on her own behalf during the
5   voluntariness hearing.  This decision is inexcusable as a
6   tactic or strategy given petitioner was the only
7   firsthand witness to Detective Saldate's overreaching
8   during her interrogation."
9        Do you agree with that criticism?
10  A.   Nope.
11  Q.   And why do you disagree with that?
12  A.   I can't get into it without breaching ethics.
13  Q.   Next section F, it says, "Defense counsel's
14  conduct of petitioner's trial was substandard."  And the
15  first thing she states is that your opening and closing
16  arguments were defective.  Ms. Milke states that in the
17  opening, you conceded to the facts as alleged by the
18  State.  Do you know what she's referring to?
19  A.   I do not know what Mr. Rosenquist is referring
20  to.
21  Q.   And she contends that you were ill prepared for
22  your closing.  Do you see that in paragraph 128?
23  A.   I see it.
24  Q.   Do you agree with that criticism?
25  A.   Of course not.

Page 158

1   Q.   In the next section, number 2 of F, she states
2   that you failed to raise cogent timely objections that
3   caused prejudice to her.
4        Do you see that?
5   A.   I see the words.  I've not studied his
6   exhibits.  I've not seen this document before, so...
7   Q.   Okay.  Well, are you sure you haven't seen this
8   document before?  Because in your affidavit --
9   A.   Maybe I did.
10  Q.   -- you state that you have, Exhibit 206.
11  A.   Where is it?
12  Q.   Should be there in front of you.
13  A.   So the appropriate statement would be I haven't
14  seen it for a long time.  If I said it in the affidavit,
15  ma'am, then I misspoke.
16  Q.   And in fairness to you, it just says, "I have
17  read sections 1, 2 and 3 of the post-conviction relief
18  petition," but I can't imagine you would have ignored --
19  A.   Well, I'll tell you, I do remember he just
20  submitted those sections.  He did not provide the whole
21  document to me.
22  Q.   Okay.  You do remember that?
23  A.   Because I would imagine that I would have gone
24  a little bit ballistic with him if he did show me the
25  rest of it.  But, you know, look, I understand.  He had a

Page 159

1   job to do.  He had a lady who had been sentenced to
2   death.  He has to do everything that he can to save her
3   life.  And I admire him for it.
4        I'm not critical of what he's done.  I'm not
5   critical of what he has said.  He has done what any good,
6   solid, diligent postconviction relief warrior would do
7   and try to save a lady's life.  I don't fault him.
8   Q.   And then in the next section, G, starting at
9   48, it states, "Defense counsel failed to investigate or
10  present the ample mitigation observed available in
11  petitioner's case."
12  A.   Uh-huh.  My recollection of it is -- and I
13  don't know whether it's borne out in the record or not.
14  But -- and maybe it's just a delusion on my part, I don't
15  know.  But I seem to have this memory of requesting
16  second counsel, being denied; requesting mitigation
17  expert, being denied.  So to that extent, that would be
18  true in that remark.
19       Failure to investigate ample mitigation
20  evidence available.  Yeah.  You don't do a murder case
21  anymore without a mitigation expert.
22  Q.   Was that the case in 1990?
23  A.   Well, apparently not because I didn't get one.
24  Q.   Do you remember any issues with respect to the
25  jury?

Page 160

1   A.   Other than after the verdict was rendered, they
2   ran.  That's what my memory is.  Really ran.
3   Q.   Instead of sticking around to answer questions?
4   A.   Right.  I mean, the media was trying to speak
5   to them afterwards and they'd just run.  And, of course,
6   I knew -- I didn't want any contact with media at all.  I
7   avoided it.  I always went out where the back -- back way
8   out of the Court because I didn't want to talk to no
9   media.
10  Q.   Do you remember there being an issue with
11  respect to Debra Milke's failure to show any kind of
12  emotion during trial?
13  A.   I -- say the question one more time, please.
14  Q.   I'll have the court reporter --
15  A.   Okay.
16  Q.   -- read it back.
17       (The last question was read back by the
18  court reporter.)
19       THE WITNESS:  An issue with what context,
20  ma'am?
21  Q.   BY MS. BERKE:  That -- do you -- well, let me
22  break it down.
23       Do you remember Kirk Fowler interviewing the
24  jurors at some later date?
25  A.   No.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
161–164

Page 161

1  Q.  Did you observe Debra Milke display any kind of
2  emotion during the trial?
3  A.  I think my observation of that falls within the
4  ethical constraints, ma'am.
5  Q.  Let's take a short break.  I think I may -- I'm
6  close to being finished.
7  A.  Okay.
8  THE VIDEOGRAPHER:  We're off the record at
9  3:29.
10  (A recess was held off the record.)
11  THE VIDEOGRAPHER:  Stand by.
12  We're back on the record at 3:42.
13  (Exhibit 213 was marked for identification.)
14  Q.  BY MS. BERKE:  Mr. Ray, I'm showing you what's
15  been marked as Exhibit Number 213, and I'm just going to
16  have you authenticate this packet of documents for us.
17  It's my understanding that these are letters exchanged
18  between you and Mr. Noel Levy, the prosecutor, during the
19  Milke prosecution.  Is that correct?
20  A.  So far so good.
21  Q.  Yeah, just keep flipping through and let me
22  know.  And take your time.
23  A.  See, you should --
24  Oh, are we off?  Never mind.  It was an
25  ad hominem comment.  Never mind.

Page 162

1  Q.  Okay.  I am going to ask a couple questions
2  and it will --
3  MS. BERKE:  Do you need me to tell you Bates
4  numbers?
5  MS. BURCH:  Uh-huh.  You need to tell Anna
6  Bates numbers, yeah.  She's going to have to pull them
7  up.
8  MS. BERKE:  Anna, can you hear me?
9  MS. HOFFMANN:  Yes.
10  MS. BERKE:  I'm going to ask some questions
11  about Milke FOLDER-00260.
12  MS. HOFFMANN:  I'm sorry.  Milke what?
13  MS. BERKE:  Folder, whatever that is.  I
14  don't know.  Milke folder in all caps.  And
15  MILKE_NSB018736.
16  MS. HOFFMANN:  Say it again.
17  MS. BERKE:  MILKE_NSB018736.
18  MS. HOFFMANN:  Okay.  I don't have those.
19  MS. BURCH:  Lori, there's one -- at least
20  one that's not complete, and there's a number of blank
21  pages.  Are they blank in -- in the actual exhibit or
22  just in the --
23  MS. BERKE:  You know what I think it is --
24  MS. BURCH:  -- stack?  I've got four blank
25  pages.

Page 163

1  MS. BERKE:  Because they're double-sided, so
2  I had them copied to one-sided.
3  MS. BURCH:  Oh.
4  MS. BERKE:  So if the back of the page is
5  blank, there's a blank page in there.
6  MS. BURCH:  Okay.
7  MS. BERKE:  The original was double-sided.
8  MS. BURCH:  Yeah, there's one that's missing
9  a page (inaudible).
10  UNIDENTIFIED SPEAKER:  What page?
11  MS. BURCH:  (Inaudible.)
12  MS. HOFFMANN:  (Inaudible).  Let me get
13  those.  Lori, is it just those single pages, or is it a
14  page range started -- document started in that page
15  range?
16  MS. BERKE:  Those are the two pages I'm
17  going to ask about.
18  MS. HOFFMANN:  Okay.  You've got to give me
19  a second to get those pulled.
20  MS. RETTS:  Anna, I'm going to ask about
21  NSB018743.
22  MS. HOFFMANN:  Hold -- hold on one second.
23  I'm in e-mail -- okay.  Say that again.  It's -- NSB --
24  yes.
25  MS. RETTS:  NSB018743.

