**Page 1**

```
 1
 2              UNITED STATES DISTRICT COURT
 3                  DISTRICT OF ARIZONA
 4
    Debra Jean Milke,              )
 5                                 )
              Plaintiff,           )
 6                                 )
    vs.                            ) No.
 7                                 ) 2:15-cv-00462-ROS
    City of Phoenix; Maricopa      )
 8  County; and Detective Armando  )
    Saldate, Jr.; and Sergeant     )
 9  Silverio Ontiveros, in their   )
    individual capacities,         )
10                                 )
              Defendants.          )
11  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ )
12
13
                HIGHLY CONFIDENTIAL
14
              VIDEOTAPED DEPOSITION OF
15
16
                ANDERS ROSENQUIST, JR.
17
                   JULY 23, 2018
18
                     9:30 A.M.
19
20
                3020 East Camelback Road
21
                   Phoenix, Arizona
22
23
        SOMMER E. GREENE, CSR, RPR, CR No. 50622
24
25
```

**Page 2**

```
 1  APPEARANCES OF COUNSEL
 2
 3          For Plaintiff:
 4              NEUFELD SCHECK & BRUSTIN, LLP
                ANNA BENVENUTTI HOFFMANN, ESQ.
                KATIE MCCARTHY, ESQ.
 5              99 Hudson Street, 8th Floor
                New York, New York 10013
 6              212.965.9081
 7
 8          For Defendant Silverio Ontiveros:
 9
                HOLLOWAY ODEGARD & KELLY, P.C.
10              SALLY A. ODEGARD, ESQ.
                3020 East Camelback Road, Suite 201
11              Phoenix, Arizona 85016
                602.240.6670
12              sodegard@hoklaw.com
13
14          For Maricopa County:
15              SANDERS & PARKS
                NICOLE STEWART, ESQ.
16              3030 North Third Street, Suite 1300
                Phoenix, Arizona 85012
17              602.532.5783
                nicole.stewart@sandersparks.com
18
19          For Defendant City of Phoenix:
20              WIENEKE LAW GROUP
                CHRISTINA RETTS, ESQ.
21              1095 West Rio Salado Parkway, Suite 209
                Tempe, Arizona 85281
22              480.715.1868
                cretts@swlfirm.com
23
24
25
```

**Page 3**

```
 1  APPEARANCES CONTINUED:
 2
 3          For Defendant Armando Saldate:
 4              BERKE LAW FIRM
                LORI V. BERKE, ESQ.
 5              1601 North 7th Street, Suite 360
                Phoenix, Arizona 85006
 6              602.254.8800
                lori@berkelawfirm.com
 7
 8          Also Present:
 9              Barb Del've, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                   I N D E X
 2
 3  WITNESS: ANDERS ROSENQUIST, JR.
 4
 5  EXAMINATION                              PAGE
 6
 7  MS. BERKE.......................................7
 8  MS. RETTS.....................................246
 9  MS. ODEGARD...................................266
10  MS. HOFFMAN...................................267
11
12                   *     *     *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Exhibit 4

**Page 5**

INDEX TO EXHIBITS

EXHIBIT                                                              MARKED

Exhibit 155  Attorney Work Product of Interview      13
             of Debra Milke

Exhibit 156  Affidavit of Anders Rosenquist, Jr.     27

Exhibit 157  E-mail to Anders Rosenquist            107
             Attaching Affidavit and Transcripts
             of Interviews

Exhibit 158  Amended Petition Postconviction        199
             Relief and Incorporated Memorandum
             of Points and Authorities

Exhibit 159  Reply to State's Response for          216
             Postconviction Relief

Exhibit 160  Court's Ruling on Debra Milke's        217
             Postconviction Relief

Exhibit 161  Affidavit of Maria Pulver              219

Exhibit 162  February 25, 1998 Letter to Debbie     219
             Milke

Exhibit 163  March 25, 1998 Letter to Debbie        219
             Milke

Exhibit 164  April 30, 1998 Letter to Debra         219
             Milke's Mom

Exhibit 165  January 9, 2001 Letter to Debra        219
             Milke's Mom

Exhibit 166  Detective Saldate's Case               241
             Chronology, From Robert Chermak to
             Terry Capozzi

Exhibit 167  Amended Petition for Postconviction    242

Exhibit 168  November 16, 1998 Letter to Debbie     247
             Milke From

**Page 6**

1     PHOENIX, ARIZONA

2     JULY 23, 2018

3

4

5     THE VIDEOGRAPHER: Good morning. This is

6  tape number 1 to the videotaped deposition of Anders

7  Rosenquist, Jr., in the matter of Debra Jean Milke versus

8  City of Phoenix, et al., being heard before the United

9  States District Court, District of Arizona, Case No.

10  2:15C-00462-ROS.

11     This deposition is being held at 3020 East

12  Camelback Road, Suite 201, Phoenix, Arizona, on

13  July 23rd, 2018, at 9:50 a.m.

14     My name is Barb Del'Ve, certified legal

15  video specialist. Our court reporter is Sommer Greene.

16     Counsel, if you'll introduce yourselves and

17  affiliations, the witness will be sworn.

18     MS. HOFFMANN: Anna Benvenutti Hoffmann from

19  Neufeld Scheck & Brustin for Debra Milke.

20     MS. MCCARTHY: Katie McCarthy, also from

21  Neufeld Scheck & Brustin for Debra Milke.

22     MS. BERKE: Lori Berke for Armando Saldate.

23     MS. ODEGARD: Sally Odegard on behalf of

24  Sergeant Ontiveros.

25     MS. RETTS: Christina Retts for the City of

**Page 7**

1  Phoenix.

2     MS. STEWART: Nicole Stewart for the

3  Maricopa County.

4

5     ANDERS ROSENQUIST, JR.,

6  called as a witness herein, having been first duly sworn

7  by the Certified Reporter to speak the whole truth and

8  nothing but the truth, was examined and testified as

9  follows:

10

11     EXAMINATION

12  BY MS. BERKE:

13     Q.  Would you please state your full name?

14     A.  Anders Vilner Rosenquist, Jr.

15     MS. HOFFMANN: Sorry. Lori, can I put the

16  statement on the record?

17     MS. BERKE: Sure.

18     MS. HOFFMANN: I just wanted to state on the

19  record on the behalf of Ms. Milke that she is not and has

20  not waived attorney/client privilege or work product

21  privilege with respect to this witness. So to the extent

22  any questions invade that privilege, I may instruct him

23  not to answer.

24     THE WITNESS: I need to mention one other

25  thing, too. My son is Anders V. Rosenquist the Third.

**Page 8**

1  And he lives in Washington. So there won't be any

2  confusion.

3     Q.  BY MS. BERKE: Is he also an attorney?

4     A.  No, thank God.

5     Q.  All right. Mr. Rosenquist, you are an

6  attorney. Correct?

7     A.  Yes, ma'am.

8     Q.  When did you become licensed?

9     A.  1971.

10     Q.  And have you maintained a bar license since

11  1971?

12     A.  Yes.

13     Q.  I assume you've taken depositions before?

14     A.  Yes, off and on.

15     Q.  Do you need me to go through the rules of a

16  deposition? Do you understand them?

17     A.  Yes, I do.

18     Q.  You understand that you're under oath?

19     A.  Yes.

20     Q.  What did you do to prepare for your deposition

21  today?

22     A.  I don't have any other materials except a

23  photograph of Debbie. So the materials you sent me, four

24  items, one entitled --

25     Q.  Did you say that I sent you?



Page 9

1    A.   You sent me?  I don't know who sent them to me.
2  Oh, wait a minute.  I can find out.
3        Katie McCarthy.
4    Q.   Okay.  And that's who's sitting across from
5  you.
6    A.   Oh, I apologize.
7    Q.   That's Ms. Milke's attorney.
8    A.   Well, I'll catch up.
9        Yeah, you sent me four items:  An affidavit,
10  confidential attorney work product interview, Sandra
11  Milke and Dorothy Markwell's telephonic interview and
12  Sandra Pickinpaugh's telephonic interview.
13    Q.   It looks like there's the Ninth Circuit opinion
14  there as well?
15    A.   Uh-huh.  I pulled that out.  I -- this is -- I
16  think this is the --
17        No, this is the Arizona Court of Appeals.
18  This is --
19    Q.   Oh, I see.
20    A.   -- when it was finally dismissed --
21    Q.   Okay.
22    A.   -- on that motion by Lori Voepel.
23    Q.   Is that something you pulled yourself or did
24  Ms. Milke's attorneys provide you --
25    A.   No, I pulled this myself.  I mean, I had

Page 10

1  this -- this is really all I had in my file besides a
2  picture of Debra.
3    Q.   Okay.  Could I see the documents that were sent
4  to you by Ms. Milke's attorneys that you just listed off?
5    A.   Sure.
6    Q.   And you were subpoenaed to be here today by my
7  office.  Correct?
8    A.   Yes.
9    Q.   Now, the letter from Ms. McCarthy to you states
10  that you're being provided with two different interviews
11  you conducted and an interview you conducted of -- or I'm
12  sorry -- two different interviews you conducted of Sandra
13  Pickinpaugh, although one says Sandra Milke.  But those
14  are really the same interview.  Correct?
15    A.   Let me -- let me see what you're talking about.
16    Q.   Okay.
17    A.   Well, yeah.  This I can explain a little
18  further when it gets there.  But the two that I
19  tape-recorded were the one from Sandra Pickinpaugh and
20  the one from Dorothy Marcort -- Mark- --
21    Q.   Markwell?
22    A.   -- -well.
23    Q.   And so the two that you've got in front of
24  you -- I guess tell us why one says Sandra Milke.
25    A.   Because it was -- the nearest I can recall,

Page 11

1  Debra's mother -- after I got involved in the case, you
2  know, down the road, her mother called me, got involved.
3  It became a real newsworthy item over in Germany where
4  she lived, and she was starting to be interviewed by
5  different, you know, TV stations and so forth.
6    Q.   "She" being who, Debra's mother?
7    A.   Yeah.  Renate --
8    Q.   Okay.
9    A.   -- was her name.  And she was married to a
10  guy -- anyway, Renate, her mother.
11        So I'm sure this one, I looked at it and
12  it's -- I -- I dictated this for her to use as a
13  reference in these interviews because she didn't know a
14  thing about what to say is going on with the case.
15  That's kind of what I -- why I put the work product on
16  it.  That's why some places it's -- it's different than
17  -- than the interviews.
18        But I just -- I don't want to look -- put
19  it -- I just -- it was kind of a casual thing I put
20  together getting the hot spot -- the high spots without
21  getting down to the exact things that were said.
22    Q.   And so the document that you provided to Debra
23  Milke's mother to assist her in interviews, can you tell
24  us what the Bates range is of that document, if you look
25  in the lower right starting with the first page?

Page 12

1    A.   274 and 290.
2    Q.   And just so that the record is clear, it's
3  MILKE_NSB018274 through 290.  That's the one that you
4  provided to Debra Milke's mother.  Correct?
5    A.   As far as I can remember, yes.
6    Q.   And then the other one is actually called
7  interview of Sandra Pickinpaugh by Anders Rosenquist on
8  October 4 of 1992.  Correct?
9    A.   Yes.
10    Q.   And what's the Bates range -- and please give
11  the full Bates range including words and letters --
12    A.   Okay.
13    Q.   -- of that document.
14    A.   Marky -- MILKE_NSB018152 to MILKE_NSB018176.
15    Q.   Okay.  And both of those documents stem from
16  the same interview of Sandra Pickinpaugh.  Correct?
17    A.   The -- the document -- how should I put it?
18  These -- this and the other document, the other
19  interview, those are the actual interviews.  This is kind
20  of a summary that I put together, the -- the one I just
21  read you off.  In other words, these are the -- these are
22  the actual interviews I did, and from these interviews I
23  threw together this for her mother.
24    Q.   Okay.  But if you look at -- so the -- let's go
25  off the record for just a moment.



Page 13

1       THE VIDEOGRAPHER:  We're off the record at
2   10 o'clock.
3       (A recess was held off the record.)
4       THE VIDEOGRAPHER:  We're back on the record
5   at 10 o'clock.
6       (A recess was held off the record.)
7       (Exhibit 155 was marked for identification.)
8   Q.   BY MS. BERKE:  I'm placing before you two
9   exhibits.  One is Exhibit 139 that was marked at a prior
10  deposition --
11  A.   Okay.
12  Q.   -- and Exhibit 155 that was marked today.  And
13  I'd like you to confirm that Exhibit Number 139 is a
14  transcript of an interview you conducted of Sandra
15  Pickinpaugh that took place on October 4th of 1992.
16  A.   That's correct.
17      MS. HOFFMANN:  Sorry.  Do you have a copy of
18  155 for us?
19      MS. BERKE:  You sent it to him.  You don't
20  have it with you?
21      MS. HOFFMANN:  No.
22      MS. BERKE:  Okay.  We can go off the record
23  and we'll make copies.
24      THE VIDEOGRAPHER:  We're off the record at
25  10:01.

Page 14

1       (A recess was held off the record.)
2       THE VIDEOGRAPHER:  We're back on the record
3   at 10:06.
4   Q.   BY MS. BERKE:  All right.  So, Mr. Rosenquist,
5   Exhibit Number 139, that is the transcript of the
6   interview you conducted of Ms. Pickinpaugh on October 4
7   of 1992.  Correct?
8   A.   Yes.
9   Q.   And then Exhibit Number 155, that's the
10  document that you prepared for Debra Milke's mother.
11  Correct?
12  A.   Yes.
13  Q.   And it -- Exhibit 155 appears to be a
14  transcript as well.  Correct?
15  A.   Yeah.
16  Q.   And you would --
17  A.   Yes.
18  Q.   And you would agree, wouldn't you, that they
19  are transcript -- or that this is a rough transcript, not
20  completely accurate, of the same interview that Exhibit
21  Number 139 is; in other words, the interview that took
22  place on October 4th of 1992?
23  A.   Yes.
24  Q.   And why is it you called it interview of Sandra
25  Milke, Exhibit Number 155?

Page 15

1   A.   I don't know.  I mean, it's so far back, I --
2   when I was putting that together, it was what I'd call an
3   informal thing, and so I was going a lot out of my head.
4   I probably put a dash or something, but I kind of did it
5   quickly because she called me --
6       Can you hear me?  Oh.  I started to play
7   with the mic.
8       I did -- as -- what I recall is she called
9   me and she said, you know, I'm getting a lot of
10  publicity, people want to interview me.  Can you prepare
11  something so I can at least know what's going on, you
12  know, and I need it by such and such.  So I was in a
13  hurry to get that to her.
14  Q.   Okay.
15  A.   That's why there's -- there's variations --
16  Q.   When --
17  A.   -- and different types of statements.
18  Q.   When you conducted the interview of
19  Ms. Pickinpaugh, did you inform her that it was being
20  recorded?
21  A.   No.
22  Q.   Why not?
23  A.   Well, it's -- I just assumed that -- really
24  never thought about it.  I think because -- and here
25  again, I'm trying to think about it.  I would say it was

Page 16

1   because either Renate or -- I think it was -- had talked
2   to her and she basically said it was okay to talk to me,
3   and I really never told her it was tape-recorded.
4   Q.   Are you aware of any ethical rules that apply
5   to an attorney in Arizona tape-recording or
6   audio-recording an interview with a subject and what the
7   requirements are in terms of whether you must inform the
8   person being recorded that they are being recorded?
9   A.   The last I remember is that in certain
10  situations you have to inform them and in other
11  situations you don't have to inform them.  I guess I
12  operated on the assumption that if she talked to me and
13  then -- I assumed it because at the end, I may have told
14  that to her before I actually started the recording.  I
15  had one of those recording devices next to my phone.
16      But the end -- you know, the affidavit, no,
17  I just assumed that -- that it was okay.  And I don't
18  know what the laws -- how the laws have changed.  I'm a
19  little rusty on that.  I know nowadays they have the --
20  the -- the victims' rights laws.  But, yeah, that's all I
21  can say.
22  Q.   And then one of the other documents Ms. Milke's
23  attorneys sent to you was a transcript of your interview
24  of Dorothy Markwell.  Correct?
25  A.   Yes.



Page 17

1    Q.   And it's right here.  And just for the record,
2   I'll tell you that that is Exhibit Number 39.
3    A.   Okay.
4    Q.   You don't have Exhibit 39 in front of you, but
5   just for everybody's purposes here today, that was marked
6   as Exhibit Number 39 to Dorothy Markwell's deposition.
7   And that states "Confidential Attorney Work Product" at
8   the top and interview of Dorothy Markwell.  Correct?
9    A.   Yes.
10   Q.   And the Bates range is MILKE_NSB023961 through
11  MILKE_NSB023993.  Correct?
12   A.   Yes.
13   Q.   And did you inform Ms. Markwell that you were
14  audio-recording your interview of her?
15   A.   No.
16   Q.   And did you make any assessment with respect to
17  her interview as to whether doing so was in violation of
18  any ethical rules?
19   A.   Well, near as I can remember, her mother,
20  Renate, was a conduit to getting ahold of them, and she
21  basically said that, you know, she's willing to talk to
22  you.  She's...
23       And then, coming back to my mind, Dorothy
24  Markwell I would consider a hostile witness.  And so I
25  wasn't going to contact her.

Page 18

1       So Sandy Pickinpaugh, as reflected, flew to
2   Las Vegas and I talked to her, and they discussed the
3   situation.
4       But as you can tell in the interview, she --
5   at first she didn't -- didn't want to talk to me.  And
6   then I -- I assume that was because it was a cold call in
7   that I never talked to her before, and I remember after
8   reading her testimony, it was pretty unhelpful for Debra,
9   and that was my main purpose of talking to her.
10   Q.   Well, what was -- specifically, what were you
11  hoping to accomplish by speaking with her?
12       MS. HOFFMANN:  Objection.  Work product.
13       What's the purpose -- relevance or purpose
14  of that?
15       MS. BERKE:  Well, I'm asking for
16  clarification of what he meant by his last answer.
17       MS. HOFFMANN:  The -- his thought process in
18  contacting her is work product.  That hasn't been
19  disclosed already.  I'm instructing him not to answer.
20       MS. BERKE:  Are you going to follow those
21  instructions?
22       THE WITNESS:  Should I go ahead and answer?
23  I'm supposed to or am I?
24       MS. HOFFMANN:  No.  If it's work product or
25  attorney/client, then they can't ask you questions about

Page 19

1   things that haven't already been disclosed.  So your
2   thought process in defending Debra as her attorney.
3       THE WITNESS:  I'm a little confused.
4       In other words, interviewing her was
5   important to me because of her testimony.  And I was
6   handling this in the postconviction stage, habeas corpus
7   stage.  Postconviction is the last hurrah you have or the
8   last appeal you have in the State Court, and then you can
9   appeal to the Federal Court, District Court and then
10  Ninth Circuit.
11       So would you just ask me the question again,
12  please?
13   Q.   BY MS. BERKE:  Well, I guess I had asked you a
14  question, and Ms. Milke's attorney objected based on work
15  product and so she instructed you not to answer.  And my
16  question is:  Are you going to follow those instructions
17  and not answer my question?  But if you need me to repeat
18  the question, we can repeat it so you can make that
19  assessment.
20   A.   No, I think it's important to -- work product
21  at that -- at that stage is at -- at a habeas or PCR
22  stages is a lot different.  It's not trial work.  You've
23  got everything done.  You've got the direct appeal done.
24  So this is basically the last appeal you've got where you
25  can put everything -- evidence, arguments, cases -- it's

Page 20

1   just the last appeal.
2       So their testimony was already done.  And I
3   wanted to find out quite a bit more about her testimony
4   considering what I -- what I determined was a kind of
5   a -- how do I put it? -- her testimony was bad, and I
6   had...
7       Well, here again, I was suspicious of her
8   testimony because of the way Noel Levy asked the
9   questions and would not let her elaborate at trial.
10      So, you know, I can't waive the work
11  product, but, realistically, I don't -- you know, I don't
12  see it being work product.  If it's what, you know -- if
13  you're asking me why I did it, I'd like to explain it
14  and --
15      THE WITNESS:  Do you have any real strong
16  objections?
17      MS. HOFFMANN:  I just -- I want to be clear.
18  We're not waiving work product, we're not waiving
19  attorney/client privilege.  I think if you ask him
20  questions about what he did and what happened and what he
21  knew other than obviously what he knows from
22  conversations with Debra, I think that's all fine.
23      I think asking his thought process and why
24  he was doing what he was doing and what he was trying to
25  accomplish is invading work product.  Obviously, you have



ANDERS VILNER ROSENQUIST JR. Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
21–24

Page 21

1 the transcript of the conversation. We're not objecting
2 to you asking questions about what happened. That's
3 already been produced.
4      THE WITNESS: Well, in there she can -- and,
5 you know, this is kind of the cart before the horse
6 thing, but she validated the stuff I had heard,
7 suspicious stuff about the way -- and then I looked at
8 the transcript of her testimony at trial, and it was
9 pretty devastating.
10     Q.   BY MS. BERKE: Devastating in what way?
11     A.   Well, it was like throwing against the wall.
12 Did he throw him against the wall?
13          And -- and as Dorothy said, when she finally
14 started opening up, he didn't pick him up -- or she
15 didn't pick him up and throw him against the wall. It
16 was one of those situations that's in the transcript
17 that, you know, I have two kids, two boys, and I -- you
18 know, I know how sometimes they can get on them. You
19 grab them by the arm and pull them away.
20          So that's what I was going for. Just it --
21 I was very suspicious about the fact that -- that Noel
22 Levy did not let her elaborate.
23     Q.   Okay. When you say her testimony was
24 devastating, you mean her testimony was devastating to
25 Debra Milke. Correct?

Page 22

1      A.   Yeah. I don't want -- I think so. I think it
2 was -- it was important, very important to elaborate.
3      Q.   And when you say "devastating," do you mean
4 that you believe Dorothy Markwell's testimony
5 significantly contributed to the jury's determination of
6 guilty?
7      MS. HOFFMANN: Objection.
8          You can answer.
9      THE WITNESS: Okay. I wouldn't say
10 significantly, but I would say -- trying to look for the
11 right word. It was one of what I consider the important
12 factors that -- that in my mind, you know, in a
13 cumulative sense, did contribute to her conviction.
14     Q.   BY MS. BERKE: Well, in fact, if you go to
15 Exhibit Number 139, which is your -- the transcript of
16 your interview with Sandra Pickinpaugh --
17     A.   Uh-huh.
18     Q.   -- if you look at page 6 of that interview,
19 it's MILKE_NSB018157.
20     A.   01584? Which one?
21     Q.   18157.
22     A.   We're talking about...
23     Q.   No. It -- you were looking at the correct
24 transcript.
25     A.   Oh.

Page 23

1      Q.   If you look at the page that's numbered page 6
2 at the bottom center.
3      A.   Oh, okay. Here we go, page 6.
4      Q.   Right. And that's Bates page MILKE_NSB018157.
5 Do you see where I am, the page number?
6      A.   18157, yes.
7      Q.   Okay. If you look at the very bottom, the
8 second-to-last line.
9      A.   Uh-huh.
10     Q.   That's you talking, AR. Correct?
11     A.   Yes.
12     Q.   Anders Rosenquist. Correct?
13     A.   Uh-huh.
14     Q.   And you state, starting at the end of the
15 second to last line -- you're telling Sandra Pickinpaugh,
16 quote, What really -- as far as myself and my associates,
17 what really tilted the scale to conviction and to the
18 death penalty was the testimony of yourself and Dorothy
19 and your father, end quote.
20          Did I read that correctly?
21     A.   Which line are you at?
22     Q.   Starting with the second to last line on page
23 6.
24     A.   Oh, page 6.
25     Q.   At the very end of that line.

Page 24

1      A.   In other words -- okay.
2      Q.   You say --
3      A.   Yeah, I got it.
4      Q.   Okay. You were telling Ms. Pickinpaugh --
5      A.   My opinion.
6      Q.   -- that as far as you were concerned and your
7 associates were concerned, what really tilted the scale
8 to conviction and to the death penalty was the testimony
9 of Sandra Pickinpaugh, Dorothy Markwell and Debra Milke's
10 father. Correct?
11     A.   I'd say basically -- I didn't really -- and,
12 here again, I haven't seen that transcript or -- for a
13 long time. I didn't write -- to the best of my
14 recollection, I don't remember her father's testimony
15 being that negative or damaging.
16     Q.   Well, this is the year 2018, and this interview
17 took place in 1992. Correct?
18     A.   Yeah.
19     Q.   And so if you made that statement to Sandra
20 Pickinpaugh, certainly you believed that at the time.
21 Correct?
22     MS. HOFFMANN: Objection.
23          You can answer.
24     THE WITNESS: Well, yeah, but you said her
25 father.



Page 25

1    Q.   BY MS. BERKE:  You said her father.  Right?
2    A.   I don't know who said it first.  But --
3    Q.   I'm just reading from the transcript that you
4  had prepared of your interview --
5    A.   Okay.
6    Q.   -- of Sandra Pickinpaugh.  Correct?
7    A.   Right.  In other words, cross-examination...
8    Q.   You made the statement to Sandra Pickinpaugh on
9  October 4th of 1992 that what really tilted the scale to
10  conviction and to the death penalty was the testimony of
11  Sandra Pickinpaugh, Dorothy Markwell and Debra Milke's
12  father.  Correct?  That's what you told Ms. Pickinpaugh?
13    A.   You know, I'm -- I apologize.  I'm trying to
14  find -- you said the last two lines.
15    Q.   And then reading -- and then continuing on to
16  the next page.
17    A.   Oh, okay.  Okay.  Okay.  That was just in the
18  order.  Now, are you saying -- what are you asking me?
19    Q.   My question is:  You told Sandra Pickinpaugh on
20  October 4th of 1992 that what really tilted the scale to
21  conviction and to the death penalty, in your view and in
22  the view of your associates, was the testimony of Sandra
23  Pickinpaugh, Dorothy Markwell and Debra Milke's father.
24  Correct?
25    A.   Yes.

Page 26

1    Q.   And what you stated to Dorothy Markwell -- I'm
2  sorry.  What you stated to Sandra Pickinpaugh next was,
3  quote, This kind of iced it with the jury that she was
4  bad news and that, you know, the comments that she
5  sometimes -- she'd rather he be dead and stuff like that,
6  end quote.  Correct?
7    A.   Right.
8    Q.   And the "he" that you were referring to was
9  Christopher Milke.  Right?
10    A.   Right.
11    Q.   And so I would assume that your memory of what
12  took place in the Debra Milke criminal trial was better
13  back in 1992 than it is today.  Correct?
14    A.   You mean my comments?
15    Q.   Your memory of -- let me back up.
16    A.   Oh, yeah, okay.
17    Q.   You reviewed the transcripts from Debra Milke's
18  criminal trial.
19    A.   Right.
20    Q.   Correct?
21    A.   Uh-huh.
22    Q.   Yes?
23    A.   Yes.
24    Q.   And you did that sometime prior to October 4th
25  of 1992.  Correct?

Page 27

1    A.   Correct.
2    Q.   And when you conducted this interview of
3  Ms. Pickinpaugh on October 4th, 1992, what took place
4  during the trial was fresh in your mind.  Correct?
5    A.   Right.
6    Q.   And so when you made these statements that I
7  just read to Ms. Pickinpaugh, that was based on your
8  assessment of various individuals' testimony that you had
9  read from Ms. Milke's criminal trial.  Correct?
10    A.   Correct.
11    Q.   So before we start getting more into the
12  substance, I want to ask you about the other documents
13  that you were provided by Ms. Milke's attorney.  I'm
14  going to have this document marked.
15        (Exhibit 156 was marked for identification.)
16        THE COURT REPORTER:  156.
17    Q.   BY MS. BERKE:  I'm showing you what's been
18  marked as Exhibit Number 156.  And is that your affidavit
19  that you were provided to review?  You can compare it to
20  the version you gave me today.
21    A.   Question again.
22    Q.   The affidavit of Anders Rosenquist that you
23  were provided by Ms. Milke's attorneys to review in
24  preparation for your deposition today is the affidavit
25  that's been marked as Exhibit Number 156.  Correct?

Page 28

1    A.   Correct.
2    Q.   And that's an affidavit that you signed in
3  2002.  Correct?
4    A.   I'm assuming that, that 2002 I couldn't confirm
5  that.  I mean, I -- this is prepared -- Mr. Kimerer and
6  Lori, I remember working on this with them and -- and
7  having the -- the transcripts reasonably fresh and -- and
8  information reasonably fresh in my mind.
9    Q.   Do you remember --
10    A.   I don't know what --  I'm sorry.
11    Q.   Do you remember being in Hawaii when you signed
12  your affidavit?
13    A.   My wife said that we were.  Let me put it that
14  way.  She has a niece that lives over there.
15    Q.   And so does this make sense then that you
16  signed and had notarized this affidavit on May 17th,
17  2002, in Honolulu, Hawaii?
18    A.   Yes.
19    Q.   And this affidavit states, in paragraph 1 on
20  the first page of Exhibit Number 156, that you formerly
21  represented Debra Milke.  Correct?
22    A.   Yes.  Correct.
23    Q.   When did your representation of Ms. Milke
24  terminate?
25    A.   I don't have a specific date.  And I can't even



Page 29

1   get close to the date. I can tell you the circumstances
2   by it.
3       Q.   Sure, that would be fine.
4       A.   Okay.
5            I had filed the initial habeas petition in
6   the Federal District Court. They had a hearing in front
7   of Judge Broomfield because I wanted to interview the
8   police officers that were working with, associated with
9   Detective Saldate. And Judge Broomfield granted that
10  motion.
11           So I contacted Debra by phone to give her
12  the good news and she wouldn't talk to me. And I
13  couldn't figure out what --
14           MS. HOFFMANN:  Sorry. I just want to remind
15  you not to say anything about conversations that you had
16  with Debra Milke --
17           THE WITNESS:  Okay.
18           MS. HOFFMANN:  -- because that's covered by
19  attorney/client privilege.
20           THE WITNESS:  I -- well, I didn't have any
21  conversation. I contacted -- I contacted the prison, and
22  the guard came back and said:  She does not want to talk
23  to you.
24           So I don't know exactly how things came
25  down. I think I called her mother or whatever, and then

Page 30

1   I -- and then I just finally realized that Kimerer had
2   taken the case over.
3            His mother had -- her mother, excuse me, had
4   collected quite a bit of money over in Germany to hire
5   Mr. Kimerer. I initially started out pro bono on the
6   case and spent a good amount of my own money. And then
7   she gave me -- Renate gave me some money to help pay the
8   bills. But, anyway...
9            And then I found out and then I called Mike
10  Kimerer, and he said, Yes, so substitution of counsel was
11  filed, and I delivered all of the -- I'd say there's
12  about 14 or 15 boxes of everything. I mean, I have
13  nothing left. I delivered that to him.
14           And then I finally found out that Lori
15  Voepel was actually going to be working on the case. But
16  as to any dates, I don't even -- I couldn't even get
17  close.
18      Q.   BY MS. BERKE:  So it was during the habeas
19  proceeding when Judge Broomfield ruled on the petition
20  for habeas relief?
21      A.   Oh, yeah, these were preliminary, kind of, I
22  guess you'd say, investigative discovery materials
23  because I wanted to talk to the police officers.
24      Q.   Oh. So it was even prior to the filing of the
25  participate for habeas relief?

Page 31

1       A.   As far as I know, no. No.
2       Q.   It was after?
3       A.   Because I remember -- yes. I remember filing
4   the -- file -- when you file the habeas, you -- in those
5   days, you just basically say you're going to -- it was
6   kind of like a notice. And you allege certain things,
7   general things. And then it -- then I filed a motion to
8   -- to interview these police officers that were involved
9   with Detective Saldate.
10           And then at that hearing, he granted me --
11  he granted my motion to interview them.
12           So I called Debbie -- called to speak to
13  Debbie and waited a while, and the person came back and
14  said, Debra is not going to talk to you anymore -- or not
15  going to talk to you.
16      Q.   Do you know why she terminated your
17  representation of her?
18      A.   Well, it's rather obvious. I had gotten in
19  some disputes with her mother towards -- you know, while
20  I was working the case. And, you know, I can go into
21  those, but that's up to you.
22      Q.   Yeah. Why don't you tell us what the disputes
23  were over.
24      A.   Well, and Kirk -- I had been working with --
25  closely with Kirk Fowler. And after about -- after about

Page 32

1   doing four or five of these -- not four or five, but I'd
2   say two or three of these summaries, I couldn't figure
3   out what was going on. Then I subsequently found out
4   that -- and these are my own words, summary -- that she
5   was becoming quite a celebrity and she was writing a
6   book.
7            And the book -- I don't know when the book
8   came out, before or after I was terminated. But the work
9   was -- I mean, the book was totally focused on poor
10  mother, it was not focused on Debbie. And -- yeah.
11  And -- yeah, she caught -- I don't know how she got ahold
12  of Mr. Kimerer or anything that went on there. I just --
13  you know, I knew Mike quite well, so I just called him
14  and he said, She just called -- her mother has just
15  called me -- no. No, Renate went in and talked to him,
16  as I recall.
17           And I don't -- no, he wouldn't be allowed
18  to go talk to -- yeah, he did not interview Debbie or
19  talk to Debbie. He basically took over the case and the
20  substitution, and that was it.
21      Q.   And was -- when you say she was becoming a
22  celebrity and writing a book, are you referring to Debra
23  Milke's mother, Renate?
24      A.   Yes.
25      Q.   And did that bother you in some way?



ANDERS VILNER ROSENQUIST JR. Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                                    33–36

Page 33

1     A.   Well, yeah, it did in the fact that things were
2  moving along, and Judge Broomfield granted -- to me that
3  was a critical -- that was critical evidence because I
4  had heard rumors about certain things that Detective
5  Saldate was told to do and all the -- all the things that
6  raised my suspicions.  And I'd say, yeah, I was more --
7  more hurt than angry.
8          It was -- you know, in the -- in criminal
9  business, you know, you can get hurt or angry, but I
10  wasn't angry at Debbie because she didn't have anything
11  to do with it.  I was angry at her mother.
12     Q.   And what were you specifically angry about?
13     A.   Well, she felt like I was a -- like when I was
14  in the public defender's office, I want a real attorney
15  attitude.  Because, you know, I handled the thing pro
16  bono from the very beginning, you know, which is a story
17  in itself.
18          And I was getting along really good with
19  Debbie, visit her, talked to her, counselors would let me
20  talk to her over the phone.  So it didn't have anything
21  to do with Debbie.  It was her mother.
22     Q.   Well, wasn't there one incident where you went
23  to visit Debra Milke at the jail and she refused to see
24  you?
25     A.   I don't remember that.  I remember the phone

Page 34

1  call.  I -- I -- no.  I mean, no.  All I remember -- and
2  this I remember clearly -- is what I just described to
3  you.  The motion, gave it, I was enthusiastic, called and
4  then she said, I can't talk to you.  And she never did
5  talk to me.  So I called -- I don't know who I talked
6  to -- Mike probably.
7          But I don't know -- I don't know how I got
8  the specifics down after that.  I don't know whether -- I
9  know I eventually called him but bits and pieces of
10  information as far as finding out who -- who he was and
11  never finding out any reason, although she had a
12  substantial amount of money from the publicity, and I
13  think there were funds -- excuse me -- and I'm pretty
14  sure there were funds being raised.  I didn't know too
15  much about what was going on over in Germany.  But, yeah,
16  from what I remember kind of in retrospect.
17          So I got a little bit irritated at the very
18  beginning because I'm writing all these things and I'm
19  getting -- that kind of put a question mark in my mind.
20  And then the next sequence of events happened.
21     Q.   What put a question mark in your mind?
22     A.   That why was I writing all of this stuff to
23  her, writing these summaries in the case to her.  I mean,
24  at first, yeah, interviews and stuff like that.  But I
25  started questioning why I'm rewriting it and then doing

Page 35

1  it, doing another one, a second one or a third one.
2     Q.   Did you feel that she was using that for her
3  book?
4     A.   Her book and to -- to, I guess, go to Kimerer,
5  find an attorney so they would know about the case.  I
6  mean, these are just my conclusions.
7     Q.   Okay.  And then you said and then things
8  transpired from there.  I can -- I can find the exact
9  words you used.  Hang on one second.
10          The exact words you used were "And then the
11  next sequence of events happened."  What did you mean by
12  that?
13     A.   The next sequence of events happened was the --
14  the phone call to -- to the jail, to the prison,
15  Perryville, to tell her that I won that motion and that
16  we were going to interview that, and she wouldn't talk to
17  me.  That sequence of events.
18     Q.   Okay.  That you've already talked about today?
19     A.   Yes.
20     Q.   And so was the substitution of counsel filed
21  shortly thereafter?
22     A.   As far as I know, yeah.  I mean --
23     Q.   And so I'm assuming you haven't represented
24  Debra Milke since sometime prior to that notice of
25  substitution of counsel being filed.  Correct?

