1  Kathleen L. Wieneke, Bar #011139
2  Christina Retts, Bar #023798
   WIENEKE LAW GROUP, PLC
3  1095 West Rio Salado Parkway, Suite 209
   Tempe, AZ 85281
   Telephone: (602) 715-1868
4  Fax: (602) 455-1109
   Email: kwieneke@wienekelawgroup.com
5  Email: cretts@wienekelawgroup.com

6  *Attorneys for Defendant City of Phoenix*

7              **UNITED STATES DISTRICT COURT**

8                   **DISTRICT OF ARIZONA**

9  Debra Jean Milke,                          NO. 2:15-cv-00462-ROS

10                              Plaintiff,    **DEFENDANTS CITY OF PHOENIX,**
                                              **ARMANDO SALDATE AND**
11         v.                                 **SILVERIO ONTIVEROS' SECOND**
                                              **MOTION FOR SANCTIONS**
12 City of Phoenix;
   Maricopa County; and
13 Detective Armando Saldate, Jr.; and
   Sergeant Silverio Ontiveros, in their individual
14 capacities,

15                             Defendants.

16

17         In this case, Milke continues with a pattern of decades long manipulation of the

18 judicial system that continues to this day with her hiding of crucial evidence, shredding

19 and destroying of documents, covering up the cover-up, and by providing false and

20 misleading deposition testimony. Defendants have repeatedly stated that Milke disregards

21 this Court's Orders. This is not an assumption. Milke testified that <u>she has not read a</u>

22 <u>single one</u> of this Court's Orders addressing the privilege issues, discovery violations, and

23 sanctions in this case. Milke has <u>never</u> read this Court's Sanctions Order, despite being

24 confronted with her failure to do so every day of a three-day sanctions deposition. *See* Ex.

25 1, 12/06/19 deposition, p. 468-474 [1]. Given the history of discovery violations that

26         [1] Defendants have attached almost the entirety of the exhibits to Milke's sanctions
   deposition to this filing. Defendants have not included the exhibit that represented Milke's
27 taxes due to the large scale redactions that would have been necessary. Rather than
   attaching separate segments of these exhibits as separate exhibits, Defendants will
28

continue to mount and this Court's explicit Order that Milke attend a deposition solely to address sanctions, this is astounding and inexcusable.

In her sanctions deposition—like in her previous depositions—Milke was woefully unprepared and confirmed that she "checked-out" of this lawsuit the minute it was filed and willfully offered no meaningful assistance in the discovery process. She made no attempt to cure any of the prejudice caused by her rampant discovery violations by refreshing her recollection through a review of documents she drafted—such as the Marino letters, Pat Galbraith letters, or materials provided to Janna Bommersbach. Milke's willful ignorance is not an excuse. Milke's choice to hide behind her convenient and likely feigned lack of memory and claim that it is "too hard" for her to be involved in this civil litigation rings hollow when she has been paid thousands of dollars to give media interviews about her experience (and where she has no difficulty remembering); when she voluntarily traveled around Germany for four-weeks promoting the untimely produced Bommersbach book; and when she voluntarily speaks at wrongful conviction seminars. She does not find it too difficult to speak about her case to the media, but she claims it is too difficult to participate in this case she filed when Defendants might obtain information harmful to her case.

What has happened in this case is not an accident. It is not explained away as a collection of dozens of "inadvertent" disclosures or a failure to find documents located in boxes (not to mention what was never timely searched electronically and what was never searched at all). It is not a single missing document, but nearly 70,000 pages of documents disclosed since January of 2019—after this Court's crucial October 2018 Order. It is not cured through meaningless depositions of an unprepared Plaintiff who has no money to reimburse Defendants for the unnecessary costs and fees spent fighting for production of documents that should have been produced years ago. It is not explained, or excused, by

---

regularly reference the deposition exhibit number and relevant bates labeled page of the same.

likely feigned memory problems when Milke refuses to look at her own documents to refresh her memory. The circumstances present in this case are not likely to ever repeat themselves because they are extreme, outrageous, and fall far outside the bounds of proper litigation conduct. This case must not continue.

As aptly stated in *Kennedy v. Allstate Ins. Col*, 2018 U.S. Dist. LEXIS 100730 (E.D.Mi. 2018):

> ...the egregiousness of the conduct displayed here and the lack of candor displayed by Plaintiff and his counsel toward both his opponent and the Court merit dismissal in this instance. The docket sheet in this case tells a sad and extraordinarily frustrating tale of unnecessarily wasted energy and costs engendered by a lack of participation by either Plaintiff or his counsel. . .admitted failure to even read several of this Court's orders at the time they were filed (let alone comply with them), and overall bungling legal representation. . . Recent efforts to suddenly feign half-hearted (and late) compliance with this Court's discovery orders can best be characterized as 'too little, too late.'

*Id.* This Court has generously given Milke chance, after chance, to right the ship. In fact, she has had more than a year to do so. This Court has been extremely patient, and forgiving, but Milke's time is now up. There is no way to cure the prejudice and put Defendants in the position that they would have been but for Milke's repeated discovery violations—including providing false and misleading testimony and discovery responses.

This case is far more egregious than *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1169 (9th Cir. 2012), where the Ninth Circuit affirmed striking a party's answer, resulting in a default, where the party intentionally delayed production of documents, misrepresented the current and past production to the Court and the parties, and violated a discovery order. In doing so, the Ninth Circuit also found compelling the District Judge's finding that "while public policy favors that cases be heard on their merits, Vision has done everything it can to prevent such resolution. Through its conduct, Vision has attempted to ensure that a fair trial on the merits of this case will never happen." *Id.* at 1170. The Court further noted that, in assessing the issue of a lesser sanction that, "in light of the defendant's 'willful disobedience,' the district court 'could reasonably

conclude that additional lesser sanctions would be pointless' because '[i]t is appropriate [for a district court] to reject lesser sanctions where the court anticipates continued deceptive misconduct." *Id.* Like in *Hester*, sanctioning Milke in the form of monetary sanctions is meaningless because she admits that she has no ability to pay anything. If this case proceeds back to the numerous depositions on the merits that are now necessary to reopen given the nearly 70,000 pages of documents disclosed since the Loevy firm took over, Milke cannot pay for that either. Milke has done everything she can to ensure that a fair trial on the merits for Defendants will never happen and she continues with her discovery violations.

In *Kovilic Construction Co., Inc. v. Missbrenner*, 106 F.3d 768, 770 (7th Cir. 1997), the Seventh Circuit stated:

> There is no question that procedural rules are important and that infractions of those rules should not be tolerated by the courts. Otherwise, the rules themselves will not be taken seriously, and eventually they may exist in name only, honored in the breach.

With every violation of every discovery deadline in this case; every time Milke signed verifications for discovery responses that were inaccurate; every time Milke provided false and misleading testimony; every time Milke failed to disclose her explicit waivers and produce documents where privilege had been waived; every time Milke refused to look at her own documents that were sitting in files accessible to her; every time Milke shredded or "destroyed" documents; and every time Milke concealed information; she demonstrated that she was not taking the rules seriously and that for her, they existed in name only. Permitting her lawsuit to continue will only serve to solidify the dim view she seemingly holds of the judicial system's ability to manage its dockets and ensure fair play.

Defendants have lamented that Milke's discovery violations and approach to this case must stop. It is clear that this Court's words ring hollow because Milke is not listening. Her time to do so is up. Milke had her chance to participate meaningfully in this litigation and squandered it. Her case must be dismissed.

1    **I.      GENERAL INTRODUCTION.**

2          Documents directly relating to the core issues in this case—whether Milke was

3    read her *Miranda* rights, whether she understood them and whether she invoked those

4    rights—were improperly withheld from Defendants under the guise of privilege, when

5    Milke had in fact waived her claim to privilege long ago. Notably, this Court need not

6    take Defendants' word for the critical nature of these documents, Milke's *habeas* counsel

7    repeatedly authored emails confirming the disaster that could ensue if certain information

8    was available to the prosecution during the retrial—her inconsistent statements; her status

9    emails to Pat Galbraith; the Milke Facebook/YouTube; and the Milke website.  *See* Doc.

10   600, 623.

11         A core issue in this case is whether Milke was read her *Miranda* rights, understood

12   those rights and invoked her right to counsel. All alleged wrongdoing by Detective

13   Saldate is completely irrelevant and inadmissible if Milke voiced her understanding of

14   *Miranda* and did not invoke. Indeed, the Ninth Circuit's decision is predicated upon Milke

15   consistently maintaining that she did not understand the *Miranda* rights that were read to

16   her and that she asked for an attorney. But, this is not what her hidden letters to her

17   lawyer, and others, state.  During the course of her criminal case, Milke admitted multiple

18   times, to multiple different people, that Detective Saldate read her her *Miranda* rights

19   twice and she only "asked to use the phone on the wall to call her dad about a lawyer,"

20   which is not an invocation.  Milke admitted this in an untimely produced tape directed to

21   journalist Peter Aleshire that was wrongfully withheld as privileged, a letter to appellate

22   lawyer Anders Rosenquist, and letters to *habeas* counsel Kimerer and Voepel.  Did the

23   prosecutor, Ninth Circuit, or Court of Appeals have any of this? Absolutely, not. *See*

24   *Davis v. U.S.* (512 U.S. 453 (1994) (ambiguous statements do not invoke *Miranda's*

25   protections).  Milke, her lawyers, her mother, Aue, and even a documentary film team—

26   intentionally and deceptively buried this crucial evidence to concoct a false story that

27   ultimately resulted in Milke gaining her freedom. *See* Ex. 1, deposition of Milke 12/06/19,

28   pp. 501-530.

1     Indeed, Defendants would discover, in an email untimely produced by Milke on

2     October 18, 2019, correspondence from Attorney Voepel (dated 1/6/2007) to media

3     personalities confirming her knowledge of Milke's actual statements regarding her alleged

4     invocation, yet Voepel would admit this when she responded to questions from the Ninth

5     Circuit during Oral argument and would persist with claiming something far different

6     (that Milke said "No, I want a lawyer."):

7                    4) Debra did not agree to be taped.  She said, "no, I want to
                     call my dad to get me a lawyer," or words to words to that
8                    effect.

9     *See* Ex. 76, L&L55256.  Yet another communication with the media/Television

10    personalities regarding some apparent documentary (it is unclear if this has been

11    produced), that was hidden.[2]

12         Milke's litigation misconduct and discovery abuses are continuing. Every week,

13    Milke trickles out more evidence—responsive to Defendants' discovery requests—that

14    document Milke's deliberate attempts to hide information and then to cover up the extent

15    of her discovery abuses. Milke provided false and misleading testimony in her depositions

16    in August and November of 2018 and hid documents that reveal the same.  There is no

17    way to cure this, or turn back the clock.  Allowing lesser sanctions will only send the

18    message that a litigant is free to do as she pleases, violating deadlines as she sees fit, hide

19    damaging documents under the guise of privilege, reluctantly produce documents only

20    after Defendants continuously hound her for what they are entitled to, disregarding or

21    half-heartedly complying with Court Orders to organize a file, never reading the Court's

22    Orders or her lawyer's pleadings that set forth factual positions relating to those discovery

23    _____

24         [2] Other errors would be made as well.  In their efforts to convince the prosecution
      not to retry Milke, Kimerer/Voepel would make claims that Milke was innocent because a
25    guilty woman would not bring her purse, with bullets from the murder, with her to the
      interrogation. *See* Ex. 353 to Milke's sanctions deposition, pp. L&L022211. Milke would
26    admit that this was not true and she had, in fact, left her purse behind at her father's house.
      Multiple witnesses would testify to this in Milke's sentencing, yet Milke would never
27    correct her habeas counsel's false argument (even when it was again made in her presence
      at the press conference she held after her release).

28

6

violations, giving instructions to destroy electronic discovery because it is damaging and then hiding the copies of that discovery that still exist in the files, and bending the truth to fit the theory of the case instead of allowing the theories of the case to conform to the truth.

Milke continues to flagrantly violate multiple discovery deadlines—that she herself agreed to—as if she controls this litigation and not the Court. Almost a year after this Court's October 2018 Order, Milke is still producing documents from Voepel's office (among other sources). She blatantly violated this Court's October 2018 Order; did nothing to get her file in order during the stay she requested and agreed to in December of 2018; passed over this Court's March 1, 2019, discovery deadline as if it was completely meaningless; provided worthless information relating to her document productions being complete as of June 17, 2019; continues to produce documents despite agreeing that everything was to be produced by September 13, 2019; and then continued to produce documents past the revised November 1, 2019, deadline.  In addition to this, Milke is not reading and learning from her own documents. She is making Defendants read her documents and identify additional documents that should have been produced (i.e. Jeff Trollinger).

This Court need only review the docket and all of the Notices of Service of Discovery to see how many times Milke has violated the various supposed ends to production of documents and discovery. Notably, Milke also continues to "inadvertently" produce incomplete documents.[3]  Nothing is working to curb these problems. Instead,

_____

[3] For example, Milke failed to timely produce YouTube videos that Aue prepared that dissect every aspect of her case—despite the fact that they sat in her lawyer's files at the time the discovery was due. They also sat in her lawyer's files as of the time of the Court's October 2018 Order. As will be discussed below, Aue removed these YouTube videos from the internet because Milke's counsel directed him to do so because they were damaging. New untimely produced emails document specific discussions with *habeas* counsel, including Kimerer, about removing the content for this reason.  In the civil case, and after Loevy was involved in the case, Defendants asked—multiple times—for the YouTube videos after reviewing repeated references to them in emails.  Loevy avowed to Defendants, several times, that Milke had no access to the YouTube videos. This was false. Loevy contacted Aue in late summer of 2019, months after Defendants raised the

1   Milke has laid waste to the effectiveness of this Court's Scheduling Orders and the

2   requirements of the Federal Rules of Civil Procedure.

3       Indeed, if it were not for this Court's Sanctions Order, Milke's current counsel

4   would have never gone back to Voepel's office to find all the new material that was in

5   existence at the time Milke filed suit in April 2015, and certainly as of this Court's

6   October 2018 Order. This new material includes multiple versions of documentaries that

7   include potential fabrication of evidence at Milke's counsel's behest/approval; YouTube

8   videos made by Aue (posted to the internet and then removed based upon counsel's

9   directive because they were damaging); printouts of the destroyed website (taken down at

10  Milke's counsel's request); limited printouts and discussion of content from Milke's

11  Facebook page (also spoliated at *habeas* counsel's request); hundreds if not thousands of

12  pages of emails between Milke's counsel and the media; and media broadcasts, including

13  those with original footage from the Milke criminal trial on crucial issues (such that the

14  jury in this case might actually be able to see Milke's bizarre demeanor, body language,

15  lengthy pauses, and other indicia of untruthfulness, instead of reading the raw words on

16  the page without this crucial visual information).

17      That Milke now—almost five years after filing suit and over a year after this

18  Court's October 2018 Order—is seemingly getting her file in Order is "too little, too late."

19  Indeed, Milke's failure to ascertain the entire contents of her file resulted in this Court

20

21  issue of the YouTube videos, and miraculously obtained Aue's cooperation to obtain these
    links. Defendants would later learn that Aue was in contact with Milke and Ms. Neff for

22  months before, yet apparently no attempt was made to gain his cooperation to provide
    either the YouTube videos or the hard-drive that would later be produced on November 7,

23  2019.  *See* Ex. 2, 12/04/19 deposition of Milke at Ex. 362, WhatsApp messages between
    Milke and Aue. Milke would never have produced these videos but for Defendants raising

24  their existence through the review of untimely produced emails. Milke has claimed that
    she did not have custody and control of Aue, which Defendants dispute.  Yet, this is

25  irrelevant as **Voepel had these videos in her possession since the outset of the case,**
    **including during the criminal case**.  Thus, not only were they taken off the internet at

26  Milke's counsel's direction, but they were hidden from Defendants and sat for years in her
    *habeas* counsel's file. This demonstrates that Milke did not follow this Court's directive to

27  get the file in order and failed to produce documents/videos/electronic information that
    was responsive to Defendants' discovery requests.

28

                                          8

conducting a completely unnecessary *in camera* privilege review because—as it turns out—Frankie Aue had access to all of the file, including work product and attorney-client communications that would otherwise be privileged, which Milke has now finally admitted has been waived and turned over (without redactions) huge amounts of what this Court spent valuable time reviewing.

As set forth in Doc. 623, Milke continues to trickle out documents, including 1345 pages of emails that were improperly withheld as privileged even over the last month and after Defendants deposed Milke on the sanctions issue. She withheld critical damages documents and providers—failing to identify Jeff Trollinger as a mental health provider. It was only after Defendants asked Milke's counsel about an individual named Jeff who, according to a document, appeared to have provided counseling services to Milke, that Milke acknowledged his existence.  When she finally turned over the receipts "for therapy" that she had possessed since the outset of this litigation and that were being stored in the Milke room at Kimerer's office, specifically identifying Mr. Trollinger as the provider, she claimed the receipts were not responsive to any discovery request because these receipts were not "provider records." That is untrue.  Regardless, she failed to identify Mr. Trollinger in response to interrogatories. Apparently, Milke believes that litigation is a game where one can parse the ordinary meaning of words, feign memory problems, and then claim "no harm, no foul," when it is revealed that the information was sitting in the files all along. This is entirely consistent with Milke's approach taken relative to the explicit waivers of privilege and Milke's refusal to review the Marino letters.  The massive problem here is that—for Defendants to catch Milke's concealment and improper assertions of privilege—Defendants must possess the documents. If Milke is hiding the documents under the guise of privilege, or has shredded and/or destroyed them, the information will remain buried and will never see the light of day.

During her incarceration, Milke engaged extensively with the media, sent documents to third-parties, had a website that she contributed content to, allowed Frankie Aue unfettered access to her file materials (including later allowing him to be copied on

confidential communications with her lawyers in the civil case), and told anyone and everyone about the intimate details of the case—including her conversations with her attorneys. Critically, during this time frame Milke obtained a Paralegal Certificate, providing her with inside knowledge of the discovery process, the consequences of sharing attorney-client information, the importance and necessity of preserving documents, and her obligations relating to the same. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at IMHOFF000567. Pat Galbraith, now deceased, and whose extensive involvement Milke also concealed, was also given uncontrolled access to information. He became the go-between for Milke and her attorneys, but also with Frankie Aue and numerous supporters of Milke across the globe. Yet, Milke continues to improperly contend that some of her lawyer's communications with Galbraith are protected by work product.

Throughout the course of this case, Milke has been the person with the most intimate knowledge of her case, yet clearly she provided little to no meaningful information to NSB, and then to Loevy. Mr. Kimerer, the attorney with the most knowledge about the case, including the witnesses, the sharing of case information with third parties, including Aue, Bommersbach and Galbraith, and the contents of the file— failed to correct Milke's concealment and took no steps to assist in providing information and documents he knew existed. As an example, on May 5, 2013, Milke wrote—almost two years prior to the date that NSB was hired as civil counsel—that she wished Bommersbach's involvement and work on a book "to be kept a secret for as long as possible." *See* Doc. 600, Ex.35, L&L 14322. Milke got her wish and this information and materials remained concealed for years – well into this litigation. Milke's sanctions deposition testimony confirms that her prior testimony about her contact with Bommersbach was false and misleading. Indeed, Milke admitted that she even had gone on a on a four-week book tour, in Germany, to promote the Bommersbach book. *See* Ex. 3, 12/05/19 deposition of Milke, pp. 385. The Bommersbach book and nearly 7,000 pages of documents Bommersbach possessed are the key to numerous issues in this case and

revealed multiple explicit waivers of attorney- client privilege.  This key, however, was willfully kept locked away by Milke and her Arizona counsel who took a backseat while it occurred.  Milke's contact with Bommersbach runs **deep**. Her testimony before the sanctions deposition was false and misleading.

Milke is responsible for her destructive efforts and concealment, which is so pervasive that it requires dismissal.  She cannot attempt to pass the blame to any of her attorneys. *See Link v. Wabash R. Co*., 370 U.S. 626, 634 (1962). Milke has verified every interrogatory response, including those that remain to be incorrect (such as that she had no involvement in the website). Despite clear evidence disproving her avowal under oath that she had no involvement with the website—including this Court's factual findings in Doc. 503 that she did—she continues to persist with this falsity. The falsity of her avowals, the incompleteness of her answers, her misleading testimony, and her refusal to review documents in this case are her responsibility alone.

## II.   FACTS

### A.   Defendants' Written Discovery Requests Relevant to the Discovery Violations.

On November 23, 2016, the City of Phoenix served its First Request for Production of Documents on Milke, who responded on January 20, 2017:

> **REQUEST FOR PRODUCTION NO. 2:**   Produce all medical, mental health, substance abuse and/or other healthcare provider records for providers seen at any time between December 2, 1988 and the present. In addition, produce an executed authorization for each provider.  A blank form of authorization is attached hereto.

> **REQUEST FOR PRODUCTION NO. 4:** Produce all letters, emails, correspondence, cards, memos or any other form of written communication—regarding the death of C.M., Detective Saldate, your criminal charges, your civil lawsuit—and/or any other communications with Jim Styers, Roger Scott, friends, witnesses, investigators, journalists, media outlets and/or family members during your incarceration at Maricopa County Jail and Arizona Department of Corrections up to your response date. This request is intended to exclude all attorney-client communications, provided that they were not shared with a third-party who was not acting as a legal representative for the Plaintiff.

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**REQUEST FOR PRODUCTION NO. 5:** Produce any and all news articles, interviews, interview transcripts, audio files, movie files, broadcasts and/or any other form of media documenting your conversations with and/or your criminal prosecution and civil lawsuit with journalists, press, news media, press **corps**, reporters, investigators, commentators and/or any other news medium in your representative's possession.

**REQUEST FOR PRODUCTION NO. 6:** Produce any and all defense interviews of any and all witnesses and/or individuals with knowledge of the **allegations** in your Second Amended Complaint to include, but not be limited to, audio files, video files, transcripts, statements, declarations, affidavits, etc.

**REQUEST FOR PRODUCTION NO. 12:** Produce any and all documents, materials, files, exhibits, transcripts, photographs, psychological reports and records, interviews, audio and/or any other material that were provided to Attorney Gary L. Stuart, who wrote the book: Anatomy of a Confession.

On June 20, 2017, Defendant Saldate served his First Request for Production of Documents on Milke, who responded on July 20, 2017:

**REQUEST FOR PRODUCTION NO. 1:** To the extent not previously produced, produce all documents, including but not limited to memoranda, summaries, reports, transcripts, audio files, communications, and notes in your possession, your representative's possession, your attorney's possession and/or any other person's possession regarding all interviews conducted relating to the investigation into the murder of C.M., the prosecution of Plaintiff, James Styers and/or Roger Scott for C.M.'s murder, and/or the post-conviction proceedings and habeas proceedings related to the convictions of Plaintiff, James Styers, and/or Roger Scott, including but not limited to all interviews conducted by Kirk Fowler and C. Kenneth Ray II.

On November 14, 2018, the City served its Second Request for Production of Documents on Milke and First Set of Non-Uniform Interrogatories, to which she responded on February 1, 2019[4]:

---

[4] Because Milke seemed to be narrowly interpreting Defendants' Requests for Production, Defendants served additional requests to attempt to ferret out documents Milke was not producing. Many of these requests cover materials that were previously requested, but as this Court has recognized, Milke has taken unreasonable interpretations about what documents are responsive. *See* Doc. 583, p. 4 ("Both emails obviously qualify as communications with the media regarding Plaintiff's criminal trial proceedings or civil

**REQUEST FOR PRODUCTION NO. 15**: Produce any and all correspondence, emails, contracts, documents, materials, files, exhibits, transcripts, photographs, psychological reports and records, interviews audio and/or any other materials that were provided to Janna Bommersbach, regardless of whether the materials and/or information provided were included in the publication or whether it was used for any other form of publicity, including, but not limited to, periodicals, social media, blogs and/or any other social/information platform.

