# EXHIBIT 1

Page 418

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Jean Milke, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. |
| | ) 2:15-cv-00462-ROS |
| City of Phoenix; Maricopa | ) |
| County; and Detective Armando | ) |
| Saldate, Jr.; and Sergeant | ) |
| Silverio Ontiveros, in their | ) |
| individual capacities, | ) |
| | ) |
| Defendants. | ) |
| ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ | ) |

VOLUME III

(PAGES 418 through 633)

VIDEOTAPED DEPOSITION OF

DEBRA MILKE

DECEMBER 6, 2019

9:30 A.M.

3030 North Third Street

Phoenix, Arizona

SOMMER E. GREENE, CSR, RPR, CR No. 50622

Page 419

```
 1   APPEARANCES OF COUNSEL

 2

          For Plaintiff:
 3

 4            LOEVY & LOEVY
              ELIZABETH WANG, ESQ.
 5            2060 Broadway, Suite 460
              Boulder, Colorado 80302
 6            720.502.2103
              Elizabethw@loevy.com
 7

 8

          For Defendant Silverio Ontiveros:
 9

              HOLLOWAY ODEGARD & KELLY, P.C.
10            SALLY A. ODEGARD, ESQ.
              3020 East Camelback Road, Suite 201
11            Phoenix, Arizona 85016
              602.240.6670
12            sodegard@hoklaw.com

13

14        For Maricopa County:

15            SANDERS & PARKS
              ROBIN BURGESS, ESQ.
16            3030 North Third Street, Suite 1300
              Phoenix, Arizona 85012
17            602.532.5783
              Robin.burgess@sandersparks.com
18

19

          For Defendant City of Phoenix:
20

              WIENEKE LAW GROUP
21            CHRISTINA RETTS, ESQ.
              KATHLEEN L. WIENEKE, ESQ.
22            LEA SHAPIRO, ESQ.
              1095 West Rio Salado Parkway, Suite 209
23            Tempe, Arizona 85281
              480.715.1868
24            cretts@swlfirm.com

25
```

Page 420

1    APPEARANCES CONTINUED:

2

3         For Defendant Armando Saldate:

4              BERKE LAW FIRM
               LORI V. BERKE, ESQ.
5              1601 North 7th Street, Suite 360
               Phoenix, Arizona 85006
6              602.254.8800
               lori@berkelawfirm.com
7

8         Also Present:

9              Bill Marinakis, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 421

1                        I N D E X

2

3    WITNESS: DEBRA JEAN MILKE

4

5    EXAMINATION                                     PAGE

6

7    MS. RETTS....................................425

8    MS. BERKE....................................460

9    MS. ODEGARD..................................575

10   MS. WANG.....................................591

11   MS. BERKE....................................614

12

13                    *       *       *

14

15

16

17

18

19

20

21

22

23

24

25

Page 422

1                              INDEX TO EXHIBITS

2

3      EXHIBIT                                              MARKED

4
       Exhibit 406   Milke Friends From Kirk Fowler        450
5                    File, L&L010774

6      Exhibit 407   Debra Jean Milke Case - Guestbook,    456
                     L&L032713
7
       Exhibit 408   E-mail Chain Between Lori Voepel      457
8                    and Pat, Re: Debbie Called,
                     L&L043882
9
       Exhibit 409   Bank of America Statement             482
10
       Exhibit 410   Audiotape Transcriptions of Debra     483
11                   Milke to Mr. Aleshire

12     Exhibit 411   April 18, 1998 Letter From Peter      484
                     Aleshire to Debra Milke,
13                   BOMMERSBACH000660 to 665

14     Exhibit 412   Phoenix Magazine Article by Peter     489
                     Aleshire, L&L033580 to 594
15
       Exhibit 413   April 30th Letter From Debra to       494
16                   Mom, MILKE-NSB026544 to 552

17     Exhibit 414   January 21, 2002 Letter to Lori       505
                     Voepel From Debra Milke, L&L020075
18                   to 79

19     Exhibit 415   January 27, 2002 Letter to Lori       510
                     Voepel From Debra Milke, L&L020080
20                   to 81

21     Exhibit 416   October 20, 20002 Letter to Lori      513
                     Voepel From Debra Milke, L&L020122
22                   to 127

23     Exhibit 417   March 28, 1990 Letter to Ken From     514
                     Debra Milke, L&L00119 to 121
24

25

Page 423

1
                          INDEX CONTINUED
2

3

4    Exhibit 418  "Continued" Letter, L&L062374 to      518
                  381
5
     Exhibit 419  Audio Transcription of Clemens        521
6                 Hoeges

7    Exhibit 420  May 14, 2002 Letter to Lori Voepel,   541
                  L&L002962 to 2964
8
     Exhibit 421  Appeal Transcript, MILKE-NSB011088    542
9                 to 1156

10   Exhibit 422  February 25, 1990 Letter to Ken       567
                  From Debra Milke, L&L00088 to 95
11
     Exhibit 423  Affidavit in Support of              608
12                Application, MILKE-NSB006092 to
                  6103

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 424

1                        PHOENIX, ARIZONA

2                  DECEMBER 6, 2019; 9:30 A.M.

3

4

5              THE VIDEOGRAPHER:  We're on the record.

6     Today is Friday, December 6th, 2019.  The time on the

7     video monitor is 9:46 a.m.  This is Volume 3 of the

8     video-recorded deposition of Debra Jean Milke noticed by

9     counsel for the defendants in the matter of Debra Jean

10    Milke versus the City of Phoenix, et al.

11              This matter is being held in the United

12    States District Court, District of Arizona.  The court --

13    or the case number is 2:15-CV-00462-ROS.

14              Our location is the law offices of Sanders &

15    Parks located in Phoenix, Arizona.  The certified court

16    reporter is Sommer Greene of Maricopa Reporting,

17    Incorporated, located at 8686 South San Alberto Drive,

18    Suite 200, Scottsdale, Arizona 85258.

19              My name is Alex Marinakis.  I'm the

20    certified legal video specialist for the firm of

21    VideoDep, Incorporated, located in Phoenix, Arizona.

22              Counsel, would you identify yourselves and

23    whom you represent starting with the plaintiff's counsel,

24    please.

25              MS. WANG:  Elizabeth Wang for plaintiff.

Page 425

1           MS. BURGESS:  Robin Burgess on behalf of

2     Maricopa County.

3           MS. ODEGARD:  Sally Odegard on behalf of

4     Silverio Ontiveros.

5           MS. BERKE:  Lori Berke on behalf of Armando

6     Saldate.

7           MS. RETTS:  Christina Retts with Kathy

8     Wieneke and Lea Shapiro on behalf of the City of Phoenix.

9           THE VIDEOGRAPHER:  Thank you, Counsel.  The

10    court reporter may swear in the witness at this time,

11    please.

12

13                    DEBRA JEAN MILKE,

14    called as a witness herein, having been first duly sworn

15    by the Certified Reporter to speak the whole truth and

16    nothing but the truth, was examined and testified further

17    as follows:

18

19                    FURTHER EXAMINATION

20    BY MS. RETTS:

21        Q.    Good morning, Ms. Milke.

22        A.    Good morning.

23        Q.    Did you read any documents last night?

24        A.    No.

25        Q.    Have you communicated with Ms. Voepel in the

1      last year?

2          A.    I -- in -- in the last -- like this year, 2019?

3          Q.    Correct.

4          A.    I may have.

5          Q.    Would you have done that through phone contact

6      or written contact?

7          A.    If I communicated with her this year, it would

8      have been by phone.

9          Q.    Would your communications with her have been

10     personal communications?

11         A.    Yes.

12               MS. WANG:  Objection.  Form.

13         Q.    BY MS. RETTS:  In other words, you were not

14     discussing your case with her, your civil case.  Correct?

15         A.    Correct.

16         Q.    I want to go back to your preparation for this

17     deposition.  I understand that you had a meeting with

18     Ms. Wang on November 21st.  Correct?

19         A.    Correct.

20         Q.    And your next meeting, what date was that?

21         A.    November 22nd.

22         Q.    How long was that meeting?

23         A.    I don't know exactly.

24         Q.    Can you give me an estimate?

25         A.    About five hours.

Page 427

1      Q.    When was the next meeting?

2      A.    The 23rd.

3      Q.    How long was that -- that meeting?

4      A.    Approximately four hours.

5      Q.    Were there any other meetings?

6      A.    No.

7      Q.    So three total meetings.  Correct?

8      A.    Yes.

9      Q.    You reviewed documents, you said, on Sunday.

10   Were those documents that you had been given in your

11   preparation that you took with you?

12     A.    Yes.

13     Q.    And you reviewed all of the documents that your

14   lawyer asked you to review.  Correct?

15     A.    Correct.

16     Q.    Was there anybody else who was present with you

17   in those meetings with the lawyer?

18     A.    No.

19     Q.    So it was just you and Ms. Wang?

20     A.    Yes.

21     Q.    Did you meet with Mr. Kimerer at all to prepare

22   you for this deposition?

23     A.    No.

24     Q.    Did you meet with Ms. Neff to prepare you for

25   this deposition?

Page 428

```
 1        A.    Not to prepare.

 2        Q.    Did you meet with Ms. Voepel to prepare you for

 3   this deposition?

 4        A.    No.

 5        Q.    Were there any other people that you spoke to

 6   to help prepare you?  For example, calling a friend?

 7        A.    No.

 8        Q.    Did you talk to anybody else about the fact

 9   that you would be deposed again?

10        A.    About just being deposed?

11        Q.    Yes.

12        A.    Yes.

13        Q.    Who did you talk to about being deposed?

14        A.    I told my friend Robin.

15        Q.    What do you remember discussing with her?

16        A.    Just telling her that I was being deposed

17   again.

18        Q.    Did you talk to your therapist about being

19   deposed?

20        A.    Yes.

21        Q.    When's the last time that you had a therapy

22   session?

23        A.    I -- I need a -- I need to see a calendar.

24   I -- is today the -- what is today?

25        Q.    Today is the 6th.
```

Page 429

1          A.     Um, I spoke -- was Thanksgiving last week?

2          Q.     Yes.

3          A.     Okay.  I spoke to her the day after

4    Thanksgiving.

5          Q.     Did you have a session in person or did you do

6    this over some form --

7          A.     We had a phone session.

8          Q.     How long was that phone session?

9          A.     One hour.

10         Q.     Over the last year, you have exchanged e-mail

11   correspondence with Mr. Rosenquist.  Do you recall that?

12         A.     Over the -- this last year?

13         Q.     Yes.

14         A.     I -- I don't recall e-mail exchanges.

15         Q.     Did you have a phone conference with

16   Mr. Rosenquist last year around December or January?

17         A.     When you say "phone conference," do you mean

18   talking to him on the phone --

19         Q.     Yes.

20         A.     -- or with other people?

21         Q.     Talking to him on the phone.  Did you talk to

22   him on the phone?

23         A.     I believe so, yes.

24         Q.     Did you reach out to him or did he reach out to

25   you?

Page 430

1        A.      I don't recall.

2        Q.      What did you discuss?

3        A.      With Mr. Rosenquist?

4        Q.      Correct.

5        A.      I discussed with him that I was seeking new

6   counsel.

7        Q.      Were you trying to get his recommendation for

8   someone to represent you?

9        A.      I don't -- I don't think I was trying to get

10   his recommendation.  I just let him know that I was

11   seeking new counsel, and if I remember correctly, I think

12   he said that he would see what he could do.  I think he

13   offered that to me.

14        Q.      What did you tell him about why you were

15   seeking new counsel?

16        A.      I don't know exactly what I said to him.  I

17   just recall telling him that I was unhappy with the

18   cou- -- current counsel that I had at that time, and

19   it -- it -- it had everything to do with the first day of

20   my deposition.

21        Q.      Did you tell him specifics about the first day

22   of your deposition and what you meant by that?

23               MS. WANG:  Objection.  Form.

24               THE WITNESS:  I didn't -- I didn't tell him

25   specifics.  I just mentioned how embarrassed I was and

1    how inappropriate I thought that behavior was that first

2    day.

3        Q.    BY MS. RETTS:  And when you -- when you mean

4    "that behavior," were you referring to your prior

5    lawyer's?

6        A.    Nick Brustin, yes.

7        Q.    Have you talked at all with Kirk Fowler in the

8    last year?

9        A.    It's possible, yes.

10       Q.    Have you e-mailed with Kirk Fowler over the

11   last year that you can recall?

12       A.    I don't -- I'm not sure.  I don't -- I don't

13   think so.

14       Q.    Have you met Kirk Fowler out for lunch or

15   dinner or anything like that?

16       A.    In the year 2019?  It's possible I did early on

17   in the year.

18       Q.    Since your release, how frequently have you had

19   contact with Mr. Fowler, whether on the phone, in person,

20   in writing, in any form?

21       A.    I don't know exactly, but it's -- it's not

22   much.

23       Q.    Have you had contact with Paul Huebl since your

24   release?

25       A.    Yes.

```
 1        Q.     Tell me what contact you've had.

 2        A.     I -- what I can recall is I think he sent me an

 3   e-mail once.

 4        Q.     What do you remember the content of that e-mail

 5   being about?

 6        A.     He made a comment about thinking that my

 7   lawsuit was resolved or something.  I don't know.  I

 8   don't remember exactly what he said.

 9        Q.     Did he make any comment to you about being a

10   witness in the case?

11        A.     I don't -- I don't know.  I don't recall.

12        Q.     Have you had any contact since your release

13   with Ken Ray?

14        A.     He -- he stopped in Mr. Kimerer's office one

15   day to say hello.

16        Q.     Have you talked to him on the phone or

17   communicated with him in any form of writing, whether

18   electronic or paper?

19        A.     I don't -- I don't -- I don't think so.

20        Q.     You know who Sherry Misany is?

21        A.     I think that's Jim's niece.

22        Q.     What contact, if any, have you had with Sherry

23   Misany?

24        A.     Since I've been out?

25        Q.     Yes.
```

Page 433

```
1        A.    None.

2        Q.    Did you go to visit her -- strike that.

3              Did you ever go to celebrate Easter with any

4    members of Mr. Styers' family?

5        A.    Yes.

6        Q.    And that would have been after your release.

7    Correct?

8        A.    Yes.

9        Q.    Do you remember Ms. Misany being there?

10       A.    No.

11       Q.    Did you ever go to visit Ms. Misany up in

12   Prescott?

13       A.    No.

14       Q.    Have you had any phone contact, e-mail contact,

15   written contact with Ms. Misany since her deposition?

16       A.    No.

17       Q.    Have you had any contact in any form, phone,

18   written, e-mail, with any member of Jim Styers' family?

19       A.    No.

20       Q.    Have you had any contact with Roger Scott?

21       A.    No.  Roger Scott, no.

22       Q.    Have you had any contact with Jim Styers?

23   Writing, telephone, visits?

24       A.    No.

25       Q.    Have you ever used an intermediary to
```

1      communicate with Jim Styers?  And by intermediary, I mean

2      a -- a go-between, someone you would send a letter to and

3      they would send a letter to Jim.

4          A.    No.

5          Q.    When you were in jail awaiting trial, did you

6      ever use an intermediary to send letters to Jim Styers?

7          A.    An intermediary?  In jail?  Which time in jail?

8          Q.    When you were awaiting trial, did you use a

9      third person to send letters to Jim, such as you would

10     send a letter out to a third person who you instructed to

11     then send those letters to Jim Styers?

12         A.    I don't -- I don't recall how -- how that --

13     the mail went out.  I don't recall.

14         Q.    So you may have used a third person to send

15     letters to Jim Styers?

16         A.    That's possible, yes.

17         Q.    Have you put any money on Jim Styers' books?

18         A.    Since being released?

19         Q.    At any time.

20         A.    No.

21         Q.    Have you ever directed a third person to send

22     money to Mr. Styers in prison?

23         A.    I don't -- I don't -- no, I don't think so.

24         Q.    Are you not sure?

25         A.    I don't -- I don't know why I would do that.  I

Page 435

```
 1      don't know.

 2           Q.    Have you ever used a third person to put money

 3      on Scott's books?

 4           A.    No.

 5           Q.    Jim sent you money when you were in jail

 6      awaiting trial.  Correct?

 7           A.    Correct.

 8           Q.    Did Jim send you any money in prison?

 9           A.    I don't know.

10           Q.    Is it possible he did?

11           A.    I -- I just -- I don't know.

12           Q.    When was the last time that you received a

13      communication from Jim Styers?

14           A.    I don't -- I don't know.

15           Q.    Has it been a number of years?

16           A.    It had to have been aft- -- I don't know.

17      After my trial, I don't know.

18           Q.    When you were incarcerated in prison, you sent

19      voice tapes to people.  True?

20           A.    Yes.

21           Q.    Tell me all the people you remember sending

22      voice tapes to.

23           A.    Well, I did the interviews for Clemens, and I

24      did the interview for Mr. Aleshire and my -- my mom.

25           Q.    Do you remember exchanging tapes with
```

Page 436

1      Ms. Imhoff?

2          A.    No.

3          Q.    If you will turn to Exhibit 356, which are the

4      Imhoff letters --

5          A.    Okay.

6          Q.    -- to IMHOFF000525, and that is a letter that

7      you wrote to Carolyn Imhoff on February 22nd, 1992.

8                      Do you see that?

9          A.    Yes.

10         Q.    And do you recognize your writing?

11         A.    Yes.

12         Q.    At the very beginning, it says, "I'm glad you

13     liked my tape."

14                     Do you see that?

15         A.    Uh --

16         Q.    The -- at the very top, it's the third

17     sentence.

18         A.    Oh, okay.  Yes.

19         Q.    Does that help refresh your recollection that

20     you were exchanging tapes with Ms. Imhoff?

21              MS. WANG:  Objection.  Form.

22              THE WITNESS:  I -- it's possible.  I just

23     don't know.  I mean, I don't know.  It's possible I sent

24     her a tape.

25         Q.    BY MS. RETTS:  When you wrote your letters, you

Page 437

1    tried to be truthful and accurate.  True?

2        A.    When I write?

3        Q.    Right.

4        A.    To be true, yes.

5        Q.    So is there a reason you can think of that you

6    would have written, "I'm glad you liked my tape," if you

7    hadn't sent her some form of a tape?

8                MS. WANG:  Objection.  Form.  Foundation.

9                THE WITNESS:  I -- I don't -- I mean, from

10   reading this, it's possible I sent her a voice tape.  I

11   don't know.

12       Q.    BY MS. RETTS:  You go on in that letter to say,

13   "I get so lazy sometimes.  I am so disgusted and a little

14   scared.  I told you I sent a tape to Felix telling" --

15   "to Vince telling him off.  I wasn't nasty or anything.

16   Well, he sent me another tape screaming at me.  He said

17   he's been talking to a lot of people about my case and

18   that he found out I was not ever going to get out of

19   here.

20                "He also said he planned to look up that cop

21   who arrested me and get buddy buddy with him.  He said

22   other stuff, and I'm truly scared of Vince.  I saved both

23   tapes, plus I asked you to save that one your husband

24   listened to.  Please save that one because I need proof

25   of this crap.  I have a feeling I'll need it later."

Page 438

```
 1              Do you see that?

 2       A.    I do.

 3       Q.    Do you remember actually saving those two

 4  tapes?

 5       A.    No, I don't.

 6       Q.    Did you know that those two tapes were in the

 7  Milke room?

 8       A.    No.

 9       Q.    Do you remember Vince Felix sending you a tape

10  where he talked about buying you a ring?

11       A.    I -- I don't -- I don't recall.  The ring

12  thing, I -- I recall, but I don't know how he

13  communicated that to me.  I don't remember.

14       Q.    If you will turn to IMHOFF00526, the next page.

15       A.    (Witness complies.)

16       Q.    Did you review any tapes at any point in time

17  after your release?

18       A.    The only -- the only tapes -- and we're talking

19  about cassette tapes.  The only cassette tapes that I had

20  when I got out were music tapes.  That's all.

21       Q.    Did you ever ask your lawyers whether, in the

22  file, there were other tapes?

23       A.    No, I don't think so.

24       Q.    You had access to the Milke room at any time

25  and could have looked through the boxes to see if there
```

Page 439

1    were any tapes.  Correct?

2              MS. WANG:  Objection.  Form.

3              THE WITNESS:  I had access to that room,

4    correct.

5        Q.    BY MS. RETTS:  And you didn't go through the

6    boxes to see if there were any tapes?

7        A.    I -- no.

8        Q.    On this page, it's -- in about the middle, it

9    says, on 526, "Danny is expecting a huge tax refund, and

10   he said he would send me a couple hundred dollars and he

11   said he wouldn't take no for an answer."

12             Do you see that?

13       A.    Where are you at?  On 526?

14       Q.    It's the first quarter.

15       A.    Are you on 526?

16       Q.    Yes.  Right --

17       A.    Oh.  Okay.  I see it.

18       Q.    Who is Danny?

19       A.    I -- I don't even know.

20       Q.    Have you ever reviewed a transcript of any

21   cassette tape that you made?

22       A.    A transcript?  I reviewed Clemens.

23       Q.    When did you --

24       A.    And --

25       Q.    Sorry.

1        A.     And Aleshire.

2        Q.     When did you review the transcript of the

3   Clemens tape?

4        A.     This past Sunday.

5        Q.     When did you review the transcript of the

6   Aleshire tape?

7        A.     This past Sunday.

8        Q.     Did you review the entire thing, the Clemens

9   tapes?  There were four tapes.  Correct?

10       A.     I'm not sure how many there were.

11       Q.     How long was the -- approximately the

12   transcript of the Clemens tape?

13       A.     Um, I don't know.  It might have been like

14   this.  This -- I'm not sure.  Something like that.  It

15   was in a -- I put it in a -- it's in a one-inch -- or

16   one-and-a-half-inch binder.

17       Q.     Did you review the entire transcript of the

18   Aleshire tape?

19       A.     I don't -- I'm not sure if I reviewed the

20   entire transcript.  I just had a copy of a transcript and

21   I read it.

22       Q.     Whatever you were provided, did you read it

23   cover to cover?

24       A.     Yes.

25              MS. WANG:  Objection.  Asked and answered.

Page 441

1      Q.    BY MS. RETTS:  Did you ever review a version of

2    the Clemens Hoeges transcript that had highlighting on

3    it?

4      A.    I'm not sure.

5      Q.    Where it would have been yellow highlighting

6    where some of your words were highlighted and some of

7    them were not?

8      A.    Whatever I got was a copy, so I don't know --

9    I -- I -- I don't -- the highlights I don't know what

10   that -- what you're talking about.

11     Q.    Was it a black-and-white copy, or was there any

12   color on the transcript?

13     A.    No.  It was black and white.

14     Q.    If you'll look at IMHOFF0527.

15     A.    Yes.

16     Q.    And the -- there's a kind of break in the page,

17   and then it's the first paragraph that's indented in, in

18   about the middle.

19     A.    Yes.

20     Q.    "I guess in one of my letters, I talked about

21   men being obsessive.  I was referring to Jim and Vince."

22              Do you see that?

23     A.    Yes.

24     Q.    Do you believe that Jim and Vince were

25   obsessive men?

Page 442

1      A.    Do I believe that today?

2      Q.    Correct.

3      A.    Or do I remember -- are you asking me to

4    remember 1992?

5      Q.    Is that your belief today?

6      A.    My belief today is that Vince was obsessive.

7      Q.    But not Jim?

8      A.    My belief today about Jim is I can't say today

9    that I believe Jim is or was obsessive.

10     Q.    Will you turn to IMHOFF530.

11     A.    (Witness complies.)

12     Q.    Toward the bottom.

13     A.    Yes.

14     Q.    And you state, quote, That private investigator

15   who was on my case wrote to me the other day.  He said

16   good paralegals make as much as 50,000 a year and

17   sometimes more.  He said he's glad I'm taking these

18   lessons.

19          Do you see that?

20     A.    Yes.

21     Q.    The private investigator, is that Kirk Fowler?

22     A.    Um, it's pos- -- that's probably who I was

23   referring to, yes.

24     Q.    At the time that you were writing this letter

25   to Ms. Imhoff, do you believe that you thought Jim Styers

1    was obsessive?

2         A.    Okay.  You're asking me to go back to February

3    of 1992.  I don't recall what I was thinking on

4    February 22nd, 1992.

5         Q.    Was there any time that you can remember ever

6    thinking that Jim was obsessive?

7         A.    It's -- it's possible there was a time during

8    these 22 years in Perryville -- there was a time when I

9    probably thought that, yes.

10        Q.    If you'll turn to 531.

11        A.    Yes.

12        Q.    At the top of the page, it states, "I wonder if

13   my lawyer got upset about my letter to him.  Frankly, I

14   don't care.  Maybe I'll get a letter from him today.  He

15   always answers me.  He will probably yell at me.

16   Carolyn, I don't like him.  Guess what I did?  I wrote

17   Maury Povich a letter.  He has his own talk show, but he

18   isn't anywhere near the gossiping type like Geraldo or

19   them."

20              Do you see that?

21        A.    I do.

22        Q.    And those are your words.  Correct?

23        A.    Yes.

24        Q.    And then you go on about a paragraph down and

25   state, "I asked him to please help me find a brilliant

1   criminal lawyer who will help me fight this on a pro bono

2   basis.  I told him I was alone and had no money.  I told

3   him about Melvin Belli and I told him about Arizona's

4   corruption.  I told him a lot."

5               Do you see that?

6       A.   Yes.

7       Q.   So according to this, you wrote a letter to

8   Maury Povich where you told him a lot about your case.

9   True?

10              MS. WANG:  Object- -- objection.  Form.

11   Mischaracterizes the letter.

12              THE WITNESS:  Okay.  What was your question

13   again?

14      Q.   BY MS. RETTS:  According to this letter --

15      A.   Yes.

16      Q.   -- you wrote to Mr. Povich?

17      A.   According to this letter, yes.

18      Q.   And you told him about your case.  True?

19              MS. WANG:  Objection.  Form.

20              THE WITNESS:  Okay.  So --

21              MS. WANG:  Foundation.

22              THE WITNESS:  He flashed a phone number on

23   the screen and said, If anyone has been accused of

24   something they didn't do, to please call in.  I couldn't

25   call obviously, so I wrote a letter.  I was brief, yet I

Page 445

1    gave him the meat of my case, which is basically the gist

2    of my case.

3              "I asked him to please help me find a

4    brilliant criminal lawyer who will help me fight this on

5    a pro bono basis.  I told him I was alone and had no

6    money.  I told him about Melvin Belli and I told him

7    about Arizona's corruption.  I told him a lot."

8         Q.   BY MS. RETTS:  So you told him a lot and you

9    told him --

10        A.   About my case.

11        Q.   -- about the meat of your case.  Correct?

12        A.   The gist of my case.

13        Q.   You wrote that you told him about the meat of

14   your case.  Correct?

15        A.   In this letter, I used that word, yes.

16        Q.   And on the next page, IMHOFF00532, about in the

17   middle of the page, you also write, "Come hell or high

18   water, I'll get out of here.  I also told Maury that I

19   plan to sue in excess of 50 million and that money meant

20   nothing to me because no amount of money will ever bring

21   Chris back."

22              Do you see that?

23        A.   I do.

24        Q.   And you said, "I said I'd gladly give a lawyer

25   my settlement just as long as I get my freedom back."

Page 446

1              Do you see that?

2        A.    I do.

3        Q.    And you said, "I told him I need someone to

4    help me get out of here first.  I also told him I was

5    enrolled in a paralegal course because I hope to help

6    people in the future.  It was a good letter I think."

7              Do you see that?

8        A.    I do.

9        Q.    So you included details about your plans to

10   file a civil lawsuit as well.  Correct?

11              MS. WANG:  Objection.  Form.  Foundation.

12              THE WITNESS:  When you say "plans" --

13        Q.    BY MS. RETTS:  "I told Maury that I planned to

14   sue in excess of 50 million."

15              Do you see that?

16        A.    I see that.

17        Q.    And your word was I "planned."  Correct?

18        A.    That's what it says here, yes.

19        Q.    And if you'll turn to IMHOFF00533.

20        A.    Yes.

21        Q.    About the -- quarter of the way down, it says,

22   "I talk to Danny a lot and he sends me voice tapes too.

23   He has a nice voice."

24              Do you see that?

25        A.    Yes.

1      Q.    So you were also apparently receiving voice

2    tapes from Danny as well.  Correct?

3      A.    Apparently, according to this letter, yes.

4      Q.    Then if you'll turn to IMHOFF00534.

5      A.    (Witness complies.)

6      Q.    The second paragraph after the break in the

7    middle, you state, "I just got my mail.  Thank you for

8    the stamps and colored paper.  Both the letter and your

9    letter and your little note got here together.  Carolyn,

10   I'm real, real upset.  My lawyer answered that letter of

11   mine and I'm firing him.

12           "He got mad at me for sending that letter to

13   him.  He said if I didn't like the way he's working, then

14   I better find another lawyer.  He also said that he found

15   nothing worth arguing and that I will spend the rest of

16   my life in prison."

17           Do you see that?

18     A.    I do.

19     Q.    So you were sharing information with Carolyn

20   Imhoff about your feelings about your lawyer.  True?

21     A.    Yes.

22     Q.    And is this Mr. Kemper?

23     A.    Yes.

24     Q.    If you'll go to 535 --

25     A.    Yes.

1      Q.    -- almost at the bottom, about a paragraph up,

2    it states, "I can't believe the arrogance of my lawyer.

3    He said I waste my time reading law.  Guest what?  I just

4    got my test results back on lesson 2.  A hundred percent

5    again.  That man can go straight to hell."

6              Do you see that?

7      A.    Yes.

8      Q.    And you're speaking of Mr. Kemper here.

9    Correct?

10     A.    It sounds like it, yes.

11     Q.    And it sounds like you are also reading case

12   law to help educate you about your case so that you can

13   actively participate.  Would you agree?

14              MS. WANG:  Objection.  Form.  Foundation.

15              THE WITNESS:  I wouldn't agree.

16     Q.    BY MS. RETTS:  Why were you reading case law?

17              MS. WANG:  Objection.  Form.

18              THE WITNESS:  I'm not sure I was reading

19   case law.

20     Q.    BY MS. RETTS:  Were you reading law --

21     A.    I --

22     Q.    -- generally?

23     A.    I was trying to -- I -- I -- I recall getting

24   legal books from the law library to read to try to get an

25   understanding of the language.

1      Q.    To help you in your criminal case?

2      A.    Not so much to help.  But to get an

3    understanding of what was going -- what was happening to

4    me.

5      Q.    And you did that on your own without your

6    lawyer telling you to do that.  Correct?

7      A.    Yes.

8      Q.    You also communicated -- strike that.

9            You also shared your communications with

10   Mr. Kemper with Carolyn about everything he told you.

11   Correct?

12     A.    I don't --

13           MS. WANG:  Objection.  Form.  Foundation.

14           THE WITNESS:  I don't -- I don't know.

15     Q.    BY MS. RETTS:  Is it possible that you did?

16     A.    It's possible, but I don't recall.

17     Q.    And you didn't go through these letters that

18   you wrote to Ms. Imhoff to help refresh your recollection

19   about what you told Ms. Im- -- Imhoff about your

20   communications with your lawyers.  Correct?

21     A.    Correct.

22     Q.    If you'll turn to 00536.

23     A.    (Witness complies.)

24     Q.    At the top, you state, "I'm making a tape for

25   Danny, and I'm going to talk about my case.  Then ask him

1    to take my tape to some criminal lawyers in Dallas.

2    Maybe someone will be interested."

3              Do you see that?

4        A.    I do.

5        Q.    So you also, according to this, had a plan to

6    make a tape for Danny where you were going to talk about

7    the case, and you wanted him to then take it to another

8    third party to listen to.  Correct?

9        A.    That's what it sounds like, yes.

10       Q.    If you'll turn to IMHOFF538.

11       A.    (Witness complies.)

12       Q.    And this is a letter to Carolyn dated 2/14/92.

13             Do you see that?

14       A.    I do.

15       Q.    And toward the bottom, this is a letter to

16   Carolyn that -- that you said, "I spent four hours

17   preparing a letter to my lawyer.  I want you to read what

18   I wrote to him."

19             Do you see that?

20       A.    I do.

21       Q.    And then you proceed for almost two pages to

22   write to Carolyn in your own handwriting a copy of the

23   letter that you sent to your lawyer.  Correct?

24       A.    That's what it looks like, yes.

25             (Exhibit 406 was marked for identification.)

Page 451

```
1        Q.    BY MS. RETTS:  Exhibit 406 is a list of

2   individuals that, at the top, says comes from Kirk

3   Fowler's file.

4              Do you see that?

5        A.    I do.

6        Q.    Who is the person identified as number 2 on

7   this list?

8        A.    It says Rick Scavone.

9        Q.    What does it say next to it?

10       A.    "High school friend.  Will not allow interview.

11  Wife hates Debbie and he's afraid the fire department

12  won't hire if he allows interview."

13       Q.    You provided the information about Rick Scavone

14  to Kirk Fowler.  Correct?

15       A.    I don't -- I don't know.  I don't remember.

16       Q.    Do you know where Mr. Fowler would have gotten

17  information about him being your high school friend if it

18  didn't come from you?

19             MS. WANG:  Objection.  Foundation.

20             THE WITNESS:  No, I don't know.

21       Q.    BY MS. RETTS:  If you'll turn back to the

22  Imhoff letters to IMHOFF00591.

23       A.    (Witness complies.)

24       Q.    And this is a March 11th, 1992, letter from you

25  to Carolyn.
```

Page 452

1              Do you see that?

2        A.    Yes.

3        Q.    And in this letter, near the top, you say,

4    "Judith sent me a cute note in 22.  I was so surprised

5    and happy.  She said she's really involved in my letter

6    to me.  So I imagine it's going to be a long detailed

7    one.  I wrote her pages about everything.  Oh, I enclosed

8    a letter to my friend Rick.  He's an old high school

9    friend of mine.  I could mail it direct, but he has a

10   jealous wife."

11             Do you see that?

12       A.    I do.

13       Q.    And those are your words.  True?

14       A.    Yes.

15       Q.    You were writing at the same time also to

16   Judith about all aspects of your life.  Correct?

17             MS. WANG:  Objection.  Form.  Foundation.

18             THE WITNESS:  I don't -- I don't -- I don't

19   recall what I wrote to Judith, and I don't even know who

20   Judith is.

21       Q.    BY MS. RETTS:  You don't know Judith as Judith

22   Radulovich?

23             MS. WANG:  Objection.  Foundation.

24             THE WITNESS:  No, that name doesn't sound

25   familiar to me.

Page 453

1     Q.    BY MS. RETTS:  Were you aware that Judith at

2   the same time was writing to Jim Styers?

3     A.    No, I don't know.

4     Q.    Were you aware of a woman who was corresponding

5   to -- with Jim Styers and giving that information to your

6   mother?

7     A.    No, I don't know.

8     Q.    Do you remember your mother passing along

9   information to you from a woman who was corresponding

10   with Jim Styers?

11     A.    No, I don't.

12     Q.    Is it possible that happened?

13     A.    I wouldn't even -- I don't know.

14     Q.    Did you review any of your letters to your

15   mother and the letters from your mother to you to help

16   refresh your recollection about the conversations in

17   writing that you had with your mother?

18     A.    Letters to my mother?

19     Q.    To and from your mother.  Did you read any

20   letters to and from your mother to help refresh your

21   recollection about you -- what you two communicated

22   about?

23     A.    I don't -- I don't have any letters to my

24   mother.

25     Q.    When you were at her house in Germany, did you

Page 454

1    find any letters to your mother?

2         A.    No.

3         Q.    Did you find any letters from your mother to

4    you?

5         A.    Yes.

6         Q.    Back again on IMHOFF00591, you continue and

7    state, "When you address the envelope, could you please

8    put your initials and street address as the return

9    address?  He's a very nice guy and not crazy or anything.

10   You can go ahead and read the letters so you can see what

11   I mean about asking you to mail it for me.

12              "I would never give out your address to

13   anyone, and if you use your address as the return, I know

14   Rick, he's not crazy, so you can feel safe with it.

15   Okay?"

16              Do you see that?

17        A.    I do.

18        Q.    And you gave Carolyn permission to read the

19   contents of whatever letter you were going to send.

20   True?

21        A.    According to this, yes.

22        Q.    And if you'll turn over to IMHOFF00052.

23              MS. WANG:  I'm sorry.  What number did you

24   say?

25              MS. RETTS:  The next page, sorry.  00592.

Page 455

1          (Multiple speakers.)

2          MS. RETTS:  Flip one over.

3     Q.   BY MS. RETTS:  On the top of the page, it says,

4  "It would be smart to give you Rick's address, huh?  He

5  was in love with me all four years of school.  We had all

6  our classes together and studied together.  But he seemed

7  more like a brother to me than anything else.  For our

8  graduation, he gave me a beautiful diamond necklace.

9          "He's a real sweet guy.  My mom loved him

10  and always tried to push us together, but I just didn't

11  feel that way towards him.  He used to visit me at

12  Durango almost all the time."

13          Do you see that?

14     A.   I do.

15     Q.   And throughout this, you call Rick Rick.

16  Correct?

17     A.   Yes.  Which is -- seems odd to me.

18     Q.   He gave you a diamond necklace?

19     A.   Yes, he did.

20     Q.   What did it look like?

21     A.   It was just on a very thin gold chain, and it

22  was just a small -- I don't know what you call it.  Just

23  very small and it was round.

24     Q.   What do you remember about how he gave that to

25  you?

Page 456

```
 1        A.    Well, because our last names started with S, we
 2    were sitting next -- near each other in the graduation
 3    line.  And I don't know when he gave it to me, before or
 4    after the ceremony, but it was in a very nice box, yes.
 5    It was on graduation night.
 6        Q.    You exchanged voice tapes with your mother.
 7    Correct?
 8        A.    Yes.
 9              (Exhibit 407 was marked for identification.)
10        Q.    BY MS. RETTS:  This is Exhibit 407.  And this
11    is a comment from the name Renate Janka.  Do you
12    recognize that as your mother's name?
13        A.    Yes.  It's Renate Janka.
14        Q.    Janka.  And in the comments -- strike that.
15              It says from USA Switzerland.
16              Do you see that?
17        A.    Yes.
18        Q.    And the date is 12/15/1998.
19              Do you see that?
20        A.    Yes.
21        Q.    See where it says, "I have about a hundred
22    voice tapes at home and uncounted letters."
23              Do you see that?
24        A.    I do.
25        Q.    And you understood that your mother was keeping
```

Page 457

```
 1     the voice tapes that you sent to her.  Correct?
 2                   MS. WANG:  Objection.  Foundation.  Form.
 3                   THE WITNESS:  I don't know what my -- I -- I
 4     don't know.  She didn't tell me, so I don't know.
 5                   (Exhibit 408 was marked for identification.)
 6          Q.    BY MS. RETTS:  This is an e-mail from Pat to
 7     Lori Voepel, your mother, Mr. Kimerer and Web master
 8     Frankie Aue.
 9                   Do you see that?
10          A.    Yes.
11          Q.    And the subject is "Debbie called."
12                   Do you see that?
13          A.    Yes.
14          Q.    In the second paragraph, it says, "She told me
15     she wrote 21 pages on her project and she was sending
16     them to me today.  She wants me to read them and faxed to
17     her mom for her to read.  She felt very good about doing
18     this right now and that it was a plus factor today.
19                   "She hadn't received my big envelope that
20     has some materials she wanted so it will help her keep
21     going.  I mentioned the tapes that Renate has and she
22     remembered them but says she is not allowed to have any
23     personal tapes anymore.  They stopped that awhile back.
24     So she said they couldn't help her now but realizes they
25     will come in handy in the future.
```

1                "I told her we were still looking for the

2       copy of the letters she sent to Mark a couple of years

3       ago and would let her know.  The only copy may be in the

4       file at Mike's office.  She thought Frankie had a copy,

5       but he has not found one as of yet.  We will keep

6       looking."

7                Do you see that?

8       A.    I do.

9       Q.    And you were told by Pat that your mother still

10      had tapes.

11               MS. WANG:  Objection.  Foundation.  Form.

12      Q.    BY MS. RETTS:  Correct?

13      A.    According to this, this is an e-mail about me.

14      So he mentions tapes in here.  I mean, what is your

15      question?

16      Q.    Do you have a recollection of being told by Pat

17      that your mother still had the tapes?

18      A.    No.

19      Q.    And you could have been told by Pat that your

20      mother still had the tapes and you just don't remember,

21      as you sit here today.  Correct?

22               MS. WANG:  Objection.  Foundation.  Form.

23               THE WITNESS:  I could have been told by Pat

24      that she had tapes and I don't remember, yes.

25      Q.    BY MS. RETTS:  And you didn't go through your

Page 459

1    letters to Pat to see if you had written to Pat about

2    those tapes and about the fact that you knew your mother

3    had the tapes.  Correct?

4                    MS. WANG:  Objection.  Foundation.  Form.

5                    THE WITNESS:  My letters to Pat, you mean in

6    here?

7        Q.    BY MS. RETTS:  Right.

8        A.    No, I didn't go through these.

9        Q.    You destroyed the tapes and letters that were

10   at your mother's house by putting them in a recycling

11   bin.  Correct?

12       A.    I absolutely did not do that.

13       Q.    Did you destroy them in any form or fashion?

14       A.    Absolutely not.

15       Q.    Did you take any pictures of what was at your

16   mother's house so that we could take a look at the

17   pictures and see what was in the boxes?

18       A.    No.

19                   MS. RETTS:  We'll take a quick break.

20                   THE VIDEOGRAPHER:  We're going off the

21   record.  The time is 10:33 -- excuse me -- 10:32 a.m.

22                   (A recess was held off the record.)

23                   THE VIDEOGRAPHER:  We're back on the record.

24   The time is 10:46 a.m.

25                   MS. BERKE:  All right.  And I'm asking you a

Page 460

1    question.  I'm not at all being accusatory.  I'm just

2    wondering because defense counsel have had some

3    conferences in here when you've stepped out.  I just want

4    to make sure you haven't been recording anything on your

5    computer in the room?

6            MS. WANG:  No.

7            MS. BERKE:  Okay.  And I wasn't being

8    accusatory at all.  I just wanted to make sure.

9

10                     EXAMINATION

11   BY MS. BERKE:

12       Q.    Ms. Milke, I'm a little confused as to what you

13   reviewed in preparation for your deposition.  So I want

14   to go document by document in terms of what you reviewed

15   to prepare for your deposition today.  Because today for

16   the first time we learned that you had read these two

17   transcripts of -- of Aleshire recordings and what was the

18   other ones?

19       A.    Clemens.

20       Q.    Clemens.

21            Did you read those while you met with your

22   attorneys or before or after you met with your attorneys?

23            MS. WANG:  Objection.  Form.

24            THE WITNESS:  I -- I -- I think I -- I read

25   them at my house last weekend.

Page 461

1      Q.    BY MS. BERKE:   Okay.  And you read them cover

2   to cover?

3      A.    I believe so.

4      Q.    And what else did you review at your house last

5   weekend?  So -- so that was after you had met with your

6   attorneys.  Correct?

7      A.    Yes.

8      Q.    Okay.  What else did you review after you had

9   met with your attorneys that's case-related?

10      A.    I just recall letters that I wrote to Anders

11   Rosenquist, letters that I had written to Kirk Fowler and

12   letters that I had written to Ken Ray.  I remember seeing

13   a couple letters in there to Pat.  And I had the August

14   deposition.  And then the stack of pages from Aleshire

15   and Clemens.

16      Q.    When you say "stack of pages," do you mean the

17   transcripts?

18      A.    I -- I -- I don't remember what it -- I think

19   it was a transcript of a voice tape.

20      Q.    Was it -- were they different documents or just

21   one running transcript?  I mean -- so let me rephrase the

22   question.

23            Were the documents you reviewed regarding

24   Clemens and Aleshire your words?

25      A.    Yes.  It appeared to me that the pages were a

Page 462

1      transcript of the tapes.

2          Q.    That you had made for them?

3          A.    Yes.

4          Q.    Okay.  So did you review -- you said when you

5      reviewed your August deposition, that was two days of

6      deposition.  Correct?

7          A.    In August, two days, yes.

8          Q.    Okay.  Let me pull up your depositions.  I just

9      want to make sure I know everything you reviewed because

10     I don't have the dates memorized.

11                MS. BURGESS:  15 and 16.

12         Q.    BY MS. BERKE:  Okay.  So you reviewed the

13     August 15 and August 16, 2018, deposition transcripts?

14         A.    In August, I had two days.  Right?

15         Q.    Right.

16         A.    And in November there were two days.  Right?

17         Q.    Right.

18         A.    And in -- so I reviewed August.

19         Q.    Okay.  And then -- and you did not review

20     November?

21         A.    No.

22         Q.    What else did you review following your meeting

23     with your lawyers?

24         A.    That's all I can recall right now.

25         Q.    And then what case-related documents did you

Page 463

1    review while you met with your lawyers?

2         A.    Interrogatories.

3         Q.    What else?

4         A.    That's all I can recall at this time.

5         Q.    And your meeting with your lawyers over a

6    course of days was approximately 14 hours?

7         A.    Yes.

8         Q.    And in those 14 hours, the only document you

9    recall reviewing are interrogatories?

10        A.    I -- at this time -- at this time, yes.

11   Because we talked.  So yes.

12        Q.    Okay.  And those were your interrogatory

13   answers?

14        A.    Yes.

15        Q.    And were they the most recent set of answers.

16   So it showed your original answer and the supplemental

17   answers?

18        A.    I guess the most recent ones.

19        Q.    And so it contained your original answers and

20   your supplemental answers?

21        A.    I -- I would have to look at the document.

22   We -- we looked at it the other day, yesterday.

23        Q.    Okay.  So it's the one we were discussing the

24   other day with you, that Ms. Retts was discussing with

25   you?

Page 464

1          MS. WANG:  Objection.  Form.  Foundation.  I

2   mean, you can -- you can show her.

3          MS. BERKE:  Yeah, I'm going to pull it out.

4          MS. WANG:  Because you did have a big stack.

5          MS. BERKE:  Right.

6          MS. RETTS:  I think it's 366.

7   Q.    BY MS. BERKE:  Okay.  Pull out Exhibit 366.

8   A.    I think it's here.

9   Q.    Did it get separated?

10  A.    Okay.

11         MS. WANG:  It got separated.  That's the

12  request for production.

13         MS. BERKE:  Let's go off the record for a

14  second.  I'm going to try to find it.

15         THE VIDEOGRAPHER:  We're going off the

16  record.  The time is 10:53 a.m.

17         (A recess was held off the record.)

18         THE VIDEOGRAPHER:  We're back on the record.

19  The time is 10:56 a.m.

20  Q.    BY MS. BERKE:  Okay.  So I've placed Exhibit

21  366 in front of you.  And that's your various sets of

22  answers to the City defendant's interrogatories.

23  Correct?

24  A.    Yes.

25  Q.    And it's my understanding from your earlier

1  testimony that what you reviewed was that last set, which

2  is Plaintiff's Third Supplemental Response to Defendant

3  City of Phoenix's First Interrogatories.  Is that

4  correct?

5       A.   Yes.

6       Q.   Okay.  And then your verification for those

7  answers to interrogatories, the third supplemental, is

8  Exhibit 375.  Correct?

9       A.   Where's 375?

10      Q.   Your attorney's going to hand it to you.

11      A.   Yes.

12      Q.   And so did you -- you signed that verification

13  on December 3rd of 2019.  Correct?

14      A.   Yes.

15      Q.   When did your review take place of the

16  supplemental responses to interrogatories, the third

17  supplemental?

18      A.   My review?

19      Q.   Correct.

20      A.   When I was in --

21      Q.   When you were meeting with your attorneys.

22  Correct?

23      A.   But also when I signed this.

24      Q.   So you reviewed your supplemental -- third

25  supplemental responses twice?

```
 1          A.    Yes.
 2          Q.    Okay.  So you reviewed them when you met with
 3     your lawyers to prepare for this deposition?
 4          A.    Yes.
 5          Q.    And then you reviewed them again later on
 6     December 3rd when you signed your verification?
 7          A.    Yes.
 8          Q.    Were any changes made to your third
 9     supplemental response to Defendant City of Phoenix's
10     first set of interrogatories between the time you met
11     with your attorneys and the time you signed this
12     verification that's Exhibit 375?
13          A.    I'm not -- I don't know.  I'm not sure.
14          Q.    So then why didn't you sign the verification in
15     November when you met with your attorneys?
16          A.    I don't know.
17          Q.    And you don't recall reviewing any other
18     documents other than Plaintiff's Third Supplemental
19     Response to Defendant City of Phoenix's First Set of
20     Interrogatories when you met with your lawyers to prepare
21     for this deposition.  Correct?
22          A.    Right now, I -- I don't recall right now, no.
23          Q.    And then prior to meeting with your lawyers to
24     prepare for the deposition -- and I'm talking the month
25     or so prior to meeting with your attorneys -- did you
```

Page 467

1     review any case-related documents?

2          A.     Like in October?

3          Q.     October or November until you met with your

4     attorneys.

5          A.     No.

6          Q.     You didn't review any case-related documents on

7     the plane while you were on your way to see your

8     attorneys?

9          A.     No.

10          Q.     Did you have a meeting with your Loevy & Loevy

11     attorneys when they took over the case?

12          A.     Yes.

13          Q.     How many meetings have you had with them

14     between the time they took over the case and your depo

15     prep meeting last month?

16          A.     I'm not sure of the -- the number.  I'm not

17     sure.

18          Q.     More than five?

19          A.     I -- I can't guess.

20          Q.     How many phone calls have you had with your

21     Loevy & Loevy attorneys since they took over the case?

22          A.     I'm not sure.

23          Q.     More than five?

24          A.     I don't want to guess.  I just don't -- I'm not

25     sure.

Page 468

1      Q.     It's my understanding you didn't review any

2   documents between yesterday's deposition and today's

3   deposition.  Correct?

4      A.     Correct.

5      Q.     And you know you've been asked every day

6   whether you've reviewed the sanctions order.  Correct?

7      A.     I was asked, I believe, on Wednesday.

8      Q.     And you were asked again yesterday.  Correct?

9      A.     It's possible.

10      Q.     So having been asked that question on two

11   occasions, why is it that you haven't reviewed the

12   sanctions order?

13      A.     Like I explained on Wednesday and I -- I think

14   yesterday, it's -- it's very difficult for me to read

15   because it's -- it's not that I don't care.  I do care.

16   But I have attorneys handling this.  And it's very

17   difficult for me to pick up a document when I see a

18   number, a case number.

19               It's -- it's very distressing

20   psychologically and emotionally, and that's why I

21   can't -- I just -- it's difficult for me to read.

22      Q.     Well, then how is it that you were able to

23   review the Clemens transcript, the Aleshire transcript

24   and the letters to Anders Rosenquist, Mr. Fowler,

25   Mr. Ray, to Pat and your August deposition?

Page 469

1        A.     How was it that I could do that?

2        Q.     Right.  But you're not able to read the Court

3    sanctions order?

4        A.     No.  I didn't even want to do that.  I did not

5    want to do that.

6        Q.     Then why did you?

7               MS. WANG:  Objection.

8               To the extent you can answer without

9    revealing any attorney/client communications, you can.

10              THE WITNESS:  I'm sorry.  What was the

11   question?

12       Q.     BY MS. BERKE:  Why were you able to review

13   those other documents that we just listed out but you

14   were unable to review the Court's sanctions order?

15       A.     It wasn't easy reading those documents at my

16   house.

17       Q.     Why did you read them?

18       A.     To prepare to come here.

19       Q.     Okay.  You know you're here because there have

20   been sanctions imposed against you.  Correct?

21       A.     Sanctions?

22       Q.     Correct.

23       A.     Yes.

24       Q.     Okay.  And so wouldn't it be important when

25   you're here to address sanctions issues to read the

1    order -- the sanctions order in order to be prepared for

2    your deposition today?

3        A.    I suppose, yes.  But I'm -- I'm being accused

4    of doing things I'm not doing.

5        Q.    Well, if you don't -- if you haven't read the

6    sanctions order, how would you know what you've been

7    accused of doing?

8            MS. WANG:  Objection to the extent you are

9    asking for her to reveal attorney/client communications.

10       Q.    BY MS. BERKE:  So knowing that you have been

11   accused of engaging in discovery violations, why is it

12   that you have not reviewed the order outlining those

13   discovery violations?

14           MS. WANG:  Objection -- objection to the

15   extent you're asking her to reveal attorney/client

16   communications with her current counsel.

17           MS. BERKE:  Are you instructing her not to

18   answer my question?

19           MS. WANG:  Yes, I am.  The -- to the extent

20   you can answer without revealing attorney/client

21   communications, you can answer.

22           THE WITNESS:  Well, I'm sorry.  What was the

23   question?

24           MS. WANG:  If you can answer without

25   revealing attorney/client communications between you and

Page 471

1    myself, you can answer.

2              MS. BERKE:  Can you read the question back?

3              (The last question was read back by the

4    court reporter.)

5              THE WITNESS:  I don't -- I don't know -- I

6    don't know.  I'm -- I'm being accused of doing -- I'm

7    being accused of doing things I'm not doing.

8         Q.   BY MS. BERKE:  What have you been accused of

9    doing that you haven't done?

10        A.   Violating discovery.

11        Q.   In what respect?

12        A.   I don't know.  The insinuation is that I'm

13   hiding stuff or destroying stuff, and I'm not doing that.

14        Q.   What have you been accused specifically of

15   doing that's a discovery violation in this case?

16        A.   I don't know specific.

17        Q.   You don't know any of the specifics?

18        A.   I don't -- I don't -- all I know is when I was

19   in Germany at my -- at -- going through my mother's

20   things, I'm being accused of -- of destroying letters and

21   stuff.  I didn't do that.

22        Q.   What else are you being accused of doing

23   specifically?

24        A.   I don't know specifically.

25        Q.   And you don't know that because you've never

Page 472

1      read the sanctions order.  Correct?

2          A.    I have not read it.

3          Q.    And do you know what the Court has -- strike

4      that.

5              Do you know what discovery violations that

6      the Court has found that you committed?

7              MS. WANG:  Objection to the extent that you

8      are asking for attorney/client communications.  Objection

9      on privilege grounds.

10             If you can answer without revealing

11     attorney/client communications, you may answer.

12             MS. BERKE:  Right.  That -- that's awareness

13     of a fact.  That's not -- I'm not asking for --

14             MS. WANG:  Okay.  Repeat the question.

15             MS. BERKE:  -- communication.

16             MS. WANG:  Repeat the question.  I mean,

17     there's obviously knowledge that she has that is only

18     based on communications with me.  So -- okay.  Ask the

19     question again.

20             (The last question was read back by the

21     court reporter.)

22             THE WITNESS:  Some.

23         Q.    BY MS. BERKE:  Okay.  What discovery violations

24     are you aware of that the Court has found you committed?

25         A.    I'm only aware of when I went to Germany and

1    going through my mother's things.

2         Q.    And are you aware of any discovery violations

3    the Court has found you committed other than that having

4    to do with going to Germany and destroying documents

5    and --

6         A.    I didn't destroy documents.

7         Q.    Okay.  Other than the issue of whether you

8    destroyed documents at your mother's place in Germany,

9    are you aware of any other findings the Court made in

10   terms of your having committed discovery violations?

11        A.    I -- I can't think of any right now.

12        Q.    Why don't you want to read the Court's findings

13   about the allegations that you committed discovery

14   violations?

15              MS. WANG:  Objection.  Asked and answered.

16              THE WITNESS:  I'm being accused of something

17   I did not do and -- I'm being accused of something I

18   didn't do, just like I was falsely accused 30 years ago

19   of something I didn't do.  And when I have a legal

20   document in my hand, it triggers and it -- it brings me

21   back to the hell that I lived.  I -- it's difficult for

22   me to read this stuff.  This is why I have attorneys who

23   handle all of this.

24        Q.    BY MS. BERKE:  You would agree it's important

25   to know what the Judge in this case is stating about your

Page 474

1      case, wouldn't you?

2          A.      Yes.

3          Q.      And where the Court has found you have been

4      engaging in discovery violations, wouldn't you agree it's

5      important to read the Court's written words on that topic

6      to make sure that you can comply with discovery going

7      forward?

8          A.      I suppose it's important to read, yes.

9          Q.      Are you on any medications currently?

10         A.      Yes.

11         Q.      What medications are you on?

12         A.      I'm taking sertraline.

13         Q.      Anything else?

14         A.      I take --

15         Q.      Pardon me?

16         A.      I take Duexis.

17         Q.      Duexis?

18         A.      D-u-e-x-i-s.

19         Q.      Anything else?

20         A.      No.  That's all I take.

21         Q.      And what do you take the sertraline for?

22         A.      Depression and anxiety.

23         Q.      What about the Duexis?

24         A.      That is for arthritis.

25         Q.      What's your -- what's the dosage of sertraline

1      you take?

2          A.      Today I took 50 milligrams.

3          Q.      What do you normally take?

4          A.      25.

5          Q.      Why did you take 50 today?

6          A.      Because this is -- to knock the edge off.  This

7      is very emotional for me.

8          Q.      Did you consult with your prescribing physician

9      about taking 50 today instead of 25?

10         A.      I have.

11         Q.      And who prescribes it?

12         A.      Well, Dr. Potts, he's -- he no longer

13     prescribes my medication.  This new bottle I got is from

14     my new doctor.

15         Q.      Who's your new doctor?

16         A.      Dr. Gotshall.

17         Q.      How long have you been seeing Dr. Gotshall?

18         A.      I don't know.  It's in here.  It's in here.  I

19     don't know.  But it's in here.

20         Q.      But why did you stop seeing Dr. Potts?

21         A.      He's retiring.

22         Q.      And did he recommend Dr. Gotshall to you?

23         A.      No.

24         Q.      How did you come upon Dr. Gotshall?

25         A.      Because my former family physician retired, and

Page 476

1      she took over his patients.

2          Q.    Who took over?

3          A.    Dr. Gotshall took over my former --

4          Q.    Okay.

5          A.    -- physician's patients.

6          Q.    Okay.  And so did you contact Dr. Gotshall to

7      discuss your desire to take 50 milligrams instead of the

8      prescribed dosage of 25 milligrams?

9          A.    No.  I've had that discussion with Dr. Potts.

10         Q.    When did you have that discussion with

11     Dr. Potts?

12         A.    I don't recall.  Yesterday I saw -- or

13     Wednesday I saw him, but I had this discussion with him

14     in the past.

15         Q.    So you saw Dr. Potts in the last couple days?

16         A.    He -- I didn't -- just in passing.

17         Q.    Where did you see him in passing?

18         A.    At Mr. Kimerer's office.

19         Q.    On what day?

20         A.    Wednesday or Thursday.  I don't remember which

21     day it was.

22         Q.    So either yesterday or the day before?

23         A.    Yes.

24         Q.    Was he there to see you?

25         A.    No.

Page 477

```
 1        Q.    Was he there about your case?

 2        A.    No.

 3        Q.    Did you know he was going to be there?

 4        A.    No.

 5        Q.    So you just kind of bumped into him?

 6        A.    I -- yes.

 7        Q.    And you asked him -- tell us exactly what was

 8   stated during the conversation.

 9        A.    I made a comment to him that I increased my

10   medication, like he said that I could do.

11        Q.    So he had told you in the past that you could

12   do that?

13        A.    Yes.

14        Q.    When -- what time of day did you run into him

15   at Mr. Kimerer's office?

16        A.    Whenever we took a 30-minute break.

17        Q.    Okay.  So in the -- at -- over the lunch hour?

18        A.    Yes.

19        Q.    Did you meet with anybody when you went to

20   Mr. Kimerer's office during the lunch hour?

21        A.    No, I just -- I just saw him -- Mr. -- or

22   Dr. Potts sitting in his office.

23        Q.    What was your reason for going to Mr. Kimerer's

24   office during the lunch hour?

25        A.    I went there to get some aspirin.
```

Page 478

```
 1          Q.    For a headache?

 2          A.    Yes.

 3          Q.    Did you meet with anybody about the case when

 4    you were there?

 5          A.    No.

 6          Q.    Did you review any documents when you were

 7    there?

 8          A.    No.

 9          Q.    Did you go into the Milke room when you were

10    there?

11          A.    Absolutely not.

12          Q.    Have you ever, on any other occasion, taken 50

13    milligrams instead of 25 of the sertraline?

14          A.    Yes.

15          Q.    When is that?

16          A.    I don't recall when, but I've done it.  I

17    believe I -- when I came back from Colorado, I took -- I

18    think I took 75 milligrams.  Some days I just take a

19    little more; some days I just stay on 25.  It depends.

20          Q.    And what effect does increasing your dosage

21    have on you?

22          A.    It -- it suppresses my emotions.

23          Q.    In your criminal trial -- I'm sorry.  Following

24    your criminal trial, you expressed some criticism of your

25    doctor who had prescribed you medications that you were
```

1    taking during your trial, about how they affected your

2    trial presentation.  Correct?

3         A.    I -- I'm not even sure what you're talking

4    about.

5         Q.    You're not aware of any issue you raised or

6    discussed with others about how the medication you were

7    taking affected your demeanor and your presentation?

8         A.    Well, the media made comments about my flat

9    affect, which that's just the media.  And I was medicated

10   during my trial.

11        Q.    And you attributed that flat affect to the

12   medication you were taking.  Correct?

13        A.    Yes.

14        Q.    And knowing that the medication, at least in

15   your view, gave you a flat affect, why did you increase

16   your dosage of the sertraline today, which according to

17   you has kind of the same effect?  Right?

18        A.    I'm not in prison anymore.  I'm not living in

19   that hell anymore.  Now I'm out in the free world, and

20   I'm living a different kind of existence.  And I have --

21   I go through therapy.  And reliving all of this affects

22   me greatly, and sometimes I can't -- I can't deal with

23   it.  And so I increase my medication.

24        Q.    Were you taking sertraline in August of 2019

25   when you were being deposed?

Page 480

1          MS. WANG:  2018, you mean?  2018?

2          THE WITNESS:  Yeah.

3     Q.    BY MS. BERKE:  I'm sorry.  2018.  I apologize.

4     A.    Yes.

5     Q.    And what dosage did you take at that time?

6     A.    I'm not sure.  I was asked about it.  And I

7  think I said -- I'm -- I'm -- I was asked about it by you

8  and I responded, and I believe I was taking 25 or 50 at

9  the time.  I'm not sure.

10    Q.    So it's whatever you testified to in your

11 deposition?

12    A.    Yes.

13    Q.    I've seen references in your counseling records

14 to this litigation being a source of great stress and

15 anxiety for you.  Is that accurate?

16    A.    That is accurate, yes.

17    Q.    Describe the level of stress that you feel as a

18 result of this litigation.

19    A.    Having to relive everything.

20    Q.    What does it do to your level of stress and

21 anxiety?

22    A.    It take -- it retraumatizes me, it triggers

23 everything from the past.  And it's -- it's -- it's very

24 stressful emotionally and physically, mentally.

25    Q.    Do you have any financial accounts with Frankie

Page 481

1    Aue?

2         A.    The only account that I have with Frankie is he

3    initially had a Bank of America account with Pat's name

4    on it, and then when I got out, they added my name to it.

5         Q.    And do you still have that account together?

6         A.    It's not -- he doesn't use it.  But we -- that

7    account still exists.

8         Q.    And what monies are in that account?

9         A.    Every month I deposit -- I just transfer -- I

10   have my own personal account, and then every month, I put

11   my bill money in there and my rent money.

12        Q.    And is Frankie still on that account?

13        A.    His name is.  In order to have it removed, he

14   has to come here physically.

15        Q.    And do you have online access to that account?

16        A.    Yes.  I'm on the account.  I'm the only one who

17   uses it.

18        Q.    Does Frankie Aue deposit money into that

19   account?

20        A.    No.

21        Q.    How much is in that account presently?

22        A.    I don't know.  I think about $4,000 or

23   something.

24        Q.    Okay.  And so you're able to obtain the

25   statements off of that account online.  Correct?

Page 482

1        A.    Yes.

2        Q.    Are you a signatory on any other accounts of

3   Frankie Aue?

4        A.    No.

5        Q.    What about any other person?

6        A.    No.

7              (Exhibit 409 was marked for identification.)

8        Q.    BY MS. BERKE:   I'm showing you what's been

9   marked as Exhibit Number 409.   This is an e-mail from

10  Frankie Aue to you dated November 9th of 2019.   Correct?

11       A.    Yes.

12       Q.    And he's forwarding an e-mail from Bank of

13  America to you letting you know that your statement is

14  available for regular checking account ending in 7038.

15  Correct?

16       A.    Yes.

17       Q.    Why would he send that to you if you have

18  access to the statements?

19       A.    So, like I said, this account 7038 was

20  initially Franke's account.   And Pat Galbraith -- this is

21  an account that Frankie opened when he bought his house.

22  And Pat was on the account.   So he -- he had someone

23  local pay his bills regarding the house.   When I got out,

24  they added me to this account.

25       Q.    And why were you added to the account?

1        A.    Because after Frankie left, that was my --

2   he -- since he's already on the account, his house

3   bills -- like I'm -- my name is not on the property tax,

4   my name's not on the homeowners' insurance.  It's all in

5   Franke's name.  But I pay the bill.  I don't -- I mean,

6   maybe Bank of America has Franke's e-mail associated with

7   this account and it -- they send him a statement and they

8   send me a statement.

9        Q.    But he doesn't use the account at all?

10       A.    No, he does not.

11             (Exhibit 410 was marked for identification.)

12       Q.    BY MS. BERKE:  I want to talk to you about the

13   Aleshire tapes.  Okay?  How many tapes did you make for

14   Mr. Aleshire?

15       A.    I'm not sure.  But this is not what I read.

16       Q.    Okay.

17             MS. WANG:  Well --

18       Q.    BY MS. BERKE:  You don't remem- --

19       A.    I don't -- this is not the form that I read it

20   in.

21       Q.    Right.  You don't know how many tape recordings

22   you made for him?

23       A.    No, I don't.

24       Q.    And the tapes that -- the transcripts you

25   reviewed on Sunday, those tapes were made specifically

Page 484

1    for Mr. Aleshire.  Correct?

2        A.    When I read the documents that said Peter

3    Aleshire, yes.

4        Q.    Those recordings were not made for any of your

5    attorneys.  Correct?

6        A.    Correct.

7        Q.    And the tapes were intended to answer some

8    questions that Mr. Aleshire had posed to you.  Correct?

9        A.    Correct.

10       Q.    And the reason you made the tapes for

11   Mr. Aleshire is because there were certain limitations on

12   having visitors.  So he couldn't obtain some of that

13   information from you personally.  Correct?

14       A.    Correct.  Journalists were not allowed to do

15   interviews at -- in the prison.

16       Q.    And so who raised the idea of you making

17   tape-recordings to answer his questions?  Was that you or

18   was that him?

19       A.    I --

20             MS. WANG:  Objection.  Foundation.  Form.

21             THE WITNESS:  I don't recall.

22       Q.    BY MS. BERKE:  We'll talk about Exhibit 410

23   shortly, but I'm going to show you another exhibit.

24             (Exhibit 411 was marked for identification.)

25       Q.    BY MS. BERKE:  I'm showing you what's been

Page 485

1    marked as Exhibit 411.  And you recognize that document.

2    Correct?

3        A.    I haven't -- I haven't seen this in a very long

4    time.

5        Q.    But you recognize that as the letter that

6    Mr. Aleshire sent to you dated April 18th of 1998 talking

7    about the article he wanted to put together about your

8    story, talking about some background about himself to

9    give you some level of comfort and providing questions

10   for you to respond to so that he could prepare this

11   article for Phoenix Magazine.  Correct?

12               MS. WANG:  Objection.  Foundation.  Form.

13               THE WITNESS:  Well, that's what this appears

14   to be.

15       Q.    BY MS. BERKE:  And he starts out the letter,

16   "Dear Debbie, I'm hoping that your mom and Andy and Kirk

17   have given you some information about me and the story

18   I'm working on and that you're willing to give me your

19   side of the story."

20               Did I read that correctly?

21       A.    Yes.

22       Q.    And so do you recall that -- and Andy is

23   referring to Anders Rosenquist?

24       A.    Yes.

25       Q.    And so you recall Mr. Aleshire having had some

Page 486

1    conversations with Mr. Rosenquist and Mr. Fowler before

2    he made contact with you?

3            MS. WANG:  Objection.  Foundation.

4            THE WITNESS:  I -- I don't -- I don't recall

5    exactly when it happened, but it -- I mean, this is in my

6    awareness, yes.

7        Q.   BY MS. BERKE:  Okay.  What made you decide to

8    participate in this process of answering questions for an

9    article that Mr. Aleshire was preparing?

10       A.   Well, if you look at the date, it's the year

11   1998.  And I was given a -- in December of 1997, a

12   warrant for execution.  And I received a stay in January

13   of 1998.  And after that time, my mother moved to

14   Phoenix, and she and others discussed about making this

15   story public.  I didn't really like the media.  So, I

16   mean, I went along.

17       Q.   And this document was produced by

18   Ms. Bommersbach in response to the subpoena that was

19   served on her.  You see that in the bottom right, the

20   Bates stamps are Bommersbach?

21       A.   Yes.

22       Q.   Did you give this letter to Ms. Bommersbach?

23       A.   I don't know.

24       Q.   You'll see that the last page is the arti- --

25   or I'm sorry -- the envelope that the letter came in to

Page 487

```
 1    you.  Correct?

 2         A.    Yes.

 3         Q.    And so is this something you had kept and that

 4    you gave to Ms. Bommersbach?

 5         A.    It's possible.  I -- I just don't know.  It's

 6    possible.

 7         Q.    Did you have any concerns about the article

 8    that Mr. Aleshire was going to be writing?

 9              MS. WANG:  Objection.  Form.

10              THE WITNESS:  The only recollection I have

11    today is that I was so disgusted with everything being

12    taken out of context, things being completely made up,

13    and so I was -- I was very concerned about accuracy.

14         Q.    BY MS. BERKE:  And when you made the tapes for

15    Mr. Aleshire, were you very careful to only make accurate

16    and truthful statements to him?

17         A.    When I made the tapes for Mr. Aleshire, um, I

18    was being truthful with him -- with -- to him.

19         Q.    Okay.  Now, take a look at Exhibit 410.  This

20    is a transcript we had made of the Aleshire recordings

21    because we haven't received the transcripts that your

22    attorneys prepared.

23              MS. WANG:  That's not true.

24              MS. BERKE:  Do we have those?

25              MS. WANG:  Yes, you do.
```

Page 488

1             MS. BERKE:  Okay.  I -- I apologize.  I

2     haven't looked at those.  So let me rephrase my question.

3        Q.    BY MS. BERKE:  Exhibit Number 410 is the

4     transcript defendants have made of Mr. Aleshire's -- or

5     recordings you made for Mr. Aleshire.  Can you please

6     read through that -- I'm not going to ask you to read the

7     whole thing, but just read through it and tell me if it

8     sounds like the recording -- or the recordings you made

9     and the transcript you read on Sunday.

10       A.    Okay.  I mean, it looks similar to what I read

11    the other day.

12       Q.    Okay.  So take a look at the very beginning

13    where it says "Hello, Mr. Aleshire."

14             Do you see that?

15       A.    Yes.

16       Q.    And it states, quote, Hello, Mr. Aleshire, this

17    is Debra Milke speaking.  Today is the 21st.

18             Did I read that correctly?

19       A.    Yes.

20       Q.    And it was April 21st.  Correct?  I'm sorry --

21    yeah, April 21st of 1998.  Correct?

22       A.    I'm not sure what the month or year is.

23       Q.    Okay.  So Mr. Aleshire's letter to you is dated

24    April 18th of 1998.  Correct?

25       A.    Correct.

Page 489

1    Q.    I'm going to show you the article he wrote.

2              (Exhibit 412 was marked for identification.)

3    Q.    BY MS. BERKE:  I'm showing you what's been

4    marked as Exhibit 412.  And you see that's Phoenix

5    Magazine.  If you look to the left, it says July 1998.

6    Right?

7    A.    Yes.

8    Q.    And then if you go to the next page, you'll see

9    that that's the article he wrote following your having

10   sent him the tape-recordings.  Correct?

11   A.    Correct.

12   Q.    And so from that, we can surmise, can't we,

13   that when you say today is the 21st, that's the 21st of

14   some month in 1998.  Correct?

15   A.    Um --

16             MS. WANG:  Objection.  Foundation.

17             THE WITNESS:  I mean, I don't -- I don't --

18   I don't want to guess, but I guess -- I mean, probably.

19   I don't know.

20   Q.    BY MS. BERKE:  Well, could it have been any

21   other year?

22   A.    I don't -- I mean, no, I only gave him one --

23   this is all I know that he wrote.

24   Q.    Exhibit 412?

25   A.    Yes.

Page 490

1      Q.    And you know his article's written in the same

2   year that you sent him the recordings.  Correct?

3      A.    It would make sense that it -- that it -- that

4   it was, yes.

5      Q.    So you would agree, then, that this recording

6   was made on or after April 18th of 1998 and before

7   whatever date in July of 1998 this Phoenix Magazine

8   article was published.  Correct?

9      A.    It's possible, yes.

10     Q.    Is it possible or is it certain?

11     A.    I can't -- I can't be certain because you're

12   asking me to remember something from 1998.

13     Q.    No.  I'm asking you to read your words and to

14   look at the document that led you to make the recordings,

15   which is -- if you look at the --

16     A.    Yes.

17     Q.    -- postmark on the last page of Exhibit 411.

18     A.    Yes.

19     Q.    It's April of 1998.  Correct?

20     A.    Yes.

21     Q.    Okay.  And so you would agree that your

22   recordings had to have been made on or after April 18th

23   of 1998 and before this Phoenix Magazine article is

24   published in July of 1998?

25     A.    Sure.

1      Q.    I mean, that's a certainty.  Correct?

2      A.    Well, the day is the 21st, maybe that was

3   April 21st.

4      Q.    Well, I'm not asking about the month.  We'll

5   get back to the month momentarily.  But I'm saying that

6   this recording was made in -- on the 21st of a month in

7   1998.  Correct?

8      A.    Correct.

9      Q.    And so it would have had to have been either

10   April, May, June or July of 1998.  Correct?

11      A.    Yes.

12      Q.    Okay.  And you tell him you received his letter

13   last night in the mail.  Correct?

14      A.    Yes.

15      Q.    And you say to him that you were surprised

16   that -- that correspondence by mail is basically your

17   only option in which to conduct an interview, that you

18   don't understand DOC's policy about personal interviews,

19   but that's the way it is around there.  Correct?

20      A.    Yes.

21      Q.    And you tell him, "I hope you don't mind

22   receiving an audio tape.  I thought it would be a little

23   bit easier to do this way than writing."

24             Correct?

25      A.    Correct.

Page 492

1        Q.    And so then it was your decision to answer his
2    questions by way of audio tape.  Correct?
3        A.    According to this, yes.
4        Q.    And then go to page 49 of the transcript of
5    Exhibit 410.
6        A.    Yes.
7        Q.    And you see at the beginning, you say, "This is
8    tape number 2 and today is April 23rd."  Correct?
9        A.    Yes.
10       Q.    And so you made these tapes for him over the
11   course of days.  Correct?
12       A.    It sounds that way, yes.
13       Q.    And in between making -- well, strike that.
14             And it looks like you had a conversation
15   with him on April 22nd.  You say, "I'm glad we were able
16   to talk yesterday on the phone."
17             Correct?
18       A.    Yes.
19       Q.    And so here you say April.  Correct?
20       A.    Yes.
21       Q.    So now, is it safe to say that when you say
22   "today is the 21st" on page 3, you're saying it's
23   April 21st, 1998?
24       A.    Yes.
25       Q.    And then you state on page 49, quote, Before I

Page 493

1    get into anything, let me tell you -- let me tell you why

2    I'm sending these tapes by way of legal mail.  It's

3    because our outgoing mail is scanned.  They open it up,

4    and they say that they just scan it for contraband, but I

5    don't believe that.

6                   I personally believe that when they open up

7    my mail, they read it, and I also believe that if they

8    saw a tape being sent out, that they would open it up and

9    listen to it.  I just -- I don't trust these -- some of

10   these officers.  So this is why I decided to send it by

11   way of legal mail because they can't open up our legal

12   mail.  So I didn't really want to say all that while the

13   counselor was sitting there, but -- so to let you know,

14   this is why I'm sending it through Kirk, end quote.

15                   Did I read that correctly?

16        A.    Yes.

17        Q.    And so you knew that it was a violation of

18   prison policy to send these tapes to Mr. Aleshire through

19   your attorneys.  Correct?

20        A.    Well, yes.  Yes.

21        Q.    And when you sent the tapes -- when you say you

22   sent it through Kirk, did you send -- did you mail the

23   tapes to Kirk?

24        A.    I -- yes, I mailed them.  I sent them to Kirk.

25        Q.    Okay.  And so you didn't send them to Kirk

1   because you were seeking legal advice in any way; you

2   sent them to him so that he could pass them on to

3   Mr. Aleshire.  Correct?

4        A.    Correct.

5        Q.    Did you receive a draft of Mr. Aleshire's

6   article before it was published?

7        A.    I don't know.

8        Q.    Do you remember having any input in the

9   article?

10       A.    I don't -- no, I don't -- I don't -- I don't

11  believe I did.

12             (Exhibit 413 was marked for identification.)

13       Q.    BY MS. BERKE:  Okay.  I'm showing you what's

14  been marked as Exhibit 413.  And this is a letter from

15  you to your mother.  Correct?

16       A.    Yes, correct.

17       Q.    And it's dated April 30th.  Correct?

18       A.    Yes.

19       Q.    And you'll see that in the third paragraph, you

20  state, quote, The denial of the personal interview with

21  Peter Aleshire didn't surprise me.  We ended up talking

22  on the phone for a while, and it was okay.  He sounded

23  very nice.  It wasn't that easy to say what I really

24  wanted to say because the counselor sat there the whole

25  time.  I just hate having no privacy.

Page 495

1              After our call, I spent a whole day making

2       three audio tapes, and I wrote a seven-page letter

3       finishing up, end quote.

4              Did I read that correctly?

5       A.    Yes.

6       Q.    And so we know that this April 30 is also 1998.

7       Correct?

8       A.    It's possible, yes.  It -- it looks -- it seems

9       like that's --

10      Q.    And on the second page of the letter, about a

11      third of the way down, you state, quote, I told him to

12      contact Anders for some further information that will

13      help, but who knows if he will, end quote.

14             Did I read that correctly?

15      A.    Yes, you did.

16      Q.    And then on the next page, which is

17      MILKENSB026546, you're asking your mom to call Peter and

18      ask him if you did okay.  Correct?

19      A.    Where is it at?

20      Q.    At the top of --

21      A.    Yes, I see it.

22      Q.    Okay.  And you state, quote, Also, if he needs

23      more info to humanize me, go ahead and share it with

24      him -- go ahead and share with him some of what I've

25      shared with you, end quote.

Page 496

1              Did I read that correctly?

2      A.    Yes.

3      Q.    And so clearly this is being written before the

4   article is published.  Correct?

5      A.    Yes.

6      Q.    And so we know, then, that this letter was sent

7   by you to your mom on April 30th, 1998.  Correct?

8      A.    Yes.

9              MS. WANG:  Do you need to take a break, just

10  a few minutes?

11             THE WITNESS:  No.  Just keep --

12     Q.    BY MS. BERKE:  If you go to the page that's

13  Bates-numbered MILKENSB026548 and look in the middle of

14  the page, you make the statement to your mother, quote, I

15  may have wanted to move out when you and Alex were

16  visiting in September, but I couldn't afford to at that

17  time, end quote.

18             Did I read that correctly?

19     A.    Yes.

20     Q.    And you're referring to September of 1989.

21  Correct?

22     A.    Yes.

23     Q.    And what changed between September of 1989 and

24  November of 1989 that made you able to move out of

25  Mr. Styers' apartment?

1    A.    I started a new job in August.  So in

2  September, I couldn't do anything, but -- but by

3  November, I could.

4    Q.    So had you saved a bunch of money between

5  August and November?

6    A.    I'm not sure.  I'm not sure.  I just remember

7  putting down a deposit on an apartment.

8    Q.    Okay.  But it's your testimony that in -- in

9  September of 1989, you couldn't financially afford to

10  move out of Mr. Styers' apartment but by November of

11  1989, you had the financial ability to do that?

12    A.    Yeah.  I just started a new job in August.  And

13  back in those days, it -- it was a lot different than it

14  is today.

15    Q.    Well, if you started the new job in August, you

16  were earning an income from that job.  Correct?

17    A.    It -- I started on -- I think it was the very

18  end of August.

19    Q.    Okay.  And so you were earning your income in

20  September.  Correct?

21    A.    Yes.

22    Q.    And that's the same income you were earning in

23  October.  Correct?

24    A.    Yes.

25    Q.    And the same income you were earning in

Page 498

1    November.  Correct?

2         A.    Yes.

3         Q.    And so if you hadn't saved up money between

4    September and November, there would have been no

5    difference financially for you between September and

6    November.  Correct?

7         A.    I'm not sure.  It's -- it's possible my mom

8    gave me money.  I don't remember.

9         Q.    But certainly if you were to receive a cash

10   infusion of $5,000, that would have enabled you to move

11   out of Mr. Styers' apartment and into an apartment of

12   your own.  Correct?

13        A.    What are you saying?

14        Q.    If you had received some money --

15        A.    $5,000?

16        Q.    Correct.  That would have enabled you

17   financially to be able to move out of Mr. Styers'

18   apartment and into your own apartment.  Correct?  It's

19   just a yes-or-no question.

20        A.    Obviously, if -- if I had rent money, enough to

21   pay for rent -- I don't even remember what the rent was

22   back then.

23        Q.    But certainly having $5,000 or $4,000 in your

24   checking account would have enabled you to be able to

25   afford to pay rent in a new apartment.  Correct?

Page 499

```
 1          A.    Yes.

 2          Q.    And then if you go to MILKENSB026549, at the

 3    bottom, you say, quote, I can't believe May is here

 4    already.  The time is going by so fast, end quote.

 5                Did I read that correctly?

 6          A.    Yes.

 7          Q.    And so you're telling your mom that time is

 8    just flying by.  Correct?

 9          A.    That's what it says here.

10          Q.    Going back to the first page of Exhibit 413,

11    you state that you wrote a seven-page letter to

12    Mr. Aleshire after you made the three audio tapes.

13    Correct?

14          A.    Correct.

15          Q.    Do you have that letter?

16          A.    If I wrote a seven-page letter and mailed it to

17    Aleshire, I wouldn't have it.

18                THE WITNESS:  And I want to take a break

19    now.

20                MS. BERKE:  Okay.

21                THE VIDEOGRAPHER:  We're going off the

22    record.  The time is 11:49 a.m.

23                (A recess was held off the record.)

24                THE VIDEOGRAPHER:  We're back on the record.

25    The time is 12 o'clock p.m.
```

Page 500

1      Q.    BY MS. BERKE:  Ms. Milke, how many pregnancies

2    have you had?

3      A.    Three.

4      Q.    How many abortions have you had?

5      A.    Two.

6      Q.    And in what years did you have those abortions?

7      A.    1988 and 1989.

8      Q.    What year was Christopher born?

9      A.    1985.

10     Q.    So both abortions were after Christopher was

11   born?

12     A.    Yes.

13     Q.    And the first abortion you had, who impregnated

14   you?

15     A.    That was Mark.

16     Q.    And was that impregnation following the rape

17   you claim occurred?

18     A.    Yes.

19     Q.    And then who impregnated when you had the

20   second abortion?

21     A.    Ernie.

22     Q.    Ernie Sweat?

23     A.    Yes.

24     Q.    Go back to Exhibit Number 410.  And, again, you

25   were truthful in the answers you gave to Mr. Aleshire.

1    Correct?  Or the information you provided to

2    Mr. Aleshire?

3         A.    Yeah, yes.  I was being truthful with him.

4         Q.    Okay.  Go to page 91 of the transcript.  And

5    just read to yourself that first paragraph that starts

6    "And the next thing."  You see that you're talking about

7    when you were transported back to Phoenix by Detective

8    Saldate after you had been arrested.  Correct?

9         A.    Yes.

10        Q.    Okay.  And so in the paragraph -- the next

11   paragraph that starts out "And so," do you see where I am

12   on page 91 of --

13        A.    Yes.

14        Q.    -- Exhibit Number 410?

15        A.    Yes.

16        Q.    And you're talking about when you got into a

17   building after you had been transported to Phoenix and

18   getting in an elevator and you got -- you went up in the

19   elevator to an open area.  Correct?

20        A.    Yes.

21        Q.    And you say, quote, And I had asked him can I

22   use the phone.

23              Do you see that?

24        A.    Yes.

25        Q.    And so you're talking about after you were

Page 502

1    transported back to Phoenix, you asked Detective Saldate

2    if you could use the phone in the building you were now

3    in.  Correct?

4         A.    I believe so.

5         Q.    Okay.  And then the next sentence reads, quote,

6    And plus, I asked him down in Florence if I could use the

7    phone and call my dad about a lawyer, but he didn't let

8    me, end quote.

9              Did I read that correctly?

10        A.    Yes.

11        Q.    And what you're referring to is a question you

12   asked Detective Saldate while you were being interviewed

13   by him in that medical room in Florence.  Correct?

14              MS. WANG:  Objection.  Form.  Foundation.

15              THE WITNESS:  When I -- all I -- all I

16   can -- well, when I was re- --

17              First of all, when I was giving this

18   interview, I wasn't giving a blow by blow how things

19   happened in order.  It wasn't like that.  I was just

20   talking from recollection and -- and off the top of my

21   head.

22        Q.    BY MS. BERKE:  Right.  And you remembered as

23   you were telling him that once you got back to Phoenix,

24   you asked if you could use the phone, you then remembered

25   that question you had asked him when you were in the

Page 503

1    medical room being interviewed by him, that you had asked

2    him if you could use the phone and call your dad about a

3    lawyer.  Correct?

4              MS. WANG:  Objection.  Form.  Foundation.

5              THE WITNESS:  At this time, I re- -- I

6    recall asking to use the phone in Florence and asking to

7    use the phone in Phoenix.

8         Q.    BY MS. BERKE:  And when you're telling

9    Mr. Aleshire that you asked Detective Saldate down in

10   Florence if you could use the phone and call your dad

11   about a lawyer, that was in the medical room where

12   Detective Saldate was interviewing you.  Correct?

13             MS. WANG:  Objection.  Foundation.  Asked

14   and answered.

15             THE WITNESS:  I'm -- I'm not sure.  I mean,

16   this could have been at the police station.  I'm not

17   sure.

18        Q.    BY MS. BERKE:  At what police station?

19        A.    In Phoenix.

20        Q.    You're -- no, you're saying it happened down in

21   Florence.

22             Do you see that?

23        A.    That's what it says here.

24        Q.    Right.  And so what you're telling Mr. Aleshire

25   is that in addition to asking to use the phone in

1    Phoenix, you had asked Detective Saldate if you could use

2    the phone and call your dad about a lawyer when you were

3    in Florence.  Correct?

4                MS. WANG:  Objection.  Foundation.

5                THE WITNESS:  Well, according -- well,

6    according to this, it sounds like I asked to use the

7    phone and call my dad about a lawyer in Florence.  That's

8    what it says here.

9       Q.    BY MS. BERKE:  Right.  That's what you're

10   telling Mr. Aleshire.  Correct?

11      A.    That was my recollection at that time.

12      Q.    Okay.  And that question would have been asked

13   when you were in the medical room being interviewed by

14   Detective Saldate.  Correct?

15               MS. WANG:  Objection.  Foundation.  Form.

16   Asked and answered.

17               THE WITNESS:  What, can I use the phone?

18      Q.    BY MS. BERKE:  Yes.  When you claim to

19   Mr. Aleshire that when you were in Florence asking if you

20   could use the phone and call your dad about a lawyer,

21   you're referring to a question that you asked Detective

22   Saldate when you were in the medical room being

23   interviewed by him.  Correct?

24               MS. WANG:  Objection.  Form.  Foundation.

25   Asked and answered.

1                    THE WITNESS:  I recall asking to use the

2     phone.  It -- it was in Florence.  It was in Phoenix.  At

3     the time I was recalling this, I don't know.  I mean, I

4     don't know.  This was my recollection in 1998.

5          Q.    BY MS. BERKE:  Right.  And your recollection in

6     1998 was that while you were in the medical room being

7     interviewed by Detective Saldate, you had asked him if

8     you could use the phone and call your dad about a lawyer.

9     Correct?

10                    MS. WANG:  Objection.  Foundation.

11                    THE WITNESS:  That's what this sentence

12     says.

13          Q.    BY MS. BERKE:  Okay.  And that's consistent

14     with what you've told several of your lawyers in this

15     case.  Correct?

16                    MS. WANG:  Objection.  Foundation.

17                    THE WITNESS:  I just recall asking to use

18     the phone.  It was Florence, Phoenix.

19                    (Exhibit 414 was marked for identification.)

20          Q.    BY MS. BERKE:  I'm showing you what's been

21     marked as Exhibit Number 414.  You recognize this

22     document.  Correct?

23          A.    I recognize my handwriting.

24          Q.    Is this one of the documents you reviewed in

25     preparation for your deposition?

Page 506

1       A.    No.

2       Q.    This is a letter to -- from you to your

3    attorney Lori Voepel who represented you in the habeas

4    proceedings.  Correct?

5       A.    Yes.

6       Q.    And it's a letter dated January 21st of 2002.

7    Correct?

8       A.    Yes.

9       Q.    And if you go to the second page of Exhibit

10   414, do you see the sentence that starts out "I already

11   told you"?

12      A.    Yes.

13      Q.    And I'm going to read it out loud, and I'd like

14   you to tell me if I've read it accurately.

15            Quote, I already told you that while he was

16   reading the Miranda warnings, I was crying hysterically

17   and devastated by what he had informed me of.  It was a

18   double shock to be told about my murdered son and to be

19   accused of being a participant in his murder, end quote.

20            Did I read that correctly?

21      A.    Yes.

22      Q.    And so you clearly understood at the time he

23   told you you were under arrest that you were being

24   accused of participating in your son's murder.  Correct?

25            MS. WANG:  Objection.  Foundation.  Form.

Page 507

1          Q.    BY MS. BERKE:  Correct?

2          A.    Well, wait a minute.  "It was a double shock to

3    be told about my murdered son and to be accused of being

4    a participant in his murder."  Because he was accusing me

5    of -- of being a participant, yes.

6          Q.    Right.  So you clearly knew at the time you

7    were being interviewed by Detective Saldate that you were

8    being accused of being involved in your son's murder.

9    Correct?

10         A.    He was accusing me, yes.

11         Q.    And then if you look at the next sentence,

12   quote, After he finished reading the Miranda warnings,

13   quote, do you understand these rights, question mark, end

14   quote?  Crying and staring at the phone, I said yes.

15               That's what you told Ms. Voepel, your

16   attorney.  Correct?

17         A.    That's what it says here.

18         Q.    And you were being truthful with your attorney.

19   Correct?

20         A.    (No oral response.)

21         Q.    Yes, you were being truthful.  Right?

22               MS. WANG:  Just -- she's going to answer the

23   question.  So --

24               THE WITNESS:  (Witness reading.)

25         Q.    BY MS. BERKE:  Ms. Milke, you were being

Page 508

1    truthful with your attorney.  Correct?

2       A.    I remember when he asked me about my rights, I

3    told him I'd never been in trouble before, never been

4    arrested before.

5       Q.    And you also told him that you understood your

6    rights.  Correct?

7       A.    Maybe he read them again.  I don't know.

8       Q.    Okay.  But you were being truthful with

9    Ms. Voepel when you stated to her that after he finished

10   reading the Miranda warnings to you and asked you if you

11   understood the rights, you said yes.  Whether it was

12   after the first time he read them or the second time he

13   read them, you told her that you told Detective Saldate

14   that you did understand your Miranda rights.  Correct?

15      A.    According to this, I wrote -- I said yes.

16      Q.    And you were being truthful with Ms. Voepel.

17   Correct?

18      A.    Yes.

19      Q.    And next, you state in your letter that's

20   Exhibit Number 414, quote, Do you want this interview

21   taped, end quote?

22            And so you're quoting a question that

23   Detective Saldate asked of you.  Correct?

24      A.    Correct.

25      Q.    And then in quotes, you put -- you write to

Page 509

1    Ms. Voepel, "No, I want to use that phone."  And then in

2    parentheses, you say, "I pointed to it, and call my dad

3    about a lawyer."

4              You are quoting yourself verbatim.  Correct?

5    A.    Correct.

6    Q.    And then you say, "But he wouldn't let me use

7    the phone."

8              Correct?

9    A.    Yes.

10   Q.    And I read all of that exactly the way you

11   wrote it to Ms. Voepel, didn't I?

12   A.    Yes.

13   Q.    And so not only did you tell that to

14   Mr. Aleshire, but you also told that to your attorney

15   Ms. Voepel, correct, that you asked Detective Saldate --

16   or you asked Detective Saldate if you could use the phone

17   to call your dad about a lawyer.  Correct?

18   A.    I told my attorney that?

19   Q.    That that's what you told Detective Saldate in

20   the interview room in Florence in the medical room where

21   you were being interviewed.

22   A.    It's -- yes, there was -- I -- there was a

23   phone, and I -- I wanted to call my dad.  But I don't

24   know if that was in Florence or in Phoenix.  I don't

25   know.

Page 510

1      Q.    Okay.  But at least -- I understand, as you sit

2    here today, you're saying that.  But what you're telling

3    Ms. Voepel on January 21st of 2002 is that at the

4    beginning of the interview, Detective Saldate asked if

5    you wanted the interview taped.  And your response to him

6    was, quote, No, I want to use that phone and call my dad

7    about a lawyer.

8              Those were the exact words that you're

9    telling Ms. Voepel you used when responding to that

10   question from Detective Saldate.  Correct?

11     A.    Correct.

12     Q.    And you knew it was important to be truthful

13   with your lawyer.  Correct?

14     A.    Yes.

15     Q.    And if you go to the page Bates-numbered

16   LNL020077.

17     A.    Yes.

18     Q.    The first full paragraph, you state to

19   Ms. Voepel, quote, I was highly emotional and

20   instinctively needed and wanted to call my dad, but he

21   wouldn't let me use the phone and that's when the

22   accusations began, end quote.

23              Did I read that correctly?

24     A.    Yes.

25              (Exhibit 415 was marked for identification.)

Page 511

1    Q.    BY MS. BERKE:  I'm showing you what's been
2    marked as Exhibit Number 415.  And this is another letter
3    from you to Lori Voepel.
4              Let's pause for a second.  Your attorney
5    hasn't gotten a copy.  Is there another copy there?
6              MS. BURGESS:  There's a whole bunch of
7    copies here.
8              MS. BERKE:  Sorry about that.
9    Q.    BY MS. BERKE:  Okay.  So take a look at Exhibit
10   415.  It's a letter from you to Lori Voepel dated
11   January 27th of 2002, so just six days after the last
12   letter we were discussing.  Correct?
13   A.    Yes.
14   Q.    And if you look at the second page, at the top,
15   it states, quote, In my last letter, I explained to you
16   that I instinctively needed and wanted to call my dad
17   after Saldate read the Miranda warnings to me.
18             Did I read that correctly?
19   A.    Yes.
20   Q.    And then you state, quote, I did the exact same
21   thing after I learned that Chris was missing.  When Jim
22   told me Chris was missing, I called the police after we
23   hung up and then I called my dad.  I was hysterical and
24   he even testified to that, end quote.
25             Did I read that correctly?

Page 512

```
 1        A.    Yes.

 2        Q.    And so you're saying right when Jim -- right

 3   after Jim Styers told you Chris was missing, you hung up

 4   with him and immediately called the police and then you

 5   called your dad.  Correct?

 6        A.    It's possible.  I mean, that's what that says

 7   here, but I -- I can't remember if I called my father

 8   first or the police.

 9        Q.    Okay.

10        A.    I don't -- I'm not sure.

11        Q.    Okay.  But at least what you're telling

12   Ms. Voepel, your attorney, is that you called the police

13   right after you hung up with Jim and then you called your

14   dad.  Correct?

15        A.    According to this letter.

16        Q.    And --

17        A.    It's also possible that in 2002, when I was

18   writing this, I could have misremembered the order --

19        Q.    Okay.

20        A.    -- here.  I don't know.

21        Q.    And then in the next paragraph, you state to

22   Ms. Voepel, quote, When I was in that room with Saldate,

23   I wanted to call my dad, but Saldate wouldn't let me use

24   the phone, end quote.

25              Did I read that correctly?
```

Page 513

1          A.    Yes.

2          Q.    And so, again, you're referring to the medical

3    room where you were being interviewed by Detective

4    Saldate.  Correct?

5          A.    Yes.

6          Q.    And then if you go further down in -- just a

7    little bit further down, actually the next sentence, you

8    state, quote, Also, Saldate acknowledges that I did ask

9    about a lawyer, but he says I asked at the end of our

10   time in that room, which is absolutely not true.  I asked

11   in the beginning when I wanted to use the phone.

12               Did I read that correctly?

13         A.    Yes.

14         Q.    You're again referring to wanting to use the

15   phone to call your dad about a lawyer.  Correct?

16               MS. WANG:  Objection.  Form.  Asked and

17   answered.

18               THE WITNESS:  Again in what, this letter?

19         Q.    BY MS. BERKE:  Yes.

20         A.    January 27th?  Is that what -- January 27th,

21   2002?

22         Q.    Yes.

23         A.    Yes.

24               (Exhibit 416 was marked for identification.)

25         Q.    BY MS. BERKE:  Okay.  I'm showing you what's

Page 514

1    been marked as Exhibit Number 416.  And this is another

2    letter from you to Lori Voepel, and this one's dated

3    October 20th of 2002.  Correct?

4        A.   Yes.

5        Q.   And if you go to the page Bates-marked

6    LNL020124 and go to the last paragraph on that page --

7        A.   Yes.

8        Q.   -- it states, quote, I was an emotional,

9    hysterical wreck, and in that precise moment, I

10   instinctively reacted to wanting to call my dad.  I saw

11   that phone, and when he mentioned the interview being

12   taped, I said, in that emotional and hysterical state,

13   no, I want to use that phone and call my dad.

14             Correct?

15       A.   Correct.

16             (Exhibit 417 was marked for identification.)

17       Q.   BY MS. BERKE:  I'm showing you what's been

18   marked as Exhibit Number 417.

19       A.   Yes.

20       Q.   This is a letter from Ken Ray -- I'm sorry,

21   from you to Ken Ray.  Correct?

22       A.   No.  It's to Pat.

23       Q.   Did I give you the wrong thing?  I'm sorry.

24             (A discussion was held off the record.)

25       Q.   BY MS. BERKE:  Okay.  I fixed the issue, and

Page 515

1      now I've placed before you Exhibit Number 417, and it is

2      a letter from you to Ken Ray.  Correct?

3          A.    Yes.

4          Q.    And it's dated March 28th of 1990.  Correct?

5          A.    Yes.

6          Q.    And if you go to the third page of that letter,

7      in the middle, you state, quote, Could you please find my

8      purse?  If I get out soon, I have no ID, everything is in

9      my purse, end quote.

10              Did I read that correctly?

11         A.    Yes.

12         Q.    So you were asking Ken Ray to get your purse

13     for you, to find your purse and to get it for you.

14     Correct?

15         A.    Correct.

16         Q.    And when you say that everything was in your

17     purse, one of the things you were referring to was the

18     bullets.  Correct?

19              MS. WANG:  Objection.  Foundation.

20              THE WITNESS:  No.

21              MS. BERKE:  Okay.  We're going to take a

22     break for lunch now and we'll reconvene.  How long do you

23     guys want to take?

24              THE WITNESS:  Well, how much time?

25              MS. WANG:  Yeah, how much time?

Page 516

```
 1                    THE WITNESS:  How much time do we have left

 2      to do this?

 3                    MS. WANG:  We can go off the record first.

 4                    MS. BERKE:  Yeah, we can go off the record.

 5                    THE VIDEOGRAPHER:  We're going off the

 6      record.  The time is 12:26 p.m.

 7                    (A recess was held off the record.)

 8                    THE VIDEOGRAPHER:  We're back on the record.

 9      The time is 1:23 p.m.

10          Q.    BY MS. BERKE:  Ms. Milke, during the lunch

11      break, did you review any documents?

12          A.    No.

13          Q.    I'm going to show you what was marked as

14      Exhibit 5 to Detective Saldate's deposition.  I brought

15      extra copies so people don't have to pull it up.  This is

16      the supplement he prepared -- a supplement's a report --

17      summarizing his interview of you.  You've probably read

18      this multiple times.  Correct?

19          A.    Yes.

20          Q.    And if you look at the -- the paragraph on the

21      first page that starts out "At approximately."

22                    Do you see that?

23          A.    Yes.

24          Q.    And if you go down seven lines, the line that

25      begins with "Asked."  Do you see where I am?
```

Page 517

```
 1        A.    Yes.

 2        Q.    Okay.  Midway through that line, it says,

 3   quote, I told her that she had been implicated in the

 4   murder by Jim and Roger, end quote.

 5              Is that a true statement?  Did Detective

 6   Saldate tell you that?

 7        A.    No, he didn't.

 8        Q.    And you're certain of that?

 9        A.    No.

10        Q.    He did -- he did not tell you that?

11        A.    I -- that I had been implicated?

12        Q.    By Jim and Roger.

13        A.    No, I don't think he said that.  I later

14   learned somewhere else that Roger implicated me, but I

15   don't think it was this night.

16        Q.    Right.  So -- and that was your testimony in

17   the first deposition, when I -- when we deposed you back

18   in August of 2018.  I -- I asked you that same question,

19   and you said, "No, Detective Saldate did not tell me

20   during the interview that Jim and Roger implicated me."

21        A.    Right.  So I must -- then I -- the implication

22   I heard later.

23        Q.    Okay.  And so this is one of the statements --

24   or this is one of the items in his report that you

25   contend is fabricated.  Correct?
```

Page 518

1          A.    Yes.

2                (Exhibit 418 was marked for identification.)

3          Q.    BY MS. BERKE:  I'm showing you what's been

4    marked as Exhibit Number 418.  This is your handwriting.

5    Correct?

6          A.    Yes.

7          Q.    And this is a document that was produced to us.

8    I don't believe we have a -- you'll see it says 39 in --

9    in the top left.  I don't believe we have a 1 through 38

10   if this is the 39th page.  You'll see it says "continued"

11   at the top.  So it looks like there are previous pages.

12   Correct?

13         A.    Correct.

14         Q.    Do you -- what is this document?

15         A.    I'm -- I really don't know.  I don't know.

16         Q.    You don't know why you prepared that document?

17         A.    I -- I -- I don't know.

18         Q.    If it was part of a memo for the retrial, your

19   retrial -- strike that.

20                Do you know if you shared this document with

21   anybody?

22         A.    I don't know.

23         Q.    Do you know whether it's an attorney/client

24   privileged communication?

25         A.    I don't know.  I mean, I don't even know why

Page 519

1      there's black stuff here.

2          Q.    Okay.  So you --

3          A.    I don't know.

4          Q.    And you may have shared it with Frankie Aue,

5      for instance.  Correct?

6                    MS. WANG:  Objection.  Foundation.

7                    THE WITNESS:  I -- I don't know.

8          Q.    BY MS. BERKE:  And you may have shared it with

9      your mom.  Correct?

10                    MS. WANG:  Objection.  Foundation.

11                    THE WITNESS:  I don't know.

12         Q.    BY MS. BERKE:  But, as you sit here today, you

13     can't testify that this is a document you prepared for

14     any of your attorneys.  Correct?

15                    MS. WANG:  This copy?  This black-and-white

16     copy?

17                    THE WITNESS:  I don't -- I don't -- I mean,

18     this is my handwriting, but I don't know what I wrote

19     this for.

20         Q.    BY MS. BERKE:  Okay.  And so as you sit here

21     today, you can't say it's an attorney/client

22     communication.  Correct?

23                    MS. WANG:  Objection.  Foundation.

24                    THE WITNESS:  I don't know because I don't

25     know -- I don't know what this -- I don't know what this

Page 520

1    was written for and to whom.

2         Q.    BY MS. BERKE:  Okay.  And you don't know who's

3    seen it between the time it was written and today.

4         A.    Yes.

5         Q.    Correct?

6         A.    Correct, yes.

7         Q.    Okay.  So take a look at the page that's

8    Bates-stamped 62378.

9              Do you see that?

10        A.    Yes.

11        Q.    Go to the very bottom and the very last

12   sentence that's a partial sentence.  You say, "I told him

13   I'd never hurt anyone, including my son.  He was yelling

14   at me and calling me a liar."

15              Do you see that?

16        A.    Yes.

17        Q.    So you're clearly talking about what occurred

18   during your interview with Detective Saldate.  Correct?

19        A.    Yes.

20        Q.    Okay.  Read the next sentence out loud.

21        A.    "He said I was implicated by Roger and Jim."

22        Q.    Okay.  So whoever you're writing this to, you

23   told them that Detective Saldate told you that you had

24   been implicated by Roger and Jim.  Correct?

25        A.    Correct.

Page 521

1          Q.    And so your testimony that he never said that

2    and that was fabricated is untrue.  Correct?

3          A.    I'm -- I'm not sure.  When I wrote this -- I'm

4    not sure.  But when I wrote this -- I don't know when I

5    wrote it, but it -- it could have been my recollection at

6    that time.  I'm not sure.

7                    (Exhibit 419 was marked for identification.)

8          Q.    BY MS. BERKE:  Well, you would agree that the

9    statement "Armando Saldate did not tell me that Roger and

10   Jim implicated me" would be an untrue statement.

11   Correct?

12         A.    At -- at my trial?

13         Q.    If you were to say that, that would be an

14   untrue statement.  Correct?

15                    MS. WANG:  Objection.  Form.

16                    THE WITNESS:  Well, I don't know when I

17   learned about the implication part.  It could have been

18   at -- in the interrogation or it could have been some

19   time later.

20         Q.    BY MS. BERKE:  Well, no, but what this is

21   saying is that Detective Saldate told you that they had

22   implicated you.  It's not about when you learned that

23   they had implicated you.  You're saying here that

24   Detective Saldate told you during his interview of you on

25   December 3rd of 1989 that Jim and Roger had implicated

Page 522

1    you.  Correct?

2        A.    That's what it appears in this document, yes.

3        Q.    That's what you stated in your own handwriting.

4    Correct?

5        A.    That's what I -- that's what I wrote in this,

6    yes.

7        Q.    Okay.  So your testimony a moment ago that

8    Detective Saldate fabricated that is mistaken.  Correct?

9        A.    What I just -- when you pointed out to his

10   police report?

11       Q.    Yes.  He didn't fabricate that, did he?

12             MS. WANG:  What question are you ask- --

13   Objection.  Form.

14       Q.    BY MS. BERKE:  When he wrote in his report

15   that's Exhibit 5, quote, I told her that she had been

16   implicated in the murder by Jim and Roger, end quote, he

17   didn't fabricate that, did he?

18             MS. WANG:  Objection.  Form.

19             THE WITNESS:  Well, I -- I don't -- I

20   don't -- I don't know that today.

21       Q.    BY MS. BERKE:  Take a look at the page of

22   Exhibit 418 Bates-numbered LNL062375.

23       A.    Yes.

24       Q.    You state, if you go down two-thirds of the

25   way -- do you see the line that starts "From overseas"?

Page 523

1          A.    Yes.

2          Q.    So you say, "My mom" -- read a little above

3    that and confirm that you're talking about being at your

4    home, being at -- at the apartment when police were at

5    Metrocenter looking for Christopher, you're waiting by

6    the phone.  This is the period of time we're talk- --

7    you're talking about here.  Correct?

8          A.    Yes.

9          Q.    And you say, "My mom called from overseas, and

10   I remember talking to her.  I remember talking to Ilse

11   too."

12                Correct?

13         A.    Correct.

14         Q.    And so do you have a recollection of speaking

15   with Ilse about the fact that Christopher was missing?

16         A.    I -- I have -- I think I was asked at my

17   deposition about Ilse, and I don't remember what I said.

18   I -- I could have had a conversation with her.  I don't

19   remember.

20         Q.    Go to page Bates-numbered LNL062377, about

21   two-thirds of the way down --

22         A.    Yes.

23         Q.    -- the line that starts out "At the jail."

24                Do you see that?

25         A.    Yes.

Page 524

1      Q.    And if you go to the end of that line, a

2    sentence starts "There was."

3                Do you see that?

4      A.    Yes.

5      Q.    It states, quote, There was a phone in the

6    room.

7                And we're talking about the medical room.

8    Right?

9      A.    Yes.

10     Q.    "There was a phone in the room and I remember

11   trying to call Carmen and/or Ernie, but neither one was

12   home."

13               Did I read that correctly?

14     A.    Yes.

15     Q.    And so while you were waiting for Detective

16   Saldate to arrive, you called Carmen using the phone that

17   was in there?

18     A.    I don't recall.  I mean, as I sit here today, I

19   don't have a memory of that, but...

20     Q.    Do you have a memory of calling Ernie Sweat?

21     A.    No.

22     Q.    But that's the Ernie you would be referring to.

23   Correct?

24     A.    Yes.

25     Q.    How -- how good of a memory do you have today,

Page 525

1    as you sit here, as to what occurred in the medical room

2    when you were being interviewed by Detective Saldate?

3         A.    Um, I mean, I remember, um, parts of that time

4    in that room with him.

5         Q.    Okay.  And have you forgotten other parts?

6         A.    I don't -- I don't know, you know, blow by blow

7    in what order everything happened.

8         Q.    Do you remember some things and not others from

9    your time with Detective Saldate in that medical room?

10        A.    I just remember --

11        Q.    I'm not asking what you remember.  I'm just

12   saying, are there parts of your conversation with him

13   that you don't have a clear recollection of?

14              MS. WANG:  Objection.  Form.

15              THE WITNESS:  I know one thing for certain:

16   I did not confess to him.

17        Q.    BY MS. BERKE:  Okay.  That's not my question.

18              MS. BERKE:  And I move to strike your

19   answer.

20        Q.    BY MS. BERKE:  My question is --

21              MS. WANG:  Move to strike her answer.

22        Q.    BY MS. BERKE:  -- do you have a vivid memory of

23   everything that was stated while you were in that room?

24        A.    Today?

25        Q.    Yes.

Page 526

```
 1        A.    No, I don't.

 2        Q.    If you go to the Bates stamp page LNL62379,

 3   one-third of the way down, the line that starts with

 4   "Also confused."

 5              Do you see that?

 6        A.    It starts with that sentence?

 7        Q.    The line starts with that, "Also confused."

 8        A.    Yes.

 9        Q.    Okay.  So go to the end of that.  And it

10   states, quote, Saldate kept saying I bought a life

11   insurance policy on my son's life.  I said I did not do

12   any such thing, end quote.

13              Did I read that correctly?

14        A.    Yes.

15        Q.    And then if you go to the next page, four lines

16   down, you say, quote, He brought up the insurance policy

17   stuff again, and I remember telling him that my dad once

18   bought a policy on Chris, but that was a few years back.

19   Saldate said it wasn't a policy from my dad but from the

20   one I bought.  I kept yelling at him that I didn't buy a

21   policy on my son's life.

22              Do you remember making that statement to

23   Detective Saldate?

24        A.    I remember -- I -- I remember this topic, yes.

25        Q.    Okay.  But when you wrote down descriptions
```

1    and -- and statements that were made about what occurred

2    in that room, would they have always been truthful

3    statements?

4                    MS. WANG:  Objection.  Form.  Foundation.

5                    THE WITNESS:  Yes.  I would write to the

6    best of my recollection, but I know I did not conf- -- I

7    did not confess to him.

8                    MS. BERKE:  Okay.  That wasn't my question.

9    Can you read the question back, please?

10                    And I move to strike that answer.

11                    (The last question was read back by the

12    court reporter.)

13                    THE WITNESS:  Yes.

14        Q.    BY MS. BERKE:  And do you have a recollection

15    of telling Detective Saldate that you didn't purchase a

16    life insurance policy on Christopher?

17        A.    I do have a recollection of that.

18                    (Exhibit 420 was marked for identification.)

19        Q.    BY MS. BERKE:  I'm showing you what's been

20    marked as Exhibit Number 420.

21        A.    It's the same as 419.

22        Q.    Oh.

23                    MS. WANG:  No.

24                    MS. BERKE:  Did I already have it marked?

25                    MS. ODEGARD:  I don't think we have a 419,

Page 528

1      Lori.

2                      (Multiple speakers.)

3      Q.    BY MS. BERKE:  Sorry.  I'm showing you what's

4      been marked as Exhibit 419.

5                      (Multiple speakers.)

6      Q.    BY MS. BERKE:  Okay.  So 419.  Do you recognize

7      this?

8      A.    Yes.

9      Q.    And tell us what it is.

10     A.    It looks like a page of the transcription of my

11     communication with Clemens.

12     Q.    And is this one of the -- is this page from the

13     transcript that you reviewed on Sunday of the tapes that

14     you made for Clemens?

15     A.    I -- it's possible.

16     Q.    Well, why don't you read through it and tell us

17     if it is and just ignore the highlighting.

18     A.    This looks like what I read on Sunday.

19     Q.    Okay.  And so if someone was to cut out those

20     highlighted portions, then they would not -- you would

21     not have a complete recitation of what you stated on that

22     tape.  Correct?

23     A.    What are you --

24            MS. WANG:  Objection.  Form.

25     Q.    BY MS. BERKE:  So if we were to delete all of

Page 529

```
1      the --
2                   MS. WANG:  Foundation.
3          Q.   BY MS. BERKE:  If we were to delete all of
4      those highlighted portions -- you see that some are
5      highlighted?
6          A.   Yes.
7          Q.   If we were to delete those, it would be an
8      inaccurate representation of what you had stated on the
9      tape to Clemens.  Correct?
10                  MS. WANG:  Objection.  Foundation.
11                  THE WITNESS:  If you deleted what's
12     highlighted and then -- yes, it would -- it -- yeah, yes.
13         Q.   BY MS. BERKE:  Or if you deleted the part that
14     wasn't highlighted and only left in what was highlighted,
15     you would have an inaccurate representation of the
16     statements you made to Clemens.  Correct?
17                  MS. WANG:  Objection.  Foundation.
18                  THE WITNESS:  Yes.
19         Q.   BY MS. BERKE:  Now, on this page of Exhibit --
20     second page of Exhibit 419, if you go halfway down, you
21     had stated on the tape to him, quote, And he asked me if
22     I wanted the interview recorded, and I looked at him and
23     I'm still crying and I saw the phone, and I said, no, I
24     want to use that phone and I want to call my dad about a
25     lawyer and I told him I wanted a lawyer.  Then he put his
```

1    hands on my knees and said he wasn't there to tolerate my

2    behavior, that he was there to get the truth.

3              Did I read that part correctly?

4         A.   You did.

5         Q.   And so if it read as follows -- well, let's

6    assume it instead read, quote, And he asked me if I

7    wanted the interview recorded and I said no, I want to

8    call a lawyer.  Then he put his hands on my knees and

9    said he wasn't there to tolerate my behavior.

10             That would be an inaccurate recitation of

11   what you had stated.  Correct?

12        A.   Wait a minute.  What did you just read?

13        Q.   I just read the highlighted part.

14        A.   And he asked me if I wanted the interview

15   recorded and I said, no, I want to call a lawyer.

16             MS. WANG:  She's not following.

17             MS. BERKE:  Right.

18             THE WITNESS:  I don't --

19        Q.   BY MS. BERKE:  You just read the highlighted

20   part.  Right?

21        A.   Isn't that what you just read?

22        Q.   Yeah.  So that's a very different thing than

23   writing the whole thing -- or reading the whole thing,

24   the highlighted part and the nonhighlighted part.  Right?

25        A.   Yes.

Page 531

1      Q.    I'm going to show you Exhibit 336.

2      A.    Okay.

3      Q.    This is from -- this was marked as an exhibit

4  at your November 14t, 2018, deposition.  It's a letter

5  from you to your mother.  Correct?

6      A.    Yes.

7      Q.    And on the second page, MILKENSB027113 --

8  actually it's the third page, if you go down and it says

9  page 2.

10          Do you see that?

11     A.    Yes.

12     Q.    And you're -- you stated to your mom -- and

13  this is a rebuttal for the Web site.  Correct?

14     A.    I have no idea.

15     Q.    Read the -- read the first paragraph and then

16  that might help you.

17     A.    (Witness complies.)

18          MS. WANG:  What page are we on?  What page?

19          MS. BERKE:  The --

20          MS. RETTS:  First page.

21     Q.    BY MS. BERKE:  The first page, the first

22  paragraph, "Hi, Mom, as I said, I received the mail from

23  Kirk and I read through all of it.  Most is accurate

24  except for some minor corrections which I made and have

25  enclosed.  The e-mails" -- "the e-mail letters" -- oh.

Page 532

1      "And I have enclosed the e-mail letters to Geraldine."

2                    Did I read that correctly?

3      A.    Yes.

4      Q.    And you say, "The section Judith prepared is

5      good.  Reading what Saldate said, knowing how he twisted

6      things around made me sick.  Anyhow, I understand that

7      you want me to make corrections or additions on my

8      rebuttal boxes, if any."

9                    Do you see that?  Did I read --

10     A.    Yeah.

11     Q.    -- that correctly?

12     A.    Yes.

13     Q.    And so this is a rebuttal you prepared to what

14     was going to be posted on your Web site.  Correct?

15     A.    I -- it -- it appears that way.

16     Q.    And then if you go to the third page,

17     MILKENSB027113, where it says page 2 down at the bottom

18     and then number 1.

19     A.    Yes.

20     Q.    You state, quote, Right after that, he asked if

21     I wanted the interview tape-recorded.  I said, quote, no,

22     I want to use that phone, and then in parentheses, you

23     said I pointed to it, to call my dad about a lawyer, end

24     quote.  However, he ignored my request and began asking

25     questions and making accusations, end quote.

Page 533

1          Did I read that correctly?

2     A.    Yes.

3     Q.    And so the part where you're reciting that what

4 you said to Detective Saldate was, "No, I want to use

5 that phone to call my dad about a lawyer," you put quotes

6 around that.  Correct?

7     A.    Yes.

8     Q.    Which indicates you're saying this is verbatim

9 what I said.  Correct?

10     A.    I'm -- I'm not -- no, I wouldn't -- I wouldn't

11 characterize it as verbatim, but it's what I said.

12     Q.    Well, when you use quotes, you're saying this

13 is verbatim what I had said.

14     A.    Well, that's true.  But what I'm telling you is

15 that when I wrote this, I used quotes, but I -- I don't

16 know if I would characterize that as verbatim.

17     Q.    Okay.  And so what you're saying is in order to

18 have correct information on your Web site, it needed to

19 say what you -- what I just read to you next to number 1,

20 on MILKENSB027113.  Correct?

21     A.    Yes.

22     Q.    Please take a look at Exhibits 363, which is

23 one of the binders.  It's the Bommersbach documents.  And

24 you can set the deposition notebook aside --

25     A.    Okay.

Page 534

1      Q.    -- to get that out of your way.

2      A.    Okay.

3      Q.    Take a look at BOMMERSBACH005556.  Are you

4    there?

5      A.    No, not yet.

6      Q.    Okay.

7      A.    5566.

8      Q.    Yes.

9            MS. WANG:  You said 55 --

10           MS. BERKE:  I'm sorry.  5556.

11           THE WITNESS:  5556.  Okay.

12     Q.    BY MS. BERKE:  And this is a letter from you to

13   Pat Galbraith dated September 25th, 2005.  Correct?

14     A.    Yes.

15     Q.    If you go to BOMMERSBACH5558, it's the third

16   page of the letter.  Correct?

17     A.    Yes.

18     Q.    And halfway down, it reads, quote, In a civil

19   matter, I can go after Saldate personally for violating

20   my civil rights.  Lori called it dereliction of duty or

21   something like that.  I can't sue Levy personally, but I

22   can sue the County for malicious prosecution, reckless

23   disregard for the truth and other things.

24           Saldate was deliberate in what he did

25   against me.  I can't have a criminal complaint filed

Page 535

1    against him.  Why?  I'll tell you.  Because there's no

2    documentation proof of what happened in that small

3    medical room when he arrested me.

4              And then if you go to the next page, it

5    states, quote, Lori told me it will be a lot easier for

6    me to file a civil complaint.  The burden of proof is

7    much lower, by a preponderance of the evidence.

8              Did I read all of that correctly?

9        A.    Yes.

10       Q.    And so what you're telling Pat in September of

11   2005 is that you're planning to file a lawsuit.  Correct?

12       A.    I -- I -- I didn't say in here I was planning,

13   but, I mean, discussing a laws- -- a lawsuit is in here,

14   yes.

15       Q.    Okay.  And you were discussing it with Lori

16   Voepel.  Correct?

17       A.    I'm not -- I don't know.  I'm not sure.

18       Q.    Well, isn't that what you're saying, Lori --

19   you say, Lori called it dereliction of duty or something

20   like that.  So, clearly, you're telling Pat what Lori had

21   told you your options are in terms of filing a civil

22   lawsuit.  Correct?

23              MS. WANG:  Objection.  Form.  Foundation.

24              THE WITNESS:  Wait a minute.  Wait a minute.

25   Most likely, this is Lori, my attorney, but it's possible

Page 536

 1    that I asked her a question about -- about Saldate and

 2    the way he conducted the interview.  I mean --

 3         Q.    BY MS. BERKE:  Well, go to the next page.

 4    You're -- you're telling --

 5                MS. WANG:  Let her --

 6         Q.    BY MS. BERKE:  You're telling --

 7                MS. WANG:  -- finish her answer.  You cut

 8    her off.

 9         Q.    BY MS. BERKE:  Were you done with your answer?

10         A.    No.  I'm -- look.  You're -- I -- in a civil

11    matter, I can go after Saldate personally for violating

12    my civil rights.  That's just a statement, a sentence I

13    wrote.  And then Lori called it dereliction of duty.

14         Q.    Right.  So you were having a conversation with

15    Lori Voepel about what kinds of claims you could assert

16    against Detective Saldate.

17         A.    No.

18         Q.    Right?

19         A.    No.

20                MS. WANG:  Objection to form.  Please stop

21    interrupting the witness.

22                THE WITNESS:  No.  That's -- that's not --

23    that's not what I was doing.

24         Q.    BY MS. BERKE:  Okay.  Well, go to the next page

25    again.  You say, quote, Lori told me it will be a lot

Page 537

1    easier for me to file a civil complaint because the

2    burden of proof is much lower, by a preponderance of the

3    evidence.

4                Correct?

5       A.    That's what it says there.

6       Q.    So you're telling Pat that Lori Voepel

7    specifically told you that.  Correct?

8                MS. WANG:  Objection.  Foundation.

9                THE WITNESS:  But you don't have the context

10   of the conversation.

11      Q.    BY MS. BERKE:  How do I not have the --

12      A.    Because --

13      Q.    -- context?

14      A.    Because I didn't -- I didn't know that you

15   can't -- the only way that you could sue -- I couldn't --

16   I couldn't ask for criminal charges to be brought against

17   him, so my only option was civil.

18      Q.    And that information came from Lori Voepel.

19   Right?

20      A.    This is how I learned it from Lori, and I asked

21   her questions about his conduct.

22      Q.    Right.  But --

23      A.    And she -- and she -- and this is where I

24   learned this term "dereliction of duty."

25      Q.    Okay.  And Lori specifically told you that in

Page 538

```
 1    terms of what options you had with respect to Detective
 2    Saldate, she recommended filing a civil complaint because
 3    the burden of proof is lower than in a criminal case.
 4    Correct?
 5         A.    No.
 6                   MS. WANG:  Objection.  Foundation.
 7                   THE WITNESS:  She did not recommend --
 8         Q.    BY MS. BERKE:  Well --
 9         A.    No, she did not recommend -- she did not say, I
10    recommend to you that you file a civil suit.  She did not
11    say that.
12         Q.    Well, you told us yesterday she did.
13         A.    No, she --
14                   MS. WANG:  No.
15         Q.    BY MS. BERKE:  You --
16                   MS. WANG:  Objection.  Mischaracterizes --
17         Q.    BY MS. BERKE:  Didn't you --
18                   MS. WANG:  -- the witness' testimony.
19    Argumentative.  Form.  Foundation.
20         Q.    BY MS. BERKE:  Oh, she encouraged you to file a
21    lawsuit against Detective Saldate, Maricopa County and
22    the City of Phoenix.  Correct?  That's what you told us
23    yesterday.
24         A.    Lori just explained to me that it would be
25    easier to file a civil suit than a criminal -- than
```

Page 539

1    trying to go through a criminal process.

2        Q.    And the civil suit was a civil suit against

3    Detective Saldate and others involved in the

4    investigation.  Correct?

5        A.    Yes.

6        Q.    And based on your testimony yesterday, Lori

7    Voepel encouraged you to file a lawsuit because you

8    wouldn't have even filed a lawsuit but for that

9    encouragement.  Correct?

10                   MS. WANG:  Objection.  Foundation.

11                   THE WITNESS:  I --

12                   MS. WANG:  Form.

13                   THE WITNESS:  I want to see where I -- what

14   I said yesterday.

15       Q.    BY MS. BERKE:  Okay.  Are you trying to protect

16   Lori Voepel?

17                   MS. WANG:  Objection.  Foundation.  Form.

18                   THE WITNESS:  No.  I'm answering your

19   questions.  But you -- you're -- you're showing me a

20   letter -- and I don't mind answering your questions.  I

21   really don't.  But you're pointing out to a sentence,

22   it's almost like you're cutting and pasting and then you

23   make this assumption.

24       Q.    BY MS. BERKE:  Well, I'm not making any --

25       A.    That's what --

Page 540

1          Q.     -- assumption.

2          A.     Yes.  You said Lori recommended to you to file

3     a lawsuit.  She did not.

4          Q.     Okay.  But you were discussing the possibility

5     of filing a civil lawsuit with Lori.  Correct?

6                    MS. WANG:  Objection.  Foundation.

7                    THE WITNESS:  When?

8          Q.   BY MS. BERKE:  Sometime around September 25th

9     of 2005 --

10         A.     No.

11         Q.     -- because you're telling Pat about your

12    conversation with Lori about that topic.

13                   MS. WANG:  Objection.  Foundation.

14                   THE WITNESS:  I was -- I had questions.  I'm

15    not a lawyer.  So I had questions about -- because what

16    Saldate did, I wanted somebody to be held accountable.  I

17    asked her, Can he be criminally responsible?  This was

18    just a conversation.

19         Q.   BY MS. BERKE:  Did --

20         A.     I -- I wasn't planning with Lori in 2005 to

21    have -- to file a lawsuit.

22         Q.     Did Lori Voepel have any involvement in

23    drafting the notice of claim?

24                   MS. WANG:  Objection.  Foundation.

25                   THE WITNESS:  I wouldn't even know.

Page 541

1    Q.    BY MS. BERKE:  Did you discuss the notice of

2    claim with her?

3    A.    I don't -- I have not discussed my civil case

4    with Lori.

5    Q.    And then if you look at BOMMERSBACH05559 and go

6    to the third paragraph, you state, quote, And while I'm

7    out, I can work on my book and get it published.  That

8    will really help me a lot, end quote.

9              Did I read that correctly?

10    A.    Yes.

11    Q.    And so that was at a time where you were

12    planning to write a book.  Correct?

13    A.    That's when the idea was in my mind, yes.

14              (Exhibit 420 was marked for identification.)

15    Q.    BY MS. BERKE:  I'm showing you what's been

16    marked as Exhibit 420.  Do you recognize this document?

17    A.    Yes.

18    Q.    And this is a letter that you sent to Lori

19    Voepel on May 14th of 2002.  Correct?

20    A.    Yeah, yes.

21    Q.    And you state in the third paragraph, quote,

22    After this criminal case is resolved, I would like to

23    pursue a civil action against Noel Levy, Rick Romley

24    and/or the County attorney's office, as well as against

25    Saldate for false arrest, false imprisonment, defamation

Page 542

1    of character, emotional distress and civil rights

2    violations.

3              A lawsuit of this type probably goes without

4    saying, but I'll -- I'd still like to keep a lid on it.

5    I don't want the County attorney's office to get wind of

6    my intentions at this time, end quote.

7              Did I read that correctly?

8    A.    Yes.

9    Q.    And so back -- you were planning to file a

10   lawsuit going back to May of 2002.   Correct?

11             MS. WANG:  Objection.  Foundation.

12             THE WITNESS:  Well, just like I said here, a

13   lawsuit of this type probably goes without saying.

14             MS. BERKE:  That wasn't my question, and I

15   move to strike.

16   Q.    BY MS. BERKE:  My question is:  You were

17   planning to file a civil lawsuit against those

18   individuals and -- and public entities I just named going

19   back all the way to May of 2002.   Correct?

20             MS. WANG:  Objection.  Foundation.  Form.

21             THE WITNESS:  The thought was in my mind in

22   2002, correct.

23             (Exhibit 421 was marked for identification.)

24   Q.    BY MS. BERKE:  I'm showing you what's been

25   marked as Exhibit 421.   And this is a portion of Roger

Page 543

1 Scott's testimony from his criminal case.

2     Do you see that?

3 A. Yes.

4 Q. And if you turn to page 30 of that testimony,

5 which is MILKENSB11117 --

6 A. Okay.

7 Q. -- he -- Roger Scott's being asked about having

8 gone on drives in connection with planning the murder of

9 your -- your son, Christopher.  Okay?

10 A. Okay.

11 Q. And at line 15, he's asked the question, "So at

12 the end of this day, what was the conclusion of the

13 discussion?"

14     Mr. Scott's answer, quote, Well, again, I

15 told him that we had talked two different times.  I told

16 him just to drop me at a bus stop.  He stopped talking.

17 And then he brought it back up and talking about various

18 things, and I told him to drop me off at the bus stop

19 again.  And he said, Well, it's too late, I'm over on

20 this side of town, and I've got to pick up Debbie.  And I

21 can't make -- I can't make traffic if I take you home

22 first.  So I got to pick up Debbie.  I'll drop her off

23 and then I'll take you home.

24     And then he's asked the question, "So did

25 you pick up Debbie?"  The answer's, "Yes."  And he's

1    asked the question, "What happened after you picked up

2    Debbie?"  And the answer was, "Well, Jim got in the back

3    seat with the kids, and I was sitting in the front seat,

4    passenger, and Debbie took over the driving of the car.

5    She -- after she got in the car, she looked back like

6    this and said, 'He's still here,'" with quotes around it,

7    that he's still here.

8                    Did I read all of that correctly?

9         A.    You did.

10        Q.    And you're familiar with that part of his

11   testimony.  Correct?

12        A.    Well, I've never -- I've never seen this, and

13   I've never read this.  But his answer is completely

14   false.

15        Q.    Were you ever in a car with him where

16   Christopher was in the back seat, Jim was in the back

17   seat, you got in the front seat, and you looked back and

18   said:  He's still here?

19        A.    No.  You -- it's -- you have it wrong.

20        Q.    How do I have it wrong?

21        A.    Jim picked me up from work and Christopher was

22   in the back seat and Roger was in the back seat and Jim

23   sat in the front seat.  And Jim knew that I did not like

24   Roger.  And when I got in my car, I turned around and saw

25   Roger in the back seat of my car with my son and I said,

1     Why is he here?  That is exactly what happened.

2         Q.    Okay.  So there was an incident where you and

3     Christopher and Jim were in your car together?

4         A.    Are we talking about this day?

5         Q.    Yes.

6         A.    This day, yes.

7         Q.    And they had picked you up at work.  Correct?

8         A.    Jim always picked me up at work.  Yes.

9         Q.    Okay.  So you don't dispute that you were in

10    the car together and a conversation like Roger Scott was

11    testifying to took place, but you're saying that in terms

12    of who he was talk -- who you were talking about when you

13    said he's -- why is he here, it related to Roger Scott

14    and not your son?

15        A.    When I -- I -- I didn't say he's -- this quote

16    is wrong.  He's still here.  I never said that.

17        Q.    Okay.  You said, Why is he here?

18        A.    I turned around and saw Roger in the back seat

19    of my car, and I looked over at Jim and said, Why is he

20    here?

21        Q.    And what did Jim say --

22        A.    Meaning -- meaning Roger.

23        Q.    And what did Jim say in response?

24        A.    He didn't say -- I don't remember what he said,

25    but I don't -- I don't think he said anything.  But I

Page 546

1    don't recall.

2        Q.    Did Roger say anything when you made that

3    statement in his presence?

4        A.    I don't remember exactly what -- if he said

5    anything.

6        Q.    So were you -- did you know that Roger gave

7    that testimony at trial?

8                MS. WANG:   Objection.   Foundation.

9                THE WITNESS:   I'm not -- I don't know

10   because I've never read this.   I've never read any of his

11   transcripts.   So I don't know.   But I do remember that

12   incident.   And this is not true.

13       Q.    BY MS. BERKE:   Is this the first time you're

14   being asked about that conversation?

15       A.    No.   I've seen this -- I've seen this out --

16   this before somewhere, but I just don't know where.   But

17   I've -- I've never read Roger's transcripts or Jim's.   So

18   I -- I don't know where I learned this, but this is not

19   true.

20       Q.    Take a look at Exhibit Number 410.

21       A.    (Witness complies.)

22             What is that?

23       Q.    That's the Aleshire transcript.

24       A.    Okay.   410.   Okay.

25       Q.    And you're positive you didn't say the words,

Page 547

```
 1    He's still here?  You said -- what you said is, Why is he
 2    here?
 3         A.    Re- -- re- -- regarding Roger --
 4         Q.    Right.
 5         A.    -- yeah.
 6         Q.    Okay.  So Roger, in his trial testimony, had
 7    the actors wrong and the words wrong when he described
 8    that incident.  Correct?
 9         A.    What you just had me read, that's not true.
10         Q.    Not in terms of what he's saying the words were
11    and who was -- who the words were being spoken about.
12    Correct?
13         A.    I want to --
14               MS. WANG:  Objection.  Form.
15               THE WITNESS:  -- go back -- let me go back
16    to this page because I really want this to be clear.
17         Q.    BY MS. BERKE:  Okay.
18         A.    What --
19         Q.    On page 31.
20         A.    All right.
21         Q.    30 and 31.  Bottom of 30, top of 31.
22         A.    So you're focused on this answer.  "Well, Jim
23    got in the back seat with the kids, and I was sitting in
24    the front seat, passenger, and Debbie took over the
25    driving of the car.  She -- after she got in the car, she
```

Page 548

1    looked back like this and said, 'He's still here.'"  This

2    is incorrect.

3        Q.    Right.  Those are not the words that were

4    spoken, you're saying.  Correct?

5        A.    No.  He's still here, no, I -- that's wrong, I

6    mean.

7        Q.    Right.  What were the words that were spoken

8    that he's misstating?

9        A.    Well, he's misstating -- he didn't sit in the

10   front seat.

11       Q.    Okay.  I understand that, but I'm talking about

12   words.  What are the words that are misstated?

13       A.    Okay.  I -- I -- okay.  So the words that were

14   stated were from me.

15       Q.    Uh-huh.

16       A.    And I don't recall today exactly what I said.

17   I don't recall specifically, but it was something like,

18   Why is he here or -- because I looked and saw Roger in

19   the back seat of my car and I looked and --  Why is he

20   here?

21       Q.    Okay.

22       A.    Something to that effect.

23       Q.    But you're a hundred percent certain the words

24   were not, He's still here.  Correct?

25       A.    I -- I -- I did not say that.

Page 549

1      Q.    And you're a hundred percent certain that the

2    words you said were not, He's still here?

3      A.    I can't remember what -- the exact words I

4    used.

5      Q.    Right.  But you've just told us that those were

6    not the words you used.  Correct?

7      A.    No.

8            MS. WANG:  Objection.  Asked and answered.

9            THE WITNESS:  Roger is attributing these

10   words to me.

11     Q.    BY MS. BERKE:  I understand that.

12     A.    And I did not say he -- he's still here.  He's

13   attributing these words to me as if I was directing this

14   question about Christopher.

15     Q.    I get that.

16     A.    Okay.

17     Q.    I'm clear on that.

18     A.    Okay.

19     Q.    But you've also told us that those aren't even

20   the words you spoke.  Right?

21     A.    I told you I don't recall with specificity what

22   I said exactly.  I just recall seeing him in the back

23   seat, I turned around and I said, Why is he here?  That's

24   most likely what I said.  I just don't remember exactly.

25     Q.    So is it possible you said the words, He's

Page 550

```
 1    still here?
 2        A.    Well, it wouldn't make sense to use those
 3    words.
 4        Q.    Why?
 5        A.    Because it doesn't make sense with the
 6    situation.
 7        Q.    Okay.  So are you a hundred percent certain you
 8    did not say, He's still here?
 9        A.    I -- a hundred percent?  You're asking me to
10    give you a hundred percent certainty from something that
11    happened in 1989 --
12        Q.    Well --
13        A.    -- 30 years ago.
14        Q.    But you were very adamant just a few minutes
15    ago that you did not say those words.  That's why I'm
16    asking that.
17        A.    I did not -- I did not -- he's attributing
18    these to me.
19        Q.    I get that.  We -- it's loud and clear that
20    it's your testimony that you were talking about Roger and
21    not Christopher.  Okay?
22        A.    Yes.
23        Q.    We understand that.
24        A.    Okay.
25        Q.    We're talking about the words that were used.
```

Page 551

1          A.      Okay.

2          Q.      And so you have said you did not use those

3    words when referring to Roger, that he's still here.

4    You're saying you didn't use those words.

5          A.      I don't -- that doesn't even make any sense.  I

6    don't believe I used those words because it doesn't even

7    make any sense.  It does not make sense.

8          Q.      Okay.  So -- right.  So if you were referring

9    to Roger when you made this statement, it wouldn't have

10   made any sense to ask the question, He's still here.

11   Right?

12                 MS. WANG:  Objection.  Asked and answered.

13   Form.

14         Q.      BY MS. BERKE:  That's what you're telling us?

15         A.      Wait.  Okay.  For me, I had worked all day.  So

16   I get in -- Jim drives my car.  Okay?  He gets out of the

17   driver's seat.  I get in the driver's seat.  Jim goes

18   around and gets in the passenger seat.  I turn around

19   because my son's in the back seat.  I turn around and I

20   see Roger.  Jim knows I can't stand him.  And then I

21   said, Why's he here?  That makes sense.

22         Q.      Okay.  And so what you're telling us is it

23   would make absolutely no sense in the situation you were

24   in to have said, He's still here, referring to Roger.

25   Right?

Page 552

1        A.      That doesn't make sense.

2        Q.      So you agree with me?

3        A.      I agree that that -- these words, He's still

4    here, referring to Roger, that does not make sense.

5        Q.      And so if you were referring to Roger, as

6    you're maintaining, it would have made no sense to ask

7    the question, He's still here.  Correct?

8                MS. WANG:  Objection.  Asked and answered.

9    You've asked her this, like, ten times.

10       Q.      BY MS. BERKE:  It's a yes-or-no question.

11       A.      It doesn't make sense.

12       Q.      Right.  So I'm correct, what I just said.

13   Right?

14       A.      That -- to use these words --

15       Q.      Right.  If you had --

16       A.      -- relating to Roger?

17       Q.      If you had made the statement that you made and

18   were referring to Roger, it wouldn't have made sense to

19   use the words, He's still here.  Right?

20       A.      Correct.

21       Q.      Okay.  And so it's your testimony --

22               Well, who was driving?

23       A.      When?

24       Q.      When you made that state- -- whatever -- when

25   you made the statement?

Page 553

```
 1        A.    I had just gotten in the driver's seat.

 2        Q.    Okay.  And who was in the front passenger seat?

 3        A.    Jim.

 4        Q.    And who was in the back?

 5        A.    Christopher.  And his daughter.

 6        Q.    So I'm sorry.  I -- tell me again who was in

 7   the car.  I apologize.

 8        A.    On this day?

 9        Q.    I got distracted.  Yes.

10        A.    On this day?

11        Q.    At that -- when this conversation took place.

12        A.    Okay.

13        Q.    You said -- who?  Roger?

14        A.    Wait a minute.  Wait a minute.

15        Q.    Well, don't you have a --

16        A.    No.

17        Q.    -- clear recollection?

18        A.    No.

19              MS. WANG:  Objection.

20              THE WITNESS:  No.

21              MS. WANG:  Can you not interrupt the

22   witness?

23              THE WITNESS:  I don't --

24        Q.    BY MS. BERKE:  Well, you're looking at the

25   transcript so --
```

Page 554

1      A.      No, because I want to be sure --

2      Q.      But -- okay.

3      A.      -- what day you're talking about because I'm

4    not going to -- I'm tired and I'm not going to let you

5    trick me.

6      Q.      I'm -- I'm not trying to trick you.

7      A.      Okay.

8      Q.      And I -- I'll let you read the testimony in a

9    moment, but right now, I want your recollection.  Do you

10   have a recollection of who was in the car when you asked

11   that question about Roger Scott?

12     A.      When I asked that question about -- my

13   recollection today is -- I don't know what day it was,

14   but Jim drove to my work to pick me up from work.  I got

15   off work at 4:30.  I go out to the parking lot and I go

16   get -- he gets out of the driver's seat and I get in.  He

17   goes around and gets in the passenger seat.

18     Q.      The front passenger seat?

19     A.      Yes.  And then I get in the car, and my son is

20   in the back seat, and I turn around and I see Roger.  And

21   I asked, What is he here -- why is he here?

22     Q.      Okay.  Do you remember anyone else being in the

23   back seat other than Jim -- I'm sorry -- other than Roger

24   and Christopher?

25     A.      Jim's daughter could have been in the car.  But

Page 555

1    I don't -- I don't recall that.  But she could have been

2    in the car.

3        Q.    Okay.  And so the only change in seating that

4    took place is Jim going from the driver's seat to the

5    front passenger seat?

6        A.    Yes.

7        Q.    And then you got in the front driver's seat?

8        A.    Yes.

9        Q.    All right.  If you go to Exhibit 410 which is

10   the Aleshire transcript, page 79, and go to the second --

11   I'm sorry -- go to page 78 --

12       A.    Okay.

13       Q.    -- line 23.

14             Do you see where I am?

15       A.    Yes.

16       Q.    And it says, quote, But I do know that I did

17   not ever have a conversation with Roger about murder.  I

18   never had a conversation about that with him.  And I

19   never went in my car and drove around or anything like

20   that.  I never did anything like that and I did not get

21   in the car and say what -- what you -- what did you say

22   here?  What you said here in your letter, let me find it.

23             Where Roger testified at trial, he initially

24   indicated that the only evidence he had that you knew

25   about the plan to kill Christopher was one time when you

Page 556

1    got into the car, looked into the back seat and said, Is

2    he still here?  I -- this is not true.  I did not get

3    into my car and look in the back seat and say, Is he

4    still here?  This didn't happen.  So I don't -- I have no

5    idea what the hell Roger's talking about.

6                   Did I read that correctly?

7         A.    You did.

8         Q.    And so when you were making this recording for

9    Mr. Aleshire, you told him you had no idea what Roger was

10   talking about.  Correct?

11        A.    No.  You're -- you're reading this wrong.

12        Q.    You told Aleshire that you had no idea what

13   Roger was talking about.  Correct?

14              MS. WANG:  Objection.  Form.  Argumentative.

15        Q.    BY MS. BERKE:  Look at lines 11 and 12 on page

16   79.

17        A.    Okay.  So let me just say this:  On lines 11

18   and 12, on page 79, "So I don't -- I have no idea what

19   the hell Roger's talking about," that's what I said.

20        Q.    Right.  You told Mr. Aleshire you had no idea

21   what Roger was talking about.  Correct?

22        A.    That's what it says here.

23        Q.    And you didn't tell Mr. Aleshire that a similar

24   statement was made, but you were talking to -- you were

25   talking about Roger and not Christopher.  Correct?

Page 557

1            MS. WANG:  Objection.  Foundation.  Form.

2            THE WITNESS:  You're -- you're really taking

3      this out of context.

4        Q.    BY MS. BERKE:  Well --

5        A.    You're really -- you --

6        Q.    Please answer my question.  You didn't tell

7      Mr. Aleshire that you had been in the car with Jim and

8      Roger and Christopher but the person you were talking

9      about was Roger and the words you said were something

10     different than he's still here.  What you told

11     Mr. Aleshire is that you have no idea what the hell

12     Roger's talking about.  Correct?

13       A.    That's what it says here.

14       Q.    Right.  So you didn't -- you didn't explain to

15     Mr. Aleshire that there actually had been a conversation

16     in the car, that you were in the car with Roger and Jim

17     and Christopher, but you were referring to Roger and the

18     words were a little different.  You didn't explain that

19     to Mr. Aleshire, did you?

20       A.    No, I didn't.

21            THE VIDEOGRAPHER:  Excuse me, Counsel.  I

22     need to take just a moment to change the media.

23            MS. BERKE:  Sure.

24            THE VIDEOGRAPHER:  We're going off the

25     record.  The time is 2:15 p.m.

Page 558

1            (A recess was held off the record.)

2            THE VIDEOGRAPHER:  We're back on the record.

3    The time is 2:16 p.m.

4        Q.    BY MS. BERKE:  Ms. Milke, I've -- I've put

5    before you Exhibit Number 353.  You recall having a

6    conversation about this letter?

7            MS. WANG:  Objection.  Foundation.

8        Q.    BY MS. BERKE:  You remember discussing this

9    during your deposition?

10       A.    We talked about this the other day.

11       Q.    Yes.  It's a letter from Lori Voepel and Mike

12   Kimerer, your two lawyers in the habeas proceeding, to

13   Vince Imbordino, the prosecutor in your case.  Correct?

14       A.    Yes.

15       Q.    And I'd ask you to turn to page -- page 16 of

16   the letter, which is MILKENSB004630.

17            MS. RETTS:  On the one marked, it's going to

18   be --

19            MS. BERKE:  Oh, I'm sorry.  LNL022213, page

20   16 of the letter.

21            THE WITNESS:  Okay.

22       Q.    BY MS. BERKE:  And do you see down on letter 3B

23   where it says "Scott's trial testimony"?

24       A.    Yes.

25       Q.    And you see that they're discussing that

1    testimony from Roger Scott's trial?

2                Do you see that?

3    A.    I -- I do.  I'm reading it.  Because I --

4    Q.    Well, we'll read it --

5    A.    Okay.

6    Q.    -- together.

7    A.    Okay.

8    Q.    So what Lori Voepel and Mike Kimerer are

9    telling the prosecutor is, quote, At Scott's trial, he

10   again said that everything he learned about the plan to

11   kill Jeff -- to kill Christopher was relayed to him by

12   Styers.  He said the one time Debra purportedly said

13   something about the murder plan was when he, Styers and

14   Chris went to pick Debra up from work in her car.

15               He claimed Styers had been telling him about

16   the murder plot and showing him places he and Debra had

17   supposedly considered doing it.  Afterwards, Scott and

18   Styers were running too late to drop off Scott at the bus

19   stop.  So they went to pick Debra up together.  Styers

20   got out of the driver's seat and into the back seat next

21   to Chris.  Scott stayed in the passenger seat.

22               When Debra got into the car, the driver's

23   seat, she looked back and asked, He's still here?  Scott

24   assumed she was talking about Christopher, stating, I

25   guess she had some kind of an idea that we were supposed

Page 560

1    to do it that day.

2              So far, have I read that correctly?

3    A.    Yes.

4    Q.    Okay.

5              MS. WANG:  Well, you skipped the citations.

6              MS. BERKE:  Skipping the citations.

7              MS. WANG:  To Scott's trial testimony.

8    Q.    BY MS. BERKE:  Right.  So it's referring to

9    Scott's trial testimony.  Correct?

10   A.    Yes.

11             MS. BERKE:  And thank you for the

12   clarification.

13   Q.    BY MS. BERKE:  So the next sentence of the

14   letter reads, quote, Debra remembers this incident

15   vividly and says she was talking about Scott, not Chris.

16   She says she was upset when she saw Scott in the car

17   because she had previously told Styers she did not want

18   Scott around her.  So she turned to Styers in the back

19   seat in a -- and in an annoyed tone asked, quote, He's

20   still here, end quote.

21             That is what your attorneys told

22   Mr. Imbordino.  Correct?

23   A.    Yes.  And that's not correct.

24   Q.    Okay.  And the only source that they would have

25   for that information would be you.  Correct?

Page 561

```
 1        A.     Well, this is --
 2               MS. WANG:  Object- -- objection.
 3   Foundation.
 4        Q.    BY MS. BERKE:  Correct?
 5               MS. WANG:  Objection.  Foundation.
 6               THE WITNESS:  No.
 7        Q.    BY MS. BERKE:  You would agree that the only
 8   source they would have to know what was stated in the car
 9   that day would be you?
10        A.     This is -- this -- this is -- this last part is
11   not correct.
12        Q.    So are you saying that your attorneys --
13        A.     This --
14        Q.    -- did not -- strike that.
15               So are you saying that your attorneys were
16   not truthfully telling Mr. Imbordino what your
17   recollection of the incident was?
18        A.    No.
19               MS. WANG:  Objection.  Form.  Foundation.
20               THE WITNESS:  I'm not saying that my
21   attorneys were not truthful to Mr. Imbordino.  No, I'm
22   not saying that.  I'm saying they just quoted all this
23   stuff from Scott's trial, his testimony.  But this last
24   part is not correct.
25        Q.    BY MS. BERKE:  Okay.  You understand they're --
```

Page 562

1  they're telling Mr. Imbordino that that is what you told

2  them.

3      A.    That --

4      Q.    Correct?

5            MS. WANG:  Objection.  Mischaracterizes the

6  document.  Foundation.

7      Q.   BY MS. BERKE:  Am I correct?

8            MS. WANG:  Objection.  Mischaracterizes the

9  document.

10           MS. BERKE:  We got your -- we got that

11  notice.

12     Q.   BY MS. BERKE:  Please answer my question.

13     A.    What was your question?

14           MS. BERKE:  Can you repeat the question?

15           (The last question was read back by the

16  court reporter.)

17           MS. WANG:  Objection.  Same objection.

18           THE WITNESS:  I understand that what is

19  written here, this is what my attorneys told

20  Mr. Imbordino but --

21     Q.   BY MS. BERKE:  Right.  They're telling

22  Mr. Imbordino what they're claiming you told them about

23  the incident.  Correct?

24           MS. WANG:  Objection.  Asked and answered.

25  Foundation and form.

Page 563

1            THE WITNESS:  I -- I -- I don't know.

2       Q.   BY MS. BERKE:  Mr. Kimerer and Ms. Voepel say,

3   "Debra remembers this incident vividly."

4            See that?

5       A.   Yes.

6       Q.   And then it goes on to say "and says she was

7   talking about Scott and Chris."  So they're -- they're

8   telling Mr. Imbordino what you've said to them in that

9   regard.  Correct?

10           MS. WANG:  Objection.  Foundation.  Form.

11      Q.   BY MS. BERKE:  Am I correct?

12      A.   Yes.

13      Q.   And then they go on to say, "She says" -- and

14   they're referring to you when they say "she says."

15   Right?

16      A.   Yes.

17      Q.   "She says she was upset when she saw Scott in

18   the car because she had previously told Styers she did

19   not want Scott around her.  So she turned around to

20   Styers in the back seat and in an annoyed tone asked,

21   He's still here?"

22           They're attributing that to you.  Correct?

23           MS. WANG:  Objection.  Foundation.

24           THE WITNESS:  That's what it looks like

25   here, but this is not correct.

Page 564

1        Q.    BY MS. BERKE:  Okay.  Grab that deposition

2    note -- transcript notebook again.  And turn to page 211

3    of your deposition from August 16th, Volume 2 of your

4    deposition.

5        A.    Okay.

6              MS. WANG:  What page did you say?

7              MS. BERKE:  211.

8        Q.    BY MS. BERKE:  Are you there?

9        A.    I'm sorry.  What was the page number?

10       Q.    211.

11       A.    Okay.

12       Q.    Are you there?

13       A.    Yes.

14       Q.    Okay.  You were asked the question at line 6 by

15   me, "Have you destroyed any documents that are related to

16   this case in any way?"  And your answer was "No."

17              Correct?

18       A.    Yes.

19       Q.    And that was not a truthful answer.  Correct?

20       A.    What do you mean?

21       Q.    Well, you've destroyed documents that were in

22   your mom's home, correct, that related to the case?

23       A.    I -- like I said before, they were court

24   filings of my criminal file, briefs.

25       Q.    Those are documents related to your case.

Page 565

1    Correct?

2        A.    Yes.  But they're copies.

3        Q.    Okay.  And then you were asked the question,

4    "You haven't destroyed any letters that you've received?"

5    And your answer was "No."

6              Do you see that?

7        A.    I do.

8        Q.    And that wasn't truthful testimony.  Correct?

9        A.    Okay.  That's -- okay.  "You haven't destroyed

10   any letters that you've received?"  Okay.

11       Q.    That's not accurate because you destroyed the

12   letters that Frankie Aue sent to you.  Correct?

13       A.    Right, yes.

14       Q.    And you destroyed the letters that Vince

15   Felix -- I'm sorry -- Joe Marino sent -- well, strike

16   that.

17              Okay.  Where are the letters Joe Marino

18   wrote to you?

19       A.    I don't know.  I don't -- I don't have them.

20       Q.    You destroyed them.  Correct?

21              MS. WANG:  Objection.  Foundation.

22              THE WITNESS:  I have no idea.  This was in

23   the early '90s.

24       Q.    BY MS. BERKE:  Earlier you testified -- where

25   are the letters that Rick Scavone wrote you?

Page 566

```
 1        A.    I --
 2                MS. WANG:  Objection.  Foundation.
 3                THE WITNESS:  I don't know.
 4        Q.    BY MS. BERKE:  He wrote you letters.  Correct?
 5        A.    I don't have any of that.
 6        Q.    Right.  But he wrote letters to you.  Correct?
 7        A.    He may have.
 8        Q.    Earlier today you stated when you were being
 9   asked about Rick Scavone that it seemed odd that -- on
10   Exhibit 406, and if you want to take a look at it, you
11   can.  It's this document that I'm showing you.
12        A.    It seemed odd that I called him Rick?
13        Q.    Right.  Why was that odd?
14        A.    Because I didn't -- I've never called him Rick.
15   I always called him Ricardo.  So it's -- it's odd to me
16   that I would refer to him as Rick.
17        Q.    Well, in the Imhoff letter, you refer to him as
18   Rick.  Correct?
19        A.    I -- yes.
20        Q.    And in your letters to Joe Marino, you refer to
21   him as Rick.  Correct?
22        A.    That's correct.
23        Q.    Where are the letters that Pat wrote to you?
24        A.    When I got out of prison in September of 2013,
25   there was no reason to hang on to Franke's letters or any
```

1    letters Pat sent me.  There was no reason to.  I was

2    free.

3         Q.    And so you destroyed them?

4         A.    I don't know.  I might have.

5               MS. BERKE:  Okay.  I'd like to take a short

6    break, if that's okay.

7               THE VIDEOGRAPHER:  We're going off the

8    record.  The time is 2:27 p.m.

9               (A recess was held off the record.)

10              (Exhibit 422 was marked for identification.)

11              THE VIDEOGRAPHER:  We're back on the record.

12   The time is 2:36 p.m.

13        Q.    BY MS. BERKE:  Ms. Milke, I've handed you

14   what's been marked Exhibit 422.  And this is a letter

15   from you to Ken Ray.  Correct?

16        A.    Yes.

17        Q.    And were you always truthful with Mr. Ray?

18        A.    Yes.

19        Q.    On the first page, if you look at the third

20   paragraph, you state, quote, It was hard to remember

21   everything exactly because I was very upset that night.

22              Did I read that correctly?

23        A.    Where were you?  On the first page?

24        Q.    Yes.  Third paragraph.

25        A.    Oh, I see it.  I see it.

Page 568

1      Q.     You -- you told Mr. Ray that it was difficult

2      for you to remember everything that had occurred the

3      night that you were in -- or the day that you were

4      interviewed by Detective Saldate because you were very

5      upset.  Correct?

6      A.     Yes.

7      Q.     And then if you go to the page that's Bates

8      stamp LNL00092.

9      A.     Okay.

10     Q.     You say, starting at the top, Saldate then put

11     his hands on my knees and reminded me that he was my

12     friend and that I could trust him.

13            Did I read that correctly?

14     A.     Yes.

15     Q.     So, again, you're still talking about what

16     occurred in the medical room where you were interviewed

17     by Detective Saldate.  Correct?

18     A.     This is my recollection as I was writing in --

19     yes.

20     Q.     In --

21     A.     At that time.

22     Q.     Right.  On February 25th of 1990.  Correct?

23     A.     Yes.

24     Q.     And you told your attorney Ken Ray that

25     Detective Saldate, quote, asked if I had insurance on

Page 569

1    Christopher and I said yes, end quote.

2              Did I read that correctly, the quoted part?

3    A.    Well, it's not in quotes, but he asked me if I

4    had insurance on Christopher and I said yes.

5    Q.    So you're telling Ken Ray that Detective

6    Saldate asked you if you had insurance on Christopher and

7    you told Detective Saldate that you did?

8    A.    That's what that sentence says, yes.

9    Q.    And was that an accurate statement?

10   A.    Well, um, I -- I would -- I would say it was

11   incomplete.  As I'm reading this now, I would say that

12   this is incomplete.

13   Q.    You never told Detective Saldate that you had

14   insurance on Christopher.  Correct?

15              MS. WANG:  Objection.  Foundation.  Form.

16              THE WITNESS:  He asked -- he -- I don't know

17   the -- how -- the exact words.  He mentioned a life

18   insurance policy.  I don't -- I said I did not have a

19   life insurance policy on Christopher.

20   Q.    BY MS. BERKE:  And you never told Detective

21   Saldate that you had insurance on Christopher.  Correct?

22   A.    I --

23              MS. WANG:  Objection.  Form.  Foundation.

24   Asked and answered.

25              THE WITNESS:  I don't recall.  I -- I don't

Page 570

1    recall right now.

2        Q.    BY MS. BERKE:  If you go further down on that

3    page, this -- the line that starts out "Heaven."

4              Do you see that?

5        A.    Yes.

6        Q.    And you're telling Ken Ray about a conversation

7    you had had with Christopher.  Correct?

8        A.    Yes.

9        Q.    And you're -- well, you're -- you're talking

10   about what you told Detective Saldate about a

11   conversation you had about Christopher.  Correct?

12       A.    I'm telling him -- Saldate then asked me if I

13   knew what Chris was wearing.  That's what it says here,

14   yes.

15       Q.    Okay.  I'm at a different place.  I'm sorry.

16             If you go to the line that starts out

17   "Saldate asked" or -- I'm sorry -- "I told Saldate" -- do

18   you see where the 2 is?  I'm sorry?

19       A.    Yes, yes.

20       Q.    Okay.  So go one line up --

21       A.    Yes.

22       Q.    -- and all the way to the right and you see "I

23   told"?

24       A.    Saldate.

25       Q.    Okay.  So it says, quote, I told Saldate about

Page 571

1    how Christopher was asking me about God and who He was.

2    I told Chris that God was in everyone's heart and He

3    loved everybody and that when people die, they go to

4    heaven.  I also told Chris that if he died, he would go

5    to heaven.

6                    Did I read that correctly?

7         A.    Yes.

8         Q.    And so that's something you told Christopher.

9    Correct?

10        A.    Um, well, not in these exact, exact words, but

11   I was recalling -- as I was writing this -- as I was

12   writing this to Ken Ray, I was recalling a conversation

13   that I had with Christopher, yes.

14        Q.    And what you're telling Ken Ray here is that

15   this is what you told Detective Saldate in the medical

16   room where you were being interviewed the -- the day of

17   your arrest.

18        A.    I'm not --

19        Q.    Correct?

20        A.    I'm not telling Ken Ray that these are my exact

21   words that I said to Saldate, no.  That's not what I'm

22   doing.  I'm just merely trying to recall what happened in

23   the room.

24        Q.    Right.  And so what you're telling Ken is that

25   you told Detective Saldate about this conversation you

Page 572

1    had previously had with Chris, including that you had

2    told Chris that if he died, he would go to heaven.

3    Correct?

4        A.    I just remember --

5              MS. WANG:  Object -- objection.  Form.

6              THE WITNESS:  Okay.  I'm so sorry.  Would

7    you please -- I'm trying to answer your question.

8              MS. BERKE:  I'll have the court reporter

9    read it back.

10             (The last question was read back by the

11   court reporter.)

12             THE WITNESS:  Something -- something like

13   that, yes.

14       Q.    BY MS. BERKE:  Why wouldn't you tell Ken Ray

15   the exact words you used in that conversation with

16   Detective Saldate?

17       A.    This -- I -- I don't know -- I don't know why I

18   did not put down the exact words.

19       Q.    Is it because you didn't remember them?

20       A.    I don't know.

21       Q.    Possibly?

22       A.    I don't know.  I mean, this is February of

23   1990.  This is two months after this tragedy.

24       Q.    And so --

25       A.    So -- I don't know.  I don't know how I was

Page 573

1    feeling on this day.

2        Q.    You knew that it was at a time when you were

3    being accused of being involved in your son's murder.

4    Correct?

5        A.    Yes.

6        Q.    And it was at a time when you knew the words

7    that were stated in that interview room were extremely

8    important.  Correct?

9        A.    I didn't know that at the time.

10       Q.    In February of 1990, you didn't know that?

11       A.    I didn't even know -- do you -- do you have

12   any -- you just don't have any idea what -- how I felt

13   and what I was going through two months after this

14   happened.

15       Q.    Okay.  You didn't have an understanding in

16   February of 1990 that what was stated in that interview

17   room with Detective Saldate was very important to your

18   case?

19                MS. WANG:  Objection.  Form.  Foundation.

20                THE WITNESS:  I don't -- I don't know.  I

21   don't know what I -- I don't know what I was thinking

22   when I wrote this.  I was just trying to recall

23   everything.

24       Q.    BY MS. BERKE:  How do feelings change the words

25   that were said in that room?

Page 574

1                    MS. WANG:  Objection.

2       Q.    BY MS. BERKE:  You said, I didn't know how I

3  was feeling.  But --

4       A.    No, no, no.  I meant when I was in jail.

5       Q.    Okay.  But how you were feeling wouldn't affect

6  your ability to remember what was said in that interview

7  room, would it?

8                    MS. WANG:  Objection.  Form.  Foundation.

9                    THE WITNESS:  This was very -- this was very

10  traumatic for me, and I was in the jail.  I don't know

11  what I was feeling this day.  I mean, I was -- I -- I

12  can't tell you.  All I know is I was trying to recall

13  what was happening.

14      Q.    BY MS. BERKE:  And you did your best to tell

15  Ken Ray precisely what was stated in that room.  Correct?

16      A.    I don't know if I was trying to do it

17  precisely.  I was just trying to -- whatever was coming

18  to my mind.

19                   MS. BERKE:  Okay.  I have nothing further.

20                   MS. ODEGARD:  Go off the record so we can

21  switch.

22                   MS. BERKE:  Yeah, why don't we go off the

23  record so I can get my stuff together and move.

24                   THE VIDEOGRAPHER:  We're going off the

25  record.  The time is 2:46 p.m.

Page 575

1                    (A recess was held off the record.)

2                    THE VIDEOGRAPHER:  We're back on the record.

3         The time is 2:48 p.m.

4

5                              EXAMINATION

6         BY MS. ODEGARD:

7              Q.    Good afternoon, Ms. Milke.  I just have a few

8         questions because our time is running very quickly here

9         today.

10             A.    Okay.

11             Q.    So would you refer to Exhibit 359 for me,

12        please?

13             A.    What is that?

14             Q.    It's the Court's order.

15             A.    Okay.

16             Q.    And, Ms. Milke, I think we've established kind

17        of ad nauseam that you have elected not to review Judge

18        Silver's 34-page order dealing with the sanctions issue

19        in this case prior to today.  Correct?

20             A.    Correct.

21             Q.    I'm going to refer you to page 26 and go over

22        just a few specifics of this order.

23             A.    Okay.

24             Q.    Under the subpart B, appropriate sanctions, the

25        first sentence reads, "Milke and her attorneys' chronic

Page 576

1    discovery abuses stretched and far exceeded the already

2    elastic bounds of acceptable advocacy, which warrant the

3    imposition of severe sanctions."

4              Did I read that correctly?

5        A.    Yes.

6        Q.    And were you aware that Judge Silver has

7    ordered the imposition of severe sanctions against you in

8    this case?

9        A.    I was aware of the imposition of sanctions, but

10   I -- the word severe was never communicated to me.

11       Q.    Okay.  And let me refer you to the next page,

12   on page 27, the beginning of the second paragraph,

13   please.  And I'll read.  It indicates, "Milke will be

14   required to bear the cost in attorneys' fees defendants

15   incurred as a result of her misconduct."

16             Do you see where I'm reading there?

17       A.    Yes.

18       Q.    "That is, Milke must pay the cost in attorneys'

19   fees defendants incurred because of Milke's failure to

20   acknowledge the scope of her privilege waiver, her

21   failure to timely produce the materials she gave

22   Bommersbach, her failure to timely produce the

23   Bommersbach book and her failure to timely produce the

24   Aleshire recordings."

25             Did I read that correctly?

Page 577

1      A.    Yes.

2      Q.    Going down to the beginning of the next

3   paragraph, Ms. Milke, on the same page, it appears,

4   "Sanctions, pursuant to Federal Rule of Civil Procedure

5   37(c), must be assessed against the party, not against

6   her counsel.  After this Court determines a fair and

7   reasonable amount of attorneys' fees and costs, Milke

8   will be required to deposit an appropriate amount with

9   the clerk of the court."

10           Do you see where I read?

11     A.    Yes.

12     Q.    And did I read Judge Silver's order and ruling

13  of this case accurately?

14     A.    Yes.

15     Q.    Were you aware of that before I read that?

16     A.    I'm aware of it, yes.

17     Q.    Okay.  And then going on to the last page, page

18  34, you'll see that the order is signed by Judge Silver

19  on July 18th of 2019.  Correct?

20     A.    Yes.

21     Q.    And in that final order, she ordered that the

22  defendants file motions for costs and fees caused by

23  plaintiff's misconduct.

24           Do you see that?

25     A.    Where is that at?

Page 578

1      Q.    It is in the second to the last full paragraph,

2    starts "It is further ordered."

3      A.    No later than when?  August.

4      Q.    No later than August 16th --

5      A.    Okay.

6      Q.    -- 2019, defendants shall file a motion for

7    costs and fees caused by plaintiff's misconduct.

8      A.    Okay.  I see that.

9      Q.    And have you read the motions filed by any of

10    the defendants for fees and costs or the briefing related

11    to that issue?

12      A.    I have not.

13      Q.    And do you understand, as you sit here today,

14    that the defendants, all the parties that you have sued,

15    the County, the City, the officers, have filed motions

16    and affidavits supporting an attorneys' fees award

17    against you in the amount of $626,000 dollars 420 -- or

18    $626,420?  Were you aware of that?

19      A.    No.

20      Q.    How would you intend to pay for such a

21    judgment?

22      A.    I can't.

23      Q.    And as Judge Silver contemplates, Ms. Milke, an

24    effective sanction against you in this case, is it your

25    position, then, that an award of substantial attorneys'

Page 579

1    fees and costs or a substantial award of monetary damages

2    against you would be fruitless because you couldn't pay

3    it?

4                MS. WANG:  Well, object -- objection.

5    Foundation.  The judge presented an alternative, and you

6    should not trick her into conceding something that --

7                MS. BURGESS:  Just please limit your

8    objections to --

9                MS. WANG:  Okay.

10               MS. BURGESS:  -- form, foundation.

11               MS. WANG:  Objection.  Foundation.

12               THE WITNESS:  Okay.  So I really don't even

13   understand your -- what you're -- what you're saying to

14   me.

15       Q.   BY MS. ODEGARD:  Okay.  In this case --

16       A.   Yeah.

17       Q.   -- do you understand that Judge Silver is in

18   the process of determining what an effective sanction --

19   severe sanction is for you in this case because of the

20   discovery abuses?  Do you understand that?

21       A.   I'm -- I'm -- I'm -- being accused of

22   discovery -- I'm being accused?

23       Q.   Ms. Milke --

24       A.   You have Jana's book.

25       Q.   -- do you understand that Judge Silver has

1    already ruled that you are subject to severe sanctions

2    for your discovery misconduct?

3        A.    Yes.

4        Q.    Okay.  And that she's in the process in this

5    case of determining what an effective sanction would be

6    against you.  Do you understand that?

7        A.    I do.

8        Q.    And one of the alternatives she's considering

9    is a substantial monetary award awarding the various

10   defendants our attorneys' fees and costs incurred because

11   of your misconduct.  Do you understand that?

12       A.    I do.

13       Q.    And would it be your position that if Judge

14   Silver awards a substantial monetary judgment against

15   you, that that would be a fruitless step because you

16   can't pay it?

17       A.    I --

18            MS. WANG:  Objection.  Foundation.

19            THE WITNESS:  I don't know.  I don't know

20   how all this works.  I don't know.

21       Q.    BY MS. ODEGARD:  Well, if she were to award 4-

22   or 5- or $600,000 in attorneys' fees and costs to the

23   various defendants, would you pay that?

24       A.    I can't.

25       Q.    Okay.  So it would be fruitless for her to

Page 581

1    award such an amount because it wouldn't be meaningful or

2    effective.  Correct?

3        A.    Yes.

4        Q.    Okay.  Your attorneys in this case filed a

5    response indicating that an award of sanctions would be

6    not meaningful because you earned minimum wage.  Were you

7    aware of that?

8        A.    When was that done?

9        Q.    You were not aware that they filed a document

10   that included that statement?

11            MS. WANG:  Well, objection.  Form.

12   Foundation.

13            THE WITNESS:  I don't -- I don't know.

14       Q.    BY MS. ODEGARD:  Okay.  My understanding of

15   your financial situation is that your main source of

16   revenue isn't your income from working at Kimerer's firm

17   but it's rather the revenue you receive from your

18   mother's estate.  Is that correct?

19       A.    That's correct.

20       Q.    And that's the $4,000 a month we talked about a

21   couple days ago?

22       A.    Yes.

23       Q.    Okay.  And besides the $4,000 a month and the

24   wage rate that you earn from Kimerer's firm, your other

25   sources of income are what?

Page 582

```
 1        A.    That's it.

 2        Q.    Okay.  You have from time to time gotten paid

 3    for speaking engagements or appearances on panels.

 4    Correct?

 5        A.    Yes.

 6        Q.    Okay.  Do you have any investment accounts?

 7        A.    No.

 8        Q.    Do you have any accounts at all other than the

 9    bank account with Frankie, who we talked about a bit ago,

10    and your personal B of A bank account?

11        A.    Do I have any other bank accounts?

12        Q.    Correct.

13        A.    No.  I just bank at Bank of America.

14        Q.    Do you have any other investment accounts of

15    any sort?

16        A.    No.

17        Q.    Do you have any stocks or bonds?

18        A.    No.

19        Q.    Do you have any real estate?

20        A.    No.

21        Q.    You own your own car?

22        A.    No.  The bank does.

23        Q.    Okay.  How much is owed on your car?

24        A.    A lot.  Like, I don't know -- I'm -- I'm not

25    positive.
```

Page 583

```
 1        Q.    Okay.  And what type of vehicle do you drive?

 2        A.    It's a Honda Civic.

 3        Q.    Okay.  What year is that?

 4        A.    2019.

 5        Q.    Why did you cut down the hours at Kimerer's

 6   firm to 18 hours a week?

 7        A.    Because, um, I -- I'd become overwhelmed.  Not

 8   with the work.  It's with daily life.  I've become very

 9   overwhelmed.  And I live out in Litchfield Park and I

10   work down here.  And sometimes the drive to and from is

11   extremely stressful.

12              And I also was considering to see Emily, my

13   therapist, more than once a week.  But I -- I can go -- I

14   can increase my hours if I want to.

15        Q.    Okay.  And you -- you've already explained that

16   you've got two lump sum payments coming under your

17   mother's estate.  Correct?

18        A.    But I don't know the amount.

19        Q.    Okay.  And at one point, I think you testified

20   it was worth approximately $400,000.  Is that correct?

21        A.    Yes.

22        Q.    And was that before or after the sale of her

23   own residence?

24        A.    I'm not sure how this all worked.  My -- I -- I

25   don't know.  I -- I -- I think this money came from
```

Page 584

```
 1      her -- the sale of her house.  I'm -- I'm not positive.

 2           Q.    Let's talk about your debt for a moment.  You

 3      owe rent of $850 a month.  Correct?

 4           A.    Yes.

 5           Q.    And you owe a car payment?

 6           A.    Yes.

 7           Q.    Do you have any other debt?

 8           A.    Yes.

 9           Q.    What's your other debt?

10           A.    I pay credit cards.  I just pay -- I pay credit

11      cards off.

12           Q.    And how many different credit cards do you

13      have?

14           A.    I don't -- I submitted all this stuff.  I don't

15      know how many.  Six, I think.

16                 MS. WANG:  Just answer.

17           Q.    BY MS. ODEGARD:  Do they all have revolving

18      credit?

19           A.    Yes.

20           Q.    Do you have an approximation of the balance of

21      your credit cards, as you sit here today?

22           A.    Um, I think on my Capital One card, I owe

23      2,000.  And on my Discover card, it's 1400.  And all the

24      other ones are below a thousand.

25           Q.    Okay.  Do you have a CPA or an accountant that
```

Page 585

1    guides you at all in your tax preparation or any of your

2    financial issues?

3        A.    No.

4        Q.    Did either Rhonda Neff or Mike Kimerer

5    participate telephonically in your deposition preparation

6    when you went to Colorado ten days ago?

7        A.    No.

8        Q.    Have you met with your attorney on any of the

9    evenings between our sessions of deposition this week?

10       A.    In the evenings?

11       Q.    Correct.

12       A.    No.

13       Q.    Or earlier in the mornings before we start --

14   resumed?

15       A.    In -- in the mornings, yes.

16       Q.    But you haven't been asked to review any

17   additional documents?

18       A.    No.

19       Q.    Did anyone travel with you when you went to

20   Colorado for your deposition --

21       A.    No.

22       Q.    -- preparation?

23       A.    No.

24            MS. ODEGARD:  That's all the questions I

25   have.  Thanks.  We'll reserve our additional time until

Page 586

1     the end.

2                    MS. WANG:   Okay.   Can we take a quick break?

3                    THE VIDEOGRAPHER:   We're going off the

4     record.   The time is 2:59 p.m.

5                    (A recess was held off the record.)

6                    THE VIDEOGRAPHER:   We're back on the record.

7     The time is 3:22 p.m.

8         Q.    BY MS. ODEGARD:   I mentioned I just had one

9     additional question.   Thanks.

10                   Ms. Milke, did you ever, at any point of

11    time during this lawsuit, review a list of the documents

12    that you produced to make sure that all of the documents

13    you know of existing that they are -- that are required

14    to be disclosed under the Federal Rules of Civil

15    Procedure or that are responsive to defendants' requests

16    for production had been produced?

17        A.    Very first one -- I read through the first ones

18    with -- when this started.

19        Q.    Okay.   And when you say the first one, what are

20    you talking about?

21        A.    The first -- I don't know what it's called.

22    The first -- when this first started.

23        Q.    You're talking about the lawsuit that you

24    filed --

25        A.    No.

Page 587

1      Q.     -- the complaint?

2      A.     No.  The -- the -- what do you call it?  The

3   production.

4      Q.     Your disclosure statement?

5      A.     Disclosures.

6      Q.     Okay.  Other than reviewing your initial

7   disclosure statement, at any other time during the course

8   of this lawsuit, did you review a list of all of the

9   documents that were produced on your behalf to make sure

10   that everything you knew existed and needed to be

11   produced pursuant to our discovery requests or the

12   federal rules had been produced?

13      A.     Did I personally review a list?

14      Q.     Correct.

15      A.     Who would have written the list?

16      Q.     Any list.  Prepared by your attorneys or anyone

17   else.

18      A.     I -- I just -- I gave --

19              MS. WANG:  I think she's confused.

20              THE WITNESS:  I'm really confused.

21      Q.     BY MS. ODEGARD:  Okay.

22      A.     I'm really confused by what you're asking.

23      Q.     Okay.

24      A.     I...

25      Q.     You indicated a moment ago that you reviewed

1    what may have been the initial disclosure statement and

2    the documents produced with that --

3         A.    Yes.

4         Q.    -- to make sure that it was complete?

5         A.    Do you -- do you have a copy of it?  I -- I

6    just -- look, I just recall reviewing it and -- not on my

7    own, though.  Not on my own.

8         Q.    Okay.

9         A.    And I gave my -- I gave them what was asked.

10        Q.    Okay.  And so are you testifying that early in

11   the case, at the beginning of the case, at some point you

12   reviewed some list of documents that was being produced

13   on your behalf?

14        A.    I don't know how to answer your question

15   because I don't know if I'm breaking privilege or not.  I

16   mean, how can I answer your question?  I didn't do

17   anything on my own.

18        Q.    Okay.  Including reviewing a list of all the

19   documents produced on your behalf to make sure that

20   everything you knew of existed had been produced?

21        A.    I -- I can tell you that I review- -- that I

22   reviewed documents not alone.  So --

23        Q.    Okay.  And that's --

24               MS. WANG:  Do you want --

25        Q.    BY MS. ODEGARD:  That's not responsive.  I'm

Page 589

1    asking about a list of documents.

2              Did you, Ms. Milke, ever review a list to

3    make sure that everything you knew existed that would be

4    responsive to our requests and what the federal rules

5    require was being produced by your lawyers?  Did you

6    yourself do that, whether in your attorneys' presence or

7    not?

8        A.    I just -- I -- I --

9              MS. WANG:  I don't think she knows.

10             THE WITNESS:  I don't understand.

11             MS. WANG:  If you want to go off the record,

12   I can -- I can try and --

13             THE WITNESS:  Please explain this to me

14   because I don't know.

15             MS. WANG:  If you want to go off the record,

16   I -- I can try to clarify because I don't think she knows

17   what you're talking about.

18             MS. ODEGARD:  No.  I don't think this is a

19   confusing question.

20       Q.    BY MS. ODEGARD:  My question is at any point

21   during the course of the lawsuit, did you review a

22   list -- a document with a list identifying everything

23   that was being produced by you in this case to make sure

24   that all the things you yourself knew about and were

25   responsive to our requests and the civil rules were being

Page 590

1       produced?

2           A.   I -- I don't know -- I think I'm confused by

3       your word list.  Whose list?  Was there a list?  A list

4       by you?  A list by my attorneys?  I don't know.

5           Q.   Ms. Milke, it doesn't make any difference who

6       generated the list.  My question is just did you ever

7       yourself ascertain and make certain that all the

8       documents you were aware of that were required to be

9       produced in this case, either because we requested them

10      by a discovery request --

11          A.   Yes.

12          Q.   -- or because they were otherwise required to

13      be produced by the civil rules of procedure, that those

14      were all produced on your behalf?

15                   MS. WANG:  Objection.  Form.  Foundation.

16                   THE WITNESS:  I gave -- I gave what I was to

17      give.  I gave it.  I mean, I -- I did.  I -- what I

18      brought to the office --

19          Q.   BY MS. ODEGARD:  Okay.  I didn't ask you --

20          A.   I don't know what you're saying.

21                   MS. WANG:  Objection.  Asked and answered.

22          Q.   BY MS. ODEGARD:  Ms. Milke, you haven't

23      answered my question.  My question isn't what you gave to

24      your lawyers.  My question is did you ever look at a list

25      at any time during the course of the case, whether it's

Page 591

1    recently, at the beginning or during the various phases

2    of discovery we've been in over the last four years --

3         A.    Please -- please --

4         Q.    -- and make certain that everything you knew of

5    that needed to be produced was being produced?  Did you

6    ever do that?

7                   MS. WANG:  Objection.  Form.  Foundation.

8                   THE WITNESS:  Did I -- Okay.  So you're

9    asking me if I made sure that what was being asked in the

10   court papers was being produced?  Is that what you're

11   asking me?

12        Q.    BY MS. ODEGARD:  I'm asking you if you yourself

13   ever made certain by looking at any kind of list that all

14   the documents you were aware of yourself that needed to

15   be produced in this case had been or were being produced?

16                   MS. WANG:  Objection.  Form.

17                   THE WITNESS:  I -- I -- I don't -- I don't

18   recall reading a list.

19                   MS. ODEGARD:  Okay.  Thank you.

20

21                          EXAMINATION

22   BY MS. WANG:

23        Q.    Yesterday, you at some point during the dep- --

24   or I think in the beginning of the deposition actually,

25   you were talking to Ms. Retts about the binders in the

Page 592

1    Milke room, and I don't think you quite -- quite finished

2    talking about that.

3            What other interaction with the binders in

4    the Milke room have you had other than what you've

5    already testified to?

6            MS. RETTS:  Form.

7            MS. BERKE:  And can an objection for one be

8    an objection for all so that we're not --

9            MS. WANG:  Yeah, I don't -- yeah, we

10    don't --

11            MS. BERKE:  All right.  Thanks.

12            THE WITNESS:  Some -- occasionally Rhonda

13    would ask me to scan whatever's in a binder to her

14    e-mail.  But I never went into the room to get what she

15    was looking for.  She retrieved a binder and handed it to

16    me to scan to her e-mail, and then I would do that and

17    then give it back to her.

18    Q.    BY MS. WANG:  What was the primary way that you

19    prepared for your deposition?

20    A.    Speaking to my attorneys.

21    Q.    Okay.  And you were asked some questions about

22    your speaking engagements that you've had that you've

23    been on over the last few years.  What -- why did you go

24    on those speaking engagements?

25    A.    Because speaking about it is therapeutic for me

Page 593

1    and also educating people, laypeople, about wrongful

2    convictions.

3         Q.    I'm showing you what was marked as Deposition

4    Exhibit 418.  I'm just going to give you the one that

5    I -- that I marked.  I can't find -- unless I can find...

6         A.    I don't know where it's at.

7         Q.    I'm not sure where the actual marked copy is.

8              Oh, here.  Here, I'll give you the official

9    copy.

10        A.    Okay.

11        Q.    I've handed you what's been marked as

12   Deposition Exhibit 2 -- I'm sorry -- 418.  Have you seen

13   this particular -- this specific document before, this

14   version?

15        A.    No.

16        Q.    Okay.  Have you seen anything that contained

17   it?

18              MS. RETTS:  Form.

19              THE WITNESS:  Yes.

20        Q.    BY MS. WANG:  And what was that?

21        A.    It was the entire document from page 1 to how

22   many -- however many pages there were to the very end.

23        Q.    To page 49?

24        A.    49.

25        Q.    And when did you write that document?

Page 594

1      A.    I don't recall exactly when I wrote it.  It --

2  this could have been written prior to the retrial or -- I

3  think so.  I'm not sure when I wrote it.  But this is

4  related to the retrial.

5      Q.    It's relating to the -- and how is it relating

6  to the retrial?

7      A.    I wrote this and -- and -- and gave this to

8  Mike and Lori.

9      Q.    Did you give it to anyone else?

10      A.    No.

11      Q.    You were asked some questions by Ms. Retts

12  about taking a paralegal course.  Do you remember those

13  questions?

14      A.    Yes.

15      Q.    At some point of time when you were in prison.

16      A.    Yes.

17      Q.    How long ago was that that you took that

18  course?

19      A.    I think it was in 1992 or '93.

20      Q.    And what do you recall learning in that course?

21      A.    I just recall learning basic legal words like

22  what a pleading is, what an order is, what a motion is,

23  those things.

24      Q.    And what work do you do at Mr. Kimerer's

25  office?

Page 595

1     A.    I file all -- all the doc- -- I -- I file all

2   the documents in all the lawyers' -- from the lawyers'

3   offices except not in my own case.  And I help with the

4   accounting -- filing, accounting, and I relieve our

5   receptionist when she goes to lunch and breaks.  And I

6   help Rhonda close out case files.

7     Q.    Um, do you ever do any paralegal work at

8   Mr. Kimerer's office like -- like checking citations for

9   briefs or anything like that?

10     A.    No.

11         MS. BERKE:  Objection.  Form.

12     Q.    BY MS. WANG:  Okay.  What is your recollection,

13   as you sit here today, of what you said to Saldate when

14   he said to you during the interrogation, Do you want this

15   recorded?

16     A.    My recollection today is that when he asked me

17   if you want -- do you want this interview recorded, I

18   said, No, I need a lawyer.  That's my recollection.

19     Q.    And did you, at some point, say to him that you

20   wanted to use the phone to call your dad about a lawyer?

21     A.    Yes.

22     Q.    When was that?

23     A.    It was either in Florence or the Phoenix police

24   station or both places.

25     Q.    Do you recall that today?

Page 596

1        A.    I do.

2        Q.    I mean, you don't -- do you recall where you

3    asked for that?

4        A.    Oh, I don't -- no, I don't -- I don't know if

5    it was in Florence or Phoenix or both places.

6        Q.    Ms. Berke showed you some letters that you

7    wrote to Lori Voepel in 2002.  Do you recall those

8    letters?

9        A.    Yes.

10        Q.    What were you trying to convey to Ms. Voepel in

11    those letters?

12        A.    That I asked for an attorney and that I -- that

13    he -- I was ignored.

14        Q.    When you made your self-recording to Peter

15    Aleshire in 1998, were you giving a blow-by-blow account

16    of everything that you said and Saldate said in that

17    interview?

18        A.    No.

19        Q.    Do you remember the portion of the Aleshire

20    recording that Ms. Berke showed you --

21              Let me get it out.  Okay.  It's Deposition

22    Exhibit 410.

23        A.    Uh-huh.

24        Q.    If you turn page 78 to 79.

25        A.    Yes.

Page 597

1          Q.    So those are the pages that Ms. Berke asked you

2     about where you said, "I don't" -- "I have no idea what

3     the hell Roger is talking about"?

4          A.    Yes.

5          Q.    Okay.  What were you communicating to

6     Mr. Aleshire here?

7                    MS. BERKE:  Objection.  Vague.

8                    THE WITNESS:  Um, I was communicating

9     Roger's testimony and when I said I have no idea what the

10    hell Roger's talking about, I was referring to his

11    testimony and what he was -- he had said in his

12    testimony.

13         Q.    BY MS. WANG:  I'm showing you what's been

14    marked as Deposition Exhibit 353.  That's the letter from

15    Ms. Voepel to Vince Imbordino.

16         A.    Yes.

17         Q.    Did you review that before it went out?

18         A.    Before -- before it went to Mr. Imbordino?

19         Q.    Yeah.

20         A.    No.

21         Q.    I'm showing you what was previously marked as

22    Deposition Exhibit 5.

23         A.    Yes.

24         Q.    Turn to page MILKENSB530.

25         A.    Yes.

Page 598

1    Q.    About three paragraphs down --

2    A.    Yes.

3    Q.    -- it says, "I asked Debra if that morning when

4    her son left she gave him a special hug or kiss and she

5    told me that she did not have to.  I asked her if she

6    could explain and she told me that approximately one week

7    ago, she told her son that God was coming down and going

8    to take him and that he was going to be going to heaven.

9    She said she also told him that she would see" -- it's

10   marked out but might say him -- "later in heaven."

11                Okay.  Do you see that?

12   A.    I do.

13   Q.    Is that true, what Saldate described there?

14   A.    No.

15   Q.    What about it is false?

16   A.    When he says she told me -- well, I asked her

17   if she could explain, that's not -- that's -- that's

18   wrong.  This whole sentence -- these sentences are wrong.

19   This is not what I said.  He took all of this out of

20   context.

21   Q.    What did you say?

22   A.    I remember recalling a conversation that I had

23   had with Christopher, and when I was recalling it, I was

24   crying and I was telling him that Christopher went to

25   church with Jim and he came home with some coloring and

1    he asked me about God and who was God and what is God.

2              And -- and I was -- in a simple way of

3    explaining to Christopher, I said what I said, which

4    is -- but I did not say it like it's written here.

5         Q.   Okay.  And so you did not say that -- is it

6    fair to say that what Saldate is accusing you of in this

7    report is of telling Christopher that he's going to be

8    going to heaven and that this was, like, imminent because

9    the assumption was that you were going to have him

10   killed?

11             MS. BERKE:  Objection.  Form.

12             THE WITNESS:  That's -- that's how -- this

13   is how he conveyed it in this report.

14        Q.   BY MS. WANG:  Okay.  And that is not what you

15   said.  Right?

16        A.   That's not what I said.

17        Q.   The conversation that you had with Christopher

18   about God had nothing to do with any -- any plan that you

19   had to have him killed?

20        A.   No.

21             MS. ODEGARD:  Form.

22             THE VIDEOGRAPHER:  Excuse me, Counsel.

23   Ms. Milke, can you just slide your microphone up for me a

24   little bit?

25             THE WITNESS:  (Witness complies.)  Okay.

Page 600

1    That better?

2               THE VIDEOGRAPHER:  Yes.  Thank you.

3        Q.    BY MS. WANG:  The -- oh.  The -- you were asked

4    a question about what you did with Pat's letters just

5    before -- I think before our break earlier.  Remember

6    that?

7        A.    Yes.

8        Q.    Okay.  What did you do with Pat's letters?

9        A.    Okay.  So I got really confused.  I -- Pat

10   wrote to me when I was in prison.  So when I would

11   respond to him, I would have his letter out, respond to

12   him and then when I was finished responding, I just tore

13   his letter up and threw it in the trash.

14       Q.    And that was before your release.  Right?

15       A.    Yes.

16       Q.    There were some letters that you were shown,

17   various letters, some dating from 2002, some dating from

18   2005, where it -- you had some thought in your mind about

19   a civil lawsuit in the -- in the future.  Right?

20       A.    Yes.

21       Q.    Okay.  Did you think at those times before you

22   were released that a civil lawsuit was likely?

23               MS. RETTS:  Form.

24               THE WITNESS:  No.

25       Q.    BY MS. WANG:  Why not?

Page 601

1    A.    Because at the time, I was in prison fighting

2    for my life, fighting a death sentence.

3    Q.    After you got out, you got rid of Franke's

4    letters.  Is that right?

5    A.    In 2- -- yes, in 2013.

6    Q.    In 2013.

7          Was that before you retained any civil

8    lawyers?

9    A.    Yes.

10   Q.    And when you got rid of Franke's letters, did

11   you think that they were relevant to anything in the

12   case?

13   A.    No.

14   Q.    Okay.  After your release, did you get rid of

15   any documents other than Franke's letters and court

16   documents?

17   A.    No.  Just the -- my copy of my court documents,

18   and Franke's letters.

19   Q.    And why did you get rid of the court documents?

20   A.    Because they were just a copy, and I did not

21   want to have any of those documents in my possession, and

22   it was extremely cathartic for me to rip the pages apart

23   from the staples and just put each page in the shredder.

24   Q.    And these court documents, what -- did they

25   have -- what did they have to do with?  Were they

Page 602

1    relating to your habeas case?

2        A.    It was my criminal file, the transcripts and --

3    and exhibits.  It was the PCR.  Just all the criminal

4    court -- the filings.

5        Q.    And it's fair to say that those were all the

6    doc- -- those were the public documents that had been

7    filed on your behalf that led to your release?

8                 MS. RETTS:  Form.

9                 THE WITNESS:  Yes.  All my copies of the

10   court filings.

11       Q.    BY MS. WANG:  Did you read Franke's letters

12   before you got rid of them?

13       A.    No.

14       Q.    Did Frankie have anything to do with your

15   underlying criminal case?

16                 MS. BERKE:  Form.

17                 MS. ODEGARD:  Form.

18                 THE WITNESS:  Did he have anything to

19   do with --

20       Q.    BY MS. WANG:  I mean, did he have anything to

21   do with the -- the murder of Christopher or -- well, let

22   me ask it simply.

23                 MS. BURGESS:  Foundation.

24       Q.    BY MS. WANG:  Was he a witness in your --

25       A.    Frankie?

Page 603

1       Q.     Okay.  Who is Frankie?

2       A.     Frankie is -- my mother -- I don't know what

3    year it was.  2000, maybe 1999 or 1998.  I don't remember

4    the year.  She gave an interview to a national magazine

5    in Germany, and Frankie read it and he made contact with

6    my mother, and he offered to help with whatever he could

7    do.  And I think -- I'm not positive.  I just don't

8    know -- the internet was starting to come out.

9              And he offered to help make my -- the story

10   public.  And so he worked together with my mother and

11   created a Web site.

12      Q.     You did not know Frankie in 1989.  Is that

13   correct?

14      A.     That's correct.

15      Q.     Okay.  He was not a witness at your trial?

16      A.     No.

17      Q.     He did not -- he did not know any of the

18   underlying witnesses in your trial, as far as you know?

19              MS. RETTS:  Form.

20              THE WITNESS:  Correct.

21      Q.     BY MS. WANG:  There were some quest- -- did you

22   ever instruct Frankie to destroy any documents?

23      A.     No.

24      Q.     Did you ever instruct Pat to destroy any

25   documents?

Page 604

1        A.    No.

2        Q.    Did you ever instruct Carolyn Imhoff to destroy

3    any documents?

4        A.    No.

5        Q.    Did you ever instruct Carolyn Imhoff to destroy

6    any tapes?

7        A.    No.

8        Q.    Did you ever instruct Frankie to destroy any

9    tapes?

10       A.    No.

11       Q.    Did you ever instruct Pat to destroy any tapes?

12       A.    No.

13       Q.    When's the last time you talked to

14   Ms. Imhoff -- Imhoff?

15       A.    I don't know the last time I talked to her.

16   Um, I think the last time I had any kind of communication

17   with her was prior to me winning my appeal, I think.  I'm

18   not sure.

19       Q.    And that would have been in about what year?

20       A.    2013.  I won my PL in 2013.  So I don't -- it

21   would be before that.  I don't remember.

22       Q.    Do you know -- sorry, strike that.

23             Did you ever ask Jeff Trollinger to destroy

24   any documents he might have had?

25       A.    No.

Page 605

1    Q.    Before Carolyn -- or I'm sorry.  Before Susan

2    Studola e-mailed you about -- in October of 2019 about

3    Jeffery Trollinger's death, did you have any documents

4    that would refresh your recollection about talking to

5    him?

6                 MS. RETTS:  Form.

7                 THE WITNESS:  Did I have any documents?

8    Q.    BY MS. WANG:  Yeah.  Before you got the e-mail

9    from Susan Studola in October of 2019 informing you that

10   Jeffery Trollinger had died, did you have any documents

11   that would have refreshed your recollection about having

12   talked to him?

13   A.    I -- I don't know.  I -- I -- I don't know.  I

14   had -- I don't know.  Because his name came to my mind

15   when Susan sent me the e-mail.

16   Q.    There were some questions yesterday or the day

17   before about deletion of your e-mails, and I don't

18   remember the exact question, but it made it sound like

19   you currently delete your e-mails.  Do you delete your

20   e-mails?

21   A.    No.

22   Q.    Okay.  Do I have access to your e-mails?

23   A.    Yes.

24   Q.    Did NSB have access to your e-mails?

25   A.    Yes.

Page 606

1      Q.    Why didn't you personally do anything to make

2  sure that documents were produced relating to the Court

3  sanctions order issued in July of 2019?

4            MS. RETTS:  Form.

5            THE WITNESS:  Why didn't I personally what?

6      Q.    BY MS. WANG:  Why didn't you personally do

7  anything -- you were asked some questions about whether

8  you have personally done anything to respond to discovery

9  in this case or to respond to the Court's sanctions

10 order.

11     A.    I -- like I said before, it's just difficult

12 for me to read all of this, and I have attorneys who

13 handle this litigation for me.

14     Q.    Are you in contact with me on a regular basis?

15     A.    Yes.

16     Q.    During what period of time did you know Ingo?

17     A.    It was in the -- I -- I want to say the late

18 '90s, before Mike and Lori came in to -- to help me.

19     Q.    Why did you ask Pat to -- sorry.  Strike that.

20            There was various letters that you were

21 shown where you wrote to Pat asking him to send money to

22 inmates at various times.  Do you recall those letters?

23     A.    Yes.

24     Q.    Why did you ask Pat to send money to inmates?

25     A.    Because there were a lot of people that I lived

Page 607

1    around that had nothing and nobody.  And I was able to

2    share some of the money that my mother gifted to me, and

3    so that's -- that's what I would do.

4        Q.    When you were in prison during the 2005 time

5    frame, why did you spend time writing about your

6    incarceration?

7        A.    Because I -- I was -- it was therapeutic for

8    me.  I didn't have anyone to talk to.  I was alone -- I

9    was alone and isolated in that room and didn't have much

10   to do.  And so writing was therapeutic for me.

11               MS. BERKE:  Can you tell us what you're

12   looking for?

13               MS. WANG:  I'm sorry.

14               MS. BERKE:  We can look at --

15               MS. WANG:  Yeah, yeah.  3 --

16               MS. BERKE:  -- for it at the same time.

17               MS. WANG:  Deposition Exhibit 353.

18       Q.    BY MS. WANG:  So if you could turn to

19   Deposition Exhibit 353 and turn to page LNL22211.

20               MS. BERKE:  Can you tell us what page

21   number?  I have a different version so the page with the

22   letter.

23               MS. WANG:  Page 14.

24               MS. BERKE:  Okay.  Thank you.

25               THE WITNESS:  Okay.  I'm here.

Page 608

1        Q.    BY MS. WANG:  And do you recall when Ms. Retts

2   was asking you about this paragraph, the second -- the

3   first full paragraph that starts with "On the evening

4   before Chris' murder, Debra was doing laundry"?

5        A.    Yes.

6        Q.    Okay.  And do you see the citation here, ER

7   1198 Debra affidavit?

8        A.    Yes.

9        Q.    Sorry.  I missed that.  What -- what deposition

10  number are we on?

11       A.    You said 353.

12       Q.    I know.  But we're on 423.  Right?

13       A.    Do I just give this to her?

14             MS. WANG:  Yes.

15             (Exhibit 423 was marked for identification.)

16       Q.    BY MS. WANG:  Okay.  So -- I'm sorry.

17  The par- -- in Deposition Exhibit 353 --

18       A.    Yes.

19       Q.    -- if you turn to page --

20       A.    22.

21       Q.    -- 11 --

22       A.    Okay.

23       Q.    -- which is page 14 --

24       A.    Okay.

25       Q.    Okay.  So in this paragraph, it cites to ER

1    1198 Debra's affidavit attached as Exhibit 12 at

2    paragraph 61.  Right?  No, this one, this letter.

3         A.    Okay.  Yes.

4         Q.    Okay.  So what has been marked as Deposition

5    Exhibit 423, is an affidavit from you.  Right?

6         A.    Yes.

7         Q.    Okay.  And if you turn to paragraph 61.

8         A.    Yes.

9         Q.    In paragraph 61, you say, "I was aware that Jim

10   owned a gun.  It's the gun that was in his closet.  When

11   the police asked for it, it was there.  I showed it to

12   them.  That was the only gun I ever thought Jim owned.  I

13   had absolutely no knowledge of two other weapons or one

14   other weapon.  When Jim bought that gun, he also bought a

15   box of the bullets.

16              "The day I was doing laundry, I was sorting

17   through all the clothes, and I was emptying out pockets.

18   Inside a pair of Jim's jeans, there was a box of bullets.

19   I put them in my purse to give them back to James Styers

20   later.  I did not want to leave them out.

21              "Then all this happened.  And when I went to

22   Florence, I took my purse with me totally forgetting

23   about these bullets being in my purse."

24              Do you see that?

25        A.    Yes.

Page 610

1      Q.    What did you mean by that last sentence when

2   you said, "When I went to Florence, I took my purse with

3   me"?

4                 MS. BURGESS:  Form.

5                 THE WITNESS:  I meant that when I went to my

6   dad's house.

7      Q.    BY MS. WANG:  So when you went to your dad's

8   house, you took your purse with you?

9      A.    Yes.

10     Q.    Your dad's house in Florence?

11     A.    Yes.

12     Q.    Okay.  Showing you what was marked as

13  Deposition Exhibit 355.

14     A.    Okay.

15     Q.    That's the letter you were asked about by

16  Ms. Retts that you wrote to -- sorry.  Strike that.

17                 You -- you -- this is a letter that you

18  wrote to Ken Ray.  Right?

19     A.    Yes.

20     Q.    On paragraph 7 --

21     A.    Yes.

22     Q.    -- it says, "My black purse is at my father's

23  house, which contains my checkbook and wallet."

24                 Right?

25     A.    Yes.

Page 611

1      Q.    Do you recall -- so you were saying in this

2    letter that your black purse had been left at your

3    father's house.  Right?

4      A.    Yes.

5      Q.    And do you recall what you testified at

6    sentencing about that?

7      A.    No.

8      Q.    Why did you cry when Ms. Retts read out your

9    inmate number?

10     A.    Because that -- that's a trigger.  And it --

11   it -- it took me back to being in prison, and for 24 -- a

12   little over 24 years, I was nothing but a number and not

13   a human.  And so it was just retraumatizing me all over

14   again.  I'm not a number.  I'm a human being and I'm

15   free.  And I don't have to worry anymore about a needle

16   getting stuck in my arm.

17               MS. WANG:  Can we go off the record?

18               THE VIDEOGRAPHER:  We're going off the

19   record.  The time is 4:01 p.m.

20               (A recess was held off the record.)

21               THE VIDEOGRAPHER:  We're back on the record.

22   The time is 4:05 p.m.

23     Q.    BY MS. WANG:  How long ago did you know Rick or

24   Ricardo Scavone?

25     A.    I met Rick in 1978.  And we went to high school

Page 612

1    together.  And we graduated in 1982.

2         Q.    Do you remember, when's the last time you

3    talked to him?

4         A.    I don't recall exactly when I -- the last time

5    I talked to him, but it -- it was -- I think it was

6    during the time I was in the County jail awaiting trial.

7    I'm not sure.

8         Q.    At the time of your original trial?

9         A.    Yeah, yes.

10        Q.    When you went through your mother's belongings

11   in Germany, did you see any audio tapes there?

12        A.    No.

13        Q.    Oh.  You were asked -- strike that.

14              Did you -- yesterday -- no, strike that.

15              You were asked some questions about when you

16   saw Mr. -- I'm sorry -- Dr. Potts.

17        A.    Yes.

18        Q.    Okay.  And, like, the -- recently?

19        A.    Yes.

20        Q.    And I think that was on the -- was that on the

21   first day of your deposition that you saw Dr. Potts?

22        A.    I -- I think it -- I think so.  I can't -- it

23   was either Wednesday or yesterday.  I can't remember

24   exactly.

25        Q.    And that was during a lunch break?

Page 613

```
 1        A.    Yes.

 2        Q.    Okay.  And does Dr. Potts share an office with

 3   Mr. Kimerer --

 4        A.    Yes.

 5        Q.    -- like in the same office --

 6        A.    Yes.

 7        Q.    -- suite?

 8              And did you -- after you saw Dr. Potts, did

 9   you -- did you meet with anyone to talk about the case

10   when you were there during lunch break?

11        A.    Yes.

12        Q.    Who was that?

13        A.    You and Rhonda.

14        Q.    Was anybody else there?

15        A.    No.

16              MS. WANG:  Okay.  I have no further

17   questions.

18              MS. BERKE:  Okay.  Let's go off the record

19   and take a break.

20              THE VIDEOGRAPHER:  We're going off the

21   record.  The time is 4:08 p.m.

22              (A recess was held off the record.)

23              THE VIDEOGRAPHER:  We're back on the record.

24   The time is 6:16 p.m. (sic)

25              MS. BERKE:  I hope it's not 6:16.
```

Page 614

1          (Multiple speakers.)

2          THE VIDEOGRAPHER:  The time is 4:00 -- now

3    4:17 p.m.

4

5                FURTHER EXAMINATION

6    BY MS. BERKE:

7      Q.    All right.  Ms. Milke, why did you leave your

8    purse at your father's house when you went to the

9    sheriff's station?

10     A.    I don't know why I left it there.  I just --

11   it -- I don't know why I left it there.  I -- it was just

12   there.

13     Q.    You have no explanation?

14     A.    Um, I had been up for two days, and my

15   stepsister woke me up and told me about the Sheriff being

16   at the door, and I just left and went with the Sheriff

17   and the family friend Jan.

18     Q.    Well, that's not completely accurate.

19     A.    Well, okay.  So I --

20          MS. WANG:  Objection.  Form.

21          THE WITNESS:  -- brushed my hair in the

22   bathroom.  Yes, those things, but yes.

23     Q.    BY MS. BERKE:  Right.  You went to the

24   bathroom, brushed your hair?

25     A.    Uh-huh.

Page 615

1       Q.      You went into the kitchen and got something to

2   drink?

3       A.      Yes.  And then I went to the door --

4       Q.      Right.

5       A.      -- yes.

6       Q.      So you did those things.  And then you're

7   saying it didn't occur to you to bring your purse to

8   the --

9       A.      No.

10      Q.      -- to the sheriff's station?

11      A.      No.

12      Q.      Take a look at Exhibit Number 353.  That's the

13  letter from Mike Kimerer and Lori Voepel to

14  Mr. Imbordino.  I think it's the next document right

15  there with the JSH at the top.

16      A.      Okay.

17      Q.      And turn to page 14 of the letter.  That's the

18  paragraph that you discussed with your attorney --

19      A.      Yes.

20      Q.      -- about the bullets.  Correct?

21      A.      Yes.

22              MS. WANG:  Objection.  Form.  Foundation.

23              MS. BERKE:  What's wrong with the form of

24  that question?

25              MS. WANG:  What do you mean by discuss with

Page 616

1      your attorney?  Maybe I'm objecting for --

2                    MS. BERKE:  During your questioning.

3                    MS. WANG:  Okay.  I thought you were

4      referring to something else.

5           Q.    BY MS. BERKE:  Okay.  The last sentence of the

6      paragraph addressing that issue states, quote, Obviously,

7      if the bullets were incriminating as to her, Debra, who

8      was by all accounts very bright, would have known better

9      than to bring them in her purse to the sheriff's station

10     to meet with the lead detective on her son's case, end

11     quote.

12                    Did I read that correctly?

13          A.    Yes.

14          Q.    So what your attorneys are communicating to

15     Mr. Imbordino is that you brought your purse to the

16     sheriff's station.  Correct?

17                    MS. WANG:  Objection.  Foundation.  Form.

18                    THE WITNESS:  I don't know what -- I don't

19     know what she's trying to -- I don't know what she means

20     by that.

21          Q.    BY MS. BERKE:  Okay.  If you read that

22     sentence --

23          A.    Yes.

24          Q.    -- what would you interpret that to mean in

25     terms of where your purse was at the time you went to the

Page 617

1      sheriff's office?

2           A.    Um, I don't know.  She -- she says

3      about bringing -- I don't know what she means by this.

4      It's not right.

5           Q.    What's not right?

6           A.    It's not -- she's confused.

7           Q.    Because the clear implication of this sentence

8      is that you brought your purse to the sheriff's office.

9      Correct?

10               MS. WANG:  Objection.  Form.

11               THE WITNESS:  Yeah.  But I -- I didn't.

12          Q.   BY MS. BERKE:  So the information she's

13     conveying in this sentence is incorrect.  Corre- --

14     right?

15               MS. WANG:  Objection.  Foundation.  Form.

16               THE WITNESS:  I don't know what she's -- I

17     don't know this -- Lori wrote this.  I don't know what

18     she's trying to convey.

19          Q.   BY MS. BERKE:  What investigation did you do

20     into the whereabouts of the tape-recordings you had sent

21     to your mother and the written letters you had sent to

22     her?

23          A.    My mom lived in Germany.  And so when I got

24     out, I was on an ankle bracelet and I wasn't allowed to

25     leave the county, the state.  And then I was allowed to

Page 618

1    after I got the bracelet off.  But by the time I got the

2    bracelet off, she had died.  So I wasn't allowed to leave

3    to go spend any time with her or even go to her funeral.

4    So all of the tapes and letters that I sent to my mother

5    were with her in Germany.

6         Q.    Okay.  And who else had access to her home in

7    Germany where the tapes and the letters were?

8         A.    I have no idea.

9         Q.    Who -- did anybody else live there?

10        A.    My mother lived in Switzerland.  She had -- she

11   had an apartment there.  And then she -- and she lived

12   there by herself.  That's my understanding.

13        Q.    In Switzerland?

14        A.    Yes.  And then she -- she resided with Reinhart

15   in his house in Germany.

16        Q.    Is that where you would send the tapes?

17        A.    No.  My mother lived in Switzerland when I

18   would correspond with her.

19        Q.    Okay.  So you mailed all of the tapes and

20   letters to Switzerland?

21        A.    Yes.

22        Q.    And when did she get rid of that apartment?

23              MS. WANG:  Objection.

24              THE WITNESS:  She didn't --

25              MS. WANG:  Foundation.

Page 619

```
 1        Q.    BY MS. BERKE:  Did she have it until the time
 2   of her death?
 3        A.    Yes.
 4        Q.    And who cleaned out her apartment once she
 5   died?
 6        A.    I don't know exactly who did it.
 7        Q.    Did you ask Reinhart?
 8        A.    Reinhart -- I'm only aware of his son and some
 9   friends.  And that's --
10        Q.    Doing what?
11        A.    Taking all of her things from Switzerland and
12   bringing them to Germany.
13        Q.    And so they packed them up in boxes and brought
14   them to Reinhart's home in Germany?
15        A.    I don't know --
16              MS. WANG:  Objection.  Foundation.
17              THE WITNESS:  I don't know what they did.
18   I -- I wasn't a part of that conversation.  I have no
19   idea what they did, how they did it.
20        Q.    BY MS. BERKE:  Did you contact Reinhart or his
21   children who were involved in moving your mother's things
22   from Switzerland to Germany to ask them what happened
23   with those tapes and letters?
24        A.    No.
25        Q.    When did your attorneys from NSB gain access to
```

Page 620

1     your e-mail for the first time?

2          A.    I'm not sure.  I don't know.

3          Q.    Do you know what year?

4          A.    I -- I really -- I just don't know.

5          Q.    It wasn't at the very beginning of this

6     lawsuit.  Correct?

7          A.    Um, NSB, I don't know when I retained them.

8     It -- I think it was in 2015.  I don't remember.

9          Q.    Did you give them access to your e-mail at the

10    same time you retained them, or was it some later point

11    in time?

12         A.    I don't know.

13         Q.    Frankie Aue interviewed Belinda Reynolds.

14    Correct?

15         A.    I wouldn't even know.  I don't know.

16         Q.    You never had a discussion with him about that?

17         A.    I -- I don't recall.

18         Q.    Have you read or reviewed the videos or the

19    transcripts of the depositions of your sister, your

20    stepmother, your stepsister or any other individuals who

21    have been deposed in this case?

22         A.    I have not.

23         Q.    Have you ever instructed anyone to preserve

24    documents, tape-recordings or anything else relevant to

25    this case?

Page 621

1       A.    Have I instructed anyone to preserve anything?

2       Q.    Correct.

3       A.    No.

4       Q.    You've never asked Frankie to retain anything

5    related to this case?

6       A.    Are you referring to the Web site?

7       Q.    I'm referring to anything.

8       A.    No.  I -- I gave NSB Franke's contact

9    information and vice versa.

10      Q.    When your attorney was questioning you, there

11   was some discussion about Exhibit 418.  Do you recall

12   that?

13             MS. WANG:  It's right here somewhere.

14             THE WITNESS:  Okay.

15             MS. BERKE:  It's this document.  Okay.

16             THE WITNESS:  Okay.  Yes.

17      Q.    BY MS. BERKE:  Now, when I was questioning you

18   about that exhibit --

19      A.    Yes.

20      Q.    -- I asked you what that document was.  And

21   your response to me was, quote, I really don't know, I

22   don't know, end quote.  Right?

23      A.     If that's what I said, sure.

24      Q.    And I asked you if you know if you shared this

25   document with anybody and you said, I don't know, that

Page 622

1    you didn't know.  Correct?

2         A.    I -- I only recall you asking me if I've seen

3    this.  I don't -- and I told you I didn't -- I didn't --

4    it didn't look familiar to me.

5         Q.    And I also asked if you had shared the document

6    with anybody, and you said you don't -- you don't know.

7         A.    Right.  Because I guess -- when you asked me

8    the question, at that time, I didn't know.

9         Q.    And did something change between the time I

10   questioned you and your attorney questioned you in terms

11   of knowing whether you -- whether you shared it with

12   anybody?

13        A.    Um, did something change?

14        Q.    Yes.

15        A.    Yes.

16        Q.    What changed?

17        A.    I can't tell you what I talked to my lawyer

18   about.

19        Q.    So it was based on a discussion that you had

20   with your lawyer that your testimony changed from you

21   don't know whether you shared it with anybody to, I

22   didn't give it to anybody else?

23        A.    At the time you showed this to me, I didn't

24   recognize this because I -- and I think I even said the

25   black marking on here.  I didn't recognize this.

Page 623

1      Q.    So were you shown a document --

2      A.    You --

3      Q.    -- when -- after your attorney's questioning

4  and we took a break, were you shown a document?

5      A.    No.

6      Q.    And so how is it that you now know that that

7  somehow relates to your retrial?

8      A.    I -- I -- this is -- I didn't recognize this.

9  This is part of other documents.

10     Q.    What happened that made you now recognize it

11 between my earlier questioning and the time your attorney

12 questioned you?

13     A.    If -- then I would have to tell you what my

14 lawyer said to me.

15     Q.    Okay.  So it was based on a conversation with

16 your lawyer that you now recognize the document as

17 relating to your retrial?

18     A.    Yes.

19     Q.    What kind of information is on pages 1 through

20 38?

21     A.    I don't -- I don't -- I don't have it in front

22 of me.  I don't know.

23     Q.    Well, what is your recollection?  You prepared

24 that document and seem to remember it now.

25                MS. WANG:  Objection.  Foundation.  Form.

Page 624

1      THE WITNESS:  I just know that this was

2   writing for the retrial.

3      Q.   BY MS. BERKE:  Okay.  What kind of information

4   is on pages 1 through 38?

5      A.   I don't re- -- I don't know exactly what was on

6   there.

7      MS. WANG:  The judge reviewed it in camera.

8   So...

9      Q.   BY MS. BERKE:  Take a look at Exhibit Number

10  423.  That's the one that was marked when your attorney

11  was questioning you.

12     A.   Which one?

13     Q.   The -- the affidavit.

14     A.   Okay.

15     Q.   In paragraph 4 of that affidavit, you state,

16  quote, I quit taking birth controls when Mark and I were

17  married because I wanted to get pregnant, end quote.

18     Did I read that correctly?

19     A.   Yes.

20     Q.   And that's contrary to the testimony you gave

21  this week here in your deposition.  Correct?

22     A.   I -- I -- I don't exact -- remember exactly

23  what I said, but this whole topic is -- it's -- it's not

24  exact.  There's --

25     Q.   Well, you were either taking birth control

Page 625

1    pills or you weren't.

2        A.    I was doing both at the same time.

3        Q.    You -- you quit taking them and you were taking

4    them at the same time?

5        A.    One day I would take one, and the next day I

6    maybe wouldn't take one.  I might skip two days and then

7    take one.  So, yes, I was taking them and, no, I wasn't,

8    at the same time.

9        Q.    And this was an affidavit you prepared.

10   Correct?  And you knew it was important -- strike that.

11              This is an affidavit you prepared and knew

12   it was important to be exact.  Correct?

13       A.    I didn't know if it was important at this time

14   to be exact.  This is -- this is not exact.

15       Q.    If you look at the verification on page 11 of

16   the affidavit, you understood you were verifying that

17   this information was true and accurate under the penalty

18   of perjury.  Correct?

19       A.    Yes.

20       Q.    And you would agree the sentence is not

21   accurate?

22       A.    It's not accurate and it's not inaccurate.

23       Q.    Every time -- or strike that.

24              MS. BERKE:  Let's go off the record for one

25   second.

Page 626

1          THE VIDEOGRAPHER:  We're going off the

2    record.  The time is 4:31 p.m.

3               (A recess was held off the record.)

4          THE VIDEOGRAPHER:  We're back on the record.

5    The time is 4:35 p.m.

6      Q.   BY MS. BERKE:  Ms. Milke, your attorney asked

7    you how long ago -- and I'm going to quote her

8    question -- how long ago did you know Rick or Ricardo

9    Scavone and she gave -- so she gave both names, Rick and

10   Ricardo.  Do you recall that question?

11     A.   I do.

12     Q.   Your response was, I met Rick in 1978 --

13     A.   Yeah.

14     Q.   -- and we went to high school together and we

15   graduated in 1982.

16     A.   Yes.

17     Q.   And you -- you referred to him as "Rick,"

18   because that's what you called him in high school.

19   Correct?

20     A.   No, that's not correct.  That's the first --

21   I'm very, very, very tired.  And when she asked me the

22   question, she said Rick or Ricardo, that's the first

23   thing I heard.  So I just repeated it.  I'm very tired.

24     Q.   Did you call him Ricardo all through high

25   school?

Page 627

```
 1        A.     I called him -- I knew him as Ricardo.

 2        Q.     Did you call him Ricardo?

 3        A.     Yes.

 4        Q.     What about all the other kids, did they call

 5   him Ricardo?

 6        A.     I don't know.

 7               MS. WANG:  Objection.  Foundation.

 8               THE WITNESS:  This was 40-some years ago.

 9        Q.     BY MS. BERKE:  But it's your testimony that you

10   always referred to him as Ricardo in high school?

11        A.     I re- -- I knew him as Ricardo, yes.

12        Q.     That's not my -- not what you knew him as.  My

13   question is:  When you would speak to him or write to

14   him, would you call him Rick or would you call him

15   Ricardo?

16        A.     I -- I don't remember.  I would most likely

17   call him Ricardo.

18        Q.     But you don't know?

19        A.     I don't.

20               MS. BERKE:  That's all I have.

21               THE WITNESS:  Okay.  Good.

22               THE VIDEOGRAPHER:  Off the record?  This

23   concludes Volume 3 of the video-recorded deposition of

24   Debra Jean Milke.

25
```

Page 628

1                    The time is 4:37 p.m.

2                    (Whereupon, the proceedings ended at

3        4:37 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 629

1                    CERTIFICATE OF REPORTER

2     STATE OF ARIZONA      )
                            )
3     COUNTY OF MARICOPA    )

4

5          I, Sommer E. Greene, a Certified Reporter in the
      State of Arizona, do hereby certify that the foregoing
6     deposition was taken before me in the County of Maricopa,
      State of Arizona; that an oath or affirmation was duly
7     administered to the witness, DEBRA JEAN MILKE, pursuant
      to A.R.S. 41-324(B); that the questions propounded to the
8     witness and the answers of the witness thereto were taken
      down by me in shorthand and thereafter reduced to
9     typewriting; that the transcript is a full, true and
      accurate record of the proceeding, all done to the best
10    of my skill and ability; and that the preparation,
      production and distribution of the transcript and copies
11    of the transcript comply with the Arizona Revised
      Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
12              The witness herein, DEBRA JEAN MILKE, has
      requested signature.
13              I FURTHER CERTIFY that I am in no way related
      to any of the parties nor am I in any way interested in
14    the outcome hereof.

15

16              IN WITNESS WHEREOF, I have set my hand in my
      office in the County of Maricopa, State of Arizona, this
17    26th of December, 2019.

18

19                        -------------------------------
                          Sommer E. Greene, RPR, CRR
20                        Certified Reporter 50622

21

22    _____
      For Maricopa Reporting, Inc.
23    Registered Reporting Firm No. R1081

24

25

Page 630

1                    CERTIFICATION OF INVOICE

2                    SUPERIOR COURT OF ARIZONA

3                       COUNTY OF MARICOPA

4

             In compliance with and under ACJA 7-206(J)(g)(3)
5      through (6), we certify that:

6            All billing and invoicing to all the parties
       related in any manner to the reporting of the proceedings
7      or cases and the production of the transcript and any
       products or services ancillary thereto comply with the
8      Arizona Revised Statutes and the ACJA;

9            All financial terms and other services have been
       offered on the same terms to all parties to the
10     litigation;

11           Each party was able to purchase the transcript and
       such ancillary services as requested by that party
12     without regard to the ancillary services purchased by any
       party: and

13

             No economic or other benefit was given by the
14     certified reporter to any party or their attorney,
       representative, agent, or insurer or insured that was not
15     provided to the other parties, attorneys or insured in
       the same case.

16

17

18

                       ------------------------------
19                     Sommer E. Greene, RPR, CRR
                       Certified Reporter 50622
20

21

       _____
22     For Maricopa Reporting, Inc.
       Registered Reporting Firm No. 1081
23

24

25

Page 631

1    DEBRA JEAN MILKE

2    TAKEN ON DECEMBER 6, 2019

3
                 DECLARATION UNDER PENALTY OF PERJURY
4

5                     I declare under penalty of perjury that I

6    have read the entire transcript of my deposition taken in

7    the above-captioned matter or the same has been read to

8    me, and the same is true and accurate, save and except

9    for changes and/or corrections, if any, as indicated by

10   me on the DEPOSITION ERRATA SHEET hereof, with the

11   understanding that I offer these changes as if still

12   under oath.

13

14   Signed on the_____day

15   of _____20__.

16

17

18

19   _____
     DEBRA JEAN MILKE
20

21

22

23

24

25

```
                                                    Page 632
 1                   DEPOSITION ERRATA SHEET

 2

 3      Page No.___Line No.___Change to:_____

 4      _____

 5      Page No.___Line No.___Change to:_____

 6      _____

 7      Page No.___Line No.___Change to:_____

 8      _____

 9      Page No.___Line No.___Change to:_____

10      _____

11      Page No.___Line No.___Change to:_____

12      _____

13      Page No.___Line No.___Change to:_____

14      _____

15      Page No.___Line No.___Change to:_____

16      _____

17      Page No.___Line No.___Change to:_____

18      _____

19      Page No.___Line No.___Change to:_____

20      _____

21      Page No.___Line No.___Change to:_____

22      _____

23      Page No.___Line No.___Change to:_____

24      DEBRA JEAN MILKE

25      Signature:_____
```

Page 633

1                    DEPOSITION ERRATA SHEET

2

3     Page No.___Line No.___Change to:_____

4     _____

5     Page No.___Line No.___Change to:_____

6     _____

7     Page No.___Line No.___Change to:_____

8     _____

9     Page No.___Line No.___Change to:_____

10    _____

11    Page No.___Line No.___Change to:_____

12    _____

13    Page No.___Line No.___Change to:_____

14    _____

15    Page No.___Line No.___Change to:_____

16    _____

17    Page No.___Line No.___Change to:_____

18    _____

19    Page No.___Line No.___Change to:_____

20    _____

21    Page No.___Line No.___Change to:_____

22    _____

23    Page No.___Line No.___Change to:_____

24    DEBRA JEAN MILKE

25    Signature:_____

# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Jean Milke, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| vs. | ) No. |
| | ) 2:15-cv-00462-ROS |
| City of Phoenix; Maricopa | ) |
| County; and Detective Armando | ) |
| Saldate, Jr.; and Sergeant | ) |
| Silverio Ontiveros, in their | ) |
| individual capacities, | ) |
| | ) |
|       Defendants. | ) |
| ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ | ) |

VIDEOTAPED DEPOSITION OF

DEBRA MILKE

DECEMBER 4, 2019

10 A.M.

3030 North Third Street

Phoenix, Arizona

SOMMER E. GREENE, CSR, RPR, CR No. 50622

Page 2

```
 1   APPEARANCES OF COUNSEL

 2
             For Plaintiff:
 3
                 LOEVY & LOEVY
 4               ELIZABETH WANG, ESQ.
                 2060 Broadway, Suite 460
 5               Boulder, Colorado 80302
                 720.502.2103
 6               Elizabethw@loevy.com

 7

 8           For Defendant Silverio Ontiveros:

 9               HOLLOWAY ODEGARD & KELLY, P.C.
                 SALLY A. ODEGARD, ESQ.
10               3020 East Camelback Road, Suite 201
                 Phoenix, Arizona 85016
11               602.240.6670
                 sodegard@hoklaw.com
12

13
             For Maricopa County:
14
                 SANDERS & PARKS
15               ROBIN BURGESS, ESQ.
                 3030 North Third Street, Suite 1300
16               Phoenix, Arizona 85012
                 602.532.5783
17               robin.burgess@sandersparks.com

18

19           For Defendant City of Phoenix:

20               WIENEKE LAW GROUP
                 CHRISTINA RETTS, ESQ.
21               KATHLEEN L. WIENEKE, ESQ.
                 1095 West Rio Salado Parkway, Suite 209
22               Tempe, Arizona 85281
                 480.715.1868
23               cretts@swlfirm.com

24

25
```

1    APPEARANCES CONTINUED:

2

3         FOR DEFENDANT ARMANDO SALDATE:

4             BERKE LAW FIRM
              LORI V. BERKE, ESQ.
5             1601 North 7th Street, Suite 360
              Phoenix, Arizona 85006
6             602.254.8800
              lori@berkelawfirm.com
7

8         Also Present:

9             Alex Marinakis, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3   WITNESS: DEBRA JEAN MILKE

4

5   EXAMINATION                                      PAGE

6

7   MS. RETTS.....................................8

8

9                         *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                   INDEX TO EXHIBITS

2

3    EXHIBIT                                        MARKED

4
     Exhibit 353  May 29, 2013 Letter From Lori        9
5                 Voepel to Vince Imbordino L&L022198
                  to 22227
6
     Exhibit 354  E-mail Chain Between Laura Collins   15
7                 and Michael Kimerer, Re: Debra,
                  L&L022103 to 104
8
     Exhibit 355  List and Diagram to Ken From Debra,  16
9                 L&L005016 to 5020

10   Exhibit 356  Binder                               33

11   Exhibit 357  Exhibit From Debbie Update to        38
                  Michael Kimerer, April 15, 2013,
12                L&L044267

13   Exhibit 358  Meet and Confer Proceedings          72
                  Transcript, November 26, 2018
14
     Exhibit 359  Court Order                          87
15
     Exhibit 360  E-mail Chain Between Michael         94
16                Kimerer and Lori Voepel, Re:
                  Contract Debra Milke, L&L044789 to
17                791

18   Exhibit 361  Bank of America Statements           96

19   Exhibit 362  Text Message Screenshots, L&L062382 103
                  to 2744
20
     Exhibit 363  Binder                              121
21
     Exhibit 364  E-mail Chain Between Michael        129
22                Kimerer and Debra Milke, Re: Hello
                  From Berlin, L&L045032 to 033
23

24

25

Page 6

1                        INDEX CONTINUED

2

3

4   Exhibit 365   Plaintiff's First Supplemental        133
                  Response to Defendant City of
5                 Phoenix First Request For
                  Production of Documents to
6                 Plaintiff

7   Exhibit 366   Plaintiff's Response to Defendant     141
                  City of Phoenix's First Set of
8                 Interrogatories

9   Exhibit 367   October 17 Letter to Mr. Anders       152
                  From Debra Milke, L&L00703 to 708
10

    Exhibit 368   E-mail Chain Between Webmaster and    156
11                Renate Janka, Re: Debbie Called,
                  L&L0044082 to 83
12

    Exhibit 369   E-mail Chain Between Webmaster and    158
13                Renate Janka, Re: Debbie Called,
                  L&L044080 to 081
14

    Exhibit 370   Letter to Mr. Anders From Debra       175
15                Milke, L&L00653

16  Exhibit 371   E-mail From Ginger Stahly to Lori     180
                  Voepel, Re: Itr From Pat to Debra,
17                L&L056898 to 900

18  Exhibit 372   Debra Milke Application Re:           186
                  Employment, Obligations and Debts,
19                L&L048043

20  Exhibit 373   E-mail From Pat to Lori Voepel, Re:   199
                  Debbie Called, L&L054987
21

22

23

24

25

Page 7

1                        PHOENIX, ARIZONA

2                    DECEMBER 4, 2019; 10 A.M.

3

4

5            THE VIDEOGRAPHER:  We're on the record.

6    Today's date is Wednesday, December 4th, 2019.  The time

7    on the video screen is 10:10 a.m.  This is the

8    video-recorded deposition of Debra Jean Milke noticed by

9    counsel for the defendants in the matter of Debra Jean

10   Milke versus the City of Phoenix, et al.

11            This matter is being held in the United

12   States District Court, District of Arizona.  The case

13   number is 2:15-CV-00462-ROS.  Our location is the law

14   offices of Sanders & Parks, located in Phoenix, Arizona.

15            The certified court reporter is Sommer

16   Greene of Maricopa Reporting, Incorporated, located at

17   8686 South San Alberto Drive, Suite 200, Scottsdale,

18   Arizona 85258.

19            My name is Alex Marinakis.  I'm the

20   certified legal video specialist for the firm of

21   VideoDep, Incorporated, located in Phoenix, Arizona.

22            Counsel, would you identify yourselves and

23   whom you represent, starting with the plaintiff's

24   counsel, please.

25            MS. WANG:  Elizabeth Wang, W-a-n-g, for

Page 8

1    plaintiff.

2              MS. BURGESS:  Robin Burgess on behalf of

3    Maricopa County.

4              MS. ODEGARD:  Sally Odegard on behalf of

5    Silverio Ontiveros.

6              MS. BERKE:  Lori Berke on behalf of Armando

7    Saldate.

8              MS. RETTS:  Christina Retts, Kathleen

9    Wieneke and Lea Shapiro on behalf of City of Phoenix.

10             THE VIDEOGRAPHER:  Okay.  Thank you,

11   Counsel.

12             The court reporter may swear in the witness

13   at this time.

14

15                  DEBRA JEAN MILKE,

16   called as a witness herein, having been first duly sworn

17   by the Certified Reporter to speak the whole truth and

18   nothing but the truth, was examined and testified as

19   follows:

20

21                    EXAMINATION

22   BY MS. RETTS:

23        Q.    Good morning, Ms. Milke.

24        A.    Good morning.

25        Q.    I'm not going to go through all of the rules

1    again because I know you've had your deposition taken

2    before.  But my goal here today is to get information

3    from you.  It's my only chance to do that in this

4    setting.

5              So if you don't understand something that I

6    am asking of you, just please tell me that so I can

7    rephrase the question and proceed from there.

8         A.    Okay.

9         Q.    If you answer the question, is it fair for me

10   to assume that you understood it?

11        A.    If I answer the question?

12        Q.    Correct.

13        A.    If -- if I don't understand it, I'll -- I'll

14   let you know.

15        Q.    So if you answer, then, is it fair for me to

16   assume that you didn't have any problems understanding

17   that you were able to tell me?

18        A.    Yes.

19        Q.    Okay.  I'm going to hand -- and we're doing

20   consecutive exhibits.  So this will be 353.

21              (Exhibit 353 was marked for identification.)

22              THE WITNESS:  Do I give this --

23        Q.    BY MS. RETTS:  That's going to be your copy.

24        A.    Okay.

25        Q.    Do you recognize this document as a memorandum

Page 10

1    that your attorneys sent to the County attorney's office
2    to set forth your position about why a retrial should not
3    happen?
4        A.    I don't -- I don't recognize this.
5        Q.    Did you know that your attorneys were sending a
6    letter to the County attorney that was setting forth your
7    position about a retrial?
8        A.    My criminal attorneys?
9        Q.    Correct.
10       A.    Did I know that they were sending this letter?
11       Q.    That they were sending a letter to the County
12   attorney that would set forth your position about whether
13   a retrial should occur.
14       A.    I don't know what my attorneys were -- I mean,
15   I don't know what they were doing.
16       Q.    Did you ever become aware that they were going
17   to send a letter to the County attorney that set forth a
18   position about whether or not there should be a retrial?
19       A.    I believe so.
20       Q.    Did you know that this document was provided to
21   the media?
22       A.    No.
23       Q.    Did you have any discussions with anybody,
24   verbally or in a letter, about whether the submittal that
25   was going to go to the County attorney's office was going

1     to be provided to the media?

2         A.    I don't recall.

3         Q.    I want you to turn to what's been marked as --

4     what's been Bates-labeled at the bottom as 22211.

5         A.    Okay.

6         Q.    Your criminal attorneys in your case, you

7     authorized them to act on your behalf.  Correct?

8         A.    Yes.

9         Q.    And I want you to look at the second paragraph,

10    where -- and, actually, if you want to turn to the very

11    last page, this document is signed by Lori Voepel and

12    Mike Kimerer.

13              Do you see that?

14        A.    Yes.

15        Q.    And those were your two criminal habeas

16    counsel.  Correct?

17        A.    Yes.

18        Q.    And turning back to 22211, the second

19    paragraph, it states, "On the evening before Chris'

20    murder, Debra was doing laundry and box" -- "found a box

21    of unopened bullets in Jim's jeans pockets."  And then

22    there's a citation to your affidavit.

23              "She figured they were bullets for the gun

24    in Jim's closet.  Because she was on the couch surrounded

25    by laundry, she temporarily stuffed the box into her

Page 12

1    purse, which was on the couch next to her, so Chris

2    wouldn't find them.  She intended to later give them to

3    Jim to put away, but she forgot about them, especially

4    after Chris went missing.

5             "The bullets were still in her purse when it

6    was impounded following her arrest by Saldate in

7    Florence.  Obviously, if the bullets were incriminating

8    as to her, Debra, who by all accounts very bright, would

9    have known better than to bring them in her purse to the

10   sheriff's station to meet with the lead detective on her

11   son's case."

12             Do you see that?

13   A.    Yes.

14   Q.    Do you agree with the sentiment from your

15   lawyers that a guilty woman would not have brought her

16   purse with the bullets to the police station?

17   A.    Would you please repeat that?

18   Q.    Do you agree with what your lawyers are stating

19   here, that obviously if the bullets were incriminating to

20   her, being you, Debra, that you would have known better

21   than to bring them in your purse to the sheriff's station

22   to meet with the lead detective on your son's case?

23   A.    Okay.  These -- these are Lori's words.  These

24   are Lori's words.

25   Q.    Do you disagree with Lori's words?

```
1          A.    I mean, if they were incriminating to me, I

2     would have -- well, I agree with that sentence.

3          Q.    So you agree that if the bullets were

4     incriminating to you, you would have known better than to

5     bring your purse to the sheriff's station.  Correct?

6          A.    Yes.

7          Q.    And in the press conference that was held

8     shortly after your release where Mr. Kimerer and

9     Ms. Voepel were also present with you, Ms. Voepel made

10    that same statement, that you must be innocent because

11    you did not bring your purse with you to the sheriff's

12    department.  Do you remember her saying that?

13         A.    No.

14         Q.    Do you dispute her saying that?

15         A.    I don't recall her saying that.  I don't

16    remember.

17         Q.    If she had said that, would you have corrected

18    her?

19              MS. WANG:  Objection.  Foundation.  Calls

20    for speculation.

21              THE WITNESS:  I don't know.

22         Q.    BY MS. RETTS:  Did you bring your purse to the

23    sheriff's department?  I think I have to correct that

24    question.

25              So do you agree with Ms. Voepel's statements
```

Page 14

1    at the press conference that you must be innocent because

2    you brought your purse with the bullets in the purse to

3    the sheriff's station when you were interviewed?

4              MS. WANG:  Objection.  Foundation.

5              THE WITNESS:  I -- I don't -- I don't know

6    what Lori said at my -- at the press conference.

7        Q.    BY MS. RETTS:  You were present at the press

8    conference?

9        A.    I was.

10       Q.    You don't remember what she said?

11       A.    No.

12       Q.    If Ms. Voepel had said something incorrect

13   about the facts of your case, would you have felt you

14   needed to correct her?

15             MS. WANG:  Objection.  Calls for

16   speculation.

17             THE WITNESS:  I -- I don't know.

18       Q.    BY MS. RETTS:  Throughout the course of

19   Ms. Voepel and Mr. Kimerer's representation in the

20   criminal case, when you were provided documents,

21   pleadings, drafts of pleadings, if you saw errors in

22   those documents, did you feel it was your obligation to

23   correct them?  Errors as to the facts of what you knew

24   had occurred?

25       A.    Yes.

Page 15

1       Q.      And at the press conference that Mr. -- Ms. --

2       Ms. Voepel and Mr. Kimerer appeared at, they were acting

3       on your behalf.  Correct?

4       A.      Yes.

5       Q.      I'm going to pass what's been marked as --

6       we're marking as Exhibit 354.

7                       (Exhibit 354 was marked for identification.)

8       Q.      BY MS. RETTS:  And if you'll take a look at the

9       very last paragraph of an e-mail dated May 30th, 2013,

10      from Mr. Kimerer to a Ms. Laura Collins.  And that second

11      paragraph states, "There was no physical evidence linking

12      Debra to the crime.  After she was convicted, there was

13      an unopened package of bullets in her purse.  She

14      explained at her sentencing that while washing clothes at

15      the apartment she shared with Styers, she found the

16      bullets in his pants pocket and stuffed them in her purse

17      to later confront him about not wanting him to have guns

18      and ammunition around Christopher.

19                      "The bullets were in her purse when she met

20      Saldate to be interrogated but were not discovered until

21      right before she was sentenced."

22                      Do you see that?

23      A.      I do.

24      Q.      And Mr. Kimerer was acting on your behalf when

25      he was communicating information about the facts of your

1    case.  Correct?

2         A.    Yes.

3                    (Exhibit 355 was marked for identification.)

4         Q.    BY MS. RETTS:  I'm going to pass what's been

5    marked as Exhibit 355.  And if you will turn to page

6    LNL005019.

7         A.    Okay.

8         Q.    You state at the top, "Ken, I would very much

9    appreciate it if you could help me get these things taken

10   care of.  I don't want to lose the little things I have.

11   Thank you very much.  Signed, Debra."

12                    Do you see that?

13        A.    Uh-huh, yes.

14        Q.    Do you recognize that as your writing?

15        A.    Yes.

16        Q.    And Ken is Ken Ray, your trial counsel.

17   Correct?

18        A.    Yes.

19        Q.    And if you will turn to page LNL005017.

20        A.    (Witness complies.)

21        Q.    Number 7, you state, "My black purse is at my

22   father's house, which contains my checkbook and wallet.

23   A set of keys should be in my purse also."

24                    Do you see that?

25        A.    Yes.

1          Q.    You actually left your purse at your father's
2     home.  Correct?
3          A.    I did, yes.
4          Q.    You didn't take it with you to the sheriff's
5     department.  Correct?
6          A.    Correct.
7          Q.    Saldate didn't take custody of your purse when
8     you were arrested.  Correct?
9          A.    Correct.
10          Q.    And you knew at the time that you testified at
11     trial that your purse had not been entered into evidence.
12     Correct?
13          A.    I don't recall that.  I don't recall.
14          Q.    So you sat through every single day of your
15     trial.  True?
16          A.    Yes.
17          Q.    So you were present when the various items of
18     evidence were admitted into evidence.  Correct?
19          A.    Correct.
20          Q.    Do you have any memory of your purse ever being
21     used in the portion of your criminal trial that was
22     before a jury?
23          A.    No, I don't -- I don't recall.
24          Q.    In this letter to Ken Ray, you note that the
25     purse contains your checkbook and wallet and a set of

1    keys in the purse also.  You don't mention that there are

2    bullets in the purse.  True?

3        A.    Correct.

4        Q.    Did you ever tell Ken Ray that there were

5    bullets in your purse?

6        A.    I don't -- I don't remember.  I don't recall.

7        Q.    So it's possible that you never told Mr. Ray

8    that there were bullets in your purse?

9                MS. WANG:  Objection.  Calls for

10   speculation.

11               THE WITNESS:  I don't know.

12       Q.    BY MS. RETTS:  Do you think that would have

13   been an important fact to communicate to your attorney,

14   that there were bullets found in your purse?

15       A.    I completely forgot about all that.

16       Q.    Regardless of whether you forgot, do you think

17   it would have been an important fact to tell your

18   attorney, if you had remembered?

19               MS. WANG:  Objection.  Calls for

20   speculation.

21               THE WITNESS:  I -- I -- I don't know.

22       Q.    BY MS. RETTS:  If the prosecutor had been aware

23   of the bullets in the purse, you would have expected he

24   would have questioned you about that.  True?

25               MS. WANG:  Objection.  Calls for

1    speculation.  Foundation.

2                 THE WITNESS:  Possibly.

3        Q.    BY MS. RETTS:  You were asked questions at your

4    criminal trial about whether you had ever seen any

5    bullets of the type found in the same box that was found

6    in your glove box.  True?

7        A.    I was questioned about a box of bullets that

8    were found in my glove box in the car, yes.

9        Q.    And you were asked if you had ever seen a box

10   such as these.  Correct?

11       A.    I was -- such as these?  I remember ask --

12   being asked if I saw a -- the box.  I -- I think I

13   testified and said, I've never seen those bullets that

14   they got from my car.  I'd never seen those.

15       Q.    You didn't volunteer that there were bullets

16   found in your purse.  True?

17       A.    I forgot about that.

18       Q.    Why were you asking Ken Ray to find your black

19   purse then?

20       A.    I don't know.

21       Q.    You sat through the sentencing portion after

22   the guilty verdict, true, of your trial?

23       A.    I don't -- I don't remember my sentencing.

24       Q.    Do you dispute that you were present for your

25   sentencing at every day of trial?

Page 20

1        A.      No, I don't dispute that.

2        Q.      Do you remember hearing that -- from various

3    witnesses, that your purse had been left at your father's

4    house and how it came to be in the possession of the

5    Pinal County Sheriff's Department?

6        A.      I don't remember -- I don't remember my

7    sentencing hearing.  I -- I don't remember it.

8        Q.      Whether or not you remember the sentencing

9    hearing, do you remember, from any source, knowing

10   that -- that individuals testified at your criminal trial

11   about the fact that the purse was discovered at your

12   father's house and then transported to the Pinal County

13   Sheriff's Department?

14               MS. WANG:  Objection.  Form.

15               THE WITNESS:  No, I don't remember.

16       Q.      BY MS. RETTS:  Where do you think -- strike

17   that.

18               Did you tell Ken Ray before your

19   voluntariness hearing that there were bullets in your

20   purse?

21       A.      I don't know.

22       Q.      Is the reason that you did not testify at your

23   volunt- -- voluntariness hearing that you knew there were

24   bullets in your purse and you were concerned that you

25   would be cross-examined with that?

Page 21

1      A.     Wait.  Repeat that again, please.

2      Q.     Is one of the reasons you didn't testify at the

3  voluntariness hearing a concern that the prosecutor,

4  Mr. Levy, may ask you about the fact that there were

5  bullets found in your purse?

6      A.     I don't know why I didn't testify.

7      Q.     Did you ever tell Mr. Kimerer or Ms. Voepel

8  that you took your purse with you to Pinal County to be

9  interviewed by Detective Saldate?

10      A.     I don't remember any exact conversations that I

11  had with Mike and Lori.

12      Q.     Do you remember any general conversations about

13  the purse and the contents of the purse?

14               MS. WANG:  Wait.  Objection.  Form.

15               THE WITNESS:  With who?

16      Q.     BY MS. RETTS:  With any -- with Ken Ray.  Let's

17  start with Ken Ray.

18      A.     No, I don't remember.

19      Q.     Do you remember asking Kirk Fowler to see if he

20  could find out where your purse was?

21      A.     No.

22      Q.     Do you remember any discussions with Kirk

23  Fowler, whether in a letter or verbally, about finding

24  your purse?

25      A.     No, I don't remember.

1         Q.    Do you remember any discussions with Anders

2    Rosenquist about the bullets in your purse?

3         A.    No, I don't remember.

4         Q.    And by discussions, I mean either verbally or

5    in a written format.

6         A.    I don't recall.

7         Q.    Do you remember having any discussions with

8    Mr. Aue about the bullets in the purse?

9         A.    No.

10        Q.    Do you remember having any discussions with

11   your mother about the bullets in your purse?

12        A.    No.

13        Q.    Do you remember having any discussions with Pat

14   Galbraith about the bullets in your purse?

15        A.    No.

16        Q.    Have you ever talked to any therapist,

17   counselor, psychologist, medical provider or anyone who

18   would fall under that umbrella of medical person about

19   the bullets in your purse?

20                MS. WANG:  Objection.  Form.

21                THE WITNESS:  No.

22        Q.    BY MS. RETTS:  Have you been trying to avoid

23   talking about the bullets in your purse?

24        A.    No.

25        Q.    What did you do to prepare for your deposition?

Page 23

```
 1        A.    I met with my attorney.  I read letters that I

 2    had written to Ken Ray and Kirk Fowler and Anders

 3    Rosenquist.  And I read my -- the pages from my

 4    deposition.

 5        Q.    And let's go through those.  Did you read all

 6    of your letters with Ken Ray?

 7        A.    I read -- I don't know if I read them all.  I

 8    read what I had.

 9        Q.    Do you remember reading the letter that we have

10    marked here as an exhibit today about finding your purse?

11        A.    I -- I don't -- I don't know.  I read -- no, I

12    don't remember.

13        Q.    How many letters do you think that you read

14    from Ken Ray?

15        A.    I didn't count them.  I don't know.

16        Q.    A half-inch stack, an inch stack?

17        A.    I -- I'm not sure.

18        Q.    From Kirk Fowler, how many letters in volume?

19    A half-inch stack, an inch stack did you review?

20        A.    I -- I don't know how many.

21        Q.    Anders Rosenquist materials, was it just

22    letters?

23               MS. WANG:  Objection.  Form.

24               THE WITNESS:  Yes, just letters from Anders.

25        Q.    BY MS. RETTS:  Was it letters --
```

1          A.    To Anders, I mean.

2          Q.    Okay.  So your letters to Anders, you reviewed

3     those?

4          A.    Yes.

5          Q.    Did you review any letters from Anders to you?

6          A.    There might have been a couple in there.

7          Q.    What do you remember from the content of the

8     letters you reviewed of Anders Rosenquist?

9          A.    The content that I wrote to Anders, I remember

10    asking him a lot of questions about the habeas, oh, the

11    PCR.  I remember venting a lot to him about the politics

12    that were going on at that time.

13         Q.    Did you review any letters where you told

14    Mr. Rosenquist that you had been untruthful in portions

15    of your criminal testimony?

16         A.    Yeah, I recall -- I recall something like that,

17    yes.

18         Q.    That you lied about whether you wanted to

19    become pregnant with Christopher?

20         A.    I -- yes, I know what you're talking about.

21         Q.    And you reviewed that to prepare for your

22    deposition?

23         A.    I -- well, it was part of the letters.

24         Q.    And in that letter to Mr. Rosenquist, you said

25    that you intended to be pregnant and when you got on the

Page 25

1    stand, you lied about that.  Correct?

2        A.    Do you have the letter?

3        Q.    On your recollection.  I'm asking you based

4    upon what you recently reviewed.  What is your

5    recollection of that?

6        A.    Well, I put the -- the word lied in quotes.

7    Because that subject was really -- it was a compound --

8    it wasn't just one answer.  It was compound, that

9    subject.

10       Q.    Did you lie in your testimony at trial when

11   you --

12       A.    I --

13       Q.    And just let me finish the question.

14       A.    Sorry.

15       Q.    Just a little reminder that --

16       A.    I know.

17       Q.    -- the court reporter can't get down when we

18   talk over one another, and it makes her job really hard.

19             Did you lie in your criminal trial testimony

20   when you testified that Christopher was not a planned

21   pregnancy?

22       A.    I -- it was not a lie.  It was -- I didn't give

23   a complete answer.

24       Q.    So was Christopher a planned or an unplanned

25   pregnancy?

Page 26

```
 1        A.     Christopher -- it was kind of both.

 2        Q.     You were on birth control at the time?

 3        A.     Yes.

 4        Q.     And you were surprised when you found out that

 5   you were pregnant.  Correct?

 6        A.     Yes.

 7        Q.     So you weren't actively trying to get pregnant

 8   without being on birth control.  Correct?

 9        A.     Yes and no.

10        Q.     Why would you still take birth control if you

11   wanted to get pregnant?

12        A.     I wasn't taking it every day.

13        Q.     Was that accidental or purposeful?

14        A.     I took some pills some days and some days I

15   didn't.

16        Q.     And that would be because you forgot to take

17   them on certain days.  Correct?

18        A.     Some days, yes; some days, no.

19        Q.     So on the days that you didn't forget to take

20   them, you were intentionally choosing not to take them?

21        A.     Yes.

22        Q.     And you were choosing not to take them for the

23   purpose of becoming pregnant?

24        A.     Hoping, yes.

25        Q.     Your parents expressed concern after they found
```

Page 27

1    out from you that you were pregnant with Christopher

2    because you had been on birth control when you got

3    pregnant.  Correct?

4                 MS. WANG:  Objection.  Foundation.

5                 THE WITNESS:  No, that's not correct.

6         Q.   BY MS. RETTS:  They suggested that you get an

7    abortion.  Correct?

8                 MS. WANG:  Objection.  Foundation.

9                 THE WITNESS:  That's correct, yes.

10        Q.   BY MS. RETTS:  And in part because you were on

11   birth control?

12        A.   No.

13        Q.   Were you concerned about Christopher because

14   you were pregnant while on birth control?

15        A.   No.

16        Q.   You had a prior abortion before Christopher.

17   True?

18        A.   Before -- no.

19        Q.   After Christopher?

20        A.   Yes.

21        Q.   So your first abortion was after Christopher?

22        A.   Yes.

23        Q.   And that abortion was because you were on birth

24   control at the time you got pregnant and there was a

25   problem with the baby.  Is that correct?

Page 28

```
 1        A.    That pregnancy, that was when Mark attacked me,
 2   yes.
 3        Q.    Did Mark rape you?
 4        A.    Yes.
 5        Q.    Did you consider it to be a rape?
 6        A.    At the time?
 7        Q.    Yes.
 8        A.    No.
 9        Q.    When did you consider it to be a rape?
10        A.    Years later.
11        Q.    When?
12        A.    I don't recall.
13        Q.    Before you were released from prison?
14        A.    I believe so, yes.
15        Q.    Would it have been around the time you wrote an
16   inmate request to Arizona Department of Corrections
17   asking not to be shackled because you had been raped in
18   the past?
19        A.    I don't -- I don't know if they were related.
20   I don't know.
21        Q.    Do you remember writing an inmate request to
22   the Department of Corrections asking that you not be
23   shackled because you had been raped by a stranger?
24        A.    I re- -- I recall that, yes.
25        Q.    And when you mean raped by a stranger, were you
```

1    referring to Mark?

2         A.    I don't know what I was referring to at the

3    time.

4         Q.    So did you make that up?

5         A.    Not entirely, no.

6         Q.    So you embellished upon the experience that you

7    had with Mark?

8         A.    No.

9         Q.    What were you referring to, then, when you

10   wrote that letter that you were raped by a stranger?

11   What part of that was true?

12        A.    Being raped.

13        Q.    And who did the rape?

14        A.    Mark.

15        Q.    So at the time that you wrote the ADOC request,

16   you had considered what happened with Mark to be a rape.

17   Correct?

18        A.    Possibly, yes.  I don't -- I don't know what I

19   was -- I can't tell you what I was thinking at that time.

20        Q.    So you may have been referring to Mark as the

21   rape or you may have been just writing whatever it took

22   to get yourself out of being shackled?

23        A.    Yes.

24        Q.    Not a truthful statement.  True?

25               MS. WANG:  Objection.  Form.

Page 30

1              THE WITNESS:  Partially, yes.

2       Q.    BY MS. RETTS:  So a kernel of truth in the ADOC

3    statement and the rest false?

4       A.    What I remember from writing that inmate

5    letter, the things that I had to go through in prison, it

6    was psychologically -- it was -- it was torture

7    psychologically, and I wanted it to stop.

8       Q.    So you lied about something that had occurred

9    to you to suit your ends?

10      A.    I -- every time I had to leave my room, I had

11   to be shackled and handcuffed and strip searched, and I

12   just -- I just wanted that to stop.  So I wrote an inmate

13   letter.  I don't know who I wrote it to.  It might have

14   been the warden.  And I wrote that.  And so part of it

15   was true.  Instead of naming Mark, I said "stranger."

16      Q.    You didn't just simply write in the ADOC form

17   that you believed it to be torture physically to be

18   moved, you didn't simply express your personal feelings;

19   you went a step further and included false information?

20      A.    Well, I don't know exactly what the inmate

21   letter says.

22      Q.    You don't remember writing it?

23              MS. WANG:  Objection.  Mischaracterizes her

24   testimony.

25              THE WITNESS:  I don't remember when I wrote

Page 31

1     it, but I recall writing something like that.

2         Q.    BY MS. RETTS:  And you recall writing something

3     about being raped by a stranger.  Correct?

4         A.    Yes.

5         Q.    And that you -- it reminded you of being -- of

6     that situation because you had been bound and kidnapped.

7     Correct?

8         A.    I don't remember the words I used.

9         Q.    Do you remember saying that you had been bound?

10             MS. WANG:  Objection.  Asked and answered.

11             THE WITNESS:  I don't --

12        Q.    BY MS. RETTS:  Were you bound in the rape with

13    Mark?

14        A.    I -- I don't -- I don't -- bound.

15        Q.    Were your hands tied?

16        A.    I'm not -- I can't remember.

17        Q.    Were you wearing handcuffs?

18        A.    I don't know.

19        Q.    Did he restrain you physically in any way?

20        A.    Yes.

21        Q.    How?

22        A.    I just remember -- I just remember my hands

23    over my head.

24        Q.    Where did this happen?

25        A.    I don't remember.

Page 32

```
 1        Q.    At his house?

 2        A.    I don't remember.

 3        Q.    At your house?

 4        A.    It was in 1988.  I don't remember.

 5        Q.    Were you married at the time?

 6        A.    Yes.

 7        Q.    Were you living together at the time?

 8        A.    No.

 9        Q.    What other letters of Anders Rosenquist do you

10    remember the content of?

11        A.    I -- I read so many of them.  What sticks out

12    is I was trying -- I -- I talked to him about the --

13    the -- the court proceedings.

14        Q.    Did you review any of your letters to Carolyn

15    Imhoff?

16        A.    No.

17        Q.    Did you review any of your letters to Pat

18    Galbraith that were in Jana Bommersbach's possession?

19        A.    I don't re- -- I -- I don't -- I -- I -- I

20    think I reviewed a letter from Pat, but I don't know

21    where it came from.

22        Q.    What would you remember about the content of

23    that letter?

24        A.    I -- I'm not sure.

25        Q.    Was it about your case?
```

Page 33

1          A.    I don't know.

2          Q.    Did it have a Bates number like the rest of

3     these in the bottom of it?

4          A.    I -- I'm not sure.

5          Q.    Do you remember reviewing any other written

6     correspondence from you to somebody else in preparation

7     for your deposition?

8          A.    Just Ken, Kirk, Anders.  And I -- and I think I

9     read a couple letters I saw from Pat and that's it.

10         Q.    If we were to visually put in a stack all the

11    materials that you reviewed, about how many inches of

12    documents?

13         A.    I --

14                  MS. WANG:  Objection.  Vague.

15                  THE WITNESS:  I don't know.

16         Q.    BY MS. RETTS:  Did you review a Bankers Box

17    full of documents?  Did you review binders full of

18    documents?  What volume can you best describe what you

19    reviewed?

20                  MS. WANG:  Objection.  Form.

21                  THE WITNESS:  I don't know.  I -- I -- I

22    don't know.  It was -- it was a lot of papers.

23         Q.    BY MS. RETTS:  I'm going to mark...

24                  (Exhibit 356 was marked for identification.)

25         Q.    BY MS. RETTS:  This is Exhibit 356.  This is

1       going around.  This is a binder full of letters that we

2       received in response to a subpoena to Carolyn Imhoff.

3            A.    Okay.

4            Q.    And if you'll turn to IMHOFF005.

5                  MS. WANG:  I'm sorry.  Can we -- this whole

6       thing is 356?

7                  MS. RETTS:  Yep.

8                  MS. WANG:  Okay.  I'm sorry.  What -- what

9       is -- number did you just say?

10                 MS. RETTS:  0005.

11           Q.    BY MS. RETTS:  And do you see that at the top

12      it says "Dear Carolyn"?

13           A.    Yes.

14           Q.    And you know Carolyn to be Carolyn Imhoff.

15      Correct?

16           A.    Yes.

17           Q.    And you recognize this as your handwriting?

18           A.    Yes.

19           Q.    I want you to turn to EMHOFF00567.

20           A.    (Witness complies.)

21           Q.    About in the middle of the page -- or first

22      quarter of the page, it says, "I will figure out a way to

23      come up with the money for my paralegal course.  I

24      shouldn't have signed up for it.  I've had the idea in my

25      head for months and I spent all the" -- "sent all the

Page 35

1    info to Vince to review."

2              Do you see that?

3    A.    Wait a minute.  What page are you on?

4    Q.    567.

5    A.    567.  Okay.

6    Q.    And it's about quarter of the way down.

7    There's two Vinces close to one another.  And it's right

8    after that.

9    A.    Okay.  I see it.

10   Q.    You took a paralegal course in prison.

11   Correct?

12   A.    Yes.

13   Q.    And you received your paralegal certificate.

14   Correct?

15   A.    Yes.

16   Q.    You learned about personal injury law.  True?

17   A.    I don't remember what it was about.

18   Q.    How long did it take you to go through all the

19   course materials for that paralegal course?

20   A.    I don't know.

21   Q.    And do you still have your paralegal

22   certificate?

23   A.    Somewhere.  I think somewhere.

24   Q.    You also work at a law office right now.  True?

25   A.    Yes.

1          Q.     And you have worked at that office, which is

2     Mr. Kimerer's office, since what year?

3          A.     2014.

4          Q.     Do you remember what day you started?

5          A.     No.

6          Q.     When you started working in 2014, there had not

7     been a decision from the Arizona Court of Appeals yet

8     about the retrial.   True?

9          A.     I -- I don't know.

10          Q.     Do you remember still being on ankle monitoring

11     while you were working at Mr. Kimerer's office?

12          A.     Yes.

13          Q.     While you were working there, were you

14     assisting with your criminal case?

15          A.     While I was working there?

16          Q.     Correct.

17          A.     What do you mean by assisting?

18          Q.     Were you doing anything to help your habeas

19     lawyers with your criminal case in the retrial process?

20          A.     No.

21          Q.     Did you make any binders or make any copies of

22     documents for your criminal case?

23          A.     I don't -- I don't think so, no.

24          Q.     What did you -- what were your job duties when

25     you started at Kimerer's office in 2014?

1          A.     When I first started working there, I worked in

2     the back with the office manager.

3          Q.     And what did you do?

4          A.     Closed out old accounting files.

5          Q.     The -- all of the boxes that are related to

6     your case are in a room in Mr. Kimerer's office that's

7     called the Milke room.  Is that true?

8          A.     Not now, no.

9          Q.     They were at some point in a room called the --

10         A.     Yes.

11         Q.     -- Milke room?

12         A.     Yes.

13         Q.     When did those boxes start residing in the room

14    that's called the Milke room?

15         A.     I don't know.

16         Q.     Had they been there the entire time you worked

17    there?

18         A.     I don't know.

19         Q.     Since 2014, every day that you worked at

20    Mr. Kimerer's office, you could have gone through any of

21    those boxes, if you had wanted to.  True?

22         A.     True.

23         Q.     You could have accessed any of that

24    information.  True?

25         A.     Yes.

Page 38

1      Q.    Where are the Milke boxes now?

2      A.    I'm not sure.  I don't know where they moved

3    them.

4      Q.    When were the boxes moved?

5      A.    I don't know.

6                (Exhibit 357 was marked for identification.)

7      Q.    BY MS. RETTS:  This is Exhibit 357.  This is an

8    e-mail dated April 15th, 2013.  It says "from Debbie,

9    Update to MDK, Kimerer, Michael."

10               Do you see that?

11     A.    I do.

12     Q.    Do you have an understanding that there was a

13   list of e-mails that were of people who would regularly

14   receive updates about you when you were in prison --

15               MS. WANG:  Objection.

16     Q.    BY MS. RETTS:  -- and when you were released?

17               MS. WANG:  Objection.  Foundation.  Form.

18               THE WITNESS:  Are you asking me if I was

19   aware there was a list?

20     Q.    BY MS. RETTS:  Yeah.

21     A.    No.

22     Q.    You never asked for any person's e-mail to be

23   added to the list of those who receive status updates

24   about you?

25     A.    I don't --

Page 39

1                    What list?

2         Q.    Did anybody keep a running list of e-mail

3    addresses and then would use that list to send out

4    updates about you?

5         A.    I don't know.

6         Q.    Did you ever tell anyone, in letter format or

7    verbally, that a certain individual should be added to

8    the list of people who receive status updates about you?

9         A.    I don't recall.  I don't know.

10        Q.    Could you have done that?

11        A.    It's possible, but I don't -- I don't recall at

12   this time.

13        Q.    Did you know that there was a listserv that was

14   being maintained through the Web site where people were

15   getting regular updates about you?

16        A.    Did I know?

17        Q.    Did you know?

18        A.    No.

19        Q.    You never knew that?

20        A.    I don't even know what a listserv is.

21        Q.    Did you know that there was a master e-mail

22   list that was being maintained by Franke to provide

23   regular updates about you?

24              MS. WANG:  Objection.  Vague.

25              THE WITNESS:  I don't -- no, I don't know.

Page 40

```
 1        Q.    BY MS. RETTS:  Did you ever believe that there
 2   was some sort of way that people who were following your
 3   case were receiving updates about what was going on?
 4              MS. WANG:  Objection.  Form.
 5              THE WITNESS:  No.
 6        Q.    BY MS. RETTS:  Who is Jen Geronimo?  Am I
 7   saying that right?
 8        A.    Jen?
 9        Q.    Yes.
10        A.    Geronimo --
11        Q.    Is that --
12        A.    That Geronio?
13        Q.    Yeah.  How do you say that?
14        A.    Oh, that's -- that's my friend Jennifer and
15   that's the name of -- well, that was the name of her
16   ex-husband's restaurant.
17        Q.    What is her full name?
18        A.    Jennifer Enslen.
19        Q.    E-n-z-l-e-n?
20        A.    No.  E-n-s-l-e-n.
21        Q.    When did you start communicating with her?
22        A.    I don't remember.
23        Q.    Did you do so through written letter,
24   correspondence?  Written correspondence?
25        A.    Yes.
```

Page 41

```
1        Q.     Did you talk to her on the phone?

2        A.     I don't -- no, I don't know.  I don't -- I

3   don't recall.

4        Q.     How many years did you write back and forth to

5   her?

6        A.     I'm not sure.

7        Q.     More than one?

8        A.     Oh, yes.  More than one, yeah.

9        Q.     Were you ever aware that Jennifer was on an

10  e-mail list where she was getting regular updates about

11  you?

12       A.     No.

13       Q.     Were you aware of her ever being on some sort

14  of written communication list where she would be sent

15  regular updates about you?

16       A.     No.

17       Q.     Who is Doug Bice?

18       A.     Doug was some -- like a supporter from Texas, I

19  think.

20       Q.     You considered Doug to be your boyfriend at

21  some point?

22       A.     I -- I don't -- I wouldn't characterize it as

23  that.

24       Q.     If Franke or Pat referred to Doug Bice as your

25  boyfriend, would you dispute that?
```

Page 42

```
 1                    MS. WANG:  Objection.  Foundation.  Calls
 2      for speculation.
 3                    THE WITNESS:  I don't know.
 4         Q.    BY MS. RETTS:  Would you dispute that he is --
 5      was at some point someone you considered to be your
 6      boyfriend?
 7         A.    I wouldn't characterize him as that.  It was a
 8      close friend.
 9         Q.    Did you ever tell him that you loved him?
10         A.    I don't recall.
11         Q.    Could you have?
12                    MS. WANG:  Wait.  Objection.  Vague.
13                    THE WITNESS:  I don't know.
14         Q.    BY MS. RETTS:  Did you ever write in a letter
15      that you loved him?
16         A.    I don't know.
17         Q.    Did Mr. Bice come visit you in person?
18         A.    Yes.
19         Q.    How many times?
20         A.    I don't know.
21         Q.    More than one?
22         A.    I don't know.
23         Q.    Did he talk to you on the phone?
24         A.    Yes.
25         Q.    How frequently?
```

Page 43

```
 1        A.    I don't know.

 2        Q.    More than once?

 3        A.    Possibly, yes.

 4        Q.    Did he have a daughter?

 5        A.    Yes.

 6        Q.    Did you ever send her any gifts?

 7        A.    I don't know.

 8        Q.    Is it possible?

 9        A.    It's -- it's possible, but I just don't recall.

10        Q.    Do you know if Doug Bice was ever on an e-mail

11   list that was sent out with regular updates about you?

12        A.    I don't know.

13        Q.    Did you ever ask that Doug Bice be kept on a

14   communications list, whether it be written communication

15   or e-mail, to receive regular updates about you?

16        A.    I don't re- -- I just don't know.

17        Q.    You don't know if you did or didn't?

18        A.    I don't.

19        Q.    If you'll take a look at what's marked as

20   Exhibit 357 again.  And it says at the top, "Again,

21   Franke went this morning," and it appears to be an e-mail

22   about Franke's visit with you in prison.

23              Do you see this?

24        A.    I do.

25        Q.    And at the bottom, it says, "To unsubscribe
```

Page 44

1        from Debbie update, just follow this link."

2                    Do you see that?

3        A.    Yes.

4        Q.    Does this refresh your recollection at all

5        about whether there was a Debbie update that was going

6        out regularly about you?

7        A.    I was still in prison on this date.  And I

8        have -- at that time, I had no idea what any of this

9        meant.

10       Q.    Did you ever communicate with Mr. Aue about the

11       fact that he was sending out a Debbie update about your

12       status in prison?

13       A.    What did -- what were -- repeat.

14       Q.    Did you ever communicate with Mr. Aue, whether

15       it be verbally through the telephone or through written

16       format, about the fact that he was sending out a Debbie

17       update that provided your status?

18       A.    I -- I don't -- I don't know.  I don't know if

19       I did or not.  I don't know.

20       Q.    Did you ever communicate with Mr. Galbraith

21       about the fact that there was a Debbie update that was

22       being sent out regularly about his visits and phone calls

23       with you?

24       A.    No, I don't -- I don't recall that.

25       Q.    When Pat Galbraith would come to visit you,

1    would he tell you that he was going to be passing along

2    certain information to certain people, such as he would

3    pass a message to Franke or pass a message to Lori?

4        A.    Yes, he would tell me that.

5        Q.    And when you communicated with him, you had an

6    understanding that if you told him to pass along

7    information, that he would follow through with that?

8        A.    Yes.

9        Q.    Now, if you'll look down to the second

10   paragraph there that's been highlighted.

11       A.    Yes.

12       Q.    It says, "We also chatted about technology, how

13   to back up data, why does a hard drive crash and all that

14   stuff.  Debbie is in danger of becoming a true tech

15   junkie when she is out there."

16             Do you see that?

17       A.    I see it.

18       Q.    Do you remember having those discussions with

19   Pat Galbraith about your interest in technology?

20       A.    No.

21       Q.    You did, in fact, have an interest in

22   technology.  Correct?

23             MS. WANG:  Well, objection.

24   Mischaracterizes the e-mail.

25             THE WITNESS:  I remember -- this is not Pat.

Page 46

1     This is Franke.

2         Q.    BY MS. RETTS:  Did you talk to Franke about

3     technology?

4         A.    I've asked -- I remember I asked questions

5     about it because I had no clue what any of it was.

6         Q.    And if Mr. Aue communicated that you chatted

7     about technology, how to back up data, why does a hard

8     drive crash and, as he characterizes it, all that stuff,

9     do you dispute that that conversation occurred?

10        A.    Well, I don't -- I don't remember the exact

11    conversation.  I just remember ask- -- talk- -- just

12    talking about technology in general, nothing specific.

13        Q.    You trusted Mr. Galbraith to handle intimate

14    details of your life.  True?

15        A.    Intimate how?

16            MS. WANG:  Objection.  Vague.

17        Q.    BY MS. RETTS:  You communicated information to

18    Mr. Galbraith that you wouldn't communicate to the public

19    generally.  True?

20        A.    I --

21            MS. WANG:  Objection.  Form.

22        Q.    BY MS. RETTS:  You told him about how you were

23    feeling mentally.  True?

24        A.    Told Pat?

25        Q.    Yes.

Page 47

1      A.      Yes, at times, yes.

2      Q.      That's not something that you would communicate

3   to everyone.  True?

4      A.      True.

5      Q.      You had Pat assist you in purchasing things to

6   be put in a storage unit or later into the room at

7   Franke's house.  True?

8      A.      The room at Franke's house, that I don't

9   recall.

10      Q.      You don't remember asking Pat to buy certain

11   clothing items for you and put them into the room at

12   Franke's house and shut the door?

13      A.      I remember asking to buy clothing items, but I

14   don't recall anything about a room and shutting the door.

15      Q.      When you got out of prison and went to live at

16   Franke Aue's house, was there a specific room that was

17   assigned to be yours?

18      A.      Well, when I got out, I didn't go straight to

19   his house.

20      Q.      You went to the Galbraith house?

21      A.      Yes.  I lived there.

22      Q.      When you went to the Galbraith house, was there

23   a room that had boxes of your items:  Clothing, legal

24   papers?

25      A.      Not at their house.

1      Q.    Was there a room at Franke's house that had

2    boxes of your clothing and legal papers?

3      A.    When?  When I got out?

4      Q.    When is the first time you remember there ever

5    being a room in Franke's house that had boxes with your

6    clothing and legal papers?

7      A.    I don't know how -- I don't -- I don't remember

8    how long I stayed at Pat -- in Patty's house.  And I'm

9    not sure exactly when I moved into Franke's house.

10      Q.    When you moved into Franke's house, was that

11    the first time you saw a room that had boxes with your

12    clothing and your legal papers?

13      A.    No.  They weren't there.

14      Q.    Where was the first time you saw boxes of your

15    clothing and your legal papers?

16      A.    Pat took me to a storage facility.

17      Q.    How big was the storage facility?

18      A.    It was very small.

19      Q.    Can you define "very small"?

20      A.    I don't know the measurements.

21      Q.    How many boxes of materials were in the storage

22    unit that were saved for you?

23      A.    I don't know how many boxes.

24      Q.    Can you estimate how many boxes?

25      A.    No.

Page 49

1          Q.    Did you take them all from the storage unit at

2     once?

3          A.    I don't remember.

4          Q.    Do you remember how they were transported from

5     the storage unit?

6          A.    No.

7          Q.    Did you take them multiple boxes at a time,

8     like you went and took one box, you went and took another

9     box?

10          A.    I -- I don't recall.  I don't -- I just don't.

11          Q.    Were there more than five boxes?

12          A.    Possibly.  I just -- I just can't recall right

13     now.

14          Q.    You had Pat Galbraith do things like buy you

15     makeup for when you went out.  True?

16          A.    For when I got out?

17          Q.    Yes.

18          A.    Yes.

19          Q.    And take care of things such as he would send

20     you your monthly allowance while you were in prison.

21     True?

22          A.    Yes.

23          Q.    And did you know how that worked?  Your mother

24     would send money to Pat and then Pat would send the money

25     to you?

Page 50

1     A.    That -- that was my understanding.

2     Q.    Pat maintained a defense fund.  Did you

3  understand that?

4     A.    I -- I knew -- I was aware of a defense fund,

5  but I didn't -- I don't know who controlled it or

6  maintained it.

7     Q.    So Pat was -- while you were in prison from

8  around 2005 on, he was intimately involved with your

9  financial matters and personal matters that you would

10  task him with.  True?

11    A.    Yes.

12    Q.    Did you trust Pat?

13    A.    Yes.

14    Q.    Did you find him to be an honest person?

15    A.    Yes.

16    Q.    If Pat typed out e-mails about his visits with

17  you, his phone calls with you, would you have any reason

18  to think that Pat was being dishonest in what he was

19  telling other people?

20          MS. WANG:  Objection.  Foundation.  Calls

21  for speculation.

22          THE WITNESS:  I don't know.

23    Q.    BY MS. RETTS:  Would you know of any motive of

24  Pat to be dishonest about you?

25    A.    No.

Page 51

```
1        Q.     You trusted Franke with a lot of information at
2    certain points as well.  True?
3        A.     What kind of information?
4        Q.     What did you communicate to Franke about
5    personal aspects of your life?
6                MS. WANG:  Objection.  Vague.  Form.
7                THE WITNESS:  I communicated a lot of my
8    feelings to Franke.
9        Q.     BY MS. RETTS:  Did Franke ever propose to you?
10       A.     Franke?
11       Q.     Yes.
12       A.     No.
13       Q.     No?
14       A.     No.
15       Q.     Did you ever communicate to anybody that he had
16   proposed to you?
17       A.     I don't know.
18       Q.     Did you ever communicate to anybody that the
19   two of you shared an intimate physical relationship?
20       A.     Franke and I?  No, I don't -- I don't know.
21       Q.     Would you dispute that you shared an intimate
22   physical relationship with Franke at a certain point in
23   time?
24       A.     Franke and I were not intimate.
25       Q.     Did you ever believe that you might marry
```

Page 52

1      Franke?

2          A.     When I was in prison you mean?

3          Q.     Correct.

4          A.     Did I believe it would happen?  I don't know.

5      Possibly.  I don't know.

6          Q.     Did you hope it would happen?

7          A.     I don't -- I don't know if I hoped.  No, I

8      don't know that.

9          Q.     When you got out of prison, did you ever

10     believe that you and Franke would get married?

11         A.     When I got out?  No.

12         Q.     Did you ever hope that you would get married?

13         A.     To Franke, no.

14         Q.     Can you identify for me all of the phones that

15     you have owned and the brand?

16         A.     Samsung and iPhone.

17         Q.     Did you have a laptop when you got out?

18         A.     When I first got out, Franke bought a laptop

19     for me, but I didn't -- I didn't learn how to use it

20     right away.

21         Q.     Do you still have that laptop?

22         A.     The one that he got me?

23         Q.     Correct.

24         A.     Yes.

25         Q.     Is that the laptop you still use on a daily

Page 53

1    basis?

2        A.    No.

3        Q.    When did you start using that laptop?

4        A.    Which one?

5        Q.    The one Franke got you.

6        A.    I'm not sure when I started using it.

7        Q.    Did you use the calendar function of that

8    laptop?

9        A.    I don't even know what that is.

10       Q.    In your job duties at Mr. Kimerer's office, do

11   you ever use an Outlook calendar where you schedule

12   meetings or look on -- for the day what is scheduled for

13   the office?

14       A.    No.

15       Q.    Do you know what an Outlook calendar is?

16       A.    I think at Mr. Kimerer's office at the

17   reception desk, I think they use Outlook.

18       Q.    And at the reception desk, you can click on the

19   little icon that looks like a calendar and it pulls up

20   and there are entries?

21       A.    Um, no, there's the Word calendar.  And click

22   on that and then it shows the schedule of the lawyers.

23       Q.    Did you on your first laptop use any

24   capability, whether it be Word, Outlook or any program on

25   your computer, to maintain a calendar of what you had

Page 54

1      scheduled in your life?

2          A.    No.  Because I didn't know how to -- I -- no.

3      I don't -- no, because I don't -- I didn't know how to

4      use all that stuff.

5          Q.    Have you ever searched -- since the inception

6      of this lawsuit, this civil lawsuit to today, have you

7      ever searched through that computer to see if there was

8      anything related to this case?

9          A.    I don't think so.

10              MS. WANG:  Take a quick bathroom break?

11              MS. RETTS:  Yeah.

12              THE VIDEOGRAPHER:  We're going -- we're

13      taking a break?

14              We're going off the record.  The time is

15      11:12 a.m.

16              (A recess was held off the record.)

17              THE VIDEOGRAPHER:  We're back on the record.

18      The time is 11:22 a.m.

19          Q.    BY MS. RETTS:  The laptop that Franke gave to

20      you when you got out of prison, did you ever provide that

21      to any of your civil lawyers to look through?

22          A.    No.  There's nothing on it.

23          Q.    Are you aware of any forensic examination ever

24      being done on that laptop confirm -- to confirm there's

25      nothing on it?

Page 55

1      A.    No.

2      Q.    How do you know there's nothing on it if you

3   didn't search through it to see if there is information

4   related to this case?

5      A.    Because I didn't put anything related to this

6   case on that computer.

7      Q.    What did you use your laptop for?

8      A.    Music, Skype.

9      Q.    Did you e-mail on it?

10      A.    Not -- well, yeah, e-mail.  But --

11      Q.    If someone sent you an attachment through

12   e-mail, did you save it to that computer?

13      A.    I don't -- I don't -- I don't know.

14      Q.    You received various documents electronically

15   after your release from your habeas counsel attached to

16   e-mail.  What would you do with those documents after you

17   received them?

18      A.    What documents?

19      Q.    Do you remember getting documents sent to you

20   through e-mail from Mr. Kimerer or Ms. Voepel, such as

21   pleadings in the case or anything else?

22      A.    Not electronically, no.  I don't remember that.

23      Q.    Do you remember communicating with Ms. Voepel

24   or Mr. Kimerer over e-mail?

25      A.    It's possible I did.

Page 56

```
1        Q.    Where do you access e-mail from?

2        A.    What do you mean by that?

3        Q.    How do you look at your e-mail?  Through a

4   phone?  Through a laptop?  Through a desktop?

5        A.    Oh, mostly through my phone.

6        Q.    Have you always looked at e-mail through your

7   phone or have you accessed it through your laptop?

8        A.    I've accessed it through my laptop.

9        Q.    The laptop from Franke?

10       A.    No.

11       Q.    The laptop you currently have?

12       A.    Yes.

13       Q.    When did you stop using the laptop from Franke?

14       A.    I'm not sure when.

15       Q.    So you have a second laptop that you use.  What

16   do you do on that laptop?

17       A.    Um, I do all -- I pay my bills on there.

18   That's pretty much what I use it for.

19       Q.    Do you use e-mail ever from that laptop?

20       A.    Not -- I don't -- I really don't communicate by

21   e-mail.

22       Q.    Do you have any documents on that laptop?

23       A.    Like documents -- like what kind of documents?

24       Q.    Do you save any type of documents, like Word

25   documents, any documents?  Is -- is there anything on
```

Page 57

1    that laptop?

2         A.   I have -- I have, like, folders that are

3    related to ADT, my dog.  I have -- I have --

4              MS. WANG:  Wait, I'm sorry.  Are you -- are

5    you asking about the -- her e-mail or are you asking

6    about on her laptop?

7              MS. RETTS:  On her laptop.

8         Q.   BY MS. RETTS:  So you have folders in your

9    e-mail where you file away certain e-mail.  Correct?

10        A.   Is it in the e-mail?

11        Q.   Do you also --

12        A.   Yes.

13        Q.   -- have folders on your computer that you do

14   the same thing with, that you, on your computer, put

15   things into folders that have names?

16        A.   In that -- okay.

17        Q.   So --

18        A.   This is confusing to me.  The e-mail, when you

19   click in the e-mail, there's some folders.  So like ADT,

20   things related to my dog, Bank of America, just bills,

21   that kind of stuff.  On the computer, I have a pictures

22   folder, a music folder, and then there's something that

23   says downloads or documents.  And in that, I have school

24   stuff.

25        Q.   Do you ever save documents to the desktop?

1       A.      So -- so like when the screen is the desktop,

2    there's folders on there?

3       Q.      Correct.

4       A.      No, I don't --

5       Q.      Or singular documents, like if you wrote a

6    paper for school and you saved it --

7       A.      I don't --

8       Q.      -- save it --

9       A.      It's not --

10      Q.      -- to the desktop?

11      A.      It's not pictured on there, no.

12      Q.      Did you search through that second laptop to

13   see if there were any documents, materials, any

14   electronic information on that laptop related to this

15   case or your criminal case?

16      A.      The only thing is I -- I think I have a

17   subfolder called civil case notes.  And I'm not sure

18   what's in there.  It's probably the complaint, but I have

19   hard paper copies of that stuff.

20      Q.      Did you search through the subfolder on your

21   laptop when you were sent written discovery requests from

22   the defendants to see if there was anything responsive in

23   that subfolder?

24      A.      I don't -- I -- I'm not sure.  I don't recall

25   that.

1        Q.    Did you ever bring your laptop to any of your

2   civil lawyers for them to search through and see if there

3   was any documents that were responsive?

4        A.    I don't know.

5        Q.    Is it possible that you did, you just don't

6   remember, or --

7        A.    It's -- it's possible.  I just don't remember

8   right now.

9             MS. WANG:  I'm sorry.  There's, like, this

10  distracting -- is there someone on the phone or is there,

11  like, an echo or something?  Do you hear that noise?

12            MS. BURGESS:  No, I don't hear anything.  Is

13  there outside noises?

14            MS. WANG:  Is there a typing noise?  Sorry.

15  It's just -- it's really -- okay.  I didn't know if there

16  was something on over there.  I heard -- okay.  Never

17  mind.

18        Q.    BY MS. RETTS:  Do you have any information that

19  that second laptop was ever forensically examined to see

20  if there were any responsive documents to the defendants'

21  discovery requests?

22        A.    I don't have any information about that.

23        Q.    Do you have a paper file at home that you keep

24  copies of documents related to the civil case in the

25  criminal case also?

Page 60

1      A.    I did.  But I turned it all over.  I don't have

2   any of that at my house.

3      Q.    When did you turn it over?

4      A.    I don't know when.

5      Q.    You also shredded documents, though.  Correct?

6            MS. WANG:  Wait.  Objection.  Form.

7   Foundation.

8      Q.    BY MS. RETTS:  You testified in your last

9   deposition that you shredded documents at Franke's house

10  after your release?

11     A.    Yes, that's true.

12     Q.    So you didn't turn everything over.  You did

13  shred some documents?

14     A.    I shredded my copies of my criminal case:  The

15  transcripts, briefs, pleadings, orders, exhibits.

16     Q.    And you didn't keep a list of the items that

17  you shredded.  Correct?

18     A.    Correct.

19     Q.    Where are all of the letters that Franke sent

20  to you?

21     A.    I shredded those as well.

22     Q.    Where are the letters -- the copies of the

23  letters that you sent to Franke?

24     A.    I don't know where they're at.

25     Q.    Did you shred any of your letters to Franke?

Page 61

1     A.    No.

2     Q.    What other letters did you shred at Franke's

3  house?

4     A.    I didn't shred -- at Franke's house in here?

5     Q.    Yes, correct.

6     A.    Oh.  Just his letters and the -- the court

7  filings of my criminal case.

8     Q.    Did you shred any other letter to any other

9  person when you shredded documents at Franke's house?

10     A.    No.

11     Q.    Did you shred any e-mails printed out at

12  Franke's house?

13     A.    No.  I only shredded my copy of the criminal

14  case, the court filings.

15     Q.    And the letters --

16     A.    The let- -- and -- and the letters -- and

17  Franke's letters.

18     Q.    Have you ever asked Franke where your letters

19  are to him?

20     A.    Have I asked him?

21     Q.    Right.

22     A.    I may have, yes.

23     Q.    What did he say?

24     A.    He doesn't have them.

25     Q.    Did Franke shred documents with you at your

Page 62

```
 1      house -- at his house?
 2           A.    No.
 3           Q.    Was Franke present when you were shredding
 4      documents?
 5           A.    You mean in the room?
 6           Q.    In the house.
 7           A.    I don't remember.
 8           Q.    What did Franke tell you that he did with your
 9      letters to him?
10           A.    I don't know.  I don't remember exactly what he
11      said.
12           Q.    Did he shred them?
13           A.    I don't re- -- I don't remember exactly what he
14      said.
15           Q.    Do you remember generally what he said about
16      the letters?
17           A.    He doesn't have them.
18           Q.    Did you shred any of your letters to Franke
19      when you shredded documents in Germany?
20           A.    I didn't shred documents in Germany.
21           Q.    You didn't -- did you recycle documents in
22      Ger- -- in Germany -- Switzerland?  Did you shred
23      documents in Switzerland?
24           A.    I did not shred documents in Switzerland.  And
25      I did not shred documents in Germany.
```

Page 63

1          Q.    Did you throw away or otherwise destroy

2    documents in any country in Europe?

3          A.    I threw out documents in Germany.  And they

4    were copies of my criminal case, the court filings, the

5    briefs, the exhibits, transcripts, pleadings.  My

6    mother's personal banking records, her medical records,

7    that I put in a recycling box.

8          Q.    Did you tell your therapist that you shredded

9    documents?

10         A.    I told Emily about -- I don't -- I said I threw

11   them out.  There was no shredder.  I didn't shred

12   anything there.

13         Q.    Did you ever tell anybody that you shredded

14   documents in Europe and use that word "shred"?

15         A.    I did not shred.  There was no shredder.

16         Q.    I'm not asking if you did.  I'm asking did you

17   tell anybody that you shredded, using the word

18   "shredded," documents in Europe?

19         A.    No, I don't recall that.

20         Q.    Is it possible that you used the word "shred"?

21         A.    It's -- it's possible, but I don't know why I

22   would use that word.

23         Q.    Did you burn any documents in Europe?

24         A.    No.

25         Q.    Can you identify every -- well, going back to

Page 64

1      your mother's house, you are in her will, the sole heir.

2      Correct?

3          A.    Yes.

4          Q.    And you were given all of her property.  True?

5          A.    Yes.

6          Q.    She had a computer.  Correct?

7          A.    There wasn't one when I got to Germany.

8          Q.    Do you know what happened to it?

9          A.    No.

10         Q.    Your mother used e-mail.  Correct?

11         A.    Yes.  As far as I know, yes.

12         Q.    Did you e-mail with your mother?

13         A.    I don't -- I don't remember.

14         Q.    Did you ask Reinhart where the computer went?

15         A.    I don't know if I asked him.

16         Q.    Did you make any attempt to figure out where

17     the computer that your mother had had in the past went?

18         A.    No.  I just -- when I got there, I just -- I

19     just saw what was there.  That's what I just assumed she

20     had.  There was no computer.

21         Q.    Have you ever made any efforts to try to access

22     your mother's e-mail?

23         A.    No.

24         Q.    As the -- are you the personal representative

25     of her estate?

1          A.     No.

2          Q.     Did you have any obligations in conjunction

3     with being an heir to go through her personal effects and

4     make sure she didn't have any outstanding debts that were

5     paid -- that needed to be paid?

6          A.     Are you asking me if that was my job?

7          Q.     Yes.

8          A.     No.

9          Q.     Did you ever undertake to be involved in that

10    process to see if your mother had any debts, if she had

11    any bills and whether or not they needed to be paid?

12         A.     No.  Reinhart is the executor of her estate.

13         Q.     You knew that Reinhart was the executor of her

14    estate.  Correct?

15         A.     Yes.

16         Q.     You understand that as the executor, he has

17    certain responsibilities to do things like determine what

18    debts there are, what the assets are and how to

19    distribute those.  Correct?

20         A.     I -- I don't have an understanding of that, no.

21         Q.     Do you have a general understanding of that?

22         A.     My only understanding is that Reinhart was the

23    executor of her will and that he authorized or has power

24    and control of making sure the money comes and if I want

25    more, I have to go through him.  That's the only

1    understanding I have.

2         Q.    And you did not have any conversation with

3    Reinhart about the computer or your mother's e-mail and

4    how to access that.  True?

5         A.    Correct.

6         Q.    You know that Reinhart and your mother shared

7    an e-mail address for a certain period of time.  True?

8         A.    No, I didn't know that.

9         Q.    When you go to Germany, do you stay with

10   Reinhart?

11        A.    Sometimes, yes.

12        Q.    Was that house remaining in his name or is it

13   in yours?

14        A.    What house?

15        Q.    Is it a house or an apartment?

16        A.    A house.

17        Q.    A house.  So Reinhart's house, is he, under the

18   terms of the will, to keep that, or is that yours?

19        A.    No.  My mother had a house in Switzerland that

20   she owned by herself.  And that -- my understanding is

21   that was sold.  Reinhart's house is in Germany and he

22   owns that house.  That's his house.  And my mother

23   stayed -- when she was ill, she stayed at his house, but

24   she had her apartment in Switzerland.

25        Q.    How much money are you receiving per month from

Page 67

1     your mother's estate?

2          A.     Right now, it's 4,000 a month.

3          Q.     Pat Galbraith's son, does he manage from a

4     financial standpoint those funds somehow?

5          A.     Pat Galbraith doesn't have a son.

6          Q.     Is there a relative of Pat Galbraith with the

7     same name -- last name Galbraith, who is involved in

8     managing your money that's in the estate?

9          A.     Pat Galbraith, Sr., has a nephew named Patrick

10    Galbraith.  Patrick Galbraith works for UBS America, and

11    he has nothing to do with my mother's will or the money

12    that I get.

13         Q.     What does Patrick manage for you?

14         A.     Nothing.

15         Q.     What does UBS America do for you?

16         A.     Well, UP -- UBS is -- there's UBS -- the money

17    from my mother's will comes from UBS out of -- I think

18    it's out of Germany.  I'm not sure.  But Patrick

19    Galbraith works for USB.  It's a wealth management firm

20    or something.  And he does nothing for me.  I have -- I

21    got a will and I set up a trust.  It's in name only.

22         Q.     How much money is left in your mother's estate?

23         A.     I don't know.

24         Q.     How much money -- have you ever been

25    told there -- there's two points in time where you're

Page 68

1    going to get a lump sum payment from that estate.   True?

2         A.   Yes.

3         Q.   And one is when you're 56?

4         A.   58.

5         Q.   58.  And then the other's what age?

6         A.   I think it's at 62.

7         Q.   How much money do you anticipate receiving when

8    you're 58?

9         A.   I -- I -- I wouldn't even -- I just have no

10   idea.

11        Q.   No one has ever told you how much money exists

12   in that estate?

13        A.   The only -- the only way that I know about any

14   figure is from the paper.  Reinhart doesn't tell -- talk

15   to me about that.

16        Q.   What do you mean, from the paper?

17        A.   The -- the -- the will.

18        Q.   So you -- you don't know how much money was in

19   there in total?

20        A.   I only know from -- from what I read on the

21   document.

22        Q.   So how much money is there in total in there?

23        A.   Now?  I don't know.

24        Q.   When you first read the document, how much did

25   it say was in there?

1   A.   I think at the bottom -- I mean, I turned this

2   document over.  I think at the bottom it said 400 and --

3   this is a rough guesstimate -- 400,000, but that would be

4   euros.

5   Q.   So 400,000 in euros.  And you understand that

6   when you're getting money, that you're getting the

7   benefit of the exchange rate, so you're getting more

8   money than euros.  Correct?

9   A.   It comes to me in US dollars, yes.

10   Q.   You -- there was a point in time when you were

11   getting 2,000 a month?

12   A.   No.  Three.

13   Q.   Three.  When did that increase?

14   A.   I think -- I'm not positive, but I think in

15   June.

16   Q.   What process did you go through to get that to

17   increase?

18   A.   Reinhart did that.

19   Q.   Did you have a conversation with him where

20   you --

21   A.   I --

22   Q.   -- asked him?

23   A.   I did, in May.

24   Q.   What did you ask him to do in May?

25   A.   Um, I cut my hours at work and I asked him if

1    he would increase it.

2         Q.    How many hours are you currently working now?

3         A.    Three days a week.  So about 18 hours.

4         Q.    If you wanted to work 40 hours, is there enough

5    work for you to do?

6         A.    Yes.

7         Q.    It's your choice to only work the 18?

8         A.    It is, yes.

9         Q.    Can you tell me all the e-mail addresses that

10   you ever had?

11        A.    Debj@post.com, djm@mail.com.  I can't -- I have

12   to look at the other one, which I don't even use.

13        Q.    I'll have you look at that at a break and --

14        A.    Okay.

15        Q.    -- and tell us what that is.

16              You -- have you ever e-mailed with Franke?

17        A.    E-mailed with Franke?

18        Q.    Right.

19        A.    Yes, I have.

20        Q.    How frequently do you e-mail with Franke?

21        A.    I don't e-mail -- I don't -- I don't e-mail

22   with him.

23        Q.    Were you told -- let's back up a minute.

24              When did you hire Buddy Rake and Daniel

25   Benchoff?

Page 71

1         A.      I don't recall exactly when.

2         Q.      Do you remember it being around 2014?

3         A.      Oh, sorry.

4                 It's possible.

5         Q.      You also had the law firm of Neufeld Scheck &

6    Brustin with Nick Brustin and Anna Hoffmann, who became

7    involved in your case around early 2015.  Correct?

8         A.      I'm not sure when they became involved.

9         Q.      Did either Mr. Rake, Mr. Benchoff or anyone

10   from NSB give you instructions to preserve your e-mail,

11   your electronic documents, your text messages or anything

12   related to your criminal or the civil case?

13               MS. WANG:  I'm going to object on privilege

14   grounds.

15               Why are you asking her about her

16   conversations with her civil attorneys?

17               MS. RETTS:  Because her civil attorneys in a

18   meet and confer already provided this information, which

19   is a waiver, and the case law says that if there's an

20   spoliation issue, then it's not privileged.  And we can

21   discover whether there was an instruction or not, but her

22   lawyers already told us there was.

23               MS. WANG:  What -- which e-mail are you

24   referring to?  What are you referring to?

25               MS. RETTS:  The November meet and confer,

Page 72

1    the transcript from the November meet and confer.

2              MS. WANG:  Okay.  Can you give me a minute?

3              (Exhibit 358 was marked for identification.)

4              THE WITNESS:  Wait a minute.  What is this?

5    Q.   BY MS. RETTS:  This is a transcript of a meet

6    and confer that occurred.

7              MS. WANG:  What page?  Tell me what page.

8    Q.   BY MS. RETTS:  And it's page 47.

9              MS. BURGESS:  I'm sorry.  What is the

10   exhibit number of this?

11             MS. RETTS:  358.

12             MS. BURGESS:  Thank you very much.

13   Q.   BY MS. RETTS:  On page 47, you see there's a

14   discussion where with -- where Ms. Hoffmann says, "She

15   was instructed to not delete.  Yes, she was instructed to

16   preserve.  I mean, anything related, you know, obviously

17   she can delete junk mail or, you know, spam things, but

18   yes, anything related to this, potentially related in any

19   way to this suit."

20             Do you see that?

21   A.   Yes.  The last paragraph.

22   Q.   Did you receive an instruction from any of your

23   civil counsel, including NSB, to preserve e-mail?

24   A.   I recall being told to turn over letters and

25   documents related to the civil case.

Page 73

1    Q.    Did anybody tell you to not delete things?

2         MS. WANG:  Objection.  Vague as to "things."

3    Q.    BY MS. RETTS:  Did anyone tell you not to

4    delete your e-mail or documents or to preserve any

5    material that could be potentially relevant to this case?

6    A.    Right.  And I could delete spam, that stuff,

7    yes.

8    Q.    Did you delete any e-mails after receiving that

9    instruction that weren't spam or junk mail?

10    A.    When you say "e-mails," what do you -- what

11    exactly do you mean, e-mails?  Because I didn't really

12    communicate by e-mail.

13    Q.    When I say related to the civil case, what do

14    you understand that to be?

15    A.    I turned over -- I found letters when I was in

16    Germany.  And I sent them to New York in the be- -- and

17    so when all this started, I turned over -- I turned over

18    documents.  I handed -- whatever I had that was related

19    to this case, I turned it over.

20         But when you say "e-mails," I didn't -- I

21    didn't really communicate by e-mail.  So I -- I mean,

22    e-mails to who?

23    Q.    E-mails to Franke.  Did you -- Franke -- you

24    had regular communications in letter format to Franke

25    about your criminal case and you also communicated to him

Page  74

1      about your civil case.  True?

2                  MS. WANG:  Object -- objection.  Mis- --

3      objection.  Foundation.  Form.

4                  THE WITNESS:  I re- --

5                  MS. WANG:  Assumes that -- assumes --

6      assumes facts not in evidence.

7                  THE WITNESS:  I recall talking to Franke

8      about my criminal case, yes.  There was a period where

9      there was this retrial phase.  I'm -- I'm -- I don't

10     know.  I may have communica- -- communicated to him

11     through e-mail about that stuff but not my civil case.

12         Q.    BY MS. RETTS:  So during the retrial period, if

13     you were communicating to Franke about that process, did

14     you preserve all of those e-mails?

15                 MS. WANG:  Objection.  Form.

16         Q.    BY MS. RETTS:  Did you save them all?

17                 MS. WANG:  Objection.  Form.

18     Mischaracterizes the witness's testimony.

19                 THE WITNESS:  I don't know.  As I -- as I

20     sit here today, I just don't know.  I don't know.

21         Q.    BY MS. RETTS:  You may have deleted e-mails

22     between Franke that were going on with him about the

23     retrial?

24         A.    I don't know how -- if I e-mailed with him, I

25     don't know how often it was.  I -- I don't -- I don't

1       know.

2            Q.    What is the process that you go through to

3       delete e-mails?  How do you do it?

4            A.    I --

5                  MS. WANG:  Wait.  Are you -- objection.

6       Vague.  Form.  Foundation as to time.

7                  MS. RETTS:  At the last deposition, the

8       Court instructed that it was form only.  So I'm going to

9       object to any other objection other than form.  We got a

10      protective order and the Court said that the only

11      objection was form.

12                 MS. WANG:  I'm not Nick Brustin.  Okay?  And

13      my objections have been proper.  This is -- the

14      objections I have been making have been what you would do

15      in court:  Asked and answered, form, foundation, calls

16      for speculation.  Those are objections that you can make

17      in court and I have not given any speaking objections at

18      all.

19                 MS. RETTS:  But those are speaking

20      objections.

21                 MS. WANG:  Well, right now we're having --

22                 MS. RETTS:  It's form and foundation.

23      Speaking objection is -- anything outside of form and

24      foundation is a speaking objection.  The Court has

25      already said that in this case, which applies to

Page 76

1    everybody.

2                   MS. WANG:  Okay.  I will check the

3    transcript.

4                   MS. WIENEKE:  Could we read back where we

5    were?

6                   (The last question was read back by the

7    court reporter.)

8        Q.    BY MS. RETTS:  What is the process that you go

9    through to delete e-mail generally?

10                  MS. WANG:  Objection.  Foundation.  Form.

11                  THE WITNESS:  Are you talking about e-mails

12   that I received from just anybody?

13       Q.    BY MS. RETTS:  Anybody.  Generally speaking, if

14   you want to delete an e-mail, what do you do?

15       A.    I'm trying to think -- I'm trying to -- I'm

16   picturing the computer screen.  I think there's a -- I

17   think there's a word that says delete.

18       Q.    After that, there's a folder on the side of

19   your e-mail that says deleted items.  Do you go in there

20   and then delete again from there?

21       A.    No.

22       Q.    If there are no e-mails in your deleted items,

23   what would be your explanation for that?

24       A.    If there are no e-mail --

25                  MS. WANG:  Objection.  Foundation.  Form.

Page 77

```
 1            THE WITNESS:  I'm not really -- I -- I
 2  really -- I just -- I'm just not into the computer all
 3  the time.  So when you say deleted all, what are you
 4  talking about?
 5      Q.    BY MS. RETTS:  In the folders on the side, you
 6  said there's a folder for your vet --
 7      A.    Yeah, I -- I create a folder.
 8      Q.    Yes.  And in -- on the side there, there's also
 9  a folder that says deleted items.  Do you ever go into
10  the deleted items folder and delete everything that's in
11  there?
12      A.    Oh, is that emptying the trash?
13      Q.    Yes.
14      A.    Oh.  I don't know.  I --
15      Q.    Do you empty the trash after you delete things
16  on your computer?
17      A.    Not really, no.
18      Q.    Have you done that?
19      A.    And there's a recycle bin --
20      Q.    Yes.
21      A.    -- which I don't know how to use that.
22      Q.    So you have not gone into your e-mail and
23  emptied out the deleted e-mails?
24      A.    I -- I don't know.  I don't think so.  I don't
25  know.
```

Page 78

1       Q.      You may have?

2       A.      It's possible.

3       Q.      There's a sent folder on your e-mail.  When you

4    send a message to someone, it lives in the sent folder.

5    You've seen that before?

6       A.      I have.

7       Q.      Have you gone into that folder and removed

8    items from there?

9       A.      I don't -- it's -- it's possible, but I don't

10   recall.

11      Q.      Other than spam e-mail or junk e-mails, since

12   your -- since you were released from prison and while you

13   were awaiting the retrial and through today, have you

14   deleted any e-mails related to your criminal case or the

15   civil case?

16      A.      Since my release?

17      Q.      Yes.

18      A.      It's possible that I deleted stuff since my

19   release.  But now I have all this on my phone.  I mean,

20   it's all in there.  It's -- it's in folders, I guess.

21      Q.      Do you have -- do you use the iCloud and do a

22   backup of your phone?

23      A.      No.  I don't even know how to do that.

24      Q.      Have you ever had to have your phone restored

25   from a backup?

Page 79

1        A.     I'm -- I don't even know what you're talking
2     about.

3        Q.     Have you ever gone into the Apple store and
4     they ask you, Have you backed up your data to the iCloud?

5        A.     No.  The only thing I know how to do is update.

6        Q.     Do you ever get the message on your iPhone that
7     says your phone has not been backed up for X number of
8     weeks?

9        A.     No.  That doesn't sound familiar to me.

10       Q.     Have you deleted any of your WhatsApp messages
11    with Franke?

12       A.     I -- not on this phone.  On the Samsung, I have
13    from -- yeah, in the past.

14       Q.     Who else do you text with or use WhatsApp with
15    on your phone?

16       A.     Mostly Franke.

17       Q.     How about text messaging, do you text message
18    with Patty?

19       A.     Patty who?

20       Q.     Is it Prust?

21       A.     Oh, yeah.  No, I don't -- I don't -- well, we
22    don't really communicate.

23       Q.     Was there a period of time that you did
24    communicate?

25       A.     On a text?

Page 80

1      Q.    Yes.

2      A.    I -- it's possible.  I don't know.

3      Q.    What about -- is it Patty Bacon?

4      A.    Well, that's the same person.

5      Q.    Same thing.  Right.

6            Patty Bacon was one of the people who

7  Dr. Agharkar interviewed.  Right?

8      A.    I don't know.

9      Q.    Do you know that Patty Bacon -- did you ever

10 have any discussions with Patty Bacon about talking to

11 the psych expert that was hired in this case?

12     A.    I -- I don't even -- I don't even know if she

13 did -- I don't know if she talked to him.

14     Q.    When's the last time you talked to Patty?

15     A.    I'm not sure.  It's possible it was maybe a

16 month ago.

17     Q.    Who is the woman that you went to New York with

18 before --

19     A.    Robin.

20     Q.    Do you text with Robin?

21     A.    Yes.

22     Q.    Robin lived with you for a period of time.  Is

23 that correct?

24     A.    Yes.

25     Q.    When did Robin live with you after you were

Page 81

1      released from prison?

2           A.     I think she moved in in 2014 sometime.

3           Q.     How long did she stay with you?

4           A.     She left in 2015.  I think just -- she just

5      stayed a year.

6           Q.     Did you search through your text messages with

7      Robin to see if were any text messages that were

8      responsive to the discovery requests that the defendants

9      sent to you?

10          A.     Did I go through my text messages with Robin?

11     I don't talk to her about my case.

12          Q.     Did you go through to check to make sure to

13     review and see if you had forgotten something?

14          A.      I don't know -- I don't know how to go through

15     text messages.  Only what's on there.  I don't know how

16     to go in the past because I don't know where they go.

17          Q.     You can scroll up as far as is available on

18     your phone.  True?  You know how to do that?

19          A.     Yeah.

20          Q.     Where there's a text, you can scroll up to the

21     top?

22          A.     Yes.

23          Q.     Have you gone to the text messages with every

24     person you've texted with that is on that phone to see if

25     there is material responsive to defendants' discovery

Page 82

1     requests?

2          A.    I don't -- I don't know if -- I mean, I

3     don't -- I don't talk about my case.

4          Q.    Did you look?  Did you look through all your

5     text messages on your phone to see if there was anything

6     responsive to what the defendants were asking in their

7     discovery requests?

8          A.    Um, I -- I may have.  I may have.

9          Q.    You can't say one way or another?

10         A.    I can't -- I just can't be certain.

11         Q.    Do you have a memory of doing it?

12         A.    No.

13         Q.    Did you ever turn your phone over to any of

14    your attorneys for your phone to be searched?

15         A.    Yes, I did.

16         Q.    And you gave them carte blanche to look through

17    the entire phone?

18         A.    Yes.

19         Q.    You texted with Dr. Bashah.  Correct?

20         A.    Yes.

21         Q.    What phone did you turn over to the attorneys,

22    the iPhone or the Samsung or both?

23         A.    Both.

24         Q.    You text with Mark Milke?

25         A.    I have, yes.  I think that was on my old phone.

1       Q.     Did you text with Pat Galbraith?

2       A.     Pat died two years ago.

3       Q.     When he was alive, did you text with Pat

4    Galbraith?

5       A.     I don't -- I don't recall.

6       Q.     What is Pat's wife's name?  Patty?

7       A.     Patty.

8       Q.     Did you text with Pat's wife --

9       A.     No.

10       Q.     -- at any time?

11       A.     No.

12       Q.     When did you turn your Samsung phone and your

13    iPhone over to your attorneys to be searched?

14       A.     I don't -- I don't know when.

15       Q.     In the last year?

16       A.     Yes.

17       Q.     Did you ever turn your Samsung phone or your

18    iPhone over to Mr. Kimerer before that time to be

19    searched?

20       A.     Mr. Kimerer?

21       Q.     Right.

22       A.     Before what time?

23       Q.     Before the time that you sent it to Ms. Wang?

24       A.     No.

25       Q.     Did you ever turn your Samsung or your iPhone

1    over to any of the lawyers with Neufeld Scheck & Brustin?

2        A.    No.

3        Q.    Did you ever turn your Samsung or your iPhone

4    over to Mr. Dubin?

5        A.    No.

6        Q.    And before you turned your phone over to

7    Ms. Wang, you have no memory of going through and

8    searching all your text messages to make sure that you

9    found responsive texts?

10       A.    I have no -- today, I have no memory of doing

11   that.

12       Q.    Do you still have the Samsung phone?

13       A.    Um, I think so.

14       Q.    Is it in your possession?

15       A.    If -- it might be or it might be at Kimerer's

16   office.  I don't know.

17       Q.    How did you turn the phone over?  Did you

18   physically hand it?

19       A.    Yes.

20       Q.    Who did you physically hand it to?

21       A.    Rhonda Neff.

22       Q.    Who do you text regularly with?

23       A.    Robin.

24       Q.    You saw a man named Jeff for some therapy

25   sessions?

1      A.     Yes.  Jeff Trollinger.

2      Q.     Does Jeff Trollinger have any relationship to

3   Susan Stodola?

4      A.     Jeff Trollinger is deceased.  The only thing I

5   know is that she and he were friends.

6      Q.     Did she recommend that you go to see him for

7   therapy?

8      A.     She rec- -- she recommended that I see him.  I

9   wouldn't -- I wouldn't say therapy but just someone to

10  talk to.

11     Q.     What do you understand his title to be?  Was he

12  a counselor, a therapist, a psychologist, psychiatrist?

13  Do you know what he was?

14     A.     He was -- he was not a mental health provider.

15  My understanding was that he was like a social worker.

16     Q.     When you first went to him for your first

17  session, did you fill out any paperwork?

18     A.     I don't remember.

19     Q.     Did you pay him?

20     A.     Yes.

21     Q.     How much did you pay him?

22     A.     I think -- I'm not positive -- $40.

23     Q.     Did -- is that something that you had to do

24  physically, like, with a credit card or with a -- with

25  cash, or was it your insurance that actually paid it?

Page 86

```
 1        A.      I think I gave him cash.
 2        Q.      How many sessions do you remember having with
 3    him?
 4        A.      I'm not sure of the number, but it was not very
 5    many.
 6        Q.      More than five?
 7        A.      I don't want to guess.  I -- it wasn't very
 8    many.
 9        Q.      You had more than one session with him.  True?
10        A.      Yes.
11        Q.      Did you have more than two sessions with him?
12        A.      Yes.
13        Q.      Did you have more than three sessions with him?
14        A.      I just remember meeting him at his house a
15    couple times and then an office building a couple times.
16    So I really don't know how many times, but it wasn't
17    many.
18        Q.      When you were having sessions with him, was he
19    writing down any notes?
20        A.      I don't remember.
21        Q.      Did you ever do any type of psychological
22    testing where you were given a written set of questions
23    and you filled in bubbles or answered questions?
24        A.      No.
25        Q.      You have had psychological testing before.
```

Page 87

1    Correct?

2         A.    Yes.

3         Q.    So you know what I'm talking about when I

4    describe filling out bubbles and paperwork?

5         A.    Yes.

6         Q.    Have you ever had any psychological testing

7    done with Ms. Bashah?

8         A.    Yes.

9         Q.    How many times?

10        A.    The very first time I met with her.  So just

11   once.

12               (Exhibit 359 was marked for identification.)

13        Q.    BY MS. RETTS:  I've handed you what's been

14   marked as Exhibit 359, which is document 503 from the

15   district court, and it is an order relative to sanctions.

16   Have you ever seen this before?

17        A.    No.

18        Q.    Take a minute and flip through.

19        A.    Do you want me to read the entire thing?

20        Q.    No, just flip through and just make sure that

21   you have not seen it.

22        A.    Yeah, I've never read this before.

23        Q.    Have you read any of the Court's orders in this

24   case?

25        A.    I may have read in the very beginning -- the

1   very beginning, but I don't read this anymore.

2       Q.    Have you read any of the Court's orders from

3   May of 2019 to the present?

4       A.    No.

5       Q.    Did you come -- become aware at any point that

6   the Court had issued an order out -- about potential

7   sanctions against you in this case?

8       A.    I became aware of that, yes.

9       Q.    After becoming aware of that, what efforts did

10  you personally undertake to make sure that you had

11  produced all responsive documents to the defendants?  I'm

12  talking about you personally searching through files,

13  searching through laptops, searching through your e-mail.

14  I want to know what you personally did.

15      A.    I -- what I personally did, I -- I only did

16  what my lawyer -- what my lawyers --

17              MS. WANG:  I'm going to object.  Just answer

18  the question that she asked.

19              THE WITNESS:  Can you repeat it, please?

20              MS. RETTS:  Can you read it back, please,

21  Sommer?

22              (The last question was read back by the

23  court reporter.)

24              THE WITNESS:  What I personally did, I

25  didn't do anything.

1      Q.    BY MS. RETTS:  Can you tell me every time that

2   you have been associated with a speaking engagement where

3   there was some form of monetary compensation?

4               For example, if you gave an interview to a

5   news outlet and you received money in response, can you

6   list those out?

7      A.    All of them?

8      Q.    Yes.

9      A.    I don't know.  I can't -- I can't tell you all

10   of them.  I can tell you the most recent ones.  The most

11   recent one was in August of this year, 2019.

12      Q.    Was that in Australia?

13      A.    Yes.

14      Q.    Were you paid to speak?

15      A.    I was -- I was paid by Witness to Innocence.

16      Q.    What exactly were you paid?

17      A.    I -- I don't know exactly.  I -- I think it was

18   1400.

19      Q.    Does that come to you in the form of a personal

20   check, or does that go into some sort of other fund

21   that's maintained for you?

22      A.    No, it comes in the form of a check.

23      Q.    When -- and you spoke at Cornell.  Correct?

24      A.    Yes.

25      Q.    And you were paid what for that speaking?

Page 90

```
 1        A.    I'm -- I can't remember the -- the amount.

 2        Q.    Was it around $25,000?

 3        A.    No.

 4        Q.    $2500?

 5        A.    I'm not sure.  I -- I'd have to -- I'd have to

 6   go back and look.  I don't know.

 7        Q.    Do those -- any reimbursements that you get for

 8   speaking, whether it be your expenses and traveling, or

 9   you get a fee for your speaking engagement, do those go

10   through your bank account?

11        A.    Yes.

12        Q.    And what bank account?  What bank do you bank

13   with?

14        A.    Bank of America.

15        Q.    So your fees that you've received for speaking

16   engagement would be reflected in your bank statements?

17        A.    Yes.

18        Q.    What about being paid for any speaking

19   engagements with -- or speaking or interviews with a

20   media outlet?

21        A.    In the past?

22        Q.    Yeah.

23        A.    In -- I think it was after -- well, obviously,

24   after I got out, Der Spiegel paid me and I think stern TV

25   paid me.
```

Page 91

1      Q.    How much did Der Spiegel pay you?

2      A.    I don't recall.  I turn --

3      Q.    Was it more --

4      A.    I turned over all those documents.  I don't

5   remember the number.

6      Q.    Was that money that personally went into your

7   account?

8      A.    Yes.

9      Q.    And you used it for living expenses and general

10  day-to-day things.  Correct?

11     A.    I -- I used it.  I don't know exactly for what.

12     Q.    Did you use it for your civil case?

13     A.    What do you mean?

14            MS. WANG:  Objection.  Form.

15     Q.    BY MS. RETTS:  Did you use it to pay for any

16  transcripts or copies of documents for your civil case?

17     A.    No.

18     Q.    Did you use it to pay for any transcripts or

19  copies of documents or anything related to your criminal

20  case?

21     A.    No.

22     Q.    It was personal use?

23     A.    Yes.

24     Q.    The first year that you -- well, let's take

25  2014.  Did you receive any compensation to give a news

Page 92

1    interview in 2014?

2        A.    I received compensation from Der Spiegel, I

3    think, and stern TV.  Those are the two that stick out.

4    And -- but I don't -- I don't know when.

5        Q.    Can you remember any other media entity that

6    paid you or paid any defense funds that was associated

7    with you for giving an interview?

8        A.    I can't think.  I don't know.

9        Q.    Did you claim those payments on your taxes?

10       A.    What payments?

11       Q.    The money you got from Der Spiegel and the

12   money from stern TV, did you claim those on your taxes?

13       A.    Yes.

14       Q.    Have you claimed all money that you've gotten

15   from all speaking engagements on your taxes?

16       A.    Yes.

17       Q.    Were you aware that your mother wrote a book?

18       A.    Yes.

19       Q.    When did you become aware that she wrote a

20   book?

21       A.    I don't know when I became aware.  I don't

22   know.

23       Q.    Was it before your release from prison?

24       A.    Yes.

25       Q.    And you were aware that some of the proceeds

Page 93

1    from that book were used for a defense fund to help you

2    with expenses in your criminal case.   Correct?

3         A.    Yes.

4         Q.    Your mother at various times asked you to give

5    news interviews to help promote that book.   True?

6         A.    Um, I -- I don't -- I'm not sure if it was to

7    promote her book.   I don't know about that.

8         Q.    Was her book in the materials that were at her

9    home in Germany or Switzerland when you went?

10        A.    I'm not -- I'm not sure.   It might have been.

11   I'm not sure.

12        Q.    Did you shred her book?

13        A.    No.

14        Q.    Did you throw away her book?

15        A.    No.

16        Q.    Did you send the book to your lawyers?

17        A.    I don't know if I gave it to NSB or if I gave

18   it to Mr. Kimerer.

19        Q.    When do you think you would have done that?

20        A.    I don't know.

21        Q.    Within the last year?   Within the last two

22   years?

23        A.    I don't know when I -- I don't know.

24        Q.    Are you aware that Franke also had a copy of

25   that book?

Page 94

```
 1        A.     Um, I'm not aware that he had -- I'm not aware
 2     that he had a copy, no.
 3        Q.     Would it surprise you if he did?
 4               MS. WANG:  Objection.  Foundation.
 5               THE WITNESS:  No.
 6               (Exhibit 360 was marked for identification.)
 7               MS. WANG:  Sorry.  What number is this?
 8               MS. RETTS:  360.
 9        Q.     BY MS. RETTS:  This is an e-mail exchange, and
10     I want to focus on the top part between Mr. Kimerer and
11     Mr. Voepel -- Mr. Kimerer and Ms. Voepel, and the date of
12     this is March 21st, 2015.
13               Do you see that?
14        A.     Yes.
15        Q.     And in this, it states, "Franke and Debra have
16     several contracts with German media; Spiegel, 10,000
17     cash; stern TV, 25,000; and another agency I don't know
18     for 25,000."
19               Do you see that?
20        A.     I do.
21        Q.     Does this help refresh your recollection that
22     these interviews likely occurred where you were paid in
23     2015?
24               MS. WANG:  Objection.  Foundation.
25               THE WITNESS:  I'm -- I'm -- you know, I
```

Page 95

1    don't remember what year it was.  It could have been

2    2014, it could have been 2015.  But there's errors in

3    this.

4        Q.    BY MS. RETTS:  What are the errors?

5        A.    Franke and I did not have contracts together.

6        Q.    You had your own contract with German media?

7        A.    It was my own.

8        Q.    So you had a contract with Spiegel for 10,000

9    cash.  True?

10       A.    Hold on.  One -- I think it was Der Spiegel.

11   The total amount was 25,000.  They gave me $10,000 --

12   they probably -- they might have given me -- they gave me

13   two separate payments that totalled 25,000, but they gave

14   it to me at separate times.  And -- and that's in the

15   documents somewhere.

16             And then stern TV, I don't recall exactly

17   how much they gave me, but it's -- that's also in the

18   paperwork that I turned over.

19       Q.    Was there another agency that paid 25,000?

20       A.    No, I -- I -- no, I don't think so, no.  One of

21   these, Spiegel or stern TV, I don't remember exact -- who

22   paid 25,000 and who paid 10-, I don't remember.  I just

23   know that one of them separated the total amount and paid

24   me twice at one point at one part of the year, and then

25   when I completed my obligation, they gave me the rest.

Page 96

1                  (Exhibit 361 was marked for identification.)

2        Q.    BY MS. RETTS:  These are various bank-related

3    documents that were turned over by your attorney, and I

4    want to --

5                  MS. BERKE:  Is this Exhibit --

6                  MS. RETTS:  360 -- or, no, 361.  Sorry.  361

7    are the bank documents.

8                  THE WITNESS:  Yeah.

9        Q.    BY MS. RETTS:  This first one, the --

10       A.    Dieter --

11       Q.    The date of 5/21/15, this Bank of America

12   account, can you tell, is this your personal account?

13       A.    Where's my account number?

14       Q.    Or maybe another --

15       A.    This is my -- oh, 6522.  This is my personal

16   account.

17       Q.    All right.  Who is Dieter?

18       A.    Okay.  Dieter, I've never met him.  He -- he

19   controlled the defense fund in Switzerland.  And after my

20   mother died, he sent me -- he said, This was the

21   remaining balance of it, and he sent it to me.

22       Q.    Okay.  So this 4804 --

23       A.    Is from the defense fund.

24       Q.    -- is from the defense fund.  And that's what

25   existed in the defense fund as of 5/21/15.  Correct?

Page 97

```
1      A.    Yes.

2      Q.    And that money, the 4804, did you use that to

3   pay for your personal expenses?

4      A.    Yes.

5      Q.    The document that's 2112 at the bottom --

6      A.    Yes.

7      Q.    -- there's another wire of 615.01 from Dieter.

8   Do you know what that's for?

9      A.    That's also, like, from the defense fund.

10     Q.    So more money coming in?

11     A.    I guess, yes.

12     Q.    And you used that for personal expenses?

13     A.    Yes.

14     Q.    2114 --

15     A.    Yes.

16     Q.    -- what is this?

17     A.    Okay.  So I was a guest on a TV show.  So that

18   must have been stern TV.

19     Q.    And are these royalties so every time it

20   re-airs, you're given a certain amount?

21     A.    I -- I don't know.  I don't -- no, because I

22   haven't gotten anything.  So I don't know.

23     Q.    Do you know if this is for a speaking

24   engage- -- like an interview or that this was from a

25   different TV appearance?
```

1          A.     Oh.

2          Q.     At the top, it says, "Your invoices beneath

3     remaining royalties will be replaced by this notice of

4     credit."  And there are amount of royalties from 7/12/15,

5     another set from 7/12/15 and then more royalties from

6     7/12/15.

7          A.     Yeah.

8          Q.     Three entries.

9          A.     Yeah, I don't -- I don't -- I'm not really sure

10    what this is.  I mean, I guessed, STV, stern TV, STV

11    guest.  So...

12         Q.     And you've never received any more payments

13    after this?

14         A.     No, no.

15         Q.     Did -- but this came to you in the mail, this

16    document?

17         A.     Yes.  This -- yeah, I think this was mailed to

18    me, yes.  And then --

19         Q.     13246 West Cambridge Avenue.  Whose address is

20    that?  Is that --

21         A.     Where are you at?

22                Oh, that's Pat's address.

23         Q.     Did you save all of the documentation that was

24    like this for any payments that you received for media

25    appearances?

Page 99

1       A.      I saved all of it.

2       Q.      The next page, 2115.

3       A.      That's the wire transfer for this --

4       Q.      Okay.

5       A.      -- for 2114.

6       Q.      So in euros, it was 7500, but you got more

7    money because in US dollars, that was 7883.25.  Correct?

8       A.      Correct.

9       Q.      When you get the money every month, is it 4,000

10   in euros or is it 4,000 in US dollars?

11      A.      It's US dollars.

12      Q.      The next one, 2117, is for 15,000.

13      A.      Okay.  So that looks like the -- so it must

14   have been stern TV that paid me 25,000.  So this is a --

15   they gave me half -- or not half, but 10,000 at one time

16   and 15- at another time.

17      Q.      And then the next page, which is 2118, is the

18   wire for that?

19      A.      Yes.

20      Q.      Do you remember any other paperwork or tran- --

21   transactions that aren't in here related to speaking

22   engagements or contact with the media?  Do you have a

23   recollection of receiving more money that's not reflected

24   in here?

25      A.      No.  If I did, I -- I would save it and turn it

1   over.

2       Q.    So you spoke in Sydney, you spoke at Cornell.

3   Any other speaking engagements that you can recall that

4   you were paid for?

5       A.    I -- the only -- I mean, I gave those -- that

6   information, I -- the only ones I have are recent.  I

7   think Cornell was in April, and then I went to a

8   training, which was not really speaking, but we get paid

9   to go to the training.  That was in June.  And then I

10  went to Australia in August.

11      Q.    What's the training for in June?

12      A.    It's Witness to Innocence and there's a -- I --

13  I work on a panel called Accuracy & Justice.  And we talk

14  about -- there's -- there's prosecuting -- prosecuting

15  offices across the country that are interested in -- that

16  have developed conviction -- what's the word -- integrity

17  units.  And then they -- they seek us out to talk to us.

18      Q.    How much were you paid for the training?

19      A.    I -- they give us like -- well, I don't know

20  exactly.  But I -- I have all that information at home.

21  I think they pay us $300 and then $50 a day per diem.

22      Q.    Are you receiving any donations from anybody,

23  or have you in the last year, just voluntary donations to

24  you?

25      A.    No.

1      Q.    Has Michael Fox been involved in any type of

2   arrangement for you to receive any donations or

3   compensation?

4      A.    I don't know.

5      Q.    Has Michael Fox ever reached out to you to

6   offer help with your financial situation?

7      A.    No.

8      Q.    What is your rent currently?

9      A.    850 a month.

10     Q.    And have you paid that the entire time?

11     A.    I -- I wire -- well, I save it.  I don't give

12   it to Franke every month.  So I just put it away, and

13   then I either wire it to him every six months, or if I'm

14   going to Germany, I'll take the cash to him.

15     Q.    When he comes to the United States, where does

16   he stay, Franke?

17     A.    He hasn't been here since, I think, 2014.

18     Q.    You lived with him for a period of time after

19   your release from prison.  Correct?

20     A.    Yes.  In his house.

21     Q.    How long did he physically reside in that house

22   at the same time that you did?

23     A.    I'm not -- I'm not sure.  I -- because I --

24   I -- I think when I first got out, I lived at Pat and

25   Patty's house.  But I don't know how long I lived there.

1              And then I think I moved into his house in

2    November of 2013 because that's when I got my dog.  And I

3    don't really remember when Franke left.  It could have

4    been the beginning of 2014.

5         Q.    When he left, did you go back to the

6    Galbraiths'?

7         A.    No.

8         Q.    Did you receive permission from the Court to

9    stay in Franke's house if you were still on an ankle

10   monitor?

11        A.    Yes.

12        Q.    And Robin lived with you at that time.  Is that

13   why you got permission?

14        A.    No, I'm not sure -- I -- I know -- I do know

15   that I had asked the Court about living in the house.  I

16   mean, I followed all the rules.  So that -- I know that.

17   I don't know when Robin moved in.  I think it was in

18   the -- I don't know if she moved in before my -- I think

19   she moved in after my mother died.  I can't remember.

20        Q.    When's the next time Franke's coming to the

21   United States?

22        A.    I have no idea.

23        Q.    Has he texted you or messaged you on WhatsApp

24   and told you of any plans he has to come to the United

25   States?

Page 103

```
 1        A.    No.

 2                    (Exhibit 362 was marked for identification.)

 3        Q.    BY MS. RETTS:  This is 362.  Do you recognize

 4   these as your most recent set of WhatsApp messages with

 5   Franke?

 6        A.    Yes.

 7        Q.    And as you kind of look through, there's some

 8   dates and then it goes to the next page.  Did you do

 9   screenshots of these and send them?

10        A.    I did.

11        Q.    And if you flip through, there's an LNL62447.

12   And it says, "Hi, Deb-chen.  Just FYI, I got back to

13   Berlin today.  In five weeks, I'll get back there."

14                    Where is the there?

15        A.    Okay.  Let me get to it.  I -- Okay.  He just

16   got back -- he owns a house on Tenerife in the Canary

17   Islands, and he was in the Canary Islands and he got back

18   to Berlin and then he's going back to the Canary Islands

19   over Christmas.

20        Q.    Does he have any plans to sell the house you're

21   in?

22        A.    No.

23        Q.    Has -- has he talked about selling the house?

24        A.    No.

25        Q.    Did you at some point have plans to buy the
```

Page 104

1      house?

2          A.    Yes.

3          Q.    Was there a Realtor that ever came over to the

4      house to look at it for putting it up on the market?

5          A.    No.

6          Q.    I want you to flip back toward the front.  Just

7      trying to find it here.  Okay.  And you'll turn to

8      LNL062394.

9          A.    394.  Okay.  All right.

10         Q.    At the bottom, it says, "I just meant to read

11     my lines to Liz to you.  Hard drive is on the way.

12     Please ask her to let me know when it arrives."

13               Do you see that?

14         A.    I do.

15         Q.    And that's on August 20th at 6:25 a.m.?

16         A.    Yes.

17         Q.    Did you have a conversation on the phone or

18     Skype with Franke about him sending a hard drive to Liz?

19         A.    When?  On what day?

20         Q.    Before this at any time.  At any time before

21     this text or WhatsApp message, do you have a conversation

22     with Franke about a hard drive and sending it to Liz?

23         A.    I had a phone conversation about -- in August

24     asking him to -- if -- yeah, to send a hard drive to my

25     attorney.

Page 105

1      Q.    How did you come to learn that there was still

2    a hard drive?

3      A.    I don't know.

4      Q.    Did you call Franke up and ask if he still had

5    materials related to your case or if he had a hard drive

6    or if he had the Web site?  What did that sound like?

7                  MS. WANG:  Objection.  Form.

8                  THE WITNESS:  I just -- it was sometime --

9    it was in August, and I talked to him on the phone and

10   asked him if he had a hard drive from the Web site and

11   send it to my attorney.  That's all I remember.

12     Q.    BY MS. RETTS:  Was that the first time that you

13   had ever asked him if he had a hard drive?

14     A.    Yes.

15     Q.    Couple months before that phone call with

16   Franke, did you ever have a phone call where both --

17   where you and Rhonda and Franke were on the phone

18   together?

19     A.    In -- I don't know.

20     Q.    Is that something that's happened in the past,

21   that you, Rhonda and Franke would be on a phone call at

22   work -- at your work together?

23     A.    I recall -- I recall one time doing that, but I

24   don't know when.

25     Q.    What do you remember from that conversation?

1          A.     I don't know.

2          Q.     Did you ask him during that conversation that

3    you can recall happening before if he had a hard drive

4    and could provide it?

5          A.     No, I don't think so.  I don't -- I don't -- I

6    don't think so, no.

7          Q.     Did you ask him if he had any materials,

8    letters, printouts of documents, e-mails, electronic

9    documents, that he would send to you?

10         A.     With -- on this phone call with Rhonda?

11         Q.     Correct.

12         A.     I don't -- I don't recall the conversation.  I

13   recall one day he Skyped me at -- or he called me at

14   work, and I just walked in Rhonda's office with the phone

15   and said, Franke's on the phone.  And so she said hi to

16   him, but there was no discussion about documents or

17   anything like that, no.

18         Q.     Prior to this instance where you remember

19   Franke being on the phone or on Skype and Rhonda being

20   involved, had you ever had a discussion with Franke where

21   you asked him if he had any paper documents, e-mail

22   documents, letters, materials on a hard drive or any form

23   of electronic documents in his possession related to your

24   criminal case, the Web site, Facebook or related to the

25   civil case?

Page 107

1            MS. WANG:  Objection.  Form.

2            THE WITNESS:  No, I don't.

3       Q.    BY MS. RETTS:  When you talked to Franke August

4    20th and asked him if he had a hard drive, was he willing

5    to provide that to you?

6       A.    Not to me, no.

7       Q.    He provided it eventually to your attorney.

8    True?

9       A.    Yes.

10      Q.    Did he express a willingness to help you get

11   that hard drive to your attorney?

12      A.    In August?

13      Q.    Correct.

14      A.    Yes.

15      Q.    So it wasn't as if you got on the phone with

16   him and he had some argument, No, I'm not going to

17   provide it to you.  No, you can't have it.  He said, Yes,

18   I will find a way to facilitate getting it to your

19   lawyer.  Correct?

20      A.    Correct.

21      Q.    You could have called Franke at any point in

22   time before that and asked him if he had any materials,

23   electronic, written or hard drive, and if he'd provide

24   that to you.  Correct?

25            MS. WANG:  Objection.  Form.

Page 108

```
 1                    THE WITNESS:  I -- I gave my attorneys, NSB,

 2      Franke's contact information and I gave Franke NSB's

 3      contact information.

 4          Q.    BY MS. RETTS:  But you didn't personally try to

 5      facilitate that by calling Franke up and saying, It would

 6      be really helpful to me if you'd provide all the

 7      documents, materials, hard drive, e-mails that you have,

 8      can you please do that?  You never had that conversation

 9      with him before August 20th?

10          A.    No, that's not true.

11          Q.    When did you have a conversation with Franke

12      before August 20th where you asked him to provide

13      everything that he had to your attorneys?

14          A.    It was when I gave him NSB's contact

15      information and gave NSB his contact information.

16          Q.    When did that occur?

17          A.    I'm not sure when.

18          Q.    What year?

19          A.    Well, it was when they became my attorneys.

20          Q.    In 2015?

21          A.    Um, I'm not sure if that's the year.

22          Q.    You made a specific verbal request to Franke

23      that he turn over everything to NSB?

24          A.    I don't know exactly what I said to Franke.  I

25      don't -- I don't remember the exact conversation.  But I
```

1     recall giving him NSB's contact information.

2          Q.    Did you give him any instructions, like I'm

3     giving you NSB's contact information, this is what I want

4     you to do?  Contact them and give them everything that

5     you have.

6          A.    I don't think I phrased it like that.  I -- if

7     I -- I told him that -- to contact them and whatever he

8     has, that's helpful of it to turn it -- to talk to them

9     about turning it over -- or giving it.  I don't know.  I

10    just provided the contact information.

11         Q.    And between the time that you provided that

12    contact information in August 20th, what personal efforts

13    did you make to reach out to Franke and ensure that he

14    had, in fact, given everything that he had access to over

15    to your attorneys?

16         A.    After I gave the contact information?

17         Q.    Correct.

18         A.    Did I personally go after him for documents?

19    No, I didn't.

20         Q.    You didn't follow-up with him and ask how did

21    the conversation go, did you provide documents to them?

22         A.    It's -- it's possible that I did.  I -- I just

23    don't recall.

24         Q.    Did you ever remember asking him specifically

25    about your letters to him, that he obtain those letters

Page 110

1      and provide those?

2          A.    It's possible.  I don't -- I don't -- I just

3      don't recall.

4          Q.    Do you remember specifically telling him that

5      you were asking him to search through his electronic

6      e-mail and provide information to the attorneys?

7          A.    I don't -- I don't recall.

8          Q.    During the time when -- when you two were

9      living in the same house together, did you have

10     conversations with him asking him to keep everything that

11     he had and provide it to Mr. Kimerer, Ms. Voepel or

12     Mr. Rake and Mr. Benchoff?

13         A.    No.

14         Q.    Did you know that the Web site had been taken

15     down?

16               MS. WANG:  Objection.  Foundation.

17         Q.    BY MS. RETTS:  The Debra Milke Web site?

18         A.    Did I know that --

19               MS. WANG:  Objection.  Form.

20         Q.    BY MS. RETTS:  That it had been taken down.

21         A.    That it had been taken down.  I was aware of

22     that, yes.

23         Q.    When did you become aware of that?

24         A.    I'm not sure when.

25         Q.    Before you filed your civil suit?

Page 111

 1        A.    I believe so.

 2        Q.    After this -- strike that.  Let me go back.

 3              When you gave Franke the contact information

 4    of your civil lawyers, how did you do that?  Through

 5    e-mail, through WhatsApp, through Skype, through written

 6    letter?

 7        A.    I'm not sure how I did it.  I'm not sure how I

 8    did it.

 9        Q.    After the August 20th WhatsApp message from

10    Franke where he --

11        A.    What page are you on?  Sorry.

12        Q.    62394 where he writes, "I just meant to read my

13    lines to Liz to you.  Hard drive's on the way.  Please

14    ask her to let me know when it arrives."

15              Do you see that?

16        A.    Yes.

17        Q.    Did you follow up with Franke on your own

18    personally after he sent that to ensure that he had sent

19    the hard drive and that it had arrived?

20        A.    Okay.  This was in August.

21        Q.    Correct.

22        A.    "Please ask her to let me know when it

23    arrives."  And I said, "Okay."  I don't recall.  I don't

24    recall.

25              MS. WANG:  Can we go off the record for a

Page 112

1    sec?

2             MS. RETTS:  Yeah.

3             THE VIDEOGRAPHER:  We're going off the

4    record.  The time is 12:52 p.m.

5             (A discussion was held off the record.)

6             THE VIDEOGRAPHER:  We're back on the record.

7    The time is 12:55 p.m.

8         Q.   BY MS. RETTS:  Ms. Milke, will you please turn

9    to LNL062398?

10        A.   Yes.

11        Q.   And on the top, Thursday, August 22nd, it says,

12   "This message was deleted."

13        A.   Yes.

14        Q.   Did you delete that?

15        A.   No.

16        Q.   How --

17        A.   I did not.

18        Q.   How is it that it was deleted?

19        A.   Okay.  If you look at these -- if you look at

20   these WhatsApp -- what do you call these -- bubbles, if

21   you look at the arrow on the -- on the -- so that means I

22   sent a message, and the arrow that goes in the opposite

23   direction, those are messages that he sent me.

24        Q.   So he can delete a message to you and it -- it

25   deletes off your phone?

Page 113

1      A.    Yes.  But I don't -- I can't -- I delete what

2    he -- unless I delete -- or unless I clear everything.

3    So apparently he put something on here and then changed

4    his mind and deleted it.

5      Q.    Do you remember what he put on there that's

6    missing?

7      A.    No.  He doesn't say.  He doesn't say.

8      Q.    And then if you'll turn to LNL06279 -- 739, and

9    it also says on that one, "This message was deleted."

10     A.    Yeah.  I didn't delete that.

11     Q.    There's a little check box with a circle on the

12   side.  Do you know what that means?

13     A.    No.

14     Q.    Do you remember ever seeing that message at

15   some point?

16     A.    No.  There was no message there.  He deletes it

17   before -- I mean, there was no message there.

18     Q.    Then if you'll turn backwards to 62444 --

19     A.    Yes.

20     Q.    And I think you're going to have to turn a few

21   pages back because it looks like there's a whole long

22   chain on November the 5th that starts on 62442.

23     A.    Well, when I screen -- when I -- what's the

24   proper word -- screenshot -- screenshot, I overlap them

25   so you can see the -- the chain.

Page 114

1      Q.    Okay.  So if we start, is it correct that

2   Tuesday, November 5th, runs from 62442 through -- through

3   at least and maybe further, that 62444 is still on

4   Tuesday, November 5th?

5      A.    Yes.

6      Q.    And on 62444, there's an exchange between you

7   and Franke about the hard drive?

8      A.    Well, it starts on 62443.

9      Q.    There's some overlap, though.  Right?  Does it

10  look like 62444 is the complete exchange?

11     A.    No.  The complete exchange is on 444.

12     Q.    Right.

13     A.    Yes, okay.

14     Q.    So Franke asked you, "Did Liz finally get the

15  hard drive?  Would you know?"  And you said, "No,

16  wouldn't know."  And then he responds, "No," with what

17  looks like a horrified face?

18     A.    Yeah.

19     Q.    "No, or you wouldn't know?  Oh, please find

20  out.  Find out, please."  And you say, "Wouldn't know.

21  Okay."

22     A.    Yes.

23     Q.    So is it fair to say that you had not followed

24  up on your own to make sure that the hard drive had

25  arrived?

Page 115

1       A.      I -- that's fair to say, yes.

2       Q.      And why do you say that you wouldn't know

3    whether or not the hard drive arrived or not?

4       A.      Because at that -- on that day, I didn't know.

5       Q.      Between August and November, did it strike you

6    as a little strange that you hadn't heard anything about

7    the hard drive for those several months?

8       A.      No.

9       Q.      You just said he sent it and then it basically

10   was off your plate?  You didn't feel like you had to

11   follow up and make sure that the documents were received?

12      A.      Correct.

13      Q.      Did you ever go through the hard drive to see

14   what was on it?

15      A.      No.

16      Q.      Have you ever seen in your deposition

17   preparation any letters between you and Franke that you

18   sent to Franke?

19      A.      No.

20      Q.      Do you know whether there are any letters

21   between you and Franke on the hard drive?

22      A.      Do I know if there's letters between Franke and

23   I on the hard drive?

24      Q.      Yes.

25      A.      I'm aware of that, yes.

Page 116

1        Q.    How are you aware of that?

2              MS. WANG:  Objection.  Objection to the

3     extent it calls for a privileged information --

4     privileged communications with her civil attorneys.

5        Q.    BY MS. RETTS:  Did Franke tell you that there

6     were letters between you and him on the hard drive?

7        A.    No.

8        Q.    You did not personally review the hard drive to

9     see if there were letters on the hard drive.  True?

10       A.    Correct.

11       Q.    And you did not review any letters from you to

12    Franke in your deposition preparation.  Correct?

13       A.    Correct.

14             MS. RETTS:  All right.  I think now we can

15    break -- take a break for lunch.

16             THE VIDEOGRAPHER:  We're going off the

17    record.  The time is 1 o'clock p.m.

18             (A recess was held off the record.)

19             THE VIDEOGRAPHER:  We're back on the record.

20    The time is 1:46 p.m.

21       Q.    BY MS. RETTS:  Ms. Milke, what is your

22    understanding of why you're here at the deposition today?

23             THE VIDEOGRAPHER:  Excuse me.  Do you --

24             MS. RETTS:  Sorry about that.

25       Q.    BY MS. RETTS:  Ms. Milke, what is your

Page 117

1    understanding about why you're here for deposition today?

2         A.    To answer more questions.

3         Q.    Do you know about what specifically, why it is

4    that you're coming back again for a deposition when we've

5    had a few already?

6         A.    This is related to a sanction motion.

7         Q.    What is -- is that your understanding, that

8    it's related to the sanctions order?

9         A.    An order that -- yeah.

10        Q.    I want you to turn back to that order, which is

11   Exhibit 359, the Court's order of July 19th, 2019.  This

12   document was something that was accessible to you if you

13   had wanted to read through it in its entirety.  Correct?

14        A.    Exhibit 359?

15        Q.    Yes.

16        A.    Yes.

17        Q.    And you chose not to read it.  Correct?

18        A.    Correct.

19        Q.    In fact, all of the court orders that have been

20   issued in the civil case you have the ability to look at

21   if you chose to.  Correct?

22        A.    Correct.

23        Q.    And from October of 2018 till the present, you

24   have chose not to read any of the Court's orders.

25   Correct?

Page 118

```
 1        A.     I'm not sure about the dates.
 2        Q.     Have you read any of the Court's orders in the
 3   last six months?
 4        A.     No.
 5        Q.     Have you read any of the Court's orders in the
 6   last year?
 7        A.     I'm not sure when I stopped reading all of
 8   this.
 9        Q.     What is your understanding of what the Court
10   held in its sanctions order?
11        A.     I'm not sure.
12        Q.     Do you know whether the Court made any specific
13   findings related to you in the sanctions order?
14               MS. WANG:  Objection to the extent it's
15   asking for attorney/client communications.
16               You can answer outside of that, if you have
17   knowledge outside of that.
18               THE WITNESS:  What was the question?
19               MS. RETTS:  Can you read it back, Sommer?
20               (The last question was read back by the
21   court reporter.)
22               THE WITNESS:  I don't know about specific
23   findings.
24        Q.     BY MS. RETTS:  What generally do you understand
25   to be the content of the Court's sanctions order?
```

Page 119

1        A.      Generally about the Web site and the documents

2     from Germany.

3        Q.      Do you have any understanding that it concerns

4     Jana Bommersbach in any way?

5        A.      No.

6        Q.      Any documents that Ms. Bommersbach possessed

7     that you gave to her?

8                MS. WANG:  Objection.  Form.

9                THE WITNESS:  I don't -- I only recall what

10    I just said.

11       Q.      BY MS. RETTS:  Why did you choose not to review

12    Exhibit 359, the Court's order dated July 19th, 2019?

13       A.      Why did I --

14       Q.      Why did you choose not to --

15       A.      Why did --

16       Q.      -- review the Court's order?

17       A.      It's not just the Court's order.  It's all of

18    these documents.  I -- it's -- it's a psychological

19    thing.  I just don't want to read about me.  This brings

20    back a lot of pain.  I don't want to read it.  I have

21    attorneys.

22       Q.      Have you read the Joe Marino letters from front

23    to back?

24       A.      No.

25       Q.      Have you read any of the Joe Marino letters

Page 120

1          since your last deposition and your deposition today?

2              A.     No.

3              Q.     Have you read any of the Imhoff letters?

4              A.     No.

5              Q.     Have you ever read any of the Imhoff letters

6          apart from -- you obviously wrote them, but after writing

7          them and sending them to Ms. Imhoff, have you ever read

8          them?

9              A.     No.

10             Q.     Have you read through the materials that Jana

11         Bommersbach produced in response to the subpoena that we

12         sent to her?

13             A.     I don't know what she produced.

14             Q.     Do you know what you gave to Ms. Bommersbach?

15             A.     No, I don't recall.

16             Q.     You understand that Ms. Bommersbach had a bunch

17         of letters between you and Pat Galbraith.  Correct?

18             A.     I don't -- I don't know.

19             Q.     Where would Ms. Bommersbach have gotten your

20         letters to Pat from?

21             A.     I don't know.

22             Q.     Did you authorize Pat to give your letters to

23         Ms. Bommersbach?

24             A.     My letters?

25             Q.     Your letters to Pat, you wrote a bunch of

Page 121

1    letters to Pat.

2                    (Exhibit 363 was marked for identification.)

3        Q.    BY MS. RETTS:   These are documents in this

4    binder that we've marked as 363 that bear the Bommersbach

5    Bates stamp.   They're double-sided.   These are documents

6    that we understand to be your letters to Pat Galbraith.

7    Do you recognize your handwriting in these?

8        A.    I do.

9                    MS. WANG:   You want her to read the whole

10   thing or --

11       Q.    BY MS. RETTS:   We'll go through specific ones

12   at some point.   But if you flip through, just kind of

13   flip through quickly, do you see your handwriting

14   throughout this document?

15       A.    Yes.

16       Q.    Can you explain how it would have come about

17   that Ms. Bommersbach would have been in possession of all

18   of your letters -- strike that.

19                   Can you explain how it would have come about

20   that Ms. Bommersbach would have been in possession of

21   these letters to Pat Galbraith that you wrote?

22       A.    No.

23       Q.    Who was keeping your letters?

24       A.    What letters?

25       Q.    These letters for -- in this, the letters that

Page 122

1      you wrote to Pat Galbraith, who kept those?

2           A.    Well, if they were addressed to Pat, Pat.

3           Q.    Pat then kept the letters and put them in your

4      storage unit.  Correct?

5                     MS. WANG:  Objection.  Foundation.

6                     THE WITNESS:  I don't -- no, I don't know

7      what Pat did with his letters.

8           Q.    BY MS. RETTS:  Did you authorize Pat to give

9      letters to Jana Bommersbach?

10          A.    I don't recall that.

11          Q.    Is it possible you had all of these letters

12     from Pat and gave them to Ms. Bommersbach?

13          A.    No.

14          Q.    Did you give Ms. Bommersbach any handwritten

15     notes of your own?

16          A.    I don't -- I don't know what I gave

17     Ms. Bommersbach.

18          Q.    You didn't keep an index?

19          A.    No.

20          Q.    You said in preparation for this deposition

21     that you reviewed some testimony.  Correct?

22          A.    Testimony?

23          Q.    Did you review your own deposition testimony?

24          A.    I read -- I read -- yes, I re- -- I read it,

25     the one -- the deposition from August.

Page 123

1      Q.    Did you review any of the testimony from

2  November?

3      A.    No.

4      Q.    The testimony from August that you read, did

5  you review all of it?

6      A.    I read through all of it, yes.

7      Q.    When reading through all of it, did you notice

8  anything in your own testimony that was incorrect?

9      A.    Incorrect?

10     Q.    That you looked at it and said, I think I

11  misspoke or that's not accurate.  Did you notice anything

12  that you think needs correction?

13     A.    The only thing I can recall is I was asked by

14  Ms. Berke about memory, and I told her that I had spotty

15  memories with short-term memory.  And she asked me a

16  question about long-term memory, and at that time, I told

17  her no.  But since our deposition, I have discovered that

18  I have issues with long-term memory as well as short-term

19  memory.  So that's the only thing that comes to my mind

20  right now.

21     Q.    How did you discover that you had issues with

22  long-term memory?

23     A.    Through my therapist.

24     Q.    What was it specifically that caused that

25  revelation to occur?

Page 124

```
 1          A.    Explanations about PTSD.  I was noticing that I
 2    couldn't remember things from a few years ago.  So I
 3    talked to her about it.
 4          Q.    Have you had any type of neurological testing
 5    to address any memory issues?
 6          A.    Right after I got out, I think his name is
 7    Dr. Sullivan, I'm not sure, but I did some testing with
 8    him and I believe he said that I had memory issues.
 9          Q.    Did you -- how many times did you see
10    Dr. Sullivan?
11          A.    Oh, I'm not positive.  I think it was a two-day
12    test.
13          Q.    So two full days of evaluation?
14          A.    I -- I think so.  I'm not positive.
15          Q.    Did you see a written report after that?
16          A.    Um, I'm not sure if I read it.  And I'm --
17    I'm -- I think -- I'm not positive if he wrote one.  He
18    might have.  I don't know.
19          Q.    Did you talk to Franke or Pat or any of the --
20    your friends that you consider a support system about
21    this evaluation that you had with Dr. Sullivan?
22          A.    I don't remember.
23          Q.    Is it possible?
24          A.    It's possible.
25          Q.    Do you remember ever having specifically a
```

Page 125

1    printout copy of any report he authored?

2         A.    I don't -- I don't recall.

3         Q.    Was the two days that you saw him -- were you

4    going through written testing or did you also speak to

5    him?

6         A.    I recall it was -- it was -- it was like -- I

7    recall writing stuff, and I recall -- gosh.  I remember

8    some wooden blocks or something like that.  I don't know.

9         Q.    Do you remember talking to him and him asking

10   you questions or filling out any paperwork where you

11   asked -- were asked questions?

12        A.    I remem- -- I'm not sure, but I remember him

13   reading a story out loud.  I think he read a story out

14   loud, and then he wanted me to tell him what it was

15   about.

16        Q.    Did Dr. Sullivan come up with any diagnoses of

17   you?

18        A.    I don't know.

19        Q.    When's the last time you remember meeting with

20   Dr. Sullivan?

21        A.    I'm not sure of -- of the date, but I think it

22   was sometime right after my release.

23        Q.    When you met with Dr. Agharkar, he didn't do

24   any type of testing.  Correct?

25        A.    No.

Page 126

1      Q.    So that's correct, he didn't do any testing?

2      A.    Um --

3      Q.    You just talked to Dr. Agharkar, you didn't

4  fill out any information like -- the same you did with

5  Dr. Sullivan?

6      A.    Correct.

7      Q.    In your Imhoff letters, you write about

8  conversations that you had with your attorney at the

9  time.  Do you remember doing that?

10     A.    No.

11     Q.    Did Ms. Imhoff maintain a storage unit for you?

12     A.    I'm not sure.  I think so.

13     Q.    Did you send legal paperwork to her to place in

14  the storage unit?

15     A.    It's possible.  I don't recall.

16     Q.    Can you tell me every person that you told or

17  wrote to about conversations that you had with any of

18  your lawyers?

19     A.    Can I --

20           MS. WANG:  Objection.  Form.

21     Q.    BY MS. RETTS:  So I can break it up.

22           During the criminal phase of your trial, who

23  did you write to or share information with about

24  conversations and communications that you had with your

25  lawyers?

Page 127

1          A.     I don't know.

2          Q.     You shared communications that you had with

3     your lawyers with Pat Galbraith.  True?

4          A.     It's possible.

5          Q.     You shared communications that you had with

6     your lawyers with Patty Galbraith.  True?

7          A.     It's possible.

8          Q.     You shared communications that you had with

9     your lawyers with Frank Aue.  True?

10         A.     That's possible, yes.

11         Q.     Who is Bryan James or James Bryan?

12         A.     I have no idea.

13         Q.     Do you remember e-mailing with a Mr. James?

14         A.     No.

15         Q.     Does Mr. James work for a funding company

16    possibly that you got your litigation loan from?

17         A.     I have no idea.  I don't recognize the name.

18         Q.     Did you share conversations that you had with

19    your lawyers with Mr. Doug Bice?

20         A.     Possibly.  I don't recall.

21         Q.     Did you have conversations that you had -- did

22    you share conversations that you had with your lawyers

23    with Ingo?

24         A.     It's possible.  I don't recall.

25         Q.     There was a woman who was incarcerated the same

Page 128

1      time as you, Wendy.  Is it Adriano?

2           A.    Andriano.

3           Q.    Andriano.

4                 Did you share conversations that you had

5      with your lawyers with Ms. Andriano?

6           A.    With my lawyers?

7           Q.    Conversations that you had with your lawyers,

8      did you communicate that information with Ms. Andriano,

9      tell her about how your visit with your lawyers went or

10     what they told you about your case?

11          A.    Possibly, yes.

12          Q.    Are there other inmates within the prison

13     system that you may also have shared communications that

14     you had with your lawyers with?

15          A.    I'm not sure.

16          Q.    Margaret?

17          A.    I don't know.

18          Q.    Is it possible that you may have shared with

19     her things that your lawyers told you?

20          A.    Possible.  I don't recall.

21          Q.    Did you share things with Patty Bacon or Prust

22     about conversations that you had with your lawyers?

23          A.    I -- I'm not -- I don't know.

24          Q.    How about Robin, did you share conversations

25     that you had with your lawyers with Robin?

Page 129

1      A.    No.

2      Q.    Jennifer that we talked about earlier, did you

3    share conversations that you had with your lawyers with

4    Jennifer?

5      A.    I don't -- no, I don't know.

6      Q.    Did you ever, at any time in this litigation,

7    sit down and try to think about all the people that you

8    shared confidential communications that you had with your

9    lawyers with and write out a list?

10     A.    No.

11     Q.    Did you ever review any documents in this case

12   to refresh your recollection about who you might have

13   shared confidential communications that you had with your

14   lawyers with?

15     A.    Re- -- review documents?

16          MS. WANG:  Objection.  Form.

17     Q.    BY MS. RETTS:  So, for example, going through

18   the Marino letters, to refresh your rec- -- recollection

19   about whether you had told Mr. Marino things that your

20   lawyers had told you?

21     A.    I didn't go -- I didn't have those letters.  I

22   didn't -- I didn't go through them.

23          (Exhibit 364 was marked for identification.)

24     Q.    BY MS. RETTS:  Handed you what's been marked as

25   Exhibit 364.  This is an e-mail exchange between you and

Page 130

1       Mr. Kimerer around December 8th, 2015.

2                       Do you see that?

3       A.    Yes.

4       Q.    And if you will turn to the document

5       Bates-labeled LNL045033.

6       A.    Yes.

7       Q.    And in the last paragraph on that page, you

8       write, "Even though I'm having a nice time here, I do

9       miss you all.  I told Heather I'd come into work the day

10      after the MLK holiday.  I have to tackle the boxes and

11      files in the Milke room.  Not a problem.  I'll be happy

12      to condense everything and store it away.  My mother

13      saved everything from my case, and next summer I plan to

14      shred it all.  Reinhart suggested a bonfire, which would

15      feel nice in the cold weather, but I'll deal with that

16      all next year.  Say hello to everyone.  I'll be in

17      touch."

18                      Do you see that?

19      A.    I do.

20      Q.    And you wrote that.  Correct?

21      A.    It appears I did, yes.

22      Q.    And you saw it as your job to go in and tackle

23      the boxes and files in the Milke room that was in

24      Mr. Kimerer's office.  Correct?

25      A.    I'm not -- I don't know what I meant by that.

1          Q.     You didn't ever have a plan to go through and

2    organize the documents in the Milke room?

3          A.     I don't know what I meant by that statement.

4          Q.     Did you have a plan at some point to go through

5    and tackle the boxes and files in the Milke room?

6          A.     I did not have a plan.

7          Q.     Did someone direct you at some point that they

8    would like you to tackle the boxes and files in the Milke

9    room?

10         A.     I don't know.  I don't know what I meant by

11   that.

12         Q.     You understood that everything in the Milke

13   room was your file.  Correct?

14         A.     My criminal file, yes.

15         Q.     And you had the right to go into any of those

16   boxes at any time if you chose to do so.  Correct?

17         A.     Correct.

18         Q.     So you could have gone through and found the

19   Joe Marino letters and looked through them.  True?

20         A.     It's possible.

21         Q.     You could have looked through any of those

22   boxes to find anything that you wanted to look through.

23   Correct?

24         A.     Correct.

25         Q.     Did you go through the boxes and files in the

Page 132

1      Milke room and condense everything?

2          A.     No.

3          Q.     You never touched any of those boxes for

4      purposes of organizing them?

5          A.     Not by myself, no.

6          Q.     Somebody helped you condense and organize the

7      boxes?

8                 MS. WANG:  Objection.  Foundation.

9                 THE WITNESS:  No.  I don't remember exactly

10     how it -- how -- when this started.  I don't remember.

11         Q.     BY MS. RETTS:  You went, at some point, into

12     the Milke room and had physical contact in those boxes

13     and did something with them.  Correct?

14         A.     Not --

15                MS. WANG:  Objection.  Form.

16                THE WITNESS:  Not boxes, no.  Binders.

17         Q.     BY MS. RETTS:  When I talk about the Milke file

18     in the Milke room, I'm going to refer to anything that

19     exists in it because I don't know how it's stored.  So

20     whether it be binders, accordion file folders, boxes,

21     what have you, did you organize any materials regardless

22     of whether they were in a box, a file folder or a binder

23     that lived in the Milke room?

24         A.     I -- I did not organize anything in that room.

25         Q.     Did you ever physically lay your hands on any

Page 133

1    document, binder, box that was in the Milke room?

2        A.    Yes.

3        Q.    For what purpose?

4        A.    Moving a box.  I -- there were binders.  I

5    brought stuff from home and put it in that room on the

6    table.

7        Q.    What did you bring from home and put it in the

8    room?

9        A.    Scrapbooks, cards and drawings that I received

10   from people in prison, things I was supposed to disclose.

11                 (Exhibit 365 was marked for identification.)

12                 THE WITNESS:  I just remembered -- well, I

13   remembered -- I forgot to say it when we came in.

14   Earlier, you asked me about talking to Franke about the

15   hard drive.

16       Q.    BY MS. RETTS:  Yes.

17       A.    So I had a phone conversation with him about

18   the hard drive.  And during that phone conversation, he

19   told me that he communicated with my attorney about it.

20       Q.    And that would have been after the first text

21   message that -- or the WhatsApp message about -- or would

22   it have been before?

23       A.    No, the August --

24       Q.    Yeah.

25       A.    In August.  However the conversation -- it's

1    August.

2         Q.    So in August, was the phone call that you just

3    spoke about -- was that before the WhatsApp message or

4    after the WhatsApp message?

5         A.    I can't -- it -- I just know it was in August,

6    and we talked on the phone and he said that he talked to

7    Liz about the hard drive.  So...

8         Q.    After that phone conversation that you had, did

9    you have any other phone conversations with Franke about

10   the hard drive?

11        A.    After August?

12        Q.    Yes.

13        A.    I don't think so.  I'm not sure.  Well, there's

14   some...

15        Q.    There's a WhatsApp message, but I'm curious

16   about specific conversations that you had --

17        A.    I --

18        Q.    -- differentiating between WhatsApp.

19             MS. WANG:  Objection.  Form.

20             THE WITNESS:  I -- I talked to him in

21   August, and he told me in the phone -- on the phone that

22   he talked to my lawyer about the hard drive.

23        Q.    BY MS. RETTS:  After that, do you remember ever

24   talking to him on the phone again about the hard drive?

25        A.    On the phone?

Page 135

```
 1        Q.    On the phone.

 2        A.    I'm not sure if it was on the phone.  I'm not

 3   sure if there -- it was on the phone, but there's --

 4   there's texts on WhatsApp here in October.

 5        Q.    So apart from the text on WhatsApp, you're not

 6   sure if you did talk to him on the phone again after

 7   August about the hard drive?

 8        A.    Yeah, I can't remember.

 9        Q.    I want to go back again to the documents in the

10   Milke room.

11        A.    Okay.

12        Q.    Tell me, did you ever take any documents out of

13   binders or out of boxes and do anything with them?

14        A.    I -- I -- during the retrial phase, the lawyers

15   were working on this all in there.  So I wasn't a part of

16   that.  I went in that room -- I was told to disclose

17   whatever I brought, scrapbooks, drawings.  I brought that

18   and I put it on the table.  There was a time when a

19   privilege log --

20              MS. WANG:  Well, can we -- can you -- can I

21   hear that question back?  Just try to answer the question

22   that she's asking.

23              (The last question was read back by the

24   court reporter.)

25              MS. WANG:  Answer that question.
```

Page 136

```
1              THE WITNESS:  Did I ever take --

2      Q.    BY MS. BERKE:  Did you take a document, for

3   example, out of a binder and make a copy of it?  Did you

4   take a document out of a binder and throw it in the

5   trash?  Did you take a document out of a binder and put

6   it somewhere else or take it to a different person?  Did

7   you manipulate, move --

8      A.    I --

9      Q.    -- remove anything from the boxes or the

10  binders?

11             MS. WANG:  Objection.  Form.

12             THE WITNESS:  I -- I -- there were multiple

13  copies of binders.  So I took the copies out and put --

14  condensed everything into one -- one binder.  That's all

15  I did.

16     Q.    BY MS. RETTS:  With the multiple other copies,

17  what did you do with the copies?  Did you throw them

18  away?

19     A.    Yeah.  They went into a shred box.

20     Q.    Was anybody supervising your work as you did

21  this?

22     A.    Yes.

23     Q.    Who?

24     A.    Rhonda.

25     Q.    Did Rhonda sit there the whole time and watch
```

1    you as you went through this process?

2         A.    Yes.

3         Q.    When did this happen?

4         A.    I don't remember.

5         Q.    When you were doing this, were you reviewing

6    every single page to make sure there weren't notes or

7    highlights or things on the documents?

8         A.    Yes.

9         Q.    Were you reviewing each page to see what it

10   was, like these are letters or these are a pleading?

11        A.    No.

12        Q.    How would you, then, go about determining if it

13   was a copy or not?

14        A.    Okay.  I'll just -- I'll give an example.

15              There was a binder -- there were three

16   binders for three different people.  And each binder had

17   its own paperwork in it.  So all three binders looked

18   alike.  And it -- they wanted it condensed to just one

19   binder.  So then the copies in the other two binders

20   got -- went to the shred box.

21        Q.    In the binders that you were reviewing, did

22   they have indexes in the front of them where it would

23   say, you know, tab 1 is this, tab 2 is that?

24        A.    No.  The tabs said -- the -- the tab -- I -- I

25   can't remember what the tab said, but I'm not sure.

Page 138

1        Q.    How did you know what was in each binder?  Did

2    it have a name on the outside and when you opened it up,

3    there was something in the front that told you what all

4    the documents were?

5        A.    I don't remember.  And I didn't go through all

6    of the binders.

7        Q.    How many did you go through, do you think?

8        A.    I don't know.  I was -- I was just in there to

9    help organize.  That's all.

10       Q.    Did you do this before your depositions

11   happened in the civil case?

12       A.    Well, this -- this would have been -- I don't

13   know when it was.  During the retrial part.

14       Q.    The document 364, Exhibit 364, the date of that

15   is December 8th, 2015, where you're discussing going

16   through and condensing and storing boxes in the Milke

17   room.

18       A.    In the last paragraph?

19       Q.    Yeah.  That was after the Court said you can

20   not be retried.  Correct?

21       A.    I don't know when all this happened.  December.

22       Q.    Does it sound familiar that around March of

23   2015 is when you received word --

24       A.    Yes.

25       Q.    -- that there wouldn't be a retrial.  Correct?

Page 139

1          A.    Yes, yes.

2          Q.    So this would have been more than six months

3     later, after the retrial process, that you were writing

4     about condensing the boxes.  Correct?

5          A.    Yes.

6          Q.    Does that help refresh your recollection as to

7     when you would have gone through and done this work with

8     the binders?

9          A.    It could have been during this time.  I'm just

10    not sure.

11                (Exhibit 365 was marked for identification.)

12         Q.    BY MS. RETTS:  I'm going to mark what we passed

13    around, the 365.

14         A.    Yes.

15         Q.    Okay.  Exhibit 365.  This is a set of some of

16    the various responses to requests for production that we

17    received.  I want you to just take a look at the first

18    one, which is the first supplemental response to

19    defendant City's first request for production of

20    documents.

21         A.    Do you want me to read the whole thing?

22         Q.    No.  I want you to go through and I want you to

23    turn to page 5.

24         A.    Okay.

25                MS. WANG:  I'm sorry.  You're on the first

Page 140

1    one?

2              MS. RETTS:  Yeah.

3         Q.    BY MS. RETTS:  Do you see how there are

4    questions, requests for production and a response?

5         A.    Yes.

6         Q.    And through your paralegal course, you became

7    familiar with the fact that in discovery, you can set

8    out -- send out written questions to someone who's

9    involved in litigation for getting responses back.

10   Correct?

11             MS. WANG:  Objection.  Form.  Foundation.

12             THE WITNESS:  No, I don't -- I don't know.

13        Q.    BY MS. RETTS:  Do you remember ever seeing this

14   document with the questions and using that to help you

15   decide what it was that you were going to take to the

16   Milke room to be disclosed?

17        A.    I remember -- is this the very first one?  Is

18   this the very first one from the beginning?

19        Q.    These are the first set of request -- these

20   are -- the questions come.  There's a request for

21   production number 1.

22        A.    Yes.

23        Q.    These are the questions with the responses.  So

24   the questions would have always remained the same, and

25   multiple times there were additional documents produced.

Page 141

1    But I'm interested in the questions and if you saw the

2    questions.

3        A.    In the very beginning, I -- I read these.  And

4    what I was told to produce, that's what I did.

5        Q.    When you read these documents, these questions,

6    did you use those and hold on to them to help you go

7    through things, like your e-mail or your laptop or any of

8    the documents that you had in your house?  Did you use

9    those to help you to make sure that you were giving

10   everything over that you needed to?

11       A.    I believe at -- at one time I did that.  I'm --

12   I'm not sure.

13                 (Exhibit 366 was marked for identification.)

14       Q.    BY MS. RETTS:  I've now handed you what's been

15   marked as Exhibit 366, which are several sets of

16   responses to the defendants' nonuniform interrogatories.

17   And those are also written questions.  The first one

18   starts on page 3.

19                 Do you remember looking at these written

20   questions as you went through items in your file or to

21   provide information?

22       A.    I don't remember -- I don't remember which --

23                 MS. WANG:  You -- just take a minute to look

24   at them, a few minutes.

25                 THE WITNESS:  I don't remember.  There's so

Page 142

1      many documents, so many pages.  I don't remember which

2      one I went through.  I can't read this stuff.  I did what

3      my lawyers asked me to do.  That's all I can tell you.

4      But I don't remember reading this stuff.

5              And at some point, I stopped altogether

6      because I can't -- I can't read this because it reopens

7      everything.  And so I can't take it.  So I stopped.  This

8      is what I have lawyers for, to tell me what I need to

9      submit.  So I don't know.  I can't answer your question.

10         Q.    BY MS. RETTS:  You understand that you have

11     some personal knowledge that your lawyers don't have?

12         A.    Like what?

13         Q.    So -- well, Ms. Wang wasn't -- wasn't with you

14     through the criminal trial process.  True?

15         A.    True.

16         Q.    She wasn't personally there when you wrote

17     letters to people.  Correct?

18         A.    Correct.

19         Q.    She wasn't there when you went to all your

20     treating providers.  True?

21         A.    What do you mean, she wasn't there?

22         Q.    So she doesn't come with you to your doctors'

23     appointments.  Right?

24         A.    Correct.

25         Q.    She relies upon you to provide her with

Page 143

1    personal information that you have that she wouldn't ever

2    have.  Right?

3        A.    I just told you that my lawyers tell me what to

4    provide, and if I have it, I provide it.

5        Q.    So I want you to turn to page 4 of this next

6    set.

7                MS. WANG:  The first one?

8                MS. RETTS:  It's -- it's 366, and it's what

9    is page 4.

10       Q.    BY MS. RETTS:  And in the middle, it says --

11               MS. WANG:  Just -- I just want to clear

12   something of the version.

13               MS. RETTS:  Of the nonuniform

14   interrogatories.  So her responses to the City's first

15   interrogatories, the first document in there, page 4.

16               MS. WANG:  Claimant's Response to Defendant

17   City of Phoenix (inaudible) Interrogatories.

18               THE WITNESS:  Which exhibit are you on?

19       Q.    BY MS. RETTS:  Exhibit 366.

20       A.    Okay.  Page 4.

21       Q.    Page 4.

22       A.    Okay.

23       Q.    And about halfway down, it says, "Plaintiff has

24   spoken with her treaters, Dr. Jack Potts and Dr. Emily

25   Bashah.  Plaintiff has spoken with the damages expert

Page 144

1      retained in this case, Dr. Bhushan Agharkar."

2               Do you see that?

3      A.    I do.

4      Q.    Did you provide a list of treating providers

5      that you saw to your attorneys?

6      A.    Which attorneys?

7      Q.    Any of them.

8      A.    Did I -- did I provide a list?

9      Q.    Did you write down a list of the people that

10     you had seen for treating providers given the fact that

11     your lawyers obviously were not at your medical

12     appointments and can't know that unless you tell them?

13     A.    Well, the only way that they would know about

14     them is if I told them.

15     Q.    Exactly.  So did you provide a list of

16     individuals that you saw to them?

17     A.    I don't -- I don't know.  Possibly.  I just

18     don't recall.

19     Q.    So Jeff, who we talked about earlier, is not in

20     this list, is he?

21     A.    Jeff Trollinger?

22     Q.    Correct.

23     A.    He is not.

24     Q.    And you talked about Dr. Sullivan.  He's not on

25     this list either, is he?

Page 145

1              MS. WANG:  Mischaracterizes the evidence.

2     Read the whole page.

3        Q.    BY MS. RETTS:  Strike that.

4              Dr. Sullivan is not identified as a treating

5     provider.  Correct?

6        A.    And neither is Trollinger.

7        Q.    Correct.  And I don't see -- and you can

8     correct me if you see it, but I don't see Trollinger

9     listed anywhere here.

10        A.    But he -- he's not a healthcare provider.

11        Q.    You spoke to him.  This question asked for --

12    "State the full name, current residential address and

13    phone number for all witnesses, individuals, businesses,

14    corporations, investigators and media who have you" --

15    "who you have spoken to about the events on December 2nd,

16    1989, the Phoenix Police Department's investigation, your

17    criminal prosecution and/or any other discussion related

18    to the claims in your lawsuit."

19              Do you see that?

20        A.    I do.

21        Q.    And Mr. Trollinger would classify as somebody

22    that you spoke to about your damages, your time in

23    prison.  Correct?

24              MS. WANG:  You should give her the

25    opportunity to read the answer, the full answer, the

Page 146

1    entire answer.

2              THE WITNESS:  Okay.  So I mentioned

3    Dr. Sullivan.  So back --

4        Q.    BY MS. RETTS:  Mr. Trollinger.  Did you mention

5    Mr. Trollinger?

6        A.    No.  I -- I -- I forgot about him back then,

7    yes.

8        Q.    And you talked to Mr. Trollinger about your

9    experiences in prison.  Correct?

10       A.    I talked to Dr. -- not Dr.  He's not a doctor.

11       Q.    Mr. Trollinger?

12       A.    Yes.

13             About -- I mostly talked to him about

14   feelings after I got out and what it was like to be out,

15   because he wasn't a psychologist.

16       Q.    Was the purpose of you going to see him to help

17   you with your mental health?

18       A.    The pur- -- the purpose -- the purpose of

19   seeing him was to have somebody other than family or

20   friends, somebody neutral to talk to about feelings,

21   about adjusting.

22       Q.    And you paid him for his services.  Correct?

23       A.    Yes.

24       Q.    And you -- did you not consider him to be

25   someone who was providing you with some type of services

Page 147

1    in connection with your mental health?

2                     MS. WANG:  You're still on interrogatory 1?

3                     MS. RETTS:  I'm asking the question.

4                     THE WITNESS:  At this time, I -- I didn't

5    remember him.

6         Q.    BY MS. RETTS:  I'm asking you generally as to

7    him, not with respect to this.  Did you consider him to

8    be someone who you were paying him money to help you with

9    your mental health?

10        A.    No, I -- I -- I didn't consider him to help me

11   with my mental health, no.

12        Q.    So what was the purpose of going to see him

13   then?

14        A.    He was just a neutral person, and I just talked

15   to him about my feelings and about adjusting.

16        Q.    Was he a licensed professional counselor?

17        A.    I don't know.  I don't know.

18        Q.    Did you choose to go see this man without

19   looking up any of his credentials?

20        A.    I did not choose to go see him.

21        Q.    Did someone tell you to go see him?

22        A.    He was recommended, yes.

23        Q.    Who recommended that you go see him?

24        A.    Susan Stodola.

25        Q.    Who is Susan Stodola?

Page 148

1        A.      She is a mitigation specialist, and at the

2    time, she would have been the mitigation specialist in

3    the retrial.

4        Q.      You told Mr. Aue that you were going to see --

5    strike that.

6                You told Mr. Galbraith that you were going

7    to see Mr. Trollinger.  Correct?

8        A.      I don't know.

9        Q.      You don't remember?

10       A.      I don't remember.

11       Q.      Did you tell anybody else that you were going

12   to see him?

13       A.      I -- I don't know.

14       Q.      Did you have an understanding of whether or not

15   his sessions with you would be included in any type of

16   mitigation report that Ms. Stodola was preparing?

17       A.      I don't know about that.

18       Q.      I want to go back to Exhibit 364.  In this

19   e-mail, you state, "My mother saved everything from my

20   case, and next summer, I plan to shred it all."  Correct?

21       A.      That's what it says here, yes.

22       Q.      So you did communicate in an e-mail to

23   Mr. Kimerer your plans to shred the materials in Germany.

24   Correct?

25       A.      Where are you exactly?

Page 149

1      Q.     On 45033.

2      A.     Okay.

3      Q.     The bottom paragraph.

4      A.     Okay.  Right here.

5      Q.     "My mother saved everything from my case, and

6   next summer, I plan to shred it all."

7      A.     And -- and what's your question?

8      Q.     So you did tell Mr. Kimerer that you planned to

9   shred the materials that were at your mother's place.

10  Correct?

11     A.     Well, this is a very broad sentence.  So...

12     Q.     "My mother saved everything from my case, and

13  next summer, I plan to shred it all."  Correct?

14     A.     Meaning she saved the briefs and the

15  transcripts, all the court filings.  That's what I was

16  referring to.

17     Q.     It says "everything."  You agree --

18     A.     Well --

19     Q.     -- that's the word you used.  Correct?

20     A.     Okay.  That's the word I used.  But that -- I

21  just -- in that I meant just the court filings and her

22  personal paperwork.

23     Q.     And it says "shred" in there too.  Correct?

24     A.     It says "shred" in there, but I didn't shred.

25     Q.     But you communicated to Mr. Kimerer in December

Page 150

1    of 2015 that you had a plan to shred everything from your

2    case.  Correct?

3        A.    That's what it says here, yes.

4        Q.    And Mr. Kimerer, in response, did he tell you

5    not to shred everything in your case?

6        A.    Is this his response up here?

7        Q.    Yes.

8        A.    I would -- okay.  It didn't say anything about

9    not shredding.

10       Q.    Down in -- on the same first page here, you

11   also say, "I transported 28 boxes and" -- "28 boxes and

12   two mattresses to Berlin after going through my mom's

13   belongings."

14       A.    Uh-huh.

15       Q.    Do you see that?

16       A.    I do.

17       Q.    Was that -- did those 28 boxes include the

18   materials from your case?

19       A.    No.

20       Q.    So there were boxes in addition to the 28

21   boxes?

22       A.    There was nothing -- there was -- what was in

23   these 28 boxes, it -- they were pictures from when I was

24   a kid.  There was all her china, all her crystal.  There

25   were the mattresses.  There were -- there were some

1   pieces of furniture.  So -- but there was nothing --

2   absolutely nothing related to my legal situation.

3        Q.    In those 28 boxes.

4        A.    Yeah.

5        Q.    But there were different boxes that had your

6   legal case in them?

7        A.    The briefs and -- yes.

8        Q.    When did Pat Galbraith die?

9        A.    In June of 2017.

10       Q.    Was it unexpected or was he having health

11  problems?

12       A.    He -- he was having health problems.

13       Q.    And was it for a long period of time that he

14  was having health problems?

15       A.    He had -- he had had a hip replacement done,

16  and then he caught MRSA.  And then he had the hip

17  replacement done again, and the -- the MRSA infection

18  never really went away.

19       Q.    Did you tell anyone on your legal -- did you --

20  strike that.

21             When did Pat Galbraith become -- start

22  becoming ill in the first place?

23       A.    I would say -- he died in June.  I would say in

24  January of that year.

25       Q.    Did you, after your civil case was filed,

Page 152

1    contact Pat and ask him what materials he still had

2    related to your case, any letters or anything and ask for

3    that material?

4         A.    Just like with Franke, I gave Pat the contact

5    information of my attorneys and I gave my attorneys the

6    contact information of Pat.

7         Q.    Did you have a specific conversation or a

8    general conversation with Pat where you said, I really

9    would like you to turn over every document that you have?

10        A.    I don't recall if I did or not.

11        Q.    So you may just have gone to Pat and said,

12   Here's the contact information for my lawyers, and told

13   the lawyers, Here's the contact information?

14        A.    Yes.

15        Q.    Do you know whether Pat told the lawyers he was

16   ill?

17        A.    I don't know that.

18        Q.    Mr. Trollinger died in 2019, October.  Correct?

19        A.    That's my understanding, yes.

20        Q.    Did you know he was ill before that?

21        A.    No.

22        Q.    And Ms. Stodola informed you that he had died?

23        A.    Yes.

24              (Exhibit 367 was marked for identification.)

25        Q.    BY MS. RETTS:  Exhibit 367 appears to be a

Page 153

1    letter from you to Anders Rosenquist.  Does that look

2    like your handwriting?

3         A.    Yes.

4         Q.    And you only know one Anders.  Correct?  And

5    that's Mr. Anders Rosenquist?

6         A.    Yes.

7         Q.    If you'll turn to 707.

8         A.    Yes.

9         Q.    At the top, you write, "Right now, all of my

10   property that was pulled is in a large box that is in the

11   storage room in the building I live in.  They plan to

12   send everything across the street to the main property

13   storage, and I can pick it up when I'm released from

14   prison.  I could have Pat pick it all up for me."

15              Do you see that?

16        A.    I do.

17        Q.    So when you were writing to Mr. Rosenquist,

18   when you had excess property in your room, you would just

19   have the option of sending it to the storage facility and

20   then having Pat pick it up.  Correct?

21        A.    Well, it depends on -- at some point, the

22   option to the storage facility across the street or

23   whatever I'm mentioning in here, that ceased.

24        Q.    So you had a point in time where there was a

25   storage facility across the street and then Pat could

Page 154

1    pick it up, and then there were other times after that

2    that it just got maintained at the prison and Pat would

3    come and pick it up.  Correct?

4                 MS. WANG:  Objection.  Foundation.  Form.

5                 THE WITNESS:  Yeah, that's generally how it

6    worked.

7         Q.    BY MS. RETTS:  And then Pat would put things

8    into storage.  Correct?

9         A.    I don't know what Pat initially did with --

10   with the boxes he picked up from prison.  I don't know

11   what he did with them.

12        Q.    At some point, you had an understanding that

13   Pat took boxes to a storage facility, though.  Correct?

14        A.    At some point, yes.

15        Q.    And if you can turn to what we marked in the

16   big binder -- it's got the 01 on the front.  No, it would

17   be 03.

18        A.    Okay.

19        Q.    And then if you'll turn to BOMMERSBACH5714.

20        A.    Okay.

21        Q.    And this is a letter that you wrote to Pat

22   dated June 8th, 2005.

23                 Do you see that at the top?

24        A.    Yes.

25        Q.    And you say, "Hi, Pat, enclosed is a property

Page 155

1    release form.  These items should be at the complex

2    property room."

3                    Do you see that?

4         A.   Yes.

5         Q.   So you would fill out a property release form,

6    and then that's how Pat would come and pick up boxes for

7    you?

8         A.   Yes.

9         Q.   And then later on you say, about that same page

10   near the bottom, "I truly can't wait until I can go

11   through all of my stuff in all of those boxes."

12                   Do you see that?

13        A.   Yes.

14        Q.   So you had been consistently sending things out

15   to Pat for him to store for you.  True?

16        A.   When you say "consistently," I mean, extra --

17   extra stuff I had I would have to send out.

18        Q.   And that could be letters that you had or legal

19   paperwork, any extra material.  You didn't have to

20   actually physically destroy it.  You could use this

21   format and have Pat pick it up and put it in your

22   property room.  Correct?

23        A.   Yeah, but I -- I didn't -- I -- I -- it was

24   mostly CDs and pictures, like I said.  People gave me

25   lots of drawings.  It was tennis shoes, just extra stuff.

 1        Q.    You could make the choice, though, to put

 2   anything in those boxes for Pat to pick up?

 3        A.    The boxes that Pat would pick up, it was extra

 4   items that -- because we were only allowed to have a

 5   certain amount of items in our possession.  So it would

 6   be extra books, extra CDs.  It could have been, you know,

 7   a pair of tennis shoes.  I don't know.  I don't remember

 8   everything.

 9        Q.    You had no restriction, though, in terms of

10   your choice.  If you wanted to send Pat legal materials

11   or letters, you could have done that.

12        A.    I didn't send letters.

13              (Exhibit 368 was marked for identification.)

14        Q.    BY MS. RETTS:  Exhibit 368 is an e-mail

15   exchange that is -- starts on August 16th of 2005.  And

16   you see it's from Pat to Lori; your mother, Renate --

17        A.    Yes.

18        Q.    -- Mr. Kimerer; and then cc the Web master,

19   which you understand that to be Franke Aue.  Correct?

20        A.    Yes.

21        Q.    And this is an e-mail about a call that you had

22   with Pat and the second paragraph says, "She continues to

23   write and said she wrote ten pages yesterday.  She's

24   focused on Mark right now and will tackle her sister

25   next.  She says when she gets a copy of her testimony,

1    Ernie Sweat's testimony and her divorce decree, she will

2    have everything she needs until the first of the year.

3            "Therefore, I don't think Renate needs to

4    send any more material right now so maybe our current

5    problem is overcome by events.  She was very positive,

6    and we critiqued the pages she sent earlier.  She has

7    received all the packages we mailed her, both from Mike

8    and from myself, so everything is flowing along.

9            "I broke down the rejected package and am

10   sending her one article in each letter I send her, so

11   things are working.  She is preparing a box of

12   miscellaneous things, so when it's ready, I will go pick

13   it up.  I told her the same stands for any excess files

14   she doesn't need anymore, just send them over to property

15   and I will pick them up and I will put them in the

16   storage room."

17            Do you see that?

18        A.    I do.

19        Q.    When you were in prison, somebody suggested to

20   you that you engage in a writing project of writing down

21   and creating information for a potential book.  Correct?

22            MS. WANG:  Objection.  Foundation.

23            THE WITNESS:  No, that's not correct.

24        Q.    BY MS. RETTS:  What is this, "She continues to

25   write and said she wrote ten pages yesterday"?

Page 158

1        A.     At one point in time, apparently in 2005, I

2     considered to write a book.

3        Q.     And when you were considering that, you were

4     actually writing pages for that book.  Correct?

5        A.     Correct.

6        Q.     And then you would send them to Pat and your --

7     also your mother sometimes, and they would critique them

8     and send them back.  Correct?

9        A.     I'm not sure.  I -- I think -- I'm not

10    positive, but I think so.

11       Q.     Where are those pages?

12       A.     Well, they're -- I decided not to do this,

13    pursue this.  It -- it was something I just changed my

14    mind about, and I just threw the pages away.

15       Q.     When?

16       A.     It was either in 2005 or 2006.  I don't know.

17       Q.     You sent out copies to be saved in your storage

18    room.  Do you remember that?

19       A.     Where do you see that?

20       Q.     Do you remember sending out copies to be saved

21    in the storage room?  Do you have a memory of that,

22    independent of documents?

23       A.     No.  I didn't -- no.

24       Q.     If you'll turn to...

25              (Exhibit 369 was marked for identification.)

Page 159

1           Q.    BY MS. RETTS:   Exhibit 369 is an e-mail

2     exchange around August of 2005 with your mother, Pat,

3     Mr. Kimerer, Mr. Voepel (sic) and Mr. Aue.

4                 Do you see that?

5           A.    On the bottom, yes.

6           Q.    Yeah.  And then do you see about halfway down,

7     on the -- or a quarter of the way down, right about

8     there.

9           A.    Oh, you're at the top?

10          Q.    Yeah, the top.  Quarter of the way down the

11     top --

12          A.    Okay.

13          Q.    -- it says -- from your mother writing,

14     "Neither Pat nor I or anyone else has sent her documents

15     which either came from her personal memories or legal

16     documents to which she always had legal access to but had

17     to pack them up for the property officer because she's

18     only allowed to keep a certain amount of files.  When

19     they raid her cell, she has to pack up everything which

20     is over the allowed amount for which I arranged a storage

21     in Goodyear to keep all the files.

22                 "And most of them I shipped to a great

23     expense back with me to Europe and would like to make

24     available" -- "them available for her project piece by

25     piece just as Pat does in order for her to bridge the

Page 160

1    time and do something worthwhile."

2                   Do you see that?

3        A.    I do.

4        Q.    Did you have an understanding that your mother

5    was also shipping over documents that were from your

6    storage unit to Germany?

7        A.    No, I don't.  I didn't.

8        Q.    Do you dispute that that happened?

9        A.    I --

10                  MS. WANG:  Objection.  Foundation.

11                  THE WITNESS:  I -- I don't know.

12       Q.    BY MS. RETTS:  And if you'll flip to the next

13   page, 44081, it says, "Franke, she asked if you could

14   contact Bill Curtis' agent and see that they got her

15   letter and forward it to him.  I tried to tell her not to

16   expect an answer for a while.  She is antsy and just

17   wants to know that he has the letter."

18                  Do you see that?

19       A.    I do.

20       Q.    Do you remember writing a letter to Bill

21   Curtis?

22       A.    No.

23       Q.    Did you write a letter to Bill Curtis asking

24   that he be a ghostwriter for your book?

25       A.    It's possible.  I just don't recall.

Page 161

1      Q.    I'm going to have you turn to, in the big book

2    that we were in, number -- on the front, it has the --

3      A.    Is this JANA?

4      Q.    -- page number 3.

5            Yeah, these are the JANA documents.

6      A.    Okay.

7      Q.    And if you'll turn to 5116.

8      A.    (Witness complies.)

9      Q.    And there's a gap.  At the bottom, there's a

10   single line, and then after that, there's a paragraph.

11     A.    Yes.

12     Q.    And it says, "I have a box of property for you

13   to pick up.  It has legal mail, miscellaneous mail, two

14   tapes, socks and tennis shoes."

15           Do you see that?

16     A.    Yes.

17     Q.    And so you were sending out at times legal

18   mail, miscellaneous mail and the --

19           MS. BERKE:  Can I ask what page number

20   you're on?

21           MS. RETTS:  5116.

22           MS. BERKE:  Okay.

23     Q.    BY MS. RETTS:  I'll start that over.

24           So you were asking Pat at times to pick up

25   legal mail, miscellaneous mail.  Correct?

Page 162

1    A.    Yes.  And I already said that miscellaneous

2    mail was most likely drawings that I got from inmates, or

3    cards.

4    Q.    The two tapes, would those have been voice

5    tapes or --

6    A.    No.

7    Q.    -- would they have been music tapes?

8    A.    Music tapes.

9    Q.    And if you'll turn to 5365.

10    A.    (Witness complies.)

11         MS. WANG:  I'm sorry.  What did she say?

12         THE WITNESS:  53- --

13         MS. RETTS:  5365.

14    Q.    BY MS. RETTS:  And it's going to be the last

15    paragraph.  This is a letter to Pat, also dated 5/22/07.

16    And you say, "Thank you for the money order.  I'll let

17    you know when I get the receipt.  I enclosed an ad of

18    some sandals.  I circled a pair I'd like.  Whenever Patty

19    is at Dillard's or if she needs an excuse to go, here's

20    one.  Haha.  I'm only interested in the sandal I circled.

21    That's the color only.  And just stash it in my storage.

22    Thank you."

23         Do you see that?

24    A.    Uh-huh.

25    Q.    So you were also directing Pat to go have

Page 163

1   people buy clothing for you, or shoes, and put it in your
2   storage.  True?
3        A.   Um, it -- it wasn't like how you're
4   characterizing it.  I wasn't directing anybody to do
5   anything.  Pat, my mother, anything you would like, just
6   ask us, and if we can get it for you, we will.
7        Q.   So you asked Pat at various times, or Patty, to
8   get you clothing items or shoes and then put them into
9   your storage unit?
10       A.   Yes.
11       Q.   And that's some of the materials that when you
12   got out of prison that Pat then brought from the storage
13   unit so that you can have.  Correct?
14       A.   Correct.
15       Q.   And then the third paragraph down, it says, "By
16   now you know about my special friend, Doug, from Dallas.
17   I can't wait to tell you and Patty about him.  He's
18   coming to see me in July, and that's why I asked you for
19   the phone number to schedule a visit.  He's been my
20   little secret for a year."
21            Do you see that?
22       A.   I do.
23       Q.   And that's Doug Bice.  Correct?
24       A.   It sounds like it could be, yes.
25       Q.   Is there any other Doug that you remember --

Page 164

```
 1        A.    No, I think --

 2        Q.    -- being a secret for a year?

 3        A.    Oh, well, Doug from Texas, yes.

 4        Q.    So that would be Doug Bice?

 5        A.    Yes.

 6        Q.    And he did come to visit you in July.  Is that

 7   correct?

 8        A.    I -- I don't recall when he came to visit.

 9        Q.    And then will you turn to BOMMERSBACH5482?

10        A.    (Witness complies.)

11        Q.    On the bottom of that page, it says, "Thank you

12   very much for mailing the hundred dollars to me and to

13   Cheryl."

14              Do you see that?

15        A.    I do.

16        Q.    Who is Cheryl?

17        A.    Cheryl is Cheryl Newberry.  I provided her

18   name.  But it's different now.  Her last name's

19   different.

20        Q.    So while you were incarcerated in prison, Pat

21   was sending money to other inmates after you asked him to

22   do that.  Correct?

23        A.    He was sending my money.

24        Q.    Right.

25        A.    My money.  Not his money.  My money.
```

Page 165

```
 1        Q.     Your money, you were directing Pat to send your

 2    money --

 3        A.     Yeah.

 4        Q.     -- to other inmates.  Correct?

 5               MS. WANG:  Objection.  Form.

 6               THE WITNESS:  Well, to Cheryl, yes.

 7        Q.     BY MS. RETTS:  And you directed Pat to send

 8    money to people other than Cheryl.  True?

 9               MS. WANG:  Objection.  Form.

10               THE WITNESS:  At times, yes.

11        Q.     BY MS. RETTS:  How much money do you think in

12    total you directed Pat to send to other inmates?

13               MS. WANG:  Objection.  Form.

14               THE WITNESS:  I don't know.

15        Q.     BY MS. RETTS:  Was Cheryl in general population

16    or was she back in -- just regularly in the unit?

17        A.     The only way that I could meet anybody in

18    prison was if they were in lockdown because that's where

19    I lived permanently.

20        Q.     How much money a month did you get as an

21    allowance?

22        A.     It varied.

23        Q.     What were the different amounts?

24        A.     I don't recall the exact amounts.  But I --

25    what comes to my mind is 125 a month, 200 a month.
```

Page 166

```
 1         Q.    So I want you to turn to Bommersbach 4371.
 2    Oops, I'm sorry.  4731.  I transposed those.
 3         A.    4731?
 4         Q.    Yes, 4731.
 5         A.    Are you sure that's the page you want me to
 6    read?
 7         Q.    Yeah.  Well, first I want you to note that it's
 8    a -- you see that that's a letter to Pat, and it's dated
 9    July 14th, 2010.  Correct?
10         A.    Yes.
11         Q.    And then if you flip to the next page, there's
12    a kind of line break in the middle, and it says, "Thank
13    you for taking care of the things on the to-do list after
14    you returned home.  I enjoyed talking to Patty while you
15    were gone.  For August, will you please send me 175 and
16    Wendi 75."
17               Do you see that?
18         A.    I do.
19         Q.    So on this occasion, you were -- for that
20    August of 2010, you were asking for 175 for yourself and,
21    out of your own money, 75 to Wendi.  Correct?
22         A.    Correct.
23         Q.    And Wendi was another woman who was on death
24    row.  True?
25         A.    Yes.
```

1      Q.    And if you'll turn to 4761, and you'll see on

2    that first page, it's a letter to Pat dated

3    February 21st, 2010.

4                  Do you see that?

5      A.    Yes.

6      Q.    And if you'll turn to the next page, at the

7    top, it says, "If you haven't gotten the money orders" --

8    or MO.

9                  That stands for money orders.  Right?

10     A.    Yes.

11     Q.    -- "for March yet, good, because I'm asking you

12    for something different this time.  Please send 160 each

13    to me and Wendi.  Go ahead and buy an MO," money order,

14    "for $80 for that other stuff but hold on to it until I

15    tell you to send it.  Okay?  I appreciate your help, so

16    much.  Thank you."

17                  Do you see that?

18     A.    I do.

19     Q.    So for March, you were asking that $160 be sent

20    to you and that $160 be sent to Wendi from your money.

21    Correct?

22     A.    Well, not March.  February.  Oh.

23     Q.    If you haven't gotten the MOs for March --

24     A.    Oh.

25     Q.    -- I think your letter's dated February, but

Page 168

1    aren't you asking for a March money order?

2         A.    Oh, yes, yes.  I'm sorry.  Yes.

3         Q.    So for March, it was 160 to you and 160 to

4    Wendi from your money?

5         A.    Yes.

6         Q.    And then you are wanting him to hold on to

7    another money order for $80 for other stuff.

8         A.    Yes.  That's what it says here.

9         Q.    Do you remember what that other stuff would

10   have been?

11        A.    I don't -- I don't know today.  I don't know.

12        Q.    And then will you turn to 4811.

13        A.    (Witness complies.)

14        Q.    And that is a letter to Pat from you dated

15   October 7th, 2009.

16        A.    Yes.

17        Q.    Do you see that?

18        A.    I do.

19        Q.    And then if you'll turn to 4815.

20        A.    Okay.

21        Q.    And about in the middle of the page, it says,

22   "Can you please go to the bank and get two money orders

23   of $200 each.  It will be my allowance for November and

24   100 for Wendi for November but another 100 for her now

25   because she has nothing.  And that's it until late

Page 169

1      November, I promise.  Thank you so much, Pat."

2                  Do you see that?

3          A.    I do.

4          Q.    So in this period of time in November, you were

5      directing Pat to send $200 to Wendi from your money.

6      Correct?

7          A.    Correct.

8          Q.    Will you turn to 4754.

9          A.    (Witness complies.)

10         Q.    And that's a letter from you to Pat dated

11     March 21st, 2010.

12                 Do you see that?

13         A.    I do.

14         Q.    And then if you go to the page -- the next page

15     that's 4755?

16         A.    Yes.

17         Q.    And you tell Pat, "Please hang on to the

18     80-dollar money order.  I'm not ready for it to go

19     anywhere just yet."

20                 Do you see that?

21         A.    I do.

22         Q.    It says, "You know when you run into a brick

23     wall and you have to find away to go around it?  Well,

24     that's what we are working on at the moment.  It's no fun

25     when things change around this place."

1              Do you see that?

2        A.    I do.

3        Q.    What was that referring to?

4        A.    I'm not sure what it was referring to.  I -- I

5   can't tell you what this -- exactly what this is

6   referring to.  But I do know how some things work in

7   prison.

8        Q.    So, generally speaking, were you sending money

9   orders or having -- directing Pat to send money orders to

10  inmates to help you get additional privileges in prison,

11  such as more food from commissory -- commissary?

12             MS. WANG:  Objection.  Form.

13             THE WITNESS:  Well, I'm not sure exactly

14  what this one would be about, but, like, I wasn't allowed

15  to have dental floss, and so I just wanted dental floss.

16  You know, there were some things -- there were some

17  makeup items that I wasn't allowed to have.  And so then

18  you can get those through GP, and then they would -- I

19  could get them.

20       Q.    BY MS. RETTS:  So you would have Pat send a

21  money order to an inmate who was in general population,

22  that inmate would make a purchase from commissary for you

23  and then they would bring that item to you, that inmate

24  would, when they might happen to pass through and hand

25  out commissary?

Page 171

1      A.    That's not how it worked, no.

2      Q.    How did it work?

3      A.    I had a friend who worked in the store so --

4   and it's -- you don't just pay for a single item, you --

5   you know.  It's -- it's just like out in the free world.

6   People -- they charge you to do a service, I guess.

7   That's the only word I can think of.

8      Q.    So you would pay inmates in general population

9   for the item plus kind of a surcharge for them doing you

10  a favor?

11     A.    That's how it worked.

12     Q.    And you knew when you did it that it was

13  against prison regulations.  Correct?

14     A.    Yes.

15     Q.    And that if you got caught, you could get

16  disciplinary sanctions.  True?

17     A.    True.

18     Q.    But you continued to do it anyway?

19     A.    That's just the way of surviving in there.

20     Q.    In that same letter, it says, "Speaking of" --

21  "Next, speaking of money orders, I only need 60 for

22  April.  I got some birthday money from someone, so I

23  don't need much more.  Will you please send Wendi $180?

24  Thank you."

25             Do you see that?

Page 172

1        A.    I do.

2        Q.    So in this particular letter, you were

3   directing $180 to be sent to Wendi?

4               MS. WANG:  Objection.  Form.

5               THE WITNESS:  According to this, yes.

6        Q.    BY MS. RETTS:  If you'll turn to 4796.

7        A.    (Witness complies.)

8        Q.    And this is a letter that's dated

9   November 15th, 2009.

10              Do you see that?

11       A.    I do.

12       Q.    And then if you'll turn to 4798, which is in

13   that same letter.

14       A.    (Witness complies.)

15       Q.    In the middle of the page, it says, "Will you

16   please send 250 to me and 250 to Wendi?  That should be

17   plenty for my extra stuff that the store sells.  Thank

18   you so much."

19              Do you see that?

20       A.    Yes.

21       Q.    So on this occasion, in total, Pat was sending

22   $500 for that month?

23       A.    And this -- because this letter's dated

24   November 15th, this was in preparation for December.

25       Q.    So you got extra money in order to buy things

Page 173

1   that came in special to the prison for Christmas.
2   Correct?
3       A.   Yes.
4       Q.   If you will turn to 4478.
5       A.   44-...
6       Q.   Actually, it's 4477.
7       A.   Okay.
8       Q.   And that is a November 8th, 2012, letter to Pat
9   from you.  Correct?
10      A.   Yes.
11      Q.   And on 4478, if you'll turn there, and it's
12  about halfway down, you write, "I've asked my mom if I
13  could take extra money from the account to buy something
14  every month to add to my wardrobe."
15      A.   Where -- where are you?  Okay.  I see.  Okay.
16      Q.   "It's not an excessive amount, just 150 to 200
17  a month.  I figured I'd ask her because I certainly don't
18  wish to hear her comments."
19           Do you see that?
20      A.   I do.
21      Q.   So as of -- as of the time of this letter, you
22  were asking for extra money in addition to what you were
23  spending in the prison in order to buy some clothing
24  items for when you got out.  True?
25      A.   Yes.

Page 174

1        Q.     And did you receive that extra money?

2        A.     Let me -- wait a minute.  Is this -- this might

3    be about HSN.

4        Q.     Yeah.  It goes on to say, "I went ahead and

5    included a few items to add to my collection at Franke's

6    house.  The robe is not from HSN.  I circled the Web site

7    to go to.  Chenille has always been my favorite texture,

8    and I'm eager to wear this ultimate softness robe.  All

9    the necessor-" -- "necess-" -- "necessary info is listed

10   on the page.  The other sheet is from HSN."

11                  Do you see that?

12       A.     I do.  This -- I was -- I recall this.

13       Q.     So you would get HSN -- you would watch HSN on

14   the TV?

15       A.     Yeah.  And then write all the stuff down, and

16   then I would send a list to Pat.  And he didn't send this

17   extra money to me.  He just took it -- like he would

18   write a check to HSN or whatever, how he paid it, and

19   then he would just take the money out of the account and

20   pay himself back.

21       Q.     And then he would put that aside for you at

22   Franke's house.  Right?

23       A.     In the boxes, yes.

24       Q.     And then on 4479, at the very bottom, it says,

25   "Please send Wendi 175 and me 160."

Page 175

1           Do you see that?

2      A.    Again, this is in November, so it was ready for

3   December, yes.

4      Q.    So for November, you were asking for that money

5   to buy additional things from the Christmas store?

6      A.    Yes.

7      Q.    Do you remember sending money or having money

8   sent to an inmate named Patricia Sanchez?

9      A.    I don't recall like -- I don't recall exactly,

10  but like I described to you about something, that's how

11  you do it.  It goes to an inmate out in GP.

12           (Exhibit 370 was marked for identification.)

13     Q.    BY MS. RETTS:  And I --

14           MS. WANG:  What exhibit is this?

15           MS. RETTS:  370.

16     Q.    BY MS. RETTS:  It's Exhibit 370.  And that's a

17  letter that you wrote to Anders dated September 14th,

18  '98.  And you write in this, "Hi, Anders, I need to get a

19  message out to my mom that I don't want these officers to

20  know about and sending it via legal mail is my only

21  option."

22           Do you see that?

23     A.    I do.

24     Q.    So you did use the legal mail to send nonlegal

25  messages to people sometimes.  Correct?

1      A.    To -- what do you mean, to people?

2      Q.    So this you did to your mom.  You also did that

3   with Pat.  Correct?

4      A.    I don't -- I may have, yes.  I mean, back then

5   in prison, in my mind, I didn't think I was doing

6   anything wrong.

7      Q.    So you write, "Please tell her that when she

8   sends my money to me later this month, to please send 25

9   of it to my friend out in general population.  This money

10  is for stuff for me.  It's not drugs or anything illegal.

11  I will explain later, but I need to have the money sent

12  to her.  And when she sends it, please put the MO in a

13  short note that says, 'Don't worry, don't stress.'

14  That's all she needs to write.  My friend's name is

15  Patricia Sanchez, 39976."

16               Do you see that?

17     A.    I do.

18     Q.    And you, when you wrote this, were asking that

19  your mom comply with your directions.  Correct?

20     A.    Yeah.  According to this, yeah.

21     Q.    There's a note on the bottom from Anders

22  Rosenquist that says, "Renate, this is a dangerous thing

23  to do because if they find out, they could terminate her

24  contact with you and put on some type of restriction."

25               Do you see that?

Page 177

```
 1         A.    I do.

 2         Q.    Were you aware that Mr. Rosenquist had advised

 3    your mother that this should not be done?

 4         A.    No, I wasn't aware of that.

 5         Q.    Did Mr. Rosenquist ever tell you that you

 6    shouldn't do this?

 7         A.    I -- he may have, yeah.

 8         Q.    Do you remember also sending money to an inmate

 9    named Priscilla Lowenberg?

10         A.    No, I don't remember.

11         Q.    Is it possible that you sent money to her; you

12    just don't remember?

13         A.    It's possible.

14         Q.    Who is Rosa Jamerson?

15         A.    I don't even know.

16         Q.    Can you turn to 4786?  This is a letter that

17    you wrote to Pat on November 29th, 2009.

18               Do you see that?

19         A.    I do.

20         Q.    And if you go over to the next page, about the

21    middle of the page, it says, "Switching gears, will you

22    please send a card with $20 to Rosa Jamerson.  Address

23    same as mine but she lives in A pod.  Don't know the room

24    number but putting down A pod will be enough.  In the

25    card, don't write Debbie says hi.  Write Patty says hi.
```

Page 178

1    That's important.  It's Patty's friend and she wants to

2    help out with Christmas.  Also, on the envelope with your

3    return address, only use your address and no name.  Thank

4    you so much for your help."

5              Do you see that?

6      A.    I do.

7      Q.    Was Patty another inmate in prison?

8      A.    I -- it sounds like it.

9      Q.    So it sounds like Patty requested that you help

10   her out by sending money to this woman named Rosa

11   Jamerson.  Is that what happened?

12     A.    It --

13              MS. WANG:  Objection.  Foundation.

14              THE WITNESS:  That's what it sounds like,

15   yeah.

16     Q.    BY MS. RETTS:  So you would also, when other

17   inmates asked you to send money to their friends, do that

18   to help out, and that would be your own money.  True?

19     A.    Yes, my own money.

20     Q.    Where was that money coming from?

21     A.    What do you mean, where was it coming from?

22     Q.    Well, you weren't working.  Correct?

23     A.    Right.

24     Q.    Did that money come from a bank account that

25   you had before you were arrested, or was it from

Page 179

1      somewhere else?

2          A.     I -- I think my mom had an account here and

3      she -- and Pat had access to it.

4          Q.     So the money that you were getting was actually

5      your mother's money that she was giving to you.  Correct?

6          A.     Yes.

7          Q.     Was Heather Trapp the inmate who worked in the

8      store and helped you out?

9          A.     I -- I don't even know what --

10         Q.     So if you'll turn to 4888, and in the top part

11     of the page, it says, "Heather is happy to help with the

12     chicken and tuna.  Will you please send her 65?  Her last

13     name is Trapp, number 117537.  Same address, but 24 yard

14     D157.  Thank you."

15                Do you see that?

16         A.     I do.

17         Q.     Is this what you were talking about earlier,

18     that you would send money to inmates who were in general

19     population so that you could get additional things, such

20     as chicken and tuna?

21         A.     Yes.

22         Q.     Is it possible she's the one who worked in the

23     store or had some association with the store so that --

24     that you can get that extra food?

25         A.     I -- I don't remember the girl.  I don't

Page 180

1    remember.  But it's possible she worked at the store,

2    yes.

3         Q.    Do you remember having money sent to Stephanie

4    Thompson?

5         A.    Yes.  She worked at -- she worked at the store.

6         Q.    Okay.  So she -- when you would send Stephanie

7    money, was that so that you could get additional items

8    from the store?

9         A.    Yes.

10        Q.    And that included money for the items for the

11   store and also her fee for getting that delivered to you.

12   Correct?

13        A.    Uh-huh, yes.

14             MS. WANG:  Could we take a quick bathroom

15   break?

16             MS. RETTS:  Yes.

17             THE VIDEOGRAPHER:  We're going off the

18   record.  The time is 3:26 p.m.

19             (A recess was held off the record.)

20             (Exhibit 371 was marked for identification.)

21             THE VIDEOGRAPHER:  We're back on the record.

22   The time is 3:33 p.m.

23        Q.    BY MS. RETTS:  We've marked now Exhibit 371,

24   which the front cover is an e-mail from Ginger to Lori

25   Voepel, subject Milke letter to Pat from Debra.

Page 181

1              Do you see that?

2       A.    Yes.

3       Q.    And if you flip to the next page, it's dated

4    2/7/13, it says, "Hello, Pat.  I'm getting a letter to

5    you this way so I can write openly without having to do

6    it in code."

7              Do you see that?

8       A.    I do.

9       Q.    So you did, in fact, sent letters to Pat

10   through your attorney Ms. Voepel so that you wouldn't

11   have to send a coded letter to him.  Correct?

12            MS. WANG:  Objection.  Form.

13            THE WITNESS:  Wait a minute.  Did I send

14   this letter to Lori?  I don't know.

15      Q.    BY MS. RETTS:  That's my understanding.  If you

16   have a different one, let me know.

17            MS. WANG:  Objection.  Form.  Foundation.

18      Q.    BY MS. BERKE:  What do you think you're saying

19   when you say, "I'm getting a letter to you this way so I

20   can write openly without having to do it in code"?

21      A.    I don't know.

22      Q.    Do you remember sending letters to Pat through

23   either Mr. Kimerer or Ms. Voepel?

24      A.    No, I don't.

25      Q.    Do you deny that you did it?

Page 182

1        A.     Through Mike and Lori?

2        Q.     Correct.

3        A.     I don't believe I did that through Mike and

4   Lori.

5        Q.     Now, halfway down, it says, "After some

6   plotting and planning, Trivia will be able to help me get

7   a new one.  This appears to be relative to a CD player."

8               Do you see that?

9        A.     I do.

10       Q.     Do you remember this exchange?

11       A.     I don't -- I don't remember this -- I mean, I

12   don't remember this exchange, but the -- the -- the

13   subject matter, I can recall some of it.

14       Q.     So it says, "She knows the girl in the property

15   room real well and they discussed that Trivia will order

16   a CD player and then the girl in the property will

17   engrave my number on it and write paperwork in my name.

18   When our store is delivered on the 21st or 28th, she will

19   personally hand it to me, paperwork and all.  This way,

20   it will be 'legal' if I'm ever questioned, which I doubt

21   I would be.

22               "It's just a good idea to have paperwork

23   along with a CD player I'm allowed to have in my

24   possession.  Get it?  Oh, the things we have to do to get

25   around those walls.  Well, the CD player costs about $40

Page 183

1    with tax, and as you know, nothing is free in here, so I

2    would like to add a hundred to that for Trivia's help.

3    She can use the money anyway.  The property clerk only

4    wants three pouchs of tobacco and some hygiene for her

5    payment, which Trivia will take care of.

6               "Pat, please keep this between us.  I don't

7    want my mom to know anything about this.  Will you please

8    send Trivia 140?  I don't care if it has to come out of

9    March's allowance.  I need to have a working CD player so

10   I can listen to my meditation CDs and instrumental

11   music."

12               Do you see that?

13        A.    I do.

14        Q.    So this is an instance of you having money sent

15   to Trivia for the property girl to take a CD -- to order

16   a CD play- -- player that would be engraved in your name.

17   Is that right?

18        A.    Well, okay.  Let me -- let's -- can we back up

19   a little bit?  Because this -- I don't want anything out

20   of context, taken out of context.

21               I was allowed -- at -- at one point, I was

22   allowed to have a CD player legally.  I was allowed to

23   have a CD player.  And then at some point -- I don't know

24   when -- they took that away from us, meaning either

25   lockdown or death row inmates.  I can't remember which.

Page 184

```
 1                   But -- and so the first CD player I had

 2       my -- your -- the inmate number was engraved on it and

 3       everything.  Well, it broke.  It just died after years.

 4       So I wasn't allowed to order another one, and the only

 5       other way to get another one was what's described in

 6       here.

 7          Q.    Okay.  So because the prison regulations did

 8       not allow you to buy a new one after your CD player

 9       broke, you had money sent to Trivia, who was going to

10       order the CD player.  Right?

11          A.    Correct.

12          Q.    And then she knew the property girl who was

13       going to then engrave your number on it, even though

14       Trivia bought it.  Correct?

15          A.    Correct.

16          Q.    And then as payment for this, you were going to

17       pay Trivia a hundred dollars for her services and $40 for

18       the CD player.  Correct?

19          A.    Correct.

20          Q.    And Trivia was going to arrange for the

21       property clerk to be paid in three pouchs of tobacco and

22       some hygiene.  Right?

23          A.    Correct.

24          Q.    Back to that big binder, will you turn to

25       BOMMERSBACH5221.
```

Page 185

1        A.      (Witness complies.)

2                MS. WANG:  I'm sorry.  What number did you

3    say?

4                THE WITNESS:  5221.

5        Q.      BY MS. RETTS:  And that's a letter that you

6    wrote to Pat on May 28th, 2008.  Correct?

7        A.      Yes.

8        Q.      In the second paragraph, you write, "Do you

9    remember when I asked you if you still had that address

10   information info?  Well, she's struggling too just like

11   everybody else.  Her pay got cut as a result of the

12   budget problems.  She's so nice to help me out with a few

13   things and I want to help her out in return.  Will you

14   please send her $30?  Thank you."

15              Do you see that?

16       A.      I do.

17       Q.      Was that a staff member?

18       A.      Oh, no.

19       Q.      This says her pay got cut.  Who would be --

20   whose pay would be cut?

21       A.      Well, some inmates in GP worked.

22       Q.      And they -- the -- their pay was getting cut

23   because of budget problems?

24       A.      Yes.

25       Q.      So you were making up for that with your money

Page 186

1      by sending her $30?

2          A.    I was just being --

3                MS. WANG:  Objection.  Form.

4                THE WITNESS:  I was just -- whoever it was,

5      I don't even know who I'm referring to here, but I was

6      just trying to help them out.

7          Q.    BY MS. RETTS:  When inmates would come from

8      general population and deliver store, you were able to

9      develop some sort of relationship with them.  Right?

10         A.    Well, yeah.  The -- I mean, most of the inmates

11     I met lived in lockdown.  So I got to know them over a

12     period of time.  And then when they would go out to GP

13     and get a job, some of them that I knew worked at the

14     store, yes.

15         Q.    And those inmates that you were able to get to

16     know a bit when you were in the lockdown setting, you

17     knew them enough to feel comfortable giving them money?

18         A.    Yes.

19                MS. WANG:  Is this 372?

20                MS. RETTS:  Yeah, this is Exhibit 372.

21                (Exhibit 372 was marked for identification.)

22         Q.    BY MS. RETTS:  Do you recognize this as part of

23     an application that you filled out?

24         A.    What is this for?

25         Q.    For your lawyers being appointed to represent

Page 187

1      you for free.

2          A.    I don't -- I mean, obviously, I signed this.  I

3      don't recognize it.

4          Q.    It says in assets, "Have you received within

5      the past 12 months any income from a business, profession

6      or other form of self-employment or in the form of rent

7      payments, interest, dividend, retirement or annuity

8      payments or other sources?"

9                Do you see that question?

10         A.    I do.

11         Q.    And you answered yes.

12               Do you see that?

13         A.    I do.

14         Q.    And then it says, "If yes, give the amount

15     received and identify the sources," and you write, "$150,

16     personal friend."

17               Do you see that?

18         A.    I do.

19         Q.    And then down below your signature, "I certify

20     under penalty of perjury that the foregoing is true and

21     correct on March 27th, 2008."

22               Do you see that?

23         A.    I do.

24         Q.    So in the past 12 months, they were asking you

25     from March 27th, 2007, to March 27th, 2008.  You

Page 188

1      understood that from reading this.  Right?

2          A.    From March -- from March of 2007 to 2008?

3          Q.    Right.  Because it asked you --

4          A.    Yeah.

5          Q.    -- within the past 12 months.  So that would be

6      from March -- the 12 months prior would be March 27th,

7      2007, to March 27th, 2008.  Right?

8          A.    Yes.

9          Q.    Now, who is the personal friend that you're

10     identifying as receiving money from?

11         A.    I don't know.

12         Q.    You received more money in that year than $150.

13     True?

14         A.    Yes.

15         Q.    So it was not accurate when you wrote that you

16     had only received $150.  Correct?

17         A.    I'm not sure.  I don't even know why I would

18     write that amount.  I don't even -- I don't recall

19     writ- -- I don't -- this doesn't look familiar to me.

20         Q.    That -- you don't deny that that's your

21     signature at the bottom.  Correct?

22         A.    That is my signature.

23         Q.    And you understood -- when filling out a

24     document that said that you were certifying under penalty

25     of perjury that the foregoing is true and correct, you

Page 189

1   understood that you needed to be truthful and accurate in

2   filling out that paperwork.  Correct?

3        A.    I'm sorry.  Please repeat the question.

4              MS. RETTS:  Can you read it back?

5              (The last question was read back by the

6   court reporter.)

7              THE WITNESS:  Yes, I understand that.

8        Q.    BY MS. RETTS:  And you know looking at this now

9   that it is not accurate that from March 27th, 2007, to

10  March 27th, 2008, you only received $150?

11             MS. WANG:  I'm sorry.  She has to read --

12  did you give her an opportunity to read the question?

13             THE WITNESS:  Yeah.

14       Q.    BY MS. RETTS:  I actually read it to her.

15       A.    It says --

16       Q.    "Have you received, in the" -- "within the past

17  12 months, any income from any other source?"

18       A.    Yeah, other sources.  And I checked yes.  I

19  don't --

20       Q.    And you put 150 from a personal friend?

21       A.    Uh-huh.

22       Q.    But you were getting money at that time from

23  your mother through Pat Galbraith.  True?

24       A.    Yes.

25       Q.    And it was more than $150 that you received

Page 190

```
 1    during that entire year.  Correct?

 2         A.    Correct.

 3         Q.    And you didn't write down that you had received

 4    any money from your mother.  True?

 5         A.    I didn't write down her name, no.

 6         Q.    Is your mother the person who is the personal

 7    friend?  Do you think that's who you were referring to?

 8         A.    I don't know what I -- I don't know what I was

 9    referring to in this section.  I just -- I don't.

10         Q.    Will you turn to BOMMERSBACH5376?  And if you

11    turn back a couple of pages, it's a letter to Pat dated

12    May 13th, 2007.

13               Do you see that?

14         A.    Yes.

15         Q.    And on 5736, down at the bottom, it says, "Will

16    you please send me $150?  Thanks."

17               Do you see that?

18         A.    I do.

19         Q.    And if you'll turn to 5365.

20         A.    5365?

21         Q.    Yes.  And, actually, on 5364, it is a letter to

22    Pat dated 5/22/2007, so about a week from the letter that

23    we just looked at.  And on 5365, it says, at the bottom,

24    "Thank you for the MO.  I'll let you know when I get the

25    receipt."
```

Page 191

1           Do you see that?

2      A.   Yes.

3      Q.   So you had asked Pat for $150, and then about a

4  week later, you wrote him thanking him for receiving the

5  money order.

6           Do you see that?

7      A.   Yeah.

8      Q.   If you'll turn to 5360.  And, actually, turn a

9  couple pages -- if you turn a couple pages back to 5358,

10 this is a letter written on June 7th, 2007.

11     A.   Yes.

12     Q.   Do you see that?

13     A.   Uh-huh.

14     Q.   And then if you turn to 5360, it says, after

15 that line break, "Oh, I forgot to tell you at the visit

16 that $500 splurge was worth it.  I can't tell you how

17 wonderful it feels.  Everything arrived."

18           Do you see that?

19     A.   I do.

20     Q.   So this is referring to some $500 that was used

21 either to buy you something that was sent to prison or

22 that you had in prison that you bought something.  Right?

23     A.   We had to buy our own sheets and towels and

24 stuff.  And we had to buy our own clothes.

25     Q.   So you got $500, which you spent on sheets,

Page 192

1       towels and clothes.  Correct?

2           A.    Yes.

3           Q.    Will you look at 5319.

4           A.    (Witness complies.)

5           Q.    In this document, it says -- will you --

6       also -- at the bottom, "Also, I made a promise to her

7       that I won't forget her in December.  She'll be so

8       excited to buy her own stuff.  Will you please send her a

9       hundred dollars?  Try to get it to her before

10      Thanksgiving so the money is posted."

11                    Do you see that?

12          A.    I do.

13          Q.    And that looks like you're going to order

14      around November of -- things for the store.

15                    Do you see that?

16          A.    Yes.  This is, again, Christmas stuff.

17          Q.    So that's additional money that you're

18      directing to be sent to someone.  Correct?

19          A.    Yes.

20          Q.    And if you go to 5313.

21          A.    5313.

22          Q.    And on the page before, this is a letter dated

23      10/28/07.

24                    Do you see that?

25          A.    I do.

Page 193

1      Q.    And on the next page, it says, "As for me," at

2   the top, "will you please send me 350?  It's for both

3   November and December.  You can send me 100 now and the

4   rest later or you can send it all now, whatever is

5   easiest.  Thank you."

6      A.    Yes.

7      Q.    Do you see that?

8      A.    I do.

9      Q.    So, again, in October of 2007, you're asking

10  for more money and that's $350.

11     A.    Yes.

12     Q.    If you'll turn to 5300.

13     A.    (Witness complies.)

14     Q.    And, actually, if you turn back a few pages to

15  5297, you'll see that the letter is dated December 24th,

16  2007.

17     A.    Yes.

18     Q.    And then if you go back to 5300.

19     A.    Yes.

20     Q.    You state, "Will you please send me $150 for

21  January?  Thank you."

22            Do you see that?

23     A.    Yes.

24     Q.    And then above that, you also ask that CDs --

25  that Pat orders two CDs to be sent to Doug Bice's house.

Page 194

1           Do you see that?

2       A.   I do.

3       Q.   That was also out of your money that you were

4   directing to be sent to Doug Bice.  True?

5       A.   Yes.

6       Q.   And if you'll turn to 5281.

7       A.   (Witness complies.)

8       Q.   That is a letter dated February 18th, 2008.

9   And almost at the bottom, it says, "It's already near the

10  end of the month, so will you please send me $150?"

11          Do you see that?

12      A.   Yes.

13      Q.   So it looks like at that point you were getting

14  a monthly allowance of about $150.  Do you remember that?

15      A.   Um, I don't remember the exact amounts.  I

16  mean, it -- it just depended on -- like you can see here,

17  I would ask for various amounts.

18      Q.   So during that time frame we just went through,

19  which was 12 months before you filled out the application

20  in Exhibit 372, you received $500 for bedding and towels,

21  you received $150 several times, you asked for $350 for

22  November and December.  You had items ordered for Doug

23  Bice.  True?

24      A.   Correct.

25      Q.   And that all adds up to well over $150.

Page 195

1      Correct?

2           A.    It would, yes.

3           Q.    You agree that in filling out this application

4      to receive pro bono funds for your lawyers, meaning that

5      the taxpayers would be paying for legal representation,

6      you did not disclose all of the money that you were

7      receiving?

8                 MS. WANG:  Objection.  Form.

9                 THE WITNESS:  I -- I --

10                MS. WANG:  The form doesn't ask her to

11     disclose all the --  Objection.  Form.

12                THE WITNESS:  I don't know.  I don't -- I

13     just -- I don't know.

14          Q.    BY MS. RETTS:  From March 27th, 2007, to

15     March 27th, 2008, you received far more than $150 that

16     you reported on this form?

17          A.    Correct.

18                MS. RETTS:  How much do we have?

19                THE VIDEOGRAPHER:  We've been on the record

20     for four hours and 42 minutes.

21          Q.    BY MS. RETTS:  Can you turn -- still in the big

22     book here, if you go to 4500.

23          A.    (Witness complies.)

24          Q.    And, actually, turn back one page to 4499.

25          A.    Yes.

1          Q.    And that's a letter that you wrote to Pat on

2    May 27th, 2013.

3                    Do you see that?

4          A.    Yes.

5          Q.    Okay.  And on 4500, about in the middle, you

6    say, "I am highly aware that I'll be on HGTV.  Therefore,

7    I must look the best I can before going to the press

8    conference.  It's a big deal to me and I would like

9    everybody to respect that."

10                   Do you see that?

11         A.    I do.

12         Q.    And it was important to you that you look your

13   best for the media.  Correct?

14         A.    It was important to me to look normal and not

15   like I just walked out of prison.

16         Q.    And you go on to tell Pat, "I can make myself

17   presentable to be on camera TV.  Prison makeup is not an

18   option at all.  I need and want makeup I know will be

19   good.  Yes, I have some in my boxes, but I don't know

20   what's there.  Right now, I'm only interested in

21   specifics.

22                   "I know exactly what I need for this

23   particular event.  I have one chance to make a good

24   impression and don't want to throw it away by looking

25   horrible.  Since I have no real idea what products are

Page 197

1    out there, I can only go by what I see in women's

2    magazines or on HSN.  Those are my available options.

3              "When I get out, obviously my options will

4    be endless.  I have enclosed some pages torn out of a

5    magazine of items I'll need.  These can be easily found

6    at a store."

7              Do you see that?

8    A.    I do.

9    Q.    Then you go on to note a bunch of makeup items

10   that you are asking Pat to buy for you?

11   A.    Yes.

12   Q.    So you felt comfortable enough with Pat that

13   you would direct him also to use the money that you had

14   available to you to get specific makeup for you.

15   Correct?

16   A.    Correct.

17   Q.    And then you go on, even the next page, to give

18   further description of the makeup.  So you've got a

19   pressed powder at $23, a neutralizing cream at $24, a

20   brighten and hide sculpt concealer at 28, luxury eye

21   liners at 24, automatic eyebrow pencil duo at 20 and some

22   hair products at 25.

23             Do you see that?

24   A.    I do.

25   Q.    So you needed more than a hundred dollars in

Page 198

```
 1    makeup, you felt, to make yourself presentable for the

 2    camera?

 3         A.    I just asked -- I just wanted something other

 4    than the morgue makeup they sold in prison.  That's what

 5    I wanted.

 6         Q.    The next page, 4503 --

 7         A.    Yes.

 8         Q.    -- is a letter from Marjorie Rice.  Do you

 9    recognize who that is?

10         A.    No.

11         Q.    The beginning -- it's dated May 23rd, 2013.  It

12    says, "Hello, Debra.  Jana Bommersbach is a dear friend

13    of mine, and we recently spoke about her concerns for you

14    and your case.  Among other things, Jana mentioned that

15    you are worried about being hounded by the media

16    following your release from prison."

17               Do you see that?

18         A.    I do.

19         Q.    And then she goes on to provide some advice to

20    you and cc's Jana Bommersbach on the next page.

21               Do you see that?

22         A.    Yes.

23         Q.    Okay.  Does this refresh your recollection at

24    all about receiving this?

25         A.    I don't know who she is.  I don't -- no.
```

1      Q.    Did you have a conversation with Jana about

2    your concerns about the media?

3      A.    I don't know.  I may have.

4            MS. BURGESS:  Can we take a break real

5    quick, go off the record real quick?

6            MS. RETTS:  Yeah.

7            THE VIDEOGRAPHER:  We're going off the

8    record.  The time is 4:02 p.m.

9            (A recess was held off the record.)

10           (Exhibit 373 was marked for identification.)

11           THE VIDEOGRAPHER:  We're back on the record.

12   The time is 4:02 p.m.

13     Q.    BY MS. RETTS:  And, Ms. Milke, I've handed you

14   what's been marked as Exhibit 373, and it is a June 25th,

15   2005, e-mail from Pat to Lori Voepel, your mother,

16   Mr. Kimerer and Franke Aue.

17           Do you see that?

18     A.    I do.

19           MS. WANG:  I'm sorry --

20     Q.    BY MS. RETTS:  And it says, "Debbie called this

21   morning and was much better when I gave her the news that

22   Franke heard back from Bill Curtis' publisher.  She got

23   very excited.  She said she would start preparing her

24   letter to him this weekend.  She feels confident she

25   could convince him she really has a story to tell, so

Page 200

1    sounds like she accepted this challenge.  It was good

2    hearing the excitement in her voice."

3                    Do you see that?

4        A.    I do.

5        Q.    Do you remember hearing back from Bill Curtis'

6    publisher?

7        A.    No, I don't.

8        Q.    Do you know what this is about?

9        A.    No, I don't.

10       Q.    Then says, "She asked me to pass on to everyone

11   that she would like copies of any letters she sent you

12   that refer to her prison life and what goes on out there.

13   She wants you to highlight those paragraphs, make copies

14   and then send them to her.  I guess she's going to focus

15   on that part first but probably realizes it may be the

16   hardest part to get together.

17                    "I reminded her that most of her letters are

18   in storage with me, and it will take some time to go

19   through seven years of correspondence looking through

20   specific subjects.  She recognized that but felt she

21   needed some help remembering some of those experiences.

22                    "I told her she was rather vague about

23   specifics as she did not get into life out there with me

24   and I'm almost sure with her mom because she didn't want

25   us to worry about her.  I think some of the bad stories I

1    heard were from other inmates, but I'll see what I can

2    find."

3                    Do you see that?

4        A.    I do.

5        Q.    So, according to this, there were letters in

6    your boxes in storage that were being kept.

7        A.    No.

8        Q.    Do you dispute that?

9        A.    I do.

10       Q.    So you believe that Pat Galbraith was incorrect

11   when he stated that most of your -- "her letters are in

12   storage with me."

13       A.    I dispute that.

14       Q.    Do you dispute that you requested for -- copies

15   of letters that you sent to third parties about prison

16   life, highlight and sent back to you?

17       A.    I don't recall.  I just don't recall this.

18             The -- and the -- this -- these are Pat's

19   words to -- you know, to Lori and my mother and Mike and

20   Franke.  These are Pat's words.

21       Q.    And Pat is deceased.  Correct?

22       A.    He is.

23       Q.    And we couldn't depose him because he died

24   before knew that he was ill.

25       A.    He died in June of 2017.

Page 202

1      Q.    So you dispute that you had letters in your

2   storage --

3      A.    No.  It says here, "I reminded her that most of

4   her letters are in storage with me."

5            That could mean his house.  That could mean

6   anything.

7      Q.    You dispute that your letters you never told

8   him to save and put in your boxes in the storage unit?

9            MS. WANG:  Objection.  Form.

10            THE WITNESS:  When I write -- when I wrote

11   Pat or anybody, what they did with the letters after it

12   left my cell, I have no control over.

13      Q.    BY MS. RETTS:  You appeared to be asking for

14   copies of any letters that were sent that refer to prison

15   life and want -- you wanted them highlighted and sent

16   back to you.

17      A.    This is -- these are Pat's words.  So I don't

18   know exactly what he meant by this.

19      Q.    Do you remember asking for copies of letters

20   that other people had to be highlighted and sent back to

21   you?

22      A.    I don't recall this.  I don't recall this.

23      Q.    And when you got out of prison, you didn't ask

24   Pat about whether he had any letters still saved from

25   you.  Correct?

Page 203

```
 1        A.     Why would I ask Pat if he had letters saved?

 2        Q.     Did you ever ask anyone to save your written

 3   letters to them?

 4        A.     I don't -- I don't know.  I don't think so.

 5        Q.     Did you ask your mother to save the written

 6   letters?

 7        A.     I don't know.

 8        Q.     When you got copies of the discovery request

 9   from the defendants, did you think that you should go and

10   ask people that you sent letters to whether they still

11   were holding on to documents for you?

12        A.     When I got the -- the discovery or, I mean,

13   the -- I'm really exhausted and I'm just -- I'm done.

14   I'm done.  We can pick up tomorrow because I'm very

15   exhausted.

16               MS. WIENEKE:  There's a question pending.

17               MS. BERKE:  Can you answer the question?

18               (The last question was read back by the

19   court reporter.)

20               MS. WANG:  Objection to form.

21               THE WITNESS:  I don't know.

22        Q.   BY MS. RETTS:  Knowing that you might --

23               MS. WANG:  We're done for the day.  She

24   answered the question.

25               MS. BERKE:  She can finish this line of
```

Page 204

1    questioning.

2              MS. WANG:  You have three days to do your 14

3    hours.

4              MS. BERKE:  We want to finish the five

5    hours.

6              We want to finish the line of questioning

7    before --

8              MS. WANG:  You would like to --

9              MS. BERKE:  So --

10             MS. WANG:  So you would like her to answer

11   questions while exhausted.  Go ahead.  The record will

12   reflect that.  Go ahead.

13             THE WITNESS:  What was the question?

14        Q.   BY MS. RETTS:  Knowing you might write a book

15   some day, did you ask people to save your letters?

16        A.   You're asking me about something from 2005.  I

17   mean, it was a thought to write a book and I started

18   writing pages and then I changed my mind.  I didn't want

19   to do it.  It didn't occur to me to ask people, Did you

20   save my letters that I wrote to you because I want to

21   write a book?  It didn't occur to me.

22             When I wrote people letters, when it left my

23   room, that was it.  It was out of my control.

24             I'm done.

25        Q.   Okay.

Page 205

1          A.    I just want to go.

2                    THE VIDEOGRAPHER:   This concludes today's

3    video-recorded deposition of Debra Jean Milke.   The time

4    is 4:09 p.m.

5                    (Whereupon, the proceedings ended at 4:09

6    p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 206

1                              CERTIFICATE OF REPORTER

2        STATE OF ARIZONA        )
                                 )
3        COUNTY OF MARICOPA      )

4

5              I, Sommer E. Greene, a Certified Reporter in the
         State of Arizona, do hereby certify that the foregoing
6        deposition was taken before me in the County of Maricopa,
         State of Arizona; that an oath or affirmation was duly
7        administered to the witness, DEBRA JEAN MILKE, pursuant
         to A.R.S. 41-324(B); that the questions propounded to the
8        witness and the answers of the witness thereto were taken
         down by me in shorthand and thereafter reduced to
9        typewriting; that the transcript is a full, true and
         accurate record of the proceeding, all done to the best
10       of my skill and ability; and that the preparation,
         production and distribution of the transcript and copies
11       of the transcript comply with the Arizona Revised
         Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
12               The witness herein, DEBRA JEAN MILKE, has
         requested signature.
13               I FURTHER CERTIFY that I am in no way related
         to any of the parties nor am I in any way interested in
14       the outcome hereof.

15

16               IN WITNESS WHEREOF, I have set my hand in my
         office in the County of Maricopa, State of Arizona, this
17       19th of December, 2019.

18

19                              -------------------------------
                                Sommer E. Greene, RPR, CRR
20                              Certified Reporter 50622

21

22       _____
         For Maricopa Reporting, Inc.
23       Registered Reporting Firm No. R1081

24

25

Page 207

1                    CERTIFICATION OF INVOICE

2                    SUPERIOR COURT OF ARIZONA

3                      COUNTY OF MARICOPA

4

5          In compliance with and under ACJA 7-206(J)(g)(3)
    through (6), we certify that:

6          All billing and invoicing to all the parties
    related in any manner to the reporting of the proceedings
7   or cases and the production of the transcript and any
    products or services ancillary thereto comply with the
8   Arizona Revised Statutes and the ACJA;

9          All financial terms and other services have been
    offered on the same terms to all parties to the
10  litigation;

11         Each party was able to purchase the transcript and
    such ancillary services as requested by that party
12  without regard to the ancillary services purchased by any
    party: and

13

14         No economic or other benefit was given by the
    certified reporter to any party or their attorney,
15  representative, agent, or insurer or insured that was not
    provided to the other parties, attorneys or insured in
    the same case.

16

17

18
                         ------------------------------
19                       Sommer E. Greene, RPR, CRR
                         Certified Reporter 50622
20

21

    _____
22  For Maricopa Reporting, Inc.
    Registered Reporting Firm No. 1081
23

24

25

Page 208

1     DEBRA JEAN MILKE

2     TAKEN ON DECEMBER 4, 2019

3

               DECLARATION UNDER PENALTY OF PERJURY

4

5                    I declare under penalty of perjury that I

6     have read the entire transcript of my deposition taken in

7     the above-captioned matter or the same has been read to

8     me, and the same is true and accurate, save and except

9     for changes and/or corrections, if any, as indicated by

10    me on the DEPOSITION ERRATA SHEET hereof, with the

11    understanding that I offer these changes as if still

12    under oath.

13

14    Signed on the_____day

15    of _____20__.

16

17

18

19    _____

      DEBRA JEAN MILKE

20

21

22

23

24

25

Page 209

1                          DEPOSITION ERRATA SHEET

2

3       Page No.___Line No.___Change to:_____

4       _____

5       Page No.___Line No.___Change to:_____

6       _____

7       Page No.___Line No.___Change to:_____

8       _____

9       Page No.___Line No.___Change to:_____

10      _____

11      Page No.___Line No.___Change to:_____

12      _____

13      Page No.___Line No.___Change to:_____

14      _____

15      Page No.___Line No.___Change to:_____

16      _____

17      Page No.___Line No.___Change to:_____

18      _____

19      Page No.___Line No.___Change to:_____

20      _____

21      Page No.___Line No.___Change to:_____

22      _____

23      Page No.___Line No.___Change to:_____

24      DEBRA JEAN MILKE

25      Signature:_____

1              DEPOSITION ERRATA SHEET

2

3     Page No.___Line No.___Change to:_____

4     _____

5     Page No.___Line No.___Change to:_____

6     _____

7     Page No.___Line No.___Change to:_____

8     _____

9     Page No.___Line No.___Change to:_____

10    _____

11    Page No.___Line No.___Change to:_____

12    _____

13    Page No.___Line No.___Change to:_____

14    _____

15    Page No.___Line No.___Change to:_____

16    _____

17    Page No.___Line No.___Change to:_____

18    _____

19    Page No.___Line No.___Change to:_____

20    _____

21    Page No.___Line No.___Change to:_____

22    _____

23    Page No.___Line No.___Change to:_____

24    DEBRA JEAN MILKE

25    Signature:_____

# EXHIBIT 3

Page 211

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Debra Jean Milke,                    )
                                     )
          Plaintiff,                 )
                                     )
vs.                                  ) No.
                                     ) 2:15-cv-00462-ROS
City of Phoenix; Maricopa            )
County; and Detective Armando        )
Saldate, Jr.; and Sergeant           )
Silverio Ontiveros, in their         )
individual capacities,               )
                                     )
          Defendants.                )
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~        )

VOLUME II

(PAGES 211 through 417)

VIDEOTAPED DEPOSITION OF

DEBRA MILKE

DECEMBER 5, 2019

9:30 A.M.

3030 North Third Street

Phoenix, Arizona

SOMMER E. GREENE, CSR, RPR, CR No. 50622

Page 212

```
 1    APPEARANCES OF COUNSEL

 2
            For Plaintiff:
 3
                LOEVY & LOEVY
 4              ELIZABETH WANG, ESQ.
 5              2060 Broadway, Suite 460
                Boulder, Colorado 80302
 6              720.502.2103
                Elizabethw@loevy.com
 7

 8
            For Defendant Silverio Ontiveros:
 9
                HOLLOWAY ODEGARD & KELLY, P.C.
10              SALLY A. ODEGARD, ESQ.
                3020 East Camelback Road, Suite 201
11              Phoenix, Arizona 85016
                602.240.6670
12              sodegard@hoklaw.com

13

14          For Maricopa County:

15              SANDERS & PARKS
                ROBIN BURGESS, ESQ.
16              3030 North Third Street, Suite 1300
                Phoenix, Arizona 85012
17              602.532.5783
                Robin.burgess@sandersparks.com
18

19
            For Defendant City of Phoenix:
20
                WIENEKE LAW GROUP
21              CHRISTINA RETTS, ESQ.
                KATHLEEN L. WIENEKE, ESQ.
22              LEA SHAPIRO, ESQ.
                1095 West Rio Salado Parkway, Suite 209
23              Tempe, Arizona 85281
                480.715.1868
24              cretts@swlfirm.com

25
```

Page 213

1    APPEARANCES CONTINUED:

2

3          For Defendant Armando Saldate:

4              BERKE LAW FIRM
               LORI V. BERKE, ESQ.
5              1601 North 7th Street, Suite 360
               Phoenix, Arizona 85006
6              602.254.8800
               lori@berkelawfirm.com
7

8          Also Present:

9              Bill Marinakis, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 214

1                          I N D E X

2

3    WITNESS: DEBRA JEAN MILKE

4

5    EXAMINATION                                    PAGE

6

7    MS. RETTS....................................219

8

9                       *       *       *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 215

1                          INDEX TO EXHIBITS

2

3    EXHIBIT                                         MARKED

4
     Exhibit 374  Tax Returns, MILKE_NSB031846 to    249
5                 1878

6    Exhibit 375  Signed Verification, 12-3-19       258

7    Exhibit 376  August 5, 2005 Letter to Debra     286
                  Milke, From Michael Kimerer, Re:
8                 Requested Documents, L&L020209

9    Exhibit 377  August 1, 2005 Letter to Debra     286
                  Milke, From Michael Kimerer, Re:
10                Requested Documents, L&L020208

11   Exhibit 378  August 14, 2005 Letter to Mike     287
                  Kimerer From Debra Milke, L&L020210
12                to 14

13   Exhibit 379  February 8, 2011 Handwritten Notes, 292
                  Re: Mark, BOMMERSBACH005972 to 6029
14
     Exhibit 380  September 2, 2005 Letter to Debra  304
15                Milke, From Michael Kimerer,
                  Attaching Requested Documents,
16                L&L020215

17   Exhibit 381  January 19, 1998 Letter to Kirk,   309
                  From Debra Milke, L&L00284
18
     Exhibit 382  E-mail From Debra Milke to Michael 314
19                Kimerer, Re: Debbie Update Message,
                  August 4, 2013, L&L044306
20
     Exhibit 383  Plaintiff's Initial Disclosures    314
21                Pursuant to the Federal Rule of
                  Civil Procedure 26(a)
22
     Exhibit 384  E-mail From Brian James to Debra   318
23                Milke, February 2, 2016, L&L031159

24

25

Page 216

INDEX CONTINUED

Exhibit 385   October 2, 2019 Letter From Buddy      334
              Rake to Kathleen Wieneke, Re:
              Subpoena Issued to Rake Law Group
              C_055964 to 56187

Exhibit 386   E-mail Chain Between Lori Voepel        334
              and Renate Janka, Re: State to
              Re-Try Debbie, July 9, 2013,
              L&L027921 to 23

Exhibit 387   E-mail Chain Between Frank Aue and      349
              Jana Bommersbach, Re: Debbie Files,
              JB0001 to 11

Exhibit 388   E-mail Chain Between Lori Voepel        352
              and Michael Kimerer, Re: Contact
              From Styers' Attorney, L&L044218 to
              23

Exhibit 389   February 4, 2013 Letter to Norm,       356
              From Debra Milke

Exhibit 390   July 4, 2011 Letter to Pat From         356
              Debra Milke

Exhibit 391   E-mail From Lori Voepel to Pat          365
              Gailbraith and Renate Janka, Re:
              Debbie's Letter to Mark, L&L023087
              to 91

Exhibit 392   Visit Screen 3/23/16                    371

Exhibit 393   E-mail Chain Between Michael            376
              Kimerer and Lori Voepel, Re: I Have
              a Concern, July 3, 2014, L&L011229

Exhibit 394   E-mail From Pat to Michael Kimerer,     378
              Re: Debra's Birthday, February 24,
              2014, L&L05220

Page 217

INDEX CONTINUED

1

2

3

4   Exhibit 395   Photograph                                    379

5   Exhibit 396   E-mail From Jana Bommersbach to    386
                  Frankie, Re: Good News, L&L002103
6                 to 109

7   Exhibit 397   E-mail From Debra Milke to Michael  390
                  Fox, Re: This is My Prison Cell,
8                 L&L031162

9   Exhibit 398   Photograph of Prison Cell,          391
                  MILKE_NSB004879 to 885
10

    Exhibit 399   E-mail From Frankie A to Pat        392
11                Gailbraith and Others, Re: Debra
                  Milke SAT1 Breakfast TV, L&L032410
12

    Exhibit 400   E-mail Chain, Re: Shopping          393
13                Agreement, July 27, 2015, L&L044882

14  Exhibit 401   E-mail Chain, Re: Checking In,       395
                  December 16, 2015, L&L023048
15

    Exhibit 402   E-mail Chain, Re: Debbie Message    400
16                Update, L&L057236

17  Exhibit 403   Photograph                          402

18  Exhibit 404   Letter to Debra Milke From Michael  406
                  Kimerer, June 5, 2007, L&L020219
19

    Exhibit 405   January 3, 1996 Letter to Anders    407
20                From Debra Milke L&L00367 to 374

21

22

23

24

25

Page 218

```
 1                      PHOENIX, ARIZONA

 2              DECEMBER 5, 2019; 9:30 A.M.

 3

 4

 5              THE VIDEOGRAPHER:  We're on the record.

 6    Today's date is Thursday, December 5th, 2019.  The time

 7    on the video monitor is 9:42 a.m.  This is volume 2 of

 8    the video-recorded deposition of Debra Jean Milke noticed

 9    by counsel for the defendants in the matter of Debra Jean

10    Milke versus the City of Phoenix, et al.

11              This matter is being held in the United

12    States District Court, District of Arizona.  The case

13    number is 2:15-CV-00462-ROS.

14              Our location is the law offices of Sanders &

15    Parks located in Phoenix, Arizona.  The certified court

16    reporter is Sommer Greene of Maricopa Reporting,

17    Incorporated, located at 8686 South San Alberto Drive,

18    Suite 200, Scottsdale, Arizona 85258.

19              My name is Alex Marinakis.  I'm a certified

20    legal video specialist for the firm of VideoDep,

21    Incorporated, located in Phoenix, Arizona.

22              Counsel, would you identify yourselves and

23    whom you represent, starting with the plaintiff's

24    counsel, please.

25              MS. WANG:  Elizabeth Wang for plaintiff.
```

Page 219

1              MS. ODEGARD:  Sally Odegard on behalf of

2      Silverio Ontiveros.

3              MS. BERKE:  Lori Berke on behalf of Armando

4      Saldate.

5              MS. RETTS:  Christina Retts, Kathy Wieneke,

6      Lea Shapiro on behalf of the City of Phoenix.

7              THE VIDEOGRAPHER:  Thank you, Counsel.  The

8      court reporter may swear in the witness at this time,

9      please.

10

11              DEBRA JEAN MILKE,

12      called as a witness herein, having been first duly sworn

13      by the Certified Reporter to speak the whole truth and

14      nothing but the truth, was examined and testified as

15      follows:

16

17

18                   EXAMINATION

19      BY MS. RETTS:

20      Q.    Good morning, Ms. Milke.

21      A.    Good morning.

22      Q.    If you would turn back again to Exhibit 359,

23      which is the Court's sanctions order.

24      A.    Okay.  But before we start with that, I wanted

25      to clarify some things from yesterday, a couple

Page 220

1    questions --

2         Q.    Okay.

3         A.    -- from yesterday.  First of all, you asked for

4    my Gmail.  So that's that address.

5         Q.    So that's dedebra64@gmail.com.  Correct?

6         A.    Yes, uh-huh.

7         Q.    Okay.

8         A.    And then the other thing is this financial

9    affidavit.  I took this home and I was looking at it last

10   night.  And I was trying to recall.  And so I put on here

11   $150, but I should have put on here a month, and this was

12   on average and the personal friend is probably related to

13   Pat.

14        Q.    So you interpreted the request for the last 12

15   months of information as an average of 150 a month?  Is

16   that --

17        A.    I inter- -- I interp- -- yes, it's not $150 in

18   a year, no.  I should have put 150 -- I should have put

19   per month and this was an average of a year.

20        Q.    Do you agree that when you read that, that it's

21   confusing, that it appears that it's $150 in the entire

22   year?

23        A.    Yes.

24        Q.    Was there anything else that you wanted to

25   clarify?

Page 221

1      A.    Yes.  Yesterday the question about the three

2      binders in the Milke room, so I got that confused with

3      work I do for Rhonda Neff.  When I do work for Rhonda

4      Neff, I help her clo- -- cases that are closeout, she

5      doesn't like duplicates, and so I go through the binders

6      and pull out all duplicates and put them in a shred box.

7            So I got the binders and the Milke room, I

8      got all -- I just got that confused.  And last fall when

9      NSB was doing the privilege log, I was in the Milke room

10     with Katie and Melissa and Rhonda Neff, and they were

11     going through the boxes and I was putting sticky notes on

12     the boxes, the ones that had -- they had gone through and

13     then I was putting sticky notes on the binders.

14     Q.    During that process that you were putting

15     sticky notes on the boxes and binders, did you look

16     through those materials to refresh your recollection at

17     all about anything in the case?

18     A.    No.

19     Q.    Why not?

20     A.    Because the task that day was just to -- they

21     were going through the box -- the boxes and the binders

22     and making a log, and I was just helping out and putting

23     sticky notes on the boxes to let -- that was their way of

24     letting them know that they had already gone through that

25     box or binder.

Page 222

1        Q.    You were the only person who would have had

2   intimate knowledge of every individual that you share

3   attorney/client privilege information with that was not

4   your counsel.  Correct?

5        A.    I -- I -- what do you mean?

6              MS. WANG:  Objection.  Form.

7        Q.    BY MS. RETTS:  So if you wrote a letter to

8   somebody, a third person such as Vince Felix, and you

9   told him about conversation that you had with your

10  lawyers, you would be the only person who had firsthand

11  knowledge about writing that letter and what you said to

12  Mr. Felix.  True?

13       A.    Well, I don't recall, you know, writing.

14       Q.    If you didn't recall, wouldn't it had been

15  important for you to go through those materials and help

16  refresh your recollection so that you can remember who

17  you told confidential attorney communications to?

18       A.    Go through the letters and -- you mean

19  reviewing that stuff?

20       Q.    Yes.

21       A.    Okay.  So what was your question?

22       Q.    So if you're having a hard time remembering

23  something, one of the things you can do is look through

24  documents that exist from the time frame that you can't

25  remember something.  Do you agree with that as a general

Page 223

1    principal?

2        A.    Yes.

3        Q.    And you had, in the Milke room, decades of

4    documentation, including letters that you personally

5    wrote in that room.  Correct?

6        A.    I don't know.  I don't know everything that was

7    in that room.

8        Q.    You knew that you had written letters during

9    the course of your incarceration.  True?

10       A.    Yes.

11       Q.    Did you ever ask anyone if those letters sat

12   within the boxes in the Milke room?

13       A.    I don't -- I don't know.

14       Q.    Did you ever personally go through those boxes

15   to see if there were your letters in those boxes?

16       A.    No.

17       Q.    When you were going through your mother's

18   materials in Germany, were you going through to find

19   correspondence and did you read that correspondence?

20       A.    I -- whatever I found, I put aside and I sent

21   it to New York.

22       Q.    But did you read it?

23       A.    No.

24       Q.    Why didn't you read it?

25       A.    It's -- it's very distressing to me to read

Page 224

1    things about my incarceration, about being in prison, on

2    death row for over two decades.  I just don't read it.

3        Q.    So you made a conscious decision to not read

4    materials and your letters to help you remember things

5    moving forward in this lawsuit.  True?

6                MS. WANG:  Objection.  Form.

7                THE WITNESS:  I just -- like I said, I --

8    it's very distressing to me to read back on anything from

9    my incarceration.

10       Q.    BY MS. RETTS:  You understood that this was a

11   voluntary choice to bring this lawsuit.  True?  No one

12   forced you to file a civil lawsuit.  Correct?

13       A.    No, no one forced me.

14       Q.    You voluntarily made the decision that you were

15   going to sue the various defendants in this case, and you

16   were going to request multiple millions of dollars.

17   Correct?

18       A.    You're putting words in my mouth.  I -- I did

19   not, on my own, decide about a lawsuit.

20       Q.    Who helped you decide to file a lawsuit?

21       A.    It was -- it was discussed.

22       Q.    Who did you -- who encouraged you to file a

23   lawsuit?

24                MS. WANG:  Wait.  I object to the extent

25   that it's asking for any attorney/client communications.

Page 225

1                    MS. BERKE:  So please be specific as to

2     communications with whom that you're objecting.

3                    MS. WANG:  Maybe you can rephrase it.

4        Q.    BY MS. RETTS:  You said the decision --

5                    MS. WANG:  See if she can answer.

6        Q.    BY MS. RETTS:  You said the decision was not

7     your own to file a civil lawsuit.  Is that right?

8        A.    I was part of a decision.

9        Q.    Who were the other people who were part of that

10    decision?

11       A.    Who I discussed this with?

12       Q.    Yes.

13       A.    Mr. Kimerer.

14       Q.    Who else?

15       A.    And Lori Voepel.

16       Q.    Would you have filed a civil lawsuit on your

17    own without encouragement from those two people?

18                    MS. WANG:  Objection.  Form.

19                    THE WITNESS:  Probably not.

20       Q.    BY MS. RETTS:  Do you regret, as you sit here

21    today, filing a civil lawsuit?

22       A.    No.

23       Q.    Do you know how much money you are requesting

24    in this litigation?

25       A.    No.

1      Q.    What's your demand?  What -- what amount of

2   money do you want?

3      A.    I -- I haven't even --

4            MS. WANG:  Objection.  Form.

5            THE WITNESS:  I haven't -- I don't -- I

6   haven't even thought of that.

7      Q.    BY MS. RETTS:  Do you know if you've ever made

8   a settlement demand to the defendants?

9      A.    I didn't.

10     Q.    Did you ever authorize an amount of money to be

11  communicated to the defendants for a settlement?

12     A.    You mean signing a paper?

13           MS. WANG:  She might -- objection.  Form.

14  I'm not sure she knows what you mean.

15           THE WITNESS:  I don't really understand what

16  you're asking of me.

17     Q.    BY MS. RETTS:  Did you ever know and say it was

18  okay for a certain monetary figure, a dollar amount, to

19  be communicated to the defendants about what you would

20  take as money to dismiss this lawsuit?

21     A.    I'm not -- I'm not -- I don't think -- I -- I

22  don't know about a dollar amount.

23     Q.    What dollar amount are you looking for

24  personally to obtain in this lawsuit?

25           MS. WANG:  Objection.  Asked and answered.

Page 227

1    Form.

2              THE WITNESS:  I haven't thought of a dollar

3    amount.  I don't know.

4        Q.   BY MS. RETTS:  You filed your lawsuit in 2015.

5    You're aware that before that, there was a notice of

6    claim, or was there a notice of claim that went out

7    beforehand?

8              MS. WANG:  Objection.  Form.  What question

9    are you -- objection.  Form.

10       Q.   BY MS. RETTS:  Strike that.

11             Do you -- are you aware that there's a

12   notice of claim that was anticipated to be sent to the

13   defendants before the lawsuit was filed?

14       A.   I'm aware of that, yes.

15       Q.   Did you read it?

16       A.   I may have.

17       Q.   Did you approve its content?

18       A.   I -- I may -- excuse me.  I may have.  I

19   don't -- excuse me.  I don't remember.

20       Q.   Do you remember there being a dollar figure in

21   that?

22       A.   No, I don't remember.

23       Q.   Did you read the civil complaint and approve

24   the contents of it?

25       A.   The -- the first one, is --

Page 228

1      Q.    The first one.

2      A.    I think I -- I may have read it.

3      Q.    Did you read the second civil complaint and --
4   and approve the contents?

5      A.    I -- I may have.  I don't know.

6      Q.    Do you understand that as filing a lawsuit, it
7   was your obligation to look through every version of your
8   complaint and ensure that the facts were accurate from
9   your personal knowledge?

10              MS. WANG:  Objection.  Form.

11              THE WITNESS:  Did I know that it was my
12   obligation?

13      Q.    BY MS. RETTS:  Yes.

14      A.    No, I didn't.

15      Q.    When you -- if you went through the civil
16   complaint, either the first version or the second
17   version, would you have understood it to be your
18   obligation to look in detail at any facts that you had
19   personal knowledge of to verify that they were true?

20              MS. WANG:  Objection.  Form.  Foundation.

21              THE WITNESS:  I'm not an attorney.  So I --
22   I don't know.  I just get a copy of everything.

23      Q.    BY MS. RETTS:  If the attorneys were not part
24   of your original civil case, they were not there during
25   your interrogation, they were not there as you sat

Page 229

1    through jail, how are they supposed to know the facts if

2    you do not communicate them to them?

3                    MS. WANG:  Objection.  Form.

4        Q.    BY MS. RETTS:  And verify in a complaint that

5    what they have written is true?

6                    MS. WANG:  Objection.  Form.  Foundation.

7                    THE WITNESS:  I don't know -- I don't know

8    how to answer your question.  I communicated with my

9    attorneys.

10       Q.    BY MS. RETTS:  But you don't have a specific

11   recollection of going through in detail either version of

12   the complaint to ensure that the facts, as you knew them

13   to be, were accurate as stated in that document?

14       A.    I -- I don't have a recollection.  I may have.

15   I just don't have a recollec- -- recollection of sitting

16   down with them and doing that, no.

17       Q.    Did you understand it was your obligation, when

18   defendants set -- sent written discovery to you, to make

19   sure in those responses that all the facts known

20   personally to you were accurate in those responses?

21       A.    The on- --

22                    MS. WANG:  Objection.  Foundation.  Form.

23                    THE WITNESS:  The only thing I can recall is

24   that I did what was asked of me.  That's all I can

25   recall.

Page 230

1       Q.    BY MS. RETTS:  And nothing more than that.  You

2    didn't take it upon yourself to help refresh your

3    recollection by reviewing the Joe Marino letters.  True?

4       A.    That's correct.

5       Q.    So when you were in that room going through the

6    privileged log, you didn't assist your attorneys by

7    looking through and refreshing your recollection as to

8    the content of any of the documents in those room.

9    Correct?

10      A.    No, that was not my job that day.

11      Q.    Was it your job any day to look through the

12   documents that were in the Milke room to help refresh

13   your recollection about issues in this civil case?

14      A.    Like I said earlier, reading documents about my

15   trial and about my incarceration, about all of it, is --

16   it's -- it is, it was -- it is very distressing to me and

17   I don't like to read it.  I don't -- I just don't read

18   it.

19      Q.    If you didn't want to read these documents, you

20   understood that it was an option for you to not proceed

21   with the civil litigation.  True?

22              MS. WANG:  Objection.  Form.  Foundation.

23              THE WITNESS:  I don't know.

24      Q.    BY MS. RETTS:  Why don't you know?

25              MS. WANG:  Just let me get the whole

1   objection out --

2               THE WITNESS:  Okay.  Sorry.

3               MS. WANG:  -- before you answer so the

4   record is not mixed up.  Okay?  Thanks.

5               Sorry.  Could you ask that again.

6       Q.    BY MS. RETTS:  Why don't you know?

7       A.    Why don't I know what?

8       Q.    I had asked you if you didn't want to read

9   these documents, you understood that it was an option for

10  you to not proceed with the civil litigation.  True?

11              MS. WANG:  Objection.  Form.  Foundation.

12      Q.    BY MS. RETTS:  And you stated, I don't know.

13  And so in follow-up, I'm asking why don't you know.

14              MS. WANG:  Objection.  Foundation.

15              THE WITNESS:  I don't know.  I -- I just --

16  I have attorneys.  And all of those boxes with all of

17  those documents in it, they had full access to.  And I --

18  I did what I was asked to do.  That's all I did.

19      Q.    BY MS. RETTS:  Your attorneys don't know things

20  that are not in documents that are not in that room.

21  Correct?

22      A.    I don't know.

23      Q.    Well, they can't -- if they don't have the

24  document, they can't know what's in the document.

25              MS. WANG:  Object --

Page 232

1          Q.    BY MS. RETTS:  Correct?

2                    MS. WANG:  Objection.  Argumentative.

3      Foundation.

4                    THE WITNESS:  What documents?

5          Q.    BY MS. RETTS:  I think that's the point, is

6      that if I have this piece of paper but you don't have

7      this piece of paper and I'm reading it, I know what's on

8      it, but you don't.  True?

9          A.    Sure, yes.

10         Q.    And if this piece of paper is important but

11     it's not in the room that your attorneys have access to,

12     how are the attorneys going to know about this document

13     unless you tell them?

14                    MS. WANG:  Objection.  Form.  Foundation.

15                    THE WITNESS:  I don't know.  I just -- I

16     don't know.

17         Q.    BY MS. RETTS:  And reading documents that you

18     have available to you helps you refresh your recollection

19     about other people that you sent materials to.  Correct?

20         A.    Materials?

21                    MS. WANG:  Objection.  Asked and answered.

22         Q.    BY MS. RETTS:  Anything.  You read a document.

23     It may refresh your recollection that, oh, I remember

24     this occurring and, yeah, this thing happened next, this

25     thing happened next.  That's kind of how memory works.

Page 233

1    Right?

2                   MS. WANG:  Objection.  Form.

3                   THE WITNESS:  There were so many documents

4    in boxes.  Anything and everything was available to my

5    attorneys.

6        Q.    BY MS. RETTS:  Did you -- how do you know that

7    anything and everything was available to your attorneys?

8                   MS. WANG:  Objection.  Form.

9                   THE WITNESS:  Whatever was in the boxes and

10   binders in that -- in that room.  I don't know.  I

11   mean...

12       Q.    BY MS. RETTS:  But what was not in the boxes

13   and binders would not have been available.  True?

14                  MS. WANG:  Objection.  Asked and answered.

15   Foundation.

16                  THE WITNESS:  I don't know -- I don't -- I

17   don't know what wouldn't have been in there.

18       Q.    BY MS. RETTS:  How many times did you meet with

19   your attorneys before this civil lawsuit was filed?

20                  MS. WANG:  Which attorneys?  Objection.

21   Form.

22       Q.    BY MS. RETTS:  Between 2013 and 2015, how many

23   times did you meet with attorneys who you believe to be

24   associated with your civil case?

25       A.    I don't recall how many times.

Page 234

1          Q.    Can you give me an estimate?

2          A.    No.

3          Q.    About how long was each meeting?

4          A.    I wouldn't even know.

5          Q.    Well, you -- you were there, so you would know,

6     but you just don't remember?

7                     MS. WANG:  Objection.  Argumentative.  Form.

8                     THE WITNESS:  I -- I mean, I had meetings

9     with attorneys.  There were two sets.  How many times, I

10    don't recall.  How long the meetings were, I don't

11    recall.

12         Q.    BY MS. RETTS:  Two sets of meetings.  What do

13    you mean by two sets of --

14                     MS. WANG:  She didn't say that.

15                     THE WITNESS:  No, two sets of attorneys.

16         Q.    BY MS. RETTS:  Okay.

17         A.    Two sets of attorneys.

18                     MS. RETTS:  Please keep your objections to

19    form and foundation.

20                     MS. WANG:  Don't mischaracterize her.

21    Listen to what she's saying, please.

22                     MS. RETTS:  She's very unclear, which is the

23    problem.

24         Q.    BY MS. RETTS:  Do you know if the Joe Marino

25    letters were in the boxes in the Milke room?

Page 235

1      A.    I don't --

2                  MS. WANG:  Objection.  Asked and answered.

3                  THE WITNESS:  I don't know if they were in

4      there.

5      Q.    BY MS. RETTS:  You would agree the items that

6      were in Ms. Bommersbach's position -- possession were not

7      in the Milke room.  Correct?

8      A.    No, I'm not aware of that.

9      Q.    Your text messages were not in the Milke room.

10     Correct?

11     A.    Text messages to who?

12     Q.    Any text messages on your phone were not in the

13     Milke room.  Correct?

14                 MS. WANG:  Objection.  Foundation.

15                 THE WITNESS:  I'm -- I'm not sure.

16     Q.    BY MS. RETTS:  Do you remember providing text

17     messages to someone to be put in the Milke room?

18     A.    No.  I don't know how that's done.

19     Q.    Your e-mails were not in the Milke room.

20     Correct?

21                 MS. WANG:  Objection.  Foundation.

22                 THE WITNESS:  I -- I don't know.

23     Q.    BY MS. RETTS:  Did you print out your e-mails

24     and deliver them to -- to Mr. Kimerer's office to be put

25     in the Milke room?

Page 236

1                    MS. WANG:  Objection.  Foundation.

2                    THE WITNESS:  I don't -- I don't -- I

3      think -- I think I just gave my e-mail address with the

4      passwords.

5           Q.    BY MS. RETTS:  When did you do that?

6           A.    I don't -- I don't -- I don't recall when.

7           Q.    We talked yesterday about the fact that you are

8      not able to remember every person that you communicated

9      confidential communications that you had with your

10     attorneys with.  Correct?

11                   MS. WANG:  Objection.  Foundation.  Form.

12                   THE WITNESS:  Yes.

13          Q.    BY MS. RETTS:  What did you do to help refresh

14     your recollection about that subject?

15                   MS. WANG:  Objection.  Form.

16                   THE WITNESS:  When?  Since yesterday?

17          Q.    BY MS. RETTS:  At the beginning of the case

18     when you were served discovery requests and you knew

19     there -- there were certain things being asked, what did

20     you do from that point to today?

21                   MS. WANG:  Objection.  Form.

22                   THE WITNESS:  I -- I went through what I had

23     in my possession.  And I turned everything over that was

24     in my possession.  I provided my attorneys -- they had my

25     e-mail.

1      Q.    BY MS. RETTS:  When you say you went through

2   things you had in your possession, did you read those

3   things or just turn them over?

4      A.    I -- whatever -- there were pictures and cards

5   and -- and I don't know all the things I turned over.

6   Just what I was asked to provide, I did.  I provided it.

7      Q.    You relied solely upon someone telling you what

8   to provide, or did you look through the questions that

9   were asked by the defendants to make sure that you were

10   capturing everything?

11      A.    When --

12              MS. WANG:  Objection.  Form.

13              THE WITNESS:  When this lawsuit was filed

14   or -- in my mind, I'm thinking 2015.  I had meetings with

15   my attorneys.  I did what they asked me to do.  And

16   that's all I did.

17      Q.    BY MS. RETTS:  What did they ask you to?

18              MS. WANG:  Objection.  I'm objecting to

19   attorney/client privilege.

20              MS. RETTS:  Are you going to instruct the

21   witness not to answer?

22              MS. WANG:  What -- what is the question

23   again?

24              MS. RETTS:  Can you read it back, Sommer?

25              (The last question was read back by the

Page 238

1      court reporter.)

2                    MS. WANG:  Wait.  Hold on.  Just

3      (inaudible).  Can we just put that question on hold?

4                    MS. RETTS:  And I'll just tell you my

5      position is that this is a spoliation deposition, and we

6      have issues about what's been produced, what's not, what

7      she has done.  And when you get into the issue of

8      spoliation, then you have a different attorney/client

9      analysis.  If she's going to say that it's -- she did

10     what her attorneys did only, then I think that's fair

11     game for us.

12                   MS. WANG:  What -- what is fair game?  I

13     don't understand your argument.

14                   MS. BERKE:  That she did what her attorneys

15     said.

16                   MS. RETTS:  That she did what her attorneys

17     said.

18                   MS. WANG:  I need to go off the record for a

19     minute.  I'm going to confer and determine whether she

20     can answer the question.

21                   MS. RETTS:  Okay.

22                   THE VIDEOGRAPHER:  We're going off the

23     record.  The time is 10:10 a.m.

24                   (A recess was held off the record.)

25                   THE VIDEOGRAPHER:  We're back on the record.

1    The time is 10:17 a.m.

2                    MS. WANG:  You can ask -- ask the question

3    again.

4                    MS. RETTS:  I'll just have it read back.

5                    (The last question was read back by the

6    court reporter.)

7                    THE WITNESS:  I don't -- I don't know

8    specifically what they asked me to do but --

9        Q.    BY MS. RETTS:  Do you recall generally what

10   they asked you to do?

11       A.    I just -- no, I don't recall.  I just -- I

12   recall having meetings with them, but I don't -- I don't

13   recall what exactly they asked me to do.

14       Q.    If you don't remember exactly what they told

15   you to do, how are you certain today you did it?

16                    MS. WANG:  Objection.  Form.  Foundation.

17                    THE WITNESS:  I know that whatever my

18   attorneys asked me to do, I did what they asked me to do.

19       Q.    BY MS. RETTS:  How did they ask you?  Verbally

20   or in writing?

21       A.    I recall verbally.

22       Q.    Is it possible that there were communications

23   about your discovery obligations in writing?

24       A.    It's possible.

25       Q.    And you have no recollection during these

1    meetings of ever bringing either one of your laptops with

2    you to give to your attorneys to review.  Correct?

3              MS. WANG:  Objection.  Foundation.  Form.

4              THE WITNESS:  I don't -- I don't recall, no.

5         Q.   BY MS. RETTS:  I want to go back to being in

6    the Milke room during the privilege log review.

7         A.   Yes.

8         Q.   How long were you in that room?

9         A.   I'm not sure how long I was in there.

10        Q.   Can you give an estimate?

11        A.   No, I can't.

12        Q.   Was it more than one day?

13        A.   I don't think so, no.

14        Q.   And when you were in the Milke room during the

15   privilege review, you were not looking at the content of

16   any documents.  Correct?

17        A.   Correct.

18        Q.   Do you have an understanding that the Court had

19   made a request that Ken Ray's file be reconstructed?

20        A.   Did I have an understanding of that?

21        Q.   Yes.

22        A.   Reconstructed, no.

23        Q.   During the privilege review process, did you go

24   through the file and try to identify letters that you

25   sent to Ken Ray and letters that you received from Ken

1    Ray?

2         A.    I did not.

3         Q.    During the privilege review in the Milke room,

4    did you read any letters that you sent to Ken Ray?

5         A.    I did not.

6         Q.    Did you read any letters that Ken Ray sent to

7    you?

8         A.    No.

9         Q.    And during that privilege review, you did not

10   review any Joe Marino letters.  Correct?

11        A.    Correct.

12        Q.    You did not review any Felix letters.  Correct?

13        A.    Correct.

14        Q.    You did not review any letters that you wrote

15   to anyone.  Correct?

16        A.    Correct.

17        Q.    Was the first time that you looked at any Ken

18   Ray letters that either he sent to you or you sent to him

19   in preparation for this deposition today?

20        A.    The -- did I review them today?

21        Q.    No.  To prepare for your deposition, you -- I

22   understood you to say that you may have reviewed some Ken

23   Ray letters.  Is that correct?

24        A.    Yes.

25        Q.    Okay.  When did that happen?

Page 242

```
 1          A.    This past Sunday.

 2          Q.    From 2013 till this past Sunday, is that the

 3    first time you had reviewed those Ken Ray materials?

 4          A.    It's -- it's possible, yes.

 5          Q.    Do you have a memory of reviewing the Ken Ray

 6    letters before that time, between 2013 and last Sunday?

 7          A.    No.

 8                MS. WANG:  Objection.  Form.

 9          Q.    BY MS. RETTS:  You also reviewed some materials

10    including letters from Mr. Rosenquist.  Correct?

11          A.    Yes.

12          Q.    From 2013 -- strike that.

13                When did you review those letters from

14    Mr. Rosenquist?

15          A.    This past Sunday.

16          Q.    From 2013 to the past Sunday, do you have a

17    memory of reviewing those Rosenquist materials before

18    that?

19                MS. WANG:  Object to form.

20                THE WITNESS:  I -- today I don't -- I don't

21    have a memory of that, no.

22          Q.    BY MS. RETTS:  You reviewed your deposition

23    testimony from August, correct, to prepare for the

24    deposition?

25          A.    I --
```

Page 243

```
 1                    MS. WANG:  Objection.  Asked and answered.
 2                    THE WITNESS:  I -- yes, I -- I reread it.  I
 3        read it.
 4            Q.    BY MS. RETTS:  Was that the first time that you
 5        had read that testimony since your August deposition?
 6            A.    Yes.
 7            Q.    Have you ever gone back and reread your
 8        deposition testimony from November of last year?
 9            A.    No.
10            Q.    To prepare for this deposition today, did you
11        review any materials from the Debra Milke Web site?
12            A.    No.
13            Q.    Did you review any materials from Jana
14        Bommersbach that she had in her possession?
15                    MS. WANG:  Objection.  Foundation.
16                    THE WITNESS:  I -- I don't know what
17        materials she has.
18            Q.    BY MS. RETTS:  We marked as an exhibit the
19        collection of letters that you sent to Pat Galbraith over
20        various years that Ms. Bommersbach had.  Did you review
21        those?
22            A.    I recall a couple letters I saw from Pat.
23            Q.    Would that be just one or two letters?
24            A.    I'm not sure.
25            Q.    This binder here is a four-inch binder of
```

Page 244

```
 1   materials.  Did you review that many letters from Pat?
 2        A.   No.
 3        Q.   When you were doing the privilege review around
 4   that time, when you talked about being in the Milke room
 5   and the privilege review was done, did you review any
 6   letters from Pat Galbraith?
 7                MS. WANG:  Object to form.
 8                THE WITNESS:  No.
 9        Q.   BY MS. RETTS:  Did you review any letters that
10   you wrote to Pat Galbraith?
11        A.   No.
12        Q.   Have you ever reviewed the letters that we
13   received from Carolyn Imhoff?
14                MS. WANG:  Objection.  Asked and answered.
15                THE WITNESS:  No.
16        Q.   BY MS. RETTS:  Are there other documents that
17   you know to exist that you didn't review, and if so, can
18   you list those?
19                MS. WANG:  Objection.  Form.  Foundation.
20                THE WITNESS:  Are there other documents?
21   Are you asking me if I know if there's documents out
22   there that I haven't reviewed?
23        Q.   BY MS. RETTS:  Yes.
24        A.   All -- all I -- all I -- can tell you is that I
25   don't -- I don't read any of this stuff.  I just can't.
```

Page 245

1    I -- I can't.  I can't read this.

2         Q.    Knowing that you were here to answer questions

3    about discovery violations, would you agree that you

4    didn't go back to look for any written documentation

5    about what your attorneys asked you to do?

6                   MS. WANG:  Objection.  Form.  Foundation.

7                   THE WITNESS:  I'm not sure I understand what

8    you're saying.

9         Q.    BY MS. RETTS:  You understand you're here today

10   because of a Court order relating to discovery

11   violations.  Correct?

12        A.    Discovery violations by who?

13        Q.    Exhibit 359, if you'll pull that out again,

14   that's the Court's order.  My understanding from your

15   testimony yesterday was that you have not read this

16   document cover to cover.  Is that correct?

17        A.    That's correct.

18        Q.    Since yesterday, have you read this document

19   cover to cover?

20        A.    No.

21        Q.    Did you make any attempt to read this document

22   last night?

23        A.    No.

24        Q.    Do you think it would have been helpful for you

25   to have read this document understanding that that's why

Page 246

1    you're here today?

2        A.    I agree that it would be helpful to review

3    documents to prepare, but I can't read this stuff.  So I

4    just don't.

5        Q.    And that is a personal choice you have made.

6    Correct?

7        A.    Yes.

8        Q.    We talked a little bit yesterday about

9    Mr. Trollinger.

10       A.    Yes.

11       Q.    And do you believe that reviewing documents

12   might have helped you remember that you had had visits

13   with Mr. Trollinger?

14              MS. WANG:  Objection.  Form.

15              THE WITNESS:  Reviewing documents, I don't

16   even know where he'd be in documents.  He came to my mind

17   because Susan sent me a text telling me he died.

18       Q.    BY MS. RETTS:  When she sent you the text

19   saying that he died, did you immediately contact your

20   attorneys and tell them that you remembered you had had

21   another medical provider?

22       A.    He wasn't a medical provider.

23       Q.    Was he a licensed professional counselor?

24              MS. WANG:  Objection.  Asked and answered.

25              THE WITNESS:  Not to my knowledge.

Page 247

 1      Q.    BY MS. RETTS:  After you received the message

 2   from Susan saying that he had died, did you contact your

 3   attorneys and tell them you remembered this person that

 4   you had had contact with?

 5      A.    This -- I provided the information, yes.

 6      Q.    Did you specifically tell your attorneys about

 7   Mr. Trollinger, or did you just merely provide your

 8   messages for your attorneys to figure it out from that?

 9      A.    This all just happened so recent -- recently.

10      Q.    Do you know whether you brought up

11   Mr. Trollinger to your attorneys or whether your

12   attorneys brought Mr. Trollinger up to you?

13            MS. WANG:  I'm objecting on the grounds of

14   privilege.

15      Q.    BY MS. RETTS:  Without being prompted -- strike

16   that -- strike that last question.

17            Without being prompted by your attorneys,

18   did you independently provide information about

19   Mr. Trollinger to them?

20            MS. WANG:  I object on grounds of privilege.

21   Try to rephrase it again.  Communications between Debra

22   Milke and myself and her current civil counsel are

23   privileged.

24            MS. RETTS:  But we have a spoliation issue

25   now about this specific provider.

Page 248

1                    MS. WANG:  What is your spoliation issue?

2                    MS. RETTS:  That he was not identified.

3                    MS. WANG:  You received the messages

4       involving Trollinger.

5                    MS. RETTS:  We don't have his records.  Had

6       he been identified as a person that she went and paid for

7       services to talk about her feelings, we certainly would

8       have subpoenaed him, and we also would have taken his

9       deposition.  He's a licensed professional counselor.

10                   And under the ethical obligations that he

11      has in his business and as a licensed professional

12      counselor, he's required to keep records.  So there's a

13      serious issue with the fact that his records don't exist.

14      And now he's deceased.  So maybe he had records at some

15      point but doesn't now because he's recently deceased.

16      And we have no access to those records.

17                   MS. WANG:  You don't need her testimony

18      about her conversations with her attorneys because you

19      have the interrogatory response that we sent back in --

20      in February when we originally responded, and he's not

21      listed on there, and you have the supplemental responses

22      where he -- where he is.  So you already have the

23      information that you need.

24                   MS. RETTS:  But the sanctions --

25                   MS. WANG:  You don't need to get it from her

Page 249

1      conversations with her current attorneys.

2                   MS. RETTS:  I disagree.  And we can address

3      it with the Court and return to it, if necessary.

4          Q.    BY MS. RETTS:  Did you specifically tell your

5      counsel that Mr. Trollinger had provided you services in

6      exchange for money to talk about your feelings after you

7      learned from Ms. Studola that he died?

8                   MS. WANG:  Objection on attorney/client

9      privilege grounds.

10                  MS. RETTS:  Are you going to instruct her

11     not to answer?

12                  MS. WANG:  Yes.

13                  (Exhibit 374 was marked for identification.)

14         Q.    BY MS. RETTS:  Ms. Milke, this is a

15     conglomeration of your various tax returns.

16         A.    Yes.

17         Q.    If you will turn to NSB31854.

18         A.    Yes.

19         Q.    This is a tax return from 2015.

20         A.    Yes.

21         Q.    You see that?

22         A.    Yes.

23         Q.    And if you flip to the next page, 31855.

24         A.    Yes.

25         Q.    You see your signature down at the bottom?

Page 250

1       A.      Yes.

2       Q.      And underneath, it says "self-prepared."

3               Do you see that?

4       A.      Yes.

5       Q.      So you prepared your taxes on your own.  True?

6       A.      Yes.

7       Q.      And if you will flip to 31857.

8       A.      Yes.

9       Q.      This is a -- appears to be a letter that you

10  wrote to the Internal Revenue Service.  Do you see that?

11      A.      I -- I wrote -- this does not look familiar to

12  me.

13      Q.      Did you remember receiving a letter from the

14  IRS asking you for additional information about your

15  taxes?  You can flip to the next page.  That's the

16  letter.  On 31858, it says, "Dear taxpayer, we received

17  your December 31st, 2015 Form 140, federal individual

18  income tax return, but we need more information to

19  process the return accurately."

20              Do you see that?

21      A.      I do.

22      Q.      Do you have a memory of receiving this

23  document, the letter from the IRS?

24      A.      No.

25      Q.      And then 31857 appears to be a letter from you.

Page 251

1    The redactions were not done by us.  That's how we

2    received them.

3         A.    Oh.  Um, on page 31859, this is Pat's

4    handwriting.  He did my taxes for me.  This is his

5    handwriting.

6         Q.    So when we flip back to 31855, where it says --

7    where you signed under the penalty of perjury -- do you

8    see that?

9         A.    Yes, I do.

10        Q.    And you say "self-prepared," that's not

11   accurate, is it?

12        A.    Well, I -- Pat did my taxes for me.  I did my

13   own taxes after this -- he did my taxes the first couple

14   years.  He did it on a computer.

15        Q.    So then this tax return would not have been

16   prepared by you, it would have been prepared by Pat?

17        A.    Yes.  He -- yeah.  I just signed it.

18        Q.    Did you verify that the information was

19   accurate when you signed it?

20        A.    I -- I may have with my W-2s and -- yeah, and

21   the -- and the -- whatever else I submitted with it.

22        Q.    You would have had to verify that all your

23   deductions were accurate.  Correct?

24        A.    Well, he -- he did this on a computer program.

25        Q.    How would he know, though, for example, what

Page 252

1    your medical expenses were that you were claiming?  You

2    would have had to provide him with receipts for that.

3    Correct?

4        A.    Yes.

5        Q.    When you signed your name to this tax reform --

6    tax return form, do you remember going through and

7    double-checking to make sure that the itemizations were

8    correct?

9        A.    I -- I -- I hand -- I handed Pat my W-2.  There

10   were documents related to the money I got from Der

11   Spiegel.  I turned all that in and I gave all of that to

12   him, and then he -- he, on his computer, did my taxes.  I

13   don't recall getting this letter.  But obviously, I

14   responded to it.

15             So I provided the documents for the dental

16   work and medical expenses and all that so he could finish

17   doing my taxes.

18       Q.    After Pat was done doing your taxes, did he

19   give you back your receipts?

20       A.    Um, I have a bunch of -- I -- I -- I keep that

21   stuff.  I have it at home, I think.

22       Q.    Okay.  So I want you to look at 31857.

23       A.    Yes.

24       Q.    And this is a letter with your name typed at

25   the bottom.

Page 253

1      A.    Yes.

2      Q.    And in this letter, you have itemized

3  counseling, $400.

4      A.    Yes.

5      Q.    And this letter would have been responding and

6  providing information relating to counseling treatment in

7  2015.  Correct?

8      A.    2015, yes, correct.

9      Q.    Do you still have this file with your receipts

10  from counseling in it?

11      A.    So $400 would be for 2015?

12      Q.    Correct.

13      A.    Okay.  I'm not positive of the year, but I went

14  to consult with a psychiatrist, Leanne Kelly, and I had

15  to pay for her fee.

16      Q.    Do you have the receipts in your possession

17  that we can track what -- the counseling, the $400 were?

18  Did you keep those?

19      A.    Yeah, I -- I -- I have this -- I save this

20  stuff.  So -- I mean, but I turned all that over.

21          MS. RETTS:  Counsel, if you have that, I

22  have not seen that and would -- we would request that it

23  be produced also without redactions.  I don't know why

24  it's redacted.

25          MS. WANG:  I -- I didn't produce this

Page 254

1    document, so I don't know why it's redacted.  But the --

2    we did produce records from Leanne Kelly, and we

3    identified her in an interrogatory.

4               MS. RETTS:  Yeah, but I don't think that's

5    what this is for.

6               MS. WANG:  I mean, I'll see what else there

7    is.

8               MS. RETTS:  I would like the receipts for

9    all counseling, any counseling records that she has.

10   Receipts for counseling would be responsive to our

11   request for production.

12       Q.    BY MS. RETTS:  Do you -- do you -- Ms. Milke,

13   do you keep receipts for all of your counseling and

14   medical appointments?

15       A.    I do.

16       Q.    And you still have those?

17       A.    Yes.

18       Q.    When did you have your deposition preparation

19   for this deposition?

20       A.    I went to Colorado on November 20th.  And I

21   came back home on November 24th.

22       Q.    Which of those days did you meet with your

23   attorney?

24       A.    Thursday, Friday and Saturday.

25       Q.    When you said you reviewed Ken Ray letters this

Page 255

1    past Sunday, did you do that on your own time or with

2    your attorney?

3        A.    On my own time.

4        Q.    How long did you meet with your attorney on

5    Thursday -- was Thursday the 20th or 21st?  Do you

6    remember?

7        A.    21st.

8        Q.    On November 21st, how long did you meet with

9    your attorney?

10       A.    I'm not -- I'm not exactly sure.  About five

11   hours.

12       Q.    Did you review any documents during that

13   meeting?

14       A.    I -- I -- I think so, yes.

15       Q.    What do you remember reviewing?

16       A.    We went over interrogatories.

17       Q.    Have you seen those marked as an exhibit?

18             MS. WANG:  (Inaudible.)

19             We should take it apart because there's a

20   bunch in there.

21             THE WITNESS:  Third?  No.  Oh.  Exhibit 366.

22       Q.    BY MS. RETTS:  Is there a specific piece of 366

23   that you went through?

24             MS. WANG:  Just make sure you review it.

25             THE WITNESS:  Okay.  I -- I recognize one

Page 256

1      that I reviewed.

2          Q.    BY MS. RETTS:  Tell me what that is.

3          A.     It is titled Plaintiff's Third Supplemental

4      Response to Defendant City of Phoenix's First

5      Interrogatories.

6          Q.    Okay.  Which one of those interrogatory

7      responses did you review?

8          A.     Page 5.

9          Q.    Okay.  The whole entire --

10         A.     Well, supplemental response, "Plaintiff has

11     also spoken to Jennifer Enslen."

12         Q.    In this same document, can you turn to page 7?

13         A.     Yes.

14         Q.    Actually, page 6 first, please.  The

15     interrogatory -- and this is in your third supplemental

16     response to defendant City of Phoenix first

17     interrogatories, which is dated November 27th, 2019.

18     That -- the interrogatory asked you to, "Identify by

19     name, address, telephone number any medical -- any

20     medical doctor, registered nurse, specialist, doctor,

21     psychologist, counselor, psychiatrist, addiction

22     specialist or any other mental -- medical or mental

23     healthcare provider who has evaluated plaintiff for any

24     reason, including for substance abuse, mental or

25     emotional problems since December 2nd, 1989, including

Page 257

1    all medical treatment plaintiff received while in Arizona

2    Department of Corrections custody."

3              Do you see that question?

4    A.    Yes.

5    Q.    And then on the next page, page 7, do you see

6    there's a supplemental response dated 11/27/19?

7    A.    Yes.

8    Q.    And it says, quote, Plaintiff recalls at some

9    point after plaintiff's release, plaintiff met with

10   Jeffery Trollinger who was a counselor.

11             Do you see that?

12   A.    I do.

13   Q.    Are you disputing that Mr. Trollinger was a

14   counselor today?

15             MS. WANG:  Well -- objection.  Form.

16             THE WITNESS:  I -- I just knew him as a

17   counselor.

18   Q.    BY MS. RETTS:  You signed a verification for

19   these interrogatories, do you remember that, recently?

20   A.    Is it on here?

21   Q.    It was e-mailed over by Ms. Neff maybe a day

22   ago.  I don't have it printed off because we just got it.

23   A.    I did sign -- I did sign it.

24             MS. RETTS:  (Inaudible) verification for

25   Rhonda.

1          MS. WANG:  I have it.

2          MS. RETTS:  Yeah, can we mark that?  Oh, is

3    that the original?

4          MS. WANG:  Yeah.

5          MS. RETTS:  Let's see if we have a copy.

6    Otherwise, we'll just mark that.

7          (Exhibit 375 was marked for identification.)

8    Q.    BY MS. RETTS:  Ms. Milke, do you recognize that

9    is your signature on that signature verification form?

10   A.    Yes.

11   Q.    And that was signed --

12   A.    Tuesday.

13   Q.    -- Tuesday the 3rd, 2019.  Correct?

14   A.    Correct.

15   Q.    When you signed that verification, did you go

16   through the entire third supplemental response to the

17   City of Phoenix's first interrogatories and make sure

18   that everything in that document was true and accurate?

19   A.    I -- excuse me.  I read through the

20   supplemental responses, yes.

21   Q.    And you read every word of those supplemental

22   responses and verified their accuracy, to the best of

23   your knowledge?

24   A.    I only read the supplemental response.  I

25   didn't read interrogatory number 4 or answer.  I just

Page 259

1    read the supplemental response.

2        Q.    So you read portions of this document, not all

3    of it, when you verified it?

4        A.    Yes.

5        Q.    In Exhibit 366, will you turn to the response

6    to the City of Phoenix first interrogatories?  It would

7    have been -- it's the marked page.

8        A.    Okay.

9        Q.    That's what's marked as 366.  And if you'll

10   turn to the very back of that, there's another

11   verification.

12       A.    Yes.

13       Q.    And it says, "I, Debra Milke, verify under

14   penalty of perjury as provided in 28 USC 1746 that the

15   answers in Plaintiff's Response to Defendant City of

16   Phoenix's First Set of Interrogatories are true and

17   accurate to the best of my knowledge."

18              Do you see that?

19       A.    Yes.

20       Q.    And that's your signature?

21       A.    Yes.

22       Q.    And it's dated 2/1/19?

23       A.    Yes.

24       Q.    When you signed this document, did you go

25   through every page of the responses to the first set of

Page 260

1    interrogatories to ensure that all factual information

2    that you had knowledge of was truthful and accurate?

3        A.    I -- I don't -- I don't recall if I did or not.

4        Q.    Did you just sign the document because your

5    lawyer gave it to you?

6              MS. WANG:  Can you give her a minute to read

7    over it?

8              THE WITNESS:  I -- I may have read through

9    this.  I mean, I may have read through this.  I just

10   don't recall.

11       Q.    BY MS. RETTS:  All right.  I want you to take a

12   look at -- in that same grouping, there's the first

13   supplemental response to the City of Phoenix's first

14   interrogatories.  So it would be the next set below

15   there.

16       A.    Yes.

17       Q.    Just verify the one you have is the first

18   supplemental response.

19       A.    Yes.

20       Q.    Now turn to the very back of that.  And there's

21   another verification.  Do you see that?

22       A.    Yes.

23       Q.    And the verification, again, states, "I, Debra

24   Milke, verify under penalty of perjury as provided in 28

25   USC 19-" -- "1746 that the answers in Plaintiff's First

Page 261

1    Supplemental Response to Defendant City of Phoenix's

2    First Set of Interrogatories are true and accurate to the

3    best of my knowledge."  And it's signed Debra Milke,

4    5/13/19.  Correct?

5         A.    Yes.

6         Q.    That's your signature.  Correct?

7         A.    Yes.

8         Q.    You signed this.  Yes?

9         A.    Yes.

10        Q.    When you signed this, did you go through every

11   single word of the first supplemental response to

12   defendant City of Phoenix's first interrogatories to make

13   sure that all factual information that you knew was true

14   and accurate?

15        A.    I -- I -- I can't -- I can't say that -- for

16   sure that I read this because I don't recall, but I -- I

17   may have read through this.

18        Q.    If you read through this, did you have an

19   understanding that it was your obligation to make sure

20   that any facts that you had knowledge about were truthful

21   and accurate?

22                 MS. WANG:  Objection.  Form.

23                 THE WITNESS:  I'm sorry.  What did you just

24   say?

25                 (The last question was read back by the

Page 262

 1      court reporter.)

 2                   THE WITNESS:  Yes.

 3      Q.     BY MS. RETTS:  Do you remember in conjunction

 4      with anything you did to prepare responses for these

 5      interrogatories going through any documents to help

 6      refresh your recollection about the questions that were

 7      being asked of you?

 8      A.     Going -- when I'm going through this, I -- it

 9      appears I gave my attorneys -- I provided information of

10      names and addresses, to the best of my recollection.

11      Q.     And what did you do to help refresh your

12      recollection, if anything?

13      A.     Refresh my recollection of what?

14      Q.     The questions that were being asked.  So if you

15      couldn't remember something and you're doing it only to

16      the best of your memory, what did you do to assist you to

17      remember things?

18      A.     I did the best -- I did the best that I could

19      with -- what I remembered, I provided.  Whatever my

20      lawyers asked for, I provided.

21      Q.     But you didn't review any documents to help

22      refresh your memor- -- memory.  Correct?

23      A.     Correct.  And I told you why.

24      Q.     So for example, in the -- in your deposition

25      that occurred in August and maybe also in November, you

Page 263

1    were shown letters from Joe Marino.  Correct?

2        A.    Correct.

3        Q.    So you knew for sure at that point that all the

4    letters from Joe Marino were marked as an exhibit to your

5    deposition, were available and you could have reviewed

6    them.  Correct?

7        A.    Correct.

8        Q.    And you didn't review Joe Marino's letters

9    after that deposition at any time to help you refresh

10    your recollection to be able to answer the

11    interrogatories.  Correct?

12        A.    I did not -- I did not review those letters,

13    no.

14        Q.    Was it Dr. Sullivan you mentioned who told you

15    that you had some memory problems?

16        A.    Dr. Sullivan, I believe I met with him for two

17    days, and he did some weird brain testing.  And I -- I

18    don't recall reading his report.  It's my understanding

19    there was memory issues and anxiety disorder.  And I just

20    don't remember what else he said.

21        Q.    But you do have a specific memory of

22    Dr. Sullivan reaching some conclusion about you having

23    memory problems.  Correct?

24        A.    I think so.

25        Q.    And you knew that before you came to this

Page 264

1    deposition today.  Correct?

2        A.    I had this -- this is an ongoing thing, yes.

3        Q.    And knowing that you had an ongoing issue with

4    your memory, what did you do to try to ensure that you

5    were best prepared to answer all questions today?

6                MS. WANG:  Objection.  Foundation.  Form.

7                THE WITNESS:  It's a struggle for me.  So I

8    work with my therapist.  This memory problem, it's a

9    struggle.  So I don't know what else to say.  That's what

10   it is.

11       Q.    BY MS. RETTS:  Did you try reviewing documents

12   to help refresh your recollection so that you might

13   remember things?

14               MS. WANG:  Asked and answered.  Objection.

15   Asked and answered.  Form.

16               THE WITNESS:  I -- I -- I said earlier, I --

17   I -- it's ve- -- it's very distressing to read this.

18       Q.    BY MS. RETTS:  Knowing that you had memory

19   problems, what did you do in terms of reviewing documents

20   to make sure that you were answering the interrogatories

21   and requests for production as accurately as you could?

22               MS. WANG:  Objection.  Asked and answered.

23   Form.

24               THE WITNESS:  I -- okay.  Let me just look

25   at this for a minute.  I'm sorry.  There's a question

Page 265

1    hanging?

2              MS. RETTS:  Yes, do you want us to read it

3    back?

4              THE WITNESS:  Okay.  So you asked me what I

5    did --

6              MS. RETTS:  We'll just read it back just so

7    we make sure that you remember it.

8              (The last question was read back by the

9    court reporter.)

10             THE WITNESS:  So -- so for example, on one

11   of these interrogatories, it tells me to list the names

12   and addresses of any other persons other than yourself

13   who have knowledge of the allegations in your second

14   amended complaint.  So then the answer, I provided names

15   and addresses of -- of -- you know, to respond to this

16   interrogatory.  So, I mean, at that time, I -- from what

17   I remembered, then I would provide the information.

18       Q.    BY MS. RETTS:  And between the first

19   interrogatories and the second interrogatories, there are

20   additional people who were added --

21             MS. WANG:  Wait --

22       Q.    BY MS. RETTS:  -- to the supplemental

23   response --

24             MS. WANG:  I'm sorry.

25       Q.    BY MS. RETTS:  -- to that interrogatory number

1     1?

2                    MS. WANG:  Wait.  Objection.  Form.

3     Q.    BY MS. RETTS:  If you compare in response to

4     interrogatory number 1 from the response to the first set

5     of interrogatories to the supplemental response that you

6     gave in your first supplemental --

7     A.    Okay.  There's --

8     Q.    -- response, there's new information added.

9     Correct?

10    A.    Okay.  There's a first supplemental.  There's a

11    second supplemental.

12    Q.    So let's look at the first supplemental.

13    A.    All right.

14    Q.    And you see in the first supplemental on page

15    5, there's a supplemental response to interrogatory

16    number 1.  Do you see that?

17    A.    Yes, yes.

18    Q.    And there are additional people who are listed

19    there.  You see that?

20    A.    Yes.

21    Q.    Doug Bice, Wendi Andriano, Trivia Thompson,

22    Marguirite Garcia, Shante Jones, Cheryl Caliguire, Monica

23    (LNU), Jessica (LNU).  Do you see that?

24    A.    Yes.

25    Q.    There's also in addition of new information,

1    about giving talks at Cornell Law School and University

2    of Arizona Law School.  Right?

3        A.    Yes.

4        Q.    The individuals above, though, Doug Bice, Wendi

5    Andriano, Trivia Thompson, Marguirite Garcia, Shante

6    Jones, Cheryl Caliguire, Monica, Jessica --

7        A.    Yes.

8        Q.    -- those were people that you had spoken to

9    years ago.  Right?

10       A.    Well, whenever this first supplemental response

11   was done, I mean, at that time, that's what I remembered

12   at that time.  And then if there's -- I mean, I just --

13   at the time, you know, I'm -- I'm asked to do something,

14   and if I -- if I remember at that time, I remember it.

15       Q.    And if you had reviewed additional documents,

16   you may have identified more people like Doug Bice, Wendi

17   Andriano, Trivia Thompson.  Correct?

18       A.    If I had reviewed documents?

19       Q.    Yes.

20       A.    I told you I did what my lawyers asked me to

21   do.  And on my own, I -- I did not -- I did not read -- I

22   did not go back and try to read old letters or old -- or

23   documents from my criminal trial.  I just did not do

24   that.

25       Q.    Now, Wendi Andriano was another woman who was

Page 268

1     on death row.  Correct?

2          A.    Yes.

3          Q.    And yesterday we went through various letters

4     with Pat where you directed money to be sent to Wendi.

5     Correct?

6          A.    Correct.

7          Q.    And you had a close relationship with Wendi.

8     True?

9          A.    Yes.

10         Q.    And you still send money to Wendi in prison.

11    Correct?

12         A.    Correct.

13         Q.    How much total money have you sent to Wendi in

14    prison?

15         A.    I don't know.  I haven't added it up.

16         Q.    Was there a time when you were both

17    incarcerated that the two of you would be allowed to go

18    out to the rec yard and walk around at night together?

19         A.    I think so.  I'm not sure.

20         Q.    Did you consider Wendi to be your closest

21    friend in prison who was also an inmate?

22         A.    She was a close friend, yes.

23         Q.    Do you still exchange letters with Wendi today?

24         A.    No.  Once in a while, I'll send a card to her.

25         Q.    Do you have an explanation for why, given the

```
 1    close relationship you had with Wendi, you're sending her

 2    money in prison, you had -- directing Pat to send her

 3    money, that you forgot to list Wendi originally when you

 4    did the first answers to interrogatories?

 5        A.    Where's the first answer?

 6        Q.    It's directly above it.  And it's the -- it's

 7    the original answer, and then there's a supplement below

 8    it.  So if you read page 3 through 4, that's your

 9    original answer.

10        A.    Okay.

11             MS. RETTS:  Can you read back the question?

12             (The last question was read back by the

13    court reporter.)

14             THE WITNESS:  The only -- the only thing I

15    can say is I guess at the time of the first

16    interrogatory, these names came up and then the -- then

17    the names came up -- another set of names came up later.

18    I don't know.

19        Q.    BY MS. RETTS:  Are you aware that the set of

20    names came up later because the defendants identified

21    them?

22        A.    I don't know.

23        Q.    Do you have a memory of spontaneously

24    remembering the people who are in the supplemental

25    response?
```

```
 1      A.    No.  Again, I just provided what I was asked by

 2   my attorneys.

 3      Q.    At what point did it become too difficult for

 4   you to read your letters?

 5      A.    What letters?

 6      Q.    You stated throughout this deposition that it's

 7   difficult for you to read documents in the case.

 8      A.    It is.

 9      Q.    At what point did it become too difficult for

10   you to read those documents?

11      A.    Well, actually, since I got out.

12      Q.    So when you were in prison, it was not too

13   difficult for you to read your documents, but it has

14   become now since you've gotten out?

15      A.    When you say "your documents," what documents

16   are you referring to?

17      Q.    Joe Marino letters, letters to -- that are in

18   your file now from Pat Galbraith, that -- to and from

19   Cat -- Pat Galbraith, Imhoff letters, the documents that

20   we have been talking about in this deposition.

21      A.    Well, clearly I didn't have these documents in

22   prison.  So after I got out, I just didn't want to read

23   any more about my incarceration or anything related to

24   it.

25                MS. WANG:  Can we take a quick bathroom
```

Page 271

1    break?

2              MS. RETTS:  Yes.

3              THE VIDEOGRAPHER:  We're going off the

4    record.  The time is 11:11 a.m.

5              (A recess was held off the record.)

6              THE VIDEOGRAPHER:  We're back on the record.

7    The time is 11:23 a.m.

8    Q.    BY MS. RETTS:  Ms. Milke, I want you to turn

9    back to Exhibit 359, which is the sanctions order.

10   A.    (Witness complies.)

11             Yes.

12   Q.    Can you confirm for me that you do have a copy

13   of this document in your possession?

14   A.    Yes.

15   Q.    Did you read any of the paperwork that the --

16   strike that.

17             Do you understand what a pleading is?

18   A.    Yes.

19   Q.    And you understand that that's something that

20   goes to the Court and your attorney may submit a document

21   in the form of the pleading, the defendants may submit a

22   document in the form of a pleading.  You understand how

23   that works?

24   A.    I do.

25   Q.    Do you have a copy of the pleadings that were

Page 272

1    filed related to the sanctions order?

2        A.    I -- I don't have a copy.  I personally don't

3    have a copy of it.

4        Q.    Do you receive only some copies of pleadings in

5    the case?

6        A.    Received from the Court or from who?

7        Q.    From anyone.

8        A.    They don't -- they don't come to me directly.

9    But I have access to them.

10       Q.    How do you have access to them?

11       A.    I can ask my attorney for them.

12       Q.    So you need to ask for documents, they just

13   aren't immediately sent to you?

14       A.    These legal documents are not sent to -- they

15   are not sent to me in the mail, they are not sent to my

16   e-mail.

17       Q.    Are they delivered to you in person somehow?

18       A.    If I -- if I want to retrieve this, I can do

19   that.  Nobody hands it to me.

20       Q.    How did you get a copy of the sanctions order?

21       A.    Yesterday was the first time I saw this.

22       Q.    Do you ever receive documents through Dropbox

23   or any other type of file service related to your case?

24       A.    From the Court?

25       Q.    From anyone.  So does an -- have you received,

Page 273

1    for example, an e-mail from anyone that says, Deborah,

2    here's a Dropbox lick -- -box link or a Hightail link for

3    you to access documents related to your civil case?

4         A.    The only -- the only thing that comes to my

5    mind is I have a folder that says civil case notes.

6    And -- and I might have received an e-mail electronically

7    and I just put it in that folder.  I'm not sure what

8    Dropbox is.

9         Q.    Did you search that folder before you came to

10   your deposition yesterday?

11        A.    No.

12        Q.    Did you search it before you came to your

13   deposition today?

14        A.    No.

15        Q.    Do you have a recollection of reading any of

16   the pleadings that were filed with the Court related to

17   attorney/client privilege?

18        A.    No.

19        Q.    Do you have a recollection of, in the last

20   year, reviewing any documents submitted by your attorneys

21   to the Court to ensure that the facts that you knew

22   represented in those documents were true and accurate?

23        A.    I have a recollection of reviewing an

24   interrogatory from the beginning of the year.

25        Q.    How about anything that was submitted to the

1    Court?  Do you have any recollection of that?  Like

2    paperwork that your lawyer submitted to the Court,

3    similar to what you reviewed in your criminal case like

4    when Ms. Voepel would submit briefs to the 9th Circuit?

5                    MS. WANG:  Objection.

6         Q.    BY MS. RETTS:  Did you do that in this civil

7    case?

8                    MS. WANG:  Objection.  Form.  Foundation.

9                    THE WITNESS:  Reviewing pleadings?

10        Q.    BY MS. RETTS:  Correct.

11        A.    No.  I haven't read any.

12        Q.    When you went to Cornell Law School for that

13   speaking engagement, what did you talk about?

14        A.    It was a classroom of law students, and it was

15   a death penalty class.  And I talked about -- you know,

16   the death penalty and just in general about being

17   convicted and -- tried and convicted and sentenced.

18        Q.    You shared your -- some of your personal

19   thoughts about your own conviction, sentence,

20   incarceration?

21        A.    I don't remember exactly what I talked to them

22   about, but I -- it wasn't in detail.  It was just, you

23   know, you only -- I only had a certain amount of time to

24   speak.  So it was just the gist of everything.

25        Q.    If you had been given unlimited time, would you

1    have been willing to sit there with the law students and

2    answer the questions that they proposed to you?

3         A.    Unlimited time?

4         Q.    Yeah.

5         A.    Would I have been willing to do that?  Probably

6    not.

7         Q.    Why not?

8         A.    Because talking about all of this is very

9    emotionally draining and painful.

10        Q.    So you're willing to speak for certain periods

11   of time up to a certain time limit?

12        A.    Well, I don't dictate how long I'll speak.  But

13   generally, these speaking engagements, you talk to a

14   group of people for, you know, as little as 15 minutes or

15   as long as a half hour.

16        Q.    And these speaking engagements, you don't have

17   to participate.  Correct?  It's your choice whether you

18   want to or not?

19        A.    Correct.

20        Q.    And even though you say it's emotionally

21   draining, you choose to appear at these speaking

22   engagements.  Correct?

23        A.    Yes.

24        Q.    And you also appeared at a speaking engagement

25   in Sydney this year.  Correct?

1       A.      Yes.

2       Q.      And did you talk about the same topics that did

3   you when you were at Cornell?

4       A.      The -- the event in Sydney was about wrongful

5   convictions, and there were other exonerees on the panel.

6       Q.      Did you talk about your experience with your

7   conviction, your incarceration?

8       A.      I just -- it's the gist of it.

9       Q.      You also voluntarily appeared at that speaking

10  engagement?

11      A.      Yes.

12      Q.      There have been other speaking engagements.

13  Correct?

14      A.      Yes.

15      Q.      Can you estimate total for me how many?

16      A.      I -- I just -- I don't know.  I mean, there's

17  not a lot, but I don't know the exact number.

18      Q.      Less than ten?

19      A.      I'm not -- I can't guess.

20      Q.      Would you say on average you attend a speaking

21  engagement around twice a year?

22              MS. WANG:  Objection.  Form.  Foundation.

23              THE WITNESS:  I think this year I did two.

24  I just -- it could be.  I mean, I don't know for sure.

25      Q.   BY MS. RETTS:  You also -- I can't remember

Page 277

1    exactly what -- what term you used.  So you'll have to

2    help me remember, where you received training to be on a

3    panel or --

4         A.    Well, Witness to Innocence has a panel they

5    created called Accuracy & Justice.  And I -- and I'm a

6    part of that.

7         Q.    And that involves, in part, relying upon your

8    past experience being incarcerated, your criminal

9    conviction?

10                   MS. WANG:  Objection.  Form.

11                   THE WITNESS:  Witness to Innocence is

12   comprised of all death row exonerees around the country,

13   and this panel -- this group, this panel, Accuracy &

14   Justice, we get invited by prosecuting offices across the

15   country to speak.  And we just tell them what our

16   experience was.  And then we answer their questions.

17        Q.    BY MS. RETTS:  How long was the training that

18   you had to go through?

19        A.    Well, I don't -- I don't recall when it first

20   started.  But we just gather in Philadelphia and --

21   and -- and meet -- you know, meet there and we're just

22   usually there for two days.

23        Q.    Is that two days a year?

24        A.    I think -- I don't know if it's every year.  I

25   think I went this year in June.

Page 278

```
 1        Q.    As part of your participation in Witness to
 2   Innocence, do you help -- you personally helped act as a
 3   liaison to individuals who are released from
 4   incarceration to maybe help them adjust?
 5        A.    As part of Witness to Innocence?
 6        Q.    Yes.
 7        A.    I have not participated in that.
 8        Q.    Is there some other group that you participate
 9   in that helps exonerees or people released from prison to
10   reintegrate that you have some involvement in?
11        A.    In -- I'm on an emergency fund committee.
12        Q.    So what does that --
13        A.    So --
14        Q.    -- emergency fund committee do?
15        A.    So if there are exonerees out there that need
16   their electric bill paid or whatever paid, the
17   committee -- we get on the phone and have a conference
18   call and discuss the situation and then agree or disagree
19   to send the money to them.
20        Q.    Over the course of the time that you've been
21   involved with the emergency fund committee, Witness to
22   Innocence and all of your speaking engagements, what's
23   the total amount of hours that you think you can
24   attribute to those activities?
25              MS. WANG:  Objection.  Form.
```

Page 279

1          THE WITNESS:  I couldn't -- I -- I have no

2    idea.

3       Q.   BY MS. RETTS:  Would you say it would be around

4    a hundred?

5       A.   I can't guess.

6       Q.   Can you give any range of the amount of time

7    that you spent and devoted to those activities?

8       A.   No, I can't.

9       Q.   How much time a week do you usually spend with

10    the emergency fund committee?

11       A.   It's -- there is no set time a week.  It -- I

12    only get -- if somebody -- if an -- if an exonerees calls

13    in and says, I need help, then I get an e-mail to set up

14    a time to speak.

15       Q.   The conferences that you go to speak at where

16    there are panels of exonerees, are those usually

17    multiple-day conferences?

18       A.   Okay.  To speak?

19       Q.   Not speaking for multiple days but you show up

20    to -- for example, Sydney, you were in Sydney for more

21    than one day.  Correct?

22       A.   Yes.

23       Q.   And during those days that you're there, do you

24    participate at all other than just being on the panel?

25    Is there a dinner?  Is there events that you participate

Page 280

1    in?

2         A.    Um, I was in Sydney for six days.  And two of

3    those days were flying days.  And I only met with these

4    people one day.  And that was it.

5         Q.    Was it a full day that you met with them?

6         A.    No, I met -- I met them at -- in the evening.

7         Q.    How about Cornell, how long did you spend

8    there?

9         A.    I don't know exactly.

10        Q.    So for Sydney, two of the days were flying

11   days, and you had a meeting in the evening?

12        A.    I -- I left -- I left Los Angeles on Saturday

13   and I arrived in Sydney on Monday.  And I had all day

14   Tuesday to myself and I had the daytime on Wednesday to

15   myself.  But I met the people on Wednesday evening.

16        Q.    How long was the flight to Sydney?

17        A.    About 14 hours.

18        Q.    During -- so total -- 28 hours total traveling

19   time?

20        A.    Yes.

21        Q.    During that 28 hours that you were flying to

22   Sydney, did you take that opportunity to review any of

23   the documents in your civil case?

24        A.    No.

25        Q.    But you utilized your time to voluntarily spend

Page 281

1    28 hours in order to attend a speaking engagement to talk

2    about your experience in prison.  Correct?

3         A.    Yes.

4         Q.    You have devoted more time traveling to and

5    attending speaking engagements and with your emergency

6    fund committee activities and with your activities

7    associated with Witness to Innocence than you had

8    reviewing documents connected with your civil case.

9    Correct?

10                  MS. WANG:  Objection.  Form.

11                  THE WITNESS:  Well, to me, there's a

12   difference between reading it -- being alone and reading

13   this stuff or -- and speaking publicly.  There's a big

14   difference.

15        Q.    BY MS. RETTS:  I understand that there may be a

16   difference.  But you would agree that you have spent more

17   time --

18        A.    That's fair.

19        Q.    I want you to go to Exhibit 373, please.

20        A.    Do I have it?

21        Q.    Yes.  It is an e-mail from Pat that we went

22   over yesterday dated June 25th, 2005.

23        A.    Okay.

24        Q.    And yesterday I asked you about a passage in

25   the middle that says, "She asked me to pass on to

Page 282

1      everyone that she would like copies of any letters she

2      sent to you that refers to her prison life and goes" --

3      "and what goes on out there.  She just wants you to

4      highlight those paragraphs, make copies of them and send

5      them to her."

6                    Do you see that?

7          A.    I do.

8          Q.    And I just want to clarify a point.  Do you

9      believe that those are Pat Galbraith's words, or do you

10     have a recollection of asking for those materials?

11                    MS. WANG:  Objection.  Form.

12                    THE WITNESS:  I don't -- I don't have a

13     recollection of this.  I mean, this was dated 2005.  But

14     this is -- this is -- this is Pat's e-mail to other

15     people.  So these are his words.  But I don't have a

16     recollection of this.

17         Q.    BY MS. RETTS:  Okay.  Can you open the binder

18     here.

19         A.    (Witness complies.)

20         Q.    Which is Exhibit -- what's the number on front

21     of the --

22         A.    This?

23         Q.    Yes.

24         A.    363.

25         Q.    363, Exhibit 363.  And if you'll turn to

Page 283

1       BOMMERSBACH05697.

2           A.      Okay.

3           Q.      This is a letter that you wrote to Pat on June

4       26th, 2005.  Do you see that?

5           A.      I do.

6           Q.      And if you'll go down to the third paragraph,

7       you start, "I wrote a letter to Bill Curtis, will mail as

8       soon as I get the address.  I hope he says yes.  Some

9       people are motivated by money, and if he sees dollar

10      signs in this, I don't care, I want his connections and

11      well-known name to help me make this book a success."

12                  Do you see that?

13          A.      I do.

14          Q.      Does that help refresh your recollection that

15      you were writing to Bill Curtis to ask him to be a

16      ghostwriter for your book?

17          A.      I -- I don't recall this, but I associate Bill

18      Curtis with A&E, the American Justice program.

19          Q.      And you go on to write, "The way I'm writing

20      over here is not in story form.  I'm writing as if I'm

21      writing in a journal."

22                  Do you see that?

23          A.      I do.

24          Q.      And those are your words.  True?

25          A.      It -- it appears that, yes.

Page 284

```
 1        Q.     And you go on to state, "For example, I'm
 2   writing about prison.  I'm recollecting some of the
 3   things I've seen and heard.  I'm just writing as much as
 4   I can remember about prison life in" -- "in general.
 5   After I exhaust that subject, I'll move on to another
 6   one.  It's easier for me to break things down by subject
 7   and write specifically about that."
 8               Do you see that?
 9        A.     Yes.
10        Q.     And those are your words.  Correct?
11        A.     Yes.
12        Q.     Then you state, "From you and my mom, I need
13   you to go through my letters and highlight my feelings
14   about prison or my case.  I'm sure I vented often.  Make
15   photocopies of the letters and send them to me.  You guys
16   keep the original letters.  Okay?  Thanks."
17               Do you see that?
18        A.     Uh-huh, I do.
19        Q.     And those are your words.  Correct?
20        A.     Yes.
21        Q.     And if you go back to the letter from Pat
22   Galbraith, Exhibit 373, and put it right next to that
23   letter --
24        A.     Yes.
25        Q.     -- and Pat says, "She asked me to pass to
```

1   everyone that she would like copies of any letters she

2   sent that refers to her prison life and what goes on

3   there.  She wants you to highlight those paragraphs and

4   make copies of them and send them to her."

5               Do you see that?

6   A.    I do.

7   Q.    So Pat is dutifully reporting what you asked

8   him to do.  Correct?

9   A.    Well, his e-mail is dated Jan- -- June 25th and

10  this letter is dated June 26th.

11  Q.    You also talked on the phone to Pat regularly

12  and could have communicated the exact same thing on the

13  phone to him.  Correct?

14  A.    That's possible, yes.

15  Q.    And then on the 26th, you write almost the

16  exact same thing and say, "From you and my mom, I need

17  you to go through my letter and highlight my feelings

18  about prison or my case.  I'm not (sic) sure I vented

19  often.  Make photocopies of the letters and send them to

20  me."

21               Correct?

22  A.    That's what it appears here, yes.

23  Q.    So Pat was sending you, then, letters back that

24  you had in prison that you could review to help you with

25  your writing.  Correct?

Page 286

1      A.    I don't -- I don't recall if he ever sent

2    letters back to me.  I don't recall that.

3                (Exhibit 376 was marked for identification.)

4                MS. WANG:  What number is this?

5                THE WITNESS:  376.

6      Q.    BY MS. RETTS:  Exhibit 376 is a letter dated

7    August 5th, 2005, around the same time as the letters

8    we're looking at from Mike Kimerer to you.  It says,

9    "Dear Debbie, enclosed are records from your file which

10   you have requested to help with your writing.  Please let

11   me know if there's anything else you need."

12               Do you see that?

13     A.    I do.

14     Q.    Do you recall also asking Pat to pass along

15   that you wanted certain materials sent to you from

16   Mr. Kimerer?

17     A.    I don't recall exactly, but I -- it's possible.

18               (Exhibit 377 was marked for identification.)

19     Q.    BY MS. RETTS:  If you'll look at Exhibit 377,

20   that's an August 1st, 2005 letter from Mr. Kimerer to

21   you --

22     A.    Yes.

23     Q.    -- that states, "Dear Debbie, Pat had indicated

24   to me that you were requesting certain materials that

25   would help with your writing.  Enclosed are copies of the

Page 287

1    information I believe you requested."

2                Do you see that?

3    A.    Yes.

4    Q.    And it appears that Mr. Kimerer is sending you

5    more materials because Pat requested that they be sent

6    because you requested him to tell Mr. Kimerer that?

7    A.    It sounds that way, yes.

8    Q.    Do you dispute that that occurred?

9    A.    No.

10               (Exhibit 378 was marked for identification.)

11   Q.    BY MS. RETTS:  If you'll look at Exhibit 378,

12   this is a letter from you to Mr. Kimerer dated August

13   14th, 2005.  And it says, "Hello, Mike, I received the

14   large package of reading material.  Thank you very much

15   for sending it.  It will be extremely helpful as I write

16   and put everything in order."

17               Do you see that?

18   A.    I do.

19   Q.    And those are your words.  Correct?

20   A.    Yes.

21   Q.    "I do have enough material to keep me busy

22   until the end of the year.  But I need a few more items

23   that go along with what I'm currently working on."

24               Do you see that?

25   A.    I do.

Page 288

1      Q.    And those are your words?

2      A.    Yes.

3      Q.    "I need a copy Mark's arrest record from 1988

4   to 1989 and court records from those two years.  I don't

5   have these years."

6                 Do you see that?

7      A.    Yes.

8      Q.    And those are your words?

9      A.    Yes.

10      Q.    And you went on to ask for materials related to

11   Mark for that DUI and you give some information about it

12   being in Phoenix City Court.  Do you see that?

13      A.    Yes.

14      Q.    You then, on 2/02/11, state, "I need a copy of

15   my trial testimony.  I need a copy of Ernie Sweat's trial

16   testimony also.  And lastly I need a copy of my divorce

17   decree.  Thank you so much."

18                 Do you see that?

19      A.    Yes.

20      Q.    And those are your words.  Correct?

21      A.    Yes.

22      Q.    You were asking Mr. Kimerer for certain

23   documents specific to the criminal trial, your testimony

24   and Mr. Sweat's testimony.  Correct?

25      A.    Yes.

Page 289

```
 1          Q.    So when you were in the process of writing this
 2   book, you were able to look through materials from your
 3   criminal case.  Correct?
 4          A.    Correct.
 5          Q.    When you prepared for your habeas testimony,
 6   what documents did you review to prepare you for that?
 7          A.    I don't know.
 8          Q.    Do you remember reviewing your criminal trial
 9   testimony?
10          A.    No.
11          Q.    Is it possible you did review your criminal
12   trial testimony and you --
13          A.    It's possible.  I just don't recall.
14          Q.    Do you believe it's likely you reviewed your
15   criminal trial testimony?
16                MS. WANG:  Objection.  Foundation.  Form.
17                THE WITNESS:  It's possible.  I just don't
18   recall.
19          Q.    BY MS. RETTS:  All right.  I want to go back to
20   the big book here that you have in front of you and have
21   you turn to BOMMERSBACH005633.
22                MS. WANG:  I'm sorry.  Could you say that
23   number again?
24                THE WITNESS:  56- --
25                MS. RETTS:  5633, BOMMERSBACH005633.
```

Page 290

1      Q.    BY MS. RETTS:  And that's a letter that you

2   wrote to Pat on August 18th, 2005.  Do you see that?

3      A.    Yes.

4      Q.    And if you'll turn to 5634.

5      A.    Yes.

6      Q.    You write, "Okay, I encluse four" -- "I

7   enclosed 14 more pages that go with the previous ten

8   pages I already sent to you regarding meeting Mark."

9              Do you see that?

10     A.    Yes.

11     Q.    You have a little arrow on the side that says,

12   "Make a copy and send back to me the copies."

13             Do you see that?

14     A.    I do.

15     Q.    So whatever you were writing at that time, you

16   were requesting copies back, as well as Pat to keep an

17   original.  Correct?

18     A.    Yes.

19     Q.    You ask, "Please clip these pages together with

20   the other ten.  This wraps up 1983."

21             Do you see that?

22     A.    I do.

23     Q.    "I've already begun writing about 1984 and have

24   around 20 pages or so."

25             Do you see that?

1      A.    I do.

2      Q.    And those are your words?

3      A.    Yes.

4      Q.    You went on to write, "While writing, I'm

5   always mindful that my experienced coauthor can dress up

6   these pages to make the words come to life.  I have zero

7   creativity.  My imagination doesn't function like an

8   author's.  So I just write the gist of events as they

9   happen."

10            Do you see that?

11     A.    I do.

12     Q.    "Things are starting to get emotional for me.

13  First of all, I can't believe how selfish I was regarding

14  my mom.  When I think back to that time, she really tried

15  to do anything to help.  My sister and I dumped on her.

16  She didn't deserve to be that way.  I've always been a

17  responsible person my whole life.  It was

18  simply emotional" -- "I was simply emotionally immature

19  at 19.  I see that now."

20            Do you see that?

21     A.    I do.

22     Q.    And those are your words?

23     A.    Yes.

24     Q.    And at this time, you were writing pages about

25  emotional subjects.  Correct?

Page 292

1      A.     Appears that way, yes.

2      Q.     And you have no memory of doing this?

3      A.     I -- I -- I recall at some point I con- -- I

4  considered writing a book.  And I don't know when, but at

5  some point, I changed my mind and I stopped.

6      Q.     So you did write some pages at some point in

7  time.  Correct?

8      A.     I -- I'm -- well, obviously, yes.

9             (Exhibit 379 was marked for identification.)

10     Q.     BY MS. RETTS:  Can you take a look through

11  what's been marked as Exhibit 379?  These are documents

12  that we received from Jana Bommersbach in response to

13  subpoena.

14     A.     (Witness complies.)

15             Yes, I see this.

16     Q.     Do you recognize this as your writing?

17     A.     Yes.

18     Q.     What is this?  What are these?

19     A.     It looks like just jotting stuff down.

20     Q.     How did Ms. Bommersbach get these documents?

21     A.     I -- I don't know.

22     Q.     Do you know if you gave them to her?

23     A.     I don't -- I don't -- I don't recall.

24     Q.     These are your notes of your own thoughts.

25  Correct?

1        A.     It -- it looks like this, yes.

2        Q.     Some of these notes are about Mark.  Correct?

3        A.     Yes.

4        Q.     Are these some of the pages that you're

5    discussing in these letters with Pat?

6               MS. WANG:  Can you give her a chance to read

7    it?  It's very long.

8               MS. RETTS:  If she wants to read the whole

9    thing, we can go off the record and let her read it.

10              THE WITNESS:  Well, just --

11              MS. WANG:  Are you asking if these are the

12   letter -- the -- the letters -- you're asking about the

13   2005 letters to Pat, if these is what she's referring to

14   in --

15       Q.     BY MS. RETTS:  Are these -- the Bommersbach

16   material -- we got these from Bommersbach.  Are any of

17   these the pages that you were talking to Pat about

18   writing?

19       A.     I don't know.

20       Q.     Did you review any of this to prepare for your

21   deposition today?

22       A.     Did I review this?

23       Q.     Right.

24       A.     I don't have -- I don't have anything like

25   this.

Page 294

1      Q.     So the answer is no?

2             MS. WANG:  What -- I'm sorry.  Did you hear

3      the question?

4             THE WITNESS:  No.  What was the question?

5      Q.     BY MS. RETTS:  Is the answer no then, that

6      you -- you did not review --

7      A.     You're asking me did I review Exhibit 379

8      before today?

9      Q.     Correct.

10     A.     The answer's no.

11     Q.     Turning back to your letters to Pat and

12     BOMMERSBACH005666, that's a letter that you wrote to Pat

13     July 20th, 2005.  Do you see that?

14     A.     Yes.

15     Q.     And in the second paragraph, you write, "I

16     enclosed some revised pages for you and my mom to look

17     at.  I followed your advice which was very helpful and

18     tried my best to be as detailed as I could.  I'm still

19     not finished with some things you pointed out, but I will

20     get back to them.  I mainly wanted to concentrate on

21     Perryville and break it down from there to give the

22     reader a visual.  Well, I tried to.  This was hard work."

23            Do you see that?

24     A.     Yes.

25     Q.     And that is your writing and your words.

Page 295

1    Correct?

2         A.    Correct.

3         Q.    And you were doing the hard work of remembering

4    all the details you could to write them down while your

5    memory was fresher in 2005 for purposes of writing a

6    book.  Correct?

7         A.    You said I was doing the hard work?  I -- no,

8    my comment was this was hard work.  It was -- in other

9    words, it was difficult to do.

10        Q.    Right.  So at that time, it was difficult for

11   you to write these pages you're describing for Pat, but

12   you did so in order to, at that point, proceed with your

13   plan to write a book?

14        A.    I don't specifically re- -- I don't

15   specifically recall, you know, this -- this time period.

16   But it appears from this letter that writing became very

17   difficult.

18        Q.    And you still did it any way and provided that

19   to Pat.  Correct?

20        A.    After June -- after July 20th, I don't know.

21        Q.    In that same letter, on the next page at the

22   bottom, it says, "These 12 pages took me six days.  It

23   was not easy, but I'm glad it's done.  Please keep the

24   original pages and send the photocopied ones.  Any

25   feedback, advice, et cetera, is welcome."

Page 296

```
 1                    Do you see that?
 2        A.    Yes.
 3        Q.    And those are your words.  Correct?
 4        A.    Yes.
 5        Q.    So you spent six pages -- six days to write 12
 6   pages of material about your time in Perryville.
 7   Correct?
 8        A.    It doesn't specify what I was writing about.
 9   But according to this, it took me six days to write 12
10   pages.
11        Q.    And on the previous page, you said, "I mainly
12   wanted to concentrate on Perryville and break it down
13   from there and to give the reader a visual."
14                    Do you see that?
15        A.    I do.
16        Q.    Does that lead you to believe that you may have
17   been writing about Perryville?
18        A.    Wait a minute.  Because -- I'm just going to
19   finish reading the letter.
20                    MS. WANG:  Could you tell me what page we're
21   on?
22                    MS. RETTS:  5666 through 5667.
23        Q.    BY MS. RETTS:  On the top of 5667, you say,
24   "After describing the prison, the rooms and the living
25   conditions during summer and winter, I decided to then
```

1    take the reader to the area in which I lived.  There

2    isn't much to say about that, but I'm stuck here, which

3    is why I ended it on page 12.  The reason is" -- "why I'm

4    stuck is because life is different at Santa Maria.  I had

5    more privileges and more freedom there.  It's the

6    opposite at Lumley."

7         A.   Yes.

8         Q.   You were writing about --

9         A.   So --

10        Q.   -- your prison conditions?

11        A.   So six -- is took six days to write 12 pages.

12   It was about Perryville.

13        Q.   And you took the time for a full six days to

14   concentrate on writing those 12 pages.  Correct?

15        A.   Apparently.

16        Q.   And that's more time than you have spent

17   reviewing documents for this civil case.  True?

18        A.   I don't know.

19        Q.   In 2005, your memory about Perryville and your

20   experiences in prison would have been fresher than it is

21   today.  Do you agree?

22        A.   In 2005, I was in Perryville.  So yes.

23        Q.   And your writings would also have been done

24   while you were actually sitting in the prison.  True?

25        A.   Yes.

1      Q.    Do you think that those writings would have

2    been helpful for you to review in preparation for any of

3    your depositions in this civil case?

4      A.    You're talking about something that was written

5    in 2005, and we are now in 2019.  And it was just as

6    emotionally painful to write back in 2005 as it is for me

7    to sit here and read this stuff now.  I had obviously

8    trouble with this, which is probably why I changed my

9    mind and decided against this project.  So you're --

10   you're talking about something from 2005.

11     Q.    Right.  But back in 2005, you would have had a

12   fresher recollection.  So if we had those pages today,

13   we'd have better information about what it was like for

14   you in Perryville than we have you able to remember

15   sitting here today.  Correct?

16     A.    If we had those pages?  There was no reason for

17   me back in 2005 to keep copies of all that.

18     Q.    Do you remember specifically destroying those,

19   or did you send them in a box of excess property to Pat?

20     A.    No, I did not send them out.

21     Q.    You knew Pat had a copy of those documents?

22           MS. WANG:  Objection.  Foundation.

23           THE WITNESS:  All -- all I can tell you is

24   that according to these letters, I would send out

25   originals and ask Pat to make copies, according to what's

1    written in here.  What he did with whatever I sent him, I

2    don't know.

3         Q.    BY MS. RETTS:  Were those materials in the

4    boxes that you shredded at Franke's house?

5         A.    No.

6         Q.    How can you be certain?

7         A.    Because the things that I shredded at Franke's

8    house was all of my court filings.

9         Q.    And also the letters from Franke?

10        A.    Yes.

11        Q.    How do you -- did you go through every single

12   page of letters for Franke to make sure that some of your

13   writings weren't mixed in?

14        A.    All of Franke's letters were still in its

15   original envelope.

16        Q.    Ms. Bommersbach, in her book, writes that you

17   spent time at Franke's house going through boxes of

18   documents to select out materials to send to her.  Do you

19   dispute that happened?

20        A.    She claims that Franke and I went through

21   boxes -- what is your question?

22        Q.    You.

23        A.    Me?

24        Q.    She claims that you went through your boxes at

25   Franke's house and pulled out documents from those boxes

Page 300

1    to send to her to assist with her writing of the book.

2    Do you dispute that?

3        A.    I don't -- I don't recall that.

4        Q.    You may have actually gone through those boxes

5    and pulled out materials to give to Ms. Bommersbach and

6    gave them to her for purposes of writing the book.

7    Correct?

8        A.    It's -- it's possible.  But I just don't

9    recall.

10       Q.    Did you read Ms. Bommersbach's book?

11       A.    No.

12       Q.    Did you read any part of the book?

13       A.    No.

14       Q.    Why not?

15       A.    Because I don't -- I don't want to read

16   anything about me or my -- about my incarceration or

17   anything related to it.

18       Q.    If you'll turn back to the letters that we

19   received from Ms. Bommersbach, on 005677 --

20       A.    Yes.

21       Q.    -- that's a letter written to Patty dated July

22   13th, 2005.  Do you see that?

23       A.    Yes.

24       Q.    And do you recognize your writing?

25       A.    Yes.

1      Q.    And you tell Patty, "Hi, Patty, I'm sending

2    home some stuff to be put in my storage."

3              Do you see that?

4      A.    Yes.

5      Q.    And you did send stuff to be put in storage.

6    Correct?

7      A.    Yeah, I did.  Like I answered yesterday, extra

8    miscellaneous things that I couldn't keep.

9      Q.    And if you'll turn to 5681 in this same letter.

10     A.    (Witness complies.)

11     Q.    On the top of page 3 of this letter, you say,

12   "I'm noticing that with this writing I've been working

13   on, a lot of emotions are surfacing.  I feel a lot of

14   anger.  Once this project is completed, I believe it will

15   be cathartic for me.  I can then put it all behind me and

16   really move forward."

17              Do you see that?

18     A.    I do.

19     Q.    And those are your words.  Correct?

20     A.    Yes.

21     Q.    And you actually are writing to Patty that you

22   think that it might help you emotionally to get all these

23   words down on paper.  Correct?

24     A.    I -- I -- at the time I wrote this letter,

25   it's -- as it states here, I'm noticing that with this

Page 302

1    writing I've been working on, a lot of emotions are

2    surfacing.  So, I mean, I was -- I was recognizing that

3    as I was writing it.

4        Q.    And you went on to say that you thought it

5    actually would help you to move forward.  Correct?

6        A.    At that time, according to this letter and --

7    at this time in 2005, according to this letter, yes.

8        Q.    And if you can go to Bommersbach 05685.

9        A.    (Witness complies.)

10       Q.    And that letter is dated July 5th, 2005.  And

11   it's from you to Pat.  Correct?

12       A.    Yes.

13       Q.    And that is your writing.  True?

14       A.    Yes.

15       Q.    And if you will turn -- I've got the wrong one.

16   Actually, I'm going to have you turn instead to

17   BOMMERSBACH5691.

18       A.    Okay.

19       Q.    Which is a letter from you to Patty dated June

20   18th, 2005.  Do you see that?

21       A.    Yes.

22       Q.    And this is your writing.  Correct?

23       A.    Yes.

24       Q.    And if you'll turn to 5694.

25       A.    Yes.

Page 303

1     Q.    You state, almost at the bottom, "Did Pat tell
2     you about his suggestion to me to think about working on
3     an outline for a book?  Ask him to share with you the
4     letter I wrote to him about all that."
5                Do you see that?
6     A.    Yes.
7     Q.    And those are your words?
8     A.    Yes.
9     Q.    You go on, on the next page, to talk again
10    about Bill Curtis, and you say, "With him and his
11    connections, this book can get a lot of attention.  Not
12    only that but there would be an interest in Europe too.
13    This book would sell.  This Bill Curtis strikes me as the
14    type of person who has integrity, and that's the kind of
15    person I prefer to deal with."
16               Do you see that?
17    A.    Yes.
18    Q.    And those are your words?
19    A.    Yes.
20    Q.    And then you write, in the next paragraph, "As
21    I do my exercises, thoughts come to my mind, and I
22    already started writing about the prison experience.  As
23    each day goes by, more and more thoughts come to mind.  I
24    would like to have the transcripts of my sister's
25    testimony.  I can only do writing in small sections."

Page 304

1                    Do you see that?

2        A.    Yes.

3        Q.    So you were asking for your sister's testimony

4   to also review in prison.  Correct?

5        A.    Yes.

6        Q.    Did you review your sister's testimony in

7   preparation for gathering documents in the civil case?

8                    MS. WANG:  Objection.  Form.

9                    THE WITNESS:  Did I review her testimony?

10       Q.    BY MS. RETTS:  Yeah.  And let's -- let's --

11  I'll ask it just broad.  Have you ever reviewed her

12  testimony after the time that you filed this civil case?

13       A.    I don't -- I don't know.

14       Q.    Is it possible that you did?

15       A.    I'm not sure.

16       Q.    Can you turn to 5633?

17       A.    (Witness complies.)

18             Yes.

19       Q.    That is -- well, we've already done that one.

20             (Exhibit 380 was marked for identification.)

21       Q.    BY MS. RETTS:  This is Exhibit 380, which is a

22  letter from Mr. Kimerer dated September 2nd, 2005 to you.

23  Do you see that?

24       A.    Yes.

25       Q.    Mr. Kimerer writes, "Dear, Debbie, enclosed are

Page 305

1     copies of the following documents you" -- "which you

2     requested that we send to you:  Divorce decree, trial

3     testimony of Ernie Sweat and your trial testimony.

4     Please let me know if there is anything else you need."

5              Do you see that?

6     A.   Yes.

7     Q.   You received a copy of the divorce decree, the

8     trial testimony of Ernie Sweat and your trial testimony,

9     which is documentation you asked for to help with your

10    writing.  Correct?

11    A.   Yes.

12    Q.   Did you feel that you -- strike that.

13              If you had wanted any other documents, you

14    could have asked them, either Mr. Kimerer or Pat, to

15    obtain those documents for you.  Correct?

16    A.   Correct.

17    Q.   What did you do with the copies of the divorce

18    decree, trial testimony and your trial testimony after

19    you were done with them?

20    A.   Well, these are legal documents.  So it --

21    I'm -- I -- I don't know for sure today.  But since

22    they're legal documents, I probably put them in a legal

23    box and they were picked up.

24    Q.   Do you recall an experience in the prison where

25    you had thrown away a magazine and you later heard out --

1    heard that a correctional officer took it out of the

2    garbage and kept it because he thought it might be worth

3    some money some day if you got out of prison?

4         A.    It rings a bell, yes.

5         Q.    When you were in prison, you were very careful

6    about your personal documents and notes.  Correct?

7         A.    In prison, you had to be.

8         Q.    Because if you weren't careful and threw away

9    some of your writings, it could fall into the hands of a

10   correctional officer.  Correct?

11        A.    When -- okay.  When you say fall into the

12   hands, are you -- no.

13        Q.    So if you wrote something, wrote a note and

14   placed it into the trash, a correctional officer coming

15   in to empty that trash could maybe decide not to throw it

16   away and take your note from the trash.  Correct?

17        A.    Correct.

18        Q.    And that was something you had a concern about;

19   that when you threw things away, you didn't want people

20   going through your trash.  Right?

21        A.    Correct.

22        Q.    So you didn't throw away documents in prison

23   that were important, like handwritten notes or materials

24   relative to your case.  You would put them in a box to be

25   sent out for someone to pick up.  Correct?

Page 307

1      A.     That's --

2                   MS. WANG:  Objection.  Foundation.  Form.

3                   THE WITNESS:  That's not correct.

4      Q.     BY MS. RETTS:  What would you do with important

5      documents in prison?

6      A.     Documents like legal -- trial transcripts,

7      legal documents, that I would have in a box, and -- and

8      Pat would pick it up.  But this writing that I did,

9      anything personal, I would tear it.

10     Q.     Would you also send them out to third parties

11     to keep, like Pat?  You asked Pat to keep photocopies and

12     send back?

13     A.     No.  According to these letters, okay, that

14     you're having me read through, it appears that I would

15     send an original to Pat and ask him to make a copy and

16     send the copy back to me.  Okay?  There came a point in

17     time -- I don't know when -- that I changed my mind about

18     all this writing because somewhere we just read, it was

19     becoming difficult for me.

20             So this is most likely why I changed my mind

21     and decided not to do this anymore.  In prison, because I

22     was considered high profile, I -- and this example with

23     the magazine rings a bell.  Officers had no power in

24     there.  None.  At any time of the day, even in the middle

25     of the night, they could wake you up out of your sleep

Page 308

1    and tell you to cuff up and they could go tear through

2    all of your stuff.

3              This is why I didn't keep legal documents in

4    my room.  And personal stuff that I didn't -- that I was

5    just throwing away, I didn't just pitch it in the garbage

6    can; I shredded it.  That was how -- that was how I threw

7    away stuff that I didn't want.

8         Q.    You also, if you wanted to keep a personal

9    document, could send it for Pat to pick up regardless of

10   what it was, not focused on it being writing.  If you had

11   a personal document, a card, a letter that you wanted to

12   keep, you could have it sent to excess property and have

13   Pat pick it up.  Correct?

14        A.    That's correct.

15        Q.    You could also -- before there was Pat, you had

16   Ms. Imhoff who maintained a storage facility or assisted

17   with a storage facility for you as well.  Correct?

18              MS. WANG:  Objection.  Form.  Foundation.

19              THE WITNESS:  I -- I'm not sure.  It's

20   possible, but I don't really recall that.

21              MS. WANG:  When were we planning to take a

22   lunch break?

23              MS. RETTS:  We can do it now.

24              MS. BURGESS:  Ten minutes or so.

25              MS. RETTS:  Ten minutes.

1          MS. BURGESS:  I can check and see.

2          MS. RETTS:  Yeah, why don't we go off the

3    record real quick and you see if lunch is here --

4          THE VIDEOGRAPHER:  We're going off the

5    record.  The time -- I'm sorry.  We're going off the

6    record.  The time is 12:24 p.m.

7               (A recess was held off the record.)

8               (Exhibit 381 was marked for identification.)

9          THE VIDEOGRAPHER:  We're back on the record.

10   The time is 12:26 p.m.

11     Q.    BY MS. RETTS:  You have what's in front of you

12   as Exhibit 381, which is a January 19th, 1998 letter from

13   you to Kirk Fowler.  Is that correct?

14     A.    Yes.

15     Q.    Did you review this document in preparation for

16   your deposition?

17     A.    It's possible.  I -- I -- this was in the pile

18   of papers.

19     Q.    So it says at the top, "My friend Carolyn and

20   her friend Judith may be calling you to set up a

21   meeting."

22               Do you see that?

23     A.    Yes.

24     Q.    And Carolyn is Carolyn Imhoff.  True?

25     A.    Yes.

Page 310

1    Q.    And Judith is Judith --

2    A.    I don't -- I don't recall her.

3    Q.    So Judith was not -- Judith was not a close

4    friend of yours.  Correct?

5    A.    No, I don't -- no.

6    Q.    You don't even remember her at all?

7    A.    No, I don't.

8    Q.    You say, "Judith is willing to get a movement

9    going for me if she has all the right information."

10            Do you see that?

11   A.    I do.

12   Q.    Do you know what that's referring to?

13   A.    Well, I -- based on the date, I must have

14   gotten a stay in January of '98, and so it must -- it --

15   it must be related to after getting the stay.

16   Q.    It goes on to say, "She wants to read through

17   the PCR and the petition for review, and she wants to

18   talk to the Mesa Tribune reporter."

19            Do you see that?

20   A.    I do.

21   Q.    Is it possible that the movement is relating to

22   the media?

23   A.    It's possible, yes.

24   Q.    And around 1998, you also had engaged with the

25   media in the form of preparing voice tapes for a man

1    named Cleemen Hoges.  Do you remember that?

2        A.    Yes.

3        Q.    You also prepared voice tapes for a man named

4    Peter Aleshire in response to some written questions that

5    he had for you.  Correct?

6        A.    Yes.

7        Q.    And you sent those voice tapes to Mr. Aleshire,

8    correct, through Kirk Fowler?

9              MS. WANG:  Objection.  Foundation.  Form.

10             THE WITNESS:  I can't -- I can't remember

11   how I sent the tapes out.

12       Q.    BY MS. RETTS:  You knew that the tapes made

13   their way to Mr. Aleshire, though.  Correct?

14             MS. WANG:  Objection.  Foundation.

15             THE WITNESS:  I'm not -- once they leave my

16   room, I don't know.  I don't -- I don't -- I don't know

17   about Mr. Aleshire.

18       Q.    BY MS. RETTS:  All right.  So you, in this

19   letter, are asking, then, to give Carolyn and Judith

20   access to the PCR and the petition for review.  Correct?

21       A.    Yes.

22       Q.    With an understanding that Carolyn and/or

23   Judith may speak to a Mesa Tribune reporter.  Correct?

24             MS. WANG:  Objection.  Foundation.

25             THE WITNESS:  That's what it sounds like

Page 312

1      here.

2          Q.    BY MS. RETTS:  You go on to say, "My legal

3      work, PCR and appendices are in my storage with Carol" --

4      "which Carolyn has access to, and I could direct them to

5      that, but it's much easier if they talk to you.  My legal

6      boxes aren't clearly organized, and it's too difficult to

7      explain what's in what."

8                    Do you see that?

9          A.    Yes.

10         Q.    And does that refresh your recollection that

11     you had a storage unit which Carolyn had access to?

12         A.    I don't -- I'm -- I'm not so sure about -- I'm

13     not -- I just don't remember that.

14         Q.    Do you dispute that Carolyn Imhoff had access

15     completely to your storage unit and because you weren't

16     there, obviously because you were in prison, she could

17     have chosen to do whatever she wanted to do in terms of

18     reviewing documents in that storage unit?

19                    MS. WANG:  Objection.  Form.  Foundation.

20                    THE WITNESS:  I just -- I can't -- I just

21     don't have a memory of -- of -- of a storage unit at

22     that -- on this -- in this particular time period.

23         Q.    BY MS. RETTS:  If you had a storage unit that

24     Carolyn had access to, Carolyn could have gone in and

25     gone through anything in there.  Correct?

Page 313

1                MS. WANG:  Objection.  Foundation.  Form.

2                THE WITNESS:  Yes.  If she had access to it,

3    yes.

4        Q.    BY MS. RETTS:  Did you tell your attorneys that

5    Ms. Imhoff had access to your storage unit?

6                MS. WANG:  Objection as to -- objection.

7    Form.  I would object on privileged grounds unless you

8    can clarify to which attorneys you're asking about.  I

9    mean, if you're asking about this time period, that's

10   fine.  But --

11               MS. RETTS:  Well, I think it relates to

12   spoliation.  If she told --

13               MS. WANG:  Well, can you just ask

14   specifically.  It may not be a problem.  Just --

15       Q.    BY MS. RETTS:  Do you remember telling anybody

16   that Carolyn Imhoff had access to all the boxes you had

17   in the storage unit?

18       A.    No, I don't.  If there was a storage and there

19   were boxes, it was legal material, legal filings.

20       Q.    Do you dispute that you sent things other than

21   legal materials to Carolyn Imhoff?

22       A.    No, I don't dispute that.

23               MS. RETTS:  All right.  We can take a break

24   for lunch.

25               THE VIDEOGRAPHER:  We're going off the

Page 314

1    record.  The time is 12:33 p.m.

2                   (A recess was held off the record.)

3                   (Exhibit 382 was marked for identification.)

4                   (Exhibit 383 was marked for identification.)

5                   THE VIDEOGRAPHER:  We're back on the record.

6    The time is 1:24 p.m.

7        Q.    BY MS. RETTS:  Ms. Milke, I'll have you look at

8    Exhibit 382 --

9        A.    Yes.

10       Q.    -- which is an e-mail that says "from Debbie

11   update to Mr. Kimerer."

12       A.    Okay.

13       Q.    Do you see that?

14       A.    Yes.

15       Q.    At the bottom, it says, "To unsubscribe from

16   Debbie update, just follow this link."

17                   Do you see that?

18       A.    Yes.

19       Q.    And at the top, it says, "Again from Franke who

20   went to visit Debbie on Saturday morning."

21                   Do you see that?

22       A.    Yes.

23       Q.    It appears to be a summary of Franke's visit

24   with you on August -- in one of the early days of August

25   in 2013.  He writes it on the 4th, but it looks like the

```
 1    visit occurred before then.  Do you agree?
 2         A.    Yes.
 3         Q.    It says, in the middle, "Debra was not allowed
 4    to bring her address book to the County jail.  So please
 5    bear with her as she's trying to retrieve the addresses
 6    she is still intending to write to.  She also wanted two
 7    more books which are on the way already."
 8              Do you see that?
 9         A.    Yes.
10         Q.    Did you keep an address book in prison?
11         A.    I don't think it was a book.  Just on paper,
12    people's names and addresses.
13         Q.    So you had a listing on some forms of paper
14    that had the names and addresses of the people that you
15    would communicate with.  Correct?
16         A.    I believe so, yes.
17         Q.    The folks that you would write to in prison,
18    you didn't have those addresses memorized.  Correct?
19         A.    I didn't write to very many people.  So there
20    were some people I didn't have the addresses memorized.
21         Q.    And for the addresses you didn't have
22    memorized, you wrote them down on paperwork.  Correct?
23         A.    Yeah, yes.
24         Q.    When did you destroy those papers?
25              MS. WANG:  Objection.  Foundation.
```

1              THE WITNESS:  Destroy?

2         Q.    BY MS. RETTS:  Did you destroy the papers that

3    you had with people addresses on them?

4         A.    I don't know.  I don't -- I don't know.

5         Q.    You may still have the papers that are being

6    referred to here that have the addresses of the

7    individuals that you wrote to?

8              MS. WANG:  Objection.  Foundation.  Form.

9              THE WITNESS:  I'm not sure.  Because when I

10   went to prison -- no, when I went to the County jail, my

11   stuff was packed up and I never went back to the prison.

12        Q.    BY MS. RETTS:  The stuff that was packed up,

13   where did it go?

14        A.    I think it went to the property office.

15        Q.    And from the property office, it was sent out

16   to Pat Galbraith?

17        A.    I don't know if -- I think he might -- he might

18   have picked it up or my mother might -- or, no, not my

19   mother.  He might have picked it up or Franke might have

20   picked it up.  I don't know.

21        Q.    The papers that you had addresses written on,

22   those may have been in the boxes?

23        A.    It's possible.

24        Q.    Have you searched for any paperwork that you

25   have that has addresses of individuals that you wrote to

1      while you were in prison?

2          A.     I -- I don't know.  It's -- I don't know.

3          Q.     Do you have any form of electronic address book

4      where in your computer you have notes about people's

5      addresses?

6          A.     The only thing I have is in the contact list

7      for the phone.  I have my therapist's address on there.

8      Not every contact, just some.

9          Q.     So in your phone, you have a list of contacts

10     for people that you either talk to on the phone or

11     communicate with in some way?

12         A.     A contact list on my phone, yes.

13         Q.     And on your contact list, are there people that

14     you also just write to, whether by e-mail or handwritten

15     letter?

16         A.     No, I don't -- no, I just talk -- no, I don't

17     do that.  I don't write.  I just talk on the phone.

18         Q.     Do you write e-mails to anybody?

19         A.     I don't -- I do have e-mail addresses, but I

20     don't communicate by e-mail.  People do send me e-mails,

21     and I only use -- I see it on my phone.  I don't open my

22     laptop and check e-mails.  It's on my phone.

23         Q.     So when you get an e-mail on your phone and

24     someone writes to you, do you respond back to those

25     e-mails?

Page 318

1    A.    Not all of them, no.

2    Q.    Some of them you do?

3    A.    Yeah.  Mostly I will -- I will respond to the

4    people at Witness to Innocence because that's the only

5    way they communicate with me, is by e-mail.

6    Q.    You have e-mailed in the past with your sister.

7    Correct?

8    A.    Yes.

9    Q.    You have e-mailed with a man named Brian James?

10   A.    I don't recognize that name.

11          MS. RETTS:  95.

12          (Exhibit 384 was marked for identification.)

13   Q.    BY MS. RETTS:  You have an e-mail that's been

14   marked as Exhibit 384.  It's an e-mail exchange between

15   you and Brian dated February 2nd, 2016, and at the top it

16   comes up as Brian James with an e-mail James Brian.  Do

17   you see that?

18   A.    I do.

19   Q.    And that's your e-mail address, debj@post.com.

20   Do you see that?

21   A.    Yes, I do.

22   Q.    Do you remember who Brian James is?

23   A.    Yeah.  This was -- it's -- this is really

24   embarrassing.  But I fell for some I think fishing thing.

25   This was -- this was all a scam.

Page 319

1      Q.     Did you send more than one e-mail to Mr. James?

2      A.     I don't -- I don't know.

3      Q.     And you say on February 2nd, 2016, "Hi there.

4   When I got to the office, I found out that Mike was at

5   prison visiting a client.  The funding company wanted a

6   copy of my civil complaint, so I forwarded it to them,

7   all 77 pages of it."

8             Do you see that?

9      A.     Yes.

10     Q.     So you're telling Mr. James that you had a copy

11  of your civil complaint, and you forwarded it to the

12  funding company and you even note how long it is, that

13  it's 77 pages.  Do you see that?

14     A.     I do.

15     Q.     So you did, in fact, have a copy of your civil

16  complaint.  Correct?

17     A.     Well, like I said, I -- I could easily get a

18  copy of it, yes.

19     Q.     And you say, "On the way home from work, they

20  called to let me know they received everything and will

21  review it.  They also said they" -- "said I should have

22  an answer tomorrow or Wednesday at the latest."

23            Do you see that?

24     A.     I do.

25     Q.     And then you go on to say, "I'll be looking for

Page 320

1    you online."

2              Do you see that?

3    A.    Uh-huh, yes.

4    Q.    And Mr. James responded, "I love you and I'm

5    always thinking about you, my sweetheart.  You mean a

6    world of happiness to me.  It gives me the greatest joy

7    sharing my happiness with," and then it stops there.

8              Do you see that?

9    A.    I do.

10   Q.    So you provided intimate details about your

11   life to Mr. James.

12              MS. WANG:  Object- --

13   Q.    BY MS. RETTS:  True?

14              MS. WANG:  Objection.  Form.

15              THE WITNESS:  What do you mean by intimate?

16   Q.    BY MS. RETTS:  Well, do you tell everybody

17   about your civil complaint and forward them copies of it?

18   A.    I didn't -- I didn't forward him a copy of

19   this.

20   Q.    Did you ever forward a copy of it to him?

21   A.    I -- I don't -- I don't think so, no.

22   Q.    So you told him about your financial

23   information, that you were getting a funding company.

24   Correct?

25              MS. WANG:  Objection.  Form.

Page 321

1              THE WITNESS:  All it says is, "The funding

2    company wanted a copy of my civil complaint, so I

3    forwarded it to them, all 77 pages of it."  That's all it

4    says.

5         Q.    BY MS. RETTS:  The funding company is for your

6    litigation loan.  Correct?

7         A.    It -- it must be, yes.

8         Q.    And that is an intimate financial detail about

9    you.  Correct?

10             MS. WANG:  Objection.  Foundation.  Form.

11   Argumentative.

12             THE WITNESS:  I'm just -- I'm not sure.

13        Q.    BY MS. RETTS:  Do you tell -- strike that.

14             How many people have you told that you had

15   contact with a fundy -- funding company and sent them

16   your civil complaint?

17        A.    I don't know.

18        Q.    Have you told other people that you have a

19   litigation loan?

20        A.    I have.

21        Q.    Who did you tell that to?

22        A.    Franke knows about it.

23        Q.    Franke also had a copy of the drafts of the

24   civil complaint before they were filed.  Correct?

25             MS. WANG:  Objection.  Foundation.

1              THE WITNESS:  I don't know.

2      Q.    BY MS. RETTS:  Were you ever copied on any

3   e-mail that was sent from Franke to your civil lawyers,

4   Mr. Rake and Mr. Benchoff about the civil complaint?

5      A.    I don't know.

6      Q.    Do you know whether or not Mr. Aue provided any

7   comments about the drafts of the civil complaints?

8      A.    I don't know.

9      Q.    Were you ever copied on any e-mails that

10  Mr. Aue sent that he provided cop- -- he provided

11  comments to the draft civil complaints to your attorneys?

12     A.    I -- I don't know.

13     Q.    Could you have been?

14              MS. WANG:  Objection.  Form.

15              THE WITNESS:  It's -- it's possible, but I

16  just don't recall at this time.  I just don't recall.

17     Q.    BY MS. RETTS:  Why is it that you believe that

18  there was a fishing scam with Mr. James?

19     A.    That -- I learned about that term -- that term.

20     Q.    Where did you first meet Mr. James?

21     A.    I can't remember.

22     Q.    It says on this e-mail, "I'll be looking for

23  you online."

24              Were you on an online dating app?

25     A.    I don't know.  I think -- I think I was in

Page 323

1    Germany.  I don't know.  I'm not sure.

2         Q.    Where does Brian James live?  Do you know?

3         A.    Well, that's a fake name.

4         Q.    How did you learn it was a fake name?

5         A.    Through someone Mr. Kimerer -- through -- I

6    can't remember exactly how I learned about his name.

7         Q.    Did you send money to Mr. James?

8         A.    Yes, I did.

9         Q.    How much money did you send to him?

10        A.    This was -- this is -- this was a scam.  It was

11   two -- there was a phone involved too.  I think it was

12   $2,000.

13        Q.    Did you talk to Mr. James over the phone?

14        A.    I -- well, I talked to somebody over the phone.

15        Q.    Someone who claimed to be Mr. James?

16        A.    Yes.

17        Q.    Do you know if there was an investigator hired

18   to track down the money or to get any of your money back?

19        A.    I don't remember.

20        Q.    Why did you send $2,000 to him?  What -- what

21   did he ask you to do?

22        A.    He claimed to be in the military.  I can't

23   remember exactly what it was for.

24        Q.    So he asked you to send him $2,000 and you did

25   so?

1      A.      That I recall, yes.

2      Q.      Did you do it in the form of gift cards?

3      A.      No.  I -- no.  I can't -- oh, gosh.  I -- I --

4  I can't remember how I did it.  I -- I just remember a

5  grocery store.

6      Q.      Is it possible that he -- he asked you to get

7  gift cards, you went to the grocery store and bought gift

8  cards or wired money?

9      A.      No, it wasn't gift cards.

10     Q.      Was it through Western Union?

11     A.      I think -- I just remember being at the grocery

12  store in the customer service part.  It could have been

13  that.

14     Q.      Do you know what Brian James' real name is?

15     A.      No.

16     Q.      Did anyone tell you what it was and you just

17  don't remember?  Do you remember having a conversation

18  about who he was?

19     A.      I don't.  He just -- I -- I remember something

20  about a phone, and he wanted it sent to some country in

21  Africa.

22     Q.      And you followed the directions he gave?

23     A.      Yes.  And then when I found out that this was a

24  scam, I went to cut the phone off.

25     Q.      So you cancelled your phone number?  Is that

1    what you mean by --

2         A.    It wasn't my phone number.

3         Q.    What do you mean about cut the phone off?

4         A.    So I got a phone at AT&T, and it had a phone

5    number.  And then when I found out that this was a scam,

6    I went back to AT&T and had the phone stopped, the

7    information.

8         Q.    Was that the Samsung phone?

9         A.    No, no.  This was a totally different separate

10   phone.

11        Q.    How many phones have you had?

12        A.    Two.

13        Q.    Was it the iPhone?

14        A.    No.  I just got my iPhone.

15        Q.    Okay.

16        A.    I've only had a Samsung and an iPhone.

17        Q.    The phone calls you were making to Mr. James,

18   what phone were you using to make those phone calls?

19        A.    I didn't -- it might have been my Samsung

20   phone.  I don't know.

21        Q.    So --

22        A.    It wasn't the iPhone.

23        Q.    You went to AT&T and had your number changed

24   but didn't have the phone changed?  I don't understand --

25   I don't understand.  Can you please explain it?

1        A.    I went to AT&T.  He led me to believe that he

2    was in Afghanistan in the military and he needed a phone.

3    And so I went to AT&T and bought a phone and had it sent

4    to some PO or APO box in Africa.  And that's where it

5    went.  And then when I found out that this was a scam, I

6    went to AT&T and had the phone shut down.

7        Q.    So not only did you send money, but you got a

8    phone at AT&T in addition to the money and sent that as

9    well?

10       A.    Yes.

11       Q.    What else did you send?

12       A.    That's it.

13       Q.    Is there a reason why you didn't remember

14   Mr. James before this when his name was brought up?

15              MS. WANG:  Objection.  Form.

16              THE WITNESS:  It just --

17              MS. WANG:  Foundation.

18              THE WITNESS:  When you mentioned the name,

19   it didn't -- I didn't recall it.  But seeing this, this

20   brings it back.  I remember this.

21       Q.    BY MS. RETTS:  So it's important to review

22   documents to help refresh your recollection about things

23   you might not recall.  Correct?

24       A.    That -- that's -- yes, it would be important.

25       Q.    You didn't recall a Brian James until you

```
 1    actually looked at the documents, even though you sent

 2    him $2,000 and a phone from AT&T.  Correct?

 3        A.     When I start -- when I read this, yes.

 4        Q.     How did you find out that it was a scam?

 5               MS. WANG:  Objection.  Asked and answered.

 6               THE WITNESS:  How did I find out?

 7        Q.   BY MS. RETTS:  Yes.

 8        A.     Well, I know, but I don't know if it's

 9    privileged or not.

10               MS. WANG:  Can we go off the record and

11    confer?

12               MS. RETTS:  Yes.

13               THE VIDEOGRAPHER:  Going off the record.

14    The time is 1:44 p.m.

15               (A recess was held off the record.)

16               THE VIDEOGRAPHER:  We're back on the record.

17    The time is 1:49 p.m.

18               MS. WANG:  You -- you can read it back.

19               (The last question was read back by the

20    court reporter.)

21               THE WITNESS:  I talked to Mr. Kimerer about

22    it, and he -- he has -- or at that time, he had a former

23    client that was in the marines, and his former client did

24    a -- like a background check on this name and came back

25    and said that there was no one by that name that existed.
```

1          And then he also said that the address in

2     Af- -- in Africa was -- the -- where to send money and

3     the phone, it was like a -- I don't know what you call

4     it, but like a P.O. Box where people just go and pick

5     stuff up.

6          Q.    BY MS. RETTS:  Did you make a report to any

7     police agency about the money?

8          A.    No.

9          Q.    Did you make a report to the attorney general's

10    office, the consumer fraud division?

11         A.    No.

12         Q.    Will you take a look at Exhibit 383.

13         A.    Yes.

14         Q.    Have you ever seen this document before?

15         A.    I -- I may have read this before.

16         Q.    Did you sit down at the beginning of this case

17    and write out any list of names of people that you

18    thought had knowledge about the case?

19         A.    I don't remember.

20         Q.    And if you'll turn to page 17, and there is a

21    description at the top for Patrick Galbraith.  Do you see

22    that?

23         A.    Yes.

24         Q.    It says, "Patrick Galbraith is a family friend

25    of Debra Milke's.  He is likely to have discoverable

Page 329

```
 1    information related to Debra Milke and/or her damages."

 2                    Do you see that?

 3         A.    Yes.

 4         Q.    What does it mean when you say Patrick

 5    Galbraith is a family friend?

 6         A.    That's what he -- well, Patrick Galbraith went

 7    to flight school with my stepfather, Alex.  And they

 8    remained friends for over 40 years.  And then, I mean,

 9    he -- he knew my mother.  And so Pat became like a father

10    figure to me.  And so he's just like a family friend.

11         Q.    And in here, it does not say that he became

12    like a father figure to you.  Correct?

13         A.    No.

14         Q.    And you would agree that this -- this is a very

15    minimal description of Pat Galbraith's role in your life.

16    True?

17                    MS. WANG:  Objection.  Form.

18                    THE WITNESS:  With -- minimal, by saying a

19    family friend?

20         Q.    BY MS. RETTS:  Well, you didn't put in here

21    that he was a father figure.  Correct?

22         A.    Well, that's my own personal feeling.  I didn't

23    write this document.

24         Q.    You didn't -- it's not in here that he managed

25    the Debra Milke defense fund.  Correct?
```

```
 1        A.    It -- it doesn't say it in that sentence, no.

 2        Q.    And you knew that he managed the Debra Milke

 3   defense fund.  Correct?

 4        A.    No.

 5        Q.    Did you know that he had an involvement with

 6   the Debra Milke defense fund?

 7        A.    I'm not sure.

 8        Q.    You knew that he sent money to you every month.

 9   Correct?

10        A.    He did.

11        Q.    He visited you regularly.  Correct?

12        A.    He visited me, yes.

13        Q.    He talked to you on the phone regularly.

14   Correct?

15        A.    We talked on the phone, yes.

16        Q.    How often did you talk on the phone?

17        A.    It varied.  I don't --

18        Q.    At least once a week?

19        A.    Well, there were some weeks when there were --

20   we didn't talk.  So I -- I -- I can't say at least once a

21   week.  I don't know.

22        Q.    How many times a month on average would you

23   talk to Pat?

24        A.    Okay.  A month on average, four.

25        Q.    How many times a month on average would you
```

1    visit with Pat where he came to prison?

2        A.   I'm -- I -- I -- I can't give you that answer

3    because in the beginning, I didn't accept visits from

4    anybody.  And then towards the end, I would take visits

5    but not every week.

6        Q.   Is it fair to say that you had more contact

7    with Pat Galbraith than you did with any other person

8    outside the prison?

9        A.   More contact than anybody outside the prison?

10       Q.   Correct.

11       A.   I don't know.  I had contact with my mother,

12   Franke.

13       Q.   Your mother didn't visit you as much as Pat

14   did, though.  True?

15       A.   Yes, correct.

16       Q.   And Franke didn't visit you as much as Pat did.

17   Correct?

18       A.   Well, I'm not -- I'm not sure because when

19   Franke was here, he would come along -- sometimes along

20   with Pat or --

21       Q.   So you may have had as much contact with Franke

22   at times as you did with Pat Galbraith.  True?

23       A.   I don't -- I don't know.  I didn't keep track

24   of it.

25       Q.   You had a lot of contact with Franke, though,

Page 332

1    also.  Right?

2         A.    By --

3         Q.    Through --

4         A.    How --

5         Q.    Through letter, through phone, through --

6         A.    Well, Franke lives in Germany.

7         Q.    Right.  But if you -- let -- let's list the top

8    five people that you had contact with while you were in

9    prison.  If you'll list them for me as top five.

10                  MS. WANG:  Objection.  Form.

11        Q.    BY MS. RETTS:  From 1998 till the time you were

12   released.

13        A.    Franke, my mother, Pat and my attorneys.

14        Q.    Can you look through this disclosure statement

15   and tell me where Franke is listed?

16        A.    Okay.  Franke is not in here.

17        Q.    You knew that Franke was the Web administrator

18   of DebraMilke.com.  Correct?

19        A.    First of all, it was DebbieMilke.com.  And I

20   don't know what -- all I know is Franke maintained it.

21        Q.    Did you ever call him your Web master?

22        A.    He used that term.

23        Q.    Did you use it?

24        A.    I may have.

25        Q.    Did you -- were you aware that Franke also

1      maintained a Facebook page for you?

2          A.    Yes, I became aware of that.

3          Q.    When did you become aware of that?

4          A.    I'm -- I'm not sure.

5          Q.    While you were in prison?

6          A.    Yes.

7          Q.    Did you ever know Franke to maintain a Twitter

8      that related to you?

9                    MS. WANG:  Objection.  Foundation.

10                   THE WITNESS:  No, I don't -- I don't know.

11         Q.    BY MS. RETTS:  Were you ever aware that Franke

12     was compiling videos to be put on the internet, You Tube

13     video clips about your case?

14         A.    I'm aware of that.

15         Q.    When did you become aware of that?

16         A.    I don't -- I don't know when.

17         Q.    While you were in prison?

18         A.    Yes.

19         Q.    Franke used his house in part as collateral for

20     your bond to bond you out.  Correct?

21                   MS. WANG:  Objection.  Foundation.

22                   THE WITNESS:  Okay.  I'm not aware of that.

23     And which house?

24         Q.    BY MS. RETTS:  Franke's house that you live in.

25     Correct?

Page 334

1          A.    I'm not aware -- I'm not aware of him using his

2    house as collateral.

3                    (Exhibit 385 was marked for identification.)

4                    MS. RETTS:  While we're at it, I'm going to

5    mark this one too.

6                    (Exhibit 386 was marked for identification.)

7          Q.    BY MS. RETTS:  I'm going to have you actually

8    start with 386.  And do you see that that is an e-mail

9    correspondence from Ms. Voepel to your mother, Pat,

10   Reinhart, Franke, Mike Kimerer dated July 9th, 2013?

11         A.    Yes.

12         Q.    And Ms. Voepel writes, "I just got off the

13   phone with Debra so she knows to" -- "what" -- "she knows

14   to expect a transfer to County jail at any time."

15                   Do you see that?

16         A.    Yes.

17         Q.    "We are glad Franke will be here tomorrow to

18   assist Pat with supporting Debra after her transfer to

19   County jail as well as to assist with bail bond

20   arrangements."

21                   Do you see that?

22         A.    Yes.

23         Q.    Were you aware of Franke assisting with bail

24   bond arrangements?

25         A.    I -- I don't recall.  I just don't recall.

Page 335

1        Q.    It says, "We may need a cash bond to supplement

2     the assignment of Franke's equity in his home, but we

3     will let everyone know if that ends up being the case."

4              Do you see that?

5        A.    Yes.

6        Q.    So did Franke assign equity in his house to you

7     for purposes of posting the bond?

8              MS. WANG:   Objection.   Foundation.

9              THE WITNESS:   To me?

10       Q.    BY MS. RETTS:   Yes.

11       A.    What does that mean?

12       Q.    Were you aware of anything relating Franke

13    assigning equity in his home to facilitate a bond for you

14    getting out?

15             MS. WANG:   Objection.   Foundation.

16             THE WITNESS:   I don't -- all -- my

17    recollection of this whole bond issue, my understanding

18    was that my mother wired money.   And Pat -- I don't know

19    anything about equity in Franke's house.

20       Q.    BY MS. RETTS:   Do you remember having any

21    conversation with Franke about how the money was going to

22    be obtained to post the bond?

23       A.    No.

24       Q.    Now I'll have you look at Exhibit 385.   And if

25    you'll turn to C056008.

Page 336

1      A.      (Witness complies.)

2              Yes.

3      Q.      And do you see that is an e-mail from Franke to

4   Daniel Benchoff, copy Michael Kimerer and you, dated

5   October 1st, 2014?

6      A.      Okay.  I see it.

7      Q.      And it says, "Dear, Daniel, Debbie and I just

8   walked through my summary of points against Levy and just

9   that.  She has no objection.  I hope this is useful to

10  you and Mr. Rake.  Please let me know if there are any

11  questions regarding this file.  With best regards,

12  Franke."

13              Do you see that?

14      A.      I do.

15      Q.      And then if you flip back to the next pages

16  through 56023, there are a bunch of collections of points

17  related to Mr. Levy and at various points in this, such

18  as 56014, there are links to DebbieMilke.com?

19      A.      Okay.  Wait a minute.  So what page are you

20  starting on?

21      Q.      So the e-mail is 56008, and there's an

22  attachment of ProsecutorialOverreaching.doc, which is the

23  documents that go behind that from 56009 --

24      A.      Okay.

25      Q.      -- to 56023.  Do you see that?

1          A.    56023.  Okay.

2          Q.    And this is what Mr. Aue was referring to, that

3     you and him went through -- that you walked through and

4     you have no objections.  Correct?

5               MS. WANG:  Objection.  Foundation.

6               THE WITNESS:  According to this e-mail, this

7     was -- gosh, I've been out a month.  No, this is a year

8     later.  God, I don't know.  I --

9          Q.    BY MS. RETTS:  You're copied on that e-mail.

10    Correct?

11         A.    It says Debra Jean, but it doesn't have my

12    e-mail address on it.  I don't know.

13         Q.    Are you disputing receiving this e-mail?

14         A.    I -- I don't --

15         Q.    Do you dispute going through the summary of

16    points with Mr. Aue?

17         A.    I don't even recall because I don't even know

18    what he's talking about.  I mean, like, I don't know what

19    he's talking about here.  Like what is this for?

20         Q.    I want you to go to 055982.  This is a July

21    1st, 2014 e-mail from Franke to Daniel Benchoff, CC Pat

22    Galbraith and you.  Do you see that?

23         A.    Yes.

24         Q.    It says, "Hello, David, Debbie told me about

25    the meeting you had with her last week.  I would love

1    help you guys if possible and I'm sure I have a few

2    results of my research to share with you which you might

3    find useful.  Debbie told me that you are looking for

4    spots of evidence that Saldate and Levy conspired against

5    Debra, and I started putting a few facts together

6    already.  But today, let me share a brief analysis with

7    you, which I call the faulty timeline."

8              Do you see that?

9        A.   I do.

10       Q.   And you received this e-mail.  Correct?

11       A.   I guess.  I don't know.  According to this, it

12   looks like it.

13       Q.   And according to this, at this time, you were

14   sharing with Franke communications that you had with your

15   lawyer and were asking for specific pieces of evidence to

16   put together to help you in the criminal -- civil case.

17       A.   Okay.  So I don't -- I don't -- I -- I recall

18   meeting -- well, he puts David, it should be Daniel.  I

19   recall meetings with Daniel and Buddy Rake.  But I don't

20   recall specifically what they were about.

21       Q.   So you may have gone back after those meetings

22   to Franke, as it states here, and asked him specifically

23   to help out looking for spots of evidence that Saldate

24   and Levy conspired against you.  True?

25       A.   I --

Page 339

1           MS. WANG:  Objection.  Foundation.

2           THE WITNESS:  You know, these are Franke's

3    words, the way he's wording things.  I don't know.  I

4    just recall giving Franke's information to my attorneys.

5       Q.   BY MS. RETTS:  You're copied on this e-mail.

6    So if you had read this e-mail and thought that anything

7    was false, incorrect or untrue, you could have chimed in

8    and responded and said, I disagree with what Franke has

9    said.  True?

10          MS. WANG:  Objection.  Foundation.

11          THE WITNESS:  I could have, yes.

12      Q.   BY MS. RETTS:  And these are e-mails we have

13   received in response to a subpoena to Mr. Rake, and he

14   did not produce any e-mails to us where you chimed in and

15   said, This is not accurate.  Do you have any recollection

16   of doing that?

17      A.   Of chiming in and responding to these e-mails?

18      Q.   Correct.

19      A.   No, I don't.

20      Q.   In that same e-mail, it also says, "I'm

21   attaching a Word file for that, but there's also a video

22   clip at http://www.YouTube," and then there's an address.

23          Do you see that?

24      A.   I do.

25      Q.   So as of July 1st, 2014, we know that you were

1    at least aware that there were video clips on YouTube.

2    True?

3        A.    I was aware of the video clips that Franke put

4    together.

5        Q.    And he actually discussed with you his idea of

6    doing that, and you agreed it would be a good idea to

7    make those YouTube clips.  Correct?

8               MS. WANG:  Objection.  Foundation.

9               THE WITNESS:  And are you talking about when

10   I was in prison?

11       Q.    BY MS. RETTS:  Yes.

12       A.    I had no idea what YouTube was.  I had no idea

13   what video clips were.  Franke maintained the Web site

14   and he had these ideas.  He just let me know what his

15   ideas were.  I had no clue what he was talking about.

16   And so --

17       Q.    But Franke followed your directions, though.

18   So if you had said, Franke, I don't like that idea, don't

19   do it, then you would have expected him to follow through

20   with your desires.  Correct?

21               MS. WANG:  Objection.  Foundation.  Form.

22               THE WITNESS:  In pri- -- when I was sitting

23   in prison, I didn't have -- I didn't know what the

24   internet was, didn't know what a Web site was, didn't

25   know what it looked like.  I didn't know what YouTube

1    was.  He -- he had all these ideas.

2              He was an advocate for me, and all he wanted

3    to do was put things out there, and I don't know what --

4    he had an idea of video clips on YouTube.  He had idea

5    about a Web site.

6        Q.    BY MS. RETTS:  And he expressed to you his

7    ideas that he had to advocate for you to the outside

8    world.  Correct?

9        A.    That he had to?

10       Q.    That he had.  He said he had ideas and he would

11   communicate to you that he had these ideas that he wanted

12   to use to spread awareness about you.  Correct?

13       A.    He -- sometimes he shared his ideas and other

14   times he didn't.

15       Q.    How do you know that he didn't share your

16   ideas?  Did you come to learn that after the fact?

17              MS. WANG:  Objection.  Form.

18              THE WITNESS:  No.  I mean, Franke was his

19   own person.  He just did his own thing.

20       Q.    BY MS. RETTS:  But I'm trying to figure out.

21   You said sometimes he would share ideas and sometimes he

22   wouldn't.  Usually when you find out that someone didn't

23   share something with you, it's because later on, you

24   discover that it happened.

25       A.    Well, okay.  I'll give you an example.  After I

Page 342

```
1    got out of prison, he told me about -- I don't know the
2    right terminology.  But he -- what's the terminology?  He
3    could tell me how many people viewed the Web site.  And
4    he -- those are things he -- I didn't know about in
5    prison.  He just -- he just did his own thing.  I had no
6    control over any of this.
7        Q.    You don't think if you would have said, Franke,
8    don't put things on the internet that he wouldn't have
9    followed your desires?
10               MS. WANG:  Objection.  Foundation.  Form.
11               THE WITNESS:  I didn't know what the
12   internet was.  I didn't know what it looked like.  I
13   didn't know what was going out there.
14       Q.    BY MS. RETTS:  Did you ever look at the Debra
15   Milke -- or DebbieMilke.com Web site?
16       A.    No.
17       Q.    Never?
18       A.    Never.
19       Q.    Did you ever look at printouts of it?
20       A.    Some.
21       Q.    When?
22       A.    Well, like this -- what you just had me look
23   at, that looks familiar.
24       Q.    Did you ever watch the YouTube video clips?
25       A.    No.
```

Page 343

1      Q.    Not parts of them ever?

2      A.    None.

3      Q.    You knew they existed, though?

4      A.    I knew they existed.

5      Q.    Will you turn to 55971.  That's an e-mail from

6   April 15th, 2014 from Sabine King to Daniel Benchoff, and

7   it looks to be a message.  It says, "Franz Aue called

8   from Germany to speak with you and introduce himself, and

9   I told him you would probably be out most of the day at

10  depo.  I asked if he wanted to leave a voice" -- "vm,"

11  voice mail, "or if he wanted your e-mail, and he said he

12  would call back in the AM.  His e-mail is

13  webmaster@DebbieMilke.com."

14            Do you see that?

15     A.    Yes.

16     Q.    "He actually called back a little bit ago to

17  see if you had gotten back from your depo and Debbie

18  spoke to him, and he will call you in the AM."

19            Do you see that?

20     A.    I do.

21     Q.    So as -- at least as of April 15th, 2014, you

22  had had contact with Mr. Rake and Mr. Benchoff for

23  purposes of initiating a civil case.  True?

24            MS. WANG:  Objection.  Foundation.

25            THE WITNESS:  I don't -- I don't -- I just

Page 344

1    know about a deadline for a notice of claim, but I -- I

2    think that was in 2014.  I don't know.

3        Q.    BY MS. RETTS:  Tell me what you remember about

4    the deadline for notice of claim.

5        A.    I just know about -- there was -- after my

6    release --

7                MS. WANG:  Wait.  Can we -- I'm going to

8    object to having you discuss any attorney/client

9    communications with Benchoff or Rake.  But if we could

10    just go off the record and confer, I don't -- I don't

11    know what she's going to say.  So --

12                MS. RETTS:  Okay.

13                MS. WANG:  -- we may not have a problem.

14                THE VIDEOGRAPHER:  We're going off the

15    record.  The time is 2:18 p.m.

16                (A recess was held off the record.)

17                THE VIDEOGRAPHER:  We're back on the record.

18    The time is 2:21 p.m.

19                (The last question was read back by the

20    court reporter.)

21                THE WITNESS:  My understanding is it had to

22    be filed within a year from the date of the 9th Circuit

23    opinion.

24        Q.    BY MS. RETTS:  Did you assist in any way in

25    gathering information or documents or in preparing the

Page 345

1      notice of claim?

2          A.    I don't know.

3          Q.    If you'll turn to C56037 in Exhibit 385,

4      please.  And do you see that that's an e-mail exchange

5      between Franke and Daniel Benchoff?

6          A.    Yes.

7          Q.    Dated January 13th, 2015?

8          A.    Yes.

9          Q.    And in the middle of it, Daniel Benchoff

10     actually writes to Franke, CC Buddy Rake, "Hi, Franke,

11     you as well, and thanks.  I was literally just a second

12     ago talking about you with Debra.  We're sending you the

13     current draft of the civil complaint today."

14             Do you see that?

15         A.    Yes.

16         Q.    And then he responds and says, "I know.  I'm

17     talking to her on Skype."

18             Do you see that?

19         A.    Yes.

20         Q.    So you were aware that your civil attorneys

21     were sending Mr. Aue a copy of the complaint, correct,

22     the current draft of the complaint?

23         A.    Well, Franke was -- like I said, he was an

24     advocate for me, and he was part of my legal team.

25         Q.    And did you consider him a part of your legal

Page 346

1    team for purposes of the civil case as well?

2        A.   Well, Franke still is an advocate for me and a

3    part of my -- with NSB -- well, with NSB, I just -- like

4    I said yesterday, I gave NSB Franke's contact information

5    and his contact information to -- vice versa.  I did --

6        Q.   At the time of this e-mail with Mr. Benchoff,

7    you knew that Franke was receiving a copy of the draft of

8    the civil complaint to act in a capacity as an advocate

9    for you.  Correct?

10               MS. WANG:  Objection.  Foundation.

11               THE WITNESS:  Well, I don't recall this

12   e-mail.  I -- I don't recall this e-mail.  But I -- I

13   just -- I can't guess because I just can't recall.

14       Q.   BY MS. RETTS:  All right.  I want you to turn

15   to the next page, C056038.  That is a January 13th, 2015

16   e-mail from Daniel Benchoff to Frankie, CC DebJ@ --

17   DebJ@post.com.  Do you see that?

18       A.   Yes.

19       Q.   And that is your e-mail address.  Correct?

20       A.   Yes.

21       Q.   And the subject is "Debra Milke, first draft of

22   civil complaint."

23               Do you see that?

24       A.   Yes.

25       Q.   In attachments, it says "Milke complaint, first

Page 347

1    draft."

2                Do you see that?

3        A.    Yes.

4        Q.    Ad it says, "Frankie, attached is the most

5    recent rough draft of the complaint.  We're just about

6    there but need to consider adding additional claims and

7    defendants and do further research.  Typos, grammar,

8    wording issues will be addressed going forward."

9                Do you see that?

10       A.    I do.

11       Q.    And then if you go before -- go later after

12   this, from 56039 to 56093, that is a copy of the civil

13   complaint draft.

14       A.    Okay.

15       Q.    So you knew because you were copied on e-mail

16   that your civil attorneys provided Franke with a copy of

17   the draft of the civil complaint.  Correct?

18       A.    It appears that way, yes.

19       Q.    Did you delete this e-mail from your e-mail?

20       A.    I don't know.

21       Q.    Is it possible you did?

22       A.    It is.

23       Q.    If you'll turn to C056095.

24       A.    Yes.

25       Q.    And that is an e-mail from Franke to Daniel

1    Benchoff, CC Debra Jean, which is you.  Do you see that?

2         A.    Yes.

3         Q.    And that's dated January 13th, 2015.  Do you

4    see that?

5         A.    Yes.

6         Q.    And Franke writes back, "Hi, Daniel, this is a

7    great complaint and reads very strong.  I understand that

8    you guys tried to avoid Scott and his statements since he

9    was not part of the recent developments in Debra's case,

10   huh?  Okay.  Just some minor annotations, if I may."

11              Do you see that?

12        A.    Yes.

13        Q.    And then he goes on to provide some input that

14   he has about the draft of the complaint.  Do you see

15   that?

16        A.    Yes.

17        Q.    You received this e-mail and were aware that

18   Franke was involved in the drafting of the civil

19   complaint.  Correct?

20        A.    I don't know.

21        Q.    It says, "I understand that you guys tried to

22   avoid Scott."

23              What do you understand that to mean?

24              MS. WANG:  Objection.  Foundation.

25              THE WITNESS:  I have no idea what he means

Page 349

1    by that.

2        Q.    BY MS. RETTS:  Are you aware that Scott gave a

3    statement implicating you in Christopher's murder?

4                 MS. WANG:  Objection.  Foundation.

5                 THE WITNESS:  Yes, I'm aware of that.

6        Q.    BY MS. RETTS:  Do you -- did you delete this

7    e-mail from your e-mail?

8        A.    I don't know.

9        Q.    Is it possible that you did?

10       A.    It's possible.

11       Q.    Why would you have deleted it and not saved it?

12       A.    Back in 2015, I'm not -- I'm not -- the only

13   thing I can say is that clean -- free up space.  I mean,

14   I -- I don't know.

15                 (Exhibit 387 was marked for identification.)

16                 MS. RETTS:  387.

17                 THE WITNESS:  This is 387.

18       Q.    BY MS. RETTS:  These are some e-mails we

19   received from Jana Bommersbach through her attorney.

20       A.    Okay.

21       Q.    And if you will turn to JB002.  And there is an

22   e-mail on December 27th, 2018 --

23       A.    Yes.

24       Q.    -- from Franke Aue.

25       A.    Yes.

Page 350

```
 1        Q.    And it says, "Hello, dear Jana, so this is my
 2   usual private e-mail address.  Deb just wanted to let you
 3   know that she cannot contact you directly.  I guess you
 4   probably heard what's going on, Franke."
 5               Do you see that?
 6        A.    I do.
 7        Q.    Have you reviewed this e-mail in preparation
 8   for your deposition?
 9        A.    I have.
10        Q.    Did you reach out to Franke and ask him to
11   contact Jana?
12        A.    When?
13        Q.    In connection with this e-mail, it says, "Deb
14   just wanted to let you know that she could not contact
15   you directly."
16               Did you reach out to Franke and tell him to
17   let Jana know that you could not contact her directly?
18        A.    I don't know what he means by that.  I have --
19   I just -- I don't know what he means by that.
20        Q.    Did you feel like you couldn't contact Jana
21   directly?
22               MS. WANG:  Objection.  Foundation.
23               THE WITNESS:  When?
24        Q.    BY MS. RETTS:  At the time that this e-mail was
25   sent around December 27th, 2018.
```

Page 351

1      A.    Did I feel that I couldn't contact her?

2      Q.    Correct.

3      A.    Um, I felt that I shouldn't contact her.

4      Q.    Why?

5      A.    Because -- being subpoenaed.

6      Q.    So you understood that Ms. Bommersbach had

7   received a subpoena.  True?

8      A.    Yes.

9      Q.    After learning that, did you call Mr. Aue and

10  tell him that you knew that?

11     A.    I don't know if I phrased it that way.

12     Q.    Did you ever have a conversation with Mr. Aue

13  about Ms. Bommersbach receiving a subpoena?

14     A.    I don't think so.

15     Q.    Did you ever have a conversation with Mr. Aue

16  about passing a message on to Ms. Bommersbach?

17     A.    Passing a message?  No.

18     Q.    Did you ever ask Mr. Aue to contacted Jana on

19  your behalf?

20     A.    No.

21     Q.    You think -- do you think that Mr. Aue did this

22  on his own, reaching out to Ms. Bommersbach and stating,

23  "Deb just wanted to let you know that she cannot contact

24  you directly"?

25              MS. WANG:  Objection.  Foundation.  Form.

Page 352

```
 1              THE WITNESS:  I don't know what Franke
 2    decided to do.
 3              (Exhibit 388 was marked for identification.)
 4         Q.   BY MS. RETTS:  Exhibit 388 is an e-mail
 5    exchange between Franke, Ms. Voepel and Mr. Kimerer dated
 6    July 18th, 2012.  Do you see that?
 7         A.   Yes.
 8         Q.   And Franke writes, "Yep, right.  I hope you had
 9    a good visit with her.  I'll also share that e-mail
10    conversation with Debbie in my next letter to her.  In
11    fact, she was asking me repeatedly if the findings I'm
12    addressing would help Jim too.  She's always had a hard
13    time to think Jim that could have ever done something to
14    Chris."
15              Do you see that?
16         A.   I do.
17         Q.   Do you remember having a conversation with
18    Franke where you asked him about whether his research
19    could help Jim?
20         A.   I don't recall.  It's possible, but I just
21    don't recall today.
22         Q.   Could you have had communications with him in
23    writing about Jim Styers and whether Franke's research
24    could help Jim?
25         A.   I don't know.
```

Page 353

1      Q.    Do you agree that you've always had a hard time

2   thinking that Jim could have ever done something to

3   Chris?

4      A.    Always -- at -- there were times when -- I -- I

5   don't know if I would say always because there were --

6   there was a period of time when I thought maybe he did.

7   But it just -- over the years, I just went back and forth

8   because I don't know for sure.

9      Q.    Now, Mr. Aue also mentions that he's going to

10  share an e-mail conversation with you in his next letter.

11  Do you see that?  "I'll share that e-mail conversation

12  with Debbie in my next letter to her."

13               Do you see that?

14               MS. WANG:  Objection.  Form.

15               THE WITNESS:  So Fra- --

16               MS. WANG:  Foundation.

17               THE WITNESS:  So Franke is writing an e-mail

18  to Lori.  I don't know what he's talking about here.

19     Q.    BY MS. RETTS:  And one of the reasons why we

20  don't know what Franke's talking about here is because

21  you shredded all of the letters that Franke sent to you.

22  Correct?

23               MS. WANG:  Objection.  Foundation.  Form.

24               THE WITNESS:  And yes, that's true.  And I

25  did that in 2013 before any of this.

Page 354

1      Q.     BY MS. RETTS:  So if we had the letters from

2      Franke Aue, we could go back and match them up with these

3      e-mails and figure out what he was talking about.  Would

4      you agree?

5                   MS. WANG:  Objection.  Foundation.  Form.

6                   THE WITNESS:  I don't know.

7      Q.     BY MS. RETTS:  Franke Aue communicated

8      important messages to you in his letters that he sent to

9      you.  Correct?

10                  MS. WANG:  Objection.  Form.

11                  THE WITNESS:  I don't recall ever -- all

12     that he talked to -- I don't recall everything he talked

13     to me about.

14     Q.     BY MS. RETTS:  Did he share information in his

15     letters to you about things that he had discovered about

16     your criminal case while doing his research?

17                  MS. WANG:  Objection.  Foundation.

18                  THE WITNESS:  Yes, I recall him writing

19     about that.

20     Q.     BY MS. RETTS:  And you received letters from

21     Franke and read them.  So if you read a letter from

22     Franke, you'd know what was in there, correct, to the

23     best of your memory?

24                  MS. WANG:  Objection.  Form.

25                  THE WITNESS:  To the best of my memory, yes.

Page 355

1          Q.    BY MS. RETTS:  Franke also shared information

2     with you in written correspondence about what he was

3     doing with the Web site.  Correct?

4          A.    At times, yes.

5          Q.    He shared things in written correspondence with

6     you about what he was doing with film clips and YouTube.

7     Correct?

8          A.    He --

9                MS. WANG:  Objection.  Foundation.  Form.

10               THE WITNESS:  He -- not all the time because

11    I had no understanding of what he was talking about.

12         Q.    BY MS. RETTS:  Without those letters, we can't

13    know what Franke shared with you.  Correct?

14               MS. WANG:  Objection.  Foundation.  Form.

15               THE WITNESS:  When I got out in 2013, there

16    was no reason -- I didn't see any relevance of keeping

17    Franke's letters that he wrote to me.  I talked to him on

18    the phone.

19         Q.    BY MS. RETTS:  You intended to file a lawsuit

20    when you got out of prison.  Correct?

21               MS. WANG:  Objection.  Foundation.

22               THE WITNESS:  Well, that was -- yes.  That

23    was -- that was something I wanted to do, yes.

24               MS. RETTS:  Just need to take a quick

25    bathroom break.

Page 356

1              THE VIDEOGRAPHER:  We're going off the

2    record.  The time is 2:40 p.m.

3                   (A recess was held off the record.)

4              THE VIDEOGRAPHER:  We're back on the record.

5    The time is 2:50 p.m.

6                   (Exhibit 389 was marked for identification.)

7                   (Exhibit 390 was marked for identification.)

8       Q.    BY MS. RETTS:  All right.  We're ready.

9       A.    So on the -- I don't know -- okay.  The Bates

10   number, it's -- this is back to an e-mail you were

11   talking about.  So 056095.

12      Q.    Okay.

13      A.    So I -- I looked at my own e-mail and this -- I

14   did -- it's in my e-mail.  I did not delete it.

15      Q.    Okay.

16      A.    So you -- you already -- you already have this

17   from my e-mails.

18              MS. RETTS:  Do you know what Bates number it

19   was produced as?

20              MS. WANG:  It was in a PST for -- at least.

21   It might have been produced a couple of times, but it

22   definitely was in a PST of all her DebJ@post.com e-mails.

23   So I wouldn't have a Bates number, I'm pretty sure.  I

24   can confirm.  I can look afterwords and see if --

25              MS. RETTS:  Yeah, if you'll confirm that it

1    was produced.

2              MS. WANG:  I mean, it would have definitely

3    been in the PST, but it might also been produced as a PDF

4    with a Bates number.

5              MS. RETTS:  There's not a lot of e-mails

6    going back this far.  Most of the e-mails are '18/19.  So

7    can you just confirm that that's the case?

8              MS. WANG:  In the PST?

9              MS. RETTS:  In the PSTs.

10             MS. WANG:  Okay.

11        Q.    BY MS. RETTS:  All right.  I'm going to have

12   you take a look what's been marked as Exhibit 389.

13        A.    Yes.

14        Q.    This is a document that came off of Mr. Aue's

15   hard drive.  It's a letter from you to Norm, "hello,

16   Norm," dated February 4th, 2013.  Who is Norm?

17        A.    Oh, he could have been a supporter.

18        Q.    Does the name Norm ring a bell to you at all?

19        A.    Norm?

20        Q.    With -- with a last name at all?

21        A.    He -- he could have been a supporter.  I

22   don't -- I don't -- I can't recall right this minute.

23        Q.    On the second page, it says, "I appreciate your

24   offer to order books for me.  I have two titles in mind,

25   would love to have these books."

Page 358

1          Do you see that?

2     A.    I do.

3     Q.    Do you remember Norm sending books to you?

4     A.    I don't recall.

5     Q.    And then you go on, you say, "My friend Franke,

6  who maintains my Web site, shared with me the e-mail

7  exchanges between the two of you."

8          Do you see that?

9     A.    I do.

10    Q.    How would Franke have shared the e-mail

11 exchanges that he had with Norm with you?

12         MS. WANG:  Objection.  Form.  Foundation.

13         THE WITNESS:  He -- he could have -- he

14 could have done it in person at a visit.  I don't know.

15    Q.    BY MS. RETTS:  Is that something that he could

16 have sent you in hard copy, the e-mail exchanges printed

17 out?

18    A.    It's possible.  I don't know.

19    Q.    And in 2013, you're telling norm that "Franke

20 maintains my Web site."  Correct?

21    A.    That's what it says here, yes.

22    Q.    And if you'll turn to Exhibit 390.

23    A.    Yes.

24    Q.    This is also a document that came from Franke's

25 hard drive.

Page 359

1          A.     Okay.

2          Q.     If you'll turn to the second page, second page

3     appears to be a letter dated July 4th, 2011.  Do you see

4     that?

5          A.     I do.

6          Q.     And at the bottom, it says -- and it's to Pat,

7     and at the bottom, it says, "I'm including a copy of my

8     message to be posted online so you can read it for

9     yourself."

10                Do you see that?

11         A.     I do.

12         Q.     And those are your words?

13         A.     Yes.

14         Q.     And you go on to say, "After I mailed

15     everything to Franke, I thought of one other thing to

16     add.  The words highlighted in blue as well as the comma

17     need to be added to that sentence.  Franke does not have

18     this revised sentence.  When he receives my letter,

19     please let him know about the revisions before he posts

20     the message online."

21                Do you see that?

22         A.     I do.

23         Q.     And then the first page of this through the

24     second page appear to be the message that you wrote

25     intending to post online.  Do you recognize that?

1      A.    I do.

2      Q.    So at this time, in July of 2011, you wrote a

3   statement and sent it intending for it to be posted

4   online.  Correct?

5      A.    I don't know if you can put these two together.

6   I -- I -- I don't know if you can put these two documents

7   together.

8      Q.    If you don't put them together, you still

9   wrote, "I e-mailed everything to Franke and I thought of

10  something to add before he posts the message online," and

11  you've made some changes.  Correct?

12          So there was something that you sent to Pat

13  with changes and asked for it to be posted online.  True?

14     A.    This first page I recognize.

15     Q.    What do you recognize it as?

16     A.    Because it was important to me.  I received so

17  much support of mail from all over, and it was very

18  important to me.  I couldn't possibly thank everybody.

19  And so I put this together, and I sent it to Franke and I

20  wanted him to post it so everybody could read it.

21     Q.    So this statement here, the first and second

22  pages, you sent to Franke for the purpose of posting it

23  online.  Correct?

24     A.    Yes.

25     Q.    And when you say posting online, did you have a

1    belief that it would be posted on your Web site?

2         A.    Yes.

3         Q.    The big binder, this one --

4         A.    Uh-huh.

5         Q.    -- what's the big binder?  What's the exhibit

6    on the front just so we have a clear record, the number?

7         A.    363.

8         Q.    Okay.  So 363.  If you'll turn to 5097 through

9    98.

10        A.    509?

11        Q.    Yes.  5097.  And do you see that is a letter

12   written 5/15/2006?

13        A.    Yes.

14        Q.    To Pat.  True?

15        A.    Yes.

16        Q.    And in the bottom section, it says, "Okay, Pat,

17   I need you to e-mail Franke and tell him to please remove

18   from my Web site that stuff on there about my graying

19   hair.  I was so shocked when someone told me about that.

20   My hair issue is a sensitive subject to me and something

21   I don't wish to share with the world.  Besides, what the

22   hell does it have to do with this miscarriage of justice?

23   It makes me wonder what other personal stuff he posted

24   for the world to see."

25                Do you see that?

1      A.    I do.

2      Q.    Then you go on to say, "Please tell him to

3  remove that from my site."

4            Do you see that?

5      A.    Well, I go on to say, "I don't want anyone's

6  pity."

7      Q.    And then after that, you say, "Please tell him

8  to remove that from my site."

9            Correct?

10     A.    Yes.

11     Q.    And those are your words.  True?

12     A.    Yes.

13     Q.    So you became aware at some time around May

14  15th of 2006 that there was information on the Web site

15  about your graying hair.  Correct?

16     A.    According to this letter, yes.

17     Q.    And then you, in response, asked Pat to e-mail

18  Franke to take it off the Web site.  True?

19     A.    Yes.

20     Q.    And you said, "Take it" -- "Remove from my Web

21  site."

22            Correct?

23     A.    That's what it says here, yes.

24     Q.    And when you became aware about information you

25  didn't like on the Web site, you asked that it be

1    removed.  Correct?

2         A.    I only became -- I only recall becoming aware

3    of this.

4         Q.    Will you turn to 5252.

5         A.    (Witness complies.)

6         Q.    That last letter that we looked at, did you

7    review that in preparation for your deposition?

8         A.    What last -- the one we just reviewed?

9         Q.    Correct.

10        A.    Yeah, I saw that in the -- I saw that in the --

11    yes.

12        Q.    And actually, if you'll turn one page back to

13    5251.

14        A.    Yes.

15        Q.    Actually, looks like 5250 is the date of the

16    letter.  It says 3/16/08.

17        A.    Yes.

18        Q.    Do you see that?

19        A.    Yeah.

20        Q.    It says "Hi Pat"?

21        A.    Yes.

22        Q.    It's a letter from you to Pat?

23        A.    Yes.

24        Q.    And if you'll turn back to 5252.

25        A.    Yes.

Page 364

1      Q.    It says, at the very bottom sentence, "I've

2   been hearing that my Web site is down.  Is Franke putting

3   the brief on there?"

4             Do you see that?

5      A.    Oh, yes.

6      Q.    So someone also communicated to you when your

7   Web site was down.  Correct?

8      A.    Yes.

9      Q.    And you were asking about whether specific

10  information was going to be posted on the Web site here,

11  the brief.  Do you see that?

12     A.    Yes.

13     Q.    You also asked at one point if the Web site was

14  going to have the address that people can go to in order

15  to hear the 9th Circuit oral arguments.

16     A.    Where are you reading that from?

17     Q.    Do you remember doing that?

18     A.    Wait.  Where are you reading from?

19     Q.    I'm asking you do you, in your memory, remember

20  asking Franke -- asking Pat if Franke was going to post a

21  link for people to view the 9th Circuit oral argument on

22  the Web site?

23             MS. WANG:  Objection.  Foundation.

24             THE WITNESS:  I don't recall.

25     Q.    BY MS. RETTS:  Is that something you may have

1   done?

2        A.   I -- it's possible.  I just don't recall.

3        Q.   If you'll turn to 5050, you'll see that is a

4   letter from you to Pat dated 6/25/06.

5        A.   Yes.

6        Q.   Do you see that?

7        A.   Yes.

8        Q.   And in the second paragraph, it says, "As I

9   told you on the phone, I got an interview request from

10  The Women's Entertainment Network.  They are doing a

11  documentary on women with a death sentence.  I agreed to

12  speak with them but not for the purpose of participating

13  in their documentary.  I want to alert them of my

14  wrongful conviction and direct them to my Web site."

15            Do you see that?

16       A.   I do.

17       Q.   And those are your words.  True?

18       A.   Yes.

19       Q.   And you wanted to, according to this, speak to

20  a media outlet to direct them to your Web site for more

21  information about your case.  True?

22       A.   That's --

23            MS. WANG:  Objection.  Foundation.

24            THE WITNESS:  That's what it appears to be.

25            (Exhibit 391 was marked for identification.)

1              MS. RETTS:  This is Exhibit 391.

2              THE WITNESS:  Do you have it?  Do you have

3      it?

4              MS. RETTS:  It's coming around.

5              MS. BERKE:  Is this 391?

6              MS. RETTS:  Yeah.

7              MS. BERKE:  Thank you.

8         Q.   BY MS. RETTS:  Do you have it now?  Do you have

9      a copy of it?

10        A.   391.

11             MS. WANG:  Yeah, yeah.

12        Q.   BY MS. RETTS:  Okay.  All right.  This is an

13     e-mail exchange occurring around June 28th, 2002 with

14     Franke, some parts of it are with Lori Voepel, Pat

15     Galbraith, your mother.  Do you see that?

16        A.   I do.

17        Q.   And there's a section in the middle that says,

18     "Hi, Lori, I received a copy of the letter which Debbie

19     has sent to Mark this week.  I'm sending it to you

20     parallel via fax.  She wrote to me about it."

21             Do you see that?

22        A.   I do.

23        Q.   And this appears to be an e-mail from Franke to

24     Lori Voepel about a letter that you sent to Mark which he

25     also had a copy of.  Do you see that?

Page 367

1       A.     Well, I'm -- I'm -- what are you referring to?

2    Yes, I'm -- I see this.

3       Q.     Okay.  And he's quoting from your letter that

4    says, "The sad part about it and why I know he'll react

5    because I'll see him being victimized" -- okay.  Strike

6    that.

7              It looks like he then quotes from a letter

8    that you sent to Franke explaining the letter that you

9    sent to Mark.  Do you see that?

10             It says, "She wrote to me about it.  I have

11   received a copy of the letter which Debbie has sent to

12   Mark this week.  I'm sending it to you parallel via fax.

13   Then she wrote to me about it."  And there's a section in

14   quotes that says, "The sad part about it and why I know

15   he'll react is because he'll see himself as being

16   victimized by the police and not because I laid out the

17   facts about Chris in speaking about that.

18             "If Mark should contact Lori to get the

19   facts and starts talking about suing Saldate under

20   Phoenix PD, ask her to talk to him about waiting on that

21   until I get out.  I don't want Saldate or the Phoenix PD

22   to get the heads up that a lawsuit is imminent.  Mark can

23   file his own after I'm out or join mine.  But I don't

24   want him to pursue anything while I'm still in here.

25             "So I don't think he will react and make

Page 368

1    contact with either you or Lori.  Send Lori a copy of the

2    letter and also to my mom.  Okay?"

3                    Do you see that?

4        A.    I do.

5        Q.    Do you remember writing a letter to Frank Aue

6    about Mark Milke and you didn't want Lori Voepel talking

7    to him about you suing Saldate and the Phoenix PD?

8        A.    No, I don't -- I don't recall any of this.

9    I -- I only recall writing Mark a letter in -- in 2002.

10       Q.    And in the letter that you wrote to Mark, you

11   actually asked him to contact your Web master, Franke.

12   Correct?

13       A.    I don't remember exactly what I wrote.

14       Q.    Could you have written that you wanted him to

15   contact, quote, my Web master?

16       A.    I -- I don't -- I don't remember exactly what I

17   wrote.

18       Q.    You see if you flip through to L&L02 -- 03090,

19   a couple more pages in.

20       A.    Wait a minute.  Where are you at?

21       Q.    In the same document --

22       A.    Yes.

23       Q.    -- it's 23090.  There's a couple numbers on it.

24       A.    230 -- okay.  23090.

25       Q.    Yes.

1                And there's another e-mail from Franke to

2       Lori Voepel where he says, "Hello, Lori, we had this

3       issue back in April.  However, Debbie came up with this

4       again in her most recent letter to me.  You didn't

5       mention to me if you were talking about it to her on the

6       phone, but I'd like to let you know what she told me in

7       this letter."

8                Do you see that?

9       A.    I do.

10      Q.    And then there is a long quote that goes on for

11      about a page that appears to be Frankie quoting from a

12      letter you sent to him.  And in the middle of it, it

13      says, "I have to be careful at this stage with how I say

14      things to Mark.  The other day when Lori and I talked,

15      she asked me about the photo albums of Christopher.  She

16      said she'd heard that there were lots of happy pictures

17      taken of Chris and me and Mark.  I told her this was true

18      and that Mark had the albums but refused to give me some

19      pictures.

20               "Lori was bummed and said it would be nice

21      if we could show some of those to Judge B.  Well, my mind

22      start thinking about the letter I've been working on for

23      Mark.  If I can pique his curiosity or interest without

24      appearing manipulative, he just may try to contact Lori

25      or my Web master (you).  I will make a suggestion to him

1    to contact the Web master of my Web site or Lori if he

2    wants documents made available to him.

3            "The thing is is that once he makes the

4    contact, you or Lori can reel him in.  By then, you know

5    he'll want to know the facts.  If he listens, who knows.

6    He may try to help me and actually share some of those

7    pictures, which Lori could use when she files my reply

8    brief."

9            Do you see that?

10       A.   I do.

11       Q.   Do you remember writing that to Frankie?

12       A.   I don't remember writing this to Frankie.  But,

13    you know, this -- this sounds familiar to me.

14       Q.   And you remember devising a plan potentially to

15    contact Mark, reach out to him and ask him to contact

16    your Web master of your Web site?

17       A.   Well, I wouldn't -- I wouldn't characterize it

18    as like devise -- or devising a plan.  It's just that in

19    2002, I wrote a letter to Mark and I don't -- I don't

20    recall exactly what I wrote to him.  But I didn't know

21    what his -- how his reaction would be.  So, I mean, I --

22    I don't -- I don't -- I don't recall this specifically.

23    But --

24       Q.   Do you have a reason to dispute that you wrote

25    what Mr. Aue puts in quotes and attributes to you?

Page 371

```
 1        A.    No.

 2        Q.    How many times did Jana Bommersbach visit you

 3   in prison?

 4        A.    My recollection is a couple times.  That's my

 5   recollection.

 6        Q.    How many is a couple?

 7        A.    Two.

 8        Q.    Did she visit you in jail?

 9        A.    When I -- after I won my appeal?  Are you

10   talking about --

11        Q.    When you were housed in the Maricopa County

12   Jail.

13        A.    I don't remember.  It's possible.  I just

14   don't -- I just don't recall.

15              (Exhibit 392 was marked for identification.)

16        Q.    BY MS. RETTS:  This is Exhibit 392.  This is a

17   visitation --

18        A.    Log.

19        Q.    -- log that has visits listed.  Do you see

20   that?

21        A.    I do.

22        Q.    And these are visits for you, Debra Milke?

23        A.    Yes.

24        Q.    And do you recognize your inmate number as

25   083533?
```

Page 372

```
 1        A.    I do, yes.  That's the number.

 2        Q.    At this time in April through -- well, this

 3   looks like visits from July of 2013 -- or April of '13 --

 4   do you need to take a break?

 5        A.    No.  I just -- I just want to get through this.

 6        Q.    This appears to be visits from April of 2013 to

 7   July --

 8        A.    July.

 9        Q.    -- of 2013.  Would you have been housed at this

10   time in Perryville?

11        A.    Yes.

12        Q.    So you were visited by Mr. Aue on April 15th

13   and April 22nd.  Correct?

14        A.    That's what it -- that's what it shows here.

15        Q.    And then again on April 29th.  Correct?

16        A.    Yes.

17        Q.    And Ms. Bommersbach visited you on April 22nd,

18   2013.  True?

19        A.    That's what it says here.

20        Q.    And it says, "Beginning time 8 o'clock" --

21   "8:04.  End time, 12:02."

22        A.    Yeah.  Our visits were four hours.

23        Q.    So you had a four-hour visit with

24   Ms. Bommersbach on April 22nd, 2013.  True?

25        A.    That's what it says here, yes.
```

Page 373

1      Q.    You then had a visit with Ms. Bommersbach on

2   May 6th, 2013.  Correct?

3      A.    Yes.

4      Q.    And it says, "Begin time 8 o'clock.  End time,

5   12:13."

6              Do you see that?

7      A.    Yes.

8      Q.    So that was four hours for the visit?

9      A.    Yes.

10      Q.    You then had a visit with Ms. Bommersbach on

11   May 20th, 2013.  Do you see that?

12      A.    Yes.

13      Q.    And that visit was from 8:28 to 12:06.  Do you

14   see that?

15      A.    Yes.

16      Q.    So approximately three and a half hours?

17      A.    Yes.

18      Q.    And then you had a visit with Ms. Bommersbach

19   on June 3rd, 2013.  Do you see that?

20      A.    Yes.

21      Q.    And it is from 7:13 to 10:26.  Do you see that?

22      A.    Yes.

23      Q.    So around a three-hour visit there.  Do you see

24   that?

25      A.    Yes.

1      Q.    So as reflected upon -- on this document, you

2   had visits with Ms. Bommersbach --

3      A.    Four times.

4      Q.    -- four times for a total of 14 and a half

5   hours.

6      A.    Yeah.  I just -- I just remember a couple times

7   coming to the prison.

8      Q.    Whose idea was it for Ms. Bommersbach to write

9   a book?  Was that something that started with you?

10     A.    Yes.

11     Q.    And you reached out to your attorney

12  Mr. Kimerer and asked him to put some feelers out for

13  Ms. Bommersbach?

14             MS. WANG:  Objection.  Form.  Foundation.

15             THE WITNESS:  It's not -- not quite like

16  that.  I had -- over the years, I had watched her on TV.

17  I watched her on PBS.  I just always thought that she was

18  very object- -- objective.  She didn't come across as

19  sensationalistic.  She appeared to have integrity, and

20  one day, I asked Mike if he knew her.  And he said yes,

21  that he knew her.  And I said, Well, if -- if this story

22  is to be told, I would want someone like her to tell it.

23             And I said, If you can, can you just ask her

24  if she's interested, if she ever would be interested.

25  And that's what he did.  And then that's how I met her,

1      was through Mr. Kimerer.

2           Q.    Did you first start corresponding with

3      Ms. Bommersbach or was the first thing -- contact you had

4      with her in a visit?

5           A.    I'm not sure.

6           Q.    Did you correspond with Ms. Bommersbach when

7      you were in prison?

8           A.    I don't remember.

9           Q.    Is it possible?

10          A.    It is.

11          Q.    Did you talk with Ms. Bommersbach on the

12     telephone while you were in prison or jail?

13          A.    Um, I don't remember.

14          Q.    Did Ms. Bommersbach ever come with your

15     attorneys to have a visit with you?

16          A.    With my attorneys as a part of a legal visit?

17          Q.    Yes.

18          A.    No.

19          Q.    Were your attorneys ever present when you had a

20     visit with Ms. Bommersbach?

21          A.    In prison -- in --

22          Q.    In prison or jail.

23          A.    No, I -- I don't think so.

24          Q.    You exchanged e-mail with Ms. Bommersbach after

25     you were released from prison.  Correct?

Page 376

1      A.     It's possible.  I just don't recall.

2      Q.     Did you go lunch with Ms. Bommersbach after you

3   were released from prison?

4      A.     I've had lunch with her, yes.

5      Q.     Have you had dinner with Ms. Bommersbach?

6      A.     I have.

7      Q.     How many times have you had lunch with her?

8      A.     I don't know.

9      Q.     More than one?

10      A.     It's possible, yes.

11      Q.     How many times have you had dinner with her?

12      A.     I don't know.

13      Q.     More than one?

14      A.     It's possible.

15             (Exhibit 393 was marked for identification.)

16      Q.     BY MS. RETTS:  This is an e-mail from

17   Ms. Bommersbach to Mike Kimerer and Lori Voepel dated

18   July 3rd, 2014.  Do you see that?

19      A.     Yes.

20      Q.     Have you seen this e-mail before?

21      A.     It -- it doesn't -- no, it doesn't look

22   familiar to me.

23      Q.     Almost at the end, Ms. Bommersbach writes, "I'm

24   having dinner with her tonight, and she wants the

25   pictures she just got from Sandra and the letters from

1    Sandra for her civil attorneys.  I'll provide them but

2    want to be sure everyone knows my great fear of a civil

3    case going forward."

4              Do you see that?

5        A.    I do.

6        Q.    Did you ask Ms. Bommersbach to provide letters

7    that she had from Sandra and pictures from Sandra to your

8    civil attorneys?

9        A.    I have no idea what she means by this.

10       Q.    Could you have asked her to provide documents

11   to your civil attorneys?

12       A.    I don't know.  I don't -- I don't know.

13       Q.    Did you provide pictures that you had from

14   Sandra to Ms. Bommersbach?

15       A.    I don't -- I don't -- I don't recall what I

16   gave Jana.

17       Q.    Did you provide letters from Sandra to

18   Ms. Bommersbach?

19       A.    I don't know.  It's -- I don't know.

20       Q.    Do you dispute that you provided letters from

21   Sandra and pictures from Sandra to Ms. Bommersbach?

22       A.    The only thing I can -- that comes to my mind

23   relating to my sister is our pictures.

24       Q.    Do you dispute that you went to dinner with

25   Ms. Bommersbach and asked her specifically to provide

1    documents that you had given to her to your civil

2    attorneys?

3         A.    I don't -- I don't know.

4              (A discussion was held off the record.)

5              MS. WANG:  Can we go off the record a sec?

6              THE VIDEOGRAPHER:  Going off the record.

7    The time is 3:27 p.m.

8              (A discussion was held off the record.)

9              THE VIDEOGRAPHER:  We're back on the record.

10   The time is 3:28 p.m.

11             (Exhibit 394 was marked for identification.)

12        Q.    BY MS. RETTS:  Exhibit 394 is an e-mail from

13   Pat to Mr. Kimerer, Ms. Voepel and Ms. Neff about your

14   birthday.  Do you see that?

15        A.    I do.

16        Q.    And you had a birthday party at Christo's.  Do

17   you -- did you have one there?

18        A.    Yes.  This was my 50th birthday.

19        Q.    And was Ms. Bommersbach present at this party?

20        A.    I think she was -- I'm not sure if she was.  I

21   think so.

22        Q.    Has she been present at a birthday party for

23   you before?

24        A.    I just have a recollection of one birthday she

25   took me out somewhere.

Page 379

```
 1          Q.    And this e-mail says, "It would be the team
 2   members, Susan and Jana and yourselves; and the four of
 3   us, Deb, Renate, Patty and I."
 4                Do you see that?
 5          A.    Yes.
 6          Q.    Does that help refresh your recollection --
 7          A.    I --
 8          Q.    -- that she came to your birthday party?
 9          A.    I remember -- I remember this night, but I --
10   I'm -- I'm not positive Jana was there.  I can't say for
11   sure.
12          Q.    At some point, though, you do have a memory of
13   Jana taking you out for your birthday?
14          A.    Yes.
15          Q.    Do you remember being at a party where you,
16   Jana and Gary Stuart were present?
17          A.    At a party?
18          Q.    Yes.  Or any type of a meeting?
19          A.    I -- I have a memory of being -- I -- I -- it
20   could have been at the Arizona Justice Project.
21                (Exhibit 395 was marked for identification.)
22                MS. RETTS:  What's this one?
23                COURT REPORTER:  395.
24          Q.    BY MS. RETTS:  That's a picture of
25   Ms. Bommersbach.  True?
```

Page 380

```
 1        A.    Yes.

 2        Q.    And Mr. Stuart's in the background also?

 3        A.    Yes.

 4        Q.    Do you remember being together with them on

 5   this night?

 6        A.    What night was it?

 7        Q.    Do you remember being together with them in

 8   the --

 9        A.    I --

10        Q.    -- setting depicted?

11        A.    I -- I don't --

12              MS. WANG:  Objection.  Foundation.

13              THE WITNESS:  I don't -- I don't recogni- --

14   I don't recognize -- I don't even know where it's at, I

15   don't know when.  I don't know.

16        Q.    BY MS. RETTS:  Do you have a memory of being at

17   an event where both Mr. Stuart and Ms. Bommersbach were

18   there in a home setting?

19        A.    In a home setting?  I don't -- no.

20        Q.    Do you dispute -- do you dispute that that

21   occurred?

22        A.    That this occurred?

23        Q.    That you had -- you were present in a home

24   setting where both Jana Bommersbach and Mr. Stuart were

25   present.
```

Page 381

```
1        A.    I -- I -- I don't know.  I -- I've been in
2   Jana's house, but I don't know if Gary Stuart's ever been
3   there at the same time.  I don't know.
4        Q.    When have you been to Jana's house?
5        A.    I don't know how many times I've been there.
6   But it was after I got out.  She invited me to her house.
7   I've had dinner at her house.  She had a Christmas party
8   one year.  I went over there one time at Christmastime.
9   I don't know how many times I've been to her house.
10       Q.    Is it fair to say that you've been to
11  Ms. Bommersbach's house a handful of times?
12       A.    That's fair to say.
13       Q.    Has Ms. Bommersbach been to your house ever?
14       A.    She has.
15       Q.    How many times?
16       A.    I'm not sure.
17       Q.    More than one?
18       A.    Yes.
19       Q.    More than five?
20       A.    I -- I can't say for sure.
21       Q.    How many times have you socialized with
22  Ms. Bommersbach where you've been at a restaurant or a
23  bar?
24       A.    I can't -- I -- I don't know.  I can't give you
25  a number.  I don't know.
```

Page 382

```
 1          Q.    Have you socialized with Ms. Bommersbach at a
 2    restaurant or bar?
 3          A.    A restaurant, yes.
 4          Q.    Have you ever met Ms. Bommersbach out for
 5    drinks?
 6          A.    Drinks?
 7          Q.    Yes.
 8          A.    Sitting at a bar?
 9          Q.    Correct.
10          A.    No.
11          Q.    Have you ever met her out for coffee?
12          A.    I don't -- it's possible I might have.
13          Q.    Were you in Germany when the book was released,
14    Jana's book?
15          A.    The German version?
16          Q.    Uh-huh.
17          A.    I don't know when it was released.  I don't
18    know the release date.  But I went to Germany in March of
19    2016 to help promote her book.
20          Q.    Were you interviewed by news outlets in
21    conjunction with promoting the book?
22          A.    Yes.
23          Q.    How many?
24          A.    I don't know.
25          Q.    What other activities did you engage in
```

1      connected with the book promotion?

2          A.    I think I was on a radio station.  They had me

3      going all over Germany.  I think I was on TV once.  I

4      don't know.  I remember radio station.

5          Q.    Was Ms. Bommersbach there at the same time?

6          A.    No.

7          Q.    You say you went all over Germany to promote

8      the book.  What cities do you remember being in?

9          A.    Berlin, Cologne, Stuttgart.  I can't think of

10     any more.  And I did -- people from magazines came to

11     talk to me.

12         Q.    What magazines do you remember?

13         A.    They were women's magazines.  I don't know the

14     names.

15         Q.    Did you talk to People Germany?

16         A.    Did I talk to who?

17         Q.    People Magazine Germany?

18         A.    I don't know.  I don't know.  I might have.

19         Q.    Did you ever maintain any type of list of all

20     the different places that you interviewed with in

21     Germany?

22         A.    I don't know if maintained a list.  I don't

23     know.

24         Q.    If you were to estimate how many news agencies,

25     radio, television or magazines that you spoke to, could

Page 384

```
 1    you give me a number of --

 2         A.    In Germany?

 3         Q.    In Germany, those separate entities.

 4         A.    I have -- I just don't know.  Maybe -- I would

 5    be guessing.  I just don't know.

 6         Q.    Would it be more than five?

 7         A.    Radio and television and magazine combined?

 8         Q.    Right.

 9         A.    I was on a radio show, I was on a TV show, and

10    then I did a morning TV show the -- with the news.  I

11    don't -- it -- I don't know.

12         Q.    For all of those different media appearances,

13    were you asked about your experience in prison?

14         A.    I don't remember what I was asked about.

15    They -- they could have asked me that question.  That's a

16    common question.

17         Q.    Were you asked about what was in the book?

18         A.    I didn't read the book.

19         Q.    Did anybody ask you questions about, for

20    example, I read this in your book, can you tell me about

21    that experience?

22         A.    No.  The questions were mostly -- because they

23    don't -- over there, they don't understand the death

24    penalty over here.  So they asked me the common question,

25    What was it like in prison, what did you do with -- that
```

Page 385

1      kind of stuff.

2          Q.    How long were you in Germany to promote the

3      book?

4          A.    Four weeks.

5          Q.    Did you get any type of compensation from any

6      of the folks that you interviewed with?  So for example,

7      when you were on the radio show, did they pay you an

8      appearance fee?

9          A.    Right now, this moment, I don't remember.  But

10     if I did, I would have saved it and it would have been

11     reported on my taxes.  So I -- I don't know for sure.

12         Q.    Do you receive, in any form or fashion, any

13     money from the sales of the book?

14         A.    No.

15         Q.    Were you paid any money to release your rights

16     to the book?

17         A.    No.

18         Q.    Did you receive any money related to the book?

19         A.    No.

20         Q.    Do you know if Ms. Bommersbach received any

21     money related to the book?

22         A.    I don't know that for sure.

23         Q.    When you were on the four-week tour of doing

24     media to promote the book, did you have any expectation

25     that you would benefit financially from that?

Page 386

1      A.     No.

2                  (Exhibit 396 was marked for identification.)

3                  COURT REPORTER:   396.

4                  MS. WANG:  What number is this?

5                  THE WITNESS:   396.

6      Q.     BY MS. RETTS:  Ms. Milke, Exhibit 396 is an

7      e-mail exchange that you are copied on between

8      Ms. Bommersbach, Frankie and you, on July 23rd, 2015.  Do

9      you see that?

10     A.     I do.

11     Q.     And then it goes on for several pages, and it

12     has a couple other attachments and e-mails with you.  Do

13     you see that?

14     A.     I do.

15     Q.     Do you remember getting these -- receiving

16     these e-mails and signing this agreement?

17     A.     I do.

18     Q.     What did you understand to be the purpose of

19     the shopping agreement that you entered into?

20     A.     My understanding, because I made it very clear

21     with Jana from the outset, that I would not be -- I would

22     not participate -- I would not be, like, a coauthor.

23     I -- I gave her exclusive authority to write.  I didn't

24     want any monetary payment from it, nothing.  That was

25     what we agreed upon.

Page 387

1               At some point, she came to me because she

2    got an agent -- now, this is my understanding.  At some

3    point, she came to me because she got an agent, and her

4    agent apparently told her that because it -- the story

5    was about me, I had to sign something to agree to it.

6               But -- and this -- this was the wording they

7    used.  So I signed something, but I did not get a penny

8    out of either the German version or her English version.

9    Q.    Now, in the top of this e-mail from

10   Ms. Bommersbach, it says, "Debra and Frankie, I have the

11   most fabulous news.  A major New York agent has taken on

12   this project and sees the Debra Milke story as both a

13   movie and a book.  He has already talked to Hollywood and

14   they're very interested."

15             Do you see that?

16   A.    I do.

17   Q.    What do you know about anything related to a

18   movie about you?

19   A.    I remember Jana mentioning something that --

20   about that to me, but as far as I know, nothing came of

21   it.

22   Q.    And if you'll turn to 2106.

23   A.    Yes.

24   Q.    And on July 24th, 2015, you wrote an e-mail to

25   Jana that said, "Jana, I forwarded everything to Mike.  I

1    will be in the office today and will take care of this.

2    I'm truly so happy for you.  I always knew that you were

3    the perfect person to write this tragic story, and I feel

4    confident that you won't allow anyone to take" -- "to

5    change anything for embellishment purposes.  Enjoy the

6    remainder of your time in North Dakota.  I'll have my

7    laptop with me in Germany, so e-mail me any time."

8                Do you see that?

9        A.    I do.

10       Q.    So you had at least a general understanding of

11   what the book was supposed to be about.  Correct?

12       A.    Sure, yes.

13       Q.    Tell me, what is your understanding of what the

14   book is about?

15       A.    I have not read it, so I don't know what she

16   wrote.  But my understanding is that it's about me and

17   the -- you know, what happened.  The -- the criminal

18   case, the conviction and sentence and fighting to get

19   out.  And -- I don't know.

20       Q.    Did Jana ever have a conversation with you

21   about what was going to be included in the book,

22   regardless of whether you've read it or not?

23       A.    I -- I don't -- I don't recall a specific

24   conversation.  I just remember -- now, I have a memory in

25   my mind of being in her office at her house.  And she

1    was -- like have these ideas.  But I just -- like I said,

2    it was up to her.  Because I didn't have any part of --

3    in the book.

4         Q.    Do you remember in that office what she talked

5    about at all?

6         A.    No.

7         Q.    It was important to you to select a writer who

8    would be accurate in their portrayal of your story.

9    Correct?

10        A.    Given the media, absolutely.

11        Q.    Why didn't you read the book, then, if you had

12   that concern about accuracy?  Wouldn't you want to make

13   sure that what was in the book was accurate and truly

14   reflected what your experience was?

15        A.    Well, like with everything else, I don't want

16   to read it.  I trust Jana.  Other people read it and was

17   conveyed to me that it was accurate.

18        Q.    Who read it that conveyed to you that it was

19   accurate?

20        A.    My friend Peggy read it.  Frankie read it.

21        Q.    Are you aware of whether Mr. Kimerer read the

22   book?

23        A.    I am not.

24        Q.    Are you aware of whether Ms. Voepel read the

25   book?

Page 390

1      A.    I'm not.

2                  (Exhibit 397 was marked for identification.)

3                  MS. WANG:  Are these separately marked?

4                  MS. RETTS:  They're separately marked.

5      Q.    BY MS. RETTS:  Ms. Milke, could you please look

6    at Exhibit 397.

7      A.    Yes.

8      Q.    And this is an e-mail from you to

9    Ms. Bommersbach dated March 10th, 2015.  Do you see that?

10     A.    I do.  No, it's from Jana to me.

11     Q.    Lower --

12     A.    Oh.

13     Q.    Lower down.

14     A.    Okay.

15     Q.    Also to Michael Fox.

16     A.    Okay.

17     Q.    Debra Jean to Michael Fox, Jana Bommersbach.

18     A.    Yes.

19     Q.    And then the subject is, "This is my prison

20    cell" --

21     A.    Yes.

22     Q.    -- paren, Debra.

23            Do you see that?

24     A.    Yeah.

25     Q.    You had provided to Ms. Bommersbach a link to

1    an article which was actually of Jody Arias' prison cell,

2    but that had been yours before.  Correct?

3        A.    Yes.

4              (Exhibit 398 was marked for identification.)

5        Q.    BY MS. RETTS:  And if you look at Exhibit 398.

6        A.    Yes.

7        Q.    Those are pictures that came from that article.

8    True?

9        A.    It's possible.  I just -- when you say article,

10   I just saw a video.  Isn't this a video?

11       Q.    I don't know.  That's what I'm trying to figure

12   out.  It says AZCentral.com.  And when you link these two

13   together, these are --

14       A.    My recollection is I believe this time

15   period -- I'm not sure.  I don't know if it was 2015 or

16   if this was an old link that I saw.  I don't know.  But I

17   do recall on the -- on the computer seeing this story,

18   and I recognized this, which is really hard to look at.

19   And I recognized it, and may -- and maybe I sent the link

20   to let them know what it looked like.

21       Q.    So these aren't -- just to clarify.  These

22   pictures that were produced in this litigation, these are

23   not pictures of your cell when you were there.  Right?

24       A.    No.  They -- they did a story -- this is what I

25   recall.  I recall seeing online a story about Jody Arias.

Page 392

1    They made a big deal about her.  Oh, this had to have

2    been before she got sentenced because they thought she

3    was going to get sentenced to death.  And the news

4    showed, Oh, this is the cell she's going to be in.  And

5    when I saw the video, I recognized it because right

6    before I left, I painted this room.

7        Q.    So when you were in this room, the warden gave

8    you permission to paint it.  Correct?

9        A.    Yes.

10       Q.    And had that been something with every room

11   that you had been in, that the warden gave you permission

12   to paint?

13       A.    Yes.

14       Q.    And then you saw the story and thought it was

15   important to forward on to Ms. Bommersbach.  True?

16       A.    Only because I've been asked many times by many

17   people what is -- what is -- what does your cell look

18   like?  I mean, so when I saw this article and the

19   pictures, then I -- I forwarded it to Jana.

20              (Exhibit 399 was marked for identification.)

21       Q.    BY MS. RETTS:  Exhibit 399 is an e-mail from

22   Mr. Aue dated March 18th, 2016.  Can you read that and

23   tell me if you know what it's about?

24       A.    Okay.  Well, I -- just few minutes ago, I told

25   you when I was in Germany, I was on a morning news show.

1    I don't know how -- my German's not really good.  But

2    Frühstück means breakfast and Fernsehen means TV.  So,

3    you know, like you have The Today Show, that's kind of

4    what I was on.

5         Q.    All right.  So this is documenting then --

6         A.    Oh, breakfast TV, yes.

7         Q.    -- the breakfast TV interview that you were a

8    part of in 2016 as part of the book tour.  Is that right?

9         A.    Yes.  I was there in March of 2016.

10        Q.    And it looks like it's providing a link to that

11   interview?

12        A.    I guess.

13        Q.    Have you ever watched that link?

14        A.    No.  I don't watch stuff about me.  I just

15   don't.

16        Q.    And that e-mail was also copied to

17   Ms. Bommersbach.  Do you see that?

18        A.    Yes.

19        Q.    And to you?

20        A.    Yes.

21        Q.    And also to Mr. Kimerer and Ms. Voepel?

22        A.    Yes.

23             (Exhibit 400 was marked for identification.)

24        Q.    BY MS. RETTS:  This is 400.  That's 400.

25   Ms. Milke, I've given you what's been marked as Exhibit

Page 394

1      400.

2          A.    Yes.

3          Q.    And it's an e-mail exchange between you and

4      Danny Baror --

5          A.    Yes.

6          Q.    -- dated July 26th, 2015.

7          A.    Yes.

8          Q.    And you write, "Hello, Danny, I've been

9      informed by Jana Bommersbach that you are interested in

10     the tragic story of my life" -- "my life.  I appreciate

11     your interest and thank you for wanting to see justice

12     done."

13                  Do you see that?

14         A.    I do.

15         Q.    Who is Danny Baror?

16         A.    Danny is -- or I don't know if he still is, but

17     at this time, he was Jana's agent.

18         Q.    And this was an e-mail that was exchanged with

19     you and him related to that shopping agreement?

20         A.    Yes, I think so.

21         Q.    And you --

22         A.    Yes.

23         Q.    Okay.  And you forwarded, then, that e-mail

24     exchange that you had with him to Mr. Kimerer.  True?

25         A.    Where do you see that?

1          Q.    At the top, it says "from Debra to MDK,

2     Kimerer, Michael."

3          A.    Yes.

4                (Exhibit 401 was marked for identification.)

5          Q.    BY MS. RETTS:   401 is coming around.

6                All right.   This is an e-mail dated

7     Wednesday, December 16th, 2015 from an A. P-o-o-l-o-s to

8     Mr. Kimerer copied to you.   Do you see that?

9          A.    I do.

10          Q.    Can you look through this and tell me if you

11     know what it's about?

12          A.    Okay.   Wait.   Where does it start?

13          Q.    It starts at the bottom --

14          A.    At the bottom --

15          Q.    -- and goes --

16          A.    -- and goes back up?

17          Q.    -- back up, uh-huh.

18          A.    Alex.   Okay.   I don't -- well, this must be

19     some -- when was this?   In 2015.   I don't know -- well, I

20     don't recognize this name, but it must be some media

21     outlet.

22          Q.    Do you remember having an interview with

23     someone from CBS News?

24          A.    Wait a minute.   I -- I was in Germany.   This is

25     all in -- this is in German -- Germany.

1      Q.    The e-mail from Ms. Poolos says

2   APoolos@CBSNews.com.  And Mr. Kimerer writes, "I did talk

3   with Debra.  She would like her reservations changed to

4   come back on December 20" --

5      A.    Oh, I know what this is about.  I -- I don't

6   remember exactly when this took place, but I did an

7   interview with 60 Minutes in California, and I met Judge

8   Kozinski.

9      Q.    When -- would it have been around this time do

10   you think?

11      A.    Yes.

12      Q.    Have you ever seen any documentation from that

13   interview, any raw footage?

14      A.    No.

15      Q.    Articles?

16      A.    No.  As -- as far as I'm aware, it never aired.

17      Q.    How long was the interview that you had with 60

18   Minutes?

19      A.    I don't -- you mean how long did I sit there

20   and talk with her?

21      Q.    Yes.

22      A.    I don't know.

23      Q.    More than an hour?

24      A.    I don't know.

25      Q.    Is it possible you talked with her more than an

Page 397

1    hour?

2         A.    I -- I really -- I just -- honestly, I just

3    don't know.  It was a long day.

4         Q.    Who -- who was the person that you talked to?

5    You say it's a she.  Who is the she?

6         A.    Lesley Stahl.

7         Q.    Did you end up ever talking to Maria Schriver?

8         A.    I talked to her on the phone right after I got

9    out.

10        Q.    How long did you have -- of a phone

11   conversation, did you have with Ms. Schriver?

12        A.    It wasn't very long.  I don't recall.

13        Q.    Did you talk to her about your case?

14        A.    I wouldn't say I talked to her about my case.

15   She wanted to do an interview with me for Dateline

16   special.

17        Q.    Did you end up doing an interview with her

18   other than talking with her on the phone?

19        A.    No.

20        Q.    Did you ever talk to Katie Couric?

21        A.    No.

22        Q.    For the 60 Minutes interview that happened, who

23   else did you talk to when you were there in California?

24        A.    As far as media people?

25        Q.    Yes.

Page 398

1        A.    Just Lesley Stahl and -- you mean as far as

2    giving an interview?

3        Q.    Yes.

4        A.    Just Lesley Stahl.

5        Q.    And did you speak with Judge Kozinski when you

6    were there?

7        A.    I met him, yes.

8        Q.    Did you have a conversation with him?

9        A.    I did.

10       Q.    How long was the conversation?

11       A.    Probably five minutes.

12       Q.    What did he tell you?

13       A.    I told him thank you.

14       Q.    Did he say anything in response?

15       A.    That my case disturbed him.

16       Q.    Did you have a conversation with any other

17   nonmedia people when you were in California for this 60

18   Minutes interview other than Judge Kozinski?

19       A.    His -- Judge Kozinski's legal -- what do you

20   call it -- JA, judicial assistant.  She just gave me a

21   hug.

22       Q.    Were you interviewed with Judge Kozinski?

23       A.    No.

24       Q.    Were you present when Judge -- strike that.

25             Did you see Judge Kozinski being interviewed

Page 399

1    also?

2        A.    No.

3        Q.    Do you have any understanding that he was

4    interviewed or wasn't interviewed?

5        A.    He was.  It was -- we didn't see each other.

6    We were at the 9th Circuit, not in San Francisco but in

7    Pasadena.  There's a 9th Circuit Court there.  And we

8    were there, and they did his interview in the early part

9    of the day and they did mine in the later part of the

10   day.  And we didn't see each other at all until both were

11   over.  And then Lesley Stahl asked me if I would like to

12   meet him and I said yes.  And so that's how it happened.

13       Q.    Are there any other people that you've been

14   interviewed by in the United States that are associated

15   with any media outlets?

16            MS. WANG:  Objection.  Form.

17            THE WITNESS:  Since my release?

18       Q.    BY MS. RETTS:  Yes.

19       A.    Media?  I can't can recall it at this moment.

20       Q.    Do you have any recollection of being

21   interviewed by any other entities that we haven't talked

22   about today in the United States?

23       A.    I -- I -- I just remember the press conference.

24   I -- I really don't -- I don't know.  I'm not -- right

25   now, I just don't know.  I'm very tired.

1      Q.      Did Jana Bommersbach ever come to prison and

2      interview you with a woman named Pia?

3      A.      Pia?

4      Q.      Yes.  Do you know?

5      A.      No.  The only way that Jana could -- anybody

6      could come see me at the prison is they had to be

7      approved to be on my list.  And I don't even know who Pia

8      is.

9      Q.      Do you have any...

10             (Exhibit 402 was marked for identification.)

11     Q.      BY MS. RETTS:  Is Pia potentially associated

12     with Irma Troud Richardson?

13     A.      Let me look.  Where are you getting this from?

14     Q.      All right.  We'll do this one first and then --

15     A.      Okay.

16     Q.      -- I'm going to show you a photograph.

17     A.      Okay.

18     Q.      This is an e-mail from Ms. Voepel dated April

19     8th, 2013 to Debbie update, which appears to be Frankie,

20     and she says, "Thanks, Frankie.  Did you tell her that

21     Jana contacted me about writing a book about Debra's case

22     and that she sat in on Pia's interview?  If not, I'll

23     write a letter to her and update her.  Thanks."

24             Do you see that?

25     A.      That who sat in on Pia's interview?

1      Q.    That Jana contacted her about writing a book

2    and that she -- I think is referring to Jana -- sat in on

3    Pia's interview.

4              MS. WANG:  Objection.  Foundation.

5      Q.    BY MS. RETTS:  Do you see that?

6              MS. WANG:  Objection.  Foundation.

7              THE WITNESS:  I see it, but I don't know

8    what this means.

9      Q.    BY MS. RETTS:  Do you ever remember getting an

10   update from Frankie or from Ms. Voepel that talked about

11   Pia interviewing someone?

12     A.    I -- no, I don't.

13     Q.    Do you recognize potentially Pia as being a

14   German correspondent?

15     A.    I -- I don't.

16     Q.    Do you know who Irma Troud Richardson is?

17     A.    Yes.

18     Q.    Who is she?

19     A.    Irmy --

20     Q.    Yes.

21     A.    -- Richardson, she -- I don't know.  I haven't

22   talked to her in so long.  She does a radio program in

23   Belgium.

24     Q.    She interviewed you in prison for that radio

25   program.  Correct?

Page 402

```
 1        A.    I think we did a phone interview.

 2        Q.    And there were -- were there one or two

 3   interviews with her?

 4        A.    I'm not -- I'm not sure.

 5              (Exhibit 403 was marked for identification.)

 6              THE WITNESS:  Oh, I think Pia is her

 7   assistant.  I just never met her.

 8        Q.    BY MS. RETTS:  So showing you Exhibit 403, this

 9   is a screenshot of a media clip that was on Frankie Aue's

10   hard drive.  And in this clip, these two women are on the

11   phone and you are speaking through that phone.

12        A.    Okay.

13              MS. WANG:  Object --

14        Q.    BY MS. RETTS:  Do you --

15              MS. WANG:  Go ahead.  Finish asking the

16   question.

17        Q.    BY MS. RETTS:  Do you remember having a phone

18   interview where you were interviewed and gave answers to

19   questions from either one of these women?

20              MS. WANG:  Objection.  Foundation.  Form.

21              THE WITNESS:  I have a recollection of doing

22   a phone interview with Irmy and Irmy's on the right.

23        Q.    BY MS. RETTS:  Irmy's in the red?

24        A.    That's her.

25        Q.    So you remember Irmy did an interview with you.
```

Page 403

1   You were on the telephone during that interview.  True?

2       A.   Yes.

3       Q.   Did you have an understanding that that was

4   going to be part of some sort of a media broadcast?

5       A.   On the radio in Belgium, yes.

6       Q.   Okay.  And then you think it's possible that

7   the woman in the gray may be Pia?

8       A.   That's possible.  As soon as -- as soon as I

9   saw the picture of Irmy, I think that's her assistant.

10  But I've never met her.  I -- I've never met her, and so

11  I don't know.

12      Q.   Who is Jacques Secretan?

13      A.   He -- I don't know about him today, but he made

14  contact with my mother or -- or Frankie.  I don't know

15  who.  And he claimed to be a journalist.  And he wanted

16  to do a documentary about my case.

17      Q.   Have you ever seen a documentary that he

18  produced?

19      A.   No.

20      Q.   Have you ever seen the Caravel Production's

21  documentary?

22      A.   No.

23      Q.   Have you ever seen the Leflare documentary?

24      A.   No.

25      Q.   Were you interviewed by Jacques Secretan?

1          A.    I think -- I'm not sure how many times.  I

2     think he -- I did once.

3          Q.    Is it possible that you were interviewed by him

4     more than once?

5          A.    It is, but I don't recall.

6          Q.    Who is Jana Henchel?

7          A.    Is there a German e-mail?  I don't know.  Jana

8     is -- that's how you pronounce it.

9          Q.    Okay.

10         A.    Jana Henchel.  That names rings a bell, but she

11    could be a -- she could be a journalist.  I don't know.

12         Q.    Do you have a recollection of giving her an

13    interview?

14         A.    Her name sounds familiar to me.  But I can't

15    place it with anything specific.

16         Q.    Do you remember writing a letter to Laurie

17    Roberts?

18         A.    That -- I can recall that.  I just don't know

19    exactly what I said.

20         Q.    Do you remember writing a letter to Al

21    Sharpton?

22         A.    I do.

23         Q.    What did you say in the letter to Mr. Sharpton?

24         A.    I don't recall.

25         Q.    Have you ever seen a copy of that letter

Page 405

```
 1      recently?

 2           A.    No.

 3           Q.    Do you remember writing letters to any other

 4      media personnel or broadcast journalists --

 5           A.    When I --

 6           Q.    -- radio people during your time in prison?

 7           A.    During my time --

 8                 MS. WANG:  Objection.  Form.

 9                 THE WITNESS:  I don't have any specific

10      recollection, but I do recall there were times when I

11      felt so scared and terrified and desperate, and I just

12      was trying to reach out to anybody that would help me.

13           Q.    BY MS. RETTS:  Do you remember writing a letter

14      to Oprah?

15           A.    I don't.

16           Q.    Did you ever write a letter to someone like

17      Maury Povich?

18                 MS. WANG:  Object to form.

19                 THE WITNESS:  I don't remember.

20           Q.    BY MS. RETTS:  Did you ever write a letter to

21      Sally Jessy Raphael?

22           A.    I don't recall.

23           Q.    At one point, you wrote a letter to Judge

24      Hendrix.  Correct?

25           A.    I -- I have a --
```

Page 406

1                    MS. WANG:  Objection.  Foundation.

2                    THE WITNESS:  I have a -- I have a vague

3      recollection of that.

4         Q.    BY MS. RETTS:  Do you remember when it was that

5      you wrote that letter?

6         A.    No, I don't know.

7         Q.    After your release from prison, are there any

8      other media personnel -- and I'm going to define media as

9      broadcast, print, magazines, podcasts, bloggers -- that

10     you can remember speaking to?

11        A.    I -- right this minute, I can't -- I can't

12     think of anyone or any group.

13        Q.    Who is Mr. Fricker?

14        A.    Does he have a first name?

15                   (Exhibit 404 was marked for identification.)

16                   THE WITNESS:  Thank you.  404.

17        Q.    BY MS. RETTS:  Ms. Milke, I've handed you

18     what's been marked as Exhibit 404, which is a June 5th,

19     2007 letter from Mr. Kimerer to you.  Do you see that?

20        A.    I do.

21        Q.    Mr. Kimerer writes, "Dear, Debbie, it was good

22     to get your letter.  I thought our meeting went well with

23     Mr. Fricker, and you did a great job of responding to his

24     questions and giving him a picture of what happened and

25     where you are now.  I all" -- "have also reviewed the

Page 407

1    letter that you wrote to him and want to let you know you

2    did an excellent job.  I have gone ahead and forwarded it

3    to him so he can use it in connection with his article."

4              Do you see that?

5        A.    I do.

6        Q.    Do you remember who Mr. Fricker is?

7        A.    No.  But if he -- if -- if it's an article,

8    then he must be a -- he must be from overseas, Europe,

9    and it would be, like, a magazine article.  So I don't

10   know.  I don't recall.  The name is -- sounds familiar,

11   but I don't -- I don't recall him or who he's associated

12   with.

13             (Exhibit 405 was marked for identification.)

14             MS. RETTS:  405.

15       Q.    BY MS. RETTS:  Ms. Milke, I've handed you

16   what's been marked as Exhibit 405, which is a January

17   3rd, 1996 letter from An- -- letter to Anders Rosenquist.

18       A.    Yes.

19       Q.    And on the last page, 374, there's your

20   signature.  Do you see that?

21       A.    Yes.

22       Q.    Is this the letter that you reviewed from

23   Mr. -- strike that.

24             Is this one of the letters that you reviewed

25   from Mr. Rosenquist in your deposition preparation?

Page 408

1       A.      Yes.

2       Q.      And then if you'll turn to 372.

3       A.      Yes.

4       Q.      You state, "So in my testimony, the only thing

5   I lied about in court was when I said that Christopher

6   was an accidental pregnancy.  He was not an accident at

7   all.  He was very much wanted by me."

8               Do you see that?

9       A.      I do.

10      Q.      And you are telling Mr. Rosenquist in this

11  letter that you lied about Christopher being an

12  accidental pregnancy.  Correct?

13              MS. WANG:  Object to form.

14              THE WITNESS:  That's what it says in here,

15  yes.

16      Q.      BY MS. RETTS:  And then in the paragraph

17  again -- above, sorry, it says, "The reason why I said in

18  court that Christopher was an accidental pregnancy is

19  because I was too ashamed to reveal the real reason why I

20  wanted him.  Number one, it sounds incredibly selfish.

21  Number two, I knew that if I revealed the real reason,

22  Charles' name would come up, and I didn't want him or his

23  family to be a part of this whole tragedy.

24              "The subject of Charles is painful enough as

25  it was, and I didn't want to go there and didn't want to

Page 409

```
 1     impose on his life by having him dragged into my case.

 2     This is why I never mentioned Charles or his parents to

 3     Ken Ray."

 4               Do you see that?

 5         A.   I do.

 6         Q.   Is it true that the reason why you said in

 7     court that Christopher was an accidental pregnancy was

 8     what's written here, that you didn't want Charles to come

 9     up?

10               MS. WANG:  Objection.  Foundation.

11               THE WITNESS:  It's -- that's not -- no,

12     that's not the only reason, no.  It's -- it's just a

13     little bit more complicated than that.

14         Q.   BY MS. RETTS:  Do you agree with what you wrote

15     here, that you lied in court when you said that

16     Christopher was an accidental pregnancy?

17         A.   Well, I put lied in quotes.  So it's -- it's --

18     it's like I -- I put it in quotes.

19         Q.   Why -- what's the significance to you of having

20     put it in quotes?

21         A.   Because it was part of an answer.

22         Q.   So it was not completely accurate, what you

23     testified in court?

24         A.   It was not completely accurate, but it was not

25     a lie either.
```

Page 410

1      Q.    Is it true what you write on 371, in the
2  middle, that "When Mark asked me to marry him, I said I
3  would but only if I could get pregnant right away"?
4      A.    That was -- that was -- that was a discussion,
5  yes.
6      Q.    So that's a true statement that you wrote
7  there?
8      A.    When Mark asked me to marry him, I said yes,
9  and I talked to him about wanting a child right away.
10     Q.    Did you condition that -- did you say you would
11 marry him only if you can get pregnant right away?
12     A.    No.
13     Q.    And at the time that you got pregnant with
14 Christopher, you were taking birth control on and off.
15 Correct?
16     A.    Yes.
17     Q.    If you wanted to get pregnant, why would you
18 have just not gone off birth control altogether?
19     A.    Because Mark said no.  Mark said no.
20     Q.    Now, going back to this statement, "When Mark
21 asked me to marry him, I said I would but only if I could
22 get pregnant right away."
23           Why did you write that if you just said that
24 you didn't condition it --
25     A.    I don't recall -- I don't know why I worded it

Page 411

1    this way in this -- in this letter.  I don't know why I

2    worded it that way.

3         Q.    Did you have plans to marry Charles?

4         A.    Charles was my first love.  I -- we were -- I

5    met him when I was 15, and we were together till I was

6    19.  And Charles is four years older than me.

7         Q.    Were you at some point devastated because you

8    had broken up with him?

9              MS. WANG:  Objection.  Form.

10             THE WITNESS:  Yeah, that was really sad.

11   Yes, I broke up with him.

12             MS. RETTS:  All right.  I think we're going

13   to break now because I'm done with this line and --

14   rather than start mid stream.

15             THE VIDEOGRAPHER:  This concludes --

16             MS. WANG:  Wait.  Can I just say -- can I

17   say something on the record?

18             THE VIDEOGRAPHER:  Sure.

19             MS. WANG:  As to the E -- the e-mail -- the

20   e-mail we were talking about earlier -- hold on -- the

21   one that's Bates stamped -- the one that's Bates stamped

22   C56095.

23             THE WITNESS:  It's right here.

24             MS. WANG:  Let me just make sure.  Yeah,

25   that one, yes.  We did produce that in PDF form as

Page 412

1    LNL26540 as well as in the PST file from Debbie's e-mail.

2              MS. RETTS:  And it's clearly identified in

3    26540 that it's from -- some of the problems we have with

4    these is that you've got her e-mail intermixed with

5    Mike's and the PDFs aren't identified.  Like it will say

6    e-mails with Mike Kimerer, but you can't tell whose

7    e-mail they were extracted from.  You know what I mean?

8              Like did they come from Mike's e-mail or did

9    they come from her e-mail?  And there's differences

10   between the two.

11             MS. WANG:  Okay.  Let me look at the PDF.

12   Hers says mail.com on top.  Yes, this says mail.com on

13   the top.  The PDF version that we produced says mail.com

14   on the top.

15             MS. RETTS:  All right.

16             THE VIDEOGRAPHER:  Is that it?

17             MS. RETTS:  Yes.

18             THE VIDEOGRAPHER:  This concludes volume 2

19   of the video-recorded deposition of Debra Jean Milke.

20   The time is 4:23 p.m.

21             (Whereupon the proceedings ended at

22   4:23 p.m.)

23

24

25

Page 413

1                    CERTIFICATE OF REPORTER

2     STATE OF ARIZONA        )
                             )
3     COUNTY OF MARICOPA      )

4


5           I, Sommer E. Greene, a Certified Reporter in the
      State of Arizona, do hereby certify that the foregoing
6     deposition was taken before me in the County of Maricopa,
      State of Arizona; that an oath or affirmation was duly
7     administered to the witness, DEBRA JEAN MILKE, pursuant
      to A.R.S. 41-324(B); that the questions propounded to the
8     witness and the answers of the witness thereto were taken
      down by me in shorthand and thereafter reduced to
9     typewriting; that the transcript is a full, true and
      accurate record of the proceeding, all done to the best
10    of my skill and ability; and that the preparation,
      production and distribution of the transcript and copies
11    of the transcript comply with the Arizona Revised
      Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
12              The witness herein, DEBRA JEAN MILKE, has
      requested signature.
13              I FURTHER CERTIFY that I am in no way related
      to any of the parties nor am I in any way interested in
14    the outcome hereof.

15

16              IN WITNESS WHEREOF, I have set my hand in my
      office in the County of Maricopa, State of Arizona, this
17    22nd of December, 2019.

18

19                         ------------------------------
                           Sommer E. Greene, RPR, CRR
20                         Certified Reporter 50622

21

22    _____
      For Maricopa Reporting, Inc.
23    Registered Reporting Firm No. R1081

24

25

Page 414

1                    CERTIFICATION OF INVOICE

2                    SUPERIOR COURT OF ARIZONA

3                       COUNTY OF MARICOPA

4

         In compliance with and under ACJA 7-206(J)(g)(3)
5    through (6), we certify that:

6         All billing and invoicing to all the parties
     related in any manner to the reporting of the proceedings
7    or cases and the production of the transcript and any
     products or services ancillary thereto comply with the
8    Arizona Revised Statutes and the ACJA;

9         All financial terms and other services have been
     offered on the same terms to all parties to the
10   litigation;

11        Each party was able to purchase the transcript and
     such ancillary services as requested by that party
12   without regard to the ancillary services purchased by any
     party: and

13

         No economic or other benefit was given by the
14   certified reporter to any party or their attorney,
     representative, agent, or insurer or insured that was not
15   provided to the other parties, attorneys or insured in
     the same case.

16

17

18
                     ------------------------------
19                   Sommer E. Greene, RPR, CRR
                     Certified Reporter 50622
20

21

     _____
22   For Maricopa Reporting, Inc.
     Registered Reporting Firm No. 1081
23

24

25

Page 415

1    DEBRA JEAN MILKE

2    TAKEN ON DECEMBER 5, 2019

3
                DECLARATION UNDER PENALTY OF PERJURY
4

5                   I declare under penalty of perjury that I

6    have read the entire transcript of my deposition taken in

7    the above-captioned matter or the same has been read to

8    me, and the same is true and accurate, save and except

9    for changes and/or corrections, if any, as indicated by

10   me on the DEPOSITION ERRATA SHEET hereof, with the

11   understanding that I offer these changes as if still

12   under oath.

13

14   Signed on the_____day

15   of _____20__.

16

17

18

19   _____
     DEBRA JEAN MILKE
20

21

22

23

24

25

Page 416

1                       DEPOSITION ERRATA SHEET

2

3      Page No.___Line No.___Change to:_____

4      _____

5      Page No.___Line No.___Change to:_____

6      _____

7      Page No.___Line No.___Change to:_____

8      _____

9      Page No.___Line No.___Change to:_____

10     _____

11     Page No.___Line No.___Change to:_____

12     _____

13     Page No.___Line No.___Change to:_____

14     _____

15     Page No.___Line No.___Change to:_____

16     _____

17     Page No.___Line No.___Change to:_____

18     _____

19     Page No.___Line No.___Change to:_____

20     _____

21     Page No.___Line No.___Change to:_____

22     _____

23     Page No.___Line No.___Change to:_____

24     DEBRA JEAN MILKE

25     Signature:_____

1                    DEPOSITION ERRATA SHEET

2

3      Page No.___Line No.___Change to:_____

4      _____

5      Page No.___Line No.___Change to:_____

6      _____

7      Page No.___Line No.___Change to:_____

8      _____

9      Page No.___Line No.___Change to:_____

10     _____

11     Page No.___Line No.___Change to:_____

12     _____

13     Page No.___Line No.___Change to:_____

14     _____

15     Page No.___Line No.___Change to:_____

16     _____

17     Page No.___Line No.___Change to:_____

18     _____

19     Page No.___Line No.___Change to:_____

20     _____

21     Page No.___Line No.___Change to:_____

22     _____

23     Page No.___Line No.___Change to:_____

24     DEBRA JEAN MILKE

25     Signature:_____

# EXHIBIT 4

June 6, 1994

Dear Mr. Rosenquist,

It has been 7 weeks since my cert was filed and I haven't heard anything but I am sure a decision is coming soon. I enclosed an article I read that really had me distressed. This is enough to make a person in my situation to want to waive all appeals because there seems to be no point in fighting with all these set rules and legal procedures. Everything always goes back to the trial. I realize my case is much different but I can't help but wonder what kind of chance I really have.

Obviously, the state believed they had an open and shut case with Saldate's police report. Judge Hendrix believed it and so did the Az. Supreme court. Unless I have a direct admission from Saldate that he did in fact fabricate that report, I really don't see how his past conduct can convince Levy and the judge that he's a liar. I am wondering if this evidence you have is enough to grant me my freedom. It seems as though uncorroborated confessions, even if they are false, are admissible in court and that they stick, regardless of how hard one fights to refute it. Since Saldate has gotten away with this conduct in the past, I feel like he will once again.

I will go to my hearing with confidence one last time. If I don't prevail, should the state win their appeal, I see no point in fighting any further. The message then would be clear to me that people with authority, even if it's abused, always come out a winner. I guess the one thing I may have to my advantage would be the elections coming up in October, if my hearing took place before then. Saldate holds some kind of political position as a constable and he should be exposed to the voters as a cheater and liar, which he is. Perhaps this hearing may put pressure on Romley as well because I'm sure he wants to keep his job.

I feel completely powerless and unhopeful. My freedom is the only thing I have left to fight for and I don't even know what it feels like anymore. I have the memories of freedom but no concept of it. Positive thinking is becoming more and more difficult for me as time passes. And talking about this with anyone is a waste of time because it doesn't

L&L00572

change anything.  I don't mean to dump on you but you are the only person who knows my case inside and out, other than myself.

I just received my diplomas and student transcripts from the correspondence school I enrolled in back in 1992.  I graduated with honors and a cumulative grade of 97.  I received a diploma for a foundation course of paralegalism and a specialty course diploma in Corporations Law.  I'm waiting for another specialty course diploma in Real Estate Law.  I am very proud of myself that I was able to complete these courses under my depressing circumstances.  I did this because I was thinking of my future and I only hope these studies are worth it.  Other than my freedom, I do have a dream to become a court reporter and this is one of the reasons why being exonerated is important to me.

After the US Supreme Court rules on my cert and you hear something from Jim Liebman, will you please call out here?  I'd really like to see you before you file my petition because I have so many questions.  I still think we can make some people shake in their boots if we get this petition filed and exposed before the October elections.  That's only 4 months away.  Please let me know something soon.  I'm trying so hard to hang in there.

Sincerely,
Debbie Milke

# EXHIBIT 5

September 21, 1993

Dear Mr. Rosenquist:

I talked to my mom last week and she brought me up to date regarding my case.  I am very excited and a lot nervous!  I sure hope that woman can get all she can and that "you know who" really incriminates himself.  It seems a little more difficult to try and call you because this new counselor I have is a real airhead.  I sure do miss Barbara Daniels.  I decided that I'll just wait until I hear from you either by phone or in person.  I have butterflies in my stomach just knowing that all of this is coming to an end.

My sister told me recently that Dorothy had called but Sandy was out at the time of the call so she didn't know what Dorothy wanted. I have this strange feeling that Dorothy is trying to find out what's up with me and she's going through my sister to try and find out.  I think she has a guilty conscience about something because Sandy and Dorothy are really not friends.  Dorothy was more my friend and she didn't know my sister that well.  Apparently, Sandy says that when Dorothy calls they don't talk about much and that Dorothy fishes for information.  I definitely think she's hiding something and I'm very curious to find out what it is.

When it comes time to expose all of this I really hope you are successful with Noel Levy.  I can't help but think that it will be election year next year and already Romley is trying to make himself look good.  I worry so much about getting burned again but then again, I keep thinking that it would be political suicide for those involved in my case to try and keep me here on something even after you expose everything.  No one will want to take the blame for making a mistake in my case.  I'm just scared of not getting any justice again.  I don't know if you have noticed but don't you think it's strange that the cops are being very discreet and quiet with this recent mass murder investigation?  They aren't acting overzealous and anxious to arrest just anyone and coming up with a "confession" in this high profile case.  Maybe the police department finally came to their senses and decided to do their jobs according to policy instead of acting like sharks in a feeding frenzy.  I find it to be a strange coincidence.  Maybe they are tired of being sued.  Well, they are in for a big surprise very soon!

L&L00542

2

I also wanted to know if you could find some civil lawyer who is good and who also might be interested in helping me with a civil lawsuit. This is something I want to file as soon as possible and really make Arizona pay for.

Another thing before I close out here.  Is it possible for you to get the state (Mr. Levy) to dismiss everything without court dates and petitions?  Either way you look at it, the state will have absolutely nothing to bring me to trial even if they wanted to and I think that filing petitions and forms is a big waste of time and money.  Can't any of this evidence you will have gathered be heard behind closed doors with Levy and/or Judge Hendrix?

I sit here anxiously waiting for the day to come when I'm told you are on the phone and that everything is ready to go.  Please extend my thanks and gratitude to this woman who is trying to get that creep of a man.  I truly appreciate all of your help Mr. Rosenquist and I hope to hear from you soon.

*Debbie Milke*

L&L00543

# EXHIBIT 6

| **From:** | PAT24288@aol.com |
|---|---|
| **To:** | LORI VOEPEL |
| **Subject:** | Re: Letter to Debra from James Burns of Ohio |
| **Date:** | Monday, October 21, 2013 4:37:32 PM |

**Got it. Sometimes the simplest of things can compound so will cease and desist from any future correspondence until given the okay. Thanks for the heads up.**

In a message dated 10/21/2013 2:08:58 P.M. US Mountain Standard Time, LVOEPEL@JSHFIRM.com writes:

> Because they know Frankie is her webmaster and that he is a strong supporter who has attended all of her court hearings (and they probably have figured out by now that Debra was/is staying at his house). So if she is writing to anyone, it would be to him.
>
> Also, I just returned from the defense team meeting, and the topic came up of your recent email update to Debra's supporters. I know we sound paranoid but, as we discussed earlier, we'd rather not have updates to anyone beyond the defense team/Debra's family regarding what and how Debra is doing in the free world. I know they are positive and not as frequent as they used to be, but you would not believe the way the state can twist that sort of thing. For example, Debra going to the fair and going shopping, etc., can be construed as Debra having a great time and not showing any remorse about her son. It could also be used to refute damages in any future civil suit. So we'd really like to go back to the prior status where you told everyone that while Debra's trial is pending, there won't be any updates.
>
> Hate to be such a downer but we really can't be too careful in a case as high profile and as high priority to the county attorney's office as Debra's.
>
> *Lori L. Voepel, Esq.*
> Appellate Department
> Jones, Skelton & Hochuli, PLC
> 2901 N. Central, Ste. 800
> Phoenix, Arizona 85012
> 602-263-7312 (phone)
> 602-200-7807 (fax)
> lvoepel@jshfirm.com
>
> ---
>
> **From:** PAT24288@aol.com [mailto:PAT24288@aol.com]
> **Sent:** Monday, October 21, 2013 12:17 PM
> **To:** LORI VOEPEL
> **Subject:** Re: Letter to Debra from James Burns of Ohio
>
> **Ok but how would they know she sent letters to Europe? Ill tell her but it seems that is a little far fetching but what do I know???????????????**
>
> In a message dated 10/21/2013 11:46:56 A.M. US Mountain Standard Tim, LVOEPEL@JSHFIRM.com writes:
>
> > I'd tell her to be careful even in writing letters to Frankie. They are not privileged and the State can subpoena them if it wants to do so.
> >
> > *Lori L. Voepel, Esq.*
> > Appellate Department
> > Jones, Skelton & Hochuli, PLC
> > 2901 N. Central, Ste. 800
> > Phoenix, Arizona 85012
> > 602-263-7312 (phone)
> > 602-200-7807 (fax)
> > lvoepel@jshfirm.com
> >
> > ---
> >
> > **From:** PAT24288@aol.com [mailto:PAT24288@aol.com]

L&L063745

**Sent:** Monday, October 21, 2013 11:26 AM
**To:** LORI VOEPEL
**Subject:** Re: Letter to Debra from James Burns of Ohio

**Any e-mail messages would be to mutual friends and I do that. She has sent a couple birthday cards and such plus writes to Frankie. Other than that she relies on me to keep people informed. No this guy does not ring a bell with me but will see what she says.**
In a message dated 10/21/2013 9:38:27 A.M. US Mountain Standard Time, LVOEPEL@JSHFIRM.com writes:

> Hi Pat -- Does this guy's name ring a bell? He wrote a letter to Debra and mailed it here to me. It sounds like they wrote for 8 years when she was in prison, but I wasn't sure if he is in the inner circle, so to speak. He is encouraging her to write or email or call him, none of which we, of course, are encouraging her to do with anyone right now. She is not emailing or writing to anyone, is she? Just making sure she's limiting her communications for the most part to phone and Skype with her mom and Frankie while her case is pending. Let me know. Thanks, Lori
>
> *Lori L. Voepel, Esq.*
> Appellate Department
> Jones, Skelton & Hochuli, PLC
> 2901 N. Central, Ste. 800
> Phoenix, Arizona 85012
> 602-263-7312 (phone)
> 602-200-7807 (fax)
> lvoepel@jshfirm.com
>
>
> This electronic mail transmission contains information from the law firm Jones, Skelton & Hochuli, P.L.C. that may be confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (602) 263-1700. Thank you.
>
> Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein. mc

L&L063746

# EXHIBIT 7

**From:**              LORI  VOEPEL
**Sent:**              Monday, April 14, 2008 7:37 PM
**To:**                'PAT24288@aol.com'
**Cc:**                'MDK Kimerer, Michael'
**Subject:**           RE: FW: Thanks for the brief....


We haven't yet raised the issue with Renate, but will likely do so. I think our concern about having extra people on your emails to us and to Renate is that we just hit "reply to all" to those instead of drafting new ones without those extra people on, then we just speak our minds as if it were just you and Renate. Quite frankly, I didn't even notice there were additional people on your weekly emails until we just recently dealt with the issue involving Arch. So my preference would still be that you re-send any general updates on Debra's status to Doug and to Jennifer, and just keep the updates with our legal information and any general update info limited to Mike, me and Renate. Would that be too much trouble? Thanks Pat. Don't worry about it in any event until after you return. Lori

---

**From:** PAT24288@aol.com [mailto:PAT24288@aol.com]
**Sent:** Monday, April 14, 2008 4:12 PM
**To:** LORI VOEPEL
**Subject:** Re: FW: Thanks for the brief....

**i do not send any of Mike and Your e-mails to me to anyone unless it is something routine. I send Doug (yes he is her boyfriend ) and Jenifer (a close friend from Va that Debbie asked me to keep up to speed on whats happening) when it is an update to her calls and visits. I also keep Kirk Fowler aware of whats happening but have not shared any legal documents with him. I think he is just supportive of Debbie and wants her to be set free. Hopefully I am not crossing the line there but if you think I am I can stop doing it that way and separate addressees from my end. . Anyway, I have tried to keep your work separate from mine and not be a "jailhouse lawyer" that some others are. This is more a problem for Renate as the Europeans do not understand our system and she gets frustrated trying to appease them with explanation. I am not pointing fingers but if others like Arch and anyone else is getting our news it has to come from Renate. I have asked her to limit discussion with any of them and we both have backed off with discussions with Frankie as they all keep trying to "have another trial " and don't seem to understand our appeal process. I think we are OK and I am cognizant of your concerns and will "protect" the client at all times. Has anyone said anything to Renate or would you like me to broach the subject with her?
Pat**
In a message dated 4/14/2008 12:50:36 P.M. US Mountain Standard Time, LVOEPEL@JSHFIRM.com writes:

Pat -- I am sorry it has taken me so long to get back with you on this. I got tied up in the midst of our communications, and had no idea you went to the hospital. I hope this situation didn't contribute too much to your stress!
In answer to your questions, Mike and I have not added anyone to our emails -- we only normally copy you, Renate and Frankie. I noted that on your emails giving us all updates, you have added DPBice2000@Yahoo.com; and jen@geranio.net. We now know from you that DP Bice is Debra's boyfriend (right?), but we don't know who Jen is. Renate added on Arch on that one set of emails to us, but it doesn't look like he is on the regular email list, so I won't worry about that.
To be honest, Mike and I are somewhat concerned about having anyone other than you, Renate and Frankie on emails to and from us, as we don't want to have to completely monitor/filter everything we say. If you are able to give your updates to DPBice and Jen separately, we would feel more comfortable with that.
Take care, and try to get some rest in Ohio.
Lori

---

**From:** PAT24288@aol.com [mailto:PAT24288@aol.com]
**Sent:** Tuesday, April 08, 2008 2:57 PM
**To:** LORI VOEPEL
**Subject:** Re: FW: Thanks for the brief....

1

L&L048150

LORI; I AM MISSING SOMETHING. ARE THESE PEOPLE ON YOUR E-MAIL DISTRIBUTION LIST OR IS RENATE FORWARDING YOUR CORRESPONDENCE TO THEM? I DO NOT SEND ANYONE COPIES OF YOUR MAIL (DEBBIE ON RARE OCCASSION BUT SELDOM DO THAT) THAT I KNOW OF. ANYWAY, IT HAS TO BE CLEANED UP SO LET ME KNOW WHAT I CAN DO TO HELP.
PAT
In a message dated 4/8/2008 2:49:59 P.M. US Mountain Standard Time, LVOEPEL@JSHFIRM.com writes:

Thanks Pat. I am copying Mike so he will have the benefit of the information you shared with me. I am sure you both saw the "follow up" questions from Arch directly to me, which I also answered. I agree that it is distracting and takes time away from Debra's case for me/us to answer these questions repeatedly, especially to those who have not been dealing with us and with Debra on an ongoing basis, namely, you and Renate, and perhaps Frankie. Regardless of who these folks are, I have always been concerned to see new names show up on our email distribution list and don't feel comfortable with anyone being on it except you, Renate, and if she still wants him on, Frankie. Whatever we end up suggesting to Renate, I think it should include that we need to remove these additional folks from our regular correspondence list. If Renate wants to pass information onto them, that is fine, but I don't like having people I don't know and who have not been involved in this appeal process suddenly receiving our communications and asking us questions about the case that we have already answered to those who count. Mike, let us know your thoughts. Thanks. Lori

---

**From:** PAT24288@aol.com [mailto:PAT24288@aol.com]
**Sent:** Tuesday, April 08, 2008 2:41 PM
**To:** LORI VOEPEL
**Subject:** Re: FW: Thanks for the brief....

**LORI: ARCH IS A LONG TIME FRIEND OF RENATE'S AND HAS FOLLOWED THE CASE CLOSELY FOR QUITE A WHILE. I HAVE MET HIM BUT I DO NOT CORRESPOND WITH HIM. FOR SOME UNKNOWN REASON RENATE HAS HAD A LOT OF CONTACT WITH HIM AND KEEPS AN ONGOING DIALOGUE WITH HIM. LIKE MANY WHO FOLLOW THIS CASE THEY ALL FEEL THEY SEE SOMETHING YOU AND MIKE DON'T AND ARE CONSTANTLY OFFERING ANALYSIS ABOUT THE CASE. I HAVE TALKED ABOUT THIS WITH HER MANY TIMES THAT WE LAYMAN DO NOT KNOW THE LAW AND HOW IT HAS TO BE APPLIED. IF WE ARE LOOKING FOR EARLY MISTAKES MADE IN THIS CASE THAN WE HAVE SOMETHING TO OFFER. BUT THIS IS THE APPEAL PROCESS AND MUST BE FOLLOWED ACCORDINGLY AND THAT IS YOUR JOB. WE CAN TALK ABOUT IT ALL WE WANT BUT STAY OUT OF YOUR BALLGAME!! I HAVE GONE AROUND AND AROUND WITH FRANKIE ABOUT THE SAME ISSUE. I KNOW HE HAS HIS THEORIES AND CANNOT SAY HE IS RIGHT OR WRONG BUT I KEEP TELLING HIM THAT THE APPEAL PROCESS IS DIFFERENT THAN THE TRIAL PROCESS SO STAY ON THE SIDELINES UNLESS WE ARE ASKED TO PARTICIPATE! (I SAID THAT NICELY!)**
**AS FOR DOUG BICE, HE IS DEBBIE'S BOYFRIEND FROM TEXAS. THEY ARE VERY CLOSE AND SHE TALKS WITH HIM WEEKLY AND HE VISITS HER QUARTERLY. HE IS JUST A STRONG SUPPORTER AND HAS ALWAYS STAYED OUT OF THE LEGAL SIDE TO MY KNOWLEDGE. I TALK WITH HIM REGULARLY AFTER EACH VISIT AS SHE USUALLY HAS MESSAGES FOR HIM AND HE IS ALWAYS INTERESTED HOW SHE IS DOING. I DON'T THINK HE IS INTRUDING IN ANY WAY BUT IF HE IS LET ME KNOW AS THAT IS FIXABLE.**
**A COUPLE OTHER NAMES ARE ON MY REPORT YOU DO NOT RECOGNIZE. BILL ANDERSON IN CALIF AND JENNIFER IN ALEXANDRIA, VA. THESE ARE TWO CLOSE FRIENDS AND SUPPORTERS OF DEBBIE WHO CORRESPOND WITH HER REGULARLY. SHE ASKS ME TO KEEP IN CONTACT WITH THEM FOR HER AND THEREFORE I TELL THEM HOW THE VISITS GO. AGAIN, FRIENDS BUT NOT "GUARDHOUSE LAWYERS"!**
**I SHARE YOUR FRUSTRATIONS AND IF YOU WOULD LIKE I WILL TALK TO RENATE AGAIN ABOUT NOT TRYING TO APPEASE HER FRIENDS BY GETTING ANSWERS TO THEIR QUESTIONS FROM YOU OR MIKE. ANOTHER APPROACH MIGHT BE AN E-MAIL TO THE THREE OF US FROM MIKE ASKING FOR OUR SUPPORT IN NOT LETTING OUTSIDERS BECOME SO INVOLVED AS TIME IS VALUABLE IN PUTTING THE APPEAL TOGETHER AND DISTRACTIONS TAKE AWAY FROM THE EFFORT WHICH IS FOR DEBBIE NOT US! JUST A THOUGHT~!**
**I WILL DO WHATEVER YOU ASK TO SUPPORT YOUR EFFORTS SO LET ME KNOW WHAT YOU WOULD LIKE ME TO DO. MIKE IS NOT BEING ADDRESSED SO IF YOU WANT HIM TO SEE IT PLEASE FORWARD TO HIM. IN THE MEAN TIME "DON'T TAKE ANY OUTSIDE CALLS!!!!"**
**PAT**

L&L048151

In a message dated 4/8/2008 9:45:57 A.M. US Mountain Standard Time, LVOEPEL@JSHFIRM.com writes:

Mike -- I don't know who this "Arch" person is or how she ended up on the email list for all of our communications with Renate and Pat. I also don't know who this "DPBice" person is, but I think we need to tell Renate that if she wants to forward certain email exchanges with us to additional people, that is her choice, but that we feel most comfortable going back to the initial people we have been communicating with throughout this process -- Renate, Pat and Frankie. I don't want to have to waste my time or energy answering and re-answering questions from people I don't even know, who somehow ended up on Renate's email list in her communications with us. I am also tired of having to address this "secret tape" non-issue over and over, and having to re-explain why we can't advance Frankie's speculative theories on how Christopher was murdered and who is actually to blame. Let me know your thoughts on how best to deal with this. I am copying Pat (only) on this email so he can give us some insight if he has any. Pat, please keep this to yourself and don't forward. Thanks. Lori

---

**From:** LORI VOEPEL
**Sent:** Tuesday, April 08, 2008 9:38 AM
**To:** 'Reinhardd.Mueller@t-online.de'
**Cc:** MDK@kimerer.com; archbell@optonline.net; PAT24288@aol.com;
webmaster@debbiemilke.com; DPBice2000@yahoo.com
**Subject:** RE: Thanks for the brief....

Renate --
I think we have all the information we need at this point for the motion to appoint counsel, but will let you know if the Court wants something from you verifying that no resources are left to fund Debra's appeal.
As for Arch's questions, I actually have addressed some of them (especially the "secret tape" issue) on a number of occasions with a variety of people including you, Frankie, Pat and Debra, and I don't know how much time you want me to spend on those topics again. The short answers are: 1) contrary to the juror's claim, the tape that went into the jury room was not "secret" (I have told Paul Huebel and Frankie that several times), it was simply the copy of Saldate's interview of Sandra, which Sandra herself taped and was admitted at trial; and 2) the conspiracy evidence against Scott was more than "mere presence," as he, among other things, stated in taped interviews that he and Styers had discussed how to kill Christopher on several prior occasions and even scoped out another site on one occasion, and there was sufficient evidence admitted at both his and at Styers' trial to convict them both of conspiracy to commit first degree murder.
As for your other questions as to arguments we did not raise, I have explained previously that we are limited to those issues that were properly raised throughout the state court process and have been granted review on the merits by the federal courts. We were not involved in the state court process and are bound by the record as it exists, which as I said even in our recent meeting at Mike's office, is pretty darn good. Very few capital cases at the habeas stage have so many strong issues that have not been procedurally barred and that are being heard on the merits. Additionally, we were able to do a great deal to expand the record in district court to include quite a bit of additional evidence, including Richard Leo's report, but all of that evidence had to be presented in the scope of the issues before the district court. We can't just argue things that "make sense" or "sound good" if they are not properly before the district court. To do so would be to simply waste time and space that we can otherwise use to strengthen our best arguments that are properly before the court. I hope this answers your questions and Arch's.
Thanks for your good wishes while I prepare the reply brief.
Take care,
Lori

---

**From:** Reinhardd.Mueller@t-online.de [mailto:Reinhardd.Mueller@t-online.de]
**Sent:** Monday, April 07, 2008 11:09 AM

L&L048152

**To:** LORI VOEPEL
**Cc:** MDK@kimerer.com; archbell@optonline.net; PAT24288@aol.com;
webmaster@debbiemilke.com; DPBice2000@yahoo.com
**Subject:** FW: Thanks for the brief....

Hi Lori,
this is a forward of an email form a very good friend of mine (NY/USA) with an excellent
education and an analytic mind.
But first of all, I do want to thank you and your staff for the excellent communication flow to
keep us up to date. We received all the documents and of course we can understand that
Debbie did not want to read the State´s reply. It would not help her stability in any way and she
knew that there was nothing positive to be expected.
At any rate, the questions raised in Arch´s mail have been raised among "us people out here
(EUR and USA) many times over the past years and I really do not have profound answers
with a valid explanation not only for my inner circle which encompass meanwhile a great
number of US Americans, but also for my own understanding in toto.
The questions posed by Arch as well as other issues not really addressed yet have been
bothering the one or the other of concerned people.
As you know, the official version and Frankie´s findings do not mesh in a number of ways. And
they again do not mesh with Arch´s questions in some other ways. But Arch came to his
questions on his own analysis over and over again, although he has read the website and
some of the recent documents. To me, it only proves that this crime was never solved and who
of the two men committed the crime solely or together or in which horrible way it occurred, is
still not proven, probably never will be
I have accepted that we will probably never solve what actually happened on Dec. 2, 1989 nor
that there will be any true investigations into the happenings of that day and those crucial
hours, because all police and forensic investigation was halted at the time of arrest of Debra
Jean Milke and the date set for the Grand Jury Hearing. All further actitivities by Saldate
served to prove HIS theory and HIS theory ONLY. Insofar, Frankie has my absolute admiration
of at least following up what should have been the task of then paid-for-by-the-state-
investigator Kirk Fowler and to at least assist underpaid and not up-to-the-task public defender
Ken Ray. Frankie´s findings as to the time table make a great deal of sense to me. Arch´s
present and former remarks make a great deal of sense to me. It seems to me that some
obvious arguments have been "left out" for reasons of higher priority or restrictions in the legal
procedural process. That part is very difficult for all of us to understand and does need
clarification.
I am fairly certain that the issue is not to solve the murder, the issue is to free Debbie of her
conviction under the obvious procedural restrictrions. For my understanding, it is and always
will be incomprehensible that former negligence (defense and investigation by Ken Ray et al)
replaced by new found evidence later on is not permitted to be applied in the appeals process.
Lori, if I may ask you (or Mike, if you are overburdened) to explain the above questions and
others pertaining to Levy and his tactics in a few, but precise and understandable sentences to
communicate to normal people - why this and why not that- , you know what I mean? Saldate
is target No. 1 - no question, but he is smart and Levy used a great number of further additonal
tricks. Rosenquists aide-de-camps-attorney, Terrii Cappozzi, called them "cumulative accrued
evidence without merit to gain the attention of the jury, because he would have failed with
Saldate´s testimony alone, since that man was nothing but a bunch of contradictions in his
testimonies whether off- or on-stage, but apparently the judge, the prosecutor and Saldate
were in bed together".
Well, much aside from that scenario and in a total other environment I have heard almost the
same analysis from a witness at trial and former neighbor of Styers/Debbie: - John Ciulla. He
was a witness during trial and totally upset as to the outcome of the twist and turns of the "Levy
questioning". 11 years later he told me some extraordinary things of this " legal marriage", but I
asked for some hard facts. I was told to come to his house the next day, but it was boarded up
and his kids who talked through the door did not let me talk to them. I instructed Kirk to go after
this lead, but he said that there was nobody there and dropped it all. I never had the chance to
talk to John again. I talked to his wife Karen on the phone once after that and she was scared
to death and to please never to call her back. They disappeared after that from AZ.
Anyway, I have been confronted with many upsets, many good leads turning to nothing in the
legal process and many bad leads with ill will. I have not yet found the truth to it all and never

L&L048153

will. I just hope that you will find right the recipe and not let any seemingly unimportant, but yet important piece of evidence go by the wayside in the permitted legal process.
I hope you got the paperwork straightened out together Pat and Debbie for the work to come. If you need for anything additiomnal corroboration, please let me know.
I think of the burden you carry each and every day and only I know how hard it is. May God bless you.
With all my best wishes
Renate


----Original Message-----
Date: Mon, 07 Apr 2008 10:04:00 +0200
Subject: Thanks for the brief....
From: archbell
To: Reinhardd.Mueller@t-online.de

...and for the birthday wishes. How did you know it was my Geburtstag? It already is as I write this.
I never understood why Scott was convicted of first degree murder. **If** his version is correct, Styers did the actual killing while Scott stayed in the car--he was just along for the ride. He knew the crime was going to be committed, and did nothing to stop it, but he did nothing in furtherance of it. I shouldn't think that merely knowing of Styers' intention in advance would make him guilty of conspiracy. I believe Scott himself admitted that he expected to be paid a pittance for his involvement in the crime. But that still leaves the question of what he had agreed his **involvement** was going to be, and what it actually turned out to be: it seems to me he was still just along for the ride.
If one believes the prosecution's claim that Debbie was involved in the conspiracy, that makes it more believable that Scott was in on the plan weeks in advance, and even that he agreed to take money for his participation. Maybe the lawyers will be able to explain to me someday why he was guilty even of conspiracy if the conspirators had never defined his **role** in the coming crime, and if indeed when the crime took place he **did** nothing but **attend.**
**Please** explain why the presence on the juryroom table of that infamous **tape** that had not been introduced at trial is not mentioned on appeal. It ought to be ground for a new trial. Huebl said a juror revealed that it was the thing which swayed them to conviction.
*Love,*
*Arch*

---

Planning your summer road trip? Check out AOL Travel Guides.

---

Planning your summer road trip? Check out AOL Travel Guides.

---

It's Tax Time! Get tips, forms and advice on AOL Money & Finance.

5

L&L048154

# EXHIBIT 8

| | |
|---|---|
| **From:** | LORI VOEPEL |
| **Sent:** | Thursday, January 31, 2008 9:53 AM |
| **To:** | 'PAT24288@aol.com'; webmaster@debbiemilke.com; renatejanka@debbiemilke.com; reinhardd.mueller@t-online.de; DPBice2000@Yahoo.com |
| **Cc:** | MDK@kimerer.com |
| **Subject:** | Updates on Debbie's case |

I received a call late Tuesday from the chief of the capital litigation section at the Attorney General's office, Kent Catanni. He is taking over for J.D. Nielson in handling Debra's appeal. I've had discussions with Mike and Dale Baich (who heads the capital habeas unit for the federal public defenders office), and have exchanged emails with Larry Hammond and Steve Drizin. The general consensus is that Kent's assignment to the case indicates they have some concerns about the strength of our position. Those who know him expect the Answering Brief to be more thorough than it would likely have been with J.D. In any event, I am taking it as a good sign that our opening brief is strong.

Because he is just taking over the case, Kent requested and obtained a 30 day extension from the Ninth Circuit. I never saw a copy of the actual motion but he did ask if we had any objection, which of course we don't. I think a 30 day extension is pretty short in light of the size of our brief and the fact that he's just taking the appeal over. The court issued an order, which I just received, saying that the State's Answering Brief is now due March 12, 2008, and our Reply Brief is due within 30 days of service of the Answering Brief. I am headed out of town around noon today for an oral argument in Bullhead City tomorrow, so Pat, if Debbie would like a legal call, we will need to schedule it for next week.

Lori

L&L048010

| | |
|---|---|
| **From:** | LORI  VOEPEL |
| **Sent:** | Saturday, March 29, 2008 7:37 PM |
| **To:** | 'PAT24288@aol.com'; webmaster@debbiemilke.com; renatejanka@debbiemilke.com; MDK@kimerer.com; reinhardd.mueller@t-online.de; DPBice2000@Yahoo.com; jen@geranio.net |
| **Subject:** | RE: Debbie Called |

Thanks Pat. I'm glad to hear she was not worried about why we are asking for appointment of us as counsel and that she sent the form right back. I'll let you all know when we receive the State's brief. Lori

---

**From:** PAT24288@aol.com [mailto:PAT24288@aol.com]
**Sent:** Saturday, March 29, 2008 3:35 PM
**To:** webmaster@debbiemilke.com; LORI VOEPEL; renatejanka@debbiemilke.com; MDK@kimerer.com; reinhardd.mueller@t-online.de; DPBice2000@Yahoo.com; jen@geranio.net
**Subject:** Debbie Called

Debbie called this morning. She was pretty good and was anxious to hear about the state's brief. The bad news was Lori hasn't received it as of Friday. She was told by the state person that he need a couple more days but wasn't specific what he requested. So they missed their deadline and we play wait and see for a little longer. She will let me know when she gets it and has a chance to make a quick analysis. She is anticipating a major effort from them since they put the top dog on it and are taking as much time as they can get. In turn I am sure she will have her work cut out for her and will need extra time to do the job that is necessary. we always need to keep in the back of our mind "we only get one chance so it has to be the best that can be done". A precious life is at stake and the stakes can't be any higher than that. So we go thru another waiting cycle while the wheels turn and all we can do is be there for her and keep her in our prayers.
Lori: She got your letter and immediately signed and returned it to you on Thursday so you should see it by Monday or Tuesday. It was self-explanatory and she had no questions. I will probably discuss it more with her during my visit.
Since I will be visiting on Monday she only used one call. She sends her love and regards to all and will let you know how the visit goes. I have had a couple Mondays off so she is anxious to see me. I am anxious to see her as well. have a good week end. Talk with you soon.
Pat
Pat

---

Create a Home Theater Like the Pros. Watch the video on AOL Home.

L&L048028