computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (602) 263-1700. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

L&L046520

| From: | Ginger Stahly |
|---|---|
| To: | "Gary Stuart" |
| Cc: | LORI VOEPEL; Kimerer, Michael |
| Subject: | RE: The Milke Case |
| Date: | Thursday, November 14, 2013 7:00:03 PM |
| Attachments: | OPENING BRIEF (Opening thru page 40).pdf |
| | OPENING BRIEF (Pages 41 thru 90).pdf |
| | OPENING BRIEF (Pages 91 thru 137).pdf |
| | MILKE - REPLY BRIEF (06-13-08).pdf |
| | MILKE"s Supplemental Brief (Miranda Issue) - (101008).pdf |
| | Appellees" Supp Ans Brief Re Miranda Waiver (110708).pdf |
| | MILKE - Supp Reply Brief Re Miranda Waiver (120108).pdf |
| | MILKE - Supp Brief Re USDC"s 012910 Order and Findings (031710).pdf |
| | State"s Post-Hearing Supp Brf Re Miranda Waiver (041410).pdf |
| | MILKE - Supp Reply Brf re Dist Cts 1 29 10 Order and Findings (052110).pdf |

Good evening Mr. Stuart –

Attached please find .pdf copies of our Ninth Circuit briefs (Opening and Reply – filed Dec. 2007 & June 2008); copies of Supplemental Briefing on the *Miranda* issue (filed before the Ninth Circuit's remand to the district court for the hearing on Miranda in 2009) and copies of the Supplemental Briefs after the findings of a valid waiver.

Please let me know if you have any problems with the transmission of the above documents and I will resend them to you.

Kindest regards,

*Ginger Stahly*
Legal Assistant to Lori L. Voepel
JS&H Appellate Department
(602) 263-7312

**From:** LORI VOEPEL
**Sent:** Monday, November 11, 2013 5:37 PM
**To:** 'Gary Stuart'
**Cc:** glewis65@gmail.com; tricia@azfinestlawyers.org; Kimerer, Michael
**Subject:** RE: The Milke Case

Hi Gary –

Yes, Mike, Gordon and Tricia have all mentioned you and your book to me. I am happy to help and look forward to meeting you too.

Before meeting, I recommend that I first send you the 9th Circuit briefs, as they are far more in depth and better written than the habeas merits briefs, which were based primarily on the initial habeas petition and done under pretty significant time constraints when we first got into the case. I had a much better handle on the file, arguments, exhibits, etc. by the time we got into the Ninth Circuit. The briefs I will send are the Opening Brief, the Reply Brief, the Supplemental Briefs on the Miranda issue (filed before the 9th Circuit's remand to the district court for the hearing on Miranda in 2009), and the Supplemental Briefs filed with the 9th Circuit after the district court's finding of a valid waiver. These are the series of briefs that formed the basis for the Ninth Circuit opinion. We can then discuss which exhibits/excerpts of record would be most helpful to you.

I'm copying my secretary, Ginger, so she can get the above briefs emailed to you. The opening brief is quite large, so we normally send it in three portions. Please let her know once you have everything, then email me to set up a time for lunch. I want to give you sufficient time to look over those briefs before we meet. Although the opening brief is large, I've been told it is a pretty easy read.

Thanks so much for your interest in Debra's case.

**Lori L. Voepel, Esq.**
Appellate Department
Jones, Skelton & Hochuli, PLC
2901 N. Central, Ste. 800
Phoenix, Arizona 85012
602-263-7312 (phone)
602-200-7807 (fax)
lvoepel@jshfirm.com

**From:** Gary Stuart [mailto:gstuart@keyed.com]
**Sent:** Monday, November 11, 2013 5:13 PM
**To:** LORI VOEPEL
**Cc:** glewis65@gmail.com; tricia@azfinestlawyers.org; Kimerer, Michael
**Subject:** The Milke Case

Dear Lori,

While we haven't "formally" met, I have been following your career for some time now. Gordon Lewis is my son-in-law and I think you know my daughter, Kara, as well. Tricia Schafer is working for me now and thinks you're a peach. You may also know that I've been talking to Mike Kimerer and Rhonda Neff about the Milke case. I attended the last hearing before Judge Mroz and will be hanging around the upcoming hearings. I'm going to write a new book based on the Milke case. It won't be the personal story about Debra Milke that I know Jana Bombersbach is writing. My book will be a narrative history of the case, laced with an occasional opinion of my own. I think the underlying theme might be how the presumption of innocence was swallowed by the beast of wrongful conviction. But the eventual theme may turn out to be something quite different. I'd very much appreciate your insight into the thematic and structural elements of my book. I've been looking at the files in Mike's office and will be down there frequently over the next month. I've read all the pleadings but none of the exhibits. Would you be willing to meet me for lunch sometime soon? I have the index for all the files in Mike's office and I noticed that some of the files are in your office. I've read your June 11, 2002 Merits Brief several times and have it fairly well indexed and digested in my database now. I'm hoping you will give me digital copies of all the exhibits attached to that particular brief. Of course, Judge Kozinski's opinion is the muscle of this case, but I think the marrow of this story is likely to be in the exhibits attached to your several briefings. You're a fine writer. Let me know if you can help.

Best wishes,

Gary



**www.GaryLStuart.com**
**602-281-1111**

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEBRA JEAN MILKE,<br><br>                              Petitioner/Appellant,<br><br>vs.<br><br>DORA B. SCHRIRO, et al.,<br><br>                              Respondent/Appellee. | No. 07-99001<br><br>District Court<br>No. CV-98-00060-PHX-RCB<br><br>**DEATH PENALTY CASE** |

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

### PETITIONER/APPELLANT'S OPENING BRIEF

Lori L. Voepel
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
(602) 263-1700
Co-Counsel for Petitioner/Appellant
Debra Jean Milke

Michael D. Kimerer
KIMERER & DERRICK, P.C.
221 E. Indianola Avenue
Phoenix, Arizona 85012
602-279-5900
Co-Counsel for
Petitioner/Appellant
Debra Jean Milke

L&L046045

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF ISSUES ..............................................................................1

    CERTIFIED: ..............................................................................................1

    NON-CERTIFIED: ....................................................................................1

STATEMENT OF THE CASE .........................................................................2

    A.    Trial Court ........................................................................................2

    B.    Direct Appeal ....................................................................................3

    C.    Post-Conviction Proceedings ...........................................................3

    D.    Habeas Proceedings .........................................................................4

STATEMENT OF RELEVANT FACTS ..........................................................5

    A.    Debra's Background ..........................................................................5

    B.    Debra's Marriage to Mark Milke & Birth of
           Christopher ........................................................................................6

    C.    Debra's Relationship with James Styers ...........................................7

    D.    Debra Meets Roger Scott ..................................................................9

    E.    Debra Obtains a New Job & Makes Plans to Move
           into Her Own Apartment with Christopher .......................................10

    F.    Day of Christopher's Murder ...........................................................11

    G.    Scott's Interrogations by Police, Including Detective
           Saldate ...............................................................................................12

    H.    Detective Saldate's Interrogation of Debra .....................................14

STANDARD OF REVIEW ..............................................................................16

SUMMARY OF ARGUMENT ........................................................................18

LEGAL ARGUMENT .....................................................................................24

i

L&L046046

## TABLE OF CONTENTS
### (continued)

Page

CERTIFIED ISSUES.................................................................................24

I.  The Overreaching Tactics of Phoenix Police Detective
    Armando Saldate Deprived Debra Of Her Rights
    Against Self Incrimination, To Due Process, A Fair Trial,
    And A Just Sentencing Determination Under The Fifth,
    Sixth, Eighth, And Fourteenth Amendments (Claim I). .........24

    A.  The District Court's Total Deference to the State
        Court's Findings Was Clearly Erroneous............................25

    B.  The State Judge's Factual Findings Are Not
        Objectively Reasonable, and Her Legal Conclusions
        Are Clearly Contrary to Established Federal Law. ...........54

    C.  The District Court Erred in Denying Habeas Relief,
        Especially In Light of New Evidence Supporting
        Debra's Claim. ..................................................................67

    D.  Saldate Also Pressured and Influenced Witnesses
        Against Debra, Violating Her Right to a Fair Trial...........87

    E.  Summary of Why the State and District Courts'
        Decisions On Claim I Are Wrong. .....................................95

    F.  At a Minimum, Debra Is Entitled to an Evidentiary
        Hearing to Fully Develop the Factual Support for her
        Claims. ...............................................................................98

II. Debra Was Denied Her Right To Effective Assistance Of
    Trial Counsel In Violation Of The Sixth Amendment
    (Claim IV(A),(G), In Part...........................................................99

    A.  Trial Counsel's Overall Investigation of Debra's Case
        Was So Deficient That Debra Was Substantially
        Prejudiced By His Performance (Claim IV(A), # 3, 4,
        7, 8, 9). ...............................................................................99

    B.  Trial Counsel Failed To Investigate or Present Ample
        Mitigation Evidence Available in Debra's Case
        (Claim IV(G)). ..................................................................109

ii

L&L046047

**TABLE OF CONTENTS**
**(continued)**

Page

III.   **Trial Court Error Infringed Upon Debra's Rights To Due Process And A Fair Trial Under The Fifth And Fourteenth Amendments (Claim III, In Part)**.........................**114**

    A.   The Trial Court Erroneously Struck, For Cause, Potential Juror Moquino (Claim III # 10).........................114

NON-CERTIFIED ISSUE..............................................................................117

IV.   **The Arizona Supreme Court Violated Debra's Rights Under The Eighth And Fourteenth Amendments By Relying On Constitutionally Insufficient Narrowing Constructions Of A Facially Vague Statutory Aggravating Circumstance (Claim X).** ....................................**117**

    A.   A Death Sentence Predicated Upon A Finding That The Offense Was "Heinous . . . Or Depraved" Under A.R.S. § 13-703(F)(6) Violates The Eighth And Fourteenth Amendments Unless That Aggravating Circumstances Has Been Given A Constitutionally Sufficient Limiting Construction......................................118

    B.   The "Shockingly Evil" Construction Is Vague And Overbroad. .........................................................................120

    C.   The "Senseless" Construction Is Vague And Overbroad. .........................................................................122

    D.   The District Court Erred in Finding the State Court Properly Applied a Constitutionally Narrowed Aggravating Factor. ...............................................................128

    E.   The District Court Also Erred in Finding That Application of the (F)(6) Factor Was Not "Arbitrary and Capricious." ..................................................................130

CONCLUSION.............................................................................................132

STATEMENT OF RELATED CASES.........................................................134

CERTIFICATION OF COMPLIANCE.........................................................135

CERTIFICATE OF SERVICE ......................................................................137

iii

L&L046048

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adams v. Texas,*
    448 U.S. 38 (1980)..................................................................115, 117

*Adamson v. Ricketts,*
    865 F. 2d 1011 (9th Cir. 1988) ...........................................123

*Ainsworth v. Woodford,*
    268 F.3d 868 (9th Cir. 2001) .............................................16

*Ake v. Oklahoma,*
    470 U.S. 68 (1985)..............................................................95

*Allen v. Woodford,*
    366 F.3d 823 (9th Cir. 2004) .............................................16

*Arave v. Creech,*
    507 U.S. 463 (1993)......................................................passim

*Barker v. Fleming,*
    423 F.3d 1085 (9th Cir. 2005) ...........................................16

*Blackburn v. Alabama,*
    361 U.S. 199 (1960)............................................................54

*Blake v. Kemp,*
    758 F.2d 523, 534-535 (11th Cir.),
    *cert. denied,* 474 U.S. 998 (1985)...................................114

*Blanco v. Singletary,*
    943 F.2d 1477, 1499 (11th Cir. 1991),
    *cert denied,* 504 U.S. 943 (1992)...................................111

*Brewer v. Aiken,*
    935 F.2d 850 (7th Cir. 1991) ...........................................111

iv

L&L046049

**TABLE OF AUTHORITIES**
(continued)

Page

*Bui v. Haley,*
   321 F.3d 1304 (11th Cir. 2003) ....................................................................18

*Caro v. Calderon,*
   165 F.3d 1223 (9th Cir. 1999) .....................................................................98

*Code v. Montgomery,*
   799 F.2d 1481 (11th Cir. 1986) ..................................................................105

*Collazo v. Estelle,*
   940 F.2d 411 (9th Cir. 1991),
   *cert. denied,* 502 U.S. 1031 (1992) ..............................................................49

*Colorado v. Connelly,*
   479 U.S. 157 (1986) .....................................................................................57

*Commonwealth v. DiGiambattista,*
   813 N.E.2d 516 (Mass. 2004) ......................................................................69

*Crowder v. Kitigawa,*
   81 F.3d 1480 10 (9th Cir. 1996)
   (O'Scannlain, J., dissenting) ........................................................................66

*Deutscher v. Whitley,*
   884 F.2d 1152 (9th Cir. 1989) ...................................................................113

*Earp v. Ornoski,*
   431 F.3d 1158 (9th Cir. 2005) .....................................................................98

*Eddings v. Oklahoma,*
   455 U.S. 104 (1982) ...................................................................................113

*Escobedo v. Illinois,*
   378 U.S. 478 (1964) .....................................................................................25

*Espinosa v. Florida,*
   505 U.S. 1079 (1992) .................................................................................120

v

L&L046050

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Foulk v. Kotz,*
138 Ariz. 159, 673 Ariz. P.2d 799 (App. 1983) ............................................61

*Furman v. Georgia,*
408 U.S. 238 (1972)......................................................................118

*Gasiorowski v. Hose,*
182 Ariz. 376, 897 P.2d 678 (App. 1994) ........................................61

*Godfrey v. Georgia,*
446 U.S. 420 (1980)......................................................................118

*Hall v. Dir. of Corrections,*
343 F.3d 976 (9th Cir. 2003) .........................................................18

*Holland v. Illinois,*
493 U.S. 474 (1990).....................................................................114

*Hutto v. Ross,*
429 U.S. 28 (1976).................................................................49, 76

*In re Hendrix,*
145 Ariz. 345, 701 P.2d 841 (1985) ...............................................65

*Jackson v. Denno,*
378 U.S. 368 (1964)......................................................................54

*Lewis v. Jeffers,*
497 U.S. 764 (1990)..............................................69, 121, 128, 130

*Lopez v. Schriro,*
WL 1760589 (9th Cir. 2007) .........................................................24

*Mak v. Blodgett,*
970 F.2d 614 (9th Cir. 1992),
*cert. denied,* 507 U.S. 951 (1993)..............................109, 110, 113

*Mancuso v. Olivarez,*
292 F.3d 939 (9th Cir. 2002) ........................................................133

vi

L&L046051

**TABLE OF AUTHORITIES**
(continued)

Page

*Marshall v. Loneberger,*
459 U.S. 422 (1983)............................................................26

*Mayes v. Gibson,*
210 F.3d 1284 (10th Cir. 2000),
*cert. denied,* 531 U.S. 1020 (2000)...........................................106

*Maynard v. Cartwright,*
486 U.S. 356 (1988)...........................................................125

*Miller v. Dormire,*
310 F.3d 600 (8th Cir. 2002) ....................................................18

*Miller v. Fenton,*
474 U.S. 104 (1985).....................................................25, 49, 56

*Moore v. Clarke,*
904 F.2d 1226 (8th Cir. 1990) ..............................................123, 126

*North Carolina v. Butler,*
441 U.S. 369 (1979).............................................................82

*Norton v. Spencer,*
351 F.3d 1 (1st Cir. 2003)........................................................18

*Outley v. City of New York,*
837 F.2d 587 (2nd Cir. 1988).....................................................60

*Patton v. Yount,*
467 U.S. 1027 (1984)............................................................95

*Paxton v. Ward,*
199 F.3d 1197 (10th Cir. 1999) ..................................................18

*Poland v. Stewart,*
117 F.3d 1094 (9th Cir. 1997),
*cert. denied,* 523 U.S. 1082 (1998)..............................................55

vii

L&L046052

**TABLE OF AUTHORITIES**
(continued)

Page

*Pruett v. Thompson,*
   771 F.Supp. 1428 (E.D.Va. 1991) ...............................................113

*Richmond v. Lewis,*
   506 U.S. 40 (1992).......................................................................118

*Russell v. Lynaugh,*
   892 F.2d 1205 (5th Cir. 1989),
   *cert. denied,* 501 U.S. 1259 (1991)............................................106

*Salem v. U.S. Lines Co.,*
   370 U.S. 31 (1962).........................................................................67

*Sanchez-Llamas v. Oregon,*
   126 S.Ct. 2669 (2006)...................................................................57

*Sanders v. Ratelle,*
   21 F.3d 1446 (9th Cir. 1994) ........................................................99

*Schneckloth v. Bustamonte,*
   412 U.S. 218 (1973)......................................................................82

*Shell v. Mississippi,*
   498 U.S. 1 (1990).........................................................................120

*Silva v. Woodford,*
   279 F.3d 825 (9th Cir. 2002) ......................................................105

*Siripongs v. Calderon,*
   35 F.3d 11308, 1315-1316 (9th Cir. 1994)..................................106

*State v. Amaya-Ruiz,*
   166 Ariz. 152, 800 P.2d 1260 (1990) ..........................................126

*State v. Barnett,*
   789 A.2d 629 (N.H. 2002) ............................................................69

*State v. Carillo,*
   156 Ariz. 125, 750 P.2d 883 (1988) ..............................................47

viii

L&L046053

## TABLE OF AUTHORITIES
### (continued)

Page

*State v. Carlson,*
  202 Ariz. 570, 48 P.3d 1180 (2002) ............................................................131

*State v. Clark,*
  126 Ariz. 428, 616 P.2d 888 (1980). ...........................................................115

*State v. Comer,*
  165 Ariz. 413, 799 P.2d 333 (1990) ............................................................127

*State v. Conde,*
  174 Ariz. 30, 846 P.2d 843 (App. 1992) .......................................................47

*State v. Cook,*
  847 A.2d 530 (N.J. 2004) .............................................................................69

*State v. Correll,*
  148 Ariz. 468, 715 P.2d 721 (1986) ............................................................127

*State v. Day,*
  148 Ariz. 490, 755 P.2d 743 (1986) ..............................................................50

*State v. Emery,*
  131 Ariz. 493, 642 P.2d 838 (1982) ..............................................................51

*State v. Gillies,*
  142 Ariz. 564, 691 P.2d 655 (1984) ............................................................127

*State v. Gretzler,*
  135 Ariz. 42, 659 P.2d 1 (1983) ............................................................passim

*State v. Hyde,*
  186 Ariz. 252, 921 P.2d 655 (1996) ............................................................128

*State v. James,*
  141 Ariz. 141, 685 P.2d 1293 (1984) ..........................................................127

*State v. Jimenez,*
  165 Ariz. 444, 799 P.2d 785 (1990) .....................................................126, 132

ix

L&L046054

**TABLE OF AUTHORITIES**
**(continued)**

Page

*State v. Johnson,*
147 Ariz. 395, 710 P.2d 1050 (1985) ....................................................128, 132

*State v. Kiles,*
175 Ariz. 358, 857 P.2d 1212 (1993) .........................................................125

*State v. Lopez,*
174 Ariz. 131, 847 P.2d 1078 (1992) ....................................................125, 126

*State v. Martinez-Villareal,*
145 Ariz. 441, 702 P.2d 670 (1985) .....................................................115, 127

*State v. Miles,*
186 Ariz. 10, 918 P.2d 1028 (1996) ...........................................................128

*State v. Milke,*
177 Ariz. 118, 865 P.2d 779 (1993) .......................................................passim

*State v. Ross,*
180 Ariz. 598, 886 P.2d 1354 (1994) ............................................................56

*State v. Rossi,*
171 Ariz. 276, 830 P.2d 797 (1992) ............................................................127

*State v. Running Eagle,*
176 Ariz. 59, 854 P.2d 169 (1993) ..............................................................51

*State v. Salazar,*
173 Ariz. 399, 844 P.2d 566 (1992) ......................................................127, 132

*State v. Scales,*
518 N.W. 2d 587 (Minn. 1994) ...................................................................69

*State v. Schackart,*
190 Ariz. 238, 947 P.2d 315 (1997) ...........................................................128

*State v. Smith,*
141 Ariz. 510, 687 P.2d 1265 (1984) ..........................................................127

x

L&L046055

**TABLE OF AUTHORITIES**
(continued)

Page

*State v. Stanley,*
167 Ariz. 519, 809 P.2d 944 (1991) ........................................................125

*State v. Strayhand,*
184 Ariz. 571, 911 P.2d 577 (1995) .......................................................47, 76

*State v. Vickers,*
159 Ariz. 532, 768 P.2d 1177 (1989) ......................................................126

*State v. Wallace,*
160 Ariz. 424, 773 P.2d 983 (1989) ........................................................123

*State v. West,*
176 Ariz. 432, 862 P.2d 192 (1993) ........................................................127

*State v. Zaragoza,*
135 Ariz. 63, 659 P.2d 22 (1983) ............................................................127

*Stephan v. State,*
711 P.2d 1156 (Alaska 1985) ................................................................69, 70

*Strickland v. Washington,*
466 U.S. 668 (1984)..............................................................................passim

*Sullivan v. Fairman,*
819 F.2d 1382 (7th Cir. 1987) ...............................................................105

*Taylor v. Maddox,*
366 F.3d 992 (9th Cir. 2004) ..............................................................passim

*United States v. Acosta,*
111 F.Supp.2d 1082 (E.D.Wisc. 2000)......................................................60

*United States v. Aminy,*
15 F.3d 258 (2nd Cir. 1994).......................................................................62

*United States v. Heldt,*
745 F.2d 1275 (9th Cir. 1984) ..................................................................82

xi

L&L046056

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Kiszewski,*
  877 F.2d 210 (2nd Cir. 1989)................................................29, 60

*United States v. Lewis,*
  355 F.Supp.2d 870 (E.D. Mich. 2005) ........................................69

*United States v. Montgomery,*
  56 M.J. 660 (Army Ct.Crim.App. 2001) ......................................60

*United States v. Ramirez,*
  894 F.2d 565 (2nd Cir. 1990)..................................................61

*United States v. Stockton,*
  788 F.2d 210 (4th Cir.),
  *cert. denied,* 479 U.S. 840 (1986)............................................60

*Wade v. Calderon,*
  29 F.3d 1312 (9th Cir. 1994) ..................................................106

*Wallace v. Stewart,*
  184 F.3d 1112 (9th Cir. 1999),
  *cert. denied,* 528 U.S. 1105 (2000)..........................................110

*Walton v. Arizona,*
  497 U.S. 639 (1990)..............................................................123

*Ward v. Sternes,*
  334 F.3d 696 (7th Cir. 2003) ...................................................18

*Waters v. Zant,*
  979 F.2d 1473 (11th Cir. 1992) ........................................111, 113

*Watkins v. Sowders,*
  449 U.S. 341 (1981)..............................................................57

*Wiggins v. Smith,*
  539 U.S. 510 (2003)..............................................................18

L&L046057

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Williams v. Taylor,*
   529 U.S. 362, 405 (2000)................................................................17

*Witherspoon v. Illinois,*
   391 U.S. 510 (1968).........................................................114, 117

*Zant v. Stephens,*
   462 U.S. 862 (1983).........................................................120, 131

**Statutes**

28 U.S.C. § 1291..........................................................................1

28 U.S.C. § 2241..........................................................................1

28 U.S.C. § 2253..........................................................................1

28 U.S.C. § 2254..........................................................................1

28 U.S.C. § 2254(d)(1),(2)..................................................passim

28 U.S.C. § 2254(e)(1) .....................................................passim

28 U.S.C. § 651............................................................................1

705 Ill.Comp.Stat.Ann. § 405/5-401.5 (West 2006) ..........................69

725 Ill.Comp.Stat.Ann., § 5/103-2.1 (West 2006) .............................69

A.R.S. § 13-703 ......................................................................119

A.R.S. § 13-703(F)(5).....................................................2, 117

A.R.S. § 13-703(F)(6)..........................................................passim

A.R.S. § 13-703(F)(9)......................................... 2, 3, 117, 131

Art. 38.22(3)(a), Texas Statutes and Codes.............................69

D.C.Code §§ 5.116.01-08 (2005) ..........................................69

xiii

L&L046058

**TABLE OF AUTHORITIES**
**(continued)**

Page

Me.Rev.Stat.Ann. tit. 25
§ 2803-B(1)(K)(West 2006) ...................................................................69

N.M.Stat.Ann.
§ 29-1-16 (West 2006) ...........................................................................69

Wis.Stat. §§ 968.073, 972.115 (2005).....................................................69

**Rules**

Fed.R.Civ.P. Rule 60(b) ...........................................................................76

Fed.R.Evid. 201 ........................................................................................66

Fed.R.Evid. 404(a)(1) .............................................................................105

Fed.R.Evid. 404(b) ...................................................................................61

Fed.R.Evid. 406 ........................................................................................61

Fed.R.Evid. 608(b) ...................................................................................60

Fed.R.Evid. 701 ......................................................................................104

Rule 3.17, New Jersey Sup.Ct.R. (2005)..................................................69

Rule 32.4(e), Ariz.R.Crim.P. ......................................................................3

Rule 608(a)(1), Ariz.R.Evid. ....................................................................52

**Constitutional Provisions**

Eighth Amendment .............................................................................passim

Fifth Amendment...................................................................24, 98, 131

Fourtheenth Amendment ....................................................................passim

L&L046059

**TABLE OF AUTHORITIES**
<u>(continued)</u>

                                                                      <u>Page</u>

Sixth Amendment ...................................................................... 98, 99, 114, 117

Victim's Rights Amendments,
    to Arizona Constitution..................................................................91

**<u>Other Authorities</u>**

Brown, J.W., *Milke Case Facing Mistrial, Judge Says*,
    PHOENIX GAZETTE at E4 (Oct. 10, 1990)................................................65

Cooke, L., *Colorado's Courts Consider Custody*,
    23 Colo.Law. 1519 (July 1994) ....................................................25

Garrett, B., *Judging Innocence*,
    108 Colum. L. Rev. (forthcoming 2008),
    avail. at http://ssrn.com/abstract = 999984 ....................................96

Harker, V., *Controversial Judge Transferred From*
    *Criminal to Domestic Cases*,
    THE ARIZONA REPUBLIC at A35 (Nov. 8, 1997)..............................65, 66

House Bill 2280, Arizona State Legislature (2007) ...........................................70

*Proving the Lie: Litigating Police Credibility*,
    26 Am.J.Crim.L. 455 (1999) .........................................................60

Sullivan, Thomas, *The Time Has Come For Law Enforcement*
    *Recordings of Custodial Interviews, Start to Finish*,
    37 Golden Gate Univ.L.Rev. 175 (Fall 2006)................................................70

Webster's Third New International Dictionary at 1726 (1986) ......................124

Whiting, B., *Court Fretting: Concert Riles Some*,
    THE ARIZONA REPUBLIC at B1 (Jan. 25, 1991) ......................................66

L&L046060

## JURISDICTIONAL STATEMENT

Debra Milke, an Arizona death row prisoner, appeals from final judgment on all habeas claims raised in U.S. District Court pursuant to 28 U.S.C. §§ 2241 and 2254. This Court has jurisdiction under 28 U.S.C. §§ 1291, 651 and 2253.

## STATEMENT OF ISSUES

**CERTIFIED:**

I.   Did The Overreaching Tactics Of Phoenix Police Detective Armando Saldate Deprive Debra Of Her Rights Against Self Incrimination, To Due Process, A Fair Trial, And A Just Sentencing Determination Under The Fifth, Sixth, Eighth & Fourteenth Amendments? (Claim I).

II.  Was Debra Denied Effective Assistance Of Trial Counsel In Violation Of The Sixth Amendment? (Claim IV (A), (G), In Part).

