92-93). In September, Debra again asked Sandra to take Chris for two months, but Sandra denied Debra asked her again in November. (SER F at 45-46).

The State's citation to Detective Davis' testimony doesn't show Debra was "hostile" when interviewed by police. (AB at 8). Davis simply said she "asked how long this would take because she wanted to go to Florence to be with her father." (SER G at 59). Nor are the State's assertions supported by Karen Smith's testimony.[2] (AB at 8). In describing Debra's demeanor, the State also ignores that she was disoriented and agitated from prescriptions, alcohol and little food or sleep. (RTs 9/13/90 at 110-13; 9/24/90 at 93-95, 102, 117, 126, 142; 10/2/90 at 107, 109-110).

The State says one year after Debra's arrest and following trial, officers inventoried and discovered a box of ammunition in her purse. (AB at 10). Debra found it with Styers' clothes while doing laundry the morning Christopher disappeared. (ER 1198). She had told Styers she didn't want guns around Christopher, so she put the bullets in her purse to give to Styers instead

---

[2] For example, the State cites pp. 70-71 of Smith's testimony in claiming Debra said "Scott could have taken Christopher," yet nothing in her testimony shows this. And Detective Davis said Debra thought *Mark* could have taken Christopher, but he wouldn't have gone anywhere with Scott. (p. 71).

2

L&L046207

of leaving them out. (Id.; ER 1036).  Debra forgot them when she learned Chris was missing.  Her parents later found and gave the purse to police.[3] (ER 1198).

The State supports three paragraphs *solely* with testimony and police reports from Scott's trial. (AB at 10-11; SER S).  The district court did not consider these sources in assessing the evidence *against Debra* because Scott didn't testify at Debra's trial and wasn't subject to her cross-examination.  The State notes Debra cited Scott's testimony in her Merits Brief (pp. 13-14), but as Debra explained in her Merits Reply, her limited references to Scott's testimony illustrate Saldate's pattern of coercion, investigative bias and misconduct with both Scott and Debra. (Merits Reply at 1-7).  Scott's testimony on Saldate's interrogations was subject to cross-examination by the State and does not pose the same reliability and Confrontation Clause problems as Scott's trial testimony *against Debra. Lilly v. Virginia,* 527 U.S 116 (1999)(co-defendant confession implicating defendant is inherently unreliable and its admission where declarant is unavailable violates Confrontation Clause); *see also Crawford v. Washington,* 541 U.S. 36 (2004); *Hernandez v. Small,* 282 F.3d 1132 (9th Cir.), *cert. denied,* 537 U.S. 851 (2002).  The State's attempt to "bootstrap" this inadmissible evidence is improper and should be disregarded.

---

[3] Styers had put ammunition in the glovebox to give to Scott with the gun later used to kill Chris. He kept more at home. (ER 1685-1700, 2053).

3

## LEGAL ARGUMENT

**I.    SALDATE'S OVERREACHING TACTICS DEPRIVED DEBRA OF HER RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH & FOURTEENTH AMENDMENTS.**

### A.    Procedure.

The State asserts Debra failed to exhaust this claim because it was procedurally barred for failure to raise it on appeal.  As the district court noted, the PCR court found this claim *both* waived *and* precluded – an internally inconsistent ruling that failed to set forth an adequate, independent state law ground. (ER 113-14, 142-43).  It correctly found that for an adequate state law ground to bar federal review, "the state must apply state law that is firmly established and regularly applied at the time of the default," adding:

> A ruling that claims are both precluded under Ariz.R.Crim.P. 32.2(a)(2) and waived under Ariz.R.Crim.P. 32.2(a)(3) is not clearly based on an adequate and independent state law ground and does not bar such claims from federal habeas review.

(Id.).  Under Rule 32.2(a)(2), a defendant is precluded from post conviction relief based upon any ground "*finally adjudicated on the merits* on appeal or in any previous collateral proceeding."  In contrast, Rule 32.2 (a)(3) says a defendant is precluded from such relief based on any ground "that has been *waived* at trial, on appeal, or in any previous collateral proceeding." (emphasis added).  The district court found the PCR court's ruling makes no sense, as the same claim cannot both have been "waived" and "finally adjudicated on the

4

L&L046209

merits." The case cited by the PCR court is not to the contrary. *See State v. Pac,* 175 Ariz. 189, 854 P.2d 1175 (1993)(finding *some* claims precluded because finally adjudicated on the merits while *others* precluded for failure to raise on appeal). Even more ambiguity was created when the PCR court ruled on the merits.[4] Debra petitioned for review from both rulings. (ER 114).

The United States Supreme Court directs that a state court must "be explicit in its reliance on a procedural default" *rejecting* the notion that if a state court decision "is ambiguous as to whether the judgment rests on a procedural bar" the federal court should presume it does. *Harris v. Reed,* 489 U.S. 255 (1989). Here, the state law grounds are highly ambiguous. Either Claim I was waived or it was finally adjudicated on the merits – not both.

The State notes Arizona's fundamental error review does not finally adjudicate the merits of a claim. *See Poland v. Stewart,* 117 F.3d 1094, 1105 (9th Cir. 1997), *cert. denied,* 523 U.S. 1082 (1998). However, this does not "cure" deficiencies in the PCR court's ruling or transform it into a "plain statement" that the state ground is waiver. Moreover, the PCR court did not "clearly and expressly" rely on waiver as a ground, but simply said, "[i]f the

---

[4] This ruling on the merits is not, as the State contends, an "alternative" finding to an independent, adequate state law procedural bar. It just adds ambiguity and "removes any bar to federal-court review that might otherwise have been available." *Ylst v. Nunnemaker,* 501 U.S. 797, 801 (1991).

L&L046210

statements were improper or improperly admitted in evidence, the appropriate forum for challenging the trial court's rulings was on appeal." (ER 142). Facing a similar ambiguity, *Harris* found such language "perhaps laid a foundation" for finding the claim waived, but "this statement falls short of an explicit reliance on a state-law ground." 489 U.S. at 266 (finding that claim "could have been raised on direct appeal" does not meet "plain statement" requirement for finding of procedural bar based on independent, adequate state law ground).

Debra's PCR also asserted ineffective assistance of appellate counsel for failing to raise the confession issue on appeal (Claim VIII). That claim was considered on the merits (ER 194-95) and raised in Debra's petition for review. (ER 134). The district court found it was fairly presented to the state's highest court and properly exhausted. (Id.). The state and district courts considered both Claims I and VIII on the merits, but primarily addressed the confession/interrogation issue under Claim I.[5] This claim was exhausted.

## B.    Merits.

The State inaccurately claims Debra failed to support her suppression argument with U.S. Supreme Court authority, citing only one case from page 54

---

[5] Claim VIII was not certified by district court.

L&L046211

of the Opening Brief.   Debra has always contended that her purported
confession was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436
(1966).   Other Supreme Court cases supporting Claim I include: *Jackson v.
Denno,* 378 U.S. 368 (1964)(cited in OB at 54 for rule that it is court's
obligation to exclude a "confession" once its unreliability becomes apparent);
*Blackburn v. Alabama,* 361 U.S. 199 (1960)(same); *Miller v. Fenton,* 474 U.S.
104 (1985)(cited in OB at 56 for proposition that certain interrogation
techniques must be condemned as offensive to any civilized system of justice);
*Escobedo v. Illinois,* 378 U.S. 478, 488-89 (1964)(cited in OB at 24-25 for
proposition that the Fifth Amendment privilege against self-incrimination is
supported by the belief that a system of law enforcement which depends on
confession evidence is less reliable and more subject to abuses than a system
which depends on independent, extrinsic evidence); *Sanchez-Llamas v. Oregon,*
126 S.Ct. 2669 (2006)(cited in OB at 57 for rule that both the voluntariness and
reliability of a purported confession must be evaluated in determining
admissibility); *Colorado v. Connelly,* 479 U.S. 157 (1986)(cited in OB at 57 for
rule that because admission of a confession so strongly tips the balance against
the defendant, we must be especially careful about its reliability); *Salem v. U.S.
Lines Co.,* 370 U.S. 31 (1962)(cited in OB at 67 for holding that interrogation
expert's opinions are admissible to assist factfinder with evaluating and

L&L046212

understanding numerous, often subtle, discrepancies and improprieties in interrogation techniques); *North Carolina v. Butler,* 441 U.S. 369 (1979)(cited in OB at 82 for rule that State bears burden of establishing compliance with *Miranda*); and *Ake v. Oklahoma,* 470 U.S. 68 (1985)(cited in OB at 95 for holding that fact-finding procedures in capital cases must "aspire to a heightened standard of reliability.").

Granted, many confession cases focus on voluntariness. However, the central principal underlying the caselaw is that only *reliable* confession evidence should be admitted because the confession is a uniquely potent (and expedient) method to obtain a conviction. Contrary to the State's characterization of this claim as whether Saldate "lied" and "did not record" Debra's interrogation, its crux is whether Saldate's tactics rendered her purported confession unreliable, and whether her death sentence can constitutionally be based *solely* on such unreliable evidence. This Court should resist the State's invitation to treat this simply as an issue of "credibility."

The notion that habeas relief is not available in a case involving the state court's resolution of conflicting testimony between a defendant and officer is also incorrect, as seen in *Taylor v. Maddox,* 366 F.3d 992 (9th Cir.), *cert. denied,* 543 U.S. 1038 (2004). The Opening Brief highlighted numerous similarities between Debra's case and *Taylor* showing she is entitled to relief

8

under *Taylor's* "objectively reasonable" factors, which the State ignores. To address the State's argument, however, this brief expands on the Supreme Court authority supporting habeas relief.

### 1.    Admission of Debra's Purported Confession Was Clearly Contrary to Established Federal Law.

Because Debra's conviction rests entirely on an uncorroborated "confession" relayed solely by a detective whose testimony was not subject to rigorous cross-examination or impeachment, it is not constitutionally sound, particularly where the State failed to meet its heavy burden of showing Debra waived her right to counsel. Admission of the purported "confession" without adequate opportunity to impeach Saldate was clearly contrary to *Miranda,* as well as to U.S. Supreme Court caselaw holding that the right of an accused to due process is the right to a fair opportunity to defend against the State's accusations and its long-standing doctrine that convictions, especially capital, should not be based on unreliable confession evidence. The state court's narrow focus on voluntariness improperly overlooked issues of reliability, full and fair cross-examination and impeachment, and the right to counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

L&L046214

     a.     ***Miranda* - Incommunicado Interrogations Require Sufficient Procedural Safeguards.**

*Miranda* held that "the prosecution may not use statements … stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444; *see also Michigan v. Jackson,* 475 U.S. 625 (1986)(procedural safeguards are required to protect defendants' rights in custodial interrogations). The "procedural safeguards" adopted in *Miranda* require that all custodial suspects be advised of their rights to counsel and against self-incrimination prior to interrogation. 384 U.S. at 467-470; *see also Missouri v. Seibert,* 542 U.S. 600 (2004); *Dickerson v. United States,* 530 U.S. 428 (2000). *Miranda's* concern was that "incommunicado interrogation of individuals in a police-dominated atmosphere" creates "difficulty in depicting what transpires at such interrogations" and can result in an accused giving "self-incriminating statements without full warnings of constitutional rights." 384 U.S. at 445. The incommunicado interrogation -- created by and within complete control of police -- "results in secrecy and … a gap in our knowledge as to what in fact goes on in the interrogation room." *Id.* at 448. Once the suspect is incommunicado, police employ interrogation methods recommended by police training manuals and specifically designed to give police every advantage and "put the subject in a psychological state where his story is but an

L&L046215

elaboration of what the police purport to know already – that he is guilty." *Id.* at 449. "Explanations to the contrary are dismissed and discouraged." *Id.*

This is precisely what happened to Debra. Yet, the state court failed to ensure Saldate's interrogation tactics[6] were balanced by sufficient procedural safeguards to protect Debra's rights. *Id.; Miller v. Fenton*, 474 U.S. 104 (1985).

