Page - 1

| TYPE OF REPORT HOMICIDE | SUPPLEMENT DATE 3-16-90 | DR # 00-042335A |
|---|---|---|
| VICTIM'S NAME WISHON, KENDALL | LOCATION OF OCCURRENCE 1805 NORTH 71 AVENUE | |
| OFFICER WRITING REPORT'S # DET. A. SALDATE #1875 | SUPPLEMENT # 09-042335.A10 | |
| DATE & TIME TYPED MARCH 17, 1990  2165 | BUREAU 61B | CLERK A1471MP |

**PENDING**

Next of kin:  JERRY ███████

1805 N. 71 Ave.   873-2528
Emp:  M.D. Valley Truck & Trailer
      4310 W. McDowell   252-1564
(Stepfather of victim, brother of suspect #1)

Suspect #1:  GALLEGOS, MICHAEL STEVEN
H/M.  ██████  5'3, 200, Brn, Brn

4130 E. Hemburg, Flagstaff  526-0411
Student:  Coconino High School
          Senior year
Booked:   First Degree Murder
          Sexual Assault
          Child Molestation

Suspect #2:  SMALLWOOD, GEORGE ANTHONY
███  ██████ ██ 185 ████ Blu

██████████ ███████kstaff  526-0411
███████  ███████ High School
          Senior year
Booked:   First Degree Murder
          Sexual Assault
          Child Molestation

I.L. #1:  SMALLWOOD, JULIETTE

████  W. Indian School  #1165  848-4496
Emp:  Wild Pair shoe store
      Christown  249-1011
(Natural sister of victim)

EXHIBIT 63
WIT: Saldate
DATE: 11-16-17
Sommer Greene, RPR, CRR

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WISHON, KENDALL | SALDATE #1875 | 09-042335A |

Uniform officers

   1)   D. ELBERT #2160
       800 District/Uniform patrol

   2)   R. WOOTEN #4714
       800 District/Uniform patrol

   3)   J. HEAD #3059
       800 District/Uniform patrol

   4)   A. MORALES #2367
       800 District/Uniform patrol

   5)   R. MALONEY #2457
       800 District/Uniform patrol

   6)   SGT. K. HAMILTON #936
       800 District/Uniform patrol

Investigators:

   1)   ARMANDO SALDATE JR. #1875
       G.I.B./Homicide Detail (case agent)

   2)   MICHAEL CHAMBERS #1678
       G.I.B./Homicide Detail (assistant case agent)

   3)   BILLY BUTLER #1756
       G.I.B. Homicide Detail (body scene)

   4)   ERNIE HANNICK
       G.I.B./Homicide Detail (residential scene)

   5)   SGT. TIM BRYANT
       G.I.B./Homicide Unit (case supervisor)

Support personnel:

   1)   F. McELVAIN #2007
       G.I.B./Missing Persons (initial case agent)

   2)   R. JONES #3025
       G.I.B./Missing Persons (assistant case agent)

   3)   SGT. J. PIZZI #2752
       G.I.B./Assault Detail (initial case supervisor)

**GALL 002**

EXHIBIT 1g

002303
MILKE_NSB002466

| TYPE OF REPORT | VICTIM | OFFICER | Page - 3 |
| HOMICIDE | WISHON, KENDALL | SALDATE #1875 | DR # 109-042335A |

Crime Lab:

1) MITCH SMALL #2847
   Latent Prints/P.I.T. (processed scene)

2) MARK HATCHER #A2663
   Latent Prints/P.I.T. (processed scene)

County Medical Examiner:

1) GEORGE BOLDUC M.D.
   120 S. 6 Ave.   262-3322
   Deputy Assistant Medical Examiner
   (Obtained swabs at body scene, performed autopsy 3-17-90)

County Attorney's Office:

1) LOUIS STALZER
   Deputy County Attorney
   Major Felony Unit
   (Present at scene)

Synopsis:

On 3-16-90 at approximately 0030 hours, the VICTIM, KENDALL WISHON, W/F, 8 years, was sexually assaulted, molested and killed by MICHAEL GALLEGOS, W/M, 18 years and her stepbrother, GEORGE SMALLWOOD, W/M, 18 years, while at her home at 1805 N. 71 Avenue. She was then carried from the home and left at 7101 W. Berkeley, lying nude under a large tree next to a public sidewalk where she was discovered.

Narrative:

On March 16, 1990 at approximately 1345 hours, I was directed along with DET. MIKE CHAMBERS to proceed to 1800 North 71 Avenue, to assist in a homicide investigation. At approximately 1400 hours, we arrived to find a two-block area which was cordoned off with crime scene tape and several uniformed officers were standing by guarding the perimeter.

Later a briefing was conducted by uniformed officers and detectives who had arrived earlier and had been investigating the missing persons report on the VICTIM. After the briefing SGT. TIM BRYANT assigned me as the case agent and directed DET. MIKE CHAMBERS as my assistant. DET. BILL BUTLER was assigned the crime scene area around the body and DET. ERNIE HAMRICK was assigned the crime scene at the residence.

During the briefing I learned that the VICTIM, KENDALL WISHON, W/F, 8 years, had been discovered missing at approximately 9:00 A.M. by her stepbrother GEORGE SMALLWOOD, W/M, 18 years. GEORGE first contacted his family who later contacted the police at approximately 10:30 A.M.

GALL 003                    EXHIBIT 1g                    002304
MILKE_NSB002467

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WISHON, KENDALL | SALDATE #1875 | 109-042335A |

Initially, uniformed police officers had been told by the VICTIM's mother
that the VICTIM had gone to bed at approximately 9:00 P.M. the night
before and that she had last seen her at approximately 9:30 P.M. when she
kissed her goodnight. The mother also told them that she was living with
a subject who she identified as JERRY GALLEGOS, as husband and wife and
that recently her husband's brother, MIKE GALLEGOS, and her son GEORGE
SMALLWOOD, had been living with them because of Spring break at the high
school which they attend in Flagstaff.

After uniformed personnel could not locate the VICTIM, they requested help
from the Missing Persons Detail and they responded. During their initial
investigation, DET. McELVAIN found what he believed were baby oil stains
on the VICTIM's bed. The VICTIM's stepbrother, GEORGE SMALLWOOD, had also
turned over a night shirt and a pair of panties that belonged to the
VICTIM and were believed to have been worn by the VICTIM last night.

The investigation by Missing Persons also found no signs of forced entry
and from the information they were receiving from JERRY GALLEGOS, the home
was locked and secured when he woke up this morning.

DET. BILLY BUTLER, who conducted the scene investigation at 7101 W
Berkeley, believed that the VICTIM had been dead for some time and that
rigor mortis was present as was lividity and was consistent with her posi-
tion. The VICTIM was found totally nude with some facial injuries and it
appeared that she had been sexually assaulted. Deputy County Medical
Examiner GEORGE BOLDUC was called to the scene and with the assistance of
DET. BILL BUTLER, DR. BOLDUC obtained 4 swabs from her vaginal vault, her
rectum and her mouth. These swabs were later transported to the Crime Lab
for further processing.

DET. BUTLER's scene investigation also located a large plastic bottle of
baby oil which appeared to have been in the center of the roadway on 71st
Avenue and had apparently been run over by a vehicle, and there was baby
oil spread along the pavement. DET. BUTLER also processed the sidewalk
directly east of the VICTIM's body as well as having the entire scene
photographed.

DET. MIKE CHAMBERS later interviewed GEORGE SMALLWOOD, the VICTIM's step-
brother, while at the main station at 620 W. Washington. During his
interview GEORGE was confronted with committing the murder on his sister
but denied it. He was later confronted with the admissions of MICHAEL
GALLEGOS and told DET. CHAMBERS that he could not remember committing the
murder.

The interview with MICHAEL GALLEGOS revealed a detailed account of what
occurred and also implicated GEORGE SMALLWOOD. MICHAEL told me that he
and GEORGE had initially gone into the VICTIM's bedroom to fondle her, but
that she began to wake up and that they both placed their hands over her
mouth and nose, suffocating her. MICHAEL said that both he and GEORGE
realized that they had killed the VICTIM. They continued to fondle the
VICTIM and that he later sodomized the VICTIM while GEORGE tried to

EXHIBIT 1g

002305
MILKE_NSB002468

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WISHON, KENDALL | SALDATE #1875 | 09-042395A |

sexually assault the VICTIM but could not, and later inserted his penis in the VICTIM's mouth. Later they decided to carry the VICTIM away from the home and then left her underneath a tree, lying nude.

MICHAEL said that both he and GEORGE had been drinking heavily all day long and that after the murder, they returned to their bedroom and fell asleep. This morning, MIKE said that he and GEORGE pretended to look for the VICTIM, knowing all along where she was and that she was dead.

A search warrant was later conducted on both GEORGE SMALLWOOD and MICHAEL GALLEGOS for their clothing, hair, saliva, pubic hairs and blood. These items will be later compared to evidence found at the residential scene and on the VICTIM's body. Both SUSPECTS were later transported to the Maricopa County Jail and booked for First Degree Murder, Sexual Assault and Child Molestation.

Report CLEARED BY ARREST.

**GALL 005**

EXHIBIT 1g

002306
MILKE_NSB002469

Page - 1

| TYPE OF REPORT HOMICIDE | SUPPLEMENT DATE 3-17-90 | OR # 09-042335A |
|---|---|---|
| VICTIM'S NAME | LOCATION OF OCCURRENCE | |
| OFFICER WRITING REPORT'S # DET. SALDATE #1875 | SUPPLEMENT # 09-042335.A10 | |
| DATE & TIME TYPED MARCH 21, 1990 2:11 PM | BUREAU GIB | CLERK A1724 |

INTERVIEW:      Suspect #1 - GALLEGOS, MICHAEL STEVEN, H/M,

On 3-16-90 at approximately 1620 hrs, I contacted MIChAEL GALLEGOS at 620
W. Washington. The purpose of my contact was to interview him in regards
to this death investigation. The following is a paraphrased account of his
interview.

At approximately 1620 hrs, I entered the interview room where MICHAEL
GALLEGOS had been placed by a uniformed officer after he was transported
from the scene to the main station. I introduced myself to MICHAEL and
identified myself with my badge and I.D. card. MICHAEL said that he knew I
was a police officer and had seen me at the scene. I then asked MICHAEL if
he was attending school currently and he said that he was. He said he was
a senior at Coconino High School and was going to be one credit short for
graduation. He said he intended on making up the one credit and
graduating.

