51



1   it down underneath her buttocks to raise her up.

2              He said that George then attempted to make

3   penetration, but that he believed George couldn't make

4   penetration because he was making these faces and, in

5   fact, Mike was making faces for me.  He closed his eyes

6   and gritted his teeth.

7              He said that he couldn't make penetration,

8   and that George got off of her, got off the bed.

9              He then said that he could only think of one

10  thing, and that's making penetration, in what he termed,

11  her ass.

12       Q.   Did he tell you what he was doing as George

13  allegedly was doing the attempted vaginal penetration?

14       A.   I remember asking him what he had been doing

15  while George was doing this.

16       Q.   What did he tell you?

17       A.   He said that apparently this time he had his

18  hand underneath her ass fondling it.

19       Q.   What did he tell you happened after George

20  apparently had been making his attempts?

21       A.   He said, again, that he could only think of

22  that one thing.  He said he pulled her off the bed, laid

23  her on the floor, the carpet floor, face down with her

24  legs spread apart.

25              He got in between her legs, and he said that



GALL 201                EXHIBIT 1g        MILKE_NSB029587

52

1    he doesn't remember whether he had his pants or shorts on

2    her not.  Later on, I believe he told me he did have his

3    shorts still on.

4              He said that he then pulled her up and made

5    penetration into her ass, as he put it.  I then questioned

6    the fact of the -- of the oil, baby oil, and he said that

7    he forgot that when she was laying on the floor, that he

8    had put baby oil all over his penis, had squirted baby oil

9    in her ass.

10             He said he then grabbed her from the waist.

11   He then brought her hips up to his penis and made

12   penetration.  He said he kept moving her in and out by the

13   motion of his hands and pushing her in and out -- away

14   from him and towards him.

15             He said finally he finished, he ejaculated,

16   and I asked him what George had been doing during this

17   time, and he said that he had seen George -- he doesn't

18   know whether George helped him take the body or ███████

19   from the bed on to the floor, but he thinks he did.

20             He said that George was towards the --

21   towards her head, and that at one point, he saw George

22   still have an erection and that he had ██████ █████

23   mouth on his penis and was moving it around his penis.

24             After he finished, or after he ejaculated, he

25   believes that George told him that he couldn't finish, and

GALL 202                                      MILKE_NSB029588

EXHIBIT 1g

53



1   then they -- he said he pulled up his pants, cleaned his

2   penis. He said there was some feces on his penis.

3           He said that he then remembered the fact of

4   when, I believe, George took off the panties or panties

5   initially, there was some feces on her panties.

6           He said that at that point, they both were

7   thinking of what to do with her.

8       Q.   Did you ask him why he proceeded to do what

9   he did after the girl, in his opinion, was dead?

10      A.   Well, he indicated that he wanted to finish.

11      Q.   What did he say happened after the sex acts

12  were finished?



13      A.   He said that -- that they decided that they

14  had to get rid of the body, get rid of ████████ that they

15  had to take her outside, do something with her, and then

16  they remembered -- either he or George remembered that

17  they needed the keys, so George left the room and he was

18  there with ████████ for a short time.

19          George came back with the keys. He said that

20  George grabbed her around underneath the arms and around

21  the chest with his arms, picked her up, and that he then

22  picked up -- picked her up by the ankles. They walked out

23  of the room into the hallway.

24          He said one of the two shut the door of the

25  bedroom, and I had asked him why, and he said well, if

54

1    someone was to wake up, he didn't want someone noticing

2    the door opened, seeing that ████████ was missing and, of

3    course, start to search for her.

4              He said they walked down the hall for a short

5    period of time to the entrance of the diningroom, which is

6    tiled.  He then noticed that George had his shoes on,

7    tennis shoes on.  He then made a motion or something.  He

8    said during this entire time, they were either whispering

9    to each other, making facial expressions or motions to

10   each other.  That's how they communicated.

11             He told George about the shoes would make

12   noise on the tile floor.  George then laid ████████ on to

13   the carpeted floor, removed his shoes, then picked her

14   back up, and they walked into the diningroom area to the

15   garage door, or the kitchen door which leads into the,

16   like I say, garage, but I mean carport.  It is a

17   double-lock, so he had to unlock it from the inside.

18             They continued outside on to the -- on to the

19   cement driveway. he said he then locked the door behind

20   him.

21             I then asked him why, and he went into a

22   narration about the fact that if -- if Mike's brother

23   would have got up, if he would have got up and would have

24   found the doors unlocked, then it would have -- he would

25   have probably immediately gone to the bedroom where they

**GALL 204**                                    **MILKE_NSB029590**

EXHIBIT 1g



55

1   sleep and questioned them about the fact why the door is

2   unlocked, when he specifically told them to lock it before

3   they went to sleep.

4            He said they locked the door, came out, put

5   her between the front of the car and the carport storage

6   area.

7            He said that then they were checking to see

8   if any cars were passing by or anybody else was around.

9   He said that George had the bottle of baby oil during this

10  period of time.

11           He said that George then tossed the bottle of

12  baby oil as far as he could into the street south of the

13  home.  He says he doesn't recall it making a lot of noise.

14  He said that they looked again from side to side to make

15  sure no cars, no one had come out of the house.

16           He said that he didn't see anybody, so they

17  went back to where the body was at.  Again, he had

18  picked -- George picked her up around the chest area by

19  one arm.  He said he then picked her up by the ankles.

20           I then asked him about the fact that probably

21  George could have done it by himself since I had seen

22  ████████ and she didn't weigh that much, and he said that

23  he probably could have, but, you know, it kind of looks

24  stupid for him just to walk behind him and ██████, so he

25  kind of felt he had to do something, so he picked her up

56

1    by the ankles.

2              He said they ran down the sidewalk on their

3    side of the street for a short period of time.   Then they

4    crossed the street, and he said they had no intention to

5    put her underneath that specific tree, but he just said it

6    was there, you know, and they dropped her off at the tree.

7              They then ran back home, went inside the

8    home -- unlocked the door, went inside the home, locked

9    the door, went inside their bedrooms, and went to sleep.

10         THE COURT:   Let's take this opportunity to take our

11   afternoon recess.

12             Members of the jury, please remember the

13   Court's admonitions.

14

15             (Whereupon, the Court stood in recess.)

16

17   IN OPEN COURT:

18         THE COURT:   Thank you.   Please be seated.

19             The record will show the presence of all of

20   our jurors, the defendant an counsel, and Mr. Saldata on

21   the stand.

22             Mr. Stalzer.

23   BY MR. STALZER:

24         Q.   Sir, you were talking as we briefly took a

25   recess about the body being placed under the tree.

GALL 206

EXHIBIT 1g

MILKE_NSB029592



57

1          Can you tell us what, if anything, Mr.

2    Gallegos told you occurred at that location.

3          A.    I don't understand exactly the question.

4    Maybe --

5          Q.    If you could just pick up the narrative or

6    any statements that were made.

7          A.    We were, I believe -- anyway, we were in the

8    area of where they had taken the body across the street,

9    and laid the body out underneath a tree.  They had gone

10   back home, and had gone inside the house, secured the

11   house, went inside the bedrooms, and went to sleep.

12          I believe that's where we ended.

13          Q.    Did you ask Mr. Gallegos any questions

14   regarding what he did or what Mr. Smallwood did the

15   following morning?

16          A.    Certainly.  We continued on his narrative

17   form.  He told me the next morning he woke up and that he

18   and George really didn't talk about it that much.  They

19   kind of didn't want to say much to each other about it.

20          He said he got up; that George did get up,

21   and that he did go to the store and get some milk, came

22   back.  I believe at some point, the milk being was in

23   regards to ██████ needing some milk for some cereal in

24   the morning to go to school.

25          So I asked him about that, and he said, well,




EXHIBIT 1g                MLRE_NSB029593

58

1    they needed to eat, so they sat around, and after he got

2    back from the store, they decided what they were going to

3    do, and then George called his mother and said that

4    ████████ was missing.

5              He said they helped to search, and made it

6    very clear that he and George only walked on the east side

7    of the street, not getting near ████████ body, because

8    they didn't want to be the ones that discovered it.

9              He said when he and George also got in the

10   International Scout, the one they had been working on,

11   they went looking for -- supposedly looking for ████████

12   assisting in the search.

13             They made sure that -- or he and George made

14   sure that they didn't go around the body, didn't go drive

15   by the body or anything like that.  Again, they didn't

16   want to be the ones to locate the body.

17        Q.   Once you were finished with your interview,

18   did you meet with your partner, Detective Chambers, at the

19   time?

20        A.   Yes, I did.

21        Q.   Did you inquire of Mr. Gallegos if he would

22   tape-record an interview?

23        A.   I met with my partner, Mike Chambers, who was

24   interviewing George Smallwood.  Then I had Mike Chambers

25   come into the interview with me.  He then repeated

**GALL 208**                                    **MILKE_NSB029594**

EXHIBIT 1g



59

1    generally what he had told me to Detective Mike Chambers,

2    and I asked George if we could tape-record the interview,

3    and he said no, that he just didn't feel very comfortable

4    with going over it all over again, and that he felt very

5    comfortable with the fact that he had told me everything.

6         Q.    Is it correct there was like a reinterview

7    with Detective Chambers present?

8         A.    There was more of a reinterview, but more of

9    like a highlight interview.  I told Mike to tell Detective

10   Chambers generally what he had told me, and he went into

11   the fact about his admissions, what happened; that George

12   was responsible with him, and just highlighted general

13   areas, admitting his guilt, admitting George's guilt,

14   admitting the fact that they had disposed of the body, and

15   the fact that they also intended later -- both attended

16   looking for the body later on, and that's when we asked

17   him about the tape-recorder and him not wanting to go

18   through the whole story again, and I don't blame him.

19        Q.    In the course of some follow-up work by you,

20   did you at any time in the days following attend the

21   autopsy of ▇▇▇▇▇   ▇▇▇▇▇▇

22        A.    Of course.

23        Q.    At the time of the autopsy, did you secure

24   any articles that would be used for any scientific

25   analysis at a later date?

