

ORDER

IT IS HEREBY ORDERED that the above-entitled cause be dismissed without prejudice in CR 90-03339,B as to GEORGE SMALLWOOD only.

DONE IN OPEN COURT this 29th day of ___June___, 1990.

_____
JUDGE OF THE SUPERIOR COURT

LFS:kg
2.2lfs

3

**GALL 051**

EXHIBIT 1j

**MILKE_NSB029626**

CR-94-0389-AP

FILED

DEC - 9 1994

NOEL K. DESSAINT
CLERK SUPREME COURT

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                    IN AND FOR THE COUNTY OF MARICOPA

3                                            CV 01-1909-PHX-ROS

4     THE STATE OF ARIZONA,              )
                                         )
5                      PLAINTIFF,        )
                                         )
6     VS.                                )     NO. CR 90-03319
                                         )
7     MICHAEL STEVEN GALLEGOS,           )
                                         )
8                      DEFENDANT.        )
                                         )
9     _____)

                                          CR-91-0149-AP

                                          FILED

10

11                                        JUN 1 9 1991

12                    PHOENIX, ARIZONA     NOEL K. DESSAINT
                      AUGUST 3, 1990       CLERK SUPREME COURT
                                           BY
13

14

15    B E F O R E :   THE HONORABLE JEFFREY A. HOTHAM, JUDGE.

16

17

18

19         REPORTER'S TRANSCRIPT OF PROCEEDINGS

                                          FILED        LODGED
20               PRETRIAL MOTIONS         RECEIVED     COPY

21

                                          NOV 1 6 2001
22
                                          CLERK US DISTRICT COURT
23    PREPARED FOR                        DISTRICT OF ARIZONA
                                          BY
                                                      DEPUTY
24    SUPERIOR COURT

25    (ORIGINAL)                          CYNTHIA S. ZAMENSKI,
                                          OFFICIAL COURT REPORTER.

DISCOVERY AND CONFIDENTIAL MATERIAL

GALL 052
                    SUPERIOR COURT
                    Phoenix, Arizona          MILKE_NSB029767
                    EXHIBIT 1j

EXHIBIT 1j

MILKE_NSB029768

2

1                    A P P E A R A N C E S

2

3

4     FOR THE STATE OF ARIZONA:          MR. LOUIS STALZER,
                                         DEPUTY COUNTY ATTORNEY.
5

6

7

8     FOR THE DEFENDANT:                 MR. GREG CLARK,
                                         DEPUTY PUBLIC DEFENDER.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**GALL 054**                    EXHIBIT 1j                    **MILKE_NSB029769**

3

1                    I N D E X

2

3

4    WITNESSES:              D        C       RD      RC

5    ARMANDO SALDATE, JR.    17      .36      62

6    MICHAEL CHAMBERS        64       71      88

7    MICHAEL STEVEN GALLEGOS 90      104     112

8

9

10·

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**GALL 055**            SUPERIOR COURT
                     Phoenix, Arizona          **MILKE_NSB029770**
                           EXHIBIT 1j

4

PHOENIX, ARIZONA
AUGUST 3, 1990

1

2

3

4

5

6

7        (THE FOLLOWING PROCEEDINGS TOOK PLACE IN OPEN

8        COURT:)

9

10        THE COURT:  THANK YOU.

11            CRIMINAL CAUSE 90-03339, STATE VS. MICHAEL STEVEN

12    GALLEGOS.  THIS IS THE TIME SET FOR HEARING VARIOUS MOTIONS

13    AND VOLUNTARINESS HEARING IN THIS MATTER.

14            ARE THE PARTIES READY TO PROCEED?

15        MR. STALZER:  LOUIS STALZER FOR THE STATE.  WE'RE

16    READY, YOUR HONOR.

17        MR. CLARK:  YES, YOUR HONOR.  GREG CLARK APPEARING

18    WITH MR. GALLEGOS.

19        THE COURT:  ALL RIGHT.  THANK YOU.

20            I HAVE PUT AN ORDER TO WHAT I WOULD LIKE TO DO.

21    I WILL ENTERTAIN BRIEF ARGUMENT ON THE DEFENDANT'S MOTION

22    TO REMAND AND THEN THE MOTIONS TO DISMISS FOR DUPLICITY, I

23    GUESS IS THE WORD THAT'S USED IN THE MOTION, AND

24    MULTIPLICITY AND VAGUENESS.  WE'LL GET THOSE ISSUES ARGUED.

25    THEN WE'LL HEAR THE VOLUNTARINESS HEARING, IF THAT'S

Case 2:15-cv-00462-ROS  Document 669-10  Filed 09/18/20  Page 7 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 25 of 174

5




1    AGREEABLE TO COUNSEL, AND THEN WE'LL INFORMALLY DISCUSS THE

2    OTHER SCHEDULING MATTERS THAT WE TALKED ABOUT EARLIER AND

3    THAT HAVE BEEN REMAINING ON THE CALENDAR.

4         LET'S TURN, THEN, FIRST TO THE MOTION TO REMAND.

5    COUNSEL, I HAVE REVIEWED ALL OF THE PLEADINGS FILED BY BOTH

6    SIDES AND IF YOU'LL KEEP YOUR ARGUMENTS BRIEF.

7         MR. CLARK?

8    MR. CLARK:  JUDGE, I'LL BE REAL BRIEF ON THAT ONE.

9    I'M GOING TO WITHDRAW THAT MOTION THAT I FILED ON BEHALF OF

10   THE DEFENDANT.  THE COPY OF THE GRAND JURY TRANSCRIPT THAT

11   I HAD WAS MISSING A PAGE.  IT WAS MISSING THE PAGE, SO MY

12   ARGUMENT IS MOOT, BECAUSE THEY DID DISCUSS THOSE ISSUES

13   THAT I SAID THEY DID BECAUSE THEY WERE IN THE PAGE WHEN I

14   DID GET A COPY OF IT.

15        THE COURT:  GOOD.  I'M GLAD TO HEAR THAT WAS THE

16   SITUATION.  I WAS GOING TO ADMONISH YOU FOR NOT PLEADING

17   MATTERS ACCURATELY.  I WANT MY ATTORNEYS TO BE COMPLETELY

18   HONEST WITH THE COURT AND TO PLEAD ACCURATELY.  SO I'M GLAD

19   TO HEAR THAT IS THE SITUATION ON THAT.

20        ALL RIGHT.  THE MOTION TO REMAND FOR NEW

21   DETERMINATION OF PROBABLE CAUSE IS SHOWN TO BE WITHDRAWN.

22        AND, THEN, MR. CLARK ON THE DUPLICITY?

23   MR. CLARK:  JUDGE, I'LL LEAVE THAT TO THE DISCRETION

24   OF THE COURT.  I THINK I'VE SAID ENOUGH IN THE PLEADINGS.

25   I THINK MR. STALZER HAS RESPONDED ADEQUATELY.  I DO HAVE



**MILKE_NSB029772**

6

1    SOME COMMENTS THOUGH ON THE MULTIPLICITY MOTION.

2         THE COURT:  ALL RIGHT.  ON THE DUPLICITY ISSUE, I

3    THINK THAT MR. STALZER'S CITATION TO THE CASE LAW IN

4    ARIZONA IS ACCURATE AND THE MOTION TO DISMISS COUNT I FOR

5    DUPLICITOUS CHARGING IS DENIED.

6              AND THEN ON THE MULTIPLICITY, GO AHEAD, MR.

7    CLARK.

8         MR. CLARK:  JUDGE, IN MY REPLY THAT I FILED I THINK

9    THAT THE STATE OF THE LAW IN ARIZONA IS SET FORTH IN THE

10   VIA CASE.  I CITE YOU THAT CASE WITHIN THE BODY OF THE

11   REPLY.

12        THE COURT:  YES, SIR.

13        MR. CLARK:  THE POINT THAT NEEDS TO BE MADE, JUDGE,

14   AND THE POINT THAT I THINK YOU CAN MAKE WHEN YOU READ

15   VIA, IS THAT WHEN YOU CHARGE, YOU KNOW, THE SAME ACT,

16   SINGLE ACT, TWICE, THAT'S MULTIPLICITY.  THE DEFENDANT IN

17   VIA RAISES THAT ISSUE AND THE COURT, YOU KNOW, UPON

18   REFLECTION LOOKED AT IT AND SAID, HEY, NO.  THIS MIGHT HAVE

19   BEEN ONE FRAUD SCHEME BUT WE HAVE SEPARATE VICTIMS, WE HAVE

20   SEPARATE BANK CARDS, YOU KNOW, WE HAVE SEPARATE -- DIFFERS

21   A LITTLE BIT, YOU KNOW.

22             IN THIS CASE, JUDGE, WE HAVE ONE ACT.  IT'S PLED.

23   I THINK, MORE THAN ONCE IN COUNTS II AND III.  AND I THINK

24   IF YOU LOOK AT VIA AND YOU LOOK AT THE WAY IT'S CHARGED

25   AND YOU LOOK AT THE STATUTE, I THINK THAT'S INAPPROPRIATE.

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 9 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 27 of 174

7

1        THE COURT:  ALL RIGHT.

2        MR. CLARK:  OTHER THAN THAT, I HAVE NOTHING TO ADD,

3    JUDGE.  I THINK ONCE AGAIN WE'VE PRETTY MUCH SET IT OUT IN

4    THE PLEADINGS.

5        THE COURT:  YES.

6        MR. STALZER?

7        MR. STALZER:  YOUR HONOR, I THINK IF YOU LOOK AT

8    BRUNI CLOSELY, THERE ARE TWO VICTIMS FROM THAT CASE.

9    WITH EACH VICTIM THERE WERE AT LEAST THREE COUNTS OF SEXUAL

10   ASSAULT.  THOSE THREE COUNTS AS TO EACH VICTIM OCCURRED ON

11   ONE EVENING FOR EACH VICTIM AND I THINK BRUNI SQUARELY

12   ADDRESSES THE ISSUE AS TO MULTIPLE PENETRATIONS REGARDING

13   ANAL INTERCOURSE, VAGINAL INTERCOURSE, OR ANY POSSIBLE ORAL

14   INTERCOURSE, AND ACCEPTING THE DISSENT FROM THE DORSEY

15   CASE, WHICH TALKS OF THAT PUBLIC POLICY, THAT YOU DON'T GET

16   TO RAVAGE A PERSON'S BODY ALL YOU WANT BECAUSE YOU CAN ONLY

17   BE CHARGED WITH ONLY ONE CRIMINAL ACT OF SEXUAL ASSAULT.

18        EVEN VIA, WHICH IS AFTER THE BRUNI CASE,

19   DOESN'T REALLY REJECT THAT TYPE OF ARGUMENT THAT WAS

20   INITIALLY ADOPTED FROM THE DECISION ITSELF.  AND BRUNI IS

21   ALSO CONSISTENT WITH SOME OF THE DECISIONS FROM OTHER

22   JURISDICTIONS, NOTABLY PEOPLE VS. HARRISON OUT OF

23   CALIFORNIA, AND I SUBMITTED A COPY OF THE HARRISON CASE

24   TO MR. CLARK EARLIER, AND I APOLOGIZE FOR NOT GETTING IT TO

25   YOU SOONER.  IF YOU SO DESIRE, I DO HAVE A COPY FOR YOUR



Case 2:15-cv-00462-ROS Document 669-10 Filed 09/18/20 Page 10 of 50
Case 2:01-cv-01909-NVW Document 135-1 Filed 12/22/16 Page 28 of 174

