Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 1 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 69 of 174

49

1        A.    YES.

2        Q.    YOU UNDERSTAND IT; RIGHT?

3        A.    YES.

4        Q.    OKAY.  MR. GALLEGOS THEN SAYS, "LET'S SAY," AND

5    THIS IS IN QUOTES IN YOUR REPORT, "LET'S SAY -- OKAY.  I'M

6    NOT ADMITTING IT, BUT LET'S JUST SAY I DID HAVE SOMETHING

7    TO DO WITH KENDALL.  WHAT YOU DO THINK WOULD HAPPEN TO ME?"

8    END QUOTE.

9             NOW, DOESN'T THAT STRIKE YOU AS SOMEWHAT BEING

10   NAIVE?  I MEAN, YOU'VE JUST TOLD US WE'RE TALKING ABOUT THE

11   DEATH OF A YOUNG GIRL.  YOU JUST TOLD US THAT YOU HAVE JUST

12   ACCUSED MR. GALLEGOS OF HAVING DONE IT OR HAVING HAD SOME

13   PART IN IT.  AND THEN YOU ASK THIS QUESTION.  DOESN'T THAT

14   SEEM NAIVE?

15       A.    THE OPPOSITE.

16       Q.    WHAT DO YOU MEAN?

17       A.    I WOULD THINK THAT THAT RESPONSE -- THAT RESPONSE

18   ITSELF MADE ME BELIEVE THAT HE WAS FEELING OUT THE

19   SITUATION AND TRYING TO FIND OUT, OKAY, I'VE GOT THE

20   SITUATION FACING ME AND HE'S ASKING ME TO TELL THE TRUTH.

21   I WANT TO TELL THE TRUTH, BUT I WONDER WHAT'S GOING TO

22   HAPPEN TO ME NOW, AND THAT'S SOMEONE THAT IS OBVIOUSLY

23   LOOKING BEYOND THE FACT OF TELLING THE TRUTH, LOOKING AT

24   THE FACTS, OKAY, I'M GOING TO TELL HIM THE TRUTH, BUT I

25   WONDER WHAT'S GOING TO HAPPEN TO ME.  NOW HE'S LOOKING AT

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 2 of 58
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 70 of 174

50

1  WHAT'S GOING TO HAPPEN TO HIM AFTER HE TELLS ME THESE

2  THINGS.  THAT'S NOT NAIVE.  I WOULD SAY HE'S LOOKING BEYOND

3  THAT.  YOU KNOW, HE'S THINKING OF JAIL.  HE KNOWS WHAT HE'S

4  DONE, AND HE'S THINKING WHAT'S GOING TO HAPPEN TO HIM.

5       Q.  UP TO THIS POINT IN TIME YOU DON'T KNOW WHAT HE'S

6  DONE BECAUSE YOU'RE THE ONE THAT'S BEEN ACCUSING HIM;

7  RIGHT?

8       A.  I'M NOT SAYING I KNOW WHAT HE'S DONE.  I'M SAYING

9  HE KNOWS WHAT HE'S DONE.

10      Q.  AFTER HE MAKES THAT STATEMENT, HE MAKES THE

11 FOLLOWING STATEMENT, ONCE AGAIN, THIS IS IN QUOTES:

12 "AGAIN, LET'S JUST SAY I DID DO IT, BUT I'M NOT ADMITTING

13 TO IT.  LET'S JUST SAY I DID.  WOULD THERE BE ANYTHING I

14 COULD SAY TO KEEP FROM GOING TO JAIL?"

15          DON'T YOU THINK THAT'S A BIT NAIVE?

16      A.  AGAIN, I THINK HE'S LOOKING FOR A WAY OUT.  I

17 THINK IT'S NOT NAIVE.  I THINK MORE HE'S TRYING TO SEE IF

18 HE CAN WAGER SOMETHING MORE IMPORTANT THAT WOULD KEEP HIM

19 FROM GOING TO JAIL.

20      Q.  OKAY.  YOU THEN TELL MR. GALLEGOS THAT THERE WAS

21 NOT ANYTHING THAT WOULD KEEP HIM FROM GOING TO JAIL, BUT

22 THAT HIS TRUE STATEMENT WOULD AT LEAST BE AN EXPLANATION OF

23 WHAT HAPPENED INSTEAD OF JUST HEARING ONE SIDE OF THE

24 STORY?

25      A.  THAT'S CORRECT.

51

1        Q.   OKAY.  AND SUBSEQUENT TO YOU MAKING THAT

2   STATEMENT, MR. GALLEGOS THEN INCULPATES HIMSELF; CORRECT?

3        A.   DENIES IT?  I DON'T UNDERSTAND THAT WORD.

4        Q:   HE GIVES YOU A CONFESSION, BASICALLY.  HOW'S

5   THAT?

6        A.   CAN YOU REPEAT THE QUESTION AGAIN.

7        Q.   SUBSEQUENT TO THAT STATEMENT, MR. GALLEGOS

8   CONFESSED TO YOU HIS INVOLVEMENT IN THE CRIME; IS THAT

9   CORRECT?

10       A.   YES.

11       Q.   OKAY.  NOW, YOU TAKE A BREAK AFTER ABOUT AN HOUR:

12   RIGHT?

13       A.   CORRECT.

14       Q.   YOU LEAVE MR. GALLEGOS IN THE ROOM, ALONE; IS

15   THAT CORRECT?

16       A.   CORRECT.

17       Q.   HE CAN'T GET OUT OF THAT ROOM, CAN HE, BECAUSE

18   IT'S PROBABLY LOCKED; RIGHT?

19       A.   AT THAT POINT: YES.

20       Q.   WHEN HE FIRST GOES IN THE ROOM AND YOU FIRST COME

21   IN THERE TO MEET HIM, IS THE DOOR LOCKED?

22       A.   NO.

23       Q.   YOU LOCKED IT THEN?

24       A.   THE DOOR WAS OPEN.

25       Q.   OKAY.  WAS ANYBODY ELSE IN THE HALLWAY WHEN YOU

**GALL 103**              SUPERIOR COURT
                          EXHIBIT 1j.              **MILKE_NSB029818**

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 4 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 72 of 174

52

1    FIRST COME IN THERE TO MEET HIM?  YOU MENTIONED A

2    SUPERVISOR EARLIER?

3         A.   NOT INITIALLY.  THERE WAS A FIELD OFFICER THAT

4    BROUGHT HIM INTO THAT ROOM.  HE WAS THERE.

5         Q.   OKAY.

6         A.   DOING SOME PAPER WORK.

7         Q.   WERE YOU PRESENT IN ANY DISCUSSIONS WITH MR.

8    GALLEGOS AND THAT FIELD OFFICER?

9         A.   NO.

10         Q.   YOU LEAVE THE INTERVIEW ROOM WITH MR. GALLEGOS,

11    AFTER AN HOUR.  YOU GO AND SPEAK TO A SUPERVISOR.  AND THEN

12    YOU SPEAK TO DETECTIVE CHAMBERS; IS THAT CORRECT?

13         A.   CORRECT.

14         Q.   AND WHAT DO YOU TALK TO DETECTIVE CHAMBERS ABOUT?

15         A.   I EXPLAINED TO HIM WHAT MR. GALLEGOS HAD TOLD ME.

16         Q.   OKAY.  AND WHEN YOU WERE HAVING THIS DISCUSSION

17    WITH DETECTIVE CHAMBERS, WHERE WERE YOU?

18         A.   WE WERE IN FRONT OF -- WE WERE JUST EAST OF HIS

19    INTERVIEW ROOM.

20         Q.   HOW CLOSE WERE YOU TO THE INTERVIEW ROOM

21    CONTAINING MR. GALLEGOS?  I UNDERSTAND YOU'RE SEPARATED

22    BASICALLY BY A DOOR?

23         A.   25 FEET.

24         Q.   OKAY.

25         A.   APPROXIMATELY.

53



1     Q.   OKAY.  YOU HAVE A DISCUSSION WITH CHAMBERS WHERE

2  YOU TELL HIM THAT MR. GALLEGOS HAS BASICALLY CONFESSED TO

3  HIS INVOLVEMENT IN THE MATTER; RIGHT?

4     A.   CORRECT.

5     Q.   THEN DETECTIVE CHAMBERS COMES WITH YOU INTO THE

6  INTERVIEW ROOM CONTAINING MR. GALLEGOS AND YOU HAVE A 10 TO

7  15-MINUTE CONVERSATION WITH MR. GALLEGOS; CORRECT?

8     A.   THEREABOUT, YES.

9     Q.   OKAY.  AND AT THAT POINT YOU TOLD MR. STALZER YOU

10 WENT OVER WHAT WAS SAID WITH MICHAEL AND DETECTIVE

11 CHAMBERS.  THERE WAS NO THREATS, NO COERCION, NO REQUESTS

12 FOR AN ATTORNEY; CORRECT?

13    A.   CORRECT.

14    Q.   YOU ALSO SAID THERE WAS NO TAPE, BECAUSE THE

15 DEFENDANT SAID, NO, I DON'T WANT TO REPEAT AND NO TAPE

16 RECORDER; RIGHT?

17    A.   CORRECT.

18    Q.   DID YOU GIVE HIM THE OPTION TO HAVE A TAPE

19 RECORDER THERE INITIALLY?

20    A.   NO.

21    Q.   WHY DID YOU WAIT?

22    A.   I WAS TOLD BY A SUPERVISOR TO ASK HIM IF HE WOULD

23 HAVE HIS -- A STATEMENT RECORDED.

24    Q.   OKAY.  YOU DON'T DO THAT AS A MATTER OF COURSE

25 WHEN YOU INTERVIEW SOMEBODY, RECORD THEM?

54



```
 1         A.    NO, I DO NOT.

 2         Q.    YOU TAKE NOTES?

 3         A.    TAKE NOTES.

 4         Q.    OKAY.   NOW, YOU'VE ALREADY TOLD US AFTER THE

 5    CONVERSATION WITH MR. GALLEGOS, DETECTIVE CHAMBERS, AND

 6    YOURSELF, THAT AT SOME POINT IT'S DECIDED TO HAVE MR.

 7    GALLEGOS GO AND CONFRONT MR. SMALLWOOD; TRUE?

 8         A.    CORRECT.

 9         Q.    OKAY.   WHO MADE THAT DECISION?

10         A.    I DON'T KNOW.   I DON'T KNOW IF IT WAS MYSELF,

11    WHETHER IT WAS DETECTIVE MIKE CHAMBERS, I DON'T KNOW.

12         Q.    ALL RIGHT.   YOU TOLD MR. STALZER THAT IT MIGHT

13    HAVE BEEN MIKE.

14         A.    IT MAY HAVE BEEN.

15         Q.    BUT YOU DON'T HAVE ANY RECOLLECTION OF THAT;

16    RIGHT?

17         A.    I TOLD MR. STALZER IT MAY HAVE BEEN MYSELF,

18    DETECTIVE CHAMBERS, AND EVEN COULD HAVE BEEN MIKE.   I DO

19    NOT HAVE A RECOLLECTION ABOUT THAT NOW.

20         Q.    WHY WERE YOU GOING TO HAVE MR. GALLEGOS GO AND

21    CONFRONT MR. SMALLWOOD?

22         A.    WHY I WAS GOING --

23         Q.    YEAH.

24         A.    I DON'T KNOW WHETHER I THOUGHT ABOUT IT.   WHETHER

25    I MADE THE DECISION OR NOT, BUT THE FACT OF THE MATTER WAS
```

