99

1    Q.   OKAY.   DID YOU EVER ASK HIM IF YOU WERE A SUSPECT
2    IN THE CASE?

3        A.   YES, I DID.

4        Q.   WHEN DID YOU ASK HIM THAT?

5        A.   I ASKED HIM THAT AFTER HE HAD SAID I HAD DONE IT
6    -- HE HAD SAID I HAD DONE IT.   I ASKED HIM, "AM I A SUSPECT
7    IN IT?"   HE SAID, "YEAH, YOU ARE."

8        Q.   AND THIS IS CLOSE IN TIME WHEN HE COMES IN THE
9    ROOM AND SHOWS YOU HIS BADGE; CORRECT?

10       A.   YES, SIR.

11       Q.   WHAT WOULD OFFICER SALDATE DO WHEN YOU DENIED ANY
12   INVOLVEMENT?

13       A.   HE WOULD GET AGGRAVATED.

14       Q.   HOW DO YOU KNOW HE GOT AGGRAVATED?

15       A.   HIS FACE WOULD BE REAL FLUSHED.   HE JUST LIKE --
16   LIKE HE WAS HOLDING HIMSELF BACK, LIKE FROM SAYING
17   SOMETHING -- OR I DON'T KNOW.   I FELT INTIMIDATED BY HIM
18   BECAUSE I WAS SCARED.   I DIDN'T KNOW WHAT TO EXPECT.

19       Q.   OKAY.   DID YOU EVER MAKE A REQUEST TO CALL
20   ANYBODY, TO CALL YOUR FOLKS OR TO CALL JERRY, TO CALL
21   ANYONE?

22       MR. STALZER:   OBJECTION; LEADING, YOUR HONOR.

23       THE COURT:   SUSTAINED.

24       THE WITNESS:   I DID NOT --

25   BY MR. CLARK:

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 2 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 120 of 174

100

1      Q.   DID YOU EVER MAKE ANY REQUESTS OF OFFICER SALDATE

2   AT ALL?

3      A.   NO, I DID NOT.

4      Q.   OKAY.  WHY DIDN'T YOU MAKE ANY TYPE OF REQUEST?

5      A.   BECAUSE I DIDN'T KNOW THAT OPTION WAS OPEN TO ME.

6      Q.   WHEN YOU ARE SPEAKING TO OFFICER SALDATE, WHEN HE

7   FIRST COMES IN AND SHOWS YOU HIS BADGE, WHAT WAS YOUR

8   UNDERSTANDING OF WHY YOU WERE THERE?

9      A.   I WAS A SUSPECT IN THE DEATH OF KENDALL.

10     Q.   DID YOU BELIEVE THAT YOU HAD ANY CHOICE IN THE

11   MATTER OF WHETHER OR NOT YOU WERE GOING TO BE THERE OR NOT?

12     A.   NO, I DID NOT.

13     Q.   DO YOU BELIEVE THAT YOU HAD ANY CHOICE IN THE

14   MATTER ABOUT WHETHER OR NOT YOU SPOKE TO OFFICER SALDATE?

15     A.   NO.

16     Q.   WHY?

17     A.   COULD YOU ASK THE QUESTION AGAIN.

18     Q.   WHY DON'T YOU BELIEVE YOU HAD ANY CHOICE?

19     A.   BECAUSE I FELT THAT I WAS A SUSPECT AND EITHER

20   WAY THEY WERE GOING TO WAIT UNTIL THEY GET AN ARREST

21   WARRANT TO TAKE ME OR NOT.  I FELT I HAD NO CHOICE BUT TO

22   GO.

23     Q.   OKAY.  PRIOR TO YOUR CONVERSATION WITH SALDATE

24   DID HE EVER TELL YOU AT ANY POINT IN TIME THAT YOU DIDN'T

25   HAVE TO BE THERE AND ANSWER HIS QUESTIONS?

101

1          A.   NO, HE DID NOT.

2          Q.   DID SALDATE EVER ASK YOU TO SIGN ANY TYPE OF

3     DOCUMENTS RELATIVE TO YOUR STATEMENT THAT DAY?

4          A.   LIKE WHAT DO YOU MEAN?

5          Q.   DID HE ASK YOU TO SIGN A WRITTEN STATEMENT,

6     DETAILED WHAT YOU HAD SAID?

7          MR. STALZER:  OBJECTION; LEADING.

8          THE COURT:  SUSTAINED, ALTHOUGH I DON'T KNOW HOW

9     BETTER YOU CAN ASK --

10         MR. STALZER:  I'LL WITHDRAW THAT, YOUR HONOR.

11         THE COURT:  ALL RIGHT.

12         MR. STALZER:  I'LL WITHDRAW THE OBJECTION.

13         THE DEFENDANT:  I DON'T REALLY UNDERSTAND.  LIKE --

14    BY MR. CLARK:

15         Q.   DID HE EVER ASK YOU TO SIGN A STATEMENT THAT

16    DETAILED YOUR INVOLVEMENT IN THE MATTER?

17         A.   YES, HE DID.

18         Q.   OKAY.  HOW DID THAT COME ABOUT?

19         A.   AFTER THE CONFESSION WAS GIVEN, HE ASKED ME TO

20    SIGN AND I REFUSED TO DO SO.

21         Q.   WHAT WERE YOU GOING TO SIGN?  DID HE HAVE PAPERS

22    THERE OR --

23         A.   HE HAD THOSE YELLOW -- HE HAD A LEGAL PAD WHICH

24    HE WAS TAKING NOTES OFF OF.

25         Q.   HE ASKED YOU TO SIGN THAT LEGAL PAD?

**MILKE_NSB029868**

Case 2:15-cv-00462-ROS  Document 669-12  Filed 09/18/20  Page 4 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 122 of 174

102

1          A.   YES.

2          Q.   OKAY.  YOU'VE HEARD SOME TESTIMONY THAT HE WANTED

3     TO TAPE-RECORD YOU.  IS THAT TRUE?

4          A.   YES, SIR.

5          Q.   OKAY.  TELL THE COURT HOW THAT CAME ABOUT.

6          A.   HE ASKED ME, "WOULD YOU FEEL COMFORTABLE SAYING

7     IT ON TAPE?"  I SAID, "NO, I WOULD NOT."

8          Q.   OKAY.  NOW, WE KNOW, BECAUSE OFFICER SALDATE AND

9     OFFICER CHAMBERS HAVE TOLD US, THAT TOWARDS THE END OF YOUR

10    INTERVIEW YOU CONFRONTED GEORGE SMALLWOOD.  IS THAT TRUE?

11         A.   YES, SIR.

12         Q.   OKAY.  WAS THAT YOUR IDEA?

13         A.   NO, IT WAS NOT.

14         Q.   HOW DID THAT COME ABOUT?

15         A.   OFFICER CHAMBERS CAME AND TOLD SALDATE TO COME

16    OUT OF THE ROOM AND THEY WERE CONVERSING OVER WHAT HAD

17    HAPPENED AND MY CONFESSION GIVEN AND SMALLWOOD WAS STILL

18    DENYING.

19         Q.   WHERE WERE THEY WHEN THIS CONVERSATION OCCURRED?

20         A.   THEY WERE RIGHT OUTSIDE THE DOOR OF THE HOLDING

21    TANK THAT I WAS IN, THE ROOM.

22         Q.   OKAY.  WELL, WAS THE DOOR OPEN?

23         A.   IT WAS CRACKED.

24         Q.   OKAY.  BUT NONETHELESS YOU OVERHEARD THIS

25    CONVERSATION?

SUPERIOR COURT
                    Phoenix, Arizona
EXHIBIT 1          **MILKE_NSB029869**

1    A.   YES, SIR.

2         MR. CLARK:  DO YOU WANT ME TO GET THAT, JUDGE?

3         THE COURT:  YES, MR. CLARK, WOULD YOU ADJUST THAT SO

4    HE DOESN'T HAVE TO LEAN OVER WHEN HE TALKS.

5              THANK YOU.

6    BY MR. CLARK:

7         Q.   WHAT DID YOU OVERHEAR, MICHAEL?

8         A.   I OVERHEARD THAT SMALLWOOD WAS STILL DENYING AND

9    IT WOULD BE A GOOD IDEA FOR ME TO CONFRONT GEORGE SO HE

10   WOULD BELIEVE THAT I HAD TOLD HIM ABOUT THE CONFESSION.

11        Q.   OKAY.  THEY'RE STILL OUTSIDE THE DOOR WHEN YOU

12   OVERHEAR THIS CONVERSATION?

13        A.   YES, SIR.

14        Q.   OKAY.  THEN WHAT HAPPENS?

15        A.   THEY COME IN AND ASK ME TO CONFRONT SMALLWOOD.

16        Q.   OKAY.  WHAT DID YOU SAY?

17        A.   I DIDN'T WANT TO CONFRONT SMALLWOOD.

18        Q.   WHAT DID THEY SAY?

19        A.   I DON'T RECALL.

20        Q.   OKAY.  DID YOU BELIEVE THAT YOU HAD ANY CHOICE IN

21   THE MATTER?

22        A.   NO, SIR.

23        Q.   WHY?

24        A.   BECAUSE THE OFFICERS AT THAT POINT -- I FELT

25   INTIMIDATED BY THE OFFICERS.  JUST THE WAY THEY CARRIED

·104

1    THEMSELVES AND THE WAY THEY WERE WALKING ABOUT.

2         Q.   OKAY.  I TAKE IT, THEN, THAT IT WAS NOT YOUR IDEA

3    TO GO AND CONFRONT MR. SMALLWOOD?

4         A.   NO, SIR.

5         MR. CLARK:   JUDGE, I HAVE NOTHING ADDITIONAL AT THIS

6    POINT.  THANK YOU.

7         THE COURT:   THANK YOU.

8              MR. STALZER?

9

10                      CROSS-EXAMINATION

11   BY MR. STALZER:

12        Q.   AT THE TIME THIS YOUNG GIRL WAS KILLED YOU WERE

13   18 YEARS, FOUR MONTHS, AND ABOUT FOUR DAYS OF AGE; IS THAT

14   CORRECT?

15        A.   YES, SIR.

16        Q.   YOU WERE AN ADULT, WERE YOU NOT?

17        A.   YES, SIR.

18        Q.   YOU'RE NO JUVENILE, ARE YOU?

19        A.   NOT LEGALLY.

20        Q.   DO YOU HAVE A DRIVER'S LICENSE?

21        A.   YES, SIR.

22        Q.   DO YOU KNOW HOW TO WORK ON CARS?

23        A.   YES, SIR.

24        Q.   DO YOU EVER DRINK BEER?

25        A.   YES, SIR.

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 7 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 125 of 174