Page 164

1  MS. HOFFMANN:  Okay.  Is that a single
2  document or a (inaudible) --
3  MS. RETTS:  It's a single --
4  MS. HOFFMANN:  Document.  Sorry.  I'm sorry.
5  Just that page or is there a Bates range?
6  MS. RETTS:  No, it's just that page.
7  MS. HOFFMANN:  Okay.  Anything else?
8  MS. RETTS:  And Milke FOLDER-00263.
9  MS. HOFFMANN:  Milke FOLDER-000263.
10  MS. RETTS:  Yeah.  Okay.
11  MS. HOFFMANN:  Okay.  Anything else?
12  MS. RETTS:  That's all that I see for now.
13  Do you know -- have you guys produced the
14  Denver police report?
15  UNIDENTIFIED SPEAKER:  The what?
16  MS. RETTS:  The police department report
17  from Colorado?
18  MS. BERCH:  I don't recall.
19  MS. RETTS:  I don't recall seeing it in any
20  of the materials.
21  MS. BERCH:  I have no idea.  Anna may not
22  know either.  I can --
23  MS. RETTS:  Okay.  If you guys have it, can
24  you please produce it?  It would be responsive to a
25  number of our discovery requests.



Page 165

1   MS. HOFFMANN:  Which was the first one you
2   wanted again?
3       MS. BERKE:  Milke FOLDER-000260.
4       MS. HOFFMANN:  Hold on a second.
5   (Inaudible).  Okay.  I got it.  I got that page up.
6   Q.  BY MS. BERKE:  Have you been through the whole
7   thing?
8   A.  Yes.
9   Q.  And are all of those letters letters that were
10  exchanged between you and Mr. Levy?
11  A.  They appear to be, yes.
12  Q.  In connection with the Milke case?
13  A.  Yeah.  They're a sampling of them, if not all
14  of them.
15  Q.  Okay.  If you look kind of -- tell you many
16  pages in -- about 15 pages in, there's a May 8th, 1990,
17  letter.  Is that the one you have open?
18      And it's Milke FOLDER-000260 is the Bates
19  number.  In it, you're enclosing a copy of another letter
20  written by James Styers, which was inadvertently not
21  enclosed in the materials previously presented to
22  Mr. Levy.  What letters is this referring to?
23  A.  Somehow or another, I must have came in the
24  possession of some letter purportedly authored by James
25  Styers.  Just gathering what this says.

Page 166

1   Q.  Do you remember --
2   A.  How that came to me, I would not know.
3   Q.  Do you remember Debra Milke and James Styers
4   corresponding with one another by letter?
5   A.  Well, no.  But does anything surprise me
6   anymore?  No.
7   Q.  You knew that James Styers was putting money on
8   Debra Milke's books?
9   A.  No, I did not.
10  Q.  You didn't know that?
11  A.  If I did, I've forgotten.
12  Q.  Would you ever counsel a client to accept money
13  from an alleged coconspirator?
14  A.  Of course not.
15  Q.  Would you ever counsel a client to write
16  letters from jail to an alleged coconspirator who is also
17  in jail?
18  A.  I would counsel them do not do such a thing.
19  Q.  And you can't think of any good reason for two
20  alleged coconspirators to be writing letters to each
21  other while they're awaiting trial, can you?
22  A.  I have no control over what people do.
23  Q.  But you can't think of any good reason for that
24  to happen?
25  A.  Look, my job is to protect the client.  If they

Page 167

1   choose to go and not follow my advice, I can't do
2   anything about it.
3   Q.  Right.  I --
4   A.  See what I'm saying?
5   Q.  Maybe -- maybe I'm not asking my question very
6   clearly.
7       Can you think of any good reason there would
8   be for two alleged coconspirators to be writing letters
9   to each other while they're in jail awaiting trial?
10  A.  Well, not off the top of my head, but I suppose
11  I could ponder it a while and come up with something at
12  least not ludicrous.
13  Q.  Okay.  But as you sit here presently,
14  nothing --
15  A.  No.
16  Q.  -- comes to mind?
17  A.  Nothing comes to mind.
18  Q.  Okay.  And then in the second paragraph of this
19  letter, you state that you believe it is clear that Roger
20  Scott was the trigger man.
21      Do you see that?
22  A.  Uh-huh.
23  Q.  Yes?
24  A.  Yes.  I'm sorry.  Yes.
25  Q.  Do you still believe that Roger Scott was the

Page 168

1   trigger man?
2   A.  What my opinion is is -- is -- I mean, does
3   anyone want to pipe in an objection to relevance?
4   What's -- may I inquire what relevance my opinion is?
5   I --
6   Q.  I --
7   A.  I just -- you know.
8   Q.  At the time of Ms. Milke's trial, did you
9   believe Roger Scott to be the trigger man?
10  A.  I can't say that I had any opinion other than
11  the one that I said in the last clause of the second
12  paragraph.  That's the only thing that I had.
13  Q.  Take a look at MILKE_NSB018736.
14  A.  Is that further ahead or behind?
15  Q.  Further ahead.  It's a July --
16  A.  Say again, 187.
17  Q.  Sure.  18736 and it's a July 3, 1990, letter.
18  A.  Okay.  From Levy to me?
19  Q.  Right.  And in it, he's giving to you a
20  disclosure consisting of a search warrant and letters of
21  Debra Milke to Styers.
22      Do you see that?
23  A.  I see that.
24  Q.  Does that refresh your recollection of there
25  being written correspondence between --



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
169–172

Page 169

1   A.   Not particularly.
2   Q.   No?
3   A.   Honestly, it doesn't.
4   Q.   Do you remember something called a Loveland
5   Police Department report regarding Debra and Chris Milke?
6   A.   You know, Loveland police report and Loveland
7   itself just sticks in my brain, but for what purpose, I
8   don't -- I don't know.
9   Q.   That was Loveland, Colorado, where --
10  A.   Yeah, I know.
11  Q.   -- Dorothy Markwell lived.
12  A.   Okay.  Nothing is registering with me right
13  now.
14  Q.   Okay.
15  A.   Or what the contents of that was.
16  Q.   But certainly you received this letter because
17  we know you filed a motion to withdraw after receiving
18  that.  Right?
19  A.   Oh, did I?  Is that this one?
20  Q.   Because that's where --
21  A.   This?  Okay.
22  Q.   -- Detective Saldate's interview of Chris
23  Landry is.
24  A.   Oh, okay.  Well, then, yes, I clearly would
25  have gotten it.

Page 170

1   Q.   Okay.
2        MS. BERKE:  That's all I have.  Thank you.
3        THE WITNESS:  Okay.
4
5        EXAMINATION
6   BY MS. RETTS:
7   Q.   I have a few questions and I --
8   A.   Oh, please.
9   Q.   -- apologize.  I'm going to skip around a
10  little bit.
11  A.   That's all right.
12  Q.   I'm going to go back to Loveland, Colorado.
13       Do you recall testimony from Ms. Markwell
14  speaking about an incident where Christopher may have
15  disappeared out in front of the home while riding his Big
16  Wheel?
17       MS. HOFFMANN:  I'm sorry, Tina.  I can't
18  hear anything you're saying.
19       MS. RETTS:  I'll speak up.
20       MS. HOFFMANN:  Thank you.
21  Q.   BY MS. RETTS:  Do you recall testimony from
22  Ms. Markwell about a situation where Christopher may have
23  disappeared out in front of the home while on his Big
24  Wheel?
25  A.   Vaguely.