Page 36

1     A.   Subsequent?
2     Q.   Right.
3     A.   No.  I haven't represented her since then or...
4     Q.   Okay.  Have you had any communications with
5  Debra Milke since being terminated by her as her
6  attorney?
7     A.   Yes.
8     Q.   How many times have you spoken with her?
9     A.   Three, maybe four times.  Kirk and I and my
10  wife and Kirk's daughter would have lunch with her.
11     Q.   What's Kirk's daughter's name?
12     A.   Hold on a second.  I can't think of it right
13  off the top of my head.  No, I'll probably come up with
14  it.
15     Q.   If you do, let us know.  We'll be deposing --
16     A.   Sure.
17     Q.   -- him tomorrow, so we can ask him as well.
18     A.   Yeah.
19     Q.   And what's your wife's name?
20     A.   Oh, Charonlee, C-h-a-r-o-n-l-e-e.  One word.
21     Q.   Spell it one more time.
22     A.   C-h-a-r-o-n-l-e-e.
23     Q.   Charonlee.  That's a pretty name.
24     A.   One word.
25     Q.   That she probably has to spell for everybody.



ANDERS VILNER ROSENQUIST JR.  Highly Confidential                     July 23, 2018
Debra Jean Milke vs City of Phoenix                                              37–40

Page 37

1  Right?
2     A.  I do.  She likes to go by Lee, and I said, It's
3  not going to work, Honey.
4     Q.  And so the three to four times you've spoken
5  with Debra Milke, was that after she was released from
6  prison?
7     A.  Yes.
8     Q.  Did you speak to her while she was in prison at
9  any time after the substitution of counsel was filed,
10  between that date and the date of her release?
11    A.  No.
12    Q.  And how did it come about that you spoke to her
13  the first time after she was released?
14    A.  Well, Kirk Fowler kind of initiated it.  I
15  don't exactly know how he did it.  But he had set up
16  these little luncheon -- luncheon get-togethers --
17  get-together.  And, you know, he wanted to see her and
18  see how she was doing.  And the only question that was
19  ever really asked is, you know, What's going on with the
20  case?  Where are you at?  And she said, Depositions or
21  this or whatever.  We didn't really want to get involved
22  because I don't think she had any really accurate idea
23  anyway.
24    Q.  Why do you think she didn't have any accurate
25  idea?

Page 38

1     A.  Because it's a -- it's legal -- it's legal --
2  it's legal with habeas, what you do and -- just a
3  layman's type...
4     Q.  So she never told you that she didn't
5  understand what was happening in her case, did she?
6     A.  No.
7     Q.  Where did you have lunch with Ms. Milke that
8  first time?
9     A.  A Mexican restaurant.  Oh, boy.  I can't think
10  of the name of it now.  It's at Shea -- right off Shea
11  and Scottsdale Road.
12    Q.  And why was it up north?
13    A.  It was near her -- where her counselor -- in
14  other words, the way it came down is she'd have lunch
15  with us and then go to her counselor.
16    Q.  And who was at that first lunch?  Was it Kirk
17  Fowler, his daughter, your wife and you?
18    A.  Yeah, that was -- yeah.  That was all.
19    Q.  And tell us everything you recall that was
20  discussed during that lunch.  And -- well, let me back
21  up.
22        When did that take place, if you remember?
23    A.  After she was released for a while.
24    Q.  Do you remember how long after?
25    A.  No.  It was a while.  We didn't want to, you

Page 39

1  know, interfere, I guess you'd say, until things settled
2  down and -- yeah, it -- you can ask Kirk about that, you
3  know, when you depose him.  I -- but he's the one that
4  made the phone calls and I said, Great.
5     Q.  And tell us everything you recall that was
6  discussed at that lunch.
7     A.  Just like I said, How you doing?  You know --
8  you know, where are you living?  Personal things.
9        We -- our primary concern was her mental
10  state and was she okay or -- in other words, we wanted
11  to -- we were -- how should I put it?  We were -- Kirk
12  and I were concerned about her mental state because it
13  had been so long since we had any contact with her.
14        And so we were -- yeah.  I mean, we just
15  wanted to see how she was doing after spending all that
16  time in prison and then all the legal battles and so
17  forth.
18    Q.  Did she tell you whether she was employed?
19    A.  Oh, yeah.
20    Q.  And where did she tell you she was employed?
21    A.  For Mike Kimerer.
22    Q.  She works for her attorney, Mike Kimerer?
23    A.  Yeah.  Yes.
24    Q.  And what did she tell you she does for him?
25    A.  A receptionist.

Page 40

1     Q.  And when you asked her how she was doing, what
2  did she tell you?
3     A.  Doing with what?  The --
4     Q.  You said you asked her how she was doing at the
5  lunch.
6     A.  She really, you know -- I would call it just
7  didn't want to answer, say something -- I don't remember
8  her saying anything specific because we said -- you know,
9  we said, you know, We don't want to get -- Kirk and I, we
10  don't want to get involved, we're just concerned about
11  you.  And then she told us she was in a -- she got a
12  house and was staying with somebody.  That was it.
13        We didn't ask her about psychiatric exams or
14  whatever -- we kind of wanted to read her, for want of a
15  better word.
16    Q.  And you're not a psychologist?
17    A.  No.
18    Q.  And you're not a -- and you're not a
19  psychiatrist?
20    A.  No.
21    Q.  And you don't do mental status exams.  Correct?
22    A.  No.
23    Q.  So I am correct that you do not do that?
24    A.  Yes.
25    Q.  And so you don't remember how she responded



ANDERS VILNER ROSENQUIST JR.  Highly Confidential                July 23, 2018
Debra Jean Milke vs City of Phoenix                                      41–44

Page 41

1  when you asked her the question how are you doing?
2     A.   No.  I don't know -- I know we -- I don't
3  remember her answering it.  You know, she probably waited
4  two or three or four seconds and then we kind of back
5  off -- we, me or him -- and asked other questions.
6     Q.   When you asked her where she was living, what
7  did she tell you?
8     A.   Well, there was a time when she was living in a
9  house.  I think she's still living there now with a
10  roommate.  But then the roommate left.  So from what I
11  understand now, she's living in that house by herself.
12     Q.   Did she tell you who owns that house?
13     A.   No.  I mean, I could guess, but I didn't go
14  that far.
15     Q.   When -- why do you think you can guess who owns
16  that house?
17     A.   Well, there was a reporter from Der Spiegel
18  magazine that came over several times.  And I -- and I
19  was aware he helped her, but he came over before she was
20  ever released.  And for want of a better guesstimate, it
21  came from either funds in Germany that he controlled
22  wherever or the money came from some other place.
23     Q.   And he's a reporter?
24     A.   Yes.  For that magazine.
25     Q.   What was the magazine?

Page 42

1     A.   Der Spiegel.  Der Spiegel.
2     Q.   And, in fact, Debra Milke did an interview for
3  that magazine.  Correct?
4     A.   I'm not aware of that.  I read articles in
5  there, but that was just him talking.
6     Q.   And how do you know that he gave her money?
7        MS. HOFFMANN:  Objection.  Misstates
8  testimony.
9        THE WITNESS:  I don't know for sure.  I just
10  kind of assumed.  And I don't think that he necessarily
11  gave her money.  I think the money came from the --
12  whatever foundation, whatever they put together, the
13  money for the mother did all that.
14     Q.   BY MS. BERKE:  So he just facilitated her
15  getting money from a fund that was --
16     A.   I --
17     Q.   -- established in Germany?
18     A.   Yeah.  He -- well, he -- between him and
19  Renate, they -- yeah, they facilitated her getting money
20  from Germany.  I can't say whether it's a fund or
21  personally or anything else, what happened over there.
22     Q.   And, by the way, any time you need to take a
23  break -- we're going to be here for a while today.  So
24  any time you feel a need to take a break, if you need to
25  use the men's room, stretch your legs, get something to

Page 43

1  drink, for any reason, you just let me know, we'll take a
2  break.  Okay?
3     A.   Sure.  I appreciate that.
4     Q.   Is there anything specific you remember being
5  discussed at that meeting or at that lunch at the Mexican
6  restaurant at Shea and Scottsdale Road other than what
7  you've told us?
8     A.   No.  We would -- we just -- I guess you'd say
9  light talk.  And it was not on the subject of her case.
10  Because I really -- well, I knew better than -- I didn't
11  want to get -- none of my business.  Let's put it that
12  way.
13     Q.   You didn't get -- want to get pulled into a
14  deposition and be asked about it?
15     A.   Well, no.  There's a lot of -- procedurally, I
16  mean, I know the high points of what I did in her case,
17  you know.  And other than that, you know, I really -- I
18  don't remember specific incidents and so forth very well.
19     Q.   Do you have any medical issues that affect your
20  memory currently?
21     A.   Not really.  I had a hip replacement recently,
22  and I've taken painkillers, but that's -- I feel better
23  than I ever did with a new hip.
24     Q.   I bet.  Have you taken any painkillers today?
25     A.   Yeah.  One earlier this morning.

Page 44

1     Q.   And what kind of pain killer was it?
2     A.   It's Oxycodone.
3     Q.   And how often do you take those?
4     A.   Oh, boy.  I apologize.
5        It's kind of taper- -- tapering off.  Last
6  time I took them was like about three or four days ago.
7  I start -- I do exercises, and then I'll take one
8  after -- excuse me -- after that.  Tapering off of them.
9     Q.   What time did you take the Oxycodone this
10  morning?
11     A.   About 8:30.
12     Q.   And what were the milligrams?  Do you know?
13  What was the dosage?
14     A.   Oh, 10 milligrams.
15     Q.   And having taken a 10-milligram Oxycodone, does
16  that affect your ability to testify accurately or
17  truthfully here today?
18     A.   No.  I've taken that before when I've had other
19  medical -- surgery and so forth.
20     Q.   Okay.  When was the next time you had lunch or
21  spoke with Debra Milke?
22     A.   I've never spoken with her over the phone at
23  all since she's been -- well, since that Kimerer took
24  over the case.  Kirk has.  So the only time I've ever
25  talked to her was at the luncheons.



ANDERS VILNER ROSENQUIST JR. Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
45–48

Page 45

1   Q.   Okay.
2   A.   And then I -- I can't describe it any more, but
3   we really didn't -- other than, you know, what's going on
4   with the case, a deposition, her deposition, whatever
5   or she'd tell me, you know, when the trial was continued
6   or whatever, but 90 -- almost all the time was spent just
7   lighthearted conversation.
8   Q.   And did she seem to enjoy the company, seeing
9   you and Kirk and Kirk's daughter and your wife?
10   A.   As much as she could.  She had a cloud over her
11   head.  I mean, you could tell.
12   Q.   Well, how could you tell that?
13   A.   She couldn't smile and just her body language.
14   You know, we'd -- we'd tell things that were funny and
15   stuff like that and, you know, she'd kind of smile a
16   little bit, but -- I mean, we've just -- I could -- just
17   read her body language.  I don't know what else to say.
18   And what she -- how she answered questions or -- it
19   seemed like she was just not relaxed and interested in
20   that conversation.
21   Q.   Do you have any training in body language --
22   A.   No.
23   Q.   -- interpretation?
24   A.   No.
25   Q.   You don't claim to have any expertise in that?

Page 46

1   A.   No.  Doing criminal work for over 45 years with
2   the worst of the worst, I've learned a little.  Put it
3   that way.
4   Q.   Have you done criminal work your whole career?
5   A.   Yes.
6   Q.   Where did you start out?
7   A.   Maricopa County Attorney's Office.
8   Q.   So you were a prosecutor?
9   A.   Yes.
10   Q.   And let's back up even further.
11       Where did you attend law school?
12   A.   ASU.
13   Q.   Where did you attend undergrad?
14   A.   ASU.
15   Q.   And did you graduate law school in 1970 or '71?
16   A.   Well, graduation -- I finished law school in
17   two and a half years, so I started working for the County
18   attorney's office in the charging bureau because I
19   couldn't go into Court yet.  But I had taken the bar
20   exam.  I'd say '71.  Around the very beginning of '71.
21   Q.   And so you were responsible for charging --
22   tell us what that involved when you first got out of law
23   school and went to work for the County attorney's office.
24   A.   Well, I was in the -- and, here again, I
25   was wait -- there was a sequence of time where I'd passed

Page 47

1   the bar and hadn't been sworn in yet.  And so they put me
2   in the charging bureau.  And --
3   Q.   When you're in the charging bureau, what are
4   you responsible for doing?
5   A.   Reviewing police reports and basically, at that
6   time, we didn't have a grand jury so had official
7   complaints.  In other words, decided to prosecute them or
8   turned them down or send them for further investigation.
9   Q.   And when you say send them for further
10   investigation, that means sending it back to the police
11   department and asking them to do some follow-up work.
12   Correct?
13   A.   Correct.
14   Q.   With the hope that you can then charge it.
15   Correct?
16   A.   Well, there was no hope.  If they didn't have
17   the evidence that I felt -- sometimes they'd come back
18   with the evidence; sometimes they wouldn't.
19   Q.   Okay.  So you would send it back for further
20   investigation so that you could adequately make that
21   charging decision?
22   A.   Yes.
23   Q.   And then how long did you do charging?
24   A.   Probably about six months.
25   Q.   And then where did you go next?

Page 48

1   A.   Then I moved to the preliminary hearing group.
2   We -- we'd go to the various justice courts and, you
3   know, do the -- preliminary is just like a probable cause
4   hearing in JPs in these various locations in the county.
5   And you'd have the police officer there and be able to
6   question them and --
7   Q.   Would the defendant be there?
8   A.   Yeah.  Oh, yeah.
9   Q.   With their attorney?
10   A.   Yes.
11   Q.   And how long did you work in the preliminary
12   hearing group?
13   A.   Probably about another four or five, six
14   months.
15   Q.   And the purpose of the preliminary hearing was
16   to demonstrate for the Court that there was probable
17   cause to support the charges?
18   A.   Yeah.  The Court would basically decide, the
19   judge, after you presented, if there was adequate
20   evidence to support the charge.
21   Q.   So that the case could move forward through the
22   system?
23   A.   Yes.
24   Q.   And if the Court determined there was no
25   probable cause, then the charges would be dismissed by



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential                    July 23, 2018
Debra Jean Milke vs City of Phoenix                                              49–52

Page 49

1  the Court.  Correct?
2      A.   But they wouldn't be really dismissed, they
3  just wouldn't be charged.
4            In other words, a complaint issued -- I
5  don't remember the actual procedures, but a complaint
6  would be issued, and then they would have the preliminary
7  hearing and they -- oh, yeah.  They used to call it bind
8  over for trial, were the key words.  Find probable cause
9  to bind it over for -- bind it all over for trial.
10     Q.   Okay.  And then where did you go after
11  preliminary hearing group?
12     A.   I worked for a -- a commission was established
13  to rewrite -- gather, clean up, rewrite all of the
14  criminal laws for the State of Arizona.  I got a position
15  on that commission with two other people, two other
16  attorneys.  Sandra Day O'Connor, when she was a senator,
17  was in charge of that -- was in charge of the commission.
18           So we basically were collecting all of the
19  criminal laws throughout the -- all of the statutes,
20  compiling them, you know, refining them, whatever and
21  going through that.
22           MS. BERKE:  Anna, do you have a microphone
23  on?
24           MS. HOFFMANN:  Yeah.  I'm just concerned
25  about all the bags and crunching.  I hope it's not --

Page 50

1  sorry.  I'm still on Eastern timeline.
2           MS. BERKE:  That's okay.
3           MS. HOFFMANN:  Take a snack so I don't have
4  to stop.
5           MS. BERKE:  Well, you can just take the
6  microphone off.
7           MS. HOFFMANN:  What if I object?
8           MS. BERKE:  We don't need to hear your
9  objections, do we?
10     Q.   BY MS. BERKE:  So you served on that commission
11  for how long?
12     A.   I'd say nine months to a year.
13     Q.   Who else was on that commission with you?
14     A.   Oh, boy.  The only one --
15     Q.   Or was it many people?
16     A.   No, just two.
17     Q.   Okay.
18     A.   Two other attorneys.  Oh, boy.  You know what,
19  I cannot remember their name --
20     Q.   Okay.
21     A.   -- their names.
22     Q.   Do you know how it came about that you got
23  placed on that commission?  Was it an honor to be placed
24  on it?  Was it --
25     A.   Yeah.

Page 51

1      Q.   How did that come about?
2      A.   It was.  I was surprised.  I applied for it
3  and -- yeah, I don't know what else to say.
4      Q.   And then once you completed your work on that
5  commission after nine to 12 months, what was your next
6  assignment?
7      A.   Went to the Maricopa County Public Defender's
8  Office.
9      Q.   And what made you decide to do that?
10     A.   Personally, it was a challenge, and I -- yeah,
11  it was more of a -- it was a challenge, and I felt, you
12  know, I was doing some good for people because at that
13  time, you know, a lot depended on how the attorney
14  handled the case and investigated it and dealt with the
15  clients.  It was just a challenge.
16     Q.   So you never tried a case as a prosecutor?
17     A.   Oh, yes.
18     Q.   You did?
19     A.   I apologize.  After the preliminary hearing,
20  then I went to the trial bureau.
21     Q.   Okay.
22     A.   Oh, yeah, I apologize.
23     Q.   That's okay.
24     A.   I tried quite a few felony, you know, jury
25  trials.

Page 52

1      Q.   Okay.  So -- and that was before serving on the
2  commission?
3      A.   Yes.
4      Q.   So tell us -- when you went to the trial
5  bureau, walk us through what kinds of cases you handled
6  initially and then if it progressed to other types of
7  cases.  Just walk us through that.
8      A.   Oh, initially, you know, it's kind of like
9  you'd start out with the felonies that are property
10  crimes, mostly low-level drug crimes.  And then you would
11  work your way up into some more serious crimes.
12     Q.   Like what?
13     A.   Oh, some murder cases, rape, child
14  pornography -- child molesting cards, cases --
15     Q.   You said child molestation?
16     A.   Yes, molestation cases.  Big drug cases.
17  Drug -- rape cases.
18     Q.   Do you remember what years you were assigned to
19  the trial bureau?
20     A.   Well, not really.  I'd say probably '72, '73
21  and thereabouts.
22     Q.   And for how long?
23     A.   I think I worked for the County attorney's
24  office for about two years.
25     Q.   Including the commission?



Page 53

1    A.   No, no, no.  Then I worked for the commission
2    for about six -- six months to nine months.
3    Q.   Okay.  So when you served on the commission,
4    you were no longer an employee of the Maricopa County
5    Attorney's Office?
6    A.   Right, I was not.
7    Q.   Okay.  So if you worked charging for six months
8    approximately in the preliminary hearing group for four
9    to six months, would it be fair to say that you probably
10   were assigned to the trial bureau for maybe a year?
11   A.   Yeah, I'd say nine months to a year.
12   Q.   And then you decided to apply for the job at
13   the commission.  You did that for nine to 12 months.
14   A.   Uh-huh.
15   Q.   And then you decided to go to the Maricopa
16   County Public Defender's Office because it presented a
17   challenge for you?
18   A.   Yes.
19   Q.   Did you have any desire to go back to the
20   Maricopa County Attorney's Office?
21   A.   No.
22   Q.   And why not?
23   A.   Well, everything was handed to you on a silver
24   platter.  In other words, all the investigation is done
25   by the police officers, so you'd get into a trial and

Page 54

1    swear them in and -- what did you do next, what did you
2    do next, what did you do next?  It was -- it was -- it
3    wasn't a challenge.  I mean, you got police reports and
4    you can read them, and then police officers pretty much
5    know the testimony.
6        And, you know, the rules of evidence, you
7    know, you had to learn those, but I just -- no, it
8    wasn't -- it wasn't much of a challenge.  But the good
9    thing about it is they didn't have all the mandatory
10   prison terms and stuff.  So a lot of times we -- it
11   boiled down to the judge and the -- and me, the
12   prosecutor, or me, the public defender, and the
13   prosecutor working the case out in chambers.
14   Q.   And throughout the cases that you prosecuted,
15   there would be evidentiary rulings made by judges.
16   Correct?
17   A.   Oh, yes.
18   Q.   And would it be fair to say that -- well, you
19   worked with the case agent from the police department on
20   your cases.  Correct?
21   A.   Yes.
22   Q.   And would it be fair to say that there were
23   times where you would tell the case agent or another
24   police officer that you can't go into a particular area
25   based on some evidentiary rulings that had been made by

Page 55

1    the judge.  Correct?
2    A.   Oh, correct.  Yeah.  Hearsay.
3    Q.   I mean, that was a common thing?
4    A.   Yeah.
5    Q.   Or you made -- were there times where you made
6    your own assessment, look, for this reason, we can't go
7    into a particular area?
8    A.   Well, yeah, I knew the rules of -- the rules.
9    You know, hearsay is probably the biggest one.  Are
10   you --
11   Q.   Well, let me ask you this:  If you instructed a
12   case agent that you were not to go into a particular
13   area, you would expect that case agent or other police
14   officer to follow that instruction.  Correct?
15   A.   Correct.
16       MS. HOFFMANN:  Objection.
17   Q.   BY MS. BERKE:  So you subsequently went to the
18   Maricopa County Public Defender's Office.  Do you
19   remember what year you started there?
20   A.   Let's see.  '71, '2, '3 -- probably '75.
21   Just -- yeah, that's the number that came into my mind.
22   Q.   And before I start asking you questions about
23   that, going back to when you were at the County
24   attorney's office, did you do your own appeals?
25   A.   No.

Page 56

1    Q.   Who did the appeals?
2    A.   The appellate department -- the appeals
3    division.
4    Q.   Of the Maricopa County Attorney's Office?
5    A.   Yes.  Or I don't -- you know, I don't know.  I
6    think it -- in those days, the AG did the appeals.  In
7    fact, I think that's the way it was, now that I reflect
8    back, because -- no, that's the way it was in those days.
9    Ours was strictly trial, and if there was an appeal, the
10   AGA handled it.
11   Q.   Did you ever handle grand jury proceedings?
12   A.   No.  No, I never -- I don't remember ever
13   presenting a case to a grand jury.  There was a time when
14   all you can do was a preliminary, and then the law
15   changed and then -- that you can start using the grand
16   jury, but that's after I left the office.
17   Q.   Okay.  And you think you started at the public
18   defender's office in around 1975?
19   A.   Yes.
20   Q.   How long were you there?
21   A.   Eight years.  Approximately eight years.
22   Q.   What kinds of cases did you handle there?
23   A.   Everything.  Murders, rapes, child molest,
24   assaults, drug cases.  You were assigned the cases.
25       They'd start you out, you know, with milder



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                          57–60

Page 57

1  cases, but then you'd work your way up to a senior -- a
2  senior defense attorney.
3      Q.   What is the public defender's office?
4      A.   Well, it's basically a group of attorney --
5  defense attorneys that handle indigent cases as they're
6  assigned to a...
7           Once the public defender's office is
8  assigned to represent somebody by the judge, you know,
9  they qualify, then the -- the file goes to the public
10 defender's office and then the supervisor, you know,
11 decides who to assign it to.
12          You know, I think I'm going to need to take
13 a break now.
14          MS. BERKE:  Absolutely.  Sure.
15          THE VIDEOGRAPHER:  We're off the record at
16 11:17.
17          (A recess was held off the record.)
18          THE VIDEOGRAPHER:  We're back on the record
19 at 11:44.
20     Q.   BY MS. BERKE:  Mr. Rosenquist, so you were at
21 the public defender's office for approximately eight
22 years.  So would you say you were there from 1975 until
23 approximately 1983?
24     A.   Yeah, that would be fair.  Yes.
25     Q.   And when you worked on cases, did you confer

Page 58

1  with other public defenders about your cases?
2      A.   Oh, yeah, we did.
3      Q.   How many attorneys worked in the public
4  defender's office during that period of time that you
5  were there those eight years?  And if it varied, you can
6  tell me that it varied.
7      A.   Yeah, it -- I'd say, oh, anywhere from 14 to 15
8  up to probably 18 or 19.
9      Q.   And did -- were you ever familiar with Armando
10 Saldate?
11     A.   No.
12     Q.   He was never a witness in any of your cases?
13     A.   No.
14     Q.   Had you ever heard the name while you were a
15 public defender?
16     A.   No.
17     Q.   Did they have different levels of seniority or
18 titles within the public defender's office?
19     A.   Not really.  The cases went to the supervisor,
20 and, gradually, as you get more and more experience, you
21 get more and more of the -- you get more serious -- the
22 serious cases.
23     Q.   Would homicide cases typically go to attorneys
24 in the public defender's office who had a significant
25 amount of experience?

Page 59

1      A.   Yes.
2      Q.   Was there a specific number of years of
3  experience you needed to have there to do homicide cases?
4      A.   No, not at that time.
5      Q.   Just if they felt -- just if the supervisor
6  felt that you were ready to handle those kinds --
7      A.   Yeah.
8      Q.   -- of cases?
9      A.   If you could handle it.
10     Q.   Do you remember when you began handling
11 homicide cases?
12     A.   Probably the last three years, four years.
13 Three years -- I'd say three to four years before I quit.
14     Q.   So the last three or four years at the Maricopa
15 County Public Defender's Office you were handling
16 homicide cases?
17     A.   Homicide cases plus other ones.  It was not
18 like -- there was no specific homicide division.
19 Everybody was equal.  A supervisor would look at your
20 caseload and your experience, and then he'd give you --
21 assign the case.
22     Q.   Having handled some homicide cases at the
23 County attorney's office, do you know why it is you
24 weren't assigned homicide cases at the very outset when
25 you went to the public defender's office?

Page 60

1      A.   I think they -- I was still green as far as
2  defense work.  It was kind of like in the public
3  defender's office, first thing I did, you know, other
4  than the charging bureau for a while, you know, where I
5  didn't do any litigation or stuff, you know, they did the
6  preliminary hearing phase and then they phased you into
7  the felony group.
8           It was kind of the same way.  Yeah, as you
9  worked your way up, you know, there was no homicide
10 group, if that's what you're asking.
11     Q.   Are there any promotions that can happen for
12 attorneys within the County -- or within the Maricopa
13 County Public Defender's Office?  And I'm talking about
14 the time you worked there.
15     A.   No.
16     Q.   And then you worked there for eight years.
17 Were you ever reprimanded for anything, or did you have a
18 solid eight years there?
19     A.   No.  There was a few clients that filed some
20 bar complaints, but they were -- I didn't even know about
21 them.
22     Q.   How did you learn about them?
23     A.   Looking up -- I don't know.  I was working on
24 my Web site, and I -- I only remember one way back when,
25 and so I decided to check it, and then there was like



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
61–64

Page 61

1  three or four, five complaints from people in prison, and
2  they didn't -- I never even heard about them.  They -- it
3  was kind of a summarily -- not dismissal but, you know,
4  they never bothered to move forward on them.
5     Q.   Okay.  Do you remember what the allegations
6  were?
7     A.   Oh, kind of a panacea of things.  Ineffective
8  assistance of counsel, and then they go down to whatever
9  he could say.  I lost at his fault.
10    Q.   And so what were -- what was your reason for
11 leaving the Maricopa County Public Defender's Office in
12 or around 1983?
13    A.   I burned out.
14    Q.   And do you know why that happened?  Was it a
15 heavy caseload?
16    A.   It was just the kind of cases.  And at that
17 time, you were going to trial all the time.  There was --
18 plea bargaining was not really that prevalent when you
19 get up into the really serious cases.  And, you know,
20 evidence and, you know, like -- you have to represent
21 them to your -- best of your ability, you know, a lot of them
22 were just ice cold cases that you -- you know, you kind
23 of felt foolish in a way, but you had to dig up whatever
24 you could, you know, because in those days, the trial was
25 all -- kind of also used as a -- as a mitigation hearing.

Page 62

1        So we'd go to trial on, well, the majority
2  of cases at that time.
3        And, yeah, it was just the stress level and
4  the kind of cases and, you know, the way the jury looked
5  at you, people...  Yeah, you were kind of identified.
6  And it wasn't a pleasant experience.
7     Q.   What do you mean, the jury would look at you?
8     A.   Well, when you had cases that there was really
9  no real good defense -- no defense to, they'd say, what
10 the hell are you doing up there trying to talk us out of
11 convicting this guy.  It was a real conflict for me.  And
12 I left there and I went into private practice.  Private
13 practice I could -- I could pick and choose who I
14 represented.
15    Q.   Did you go into a solo firm setting, or did you
16 get some partners?
17    A.   No.  I just went out -- I had a friend of
18 mine -- good friend of mine that had an office in his
19 building, and I moved over there, and he gave me some
20 referrals and kind of grew from there.
21        I knew a lot of attorneys, though, defense
22 attorneys people.  So I had built up a -- actually a
23 referral system.  I never really did anything pro bono
24 except -- I can think of one case and then I guess
25 Debra's case.  That really was -- I started out pro bono,

Page 63

1  but then her mother helped me.
2     Q.   Now, the firm -- the solo firm that you started
3  in when you left the County attorney's office, is that
4  the same firm you have now, or did you change at any
5  time?
6     A.   Oh, no.  I'm -- I'm sole practitioner --
7     Q.   Okay.
8     A.   -- all the way through.
9        I worked for about six months for a -- for
10 another business.  It was kind of a misunderstanding.
11 They -- I was supposed -- I thought I was supposed to be
12 hired -- Phillips & Lyon to handle the criminal matter,
13 like a division, and it turned out -- it didn't turn out
14 that way.  So things just didn't work out, not really
15 anybody's fault.
16        But, realistically, if you're doing criminal
17 work, you just -- I don't know how you can do it
18 ethically without doing it yourself.  So I just didn't
19 really incorporate.  Just got insurance and just sole
20 practitioner, you know.
21    Q.   Unless a case goes on appeal -- well, do you
22 still do trial work, or do you just do appeals?  I know
23 you do appeals now.
24    A.   Yeah.  Like I had a trial -- I got a case at
25 the trial stage now.  It's out of state, though -- boy,

Page 64

1  the looks she gives me.
2     Q.   You're talking about the videographer?
3     A.   Yeah, she means business.
4     Q.   So you still do trial -- some trial work?
5     A.   This -- this is the first trial-stage case I've
6  handled for years.
7     Q.   What state is it in?
8     A.   It's in -- it's in the Federal District Court
9  in Nebraska, Omaha.  And, yes, it's still in the
10 negotiating discovery stage.  They have a trial set for
11 September 4th.
12    Q.   Now, when you started out being a solo
13 practitioner after leaving the Maricopa County Public
14 Defender's Office, you would do trial work at that time.
15 Correct?
16    A.   Oh, yes.
17    Q.   And unless a case went on appeal, would it be
18 fair to say that you wouldn't receive transcripts of
19 those criminal trials?
20    A.   Yeah.  Yes.  I didn't -- didn't handle the
21 appeals at that time.
22    Q.   Right.  And so you would never see the
23 transcripts.  Correct?
24    A.   Right.
25    Q.   And so it would be possible that the court



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                          65–68

Page 65

1  reporter for a particular trial could have made mistakes
2  on the transcript, and you would never know that.
3  Correct?
4      A.   Correct.
5      Q.   You wouldn't know that unless there was an
6  appeal, and you obtained the transcripts and reviewed
7  them.  Correct?
8      A.   Yeah.  But I never did that.
9      Q.   Did you ever know court reporters to make
10  mistakes on transcripts?
11     A.   Not really.
12     Q.   Not really?  You've never seen a court reporter
13  make an error?
14     A.   I've never been aware of it.  I -- No.  Never
15  been aware of it.  That's all I could say.  I've never
16  been -- I'm not saying they could or couldn't, obviously,
17  but I've never been aware of it.
18         Even in the subsequent appellate work I did,
19  I never was moved into doing -- well, down the road,
20  shifting into appeals.
21     Q.   I was looking for your affidavit.  Take a look
22  at Exhibit 156.
23     A.   You've -- oh, okay, here we go.
24     Q.   That's your affidavit that Ms. --
25     A.   Yeah, right here.

Page 66

1      Q.   -- Milke's attorneys gave you to review --
2      A.   I got it.
3      Q.   -- to prepare for today.
4      A.   Uh-huh.
5      Q.   And this is an affidavit that you reviewed
6  before signing.  Correct?
7      A.   Yes.
8      Q.   You reviewed it for accuracy.  Correct?
9      A.   Yes.
10     Q.   Now, if you take a look at paragraph 2, you
11  state, quote --
12         And who prepared this?  Did Mr. Kimerer's
13  office prepare this?
14     A.   I think it was, yeah, a collaboration.  I wrote
15  out the general stuff and -- I mean, he prepared it.  I
16  prepared it, he -- then he printed it out.
17     Q.   Okay.  So you actually drafted the affidavit?
18     A.   I'd say yes.  Yeah.
19     Q.   Okay.
20     A.   I mean --
21     Q.   So take a look at paragraph 2, which reads,
22  quote, In the course of my representation, I spoke with
23  Debra's sister, Sandra Pickinpaugh, by telephone on
24  October 19th, 1995, after her mother, Renate, informed me
25  that Sandra had no objection to me calling her, end

Page 67

1  quote.
2         Did I read that correctly?
3      A.   Wait a minute.  I don't have the -- the page is
4  skipped.  In other words, I go from 1 to 3 on this
5  exhibit.  1 to 3 to 5 --
6      Q.   Oh, it was double-sided?
7      A.   On the back.
8         MS. BERKE:  We're going to have a new
9  exhibit made.  Yeah.
10         MS. HOFFMANN:  I'm sorry.
11         MS. BERKE:  That's okay.  Let's go off the
12  record.
13         THE VIDEOGRAPHER:  We're off the record at
14  11:59.
15         (A recess was held off the record.)
16         THE VIDEOGRAPHER:  Stand by.
17         We're back on the record at 12:05.
18     Q.   BY MS. BERKE:  Mr. Rosenquist, I have placed
19  Exhibit 156 in front of you before we went off the
20  record, and we saw that the original had been
21  double-sided and the copy that was made was only
22  one-sided, so only every other page was there.  So we had
23  a replacement copy made that has the entire affidavit.
24  Do you see that with Exhibit 156?  It's now your complete
25  affidavit?

Page 68

1      A.   Yes.
2      Q.   And you signed this affidavit under penalty of
3  perjury.  Correct?
4      A.   Yes.
5      Q.   You had it notarized.  Correct?
6      A.   Well, yes.
7      Q.   And so basically your affidavit is equivalent
8  to testimony under oath.  Correct?
9      A.   Right.
10     Q.   And so if you take a look at paragraph number
11  2, it states, quote, In the course of my representation,
12  I spoke with Debra's sister, Sandra Pickinpaugh, by
13  telephone on October 19th, 1995, after her mother,
14  Renate, informed me that Sandra had no objection to me
15  calling her, end quote.
16         Do you see that?
17     A.   Yes.
18     Q.   And you only interview -- you only interviewed
19  Sandra Pickinpaugh on one occasion.  Correct?
20     A.   Yes.
21     Q.   And so take a look at Exhibit Number 139.
22     A.   Okay.
23     Q.   The only date upon which you interviewed Sandra
24  Pickinpaugh was October 4th of 1992.  Correct?
25     A.   Yes.  It's on the affidavit.



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                          69–72

Page 69

1    Q.   And so on the affidavit, when you stated that
2  you interviewed her on October 19th, 1995, that was
3  inaccurate.  Correct?
4    A.   Obviously, yeah.
5    Q.   And how do you explain that inaccuracy?
6    A.   I can't explain it.
7    Q.   Were you being dishonest when you wrote that,
8  or was it a mistake?
9    A.   Well, obviously, it was a mistake.  I'm not
10  trying to lie about anything.
11    Q.   And so you did your best to be completely
12  accurate on this affidavit.  Correct?
13    A.   Yes.
14    Q.   And so when you put October 1990- -- 1995
15  instead of October 4, 1992, that was simply a
16  misstatement.  Correct?
17    A.   Just a second.  Which -- which one are you
18  talking about?  Sandra?
19    Q.   Yes.
20    A.   I mean the affidavit.  I apologize.  The only
21  date...
22    Q.   If you look at paragraph 2, you stated that you
23  interviewed her on October 19th, 19- --
24    A.   Yeah, '95.
25    Q.   -- '95.  But you actually interviewed her on

Page 70

1  October 4th of 1992.  Correct?
2    A.   That could be true, yeah.
3    Q.   Well --
4    A.   I mean, the transcript -- the telephone call of
5  that -- that date is there.  I'm confused now.  In other
6  words -- you say I actually interviewed her on -- are you
7  talking about Sandra then?  I mean --
8    Q.   Yes.
9    A.   Okay.  Okay.  Right.  This would be -- this
10  would be accurate.
11    Q.   The transcript that's Exhibit --
12    A.   Yes.
13    Q.   -- 139?
14    A.   Right, right.
15    Q.   And so when you recited on your affidavit that
16  you interviewed her on October 19th, 1995, that was a
17  misstatement.  Correct?