**Response:** Plaintiff objects that this request seeks documents not in her possession, custody, or control and which are in the possession of a third party, Jana Bommersbach. Plaintiff further objects that Defendants have already obtained documents they subpoenaed from Ms. Bommersbach, and Ms. Bommersbach has produced the documents requested. Furthermore, Plaintiff's counsel previously requested that Ms. Bommersbach produce to Defendants any documents in her possession which had been provided to her by Plaintiff. See also emails being produced with this response, L&L002103-2109. Plaintiff reserves the right to supplement this response as discovery and investigation continue.[5]

**REQUEST FOR PRODUCTION NO. 22:** Produce any and all interviews, diagrams, photographs, recordings, videos, statements, photographs, x-rays, movies, video reproductions, animations, diagrams, visual depictions of Plaintiffs alleged claims and injuries, and notes of any and all witnesses and/or individuals with knowledge of the allegations in your Second Amended Complaint, including, but not limited to, audio files, video files, transcripts, statements, declarations, and affidavits.[6]

**INTERROGATORY NO. 2:** Identify by name, address and telephone number any medical doctor, registered nurse, specialist, doctor, psychologist, counselor, psychiatrist, addiction specialist or any other medical or mental healthcare

---

lawsuit.  Plaintiff's interpretation that communications with the media are not responsive unless they involve substantive discussion of Plaintiff's criminal or civil case has no basis).

[5] The documents produced with this production were responsive to Defendants' earlier RFP Nos. 4 & 5, but were not produced at that time. *See* Ex. 2, 12/04/19 deposition of Milke at Ex. 369 at L&L002103-2109. Notably, Milke would also fail to find additional email documenting materials produced to Bommersbach, which she recently produced as outlined below.

[6] Numerous documents/emails, are responsive to this request including the untimely produced "status updates" that Patrick Galbraith circulated (*See* Doc. 623, wherein Ms. Voepel identifies the significance of these items to disputing damages), YouTube videos, materials from Aue's hard-drive (relating to the website, Milke's appearances in the media discussing her experiences, written quotes from Milke, letters), various versions of documentaries, the untimely produced Aleshire tape, etc.

13

1

2

3

provider who has evaluated Plaintiff for any reason, including, for substance abuse, mental or emotional problems since December 2, 1989, including all medical treatment Plaintiff received while in Arizona Department of Corrections' custody.[7]

4    After it had become readily apparent to Defendants that Milke was not producing

5   all responsive documents, the City served its Third Request for Production on August 13,

6   2019. The following Request for Production is particularly relevant—albeit it should have

7   been unnecessary, as it is duplicative of prior requests outlined above:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**REQUEST NO. 34**: Produce all emails sent, received, forwarded, and/or possessed by Mike Kimerer and Lori Voepel that include the search term "Milke," and that: (1) have been shared with, displayed to, copied to, bcc'd to, cc'd to, and/or forwarded to a third-party; and/or (2) contain subject matter Plaintiff has agreed have been waived under the attorney client privilege analysis; and/or (3) contain subject matters that Plaintiff has agreed have been waived under the work product analysis; and/or (4) that fall within the scope of what the Court in this LAWSUIT has determined should have been produced and/or within the scope of what Plaintiff or the Court in this LAWSUIT determined there is no longer a viable claim of attorney-client privilege, including but not limited as set forth in the Sanctions Order, Doc. 503; and/or (5) contain subject matter Plaintiff has shared with third-parties, thereby resulting in waiver, including but not limited to all subjects discussed in letter or verbal format with Joe Marino, Vince Felix, Carolyn Imhoff, Rick Scavone, the various inmates that Plaintiff corresponded with and/or sent money to, Patrick Galbraith, Frank Aue, Janna Bommersbach, Peter Aleshire, any journalist, TV producer, web site administrator, documentary maker, blogger, etc. If any documents responsive to this request have been destroyed and/or are simply no longer in your possession or your attorneys' possession, please state the date upon which each such document was destroyed or left your or your attorney's possession, the date of same, and the facts and circumstances surrounding its destruction and/or separation from your or your attorney's possession.

*See* Ex. 2, 12/04/19 deposition of Milke at Exs. 365 & 366.

23

24

25

26

27

28

---

[7] Plaintiff failed to voluntarily and timely identify provider Jeff Trollinger, as outlined below, until Defendants brought this to Milke's attention on November 7, 2019. Nearly a month later, Defendants were advised that Mr. Trollinger was deceased.  *See* Doc. 623. This is a <u>new</u> sanctions issue.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    **B.**    **Timeline Related to Milke Planning a Lawsuit and Duty to Preserve Documents.**

    For decades, Debra Milke and her *habeas* counsel (some of whom remain civil counsel) amassed information, documents, and knowledge directly relevant to the civil lawsuit she began planning even while she sat in her jail cell in 1990, awaiting trial. This Court has already determined that Milke had a duty to preserve evidence following the issuance of the Ninth Circuit's decision (Doc. 503), but Defendants contend that this duty actually was triggered much earlier given Milke's explicit statements acknowledging her intent to file a civil lawsuit. Milke was not only discussing her litigation plans with her jail boyfriend Joe Marino, but Milke and her *habeas* counsel were discussing the specific contours of her civil claims as early as 2002. Milke reasonably anticipated litigation when she determined, in her mind, that she was going to file a lawsuit.[8]

    Milke repeatedly took steps to retain counsel for a civil matter beginning in the early 90s, when she detailed her plans in a letter to Carolyn Imhoff (a witness she never timely disclosed):

> -I found out that Arizona has to pay me $100 a day for every day I'm incarcerated. So far, it's over $80,000... I'm almost sure they will want to settle. I just took a test on civil lawsuits & I read about how it all works. I'm not worried about not getting compensated because I know I will. I won't forget you either when I get the first check. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 462.

> -200 million dollars is just a number. I plan to start high and go from there. I know I'll never get that much and I don't want that much. But in my school stuff, I learned about civil law, civil suits and trials. I know what I'm entitled to and I do know the state has to pay me for each and every day I've been incarcerated...A good civil lawyer will make sure I get what I deserve plus he'll make sure of his share too. I just want to

---

[8] Defendants address this issue extensively given Milke's counsel's continued attempt to argue that Milke had no duty to preserve relevant documents until well after the Ninth Circuit's opinion. In some pleadings, Milke's counsel has contended that she did not anticipate litigation until the fall of 2014, even though she hired civil counsel in April of 2014. Notably, Milke's privilege log also continues to include references to a 2013 draft Notice of Claim, which Milke refuses to produce while arguing that her duty to preserve was not triggered when she destroyed documents at Aue's house in the fall of 2013 (months after the Ninth Circuit's order).

> make sure Arizona pays me enough to be taken care of the rest of my life.   Saldate will be sued too. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at IMHOFF 649-650.

When explaining her reasoning for enrolling in the paralegal course, Milke stated: "I am taking that course for knowledge and better understanding because of my legal predicament." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 567. Milke "graduated with honors and a cumulative grade of 97" from her paralegal course. *See* Ex. 4, L&L 573. Milke also enlisted others, such as a pen pal in San Francisco who was apparently a civil lawyer, to help her with her legal schooling. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 472. Through this class, Milke undoubtedly learned about document preservation and attorney client privilege and work product. Thus, Milke is not the normal litigant unschooled in the law. She possesses additional knowledge (including her work in filing legal documents at Kimerer's office in her current job).

Milke took a major step towards civil litigation in 1993, when she approached her appellate attorney, Anders Rosenquist, for a civil lawyer recommendation:

> I also wanted to know if you could find some civil lawyer who is good and who also might be interested in helping me with a civil lawsuit. This is something I want to file as soon as possible and really make Arizona pay for.

*See* Ex. 5, L&L00542. In 2002, Milke again discussed her plans to file a civil lawsuit and—in an effort to manipulate Mark Milke—wrote a series of letters to Aue about her "plan" to "reel him in." Part of that plan included enticing him with the potential of joining her in a civil suit. Milke's original letters to Aue do not still exist.  This is because they were destroyed by Milke at Aue's house following her release, or perhaps in Germany during her shredding party there.[9] Some portions of the letters, however, are

---

[9] Emails also document the extent of Milke's letter writing to Aue (letters which have been destroyed), with Milke using Pat Galbraith as a conduit for passing information that "lots of letters" are on the way. *See* Doc. 600, Ex. 37, L&L023324; Doc. 600, Ex. 38, L&L023381. Galbraith also apparently sent separate emails to Aue documenting special messages for Aue, from Debbie.  See Doc. 600, Ex. 39, L&L023341; See Doc. 600, Ex. 40, L&L023444.

preserved in email correspondence because Aue retyped portions of the letters in his exchanges with *habeas* counsel, including Kimerer.  These emails, containing portions of Milke's letters to Aue, also contain admissions about ownership of **her website** and her intent to file litigation against Detective Saldate:

> …if Mark should contact Lori to get the facts, and starts talking about suing Saldate and/or Phx PD, ask her to talk to him about waiting on that stuff until I get out. I don't want Saldate or the Phx PD to get the heads up that a lawsuit is imminent. Mark can file his own after I'm out or join mine, but I don't want him to pursue anything while I'm still in here. See Ex. 3, 12/05/19 deposition, Ex. 391 at L&L023087.
>
> …
>
> Well, my mind started thinking about the letter I've been working on for Mark. If I can pique his curiosity or interest without appearing manipulative, he just may try to contact Lori or my webmaster (you). I will make a suggestion to him to contact the webmaster of my website or Lori if he wants documents made available to him.  The thing is, is that once he makes the contact, you or Lori can reel him in.  By then you know he'll want to know the facts. If he listens, who knows, he may try to help me and actually share some of those pictures, which Lori could use when she files my Reply brief (That's my reply to Nielsen's response). Do you see what I mean? …because if he contacts my webmaster, I want you to be prepared.  Do you follow me?..."  See Ex. (emphasis added). *Id*. at L&L023090.

And, long before the Ninth Circuit ever authored its opinion, in 2005, Milke's *habeas* counsel Lori Voepel was giving her advice about the claims she could bring:

> In a civil matter, I can go after Saldate personally for violating my civil rights. Lori called it dereliction of duty or something like that.  I can't sue Levy personally but I can sue the county for malicious prosecution, reckless disregard for the truth, and other things…Lori told me it will be a lot easier for me to file a civil complaint. The burden of proof is much lower (by a preponderance of the evidence). All of this is down the road…

*See* Ex. 1, 12/06/19 deposition of Milke, pp. 534-540, 541-2, and Ex. 3, 12/04/19 deposition of Milke at Ex. 363 (to the same) at Bommersbach 5558-9. Milke also voiced her interest in filing a lawsuit to Pat Galbraith, in 2006 (discovered in a letter that she gave to Bommersbach and untimely produced): "I'm <u>thinking</u> about maybe contacting (NOT NOW) Gloria Allred to see if she'd be interested in helping me file a civil lawsuit against

17

Saldate, the police depart. and the county." *See* Ex. 2, 12/04/19 deposition of Milke, Ex 363 at Bommersbach 4986.

Then, on July 3, 2014, in email correspondence turned over to Defendants after NSB's withdrawal, Bommersbach wrote the following:

> I understand from Debra that her civil attorney—I don't know those guys, but hope you've vetted them—plan to file a lawsuit against the state NOW, before anything is resolved…I'm having dinner with [Milke] tonight and she wants the pictures she just got from Sandra and the letters from Sandra for her civil attorneys. I'll provide them, but want to be sure everyone knows my great fear of a civil case going forward.

*See* Bommersbach July 3, 2014 email to Kimerer/Voepel, attached as Ex. 4 to Doc. 454. Starting immediately after her arrest, Milke **intended** to file civil litigation. She never waivered in this desire and took steps to move forward with this plan, by consulting with her lawyers about the specific nature of the claims she would bring. Milke clearly had the intent to file a lawsuit dating back to the 1990s, was aware of the duty to preserve relevant documents and continued to methodically destroy documents anyways, and her subsequent destructive actions were willful and in bad faith.

### C.    Milke's Access to Her Own Documents and the Milke Room.

After her release from prison, documents that Milke had been collecting over the years were transported to Aue's house in Arizona. Milke also worked in Kimerer's office and had unfettered access to the Milke room. *See* Ex. 1, 12/06/2019 deposition of Milke, p. 438. In an untimely produced email to Kimerer, on December 18, 2015, she would write as follows:

> I do miss you all. I told Heather I'd come in to work the day after the MLK holiday. I have to tackle the boxes and files in the "Milke room." Not a problem. I'll be happy to condense everything and store it away. My mother saved everything from my case and next summer I plan to shred it all. Reinhard suggested a bonfire, which would feel nice in the cold weather, but I'll deal with all that next year.

*See* Ex. 2, 12/04/19 deposition of Milke at Ex. 364 at L&L045032-3. This email was produced on October 18, 2019. That Milke now claims she never had any part in

organizing the Milke file, because it was emotionally too difficult for her, is belied by her own words. It is true, however, that Milke has not given this civil case the time or attention it requires:

> Q. You have devoted more time traveling to and attending speaking engagements with your emergency fund committee activities and with your activities associated with Witness to Innocence than you had reviewing documents connected with your civil case. Correct?
>
> A. Well, to me, there's a difference between reading it – being alone and reading this stuff or –and speaking publicly. There's a big difference.
>
> Q. I understand that there may be a difference. But you would agree that you have spent more time –
>
> A. That's fair.

*See* Ex. 3, 12/05/19 deposition of Milke, p. 281. Milke cared naught to read this Court's Sanctions Order.  *See* Ex. 2, 12/04/19 deposition of Milke, p. 117; Ex. 1, 12/06/19 deposition of Milke, p. 425, 468. And, but for discussions with and encouragement from her *habeas* counsel, she would not have even filed this lawsuit. *See.* Ex. 3, 12/05/19 deposition of Milke, p. 225. She seeks to remove herself from any personal responsibility, despite acknowledging that her attorneys cannot know all of the facts. *Id*. at p. 231.  She has chosen not to look at documents that would assist her in providing full and complete discovery responses and competently testifying at deposition:

> Q. Do you think it would have been helpful for you to have read this document understanding that that's why you're here today?
>
> A. I agree that it would be helpful to review documents to prepare, but I can't read this stuff. So I just don't.
>
> Q. And that is a personal choice you have made. Correct?
>
> A. Yes.

*See* Ex. 3, 12/05/19 deposition of Milke, p. 246. Milke is an uncooperative party. She has intentionally chosen not to be prepared and, as a result, has caused extensive delay and waste of money. The lawyers in this case are not the plaintiff. Milke is. Because she refuses to participate, her case should be dismissed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.    Incomplete Search for Documents.**

Defendants have spent countless hours hounding Milke to ensure complete disclosures and search for documents.  It is Defendants' efforts, alone, that have resulted in Milke reluctantly agreeing to privilege waivers and finding many "inadvertently" not disclosed and responsive documents. Yet, in her sanctions deposition, Milke identified even more areas that apparently have not been searched appropriately.

First, Milke has two computers, neither of which appear to have been examined for information responsive to the outstanding discovery requests. Milke admitted that her personal computer even has a "civil litigation" folder:

> Q. Have you ever searched – since the inception of this lawsuit, this civil lawsuit to today, have you ever searched through that computer to see if there was anything related to this case?
>
> A. I don't think so.
>
> …
>
> Q. The laptop that Franke gave to you when you got out of prison, did you ever provide that to any of your civil lawyers to look through?
>
> A. No. There's nothing on it.
>
> Q. Are you aware of any forensic examination ever being done on that laptop to confirm – to confirm there's nothing on it?
>
> A. No.
>
> Q. How do you know there's nothing on it if you didn't search through it to see if there is information related to this case?
>
> A. Because I didn't put anything related to this case on that computer.
>
> …
>
> Q. So you have a second laptop that you use. What do you do on that laptop?
>
> A. Um, I do all – I pay my bill on there. That's pretty much what I use it for.
>
> Q. Do you use e-mail ever from that laptop?
>
> A. Not – I don't – I really don't communicate by e-mail.

20

1    Q. Do you have any documents on that laptop?

2    A. Like documents – like what kind of documents?

3    Q. Do you save any type of documents, like Word documents, any documents? Is – is there anything on that laptop.

4

5    A. I have – I have, like, folders that are related to ADT, my dog. I have – I have –

6    …

7    Q.  Did you search through the second laptop to see if there were any documents, materials, any electronic information on
8    that laptop related to this case or your criminal case?

9    A. The only thing is I – I think I have a subfolder called civil case notes. And I'm not sure what's in there. It's probably the
10   complaint, but I have hard paper copies of that stuff.

11   Q. Did you search through the subfolder on your laptop when you were sent written discovery requests from the defendants
12   to see if there was anything responsive in the subfolder?

13   A. I don't – I – I'm not sure. I don't recall that.

14   Q. Did you ever bring your laptop to any of your civil lawyers for them to search through and see if there was any documents
15   that were responsive?

16   A. I don't know.

17   Q. Is it possible that you did, you just don't remember, or –

18   A. It's – it's possible. I just don't remember right now.

19   *See* Ex. 2, 12/04/19 deposition of Milke, p. 54-60. Notably, at the outset of this

20   questioning, Milke denied having any relevant information on her computer. As usual,

21   only after repetitive detailed questioning, did she finally relent and admit that she has a

22   "civil litigation" folder on her laptop, which she had no memory of ever reviewing for

23   responsive information or giving to her attorneys for review.  Milke has never produced

24   documents from a third-party forensic analysis of her computers, which is warranted

25   given the pattern and history of discovery violations. Defendants are entitled to know if

26   there are responsive documents and whether any were deleted. If this case is not

27   dismissed, Defendants request that this Court order a forensic examination of Milke's two

28   computers and her mobile phones.

Second, Milke continues to fail to identify all of the individuals she wrote to about her case, despite Rog No. 2 and RFP No. 4. Emails that were recently produced on December 16, 2019 reveal the existence of a long-time pen pal:

> Hi Pat – Does this guy's name ring a bell? He wrote a letter to Debra and mailed it here to me. It sounds like they wrote for 8 years when she was in prison, but I wasn't sure if he is in the inner circle, so to speak.

*See* Ex. 6, L&L63746. Conveniently, Milke failed to mention this eight-year writing relationship with Jim Burns, from Ohio. Milke initially and wrongfully claimed this email was protected by work-product, and only recently produced it after Defendants objected.

Milke also failed to identify likely explicit waivers that occurred with her boyfriend, Doug Bice:

> Voepel: Mike and I have not added anyone to our emails- we only normally only copy you, Renata, and Frankie…We now know from you that DP Bice is Debra's boyfriend (right?), but we don't know who Jen is. Renata added Arch… Mike and I are somewhat concerned about having anyone other than you, Renata, and Frankie on emails to and from us, and we don't want to have to completely monitor/filter everything we say. If you are able to give your updates to DPBice and Jen separately, we would feel more comfortable to that.

*See* Ex. 7, L&L48105. Bice was added to Pat's routine Milke status updates starting in 2007—status updates that were improperly also withheld as privileged. *See* Ex. 8, L&L048010, 48028, 48395. Bice was also added to her prison visiting list. *See* Ex. 9, ADOC7-11. Defendants suspect there are others, like Bice, who Milke has not identified.

When questioned about Bice in her sanctions deposition, Milke was again evasive:

> Q. Who is Doug Bice?

> A. Doug was some – like a supporter from Texas, I think.

> Q. You considered Doug to be your boyfriend at some point?

> A. I –I don't – I wouldn't characterize it as that.

> Q. If Frankie or Pat referred to Doug Bice as your boyfriend, would you dispute that?

> A. I don't know.

Q. Would you dispute that he is – was at some point someone you considered to be your boyfriend?

A. I wouldn't characterize him as that. It was a close friend.

Q. Did you ever tell him that you loved him?

A. I don't recall.

Q. Could you have?

A. I don't know.

Q. Did you ever write in a letter that you loved him?

A. I don't know.

Q. Did Mr. Bice come visit you in person?

A. Yes.

Q. How many times?

A. I don't know.

Q. More than one?

A. I don't know.

Q Did he talk to you on the phone?

A. Yes.

Q. How frequently?

A. I don't know.

Q. More than once?

A. Possibly, yes.

*See* Ex. 2, 12/04/19 deposition of Milke, p. 41-43.   After Milke's evasive deposition testimony, Defendants located prison documents designating Bice as her secondary emergency contact. *See* Ex. 10, AZDOC655. Milke also directed Galbraith to send messages to Bice, such as that she "loves him a lot." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 363, Bommersbach 5180, 5189, 5199, 5300, 5311. Bice was not just a "supporter from Texas. I think." Bice was a trusted friend and boyfriend. There are no letters between Milke and Bice that have been produced. Milke conveniently can

23

1    remember nothing about him. This is, again, par for the course. Milke cannot be trusted to

2    testify or respond to discovery – fully and accurately.  Because the foregoing emails were

3    not timely produced, Defendants had no opportunity to search for Bice, investigate

4    whether he still has possession of the letters Milke sent to him.  Milke has destroyed or is

5    concealing the letters Bice sent to her, constituting further spoliation of evidence.

6         **E.    Explicit Waivers**

7         ***Frankie Aue.***

8         Milke failed to timely acknowledge the extent of the waivers relating to her

9    communications with Mr. Aue (and her knowledge of his efforts on her behalf publicizing

10   her case through internet channels). *See* Ex. 3, 12/05/09 deposition of Milke, pp. 332-355.

11   While Milke has claimed—at various points—that her sharing of information with Aue

12   (including his access to all materials in the Milke room) would not have increased the risk

13   that confidential communications would be revealed to an adversary, this is belied by

14   Voepel's newly produced email to Pat Galbraith:

15        Voepel to Galbraith: I'd tell her to be careful even in writing
          letters to Frankie. They are not privileged and the State can
16        subpoena them if it wants to do so. . .Because they know
          Frankie is her webmaster and that he is a strong supporter who
17        has attended all of her court hearings (and they probably have
          figured out by now that Debra was/is staying at his house). So
18        if she is writing to anyone, it would be to him.

19   *See* Ex. 11, L&L63745. It was shortly after this email was sent that Milke destroyed all of

20   Aue's letters that he sent to her:

21        Q. Where are all of the letters that Franke sent to you?

22        A. I shredded those as well.

23   *See* Ex. 2, 12/04/19 deposition of Milke, p. 60. Any information Aue received from emails

24   that he was copied on (from Voepel/Kimerer) could have easily been shared with Milke in

25   the form of written correspondence that her *habeas* counsel contended would have been

26   subject to a subpoena (if she had kept those letters instead of shredding them).

27        As this Court is already aware from the in *camera* inspection, Milke's *habeas*

28   lawyers and Milke relied extensively on Aue for his knowledge of the facts in the case and

the documents in the file.[10] Aue, however, was not timely listed in any disclosure statement. Aue's email correspondence—printed in hard-copy form and stored in the Milke room—was not timely produced in response to discovery either.