    A.   Was Trial Counsel's Overall Investigation So Deficient That Debra Was Substantially Prejudiced By His Performance? (Claim IV(A), # 3, 4, 7, 8, 9).

    B.   Was Trial Counsel Ineffective For Failing To Investigate Or Present Available Mitigation Evidence? (Claim IV(G), In Part).

III. Did Trial Court Error Infringe Upon Debra's Rights To Due Process And A Fair Trial In Violation Of The Fifth And Fourteenth Amendments? (Claim III, In Part).

    A.   Did The Trial Court Erroneously Strike, For Cause, Potential Juror Moquino? (Claim III # 10).

**NON-CERTIFIED:**

IV.  Did The Arizona Supreme Court Violate Debra's Rights Under The Eighth And Fourteenth Amendments By Relying On Constitutionally Insufficient Narrowing Constructions Of A Facially Vague Statutory Aggravating Circumstance? (Claim X).

## STATEMENT OF THE CASE

### A.   Trial Court.

In December 1989, the State charged Debra Milke and co-defendants James Styers and Roger Scott with first-degree murder, conspiracy to commit murder, child abuse and kidnapping relating to the death of Debra's four-year-old son, Christopher.   In separate trials, the State sought the death penalty against all three defendants.

Prior to trial, Judge Cheryl Hendrix held a suppression hearing regarding Debra's alleged "confession" to police detective Armando Saldate.   Trial counsel did not call Debra to testify, and the judge ruled her alleged confession admissible.   On October 12, 1990, a jury found Debra guilty on all charges.

On January 18, 1991, Judge Hendrix entered judgment and sentenced Debra to death, finding three aggravating factors: 1) the offense was committed in an especially heinous and depraved manner, A.R.S. § 13-703(F)(6); 2) it was committed for pecuniary gain, A.R.S. § 13-703(F)(5); and 3) the victim was under age fifteen, A.R.S. § 13-703(F)(9). (ER 209, 231).   She found no statutory mitigating factors and gave weight to only three non-statutory mitigating factors (no prior felony record, employment history, and conduct while incarcerated), but found these insufficient to call for leniency. (Id.). Debra has been on death row for seventeen years.

2

**B.    Direct Appeal.**

The Arizona Supreme Court affirmed most of Debra's convictions, but set aside her child abuse conviction as fundamental error. *State v. Milke*, 177 Ariz. 118, 865 P.2d 779 (1993) (ER 197). It also vacated pecuniary gain as an aggravating factor, but affirmed Debra's death sentence under the (F)(6) and (F)(9) aggravating factors. Debra petitioned for a Writ of Certiorari, which the U.S. Supreme Court denied. (ER 196).

**C.    Post-Conviction Proceedings.**

On November 1, 1995, Debra petitioned for Post Conviction Relief (PCR), raising several issues primarily relating to Detective Saldate's interrogation tactics, ineffective assistance and prosecutorial misconduct. She requested an evidentiary hearing and post-conviction discovery of Saldate's personnel file. She also moved for change of judge for bias under Ariz.R.Crim.P. Rule 32.4(e), which Judge Hendrix denied. (ER 1173).[1] On November 18, 1996, Judge Hendrix summarily dismissed the PCR without discovery or a hearing. (ER 141). Debra's Petition for Review was denied. (ER 140).

---

[1] A second judge also denied the motion because Debra failed to verify the grounds by affidavit. (ER 1576). Debra re-urged her request and included an affidavit, which Judge Hendrix again denied. (ER 1173-75). The Arizona Supreme court declined special action review of this ruling. (ER 1149-50).

L&L046063

**D.**   **Habeas Proceedings.**

On August 31, 1998, Debra filed an Amended Petition for Writ of Habeas Corpus.  On July 7, 2000, the district court granted review on the merits of Claims I, III (in part), IV(A) (in part), IV(B), IV(G) (in part), V(C), VII, VIII (in part), X, and XI (in part).[2] (ER 106).  It also granted Debra's request for discovery of Detective Saldate's personnel file and disclosed several documents to counsel following *in camera* review. (ER 76, 89).  The court also granted leave for two *amicus curiae* briefs to be filed in support of Debra's petition – one by Steve Drizin of the Center on Wrongful Convictions, Northwestern University School of Law, and one by Larry Hammond and former appellate court judge Rudy Gerber on behalf of the Arizona Civil Liberties Union.  (CR 132, 146, 124, 126).  It also granted Debra's Motion to Expand the Record, admitting 26 additional exhibits, primarily regarding the unreliability of Saldate's interrogation techniques and the purported confession. (ER 68).

Notwithstanding these early favorable rulings, the district court denied habeas relief on November 28, 2006, after the petition was pending for over six years. (ER 12).  It also denied Debra's request for an evidentiary hearing and her Motion to Alter or Amend the Judgment. (ER 3).

---

[2] This Brief includes parenthetical references to these claim numbers.

4

The district court issued, *sua sponte,* a Certificate of Appealability (COA), certifying three of ten issues considered on the merits. (ER 9). Inexplicably not certified were claims regarding trial and appellate counsel's failure to properly challenge admissibility of the "confession," and one based on unconstitutional application of the death penalty.  On February 7, 2007, Debra filed a Notice of Appeal, and on February 12, 2007, she requested an amended COA, which was summarily denied. (ER 1, 294).

## STATEMENT OF RELEVANT FACTS

### A.    Debra's Background.

Debra is the oldest of two daughters of career military man Richard Sadeik and his German wife, Renate.  Her sister Sandra is two years younger. Debra's family strongly believed in institutions of authority like the military and government. (ER 955-58, 332-33).   Renate divorced Richard, a chronic alcoholic, when Debra was 14 and Sandra 12. (ER 966-68, 381).   Richard resented Debra's support for her mother's decision and refused to assist Debra years later when she married Mark Milke.  (RT 10/1/90 at 26, 38).

After the divorce, Debra lived with Renate, attending community college and becoming employed by age 18.  (RT 10/1/90 at 11-12).  In contrast, Sandra became rebellious, and Renate sent her, then 15, to live with Richard and his new wife. (ER 960, 968-71).  From that point forward, the family was divided:

L&L046065

Sandra and Richard versus Renate and Debra.[3] (Id.).   Sandra and Debra developed a complicated love-hate relationship. (ER 326, 387, 974).

Renate was laid off once Debra turned nineteen. (ER 974).   She accepted a new job in Germany, leaving Debra on her own. (RT 10/1/90 at 9).

**B.     Debra's Marriage to Mark Milke & Birth of Christopher.**

Within two months, Debra met Mark Milke, and they moved in together. (RT 10/1/90 at 15).   Shortly after, Mark was arrested for possession of cocaine, and Debra left him. (RT 10/1/90 at 23).   Mark swore he'd change, so the two reconciled and later married.   Almost immediately, Mark was again arrested for drug possession. (Id. at 30).   Within two months of marriage, Debra became pregnant with Christopher. (Id. at 31).   During her pregnancy, Mark wrecked their car and was arrested for DUI. (Id. at 33-34).

Christopher was born on October 2, 1985. (ER 991).   Debra was virtually a single parent due to Mark's extensive drug and alcohol abuse. (RT 10/1/90 at 34-38; ER 993-1033).   Mark was convicted of DUI shortly after Christopher's birth, serving six months in prison. (RT 10/1/09 at 34, 37, 48).   Within three months of release, he was arrested for domestic violence and parole violation. (Id. at 48).   Debra filed for divorce. (ER 1007-08).   Yet, Debra felt Christopher

---

[3] This dynamic reared its ugly head during Debra's trial, as both Sandra and Richard were persuaded by Saldate to testify negatively about Debra's character. (RT 9/13/90 at 86-117; RT 9/14/90 at 83-101).

L&L046066

needed his father and encouraged regular visitation. (RT 10/1/90 at 66). After

one of Mark's prison stints, he lived with Sandra, during which Debra allowed

Christopher to stay with him so long as he was in rehabilitation. (Id. at 70).

When Mark again began abusing drugs, he took Christopher to a "drug house"

and became verbally abusive, causing Debra to obtain a restraining order. (ER

1216).  Debra later allowed visitation, but for shorter periods with increased

supervision. (RT 10/1/90 at 75-80).

Debra worked fulltime (sometimes two jobs) to support Christopher

alone. (RT 10/1/90 at 35).  She relied on family and friends for babysitting. (Id.

at 40, 44-45, 49, 55).  Christopher was a high energy child (RT 9/14/90 at 55),

but his behavior improved after treatment for a thyroid tumor in 1988.[4]  (RT

10/1/90 at 102-103; ER 1220-69).

### C.   Debra's Relationship with James Styers.

Debra and Sandra met Jim Styers at an apartment complex where they

lived during one of Debra and Mark's separations. (RT 10/1/90 at 102-03).

Styers seemed like a "nice guy" and loving father to his daughter, Wendy. (Id.

at 18, 63).  Both sisters trusted and allowed Styers to occasionally babysit their

---

[4] During Christopher's hospitalization, the staff was impressed with
Debra's dedication. (ER 1220-25).

7

children.  (RT 9/17/90 at 25; RT 10/1/90 at 64).  After Debra moved from the apartment in 1986, she rarely had contact with Styers. (RT 10/1/90 at 90-91).

Debra sought Styers' assistance in July 1989, however, when her relationship with Mark again became hostile. (Id. at 113).   Mark had confiscated Debra's only transportation, leaving her stranded on the street with Christopher.  Debra called Styers for a ride because he lived nearby, and he offered to let them stay at his apartment. (RT 10/1/90 at 120-121; ER 1025). Debra and Christopher had been living with Mark's mother, but with increased tension between she and Mark,[5] Debra decided to accept Styers' invitation until she could get back on her feet. (RT 10/2/90 at 2-5).  Debra and Christopher shared a room with Styers' daughter. (Id. at 32).  Although Debra knew Styers served in Vietnam, she was unaware he suffered psychological problems from his Marine combat experience.[6]  (RT 10/1/90 at 62-64; ER 1027).

---

[5] In October 1989, Mark unsuccessfully challenged custody. (RT 9/17/90 at 44-45).  Due to his harassment and abuse, Debra obtained another order of protection. (Id.). However, she allowed Mark visitation with Christopher until he left for Texas in November 1989.  (RT 10/2/90 at 60).

[6] It was revealed in Styers' trial that he killed women and children in Vietnam and often heard voices and children crying. (RT (Styers) 10/29/90 at 19; ER 1676-80, 1027).  In 1969, he experienced syncope and was transferred to a base in Yuma, Arizona for the rest of his tour. (ER 1027, 1779).  In 1971, he fell from a truck, suffering a skull fracture, brain contusion and coma. (RT 10/29/90 at 20-21; ER 1779).  He also experienced mental confusion and severe memory loss. (ER 1779).  Tests revealed a low I.Q., lack of motivation and

L&L046068

In the four months they lived together, Styers became increasingly obsessed with Debra. (ER 1028). While Debra treated Styers as a friend, he started calling her "Honey" and "Sweetie." (Id.; ER 2051). He once told Renate not to "interfere," that he would take care of Debra. (ER 1029). However, Styers apparently did not share the same fond feelings for Christopher. It was later revealed that he complained to neighbors about Christopher, saying the boy required discipline. (RT 1/30/91 at 37; RT 1/29/91 at 50). At Christopher's fourth birthday party, Styers told him to stop playing with a truck, and when he disobeyed, Styers allegedly told a neighbor, "I wish he were dead." (RT 1/29/91 at 27). Unaware of these feelings, Debra regularly entrusted Christopher to Styers' care.

Despite claiming he shunned guns due to his military experiences, Styers purchased several handguns while Debra and Christopher lived with him, including a .22 caliber handgun at a November 1989 gun show. (RT 10/2/90 at 21-23). He also began target shooting. (Id. at 19, 20, 24; RT 9/13/90 at 98).

**D.    Debra Meets Roger Scott.**

Debra met Roger Scott about one month after she and Christopher moved into Styers' apartment. (ER 1028). Styers was Scott's only friend for over

---

learning limitations. (Id.). He was also diagnosed and received regular treatment and medication for post traumatic stress disorder. (Id.).

9

L&L046069

twenty years. (ER 1609, 1624-26). Scott was a "passive dependent person" who did whatever it took to keep Styers in his life. (ER 935-40). Debra was uncomfortable around Scott and found him "kind of strange." (RT 10/3/90 at 36). Not long after meeting, Scott asked Debra for several hundred dollars to appeal a denial of his disability benefits, which she refused. (ER 1028).

### E.    Debra Obtains a New Job & Makes Plans to Move into Her Own Apartment with Christopher.

In September 1989, Debra was hired by John Alden Insurance Company. (RT 10/2/90 at 68). She elected medical, dental, long term disability and life insurance benefits for herself and Christopher.[7] (ER 1201). Debra had elected similar benefits through prior employers' policies. (ER 1204, 1737-39). Debra left her benefits application and policy in Styers' room, where she kept all her paperwork, boxes and clothing, due to space limitations. (ER 1731-35). She also discussed her benefits with Styers when he asked about them one day. (Id.). Scott also had access to Debra's insurance benefit forms, as he was frequently at Styers' apartment when Debra was working. (ER 1743-46).

---

[7] Debra did not "take out" an insurance policy on her son as alleged by the State.

10

Debra told Styers in late November 1989 that she had located a new apartment, and they would be moving in January.[8]   (ER 1034).   One reason Debra wanted to move soon was that she discovered Styers had purchased a gun, which she did not want around Christopher. (ER 136).

**F.   Day of Christopher's Murder.**

On December 2, 1989, Styers asked if he could use Debra's car to go to a shopping mall, Metrocenter.[9] (RT 10/2/90 at 80).   Christopher begged to go so he could see Santa Claus, which Debra allowed when Styers said he did not mind. (Id. at 80-81).   Debra stayed home to clean and do laundry. (Id. at 89).   Around 2:45 p.m., Styers called Debra and said Christopher was missing. (RT 10/3/90 at 37).   He said he was with a security guard and they would notify police. (RT 10/3/90 at 37-38).   Debra was hysterical and called her father several times over the next few hours. (RT 9/24/90 at 103-104, 106-107).   She also called Crime Stop. (RT 10/2/90 at 100).

That evening, Debra's stepmother and stepsister arrived.   Debra's father stayed in Florence where he was a prison guard, as he feared Christopher's disappearance was a prison-related kidnapping. (RT 9/13/90 at 108).   During the night, police repeatedly interviewed Debra.   With friends at the apartment

---

[8] The rental application shows Christopher would be living with Debra at the apartment beginning January 13, 1990. (ER 1212-15).

[9] Styers regularly used her car, as his needed repair. (RT 10/4/90 at 28).

11

and others searching the mall, Debra kept a 21-hour vigil by the phone. (RT 9/24/90 at 93-95, 102, 117, 142). Recognizing Debra's distress, friends and family gave Debra alcohol and medication to try and calm her. (RT 9/24/90 at 126; RT 10/2/90 at 107, 109-110).

Meanwhile, police interviews with Styers led them to Roger Scott, whom they located at home around 12:30 a.m. on December 3. (Id. at 26-28; ER 1627). Scott first told police the "kidnapping" story, and they left. (Id. at 53). When discrepancies arose between Styers' and Scott's stories, police returned to Scott's home at 2:00 a.m. (Id. at 50-60). They re-interviewed him, then took him for a lengthy drive before bringing him to the police station for interrogation. (ER 1055-56; RT (Scott) 1/28/91 at 27, 30-33).

**G.    Scott's Interrogations by Police, Including Detective Saldate.**

Police detained Scott for 18 hours, deprived him of food, drink and seizure medication, and left him alone in an interrogation room for long periods. (ER 1041). Officers took turns questioning Scott, and he always gave the same story. (Id.). At 12:50 p.m., Detective Armando Saldate began questioning. (ER 1655-59). Saldate, who has a documented history of coercing and fabricating confessions,[10] claimed Scott had "not been given the opportunity to be truthful." (RT (Milke) 9/10/90 at 12). He did not record the

---

[10] Saldate's history is described in Argument I.

12

interrogation. (ER 1657-59).   After eight minutes of questioning and nearly eleven hours after Scott was taken into custody, Saldate *Mirandized*[11] Scott. (Id.). He accused Scott of lying and threatened to interrogate Scott's mother, whom he knew was elderly and in poor health. (RT 9/10/90 at 26-28).   Scott, who lived with and was his mother's sole caretaker, begged Saldate not to disturb her. (Id.).  Saldate told Scott to at least lead them to Christopher's body, after which Scott said, "Jim [Styers] killed him," and he knew where the body was located.  (Id. at 10-12).

Around this timeframe, Debra's stepmother urged Debra to go see her father in Florence, which she did. (RT 9/13/90 at 110; RT 10/2/90 at 115, 120-123).  When she arrived, Richard fed her, gave her beer and put her to bed, as she hadn't slept or eaten and was exhausted. (RT 9/13/90 at 110-113).

While driving to the desert location where Christopher was killed, Saldate continued questioning, during which Scott allegedly made statements vaguely implicating Debra in Christopher's death (none of which were admitted at Debra's trial). (ER 2071; RT 1/21/90 at 7-12; RT 9/10/90 at 30-31).   After locating Christopher's body and returning to the police station, Saldate flew by helicopter to Florence to interview Debra. Meanwhile, Detective Mills tape recorded Scott's "confession" in which he claimed Styers and Debra agreed to

---

[11] *Miranda v. Arizona*, 396 U.S. 868 (1969).

13

L&L046073

pay $250 from a $5,000 life insurance policy for his help with the murder. (ER 2071). Scott's confession (which was also not admitted at Debra's trial) reveals confusion and uncertainty regarding the course of events, times, dates, locations, and the extent of Debra's supposed involvement. (Id.). Mills asked Scott leading questions to get him through the interview.[12] (Id.).

### H.   Detective Saldate's Interrogation of Debra.

Before Saldate left for Florence, his supervisor told him to tape record his interview of Debra. (RT 9/10/90 at 29, 41-43). Saldate ignored this directive and took no tape recorder with him. (Id.). At Saldate's request, local officers escorted Debra from her father's house to the Florence Sherriff's station, where she waited two to three hours with a friend. (Id. at 42; RT 10/2/90 at 11, 124).

By the time he arrived, Saldate had already concluded that Debra conspired with Scott and Styers to have Christopher murdered. He admittedly based this determination solely upon a few words by Scott. (RT 9/10/90 at 13-15, 40-43). Every action the 21-year police veteran took from that point forward was designed to support his belief. (ER 390, 1307). For the next half hour, Saldate sat alone with Debra without the benefit of a witness, audiotape or

---

[12] Scott's own trial testimony also reveals confusion and inconsistencies. (Habeas Reply at 4; ER 1638-52). During cross-examination, Scott backed off on his prior incriminations and said he "did not recall" facts regarding the purported conspiracy. (ER 1638-52). He would only concede that the facts alleged by the State were "on the tape." (Id.; ER 2071).

14

L&L046074

videotape to memorialize her interrogation. (RT 9/10/90 at 44, 55). When he emerged, Saldate claimed Debra had confessed to participating in the murder. (RT 9/10/90 at 55; RT 9/12/90 at 80-81). Afterward, Saldate rode with Debra (unhandcuffed) to Phoenix where she was booked. (RT 9/13/90 at 14).

Saldate never asked Debra to write or sign a statement acknowledging her participation, even though he had no corroborating witness and no taped record of the interrogation. Several days later, Saldate prepared a paraphrased report and destroyed his contemporaneous notes, leaving only his "official" version. (ER 2064; RT 9/13/90 at 34-35). Nothing corroborates Saldate's account of Debra's purported confession.

Debra has consistently denied confessing to Saldate. (RT 10/3/90 at 22-23, RT 1/18/91 at 15-27). This is supported by three witnesses who spoke independently with Debra shortly after her arrest.[13] To the extent Saldate's

---

[13] Investigative reporter Paul Huebl saw Debra in the receiving area of the jail shortly after her arrest. (ER 347). He describes Debra as "astonished," "shocked" and "confused" when he told her police claimed she had confessed and states she was "adamant" about her lack of involvement. (Id.). Defense investigator Kirk Fowler also avows that Debra has consistently denied any involvement. (ER 376). He has never observed any behavior or statements by Debra supporting Saldate's claim that she confessed. (Id.). He found her forthright, cooperative and sincere in her grief over Christopher. (Id.). Dr. Kassell, a jail psychiatrist, treated Debra for depression after her arrest. (RT 9/10/90 at 78-79). Once, when they spoke about Saldate's interrogation, Kassell asked to tape record Debra's explanation. (Id. at 80-81; ER 2045). The recording shows how Saldate twisted and fabricated Debra's statements. (Id.).

15

L&L046075

police report describes actual disjointed statements by Debra, she contends these were borne of shock, disbelief, confusion, and terror at the news that her son was murdered and she was being blamed. (RT 10/3/90 at 13-14, 18, 42-46). She says Saldate also twisted and took several critical statements out of context, giving them a different meaning than intended. (Id. at 11-59). Other alleged statements were completely fabricated. (Id)

Unfortunately, because of Saldate's failure to record, document or have the interrogation witnessed, no one can prove with certainty what occurred. Given his long tenure as a police officer and confidence in his ability to sway a jury, Saldate knew he would receive the benefit of any doubt.

## STANDARD OF REVIEW

In habeas proceedings, two standards of review apply – one to the district court's decision, and another to the state court's decision. *Barker v. Fleming,* 423 F.3d 1085, 1091 (9th Cir. 2005). The district court's decision is reviewed *de novo. Id.* Factual findings are reviewed for clear error. *Ainsworth v. Woodford,* 268 F.3d 868, 873 (9th Cir. 2001). Ineffective assistance claims are mixed questions of law and fact, reviewed *de novo. Allen v. Woodford,* 366 F.3d 823, 836 (9th Cir. 2004). Here, the district court clearly erred by completely deferring to the state court's findings and applying the wrong standards in reviewing Debra's challenge to those findings.

L&L046076

The state court's decision is reviewed under the AEDPA.[14]   Debra is entitled to relief on any claim adjudicated on the merits by a state court which meets the requirements of 28 U.S.C. § 2254(d).   In evaluating a state court's application of federal law, a federal court must apply § 2254(d)(1).   Two concepts are central -- whether the state court's decision 1) was "contrary to" or 2) involved an "unreasonable application of" clearly established Supreme Court precedent. *Id.*  Under the "contrary to" test, habeas relief should be granted as to claims adjudicated on the merits if the state court arrives at a conclusion contrary to that reached by the U.S. Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000).   Under the "unreasonable application" test, a federal court may grant relief if the state court identifies the correct governing legal principle but unreasonably applies it to the facts. *Id.* at 407-08.  Here, the state court rulings were contrary to established federal law pertaining to 1) admissibility of confession evidence and 2) a defendant's ability to challenge the reliability of a purported confession through impeachment, habit evidence and expert testimony regarding interrogation tactics.   The state court's rulings also

---

[14] Debra's petition was filed January 12, 1998, making the Antiterrorism and Effective Death Penalty Act (AEDPA) applicable.

L&L046077

involved an unreasonable application of clearly established federal law pertaining to ineffective assistance and imposition of the death penalty.

State court findings of fact are reviewed according to § 2254(d)(2). Habeas relief is proper where the state court's determinations of fact are "objectively unreasonable." *Taylor v. Maddox,* 366 F.3d 992 (9th Cir. 2004).[15] Only if the state court's factual findings survive an intrinsic challenge of objective reasonableness are they entitled to a "presumption of correctness" under § 2254(e)(1) and subject to rebuttal by clear and convincing evidence. *Id.* at 999-1000. The state court's factual findings in Debra's case are objectively unreasonable and not entitled to a presumption of correctness.

## SUMMARY OF ARGUMENT

Debra's capital conviction sends a message that is incomprehensible in any constitutional system of justice:

> If a police officer can get you into a room alone for thirty minutes without a tape recorder, you can be executed in this country solely on the basis of what he claims happened in that room.

---

[15] The "unreasonable determination" standard is not impossible to meet. *Taylor,* 366 F.3d at 999; *see also Wiggins v. Smith,* 539 U.S. 510 (2003); *Norton v. Spencer,* 351 F.3d 1 (1st Cir. 2003); *Ward v. Sternes,* 334 F.3d 696 (7th Cir. 2003); *Hall v. Dir. of Corrections,* 343 F.3d 976 (9th Cir. 2003); *Bui v. Haley,* 321 F.3d 1304 (11th Cir. 2003); *Miller v. Dormire,* 310 F.3d 600 (8th Cir. 2002); *Paxton v. Ward,* 199 F.3d 1197 (10th Cir. 1999).

L&L046078

Debra's conviction is based on the word of one police detective, Armando Saldate, whose interrogations history reveals a gross disregard for civil rights and a "convict at all costs" mentality. No physical evidence implicates Debra. The State never even claimed she was present at the murder scene. Nor did either co-defendant testify against Debra. Jim Styers adamantly insists Debra had nothing to do with the murder.[16] (ER 1037-40). Although Roger Scott vaguely implicated Debra after repeated, coercive interrogations by Saldate, he refused to testify against her even for a plea agreement to save his own life.[17]

Saldate was directed to tape record Debra's interrogation. Unfortunately for Debra, taping was not Saldate's "practice" because he claims it "inhibits"

---

[16] Styers testified at his trial that he, Scott and Christopher went to the desert at Scott's suggestion to "go look at snakes." (ER 1699-1700, 2053). While walking back to the car, Styers heard gunshots, turned around and saw Scott pointing a gun, which he had obviously just used to shoot Christopher, who was lying on the ground. (RT 10/29/90 (Styers) at 8, ER 2053). Styers said he doesn't know why Scott shot Christopher, but noted he was careless with guns. (ER 1689). Styers also testified that he and Debra did not conspire with Scott to kill Christopher. (RT 10/29/90 at 53-60). Styers thought Scott probably learned about Christopher's life insurance policy after seeing Debra's benefits booklet at Styers' apartment. (ER 2057). He said Scott had asked both he and Debra for money, but they turned him down. (ER 1669-71). Styers insisted Debra had no involvement in the murder and said Scott only implicated her in an attempt to deflect blame from himself after he confessed involvement. (ER 1672). Styers testimony is consistent with evidence revealing Scott has a strong tendency to project blame onto others while minimizing his own culpability, criminal history and alcohol abuse. (ER 1609, 1117-22).

[17] In turning down the agreement, Scott noted he would say what his attorney "wanted him to say," but his testimony would not be what he felt was "the truth." (ER 1123).

19

suspects from telling the truth.  Although the State and trial judge blamed Debra for Saldate's failure to record, it is evident he never intended to comply with his superior's directive, did not bring a tape recorder, and twisted Debra's assertion of her right to counsel into a "refusal" to have the interrogation recorded.

The primary evidence at trial consisted of Debra's testimony versus Saldate's testimony about what was said in the interrogation room.[18]  Defense counsel was precluded from asking about Saldate's interrogations history and from calling any experts to assist the jury in evaluating Saldate's tactics and the reliability of the purported confession.  The only other evidence against Debra was "character" evidence from witnesses influenced and pressured by Saldate.

If we as a civilized society have learned anything in recent years, it is that "confession" evidence is inherently unreliable.  Twenty-five percent of death row inmates who were subsequently exonerated through DNA and other evidence were initially condemned to die based on "confession" evidence ultimately deemed faulty.  This unacceptably high error rate has resulted in a massive nationwide effort to mandate recording of interrogations.  This effort has occurred in the majority of state legislatures, at the federal level, and in numerous law enforcement agencies throughout the United States with an

---

[18] In addition to no tape recording, there was also no witness, signed statement or contemporaneous notes to verify what occurred.