### b. The Exclusive Focus on Voluntariness was Clearly Contrary to *Miranda* and Other Established Law.

The trial court's narrow focus on voluntariness was clearly contrary to established federal law.[7] Voluntariness was not *Miranda's* central concern:

---

[6] The State wrongly claims the only tactic Debra highlights is Saldate's failure to record and says there is "no dispute" Debra didn't want it recorded. Debra raises numerous questionable tactics by Saldate. (OB at 25). She also maintains she told Saldate she wanted an attorney, not that she did not want a recording. Even if her statement is construed to mean she both wanted an attorney and didn't want the interrogation recorded, Saldate's animosity toward recording shows he never intended and purposefully came unprepared to record.

[7] That Debra's case also presents voluntariness problems creates no "obvious tension." (AB at 39-40). Consistent with his pattern, Saldate employed an overbearing interrogation strategy, first hitting Debra with the traumatic news that Chris was dead and she was under arrest for his murder, then cutting off her hysteria, saying he would not "tolerate" crying. He then dominated the interrogation, sending the already impaired Debra (from exhaustion, alcohol and medications) into a discombobulated state where she recounted her life history and made some odd revelations such as her attempt after having Christopher to get her "tubes tied." Although Debra denies confessing or making statements implicating herself, to the extent any comments can even be misconstrued as "inculpatory," they were not the product of a rational mind in a voluntary setting.

11

> In these cases, we might not find the defendants' statements to have been involuntary in traditional terms. Our concern for adequate safeguards to protect precious Fifth Amendment rights is ... not lessened in the slightest.

*Id.* at 457. Its purpose was to give "teeth" to the Fifth Amendment right against self-incrimination and the Sixth Amendment right to counsel and ensure that the State meet its burden of proving criminal charges against an accused:

> To maintain a fair state-individual balance, to require the government to shoulder the entire load, to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.

*Id.* at 460. Although the issues sometimes overlap, voluntariness and reliability are not one in the same. *Jackson v. Denno,* 378 U.S. 368 (1964); *Sanchez-Llamas v. Oregon,* 126 S.Ct. 2669 (2006). In *Colorado v. Connelly,* 479 U.S. 157 (1986), the Supreme Court emphasized that because admission of a confession so strongly tips the balance against the defendant, courts must be especially careful about its reliability. Yet the state court here focused solely on voluntariness, failing to assess the "confession's" reliability.[8]

Because no other evidence linked Debra to this horrendous crime, it was incumbent on the trial court to evaluate whether Saldate's hearsay testimony

---

[8] The Opening Brief lists some of many inconsistencies and reliability problems with Saldate's account. (OB at 57-58, 67-77, 81-82).

L&L046217

had sufficient indicia of reliability. In *Smith v. United States,* 348 U.S. 147 (1954), the Supreme Court confirmed that an accused cannot generally be convicted solely on the basis of an uncorroborated confession. This rule "prevent[s] errors in convictions based upon untrue confessions alone." *Id.* at 153 (quoting *Warszower v. United States,* 312 U.S. 342, 347 (1941)). "Its foundation lies in a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused." *Id.*

Although the "corroboration rule" initially only required a *corpus delicti* (independent proof of a crime), it was expanded in *Opper v. United States,* 348 U.S. 84, 90 (1954), which noted that "admissions, retold at a trial, are much like hearsay" having "neither the compulsion of the oath nor the test of cross-examination." Because they are only admissible as an "admission against interest" the State must introduce "substantial independent evidence which would tend to establish the trustworthiness of the statement." *Id.* at 93. This requirement "tends to make the admission *reliable,* thus corroborating it while also establishing independently the other necessary elements of the offense." *Id.; see also United States v. Lopez-Alvarez,* 970 F.2d 583, 590-91 (9th Cir.), *cert. denied,* 506 U.S. 989 (1992)(explaining *Opper* rejected the traditional *corpus delicti* rule as to every element and "adopted the new requirement that

13

the prosecution introduce evidence tending to establish the trustworthiness of the statement."). Citing *Opper* and *Wong Sun v. United States,* 371 U.S. 471 (1963), this Court held that only when the state introduces sufficient evidence that the crime occurred *and* independent evidence establishing the trustworthiness of the alleged confession, will a jury be "sufficiently justified" in believing the truth of a criminal admission. *Lopez-Alvarez,* 970 F.2d at 592. The only exception is where the confession is, by virtue of special circumstances, "inherently reliable." *Id.*

No "special circumstances" make Saldate's account "inherently reliable." Nor did the trial court even evaluate whether sufficient independent evidence established the trustworthiness of the purported confession, or whether Saldate's hearsay testimony bore sufficient indicia of reliability. Its sole concern was voluntariness. Failure to consider the reliability of Saldate's testimony or the complete lack of independent corroborating evidence was clearly contrary to established federal law in *Miranda, Smith* and *Opper.*

As Debra's Opening Brief notes, the privilege against self-incrimination and the corroboration rule are supported by the belief that "a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation."

L&L046219

*Escobedo v. Illinois,* 378 U.S. 478, 488-89 (1964); *Lopez-Alvarez,* 970 F.2d at 589 n. 5. This principle was entirely forgotten in Debra's case.

**c.    The Waiver Finding Was Clearly Contrary to Established Law and Objectively Unreasonable.**

Because our system demands that the State produce *independent* evidence against an accused, "a ***heavy burden*** rests on the [State] to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda* at 475 (emphasis added). The trial court failed to require the State to meet this "heavy burden," which was clearly contrary to established federal law.[9] Instead, it treated this like a "swearing contest," decided Saldate was more credible, and without corroboration, submitted the evidence to the jury. The district court upheld this ruling, reasoning that state court determinations of credibility are entitled to "special deference."

The State claims this high level of deference was warranted, citing *Patton v. Yount,* 467 U.S. 1025 (1984).[10] This ignores *Taylor,* 366 F.3d at 1004, which

---

[9] The State agrees waiver is an issue properly before the Court. (AB at 42-43).

[10] *Patton* is vastly distinct, as it involved the credibility of jurors who said they could set aside opinions based on pre-trial publicity. In contrast to an interrogator who creates the conditions necessary to ensure he wins a credibility contest, there is no reason to suspect a juror's credibility in such circumstances.

15

L&L046220

found the state court improperly admitted an alleged confession after treating the relative credibility of different accounts of what happened in the interrogation room merely as a "swearing-contest" between the officer and the defendant, and simply deciding to believe the officer. *Taylor* recognizes that determinations of credibility in the context of incommunicado interrogations are different from other witness credibility issues, which are normally subject to more deference. Reliability determinations involving police officers regarding what happened in an interrogation are not entitled to special deference, especially where the officers created the conditions they knew would result in a "swearing contest" they would inevitably win.

Long before *Taylor*, the Supreme Court criticized the practice of incommunicado interrogation and observed the extreme disadvantage of an accused in a swearing contest with police. *Reck v. Pate*, 367 U.S. 433, 446 (1961)("There is the word of the accused against the police. But his voice has little persuasion."). *Miranda* also emphasized:

> Since the State is *responsible for establishing the isolated circumstances* under which the interrogation takes place *and has the only means of making available corroborated evidence of warnings* given during incommunicado investigation, the burden is rightly on its shoulders.

384 U.S. at 475 (emphasis added). Although Debra did not fully comprehend her *Miranda* rights, she asserted her right to counsel, which Saldate ignored.

16

(RT 10/3/90 at 16-17). Yet, despite the Supreme Court's long-standing suspicion of incommunicado interrogations, the trial court did not demand or even question the lack of a written (or recorded) waiver or any other evidence corroborating Saldate's claim that Debra waived her right to counsel. Nor was the trial court apparently even bothered by the undisputed evidence presented at the suppression hearing that Saldate *typically ignored* assertions of the right to remain silent.[11] (RT 9/10/90 at 17-19; 9/11/90 at 24-25). Plainly, a detective who ignores *Miranda* and runs rampant over a suspect's right against self-incrimination would have no problem ignoring assertions of the right to counsel. Even with this undisputed evidence of Saldate's unlawful practices and no corroboration, the trial court chose to believe Saldate over Debra, whose word as the accused carried little weight. *Reck,* 367 U.S. at 446. By not requiring the State to meet its heavy burden of proving waiver, the state court's decision was clearly contrary to *Miranda* and was not entitled to a "presumption of correctness." *North Carolina v. Butler,* 441 U.S. 369 (1979).

---

[11] *Miranda* demands: "if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, ***the interrogation must cease.***" 384 U.S. at 473-74. Yet Saldate took the position that any inculpatory statements he extracted after an assertion of rights merely could not be used in court. This blatant disregard for *Miranda* was obviously designed to obtain "fruits" from subsequent statements.

17

L&L046222

**d.  Failure to Consider Lack of Recording in These Circumstances Was Contrary to Federal Law.**

Where no evidence corroborated Saldate's version, no signed, written confession existed, *and* Saldate destroyed his contemporaneous notes, leaving only his "official" paraphrased report, the trial court was obligated to consider the lack of a recording. Although *Miranda* did not impose a recording requirement *per se*, one was certainly foreshadowed by its mandate of sufficient procedural safeguards, which are meant to evolve as better methods for ensuring protection of rights are developed. *Miranda's* "warnings" requirement was not intended to create a "constitutional straightjacket which will handicap sound efforts at reform." 384 U.S. at 467.  The Court encouraged congress and the states "to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws," adding:

> Unless we are shown *other procedures which are at least as effective* in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it, [warnings] must be observed.

*Id.*  Unlike the time of Debra's interrogation, recording equipment was not widely available in police departments when *Miranda* was decided.  *Miranda's* intent, however, was that increasingly effective procedures should be identified and required to ensure protection of constitutional rights during interrogations.

18

The procedural safeguard of recording an interrogation most effectively protects a suspect's rights to remain silent and to counsel. Recording was needed to protect Debra's rights, and Saldate's failure to do so undermines the reliability of his claim that Debra "confessed." Saldate was *directed* by his supervisor to record, but *his* "practice" was to **not** record, saying it "inhibits" suspects. (OB at 33-34). He undoubtedly also preferred not recording because it gave him *total control* over relaying what was said in an interrogation. Even Saldate's claim that Debra didn't want the interrogation recorded cannot be verified because *he created the conditions needed to ensure no corroboration existed* and that it would be his word against Debra's. That should have caused the trial court to give the benefit of any doubt to Debra. Instead, its deference to Saldate and limited admissibility analysis reinforced Saldate's tactics.

*Miranda* recognized that "[c]ustodial interrogation … does not necessarily afford the innocent an opportunity to clear themselves." 384 U.S. at 482. That statement could not hold more truth than here where Debra's entire conviction turns on what Saldate said occurred incommunicado.[12] Any court

---

[12] The State claims Debra's version was "virtually identical." (AB at 41-42). This is flat wrong, as the Opening Brief demonstrates in painstaking detail. Debra never said she decided it would be best for Christopher to die, or that she had a hard time asking Styers to do it but finally was able to do so, or that she wanted God to take care of Christopher. These are just a few inculpatory statements Saldate attributed to Debra that she adamantly denies.

L&L046224

concerned with justice should be deeply disturbed by a case like this, where one officer's word can send someone to her death. This is exactly the evil *Miranda* attempted to prevent by implementing the procedural safeguards then available. Here, much more reliable safeguards were available and dictated by Saldate's supervisor, which the state court disregarded. By not considering whether *Miranda* required the procedural safeguard of recording in these circumstances given Saldate's history, his supervisor's directive and the lack of other corroboration, the trial court's decision was clearly contrary to *Miranda. See also Giles v. Wolfenbarger,* 2006 WL 176426 (E.D.Mich. 2006)[13](granting habeas relief in part because reliability of purported confession was weakened by failure to record interrogation and extolling virtues of recording as a procedural safeguard); *United States v. Lewis,* 355 F.Supp.2d 870 (E.D.Mich. 2005)(excluding confession because given totality of circumstances of the interviews, which were not memorialized by video or audio recording despite availability of equipment, government did not meet burden of proving compliance with *Miranda*); *Hendricks v. Swenson,* 456 F.2d 503 (8th Cir. 1972)(noting limited capacity of persons to observe, remember and relate events and strongly encouraging videotaping of all interrogations, which

---

[13] *rev'd. on different grounds,* 2007 WL 1875080 (6th Cir. 2007).