I asked MICHAEL about his study skills and he told me that he was in
special education and was considered a slow learner. His only problem area
was in math and he believed that he was at a 9th grade skill level. He
thought that everything else was comparable with a senior level. I asked
him about his reading skills and he believed his reading was at the 12th
grade skill level. I then asked him if he had problems understanding any
of his homework or studies and he said he did not. I then removed a
Miranda rights card as provided by the Phoenix Police Department and
handed it to him. I asked him to read the rights out loud to me which he
did with no problem. I asked him if he understood what he had read and he
immediately said he did. I asked him if he knew what a lawyer was and he
said he did. I then asked him if he understood that he did not have to
speak with me and he said he did. He then wanted to know if he was a
suspect. I explained to him that I did not have enough information from
him or anyone else to determine that he in fact was or was not the
suspect. I told MICHAEL that I was going to ask him where He was last
night and what he had been doing and if he knew anything about KENDALL's
death. MICHAEL then told me that he would answer all my questions and
cooperate fully.

MICHAEL began in a narrative form by telling me that he had come down from
Flagstaff on March 10 to be with his brother JERRY GALLEGOS. He said he
was on spring break from high school. I then explained to MIKE that I
wanted to know what happened yesterday (3-15-90). MICHAEL said that he had

GALL 006

MILKE_NSB029540

Page - 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
| HOMICIDE | | SALDATE #1875 | 09-042335A |

gone to his brother's employment which he identified as MB Valley Truck
and Trailer. He said he and GEORGE SMALLWOOD had gone to see his brother
so they could do some work on GEORGE's truck. Earlier in the day, his
brother had said that they could go by the shop after 4:30 PM and do some
work on GEORGE's truck. MICHAEL said they arrived at his brother's place
of employment at approximately 4:20 PM and that they waited for
approximately 10 minutes, until the shop closed at 4:30 PM. His brother
then allowed GEORGE to work on his truck which MICHAEL identified as an
International Scout 4-wheel drive vehicle. MICHAEL said that they replaced
the tie rods on the Scout and did some more work to it until it got dark.
MICHAEL said he, GEORGE and his brother then left for home.

Shortly after arriving at his brother's home, MICHAEL said he went outside
to the carport and began working around his car which was disabled and
parked in the carport because of a bad transmission. He said he was
working on his car for some time when his brother told him that it was
getting late and that he ought to come inside the house. He went inside
the home, took a shower and then began playing Nintendo with GEORGE and
his brother. They all played Nintendo until approximately 11:30 PM when
his brother got tired and went to bed.

MICHAEL said that he and GEORGE continued to play Nintendo for the next
hour. At approximately 12:00 or 12:30 AM, MICHAEL said that GEORGE decided
to go to bed. He then went into the bathroom and then decided to go to bed
himself. When he entered the bedroom, he noticed that GEORGE was already
asleep and the pit bull, which is the family dog, was lying on the bed
with GEORGE. He was only in bed a few minutes before he also fell asleep.

This morning at approximately 8:30 AM, he was awakened because he had a
phone call from a friend of his who he identified as ANTHONY DURAN who
lives in Tucson. ANTHONY was calling him to tell him that he was coming
down in a day or two to visit him. He explained that he and ANTHONY had
gone to school together until ANTHONY moved to Tucson.
ANTHONY has been training for the Olympics and was coming to Phoenix for
that reason.

A short time after he received the phone call, he noticed that GEORGE got
up out of bed, got dressed and then left in his Scout. GEORGE then
returned with him some milk. He then went into the room, changed into some
dirty clothes and went outside to work on his car. He said just before he
walked outside, he saw GEORGE in the living room playing with the Nintendo
game.

MICHAEL said he could not estimate the time but it was a short time after
he had walked out to start working on his car when GEORGE came out and
told him that he could not find ▬▬▬. GEORGE asked him if he had seen
▬▬▬ and he told him that he had not. They then walked back into the
home and GEORGE started calling several of ▬▬▬'s friends and that he
finally called his mother. He believes that GEORGE's mother told him to
call the police. MICHAEL said the police arrived shortly before GEORGE's
mother. MICHAEL said that CINDY, GEORGE's mom, gave them a large 8 x 10

GALL 007

EXHIBIT 1g

MILKE_NSB029541

Page - 5

| TYPE OF REPORT HOMICIDE | VICTIM | OFFICER SALDATE #1875 | DR # 09-042335A |
|---|---|---|---|

photograph of ▇▇▇▇ that he could use while he was looking for ▇▇▇▇.
He and GEORGE went together and walked down the street showing ▇▇▇'s
picture but found no one that had seen her. They went to Peralta School
where ▇▇▇▇ attends and also drove around in GEORGE's Scout looking for
▇▇▇▇ but were not successful.

I told MICHAEL that it was my belief that someone in the house had to have
killed ▇▇▇▇. I explained to him that there was no indication that anyone
had broken into the house but rather the house was locked and secured the
entire night. MICHAEL agreed with me that the house was locked and could
not understand how ▇▇▇▇ could have gotten out. I then told MICHAEL that
I wasn't totally sure but that it was my belief that he may have had
something to do with ▇▇▇▇'s death. MICHAEL immediately denied being
involved and said that he had told me everything that had occurred last
night. I told him that I believed that he was probably drinking and that
he probably did not mean to kill ▇▇▇▇. MICHAEL was shaking his head
from side to side, indicating no, but did not verbally respond.

I told ▇▇▇▇ MICHAEL that the best thing for him to do was to tell me the
truth and that I was there only to get the truth and not to judge him. I
told him that I had visibly examined ▇▇▇▇'s body and that I knew what
he had done to her. I explained to him that I was ready to hear what had
actually happened and that I could believe that he probably did not intend
on killing ▇▇▇▇. He asked if I realized what I was asking him and I
told him that I was only asking him to tell me the truth. He said that I
was asking him to say something that would cause him to lose him family.
"What do you think my brother will think of me?" I then told MICHAEL that
he was thinking more about his welfare instead of telling the truth.
MICHAEL then said "let's say, okay, I'm not admitting it, but let's just
say I did have something to do with ▇▇▇▇, what do you think would
happen to me." I told MICHAEL that he would undoubtedly be placed under
arrest and would be charged with the murder of ▇▇▇▇ and go to jail.
MICHAEL then asked "again, let's just say I did do it but I'm not
admitting to it, let's just say I did, would there be anything I could say
to keep from going to jail?" I then told MICHAEL that there was not
anything that would keep him from going to jail but that his true
statement would at least be an explanation of what happened instead of
just hearing one side of the story. MICHAEL finally asked me "do you think
I did it by myself?" I told him that I did not really know but that I
would listen to the truth and if someone else was involved with him, I
would expect him to tell me who that person was. MICHAEL then told me
"okay. I did do it but I was not by myself, GEORGE helped me and he's as
much to blame as I am." I then told MICHAEL that I wanted him to tell me
everything that happened and that I did not want him to minimize his
involvement and place any blame on GEORGE that he was not deserving of.
MICHAEL then told me that he understood and would tell me the truth.

MICHAEL continued the interview in narrative form. He said he and GEORGE
had been drinking most of the day, mixing whiskey with koolaid. He said
that everything he had told me about what had occurred up to when his
brother went to sleep was the truth. He said when they arrived at his

GALL 008                                                    MILKE_NSB029542

EXHIBIT 1g

Page -- 4

| TYPE OF REPORT | VICTIM | OFFICER | OR # |
|---|---|---|---|
| HOMICIDE | | SALDATE #1875 | 09-042335A |

brother's work to work on GEORGE's truck that the employees were drinking
beer and that he and GEORGE had possibly 6 or 7 beers apiece. When they
arrived back home until approximately 11:30 PM, he and GEORGE also had
about 6 or 7 beers. He said that his brother had bought a case of beer
enroute home because GEORGE had given him the money to do so. MICHAEL was
then worried whether we were going to charge his brother for supplying
liquor to them and I told him that was not my concern at this time.

After his brother went to sleep, MICHAEL said that he and GEORGE continued
to play Nintendo and that they began to discuss sex. MICHAEL said that he
has only had sexual intercourse on three occasions and that the last time
was approximately one year ago. He said he and GEORGE discussed the fact
that neither one had had sex for approximately one year and he believed
that GEORGE was also not that experienced with sexual intercourse.

Shortly after midnight, MICHAEL said he doesn't know why, but he thought
about possibly going into _____ 's room and fondling her. He said his
intentions were only to go inside the room and touch her "ass" and then
leave. He mentioned this idea to GEORGE but did not know how GEORGE would
take it since _____ was his sister. MICHAEL said he was somewhat
surprised when GEORGE agreed. MICHAEL said this made him a little unsure
about whether they should do it and that GEORGE assured him that no one
would know and that if _____ did wake up, she would not tell anyone.

MICHAEL said that he was wearing a pair of light colored shorts and that
GEORGE was also wearing shorts but that they were blue and green checked.
They turned off the Nintendo game and they both walked down the hall. He
said when they got to the door, he told GEORGE to wait a minute because he
wanted to go inside the bathroom and get the baby oil. I asked MICHAEL
what he needed the baby oil for and he said he had intentions of putting
the baby oil on _____ 's ass" because he had this thing about how baby
oil made the skin feel so soft. MICHAEL continued and said that he went
into the bathroom, removed the baby oil frow the shelf and then walked
back to _____ 's bedroom door. He noticed GEORGE standing with his hand
on the door knob and his other hand down the front part of his shorts.
MICHAEL said it was obvious to him that GEORGE was "playing with himself."

They entered _____ 's room, MIKE said that he saw _____ lying on her
side facing the wall. She was not covered and her nightshirt was just
above her waist. He said this exposed a small part of her back and her
panties. They both walked up next to the bed and that he was standing in
the area of her buttocks. GEORGE was standing next to him near her head.
MICHAEL said it was very hard for him to tell me these things and I
explained to him that I understood that but that I was there to listen.
MICHAEL said he understood, paused for a moment and then continued.

MICHAEL said that for some reason, he liked _____ 's buttocks area and
referred to it as "her ass". He said he began rubbing _____ 's buttocks
over her panties and he noticed that OKDROK was rubbing _____ 's breast
area. MICHAEL said that during this time, _____ was still asleep. He
applied some baby oil to his hand, to rub the baby oil on the area of

GALL 009

EXHIBIT 1g

MILKE_NSB029543

Page - 5

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | | SALDATE #1475 | 09-042335A |

's back that was exposed. MIKE said he likes the way baby oil feels
on someone's skin and was doing it for that reason. He said that GEORGE
had moved his hand to            's vaginal area and was sort of rubbing his
finger around it. He said he then placed his hand which had oil on it on
         's back and that almost immediately           began to wake up. He
believed that it just have been the baby oil and that he thought it was
cold and that may have been what woke           up. He is not really sure
but he thinks           had turned to look at them and he then saw GEORGE
place his hand on           's mouth and hold it so she could not scream.
         was still making a noise which he then illustrated to me by
covering his own mouth and then taking deep breaths through his nose. This
made a sound as a pig would do and he said that was the same sound that
         was making. Because of that, he placed his hand on top of GEORGE's
hand, covering           's nose. He doesn't know how long he and GEORGE kept
their hands on           's mouth and nose but then he realized that
went limp.           was not moving anymore and he said that he immediately
thought that they had killed her. He and GEORGE both let go of           and
he is not sure but he believes that he whispered to GEORGE that she was
dead. MIKE said that he did not really mean to kill           but that
things just got carried away. I then asked MIKE why they still sexually
assaulted           and he said that they knew they had already killed her
so they figured they might as well finish.