**GALL 209**                                    **MILKE_NSB029595**

1 IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2 IN AND FOR THE COUNTY OF MARICOPA

3

4 STATE OF ARIZONA, )
)
5 Plaintiff, )
)
6 vs. )
) CR 90-03339
7 MICHAEL STEVEN GALLEGOS, )
)
8 Defendant. )
_____)

9

10 Phoenix, Arizona
March 13, 1991
11

12

13

14 Before: The Honorable JEFFREY HOTHAM,
Judge of the Superior Court
15

16

17 REPORTER'S TRANSCRIPT OF PROCEEDINGS
(JURY TRIAL)
18

19

20

21

22 DONALD E. MOLL
Court Reporter
23

24 COPY

PREPARED FOR:
25
ON APPEAL

JUL 16 591

APPEALS RECEIVED

GALL 210

EXHIBIT 1g

MILKE_NSB029670

5

1    No semen was detected on vaginal or oral swabs.

2              Further, the stipulation being that items

3    were submitted to Cellmark Diagnostic in Germantown,

4    Maryland, and they were the following items:  Three rectal

5    swabs; carpet; underwear; panty crotch, front and back;

6    filter paper labeled introitus I-n-t-r-o-i-t-u-s, left

7    buttocks and inner left thigh, along with blood samples

8    from ▓▓▓▓▓▓▓▓, blood sample of George Smallwood and

9    a blood sample from Michael Gallegos.

10             The results of their testing is as follows:

11   Human DNA was extracted from the items listed above, and

12   insufficient quanity of DNA was obtained from the carpet

13   to continue any testing.  No DNA banding pattern was

14   obtained from the combined filter papers labeled

15   introitus, left buttocks and upper left thigh due to an

16   insufficient quanity of human DNA.

17             DNA banding patterns were obtained from the

18   three combined rectal swabs, the material labeled

19   underwear, the material labeled panty crotch, front and

20   back, the blood samples of ▓▓▓▓▓▓, the blood

21   sample of George Smallwood and the blood sample of Michael

22   Gallegos.

23             In a report of laboratory examination dated

24   August 9, 1990, it was concluded that the DNA banding

25   pattern obtained from the stained material labeled panty

**GALL 211**                                    **MILKE_NSB029671**

EXHIBIT 1g

6

1    crotch, front, back, matches the DNA banding pattern

2    obtained from the blood sample labeled Michael Gallegos.

3              The frequency in the Caucasian population for

4    another person being a contributor of the DNA banding

5    pattern obtained from the panty crotch and Michael

6    Gallegos is approximately 1 in 10 million.

7              The frequency in the Hispanic population for

8    another person being a contributor of the DNA banding

9    pattern obtained from the panty crotch and Michael

10   Gallegos is approximately 1 in 67 million.

11             That is the extent of the stipulations, Your

12   Honor.

13        THE COURT:  All right.  Mr. Clark, do you agree

14   with the reading and so stipulate?

15        MR. CLARK:  Yes, I do, Judge.

16        THE COURT:  Thank you, sir.  All right.  Thank you,

17   Mr. Stalzer.

18             And does the State rest at this time?

19        MR. STALZER:  Your Honor, the State does rest at

20   this time.

21        THE COURT:  Thank you.

22             Members the jury, the State having rested its

23   case, there are some legal issues that I am going to be

24   discussing with the lawyers, and rather than having you

25   wait around, what we're going to do is send you to lunch

**GALL 212**                          **MILKE_NSB029672**

EXHIBIT 1g

PETER R. CLAUSSEN
State Bar No. 007364
Deputy Public Defender
132 South Central Avenue, Suite 6
Phoenix, Arizona 85004
(602) 262-3024
Attorney for Defendant





FILED

1990 JUN 27 PM 3 45

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

                Plaintiff,

        v.

GEORGE SMALLWOOD,

                Defendant.

No. CR-90-03339

MOTION TO SUPPRESS STATEMENTS

(Assigned to the Honorable
 Jeffrey Hotham)

(Oral Argument Requested)

(Evidentiary Hearing Requested)

        COMES NOW the Defendant, by and through his attorney undersigned,
and hereby moves for an order suppressing, and preventing the use at trial,
of statements made by George Smallwood to Phoenix police officers on March
16, 1990. Defendant also requests that the Court enter findings that the
statements must be suppressed for the following reasons:

        1. The statements were involuntarily, because they resulted from
coerced police tactics in violation of the Fifth and Fourteenth Amendments of
the United States Constitution;

        2. The statements were obtained in violation of the Defendant's
Sixth Amendment right to counsel pursuant to Edwards v. Arizona, 451 U.S. 477
(1981);



01453

GALL 213

EXHIBIT 1g

MILKE_NSB012539

3. The statements were obtained in violation of the Defendant's right against self-incrimination, as outlined in Miranda v. Arizona, 384 U.S., 436 (1966);

4. The statements were obtained in violation of the Defendant's right not to be compelled to give evidence against himself pursuant to Article II, Section 10 of the Arizona Constitution;

5. The statements were obtained in violation of the Defendant's right to counsel under Article II, Section 24 of the Arizona Constitution.

The Defense requests that statements by George Smallwood be suppressed and their use by the State be prohibited in the State's case-in-chief, in rebuttal, as well as for purposes of impeachment in the event the Defendant chooses to testify at trial.  This motion is based on the authorities cited, as well as the attached Memorandum of Points and Authorities.

Respectfully submitted this _2⧸_ day of June, 1990.

DEAN W. TREBESCH
Maricopa County Public Defender

By _____
PETER K. CLAUSSEN
Deputy Public Defender
Attorney for Defendant

MEMORANDUM OF POINTS AND AUTHORITIES

According to Phoenix Departmental Report number 09-042335A filed by Detectives Chambers and Saldate of the Phoenix Police Department, Mr. Smallwood was taken into custody for questioning at the Phoenix main police station, at 620 West Washington, on the 16th of March, 1990. Police officers wished to question Mr. Smallwood as to any information he might have con-

-2-

01454

**GALL 214**

EXHIBIT 1g                    **MILKE_NSB012540**

cerning the apparent homicide of his sister, who had been discovered dead.

George Smallwood was questioned at length, while detained in an interview room at the General Investigations Bureau, at 620 West Washington. Mr. Smallwood is a naive young man, 18 years of age, completely inexperienced in the ways of police officers and the criminal justice system.    Mr. Smallwood agreed to answer Detective Chambers' questions, and spoke to him at length about what he had been doing for the prior 24 hours.   Mr. Smallwood agreed to be fingerprinted, to have hair and blood samples taken, and to be photographed.   Mr. Smallwood indicated to the police that he was happy to have his hair and blood samples taken, because he knew that he had no connection whatever with the death of his sister.

Simultaneously, in another room, Michael Gallegos was offering a complete confession to Detective Saldate.   Unfortunately, Mr. Gallegos' confession included a fabrication alleging Mr. Smallwood's involvement in the murder.   Mr. Smallwood was completely unaware of the statement being made by Mr. Gallegos.

When Detective Chambers confronted Mr. Smallwood with the statement made by Mr. Gallegos, Mr. Smallwood continued to deny involvement in the death of his sister, and continued to insist that his blood and hair be tested.   In the words of Detective Chambers, "He was adamant he had not been involved in the death of his sister."   After approximately two and one-half hours of continuous questioning by Detectives Chambers and Saldate, questioning during which Mr. Smallwood repeatedly denied involvement, and Detectives Saldate and Chambers repeatedly told him they did not believe him, Mr. Smallwood invoked his right to counsel.   Mr. Smallwood indicated to Detective Saldate, he did not want to answer anymore questions without a lawyer.

-3-

01455

**GALL 215**

EXHIBIT 1g

**MILKE_NSB012541**

Although Mr. Smallwood had indicated he did not wish to answer anymore questions, Detective Chambers returned to Mr. Smallwood and directly stated that he was a aware of Mr. Smallwood's request for counsel. On page 16 of Detective Chamber's own report, he states, "I indicated to him my understanding, he did not want to answer further questions without a lawyer. I indicated to him that I would not ask further questions. I indicated to him, rather, I would make a statement to him. I spoke to him. In a situation such as this, it would appear Michael was being truthful and he "George" was not. I further indicated with the situation so serious only the truth should ever be told. Any other statement is like digging a hole. I further indicated it would make the situation appear even possibly premeditated."

It is clear from the statement made by Detective Chambers in his report that he was very much aware that the Defendant had invoked his right to counsel. It is also clear that the interrogation continued in violation of the Defendant's right to counsel, as outlined in <u>Miranda v. Arizona</u>, <u>supra</u>. Interrogation includes, "Express questioning or its functional equivalent," that is, "Words or actions on the part of the police, other than those normally attendant to arrest and custody that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300, 2301 (1980). This police technique, interrogating a suspect after he has invoked his right to counsel, has been specifically condemned by the Arizona Supreme Court in <u>State v. Bravo</u>, 158 Ariz. 364, 762 P.2d 1318 (1988). The Supreme Court in that case made it clear that the suspect's right to cut off all questioning must be, "scrupulously honored." There is simply no excuse to permit the use of statements obtained from Mr. Smallwood in violation of his rights, once they have been

-4-

**GALL 216**

EXHIBIT 1g                    **MILKE_NSB012542**

invoked. Because Mr. Smallwood did invoke his right and attempt to cut off the interview, and because his request was not scrupulously honored by Detectives Chambers and Saldate, his statement must be suppressed. State v. Finehout, 136 Ariz. 226, 665 P.2d 570 (1983); State v. Bravo, supra.

One test of admissibility, which the Court must apply before admitting any statements made to the police, is the question of whether the Defendant's right to counsel has been respected. Arizona Revised Statutes §13-3988(B)(5). While a refusal to recognize and honor the Defendant's request for counsel is a violation of his Sixth Amendment rights under the United States Constitution and Article II, Section 24 rights under the Constitution of the State of Arizona, it is also a violation of statutory law and a specifically enumerated factor in the above-cited section of Arizona's criminal code.

The situation presented here is one in which Mr. Smallwood invoked his right to counsel, and communication continued thereafter. In Edwards v. Arizona, supra, the United States Supreme Court addressed just such an issue. In that case, the rule was stated quite plainly:

> An accused...having expressed his desire to deal with the police only through counsel, is subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.

This simple rule set forth by the Supreme Court was not followed in the case of George Smallwood. Detectives Chambers and Saldate chose to disregard Mr. Smallwood's request for a lawyer and continued to question him until such time as the statement was made.