8

1    HONOR IF YOU WANT TO LOOK AT THAT SO YOU DON'T HAVE TO HAVE

2    A CLERK RUN TO THE LAW LIBRARY.  BUT I THINK BRUNI JUST

3    ADDRESSES IT AS WELL AS THE OTHER CASES CITED IN THE

4    STATE'S RESPONSE.

5         THE COURT:  ALL RIGHT.

6              ANY FINAL WORDS, MR. CLARK?

7         MR. CLARK:  YES, I DO, JUDGE.

8              MR. STALZER DID GIVE ME A COPY OF THE HARRISON

9    CASE AND I WOULD HOPE THAT YOU WOULD READ THE CASE, JUDGE,

10   BECAUSE IF YOU LOOK AT THE STATUTE IN HARRISON AND YOU

11   LOOK AT OUR STATUTE, YOU CAN SEE WHY THEY REACHED THAT

12   DECISION. I THINK THE STATUTE IN HARRISON ADDRESSES THE

13   ISSUE I RAISED.  I THINK IF OUR STATUTE WAS WORDED THAT

14   WAY, I WOULDN'T HAVE, YOU KNOW, MUCH REASON TO EVEN RAISE

15   THIS, BUT IF YOU LOOK AT IT, I BELIEVE IT'S ON -- IT'S IN A

16   FOOTNOTE, JUDGE.  IT'S ON PAGE 1081, FOOTNOTE SEVEN.  IT

17   SETS FORTH THE STATUTE AND RIGHT ABOVE IT IN THAT -- RIGHT

18   UNDER THE FIRST HEADNOTE NUMBER ONE, THEY SET FORTH THE

19   REASONING WHY THEY ALLOWED IT IN THAT CASE.  I THINK IT'S

20   TOTALLY DIFFERENT FROM OUR STATUTE, JUDGE.  I THINK YOU

21   CAN, YOU KNOW, ADDRESS THE ISSUE READING HARRISON AND

22   COMPARING IT WITH OUR STATUTE.

23        THE COURT:  ALL RIGHT.  I'LL TAKE THAT ONE UNDER

24   ADVISEMENT, IF YOU WILL GIVE ME A COPY OF THE --

25        MR. STALZER:  MAY I APPROACH?

9

1          THE COURT:  YES, UH-HUH.

2              THANK YOU.

3              THEN AS TO THE ISSUE OF VAGUENESS, THE MOTION TO

4    DISMISS COUNTS I, II, AND III FOR VAGUENESS.  ANYTHING

5    ADDITIONAL OTHER THAN THE PLEADINGS THAT YOU WOULD LIKE TO

6    ADD, MR. CLARK?

7          MR. CLARK:  ONLY, JUDGE, THAT I POINTED OUT IN MY

8    REPLY THE CASES THAT THE STATE CITES IN OPPOSITION ARE NOT

9    RIGHT ON POINT, JUDGE.  VAGUENESS IS DIFFERENT FROM AN

10   EQUAL PROTECTION ARGUMENT WHICH IS THE ROMERO CASE THAT

11   THE STATE CITES.  I THINK IF YOU READ ROMERO, YOU WILL

12   SEE THAT.  IT WAS AN OLD CODE, PEOPLE PROTECTION ARGUMENT

13   ON THE THEN CHILD MOLEST STATUTE VIS-A-VIS THE SEXUAL ABUSE

14   STATUTE.  I THINK IT'S DIFFERENT.

15          I THINK THE POINT IN VAGUENESS, JUDGE, YOU KNOW,

16   GOES TOWARDS THE, YOU KNOW, THE UNFETTERED DISCRETION THAT

17   IT FOSTERS BOTH -- FROM THE STANDPOINT OF THE STATE AND I

18   BELIEVE IN FRONT OF THOSE OTHER PEOPLE WHO DECIDE THE

19   CHARGE, NAMELY, THE GRAND JURY, I THINK -- WE DON'T HAVE A

20   DEFINITION OF WHAT A MOLEST IS UNDER 1410, I BELIEVE.  AND

21   I THINK THAT IN LOOKING AT THE VAGUENESS CHALLENGE, JUDGE,

22   YOU HAVE TO KIND OF LOOK AT THE BROADER PICTURE.  IT'S NOT,

23   YOU KNOW, AS CUT AND DRIED AS THE STATE WOULD HAVE YOU

24   BELIEVE.

25          OTHER THAN THAT, JUDGE, I THINK WE HAVE

GALL 061                    SUPERIOR COURT                    **MILKE_NSB029776**
                    Phoenix, Arizona

10

1    ADEQUATELY COVERED EVERYTHING IN THE PLEADINGS.

2        THE COURT:  AND YOU'RE CHALLENGING THE

3    CONSTITUTIONALITY OF THE STATUTE?  YOU'RE NOT -- I'M

4    WONDERING IF I USE THE STATE VS. ROMERO DEFINITION IN MY

5    INSTRUCTION TO THE JURY ITSELF ABOUT PRIVATE PARTS, WHETHER

6    THAT IS STILL A PROBLEM.

7        MR. CLARK:  I WOULD HAVE A PROBLEM BECAUSE ROMERO

8    DEALT WITH THE OLD CODE AND I THINK THE OLD CODE -- THE

9    STATUTORY LANGUAGE DEALT WITH A LITTLE MORE OF A CONVOLUTED

10   DESCRIPTION OF WHAT WAS INVOLVED.  I THINK IT'S PROBABLY

11   WHY THEY CHANGED IT.  SO I WOULD HAVE A PROBLEM WITH GIVING

12   THAT INSTRUCTION WITH THIS STATUTE.  AND I -- JUDGE, BEFORE

13   I FILED THIS I LOOKED FOR AN INSTRUCTION AND I THOUGHT IT

14   WOULD MATCH UP AND QUITE FRANKLY I DIDN'T FIND ONE.  I

15   LOOKED IN THE NEW JURY INSTRUCTIONS AND I REALLY DIDN'T

16   THINK THE ONE WAS ADEQUATE.  SO -- AND THAT WOULD BE MY

17   RESPONSE TO THAT.  THAT INSTRUCTION WAS GEARED TOWARDS THAT

18   OLD PRE-CODE STATUTE AND THAT STATUTORY, YOU KNOW, SETTING

19   FORTH OF THE OFFENSE.

20       THE COURT:  AND THE -- HOW DO YOU DISTINGUISH STATE

21   VS. JACKSON?  APPARENTLY APPROVING THAT MOLESTATION

22   DEFINITION.

23       MR. CLARK:  I DON'T KNOW, JUDGE.  I GUESS I'D HAVE TO

24   LOOK AT, YOU KNOW, THAT A LITTLE MORE CLOSELY.  YOU KNOW, I

25   DON'T KNOW THE FACTS OF THAT CASE.  AND, YOU KNOW, IT COULD

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 13 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 31 of 174

11

1   HAVE BEEN BECAUSE NOBODY RAISED IT, JUDGE.  YOU KNOW, OR

2   ADDRESSED IT IN THE MATTER THAT WE HAVE.

3         THE COURT:  MR. STALZER?

4         MR. STALZER:  YOUR HONOR, IT'S CLEAR YOU HIT THE NAIL

5   ON THE HEAD BY ADDRESSING ROMERO WITH NOT RESPECT TO ANY

6   EQUAL PROTECTION CLAIM.  THE STATE DOESN'T CITE IT AS A

7   SQUARE DISPOSITIVE CASE OF THE ISSUE.  AS YOU NOTED

8   ALREADY, IT'S THE INSTRUCTION WHICH CAN GO TO A JURY OR AN

9   INSTRUCTION WHICH LIMITS THE STATE AND POSSIBLY WOULD

10  CREATE A SITUATION WHERE A MATTER COULD BE DISPOSED OF

11  BEFORE GOING TO THE JURY THROUGH A DIRECTED VERDICT BECAUSE

12  OF THAT INSTRUCTION AND THAT'S WHY IT'S CITED, TO GIVE

13  GUIDANCE AS TO WHAT IS ENCOMPASSED BY THE CHILD MOLEST

14  STATUTE, THAT PROHIBITION.

15        ALSO, WE'RE LOOKING AT NOT SOME DEFINITIVE

16  DEFINITION OF CHILD MOLEST IN ALL SPECIFIC FORM, BUT

17  RATHER, YOU KNOW, IT DOES TELL A REASONABLE PERSON OF

18  REASONABLE INTELLIGENCE WHAT IS PROSCRIBED BY A STATUTE AND

19  THE STATE'S POSITION IS THAT 1410 IS EFFECTIVE IN THAT

20  SENSE.

21        AS YOU KNOW BY THE CASES CITED, THERE IS NOTHING

22  IN ARIZONA, AT LEAST TO MY KNOWLEDGE, THAT ADDRESSES A

23  VAGUENESS ARGUMENT FROM AN APPELLATE STANDPOINT AND THAT'S

24  WHY THE CASE -- CASES FROM GEORGIA ARE INDICATED BECAUSE

25  THEY'RE SOMEWHAT SIMILAR IN NATURE AND ALSO THE JACKSON

Case 2:15-cv-00462-ROS  Document 669-10  Filed 09/18/20  Page 14 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 32 of 174

12

1   CASE WHICH SEEMS TO FOLLOW ROMERO AFTER THE OLD CODE INTO

2   THE NEW CODE ERA WHICH MORE OR LESS ADOPTS THAT POINT OF

3   VIEW AS TO WHAT DOES CHILD MOLEST MEAN AND WHAT DOES IT

4   ENCOMPASS BY PRIVATE PARTS TO GIVE GUIDANCE, ONE, TO A JURY

5   AS WELL AS TO THE AVERAGE LAY PERSON.  AND AS IN THE OTHER

6   CASE FROM CALIFORNIA, I HAVE THE COPIES OF THREE CASES THAT

7   ARE FROM ALABAMA AS WELL AS GEORGIA, AND IF I MAY APPROACH,

8   YOUR HONOR, IF YOU WANT TO LOOK AT THEM?

9       THE COURT:  ALL RIGHT.

10.     MR. STALZER:  I TENDERED COPIES TO MR. CLARK EARLIER

11  THIS AFTERNOON.

12      THE COURT:  THANK YOU.

13      MR. STALZER:  ONE FINAL STATEMENT I WISH TO MAKE IS

14  THAT THROUGH ROMERO AND JACKSON, MR. CLARK ADDRESSES

15  THE ISSUE OF ARBITRARY ENFORCEMENT BY THE STATE AND AGAIN

16  THAT ARBITRARY ENFORCEMENT WOULD BE LIMITED BY THESE TWO

17  DECISIONS AT A TRIAL SETTING THROUGH THE TYPE OF DEFINITION

18  GIVEN BY THE COURTS IN THOSE TWO CASES.

19      THE COURT:  ALL RIGHT.

20      AND, MR. CLARK, ANYTHING FURTHER?

21      MR. CLARK:  YES, JUDGE.  I WOULD ASK YOU, TOO, TO READ

22  THE HOWELL CASE WHICH IS THE COURT OF APPEALS GEORGIA

23  CASE THAT THE STATE HAS HANDED YOU.  JUDGE, THAT DEALS WITH

24  AN OVERBREATH ARGUMENT WHICH IS DIFFERENT FROM VAGUENESS

25  AND THAT'S SET FORTH ON PAGE 756, JUDGE.



1          THE POINT TO BE MADE IS THE STATUTE HAS TO TELL

2     SOMEBODY WHAT'S PROHIBITIVE CONDUCT.  THE LANGUAGE OF OUR

3     STATUTE DOESN'T TELL ANYBODY THAT.  I DON'T THINK YOU CAN

4     READ IT AND COME TO THAT CONCLUSION YOURSELF.

5          OTHER THAN THAT, JUDGE, I WOULD ASK YOU TO READ

6     HOWELL BECAUSE IT POINTS THAT OUT AS WELL.  THAT'S ON

7     PAGE 756.  OTHER THAN THAT, I HAVE NOTHING ADDITIONAL.

8          THE COURT:  ALL RIGHT.  YOU'RE NOT COMPLAINING THAT

9     THIS PARTICULAR INDICTMENT ITSELF IS VAGUE, BECAUSE IT

10    SPECIFICALLY PUTS YOU ON NOTICE OF WHAT THE ALLEGED ACTS

11    ARE; CORRECT?

12          MR. CLARK:  NO.  I MEAN, THERE'S NO NOTICE PROBLEM

13    WITH THE CHARGE ITSELF.  THE VAGUENESS GOES TO THE STATUTE

14    ITSELF.

15          THE COURT:  ALL RIGHT.

16          MR. CLARK:  ANYBODY CAN SEE WHAT THAT SAYS.  IT'S VERY

17    CONCISE.

18          THE COURT:  ALL RIGHT.

19          I'LL TAKE THAT ISSUE ALSO UNDER ADVISEMENT AND

20    READ THE CASES FROM THE OTHER JURISDICTIONS.

21          MR. STALZER:  YOUR HONOR, ACCORDING TO YOUR SCHEDULING

22    DOCKET, AT THIS POINT WE MAY BE PROCEEDING INTO THE

23    VOLUNTARINESS HEARING.  I DID HAVE A MOTION PENDING WHICH

24    WAS A MOTION TO AMEND THE INDICTMENT TO STRIKE FROM THE

25    CAPTION OF COUNT I THAT PORTION WHICH STATES: "AND



**GALL 065**          SUPERIOR COURT          **MILKE_NSB029780**
                    Phoenix, Arizona
                    EXHIBIT 01