**GALL 106**

SUPERIOR COURT
Phoenix, Arizona
EXHIBIT 1j

**MILKE_NSB029821**




55

1    MR. GALLEGOS HAD CONFESSED WHAT HE HAD DONE, HAD TOLD ME

2    THAT IT WAS HIS PAST EXPERIENCE BEING ASSOCIATED WITH MR.

3    SMALLWOOD THAT HE WOULD ALWAYS DENY IT AND ALWAYS GET AWAY

4    WITH THINGS.  AND WE WANTED TO GET THE MATTER RESOLVED AND

5    WE ASKED MIKE IF HE WOULD GO IN THERE AND JUST -- AND HE

6    DID.

7         Q.   YOU ASKED HIM IF HE WOULD GO AND DO THAT?

8         A.   IF IT WAS ME WHO SUGGESTED IT, IT WOULD HAVE BEEN

9    ME WHO ASKED MIKE TO GO IN THERE.

10        Q.   BUT YOU DON'T HAVE ANY RECOLLECTION OF IT?

11        A.   I DON'T REALLY HAVE ANY RECOLLECTION OF IT, BUT I

12   COULD HAVE, YES.

13        Q.   UP TO THIS POINT MR. SMALLWOOD IS DENYING ANY

14   INVOLVEMENT; RIGHT?

15        A.   FROM WHAT I UNDERSTOOD, YES.

16        Q.   OKAY.  DON'T YOU THINK THAT'S A LITTLE COERCIVE?

17        A.   NO.

18        Q.   YOU DON'T THINK THE FACT THAT YOU TOOK MR.

19   GALLEGOS AND HAD HIM CONFRONT SOMEONE WAS COERCIVE?

20        THE COURT:  AS TO WHO, MR. CLARK?

21        MR. CLARK:  AS TO MR. GALLEGOS AND HIS POSITION AT

22   THAT TIME.

23        THE WITNESS:  NO.

24   BY MR. CLARK:

25        Q.   OKAY.  YOU DIDN'T PUT THAT IN YOUR REPORT.



56

1       THOUGH, DID YOU?

2               A.    IN MY REPORT?

3               Q.    YEAH.

4               A.    NO, IT'S NOT IN MY REPORT.

5               Q.    IN FACT, IT'S PROBABLY A LITTLE BIT

6       MISCHARACTERIZED IN YOUR REPORT; ISN'T THAT TRUE?

7               A.    PARDON ME?

8               Q.    I SAID THIS CONFRONTATION BETWEEN MR. GALLEGOS

9       AND MR. SMALLWOOD IS PROBABLY A LITTLE BIT MISCHARACTERIZED

10      IN YOUR REPORT, ISN'T IT?

11              A.    IT'S NOT IN MY REPORT.  YOU SAID -- I DON'T KNOW.

12              Q.    OKAY.  DO YOU REMEMBER WRITING THIS IN YOUR

13      REPORT ON THE LAST PAGE:  "I LATER CONTACTED DETECTIVE

14      CHAMBERS, BRIEFED HIM OF THE INTERVIEW I HAD HAD WITH MIKE,

15      AND HE SAID THAT HE HAD ONLY OBTAINED DENIALS FROM GEORGE.

16      GEORGE WAS LATER CONFRONTED BY DETECTIVE CHAMBERS WITH

17      MIKE'S STATEMENTS, BUT HE CONTINUED TO DENY IT."  REMEMBER

18      WRITING THAT?

19              A.    WHERE ARE YOU AT?

20              Q.    LAST PAGE.  SECOND PARAGRAPH.

21              A.    OH, IT IS IN THE SECOND PARAGRAPH, CORRECT.

22              Q.    PARDON?

23              A.    YES, IT IS THERE.

24              Q.    DO YOU REMEMBER WRITING THAT?

25              A.    CERTAINLY.

**GALL 108**          SUPERIOR COURT          **MILKE_NSB029823**
                      Phoenix, Arizona
                      EXHIBIT

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 9 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 77 of 174

57

1          Q.    THAT'S NOT THE CASE, THOUGH, IS IT?  DETECTIVE

2    CHAMBERS DIDN'T GO AND CONFRONT MR. SMALLWOOD WITH MR.

3    GALLEGOS'S STATEMENTS?  IN FACT, MR. GALLEGOS WENT AND

4    CONFRONTED MR. SMALLWOOD; IS THAT TRUE?

5          A.    NO.  DETECTIVE MIKE CHAMBERS ALSO CONFRONTED

6    GEORGE, BUT LATER ON, OF COURSE, THAT OTHER CONFRONTATION

7    BETWEEN -- I WOULDN'T EVEN CALL IT A CONFRONTATION, BUT THE

8    CONTACT WITH MIKE AND GEORGE SMALLWOOD DID TAKE PLACE.

9          Q.    OKAY.  YOU DIDN'T --

10          THE COURT:  SO YOU'RE SAYING -- I'M SORRY, GO AHEAD.

11    YOU'RE SAYING THAT'S REFERRING -- THAT PARAGRAPH THERE IS

12    REFERRING TO --

13          THE WITNESS:  REFERRING TO STATEMENTS TO THE FACT THAT

14    DETECTIVE MIKE CHAMBERS DID CONFRONT GEORGE WITH THE

15    STATEMENTS FROM MICHAEL.

16          THE COURT:  BEFORE MR. GALLEGOS WAS TAKEN IN?

17          THE WITNESS:  THAT'S CORRECT.

18          THE COURT:  ALL RIGHT.  THANK YOU.

19    BY MR. CLARK:

20          Q.    OKAY.  ARE YOU TELLING US THAT YOU DIDN'T FEEL

21    THAT THIS CONFRONTATION BETWEEN MR. GALLEGOS AND MR.

22    SMALLWOOD WAS SIGNIFICANT ENOUGH AN EVENT TO PUT IN YOUR

23    REPORT?

24          A.    I DID NOT PUT IT IN THIS REPORT, NO.

25          Q.    WHY?



2c4bbb4c25d696f7

58

1     A.   I DON'T THINK IT WAS SIGNIFICANT.

2     Q.   OKAY.  IS THERE ANYTHING ELSE LIKE THAT THAT YOU

3     DIDN'T PUT IN YOUR REPORT?

4     A.   NO, THERE IS NOT.

5     Q.   YOU JUST TOLD ME A FEW MINUTES THAT YOU DIDN'T

6     BELIEVE THE MEETING OF MR. GALLEGOS AND MR. SMALLWOOD WAS A

7     CONFRONTATION?  YOU DIDN'T BELIEVE THAT WAS

8     CONFRONTATIONAL?

9     A.   NO.

10    Q.   OKAY.  WHAT DID YOU BELIEVE THAT WAS?

11    A.   I BELIEVED THAT THAT WAS MICHAEL WHO HAD ADMITTED

12    WHAT HAD HAPPENED, WHO HAD ADMITTED KILLING SOMEONE, GOING

13    IN TO HIS BEST FRIEND, WHICH HE SAID IT WAS -- GEORGE WAS,

14    WHO HE HAD JUST IMPLICATED HIS BEST FRIEND, I THOUGHT THAT

15    THAT WAS MICHAEL GOING IN THERE AND TELLING HIS BEST FRIEND

16    TO TELL US THE TRUTH.

17    Q.   OKAY.  LET ME BACK UP A SECOND.  YOU FIRST COME

18    IN AND YOU TALK TO MR. GALLEGOS AND HE DOESN'T ADMIT TO HIS

19    INVOLVEMENT.  YOU MAKE YOUR STATEMENT TO HIM THAT YOU

20    BELIEVE HE MAY HAVE SOME INVOLVEMENT IN IT.  AND YOU GET TO

21    THE POINT WHERE YOU SAY THE BEST THING FOR HIM TO DO IS TO

22    TELL THE TRUTH.  AT THAT POINT DID YOU EVER TELL HIM THAT

23    YOU EXAMINED THE BODY AND YOU KNEW WHAT HE HAD DONE?

24    A.   AT ONE POINT I DID TELL HIM THAT I HAD ALREADY

25    EXAMINED THE BODY AND THAT I ALREADY KNEW WHAT HE HAD DONE.

**GALL 110**

**MILKE_NSB029825**

1    THAT IT WAS NOT GOING TO BE OF ANY SURPRISE TO ME, AND FOR

2    HIM TO TELL ME THE TRUTH.

3         Q.   OKAY.   AND THIS WAS AFTER MR. GALLEGOS WAS

4    SHAKING HIS HEAD NO IN RESPONSE TO YOUR STATEMENT TO HIM

5    THAT YOU TOLD HIM THAT YOU BELIEVED HE WAS DRINKING AND HE

6    PROBABLY DID NOT MEAN TO KILL KENDALL; RIGHT?

7         A.   THAT'S CORRECT.

8         Q.   OKAY.   BASICALLY WE HAVE A SITUATION WHERE MR.

9    GALLEGOS WAS DENYING HIS INVOLVEMENT AND YOU WERE BASICALLY

10   ASSERTING THAT HE WAS INVOLVED; RIGHT?

11        A.   HE WAS NOT DENYING HIS INVOLVEMENT.   HE WAS JUST

12   NOT IMPLICATING HIMSELF WITH HIS STATEMENT AT THAT TIME.

13        Q.   OKAY.

14        A.   AT ONE POINT HE WAS SHAKING HIS HEAD NO, NO,

15   WHEN I TOLD HIM I DID FEEL HE WAS INVOLVED, BUT VERBALLY HE

16   DIDN'T COME OUT AND SAY, "NO, I DIDN'T DO IT."

17        Q.   OKAY.   SO YOU MAKE THE DIFFERENTIATION BETWEEN

18   DENIALS AND HIM IMPLICATING HIMSELF?

19        A.   HIS FIRST STORY AFTER HIS MIRANDA RIGHTS WERE

20   GIVEN OR WERE READ BY HIM, HIS FIRST STORY DID NOT

21   IMPLICATE HIMSELF.   HIS FIRST STORY INDICATED THAT HE WAS A

22   OCCUPANT OF THAT RESIDENCE, THAT HE HAD DONE CERTAIN

23   THINGS, AND THAT HE HAD BEEN TOLD BY GEORGE SMALLWOOD AFTER-

24   GEORGE HAD RETURNED FROM BUYING MILK THAT HE COULD NOT FIND

25   KENDALL.   THAT WAS HIS FIRST STATEMENT, BRIEFLY.




60.

1       Q.    OKAY.  AND AFTER THAT, THAT'S WHEN YOU COME IN

2    AND SAY, WELL, I BELIEVE YOU HAD SOMETHING TO DO WITH IT;

3    IS THAT A FAIR STATEMENT?

4       A.    I WAS ALREADY THERE, YES, AND I CONTINUED THE

5    INTERVIEW, YES, AS WE HAVE SPOKEN BEFORE.

6       Q.    FROM THAT POINT ON WE HAVE THAT QUESTION AND

7    ANSWER EXCHANGE THAT WE'VE GONE THROUGH RATHER

8    EXHAUSTIVELY; RIGHT?

9       A.    CORRECT.

10      Q.    IS THERE ANYTHING INACCURATE ABOUT THAT QUESTION

11   AND ANSWER EXCHANGE THAT YOU HAD WITH MR. GALLEGOS THAT YOU

12   CAN TELL US ABOUT NOW?

13      A.    NO.

14      Q.    YOU DID NOT LEAVE ANYTHING OUT OF YOUR REPORT?

15      A.    I DID NOT.

16      Q.    OKAY.  DID YOU EVER ASK MR. GALLEGOS ABOUT ANY

17   PRIOR EXPERIENCE WITH LAW ENFORCEMENT OFFICERS?

18      A.    I DID NOT.

19      Q.    DID YOU EVER INQUIRE OF HIM IF HE HAD EVER BEEN

20   IN A SITUATION BEFORE WHERE HE HAD BEEN ARRESTED AND

21   QUESTIONED?

22      A.    FOR KILLING SOMEONE, NO, I DID NOT.

23      Q.    NO.  FOR ANYTHING?

24      A.    NO.

25      Q.    DID YOU HAVE ANY CONCERN WHATSOEVER ABOUT THE

**GALL 112**

**MILKE_NSB029827**

51

1    LANGUAGE AND THE METHOD IN WHICH YOU EXPLAINED HIS MIRANDA

2    RIGHTS TO HIM BASED UPON THE FACT THAT HE HAD INDICATED HE

3    WAS IN SPECIAL EDUCATION CLASSES?

4         A.   I DON'T UNDERSTAND THAT QUESTION.  I DIDN'T READ

5    HIM HIS RIGHTS.  HE READ THE RIGHTS TO ME, RATHER WELL.  I

6    ASKED HIM IF HE UNDERSTOOD THEM.  HE SAID HE DID.  I THEN

7    WENT ON TO EXPLAIN TWO PORTIONS OF THE RIGHTS.

8         Q.   YOU EXPLAINED TWO PORTIONS OF THE RIGHTS?

9         A.   THAT'S CORRECT.

10        Q.   OKAY.  WHICH TWO PORTIONS?

11        A.   AS I SAID EARLIER, I ASKED HIM IF HE KNEW WHAT A

12   LAWYER WAS.  HE SAID HE DID.  I ASKED HIM IF HE KNEW HE DID

13   NOT HAVE TO SPEAK TO ME AND HE SAID HE DID.

14        Q.   AND THIS IS AT THE BEGINNING OF YOUR INTERVIEW

15   WITH HIM; RIGHT?

16        A.   THAT'S AT THE END OF HIM READING HIS MIRANDA

17   RIGHTS.

18        Q.   DID YOU EVER ASK MR. GALLEGOS IF HE WISHED TO

19   CONTACT ANYONE PRIOR TO BEGINNING YOUR INTERVIEW?

20        A.   NO.

21        Q.   DID YOU EVER GIVE HIM ANY OPPORTUNITY TO DISCUSS

22   IT WITH HIS BROTHER OR AN ADULT OR ANYONE?

23        A.   HIS CONFESSION?

24        Q.   HIS SPEAKING TO YOU.

25        A.   OH, NO.



**GALL 113**          SUPERIOR COURT
EXHIBIT          **MILKE_NSB029828**

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 14 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 82 of 174

62

1        Q.    OKAY.

2        MR. CLARK:  I HAVE NOTHING ADDITIONAL, JUDGE.  THANK

3   YOU.

4        THE COURT:  MR. STALZER, WILL THERE BE A LOT OF

5   REDIRECT?  WE'RE ALMOST ABOUT READY TO TAKE A BREAK.  DO

6   YOU WANT TO DO THAT BEFORE OR AFTER THE BREAK?

7        MR. STALZER:  PROBABLY ABOUT FIVE MINUTES, ONLY, YOUR

8   HONOR, IF THAT.

9        THE COURT:  LET ME CHECK AND SEE HOW MY COURT REPORTER

10   IS DOING.

11            (A RECESS.)