105

1        Q.   HOW DID YOU GET DOWN FROM FLAGSTAFF TO PHOENIX

2   THE WEEK BEFORE THIS OCCURRED?

3        A.   MY DAD PULLED MY CAR DOWN TO PHOENIX.

4        Q.   WERE YOU EVER WORKING ON THAT CAR?

5        A.   YES, SIR.

6        Q.   YOU KNOW HOW TO WORK ON CARS, DON'T YOU?

7        A.   YES, I DO.

8        Q.   YOU'RE NOT A DUMB PERSON, ARE YOU?

9        A.   NO.

10       Q.   IN FACT, YOU'RE FAIRLY INTELLIGENT?

11       A.   TO MY KNOWLEDGE.

12       Q.   IN FACT, WOULD IT BE A FAIR STATEMENT TO SAY

13   YOU'RE STREETWISE?

14       A.   IT'S A FAIR STATEMENT.

15       Q.   I'M NOT TALKING ABOUT ACADEMICS BECAUSE, YOU

16   KNOW, YOU GET, WHAT, B'S AND C'S AND SOME D'S IN YOUR

17   CLASSES?

18       A.   MOSTLY C'S AND D'S.

19       Q.   AND THAT'S PASSING GRADE?

20       A.   YES, SIR.

21       Q.   MR. CLARK TOUCHED ON THE FACT THAT YOU MAY HAVE

22   BEEN REFERRED TO JUVENILE COURT AND IS IT CORRECT YOU WERE

23   REFERRED SOMETIME BACK IN 1984, REGARDING A BB GUN

24   INCIDENT?

25       A.   YES, SIR.

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 8 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 126 of 174

106

1          Q.   AND THAT WAS -- I THINK THEY CALL IT ADJUSTED?

2     WOULD THAT BE CORRECT?

3          A.   YES.

4          Q.   AND THEN IN 1985, THERE WAS A POSSESSION OF

5     MARIJUANA CHARGE?

6          A.   YES, SIR.

7          Q.   AND WERE YOU PLACED ON PROBATION WITH THE

8     JUVENILE COURT FOR THAT OFFENSE?

9          A.   YES, I WAS.

10         Q.   HOW MANY YEARS PROBATION DID YOU HAVE?

11         A.   SIX MONTHS PROBATION.

12         Q.   NOW, YOU WERE ARRESTED ONCE AGAIN AS A JUVENILE

13    THROUGH THE JUVENILE COURT SYSTEM IN 1988, WERE YOU NOT?

14         A.   YES, I WAS.

15         Q.   AND WAS THAT FOR A THEFT?

16         A.   YES, IT WAS.

17         Q.   WAS THAT THE INCIDENT ABOUT A SCALE FROM ONE OF

18    YOUR SCIENCE CLASSES BEING STOLEN?

19         A.   YES, IT WAS.

20         Q.   AND WERE YOU PLACED ON FORMAL PROBATION AGAIN?

21         A.   YES, I WAS.

22         Q.   WAS THAT FOR ABOUT A YEAR?

23         A.   YES, SIR.

24         Q.   THEN THERE WAS SOME OTHER INCIDENT.   I THINK THEY

25    CLAIM YOU STOLE MAYBE SOME TIRES?

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 9 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 127 of 174

107



```
 1        A.   YES, SIR.

 2        Q.   THAT WAS DISMISSED; RIGHT?

 3        A.   YES.

 4        Q.   NOW, WERE YOU EVER IN COURT FOR A VIOLATION OF

 5   PROBATION AT ANY TIME?

 6        A.   YES, I WAS.

 7        Q.   WOULD THAT HAVE BEEN IN 1989, SAY AROUND JANUARY?

 8        A.   ABOUT THAT TIME.

 9        Q.   DO YOU RECALL WHAT THE REASON WAS FOR THE

10   VIOLATION?

11        A.   FAILING TO GIVE A URINALYSIS.

12        Q.   WAS IT FAILURE OR THAT YOU HAD A DIRTY URINE?

13        A.   FAILURE TO GIVE URINALYSIS.

14        Q.   IT WASN'T FOR METHAMPHETAMINE IN YOUR URINE

15   SAMPLE?

16        A.   YES, IT WAS.

17        Q.   IT WAS FOR THAT, THEN?

18        A.   YES, SIR.

19        Q.   SO IT WASN'T THE FACT THAT YOU DIDN'T GIVE A

20   URINE SAMPLE?

21        A.   NO.  I SAID I FAILED MY U.S.

22        Q.   I'M SORRY.

23             NOW, WASN'T THERE ANOTHER PETITION THAT INDICATED

24   ANOTHER DIRTY URINE SAMPLE FOR MARIJUANA USE?

25        A.   YES.
```



Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 10 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 128 of 174

108

1      Q.   AND THAT WAS ALSO IN SOMETIME AROUND JANUARY OF

2      '89?

3      A.   YES.

4      Q.   HOW WERE YOU SUPPOSED TO GET BACK FROM PHOENIX TO

5      FLAGSTAFF ONCE YOUR SPRING BREAK ENDED THAT FOLLOWING

6      MONDAY?

7      A.   I WAS SUPPOSED TO DRIVE MY CAR BACK.

8      Q.   WAS YOUR DAD GOING TO DRIVE THE CAR BACK?

9      A.   NO, I WAS.

10     Q.   YOU WERE?  HAVE YOU EVER WORKED ANYWHERE IN THE

11     PAST FOUR, FIVE YEARS?

12     A.   YES.

13     Q.   WHERE DID YOU WORK?

14     A.   I WORKED CONSTRUCTION.

15     Q.   WHAT COMPANY?

16     A.   S & M CONSTRUCTION, SHEET ROCK.

17     Q.   HOW DID YOU GET THAT JOB?

18     A.   THROUGH MY DAD.

19     Q.   HE WORKED THERE?

20     A.   HE WAS WORKING FOR TRANSPORT S & M CONSTRUCTION.

21     Q.   WHERE ELSE DID YOU WORK?

22     A.   I WORKED AT THE VILLAGE INN.  THE VILLAGE INN

23     RESTAURANT.  I WAS A COOK.

24     Q.   AND DID YOU HAVE ANY OTHER JOBS OTHER THAN THOSE

25     TWO?  FOR EXAMPLE, MAYBE THE CROWN MOTEL?



```
 1        A.   YEAH, I WORKED AT THE CROWN MOTEL TOO.

 2        Q.   WHAT DID YOU DO AT THE CROWN MOTEL?

 3        A.   I WAS MAKING BEDS.

 4        Q.   HOW LONG DID YOU WORK THERE?

 5        A.   THREE MONTHS.

 6        Q.   ANY OTHER JOBS?

 7        A.   I HAD QUIT THE CROWN AND THEN I GOT THE JOB BACK.

 8        Q.   WHAT'S THE COCONINO MECHANICAL SERVICES?

 9        A.   THAT'S WORKING ON POLICE VEHICLES AND STATE

10   VEHICLES, LIKE TRANSPORT BUSES.

11        Q.   WAS THAT A JOB YOU HAD?

12        A.   YES, SIR.

13        Q.   WOULD YOU SAY THAT'S KIND OF A LIFE EXPERIENCE?

14        A.   I WOULDN'T.   NOT REALLY.   I WOULDN'T THINK SO,

15   BECAUSE I'VE WORKED ON CARS BEFORE.   IT WAS NOTHING NEW TO

16   ME.

17        Q.   WAS THE CROWN MOTEL SOMETHING YOU WOULD CONSIDER

18   A LIFE EXPERIENCE?

19        A.   NO, SIR.

20        Q.   DID YOU KIND OF GET THE IMPRESSION THAT SOME OF

21   THESE JOBS HELP YOU TO DEVELOP A LITTLE BIT OF INTELLIGENCE

22   YOU CAN'T GAIN FROM A TEXTBOOK?

23        A.   I DON'T UNDERSTAND THE QUESTION.

24        Q.   DO YOU THINK WHEN A PERSON GROWS UP, SAY, LIKE

25   YOU, UP TO THE AGE BEYOND 18 YEARS, THE ONLY WAY YOU CAN
```

**GALL 161**



SUPERIOR COURT
Phoenix, Arizona

**MILKE_NSB029876**

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 12 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 130 of 174