Page 171

1   Q.   Does that refresh your recollection at all as
2   to whether -- or what the Loveland police report might
3   have been about?
4   A.   No.
5        MS. RETTS:  Anna, I'm going to have him turn
6   to NSB018743.
7        MS. HOFFMANN:  Okay.  Thank you.
8   Q.   BY MS. RETTS:  If you could turn to --
9   A.   Oh, say it again.  What was the number?
10  Q.   NSB018743.  It's a letter written July 30th,
11  1990.
12  A.   I have it.
13  Q.   And that's a letter written from you to
14  Mr. Levy.  Is that correct?
15  A.   Yes.
16  Q.   And in the first sentence, you indicate,
17  "Please find enclosed copies of the written reports
18  prepared by the court-appointed investigator Kirk Fowler
19  in connection with this case."
20       Do you see that?
21  A.   I do.
22  Q.   Do you recall turning over Kirk Fowler's
23  reports to the prosecution?
24  A.   Do I specifically recall it?  No.  But I
25  wouldn't have wrote this letter if I wasn't enclosing it,

Page 172

1   as I stated.
2   Q.   I think you testified earlier that it was your
3   belief that your obligations under criminal Rule 15.2
4   required you to give the substance of witnesses that you
5   were calling, their testimony.  Consistent with that, was
6   it your practice to turn over investigators' reports to
7   fulfill that obligation?
8   A.   If the intent was to call Mr. Fowler as a
9   potential witness, yes.
10  Q.   What about if he was just the investigator and
11  Mr. Fowler had interviewed witnesses, would you turn over
12  his reports of those interviews to fulfill those
13  obligations of disclosing the content of witness
14  testimony?
15  A.   Potentially, yes.  I could see it as
16  potentially impeachment-type -- type information.
17  Q.   Do you know what happened to your file?
18  A.   I turned it over to Anders Rosenquist.
19  Q.   Did you turn over it in its entirety or did --
20  A.   Yes.
21  Q.   -- you hold back things?
22  A.   No, everything.
23  Q.   And I --
24       MS. RETTS:  Anna, I'm going to have him look
25  at Milke FOLDER-00263.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
173–176

Page 173

1       MS. HOFFMANN:  Okay.
2       THE WITNESS:  Is that ahead or behind?
3   Q.  BY MS. RETTS:  I think it's behind.
4   A.  263, you said?
5   Q.  Yes, 263.  I thought it -- yeah, it is -- the
6   date on that is July 17th, 1990, so it's just a couple
7   letters from where we just were.
8   A.  I see Milke FOLDER-260.  And you said 263?
9   Q.  263.  These look to be in chronological order,
10  so if you go to July 17th, 1990.
11  A.  There it is.  Okay.  Got it.
12  Q.  Do you recognize that as a letter from you
13  written to Noel Levy?
14  A.  I do.
15  Q.  And in the fourth paragraph, it states, "You
16  have indicated that you want the original Styers letters
17  to my client turned over to Detective Mills for purposes
18  of handwriting analysis.  I will do so upon your
19  assurance that such will become part of the physical
20  evidence of" -- "evidence of this case.  I do not want
21  the originals lost."
22      Do you see that?
23  A.  I do.
24  Q.  Does that refresh your recollection at all
25  about having possession of original letters from

Page 174

1   Ms. Milke to Styers?
2   A.  It doesn't presently refresh my memory, but I
3   wouldn't have written it if it wasn't so.
4   Q.  Now, speaking as a general proposition and not
5   specific to any conversations that you had with
6   Ms. Milke, is it a true statement that you would never
7   counsel a client to destroy potential evidence in a case?
8   A.  Is it a true statement that I would counsel?
9   Q.  That you would never counsel them?
10  A.  To destroy -- never counsel them --
11  Q.  Right.
12  A.  -- to destroy evidence?  I would never tell a
13  client to destroy evidence --
14  Q.  All right.
15  A.  -- period.
16  Q.  And would you agree that you also would never
17  tell a client to tell another potential witness that they
18  should lie about knowing your client if questioned?
19  A.  I would never counsel someone to do that.
20  Q.  Okay.  Did you ever become aware that some of
21  your letters that you exchanged with Debra Milke were
22  attached to the postconviction relief proceedings?
23  A.  No, I was not aware.
24  Q.  So you have no recollection of reviewing those
25  letters in conjunction with preparing your affidavit that

Page 175

1   we went through today?
2   A.  I -- I would have to say unless it was part of
3   those three sections that were mentioned, then I wouldn't
4   have seen them, but I don't recall that being part of the
5   three sections.
6   Q.  If a client ever told you that they planned to
7   destroy potential evidence, you would always counsel
8   against that?
9   A.  Absolutely.
10  Q.  Do you have a recollection of Kirk Fowler
11  traveling out to Las Vegas to meet with Dorothy Markwell
12  before you became aware that the State was going to call
13  her as a witness?
14  A.  I don't remember.  I'm sorry.  That's not
15  audible.  I don't remember.  Thank you.
16  Q.  In your affidavit which is marked as Exhibit
17  206, paragraph 7 states that, "I was not allowed by the
18  Court to impeach Detective Saldate" --
19  Q.  Can I get it?  Can I get the --
20  Q.  I'm sorry.  What are --
21  A.  206 she said.
22      MS. BERKE:  211.
23      MS. RETTS:  206.
24      MS. BERKE:  206.
25      MS. RETTS:  His affidavit.

Page 176

1       MS. BERKE:  You should have 206 in front of
2   you.  Oh, wait, maybe it's down --
3       THE WITNESS:  I had my whole stack right
4   there.
5       MS. BERKE:  Maybe some got put down here.
6   It looks like some are down here.  Here.  There you go.
7       THE WITNESS:  Okay.  Start again, please.
8   Q.  BY MS. RETTS:  All right.  And I want you -- to
9   direct you specifically to paragraph 7.  It states, "I
10  was not allowed by the Court to impeach Detective Saldate
11  with the fact that he falsified his election campaign
12  forum by putting down a false address."
13      Do you see that?
14  A.  I do.
15  Q.  So the way I read this, you possessed that
16  information at the time of Debra Milke's criminal trial.
17  Is that correct?
18  A.  Correct.
19  Q.  Do you recall how you learned about that?
20  A.  I would have to think that I went to -- I don't
21  know if we had Web sites back then, but somehow or
22  another, I went to the elections department and gained
23  access to -- to something that told me that.  I think.
24  You know, I -- I just remember having it, and I remember
25  having a discussion with Judge Hendrix about this issue.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
177–180

Page 177

1    Q.   Is there anything else that you remember
2   specifically possessing about Detective Saldate and
3   having a discussion with the Court about?
4    A.   No.
5    Q.   As part of your preparation for this deposition
6   today or any time after Ms. Milke's release from prison,
7   have you reviewed the police reports in the other cases
8   that were mentioned in the Ninth Circuit's opinion?
9    A.   No.
10   Q.   Have you reviewed any grand jury testimony from
11   any of those other cases --
12   A.   No.
13   Q.   -- that were mentioned?
14   A.   No.
15   Q.   Have you reviewed any documentation from those
16   actual prosecutions other than looking at the Ninth
17   Circuit's opinion?
18   A.   The only thing I've seen is the Ninth Circuit
19   opinion.  I haven't studied or received or looked at any
20   of the other materials.
21   Q.   And just so I'm correct for the -- or clear for
22   the record --
23   A.   Uh-huh.
24   Q.   -- the materials that you were sent by
25   Ms. Milke's counsel prior to your deposition, what -- it

Page 178

1   was the affidavit?
2    A.   I believe Exhibit Number 206.
3    Q.   206.  Anything else?
4    A.   Well, I have everything that was given to me
5   here, so -- Fastcase wasn't working correctly so I had to
6   find the Kozinski opinion by some other source.  It's
7   horrible to read that.  These are letters I believe you
8   sent.
9        MS. BERKE:  I didn't send you any letters.
10       THE WITNESS:  It was attached to this.  It
11   was attached to your letter.
12       MS. BERKE:  Hmmm.  Oh, I thought you
13   meant -- okay.  With our August 9th letter, the
14   attachments, yes.
15       THE WITNESS:  Yeah.  These letters.
16       MS. BERKE:  Sorry.
17       THE WITNESS:  So the question was what else
18   have I looked at or what else did they -- did the
19   plaintiff's counsel send me?
20   Q.   BY MS. RETTS:  What did plaintiff's counsel
21   send you?
22   A.   I think that is it, is the affidavit.
23   Q.   Did you ask for any materials to review in
24   preparation for your deposition?
25   A.   No.  I asked if it would be appropriate to look

Page 179

1   at the -- the docket, the district court docket in this
2   case.  And I believe the response was, You can do as you
3   wish.  And I chose not to.
4    Q.   And when you say the docket for this case, are
5   you referring to the civil case?
6    A.   The civil case, yes.
7    Q.   Do you have a recollection of there being an
8   issue in the criminal trial that was brought to the
9   judge's attention about the time limits that she was
10   imposing upon the time you had to present your case and
11   the time that the jurors had to deliberate?
12   A.   With all due respect to Judge Hendrix, it
13   wouldn't surprise me.  But as a specific recollection,
14   no, I don't.
15   Q.   Do you have a recollection of requesting that
16   the Court allow you to have Dr. Bunuel-Garcia [sic]
17   testify, who was Ms. Milke's treating mental health
18   provider --
19   A.   Right.
20   Q.   -- about her emotional reactions?
21   A.   That seems to ring a bell with me.
22   Q.   Tell me what you can recall about that.
23   A.   Well, again, I think I may be getting into --
24   to fully answer your question would be a breach of my
25   ethical considerations here.