18    A.   Yes.
19    Q.   It was not a lie?
20    A.   Right.
21    Q.   You did your best to be honest?
22    A.   Yes.
23    Q.   And people make misstatements.  Correct?
24    A.   Yeah.  And this is after I'd been off the case
25  for quite a while, so I didn't have anything to refer to.

Page 71

1  Not making any excuses, but this -- this affidavit was a
2  collaboration between Kimerer and me, so dates and stuff
3  I -- all I can say is I didn't have anything to refer to.
4    Q.   Okay.  And if you had -- well, given that
5  Mr. Kimerer had your file, you expected him to be
6  familiar with it and to correct any misstatements that
7  were in your affidavit.  Correct?
8    A.   Correct.
9    Q.   And, similarly, when police officers are
10  testifying at criminal trials and they have their report
11  there and the defense attorney has the report and the
12  prosecutor has the report, if the police officer makes a
13  misstatement -- in other words, testifies inconsistent
14  with the police officer's report -- you would expect the
15  defense attorney and/or the prosecutor to direct the
16  officer to that part of his or her report so that the
17  officer can correct him or herself.  Correct?
18        MS. HOFFMANN:  Objection.
19        You can answer.
20        THE WITNESS:  Yes.
21    Q.   BY MS. BERKE:  And that would happen with some
22  frequency in trial, correct, where there would be --
23  maybe a police officer would make a misstatement, and you
24  would say, Let me direct you to page 3 of your report,
25  and this is what you stated, and then the officer would

Page 72

1  correct themselves.  Correct?
2    A.   Not frequently, though.
3    Q.   But it happened?
4    A.   I don't -- I don't recall any specific
5  incident, but I'm sure it might have happened.
6    Q.   Okay.  But certainly if it did happen, you
7  would agree that as a prosecutor when you were at the
8  County attorney's office or as a defense attorney when
9  you were at the public defender's, part of your
10  responsibility was to be familiar with the police reports
11  in a case, and if a police officer testified
12  inconsistently with his or her report, it was your
13  responsibility to direct the officer to that portion of
14  his report to -- so that he could correct it.  Correct?
15        MS. HOFFMANN:  Objection.
16        THE WITNESS:  Well, obviously, if you're a
17  prosecutor, you'd correct it.  If you're a defense
18  attorney, you would point out the error.
19    Q.   BY MS. BERKE:  Right.  If it benefitted your
20  client to do that?
21    A.   Yes.
22    Q.   And you would agree that the simple fact that a
23  police officer might testify inconsistently with his
24  report doesn't necessarily mean he's intentionally lying,
25  but he could be making a misstatement just like you made



Page 73

1  in your affidavit. Correct?
2       MS. HOFFMANN:  Objection.
3       THE WITNESS:  Well, yeah, sure.
4    Q.   BY MS. BERKE:  Okay.  And then if you take a
5  look at paragraph 4 of your affidavit that's Exhibit
6  Number 156 --
7    A.   Uh-huh.
8    Q.   -- you say that "she," referring to Sandra
9  Pickinpaugh, stated that she was in her seventh month of
10  pregnancy with her second child when Armando Saldate and
11  another investigator telephoned her repeatedly.
12       Do you see that?
13    A.   Uh-huh.
14    Q.   Yes?
15    A.   Yes.
16    Q.   And so if you go back and look at Exhibit
17  Number 139 --
18    A.   Uh-huh.
19    Q.   -- the transcript of her interview, and if you
20  go to page 10 of that interview, which is
21  MILKE_NSB018161 --
22    A.   Page 10?
23    Q.   Yes.
24    A.   Okay.
25    Q.   If you read that page, I'd like you to confirm

Page 74

1  that when these telephone calls took place, it was in her
2  ninth month of pregnancy?
3    A.   Yes.
4    Q.   And so --
5    A.   She agreed with that.
6    Q.   And so when you stated in your affidavit that
7  she told you she was in her seventh month of pregnancy
8  with her second child when these calls took place, that
9  was another misstatement.  It should have said ninth
10  month.  Correct?
11    A.   Yes.  Yes.
12    Q.   And, again, did you -- were you intentionally
13  lying when you put seventh month, or was that just a
14  simple misstatement?
15    A.   It was just a simple misstatement, an error.
16    Q.   And, again, even though you knew you were under
17  oath and you did your best to put an accurate affidavit
18  together, it did contain at least two misstatements.
19  Correct?
20    A.   Yes.
21    Q.   And unlike giving testimony where you're having
22  to respond immediately with information when you prepare
23  a written affidavit, you actually have time to sit down,
24  write it out, review it for accuracy and to contemplate
25  what's in it.  Correct?

Page 75

1    A.   Yes.
2    Q.   And misstatements can still be made.  Correct?
3    A.   Well, the situation here is I made the -- the
4  -- as I told you before, I made the affidavit while
5  Mr. Kimerer was representing her.  I did not have access
6  to any of these interviews that I did.  So I -- I'm not
7  blaming him on the mistake, but I didn't have the -- I
8  did not have the direct -- the interview in front of me
9  to verify certain things.
10    Q.   But you had delivered it to Mr. Kimerer, and so
11  he had it.  Correct?
12    A.   Yes.  I mean, he had these, so yeah.
13    Q.   Exhibit 139 you're talking about?
14    A.   Yeah.  He had the interviews.  So when he --
15  when he/we prepared these, I really didn't pay much
16  attention to those --
17    Q.   Okay.
18    A.   -- those errors.
19    Q.   So even with two sets of attorneys' eyes on
20  your affidavit, two -- at least two misstatements were
21  still made.  Correct?
22    A.   Yes.
23    Q.   Let's go back to the lunches.  Where did you
24  have lunch with Ms. Milke the second time you had lunch
25  with her after she was released from prison?

Page 76

1    A.   Oh, well, we -- we -- we had lunch with her
2  probably three times I think.  I don't know about the
3  fourth time.  Three times we had it at this Mexican
4  restaurant over there by Shea and Scottsdale Road in a
5  little shopping center there, and then there's another
6  time she wanted to go to this restaurant along Camelback
7  around this area.
8    Q.   Around 32nd and Camelback?
9    A.   Yeah.  It was kind of like a different
10  unique-type restaurant, organic or something like that.
11    Q.   Okay.  And then you think there might have been
12  a fourth lunch, but you don't know for sure?
13    A.   I don't think so now that I think about it.
14    Q.   Okay.  So the second time you had lunch at the
15  Mexican restaurant up at Shea and Scottsdale Road, what
16  do you recall about that lunch, beginning with who was in
17  attendance?
18    A.   Well, I told you that there's just -- I don't
19  remember anybody being at -- I think that Kirk's daughter
20  was not at one of those or two of those get-togethers.
21  So it was just Kirk, me and my wife and then his daughter
22  I think probably a couple of times.  Yeah, that's the
23  best I can recall.
24    Q.   And what do you recall about that lunch, about
25  what was discussed?



Page 77

1   A.   Well, like I told you, there was kind of
2   lighthearted things, discussions and ask her what were --
3   you know, what's going on with the case.  And --
4   Q.   And you were referring to the civil case?
5   A.   Yes.  She'd say, Oh, I'm going to have a
6   depo -- this deposition or they're still taking
7   deposition or it got continued or some comment like that,
8   so...
9   Q.   Why were you interested in knowing the status
10  of her civil case?
11  A.   Personal.  It was like it was moving, you know,
12  in my opinion, too slow.
13  Q.   And what is that opinion based on?
14  A.   Based upon my -- I've been involved in some
15  civil cases before, a big one.  If you look at my -- my
16  Web site, a quadriplegic case, and, you know, you have
17  your -- your -- your -- your discovery, your disclosure
18  and then your depositions, and the judge puts a cutoff
19  date and then -- you know, then you come -- then you do
20  your motions and negotiations.  And it's been -- from
21  what I've observed and my experience, it's just -- it --
22  the case -- I don't know.
23         In the course -- this is much more serious,
24  but not -- not that much.  You know, this young boy that
25  was quadriplegic, you know, it was against the City and

Page 78

1   the County.  And I associated with an expert in that
2   area, Steve Coppell.  And it -- it went -- it moved right
3   along.  I'd say within two years it was settled.
4   Q.   And so based on your experience handling one
5   civil case, you believe this case is taking too long?
6   A.   Well, but experience means I read the cases
7   every day from the -- the magazines, the cases and the
8   verdicts and so forth.  It's just my general impression
9   that, yeah, it was taking a long time.  But then it's
10  a -- it's a substantial case, so...
11  Q.   When was this lawsuit filed?
12  A.   I don't know.  I don't have any real specific
13  dates.  I never really heard about anything.  I was not
14  in the loop as far as...
15         Which -- which lawsuit are you talking?
16  Q.   Ms. Milke's lawsuit.
17  A.   Oh.  I don't know.  I mean, I was not in the
18  loop, and there was nothing -- you know, there was
19  nothing in a paper or in the legal opinions or -- in
20  other words, there's -- there's no way for me to know.
21  And so I don't -- I don't really know.  I know that it
22  was eventually filed, but other than that, I don't have
23  any specific dates or anything like that.
24  Q.   Do you know what motions have been filed in the
25  case?

Page 79

1   A.   No.
2   Q.   Do you know what depositions other than yours
3   have been taken?
4   A.   Not -- honestly, no, I don't.  I don't mean
5   honestly.  I just don't know.
6   Q.   Do you know how many depositions are slated to
7   be taken in the case?
8   A.   No.  That's what I was asking you just to get
9   an idea.
10  Q.   Do you know how many expert witnesses there
11  are?
12  A.   No.
13  Q.   Do you know anything procedurally about the
14  lawsuit?
15  A.   No.
16  Q.   But in your opinion, it's taking too long?
17  A.   Yeah.  My opinion, for what it's worth.
18  Q.   Do you have a financial stake in the outcome of
19  this case?
20  A.   Do I what?
21  Q.   Do you have a financial stake in the --
22  A.   Oh, no.
23  Q.   -- outcome of this case?
24  A.   Oh, gosh, no.
25  Q.   Does Debra Milke owe you money?

Page 80

1   A.   No.
2   Q.   What was your arrangement with Ms. Milke in
3   terms of representing her and her paying you?
4   A.   It was basically -- I was retained, but
5   financially, it was basically pro bono.  And then when
6   the expenses started getting up and her mother -- her
7   mother contacted me, I asked her if she could help me
8   out, but there was never any contract.  She never owe --
9   she never legally owed me any money.  Her mother would
10  pay me I think on two or three occasions 2- or $3,000 or
11  something, and -- and that was basically it.
12  Q.   Did you have a written fee agreement with Debra
13  Milke?
14  A.   No.  I had a retainer agreement.  I didn't --
15  there was no fee in the retainer agreement.
16  Q.   Was the retainer agreement signed by Debra
17  Milke?
18  A.   I assume it was.  I would have to because -- to
19  represent her in Court.  Notice of appearance.
20  Q.   Well, just because you filed a notice of
21  appearance doesn't mean that there's a retainer agreement
22  signed.  Do you recall there being a retainer agreement
23  signed by Ms. Milke?
24  A.   Well, no.  If -- you've got to enter a notice
25  of appearance in a criminal matter.  And that means you



Page 81

1 are her attorney. The -- the fee is not mentioned,
2 nothing else is mentioned. And not even pro bono,
3 anything else like that. You file a notice of appearance
4 on record to get you to be able to handle a case. You
5 can't go into Court without being officially noticed as
6 her attorney.
7    Q. Right. I understand that you file a notice of
8 appearance to let the Court, the other side and the rest
9 of the world who --
10   A. Right.
11   Q. -- does a public record search know that you
12 are representing the individual.
13   A. Right.
14   Q. But I'm talking about a written agreement
15 between you and the person you're representing,
16 Ms. Milke, in this instance. Did you have an agreement,
17 a written agreement between you and her, aside from the
18 notice of appearance --
19   A. For what? Money --
20   Q. -- you filed in Court --
21   A. -- or for the representation.
22   Q. Setting forth the scope and nature of the
23 representation.
24   A. Yes. That was the -- basically in
25 the notice -- notice of appearance, you just say you're

Page 82

1 going to represent her, period, in a criminal case and
2 that's it.
3    Q. So you don't have your clients sign any kind of
4 a retainer agreement or a fee agreement?
5    A. Well, I'd have -- how should I put it? Going
6 way back then, either -- she would sign it normally, and
7 that would be it. You know, I mean, a written agreement
8 in those days, I -- I don't think you even needed that.
9 But I don't know whether I did or not. I don't -- I
10 don't think I -- I did that, but I'd have to do that
11 eventually.
12   Q. Why?
13   A. Because then I couldn't file anything. I
14 couldn't represent her, I couldn't interview witnesses, I
15 couldn't get access to the files, I couldn't do anything
16 related to the case.
17   Q. Do you mean if you didn't file a notice of
18 appearance?
19   A. Yes.
20   Q. But I'm talking separate and apart from a
21 notice of appearance, was it your practice as a solo
22 practitioner to have your clients sign a retainer
23 agreement, a fee agreement, something of that sort?
24   A. Yes, absolutely. But I didn't do it with her
25 because it was pro bono. And I don't know what she

Page 83

1 signed, if she signed anything, but it was...
2       See, in those days, I'm almost positive that
3 you would do that, and -- and then you'd be noted on the
4 record and -- and it would -- you know, it's like to
5 represent such and such in all further -- further
6 proceedings in this case.
7       So pro bono, everything has to start with
8 the notice of appearance. And you really don't have to
9 say much of anything else. And right now, I -- because
10 there was no fee, it's really not -- I mean, it's really
11 not necessary. You know, there's the retainer agreement
12 and then there's a fee agreement that you can combine if
13 you want, you know.
14       And I do that in all of my -- you know, when
15 I'm retained. It spells out clearly, but that's personal
16 between me and them. Then I go in and just file a notice
17 of appearance.
18   Q. Okay. Have you written any books?
19   A. Some articles way, way back when, when I was
20 working in juvenile court when I first was -- I think it
21 was in the public defender's office. I forgot to mention
22 that. I did work in juvenile court for a while.
23   Q. So you've never written a book?
24   A. No.
25   Q. Have you ever taken a sabbatical?

Page 84

1    A. Define sabbatical. I -- when I burned out,
2 yeah, I left -- I whittled my practice down and moved
3 over to -- moved to California, rented a place over
4 there, my wife and kids were over there, but they were in
5 school by then.
6    Q. Ran a place you said?
7    A. Huh?
8    Q. Did you say ran a place?
9    A. Rent.
10   Q. Oh.
11   A. Rent a place. And then I'd commute with the
12 cases I do have back to Phoenix.
13   Q. Have you ever written any articles about Debra
14 Milke's case?
15   A. I've been interviewed by the TVs -- TV
16 programs, but I've never written anything.
17   Q. If you take a look at Exhibit Number 139, which
18 is the transcript of your interview of Sandra Pickinpaugh
19 on October 4th of 1992.
20   A. Uh-huh.
21   Q. If you look at that first page, you introduce
22 yourself as the attorney that's been working with her
23 mother on Debra's case. Correct?
24   A. Yeah. Yes.
25   Q. And so your client, though, is Debra Milke.



Page 85

1  Correct?
2      A.  Yes.
3      Q.  And would you communicate to Ms. Milke's mother
4  information that you had received from Debra Milke?
5      A.  No, not really.  She talked to Debra herself.
6  And I really -- no, I know better than to do stuff like
7  that.
8      Q.  And you were not Debra Milke's mother's
9  attorney.  You were Debra Milke's --
10     A.  No, no.
11     Q.  -- attorney.  Correct?
12     A.  No way.  Correct.
13     Q.  And so there's no attorney/client privilege as
14  to any communications you had with Debra Milke's mother.
15  Correct?
16     A.  Correct.
17     Q.  And there's no work product privilege
18  associated with communications you had with Debra Milke's
19  mother.  Correct?
20         MS. HOFFMANN:  Objection.  That's an
21  incorrect statement of the law.
22     Q.  BY MS. BERKE:  Am I correct?
23     A.  Say that one more time.  I apologize.
24     Q.  I'll have the court reporter read it back.
25         (The last question was read back by the

Page 86

1  court reporter.)
2         THE WITNESS:  Well, other than -- no, there
3  was no -- because she didn't know anything about the
4  case.  The only thing I can say is when she connected me
5  with Sandy and -- and then Dorothy, kind of coordinated
6  that connection.  But, no, there -- there -- I wouldn't
7  call it work -- work product.
8      Q.  BY MS. BERKE:  Okay.  If you go further down on
9  page -- the first page of Exhibit 139 --
10     A.  Uh-huh.
11     Q.  -- if you go midway down, that large part where
12  it says AR meaning Anders Rosenquist --
13     A.  Uh-huh.
14     Q.  -- it says -- if you see that line that starts
15  "I had" at the very end.  Do you see where it says I --
16  look to the very right.
17     A.  Hold on a second.
18     Q.  After referred cases, then it says "I had."
19         Do you see that?
20     A.  I'm getting there.
21     Q.  It's about midway down.
22     A.  Hold on.  Hold on.
23     Q.  Sure.  Take your time.
24     A.  You're not talking about -- oh, here it is.  I
25  have quite a large practice.

Page 87

1      Q.  Right.  It says, quote, I had quite a large
2  practice for a while, but then I wound it down and took a
3  sabbatical and wrote a book --
4      A.  Uh-huh.
5      Q.  -- and all that stuff and started out fresh
6  again, end quote.
7         Did I read that correctly?
8      A.  Right.
9      Q.  So what is the large practice you're referring
10  to?
11     A.  Clients.  I had a lot -- I had a large
12  practice, clients.
13         The book I was referring to was -- was --
14  dream on.  I had piles and piles of -- of notes about all
15  the cases I've handled.  I was going to write a book,
16  kind of like a little -- a little -- in other words, just
17  like the truth is stranger than fiction and, you know, do
18  a little -- a little collection of small stories, I
19  guess.  But I never really got moving on that at all.
20     Q.  And so were you embellishing when you told her
21  that you wrote a book?
22     A.  Yeah.  Yes.
23     Q.  How did it come about that you got involved in
24  the Debra Milke case?
25     A.  I was -- I was involved in the group of private

Page 88

1  attorneys, defense attorneys, and we would get together
2  different places, particularly lunch.  There was a
3  cafeteria over in the -- one of the buildings right next
4  to the old courthouse.  And we would just ask questions,
5  talk to each other and exchange ideas, talk about our
6  cases as far as -- not specifics as such but exchange
7  information, I guess is the only thing I can say.
8      Q.  Would you exchange information about various
9  detectives who had worked on criminal investigations that
10  you defended criminal defendants in?
11     A.  I don't remember until it came to Saldate.  I
12  don't remember.  There were some police officers I know
13  that the PD's office kept records on and -- as far as
14  problems with them.
15     Q.  Can you tell us about that?
16     A.  Not really because I never saw it and I never
17  really reported any police officer.  I did -- I -- no, I
18  didn't ever -- I had a real -- a good relationship with a
19  lot of police officers.
20     Q.  So -- but you did know of a file within the
21  public defender's office that was kept on certain police
22  officers?
23     A.  I remember just one.  And -- specifically,
24  because his name kept coming up and problems with the
25  cases.  But I can't even begin to remember his name.  He



Page 89

1  was quite a bit before Armando Saldate.
2      Q.   And did you ever look in that file?
3      A.   No.
4      Q.   How did you know it was there?
5      A.   Well, because it was kind of a scandalous thing
6  that people were talking about.  And I actually went for
7  a ride with him one night.  He was going 120 miles an
8  hour down Van Buren.  I mean, he's kind of like -- yeah,
9  I mean, he's a scary guy.  And what we would do or what
10  they would do -- I'm -- I wasn't in part of that, the
11  administration, you know, the chief public defender.
12          They would turn that over to the Phoenix
13  Police Department with the specific facts.  And this guy
14  wasn't around anymore.  But that's the only way I
15  remember it is that ride.
16     Q.   Did you take that ride -- was this a
17  ride-along?
18     A.   Uh-huh.  Yes.
19     Q.   And did you participate in this ride-along with
20  the police officer after you knew there was a file on
21  him?
22     A.   No.
23     Q.   Or before?
24     A.   No.
25     Q.   It was before?

Page 90

1      A.   Yeah, I took the ride-along before.
2      Q.   And then how -- do you remember how you learned
3  there was a file on him?
4      A.   Not specifically, but, you know, there's 16 of
5  us in the office walking around and talking and -- and,
6  yeah, just bringing up incidents and issues and
7  everything --
8      Q.   Do you remember what any of the issues were
9  with respect to that officer?
10     A.   No, I wouldn't want to say anything because I
11  don't know what they were, because I never had any
12  interaction with him on a case.
13     Q.   Do you know what the purpose of the file was?
14     A.   Yeah, find -- eek out bad cops, cops that lie.
15     Q.   Do you know whether there existed more than one
16  file?
17     A.   No.
18     Q.   So he's the only police officer you're aware of
19  where there was a feeling amongst the public defender's
20  office that he was dishonest, or belief?
21     A.   You know, specifically, yes.
22     Q.   A belief that any officer was dishonest, that
23  was the only one you were aware of at the time?
24     A.   Yes.
25     Q.   And do you know how that file was utilized?

Page 91

1      A.   Yeah.  Give it to the -- the -- the right
2  person in, I think, I&I at the Phoenix Police Department.
3      Q.   So internal affairs?
4      A.   Uh-huh.
5      Q.   Yes?
6      A.   Yes.
7      Q.   And so the purpose was to collect evidence to
8  demonstrate for the police department that one of their
9  police officers was giving dishonest testimony?
10     A.   And doing other things.
11     Q.   Like what other kinds of things?
12     A.   Oh, inappropriate contact with -- inappropriate
13  contact with the defendant, you know, when they stop them
14  or arrest them.  Had a few -- I remember there was a few
15  girls that worked -- well, that was a different police
16  department.  But generally anything that breaks the rules
17  or is unethical or worse.
18     Q.   And so you would -- you and your colleagues
19  would gather information to demonstrate for whatever
20  police department that officer was employed by to show
21  that there's -- there are issues with this police officer
22  that need to be addressed?
23     A.   Yes.
24     Q.   And was that officer employed by Phoenix or
25  another department?

Page 92

1      A.   Phoenix.
2      Q.   And do you know whether that information was
3  delivered to the Phoenix Police Department?
4      A.   No.  I mean, I can assume it was.
5      Q.   But you don't know for sure?
6      A.   But I don't know.
7      Q.   Was there some kind of written policy or an
8  unwritten policy, for that matter, as to how to get one
9  of these files started?
10     A.   No.  It was pretty casual.  Guys would start
11  talking and then -- you know, and then, Oh, yeah, I had
12  him on a case or this, that and the other.  Oh, yeah, I
13  did this.  Then pretty soon, it kind of -- it just
14  developed.
15     Q.   Okay.  But you're only aware of one such file?
16     A.   No.  It's not a specific file.  I probably
17  should have said it's a collection.  In other words,
18  there's nothing formal about it.  It probably just had a
19  manilla file and they put the incidents in there.  It all
20  start with discussions among, you know, the public
21  defender attorneys.
22          And, you know, pretty soon a police
23  officer's name would start popping up, and then when it
24  kept popping up, you know, over the months, then stuff
25  would be put in that file.  And when it got to the point



ANDERS VILNER ROSENQUIST JR. Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                               93–96

Page 93

1  where it was serious that -- I don't even know who would
2  deliver it. It was no -- nothing really secret about it.
3      Q.   Did they have a similar file at the County
4  attorney's office when you were there?
5      A.   In those days, I don't -- I've never -- I was
6  not aware of them in those days. They did eventually
7  have to start doing that. It wasn't very successful.
8      Q.   Do you know when that was?
9      A.   No, I don't.
10     Q.   Before I start discussing your retention by
11  Ms. Milke, let's finish these lunches.
12          So you had lunch with Ms. Milke the second
13  time at the Mexican restaurant at Scottsdale Road and
14  Shea.
15     A.   Uh-huh.
16     Q.   And what do you remember about that lunch? You
17  talked about the civil case a little bit.
18     A.   Not really. Just asked her -- I didn't want to
19  get involved. She had another attorney -- other
20  attorneys. So it was an arm's-length thing. And Kirk --
21  we just basically asked her, like, How's the case going,
22  what's going -- what's happening? And she said, Oh,
23  they're still taking depositions or they've continued it.
24  And -- and that was it.
25     Q.   What else did you talk about with Ms. Milke at

Page 94

1  this lunch?
2      A.   A lot, like I said, lighthearted things, stuff
3  that would get her mind off, you know. Girl stuff, my
4  wife and Kirk's daughter, you know, different things, you
5  know, that are positive and -- you know.
6      Q.   Do you have any specific recollections of what
7  you talked about with her other than the civil case?
8      A.   No, not really. But just kind of social things
9  Debra and how she was getting along.
10     Q.   And what did she tell you?
11     A.   Not much of anything. Like I told you, just
12  she gave the appearance of -- of, you know, having her
13  head on good and sensible. But she wouldn't be really --
14  real responsive.
15     Q.   So what was your purpose in getting together
16  with her?
17     A.   My God, you know, I had to live with the fact
18  that I was representing her and she might die. She might
19  be executed.
20     Q.   Well, by the time you had lunch with her, you
21  knew she wasn't going to be.
22     A.   No.
23     Q.   Correct?
24     A.   Well, yeah. In other words, it -- maybe it was
25  just to see -- you know, when I think about it, it was

Page 95

1  just to see how she was. You know, I never -- I mean, I
2  hadn't seen her years and years, you know.
3      Q.   Did you talk to her about the fact that she had
4  terminated you?
5      A.   No. No way.
6      Q.   Your --
7      A.   Not -- and you know what, the thing is I don't
8  even know if she terminated me or whatever. I -- I'm --
9  I'm reasonably sure that Renate somehow got connected
10  with Kimerer, went in there, paid him and then told
11  Debbie, you know, I hired you another attorney. Because
12  there was some friction between Renate and me and Kirk.
13          She was pushing too hard, like I said, and
14  backing up and we're starting to figure out what's -- you
15  know, at first she just asked questions, and then after
16  that, she'd start, Well, you know, can you do this, can
17  you do that, you know, can you get this or that? And
18  then...
19          But, realistically, we didn't know what was
20  going on over in Germany until later on, you know, we'd
21  hear bits and pieces, and then that reporter came into
22  town, you know, and we met with him and -- from Germany,
23  that Der Spiegel and then --
24     Q.   When you say we didn't know all that was going
25  on in Germany, what are you referring to?

Page 96

1      A.   Her -- what Renate was doing. In other words,
2  what she was doing in Germany, we don't -- we don't have
3  any information on.
4      Q.   Well, you said you didn't, but you acquired the
5  information. Correct?
6      A.   Well, yes, eventually. Eventually. Eventually
7  I found out that she was going on these -- eventually I
8  found out that she was going on these talk shows and then
9  that some movie star was really -- how should I put
10  it? -- some movie star was really into helping her, and I
11  don't know whether that movie star over there footed all
12  the bills or started a collection or whatever.
13          The only things I knew is she made friends
14  with a movie star, she was on these talk shows. But I
15  never had any kind of -- any specific information as to
16  who's getting paid, what kind of money was going on, and
17  to this day, I don't know how much she paid Kimerer. I
18  don't know how much she had. I don't know anything about
19  that -- about the financial situation.
20     Q.   So do you remember any of the specifics about
21  what you discussed with Debra Milke other than a little
22  bit about her civil lawsuit at that second lunch?
23     A.   It could have been the first lunch -- the
24  lunches were all basically the same, you know. You know,
25  can you get out.



Page 97

1     So, you know, we'd go to the -- go, you
2  know, for lunch, pick her up or she'd meet us there,
3  whatever. And -- yeah. And, basically, how's things
4  going with the lawsuit and then talk about other things.
5     Q.   Do you remember anything specific about your
6  luncheon Camelback, the third lunch?
7     A.   No.
8     Q.   Do you remember how long ago that was?
9     A.   I don't know. Six months to a year. I don't
10  know. But the last time Kirk called, she said, you know,
11  I can't do this anymore -- or I don't want to do this
12  anymore. You'd have to ask her.
13     So after that, we just figured that, you
14  know, it was either -- you know, the attorneys didn't
15  want us to do that or it was making her uncomfortable.
16     You know, I know -- I mean, after the kind
17  of time she spent in prison and losing her kid, Kirk and
18  I were really worried that she would just be -- extremely
19  serious mental health problems.
20     Q.   Okay. But you don't have any personal
21  knowledge regarding whether she has any mental health
22  problems or the extent of any mental health problems.
23  Correct?
24     A.   No, no.
25     Q.   So I am correct?

Page 98

1     A.   At least --
2     Q.   So I am correct. Right?
3     A.   Yeah, I don't have any mental health stuff.
4     Q.   Okay. If you'd go to page -- pages 2 and 3 of
5  Exhibit 139, the transcript of your interview of Sandra
6  Pickinpaugh.
7     A.   Wait a minute. Okay.
8     Q.   If you go down to the very bottom of page 2 and
9  the top of page 3, you're telling her about your
10  experience -- and actually that whole page, you're
11  telling her about your experience as a criminal attorney.
12  Correct?
13     A.   Yes.
14     Q.   And you're talking to her about kids who grow
15  up in families where there's neglect. Correct?
16     A.   Uh-huh. Right.
17     Q.   And then if you look at the very last line of
18  page 2 and going up onto page 3, it states, You -- quote,
19  You look at the families, they're broken families,
20  they're unwanted kids or uncared for. You know, I always
21  like to use the words just that they were uncared for,
22  most of them unwanted. But the real cornerstone is the
23  uncared for kids, you know, and I covered quite a bit of
24  that in my book, end quote.
25     Did I read that correctly?

Page 99

1     A.   Yeah. And it's still laying there in the pile.
2     Q.   Okay. So you're still telling her that you
3  wrote a book, and you're telling her one of the topics
4  that was covered in the book you wrote, but you never
5  wrote a book. Correct?
6     A.   I was in the process of writing a book.
7  Compiling information.
8     Q.   Well, you would agree that --
9     A.   Wrote a book --
10     Q.   -- this --
11     A.   -- I know.
12     Q.   -- statement makes it appear that you wrote a
13  book and --
14     A.   Okay.
15     Q.   -- completed a book. Right?
16     A.   I should have used the word "writing."
17     Q.   Okay. Would you agree that one reading that
18  would believe you had written a book?
19     A.   Right.
20     Q.   So it's an embellishment?
21     A.   I guess. I mean, it -- Yeah --
22     Q.   Okay.
23     A.   -- it's an embellishment because I didn't get
24  the book completed --
25     Q.   And the next --

Page 100

1     A.   -- when I said that.
2     Q.   Okay. Sorry to interrupt.
3     A.   Uh-huh.
4     Q.   And then the next sentence, you're talking
5  about how your career has developed and you eventually
6  shifted your practice from being a criminal trial
7  attorney to doing postconviction relief work, which is --
8     A.   Uh-huh.
9     Q.   -- more drafting of motions and petitions.
10  Correct?
11     A.   No. Postconviction work is -- postconviction
12  is the last -- postconviction petition is the last
13  appeal. In other words, a person's convicted. Then you
14  have a right to what they call a direct appeal. But that
15  direct appeal, you can only raise issues that were raised
16  in the trial.
17     So if the attorney -- and the defense
18  attorney did not object to something or -- object to
19  something that was very damaging or did not file a motion
20  to suppress or do something else, then you couldn't raise
21  the issue in the appeal.
22     In other words -- but -- but the PCR --
23  state PCR and the federal habeas corpus is where you put
24  everything in there, stuff off the record. It's like on
25  the record, it's a direct appeal; off the record is a



Page 101

1  PCR.  You put everything in there that -- that -- that
2  you feel makes a difference.
3      Q.   But my point is, it's a written document you
4  file, it's an appellate-type document.  It's --
5      A.   Yes.
6      Q.   -- not being in the -- in the courtroom trying
7  cases?
8      A.   It's not motions or anything like that.
9  It's -- it's -- you just gather everything up, and you
10  can investigate if you want, research.  It's -- it's
11  just -- I mean, almost all death penalty cases end up in
12  habeas corpus petitions from the State to the Federal
13  District Court.  In other words, you've got to exhaust
14  your remedies in the State Court.
15          You go to the State Court of Appeals, State
16  Supreme Court and then you have a year to file a habeas
17  in the Federal Court District Court.  And once you file
18  that, they make a decision on it, and then if you get an
19  adverse decision, then you can go to the Ninth Circuit.
20      Q.   Okay.  And then in the middle of the page of
21  page 3, which is MILKE_NSB018154, you talk about being
22  contacted by Sandra and Debra's mother.  Correct?
23      A.   Yeah.  Renate.
24      Q.   And you said, "I would at least talk to her and
25  look into it and see if there's anything there because

Page 102

1  I'm familiar with the case."
2          Do you see that?  In the middle of the page?
3      A.   "I would at least talk to her" -- okay.  "Well,
4  one thing led to another, and I was contacted by your
5  mother, and I said certainly I would at least talk to her
6  and look into it and see if there's anything there
7  because I'm familiar with the case."
8      Q.   So that's what you told Sandra.  Correct?
9      A.   Yes.
10      Q.   What was your familiarity with the case before
11  you were retained by Debra Milke?
12      A.   See, her mother did not contact me for a good
13  six, nine months until after I was -- after I'd started
14  working on the case.
15      Q.   You started working on the case before you were
16  ever contacted by Renate?
17      A.   Yes.
18      Q.   Who retained you?
19      A.   You want me to go into that, I'll tell you.
20      Q.   Yes.
21      A.   I -- Okay.
22          What happened was during my practice as a
23  criminal defense attorney, I got to know counselors in
24  the prisons, you know.  And so, you know, representing
25  people in prison, most of them, and so when -- I got a

Page 103

1  call one day from one of the counselors out at
2  Perryville, and he told me -- that I had known before
3  and -- you know, not a cold call -- in other words,
4  friends, because I'd talked to him about cases.
5          And he said, you know, The counselors in
6  here and I don't think she's guilty and could you look
7  into it?  And, you know, I got that guy's name.  I don't
8  know where it's at.  And even -- and after the Ninth
9  Circuit reversed it, he actually called me, and I talked
10  to him a little bit.  But...
11          So that kind of started the ball rolling.
12  And then I started looking into it and asking -- and I
13  didn't know Armando Saldate at all at that time.  But,
14  you know, police reports and so forth --
15      Q.   Where did you get the documents from the case?
16      A.   I don't remember.  I -- you know, I don't
17  remember.  Because her direct appeal was over with.  And
18  I think I probably -- I probably got the police reports
19  and basic information from the public defender's office.
20  Or no, what's his name -- oh, gosh, the trial attorney.
21      Q.   Ken Ray?
22      A.   Ken Ray.
23      Q.   So Ken Ray provided you portions of Debra
24  Milke's file before you were ever retained by Debra
25  Milke?

Page 104

1      A.   You were putting -- you're putting words in my
2  mouth.  What happened, he called and I started looking
3  into the case.  I don't know what I did to look in there.
4  I don't know the sequence of events.  But as best I can
5  recall, I connected with Kirk Fowler, who had the
6  information, and Ken Ray.  I don't think -- I never did
7  talk to Ken Ray, as far as I know.  Kirk had contacted me
8  down the line.  But I don't know the sequence of events.
9          But -- and I don't know where I got the
10  reports to look at.  I'm sure it was from the direct
11  appeal attorney because his work's over with.  And I
12  think I went out and -- if my memory serves me correct, I
13  made arrangements to go out and talk to her pretty
14  quickly.  And I talked to her for a while and asked her
15  questions and so forth and so on like that and got my own
16  impressions.
17          And then I went out and I either got the
18  police reports from somebody -- well, yeah, I did.  Ken
19  Ray -- whatever.  And during that time, Kirk Fowler
20  eventually contacted me, and we started collaborating.
21          But then when I got to the point where I'd
22  reviewed the police reports and -- and I don't know
23  whether I got the transcripts from him or what.  I
24  honest -- you know, I just don't know.
25      Q.   Well, let me tell you why it was my



ANDERS VILNER ROSENQUIST JR. Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                               105—108

Page 105

1  understanding that your initial introduction to this case
2  came through Renate.
3     A.   It's not true.
4     Q.   If you look --
5     A.   I know I said it.
6     Q.   Oh, in here?
7     A.   Yeah.
8     Q.   Oh, okay.  So you did tell Sandra Pickinpaugh
9  that that's how you got involved in the case, was through
10  Renate?
11     A.   Yes.  And the reason is Sandy and especially
12  Dorothy -- a cold call to somebody like that, they're
13  going to hang up on you.  So you've got to -- I don't
14  know what you call it.  You've got to bring them down and
15  make friends, and if you -- if you notice with Dorothy,
16  that was difficult.  She's ready to hang up on me.  But
17  she was critical.
18        So I kept talking to her and, you know,
19  saying a lot of things to impress her, to diffuse her and
20  finally turned around and then talked to me about the
21  facts I really wanted to know.  Like did Debbie actually
22  pick him up -- Chris up and throw him against the wall.