Aue was called the "Master of Debbie's file," by *habeas* counsel, with Voepel complaining about Milke running everything by Aue. Indeed, as this Court recognized in the Sanctions Order, Mr. Kimerer himself described Aue as a "journalist." Defendants first learned of Aue's extensive access through Bommersbach's book, but this is something Milke and her habeas counsel should have recognized at the outset of the case such that all Fowler, Ray, Rosenquist, and many *habeas* documents should have been turned over years ago.[11] Now, as Milke's new counsel trickles out *habeas* counsel's hard copy email relating to Aue (the first production starting nearly thirty days after this Court's Sanctions Order and only after Defendants pointed out that Milke was unable to file a Motion for Reconsideration because the time to do so had passed), more and more documentation of his extensive involvement and access is being discovered. And, on August 22, 2018, Milke—for the first time—finally acknowledged Aue's access and admitted that even more materials need to be turned over. *See* Doc. 549, Ex. 1. This should have happened years ago, not after the Court's *in camera* review.

While these hard copy emails (in addition to more emails in electronic format) should have been reviewed by Milke's civil counsel during the 16 months that the Motions to Dismiss were pending in the case (see Doc. 503), such a review would have been unnecessary if Milke and Kimerer simply divulged the true extent of Aue's involvement in Milke's case, and life. Aue was hardly just a supporter, he was a walking

---

[10] Defendants did not have the benefit of the documents Milke withheld as privileged, but produced to this Court as part of the *in camera* inspection. Those documents are all supportive of this Court's findings in Doc. 503, relating to the discovery violations in this case. If Defendants had these documents at the time of the filing of the Motion for Sanctions, Defendants would have utilized these documents to support their arguments (and also would have made additional requests for sanctions).

[11] Milke's letters to and from Aue would have been Responsive to Request for Production No. 4, but Milke and Aue shredded these materials.

index of the Milke file, who *habeas* counsel routinely contacted when they needed to know facts, or where a document was located in the file:

- 2002: Voepel to Kimerer: "Frankie (below) is the webmaster for **Debra's website**. (emphasis added).  He is not an attorney or even an investigator, but he has the case totally "figured out" (in great detail). . . Unfortunately, he is in almost constant contact with Renata and Debbie and has a significant amount of influence over both of them. They run everything by him and ask me to get his input constantly. I have accepted all of Frankie's input via email and his "website packet" *See* Doc. 600, Ex. 28, L&L020037,

- 4/10/2013:"Hi Frankie: Mr. Kimerer wants me to pull the transcripts of his district court examination of Saldate. Since you are the master of Debbie's file, I was hoping I could save myself some time and ask you to point me in the right direction to locate the transcripts?"[12] *See* Doc. 549, Ex. 40, L&L14676.

- Voepel to Aue: "Tracy and I spent about 4 hours yesterday doing some additional organizing of the file and making sure all the transcripts are complete, etc. You did a great job getting the file in better order, which is making our job of organizing the rest of the way much easier.  Thanks again." *See* Doc. 549, Ex. 41, L&L 14938.

- 1/31/2002: Voepel/Aue: "Do you know which box that is in? It is in a folder called 'Anders Rosenquist, Vol. 1.' Of course I wouldn't be able to tell the box. BTW, did Tracy pass the index file on to you, that file that indicates where to find what stuff? The transcript can also be found online at http://www.debbiemilke.com/en/case/docs/sandratelephoneintervi ew.shtml."  *See* Ex. 73, L&L14945.

- 2/12/2012, Voepel/Aue: "Aue: There is a list summarizing all of the evidence and exhibits entered, I think you'll be able to find that in the first folder [01-05-1990/09-11-1990] of the trial transcripts.  Pretty much at the end [if not the very last item] you'll find that document. If you have trouble with this I could look it up on Friday.  Lori: You are a walking index file on Debra's case! :) Lori. Aue: Well, I had a great office where I could sleuth around for weeks and weeks. Fr@nkie." *See* Doc. 549, Ex. 41, L&L014941.

- 1/24/2002, Aue to Voepel: "Within the records, you will find one folder, almost like an open briefcase. That contains any and all

---

[12] Many of these documents were obtained recently as they were improperly identified as privileged by Loevy counsel. Defendants have been thwarted at every pass from discovery of this information. *Habeas* counsel/civil counsel should never have taken the position that work product or attorney client privilege applied to Mr. Aue and should have notified NSB and Loevy of this fact.

affidavits I could find, drafts and actual signed affidavits. One affidavit is from Roland J. Steinle III., the initial defense attorney of Roger Scott. That will tell you a lot." *See* Doc. 549, Ex. 42, L&L14771.

- Aue to Voepel, April 26, 2002: "Hi, Lori, I just wanted to ask cautiously…whether you have everything pertaining to December 3, 1989 or if you feel you could need more info? I have another file ready, but it basically contains everything I reported to you earlier…" *See* Doc. 549, Ex. 43, L&L014885.

- Aue to Voepel, April 25, 2013: "Dear Mike, dear Lori, I finished my little 'sorting job' and brought the printouts of—what I call—the index file to Mike's office today. They are in the small black binder on top of the boxes. I'm attaching an (sic) Excel sheets to show the contents of all binders and boxes. Hopefully, if something is needed, you might be able to locate by first looking it up from this file I showed the results to Melissa and Jeanie this afternoon and they are positive any stuff will be easier to find now. All the best, Fr@nkie." See Doc. 600, Ex. 24, L&L032385-32399. **Note**: The indexes demonstrate that Aue had access to Ray, Rosenquest and Fowler documents, the Aleshire tapes, and materials habeas counsel would later claim privileged (Lori attorney notes).[13] Aue also prepared the indexes for all of the witness binders for the retrial, which reside in Voepel's office.

- Milke to Voepel, December 22, 2002: "Since Frankie knows my case inside and out, and more about the police reports than I do, he can easily assist you in telling you who's lying about what." *See* Ex. 12, L&L120134.

- Aue to Bommersbach, May 6, 2015: "I arrived there in April and Mike and Lori had offered me to look into the file which was turned over by Anders… When I first looked into the boxes I realized what a mess they were. I showed up at Mike's firm every morning and sorted through the 17 boxes for a few weeks. The great thing was that I could take with me whatever I wanted and copy it for my own use and analysis. I made myself privy with every sheet of paper." *See* Ex. 13, Bommersbach0628-31

Given Aue's extensive knowledge of the file and his repeatedly demonstrated value to *habeas* counsel in answering questions about the file, it is most telling that Aue was never

---

[13] Milke's prior counsel would claim, repeatedly in this litigation, that the discovery failures were due to the disorganization of the file. But, Aue organized the file and provided a roadmap for location of documents within the file. Moreover, Milke has since produced numerous indexes of witness binders (which Aue also prepared) that also demonstrate that the file was not in shambles, but was instead carefully organized. *See* Ex. 14, L&L23632-23645, 23651-2, 23732-23746, Despite this organization, documents have been dumped on Defendants in a disorganized fashion throughout this litigation. Milke's new counsel is disclosing documents by letter, instead of utilizing disclosure statements or supplementing specific Requests for Production (as required by the rules).

disclosed by Milke in her disclosure statements. *See* Ex. 15, Plaintiff's Seventh Supplemental Disclosure Pursuant to the Federal Rule of Civil Procedure 26(a).  It is certainly curious that Milke would list every single one of her lawyers and her investigator (Fowler), but would leave Aue off of her list.  The most likely explanation is that Milke concealed the extent of Aue's involvement—likely because she knew that in doing so she would necessarily reveal that she and Aue had a shredding party and destroyed evidence.

As this Court recognized in ruling on the previous Motion for Sanctions and privilege disputes, Milke also failed to candidly reveal her explicit waivers resulting from sharing attorney-client privileged documents with Bommersbach (that were later printed in the book). Yet, in addition to this, Bommersbach was also communicating with Aue, and receiving links from him to DVDs and YouTube videos (other sources of information that would never be timely produced):

> Today, I -unexpectedly—received a DVD from this Switzerland film company which was working on a documentary on Debra's case for a while (four to six years or so, I think). I looked at the show, merged it into one single file and uploaded it to YouTube so I can share it with all of you. It is actually a pretty good documentary and I was pleased with how many facts and details are included.  I didn't list this publicly on YouTube. However, at this juncture it's just an F.Y.I.  http://youtu.be/bbzxGXQTXww.  If you like this show I may ask Jean-Francois if I could make it public on our Facebook page. I have no idea what they intend to do with it.

*See* Ex. 16, L&L032409. Thus, not only was Aue receiving confidential information from Milke and her attorneys, which he could then post on the internet without restriction (if he chose), but he was also sharing information with journalist Bommersbach, the book writer, with full knowledge of <u>everyone</u> that she was involved in writing a book for publication. Aue would also communicate with other journalists about Milke, thereby increasing further the risk of dissemination of confidential information.

### *Carolyn Imhoff, Media, and Others.*

In addition to sharing confidential information with Frankie Aue, Milke also shared confidential attorney-client communications with many individuals, including: Carolyn Imhoff (the prison hairdresser), Judith Radlovich ("..I wrote her pages about

everything."), and media personalities, such as Maury Povich (who she told in the 90s about her plans to sue for in excess of $50 million). *See* Ex. 1, 12/06/2019 deposition of Milke, p. 442-452. Milke failed to acknowledge these waivers when she claimed privilege at the outset of this case. *See* Ex. 3, 12/05/19 deposition of Milke, p. 311-313 (failed to inform her lawyers that Imhoff had access to all of her legal files). Milke has never read the Marino, or Felix letters, to refresh her recollection about other waivers that may have occurred.

As it relates to Imhoff, Milke failed to even timely identify her as a witness, at all. When Defendants identified and subpoenaed Imhoff, they discovered a trove of explicit waivers, which led Milke to erroneously claim privilege over materials from trial and appellate counsel:

- "My atty told me to keep my mouth shut and it's very important to me that nothing leaks out, however, I broke his word and told you stuff, silent and now my mom. I can't help it because it is only natural to react when you have been wronged." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff255.

- "I also got a letter from my atty. He said he asked the Supreme Court for an extension until Dec. 13. He said by that date he will definitely be done with my brief." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff263.

- "My atty knows I want him to look for insufficient evidence or at least a reason for a new trial." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 298.

- "I don't mind telling you about my legal stuff...My lawyer told me that the 5 judges on the Supreme Court do not tolerate political corruption at all.  He said he knows 2 of those judges personally.  Plus he knows other people within the system." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff00322.

- "My lawyer told me the first of the year is when he'll be ready. (Hopefully) I think I told you how a certain witness is avoiding my lawyer and she's hiding out somewhere." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff00343.

- "I got a notice from my appellate lawyer & my last brief is due on Sept. 11. After that the Supreme Court is supposed to review my case. My new lawyer is aware of the deadline, so hopefully everything will be ready before Sept. 11…I'm sure my appellate lawyer will ask the court for an extension of 30 days. The purpose of all this is to have my appeal put on hold while my new lawyers proves my innocence." *See* Ex. 2, 12/04/19 deposition of Milke,

Ex. 356 at Imhoff 423.

- "I got some news from my lawyer but I won't write it in this letter because I know these cops will scan through my mail. I'll tell you all about it when you come on the 22nd. It's great stuff maynard!" *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff0438.

- "I haven't talked to my lawyer lately so I don't know anything new. I'll probably talk to him next week. I'll keep you posted now that I know they open my letters to you, I'll have to be real careful." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 00483.

- "My lawyer answered that letter of mine and I'm firing him... He said if I didn't like the way he's working then I better find another lawyer. He also said that he found nothing worth arguing and that I will spend the rest of my life in prison!" *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 534.

- "I got a letter from my lawyer...Well, apparently my stupid lawyer reread 1730 pages of transcript and had to rewrite my brief...I slept on my frustrations and today I spent 4 hours preparing a letter to my lawyer. I want to read what I wrote to him. Mr. Kemper, I received a copy of the motion requesting another extension of time..." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff00538-40. **Note, this is merely an excerpt—there are nearly three pages of the letter to Kemper, who was postconviction counsel. Milke's current counsel, Loevy, withheld the Kemper documents despite avowing to this Court that the only dispute remaining as to attorney-client privilege and work product was for habeas counsel and despite possessing the Imhoff letters showing these disclosures. The Kemper documents were finally produced in August of 2019.

- "It's ok to share the news of my atty with Judith but please mention her that it needs to be kept quiet. Rosenquist doesn't want anyone to become suspicious and then try to cover up any lies...I felt so distressed when you asked if Rosen was bullshitting me. Why would a lawyer lie to me? Especially about a case as serious as mine....[Rosenquist] told me that since our visit he had begun his investigation and has uncovered evidence proving my innocence- the evidence is about Saldate but I'm not sure exactly what. I do know some phony confessions were done in the past by him and there's other stuff he found that shows Saldate is a pathological liar. *See* Ex.2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 645-646.

- "There are court maneuvers Rosenquist is planning to do with my case...We won't need a bunch of evidence to prove my innocence- only enough to show beyond a reasonable doubt that with the new evidence, my trial would be void... The cornerstone of the state's case against me is only Saldate's report. Once that issue is proven to be false, there's nothing left to hold me here." E *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 647.

- "Rosenquist told me to keep this stuff quiet because his investigation has uncovered some evidence about that cop who arrested me. He doesn't want anyone to get wind that my case is being reinvestigated because he doesn't want anyone who testified against me to possibly cover up any lies…He has found evidence of my innocence and they are still finding more. He has his own PI. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 659.

- "Anders won't need testimony from Jim + Roger. He already has an affidavit of their statements." *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 806.

- "I talked to my lawyer today…The lengthy waiting had a lot to do with money. My lawyer had to wait for some income so he could pay his investigators…Now things are rolling because everyone has been paid- He came into some money…My lawyer managed to get my trial judge off my case! I don't know how- he just did. So if I have a new trial, she wont be the judge!" *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 834-835.

- "There are some things going on regarding my case and I really can't elaborate in a letter. My lawyer could have been ready months ago but he wants to pursue a certain issue so I won't have to go through another trial. He has accumulated a lot of evidence already…He did tell me that he will represent me if I have a trial and that I will be acquitted. He said my case is so simple to resolve as far as proving I had nothing to do with the crime – it's political corruption he's trying to prove that makes this whole thing frustrating to him. On the phone, he told me all the evidence he and his investigators have gathered and I'm so relieved. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 836-8.

Once again, Milke failed to identify people with whom she shared confidential attorney client privileged information. Defendants only learned of these disclosures when they issued a subpoena for Imhoff's letters, after Milke's November 2018 deposition. There are likely more people like Imhoff, who possess letters, but who Milke has not identified.

### F.   Timeline Related to Continuous Extensions of the Discovery Deadlines.

In the first Motion for Sanctions, Defendants provided a timeline related to the discovery violations up until that point in time, including Milke's failure to follow this Court's Scheduling Orders.  *See* Doc. 466, Ex. 1. Unfortunately, the pattern has continued and also revealed discovery violations that were not yet apparent at the time of the first Motion for Sanctions, or the full extent of the violation was not apparent. For example, while the Court addressed the Peter Aleshire tapes, Defendants have learned even more

31

1  about the Aleshire tapes after Plaintiff provided copies of photographs of the same.[14]  *See*

2  Ex. 1, 12/06/19 deposition of Mike, p. 485-499, 500-505. Those photographs document

3  the following handwritten notes on the Aleshire tapes: **"original to Peter Aleshire. 4-29-**

4  **98."** (emphasis added).  *See* Ex. 17, L&L62153-62317. In the first sanctions briefing,

5  Milke falsely contended that there was a reasonable belief that the Aleshire tapes were

6  privileged because they were contained in her attorney's file in the Milke room.  Not only

7  is this demonstrably false from the content of the tapes and Milke's acknowledgement that

8  they were never intended to be privileged, but the handwritten notes identified above

9  confirm this to be the case.  This note on the tape establishes the originals were sent to

10  Aleshire, and thus could never have been reasonably mistaken as being privileged even if

11  the tapes had not been listened to.  Repeatedly, Milke's avowals have been found to be

12  inaccurate, misleading, and/or false.

13      This Court has extended the close of discovery, multiple times, because of Milke's

14  repeated failures relating to production of documents. Milke's discovery violations have

15  necessitated Defendants repeatedly moving for relief because of the delays.  As this Court

16  noted on January 10, 2019:

17          The Scheduling Order issued on October 30, 2019, required
            the parties to complete discovery by December 14, 2018.
18          (D0c. 379). On December 4, 2018, the parties submitted a
            stipulation to stay discovery for one month. (Doc. 391). The
19          Court granted that stipulation but ordered the parties to file a
            status report on January 4, 2019. According to the status report
20          filed on that date, the parties continue to have discovery
            disputes involving privilege issues. They now request the
21          Court allow them to file briefing on their privilege issues on
            March 1, 2019.  This case has been pending for a long time
22          and the parties should have completed the vast majority of
            discovery long ago.  The Court will approve the parties'
23          request to brief the privilege issues on March 1, 2019, but they
            must complete all other discovery before that date. Once the
24

25      [14] Loevy sent correspondence to Defendants, on November 11, 2019 as follows:
    "On November 6, 2019, local counsel received a box of original cassettes from NSB,
26  which NSB sent to local counsel after retrieving it from storage. This box of cassettes was
    digitized by NSB during discovery. Local counsel took photos of the contents of the box.
27  These photos are produced here as L&L 62153-62317."  *See* Ex. 18, correspondence from
    Ms. Wang.

28

1
2
3
4

> court resolves the privilege issues, the parties will be given a very limited amount of time to complete any discovery that is dependent on the Court's privilege related rulings…IT IS FURTHER ORDERED no later than March 1, 2019, the parties shall complete all discovery that does not involve privilege.

*See* Doc. 399. As the Court will see below, Milke disregarded this second warning (the first being in October, 2018), and did not complete all discovery and completely disregarded this Court's orders, again. Milke's repeated refusal to abide by the Scheduling Order is a valid basis for severe sanctions. *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co*., 726 F.2d 1202 (7th Cir. 1984) (district court did not abuse its discretion in refusing to vacate a default judgment entered when defendants failed to meet the court's deadline for responding to interrogatories, which deadline had been extended twice by the District Court).Milke has not taken the initiative to request that this Court move deadlines because she could not comply with the same. Instead, she repeatedly blows through them—seemingly without a care—leaving Defendants to address her non-compliance. Milke has failed to comply with nearly every single deadline imposed by this Court. She has done so while repeatedly claiming that she was finished producing documents. For example, on May 3, 2019, in Doc. 462 (Plaintiff's work product brief), Plaintiff avowed that **"anything that has been withheld is on a privilege log. Everything else has been produced."** (emphasis added). This is clearly not true. Multiple items were withheld from Voepel's office that were not on the privilege log and were never privileged, including the YouTube videos, multiple versions of documentaries, and thousands of pages of emails that were not on any privilege log. Multiple items also remained in Kimerer's office, such as the Trollinger receipts and thousands of pages of emails.

Only once in this case did Milke seemingly request relief on her own, when on December 3, 2018, she requested that Defendants agree to a four week stay. Milke's professed reason for this stay was to afford her time to diligently review additional documents to enable her to fully and completely respond to City of Phoenix Second Request for Production of Documents to Plaintiffs, First Interrogatories to Plaintiff, and

33

First Request for Admission to Plaintiff —served on November 14, 2018 (with responses due on Dec 14, 2018), and to address the remaining privilege issues.  But, as we now know, this was not the reason for the stay at all. Instead, Milke used this time—to Defendants' detriment—to fire her counsel. At the end of the four-week stay, she did not serve her responses to Defendants' discovery.  Instead, she requested an additional 30-days to respond.  She served her incomplete and misleading responses (see section relating to the website and social media) on February 1, 2019. Milke proceeded not to comply with this Court's new March 1, 2019, deadline either. Milke has only intentionally acted to seek relief, on one other occasion, when she requested this Court to clarify its ruling on the production of emails—something that would potentially inure to her benefit. Milke does not act until this Court requires that she do something and, then, still fails to fully comply.

| Deadline | Documents Produced After the Deadline |
|---|---|
| October 31, 2018—Court Order for Milke to get her file in Order and produce documents identified as responsive to discovery | - **September 14, 2016-** Plaintiffs' Rule 26(a)(1) disclosure statement, NSB1-6050, NSB6108-12391, and approximately 1551 files produced by Ms. Milke's counsel by the Arizona state courts.<br>- **January 20, 2017-** Plaintiff's Response to Defendant City of Phoenix's First Request for Production of Documents to Plaintiff, NSB12392-18569, various audio and video recordings<br>- **April 7, 2017-** Plaintiff's Supplemental Disclosures Pursuant to the Federal Rules of Civil Procedure 26(a), Plaintiff's First Supplemental Response to Defendant City of Phoenix's First Request for Production of Documents to Plaintiff, and NSB1857-29193, AZDOC1-1007, AZDOCHealth1-322<br>- **July 20, 2017-** Plaintiff's Response to Defendant Armando Saldate's First Request for Production of Documents to Plaintiff, NSB30399-30477<br>- **November 8, 2017-** Plaintiff's Third Supplemental Response to Defendant City of Phoenix's First Request for Production of Documents to Plaintiff. Plaintiff's First Supplemental Response to Defendant Armando Saldate's First Request for Production of Documents to Plaintiff, NSB30516-31845<br>- **May 23, 2018-** Disclosure of expert testimony (1) Stephanie Rizzardi, )2  Bhushan Agharkar, M.D., (3) Lou Reiter, and (4) Richard Drooyan<br>- **June 7 2018-** Plaintiff's Fourth Supplemental |

Response to Defendant City of Phoenix's First Request for Production of Documents to Plaintiffs, Plaintiff's Second Supplemental Disclosure Pursuant to the Federal Rule of Civil Procedure 26(a), NSB31846-32148, AZDOC1008-1030, AZDOCHealth323-638