L&L046080

amazingly high success rate.  Agencies that have adopted mandatory recording policies have learned that detectives like Saldate are flat wrong in claiming that recording "inhibits" suspects.  They have also come to see that mandatory recording protects both suspects and police and virtually eliminates the need for suppression hearings because admission of confessions is no longer based on a "swearing contest" between an officer and a defendant.

Unfortunately for Debra, this awareness about the unreliability of "confessions" elicited in unrecorded interrogations comes long after her trial. There is little doubt that with what we know today, a modern jury weighing the evidence against Debra would acquit her.  Yet, the state and federal district courts have somehow rationalized that 1) post-trial evidence of this detective's sordid interrogations history and 2) opinions of top interrogations experts regarding the unreliability of Debra's purported confession are inadmissible and cumulative to evidence that Debra's jury considered seventeen years ago. These decisions are not only clearly erroneous; they are unconscionable. Debra should not be put to death because she had the misfortune of being charged with her son's murder before our society came to fully appreciate the unreliability of "confession" evidence based on the word of one police officer.

This Court has recently recognized the problem of federal courts giving too much deference to a state court's findings in cases involving interrogations.

21

L&L046081

In *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), this Court firmly criticized what has been deemed "fact-finding" in interrogation/confession cases and set forth the steps a federal judge must take in reviewing findings of state court judges, including issues of credibility. *Taylor* clarified that even under the AEDPA, federal judges should not uphold convictions involving alleged confessions where state court judges have given undue deference to law enforcement officers in swearing contests with suspects over what transpired in the interrogation room. Yet, that is precisely what the district court did here.

A review of the record shows the state court failed to make critical findings of fact, made findings under a misapprehension of the law, and plainly misapprehended or misstated the record. *See Taylor*, 366 F.3d at 1000-1001 (applying "unreasonable determination" standard of § 2254(d)(2)). It also made findings without granting Debra an opportunity to fully challenge the reliability of the "confession" evidence, even though she attached significant evidence to her post conviction petition regarding Saldate's troubling interrogations history. *Id.* Although the district court referenced *Taylor,* it failed to properly apply the *Taylor* factors and erroneously applied the more stringent standards of §2254(e)(1) without first determining if the state court's decision survives an intrinsic challenge. *Taylor,* 366 F.3d at 1000 ("presumption of correctness and the clear-and-convincing standard of proof only come into play once the state

22

L&L046082

court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the "unreasonable determination" standard of section 2254(d)(2)").

At a minimum, Debra was entitled under *Taylor* to fully challenge the state court's factual findings, particularly regarding Saldate's credibility, in an evidentiary hearing. The district court compounded this error by not giving Debra an opportunity to fully develop her new evidence, which included an evaluation of Debra's case by a renowned expert on interrogations, Professor Richard Leo, and extensive materials regarding the unreliability of confessions obtained in unrecorded interrogations and the mandatory recording movement.

Unlike many former death row inmates exonerated through DNA evidence conclusively proving their confessions to be false and/or fabricated, Debra cannot "prove" her innocence in this manner. Because there is no claim she was physically present at the murder scene, there is no way that DNA evidence can save Debra's life. That will require the intervention of this Court. An evaluation of the evidence presented at various stages of Debra's case should leave this Court with one inescapable conclusion:

> We cannot constitutionally allow the State to put a woman to death solely on the basis of the word of one detective whose interrogation tactics were designed to ensure he would "win" the swearing contest.

23

Debra's case involved the "perfect storm" of misfortune: a rogue detective with a history of coercing and fabricating confessions and disregarding constitutional rights; an overzealous prosecutor whose prosecutions include the capital conviction of now infamously exonerated Ray Krone; and a trial judge who was removed from the criminal bench shortly after denying Debra's PCR for displaying years of poor judgment and bizarre courtroom behavior.  It is time for Debra's storm to end.  She asks this Court to acknowledge the miscarriage of justice that has occurred in her case, reverse the district court's decision and grant her habeas relief.[19]

## LEGAL ARGUMENT

## CERTIFIED ISSUES

I.   **THE OVERREACHING TACTICS OF PHOENIX POLICE DETECTIVE ARMANDO SALDATE DEPRIVED DEBRA OF HER RIGHTS AGAINST SELF INCRIMINATION, TO DUE PROCESS, A FAIR TRIAL, AND A JUST SENTENCING DETERMINATION UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS (CLAIM I).**

The Fifth Amendment privilege against self-incrimination reflects the notion that a system of law enforcement which depends on the confession will,

---

[19]  Although Debra raised claims of prosecutorial misconduct and trial court error, none were certified or considered on the merits by district court, except for one involving the improper strike of a juror. The district court's determination that these claims were procedurally barred is contrary to *Lopez v. Schriro,* WL 1760589 at *8 (9th Cir. 2007).

L&L046084

in the long run, be less reliable and more subject to abuses than one relying on independent investigation. Cooke, L., *Colorado's Courts Consider Custody*, 23 Colo.Law. 1519 (July 1994)(citing *Escobedo v. Illinois*, 378 U.S. 478, 488-89 (1964)).  Perhaps no case illustrates this principle better than Debra's.

Under the Fourteenth Amendment, Due Process Clause, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109, (1985).  In nearly 21 years as a police officer, Saldate employed interrogation methods that defied his supervisors' instructions, standard police procedure and the Constitution. (ER 1307-1575, 1620; RT 9/10/90 at 41, 44, 56; RT 9/11/90 at 3-4, 7; RT 9/12/90 at 139-47; RT 9/13/90 at 35-45).  Driven by overzealousness to make his case, Saldate became increasingly comfortable relying on his "instincts" in lieu of sound investigative techniques.  Such tactics deserve the condemnation of a civilized system of justice. *Miller*, 474 U.S. at 109.

A.     **The District Court's Total Deference to the State Court's Findings Was Clearly Erroneous.**

The district court found that Debra failed to prove she was entitled to relief on this claim under this Court's application of the AEDPA standards in *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004). (ER 29-33).  *Taylor*, however, was not published until well after the merits briefing was completed in this

25

case. Once *Taylor* was issued, Debra addressed it in a Notice of Supplemental Authority, which the district court apparently did not review.[20] (ER 306). Moreover, Debra addressed her claims under pre-*Taylor* caselaw and showed how the state court's findings were contrary to federal law and objectively unreasonable.

Additionally, although it cited *Taylor* throughout its decision, the district court failed to apply its central tenets.  For example, the court "cherry-picked" the general prefatory language from *Taylor* to support its position that "federal habeas courts owe particular deference to state court fact finding." (ER 29).  It then said that the state court judge had **"addressed the relative credibility of Petitioner's testimony as compared with that of Det. Saldate. Determinations of credibility are entitled to "special deference"** (ER 30), and that **"habeas courts have no license to redetermine the credibility of witnesses whose demeanor has been observed by the state court, but not by them."** (Id., citing *Marshall v. Loneberger,* 459 U.S. 422, 434 (1983)).

The district court's analysis ignores *Taylor's* criticism of "fact-finding" in interrogation/confession cases and fails to adhere to *Taylor's* steps for reviewing state court's factual findings -- *especially* those involving *credibility*

---

[20] The district court also failed to address *Crawford v. Washington,* 541 U.S. 36 (2004), which Debra's Notice cited due to the state court's admission of hearsay testimony about Scott's and Styers' "Metrocenter" story. (ER 310).

26

L&L046086

*issues in swearing contests between a law enforcement officer and a defendant. Taylor,* 366 F.3d at 1000-01. If anything, *Taylor* teaches that federal judges should *not* uphold convictions involving alleged confessions where state court judges have given **undue weight to the credibility of law enforcement officers** regarding what transpired in the interrogation room, especially where "the detectives could have fully documented the interrogation by taping it in its entirety or preserving notes of the session." *Id.* at 1012-13. The district court's complete deference to the state court's decision to believe Detective Saldate over Debra in this "swearing contest" clearly contravenes the dictates of *Taylor.*

The district court also found that Debra failed to overcome the "presumption of correctness" of the state court's findings by clear and convincing evidence under §2254(e)(1). (ER 30). This finding ignores *Taylor's* instruction that the presumption of correctness and clear and convincing standard *only* come into play when the state court's factual findings survive an intrinsic challenge.[21] 366 F.3d at 1000. Even assuming the more stringent standard of §2254(e)(1) applies, however, the reasons given by the district court for why Debra did not meet it reveal exactly what is wrong with this case: In deferring to the state court's credibility determinations, the district court

---

[21] An analysis of the state court's findings under the "unreasonable determination" standard (later in this argument) shows they do not survive intrinsic challenge and are not entitled to special deference under § 2254(e)(1).

27

L&L046087

criticized Debra for relying only on her own trial testimony (ER 30), when Debra has no ability beyond her own testimony to prove what happened in the interrogation room. This is because **Detective Saldate purposefully refused to record or otherwise document the interrogation,** thereby making this a "swearing contest" he knew he would win. It was clearly erroneous for the district court to give "special deference" to these credibility determinations, as it was based on nothing more than the state court judge's decision to "believe" Saldate over Debra. *Taylor,* 366 F.3d at 1004.

Debra has made a Herculean effort in state post conviction and federal habeas proceedings to show, through something other than "her word," that Saldate is not credible. She brought to the courts' attention Saldate's history/pattern of misconduct in interrogations, which also reveals his habit of purposely not recording interrogations. She offered an in-depth analysis of Saldate's interrogation by a renowned interrogations expert. And she submitted statistics, cases and articles revealing the inherent unreliability of unrecorded interrogations and steps that law enforcement, legislatures and courts throughout the nation are taking to address this problem. Yet, the state and federal courts have blocked her attempts to present such evidence, calling it "inadmissible" and "cumulative." The state and district courts have thereby ensured that Debra can never overcome the improper undue deference given by

28

L&L046088

the trial judge to Saldate.  Neither *Taylor* nor the AEDPA set the bar this high.

The district court's decision improperly defers to the state court's erroneous determination that evidence presented after trial regarding Saldate's history and pattern of misconduct in interrogations was inadmissible. (ER 28). As the district court's own prior order granting discovery of Saldate's personnel file recognized, such evidence is clearly admissible to impeach the credibility of a witness. (ER 98-101)(citing 18 cases involving Saldate's tactics and granting discovery of Saldate's police file admissible as impeachment).  Indeed, reliable evidence of a law enforcement officer's misconduct in unrelated cases is admissible to impeach that officer's credibility, particularly **"where credibility is the central issue in the case and the evidence presented at trial consists of opposing stories presented by the defendant and government agents."** *United States v. Kiszewski*, 877 F.2d 210, 216 (2nd Cir. 1989).[22]

The district court also erroneously found that Debra's new evidence and research relating to interrogation practices was "cumulative" to that presented at Debra's trial.  This determination simply does not pass the "straight face" test. There is perhaps no other procedure in the criminal justice system that has come under more intense scrutiny over the past ten years than the unrecorded police

---

[22] Admissibility of this evidence is fully addressed below in an evaluation of the state court's findings.

L&L046089

interrogation and the unreliable "confession" evidence it produces.   Debra presented the district court with extensive recent research findings and statistics regarding the high incidence of "false" and/or "fabricated" confessions in cases where defendants were subsequently exonerated by DNA evidence (25% or more); information on widespread recent legislative attempts to make electronic recording of interrogations mandatory; an exhaustive analysis from a leading interrogations expert, Richard Leo, of the improper interrogation tactics used by Saldate and his opinion that the purported "confession" in this case is unreliable and should not be used to form the basis for a death sentence; and two compelling amicus briefs addressing the inherent unreliability of "confessions" obtained during unrecorded interrogations.[23]   (ER 390, 495-912, CR 124, 126, 132, 146).

To call the above evidence and research just "more of the same" as was considered by jurors seventeen years ago is absurd.   Evaluating the evidence and findings at various phases of Debra's case illustrates that post-trial evidence was not in the least cumulative and that Debra is entitled to habeas relief.

---

[23]   In summarily dismissing these materials as "cumulative," the district court merely mentioned that they included "articles" and "amicus briefs." (ER 28). It did not even acknowledge that one amicus brief was authored by one of the foremost authorities on interrogation practices and confessions, which is troubling in view of the enormity of this issue on a national scale.

L&L046090

1.      **Evidence and Findings in State Court.**

      a.      **Suppression Hearing Evidence.**

The following witnesses testified at the suppression hearing: Detective Saldate, Dr. Martin Kassell (a jail psychiatrist), Dr. John Fritz (a criminologist), and Kirk Fowler (a private investigator). (RT 9/10/90 at 127; RT 9/10/90 at 152). A tape of Dr. Kassell's jail interview with Debra was also admitted. (RT 9/10/90 at 76). Inexplicably, defense counsel did not call Debra.

**Saldate's Testimony:**

Saldate first testified regarding his interrogation of Scott. (RT 9/10/90 at 10-16). Saldate said he had "an assumption" and "suspicions" that Scott was not telling the truth, and he believed Scott had not been "given the opportunity to be truthful" in prior interviews. (Id. at 11-13). He described his interviewing "style" as different from other detectives.[24] (Id. at 10). After asking other detectives to leave the room, he employed what he called a "straightforward" style of interrogation intended "to make sure that whatever he told me was going to jive with the facts." (Id. at 9, 12). According to Saldate, he knows when someone is lying based on a "gut feeling" (id. at 16-17, 28), is "intolerant with lies" (id. at 26), and knew once he entered the room, "Mr. Scott would be telling me the truth." (Id. at 15). Indeed, as a result of Saldate's interrogation,

---

[24] Saldate admitted, however, that he had no training and attended no seminars on interrogation techniques. (RT 9/10/90 at 4).

L&L046091

Scott finally incriminated himself and Jim Styers. (Id. at 29). Saldate conceded Debra's name never came up until Scott suddenly said she was "involved" when he and Saldate were en route to locate Christopher's body.[25] (Id. at 30).

Saldate testified that by the time he arrived in Florence, he had an "assumption" Debra was involved. (Id. at 40-41). He based this determination solely on a few words by Roger Scott. (RT 9/10/90 at 13-15, 40-43). Saldate said when he arrived, Debra was in the room with another woman, whom he asked to leave. (Id. at 46-47). Saldate told Debra her child had been found shot to death in the desert and she was under arrest. (Id. at 48-50). He claimed Debra said, "what, what" and, in his opinion, "feigned crying," which Saldate said he would not tolerate. (Id. at 50-51). Saldate told her this because he "was trying to accomplish the end result," that they "were going to sit down and ... going to talk about it" and she was going to tell him the truth.[26] (Id. at 50-51).

Saldate claimed he then *Mirandized* Debra, and she indicated she understood her rights. (Id. at 57-58). He said she again started to cry, but he repeated he would not tolerate that and was there "to gather the truth." (Id. at 59-60). Saldate said Debra then asked what he wanted to know and what he

---

[25] None of Saldate's testimony regarding Scott's interrogation or alleged statements was elicited by the State at Debra's trial.

[26] Saldate claimed, "by me asking the person, being truthful with them, usually they tell me the truth." (RT 9/10/90 at 75).

L&L046092

wanted her to tell him. (Id. at 60). He said Debra then began talking to him in a "normal, even voice," and he characterized their conversation as "friendly." (Id. at 67). He claimed that within thirty minutes, she confessed. (Id. at 67-68). He said Debra never showed signs of confusion or disorientation and appeared to be "very, very intelligent." (Id. at 70-71). Yet, he claimed Debra's main concern at the end of the interview "was her job, getting out, maybe lifetime probation, maybe the Court could give – could fix her up so she would never have kids." (Id. at 68). He claimed she also said "if she could get out on her own recognizance, she could go back to work the next day." (Id. at 69).

Saldate said Debra never asked for an attorney or asserted her right to remain silent. (Id. at 70). He also claimed Debra told him "she had not had anybody that would listen to her for a long time," he "was the first one to listen to her," she was "starting to feel better" as a result, and she was "starting to get a little bit of [her] self-esteem back." (Id.).

Saldate said he took notes during the interrogation but destroyed them after preparing his December 6, 1989 police report. (Id. at 64; ER 2064). Saldate claimed he asked Debra if he could record the interview, but she did not want it recorded. (Id. at 51-52). He claimed that had she wanted it recorded, he would have complied. (Id. at 65). Saldate admitted, however, that even though his supervisor directed him to record the interview, he did not bring a tape

L&L046093

recorder. (Id. at 41-44). He also conceded it is not his habit and custom to record interrogations. (Id. at 44). Saldate made the following admissions during defense counsel's questioning:

Q: Do you use, or have you used tape recorders in interviews?

A: **I don't use a tape recorder in interviews.**

Q: Is there a particular reason?

A: Several reasons. I think that a tape recorder is sometimes not a good tool to use, not as far as the detective is concerned, but as far as that person in concerned. That person gets intimidated by the tape recorder, doesn't wish to feel – doesn't feel as free to be able to express theirself. And I'm there to get the information as that person wishes to tell me. And if she is – he is held back by a tape recorder or feels intimidated, then I'm not going to get the information.

(RT 9/11/90 at 7; ER 1890)(emphasis added).

Defense counsel asked Saldate about his interrogation tactics in only one other case, *State v. Running Eagle*, CR 87-11508 (ER 1310, 1370-94). Counsel's questioning was limited to eliciting the following: 1) Saldate told Running Eagle he was lying and Saldate expected him to tell him the truth; 2) Running Eagle asserted his right to remain silent and to counsel, but Saldate continued interrogating; and 3) Saldate did not believe the law requires an officer to cease an interrogation once a suspect asserts his or her rights --

34

L&L046094

information obtained from ongoing questioning after that point just "may not be used in court."[27] (RT 9/10/90 at 17-19; 9/11/90 at 24-25).

**Dr. Kassell's Testimony:**

Dr. Kassell testified regarding his jailhouse interview of Debra about Saldate's interrogation and provided opinions from a "psychological standpoint." (RT 9/11/90 at 80-81). He said much of Saldate's report was apparently based on unsupported "impressions" and "assumptions," and said Saldate appears to have employed "false logic" by starting with a premise then gathering facts to prove his premise. (Id. at 84-85). As to the *Miranda* warnings, Dr. Kassell believed Debra "may have heard what was being said and may have understood to a certain degree what was being said," but he doubted "she really fully comprehended what the *Mirandizing* was all about" because of how Saldate began the interrogation (saying her son was dead, she was under arrest, and he would not tolerate her crying). (Id. at 94). The prosecutor attacked Dr. Kassell asking, "are you suggesting, Dr. Kassell, that Detective Saldate is a liar?" (Id. at 101, 114). Dr. Kassell conceded he was not at the interrogation and could not say with certainty what occurred. (Id. at 101, 114, 126).

---

[27] Saldate justified this blatant disregard for *Miranda* by telling defense counsel that their "areas of responsibility" are different. (RT 9/10/90 at 19). He said his responsibility is to "always obtain the truth," whereas it is defense counsel's responsibility to "defend your defendant." (Id.).

35

L&L046095

**Dr. Fritz' Testimony:**

Dr. Fritz attempted to provide expert testimony on Saldate's interrogation techniques.[28] (9/10/90 at 127).  He noted the lack of a mechanism to maintain integrity of the interview, such as a tape recorder or independent monitor, as well as a few other areas of concern, such as Saldate's failure to follow specific regulations (like handcuffing and searching Debra before placing her in the police car). (Id. at 133-36).  In his view, Saldate's report was either "altered" or "fabricated." (Id. at 134).  However, he could not identify any specific area of the report that was clearly altered or fabricated.  (Id. at 148-49).

**Kirk Fowler's Testimony:**

Kirk Fowler testified that Debra told him she asked Saldate for an attorney early in the interrogation. (RT 9/10/90 at 156-57).  He said that in departments where he previously worked, officers always tried to have at least one person to witness interrogations, and they tape-recorded interrogations once the technology became more readily available.  (Id. at 154).

**b.    Suppression Hearing Findings.**

After the hearing, Judge Hendrix made the following factual findings:

- Debra was properly *Mirandized.*

---

[28]  Dr. Fritz' testimony likely had no impact on Judge Hendrix, who held him in contempt in this case shortly before the suppression hearing. (ER 1726).

36

L&L046096

- Notwithstanding her "emotional state at the time," Debra understood her rights.

- "[A]t no time did [Debra] request an attorney, either before or after she was advised of her rights."

- Debra "was given a free choice to discuss, admit or deny or refuse to answer questions."

(ER 291).  She also made the following legal determinations:

- Debra "voluntarily, knowingly and intelligently relinquished her right to counsel and her right to remain silent."

- She voluntarily, knowingly and intelligently answered questions and made statements without any promises being made and without any threats or coercion, either psychological or physical.

- The State showed by a preponderance of the evidence under the totality of circumstances that Debra's statements were voluntary.

(ER 291-92).  She therefore ruled the "confession" admissible.

### c.   **Trial Evidence.**

Trial began the next day with Saldate as the State's primary witness.  The judge also allowed limited hearsay testimony from Detective Mills regarding Scott's and Styers' initial story that Christopher was "missing" from Metrocenter.[29]  (RT 9/18/90 at 25-27).  The remaining witnesses were essentially "character" witnesses, including Debra's father and sister.  The trial

---

[29] Over defense counsel's objection, the State used this testimony as evidence of the "plan" the co-defendants supposedly had to "cover up" the conspiracy.  (RT 9/18/90 at 25-27, 61-62).  Such testimony would now likely be inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004).

37

L&L046097

judge precluded the defense from calling any experts to assist the jury in evaluating the interrogation techniques, even though counsel asserted such evidence was necessary to assist the jury in determining the reliability and voluntariness of the purported confession. (ER 157-60). She also precluded counsel from asking Saldate questions about the Running Eagle case. (ER 177-78). Although Debra testified at trial, it was her word against Saldate's as to what occurred in the interrogation room.

### Saldate's Testimony:

Detective Saldate repeated, and supplemented, his testimony from the suppression hearing. Saldate said Debra told him during the interrogation that Christopher was a difficult child whom she did not want to "grow up like his father," a drug and alcohol abuser in trouble with the law. (RT 9/12/90 at 71-74). He said Debra discussed high school experiences, saying she was popular with high self-esteem until she met and married Mark. (Id. at 72). According to Saldate, Debra said when she became pregnant, she considered abortion but thought it would be too painful. (Id. at 72-73). He said she told him she considered suicide but did not want Mark to gain custody of Christopher. (Id. at 74-75). He claimed Debra decided it would be better for Christopher to die, and expressed her feelings to Styers. (Id.). He quoted Debra as saying, "Look, I just didn't want him to grow up like his father. I'm not a crazy person. I'm not

38

an animal.  I just didn't want him to grow up like that ... I'm not a malicious person.  I just wanted God to take care of him." (Id. at 71, 74).

According to Saldate, Debra told him they agreed to have Styers kill Christopher.[30] (Id. at 76).  He claimed Debra told him she, Scott and Styers discussed the plan several times, and she went with Styers once to kill Christopher but the plan fell through. (Id. at 79).  According to Saldate, Debra said they then planned for Styers and Scott to kill Christopher, then go to Metrocenter mall and report him missing. (Id.).

Saldate said he asked Debra if she dressed her son in special clothes or gave him a special hug or kiss the morning of his murder, and she said she had not because she previously told Christopher he was going to heaven soon and she would meet him there later. (Id. at 80).  Saldate claimed Debra told him she knew Styers had completed the plan when he called her from Metrocenter, and that she prayed she would have no more children.  (Id. at 81; RT 9/13/90 at 9).

Saldate testified that after Debra's "confession," she expressed concern her family would disown her and think she was crazy. (RT 9/13/90 at 10). Saldate said he asked if she thought she was crazy and she answered, "No, I'm

---

[30]   According to Saldate, Debra denied having life insurance on Christopher but said her father had a policy. (RT 9/12/90 at 76).  He claimed she also denied that insurance money was her motive but said it may have been one for Styers and Scott because Styers knew about the policy. (Id.).

L&L046099

just an emotionally troubled 25-year-old girl who needs help dealing with her problems." (Id.). He also claimed Debra told him she always had difficulty discussing her problems "until now." (Id. at 11). He said he told Debra there were other options if she no longer wanted custody of her son, to which she said, "I guess I just made a bad judgment call." (Id. at 12).

After cross-examining Saldate, defense counsel sought discovery of his personnel records for impeachment purposes. (ER 1752-60). Judge Hendrix ordered an *in camera* inspection of Saldate's file *only* as to any training he received over the prior five years, and any Phoenix Police Department policies, procedures or guidelines for interrogations in effect on December 3, 1989. (ER 1747-51). None of this material was provided to defense counsel. (ER 79).

**Debra's Testimony:**

Debra testified that she never confessed to Saldate. (RT 10/3/90). She said Saldate entered the room, told her friend to leave with another officer, and shut the door. (RT 10/3/90 at 12). He then said her son was murdered and she was under arrest. (Id. at 13). Debra started crying and screaming, "What, what?" (Id.). Saldate said he would not tolerate her crying, and she said, "Why are you doing this?" (Id.). He told Debra to be quiet, pulled a card out of his pocket and read Debra her rights. (Id.). Although Debra recalls Saldate saying she had the right to remain silent and mentioned the word "attorney," she did

L&L046100

not clearly comprehend the *Miranda* warnings. (Id. at 13-17).   When Saldate asked if she understood, Debra said she had never been arrested and did not understand her rights. (Id. at 17).   Rather than explaining the rights, Saldate changed the subject and asked if she wanted the interview recorded. (Id.).   Confused, Debra said "No, I need a lawyer."[31] (Id.).   Saldate ignored her and pulled his chair up to hers so they were sitting face-to-face. (Id. at 17-18).

Debra said Saldate leaned forward "right in front of" her and asked her age. (Id.).   When she said she was 25, he said, "I have a daughter your age, so I understand how you feel." (Id. at 18).   He then put his hands on her knees and said repeatedly, "you can trust me, Debbie, I'm your friend, I'm here to help you." (Id.).   Debra again started crying and would not answer.   (Id.).   At that point, he sat back in his chair and said he would not "tolerate this type of activity" from her or tolerate "any lies," that this was her "opportunity" to tell him the "truth." (Id.).   She asked Saldate "what do you want from me?" and he replied, "the truth." (Id. at 19).   She then yelled "what do you want from me?" because she still "didn't understand where he was coming from." (Id.).   Debra said she was crying throughout this period and used a corner of her sweater to

---

[31] The State and trial court treated this as a "refusal" to have the interview recorded, instead of as Debra's attempt to assert her right to counsel.

L&L046101

wipe her tears, until Saldate gave her some paper towels. (Id.). She then began "staring at the floor" and "was in shock." (Id. at 20).

Saldate asked Debra what she was thinking, and she said she was remembering one night recently when she "opened up" to Styers about conflicts she and Mark were having over custody and visitation. (Id. at 20-21). She told Styers Mark was constantly harassing her and she had obtained a restraining order. (Id. at 21). She told Styers she wanted to raise Christopher and did not want him to grow up and be like Mark. (Id.). She was crying and said, "But Jim wouldn't do anything to hurt my son." (Id. at 22). Saldate then accused her of not being truthful. (Id.). He said he had "an idea already of what happened" and that this was her "opportunity" to tell him. (Id. at 23). Debra became upset at his insinuations and said, "Look, I'm not crazy, I'm not an animal ... I just didn't want Christopher growing up and being like his father. I don't see anything wrong with that. I wouldn't do anything to hurt anybody." (Id.).