20

enhances truth-seeking process); *State v. Jones,* 203 Ariz. 1, 49 P.3d 273 (2002)(finding best practice is to tape entire interrogation process, including advice of rights, waiver, questioning and confession, as recommended by Arizona Capital Case Commission and Illinois Commission on Capital Punishment, and required by various states).  The state court should at least have considered failure to record in determining whether the State met its "heavy burden" of proving waiver. *See Lewis,* 355 F.Supp.2d 870.

## 2.   **Debra's Right to Fully Cross-Examine and Impeach Saldate Was Violated.**

The trial court's error in admitting this unreliable, uncorroborated "confession" was compounded by its preclusion of full cross-examination and impeachment of Saldate at trial, and its exclusion of defense witnesses.  It is well-established that the Fourteenth Amendment right to a fair trial demands an opportunity to present a complete defense and to fully and fairly confront and cross-examine witnesses. *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973). The right of cross-examination is "implicit in the constitutional right of confrontation, and helps assure the accuracy of the truth-determining process." *Id.* at 295.  It is "essential and fundamental" and "its denial or significant diminution calls into question the ultimate integrity of the fact-finding process and requires that the competing interest be closely examined." *Id.*

21

L&L046226

### a. Precluding Cross-examination on Saldate's History Was Clearly Contrary to *Chambers*.

The integrity of the fact-finding process was seriously compromised here by the trial court's failure to allow cross-examination of Saldate regarding misconduct in other cases. (ER 177-78). As shown in the Opening Brief, such evidence was admissible as Saldate's credibility was **central** to the ultimate determination of Debra's guilt. *See, e.g., United States v. Kiszewski,* 877 F.2d 210, 216 (2nd Cir. 1989); *United States v. Stockton,* 788 F.2d 210, 219 n. 15 (4th Cir.), *cert. denied,* 479 U.S. 840 (1986); *United States v. Acosta,* 111 F.Supp.2d 1082, 1090 (E.D. Wis. 2000); *see also* Rule of Evidence 608 (b)(character for truthfulness); Rule of Evidence 404(b)(state of mind, motive, opportunity and intent); Rule of Evidence 406 (habit and routine practices).[14]  Preclusion of cross-examination relating to Saldate's other cases, such as *State v.*

---

[14] The State calls this "bad character" evidence inadmissible under Rule 404(b).  This overlooks the rule's exceptions, three of which apply here – state of mind, motive and intent – and ignores other rules allowing admission. (OB at 59-62). Procedural rules are not to be applied mechanistically in a way that violates due process, *Chambers,* 410 U.S. at 302, yet that occurred here.  After allowing Saldate to make this a "he said – she said" case, the trial court forbade Debra from showing the jury it should not believe what "he said."  Where Saldate turned this into a swearing contest by not recording or corroborating, due process required the trial court to give *very wide* latitude to Debra to cross-examine Saldate.  It certainly gave the State wide latitude in allowing "bad character" evidence against Debra through Sandra Pickinpaugh, Richard Sadeik and Dorothy Markwell.  Due process entitled Debra to even-handed justice.

22

*Runningeagle,* 176 Ariz. 59, 859 P.2d 169 (1993), was clearly contrary to established law because it significantly diminished Debra's right to full and fair cross-examination and to present a complete defense under *Chambers*. This ruling undermined the integrity of the fact-finding process and severely prejudiced Debra, as the entire determination of guilt rested on whether the jury believed her or Saldate.

The PCR court's ruling that evidence of Saldate's misconduct in eighteen other cases was inadmissible was also clearly contrary to *Chambers*. The State's claim that these cases do not reflect dishonesty or a pattern of misconduct is bogus. Evidence of misconduct in these cases is potent and likely would have made a difference in the jury's evaluation of Saldate's credibility and the "confession's" reliability. In minimizing their import, the State mischaracterizes them and accuses Debra of "character assassination."

It first claims exclusion of the confession in *Conde* was not due to Saldate but for failing to timely bring Conde before a magistrate. However, there were *two* interrogations by Saldate, the first while Conde was in intensive care, in severe pain, intubated and drifting in and out of consciousness, which was clearly inadmissible. *State v. Conde,* 174 Ariz. 30, 31, 846 P.2d 843, 844 (1993)(ER 1520). The *second* confession was excluded for delaying initial appearance. *Id.*

23

Debra acknowledged that in *Blackerby,* the suppression motion was denied. (OB at 48). That does not change Blackerby's status as a minor with a known history of mental impairment and psychological problems who, after being held for four hours and interrogated for two, finally began to "nod his head yes" to everything Saldate said. (ER 1311, 1420). Nor does admission of the defendant's statement in *Runningeagle* alter the fact that Saldate admittedly ignored assertions of *Miranda*,[15] repeatedly poked him in the chest while he cried, purposefully failed to record the interrogation, and applied repeated, improper pressure on an intoxicated witness. (ER 1310, 1370).

The State claims the order granting a new trial in *Yanes* did not "allege" misconduct by Saldate.   However, the trial court based its ruling "upon the pleadings and argument," finding ineffective assistance for failing to present important evidence regarding voluntariness and showing the statements "were obtained in violation of [Yanes'] constitutional rights." (ER 1341-42).   The pleadings referenced by the court detailed how Saldate repeatedly interrogated

---

[15] The State says no evidence shows Saldate lied about circumstances surrounding confessions, noting he admitted having obtained confessions he knew were inadmissible.  This does not negate Saldate's dishonesty and routine, knowing violations of *Miranda*.  It just shows how brazen he was about conducting interrogations how *he* wanted despite what the constitution requires.

24

Yanes while incoherent, strapped and handcuffed to a gurney, intoxicated and suffering from brain damage and a skull fracture. (ER 1322-40, 1355-64).

The State next incorrectly claims the trial court could not have considered four cases involving misconduct by Saldate occurring after Debra's interrogation because they "had yet to occur." (AB at 48). In *Mahler,* Saldate's interrogation occurred January 19, 1990, just one month after Debra was arrested and charged, and eight months before Debra's suppression hearing and trial. (ER 1314). The *Gallegos* interrogation occurred March 16, 1990, within three months of Debra's interrogation and six months before Debra's suppression hearing and trial. (ER 1315). Saldate interrogated *Jones* March 22, 1990, also within three months of Debra's interrogation and six months before her hearing and trial. (ER 1315). And Saldate's interrogation in *King* took place December 29, 1989, less than one month after Debra's interrogation and nine months before her hearing and trial. (ER 1471). The trial court could have taken *all* these interrogations into account at Debra's suppression hearing and trial, and in post conviction proceedings. Their occurrence within one to three months of Debra's makes them even more probative of Saldate's pattern of misconduct. The State wants this Court to ignore them because, in two, the Arizona Court of Appeals severely chastised Saldate's tactics.   *Jones* determined Saldate engaged in "flagrant misconduct" which "did not involve an

25

arguable mistake," calling it "a purposeful arrest lacking in probable cause, for the improper motive of investigation" and finding "the manner of the detention – handcuffing a juvenile alone to a desk in a locked room – increased the flagrancy of the illegal detention and the coercive nature of the confession." (ER 1413-15). *Mahler* found Saldate intentionally continued to interrogate after the defendant made an "unequivocal invocation to remain silent," adding, "the law is clear that Saldate was required to immediately terminate the interview." (ER 1445). In *King,* Saldate also disregarded the defendant's assertion of his right to remain silent, resulting in suppression. (ER 1470-72).

The State's claim that *Rangel* is irrelevant because remand resulted from failure to inform grand jurors of the exculpatory portion of Rangel's confession misses the point. *Rangel* is yet another example of Saldate ***routinely ignoring Miranda*** assertions. The State conceded Saldate continued interrogating Rangel after three separate requests for counsel and that subsequent admissions were obtained in "clear violation of the Fifth Amendment." (ER 1477).

The State inaccurately claims the *Rodriguez* and *Reynolds* remand orders do not suggest Saldate lied to grand jurors. In *Rodriguez,* the State admitted Saldate's representation "the victim was shot four times" was "an incorrect statement of fact." (ER 1506). It blamed the transcription, but the court found *even the reporter's notes* showed Saldate made this false statement during

26

testimony. (ER 1508). The *Reynolds* court found three areas of Saldate's grand jury testimony that weren't "fully and fairly presented" and expressly incorporated portions of the motion to remand: 1) "Detective Saldate misstated the facts;" 2) the misstatement "was particularly harmful because Detective Saldate and the prosecution knew that several witnesses had reported seeing the victim alive long after 8:00 p.m.;" and 3) Saldate's testimony that Reynolds said he wasn't drunk was false, as police reports showed Reynolds told Saldate he had been drinking beer and smoking pot the night before and was "too drunk" to remember. (ER 1511-17).

The State says *Ross* and *Webster* are irrelevant because they involve line-ups. But these cases also show Saldate's pattern of misconduct, dishonesty and willingness to influence witnesses to gain convictions at any cost. (ER 1442).

The four cases resulting in plea agreements should also be considered, as they too reveal Saldate's pattern of misconduct in interrogations. *See Salas* (Saldate knew defendant was highly intoxicated); *Kelley & Moynihan* (Saldate knew both defendants were intoxicated and coming off crystal meth); *Stark* (Saldate failed to give *Miranda* rights, refused to offer defendant protection even though he was already a State's witness, and threatened to arrest his girlfriend if he did not confess); *Biggica* (Saldate told defendant it was "necessary" to talk to him about the crime).

27

Such tactics have been soundly condemned by the U.S. Supreme Court in cases involving injured or hospitalized defendants, *Mincey v. Arizona,* 437 U.S. 385 (1978)(hospitalized and in pain from gunshot wound and encumbered by tubes, needles and breathing apparatus); *Beecher v Alabama,* 389 U.S. 35 (1967)(shot in leg); *Denno,* 378 U.S. 368 (bullet wound); juvenile defendants, *Gallegos v. Nebraska,* 342 U.S. 55 (1951)(14 year old); *Haley v. Ohio,* 332 U.S. 596 (1948)(15 year old); drug and alcohol impaired defendants, *Townsend v. Sain,* 372 U.S. 293 (1963)(medication with truth serum); *see also* LaFave & Israel, *Criminal Procedure* § 6.2(c) at 639-40 n. 172-73 (3d ed. 2007); defendants under emotional distress, *see* La Fave §6.2(c) at n. 171; and fatigued defendants, *Ashcraft v. Tennessee,* 322 U.S. 143 (1944)(36 hours without rest).

These eighteen other cases demonstrate a clear pattern of misconduct and are admissible especially where courts expressly chastised Saldate and/or granted relief. Such evidence unquestionably would have impacted the jury's assessment of Saldate's credibility and the "confession's" reliability.

> **b.     Failure to Require Disclosure of Saldate's Personnel Records Was Clearly Contrary to *Brady* and *Chambers*.**

*Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny require the State to disclose material impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *see also*

L&L046233

*U.S. v. Kiszewski,* 877 F.2d 210, 216 (2nd Cir. 1989).  Witness impeachment can mean the difference between acquittal and conviction. *Napue v. Illinois,* 360 U.S. 264, 269 (1959), particularly "where credibility is the central issue in the case and the evidence presented at trial consists of opposing stories presented by the defendant and government agents." *Kiszewski,* 877 F.2d at 216 (government required to produce officer's personnel file as impeachment).