MICHAEL said GEORGE turned           on her back. GEORGE grabbed the pillow
that           's head was lying on and moved it down and placed it
underneath her buttocks. MIKE noticed that GEORGE did no longer have his
pants on and he saw GEORGE get on to the bed with           . He could see
that GEORGE had a complete erection as he did. GEORGE then spread
         's legs apart. He was not on the bed but was standing in
approximately the same position that he was when he first began to fondle
         .

He does not think that GEORGE ever made penetration into           because
he made this face which he again illustrated by closing his eyes, opening
his mouth and gritting his teeth. He said when he saw this face on GEORGE,
he assumed that it was hurting GEORGE and that he apparently was unable to
"get it in". I then asked MIKE what he was doing and MIKE said he had his
hand underneath           's "ass" and that he was fondling her while GEORGE
was attempting to make entry. I asked MIKE what was it about           's
buttocks that turned him on and he said he did not know but that was the
only thing he was interested in.

GEORGE then got off the bed quietly and MIKE said the only thought he had
was that he wanted to make entry into "her ass". He grabbed           around
the waist, lifted her from the bed and placed her softly on the floor. He
believes that when he picked her up from the bed, GEORGE was helping but
he does not remember where GEORGE was holding her.           was lying face
down on the carpet next to the bed and he then spread her legs apart. MIKE
said he does not remember whether he had his shorts completely off but he
does not believe he did.

GALL 010

EXHIBIT 1g

MILKE_NSB029544

Page - 6

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | | SALDATE #1875 | 09-042335A |

MIKE said he had a full erection and that he was kneeling on the carpet between ▓▓▓▓▓'s legs. He then reached down and grabbed ▓▓▓▓▓ from the waist with both his hands and than picked her up and moved her towards his erect penis. MIKE then told me that he made entry into "her ass". I then asked MIKE if he used anything for e lubricant and he then remembered that he had put oil while kneeling batween ▓▓▓▓▓'s legs all over his penis. He said he also squirted oil onto ▓▓▓▓▓'e "ass" before he made entry. MIKE said he was holding ▓▓▓▓▓ s hips and was pushing ▓▓▓▓▓'s buttocks back and forth on his penis. He does not know the amount of time that it took him to ejaculate but he does know that it was not right away.

MIKE then said that while he was sodomizing ▓▓▓▓▓, he saw GEORGE with his pants still off and still with a full erection. He was holding ▓▓▓▓▓'s face. He saw GEORGE putting ▓▓▓▓▓'s mouth over him penis. MIKE said he then ejaculated and pushed ▓▓▓▓▓'e buttocks eway from him. He then reached down and pulled up his shortn to clean off his penis. He said he remembers cleaning some fecex from him penis onto his shorts. MICHAEL then remembered that when GEORGE took ▓▓▓▓▓'s panties off. he had noticed that ▓▓▓▓▓ had some feces on her panties.

MIKE said that when he finished, GEORGE still had so erection but that he no longer had his penis in ▓▓▓▓▓'s mouth. GEORGE told him he had not finished. I then specifically asked MIKE whether GEORGE had verbalized this to him and MIKE said that he thougbt he did. MIKE then told me that during this whole situation, he and GEORGS communicated by either facial expressions, body language and some whispering.

MIKE then said that he and GEORGE began to think of what lo do next and that they decided that they ought to take ▓▓▓▓▓ outside and take her down the street and leave her. GEORGE then grebbed ▓▓▓▓▓'s nightshirt and panties and stuffed them underneath the chest of drawars. MIKE then commented that was the reason GEORGE was able to locate them. GEORGE then reached down and grabbed the hottle of baby oil and then told him that they needed to take her outside. He then reminded GEORGE that they nended the keys so GEORGE left the bedroom, leaving he and ▓▓▓▓▓. A few seconds later, GEORGE came back into the room and he had a set of keys which he thinks were his brother JERRY's. GEORGE then reached down and picked up ▓▓▓▓▓ from around the chest area and was holding her around the cheat with one arm. MIKE said that he then reached down end grebbed ▓▓▓▓▓ by the ankles and held her feht up white they carried her out of the hedroom into the hallway. He said he doesn't remember but one of them clowed the bedroom door and they did this in case somebody got up, they did not want her bedroom door to be open because that person would immediately notice that ▓▓▓▓▓ was missing.

GEORGE were carrying ▓▓▓▓▓ down the hallway to the opening of the kitchen when he saw GEORGE still had his shoes on. He said he doesn't know whether GFORGE also had socks on. He reminded GEORGE that his shoes would make noise on the vinyl floor so GEORGE sat ▓▓▓▓▓ down onto the carpet and reached down and pulled off his tennis shoes. He then picked up ▓▓▓▓▓ and they continued out into the kitchen area, towards the carpurt

GALL 011

EXHIBIT 1g

MILKE_NSB029545



Page - 7

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | | SALDATE #1875 | 09-042335A |

door. MIKE said that the carport door is always locked and for that
reason, GEORGE used the keys to unlock the door. They then carried her out
the carport door to the front of a white vehicle and laid her on the
cement floor between the front of the white vehicle and the back of the
carport. GEORGE then went to the carport door and locked the door from the
outside. I then asked MIKE why they did this and he said that GEORGE did
this because he didn't want JERRY to wake up while they were gone and
check the doors as he does on occasion and find the door unlocked. He said
if his brother would have done this, he would have immediately gone to
their bedroom and confronted them about the fact of not locking the door
as they had been told by him before he went to sleep.

He and GEORGE then walked from the carport door out into the front of the
driveway of the house and towards the street. He said they were looking
for anyone around the street or any cars but they did not see any. GEORGE,
who was holding the bottle of oil, then tried to toss it as far as he
could but the bottle of oil landed in the center of the street. MIKE does
not remember the bottle making very much noise but they again looked up
and down the street to see if anyone was coming. After seeing no one,
they walked back into the carport and again GEORGE picked up ▇▇▇▇ from
around the chest area and he picked her up from the ankles. I then asked
MIKE why he needed to pick up ▇▇▇▇ since it was my belief that ▇▇▇▇
didn't weight that much. MIKE then said that he thought ▇▇▇▇ only
weighed about 60 or 70 pounds, but that when GEORGE picked her up, he kind
of felt foolish just walking behind him, not doing anything so he picked
up her feet.

MIKE said that both he and GEORGE were carrying ▇▇▇▇ and that they ran
on the sidewalk for a short distance and then crossed the street until
they got to the tree where he and GEORGE laid her down. MIKE said that
they really had no intentions of placing her underneath this particular
tree but that it was just there. After doing this, they ran back to the
house and stood by the outside of the carport door for just a couple of
seconds to see if anyone was coming. They unlocked the door, entered it,
and then relocked it. They then walked back to their bedroom, got into bed
and fell asleep.

The next morning, he said that he and GEORGE didn't talk about what had
happened but instead avoided the subject. He did get up and answer a phone
call from his friend and that GEORGE did get up and go to the store and
buy milk. I then asked MIKE why he did this, since they both knew that
▇▇▇▇ would not be up to eat any cereal. MIKE then quickly responded
"but we needed to eat." MIKE said that he and GEORGE did get together and
walked up and down the street that they made a point to only walk down the
east side of the street so they would not find the body. When they went in
GEORGE's Scout, they also drove around the area but stayed away from
having to drive by ▇▇▇▇ so they would not have to see the body.

GALL 012

MILKE_NSB029546



| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | | SALDATE #1875 | 09-012335A |

Page - B

MIKE then asked me if I was now going to go ask GEORGE about what had
happened and I told him that my partner MIKE CHAMBERS, who he had had
contact with at the scene, was already talking to him. MIKE then told me
that GEORGE would not admit to it because any time he and GEORGE were
involved in any illegal activity, that GEORGE would always deny any
involvement. MIKE then suggested that GEORGE would never admit to it
because ▇▇▇▇▇ was his sister and that he would automatically lose his
family if he was to admit being involved with something like this.

I later contacted DET. CHAMBERS, briefed him of the interview I had had
with MIKE and he said that he had only obtained denials from GEORGE.
GEORGE was later confronted by DET. CHAMBERS with MIKE's statement but he
continued to deny it.

MIKE was again contacted in the presence of DET. CHAMBERS. MIKE briefly
went over his confession with me and DET. CHAMBERS. MIKE refused to have
his statement tape recorded because he had already talked to me, to DET.
CHAMBERS and didn't feel comfortable in having to go through the story
again.

A search warrant was then obtained for clothing, hair and blood from
suspect MICHAEL GALLEGOS as well as GEORGE SMALLWOOD. These warrants were
served and the evidence was seized.

For further information, refer to DET. CHAMBERS' supplement.

MIKE was then transported to the main jail where he was booked for First
Degree Murder, Sexual Assault and Molestation.

INVESTIGATION CLEARED BY ARREST

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WISHON, KENDALL | DET.CHAMBERS #1678 | 09-042335A |

**SUSPECT INTERVIEW:** SMALLWOOD, GEORGE ANTHONY
W/M
Resides 4120 East Remberg, 526-0411, Flagstaff, AZ
Resides with JERRY and HORTENCIA GALLEGOS
Student - Coconino High School, Grade 12, 5 year plan
Employed: Woodman's Restaurant, K-Mart Shopping Plaza,
Flagstaff, Arizona, as busboy, dishwasher, cook

**ADVISEMENT OF
RIGHTS:** Verbatim at General Investigations Bureau, 3-16-90,
4:25 p.m. by DETECTIVE M. CHAMBERS #1678. "Yes"
nodding affirmatively when asked if he understood.

---

I spoke briefly with SERGEANT CARL RICHARDSON at the scene. I provided
him with a capsule of the results of the previous interviews. I pointed
out to him the difference in observation as to the sobriety of GEORGE and
MICHAEL per CINDY and JERRY. I also pointed out her request to thoroughly
investigate JERRY, MICHAEL and GEORGE and her suspicion a SUSPECT would be
someone from within the residence. I was told DETECTIVE SALDATE would be
available shortly for an interview of either GEORGE or MICHAEL. I was
further told the interview would take place at General Investigations
Bureau allowing the cooperation of GEORGE and MICHAEL. I was contacted by
SERGEANT JOHN PIZZI who offered to arrange for transportation for GEORGE
and MICHAEL to General Investigations Bureau. He understood they would be
transported separately.