-5-

01457

**GALL 217**

EXHIBIT 1g

**MILKE_NSB012543**

1 | GREG CLARK
HENZE, RONAN & CLARK
2 | 45 West Jefferson, 11th Floor
Phoenix, Arizona 85003
3 | Telephone (602) 257-9343
State Bar I.D. No. 009431

4 | Attorney for defendant Gallegos

5

6 | IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

7 | IN AND FOR THE COUNTY OF MARICOPA

8

9 | STATE OF ARIZONA,                          )
                                             )
10 |             Plaintiff,                    )        No. CR 90-03339
                                             )
11 |     v.                                    )
                                             )        SUPPLEMENT TO REQUEST
12 | MICHAEL GALLEGOS,                         )        FOR VOLUNTARINESS HEARING
                                             )
13 |             Defendant.                    )        (Hon. Jeffrey Hotham)
                                             )

14

15 | The defendant, MICHAEL GALLEGOS, acting through counsel,

16 | GREG CLARK, hereby supplements his request for voluntariness

17 | hearing with the attached Memorandum of Points and Authorities.

18 | RESPECTFULLY SUBMITTED this 30th day of July, 1990.

19 |                                   HENZE, RONAN & CLARK

20

21 |                             By_____
                                     GREG CLARK

22

23

24

25

26

27

28

GALL 218

EXHIBIT 1g                      **MILKE_NSB012535**

1  determined that young Kendall died as a result of the boys
2  cutting off her air supply.

3      Once Kendall had died, the pair removed the body, placing
4  it down the street in the yard of a neighbor. When the body had
5  been removed from the home, the pair went to sleep and reported
6  the child missing the next day.   In response to the report of
7  Kendall's disappearance, the Phoenix Police responded and the
8  body of Kendall was found within a short time.   Subsequent to
9  finding the body, it was determined that both the defendant and
10 Smallwood were the prime suspects.   While at the scene, the
11 defendant and Smallwood were separated, questioned, and asked to
12 voluntarily come to the police station for questioning.   The
13 defendant was told that if refused to voluntarily come to the
14 station, he would be arrested and transported anyway.   Both the
15 defendant and Smallwood were taken to the main station of the
16 Phoenix Police Department and placed into separate rooms to be
17 questioned.

18     Detective Saldate of the Phoenix Police Department was in
19 charge of questioning the defendant, and Detective Chambers of
20 the Phoenix Police was in charge of speaking to Smallwood.
21 Saldate began the interview by telling the defendant that he knew
22 he was responsible for the death of Kendall.   The defendant
23 denied these assertions and continued to do so in the face of
24 Saldate's continued insistence.   The defendant repeatedly asked
25 for counsel and was repeatedly ignored by Saldate until he
26 finally admitted his involvement.   Once he had admitted his
27 involvement, he was asked by Saldate to sign a confession, and he
28

-3-

01450

EXHIBIT 1g

MILKE_NSB012536

1  refused to do so.  Once the defendant made these admissions to
2  Saldate, he was read his rights, and the questioning continued.
3  At one point in time, Detective Chambers came into the room and
4  summoned Saldate outside.  The defendant overheard a conversation
5  where it was decided that he would be brought into the interview
6  room where Smallwood was held to confront him.  The detectives
7  had decided to initiate this confrontation because Smallwood was
8  continuing to deny his involvement in the face of what the
9  defendant had told them.  The defendant was thereafter brought
10 before Smallwood and forced to confront and accuse him.

11
                              THE LAW
12
13          In Arizona, confessions are prima facie involuntary.
   State v. Arnett, 119 Ariz. 38, 579 P.2d 5542, 546 (1978); State
14
   v. Edwards, 111 Ariz. 357, 360-61, 529 P.2d 1174, 1177-78 (1974).
15
   The State has the burden to show by a preponderance of the
16
   evidence that the confession was freely and voluntarily made.
17
   State v. Knapp, 114 Ariz. 531, 538, 562 P.2d 704, 711 (1977),
18
   cert. denied, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).
19
   The trial court must look to the totality of the circumtances in
20
   evaluating the voluntariness of a confession to decide whether a
21
   defendant's will has been overborne.  Schneckloth v. Bustamonte,
22
   412 U.S. 218, 225-27, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862
23
   (1973); State v. Edwards, 111 Ariz. 357, 361, 529 P.2d 1174,
24
   1178 (1974); State v. Hall, 120 Ariz. 454, 456, 586 P.2d 1266
25
   (1978).  All questions involved are for the trial court to
26
   decide.  A.R.S. §13-3988.  Absent clear and manifest error, the
27

28                              -4-

                              01451

GALL 220

EXHIBIT 1g                              MILKE_NSB012537

1 | 445, 473-74, 86 S.Ct. 1602, 1612, 1627-28, 16 L.Ed.2d 694, 707,
2 | 723 (1966).

## THE ARGUMENT

It is the position of the defendant that he is a juvenile and his confesion was involuntary due to his mental age, educational level, lack of prior experience with the police, lack of consultation with an adult, and general lack of "life experiences". The defendant is, as a result of his young age, susceptible to having pressures brought to bear sufficient to overbear his will in the face of police authority. When faced with being ignored at the invocation of his right to counsel, the defendant's intent to remain silent gave way to the subtle tactics of Detective Saldate.

It is respectfully submitted that the "totality of the circumstances" support the contention that the confession in this matter, as well as the fruits thereof, be suppressed as being involuntary.

RESPECTFULLY SUBMITTED this 30th day of July, 1990.

HENZE, RONAN & CLARK

By _____
GREG CLARK

-7-

01452



GALL 221

EXHIBIT 1g

MILKE_NSB012538

1  Jon M. Sands
2  Federal Public Defender
   District of Arizona
3  Ashwin Cattamanchi (Illinois Bar No. 6289199)
4  Emma L. Smith (Illinois Bar No. 6317192)
   Assistant Federal Public Defenders
5  850 West Adams Street, Suite 201
6  Phoenix, Arizona 85007
   Ashwin_Cattamanchi@fd.org
7  Emma_Smith@fd.org
8  Telephone (602) 382.2816
   Facsimile (602) 889.3960
9

10          **IN THE UNITED STATES DISTRICT COURT**
            **FOR THE DISTRICT OF ARIZONA**
11

12  Michael Gallegos,                    CV 01-1909-PHX-NVW

13                  Petitioner,          DEATH-PENALTY CASE

14          vs.

15  Charles L. Ryan,                     Motion to Stay and Hold Habeas
                                         Proceedings in Abeyance, to
16                                       Supplement Petition, and to Represent
                    Respondent.          Petitioner in State Court Proceedings
17

18

19          Petitioner Michael Gallegos returns to this Court on remand from the Ninth

20  Circuit following the partial grant of his Motion to Remand to the District Court

21  and Request for Authorization of Federal Habeas Counsel to Appear in State

22  Court Litigation.[1] *See Gallegos v. Ryan*, 820 F.3d 1013, 1015–16 (9th Cir. 2016).

23

24  [1] Following Mr. Gallegos's Petition for Rehearing, the Ninth Circuit additionally
25  granted in part Mr. Gallegos's Motion for Stay and Partial Remand for
    Reconsideration in Light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).
26  *See Gallegos v. Ryan*, No. 08-99029, ECF No. 84 (9th Cir. Nov. 30, 2016).
    Because the parties disagree as to the timeliness of Mr. Gallegos's *Brady* claim
27  and the relevant dates, Mr. Gallegos in an abundance of caution presents this
    motion immediately following the issuance of the mandate from the Ninth Circuit.
28  He will, however, await this Court's instruction and schedule concerning the
    briefing of the *Martinez* issue.

**GALL 222**

SALDATE000320

EXHIBIT 1g

1   Mr. Gallegos respectfully asks this Court to 1) temporarily stay and hold federal

2   proceedings in abeyance while he pursues available state court relief, 2) allow him

3   to supplement his 28 U.S.C. § 2254 petition to include a claim under *Brady v.*

4   *Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972),

5   based on newly discovered impeachment evidence regarding the lead detective in

6   this case, Armando Saldate, and 3) authorize his federal habeas counsel to appear

7   on his behalf in state court.

8   **I.    Statement of Facts**

9        Detective Armando Saldate was the lead detective in Mr. Gallegos's case,

10  and within 24 hours of the offense he interrogated Mr. Gallegos, who was at that

11  time an 18-year-old high school student in special education classes. (Ex. A at 1;

12  Ex. B at 23; Ex. D at 25.) Detective Saldate did not tape record the interrogation,

13  secure a written confession, or get a signed waiver of *Miranda* rights from

14  Mr. Gallegos. After Mr. Gallegos allegedly confessed, Detective Saldate

15  purportedly conducted a re-interview in the presence of his partner, Detective

16  Michael Chambers, that lasted only 10 or 15 minutes. (Ex. B at 29, 32.) According

17  to Detective Saldate, in this "highlight interview" he told Mr. Gallegos "to tell

18  Detective Chambers generally what he had told" him, and Mr. Gallegos "just

19  highlighted general areas." (Ex. D at 59.) Detective Chambers, now deceased,

20  wrote lengthy reports, but did not include anything about this "highlight

21  interview." (Ex. E.) Like the initial interrogation, the second interrogation in the

22  presence of Detective Chambers was not recorded, and there was no signed,

23  written confession or waiver of *Miranda* rights.

24       The State charged both Mr. Gallegos and George Smallwood, the victim's

25  half-brother. *State v. Gallegos,* 870 P.2d 1097, 1102, 1104 (Ariz. 1994) (en banc).

26  Mr. Gallegos purportedly gave a statement that implicated both defendants. (Ex. A

27  at 3–4.) Mr. Smallwood told Detective Chambers that "I could have done this, but

28  I don't remember it, I black out a lot." *Id.* at 1116. About three months after the

1  offense, on June 29, 1990, the State informed the court that it had no forensic

2  evidence implicating Mr. Smallwood (Ex. F at 3) and moved to dismiss the

3  charges against him (Ex. G). The court granted the motion. (*Id.* at 3.)

4      The court then conducted a pre-trial voluntariness hearing regarding

5  Mr. Gallegos's alleged confession. Detective Saldate testified that Mr. Gallegos

6  first told a story that involved no wrongdoing. According to Detective Saldate,

7  after he told Mr. Gallegos he thought the offense was committed by someone

8  inside the house, Mr. Gallegos confessed. (Ex. B at 25–29.) Detective Saldate

9  further testified that he reviewed Mr. Gallegos's *Miranda* rights with him before

10  the alleged confession and that Mr. Gallegos never requested counsel. (*Id.* at

11  23–25, 29.)