14

*[handwritten: When? We have no Earlier Pretrial Conference!]*

1    DANGEROUS CRIME AGAINST CHILDREN".   I RAISED THIS

2    EARLIER PRETRIAL CONFERENCE AND I BELIEVE WE SET

3    TODAY'S DATE, JUST FOR HOUSEKEEPING PURPOSES.

4         THE COURT:  YES.  REFRESH MY RECOLLECTION, I

5    WRONG.  I THOUGHT I GRANTED THE MOTION AND THEN YOU WANTED

6    TO -- THERE WAS A MINUTE ENTRY ERROR OR SOMETHING?

7         MR. STALZER:  THAT PERTAINED TO THE CO-DEFENDANT AT

8    THE TIME, GEORGE SMALLWOOD.  WE DIDN'T HAVE BOTH CASES

9    CALLED AT THE SAME TIME AND IT WAS JUST MY FORGETTING TO

10   BRING IT UP WITH MR. CLARK AND SUBSEQUENT TO THAT HEARING

11   MR. CLAUSSEN AND I DISCUSSED IT AND THAT WAS THE MINUTE

12   ENTRY AS TO MR. SMALLWOOD ONLY.

13        THE COURT:  I SEE.  ALL RIGHT.

14        MR. CLARK, YOU HAVE NO OBJECTION, I TAKE IT, TO

15   DELETING FROM THE INDICTMENT --

16        MR. CLARK:  THAT'S CORRECT, JUDGE, I DON'T.

17        THE COURT:  ALL RIGHT.  IT'S ORDERED GRANTING THE

18   STATE'S MOTION TO AMEND THE CAPTION OF THE INDICTMENT FOR

19   COUNT I; TO DELETE FROM THAT ALLEGATION THAT THE MATTER WAS

20   A DANGEROUS CRIME AGAINST CHILDREN, AND WE'RE TALKING ABOUT

21   COUNT I ONLY.

22        MR. CLARK:  JUDGE, AS A MATTER OF HOUSEKEEPING, I DID

23   FILE ANOTHER MOTION TO DISMISS AND I ASSUME THAT WE ARE

24   GOING TO PROBABLY RESCHEDULE THAT.

25        THE COURT:  YES, I THINK WE'RE GOING TO HAVE TO DO

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 17 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 35 of 174

15

1    THAT.  THAT IS AN INTERESTING ISSUE AND I BELIEVE MR.

2    STALZER WILL NEED TIME TO RESPOND TO THAT IN WRITTEN

3    FASHION BEFORE WE GET TO THAT.

4          AND, MR. STALZER, WAS THERE A BRIEF OR ANY

5    PLEADING FROM THE STATE ON THE VOLUNTARINESS ISSUE ITSELF?

6          MR. STALZER:  NO, YOUR HONOR, BECAUSE THE EXACT ISSUES

7    WERE NOT ADDRESSED ORIGINALLY BY THE DEFENSE.  HOWEVER,

8    LAST WEDNESDAY I BELIEVE MR. CLARK DID FILE A SUPPLEMENT TO

9    HIS MOTION AND IF YOUR HONOR IS SO INCLINED, I WOULD BE

10   REQUESTING TO FILE SOMETHING EARLY NEXT WEEK TO ADDRESS

11   SOME OF THE ISSUES WHICH MAY BE RAISED TODAY.

12         THE COURT:  YES.  THE PROCEDURE I THINK THAT WE OUGHT

13   TO GO AHEAD AND USE IS LET'S HAVE THE EVIDENTIARY HEARING

14   AT THIS TIME AND I WOULD NEED FOR YOU TO FILE A BRIEF ON

15   THE ISSUE ON THE POINTS RAISED BY THE DEFENSE AND IF YOU'RE

16   NOT PREPARED TO ARGUE THOSE ISSUES TODAY, WE MAY HAVE TO

17   SET ORAL ARGUMENT ON THAT AT A LATER DATE.

18         WHAT IS YOUR THOUGHT?  DID YOU WANT TO GO AHEAD

19   AND ARGUE THAT NOW AND JUST GIVE ME THE CASES AND THE

20   CITATIONS FOR THAT LATER?

21         MR. STALZER:  YES, I BELIEVE I COULD ARGUE AND EVEN

22   PROVIDE SOME CASE CITATIONS TODAY.

23         THE COURT:  OKAY.  FINE.  THAT'S THE PROCEDURE WE'LL

24   USE.  WE'LL GO AHEAD AND CONDUCT THE EVIDENTIARY HEARING.

25   WE'LL HAVE ORAL ARGUMENT ON THAT AND THEN I'LL ASK YOU TO

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 18 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 36 of 174

16

1    FILE A SUPPLEMENTAL BRIEF ON THOSE ISSUES.

2              MR. CLARK, DO YOU THINK THAT YOU WILL NEED TO

3    REPLY TO THE SUPPLEMENTAL BRIEF?

4         MR. CLARK:  DEPENDING UPON WHAT IT SAYS, I MAY, JUDGE.

5    I HAVE PRETTY MUCH SET OUT THE LAW AS I PERCEIVED IT, AND I

6    THINK THAT WAS IT, SO --

7         THE COURT:  YEAH, I DON'T THINK THERE WILL BE A NEED

8    FOR A REPLY BRIEF IN THAT MATTER.  SO WE'LL PROCEED, THEN,

9    WITH THE EVIDENTIARY HEARING.

10             MR. STALZER?

11        MR. STALZER:  YES.

12        THE COURT:  DETECTIVE SALDATE, PLEASE COME FORWARD.

13             ARE YOU GOING TO HAVE MORE THAN ONE WITNESS

14   TESTIFY?

15        MR. STALZER:  YES, YOUR HONOR.  DETECTIVE CHAMBER TO

16   MY RIGHT WOULD BE THE CURRENT INVESTIGATOR ASSIGNED TO THE

17   CASE.

18        THE COURT:  ALL RIGHT.  WHY DON'T WE SWEAR THEM IN

19   BOTH AT THE SAME TIME.

20             WILL THERE BE ANYBODY ELSE?

21        MR. CLARK:  YES, JUDGE.  I HAD SUBPOENAED MR.

22   SMALLWOOD HERE TODAY.  I MAY CALL HIM SUBSEQUENT TO THE

23   OFFICERS.  SO I ASK THAT HE BE SWORN AS WELL AND I ASK THAT

24   THE RULE BE INVOKED.

25        THE COURT:  ALL RIGHT.  IS MR. SMALLWOOD PRESENT?

1          YES, SIR, LET'S HAVE ALL THREE OF YOU SWORN IN AT

2    THIS PRESENT TIME.

3               (THE PROSPECTIVE WITNESSES WERE DULY SWORN.)

4        THE COURT:  ALL RIGHT.  THANK YOU.

5          GENTLEMEN, THE RULE OF EXCLUSION OF WITNESSES HAS

6    BEEN INVOKED BY COUNSEL IN THIS MATTER.  THAT MEANS YOU ARE

7    NOT TO BE IN THE COURTROOM EXCEPT DURING YOUR TESTIMONY AS

8    IT APPLIES TO YOU, MR. SMALLWOOD, AND DETECTIVE SALDATE.  I

9    WILL ALLOW DETECTIVE CHAMBERS TO REMAIN IN AS THE

10   INVESTIGATING OFFICER.

11          NONE OF YOU SHOULD TALK ABOUT YOUR TESTIMONY

12   TODAY WITH ANYONE ELSE OTHER THAN THE LAWYERS AND IF YOU DO

13   TALK TO THE LAWYERS ABOUT YOUR TESTIMONY TODAY, MAKE SURE

14   THAT NO ONE ELSE IS PRESENT TO OVERHEAR WHAT IS DISCUSSED.

15          SO, MR. SMALLWOOD, IF YOU'LL STEP OUTSIDE THE

16   COURTROOM.

17          MR. SALDATE, YOU MAY TAKE THE STAND AND,

18   DETECTIVE CHAMBERS, HAVE A SEAT.

19

20                    ARMANDO SALDATE, JR.,

21   CALLED AS A WITNESS HEREIN, HAVING BEEN FIRST DULY SWORN,

22   WAS EXAMINED AND TESTIFIED AS FOLLOWS:

23

24                    DIRECT EXAMINATION

25   BY MR. STALZER:

Case 2:15-cv-00462-ROS  Document 669-10  Filed 09/18/20  Page 20 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 38 of 174