12            (THE FOLLOWING PROCEEDINGS TOOK PLACE IN OPEN

13        COURT:)

14        THE COURT:  THE RECORD WILL SHOW THE PRESENCE OF THE

15   DEFENDANT, AND COUNSEL.  MR. SALDATE STILL ON THE STAND.

16            MR. STALZER, GO RIGHT AHEAD.

17

18            ARMANDA SALDATE, JR.,

19   CALLED AS A WITNESS HEREIN, HAVING BEEN PREVIOUSLY DULY

20   SWORN WAS EXAMINED AND TESTIFIED FURTHER AS FOLLOWS:

21

22            REDIRECT EXAMINATION

23   BY MR. STALZER:

24        Q.    SIR, YOU WERE ASKED BY DEFENSE COUNSEL REGARDING

25   THE LOCATION OF THE VICTIM'S BODY.  AS YOU PROCEED NORTH

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 15 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 83 of 174

63

1    FROM MCDOWELL AND 71ST WAS THE BODY ON THE EAST OR WEST

2    SIDE OF THE STREET?

3         A.   WEST SIDE OF THE STREET.

4         Q.   AT ANY TIME DURING YOUR INTERVIEW WITH THE

5    DEFENDANT DID YOU HAVE TO REPEAT ANY QUESTIONS BECAUSE HE

6    INDICATED HE DIDN'T UNDERSTAND YOUR LINE OF QUESTIONING?

7         A.   NO.

8         Q.   DID THE DEFENDANT AT ANY TIME APPEAR MENTALLY

9    DISABLED IN A WAY DISCUSSING THE CASE COHERENTLY WITH YOU?

10        A.   NO.

11        Q.   DID MICHAEL GALLEGOS APPEAR NAIVE TO ANY EXTENT

12   DURING ANY PORTION OF YOUR CONTACT WITH HIM?

13        A.   NO.

14        Q.   THERE WAS THE CONVERSATION ABOUT MICHAEL GALLEGOS

15   BEING FACE TO FACE WITH GEORGE SMALLWOOD.  DID MICHAEL

16   GALLEGOS SAY ANYTHING TO GEORGE SMALLWOOD WHEN THAT

17   OCCURRED?

18        A.   YES, HE DID.

19        Q.   WHAT DID HE SAY?

20        A.   I BELIEVE HE SAID SOMETHING TO THE EFFECT; "GO

21   AHEAD AND TELL THEM, GEORGE.  TELL THEM THE TRUTH.  I'VE

22   ALREADY TOLD THEM EVERYTHING.  THEY KNOW EVERYTHING.  JUST

23   GO AHEAD AND TELL THEM."  SOMETHING TO THAT EFFECT.

24        Q.   FOR CLARIFICATION IS IT ACCURATE THAT THE

25   FACE-TO-FACE MEETING BETWEEN GALLEGOS AND SMALLWOOD WAS

MILKE_NSB029830

64

1   VIRTUALLY THE LAST ENCOUNTER REGARDING DISCUSSION OF THIS

2   CASE BETWEEN YOU AND ANY OF THE SUSPECTS AT THE TIME?

3       A.   YES.

4       Q.   YOU DID NOT REINTERVIEW MR. GALLEGOS AFTER THAT

5   FACE-TO-FACE MEETING WITH GEORGE SMALLWOOD?

6       A.   NO, I DID NOT.

7       MR. STALZER:  NOTHING FURTHER, YOUR HONOR.

8       THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY STEP

9   DOWN.

10      MR. CLARK, DO YOU HAVE ANY OBJECTION TO THIS

11  WITNESS BEING EXCUSED?

12      MR. CLARK:  NO, I DON'T, JUDGE.

13      THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU'RE

14  EXCUSED.

15

16                  MICHAEL CHAMBERS,

17  CALLED AS A WITNESS HEREIN, HAVING BEEN PREVIOUSLY DULY

18  SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

19

20                  DIRECT EXAMINATION

21  BY MR. STALZER:

22      Q.   SIR, PLEASE STATE YOUR NAME.

23      A.   MICHAEL CHAMBERS.

24      Q.   YOU'RE A DETECTIVE WITH THE PHOENIX POLICE

25  DEPARTMENT?

65

1.        A.    YES, I AM.

2         Q.    HOW LONG HAVE YOU BEEN EMPLOYED BY THE PHOENIX

3    POLICE DEPARTMENT?

4         A.    NEARLY 22 YEARS.

5         Q.    AND YOU'RE CURRENTLY ASSIGNED TO THE HOMICIDE

6    DETAIL, ARE YOU NOT?

7         A.    THAT'S CORRECT.

8         Q.    HOW MANY YEARS HAVE YOU SPENT IN THE HOMICIDE

9    UNIT?

10        A.    JUST OVER FOUR YEARS.

11        Q.    WERE YOU INVOLVED IN THE HOMICIDE INVESTIGATION

12   INVOLVING THE VICTIM KENDALL WISHON?

13        A.    YES, I WAS.

14        Q.    WERE YOU AT THE CRIME SCENE OUT ON 71ST AVENUE?

15        A.    YES, I WAS.

16        Q.    AT THAT TIME DID YOU SPEAK TO ANY INDIVIDUALS

17   AFFILIATED WITH THE VICTIM?

18        A.    YES, I DID.

19        Q.    DID YOU HAPPEN TO SPEAK TO A PERSON BY THE NAME

20   OF CINDY WISHON?

21        A.    YES, I DID.

22        Q.    WHO IS CINDY WISHON?

23        A.    SHE IS THE MOTHER OF THE DECEDENT.

24        Q.    DID YOU DISCUSS VARIOUS FACTS CONCERNING HER

25   DAUGHTER'S ACTIVITIES OF THE NIGHT OF THE 15TH CARRYING

66

1    OVER TO THE 16TH OF MARCH, 1990?

2         A.   YES, I DID.

3         Q.   DID YOU IN DISCUSSING THE MATTER WITH THE

4    VICTIM'S MOTHER TALK ABOUT GEORGE SMALLWOOD?

5         A.   YES.

6         Q.   DID YOU DISCUSS WITH MISS WISHON ABOUT

7    INTERVIEWING GEORGE SMALLWOOD?

8         A.   YES.

9         Q.   CAN YOU TELL JUDGE HOTHAM WHAT KIND OF TRANSPIRED

10   RELATING TO THE INTERVIEWING OF HER SON GEORGE SMALLWOOD?

11        A.   WELL, I SPOKE TO THE MOTHER AT LEAST TWICE. THE

12   FIRST TIME WAS A FACT FINDING INTERVIEW.

13        Q.   OKAY.  LET'S ISOLATE ON WHAT WAS SAID REGARDING

14   INTERVIEWING HER SON GEORGE SMALLWOOD.

15        A.   OKAY.

16        Q.   TELL US WHAT TRANSPIRED.

17        A.   IT'S DIFFICULT TO ISOLATE, BUT THAT WAS IN MY

18   SECOND CONTACT WITH HER AND I INDICATED TO HER MY INTENT TO

19   TAKE HIM FROM THE SCENE TO THE POLICE STATION FOR THE

20   PURPOSES OF INTERVIEW.  I EXPLAINED A COUPLE OF REASONS,

21   POTENTIALLY SCIENTIFIC EVIDENCE, SO TO SPEAK, IN THAT I MAY

22   REQUIRE A BLOOD SAMPLE OR HAIR SAMPLES, FINGERPRINT

23   SAMPLES, FROM HIM.

24        Q.   IN THE COURSE OF THAT CONVERSATION DID SHE VOICE

25   ANY OBJECTION TO YOU TALKING TO HER SON DOWN AT THE POLICE



**GALL 118**          SUPERIOR COURT          **MILKE_NSB029833**
                      EXHIBIT 1J

1    DEPARTMENT ON 620 WEST WASHINGTON?

2        A.   NO.   TO THE CONTRARY.   SHE WAS INSISTENT THAT I

3    DO WHATEVER NECESSARY.

4        Q.   IN FACT, IS IT NOT CORRECT SHE WANTED YOU TO TALK

5    TO ALL OF THE MALES WHO RESIDED IN HER RESIDENCE?

6        A.   THAT'S CORRECT.

7        Q.   BRIEFLY, WHY WAS THAT SO?

8        A.   WELL, THAT'S WHY I CAN'T SEPARATE THE TWO.

9        Q.   LET ME ASK YOU THIS.   DID IT RELATE TO THE FACT

10   THAT THE HOUSE DID NOT SHOW ANY SIGNS OF FORCED ENTRY AS

11   ONE OF THE REASONS?

12       A.   ONE, YES.

13       Q.   WAS THE AREA OF 1805 NORTH 71ST AVENUE CONDUCIVE

14   FOR CONDUCTING AN INTERVIEW OF GEORGE SMALLWOOD OR MICHAEL

15   GALLEGOS ON THAT DAY?

16       A.   AT THAT DAY, ON THAT TIME, NO, ABSOLUTELY NOT.

17       Q.   WHY WAS IT NOT?

18       A.   WELL, FOR A NUMBER OF REASONS.   FIRST, THE

19   IMMEDIATE AREA OF THE RESIDENCE WAS SECURED OR ISOLATED FOR

20   THE PROCESS AS A SCENE.

21       Q.   WAS THE HOUSE PROCESSED AT THAT POINT IN TIME?

22       A.   IT WAS IN THE PROCESS.   I CAN'T TELL YOU, AS I

23   WAS NOT PERSONALLY INVOLVED, WHETHER OR NOT IT WAS AT A

24   POINT WHEN A SEARCH WARRANT HAD BEEN OBTAINED TO PROCESS IT

25   OR NOT OR IF ONE WAS EVEN USED.   I WAS NOT INVOLVED IN THAT

88

1    ASPECT OF THE INVESTIGATION.   THERE WERE A NUMBER OF
2    PEOPLE, WHO, THROUGH THE CONTACT OVER A FEW HOURS OF A
3    NUMBER OF POLICE OFFICERS IN THE AREA, BOTH A POLICE
4    HELICOPTER IN THE AREA, NEWS MEDIA HELICOPTER IN THE AREA,
5    THAT WERE DRAWN TO IT.   THE ONLY LOCATION FOR A LENGTHY
6    INTERVIEW WOULD BE INSIDE A POLICE CAR WHICH MAY HAVE EVEN
7    BEEN MY OWN.

8              AT A POINT IN TIME IT WAS DETERMINED THAT
9    DETECTIVE SALDATE WOULD CONDUCT ONE OF TWO INTERVIEWS, AND
10   I THE OTHER AND THEY WOULD OCCUR, IF POSSIBLE,
11   SIMULTANEOUSLY.   I DROVE SALDATE IN MY CAR.   HE WOULD HAVE
12   BEEN IN THE BACK SEAT WITH SOMEONE ELSE.   IT WOULD HAVE
13   BEEN IMPOSSIBLE TO DO THIS INTERVIEW.   ALSO THE FISH BOWL
14   TYPE OF EFFECT.