110

1   GAIN INTELLIGENCE IS FROM SCHOOL ALONE?

2       A.   NO.

3       Q.   YOU'VE HAD PRIOR EXPERIENCE WITH THE POLICE, HAVE

4   YOU NOT?

5       A.   YES.

6       Q.   YOU'RE FULLY AWARE BEFORE YOU EVEN SAW THIS MAN

7   TO MY RIGHT, DETECTIVE CHAMBERS, OR THAT OTHER MAN,

8   DETECTIVE SALDATE, YOU KNEW WHAT MIRANDA RIGHTS WERE;

9   CORRECT?

10      A.   YES.

11      Q.   I MEAN, YOU'VE SEEN IT ON TV; RIGHT?

12      A.   YES, SIR.

13      Q.   AND WOULD IT BE FAIR TO SAY YOU'VE BEEN READ

14  THOSE SAME RIGHTS BY SOME POLICE OFFICER REGARDING JUVENILE

15  MATTERS?

16      A.   NO.  NOT AS A JUVENILE.  I WAS NEVER --

17      Q.   YOU'VE HEARD ABOUT THEM IN SCHOOL?

18      A.   YES, SIR.

19      Q.   WHEN YOU WERE OUT ON THE CURB AT 71ST AVENUE AND

20  KENDALL, YOU KNOW, DEAD UNDER THAT TREE, YOU DIDN'T TELL

21  THIS MAN, DETECTIVE CHAMBERS, YOU DIDN'T WANT TO GO

22  DOWNTOWN, DID YOU?

23      A.   YES, I DID.

24      Q.   YOU TOLD HIM YOU DID NOT WANT TO GO TO 620 WEST

25  WASHINGTON STREET FOR AN INTERVIEW?

111

1          A.    I DIDN'T KNOW I HAD A CHOICE IN THE MATTER.

2          Q.    MY QUESTION.  DID YOU TELL HIM SO HE COULD HEAR

3    WITH EITHER HIS LEFT OR RIGHT EAR YOU DID NOT WANT TO GO

4    DOWNTOWN TO THE POLICE DEPARTMENT?

5          A.    NO.

6          Q.    DID YOU TELL HIM THAT?  NO?

7          A.    NO.

8          Q.    YOU SEE THIS LADY TO MY REAR?

9          A.    YES, I DO.

10         Q.    THIS IS -- WHO IS THIS LADY?

11         A.    CYNTHIA WISHON.

12         Q.    DID YOU EVER TELL HER THAT YOU DID NOT WANT TO GO

13    DOWNTOWN TO TALK --

14         A.    NO, I DID NOT.

15         Q.    DID YOU EVER TELL YOUR BROTHER JERRY?

16         A.    NO, I DID NOT.

17         Q.    DETECTIVE SALDATE, HE DIDN'T BEAT YOU, DID HE?

18         A.    NO.

19         Q.    HE DIDN'T TWIST YOUR ARM WHEN HE INTERVIEWED YOU?

20         A.    NO.

21         Q.    HE NEVER THREATENED YOU, DID HE?

22         A.    NOT BY PHYSICAL MEANS.

23         Q.    WHY DON'T YOU TELL JUDGE HOTHAM HOW HE THREATENED

24    YOU BY NONPHYSICAL MEANS.  I THINK WE'D LIKE TO HEAR THAT.

25         A.    IT'S NOT BY PHYSICAL MEANS.  IT'S BY MENTAL

112

```
1    MEANS.

2         Q.   BY MENTAL MEANS?

3         A.   YES, I FELT INTIMIDATED BY HIM.

4         Q.   DID HE SAY HE WOULD SIT ON YOU?

5         A.   NO.

6         Q.   HOW WERE YOU INTIMIDATED BY HIM?

7         A.   I WAS JUST SCARED OF HIM.

8         Q.   HOW DID HE SCARE YOU?

9         A.   JUST BECAUSE OF THE SIZE OF HIM AND THE POSITION

10   I WAS IN.

11        Q.   YOU KILLED KENDALL; RIGHT?

12        A.   YES.

13        Q.   THAT WOULD SCARE ANYONE, WOULDN'T IT, MICHAEL?

14        A.   YES, SIR.

15        Q.   AND IT SCARED YOU; RIGHT?

16        A.   YES.

17        Q.   AND IT PROBABLY WOULD SCARE EVERYONE IN THIS

18   COURTROOM TODAY, WOULDN'T IT?

19        A.   YES, SIR.

20        MR. STALZER:  I HAVE NOTHING FURTHER, YOUR HONOR.

21        THE COURT:  MR. CLARK, REDIRECT?

22        MR. CLARK:  THANK YOU, JUDGE.

23

24                    REDIRECT EXAMINATION

25   BY MR. CLARK:
```

113

1          Q.   MICHAEL, WHY DIDN'T YOU ASK TO SPEAK TO ANYONE
2    REGARDING YOUR BEING TRANSPORTED TO 620 WEST WASHINGTON?
3          A.   BECAUSE I DID NOT KNOW THE OPTION WAS OPEN TO ME.
4          Q.   OKAY.  IS IT BECAUSE YOU WERE TOLD YOU DIDN'T
5    HAVE AN OPTION?
6          A.   NO, I DID NOT KNOW.  THEY DID NOT SAY, NO, I
7    DIDN'T HAVE AN OPTION.  I DID NOT KNOW I HAD AN OPTION.
8    THEY DID NOT SAY THAT, THOUGH.
9          Q.   OKAY.  YOU INDICATED TO MR. STALZER THAT YOU HAD
10   NOT HAD ANY EXPERIENCE WITH THE JUVENILE COURT SYSTEM
11   RELATIVE TO SOMEBODY READING YOU YOUR RIGHTS.  IS THAT
12   TRUE?
13         A.   TRUE.
14         Q.   OKAY.  HOW WOULD THAT COME ABOUT?
15         A.   USUALLY WHEN YOU'RE IN JUVENILE OR WHEN YOU'RE AS
16   A JUVENILE THE POLICE REALLY DON'T HAVE MUCH.  THEY JUST
17   TRANSPORT YOU AND LET THE PROBATION OFFICER TAKE OVER FROM
18   THERE.
19         Q.   OKAY.  SO I TAKE IT THE PROBATION OFFICER NEVER
20   READ YOU YOUR RIGHTS?
21         A.   NO.
22         Q.   OKAY.
23         MR. CLARK:   I HAVE NOTHING ADDITIONAL, JUDGE.  THANK
24   YOU.
25         THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY STEP

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 16 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 134 of 174

114

1    DOWN.

2        MR. CLARK:  WE WOULD REST AT THIS POINT, TOO, JUDGE.

3        MR. STALZER:  THE STATE HAS NO REBUTTAL, YOUR HONOR.

4        THE COURT:  ALL RIGHT.

5        I'LL HEAR FROM YOU, MR. CLARK, FIRST AND THEN MR.

6    STALZER.  GO AHEAD.

7        MR. CLARK:  YES, SIR.  IT SEEMS TO ME THAT A LOT HAS

8    BEEN MADE OF THE FACT THAT NO ONE THREATENED, NO ONE BEAT,

9    NO ONE EXERTED ANY TYPE OF PHYSICAL INFLUENCE THAT WAS

10   COERCIVE OR OVERBEARING UPON MR. GALLEGOS.  JUDGE, THAT'S

11   NOT THE POINT.  THAT'S NOT WHAT WE'RE SAYING HAPPENED HERE.

12   THE POINT IN THESE TYPES OF HEARINGS IS TO ASCERTAIN THE

13   LEVEL OF UNDERSTANDING OF THE DEFENDANT, TO LOOK AT THE

14   POLICE PROCEDURES INVOLVED, AND TO REACH A DETERMINATION OF

15   WHETHER OR NOT ANY SUBTLE, OVERBEARING BEHAVIOR ON THE PART

16   OF THE POLICE HAS OVERBORNE THE WILL OF A DEFENDANT

17   REGARDING WHETHER OR NOT HE MAKES A STATEMENT.  THAT'S WHAT

18   IS AT ISSUE HERE, JUDGE.

19       I THINK THE CASE LAW THAT I SUBMITTED TO YOU IN

20   MY SUPPLEMENTAL MEMORANDUM TO MY REQUEST FOR A

21   VOLUNTARINESS HEARING, THOSE CASES SET FORTH JUST THAT.

22   THE CASES ARE ALMOST NONEXISTENT WHERE DEFENDANTS ARE

23   BEATEN AND THE CONFESSIONS ARE GOTTEN IN THAT MANNER.  THAT

24   JUST DOESN'T HAPPEN ANYMORE, JUDGE.  WHAT WE ARE TALKING

25   ABOUT HERE IS THE SUBTLE, OVERBEARING WILL OF THE POLICE

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 17 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 135 of 174

115



1    COMING TO IMPINGE UPON A DEFENDANT.

2              WHAT WE HAVE IN THIS CASE, JUDGE, IS A HIGH

3    SCHOOL STUDENT, SOMEONE WHO INITIALLY TRAVELS TO PHOENIX,

4    ARIZONA IN MARCH OF 1990 WITH HIS FATHER. HE COMES DOWN

5    HERE TO STAY WITH HIS BROTHER. HE'S NOT IN A SITUATION

6    WHERE HE'S COMING DOWN HERE, WHERE HE'S STAYING AT A MOTEL,

7    WHERE HE'S ON HIS OWN. HE DIDN'T HAVE THE WHEREWITHAL TO

8    DO THAT, JUDGE. HE'S A HIGH SCHOOL STUDENT. HE COMES DOWN

9    HERE WITH A PARENT. HE'S STAYING WITH A SIBLING. HE IS

10   DEPENDENT UPON THEM. HE'S SOMEONE WHO IS IN A SPECIAL

11   EDUCATION CLASS, WHO BY VIRTUE OF HIS VERY POSITION IN LIFE

12   HAS LIMITED EXPERIENCE. HE IS NOT SOPHISTICATED IN THE

13   WAYS OF THE WORLD, I GUESS. HE IS NOT THE TYPE OF PERSON

14   BY VIRTUE OF HIS POSITION IN LIFE THAT, YOU KNOW, ASSERTS

15   HIMSELF IN THE FACE OF ADULT OR POLICE AUTHORITY. HE JUST

16   DOESN'T DO THAT. HIS PRIOR EXPERIENCE IS AT THE JUVENILE

17   LEVEL WHERE I THINK THE COURT IS COGNIZANT OF HOW THE

18   JUVENILE COURT TREATS SOMEONE AS OPPOSED TO HOW AN ADULT

19   SHOULD BE.

20             I THINK HIS RENDITION TO YOU OF INVOLVEMENT IS

21   QUITE BELIEVABLE. I ALSO THINK THE RENDITION OF THE FACTS

22   ARE BELIEVABLE. AND IN ADDITION TO THAT I WOULD POINT OUT

23   NOWHERE IN THE POLICE REPORTS SUBMITTED IN DISCOVERY IN

24   THIS CASE WAS THERE ANY MENTION OF CONFRONTATION UNTIL I

25   PUT IT IN MY PLEADING. AT THAT POINT, JUDGE, I THINK MR.



SUPERIOR COURT
Phoenix, Arizona
EXHIBIT 1J

MILKE_NSB029882

Case 2:15-cv-00462-ROS Document 669-12 Filed 09/18/20 Page 18 of 50
Case 2:01-cv-01909-NVW Document 135-1 Filed 12/22/16 Page 136 of 174