Page 180

1    Q.   Well, in setting aside any conversations that
2   you had with Ms. Milke --
3    A.   Yes.
4    Q.   -- what -- what can you remember about what you
5   would have brought to the Court's attention specifically
6   about that?
7    A.   Whatever was in the transcript, ma'am.  I -- to
8   independently regurgitate that to you, I'm just not able
9   to do so.
10   Q.   Do you have a recollection of ever possessing
11   any Rule 11 evaluations for Jim Styers or Roger Scott?
12   A.   If it wasn't in the materials that were given
13   to Anders, I don't have an independent recollection of
14   it.
15   Q.   In your experience --
16   A.   I don't think I could even get access to those
17   without a court order, and I don't recall making an
18   application for a court order.
19   Q.   And --
20   A.   I'm sure that counsel for those two fellows did
21   not agree to give it to me.
22   Q.   And you anticipate --
23   A.   Otherwise, it's sealed in the court, so I can't
24   get it.
25   Q.   So you anticipated where I was going with that.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
181–184

Page 181

1    A.   Yeah.
2    Q.   And in -- in your history of working as a
3  criminal defense attorney, can you recall ever having
4  access to a Rule 11 report without the Court or the
5  person who the Rule 11 was done on specifically
6  authorizing that?
7    A.   Not the physical report itself.  I've sat in on
8  many Rule 11 hearings where the subject of what the
9  contents of the report are are discussed.  They don't --
10  they don't seal them for some reason; that is, the
11  hearings.  But as far as the physical Rule 11 report by
12  anyone other than my own client, no, never received that.
13    Q.   Do you have any recollection of ever sitting in
14  on any Rule 11 hearing for Mr. Styers or Mr. Scott?
15    A.   I don't have a recollection of doing that.
16         I still wish you would tell me who Scott's
17  lawyer is because that would help me.
18    Q.   Yes.  And I do have the answer to that.
19  Scott's lawyer was Roland Steinle.
20    A.   No, Styers --
21    Q.   No, Styers' lawyer was Jesse Miranda.
22    A.   I would have swore it was the other way around.
23  So Steinle had Scott?
24    Q.   That's my understanding from --
25    A.   Well, I think I take it (inaudible) --

Page 182

1    Q.   Those are the answers I got.  It was Jesse
2  Miranda --
3    A.   And Jesse Miranda had the other one.
4    Q.   -- for Styers and Roland Steinle for Scott.
5    A.   Well, there you are.  The failings of 28 years.
6    Q.   Do you have a recollection of ever having any
7  lawyers out of Washington, D.C. contact you about Debra
8  Milke's case, unsolicited contact?
9    A.   For what purpose?
10    Q.   For any purpose.
11    A.   Out of Washington, D.C.?  I don't know anybody
12  in Washington, D.C.  i certainly didn't back then.
13  Except John McCain.  I knew him.
14    Q.   Do you have a recollection of doing any
15  criminal interviews of any of the other police detectives
16  who were involved, such as maybe Detective Mills?
17    A.   I don't remember whether I did or didn't,
18  ma'am.  Whatever's disclosed is what I did.
19    Q.   Do you have a recollection of someone from The
20  Oprah Winfrey Show calling you and offering $150,000 for
21  Debra Milke to be on the show?
22    A.   No, ma'am.  We receive a lot of -- some calls,
23  but I just -- I wouldn't return them.  And Oprah Winfrey
24  may have been one of them.
25    Q.   She may have been; she may not.  You don't have

Page 183

1  a recollection of it?
2    A.   Well, I don't know whether it was necessarily
3  Oprah Winfrey Show.  It --  I'd seem to have a memory of
4  that, but it may well have been her show or her
5  producers.  But --
6    Q.   So do you have --
7    A.   I didn't talk to them.
8    Q.   Okay.  Do you have some memory of someone from
9  an outlet like that, a news outlet calling and wanting an
10  interview from Ms. Milke?
11    A.   Oh, there -- there was probably numerous ones
12  as -- as high-profile as this case was.  But, again, when
13  it came to the media, I avoided them at -- at all -- if
14  at all possible.
15    Q.   So fair to say that in your practice as a
16  criminal defense attorney, it is your position that you
17  would like your clients to avoid media exposure?
18    A.   Absolutely.  It's hard enough to try them in a
19  courtroom let alone the trial of public opinion.
20    Q.   Do you have a recollection of over -- ever
21  overhearing Mark Milke tell reporters that he was going
22  to write a book?
23    A.   I don't remember overhearing it.  I remember
24  hearing about it, but I don't believe I overheard it.
25    Q.   When you as a criminal defense attorney would

Page 184

1  have a private investigator who was assisting you on the
2  case, when that investigator was doing interviews where
3  the prosecutor was not present before you determined if
4  you were going to call someone as a witness, was it your
5  practice to tell them to record those interviews?
6    A.   Yes.
7    Q.   Were any of the interviews that were conducted
8  by Kirk Fowler in this case recorded?
9    A.   I assume so but I couldn't swear to it.
10    Q.   If none of them were recorded, what would be
11  your position on that?
12    A.   I'd be a little upset.  But at the same time, I
13  don't know -- you know, look, part of recording people is
14  to do so with their consent and permission, in my
15  opinion.  It's not something you -- a lawyer -- no lawyer
16  nor his people working for him should ever
17  surreptitiously record anyone.  And so it could be that
18  he did not record because they wouldn't consent to it so
19  he wrote a report.  I don't know.  I just don't know,
20  ma'am.
21    Q.   Would -- would you agree that as a lawyer
22  practicing in Arizona that if you were to want to record
23  a witness, you would have to advise them that you were
24  recording?
25    A.   Absolutely.  And get their consent beyond just



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
185–188

Page 185

1  advising them.
2      Q.   Now, you testified a little bit about a
3  polygraph.  And that to your knowledge, Ms. Milke did not
4  take a polygraph examination?
5      A.   I have no memory of her doing that.  I can't --
6  if -- if she had, I think I would have seen a polygraph
7  report, and I have no memory of seeing one of those.  It
8  would have been probably something that I would had to
9  have applied for some kind of funds to pay for a
10 polygrapher.
11           And so as -- immediately, as soon as you
12 apply for funds, Mr. Levy gets a copy of it, and then
13 he's going to go, Well, what was the result?
14           So I just can't imagine having requested
15 one.
16     Q.   And it's my understanding -- and correct me if
17 yours is different -- that a polygraph could not be
18 admissible in a criminal proceeding?
19     A.   It wasn't then, and I don't think it is yet.
20     Q.   So it -- it's --
21     A.   I think it should be on occasion, especially if
22 it helps my client.
23     Q.   But as of -- as of 1990 --
24     A.   Yeah.
25     Q.   -- your understanding was that a polygraph