23  I said, It doesn't make sense.
24     Q.   Okay.  So --
25     A.   And then she started opening up and telling me

Page 106

1  this information.
2     Q.   So are you saying that you intentionally
3  misrepresented information to Sandra Pickinpaugh during
4  this interview?
5        MS. HOFFMANN:  Objection.
6        THE WITNESS:  I probably -- yeah, I probably
7  misrepresented a lot of things, but I was trying to get
8  enough out there to make her relax so I can talk to her,
9  you know.
10     Q.   BY MS. BERKE:  And when you misrepresented
11  things, it was intentional?
12     A.   Yeah.  Right.
13        MS. HOFFMANN:  Lori, sorry, we talked about
14  stopping now because we have a call.
15        MS. BERKE:  What time is your call?
16        MS. HOFFMANN:  Right now.
17        MS. BERKE:  Okay.  We're going to break for
18  lunch.
19        THE VIDEOGRAPHER:  We're off the record at
20  1:02.
21        (A recess was held off the record.)
22        THE VIDEOGRAPHER:  We're back on the record
23  at 2:08.
24     Q.   BY MS. BERKE:  Mr. Rosenquist, during the lunch
25  break that we just took, did you have any conversations

Page 107

1  with Ms. Milke's attorneys?
2     A.   No.
3     Q.   Who did you speak with to prepare for your
4  deposition today?
5     A.   No one.
6     Q.   Nobody?
7     A.   I just read those -- refreshed my memory with
8  the documents that were sent.
9     Q.   Okay.  Did you happen to take any more
10  medication during lunch?
11     A.   No.
12     Q.   Okay.  Are you feeling okay?
13     A.   Oh, yeah.  I'm fine.
14     Q.   Okay.
15        (Exhibit 157 was marked for identification.)
16        THE COURT REPORTER:  Exhibit 157.
17     Q.   BY MS. BERKE:  I've placed before you Exhibit
18  Number 157.  And this is the -- a printout of the e-mail
19  that accompanied the documents that Ms. Milke's attorneys
20  provided to you for review to prepare for your
21  deposition.  Correct?
22     A.   Yes, yes.
23     Q.   And it starts -- it's an e-mail from Katie
24  McCarthy and it states initially, "Thanks for speaking
25  with us earlier."

Page 108

1        Do you see that?
2     A.   Yes.
3     Q.   Who did you speak with?
4     A.   Which one?  I think it was -- oh.  Well, I
5  didn't know.
6     Q.   Were there any men on the phone or was it just
7  women?
8     A.   Just women.
9     Q.   How many?
10     A.   I think two.  I -- yeah.  I called --
11     Q.   I'm just narrowing it down.
12     A.   Oh, yeah.
13     Q.   Okay.  So it was Katie McCarthy and one other
14  female attorney?
15     A.   Yes.
16     Q.   And what did you discuss?
17     A.   Oh, I don't know.  Just an overview of things I
18  could remember.  Kind of highlights since it's been so
19  long, the kind of high points in my life with the case.
20     Q.   How long did the call last?
21     A.   Oh, I don't know.  Ten, 15 minutes.
22     Q.   And tell us everything you recall about that
23  conversation.
24     A.   Do you want me to just start talking?
25     Q.   Sure.



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                          109–112

Page 109

1    A.  Okay.  Let's see how I get started.
2         Well, I talked about how I came to get the
3  case, like I told you earlier.  And then I talked about
4  how I accumulated the evidence against Detective Saldate,
5  just the procedures I followed.
6         You want me to repeat that, tell you that?
7    Q.  We'll go into that.
8    A.  Okay.
9    Q.  You can just do topics.
10   A.  And then I just -- the next thing I remember
11  mentioning -- talking about was the worst Christmas I
12  ever had in my life when the Arizona Supreme Court issued
13  an execution order during Christmas, and I had to put
14  together a stay and get it to the Federal Court during
15  the -- during the -- I think it was either before or
16  after Christmas, and I got it there and couldn't talk to
17  any of the judges or anyone.  And the clock was running
18  down and then I finally got notified of the stay.
19   Q.  What did Ms. Milke's attorneys tell you about
20  the case?
21   A.  That's kind of a broad question.  They didn't
22  tell -- Kimerer, nobody told me anything.  In fact, I
23  haven't even talked to anybody, Kimerer or these --
24  the -- I'll refer to you as the New York firm.  I haven't
25  talked to anyone there.  And I haven't talked to Kimerer

Page 110

1  or anyone there.
2    Q.  Have you talked to Kirk Fowler?
3    A.  Oh, yeah.
4    Q.  When is the last time you talked to him?
5    A.  Oh, he got his subpoena and then I got mine and
6  didn't talk about the case.  He just said he's going to
7  prepare and start working on it and preparing everything.
8    Q.  Well, what was -- who called who?
9    A.  He called me and said he got a subpoena.  And
10  at that time, I hadn't -- I didn't get one.  And that's
11  kind of about it.
12   Q.  You had no conversation about the case at all?
13   A.  Oh, kind of -- I think he told me about
14  standard procedure for police.  He was with the DEA, I
15  think --
16   Q.  Standard procedure for what?
17   A.  For confessions.
18   Q.  Why was he telling you that?
19   A.  I don't know.  We were just -- we kind of talk
20  about different things, and that's kind of what really
21  kind of stuck in his craw about the whole case.  And
22  then --
23   Q.  Well, tell me how that topic came up in the
24  context of you both being noticed for depositions.
25   A.  Well, then I got my notice and then I called

Page 111

1  him back, and I said, We better not be talking, you know,
2  and that was about it.  We didn't talk after that, after
3  I got mine.
4    Q.  So once he got his, he called you and talked
5  about proper procedures during confession -- or during
6  interrogations?
7    A.  He -- No.  Taking a confession.  I mean, we
8  talked about it a hundred times before, and he just
9  happened to kind of mention that out of the blue.  We --
10  well, we were both kind of frustrated that we didn't know
11  what was going on in the cases, you know, years down the
12  road and that -- especially his testimony would be
13  critical because it wouldn't be hearsay.  Oops.
14        He saw -- I mean, he was the investigator
15  there in chambers with the judges, everything.  So that's
16  about it.  I don't know of anything that we -- I mean, we
17  did discuss the case way back when for a long time when I
18  had it and different things, and he worked with me on it
19  and helped.  And together we got a lot of stuff done
20  because he was on the law enforcement side, and so we
21  worked together.  I can't begin to even tell you how --
22  all the topics we covered.
23   Q.  Well, I'm talking about in preparation for your
24  deposition.
25   A.  I read this -- these documents.  That was it

Page 112

1  for me.
2    Q.  Did you have any other phone calls with any of
3  Ms. Milke's attorneys?
4    A.  No.  I had that one phone call -- you -- they
5  called me.
6    Q.  The New York attorneys?
7    A.  Yes.  They called me and, I don't know, we were
8  talking about -- we were talking about how I got the
9  case, then we talked about the situation with the
10  execution warrant, and then I basically told them, you
11  know, I said -- I don't remember anything else but
12  saying, you know, Kirk's the one -- is probably what you
13  really need to do is -- you really need to talk to
14  because any information I got specifically from him --
15  was from him as far as what happened at the trial.  I
16  never talked to Ken Ray either and --
17   Q.  You've never spoken to Ken Ray?
18   A.  I haven't.
19   Q.  In your life?
20   A.  Oh, yeah, lunch tables when we -- way back
21  when, when we were all attorneys sitting around and
22  having lunch and stuff.  Yeah, I know him.
23   Q.  But you didn't -- you've never spoken with him
24  in connection with the Debra Milke case?
25   A.  No.



Page 113

1    Q.   Not even when you took over as her attorney?
2    A.   When I what?
3    Q.   Took over as Debra Milke's attorney?
4    A.   No. Kirk was there and he had a lot better
5  grasp on the case than Ken did. Because he'd worked the
6  case and -- during the trial. I don't know of anything
7  else about how I got the case, how I researched it. That
8  was about it.
9    Q.   Okay. Did you have an initial meeting in
10  person with Debra Milke when you got the case?
11   A.   When I got the case at the beginning?
12   Q.   Uh-huh. Yes.
13   A.   Yeah. I probably visited her two, three -- I
14  can't even keep track of it -- initially --
15   Q.   Do you remember how long --
16   A.   -- fairly frequent.
17   Q.   -- you met with her the first time?
18   A.   No, probably 15 minutes, something like that,
19  20 minutes. But when I needed -- when I was handling the
20  case, the counselors, I would call one and -- I'd call a
21  counselor, and they'd set up a phone call for me to call
22  into his office and allow her to talk to me, which was --
23  my understanding that nothing was recorded and it was
24  confidential.
25   Q.   If you'd look at Exhibit Number 139, the page

Page 114

1  that's numbered 3 in the bottom center, it's
2  MILKE_NSB018154.
3    A.   Yeah.
4    Q.   If you look in -- at the very bottom, this
5  whole page is you talking. Correct?
6    A.   Yes.
7    Q.   To Sandra Pickinpaugh?
8    A.   Yeah.
9    Q.   And if you look to the -- at the fourth from
10  the bottom line up, you say, quote, These facts in a
11  nutshell are -- first of all, I talked to the trial
12  attorney, and then I talked to the investigator for the
13  trial attorney who had been around for quite a while, and
14  I think he had talked to you, either you or Dorothy, I'm
15  not sure, end quote.
16   A.   Okay.
17   Q.   Did I read that correctly?
18   A.   Yeah.
19   Q.   And so you were telling Sandra Pickinpaugh that
20  you had a conversation with Ken Ray. Correct?
21   A.   Right.
22   Q.   But you didn't?
23   A.   No.
24   Q.   And so you were misrepresenting that to Sandra?
25   A.   Yeah. I was misrepresenting that because I had

Page 115

1  to overcome her preconception of what Saldate told her
2  when she was convinced that Debra killed her kid, killed
3  Chris. And that's how I do it. I don't sit there and --
4  I roll along, just like you read the first ten pages, to
5  get a person to relax, cool down, get to know me. I'd
6  say a lot of stuff so they know who they're talking to,
7  and then I slowly move into getting them to talk to me.
8    Q.   And was your goal to convince Ms. Pickinpaugh
9  that Detective Saldate had fabricated Ms. Milke's
10  confession?
11       MS. HOFFMANN: Objection. That's --
12       THE WITNESS: My goal --
13       MS. HOFFMANN: Sorry. That's -- she's
14  asking for work product. I object that any question
15  about your objection in the interview as opposed to what
16  you actually did is work product and is protected.
17   Q.   BY MS. BERKE: Is that why you were
18  misrepresenting the information to Sandra Pickinpaugh?
19       MS. HOFFMANN: Objection.
20       THE WITNESS: Do I go ahead?
21       MS. HOFFMANN: Well, so what she's asking
22  for in your thought process when you're representing
23  Debra Milke is your work product, which is privileged.
24  You don't have to answer that question. You can answer
25  questions about what you did, which is on the transcript.

Page 116

1       THE WITNESS: Well, I want to go ahead and
2  answer it because I think it's important. And I've
3  already told you that I've been doing this work ever
4  since I became a lawyer. And when you have a person like
5  Sandy and even Dorothy that's hostile in the trial, to
6  get anybody like that to talk to you, especially when
7  Saldate approached her the way he did, basically
8  convinced her that -- that Debra had confessed and taken
9  her clothes off and -- and did all sorts of things. I
10  mean, Sandy was totally convinced Debra was guilty based
11  upon what Saldate told her.
12   Q.   BY MS. BERKE: Where do you get that Saldate
13  told Sandra that Ms. Milke took her clothes off?
14   A.   Ask Kirk. Ask Kirk. He told me.
15   Q.   What articles of clothing did Detective Saldate
16  say that Ms. Milke removed?
17   A.   I don't know. Ask Kirk. It was something
18  about her bra and her sweater and it couldn't have
19  happened that way because Kirk picked her clothes up and
20  so forth. But you're going to have to ask Kirk about
21  that. But --
22   Q.   So Mr. --
23   A.   -- I got a lot of this information from Kirk.
24   Q.   So Mr. Fowler told you that Detective Saldate
25  told Ms. Pickinpaugh that Ms. Milke removed articles of



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
117–120

Page 117

1  clothing?
2      A.    Either removed them or pulled -- I think it was
3  pulled her -- pulled her sweater and everything up to
4  expose her breasts.
5      Q.    Okay.  So you were embellishing when you said
6  that Ms. -- that Detective Saldate told Ms. Pickinpaugh
7  that Debra Milke removed clothing?
8          MS. HOFFMANN:  Objection.
9          THE WITNESS:  Well, you know, what's the
10  difference?  I mean, removing up here or, you know,
11  undressing?  That -- yeah.  I felt it's -- I'm not lying.
12  It's essentially the truth, and I believe Kirk and I had
13  to get her unstuck on the fact and overcome all the
14  things that Saldate told her, according to Kirk and the
15  transcripts and everybody -- and other information I had.
16      Q.    BY MS. BERKE:  And so it's your testimony, as
17  you sit here today, that Ms. Milke did not lift her shirt
18  up?
19      A.    No.
20          MS. HOFFMANN:  Objection.
21          THE WITNESS:  I'm sorry.
22          MS. HOFFMANN:  No, go ahead.  But --
23          THE WITNESS:  No.  It's not that it's not --
24  ask Kirk.  I -- Kirk told me and that's where I got the
25  information.  And I trust Kirk implicitly.  He was

Page 118

1  working with me.
2      Q.    BY MS. BERKE:  So he told you that Ms. Milke
3  never lifted her shirt up?
4      A.    No.
5      Q.    He didn't tell you that or he did?
6      A.    He told me that Saldate told Sandy -- I mean
7  told Debbie in -- I mean Saldate said in his reports --
8  and it's even reflected -- that she -- Saldate said that
9  she picked up her sweater or something and picked it up
10  like that.  And, like I said, that's -- you'll have to
11  talk to Kirk about that because he did the investigation
12  on it.
13      Q.    Right.  And it's your belief that that never
14  happened, that she never lifted up her shirt?
15      A.    No.  I trust Kirk.  And if he said that never
16  happened, it never happened.
17      Q.    Did he tell you it never happened?
18      A.    Well, when we converse, we don't say it never
19  happened.  He told me why it couldn't have happened.
20  Because he picked up her clothes and what she was wearing
21  that time and talked to a lot of people and so forth.
22  That's -- you know, I'm second-guessing Kirk.
23      Q.    Okay.  So are you -- are there any ethical
24  prohibitions to lying to witnesses that you have as an
25  attorney?

Page 119

1      A.    Lying to witnesses?  It depends on what your
2  goal is.  It depends.  In my -- in my book, no.  No.  If
3  you are -- you know, you -- when I practice law, and a
4  lot of other attorneys, you meet the situation you're
5  presented with the same way to counter it.  In other
6  words, there's situations where police officers are
7  completely ethical and tell the truth; I have no problem.
8          When these police officers start lying and
9  telling stuff to persuade a witness, talk them into
10  giving damaging testimony, then I feel like I have an
11  ethical and a legal -- an obligation, moral and ethical
12  obligation to use the same kind of tactics to counter
13  what they said so -- to get the person to relax and get
14  to know me and then tell me what really happened and to
15  expand on it, you know.
16          You know, I mean, Noel Levy -- I know Noel
17  Levy.  I've known him for a long time, way back when.  I
18  don't know what happened to him.  I mean, I don't know
19  anything about him in the last five or ten years, but,
20  realistically, just the way the stuff was presented in
21  testimony, I mean, it's all explained in the -- in the
22  interview.
23          And I got what I wanted where I was --
24  wanted to go instead of -- instead of the people -- and
25  she said it.  You know, Sandy, in particular Dorothy.

Page 120

1  She said it.  You know, this was transcribed by one of my
2  secretaries who -- who I trusted.  And -- yeah.
3          When somebody -- when a police officer does
4  that, lies to -- lies to a defendant, which they're
5  allowed to do, but then if it's really taken and
6  manipulated, then it gets -- it's fair game to use the
7  same tactics to -- to -- I'll say it again -- to get the
8  witness feet on the ground again so they'll open up
9  about -- about what actually happened.
10          You know, not -- did you see her throw Chris
11  against the wall?  Yeah.  You know, it's like didn't
12  give -- didn't give her -- and she said it right here,
13  didn't give her a chance to elaborate on it like -- and
14  he misled her as far as just background, whatever.
15          Noel -- I'm not going to say any more about
16  Noel Levy, but you pretty much know what I think of him.
17      Q.    On page 4 of the transcript with Sandra
18  Pickinpaugh --
19      A.    Okay.
20      Q.    -- you told her -- and it's MILKE_NSB018155.
21  Toward the bottom, you say, quote, So I have my
22  investigators start checking the background on this
23  police officer, this Saldate guy, and he's got a real
24  track record of the same thing.  And I'm saying -- you
25  say what and he's been caught apparently several times

ANDERS VILNER  ROSENQUIST JR.  Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                          121–124

Page 121

1  actually lying about confessions, end quote.
2       Did I read that correctly?
3    A.  Yes.
4    Q.  So, first of all, who were your investigators
5  that you had checking the background of Saldate?
6    A.  The procedure was -- I've got to prep it a
7  little bit.  I'm trying to find out why they didn't
8  believe Debra and believed Saldate.  So it boiled down to
9  a he said/she said, except for those embellishments.  You
10  know, and --
11    Q.  My question, sir, was, who were the
12  investigators that you had start checking the background?
13    A.  I'm going to tell you in a minute.
14    Q.  Right.  But that's my question.  So --
15    A.  Okay.  I hired -- I went in and talked to Ron
16  Reinstein, the chief criminal -- presiding judge, and I
17  asked him if I could set up a room in the library and
18  review all of the -- the tapes that were -- all of the --
19  what do they call them, the old ones, the -- anyway, the
20  film on -- and then I rented about six or seven of the --
21  of those things that you read -- the fiche, whatever it
22  is.
23    Q.  Microfiche?
24    A.  Yeah.  I'm sorry.  Yes.  Microfiche.
25       And he gave me permission to take all of the

Page 122

1  cases during the time Saldate first started working for
2  the Phoenix Police Department until he retired, over
3  18,000 cases.  And I set up in that room and I hired -- I
4  believe they were young -- I put -- I put a note on the
5  bulletin board in a law school for law students to, you
6  know, help me and I'd pay them like $15 an hour, $20.
7       So it ended up then I had an attorney who,
8  you know, was a licensed attorney there, a young guy, and
9  so the process was they'd go and pick up so many of the
10  tapes and go through them, and anywhere Saldate's name
11  came up, they would mark it.  So after about, I don't
12  know, three or four months, we had like -- I think in
13  round figures about 350 cases.  And then we --
14    Q.  So that's 350 cases where Detective Saldate's
15  name appears as having been involved in the case?
16    A.  Yes.
17    Q.  Okay.
18    A.  And then we started getting into it and
19  getting -- I started looking at them, and we narrowed it
20  down to like about 12 cases.  And then I think it was the
21  final eight cases where there was absolute -- I'll call
22  it misconduct.  And those are the eight cases that we
23  cited in the -- in the petition.  So that's where I got
24  that information from.
25    Q.  Okay.  So if I'm understanding you correctly,

Page 123

1  you did a search of criminal court files at the
2  courthouse --
3    A.  Yes.
4    Q.  -- for Detective Saldate's name?
5    A.  Yes.
6    Q.  And you came up with 350 cases in which
7  Detective Saldate was involved as a detective?
8    A.  No.  Just what is -- when his name was
9  mentioned for whatever reason.  I don't know -- I can't
10  separate them because that's what we came up with.  And
11  then we had to go through them and see whether -- what he
12  was doing, you know.
13    Q.  Well, what other context would his name have
14  been mentioned other than as a detective?
15    A.  I don't really know.  Maybe somebody mentioned
16  it in testimony or motions or whatever.  So that was the
17  key.
18       And then after that, we started going
19  through each case and kept narrowing it down to cases
20  where the judge actually sustained a motion to suppress
21  and/or made comments or remarks.
22       I don't know.  It's been so long since I
23  looked at them, but those are the cases that the Ninth
24  Circuit looked at to reverse it on a Brady -- on a
25  Brady -- a Brady situation.  And that was -- that was it

Page 124

1  as far as a basis for making these statements.
2    Q.  You would agree that motions to suppress can be
3  granted without there being misconduct.  Correct?
4    A.  Criminal law, it either is or isn't.  It's
5  either a reliable, knowing intelligently voluntarily made
6  or it isn't.  And that's it.  That's the whole turning
7  point, that you either prove it is or it isn't.  And you
8  also have to advise them of the Miranda rights.
9    Q.  Right.  You would agree that there are cases
10  where there could be a good faith debate over whether
11  there was some kind of a Miranda violation that should
12  result in a confession or a statement being suppressed.
13  Correct?
14       MS. HOFFMANN:  Objection.
15       You can answer.
16       THE WITNESS:  No.
17    Q.  BY MS. BERKE:  You disagree with that?
18    A.  Yeah.
19    Q.  Okay.  So if you have a trial court rule one
20  way that there -- let's say for instance that there's no
21  Miranda violation --
22    A.  Wait a minute.  Criminal trial court or civil?
23    Q.  Yes, criminal.
24    A.  Okay.
25    Q.  So if you have a trial court in a criminal case



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
125–128

Page 125

1  rule that there is no Miranda violation and then it's
2  appealed to the Arizona Court of Appeals and the Court of
3  Appeals ruled that there is a Miranda violation --
4      A.   Uh-huh.
5      Q.   -- are you saying on the same set of facts --
6  how do you reconcile the fact that the trial court
7  concluded one thing and the Court of Appeals concluded
8  another?
9          MS. HOFFMANN:  Objection.
10          You can answer.
11          THE WITNESS:  Well, what you're asking me is
12  how the appellate court reverses a trial court, which
13  happens all the time.
14      Q.   BY MS. BERKE:  Right.
15      A.   So I can't -- I don't have a crystal ball to
16  look in there and say that because a lot of times the
17  appeals courts are much more strict on their
18  interpretation of the facts and a trial court judge may
19  not be up to speed on the violations or incompetent or --
20  or a lot of reasons why or the full set of -- or the
21  facts were not appreciated by the trial court.
22      Q.   Well, you would agree that legal minds can
23  differ on whether something constitutes a Miranda
24  violation.  Correct?  You could have one federal circuit
25  rule one way and another federal circuit rule another way

Page 126

1  on the same exact issue?
2      A.   Yeah.  Then it goes to the Supreme Court.
3      Q.   Right.  But are you saying then that -- I guess
4  how do you reconcile that you have circuit court of
5  appeals judges in one case and let's say the Ninth
6  Circuit ruling differently than the Fifth Circuit?
7      A.   Because some --
8          MS. HOFFMANN:  Objection.
9          THE WITNESS:  Because some appellate courts,
10  especially the Ninth Circuit, take the -- take the Bill
11  of Rights and the -- the protections under the Bill of
12  Rights and the case law more seriously than -- than other
13  ones.  It's the old conservative/liberal shifting around,
14  the big argument that's going on with our Supreme Court
15  right now.
16      Q.   BY MS. BERKE:  Okay.  But -- so you don't agree
17  that different legal minds can differ on what constitutes
18  a Miranda violation and what doesn't constitute a Miranda
19  violation?
20          MS. HOFFMANN:  Objection.
21          THE WITNESS:  Do I agree with some courts
22  can and some -- Well, of course.
23      Q.   BY MS. BERKE:  That reasonable -- well,
24  reasonable legal minds can differ?
25      A.   Reasonable minds can differ.

Page 127

1      Q.   Right.
2      A.   Legal minds can differ, too, of course.
3      Q.   And so certainly there -- wouldn't you agree
4  that there could be instances where a police officer, who
5  doesn't have a law degree, may believe that his
6  questioning was not in violation of Miranda --
7      A.   Uh-huh.
8      Q.   -- and have a Court agree with him and there
9  would be no misconduct?
10          MS. HOFFMANN:  Hypothetically?  Is that your
11  question, hypothetically?
12          MS. BERKE:  I've asked my question.
13          THE WITNESS:  Repeat it, please.  I was
14  interrupted there.
15          MS. BERKE:  Can you repeat my question,
16  please?
17          (The last question was read back by the
18  court reporter.)
19          THE WITNESS:  Yeah, there would be
20  misconduct.
21      Q.   BY MS. BERKE:  Why is that?
22      A.   Because the police officer should know the law,
23  period.  And if he violates Miranda and -- if he believes
24  he doesn't have to do that, it still gets kicked out.
25      Q.   So are you --

Page 128

1      A.   It still gets suppressed.  So you're -- you're
2  telling me then that if -- what you're saying is, a
3  police officer can do whatever he wants and then go into
4  Court and say, Oh, I don't know the law and so it's okay.
5      Q.   No, I'm not --
6      A.   And it's not that way.
7      Q.   -- suggesting that at all.
8      A.   Well, it sounds like it.
9      Q.   Do you -- do you ever have disagreements with
10  any of your colleagues as to whether a particular
11  incident in an interrogation, a particular line of
12  questioning violated Miranda?  Have you ever gotten in a
13  debate with any of your colleagues about that?
14      A.   You know, I can't really answer that because
15  it's one of those things that the prosecutor says, You
16  didn't violate Miranda; the defense attorney says, It did
17  violate Miranda.  So they file a motion to suppress.  And
18  one side presents their evidence, the other side presents
19  their evidence and a judge makes his -- makes a ruling.
20      Q.   Right.
21      A.   So, yeah, they can disagree.  If you're a
22  conservative and you're a prosecutor, you're going to
23  argue one way and a defense attorney another way.
24      Q.   And is the party who loses that legal argument
25  in Court, the prosecutor or the defense attorney, guilty



ANDERS VILNER ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
129–132

Page 129

1  of misconduct for arguing their point?
2      A.   Yeah.
3          MS. HOFFMANN:  Objection.  Vague.
4      Q.   BY MS. BERKE:  Yes?
5      A.   Yes.  Because it's their responsibility to know
6  the law.  Whether they know it or not, it's their
7  business.
8      Q.   Have you ever lost on a Miranda issue in Court?
9      A.   Don't ask me that.  I mean, I've had over 45
10  trials -- years of trials.
11     Q.   Have you ever filed a motion to suppress and
12  lost it?
13     A.   Yeah.
14     Q.   Was -- and have you ever had a motion to
15  suppress denied where it was not overturned, the order --
16  the ruling was not overturned?
17     A.   Now you're getting into the -- the -- have I
18  ever had...  I can't understand your question it's so
19  broad.
20     Q.   Have you ever had a motion to suppress denied
21  by the trial court and that ruling remained intact?
22     A.   Yes.
23     Q.   So did you engage in misconduct by making the
24  argument that the interrogation was in violation of
25  Miranda?

Page 130

1          MS. HOFFMANN:  Objection.
2          THE WITNESS:  I'm making an argument of
3  facts that support -- you know, circumstantial evidence
4  that supports my position.  I can't go black and white
5  and say it does or doesn't.  I'm saying, Judge, here's a
6  lot of facts that you consider -- should consider that
7  says it's in violation of Miranda.
8      Q.   BY MS. BERKE:  Right.
9      A.   And the prosecutor says the other thing.
10     Q.   Right.  And sometimes it's -- there's no
11  black-and-white answer, and you need a judge to make that
12  determination.  Correct?
13     A.   Yes.  That's why you have to file a motion to
14  suppress.
15     Q.   Right.  And that's why it's important for the
16  detective to accurately recite in his report precisely
17  what was stated during the interrogation so that a
18  judge -- so that the lawyers can make their arguments and
19  a judge later rules on that issue.  Correct?
20     A.   I don't understand that question.  Accurately
21  state and -- you're -- you're going to have to repeat the
22  question.
23     Q.   Sure.
24          You would agree that that's why it's
25  important for the detective to accurately recite in his

Page 131

1  report what was stated during the interrogation so that
2  the defense attorney and the prosecutor can later argue
3  their objections -- or argue their positions, rather, to
4  the Court on whether a particular interrogation violated
5  Miranda.  Correct?
6      A.   You know, I can't -- I can't really answer that
7  because you're getting down to issues of whether a police
8  officer is really telling the truth or isn't telling the
9  truth, and you're getting into jury questions, questions
10  the judge has got to rule on.  I -- I don't know how
11  to -- I mean, you're blanketing my career of every trial
12  I've had and you're saying haven't you ever had this or
13  that.
14          Every criminal defense attorney, every
15  prosecutor has cases go one way or the other.  But you
16  still make the arguments.  So I -- I don't know the point
17  you're trying to make.
18     Q.   Okay.  Well, let me ask it again.
19          So I'm not talking about your cases.  We're
20  talking about generally speaking.
21     A.   Well, how do you mean generally --
22     Q.   When --
23     A.   I'm sorry.
24     Q.   Let me ask my question.
25          In order for a determination to be made as

Page 132

1  to whether an interrogation complied with Miranda or
2  didn't comply with Miranda, what's important is that the
3  detective who conducted the interrogation accurately
4  recites what took place during that interrogation so that
5  the defense attorney can then make his or her arguments,
6  the prosecutor can make his or her arguments and the
7  judge will ultimately rule on whether Miranda was
8  complied with.  Correct?
9      A.   So you're saying that the police officer
10  accurately relates the facts involving Miranda?
11     Q.   Accurately relates the facts of what took place
12  during the interrogation.
13     A.   Well, that's a big assumption, you know.
14  That's the -- that's the whole issue, is the problem
15  defense attorneys have is police officers that aren't
16  really, you know, telling the truth.  They're not going
17  to go in there and say that.  They're going to make --
18  then you have an issue of credibility with police
19  officers.
20     Q.   Right.  But --
21     A.   You're making -- you're telling me to assume
22  that everything that the officer is stating in his police
23  report is accurate, which is -- is a stopping point right
24  there.
25     Q.   Okay.  Well, let me add a fact then.



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential     July 23, 2018
Debra Jean Milke vs City of Phoenix                     133—136

Page 133

1    A.   Okay.
2    Q.   Isn't it important for -- the important thing
3  with an interrogation is for a detective to accurately
4  recite what took place during the interrogation, and
5  let's say the defendant takes no issue with what the --
6    A.   Yeah.
7    Q.   -- detective has written.  Okay?  So there's no
8  issue here as to whether the detective is or is not
9  telling the truth.
10       What's important is that the detective -- is
11  that the detective accurately recite what took place in
12  the interrogation so that the defense attorney can make
13  his or her argument, the prosecutor can make his or her
14  argument as to whether the interrogation complied with
15  Miranda and then the judge can make a ruling on that
16  issue.  Ideally, that's what happens.  Correct?
17       MS. HOFFMANN:  Objection.  That's a very
18  long and vague question.
19       THE WITNESS:  No.  Because you're getting
20  down to the street level of dealing with -- with police
21  officers and -- and witnesses.  The whole -- the whole
22  issue is who do you believe, and what you've got is
23  circumstantial evidence, certain bits of evidence.  You
24  know, you watch television programs, how they prove it or
25  how they disprove it.

Page 134

1        And when you're saying the completely
2  accurate statement, you know, way back in our times --
3  when this thing -- when this confession was taken, there
4  was no requirements that it be -- you know, like later
5  requirements, like you see on TV all the time, you record
6  it or you witness it or you have a window where people
7  can see it and hear it and so forth.
8    Q.   BY MS. BERKE:  And you agree that at the time
9  of the Milke investigation, there were no such
10  requirements?
11    A.   There -- there -- there was with Miranda but
12  with other -- other facts about -- other facts about the
13  case.  There -- Miranda you got five things you have to
14  advise the client -- I mean, the defendant of before you
15  interrogate them when the -- when the interrogation is
16  focusing on them.
17    Q.   You would agree that at the time of Detective
18  Saldate's questioning of Debra Milke, there was no
19  requirement that police officers audio-record the
20  interrogation.  Correct?
21    A.   Right.  There's no requirements.
22    Q.   And you would agree that there was no
23  requirement to have a witness present for the
24  interrogation.  Correct?
25    A.   Right.

Page 135

1    Q.   And you would agree that there was no
2  requirement for there to be a window for somebody to look
3  in and watch the interrogation?
4    A.   Right.
5    Q.   But it's your testimony that there can never be
6  a good faith dispute over whether a particular
7  interrogation complies with Miranda?
8        MS. HOFFMANN:  Objection.  Misstates his
9  testimony.
10       THE WITNESS:  Good faith dispute.  I think
11  the only thing I can think of is the officer makes
12  mistakes, you know, forgets to advise him, you know, like
13  he can have an attorney or something like that.  I guess
14  you're --
15    Q.   BY MS. BERKE:  Well --
16    A.   -- talking about that good faith.
17    Q.   -- there can be some language where it's
18  debatable as to whether someone was invoking their right
19  to remain silent or requesting an attorney.  Correct?
20    A.   Language that's debatable, yeah, that's true.
21    Q.   Okay.  And so wouldn't you agree that in such
22  an instance, it's simply important for the detective to
23  accurately recite what took place so that a judge can
24  later determine whether that statement did comply with
25  Miranda or didn't.  Correct?

Page 136

1    A.   Yep.
2    Q.   And there could be no misconduct on the part of
3  the officer.
4    A.   For what?
5    Q.   Correct?
6    A.   For what?
7    Q.   For violating Miranda.
8        MS. HOFFMANN:  Objection.  Vague.
9    Q.   BY MS. BERKE:  If it's a situation where
10  there's a good faith debate.
11    A.   Well, yeah, but let me answer your first
12  question.
13       There's officers -- plenty of police
14  officers that violate some rule, you know, because they
15  honestly don't -- don't know that that rule existed.  But
16  when there's no rules, there's procedures by police
17  departments to make a confession credible; in other
18  words, believable.
19    Q.   Okay.  But that's not my question.
20    A.   Okay.
21    Q.   You keep bringing this back to the Milke case.
22    A.   No, I don't.  Every criminal case is an issue
23  of guilt or innocence, which means either -- both sides
24  present evidence to support their position guilt or
25  position innocence.  And those pieces of evidence,



Page 137

1  circumstantial, direct, whatever, are what's presented.
2      Q.   Okay.  Let me ask it this way:  Wouldn't you
3  agree that you could have a situation where a detective
4  conducts an interrogation, he accurately recites what
5  took place in that interrogation, the defendant is a
6  hundred percent in agreement as to what took place in the
7  interrogation, agrees that the report is accurate and it
8  could be debatable as to whether what took place was in
9  accordance with Miranda?  Correct?
10     A.   No.
11     Q.   Never?
12     A.   You're -- you're -- you're asking what I call
13  an oxymoron-type question, that -- that -- that you can
14  plug in facts that -- if a police officer is completely
15  accurate when he puts in his report but he forgets to
16  ask -- tell him that he needs -- he has a right to an
17  attorney --
18     Q.   I'm not talking about reading rights.
19     A.   Well, what are you talking about?
20     Q.   Different statements made in an interrogation
21  can be construed --
22     A.   Statements made in an interrogation.
23     Q.   -- that -- there are some statements made
24  during an interrogation that could be construed as a --
25  an indication that the person wishes to remain silent but

Page 138

1  could be construed differently.  Correct?
2      A.   Yeah.
3      Q.   Okay.  That's what I'm talking about.
4      A.   Statements.  But you're talking about if the
5  police report was perfectly accurate.
6      Q.   Right.
7      A.   Well, if it was perfectly accurate and he
8  fulfilled all the Miranda requirements, then the motion
9  to suppress wouldn't be filed.  Unless somebody mis-- --
10  you know, but if he --
11     Q.   For instance, the statement, I think I might
12  need to talk to somebody, I think I might need an
13  attorney --
14     A.   Uh-huh.
15     Q.   -- or I don't think I need an attorney, but
16  what do you think?
17     A.   What do I think?
18     Q.   Statements like that.
19     A.   Yeah, but see, I'm trying -- trying to put
20  those in perspective.  A good police officer, a good
21  police agency would take that, interpret that as a
22  request for an attorney under case law.
23     Q.   Okay.  So even the statement, I don't think I
24  need an attorney, what do you think, is a request for an
25  attorney in your view?

Page 139

1      A.   Yeah.  Because they're turned around asking the
2  cop if he needs an attorney, and the police officer is
3  not going to be real objective.  That's all I can say
4  about that.  You know, he's going to be -- want to
5  interrogate this guy.
6      Q.   And so in your view, it's black and white that
7  that's a request for an attorney under Miranda?
8      A.   No.  You know, you're saying black and white.
9  There's no -- there's no such thing.  You know, it's --
10  they got various levels of proof, you know.  And you get
11  down to probable cause, more likely than not, clear and
12  convincing and then beyond a reasonable doubt.  And it
13  depends.  Like in civil cases, the level of proof is a
14  lot lower than in criminal.
15     Q.   I'm talking about Miranda.
16     A.   Well, I don't know.  You know, you're -- go
17  ahead and ask your questions.  There's a lot of other
18  things besides just rattling off Miranda right at the
19  beginning of interrogating somebody.
20          I mean, interrogations go along.  I mean, it
21  could be like the interrogations that last 18 hours.