- **June 22, 2018**- Plaintiff's Fifth Request for Production of Documents to Defendant City of Phoenix, and Plaintiff's First Request to Inspect to Defendant City of Phoenix
- **July 12, 2018**- Plaintiff's Third Supplemental Disclosures Pursuant to the Federal Rule of Civil Procedure 26(a), NSB32150-32152, 32153-32397, 32398-32504
- **August 3, 2018**- Plaintiff's Fourth Supplemental Disclosures Pursuant to the Federal Rule of Civil Produced 26(a), NSB32505-32528
- **August 9, 2018-** Plaintiff's Third Set of Requests for Production of Documents and Things to Defendant Maricopa County, Plaintiff's First Set of Requests for Admission to Defendants
- **August 10, 2018**- Plaintiffs Fifth Supplemental Rule 26(a) Disclosure, NSB32529-32858
- **September 7, 2018**- Plaintiff's Subpoena to Produce Documents to Dr. Mace Beckson, Plaintiff's Subpoena to Produce Documents to Mr. Jeffrey Noble, Plaintiff's Subpoena to Produce Documents to Mr. Joshua Marquis,
- **September 10, 2018**- Plaintiff's Sixth Supplemental Disclosure Pursuant to the Federal Rule of Civil Procedure 26(a), NSB32859-32860, 32861-32862, 32863-32865, 32866-32877
- **October 26, 2018**- Plaintiff's Response to Defendant's Subpoena on behalf of Dr. Bashah
- October 31, 2018 – MILKE_NSB032878-033545, Plaintiff's Updated Privilege Log, Plaintiff's Second Supplemental Response to Defendant Armando Saldate's First Request for Production of Documents to Plaintiff, Plaintiff's Fifth Supplemental Response to Defendant City of Phoenix's First Request for Production of Documents to Plaintiff
- November 13, 2018 – MILKE_NSB033546-33733.
- November 14, 2018- Plaintiff's Sixth Supplemental Response to Defendant City of Phoenix's First Request for Production of Documents to Plaintiff, Plaintiff's Seventh Supplemental Rule 26 Disclosure, and updated Privilege Log
- November 15, 2018—Bommersbach book— MILKE NSB033734-34174.
- January 24, 2019 – L&L00001-01088
- February 1, 2019 – L&L01088-1227, 1234-1243, 1245-1673, 1676-1683, 1687-1701, 1712-1818,

| | |
|---|---|
| | 1820-2053, 2055-2911, Plaintiff's Ninth Supplemental Rule 26(a)(1) Disclosures; Plaintiff's Responses to Defendant City of Phoenix's First Interrogatories, First Requests for Admission, and Second Request for Production<br>- **February 28, 2019** –L&L2912-3044, 3046-3103<br>- **March 1, 2019** –L&L3115-10431 |
| March 1, 2019, Court modified deadline for the close of discovery. (Doc. 399, dated 1/10/19) | - **March 29, 2019** –L&L10432-10675, 10688-10959<br>- **April 1, 2019** – Documents received from Kirk Fowler<br>- **April 8, 2019** – L&L 010960-011024<br>- **April 17, 2019**- L&L 11179-12894 & L&L 12895-13019<br>- **May 13, 2019**- L&L 13020-13040, 13043-13046, 13041-13042, 13047-13052<br>- **May 15, 2019** –L&L 13053-13056b, 13057-13062, 13063-13130;<br>- **May 16, 2019** –L&L 13131-13223 and Plaintiff's First Supplemental Response to Defendant City's First interrogatories<br>- **May 17, 2019** –L&L013224-013999<br>- **June 5, 2019**- L&L14000-14002<br>- **June 14, 2019** –L&L14003<br>- **June 17, 2019**- L&L 14004-14070<br>- **June 18, 2019** –L&L 14071-14089<br>- **June 21, 2019** – L&L014090-014144 |
| Court Order, filed on July 12, 2019, for close of discovery by September 27, 2019. | - July 10, 2019 – L&L014145-14364<br>- August 2, 2019 – L&L-14365-14451<br>- August 12, 2019 – L&L014452-014561<br>- August 15, 2019 – L&L014562-014706<br>- August 16, 2019 – L&L014707-015195<br>- August 20, 2019 – L&L014605-14621; L&L015196-020040<br>- August 21, 2019 – L&L020041-020277<br>- August 23, 2019 – L&L020278-021887; MILKE_NSB020289 unredacted<br>- August 27, 2019 – L&L021888-022852<br>- August 28, 2019 – L&L022853-023079<br>- September 6, 2019 – L&L023080-023480 |
| Court Order, filed on September 6, 2019, with September 13, 2019, deadline to complete discovery. Note: Milke agreed to this deadline. | - September 9, 2019 – L&L023481-023631<br>- September 10, 2019 – L&L023632-023754<br>- September 12, 2019 – L&L023755-027305<br>- September 13, 2019 – L&L027306-032360<br>- **September 16, 2019**- L&L 32361-32466-32484, L&L 32465<br>- **September 17, 2019**- L&L 32515-32692, 32485-32514<br>- **September 23, 2019**- L&L 32693-33307<br>- **September 25, 3019** – CDs of media files produced electronically on September 13, 2019<br>- **September 27, 2019** – L&L 33608-33611, 33612- |

| | |
|---|---|
| | 33811. 33812-33855, 33856, 33857, 33858-33871, 33872-33882, 33883-33891, 33892-33907, 33908-34001 & 34625, 34002-34001, 34012-34015, 34016-34253, 34626-34628, 34254, 34255-34543, 34544-34624, 34629-34699<br>- **September 30, 2019** – L&L 34700-37087<br>- **October 1, 2019** – L&L 37088-39919 & L&L39920-39991<br>- **October 2, 2019** – L&L039992-042550<br>- **October 4, 2019** – L&L042551-43096<br>- **October 12, 2019** – 620 page privilege log for Michael Kimerer and Lori Voepel's emails and documents, a 9 page privilege log of *habeas* counsel client letters, and a 6 page privilege log of Michael Kimerer's privileged emails relating to civil case<br>- **October 18, 2019** - L&L44750-44819, 44820-44910, 44911-56138, 56139-56142, 56143- 61836<br>- **October 21, 2019** - L&L61837-61847, 61856-61864, L&L61848-61855, following .pst files, which are not bates stamped: debj@post.com produce to defs.pst, djm@mail.com produce to def.pst, MK email Aug-Oct 2019 produce.pst, an updated privilege log for the Michael Kimerer and Debra Milke's emails |
| Court Order, filed on October 24, 2019, requiring all non-privileged documents/emails by November 1, 2019 | - November 1, 2019 – L&L061865-062149; email exchange Mike Kimerer and Pat 05-10-13 no bates-numbers<br>- **November 5, 2019** - (requested by Defendants on November 5, 2019) – bates stamped version of emails and text messages to/from Elizabeth Wang and Frankie Aue concerning hard drive, produced without Bates-stamped<br>- **November 11, 2019** – L&L62153-62317 and audio file named "32 Henry Milke 2 061590-1.36.35" a transcript of previously produced NSB 17750, audio file named "87 Indecipherable, and an audio file named "65-XXX_06_27_Interview of Mark Milke" – Starts with 'Testing 1234'[F-RAY]_1.18.42" a transcript of NSB 18189-18244, and L&L62153-62317; L&L062150-62152; L&L62318-062319<br>- **November 27, 2019** – L&L62320-62327, 62328-62371, 62372-62373, 62374-62381<br>- **December 2, 2019** – L&L62382-62449, 62737-62744, 62450-62612, 62613-62614, 62615-62635, 62636-62638, 62639-62733, 62734-62736, Plaintiff's Seventh Supplemental Response to Defendant City of Phoenix's First Request for Production, Plaintiff's First supplemental response to Defendant City of Phoenix's Second Request for Production, Plaintiff's First Supplemental Response to Defendant City of Phoenix's Second Request for Production, Plaintiff's First |

|   | Supplemental Response to Defendant City of Phoenix's Third Request for Production, Plaintiff's Thirteenth Supplemental Rule 26(a)(1) Disclosures<br>- **December 3, 2019** – L&L62745-62759<br>- **December 5, 2019** – L&L62760<br>- **December 9, 2019** – Plaintiff's Fourteenth Supplemental Rule 26(a)(1) Disclosures, L&L62761-62764, Plaintiff's Second Supplemental Response to Defendant's City of Phoenix's Third Request for Production and documents of unredacted MILKE_NSB 31857; L&L062765-062772<br>- **December 13, 2019** – L&L062773-062777, 62778-62779, 62780-62831, 62832-64176.<br>- **December 16, 2019-** L&L062832, 64177-64190<br>- **December 24, 2019-** L&L64191-64209, 64210-64223, Privilege log, Plaintiff's Ninth Supplemental Response to City of Phoenix First Request for Production; Plaintiff's Third Supplemental Response to Defendant City of Phoenix's Third Request for Production of documents<br>- **January 9, 2020 –** Plaintiff's Tenth Supplemental Response to Defendant City of Phoenix's First Request for Production; L&L064224-064246<br>- **January 13, 2020-** L&L64247-64281, 64282-64284 |
|---|---|

The reality is that Milke is slow-walking discovery because the responsive documents are harmful to her case. Milke cares naught if any of this evidence gets excluded for untimely disclosure because it harms her case. She cannot afford to pay any sanctions:

> Q. Well, if she were to award 4- or 5- or $600,000 in attorneys' fees and costs to the various defendants, would you pay that?

> A. I can't.

> Q. Okay. So it would be fruitless for her to award such an amount because it wouldn't be meaningful or effective. Correct?

> A. Yes.

*See* Ex. 1, 12/06/19 deposition of Milke, p. 580-581. Given the fruitless effect of sanctions coupled with the severity of continuing discovery violations, Defendants request that this Court determine that dismissal of this case is merited because the lesser sanction, of a monetary award, is not available. *See* Doc. 503 at 28.

38

Milke seemingly believes that she has "gotten away" with her multiple late productions. She continues with a pattern of granting herself extensions to this Court's deadlines—hoping for forgiveness later rather than asking for permission. *See Diehl v. H.J. Heinz Co.*, 901 F.2d 73, 74-75 (7th Cir. 1990) (dismissal of plaintiff's action justified for willful failure to comply with the defendants' request for discovery on a timetable to which plaintiff's lawyer had agreed). She might be assessed monetary sanctions, but what does that matter if she cannot pay them and if the risk of paying sanctions is far outweighed by the ultimate amount she is going to seek at trial. In other words, Milke might have to pay $750,000 in sanctions, but if she can somehow find a way to get to trial (notwithstanding all of her discovery violations) she stands to gain far more and indeed will ask for $50 million. Thus, the monetary sanctions become merely a cost of doing business. A means to an end.

If Defendants never wise up to her discovery violations—finding the needles in her confusing document haystack dumps, forcing her to look for documents, confronting her with documents not produced, all the while wasting money seeking to force Milke to own up to her discovery violations—then she fares even better. Indeed, she can merely do what she has been doing in this case—blame Defendants for not finding her "inadvertent' failures sooner and demanding that she act. If the Court accepts this, then she frees herself from all of the blame because it is now someone else's fault for not finding what she did wrong sooner. She broke the window, but doesn't want to pay for it because Defendants should have recognized earlier that she had tiny shards of glass in her hands. She should have gone to the neighbor and fessed up, apologized, and offered a remedy. This, she simply will not do. She simply takes no personal responsibility.

In addition, it is worth noting that for at least six months after Milke responded to Defendants' Interrogatories and Requests for Production in February of 2019, Milke failed to comply with the Federal Rules in her productions. She produced documents by inadmissible letter, instead of in supplemental responses to discovery or disclosure statements. *See* Fed.R.Civ.P. 26(e) (imposing an ongoing responsibility to supplement

1  discovery responses and disclosures).   She data dumped upwards of 50,000 pages of

2  documents without identifying which documents were responsive to which specific

3  discovery requests, only doing so long after Defendants had reviewed the documents to

4  figure it out for themselves. Now, there is not a clear place that this Court can go—i.e.

5  discovery responses that were supplemented contemporaneous with the production of

6  documents—to ascertain what documents were disclosed when. Instead, Milke has shifted

7  the onus to Defendants to present a timeline to this Court collecting her various non-

8  compliant productions.   This is improper under the Federal Rules and also represents an

9  attempt to obfuscate rather than clarify.

10  **III.   MILKE'S FALSE AND MISLEADING TESTIMONY.**

11    **A.   The Law.**

12      The most insidious form of discovery violations relate to: giving false or

13  misleading testimony; and manipulation or falsification of evidence. Both have occurred

14  in this case. Numerous courts have dismissed cases (relying on the Court's inherent

15  power, Rule 37, Rule 11 and/or Rule 41) where this has occurred, because a lesser

16  sanction, such as assessing monetary sanctions, does not ensure the integrity of the

17  judicial process. *See Kojis v. Equifax Credit Info. Servs.*, 2004 U.S. Dist. LEXIS 7948

18  (N.D. of Ill. 2004) (dismissal where a litigant was involved in falsification of evidence

19  and tried to "cover their tracks" with even more fraud after their misconduct was

20  discovered). Courts should have "zero tolerance for parties who intentionally distort the

21  discovery and trial process." *Bogdan v. Eggers*, 2000 U.S. Dist. LEXIS 18225 (N.D. Ill.

22  2000); *Pope v. Federal Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992) (affirming

23  dismissal with prejudice of plaintiff's lawsuit as Rule 11 sanction where plaintiff

24  manufactured evidence and offered perjured testimony to enhance her case); *Combs v.*

25  *Rockwell Intl. Corp.*, 927 F.2d 486, 488-89 (9th Cir. 1991) (affirming dismissal with

26  prejudice under Rule 11 where plaintiff authorized counsel to alter his deposition

27  transcript in material respects, signed the revised deposition and swore under penalty of

28  perjury that he had reviewed the transcript and had made the changes himself.)   The

sanction of dismissal is designed "not merely to penalize those whose conduct may be deemed to warrant a **sanction**, but to deter those who might be tempted to such conduct in the absence of such deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc*., 427 U.S. 639 (1976).

Complete, accurate "responses to discovery are required for the proper functioning of our system of justice . . . [p]roviding false or incomplete discovery responses violates the Federal Rules of Civil Procedure and subjects the offending party and its counsel to sanctions." *Skinner v. Ryan*, 2014 WL 3064897, at *4 (D. Ariz. July 7, 2014); "Knowingly incomplete and misleading answers to written interrogatories constitutes perjury, as well as fraud. *In re Amtrack "Sunset Limited" Train Crash in Bayou Canot, Alabama on September* 22, 1993, 136 F.Supp. 2d 1251, 1258 (S.D.Al. 2001). Not only are complete and accurate responses required, but so too is accuracy in the litigant's reporting to the Court and the parties about the completeness of its discovery productions.

A party who provides false deposition testimony "attempt[s] to deceive the district court on material matters before it," *Combs v. Rockwell Int'l Corp*., 927 F.2d 486, 488 (9th Cir. 1991), which "constitutes a fraud on the court," *Da-Silva v. Smith's Food & Drug Centers, Inc*., 2013 WL 2558302, at *2 (D. Nev. Jun 8, 2013). While perjury should not be confused with mere inconsistencies, Ninth Circuit courts have often found witnesses to have committed perjury when failing to disclose material information or facts. *See, e.g., Chamberlain v. Les Schwab Tire Center of California*, 2012 WL 6020103 (E.D. Cal. Dec. 3, 2012) (plaintiff committed perjury when he lied about recording conversation); *Arnold*, 2012 WL 3276979, at *4 (finding plaintiff committed perjury when lying about taking a video, noting her continuous, evolving false statements). False testimony may also be inferred when—as is present here—circumstantial evidence also suggests a knowing misrepresentation. *Sell*, 189 F. Supp.3d at 940 (finding a deponent's selective memory lacked credibility).

When a party has committed perjury or a fraud on the court, sanctions may be severe, because this conduct is an affront to the pursuit of justice. *Vogel v. Tulaphorn,*

41

*Inc*., 2013 WL 12166212, at *5 (C.D. Cal. Nov. 5, 2013); *Newman v. Brandon*, 2012 WL 4933478, at *4 (E.D. Cal. 2012) ("[P]erjury on any material fact strikes at the core of the judicial function and warrants a dismissal of one's right to participate at all in the truth seeking process."); *United States v. Mandujano*, 425 U.S. 564, 576–77 (1976) (the Supreme Court has "without exception allowed sanctions for false statements or perjury."); *Alexander v. Caraustar Indus., Inc*., 930 F. Supp. 2d 947, 957 (N.D. Ill. 2013) ("[P]erjury strikes at the heart of the integrity of the judicial system."). As one Court aptly noted:

> Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence is merely excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means.

*Brady v. United States*, 877 F.Supp. 444 (C.D. Ill. 1994).  Giving perjurious answers during a deposition and in interrogatory responses will support a Rule 37 sanction of dismissal with prejudice. *See Dotson v. Bravo*, 202 F.R.D. 559, *569 (dismissing a case where the plaintiff provided false and misleading testimony and discovery responses finding that the deceit "hindered and impeded the orderly and speedy progression of the case," noting that permitting him to "profit from his deceit" by allowing him to proceed to trial and merely be impeached by his misconduct was inappropriate, and finding that awarding monetary sanctions would not be appropriate because there was no ability to pay.). This is true even if the deceit concerns issues that are not core to the litigation, but relate to the discovery that has impeachment value. *Id*. at *571.  The "harm to the defendants must be presumed because it is intrinsic to our truthfinding adversary system and, therefore is intangible and immeasurable. The defendants have a right to expect that if they abide by the rules, the opposing party will do so also." *Id*. at *572.

Milke's testimony, during the first two installations of her deposition, was designed to both conceal the existence of documents and information in some instances, and hide the extent of her destruction in others. *See BFOW, Inc. v. Hurt (In Re Hurt)*, 2000 U.S.

42

App. LEXIS 1861 (9th Cir. 2000) (noting that dismissal sanctions can be appropriate when there is a "pattern of deception and "even a single violation of a discovery order can be justification for dismissing a case under our cases if critical documents are being withheld, and the integrity of the entire process is called into question."). She continued this pattern in her third deposition, where she only reluctantly, partially, and half-heartedly gave up information after exhaustive efforts to ask the question in just the right way to ensure that she was answering completely. Milke repeatedly disavowed knowledge of certain subjects, or her own conduct, only to be forced to admit the same when impeached with her own words. During the first two sessions of her deposition, Defendants did not have the materials to impeach her—only later obtaining them from documents untimely disclosed by Milke. Milke repeated this for her third deposition by untimely producing documents, again, after her sanctions deposition.  Milke has written, or told, so many stories to so many people that she cannot remember it all.  Her lies have been explained by "half-truths" and convenient short-term or newly discovered long-term memory loss. *See* Ex. 2, 12/4/19 deposition of Milke, p. 123.

**B.**    **Specific Instances of Some of Milke's False and Misleading Testimony.**

Milke's discovery violations include false and misleading testimony that was designed, in some cases, to cover up the cover up. It was also designed to avoid her admission of critical facts relating to the merits. In many instances, Milke's deception was not discovered until Milke produced a litany of documents that were wrongfully withheld and responsive to discovery.  As the Court noted in *Dotson v. Bravo*:

> 'Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts.' Dotson seriously violated the 'rules of the game,' and he can't be permitted to say 'oops, you've caught me,' and thereafter be allowed to continue to play the game:

> [When courts] find deliberate falsehoods told in proceedings, [they] cannot allow such conduct to go unchecked.  Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system.

202 F.R.D. at *572.  Dismissal is an appropriate sanction for giving false and misleading testimony and for false interrogatory responses.  *Id*. at *574.  "Through lies, misrepresentation, and non-disclosure, [Plaintiff] has willfully engaged in a pattern of obstructive discovery tactics in an effort to deny defendants the means to effectively mount a defense to his accusations against them.  He cannot be permitted to profit from his misconduct." *Id*. at *575.  Perjury is a willful deceit on the court and, until discovered, "it infects all of the pretrial procedures, and interferes 'egregiously with the court's administration of justice.'" *Id*. And, impeachment is not an appropriate sanction as "impeachment has little punitive or deterrent effect for obstructive discovery tactics or perjury…tampering with the administration of justice must be shown to bring the severest of consequences. Otherwise, the institutions of justice will appear impotent and helpless." *Id*.

Defendants have attached the entirety of Milke's sanctions deposition and exhibits, which provide excruciating detail relating to the discovery violations, including false and misleading testimony, which requires dismissal of this lawsuit. In addition, in Doc. 600, Defendants detailed additional examples involving Milke's false testimony, including: (1) her false testimony that she never read the civil complaint. Yet, her untimely produced emails demonstrate otherwise (Doc. 600, p. 10-12, and Ex. 7-8, to the same); *see* Ex. 3, 12/05/19 deposition of Milke, Ex. 384, at L&L031159; and (2) her false testimony regarding the extent to which she uses email. (Doc. 600, p. 1-2, and Ex. 1 to the same).

Milke's deception concerning her reading of the civil complaint is particularly troubling as her deception strikes at the heart of her case. She feigned ignorance to avoid making admissions and/or concessions. There is no other reasonable explanation: if she stood by her factual allegations, Milke should have no problem answering truthfully about what she has alleged. Notably, Defendants would learn, in her sanctions deposition, that the "man" she sent her civil complaint to would later turn out to be part of a phishing scam. *See* Ex. 3, 12/05/19 deposition of Milke, pp. 318-321. Milke was willing to share

information with a stranger who stole her money, but not answer questions openly in her civil case.

### 1.    Janna Bommersbach

This Court has already recognized the likelihood of Milke's false and misleading testimony concerning her contact with Bommersbach—which strikes at the heart of the integrity of the judicial system as it was intentionally designed to conceal critical information striking at the core of Milke's claims and damages. *See* Doc. 503. Defendants have confirmed the falsity of Milke's testimony at her sanctions deposition.  *See* Ex. 3, 12/05/19 deposition of Milke, pp. 371-395. That Milke intentionally concealed this information is confirmed by several untimely and recently produced documents.[15] *See* Doc. 600, Ex. 35*, L&L 14322.  Milke would finally testify, in her sanctions deposition, that: (1) Bommersbach interviewed her in prison  four times for a total of 14 hours (not the casual one time she avowed in her initial testimony); (2) it was Milke's decision to have Bommersbach write the book; (3) she exchanged email with Bommersbach; (4) she had lunch with Bommersbach; (5) Bommersbach was at her birthday party; (6) she has been to Bommersbach's home; and (7) she participated in a four-week media tour in Germany to promote the book she never timely produced and claims she has never read. *See* Ex. 3, 12/05/19 deposition of Milke, pp. 371-85.

Milke intentionally tried to conceal her contact with Bommersbach—and the materials she gave to her—around the exact time that Defendants served a subpoena on Bommersbach, as documented in an email—dated December 27, 2018—between Aue and Bommersbach: "Hello, dear Janna, so, this is my usual private mail address. Deb just wanted to let you know that she cannot contact you directly. I guess you probably heard what's going on. Fr@nkie." *See* Ex. 3, 12/05/19 deposition of Milke, Ex. 387, JB0002.

---

[15] In her book, Bommersbach writes that she visited Milke four times in prison. Lest this Court have any doubt about who is providing accurate information, Milke's visitation records—from 2013—document Bommersbach's four visits.  *See*  Ex. 3, 12/05/19 deposition of Mike, Ex. 392.

**Produced by Bommersbach's counsel on May 30, 2019.[16]  "What's going on," is undoubtedly Defendants' discovery of the contents of the book, the trove of information possessed by Bommersbach, and Milke's realization that her inaccurate testimony would be revealed. Milke's use of Aue as a conduit for communicating with Bommersbach was designed directly to thwart the discovery process because Aue, as a German citizen, cannot be deposed or subpoenaed by Defendants.[17]

Milke's testimony was not only false on its face, but it was designed to conceal the existence of a litany of documents Milke knew to be in Bommersbach's possession, because Milke gave them to Bommersbach (including thousands of pages of her letters to Pat Galbraith, letters to her legal counsel, and other items). Milke also concealed email correspondence that she—along with her lawyers—had with Bommersbach, which were likewise never privileged (and responsive to requests for communications with the media):

- On April 23, 2013, Bommersbach informed *habeas* counsel, "I had a fabulous four hour interview with Debra yesterday- they let me take in my notebook and pen!! I'm getting on her visitor list so I can go out regularly-she's a lovely woman, as you well know, and I came away knowing this: there's no way in hell that woman had anything to do with her son's murder. But then, you've known that for a long time." *See* Ex. 19, L&L045888.

- On June 11, 2013, *habeas* counsel received an email from Bommersbach stating "I've asked Kirk to help me find Dr. Garcia, who has retired and moved to Reno. Kirk thinks his testimony on what he concluded from his frequent interviews with Debbie back in 1990 will be very convincing in my book, also probably in any "retrial." Kirk says he's found him- Garcia has an unlisted number, but it is $140. I was wondering if you guys had found Dr. Garcia or if I should just go ahead and pay the finders fee" *See* Ex. 20, L&L055565.

---

[16] Bommersbach did not timely produce this email in response to the subpoena that Defendants sent to her for all materials, including email. It was responsive and should have been produced.

[17] As Defendants have pointed out previously, Bommersbach did not timely produce this email in response to Defendants' subpoena either.  Instead, only after Defendants saw evidence—from other untimely produced documents—that Bommersbach was emailing, did Defendants return to Bommersbach's counsel and demand production of any and all emails.

-  On June 10, 2013, Bommersbach to *habeas* counsel after she had phone calls with Milke and her mother "This is a humanitarian issue if I ever hear one. Have you considered going to the media…I think your friend Wendy at Channel 12 could make hay with this! And by the way, the thought of me doing a blog-after thinking about it, doesn't seem right." *See* Ex. 21, L&L44293.