She then reflected on her life and told Saldate she was a friendly person who got along with everyone when she was in school. She told Saldate these things because he was arresting her for first-degree murder, and she was trying to explain to him that she was not capable of that. (Id. at 23-24). She said she had a positive attitude and high self-esteem until she met Mark, who was a drug addict and alcoholic. (Id. at 24-25). Debra testified she was not sure why she

42

told Saldate these details, but said she didn't understand what Saldate wanted, so she just continued recounting her life with Mark and Christopher. (Id. at 27-28). Debra said she was on birth control when she became pregnant, and because her parents thought something might be wrong with the baby, she considered abortion, but decided against it.[32] (Id.). Debra told Saldate how Mark was imprisoned shortly after Christopher's birth and that she ultimately divorced him. (Id. at 28-30). She said she had allowed Mark visitation but that he was malicious and in and out of jail. (Id. at 30). She said she had been dealing with mixed feelings regarding her ex-husband's ongoing influence on Christopher and was trying to decide what to do. (Id. at 28-29).

At that point, Saldate asked Debra how she felt, and she said "numb." (Id. at 30). She was still crying and said, "I'm not a malicious person; God, I just wanted to take care of him."[33] (Id.). Saldate asked if she could have let Mark take care of Christopher, and she said she would die before letting him have sole custody and raise her son. (Id. at 31). She said this because she did not feel Mark was responsible. (Id.).

---

[32] Debra said she later looked into having her "tubes tied" because she was having trouble with birth control and did not want more children as a single parent. The doctors said she was too young, and she had wondered if that was something the court could order. (Id. at 27). Debra doesn't know exactly why she told this to Saldate. (Id.).

[33] She said Saldate twisted her statement into "I just wanted God to take care of him." (Id. at 30).

43

L&L046103

Saldate asked if Debra had a life insurance policy on Christopher. (Id.). She said she thought her father might, but she did not. (Id.). Debra stated she did not think about the life insurance she selected for her son with her benefits package, which she considered part of her health insurance. (Id. at 32). Saldate said he understood that Styers and Scott were to receive a $5,000 payment from Christopher's life insurance. (Id. at 34). She again stated she had no policy on Christopher, and not understanding his question, said "Jim may have heard about my dad's policy." (Id. at 34-35). She then said, "I don't know if that was their motivation, but I wouldn't do something like that." (Id. at 35).

Debra was confused when Saldate mentioned Styers, Scott and the life insurance, and said the only thing she knew was that Styers took Christopher to Metrocenter. (Id. at 37). Sobbing, she continued recounting the prior day's events for Saldate and how she learned Christopher was missing. (Id. at 37-38). After receiving the call from Styers, she said was in shock and saying, "Oh my God, please find my son, please find my son." (Id.). She told Saldate she never wanted any more children, that Christopher was all she wanted. (Id.). At that point, Debra said she stopped speaking, and just stared at the floor, crying, for about five minutes. (Id. at 39). Saldate again asked what she was thinking. (Id. at 39-40). She said she was thinking about a recent conversation she had with Christopher in which he brought her a picture from the church he attended with

44

L&L046104

Styers, and asked her about God. (Id. at 40). Debra tried to explain God and heaven, saying there is a time when people die, and if they are good, they get to go to heaven. (Id.). He asked when he would get to see God, and she said he would not go to heaven to meet God for a long time because he was still a young child. (Id. at 41). Saldate asked if she gave Christopher a special hug or kiss on the day of his disappearance, and she said she "always gave him a hug and kiss when he left." (Id.). He also asked if she dressed Christopher "specially" that day, and she said, no, that Christopher picked out his own clothes, and she just changed his sweatshirt. (Id. at 41-42).

Toward the end of the interrogation, Debra told Saldate she felt her parents would probably disown her because she was being arrested. (Id. at 43-45). She said this in light of the seriousness of the charge and because she had never been in trouble before. (Id. at 45). She asked Saldate about jail because he said she would have to go. (Id. at 46). She said, "couldn't I just go home, can't you take me home?" (Id.). He said "no," that she was being arrested for first degree murder. (Id.). She asked if they would think she was "insane" when she got to jail, and he asked if she was insane. (Id.). Debra said "no ... I just have a real hard time letting go of my emotions, I have a hard time expressing my feelings to people ..." (Id). She denied saying, "I'm just an emotionally troubled 25-year-old girl who needs help dealing with her problems." (Id.).

L&L046105

Debra admitted she and Saldate discussed the possibility of alternative custodial arrangements for Christopher, but said *she* raised it in response to Saldate's implication that she would have her son killed for insurance money. (Id. at 47). She said, "If I didn't want my son, then I could give him – I would have given him to my family, my sister or someone else in my family." (Id.). She said *Saldate* then stated, "Well, I understand that; I guess you just made a bad judgment call." (Id.). She thought he was implying it was her fault for letting Christopher go with Styers to the mall and for living with Styers. (Id.).

Debra denied admitting any knowledge of or involvement in the death of Christopher. (Id. at 43-45). She also denied saying she couldn't talk to anyone, but felt comfortable with Saldate. (Id. at 51). During the car ride to Phoenix, she asked Saldate about bail, but he did not know if this offense was bailable. (Id. at 55). She asked if he would call her dad when they got to Phoenix, as he said he would do so when they were in Florence. (Id. at 55-56).

### d.   **Trial Rulings.**

Judge Hendrix issued a "voluntariness" instruction. (RT 10/11/90 at 78).

### e.   **Post Conviction Evidence.**

In post-conviction proceedings, Debra's new attorney extensively challenged Saldate's interrogation tactics. He presented significant additional evidence of Saldate's history and pattern of overreaching and unprofessional

46

L&L046106

conduct including interrogating impaired and injured suspects, violating suspects' *Miranda* rights, lying to the grand jury, corrupting and misusing line-up identifications and fabricating confessions. (ER 1307-1575). He presented the following eighteen cases involving misconduct by Saldate:[34]

    **1)** ***State v. Conde*, 174 Ariz. 30, 846 P.2d 843 (App. 1992):** Conde was a suspect in a robbery/murder whom Saldate interrogated while he was hospitalized in critical condition, intubated and on IV lines. Whenever Conde drifted out of consciousness, Saldate jostled him awake. During questioning, Conde sought pain medication. Saldate alleged that Conde made incriminating statements. Questioning mentally or physically impaired suspects is highly improper. *See State v. Carillo*, 156 Ariz. 125, 750 P.2d 883 (1988); *State v. Strayhand*, 184 Ariz. 571, 911 P.2d 577 (1995). Conde's statements were held involuntary and inadmissible. *Conde*, 174 Ariz. at 31, 35, 846 P.2d at 844, 848. On appeal, the State did not even challenge this ruling. (ER 1311, 1518).

    **2)** ***State v. Yanes*, CR-130403:** Saldate questioned suspect Yanes while he was handcuffed, strapped to a hospital gurney, intoxicated and suffering from a skull fracture, which resulted in brain damage. Yanes' physician testified that during the interrogation, Yanes was mostly unconscious, and when semi-conscious, he was incoherent. Yet, Saldate persisted and claimed Yanes made incriminating statements. Yanes was convicted of second degree murder, but was granted a new trial in post-conviction proceedings. At a

---

    [34] The district court did not even evaluate these cases, noting in a footnote only that "petitioner has attached information concerning some seventeen cases in which Det. Saldate is alleged to have engaged in improper conduct during an interrogation. ... It appears that in three of those cases a court ruled that the suspect's statement must be suppressed based on Det. Saldate's conduct." (ER 33 n. 6). In fact, suppression was ordered in *five* of the cases (*Conde, Yanes, Jones, Mahler & King*); *three others* resulted in remands because of Saldate's misrepresentations to the grand jury (*Rangel, Rodriguez & Reynolds*); and *two more* involved tainted line-ups (*Ross & Webster*). Saldate's tactics were severely criticized by the Arizona Court of Appeals in two cases (*Jones & Mahler*). Several others resulted in plea agreements before the suppression hearings. (*Salas, Kelly, Moynihan & Biggica*).

L&L046107

subsequent suppression hearing, Yanes' statements were deemed inadmissible, and the State dismissed the case. (ER 1307, 1318).

3)   *State v. Salas,* CR 89-03252: Salas was highly intoxicated when he allegedly chased and stabbed a victim to death in front of witnesses. Saldate acknowledged Salas had been drinking heavily, but decided he was not "too drunk" to be interrogated.   Salas entered a plea agreement prior to the suppression hearing. (ER 1313, 1365).

4)   *State v. Kelley & State v. Moynihan,* CR 87-00882: In this consolidated case, Saldate interrogated Moynihan while he was intoxicated and Kelley while he was "messed up, coming off of crystal." Both confessed and both entered pleas before their suppression hearings. (ER 1309, 1395).

5)   *State v. Jones,* CR 90-05217: Jones, a minor, was a passenger in an automobile owned by a missing person, who was later found murdered. The adult driver was taken in for questioning.   At the same time, Saldate locked Jones in an interrogation room and handcuffed him to a desk. He later entered and told Jones the driver confessed, which prompted Jones to confess. Jones was tried as an adult for first-degree murder. The trial court suppressed Jones' confession and subsequent fruits because Saldate disregarded *Miranda* and the probable cause requirement.   In affirming, the Arizona Court of Appeals severely chastised Saldate for his illegal tactics, calling it "a purposeful arrest lacking in probable cause, for the improper motive of investigation" and finding that "the manner of the detention – handcuffing a juvenile alone to a desk in a locked room – increased the flagrancy of the illegal detention and the coercive nature of the confession." The State dismissed the charges. (ER 1315, 1406).

6)   *State v. Blackerby,* CR 88-07047: Blackerby, a minor with a known history of mental impairment and psychological problems, was held for two hours before Saldate began interrogating.   Saldate and another detective then alternated questioning for two hours until 2:00 a.m.   Finally, Saldate ordered Blackerby to "cleanse his soul," after which Blackerby admitted to armed robbery and began to "nod his head yes" to everything Saldate asked him. Blackerby was convicted and sentenced to 50 years. (ER 1311, 1420).

7)   *State v. Mahler,* CR 90-06988: While being interrogated for murder, Mahler asserted *Miranda,* telling Saldate he wished to remain silent. After promising he would be lenient to Mahler's girlfriend, Saldate reinitiated questioning, saying he did not want an admission, just Mahler's "side of the

48

story." The Court of Appeals again criticized Saldate's tactics, calling his conduct intentional. (ER 1314, 1432). Saldate also violated the rule that a confession resulting from any direct or implied promise is involuntary. *Hutto v. Ross*, 429 U.S. 28, 30 (1976).

8)    *State v. Gallegos,* **CR 90-03339:** In this murder case, Gallegos repeatedly requested counsel during Saldate's interrogation, which went ignored. Only when Gallegos admitted involvement did Saldate issue *Miranda* warnings – long after custodial interrogation began and after Gallegos requested counsel. Saldate then used Gallegos' confession in attempting to extract a confession from a co-defendant. Gallegos was convicted and sentenced to death. (ER 1315, 1448). *State v. Gallegos*, 178 Ariz. 1, 870 P.2d 1097 (1994).

9)    *State v. Stark,* **CR 130819:** Stark avowed that Saldate interrogated him while in custody without reading his *Miranda* rights. He said Saldate and his partner lied, threatened, and refused to offer him protection even though he was already a State's witness. Saldate also took Stark's girlfriend into custody and threatened to arrest her unless Stark confessed, which he ultimately did. (ER 1307, 1458). A confession obtained through threats that lack of cooperation may result in harsher treatment is involuntary and violates a person's right to remain silent. *See Miller,* 474 U.S. at 116; *Collazo v. Estelle,* 940 F.2d 411, 416-19 (9th Cir. 1991), *cert. denied*, 502 U.S. 1031 (1992).

10)   *State v. King,* **CR 90-0005:** King asserted his right to remain silent, but Saldate continued his interrogation. At the suppression hearing, Saldate denied King's claim that he attempted to stop the interrogation. Yet, embodied in Saldate's own report was a quote from King stating, "I know exactly what you're trying to do, but I'm not going to answer any more of your questions." The trial court suppressed King's statements. (ER 1316, 1466).

11)   *State v. Rangel,* **CR 89-08086:** Rangel requested an attorney three times, yet Saldate continued interrogating. In grand jury proceedings, Saldate redacted portions of Rangel's confession, only giving information corroborating first-degree murder. The trial court remanded. (ER 1313, 1473).

12)   *State v. Biggica,* **CR 90-00715:** After Biggica initially denied participation in a murder, Saldate said it was "necessary" for him to talk to Saldate about the crime, in violation of *Miranda*. Because Saldate said he had no choice, Biggica confessed. He moved to suppress, but entered a no contest plea before the hearing. (ER 1314, 1493).

49

**13)** *State v. Rodriguez,* **CR 161282:** In this first-degree murder case, Saldate swore to the grand jury that the victim was shot four times, even though he knew the undisputed evidence showed the victim was shot only once. The trial court remanded. (ER 1309, 1497).

**14)** *State v. Reynolds,* **CR 88-09605:** In this murder case, Saldate knowingly withheld exculpatory evidence from the grand jury. Even in response to a juror's question, Saldate omitted the fact that an eyewitness placed Reynolds with the victim at 8:00 p.m., and the victim was seen alive over two hours later. Saldate also represented that Reynolds was not intoxicated the night of the murder, although evidence showed Saldate knew he was under the influence of marijuana to the point where he could not remember certain events. The trial court remanded to the grand jury. (ER 1312, 1509).

**15)** *State v. Ross,* **CR 90-00296:** In attempting to identify the man who broke into her home and killed her husband, a woman viewed a photo line-up, which did not contain Ross' picture. She identified a different person as the perpetrator. Saldate told her father-in-law that she selected the wrong person, which clearly violates the condemnation of post line-up commentaries. *State v. Day,* 148 Ariz. 490, 755 P.2d 743 (1986). Ross was later taken into custody, but any line-up involving him was tainted due to Saldate. (ER 1317, 1442).

**16)** *State v. Webster,* **CR 143926:** Two witnesses told Saldate they could only "possibly" identify the perpetrator. Saldate showed them a photo line-up in which Webster's photo looked little like the others. The witnesses said Webster "looked like" the perpetrator. Saldate swore in his application for a warrant that the witnesses "positively" identified Webster. (ER 1308, 1546).

**17)** *State v. Fraser,* **CR 89-08277:** In this murder case, Saldate failed to record his interviews with the central parties. Fraser claimed that Saldate fabricated several witness statements.[35] (ER 1317, 1567).

**18)** *State v. Running Eagle,* **CR 87-11508:** Although Debra's trial attorney touched on this case at the suppression hearing, the trial court precluded defense counsel from asking Saldate about it at trial. Additionally,

---

[35] Another individual called Debra's attorney during trial, claiming Saldate also fabricated a confession in his case. (ER 934).

50

L&L046110

more information on this case was revealed in post-conviction proceedings. For example, Saldate admitted that during interrogation of a highly intoxicated witness, he refused to accept the witness' rendition of events. When the witness said he was "too drunk to remember," Saldate continually said, "This is too important of a case. We can't have an answer like that in a case like this. This is too serious. You got to do better than that." He admitted this continued for several days, with Saldate saying, "I don't believe that, you got to do better," and the witness "would keep doing better." (ER 1310, 1370).[36]

Running Eagle also asserted his right to remain silent, which Saldate ignored. While continuing questioning, Saldate held his face 6 to 12 inches from Running Eagle's and repeatedly poked him in the chest while Running Eagle cried. Saldate also admitted that although he had the equipment to do so, he did not tape record Running Eagle's interrogation saying, **"I don't believe it's very good, a taped confession or an interview with someone, especially since it involves such a serious crime. Because I think it hinders that person from coming out, discussing what he really wants to say. I think that maybe that tape kind of keeps them from wanting to talk to us."** (Id.). Saldate claimed that Running Eagle confessed. He was convicted and sentenced to death. *State v. Running Eagle*, 176 Ariz. 59, 854 P.2d 169 (1993).

Debra's post conviction counsel argued that when combined with an evaluation of the facts of Debra's case, Saldate's history and pattern of misconduct and untruthfulness support the position she has consistently maintained – that she never "confessed" to Saldate. He asserted that Saldate's pattern/history should be considered in assessing the reliability of his assertions, and that had Debra's jury been provided with this information, it would have given far less weight to Saldate's testimony.

---

[36] The intoxicated witness did recall Saldate mentioning the gas chamber. Any such discussion is highly improper in an interrogation context. *State v. Emery*, 131 Ariz. 493, 502-03, 642 P.2d 838, 847-48 (1982).

51

L&L046111

Post conviction counsel also attached affidavits from three longtime law enforcement officers[37] who evaluated testimony regarding Saldate's interrogation and opined that Debra's "confession" was unreliable. (ER 1284).

### f.   Post Conviction Findings.

Judge Hendrix summarily denied Debra's claims, finding that "If the [confession] had been improperly admitted, the Supreme Court would have addressed the issue ... since the Supreme Court reviews the entire record for any and all fundamental error." (ER 142-43). She disregarded evidence of Saldate's misconduct in the eighteen other cases, finding it inadmissible under Ariz.R.Evid. 608(a)(1)[38] (ER 146). And she rejected the officers' affidavits, construing them as expert opinions that Saldate "was a liar." (ER 145-46).

She also stated she "knows of no law requiring an interrogator to be fair and impartial" and focused her analysis on whether Debra's statements were

---

[37] Bob Benson was a federal agent with the U.S. Department of Justice, Drug Enforcement Administration from 1969 through 1991, and previously worked as a Naval Intelligence Agent. (ER 1284). Kenneth Lindley was a private investigator, certified police instructor, police officer on the Navajo and Hopi Nations and training staff member for the Arizona Department of Public Safety, with 23 years of experience. (ER 1288). John Meyer worked for the U.S. Department of Justice, Drug Enforcement Administration, from 1973 to 1986, and previously was an investigator for U.S. Customs and the Naval Investigative Service. (ER 1298).

[38] The judge also precluded defense counsel from asking Saldate about the Running Eagle case at trial, a ruling she reiterated as "correct" in denying relief on Debra's claim that trial counsel was ineffective for failing to uncover evidence of Saldate's history. (ER 177-78).

52

L&L046112

"voluntary." (ER 143). Calling interrogation techniques a "necessary part of law enforcement," she held that an interrogation "only becomes improper if there are implied promises or improper influence." (ER 143-44). She found "no indication the defendant was mentally impaired or hysterical to the point of being unable to comprehend what was being said to her" and "no indication of any implied promise or improper influence." (Id.). She also found that the extent to which Debra may have felt intimidated or coerced to make a statement to Saldate was a jury question. (Id.).

Incredibly, the judge also called Debra's version of events "substantially the same" as Saldate's report. (ER 144-45). She said the only "significant difference" between their versions "is when and how [Debra] requested an attorney." (ER 145). Referencing her own suppression hearing, she stated, "the trial court made the factual determination that the defendant did not ask for an attorney at the beginning of the interview." (Id.).

Judge Hendrix also rejected the argument that Saldate's destruction of his notes was improper, calling this a "meritless" argument "often made by defense attorney[s]." (ER 146). Yet, she determined that Debra's statements to Saldate "were not an unequivocal confession of 'yes, I did it,'" and she considered Debra's "most inculpatory statement" to be "that she did not want her son to grow up to be like his father," adding:

53

Reasonable minds could differ as to the interpretations to be given to the statements and the conclusions that could be reached. The jury made the determination of the reliability of the statements and the conclusions to be reached after considering the statements.

(ER 147). Judge Hendrix concluded that notwithstanding the "inflammatory adjectives" used to describe Saldate's conduct, the jury heard Saldate's and Debra's versions of the interrogation and decided the case. (ER 147-48).

**B.    The State Judge's Factual Findings Are Not Objectively Reasonable, and Her Legal Conclusions Are Clearly Contrary to Established Federal Law.**

**1.    Judge Hendrix's Denial of Post Conviction Relief.**

The judge's overall ruling improperly defers to her own decisions in the suppression hearing and the jury's verdict. One of the most egregious errors is her finding that the reliability of the alleged confession was solely a jury question. This is clearly contrary to established federal law because it is the court's obligation to exclude a "confession" once its unreliability becomes apparent. *Blackburn v. Alabama*, 361 U.S. 199, 210 (1960); *Jackson v. Denno*, 378 U.S. 368 (1964). The judge's other findings are also objectively unreasonable and contrary to established federal law:

   ♦    She Erred By Relying On Fundamental Error Review.

The finding that Arizona Supreme Court's fundamental error review disposed of this claim "on the merits" is clearly contrary to established federal law. § 2254(d)(1),(2). First, it ignores the fact that Debra also argued

54

L&L046114

ineffective assistance of trial counsel for failing to adequately investigate and cross-examine Saldate and for deficient performance in preparing her motion to suppress (ER 1899) and handling the suppression hearing.[39] Obviously, if the record on this claim was not properly developed by trial counsel, how can fundamental error review correct for this error?  Second, appellate counsel failed to challenge admission of Debra's purported confession, which was also the subject of an ineffective assistance claim.[40]  Third, this Court has rejected the notion that Arizona Supreme Court's fundamental error review exhausts claims for habeas review. *Poland v. Stewart,* 117 F.3d 1094, 1105 (9th Cir. 1997), *cert. denied,* 523 U.S. 1082 (1998).

---

[39] The district court did not certify these claims, which relate directly to Claim I involving Saldate's interrogation tactics, and which show how the jury could have convicted Debra on the inadequate record developed by trial counsel.  Debra requests this Court to also take these claims into account. (See Claims IV(B) and (E), Habeas Merits Brief).

[40] This claim was also not certified even though the failure of appellate counsel to raise the "confession" issue perpetuated the problem.  Unfortunately, no court has ever considered the ineffective assistance of appellate counsel claim on the merits because Judge Hendrix erroneously concluded that the Arizona Supreme Court "must have" also considered that issue as part of fundamental error review, even though nothing indicates it did. *See Milke,* 177 Ariz. 118, 865 P.2d 779. Debra therefore also requests this Court to take into account her ineffective assistance of appellate counsel claim. (See Claim VIII).

L&L046115

♦ She Erred In Her View of What makes "Confessions" Inadmissible.

Judge Hendrix's reliance on *State v. Ross,* 180 Ariz. 598, 886 P.2d 1354 (1994), and her findings that no law requires an interrogator to be "fair and impartial" and that "a confession resulting from the use of the techniques only becomes improper if there are implied promises or improper influence" are also clearly contrary to federal law. "Certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). The techniques employed by Saldate reflect an "ends over means" mentality which offends our system of justice. His pattern shows he is unconcerned with a suspect's mental or physical state during interrogation, willing to lie to the grand jury and court in order to obtain warrants, indictments and convictions, and willing to ignore *Miranda* assertions. To ensure he receives the benefit of any doubt, he *chooses* not to tape record or otherwise independently document what occurs in the interrogation room. Here, in addition to ignoring his supervisor's directive to record and Debra's assertion of *Miranda*, Saldate interrogated Debra without a witness, failed to have her sign a statement and destroyed any contemporaneous notes. Such techniques, especially in a custodial setting where recording equipment and witnesses are readily available, "must be condemned." *Id.*

56

◆   She Failed to Comprehend the Evidence of the Unreliability
of Saldate's Interrogation Tactics.

Judge Hendrix's ruling is also clearly contrary to established federal law because it focuses exclusively on voluntariness. Both the voluntariness and reliability of a purported confession must be evaluated in determining admissibility. *Sanchez-Llamas v. Oregon*, 126 S.Ct. 2669, 2681 (2006)("We require exclusion of coerced confessions both because we disapprove of such coercion and because such confessions tend to be unreliable."); *Colorado v. Connelly*, 479 U.S. 157, 182 (1986)("Because the admission of a confession so strongly tips the balance against the defendant in the adversarial process, we must be especially careful about a confession's reliability."). Significant evidence indicates Saldate twisted and fabricated portions of Debra's alleged confession, undermining its reliability. Numerous inconsistencies taint Saldate's testimony, police reports, interviews and other statements. (ER 314-25). These include his Grand Jury testimony that Debra supposedly formed the idea to have Chris killed one month prior to the killing, which is nowhere else in the record. (Id.). In his report, Saldate claimed he told Debra that both Scott and Styers had implicated her. (Id.). He acknowledged this was false during his pretrial interview. (Id.). He also said in his interview he had checked this assertion against his "notes." (Id.). Yet at trial, Saldate said he destroyed his notes immediately after preparing his report. (Id.). One of the most bizarre

57

discrepancies is Saldate's accusation in an interview of Debra's sister that Debra "flashed her breasts" during the interrogation in attempting to "manipulate" him. (ER 1933). Saldate also claimed in a newspaper interview that during the investigation, Debra tried "to get me in her stable of guys who would do things for her." (ER 1620). Yet, Saldate failed to mention either of these very unusual "facts" in his written reports or pretrial interview, and he testified that nothing "unusual" occurred during his interrogation that was not contained in his report. (ER 1925, 1985; RT 9/13/90 at 28-40). Moreover, the assertion makes no sense in light of what Debra wore that day – a t-shirt tucked into jeans with a sweater.[41] (RT 10/3/90 at 19-20). When viewed with Saldate's history, such discrepancies seriously call into question Saldate's ability to objectively interpret and convey information regarding Debra's statements and non-verbal behaviors and undermines the reliability of the "confession."

> ◆ She Clearly Erred in Saying Saldate's Version of the Interrogation Was the Same as Debra's.

One of Judge Hendrix's objectively unreasonable factual determinations is that Debra's version of the interrogation was substantially the same as that in Saldate's report. According to Debra, Saldate twisted certain statements she

---

[41] Debra said she used her sweater to wipe her tears until Saldate gave her a paper towel. (RT 10/3/90 at 19-20). Perhaps this was the act Saldate construed as Debra "flashing her breasts." (Id.). Saldate's interpretation reflects preconceived judgments about Debra and illustrates extreme arrogance.

58

L&L046118

made in a way that made them appear inculpatory, and he completely invented others to make them "fit" his theory of the case. Nothing in Debra's explanation even implies she participated in the murder of her son. Rather, it details the lengths she went to protect and care for him, albeit in a somewhat disconnected fashion likely resulting from lack of sleep and trauma over learning of Christopher's death. In contrast, Saldate's version is highly inculpatory and paints Debra as an extraordinarily selfish mother who would rather have her young child killed than grow up like his father. Although there are certain similarities, a comparison of Saldate and Debra's testimony highlights the objective unreasonableness of the judge's determination that their versions are essentially the same.

> ◆ She Was Wrong on the Admissibility of Saldate's Prior Interrogations History.

The judge's determination (at trial and in PCR proceedings) that evidence regarding Saldate's history was inadmissible is also contrary to established federal law. The State's principal evidence against Debra was her purported "confession" and Saldate's opinion that he obtained the "truth" because he "knows" when suspects are lying. The State touted Saldate's experience, training and background in conducting interrogations to establish the very foundation for his "opinion" testimony that he was able to "know" that Debra

59

was lying when she denied wrongdoing, and telling the "truth" when she finally "confessed" after Saldate's interrogation.

Saldate's history and pattern of interrogation tactics is highly relevant to the determination of his credibility and is admissible for impeachment. *United States v. Stockton,* 788 F.2d 210, 219 n. 15 (4th Cir.), *cert. denied,* 479 U.S. 840 (1986); *United States v. Acosta,* 111 F.Supp.2d 1082, 1090 (E.D.Wisc. 2000); *Outley v. City of New York,* 837 F.2d 587 (2nd Cir. 1988); *United States v. Montgomery,* 56 M.J. 660 (Army Ct.Crim.App. 2001). Evidence of an officer's misconduct in unrelated cases is admissible to impeach that officer's credibility, particularly "where [as here], credibility is the central issue in the case and the evidence presented at trial consists of opposing stories presented by the defendant and government agents." *United States v. Kiszewski,* 877 F.2d 210, 216 (2nd Cir. 1989); *see also Acosta,* 111 F.Supp.2d at 1090. One scholar notes:

> a pattern of misconduct and deceit might prove that a police witness is self-interested in the arrest, prosecution and conviction of this (or any) defendant. **At the very least, such a pattern could prove that the police witness is partial in his testimony, and therefore such bias serves to rebut any unstated presumption of credibility.**

Dorfman, D., *Proving the Lie: Litigating Police Credibility,* 26 Am.J.Crim.L. 455, 498 (1999) (emphasis added).