The state court denied Debra's request for Saldate's personnel records for impeachment, merely ordering *in camera* inspection of any recent training and departmental interrogation policies, but not requiring disclosure of even that evidence. (ER 1747-60).  The district court disagreed, ordering the State to disclose evidence from Saldate's file bearing on veracity and departmental interrogation policies. (ER 913, 917).  The State concedes such evidence is admissible under Rule 608 (a)(character for truthfulness). (AB at 53).  The state court's ruling was clearly contrary to *Brady* and *Chambers* and prejudiced Debra, especially where Saldate's prior misconduct was also excluded.

### c.    Preclusion of Defense Witnesses Was Also Clearly Contrary to Federal Law.

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers,* 410 U.S. at 302.  Although a defendant's evidence, like the State's, should generally comply with procedural rules, trial courts must not apply such rules "mechanistically to defeat the ends

29

of justice." *Id.* Yet that is what the state court did in finding that expert testimony regarding the interrogation was inadmissible and cumulative.

The trial judge precluded Debra from calling *any* interrogations expert at trial and affirmed that decision in PCR proceedings. (ER 157-60). She also found opinions of three law enforcement officers in PCR proceedings inadmissible. Both rulings are clearly contrary to *Salem v. U.S. Lines Co.,* 370 U.S. 31 (1962), which held that an interrogation expert's opinions are admissible to assist the factfinder with evaluating and understanding the numerous, often subtle, discrepancies and improprieties in interrogation techniques. *See also Crane v. Kentucky,* 476 U.S. 683 (1986); *United States v. Cronic,* 466 U.S. 648 (1984); *Lego v. Twomey,* 404 U.S. 477 (1972).

Richard Leo's opinions are also admissible to assist the court and jury with evaluating the purported confession's reliability, understanding how Saldate's interrogation violated police protocol and departmental policies, and seeing how Saldate's account was not consistent with hundreds of other interrogations.[16] Leo's opinions are also not cumulative because Debra was precluded from calling an interrogations expert at trial.

---

[16] The State faults the district court's expansion of the record to include Leo's opinions, claiming Debra received a full and fair suppression hearing. This ignores the state court's exclusion of expert testimony at trial and failure to

L&L046235

The State contends Leo's "disagreement" with the state court regarding Saldate's credibility does not provide a basis for relief under 28 U.S.C. §2254. This misconstrues Debra's argument.  The state court erred by excluding an interrogations expert at trial which, as shown above, was clearly contrary to established federal law. *Salem,* 370 U.S. 31; *Crane,* 476 U.S. 683; *Cronic,* 466 U.S. 648; *Lego,* 404 U.S. 477.  The high percentage of wrongful convictions based on confession evidence shows jurors do not have sufficient understanding of how interrogations work and what procedural safeguards improve a confession's reliability.  An interrogations expert can significantly assist jurors with their understanding so they can make well-founded decisions, *Salem,* 370 U.S. 31, which is crucial when someone's life is at stake.  Admission of expert testimony like Leo's, especially combined with Saldate's history of misconduct, disciplinary record of dishonesty, and deviation from interrogations policies, would have impacted the jury's determinations, including on waiver.

The State also claims Leo's opinions are based on "faulty assumptions" because they ignore that Scott led police to Christopher's body, Scott's confession to his (and Styers') involvement and "damning" circumstantial evidence. (AB at 54).  The fact that Scott led police to the body does not mean

---

grant Debra an evidentiary hearing on her PCR, and Debra's ineffective assistance claim regarding counsel's handling of the suppression hearing.

31

L&L046236

his entire confession is reliable, nor does Scott's confession to his and Styers' involvement mean Debra was involved.  Scott refused to testify against Debra, and nothing from Scott's confession implicating Debra was introduced at trial.[17]

None of the so-called "damning" circumstantial evidence establishes Debra conspired to have her son murdered, and the State mischaracterizes virtually all of it.[18]  Debra's recounting of her life history in the interrogation is easily explained by extreme disorientation resulting from the news that her son was dead and she was under arrest, Saldate's command that she contain all emotion, and her impairment from prescriptions, alcohol and lack of sleep and food.  Debra was young and did her best while impaired and confused to explain why she was not someone who would have her only son murdered. Also contrary to the State's claim, evidence showed Debra attempted to contact Styers to find out what had happened. (RT 9/14/90 at 80).

---

[17] As Leo notes, Scott did not implicate Debra until after repeated interrogations. (ER 399).  Because he first allegedly did so while in the car with Saldate, no one knows if it was spontaneous or in response to suggestion.

[18] As noted, no evidence at trial indicated Debra said she wished Christopher were dead or that she pressured Sandra to take him so she "could lead a different lifestyle." (Reply Brf. at 1-2).  Nor did the evidence show Debra believed Ernie Sweat wouldn't marry her because she had a child; Sweat testified the topic never came up. (ER 1896).  There was also no evidence Debra misled Saldate about her employee life insurance benefits.  (ER 1201).

L&L046237

The State ignores Paul Huebel's affidavit (ER 347), which corroborates Debra's version of events, particularly when viewed with Kirk Fowler's affidavit (ER 376) and the suppression hearing testimony and tape recorded interview of Debra by Dr. Kassell. (RT 9/10/90 at 78-81; ER 2045). This evidence is "highly probative" because it matches Debra's account and provides insight into her demeanor following the interrogation and when confronted with the claim that she "confessed." *Taylor,* 366 F.3d at 1005. The district court clearly abused its discretion in finding this evidence "cumulative," as no such testimony was presented at trial, nor was Huebel's information presented at the suppression hearing.

### 3. There Was Sufficient Evidence That Saldate Pressured and Influenced Witnesses.

The district court's finding of insufficient evidence of Saldate's influence overlooks that Debra had no opportunity to develop it in an evidentiary hearing. Debra's proffered affidavits are also particularly persuasive given Saldate's tendency to pressure and influence witnesses in other cases. (ER 1370).

### a. Richard Sadeik.

The State says Kirk Fowler's affidavit and Dr. Biegen's report should be disregarded because neither was presented in state court nor support Debra's claim. First, both were included in the district court's order expanding the record. (ER 68-75). Second, the State oversimplifies Fowler's affidavit, noting

33

only one statement by Richard while omitting that Saldate contacted him immediately after Debra's arrest saying she confessed. (ER 2069). Richard believed Saldate because he couldn't conceive of a detective misstating facts due to his own military/corrections background. (ER 332-353). Dr. Biegan's opinions are admissible to counter the character evidence from Debra's father and sister by helping to explain the family dynamics and why these members were especially susceptible to Saldate's influence.

### b.   <u>Sandra Pickinpaugh.</u>

The State claims the affidavits from Anders Rosenquist, Renate Janka and Barbel Jacks are inadmissible hearsay and don't show Sandra recanted. It also claims Rosenquist's affidavit shows Sandra was harassed by the defense, not Saldate. First, Debra was required to submit affidavits in support of her petitions and was never granted a hearing to develop this evidence. Second, Saldate's interview of Sandra reveals exactly how he influenced her, which the State ignores. (ER 1933). This interview shows the lengths Saldate was willing to go to get Sandra "on board," including falsely claiming Debra tried to seduce her way out of trouble by exposing her breasts during the interrogation, which Saldate never claimed in his police report, pre-trial interview or testimony. (ER 1962-63). Third, Rosenquist's affidavit details how Saldate pressured Sandra to testify against Debra, including threatening to subpoena her, saying she'd "just

34

have to deliver [her] baby early." (ER 365).  Sandra also said Saldate misled her regarding evidence, saying Debra tried to kill Christopher twice before and told inmates she killed Chris and would "do it again." (ER 366-67).  Rosenquist's affidavit is bolstered by Janka's and Jacks,' who confirmed Sandra did not believe Debra was capable of having Chris killed, but that Saldate put her under extreme duress. (ER 381, 387).

Although Sandra would not sign an affidavit, she allowed defense investigator Fowler to interview her three years later for four hours. (ER 356).  She again failed to sign an affidavit, which the State attributes to her feeling "harassed" by the defense, citing warnings from the Attorney General's office to not initiate further contact.  However, Dr. Biegan says Sandra's vacillation between coming forward with evidence and retreating into her shell is not surprising given the family and sibling dynamics, which he notes allowed Saldate to pressure and influence Sandra in the first place. (ER 328).

Saldate understood he needed to paint Debra as someone who did not want to be a mother.  The State's evidence was paper thin — no direct evidence she was involved, no testimony from a co-defendant, only Saldate's word against Debra's.  Saldate knew he needed to damage Debra's credibility, and what better way than to negatively influence two disgruntled family members.

L&L046240

He was willing to say anything to persuade Richard and Sandra that Debra was capable of having Christopher killed, and that's exactly what he did.

### c.   Renate Janka, Henry Milke & Ernie Sweat.

The State claims Debra could not have been prejudiced by Saldate's attempts to "poison" Debra's mother and father-in-law because neither testified. The fact that these family members were *dissuaded* from testifying was prejudicial. Saldate knew Renate had the best familial relationship with Debra and would have offered positive character evidence for Debra and rebuttal testimony against Sandra and Richard. So when Renate tried to meet with Saldate, he said Debra was "guilty as hell," he'd "make sure she will roast," that she'd "never see the light of day again," and that Renate would "do better by returning to where [she] came from and fast." (ER 382). He refused to show Renate the "confession" saying, "you are wasting my time." (Id.).[19] Saldate's influence of Henry Milke (saying Debra killed Christopher for a $5,000 life insurance policy and "giving [Henry] hell" about media comments) further reveals Saldate's controlling nature and how he interjected himself to influence the outcome.

---

[19] Debra's trial counsel was then ineffective by failing to return Renate's calls and have her testify. (ER 382).

L&L046241

The State argues Debra fails to show Ernie Sweat testified untruthfully, which is not Debra's claim. She contends Saldate misreported and skewed Sweat's statements at trial to make them "fit" the State's motive theory. In his pre-trial interview, Sweat detailed serious inaccuracies in Saldate's police report, including Saldate's claim that Sweat told Debra he was not ready for marriage, which Sweat said never occurred. (ER 1896). Saldate's report also wrongly claimed Sweat told Debra she was neglecting Chris. (ER 1898).

When combined with the proof of his misconduct in this and other cases, these exhibits show Saldate influenced and pressured witnesses to help ensure Debra would be found guilty of capital murder even though his testimony provided the *only* evidence she committed a crime.

### C.  Debra is Entitled to a New Trial.

In sum, the State urges this Court to make the same mistake as the lower courts by limiting review of this issue to "voluntariness." *Miranda* and other longstanding Supreme Court cases require that confession evidence purportedly obtained in incommunicado interrogation also be *reliable,* and that sufficient procedural safeguards prevent officers from turning a trial into a mere "swearing contest" they will invariably win. A high level of proof is also required to show compliance with *Miranda* and waiver. Debra's trial judge failed to evaluate whether there were sufficient procedural safeguards, failed to

37

require corroboration, and failed to hold the State to its high burden of proving Debra waived her rights, opting to just believe Saldate over Debra.  Her legal rulings were clearly contrary to federal law, and her objectively unreasonable factual findings are not entitled to a presumption of correctness or deference.

As the Opening Brief notes, ***too much deference*** has led appellate courts to routinely affirm in proven wrongful conviction cases involving "swearing contests" between police and defendants.  *See* Garrett, B., *Judging Innocence,* 108 Colum.L.Rev. 55 (January 2008).  Because it is impossible for Debra to exonerate herself through DNA evidence, her case deserves at least the level of scrutiny applied in *Taylor.*  She asks this Court to hold that when a state court bases its factfinding on such fundamentally unreliable evidence as Saldate's testimony, those factual findings are entitled to less deference on habeas review. (CWC Amicus Brief at 5).  Debra deserves a new trial, or at least an evidentiary hearing, under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

## II.   DENIAL OF DEBRA'S INEFFECTIVE ASSISTANCE CLAIM WAS CLEARLY CONTRARY TO *STRICKLAND*.

Although the State is correct that deference is normally accorded to trial counsel's judgments, counsel must "conduct a reasonable investigation." *Strickland v. Washington,* 466 U.S. 668 (1984).  The record shows and counsel agrees he was ineffective for failing to adequately investigate this capital case.