I contacted GEORGE ANTHONY SMALLWOOD at the west curb of 71st Avenue
directly across the street from 1805 North. He was sitting on the
sidewalk alone with a uniformed Police Officer standing nearby. I
introduced myself to him and confirmed his identity. I indicated my
intention to interview him but not here at the scene. I further indicated
my intention to perform some tests as fingerprinting, possibly blood
typing, etc. He indicated his understanding and would willingly
accompanied a uniformed Police Officer to the Main Police Station for
these purposes. I indicated to him when a Police Officer would arrive on
the second shift he would be driven directly and I would follow. I asked
him to remain with the Officer he was with for the time being and he did
so. I contacted CINDY WISHON and explained to her my intent involving
GEORGE ANTHONY SMALLWOOD. MS. WISHON was very cooperative and receptive
to this arrangement. She was with JERRY GALLEGOS at this contact. I
explained to GALLEGOS I intended to so similarly with his brother, MICHAEL
STEVEN GALLEGOS. JERRY also agreed this would be appropriate.

**GALL 014**

EXHIBIT 1g

002342
MILKE_NSB002505

| TYPE OF REPORT HOMICIDE | VICTIM WISHON, KENDALL | OFFICER DET. CHAMBERS #1678 | Page 12 DR # 09-042335A |
|---|---|---|---|

I contacted MICHAEL STEVEN GALLEGOS sitting in the front yard of the house immediately south of 1805 North. I identified myself to him, confirmed his identity and explained as I had to SMALLWOOD of my intent. He agreed to go to General Investigations Bureau for these various purposes to include blood test and fingerprinting. I indicated to him when a second shift uniformed police car would arrive they would transport him to the police station and myself and DETECTIVE SALDATE would follow.

I drove DETECTIVE SALDATE and myself to General Investigations Bureau. We decided enroute SALDATE would interview MICHAEL STEVEN GALLEGOS and I would interview GEORGE ANTHONY SMALLWOOD at General Investigations Bureau. We arrived at General Investigations Bureau to find uniformed Police Officer standing by with the subjects in the area east of the General Investigations Bureau Desk Sergeant area. Note: there are three interview room available at this area. SMALLWOOD and GALLEGOS were within adjoining rooms. The other room being vacant SMALLWOOD was moved to the furthest from GALLEGOS with an empty room in between.

I entered the interview room occupied by SMALLWOOD at 4:25 p.m. (3-16-90). I again identified myself to SMALLWOOD and notified him of his Miranda warning rights. I explained to him he would be considered involved in a custodial interview as it was taking place within the police station. He indicated understanding this and his rights. Specifically when asked by me if he understood he said "yes". He was also nodding his head up and down in an affirmative manner.

I obtained specific biographical information from SMALLWOOD. He indicated to me as his mother had previously the reason he was living in Flagstaff. He said of being on a five year plan in high school and currently receiving B's and C's. He admitted more C's than B's. He had previously attended three years of school consecutively at Alhambra High. He complained of racial problems at the high school made him very uncomfortable. His attendance as a Junior had become irregular as a result. He estimates being three full credits short of graduating in 1990 (summer). He should, however, graduate attending a full year in the fall 1990, spring 1991.

GEORGE said he had been staying in Phoenix since Monday (3-12-90). He and MICHAEL are currently out of school from Coconino High School for spring break. They are expected back in class on 3-19-90. GEORGE said MICHAEL had come to Phoenix on 3-10-90 as he does not work. GEORGE had working responsibilities for the weekend 3-10 and 3-11-90. GEORGE estimated he arrived in Phoenix about 10:30 a.m. Monday morning (12th). GEORGE drove himself to Phoenix from Flagstaff in his 1967 International four wheel drive truck. He complained intending to start earlier but was prevented due to snowy conditions in the Flagstaff area. GEORGE said when he arrived at his mother's home MIKE was the only one there. He believed his mother was off that day and out of the home performing chores. JERRY was at work and his sister KENDALL was at school.

**GALL 015**

002343 MILKE_NSB002506

GEORGE said one reason he and MICHAEL had come to Phoenix was to make repairs on a vehicle owned by MICHAEL. The vehicle is a Ford Ranchero, 1972. The vehicle had transmission problems and as a result was towed the previous weekend to Phoenix by MICHAEL'S father, JERRY. The intent was brother JERRY would be able to offer technical advice while MICHAEL and GEORGE made the appropriate repairs. GEORGE said when they opened the transmission on the carport at 1805 North 71st Avenue they found in fact it was irreparable. He described the clutch pack frozen and a front section of the transmission bad. They decided to replace the transmission with another. He offered the new transmission would cause the necessity for a custom drive line being fabricated. GEORGE said during the week the new transmission was obtained, installed and the new drive line was fabricated and ready for installation and beyond that the cooler hoses and starting motor need to be installed. The vehicle will then be driveable.

I spoke to GEORGE about having worked the previous day at JERRY'S shop. He described how they had moved equipment, tools and been involved in working on another person's vehicle. He estimated having left JERRY'S shop abut 6:30 p.m. or possibly 7:00 p.m. GEORGE left ahead of JERRY and MIKE who rode together. He estimated MIKE and JERRY arrived at 1805 North about 7:15 p.m. He denied they had anything to drink while at JERRY'S job site. He offered an excuse they would cause JERRY to lose his job doing so.

GEORGE said his mother was preparing dinner for all when he arrived home. He and MICHAEL ate with her at the dining room table. KENDALL prepared herself a plate and took the plate of food into her bedroom to eat. GEORGE said JERRY and CINDY were arguing. JERRY did not eat as a result. He said it was the usual argument they would have over too many bills and not enough money.

I asked what they had for dinner. GEORGE told me of having had beef stroganoff prepared especially by CINDY using smoked sausage. They also had raw broccoli with ranch dressing and barbecued beans with corn mixed in. GEORGE said he drank Kool-Aid with the meal.

JERRY, MIKE and GEORGE straightened up tools used previously and left about the carport. They cleaned and put the tools away then came into the house about 8:30 p.m. GEORGE said he washed up and immediately after KENDALL used the bathroom to take a bath. GEORGE said he, JERRY and MICHAEL watched television while KENDALL was bathing. He recalls KENDALL finishing her bath, coming into the living room and telling each goodnight. KENDALL kissed JERRY then went to her room. GEORGE estimates this to be about 9:00 p.m.

GEORGE said it was about this point when he and MICHAEL began playing Nintendo video games. JERRY remained in the living room watching as they played. He offered the Nintendo games they have are Mario Bros. for one player, a space ship game involving two players and a guerilla war game for

**GALL 016**

002344
MILKE_NSB002507

EXHIBIT 1g

| TYPE OF REPORT | | | |
|---|---|---|---|
| HOMICIDE | VICTIM | OFFICER | Page   14 |
| | WISHON, KENDALL | DET.CHAMBERS #1678 | DR # 09-042335A |

two players they had rented. GEORGE noted when his mother went to KENDALL'S room to "tuck her in", GEORGE offered it is routine and he has seen her do this often in the past. He estimated it was about one half hour after KENDALL had gone to bed.

GEORGE recalled his mother doing dishes after having tucked KENDALL in. It was at this time JERRY got up from the living room and took a shower. GEORGE recalled JERRY complaining to CINDY as her doing dishes caused him to have run out of hot water. JERRY finished his shower and shortly after CINDY went to bed. JERRY at that point decided to eat. He prepared himself a meal of rice and chicken that were left overs from the previous night's dinner. JERRY ate while continuing to watch GEORGE and MICHAEL play Nintendo.

I pointed out to GEORGE he had not mentioned their having drank beer with JERRY. GEORGE admitted having drank a beer with JERRY and MICHAEL. He said he does not like the taste of beer and did it to be social. I asked him to estimate how many beers MICHAEL had drank. He first said MICHAEL was not drunk and could tell with the dexterity he played Nintendo. He estimated MICHAEL had a few beers, possibly two, three or even four. He estimated JERRY had approximately six cans of beer.

GEORGE said JERRY went to bed about 11:30 p.m. He and MICHAEL continued playing video games for about an hour. GEORGE said he became tired and took a shower. He returned to the living room as MICHAEL was still playing games. He almost fell asleep in a chair watching MICHAEL and went off to bed alone. He recalls as he was going to bed having heard JERRY snoring through the closed door of the master bedroom. He said MICHAEL was still playing videos when he had gone to bed. GEORGE said he was almost asleep when MICHAEL came into the room for the night.

I asked GEORGE about the doors being locked. GEORGE said he personally had locked the carport door. He knew previously the arcadia door was locked and the front door had never been opened that night with the dead bolt lock locked.

I asked if GEORGE and MICHAEL share a room at their home in Flagstaff. GEORGE said they do not and sleeping with someone else does bother him. He said they each have their own rooms in a very large house having five or six bedrooms. GEORGE was emphatic if MICHAEL rolls around in the bed it wakes him let alone if MICHAEL gets out of bed while he (GEORGE) is sleeping. GEORGE describes himself as a light sleeper. GEORGE offered he and MICHAEL are often companions in Flagstaff. He pointed out they go to school together, they live together, they spend a lot of free time together.

GALL 017

EXHIBIT 1g

002345
MILKE_NSB002508

| TYPE OF REPORT | VICTIM | | Page   15 |
| HOMICIDE | WISHON, KENDALL | OFFICER<br>DET. CHAMBERS #1678 | DR #<br>09-042355A |

I asked GEORGE as to the living arrangement in Flagstaff. He describes living with JERRY and HORTENCIA GALLEGOS. MICHAEL obviously lives with his parents. MICHELLE COVARRUBIAS, 19 years, who is six months pregnant and her sister NAOMI, 14 years, also live at the residence. He describes it as a three story house having five bedrooms. Four are located in the upstairs and one in the basement. The basement bedroom is occupied by MICHELLE. The basement is converted almost as an apartment with the bedroom, living room, etc.

I asked GEORGE to begin with his earliest activities on the morning of 3-16-90. He told me of having been waken by his mother being told to get milk from the Circle K nearby and being given $2.00 in cash from her. He estimated this was approximately 8:30 a.m. He waited until she had left to go to work then drove himself to 75th Avenue and McDowell to the Circle K. He bought a half gallon of milk and a pack of cigarettes for himself (Richland).

I asked if he had slept in clothing. GEORGE said he had slept in the same clothes he had worn the previous night being green plaid shorts, a white t-shirt with grease stains and a logo "Skateboarding is not illegal", and a pair of white brief undershorts. He indicated the undershorts he was wearing at this time are the same undershorts he was wearing to sleep in. I asked what MICHAEL had slept in and he thought possibly in a pair of shorts, a shirt and underwear but could not be certain. GEORGE said MICHAEL had gotten out of bed just prior to him. MICHAEL had gotten up to talk on the telephone to a subject TONY DURAN (19) who resides in Tucson, TONY DURAN is a mutual friend of both and had attended high school in Flagstaff.