12      Mr. Gallegos also testified at the voluntariness hearing, but his account of

13  his interactions with Detective Saldate differed significantly from

14  Detective Saldate's version. He testified that Detective Saldate repeatedly ignored

15  his requests for counsel, saying that Detective Saldate would "just look at me and

16  just keep writing. . . . Like it went in one ear and out the other. . . . It was just like

17  I didn't say anything." (*Id.* at 97–98.) Mr. Gallegos also testified that

18  Detective Saldate did not inform him of his *Miranda* rights until after he allegedly

19  confessed. (*Id.* at 96.) The court credited Detective Saldate's testimony over

20  Mr. Gallegos's and held that Mr. Gallegos's statements were voluntary and

21  admissible.

22      Detective Saldate's testimony was also crucial at trial, where he testified

23  about Mr. Gallegos's alleged statement. (Ex. D at 33–58.) Upon advice of counsel,

24  Mr. Gallegos also testified at trial. Mr. Gallegos's trial counsel, Greg Clark,

25  testified during state post-conviction proceedings that he advised Mr. Gallegos to

26  testify because he knew that Detective Saldate's testimony would be admitted at

27  trial and that the testimony would be detrimental to the defense. (Ex. H.)

28  Mr. Clark believed that the testimony of Mr. Gallegos was necessary to mitigate

1    Detective Saldate's testimony. (Ex. H; Ex. I at ¶ 7.)

2         Mr. Gallegos was convicted of first-degree murder and sexual conduct with

3    a minor. (Ex. J at 45–46.) He was sentenced to consecutive sentences of death and

4    20 years' imprisonment. *See Gallegos,* 870 P.2d at 1104. After the Arizona

5    Supreme Court on direct appeal remanded the case for re-sentencing on the

6    first-degree murder conviction, *id.* at 1117–19, the trial court once again imposed

7    death (Ex. L at 190).

8         What was undisclosed to defense counsel, the jury, the trial judge, and the

9    Arizona Supreme Court was that Detective Saldate had a history of both lying in

10   judicial proceedings and ignoring defendants' constitutional rights. Specifically:

11        •    On October 2, 1992, after Mr. Gallegos's trial but before he was

12             re-sentenced, the Court of Appeals of Arizona held that Detective Saldate

13             violated a defendant's right to remain silent when he continued to

14             interrogate him after an "unequivocal invocation" of the right. *See Milke v.*

15             *Ryan,* 711 F.3d 998, 1017, 1021 (Appendix) (9th Cir. 2013) (discussing

16             *State v. Mahler,* No. 1 CA-CR 90-1890 (Ariz. Ct. App. Oct. 2, 1992)).

17        •    On November 29, 1990, less than 4 months before trial, a court

18             suppressed a murder confession taken by Detective Saldate of a juvenile

19             kept alone in an interrogation room, handcuffed to a table. The Maricopa

20             County Attorney's Office admitted, and the court found, that there was no

21             probable cause for the detention. The court called the interrogation "a show

22             of flagrant misconduct." *Id.* at 1015, 1021 (Appendix) (discussing *State v.*

23             *Jones,* No. CR 90-05217 (Ariz. Supr. Ct. Nov. 29, 1990)).

24        •    On June 22, 1990, less than 2 months before the voluntariness

25             hearing, a court found that Detective Saldate lied under oath and "continued

26             to interrogate the defendant despite the defendant's demand to cease

27             questioning." *Id.* at 1013–14, 1020 (Appendix) (discussing *State v. King,*

28             No. CR90-00050 (Ariz. Super. Ct. June 22, 1990)). The trial judge in that

1    case suppressed the portion of the confession that followed the defendant's

2    request to end the interview. *Id.*

3    •    On October 16, 1989, less than 10 months before the hearing, a court

4    held that Detective Saldate misled a grand jury by omitting some of the

5    defendant's statements to make him look more culpable and remanded for a

6    new finding of probable cause. *Id.* at 1014, 1020 (Appendix) (discussing

7    *State v. Rangel*, No. CR89-08086 (Ariz. Super. Ct. Oct. 16, 1989)).

8    •    On February 27, 1989, less than 18 months before the hearing, a

9    court found that Detective Saldate's false statement to a grand jury "denied

10   [the defendant] his right to due process and a fair and impartial presentation

11   of the evidence" and granted the motion for a new finding of probable

12   cause. *Id.* at 1013, 1020 (Appendix) (discussing *State v. Reynolds*, No.

13   CR88-09605 (Ariz. Super. Ct. Feb. 27, 1989)).

14   •    Also in 1989, as recounted in the court of appeals decision, a trial

15   court held a statement "involuntary and inadmissible" that Detective Saldate

16   had taken from a suspect in intensive care who was intubated and losing

17   consciousness. *Id.* at 1014, 1022 (Appendix) (discussing *State v. Conde*,

18   846 P.2d 843, 845 (Ariz. Ct. App. 1992)).

19   •    On November 20, 1986, a court ordered a redetermination of

20   probable cause because Detective Saldate testified to the grand jury that

21   there were four shots, when it was undisputed that the victim was shot only

22   once. *Id.* at 1013–14, 1020–21 (Appendix) (discussing *State v. Rodriquez*,

23   No. CR 161282 (Ariz. Super. Ct. Nov. 20, 1986)).

24   •    On July 26, 1984, a court vacated a conviction and ordered a new

25   trial after Detective Saldate admitted he interrogated a suspect who had just

26   suffered a skull fracture and was strapped to a hospital bed, incoherent.

27   Statements made to Detective Saldate were suppressed at a suppression

28   hearing for the new trial in November of 1984. *Id.* at 1004–05, 1014, 1021

1   (Appendix) (discussing *State v. Yanes*, CR 130403 (Ariz. Super. Ct. July 26,
2   1984)).

3   •   On August 31, 1973, a Phoenix Police Department Internal Affairs
4   investigation concluded that Detective Saldate lied about an incident where,
5   in exchange for a kiss and other advances, he allowed a female motorist to
6   leave without checking on a possible warrant. The report concluded that
7   "because of this incident, your image of honesty, competency, and overall
8   reliability must be questioned," and Detective Saldate was suspended for 5
9   days. *Id.* at 1012, 1020 (Appendix).

10  This evidence, which the State did not provide to Mr. Gallegos, was the
11  subject of the Ninth Circuit's opinion in *Milke v. Ryan*, where the Court granted
12  Debra Milke's habeas petition based on her claim that her due process rights had
13  been violated by the State's suppression of this evidence.[2] 711 F.3d at 1019. After
14  learning of the suppressed evidence, Mr. Gallegos filed a Motion to Remand to
15  the District Court and Request for Authorization of Federal Habeas Counsel to
16  Appear in State Court Litigation in the Ninth Circuit, where his case was pending.
17  *Gallegos v. Ryan*, No. 08-99029, ECF No. 57-1 (9th Cir. Mar. 14, 2014). The
18  Ninth Circuit granted Mr. Gallegos's request for a remand, *Gallegos*, 820 F.3d at
19  1015–16, which precipitated this filing.

20  **II.   Argument**

21      **A.   The Court should stay Mr. Gallegos's federal proceedings so
           state courts can first rule on his *Brady* claim**
22

23  The requested stay is consistent with "Congress' intent to · channel
24  prisoners' claims first to state courts." *Cullen v. Pinholster*, 563 U.S. 170, 182

---

25  [2] After he was noticed as a witness in the re-trial of Ms. Milke, Detective Saldate
26  sought to invoke his Fifth Amendment right against self-incrimination and to
    refuse to testify. The Court of Appeals of Arizona held that he could not invoke
27  that right. *Arizona ex rel. Montgomery v. Mroz*, No. 1 CA-SA14-0028, 2014 WL
    1516585 (Ariz. Ct. App. Apr. 17, 2014). The court subsequently held that
28  Ms. Milke could not be retried. *Milke v. Mroz*, 339 P.3d 659 (Ariz. Ct. App.
    2014).

SALDATE000325

1   (2011). The Supreme Court, in *Rhines v. Weber*, 544 U.S. 269, 275–79 (2005),

2   approved a process by which district courts have authority to stay pending federal

3   habeas corpus proceedings and allow the petitioner to return to state court to

4   exhaust his claims. When a petitioner can show good cause, has not engaged in

5   intentionally dilatory litigation tactics, and presents a potentially meritorious

6   federal claim, "it likely would be an abuse of discretion for a district court to deny

7   a stay." *Id.* at 278.

8          The Ninth Circuit instructively utilized this stay-and-abeyance procedure in

9   *Gonzalez v. Wong*, 667 F.3d 965, 972, 978 (9th Cir. 2011), where the petitioner

10  raised a *Brady* claim in district court—in motions for reconsideration from the

11  denial of his habeas petition—that was supported by evidence not presented to the

12  state court. The Ninth Circuit remanded to the district court, instructing it to stay

13  the federal proceedings. *Id.* at 980 (citing *Rhines*, 544 U.S. at 278). The court

14  recognized that the stay provided "the state court with the first opportunity to

15  resolve this claim," consistent with Congress's intent, while still protecting the

16  petitioner's interest "in obtaining federal review of his claim." *Id.* at 980.

17         A stay is similarly appropriate here. As discussed below, Mr. Gallegos

18  meets the requirements outlined in *Rhines*, and an avenue for relief is available to

19  him in state court under Arizona Rule of Criminal Procedure 32.1(e). The

20  proposed stay will permit this Court to address Mr. Gallegos's claim based on a

21  fully developed record when he returns to federal court following exhaustion. It

22  will also prevent two forums from adjudicating Mr. Gallegos's case

23  simultaneously, with the *Brady* claim proceeding through state court while

24  litigation on the *Martinez* issue is litigated in this Court. The stay therefore will

25  promote judicial efficiency and conserve judicial resources, recognized goals of

26  AEDPA. *See Day v. McDonough,* 547 U.S. 198, 205–06 (2006) (internal

27  quotation marks and citation omitted).

28

1

**1.   Mr. Gallegos satisfies the requirements for a *Rhines* stay**

2

        **a.   Mr. Gallegos has good cause for not exhausting his *Brady* claim**

3

4       The Ninth Circuit has explained that the good cause requirement under

5  *Rhines* is satisfied when the petitioner "can set forth a reasonable excuse" for his

6  failure to exhaust a claim in state court. *Blake v. Baker*, 745 F.3d 977, 982 (9th

7  Cir. 2014). The showing required for good cause to warrant a stay is less stringent

8  than the cause required to excuse procedural default. *See Pace v. DiGuglielmo*,

9  544 U.S. 408, 416 (2005); *Blake*, 745 F.3d at 984 n.7.