18

1        Q.    SIR, WOULD YOU PLEASE STATE YOUR NAME.

2        A.    ARMANDA SALDATE, JR.

3        Q.    WHAT IS YOUR OCCUPATION?

4        A.    I'M CURRENTLY THE CONSTABLE FOR THE CENTRAL

5   JUSTICE COURT SYSTEM.

6        Q.    HOW LONG HAVE YOU BEEN EMPLOYED AS A CONSTABLE?

7        A.    SINCE JULY 11TH OF 1990.

8        Q.    WHAT WAS YOUR PREVIOUS OCCUPATION?

9        A.    I RETIRED FROM THE PHOENIX POLICE DEPARTMENT.

10       THE COURT:  IF COUNSEL CANNOT HEAR HIM, WE'LL ASK HIM

11   TO SPEAK LOUDER, BUT GO AHEAD.

12       THE WITNESS:  I RETIRED FROM THE PHOENIX POLICE

13   DEPARTMENT ON JULY 10TH, 1990, AND WAS APPOINTED BY THE

14   BOARD OF SUPERVISORS TO THE CONTABLE'S POSITION THE NEXT

15   DAY.

16   BY MR. STALZER:

17       Q.    WHEN YOU WERE EMPLOYED WITH THE PHOENIX POLICE

18   DEPARTMENT, WHAT WERE YOUR DUTIES TOWARDS THE END OF YOUR

19   EMPLOYMENT?

20       A.    I WAS ASSIGNED AS A DETECTIVE IN THE HOMICIDE

21   DIVISION.

22       Q.    HOW MANY YEARS DID YOU SPEND IN THE HOMICIDE

23   DIVISION?

24       A.    I WAS ASSIGNED TO THE HOMICIDE DETAIL APRIL 1986

25   UNTIL I RETIRED JULY 10TH, 1990.

1          Q.    HOW MANY YEARS DID YOU SPEND WITH THE PHOENIX

2     POLICE DEPARTMENT?

3          A.    A TOTAL OF 21 YEARS.

4          Q.    DIRECTING YOUR ATTENTION TO MARCH 16, 1990, DID

5     YOU HAVE AN OCCASION TO BECOME INVOLVED IN AN INVESTIGATION

6     OF A HOMICIDE INVOLVING A VICTIM BY THE NAME OF KENDALL

7     WISHON?

8          A.    YES, I DID.

9          Q.    DID YOU RESPOND TO THE VICTIM'S ADDRESSES OF 1805

10    NORTH 71ST AVENUE IN PHOENIX?

11         A.    YES, I DID.

12         Q.    DO YOU RECALL WHAT TIME YOU WENT TO THE SCENE?

13    APPROXIMATELY.

14         A.    AROUND 3:00 OR SO.

15         Q.    AT SOME POINT IN TIME WERE YOU REQUESTED BY

16    ANYONE TO CONDUCT ANY INTERVIEWS REGARDING THE HOMICIDE

17    INVESTIGATION?

18         A.    YES, I WAS.

19         Q.    WHAT WERE YOUR DUTIES WITH RESPECT TO ANY

20    INTERVIEWS THAT YOU MAY HAVE CONDUCTED?

21         A.    OBVIOUSLY TO INTERVIEW THAT PERSON TO FIND OUT IF

22    THEY KNEW ANYTHING THAT HAD TRANSPIRED THAT MAY HAVE CAUSED

23    THE DEATH OF KENDALL WISHON.

24         Q.    DID YOU INTERVIEW MICHAEL GALLEGOS?

25         A.    YES, I DID.

20

1        Q.   DO YOU SEE THAT INDIVIDUAL IN COURT HERE TODAY?

2        A.   YES, I DO.

3        Q.   WOULD YOU POINT THE PERSON OUT AND DESCRIBE SOME

4   ITEM OF CLOTHING WORN BY THE PERSON.

5        A.   HE'S WEARING THE LIGHT BLUE JAIL SMOCK SITTING

6   NEXT TO HIS ATTORNEY ON THE DEFENSE TABLE WEARING TINTED

7   GLASSES.

8        MR. STALZER:   MAY THE RECORD REFLECT THE WITNESS HAS

9   IDENTIFIED THE DEFENDANT MICHAEL GALLEGOS?

10       THE COURT:   MR. CLARK, IS THE IDENTITY OF THE

11  DEFENDANT AN ISSUE IN THIS CASE?

12       MR. CLARK:   I DON'T BELIEVE SO, JUDGE.

13       THE COURT:   THE RECORD WILL SO REFLECT.

14  BY MR. STALZER:

15       Q.   SIR, WHERE DID YOU MEET MR. GALLEGOS INITIALLY ON

16  THE 16TH?

17       A.   OFFICIALLY I MET HIM AT 620 WEST WASHINGTON, AT

18  THE MAIN POLICE STATION.

19       Q.   WHILE YOU WERE AT THE CRIME SCENE, DID YOU HAVE

20  ANY CONTACT WITH HIM AT THAT LOCATION?

21       A.   I DON'T BELIEVE SO.

22       Q.   DID YOU TRANSPORT MR. GALLEGOS FROM THE CRIME

23  SCENE TO THE MAIN POLICE DEPARTMENT?

24       A.   NO, I DID NOT.

25       Q.   WHERE DID YOU MEET HIM IN THE POLICE DEPARTMENT

**GALL 072**

**MILKE_NSB029787**

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 23 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 41 of 174

21

1    OFFICES?

2         A.    HE HAD BEEN PLACED IN AN INTERVIEW ROOM AT THE

3    MAIN POLICE STATION JUST BEHIND THE GENERAL INVESTIGATIONS

4    BUREAU'S DESK.

5         Q.    NOW, WOULD IT BE CORRECT YOU MET HIM AT

6    APPROXIMATELY 4:20 P.M.?

7         A.    YES, APPROXIMATELY 4:20.

8         Q.    AND THAT WAS THE SAME DAY, MARCH 16TH?

9         A.    THAT IS CORRECT.

10        Q.    WAS ANYONE ELSE PRESENT WITH YOU AND THE

11   DEFENDANT?

12        A.    NO.

13        Q.    CAN YOU DESCRIBE THE INTERVIEW ROOM WHERE YOU

14   SPOKE TO MR. GALLEGOS?

15        A.    A SMALL ROOM.  SET BEHIND THE LOBBY OF THE

16   GENERAL INVESTIGATIONS BUREAU.  IT'S PROBABLY, AND MY

17   ESTIMATES CAN BE WRONG, MAYBE SIX FOOT BY FIVE FOOT.  MAYBE

18   SIX FOOT SQUARE.  ROOM WITH A DOOR, THAT HAS A WINDOW ON

19   IT.

20        Q.    WHEN THE INTERVIEW WAS INITIATED, WERE YOU BOTH

21   STANDING OR SEATED OR CAN YOU DESCRIBE GENERALLY HOW IT

22   BEGAN?

23        A.    WHEN I ENTERED THE INTERVIEW ROOM, MIKE WAS

24   SEATED ON A CHAIR AT THE END OF A TABLE THAT WAS ALSO

25   INSIDE THE INTERVIEW ROOM.  THERE WAS ALSO ANOTHER CHAIR.

Case 2:15-cv-00462-ROS  Document 669-10  Filed 09/18/20  Page 24 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 42 of 174