15         Q.   I'M SORRY?.

16         A.   THERE WOULD EXIST A FISH BOWL TYPE OF EFFECT, FOR
17   US TO INTERVIEW IN DEPTH IN FRONT OF THIS CROWD, SO TO
18   SPEAK.

19         Q.   DID YOU HAVE AN OPPORTUNITY TO BRIEFLY TALK TO
20   JERRY GALLEGOS?

21         A.   YES, I DID.

22         Q.   WHO IS JERRY GALLEGOS?

23         A.   HE IS THE BROTHER OF THE DEFENDANT.

24         Q.   DO YOU KNOW HIS APPROXIMATE AGE?

25         A.   35.

69

1      Q.   IN FACT, WASN'T HE THE BOYFRIEND OF CINDY WISHON

2   AT THAT TIME?

3            A.   HE WAS AT THAT TIME.

4      Q.   WAS JERRY GALLEGOS INFORMED THAT HIS ADULT

5   YOUNGER BROTHER WOULD BE GOING TO THE MAIN POLICE

6   DEPARTMENT FOR AN INTERVIEW?

7      A.   YES, HE WAS.

8      Q.   DID HE STATE ANY OBJECTIONS TO THAT PROCEDURE?

9      A.   NO, HE DID NOT.

10     Q.   YOU WERE HERE WHEN FORMER DETECTIVE SALDATE WAS

11  TESTIFYING.  YOU HEARD HIM STATE THAT YOU WERE PRESENT

12  DURING A PORTION OF AN INTERVIEW WITH MICHAEL GALLEGOS;

13  CORRECT?

14     A.   YES.

15     Q.   DURING THAT INTERVIEW DID YOU COERCE MICHAEL

16  GALLEGOS IN ANY WAY TO MAKE A STATEMENT?

17     A.   NO.

18     Q.   DID YOU EVER THREATEN HIM?

19     A.   NO.

20     Q.   DID YOU MAKE ANY PROMISES TO HIM IN RETURN FOR A

21  STATEMENT OF ANY KIND INVOLVING HIS INVOLVEMENT IN THE

22  KILLING OF THE YOUNG MINOR CHILD?

23     A.   NO, I DID NOT.

24     Q.   WERE YOU TAKING NOTES DURING THAT INTERVIEW?

25     A.   NO, I WASN'T.

**GALL 121**          SUPERIOR COURT          **MILKE_NSB029836**
EXHIBIT 11

Q. WAS DETECTIVE SALDATE TAKING NOTES AT THAT TIME IF YOU REMEMBER?
A. HE MAY HAVE MADE SLIGHT NOTES, AND IT VAGUELY SEEMS HE DID, BUT NOT TO ANY GREAT LENGTH.
Q. OTHER THAN THE TIME YOU WERE WITH DETECTIVE SALDATE AND MICHAEL GALLEGOS, WAS THERE ANY OTHER OCCASION WHERE YOU HAD THE OPPORTUNITY TO TALK TO MICHAEL GALLEGOS ABOUT THIS CASE?
A. I SPOKE WITH HIM, BUT NOT ABOUT THE CASE.
Q. WAS THAT BEFORE OR AFTER THE INTERVIEW THAT YOU ATTENDED?
A. IT WAS BEFORE. I WAS ACTUALLY THE PERSON WHO CONTACTED HIM AND MADE HIM AWARE OF MY INTENT TO HAVE HIM TAKEN TO THE POLICE STATION FOR THE PURPOSE OF INTERVIEWING AND I MADE HIM AWARE OF THAT.
Q. WAS THAT DONE AT THE SCENE?
A. YES.
Q. DID HE VOICE ANY OBJECTIONS OF ANY KIND TO GOING TO THE MAIN POLICE DEPARTMENT?
A. NO, HE DID NOT.
Q. AT ANY TIME IN YOUR OPINION DID MICHAEL GALLEGOS APPEAR NOT TO UNDERSTAND WHAT WAS BEING ASKED OF HIM BY EITHER YOU OR MR. SALDATE?
A. NO.
MR. STALZER: I HAVE NOTHING FURTHER, YOUR HONOR.

71

1          THE COURT:   THANK YOU.

2               MR. CLARK, YOU MAY CROSS-EXAMINE THE WITNESS.

3          MR. CLARK:   THANK YOU, JUDGE.

4

5                    CROSS-EXAMINATION

6   BY MR. CLARK:

7          Q.   DETECTIVE CHAMBERS, WHAT TIME DID YOU ARRIVE AT

8   THE SCENE?

9          A.   I BELIEVE IT WAS IN THE AREA OF 2:00, POSSIBLY

10   2:15, MAYBE 2:30.

11          Q.   OKAY.  WHEN YOU ARRIVED AT THE SCENE, WHERE WAS

12   MR. GALLEGOS?  DID YOU SEE HIM?

13          A.   I HAVE NO IDEA.  HE WOULD HAVE BEEN -- IF HE WAS

14   IN THE SAME LOCATION AS WHERE I LATER FOUND HIM, HE WOULD

15   HAVE BEEN 150, 200 YARDS NORTH.  AND THE AREA WHERE I

16   ARRIVED WAS CORDONED OFF, 71ST AVENUE, WAS BLOCKED FOR

17   VEHICULAR TRAFFIC.

18          Q.   OKAY.  WHEN YOU ARRIVED AT THE SCENE, DID YOU

19   TALK TO ANYBODY WHEN YOU FIRST GOT THERE?  DID YOU GET

20   BRIEFED, WHAT?

21          A.   WHEN WE FIRST GOT THERE, UNDERSTANDING THAT WE

22   WERE NOW BEING CALLED INTO THE INVESTIGATION AS HOMICIDE

23   INVOLVEMENT, IT INITIALLY HAD INVOLVED A NUMBER OF PATROL

24   OFFICERS WHO HAD DONE A SEARCH OF THE AREA.  IT THEN

25   INVOLVED, BECAUSE OF THE VICTIM'S AGE, A NUMBER OF MISSING

**GALL 123**                SUPERIOR COURT            **MILKE_NSB029838**
                            EXHIBIT 1



Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 24 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 92 of 174

72

1    PERSONS INVESTIGATORS.  THERE WERE BOTH THESE VARIOUS

2    PATROL AND INVESTIGATOR LEVEL OFFICERS IN THE AREA AND AT

3    A, WHAT I'LL SAY LOOSELY, A COMMAND POST.

4         THEN THE DISCOVERY OF THE BODY HAD RESULTED THEN

5    IN SUPERVISORS' SUPERVISORS, AND VARIOUS OFFICERS IN THAT

6    IMMEDIATE AREA.  THERE WAS VARIOUS INFORMATION BEING

7    EXCHANGED BETWEEN THE PATROL OFFICERS WHO WERE TRYING TO

8    EXPLAIN TO SOMEONE CHRONOLOGICALLY THEIR INVOLVEMENT, AND

9    THEN THE MISSING PERSONS INVESTIGATORS AND SUPERVISORS, AND

10   THEN THE HOMICIDE INVESTIGATIVE SUPERVISORS AS WELL.

11   Q.   OKAY.  AT WHAT POINT IN TIME DID YOU SPEAK TO

12   CINDY WISHON?

13   A.   AFTER THE INITIAL INFORMATION AND ASSIGNMENTS

14   WERE MADE, I WAS ASSIGNED TO INTERVIEW THE MEMBERS OF

15   FAMILY AND IT WAS AT THIS POINT WE REALIZED THAT THE

16   DECEDENT'S MOTHER WAS NOT AWARE OF THE DISCOVERY OF THE

17   BODY AND THE FACT -- OR IN FACT HER CHILD WAS DEAD.

18        DETECTIVE SALDATE AND MYSELF WENT TOGETHER TO THE

19   SCENE RESIDENCE AND CONTACTED THE MOTHER AND NOTIFIED HER

20   OF THE DEATH.  FOLLOWING THAT I INTERVIEWED HER.

21   Q.   OKAY.  AT THIS POINT IN TIME DID SHE VOICE HER

22   OPINION THAT SHE WANTED JERRY, MICHAEL, AND GEORGE

23   THOROUGHLY INVESTIGATED?

24   A.   YES, SHE DID.

25   Q.   DIDN'T SHE ALSO TELL --

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 25 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 93 of 174

73

1.      A.   NOW, UNDERSTANDING THAT THAT WASN'T THE FIRST

2   REMARK. I'VE TOLD YOU I BEGAN AN INTERVIEW OF HER.  IT WAS

3   SUBSEQUENTLY IN THAT INTERVIEW THAT SHE MADE THAT STATEMENT

4   TO ME, YES.

5      Q.   OKAY.  SHE ALSO TOLD YOU THAT IT IS HER SUSPICION

6   THAT A SUSPECT WOULD BE SOMEONE FROM WITHIN THE RESIDENCE;

7   RIGHT?

8      A.   YES.

9      Q.   NOW, AT SOME POINT IN TIME AFTER THE STATEMENT IS

10   MADE BY MISS WISHON THAT SHE BELIEVES IT'S EITHER JERRY;

11   MICHAEL, OR GEORGE, ARE THOSE INDIVIDUALS SEPARATED FROM

12   EACH OTHER?  ARE THEY STANDING TOGETHER?  WHAT?

13      A.   CYNTHIA'S SEPARATED FROM JERRY BY ME.  I'M

14   INTERVIEWING HER ALONE.  THAT'S ONE-ON-ONE.

15      Q.   OKAY.

16      A.   I DON'T KNOW THAT I KNEW THEN, BUT SHORTLY AFTER

17   FOUND IN FACT THAT GEORGE AND MICHAEL HAD BEEN SEPARATED

18   AND WERE ONE-ON-ONE WITH UNIFORM OFFICERS.

19      Q.   OKAY.  NOW, WHERE WERE THEY PHYSICALLY?

20      A.   OUTSIDE.

21      Q.   I KNOW THEY'RE OUTSIDE.  WHERE IN RELATION TO THE

22   HOUSE?

23      A.   WELL, WHEN I MET THEM, THEY WERE ACROSS FROM THE

24   RESIDENCE ON THE WEST SIDE OF THE STREET.  ON THE SIDEWALK/

25   CURB AREA.

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 26 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 94 of 174