116

1   GALLEGOS BECOMES BELIEVABLE.  OFFICERS CHAMBERS AND SALDATE
2   WOULD HAVE YOU BELIEVE THAT AFTER 20 YEARS, PROBABLY 40
3   PLUS COLLECTIVE, THAT THAT WAS AN INSIGNIFICANT FACTOR THAT
4   THEY SIMPLY LEFT OUT OF THEIR REPORT.  I DON'T THINK THAT'S
5   THE CASE, JUDGE.
6        THE COURT:  I HAVE A HARD TIME BELIEVING THAT MYSELF.
7        MR. CLARK:  JUDGE, IT IS EXTREMELY IMPORTANT BECAUSE
8   WHAT IT DOES, IT KIND OF COLORS IN FOR THE COURT THE
9   CIRCUMSTANCES THAT WERE ATTENDANT TO THE STATEMENT THAT MR.
10  GALLEGOS GAVE.  I FIND THAT; JUDGE -- I THINK THAT'S
11  ABSOLUTELY APPALLING THAT WOULD OCCUR IN A CUSTODIAL
12  SITUATION INVOLVING TWO YOUNG MEN WHO WERE IN HIGH SCHOOL.
13  IT'S KIND OF REMINISCENT OF THE CHRISTIAN BURIAL THEY
14  TOUGHT YOU IN LAW SCHOOL.  THEY ALWAYS USE THOSE EXTREME
15  EXAMPLES.  I THINK THEY CAN CERTAINLY USE THIS ONE AS AN
16  EXAMPLE OF THE TYPE OF CONDUCT THAT OUGHT TO BE PROHIBITED
17  AND THAT IS CERTAINLY OVERBEARING AND IMPERMISSIBLE ON THE
18  PART OF A POLICEMAN, JUDGE.
19         IN THIS, JUDGE, WHILE IT COMES AT THE END OF THE
20  CONVERSATION THAT MR. GALLEGOS HAD WITH OFFICER SALDATE, I
21  THINK IT PUTS IN LIGHT AND MAKES BELIEVABLE WHAT HE SAID,
22  AND I THINK WHEN COUPLED WITH THE SITUATION THAT WE HAVE
23  FROM OFFICER SALDATE ABOUT THIS THAT'S GOING BACK AND FORTH
24  BETWEEN MY CLIENT, IT SEEMS QUITE IMPRESSIVE.  WE HAVE MR.
25  GALLEGOS WHO COMES IN HERE AND DENIES INVOLVEMENT, ALTHOUGH

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 19 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 137 of 174

117

1    MR. SALDATE WOULD HAVE YOU BELIEVE THAT HE SIMPLY DIDN'T

2    IMPLICATE HIMSELF.  WE HAVE SALDATE TELLING YOU HE'S NOT A

3    SUSPECT AT THIS POINT, WHEN CLEARLY HE'S HAVING THIS

4    CONVERSATION WITH DETECTIVE SALDATE JUST MOMENTS BEFORE HE

5    ARRIVES AT THE STATION.

6           I THINK WHEN YOU COUPLE THAT WITH THE FACTS AS WE

7    KNOW FROM MR. SALDATE THAT MR. GALLEGOS SAYS, "NO, I DIDN'T

8    DO IT" AND SALDATE SAYS, "NO, YOU DID IT," I THINK AT THAT

9    POINT IN TIME WE HAVE WHAT THE CASES ALL INDICATE, THEY ARE

10   OVERBEARING HIS WILL.  HE DENIES IT.  AND THEY SAY, "NO,

11   YOU DID IT."

12          SO I THINK, JUDGE, IF YOU LOOK AT THE CASES AND

13   YOU KEEP IN MIND THAT WE'RE NOT DEALING WITH PHYSICAL

14   THREATS.  WE'RE NOT DEAL DEALING WITH ARM TWISTING.  WHAT

15   WE'RE DEALING WITH IS SUBTLES OF COERCION AS I GUESS WE

16   KNOW IT.  WE'RE DEALING WITH A YOUNG MAN.  WHILE

17   CHRONOLOGICALLY IS AN ADULT, I DON'T THINK THAT HIS LIFE

18   EXPERIENCE IN ANY WAY, SHAPE, OR FORM INDICATE THAT HE IS

19   SOPHISTICATED ENOUGH TO HAVE RESISTED THE OVERBEARING

20   ACTIONS OF THE POLICE.

21          OTHER THAN THAT I HAVE NOTHING ADDITIONAL, JUDGE.

22       THE COURT:  ALL RIGHT.

23       MR. CLARK:  THANK YOU.

24       THE COURT:  I FIND THAT THE STATE VS. SCHOLTZ

25   FACTORS ARE PROBABLY NOT RELEVANT, BUT I WILL FIND THAT THE

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 20 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 138 of 174

118

1    CHRONOLOGICAL AGE OF THE DEFENDANT AND THE APPARENT MENTAL

2    AGE OF THE DEFENDANT AND THE EDUCATIONAL LEVEL OF THE

3    DEFENDANT, HIS PHYSICAL CONDITION, HIS PRIOR EXPERIENCE

4    WITH THE POLICE, AND THE MANNER IN WHICH HE CONDUCTED

5    HIMSELF AT THE HEARING TODAY, INDICATE TO ME THAT IT'S

6    APPROPRIATE TO TREAT HIM AS AN ADULT AND THAT HE HANDLES

7    HIMSELF FAIRLY WELL AS AN ADULT.

8            ON THE BASIS OF THE RECORD THE COURT FINDS THAT

9    THE STATEMENTS MADE BY THE DEFENDANT TO DETECTIVES SALDATE

10   AND CHAMBERS WERE MADE INTELLIGENTLY, KNOWINGLY, AND

11   VOLUNTARILY.

12           FRANKLY, I MUST STATE I AM UNABLE TO BELIEVE THE

13   DEFENDANT WHEN HE ASSERTS THAT -- HE ASSERTED HIS

14   CONSTITUTIONAL RIGHTS NUMEROUS TIMES AND THAT DETECTIVE

15   SALDATE IGNORED THEM.  AND THAT DETECTIVE SALDATE DID NOT

16   GIVE HIM HIS CONSTITUTIONAL RIGHTS UNTIL AFTER HE HAD

17   CONFESSED.  I FIND TO THE CONTRARY, THAT THE STATEMENTS

18   MADE BY THE DEFENDANT WERE NOT THE RESULT OF FORCE, THREATS

19   OR PROMISES OF LENIENCY AND THE STATEMENTS WERE MADE AFTER

20   THE DEFENDANT WAS PROPERLY ADVISED OF HIS CONSTITUTIONAL

21   RIGHTS AND THAT THEREFORE THE STATEMENTS OF THE DEFENDANT

22   MADE TO THE DETECTIVES SALDATE AND CHAMBERS ARE ADMISSIBLE.

23           YOU WON'T NEED TO FILE A BRIEF, MR. STALZER.  I

24   WASN'T SURE PRIOR TO THE EVIDENTIARY HEARING WHETHER I

25   WOULD NEED MORE OR NOT ON THAT.

Case 2:15-cv-00462-ROS  Document 669-12  Filed 09/18/20  Page 21 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 139 of 174

119

1          RICHARD, MAY I HAVE OUR CALENDAR, PLEASE.

2          HAVE COUNSEL DETERMINED THE AVAILABILITY OF THE

3    WITNESSES AND HOW SOON YOU'RE GOING TO BE ABLE TO PROCEED

4    ON THE ADMISSIBILITY OF THE DNA EVIDENCE, MR. CLARK?  HAVE

5    YOU HAD THOSE RESULTS YET?

6          MR. CLARK:  NO, I DON'T, JUDGE.  MR. STALZER AND I

7    HAVE DISCUSSED THAT AND I'M KIND OF IN A ROCK AND A HARD

8    PLACE BECAUSE MY RESEARCH INTO DNA I BELIEVE NECESSITATES

9    AT LEAST THAT I HAVE SOMETHING BACK FROM THEM BEFORE I CAN

10   GO APPROACH THESE PEOPLE AS TO THE BASIS -- AND WHAT'S

11   GOING TO BE AT ISSUE AT THE TRIAL, BECAUSE WE'RE TALKING

12   ABOUT THE RELIABILITY, REPLICABILITY, AND I NEED TO HAVE

13   SOMETHING TO GO AND HAND THEM WITH IN ORDER TO REACH THAT

14   POINT.

15         I WILL INFORM THE COURT I HAVE A GOOD IDEA OF WHO

16   I AM GOING TO BE APPROACHING.  AND MY RESEARCH CERTAINLY

17   LEADS ME TO BELIEVE THAT THOSE PEOPLE ARE GOING TO BE

18   ACCESSIBLE, BUT I THINK I NEED TO GO TO THEM WITH SOMETHING

19   IN HAND RATHER THAN JUST WALKING UP AND SAYING TELL ME

20   ABOUT THIS BECAUSE I THINK IT WOULD BE A WASTE OF TIME AND

21   EFFORT.

22         THE COURT:  SURE.  ARE WE TALKING ABOUT IT'S BEEN 90

23   DAYS FOR THE INITIAL REPORT?

24         MR. STALZER:  YES, YOUR HONOR.  AND WHEN THE FINAL

25   REPORT WILL BE DONE, I HAVE BEEN TOLD AS OF TODAY IT WILL

Case 2:15-cv-00462-ROS    Document 669-12    Filed 09/18/20    Page 22 of 50
Case 2:01-cv-01909-NVW    Document 135-1    Filed 12/22/16    Page 140 of 174