Page 186

1  would not have any evidentiary value --
2      A.   Correct.
3      Q.   -- in a criminal case?
4      A.   Correct.  It has some persuasive value if it's
5  helpful to your position.  And that of course is in the
6  nontrial context.  If I'd had a polygraph done and I
7  wanted Mr. Levy to know how great it was, I'd be sure to
8  tell him.  I wouldn't tell him if it was bad.
9      Q.   You testified a little bit about voluntariness
10 hearings in general and when you would have someone
11 testify.  If a client is claiming innocence, is that
12 something that factors into your decision of whether to
13 have them testify?
14     A.   Well, yes, it's a factor.  But, again, it's the
15 totality of the circumstances that are presenting
16 yourself -- presenting to the lawyer at the time, and so,
17 yeah, that would have to be a factor.  I don't know that
18 the weight of it is particularly determinative of whether
19 you suggest that they testify or not testify.
20     Q.   When do you remember first becoming aware that
21 bullets had been found in Ms. Milke's purse?
22     A.   Was I ever aware of that?
23     Q.   Yeah.
24     A.   I was?
25     Q.   Do you remember when you became aware of

Page 187

1  that outside of the --
2      A.   I don't remember being aware of it.
3      Q.   Oh, okay.
4      A.   But if there's something that could refresh my
5  memory, I'd be happy to look at it.
6      Q.   Do you remember the issue of bullets being in
7  Ms. Milke's purse being part of sentencing proceedings?
8      A.   I don't, ma'am.
9      Q.   Sorry, we have quite a few exhibits.
10     A.   That's all right.
11     Q.   So it just --
12     A.   I could imagine.
13     Q.   It takes a little bit.  What's that?  It was
14 early I feel like.  Do you have a recollection of there
15 being an issue with Pinal County locating Debra Milke's
16 purse?
17     A.   The Pinal County Sheriff's Office are you
18 speaking of?
19     Q.   Yes.  The Pinal County Sheriff's Office would
20 have impounded the purse?
21     A.   If at the time that they -- that she went to
22 the police station to wait for Saldate to show up.
23     Q.   Yes.
24     A.   And then the suggestion in your question is
25 that somewhere or another that purse got lost by --

Page 188

1      Q.   That the purse was -- what we understand from
2  the deputy is that the purse was held at all times within
3  the evidence locker but that it -- in Pinal County, but
4  that it fell off the back of a shelf --
5      A.   I'm sorry.
6      Q.   -- there and that it remained in its contents
7  and it ultimately was admitted.  The purse was admitted
8  into evidence at some point in sentencing and that the
9  bullets --
10     A.   Nothing is -- nothing is refreshing my --
11     Q.   Nothing rings a bell at all on that?
12     A.   Nothing at all.
13     Q.   Does it surprise you, as we sit here today, to
14 talk about bullets being found in Ms. Milke's purse?
15     A.   It does.  But I'm not sure what surprises me
16 more.  That fact, if it's so, or the fact that I don't
17 remember it, which is -- speaks to my waning memory,
18 which is concerning.
19     Q.   All right.  I may have located it.  All right.
20 I'm going to show you what was marked previously as
21 Exhibit 57.
22           COURT REPORTER:  Watch your mic.
23           THE WITNESS:  Oh, that's right.
24     Q.   BY MS. RETTS:  Here, I'll just hand this to
25 you.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
189–192

Page 189

1   A.   Thank you.
2   Q.   And that appears that it may be actually --
3  this may be from Scott's trial, but if you'll look
4  through --
5        MS. HOFFMANN:  What document are you looking
6  at?
7        MS. RETTS:  What -- the Exhibit 57 to the
8  deposition.
9        MS. HOFFMANN:  Thank you.
10   Q.   BY MS. RETTS:  And then these are -- this is an
11  evidence control form.  Do you recall ever seeing that
12  before?
13   A.   May I turn the page?
14   Q.   Yes.  And that's from Ms. Milke's purse.
15        Do you see that?
16   A.   Well, I don't see anything referencing -- oh,
17  there it is.  It says suspect or arrestee Debra Milke,
18  owner.  I don't have any memory of this, ma'am.
19   Q.   Okay.  And the -- the bullets listed on there,
20  they say they're .22 caliber bullets?
21   A.   That's what it says.
22   Q.   Do you recall what caliber of bullets was used
23  to kill Christopher Milke?
24   A.   I think .22.
25   Q.   Now, I think you said that you handled one

Page 190

1  death penalty case before Ms. Milke, the Jimenez case,
2  but you had also handled homicide cases before, though.
3  Correct?
4   A.   Before her case?
5   Q.   Yes.
6   A.   I don't -- well, there's been one other one I
7  think before the Jimenez case, and it resulted in a
8  dismissal.
9   Q.   What about homicide cases where there wasn't a
10  death penalty, where it was just a manslaughter or
11  negligent homicide or something --
12   A.   You know, I don't think that I did -- and
13  I'm -- the record may prove me wrong, but I cannot
14  remember another homicide case until I moved up here in
15  '93 or '94.  And up here I've handled one, two -- let's
16  see.  One, two, three -- I believe four, if my count's
17  correct, noncapital homicide cases.  One guilty and one
18  hung jury and two not guilties.
19   Q.   Was one of those cases up here in Prescott?
20   A.   All of --
21   Q.   All of them were?
22   A.   All of the ones that I just mentioned were here
23  in Prescott.
24   Q.   Do you -- do you remember having a homicide
25  case up here around the same time as Debra Milke's case

Page 191

1  was proceeding?
2   A.   Well, there was the Navajo riot trial which
3  took place after Milke's case.  That was in federal
4  court.
5   Q.   None that would have been tried before, like
6  sometime around the summer of 1990?
7   A.   Up here?
8   Q.   Yes.
9   A.   Oh, no.  I didn't have any cases up here until
10  the federal case when I came up.
11   Q.   What year was that?
12   A.   The federal case?
13   Q.   Yes.
14   A.   1990 -- either '92 or '93.  It was Peter
15  MacDonald, the tribal chairman, was the lead defendant
16  represented by Bruce Griffen.  I represented his
17  secretary.  And there were, of course, nine other
18  defendants in that trial at the same time.
19   Q.   Do you remember ever filing a motion to have
20  Detective Saldate psychologically examined?
21   A.   No.  It had been the subject of discussion, I'm
22  sure, but I seem to have read it somewhere in something
23  we read today, I think.  Some letter or something.
24   Q.   It was mentioned in a letter.  That's why I --
25   A.   Oh, okay.

Page 192

1   Q.   -- I'm wondering if you ever did such a thing.
2   A.   Of course not.
3   Q.   Grand jury testimony generally, based upon your
4  experience here in Arizona, is grand jury testimony
5  usually to remain secret and sealed unless you're going
6  to make a challenge to remand it?
7   A.   No.  Well, secret and sealed from public, yes.
8   Q.   Yes.
9   A.   Yes, from public.
10   Q.   So if I were to go and look up a case --
11   A.   You'll not --
12   Q.   -- I'm not going to find it?
13   A.   You're not going to find it as John Q. Public,
14  no, but on the other hand, if you're researching a case
15  where the 12.9 motion has been filed, you may well see it
16  attached to the -- to the 12.9 motion.  Probably
17  shouldn't be, but it happens.
18   Q.   Is there another process for taking care of
19  that secrecy?  In other words, if you're going to file
20  your 12.9 motion, you can refer to the transcript and not
21  attach it or seal it?
22   A.   Yeah.  Just make reference to whatever page and
23  line of the grand jury transcript and explain what you're
24  mad about.
25   Q.   In your course as a criminal defense attorney,



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
193–196

Page 193

1 have you ever -- ever had a prosecutor disclose as Brady
2 or Giglio material any police reports from other cases
3 that involved a suspect other than yours?
4    A.   Probably not.  I can't -- nothing comes to
5 mind.
6    Q.   Same question as to grand jury transcripts or
7 testimony.  Have you ever had a prosecutor disclose as
8 Brady or Giglio material any grand jury testimony from a
9 cases that -- from a case that involved a suspect that
10 was not yours?
11   A.   Yes.  They were required to do it given the
12 issue that I had.
13   Q.   Was it --
14   A.   It was redacted, but, nonetheless, it did
15 contain testimony.
16   Q.   Was that a unique experience, in your -- in
17 your experience?
18   A.   Everything -- everything's unique to me.  I
19 mean, you know, every day is a new issue.  So -- and in
20 this particular context, it would -- again, it was up
21 here, and for some reason, I needed it and it was given
22 to me.  I think it had to do with grand jury
23 instructions, at least that was part of it.
24        Up here they don't -- they just make a
25 reference to the grand jury, You've been previously