22  Don't let them go to a bathroom, you know.  Scare the
23  hell out -- I mean, it's -- there's all sorts of other
24  things that could make a confession unreliable.  And
25  that's the word they use.  They don't say right or wrong,

Page 140

1  just unreliable.
2      Q.   Right.  And in those situations, there could be
3  fact patterns that could go either way.  Right?
4          MS. HOFFMANN:  Objection.  Vague.
5      Q.   BY MS. BERKE:  Where it's not black and white.
6  The defense has a good argument that it's a violation of
7  Miranda but the prosecution has a good argument that it's
8  not, and you need a judge to make that ruling.  Correct?
9      A.   Well, you know, I can't answer that because
10  if -- you either -- you either -- you either give a
11  person the Miranda rights or you don't give a -- give
12  them the Miranda rights or you don't give them the
13  Miranda right -- all of the Miranda rights.  Now, even if
14  a police officer says in his report, I read him his
15  Miranda rights, well, what if the defendant says, He did
16  not?
17     Q.   That's not the situation I gave you, though.
18     A.   Well, you tell me then.
19     Q.   The situation I gave you was where there was no
20  disagreement.
21     A.   Then there wouldn't have been any motions or
22  there wouldn't have been any arguments.  If the -- if
23  the -- you know, if the --
24     Q.   Well, a police officer could read the suspect
25  his Miranda rights --



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential                July 23, 2018
Debra Jean Milke vs City of Phoenix                                      141–144

Page 141

1    A.  Yeah.
2    Q.  -- and question him for five hours, and the
3  defendant contends that he was exhausted, had had no
4  sleep, didn't understand his rights, was hungry, that
5  kind of thing, hadn't eaten in days and there could be an
6  argument from the prosecution that there was no way to
7  know that they hadn't eaten in days.  I mean --
8    A.  I don't --
9    Q.  You don't ever see situations where it could go
10  either way?
11         MS. HOFFMANN:  Objection.
12         You can answer.
13         THE WITNESS:  But it's -- you're -- you're
14  just making it so broad.  Either way, you got to take
15  every particular situation and look at it and see if
16  there was duress, you know, if the client had mental
17  problems to understand.  It's -- it's -- nothing's --
18  it's not black and white.
19    Q.  BY MS. BERKE:  Right.
20    A.  And you're telling me if I agree it's either
21  black or white.
22    Q.  No.  My question was, going back to the very
23  beginning of this line of questioning, is it your
24  position that any time a Court concludes that there was a
25  Miranda violation, there's automatically misconduct on

Page 142

1  the part of the officer who conducted the interrogation?
2    A.  See, you're using the word "misconduct."
3  That's the wrong word.  A mistake.  If he's innocent in
4  good faith.  If he lies about it, that's misconduct.
5    Q.  Okay.  So you would agree, then, that -- I
6  agree with you that mistakes and misconduct are two
7  different things.  And my question was related to
8  misconduct.
9    A.  Uh-huh.
10    Q.  Would you agree -- it sounds like you do
11  agree -- that just because a Court concludes that there
12  was a Miranda violation stemming from a police
13  interrogation, it doesn't necessarily mean that the
14  police officer engaged in misconduct.  It's possible but
15  not necessarily true?
16    A.  No, I agree with you there.
17    Q.  Okay.
18    A.  Well, you know, you laugh about that but --
19    Q.  No, I'm just laughing --
20    A.  -- you used a different word --
21    Q.  -- because that was my initial question at the
22  beginning.
23    A.  I know, but you keep using the word
24  "misconduct."  And see, mistake and misconduct, there's
25  quite a big difference.

Page 143

1    Q.  Okay.  And tell us what the difference is.
2    A.  Misconduct means you intentionally did it.
3  Mistake means you just didn't know to do it.
4    Q.  Okay.  And I -- I agree with you.
5    A.  Uh-huh.
6    Q.  So let me just, so that we have a clear record,
7  ask the question one last time.
8    A.  Uh-huh.
9    Q.  Would you agree with me that there can be
10  situations where a trial judge or a Court of Appeals or
11  the Supreme Court rules that there was a Miranda
12  violation stemming from an interrogation and there wasn't
13  necessarily misconduct on the part of the police officer?
14  In other words --
15    A.  Oh, yes, absolutely.
16    Q.  -- it's not automatic.  You agree with me?
17    A.  Absolutely.
18    Q.  Okay.  And in the cases that your team
19  uncovered, the 350 cases where Saldate's name is
20  mentioned, you said that you narrowed it down to 12 cases
21  and then eight.  Correct?
22    A.  Right.
23    Q.  What was -- what were the factors that led to
24  350 cases becoming 12 cases?
25    A.  We looked at each case and saw what the

Page 144

1  situation was.
2         First, we found his name, and then his name
3  was in there, but it didn't have any relationship to his
4  credibility.
5         And then, you know, he was a witness, maybe
6  he stopped the guy, whatever.
7         And then after we went through all of those,
8  I think it was actually we -- it was kind of a stemming
9  process.
10         We had -- we wanted to find cases that were
11  clear and clearly showed misconduct.  And those boiled
12  down to the eight that were presented in the PCR and in
13  the habeas corpus petition --
14    Q.  Okay.  So --
15    A.  -- that were the footnote in the -- in the
16  habeas petition.
17    Q.  Okay.  So out of 350 cases in which Detective
18  Saldate's name was mentioned, you found eight cases where
19  you concluded there was clear misconduct on his part?
20    A.  No.  Eight cases where the Court considered
21  there was clear misconduct by granting a motion to
22  suppress or by actually telling -- if I remember
23  correctly, telling Saldate or the prosecutor he didn't
24  believe him.  I'd have to look at the cases, but they're
25  there and you can look at them.



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
145–148

Page 145

1    Q.    So when you say, I had my investigators start
2    checking the background on this police officer, the
3    Saldate guy, on page MILKE_NSB018155 of Exhibit 39, are
4    you talking about the team of law students?
5    A.    Yes, basically.  You asked that question way
6    back, and I was trying to preface it because they were,
7    in essence, acting as investigators.  They were not
8    licensed investigators.  They were students.  So I can't
9    say my investigator did it, but it was investigated.
10    Q.    Well, you refer to them when you're talking to
11    Sandra Pickinpaugh as your investigators.  Correct?
12    A.    Yeah.  And as far as I'm concerned, they were.
13    They were acting as investigators.
14    Q.    Did you ever contact anyone at the public
15    defender's office to inquire about Detective Saldate?
16    A.    No, not that I can --  No.
17    Q.    Why not?
18    A.    What good would it do?
19    Q.    Well, remember that file we talked about
20    earlier --
21    A.    No.
22    Q.    -- that you said was maintained by the public
23    defender's office about officers who were known to be
24    dishonest?
25    A.    You know, that was one instance that I can

Page 146

1    remember, and it was just an accumulation of everybody
2    saying, you know, I had a case with this guy, he had a
3    case, and pretty soon with 19, 18, whatever the number of
4    public defenders, handling cases every day, it started to
5    accumulate.
6    Q.    Right.  And -- but you never made any inquiries
7    with the public defender's office as to whether there was
8    a similar accumulation of information or documents
9    regarding Detective Saldate.  Correct?
10    A.    Correct.
11    Q.    And you regularly had lunch with other criminal
12    defense attorneys --
13    A.    Right.
14    Q.    -- at that time.  Correct?
15    A.    Uh-huh.
16    Q.    Yes?
17    A.    Yes.  I'm sorry.
18    Q.    And did you make any inquiries at that time
19    about Detective Saldate with any of your colleagues?
20    A.    Yes.
21    Q.    And who did you speak with?
22    A.    I have no idea.  That -- the name was brought
23    up and I think two, three, four of the attorneys say,
24    Yeah, you know, I've had experience with Saldate and he
25    can't be trusted.

Page 147

1    Q.    And --
2    A.    And that was probably one of the early steps I
3    took after -- I'm trying to get things in a sequential
4    order.  And I know that -- talked to the counselor,
5    visited Debra, but I may have asked my colleagues about
6    this detective or visited her.  I don't know what
7    happened.
8        But once they said that, then I said, you
9    know, after going -- digging into the case, I said, Well,
10    this boiled down to a he said/she said thing.  And so the
11    only thing I can do is attack his credibility.  And so I
12    asked the -- my colleagues and they said, yeah, you know,
13    he can't be -- he can't be trusted.
14    Q.    And you have no recollection as to who you were
15    speaking with?
16    A.    No.  It was a group of people talking about
17    different things, and I said, you know, Do any of you
18    know about this Detective Saldate?  And there was two
19    cases, Flying Eagle, something like that, and --
20    Q.    Runningeagle?
21    A.    Huh?
22    Q.    Runningeagle?
23    A.    Yeah, I guess that was it.  And another one --
24    and then maybe another one that somebody brought up.  But
25    I don't -- but there's no way because I didn't even know

Page 148

1    who -- it was kind of a general conversation, and people
2    said, Yeah, yeah.  And then I come up with these two
3    cases and I say, Well, where do I go from here?  That
4    doesn't help me to discredit him.
5        So that's when I said, The only way I'm
6    going to do it, because I can't go to I&I, I won't
7    never -- I won't get anything out of the police
8    department, period.  So I said -- I made the decision
9    that the only way to do it was to do what I did and
10    accumulate those -- and go down there where I found
11    and -- and that's how it happened.
12        And that was probably -- but -- but I don't
13    know if you want me to keep going, but there was another
14    factor -- critical factor with a jail psychiatrist,
15    Dr. Bunwell, Garcia Bunwell, that I consulted with.  I
16    think he's passed away now.
17    Q.    Was he someone you retained in the Milke case?
18    A.    No.  He was a jail psychiatrist, and I was --
19    and I knew him from the public defender's office.  And so
20    I contacted him.  He was scheduled to testify, and Cheryl
21    Hendricks -- Cheryl Hendricks, the judge, I don't exactly
22    know what happened, but he wasn't allowed to testify or
23    he didn't testify.  And when I talked to him after the
24    fact when I took the case, he explained to me the
25    situation of why Debra had such a flat affect.



Page 149

1    Q.   A flat affect when she was testifying at trial?
2    A.   Yes.
3    Q.   And what did he tell you?
4    A.   He told me that when she was in the jail, that
5   her and her -- and him -- that he and his other
6   psychiatrist, whoever else worked in the jail, worked
7   with Debra for over a year while he was in the jail to
8   keep her from, quote/unquote, going crazy, and they were
9   teaching her how to control her emotions and they did too
10  good a job.
11          And when I talked to him afterwards, he was
12  just literally heartbroken that he couldn't testify to
13  explain that, that she was so -- so programmed from their
14  -- their work, with what -- you know, what they ever did
15  with her to -- that she couldn't -- couldn't react.
16  And that's why she had a flat affect.
17   Q.   Well, but why is that relevant?
18   A.   Because they didn't believe her.
19   Q.   Who didn't believe her?
20   A.   The jury.
21   Q.   Because she had a flat affect?
22   A.   Well, if your kid -- if you're accused of
23  murdering your kid, your four-year-old kid...
24          First of all, if you lose your four-year-old
25  kid and you're accused of murdering your four-year-old

Page 150

1   kid or having him murdered, yeah, I think you would show
2   some emotion, you know. That's just common sense, and
3   she didn't show any emotion.
4    Q.   And because of that, the jury didn't believe
5   her?
6    A.   Wait a minute. You know, there's a lot of
7   other factors too. I'm just saying that that -- that
8   that can be -- could be -- that, in my opinion, would be
9   a very critical factor.
10   Q.   As to why the jury didn't believe her?
11   A.   Yeah. Because I had to answer that question
12  because Kirk -- I mean, I talked to Kirk. I mean, this
13  went on for a long time. And I had to answer that
14  question, what's going on. And then once I talked to
15  Dr. Bunwell, he explained it. And that's what he was
16  going to testify to. And then Cheryl Hendricks, I
17  guess -- I don't know -- didn't allow him to testify.
18   Q.   One of the cases you talked about was
19  Runningeagle and that when you met with two, three or
20  four of your colleagues over lunch and asked about
21  Detective Saldate, they raised three cases, one of them
22  being -- well, I think you said something close to
23  Runningeagle?
24   A.   Yeah. It had to do with an Indian --
25   Q.   Okay.

Page 151

1    A.   -- name.
2    Q.   And so then did you go read --
3    A.   No.
4    Q.   -- information from that case?
5    A.   No.
6    Q.   Why not?
7    A.   I didn't have to. Because the attorney said --
8   you know, I asked the question, Do any of you know about
9   this Detective Saldate? And then, you know, some of
10  them -- Yeah, I know him. And then -- and then I said,
11  Well, you know what the -- what do you think of him? And
12  they said, He should not be trusted. And then somebody
13  popped up with the Runningeagle case and then a couple
14  other people popped up with different supportive
15  statements that he should -- he could not be trusted.
16  And I can't --
17   Q.   Did they mention any other cases?
18   A.   No. And that's what I was facing. That's the
19  problem I was facing.
20   Q.   Well, when they brought up the Runningeagle
21  case, why didn't you look at that case?
22   A.   Because I didn't need to. One case and one
23  case is not going to -- not going to work. And that
24  case, I'm -- I'm positive that that's, as best I can
25  remember, was one of the eight cases that was presented.

Page 152

1   I just -- I didn't know what went on with the case, but I
2   had to establish a track record for this police officer.
3   I can't go in there and argue based upon one case.
4    Q.   In any of the cases that you found, any of
5   those eight cases that you've cited, was Detective
6   Saldate found to have lied about a confession?
7    A.   In my recollection is -- is -- it's not a
8   matter of -- the only things I could remember is motions
9   to suppress were granted because of misconduct by
10  Saldate.
11          And if I'm not mistaken, there's statements
12  in there made by some judges as far as not believing him.
13  But why ask -- you know, just look at the cases. I can't
14  remember that far back. Gosh.
15          And --and they must have been pretty good
16  because the Ninth Circuit reversed it on a Brady
17  violation. Brady violation is not turning the -- the
18  State not providing exculpatory evidence to the defense.
19  And that's why it was reversed and set for a new trial
20  because that could be corrected.
21          Now, if it was a Miranda violation or
22  another search-and-seizure violation, then it couldn't be
23  corrected.
24          So -- but that's how her case ended up being
25  retrial.



ANDERS VILNER ROSENQUIST JR. Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
153–156

Page 153

1      And then Lori Voepel found in that statute,
2   the double jeopardy statute, that it's double jeopardy if
3   the violation is so outrageous that the case should be
4   thrown out, and that's what the Arizona Court of Appeals
5   did.
6          MS. BERKE:  All right.  Let's take a break.
7          THE VIDEOGRAPHER:  We're off the record at
8   3:17.
9          (A recess was held off the record.)
10         THE VIDEOGRAPHER:  We're back on the record
11  at 3:29.
12     Q.  BY MS. BERKE:  All right.  Mr. Rosenquist, I
13  have placed before you Exhibit Number 37, which is the
14  Ninth Circuit opinion you referred to earlier.  Correct?
15     A.  I assume, yes.
16     Q.  Well, take a look at it and confirm that for
17  us.
18     A.  Okay.  See it is -- it is.
19     Q.  Okay.  And while we were on a break, I asked
20  you to review the appendix that lists the cases that I
21  believe you were referring to earlier.
22     A.  Right.
23     Q.  Are those the cases that you were referring to
24  earlier?
25     A.  I assume.  I mean, yes, the -- if you believe

Page 154

1   the opinion, that's the only thing that was put in the
2   opinion, so if they repeated it here, yes.
3      Q.  Well, would you be more comfortable reading
4   through the opinion to confirm that those are the cases
5   that you had presented -- or those are the eight cases
6   that you had found that were addressed by the Ninth
7   Circuit in its decision?  We can take as much time as you
8   need to do that.
9      A.  No.  I'll -- I'll assume that that -- these
10  were the cases because they'd have to be.
11     Q.  And do any of those cases involve Detective
12  Saldate having been found to have lied about a
13  confession?
14     A.  If it doesn't say there, then I assume it
15  doesn't -- I assume you're right.
16     Q.  Well, I'd like you to tell us whether any of
17  those cases involve findings by a Court that Detective
18  Saldate lied about a confession.  And while --
19     A.  You're asking --
20     Q.  -- we were on the break, you read through that.
21     A.  Wait a minute.  You're asking me to look at the
22  opinion of the Ninth Circuit and tell you if any of these
23  cases say that he lied?
24     Q.  Involved him lying about a confession.
25     A.  I don't -- okay.  Do you want me to answer

Page 155

1   that?
2      Q.  Yes.
3      A.  Well, the one here, Saldate admitted to
4   interrogating a suspect who was strapped to a hotel -- a
5   hospital, incoherent, disorderly, whatever.
6      Q.  Which case is that?
7      A.  State v. Yanes, Y-a-n-e-s.
8      Q.  Uh-huh.  And so where does it say he lied about
9   a confession?
10     A.  It doesn't, but it's obvious.  The --
11     Q.  How is it obvious?
12     A.  He interrogated him.
13     Q.  Okay.
14     A.  While he -- while he -- he interrogated him.
15  He interrogated him.
16     Q.  Okay.  Where is the lie?  What did Detective --
17  where do they say Detective Saldate lied about what took
18  place during that interrogation?
19     A.  You're asking -- you're asking me to
20  second-guess the Supreme -- the Ninth Circuit?
21     Q.  I'm not asking you.  I'm -- you're saying --
22     A.  You're using the word "confession."  You're
23  using the word "confession."  You can be interrogated and
24  not confess.  You can be interrogated and -- and -- I
25  mean, Saldate admitted interrogating a suspect.  He

Page 156

1   interrogated him and got information out of him.  That's
2   a confession.
3      Q.  Where is the lie?
4      A.  The lie?
5      Q.  Where did it say he lied about a confession?
6      A.  Those words?
7      Q.  Yes.
8      A.  Those words aren't in here.
9      Q.  It -- is there -- are there any words that you
10  construe as stating that Detective Saldate lied about a
11  confession?
12     A.  These words right here, "Saldate admitted
13  interrogating a suspect."  Okay.  If he -- if he
14  didn't -- it's like if he interrogated him, then he would
15  have gotten evidence against the defendant.  Otherwise,
16  it wouldn't make any difference.
17     Q.  I'm asking about lying about a confession.
18     A.  Well, you know what, if you want to ask that,
19  then I'll say no, it's not -- it's not verbally put in
20  here lying about a confession.
21     Q.  Is there anywhere in the description of Yanes
22  suggesting that Detective Saldate lied about anything?
23     A.  Yeah.
24     Q.  What did he lie about?
25     A.  Interrogating, interrogating, interrogating.



ANDERS VILNER ROSENQUIST JR.  Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                                157–160

Page 157

1  That -- if he interrogated him and he didn't confess,
2  then it wouldn't even be an issue.
3     Q.  Where -- where is the lie?  Where is the Ninth
4  Circuit saying he lied?
5     A.  You know, I can't debate that with you because
6  I really don't think you understand what happens in
7  situations, interrogation.
8     Q.  Okay.
9     A.  Interrogation.
10    Q.  That's what interrogating is --
11    A.  If it has resulted in a confession or
12  inculpatory statements, then they wouldn't -- it wouldn't
13  have amounted to anything.
14    Q.  Okay.  My question is --
15    A.  In other words, if he made statements here that
16  were innocuous, it wouldn't make any difference if he was
17  strapped to the bed or anything else.
18    Q.  Right.  But the Ninth Circuit isn't saying that
19  Detective Saldate lied about anything in his report, are
20  they?
21       MS. HOFFMANN:  Objection.  Vague.
22       THE WITNESS:  I can't -- yeah, they didn't
23  use those specific words.  They didn't say Saldate lied
24  about a confession.  They didn't --
25    Q.  BY MS. BERKE:  They're not saying he stated

Page 158

1  anything untruthfully in his report of his
2  interrogation --
3     A.  Well, that's --
4     Q.  -- of that --
5     A.  That --
6     Q.  -- individual.  Right?
7     A.  Well, you know what, that's a dispute between
8  you and me because I see that in that interrogation.
9     Q.  Okay.  Read the Ninth --
10    A.  And I'll explain it, if you let me.
11    Q.  Read the Ninth Circuit's discussion and its
12  opinion about the Yanes case, and tell me where they're
13  saying he lied about what took place during the
14  interrogation.
15    A.  Why would they say that?  The foundation is
16  there.
17    Q.  Well --
18    A.  If he had not gotten inculpatory statements
19  from this guy, they would not have cared if he was
20  strapped or anything else.  This interrogation --
21    Q.  You know a lie is an untruth.  Right?
22    A.  Yeah.
23    Q.  Okay.  Tell me where the Ninth Circuit found
24  that Detective Saldate recited an untruth in his
25  report --

Page 159

1     A.  You know what --
2     Q.  -- or in his testimony.
3     A.  -- whatever you want me to say.  I think that
4  this clearly shows it.  It's not stated that way, but it
5  clearly shows it.
6     Q.  Show -- okay.  Read the Ninth Circuit's
7  discussion regarding the Yanes case and tell me where the
8  Ninth Circuit is saying --
9     A.  You know what --
10    Q.  -- that Detective Saldate lied about a
11  confession.
12    A.  You know what, you're just --
13    Q.  Go to page --
14    A.  -- you are -- I don't think you understand
15  criminal law.  I really don't.
16    Q.  Go to page 11 of the Ninth Circuit decision,
17  Exhibit 37, you'll see the discussion of the Yanes case.
18    A.  What page?
19    Q.  11.
20    A.  Okay.
21    Q.  Okay.  Just read it to yourself.  You see State
22  v. Yanes on the bottom left?
23    A.  Okay.  Right here, no, it does not say Saldate
24  lied when he took this confession.  But right here it
25  says, "The prosecutor nonetheless presented the suspect's

Page 160

1  statement to Saldate at trial."
2       Now, he must have given inculpatory
3  evidence.
4     Q.  I'm not asking about inculpatory evidence.  I'm
5  talking about lies.
6     A.  He --
7     Q.  Untruths.
8     A.  As far as I'm concerned, that right there says
9  that he got a confession, statements, whatever you want
10  to call it.  You call it a confession.  It doesn't have
11  to be called a confession.  It can be called inculpatory
12  statements.
13    Q.  Okay.  Where does it say that Armando
14  Saldate --
15    A.  It doesn't.
16    Q.  -- lied --
17    A.  It doesn't.
18    Q.  Let me finish my question.
19    A.  It doesn't.
20    Q.  Where does it say that Armando Saldate lied
21  about inculpatory statements given by Yanes?
22    A.  Because the prosecutor used those statements in
23  the trial.
24    Q.  How does that translate to --
25    A.  Because he wouldn't --



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
161–164

Page 161

1    Q.    Let me finish --
2    A.    -- use the statements --
3    Q.    -- my question.
4    A.    -- if they weren't inculpatory.  If they
5    weren't a --
6    Q.    Let me finish --
7    A.    -- a type of confession.
8    Q.    Let me finish my question, sir.
9    A.    Okay.
10    Q.    Where does it say that Armando Saldate lied
11    about information given to him by Mr. Yanes during his
12    interrogation?
13    A.    It doesn't.
14    Q.    Okay.  Are you able to point me to any case
15    where Detective Saldate has been found by a Court to have
16    lied about a confession?
17    A.    No.
18    Q.    Now let's go back to Exhibit Number 139, the
19    transcript of your interview of Sandra Pickinpaugh.
20    A.    Uh-huh.
21    Q.    At the bottom of page 4 and going up to the top
22    of page 5, you say, quote, And I'm saying -- you say
23    what?  And he's been caught apparently several times
24    actually lying about confessions, end quote.
25          Did I read that correctly?

Page 162

1    A.    Yep.
2    Q.    And so what are you referring to there?
3    A.    Well, you don't look at a case the way I like
4    to look at it.  You don't look at a case the way I look
5    at it as a criminal defense attorney.  And when you say
6    lied, that -- it just doesn't work black and white.  No,
7    I said that.  Because that's my conclusion.
8    Q.    Based on what case?
9    A.    On all my experience with criminal law over 45
10    years.
11    Q.    Okay.  So --
12    A.    I know confessions pretty well and I know the
13    law.
14    Q.    Okay.  Where in the Ninth Circuit decision --
15    because those are the eight cases that you found --
16    A.    Yeah, uh-huh.
17    Q.    -- that you said show that Armando Saldate
18    engaged in misconduct.  Right?
19    A.    I used the word misconduct.
20    Q.    Right.
21    A.    Right.
22    Q.    Okay.  But where in --
23    A.    But I found --
24          Go ahead.
25    Q.    Where in any of those cases was there a

Page 163

1    determination that Armando Saldate lied about a
2    confession?
3    A.    Well, in my opinion -- well, it does not state
4    in there Armando Saldate lied about the confession, no.
5    And this documents on all of these cases, they do -- it
6    does not say that.  So I agree with you.
7    Q.    Okay.
8    A.    It doesn't say it.
9    Q.    Point me to any case -- any of those cases in
10    which it's your conclusion that Armando Saldate lied
11    about a confession.
12    A.    You know what, I haven't had a chance to look
13    at this stuff.  All I can tell you is that -- you want
14    the words lied about a confession.
15    Q.    Those are your words.  That's why I'm asking
16    you these questions.
17    A.    And I told you way back when I was using
18    these -- I was paraphrasing all of the information I had
19    to diffuse her to get her to cooperate with me.
20    Q.    Were you intentionally --
21    A.    You're picking apart a fact that I stated
22    something as a generality, lied about a confession or
23    just plain lied.
24    Q.    Okay.
25    A.    What do you want?

Page 164

1    Q.    Well, you were trying to convince
2    Ms. Pickinpaugh that Armando Saldate fabricated
3    Ms. Milke's confession by telling her that he had been
4    caught lying several times about other confessions.
5    Correct?
6    A.    That's paraphrased as far as --
7    Q.    Am I correct?
8    A.    If you say so, yeah.
9    Q.    And so you knowingly told Ms. Pickinpaugh an
10    untrue statement that Armando Saldate had been caught
11    lying about confessions.
12          MS. HOFFMANN:  Objection.
13          BY MS. BERKE:  Correct?
14          MS. HOFFMANN:  Misstates his testimony.
15          THE WITNESS:  It's just a conclusion of mine
16    that I made to get her to cooperate with me, to make a
17    general statement rather than going through every case
18    and telling her the specifics.
19          As far as I'm concerned, that one case --
20    and I haven't even really looked at the other one -- that
21    tells me -- a confession.  A confession is when somebody
22    makes statements against their own interest that
23    proves -- that are strong evidence that they committed
24    the crime.  Okay?  That's a confession.
25    Q.    BY MS. BERKE:  Okay.  And point me to a single



Page 165

1  case --
2      A.   Don't do that to me --
3      Q.   -- where a Court determined --
4      A.   -- because --
5      Q.   -- that --
6      A.   -- because they don't say it that way.
7      Q.   Point me to a single case where the Ninth
8  Circuit said that Armando Saldate lied about statements a
9  defendant made to him.
10     A.   They're not in here.  So is that what you want
11 me to say?  Because I'm giving an opinion.  And I'm
12 giving her my opinion and my comment.
13     Q.   Are you saying that the words Armando Saldate
14 has been caught lying -- caught several times lying about
15 confessions is an opinion?
16     A.   Confession, lying.  And then you want to -- you
17 want to say that I am -- I'm telling -- no, you're --
18 whatever you want to take out of that opinion, in those
19 cases, you take what you want.
20     Q.   Are you saying --
21     A.   I -- I -- in my mind -- in my mind, he lied
22 about confessions.
23     Q.   In what case?
24     A.   That case I just told you.  You -- you wanted
25 me to read it.

Page 166

1      Q.   I want to know where the lie is.
2      A.   The lie is it had to be a lie.
3      Q.   What had to be a lie?
4      A.   Okay.  We'll start out again.
5           He got statements from the defendant.  Okay?
6  And the prosecutor presented those in the trial.  So the
7  fact of the matter is they don't say it's a confession,
8  but if the prosecutor used -- that doesn't make it
9  truthful.  He interrogated the defendant.  He must have
10 gotten statements out of -- some kind of a confession out
11 of him, otherwise the prosecutor would not present the
12 evidence at trial.
13     Q.   Where is the lie?
14     A.   I don't know.  Wherever you want it to be.  I
15 -- I look at this and based upon my experience, you're
16 asking me to -- to nitpick something apart.  I made --
17 for when I was talking to her, and I'll tell you again, I
18 was basically trying to diffuse her so she would talk to
19 me about making general statements.  And I had to use
20 some pretty strong language to counter what Saldate said
21 she did, and -- and I had the cases there.  I wasn't
22 lying.
23          And these cases here, I made a general
24 statement to diffuse her.  It's not like I was testifying
25 under oath when I talked to her.  It's like I had to

Page 167

1  tell -- summarize as quick as I could the main points to
2  diffuse her from believing Saldate lied to her when he
3  interrogated her.
4      Q.   And it's your position that it was okay for you
5  to misrepresent to her that Detective Saldate had been
6  caught lying about confessions several times because you
7  believed that Detective Saldate engaged in misconduct of
8  his own?
9           MS. HOFFMANN:  Objection.  Misstates his
10 testimony.
11     Q.   BY MS. BERKE:  Correct?
12     A.   Yeah.  I believe.
13     Q.   You would agree that the statement Armando
14 Saldate has been caught lying about confessions several
15 times is a fact and not an opinion.  Correct?
16          MS. HOFFMANN:  Objection.
17     Q.   BY MS. BERKE:  That statement is a factual
18 statement and not an expression of an opinion.  You agree
19 that -- with that.  Right?
20     A.   No.  I -- I take the position that a confession
21 is something that happens in those circumstances where
22 people are forced to make statements that can't be true.
23 I mean, they're saying their -- the statements are
24 unreliable because of the condition the guy is in.  But
25 he still got statements from him.

Page 168

1           And as far as lying, it's not -- it's not
2  directly lying.  It's just manipulating the situation.
3  Where is -- okay.  Then where in here is the --
4      Q.   If --
5      A.   Where in here are the statements that the man
6  made when he was injured?  See, that's the thing.
7      Q.   I'm going to grab the supplement that Detective
8  Saldate prepared summarizing his interview of Mr. Yanes,
9  and I'm going to ask you to point me to where the lie is
10 or lies are.
11     A.   Whatever you want.
12     Q.   Okay.
13     A.   Uh-huh.  Because in my mind, he was committing
14 misconduct.  And you try to use confession as black and
15 white and it's not that way.
16     Q.   Well, I'm using your word, sir.
17     A.   Any time statement --
18          My word?  It's a summary word.  A confession
19 is a collection of statements that inculpate -- inculpate
20 the defendant.
21     Q.   So are you saying that what you meant when you
22 told Mrs. -- or Ms. Pickinpaugh that Armando Saldate had
23 been caught lying about confessions, what you really
24 meant was that he had been found to have engaged in
25 misconduct of some type?



ANDERS VILNER ROSENQUIST JR. Highly Confidential      July 23, 2018
Debra Jean Milke vs City of Phoenix                              169–172

Page 169

1   A.   Lying, yeah.
2   Q.   Okay.
3   A.   Now, you attached the word confession to it but
4   lying. And the Ninth Circuit apparently agreed with me.
5   Q.   I'm going to show you what's been marked as
6   Exhibit 72, and I'm going to have you read Detective
7   Saldate's report of his interview of Mr. Yanes. And I'm
8   going to ask you to point me to where he lies about a
9   confession or lies about anything.
10   A.   You know what, I can't do that because I don't
11   know anything about the case. And this is a report that
12   Saldate made and I -- okay. Here we go. You're saying
13   this is a statement made by Saldate -- a report prepared
14   by Mr. Saldate. Right?
15   Q.   Correct. So --
16   A.   Well, you're -- -- you're asking me to read a
17   man I've accused of lying his report and ask me where
18   he's lying in his report without me knowing any other
19   information on the case. I mean, I can't do it because I
20   don't know any more information about the case. So
21   you're asking --
22   Q.   Did you at any time --
23   A.   No, you're --
24   Q.   Did you at any time --
25   A.   -- asking me to presume everything he says in

Page 170

1   here is accurate.
2   Q.   Well --
3   A.   Because he made it.
4   Q.   Did the Court of Appeals --
5   A.   Even though I'm accusing him of lying, of being
6   a liar.
7   Q.   Did the Ninth Circuit Court of Appeals conclude
8   in its decision that anything stated in that report was a
9   lie?
10   A.   No.
11   Q.   Okay. So where is -- what is the basis for
12   your position --
13   A.   A conclusion.
14   Q.   -- that Mr. -- or that Detective Saldate lied
15   about a confession in the Yanes case?
16   A.   A conclusion.
17   Q.   What's a conclusion?
18   A.   That -- that he lied about confessions and
19   whatever you said.
20   Q.   Well, you said in the --
21   A.   Lies.
22   Q.   -- in the Yanes case, the Ninth Circuit
23   found -- or I'm sorry. You said that in the Yanes case,
24   Detective Saldate lied about a confession.
25   A.   You know, I can't answer that and I can't

Page 171

1   answer that because I don't know -- you're asking me to
2   believe -- you're asking me to --
3   Q.   I'm not asking you to believe anything.
4   A.   Yes, you are. You're saying find out anywhere
5   in here he lied. I don't know. This is his statement.
6   He's a liar. So how do I find any statement in here that
7   he's lied about?
8   Q.   I've asked you to look at the Ninth Circuit
9   decision --
10   A.   You know, whatever you want.
11   Q.   -- and tell us where the Ninth Circuit
12   concludes that anything contained in his report was a
13   lie.
14   A.   They didn't state it.
15   Q.   Okay.
16   A.   But I conclude it.
17   Q.   And do you know your basis for concluding that
18   he lied in the Yanes case?
19   A.   Why -- you're pinning me down on the Yanes
20   case. I already told you time and time again that I --
21   the circumstances where he -- I mean, you give me this.
22   Okay? And you're asking me to find anywhere in this
23   statement where he lied.
24   Q.   I'm asking you --
25   A.   No, you are -- you're asking me.

Page 172

1   Q.   I'm asking you to tell me what your basis is
2   for concluding that anything in that report is a lie.
3   Because I don't see anything in the Ninth Circuit
4   decision where it's even contended by the Court that he
5   lied in that case, and yet you have said that he lied
6   about a confession in that case. So I want to know what
7   your basis is.
8   A.   You're going to beat the confession, and I'm
9   telling you that a confession is a lot broader than just
10   Miranda rights and writing something down, and again,
11   when you give me a document prepared by a man I've
12   accused of lying, how can I find anything in here that's
13   the truth?
14   Q.   Okay. What is your basis for contending that
15   Detective Saldate lied about anything in the Yanes case?
16   You've looked at the Ninth Circuit decision. They don't
17   say he lied about anything. Correct?
18   A.   Right.
19   Q.   So what is your basis for contending that
20   Detective Saldate lied about anything in the Yanes case?
21   A.   You're talking about a specific case now.
22   Q.   Well, that's because --
23   A.   I interpret that --
24   Q.   -- you pointed to the Yanes case?
25   A.   They didn't say it. I'm interpreting it.



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential                    July 23, 2018
Debra Jean Milke vs City of Phoenix                                          173–176

Page 173

1    Q.   Okay.  What is your basis for interpreting the
2  Yanes case, as discussed in the Ninth Circuit decision,
3  as support for your representation to Ms. Pickinpaugh
4  that Detective Saldate has been caught lying about
5  confessions?
6    A.   I already explained that to you.  You've asked
7  me that question over and over again, and I've explained
8  it.
9    Q.   Well --
10   A.   As far as I'm concerned, based upon my
11  experience and your wanting me to find something that was
12  prepared by a liar, I can't find anything here.
13   Q.   I'm not asking --
14   A.   I haven't seen the rest of the case.  I haven't
15  seen any of the evidence in here, and you're just trying
16  to argue with me about it, and it's a stalemate.
17   Q.   Okay.
18   A.   I have my impressions about what happened, and
19  you can do all you want here with this stuff, and in my
20  impression is -- it is -- this whole thing is probably a
21  lie.
22   Q.   Okay.  You understand that a confession can be
23  suppressed because of voluntariness where a suspect said
24  what a detective reports he said but was incompetent.
25  Correct?

Page 174

1    A.   Say that again.
2        (The last question was read back by the
3  court reporter.)
4        THE WITNESS:  Incompetent?  I don't
5  understand the word.
6    Q.   BY MS. BERKE:  You don't know what the word
7  incompetent means?
8    A.   Yeah, I do, but I don't know how you're using
9  it.  Incompetent means just really --
10   Q.   Incoherent.
11   A.   Okay.
12   Q.   Okay.
13   A.   Now your question is -- change --
14   Q.   Unable to understand his rights.
15   A.   Uh-huh.
16   Q.   Okay.  So you would agree that -- or do you
17  understand that a confession can be suppressed because of
18  voluntariness -- what does voluntariness mean?
19   A.   It just means that the person knows what
20  they're doing.
21   Q.   Okay.  You would agree that a confession can be
22  suppressed because of voluntariness where a suspect said
23  precisely what the officer states in the report the
24  suspect said.  Correct?