Milke trickled out this responsive email over several months. *See* Doc. 600, p. 35-36 and Exs. 31-35, attached thereto; *See* Ex. 1, 12/06/19 deposition of Milke, Exs. 385 at L&L002106, Ex. 396 at L&L002103 (documents produced February 1, 2019), Ex. 392 at L&L023045 (Produced August 28, 2019), Ex. 397 at L&L031162 (produced September 13, 2019)[18]; Doc. 600, Ex. 33, L&L023051 (produced August 28, 2019); *See* Ex. 22, L&L020802 (produced August 23, 2019); Ex. 23, L&L032475 (email from Bommersbach to Aue/Voepel regarding Mark Milke, produced September 17, 2019).

Indeed, in September of 2015, Bommersbach was still exchanging correspondence with Aue and the Rake civil law firm. *See* Ex. 24, L&L032466 (produced September 16, 2019). Moreover, Pat Galbraith, who visited Milke frequently and drafted "status updates"—that Milke's *habeas* counsel would later direct him to stop sending because they could be harmful in the civil case (see Doc. 623)— often included Bommersbach on emails (where habeas counsel were also copied). *See* Ex. 25, L&L55569, L&L55571, & L&L57307.

The overwhelming evidence establishes that Milke's claims of "inadvertence" concerning her failure to produce the book transcript—in light of her false testimony about Janna Bommersbach—are specious, at best.

---

[18] This email was responsive to Defendants' Request for Production Nos. 4 &5 and also No. 15. It was not located and produced in response to Request No. 15, despite the fact that Milke produced another email with Bommersbach. This reveals that she was using woefully inadequate procedures and/or was selectively producing emails to hide her discovery violations.

1

2

### 2. *Misleading and False Testimony Relating to the Existence of Documents Created by Milke, Including Journals and Writings, and Letters She Received from Aue.*

3

4

5

While Milke admitted to shredding documents that were at Aue's house, she falsely implied that she shredded, or got rid of everything, and failed to mention that Bommersbach still had thousands of pages of documents:

6

7
Q: What else did you shred?

A: It—it was just a copy of my legal file.

8

9
Q: Were there any of your notes in there, like your hand written notes?

10

11
A: Oh, I don't know. I mean, I don't –I didn't really—I didn't really take notes. I didn't journal.  I just had copies of my transcripts and briefs, all that stuff. I just—I just got rid of it.

12

13

14
*See* Doc. 549, Ex. 6 Volume III of Milke's deposition, p. 535-537.  When asked again about destruction of documents, Milke would also testify falsely about the extent of the same, which she would later reluctantly admit in her sanctions deposition:

15

16
Q: [Y]ou were asked the question at line 6 by me, "Have you destroyed any documents that are related to this case in any way?" And your answer was, "No." Correct?

17
A: Yes.

18
Q: And that was not a truthful answer. Correct?

19
A: What do you mean?

20
Q: Well, you've destroyed documents that were in your mom's home, correct, that related to the case?

21

22
A: I—like I said before, they were court filings of my criminal file, briefs.

23
Q: Those are documents related to your case.  Correct?

24
A: Yes, but they're copies.

25

26
Q: Okay. And then you were asked the question, "You haven't destroyed any letters that you've received?" And your answer was       "No."       Did       you       see       that? A:  I do.

27
Q: And that wasn't truthful testimony. Correct?

28

1

2

A: Okay. That's—okay. "You haven't destroyed any letters that you've received?" Okay.

3

Q: That's not accurate because you destroyed the letters that Frankie         Aue         sent         you.         Correct?
A: Right, yes.

4

*See* Ex. 1, 12/06/19 deposition of Milke, p. 564-5.

5

6

Milke testified falsely about documents destroyed and also misrepresented the extent of

7

the documents she created over the years (journals, additional writings for a different book

8

years later, notes, thousands of pages of correspondence, etc.). In Doc. 549, pp. 10-13,

9

Defendants outlined numerous instances of misleading testimony and documents

10

supporting the same. Then again, in Doc. 600, pp. 40-41, Defendants provided numerous

11

examples confirming the existence of documents that Milke denied existed, but which

12

did—seemingly until Milke destroyed them. *See also* Ex. 26, L&L4567.[19]

### 3.    *Joe Marino*

13

In Doc. 549, pp. 14-15, Defendants identified false and misleading testimony

14

relating to Joe Marino and Milke's memory relating to him. The Marino letters are the

15

first example of a decades long pattern of destruction of documents that Milke believed

16

were damaging to her—whether she did it personally or instructed others to do so.  The

17

Marino letters remain a critical piece of evidence in this case on multiple fronts—related

18

not only to the explicit waivers of privilege, but also to the merits and damages. Milke's

19

explanation of not remembering writing to Joe Marino is incredible—a convenient excuse

20

to absolve her of any responsibility for remembering any of the contents of the letters,

21

because they were embarrassing, damaging to her case, and paint the picture of a woman

22

more concerned about her new love interest – Marino, than the death of her son. Milke

23

knew these letters were damaging—this is why she instructed Marino to destroy them and

24

25

26

27

[19] 6/6/98: Renate fax to Anders  "I have about read about 30 pages of her own recollections which she has either sent to me, Charles' father (remember Mr. Jones and his wife and their affidavit) as well as a journal written by her during her imprisonment…I have dedicated this chapter almost totally to Debbie's own words and condensed the various accounts to those 7 pages I am faxing you for your information." *See* Ex. 26, L&L4567.

28

1   lie about knowing her.  Milke used this feigned memory lapse to also hide her extensive

2   explicit waivers of privilege (as she would do with other witnesses). Milke wrote the

3   letters and certainly knew the contents of them all along and thus, she is the one who

4   engaged in bad faith.

5          When this Court directed Milke to get the file in Order, Milke seems to have

6   interpreted this as not requiring review of all of the letters she wrote. And, after this Court

7   noted that there was <u>no good explanation</u> for Milke having not reviewed the Marino letters

8   in the Sanctions Order (Doc. 503), incredibly, Milke still has not read them. Milke was

9   not prepared to answer questions about the Marino letters and how they related to

10  sanctions at the time of her sanctions deposition.

11              *4.      **Rick Scavone and Carolyn Imhoff***

12         In Doc. 549, pp. 15-17, Defendants identified false and misleading testimony

13  relating to these topics as well as additional discovery violations. Milke intentionally

14  concealed the identities of Imhoff and Scavone. While Milke had extreme difficulties in

15  her first deposition even remembering who Scavone was—relenting only after Defendants

16  had shown her page after page after page of references to him—in her sanctions

17  deposition, Milke conveniently remembered more, including specific details about the

18  diamond necklace he gave her. *See* Ex. 1, 12/06/19 deposition of Milke, pp.455- 456.

19         Imhoff was not identified until Milke testified on the last day of her November

20  deposition, but Milke still concealed the comprehensive extent of Imhoff's role in her life.

21  When Defendants questioned Milke about Vince Felix (who she wrote to from 1991-

22  1994), Milke would testify as follows at her original deposition:[20]

23  _____

24      [20]Letters from Felix to Milke written during the period 1991 to 1995 have been
    produced.  Letters from Milke to Felix are largely only from 1991. From the content of
25  Felix' letters and the newly produced voice tapes, it is clear that Milke was writing him
    but those letters no longer exist. *See,* for example NSB027787 (1/16/92: "Oh, by the way,
26  I loved that tape you made me it's great!..I'm sending you $10.00. It's the best I can do
    right now."); NSB02719 (5/25/92: "Yep—I sure did received (sic) your letter today the
27  25th of May. I just sent the stuff you wanted ordered."); *See* Ex. --, August 15 deposition
    of Milke, Ex. 224 at NSB028770 (1-10-94: "I received your sweet letter last night.").

28
                                              50

Q: How would you describe your relationship with him?

A: He—at the time—he was like, the only person I had a—a connection to, to the outside world. He—I was completely abandoned and all alone, and he was the only one who reached—that I had a connection to.

*See* 8/15/18 deposition of Milke, p. 153.  This false testimony would go on to form the inaccurate basis of damages expert Dr. Agharkar's opinion that Milke's only connection to the outside world was Felix, which explained some of her bizarre writings to him. Certainly, Milke also appears to have misled Dr. Agharkar in his interviews with her as well. Milke was, at the same time as the Felix correspondence, regularly writing to Imhoff. Indeed, Imhoff was sending/buying her things to save in storage (clothing), sending her money, keeping track of her legal file, and—as stated by Renata—acting as her liaison.

At the same time she was writing to Felix about how she loved him, Milke was writing to Imhoff about how much she despised Felix.  Milke was manipulating Felix to get money and commissary:

- 9/16/1991: I have another friend who writes me, but he gets on my nerves sometimes because he is so pushy and a baby...I met him at my trial. His name is Vince.  *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 287-288. Compare to 5/29/1991 letter from Milke to Felix: "I can't wait to see you on the 5th! I love you with all my heart!...All you have to do is hold me close and tell me that you love me , and I will BE privileged beautiful, and special." *See* Ex. 27, NSB_027902-3.

- 11/14/1991: Vince is so upset with me because I refused to commit myself to him and agree to marriage, that he turned over every letter I ever wrote to him to the state attorney general's office… In some letters, I wrong to him I just went along with him. I basically told him what he wanted to hear. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 65-66.

- 11/17/1991: if [Vince Felix] tries to humiliate me by exposing my letters to people, I will fight back should it become necessary. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 5.

- 1/14/92: Vince started writing again…I wrote back and said if he wants me to write that bad he better support me financially. I told him I was tired of his games and that I needed money regularly to pay for my writing materials and hygiene stuff. He said $60 is coming. I won't write until I see the money.  *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 356 at Imhoff 578.

51

*See* also Ex. 2, 12/04/19 deposition of Milke, Ex. 356, Imhoff 18-19, 37, 567-8, 546.

Milke also wrongfully withheld two voice tapes from Vince Felix, which he sent to her in 1994, but did not produce until 2019. One of those tapes discusses the fact that he bought Milke a ring, with the inscription "I love you forever," which Milke ultimately sent out to Imhoff to store for her. *See* Ex. 23, Kimerer021351, 021354; NSB028830 (1-31-95: "Hi baby, how are you doing?  I received your recent letter yesterday and was very touch (sic) by it. Thanks for liking the ring…Glad you like the engraving…After thinking about it maybe it should have read-"I love you with all of my heart."). This receipt was part of the Milke room, which Defendants only were provided access to in early 2019. Milke likely did not want Defendants to find evidence of yet another man that she was manipulating to suit her needs, just as she did with Styers.

Indeed, in her original deposition, Milke was asked if she sent any voice tapes:

> Q: In fact, you had a routine where in the afternoon you would spend over an hour every day writing letters?
>
> A: sometimes.
>
> Q: You also did voice-tape letters?
>
> A: Yeah. To my mom.

*See* 11/15/18 deposition of Milke, p. 627.  But, Defendants have uncovered that Milke sent voice tapes out to others—including Peter Aleshire and Vince Felix. Milke also withheld the Aleshire tapes and did not produce Felix' responses to her voice tapes, which she possessed since the outset of the litigation.

Milke's failure to disclose these relationships caused Defendants to continue to question the full extent of her disclosure.  Are there other people that she is not disclosing?  The history of this case and Milke's continued evasive testimony makes this likely.

### 5.    *False and Misleading Testimony about the Website.*

During the course of discovery, Milke has repeatedly provided false and misleading testimony and inaccurate verified discovery responses regarding the website:

1    www.debbiemilke.com. This was addressed by the Court in the Sanctions Order, Doc.

2    503.  Since that ruling, additional documents have been produced documenting the

3    expanded scope of this deception. Defendants incorporate, by reference, the discussion

4    and exhibits set forth in Doc. 549, pp. 17-20 and Doc.  600, p. 33.

5        In her sanctions deposition, Milke would admit—albeit partially and reluctantly—

6    that she had knowledge of the website, could control the content, and contributed to its

7    content.  *See* Ex. 3, 12/05/19 deposition of Milke, pp. 332-345, and Ex. 2, 12/04/19

8    deposition of Milke, Exs. 363 at Bommersbach004478, Bommersbach005027-28,

9    Bommersbach005107-5018,    Bommersbach005050-5051,    Bommersbach005097-5098,

10   Bommersbach005190-5196,    Bommersbach005224,    Bommersbach005252-5253,

11   Bommersbach 5097-98, Bommersbach005191, Ex. 3, 12/05/19 deposition of Milke Exs.

12   391 at L&L023090. Indeed, Milke was confronted with content that she specifically

13   directed to be put on the website, which was only discovered when Milke untimely

14   produced a hard drive full of documents from Aue in November 2019. *See* Doc. 623.  In

15   conjunction with the untimely production of the hard-drive (which includes website

16   material not timely produced), Milke would produce the following letter from Aue:

17               Since 1998 I cooperated with Debra's mother Renate Janka in
18               order to create a meaningful and comprehensive website
                 (debbiemilke.com). The legal owner of the website/domain
                 was Renate Janka; I was listed as the technical contact. With
19               the development of social media platforms I also started using
                 services like Facebook, Twitter and Youtube (approx.. 2011).
20               **This happened with the knowledge and consent of Renate
                 Janka, Debra (as much I as I could describe it to her), the
21               representing attorneys and our "inner circle" of friends
                 and family...In the aftermath of Debra's release in
22               September 2013 I was asked by the attorneys to take all
                 the sites down (in order not to interfere with the further
23               legal proceedings**). I let the hosting of the website run out,
                 deleted the Facebook and Twitter accounts. Video clips on
24               YouTube were made private (some of which are also
                 contained  on  the  hard  drive,  various  in  German).
25               Unfortunately with the termination of 'debbiemilke.com' I
                 was  no  longer  able  to  use  the  contact  email  address
26               (webmaster@debbiemilke.com) and therefore I have no power
                 over the YouTube channel anymore..."

27

28

*See* Ex. 29, L&L062146 (emphasis added). This letter is dated August 20, 2019. Yet, Milke would not produce it until November 1, 2019, which is far from timely supplementation. Critically, during the time that Milke withheld this letter, this Court was still embroiled in ruling on discovery disputes, including disputes related to Milke's production of email. Milke undoubtedly held on to this correspondence knowing that the Defendants would approach the Court for further relief.

Milke failed to admit her full knowledge of the website, her active contributions of content, her regard for her website as her "calling card," her awareness of the extent of the content that was posted on the website, and—ultimately—her knowledge that the website was taken down because in the **civil proceedings the attorneys were asking to remove literally everything**. As Defendants noted in prior filings, Defendants served Non-Uniform Interrogatories on Milke in November of 2018, which were answered by Milke's current counsel. *See* Doc. 549, Ex. 37. When asked for information about social media accounts, including blogs and websites, Milke responded as follows: "Plaintiff is aware of certain social media accounts that were created in her name by other people, but she has never maintained them or had any involvement in them."[21] *Id.* at p. 9-10. This verified discovery response is false and perjurious.

Milke did not just verify this false and misleading response once, she did so multiple times (including a December 2019 verification). Every verification is a perpetuation of knowingly false information. Each signature is a separate act of perjury. Not only did Milke falsely disavow the website, but she also failed to identify a Facebook page that Aue maintained (which was also destroyed per her counsel's instructions), and the YouTube videos. Milke's cover-up of the cover-up continues to serve a specific purpose: to hide the destruction and the destructive information.

---

[21] Milke prepared a rebuttal to be put on the website, but then tried to distance herself from it by providing false and misleading testimony about it.

1       While Milke has claimed that portions of the website were produced, what was

2   actually produced is a far cry from what appeared on the actual website.[22] Milke knew this

3   as she and Aue reviewed portions of the website—which had been taken down—in the

4   process of drafting the Complaint and then provided this information to civil counsel

5   (with the email and attachment conveniently not produced until August of 2019, and

6   wrongfully withheld as privileged):

7           Dear Daniel,

8           Debbie and I just walked through my summary of points
            against Levy (and just that!).  She has no objections. I hope
9           this is useful to you and Mr. Rake. Please let me know if there
            are any questions regarding this file.
10

*See* Doc. 600, Ex. 19, L&L021625-21640.  Milke certainly knew what was on the
11
website, that it was being used to advance her civil case, and she should have taken steps
12
to preserve everything in its entirety, but did not.  Instead, she and her attorneys took steps
13
to destroy and conceal it.[23]
14

15      Milke now contends that there is "no harm, no foul," because in the summer of

16  2019, she provided a link to the wayback machine (a third-party website, for which no

17  witness can lay foundation) which allegedly preserves some of her website.  Yet, this is a

18  red herring because: (1) Milke had an obligation to preserve the entirety of the website,

19  yet did not do so. Instead, the destruction of the website was endorsed after litigation was

20  anticipated and after portions of the website were being used to help advance her civil

21

22      [22] NSB contended that they produced from the website what was printed out in the
Milke room. Milke, however, has just produced Aue's index of the "Milke room." The
23  website appears on Aue's index with a notation that the material was a printout from
1998.  Thus, based on all of the new emails from *habeas* counsel, it is clear that this
24  printout would be incomplete because Aue made substantial additions and revisions long
after 1998.  Milke also only recently produced, in November of 2019, Aue's hard-drive,
which includes additional materials related to the website.
25
        [23] There are other materials related to the website that were not preserved in their
26  entirety.  For example, various email updates sent from the webmaster to subscribing
persons (some have been produced, but there is no way to verify that everything has been
27  produced); discussion boards; and inquiries to the webmaster (only some of which were
untimely produced because they are imbedded in emails with *habeas* counsel). CITE

28

1  case; (2) Milke waited three years to disclose the link to the wayback machine—long after

2  all police depositions had occurred and expert witnesses had been deposed. Milke's own

3  admissions, from the website, were not available for any part of this discovery; (3) there is

4  no witness who can testify as to what the wayback machine actually does and the

5  completeness of what it actually catalogued; (4) per Milke's counsel's own admission, the

6  wayback machine provides only snapshots in time and not an entire catalogue—thereby

7  necessarily making it incomplete; (5) as demonstrated by untimely produced emails,

8  content was constantly being revised/taken down at *habeas* counsel's directive because it

9  was harmful/damaging; and (6) as demonstrated by Milke's much too late attempt to

10  obtain Aue's hard-drive, with content from the website, Milke had control of Aue and

11  should have requested this data long before she did.

12  **IV.     THE LAW RELATING TO DISCOVERY VIOLATIONS.**

13         Defendants incorporate, by reference, the law set forth in their first Motion for

14  Sanctions and identify additional relevant law below. Milke has intentionally concealed

15  documents, acted evasively, presented false and misleading testimony, and has blanketly

16  refused to meaningfully participate in the litigation process. Milke demonstrates contempt

17  for this Court's Orders by refusing to even read them. Milke clearly hoped for a quick

18  settlement and threw a tantrum when she had to become involved in the discovery

19  process, rather than quickly collecting money. Milke is making a mockery out of the

20  Federal Rules, case law related to discovery violations, and this Court's Orders. *Roadway*

21  *Express, Inc. v. Piper*, 447 U.S. 752, 765, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980)

22  (courts have inherent power to levy sanctions on parties who engage in abusive litigation

23  practices). In this circuit, "courts have inherent power to dismiss an action when a party

24  has willfully deceived the court and engaged in conduct utterly inconsistent with the

25  orderly administration of justice." *Wyle v. R.J. Reynolds Industries, Inc*., 709 F.2d 585,

26  589 (9th Cir. 1983). This includes situations where evidence is spoliated. *See Surowiec v.*

27  *Capital Title Agency, Inc*., 790 F.Supp. 2d 997, 1005 (D. Ariz. 2011); *E. & J. Gallo*

28  *Winery v. Gibson, Dunn & Crutcher LLP*, 432 F. App'x 657, 659 (9th Cir. 2011) (a court

may levy a sanction on the basis of its own inherent power); *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (imposing sanctions of nearly $1 million in fees after defendant misled the court, violated court orders, and engaged in dilatory tactics).

As the Court noted in *Swisher Hygiene Franchise Corp. v. Clawson*, 2019 U.S. Dist. LEXIS 149512 (D.Ariz. 2019):

> Dismissal is appropriate where a 'pattern of deception and discovery abuse made it impossible' for the district court to conduct a trial 'with any reasonable assurance that the truth would be available.' *Valley Engineers Inc. v. Elec. Eng'g Co*., 158 F.3d 1051, 1057-58 (9th Cir. 1998). The Ninth Circuit has explained that '[w]hat is most critical for case-dispositive sanctions . . . is whether the discovery violations threaten to interfere with the rightful decision of the case.' *Id*. Under its inherent power to control litigation, a district court may levy sanctions, including dismissal of the action, for spoliation of evidence. *Leon v. IDX Sys. Corp*., 464 F.3d 951, 958 (9th Cir. 2006) (citing *Anheuser—Busch, Inc. v. Natural Beverage Distribs*., 69 F.3d 337, 348 (9th Cir. 1995)).

*Id*. at *11-12. Moreover, whether the conduct was Milke's fault alone, or was confounded by her attorneys, the Ninth Circuit has upheld dismissal of a case solely based upon the conduct of an attorney's party. *See Malone v. U.S. Postal Serv*., 833 F.2d 128, 134 (9th Cir. 1987). In so ruling, the Ninth Circuit rejected the argument that the client would be punished for the misdeeds of the attorney noting that "in light of the egregious nature of the malfeasance at issue here, we cannot conclude that the district court abused its discretion in declining to excuse Malone for the faults of her attorney." *Id*. Thus, Milke cannot excuse the fact that she willfully checked out of this litigation by blaming her lawyers. Even the United States Supreme Court has rejected such an approach:

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

*See Link v. Wabash R. Co*., 370 U.S. 626, 633-34, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962).

57

1         *Scheduling Orders and Rule 16*

2       The evidence establishes that Milke has repeatedly and continuously failed to

3 comply with this Court's Scheduling Orders. This relates not only to material that she

4 improperly claimed as privileged, but also other non-privileged materials that should have

5 been located and produced years prior. Fed.R.Civ.P. 16, authorizes a district court to enter

6 a scheduling order, which may only be modified upon a showing of good cause. Milke

7 repeatedly blew through this Court's deadlines without ever moving, pursuant to Rule 16,

8 for a new Scheduling Order. Violations of a scheduling order, may result in sanctions,

9 including dismissal under Rule 37(b)(2)(C); Fed.R.Civ.P. 16(f).  The more opportunities a

10 litigant has to comply with a Court Order, the more egregious it becomes when that

11 compliance is not forthcoming.  *See Bump Babies Inc. v. Baby the Bump, Inc*., 2001 U.S.

12 Dist. LEXIS 122798 (C.D.Cal. 2011) (dismissing action where Plaintiff ailed to comply

13 with two scheduling orders and a motion to compel Order); *Const. Laborers Trust Funds*

14 *For S. Cal. Admin. Co. v. Montalvo*, 2011 U.S. Dist. LEXIS 34259 (C.D.Cal. 2011)

15 (dismissing case where party refused to comply with several court orders despite multiple

16 written and verbal warnings).

17       Here, Milke has never justified her late disclosures or failure to comply with

18 multiple Scheduling Orders, which should have been completely unnecessary given this

19 Court's October 2018 Order for Milke to get her file in order and fully supplement her

20 discovery responses, or face dismissal.  Despite this Court's clear directive, Milke

21 marched on with the same willful disregard for deadlines that were clear and

22 unambiguous. It has been more than a year since this Court's October Order, yet nothing

23 has changed.