Debra's counsel was entitled to cross-examine Saldate concerning his character for truthfulness or untruthfulness. *See* Rule of Evidence 608(b). The

60

L&L046120

judge wrongly shut the very door Saldate opened when he established his credentials to support his opinions about Debra's truthfulness and "confession." Debra was entitled to explore other specific cases involving Saldate's tainted "confessions" and to present opinion or reputation evidence to refute the State's claims about Saldate's history and experience. *Foulk v. Kotz*, 138 Ariz. 159, 673 Ariz. P.2d 799 (App. 1983)(witness may be asked about specific instances of deceptive behavior).

Such evidence was also admissible under Rule of Evidence 404(b) to show Saldate's state of mind, motive, opportunity and intent. *United States v. Ramirez*, 894 F.2d 565, 569-70 (2nd Cir. 1990). Extrinsic evidence of Saldate's history and pattern was admissible to illustrate his motive and intent to obtain a "confession" at any cost, even when his tactics violate constitutional rights. It also shows how he knowingly planned to interrogate suspects in isolation, without a recording device or witness, so he could completely control the interrogation and report whatever he felt was necessary to secure a conviction.

Such evidence was also admissible under Rule of Evidence 406 to show Saldate's habit and routine practices during interrogations, to prove that Saldate acted in conformity during Debra's interrogation. *See Gasiorowski v. Hose*, 182 Ariz. 376, 897 P.2d 678 (App. 1994)(admitting evidence of physician's pattern of performing same type of procedure that allegedly harmed plaintiff). Habit

61

evidence is relevant when it is similar enough to the conduct at issue and within a relevant time period. *United States v. Aminy,* 15 F.3d 258, 260 (2nd Cir. 1994). Saldate's other cases were all litigated within the same timeframe as Debra's or within the preceding seven years. His actions are also "sufficiently similar" to those alleged here: an egregious pattern of conduct designed to elicit alleged confessions and inculpatory statements regardless of their truth or falsity. Saldate interrogated suspects based on a premise that they were guilty. He did not cease interrogating until the suspect proved him "right," and "bolstered" statements if the suspect did not. These are the very claims made by Debra.

Judge Hendrix's finding that Saldate's "other cases evidence" was inadmissible is clearly contrary to established federal law, especially where Debra's capital conviction turned entirely on the issue of credibility, and the evidence at trial consisted of opposing stories by Debra and Saldate. *Kiszewski,* 877 F.2d at 216. The failure to admit this evidence violated Debra's fundamental right to due process and a fair trial.

> ◆ She Was Wrong in Concluding That the Post-Trial Evidence Was Cumulative.

A review of the evidence presented at each stage of Debra's proceedings illustrates the objective unreasonableness of the state court's finding that evidence of Saldate's history is cumulative. When combined with an evaluation of the specific facts of Debra's case, Saldate's history and pattern

62

supports the position she has consistently maintained – that her alleged "confession" never occurred. Had the jury been provided with this crucial information regarding Saldate's pattern of conduct, it would no doubt have given far less, if any, credence to the purported confession.

- ◆ There Was Nothing Objectively Reasonable About Judge Hendrix's Findings.

The last two paragraphs of the judge's order strikingly reveal the objective unreasonableness of her findings and highlight what is wrong with this conviction. After conceding this is not an "unequivocal confession," she identifies Debra's "most inculpatory statement" as her comment that "she did not want her son to grow up to be like his father." (ER 147). Even though Debra explained what she was trying to convey, Judge Hendrix basically said, "oh well, reasonable minds can differ as to the meaning of these statements, and the jury decided what the statements meant." (Id.). It is frightening to think that a person's life can hinge on a jury's "interpretation" of such an innocuous statement, especially when viewed in the context Debra claims she made it.

Perhaps the most revealing finding was the judge's final paragraph:

Notwithstanding the inflammatory adjectives used to describe Det. Saldate and his conduct (over zealous, rampant overreaching, abusive interrogation techniques, coercive interrogative methods, manipulation of evidence, lying under oath, spurious practices, and oppressive and unprofessional interrogation tactics), the jury heard his version of the interview, and they heard the defendant's version of the interview. The jury decided the case.

L&L046123

(ER 147-48).   Obviously, the judge felt more compelled to protect Saldate's reputation than to ensure Debra received a fair trial.   Her language further illustrates that this entire case hinged on who the judge and jury believed in this "swearing contest" – the 21-year veteran police detective and recently elected constable, or the single mother charged with the first degree murder of her 4-year-old child.   Debra did not stand a chance absent some additional way for the jury to assess the credibility of these witnesses.   Unfortunately, the judge kept the additional evidence from the jury, leaving them to decide the case on the word of these two witnesses and character evidence *about Debra* from other witnesses tainted by Saldate.

On these facts, with no objective documentation of what happened in that room, and no physical evidence or other testimony inculpating Debra, it was objectively unreasonable and clearly contrary to federal law for the state court to disregard the extensive evidence of Saldate's overreaching tactics in other cases, and the opinions of other law enforcement officers regarding the unreliability of this interrogation and purported confession.

### 2.   Judge Hendrix's Questionable Judgment and Controversial Decision-Making While on the Bench.

In evaluating the "objective reasonableness" of the state court's factual determinations, this Court should also consider the judge's removal from the criminal bench not long after she denied Debra's PCR.   *See* Harker, V.,

L&L046124

*Controversial Judge Transferred From Criminal to Domestic Cases*, THE ARIZONA REPUBLIC at A35 (Nov. 8, 1997). Judge Hendrix left a colorful history of controversial decision-making during her tenure. Her reputation as a "loose cannon" before, during and after Debra's trial became a topic of significant local and national public interest.

Among other things, Judge Hendrix was publicly censured by the Arizona Supreme Court for issuing an ex parte order allowing her court clerk numerous "legal visits" and extended telephone calls with a criminal defendant whose case was assigned to another division. *In re Hendrix*, 145 Ariz. 345, 701 P.2d 841, 842-43 (1985). The Arizona Commission on Judicial Qualifications found that Judge Hendrix undermined the public's confidence and integrity in the judiciary when she gave a robbery defendant a can of beans during sentencing. *Id.* at 844-45. She also received national publicity for ordering a defendant who pled guilty to manslaughter for shooting her abusive husband not to remarry or live with a man without permission from her probation officer and psychiatrist. *See* Associated Press, *Woman Told Not To Remarry*, THE NEW YORK TIMES (Dec. 25, 1983).

In Debra's case, Judge Hendrix suggested she would declare a mistrial if the case was not completed by a particular date. *See* Brown, J.W., *Milke Case Facing Mistrial, Judge Says*, PHOENIX GAZETTE at E4 (Oct. 10, 1990). Her

65

L&L046125

questionable judgment continued post-verdict when she allowed a clerk's teenage son to give a 15-minute violin performance in court to relieve stress and provide entertainment prior to sentencing Debra to death. *See* Whiting, B., *Court Fretting: Concert Riles Some*, THE ARIZONA REPUBLIC at B1 (Jan. 25, 1991).  Judge Hendrix was ultimately removed from the criminal bench and assigned to domestic-relations court in a highly publicized transfer widely known to have resulted from her questionable decisions. Harker, *supra*.

Debra requests this Court to take judicial notice of the foregoing articles and Arizona Supreme Court opinion censuring Judge Hendrix. *See* Fed.R.Evid. 201; *Crowder v. Kitigawa,* 81 F.3d 1480, 1491 n. 10 (9th Cir. 1996) (O'Scannlain, J., dissenting).  Debra repeatedly attempted to develop a record regarding Judge Hendrix's questionable judgment and bias.  In state court, Judge Hendrix *personally* prevented Debra from doing so by denying motions to remove her for bias, even after Debra attached an affidavit stating she wanted to call the judge in any post conviction hearing.  Debra then planned to call Judge Hendrix and/or Judge Meyers (the judge who transferred her) at any hearing on the habeas petition.  When the habeas was summarily denied, Debra detailed the judge's history in her Motion to Amend or Alter the Judgment, which the district court ignored. (CR 153).

66

**C.** **The District Court Erred in Denying Habeas Relief, Especially In Light of New Evidence Supporting Debra's Claim.**

      **1.** **Evidence and Findings in Federal District Court.**

In habeas proceedings, the district court partially granted Debra's Motion to Expand the Record, admitting 26 additional exhibits. (CR 115, ER 68). These related to the unreliability of Saldate's interrogation, including an exhaustive report by interrogations expert, Richard Leo, PhD, JD.[42] (ER 390). It also included portions of Saldate's personnel files and Phoenix Police Department Interrogation Policies and Procedures, which Debra finally obtained in habeas proceedings. (ER 913, 917).

**EVIDENCE**

      **a.** **Evaluation By Interrogations Expert, Richard Leo.**

          **1)** **Saldate's Rush to Judgment.**

After reviewing the evidence, Professor Leo concluded that Saldate's account is "problematic, troubling, and at times altogether implausible, for

---

[42] Professor Leo is an internationally recognized authority in police interrogation practices, coercive interrogation techniques, and confessions. (ER 394, 401-28). He has conducted extensive research on interrogations and confessions since 1990 and is widely published on these topics in scientific journals. (Id.). At the time of his report in this case, Leo had analyzed over 800 cases, consulted on more than 300 cases involving disputed interrogations and confessions, and was qualified as an expert in these areas in sixteen states. (Id.). His opinions are admissible as they assist the factfinder with evaluating and understanding the numerous, though often subtle, discrepancies and improprieties in Saldate's interrogation techniques. *See Salem v. U.S. Lines Co.,* 370 U.S. 31 (1962).(See also ER 429-94).

L&L046127

numerous reasons." (ER 395).    First, Saldate's behavior and statements

contradict his assertion that he did not presume Debra's guilt from the outset.

(Id.).  Police are trained only to arrest and interrogate suspects they believe are

guilty. (Id.).    Had Saldate not presumed Debra's guilt, he would have

interviewed her in a non-custodial format. (Id.).    Leo calls it "telling" that

Saldate told Debra early in the interrogation she was not being truthful when

she denied committing the crime. (Id.).  "[W]hile the purpose of a non-custodial

interview is to get the truth by asking non-threatening and open-ended

questions, the purpose of a custodial interrogation is to get a confession by

using interrogation techniques that involve, among other things, accusing a

suspect of having committed a crime, cutting off any denials, and pressuring

them to confess." (Id.).    Saldate's assertion that he was merely questioning

Debra to find the truth, not to get a confession, is not credible. (Id.).  Further,

Saldate's rush to judgment violated Phoenix Police Department investigative

policy. (ER 395, 917).

### 2)    Saldate's Failure to Record.

Professor Leo notes that Saldate's failure to record this interrogation

means that no one, other than Saldate and Debra, can ever know exactly what

transpired. (ER 395).  Notably, in several states, constitutional provisions,

supreme court rules or caselaw require all interrogations to be electronically

68

recorded where feasible, and mandate recording if the questioning occurs in a place of detention.[43]   Some states require cautionary jury instructions about non-recorded custodial statements, *Commonwealth v. DiGiambattista,* 813 N.E.2d 516 (Mass. 2004); others require both mandatory recording and cautionary instructions. New Jersey Sup.Ct.R. 3.17 (2005).   Recently, a federal district court suppressed alleged statements where officers failed to take notes and failed to record even though recording equipment was readily available. *See United States v. Lewis,* 355 F.Supp.2d 870 (E.D. Mich. 2005).[44]   (ER 298).

A growing number of state legislatures have also adopted mandatory recording statutes, including Illinois, Maine, New Mexico, Wisconsin and the District of Columbia.[45]   Legislatures in at least 21 other states have recently

---

[43] *See, e.g.* New Jersey Sup.Ct.R. 3.17 (2005); *State v. Cook,* 847 A.2d 530 (N.J. 2004); *State v. Barnett,* 789 A.2d 629 (N.H. 2002); *State v. Scales,* 518 N.W. 2d 587 (Minn. 1994); *Stephan v. State,* 711 P.2d 1156 (Alaska 1985).

[44] Just as here, the only evidence memorializing the interrogation in *Lewis* was a summary in the officers' reports.   The *Lewis* court rejected the argument that suppression is not required just because an interview is not recorded, noting that "[t]aping is ... the only means of eliminating 'swearing contests' about what went on in the interrogation room." 355 F.Supp.2d at 873.

[45] *See* 725 Ill.Comp.Stat.Ann., § 5/103-2.1 (West 2006)(adults); 705 Ill.Comp.Stat.Ann. § 405/5-401.5 (West 2006)(minors); Me.Rev.Stat.Ann. tit. 25 § 2803-B(1)(K)(West 2006); N.M.Stat.Ann. § 29-1-16 (West 2006); Wis.Stat. §§ 968.073, 972.115 (2005); D.C.Code §§ 5.116.01-08 (2005); *see also* Art. 38.22(3)(a), Texas Statutes and Codes.

L&L046129

introduced mandatory recording statutes,[46] and as many as 450 to 500 law enforcement agencies and jurisdictions have adopted voluntary recording policies.[47] The reason for these increasingly common mandatory recording requirements is evident: **"[I]n the absence of a tape recording, the prosecuting authorities invariably will win the swearing contest."** *Harris v. State*, 678 P.2d 397, 414 (Alaska App. 1984)(Singleton, J., dissenting).[48] Unfortunately for Debra, that was exactly what happened here. Although Arizona does not yet have a statutory or constitutional requirement,[49] the failure to record Debra's interrogation violated her due process rights under the Fourteenth Amendment, as no other evidence linked her to the murder.

---

[46] See 2007 Recording Interrogations Bills – Sorted by State, compiled by Scott Ehlers, NACDL State Legislative Affairs Director.

[47] See Sullivan, Thomas, *The Time Has Come For Law Enforcement Recordings of Custodial Interviews, Start to Finish,* 37 Golden Gate Univ.L.Rev. 175 (Fall 2006) and appendix; see also 3/22/07 List of Departments that Currently Record a Majority of Custodial Interrogations, compiled by Thomas Sullivan. Sullivan is a former U.S. Attorney from Northern Illinois who also co-chaired Illinois Governor Ryan's Commission on Capital Punishment from 2000-2002.

[48] Judge Singleton's position was later adopted when the Alaska Supreme Court overruled *Harris* in *Stephan v. State,* 711 P.2d 1156 (Alaska 1985).

[49] Arizona's legislature recently introduced a mandatory recording bill, which will likely be re-introduced in 2008. See House Bill 2280, Arizona State Legislature (2007).

70

L&L046130

### 3)   <u>Saldate Ignores Directive to Record.</u>

Professor Leo finds Saldate's failure to record this interrogation "especially troubling in light of the fact that he was instructed by his superior to record his conversation with Ms. Milke and that tape recorders were readily accessible to him at the Phoenix Police Department prior to his departure ..." (ER 395). He calls Saldate's failure to record "tantamount to destroying the evidentiary record of the most significant piece of information in this case." (Id.). Saldate's assertion that he did not record the interrogation because Debra did not permit him to do so is, according to Professor Leo, "simply implausible, and ... severely undermines [his] credibility," especially since Saldate openly acknowledges in this and other cases that "it is simply not his practice to tape record interviews or interrogations." (ER 395-96).

### 4)   <u>Failure to Otherwise Document.</u>

Professor Leo finds the manner in which Saldate states he elicited Debra's *Miranda* waiver troubling, if not illegal. (ER 396). His destruction of contemporaneous notes of the interrogation is also suspicious, especially in light of the other circumstances surrounding this case. (Id.). Saldate's actions also violated Phoenix Police Department Policy, which instructs detectives to "document everything said by the suspect." (Id.; ER 917 at 8(B)(2)(b)(ii)).

71

L&L046131

### 5)   Saldate's Questionable Assertions.

Many of Detective Saldate's assertions about what occurred during the interrogation are, according to Leo, "simply implausible." (ER 396).  He finds Saldate's claim that he did not use any interrogation techniques "very hard to believe." (Id.).  Police are taught in the field and classroom to use interrogation techniques to elicit confessions. (ER 396-97).  "Everyone in the police business knows that suspects do not give spontaneous, unprompted, free-wheeling narratives to serious crimes such as murder. Yet, this is exactly what Detective Saldate alleges occurred during his interrogation of Ms. Milke." (ER 397).

Leo also finds a "wide incongruity" between how police are trained and actually do interrogate, and Saldate's claims regarding how he supposedly questioned Debra, explaining:

> Very few suspects actually report feeling better after confessing to police detectives.  It is therefore very unlikely that Ms. Milke actually told Detective Saldate that she felt better or suddenly unburdened or as if she had taken a load off her shoulders after confessing to him.  Or that she somehow regarded Detective Saldate as a friend (during merely one-half hour of interrogation!) or that she somehow felt comfortable with him because she knew she was under arrest and going to jail or that she felt relaxed when she left the interrogation.

(Id.).  Professor Leo notes, "These assertions literally make no sense."  (Id.).  He also finds "too implausible, if not bizarre" Saldate's claim that Debra asked if she could get probation or just have her "tubes tied" for the crime of first degree murder of a child in a state that strongly endorses the death penalty.

72

L&L046132

(Id.).  According to Leo, Saldate's assertion that Debra said she finally found in him someone with whom she could speak her mind "borders on the ludicrous," adding, "Such assertions fly in the face of all reason, logic and experience. Detective Saldate's narrative of what occurred is wildly implausible and, in my professional opinion, therefore cannot be credited." (Id.).

Leo criticizes Saldate's assertions about the meaning of Debra's "body language" and behavior during the interrogation. (ER 398).  Saldate's report, testimony and pre-trial interview demonstrate that he "too often treats his gut hunches, speculations and intuitions as if they are established facts, rather than treating them as hypotheses to be tested against the evidence." (Id.).  For example, Saldate's assertion that Debra "feigned grief" and "pretended to cry" when told of her son's death is nothing more than Saldate's presumption of her guilt.  Explains Leo, "It is well known that suspects react to the stress of accusation and interrogation differently.  Even if Ms. Milke had been crying without tears or acting hysterical, this is not a reliable indicator of guilt or deception." (Id.).  Saldate's perceptions of Debra's body language as "evidence" of her guilt "suggests his bias against her, his poor training and his inability to objectively investigate this case." (Id.).

73

### 6)   Saldate's Demonstrable Investigative Bias.

Professor Leo finds Saldate's "demonstrable investigative bias" particularly troubling "in light of the salient fact that there is no evidence, other than his word, that Debra Milke confessed to the capital murder of her only child, and that, as a result, she now awaits execution." (ER 398).   Saldate presumed Debra's guilt even prior to questioning and immediately set out to confirm this belief by getting a confession. (Id.).   According to Leo, this "rush to judgment" and "investigative bias" explain how Saldate could have interpreted Debra's body language and behavior in a way that generated his implausible scenario of how and why Debra purportedly confessed to the murder of her son.   (Id.).

Professor Leo notes that Saldate's interview of Debra's sister, Sandra, provides an insightful glimpse into some of Saldate's techniques, which Professor Leo describes as "contrary to any expectations of objectivity and contemporary standards of professional police investigation." (ER 398, 1933).

### 7)   Saldate's History & Pattern of Misconduct.

In reviewing the 18 other cases involving Saldate's questionable or illegal tactics, Professor Leo finds these cast "considerable doubt on Detective

L&L046134

Saldate's credibility, integrity and professionalism." (ER 398). So does Saldate's disciplinary record with the Phoenix Police Dept.[50] (ER 398-99, 913).

### 8)   Saldate's Tactics Tainted Scott's Statements.

Finally, Professor Leo finds the statements Saldate elicited from Roger Scott "inherently unreliable," which "cannot reasonably be construed to corroborate Ms. Milke's alleged, but undocumented, confession." (ER 399). This is partly due to the fact that, "by his own admission, Detective Saldate used coercive interrogation techniques to elicit statements from Mr. Scott." (Id.). According to Leo, "[t]hese coercive tactics … could easily have caused a person of normal intelligence and hardiness to make false statements to please his interrogator." (Id.). Further, "[t]he risk of coercing false statements from Mr. Scott was heightened by his weak personality and history of psychological problems." (Id.). According to a psychological assessment, Scott has a "passive dependent personality," and is, by his nature, "highly suggestible, submissive, and compliant." (Id.; ER 935-40). Professor Leo notes that "[t]he statements from Mr. Scott's trial lawyers – that he would agree to or sign anything they put

---

[50] The records show Saldate was formally suspended and reprimanded for engaging in sexual conduct with a female motorist in exchange for not arresting her on an outstanding warrant. He lied about the incident to supervisors until a polygraph revealed deception, after which he confessed. (ER 913-16).

L&L046135

before him, even if he did not comprehend it or it is not the truth, just to please

them and avoid conflict – bear out Dr. Tatro's diagnosis."[51] (ER 399, 1123-26).

### 9)   Leo's Conclusion: Wrongful Conviction.

Professor Leo concludes that Debra was wrongfully convicted:

> **The combination of all these risk factors ... strongly raise the possibility that the ultimate miscarriage of justice may have occurred here: the wrongful conviction of a factually innocent person who awaits execution.**

(ER 399).   He notes that "much of Detective Saldate's account reveals an

inexcusably low level of professionalism that casts considerable doubt on his

assertions about Ms. Milke's interrogation, as well as his integrity." (ER 399-

400).   In Professor Leo's opinion:

---

[51] Scott's situation is akin to *State v. Strayhand*, 184 Ariz. 571, 911 P.2d 577 (1995), where the defendant was in custody for twelve hours and had not slept or eaten since the prior morning.   His first interrogation lasted over two hours, during which he broke down, cried and threatened suicide. *Id.* at 576, 911 P.2d at 582. *Strayhand* held that voluntariness should be assessed "in light of what the police should perceive from the objective manifestations of the suspect's physical or mental condition." *Id.*   Police also pressured Strayhand through threats and promises, causing him to eventually confess. The Arizona Supreme Court suppressed his statements, finding that a confession obtained by any direct or implied promises, however slight, or by threats through which the defendant's will is overborne, is involuntary. *Id.* (citing *Hutto v. Ross*, 429 U.S. 28, 30 (1976); *Miller v. Fenton*, 474 U.S. 104, 116 (1985)). Such threats and implied promises existed in Scott's case, however, his trial and initial habeas attorneys failed to challenge the confession. (ER 1041-61).   Scott's present habeas attorneys attempted to raise these issues through a Fed.R.Civ.P. Rule 60(b) motion, which the district court denied. (See 3/12/07 Rule 60(b) Motion, CV 97-1554-PHX-PGR). That ruling is now before this Court as part of Scott's habeas appeal, but habeas counsel did not specifically address the confession issue or denial of Rule 60(b) relief. (No. 05-99012).

76

L&L046136

> Detective Saldate's account of the interrogation and alleged confession is too untrustworthy to support a conviction (especially a capital conviction) and ... he may very well have fabricated or coerced a false or non-existent confession from Debra Milke.

> In the hundreds of cases I have studied, I have never seen a conviction rest on nothing more than a disputed, undocumented and unsigned confession.

(ER 400)(emphasis added).

### b.   Additional Evidence Admitted By District Court.

In addition to Professor Leo's report, Debra presented research findings showing the high incidence of false/fabricated confessions in cases where defendants were subsequently exonerated by DNA evidence (over 25%)(See Habeas Briefs and Exhibits); information on widespread recent legislative and judicial attempts to require electronic recording of interrogations (Id.; ER 495-912); Phoenix Police Department procedures showing Saldate did not follow his own department's protocol by failing to record or otherwise document his interrogation (ER 917); Saldate's disciplinary records showing he is willing to lie to "cover up" his improper, unprofessional tactics (ER 913-16); and affidavits and other materials supporting Debra's version of events.

In addition, two amicus briefs addressed the inherent unreliability of "confessions" obtained during unrecorded interrogations. One is from the Arizona Civil Liberties Union (CR 124); the other is from the Center on Wrongful Convictions at Northwestern University College of Law, outlining

77

L&L046137

the significant data in which wrongful convictions have been based on confession evidence, and opining that evidence of Debra's "confession" is too unreliable, especially to support a capital conviction. (CR 134).

**FINDINGS**

As noted at the outset of this argument, the district court found that the state court's findings of law were reasonable under AEDPA standards.  It also determined that the additional evidence in support of Debra's claim, including Professor Leo's report, were "largely cumulative" to that presented to the state PCR court, and was of "little relevance" to the issues presented.

### 2.    The District Court's Findings are Clearly Erroneous.

■    Professor Leo's Report Is Not Cumulative.

The district court's determination that Professor Leo's report is cumulative to that presented at trial is clearly erroneous.  No qualified, credible interrogations expert testified at any stage of Debra's trial proceedings.  The only interrogations "expert" called *at the suppression hearing*, Dr. Fritz, was held in contempt by Judge Hendrix one month before the hearing and was obviously not highly regarded by her. (ER 1726).  Additionally, Dr. Fritz only testified regarding the lack of a mechanism to maintain the integrity of the interview, and he opined that Saldate's report was likely "altered" or "fabricated," but could not articulate why.  In contrast, Professor Leo, a

78

L&L046138

nationally recognized authority on police interrogations and confessions, identified numerous ways in which Saldate's rendition of events is incredible, showed how Saldate failed to follow normal police protocol, and after evaluating Debra's case in the context of eighteen other cases involving tainted interrogations by Saldate, concluded that she was wrongly convicted. This evidence is hardly "cumulative" to that presented at trial. No interrogations expert even testified *at Debra's trial*.[52]

- ■ The Other New Evidence Is Also Not Cumulative.

Saldate's disciplinary records and the Phoenix Police Department policies on interrogations obtained in discovery in habeas proceedings are also not cumulative. The trial judge would not allow defense counsel access to anything in Saldate's personnel files and did not turn over any police procedures even though counsel requested them for the express purpose of impeaching Saldate. The research and statistics showing the high incidence of unreliable confession evidence resulting from unrecorded interrogations is also not cumulative, as it was not even available until well after Debra's trial.

The additional affidavits submitted in habeas proceedings are also not cumulative. In one critical affidavit, investigative reporter Paul Huebl explains

---

[52] The trial judge precluded counsel from calling *any* interrogations expert at trial, a decision she affirmed as correct on PCR review. (ER 157-60).

L&L046139

how he went to see Debra in the receiving area of the jail shortly after her arrest in hopes of "capturing" incriminating statements for the "dinner hour newscast." (ER 347-50).   Instead, he found her "distraught" and "adamant" about her denial of any involvement in her son's murder. (ER 349).   She was "astonished" and "confused" when he said police alleged she had confessed, and she "strongly denied that she had confessed to anything." (Id.).   He found her perplexed state and denial of any confession genuine. (Id.).   Where no one witnessed or recorded the interrogation, evidence that Debra was "astonished" and "confused" when told of Saldate's assertion that she confessed is highly relevant and corroborates Debra's version of events.