L&L046243

(ER 378, 1304).  Moreover, counsel's failures should be viewed collectively, not separately as urged by the State.

**A.     Trial.**

The State first inaccurately claims Rosemary Houston's testimony was irrelevant.  Houston's testimony would have corroborated Debra's motivation for moving in with Styers and her efforts to shield Christopher from Mark's abusive behaviors.  Patricia Prust would have testified regarding Debra's positive attitude about her pregnancy and performance as a mother, and could have impeached Sandra and Dorothy.  Prust knew both women well, including the fact that Dorothy used drugs and that both were jealous of Debra.  Prust also saw Debra with Christopher *two months* before his murder, much later than either Sandra or Dorothy, and could have more accurately testified regarding Debra's treatment of Christopher shortly before his death.  The State's claim that this evidence would be inadmissible is nonsensical, as there is no material difference between Prust's proffered testimony and the character/impeachment evidence the State elicited through Sandra and Dorothy.  Similar testimony from the Jones family would also be admissible.  Considering the wide latitude given to the State to present character/impeachment evidence against Debra, exclusion of such testimony against the State's witnesses would violate due process. *See Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971).

39

The State notes the PCR court found the failure to call Christopher's doctors and day care providers not prejudicial and cumulative. No such evidence was presented at trial, however, which would have dispelled Dorothy's unsubstantiated claim of abuse with reliable evidence of Chris' care.

The State asserts that testimony from Debra's supportive family members and impeachment evidence would also be inadmissible. This testimony goes to Debra's character for peacefulness and non-aggression and shows she was a caring mother, which is admissible under Rule 404(a)(1). It also makes no sense that character and impeachment evidence was admissible for the State, but would be inadmissible on Debra's behalf. The idea that nothing indicated what these witnesses would say is also baseless. Debra presented an extensive affidavit from Renate in PCR proceedings,[20] and she and Alex were available for an evidentiary hearing. Debra then presented a second affidavit from Renate and one from Alex in habeas proceedings, both of which were made part

---

[20] The State complains about differences in Renate's affidavits, but they address different topics. The first focuses on family dynamics and interactions she had with Styers before Christopher's death; the second focuses on her interactions with Saldate after Chris' death. (ER 381). The State's characterization of Renate's phone call with Dorothy also omits that Dorothy never said Debra was physically violent with Christopher. (SER T). The evidence also doesn't suggest Debra's relationship with Chris was "troubled," as Debra explained that Christopher's hyperactivity while staying with Dorothy subsided after thyroid surgery. (ER 1194).

40

of the record. (ER 68). Counsel's failure to interview family members and to obtain impeachment evidence was clearly ineffective.

The State argues the failure to obtain school and medical records was not ineffective because they are irrelevant. Debra's school records countered the State's cross-examination regarding her school work and show she was never disciplined. Her medical records show she cared for herself and was not resentful of her pregnancy. Christopher's medical records show he was well cared for and not abused. And records of his thyroid surgery support Debra's claim that his hyperactivity subsided afterward and show Debra was attentive. The district court found counsel elicited some of this through witnesses, but corroboration was needed because the State made Debra's character central.

Failure to investigate witnesses is particularly egregious in capital cases. *Silva v. Woodford,* 279 F.3d 825 (9th Cir.), *cert. denied,* 537 U.S. 942 (2002). Counsel's collective errors here were especially prejudicial given the lack of direct evidence.

**B.     Sentencing.**

The State does not deny that the duty to investigate mitigation takes on supreme importance in a capital case. *Strickland,* 466 U.S. at 706. Rather, it claims nothing in Renate's affidavits, Debra's social history, personal records,

L&L046246

psychological evaluation, or evidence of close family ties would have mattered, because Debra's testimony covered these topics.

Judge Hendrix clearly did not place much weight on Debra's testimony in the guilt or penalty phase. Evidence corroborating Debra's explanation of her family dynamics and history was essential, yet counsel failed to contact Debra's own mother until one day before sentencing. Moreover, social histories outlining the defendant's background and family dynamics are *routine* in capital cases, and the lack of one here is disconcerting. Debra's post conviction team assembled an extensive one (ER 941-1036), which was virtually ignored by the state and district courts. Incredibly, the state court also found no use for a psychological evaluation of Debra, even though these are also routine in capital cases.

The State admits evidence of close family ties constitutes non-statutory mitigation, but minimizes its import here, saying Debra fails to show prejudice. As the Opening Brief notes, Debra was convicted of conspiring to have her only child killed, and her estranged sister and father testified against her at trial. Evidence of Debra's close family ties with other members was crucial.

The State misperceives Debra's last argument. She is not saying the memoranda is constitutionally defective, but that counsel could not effectively show mitigation outweighed aggravation without supporting documentation and

42

L&L046247

testimony. (OB at 114).   The state court's finding that counsel was not ineffective is clearly contrary to *Strickland,* as there is a reasonable probability that had counsel presented evidence available through sufficient investigation, Debra would not have received the death penalty.

## III. **POTENTIAL   JUROR   MOQUINO'S   DISMISSAL   WAS CONTRARY TO *ADAMS* .**

Under *Adams v. Texas,* 448 U.S. 38, 45 (1980), a juror who expresses conscientious objections to capital punishment cannot be dismissed unless his views "would prevent or substantially impair" performance of his duties.   The State failed to establish Moquino could not be impartial.   Moquino's questionnaire said he had not formed any opinion on guilt or innocence and had no experiences that might affect his ability to be impartial. (ER 1872).   The statement, "I don't think I'd want to have anything to do with it" is not so "unambiguous" that it required no clarification.   Follow up questioning was required before the court could properly strike Moquino, and its failure to do so was contrary to *Adams* and violated the Sixth and Fourteenth Amendments.

43

L&L046248

## CONCLUSION

For the reasons in Debra's Opening and Reply Briefs, she asks this Court to grant habeas relief and vacate her convictions and sentences.

RESPECTFULLY SUBMITTED this /3͞ day of June, 2008.

JONES, SKELTON & HOCHULI, P.L.C.

By _____
Lori L. Voepel, Bar #015342
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
*Co-Counsel for Petitioner/Appellant*
*Debra Jean Milke*

KIMERER & DERRICK, P.C.

By _____
Michael D. Kimerer
221 E. Indianola Avenue
Phoenix, Arizona 85012
*Co-Counsel for Petitioner/Appellant*
*Debra Jean Milke*

44

L&L046249

## CERTIFICATION OF COMPLIANCE
## TO FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1
## FOR CASE NUMBER 07-99001

**I certify that: (check appropriate option(s))**

\_\_\_1. Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening/answering/reply/cross-appeal brief is

☐   Proportionately spaced, has a typeface of 14 points or more and contains\_\_\_\_\_ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words),

**or is**

☐   Monospaced, has 10.5 or fewer characters per inch and contains \_\_\_ words or \_\_\_ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

\_\_\_2. The attached brief is not subject to the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because

☐   This brief complies with Fed. R. App. P. 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages;

☐   This brief complies with a page or size-volume limitation established by separate court order dated _____ and is

☐   Proportionately spaced, has a typeface of 14 points or more and contains \_\_\_\_\_ words,

**or is**

☐   Monospaced, has 10.5 or fewer characters per inch and contains \_\_ pages or \_\_\_ words or _____ lines of text.

45

L&L046250

　
X 3. Briefs in Capital Cases.

    XX    This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 **and is**

        XX    Proportionately spaced, has a typeface of 14 points or more and contains 9,799 words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words),

        **or is**

        ☐    Monospaced, has 10.5 or fewer characters per inch and contains ___ words or _____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

____ 4. Amicus Briefs.

    ☐    Pursuant to Fed. R. App. P. 29(d) and 9th Cir. R. 32-1, the attached amicus brief is proportionately spaced, has a typeface of 14 points or more and contains 7000 words or less,

    **or is**

    ☐    Monospaced, has 10.5 or fewer characters per inch and contains not more than either 7000 words or 650 lines of text,

    **or is**

    ☐    **Not** subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed. R. App. P. 32(a)(1)(5).

6/13/08
Date

_____
Signature of Attorney or Unrepresented Litigant

L&L046251

## CERTIFICATE OF SERVICE

Lori L. Voepel, being first duly sworn, upon oath states that on the /3 ᵀʰ

day of June, 2008, she caused the original and 15 copies of the foregoing

PETITIONER/APPELLANT'S REPLY BRIEF to be delivered for filing to:

| |
|---|
| Clerk of Court<br>U.S. Court of Appeals<br>Ninth Circuit<br>95 Seventh Street<br>San Francisco, CA 94103-1526 |

and that she caused two copies of the foregoing brief to be deposited in the

United States Mail, postage prepaid, to:

| | |
|---|---|
| Kent Cattani, Esq.<br>Chief Counsel, Capital Litigation Section<br>Jim Nielsen, Esq.<br>Assistant Attorney General<br>1275 W. Washington<br>Phoenix, Arizona 85007-2926<br>*Counsel for Respondent/Appellee* | Larry Hammond, Esq.<br>OSBORN MALEDON, P.A.<br>2929 N. Central Avenue, Suite 2100<br>Phoenix, Arizona 85012-2765<br>*Counsel for Amicus, AzCLU* |
| Steven A. Drizin, Esq.<br>BLUHM LEGAL CLINIC<br>NORTHWESTERN UNIVERSITY<br>SCHOOL OF LAW<br>357 E. Chicago Avenue<br>Chicago, Illinois 60611-3059<br>*Counsel for Amicus,*<br>*Center for Wrongful Convictions* | Daniel Pochoda, Esq.<br>ACLU OF ARIZONA<br>77 E. Columbus, Suite 205<br>Phoenix, Arizona 85012-2352<br>*Counsel for Amicus,*<br>*AzCLU* |

Lori L. Voepel

47

L&L046252

SUBSCRIBED AND SWORN to before me this _13th_ day of June, 2008.



NOTARY PUBLIC

1927169.1

OFFICIAL SEAL
VIRGINIA LEE STAHLY
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Dec. 1, 2011

48

L&L046253

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEBRA JEAN MILKE,<br><br>              Petitioner/Appellant,<br><br>vs.<br><br>DORA B. SCHRIRO, et al.,<br><br>              Respondent/Appellee. | No. 07-99001<br><br>District Court<br>No. CV-98-00060-PHX-RCB |

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

---

## PETITIONER/APPELLANT'S
## SUPPLEMENTAL BRIEF REGARDING
## MIRANDA WAIVER

---

Lori L. Voepel
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
(602) 263-1700
*Attorneys for Petitioner/Appellant*
*Debra Jean Milke*

Michael D. Kimerer
KIMERER & DERRICK, P.C.
221 E. Indianola Avenue
Phoenix, Arizona 85012
*Co-Counsel for Petitioner/Appellant*

L&L046254

**TABLE OF CONTENTS**

**Page**

I.    THE STATE FAILED TO MEET ITS BURDEN OF
      PROVING A VOLUNTARY, KNOWING AND
      INTELLIGENT WAIVER.............................................................1

    A.   The Court Must Presume Debra Did Not Waive Her
           Rights, And The State Bears a "Heavy Burden" In
           Proving Waiver. ..................................................................1

    B.   The Facts And Circumstances of Debra's Case Do
           Not Support a Finding of Express or Implied Waiver..........2

    C.   Debra's Post-Request Responses To Further
           Interrogation Cannot Be Used To Cast Retrospective
           Doubt On The Clarity of Her Initial Request For
           Counsel. ...........................................................................17

CONCLUSION ......................................................................................20

CERTIFICATION OF COMPLIANCE..........................................................22

CERTIFICATE OF SERVICE....................................................................23

i

L&L046255

# TABLE OF AUTHORITIES

**Page**

## Cases

*Burket v. Angelone,*
   208 F.3d 172 (4th Cir. 2000) .................................................................. 13, 14