GEORGE said when he returned to 1805 North, MICHAEL was in the carport working on his car. He has no idea what area of the car MICHAEL was working on. He described paying little attention to him. GEORGE went into the residence and decided it was time to get KENDALL up. He went to her room finding the door closed and upon entering found she was gone. He described her bed appeared as if someone had slept in it but there was no sign of her. He said of having checked around the house, in and out of closets, under the beds, etc., expecting she playing a prank. He and MICHAEL checked in the immediate area for approximately one half hour and with negative results he became worried and called his mother at work. GEORGE said after having called his mother he also called the Police. He was unsure of the time he had actually phoned the Police. GEORGE said he sent MICHAEL driving down the streets in the immediate area looking for her as he waited for CINDY to return home. GEORGE and MICHAEL drove up and down north/south streets in the immediate neighborhood. They drove to nearby apartment complexes on McDowell and checked a field east of those apartments with negative results. They drove to a canal bank nearby with still no sign of KENDALL. GEORGE said when they returned to 1805 North he found Police were already present. SHAWNA'S father, REX, was present as

| TYPE OF REPORT | | | Page – 16 | |
|---|---|---|---|---|
| HOMICIDE | VICTIM WISHON, KENDALL | OFFICER DET. CHAMBERS #1678 | DR # 09-042335A | |

I stopped the interview at this point and asked GEORGE to submit to a "one roll" of his fingerprints. He agreed to do so and was taken to the Identification Bureau by uniformed officer. In his absence I spoke with DETECTIVE SALDATE. SALDATE had been simultaneously interviewing GALLEGOS. GALLEGOS had made a complete statement to SALDATE of their involvement in KENDALL WISHON'S death. GALLEGOS was very specific as to his own and GEORGE'S role in events leading up to and beyond KENDALL'S death. GEORGE was returned to the interview room by uniformed Police Officers.

I spoke with GEORGE telling him of the statement by GALLEGOS. GEORGE complained repeatedly of GALLEGOS being a liar and having previously sworn he would never go down alone. GEORGE repeated over and over again he was telling the truth and asked for a divine intervention. I told GEORGE of still intending to take blood sample, possibly hair samples. He was emphatic to do so indicating this would prove he was telling the truth and MICHAEL was lying. I indicated this could also prove he was lying (GEORGE) was lying scientifically. He was adamant he had not been involved in the death of his sister. I pointed out MICHAEL GALLEGOS had told SALDATE it would be impossible for GEORGE to admit his involvement as it was GEORGE'S sister who had died and whom they had molested.

Note: My original interview with GEORGE had ended at 5:30 p.m. He had been in the records section until about 6:30 p.m. I spoke to him for about 10 minutes. DETECTIVE SALDATE was available to speak with GEORGE and did. I exited the interview room. SALDATE began speaking with GEORGE at about 6:40 p.m. and remained with him until 7:00 p.m. GEORGE indicated to SALDATE at that time he did not want to answer anymore questions without a lawyer.

I summoned Latent Print Examiner KAREN ANTONINI for the purpose of taking full length photos of both MICHAEL and GEORGE. She responded to General Investigations Bureau and at my direction took these photos. I directed close up photos be taken of the faces and hands, palms and backs. The photos having been taken I again spoke with GEORGE. I indicated to him my understanding he did not want to answer further questions without a lawyer. I indicated to him I would not ask further questions. I indicated to him rather I would make a statement to him. I spoke to him in a situation such as this it would appear MICHAEL was being truthful and he (GEORGE) was not. I further indicated with the situation so serious only the truth should ever be told. Any other statement is like digging a hole. I further indicated it would make the situation appear even possibly premeditated. GEORGE responded to me saying he may have been involved in KENDALL'S death but does not recall. He added at times he has done things in the past and not later recall them. I indicated my concern about his personality if this were true. He indicated a concern with himself. The interview with GEORGE was terminated. I later obtained a search warrant specifying biological evidence be taken from GEORGE SMALLWOOD. The evidence was taken in my presence and submitted to Phoenix Police Crime Lab for comparison to scene autopsy, etc.

GALL 019

EXHIBIT 1g

002347
MILKE_NSB002510

**POLICE DEPARTMENT**
**CITY OF PHOENIX, ARIZONA**

DR # _C9- 042335- 1_

# SEARCH WARRANT

COUNTY OF MARICOPA, STATE OF ARIZONA

WARRANT No. _51, 9C -4157_

TO ANY PEACE OFFICER IN THE STATE OF ARIZONA

Proof by affidavit having been made this day to me by _DETECTIVE HARVEY E HAMRICK #1789_
I am satisfied that there is probable cause to believe that

☐ on the person(s) of _____

☒ on the premises known as _1465 NORTH 71ST AVENUE, A SINGLE FAMILY RESIDENCE POINTED_
_BEIGE WITH TAN TRIM. THE HOUSE IS LOCATED ON THE EAST SIDE OF 71ST AVENUE_
_FACING TO THE WEST AND HAS NUMBERS 1465 DISPLAYED ON THE FRONT_

☐ in the vehicle(s) described as _____

in the City of _PHOENIX_ County of _MARICOPA_ State of Arizona
there is now being possessed or concealed certain property persons or things described as

1. HEAD HAIR
2. PUBIC HAIR
3. SEMEN
4. BLOOD
5. STAINED CLOTHING OR MATERIAL
6. FINGERPRINTS
7. SHOE PRINTS
8. PHOTOGRAPH OF HOUSE INSIDE AND OUT.
9. ANY EVIDENCE TO SHOW THAT THE CRIME OF MURDER AND/OR
   SEXUAL ASSAULT WAS COMMITTED

GALL-020

EXHIBIT 1g

002315
MILKE_NSB002478

which property, persons or things

☐ were stolen or embezzled

☒ were used as a means for committing a public offense

☐ is (are) being possessed with the intent to use as a means of committing a public offense

☐ is (are) in possession of _____
to whom it was delivered for the purpose of concealing it or preventing it from being discovered

☒ constitutes evidence tending to show that a public offense has been committed, or tending to show that _____

PERSON/S withheld _____ has (have) committed the offense

☐ such person is the subject of an outstanding arrest warrant

such public offense being __MURDER__

which occurred on or about the __16__ day of __March__ , 19 __90__

at __1805 NORTH 71 AVENUE__

## YOU ARE THEREFORE COMMANDED

☒ in the daytime (excluding the time period between 10 PM and 6:30 AM)

☐ or nighttime (good cause therefore having been shown)

to make a search of the above named or described person(s), premises, and vehicles for the herein above described persons, property or things, and if you find the same or any part thereof, to retain such in your custody or in the custody of the Phoenix Police Department as provided by A.R.S. 13-3920

Return this warrant to me within five (5) days of the date thereof, as directed by A.R.S. 13-3918

Given under my hand and dated this __16__ day of __March__ , 19 __92__

_____
JUDGE, JUSTICE OF THE PEACE OR MAGISTRATE

of __JC Gleason J.P.__ _____ Court

1.

**AFFIDAVIT FOR SEARCH WARRANT**

**COUNTY OF MARICOPA, STATE OF ARIZONA**

No. SW 90-457

YOUR AFFIANT DETECTIVE HARVEY E. HAMRICK #1739 , a

peace officer in the State of Arizona, being first duly sworn, upon oath, deposes and says:

That on or about the ___16th___ day of ___MARCH___, 19_90_, in the

County of ___MARICOPA___, State of ___ARIZONA___, the crime

of ___MURDER___ (was)(is being) committed by

___PERSON/S UNKNOWN.___

THAT THE AFFIANT has probable cause to believe that

( ) on the person(a) of _____

_____

_____

_____

_____

(X) on the premise(s) known as ___1805 NORTH 71ST AVENUE, A SINGLE___

___FAMILY RESIDENCE PAINTED BEIGE WITH TAN TRIM. THE___

___HOUSE IS LOCATED ON THE EAST SIDE OF 71ST AVENUE___

___FACING TO THE WEST AND HAS THE NUMBERS 1805___

___PROMINENTLY DISPLAYED ON THE FRONT.___

_____

( ) in the vehicle(s) described as _____

_____

_____

_____

_____

_____

_____

80 2865 REV 7-82

**GALL 022**

002317
MILKE_NSB002480

EXHIBIT 1g

2.

in the City of _Phoenix_ , County of _Maricopa_ , State of Arizona, there is

now being possessed or concealed certain property, persons or things which

(  ) were stolen or embezzled

(X) were used as a means for committing a public offense

(  ) is (are) being possessed with the intent to use as a means of committing a public offense

(  ) is (are) in the possession of _____

_____

to whom it was delivered for the purpose of concealing it or preventing it from being discovered

(X) constitute(s) any evidence tending to show that a public offense has been committed, or

tending to show that _Person/s Unknown_ _____

_____

has (have) committed the offense.

(  ) such person is the subject of an outstanding arrest warrant

That said property, persons or things are described as follows:

1. HEAD HAIR
2. PUBIC HAIR
3. SEMEN
4. BLOOD
5. STAINED CLOTHING OR MATERIAL
6. FINGERPRINTS
7. SHOE PRINTS
8. PHOTOGRAPHS OF HOUSE INSIDE AND OUT.
9. ANY EVIDENCE TO SHOW THAT THE CRIME OF MURDER OR SEXUAL ASSAULT WAS COMMITTED.

GALL 023

EXHIBIT 1g

002318
MILKE_NSB002481

# REGULAR INFORMATION OR INFORMANT FORM

3.

That the following facts establish probable cause for believing that grounds for the issuance of a search warrant for the aforementioned property, persons or things exist:

Between the dates ___3-15___ and ___3-16___ 19 __70__

CHECK ONE: ✓ the affiant learned the following information in the following manner.

— the affiant received information from a/an (confidential informant, the information is as follows:

ON 3-16-'90 AT ABOUT 10:00AM PHOENIX POLICE OFFICERS WERE CALLED TO 1805 NORTH 71ST AVENUE TO LOOK FOR A MISSING EIGHT YEAR OLD GIRL WISHON, KENDALL (DOB ████). THE SURROUNDING NEIGHBOR WAS BEING SEARCHED BY UNIFORM POLICE OFFICERS AND DETECTIVES OF THE MISSING PERSONS DETAIL OF THE PHOENIX POLICE DEPT. WHEN THE NUDE, DEAD BODY OF WISHON WAS FOUND LYING IN THE GRASS, UNDER A TREE, AT THE EAST END OF THE HOUSE AT 7101 WEST BERKELEY.

THE HOUSE AT 1805 NORTH 71ST AVENUE IS OCCUPIED BY WISHON KENDALL, HER MOTHER RINDY KENDALL AND RINDYS FIANCE JERRY GALLEGOS. VISITING AT THE HOME IS GEORGE ANTHONY Smallwood (DOB ████) AND MICHAEL STEVEN GALLEGOS (DOB ████) WHO BOTH ARE ON SPRING BREAK FROM COCONINO HIGH SCHOOL IN FLAGSTAFF.