10      In the context of *Brady*, it is the State's withholding of evidence that causes

11  delay in the presentation of the claim. When the suppressed evidence is

12  discovered after state proceedings are completed, the petitioner is not responsible

13  for the unavailability of the claim in state court and the good cause requirement is

14  satisfied. *See Gonzalez*, 667 F.3d at 980 (finding good cause for failure to exhaust

15  *Brady* claim); *Quezada v. Scribner*, 611 F.3d 1165, 1168 (9th Cir. 2010) (noting

16  that if *Brady* claim is unexhausted and not procedurally barred in state court,

17  district court should stay and hold in abeyance the federal proceedings);

18  *Wogenstahl v. Mitchell*, 668 F.3d 307, 322 (6th Cir. 2012) (finding good cause

19  when *Brady* information not disclosed until petitioner was in federal court).

20  Mr. Gallegos seeks to present a *Brady* claim that is based on evidence that was not

21  available while he was in state court. He has therefore shown good cause for his

22  failure to exhaust the claim.

23

        **b.   Mr. Gallegos has not engaged in intentionally dilatory litigation tactics**

24

25      Mr. Gallegos has not engaged in intentionally dilatory litigation tactics but

26  has instead diligently pursued his rights since the State's suppression of

27  impeachment evidence was revealed. *Cf. Douglas v. Workman*, 560 F.3d 1156,

28  1195 (10th Cir. 2009) (noting that in context of a *Brady* claim, "any delay,

1   inefficiency, or waste of judicial resources stems from the prosecution"). The

2   State did not disclose the suppressed evidence in this case, and after the *Milke*

3   decision made available the evidence that Detective Saldate had a history of lying

4   and violating defendants' constitutional rights, Mr. Gallegos took steps to discover

5   more information about Detective Saldate. He attempted to speak with

6   Detective Saldate, but was unsuccessful. (Ex. M.) He also requested "all files,

7   records and other documents" pertaining to Detective Saldate from the Maricopa

8   County Attorney's Office. (Ex. N.) When the documents were finally received on

9   July 11, 2013, they did not include any documents about Detective Saldate.

10  (Ex. O.) Finally, through a search of the District Court case file in *Milke*,

11  Mr. Gallegos discovered that the State filed affidavits revealing that Detective

12  Saldate's files had been destroyed by unknown persons on unknown dates.[3]

13  *See Milke v. Ryan*, No. 98-cv-00060-RCB, ECF Nos. 205, 210 (D. Ariz. June 16,

14  2013; July 5, 2013).

15        Following these pursuits, Mr. Gallegos filed a motion in the Ninth Circuit,

16  where his case was pending, seeking a stay of his federal proceedings so he could

17  return to state court to present a *Brady* claim based on the newly discovered

18  evidence. *Gallegos*, No. 08-99029, ECF No. 57-1 (9th Cir. Mar. 14, 2014).

19  Mr. Gallegos therefore diligently pursued evidence of a *Brady* violation and

20  swiftly brought the claim to the attention of the court with jurisdiction over his

21  case. *See generally United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102,

22  1109 (9th Cir. 2001) ("Once a notice of appeal takes effect, the district court loses

23  jurisdiction over the matter placed before the appellate court."). That action

24  precipitated a remand to this Court, where Mr. Gallegos continues to pursue his

25  rights.

26

27

28  _____

[3] The Respondent subsequently submitted this information to the Ninth Circuit in this case. *See Gallegos,* No. 08-99029, ECF No. 66-1 (9th Cir. May 19, 2014).

SALDATE000328

1

2          c.    **Mr. Gallegos has a potentially meritorious *Brady***

3                **claim**

4          The potentially meritorious inquiry set forth in *Rhines* requires nothing

5   more than a showing that the petitioner has stated a colorable federal claim. In

6   *Rhines*, the Court referred to a potentially meritorious claim as one that is not

7   "plainly meritless." 544 U.S. at 277. The *Rhines* Court compared the requirement

8   to the inquiry under 28 U.S.C. § 2254(b)(2), *see id.*, which the Ninth Circuit has

9   interpreted to allow a federal court to "deny an unexhausted petition on the merits

10  only when it is *perfectly clear that the applicant does not raise even a colorable*

11  *federal claim*," *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (emphasis

12  added). Following *Rhines* and *Cassett*, district courts have held that a claim is

13  "potentially meritorious" so long as the claim is colorable. *See Greene v.*

14  *McDaniel*, No. 3:09-cv-00601-ECR-VPC, 2012 WL 1142719, at *3 (D. Nev. Apr.

15  4, 2012) (characterizing the threshold as "quite low"); *Provencio v. Chrones*,

16  No. 06-1760-L(LSP), 2007 WL 1299967, at *5 (S.D. Cal. Apr. 30, 2007); *Lugo v.*

17  *Kirkland*, No. 4:05-cv-00580-SBA, 2006 WL 449130, at *4 (N.D. Cal. Feb. 22,

18  2006).

19         To succeed on a claim that the prosecution's suppression of evidence

20  violated his due process rights, Mr. Gallegos will have to show that the evidence

21  is favorable to the defense, that the government either willfully or inadvertently

22  failed to produce the evidence, and that the suppressed evidence was material in

23  that the suppression prejudiced him. *See Banks v. Dretke*, 540 U.S. 668, 691

24  (2004). Mr. Gallegos can make a colorable showing as to each factor.

25                i.    **The suppressed evidence is favorable to**

26                      **Mr. Gallegos**

27         "Any evidence that would tend to call the government's case into doubt is

28  favorable for *Brady* purposes." *Milke*, 711 F.3d at 1012. "Impeachment evidence,

1  however, as well as exculpatory evidence, falls within the *Brady* rule. Such

2  evidence is evidence favorable to an accused, so that, if disclosed and used

3  effectively, it may make the difference between conviction and acquittal." *United*

4  *States v. Bagley*, 473 U.S. 667, 676 (1985) (internal citations and quotations

5  omitted).

6      Mr. Gallegos relies on the same "menagerie of lies and constitutional

7  violations" found favorable to the defense by the Ninth Circuit in *Milke.*

8  *See Milke,* 711 F.3d at 1015. The court held that Detective Saldate's personnel

9  file, as well as court orders showing that he had lied under oath and violated

10  defendants' constitutional rights, were favorable to the defense because they

11  showed that Detective Saldate had "no compunction about lying during the course

12  of his official duties," *id.* at 1012, had repeatedly "lied under oath in order to

13  secure a conviction or to further a prosecution," *id.* at 1013 (internal quotation and

14  citation omitted), and "kept asking questions long after the defendant indicated he

15  no longer wanted to answer," *id.* at 1014. Here, Detective Saldate testified both at

16  the voluntariness hearing and at trial after interrogating Mr. Gallegos. In light of

17  the similarly critical role Detective Saldate played in Mr. Gallegos's case as in the

18  *Milke* case, the suppressed evidence is favorable also to Mr. Gallegos.

19                      **ii.    The    prosecution    either    willfully    or**
20                      **inadvertently failed to disclose the evidence**

21      *Brady* protects against both willful and inadvertent failures to produce

22  evidence. *See Strickler v. Greene,* 527 U.S. 263, 282 (1999). Therefore, regardless

23  of whether the particular prosecutor in this case knew about the impeachment

24  evidence concerning Detective Saldate, the State had an obligation to produce it.

25  *See Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995). The evidence was never

26  produced in this case, and Mr. Gallegos cannot be faulted for failing to discover it

27  independently. "Where a defendant doesn't have enough information to find the

28  *Brady* material with reasonable diligence, the state's failure to produce the

SALDATE000330

1    evidence *is* considered suppression." *Milke*, 711 F.3d at 1018 (emphasis in

2    original). This is true even for the court records at issue here, as the *Milke* Court

3    expressly rejected the argument that Ms. Milke's trial counsel should have located

4    them. *Id.* at 1017–18; *see also Wilson v. Beard*, 589 F.3d 651, 664 (3d Cir. 2009)

5    (rejecting argument that evidence of witness's criminal history was not suppressed

6    because it was public record); *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir.

7    1995) (rejecting argument that prosecution did not have to disclose affidavit

8    because it was available in public court records). It took Ms. Milke's

9    post-conviction team nearly 7,000 hours of sifting through court records to

10   discover the *Brady* evidence, and the Ninth Circuit found that a "reasonably

11   diligent lawyer couldn't possibly have found these records" in time to use them at

12   trial. *Milke*, 711 F.3d at 1018. The impeachment evidence therefore should have

13   been but was not disclosed by the State in this case.

14             iii.    **Had the impeachment evidence been disclosed,**

15                   **there is a reasonable probability that the outcome would have been different at several**

16                   **stages**

17   When determining whether a petitioner has a colorable claim that *Brady*

18   evidence is material, the question is whether a reasonable state court could find a

19   reasonable probability of a different outcome. *See Gonzalez*, 667 F.3d at 982. The

20   petitioner need only show that there is "any reasonable likelihood" the suppressed

21   evidence "could have affected the judgment of the jury," not that he "more likely

22   than not would have" prevailed. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016)

23   (internal quotations and citations omitted). The Supreme Court has made clear that

24   materiality is not a sufficiency of the evidence test, meaning a petitioner "need not

25   demonstrate that after discounting the inculpatory evidence in light of the

26   undisclosed evidence, there would not have been enough left to convict." *Kyles*,

27   514 U.S. at 434–35. Mr. Gallegos was prejudiced by the suppression of the

28   impeachment evidence regarding Detective Saldate at several stages of his

1  criminal proceedings.