22

1    THAT WAS AVAILABLE INSIDE THAT INTERVIEW ROOM WHICH I USED.

2         Q.   WAS MR. GALLEGOS HANDCUFFED AT THE TIME?

3         A.   NO.

4         Q.   WAS HE RESTRICTED PHYSICALLY IN ANY WAY?

5         A.   NO, HE WAS NOT.

6         Q.   CAN YOU TELL US HOW YOU BEGAN THE INTERVIEW?

7    WHAT DID YOU DO?

8         A.   WELL, WHEN I FIRST ENTERED THE ROOM, I IDENTIFIED

9    MYSELF WITH MY BADGE AND I.D. CARD.  I ADVISED HIM WHO I

10   WAS.  HE IMMEDIATELY TOLD ME HE KNEW WHO I WAS AND THAT HE

11   HAD SEEN ME AT THE SCENE AND KNEW THAT I WAS A POLICE

12   OFFICER.  I THEN SAT DOWN AND BEGAN TO TALK TO HIM.

13        Q.   DID HE INDICATE IF HE WAS IN SCHOOL OR OUT OF

14   SCHOOL AS YOU STARTED TO TALK TO HIM?

15        A.   HE INDICATED THAT HE WAS CURRENTLY ENROLLED IN

16   SCHOOL AT COCONINO HIGH SCHOOL.  HE WAS A SENIOR AND THAT

17   HE HAD BEEN ON SPRING VACATION SINCE MARCH 10TH.

18        Q.   DID HE INDICATE TO YOU HOW CLOSE HE WAS TO

19   GRADUATION AT ANY POINT, DURING THAT VERY INITIAL START OF

20   THE INTERVIEW?

21        A.   YES.  I ASKED HIM IF HE WAS GOING TO GRADUATE AND

22   HE SAID THAT HE WAS GOING TO BE ONE CREDIT SHORT ON

23   GRADUATION, BUT HAD INTENDED ON MAKING UP THAT CREDIT

24   DURING SUMMER SCHOOL.

25        Q.   DO YOU KNOW HOW OLD HE WAS AT THAT TIME?

1       A.    HE WAS 18 YEARS OLD.

2       Q.    DID YOU DISCUSS IF HE HAD ANY PROBLEMS IN SCHOOL?

3       A.    YES, WE DID.

4       Q.    WHAT DID HE SAY TO YOU?

5       A.    I ASKED HIM ABOUT HIS STUDY SKILLS IN SCHOOL AND

6   HE INDICATED TO ME THAT HE WAS IN SPECIAL EDUCATION, THAT

7   HE WAS CONSIDERED A SLOW LEARNER. HE SAID THAT HIS PROBLEM

8   AREA WAS MATH AND CONSIDERED HIMSELF A LEVEL OF 9TH GRADE

9   IN MATH. HE INDICATED THAT MOST OF HIS OTHER STUDIES WERE

10  COMPARABLE WITH HIS GRADE LEVEL AND I ASKED HIM ABOUT HIS

11  READING SKILLS AND HE SAID THAT HE CONSIDERED HIMSELF

12  SENIOR LEVEL.

13      Q.    DID YOU ASK HIM ABOUT HIS STUDY HABITS OR HIS

14  ABILITY TO DO HOMEWORK? IF YOU REMEMBER.

15      A.    I DON'T RECALL.

16      Q.    DID YOU AT ANY TIME ADVISE HIM OF HIS MIRANDA

17  RIGHTS?

18      A.    YES, I DID.

19      Q.    CAN YOU TELL JUDGE HOTHAM HOW THAT WAS DONE.

20      A.    I REMOVED A MIRANDA CARD, LISTING HIS MIRANDA

21  RIGHTS, THAT'S ISSUED BY THE PHOENIX POLICE DEPARTMENT. I

22  HAD IT IN MY WALLET. I REMOVED THE CARD. I HANDED HIM THE

23  CARD AND ASKED HIM TO READ THE RIGHTS OUT LOUD TO ME TO

24  ENSURE THAT HE UNDERSTOOD THE RIGHTS. I WANTED TO ALSO SEE

25  IF HE COULD READ THEM CLEARLY, AND TEST HIS STATEMENT TO ME

24

1    THAT HE COULD READ RATHER WELL.

2        Q.   HOW DID HE READ FROM THE CARD?

3        A.   HE HAD NO PROBLEM IN READING THE CARD.  HE NEVER

4    HESITATED ON ANY WORD.  HE READ IT VERY CLEARLY AND WITHOUT

5    HESITATION.

6        Q.   DID HE APPEAR TO BE ALERT WHEN HE WAS TALKING

7    WITH YOU?

8        A.   OH, YES.

9        Q.   WHEN HE WAS READING FROM THE CARD, DID YOU HEAR

10   HIM MENTION THAT HE HAD THE RIGHT TO REMAIN SILENT?

11       A.   YES.  HE READ THE ENTIRE RIGHTS CARD.

12       Q.   AND THAT ALSO ADDRESSED THE ISSUE THAT HE HAD THE

13   RIGHT TO AN ATTORNEY?

14       A.   THAT IS CORRECT.

15       Q.   AND THAT IF HE COULDN'T AFFORD AN ATTORNEY, ONE

16   WOULD BE APPOINTED FOR HIM?

17       A.   THAT IS CORRECT.

18       Q.   AND DID YOU HEAR HIM SAY FROM THE CARD, AS IT'S

19   PRINTED, THAT ANYTHING HE SAID COULD BE USED AGAINST HIM IN

20   A COURT OF LAW?

21       A.   THAT IS CORRECT.

22       Q.   NOW, DID YOU DO ANYTHING ELSE TO KIND OF

23   REINFORCE FOR YOUR OWN PIECE OF MIND THAT HE UNDERSTOOD

24   THOSE RIGHTS?

25       A.   AFTER READING THE RIGHTS I ASKED HIM IF HE

1  UNDERSTOOD, AND HE IMMEDIATELY SAID THAT HE DID.  I ASKED

2  HIM IF HE UNDERSTOOD WHAT A LAWYER WAS AND HE SAID THAT HE

3  DID.  I ASKED HIM IF HE UNDERSTOOD THAT HE DIDN'T HAVE TO

4  TALK TO ME RIGHT NOW AND HE SAID THAT HE DID.  THEN HE MADE

5  -- QUESTIONED ABOUT WAS HE A SUSPECT AND I TOLD HIM THAT AT

6  THIS POINT I DIDN'T HAVE ENOUGH FACTS TO SAY WHETHER HE WAS

7  OR WAS NOT A SUSPECT AND THAT I WAS JUST GOING TO ASK HIM

8  WHERE HE WAS LAST NIGHT, WHAT HE DID, AND IF HE KNEW

9  ANYTHING ABOUT KENDALL'S DEATH, AND HE IMMEDIATELY SAID HE

10  WOULD FULLY COOPERATE WITH ME.

11      Q.    AND IS IT NOT CORRECT THAT HE BEGAN TO EXPLAIN

12  THE COURSE OF EVENTS TO YOU FROM THE NIGHT OF THE 15TH OF

13  MARCH OVER INTO THE EARLY MORNING HOURS OF APPROXIMATELY

14  9:00 O'CLOCK OR SO ONCE THE YOUNG GIRL WAS FOUND TO BE

15  MISSING?  WOULD THAT BE A FAIR STATEMENT?

16      A.    YES.

17      Q.    AND WOULD IT ALSO BEEN A FAIR STATEMENT HIS

18  INITIAL COMMENTS TO YOU WOULD NOT IN ANY WAY INDICATE ANY

19  WRONGFUL INVOLVEMENT BY HIM IN THE YOUNG GIRL'S DEATH?

20      A.    THAT IS CORRECT.

21      Q.    WHAT HAPPENED AFTER THAT POINT, CAN YOU TELL US?

22      A.    WELL, AFTER HEARING WHAT HE HAD TOLD ME, I TOLD

23  HIM THAT I FELT THAT MAYBE HE WAS INVOLVED.  I EXPLAINED TO

24  HIM ABOUT THE SITUATION OF THE HOUSE, THAT IT WAS LOCKED

25  UP, THERE WAS NO INDICATION OF ANYONE BREAKING IN, NO

GALL 077   SUPER EXHIBIT 1J   MILKE_NSB029792

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 28 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 46 of 174

26

1    INDICATION OF ANYONE BREAKING OUT.  IT WAS JUST -- THE

2    HOUSE WAS SECURED.  AND WE DISCUSSED THAT AND HE AGREED.

3         Q.   WHEN YOU SAY HE AGREED, DO YOU MEAN HE

4    ACKNOWLEDGED THAT THE RESIDENCE WAS LOCKED --

5         A.   THAT'S CORRECT.

6         Q.   -- THE NIGHT BEFORE THE GIRL WAS FOUND TO BE

7    MISSING?

8         A.   THAT'S CORRECT.

9         Q.   YOU WERE BRIEFED ON WHAT WAS FOUND AT THE SCENE,

10   AS FAR AS PHYSICAL EVIDENCE; IS THAT NOT CORRECT?

11        A.   YES.

12        Q.   WHEN YOU SAY THE HOUSE WAS NOT BROKEN INTO, WOULD

13   IT BE FAIR TO SAY THERE WAS NO OBVIOUS SIGN OF BREAK-IN

14   THROUGH ANY MEANS --

15        A.   THERE WAS NO OBVIOUS SIGNS OF FORCED ENTRY AT ALL

16   IN THE HOUSE.

17        Q.   AFTER THAT BRIEF CONVERSATION DO YOU RECALL

18   MAKING THE STATEMENT TO HIM SOMETHING TO THE EFFECT THE

19   BEST THING WOULD BE TO TELL THE TRUTH AND THAT YOU WEREN'T

20   THERE TO JUDGE HIM?

21        A.   THAT IS CORRECT.

22        Q.   WHAT OCCURRED NEXT THAT YOU RECALL?

23        A.   I BELIEVE WE BEGAN TALKING ABOUT ME EXPLAINING TO

24   HIM THAT I WAS JUST THERE TO GET THE TRUTH AND THAT IT WAS

25   BEST FOR HIM TO TELL ME THE TRUTH AND AT LEAST HAVE AN

1    EXPLANATION FOR WHAT HAPPENED.

2         Q.   AT THAT POINT IN TIME WOULD YOU DESCRIBE HIS

3    EMOTIONAL STATE FOR US, IF YOU RECALL.

4         A.   HE -- HE HADN'T CHANGED AT ALL.  HE WAS VERY

5    CALM.  VERY COOPERATIVE.  SOFT SPOKEN, AS HE IS.

6         Q.   DID HE APPEAR EMOTIONALLY AGITATED IN ANY WAY?

7         A.   NOT AT THAT POINT, NO.

8         Q.   DID HE APPEAR TO BE UPSET IN ANY WAY?

9         A.   NO.

10        Q.   WAS HE CRYING?

11        A.   NOT AT THAT POINT, NO.

12        Q.   DID YOU, IN THE COURSE OF THOSE STATEMENTS THAT

13   YOU JUST TOLD US, RECALL HIM MAKING THE COMMENT "DO YOU

14   REALIZE WHAT YOU'RE ASKING OF ME?"

15        A.   YES, I DO.

16        Q.   NOW, YOU PREPARED A REPORT, DID YOU NOT, OF YOUR

17   --

18        A.   YES.

19        Q.   -- INTERVIEW WITH HIM?

20             AND IF SOMETHING IS PUT IN YOUR REPORT IN QUOTES,

21   WOULD THAT BE MORE OR LESS A DIRECT QUOTE FROM THE

22   INDIVIDUAL?

23        A.   THAT WOULD BE, YES.

24        Q.   DID HE SAY TO YOU, "WHAT DO YOU THINK MY BROTHER

25   WILL THINK OF ME?"

**GALL 079**                    SUPERIOR COURT                **MILKE_NSB029794**

EXHIBIT 11

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 30 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 48 of 174

28

1          A.    THAT IS CORRECT.

2          Q.    WHAT DO YOU RECALL HIM SAYING AFTER THOSE TWO

3   COMMENTS WERE MADE?

4          A.    I BELIEVE HE BEGAN DISCUSSING THE POINT OF --

5   INDICATING WHAT IF HE WAS INVOLVED, BUT THEN HE QUICKLY

6   SAID I'M NOT ADMITTING IT, BUT LET'S JUST SAY WHAT IF I WAS

7   INVOLVED, WHAT WOULD HAVE HAPPENED OR WHAT WOULD HAPPEN TO

8   ME?

9          Q.    HE SAID THAT TO YOU?

10         A.    YES.

11         Q.    WHAT DID YOU SAY IN RESPONSE, IF ANYTHING?

12         A.    I TOLD HIM THAT HE WOULD BE PLACED UNDER ARREST

13   AND HE WOULD BE PUT IN JAIL AND CHARGED WITH MURDER.

14         Q.    DO YOU RECALL HIM SAYING, AGAIN, "LET'S JUST SAY

15   I DID DO IT; BUT I'M NOT ADMITTING TO IT, LET'S JUST SAY I

16   DID. WOULD THERE BE ANYTHING I COULD SAY TO KEEP FROM

17   GOING TO JAIL?"  DO YOU RECALL HIM MAKING THAT COMMENT?

18         A.    HE DID.

19         Q.    DID YOU MAKE A RESPONSE TO HIM?

20         A.    YES, I DID.

21         Q.    WHAT DID YOU SAY TO HIM?

22         A.    I TOLD HIM THERE WAS NOTHING THAT HE COULD SAY TO

23   KEEP HIM FROM GOING TO JAIL.

24         Q.    DO YOU RECALL HIM ASKING YOU, "DO YOU THINK I DID

25   IT BY MYSELF?"

1        A.   YES, HE DID ASK THAT.

2        Q.   AND WHAT DID YOU SAY, IF ANYTHING, IN RESPONSE?

3        A.   I TOLD HIM I DIDN'T KNOW.  I TOLD HIM I DIDN'T

4    KNOW WHETHER HE HAD DONE IT BY HIMSELF.  I ONLY EXPECTED

5    HIM TO TELL ME THE TRUTH AND THAT IF SOMEONE ELSE WAS

6    INVOLVED WITH HIM, I WOULD EXPECT HIM TO TELL ME WHO THAT

7    PERSON WAS AND TO TELL ME THE ENTIRE TRUTH OF WHAT

8    HAPPENED.

9        Q.   DID HE PROCEED TO TELL YOU FACTS THAT INDICATED

10   HE WAS INVOLVED IN THE DEATH OF KENDALL WISHON?

11       A.   YES, HE DID.

12       Q.   DID YOU AT ANY TIME THREATEN MICHAEL GALLEGOS?

13       A.   NEVER.

14       Q.   DID YOU MAKE HIM ANY TYPE OF PROMISES IN EXCHANGE

15   FOR ANY FORM OF ADMISSION OR CONFESSION?

16       A.   NEVER.

17       Q.   DID YOU COERCE HIM IN ANY WAY TO MAKE ANY TYPE OF

18   INCULPATORY STATEMENT?

19       A.   ABSOLUTELY NOT.

20       Q.   AT ANY TIME DURING THE INTERVIEW YOU HAD WITH

21   MICHAEL GALLEGOS, DID HE EVER REQUEST TO HAVE AN ATTORNEY?

22       A.   ABSOLUTELY NOT.

23       Q.   YOU'RE POSITIVE?

24       A.   I AM POSITIVE.

25       Q.   IF HE WOULD HAVE ASKED FOR AN ATTORNEY, WOULD YOU

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 32 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 50 of 174