74

1        Q.    OKAY.  NOW, YOU SAID THEY WERE WITH UNIFORMED

2    OFFICERS.  ONE WAS WITH EACH ONE AND THEY WERE SEPARATED

3    APART; IS THAT CORRECT?

4        A.    THAT'S CORRECT.

5        Q.    WAS JERRY WITH A UNIFORMED?

6        A.    I'M SURE HE WAS.  AND BY THE SAME TOKEN, WHEN I

7    SAY THAT, IT'S BECAUSE THERE'S A UNIFORM OFFICER WHO IS

8    PRESERVING THE INTEGRITY OF THE RESIDENT SCENE AND I RECALL

9    HIM BEING THERE, BUT NOT AS CLOSELY AS WHAT HE WAS WITH

10   MICHAEL OR GEORGE.

11       Q.    OKAY.  AT SOME POINT IN TIME IT'S DECIDED THAT

12   GEORGE SMALLWOOD AND MICHAEL GALLEGOS WILL BE TAKEN

13   DOWNTOWN FOR AN INTERVIEW; IS THAT CORRECT?

14       A.    THAT'S CORRECT.

15       Q.    WHO MADE THAT DECISION?

16       A.    I THINK THAT WAS A JOINT DECISION.  I NOTIFIED

17   CARL RICHARDSON, WHO WAS ONE OF OUR HOMICIDE SUPERVISORS,

18   AND STILL IS, OF THE RESULTS OF MY FIRST THREE OR FOUR

19   INTERVIEWS.  AND I ALSO NOTIFIED HIM, NOT HAVING SPOKEN TO

20   MICHAEL OR GEORGE PRIOR, THAT I WOULD PREFER TO DO THIS

21   INTERVIEW AWAY FROM THE SCENE FOR THE SEVERAL VARIOUS

22   REASONS THAT I INDICATED AND HE WHOLLY AGREED.

23            AT THAT TIME MISSING PERSONS SERGEANT PIZZI WAS

24   NEARBY AND PRIVY TO THAT CONVERSATION AND HE ASSURED ME HE

25   WOULD ARRANGE FOR SEPARATE TRANSPORTATION FOR EACH

**GALL 126**

**MILKE_NSB029841**

75

1     INDIVIDUAL BY AN ONCOMING SECOND SHIFT POLICE OFFICER.

2          Q.   OKAY.   NOW, AT THAT POINT IN TIME IN YOUR MIND

3     HAD THIS INVESTIGATION FOCUSED ON GEORGE SMALLWOOD AND

4     MICHAEL GALLEGOS?

5          A.   I WOULD SAY IT WAS BEGINNING TO.

6          Q.   OKAY.   AT THAT POINT IN TIME WERE THEY SUSPECTS?

7          A.   THAT WOULD BE A STRONG CHOICE OF WORDS, BUT THEY

8     WERE WHAT I WOULD REFER TO AS VERY STRONG INVESTIGATIVE

9     LEADS WHICH IS SOMEWHAT LESS THAN SUSPECT, BUT NOT MUCH.

10         Q.   OKAY.   DID YOU DISCUSS THIS WITH OFFICER SALDATE

11    WHEN YOU WERE DRIVING TO THE POLICE STATION?

12         A.   WE HAD A DISCUSSION EN ROUTE TO THE POLICE

13    STATION AND I THINK IT WAS MORE OF HIS EXCHANGE OF

14    INFORMATION OF FACT WITH ME ABOUT HIS OBSERVATIONS OF THE

15    DECEDENT'S REMAINS, THE MANNER OF HER DEATH, AND MY

16    DISCUSSION WITH HIM AS A RESULT OF MY INTERVIEWS.

17              WE ALSO AGREED THAT ON ARRIVAL AT GENERAL

18    INVESTIGATIONS BUREAU HE WOULD INTERVIEW THE DEFENDANT AND

19    I WOULD INTERVIEW SMALLWOOD.   WE ROUTINELY WORK TOGETHER

20    AND THIS IS VERY COMMON.

21         Q.   OKAY.   DID THIS DISCUSSION WITH SALDATE THAT YOU

22    HAD WITH HIM, WHILE YOU WERE DRIVING TO THE STATION,

23    REVOLVE AROUND YOUR OPINION THAT MR. SMALLWOOD AND MR.

24    GALLEGOS WERE STRONG INVESTIGATIVE LEADS?

25         A.   I DON'T KNOW THAT IT WOULD BE SO MUCH THAT OR

**GALL 127**                    SUP EXHIBIT 1                    **MILKE_NSB029842**

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 28 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 96 of 174

76

1   ASSESSMENT BY US.  WE WERE PARTNERS A LONG TIME AND WE HAD

2   A TENDENCY TO PLAY DOUBLE ADVOCATES WITH ONE ANOTHER AND I

3   THINK IT WOULD BE MORE OF THAT TYPE SITUATION IN EVALUATING

4   OR ASSESSING IF EITHER OR BOTH WERE SUSPECTS OR WHICH WERE

5   MORE LIKELY TO BE A SUSPECT, ET CETERA.

6          CONSISTENT WITH THAT I WOULD HAVE TO SAY ALSO

7   THAT WE VERY MUCH AGREED THAT THE RESPONSIBILITY OF THE

8   CASE AGENT, WHICH HE WERE, WOULD BE THE INTERVIEW OF A

9   SUSPECT.  SO I THINK THIS IS PROBABLY WHY HE WAS ASSERTING

10   HE WISHED TO INTERVIEW GALLEGOS.  IT'S SPECULATION ON MY

11   PART THERE.

12      Q.   OKAY.  WHO ACTUALLY TOLD MR. SMALLWOOD AND MR.

13   GALLEGOS THEY WERE GOING TO BE TRANSPORTED TO 620 WEST

14   WASHINGTON?  DID YOU DO THAT?

15      A.   I DID.

16      Q.   OKAY.  DID YOU SAY, HEY, YOU DON'T HAVE TO COME,

17   THIS IS PURELY VOLUNTARY, IF YOU REFUSE, THAT'S FINE?

18      A.   NO, I DON'T THINK SO.  I THINK IT WAS MORE --

19   MORE ACCURATELY STATED IN THE FORM OF AN INVITATION.

20   SOMETHING TO THE EFFECT I'D LIKE YOU TO GO OR I'D LIKE TO

21   TAKE YOU TO THE POLICE STATION FOR PURPOSES OF INTERVIEW,

22   FINGERPRINTING POTENTIALLY, ET CETERA.

23      Q.   DID YOU EVER INDICATE TO THEM THAT THEY HAD THE

24   RIGHT TO REFUSE TO GO?

25      A.   NO, I DIDN'T.



**GALL 128**          SUPERIOR COURT          **MILKE_NSB029843**
                    Phoenix, Arizona
                    EXHIBIT 1j

77

1       Q.   DID YOU EVER TELL THEM EITHER THEY VOLUNTARILY
2   WENT OR THEY WERE GOING TO GO ANYWAY?
3       A.   NO.
4       Q.   OKAY.
5       A.   THE ONLY EXPLANATION FURTHER ALONG THOSE LINES, I
6   MADE AN EXPLANATION THERE WOULD BE A DELAY.  I COULDN'T
7   TRANSPORT, AND I RECALL VIVIDLY EXPLAINING TO EACH, THE
8   NECESSITY TO WAIT THE ARRIVAL OF A ONCOMING SHIFT TWO
9   OFFICER AND THERE WOULD BE A TIME DELAY FOR THAT, AND THEN
10  TRANSPORT.
11      Q.   OKAY.  YOU ALREADY TOLD US ABOUT A CONVERSATION
12  YOU HAD WITH CINDY WISHON RELATIVE TO MR. SMALLWOOD BEING
13  TRANSPORTED TO THE POLICE STATION; IS THAT CORRECT?
14      A.   THAT'S CORRECT.
15      Q.   NOW, WHEN YOU SPOKE TO CINDY WISHON, DID YOU
16  UNDERSTAND AT THAT POINT IN TIME THAT SHE WAS THE MOTHER OF
17  GEORGE SMALLWOOD?
18      A.   YES, I DID.
19      Q.   ALL RIGHT.  DID YOU EVER ASCERTAIN IF ANYONE WAS
20  IN THAT SAME TYPE OF POSITION RELATIVE TO MR. GALLEGOS?  IN
21  OTHER WORDS, DID YOU MAKE ANY EFFORT TO CONTACT ANY
22  RESPONSIBLE ADULT REGARDING YOUR TRANSPORTING MR. GALLEGOS
23  TO THE POLICE STATION?
24      A.   I THINK YOU'RE MISCONCEIVING SOMETHING.  MY
25  SITUATION OF NOTIFYING MISS WISHON WAS MORE FOR THE



1    COURTESY OF THE SITUATION THAN INQUIRING OF HER HER

2    PERMISSION.  AT THAT SAME TIME -- NOW, I HAD PREVIOUSLY

3    THEN SPOKEN TO GEORGE SMALLWOOD AND AT THE SAME TIME I'M

4    MAKING THAT STATEMENT TO CYNTHIA WISHON, JERRY GALLEGOS IS

5    NEARBY AND THEN I INDICATED MY INTENT TO DO THE SAME THING

6    WITH THE DEFENDANT AND BEYOND THAT, THEN I NOTIFIED

7    DEFENDANT OF MY INTENT AND DID SO.

8         Q.   OKAY.  BUT WHEN YOU NOTIFY HIM OF YOUR INTENT,

9    YOU NEVER GAVE HIM ANY OPTION TO REFUSE; IS THAT CORRECT?

10        A.   JERRY?

11        Q.   NO.  MR. GALLEGOS.

12        A.   NO, I DIDN'T.

13        Q.   OKAY.  AT THE TIME THAT YOU DECIDE TO INTERVIEW

14   BOTH MR. SMALLWOOD AND MR. GALLEGOS WHAT INFORMATION DID

15   YOU POSSESS ABOUT THOSE TWO INDIVIDUALS?

16        A.   WELL, I'M NOT SURE OF YOUR QUESTION.  I HAD BASIC

17   IDENTIFICATION INFORMATION ABOUT THEM.  I HAD OTHER

18   PEOPLE'S IMPRESSIONS THAT WAS IN CONFLICT OF THEIR

19   CONDITION THE NIGHT BEFORE.  THE CONFLICT BEING THEIR

20   SOBRIETY OR HOW MUCH EITHER OR BOTH HAD HAD TO DRINK THE

21   NIGHT BEFORE.

22        AND AS I SAY, THERE WAS A CONFLICT BETWEEN AN

23   INTERVIEW I HAD WITH DEFENDANT'S BROTHER JERRY AND MY

24   INTERVIEW WITH DECEDENT'S MOTHER, CINDY.  THERE WAS THE

25   STATEMENTS THAT I HAD FROM AGAIN BOTH CINDY AND JERRY AS TO



**MILKE_NSB029845**

79

1    THEIR SLEEPING ARRANGEMENTS OR SLEEPING HABITS, ET CETERA,

2    THEIR OWN PERSONAL. AND THE CONDITION OF THE HOUSE, WHERE,

3    AGAIN, IT WAS SECURE FROM OBVIOUS VIOLATION, TO INCLUDE

4    LOCKS IN PLACE ON THE DOORS.

5         Q.   OKAY. DID YOU HAVE ANY INFORMATION RELATIVE TO

6    MR. SMALLWOOD AND MR. GALLEGOS BEING HIGH SCHOOL STUDENTS

7    ON SPRING BREAK FROM FLAGSTAFF?

8         A.   YES, I DID.

9         Q.   OKAY. BASED UPON THAT INFORMATION, DID YOU MAKE

10   ANY EFFORT TO CONTACT THE RESPONSIBLE ADULT ON BEHALF OF

11   MR. GALLEGOS?

12        A.   NO. I WAS DEALING WITH ADULTS. I DON'T

13   ROUTINELY NOTIFY ADULTS' PARENTS THAT I HAVE A CONTACT WITH

14   AN ADULT. THE ONLY EXCEPTION WOULD BE IF I HAVE A DEATH OF

15   THE ADULT TO MAKE THAT EMERGENCY NOTIFICATION TO THE NEXT

16   OF KIN.

17        Q.   YOU HAD NO CONCERN AT THAT POINT ABOUT THE FACT

18   THAT MR. GALLEGOS WAS IN HIGH SCHOOL, THAT HE MIGHT NOT

19   HAVE A FULL AND COMPLETE UNDERSTANDING OF WHAT WAS GOING

20   ON? THAT DIDN'T HAVE ANY CONCERN FOR YOU?

21        A.   THE ONLY THING THAT I'VE TAKEN EXCEPTION WITH AS

22   FAR AS HIS FULL UNDERSTANDING, AND I RELATE TO IT VERY

23   EASILY, I PERSONALLY ONLY HAVE A 9TH GRADE COMPREHENSION OF

24   MATHEMATICS AND IT'S THE ONLY AREA I UNDERSTAND HE HAD A

25   PROBLEM IN. HE WAS SLOW IN MATH.

GALL 131                    SUPEREXHIBITRTJ                    MILKE_NSB029846

80

1      Q.   NOW, IS THAT BEFORE YOU TRANSPORTED HIM TO 620
2.   WEST WASHINGTON OR IS THAT SUBSEQUENTLY?
3      A.   NO.  THAT'S SUBSEQUENTLY.  AND THAT'S WHY I SAY
4   THAT'S THE ONLY KNOWLEDGE I HAVE OF A PROBLEM AREA HE HAS.
5      Q.   OKAY.  YOU, I TAKE IT, DID NOT HAVE ANY CONCERNS
6   THEN ABOUT THE FACT THAT MR. GALLEGOS WAS IN HIGH SCHOOL
7   AND THAT HE MIGHT NOT POSSIBLY UNDERSTAND HIS RIGHTS
8   RELATIVE TO YOUR TRANSPORTING HIM TO THE POLICE STATION?
9      A.   NO.  UP TO THAT POINT IN TIME OF THE TRANSPORT I
10   HAD ABSOLUTELY NO KNOWLEDGE OF ANY UNUSUAL CIRCUMSTANCE.
11      Q.   PRECISELY WHAT INFORMATION DID YOU HAVE ABOUT MR.
12   GALLEGOS WHEN YOU ASKED HIM TO COME TO THE POLICE STATION?
13      A.   SOME SLIGHT INFORMATION BIOGRAPHICALLY.  HIS AGE.
14   HIS HOME ADDRESS.  THE FACT HE WAS ON SPRING BREAK.  I
15   DON'T RECALL IT BEING SPECIFIED FOR HIM, BUT I DO WITH
16   SMALLWOOD, THAT SMALLWOOD WAS ON A FIVE-YEAR HIGH SCHOOL
17   PLAN WHICH WOULD SUGGEST ANY NUMBER OF POSSIBILITIES,
18   DROPOUT, WHATEVER.  I RECALL A CONVERSATION WITH MISS
19   WISHON ABOUT WHY SMALLWOOD HAD WANTED TO GO TO A SMALLER
20   SCHOOL OUTSIDE THE METROPOLITAN PHOENIX AREA.  THAT WAS DUE
21   TO SOCIOLOGICAL PROBLEMS AND HIS POOR ACADEMIC SCORES.
22   WHEN HE WENT TO FLAGSTAFF, SHE HAD SEEN IMPROVEMENT IN THE
23   ACADEMIC SCORES AND APPARENTLY THAT WAS A VALID DECISION,
24   ET CETERA, ET CETERA.  INFORMATION OF THAT NATURE.
25      Q.   IRREGARDLESS OF WHATEVER INFORMATION YOU HAD, HE