120

1    BE ABOUT FOUR MORE WEEKS.  HOWEVER, I DON'T KNOW IF THAT

2    NECESSARILY ADDRESSES THE FRYE ISSUE ITSELF.  HOWEVER, A

3    FINAL WRITTEN REPORT WILL NOT BE AVAILABLE FOR FOUR WEEKS.

4        THE COURT:  THAT'S NOT ACCEPTABLE, SIR.  CAN THEY

5    ISSUE A PRELIMINARY REPORT --

6        MR. STALZER:  I HAVE BEEN TOLD THERE WILL BE A

7    PRELIMINARY REPORT WITHIN APPROXIMATELY ONE WEEK.

8        THE COURT:  I'M NOT SURE THAT I UNDERSTAND THE CAUSE

9    OF DELAY.  ARE YOU ABLE TO FIGURE THAT OUT?

10        MR. STALZER:  JUST PROCESSING THE INFORMATION.  THE

11   PERSON WHO WAS WORKING SOLELY ON THIS CASE WAS ON VACATION

12   THIS WEEK, BUT IT'S A MATTER OF THAT INDIVIDUAL SITTING

13   DOWN AND THEY HAVE BASICALLY A MEETING WITH OTHER

14   SCIENTISTS TO DISCUSS THE OVERALL TESTING AND TO EXAMINE

15   WHAT THEY CALL THE BANNED FREQUENCIES AND DO A TOTAL

16   ASSESSMENT OF WHAT WAS DONE BY THIS ONE INDIVIDUAL WHO HAS

17   BEEN ASSIGNED TO THE CASE FROM ITS INCEPTION.

18        I HAVE ALSO DISCUSSED THE MATTER WITH MY

19   SUPERVISOR ABOUT THE OTHER CASE THROUGH THE SELMAR

20   CORPORATION, WHICH I BELIEVE MAY BE BEFORE JUDGE BROWN, IF

21   IT'S STILL THERE.  THE PROBLEM IS WE MAY HAVE TO PROCEED ON

22   OUR OWN BECAUSE THERE'S ANOTHER F.B.I. CASE WHICH MR.

23   CLARK, MR. HENZE IS INVOLVED, K.C. SCULL, AND I THINK

24   THAT'S PROCEEDING FIRST AND IT MAY BE TIED IN WITH ANOTHER

25   CASE HANDLED BY ANOTHER PROSECUTOR WHICH IS ALSO A DNA CASE

121

1    FROM THE F.B.I. LAB.

2         THE COURT: ALL RIGHT. I'M GOING TO ORDER THAT A

3    PRELIMINARY REPORT BE PREPARED AS SOON AS POSSIBLE.

4         WE'RE GOING TO SET THIS MATTER FOR PRETRIAL

5    CONFERENCE ON AUGUST 17TH. DO COUNSEL HAVE ANY PROBLEMS

6    WITH FRIDAY, AUGUST 17TH, FOR A STATUS CONFERENCE AND

7    ARGUMENT ON THE DEFENDANT'S MOTION TO DISMISS IN REFERENCE

8    TO THE AIDING AND ABETTING?

9         MR. CLARK: I DON'T HAVE A PROBLEM WITH THAT. I'M

10   SAYING THAT WITHOUT LOOKING AT MY CALENDAR, JUDGE.

11        MR. STALZER: THAT'S FINE, YOUR HONOR.

12        THE COURT: ALL RIGHT. WE'LL SET THAT AT 10:30 ON

13   AUGUST 17TH, 1990, IN THIS DIVISION. THAT WILL BE A

14   PRETRIAL CONFERENCE IN REFERENCE TO THE DNA STATUS

15   SITUATION AND I'M NOT PUTTING A DEADLINE ON THAT, MR.

16   STALZER, BUT -- WELL, I GUESS I AM, BUT BY AUGUST 17TH

17   THERE'S GOT TO BE A PRELIMINARY REPORT TO MR. CLARK IN

18   WRITING.

19        MR. STALZER: I WILL SAY FOR WHAT IT'S WORTH AND

20   PROBABLY NOT MUCH, I WAS NOT THRILLED TO HEAR WHAT I HEARD

21   TODAY IN LIGHT OF WHAT I WAS TOLD BEFORE THE MATERIALS WERE

22   EVEN SENT TO THE LAB WHICH WAS ONE REASON WE USED A PRIVATE

23   CORPORATION VERSUS F.B.I. I WILL BE IN TOUCH WITH THE

24   REPRESENTATIVE, PHYSICALLY WORKING ON THE CASE, AND

25   LITERALLY SCREAMING A LITTLE BIT TO GET, YOU KNOW, WHAT WE

**GALL 173**

SUPERIOR COURT
Phoenix, Arizona
EXHIBIT 1

MILKE_NSB029888

Case 2:15-cv-00462-ROS  Document 669-12  Filed 09/18/20  Page 24 of 50
Case 2:01-cv-01909-NVW  Document 135-1  Filed 12/22/16  Page 142 of 174

122

1    HAVE TO PAY FOR WHICH ISN'T 10 CENTS, AS YOU PROBABLY KNOW,
2    BUT --

3         THE COURT:  SURE.  YOU MIGHT TELL THEM OF THE
4    DEFENDANT'S CONSTITUTIONAL RIGHT TO SPEEDY TRIAL AND THE
5    FACT THAT THE COURT MAY PRECLUDE THE STATE FROM GOING INTO
6    ANY OF THIS EVIDENCE IF IT'S NOT PROVIDED PROPERLY.

7         MR. STALZER:  EXACTLY, AND I AGREE WHOLEHEARTEDLY.
8         THE COURT:  THAT BEING THE STATUS OF THE CASE, I'LL
9    ENTERTAIN AN ORAL MOTION TO CONTINUE THE TRIAL DATE, MR.
10   CLARK.

11        MR. CLARK:  JUDGE, OBVIOUSLY I WOULD MOVE TO CONTINUE.
12   I HAVE DISCUSSED THE MATTER WITH MR. GALLEGOS AS WELL.  HE
13   UNDERSTANDS IF WE DO CONTINUE IT, WE'RE GOING TO ONCE AGAIN
14   BE EXTENDING THE TIME LIMITS UNDER RULE 8 AND HE'S AMENABLE
15   TO THAT, JUDGE.

16        MR. STALZER:  YOUR HONOR, MAY I HAVE ADDITIONAL TIME
17   TO RESPOND TO MR. CLARK'S LATEST MOTION?  I PROMISE I WILL
18   GET IT TO HIM SO HE DOESN'T HAVE THREE DAYS BEFORE THE 17TH
19   SO HE HAS ADEQUATE TIME TO RESPOND AND RESEARCH ANY CASES
20   THAT MAY OR MAY NOT COME FROM JURISDICTIONS OTHER THAN
21   ARIZONA, JUST SO I DON'T RUN INTO A BIND.  I THINK IT'S DUE
22   BY TUESDAY OF NEXT WEEK.

23        MR. CLARK:  JUDGE, I HAVE NO OBJECTION WITH THAT.
24        THE COURT:  SURE.  I'LL GIVE YOU UNTIL -- WOULD FRIDAY
25   THE 10TH BE SUFFICIENT TIME?