Page 194

1 instructed on such and such.  And then you have to go
2 fishing for wherever that instruction was from some other
3 case.  That's one aspect.  There's been other reasons
4 that we've had to do that.
5    Q.   Did you make a specific request for that grand
6 jury testimony that you're referencing?
7    A.   No.  I -- I got it as a result of just my
8 cooperation with the prosecutors.  They knew that it was
9 going to have to be disclosed so why -- why jump through
10 the hoops.  They provided it, they redacted it, and
11 everybody was happy.
12   Q.   So you received -- like the content redacted
13 but you got the instruction piece of it?
14   A.   I got the instruction piece of it and -- and,
15 of course, the name of the individual was redacted as
16 well so --
17        MS. RETTS:  That's all the questions I have.
18 Thank you.
19        THE WITNESS:  Darn.
20        MS. ODEGARD:  I have no questions.
21        THE WITNESS:  All righty.
22        MS. BURGESS:  I have just a few.
23        THE WITNESS:  Okay.
24
25              EXAMINATION

Page 195

1 BY MS. BURGESS:
2    Q.   You made some comments earlier in this
3 deposition where you indicated it was your belief that
4 Noel Levy was aware of other cases where Detective
5 Saldate may have questioned witnesses after they invoked
6 their rights or things of that nature.  Where did you get
7 the impression that Noel Levy had that information at the
8 time of the Milke trial?
9    A.   The opinion, the Ninth Circuit opinion.
10   Q.   Okay.  You read something in the Ninth Circuit
11 opinion that influenced your opinion as to whether Noel
12 Levy did, in fact, have information back at the time of
13 Debra Milke's trial?
14   A.   I'm accepting as gospel what the Ninth Circuit
15 wrote as -- accepting it as gospel, then it is what it
16 is.  But...
17   Q.   Putting --
18        Oh, I'm sorry.
19   A.   Now, he may -- maybe Judge Kozinski's all wet
20 about all of this stuff.  I don't know.
21   Q.   Putting aside the Ninth Circuit --
22   A.   Sure.
23   Q.   -- opinion offered by former Judge Kozinski, if
24 you could, do you have any independent basis upon which
25 to conclude that Noel Levy had any knowledge of any of

Page 196

1 those other matters that are actually referenced in that
2 opinion?
3    A.   I have no factual basis.
4    Q.   Did you ever have a conversation with Mr. Levy
5 in the course of your representation of Debra Milke where
6 any of those other matters came up in any way, shape or
7 form?
8    A.   Not that I can recall, no.  Other than his
9 resistance that he voiced at the time of the motion to
10 quash the subpoena.  I believe he joined in that as well.
11   Q.   Are you sure that he joined in the motion to
12 quash?
13   A.   Well, I seemed to -- just by recollecting by
14 the transcript that was shown to me today, I thought that
15 the judge asked him his view on this, and I thought he
16 joined in, but maybe -- maybe I misread.
17   Q.   You're not aware that Mr. Levy filed any
18 briefing either in support of or opposing your subpoena
19 or the motion to quash?
20   A.   I have no -- I do not recall, as we're sitting
21 here today.  I assume that that would have been shown to
22 me if there was one.
23   Q.   Are you aware that none of the cases that are
24 cited in the Ninth Circuit decision or opinion were cases
25 where Mr. Levy himself had been involved as a prosecutor?



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
197–200

Page 197

1    A.   I'm not aware because I haven't researched
2  them, ma'am.
3    Q.   You understand that counsel needs to be aware
4  of information that is considered Brady material in order
5  to produce it?
6    A.   Under State versus Carpenter, it's my
7  understanding that law enforcement and the prosecutor are
8  one and the same.  If law enforcement knows it, the
9  prosecutor is presumed to know.
10   Q.   Okay.  And my question to you is a little
11  different than that.
12   A.   That's Carpenter versus Superior Court.  I
13  apologize.
14   Q.   All right.  My question is a little bit
15  different than that.
16        If the prosecutor is not made aware of the
17  information --
18   A.   Yes.
19   Q.   -- by law enforcement for some reason --
20   A.   Yes.
21   Q.   -- or by anyone --
22   A.   Yes.
23   Q.   -- for that matter, the prosecutor does not
24  have the ability to produce the information?
25   A.   However, the prosecutor has the obligation

Page 198

1  under Rule 15.1 to find out.
2    Q.   And --
3    A.   And to -- and so exercise due diligence to find
4  out, and if there is, disclose.  That's my opinion.
5    Q.   And what case do you base that opinion on?
6    A.   I base it on the Rule 15.1.
7    Q.   Okay.  And they have --
8    A.   As well as perhaps Brady and Giglio.  I mean, I
9  think they all speak to that.
10   Q.   Okay.  So is there a reason, sir, why sometime
11  early in the course of your career, despite the fact that
12  Brady and Giglio already existed, you felt the need to
13  send a letter to prosecutors asking them for any Brady
14  material?
15   A.   Rephrase it one more time.
16   Q.   Sure.
17        Earlier you testified that you had a form
18  letter that you used where you sent it out to prosecutors
19  on your cases asking them to produce Brady --
20   A.   I believe that I said that I had one that I
21  used primarily in federal cases, but I didn't recall
22  using it very often in -- in a state case.
23   Q.   And was that because federal prosecutors tended
24  not to produce information --
25   A.   Well, it's --

Page 199

1    Q.   -- and state prosecutors did?
2    A.   It's covered by the Jencks Act, and you always
3  want to get as much information as you can in a federal
4  case rather than wait till the witness swears in and
5  testifies and then you get your discovery.
6        But in -- in the State cases, most of the
7  times, again, even the smaller community of Phoenix,
8  Maricopa County back in those days, you worked with these
9  prosecutors every day.  You got to know them.  You
10  trusted them.
11   Q.   And how many times prior to the Debra Milke
12  case had you worked with Noel Levy?
13   A.   None.
14   Q.   How many times prior to Debra Milke case had
15  you worked with Paul Rood, for example?
16   A.   Many times.
17   Q.   In the course of representing Ms. Milke, did
18  you confer with the attorneys for her alleged
19  coconspirators?
20   A.   Did I confer with them?  No.
21   Q.   Did you --
22   A.   Other -- other -- well, I mean, what do you
23  mean in the context to confer?  And I don't mean to pull
24  a Clinton on you here, but what do you mean by that word?
25   Q.   Well, did you -- did you share information back

Page 200

1  and forth amongst yourselves regarding --
2    A.   Oh, no.  We --
3    Q.   -- any of the facts of the case?
4    A.   No.  We had no joint defense agreement
5  whatsoever.
6    Q.   And did you share any evidence back and forth?
7    A.   No.
8    Q.   Could you have called the other defense
9  attorneys and asked them, for example, whether they had
10  done any investigation regarding Detective Saldate or
11  anybody else?
12   A.   I could have.  Whether they would have shared
13  that information may -- you know, in other words, if they
14  had called me, I might not have disclosed it either.
15   Q.   Well, you did say that you contacted other
16  defense attorneys in town.
17   A.   Right.  Who were not related to the case.
18   Q.   And so you could have contacted the other
19  defense attorneys involved with this particular
20  conspiracy and, for whatever reason, you did not?
21   A.   I did not.  At least that I recall.  I don't
22  know.  Jesse may have a different memory of that but I
23  just -- I don't.
24   Q.   You -- you made a comment about at some point
25  in time, with the advent of computers, you no longer