25   A.   Yeah.

Page 175

1    Q.   In other words --
2    A.   No, you're right.  You're right.
3    Q.   In other words, voluntariness doesn't equate to
4  a lie.  Correct?
5        MS. HOFFMANN:  Objection.  Vague.
6        THE WITNESS:  Voluntariness doesn't equate
7  to a lie.  No, it doesn't equate to a lie.
8    Q.   BY MS. BERKE:  And isn't that what -- the
9  situation they were dealing with in the Yanes case was
10  that the prosecutor used a statement that was not given
11  voluntarily?
12   A.   Yes.
13   Q.   And so do you agree that that doesn't mean that
14  there was a lie involved?
15   A.   Okay.  Yeah.  I mean, whatever you want.
16   Q.   Well, I'm asking for your testimony.
17   A.   No, I'm giving it to you, and you keep
18  repeating yourself until you get me to agree with you on
19  certain things and I'm not going to.  I mean, you give me
20  this and asked for me to look --
21   Q.   You can set that aside.  We're -- I'm not
22  asking you any more --
23   A.   Well, you're changing --
24   Q.   -- questions about that report.
25   A.   -- the whole issue --

Page 176

1    Q.   Okay.
2    A.   -- you know.
3    Q.   My next question was, do you understand that a
4  confession can be suppressed because of voluntariness
5  where a suspect made precisely the statements that are
6  recited in the interrogating officer's report?
7    A.   Yes.
8    Q.   And that doesn't necessarily involve a lie
9  being --
10   A.   Right.
11   Q.   -- made by the officer.  Correct?
12   A.   Right.  Uh-huh.
13   Q.   Okay.  You would agree that it's possible that
14  that's what occurred in the Yanes case.  Correct?
15   A.   Well, yeah.  Yeah.  I'll agree with you on
16  that.
17   Q.   So now, since the Ninth Circuit doesn't state
18  that Detective Saldate lied about anything in the Yanes
19  case, you understand that what they were saying was he
20  took a statement that was not voluntary and the
21  prosecutor used it in the prosecution.  Correct?
22   A.   Yes.
23   Q.   And that doesn't involve anything about lying.
24  Correct?
25   A.   Right.



Page 177

1    Q.   And so going back to my original question on
2    this subject, are you able to point me to anything in the
3    Ninth Circuit that's Exhibit Number 37 where the Ninth
4    Circuit stated that Detective Saldate lied about a
5    confession?
6    A.   No.  I mean, I agree with you.  They did not
7    say that in the Ninth Circuit opinion.
8    Q.   Are you aware of any case in which Detective
9    Saldate was caught lying about a confession?
10        MS. HOFFMANN:  Objection.
11        THE WITNESS:  Am I aware of any case?
12   Q.   BY MS. BERKE:  Right.
13   A.   I'd have -- I'd have to go -- I'm not aware of
14   a specific case.  Let me put it that way.
15   Q.   Okay.  And when you told Ms. Pickinpaugh that
16   Detective Saldate had been caught several times lying
17   about confessions, you were intentionally misrepresenting
18   that fact to her.  Correct?
19   A.   Yes.
20        MS. HOFFMANN:  Objection.  Misstates his
21   testimony.
22        THE WITNESS:  Yes.  And I told you a number
23   of times why.
24   Q.   BY MS. BERKE:  And you talk at page 5 of your
25   interview of Sandra Pickinpaugh, MILKE_NSB018156,

Page 178

1    about -- one, two, three, four, five, six, seven, eight,
2    nine, ten, 11, 12 -- 11 or 12 lines down, you talk about
3    Detective Saldate's record and the convictions he's
4    gotten just on confessions in the cases where every one
5    of these people are screaming up and down they didn't
6    confess.  And, again, you were misrepresenting to
7    Ms. Pickinpaugh that that was, in fact, the case?
8    A.   Right.
9        MS. HOFFMANN:  Objection.
10        THE WITNESS:  Yeah.
11   Q.   BY MS. BERKE:  Further down on that page, you
12   are telling her about Mr. Styers' and Mr. Scott's
13   involvement in the murder of Christopher Milke.
14        Do you see that?
15   A.   Okay.  Styers -- so then kind of backed off and
16   then the two other players in the case of course -- as
17   you're well aware, Mr. Styers and Mr. Scott, so forth.
18   Every one of those people -- and so forth, then I got
19   extremely suspicious.  And on Debbie's case -- okay.
20   That connects -- I had connections in the prison,
21   fortunately or unfortunately.  It was kind of an
22   ironic -- what?
23   Q.   So, yeah, keep reading to yourself.  But the
24   question I have is you say, "Mr. Styers is just
25   adamantly -- you know, just was crying quite a bit and

Page 179

1    saying that she didn't have anything to do with it, I
2    made up the story that I told Scott to get him to go
3    along with me."
4        Do you remember what that that was about and
5    where you got that information?
6    A.   Do I know what that was about?
7    Q.   It sounds like you're telling her that another
8    inmate reported something.  That's my interpretation, but
9    I may be incorrect.
10   A.   I got this -- that information I remember
11   getting, but I don't remember where I got it.  In other
12   words, he eventually -- and you can ask Kirk about this,
13   and I'm pretty sure Kirk told me about -- you know, I
14   seem to remember that -- I know one thing for a fact,
15   that in my opinion, he really changed and basically said
16   Debra didn't have anything to do with it.
17   Q.   When you say "he" changed, are you referring to
18   Styers?
19   A.   Styers.
20   Q.   And when you say "changed," what do you mean?
21   A.   He was silent, and then he said something to
22   other people.
23   Q.   Other inmates?
24   A.   Yeah, apparently, yeah.
25   Q.   Where -- and when you say I -- that Styers said

Page 180

1    I made up the story that I told Scott to get him to go
2    along with me, do you remember what you're talking about
3    specifically?
4    A.   Yeah, that was my conclusion.  I mean, I'm
5    giving -- that's my conclusion that made -- that's the
6    only thing that made sense to me.  Because if I remember
7    correctly, Saldate -- Scott is the one that told Saldate
8    that Debra was in on it and Styers, in order to get him
9    to go along with him to kill Chris, he told him that
10   story.
11   Q.   That Debra was involved and that --
12   A.   Yes.
13   Q.   -- Debra was going to give him some insurance
14   money?
15   A.   Yeah, right.
16   Q.   Okay.  So it's your belief that Jim Styers told
17   Roger Scott that Debra was in on the plan to murder
18   Christopher and that Debra had agreed to give Roger Scott
19   some of the money, some of the life insurance money she
20   would receive as a result of Christopher's death?
21   A.   Is that -- do I believe that?
22   Q.   That's your belief, that --
23   A.   Yes.
24   Q.   Okay.  And then a little ways down from there,
25   you say that Scott drove the car and Mr. Styers just did



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential                July 23, 2018
Debra Jean Milke vs City of Phoenix                               181—184

Page 181

1  it. And he said, quote, Well, I love Debbie, and I knew
2  I couldn't get anywhere with her because of her
3  ex-husband and her son. She wouldn't really give me the
4  time of day and so I did what I did, end quote.
5      Why is -- or what forms that belief that
6  that's what occurred?
7      A.   Just all of the information I had. I can't
8  point to one thing. It just -- it's -- it's an opinion
9  based upon all of the information I had that made sense
10 out of how this thing came down.
11      And as positive as I can be, this
12 information came -- you know, you can ask Kirk, but this
13 information was -- he and I -- I would say this
14 information was a conclusion that he and I reached after
15 looking at all of the evidence we've uncovered to explain
16 what happened.
17     Q.   Right. That was -- that was a way for you to
18 explain how Roger Scott would have arrived at the
19 conclusion that Debra Milke was involved?
20     A.   And told --
21     Q.   And told --
22     A.   -- Saldate that.
23     Q.   And told Saldate that, which cleared your
24 client of any involvement. Correct?
25     A.   You mean Debra?

Page 182

1      Q.   Yes.
2      A.   Well, it goes further than that. It was a
3  motivation for Saldate too, as I understand it, and I'm
4  pretty sure Kirk can testify to this because he was there
5  at the trial, that apparently he flew down a helicopter
6  because he was -- he couldn't give Scott a deal to
7  testify.
8      Q.   Why is that? Well, police officers don't give
9  deals to testify, do they?
10     A.   No.
11     Q.   Isn't that the prosecutor?
12     A.   Prosecutor, yeah.
13     Q.   Right.
14     A.   Well, okay. The prosecutor, you know, but --
15 but Saldate is smart enough to know that -- know that --
16 and he wouldn't want to give Scott a deal to testify
17 against Debbie, and Styers wouldn't testify against,
18 period.
19     Q.   Where's the evidence that Detective Saldate was
20 consider -- had any consideration of a deal that might or
21 might not -- might not be given to one of the individuals
22 involved in this murder?
23     A.   It's my conclusion because the only way -- if
24 he believed Scott, then he needed a confession from Debra
25 to get her, to convict her. That's the motivation.

Page 183

1  Otherwise, he couldn't give the other two guys immunity
2  or deals to testify --
3      Q.   He who?
4      A.   -- against herself.
5          Huh?
6      Q.   He who?
7      A.   Saldate.
8      Q.   Saldate doesn't have --
9      A.   The prosecutor.
10     Q.   -- power to give anybody deals, does he?
11     A.   I know, but he's talking to the prosecutor,
12 believe me.
13     Q.   At the time of Debra Milke's trial?
14     A.   Now you're --
15     Q.   Or at the time of Scott's and Styers' trials?
16     A.   No. I'm going back to the time this came down.
17 And I tell you when a -- when a defense attorney, when a
18 prosecutor -- cop/prosecutor -- the cops can give deals
19 too, but they got to get them approved by the prosecutor,
20 and a lot of times they will cut deals. But they have to
21 be approved by the prosecutor. What I'm saying is that
22 they couldn't give --
23          How are you going to convict Debbie?
24          Saldate believes that she was involved.
25 Okay? How do you convict her? There's no other

Page 184

1  evidence, no evidence at all unless you get a confession.
2          And because, like I said, Styers wouldn't
3  implicate her and Scott was saying -- telling Saldate
4  what Styers told him.
5      Q.   Okay. These are all your theories. Right?
6      A.   No. I mean, theories based upon factual stuff
7  that I'd looked at. And you're going to start talking --
8  asking me about that, that was 20-some-odd years ago, and
9  -- and you expect me to be like the next day and pop up
10 with this stuff, and I -- I can't get into specifics.
11 I'm just saying, you know, this is the logic I used to
12 figure out.
13          And then plus the fact that -- that, you
14 know, there's other -- other evidence too.
15     Q.   Has this --
16     A.   Styers was in -- you know, is -- here again, I
17 Kirk -- you know, I'm sure I got the information.
18          Styers was in -- in two -- two -- in two
19 terms -- two -- two terms in the military, you know,
20 fighting in a -- in an ugly war, and then he gets a
21 concussion and whatever. But I've dealt with men that
22 come back from Vietnam particularly and -- and -- and
23 they react and shoot people. It's like -- it's a sad
24 situation.
25     Q.   Were you aware of any --



Page 185

1   A.   Oh, here you go --
2   Q.   -- shootings that --
3   A.   -- anybody, no.
4   Q.   Let me finish --
5   A.   I am aware over --
6   Q.   -- my question.
7        Were you aware of any shootings that
8   Mr. Styers was involved in in Vietnam?
9   A.   No.
10       What do you think he was doing over there?
11  Q.   Are you -- can you point me to any evidence, as
12  you sit here today, that Detective Saldate at any time
13  considered what deals or immunities might be given to
14  Styers, Scott or Debra Milke?
15  A.   No, I don't have any direct evidence. I'm just
16  thinking as to how else could they convict her if they
17  thought she was guilty and they didn't have the evidence.
18       MS. BERKE: Yeah. One of the attorneys has
19  requested a break, so we're going to take a short rest
20  room break.
21       THE VIDEOGRAPHER: We're off the record at
22  4:18.
23       (A recess was held off the record.)
24       THE VIDEOGRAPHER: We're back on the record
25  at 4:26.

Page 186

1   Q.   BY MS. BERKE: You would agree that Debra Milke
2   has never been exonerated for the murder of Christopher
3   Milke. Correct?
4        MS. HOFFMANN: Objection.
5        THE WITNESS: You are using the word
6   exonerated. You should use the word found innocent,
7   actual innocence.
8   Q.   BY MS. BERKE: Okay.
9   A.   And that's right.
10  Q.   Okay.
11  A.   Actual innocence. Exonerated is -- yeah. In
12  other words, she was found guilty of misconduct by the
13  police officer and the prosecutor that can be corrected
14  in another trial. It's not a constitutional violation.
15  In other words, if you search somebody in violation of
16  the constitution, you can't go back and do the search
17  right.
18       So, yes. People call it a technical
19  violation, but it's a law under the -- under the Brady
20  case that you got to turn over all exculpatory evidence
21  to the defense so it's a fair trial. It's a due process.
22  It's a fair trial.
23  Q.   What's the word exonerated to you?
24  A.   They use that when -- it's a general term.
25  It's used basically in a general term when there -- just

Page 187

1   it's too loose of a term. It can mean actual innocence
2   or it can mean technicality. It is used to cover all
3   those situations. In other words, she got off.
4   Q.   I see. Okay. And so what you were saying is I
5   agree she's never been found to be innocent of the crime?
6   A.   Yeah, actual innocence.
7   Q.   Okay. Now I'm going to move on to the
8   interview you conducted of Dorothy Markwell.
9   A.   Uh-huh.
10  Q.   It is Exhibit Number 39. It's somewhere in
11  there in front of you.
12  A.   139, okay.
13  Q.   No, not 139. 39. It should be there in front
14  of you.
15  A.   Oh, I'm sorry.
16  Q.   I think that's it. No, that's not it.
17  A.   There's 55. 156, 155. This opinion.
18       MS. BERKE: That's the one I asked if you
19  could copy.
20       THE WITNESS: I don't --
21       MS. ODEGARD: If I could copy?
22       MS. BERKE: Sorry, I had intended to get
23  that during a break, but I can just put a copy of it in
24  front of you.
25       MS. MCCARTHY: Which one was it? I'm sorry.

Page 188

1        MS. BERKE: Dorothy Markwell, Exhibit 39.
2        THE WITNESS: Now, where is -- where is my
3   copy?
4   Q.   BY MS. BERKE: We're finding it for you.
5   A.   Oh, you hid it from me.
6        MS. MCCARTHY: Yeah. And so --
7   Q.   BY MS. BERKE: Maybe we did. Oh, maybe I do
8   have it. Oh, I do have it.
9   A.   Uh-huh. Trying to drive me crazy.
10  Q.   I'll just write 39 on it.
11  A.   Okay.
12  Q.   Because that's what it is. All right. So --
13  A.   Thank you.
14  Q.   -- that's Exhibit 39.
15       MS. BERKE: Does anybody need one?
16       MS. ODEGARD: Yeah, I could use one.
17  Q.   BY MS. BERKE: And if you go to page 12 of that
18  interview, which is MILKE_NSB023972.
19  A.   Wait a minute. I got 11. Oh, here we go
20  again. I got 11 to 13.
21  Q.   Oh, gosh.
22       MS. ODEGARD: Oh, no.
23       THE WITNESS: I know. I do the same thing.
24       MS. ODEGARD: It's the heat.
25       THE WITNESS: When they do that on the back



ANDERS VILNER ROSENQUIST JR. Highly Confidential        July 23, 2018
Debra Jean Milke vs City of Phoenix                      189–192

Page 189

1  of the pages.
2        MS. BERKE: So apparently the double-sided
3  copy --
4        THE WITNESS: Right.
5        MS. BERKE: -- didn't get made again.
6        MS. HOFFMANN: Was this -- is this one of
7  the documents you brought with you today?
8        THE WITNESS: Huh?
9        MS. BERKE: It is. So he can just look at
10  his copy.
11  Q.   BY MS. BERKE: If you want to just take --
12        MS. HOFFMANN: You want to look --
13  Q.   BY MS. BERKE: -- from the documents you --
14  A.   Oh.
15  Q.   -- were provided -- yeah, you've got it there.
16  A.   Okay. Okay.
17        UNIDENTIFIED SPEAKER: Then hopefully we
18  don't need to copy --
19        THE WITNESS: Here we go.
20  Q.   BY MS. BERKE: So go to page 12.
21  A.   Markwell, 12, yeah.
22  Q.   Okay.
23  A.   Yeah, mine's full. Okay. I'm --
24  Q.   So this is --
25  A.   What --

Page 190

1  Q.   -- your interview --
2  A.   I'm going to give you this.
3  Q.   You want to give me the other one back?
4  A.   Yeah.
5  Q.   I'll take it. The defective one.
6  A.   Okay. Here we go.
7  Q.   Where I wrote 39 at the bottom.
8  A.   Pickinpaugh. Eww.
9  Q.   Here it is.
10  A.   Okay.
11  Q.   I'll take that back.
12  A.   Yeah, and here's those other exhibits. I don't
13  know what to do with these things.
14        UNIDENTIFIED SPEAKER: Focus on the odd
15  pages.
16  Q.   BY MS. BERKE: Okay. We'll just focus on the
17  odd pages.
18  A.   That's not fair.
19  Q.   I'm just kidding.
20  A.   That's not fair.
21  Q.   So -- okay. You have the complete copy that
22  you brought with you, so let's take a look at page 12 --
23  A.   Okay.
24  Q.   -- which is Exhibit 39. And the last line on
25  MILKE_NSB023972, the last three lines are you speaking.

Page 191

1  Correct?
2  A.   On page 12?
3  Q.   Yes. It's Bates-numbered MILKE_NSB023972.
4  A.   Two --
5  Q.   Do you have Dorothy Markwell or do you have
6  Sandra Pickinpaugh?
7  A.   Oh, I have Sandra.
8  Q.   Okay.
9  A.   I'm sorry.
10  Q.   That's okay. Just grab your Dorothy Markwell
11  one.
12  A.   Where the heck is --
13  Q.   Okay. Is it in the file folder? Oh, maybe
14  it's right there.
15  A.   There's Dorothy.
16  Q.   Okay.
17  A.   Sorry.
18  Q.   That's okay.
19  A.   Okay. Here we go. Oh. 12.
20  Q.   Third time's a charm. Right?
21  A.   Yeah.
22  Q.   So go to page 12.
23  A.   Okay. Here we go. Okay. Here we go.
24  Q.   The last line -- the last three lines are you
25  speaking. And, again, this is a --

Page 192

1  A.   Yes.
2  Q.   -- transcript prepared by your secretary --
3  A.   Yes.
4  Q.   -- of a --
5  A.   Transcribed of a -- of a tape recording I --
6  and the tape should be in the stuff that I gave Kimerer.
7  Q.   Okay. The last three lines are you speaking,
8  and in the last line, it says, "We have kind of -- how
9  would you call it? -- a psychological profile of Debbie
10  that she lies a lot." And then Dorothy responds, "She is
11  a good liar." Correct?
12  A.   Yeah. That's what I've -- I was aware of that
13  when the psychiatrist or -- I don't know who examined
14  her. I never saw it. I found out about it through Kirk
15  or some other way.
16  Q.   But you were aware of a psychological profile
17  of Debra Milke that concluded that she lies a lot?
18  A.   At this time, yeah, I was -- I was -- that --
19  okay.
20        Go ahead.
21  Q.   And then after she responds that Debra Milke's
22  a good liar, you say, quote, They didn't say she was a
23  pathological liar, but they just -- you know,
24  professionals will say that a lot of times she would not
25  tell the truth, end quote.



ANDERS VILNER ROSENQUIST JR. Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                        193—196

Page 193

1    And so you became aware of this information
2  from Kirk Fowler or --
3    A.  Yeah.  But I don't know for sure.  I know that
4  either Ken Ray or -- had a -- did a psychiatric exam of
5  her.  I don't even know the doctor.  But it was -- that's
6  what it said.
7    Q.  Why were you providing that information to
8  Dorothy Markwell?
9    A.  Same reason.  Well, if you start out at the
10  beginning, she would have hung up on me.  So what I was
11  trying to do is -- and she was the hardest -- the hardest
12  one to get to talk to because she's the one who had the
13  comment that Levy used of throwing Chris against the
14  wall.  And I had to get her to relax, trust me, whatever,
15  diffuse her so she's comfortable.  And as you can see
16  about halfway through it, she started talking and
17  that's -- and then I got what I wanted.
18    Q.  So you felt if you gave up a little bit of
19  information about your client, which was truthful
20  information that this psychological profile had concluded
21  that she lies a lot, you felt that you would be able to
22  get more information from Ms. Markwell?
23        MS. HOFFMANN:  Objection.
24        THE WITNESS:  Well, yeah.  I have to be
25  truthful.  I mean, here I go.  I'm as truthful as I can

Page 194

1  be to kind of balance things out.  But, yeah, I mean, the
2  whole purpose of that is what I told you.  Otherwise,
3  it's a cold call from somebody she doesn't know.  She
4  testified, her testimony was pretty damning, and so I --
5  and then when I saw how Levy questioned her, I had to get
6  down to the details because they had told her, you know,
7  first of all, We just want to -- I think a background or
8  something -- character witness.
9        And then -- and then they lied to her about,
10  you know, just wanting -- and then they start asking her
11  the exact opposite questions and the -- I mean, she says
12  it herself.
13    Q.  BY MS. BERKE:  And then you go on to tell her
14  that Debra Milke manipulates.  Correct?
15    A.  Yeah.
16    Q.  And you knew that to be the case.  Correct?
17        MS. HOFFMANN:  Objection.
18        THE WITNESS:  But she says -- she -- I was
19  aware that she said stuff like that.
20    Q.  BY MS. BERKE:  Well, no.
21    A.  I mean, that -- I said it.  What do you want me
22  to --
23    Q.  I'm sorry.  Let me clarify.
24    A.  Okay.
25    Q.  You were telling Dorothy Markwell that Debra

Page 195

1  Milke manipulates.  Correct?
2    A.  Uh-huh.
3        MS. HOFFMANN:  Objection.
4        THE WITNESS:  Well, yeah, I mean, there.
5    Q.  BY MS. BERKE:  And that was a truthful
6  statement.  Correct?
7    A.  Well, it was based upon I think that
8  psychological report, but yeah.  But see, Dorothy and
9  this...
10    Q.  And then if you go to page 28 of the transcript
11  of the Dorothy Markwell interview you conducted, it's
12  MILKE_NSB032988 --
13    A.  Uh-huh.
14    Q.  -- the last five lines, it's you speaking.
15  Correct?
16    A.  Yes.
17    Q.  And you say, quote, Actually, really I'm
18  relieved because my psychiatrist -- I mean, I have been
19  around this business for 22 years.  This is just the
20  perfect profile.  And I have talked to him about it and
21  they say, quote, we don't have enough facts and we cannot
22  get the facts from her because we don't know when she is
23  telling the truth and when she is not, end quote.
24        Did I read that correctly?
25    A.  Yes.

Page 196

1    Q.  And Dorothy responds, "I know, she is a real
2  good liar."  Correct?
3    A.  Yes.
4    Q.  And the "she" that you are both referring to is
5  Debra Milke.  Correct?
6    A.  Yes.
7    Q.  And so do you remember who the psychiatrist was
8  that you're referring to?
9    A.  It wasn't doing well.  I know that.  It was
10  this -- it had to be the psychiatrist that did the
11  profile on her that said all of these things.  And I
12  wasn't in a position or wanted to argue with -- argue
13  about that.  That wasn't the issue.
14    Q.  And you shared with Ms. Markwell that this
15  psychiatrist who did a profile of her, who you hired,
16  told you that we can't tell when she's telling the truth
17  and when she's not.
18        MS. HOFFMANN:  Objection.
19    Q.  BY MS. BERKE:  Correct?
20        MS. HOFFMANN:  Misstates his testimony.
21        THE WITNESS:  I hired?
22    Q.  BY MS. BERKE:  Oh, Kenneth Ray hired.
23    A.  Yeah.  I mean -- yeah.
24    Q.  Okay.
25    A.  Okay.



Page 197

1    Q.   I apologize.  But hired by the defense?
2    A.   Yeah.  Not me.
3    Q.   Okay.
4    A.   Okay.  Okay.
5    Q.   You would agree that police officers are
6    permitted under the Arizona Rules of Criminal Procedure
7    to destroy their notes once they are substantially
8    incorporated into a report.  Correct?
9    A.   I would agree that they are, what, allowed to?
10   Q.   Right.
11   A.   At that time, that's what they did.  I mean,
12   it --
13   Q.   That was common practice?
14   A.   Oh, no, I will not -- no, I will not say it's
15   common practice.  If a police officer's telling the
16   truth, he will make his notes, and based upon those
17   notes, he will write his report when he has time and does
18   it.  But police officers, if they destroy their notes,
19   that's -- that's -- that's -- raises suspicion.  It
20   really does.
21   Q.   Can you -- you would agree that under the law,
22   police officers are permitted to destroy their notes once
23   they are substantially incorporated into a report.
24   Right?
25   A.   Not under the law.  In other words, there's no

Page 198

1    law against it back then.
2    Q.   Is there now?
3    A.   Well, it's a different situation now.  Police
4    officers, I mean, they're -- they're virtually -- I mean,
5    normally now police officers bring the people in, put
6    them in an interrogation room, and in -- it's recorded,
7    it's video, it's -- in other words, there's a lot of
8    corroboration.
9         And back then, yeah, they could -- they
10   could destroy it.  And they -- and police officers did.
11   Q.   And it was common practice.  Correct?
12   A.   I wouldn't say that.  I would say a good police
13   officer keeps his notes.  But it's just one of those
14   things, those little pieces of circumstantial evidence
15   that you say, okay, look at this, this is kind of
16   suspicious.  Circumstantial evidence is pretty soon when
17   you have so many of these things that are -- look bad, it
18   comes together to reach beyond a reasonable doubt.
19   Q.   Are you able to name any police officers who,
20   during this time frame in 1989, 1990, would keep their
21   notes and not destroy them after they're substantially
22   incorporated into a report?
23   A.   I wouldn't -- I wouldn't be -- I wouldn't know
24   who to -- I don't know any police officers' names.  I
25   know that it was general practice for -- I mean, police

Page 199

1    officers could either keep them or destroy them.  As a
2    defense attorney, it's just one of the elements.  In and
3    of itself, you're not going to get very far, but it's
4    just another little piece of circumstantial evidence.
5    Q.   Right.  So you're not able to identify a
6    particular police officer who you're aware of who would
7    not destroy his or her notes back in that time frame --
8    A.   No.
9    Q.   -- once they were incorporated into a report?
10   A.   No.
11        THE COURT REPORTER:  Exhibit 158.
12        (Exhibit 158 was marked for identification.)
13        MS. HOFFMANN:  I would like a copy, yes.
14        MS. BERKE:  Yes.
15   Q.   BY MS. BERKE:  I'm showing you what's been
16   marked as Exhibit Number 158.  Are you familiar with this
17   document?
18   A.   I'm not familiar with it, but it's what I
19   file-stamped I did.
20   Q.   You don't recall this document?
21   A.   Not specifically, no.  I mean, I have no reason
22   to disbelieve -- I have no reason to be suspicious that
23   it's not what I filed.
24   Q.   And you were acting as Debra Milke's agent when
25   you filed this document.  Correct?

Page 200

1    A.   Attorney?
2    Q.   Attorney and agent.
3    A.   Okay.
4    Q.   Correct?
5    A.   Yes.
6    Q.   And what is the purpose of this document, this
7    amended petition for postconviction relief?
8    A.   Well, back in the -- in '95, you file an
9    initial petition for postconviction relief, which -- you
10   used to.  And then you're allowed -- you know, you name
11   the specific categories that you think there's issues.
12   And then you've got as much -- you know, got a
13   considerable amount of time to actually do the -- they
14   call it the petition on the merits, in other words, and
15   then so that's what they mean, amended petition to
16   post- -- in other words, this is -- the memorandum points
17   and authorities, this is what they call on the merits.
18   Q.   This is --
19   A.   All the arguments in cases and everything.
20   Q.   This is the merits document?
21   A.   Yes.
22   Q.   Okay.  And so are you pointing out to the Court
23   in this document the bases on which you claim Debra Milke
24   did not receive a fair trial in this case?
25   A.   Yes.



Page 201

1    Q.    And one of the bases that you contended that
2    she did not receive a fair trial is that, quote, The
3    prosecutor in Debra Milke's trial was with the
4    acquiescence of the trial court allowed to engage in
5    misconduct that resulted in a, quote, trial by ambush,
6    end quote.
7          You claimed that he repeatedly misstated
8    prior testimony, relied on innuendo and engaged in
9    inflammatory rhetoric and improper argument to secure a
10   conviction and death sentence for Debra Milke.  Correct?
11   A.    Yes.
12   Q.    And you also claimed that the trial court's
13   rulings clearly demonstrated the existence of
14   impermissible bias against her.  Correct?
15   A.    Yes.
16   Q.    And it was your position and Ms. Milke's
17   position that her guilt was determined by a jury which
18   was unconstitutionally selected.  Correct?
19   A.    Yes.
20   Q.    And you also argued that Debra Milke was
21   represented at trial by an attorney who failed to
22   properly investigate the case or to adequately prepare
23   for her trial.  Correct?
24   A.    Yes.
25   Q.    And her trial attorney was Kenneth Ray?

Page 202

1    A.    Yes.
2    Q.    What do you know about Kenneth Ray in terms of
3    his quality -- the quality of his lawyering?
4    A.    Well, Ken's a nice guy and I knew him pretty
5    well.  But he was like a misdemeanor attorney and, you
6    know, he handled low-level felonies and misdemeanors,
7    DUIs and stuff like that.
8          And what -- what he did was get on a list of
9    revolving -- where cases are, you know, down the line
10   assigned, and he got assigned to this case.  And, you
11   know, with all due respect to him, he -- he was just not
12   prepared for -- to handle this type of case.
13   Q.    A death penalty case?
14   A.    Especially a death penalty case, yes.
15          Nowadays, they have two attorneys that are
16   death penalty qualified, two attorneys to every death
17   penalty case that are -- receive the specific training in
18   death penalty cases only.  But back then, it could be a
19   petty theft, any felony and then, all of the sudden, a
20   death penalty case down the line.
21   Q.    Are you so certified?
22   A.    Not as death penalty, no.  They didn't -- I
23   said nowadays.  Those days, it was a roll of the dice.
24   Q.    Okay.  Do you recall, as you sit here today,
25   how it is you believe he failed to adequately prepare for

Page 203

1    her trial or would you need to read the brief?
2    A.    No, he -- he -- he was not competent to handle
3    this serious a case.  That -- that's the point.  I
4    mean -- and I'm talking about competent.  I'm not talking
5    about somebody that -- misconduct or anything else.  It's
6    like, you know, having you go out or somebody -- me go
7    out and try to fly a plane.  You know, it just -- he
8    didn't have the experience that you need to to try the --
9    I mean, this is life or death.  You know, in those days,
10   it was -- it was pretty bad.
11   Q.    What -- what is your position in terms of what
12   he should have done differently to prepare for her trial?
13   A.    You know what, I can't -- it's in the petition.
14   Initially, these are allegations.  And then when you get
15   out of State Court, then you go and you file a habeas.
16   And you can use the different -- you usually discard all
17   the allegations that are not constitutional, federal
18   constitutional violations.  So here you allege a lot of
19   things.
20          And, I mean, he was overwhelmed, you know.
21   I know the judge.  I know Cheryl Hendricks.  I went to
22   school with her.  The way she handled this case, this
23   trial and Levy handled the trial and up against the --
24   you know, it's like a black belt going up to some guy
25   who's -- who's -- I don't know, used a sling shot.  I

Page 204

1    mean, it's like so outweighed.
2          And then you get the -- you get a -- you
3    know, I mean, I hate to say this, but it's obviously in
4    the record.
5          And Cheryl Hendricks, as I understand,
6    basically said sometime back that she should have not
7    given her the death penalty, comment I heard.  You know,
8    still part of the grapevine.  And -- and if you can
9    imagine paying somebody like $20 an hour and
10   investigation and Kirk did his best, but they couldn't
11   have done what -- what I did.  It took me so long to do
12   that.
13          So it's not that he -- I don't know.  You
14   know, you get somebody like John Leonard or Tom Tennis or
15   -- or Tom Karas, the big heavyweights in those days, it
16   would have been a different story, but they were private
17   -- private defense attorneys.  But just overwhelmed.  All
18   the publicity it got, totally intimidated.
19   Q.    If you go to page 8 of Exhibit 158 --
20   A.    Okay.
21   Q.    -- paragraph 16, you state that Detective
22   Saldate engaged in a pattern of rampant overreaching in
23   his effort to secure the type of information that he
24   wanted from suspects under his control.
25   A.    That's just an allegation.



ANDERS VILNER ROSENQUIST JR. Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                                    205–208

Page 205

1    Q.   And you cite to some cases.  Are those cases --
2    A.   Yeah.
3    Q.   -- that you found through that search --
4    A.   Yes.
5    Q.   -- with your investigators that were law
6    students?
7    A.   Yes.  Yeah, I'm pretty sure there's -- I think
8    there's more in there too.
9         THE WITNESS:  You know, I have to take a
10   break, if you don't mind.
11        MS. BERKE:  Not at all.  That's fine.
12        THE VIDEOGRAPHER:  We're off the record at
13   4:55.
14        (A recess was held off the record.)
15        THE VIDEOGRAPHER:  We're back on the record
16   at 5:02.
17   Q.   BY MS. BERKE:  All right.  If you would turn to
18   page 36 of Exhibit 158, please.
19   A.   Okay.
20   Q.   Go to paragraph 93.  Ms. Milke --
21   A.   You said page?
22   Q.   36.  I'm sorry.  I might have told you the
23   wrong page number.  I apologize.  Page 36.
24   A.   Go to what?
25   Q.   Paragraph 93.  Do you see where I am?

Page 206

1    A.   Got you.
2    Q.   Ms. Milke alleges that she was denied effective
3    assistance of counsel in violation of the 6th and 14th
4    Amendments of the United States Constitution and Article
5    2, Sections 1, 4, 15 and 24 of the Arizona Constitution
6    and due process because of the performance of her
7    attorney, Ken Ray.  Correct?
8    A.   Yes.
9    Q.   Claiming that he fell below reasonable
10   standards of representation.  Correct?
11   A.   Yes.
12   Q.   She alleges that Mr. Ray failed to exercise the
13   skilled judgment and diligence expected of reasonably
14   competent criminal defense lawyers in investigating the
15   case, preparing the guilt-phase trial and presenting
16   evidence and a defense at trial and that resulted in
17   prejudice to her.  Correct?
18   A.   Yes.
19   Q.   And she goes on to allege that there was no
20   tactical or strategic decision for Mr. Ray's failure to
21   investigate and prepare adequately for trial -- for his
22   performance at trial.  Correct?
23   A.   Yes.
24   Q.   And Ms. Milke alleges that but for the
25   performance of Mr. Ray, the results at trial would have

Page 207

1    been different for her.  Correct?
2    A.   Yes.
3    Q.   So, in other words, but for his performance,
4    she would have been found not guilty.  That's the
5    argument she's making here?
6    A.   Yes.  That's the -- that's the ineffective
7    assistance of counsel requirement.
8    Q.   Okay.  And then on the next several pages, you
9    and Ms. Milke go through the various bases or the various
10   facts that support that argument.  Correct?
11   A.   Yes.
12   Q.   And one of -- if you go to page 41, one of the
13   bases on which she claims that Mr. Ray failed to exercise
14   the skilled judgment and diligence expected of a
15   reasonably competent criminal defense lawyer is that he
16   failed to subpoena the personnel records of Detective
17   Saldate until September 18th of 1990, a full week after
18   he had first testified in the voluntariness hearing and
19   after Mr. Ray had cross-examined him during trial in
20   front of the jury.  Correct?
21   A.   Yes.
22   Q.   And so can you explain when that should have
23   been done?
24   A.   The investigation?  Before the voluntariness
25   hearing.

Page 208

1    Q.   So was it your practice at that time to always
2    request a police officer's personnel file in advance of a
3    voluntariness hearing?
4    A.   Well, you try.  I mean, sometimes they'll give
5    it to you, sometimes they won't.  But, yeah, I mean,
6    that's one of the things you'll request.  I&I has that,
7    and --
8    Q.   What is I&I?  You've said that several times.
9    A.   Oh, internal affairs.  It's I -- IA, actually,
10   but they call it I -- internal affairs.
11   Q.   Okay.
12   A.   That's the -- the part of the police department
13   that takes -- that runs roughshod over the police
14   officers.  In other words, they do a lot of stuff that
15   they shouldn't do, and I&I is what can get them fired or
16   dismissed or reduced in rank or -- it's not a criminal
17   thing; it's -- it's an employment thing.
18   Q.   And then in paragraph 109, Ms. Milke alleges
19   that Mr. Ray was also incompetent to -- in defending her
20   case because he failed to uncover or challenge Detective
21   Saldate with evidence of past misconduct that was
22   available via a thorough search of the public record.