24       **The October 2018 Order**

25     "Civil contempt occurs when a party disobeys 'a specific and definite court order

26 by failure to take all reasonable steps within the party's power to comply.'" *In re Dual-*

27 *Deck Video Cassette Recorder Antitrust Litig*., 10 F.3d 693, 695 (9th Cir. 1993). In

28 addition, Rule 37(c) applies where a Court Order is not followed. *See* Fed.R.Civ.P. 37(C)

("the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.").

This Court's October Order was clear and unambiguous. The evidence establishes that Milke did not comply with the Order. Non-privileged documents responsive to discovery were not located and produced (Aleshire tapes, YouTube clips, documentaries, hard-copy printouts of emails, etc.). Misleading affidavits were produced that suggested a complete search, yet that was not the case. Milke failed to provide accurate information regarding her explicit waivers and failed to read any documents to refresh her recollection. This Court explicitly warned Milke to get her file in order, or she would be in hot water, and that the case could be dismissed as a result.  Inaccurate avowals were made to the Court, which were never voluntarily corrected by Milke (such as the Gary Stuart debacle). *See Life Techs. Corp v. Biosearch Techs, Inc*., 2012 U.S. Dist. LEXIS 63974 (D.Cal. 2012); *Glover v. BIC Corp*, 6 F.3d 1318 (9th Cir. 1993) (District Courts may impose sanctions against a spoliating party that merely had "simple notice of 'potential relevance to the litigation'"); Advisory Committee Notes to Rule 37(e) ("It is important that counsel become familiar with their clients' information systems and digital data—including social media—to address [preservation issues.]);" California State Bar Formal Opn. No. 2015-193, outlining the obligations regarding e-discovery; *Da Silva Moore v. Publicis Group & MSL Grp*. 287 F.R.D. 182 (S.D.N.Y. 2012) (when attorneys employ "keywords or any other technological solution to ediscovery, counsel must design an appropriate process, including use of available technology, with appropriate quality control testing.")

### *Spoliation of Electronic Discovery*

The Federal Rules of Civil Procedure require parties to take reasonable steps to preserve relevant ESI in the anticipation, or conduct of litigation. *See* Fed.R.Civ.P. 37(e). Courts may sanction a party if it fails to do so and the lost ESI cannot be restored or replaced through additional discovery. During a time that Milke contemplated civil

litigation, she took no steps to preserve electronic information she knew was related to her case. Instead, her agents acting on her behalf, took specific steps that were designed to result in the destruction of evidence. These instructions were specifically intended to "deprive another party of the information's use in litigation."

If electronic information is destroyed, the moving party is not required to prove the likely contents of the destroyed evidence, only that there are categories of irreplaceable relevant documents. *Alabama Aircraft Industries, Inc. v. Boeing Company*, 319 F.R.D. 730, 742-43 (N.D. Alabama, Southern Division 2017) (ESI was "lost" under circumstances where the defendant could not even identify some of the lost data, other ESI that could be identified was nevertheless not preserved, and the allegedly spoliated data could not be restored or found by conducting additional discovery). Here, the Facebook page has been spoliated in its entirety, as have portions of the website.

### A.   Instructions to Destroy Information—the Website, Facebook, YouTube Videos.

After Milke's lawsuit was filed in May of 2015, Milke and Aue were both interviewed for "Injustice Anywhere Radio," and Aue was questioned about the Debbie Milke website/YouTube videos that were posted.  In the interview, Aue provided critical information about Milke and her criminal counsel's endorsement and approval of his actions associated with the website and YouTube—which, as this Court has previously found, Milke disingenuously attempted to distance herself from to avoid discovery sanctions. Aue—in his own words—also reaffirmed that he was given complete access to Milke's criminal file, including privileged material, to organize and take what he wished for purposes of online use.[24] In their recent filing NSB (Plaintiff's former counsel) has confirmed that privileged materials were not segregated and were interspersed throughout these file materials. Aue had access to all of it. Aue then provided a shocking admission

---

[24] In its Sanctions Order, the Court cited to Bommersbach's description of Aue's involvement in organizing and accessing the file. Doc. 503 p. 15. Aue confirms that this description is accurate and that he had complete access to the file.

about instructions he received from Milke's civil attorneys (or by Milke using her civil attorneys as cover) to conceal or destroy evidence:

> Q: You put a series of videos on YouTube that I thought were incredibly effective. How did that whole idea come about? What made you decide to do the YouTube videos.
>
> A: I would have preferred a native American to be the host…I suggested to Debbie, well, would you mind that I do them alone.  I don't think that she has seen all of them. I know that she has seen one of them.  In total we have six episodes that uh, you know, slice the entire case up into different parts so that people could understand bit by bit how this went. Well, if it helped people to understand what the case was about, then I will be more than glad.
>
> Q: Now are those videos still available online today?
>
> A:   **I took them off right now because in the civil proceedings the attorneys were asking to remove literally everything.** I could make them available. I believe they are still streaming from your website, from Justice Anywhere.
>
> Q: Okay.  They're not…Those actual videos aren't there now. That is why I asked the question. And I did think it was possible that the civil suit had…was playing some bearing on that.
>
> A:   **Yeah, Yeah…That's the reason. I basically took everything off and in fact I will let DebraMilke, or DebbieMilke.com run out since there is no need for that anymore**.

*See* Injustice Anywhere Radio, "Debra Milke Discusses Her Exoneration," starting at 59:00,  https://www.youtube.com/watch?v=wEkgPGnS9lQ. These YouTube videos were not timely produced by Milke. Instead, links were only provided by Aue—to Milke's current counsel—on August 14, 2019, only after Defendants raised the impropriety of the same.[25] These YouTube videos were also sitting in Voepel's file and were not produced

---

[25] These YouTube videos were responsive to Defendants' Requests for Production No. 4, but also Defendants Request for Production No. 22.  *See* Ex. 31, City of Phoenix' Second Request for Production.  Milke did not produce everything in her custody and control.  She failed to produce the YouTube videos, and wrongfully withheld the "Summary of Falsehoods," that was posted on the website, but within her *habeas* counsel's files. *See* Doc. 541.

on October 31, 2018, despite the Court's Order that clearly required them to be produced. They were only recently produced in their entirety after the September 13, 2019 deadline.

Notably, when Defendants demanded that Milke contact Aue months ago, to obtain whatever material he had access to, nothing was produced. Aue was represented not to be within Milke's custody and control, but emails now produced establish that he was helping civil counsel at the outset of this case and keeping materials for "our file"— apparently a reference to a file of materials for the civil case.  *See* Ex. 30, L&L021674. Notwithstanding the same, buried in the *habeas* emails and materials were numerous references to website content and actual printouts from the same that could have been produced, with only a smattering quoted below (some of which were part of this Court's *in* camera privilege review):

- "Secondly, I wanted to bring to your attention that two, three minor updates have been made on the list that we call "Summary of falsehoods." The direct URL would be:http://www.debbiemilke.com/en/pla/summaryfalsehods.shtml and in case you want to download a pdf (Adobe Acrobat) file you may do that here:   http://www.debbiemilke.com/acroread/summaryfalsehoods.pdf. *See* Doc. 549, Ex. 46, L&L14819.

- "Dear Lori, I'm aware you have other things on your mind right now and other cases to take care of, but I'd like for you to have a brief look at these pages that I added to our website…" *See* Doc. 549, Ex. 47, L&L 14817.

- Dear Lori, dear Milke, Please find attached the DVD on which I put all five film clips together. I hope (and think) it will play on American DVD players (NTSC). I'm currently having problem uploading such huge files to YouTube but will work something out. With best regards, Frankie."  *See* Ex. 74, L&L 14778.  \*\*\***Note**: These appear to be the YouTube videos that were just recently produced and sitting in Voepel's file all along. Milke did not produce the YouTube files with this email. This email was produced on August 16, 2019.  A month later, and after the September 13, 2019 deadline for production, on September 17, 2019, Milke produced an incomplete version of these videos.  If this is something else, then who knows if it has been produced.

- June 25, 2014: "Frankie, My name is Lisa Sivertsen and I'm a producer with ABS News Good Morning America.  I am doing a story on Debra Milke's case and her attorney, Michael Kimerer gave me your email. Would like to get permission to use the photographs on your site, of course with Debra's permission and wondering if you can help? *See* Doc. 600, Ex. 29, L&L021605.

- June 8, 2014: Frankie to third-party Ryan (not privileged): "Mr. Kimerer forwarded your request and questions in respect to Jim Styers to me. I will be happy to give you the information you are asking for." *See* Doc. 600, Ex. 30, L&L210619-20. In this correspondence, Frankie then provides numerous links to the Milke website to support his assertions.

- Mike Kimerer to Rjansen@purduecal.edu: "Because Debra Milke's trial is pending I am restrained from making any public statements about the case. I have asked Frankie Aue (runs debra's website) to contact you and help answer some of the questions you have raised." *Id.* at L&L21620.

The emails also reveal that *habeas* counsel, including Kimerer, identified harmful information in the online content and directed it to be removed—and stay removed because of the civil suit (all the while understanding the obligation for it to be preserved due to the pending civil case):

- March 20, 2015: email, subject—Debra Milke: Facebook page:
  - Frankie: "Hi, Lori. do you think it's safe that I make our Facebook page visible again? I'd post a few media dates that I know of already. Just checkin' back with you for security…"
  - Lori, cc: Mike Kimerer: "I don't know, given the civil suit. Thoughts? *See* Doc. 600, Ex. 10, L&L021670.

- October 23, 2014[26], email, subject—Debra Milke websites:
  - Frankie: "Hi Lori, the Facebook and the (sic) my 'crucial' videos on YouTube are gone: https://facebook.com/TheDebraMilkeCase https://www.youtube.com/user/DebraMilke   The website will disappear as soon as the name servers will update (you know how that goes step by stem)/ Please let me know what you want me to do from my side. Fr@nkie."
  - Lori: "Thanks Frankie. I'm copying Mike so he will know too. Please let us know when the website is down also. Take care, Lori."
  - Frankie:  The website is down entirely here in Germany now (where the server is located). In case you still see bits and pieces right now it would be cashed (stored) on the servers on the way. They will be updated shortly. Fr@nkie." *See* Doc. 600, Ex. 11, L&L021641.

- September 08, 2014, email:
  - Paul Huebl[27]: Frankie just posted this hearsay garbage from his website to Facebook. We hope we won't see a second trial but

---

[26] As referenced above in the timeline regarding Milke's intent to file a lawsuit, months earlier, on July 3, 2014, Bommersbach confirmed that Milke had already hired civil lawyers. Thus, there is documentary evidence establishing that the instruction to remove this electronic discovery was made after civil counsel was hired.  *See* Ex. 4 to Doc. 454

stranger things have happened. We know that jurors overwhelmingly search the internet on their cases despite redundant court admonishments. This Johnson interview crap will be seen by jurors if there is a retrial and this will only damage Debbie. I may not be fond of Frankie and vise versa but his value as a legal expert or investigator is non-existent. He is too often incredibly thoughtless and impulsive. His rambling and lengthy YouTube videos should also be screened or removed. The Debra Milke website has outlived its usefulness. Taking it down now may be a good idea. At minimum it should be cleansed of things that should or will never see light in a court as evidence that damages Debbie. Frankie's theories are usually lacking in meaningful substance. Saying that if there are any stories or videos I posted that you may feel be counter productive I will remove them at once upon request. Check it out…http://www.debbiemilke.com/encase/docs/robertjohnson.sht ml#.VA%jJtq9KK1.

o   Voepel:  Thank you, Paul.  I asked Frankie to remove it, and he took it down early this morning. Lori.[28]

-   September 9, 2014: Voepel to Aue: "Here's what I'm talking about in my text.  Please remove it and let mike and I make these calls. Thanks Frankie.                                        Lori. http://www.debbiemilke.com/en/case/docs/robertjohnson.shtml#.VA6m eom9LCT.  See Doc. 600, Ex. 12, L&L21622.

---

[27] Paul Huebl is also is a journalist, who interviewed Milke at the jail after her arrest and continued to post content on-line about Milke's case.  He testified in her *habeas* proceedings and has been identified as a witness in this civil litigation. He intends to testify that when he interviewed Milke following her arrest, she denied ever confessing. Milke should have produced all emails with him as well-because he is a journalist and no privilege attaches— including those from her habeas counsel stating as follows: "If we didn't need him as a witness I would lead the lynch mob to string him up. There will be a perverse pleasure in confronting his "Chicago Cop" background that he crows about in his email."  *See* Doc. 600, Ex. 13, L&L020811-13. It is telling that, behind the scenes, Huebl was being attached by *habeas* counsel, but this information was hidden from the light of day because Milke "needed" him to suit her ends of being released from prison. She also needs Huebl for this litigation and likely withheld these damaging emails to avoid alienating him as a witness and to prevent Defendants from impeaching him.

[28] In separate email correspondence dated October 10, 2012, Voepel would tell Frankie that Milke could not afford to have the Robert Johnson information used because: "I just finished reviewing the Johnson transcript again.  I thought I remembered there was something I didn't like about it and why we didn't focus on it in any of our briefing, and it is this: Johnson claims both Styers and Scott told him Debra was involved.  I do not want this tape or transcript highlighted, in the media or otherwise, regardless of whether it could be used to 'confirm' Styers' claim that Scott shot Chris.  We can't 'cherry pick' the parts we like and expect everyone else to ignore that particular claim. Please be careful with it. Lori."  *See* Ex. 32, L&L027461.  Notably, Aue did not follow Voepel's advice and did post the Robert Johnson interview on the website and Facebook, which resulted in Voepel instructing him to take it down due to the recognition of the harmful information it contained relative to Milke's assertions.

- May 10, 2013: Frankie to Voepel: "Lori, I just got word from Pat that you were unhappy about two recent posts about Mark Milke and Armando Saldate. Both are already removed. I wouldn't have picked up on Mark if he hadn't posted damaging stuff on Debbie on his page, but I usually let our (growing)following do the commenting. The picture of Saldate's house came from a Channel 12 footage. As I said, all that is removed. Sorry, I didn't mean to bug anyone. *See* Doc. 600, Ex. 14, L&L020714.

- May 10., 2013: Paul: I'm going to remind you that Frankie has put up all this crap about Scott on the Debra Milke and YouTube websites that really needs to be removed. Frankie has decided that Scott is the chief criminal. He doesn't get it that it was Styers who made up the phony missing report and despite having an army of cops around him at Metro Center with Roger Scott being miles away that he (styers) was fully involved. Frankie wants to exonerate Styers and that's anything but helpful. I am convinced that you got to get Frankie to remove anything from the website about Roger Scott and his statements along those videos about Scott that Frankie put up. If there is somehow a new trial I promise you the jury is going to be looking at their crap in violation of court orders. *See* Ex. 33, L&L057573-4.

- May 12, 2013, email from Pat to Voepel explaining the removal process for Facebook (the implications of the same) and the website and, "As for Facebook it would take a couple more days but it would be taken completely off and couldn't be reinstated." *See* Doc. 600, Ex. 15, L&L020715

- May 11, 2013 email exchange with Frankie:
  o Frankie: "There is nothing in conjunction with Scott & Styers on the Facebook page. However, of course the website (debbiemilke.com) is full of it. To change a few of the 500 pages does not make much sense in my mind. Therefore I was suggesting to chop the connection between the domain name and the physical server. The website would simply be gone ('temporarily unavailable') and no content visible anymore. That is easy to do at this juncture, and easy to later reinstated the website if desired."
  o Lori to Mike Kimerer: "Mike—what do you think? I'm not sure how that would look but want your input. I think one of the main concerns is the one you tube video frankie made with Scott's statements re what he thinks really happened, but perhaps we need to look at everything on there re Scott and Styers to see what would be best. Lori."[29] *See* Doc. 600, Ex. 16, L&L20716.

---

[29] This YouTube video was not timely produced in response to discovery, nor in response to this Court's October Order, notwithstanding the fact that this video sat in Lori Voepel's files, it was not until on September 17, 2019. These videos were not available for questioning of any of the police witnesses, for preparing Detective Saldate for his deposition or for expert review and opinions. As revealed in the Injustice Anywhere radio program, Milke was aware of the YouTube videos and actually watched at least one. Aue was not given any instruction to preserve and, in fact, was told the opposite.

1

2        - May 14, 2013, Voepel to Aue: "Frankie—Can you please also make
           sure that any you tube video of this is removed for now from the web?
           Thanks,                                                    Lori.
3          http://www.debbiemilke.com/en/case/docs/rogersscottstestimony.shtml.
           See Ex. ___, L&L020723.

4        - May 14, 2013, Voepel to Aue: "Also, the you tube videos on Robert
           Johnson should come down as they also contain statements of Scott."
5          Aue: "Done. No Johnson, Scott, and/or Mark Milke." *See* Doc. 600,
           Ex. 18, L&L020724.

6
         - February 12, 2015 "Debbies lawyers have had to repeatedly tell Aue to
7          take that garbage down. Finally Aue shut down the website." *See* Ex.
           34, L&L045037-41.

8
         - October 10, 2013: Pat email to Frankie: "Lori angry.  Made aware of
9          material on Facebook sight (Saldate's house) that they are displeased.
           They would like you to clean things up and get it off there and refrain
10         from any more entries like this.  Although your free to say whatever you
           want they say this could be damaging since it appears it is Debbie
11         speaking not another voice…We think it has to avoid a lawsuit but may
           be other reasons but for now crisis management is in effect.  Will let
12         you know what comes down but for now please refrain from any
           unnecessary comments on the web-sites." *See* Ex. 35, L&L57572.

13
     Notably, as it relates to the YouTube videos, On January 1, 2012, Aue wrote:
14

15              I therefore suggested to Debbie in January already that I
                produce small film clips in connection with the various issues
16              of her case.  All this would require is approval and support of
                our inner circle. Deb completely understood my idea and is
17              very much in favor of it, in fact, she even pushed me to get
                these clips done asap.

18   *See* Ex. 36, L&L55500. Aue kept Milke apprised of his online activities, performed on

19   her behalf, and done with her approval and consent. *See* Ex. 3, 12/05/19 deposition of

20   Milke, pp. 332-345. Yet, in responding to Interrogatory No. 6, Milke gave a false and

21   misleading answer about her knowledge and input into these electronic sites. Yet, we will

22   never know the full extent of what Aue told Milke because she shredded his letters to her

23   (after her duty to preserve was triggered). Milke did not timely produce the 'crucial'

24   YouTube videos, dissecting her case, that she was aware for years.  She did not even do

25   so in response to this Court's October Order and warning that Milke would be required to

26   get her file in order, or face the dismissal. And, in fact, these videos sat in Voepel's office

27

28

                                         66

1    all of these years only to be produced almost a year after this Court's October 2018

2    Order.[30]

3        This instruction to destroy prevents this Court, and Defendants, from evaluating the

4    full material available in the public sphere as it relates to the privilege issues that have

5    been litigated for over a year and any other "damaging" information that was removed.[31]

6    Only recently, did Milke produce a link to a third-party website, the waybackmachine,

7    that she now and for the first time, contends contains portions of the website—albeit not

8    the whole thing and identified <u>years</u> late. *See* Doc. 549, Ex. 49, correspondence. Her new

9    lawyers disingenuously claim that Defendants should have found this material on their

10   own, while at the same time disclaiming any responsibility because neither Loevy nor

11   NSB knew about the waybackmachine until Aue finally gave them a link in August of

12   2019. However, it was Milke all along who sought to prevent the website from being

13   discovered by the instruction to "remove literally everything" and then by hiding the

14   portions that were in her file.

15       As this Court is aware from previous filings, Milke has a history of instructing

16   people to destroy evidence (e.g. instructing Joe Marino to destroy letters that she knew the

17   prosecutor was seeking in the criminal case) and likely witnesses to lie (e.g. instructing

18   Marino to lie to prosecutors about the nature of their relationship). Milke has also

19   previously provided false information about her lawyers—claiming, for example, an

20   agreement by Ray to loan her $10,000. (Ray denies he agreed to loan money to her.)

21   Thus, Milke herself may have given this directive to Aue and claimed it came from her

22   attorneys.

23   _____

24   [30] Defendants requested these YouTube videos multiple times only to be told, multiple times, that Milke and her counsel had no access to them.  This was later determined to be false.

25   [31] Not only is there a website, but Aue also exchanged emails with individuals who contacted the host of the website. These emails were not produced. Renata Janka, Milke's mother, also had an email that was associated with the site.  Each contact/response with a member of the public was an additional mechanism whereby Milke's confidential attorney client and work product material could have been disseminated.

26

27

28

1

**B.      Facebook, Belinda Reynolds, and Journalist Wendy Halloran.**

2      Milke's operative Complaint contains allegations that Detective Saldate engaged in

3    misconduct—nearly 20 years after Milke's arrest—related to a woman named Belinda

4    Reynolds. Detective Saldate was never charged and the investigating agency, the Attorney

5    General's Office, found no merit in the accusations.  There is a witness binder in Voepel's

6    office, for Reynolds, with an index prepared by Frankie Aue.  *See* Doc. 600, Ex. 21,

7    L&L023646. Listed on that index are the following items: "Belinda Reynolds' Facebook

8    post reaching out to Debra Milke…"; and "Wendy Halloran Email to Mike Kimerer

9    regarding the 'Public Records Request' she obtained from the Attorney General's Office."

10   *Id.*  Neither of these documents was timely produced, despite being responsive to Request

11   for Production Nos. 4, and 5.

12      Milke included the Reynolds allegations in her operative Complaint while hiding

13   emails her lawyers exchanged with journalist, Wendy Halloran, about Reynolds massive

14   credibility problems. *See* Ex. 37, L&L03614-615, L&L11363-11365. Indeed, the news

15   station that Halloran worked for would not even let her run the story about Reynolds

16   because—as Halloran admitted—Reynolds was mentally ill (SMI) and had credibility

17   problems.  Halloran's supervisors, undoubtedly, were worried about defaming Detective

18   Saldate given the suspicious nature and timing surrounding Reynolds' untimely

19   allegations.

20      In addition, Reynolds used Milke's Facebook page to contact Frankie Aue and he

21   then recorded an interview with Reynolds—at Milke's counsel's direction.[32]  *See* Ex. 38,

22

_____

23   [32] Despite being responsive to the City's Request for Production No. 6, Milke did
     not produce the Aue interview in response to the City's document request, which she
24   responded to on January 20, 2017.  Instead, she waited six months, until Saldate served
     his Request for Production No. 1, and then produced 19 audio interviews related to her
25   criminal case, including Aue's interview of Reynolds, on July 20, 2017.  This was one
     month after Detective Saldate was deposed and questioned about the Reynolds
26   allegations. Thus, Milke's untimely production of this interview prevented him from
     being fully and adequately prepared for this questioning. These 19 interviews included
27   multiple defense interviews that were responsive to the City's Request for Production No.
     6.

28

L&L045878-82, L&L54911. Milke did not timely produce the Belinda Reynolds Facebook information either. Even though the Facebook page was wrongfully and intentionally destroyed, Milke still had access to a hard copy printout of this Facebook message, yet it was not timely produced either. Not only did Aue email a copy of the Belinda Reynolds' Facebook post to Voepel/Kimerer, Aue included a copy of the post in Reynolds' witness binder.  The Reynolds binder index clearly identifies the printout of the Facebook post.  *See* Ex. Doc. 600, 21, L&L023646. Producing this message, however, would have exposed the fact that there was a Facebook page that had been destroyed:  a cover-up of the cover-up.