In *Taylor*, this Court found similar testimony from the defendant's attorney to be highly relevant and credible.   Shortly after Taylor's "confession," he called his attorney, Arthur Close, and told him what had occurred in the interrogation room.   Taylor was "crying and upset" during the call. *Id.* at 1005. Even though Close's account was based on what Taylor told him and was not conclusive, this Court found the attorney's account "highly probative" because it "matched" the defendant's account of what occurred and provided important insight into the defendant's demeanor following the interrogation. *Id.* at 1005-07.   Yet, this evidence was completely ignored by the lower courts. *Id.*   Like the attorney in *Taylor,* Paul Huebl's conversation with Debra occurred shortly after

80

L&L046140

her interrogation, and he found her astonishment, grief and spontaneous denial that she had confessed to be genuine. This conversation provided the best, most objective "snapshot" of what Debra was thinking after the interrogation. Especially when combined with Dr. Kassell's account of what Debra told him within months of her arrest, Paul Huebl's corroborating evidence is *highly* relevant and certainly not cumulative.

The district court clearly abused its discretion in determining that Professor Leo's report and opinion, as well as the other evidence presented in support of this claim, were "cumulative" to evidence presented at trial and would not have made a difference in Debra's case.

- The State Court Findings Are Not Entitled To a Presumption of Correctness.

The district court's determination that the state court's findings are entitled to a "presumption of correctness" is also erroneous. Debra's purported confession is acknowledged by all to be the "keystone" of the prosecution's case. No physical or other evidence linked Debra to this crime. Thus, she was clearly denied due process by Detective Saldate's overreaching and "ends justify the means" tactics. These include Saldate's failure to record the interrogation, ignoring Debra's request for an attorney, use of coercive and unprofessional techniques, and essential fabrication of the confession by taking some of Debra's comments out of context and completely fabricating others.

81

L&L046141

Here, as in many of his other cases, Saldate's tactics are an affront to the United States Constitution. *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). Where Saldate had nothing but his contemporaneous notes to help corroborate the interview, destruction of those notes *alone* violated Debra's due process rights.

Certainly, in light of the evidence of Saldate's history and pattern, the state court's finding that Debra did not assert her *Miranda* rights is not entitled to a "presumption of correctness." The State bears the burden of establishing compliance with *Miranda. See United States v. Heldt,* 745 F.2d 1275, 1277 (9th Cir. 1984)(citing *North Carolina v. Butler,* 441 U.S. 369, 373 (1979). It did not meet that burden here, and the state court erred in finding that it did, especially when presented with additional evidence in post conviction proceedings showing Saldate's history of violating defendants' *Miranda* rights and disregarding assertions of those rights. Debra testified she told Saldate she did not understand her *Miranda* rights. (RT 10/3/90 at 13, 17). Saldate did not read them again or explain them. (Id.). He resumed questioning, and Debra asked for a lawyer. (Id.). Saldate ignored the request and continued the interrogation. (Id. at 18). This conduct violated *Miranda* and is consistent with Saldate's refusal to acknowledge *Miranda* assertions in other cases.

82

L&L046142

> ▪ The Record Shows Several Ways in Which the State
> Court's Determination of Facts Was Unreasonable.

Federal habeas judges should not uphold convictions involving alleged confessions where, as here, state court judges give undue deference to law enforcement officers in swearing contests with suspects over what transpired in the interrogation room. *Taylor,* 366 F.3d 992. *Taylor* outlined several ways in which a state court's fact-finding process can result in an unreasonable determination of facts. Importantly, if **any** of these criteria are met, the state court's decision cannot survive an intrinsic challenge based on § 2254(d)(2) – in which case the more stringent standards of § 2254(e)(1) (which the district court applied here) are inapplicable. *Id.* at 1000.

First, "[w]here the state court should have made a finding of fact but neglected to do so ... the state court factual determination is perforce unreasonable and there is nothing to which the presumption of correctness can attach." *Taylor,* 366 F.3d at 1000-01. Second, where the state court makes factual findings but "does so under a misapprehension as to the correct legal standard," the resulting factual determination is unreasonable and no presumption of correctness can attach. *Id.* at 1001. Closely related are cases where "the fact-finding process itself is defective," such as where a state court makes evidentiary findings without holding a hearing and giving a petitioner a chance to present evidence. *Id.* Two other situations where habeas relief is

83

appropriate under § 2254(d)(2) are those where the state courts "plainly misapprehend or misstate the record in making their findings, and that misapprehension goes to a material factual issue ... central to petitioner's claim" or "where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Id.* Both situations can also "fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Id.* As shown in Debra's Notice of Supplemental Authority and below, **every type of unreasonable determination of fact** outlined in *Taylor* is present in Debra's case as to the findings by the state court regarding the interrogation, the alleged confession, and Detective Saldate's credibility. (ER 306-09).

> ➢ State Court Failed to Make Key Findings
> Regarding Evidence of Saldate's History.

As to Saldate's history, the state judge simply stated: "the fact that requests for voluntariness hearings were filed in other cases in which Det. Saldate was the interrogating officer does not establish he has lied under oath to obtain convictions." (ER 146). This is not only an insufficient finding, it is highly inaccurate and indicates the judge did not closely review the materials. As noted above, suppression was ordered in five of the eighteen cases, three others resulted in remands because of Saldate's misrepresentations to the grand jury, and two more involved tainted line-ups. Saldate's tactics were criticized by the Arizona Court of Appeals in at least two of the cases. Several others

84

resulted in plea agreements before suppression hearings could be held. This evidence shows a clear pattern of misconduct that is highly relevant.

In *Taylor,* this Court cited the "Goldstein" case in noting that the very police department and detective involved in the *Taylor* interrogation was no stranger to police misconduct. *Taylor,* 366 F.3d at 1014, n. 17. Here, the evidence of Saldate's pattern of police misconduct is *much* stronger and involves numerous cases, yet this evidence was virtually ignored by the state (and district) courts. In failing to properly evaluate these cases and their impact on the credibility and reliability determinations made in Debra's case, the state court neglected to make necessary findings of fact, making her factual determinations "perforce unreasonable" and leaving "nothing to which the presumption of correctness can attach." *Taylor* 366 F.3d at 1000-01.

> ➢ State Court Made Certain Findings Under a Misapprehension of Law.

Judge Hendrix wrongly found that the issue regarding Saldate's interrogation techniques was precluded for failure to raise the issue on appeal, even though ineffective assistance of appellate and trial counsel issues relating to these claims were raised in post conviction proceedings. She also based many of her factual findings on a misapprehension of law relating to *Miranda,* and applied an overly narrow test for determining admissibility of a purported confession (focusing solely on voluntariness and disregarding reliability). *Id.*

85

L&L046145

> State Court Made Numerous Findings Without
> Holding an Evidentiary Hearing.

The state judge denied Debra the opportunity to develop the basis for her claims in an evidentiary hearing in post-conviction proceedings, making "the fact-finding process itself ... defective." *Id.* She also wrongfully precluded trial counsel from presenting expert testimony to challenge the reliability of the "confession" in light of Saldate's techniques, and disallowed discovery of Saldate's personnel file and Phoenix Police Department interrogation policies at both trial and in post-conviction proceedings.[53]

> State Court Plainly Misapprehended or
> Misstated the Record.

In finding that Debra's "version of the interrogation was not much different from the version given by Det. Saldate" and that the "only significant difference between Ms. Milke's recollection of the interview and Det. Saldate's recollection is when and how she requested an attorney," the state judge clearly misapprehended/misstated the record. (ER 144-45). This goes to a material factual issue central to Debra's claim -- that she, in fact, did not confess to

---

[53] Because the state court precluded this evidence at trial and would not allow counsel to develop it in post-conviction proceedings, this Court should consider Richard Leo's report and evidence of Saldate's disciplinary history and non-conformance with PPD policies admitted in habeas proceedings in determining whether the state court's fact-findings survive *Taylor's* "intrinsic challenge."

86

Detective Saldate. *Taylor* at 1001.   The state court also ignored evidence presented on post conviction review regarding Saldate's pattern and history. *Id.*

The presence of all the *Taylor* factors "fatally undermine[s] the fact-finding process, rendering the resulting factual finding unreasonable." *Id.* Because the state court's factual findings do not survive an intrinsic challenge under § 2254(d)(2), the district court erroneously applied the "presumption of correctness" and "clear and convincing" evidence standard of § 2254(e)(1).

### D.   Saldate Also Pressured and Influenced Witnesses Against Debra, Violating Her Right to a Fair Trial.

The district court also erroneously found Debra failed to present sufficient evidence in support of her assertion that Saldate pressured and negatively influenced witnesses against Debra, including her father and sister. (ER 33-34).   Significant evidence shows Saldate contaminated these two witnesses.   In doing so, Saldate undoubtedly helped to sway the jurors toward his version of events, especially where there was no other "independent" evidence to gauge Debra's and Saldate's credibility.

Saldate called Debra's father Richard immediately after Debra's arrest and said she confessed. (ER 2069).   He said Debra killed Christopher because "she did not want him to grow up to be like his father." (Id.).   Afterward, Richard refused to speak with or assist Debra, suggesting she get a public defender. (Id.).   Shortly before his death in March 1998, Richard spoke with

87

defense investigator Kirk Fowler.[54] (ER 351-54). Richard wanted to learn what evidence indicated Debra had not confessed. He said he had believed Saldate's assertion that Debra confessed because he could not believe a law enforcement officer would misstate facts. (ER 332-33, 352). Richard said this was due to his background in the military and corrections, and his faith in the justice system. (ER 353). Richard told Fowler that if Debra is not guilty and Saldate was untruthful, "I'm killing the son of a bitch for what he's put me through and my family." (Id.). Richard's intensity demonstrates the degree to which he relied on Saldate's representations in forming his belief that Debra conspired in the murder and his willingness to provide negative character evidence against his own daughter. Unfortunately, Richard died before he and Fowler could meet.

According to psychologist Dr. David Biegan, Richard was a prime candidate for Saldate's negative influence. (ER 332-34). In addition to being strongly biased in favor of law enforcement, Richard was a chronic alcoholic with a dysfunctional family history and deep resentment toward Debra for "siding" with her mother after their divorce. (Id.). After reviewing the social history, trial testimony and other documents in this case, Dr. Biegan concluded it likely that Debra's father was strongly influenced by Saldate.

---

[54] Debra had written to Richard after learning he had terminal cancer.

88

Saldate's efforts to turn Debra's sister against her are evident from Saldate's interview of Sandra, which *she* recorded. (ER 1933). Saldate first tried to sell Sandra on Debra's guilt by saying she confessed. (ER 1942). Then, knowing of Sandra's prior close relationship with Styers and sensing the strong sibling rivalry between the sisters, he said Styers wrote "lovelorn" letters to Debra while in jail. (ER 1953-54). Saldate also claimed Debra tried to "seduce" her way out of trouble by exposing her breasts to him during the interrogation, after which Sandra joined in trashing her sister's character. (ER 1962-63).

In a 1995 phone interview, Debra's post conviction counsel Anders Rosenquist learned more about the circumstances surrounding Saldate's interview of Sandra.[55] (ER 364-65, 1584). Sandra said Saldate made misleading comments in attempting to persuade her to testify against Debra. (ER 365). Additionally, prior to trial, Saldate and another investigator phoned Sandra repeatedly. (Id.). They were upset because she kept postponing her interview, which she did because she was seven months pregnant and did not want to become involved. (Id.). She said Saldate hounded her and ultimately called to say he was coming to see her in Wyoming the next day. (Id.). When

---

[55] The district court said Sandra considered Mr. Rosenquist's contact "harassment" (ER 34 n. 7), but Sandra gave permission through her mother, Renate, for Rosenquist to call her. (ER 365). She then spoke at length with him.

L&L046149

she said that wasn't convenient, he threatened to subpoena her even if it meant she would have to deliver her baby early. (Id.).

When Saldate arrived, he told Sandra she needed to provide character evidence against her sister, because she knew Debra better than their parents. (ER 365-66). Sandra told him she and Debra were never close, but they did generally know what was going on with each other. (ER 366). Saldate seriously misled Sandra before the interview regarding the evidence against Debra. (Id.). He said Debra began confessing to him while en route to the Pinal County Sheriff's Office from her father's house, and that Debra said she felt much better after confessing because she had been hiding the secret for a long time. (Id.). Saldate claimed Debra said she tried to kill Chris twice before, once when their mother and stepfather were in Phoenix, and once when Debra allegedly tried to put cyanide in Chris' cereal. (Id.). Another time, he said Debra and Styers went out to the site to kill Chris, but there was too much traffic. (Id.). Saldate also claimed that while en route from Florence to Phoenix, Debra tried to exchange a sexual favor for her freedom. (ER 367). He also said Debra offered to be sterilized for punishment. (Id.). And he claimed that while in county jail, Debra told other inmates, "Yes, I did it, and I'd do it again." (Id.). Sandra said Saldate seemed more interested in Debra's sexual practices than her

90

abilities as a mother. (Id.).  She said many of his questions seemed like those of a man trying to find out what Debra likes to do on dates. (Id.).

Even though Sandra allowed Saldate to interview her in Wyoming, the State still subpoenaed her to testify, requiring early inducement of labor so she could fly to Phoenix immediately after birth. (Id.).  She said her baby was colicky and she got little sleep, resulting in her being extremely tired during her testimony and anxious to return to Wyoming. (ER 368).  She also said the victim/witness advocate told her what to say every day and that she felt like a "puppet." (Id.).  She was not allowed to elaborate on her answers at trial.  (Id.).

Following this conversation, Sandra shifted and would not sign an affidavit. (ER 368-69).  Rosenquist then received a warning from an assistant attorney general, claiming Sandra was a "designated victim" whom Rosenquist could not contact pursuant to the Victim's Rights Amendments.[56] (ER 369-70).

Three years later, Rosenquist learned Sandra was again willing to reveal information regarding Saldate's influence and pressure.[57] (ER 371). Mr. Fowler met with Sandra at her home for four hours, where she was cordial and friendly. (ER 356).  Sandra said neither she nor her father ever believed Debra had

---

[56] Sandra is Debra's sister, not a member of Christopher's immediate family.  However, Rosenquist ceased all communication.  (ER 370).

[57] Shortly before his death, Richard asked Sandra to speak with the defense team. (ER 355-58).

91

L&L046151

anything to do with Chris' death. (Id.). She said, "Debbie is intelligent but she is too ditzy to balance a checkbook, let alone plot a murder conspiracy." (Id.). When Fowler asked if Sandra would sign an affidavit, she said she'd discuss it with her boyfriend and let him know. (Id.). After exchanging phone messages with Sandra, defense counsel received another warning from the AG's Office saying to cease contact. (ER 357, 371).

Renate confirms that Sandra did not believe Debra was capable of conspiring to have Christopher killed and that Saldate strongly pressured Sandra to testify against Debra. (ER 381-83). Sandra called Renate when she was pregnant, saying Saldate put her under extreme duress while meeting in Wyoming. (Id.). She also said Saldate pressed her to induce Renate into testifying against Debra. (Id.). A reporter who prepared a program on Debra's case in 1998 also corroborates these facts. (ER 387-89). Sandra told the reporter she did not believe her sister was capable of having Christopher killed, and that her father believed in Debra's innocence. (Id.). She said she never intended to help convict Debra and that in the event of a re-trial, she would testify that Debra was not the kind of person who would have her son killed. (Id.).

After evaluating materials pertaining to Sandra, Dr. Biegan concluded that the "multiple pressures applied ... by Detective Saldate in his interview of June 30, 1990," combined with the family's social history, explained Sandra's

92

L&L046152

"shifts" and "ambivalence." (ER 328).  Compared to Debra, Sandra had failed to achieve their parents' acceptance, causing intense sibling rivalry, particularly after their parents' divorce. (Id.).  Sandra resented having to live with their alcoholic father and new wife and the fact that their parents viewed her as the "bad daughter." (ER 329).  According to Dr. Biegan, Christopher's death "was the first opportunity to excel, exceed and step over her sister.  She was desperate to be admired by mother the way she perceived Debra to be favored." (Id.).  Once removed from "the pressure and her own neurotic vulnerability," Sandra was able to describe her feelings about the situation so long as Saldate "was no longer pressuring or bullying her." (Id.). According to Dr. Biegan, Sandra was "particularly vulnerable, impressionable, and easily pressured by Detective Saldate who … seemed … so eager to convict Debra that he could barely contain his enthusiasm leaning on, traipsing over, and stomping, if not legal, then certainly ethical boundaries in his interviews." (Id.).

Contrary to the district court's finding, evidence shows Saldate's pressure and influence significantly exploited and tainted these two family members against Debra.  Evidence also shows Saldate attempted to "poison" Debra's mother, Renate, (ER 381), Debra's father in law, Henry Milke, (ER 1977), and Debra's former boyfriend, Ernie Sweat. (ER 1891).  Mr. Sweat highlighted specific areas where Saldate misreported his statements (ER 1892-98) and

93

skewed his statements against Debra at trial. (ER 1761-78). For example, Saldate reported that Mr. Sweat told Debra he was not ready for marriage, but Mr. Sweat did not ever tell Saldate this. (ER 1767-69, 1774-75, 1896-98). Yet the State adopted Saldate's version, attempting to establish that Debra had a motive for having Christopher killed -- to "win" Ernie Sweat. (RT 10/10/90 at 145-148). Saldate's report also stated that Mr. Sweat told Debra she was neglecting Chris and needed to spend more time with him. (ER 1776). Mr. Sweat testified he had no such conversation with Debra and did not tell Saldate he did. (Id.). Mr. Sweat testified he saw many displays of affection between Debra and Christopher and that Chris was well dressed, appeared healthy, and had no signs of abuse. (ER 1772-73). Mr. Sweat also said Christopher and Debra seemed happy together. (Id.).

Mr. Sweat's testimony also reveals Saldate's willingness to misrepresent witness statements to make them "fit" his "theory" of the case. Although these may be minor misrepresentations in isolation, they take on major proportions when used by the State to establish Debra's supposed motive. (RT 9/12/90 at 17; RT 10/10/90 at 145). Such inaccuracies also become highly prejudicial when combined with Saldate's contamination and pressuring of witnesses.

No physical or reliable circumstantial evidence linked Debra to this horrific crime. Neither co-defendant testified against Debra. Because the only

L&L046154

evidence purportedly implicating Debra in her son's murder is an unrecorded, unwitnessed "confession" obtained by a detective with a sordid history of coercing and fabricating confessions, *any* evidence of possible motive and negative character evidence the State could come up with was particularly persuasive. Saldate's ability to influence and pressure two family members and a former boyfriend to testify against Debra was critical in persuading the jury that Saldate's version of events was correct.

### E.    Summary of Why the State and District Courts' Decisions On Claim I Are Wrong.

"In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases." *Ake v. Oklahoma,* 470 U.S. 68, 87 (1985). Fact finding procedures in capital cases must "aspire to a heightened standard of reliability." *Id.* at 87. Unfortunately, rather than meeting this higher standard, the fact finding procedures in Debra's case sank far below those normally required in non-capital cases. In post-conviction proceedings, Debra built on the factual basis for Claim I, yet the state court judge summarily denied relief. On habeas review, the federal district judge amplified this problem by doing exactly what *Taylor* cautioned against. After reciting verse and line the state court's decision, it then construed *Taylor* as requiring "particular deference to state court fact finding," and, citing *Patton v. Yount,* 467 U.S. 1027, 1038 (1984), it held that the state court's determinations of credibility are

95

L&L046155

entitled to "special deference." (ER 29-30).  The district court also concluded that the state court judge's "factual determinations are entitled to a presumption of correctness." (ER 30).  This was plainly wrong.  Nowhere did the district court heed *Taylor's* warning to apply special scrutiny to factual findings relating to what happened in an interrogation in the context of a "swearing contest" between a detective and defendant.

A primary reason for giving less deference to trial court fact-finding regarding confession evidence where the only evidence involves a "swearing contest" is that too much deference has led appellate courts to routinely affirm what have turned out to be wrongful convictions.  An article to be published by the Columbia Law Review in January 2008 evaluates the proven wrongful convictions of 205 people exonerated through post conviction DNA testing, and concludes that "appellate courts did not effectively review the unreliable and false evidence that supported these convictions."[58]  Fortunately for those 205 people, DNA testing ultimately proved them innocent.

Debra is not so fortunate.  She cannot be exonerated through DNA evidence because she was not present at the scene.  Her case thus deserves special scrutiny of the totality of circumstances, which in this case require that

---

[58] *See* Garrett, B., *Judging Innocence,* 108 Colum. L. Rev. (forthcoming 2008), avail. at http://ssrn.com/abstract = 999984.

L&L046156

less deference be given to the state court's findings under *Taylor*.  Among other factors: 1) the detective was instructed to electronically record the interrogation and failed to do so; 2) the detective destroyed his contemporaneous notes; 3) the detective prepared his report several days after the interrogation; 4) Debra told a reporter she did not confess before the detective prepared his report; 5) the detective was the sole police officer to witness the interrogation; 6) the detective has a history of interrogating outside the bounds of *Miranda,* and ignoring suspects' invocations of *Miranda* rights; 7) the detective has a history of taking advantage of vulnerable witnesses (with drug and/or alcohol dependencies or who are under the influence); 8) the detective has a history of embellishing conversations with witnesses (ie: Sandra's taped interview differs from Saldate's police report); 9) the detective has a history of embellishing other reports (to gain warrants, indictments, etc); 10) the detective has a history of lying under oath (to grand jury); and 11) the detective failed a polygraph regarding his own inappropriate conduct with a female during a traffic stop. When added with the state judge's removal from the criminal bench for exercising poor judgment, these facts *seriously* undermine the reliability of the purported confession and require that less deference be given to the state court's findings under *Taylor*.  In these circumstances, the improper interrogation tactics and investigative techniques used by Detective Saldate violated Debra's

97

rights against self-incrimination, to due process, a fair trial and a just sentencing determination under the Fifth Amendment, Sixth, Eighth, and Fourteenth Amendments.

The findings of the state and district courts regarding admissibility and cumulative nature of this evidence are plainly objectively unreasonable. Debra urges this Court to review this claim with the "long view" perspective required to understand how a jury in 1990 wrongly convicted Debra on the basis of "confession" evidence that a reasonable jury in 2007 would almost certainly find wholly unreliable, especially in light of all we have since learned about Saldate's history and pattern of interrogations and about the unreliability of unrecorded, undocumented interrogations. Even on the present record, Debra's capital conviction should be vacated under *Taylor* and established federal law.

### F.     At a Minimum, Debra Is Entitled to an Evidentiary Hearing to Fully Develop the Factual Support for her Claims.

Although the present record provides ample support to vacate Debra's convictions and death sentence, she is entitled at a minimum to further develop her claims in an evidentiary hearing. *Taylor,* 366 F.3d 992; *see also Earp v. Ornoski,* 431 F.3d 1158, 1169 (9th Cir. 2005)(where factual basis for claim was adequately proffered to state court, petitioner is entitled to evidentiary hearing if never previously given full and fair opportunity to develop facts of colorable claim); *Caro v. Calderon,* 165 F.3d 1223, 1226 (9th Cir. 1999)(same). By

98

L&L046158

summarily denying relief, the district and state courts denied Debra's right to fully develop the evidentiary basis for her claims.

## II.   DEBRA WAS DENIED HER RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT (CLAIM IV(A),(G), IN PART.

### A.   Trial Counsel's Overall Investigation of Debra's Case Was So Deficient That Debra Was Substantially Prejudiced By His Performance (Claim IV(A), # 3, 4, 7, 8, 9).

The district court found that Debra failed to show trial counsel was deficient in his investigation or that she suffered prejudice. (ER 30-38). This ruling is erroneous under § 2254(d)(2), as the state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984).

The Sixth Amendment requires effective assistance of trial counsel. *Id.* at 685. Under *Strickland,* a petitioner must show counsel's representation fell below an objective standard of reasonableness and the deficiency prejudiced the defense. *Id.* at 687. "Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, ... counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular

99

L&L046159

investigations unnecessary." *Strickland,* 466 U.S. at 690-91; *see also* ABA Code of Prof. Resp., Canon 6; EC6-4; DR6-101(A)(2, 3) (attorney has duty to investigate and prepare every phase of client's case). This includes a duty to investigate important defenses and to adequately investigate and introduce into evidence records demonstrating factual innocence or raising sufficient doubt on that question to undermine confidence in the verdict. *Sanders,* 21 F.3d at 1456.

Here, trial counsel had been an attorney for under seven years. He had only tried one other capital case when appointed to defend Debra. (ER 1304). Although an investigator was appointed to assist, (ER 376-77), counsel still failed to aggressively investigate a number of areas. Both counsel and his investigator agree their performance fell below acceptable standards and Debra was prejudiced as a result. (ER 378, 1304). Counsel's failures, individually and cumulatively, constitute ineffective assistance under *Strickland.*

### 1.    Failure to Contact Rosemary Houston.

Debra wrote to defense counsel in May 1990, telling him of potential witnesses who could aid her defense. (ER 1981-83). She specifically explained that Rosemary Houston would be beneficial because she worked with Debra and knew about Debra's relationship with Mark, how frightened she was of him and why she and Christopher moved. (Id.). Defense counsel failed to interview or call Rosemary to testify.

L&L046160

The district court found this neither deficient nor prejudicial because Debra testified she was afraid of Mark, which the court found of "little relevance." (ER 42). This rationale is contrary to *Strickland*. Trial counsel did not even determine what information Rosemary had. Where Debra's credibility was imperative to her defense, there is no strategic justification for not calling a witness who could corroborate Debra's overall version of events, including her claims regarding Mark and her efforts to care for and protect Christopher. Under *Strickland*, counsel failed to make a reasonable decision that made particular investigations unnecessary.

### 2. Failure to Investigate Debra's Past and Locate Witnesses

First, counsel failed to call or investigate Patricia (Bacon) Prust. Patricia and Debra attended high school together, then worked and lived together after graduation. (ER 341-46). Patricia had first-hand knowledge of Debra's relationship with Mark, her attitude about being pregnant with Christopher, and her performance as a mother. (Id.). Patricia also had critical information that could have been used to impeach the credibility of State witnesses Sandra Pickinpaugh and Dorothy Markwell. Patricia would have testified that Sandra and Dorothy were dishonest. (Id.). She had information regarding Dorothy's drug use, jealousy of Debra and possible motives for testifying. (Id.). Patricia could have testified to Debra's family dynamics and corroborated the defense

101

L&L046161

theory that Sandra testified against Debra in an attempt to be the "good sister."
(Id.). Most important, Patricia saw Debra with Christopher **two months** before
his death, and Debra said her hard times were behind her and she was looking
forward to their children spending time together. (Id).

Patricia made several unsuccessful attempts to contact defense counsel.
(Id.). She was never interviewed or called as a witness. (Id.). Sandra was
inadequately impeached, (Claim IV(A)(4) below), and Dorothy was essentially
left unchallenged when she testified as a last minute rebuttal witness for the
State. (ER 359). Had the jury heard Patricia's testimony, there is a reasonable
likelihood it would have changed the outcome. *Strickland* 466 U.S. at 692.

Counsel also failed to call or investigate Charles Jones and his parents,
Donald and Josephine. Charles dated Debra from 1980 to 1983 and had
valuable information regarding Debra's interactions with her family. (ER 1582).
He could have testified to the longstanding, destructive tension between Debra
and Sandra, and his view that Debra was not capable of harming Christopher.
(Id.). Donald and Josephine also had critical information about Sandra's
behavior toward Debra and Debra's care of Christopher. (ER 1578). They
expected to testify on Debra's behalf but were never even contacted. (Id.)

Counsel also failed to investigate or call anyone from the Mary Moppets
Pre-School or Day Bridge Learning Center, where Debra regularly took and

102

interacted with Christopher. (ER 360).  He also failed to call Dr. Tefteller, who performed thyroid tumor surgery on Christopher, and Dr. Zuerlein, who treated Christopher during that time. (ER 360, 1220). Both observed Debra with Christopher and could have testified regarding her attentiveness. (Id.).