*Colorado v. Connelly,*
   479 U.S. 157 (1986).......................................................................................... 1

*Edwards v. Arizona,*
   451 U.S. 477 (1981).......................................................................... 17, 18, 20

*Jackson v. U.S.,*
   404 A.2d 911 (D.C. Cir. 1979) ............................................................ 11, 12

*Miranda v. Arizona,*
   384 U.S. 436 (1966)................................................................................ passim

*North Carolina v. Butler,*
   441 U.S. 369 (1979)................................................................................ passim

*Paulino v. Castro,*
   371 F.3d 1083 (9th Cir. 2004) .............................................................. 12, 13

*Shreeves v. U.S.,*
   395 A.2d 774 (D.C.App. 1978) ................................................................ 3, 11

*Smith v. Illinois,*
   469 U.S. 91 (1984)............................................................... 17, 18, 19, 20

*United States v. Cazares,*
   121 F.3d 1241 (9th Cir. 1997) ...................................................................... 14

*United States v. Earle,*
   473 F.Supp.2d 131 (D. Mass. 2005)...................................................... 10, 11

*United States v. Younger,*
   398 F.3d 1179 (9th Cir. 2005) .............................................................. 15, 16

ii

L&L046256

## TABLE OF AUTHORITIES
### (continued)

Page

**Statutes**

28 U.S.C. §2254(d)(1), (2)............................................................................ 2, 20

iii

L&L046257

I.    **THE STATE FAILED TO MEET ITS BURDEN OF PROVING A VOLUNTARY, KNOWING AND INTELLIGENT WAIVER.**

   A.    **The Court Must Presume Debra Did Not Waive Her Rights, And The State Bears a "Heavy Burden" In Proving Waiver.**

   In *Miranda v. Arizona*, 384 U.S. 436, 475 (1966), the Supreme Court held that once a suspect is read her rights, if "the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the [State] to demonstrate that the defendant knowingly and intelligently waived" his rights to silence and to counsel. Even *North Carolina v. Butler*, 441 U.S. 369, 373 (1979), emphasizes that "courts must presume that a defendant did not waive his rights; the prosecution's burden is great …"

   The State's "heavy burden" requires it to prove that Debra: 1) was issued and understood her rights; 2) voluntarily, knowingly and intelligently relinquished her rights; and 3) did not assert her rights. *Miranda*, 384 U.S. at 475-76; *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The question of waiver "must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Butler*, 441 U.S. at 374-75. According to *Miranda*, "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." 384 U.S. at 475. But "a valid waiver will *not* be presumed simply from the silence of the

1

L&L046258

accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id.*   Thus, "an express statement can constitute a waiver, but silence alone after such warnings cannot do so." *Butler,* 441 U.S. at 373.

In addressing whether an express waiver is required, *Butler* emphasized that "an express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually *strong proof* of [its] validity," however, an express waiver "is not inevitably either necessary or sufficient ...." *Id.* at 373. "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived" her rights. *Id.*   Thus, although courts must *presume* the defendant **did not** waive her rights, "in at least some cases waiver can be *clearly inferred* from the actions and words of the person interrogated." *Id.* (emphasis added).

### B.   The Facts And Circumstances of Debra's Case Do Not Support a Finding of Express or Implied Waiver.

The trial court did not require the State to meet its "heavy burden" of proving waiver.   In fact, the court failed to require **any** evidence of waiver, making its waiver finding objectively unreasonable. 28 U.S.C. §2254(d)(1), (2).

2

L&L046259

1.      **The Trial Court Did Not Articulate The Basis For Her Waiver Finding.**

The trial court failed to cite any evidence supporting its finding that Debra "voluntarily, knowingly and intelligently relinquished her right to counsel and her right to remain silent." (ER 291). The basis for its waiver finding is thus entirely unclear, which alone renders it objectively unreasonable. *Shreeves v. U.S.,* 395 A.2d 774, 781 (D.C.App. 1978)(trial court is required to "make explicit findings of fact" regarding waiver).

2.      **Even an Independent Evaluation of the Evidence Reveals Insufficient Proof of Waiver, as the State Failed to Elicit Evidence on that Topic.**

**Suppression Hearing:**

*1) Detective Saldate:* Saldate testified that he entered the room, asked Debra's friend to leave and shut the door, introduced himself and told Debra "her son Chris had been found in a desert area ... shot to death." (RT 9/10/90 at 45-49). He said she was under arrest for murder, after which she yelled, "what, what" then started to scream and feign crying. (Id. at 50). Saldate said he "would not tolerate" that, then read her *Miranda* rights. (Id. at 57-58).

Saldate asked if Debra understood, and she "nodded her head," then he "asked her to verbalize it and she said yes." (Id. at 58). He said Debra had no difficulty comprehending. (Id. at 59; 9/11/90 at 14). Saldate said Debra "began to cry again" but he didn't see any tears. (9/10/90 at 59). He repeated he

3

L&L046260

"wasn't going to tolerate that," "wasn't there to have her cry," "was there to gather the truth," (id. at 60), and "wanted the truth from her." (9/11/90 at 15).[1] Saldate said Debra asked, "what do you want to know, what do you want me to tell you," and he responded "I just want to know the truth, I want you to tell me everything, I don't want you to minimize your involvement, I just want you to tell me everything." (9/10/90 at 60-61).  He "asked if she was going to tell [him] everything and she said she would." (Id. at 61; 9/11/90 at 15).  He said they "began the interview from there." (9/10/90 at 61).

Saldate said Debra did not ask for an attorney during the interrogation (id. at 52, 70; 9/11/90 at 12, 14-16, 23), even when he asked if she wanted it recorded. (9/10/90 at 52).  He said she asked him afterward to call her father to bail her out and get her an attorney. (Id. at 69-70; 9/11/90 at 12).  He said she never "invoke[d] her right to remain silent." (9/10/90 at 70; 9/11/90 at 16).

2) *Other Witnesses:* Kirk Fowler did not testify regarding waiver.  He testified that Debra told him Saldate entered the room, said her son was found murdered, and he was charging her with murder. (9/10/90 at 156-57).  He said Debra requested counsel shortly thereafter. (Id. at 157).  Dr. Kassell testified Debra told him Saldate walked into the room, said her son had been found

---

[1] Saldate said he "was trying to accomplish the end result, that me and her were going to sit down and we were going to talk about it." (9/10/90 at 51).

4

L&L046261

murdered and she was under arrest, after which she became hysterical and Saldate said he "wouldn't tolerate" her screaming and was there to ascertain the truth. (9/10/90 at 82).  He testified that Debra said Saldate then *Mirandized* her and "she did not fully comprehend what was being said because she was too involved with absorbing the information that her son was killed." (Id.).  Dr. Kassell recorded his session with Debra, and the tape was admitted into evidence and considered by the court. (Id. at 87, 95, 168-72; ER 2045: Tab 99).[2]

    3)  *Debra's Tape-recorded Interview:* Debra said after Saldate entered the room and asked Jan to leave, she asked if he had heard anything, and he said, "We found your son.  He was murdered and you're under arrest," after which she "started screaming" and crying. (ER 2046).  Saldate said he wouldn't "tolerate" that, he knew "the whole story," was "here to get the truth," and was "not going to tolerate any lies." (Id.).  She said Saldate then "pulled out a business card and start[ed] reading me my rights." (Id.).  He asked if she understood, and she said she had never been in trouble or arrested and didn't know her rights. (Id.).  He then asked if she wanted the interrogation recorded

---

[2] Dr. Kassell's recording was made just three months after Debra's arrest. He asked if he could tape the session when Debra became "extremely emotional," "quite distraught,' and "quite tearful" while recounting the interrogation, which he found strange in light of Saldate's claim that Debra "feigned" crying. (ER 2045: Tab 99; RT 9/10/90 at 87-88).

L&L046262

and she said, "no, I want an attorney." (ER 2047).  Saldate "scooted the chair in front of" her, "put his hands on [her] knees" and told her she "could trust him, that he was [her] friend." (Id).  He said "he had a daughter the same age as [Debra] and he could understand how [she] felt." (Id.).  Debra said she stated, "I don't know what you want to know, cuz I don't know anything." (Id.).  She then recounted some of her statements, which Saldate twisted or took out of context.  (Id.).

**Trial:**

*1) Detective Saldate:* Saldate testified that he walked into the room, asked the woman with Debra to leave, closed the door, said he was "investigating the disappearance of her son," and moved his chair "directly in front of Debra."  (RT 9/12/90 at 64; 9/13/90 at 63).  He said they found her son "in a desert area and that he had been shot." (9/12/90 at 66; 9/13/90 at 63).  He said she started saying in an "excited manner," "what, what," and "sort of yelled" and was "moaning and crying, or she seemed to try crying," but he "saw no tears." (9/12/90 at 66; 9/13/90 at 63-66).  He said he wouldn't "tolerate that," he was "there to interview her, to get the truth."  She "began to cry" or "try to cry" so he "told her to be quiet." (9/12/90 at 66).  He said "she was under arrest for the murder of her son" and he "wanted her to remain calm and quiet because [he] was going to read her her rights." (Id.).

6

Saldate said he "removed a card from his badge case," and read her *Miranda* rights. (9/12/90 at 66-67; 9/13/90 at 64).  The last statement he read was "Do you understand these rights?," and Debra "responded first by moving her head in an up and down motion," then stated "yes" when he asked for a verbal response. (9/12/90 at 67).  Saldate then "told her he was there to get the truth and just the truth" and "wasn't going to tolerate any lies." (Id. at 68).  He "asked her if she was going to tell [him] the truth and going to tell [him] what happened from her standpoint," and said he "did not want her to minimize her involvement at all." (Id.).  He claimed she asked twice, "Well, what do you need to know?" after which he asked, "Are you going to tell me what happened now?" and "she said she was." (Id.).  He then asked, "Can I tape record this interview?" and she said "No; isn't it enough to talk to you?" and he said "Fine." (Id. at 69).  He claimed Debra never invoked her right to remain silent or to an attorney and just started telling him "a version of what I guess she expected me to believe." (Id.).  He said after the interrogation, Debra asked him to call her father to see if he could bail her out and get her an attorney." (9/13/90 at 16).

*2) Debra Milke:* Debra said Saldate came into the room, asked her friend to leave, shut the door, sat in a chair, took out a pen and started writing on a notebook. (10/3/90 at 12-13).  She asked if he had heard anything, which he

L&L046264

ignored. (Id. at 13). After a few moments he said, "We found your son, he was murdered and you are under arrest." (Id.). She "screamed," "started crying" and yelled, "what, what." (Id.). He said he was "not going to tolerate" that and she asked "Why are you doing this?," but he just "told [her] to be quiet." (Id.). He then "pulled out a card that was like the size of a business card" and read her *Miranda* rights. (Id.). She said she heard but "didn't comprehend" them. (Id.). But she recalls him saying she "had the right to remain silent" and mentioning "the word 'attorney'" several times. (Id. at 17). He asked if she understood her rights, and she said she did not, that she had never been in trouble or under arrest. (Id.) He then asked, "Do you want this interview recorded?" and Debra said, "No, I need a lawyer." (Id. at 17, 70; 10/4/90 at 77-80).

She said he then "moved his chair up directly in front of me." (10/3/90 at 17-18). He asked Debra's age and said "I have a daughter your age, so I understand how you feel." (Id. at 18). He "put his hands on [her] knees" and said she "could trust him," that "he was [her] friend" and was there "to find out what happened." (Id.). He kept saying "You can trust me, Debbie, I'm your friend, I'm here to help you." (Id.). She was crying, so he "sat back in the chair" and said "I'm not going to tolerate this type of activity from you." (Id.). He said, "I'm here to question you about this murder and this is your opportunity to tell me the truth, I'm not here to tolerate any lies." (Id.). She

8

asked, "What do you want from me?" and he said "The truth." (Id. at 19).
Debra said Saldate never gave her any opportunity to speak with a lawyer or
make a phone call. (Id. at 39, 56).