3-15-'90 ABOUT 4:00 PM WISHON KENDALL KISSED HER MOM GOODNIGHT AND WENT TO BED CLOSING HER BEDROOM DOOR AS SHE ALWAYS DOES. BEFORE 11:30 PM MS KENDALL WENT TO BED LEAVING JERRY GALLEGOS GEORGE SMALLWOOD AND MICHAEL GALLEGOS STILL UP. AT ABOUT 11:30 PM JERRY CAME TO BED LEAVING GEORGE AND MICHAEL STILL UP.

AT NIGHT THIS HOUSE IS SECURED BY LOCKING A DEADBOLT ON THE ARCADIA DOOR, THE FRONT DOOR IS NOT USED. THE FAMILY HAS A PIT BULL DOG THAT STAYS IN THE HOUSE AND IS VERY LOUD AND HOSTILE TO STRANGERS. AT ABOUT 7:30 AM 3-16-90, JERRY GALLEGOS LET THE DOG OUT THE BACK DOOR AND THE LOCK WAS STILL LOCKED. DURING THE NIGHT THE DOG HAD NOT MADE ANY LOUD OR UNUSUAL NOISES.

MS KENDALL GOT UP AND WENT TO WORK AT 8:45 AM. PRIOR TO GOING TO WORK SHE SAW THAT WISHON'S BEDROOM DOOR WAS STILL CLOSED AND SHE WENT INTO THE BEDROOM BEING USED BY MICHAEL GALLEGOS AND GEORGE SMALLWOOD, BOTH WERE ASLEEP AND SHE WOKE GEORGE AND GAVE HIM SOME MONEY.

AT ABOUT 9:00 AM MICHAEL GALLEGOS KNOCKED ON WISHON'S BEDROOM DOOR AND WHEN HE GOT NO ANSWER HE OPENED THE DOOR AND SAW THAT SHE WAS NOT IN THE ROOM. MS. KENDALL WAS CONTACTED AT WORK AND CAME HOME AND CALLED THE POLICE TO REPORT HER MISSING.

**(INFORMANT ONLY)**

THIS affiant believes the informant to be reliable because:

THE BRIEF EXAMINATION OF THE HOUSE AND CIRCUMSTANCES, LOCKED DOORS AND NO NOISE FROM A DOG THAT IS VIOLENT TOWARD PERSONS NOT ALLOWED IN THE HOUSE INDICATE THE LACK OF FORCED ENTRY. IN THE EVENT THAT ONE OF THE CURRENT RESIDENTS IS INVOLVED IN THE DEATH OF WISHON KENDALL YOUR AFFIANT REQUEST PERMISSION TO ENTER 1805 NORTH 71ST AVENUE TO LOOK FOR EVIDENCE TO IDENTIFY WISHON KENDALL'S KILLER AT THIS POINT THERE ARE NO LEADS AS TO THE IDENTITY OF THE SUSPECT/S.

The affiant believes the information given him is reliable because:

80-286D REV 7-82

**GALL 024**

EXHIBIT 1g

002319
MILKE_NSB002482

4.

Affiant believes that the following information demonstrates good cause for permitting this
warrant to be served between 10:00 PM and 6:30 AM:

Wherefore affiant prays that a search warrant be issued commanding that an immediate
search be made of the persons, premises and buildings, and vehicles described herein for the
property, persons and things herein described, and that the same be retained in the custody of
affiant or in custody of the agency which affiant represents and disposed of according to law,
pursuant to A.R.S. 13-3920

_____ #1739
AFFIANT                          SERIAL NUMBER

PHOENIX POLICE DEPT.
LAW ENFORCEMENT AGENCY

SUBSCRIBED AND SWORN to before me this 16 day of March,
19 972.

_____
JUDGE, JUSTICE OF THE PEACE, MAGISTRATE

of TD //efon Court.

PD 2660 REV 1-82

GALL 025

EXHIBIT 1g

002320
MILKE_NSB002483

Page - 1

| TYPE OF REPORT HOMICIDE | | SUPPLEMENT DATE 3-19-90 | DR # 09-042335A |
| VICTIM'S NAME WISHON, KENDALL | | LOCATION OF OCCURRENCE 1805 N. 71 AVENUE | |
| OFFICER WRITING REPORT'S # DET. HAMRICK #1739 | | SUPPLEMENT # 09-042335.A12 | |
| DATE & TIME TYPED MARCH 19, 1990 3:48 PM | BUREAU GIB | CLERK A1724 | |

Search Warrant:

Number:          SW90-457
Date/Time:       3-16-90, 1645 hrs
Jurisdiction:    Tolleson Justice Court
Judge:           DON STUMP
Location:        1805 N. 71 Avenue
Service:         1800 hrs, 3-16-90 (entry)

-----------------------------------------------------------------

On 3-16-90 as part of my duties as scene investigator, I authored a search
warrant and affidavit for search warrant for the house at 1805 N. 71
Avenue.

I presented both documents to JUDGE STUMP which he reviewed while I gave
him an oral explanation of the circumstances. He then administered the
oath of truthfulness, 1645 hrs, and signed both.

I returned to 1805 N. 71 Avenue, and did some exterior investigation
before entering the house at 1800 hrs. Evidence collected will be listed
on attached impound sheets.

**GALL 026**

EXHIBIT 1g

002350
MILKE_NSB002513

1    **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

9    Michael S. Gallegos,          )    No. CV-01-1909-PHX-NVW

                            )

10          Petitioner,        )    <u>DEATH PENALTY CASE</u>

                            )

11    vs.                      )

                            )

12    Dora B. Schriro, et al.,       )    **MEMORANDUM OF DECISION**

                            )    **AND ORDER**

13          Respondents.      )

                            )

14                               )

15

16       Before the Court is Petitioner Michael S. Gallegos's amended petition for writ of

17 habeas corpus. (Dkt. 74.)[1] Petitioner alleges, pursuant to 28 U.S.C. § 2254, that he was

18 convicted and sentenced to death in violation of the United States Constitution. (*Id.*)

19       The amended petition raised 33 claims for relief. (*Id.*) Respondents filed an answer

20 to the petition and Petitioner filed a traverse. (Dkts. 68, 86.) In an order denying Petitioner's

21 requests for evidentiary development, the Court dismissed Claim 30 based on a procedural

22 bar, Claim 31 on the merits, Claim 32 for failure to state a cognizable ground for habeas

23 relief, and Claim 33 as premature.[2] (Dkt. 106.) This Order addresses the procedural status

24 and/or the merits of the remaining claims and concludes, for the reasons set forth below, that

25 Petitioner is not entitled to habeas relief.

26

27 _____

     [1]    "Dkt." refers to the documents in this Court's case file.

28

     [2]    Petitioner acknowledges that Claim 10 is moot. (Dkt. 86 at 60.)

**GALL 027**

SALDATE000250

1  any involvement in the victim's death, Petitioner confessed to Detective Saldate.  He later

2  confessed a second time in the presence of both Detective Saldate and Detective Chambers.

3  The trial court determined that these confessions were voluntary.

4      When Smallwood was confronted with Petitioner's confessions, he denied any

5  involvement in the victim's death. He stated that if Petitioner had implicated him, it was only

6  because he did not want to take the blame alone.  The two were subsequently indicted for the

7  murder and sexual molestation of the victim.

8      The State submitted blood samples taken from Petitioner and Smallwood, along with

9  the evidence obtained at the crime scene, to a forensic laboratory for DNA testing.  The lab

10  later notified the State that Smallwood could not be included as a contributor to the evidence.

11  The State dismissed the case against Smallwood based on insufficient evidence.

12      During Petitioner's trial, the parties stipulated that a fingerprint removed from the

13  victim's bedroom matched Petitioner's right middle finger; that semen was detected on the

14  victim's panties, nightshirt, and bed sheet; that DNA testing showed that the stain on the

15  victim's panties contained a banding pattern that matched the pattern obtained from

16  Petitioner's blood; and that the probability that an individual other than Petitioner was the

17  source of the stain on the victim's panties was one in 10 million for Caucasians and one in

18  67 million for Hispanics.

19      Petitioner took the stand in his own defense and testified that he participated in the

20  victim's death.  He maintained that he was drunk and did not intend to kill her.  He also

21  testified that he believed the victim was dead at the time of the sexual penetration. On cross-

22  examination, he was unable to explain the various bruises and abrasions on the victim's

23  body.  Petitioner was prepared to call Smallwood as a witness, but on the advice of counsel

24  Smallwood invoked his Fifth Amendment right not to testify.

25      The jury unanimously found Petitioner guilty of first degree murder and sexual

26  conduct with a minor. The jury was divided, however, on whether the murder was

27  premeditated or felony murder.

28

- 5 -

SALDATE000254

EXHIBIT 1g

| TYPE OF REPORT | | SUPPLEMENT DATE | DR # |
| HOMICIDE | | 3-17-90 | 09-042335A |
| VICTIM'S NAME | | LOCATION OF OCCURRENCE | |
| WISHON, KENDALL | | 1805 N. 71 AVENUE | |
| OFFICER WRITING REPORT'S # | | | |
| DET. BUTLER #173H | | SUPPLEMENT # | |
| | | 09-042335.A1A | |
| DATE & TIME TYPED | BUREAU | CLERK | |
| MARCH 17, 1990 12:07 PM | GIB | A1724 | |

**SCENE:**

Evidence:

1. Vaginal, rectal, oral swabs
2. Unknown hairs removed from the body of the victim
3. Photographs of scene
4. Electrostatic dust print lifts.

Refer to impound supplements.

----------------------------------------------

The scene of where the nude body of KENDALL WISHON, W/F        , was found, was located on the east side of the residence in the grassy area underneath a large bottlebrush tree, between the sidewalk and the east wall of this home. The address of this residence will be 7101 W. Berkeley Road. This area will be just south of the intersection, the southwest corner, of 71 Avenue and Berkeley. The surrounding area had been secured by uniformed Phoenix Police officers with yellow crime scene tape in position to keep out any unauthorized persons from entering.

Standing in the street just east of the sidewalk looking west towards the body, I observed that it was lying on its back, nude, with the head to the west and the legs to the east. The head was turned towards the north. The right arm was out at a 45 degree angle, bent at the elbow in a southwesterly direction. The left arm was straight out at a 90 degree angle, bent at the elbow, with the hand and arm towards the west by the face. The legs were spread apart and you could clearly see the vaginal area. The body was laying on a dried grassy area on the south side of the bottlebrush tree, near the trunk. On the right wrist I did observe two cloth or fiber bracelets around this area. One was black and one was orange.