2      First, if the impeachment evidence had been available for the voluntariness

3  hearing, there is a reasonable probability that the trial court would have

4  suppressed Mr. Gallegos's statement to Detective Saldate.[4] *See United States v.*

5  *Gamez-Orduño,* 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material

6  evidence helpful to the accused, whether at trial or on a motion to suppress,

7  violates due process if there is a reasonable probability that, had the evidence been

8  disclosed, the result of the proceeding would have been different."); *cf. United*

9  *States v. Barton,* 995 F.2d 931, 935 (9th Cir. 1993) (holding *Brady* "must be

10  applied to a suppression hearing involving a challenge to the truthfulness of

11  allegations in an affidavit for a search warrant"). The trial court explained its

12  decision to credit Detective Saldate, stating, "Frankly, I must state I am unable to

13  believe the defendant when he asserts that—he asserted his constitutional rights

14  numerous times and that Detective Saldate ignored them. And that Detective

15  Saldate did not give him his constitutional rights until after he had confessed. I

16  find to the contrary."(Ex. C at 118.) With evidence of Detective Saldate's

17  propensity to lie and violate defendants' constitutional rights during

18  interrogations, there is a reasonable probability that the court would have believed

19  Mr. Gallegos's testimony. *See Milke,* 711 F.3d at 1019, 1020–22 (Appendix)

20  (finding that the "evidence of Saldate's falsifications and his disregard of

21  *Miranda*" would have been "highly relevant" to the question of whether

22  Ms. Milke's confession was legally obtained and citing in appendix cases where

---

23

24  [4] If Mr. Gallegos's statement to Detective Saldate had been suppressed, his
statement to Detective Chambers would have been suppressed as well. The

25  re-interrogation in front of Detective Chambers occurred after Mr. Gallegos
requested counsel. Counsel was not provided, and Mr. Gallegos did not initiate the

26  subsequent interrogation. The second statement therefore was also taken in
violation of Mr. Gallegos's constitutional rights. *See Edwards v. Arizona,*

27  451 U.S. 477, 484–85 (1981). Mr. Gallegos's statement to Detective Chambers
also was not "sufficiently attenuated from his initial admission of guilt so as to

28  dissipate its taint." *United States v. Wauneka,* 770 F.2d 1434, 1441 (9th Cir.
1985).

13

EXHIBIT 1g

SALDATE000332

1  the court suppressed the defendants' statements after Detective Saldate violated

2  the defendants' Fifth Amendment rights).

3       The State's suppression of the impeachment evidence also prejudiced

4  Mr. Gallegos at trial in several ways. If Mr. Gallegos's confession had been

5  suppressed, there is a reasonable probability that the jury would not have found

6  Mr. Gallegos guilty of first-degree murder because the state's other evidence was

7  insufficient. The State presented no witnesses to the crime, and the only

8  substantial physical evidence tying Mr. Gallegos to a crime was the State's

9  evidence that Mr. Gallegos's DNA was found in the victim's underwear.[5] (Ex. P.)

10 While this evidence is relevant to Count 2, Sexual Conduct with a Minor, it does

11 not provide evidence of first-degree murder, even based on a felony murder

12 theory, as there would have been no evidence linking Mr. Gallegos to the victim's

13 death. And the DNA evidence was far from unassailable. Hearsay testimony

14 admitted at trial indicated that co-defendant Smallwood reportedly found the

15 underwear in the victim's bedroom during the search for the victim and that a

16 family member placed them on the kitchen table, where they were collected by the

17 police. (Ex. R; Ex. S; Ex. T.) There was no reliable chain of custody regarding the

18 underwear, and Mr. Smallwood did not testify at trial.[6] Further, the Arizona

19 Supreme Court on direct appeal sua sponte found another problem with the DNA

20 evidence. The court held that the procedures used by Cellmark, the State's DNA

21 lab, to determine the statistical probabilities to which the parties stipulated were

22

---

23 [5] In state and federal proceedings, there have been inaccurate and damning
   references to Mr. Gallegos's DNA being found in the victim's rectum. The trial
24 judge, in denying Mr. Gallegos's petition for state post-conviction relief,
   misapprehended the facts and found that "the DNA evidence in [the victim's]
25 rectum linked to the Defendant was devastating to the defense." (Ex. Q at 3.)
   There was no evidence introduced to the jury that Mr. Gallegos's DNA was found
26 in the victim's rectum; the only DNA evidence tied to Mr. Gallegos and presented
   to the jury was the evidence of Mr. Gallegos's DNA in the victim's underwear.
27 (Ex. P.)

28 [6] Mr. Smallwood invoked his Fifth Amendment right against self-incrimination
   and did not testify before the jury. (Ex. U.)

1  not generally accepted by the scientific community and were inadmissible.

2  *Gallegos*, 870 P.2d at 1109–10. Therefore, without Mr. Gallegos's confession, the

3  only evidence presented was easily undermined.

4      Next, even if the court did not suppress Mr. Gallegos's statement after the

5  voluntariness hearing, there still is a reasonable probability that the jury would not

6  have convicted Mr. Gallegos of first-degree murder. If the impeachment evidence

7  had been disclosed, Mr. Gallegos would not have testified at trial. Defense counsel

8  develops a trial strategy based on evidence that is available. The Supreme Court

9  has recognized that when the State withholds evidence, the State is telling the

10  defense that "the evidence does not exist." *Bagley*, 473 U.S. at 682. Relying on

11  this misrepresentation, defense counsel "might abandon lines of independent

12  investigation, defenses, or trial strategies that it otherwise would have pursued."

13  *Id.* Courts therefore have recognized that withheld evidence is material and

14  prejudicial to the defendant if it affects the defense strategy. *See Kyles,* 514 U.S. at

15  445–47; *United States v. Vgeri*, 51 F.3d 876, 880 (9th Cir. 1995); *Bagley v.*

16  *Lumpkin*, 798 F.2d 1297, 1301 (9th Cir. 1986 ); *United States v. Johnson*, 519

17  F.3d 478, 489 (D.C. Cir. 2008); *United States v. Spagnoulo*, 960 F.2d 990, 995

18  (11th Cir. 1992).

19      Mr. Gallegos's trial counsel developed a strategy based on an understanding

20  that Detective Saldate would testify at trial against Mr. Gallegos and that this

21  testimony could not be effectively impeached. Indeed, Detective Saldate had

22  testified at the voluntariness hearing, and the judge credited him over

23  Mr. Gallegos. Believing that he faced unassailable testimony by the case agent,

24  trial counsel chose to not contradict Detective Saldate at trial, but to attempt to

25  mitigate the impact of his testimony by having Mr. Gallegos testify. (Ex. I ¶ 7.)

26  With the impeachment evidence, trial counsel had a means to refute

27  Detective Saldate's testimony, and Mr. Gallegos therefore would not have needed

28  to testify at trial. Armed with the withheld evidence, counsel:

**GALL 236**

15

SALDATE000334

1
2
3
4
5
6

> would have had a good-faith basis for questioning Saldate about prior instances where he had lied on the witness stand. If Saldate admitted the lies, his credibility would have been impaired. If he denied them, he would have exposed himself to a perjury prosecution. If he claimed he couldn't remember, defense counsel could have shown Saldate the documents to refresh his memory. And if Saldate still couldn't recall, the jury would have had reason to doubt, not only his veracity, but his memory as well.

7   *Milke,* 711 F.3d at 1009 (citations omitted). The *Milke* Court called the *Brady*

8   material a "game-changer," *id*, and evidence of perjury undoubtedly would have

9   undermined Saldate's credibility, *see Bagley*, 798 F.2d at 1301 ("It is

10  inconceivable that evidence of perjury would not, as an objective matter, affect a

11  factfinder's assessment of a witness' credibility.")

12       The prosecutor emphasized the importance of Detective Saldate's testimony

13  in his opening statement, saying that "[t]he key in this case will fall with

14  testimony by Detective Saldate." (Ex. K at 40.) And this Court previously found

15  that "the information most damaging to Petitioner's defense was contained in

16  Detective Saldate's testimony." (ECF No. 111 at 34.) If the suppressed

17  impeachment evidence had been available to trial counsel, then he could have

18  undermined this key evidence, leaving the jury with only the DNA evidence

19  discussed above. The impeachment evidence is therefore material even if

20  Mr. Gallegos's statement was not suppressed and was recounted through

21  Detective Saldate. *See Kyles*, 514 U.S. at 444 (noting that the materiality of

22  evidence "is best understood by taking the word of the prosecutor"); *Shelton v.*

23  *Marshall*, 796 F.3d 1075, 1086 (9th Cir. 2015) (same); *Hayes v. Brown*, 399 F.3d

24  972, 985–86 (9th Cir. 2005) (discussing the importance of suppressed

25  impeachment evidence that undermined testimony that the defendant had

26  confessed, which was "the centerpiece of the prosecution's case").

27       The prejudice Mr. Gallegos suffered as a result of the State's suppression of

28  the impeachment evidence continued beyond trial. Mr. Gallegos was sentenced by

**GALL 237**

16

EXHIBIT 1g

SALDATE000335

1   the same judge who presided over his trial and heard the testimony of Mr.

2   Gallegos and the unimpeached testimony of Detective Saldate. That testimony

3   inevitably influenced the judge. In finding the "heinous and depraved" aggravator,

4   the trial judge expressly relied on Mr. Gallegos's testimony regarding the offense.

5   (Ex. L at 180–81.) Mr. Gallegos's testimony also impacted his appeal. After the

6   Arizona Supreme Court found that Cellmark's procedures for determining

7   statistical probabilities related to the DNA evidence were inadmissible, the court

8   found no fundamental error in light of Mr. Gallegos's alleged confession and trial

9   testimony. *Gallegos*, 870 P.2d at 1109–10. Without Mr. Gallegos's testimony,

10  there therefore is a reasonable probability of a different outcome either at

11  sentencing or on appeal.

12        The importance of the suppressed evidence cannot be overstated. With

13  access to the staggering impeachment evidence, Mr. Gallegos's statement either

14  would have been excluded from trial or he would not have testified and

15  Detective Saldate's testimony would have been impeached. The suppression

16  impacted the finding that Mr. Gallegos's confession was voluntary, the finding of

17  guilt, the imposition of the death sentence, and the upholding of those verdicts on

18  appeal. Mr. Gallegos has therefore made a colorable showing that the suppressed

19  evidence was material because under these circumstances there can be no

20  confidence in either Mr. Gallegos's guilty verdict or sentence of death.

21              **2.   Mr. Gallegos has an available avenue for relief in state
22                    court under Rule 32.1 of the Arizona Rules of Criminal
23                    Procedure**

24        Mr. Gallegos has met the *Rhines* requirements, so a stay is appropriate

25  because there is an avenue for relief in state court still available to him. If a

26  petitioner has not exhausted a claim in state court, it is procedurally defaulted and

27  thus barred from federal review "only if a mandatory rule of state law precludes

28  [the petitioner] from raising his claims at this date." *Moreno v. Gonzalez,* 116 F.3d

1   409, 411 (9th Cir. 1997); *see also Cassett*, 406 F.3d at 623 (finding claim not

2   procedurally defaulted where it was not clear that the Arizona courts would find

3   claim barred under Rule 32); *Lopez v. Ryan*, No. CV-97-224-TUC-CKJ, 2015 WL

4   5817642, at *19 (D. Ariz. Oct. 6, 2015) (declining to find a claim procedurally

5   defaulted because it was unclear that "under Arizona law, the Arizona courts

6   would hold Petitioner's claim barred if Petitioner were to return to state court"

7   under Rule 32). If there is no such mandatory rule, then the petitioner can return to

8   state court, exhaust the claim, and then receive federal review. *See Moreno*,

9   115 F.3d at 411.