30

1    HAVE CONTINUED QUESTIONING HIM ABOUT THE OFFENSE?

2         A.    I WOULD HAVE IMMEDIATELY STOPPED THE INTERVIEW AT

3    THAT POINT, CLARIFIED HIS QUESTION, ABOUT THE ATTORNEY.

4         Q.    NOW, IS IT NOT CORRECT GEORGE SMALLWOOD WAS ALSO

5    AT THE POLICE DEPARTMENT AT ABOUT THE SAME TIME?

6         A.    YES, HE WAS.

7         Q.    WAS HE ALSO IN AN INTERVIEW ROOM ON THE SAME

8    FLOOR?

9         A.    YES, HE WAS.

10        Q.    HOW MANY INTERVIEW ROOMS ARE THERE?

11        A.    THERE'S A TOTAL OF THREE INTERVIEW ROOMS IN THAT

12   SECTION.

13        Q.    WERE THE INTERVIEWS CONDUCTED IN ROOMS ADJACENT

14   TO ONE ANOTHER OR WAS THERE --

15        A.    THEY WERE --

16        Q.    -- A SPACE IN BETWEEN?

17        A.    IN THE FIRST INTERVIEW ROOM WAS MYSELF AND

18   MICHAEL.  THE SECOND INTERVIEW ROOM WAS EMPTY.  IN THE

19   THIRD INTERVIEW ROOM WAS DETECTIVE MIKE CHAMBERS AND MR.

20   SMALLWOOD.

21        Q.    APPROXIMATELY HOW LONG DID YOU TALK TO MR.

22   GALLEGOS BEFORE TAKING ANY BREAK?

23        A.    APPROXIMATELY AN HOUR.

24        Q.    DURING THAT HOUR PERIOD DID HE SHOW ANY SIGNS OF

25   FATIGUE?



1      A.   NO, HE DID NOT.

2      Q.   DID HE SHOW ANY SIGNS THAT HIS STATEMENTS WERE

3   ANYTHING BUT VOLUNTARY?

4      A.   NO.

5      Q.   DID HE MAKE ANY SPECIAL REQUESTS OF YOU OF ANY

6   KIND THAT ARE NOTEWORTHY, AT LEAST IN YOUR MIND?

7      A.   I BELIEVE HE ASKED ME IF I WAS NOW GOING TO TALK

8   TO MR. SMALLWOOD AND I TOLD HIM THAT DETECTIVE MIKE

9   CHAMBERS WAS ALREADY CONDUCTING THAT INTERVIEW.

10      Q.   WHAT HAPPENED AFTER YOU FINISHED YOUR INITIAL

11   ONE-HOUR INTERVIEW WITH THE DEFENDANT?

12      A.   I EXITED THE INTERVIEW ROOM.  DETECTIVE MIKE

13   CHAMBERS WAS STILL TIED UP WITH HIS INTERVIEW.  I REMAINED

14   OUTSIDE THE ROOM.  I SPOKE TO A SUPERVISOR.  EXPLAINED TO

15   HIM WHAT HAD TRANSPIRED IN MY INTERVIEW, BRIEFLY.  THEN

16   DETECTIVE MIKE CHAMBERS EXITED THE INTERVIEW ROOM MINUTES

17   AFTER AND WE SPOKE BRIEFLY AND THEN I REENTERED THE

18   INTERVIEW ROOM SEVERAL MINUTES LATER.

19      Q.   WAS THERE A TIME WHEN YOU REINTERVIEWED THE

20   DEFENDANT ABOUT WHAT OCCURRED ON THE EVENING OF THE 16TH OF

21   MARCH, 1989?

22      A.   UPON MY SECOND ENTRY INTO THE INTERVIEW ROOM.

23      Q.   WAS ANYONE ELSE PRESENT OTHER THAN YOU AND THE

24   DEFENDANT?

25      A.   YES, THERE WAS.



1      Q.   WHO WOULD THAT PERSON BE?

2      A.   DETECTIVE MIKE CHAMBERS.

3      Q.   HOW LONG DID THE SECOND INTERVIEW LAST,

4   APPROXIMATELY?

5      A.   10, 15 MINUTES, MAYBE.

6      Q.   DID YOU AT THAT SECOND INTERVIEW NOTE ANY

7   SUBSTANTIALLY DIFFERENT FACTS THAN WHAT YOU WERE GIVEN

8   DURING THE FIRST INTERVIEW?

9      A.   NO.   THE SECOND INTERVIEW HE JUST BRIEFLY WENT

10   OVER WHAT HAD TRANSPIRED.

11     Q.   WERE ANY THREATS MADE TO MR. GALLEGOS?

12     A.   ABSOLUTELY NOT.

13     Q.   DID YOU PROMISE HIM ANYTHING DURING THE SECOND

14   INTERVIEW?

15     A.   ABSOLUTELY NOT.

16     Q.   DID YOU COERCE HIM IN THE SECOND INTERVIEW?

17     A.   ABSOLUTELY NOT.

18     Q.   AT THE SECOND INTERVIEW DID HE SAY HE WANTED THE

19   SERVICES OF AN ATTORNEY?

20     A.   HE DID NOT.

21     Q.   ARE YOU SURE?

22     A.   ABSOLUTELY.

23     Q.   DID YOU ATTEMPT TO GET AN -- EXCUSE ME.  STRIKE

24   THAT.

25          WAS THERE A TIME WHEN YOU TRIED TO HAVE A TAPED

**GALL 084**

**MILKE_NSB029799**

33



1        INTERVIEW WITH MR. GALLEGOS?

2            A.   THERE WAS.

3            Q.   WAS THAT DONE?

4            A.   THAT WAS NOT DONE.

5            Q.   CAN YOU EXPLAIN WHY NOT?

6            A.   DETECTIVE MIKE CHAMBERS WAS INSIDE THE INTERVIEW

7        ROOM. I ASKED HIM SHORTLY AFTER -- SHORTLY AFTER HE

8        COMPLETED THE INTERVIEW WITH -- THE SECOND INTERVIEW, I

9        ASKED HIM IF HE WOULD VOLUNTARILY MAKE THE STATEMENT AGAIN

10       BUT THIS TIME HAVE IT TAPE-RECORDED AND HE DENIED A -- SAID

11       HE WOULD NOT. SAID HE HAD ALREADY TOLD ME EVERYTHING THAT

12       HAPPENED   HE HAD TOLD DETECTIVE MIKE CHAMBERS EVERYTHING

13       THAT HAPPENED AND THAT WAS IT.

14           Q.   WAS THERE A TIME WHEN MICHAEL GALLEGOS WAS IN THE

15       PRESENCE OF GEORGE SMALLWOOD FOR INTERVIEW PURPOSES?

16           A.   THERE WAS.

17           Q.   CAN YOU EXPLAIN TO JUDGE HOTHAM THE CIRCUMSTANCES

18       OF THAT EVENT.

19           A.   WHEN I EXITED THE FIRST TIME, FROM THE INTERVIEW

20       ROOM, OBTAINING MICHAEL'S STATEMENTS THAT CLEARLY

21       IMPLEMENTED GEORGE SMALLWOOD, DETECTIVE MIKE CHAMBERS

22       STEPPED OUT OF THE INTERVIEW ROOM, COMPLETING HIS INTERVIEW

23       AT THAT TIME.   I EXPLAINED TO DETECTIVE MIKE CHAMBERS WHAT

24       HAD TRANSPIRED IN MY INTERVIEW.   HE INDICATED TO ME THAT

25       GEORGE WAS NOT ADMITTING ANYTHING ABOUT THE INCIDENT TO

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 36 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 54 of 174

34

1      HIM.   I EXPLAINED TO HIM THAT MICHAEL HAD SAID THAT THAT

2      WOULD PROBABLY HAPPEN.   THAT GEORGE, ANY TIME THEY HAD GOT

3      INTO INTO TROUBLE, GEORGE WOULD, YOU KNOW, ALWAYS ESCAPE

4      FROM ANY PROBLEM BECAUSE HE WOULD ALWAYS DENY IT.

5           Q.   NOW, MICHAEL TOLD YOU THAT?

6           A.   MICHAEL SAID THAT TO ME.   AND AFTER WE SPOKE FOR

7      JUST A FEW MINUTES, I DON'T KNOW AT WHOSE SUGGESTION,

8      WHETHER IT WAS MINE OR DETECTIVE CHAMBERS' OR EVEN

9      MICHAEL'S, IT WAS DECIDED THAT HE MAY CONFRONT GEORGE

10     SMALLWOOD AND WE DID.   I ASKED MICHAEL -- WE STEPPED OUT OF

11     THE ROOM -- I TOLD MICHAEL WE WOULD STEP OUT OF THE ROOM.

12     I TOLD HIM WE WOULD GO TO THE INTERVIEW ROOM.   I TOLD HIM I

13     DID NOT WANT HIM AT ALL -- IF IT WAS GOING TO BECOME A

14     CONFRONTATION AT ALL, I DID NOT WANT THAT,

15          Q.   YOU MEAN PHYSICAL CONFRONTATION?

16          A.   PHYSICAL CONFRONTATION.   ARGUING, YELLING, I DID

17     NOT WANT THAT.   MICHAEL AGREED.   WE BOTH WALKED INTO THE

18     INTERVIEW ROOM WHERE DETECTIVE MIKE CHAMBERS WAS WITH

19     GEORGE SMALLWOOD.   WE INTERRUPTED THE INTERVIEW ROOM --

20     INTERRUPTED THE INTERVIEW AND MICHAEL TOLD GEORGE GO AHEAD

21     AND TELL THEM THE TRUTH OR SOMETHING TO THAT EFFECT.   I'VE

22     ALREADY TOLD THEM EVERYTHING THAT HAPPENED.   JUST GO AHEAD

23     AND TELL THEM THE TRUTH.

24          Q.   HOW LONG DID THAT FACE-TO-FACE CONFRONTATION

25     LAST?



1    A.   MINUTE, TWO MINUTES.

2    Q.   DID YOU INTERVIEW MR. GALLEGOS AGAIN AFTER THAT

3    FACE-TO-FACE INTERVIEW?

4    A.   I DID NOT.

5    Q.   DID ANYONE ELSE TO YOUR KNOWLEDGE INTERVIEW THE

6    DEFENDANT, MICHAEL GALLEGOS?

7    A.   NOT TO MY KNOWLEDGE.

8    Q.   DID YOU HAVE ANY FURTHER CONTACT WITH MICHAEL

9    GALLEGOS AFTER THE ONE-ON-ONE CONFRONTATION WITH GEORGE

10   SMALLWOOD?

11   A.   CERTAINLY.

12   Q.   WHERE AND WHEN DID THAT OCCUR?

13   A.   THE CONTACT CONTINUED WITHOUT ANY INTERVIEW

14   TAKING PLACE, CONTACT CONTINUED BETWEEN MIKE AND I, BECAUSE

15   HE WAS BEING READIED TO BE TAKEN TO HAVE HIS FINGERPRINTS

16   TAKEN.  HE WAS BEING READIED WITH THE BOOKING PROCEDURE,

17   AND JUST I HAD TO BE THERE WHILE HE WAS THERE AND I WAS

18   JUST -- JUST GENERAL CONTACT.

19   Q.   THAT GENERAL CONTACT, DID IT INVOLVE ANY TYPE OF

20   QUESTIONING ABOUT WHAT OCCURRED --

21   A.   NO, IT DID NOT.

22   Q.   -- WITH RESPECT TO THE OFFENSE FOR WHICH HE IS

23   FACING TRIAL?

24   A.   NO, IT DID NOT.

25   MR. STALZER:  NOTHING FURTHER, YOUR HONOR.



GALL 087

MILKE_NSB029802

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 38 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 56 of 174

36

1        THE COURT:  THANK YOU, MR. STALZER.

2              MR. CLARK, YOU MAY CROSS-EXAMINE THE WITNESS.

3        MR. CLARK:  THANK YOU, JUDGE.

4    BY MR. CLARK:

5        Q.   DETECTIVE SALDATE, MY NAME IS GREG  CLARK AND I

6    REPRESENT MR. GALLEGOS.

7        A.   I'M AWARE OF THAT.

8        Q.   IT'S MY TURN TO ASK YOU SOME QUESTIONS.  IF I ASK

9    YOU SOME QUESTIONS THAT YOU DON'T UNDERSTAND, OR IF I AM

10   INARTICULATE, I WILL REPHRASE IT OR TRY TO MAKE IT MORE

11   CLEAR, ALL RIGHT?

12       A.   OH, CERTAINLY.

13       MR. CLARK:  MAY I APPROACH THE WITNESS, JUDGE?

14       THE COURT:  YES.

15   BY MR. CLARK:

16       Q.   IS THAT THE REPORT THAT YOU AUTHORED?

17       THE COURT:  DO YOU WANT THAT MARKED AS AN EXHIBIT FOR

18   THE HEARING, MR. CLARK?

19       MR. CLARK:  NO, I DON'T, JUDGE.

20       THE WITNESS:  I'M TAKING A LITTLE BIT OF TIME BECAUSE

21   YOU HAD TWO PAGE 1'S IN HERE.  YOU HAVE PAGE 1, OF COURSE,

22   ON TOP.  THEN YOU HAVE PAGE 1 JUST BEHIND NUMBER 6.  SO

23   OTHER THAN THAT, YES, IT APPEARS TO BE A COPY OF THE REPORT

24   I AUTHORED.

25   BY MR. CLARK:

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 39 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 57 of 174