81



1   WAS TRANSPORTED TO THE POLICE STATION AND PUT IN A ROOM

2   THAT WAS ONE ROOM AWAY FROM MR. SMALLWOOD; CORRECT?

3       A.   NOT ORIGINALLY.

4       Q.   OKAY.  WHERE WAS HE ORIGINALLY TAKEN?

5       A.   OKAY.  ORIGINALLY THE ROOM WAS IN THE WESTERN

6   MOST ROOM OF THREE AND SMALLWOOD WAS IN THE ROOM ADJOINING

7   IMMEDIATELY.  WHEN SALDATE AND I ARRIVED, THIS WAS NOT A

8   SITUATION WE PREFER, AS THOSE ROOMS ARE NOT SOUNDPROOF.

9   AND HE -- SMALLWOOD -- WAS MOVED FROM THAT ROOM TO THE

10   FURTHEST EASTERN ROOM.  I ALSO TAKE EXCEPTION WITH THE

11   ESTIMATION OF THE SIZE OF THE ROOMS.  THEY'RE ABOUT 10 FEET

12   SQUARE.

13       Q.   OKAY.  WHY DID YOU HAVE SOME CONCERN ABOUT THE

14   FACT THAT THE ROOMS WEREN'T SOUNDPROOF?  I MEAN, CAN YOU

15   HEAR WHAT'S GOING ON, IF YOU'RE INSIDE THAT ROOM OUTSIDE?

16       A.   THERE WOULD BE A CHANCE OF IT, AND, YES, I WOULD

17   HAVE A CONCERN ABOUT THAT.

18       Q.   SO THAT WOULD NOT BE UNUSUAL IF SOMEBODY WAS IN

19   ONE OF THOSE ROOMS AND THEY OVERHEARD SOMETHING THAT WAS IN

20   THE NEXT ROOM IMMEDIATELY OUTSIDE?

21       A.   IT IS POSSIBLE.  I HAVE HEARD THINGS MYSELF.

22       Q.   OKAY.

23       A.   IT'S ALSO A DISTRACTION THAT I WOULD NOT WANT TO

24   UNDERTAKE, PUT UP WITH.

25       Q.   OKAY.  YOU INTERVIEW MR. SMALLWOOD AND HE

**GALL 133**                    SUPERIOR COURT                    **MILKE_NSB029848**
                               EXHIBIT 1
                               Phoenix, Arizona

82

1    BASICALLY DENIES ANY INVOLVEMENT; IS THAT TRUE?

2         A.   YES, HE DID.

3         Q.   OKAY.  YOU, ACCORDING TO YOUR REPORT, INDICATE TO

4    MR. SMALL WOOD THAT YOU WANT TO HAVE ONE ROLL OF HIS

5    FINGERPRINTS; RIGHT?

6         A.   THAT'S CORRECT.

7         Q.   HE AGREES TO DO SO AND HE'S TAKEN BY AN

8    IDENTIFICATION OFFICER TO BE PRINTED; IS THAT CORRECT?

9         A.   NO.  HE'S TAKEN BY A PATROL OFFICER.  UNIFORM

10   OFFICER.

11        Q.   OKAY.

12        A.   ACROSS THE HALL WHERE BY RECORDS SECTION IS

13   LOCATED AND HIS FINGERPRINTS ARE OBTAINED, YES.

14        Q.   OKAY.  IN HIS ABSENCE YOU GO AND SPEAK TO

15   DETECTIVE SALDATE; IS THAT CORRECT?

16        A.   I BELIEVE THAT'S CORRECT, YES.

17        Q.   AND SALDATE TELLS YOU THAT MICHAEL GALLEGOS HAD

18   MADE A COMPLETE STATEMENT OF THEIR INVOLVEMENT IN KENDALL

19   WISHON'S DEATH; IS THAT TRUE?

20        A.   THAT'S CORRECT.

21        Q.   OKAY.  THEN MR. SMALLWOOD IS RETURNED TO THE

22   INTERVIEW ROOM BY THE OFFICER; RIGHT?

23        A.   THAT'S CORRECT.

24        Q.   OKAY.  WHAT DO YOU DO NEXT?

25        A.   I BELIEVE THAT IT'S AT THAT POINT ON HIS RETURN

SUPERIOR COURT          MILKE_NSB029849
                                PHOENIX EXHIBITS, AZ


Case 2:15-cv-00462-ROS  Document 669-11  Filed 09/18/20  Page 35 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 103 of 174

83

1    THAT I WAS INVITED BY SALDATE AND INTRODUCED BY HIM TO THE
2    DEFENDANT AND HEARD SOMEWHAT AS A WITNESS THE STATEMENT
3    THAT THAT DEFENDANT HAD PREVIOUSLY MADE TO SALDATE.  I'M
4    SURE I DIDN'T HEAR IT INASMUCH DETAIL BECAUSE I SPENT ONLY
5    15, POSSIBLY 20 MINUTES WITH HIM.

6        Q.    OKAY.  NOW, THIS IS IN THE INTERVIEW ROOM WITH
7    MR. GALLEGOS, MR. SALDATE, AND YOURSELF?

8        A.    THAT'S CORRECT.

9        Q.    OKAY.  THEN WHAT HAPPENS AFTER THAT?

10       A.    THEN I RETURN TO THE INTERVIEW ROOM, AGAIN NOW
11   OCCUPIED BY SMALLWOOD.  I CONFRONT SMALLWOOD'S DENIALS WITH
12   GALLEGOS' ADMISSIONS, AND MY IMPRESSION WAS THAT SMALLWOOD
13   BELIEVED THAT THIS WAS SOME TYPE OF A TRICK THAT I WAS
14   TRYING TO MANIPULATE HIM BY.  HE SAID IF GALLEGOS HAD IN
15   FACT MADE STATEMENTS TO THIS TYPE, AND I'M PARAPHRASING
16   HIM, IT WOULD BE TO DRAW SOMEONE ELSE INTO TROUBLE WITH
17   HIM; THAT WHEN HE WOULD GET IN TROUBLE IN THE PAST, HE
18   NEVER WANTED TO IN EFFECT TAKE THE BLAME ALONE.  HE WANTED
19   TO SHARE IT WITH SOMEBODY ELSE.  I THINK HIS IMPRESSION WAS
20   THEN IT WOULD KIND OF SPLIT THE LOAD THEN BETWEEN TWO OR
21   MORE.

22       Q.    AT SOME POINT HE INVOKED HIS RIGHT TO REMAIN
23   SILENT OR REQUESTED A LAWYER, DIDN'T HE?

24       A.    AT A POINT IN TIME HE DID, YES.

25       Q.    NOW, IS THAT SUBSEQUENT TO HIS DENIALS OR WHEN

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 36 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 104 of 174

84

1    DID THAT HAPPEN?

2         A.   IS IT AFTER HIS DENIALS?

3         Q.   YEAH.

4         A.   DEFINITELY.  THE WHOLE FIRST HOUR I SPENT WITH

5    HIM WAS DENIALS.

6         Q.   WHEN RELATIVE TO THIS CONFRONTATION THAT WE'VE

7    HEARD ABOUT BETWEEN MR. GALLEGOS AND MR. SMALLWOOD DID THAT

8    OCCUR?

9         A.   WHICH?

10        Q.   HIS ASSERTING HIS RIGHTS.

11        A.   IT WAS AT THE VERY END.  IT WAS FOLLOWING, AND I

12   SPENT ABOUT 10 MINUTES WITH HIM CONFRONTING HIS DENIALS AND

13   AGAIN GALLEGOS'S ADMISSIONS FOR HIM, AND THEN I'M NOT SURE

14   WHERE THE IDEA ORIGINATED, BUT WE DETERMINED, AND I'M GOING

15   TO SAY BETWEEN THE THREE OF US, INCLUDING THE DEFENDANT, IT

16   SEEMS THAT HE OFFERED TO DO THE CONFRONTATION, AND THE

17   OBJECT WAS THE REALIZATION THAT THIS WAS NOT A GAME WE WERE

18   TRYING TO MANIPULATE SMALLWOOD BY, BUT HERE IS GALLEGOS

19   ADMITTING THAT HE HAS MADE STATEMENTS, ET CETERA, AND WE

20   DID MAKE A CONFRONTATION BETWEEN GALLEGOS AND SMALLWOOD.

21   WE HAD EXPLAINED TO GALLEGOS PREVIOUSLY THAT WE WOULD NOW

22   ALLOW HIM TO APPROACH SMALLWOOD OR CONVERSELY SMALLWOOD TO

23   APPROACH HIM, AND I RECALL GALLEGOS URGING TO SMALLWOOD TO

24   TELL THE TRUTH, ADMITTING HE HAD TOLD THE TRUTH, AND IN

25   RESPONSE SMALLWOOD'S DENIALS AND MORE EMPHATIC URGING BY

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 37 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 105 of 174

85

1   HIM FOR GALLEGOS TO QUIT LYING AND TO TELL THE TRUTH THAT

2   SMALLWOOD WAS NOT INVOLVED.

3       Q.   OKAY.  LET'S BACK UP A MINUTE.  YOU'RE TELLING ME

4   THAT THIS CONFRONTATION MAY HAVE BEEN THE RESULT OF MR.

5   GALLEGOS VOLUNTEERING TO DO THIS?

6       A.   IT MAY HAVE.

7       Q.   YOU MEAN OUT OF THE BLUE HE SAYS WHY DON'T YOU

8   LET ME GO OVER AND CONFRONT GEORGE SMALLWOOD?

9       A.   THE MORE I THINK ON IT, AND I DIDN'T DWELL

10  HEAVILY ON THE WHY AT THAT MOMENT IN TIME, BUT THE MORE I

11  THINK ON IT, IT SEEMS IT WAS HIS OFFER BECAUSE OF MY

12  EXPLANATION TO THE DEFENDANT SMALLWOOD EMPHATICALLY DENIES

13  ABSOLUTELY ANY INVOLVEMENT IN THIS SITUATION.  AND I THINK

14  THAT IT WAS HIS OFFER CAN I SEE HIM OR WOULD IT MAKE A

15  DIFFERENCE IF I SAW HIM OR SOMETHING TO THAT EFFECT.

16      Q.   OKAY.  YOU'RE TALKING TO MR. GALLEGOS AND YOU'RE

17  TELLING HIM THAT MR. SMALLWOOD IS DENYING ANY INVOLVEMENT.

18  AND THEN ALL OF A SUDDEN HE SAYS, WELL, LET ME GO TALK TO

19  HIM?

20      A.   I BELIEVE HE DID.  I'M NOT ABSOLUTELY CERTAIN,

21  BUT I BELIEVE HE DID.

22      Q.   OKAY.  DO YOU HAVE A COPY OF THE REPORT THAT YOU

23  AUTHORED IN THIS CASE?

24      A.   YES.  WITH REFERENCE TO WHAT AREA?  \

25      Q.   THE ONE I'M TALKING ABOUT -- LET'S SEE.  IT'S

**GALL 137**          SUPERIOR COURT          **MILKE_NSB029852**
                      Phoenix, Arizona
                      EXHIBIT 14

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 38 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 106 of 174