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 25 of 50
Case 2:01-cv-01909-NVW   Document 135-1   Filed 12/22/16   Page 143 of 174

123

1          MR. STALZER:  THAT'S FINE.  THANK YOU.

2          THE COURT:  ALL RIGHT, TO RESPOND.

3          MR. CLARK:  JUDGE, I WOULD LIKE TO INFORM THE COURT I

4     WILL BE PREPARED ON THE 17TH TO COME IN AND INDICATE TO THE

5     COURT WHAT I WILL NEED IN THE WAY OF BEING ABLE TO PROCEED

6     ON THE DNA.  HOPEFULLY THAT WILL INCLUDE A LIST OF COSTS

7     INVOLVED BECAUSE IT IS GOING TO BE QUITE EXPENSIVE AND MR.

8     GALLEGOS IS INDIGENT.  SO I DO HAVE THAT PROCESS BEGUN,

9     JUDGE, BUT IT IN ITSELF IS GOING TO TAKE SOME TIME.

10         THE COURT:  IT'S ORDERED GRANTING THE DEFENDANT'S

11    MOTION TO CONTINUE, THE COURT FINDING EXTRAORDINARY

12    CIRCUMSTANCES PURSUANT TO RULE 8.5.

13         MR. GALLEGOS, YOU UNDERSTAND THAT YOU'RE ENTITLED

14    TO GO TO TRIAL SOON, BUT YOUR ATTORNEY OBVIOUSLY NEEDS MORE

15    TIME TO ADEQUATELY PREPARE A DEFENSE.  IS IT OBJECTIONABLE

16    TO YOU AT ALL THAT WE CONTINUE THE DATE FOR YOUR TRIAL

17    UNTIL SEPTEMBER 5TH OF 1990?

18         THE DEFENDANT:  NO, SIR.

19         THE COURT:  ALL RIGHT.  THE COURT THEN WILL ORDER TIME

20    EXCLUDED AND IT'S ORDERED THAT THE MATTER IS SET FOR TRIAL

21    AT 10:00 A.M. ON SEPTEMBER 5TH, 1990, IN THIS DIVISION.

22    AND WE'LL RECONSIDER HOW WE'RE GOING TO SCHEDULE ALL THE

23    OTHER MATTERS WHEN WE MEET ON THE 17TH, ALL RIGHT?

24         OKAY.  HAVE YOU COVERED EVERYTHING THAT WE NEED

25    TO COVER TODAY?

GALL 175                    SUPEEXHIBITR1j                    MILKE_NSB029890

124

1        MR. STALZER:  I BELIEVE WE HAVE, YOUR HONOR.

2        MR. CLARK:  I THINK SO, JUDGE.

3        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  COURT

4    WILL BE ADJOURNED.

5                        *    *    *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPERIOR COURT
Phoenix, Arizona

EXHIBIT 1j

MILKE_NSB029891

I _____ CYNTHIA S. ZAMENSKI _____ , do
hereby certify that the foregoing pages constitute a full,
accurate typewritten record of my stenographic notes
taken at said time and place, all done to the best of my
skill and ability.

DATED this 14th day of ___March___ ,19 91

*Cynthia S. Zamenski*
Official Court Reporter

FILED

CR-94-0389-AP

DEC 9 1994

NOEL K. DESSAINT
CLERK SUPREME COURT
BY

1            IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                  IN AND FOR THE COUNTY OF MARICOPA

3

4    THE STATE OF ARIZONA,                    )
                                              )
5                      PLAINTIFF,             )         CR-91-0149-AP
                                              )
6    VS.                                      )      NO. CR 90-03339
                                              )
7    MICHAEL STEVEN GALLEGOS,                 )      CV 01-1909-PHX-ROS
                                              )
8                      DEFENDANT.             )
     _____)         FILED

9

10                                                     AUG - 5 1991

11                        PHOENIX, ARIZONA          NOEL K. DESSAINT
                                                    CLERK SUPREME COURT
                          MARCH 7, 1991            BY
12

13

14   B E F O R E :   THE HONORABLE JEFFREY A. HOTHAM, JUDGE.

15

16            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                                                       LODGED
17                         MOTIONS          RECEIVED      COPY

18                        JURY TRIAL             NOV 1 6 2001

19                                          CLERK U S DISTRICT COURT
                                               DISTRICT OF ARIZONA
20                                          BY            DEPUTY

21

22

23   PREPARED FOR APPEAL

24
                                       CYNTHIA S. ZAMENSKI,
25   (ORIGINAL)                        OFFICIAL COURT REPORTER.

DISCOVERY AND CONFIDENTIAL MATERIAL
MILKE_NSB029647

GALL 178

EXHIBIT 1j

3

1                         I N D E X

2                                                              PAGE
3    STATE'S OPENING STATEMENT                                  35

4    DEFENDANT'S OPENING STATEMENT                              44

5

6    WITNESSES:                    D         C          RD

7    CYNTHIA WISHON GALLEGOS      53        86         122

8    JERRY ANDY GALLEGOS         126       144

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GALL 179                           MILKE_NSB029648

EXHIBIT 1
SUPERIOR COURT
Phoenix, Arizona

Case 2:15-cv-00462-ROS  Document 669-12  Filed 09/18/20  Page 30 of 50
Case 2:01-cv-01909-NVW  Document 130-1  Filed 12/09/16  Page 114 of 116

40



1    ROOF, HITTING THE GROUND DIRECTLY BELOW.  YOU HAD
2    BREAKFAST.  YOU LOOKED OUTSIDE.  YOU SAW MOISTURE AND YOU
3    SAID, SURE ENOUGH, IT WAS RAIN THAT I HEARD.  BUT DID YOU
4    SEE IT?  CIRCUMSTANTIAL.  YOU HAVE NO ACTUAL FIRSTHAND
5    AWARENESS, BUT BY YOUR SENSES, YOUR COMMON SENSE, YOU DRAW
6    THAT CONCLUSION.

7            THE WEIGHT YOU GIVE EITHER ONE IS UP TO YOU.  THE
8    LAW DRAWS NO DISTINCTION.

9            GETTING YOU TO THE ULTIMATE DESTINATION, THE
10   FACTS, THE REAL GUTS OF THE BOOK, THE REAL POINTS IN
11   BETWEEN A AND B ON OUR ROAD MAP, YOU'RE GOING TO HEAR
12   PROBABLY FROM A FEW POLICE OFFICERS OR DETECTIVES.  YOU'RE
13   GOING TO HEAR FROM THE VICTIM'S MOTHER.  YOU'RE GOING TO
14   HEAR FROM THE DEFENDANT'S FAMILY MEMBERS POSSIBLY.

15           YOU WILL HEAR WHAT MAY BE IN THIS CASE POSSIBLY
16   SOME STIPULATIONS, AND STIPULATIONS AMOUNT TO AN AGREEMENT
17   BETWEEN THE PARTIES, THE STATE AND THE DEFENSE, THAT A
18   CERTAIN FACT EXISTS, SUCH AS THE CAR WAS RED.  WHETHER YOU
19   WANT TO BELIEVE IT OR DISBELIEVE IT, AGAIN, IS UP TO YOU TO
20   WEIGH THAT EVIDENCE, TO ACCEPT HOW MUCH YOU BELIEVE OR HOW
21   MUCH YOU DISBELIEVE.

22           THE KEY IN THIS CASE WILL FALL WITH TESTIMONY BY
23   DETECTIVE SALDATE.  IT MAY FALL WITH THE TESTIMONY OF THE
24   MEDICAL EXAMINER WHO IS CURRENTLY IN SAN DIEGO FOR
25   SOMETIME, DR. BOLDUC.  THE ISSUE TO FOCUS ON IS WHAT IS



**GALL 180**              SUPERIOR COURT          **MILKE_NSB029649**
                         Phoenix, Arizona
                         EXHIBIT 1)

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3                                        **PUBLIC DEFENDER**

4    STATE OF ARIZONA,          )        **JUL 1 6 1991**

5              Plaintiff,       )        **APPEALS RECEIVED**

6              vs.              )
                                )        CR 90-03339
7    MICHAEL STEVEN GALLEGOS,   )

8              Defendant.       )
     _____)

9

10                      Phoenix, Arizona
                        March 12, 1991    PM

11

12

13

14   Before:  The Honorable JEFFREY HOTHAM,
              Judge of the Superior Court

15

16

17           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                        (JURY TRIAL)

18

19

20

21                                 DONALD E. MOLL
                                   Court Reporter
22

23   COPY

24   PREPARED FOR:

25   GALLOS ON APPEAL

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 32 of 50
Case 2:01-cv-01909-NVW   Document 130-1   Filed 12/09/16   Page 33 of 116

25



1          At first, it was my understanding after I got

2     there, that it was being handled as a missing person.

3     Ultimately they found the person dead.  Thusly, it became

4     a homicide, and they called our office.

5          A team was summoned.  I was part of that team

6     that went out to that address and waited there.

7     Ultimately supervisors arrived and began to give

8     assignments, and, therefore, I ended up with the job as

9     case agent, or the person responsible for the actual

10    murder case.

11         Q.   Could you tell us a little bit more about

12    what precisely is the case agent?

13         A.   Well, the case agent is nothing -- I mean, to

14    be the case agent, you are just, of course, one of the

15    detectives.

16         However, an assignment has to be made to

17    someone that has to look over the case.  He doesn't --

18    that doesn't mean that he does everything in the case.

19    That just means that other detectives that are working the

20    case also report to you, and you're just a gathering point

21    of the reports.

22         You're also the person that's responsible for

23    going to all the hearings.  You're responsible for

24    basically the investigation of the case, if further

25    investigation needs to be done.



**GALL 182**                                    **MILKE_NSB029568**



1        Q.    Was anyone else present in the room when you

2   began your interview with Mr. Gallegos?

3        A.    No.

4        Q.    Could you tell us how you began the

5   interview?  What occurred?

6        A.    I entered the interview room.  I introduced

7   myself, identified myself.

8        Q.    How did you do that?

9        A.    With my badge case, my badge case and ID

10  card; and Mike made mention that he knew I was a

11  policeman; he had seen me out at the scene, and I then

12  talked to him about his schooling.  We talked about his

13  education.  We talked about where he went to school, what

14  kind of grades he -- what kind of grades he had.

15              He told me that he was in special education

16  at Coconino Highschool in Flagstaff, but that the only

17  problem area he had was with math; and he did indicate he

18  was a slow learner.

19              I asked him about the area of reading and

20  comprehending.  He said that he thought he was at the

21  senior level in those areas, but that he did have some

22  problems with his math.

23              We continued on, and then I finally removed a

24  Miranda rights card that was given to me by the Phoenix

25  Police Department.  They're supplied to us.  It's sort of



GALL 183                    EXHIBIT 1j                    MILKE_NSB029569

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 34 of 50
Case 2:01-cv-01909-NVW   Document 130-1   Filed 12/09/16   Page 35 of 116

34

1   standard, as far as I know, for the State of Arizona.  I

2   removed the card from my badge case.  I handed him the

3   card, and I asked him to read the card to me.