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
201—204

Page 201

1 really needed to have much office staff.  Do you remember
2 about when that occurred?
3     A.   No.  That was well after the Milke case.
4     Q.   At the time of the Milke case, you didn't have
5 the ability, for example, to do an internet search for
6 information?
7     A.   No.
8     Q.   And if you wanted information from the City of
9 Phoenix relating to Detective Saldate or any other police
10 officer or detective, you would have to either do a
11 public records request or a subpoena?
12     A.   Or ask the prosecutor to disclose it.
13     Q.   Okay.
14     A.   Yeah.
15     Q.   And in this case, did you ever ask Noel Levy to
16 disclose any information or obtain any information
17 relating to Detective Saldate?
18     A.   It appears to me from looking at one of the
19 exhibits, the letters, that having not worked with
20 Mr. Levy, it looks like all my communications were in
21 writing with him.  And especially after a little brush-up
22 that's ref- -- referenced here in a conversation we had
23 in the hallway.  So I -- with him, I -- I did it all in
24 writing.
25     Q.   And did you ever write to him and ask him --

Page 202

1     A.   If it's not here, ma'am, I didn't.
2     Q.   Okay.  And just so I can complete the
3 question --
4     A.   Oh, I'm sorry.
5     Q.   -- so that we know what it --
6     A.   Yes.
7     Q.   -- would have been, you never asked Mr. Levy to
8 obtain any information regarding Detective Saldate?
9     A.   Correct.
10     Q.   And even after the hearing with the judge where
11 the judge and you had a discussion about what you were
12 asking for, in follow-up, you did not write to Mr. Levy
13 and ask him specifically to obtain internal investigation
14 information on Detective Saldate from the City of Phoenix
15 or any other information --
16     A.   That --
17     Q.   -- that might be available?
18     A.   That would be true.
19     Q.   I think you told us you have not looked at the
20 underlying documentation relating to any of the cases
21 that former Judge Kozinski mentions in the Ninth Circuit
22 opinion?
23     A.   That's correct.
24     Q.   And so you have no way of knowing whether Judge
25 Kozinski has accurately and completely characterized the

Page 203

1 information in his opinion?
2     A.   No.  No, I would not -- no.
3     Q.   That might be all I have for you.  I'm not sure
4 if anybody else has any questions in follow-up.  No?
5         I do, though, want to comment that we
6 obviously had a lot of questions that would have been
7 asked of you that -- that may or may not relate to -- or
8 that would relate to information that we believe
9 Ms. Milke sort of waived the privilege --
10     A.   I appreciate your position on --
11     Q.   -- and --
12     A.   -- that, and I appreciate that I may have to
13 come back and I'll be here.
14     Q.   Right.  And so I -- to the extent that I'm
15 saying I have no further questions, I only have no
16 further questions because my remaining questions and I
17 think some of the other attorneys' questions would relate
18 to those issues.  And so I -- when I say I have no
19 further questions, I don't want there to be a
20 misunderstanding that I have completed and exhausted my
21 areas.
22     A.   And I don't know because I don't do civil law
23 that much -- never get to a deposition, anyway -- is,
24 you're going to be making an application to Judge Silver?
25         MS. BERKE:  Yes.  We will get that in this

Page 204

1 week.  Should we hold the deposition open until the Court
2 rules?
3         THE WITNESS:  Well, that's not my question.
4 My question is, do I get a chance to voice my position on
5 this issue in response to your application?
6         MS. BERKE:  I don't know.
7         THE WITNESS:  I don't know if I'm --
8 that's -- ma'am, I'm just asking what's proper here.
9         MS. BURGESS:  I can't answer that question.
10 Had we been able to reach the judge today --
11         THE WITNESS:  Yes.
12         MS. BURGESS:  -- we certainly would have had
13 you respond to any -- any information --
14         THE WITNESS:  Sure.
15         MS. BURGESS:  -- that she may have wanted.
16 I think if we could just maybe put your -- your position
17 on the record right now, that might be helpful, and it
18 can be submitted to the Court.  That might be a way of --
19         THE WITNESS:  Well, I would --
20         MS. BURGESS:  -- handling it.
21         THE WITNESS:  -- certainly appreciate you
22 doing this much, and that is to put my letter as a part
23 of -- as an attachment to your --
24         MS. BERKE:  We're attaching all of the
25 letters we exchanged.



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
205—208

Page 205

1    THE WITNESS:  Excellent.

2    MS. BERKE:  Yeah.

3    THE WITNESS:  And then I would imagine
4  counsel for --

5    MS. HOFFMANN:  (Inaudible.)

6    THE WITNESS:  I'm sorry.

7    MS. HOFFMANN:  We could also -- I'm sorry.
8  We can also make sure you get -- you are served with
9  whatever the papers are so if you've got -- if there's
10  anything that you think you need to say to the judge,
11  you're at least aware of what everyone is saying.

12    THE WITNESS:  Okay.  I'd appreciate that.

13    MS. HOFFMANN:  My -- I also -- sorry.  I
14  have a handful of clarification questions.  So I don't
15  know if the defense are -- are done, but I do need to ask
16  a couple of questions just to clear things up.

17    MS. BURGESS:  Can I just ask to just be
18  clear.

19    My understanding is it's your opinion that
20  the letter that you received from Ms. Milke didn't extend
21  the waiver of the privilege beyond exactly what was in
22  there and the defense's position is that she has also
23  waived the privilege as to other interactions by
24  discussing conversations that she had with you or that
25  she told other people she had with you.

Page 206

1    And by communicating with third parties
2  about conversations she had with you as her counsel, she
3  has waived her privilege as to those specific
4  discussions.

5    THE WITNESS:  Well, just as a knee-jerk
6  reaction, I don't necessarily agree with that assessment.

7    MS. BURGESS:  Okay.

8    THE WITNESS:  But my assessment of all of
9  this is set forth in the July 11th letter.  And while I
10  appreciate the -- the letter from Ms. Berke, I don't
11  necessarily agree with all that she wrote in there
12  either.

13    My -- my position is this:  She may be
14  completely accurate on how it is that those cases that
15  she cited held, but that's not this case.

16    And that's -- I still have to abide by what
17  I perceive to be the correct ethical rules and -- which
18  was bolstered by state bar counsel that I talked to about
19  what was going to be happening here.  And if Judge Silver
20  says I talk, I talk.  I'm not -- I'm not going to disobey
21  a federal judge at this point.  But I -- I hope that you
22  can appreciate my concerns, you all being lawyers as
23  well.

24    MS. BERKE:  We do, and that's why --

25    THE WITNESS:  Yeah.

Page 207

1    MS. BERKE:  -- we're going to Judge Silver.

2    THE WITNESS:  I appreciate it.  Okay.

3    MS. BERKE:  Thank you.

4    THE WITNESS:  All right.  Now.

5

6        EXAMINATION

7  BY MS. HOFFMAN:

8    Q.   It's my turn.  I promise this will be very
9  quick.

10    You were asked some questions about your
11  knowledge at the time of Debra Milke's trial about the
12  cases that were referenced in the Ninth Circuit opinion?

13    A.   Yes.

14    Q.   Do you remember that?

15    A.   Yes.

16    Q.   Do you remember from reading the Ninth Circuit
17  opinion one of the things that the Court was talking
18  about was a 1973 incident in which Saldate stopped a
19  female motorist and there were accusations that he had
20  sexually -- attempted to trade sexual favors for leniency
21  in the (inaudible) and then (inaudible) to superiors
22  about it after the fact?  Do you remember reading that
23  Ninth Circuit opinion?

24    A.   I do.

25    MS. BERKE:  Objection.  Misstates evidence.

Page 208

1  Compound.

2    Q.   BY MS. HOFFMAN:  Were you aware of that
3  incident -- anything about that incident at the time of
4  Ms. Milke's criminal trial?

5    A.   No.

6    Q.   The defense asked -- the defense counsel read
7  to you some portions of the hearing on the subpoena that
8  you served on the Phoenix Police Department requesting
9  internal affairs files with respect to Saldate.  Do you
10  remember being questioned about that?