23   Correct?
24   A.   Yeah.
25   Q.   And is that the thorough search of the public



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
209—212

Page 209

1  record that you had conducted by your investigators?
2     A.   Yes.
3     Q.   And so it's -- it was your and Ms. Milke's
4  position that Mr. Ray should have done that same thing?
5     A.   Yes.
6     Q.   And should have known to have done that?
7     A.   Well, if he would -- if he was faced with this
8  situation and had the experience and realized that it was
9  a he said/she said thing and what he was up against, yes.
10        I mean, you impeach somebody.  I mean, that
11  was the only -- this is the only thing he could have done
12  to get -- and, again, it's a -- it's kind of a shot in
13  the dark, but, you know, that's why I talk to people
14  initially, other attorneys I knew, because if they said,
15  you know, Saldate was -- is -- he really is a good cop,
16  he's trustworthy, is -- it would have been a different
17  story.
18     Q.   Well, is it your practice to --  Well, let me
19  back up.
20        How many death penalty cases have you
21  handled?
22     A.   Not -- I handle -- I handled a few of them
23  while I was in the public defender's office, but
24  Debra's -- Debra's was the first one I handled.
25     Q.   As a private practitioner?

Page 210

1     A.   Yes.
2     Q.   And in death penalty cases that you handled in
3  the public defender's office, did you conduct defense
4  interviews of the case agent and any police officers who
5  had significant involvement in the investigation?
6     A.   Well, of course.  I mean, yes.
7     Q.   And when you would -- and when -- you did that
8  in other criminal cases as well, not just homicide cases?
9     A.   Absolutely.  I have two habeases pending now.
10  And it took me almost a year to dig up all the -- do the
11  investigation and dig up all the evidence that, in my
12  opinion, is going to get them thrown out.
13     Q.   And is it your practice when you're conducting
14  those defense interviews to ask the police officer if
15  he's ever been found to have engaged in misconduct?
16     A.   You just never do that.
17     Q.   Why not?
18     A.   Because you don't want him to get mad at you.
19     Q.   Why not?
20     A.   Well, because the reality tells you that you
21  just don't do that.  You know, you never -- I mean,
22  Saldate's case is a rare case, and you see rare cases
23  where you have to do that because there -- but,
24  realistically, it gets you nowhere.  It just makes them
25  mad.  I mean, you're insulting them.

Page 211

1     Q.   And --
2     A.   Even if they're liars, they're -- you're still
3  questioning them, you're insulting them.
4     Q.   In a case like this where the defendant is
5  claiming that the detective fabricated a confession,
6  would that be a situation where you would ask the
7  detective about that in a defense interview?
8     A.   Well, ask if they had a history or what did you
9  say?
10     Q.   If they've ever been found to have engaged in
11  misconduct of any type.
12     A.   I wouldn't do it.  No, I don't know any other
13  attorneys do that.
14        If you're going to go after a police
15  officer, you better do your homework first because you
16  don't -- you know, when they're bad, they can be real
17  scary.  And you -- and you don't want them to turn -- you
18  don't want to turn them against you because, you know,
19  you're going to -- you could very well end up in plea
20  bargaining.
21        And, you know, you don't want a police
22  officer mad at -- I mean, mad at your client or mad at
23  you because they'll -- they have all the power with the
24  prosecutor and that's -- that's all there is -- I mean,
25  that's just where it -- that's the reality.

Page 212

1     Q.   And so you would agree that there was nothing
2  to have prevented Mr. Ray from doing the same public
3  records search that you conducted if he was competent to
4  handle a death penalty case.  Correct?
5        MS. HOFFMANN:  Objection.
6        THE WITNESS:  Well, that -- I mean, would
7  have prevented him to do that.  I doubt very much if --
8  well, I just don't know in those days.  I mean, when you
9  get $20 an hour and $30 an hour and an investigator gets
10  15 or 20 and the Court really clamps down on paying you,
11  there's probably a pretty good chance that he couldn't --
12  couldn't get it done.  I mean, I have to admit that.
13        It's -- it's just -- it's a sad situation,
14  is what it is, but I have to agree with you that -- I
15  have to agree with the fact that he could get it done,
16  but it would have taken him a lot of -- of course, Judge
17  Reinstein was pretty good about that.  I don't know.  It
18  was just a matter of money.
19     Q.   BY MS. BERKE:  Did you have some kind of a
20  grant to pay the law students?
21     A.   No.
22     Q.   Did they volunteer their time?
23     A.   No.
24     Q.   How were they paid?
25     A.   I paid them out of my pocket as a pro bono



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
213–216

Page 213

1  thing all the way through except for Renate had given me,
2  you know, 2,000 here, 3,000 here and that's about it.
3     Q.   Do you remember how much you paid those
4  volunteer investigators?
5     A.   I know I was at --
6     Q.   I'm sorry, not volunteers.  Do you remember how
7  much you paid those investigators?
8     A.   I'm guessing around, oh, 30,000.  Because I had
9  a licensed attorney there kind of supervising them.
10    Q.   Who was the licensed attorney?
11    A.   You know, he was a young guy and -- there's no
12  way I can remember who it was.  It's just too long ago.
13    Q.   Was it Robert Chermak?
14    A.   Could have been.  It sounds like it could have
15  been.
16    Q.   One of the things you say, if you go to page 46
17  of the petition, Exhibit 158, paragraph 124, Ms. Milke
18  alleges that --
19    A.   Wait a minute.  Which page?
20    Q.   46.
21    A.   Okay.  I got page 46.  You said 124?
22    Q.   Yes.
23    A.   Okay.
24    Q.   The -- a criticism of Mr. Ray is that he did
25  not have her testify on her own behalf during the

Page 214

1  voluntariness hearing.  She alleges that this decision is
2  inexcusable as a tactic or strategy given that she was
3  the only firsthand witness to Detective Saldate's
4  overreaching during her interrogation.  That's what you
5  and Ms. Milke alleged.  Correct?
6     A.   That's what I alleged, yeah.
7     Q.   And so can you explain the analysis that goes
8  into that?  Does -- when it's one person's word
9  against -- when it's the defendant's word against the
10  officer's, is it always the case that the defendant would
11  testify or would there be situations where they wouldn't?
12    A.   Well, it's a tactical thing, but in this case,
13  the voluntariness hearing is -- it encompasses -- they
14  call it voluntariness.  It's just basically a hearing
15  where the judge hears both sides and decides whether the
16  confession is voluntary or legal or fabricated or
17  whatever.
18        So that would have been the time that Ken
19  Ray should have been able to -- even presenting her
20  evidence as far as what happened in that room by him, it
21  would have countered it.
22        And plus I would have brought up the fact
23  that there was a police officer there that he actually
24  told to leave the room, didn't take a recorder like a
25  supervisor said and -- and didn't have her sign anything

Page 215

1  to -- to corroborate the confession.
2        So, yeah, because it's limited to just that
3  thing.  Not guilt or innocence, it's just a suppress --
4  voluntariness is basically the same as a motion to
5  suppress.
6     Q.   And does that waive any --
7     A.   You can't question them about -- you can't --
8  that would have been facts that -- he would have have
9  testified to and she would have just refuted it, and then
10  I would have argued and questioned her, I said, you know,
11  Is he telling the truth or isn't he?  You know, what did
12  he do, this, that and the other?
13    Q.   But that wouldn't constitute a waiver for a 5th
14  Amendment right to remain silent?
15    A.   No, no.  Those -- I mean, she has to volunteer.
16  I mean, she has the right to take the stand, too, if she
17  wants to in her trial, but then tactical decisions, you
18  know, it kind of depends on how your client's going to
19  come across.
20    Q.   Is it your testimony that any competent
21  criminal attorney who handles homicide cases would know
22  that they had to put her on the stand for this
23  voluntariness hearing, she needed to testify?
24    A.   I would --
25        MS. HOFFMANN:  Objection.

Page 216

1        THE WITNESS:  I would say that any competent
2  experienced attorney would do that.  And you weigh a lot
3  of factors.  I mean, you got to figure out -- you've got
4  to say, you know, is my client suicidal as far as saying
5  the wrong things or, in other words, competent -- you've
6  got to weigh a lot of things.  If they don't come across
7  right, then you don't have a choice, you just even don't
8  put them on there.
9        A lot of times when you go to trial, you
10  don't put your client on the stand because they'll turn
11  everybody off and convict themselves.
12    Q.   BY MS. BERKE:  Take a look --
13        MS. BERKE:  Actually, let me have another
14  document marked.
15        THE COURT REPORTER:  Exhibit 159.
16        (Exhibit 159 was marked for identification.)
17    Q.   BY MS. BERKE:  I'm showing you Exhibit 159.
18  And this is the reply that you filed on behalf of
19  Ms. Milke in response to the State's response to your
20  petition for postconviction relief.  Correct?
21    A.   Yes.
22    Q.   And attached as support for this reply is an
23  affidavit executed by Debra Milke.  Correct?
24    A.   Where is that at?  What page?
25    Q.   If you go back to MILKE_AZAG004897.  So keep



ANDERS VILNER ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
217–220

Page 217

1  flipping through.  Keep going.  It's towards the back.
2    A.  Oh, 97.
3    Q.  97.
4    A.  Okay.
5    Q.  And this is an affidavit that you prepared to
6  have her sign.  Correct?
7    A.  Yes, yes.
8    Q.  And, in fact, if you go to page 11 of the
9  affidavit, that's her signature.  Correct?
10    A.  God, I don't have any page numbers.  Wait a
11  minute.  Okay.  I'm sorry.  11.
12    Q.  Page 11 of the affidavit.
13    A.  9, 10, oh.  Here we go.  Yes.
14    Q.  And the information in this affidavit obviously
15  came from Ms. Milke.  Correct?
16    A.  Yes.  Well, yes.
17    (Exhibit 160 was marked for identification.)
18    Q.  BY MS. BERKE:  I'm showing you what's been
19  marked as Exhibit 160, and this is the Court's ruling on
20  Ms. Milke's petition for postconviction relief.  Correct?
21    A.  Yes.
22    Q.  It was filed on November 19th, 1996.
23    A.  18th, 1996.  Or 19th.
24    Q.  Correct?  Is that correct?
25    A.  Yes.

Page 218

1    Q.  And Judge Hendricks issued this ruling.
2  Correct?
3    A.  Yes.
4    Q.  Denying postconviction relief?
5    A.  Yes.
6    Q.  And if you go to page 4 of the ruling --
7    A.  Okay.
8    Q.  -- the last paragraph that starts "When the
9  defendant."
10    A.  Uh-huh.
11    Q.  Judge Hendricks states, quote, When the
12  defendant related the interview by Detective Saldate to
13  Dr. Kassell, her version of what was said was
14  substantially the same as what was in Detective Saldate's
15  report.  When the defendant testified she told the jury
16  about her interrogation by Detective Saldate, her version
17  of the interrogation was not much different from the
18  version given by Detective Saldate.  The only significant
19  difference between Ms. Milke's recollection of the
20  interview and Detective Saldate's recollection is when
21  and how she requested an attorney, end quote.
22    Did I read that correctly?
23    A.  Yes.
24    Q.  And you would agree with that, wouldn't you?
25    MS. HOFFMANN:  Objection.

Page 219

1    THE WITNESS:  I'm not going to offer an
2  opinion on that.  I mean, I'm not.  I mean, I disagree
3  with her logic in this as a defense attorney, and so I'm
4  not going to agree with anything she says.  She said it.
5  It's there.  And that's her reasoning.
6    (Exhibit 161 was marked for identification.)
7    THE COURT REPORTER:  161.
8    Q.  BY MS. BERKE:  Showing you what's been marked
9  as Exhibit Number 161.  Have you seen this document
10  before?
11    MS. HOFFMANN:  Sorry, I didn't get a copy of
12  that.
13    THE WITNESS:  I don't think so.
14    MS. BERKE:  Sorry.  We need one more over
15  here.
16    THE WITNESS:  That should be Fowler.  This
17  is his daughter -- Kirk's daughter, Maria.
18    Q.  BY MS. BERKE:  Maria Pulver?
19    A.  That's Fowler, F-o-u-l-e-r [sic].  Oh, wait a
20  minute.  Wait a minute.  Oh.  No, I apologize.  No, this.
21    Q.  Who's Maria Pulver?
22    A.  I guess the woman at the law school.  I don't
23  know.  I mean, she obviously -- it's kind of
24  self-explanatory.  I don't remember her name offhand.
25  The attorney I had in there was a man.  So...

Page 220

1    Q.  So this is an affidavit prepared by someone
2  named Maria Pulver or signed by somebody named Maria
3  Pulver.  Correct?
4    A.  Yes.
5    Q.  And she states in the first paragraph -- first
6  numbered paragraph that in May of 1995, at your
7  direction, she hired approximately eight paralegal
8  graduates and college students to work on a research
9  project for the Debra Milke case.  Correct?
10    A.  Yes.
11    Q.  And so it wasn't law students; it was paralegal
12  graduates and college students.  Correct?
13    A.  Yeah.  Yes.
14    Q.  And if you just read --
15    A.  Robert Chermak is that attorney.
16    Q.  Okay.  And she says in -- on page 3, in July of
17  1995, she transferred all of her responsibilities to
18  Robert Chermak.
19    A.  Okay.
20    Q.  Correct?
21    A.  Yes.  That sounds like it.
22    Q.  And how did Robert Chermak get involved in
23  this?
24    A.  He -- he's the guy I hired.  I don't remember
25  hiring her, but I must have.  And...



Page 221

1    THE WITNESS: I've got to go to the bathroom
2  again. I apologize. I drank a bunch of water.
3    THE VIDEOGRAPHER: We're off the record at
4  5:28.
5    (A recess was held off the record.)
6    THE VIDEOGRAPHER: We're back on the record
7  at 5:32.
8    MS. BERKE: Mark this.
9    MS. HOFFMANN: I'm sorry. Which one is
10 this?
11   MS. BERKE: Sorry. It's within the big
12 stack I just gave you. It's MILKE_NSB026981, and it's a
13 February 25th, 1998, letter from Debra Milke to her -- I
14 mean to Debra Milke from her mother.
15   MS. HOFFMANN: Okay. And it's my
16 understanding that all of these letters have been
17 produced as confidential and so that should be -- this
18 should remain confidential and this portion of the
19 deposition should be marked as confidential.
20   MS. BERKE: Okay.
21   Q.  BY MS. BERKE: So, Mr. Rosenquist --
22   MS. HOFFMANN: Sorry, I can't find -- you've
23 got to give me a minute --
24   MS. BERKE: Okay. Sure.
25   MS. HOFFMANN: -- to find it in this big

Page 222

1  stack.
2    MS. MCCARTHY: Sorry. What was the Bates
3  range on this?
4    THE WITNESS: You want to staple this?
5    MS. BERKE: It starts at MILKE_NSB026981.
6    MS. MCCARTHY: Thank you.
7    MS. HOFFMANN: Do you know where it was in
8  the --
9    THE WITNESS: Here. I know what it is.
10   MS. HOFFMANN: You want to --
11   MS. BERKE: Did you find it?
12   MS. HOFFMANN: No. They weren't in
13 chronological order.
14   MS. BERKE: I don't know.
15   THE WITNESS: You can just work off that.
16   MS. HOFFMANN: Let's see that one.
17   THE WITNESS: I've never seen --
18   MS. RETTS: It's about in the middle.
19   MS. HOFFMAN: Yeah.
20   MS. RETTS: It's one of the typed ones.
21   MS. MCCARTHY: Is it possible that we're
22 missing --
23   MS. BERKE: I don't think so. I mean,
24 anything's possible, but I don't think so.
25   MS. HOFFMANN: You can look there. I don't

Page 223

1  see it.
2    MS. BERKE: Did you find it?
3    MS. HOFFMANN: No. It's just...
4    MS. BERKE: Do you want me to tell me where
5  I'm going to question him?
6    MS. HOFFMANN: Yeah, yeah, yeah, yeah.
7    MS. BERKE: So if you just look at 26983,
8  the bottom right.
9    MS. HOFFMANN: Yeah.
10   MS. BERKE: The part that starts Debbie.
11   MS. MCCARTHY: Here.
12   MS. HOFFMANN: Thank you.
13   THE WITNESS: Oh.
14   MS. BERKE: Okay.
15   MS. HOFFMANN: This is 162?
16   MS. BERKE: Yes.
17   Q.  BY MS. BERKE: Mr. Rosenquist, I'm showing you
18 a letter that was from Debra Milke's mother to Debra
19 dated February 25th, 1998. And if you turn to the page
20 that's Bates-numbered MILKE_NSB026983 and go to the
21 second half of the letter, do you see it says, "Debbie, I
22 need some important information from you."
23   A.  Yeah.
24   Q.  "Please try to remember as best as you can or
25 if you have written material, send it to me."  Correct?

Page 224

1    A.  Do you remember --
2    Q.  That's what it says.
3      Do you see that?
4    A.  That's wrong.
5    Q.  Do you see where I read from?
6    A.  Yeah.
7    Q.  And did I read it correctly?
8    A.  Yeah.
9    Q.  And the first question she asks Ms. Milke is,
10 quote, Do you remember when exactly Anders became your
11 lawyer of record, and do you have anything in writing
12 that he signed, end quote.
13     Did I read that correctly?
14   A.  Yes.
15   Q.  And you told us that there wasn't anything that
16 she signed. Correct?
17   MS. HOFFMANN: Objection. Misstates his
18 testimony.
19   THE WITNESS: No. You know, the requirement
20 for retainer fee agreement would -- was pretty loose way
21 back then. It could be a verbal. Now it's changed over
22 the years drastically.
23   Q.  BY MS. BERKE: Right. And you -- I think you
24 testified earlier that because you were representing her
25 pro bono you didn't have her sign anything that you



ANDERS VILNER ROSENQUIST JR. Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                            225–228

Page 225

1 recall.

2    A.   Well, yeah.  Because I signed -- well --

3        MS. HOFFMANN:  Objection.  Misstates his

4 testimony.

5        THE WITNESS:  I didn't -- I didn't say I

6 didn't have to.  I just didn't think about doing that

7 because I was pro bono, so there's no fee involved and --

8    Q.   BY MS. BERKE:  But even when you're

9 representing someone pro bono, you're saying there

10 wouldn't be any requirement to define the scope of your

11 representation --

12   A.   Oh, yeah --

13   Q.   -- in writing?

14   A.   -- there would.

15   Q.   But at that time?

16   A.   No, at that time there was -- they didn't even

17 require a written document.  They started saying you

18 should put it in writing.

19   Q.   Okay.

20   A.   And then of course, the bar requires it, you

21 know.  It's required for a long time now.

22   Q.   And do you see the third item there, she says,

23 What, quote, book deal, end quote, or any other deal did

24 you sign with Anders, and do you have copies?  This is

25 very important.  I need to know the full load on this.

Page 226

1        Did I read that correctly?

2    A.   Yeah.

3    Q.   And so she -- she's apparently under the

4 impression that you have some kind of deal with Debra

5 Milke, possibly a book deal.  Correct?

6    A.   She's implying that.  That's crazy.  I

7 didn't -- I mean, I shouldn't say that, but she's got it

8 all wrong.

9    Q.   Did you ever have a book deal with Debra Milke?

10   A.   Gosh no.

11   Q.   Never discussed it with her?

12   A.   No.

13   Q.   Have you ever had a plan to write a book about

14 that case?

15   A.   No.  The only -- the book deal -- the only book

16 that was ever written her mother wrote in Germany.  And I

17 think what she's doing here is making sure she could cut

18 a deal over in Germany to write a book.

19   Q.   You --

20   A.   That's what my -- because Kimerer becoming your

21 second public defender, Kimerer was not involved at all.

22 He did the direct appeal.  He was -- he was out of the

23 picture.

24       What book deal, if any other deal, did he --

25 yeah, she's implying -- because she didn't know.  No way.

Page 227

1 This is a surprise to me.  But I can say that that's

2 probably the reason because that book of hers came out

3 and -- very, very upsetting.

4    Q.   Because you felt she was profiting on --

5    A.   Yeah.

6    Q.   -- Debra's case?

7    A.   Yeah.  It's poor me, you know, martyr mother,

8 MM, martyr mother.  It was terrible.  And had a big

9 picture of her standing in front of the prison with this

10 foreign look on her.

11   Q.   And why does that bother you?

12   A.   Because she's more worried about her reputation

13 and making money and being a celebrity than she's worried

14 about Debra.  Boy.

15   Q.   I'll show you another letter dated March 25th

16 of 1998, Bates-numbered MILKE_NSB026998.  It will take me

17 a second to find it here.

18       MS. HOFFMANN:  Which date did you say?

19       MS. BERKE:  March 25th of 1998.

20       MS. MCCARTHY:  Is it typed?

21       MS. BERKE:  It's typed.

22       THE WITNESS:  Oh, let me -- I need to

23 correct something.

24   Q.   BY MS. BERKE:  Sure.  Go ahead.

25   A.   Jana Bommersbach was writing a book on her.

Page 228

1    Q.   Who?

2    A.   Jana Bommersbach.  She goes back -- she was a

3 reporter from the New Times, and she wrote that Winnie

4 Ruth Judd book.  Yeah, and I talked to her about it,

5 yeah.  She was writing a book, and it came out in Germany

6 but -- I think.  Yeah.  But it never came out in the

7 States, and I never heard from her again.

8    Q.   Did you have some financial interest in it?

9    A.   No.

10   Q.   Did you receive any money from it?

11   A.   No.

12       MS. MCCARTHY:  Sommer, can we borrow your

13 stapler?

14       MS. BERKE:  I'm trying to find it.  Okay.

15 Can you find mine and I'll use this one.

16       MS. ODEGARD:  Okay.

17       MS. BERKE:  So we'll have this marked.

18       THE COURT REPORTER:  Exhibit 163.

19   Q.   BY MS. BERKE:  Exhibit 163 is a March 25, 1998,

20 letter to Debbie from her mother.

21       Do you see that?

22   A.   Well, I don't see a signature on it.  I -- oh,

23 yeah, here.  Well, your mom -- okay.  Yeah, okay.

24   Q.   And if you look at the first page, which is

25 MILKE_NSB026998.



ANDERS VILNER ROSENQUIST JR.  Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                                229–232

Page 229

1   A.   Uh-huh.
2   Q.   Debra Milke's mother, Renate, states, starting
3   at the fifth line from the bottom, quote, I truly had the
4   suspicion that I was writing Anders' book.  I was
5   thinking of your contract with him.  That's why I asked
6   you all those questions, end quote.
7        Do you see --
8   A.   Yeah.
9   Q.   -- where I'm reading from.
10  A.   Geez.  "I truly had suspicion that I was
11  writing Anders' book."  Well, she's writing a book.  "I
12  was thinking of your contract with him.  That's why I ask
13  you all these questions.  Between Judith, Carol, Rachel,
14  Karen and me, we all became frustrated, so I did a
15  background check on Anders, which came out good."  Oh,
16  thanks.  "But he still would have no time for you" --
17  "for me."
18  Q.   For me.
19  A.   "And felt that he was blocking everything I
20  tried to do in the public work."  God.
21  Q.   And then if you go --
22  A.   "Kirk always seemed to agree with my ideas, but
23  then wouldn't do anything" -- "or things to dig up."
24  Wow.
25       Now, what do you want to ask me.

Page 230

1   Q.   And then --
2   A.   That's a total surprise.
3   Q.   And then she says, a few lines down from there,
4   "Besides, Anders was royally pissed that I had spoken to
5   another attorney.  What a fool."
6        Do you see that?
7   A.   Where?
8   Q.   A few lines down from where you were just
9   reading.
10  A.   You mean the next page or --
11  Q.   No, 26999.  Just a few lines down from where
12  you were a moment ago.
13  A.   Oh, 999.  "I had dug up any" -- "set these guys
14  straight.  You see, they still look at me like I'm an
15  overemotional mom who can't think.  Besides, Anders was
16  royally pissed that I had spoken to another attorney.
17  What a fool.  I'll be glad to have someone of that
18  caliber to tell me that I needed to know and not charge
19  me.  I could have never hired him even if I wanted to.
20  But I am not too proud to" -- geez.
21       Oh, anyway, when Alex came over -- that's
22  way -- way back.  Alex was her first husband.  "We had a
23  meeting with Anders."
24  Q.   Her first husband?
25  A.   Yeah.  One of them died.

Page 231

1   Q.   Debra's father was her first husband.  Is
2   that --
3   A.   Yeah, yeah.  I'm sorry.  Yeah, that was --
4   yeah, right.  This was her husband from Germany that she
5   met at the air base here, and he passed away quite awhile
6   ago.
7        "We had a meeting with Anders, and boy, did
8   Alex set him straight as to what we expected from him.
9   After all, he hired himself."  Oh.  "Again, although he
10  was not an attorney of record upon appointment of
11  these" -- "those two public defenders."
12       Boy, I don't remember any of that.
13       She's -- she is very -- Kirk can tell you.
14  I don't know.  This blows me away.  None of this is true.
15  I never hired any -- tried to -- I had another attorney
16  that was really bright that was working with me -- I
17  can't think of her name right now -- on this stuff.  And
18  I paid her, but that was it.  And she knew her.  God, I
19  can't think of her name.  Anyway, that's unbelievable.
20  Oh --
21  Q.   So --
22  A.   I'm sorry.  Excuse me.
23  Q.   Sure.  Do you need to take that?
24  A.   No.
25  Q.   Okay.  So what here is inaccurate?

Page 232

1   A.   Everything.  I mean, this is unbelievable.  I
2   mean, she's off -- she doesn't understand anything.  I
3   mean, I don't know what she's -- she's coming off to --
4   Alex -- I mean, he was the nicest guy in the world.  He
5   didn't tell me -- tell me off or anything like that.
6   They came over briefly and we talked.
7        And, actually, now I remember, we even had a
8   birthday party for Renate when she was here at my house.
9   I remember that specifically, and he was there.  That's
10  the only meeting we ever had, and it wasn't a meeting.
11       God, this is wild.
12  Q.   Do you know anything about her speaking with
13  another attorney?
14  A.   No.
15  Q.   What about that last paragraph that starts out,
16  "Well, today" on the same page?
17  A.   Uh-huh.  Oh, well, that's nice of her.  God.
18       Yeah, I didn't have -- I knew Phoenix
19  Magazine -- I think they did write an article, but I
20  don't know anything about this guy.  Never talked to him,
21  I mean, you know.  The only person I know of is, you
22  know, the New Times, Bommersbach.  And then that one
23  Der Spiegel guy from Germany.
24  Q.   So this -- is there anything accurate in that
25  paragraph that says, "Well, today"?



Page 233

1    A.   Well, I used to fill her in all the time.  And
2  then she's talking about she -- I think there was an
3  article, but I didn't have anything to do with that.
4    Q.   And then look at --
5    A.   She was --
6    Q.   Look at the next page, two-thirds of the way
7  down that starts out that is the reason.  Do you see
8  where I am, the first -- actually --
9    A.   Oh, you're talking about --
10   Q.   27000.
11   A.   Okay.
12   Q.   The first words on the line are with amazing
13  things.  Do you see where that is?
14   A.   Give me a chance here.
15       Yeah.
16   Q.   And it starts, "That is the reason why Anders
17  is focusing now on the trial transcripts of Styers and
18  especially Scott and their medical background.
19  Thankfully, Scott's attorney is cooperating with us
20  because there's a wonderful tradeoff.  She needs the
21  stuff on Saldate and his methods to help her client in
22  this respect, knowing that he will not get off, but it is
23  her duty to show that her client wasn't treated properly
24  either.  That's all she wants.  In return, she will
25  furnish us with everything on Scott, showing his motive

Page 234

1  and capacity for either doing it himself or
2  participating."
3        Was that accurate?
4    A.   Nope, not at all.
5    Q.   Were you working with Scott's attorney and --
6    A.   No.
7    Q.   Not at all?
8    A.   I didn't even know who was representing him for
9  a long time.  And he was in jail and so was Scott, you
10  know.  I couldn't talk to them if I wanted to.  I mean,
11  his attorney --  No.  I could have talked to him, but I
12  sure don't remember, and he sure didn't help me out.
13  There was no tradeoff.
14   Q.   Then go to MILKE_NSB27003.  Go down toward the
15  bottom that says while I was with Anders today.  Do you
16  see where I am?
17   A.   Yeah.
18   Q.   He's -- she says, "I asked him your questions
19  and this is what I got.  We have to convince the Court
20  that the confession was inherently unreliable.  I am
21  hiring three professional experts to dissect Saldate's
22  narrative to come up with an affidavit concerning his
23  unethical conduct, just to let you know.  Now, we cannot
24  second-guess the judge, but upon enough proof, he can
25  declare it void, would mean the State's case has no

Page 235

1  bearing any more.  Your release could be ordered.
2        "Of course, there are the many other factors
3  too which Anders is putting together now with the help of
4  Scott's attorney which is also good, but the release
5  strictly depends on what the judge bases his opinion on."
6        Do you know what any of that is talking
7  about?
8    A.   No.  I think -- you know, I'm no psychologist,
9  but, you know, Kirk and I, we couldn't figure her out.
10  At first I was really happy to work with her and advise
11  her and stuff, and this is -- this is kind of delirious
12  stuff.  I mean, this is unbelievable.  I'm -- I am hiring
13  three professional experts to dissect -- that's -- no
14  way.  I mean, if she did it, I never heard about it.
15       She is -- how should I put it, you know?
16  She's died a couple -- two or three years ago, maybe
17  more.  But she was --  God.  I learned -- Kirk and I
18  learned not to trust her, I guess is the fairest way to
19  put it.
20   Q.   And why -- what was it that caused you not to
21  trust her?
22   A.   Well, the big thing was she kept wanting me to
23  write these summaries, these detailed summaries of what
24  was going on under the pretense that she needed that
25  to -- to -- to -- I don't know, to present the case over

Page 236

1  in Germany or whatever.  And I didn't really know what
2  she was doing in Germany.  I don't know how I found out.
3  Excuse me.  But she was getting very popular.
4        Wait until Kirk sees some of these things.
5    Q.   So did you know her to be dishonest?
6    A.   Not -- I just didn't trust what she was up to
7  because of that.  That's the only thing I can say.  She'd
8  want information from me, detailed stuff and I'd write up
9  stuff.  And about the third time I did that, I said,
10  what's going on myself, but...
11       MS. BERKE:  Next I'm going to show you a
12  letter from -- I'm sorry.
13       UNIDENTIFIED SPEAKER:  That's okay.
14   Q.   BY MS. BERKE:  Next I'm going to show you a
15  letter from Debra Milke to her mom dated April 30 and it
16  appears to be 1998.  It's MILKE_NSB026544.
17   A.   Okay.
18   Q.   So you can go ahead and read it while everybody
19  else is looking for it.
20       MS. MCCARTHY:  This one is handwritten.
21       MS. BERKE:  Handwritten.
22       MS. MCCARTHY:  Sorry.
23       MS. BERKE:  I can show you what it looks
24  like.  Looks like this.
25       MS. MCCARTHY:  Oh, there it is.  Okay.



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
237–240

Page 237

1   130.
2      Q.   BY MS. BERKE:  I'm going to be asking
3   specifically about the number that's marked 2.  It's
4   MILKE_NSB026546.  Midway down you'll see it starts I got
5   a letter from Anders?
6      A.   (Witness reading.)
7      Q.   Do you see where I am, 26546?
8      A.   Okay.  I got a letter from Anders.
9      Q.   Yeah.
10     A.   And he said --
11     Q.   So read there to the -- through the rest of the
12  page.
13     A.   (Witness reading.)
14          Yeah, I remember her not wanting me to visit
15  her because they'd have to shackle her up and had, like,
16  four guards with these huge machine guns walking two in
17  back of her and two besides her, and she had her legs
18  shackled and her arms shackled and both of them shackled
19  together so she had to bend over.
20          That's why she didn't want me to come out
21  there and visit her because they'd take her clear
22  across -- it happened one time and I saw it.  They take
23  her to -- took her clear across the yard in front of
24  everybody, all these other girls.  It was lockdown, but
25  they could still see.  And it was -- it was just too

Page 238

1   embarrassing.  Okay.  That's what she means, I can't take
2   it anymore.
3      Q.   I'm going to ask you about a different one, and
4   it's towards the end of the stack.
5      A.   Say that -- is that -- are we finished with
6   that?
7      Q.   Yeah.
8      A.   Yeah, that explained -- I mean, that's what she
9   meant, what she's talking about.  And I'll tell you
10  another thing they did too.  Once the -- once the
11  execution order was issued, they ran her through a trial
12  run clear to where they -- just like they were going to
13  execute her with gas, and they took her in there and
14  strapped her in the chair in the gas chamber and
15  basically shut the door, and the only thing they didn't
16  do was drop the pellet and then they, you know, took her
17  out and took her back to her cell.
18     Q.   And this is information she provided to you.
19  You didn't witness this?
20     A.   Oh, gosh, no.
21     Q.   Okay.  Let me --
22     A.   I mean, she told me that.
23     Q.   I need the court reporter to mark something, so
24  you can't keep talking.
25     A.   Oh, I'm sorry.

Page 239

1      Q.   That's okay.  This is a January 9, 2001,
2   letter, toward the end of the stack.  It's
3   MILKE_NSB031976.
4      A.   So what do you want me to read?
5      Q.   So this is a January 9th letter.  If you look
6   midway down, she says, "I've been talking to Anders on a
7   regular basis, about every other week, but I'm beginning
8   to feel like he's done nothing but appease me.  I don't
9   feel like he's been honest with me.  Back in September,
10  he told me that the media would make an issue out of
11  things if Nielsen opposed my motion for the documents.  I
12  specifically asked how and he told me not to worry about
13  it, that he has a list of numbers, blah-blah-blah.
14  Nothing happened.
15          "Then he tells me about a month later that
16  he met someone from that commission and that he would
17  submit an application to them, et cetera, et cetera.
18  When I asked what was up with that, he said he changed
19  his mind."
20          Do you know what this is all talking about?
21     A.   Appeal will drag out into the Ninth Circuit.
22  The only thing I -- wait a minute.  Okay.  Let me just
23  read it.
24     Q.   Sure.  You can read the whole thing if you
25  want.

Page 240

1      A.   January -- I don't know.  The only thing I can
2   think of is when I told you about that Christmas and
3   the -- getting the stay on the execution.  Because she
4   kept calling me -- well, she kept calling says, Has
5   anything happened, anything happened?  And I said, Not
6   yet, not yet.  And -- yeah.  I mean, she knew what I was
7   doing.  But I was doing -- filing the habeas and the stay
8   order and the end -- God, I don't know, you know.
9          The dates I'm getting mixed up, but the only
10  thing I could think of is that's what we were talking
11  about.  And when she says, "Oh, yeah, I'm happy that the
12  holidays are over but irritated to no end that I still
13  haven't heard from the Court."  Yeah.  This is -- that's
14  referring to the stay order, the execution.
15     Q.   I had my paralegal look up the substitution of
16  counsel date, and, you know, according to her -- which
17  she can't testify, I'm just going to tell you -- what she
18  found was that Kimerer substituted in on April 23rd of
19  2001.  Does that make sense to you?
20     A.   Yeah.
21     Q.   I mean, does that sound accurate?
22     A.   Yeah, because this would be about the right
23  time because once I got the stay order, I called her
24  and -- her counselor, and he told her -- because she's
25  saying holidays are over but irritated to no end that I



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
241–244

Page 241

1  still haven't heard from the Court.  That's the stay
2  order from the Federal District Court.  The waiting is --
3  yeah, I can understand.
4          And I was talking to her after that once it
5  was stayed, and then Broomfield had it, and I filed that
6  motion to interview those people.  I don't know whether I
7  talked to her about -- well, I filed a motion, and one --
8  and then he granted it, and then I called her to tell her
9  that, and then she wouldn't speak to me.  And that was
10  it.
11          MS. BERKE:  Can I get this marked?
12          THE COURT REPORTER:  166.
13          (Exhibit 166 was marked for identification.)
14    Q.  BY MS. BERKE:  I'm showing you what's been
15  marked as Exhibit 166.  Are you familiar with this
16  document?
17    A.  Oh, yeah.  Terri Capozzi was the attorney that
18  I worked with on -- that I hired -- well, I mean, she'd
19  been working with me for a while.  And she was pretty
20  sharp and so we worked together on preparing the
21  documents.  But I paid her.
22          And Chermak -- this is -- yeah.  I guess
23  he's the guy, Chermak, the attorney -- the attorney who
24  was in the -- overseeing the clerks that were...
25    Q.  And he prepared this memo?

Page 242

1    A.  Let me look here.  I think he did.  I mean,
2  yeah.  I mean, I don't -- remember Rangel Jones.  There's
3  more cases in here, and I remember that he gave me all
4  the cases, and then it was whittled down, is what I
5  remember.  One, two, three, four, five, six, seven,
6  eight -- oh, it's on the back pages.  Well, anyway, yeah,
7  there's that Runningeagle case.