### C.    The Untimely Produced Aue Hard-Drive.

After multiple Court filings where Milke represented that she was done producing documents and after multiple deadlines passed, Milke untimely produced Aue's hard-drive, on November 7, 2019.[33] *See* Doc. 623. This hard-drive is meticulously organized, by year, and contains over 96 GB of material responsive to discovery.[34] *See Ex. 39,* electronic copy of hard-drive. It contains a file, titled signature, that identifies all of the online platforms that were utilized for Milke:

> Frank Aue
> ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
> Debra Milke - Innocent on Arizona Death Row!
> http://www.debbiemilke.com
> http://www.youtube.com/DebraMilke
> http://www.facebook.com/DebraMilke
> http://twitter.debbiemilke.com
> http://myspace.debbiemilke.com
> eMail. webmaster@debbiemilke.com
> ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

---

[33] Loevy would first claim that the Aue hard drive "does not start anymore and is ruined." *See* Ex. 40, L&L62150. NSB would claim, in December of 2019, that they contacted Aue, that he was not responsive, beyond the subpoena power, and that he would not produce the hard-drive because it was work-product.  The evidence suggests that Milke had no intention of encouraging Aue to produce the hard-drive until she was sanctioned and it was revealed that Aue received instruction to destroy electronic information.

[34] Much of Milke's lamenting about the difficulties in organizing her file ring hollow in light of the clear organization of this hard-drive.  The same rings true with the hard-copies of the file, which Aue organized despite Milke's allegations to the contrary.

*Id.* The documents on the hard-drive reveal additional areas of waiver, such as Aue's possession of drafts of amicus briefs, and communications with civil counsel; despite that, Milke is still claiming privilege for amicus communications and drafts. Materials from that hard-drive also lay waste to Milke's false discovery responses about her participation in the website. The hard-drive has correspondence from Milke to Aue about the website, her ownership of it, and her contributions to it. *See* Ex. 3, 12/05/19 deposition of Milke, pp. 357-358, 359, 366, and Ex. 389 to the deposition. There are also portions of the website, videos of Milke's media appearances, and other media articles about the case on the Aue hard-drive. There are photographs of Milke, including with Bommersbach, in a document titled Bommersbach_Milke_Bildteil.pdf. There is a document titled "Debbie-Quotes.doc," that relate to all aspects of this case. There is a copy of the cover of Bommersbach's book, dated October of 2015, with what appears to be a professional photo of Milke. *Id.* at Photos-Buchlayout_Ein_geraubtes_Leben.jpg. There are timelines, audio files (that were trickled out over several months as NSB claimed that they needed to be digitized). There are Aue's comments to various filings in the criminal case, including information he was advocating should be included. Aue also saved a communication he had with civil counsel, where he provided factual input into the claims against many of the dismissed Defendants, such as Masino, which demonstrates that there was no factual basis for proceeding on some of those claims:

> 28. These officers, including Masino, subsequently misrepresented Ms. Milke's statements and demeanor during these interviews. For example, Masino falsely reported that Ms. Milke appeared unconcerned about her son's disappearance and was instead more concerned with Styers; Masino further suggested that she was uninterested in coming to the mall to assist in the search for her son.

> - I never read Masino claiming this.

*Id.* at "Annotations to Second Amended Complaint.txt." Tellingly, Aue only offered to send the hard-drive after this Court's ruling on the Motion for Sanctions, even though Milke and attorney Neff were in contact with him—multiple times—in the preceding

months.  Milke was aware that Aue was sending a copy of the hard-drive, in August of 2019, because Aue sent her a message asking that she inform him of its arrival:

> Aue: Did Liz finally get the hard drive? Would ya know?

> Milke: No. Wouldn't know

> Aue: No? 😭 . "No" or "you wouldn't know"? Oh… Find out. Please.

> Milke: Wouldn't know. Ok

*See* Ex. 41, L&L62444.  But, despite Aue specifically asking her to inform him of the hard-drive's safe arrival, she chose to remain willfully ignorant:

> Q. Between August and November, did it strike you as a little strange that you hadn't heard anything about the hard drive for those several months?

> A. No.

> Q. You just said he sent it and then it basically was off your plate? You didn't feel like you had to follow up and make sure that the documents were received?

> A. Correct.

> Q. Did you ever go through the hard drive to see what was on it?

> A. No.

> Q. Have you ever seen in your deposition preparation any letters between you and Franke that you sent Franke?

> A. No.

*See* Ex. 2, 12/04/19 deposition of Milke, p. 115. The Aue hard-drive is yet another example of Milke's strategy regarding the existence of documents: she feigns ignorance and is completely uncooperative until it appears that she may face some consequences. Only then does she contact those who are within her control to obtain documents she should have obtained long ago.

   The contents of this hard-drive were produced after the November 1, 2019, deadline to produce documents. Once again, Milke did not ask permission to violate this Court's

Scheduling Order.  Once again, she showed total disrespect for this Court's Orders and Defendants' specific requests for time to allow for full review of documents before the sanctions deposition. Milke, instead and again, dumped thousands of pages of documents with little time for them to be analyzed before her sanctions deposition.  Milke's strategy regarding the existence of documents continues to be feigning ignorance. These contents on the hard drive were produced days before the last deposition of Milke leaving Defendants little time to analyze before the deposition. However, the existence shows that Aue has documents relating to Milke's case and is more than "just a family friend and supporter."

## D.    Failure to Identify Medical Records and Providers.

Defendants sent multiple discovery requests pertaining to medical records and treating providers, including Request for Production Nos. 2 & 22 and Interrogatory No. 2. Several of Defendants other discovery requests—seeking information about conversations/correspondence Milke had with others about her case/damages—should have also resulted in Milke voluntarily identifying the medical/mental health providers she has spoken to about the case, especially treaters who provided counseling services to her.  Milke's discovery violations relating to medical records include: (1) Milke failed to timely produce original jail records, from provider Dr. Garcia, which were found in Voepel's office in October of 2018; (2) until the Spring of 2019, Milke was not timely supplementing her discovery responses with records from Dr. Bashah; (3) Milke failed to identify a counselor, Jeff Trollinger, who she had at least eight therapy sessions with; and (4) Milke failed to timely produce non-privileged emails, residing in her *habeas* lawyer's files, which documented information related to Milke's treatment with Jeff Trollinger. This resulted in Defendants not being able to obtain any records or testimony from Mr. Trollinger who recently died.  Given the fact that Mr. Trollinger only died recently, had Milke timely identified him, Defendants would have been able to serve him with a subpoena, obtain records, and depose him. Milke's dilatory conduct has resulted in

1    spoliation of his records and the complete inability to question him about the contents.  It

2    goes without saying that Defendants did not have these records to cross-examine Milke's

3    damages expert, Dr. Agharkar (including the emails documenting Milke's treatment

4    sessions with Trollinger). Notably, Defendants also did not have a litany of other damages

5    records to use during this cross-examination either (status updates from Galbraith that

6    Voepel identified would be harmful to the damages claim; Dr. Garcia treatment records

7    from 1989 to 1990; all of the most current treatment records from Dr. Bashah).[35]

8         ***Dr. Garcia Original Jail Records***

9         Apparently, at the time of Milke's criminal trial, the original jail treatment records

10   from Milke's treatment with Dr. Garcia were not obtained and utilized. Instead, these

11   records were later obtained by Aue in 2001, which he memorialized in a letter to Voepel

12   and Kimerer when an inquiry was made about the existence of these records, on March

13   25, 2013:

14              Lori, we obtained the medical file (of Debbie) from Dr.
15              Garcia-Bunnel in 2001. His hospital was about to shredder the
                documents, and we were happy we got them. They must be in
16              one of the boxes too.

17   *See* Ex. 42, L&L020688. After Aue obtained the records, they were placed in Milke's

18   witness binder for the retrial and <u>clearly and unambiguously</u> listed on the index for the

     same.  *See* Ex. 43, L&L023644-23645. It was not until this Court's October 2018 Order,
19
     that the records were finally produced, albeit nearly two years after the City's original
20
     Request for Production of Documents was served and after the close of discovery. This is
21
     another egregious discovery violation.
22

23

24        [35]Dr. Agharkar met with Milke several times to conduct interviews of her. Yet,
     when Defendants sent a subpoena for his file no such notes of those interviews were
25   produced.  Instead, when Defendants asked Dr. Agharkar why he did not take notes,
     Milke revealed that the notes were "inadvertently" not produced.  The notes were
26   produced in the middle of the deposition, leaving Defendants flat-footed and questioning
     Dr. Agharkar on the fly (and with time limitations given Dr. Agharkar needed to leave at a
27   certain time).  *See* 9/25/18 deposition testimony of Dr. Agharkar, p. 48, 53-4. 90-91.

28

The records were produced after the deadline for disclosure of expert witnesses and after expert witness depositions occurred, thus negatively impacting Defendants' ability to fully and fairly cross-examine Dr. Agharkar. Rather than offer a remedy to her discovery violations by allowing Dr. Agharkar to be deposed again, Milke vigorously objected to the same. *See* Doc. 563, p. 6-7. Dr. Garcia's records which Plaintiff failed to produce are not only critical to damages, but also establish critical information confirming that Milke went into her purse on December 2 and 3, 1989—the purse that held the box of bullets of the same caliber and brand, in the identical packaging, containing the same price tag from the same store as the box of bullets from which the bullets-used to kill her son came. At her criminal trial, she denied seeing a box of bullets such as the box from which the bullets used to kill her son came, which we now know was untruthful testimony.  When her purse and the box of bullets inside of it were located, she would later claim she merely "forgot" about the bullets because she didn't have occasion to go into her purse that weekend. Indeed, that was the testimony at her deposition in this case. *See* 8/15/18 deposition of Milke, p. 90. We now know from the untimely produced medical records that this testimony was untruthful too, as the medical records show she went into her purse to retrieve her birth control pills, and thus knew full well that the box of bullets she had put in her purse two days earlier were there.

Milke's *habeas* counsel recognized the importance of the purse, and bullets, when it was falsely claimed—as part of the retrial process—that Milke was not guilty because she allegedly brought her purse (with the bullets) with her to the interrogation by Saldate. *See* Ex. 2, 12/04/19 deposition of Milke and Exs. 353 at L&L22211, Ex. 354, 355, pp 11-16.  Why would a guilty woman bring this evidence with her? She would have been smart enough to leave it at home.  But, the truth is that Milke did leave her purse at home. Yet, in order to try to convince Maricopa County not to retry her again, a different story emerged.

1      ### *Counselor Jeff Trollinger*

2      Milke saw Trollinger for counseling treatment at least eight times.  See Doc. 623.

3    Her habeas lawyers were informed of her treatment with Trollinger—through the

4    mitigation specialist, Stodola, and also through Pat Galbraith.  The only reason that Milke

5    identified Trollinger was because Defendants found a reference to his name in untimely

6    produced emails and questioned Milke's counsel about the same.   *See* Ex. 44,

7    L&L050167; *See* Ex. 45, L&L054129 ("Today she had a session with Jeff, so that is great

8    timing.  She knows they will talk about this and should make her feel more at ease as the

9    time nears."); *See* Ex. 46, L&L050836 ("She is feeling better getting of town. She will

10   pick up the pace with Jeff as I have been talking to her about getting more help. She

11   agrees so will see how it goes.") Undoubtedly, during the privilege review, Milke and/or

12   her counsel saw thef multiple references in emails to Trollinger, but did nothing in

13   response. Yet again, Defendants had to find the needle in the proverbial haystack to

14   prompt Milke to act.

15      Milke was questioned about her sessions with Trollinger in her sanctions

16   deposition, where she continued her pattern of attempting to cover-up the cover-up by

17   claiming that he was not a mental health provider:

18            Q. You saw a man named Jeff for some therapy sessions?

19            A. Yes. Jeff Trollinger.

20            Q. Does Jeff Trollinger have any relationship to Susan
21            Stodola?

22            A. Jeff Trollinger is deceased. The only thing I know is that
             she and he were friends.

23            Q. Did she recommend that you go to see him for therapy?

24            A. She rec - -- she recommended that I see him. I wouldn't – I
25            wouldn't say therapy but just someone to talk to.

26            Q. What do you understand his title to be? Was he a
             counselor, a therapist, a psychologist, psychiatrist? Do you
27            know what he was?

28            A. He was – he was not a mental health provider. My
             understanding was that he was like a social worker.

1    Q. When you first went to him for your first session, did you fill out any paperwork?

2

3    A. I don't remember.

     …

4

5    Q. Correct. And I don't see – and you can correct me if you see it, but I don't see Trollinger listed anywhere here.

6    A. But he—he's not a healthcare provider.

7    Q. You spoke to him. The question asked for – "State the full name, current residential address and phone number for all

8    witnesses, individuals, businesses, corporations, investigators and media who have you" – "who you have spoken to about

9    the events on December 2nd, 1989, the Phoenix Police Department's investigation, your criminal prosecution and/or

10   any other discussion related to the claims in your lawsuit." Do you see that?

11   A. I do.

12

13   Q. And Mr. Trollinger would classify as somebody that you spoke to about your damages, your time in prison. Correct?

14   …

15   A. Okay. So I mentioned Dr. Sullivan. So back –

16   Q. Mr. Trollinger. Did you mention Mr. Trollinger?

17   A. No I—I—I forgot about him back then, yes.

18   Q. And you talked to Mr. Trollinger about your experiences in prison.                                        Correct?

19   A. I talked to Dr. –not Dr. He's not a doctor.

20

21   Q. Mr. Trollinger?

     A. Yes. About – I mostly talked to him about feelings after I

22   got out and what it was like to be out, because he wasn't a psychologist.

23

24   Q. Was the purpose of you going to see him to help you with your mental health?

25   A. The pur - -- the purpose – the purpose of seeing him was to have somebody other than family or friends, somebody neutral

26   to talk to about feelings, about adjusting.

27   Q. And you paid him for his services. Correct?

28   A. Yes.

76

*See* Ex. 2, 12/04/19 deposition of Milke, p. 84 – 85; 145-146. Yet, when Defendants would receive the receipts for at least eight sessions of treatment—after the deposition—the handwritten notes accompanying the same state "for therapy" and Milke claimed all of these sessions as deductible medical expenses on her tax returns. *See* Doc. 623. Milke's explanation at her deposition was evasive, misleading, and false.

   After Defendants voiced their outrage related to the Trollinger issue, Milke released over 1300 pages of documents, which had been previously withheld as work-product protected. This production included email exchanges between Kimerer, Voepel, and Stodola depicting the extent of Milke's treatment with Jeff Trollinger in 2015:

> --I also want you to know that Debra has been quite depressed as of late. After receiving a concerned email from her yesterday morning, I called Jeff and asked him to call her. He contacted her and she went to see him. It was a long session but she came out feeling better. I asked her in an email to her tonight to promise me that she will see him weekly…Please know that I will be checking back with Debra weekly to make sure she sees Jeff…I am quite concerned about her for now, my focus is on getting her to attend counseling on a regular basis. *See* Ex. 47, L&L64162.
>
> --I talked with her for an hour after her last session with Jeff, and she felt better but still in the "dumps". I think not getting the ankle bracelet off triggered the depression, but I think most of it is coming from the realization it may truly almost be over. *See* Ex. 48, L&L64166.
>
> --Thanks, Mike! I sent her an email last night with my plea to see Jeff 1X per week. What happens is she sees him, then feels better, then she thinks she is OK at which point she stops seeing him and then she tumbles back down. Jeff is more than willing to see her each week. *See* Ex.49, L&L64167.
>
> --…I made a strong suggestion/told Debra that she needs to see Jeff 1X per week. I received an email from her yesterday indicating that she did not feel this was necessary since she is now coming out of her depression. Debra's pattern seems to be that she becomes depressed, sees Jeff, feels better, doesn't see him and then gets depressed again. I truly believe, as painful as it is, that not seeing Jeff on a regular basis and not dealing with the pain serves to bring back depression. *See* Ex. 50, L&L64171.

Once again, Milke (and her attorney Kimerer) "inadvertently" failed to identify Trollinger in response to Requests for Production and Interrogatories; "inadvertently" failed to

identify him again each time she verified the incomplete interrogatories; used work product to hide facts (her treatment with Jeff); and testified in a misleading manor to downplay Defendants discovery of her withholding of information relating to Jeff. *See* Ex. 3, 12/05/19 deposition of Milke, p. 246-248. Milke's recent production of an email exchange between Voepel and Pat Galbraith, provides yet another example of the approach taken towards damaging material:

> I know we sound paranoid but, as we discussed earlier, we'd rather not have updates to anyone beyond the defense team/Debra's family regarding what and how Debra is doing in the free world. I know they are positive and not as frequent as they used to be, but you would not believe the way the state can twist that sort of thing. For example, Debra going to the fair and going shopping, etc., can be construed as Debra having a great time and not showing any remorse about her son. It could also be used to refute damages in any future civil suit. So we'd really like to go back to the prior status where you told everyone that while Debra's trial is pending, there won't be any updates.

*See* Ex. 11, L&L063745. Documents are concealed, hidden, destroyed, shredded, testimony is used to further conceal their existence, and privilege is used to both conceal relevant information and the scope of discovery violations.

### E.      Journalist Emails and the Carvel Documentary.

There is no attorney client or work product privilege that exists between a lawyer and a journalist, or a litigant and a journalist. As this Court already recognized, in Doc. 583, Milke and her *habeas* counsel's emails with journalists would ". . . obviously qualify as communications with the media regarding Milke's criminal trial proceedings or civil lawsuit."   Journalists include Frankie Aue, Jana Bommersbach, Paul Huebl, Wendy Halloran, and many others.  Yet, Milke never timely produced these emails. She withheld her own emails with Bommersbach, Huebl, and other news entities. Her *habeas* attorneys withheld hundreds, if not thousands, of emails with multiple members of the media.[36]

---

[36] From the emails that were produced, all actual contact that Milke had with the media was still not clear (i.e. face-to-face, phone, interviews, television appearances).  For example, Milke testified at her sanctions deposition that she was interviewed by 60 minutes and met Judge Kozinski at that interview.  *See* Ex.  3, 12/05/19 deposition of

Milke's untimely production of journalist emails started only after Loevy entered an appearance, in 2019, and after Defendants had repeatedly asked Milke about her incomplete production.[37]  That production was limited, however, because Milke was only willing to search for journalist names that Defendants identified, rather than identify the names of journalists that she and her counsel had contact with.  Defendants were reaching in the dark while, Milke refused to use documents available to her to create a complete list.  In other words, Milke appeared to be creating a trap whereby she would later claim that Defendants did not identify specific media personnel therefore she had no requirement to produce documentation related to them (notwithstanding her knowledge of communications and their responsiveness to discovery).

Notably, after the first journalist email production, Milke produced a spreadsheet of media that *habeas* counsel had contact with. Defendant demanded that Milke search the emails again using the names on the spreadsheet.  Milke refused. On April 17, 2019, Defendants sent correspondence demanding that Milke use the spreadsheet to search for media emails.  *See* Ex. 51, 4/17/19 Retts email exchange.  Only after the Sanctions Order, did Milke agree that she would search the emails using the names on the spreadsheet as well as additional media names that **Defendants** identified through their own review of Milke's records.  Milke then produced an additional 226 pages of emails on August 28, 2019, between her habeas counsel and journalists.[38]  This number does not include the

Milke, pp. 395-398. Milke also revealed that she had promoted the Bommersbach book for four weeks in Germany, yet emails produced seemingly relate to only one media interview.

[37] Numerous journalist emails appear in the L&L11000 bates range.  Milke then continued to trickle out emails after that.

[38] Milke is not using a litigation vendor. She is also not deduplicating the emails—at all.  Thus, she is producing duplicative emails, which Defendants have to then review multiple times.  Rather than use the appropriate tools for e-discovery, Milke insists upon a procedure that wastes Defendants' time and resources.  It also makes it more expensive for her to conduct any privilege review.  As a result, Defendants cannot identify the number of unique emails that have been disclosed relating to the media because it would require an inordinate amount of time to do so. Defendants' discovery requests require production in native format, which Milke has not done either. This means that the emails are not searchable and critical information (such as bcc) is not available either.

79

1    Frankie Aue emails, who Kimerer also identified as a journalist.  Numerous other emails

2    were then found within the Voepel emails, which were produced after this time frame.

3            Milke also produced her own emails with journalists. Defendants provided some of

4    these emails to the Court.  *See* Doc. 583.  In addition, however, Milke failed to produce

5    additional emails, including one she exchanged with Bommersbach related to materials to

6    use in the book.  *See* Ex. 3, 12/05/19 deposition of Milke, Ex. 398. She similarly failed to

7    produce the email relating to obtaining and providing her 77-page Complaint to a funding

8    company.  *See* Ex. 3, 12/05/19, Ex. 384.  Instead, she actively tried to cover up her use of

9    email by testifying as follows:

10           Q: Did you make any efforts to look for the items identified in
             request for production no. 4?
11
             A:  Yes.
12
             Q:  Tell me what you did.
13
             A:  I gathered up all the letters that—um, from my mother
14           sister, um, e-mails. I—I don't email.  I don't correspond (sic)
             e-mail.  Cards, whatever was relevant I turned over. I mean,
15           communications.

16           …

17           Q: Do you use e-mail to correspond with anybody?

18           A: Um, not really, no.

19   *See* 11/14/18, p. 520-521.   Milke, does in fact, email. And did, in fact, email with

20   journalists. Milke's friends and counsel also had routine contact with the media.  Attorney

21   Voepel not only kept the media up to date, she corrected and changed media stories

22   throughout the years:

23           --As to your first question, that is actually inaccurate. His
             spokesperson said that, which as always perplexed me. The
24           AG's only decision (following denial of their petition for
             rehearing en banc) was whether to appeal the ninth circuit's
25           decision to the USSC through a petition for certiorari. Now the
             case is in the district court's hands to order the Phoenix Police
26           Department (through the AG's Office) to disclose the
             detective's entire personnel file.   When that process is
27           complete, the district court is required to order Debra's release
             unless the county attorney notifies the court within 30 days
28           that he intends to retry her. *See* Ex. 52, L&L057613-4.

> --I explained to Wendy that Renate and close family friends were very offended and hurt by her station's use of the nick name "Death Row Debbie" in the intro and tagline throughout the story. I told her that notwithstanding her good, moving story, the use of that term in lieu of Debra's name really colored Renate's and others' ability to appreciate her story in light of the negative connotations associated with that phrase and their very negative experiences with the local media during and after the first trial. Wendy feels horrible, and has now notified all producers at the station to drop that "nick name" from all future stories. She had already told all of them on Friday that Debra has the presumption of innocence and should be afforded such, and that Debra is released and no longer on death row. *See* Ex. 53, L&L060626.

Milke's counsel also utilized journalist and witness, Paul Huebl as well as Wendy Halloran, to seemingly act as middle-men to provide the media with information to advance Milke's cause. In an email chain relating to contact with Maria Shriver for an NBC interview, Voepel wrote:

> My co-counsel and I just spoke and determined we are probably not the best people to give this background information right now, as the judge has been pretty clear that she does not want us talking about the facts of the case to the media while the case is pending. Wendy Halloran at the local NBC affiliate knows the facts of Debra's case very well, and she is able to provide you with that background information and footage. I have emailed her asking her to do so, as I know you two have communicated about the case. Paul Huebl said he has also been in touch with you and is willing to provide you with old footage, etc, so I told both of them to work together in getting you what you need. I am also happy to provide some limited comments on Debra's release if that would help. *See* Ex. 54, 60568-72 (9/9/13).