In denying this claim, the district court *only* discussed trial counsel's failure to investigate the Jones family. (ER 42-43).  It generally classified the remaining witnesses (Patricia Prust, employees of Christopher's schools and his treating physicians) as "various acquaintances" and failed to specifically address any of those arguments. (Id.).  The court dismissed any impropriety in trial counsel's failure to contact Charles Jones by stating that Charles last saw Debra two years prior to Christopher's death. (Id.). Yet, it ignored the fact that Patricia Prust saw and spoke to Debra just two months before Chris' death. (Id.). And it ignored Debra's argument that Patricia's testimony could have severely impeached Dorothy Markwell (who hadn't seen Debra for fifteen months prior to Chris' death) and Sandra (who hadn't seen Debra for six months prior to his death). (Id.).  The district court also improperly relied on the state PCR court's finding that nothing indicated trial counsel knew of the Jones family. (ER 43).  This finding ignores *Strickland's* requirement that counsel at least conduct an adequate investigation into all potential defenses. And, the Jones were but a few of the available character and impeachment witnesses.

103

3.      **Failure to Interview Members of Debra's Family.**

Debra's mother and stepfather had vital information that should have been presented at trial. Debra's mother Renate could have testified about her interactions with Saldate. (ER 381-83). Saldate told her, "[Debra] is guilty as hell," "I will make sure she will roast," and "She will never see the light of day again." (ER 382). He also tried to intimidate Renate and told her to go back to Germany. (Id.). This evidence could have been used to help impeach Saldate by showing his bias and subjective opinions about Debra's case. It also could have been used to show how Saldate pressured and influenced members of Debra's family, tainting the trial. Renate made numerous attempts to contact trial counsel, but he never returned her calls and failed to call her as a witness. (Id.). Debra's stepfather Alex Janka was also never contacted. (ER 384). Alex witnessed numerous interactions between Debra and Christopher and would have testified that Debra was a loving, affectionate mother. (Id.).

In holding that trial counsel's failure to interview Debra's family was neither deficient nor prejudicial, the district court relied on the state PCR court's finding that "much of the information Petitioner criticizes counsel for failing to present would not have been admissible at the guilt stage of trial." (ER 44-46). This finding over-generalizes this evidence as improper opinion testimony under Rule of Evidence 701. Although Debra's family may not have

104

been permitted to directly "opine that Petitioner was not the kind of person who would have arranged for her child to be murdered," as suggested by the state and district courts, other favorable character testimony would  have been admissible under Fed.R.Evid. 404(a)(1).  Testimony that Debra was gentle, non-aggressive and a loving, caring mother would have been admissible. *Id.*

Not only was character testimony admissible, it was of the utmost import here.  Testimony from the family members of a woman accused of conspiring to kill her own child is critical and clearly admissible under Rule 404(a)(1). Obviously, the trial court believed such testimony was admissible when offered by the State, as Debra's father and sister were allowed to provide this exact type of character testimony ***against*** Debra.  For trial counsel to fail to even interview Debra's mother and stepfather under these circumstances is clearly deficient and highly prejudicial under *Strickland.*   Minimal professional standards demanded that trial counsel at least talk to these family members. *See Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir. 1987)(counsel's cursory attempts to locate witnesses ineffective); *Code v. Montgomery*, 799 F.2d 1481 (11th Cir. 1986) (counsel interviewing only one witness was unreasonable).

Failure to investigate valuable witnesses is particularly egregious in a capital case. *See, e.g., Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002); *Mayes v. Gibson*, 210 F.3d 1284, 1290-91 (10th Cir. 2000), *cert. denied,* 531 U.S.

105

L&L046165

1020 (2000); *Siripongs v. Calderon*, 35 F.3d 11308, 1315-1316 (9th Cir. 1994);

*Wade v. Calderon*, 29 F.3d 1312, 1323-25 (9th Cir. 1994). Though some of

these cases involve the sentencing phase, failure of Debra's attorney to call

these witnesses at trial was highly prejudicial in light of State witnesses

claiming Debra was a poor mother who didn't want Christopher. Unlike the

typical capital case, Debra's guilt is **seriously** in doubt, as no physical evidence

links her to the crime and Saldate's testimony is unreliable. *Russell v. Lynaugh*,

892 F.2d 1205, 1206 (5th Cir. 1989), *cert. denied*, 501 U.S. 1259 (1991).

### 4.   <u>Failure to Obtain Critical and Available Impeachment.</u>

Counsel's failure to obtain impeachment information regarding family

members who testified against Debra was also deficient and highly prejudicial.

As noted, Debra's sister Sandra and her father Richard testified against Debra at

trial. (RT 9/14/90 at 95-101; RT 9/13/90 at 103-17). Unfortunately, trial

counsel was unable to satisfactorily explain their testimony due to his own

failure to obtain available impeachment. Thus, Sandra's negativity toward

Debra was only superficially challenged, which was recognized by the district

court in stating, "counsel did not attack Ms. Pickinpaugh's character or

motivations." (ER 46). Richard's characterization of Debra's demeanor upon

learning her son was killed was also essentially unchallenged. Significant

106

L&L046166

impeachment could have been obtained had counsel simply spoken with Renate

and Alex. Patricia Prust also could have impeached Dorothy Markwell.

The district court excused counsel's failures as reasonable trial strategy,

citing *Strickland's* warning against second-guessing counsel's performance.

(ER 47).  Where the primary case against Debra was Saldate's testimony and

the primary defense involved convincing jurors that Debra was not the kind of

person who could have had her son murdered, failing to impeach key State

witnesses portraying Debra in a negative light could *never* be reasonable trial

strategy.  Without available impeachment testimony against Sandra, Richard

and Dorothy, the jury could not accurately assess their credibility.  Failing to

investigate and impeach these witnesses significantly prejudiced Debra.

### 5. Failure to Obtain Medical and School Records.

Counsel was further ineffective by failing to obtain medical and school

records. (ER 1220, 1226, 1270, 1273, 1281).  Given the amount of time spent

by the prosecutor trying to impeach Debra with testimony about her

schoolwork, her school records were crucial to her defense.  (RT 10/3/90 at 61-

65). Records would have shown Debra was never disciplined at school and was

an above average student. (ER 1273, 1281).

Debra's medical records reveal she cared for herself while pregnant. (ER

1270).  This evidence could have been used to rebut inferences that Debra did

L&L046167

not want her child and resented her pregnancy. (RT 10/3/90 at 91-93). Likewise, Christopher's medical records show he was in good health and well cared for by Debra. (ER 1220, 1226). Medical records of Christopher's thyroid surgery less than one year before his death and the affidavit from his treating physician during that time show Debra was a caring, attentive mother. (Id.) Dr. Zuerlein described Debra's concern for Christopher as above average compared with other mothers he had observed in similar situations. (Id.). He also noted Christopher showed no signs of abuse. (Id.).

The district court found counsel "placed much of this information before the jury through the testimony of the defense witnesses." (ER 47). It failed to recognize, however, that the State's theory made Debra's character critical to the case. Corroborating Debra's testimony and providing good character evidence was imperative, and there was no sound trial strategy not to do so. Christopher's medical records would have corroborated that he was healthy and not neglected or abused.

The state court unreasonably applied the two pronged test in *Strickland,* and the district court erred in denying this claim. All of the foregoing failures to investigate individually and cumulatively prejudiced Debra under *Strickland.*

108

L&L046168

**B.    Trial Counsel Failed To Investigate or Present Ample Mitigation Evidence Available in Debra's Case (Claim IV(G)).**

"Counsel's general duty to investigate ... takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care." *Strickland*, 466 U.S. at 706 (Brennan, J.).   In reviewing ineffective assistance in capital sentencing, the question is "whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.   In a capital case, where counsel's failure to introduce "substantial and important mitigation evidence readily available" is not due to a reasonable tactical evaluation, his performance is constitutionally deficient. *Mak v. Blodgett*, 970 F.2d 614, 618 (9th Cir. 1992), *cert. denied*, 507 U.S. 951 (1993).  Because of the potential consequences in capital sentencing:

> we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of the trial. ... The sentencing hearing is defense counsel's chance to show the jury the defendant, despite the crime, is worth saving as a human being. ... To fail to present important mitigating evidence in the penalty phase ... can be as devastating as a failure to present proof in the guilt phase.

L&L046169

*Id.* at 614. *See also Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999), *cert. denied*, 528 U.S. 1105 (2000) ("imperative" that all relevant mitigating information be unearthed for consideration in capital sentencing phase.).

Despite its extreme importance in capital sentencing, trial counsel failed to present readily available mitigating evidence. He waited a month after Debra was convicted to even request appointment of associate counsel to assist with sentencing. (ER 1724). The trial court compounded the problem by denying his request. (ER 1723). Counsel admitted he had a full trial schedule and was "taking off for the holidays" just prior to sentencing. (RT 12/7/90 at 116-118). It was not until after twice moving to continue sentencing that counsel finally began mitigation efforts. (ER 1710). Even then, he failed to present substantial mitigation that could have helped Debra avoid a death sentence.

### 1.   Failure to Secure Renate's Presence Until the Day Before the Sentencing Hearing.

Renate had key mitigating information that should have been presented on Debra's behalf. Yet, defense counsel did not even attempt to contact her until the day before the mitigation hearing, even though she resided in Germany. (ER 1708). The fact that Debra's other family members testified against her at trial made it critical to have her mother testify in mitigation. Had counsel contacted Renate, he would have realized the import of her testimony. No tactical rationale explains the failure to call Renate as a witness. *Mak*, 970

110

F.2d at 618.  Contrary to the district court's ruling, failure to contact Renate until one day before the sentencing hearing constitutes ineffective assistance. *See Brewer v. Aiken*, 935 F.2d 850, 860 (7th Cir. 1991).

### 2.   Failure to Obtain Debra's Records or a Complete Social, Medical, or Psychological Evaluation.

In *Waters v. Zant*, 979 F.2d 1473, 1478 (11th Cir. 1992), the court identified at least five "constitutionally significant errors" which viewed together, undermined confidence in the sentencing phase, requiring reversal. One was counsel's failure to present mitigating evidence of the defendant's medical history and troubled childhood. *Id*; *see also Blanco v. Singletary*, 943 F.2d 1477, 1499 (11th Cir. 1991), *cert denied*, 504 U.S. 943 (1992).

A thorough social history would have shown that Debra grew up in a hostile, difficult environment. (ER 941-1036).  She was born in a military hospital in Germany, and the family moved constantly. (ER 945, 957).  Her father constantly drank, wasted the family's income, and was abusive toward Renate. (ER 955-56).  Sandra was routinely beaten for misbehaving while Debra was rarely disciplined, causing Sandra to harbor resentment toward Debra. (ER 960-61).  Debra once witnessed her stepbrother trying to beat Renate with a baseball bat. (ER 963).  Debra's parents divorced, after which the girls moved in with Renate. (ER 964-65).  When Renate remarried to Alex, he moved in with them. (ER 971).  Debra held numerous jobs to help care for her

111

L&L046171

family. (ER 972).  Sandra and Debra's relationship became strained, and when

Renate could no longer handle Sandra, she sent her to live with Richard. (ER

973).  Sandra resented Renate, as Richard did not treat her well. (ER 974-76).

Renate and Alex then moved to Germany, leaving the girls in Phoenix. (Id.).

       While living with Patricia Prust, Debra started dating Mark Milke.  (ER

979).  Mark moved in with Debra and was soon arrested for drug possession.

(ER 980).  Debra had Christopher in 1985. (ER 991). Shortly after, Mark was

imprisoned on drug charges and was later arrested for domestic violence toward

Debra.  (Id.).  Debra left Mark due to his excessive drinking and drug use,

forcing her to raise Chris alone. (ER 993). She moved around and worked one

to two jobs, as Mark provided no support.  (Id.).

       A complete social history was imperative to illustrate difficulties Debra

had in her childhood and adult life and her efforts to overcome them for herself

and her son. Counsel severely prejudiced Debra by not obtaining and presenting

a complete social history in mitigation.  He was also ineffective for failing to

obtain and present Debra's and Christopher's medical records in mitigation.

(ER 1220, 1226, 1270).  These records showed Debra took good care of herself

and her son, which would have rebutted the inference that Debra was an unfit

mother who did not want or care for her child.  Counsel was also ineffective for

failing to obtain a psychiatric evaluation of Debra, *Pruett v. Thompson*, 771

112

L&L046172

F.Supp. 1428, 1440 (E.D.Va. 1991), to help explain her family dynamics and why Sandra and Richard testified as they did. (ER 326-34).

Nothing indicates these failures were based on a reasoned decision or that submission of this evidence would have been harmful. Counsel simply failed to present available mitigation, which was clearly deficient here. *Deutscher v. Whitley,* 884 F.2d 1152, 1159-62 (9th Cir. 1989); *Mak,* 970 F.2d at 621.

### 3.   Failure to Investigate Debra's Childhood and Home Life.

Counsel was ineffective for failing to investigate Debra's early years or home life. *See Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Waters v. Zant,* 979 F.2d 1473, 1478 (11th Cir. 1992). As shown above, extensive evidence showed Debra's childhood and home life were very difficult. Although the court denied this claim because "Petitioner's background as the child of divorce does not constitute persuasive mitigation evidence" (ER 56), Debra's parents' divorce is only one aspect of her childhood that should have been presented in mitigation.

### 4.   Failure to Provide Evidence of Close Family Ties.

Debra was charged with conspiracy to have her only child killed. At trial, Debra's nearly estranged sister and father testified against her. Renate and Alex dearly loved their grandson and were devastated by his death. Yet, they believed in Debra's innocence and were her closest family members. (ER 381, 384). The fact that Debra maintained such loving relationships with them

113

L&L046173

established non-statutory mitigation. *Eddings*, 455 U.S. 104. Counsel's failure to call them was clearly ineffective.

After the hearing, counsel filed a sentencing memorandum. (ER 1715). Without supporting documentation and testimony, however, counsel could not show that mitigation outweighed aggravation. Counsel's performance at sentencing fell far below prevailing standards and clearly prejudiced Debra. There is a reasonable probability that had counsel presented evidence available or discoverable through minimal investigation, Debra would not have received the death penalty. *Strickland*, 466 U.S. at 694; *Blake v. Kemp*, 758 F.2d 523, 534-535 (11th Cir.), *cert. denied*, 474 U.S. 998 (1985).

## III.  TRIAL COURT ERROR INFRINGED UPON DEBRA'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS (CLAIM III, IN PART).

### A.  The Trial Court Erroneously Struck, For Cause, Potential Juror Moquino (Claim III # 10).

The trial judge dismissed potential juror Pete Moquino for cause because he opposed the death penalty. (ER 1878-85). A defendant has a Sixth Amendment right to a fair, impartial jury, *Holland v. Illinois*, 493 U.S. 474 (1990), which is violated when venire members expressing conscientious objections to capital punishment are excused for cause. *Witherspoon v. Illinois*, 391 U.S. 510 (1968). "A juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or

114

substantially impair the performance of his duties as a juror in accordance with

his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980).  The

Arizona Supreme Court's decision upholding the dismissal was based on an

unreasonable determination of facts and was contrary to established federal law.

When Debra was sentenced, the capital sentencing determination was left

to the trial judge, but jury questioning regarding capital punishment was still

allowed. *State v. Clark*, 126 Ariz. 428, 431, 616 P.2d 888, 891 (1980).  The test

was whether certain views would prevent or substantially impair a juror's

ability to decide the case in accordance with his oath and court instructions.

*State v. Martinez-Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985).  The

following occurred in voir dire:

> THE COURT:  Is there anyone here who feels they would rather not sit as a juror on this case because of the charge of first degree murder and because there is a possibility that the death penalty could be imposed? Mr. Moquino?
>
> MR. MOQUINO: Yes.
>
> THE COURT:  Would it make a difference if I told you that the jurors did not determine punishment; even in a capital case that decision is left to the judge?
>
> MR. MOQUINO:  I don't think I'd want to have anything to do with it. I don't believe in capital punishment.
>
> THE COURT:  All right.  Thank you, sir.  Anyone else?

L&L046175

(ER 1880).  When the judge addressed strikes for cause, the prosecutor asked to strike Moquino but did not explain why he could not be impartial. (ER 1884). The judge struck Moquino for cause.[59] (Id.). Under *Adams,* mere opposition to capital punishment is insufficient cause.

Contrary to the district court's speculation that "Moquino's views on the death penalty likely did not constitute the sole basis for his excusal" (ER 37 n. 9), the **only** reason reflected on the record was his opposition to the death penalty.  Although Moquino said he didn't want "anything to do with it," neither the court nor prosecutor followed up with additional questions regarding Moquino's apprehension.  Plainly, the State failed to establish whether Moquino was just opposed to capital punishment or if he truly could not be impartial.  Moquino's ambiguous statement required clarification before he was excused for cause.  Moreover, the jury questionnaire shows Moquino could have been impartial.  In answering whether he had formed an opinion on guilt or innocence, Moquino circled "no." (ER 1872).  He noted that if he had formed an opinion, he could set it aside, and he had no personal or family experiences that might affect his ability to be impartial. (Id.).  Striking Moquino for cause

---

[59] Although the judge then stated she "does not need to excuse Mr. Moquino for cause," the jury list shows he was excused for cause. (ER 1876).

L&L046176

violated Debra's right to an impartial jury under the Sixth and Fourteenth Amendments. *Witherspoon*, 391 U.S. at 511; *Adams* 448 U.S. at 40.

**NON-CERTIFIED ISSUE**

IV.   **THE ARIZONA SUPREME COURT VIOLATED DEBRA'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BY RELYING ON CONSTITUTIONALLY INSUFFICIENT NARROWING CONSTRUCTIONS OF A FACIALLY VAGUE STATUTORY AGGRAVATING CIRCUMSTANCE (CLAIM X).[60]**

In upholding Debra's death sentence, the Arizona Supreme Court found and reweighed two aggravating factors.[61]   First, it found the murder was committed in an "especially heinous ... or depraved" manner, A.R.S. § 13-703(F)(6), because a) the killing was senseless, b) the victim was helpless, and c) Debra had a parental relationship with the victim, making the crime "shockingly evil." (ER 202-05; *Milke,* 177 Ariz. at 124-27, 865 P.2d at 785-88). Second, it found that the victim was under age 15. *See* A.R.S. § 13-703(F)(9). (Id.)  Imposition of the death penalty violated the Eighth Amendment because the criteria used for its (F)(6) finding of "especially heinous ... or depraved"

---

[60]   The district court reviewed the merits of this claim, but failed to certify it, even though it certified the same issue in *Rossi v. Schriro,* No. 01-99010 (filed May 19, 2005).

[61] The court invalidated a third aggravating factor – that the murder was committed for pecuniary gain. *See* A.R.S. § 13-703(F)(5).

117

L&L046177

insufficiently narrowed what the U.S. Supreme Court has already determined to be a facially vague statutory aggravating circumstance.

A.   **A Death Sentence Predicated Upon A Finding That The Offense Was "Heinous . . . Or Depraved" Under A.R.S. § 13-703(F)(6) Violates The Eighth And Fourteenth Amendments Unless That Aggravating Circumstances Has Been Given A Constitutionally Sufficient Limiting Construction.**

In *Furman v. Georgia*, 408 U.S. 238, 247-49 (1972), the United States Supreme Court struck down all then-existing death penalty laws, finding they allowed "untrammeled discretion" to decide who could be sentenced to death. To satisfy the Eighth and Fourteenth Amendments, state law must guide sentencing discretion so it provides a principled basis for distinguishing the "few cases in which [the death penalty] is imposed from the many cases in which it is not." *Id.* at 313 (White, J., concurring).   Under *Furman,* **each** statutory aggravating circumstance must provide "specific and detailed guidance" that "make[s] rationally reviewable the process of imposing death sentences." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). "[I]t is constitutional error ... to give weight to an unconstitutionally vague aggravating factor even if other, valid aggravating factors obtain." *Richmond v. Lewis*, 506 U.S. 40, 46 (1992).  "Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor," the state appellate court must "perform a new sentencing calculus if the sentence is to stand." *Id.* at 49.

118

To sentence someone to death under A.R.S. § 13-703, the sentencer must find at least one statutory aggravating circumstance and conclude that aggravating circumstances are not outweighed by mitigating circumstances. The (F)(6) "heinous ... or depraved" aggravating factor is one of ten that Arizona permits a sentencer to find and weigh in the sentencing calculus. The U.S. Supreme Court has held that Arizona's (F)(6) factor is "facially vague" and cannot be weighed in the sentencing calculus unless given a constitutionally sufficient limiting construction. *Richmond*, 506 U.S. 40.

In a judicial effort to save Arizona's facially unconstitutional statute, the Arizona Supreme Court has adopted various limiting constructions of "heinous ... or depraved." In *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983), the court identified five factors, any one of which could contribute, but none of which is necessary, to justify a "heinous ... or depraved" finding. They are: (1) defendant relished the murder; (2) defendant inflicted gratuitous violence on the victim; (3) defendant mutilated the victim; (4) the crime was senseless; and (5) the victim was helpless. *Id.* at 51-53, 659 P.2d at 10-12.

In *Arave v. Creech*, 507 U.S. 463 (1993), the Supreme Court established requirements for determining whether limiting constructions such as those in *Gretzler* are constitutionally sufficient. First, while a limiting construction need not be mathematically precise, it must be sufficiently definite, i.e., "clear,"

119

L&L046179

"objective," and "ascertainable from the surrounding facts" and "circumstances" of the offense. *Id.* at 474.  Second, a limiting construction must "'genuinely narrow the class of persons eligible for the death penalty'" to something less than all murders and "every defendant," *id.* (quoting *Zant v. Stephens*, 462 U.S. 862, 867 (1983)), while providing a "principled basis" "to distinguish those who deserve capital punishment from those who do not." *Id.*

In attempting to sufficiently narrow application of the (F)(6) factor here, the Arizona Supreme Court relied on two criteria that do not satisfy the Eighth and Fourteenth Amendments: "shockingly evil" and "senseless." As applied in Debra's case, these limiting constructions fail both the definiteness and narrowing requirements of *Creech*.

**B.    The "Shockingly Evil" Construction Is Vague And Overbroad.**

In *Shell v. Mississippi*, 498 U.S. 1 (1990), the U.S. Supreme Court rejected "shockingly evil" as a constitutionally insufficient limiting construction of the facially vague "especially heinous, atrocious or cruel" aggravating circumstance. *See also Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992).  The Arizona Supreme Court's incorporation of this criteria in upholding Debra's death sentence is therefore unconstitutional.  The district court's finding that the state court "did not really" rely on the "shockingly evil" limiting construction

120

L&L046180

and just used it "as a means of defining or describing what is meant by the word 'heinous'" is clearly erroneous. (ER 64).

The Arizona Supreme Court began its (F)(6) analysis acknowledging that "the term 'especially heinous, cruel, or depraved' is facially vague" and needs a narrowing "interpretation ... [that] meets constitutional requirements." (ER 203-04; *Milke*, 177 Ariz. at 125, 865 P.2d at 786). It then cited two interpretations of (F)(6) it had used previously — *Gretzler's* five factors **and** the definitions of "heinous" and "depraved" in *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977), *cert. denied*, 435 U.S. 908 (1978). (ER 204). *Knapp* defined the terms as follows: "'**Heinous' means 'hatefully or shockingly evil'**; ... 'depraved' means 'marked by debasement, corruption, perversion or deterioration.'" 114 Ariz. at 543, 562 P.2d at 716. Although *Gretzler's* five factors purportedly replaced the *Knapp* definitions, 135 Ariz. at 51-52, 659 P.2d at 10-12, the Arizona Supreme Court expressly relied on *both* cases here, stating that "[i]n *Lewis v. Jeffers*, 497 U.S. 764, 777-78 (1990), the Court affirmed our interpretation of the (F)(6) factor ... which relied on the five *Gretzler* factors *and* the definition of heinous and depraved set forth in *State v. Knapp*." (ER 203-04; *Milke*, 177 Ariz. at 118, 865 P.2d at 786). In fact, *Jeffers* did not uphold *Knapp's* "shockingly evil" definition. It merely quoted the *Knapp* definitions but affirmed using two *Gretzler* factors. *Jeffers*, 497 U.S. at 769-71,

121

L&L046181

777.   The constitutional infirmity of the "shockingly evil" definition became evident three months later when the high court decided *Shell.*

Additionally, the only way the Arizona Supreme Court could find that "use of the parent/child relationship ... is permissible and is within the *Gretzler-Knapp* parameters," while acknowledging that "the parent/child relationship does not fit neatly within any of the five *Gretzler* factors" was to draw from the "hatefully or shockingly evil" definition of (F)(6) from *Knapp.* (ER 204; *Milke,* 177 Ariz. at 119, 865 P.2d at 787).   The paragraph of the Arizona Supreme Court's opinion in *Milke* cited by the district court illustrates that the state court expressly wove the "shockingly evil" criteria into its finding that the parent/child relationship could be properly used to support "heinousness and depravity" under (F)(6). (ER 65, quoting *Milke,* 177 Ariz. at 126, 865 P.2d at 787). (ER 204). Because the "shockingly evil" construction violates the Eighth and Fourteenth Amendments, Debra's death sentence must be set aside.

C.   **The "Senseless" Construction Is Vague And Overbroad.**

Even if this Court were to somehow uphold "shockingly evil" as a valid limiting construction,[62] it must still set aside Debra's death sentence because the "senseless" limiting construction of (F)(6) provides "no inherent restraint on the

---

[62] The "shockingly evil" criteria provided only partial support for (F)(6) aggravation here. *Milke,* 177 Ariz. at 185, 865 P.2d at 787. (ER 204-05).

122

L&L046182

arbitrary and capricious infliction of the death sentence." *Godfrey*, 446 U.S. at 428. Both this Court and the Eighth Circuit have found the "senseless" limiting construction vague and overbroad. *Adamson v. Ricketts*, 865 F. 2d 1011, 1032-35 (9th Cir. 1988)(en banc), *cert. denied*, 505 U.S. 1213 (1992);[63] *Moore v. Clarke*, 904 F.2d 1226, 1232 (8th Cir. 1990).

In *Adamson,* this Court observed that nothing about "senseless" makes it a more appropriate modifier of the concept of murder than words like "heinous," "depraved," "cruel," "atrocious," "vile," or "evil," found unconstitutionally vague by the Supreme Court. 865 F.2d at 1032-35. *See also Moore*, 904 F.2d at 1232 ("senselessness of the crime" is an unconstitutional limiting construction because it "has no objective meaning" and encompasses "virtually all murderers"); *State v. Wallace*, 160 Ariz. 424, 428, 773 P.2d 983, 987 (1989)("all murders may be considered senseless").

In determining whether a limiting construction satisfies the definiteness and narrowing requirements, a reviewing court must first consider whether it has reliable, facial "content" in "ordinary usage" such that it defines some "sub-class" of persons eligible for the death penalty. *Creech,* 507 U.S. at 471-72. For example, *Creech* found sufficient content in the "cold-blooded" limiting construction in its dictionary definition, which describes a "killer who kills

---

[63] *Abrogated by Walton v. Arizona*, 497 U.S. 639 (1990).

123

L&L046183

without feeling or sympathy." *Id.* at 476 (quoting Webster's Third New International Dictionary at 1726 (1986)). It further noted that "some within the broad class of first degree murderers do exhibit feeling," and kill "with anger, jealousy, revenge, or a variety of other emotions." *Id.*

In contrast, relevant dictionary definitions of "senseless" reveal no definite content as the word is ordinarily used and do not come close to identifying a "subclass" of persons eligible for the death penalty. *See* Webster's Third New International Dictionary at 2067 (1986) (defining "senseless" as: "c: deficient in knowledge, appreciation, or reasoning power[,] stupid; d: lacking good sense[,] unwise, unreasonable, nonsensical; e: proceeding from or characterized by a lack of good sense or meaning[,] foolish, purposeless, meaningless."). Accordingly, when applied to modify murder, the term "senseless" and its dictionary synonyms add nothing. No person of "ordinary sensibility" could describe any unjustified, unexcused, and deliberate taking of life as anything but "unreasonable," "purposeless," or "senseless." *Godfrey*, 446 U.S. at 428-29. Nor could any murder be characterized as "wise," "meaningful," or "sensible."