None of this evidence supports a finding that Debra waived her *Miranda*
rights. The State failed to meet its heavy burden of proving waiver and did not
even elicit testimony on the subject.

### 3.    Cases Finding Implied Waiver Are Distinct.

Even if this Court looks beyond the trial court's failure to articulate a
basis for its waiver finding *and* the State's failure to elicit testimony on waiver,
the cases finding implied waiver are distinct.

In *Butler,* the agent's testimony was *uncontroverted.* 441 U.S. at 370. He
testified that Butler was given an "Advice of Rights" form, which he read.
Butler acknowledged he understood but refused to sign a waiver form. *Id.* at
371. The agents explained he was not required to speak or sign the form, but
they wanted him to talk with them. He replied, "I will talk to you but I am not
signing any form," then made inculpatory statements. *Id.* Butler said nothing
when advised of his right to counsel and never requested counsel or attempted
to terminate questioning. *Id.* The Supreme Court found there was "no doubt"
Butler was "adequately and effectively apprised of his rights," and his refusal to
sign the waiver form did not preclude a finding of waiver on the *uncontroverted*

9

L&L046266

facts of that case. *Id.* at 374-376.  Debra's case is not even remotely similar to *Butler.*  There was no dispute that Butler agreed to waive his rights, but simply refused to sign the waiver form.   In contrast, Debra has never admitted to waiving her rights and maintains she asserted her right to counsel.  This is not simply a failure to sign a waiver form.  The evidence shows Debra was never even asked if she wanted to waive her rights, and she has *always* contested Saldate's claim that she failed to request counsel.

Several other courts addressing implied waiver have distinguished *Butler* on its facts.  In *United States v. Earle*, 473 F.Supp.2d 131, 134 (D. Mass. 2005), the suspect signed a booking form containing *Miranda* warnings and a question: "do you understand what I have told you?"  The statement "yes, I understand" with a signature line followed this question.  It also contained a description of Earle's property and a signature line for him to acknowledge the property being held. *Id.*  However, the form did not contain a place to indicate whether Earle wished to waive his rights. *Id.*  Moreover, although Earle signed the form, there was no evidence he read it first.  The agent testified he also orally administered the rights, but the court found the government failed to prove Earle heard or understood the warnings. *Id.* at 133.  The agent's report indicated he initiated the interview by asking if Earle had been advised of his rights and understood them, which Earle said he did. *Id.* at 134.  The agent testified that Earle never

10

L&L046267

invoked or referred to his rights to remain silent or to counsel, and the agents "did not ask if he wanted to waive" his rights." *Id.* The court determined that the government failed to carry its "heavy burden" of proving waiver. *Id.* at 138-39. As in Debra's case, "the conflicting evidence" in *Earle* indicated the officers "either ignored their duty to determine whether the defendant wished to waive his *Miranda* rights or lulled him into believing that it was not important whether he understood them …" *Id.* at 139.

Another case distinguishing *Butler* is *Jackson v. U.S.,* 404 A.2d 911 (D.C. Cir. 1979). Jackson was read his *Miranda* rights and indicated on a police form that he did not wish to answer questions and wanted an attorney present. *Id.* at 915. Later, while providing handwriting exemplars, Jackson began a rambling monologue in which he eventually inculpated himself. The court found the government failed to satisfy its "great burden" of showing waiver because: 1) Jackson was re-questioned before being given the opportunity to consult counsel; 2) he did not possess sufficient capacity to make a knowing, intelligent waiver; and just as here, 3) the record "d[id] not reflect any extensive findings of facts as to an intentional and knowing relinquishment." *Id.* at 923; s*ee also Shreeves,* 395 A.2d at 781. *Jackson* found *Butler* inapplicable because "appellant, unlike Butler, requested the presence of an attorney." *Id.* at 922, fn 17. Debra also contends she requested counsel,

11

L&L046268

which like *Jackson,* makes her case distinct from *Butler,* where the failure to assert rights was *uncontested.*

Other cases finding implied waiver are also distinct.   In *Paulino v. Castro,* 371 F.3d 1083 (9th Cir. 2004), the facts were also *undisputed.* Paulino was advised of his rights, stated he understood and wanted to talk, initialed the admonitions on a waiver form, and wrote "yes" next to questions asking whether he understood his rights *and* wished to give up his right to remain silent. *Id.* at 1085.  Paulino did not complete the item asking whether he wished to give up his right to speak with and have an attorney present during questioning, but wrote, "I want to talk to Felix" and signed the form. *Id.* at 1085-86. Detective Felix then activated a hidden tape recorder, reiterated Paulino's rights, and asked if he understood. *Id.*  Paulino asked "Where's the attorney?" and Felix said none were present, but he had a right to one before questioning.  Paulino asked, "You mean it's gonna take him long to come?" and Felix responded, "Well, I'm just asking you a question, man - do you, do you want to talk to me?" *Id.*  Paulino said, "Okay, I want to talk to you but I wanna know what's going on."  The detective said he would explain, and Paulino said, "I want to talk to you Detective Felix." *Id.*

This Court noted that Paulino "said he understood his rights - in particular, his right to counsel - and said he wanted to talk." *Id.* at 1087.  And,

12

L&L046269

"when specifically advised of the right to counsel, far from being silent, he actually repeated, 'I want to talk to you'" … and "wrote 'I want to talk to Felix' at the bottom of the advisement form." *Id.*  Applying *Butler,* this Court found Paulino's "verbal and written responses to Felix's advisement of the right of counsel, when considered in context, constituted a waiver of that right." *Id.*  It rejected the argument that Paulino's failure to confirm his waiver in writing and questions regarding the location of and time it would take an attorney to arrive did not constitute an unambiguous request for counsel. *Id.*  These *undisputed* facts are far different from Debra's case, where a dispute exists as to whether she asked for counsel at the outset, and there is no evidence that Saldate asked if she wanted to waive her rights or speak with him without an attorney.  The detective in *Paulino* also obtained initials on a waiver form and recorded the interrogation, which allowed the Court to review the questions and statements.  Here, there was no waiver form, no recording, no witness or any other form of corroboration.

In *Burket v. Angelone,* 208 F.3d 172, 198 (4th Cir. 2000), Burket was advised of his rights, after which the detective returned to the interrogation room to complete a booking form.  Burket initiated a conversation, and the detective again issued warnings.  Burket said he understood his rights "and wanted to talk to Detective Hoffman." *Id.*  Although he never said "I waive my

13

*Miranda* rights" or signed a waiver form, the court found Burket's "cooperation and desire to speak with [the detective], coupled with his acknowledgement that he understood his rights, constituted an implied waiver ..." *Id.* A videotape was also made of Burket's interrogation, so again, the facts showing waiver and failure to invoke are not in dispute. *Id.* at 195.[3]

Although *United States v. Cazares,* 121 F.3d 1241 (9th Cir. 1997), may appear to support the State's position, it deserves closer examination. First, it is not clear what actually happened during that interrogation because detailed facts are not set forth in the opinion -- merely a summary of the government's showings and a finding that "the sum of the evidence presented to the district court supports the conclusion that [despite Cazares' language difficulties], he understood his rights ... and knowingly, and intelligently waived them." *Id.* at 1244. Second, it is not clear what Cazares was arguing, but it appears the central issue involved whether the Spanish speaking suspect *understood* his rights. Although the Court also found the showings sufficient to support implied waiver, it did not address what, if any, dispute existed regarding waiver. *Id.* Third, unlike Debra's case, Cazares apparently did not claim he

---

[3] Although Burket stated early on, "I'm gonna need a lawyer," he was not yet in custody and was told he was free to leave. He never asserted his right to counsel after being *Mirandized.* 208 F.3d at 195-97.

14

asserted his right to counsel.  Finally, the opinion indicates that *two officers* were at the interrogation, *which* helped to corroborate what occurred. *Id.*

    *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), is also distinct. Younger was read his rights and acknowledged his understanding, but then made a spontaneous inculpatory statement prior to questioning. *Id.* at 1183-84. He was then transported to the police station where, during a recorded interview, he was again *Mirandized*, said he understood, and made additional inculpatory statements. *Id.*  Although he asked, "if I'm right, I can have a lawyer present …?" and the officer answered, "if you want one," this was interpreted as merely an indication that Younger understood his rights. *Id.* Younger later said in response to a question about a backpack's contents, "I don't know about the bag.  We'll talk about that in front of a lawyer or something …" *Id.*

    *Younger* reiterated that a waiver need not be express, but emphasized the presumption ***against*** waiver. *Id.* at 1185.  It also noted that the officer's decision to forego the simple step of requesting an express waiver "resulted in unnecessary time and effort and a waste of judicial resources." *Id.* at 1186, fn 5. Nevertheless, this Court upheld the implied waiver finding on the grounds that after the officer advised Younger of his rights but before questioning, he made a spontaneous inculpatory statement and responded to further questions without

L&L046272

referencing counsel.  It also found Younger's conduct at the station was consistent with implied waiver. *Id.* at 1186.  These spontaneous inculpatory statements prior to questioning and the recorded interview showing no clear request for counsel also distinguish *Younger* from Debra's case.

None of these cases are similar to Debra's.  They involve primarily undisputed or verifiable facts *clearly* showing the suspect waived his rights, *Butler*, 441 U.S. at 373, and wanted to proceed with questioning or spontaneously volunteered information.  None involved a swearing contest over *disputed* facts regarding *what happened* in the interrogation where there was no recording, no witness, no signed statement or waiver, and no other form of corroboration, *plus* no physical evidence connecting the suspect to the crime. Even assuming the truth of Saldate's testimony -- that Debra did not assert her right to counsel (until afterward) and ultimately confessed -- a valid waiver cannot be presumed simply from Debra's silence following Saldate's issuance of warnings or from the fact that a purported confession was eventually obtained. *Miranda*, 384 U.S. at 475; *Butler*, 441 U.S. at 373.  Yet, that is precisely what the State relies on in arguing implied waiver.

Finding implied waiver on the facts and circumstances of Debra's case would be clearly contrary to *Miranda* and *Butler*, and would render

16

L&L046273

meaningless the protections *Miranda* was intended to extend to a suspect in an incommunicado interrogation.

**C.   Debra's Post-Request Responses To Further Interrogation Cannot Be Used To Cast Retrospective Doubt On The Clarity of Her Initial Request For Counsel.**

Although the inquiries regarding waiver and invocation may seem to overlap, the Supreme Court has instructed that "invocation and waiver are entirely distinct inquiries" which "must not be blurred by merging them together." *Smith v. Illinois,* 469 U.S. 91, 98 (1984).   *Smith* stated that "the importance of keeping the two inquiries distinct is manifest," noting *Edwards v. Arizona,* 451 U.S. 477 (1981), set forth a "bright-line rule" that "*all* questioning must cease after an accused requests counsel." *Smith,* 469 U.S. at 98.

In requesting supplemental briefing, this Court specifically referenced *Smith*, which held that an accused's post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request for counsel. *Id.* at 100.  After being advised of his right to have a lawyer present during questioning, Smith said, "Uh, yeah. I'd like to do that." *Id.* at 93.  Instead of terminating questioning, officers finished reading Smith's *Miranda* rights and pressed him again to answer questions.  One officer asked, "Do you wish to talk to me at this time without a lawyer being present?," and Smith responded, "Yeah and no, uh, I don't know what's what really." *Id.*  The

L&L046274

officer said, "Well. You either have [to agree] to talk to me this time without a lawyer being present and if you do agree to talk with me without a lawyer being present, you can stop at any time you want to.", and Smith said, "All right. I'll talk to you then." *Id.*

*Smith* held the responses after the initial request for counsel, "Uh, yeah. I'd like to do that," could not be used "to cast doubt on the adequacy of the initial request itself." *Id.* at 98-99. It emphasized:

> No authority, and no logic, permits the interrogator to proceed … ***on his own terms and as if the defendant requested nothing***, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all.