Latent Print Examiner MITCH SMALL #A2847 arrived at the scene. I then directed MR. SMALL to use the electrostatic dust print lifter on the concrete sidewalk which was located east of the victim to the area of the southwest corner of 71 Avenue and Berkeley Road. After securing a small area of the sidewalk directly east of where the deceased was lying, DET. SALDATE and I then approached the body. Due to the hardness of the ground, the large amount of dried grass and droppings from the bottlebrush tree, no shoe impressions could be found in the area.

GALL 029

EXHIBIT 1g

002321
MILKE_NSB002484

At the completion of this cursory examination, I then directed Latent Print Examiner SMALL in photographing the immediate scene and the body of the deceased.

The body was fully rigored and lividity was consistent with the position. Some type of oil was observed on the right leg and vaginal area of the deceased. Some type of transfer was observed on the left leg upper thigh area of the deceased. A contusion was observed to the left side of the face, to the right eye, center of forehead, the right nose, bruising to the left side of the face. It appeared that the deceased had previously been lying face down. A close examination of the body revealed trauma to the vaginal area, rectal area, and possibly to the oral area. In examining the eyes of the deceased, a slight amount of petechia could be observed.

DR. BOLDUC, the Assistant Medical Examiner of Maricopa County, arrived at the scene. DR. BOLDUC was then led into the area of where the deceased was lying. DR. BOLDUC then obtained oral, rectal and vaginal swabs from the deceased. DR. BOLDUC also obtained numerous foreign hair samples from the body of the deceased. After examining the body of the deceased, DR. BOLDUC advised me that he had no definite marks on the neck that would indicate manual strangulation and that death possibly could be from suffocation. Due to this fact, it is quite possible that the deceased had been killed somewhere else and then brought to this location and left.

At the conclusion of DR. BOLDUC's examination, the oral, rectal and vaginal swabs along with the foreign hairs were taken by DET. SCOTT of the Assault Detail to the Phoenix Police Department Crime Lab located at 620 W. Washington and there submitted for analysis. Refer to DET. SCOTT's supplement for further details.

The body of the deceased was rolled to the side so the back could be viewed. The back indicated that lividity was present as to the deceased having been lying on her back. No trauma was observed to the back area.

After examining the body of the deceased, I then did an in-detail survey of the surrounding area for any items of evidence. None could be found.

Measurements were taken of the body to place its location at the scene. These measurements will be included in the scene diagram. It should be noted that the body of the deceased had been found approximately 252 feet southeast of where she resided, which would be 1805 N. 71 Avenue.

Botler's Mortuary was obtained from the Medical Examiner's list. They were contacted by phone and advised that Western States would be transporting for them. A red tag was completed with all available information. When Western States Transportation arrived, I had them wrap the body of the deceased in a sterile, clean white sheet to preserve any items of evidence that might fall off the body of the deceased while transporting the body to the Office of the Medical Examiner. Western States then transported the body and the red tag to the Office of the Medical Examiner.

**GALL 030**

EXHIBIT 1g

002322
MILKE_NSB002485

Page   3

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WISHON, KENDALL | BUTLER #1738 | 89-942335A |

At the conclusion of the scene investigation, I then proceeded to 1805 N. 71 Avenue. There I examined the front yard and the dirt area just south of the carport. Numerous shoe impressions were found in the front yard and on the south side of the carport in the dirt. These shoe impressions somewhat matched the shoe prints that had been found on the sidewalk where the deceased had been located. I then had Latent Print Examiner SMALL photograph these shoe impressions with the 4 x 5 camera. Refer to the supplement as to where these shoe impressions were found.

For further information as to the scene, refer to the scene photographs, scene supplement and scene diagram.

GALL 031

EXHIBIT 1g

002323
MILKE_NSB002486

**CITY OF PHOENIX, ARIZONA**
**POLICE DEPARTMENT**

**LATENT PRINT**
**COMPARISON SUPPLEMENT**

| | | | |
|---|---|---|---|
| 3-17-90 1500 | Homicide | 1805 N. 71 AVE | 09-042335-A |

O.R. S.22ct    1875

**FOR LABORATORY BUREAU USE ONLY**

GIB | Homicide    7456

GALLEGOS, MICHAEL S.    M/m

SMALLWOOD, GEORGE A    M/m

---

Do NOT write below this line — for Laboratory Bureau use only

**RESULTS**

Latent lift card numbered one marked "left side of door frame, interior, NW bedroom" has been identified as the right thumb of MICHAEL GALLEGOS    Latent lift card numbered two marked "interior, door of NW bedroom" has been identified as the right middle finger of MICHAEL GALLEGOS    Latents numbered three and four have been compared to the inked prints of the above individuals with negative results.

| | | |
|---|---|---|
| | 3-20-90 | 1700 |

A1193

SIGNATURE OF LATENT PRINT EXAMINER

GALL 032

EXHIBIT 1g

002326
MILKE_NSB002489

CITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

INVESTIGATIVE
REPORT

Homicide     89-0423554

On 3-16-90 at 2015 hrs, photos were
taken of George Smallwood and Michael Galligan
at C.I.B. at the direction of Detective Chambers

K. Jones #1193
Latent Printer

EXHIBIT 1g

002327
MILKE_NSB002490

CITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

Evidence Examination
Supplement

| THE FOLLOWING ARTICLES AND/OR OTHER AS WERE EXAMINED FOR LATENT PRINTS OR OTHER PHYSICAL EVIDENCE | METHODS USED | RESULTS (NO PRINTS, PALM PRINTS, NO PRINTS, ETC.) | DISPOSITION OF EVIDENCE |
|---|---|---|---|
| Sidewalk South of Berkeley & 71st Ave | Esm | Shoe Impressions | |
| Door to SE bedroom interior | | | |
| Bookcase by bed - NE bedroom | | | |
| | | | |
| baby oil spray bottle, SW bedroom shelf | | No prints | |

At the request and direction of Detective Navarro, photographs were taken of the shoe prints seen in the yard found in the yard of the victim's home and of the area where the victim was found.

## QUEST FOR SCIENTIFIC ANALYSIS

GALLEGOS, MICHAEL

09-042335A

SMALLWOOD, GEORGE

HOMICIDE

1805 N. 71 Ave

Armando Saldate          1875

3-16-90          0030

Wishon, Kendall          X

3-17-90          1230

Examine clothing of each suspect for blood or semen.

---

The undersigned agrees and to certify that he is in custody of property the City of Phoenix and that he did on the 19          March          ,90          Det. Daldate in lab at 1000

X

No blood was detected on the shoes, socks, shirt, pants or undershorts (items 1A through 1E).

No blood was detected on the socks, T-shirt, pants, undershorts or the hat (item 2B through 2F).

Chemical testing indicated the presence of blood on the right shoe (item 2A).

At the conclusion of the analysis the evidence on the          19          day of          April          , 19 90 was:

X

M. Patel          [signature]

4-19-90 1116 A2959p1 09-042335A

## REQUEST FOR SCIENTIFIC ANALYSIS

| | |
|---|---|
| GALLEGOS, MICHAEL | 09-042335A |
| SMALLWOOD, GEORGE | HOMICIDE |
| 1805 N. 71 Ave | |
| Armando Saldate Jr     1875 | 3-16-90     0030 |
| Wishon, Kendall | 3-17-90     1230 |

Type and cross, examine items for evidence; also sheet for hairs and

fibers.  "Except item #16."

---

The examinate is prepared to testify that he is a criminalist employed by the City of Phoenix and that he did on the

19      day of March      19 90      at the lab   Det. Saldate in lab at 1000

X

That he did make an examination and analysis of the evidence and in his opinion:

Semen was indicated on the filter papers marked "Inner left thigh, Forcheet and Labia Majora.  Semen was identified on the filter papers marked "Introitus" and "Left Buttocks".

Serological testing of the blood in the tube marked "Wishon Kendall" gave the following results.

| ABO | ESD | PGM | PGM Sub | GLO | EAP | ADA | AK |
|---|---|---|---|---|---|---|---|
| A | 1 | 1 | 1 | 2-1 | 1+,2-1 | B | 1 | 1 |

No semen was detected on the "Vaginal" or "Oral" swabs.

Semen was identified on the "Rectal" swabs.

No spermatozoa were detected on the slides marked "Vaginal", "Oral" or "Rectal".

At the conclusion of my examination the date on this   19      day of April      19 90      at

X

SIGNATURE OF CRIMINALIST

M. Patel     *[signature]*

| DATE & TIME TYPED | LABOR ITEM NUMBER |
|---|---|
| 4-19-90  1433  A2959p1 | 09-042335A |

EXHIBIT 1g

002384
MILKE_NSB002547

QUEST FOR SCIENTIFIC ANALYSIS

09-042335A

HOMICIDE

71 Ave/Berkely

Det. A. R. Scott          4500          3-16-90

Wishon, Kendall                                    3-16-90      1624

X

Homicide Victim

The undersigned is prepared to testify that he is a criminalist as employed by the City of Phoenix and that he did on the

16   day of March          1990          Det. Scott 4500 in lab 1624

X

12 swabs
one 4x9 env.

No semen was indicated on the swabs marked "Oral" and "Vaginal".

Semen was identified on the swabs marked "Rectal".

Serological testing of the "rectal", "oral" and "vaginal" swabs produced
a 1+2- PGM Sub type.

The hair (Item 4) was determined to be of an animal origin.

At the conclusion of the analysis the ev. service the   19   day of   APRIL          1990 at

X

M. Patel          4-19-90  1110  A2959pt   09-042335A

## REQUEST FOR SCIENTIFIC ANALYSIS

| | |
|---|---|
| GALLEGOS, MIKE | 09-042335A |
| SMALLWOOD, GEORGE | HOMICIDE |
| 1805 N. 71 Ave | |
| Det. R. Butler       1748 | 4-16-90      1030 |
| Wishon, Kendall | 4-19-90      0837 |

Compare unknown hairs with known hair samples of suspects and victim.

19 ___ March ___            Det. Butler in lab at 0840

X

The hair (item 1 book 181, 239, 1) could not be differentiated from the pubic hairs from Mike Gallegos due to overlap of color and physical characteristics.  This hair was dissimilar to the pubic hair sample from George Smallwood.

At the conclusion of the analysis, the evidence on the    19    day of   April   ___ 19 90 was:

X

M. Patel            _mspatel_            4-19-90  1055  A2959p1   09-042335A

REQUEST FOR SCIENTIFIC ANALYSIS

| GALLEGOS, MICHAEL | 09-042335A |
| SMALLWOOD, GEORGE | HOMICIDE |
| 1805 N. 71 Ave | |
| Det. H. E. Hamrick     1739 | 3-16-90 |
| Wishon, Kendall | 3-19-90 |

Examine Items 1-31 for the presence of semen, blood, oily substance, hairs
and foreign substances.  Compare to blood and hairs from Michael Gallegos
and George Smallwood, to oil in item #30A and 29 and to swabs and foreign
materials collected from the _____ body of Kendall Wishon.