10       No rule prevents Mr. Gallegos from pursuing a successive petition in state

11   court. Instead, Mr. Gallegos's path to relief in state court can be found in

12   Rule 32.1(e) of the Arizona Rules of Criminal Procedure, which allows for the

13   filing of successive petitions when "[n]ewly discovered material facts probably

14   exist and such facts probably would have changed the verdict or sentence." Newly

15   discovered material facts exist when the facts are discovered after trial through the

16   defendant's exercise of due diligence. ARIZ. R. CRIM. P. 32.1(e)(1)–(2).

17   Impeachment evidence can qualify if it "substantially undermines testimony

18   which was of critical significance at trial such that the evidence probably would

19   have changed the verdict or sentence." ARIZ. R. CRIM. P. 32.1(e)(3).

20       Mr. Gallegos has presented a potentially meritorious *Brady* claim that is

21   cognizable under Rule 32.1(e) because it is based on newly discovered, material

22   facts. *See State v. Muldrow*, No. 2 CA-CR 2015-0452-PR, 2016 WL 538327

23   (Ariz. Ct. App. Feb. 11, 2016) (unpublished) (deciding on the merits a *Brady*

24   claim presented under Rule 32.1(e) based on the evidence about Detective Saldate

25   discovered in *Milke*). Whether he can ultimately succeed under the rule is a

26   question of state law to be answered by the state courts. *See generally Taylor v.*

27   *Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) ("Principles of comity and federalism

28   counsel against substituting our judgment for that of the state courts. . . ."). The

1  only question at this juncture is whether an avenue for relief in state court remains

2  available to Mr. Gallegos. Because Rule 32.1(e) is available, a stay is appropriate.

3     **B.   The interests of justice support the requested supplement to
4           Mr. Gallegos's habeas petition**

5     To ensure that Mr. Gallegos can pursue his *Brady* claim in federal court

6  once it is exhausted, he asks that the claim be added to his federal habeas petition.

7  A petition for writ of habeas corpus "may be amended or supplemented as

8  provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242;

9  *see also James v. Pliler*, 269 F.3d 1124, 1126 (9th Cir. 2001). Rule 15 of the

10 Federal Rules of Civil Procedure in turn permits a party to amend or supplement a

11 pleading with the court's leave. FED. R. CIV. P. 15(a), (d). Such permission should

12 be "freely granted when justice so requires." *Lopez v. Smith*, 203 F.3d 1122, 1127

13 (9th Cir. 2000) (en banc) (internal quotation marks omitted); *see Carter v.*

14 *Bigelow*, 787 F.3d 1269, 1278 n.6 (10th Cir. 2015) ("[T]he standard used by

15 courts in deciding to grant or deny leave to supplement is the same standard used

16 in deciding whether to grant or deny leave to amend." (internal quotation and

17 citation omitted)). Because the Ninth Circuit explicitly remanded Mr. Gallegos's

18 *Brady* claim, this Court has jurisdiction to permit Mr. Gallegos to amend or

19 supplement his petition to include that claim. *Cf. Nguyen v. United States*,

20 792 F.2d 1500, 1502 (9th Cir. 1986) (explaining that district court is allowed on

21 remand to consider issues not explicitly precluded by remand); *Detrich v. Ryan*,

22 No. CV-03-00229-TUC-DCB, 2016 WL 3854459, at *3 (D. Ariz. July 15, 2016)

23 (refusing amendment to include claim outside scope of limited remand).

24     Because Mr. Gallegos has a potentially meritorious *Brady* claim that he

25 could not bring in his prior state court proceedings and which no court has yet

26 considered, justice will be served by allowing Mr. Gallegos, before returning to

27 state court, to amend or supplement his federal petition. Doing so also will allow

28 the claim to be considered by state courts as quickly as possible while still

**GALL 240**                              19                    SALDATE000338

1    protecting Mr. Gallegos's right to have the claim presented in federal court if the

2    state court denies the claim. Courts have previously included in habeas petitions

3    *Brady* claims based on evidence discovered after the petition was denied.

4    *See Gonzalez,* 667 F.3d at 972, 978 (directing district court to stay and hold in

5    abeyance *Brady* claim based on evidence raised in motion for rehearing);

6    *Quezada,* 611 F.3d at 1166, 1168 (directing district court to stay and abey *Brady*

7    claim discovered while appeal was pending if claim unexhausted and state avenue

8    to relief available); *Douglas*, 560 F.3d at 1160, 1187 (treating a *Brady* claim

9    discovered and raised while appeal was pending as a supplement to the

10   petitioner's § 2254 petition). The same relief is warranted here.

11          Mr. Gallegos's new *Brady* claim is attached at Exhibit W. In the interests of

12   judicial economy and preserving resources, Mr. Gallegos requests that he be

13   temporarily relieved of any obligation under Local Rule 15.1 to attach a complete

14   proposed amended habeas petition until after the claim has been exhausted in state

15   court. After completion of state court proceedings, Mr. Gallegos will file a

16   complete amended habeas petition.

17   **C.    The Court should exercise its discretion to authorize current**
18        **counsel to represent Mr. Gallegos in state court**

19          Under the Criminal Justice Act, it is appropriate for appointed counsel to

20   represent a party in "ancillary matters appropriate to the proceedings." 18 U.S.C.

21   § 3006A(c). Additionally, 18 U.S.C. § 3599 provides that defendants involved in

22   capital § 2254 cases "shall be entitled" to the appointment of counsel. Under this

23   section, counsel:

24          shall represent the defendant throughout every subsequent
            stage of available judicial proceedings, including pretrial
25          proceedings, trial, sentencing, motions for new trial,
            appeals, applications for writ of certiorari to the Supreme
26          Court of the United States, and all available
            post-conviction process, together with applications for
27          stays of execution and other appropriate motions and
            procedures, and shall also represent the defendant in such
28          competency proceedings and proceedings for executive or

1         other clemency as may be available to the defendant.

2    *Id.* § 3559(e).

3         In *Harbison v. Bell*, 556 U.S. 180 (2009), the Supreme Court refused to

4    interpret § 3559 narrowly to limit representation by federally appointed counsel in

5    state court proceedings. In rejecting the argument that § 3559 did not include

6    representation at a state clemency proceeding, the Court noted that any limitation

7    § 3559 placed on representation did not arise from "a strict division between

8    federal and state proceedings," but rather from the term "subsequent" in

9    § 3559(e). *Id.* at 188. Therefore, once federally funded counsel is appointed to

10   represent a state prisoner in § 2254 proceedings, the duties enumerated in

11   § 3599(e) authorize that same counsel to represent the prisoner in all available and

12   subsequent judicial proceedings.

13        Furthermore, the Judicial Conference Committee on Defender Services in

14   1998 determined that federal defenders representing petitioners in capital habeas

15   corpus matters could represent clients in state court after a "presiding judicial

16   officer in a federal judicial proceeding involving the individual has determined

17   that such use" of funds is authorized by law. *See* Rep. of the Judicial Conf. Comm.

18   on Def. Servs. to the Chief Justice of the U.S. and Members of the Judicial Conf.

19   of the U.S. 9–10 (Mar. 1999) (CR-DEFSVS-MAR 99). This policy remains in

20   effect. *See* Rep. of the Judicial Conf. Comm. on Defender Servs. to the Chief

21   Justice of the U.S. and Members of the Judicial Conf. of the U.S., 10–12

22   (Mar. 2016) (CR-DEFSYS-MAR-16). Consistent with that policy, on December

23   9, 2010, the Committee issued a memorandum providing guidance to federal

24   magistrate and district court judges when determining when to authorize a federal

25   defender organization to represent a capital habeas client in state court

26   proceedings. (Ex. V.)

27        Therefore, this Court has discretion to authorize Mr. Gallegos's federal

28   counsel to litigate state court matters. In this District, counsel for habeas

**GALL 242**

. 21

SALDATE000340

1    petitioners have been authorized to conduct state court and clemency litigation in
2    numerous capital cases. *See, e.g., Schurz v. Ryan*, CV-97-00580-PHX-JJT,
3    ECF No. 183 at 1 (D. Ariz. Apr. 7, 2016) (successive post-conviction relief
4    petition).[7] Permitting federal habeas counsel to represent Mr. Gallegos in the
5    proposed state court proceeding will promote efficiency, minimize overall costs,
6    and further justice. The Federal Public Defender has represented Mr. Gallegos
7    since 2001, and counsel has developed a relationship with Mr. Gallegos. Counsel
8    is knowledgeable about the facts of the case and prior legal proceedings. Finally,
9    in light of Mr. Gallegos's argument that his post-conviction counsel rendered
10   ineffective assistance and the remanded motion under *Martinez*, appointing
11   Mr. Gallegos's original state post-conviction counsel to handle a successor
12   petition presents a conflict of interest and is inappropriate.

13   **III.    Conclusion**

14        Mr. Gallegos has made a colorable showing that the State violated *Brady*
15   and his constitutional rights by suppressing the voluminous impeachment
16   evidence concerning the lead detective in this case. He respectfully requests that
17   this Court grant a stay of his federal proceedings after amending his habeas
18   petition to include his *Brady* claim and allow current counsel to pursue his rights
19   first in state court. The requested relief will promote judicial efficiency because it
20   will permit state courts to first address the claim, avoid simultaneous litigation in
21   two forums, and allow this Court to review this case based on a fully developed
22   record following exhaustion.

23   _____

24   [7] *See also Jones v. Ryan*, CV-03-00478-TUC-DCB, ECF No. 119 at 1 (D. Ariz.
25   Sept. 25, 2013) (post-conviction challenges to conviction and lethal-injection
     challenge); *Lopez v. Schriro*, CV-98-00072-PHX-SMM, ECF No. 255 at 1
26   (D. Ariz. June 12, 2012) (ancillary state-court matters); *Beaty v. Ryan*,
     No. CV-92-02076-PHX-SRB, ECF No. 356 at 1 (D. Ariz. Apr. 22, 2011)
27   (successive post-conviction relief petition and clemency); *Medrano v. Schriro*,
     CV-99-603-TUC-JMR, ECF No. 103 at 2 (D. Ariz. Jan. 10, 2005)
28   (intellectual-disability claim); *Ramirez v. Schriro*, No. CV-97-1331-PHX-JAT,
     ECF No. 119 at 7 (D. Ariz. Mar. 11, 2005) (intellectual-disability claim).