37



1          Q.    WHEN DID YOU WRITE THAT REPORT?

2          A.    I WOULD HAVE WRITTEN OR DICTATED THAT REPORT THE

3     NEXT DAY.

4          Q.    OKAY.  THIS HAPPENED -- THIS INTERVIEW TOOK PLACE

5     AT 4:20 ON THE 16TH OF MARCH?

6          A.    THAT IS CORRECT.

7          Q.    DID YOU DICTATE THE NEXT MORNING OR THE NEXT

8     AFTERNOON?

9          A.    THE NEXT MORNING.

10         Q.    SO THE FACTS AS YOU RELATE THEM IN THAT REPORT

11    ARE FAIRLY ACCURATE BASED UPON YOUR DISCUSSIONS; IS THAT A

12    FAIR STATEMENT?

13         A.    THAT'S CORRECT.

14         Q.    OKAY.  ARE THERE ANY INACCURACIES IN THAT REPORT?

15         A.    I'VE ONLY REVIEWED IT THAT INITIAL TIME AFTER IT

16    WAS TYPED, CORRECTED ANY TYPOS THAT WERE MADE, AND TO THE

17    BEST OF MY KNOWLEDGE THERE WAS NOT.

18         Q.    ALL RIGHT.  IF THERE WERE SOME INACCURACIES, YOU

19    WOULD TELL US ABOUT THEM RIGHT NOW, WOULDN'T YOU?

20         A.    CERTAINLY.

21         Q.    HOW LONG HAVE YOU BEEN A POLICE OFFICER?

22         A.    21 YEARS.

23         Q.    OKAY.  HOW LONG HAVE YOU BEEN WORKING THE

24    HOMICIDE DETAIL?

25         A.    SINCE APRIL OF 1986.

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 40 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 58 of 174

38

1        Q.    FOUR YEARS, A LITTLE MORE BEFORE?

2        A.    A LITTLE MORE THAN FOUR YEARS.

3        Q.    OKAY.  WHAT TIME DID YOU ARRIVE ON THE SCENE ON

4   THE 16TH OF MARCH?

5        A.    AGAIN, I'M GUESSING, THREEISH, MAYBE.

6        Q.    OKAY.  WHEN YOU FIRST GOT THERE, YOU INDICATED TO

7   MR. STALZER THAT YOU WERE BRIEFED; IS THAT TRUE?

8        A.    WE DID HAVE A BRIEFING, YES.

9        Q.    OKAY.  WHO BRIEFED YOU?

10       A.    I BELIEVE SERGEANT BRYANT WAS THERE.  LIEUTENANT

11   TED MCCREARY WAS THERE.  THE CAPTAIN WAS THERE.  SEVERAL

12   OTHER UNIFORMED SERGEANTS WERE THERE.  UNIFORMED OFFICERS

13   WERE THERE.  SOME OF THE DETECTIVES HAD BEEN THERE FROM

14   MISSING PERSONS.  THEY MENTIONED SOME THINGS, YES.

15       Q.    OKAY.  DURING THIS BRIEFING WHAT WERE YOU TOLD?

16       A.    IT WAS JUST A GENERAL BRIEFING AT THAT POINT.  WE

17   WERE TOLD WHAT HAD HAPPENED.  THAT THE MOTHER HAD REPORTED

18   THE CHILD MISSING.  WE WERE TOLD -- I WAS -- IT WAS POINTED

19   OUT TO ME THE LOCATION OF THE HOME WHERE THE CHILD WAS

20   MISSING.  IT WAS POINTED OUT THE LOCATION OF THE VICTIM'S

21   BODY, WHERE IT WAS PRESENTLY AT.  AND THE MISSING PERSON

22   REPORT HAD BEEN MADE.  A SEARCH WAS STARTED.  THEY FOUND

23   THE BODY.  WHO WAS OCCUPIED IN THAT HOUSE, IN THE VICTIM'S

24   HOUSE.  WHO WAS OCCUPYING THAT HOUSE AT THAT POINT.

25   BASICALLY JUST GENERAL INFORMATION.



1      Q.   OKAY.   WERE YOU TOLD AT THAT POINT IN TIME THE

2   HOUSE WAS LOCKED AND THAT THEY -- THE CONSENSUS WAS THAT

3   SOMEBODY WITHIN THAT HOUSE MAY HAVE PERPETRATED THE CRIME?

4      A.   NO.

5      Q.   NO?

6      A.   NO.

7      Q.   OKAY.   YOU WERE NOT THE ONE THAT WAS RESPONSIBLE

8   FOR SINGLING OUT MR. GALLEGOS, IN ORDER TO BE TRANSPORTED

9   TO THE STATION; IS THAT CORRECT?

10     A.   THAT'S CORRECT.

11     Q.   YOU GET THERE ABOUT 3:00 O'CLOCK.   YOU LEAVE THE

12   SCENE AT APPROXIMATELY, WHAT, 4:00?

13     A.   A COUPLE MINUTES AFTER.   I ASSUMED THAT IT WOULD

14   TAKE 15 TO 20 MINUTES AT THE MOST TO ARRIVE FROM -- OR GET

15   FROM THE AREA OF 71ST AND MCDOWELL TO 620 WEST WASHINGTON.

16     Q.   WHEN YOU FIRST ARRIVED AT THE SCENE, WHERE IS MR.

17   GALLEGOS?   DO YOU SEE HIM?

18     A.   NO.

19     Q.   DO YOU SEE MR. SMALLWOOD?

20     A.   NO.

21     Q.   OKAY.   WHERE WERE THE POLICE OFFICERS WHEN YOU

22   FIRST ARRIVED?

23     A.   WELL, THE BRIEFING TOOK PLACE DIRECTLY ACROSS

24   FROM WHERE THE BODY WAS FOUND OR JUST WEST -- WELL, THE

25   BRIEFING WAS HELD ON THE WEST CURB OF 71ST AVENUE.   THE



**GALL 091**             SUPERIOR COURT          **MILKE_NSB029806**
                      Phoenix EXHIBIT, Inc.

40

1    BODY WAS FOUND ON THE EAST CURB OF 71ST AVENUE, UNDER A

2    TREE. AND THEN WE WERE APPROXIMATELY TWO HOUSES -- TWO TO

3    THREE HOUSES SOUTH OF THE WISHON HOME.

4         Q.   YOU ARRIVED AT 620 WEST WASHINGTON AT

5    APPROXIMATELY 4:20; IS THAT CORRECT?

6         A.   SEVERAL MINUTES BEFORE THAT.

7         Q.   OKAY. YOU FIRST MEET MR. GALLEGOS WHEN HE'S IN

8    THIS INTERVIEW ROOM; IS THAT CORRECT?

9         A.   ACTUALLY MEET HIM FACE TO FACE, YES.

10        Q.   YES. OKAY. YOU OPEN THE DOOR TO THE INTERVIEW

11   ROOM AND HE'S SITTING IN THERE WITHOUT HANDCUFFS; IS THAT

12   CORRECT?

13        A.   YES.

14        Q.   OKAY. YOU DIDN'T PLACE HIM IN THAT ROOM, THOUGH;

15   RIGHT?

16        A.   I DID NOT.

17        Q.   OKAY. THAT ROOM HAS A DOOR ON IT, WITH A -- DOES

18   IT HAVE A WINDOW?

19        A.   YES.

20        Q.   DOES IT HAVE A WINDOW TO THE OUTSIDE? PROBABLY

21   NOT.

22        A.   A WINDOW TO THE OUTSIDE?

23        Q.   YES.

24        A.   NO.

25        Q.   OKAY. DID YOU HAVE ANY IDEA -- OR DO YOU HAVE

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 43 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 61 of 174

41



1    ANY IDEA HOW LONG MR. GALLEGOS WAS IN THAT ROOM PRIOR TO

2    YOU FIRST MEETING HIM?

3        A.    A COUPLE OF MINUTES.

4        Q.    OKAY.   PART PRIOR TO THAT TIME HE WAS OBVIOUSLY

5    IN THE CUSTODY OF THE UNIFORMED OFFICER WHO TRANSPORTED

6    HIM?

7        A.    HE HAD BE TRANSPORTED FROM THE SCENE IN A UNIFORM

8    PATROL CAR TO 620 WEST WASHINGTON.

9        Q.    OKAY.   WHEN YOU FIRST MET MR. GALLEGOS IN THAT

10   SMALL INTERVIEW ROOM, WAS HE FREE TO LEAVE?   I MEAN, COULD

11   HE HAVE JUST SAID L WANT TO GO HOME?

12       A.    IF HE HAD TOLD ME INITIALLY THAT HE'S NOT GOING

13   TO TALK TO ME?

14       Q.    YES.

15       A.    YES, HE WOULD HAVE BEEN.

16       Q.    OKAY.   DID YOU TELL HIM THAT?

17       A.    NO.

18       Q.    DID ANYBODY ELSE TELL HIM THAT?

19       A.    I DON'T HAVE ANY IDEA.

20       Q.    NOW, YOU FIRST MEET MR. GALLEGOS AND YOU TALK

21   ABOUT HIS SCHOOL; RIGHT?

22       A.    WE TALK ABOUT HIS SCHOOLING, YES.

23       Q.    YOU ASKED HIM WHAT KIND OF GRADES HE GOT AND HE

24   SAID HE WAS A SLOW LEARNER; IS THAT TRUE?   HE WAS IN

25   SPECIAL ED CLASSES?

**GALL 093**          SUPERIOR COURT

EXHIBIT 1j          **MILKE_NSB029808**

1        A.   HE SAID HE WAS IN SPECIAL ED.   HE SAID HE WAS A

2   SLOW LEARNER, YES.

3        Q.   WHEN HE SAID THAT, DID THAT CAUSE YOU ANY CONCERN

4   AT ALL?

5        A.   NOT CONCERN, NO.

6        Q.   OKAY.   DID YOU FEEL THAT BASED UPON HIS BEING A

7   SPECIAL EDUCATION STUDENT, THAT THAT WAS NOT GOING TO BE A

8   DISABILITY TO YOUR EXPLANATION OF WHY HE WAS THERE OR HIS

9   RIGHTS OR ANYTHING LIKE THAT?

10       A.   NO.

11       Q.   DID YOU FEEL HIS AGE IN ANY WAY, SHAPE, OR FORM

12   WAS GOING TO BE AN IMPEDIMENT TO THAT PROCESS?   AND BY THE

13   PROCESS, I MEAN TO HIM UNDERSTANDING WHY HE WAS THERE,

14   UNDERSTANDING HIS RIGHTS, UNDERSTANDING HIS ROLE AND YOUR

15   ROLE.

16       A.   NO.

17       Q.   THE FACT THAT HE WAS A HIGH SCHOOL STUDENT DIDN'T

18   MAKE ANY LIGHT BULBS GO ON IN YOUR HEAD THAT HE MIGHT NOT

19   UNDERSTAND WHAT'S GOING ON?

20       A.   ABSOLUTELY NOT.

21       Q.   THE FACT THAT HE MAY OR MAY NOT HAVE A 9TH GRADE

22   MATH ABILITY, THAT DIDN'T CAUSE ANY CONCERN TO YOU?

23       A.   WE WEREN'T --

24       Q.   AS FAR AS HIM UNDERSTANDING WHY HE WAS THERE AND

25   WHAT HIS ROLE WAS AND YOUR ROLE.

1          A.   WE WEREN'T GOING TO TALK ABOUT MATH.   THAT'S WHY

2     I CLARIFIED ABOUT HIS READING SKILLS AND HIS UNDERSTANDING.

3          Q.   OKAY.  NOW, AFTER YOU HAVE THIS CONVERSATION WITH

4     HIM ABOUT HIS READING SKILLS, ABOUT HIS EDUCATIONAL

5     ABILITIES, YOU THEN HAVE A BRIEF DISCUSSION WITH HIM ABOUT

6     MIRANDA; IS THAT CORRECT?

7          A.   THAT'S CORRECT.

8          Q.   NOW, YOU HAD PREVIOUSLY TOLD US THAT YOUR REPORT

9     IS ACCURATE, SO YOU'RE SURE, THEN, YOU HAVE THIS DISCUSSION

10    WITH HIM ABOUT MIRANDA PRIOR TO EVER DELVING INTO THE FACTS

11    OF THE CASE?

12         A.   THAT IS CORRECT.

13         Q.   OKAY.  AFTER MIRANDA, YOU HAVE THIS BRIEF

14    CONVERSATION WITH MR. GALLEGOS WHEREIN HE SAYS -- OR HE

15    INQUIRES OF YOU IF HE IS A SUSPECT IN THE CASE?  REMEMBER

16    THAT?

17         A.   THAT IS CORRECT.  YES.

18         Q.   AND YOU TELL HIM THAT AT THAT POINT NO?  RIGHT?

19         A.   THAT IS INCORRECT.

20         Q.   OKAY.  WHAT DID YOU TELL HIM?

21         A.   I TOLD HIM AT THIS POINT I DID NOT HAVE ENOUGH

22    INFORMATION TO KNOW WHETHER HE WAS OR WAS NOT THE SUSPECT.

23         Q.   OKAY.  WHY DO YOU THINK YOU WERE THERE THEN?

24         A.   PARDON ME?

25         Q.   WHY WERE YOU THERE, THEN, WITH HIM IF HE WASN'T A

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 46 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 64 of 174