86

1   APPROXIMATELY SIX PAGES LONG.  THE ONLY DATE THAT APPEARS

2   ON IT IS 3/16/90, 4:20 P.M., BY DETECTIVE CHAMBERS.  I HAVE

3   A COPY OF IT.

4       MR. CLARK:  MAY I APPROACH THE WITNESS, JUDGE?

5       THE COURT:  YES.

6       MR. STALZER:  ASK THAT THERE BE A QUESTION BEFORE THE

7   OFFICER TO REFRESH HIS RECOLLECTION.

8       THE WITNESS:  YES, I BELIEVE I HAVE THIS SAME COPY.

9   BY MR. CLARK:

10     Q.  OKAY.  THE QUESTION I HAD ASKED YOU BEFORE

11  APPROACHING AND GIVING YOU THE REPORT IS ANYWHERE IN THAT

12  REPORT HAVE YOU RELATED THE FACT THAT MR. GALLEGOS HAD

13  VOLUNTEERED TO GO CONFRONT MR. SMALLWOOD?

14     A.  NO.

15     Q.  OKAY.  IN FACT, NOWHERE WITHIN THAT REPORT IS ANY

16  TYPE OF CONFRONTATION EVEN MENTIONED BETWEEN MR. GALLEGOS

17  AND MR. SMALLWOOD?

18     A.  THAT'S CORRECT.

19     Q.  OKAY.  IN FACT, THE REPORT BASICALLY SAYS THAT

20  YOU CONFRONTED MR. SMALLWOOD WITH THE STATEMENTS OF MR.

21  GALLEGOS?

22     A.  THAT'S CORRECT.

23     Q.  OKAY.  IS THE REASON YOU DIDN'T PUT THAT IN THERE

24  IS BECAUSE YOU THOUGHT IT WASN'T SIGNIFICANT?

25     A.  FOR THE MOST PART.  AND UNDERSTANDING, I'M

GALL 138     SUPERIOR COURT
Phoenix, Arizona
EXHIBIT TJ   MILKE_NSB029853

87



1    CONFRONTING, AS I SAID, SMALLWOOD'S DENIALS WITH GALLEGOS'S

2    ADMISSIONS AND STILL RECEIVING SMALLWOOD'S DENIALS.   THE

3    CONFRONTATION OR THE FACE-TO-FACE WITHIN THE SAME ROOM

4    VIEWING OF GALLEGOS AND SMALLWOOD OCCURRED FOR A MINUTE AND

5    LED TO NOTHING.

6         Q.    OKAY.

7         A.    SO IT WAS FRUITLESS.

8         Q.    DID YOU EVER TELL MR. GALLEGOS THAT HE DID NOT

9    HAVE TO CONFRONT ANYONE?

10        A.    NO.   IT WASN'T A QUESTION IN ISSUE.

11        Q.    AND THAT'S BECAUSE IT'S YOUR BELIEF NOW THAT HE

12   VOLUNTARY -- HE VOLUNTEERED TO DO THIS?

13        A.    IT'S SOMETHING THAT'S VERY UNUSUAL AND I CAN'T

14   TELL YOU IF -- THE LAST TIME I HAD THIS SITUATION OCCUR AND

15   THERE AGAIN IT'S NOT SOMETHING THAT I ROUTINELY DO.   AS A

16   MATTER OF FACT, IT'S SOMETHING THAT I WOULD RATHER NOT DO,

17   AND IT'S WHAT MAKES ME THINK THAT THE SUGGESTION IN THE

18   FIRST PLACE HAD BEEN GALLEGOS AGAIN WITH THE UNDERSTANDING

19   FROM ME THAT SMALLWOOD IS EMPHATICALLY DENYING EVERYTHING

20   GALLEGOS IS ADMITTING TO AND THERE AGAIN THE OFFER, I

21   BELIEVE WAS BY HIM, TO LET ME SEE HIM, MAYBE IT WILL MAKE A

22   DIFFERENCE COMING FROM ME.

23        MR. CLARK:   I HAVE NOTHING FURTHER, JUDGE.   THANK YOU.

24        THE COURT:   REDIRECT, MR. STALZER?

25   ///

GALL 139        SUPERIOR COURT        MILKE_NSB029854
EXHIBIT 1j

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 40 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 108 of 174

88

1                    REDIRECT EXAMINATION

2   BY MR. STALZER:

3       Q.   THE ISSUE OF THE CONFRONTATION, WAS IT THE

4   GENERAL INTENT TO HAVE THAT IMPACT ON SMALLWOOD OR

5   GALLEGOS?

6       A.   DEFINITELY SMALLWOOD.

7       Q.   WITH RESPECT TO YOUR REPORT WHERE IT STATES YOU

8   CONFRONTED GEORGE SMALLWOOD, THAT CONFRONTATION, DID IT

9   OCCUR BEFORE OR AFTER THIS FACE-TO-FACE CONFRONTATION?

10      A.   IT HAD OCCURRED BEFORE.

11      Q.   WHAT WAS IN YOUR OPINION THE STATE OF MICHAEL

12  GALLEGOS'S SOBRIETY WHEN YOU MET HIM THAT DAY?

13      A.   WHEN I MET HIM, HE WAS OBVIOUSLY SOBER OR

14  CONVERSELY THERE WERE NO OBVIOUS INDICATIONS ABOUT HIM IN

15  ANY WAY THAT HE WAS ANYTHING OTHER THAN SOBER.

16      Q.   HE APPEARED TOTALLY ALERT TO YOU?

17      A.   OH, YES, HE WAS RESPONSIVE AND UNDERSTOOD

18  ANYTHING I SAID TO HIM.

19      Q.   AT ANY TIME DID HE INDICATE VERBALLY OR

20  NONVERBALLY THAT HE DID NOT WANT TO GO TO THE POLICE

21  DEPARTMENT FOR AN INTERVIEW?

22      A.   NO.   HE WAS VERY COOPERATIVE.

23      MR. STALZER:   NOTHING FURTHER, YOUR HONOR.

24      THE COURT:   THANK YOU, SIR.   YOU MAY STEP DOWN.

25      MR. STALZER:   THE STATE RESTS, YOUR HONOR.

Case 2:15-cv-00462-ROS Document 669-11 Filed 09/18/20 Page 41 of 50
Case 2:01-cv-01909-NVW Document 135-1 Filed 12/22/16 Page 109 of 174

89



1          THE COURT: ALL RIGHT.

2               MR. CLARK, WHAT WOULD YOU LIKE TO DO AT THIS

3     TIME?

4          MR. CLARK: JUDGE, I'D CALL MR. GALLEGOS TO THE STAND.

5          THE COURT: ALL RIGHT. PLEASE COME FORWARD, SIR, AND

6     BE SWORN IN.

7          THE COURT: PLEASE HAVE A SEAT OVER HERE.

8               WILL COUNSEL PLEASE APPROACH.

9          MR. CLARK: YES, JUDGE.

10              (AN OFF-THE-RECORD DISCUSSION ENSUED BETWEEN

11              COURT AND COUNSEL AT THE BENCH.)

12         THE COURT: PRIOR TO MR. GALLEGOS TESTIFYING TODAY I

13    WANT THE RECORD TO REFLECT THAT HE HAS HAD A CONVERSATION

14    WITH HIS COUNSEL AND REALIZES THAT ANYTHING HE SAYS TODAY

15    CAN BE USED AGAINST HIM IN A TRIAL IN THIS MATTER AND IF

16    YOU WOULD, MR. CLARK, WOULD YOU ADVISE THE COURT WHAT IT

17    IS, HOW YOU DISCUSSED THIS WITH YOUR CLIENT, AND WHETHER HE

18    BELIEVES HE UNDERSTANDS WHAT YOU TOLD HIM.

19         MR. CLARK: YES, JUDGE. YESTERDAY I HAD A MEETING

20    WITH MR. GALLEGOS REGARDING THE MOTIONS THAT WERE GOING TO

21    BE HEARD TODAY AND HIS TESTIMONY. WE HAVE DISCUSSED THIS

22    FOR MANY MONTHS NOW, THE POSSIBILITY THAT HE WOULD HAVE TO

23    TAKE THE STAND, OR THAT HE COULD TAKE THE STAND IN A

24    VOLUNTARINESS HEARING. I'VE DISCUSSED THE RULE WITH HIM.

25    HE UNDERSTANDS THAT THE STATEMENTS THAT HE IS GOING TO MAKE



**GALL 141**          SUPERIOR COURT          **MILKE_NSB029856**
                      Phoenix, Arizona
                      EXHIBIT

90

1    ARE UNDER OATH, THAT THEY CAN BE USED AGAINST HIM IN A

2    SUBSEQUENT TRIAL BECAUSE THEY ARE BEING TAKEN DOWN AND

3    AFTER HAVING THAT DISCUSSION, JUDGE, HE HAS INDICATED THAT

4    HE DOES WISH TO PROCEED IN THIS FASHION.

5         THE COURT:  ALL RIGHT.

6              MR. GALLEGOS, FOR THE RECORD, DO YOU RECALL THAT

7    CONVERSATION WITH YOUR COUNSEL AND HIM ADVISING YOU OF THE

8    RIGHTS AND THE DECISION MAKING PROCESS OF WHETHER TO

9    TESTIFY IN THIS HEARING OR NOT?

10        THE DEFENDANT:  YES, SIR.

11             THE COURT:  AND YOU ARE WILLING TO GO AHEAD AND

12   UNDERSTAND THAT YOU'RE UNDER OATH AND KNOW THAT EVERYTHING

13   THAT YOU SAY TODAY CAN BE USED IN THE TRIAL ITSELF?

14        THE DEFENDANT:  YES, SIR.

15        THE COURT:  ALL RIGHT, SIR.  LET'S GO AHEAD.

16        MR. CLARK:  THANK YOU, JUDGE.

17

18                    MICHAEL STEVEN GALLEGOS,

19   CALLED AS A WITNESS HEREIN, HAVING BEEN FIRST DULY SWORN,

20   WAS EXAMINED AND TESTIFIED AS FOLLOWS:

21

22                    DIRECT EXAMINATION

23   BY MR. CLARK:

24        Q.   WOULD YOU STATE YOUR NAME FOR THE RECORD, PLEASE.

25        A.   MICHAEL STEVEN GALLEGOS.

91

1       Q.   MIKE, HOW OLD ARE YOU?

2       A.   18 YEARS OLD.

3       Q.   WHERE HAVE YOU LIVED PRIOR TO MARCH 16TH OF 1990?

4       A.   FLAGSTAFF, ARIZONA.

5       Q.   OKAY.  HAVE YOU LIVED THERE MOST OF YOUR LIFE?

6       A.   YES, I LIVED THERE ALL MY LIFE.

7       Q.   AND I TAKE IT YOU WENT TO GRADE SCHOOL THERE; IS

8  THAT TRUE?

9       A.   YES, SIR.

10      Q.   AND YOU ARE PRESENTLY A HIGH SCHOOL STUDENT; IS

11 THAT CORRECT?

12      A.   YES, SIR.

13      Q.   WHEN YOU LIVED IN FLAGSTAFF, ARIZONA, WHO DID YOU

14 RESIDE WITH?

15      A.   MY PARENTS, MR. AND MRS. GALLEGOS.

16      Q.   ALL RIGHT.  HAVE YOU EVER RESIDED WITH ANYBODY

17 ELSE?

18      A.   NO, SIR.

19      THE COURT:  SIR, COULD YOU TURN YOUR MICROPHONE ON.

20 I'M HAVING DIFFICULTY HEARING.

21      MR. CLARK:  I DON'T KNOW IF HE CAN REACH IT, JUDGE.

22      THE COURT:  OKAY.  THANK YOU.

23 BY MR. CLARK:

24      Q.   MIKE, HOW DO YOU DO IN SCHOOL, HOW WELL DO YOU

25 DO?

92

1        A.    I DO PRETTY MUCH DECENT GRADES.  NOT VERY GOOD.

2    NOT TOO GOOD.  JUST ENOUGH TO GET BY.

3        Q.    YOU HEARD THESE OFFICERS TESTIFY THAT YOU'RE IN

4    SPECIAL EDUCATION CLASSES.  IS THAT TRUE?

5        A.    YES, SIR.

6        Q.    AND WHY IS THE REASON -- WHY ARE YOU IN SPECIAL

7    ED CLASSES?

8        A.    BECAUSE I'M A SLOW LEARNER AND EVERYTHING.  IT

9    TAKES -- WHAT THEY PRESENT TO ME TO LEARN, IT TAKES TIME

10   FOR ME TO LEARN AND TO UNDERSTAND.

11       Q.    OKAY.  HAVE YOU EVER HAD ANY PRIOR INVOLVEMENT

12   WITH THE POLICE AUTHORITIES EITHER IN PHOENIX OR IN

13   FLAGSTAFF?

14       A.    YES, IN FLAGSTAFF I HAVE.

15       Q.    WHAT TYPE OF INVOLVEMENT WAS THAT?

16       A.    MINOR DRUG OFFENSES.

17       Q.    OKAY.  AND I TAKE IT THESE WERE HANDLED IN A

18   JUVENILE SETTING; IS THAT TRUE?

19       A.    YES, SIR.

20       Q.    OKAY.  HOW WERE THOSE RESOLVED?  I MEAN, WERE YOU

21   ARRESTED OR WHAT HAPPENED?

22       A.    I WAS TAKEN TO JUVENILE -- FOUND AT SCHOOL WITH

23   DRUGS AND TAKEN TO -- TAKEN TO JUVENILE.  GOT A PROBATION

24   OFFICER.  SPENT A NIGHT IN JUVENILE AND GOT LIKE SIX MONTHS

25   TO A YEAR ON PROBATION.

Case 2:15-cv-00462-ROS Document 669-11 Filed 09/18/20 Page 45 of 50
Case 2:01-cv-01909-NVW Document 135-1 Filed 12/22/16 Page 113 of 174