4           Q.    Did he read it back to you?

5           A.    Yes, he did.  He didn't appear to have any

6   problem with it either.

7           Q.    What happened after he read the card back to

8   you?

9           A.    I asked him if he understood his rights, and

10  he said he did.  It's unique that I would give him the

11  card, only because since he said he was, you know, a slow

12  learner, I just wanted to make sure that he understood the

13  rights, and for that reason, I let him read them.

14          Q.    After -- I'm sorry.

15          A.    I also asked him specifically if he knew what

16  a lawyer was, and he said he did.  I asked him -- I asked

17  him if he knew that he didn't have to speak to me, and he

18  said he did, and he said something about whether he was a

19  suspect at this point.

20          Q.    What did you say to him in response?

21          A.    I told him immediately that I didn't know

22  whether he was or wasn't.  I didn't have enough

23  information at that point to decide whether he was or

24  wasn't.  I was there to interview him, to ask him

25  questions.



Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 35 of 50
Case 2:01-cv-01909-NVW   Document 130-1   Filed 12/09/16   Page 36 of 116

35

1          I told him that I was gonna ask him certain

2   questions about last night, about ████████████, what he

3   had done last night, and he finally said, "No problem.

4   I'll cooperate and tell you everything."

5          Q.    How does the interview progress, then, after

6   that point?

7          A.    Mainly in a narrative form, and I mean that

8   by the fact that I -- I let him talk to me. He progressed

9   and tells me what's happening. If I have any problems

10  with any area of the interview, if I have any questions, I

11  may stop him and ask him, which I did on numerous

12  occasions, and ask him to explain something I may not have

13  understood, to tell me again, that maybe I -- maybe I

14  missed something, but for the most part, I would let him

15  talk to me and tell me what had happened.

16          And he basically went on to say that he was

17  only visiting his brother there, Mike. Mike was only

18  visiting his brother there at that home where ████████

19  ████████ is at.

20          He was with George Smallwood, who he had come

21  down with from Flagstaff, that he had come down, I believe

22  it was March 10th, in that area, that he had come down

23  initially from Flagstaff, and that he and George were

24  there visiting, and that on that day, on that previous

25  day, that he and George were concerned about working on

**GALL 185**                    EXHIBIT 1j                    **MILKE_NSB029571**

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 36 of 50
Case 2:01-cv-01909-NVW   Document 130-1   Filed 12/09/16   Page 37 of 116

36

1   George's truck, which was a Scout, a four-wheel drive, and

2   that he said his brother had told him that they would

3   be -- he would allow them to work on the Scout at his

4   place of business.

5          Mike's brother worked as apparently a

6   mechanic and had worked as a supervisor of a shop, and he

7   told him after 4:30, when the shop closed down, he would

8   allow them to come and work at the shop and do some odds

9   and ends to the Scout that they were working on which

10  belonged to George.

11         And he went on to say that he had gotten

12  there, he and George had drove to the location where his

13  brother worked.  I believe he said they got there at 10

14  minutes -- 10 minutes or so earlier.

15         They sat around, waited until 4:30.  They

16  started working on the -- the Scout.  They replaced tie

17  rods or something to that effect, some major thing on the

18  truck, the suspension.

19         They -- it got dark.  They decided to -- the

20  brothers decided to go home.  They went home.  He said

21  he -- they both went into the house.  He went and got a

22  shower.  They came back out.

23         Him and George were playing, I believe,

24  Nintendo, and his brother remained up with them both until

25  about just before midnight, and then his brother went to



1    sleep.

2            He said that he and George stayed up until a

3    little bit after midnight, around midnight, playing

4    Nintendo, and that they both decided to go into the

5    bedroom and go to sleep.

6            He said he stopped by the bathroom, came back

7    out and went to bed, and he said that George was already

8    asleep, and I think he mentioned something about the pit

9    bull dog that they had was already in bed with George. He

10   said that he went to bed, and within a short time, fell

11   asleep.

12           The next morning he remembers getting up with



13   a phone call from a friend of his who was coming down from

14   Tucson. He talked to him briefly. He remembers George

15   leaving for the store to buy -- or leaving, and then he

16   came back with some milk, so he knew that he had gone to

17   the store.

18           I believe he said he went inside or was still

19   inside, decided to change into his old -- some old clothes

20   to work in on his car, which he did.

21           A short time later, George came out and told

22   him that they couldn't find ████████, and the last time he

23   had seen George, George was playing with Nintendo again in

24   the morning, and George told him he couldn't find ████████,

25   and that they attempted to look for ████████ and they did

GALL 187                    EXHIBIT 1j          MILKE_NSB029573

Case 2:15-cv-00462-ROS   Document 669-12   Filed 09/18/20   Page 38 of 50
Case 2:01-cv-01909-NVW   Document 130-1   Filed 12/09/16   Page 39 of 116

38

1    for most of the morning.

2          Q.    During the course of that narrative, did he

3    ever mention anything about alcoholic beverages?

4          A.    No.

5          Q.    Did you have any discussion or did he

6    mention, Mr. Gallegos, anything about the security of the

7    house?

8          A.    He had already told other detectives that

9    the -- the house had been locked up, was secured the

10   entire time.  When he woke up, the house was locked.

11   There were deadbolts on the doors, and they were locked

12   when he woke up, and he indicated that the entire house

13   was secured.

14         Q.    What happens after this first narrative is

15   given about his activities the preceding day, on Thursday,

16   carrying over into Friday morning?

17         A.    During this period of time, of course, I was

18   aware of what he had told other police officers.  I was

19   aware also, because of the briefing that we had had at the

20   scene, that other police officers had looked at the -- at

21   the doors and looked at the windows, and looked at the

22   locks, had looked at other areas where entry may have been

23   forced, entry may have been made, exit may have been

24   forced, exit may have been made, and was told, you know,

25   that there was just no evidence that that occurred, you



1    know.

2              In fact, the evidence was that -- that Mike

3    was telling the truth, that the house was secured or

4    appeared to be secured.

5              Because of that, and because of the

6    indication of Mike and George, it was my belief that it

7    was very possible that these two individuals could have

8    been responsible for the death, and after believing that

9    or coming to that opinion, after listening to Mike and

10   knowing everything that had transpired or that other

11   officers had done, even though I had just been given just

12   a briefing, I told Mike that I believed that he was

13   involved with killing her.

14        Q.    Did he have any response when he made that

15   statement?

16        A.    He denied it, of course, at first, and then

17   shook his head no.

18              I told him that I thought he was involved in

19   the -- in the killing of ████████████████   I even suggested

20   to him that I didn't think that he probably meant to kill

21   her.

22        Q.    When you made those comments, do you recall

23   what his response was about basically telling exactly what

24   happened?  Do you recall what he said to you?

25        A.    Briefly we went into a -- an area where he



40

1   was trying to question me about what if he had been

2   involved, what would happen.

3            In that area, he was trying to question me

4   and trying to kind of feel me out on what possibly could

5   happen to him if, in fact, he was involved, but he made it

6   very clear that he wasn't admitting to it, he was just

7   wanting to know whether if he had been involved in it,

8   what would I do, what different things like that.

9            He made several statements that, of course, I

10  quoted.

11  Q.   If I could stop you there and interrupt you

12  and ask you, did he make statements about or to the effec

13  what it was you were really asking of him?

14  A.   He made -- he made something to the effect --

15  said something to the effect that was actually wanting him

16  to -- I believe something to the effect that, "Do you know

17  what you're asking me to do?  You're asking me to say

18  something that would lose my family," or something to that

19  effect.

20            I, of course -- my total response to him this

21  entire time, as it always is, is that I'm there to get the

22  truth.  I'm not there to judge him.  I explained that to

23  him.  I wasn't there to judge him.  I'm not there to bring

24  anything on him or to tell him anything other than to

25  listen.  I'm there to get the truth.

**GALL 190**

MILKE_NSB029576

EXHIBIT 1j

41

1          I'm there to get the truth as he knows it,

2   and I was there as a listening post.  I was going to

3   listen to him.  I explained that to him, and he made

4   various statements that I quoted in the report.  If you're

5   asking for the specific quotes, I'd have to refer to the

6   report.

7          Q.   Do you recall him making a statement to the

8   effect, quote, "What do you think my brother will think of

9   me" end quote?

10         A.   Absolutely.

11         Q.   Did he make the remark to you, Mr. Gallegos,

12  quote, "Let's say, okay, I'm not admitting it, but let's

13  just say I did have something to do with ▓▓▓▓▓  What do

14  you think would happen to me?"

15         A.   I remember him making that statement, and I

16  remember telling him that he would go to jail.

17         Q.   Did he make another statement, quote, "Again,

18  let's just say I did do it, but I'm not admitting to it.

19  Let's just say I did.  Would there be anything I could say

20  to keep from going to jail?"

21         A.   He did say that, and I responded that there

22  was absolutely nothing he could say that would keep him

23  from going to jail.

24         Q.   And did he ask you quote, "Do you think" --

25         MR. CLARK:   Judge, may I interject for a moment?

GALL 191                                 MILKE_NSB029577

EXHIBIT 1j

42

1    He appears to be refreshing himself from a document.  If

2    he is going to do that, I'd like to have some foundation

3    laid for it.

4            THE WITNESS:  I'm just --

5    BY MR. STALZER:

6            Q.   Excuse me.  Constable, have you ever referred

7    to any of that report that's in front of you so far today?

8            A.   Well, I reviewed it earlier, but I haven't --

9    as I'm testifying now, I was just trying to find the area

10   where you're at to verify those quotations that you're

11   making.