11    A.   Yes.

12    Q.   Okay.  And do you remember that one of the
13  things that defense counsel pointed to as -- was an
14  accusation or a comment in opposition to your request
15  calling it a fishing expedition?

16    A.   Yes.

17    Q.   If you had had any specific information about
18  prior incidents involving Saldate, in particular, for
19  example, an incident in 1973 in which he had been
20  disciplined, would you have presented that information to
21  the Court in support of your request for internal
22  affairs --

23    A.   Yes.

24    MS. BERKE:  Objection.  Vague.  Compound.

25    Can you pause --



C. KENNETH RAY, II  Highly Confidential
Milke vs City of Phoenix

August 13, 2018
209–212

Page 209

1    THE WITNESS:  I apologize.

2    MS. BERKE:  -- just a moment?

3    THE WITNESS:  Strike my answer.  Have you

4  objected?

5    MS. BERKE:  Objection.  Vague and compound.

6    THE WITNESS:  And I gather I can answer.

7    MS. BERKE:  Foundation.  Speculation.

8    THE WITNESS:  The answer is still yes.

9    Q.  BY MS. HOFFMAN:  You were asked some questions

10  and shown some hearing testimony where you questioned

11  Mr. Saldate about a report from the Runningeagle case.

12  Do you recall that?

13  A.  Yes.

14  Q.  Okay.  Do you know if you had any documents

15  other than the police report from the Runningeagle case

16  at the time of Ms. Milke's criminal trial?

17  A.  I think all that I had was the police report,

18  and I emphasize think because the sum total of what I've

19  read suggests to me very strongly that's exactly what I

20  had.

21  Q.  And the last question I had is you were asked

22  some questions about information that you obtained at

23  some point about Styers and his activity in Vietnam?

24  A.  Yes.

25  Q.  Do you know when it is you learned whatever

Page 210

1  information you learned about Styers and his time in

2  Vietnam?

3  A.  Specifically, I don't remember other than it

4  had to do with his activities while in Vietnam and that

5  whatever happened in Vietnam tended to screw him up.  He

6  may be suffering from PTSD or something, but...

7  Q.  So, most specifically, do you remember whether

8  you had -- whether you learned whatever it is you learned

9  at the time of Ms. Milke's criminal trial or if this was

10  something that you learned in the 25-plus years since

11  Ms. Milke's trial?

12  A.  That -- that I can't isolate for you.  I don't

13  know.

14    MS. HOFFMANN:  Okay.  That's all the

15  questions I have.

16    MS. BURCH:  Hey, Anna, can you just look at

17  the last e-mail I sent you?

18    MS. HOFFMANN:  Okay.  Hold on a second.  I

19  think -- I think this -- that's all I have.  I just want

20  to put a statement on the record, which I think you

21  discussed with counsel already, that the letters from

22  Ms. Milke are marked as confidential, and so both the

23  letters and the questions about the letters are -- shall

24  be marked as confidential in the deposition.

25    MS. BERKE:  So I guess what we'll do is,

Page 211

1  depending on the Court's ruling, we'll either not reopen

2  or we'll reopen your deposition.

3    So this will conclude your deposition for

4  now, and the defendants are intending to reopen it, as

5  you know.  So the court reporter will prepare a

6  transcript of what took place today, and you have the

7  right to read and sign it, if you wish.  You're not

8  obligated to do that.  But if you would like to, we'll

9  send it to you.

10    THE WITNESS:  Let me have it.

11    MS. BERKE:  Okay.

12    THE WITNESS:  Yes, please.

13    MS. BERKE:  Do you like it e-mailed or --

14    THE WITNESS:  E-mail is fine.

15    MS. BERKE:  -- hard copy?

16    THE WITNESS:  E-mail is fine.

17    MS. BERKE:  Okay.  What is your e-mail

18  address?

19    THE WITNESS:  CKRPClawyer@Gmail.com.

20    MS. BERKE:  Sounds good.

21    THE VIDEOGRAPHER:  This concludes today's

22  deposition of C. Kenneth Ray.

23    We're off the record at 4:54.

24    (Whereupon, the proceedings ended at

25  4:54 p.m.)

Page 212

```
1
2                    CERTIFICATE OF REPORTER
3   STATE OF ARIZONA      )
                          )
4   COUNTY OF MARICOPA    )
5
6       I, Sommer E. Greene, a Certified Reporter in the
    State of Arizona, do hereby certify that the foregoing
7   deposition was taken before me in the County of Maricopa,
    State of Arizona; that an oath or affirmation was duly
8   administered to the witness, C. KENNETH RAY II, pursuant
    to A.R.S. 41-324(B); that the questions propounded to the
9   witness and the answers of the witness thereto were taken
    down by me in shorthand and thereafter reduced to
10  typewriting; that the transcript is a full, true and
    accurate record of the proceeding, all done to the best
11  of my skill and ability; and that the preparation,
    production and distribution of the transcript and copies
12  of the transcript comply with the Arizona Revised
    Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
13      The witness herein, C. KENNETH RAY II, has
    requested signature.
14      I FURTHER CERTIFY that I am in no way related
    to any of the parties nor am I in any way interested in
15  the outcome hereof.
16
        IN WITNESS WHEREOF, I have set my hand in my
17  office in the County of Maricopa, State of Arizona, this
    25th of August, 2018.
18
19                       Sommer E. Greene
20      --------------------------------
21      Sommer E. Greene, RPR, CRR
        Certified Reporter 50622
22
            /S/
23      ----------------------------------
    For Esquire Deposition Solutions
24  Registered Reporting Firm No. R1048
25
```



**Page 213**

```
1    Milke v. City of Phoenix, et al.
     ASSIGNMENT NUMBER 2286082
2
3         DECLARATION UNDER PENALTY OF PERJURY
4              I declare under penalty of perjury that I
5    have read the entire transcript of my deposition taken in
6    the above-captioned matter or the same has been read to
7    me, and the same is true and accurate, save and except
8    for changes and/or corrections, if any, as indicated by
9    me on the DEPOSITION ERRATA SHEET hereof, with the
10   understanding that I offer these changes as if still
11   under oath.
12
13   Signed on the_____day
14   of _____20__.
15
16
17
18   _____
     C. Kenneth Ray II
19
20
21
22
23
24
25
```

**Page 214**

```
1              DEPOSITION ERRATA SHEET
               ASSIGNMENT NUMBER 2286082
2
3     Page No.___Line No.___Change to:_____
4     _____
5     Page No.___Line No.___Change to:_____
6     _____
7     Page No.___Line No.___Change to:_____
8     _____
9     Page No.___Line No.___Change to:_____
10    _____
11    Page No.___Line No.___Change to:_____
12    _____
13    Page No.___Line No.___Change to:_____
14    _____
15    Page No.___Line No.___Change to:_____
16    _____
17    Page No.___Line No.___Change to:_____
18    _____
19    Page No.___Line No.___Change to:_____
20    _____
21    Page No.___Line No.___Change to:_____
22    _____
23    Page No.___Line No.___Change to:_____
24    C. Kenneth Ray II
25    Signature:_____
```

**Page 215**

```
1              DEPOSITION ERRATA SHEET
2              ASSIGNMENT NUMBER 2286082
3     Page No.___Line No.___Change to:_____
4     _____
5     Page No.___Line No.___Change to:_____
6     _____
7     Page No.___Line No.___Change to:_____
8     _____
9     Page No.___Line No.___Change to:_____
10    _____
11    Page No.___Line No.___Change to:_____
12    _____
13    Page No.___Line No.___Change to:_____
14    _____
15    Page No.___Line No.___Change to:_____
16    _____
17    Page No.___Line No.___Change to:_____
18    _____
19    Page No.___Line No.___Change to:_____
20    _____
21    Page No.___Line No.___Change to:_____
22    _____
23    Page No.___Line No.___Change to:_____
24    C. Kenneth Ray II
25    Signature:_____
```