8          Yeah, this is what he sent to me.
9    Q.  Okay.
10    A.  Because there was more cases than --
11          MS. BERKE:  Wait, wait, wait.  Wait, wait.
12  Okay.
13          THE WITNESS:  This is what he sent me, and
14  then I went through and whittled them down to the ones
15  that ended up being on the petition.
16          (Exhibit 167 was marked for identification.)
17    Q.  BY MS. BERKE:  And what analysis did you go
18  through to whittle it down?
19    A.  Finding the strongest evidence I could that he
20  was dishonest to the Court.  I figured that's the only
21  thing the Courts would ever -- would really look at.
22    Q.  I'm showing you what's been marked as Exhibit
23  167.
24    A.  Yeah.
25    Q.  Well, have you ever met Detective Saldate?

Page 243

1    A.  No.
2    Q.  Did you review any of the case documents other
3  than this memo that's Exhibit 166?
4    A.  What's 166?
5    Q.  The memo we were just discussing.
6    A.  Oh, this.  Ask me the question again.
7    Q.  Sure.
8          You've never met Detective Saldate?
9    A.  No.
10    Q.  And did you review any of the documents from
11  the cases listed in Exhibit 166, or did you just simply
12  review these summaries?
13    A.  Oh, no, I -- he gave me this, and then I went
14  through the cases and ended up with the ones I felt were
15  the strongest.  That was kind of the last -- the last
16  thing.  So this was reviewed -- he gave me this, and then
17  I looked at the cases and put together ones I felt were
18  the strongest.
19    Q.  Okay.
20    A.  What's this?  Affidavit.
21    Q.  And you weren't present when Armando Saldate
22  questioned Debra Milke.  Correct?
23    A.  Oh, gosh, no.
24    Q.  And so you don't know what was discussed in
25  that room.  Correct?

Page 244

1    A.  No.
2    Q.  I am correct?
3    A.  Yes, you're correct.
4    Q.  And so take a look at Exhibit 167.
5    A.  Yeah.
6          MS. HOFFMANN:  Sorry.  What's 167?
7          MS. BERKE:  Oh, did I not give it to you?
8  Sorry about that.
9    Q.  BY MS. BERKE:  This appears to be Exhibit 79 to
10  the amended petition for postconviction relief that we
11  discussed earlier.
12    A.  Oh.
13          MS. MCCARTHY:  Can we have this back?
14          THE WITNESS:  Okay.  This sounds pretty
15  accurate.  This refreshes my memory.  It's obviously more
16  accurate than my memory.  But it pretty much spells out
17  in essence what I did.
18    Q.  BY MS. BERKE:  And if you look at paragraph
19  8 --
20    A.  8.
21    Q.  -- they found 60 homicide cases that Detective
22  Saldate was involved in and 40 nonhomicide cases.
23  Correct?
24    A.  Yeah.  I mean, that's what he's saying.
25    Q.  Do you have any reason to doubt that?



Page 245

1    A.   No.

2    Q.   In paragraph 10, he states that from

3    September 4, 1995, to the present, which would be

4    September 25th, 1995, he's contacted 125 attorneys about

5    their recollections of Detective Saldate.

6         Do you see that?

7    A.   Yeah.

8    Q.   Did he prepare any kind of a memo summarizing

9    those calls?

10   A.   I don't -- I don't even -- I don't even know

11   about this.  I know he probably called the attorneys on

12   the cases that he found.  But I didn't -- didn't know a

13   number.

14   Q.   When is the last time you spoke with Robert

15   Chermak?

16   A.   Well, when we dissolved the -- the -- when they

17   did the work -- done, the work that I asked him to do.

18   And yeah.  Shut everything down.

19        MS. BERKE:  Let's take a quick break.

20        THE VIDEOGRAPHER:  We're off the record at

21   6:12.

22        (A recess was held off the record.)

23        THE VIDEOGRAPHER:  Stand by.

24        We're back on the record at 6:15.

25        MS. BERKE:  And I have nothing further.

Page 246

1    Thank you, Mr. Rosenquist.

2         THE WITNESS:  Thank you.

3         MS. BERKE:  The other attorneys will have

4    some questions for you.

5         THE WITNESS:  Oh.  That -- that's not fair.

6

7              EXAMINATION

8    BY MS. RETTS:

9    Q.   Mr. Rosenquist, I just have --

10   A.   Oh, okay.  Good.

11   Q.   I just have a few scattered questions, but in

12   that pack of letters that we were looking at --

13   A.   Yeah, I'll find them.  Whatever I did with

14   that.

15   Q.   Okay.

16   A.   I got them all memorized here.

17   Q.   Okay.  Let's mark that one as 168, and the

18   Bates number at the bottom is NSB027088?

19        MS. HOFFMANN:  What's the date on the

20   letter?

21        MS. RETTS:  The date on the letter is

22   November 16th, 1998.

23        THE WITNESS:  027088.  Okay.  I got it.

24        MS. BERKE:  November 10th?

25        MS. RETTS:  November 16th.

Page 247

1         (Exhibit 168 was marked for identification.)

2    Q.   BY MS. RETTS:  It appears to be a letter from

3    Renate and the first paragraph on 27088 --

4    A.   Okay.

5    Q.   -- it states, "I met with Barry Scheck" --

6    A.   Scheck.

7    Q.   -- "and he listened to me for 20 minutes.  He

8    promised me to call Anders."

9         Did you ever have a conversation with

10   Mr. Scheck?

11   A.   No, as far as I remember.  I might have.  I

12   don't -- I could have.  I just don't know.  Date-wise, it

13   was my impression that she hired Kimerer and Kimerer

14   contacted Barry Scheck.  But I don't know.  He promised

15   me to call Anders, says (witness reading under breath).

16        Oh.  What's your question?

17   Q.   You don't have a specific recollection of

18   whether or not you had any contact with Barry Scheck in

19   1998?

20   A.   I'll tell you it -- vaguely it sounds familiar.

21   That's all I can say.  I wouldn't want to say I didn't

22   because, I mean, I'm going way back and -- yeah.  I

23   wouldn't -- I wouldn't say I didn't.  I just don't

24   remember it.  Put it that way.

25   Q.   Do you have an understanding today that

Page 248

1    Mr. Scheck is an attorney with the law firm who is

2    representing Ms. Milke in her civil case?

3    A.   Yes.

4    Q.   Do you have any recollection of having any

5    conversations with Kirk Fowler about Mr. Fowler having a

6    session with Barry Scheck back in 1998?

7    A.   No.

8    Q.   Did you keep any type of a ledger that you

9    still possess about how much money you received from

10   Renate over the years relating to Debra Milke's

11   representation?

12   A.   No.

13   Q.   At some point in the deposition today, you

14   spoke about the rate of pay that Mr. Ray was likely

15   receiving and --

16   A.   That was just a guesstimate.  I know it was

17   really low and that kind of -- that number kind of sticks

18   in my mind way back then.

19   Q.   Do you agree than an attorney -- a criminal

20   defense attorney has an ethical obligation to represent

21   his client to the best of his ability regardless of

22   whether he's being paid anything at all?

23   A.   Absolutely.

24   Q.   So Mr. Ray had an ethical obligation to render

25   effective assistance of counsel regardless of whether he



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                                    249–252

Page 249

1  was being paid or what his rate of pay was.  Would you
2  agree with that?
3     A.   Yes.
4     Q.   Did you -- or do you, as you sit here today,
5  have a recollection of reviewing Detective Saldate's
6  testimony at the voluntariness hearing?
7     A.   Viewing it?
8     Q.   Yes.
9     A.   No.
10    Q.   Can you say today one way or another whether
11  you did or you did not review Detective Saldate's
12  testimony from the voluntariness hearing?
13    A.   I -- let me put it -- the only thing I can say
14  is I think I did, but I don't remember specifically.  I
15  mean, it would -- it would -- I mean, I would -- I would
16  think I did, but I can't -- I can't -- I remember the
17  transcripts and everything for sure, but that being part
18  of it, I would say that I did.
19    Q.   In that voluntariness hearing, Mr. Ray
20  questioned Detective Saldate about his involvement in the
21  Runningeagle case.  Do you have a recollection of that?
22    A.   No.
23    Q.   If Detective Saldate had given testimony about
24  his practices relating to Miranda or interrogation during
25  that voluntariness hearing, would you have expected a

Page 250

1  competent criminal defense attorney to follow-up on
2  information learned from that testimony?
3        MS. HOFFMANN:  Objection.
4        THE WITNESS:  Say that one more time,
5  please.
6        MS. RETTS:  Can you read it back, please?
7        (The last question was read back by the
8  court reporter.)
9        THE WITNESS:  Well, I -- I'd expect a
10  competent attorney to follow-up regardless of his
11  testimony because of the circumstances surrounding the
12  testimony -- the testimony and the information I knew
13  about him subsequent.
14    Q.   BY MS. RETTS:  As we sit here today, do you
15  have any recollection of any of the details about the
16  Runningeagle case?
17    A.   No.
18    Q.   If Detective Saldate had testified in the
19  voluntariness hearing that there were occasions where he
20  would continue to speak with a suspect after giving
21  certain Miranda rights, would you have asked him about
22  every single case where that occurred?
23    A.   No.
24    Q.   Why not?
25    A.   Because at that point in time, I wouldn't

Page 251

1  believe him.  And I don't think he would know.
2     Q.   What do you mean, you don't think he would
3  know?
4     A.   Well, if I understand your question, I would
5  follow up by asking him about every case.
6        Is that what you said?
7     Q.   Let's take a hypothetical question.
8     A.   Okay.
9     Q.   Let's say you're the criminal defense attorney
10  and you ask the homicide detective, Are there any cases
11  where you have ever continued to question a suspect after
12  he said he wanted to remain silent and the detective said
13  yes, do you believe a competent criminal defense attorney
14  should have clarified that and asked for the detective to
15  identify every single case in which that had occurred?
16        MS. HOFFMANN:  Objection.
17        THE WITNESS:  Well, yeah.  I mean, yes.  Not
18  that it would do much good.
19    Q.   BY MS. RETTS:  If you were the criminal defense
20  attorney who had received that response, you would have
21  followed up and said, Please tell me what cases that
22  occurred in.  Would you agree with that?
23    A.   Yeah.  And I'm sure he'd say, I don't remember.
24  That's --
25    Q.   But you wouldn't know that unless you asked the

Page 252

1  question.  Correct?  In other words, you can't -- you
2  can't say what he's going to answer until you at least
3  make the effort --
4     A.   I know, but --
5     Q.   -- to answer -- ask the question?
6     A.   But, realistically, when you're focusing in on
7  a detective that you think is not telling the truth, then
8  you assume that everything is distorted or lies or
9  whatever.  In other words, it's -- they call it not --
10  it's not credible evidence, reliable evidence.
11    Q.   So if you're coming from the place of assuming
12  that the detective is not telling the truth on
13  everything, wouldn't you agree that part of
14  cross-examination would be to find any type of objective
15  source that could prove or disprove what the detective
16  was saying?
17    A.   Well, of course, yes.
18    Q.   So as a competent criminal defense attorney,
19  that would be your focus, would be to elicit information
20  from that detective from which you can go and check to
21  tell if he was, in fact, telling the truth?
22    A.   Yes.
23    Q.   And one of the ways you could do that in the
24  scenario that I gave you was by having him identify any
25  cases, and if he did so, you would go and pull those



ANDERS VILNER ROSENQUIST JR.  Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
253–256

Page 253

1  police reports and any testimony in those criminal cases.
2  Would you agree?
3      A.  Yeah, if he identified them, but I've never had
4  that experience where a police officer can look back over
5  18 years of employment and be able to name off those
6  cases.
7          What you would normally do is ask them and
8  then lead into -- you know, he'd say, Well, I can't
9  remember, and then you'd request the judge to order him
10  to produce or the prosecutor to produce all the cases.
11     Q.  So one avenue, if the detective could not
12  remember the cases, would be to submit a request for
13  production of documents to either the Court or request
14  for disclosure to the State to produce all of the cases.
15  Would you agree?
16     A.  Yes.
17     Q.  During the course of your career as a criminal
18  defense attorney, whether at the public defender's office
19  or in private practice, did you submit any public records
20  requests?
21     A.  No.
22     Q.  You mentioned earlier that you were aware --
23  you were aware of the Phoenix Police Department having an
24  internal affairs division?
25     A.  Oh, yeah.

Page 254

1      Q.  Did you ever make a request to the internal
2  affairs division of the Phoenix Police Department for any
3  materials relating to any Phoenix police officer?
4      A.  I didn't.  I think Ken Ray did.  But it's
5  basically one of those things where at that time, the
6  internal affairs is -- at that time, they wouldn't turn
7  it over, and the judge wouldn't force them to turn it
8  over.  Or they'd do, you know, an in camera, you know,
9  examination, but it would never get that far.
10         Because at that time, they still treated
11  that as, you know, confidential unless -- the biggest
12  problem you got is you can allege -- you can allege
13  somebody's lying all you want.  But unless you got -- go
14  outside of the loop and do the investigation, you can't
15  really ask or expect the prosecution or the police
16  department to give you all of the damning evidence about
17  their police officers, and the prosecutor's the same way.
18  You can't expect that.
19     Q.  Based upon how you believe that things worked
20  and documents were turned over, would you believe that a
21  competent criminal defense attorney would have needed to
22  do that type of investigation and go outside the loop and
23  try to find whatever they could on testifying officers?
24     A.  Yeah.  Competent, yeah.
25     Q.  I want to go back to your statement that you

Page 255

1  didn't think that IA would turn materials over.  Was that
2  based upon your -- your own personal experience in
3  submitting a request to internal affairs?
4      A.  That was based on other attorneys in the public
5  defender's office and other attorneys in private practice
6  that I know, and it's basically -- they said it's a waste
7  of time.  And a judge is not going to enforce it.  And
8  this was back during that time.
9      Q.  So you did not, though, personally attempt to
10  do that?
11     A.  No.
12     Q.  I think you mentioned earlier that you were
13  aware of certain times when the public defender's office
14  made a complaint to the Phoenix Police Department.  Did I
15  hear you correctly?
16     A.  Well, I -- all I -- all I remember is one
17  particular police officer.  And I think there may have
18  been other instances.  But when I was in the public
19  defender's office, everybody would keep a mental note of
20  police officers, you know, and form their own conclusions
21  of whether -- you know, whether they can be trusted,
22  whether they're honest or whether they're deceptive and
23  based upon a kind of group evaluation.  I guess -- I
24  don't know.  That answer your question?
25     Q.  This one particular police officer that you can

Page 256

1  recall, do you remember learning at some point that he
2  had been terminated?
3      A.  Yes.
4      Q.  So is your impression that material was sent to
5  the police department and as a result of an investigation
6  action was taken and he lost his job?
7      A.  Yeah.  Yes.
8      Q.  Based upon any of the work that you did in
9  connection with Debra Milke's case, did you ever go to
10  the Phoenix Police Department and make a complaint
11  against Armando Saldate?
12     A.  No.
13     Q.  Tell me why not.
14     A.  It wouldn't do any good.
15     Q.  Had you ever in your career made a complaint to
16  the Phoenix Police Department against any police officer?
17     A.  No.
18     Q.  So you had no personal experience in the inner
19  workings of internal affairs and whether or not a
20  complaint that you hypothetically might have made would
21  have been investigated?
22     A.  Say that again.
23     Q.  You state -- stated that it wouldn't have done
24  any good to make a report of Armando Saldate.
25     A.  Uh-huh.



ANDERS VILNER ROSENQUIST JR.  Highly Confidential                     July 23, 2018
Debra Jean Milke vs City of Phoenix                                           257—260

Page 257

1    Q.   Why do you come to that conclusion?
2    A.   Because that's been -- that was just the
3  experience at that time.  And they wouldn't turn it
4  over -- they wouldn't turn it over and the judges
5  wouldn't force them to turn it over.
6    Q.   When you say that was the experience, that was
7  not your personal experience.  True?
8    A.   No.  I mean, I don't think I even tried it
9  because it was a waste of time.  I mean, at that time,
10 the police department wouldn't do it and the judges
11 wouldn't force them to do it.
12   Q.   And I think maybe -- I want to get a little
13 clarification on this.
14        Are you saying -- are you talking about that
15 you would not have requested a personnel file or IA
16 materials because it was your impression that it wouldn't
17 be turned over?
18   A.   Well -- Yes.
19   Q.   I guess --
20   A.   Yeah.
21   Q.   Okay.  So --
22   A.   I mean, that's not my impression.  That was the
23 experience of other attorneys I've talked to and the way
24 the Courts treated the situation at that time.
25   Q.   And my question's a little different.  It

Page 258

1  relates not to requesting information that exists but in
2  making your own formal complaint in asking that an
3  internal affairs investigator look at a police officer
4  for information that you discovered.
5        So did you ever in connection with Debra
6  Milke's case take it upon yourself to call up the Phoenix
7  Police Department's internal affairs division and make a
8  complaint against Detective Saldate?
9    A.   No.
10   Q.   Why not?
11   A.   Because it wouldn't do any good.
12   Q.   Why do you believe that?
13   A.   Because of the experience of all the attorneys
14 I knew doing this.  And I don't know any other way to end
15 it -- to answer it.  They -- they couldn't get the
16 information.  And if they did, they'd turn over something
17 in a -- I don't know, they've -- they have two files.
18 They have a personnel file and then they have an internal
19 investigation/IA file on police officers.
20        You can get the personnel file to some
21 extent, but they're not going to turn that over because
22 that's -- that's -- I don't know what you would call it,
23 internal information that goes on in the police
24 department.  And I doubt nowadays if -- I don't know.
25 It's been so long, but just when I was practicing law in

Page 259

1  the --
2    Q.   And I think -- and I'll try to ask it a little
3  differently because I think that my question's a little
4  different.  I understand what you're saying related to
5  requesting documents that already exist.
6    A.   Uh-huh.
7    Q.   My question relates to something different.
8  Maybe a hypothetical's in order here.
9        Let's assume that you were working a
10 criminal case and you had a police officer who got on the
11 stand and intentionally lied about something.  You had
12 the opportunity and could have reported that officer to
13 the internal affairs division of the Phoenix Police
14 Department and asked for an investigation of what you
15 personally witnessed.  Not asking for his personnel file
16 or any IA files but actually making a complaint.  Were
17 you aware that you could do that?
18   A.   If you were going to do that, you better have
19 some really concrete evidence that they were lying.
20 Until you have that, you better not do it.  That's my
21 personal opinion based upon the way the Courts were --
22 the totality of my -- of the circumstances I've
23 experienced.
24   Q.   And at no point during your representation of
25 Ms. Milke did you call the Phoenix Police Department and

Page 260

1  make a complaint against Detective Saldate.  Is that
2  correct?
3    A.   No.
4    Q.   I'm sorry.  That was probably a double
5  negative.
6    A.   No.
7    Q.   You agree you never called them?
8    A.   Yeah.  Right.  That's kind of -- well, that's
9  going -- that can be an ethical violation.  You know,
10 it's just like you just -- you just don't do it unless
11 you've got -- just like with that one police officer.
12 Before they submitted anything or gave the file -- the
13 information to the Phoenix Police Department about this
14 officer, they established a hundred percent that he was
15 lying.  In other words, they proved a sufficient amount
16 of situations with concrete proof, and that's the only
17 way you can get IA to do anything.
18   Q.   You mentioned earlier in your testimony that
19 you had filed a motion to interview certain police
20 officers, and that had been granted by Judge Broomfield?
21   A.   Yes.
22   Q.   Which officers were you intending to interview?
23   A.   I forget.  Officer Mills is one I remember, and
24 then there was two or three of the other officers, four.
25 I don't know.  The officers that were on duty that night



ANDERS VILNER ROSENQUIST JR.  Highly Confidential          July 23, 2018
Debra Jean Milke vs City of Phoenix                         261–264

Page 261

1  that knew about the case and then -- to find out what
2  happened because -- well, based -- it was my knowledge
3  that Saldate was off duty at home, and they called him
4  specifically -- the supervisor, somebody from that
5  department, specifically to handle the investigation, and
6  his supervisor told him to take a tape-recorder along.
7          You know, I'm not going to venture out in
8  that area because, you know, I never did get a chance --
9  I mean, he said I could, but then Debra, you know, hired
10  a different lawyer, and I told Mike Kimerer about that,
11  and as far as I know, he didn't -- he didn't do anything
12  like that.
13     Q.   So your intention was to interview officers
14  that had been involved in the Christopher Milke
15  investigation?
16     A.   Yes.
17     Q.   Is that correct?
18     A.   Yeah.  And the people, the officers -- yeah,
19  all the officers that were involved in the decisions in
20  the department and why they sent him when he was off duty
21  when there was other detectives around.  And I could
22  venture a guess, but I won't --
23     Q.   Did you --
24     A.   -- at this point.
25     Q.   Did you have an intention to interview any

Page 262

1  officers that were involved in any of the eight cases
2  that you identified in the postconviction filings?
3     A.   Did I have the intention to?  No.  The
4  decisions are the decisions.  The Court made the
5  decision, not me.
6     Q.   You mentioned that Debra Milke's mother wrote a
7  book.  Do you recall that name of that book is?
8     A.   Sorry, but I just don't know.  It's --
9     Q.   Did you ever have a copy, your own copy of that
10  book?
11     A.   I didn't, but either Kirk had it or somebody
12  else.  I looked at the book, read it.  It was -- my
13  impression was it was the martyr mother, you know, poor,
14  poor Renate.  It's like, well, you know, Debra's, you
15  know, going to be gassed and nothing much we can do about
16  it, but -- it's kind of like the focus was on her and
17  what she was going through, all the emotional problems
18  and so forth.
19     Q.   As for a time frame for when this book was
20  written, was it before Kimerer was hired?
21     A.   Oh, yeah.  Oh, yes.  Yes.
22     Q.   The summaries that you provided to Renate of
23  Sandy Pickinpaugh's interview and Dorothy Markwell's
24  interview, did you obtain specific authorization from
25  Debra Milke to provide those summaries to her mother?

Page 263

1     A.   Well, there was kind of an understanding that
2  I'd keep her mother abreast of everything.  There was
3  never any issue as far as getting her --
4     Q.   Do you recall whether those same summaries were
5  sent to Debra Milke?
6     A.   Sent to her?
7     Q.   Yeah, did you --
8     A.   No.
9     Q.   -- send her the same summaries?
10     A.   No.  You don't do that when somebody's in
11  prison because it gets out.  Nothing's private in there.
12  And this is basically kind of a work product thing that I
13  can share with people that I know Debra wouldn't object
14  to.  And that was her mother.  There was really nobody
15  else.
16          Kirk -- as far as I know, Kirk didn't -- I
17  didn't give -- I didn't even give copies to Kirk Fowler.
18     Q.   With respect to the lunch meetings or lunches
19  that you had with Ms. Milke, approximately three to four
20  of them, what year did those occur in?
21     A.   It was after she got out, probably six months,
22  Kirk called her and asked her, you know, if she, you
23  know, would like to get together, whatever.  You can ask
24  Kirk.  I didn't do that.  He just called me and said, you
25  know, We can have lunch with Debra.  It was an informal

Page 264

1  thing.
2     Q.   The first lunch that you had, is it fair to say
3  that it had been roughly 18 years since you had had any
4  contact with Debra Milke?
5     A.   If the numbers say it, that way -- I mean, it
6  was a long, long time.  Yeah.  Because -- yeah, I just
7  filed -- the filing with the Federal Court, the notice,
8  and then the motion and then Kimerer took over, and Lori
9  Voepel.
10     Q.   After Kimerer took over and substituted in, you
11  did not have any more contact with Ms. Milke.  Correct?
12     A.   Nope, no contact.
13     Q.   Did you ever hear any rumor or scuttlebutt that
14  Ms. Milke and Mr. Ray had any type of romantic feelings
15  for one another?
16     A.   No.  I can't believe it.  Just an opinion.  I
17  know her and I know Ken.
18     Q.   Returning back to the lunches, how did it come
19  about that your wife accompanied you to those lunches?
20     A.   Well, she was with me all through -- I mean,
21  all through the case.  And, I mean, you know, she --
22  yeah.  I mean, she was a part of the case, you know,
23  helping and doing things and keeping up to speed as much
24  as she could.  But, you know, she was genuinely -- and
25  she heard about the case before I ever got involved,



ANDERS VILNER  ROSENQUIST JR.  Highly Confidential                    July 23, 2018
Debra Jean Milke vs City of Phoenix                                        265–268

Page 265

1  before we even met and, you know, got married.
2       I mean, she had heard about it when it
3  happened, and, you know, her husband who was a doctor --
4  I don't know -- he said, For some reason, I don't believe
5  that, I don't believe she's guilty.  And, anyway, so she
6  followed it with me, and so she had -- you know, it
7  was -- I don't know.  It was a friendly relationship even
8  though she'd never met her before that time.
9    Q.   Before the first meeting where your wife was
10  present, had Ms. Milke ever had any type of contact with
11  your wife?
12    A.   Oh, gosh, no.
13    Q.   So she was going to a lunch where this was a
14  stranger to her, your wife?
15    A.   Basically, yeah.
16    Q.   And Kirk Fowler's daughter --
17    A.   Yes.
18    Q.   -- is it your understanding that his daughter
19  was involved at all in the investigative activities, or
20  was she also a stranger to Ms. Milke?
21    A.   She really wasn't involved in the
22  investigation.  She was very sympathetic and
23  compassionate and she was just interested in the case.
24        MS. RETTS:  I don't have anything further.
25        MS. ODEGARD:  I have a couple brief.

Page 266

1
2                 EXAMINATION
3  BY MS. ODEGARD:
4    Q.   Have you ever exchanged any texts or e-mails
5  with Debra Milke since she was released?
6    A.   I didn't hear that.
7    Q.   Sure.
8        Have you ever exchanged any texts or e-mails
9  with Debra Milke since she was released from prison?
10    A.   No.
11    Q.   How about Kirk Fowler in relation to the Debra
12  Milke case?
13    A.   No.
14        MS. HOFFMANN:  Sorry.  I just didn't
15  understand.  You said did he --
16        MS. ODEGARD:  Sure.
17        MS. HOFFMANN:  -- exchange texts --
18        MS. ODEGARD:  Yeah.
19        MS. HOFFMANN:  -- or did Kirk
20  Fowler exchange texts --
21        MS. ODEGARD:  My --
22        MS. HOFFMANN:  -- with Debra Milke?
23        MS. ODEGARD:  Yeah.
24    Q.   BY MS. ODEGARD:  My second question was have
25  you exchanged any texts or e-mails with Kirk Fowler in

Page 267

1  relation to Debra Milke's case?
2    A.   I don't remember doing that.  We would discuss
3  it over the phone.  I really didn't -- it was -- you
4  know, it was something that was -- that we just talked
5  about over the phone.  Before cell phones, you know.
6  It's -- as far as I can remember, no.  I mean, gosh, I
7  think I had a computer at that time.  I certainly didn't
8  have a cell phone.
9    Q.   Okay.
10    A.   So --
11        MS. ODEGARD:  Thank you.  That's it.
12        THE WITNESS:  Okay.
13        MS. MCCARTHY:  I don't have any.
14        MS. HOFFMANN:  Okay.  I have a couple short
15  questions.
16
17                 EXAMINATION
18  BY MS. HOFFMANN:
19    Q.   Just for clarification, you were asked some --
20  a bunch of questions about your interview with Sandra
21  Pickinpaugh.
22    A.   Yes.
23    Q.   Right?
24        And the entirety of the conversation that
25  you had with Ms. Pickinpaugh was recorded?

Page 268

1    A.   Yes.
2    Q.   Right.  And that the tape, the recording of
3  that entire conversation was in your file.  Correct?
4    A.   Yes.
5    Q.   And then it was also transcribed, and we have a
6  transcription of the entirety of that conversation?
7    A.   Yeah.  The transcript that you sent me, it
8  was -- that's -- that's it.
9    Q.   Okay.  You were asked a bunch of questions
10  about the -- in the search that you paid for the -- and
11  students searching records about Saldate?
12    A.   Yes.
13    Q.   Do you remember about how many hours total of
14  work went into that search?
15    A.   Well, it was every -- you know, five days a
16  week, the morning till, you know, afternoon.  I would --
17  hundreds of hours.  I don't know.
18    Q.   If the Ninth Circuit opinion describes it as
19  nearly 7,000 hours, does that sound accurate to you?
20        MS. BERKE:  Objection.  Foundation.
21        MS. RETTS:  Foundation.
22        THE WITNESS:  The -- yeah.  I mean, if they
23  said it.
24    Q.   BY MS. HOFFMANN:  You were discussing some
25  conversations you had with a Dr. Garcia Burnell --

ESQUIRE
DEPOSITION SOLUTIONS

ANDERS VILNER ROSENQUIST JR. Highly Confidential
Debra Jean Milke vs City of Phoenix

July 23, 2018
269–272

Page 269

1    A.   Yes.
2    Q.   -- about Debra Milke's condition around the
3  time that she was testifying at her trial?
4    A.   Yes.
5    Q.   Did Dr. Garcia Burnell talk to you at all about
6  any medication that Ms. Milke was on at the time that she
7  was testifying at trial?
8    A.   No.
9    Q.   Just another point of clarification, I think
10 you said that all of the -- that you reviewed all
11 underlying files for all the cases that you -- all the
12 prior Saldate misconduct cases that you put in the PCR
13 petition.  Is that correct?
14   A.   Oh, yeah.
15   Q.   So at some point before you filed the PCR
16 petition, you actually looked at underlying documents for
17 all of those --
18   A.   Oh, yes.
19   Q.   -- cases?
20        But you didn't look at any of those
21 documents before your deposition today.  Is that correct?
22   A.   Right.
23   Q.   And when was the last time you actually
24 reviewed those files before your deposition?
25   A.   Before I what?

Page 270

1    Q.   Before your deposition today, when was the last
2  time you actually looked at those underlying case files?
3    A.   I -- after that initial PCR was filed, I never
4  looked at them again.
5    Q.   Okay.  So approximately 20 or more years ago?
6    A.   At least, yeah.
7    Q.   Okay.  You were asked a number of questions
8  about the -- sorry.  Do you have Exhibit 37 in front of
9  you?  It's the Ninth Circuit opinion.
10   A.   Oh, the Ninth Circuit opinion, yes, right here.
11   Q.   Okay.
12   A.   Yes.
13   Q.   So if you turn to page 15 with the opinion
14 where it starts -- the chart of the misconduct
15 allegations.
16   A.   Hold on a second.  Page -- okay.  15.  Yes.
17   Q.   Okay.
18   A.   And what is it?
19   Q.   And you were asked -- you were asked some
20 questions about whether any of these misconduct
21 allegations relate to lying?
22   A.   Yes.
23        MS. BERKE:  Misstates testimony.
24   Q.   BY MS. HOFFMANN:  And so would you just --
25        MS. BERKE:  Misleading.

Page 271

1    Q.   BY MS. HOFFMANN:  Would you agree that -- one,
2  two, three four, five -- the first five summaries all are
3  about Saldate lying either to internal affairs of
4  investigators or under oath?
5        MS. BERKE:  Objection.  It misstates
6  evidence.  And foundation.
7        THE WITNESS:  Internal affairs.  Is that --
8    Q.   BY MS. HOFFMANN:  Just -- sorry.  Just look at
9  the -- so starting with the first one --
10   A.   Yeah.
11   Q.   -- page 15.  That's about lying to internal --
12   A.   Yeah.
13   Q.   -- affairs investigators.  Is that correct?
14        MS. RETTS:  Foundation.
15        MS. BERKE:  Join.
16        THE WITNESS:  Say that again.
17   Q.   BY MS. HOFFMANN:  This first --
18   A.   Yes.
19   Q.   -- allegation --
20   A.   Yes.
21   Q.   -- on page 15 --
22   A.   Yes.
23   Q.   -- that case summary that's about lying -- this
24 is -- this is the summary included in the Ninth Circuit
25 decision about Ms. Milke's case.

Page 272

1    A.   Yes.
2    Q.   Correct?
3    A.   Yes.
4    Q.   And this first one is about lying to internal
5  affairs investigators?
6        MS. BERKE:  Objection.
7        MS. RETTS:  Foundation.
8        MS. BERKE:  Foundation.
9    Q.   BY MS. HOFFMANN:  See right there under
10 evidence type?
11   A.   Yeah.  It says lying, right here, to internal
12 affairs.
13   Q.   Okay.  And then if you look -- just read to
14 yourself the next -- one, two, three, four cases, those
15 are all about lying under oath?
16        MS. BERKE:  Objection.  Foundation.
17        THE WITNESS:  Okay.  You got to give me some
18 time.  Now, you did the first case and the -- tell me one
19 more time.
20   Q.   BY MS. HOFFMANN:  Starting -- so the next four
21 entries.  State v. King, State v. Reynolds, State v.
22 Rodriguez and State v. Rangel.  All four of those cases.
23   A.   Lying under oath.  Lying under oath.  Lying
24 under oath.  Lying under oath.  Lying under oath.
25   Q.   Just I think it's those four.

**Page 273**

1    A.  Oh, okay.  Okay.

2    Q.  Correct?

3    A.  Yes.

4    Q.  Okay.  You were asked some questions about --

5 as part of your interview with Dorothy Markwell, that you

6 were discussing a psychiatrist?

7    A.  Yes.

8    Q.  And there's a few points of clarification on

9 that.  You didn't hire -- what you're talking about was

10 not a psychiatrist that you hired.  Correct?

11    A.  Right.

12    Q.  And you don't have a specific memory of who

13 this psychiatrist might have been.

14    A.  No.

15    Q.  Is that correct?

16        Or even whether this psychiatrist was anyone

17 ever hired by Ms. Milke's attorneys?

18        MS. BERKE:  Objection.  Misstates testimony.

19        THE WITNESS:  You know, I don't have any

20 recollection -- say that again, please.

21    Q.  BY MS. HOFFMANN:  You don't have a specific

22 memory, sitting here today, of who that psychiatrist was.

23 Correct?

24    A.  Yes.  I mean, yes, I don't have a memory.

25    Q.  Or even whether this was a psychiatrist that

**Page 274**

1 was ever hired by Ms. Milke's attorneys.  Correct?

2        MS. BERKE:  Objection.  Misstates testimony.

3        THE WITNESS:  Correct.  I don't have any

4 recollection.

5        MS. HOFFMANN:  All right.  That's all I

6 have.

7        MS. BERKE:  All right.

8        THE VIDEOGRAPHER:  This concludes --

9        MS. BERKE:  Well, let me just tell him.

10        You have a right to read and sign your

11 deposition.  You know what that means.  Once the court

12 reporter prepares a transcript, we can e-mail it to you

13 to review if you're so interested.  You're not required

14 to do that.  You can waive it or --

15        THE WITNESS:  No, I'll waive it.

16        MS. BERKE:  Okay.

17        THE WITNESS:  But if you call me to testify,

18 I'd appreciate it.  I'm sure somebody would supply it to

19 me.

20        MS. BERKE:  Sounds good.

21        THE VIDEOGRAPHER:  This concludes today's

22 deposition.  We're off the record at 6:56.

23

24        (Signature waived.)

_____

25        Anders Rosenquist, Jr.

**Page 275**

1            CERTIFICATE OF REPORTER

STATE OF ARIZONA    )

2                    )

COUNTY OF MARICOPA   )

3

4

5    I, Sommer E. Greene, a Certified Reporter in the

State of Arizona, do hereby certify that the foregoing

6 deposition was taken before me in the County of Maricopa,

State of Arizona; that an oath or affirmation was duly

7 administered to the witness, ANDERS ROSENQUIST, JR.,

pursuant to A.R.S. 41-324(B); that the questions

8 propounded to the witness and the answers of the witness

thereto were taken down by me in shorthand and thereafter

9 reduced to typewriting; that the transcript is a full,

true and accurate record of the proceeding, all done to

10 the best of my skill and ability; and that the

preparation, production and distribution of the

11 transcript and copies of the transcript comply with the

Arizona Revised Statutes and ACJA 7-206(j)(1)(g)(1) and

12 (2).

        The witness herein, ANDERS ROSENQUIST, JR.,

13 has waived signature.

        I FURTHER CERTIFY that I am in no way related

14 to any of the parties nor am I in any way interested in

the outcome hereof.

15

16        IN WITNESS WHEREOF, I have set my hand in my

office in the County of Maricopa, State of Arizona, this

17 4th day of July, 2018.

18

19

20        Sommer E. Greene, RPR, CRR

        Certified Reporter 50622

21

22        /S/

_____

23 For Esquire Deposition Solutions

Registered Reporting Firm No. R1048

24

25