Paul, always a staunch advocate for Milke, regularly revealed his bias, his involvement with the media, and his views about information being removed from Milke's Facebook and website. *See* Ex. 55, L&L060547. In addition to Aue maintaining a myriad of web-based sites for Milke, he too was asked to assist Milke by providing facts and information to other members of the media:

> Additionally we are permanently in touch with Frank Aue regarding all developments…As far as I understood, there is nobody, but you, Mrs. Lori Voepel and **Frank Aue,** who might handle all the media request to come in the future…

1    *See* Ex. 56, L&L60595. Milke has utilized the media extensively for decades to advance

2    her cause and those communications should have been produced years ago. This includes

3    the emails that Milke's *habeas* counsel exchanged with Carvel Productions, regarding the

4    documentary that was manipulated to advance Milke's cause (and including all versions

5    the documentary itself that was not timely produced). *See* Doc. 595. In direct response to

6    Milke's *habeas* counsel's expression of concern that Carvel was utilizing Milke's

7    inconsistent statements about whether she asked for an attorney during her interview with

8    Detective Saldate, in the Clemens Hoges tapes, Carvel manipulated Milke's statement to

9    remove thirteen words, which changed the meaning of her statement both literally and

10   legally to conform with her theory of the case and to prevent the prosecutor from

11   obtaining critical impeachment evidence. *See* Doc. 584. The different versions of this

12   documentary sat in Ms. Voepel's files for years and were not located by Milke and

13   produced to comply with the Court's October 31, 2018, deadline for production. These

14   documentaries were not identified in Voepel's affidavit either. See Doc. 380-3. Instead,

15   Voepel wrote: "Upon review, although the vast majority of documents are duplicates or

16   triplicates of documents at Mr. Kimerer's office, we did identify a few items inside the 51

17   boxes that were originals not otherwise stored at his office."[39] Doc. 380-3, p. 2. Although

18   this affidavit was not required by Court order, it was seemingly an attempt by Milke likely

19   to convince the Court and Defendants that she had done what the Court had asked, which

20   we know now is not accurate.[40] Hard-copy emails, the Carvel Documentaries, copies of

---

22   [39] In addition to the Dr. Garcia medical records that were not timely disclosed, Milke also did not timely produce her personnel files from Lincoln National and Farmers

23   Insurance, which include information that impeaches her criminal trial testimony. This is another discovery violation as these documents were responsive to Request for Production

24   No. 3, seeing that Milke "Produce all employment records for all of your employers for the five (5) years prior to December 2, 1989 to your response date. In addition, produce an

25   executed authorization for each employer. A blank form of the authorization is attached hereto. Please fill in Plaintiff's date of birth and social security number, as well as the

26   name and contact information for each provider."

27   [40] Loevy did not discover this inaccuracy until late July or early August of 2019. Discovery, however, was supposed to have closed months before on March 1, 2019.

28   Moreover, Kimerer had to be aware of this information being inaccurate. After the

YouTube videos, limited printouts from Facebook, portions of the website, and electronically stored emails remained in Milke's file that was housed at Voepel's office.

Milke has been evasive in discovery in order to hide the systematic media involvement she and her team had in her release and post-release process.

### Paul Huebl

In the Response to the Motion for Clarification, Doc. 600, Defendants raised problems concerning Milke's untimely production of important correspondence relating to Huebl. Defendants incorporate, by reference those arguments. Critically, despite the fact that Milke identified Huebl as a witness to support her claim that the confession never occurred, she failed to produce key documents where her own counsel questioned Huebl's credibility:

> -Pat Galbraith re updating Debbie about Paul Huebl- LV: she needs to know he is out of control and she should not respond or probably even accept his mail at this point. *See* Ex. 570, L&L056774-780.
>
> -LV re Paul Huebl: I don't care if I ever see or speak with him again. He is a real trouble maker, driven by nothing but his own ego. *See* Ex. 58, L&L056837.
>
> -Mike and I would like to talk with you by phone about Paul Huebl. He has recently created some very serious problems by interfering directly with our representation of Debra, which unfortunately continues to this day. *See* Ex. 59, L&L63179.
>
> -It appears he still won't listen. He continues to march forward even when asked not to. Hopefully he won't flip the switch but you can't trust him as it still is "all about Paul!" Sure hope you can convince him to back off but not too confident that will happen. Talk to you soon. *See* Ex. 60, L&L057915.
>
> -I have emailed MK about this and feel we are the best ones to talk with Paul. Remember Paul is still a witness we need for suppression hearing if the case gets that far (and for trial if it

Court's Sanctions Order, Milke began to take the position that Voepel's file was not in her custody and control. As a result, Defendants repeatedly asked that Milke obtain Voepel's entire file because she, as the client, had an absolute right to the file. Milke's counsel repeatedly ignored these requests and finally went to Voepel's office in August of 2019, and began looking through the hard copy boxes and through that search identified additional materials. Some of those materials remain on the privilege logs and are identified, in the descriptor, that the material came from a Voepel box.

> goes all the way). Plus, we don't want paul out there claiming to others in the media that we have somehow broken our rule of not permitting Debra to be interviewed by anyone in the media. *See* Ex. 61, L&L60920.
>
> -He is becoming more dangerous each day and hopefully you can eventually get him to back off. Hopefully he hasn't gone and done something stupid on his own. *See* Ex. 62, L&L05791

*See* Ex. 63, L&L55526, 011703, 011699, 043668, 44190-93. To conceal this correspondence, Milke would improperly claim it was privileged. She would also fail to timely produce email that she received from Huebl.  *See* Ex. 64, L&L55606. Huebl's credibility is dubious, at best, as Milke's own lawyers admit. And, Huebl's penchant for not following directions, flipping a switch, and acting for his own self-interest makes it highly likely that any of the purported "work-product" emails he was copied on, would find their way into the hands of Milke's adversaries.

F.     **Survey and Status Updates Regarding Prison Conditions and Life Post-Release.**

While incarcerated, Milke had regular phone calls and visits with non-relative, third parties, Patti and Pat Galbraith. Almost religiously, after every visit, Pat Galbraith would send a status email regarding what was discussed and his evaluations of Milke's mental status and well-being. Thus, these emails relate to the damages claims and the merits.  These emails were sent to Voepel, Kimmerer, Aue, Renata, and sometimes others (such as a boyfriend of Milke's, or Janna Bommersbach). There are hundreds, if not thousands, of these updates that were never timely produced and were never privileged. *See* Ex. 75, sample of status update emails.  These status updates, however, drew the attention of Milke's counsel, who eventually requested that they stop because they "could be used to refute damages in any future civil suit." *See* Ex.11, L&L63745. It is easy to surmise that these updates were not produced for this reason.

In addition to the status updates, Milke was asked to respond to a survey about prison conditions, while she was incarcerated. The survey was transmitted through counsel, Mr. Kimerer, but Milke's responses were provided to a third-party.  *See* Ex. 65,

Kimerer 9816-9819. Milke's claimed damages relate almost entirely to her incarceration. This survey is relevant to her damages claims, assertions regarding the conditions of her confinement, and was responsive to discovery. It should have been timely produced and identified in response to Interrogatory No. 5 and Request for Production Nos. 16, 19 & 22, but was not.

### G.    Gary Stuart and the 95+ Emails.

NSB appears to have delegated the responsibility for responding to Defendants' discovery concerning the Gary Stuart materials to Mike Kimerer, who then failed to identify a very simple method whereby he could have outlined what Mr. Stuart was provided:  Mr. Kimerer and Ms. Voepel's email. In their subpoena to Mr. Stuart, Defendants requested, as item No. 6: "Any and all correspondence, emails, voicemails, notes of voice messages or conversations, recordings of conversations and/or documents exchanged between you and Debra Milke and/or any of her attorneys regarding the Request for Production sent by the City of Phoenix to Ms. Milke for documents that you reviewed in conjunction with writing the book." *See* Ex. 38, Subpoena rider for Stuart. NSB attaches a copy of email correspondence from Stuart, which he provided in response to that subpoena. *See* Doc 507-7.  With respect to Item 6, Stuart wrote:

> This is a mystery to me.  I know that there is a civil case pending, but I have no role in it. I'm sure you requested documents from Debra Milke and her lawyers, but I had nothing to do with it.  I hope to follow the case if it goes to trial It might have the makings of another book, or not. In any event I didn't talk to Debra, or her lawyers about 'the Request for Production sent by the City of Phoenix.

*See* Doc. 507-7, p. 2. Stuart denied discussing any Request for Production with anyone. Stuart also denied making his own assessment of whether materials were privileged, instead stating that it was his understanding that "they"—habeas counsel—did not believe them to be privileged. Indeed, *habeas* counsel would have known of Aue's access, Milke's widespread sharing of privileged information (the Marino letters were reviewed by *habeas* counsel for the retrial), and should have known that privilege was indeed

1    waived. This information, however, does not appear to have been shared with NSB, or

2    even timely shared with Loevy, leading to continued protracted litigation over privileged

3    material.

4           This Court found discovery violations related to Milke's failures to produce hard

5    copy documents that were possessed by Gary Stuart, but after that time, Milke untimely

6    produced an additional 95 emails between Stuart, Voepel, and Kimerer that outlined

7    numerous documents that he was provided for the writing of his book. *See* Ex. 39, 95

8    Stuart Emails.  These emails were produced on April 17, 2019. Since the production of the

9    95 emails, **MORE** emails with Stuart were located and produced.  These emails also

10   confirm that NSB asked Stuart for an advance copy of the book, which had previously

11   been provided to Kimerer and Milke, which was not timely produced either.[41]  *See* Ex. 66,

12   L&L42596, 43037-39, 45033-75, 46518-46520, 46043-46424, 46966, 54206-212, 54215,

13   54380, 55970, 56022-56028, 61821-61822, 61845-47.  In one particularly interesting

14   email (portions remain redacted for privilege), Stuart notes as follows:

15
16          I don't want to look at the whole file. I've already done that at
            Mike's office. I only wanted to see Anders Rosenquist's
17          notebook again. Now that I've interviewed him, I'm
            particularly interested in the yellow note pad at the end of the
18          notebook. Neither he, nor Kirk Fowler have a good memory of
            what's in there, but both said they would be happy to let me
19          thumb through them for book content. They deal with
            interviews with witnesses (not including the client). Also, I'm
20          trying to determine whether Debra made a "final say" at her
            sentencing hearing before Judge Hendrix. I don't think
21          Anders' notes (which belong to him, not the client) are
            privileged, but you may differ.

22   *Id.* at L&L056022-29. This yellow notepad was not timely produced—even though it was

23   reviewed by Stuart, thus destroying any privilege. Notably, Stuart, a legal ethics scholar,

24   identified these notes as non-privileged. Yet, Milke would claim privilege over the same

25   in this litigation.

26
     _____

27      [41] Kimerer's email to Milke, forwarding the book, was not produced from her
     email. Defendants have identified several instances where Milke deleted emails.

28

Not only did Plaintiff not produce these emails in response to discovery, but she did not produce them after this Court's October 2018, Order. Instead, she continued to falsely contend that it would have been unduly burdensome to determine what exactly Stuart received and reviewed. An actual review of all file materials, to comply with the Court's October Order, would have revealed this information.  As this Court likely expects, Milke did not provide a supplemental discovery response identifying each of the Stuart emails. Instead, Defendants had to comb through to find them.

These untimely produced emails also reveal that Bommersbach wrote a book and that Stuart had a lengthy lunch with Bommersbach about the same. *Id*. at L&L012471, 12495. Because it has been established that Bommersbach had access to attorney-client information she could also have easily shared that information with Stuart and vice versa. These emails also disclose that a copy of the civil Complaint was circulated to members of the media (specifically Wendy Halloran), before it was filed. *Id.* at L&L012508-10.

The Stuart debacle—including the incorrect avowals to the Court about the same—are symptoms of a larger virus of discovery violations that has infected this entire case.

### H.    Concealment Relating to Pat Galbraith.

Pat Galbraith was Milke's liaison in all aspects of her life.  Yet, when she disclosed him as a witness in this case she concealed his extensive involvement by providing a one-line generic statement: "Patrick Galbraith is a family friend of Debra Milke's. He is likely to have discoverable information relating to Debra Milke and/or her damages." *See* Ex. 3, 12/05/19 deposition of Mike, Ex. 383. She would never supplement this disclosure and would repeat the same generic one-liner for other witnesses, providing no way for Defendants to determine—who out of all of these family friends—had substantial information that would merit a deposition.

Defendants only learned of Galbraith's role after issuing a subpoena to Bommersbach and receiving thousands of pages of letters Milke wrote to Galbraith. Yet, at this point, Galbraith was deceased.   Milke's *habeas* counsel certainly knew of

Galbraith's major role in Milke's life, but downplayed/withheld it as well. The instruction to Galbraith to discontinue his status updates, because they could be used to dispute damages, suggests that the basis for the concealment was to benefit Milke's case.

Galbraith did everything for Milke; regularly spoke with her on the phone and visited her in prison; managed her funds; sent funds to other inmates, at her request (and in violation of prison rules); managed the Debra Milke defense fund; maintained Milke's storage unit; was her custodian of records; passed messages to and from her attorneys; and Milke lived with him following her release. *See* Ex. 67, L&L62920-23 & L&L020187. Milke shared confidential communications with him. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 363 at Bommersbach4495. Milke has never produced any of the letters Galbraith wrote to her and likely shredded or destroyed them.[42] As Pat described to Lori Voepel, he was a focal point for people who wanted information on Milke:

> I know I am not the client and all that but I am a focal point for a lot of people following her progress and do not want to say the wrong thing, ever. I rely on your guidance as to what to say and not to say so just need to know we are together on this.

*See* Ex. 68, L&L62946. Pat, however, did share information with third-parties:

> I have used my nephew, who is a former Prosecuting Attorney up in Washington State, as a sounding board on events as they have been occurring over the last few years…Anyway, I sent him a copy of the briefs to see what he thought and now want to share his comments with you.

*See* Ex. 69, L&L63047. In her sanctions deposition, Milke would reluctantly admit to the extent of Galbraith's involvement, demonstrating that she had the ability to provide this information earlier and should have.  *See* Ex. 3, 12/05/19 deposition of Mike, pp. 44, 46-47, 83. However, she would fail to admit to the extent of his control of her documents and storage of the same:

> -All I can think about is sitting outside on Pat's patio & going

---

[42] A scant collection of letters from Galbraith were produced by Bommersbach, in response to the subpoena directed to her. *See* Ex. 70, Bommersbach 2956-58, 3090. There were likely many more at some point.

through all of my boxes. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 363 at BOMMERSBACH 5471.

-Milke Ltr. to Pat Galbraith: I truly can't wait until I can go through all of my stuff in all those boxes. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 363 at BOMMERSBACH 5714.

-Milke Ltr. to Pat Galbraith: I look forward to going through all of my boxes and organizing it all.  I won't need any more clothes because I'm sure I have plenty to get me started. *See* Ex.  2,  12/04/19  deposition  of  Milke,  Ex.  363  at BOMMERSBACH 5755.

-Milke Ltr. to Pat Galbraith: [I] discovered one of my favorite CD's is closing out (or not being produced anymore) and is on sale for $6.99.  I enclosed an order for it to be sent to your house.  Will you please take care of this and then put it with my other stuff in storage? *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 363 at BOMMERSBACH 5483-84.

-Milke Ltr. to Patti Galbraith: I'm send home some stuff to be put in my storage. Recall my 22 page writing when I talked about the art talent I've seen over the years?  Enclosed are some drawings.  *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 363 at BOMMERSBACH 5677.

-Milke Ltr. to Pat Galbraith: Enjoy the photos…Please put them in my storage when you're finished looking at them. *See* Ex.  2,  12/04/19  deposition  of  Milke,  Ex.  363  at BOMMERSBACH 5775.

-Ok, Pat, when Debbie is through with whatever she is allowed to have, please put it in our storage. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 368 at L&L44082.

Milke  would  claim  in  her  sanctions  deposition  that  she  did  not  know  what Galbraith saved for her in storage, yet Galbraith's emails reveal that there was a leak in Milke's storage facility and that Milke's personal writings were saved:

Briefed her on all the items I have gone through so far in our storage space that received water damage a couple weeks ago when a pipe broke and flooded the area…There was a couple boxes of her personal papers over the years that got pretty wet so I have a lot of letters and things spread out to dry but think overall they will be fine.

*See* Ex. 71 at L&L56252. Not only did Pat acknowledge that most documents were saved, some items produced from the Bommersbach subpoena are actually water stained. *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 363 at Bommersbach5067-5120, 5487-5529.

89

1    Similarly, Milke would claim that she did not have access to her letters, but

2  Galbraith would state otherwise:

3           She asked me to pass on to everyone that she would like
            "copies" of any letters she sent you that refers to her prison
4           life and what goes on out there. She just wants you to
            highlight those paragraphs, make copies of them and send
5           them to her…I reminded her that most of her letters are in
            storage with me and it will take me some time to go through
6           seven years of experiences.

7  *See* Ex. 2, 12/04/19 deposition of Milke, Ex. 373 at L&L054987.   Milke shredded

8  documents at Aue's house and destroyed documents in Germany.   Milke would

9  conveniently claim that she did not have access to any of her letters (yet the watermarked

10 pages and letters in her own hand would show otherwise):

11          Q. So you believe that Pat Galbraith was incorrect when he
            stated that most of your – "her letters are in storage with me."
12
            A. I dispute that.
13
            Q. Do you dispute that you requested for – copies of letters
14          that you sent to third parties about prison life highlight and
            sent back to you?
15
            A. I don't recall. I just don't recall this. The – and the – this –
16          these are Pat's words to – you know, to Lori and my mother
            and Mike and Franke. These are Pat's words.
17
            Q. And Pat is deceased. Correct?
18
            A. He is.
19
            Q. And we couldn't depose him because he died before knew
20          that he was ill.

21          A. He died in June of 2017.

22          Q. So you dispute that you had letters in your storage –

23          A. No. It says here, "I reminded her that most of her letters are
            in storage with me." That could mean his house. That could
24          mean anything.

25          Q.  You dispute that your letters you never told him to save
            and put in your boxes in the storage unit?
26
            A. When I write – when I wrote Pat or anybody, what they did
27          with the letters after it left my cell, I have no control over.

28

> Q. You appeared to be asking for copies of any letters that were sent that refer to prison life and want – you wanted them highlighted and sent back to you.
>
> A. This is – these are pat's words. I don't know exactly what he meant by this.

*See* Ex. 2, 12/04/19 deposition of Milke, p. 200-202. Milke would claim that the words used were not hers, yet in her own words she wrote to Galbraith, specifically asking that he:

> From you + my mom, I need you to go through my letters and highlight my feelings about prison or my case. I'm sure I vented often. Make photocopies of the letters and send them to me. You guys keep the original letters. Ok? Thanks!

*See* Ex. 72, Bommersbach 5698. Once again, unless Defendants are able to identify a specific instance of Milke's false testimony, or of impeachment material, she will engage in denial, obfuscation, or claim that other people did not record her accurately. She simply will not admit the truth. Here, it is clear that Galbraith accurately reported what Milke asked of him in <u>her own words</u>. He was merely regurgitating what she told him to do. She does know what he meant because she made the request.

This is yet another example of Milke's evasive and untruthful testimony designed to cover-up her paltry disclosures and discovery violations. Milke's conduct cannot be rectified because Galbraith is deceased, cannot be deposed, and no longer has any documents that otherwise would have been subject to a subpoena during his lifetime.

## V.   <u>CONCLUSION</u>

There can be nothing more insidious to the pursuit of justice than Milke providing evasive, incomplete, false, and misleading testimony to block discovery. Milke has disregarded this Court's Orders, intentionally and willfully. She failed to even read the Court's Sanctions Order. She failed to prepare for her sanctions deposition. This case demonstrates a most egregious pattern of discovery violations. This is not a case where Milke failed to identify a single document, or a handful of documents. She failed to produce almost 68,000 pages of documents. But for Defendants' exhaustive and expensive efforts, these documents would never have been uncovered.

1     Milke's pattern started long ago with the Marino letters and her direction to him to

2  hide and destroy the letters to avoid a subpoena. She received a direct benefit in her

3  criminal case from this concealment because the prosecutor did not have the letters to use

4  in the criminal trial. Nor did the prosecutor have evidence of all of her explicit waivers of

5  privilege, which would have required that much of her attorney client privileged

6  information be turned over to the State. Milke is now seeking to benefit from continued

7  destruction, false and misleading testimony, inaccurate and incomplete discovery

8  responses, and improper assertions of privilege. All of which were willful. This case must

9  be dismissed. There is no lesser sanction that can right this ship, nor deter litigation abuses

10  like this in the future.

11

12     DATED this 15th day of January, 2020.

13                    WIENEKE LAW GROUP, PLC

14          By:   */s/ Christina Retts*
                  Kathleen L. Wieneke
15                Christina Retts
                  1095 West Rio Salado Parkway, Suite 209
16                Tempe, Arizona 85281
                  *Attorneys for Defendant City of Phoenix*
17
                    HOLLOWAY ODEGARD & KELLY, P.C.
18
            By:   */s/ Sally A. Odegard (w/ permission)*
19                Sally A. Odegard
                  3020 East Camelback Road, Suite 201
20                Phoenix, AZ 85016
                  *Attorney for Defendant Silverio Ontiveros*
21
                    BERKE LAW FIRM PLLC
22
            By:   */s/ Lori V. Berke (w/ permission)*
23                Lori V. Berke
                  Jody C. Corbett
24                Whitney M. Harvey
                  160 N. 7th Street, Suite 360
25                Phoenix, AZ 85006
                  *Attorneys for Defendant Armando Saldate, Jr.*
26

27

28

1

**CERTIFICATE OF SERVICE**

2

3        I hereby certify that on January 15, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

4

5        Michael D. Kimerer, Esq.
         Rhonda Elaine Neff, Esq.
6        KIMERER & DERRICK, P.C.
         1313 E. Osborn Road, Suite 100
7        Phoenix, Arizona 85014
8        MDK@kimerer.com
         rneff@kimerer.com
9        *Attorneys for Plaintiff*

10

11       Elizabeth Wang, Esq.
         Rachel Brady, Esq.
12       LOEVY & LOEVY
         2060 Broadway, Suite 460
13       Boulder, CO 80302
         elizabethw@loevy.com
14       troyer@loevy.com
15       brians@loevy.com
         brady@loevy.com
16       abraham@loevy.com
         troyer@loevy.com
17       *Attorneys for Plaintiff Pro Hac Vice*

18

19       Jon Loevy, Esq.
         LOEVY & LOEVY
20       311 N. Aberdeen Street, 3rd Floor
         Chicago, IL 60607
21       Jon@loevy.com
         david@loevy.com
22       *Attorneys for Plaintiff Pro Hac Vice*

23

24       Joshua E. Dubin, Esq.
         JOSHUA E. DUBIN, ESQ., P.A.
25       7413 Fairfax Dr.
         Tamarac, Florida 33321
26       dubin.joshua@gmail.com
         *Attorneys for Plaintiff Pro Hac Vice*
27

28

Lori V. Berke, Esq.
Jody C. Corbett, Esq.
BERKE LAW FIRM PLLC
160 N. 7th Street, Suite 360
Phoenix, AZ 85006
lori@berkelawfirm.com
jody@berkelawfirm.com
***Attorneys for Defendant Armando Saldate, Jr.***

Sally A. Odegard
HOLLOWAY ODEGARD & KELLY, P.C.
3020 East Camelback Road, Suite 201
Phoenix, AZ 85016
sodegard@hoklaw.com
***Attorney for Defendant Silverio Ontiveros***

J. Arthur Eaves, Esq.
Robin E. Burgess, Esq.
SANDERS & PARKS, P.C.
3030 N. 3rd Street, Suite 1300
Phoenix, Arizona 85012
artie.eaves@sandersparks.com
robin.burgess@sandersparks.com
michele.logan@sandersparks.com
***Attorneys for Maricopa County Defendants***

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:   N/A.

By:   */s/ Mica Mahler* _____