Although the Arizona Supreme Court has articulated further formulations of "senseless," none provides sufficient content to satisfy *Creech's* definiteness or narrowing requirements. In *Creech*, an examination of cases revealed that

124

state court formulations of the "cold blooded" limiting construction were "consistent" and not "unclear." 507 U.S. at 476-77. However, an examination of Arizona's formulations of the "senseless" limiting construction confirms it applies to all murders.

First, although here the Arizona Supreme Court treated "shockingly evil" as a parallel limiting construction of "heinous ... or depraved" rather than as a definition of the "senseless" limiting construction, in other cases it has reasoned that the "shockingly evil" nature of an offense makes it "senseless" and hence "heinous ... or depraved." *See, e.g., State v. Kiles*, 175 Ariz. 358, 373, 857 P.2d 1212, 1227 (1993); *State v. Lopez*, 174 Ariz. 131, 144, 847 P.2d 1078, 1091 (1992). Whether treated as a limiting construction of a facially vague aggravating circumstance, or as a formulation of a facially vague limiting construction of a facially vague aggravating circumstance, "shockingly evil" violates the Eighth and Fourteenth Amendments. *Shell*, 498 U.S. at 1; *Maynard v. Cartwright,* 486 U.S. 356 (1988).

Second, the Arizona Supreme Court has defined "senseless" to mean "outside normal behavioral parameters." *State v. Stanley*, 167 Ariz. 519, 531, 809 P.2d 944, 956 (1991). Even more than "heinous," "depraved" and "shockingly evil," the phrase "outside normal behavioral parameters" lacks content as a modifier. It applies not only to all murders (none of which lie

125

within "normal behavioral parameters"), but also to moral conduct that is "strange," "unusual," "peculiar" or "odd." *Moore v. Clark, supra* (aggravating circumstance facially vague where based on criteria that murderer "manifested exceptional depravity by ordinary standards of morality and intelligence.").

Finally, in an effort to move beyond these vague formulations ("shockingly evil" and "outside normal behavioral parameters") of a vague limiting construction ("senseless") of a vague aggravating circumstance ("heinous ... or depraved"), Arizona courts have attempted to provide a definition of "senseless" based on the killer's "purpose" or lack thereof. That too has failed to produce any clear and consistent narrowing principle. The Arizona Supreme Court deems a murder to be "senseless" if (1) it was not committed to further any purpose,[64] or (2) it was committed for a noncriminal or a criminal purpose but was not necessary to further that purpose,[65] or (3) it

---

[64] *E.g., State v. Amaya-Ruiz*, 166 Ariz. 152, 178, 800 P.2d 1260, 1286 (1990)("The victim and her husband befriended defendant and provided him with food, shelter, and clothing. Clearly, this was a senseless crime."); *State v. Jimenez*, 165 Ariz. 444, 455, 799 P.2d 785, 796 (1990) ("This was a senseless crime; defendant, for no apparent reason, murdered a helpless child who trusted him"); *State v. Vickers*, 159 Ariz. 532, 546, 768 P.2d 1177, 1191 (1989)("Vickers had not been harmed by Holsinger and gained nothing by the crime. Vickers ... killed senselessly.")

[65] Cases applying this formulation of "senseless" to murders committed in order to achieve a "criminal purpose" include *State v. Lopez*, 175 Ariz. 411, 857 P.2d 1261, 1265 (1993)("The murder was senseless. ... The sexual assault could have been committed without the murder"); *State v. Rossi*, 171 Ariz. 276,

126

L&L046186

was committed for a noncriminal or criminal purpose and was necessary to achieve that purpose but the purpose was senseless.[66]

Far from "genuinely narrow[ing] the class of persons eligible for the death penalty," *Creech*, 507 U.S. at 474, Arizona's various formulations of "senselessness" based on the killer's purpose or lack thereof capture all murders imaginable in a seamless web of (F)(6) aggravation. The only ones not covered

---

279, 830 P.2d 797, 780 (1992)(offense was "senseless" because "defendant could have escaped without firing the fatal shot"); *State v. Correll,* 148 Ariz. 468, 481, 715 P.2d 721, 734 (1986)("murders were unnecessary to accomplish the robbery" and, therefore, "senseless"); *State v. Smith,* 141 Ariz. 510, 511, 687 P.2d 1265, 1266 (1984)("It was senseless because Smith could have robbed the victim and escaped without harming the victim"); *State v. Zaragoza*, 135 Ariz. 63, 69, 659 P.2d 22, 28 (1983)("[defendant] could have accomplished whatever criminal goals he desired without killing her," making the crime "senseless"). Cases applying this aspect of "senseless" to murders committed in order to achieve a "noncriminal purpose" include this one, *Milke*, 865 P.2d at 786 ("This crime most certainly was senseless in that it was unnecessary for Debra Milke to kill her son to free herself from the responsibility of being a single mother or to prevent the boy from growing up like his father"); *State v. West*, 176 Ariz. 432, 448, 862 P.2d 192, 208 (1993)("A murder is senseless if it was unnecessary to achieve the defendant's goal."); *State v. Comer,* 165 Ariz. 413, 428, 799 P.2d 333, 348 (1990)("The murder was 'senseless' in that it was not necessary to achieve appellant's goal of obtaining money and supplies ...").

[66] *E.g., State v. Martinez-Villareal*, 145 Ariz. 441, 451, 702 P.2d 670, 680 (1985) ("Murdering another human being to show manliness constitutes depravity in that the killer senselessly takes life to demonstrate his superiority over his victims"); *State v. Salazar*, 173 Ariz. 399, 420, 844 P.2d 566, 587 (1992)(murder was senseless because it "was an attempt to extract, if possible, information of where imagined valuables were hidden"); *State v. Gillies*, 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984)(murdering to eliminate witness to the kidnapping, aggravated robbery, and sexual assault is senseless); *State v. James*, 141 Ariz. 141, 147, 685 P.2d 1293, 1299 (1984)("[T]his was a totally senseless murder. There was no reason for the killing other than the perpetrators' greed").

L&L046187

by these formulations are murders necessary to achieve a "sensible" purpose. But neither Arizona law nor common usage defines any "sensible" purpose for first-degree murder (deliberately killing without legal justification or excuse).

For these reasons, the "senseless" limiting construction of (F)(6), like the "shockingly evil" limiting construction, violates the Eighth and Fourteenth Amendments. Debra's death sentence must be vacated.

### D.   The District Court Erred in Finding the State Court Properly Applied a Constitutionally Narrowed Aggravating Factor.

Noting Debra only challenged the "senselessness," but not the "helplessness" finding, the district court found that "Because the senselessness and helplessness criteria are both found in the construction of the (F)(6) factor that was approved by the United States Supreme Court [in *Lewis v. Jeffers,* 497 U.S. at 777-78], Petitioner's criticism of the Arizona Supreme Court's analysis is baseless." (ER 64). However, a finding of helplessness **or** senselessness alone, or in combination, **are insufficient to establish the (F)(6) factor.** *State v. Schackart*, 190 Ariz. 238, 947 P.2d 315 (1997); *State v. Hyde*, 186 Ariz. 252, 281, 921 P.2d 655, 684 (1996); *State v. Miles*, 186 Ariz. 10, 18, 918 P.2d 1028, 1036 (1996); *Correll*, 148 Ariz. at 481, 715 P.2d at 734; *State v. Johnson*, 147 Ariz. 395, 401, 710 P.2d 1050, 1056 (1985).

The district court next reasoned that the "additional finding" of parent/child relationship "does not invalidate its finding that the two

128

L&L046188

specifically listed and constitutionally appropriate factors had been proved."
(ER 64).  Again, this ignores established caselaw holding that these two factors
(senseless and helpless) provide inadequate support for (F)(6) aggravation.
Something more is required to uphold this particular aggravating factor.

The "something more" according to the Arizona Supreme Court was the
parent/child relationship.  However, as set forth above, the court did not rely on
the parent/child relationship as a "separate factor" under *Gretzler*.  Rather, the
court determined that the parental relationship rendered this particular crime
"shockingly evil." (ER 63, citing *Milke,* 177 Ariz. at 124-26, 865 P.2d at 785-
87).  The "shockingly evil" criteria cannot constitutionally be used to limit the
facially vague (F)(6) aggravating factor. *Shell*, 498 U.S. at 1.

The district court's order then inexplicably relies on Arizona Supreme
Court cases, including its opinion in Debra's case, to support a finding that "it is
permissible to use the parent/child relationship in partial support of the
heinousness and depravity finding." (ER 64).  Obviously, Arizona state case
law is not sufficient support in determining the constitutional propriety of
relying on a criteria which is neither included within the approved *Gretzler*
parameters, nor properly included in a finding that the crime is "shockingly
evil."  No United States Supreme Court case supports a finding that "shockingly
evil" or "parental relationship" adequately narrows the (F)(6) factor.  And it is

129

nonsensical for the district court to rely on Arizona Supreme Court caselaw --

*especially* its opinion in Debra's case -- to evaluate and uphold that same

court's application of this facially vague aggravating factor here.[67]

The district court erred in finding Debra's challenge to the state court's

application of the (F)(6) factor "without merit." (ER 65). It further erred in

limiting its review to determining whether the state court's finding of this

aggravating factor was "arbitrary and capricious." (Id.). Because the Arizona

Supreme Court relied on an insufficient limiting construction of a facially vague

aggravating factor, Debra's death sentence must be set aside.

### E.      The District Court Also Erred in Finding That Application of the (F)(6) Factor Was Not "Arbitrary and Capricious."

Even if this Court finds the Arizona Supreme Court applied a sufficiently

narrowed construction of the (F)(6) factor, its decision upholding Debra's death

sentence is highly inconsistent with those in other cases involving the

parent/child relationship, making its finding of aggravation so arbitrary or

capricious as to constitute an independent due process or Eighth Amendment

violation. *Lewis v. Jeffers,* 497 U.S. at 780. When invalidating a woman's

death sentence in *State v. Carlson,* 202 Ariz. 570, 584, 48 P.3d 1180, 1194

---

[67] Other than citing *Lewis v. Jeffers*, 497 U.S. at 777-78, in noting that the *Gretzler* factors have been approved by the U.S. Supreme Court, the district court did not cite one federal case in its analysis of this claim.

130

(2002), the Arizona Supreme Court noted that in other cases where parental relationship was considered in aggravation, the "primary components of heinous and depraved conduct" such as "relishing" or "gratuitous violence" were also found. Yet, the court *specifically excluded* Debra's case. *Id.*

Indeed, the only other aggravating factor upheld in Debra's case – age of the victim (F)(9) -- is somewhat redundant to the parent/child relationship "criteria" and findings under the (F)(6) factor generally. In fact, the aggravation in this case seems to all run together as one factor: 1) the murder was heinous and depraved because the victim was a small child (helpless and senseless)(F)(6); 2) the murder was heinous and depraved because the victim was the mother's small child (parental relationship/shockingly evil)(F)(6); and 3) the victim was a small child under 15 years of age (F)(9). This makes Debra's case in stark contrast to other parental relationship cases where the (F)(6) factor was upheld because they also involved "traditional" facts supporting a heinous and depraved finding.

A comparison of *Carlson* to Debra's case also reveals the "arbitrary and capricious" nature of Debra's sentence.[68] Doris Carlson was the undisputed

---

[68] Comparing these cases also shows that Arizona's statute fails to genuinely narrow the class of persons eligible to receive the death penalty, in violation of the Fifth and Eighth Amendments. *See Zant v. Stephens*, 462 U.S. 862, 877 (1983). This issue was considered separately on the merits but was not certified. (ER 58-60).

131

mastermind of her mother-in-law's murder, whom she plotted with her husband to have murdered by two "hired guns" solely for pecuniary gain. *Carlson,* 202 Ariz. 570, 48 P.3d 1180. The wheelchair bound victim suffered from multiple sclerosis and was completely dependent. She suffered for six months before finally dying of the multiple stab wounds she received in the brutal attack while sleeping in her assisted care apartment. In contrast, someone else shot Christopher in the head from behind, and he died quickly. And the only evidence implicating Debra is Saldate's highly questionable testimony. Yet, Doris' death sentence was invalidated while Debra's was upheld.

Debra is sitting on death row based on nothing more than a contested "confession" while others with direct, physical evidence against them (including Carlson) were not sentenced to death. *See also State v. Jimenez,* 165 Ariz. 444, 799 P.2d 785 (1990); *State v. Johnson,* 147 Ariz. 395, 710 P.2d 1050 (1985); *State v. Salazar,* 173 Ariz. 399, 844 P.2d 566 (1992). The state court's application of the (F)(6) factor and upholding of Debra's death sentence is "arbitrary and capricious" within the meaning of *Jeffers.*

## CONCLUSION

Any of these grounds independently warrant habeas relief, particularly Saldate's interrogation tactics and admission of the unreliable "confession." However, the cumulative prejudicial effect of these errors clearly requires

132

L&L046192

Debra's conviction to be overturned. *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Debra urges this Court to set aside her convictions and death sentence. At a minimum, her case should be remanded for a hearing.

RESPECTFULLY SUBMITTED this 11th day of December, 2007.

JONES, SKELTON & HOCHULI, P.L.C.

By _____
   Lori L. Voepel, Bar #015342
   2901 North Central Avenue, Suite 800
   Phoenix, Arizona 85012
   Co-counsel for Petitioner/Appellant
   Debra Jean Milke

KIMERER & DERRICK, P.C.

By _____
   Michael D. Kimerer
   221 E. Indianola Avenue
   Phoenix, Arizona 85012
   Attorneys for Petitioner/Appellant
   Debra Jean Milke

133

L&L046193

## STATEMENT OF RELATED CASES

Counsel for Debra Milke states that to the best of their knowledge, two related cases are pending before this Court.  Those involve appeals from the denials of habeas corpus relief to Debra's co-defendants, James Styers and Roger Scott.  *See Styers v. Schriro*, 07-99003, and *Scott v. Schriro*, 05-99012.

_____
Lori L. Voepel

SUBSCRIBED   AND   SWORN   to   before   me   this   11th   day   of December, 2007.

_____
Notary Public

OFFICIAL SEAL
LINDA J. MASON
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Feb. 27, 2011

134

L&L046194

## CERTIFICATION OF COMPLIANCE TO
## FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1
## FOR CASE NUMBER 07-99001

I certify that: **(check appropriate option(s))**

\_\_\_1. Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening/answering/reply/cross-appeal brief is

  ☐  Proportionately spaced, has a typeface of 14 points or more and contains\_\_\_\_\_ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words),

  **or is**

  ☐  Monospaced, has 10.5 or fewer characters per inch and contains \_\_\_ words or \_\_\_ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

\_\_\_2. The attached brief is not subject to the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because

  ☐  This brief complies with Fed. R. App. P. 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages;

  ☐  This brief complies with a page or size-volume limitation established by separate court order dated _____ and is

    ☐  Proportionately spaced, has a typeface of 14 points or more and contains \_\_\_\_\_ words,

    **or is**

    ☐  Monospaced, has 10.5 or fewer characters per inch and contains \_\_ pages or \_\_\_ words or _____ lines of text.

L&L046195

_XX__3.    Briefs in Capital Cases.

    ☐    This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 **and is**

        ☐    Proportionately spaced, has a typeface of 14 points or more and contains 31,947 words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words),

    **or is**

        ☐    Monospaced, has 10.5 or fewer characters per inch and contains ___ words or _____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

___4. Amicus Briefs.

    ☐    Pursuant to Fed. R. App. P. 29(d) and 9th Cir. R. 32-1, the attached amicus brief is proportionately spaced, has a typeface of 14 points or more and contains 7000 words or less,

    **or is**

    ☐    Monospaced, has 10.5 or fewer characters per inch and contains not more than either 7000 words or 650 lines of text,

    **or is**

    ☐    **Not** subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed. R. App. P. 32(a)(1)(5).

12/11/07
Date

_____
Signature of Attorney or Unrepresented Litigant

136

## CERTIFICATE OF SERVICE

Lori L. Voepel, being first duly sworn, upon oath states that on the /1ᵗʰ

day of December, 2007, she caused the original and six copies of the foregoing

Petitioner/Appellant's Opening Brief to be delivered for filing to:

        Clerk, United States Court of Appeals
        Ninth Circuit
        95 Seventh Street
        San Francisco, CA 94103-1526

and that she caused two copies of the foregoing brief (one to amicus counsel) to

be deposited in the United States Mail, postage prepaid, to:

| | |
|---|---|
| Jim Nielsen, Esq. | Larry Hammond, Esq. |
| Assistant Attorney General | Osborn Maledon, P.A. |
| 1275 W. Washington | 2929 N. Central, Ste 2100 |
| Phoenix, Arizona 85007 | Phoenix, Arizona 85067-6379 |
| Counsel for Respondent/Appellee | Counsel for Amicus, AzCLU |
| Steven A. Drizin, Esq. | Daniel Pochoda, Esq. |
| Bluhm Legal Clinic | ACLU of Arizona |
| Northwestern University School of Law | 77 E. Columbus, Suite 205 |
| 357 E. Chicago Avenue | Phoenix, Arizona 85012 |
| Chicago, Illinois 60611 | Counsel for Amicus, AzCLU |
| Counsel for Amicus, | |
| Center on Wrongful Convictions | |

_____
                                        Lori L. Voepel

SUBSCRIBED AND SWORN to before me this 11ᵗʰ day of

December, 2007.

_____
                                        Notary Public

OFFICIAL SEAL
LINDA J. MASON
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Feb. 27, 2011

137

L&L046197

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEBRA JEAN MILKE, | No. 07-99001 |
| Petitioner/Appellant, | |
| vs. | District Court<br>No. CV-98-00060-PHX-RCB |
| DORA B. SCHRIRO, et al., | |
| Respondent/Appellee. | **<u>DEATH PENALTY CASE</u>** |

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

---

## PETITIONER/APPELLANT'S
## REPLY BRIEF

---

Lori L. Voepel
Jones, Skelton & Hochuli, P.L.C.
2901 N. Central Avenue, Suite 800
Phoenix, Arizona 85012
(602) 263-1700
*Co-Counsel for Petitioner/Appellant*
*Debra Jean Milke*

Michael D. Kimerer
Kimerer & Derrick, P.C.
221 E. Indianola Avenue
Phoenix, Arizona  85012
(602) 279-5900
*Co-Counsel for Petitioner/Appellant*
*Debra Jean Milke*

L&L046198

# TABLE OF CONTENTS

**Page**

CORRECTIONS TO APPELLEES' STATEMENT OF THE CASE ................ 1

LEGAL ARGUMENT ...................................................................... 4

I.     SALDATE'S OVERREACHING TACTICS DEPRIVED
DEBRA OF HER RIGHTS UNDER THE FIFTH, SIXTH,
EIGHTH & FOURTEENTH AMENDMENTS. ............................ 4

     A.     Procedure. ............................................................. 4

     B.     Merits. .................................................................. 6

     C.     Debra is Entitled to a New Trial. ....................... 37

II.     DENIAL OF DEBRA'S INEFFECTIVE ASSISTANCE
CLAIM WAS CLEARLY CONTRARY TO *STRICKLAND*. ..... 38

     A.     Trial. ................................................................. 39

     B.     Sentencing. ........................................................ 41

III.    POTENTIAL JUROR MOQUINO'S DISMISSAL WAS
CONTRARY TO *ADAMS* . ........................................... 43

CONCLUSION ............................................................................. 43

CERTIFICATION OF COMPLIANCE ............................................... 45

CERTIFICATE OF SERVICE ......................................................... 47

i

L&L046199

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adams v. Texas,*
    448 U.S. 38 (1980)..........................................................................43

*Ake v. Oklahoma,*
    470 U.S. 68 (1985)............................................................................8

*Ashcraft v. Tennessee,*
    322 U.S. 143 (1944)........................................................................28

*Blackburn v. Alabama,*
    361 U.S. 199 (1960)..........................................................................7

*Brady v. Maryland,*
    373 U.S. 83 (1963)....................................................................28, 29

*Chambers v. Mississippi,*
    410 U.S. 284 (1973)............................................... 21, 22, 23, 29

*Colorado v. Connelly,*
    479 U.S. 157 (1986)....................................................................7, 12

*Crane v. Kentucky,*
    476 U.S. 683 (1986)....................................................................30, 31

*Crawford v. Washington,*
    541 U.S. 36 (2004)............................................................................3

*Dickerson v. United States,*
    530 U.S. 428 (2000)........................................................................10

*Escobedo v. Illinois,*
    378 U.S. 478 (1964)....................................................................7, 15

*Gallegos v. Nebraska,*
    342 U.S. 55 (1951)..........................................................................28

L&L046200

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Giglio v. United States,*
    405 U.S. 150 (1972).........................................................................28

*Giles v. Wolfenbarger,*
    2006 WL 176426 (E.D.Mich. 2006),
    *rev'd. on different grounds,*
    2007 WL 1875080 (6th Cir. 2007) ...............................................20

*Haley v. Ohio,*
    332 U.S. 596 (1948).........................................................................28

*Harris v. Reed,*
    489 U.S. 255 (1989)......................................................................5, 6

*Hendricks v. Swenson,*
    456 F.2d 503 (8th Cir. 1972) .........................................................20

*Hernandez v. Small,*
    282 F.3d 1132 (9th Cir.),
    *cert. denied,* 537 U.S. 851 (2002)..................................................3

*Jackson v. Denno,*
    378 U.S. 368 (1964)..............................................................7, 10, 12

*Lego v. Twomey,*
    404 U.S. 477 (1972)..................................................................30, 31

*Lilly v. Virginia,*
    527 U.S 116 (1999)............................................................................3

*Mayberry v. Pennsylvania,*
    400 U.S. 455 (1971).........................................................................39

*Miller v. Fenton,*
    474 U.S. 104 (1985)...................................................................7, 11

iii

L&L046201

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Mincey v. Arizona,*
   437 U.S. 385 (1978)........................................................................28

*Miranda v. Arizona,*
   384 U.S. 436 (1966)................................................................passim

*Missouri v. Seibert,*
   542 U.S. 600 (2004)........................................................................10

*Napue v. Illinois,*
   360 U.S. 264 (1959)........................................................................29

*North Carolina v. Butler,*
   441 U.S. 369 (1979)....................................................................8, 17

*Opper v. United States,*
   348 U.S. 84 (1954)....................................................................13, 14

*Patton v. Yount,*
   467 U.S. 1025 (1984)......................................................................15

*Poland v. Stewart,*
   117 F.3d 1094, 1105 (9th Cir. 1997),
   *cert. denied,* 523 U.S. 1082 (1998)..................................................5

*Reck v. Pate,*
   367 U.S. 433 (1961)....................................................................16, 17

*Salem v. U.S. Lines Co.,*
   370 U.S. 31 (1962)................................................................7, 30, 31

*Sanchez-Llamas v. Oregon,*
   126 S.Ct. 2669 (2006)..................................................................7, 12

*Silva v. Woodford,*
   279 F.3d 825 (9th Cir.),
   *cert. denied,* 537 U.S. 942 (2002)..................................................41

L&L046202

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Smith v. United States,*
    348 U.S. 147 (1954)................................................................13, 14

*State v. Conde,*
    174 Ariz. 30 846 P.2d 843 (1993) ..................................................23

*State v. Jones,*
    203 Ariz. 1, 49 P.3d 273 (2002) .....................................................21

*State v. Pac,*
    175 Ariz. 189, 854 P.2d 1175 (1993) ................................................5

*State v. Runningeagle,*
    176 Ariz. 59, 859 P.2d 169 (1993) ..........................................23, 24

*Strickland v. Washington,*
    466 U.S. 668 (1984)..........................................................38, 41, 43

*Taylor v. Maddox,*
  366 F.3d 992 (9th Cir.),
    *cert. denied,* 543 U.S. 1038 (2004)........................................passim

*Townsend v. Sain,*
    372 U.S. 293 (1963).........................................................................28

*United States v. Acosta,*
    111 F.Supp.2d 1082 (E.D. Wis. 2000) ...........................................22

*United States v. Bagley,*
    473 U.S. 667 (1985).......................................................................28

*United States v. Cronic,*
    466 U.S. 648 (1984)..................................................................30, 31

*United States v. Kiszewski,*
    877 F.2d 210 (2nd Cir. 1989)....................................................22, 29

v

L&L046203

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Lewis,*
   355 F.Supp.2d 870 (E.D.Mich. 2005) ......................................................20, 21

*United States v. Lopez-Alvarez,*
   970 F.2d 583, 590-91 (9th Cir.),
   *cert. denied,* 506 U.S. 989 (1992)......................................................13, 14, 15

*United States v. Stockton,*
   788 F.2d 210, 219 n. 15 (4th Cir.),
   *cert. denied,* 479 U.S. 840 (1986)..................................................................22

*Warszower v. United States,*
   312 U.S. 342 (1941).........................................................................................13

*Wong Sun v. United States,*
   371 U.S. 471 (1963).........................................................................................14

*Ylst v. Nunnemaker,*
   501 U.S. 797 (1991)...........................................................................................5

**Statutes**

28 U.S.C. §2254................................................................................................31

**Rules**

Ariz.R.Crim.P. 32.2 ...........................................................................................4

Ariz.R.Evid. 404 .........................................................................................22, 40

Ariz.R.Evid. 406 ...............................................................................................22

Ariz.R.Evid. 608 .........................................................................................22, 29

L&L046204

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**Constitutional Provisions**

Eighth Amendment ........................................................................................9, 38

Fifth Amendment ........................................................................................passim

Fourteenth Amendment ...................................................................9, 21, 38, 43

Sixth Amendment ...........................................................................9, 12, 38, 43


**Other Authorities**

Garrett, B., *Judging Innocence,*
   108 Colum.L.Rev. 55 (January 2008) ............................................................38

LaFave & Israel, *Criminal Procedure*
   § 6.2 (3d ed. 2007) ..........................................................................................28

L&L046205

## CORRECTIONS TO APPELLEES' STATEMENT OF THE CASE

The State claims Debra dated a "Brian" (AB at 5), however, none of its excerpts (SER Q) reference a "Brian." Moreover, the 12/14/90 transcript is from sentencing, which provides no basis for Debra's conviction, and no trial transcript cites a "Brian."[1] These references to "Brian" should be disregarded.

The State's description of how Debra came to live with James Styers is misleading. (AB at 6). She and Christopher moved in with Styers temporarily in July 1989 after Mark left them stranded. Debra called Styers for a ride, but accepted his offer to stay until she could get her own place, as they could not return to Mark's mother's home. Four months later, Debra signed a lease and told Styers they were moving in January. (OB at 6-11).

The State claims Debra asked Sandra to "take Christopher because he was causing too many problems." (AB at 6). This implies Debra wanted her to take Chris indefinitely when testimony shows she only asked Sandra "to keep Christopher a couple of months until she and Ernie could get their situation handled." (SER F at 48). This was in July 1989 when tensions between Debra and Mark were high and just before Debra moved in with Styers. (RT 9/16/90 at

---

[1] The only "Brian" mentioned was in sentencing testimony of Rita Console, who Debra worked for very temporarily. Her testimony was not corroborated or presented at trial, and no prior orders or briefs mention a "Brian." Debra didn't know a "Brian" or say Chris was dead. (ER 54).

1

L&L046206