*Id. Smith, Edwards and Miranda* – all of which were decided long before Saldate's interrogation of Debra -- make it clear that questioning must cease once a request for counsel is made. Nothing said after that point can be used to cast doubt on the initial request, just as a valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation." *Smith*, 469 U.S. at 98-99. Because the interrogators improperly ignored Smith's invocation in hopes of extracting more equivocal statements, his statements were suppressed.

Unlike Smith, whose interrogation was recorded and conducted by two officers, Debra has only her word against Saldate's because *Saldate* decided not

18

L&L046275

to corroborate the interrogation.[4]   Debra has *consistently maintained* she asserted her right to counsel after Saldate read and asked if she understood her rights, then asked if she wanted the interrogation recorded.  Both Dr. Kassell's taped and Debra's trial testimony support her claim that she said, "no, I want an attorney" or "no, I need a lawyer." (ER 2045; RT 10/3/90 at 17, 70; 10/4/90 at 77-80).  The trial court's finding that Debra did not ask for an attorney at the beginning of the interrogation was objectively unreasonable, especially in light of: 1) Saldate's admissions that he routinely continued interrogations following invocations; 2) evidence showing Saldate's pattern of ignoring invocations; and 3) Saldate's creation of the very conditions that made it impossible for Debra to corroborate what she said and when.

*Smith* requires that this Court not look at what occurred after Debra's assertion of counsel in determining the adequacy of her assertion.  The fact that Debra subsequently answered questions when Saldate ignored her and said "he was there to get the truth and just the truth," "wasn't going to tolerate any lies," and "did not want her to minimize her involvement at all" (9/12/90 at 68),

---

[4] Ironically, Debra's inability to support her claims through anything but her own testimony has been used against her by the State and even the district court who found Debra did not overcome the "presumption of correctness" of the state court findings because "the only evidence to support her claim of a *Miranda* violation remains her trial testimony." (ER 30: Tab 4).

L&L046276

cannot be used in determining whether Debra invoked. Notably, Saldate's demands after her invocation are very similar to the officer's communications in *Smith,* which "imparted to the defendant the warning that he had to talk to the interrogator and was seriously misleading." *Smith,* 469 U.S. at 99; *see also Edwards,* 451 U.S. at 479 (after requesting counsel, the accused was improperly told "he had" to talk to his interrogators).

The state court's finding that Debra did not assert her right to counsel at the beginning of the interrogation and its waiver finding are objectively unreasonable. Saldate violated Debra's *Miranda* rights, entitling her to relief.

## CONCLUSION

For the above reasons and those contained in the principal briefs, Debra Milke respectfully requests this Court to grant her habeas relief. The State failed to meet its heavy burden of showing waiver, and the state court's determinations regarding waiver and invocation are objectively unreasonable under §2254(d)(1) and (2).

L&L046277

RESPECTFULLY SUBMITTED this 10th day of October, 2008.

JONES, SKELTON & HOCHULI, P.L.C.


By   /s/  Lori L. Voepel
    Lori L. Voepel, Bar #015342
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona  85012
    *Counsel for Petitioner/Appellant Debra*
    *Jean Milke*

KIMERER & DERRICK, P.C.

By   /s/  Lori L. Voepel for
    Michael D. Kimerer
    221 E. Indianola Avenue
    Phoenix, Arizona  85012
    *Co-Counsel for Petitioner/Appellant*
    *Debra Jean Milke*

L&L046278

## CERTIFICATION OF COMPLIANCE

I certify that this Supplemental Brief Regarding *Miranda* Waiver is being filed in a capital case in accordance with the limitations set forth by Circuit Rule 32-4 and this Court's September 5, 2008 Order, and is proportionately spaced, has a typeface of 14 points or more and contains 4,996 words.

| | |
|---|---|
| _October 10, 2008_ | /s/  Lori L. Voepel |
| Date | LORI L. VOEPEL |

22

L&L046279

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2008, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system:

>Jim Nielsen, Esq.
>ARIZONA ATTORNEY GENERAL OFFICE
>1275 W. Washington
>Phoenix, Arizona 85007
>Counsel for Respondent/Appellee

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

>Kent Cattani, Esq.
>ARIZONA ATTORNEY GENERAL OFFICE
>1275 W. Washington
>Phoenix, Arizona 85007
>Counsel for Respondent/Appellee

>Larry Hammond, Esq.
>OSBORN MALEDON, P.A.
>2929 N. Central Avenue, Ste 2100
>Phoenix, Arizona 85067-6379
>Counsel for Amicus, AzCLU

>Daniel Pochoda, Esq.
>ACLU OF ARIZONA
>77 E. Columbus, Suite 205
>Phoenix, Arizona 85012
>Counsel for Amicus, AzCLU

L&L046280

Steven A. Drizin, Esq.
BLUHM LEGAL CLINIC
NORTHWESTERN UNIVERSITY SCHOOL OF LAW
357 E. Chicago Avenue
Chicago, Illinois 60611
Counsel for Amicus, Center on Wrongful Convictions

Michael D. Kimerer, Esq.
KIMERER & DERRICK, P.C.
221 E. Indianola Avenue
Phoenix, Arizona 85012
Co-Counsel for Petitioner/Appellant


_____ /s/  Ginger Stahly _____

1972752.1

24

L&L046281

RECEIVED

No. 07-99001

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

LLW

DEBRA JEAN MILKE,

Petitioner-Appellant,

vs–

DORA B. SCHRIRO, ET AL.,

Respondents-Appellees.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE DISTRICT OF ARIZONA,
No. CIV 98-00060-PHX-RCB

RESPONDENTS-APPELLEESS' SUPPLEMENTAL ANSWERING BRIEF
REGARDING MIRANDA WAIVER

Terry Goddard
Attorney General
(Firm State Bar No. 14000)

Kent E. Cattani
Chief Counsel
Criminal Appeals/Capital Litigation
Section

J.D. NIELSEN
Assistant Attorney General
Criminal Appeals/Capital Litigation
Section
1275 West Washington
Phoenix, Arizona 85007-2997
Telephone: (602) 542-4686
State Bar Number 007715

Attorneys for Respondents-Appelleess

L&L046282

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS..................................................................................... i

TABLE OF AUTHORITIES ............................................................................. ii

PROCEDURAL BACKGROUND..................................................................... 1

ARGUMENT..................................................................................................... 1

CONCLUSION.................................................................................................. 21

CERTIFICATE OF SERVICE ......................................................................... 22

CERTIFICATE OF COMPLIANCE ................................................................ 23

STATEMENT OF RELATED CASES ............................................................. 24

i

L&L046283

# TABLE OF AUTHORITIES

**Cases**                                                                                   Page

Amaya-Ruiz v. Stewart, 121 F.3d 486 (9th Cir. 1997) .......................................... 3, 15, 16

Bourjaily v. United States, 483 U.S. 171 (1987) ............................................... 12, 15, 16

Brecht v. Abrahamson, 507 U.S. 619 (1993) ...................................................................... 3

Burket v. Angelone, 208 F.3d 172 (4th Cir. 2000) ........................................................... 20

Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003) ............................................................. 19

Colorado v. Connelly, 479 U.S. 157 (1986) ................................................................. 2, 14

Derrick v. Peterson, 924 F.2d 813 (9th Cir.1990) ........................................... 2, 3, 15, 16

Edwards v. Arizona, 451 U.S. 477 (1981) ....................................................................... 16

Jackson v. United States, 404 A.2d 911 (C.C. Cir. 1979) ............................................... 19

Lockyer v. Andrade, 538 U.S. 63 (2003) ........................................................................ 19

Marshall v. Loneberger, 459 U.S. 422 (1983) .................................................. 12, 14–16

Miller v. Fenton, 474 U.S. 104 (1985) .............................................................................. 2

Miranda v. Arizona, 384 U.S. 436 (1966) ............................... 1–6, 10, 11, 14, 15, 17–19

Moran v. Burbine, 475 U.S. 412 (1986) .................................................. 2, 3, 15, 16, 21

North Carolina v. Butler, 441 U.S. 369 (1979) ....................................... 3, 14–16, 18, 20

Patton v. Yount, 467 U.S. 1025 (1984) ...................................................................... 13, 14

Paulino v. Castro, 371 F.3d 1083 (9th Cir.2004) ........................................................... 20

Shreeves v. United States, 395 A.2d 774 (D.C. 1978) ..................................................... 17

Smith v. Illinois, 469 U.S. 91 (1984) .............................................................................. 16

Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004) ........................................................... 10

United States v. Cazares, 121 F.3d 1241 (9th Cir. 1997) ............................................... 19

United States v. Earle, 473 F.Supp.2d 131 (D.Mass. 2005) ........................................... 19

United States v. Rodriguez, 518 F.3d 1072 (9th Cir. 2008) ............................................. 3

United States v. Younger, 398 F.3d 1179 (9th Cir. 2005) ............................................... 19

L&L046284

**Statutes**

28 U.S.C. § 2254(d) ................................................................................................ 3

28 U.S.C. § 2254(d)(1) ..................................................................................... 19, 20

28 U.S.C. § 2254(d)(2) .......................................................................................... 10

28 U.S.C. § 2254(e)(1) ...................................................................... 3, 11, 13–16, 20

**Rules**

9th Cir. R. 28–2.6 ................................................................................................ 24

9th Cir. R. 32–1 ................................................................................................... 23

Rule 608(a), Ariz. R. Evid. .................................................................................... 9

**Constitutional Provisions**

U.S. Const. amend V ............................................................................................ 15

iii

L&L046285

## PROCEDURAL BACKGROUND

On September 5, 2008, the panel, after hearing argument, ordered the

parties to file supplemental briefs addressing the following questions:

1.   What evidence is required to prove that a defendant's waiver of
     rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) was made
     voluntarily, knowingly and intelligently?

2.   Was that burden met in this case?

(Dkt. # 61.)

## ARGUMENT

At an evidentiary hearing prior to trial, Milke did not controvert evidence

establishing that her confession was made voluntarily, knowingly, and

intelligently. Instead, she argued only that the detective who questioned her

misinterpreted her answers or lied about what she said. The trial judge rejected

Milke's argument that the detective lied or misinterpreted her answer. So to, the

jurors, as well as the Arizona Supreme Court on review, rejected her claim that

the detective's testimony was not credible. Milke's belated attempt to argue that

her confession was not voluntary, knowing and intelligent is unpersuasive and

does not overcome the state courts' reasoned conclusion to the contrary.

## I.   LEGAL BACKGROUND REGARDING *MIRANDA* WAIVERS.

*Miranda v. Arizona*, 384 U.S. 436 (1966), held that a criminal defendant's

incriminating statement cannot be admitted unless the government proves, by a

1

L&L046286

preponderance of the evidence, that the accused voluntarily, knowingly, and intelligently waived his right against self incrimination. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Moran v. Burbine*, 475 U.S. 412, 421–424 (1986); *Miranda*, 384 U.S. at 444. In determining whether a *Miranda* waiver is voluntary, knowing, and intelligent, a court analyzes the "totality of the circumstances surrounding the interrogation." *Burbine*, 475 U.S. at 421.

The inquiry into the constitutional adequacy of a *Miranda* waiver has "two distinct dimensions." *Id*. First, with respect to the voluntariness inquiry, the waiver must have been the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Id*. The existence of intimidation, coercion, or deception is critical to this inquiry, because without state compulsion, a waiver cannot be found to have been involuntary. *Connelly,* 479 U.S. at 170

This voluntariness inquiry presents a mixed question of fact and law. *Connelly*, 479 U.S. at 169–71; *Miller v. Fenton*, 474 U.S. 104, 110–112 (1985). Although the ultimate determination of whether a *Miranda* waiver was made voluntarily is a legal question, a state court's subsidiary factual determinations underlying voluntariness are questions of fact, subject to the AEDPA's presumption of correctness. *Derrick v. Peterson,* 924 F.2d 813, 817, 820 (9th Cir.1990).

2

L&L046287