The undersigned is prepared to testify that he is a criminalist employed by the City of Phoenix and that he did on the
    19    day of  March    19 90   at 9 am from Det. Butler in lab at 0900

X _____

That he did make a careful examination and analysis of the evidence listed and in his opinion:

  Semen was indicated on the panties (Item 8).

  Semen was indicated on the fitted sheet (Item 3)

  Chemical testing indicated the presence of blood on the fitted sheet(Item 3)

Chemical testing indicated the presence of blood and semen on the garment
(Item 7).

Serological testing of the underwear (Item 27) gave the following results:

| ESD | PGM | PGM Sub | GLO | EAP | ADA | AK |
|-----|-----|---------|-----|-----|-----|-----|
| 1 | 2-1 | 1-2- | 1 | N/A | N/A | 1 |

              N/A = No Activity

  Semen was identified on the carpet (Item 31).  Serological testing of
  the stain produced a 1+1- PGM Sub type.

The oil on the stained sheets (Items 3,4 & 17) and pillow case (Item 5)
was consistent with the oil in the glass vial (Item 30A).

At the conclusion of the analysis the evidence on the    19    day of  April    19 90  was:

X _____

| M. Patel | _signature_ | 4-19-90 | 1515 | A2959p | 09-042335A |

## REQUEST FOR SCIENTIFIC ANALYSIS

GALLEGOS, MICHAEL STEVEN

SMALLWOOD, GEORGE A.

1805 N. 71 Ave

M. D. Chambers          1678

Wisbon, Kendall

X

Compare to scene and autopsy

09-042335A

HOMICIDE, SEXUAL ASSAULT

1-16-90      1028

1-16-90      2300

That he did make an examination and analysis of this evidence and that he did on the

19   day of   March        19.90   obtain from  Det. Butler in lab at 0800

X

That he did make an examination and analysis of this evidence and in his opinion:

Serological testing of the blood in the tube marked "Smallwood George Anthony" gave the following results:

| ABO ESD | PGM | PGM Sub | GLO | EAP | ADA | AK |
|---------|-----|---------|-----|-----|-----|-----|
| 0  1 | 2 | 2+2- | 2-1 | B | 1 | 1 |

At the conclusion of the analysis the evidence on the   19   day of  April                   19 90  was:

X

M. Patel

4-19-90  1037  A2959p1   09-042335A

EXHIBIT 1g

002388
MILKE_NSB002551

## REQUEST FOR SCIENTIFIC ANALYSIS

| | |
|---|---|
| GALLEGOS, MICHAEL STEVEN | 09-042335A |
| SMALLWOOD, GEORGE A. | HOMICIDE, SEXUAL ASSAULT |
| 1805 N. 71 Ave | |
| M. D. Chambers          1678 | 3-16-90          1028 |
| Wishon, Kendall | 3-16-90          2300 |
| Compare to scene and autopsy   X | |

The undersigned is prepared to testify that he is a criminalist employed by the City of Phoenix and that he did on the

19      day of  March                      19 90   obtain from  Det. Butler in lab at 0850

X received as a proper place in .....      (place of ..)

That he did make an examination and analysis of this evidence and in his opinion:

Serological testing of the blood in the tube marked "Gallegos Michael" gave the following results:

| ABO | ESD | PGM | PGM Sub | GLO | EAP | ADA | AK |
|---|---|---|---|---|---|---|---|
| 0 | 1 | 1 | 1+ | 2 | BA | 2-1 | 1 |

At the conclusion of the analysis the evidence on the     19     day of  April                            19 90  was:

X  RELEASED to Police property        RELEASED to

M. Patel            _mspobel_            4-19-90 1047 A2959p# 09-042335A

1

1

2          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

3                IN AND FOR THE COUNTY OF MARICOPA

4

5

6    STATE OF ARIZONA,                    )
                                          )
7              Plaintiff,                 )
                                          )
8    vs.                                  )    No. CR 90-03339b
                                          )
9    GEORGE ANTHONY SMALLWOOD,            )
                                          )
10             Defendant.                 )

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              State's Motion to Dismiss

15                  Phoenix, Arizona
                    June 29, 1990
16                    1:35 p.m.

17

18

19          BEFORE:    THE HONORABLE JEFFREY A. HOTHAM,
20                     Judge of the Superior Court

21

22

23

24   Prepared by Teresa Louis,        COPY
     Official Court Reporter
25

GALL 042                              MILKE_NSB029617
                    EXHIBIT 1g

Case 2:15-cv-00462-ROS  Document 669-1  Filed 09/18/20  Page 43 of 50
Case 2:01-cv-01909-NVW  Document 130-1  Filed 12/09/16  Page 83 of 116

2

```
1

2                              APPEARANCES

3

4    For the State:                          MR. LOUIS STALZER,
                                             Deputy County Attorney
5

6    For the Defendant:                      MR. PETER CLAUSSEN,
                                             Deputy Public Defender
7

8

9

10

11                                           Phoenix, Arizona
12                                           June 29, 1990
                                             1:35 p.m.
13

14

15

16

17

18            THE COURT:  Criminal cause 90-03339, State vs.

19    George Anthony Smallwood.  Counsel may note their presence.

20            MR. STALZER:  Louis Stalzer for the State.

21            MR. CLAUSSEN:  Peter Claussen on behalf of Mr.

22    Smallwood, Your Honor, who is present.

23            THE COURT:  I have in front of me the State's

24    motion to dismiss and order and the defendant's motion to

25    release the defendant on his own recognizance.  We will take the
```



Case 2:15-cv-00462-ROS   Document 669-1   Filed 09/18/20   Page 44 of 50
Case 2:01-cv-01909-NVW   Document 130-1   Filed 12/09/16   Page 84 of 116

3

1    State's motion to dismiss at this time.

2    MR. STALZER:  Yes, Your Honor.  I filed the motion

3    previous to today based on the fact that I had verbal

4    confirmation from the laboratory in Maryland indicating that

5    there was no evidence apparent from their testing of the various

6    forensic samples which would implicate Mr. Smallwood in the

7    crime charged.

8    For that reason, the State believes that it would

9    have inadequate evidence to prove his guilt beyond a reasonable

10    doubt at the present time, and therefore moves for the dismissal

11    without prejudice so as not to keep him incarcerated any longer.

12    THE COURT:  Would counsel please approach the

13    bench?

14    (Whereupon a discussion was held at the bench

15    between Court and counsel, outside the hearing of the jury and

16    the court reporter.)

17    THE COURT:  Good cause appearing, it is ordered

18    granting the motion of the State, dismissing the charges against

19    the defendant without prejudice.

20    MR. CLAUSSEN:  Your Honor, could I be heard on the

21    point of prejudice?

22    THE COURT:  Yes, you may.

23    MR. CLAUSSEN:  Your Honor, this case arose March

24    17.  Mr. Smallwood was charged quite openly, quite publicly.  He

25    appeared on every television station in town.  The story was

**GALL 044**

EXHIBIT 1g

**MILKE_NSB029619**

4



1    carried in both local newspapers, in the Mesa Tribune, carried

2    in the Flagstaff newspaper, where Mr. Smallwood lives.

3            His name has been sullied. His reputation has been

4    muddied terribly. The crimes involved here are incredibly

5    heinous. His name has been dragged through the mud. There's

6    been extreme prejudice to Mr. Smallwood. The victim here is his

7    sister. He has never been given the opportunity to grieve for

8    her, as he would obviously. The opportunity to grieve was

9    really torn from him because he was in jail being charged for

10   this crime, and he's been extremely confused about that from the

11   very beginning.

12           There's been prejudice to him. There is no need to

13   have this hang over his head any further. To make it without

14   prejudice is not to give him the exoneration that he clearly

15   should be given at this point. His name should be cleared as

16   completely as can possibly be done.

17           You can't give him back his good name, but you can

18   at least make it with prejudice so that it can be clear to

19   anyone who might ever ask that it's now acknowledged he is

20   innocent, he had nothing to do with this. To make it without

21   prejudice is to make it sound as if somehow or other in the

22   future the State may choose to charge him again.

23           There is no evidence. There's never been any

24   evidence. There is a statement by a co-defendant, and that's

25   it.



**GALL 045**                    EXHIBIT 1g                    **MILKE_NSB029620**

Case 2:15-cv-00462-ROS   Document 669-1   Filed 09/18/20   Page 46 of 50
Case 2:01-cv-01909-NVW   Document 130-1   Filed 12/09/16   Page 86 of 116

5

1          THE COURT:   There are of course under Arizona law

2    several civil remedies available to Mr. Smallwood.   The Court's

3    order will be without prejudice.

4          It's ordered further releasing the defendant from

5    incarceration as soon as possible.

6          Thank you, counsel.

7          MR. STALZER:   Your Honor, I believe as a result of

8    your order all pending motions are rendered moot.

9          THE COURT:   Yes, that's correct.   Thank you.

10          (Whereupon at 1:40 p.m. these proceedings

11    concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GALL 046                              MILKE_NSB029621

EXHIBIT 1g

# EXHIBIT G

**GALL 047**                    EXHIBIT 1g                    **MILKE_NSB029622**

# EXHIBIT G

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

Louis F. Stalzer
BAR ID #:   010471
Deputy County Attorney
111 West Monroe, Suite 1800
Phoenix, AZ   85003
Telephone:   602 256-5780
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | |
| Plaintiff, | NO. CR 90-03339,B |
| vs. | STATE'S MOTION TO DISMISS AND ORDER |
| GEORGE SMALLWOOD, | |
| Defendant. | (Assigned to the Honorable Jeffrey A. Hotham - Div. 46) |

COMES NOW the State of Arizona, by and through undersigned counsel, and moves this Court to dismiss the above-entitled cause without prejudice as to GEORGE SMALLWOOD only, for the reason that:

The State would be unable to prove the defendant guilty of the crimes charged beyond a reasonable doubt.

Counsel certifies that this motion is brought in good faith and not for the purpose of avoiding the provisions of Rule 8, Arizona Rules of Criminal Procedure.

### MEMORANDUM OF POINTS AND AUTHORITIES

Rule 16.5, Arizona Rules of Criminal Procedure.



**GALL 049**

EXHIBIT 1g

**MILKE_NSB029624**

Respectfully submitted this _26_ day of June, 1990.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

BY _____
Louis F. Stalzer
Deputy County Attorney

Copy of the foregoing
mailed/delivered this
_26_ day of
June, 1990, to:

The Honorable Jeffrey A. Hotham
Judge of the Superior Court

Peter Claussen
Deputy Public Defender
132 South Central
Phoenix, AZ   85004

Greg Clark
45 W. Jefferson, 11th Floor
Phoenix, Arizona 85003

BY _____
Louis F. Stalzer
Deputy County Attorney

2

GALL 050

MILKE_NSB029625

EXHIBIT 1g