**GALL 243**

22

SALDATE000341

1        Respectfully submitted this 8th day of December, 2016

2
                                        Jon M. Sands
3                                       Federal Public Defender
4                                       District of Arizona

5                                       Ashwin Cattamanchi
6                                       Emma L. Smith
7                                       Assistant Federal Public Defenders

8                                       s/ Ashwin Cattamanchi
9                                       Counsel for Petitioner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GALL 244**                          23                    SALDATE000342
                                  EXHIBIT 1g

**Certificate of Service**

I hereby certify that on December 8, 2016, I electronically filed the foregoing Motion to Stay and Hold Habeas Proceedings in Abeyance, to Supplement Petition, and to Represent Petitioner in State Court Proceedings with the Clerk's Office by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


s/ Mercedes Vasquez-Rodriguez
Assistant Paralegal
Capital Habeas Unit

SALDATE000343

1  MARK BRNOVICH
   ATTORNEY GENERAL
2  (FIRM STATE BAR NO. 14000)
   JON G. ANDERSON
3  ASSISTANT ATTORNEY GENERAL
   CAPITAL LITIGATION SECTION
   PHOENIX, ARIZONA 85007-2997
4  TELEPHONE: (602) 542-4686
   CADOCKET@AZAG.GOV
5  (STATE BAR NUMBER 005852)
   ATTORNEYS FOR RESPONDENTS

6

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Gallegos, | CV 01-1909-PHX-NVW |
| Petitioner, | |
| -vs- | **RESPONSE TO MOTION TO STAY AND HOLD HABEAS PROCEEDINGS IN ABEYANCE, TO SUPPLEMENT PETITION, AND TO REPRESENT PETITIONER IN STATE COURT PROCEEDINGS** |
| Charles L. Ryan, et al., | |
| Respondents. | |

Respondents oppose Gallegos' motions to stay and hold habeas proceedings in abeyance, and to supplement the petition. They take no position on his motion to represent Petition in the state courts, if the other motions are granted.

DATED this 21st day of December, 2016.

Respectfully submitted,

Mark Brnovich
Attorney General

Lacey Stover Gard
Chief Counsel

s/ Jon G. Anderson
Assistant Attorney General

Attorneys for Respondents

1

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    SUMMARY OF ARGUMENT.**

First, Respondents oppose Gallegos' motion to supplement the petition with a claim based on *Brady v. Maryland*, 373 U.S. 83 (1963), specifically involving impeachment evidence regarding Detective Armando Saldate. Second, they oppose his motion to stay-and-abey these habeas proceedings to return to state court to exhaust the *Brady* claim. Both motions should be denied, for similar reasons, but primarily because of the untimeliness of the new claim.  Whether or not this Court permits the amendment to the petition, this Court must determine whether the new claim is untimely.

Section 2254(d)(1)(D) applies the AEDPA 1-year limit from "the date on which the factual predicate of the claim . . . presented could have been discovered through the exercise of diligence.   The dissenting judge on the panel, as discussed further below, persuasively explains why Gallegos' claim is untimely. *See Gallegos v. Ryan*, 820 F.3d 1013, 1040 (9th Cir. 2016) (Callahan, J., dissenting). Further, the panel majority states the scope of the remand to this Court:

> On remand, the District Court shall consider in the first instance whether to permit Gallegos to supplement his existing petition with his Brady claim based on newly discovered evidence. The District Court may permit an evidentiary hearing on the issue whether that claim is timely under 28 U.S.C. § 2244(d)(1)(D).

This Court must first consider whether to allow Gallegos to supplement his petition with the concededly new *Brady* claim.  *See Mardesich v. Cate*, 668 F.3d 1164, 1173 (9th Cir. 2012) (AEDPA statute of limitations must be applied on a "claim-by-claim basis"). Amendment would be futile if the new claim is time-barred under AEDPA's statute of limitations.  The Ninth Circuit's mandate that this Court "consider in the first instance" whether to permit amendment of the petition does not provide for a remand to state court "in the first instance."  The mandate

GALL 247

2

EXHIBIT 1g

SALDATE000352

aside, whether a claim is time-barred in federal habeas is a threshold issue that must be resolved before this Court can consider other procedural issues or the merits of the claim. *See White v. Klitzkie*, 281 F.3d 920, 921–22 (9th Cir. 2002).

A return to state court to exhaust a time-barred claim would be futile, not to mention a great waste of judicial and attorney resources. Therefore, this Court must first decide the amendment and timeliness issues. Respondents submit a hearing is unnecessary in light of the record. But if this Court thinks it is not, it should hold an evidentiary hearing to determine: "What did the Federal Public Defender [FPD] know, or reasonably could have known, and when did it know, or reasonably could have known, the facts that it is now presenting in support of the *Brady* claim?"

## II.   BACKGROUND.

Gallegos' convictions for first-degree murder and sexual conduct with a minor (and the sentence on the latter) were affirmed on direct appeal. *See State v. Gallegos*, 870 P.2d 1097, 1101 (Ariz. 1994). However, the Arizona Supreme Court remanded for re-sentencing on the murder conviction. *Id.* at 1119. On remand, the trial judge re-sentenced Gallegos to death on the murder count, and the Arizona Supreme Court thereafter affirmed the death sentence. *State v. Gallegos*, 916 P.2d 1056, 1059-1060 & 1064 (Ariz. 1996).

Gallegos thereafter filed a petition for state post-conviction relief (PCR) and a supplemental petition in the trial court. (Dist. Ct. Docket #111, at 6-7, citing PCR docs. 188, 204.) The court denied relief on most of the claims, but set an evidentiary hearing regarding Petitioner's claims of ineffective assistance of counsel. (ME 9/28/00.) Following the evidentiary hearing, the court denied those claims on the merits. (PCR doc. 227; see PR doc. 10.) Petitioner filed a petition for review in the Arizona Supreme Court, which summarily denied relief. (PR docs 1, 12.)

1  On December 4, 2002, Gallegos filed his amended habeas petition setting
2  forth 33 grounds for habeas relief.  (Dkt. #74.) On September 29, 2008, this Court
3  filed its judgment and decision and order denying relief.  (*Id.* at ##110, 111.)

4  On appeal to the Ninth Circuit, Gallegos raised claims of ineffective
5  assistance of counsel at the guilt and sentencing phases of trial.  820 F.3d at 1025.
6  The court rejected the claims that had been raised in appellate briefing.  *Id.* at
7  1026-1039.  However, the panel majority remanded to this Court after granting
8  Gallegos' motion to remand for consideration of a *Brady* claim.  *Id.* at 1015.  On
9  rehearing, the panel majority further amended the opinion to grant Gallegos'
10 motion to remand for consideration of a claim of ineffective assistance at
11 sentencing, pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). *Gallegos v.*
12 *Ryan*, 2016 WL 6994242, *1 (9th Cir. Ninth Circuit, Nov. 30, 2016).

13 **III.   THIS COURT SHOULD DENY AMENDMENT BECAUSE IT WOULD BE FUTILE.**

14 Under Rule 15, when deciding whether to grant a party's motion to amend a
15 federal habeas petition, a district court may take into consideration such factors as
16 "bad faith, undue delay, prejudice to the opposing party, futility of the amendment,
17 and whether the party has previously amended his pleadings." *Bonin v. Calderon*,
18 59 F.3d 815, 845 (9th Cir. 1995).

19 **A.  *Amendment would be futile.***

20 Amendment would be futile, for two reasons: (1) the new claim is time-
21 barred, and (2) the claim lacks merit.

22 The new claim is barred under AEDPA's statute of limitations, as discussed
23 below in more detail in Respondents' response to Gallegos' motion to stay.
24 Amendment is not allowed under Rule 15(c) because the new claim does not
25 "relate back" to any other claim; rather it asserts a new ground for relief supported
26 by facts that differ both in time and type from his original habeas petition. *See*
27 *Mayle v. Felix*, 545 U.S. 644, 650 (2005). This Court may deny a stay when
28

4

1   *Mayle's* relation-back doctrine would prevent the prisoner from ever successfully

2   amending his petition to include the new claim. *See King v. Ryan*, 564 F.3d 1133,

3   1141-1142 (9th Cir. 2009).  It would be futile to allow amendment to include an

4   untimely claim.

5     Furthermore, amendment would be futile because the *Brady* claim would fail

6   in state post-conviction proceedings pursuant to Rule 32, Arizona Rules of

7   Criminal Procedure, particularly in view of significant factual differences between

8   this case and *Milke v. Ryan*, 711 F.3d  998 (9th Cir. 2013). *See Runningeagle v.*

9   *Ryan*, 686 F.3d 758, 768-69 (9th Cir. 2012) (in third state PCR, state court found

10   *Brady* claim did not satisfy requirements of Rule 32.1(e), which resulted both in a

11   procedural default and a ruling on the merits); *Schad v. Ryan*, 671 F.3d 708, 716

12   (9th Cir. 2011) (the new evidence would not probably have changed the verdict or

13   sentence, as required for a successful *Brady* claim), *overruled on other grounds by*

14   *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015).

15     **B.  *Undue delay.***

16     Also, amendment should be denied for undue delay in bringing this claim.

17   Gallegos has known about the factual basis for the asserted *Brady* claim, at the

18   very least, since the *Milke* opinion was issued on March 13, 2013.  Furthermore,

19   the FPD knew much earlier about the factual basis for such a claim, having

20   presented such evidence in a federal habeas appeal before the Ninth Circuit in

21   2009—*Runningeagle v. Ryan*, No. 07-99026. (Exhibit A, Opening Brief.) Thus,

22   Gallegos has unduly delayed in presenting this issue to this Court and in seeking to

23   amend his petition. And Gallegos has delayed in presenting it to the state courts

24   because nothing prevented him from asserting the *Brady* claim in another state

25   petition for post-conviction relief.  *See Hamilton v. Vasquez*, 17 F.3d 1149, 1165

26   (9th Cir. 1994) ("Nowhere in his brief does [Hamilton] explain why he could not

27   have presented his unexhausted claims to the California Supreme Court during this

28

**GALL 250**

SALDATE000355