44

1    SUSPECT?

2         A.   I WAS INVESTIGATING A MURDER, SIR.

3         Q.   OKAY.  AND THIS WAS JUST SOME GUY WHO YOU WERE

4    GOING TO TALK TO --

5         A.   NO, SIR, HE WAS NOT JUST SOME GUY.  HE WAS AN

6    OCCUPANT OF A HOME WHERE A EIGHT-YEAR OLD GIRL WAS FOUND

7    MISSING, WAS REPORTED MISSING, AND LATER FOUND MURDERED.

8    THAT'S WHY I WAS SPEAKING TO HIM.

9         Q.   OKAY.  YOU COULDN'T HAVE DONE THAT AT THE SCENE?

10        A.   ABSOLUTELY NOT.

11        Q.   WHY?

12        A.   FIRST OF ALL, IT WAS NOT MY DECISION TO HAVE HIM

13   TRANSPORTED.  SECONDLY, HAD IT BE MY DECISION, I WOULD HAVE

14   DEFINITELY NOT DONE IT AT THE SCENE.  THERE WAS NUMEROUS

15   REPORTERS THERE.  THE HOME WAS SEALED OFF AS A CRIME SCENE.

16   THE ONLY OTHER WAY WE COULD HAVE DONE IT WAS IN A CAR.

17   THAT WASN'T A SUITABLE PLACE.

18        Q.   OKAY.  YOU FELT THAT BEING IN THIS ROOM IN A

19   POLICE STATION WITH A HIGH SCHOOL STUDENT WAS A MORE

20   SUITABLE PLACE TO FOSTER WHAT YOU NEEDED TO GET FROM HIM;

21   IS THAT CORRECT?

22        A.   I DON'T UNDERSTAND THE QUESTION, SIR.

23        Q.   OKAY.  NOW, AFTER YOU HAVE THIS DISCUSSION WITH

24   MIRANDA, ABOUT MIRANDA, AND MR. GALLEGOS INQUIRES ABOUT

25   WHETHER HE'S A SUSPECT, HE BASICALLY GIVES A STATEMENT

1    WHERE HE DENIES HIS INVOLVEMENT; IS THAT A FAIR STATEMENT?

2        A.   YES.

3        Q.   YOU HAD THAT CONVERSATION, HE DENIES IT, AND YOU

4    TOLD MR. STALZER A FEW MINUTES AGO THAT YOU THEN MADE THE

5    COMMENT THAT YOU BELIEVED THAT SOMEONE IN THE HOUSE HAD TO

6    HAVE KILLED KENDALL; IS THAT CORRECT?

7        A.   YES.

8        Q.   AND YOU TOLD HIM THAT BECAUSE THE RESIDENCE WAS

9    LOCKED, IT WAS SECURED THE ENTIRE NIGHT, AND IT WAS YOUR

10   BELIEF THAT THAT HAD TO HAVE HAPPENED OR SOMEONE FROM

11   WITHIN HAD TO BE RESPONSIBLE; IS THAT A FAIR STATEMENT?

12       A.   CORRECT.

13       Q.   OKAY.  AND THIS IS AFTER HE DENIES IT; RIGHT?

14       A.   THAT IS A DENIAL IN THE FACT THAT HE HAD MADE

15   MENTION OF WHAT HE HAD DONE.  ACTUALLY DENIED IT.  I NEVER

16   CONFRONTED HIM WITH THAT FACT.  SO ACTUALLY HE CANNOT DENY

17   IT, BUT HE HAD MENTIONED WHAT HE HAD DONE THAT MORNING,

18   THAT NIGHT, AND THAT IN ITSELF DID NOT PLACE HIM MURDERING

19   KENDALL.  SO IF YOU WISH TO CALL IT A DENIAL, THAT'S FINE.

20       Q.   WELL, HE DIDN'T ADMIT TO ANYTHING, DID HE?

21       A.   THAT IS CORRECT.

22       Q.   OKAY.  THEN YOU TOLD MR. STALZER THAT YOU SAID

23   SOMETHING TO THE EFFECT THAT I TOLD MICHAEL THAT THE BEST

24   THING FOR HIM TO DO WAS TO TELL ME THE TRUTH AND THAT I WAS

25   ONLY THERE TO GET THE TRUTH AND NOT TO JUDGE HIM?



**GALL 097**

**MILKE_NSB029812**

45

1       A.    THAT IS CORRECT.

2       Q.    OKAY.  SO HE DENIES IT, OR AT LEAST GIVES A

3  STATEMENT WHERE HE DOESN'T ADMIT ANYTHING, AND THEN YOU

4  TELL HIM THAT IT'S YOUR BELIEF SOMEONE IN THE HOUSE KILLED

5  HER, AND THEN YOU TELL HIM THAT YOU'RE JUST THERE FOR THE

6  TRUTH; RIGHT?

7       A.    THAT IS CORRECT.

8       Q.    OKAY.  DIDN'T YOU SAY SOMETHING ELSE IN BETWEEN

9  THERE?

10      A.    THAT IS ABSOLUTELY NOT TRUE.

11      Q.    OKAY.  DO YOU REMEMBER SAYING SOMETHING LIKE

12 THIS.  I THEN TOLD MICHAEL THAT I WASN'T TOTALLY SURE, BUT

13 THAT IT WAS MY BELIEF THAT HE MAY HAVE HAD SOMETHING TO DO

14 WITH KENDALL'S DEATH?  AND I'M REFERRING TO THE THIRD PAGE

15 OF YOUR D.R., SECOND PARAGRAPH, RIGHT AFTER YOU TELL HIM

16 THAT IT MUST HAVE BEEN SOMEBODY IN THE HOUSE.

17      A.    THAT IS CORRECT.  I DID TELL -- I THEN TOLD

18 MICHAEL THAT I WASN'T TOTALLY SURE, BUT THAT IT WAS MY

19 BELIEF THAT HE MAY HAVE HAD SOMETING TO DO WITH KENDALL'S

20 DEATH.

21      Q.    SO HE GIVES YOU A STATEMENT NOT ADMITTING TO

22 ANYTHING AND THEN YOU TURN AROUND AND SAID, WAIT A MINUTE.

23 I THINK YOU HAD SOMETHING TO DO WITH IT; RIGHT?

24      A.    THAT'S CORRECT.

25      Q.    AND HE DENIES THIS; RIGHT?

Case 2:15-cv-00462-ROS   Document 669-10   Filed 09/18/20   Page 49 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 67 of 174

47

1        A.    CORRECT.

2        Q.    THEN YOU TURN AROUND AND YOU TELL HIM THAT YOU

3    BELIEVED HE WAS PROBABLY DRINKING AND THAT HE PROBABLY

4    DIDN'T MEAN TO KILL KENDALL AND MR. GALLEGOS'S RESPONSE TO

5    THIS WAS HE WAS SHAKING HIS HEAD SIDE TO SIDE INDICATING

6    NO; IS THAT CORRECT?

7        A.    THAT'S CORRECT.

8        Q.    OKAY.  IT'S AT THAT POINT, AFTER YOU HAVE ACCUSED

9    HIM OF HAVING SOMETHING TO DO WITH THE KILLING, THAT YOU

10   THEN SAY, HEY, I'M JUST HERE TO GET THE TRUTH; RIGHT?

11       A.    THAT'S CORRECT.

12       Q.    OKAY.  THEN YOU EXPLAIN TO HIM THAT YOU ARE NOW

13   READY TO HEAR WHAT HAD ACTUALLY HAPPENED; RIGHT?

14       A.    THAT'S CORRECT.

15       Q.    OKAY.  DO YOU KNOW WHAT THE WORD COERCION MEANS?

16       A.    YOU HEARD MY DEFINITION.

17             MY DEFINITION?

18       Q.    YES.

19       A.    COERCION WOULD PROBABLY BE IF I TOLD A PERSON --

20   COERCED THAT PERSON TO TELL SOMETHING THAT HE MAY NOT WANT

21   TO SAY BY OTHER MEANS.  YOU KNOW, I DON'T KNOW WHAT YOU

22   MEAN.  COERCION.  I KNOW WHAT IT MEANS, BUT --.

23       Q.    YOU KNOW IT IF YOU SEE IT?

24       A.    PARDON ME?

25       Q.    YOU KNOW IT IF YOU SEE IT?

**GALL 099**

**MILKE_NSB029814**



Case 2:15-cv-00462-ROS  Document 669-10  Filed 09/18/20  Page 50 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 68 of 174

48

1        A.    YEAH.

2        THE COURT:  THAT'S A LEGAL TEST.  WE DON'T NEED TO GO

3   INTO THAT.

4        MR. CLARK:  I THOUGHT I'D SNEAK THAT IN.

5   BY MR. CLARK:

6        Q.    YOU DON'T BELIEVE IT WAS COERCIVE FOR YOU TO

7   ACCUSE HIM AND HAVE HIM DENY RATHER THAN HAVE YOU ACCUSE

8   HIM AGAIN?

9        A.    NO.

10       MR. STALZER:  OBJECTION TO THE FORM OF THE QUESTION.

11       THE COURT:  THE ANSWER MAY STAND.

12   BY MR. CLARK:

13       Q.    CAN YOU ANSWER THAT?

14       A.    I ANSWERED IT NO.

15       Q.    OKAY.  MR. GALLEGOS, THEN, INQUIRES OF YOU

16   WHETHER YOU REALIZE WHAT YOU'RE ASKING HIM, REMEMBER THAT?

17       A.    YES.

18       Q.    AND THEN YOU TOLD MR. GALLEGOS THAT HE WAS

19   THINKING OF HIS OWN WELFARE, REMEMBER THAT?

20       A.    THAT'S CORRECT.

21       Q.    OKAY.  UP UNTIL THIS POINT IN TIME IN YOUR

22   CONVERSATION WITH MR. GALLEGOS, IT SEEMS TO ME, BASED UPON

23   WHAT YOU TOLD US, WHAT YOU'RE TALKING ABOUT IS A HOMICIDE

24   OF A YOUNG GIRL; CORRECT?  I MEAN, HE UNDERSTANDS THAT OR

25   AT LEAST YOU BELIEVE HE DOES AT THAT POINT IN TIME; RIGHT?