93

1      Q.   AND WERE YOUR PARENTS INVOLVED?

2      A.   YES.

3      Q.   HOW WERE THEY INVOLVED?

4      A.   THEY HAD TO BE THERE FOR ME TO BE RELEASED AND

5   THEIR DISCRETION HAD TO BE -- EVERY TIME -- LIKE IF THE

6   PROBATION OFFICER -- HOW WOULD I PUT IT?  WOULD LIKE TO DO

7   SOMETHING WITH PROBATION, IF HE WOULD THINK IT WOULD HELP

8   ME, HE WOULD TALK TO THEM FIRST.

9      Q.   WHEN YOU WERE INITIALLY ARRESTED OR DETAINED,

10  WERE YOUR PARENTS CALLED INITIALLY AT THAT POINT?  OR HOW

11  DID THAT PROCESS COME ABOUT?

12     A.   THEY WERE CALLED AFTER I WAS AT JUVENILE.

13     Q.   SO YOU HAD BEEN ARRESTED AND THEN TRANSPORTED TO

14  THE JUVENILE FACILITY AND THEN YOUR PARENTS WERE CALLED?

15     A.   YES.

16     Q.   OKAY.  HOW MANY OCCASIONS DID THAT HAPPEN?

17     A.   I'D SAY TWO TO THREE TIMES.

18     Q.   OKAY.  AND IN EACH INSTANCE WERE YOU IN HIGH

19  SCHOOL AT THE TIME OR LOCATED AT THE SCHOOL WHEN YOU WERE

20  TAKEN?

21     A.   YES, SIR.

22     Q.   OKAY.  SO YOU WERE SIMPLY TAKEN FROM SCHOOL DOWN

23  TO THE JUVENILE FACILITY, YOUR PARENTS WERE CALLED, AND

24  THINGS WENT FROM THERE; IS THAT CORRECT?

25     A.   YES, SIR.

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 46 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 114 of 174

94

1        Q.   OKAY.

2        Q.   ON MARCH 16TH OF THIS PAST YEAR, YOU WERE TAKEN

3   DOWN TO 620 WEST WASHINGTON, WHICH IS A POLICE STATION IN

4   PHOENIX.   DO YOU REMEMBER THAT?

5        A.   YES, SIR.

6        Q.   OKAY.   TELL THE COURT HOW THAT HAPPENED.

7        A.   WHEN WE WERE FIRST PROPOSITIONED BY THE OFFICER

8   TO GO DOWN TO THE STATION, IT WAS EITHER YOU VOLUNTARILY GO

9   OR YOU BE ARRESTED AND BE TAKEN TO THE STATION.

10        Q.   NOW, WHO TOLD YOU THAT?

11        A.   OFFICER CHAMBERS.

12        Q.   AND THAT'S THIS GENTLEMAN SITTING RIGHT HERE?

13        A.   YES, SIR.

14        Q.   WHERE WERE YOU WHEN HE TOLD YOU THAT?

15        A.   I WAS SITTING UNDER THE TREE IN THE NEXT DOOR

16   NEIGHBOR'S YARD.

17        Q.   WAS A UNIFORMED POLICE OFFICER WITH YOU?

18        A.   YES, SIR.

19        Q.   OKAY.   DO YOU REMEMBER WHAT -- DID HE SAY

20   ANYTHING ABOUT IT?

21        A.   NO.

22        Q.   OKAY.   IT WAS YOUR UNDERSTANDING THAT YOU HAD NO

23   CHOICE BUT TO GO TO THE POLICE STATION; IS THAT A FAIR

24   STATEMENT?

25        A.   TO MY UNDERSTANDING THAT'S WHAT I FELT, I HAD NO

GALL 146                    SUPERIOR COURT                MILKE_NSB029861
                           Phoenix, Arizona
                            EXHIBIT 11

Case 2:15-cv-00462-ROS  Document 669-11  Filed 09/18/20  Page 47 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 115 of 174

95

1    CHOICE WHETHER TO GO OR NOT.

2        Q.   IN FACT, THEY TOLD YOU IF YOU DIDN'T GO

3    VOLUNTARILY, THEY WOULD TAKE YOU ANYWAY; RIGHT?

4        A.   YES, SIR.

5        Q.   NOW, ONCE YOU GET TO THE POLICE STATION, WHAT

6    HAPPENS?

7        A.   WHEN WE GET TO THE POLICE STATION, ME AND MR.

8    SMALLWOOD ARE PLACED INTO SEPARATE HOLDING ROOMS.

9        Q.   NOW, ARE YOU MOVED AROUND A NUMBER OF TIMES OR

10   ARE YOU JUST SIMPLY PLACED IN A ROOM AND LEFT THERE?

11       A.   PLACED IN A ROOM WITH THE DOOR CLOSED.

12       Q.   OKAY.  HOW LONG WERE YOU IN THERE?

13       A.   I WOULD SAY 15 MINUTES TO A HALF AN HOUR.

14       Q.   WHO'S THE FIRST PERSON YOU SEE?

15       A.   OFFICER SALDATE.

16       Q.   AND WHAT DOES SALDATE DO WHEN HE FIRST SEES YOU?

17       A.   THE FIRST THING HE SHOWS, IS HE SHOWS ME HIS

18   BADGE AND TELLS ME WHO HE IS AND I REMEMBER HIM FROM THE

19   CRIME SCENE.

20       Q.   YOU HAD SEEN HIM AT THE SCENE THEN?

21       A.   YES, SIR.

22       Q.   OKAY.

23       A.   AND I HAD TALKED TO HIM AT THE SCENE, TOO.

24       Q.   OKAY.  HE SHOWS YOU HIS BADGE AND WHAT'S HE DO

25   AFTER THAT?

EXHIBIT 1

MILKE_NSB029862

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 48 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 116 of 174

96

1        A.   HE SITS DOWN AND HE BEGINS THE CONVERSATION WITH,
2    HE SAYS, "I THINK YOU DID IT."
3        Q.   OKAY.  WHAT'S YOUR RESPONSE TO THAT?
4        A.   I DENY IT.
5        Q.   OKAY.  NOW, PRIOR TO HIM SITTING DOWN AND
6    BEGINNING THIS CONVERSATION, YOU'VE HEARD HIM TESTIFY THAT
7    HE WENT THROUGH THIS EXPLANATION OF MIRANDA RIGHTS BY
8    HAVING YOU PHYSICALLY READ THE CARD.
9             NOW, DID THAT HAPPEN AS DETECTIVE SALDATE HAS
10   TOLD THE COURT?
11       A.   NO, SIR.
12       Q.   HOW DID IT HAPPEN?
13       A.   IT HAPPENED AFTER I HAD GIVEN THE CONFESSION.
14       Q.   OKAY.
15       A.   HE HAD READ ME MY RIGHTS.
16       Q.   OKAY.  DID HE EVER GIVE YOU THE CARD TO READ?
17       A.   YEAH, I READ THE CARD.
18       Q.   AND WHEN DID THAT HAPPEN?
19       A.   AFTER THE CONFESSION WAS GIVEN.
20       Q.   OKAY.  AND IS THAT BEFORE YOU ARE -- YOU CONFRONT
21   MR. SMALLWOOD?
22       A.   YEAH.
23       Q.   OKAY.  NOW, THE ONLY PERSON IN THAT ROOM AT THAT
24   POINT IN TIME IS YOU AND DETECTIVE SALDATE; CORRECT?
25       A.   YES, SIR.



Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 49 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 117 of 174

97

```
1       Q.   THERE'S NO TAPE RECORDER; IS THAT RIGHT?
2       A.   NO TAPE RECORDER.
3       Q.   WE'VE HEARD DETECTIVE CHAMBERS SAY HE TOOK SLIGHT
4   NOTES.  IS THAT A FAIR ASSESSMENT?  WAS HE TAKING LOTS OF
5   NOTES, WAS HE TAKING A FEW NOTES --
6       A.   FAIR.
7       Q.   OKAY.
8       Q.   AT ANY POINT IN TIME DID YOU EVER ASK FOR A
9   LAWYER?
10      A.   YES, I DID.
11      Q.   WHEN?
12      A.   I ASKED FOR IT AFTER I -- BEFORE I HAD GIVEN THE
13  CONFESSION, REPEATED TIMES DURING THE CONFESSION AND AFTER,
14  AND HE WOULD JUST IGNORE MY REQUESTS FOR COUNSEL.
15      Q.   WHAT WOULD YOU SAY TO HIM?
16      A.   I WISH TO BE REPRESENTED BY COUNSEL.
17      Q.   OKAY.  DID YOU -- IS THAT EXACTLY HOW YOU SAID IT
18  OR DID YOU SAY I WANT A LAWYER OR WHAT?
19      A.   YEAH, I SAID I WANT A LAWYER AND I SAID NUMEROUS
20  TIMES I WANT COUNSEL.
21      Q.   OKAY.  WHAT WAS DETECTIVE SALDATE'S REACTION TO
22  THAT?
23      A.   HE WOULD JUST LOOK AT ME AND JUST KEEP WRITING.
24      Q.   HE BASICALLY IGNORED YOU WHEN YOU SAID THAT?
25      A.   LIKE IT WENT IN ONE EAR AND OUT THE OTHER.
```

**GALL 149**     SUPERIOR COURT
Phoenix, Arizona
EXHIBIT 1j             **MILKE_NSB029864**

Case 2:15-cv-00462-ROS   Document 669-11   Filed 09/18/20   Page 50 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 118 of 174

98

1      Q.   DID HE KEEP SPEAKING WHEN YOU WOULD SAY THIS OR

2   WOULD HE STOP AND LISTEN AND KEEP ON, OR HOW WOULD THAT

3   HAPPEN?

4      A.   IT WAS JUST LIKE I DIDN'T SAY ANYTHING.

5      Q.   OKAY.  YOU'VE HEARD DETECTIVE SALDATE TELL THE

6   COURT THAT HE TOLD YOU THAT HE BELIEVED YOU WERE INVOLVED.

7      A.   YES.

8      Q.   DID HE SAY THAT TO YOU?

9      A.   YES.

10     Q.   WHEN DID HE SAY THAT TO YOU?

11     A.   HE SAID THAT AT THE BEGINNING OF THE

12   INTERROGATION.

13     Q.   OKAY.  AND YOU'VE ALSO HEARD HIM TESTIFY THAT

14   YOUR RESPONSE WAS BASICALLY A DENIAL.  IS THAT FAIR OR

15   WHAT?

16     A.   YEAH.

17     Q.   WHAT DID YOU RESPOND?

18     A.   HOW DID I RESPOND?

19     Q.   YES.

20     A.   I DENIED IT.

21     Q.   WHAT WAS HIS RESPONSE TO THAT?

22     A.   HE GOES, "NO."  HE GOES, "DON'T LIE TO ME.  WE

23   GOT ALL NIGHT."

24     Q.   DID HE SAY ANYTHING ELSE?

25     A.   HE SAID, "DON'T LIE AND TELL THE TRUTH."