12           THE COURT:  The objection is overruled.  So we all

13   understand our procedure, Mr. Saldata, if you need to

14   refresh your recollection about what the exact statements

15   were, then let Mr. Stalzer know, and we'll all know about

16   that, and that will be on the record.

17           THE WITNESS:  Okay.

18           THE COURT:  Thank you, sir.

19   BY MR. STALZER:

20           Q.   Did he ask a question of you, quote, "Do you

21   think I did it by myself?"

22           A.   Yes, he did.

23           Q.   What did you say in response, if anything?

24           A.   I believe I told him that I wanted the truth

25   from him, and I expected of him -- that if someone else

**GALL 192**                                    **MILKE_NSB029578**

EXHIBIT 1j

43



1    was involved with him, I would expect him to tell me the

2    entire truth and tell me who that other person was, and

3    that I would not want him to minimize his involvement at

4    all.

5        Q.    Did he make this following response:  "Okay.

6    I did do it, but I was not by myself.  George helped me,

7    and he's as much to blame as I am."

8        A.    Yes, he did.

9        Q.    When was that statement made in response to

10   the previous one I quoted to you?

11       A.    It would have been just after.

12       Q.    What happened after he made the last

13   statement that I mentioned?

14       A.    I then asked him to tell me what happened,

15   and that I wanted him to tell me everything, and again

16   reminded him that I didn't want him to minimize his

17   involvement, and if anyone else was involved, to tell me

18   about it, and then he went into a narrative about what

19   occurred.

20       Q.    What did he say happened?

21       A.    Initially he told me that -- that everything

22   that he had said regarding his movements during that day

23   were basically correct.

24       Q.    Which day was he referring to?

25       A.    The day before.



12

44

1     Q.    That'd be Thursday?

2     A.    That's correct.

3     He also at this point interjected the fact

4 that he and George had been drinking whiskey and Kool-Aid

5 most of the day.

6     He also told me that when they'd gone to the

7 shop to work on the car, and as he had stated, he had

8 gotten there early, that they had made, when they got

9 there, the employees were drinking some beer, and that he

10 believed that he and George had six or seven beers apiece

11 while working on the truck.

12     He also indicated that they did leave there

13 at night, when it was dark; that they were on the way

14 back, and that when they got back to the house, that he

15 and George had probably another six or seven beers, and

16 that was from a case of beer that Mike's brother had

17 purchased from money that was given to him by George.

18     And that for the most part, that everything

19 had happened the way he had said.  It was 11:30 or so.

20 The brother went to sleep.  Midnight or so, a little

21 after, he and George were sitting there playing Nintendo.

22 He then began to reference the fact about he had only had

23 sexual intercourse maybe two or three times in his life.

24     He had indicated that the last time he had

25 had sexual intercourse was about a year before.  He said

**GALL 194**     EXHIBIT 1j     **MILKE_NSB029580**

1    that he was thinking about going in and -- into ████████

2    room.

3           Q.   Let me stop you there.

4           A.   Sure.

5           Q.   When you use the term "sexual intercourse,"

6    was that a term he used? Mr. Gallegos used that term?

7    I'm referring to the discussion he had with George

8    Smallwood.

9           A.   I don't believe so.

10          Q.   How did he describe what you've termed

11   "sexual intercourse"?

12          A.   I believe he kept referring to it as screwed.

13          Q.   After -- after he had this conversation with

14   George, what did he then tell you happened afterwards?

15          A.   Well, he said that he had had this thought of

16   going into ████████ room and fondling her buttocks.  Of

17   course, he referred to it as her ass.

18               He said that he had had these thoughts, and

19   that he at first didn't really want to tell George about

20   them because, of course, George was a brother.  He didn't

21   know how he would react to it, but that he finally

22   mentioned to George that, "Well, we ought to go into

23   ████████ room," or something to that effect, and that he

24   wanted to go in and fondle her, as he said it, her ass.

25               He said that he was sort of surprised when

**GALL 195**

EXHIBIT 1j

**MILKE_NSB029581**

Case 2:15-cv-00462-ROS  Document 669-12  Filed 09/18/20  Page 46 of 50
Case 2:01-cv-01909-NVW  Document 130-1  Filed 12/09/16  Page 47 of 116

46

1   Georgia agreed, and then he kind of was wavering a little

2   bit, and then George then told him, "Don't worry about it.

3   Even if she wakes up, she won't say anything.  She won't

4   tell anybody anything."

5           He said that they then both got up.  He told

6   me what they were wearing.  He told me they were wearing

7   some shorts and George was wearing some shorts, and that

8   they both got up and walked towards ███████ room, and he

9   said that he did stop at the bathroom.

10          He told George that he was going into the

11  bathroom to get baby oil.  I then, of course, at this

12  point asked him if he was going to -- why he was going to

13  get baby oil since he had told me that his only intention

14  was to go in there and feel her ass.

15          He said -- well, he said something to the

16  effect that he liked the way baby oil made skin feel, and

17  that he really got apparently turned on by the fact or the

18  way the baby oil felt on the skin.

19          He said he went to the bathroom, got the baby

20  oil, came back out, and I believe he saw George standing

21  at the door of the bedroom.

22          I think he said something to the effect that

23  George had one hand on the door handle and the other hand

24  down in front of his pants, and he said they both walked

25  in, and as soon as they walked in, he said he could see

GALL 196                                    MILKE_NSB029582

47

1      ████████ lying on her side facing the wall.  She had a

2    night shirt on.  The night shirt was just above the waist

3    exposing a little bit of her back and her panties.

4                    He said that he walked up to her bed and that

5    George then walked up next to him and was standing next to

6    him.

7             Q.    Let me put the brakes on.

8             A.    Sure.

9             Q.    Is there any doubt in your mind he said to

10   you the night shirt was above her waist?

11            A.    No.

12            Q.    He said that to you?

13            A.    I believe he did.  I would have to refer to

14   the report if there's --

15            Q.    And when he made that statement, Mr. Gallegos

16   said her buttocks was exposed?

17            A.    He said he could see her panties.  She only

18   had panties on.

19            Q.    I think I cut you off when you said both

20   gentlemen were standing at the side of her bed as she was

21   facing the north wall.

22            A.    Yes.  And again, he just said wall.  I don't

23   know if it was the north wall or not.  I never went into

24   the -- into the scene.

25                    But he said that he walked up to her and was




**GALL 197**                EXHIBIT 1j                **MILKE_NSB029583**

48

1    standing in the area of her buttocks.  He said that George

2    was standing next to him, and I asked him where, and he

3    said towards the head.  He said he then began fondling

4    her, as he referred to it, her ass.

5            He said that he fondled it some time.  He saw

6    George fondling the -- her breast, the area of her breast.

7    She was still asleep.  He said he then got a piece of or

8    some, I believe, some baby oil, and put it on his hand and

9    started rubbing the baby oil.  I'm sorry.  He started

10   rubbing the baby oil on the exposed portion of her back.

11           Q.    Let me stop you there.

12           A.    Sure.

13           Q.    Do you have any doubt he said, "exposed

14   portion of her back"?

15           A.    No, I don't.

16           Q.    Would you proceed to tell us what he

17   continued to tell you.

18           A.    I believe we next talked about the fact that

19   George was still rubbing on her breasts, in the area of

20   her breasts, and that he then got some more baby oil and

21   began to rub some more baby oil on her back, and he said

22   that immediately upon doing that, Kendall woke up.

23           He said that he remembers ████████ waking up,

24   turning towards him and looking at him.  He said he

25   believes that the baby oil was cold and that is probably

Case 2:15-cv-00462-ROS Document 669-12 Filed 09/18/20 Page 49 of 50
Case 2:01-cv-01909-NVW Document 130-1 Filed 12/09/16 Page 50 of 116

49



1    what woke her up, when he put the baby oil on her back.

2                    He said that she then started to turn.

3    George then placed his hand over her mouth to try to keep

4    her from screaming. He said he could -- ████████ was then

5    making a noise like a pig would make, still trying to

6    breathe through her nose.

7         Q.    Did he explain in greater detail at all about

8    the noises and what she was doing?

9         A.    He actually made the noises of a pig, trying

10   to explain it to me the noises ████████ was making.

11        Q.    Did he say what he did at that time, Mr.

12   Gallegos?

13        A.    He said that he then reached over, put his

14   hand on top of George's hand, over her nose, and held it

15   there. He said he doesn't remember how long he held his

16   hand there, but she then went limp.

17        Q.    Did you ask him any questions after that

18   about what happened?

19        A.    I think we discussed about the fact of what

20   he had thought had happened to her, and I think he said he

21   thought that she was dead.

22                    I believe he may have said something to the

23   effect that he doesn't know whether he whispered to George

24   that she was dead, but he believed he did. I think he

EXHIBIT 1j

MIEKE_NSB029585

1    dead.

2         Q.   Did he ask you any questions at that point

3    about whether the victim was dead or not?

4         A.   Did he ask me?

5         Q.   Yes.

6         A.   No, sir.  I wouldn't have known.

7         Q.   Did he ask you what you thought her condition

8    was?

9         A.   No.

10        Q.   What occurred after he made those comments

11   about what he thought the victim was as far as life and

12   death?

13        A.   He said that he and George figured that --

14   something to the effect that since she was dead, they

15   might as well finish, in terms of ejaculating.  He said

16   that George turned her on her back -- excuse me -- that

17   George turned her on her back, spread open her legs.

18             At this point her panties were off.  Later on

19   he told me that George was taking her panties off, but her

20   panties were off.  He said that George got up on to the

21   bed.

22             He said he was standing right next to him in

23   the same position that he was in.  He said that George had 

24   an erection.  He had his penis out.  He then removed the

25   **GALL 200** pillow from -- which had been underneath **MIKE_NSB029586**ed

EXHIBIT 1j