## Page 1

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF ARIZONA
 2
 3
   Debra Jean Milke,              )
 4                               )
          Plaintiff,             )
 5                               )
   vs.                           ) No.
 6                               ) 2:15-cv-00462-ROS
   City of Phoenix; Maricopa      )
 7 County; and Detective Armando  )
   Saldate, Jr.; and Sergeant     )
 8 Silverio Ontiveros, in their   )
   individual capacities,         )
 9                               )
          Defendants.            )
10 ------------------------------- )
11
12
13
                VIDEOTAPED DEPOSITION OF
14
                    ARMANDO SALDATE
15
16
                    APRIL 26, 2017
17
                     10:07 A.M.
18
19
20
             2929 North Central Avenue, Suite 2100
21
                    Phoenix, Arizona
22
23
24
         SOMMER E. GREENE, CSR, RPR, CR No. 50622
25
```

## Page 2

```
 1 APPEARANCES OF COUNSEL
 2
 3      For Plaintiff:
 4         NEUFELD SCHECK & BRUSTIN, LLP
           NICK BRUSTIN, ESQ.
 5         AMELIA GREEN, ESQ.
           99 Hudson Street, 8th Floor
 6         New York, New York 10013
           212.965.9081
 7         nick@nsbcivilrights.com
 8         KIMERER & DERRICK, P.C.
           MICHAEL D. KIMERER, ESQ.
 9         RHONDA E. NEFF, ESQ.
           1313 East Osborn Road, Suite 100
10         Phoenix, Arizona 85014
           602.279.5900
11
12      For Defendant Silverio Ontiveros:
13         HOLLOWAY ODEGARD & KELLY, P.C.
           SALLY A. ODEGARD, ESQ.
14         3020 East Camelback Road, Suite 201
           Phoenix, Arizona 85016
15         602.240.6670
           sodegard@hoklaw.com
16
17      For Maricopa County:
18         SANDERS & PARKS
           ROBIN E. BURGESS, ESQ.
19         3030 North Third Street, Suite 1300
           Phoenix, Arizona 85012
20         602.532.5783
           robin.burgess@sanderssparks.com
21
22
23
24
25
```

## Page 3

```
 1 APPEARANCES CONTINUED:
 2
 3      For Defendant City of Phoenix:
 4         STRUCK WIENEKE & LOVE
           CHRISTINA RETTS, ESQ.
 5         3100 West Ray Road, Suite 300
           Chandler, Arizona 85226
 6         480.420.1605
           cretts@swlfirm.com
 7
 8      For Defendant Armando Saldate:
 9         BERKE LAW FIRM
           LORI V. BERKE, ESQ.
10         1601 North 7th Street, Suite 360
           Phoenix, Arizona 85006
11         602.254.8800
           Lori@berkelawfirm.com
12
13      Also Present:
14         Kathleen Kolm, Maricopa County
           Shannon Murphy, Maricopa County
15         Vanessa Buch
16         Jeff Burton, Videographer
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                  I N D E X
 2
 3 WITNESS: ARMANDO SALDATE
 4
 5 EXAMINATION                              PAGE
 6
 7 MR. BRUSTIN...................................7
 8
 9              *     *     *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
5—8

Page 5

1                  INDEX TO EXHIBITS
2
   EXHIBIT                                    MARKED
3
4   Exhibit 1  Transcript of Interview, May 3,      50
               1990
5
    Exhibit 2  Presentence Report, Styers Trial     74
6
    Exhibit 3  Handwritten Document from James      74
7              Styers, Dated 1/4/85
8   Exhibit 4  Dr. Berman's Evaluation of Jim       75
               Styers, 1990
9
    Exhibit 5  Supplemental Homicide Report        151
10
    Exhibit 6  Photograph                          177
11
    Exhibit 7  Transcription of Interview          185
12
    Exhibit 8  Report of Interview                 185
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1              PHOENIX, ARIZONA
2          APRIL 26, 2017; 10:07 A.M.
3
4
5          THE VIDEOGRAPHER:  One moment.  This is tape
6   No. 1 to the videotaped deposition of Armando Saldate in
7   the matter of Milke versus City of Phoenix, et al., being
8   heard before the U.S. District Court, District of
9   Arizona, Case No. 2:15-CV-00462-ROS.  This deposition is
10  being held at 2929 North Central Avenue, Phoenix,
11  Arizona.
12         Today's date is April 26th, 2017, and the
13  time on the record is 10:09 a.m.  My name is Jeff Burton,
14  and I'm the videographer.  The court reporter is Sommer
15  Greene.
16         Counsel, will you please introduce
17  yourselves and affiliations, and the witness will be
18  sworn.
19         MR. BRUSTIN:  Nick Brustin, Neufeld Scheck &
20  Brustin, for the plaintiff, Debra Milke.
21         MS. GREEN:  Amelia Green, Neufeld Scheck &
22  Brustin, for plaintiff.
23         MS. BUCH:  Vanessa Buch for plaintiff.
24         MR. KIMERER:  Michael Kimerer, Kimerer &
25  Derrick, for the plaintiff in the case.

Page 7

1          MS. NEFF:  Rhonda Neff, Kimerer & Derrick,
2   for the plaintiff, Debra Milke.
3          MS. ODEGARD:  Sally Odegard on behalf of
4   Silverio Ontiveros, defendant.
5          MS. BURGESS:  Robin Burgess on behalf of
6   Maricopa County.
7          MS. RETTS:  Christina Retts for the City of
8   Phoenix.
9          MS. BERKE:  Lori Berke for Armando Saldate.
10
11
12          ARMANDO SALDATE,
13  called as a witness herein, having been first duly sworn
14  by the Certified Reporter to speak the whole truth and
15  nothing but the truth, was examined and testified as
16  follows:
17
18              EXAMINATION
19  BY MR. BRUSTIN:
20     Q.   Good morning, sir.
21     A.   Good morning.
22     Q.   Sir, how do you prefer to be addressed?
23  Mr. Saldate -- does that work for you?
24     A.   Works for me.
25     Q.   Mr. Saldate, I see that you're wearing a pin on

Page 8

1   your tie?
2      A.   Yes.
3      Q.   What is that pin?
4      A.   Phoenix Police pin.
5      Q.   Okay.  And why are you wearing it?
6      A.   Because I wanted to.
7      Q.   Any --
8      A.   I thought it looked appropriate, and I liked
9   it.
10     Q.   Do you typically wear that pin?
11     A.   At times.
12     Q.   Okay.  When is the last time you wore the pin
13  before today?
14     A.   At a funeral about a month and a half ago in
15  San Bernardino.
16     Q.   Let me start by asking a few questions,
17  Mr. Saldate, about your preparation for today.  Okay?
18         Since you learned you were named as a
19  defendant in this case -- withdrawn.
20         At some point, you received the complaint in
21  this case naming you as a defendant.  Correct?
22     A.   That's correct.
23     Q.   And you read it.  Right?
24     A.   Yes.
25     Q.   Read it carefully.



Page 9

1   A.   Not at first, no.

2   Q.   When did you read it carefully?

3   A.   Since I started working with Lori.

4   Q.   Okay.  So the first time you got it, you didn't

5   read it very carefully?

6   A.   Not very carefully.

7   Q.   How come?

8   A.   It's just a standard, standard complaint, civil

9   complaint.

10   Q.   Standard complaint alleging that you caused a

11   woman to spend most of her life in prison for a crime she

12   didn't commit.  Right?

13   A.   That's your opinion, yes.

14   Q.   Let's talk about what you've done to prepare

15   for today.  How many times have you met with Ms. Berke

16   since you were named as a defendant?

17   A.   Oh, ten times maybe.

18   Q.   Ten times in person?

19   A.   Yeah.

20   Q.   And how long were each of those meetings, best

21   you can recall?

22   A.   Hour, two hours maybe.

23   Q.   Okay.  So you think that you met with Ms. Berke

24   for approximately 20 to 30 hours?

25   A.   No, I would say 10 to 20 hours.

Page 10

1   Q.   Ten to 20 hours.  Okay.  Let's -- let's go

2   back.  Let's start with present going back.

3        When's the last time you met with Ms. Berke?

4   A.   Yesterday.

5   Q.   How long did you meet before yesterday?

6   A.   A couple hours.

7   Q.   Okay.  And how about before that?

8   A.   Several weeks ago.

9   Q.   Okay.  And how long was that meeting?

10   A.   Two hours.  Two hours.

11   Q.   I should have asked this initially:  Was -- was

12   anybody else present besides you and Ms. Berke for those

13   meetings?

14   A.   No.

15   Q.   No?

16   A.   No.

17   Q.   Okay.  And before that, you said three weeks

18   ago was the last meeting.  How about before that?

19   A.   I met with her for like three days in a row.

20   Q.   When was that in relation to today?

21   A.   Several weeks back.

22   Q.   Okay.  So certainly in the last month you felt

23   well enough to meet with your attorney to prepare for

24   today.  Is that fair to say?

25   A.   Yes.

Page 11

1   Q.   I'd like to ask you about the documents that

2   you reviewed in preparation for today.  Okay?

3   A.   Uh-huh.

4   Q.   If you could, tell me every piece of paper that

5   you've read related to this case since you were named as

6   a defendant.

7   A.   Reports and interviews, you know, of -- all

8   supplied by Lori.

9   Q.   Okay.  Let's be a little more specific.

10        Is it your belief that you have reviewed in

11   preparation for today every report that you created in

12   this case?

13   A.   I would think so.

14   Q.   Okay.  And when I say "this case," what I'm

15   referring to is the prosecution of Debra Milke but also

16   anything to do with the prosecutions of Styers or Scott.

17   Is that fair?

18   A.   That's fair.

19   Q.   Okay.  And so it's your belief that you have

20   reviewed every report that you created in this case

21   relating to any of those three individuals?

22   A.   I have.

23   Q.   Okay.  And you also said you reviewed some

24   other interviews that you conducted.  I take it what you

25   mean by that is you reviewed tape recordings and

Page 12

1   transcripts.  Is that right?

2   A.   Transcripts.

3   Q.   Okay.  So, for example, you reviewed the

4   transcript of Debra -- withdrawn.

5        You reviewed the transcript of Roger Scott?

6   A.   Yes.

7   Q.   You reviewed the transcript of James Styers?

8   A.   Yes.

9   Q.   You reviewed the transcript of Sandra

10   Pickinpaugh?

11   A.   Yes, the transcripts, yeah.

12   Q.   Okay.  Now, have you also reviewed any

13   testimony from any of the trials in these cases?  I know

14   there's a lot of it.

15   A.   Yes.

16   Q.   Okay.  Tell me --

17        First of all, let's start with your

18   testimony.  Is it your belief, as you sit here today,

19   that you have reviewed all of your testimony in this

20   case?

21   A.   Yes.

22   Q.   And what -- other than your testimony, what

23   other testimony have you reviewed?

24   A.   Testimony that was in the packet that was

25   supplied to me.  I think it was Mr. Sweat.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
13–16

Page 13

1    Q.    Okay. I'm actually not entitled to know where
2  you got it, but I am entitled to know what you read. So
3  that's all I'm interested in.
4          So you've read all of your testimony. What
5  other witness -- what other witness testimony have you
6  read? Have you read Debra Milke's testimony?
7    A.    Yes.
8    Q.    Have you read Roger --
9    A.    No, no, I have not read Debra.
10    Q.    Not recently?
11    A.    I have not read her testimony for years.
12    Q.    Okay.
13    A.    I've read the report I made.
14    Q.    Okay. Have you read anybody else's testimony
15  other than your testimony -- sworn testimony under oath?
16    A.    I don't know because the package was so big I
17  just --
18    Q.    I'm just -- it's not a test. I just want to
19  know the best you can recall what other testimony have
20  you read in preparation for today? What other witnesses
21  do you recall reading?
22    A.    Jim Styers, probably.
23    Q.    All right.
24    A.    It's the only one I can remember.
25    Q.    All right. Would it be fair to say that you've

Page 14

1  done your very best to refresh your recollection about
2  the events in this case so you can defend yourself?
3    A.    As best I could at this time, yes.
4    Q.    Okay. But you've done your best to do that.
5  Correct?
6    A.    Yes.
7    Q.    You understood it was important for you to do
8  that. Correct?
9    A.    Yes.
10    Q.    And did -- did you, in fact -- were you able to
11  refresh your recollection when you were reading reports
12  and reading the transcripts?
13    A.    At times.
14    Q.    Did you also review -- I had never seen this
15  before, but I guess in Arizona there's a process by which
16  defense attorneys can interview the lead detectives. Is
17  that right?
18    A.    Yes.
19    Q.    Did you review those transcripts of your -- of
20  your interviews with the defense lawyers in this case?
21        MS. BERKE: Objection. Vague.
22        BY MR. BRUSTIN: I'll be more specific.
23          There is a transcript from 1990 by
24  Ms. Milke's former defense counsel. I don't -- and I
25  can't remember his name right now.

Page 15

1        MS. GREEN: Ken Ray.
2    Q.    BY MR. BRUSTIN: Ken Ray.
3          Do you remember reviewing that document?
4    A.    I think I do.
5    Q.    Okay. And do you remember reviewing the more
6  current documents from Mr. Kimerer?
7    A.    No.
8    Q.    Other than reports and interviews and
9  transcripts, is there anything else you've reviewed in
10  preparation for today?
11    A.    No.
12    Q.    Have you spoken, since you were named as a
13  defendant, to any of the officers involved in the Milke
14  investigation about the Milke investigation?
15    A.    No.
16    Q.    You said that with certainty. You're sure
17  about that?
18    A.    I'm positive.
19    Q.    All right. We're going to have to take a break
20  in just a minute, but let -- let me get started on you a
21  little bit about your background.
22          Why don't we start with your -- when you
23  began -- let's go back even further.
24          Why don't you tell me where you graduated
25  from high school?

Page 16

1    A.    Phoenix Union High School.
2    Q.    When -- what year was that?
3    A.    1967.
4    Q.    And how old are you, sir?
5    A.    Sixty-eight years old.
6    Q.    And when did you first enter -- withdrawn.
7          Did you have any higher education after high
8  school?
9    A.    I had some college at Phoenix College.
10    Q.    Okay. How many years?
11    A.    Just several semesters. Maybe 12, 15 hours
12  total, I guess.
13    Q.    What did you study?
14    A.    Just general studies -- English. I took
15  psychology, English and that kind of stuff.
16    Q.    Okay.
17    A.    Just get my core classes in.
18    Q.    When did you apply to be in law enforcement?
19    A.    I don't quite remember the month, but it was in
20  1969.
21    Q.    1969. And did you -- you applied with the
22  Phoenix Police Department?
23    A.    Yes, I did.
24    Q.    Anybody else?
25    A.    No.



Page 17

1    Q.    And why did you -- why did you want to become a
2    police officer?
3    A.    At that time, I was a married man with a child,
4    and I needed a job.  And I applied for the police
5    department.
6    Q.    No other draw to law enforcement?
7    A.    No other draw.
8    Q.    When did you start in the force?
9    A.    I graduated the academy in October of 1969.
10   Q.    Okay.
11   A.    I can't tell you the exact date.
12   Q.    Okay.  By the way, at that time, did you have
13   any other family in law enforcement?
14   A.    No.
15   Q.    Do you currently have any family in law
16   enforcement?
17   A.    My son.
18   Q.    Where's your son employed?
19   A.    He's employed by the -- now he's employed by
20   Colorado -- no, Denver Sheriff's Department.
21   Q.    Okay.  Could you just tell me what his rank is?
22   A.    He is -- was a director of internal affairs for
23   the sheriff's department, and then he is -- was made
24   director of something he started -- I forget -- analysis
25   team or something like that.

Page 18

1    Q.    Okay.  All right.  Before I go into your prior
2    career, let me ask you about your current position.
3          Are you currently employed?
4    A.    No.
5    Q.    When were you last employed?
6    A.    July -- I think it was July 30th -- but I'm not
7    sure -- of 2010.
8    Q.    You've been retired since then?
9    A.    Yes.
10   Q.    You were a constable until then?
11   A.    Yes.
12   Q.    And why did you retire?
13   A.    I injured my leg.  I had my time in anyway, but
14   I injured my leg, and I retired because of that.  I could
15   not -- no longer be a postcertified police officer.
16   Q.    Any part-time work since then?
17   A.    No.  I do volunteer several, you know...
18   Q.    What kind of volunteer work do you do?
19   A.    I work at the Andre House.
20   Q.    What's that?
21   A.    That is a hospitality for -- we feed dinner to
22   individuals every night, and they also provide clothing,
23   showers, different things for homeless people.
24   Q.    Okay.  Let's go back to your career in law
25   enforcement.

Page 19

1          You joined the department.  You started in
2    about 1969.  If you could take me through your career.  I
3    don't need every assignment but just generally your --
4    your trajectory in the department.  Where were you first
5    assigned?
6    A.    Patrol.
7    Q.    Okay.  And how long were you on patrol?
8    A.    Five years, maybe.
9    Q.    Okay.
10   A.    Five to six years.
11   Q.    So we're about 1974?
12   A.    '75.
13   Q.    Any undercover work during those five years?
14   A.    Very small.
15   Q.    What were you doing?
16   A.    We were in a team that was set up by the chief
17   of police.  He -- he hand-picked six people to -- to be
18   just -- go to areas where crime is being done and try to
19   suppress it.
20   Q.    Okay.  And what is your understanding as to why
21   you were hand-picked for that assignment?  It sounds like
22   a plum job.
23   A.    It wasn't a plum job.  It was a job that the
24   chief picked me, but I wouldn't know why.
25   Q.    No idea?

Page 20

1    A.    No.
2    Q.    How long did you do that for?
3    A.    About a year and a half, and the chief had
4    another idea, and he dismantled the group.
5    Q.    Okay.  And what happened in 1975?
6    A.    I became a detective.
7    Q.    All right.  And how did you become a detective
8    in 1975?  What was the process?
9    A.    The process was the -- your -- your -- you
10   know, your yearly -- I don't -- I can't get the word out.
11   But, anyway, your yearly --
12   Q.    Evaluations?
13   A.    -- evaluation and -- and your sergeant's
14   request or -- or, you know, nomination and -- to other
15   sergeants in the detective bureau, and then they would
16   get together, and they would -- if they didn't know me or
17   didn't know the person, then they would contact the
18   person, but in my case, I was well known.
19   Q.    How were you well known?  How were you well
20   known?
21   A.    I was well known because I did my job.
22   Q.    So you were -- you were -- by that -- by 1975,
23   you were well known in -- it's your belief that you were
24   well known in the department -- in the department as
25   someone that did their job well.  Is that fair to say?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
21–24

Page 21

1    A.    Yes.
2    Q.    And someone who did their job with honesty and
3    integrity.  Would that be fair to say?
4    A.    That's correct.
5    Q.    And that's something that you always prided
6    yourself on, your honesty and integrity.  Is that fair to
7    say?
8    A.    Yes.
9    Q.    It's the most important thing in your personal
10   life and your police life.  Fair to say?
11   A.    Fair to say.
12   Q.    Okay.  But even by 1975, you believe you were
13   known as somebody with tremendous honesty and integrity.
14   Correct?
15   A.    Sure.  That's what I felt, yes.
16   Q.    That's what you believed?
17   A.    Yes.
18   Q.    And you believed that based on the feedback you
19   were getting from your superiors.  Correct?
20   A.    Correct.
21        MR. BRUSTIN:  Okay.  I think now we need to
22   call the Court.  So we'll go off the record.
23        THE VIDEOGRAPHER:  We are off the record at
24   10:26 a.m.
25        (A recess was held off the record.)

Page 22

1        THE VIDEOGRAPHER:  We are back on the record
2    at 11:08 a.m.
3    Q.    BY MR. BRUSTIN:  Mr. Saldate, when we broke, I
4    think we were talking about your promotion to detective.
5    Did you apply or make it known that you wanted to be a
6    detective in 1976?
7    A.    Yes.
8    Q.    Okay.  How did you do that?
9    A.    Talking to my sergeant.
10   Q.    Okay.
11   A.    Advising him.
12   Q.    Who's -- who was your sergeant at that time?
13   A.    I don't recall.
14   Q.    It doesn't matter.  That's fine.
15        And would it be fair to say that one of your
16   goals once you joined the police department was to become
17   a detective?
18   A.    No.
19   Q.    When did that become a goal of yours?
20   A.    After I became a police officer -- a seasoned
21   police officer of five years or more.
22   Q.    Okay.  Your goal was to become a detective --
23   then it became your goal to become a detective and a
24   homicide detective.  Correct?
25   A.    No.

Page 23

1    Q.    Was it ever your goal to become a homicide
2    detective?
3    A.    Latter in the years I was being used by the
4    homicide detail in -- to translate for Spanish-speaking
5    suspects.  I got acquainted with the investigations, and
6    I -- I liked it.
7    Q.    Okay.  So when you became a detective in
8    1976 --
9    A.    '75, I think it was.
10   Q.    '75.
11   A.    I'm not sure.  Times to me are hard to --
12   Q.    Fair enough.  When you became a detective
13   around '75 or '76, where were you assigned first?
14   A.    Burglary unit.
15   Q.    Okay.  And how long did you remain in burglary?
16   A.    About a year.
17   Q.    What was next?
18   A.    Robbery detail.
19   Q.    For how long?
20   A.    I would say five, six years, something like
21   that.
22   Q.    And after that?
23   A.    I went to forgery detail.  For about eight
24   months I was there.
25   Q.    Then what was next?

Page 24

1    A.    And then homicide.
2    Q.    What year was that?
3    A.    I think it was in 1985, but I don't remember
4    the month, no.
5    Q.    Okay.  So certainly by 1989 you were a seasoned
6    homicide detective.  Correct?
7    A.    No, there's always a lot to learn in homicide,
8    but I wouldn't consider myself a seasoned homicide
9    detective.  I would consider myself experienced enough.
10   Q.    Okay.  You were an experienced homicide
11   detective, and at that time, as you told us, you were
12   known in the department for being someone who's very
13   conscientious and honest.  Correct?
14   A.    That's correct.
15   Q.    And also being meticulous, right, very careful
16   in the work that you did?
17   A.    That's correct.
18   Q.    In terms of documenting, in terms of reporting,
19   all of those things -- you were known to be very good at
20   those things.  Correct?
21   A.    Correct.
22   Q.    And you took great pride in those things?
23   A.    Sure.
24   Q.    You took pride in being meticulous in your
25   reports.  Correct?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
25—28

Page 25

1    A.   Sure.
2    Q.   You took pride in being honest in everything
3  that you did?
4    A.   That's correct.
5    Q.   You took pride in being very conscientious in
6  everything that you did?
7    A.   That's correct.
8    Q.   You took pride in being both honest and
9  meticulous in any report that you made to a superior.
10 Correct?
11   A.   Yes.
12   Q.   Or to a district attorney.  Correct?
13   A.   That's correct.
14   Q.   Or even more importantly at trial.  Correct?
15   A.   Correct.
16   Q.   Now, in 1990, you also did some teaching at the
17 academy.  Is that correct?
18   A.   That's correct.
19   Q.   What courses did you teach?
20   A.   I taught a robbery investigation.  I also
21 taught very little of death investigation, not homicide
22 but just death investigation --
23   Q.   Okay.
24   A.   -- at the patrolman level.
25   Q.   Okay.  In other words -- well, let's split it

Page 26

1  up.
2        Did you teach robbery investigation to
3  patrol level or higher level?
4    A.   Patrol level.
5    Q.   Okay.  And same with death investigation?
6    A.   Yes.
7    Q.   In other words, you trained police officers on
8  their role in assisting detectives in those cases.
9  Correct?
10   A.   Correct.
11   Q.   And I take it as part of that training, you
12 also provided training in regard to the ethics of robbery
13 and homicide investigations?
14   A.   No.
15   Q.   No?
16   A.   No.  I mean, I would never get into that.
17   Q.   All right.  Well, certainly when I say
18 "ethics," I mean simply as the importance of being honest
19 in all -- all of your investigative activities.  Is that
20 something you emphasized to the officers?
21   A.   I don't think so.
22   Q.   All right.  How were you chosen to be a trainer
23 of officers in how to conduct investigations?
24   A.   In robbery, it came down to someone retiring, I
25 think, and I guess my name just came up.  And they said

Page 27

1  go do it, and I did it.
2    Q.   Now, were you also working homicide at the
3  time?  Was that an extra detail?
4    A.   It was an extra detail.
5    Q.   Okay.  Were you getting paid overtime for that?
6    A.   No.  During -- the academy is during the day.
7    Q.   Okay.  And -- but you were still doing your job
8  as a homicide detective while you were training?
9    A.   1990?
10   Q.   Yes.
11   A.   Yeah, until I retired.
12   Q.   In 1989?
13   A.   Yeah, until I retired.
14   Q.   So in 1989, you were both a trainer and a
15 homicide detective?
16   A.   That's correct.
17   Q.   And so I take it you were getting paid more
18 money because you were doing two jobs.  Right?
19   A.   No.
20   Q.   You got paid one salary?
21   A.   That's correct.
22   Q.   And no -- were you able to get overtime for
23 your homicide work as a result of doing the training?
24   A.   Not as a result of doing the training, but
25 homicides happen usually during off hours, and when I was

Page 28

1  called out, I would get paid overtime.
2    Q.   Now, as part of your training of officers on
3  robbery and death investigations, did you -- I take it
4  that you must have touched on interrogations?
5    A.   No, just their role in death investigation.
6    Q.   All right.  But certainly by 1989 you were
7  somebody who was known in the department -- in addition
8  to what you've already told us, you were known in the
9  department for somebody who was good at getting people to
10 give admissions.  Correct?
11       MS. RETTS:  Form.  Foundation.
12       MS. BERKE:  Join.
13   Q.   BY MR. BRUSTIN:  When they object, it's just
14 for the record.  Unless they tell you not to -- unless
15 your attorney tells you not to answer, you always can.
16   A.   Okay.  You'll have to repeat it.
17   Q.   Sure.
18       You told us about -- you told us about your
19 reputation in 1989, what you were known as:  Honesty,
20 integrity, being conscientious, all those things.
21   A.   As any -- as any police officer's considered
22 that.
23   Q.   And in 1989, you were also known as somebody
24 who was skilled at getting admissions from suspects.
25 Correct?



Page 29

1       MS. RETTS:  Form.

2       MS. BERKE:  Objection.  Foundation.

3       THE WITNESS:  I -- it's hard to answer that

4   question because I don't know what the other people knew

5   about me or thought about me.

6    Q.   BY MR. BRUSTIN:  Well, what do you think?  What

7   was the -- what was the -- what was the --

8    A.   I'd hate to guess because I'm sure some people

9   didn't like me; some people did.

10   Q.   Okay.

11   A.   So I don't know.

12   Q.   But you certainly thought of yourself as

13  somebody who was skilled at getting people to confess.

14  Correct?

15   A.   I knew where my skills were, yes.

16   Q.   And that one of your skills was getting people

17  to give you admissions.  Correct?

18   A.   To get people to talk, not necessarily

19  admissions.  Sometimes -- most of the time, I never did.

20   Q.   Okay.  I think you estimated in -- in one of

21  your -- in your testimony in this case that you were

22  about -- you thought you were about 50/50 in obtaining

23  confessions.  Does that sound about right?

24   A.   That's about right.

25   Q.   Okay.  You retired in 1990?

Page 30

1    A.   Yes.

2    Q.   Why?

3    A.   I retired because I was asked to become a

4   constable by our ex-Congressman Pastor and our

5   ex-Supervisor Carpenter.  They asked me if I would take

6   the job, and I said yes.

7    Q.   All right.  And I take it that your supervisors

8   in 1990 all recommended you for that?

9    A.   No.

10   Q.   Well, did you have the support of your

11  supervisors in the department when you left and ran for

12  constable?

13       MS. BERKE:  Objection.  Foundation.

14       THE WITNESS:  I guess.

15   Q.   BY MR. BRUSTIN:  Have you ever filed for

16  bankruptcy?

17   A.   Yes.

18   Q.   When?

19   A.   Just recently.

20   Q.   When?

21   A.   May of '13.

22   Q.   Okay.  And why did you do that?

23   A.   I had rentals, and when the market went down, I

24  couldn't get anyone to rent them.  And I filed bankruptcy

25  on my rentals.  Chapter 13.

Page 31

1    Q.   Do you own any -- do you currently own any real

2   property?

3    A.   Yes.

4    Q.   What do you own?

5    A.   Two houses.

6    Q.   Anything else?

7    A.   Some land in Colorado.

8    Q.   Anything else?

9    A.   Property.  No.

10   Q.   Have you taken any steps in the last ten years

11  to transfer any real property that you own into somebody

12  else's name?

13   A.   No.

14   Q.   You sure?

15   A.   As far as I can remember.

16   Q.   So any property that you've owned in the last

17  ten years has been in your name?

18   A.   Mine and my wife's.

19   Q.   And you took no steps for any reason to convey

20  that property to somebody else?

21   A.   You mean sell it?

22   Q.   Convey it in any manner.

23   A.   Well, yeah, I sold some property, yes.

24   Q.   Okay.  Aside from sales, did you take any steps

25  to convey real property that you owned to any other

Page 32

1   members of your family?

2       MS. ODEGARD:  Form.

3       THE WITNESS:  No.

4    Q.   BY MR. BRUSTIN:  Now, you testified in numerous

5   hearings and trials as a detective.  Fair to say?

6    A.   Yes, that was my job.

7    Q.   One part of your job was testifying in court

8   about your investigation.  Correct?

9    A.   Yes.

10   Q.   It was an important part of your job.  Correct?

11   A.   It was part of the job.

12   Q.   Do you consider that an important part of the

13  job?

14   A.   Just as important as the death investigation, I

15  guess.

16   Q.   Okay.  And each time you testified certainly in

17  a homicide case, before trial you would meet with the

18  district attorney so that you'd be prepared for trial.

19  Correct?

20   A.   The county attorney.

21       MS. BURGESS:  Form.

22   Q.   BY MR. BRUSTIN:  The county attorney.  I

23  apologize.

24       Is that correct?

25   A.   Correct.

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
33—36

Page 33

1   Q.   And you understood that each time you met with
2   the county attorney before testifying at trial, it was
3   your job to make sure that the county attorney understood
4   all of the relevant investigative steps you had taken.
5   Correct?
6   A.   That wasn't my -- my concern, no.
7   Q.   Well, you wanted to make sure that the county
8   attorney understood what you had -- what evidence you had
9   gathered and how.  Correct?
10  A.   No, that's the county attorney's job.
11  Q.   Okay.  Fair enough.
12  A.   He's asking me.  So...
13  Q.   Fair point.  Obviously, that's something you
14  would discuss with the county attorney before trial, what
15  you had done, what you had gathered, those types of
16  things?
17  A.   Yes.
18  Q.   And you would always answer those questions
19  openly and honestly.  Correct?
20  A.   True.
21  Q.   And you always testified consistently with what
22  you reported to the DA before trial.  Correct?
23       MS. BURGESS:  Form.
24       THE WITNESS:  Yeah.  I don't understand the
25  question that much.

Page 34

1   Q.   BY MR. BRUSTIN:  Obviously, you told the
2   truth -- withdrawn.
3       You always -- you always knew -- withdrawn.
4       You always reported to -- the truth to the
5   DA before trial about what you had done.  Correct?
6       MS. BERKE:  Objection.  Vague.
7       THE WITNESS:  Correct.
8   Q.   BY MR. BRUSTIN:  And you also testified about
9   those facts in the same way at trial.  Correct?
10      MS. BERKE:  Objection.  Vague.
11      THE WITNESS:  Yes.
12  Q.   BY MR. BRUSTIN:  In this case and every case.
13  Correct?
14  A.   Yes.
15  Q.   Now, you already told --
16      MS. BERKE:  You know what?  You're getting a
17  little off track with the topics you said you were going
18  to cover.  Other cases was not part of what you had said
19  you were going to question him about.
20      MR. BRUSTIN:  His practice -- his practices
21  were, absolutely.
22      MS. BERKE:  If you're going to ask him about
23  other cases --
24      MR. BRUSTIN:  I'm not going to be specific,
25  just his practices.  Of course I am.

Page 35

1       MS. BERKE:  Well, if you're asking about all
2   other cases --
3       MR. BRUSTIN:  Yes, his practice is for other
4   cases.
5       MS. BERKE:  You can ask him about practices,
6   but if you are going to use the term "all other cases,"
7   he's not going to respond to questions because that
8   wasn't on the list or --
9       MR. BRUSTIN:  If --
10      MS. BERKE:  -- what --
11      MR. BRUSTIN:  -- if --
12      MS. BERKE:  -- you agreed to testify about.
13      MR. BRUSTIN:  -- you think you're going to
14  make this list a basis for you to do what you're doing
15  right now, we will immediately stop that list --
16      MS. BERKE:  Okay.
17      MR. BRUSTIN:  -- and I will go to the Court.
18      MS. BERKE:  Okay.
19      MR. BRUSTIN:  You have no basis to instruct
20  him not to answer.  I'm going to keep asking him
21  questions.  That's what we're going to do.
22  Q.   BY MR. BRUSTIN:  Now, you've already told us
23  that you were a meticulous, conscientious detective.
24  Correct?
25  A.   Yes.

Page 36

1   Q.   And as part of that, you prided yourself on
2   your attention to detail in your reports.  Fair to say?
3       MS. BERKE:  Objection.  Asked and answered.
4       THE WITNESS:  Yes, I guess.
5   Q.   BY MR. BRUSTIN:  And, in other words, you were
6   always careful to put down anything that could be
7   relevant in your report.  Correct?
8   A.   Correct.
9   Q.   Let me ask you just a couple of questions about
10  your -- your health.  Okay?  I understand that you had --
11  and I don't want to pry.  I only want to know what's
12  relevant to this case.  I understand that you had a head
13  injury?
14  A.   That's correct.
15  Q.   And you've recovered from that?
16  A.   Not quite, no.  I haven't been released yet.
17  Q.   All right.  But you -- you've been cleared to
18  testify here in this deposition?
19  A.   Yes.
20  Q.   All right.  Are there any -- are there any
21  measures you need to take today to make sure that you're
22  able to continue?
23  A.   I just need to take some breaks.
24  Q.   All right.
25  A.   And I may need to take some rest room breaks.



Page 37

1    Q.    That's fine.  The only thing I would ask is
2  that you try to answer the question pending before taking
3  a break.  Okay?
4    A.    Okay.
5    Q.    And just tell me any time you want to take a
6  break, and you can.  Okay?
7    A.    Okay.
8    Q.    By the way, you understand that you're --
9  you've -- that the oath you've taken here today is the
10  precise -- is the same oath that you would take in a
11  court of law, the same meaning?
12    A.    Correct.
13    Q.    Now, I've had a lot of time to read your
14  testimony in this case, and one of the things that comes
15  up again and again is you making clear that you've always
16  believed that honesty and integrity are the most
17  important things you bring to the job.  Is that a fair
18  characterization?
19    A.    I don't know what you've read or anything else,
20  and I don't know where that's ever come up in a report,
21  no.
22    Q.    Well, I think you've already told us this, but
23  I'm going to ask you again.  For you honesty and
24  integrity are the most important parts of the job.  Fair
25  to say?

Page 38

1    A.    Fair to say, but I can't believe you read that
2  into the report.
3    Q.    Okay.
4    A.    You read that in the report.
5    Q.    I can show you in a minute.
6    A.    Well, fine.
7    Q.    I can read your quote.  "Absolutely would never
8  lie, absolutely didn't lie regarding Debra Milke."  Is
9  that something that you said?
10    A.    Yes, that's correct.
11    Q.    Okay.  And that's because the truth was so
12  critically important to you as a police officer.
13  Correct?
14    A.    The truth is always important.
15    Q.    It's important -- it was important to you as a
16  police officer and in your everyday life.  Fair to say?
17    A.    Okay.
18    Q.    You agree with me?
19    A.    Yes.
20    Q.    And you never lied about your investigative
21  activities in this case.  Correct?
22    A.    That's correct.
23    Q.    You never lied about your investigative
24  activities in any case.  Correct?
25          MS. BERKE:  I'm going to instruct him -- we

Page 39

1  have already advised you that he's asserting the Fifth
2  Amendment as to the Gallegos case.  So if you want to
3  separate that out, you can.
4          MR. BRUSTIN:  Okay.
5    Q.    BY MR. BRUSTIN:  Other than the Gallegos case,
6  you've never lied about your investigative activities in
7  any case.  Correct?
8          MS. BERKE:  And he didn't -- he's --
9          MR. BRUSTIN:  I'm just trying to do what you
10  asked me to do.
11          MS. BERKE:  Okay.
12          THE WITNESS:  Well, you're inferring that I
13  lied --
14          MS. BERKE:  Right.  You're implying that he
15  lied in the Gallegos case.
16          THE WITNESS:  -- in the Gallegos case, and
17  that's not true either.
18          MS. BERKE:  So why don't you form your
19  question in a different manner.
20    Q.    BY MR. BRUSTIN:  All right.  I'm not going to
21  be asking you any questions about the --
22          MS. BERKE:  Gallegos.
23    Q.    BY MR. BRUSTIN:  -- Gallegos case today, but is
24  it -- so I'm putting that aside, and I'm not making a
25  suggestion one way or another about that case.

Page 40

1          Have you ever lied about your investigative
2  activities in any of your cases?
3    A.    No.
4    Q.    You've never lied about what a witness said to
5  you or what you said to them.  Correct?
6    A.    To the best of my knowledge, yes.
7    Q.    And you understand that in order to be -- to
8  maintain that level of honesty, it's important that you
9  were very careful in your documentation of interviews.
10  Fair to say?
11    A.    Yes.
12    Q.    You lived your life on and off the job with
13  honesty and integrity.  Correct?
14    A.    I tried to.
15    Q.    It was the most important thing to you.
16  Correct?
17    A.    I tried to make it the most important thing.
18    Q.    Another way of saying it is you tell it exactly
19  like it is always.  Right?
20    A.    I try to.
21    Q.    Especially in homicide cases because the stakes
22  are so high.  Right?
23    A.    I try to.
24    Q.    You understood that you literally held
25  somebody's life in your hands in a homicide



Page 41

1  investigation.  Correct?
2        MS. RETTS:  Form.
3        MS. BERKE:  Objection.  Vague.
4        THE WITNESS:  I don't understand what you
5  mean.
6     Q.  BY MR. BRUSTIN:  Let me be more clear.
7        You understood that somebody that you were
8  arresting might face the death penalty.  Correct?
9        MS. RETTS:  Form.
10       THE WITNESS:  That wouldn't be my job.
11    Q.  BY MR. BRUSTIN:  Did you understand, sir, that
12  when you were investigating homicides, there was a chance
13  that somebody you were investigating could face the death
14  penalty?
15    A.  Yes.
16    Q.  You understood when you learned about the
17  circumstances of Debra Milke's case that the people
18  involved in that case could face the death penalty?
19    A.  I didn't think about it.
20    Q.  Okay.  So one thing I'm going to try to make
21  sure that we do here today and throughout your
22  deposition -- it will make things go much more
23  smoothly -- is to make sure that you answer the
24  question -- the specific question that I'm asking.
25    A.  Okay.

Page 42

1     Q.  I'm not interested in what you thought about.
2  If I am, I'll ask it.  What I'm asking you right now is
3  you understood that --
4     A.  No, I did not.
5     Q.  Okay.  So at no time during the investigation
6  of Debra Milke did it ever cross your mind that one of
7  the three people who were being prosecuted might face the
8  death penalty?
9     A.  No.  I mean, it wasn't important to me.
10    Q.  One of the things you said at your hearing
11  was -- and I'm paraphrasing, but you tell me if it sounds
12  like you -- truth matters.  Police officers are out to
13  seek the truth, especially in homicide cases, and you
14  would never put your position on the line to lie in an
15  interview.
16    A.  That's correct.
17    Q.  Is that accurate?
18    A.  That's correct.  That's accurate.
19    Q.  And one of the things you also said in that
20  same hearing was that you teach other officers that no
21  case, no issue, no suspect is more important than your
22  integrity?
23    A.  I can't recall that.
24    Q.  Is that -- is that something you agree with?
25    A.  No, because I -- I don't recall doing that.

Page 43

1     Q.  Well, okay.  Why don't we take a quick look at
2  it.  Take a look at -- and I'm going to -- this one's
3  mine.  Here you go.
4        And what we've tried to do is we've tried to
5  tab your testimony, and this is document -- this is a
6  binder that contains all of your testimony.  So it's easy
7  for you to see.
8        MR. BRUSTIN:  Which tab is it?
9        MS. GREEN:  It's the bottom tab for him.
10       MR. BRUSTIN:  Which one is it for me?
11       MS. GREEN:  It should be --
12    Q.  BY MR. BRUSTIN:  Take a look at the final tab
13  which says Saldate 2010 Evidentiary Hearing.
14    A.  Okay.
15       MS. BERKE:  What's the date?
16       MS. GREEN:  Evidentiary hearing 2010.  The
17  date of the hearing is January 11th, 2010.
18    Q.  BY MR. BRUSTIN:  All right.  Take a look at
19  page 32.
20       MS. ODEGARD:  Bates on that?
21       MR. BRUSTIN:  There's no Bates, not on mine.
22       MS. GREEN:  It's 12234.
23    Q.  BY MR. BRUSTIN:  Okay.  Take a look at page 32.
24  Let me know when you're there.
25    A.  Line 12?

Page 44

1     Q.  Line 10.
2        "Question:  And would you ever put your
3  position on the line to lie in an interview?
4        "Answer:  Absolutely not.  I've told many a
5  young officer -- I've taught at the academy, and I've
6  told them that there's no issue, no person, no suspect
7  that is bigger or more important than your integrity."
8        Do you stand by that statement?
9     A.  Yes.
10    Q.  Now, the same way you were always honest in
11  your personal and professional life, generally you were
12  also honest with suspects in interrogations, and you
13  demanded honesty in return.  Correct?
14    A.  Correct.
15    Q.  That was kind of a mantra for you, one of
16  your -- withdrawn.
17       To the extent that you had any technique in
18  interrogation, that was your technique.  You tell them
19  the truth; they tell you the truth.  Correct?
20       MS. BURGESS:  Form.
21       THE WITNESS:  I don't think it's technique.
22  It's just --
23    Q.  BY MR. BRUSTIN:  Just who you are?
24    A.  -- a request.
25    Q.  It's just who you are.  Right?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
45–48

Page 45

1    A.    Okay.

2    Q.    You agree?

3    A.    Agree.

4    Q.    You are honest with everybody, and you expect

5    them to be honest with you?

6    A.    During that interview, yes.

7    Q.    That includes suspects.  Right?

8    A.    That includes suspects.

9    Q.    That includes witnesses?

10    A.    Well, I -- I will never know.  I mean, they --

11    witnesses view things from their own perspective.  So I

12    mean, they may not be the truth.

13    Q.    You misunderstood me.  I'm saying that you're

14    always honest with them?

15    A.    Yes, I'm always honest with them.

16    Q.    You're honest with suspects.  You're honest

17    with witnesses.  Right?

18    A.    Yes.

19    Q.    Without exception.  Correct, sir?

20    A.    I would not say without exception.  I mean, I

21    can't recall an instance that I would have not been.

22    Q.    Okay.

23    A.    But I mean, that's -- without exception is a

24    pretty hard standard.

25    Q.    If you did it, it was an accident.  Correct?

Page 46

1    You never did it on purpose.  You never lied to a suspect

2    or witness on purpose.  Correct?

3         MS. BURGESS:  Form.

4         THE WITNESS:  That's not true.

5    BY MR. BRUSTIN:  When have you lied to a

6    suspect or a witness?

7    A.    May -- I may have.  I can't recall right now

8    the incident nor the case, but I may have involved --

9    told the witness something that wasn't the truth.

10    Q.    You just told us that your -- your -- the most

11    important thing to you was to always be honest with

12    suspects and witnesses.  Correct?

13    A.    Yes, but one step higher is the investigation.

14    Q.    So there may have been a time when there was

15    this -- when there was an exception to that, but you

16    can't remember any today?

17    A.    I think in the Milke case, I said I've already

18    got the statements of Styers and Scott.

19    Q.    That's a perfect example because you testified

20    about that in your trial, and what you said was that that

21    was just a mistake.  You mis- --- you forgot that you

22    hadn't gotten the statement from Styers.  Correct?

23    A.    Well, at that time, yes.

24    Q.    That was just inadvertent.

25    A.    Okay.

Page 47

1    Q.    You were trying to be honest with the

2    witness -- with the suspect, and you misremembered a

3    fact.  Correct?

4    A.    I may have, yes.

5    Q.    You always try to be honest, though.  Correct?

6    A.    I try, yes.

7    Q.    That was very important to you?

8    A.    Was that a question?

9    Q.    Yes, sir.

10    A.    Yes, of course.

11    Q.    And you were honest with all of the witnesses

12    in this case, beginning with Roger Scott.  Correct?

13    A.    Certainly.

14    Q.    With James Styers.  Correct?

15    A.    Certainly.

16    Q.    With Debra Milke.  Correct?

17    A.    Absolutely.

18    Q.    With Sandra Pickinpaugh.  Correct?

19    A.    Yes.

20    Q.    And one of the things that you always tell

21    witnesses and, in fact, you told Debra Milke according to

22    you is that you won't accept lies.  Right?

23    A.    That is correct.

24    Q.    I'm going to be straight with you; you be

25    straight with me.  Correct?

Page 48

1    A.    Correct.

2    Q.    And that's how you lived your life as a police

3    officer?

4    A.    That's how I investigated crimes, yes, and

5    interviewed witness.

6    Q.    And you would tell them and you would mean it:

7    My style is that you're going --

8         Withdrawn.

9         You testified that your style, if you had

10    one -- and I can show it to you if you need to -- was

11    that you're going to be very truthful, and you expected

12    truth in return.  Correct?

13    A.    That's correct.

14    Q.    You were as straightforward as you can be?

15    A.    I tried to be.

16    Q.    Some officers that you knew would try to trick

17    a suspect into confessing.  That wasn't what you did.

18    Correct?

19    A.    No.

20         MS. BURGESS:  Foundation.

21    Q.    BY MR. BRUSTIN:  You agree, though, that is --

22    that is sometimes what other officers would do?

23    A.    I --

24         MS. BURGESS:  Foundation.

25         MS. BERKE:  Join.



Page 49

1          THE WITNESS:  -- wouldn't know but --
2     Q.   BY MR. BRUSTIN:  You just didn't do it?
3     A.   I didn't do what?  I mean --
4     Q.   You didn't --
5     A.   -- I don't know that they didn't do it.
6     Q.   -- you didn't use tricks.  You used the truth?
7     A.   Oh, no, I did not use tricks.
8     Q.   You used the truth.  Correct?
9     A.   Well, that's -- as far as it would take me,
10    yes.
11    Q.   Either it worked there or it didn't, but you
12    always used the truth?
13         MS. BERKE:  Objection.  Misstates testimony.
14         THE WITNESS:  I -- I just hate to use the
15    word "always."  I mean -- I mean it's --
16    Q.   BY MR. BRUSTIN:  Are you telling me --
17         MS. BERKE:  Let him finish his answer before
18    you ask another question.
19         THE WITNESS:  I just don't like to use the
20    term "always," because that means that everything that I
21    ever did you're -- you're comparing that to the Milke
22    case.
23         MR. BRUSTIN:  Let's make this an exhibit.
24    So we'll mark this as Plaintiff's 1, please.
25         MS. BERKE:  Can you tell what this is so we

Page 50

1     can all get to it?
2          MR. BRUSTIN:  I will.
3          (Exhibit 1 was marked for identification.)
4     Q.   BY MR. BRUSTIN:  I'm showing you, Mr. Saldate,
5     what's been marked as Plaintiff's 1 for identification,
6     which is a transcript of an interview that was conducted
7     by Ken Ray on May 3rd, 1990, and it's Bates-stamped
8     NSB18092 through 18151.  Okay?
9     A.   (No oral response.)
10    Q.   You have to answer verbally.
11    A.   Yes.
12    Q.   And as you've told us, one of the practices
13    that I wasn't familiar with in Phoenix is that defense
14    lawyers are allowed to interview detectives in a homicide
15    case.  Correct?
16    A.   Correct.
17    Q.   And Mr. Ray took advantage of that here.
18    Correct?
19    A.   I don't think he took advantage of it.  He
20    just --
21    Q.   I meant --
22    A.   He did his job.
23    Q.   He did his job, exactly, and you weren't under
24    oath in this interview.  Correct?
25    A.   No.

Page 51

1     Q.   But, obviously, you were no less truthful than
2     you would have been if you were under oath.  Is that fair
3     to say?
4     A.   I think that's fair to say, yeah.
5     Q.   Okay.  You told the truth same way you would if
6     you were under oath.  Correct?
7     A.   I believe so.
8     Q.   And you understood that this was an interview
9     that Mr. Ray was using to defend his client, Ms. Milke,
10    at the time?
11    A.   Yes.
12    Q.   And you took your obligation to report honestly
13    and accurately to him as seriously as you would as if you
14    were on trial.  Correct?
15    A.   I tried.
16    Q.   All right.  Take a look at page 19.
17         MS. BERKE:  Amelia, could I get your copy or
18    get a copy of this?
19         MS. GREEN:  I believe we provided you with a
20    copy before the deposition.
21         MS. BERKE:  At the beginning?
22         MR. BRUSTIN:  It's one of the --
23         MS. BERKE:  Oh, is it one of the ones --
24         MR. BRUSTIN:  Yeah.
25         MS. GREEN:  (Inaudible.)

Page 52

1          MR. BRUSTIN:  Yeah, that's what I want.
2     Q.   BY MR. BRUSTIN:  So we're going to use this
3     later.  So you can keep this, but let's put this aside
4     for a minute and go back to the binder.
5          MR. BRUSTIN:  Where's the other binder?
6          MS. GREEN:  It's Debra Milke
7     volunteeringness hearing on the 10th of September 1990.
8          MR. BRUSTIN:  So where is it in his, the
9     tab?
10         MS. GREEN:  In his binder, it's the third
11    tab.
12    Q.   BY MR. BRUSTIN:  Third tab in that binder,
13    please.  This is the 1990 volunteeringness hearing, your
14    testimony?
15         MS. BERKE:  And, for the record, this is not
16    a complete transcript.  I don't -- is that intentional,
17    Exhibit 1?
18         MS. GREEN:  It's his testimony.
19         MR. BRUSTIN:  It's just his testimony.
20         MS. BERKE:  Right.  But it's not every page
21    of his testimony.  It goes page 2, page 5, page 7, 8, 11.
22         MR. BRUSTIN:  Oh, there's some missing
23    pages.  That's right.  I think -- I think we've located
24    those, and we will -- we will put those in.
25         MS. GREEN:  But we're no longer on that



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
53–56

Page 53

1  exhibit.

2        MR. BRUSTIN:  But you're right.

3        MS. BERKE:  So you're not asking him about

4  this?

5        MR. BRUSTIN:  Not right now.

6        MS. BERKE:  Okay.

7        MR. BRUSTIN:  But you're right.  There are

8  some missing pages, and we can fill those in.

9    Q.    BY MR. BRUSTIN:  Take a look at page 16.

10        MS. BERKE:  Which transcript?

11        MR. BRUSTIN:  This is the volunteeringness

12  hearing.  It's the third tab.

13        THE WITNESS:  Okay.

14    Q.    BY MR. BRUSTIN:  Take a look at page -- line --

15  page 16, line 10.  "I'm telling you that I walk in a

16  room, I'm straightforward with the person, I challenge

17  the person if that person is lying because I'm there to

18  get the truth."

19        And then if you take a look at page 18 --

20  I'm sorry -- page 19 -- I'm sorry.  Go back to page 12.

21  I apologize.

22    A.    Where is 12?

23        MS. GREEN:  It's before 13.  Somehow the

24  number got messed up.  The Bates number is 11921.

25    Q.    BY MR. BRUSTIN:  Page 12, line 1, "Secondly, I

Page 54

1  knew the relationship between him and Styers, or I had

2  been told the relationship.  And I didn't believe at that

3  point he had been given the opportunity to be truthful,

4  and because of different styles of interviews -- again,

5  my style's a little different.  I knew that I was going

6  to be straightforward with him.  I was going to be very

7  truthful with him, but I was going to make sure that

8  whatever he told me was going to jibe with the facts, and

9  that's my style."

10        That's what I was referring to earlier, sir.

11  Your style, to the extent you have one, as you swore to

12  under oath here is that your style is to be very truthful

13  with the suspect.  Correct?

14    A.    Yes.

15    Q.    That's what you did in this case.  That's what

16  you did in every case.  Correct?

17        MS. BERKE:  That -- objection.  Once again,

18  can we just have a standing agreement --

19        MR. BRUSTIN:  Absolutely.

20        MS. BERKE:  -- that your questions when you

21  say "all cases" do not include Gallegos?

22        MR. BRUSTIN:  We can.

23        MS. BERKE:  Okay.

24        THE WITNESS:  True.

25    Q.    BY MR. BRUSTIN:  In fact, one of the things you

Page 55

1  volunteered at a hearing in 1990 was that you had an

2  opportunity to get rid of some disciplinary records in

3  your file, and you chose not to because you thought it

4  was important that it remain there as a matter of

5  integrity.  Correct?

6    A.    Correct.

7        MS. GREEN:  2009.

8        MR. BRUSTIN:  2009.  I apologize.

9    Q.    BY MR. BRUSTIN:  That's how honest you are.

10  Right?

11    A.    That's me.

12    Q.    And another thing you volunteered in 2010 was

13  that at the time you were called into this case, you were

14  at home.  Right?

15    A.    Correct.

16    Q.    And that your wife was baking Christmas

17  cookies.  Right?

18    A.    Correct.

19    Q.    You volunteered that.  Right?

20    A.    Volunteered?  That's how I remembered it.

21    Q.    Okay.  And why was it significant to you --

22  significant to you that your wife was baking Christmas

23  cookies, and why did you think that was important to

24  mention under oath?

25        MS. BERKE:  Objection.  Compound.

Page 56

1        THE WITNESS:  I would like to see the

2  previous -- the question that resulted in that answer.

3    Q.    BY MR. BRUSTIN:  Okay.

4        MR. BRUSTIN:  What tab is it?

5        MS. GREEN:  His last tab of his binder.

6        MR. BRUSTIN:  The last tab of your binder.

7        THE WITNESS:  Last tab.

8        MS. GREEN:  2010, evidentiary hearing on

9  January 11, 2010.

10    Q.    BY MR. BRUSTIN:  Let me know when you're there.

11  Turn to page 15.

12    A.    Oh, okay.

13    Q.    You there?

14    A.    Yes.

15    Q.    All right.  Line 25 -- 24.  Sorry.  "Do you

16  remember what day of the week it was?

17        "Answer:  I think it was Sunday.

18        "Question:  Okay.

19        "Answer:  Because my days off were Sunday

20  and Monday.

21        "Question:  Okay.

22        "Answer:  And I think it was Sunday, and I

23  was at home alone.  My wife had gone to make -- I think

24  it was bake cookies or something with a friend for

25  Christmas."  And that's when you got the call.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
57–60

Page 57

1    So you volunteered that your wife was baking
2  Christmas cookies.  Right?
3    A.  Okay.  Yes, I did.
4    Q.  Is that an accurate description?
5    A.  Yes.
6    Q.  And the reason you volunteered that your wife
7  was baking Christmas cookies was because you wanted to
8  portray yourself as an honest family man who draws his
9  honesty from his faith.  Would that be fair to say?
10   A.  No.
11   Q.  Do you believe you draw your honesty from your
12  faith?
13   A.  I draw it from my conscience.
14   Q.  Okay.  Not from your faith?
15   A.  I have faith, yes.
16   Q.  But there was no ulterior motive in mentioning
17  that your wife was out baking Christmas cookies?
18   A.  Rather than saying that she was building a
19  barn, I thought that was more appropriate.
20   Q.  Okay.  Now, another thing that you talked about
21  throughout your testimony in this case that I've reviewed
22  is that through your many years of experience, you often
23  get gut instincts about the truth, gut instincts about
24  what's true and what's not during an investigation.
25   A.  That's every detective, yes.

Page 58

1    Q.  Fair enough.  And that certainly by 1989 you
2  had learned as a general matter to trust those instincts.
3  Fair to say?
4    A.  At times, yes.
5    Q.  You felt like your instincts were pretty good.
6  Right?
7    A.  I felt, yes.
8    Q.  Obviously, there are facts that you have to
9  consider, but often you just get a gut instinct about who
10  is lying and who is not.  Right?
11   A.  At times, yes.
12   Q.  And you used your gut and your gut reaction
13  when you were interviewing people, in this case in
14  particular.  Correct?
15   A.  Yes.
16   Q.  And one of the things you talked about under
17  oath was that you know generally from your 21 years
18  experience when someone is lying?
19   A.  I may have said that, but I don't actually
20  know.  I may believe I know but, you know...
21   Q.  Okay.  Certainly you believe you know
22  generally?
23   A.  Yeah, yes.
24   Q.  You're a good -- you're good at telling when
25  someone's telling the truth and when they're not in your

Page 59

1  own opinion?
2    A.  At times, yes.
3    Q.  For example, in this case, you had a gut
4  feeling that Roger Scott was not telling the truth, and
5  you followed that gut instinct.  Correct?
6    A.  Yes.
7    Q.  You had a gut instinct that he was more
8  involved than he was letting on to Detective Mills when
9  he was interviewing him.  Correct?
10   A.  Correct.
11   Q.  And you also had a gut instinct that once he
12  began telling you about his involvement when he finally
13  cracked that he was actually telling you the truth.
14  Right?
15   A.  Yes.
16   Q.  And the same was true with Styers.  When you
17  observed Styers and talked to him, you had a gut instinct
18  that he was not telling the truth, that none of it was
19  fitting together.  Correct?
20   A.  Correct.
21   Q.  And would it be fair to say that from talking
22  to Styers and particularly Scott early on in this case,
23  it was pretty clear that neither of them were
24  particularly bright?
25       MS. BERKE:  Objection.  Form.  Foundation.

Page 60

1       MS. RETTS:  Foundation.
2       MS. BERKE:  Vague.
3       THE WITNESS:  I didn't make that
4  determination, no.
5    Q.  BY MR. BRUSTIN:  Not even with Scott?
6    A.  Not even with Scott.
7    Q.  Would it be fair to say that your gut -- one of
8  your gut instincts at the beginning of this case when you
9  started talking to people early on that day was that the
10  mother wasn't acting as you might expect a mother to act?
11   A.  I wouldn't know about that.
12   Q.  You hadn't gotten any information from them --
13   A.  No.
14   Q.  -- about any of the officers at the scene?
15   A.  No.
16   Q.  Well, let me try this:  Certainly, when Roger
17  Scott mentioned to you that he was interested in getting
18  paid from an insurance policy that Debra Milke had, you
19  had a gut instinct that she might be involved.  Fair to
20  say?
21   A.  Yes.
22   Q.  You didn't know at that point how she was
23  involved, but you had a gut instinct that she might be.
24  Correct?
25       MS. BERKE:  Objection.  Vague.

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
61–64

Page 61

1     THE WITNESS: I --
2   Q.   BY MR. BRUSTIN: Withdraw the question.
3       Certainly, by the time you'd gotten to Debra
4   Milke when you interrogated her or interviewed her, you
5   had a gut instinct that she was guilty?
6       MS. RETTS: Form.
7       THE WITNESS: It was beyond a gut instinct.
8   Q.   BY MR. BRUSTIN: Okay. You -- you believe she
9   was guilty?
10  A.   Yes.
11  Q.   And -- and that's why you immediately told her
12  within -- certainly within minutes but maybe even seconds
13  that she was under arrest for the murder of her son?
14  A.   Correct.
15  Q.   That was before she made, according to you, any
16  admissions?
17  A.   That's true.
18  Q.   And because you had such a strong belief that
19  she was guilty, that's why you confronted her so directly
20  when you got to her. Correct?
21  A.   No. I -- I don't know if I had a -- that
22  strong a belief. I just felt that it -- she was guilty.
23  Q.   Okay. And that's why you confronted her so
24  directly immediately?
25  A.   Like you said before, it's my style.

Page 62

1   Q.   Okay. And what you said to her generally --
2   and we're going to go much more specifically later on.
3   What you said to her generally was, Your son is dead, and
4   you killed him. Correct?
5   A.   I don't recall whether I -- what the words are.
6   Q.   Not suggesting that. That's -- that's in
7   substance what you said to her. Your son is dead, and we
8   believe you killed her -- you killed him.
9       MS. RETTS: Form.
10      THE WITNESS: Again, I -- I don't recall the
11  exact words I used --
12  Q.   BY MR. BRUSTIN: Let me --
13  A.   -- but I'm willing to read it and --
14  Q.   Let me be very clear.
15      You do know that you told her -- because you
16  reviewed her report very carefully for today that you
17  told her that her son was dead. Correct?
18  A.   Yes.
19  Q.   And that she was under arrest for being part of
20  the murder. Correct?
21  A.   Correct.
22  Q.   So I described it accurately, didn't I?
23  A.   No, you said that she murdered him, and she did
24  not.
25  Q.   And I appreciate that. You're being very

Page 63

1   careful, and I appreciate that. Even today you're being
2   very careful.
3       In substance what you told her is that her
4   son was murdered and that you believed she was involved,
5   and that's why you were arresting her. Correct?
6   A.   Correct.
7   Q.   And you said that to her within seconds?
8   A.   I don't -- I wouldn't know seconds, minutes. I
9   mean, you know --
10  Q.   Early on in the interview?
11  A.   Early on.
12  Q.   And at that time, would it be fair to say
13  another word for a gut feeling is a working theory of the
14  case? Have you ever heard that term before?
15  A.   Yes.
16  Q.   All right. And any detective, certainly a
17  homicide detective, when you're looking at facts and
18  evidence in a case, you come up with working theories of
19  how the crime may have been committed and who may have
20  committed it. Correct?
21  A.   Yes.
22  Q.   You see how the evidence fits together, and you
23  have theories of what might have happened. Correct?
24  A.   Correct.
25  Q.   Any good detective does that, and you did that.

Page 64

1   Right?
2   A.   Correct.
3   Q.   And so, for example, early on in this case,
4   your gut or your working theory of the case was that
5   Debra convinced Styers and Scott to do her bidding and
6   kill her son?
7   A.   That's right.
8       MS. BERKE: Objection.
9   Q.   BY MR. BRUSTIN: More specifically your working
10  theory of the case was that Debra had convinced them to
11  kill her four-year-old son for money and perhaps the
12  promise of a romantic relationship. Fair to say?
13  A.   I -- I don't think nothing's fair to say
14  because this hasn't been -- that whole Milke thing hasn't
15  been fair, but that she --
16      You'll have to repeat the question.
17  Q.   Sure.
18      What do you mean this "whole Milke thing
19  hasn't been fair"?
20  A.   That's my opinion.
21  Q.   Okay.
22  A.   Keep it to myself.
23  Q.   Would it be fair to say that to the extent
24  there's a victim in this case, it's you?
25      MS. BERKE: Form.

Page 65

1        THE WITNESS:  I'm not a victim.
2    Q.   BY MR. BRUSTIN:  Okay.  Well, who hasn't it
3    been fair to?
4    A.   Hasn't been fair to Roger, to Styers, to me for
5    many things that have been put out that were wrong.
6    Q.   In other words, you're a victim.  Right?
7    A.   No, I'm not a victim.  I don't consider myself
8    a victim.
9    Q.   Working theory of the case -- that's all I'm
10   asking about.
11   A.   Okay.
12   Q.   And I want you to focus on it, please.
13   A.   All right.
14   Q.   Your working theory of the case as a very
15   experienced, very smart homicide detective was that --
16   A.   That's your opinion?
17   Q.   Absolutely.
18   A.   Thank you.
19   Q.   -- was -- your opinion was that what may have
20   happened here was that Debra Milke -- withdrawn.
21       Your working theory at the time you walked
22   into that interview with Debra Milke was that what may
23   have happened here is that Debra Milke convinced these
24   guys to kill her four-year-old son for money and perhaps
25   for promise of romance?

Page 66

1    A.   Yes.
2    Q.   And would it be fair to say that at that time
3    there was no other explanation in your mind based on your
4    many years of experience and your gut why two guys like
5    Styers and Scott would do this.  It doesn't make any
6    sense.  Right?
7    A.   Up until the -- time that Scott injected
8    Debra, my working theory was that these two men had killed
9    this young boy.
10   Q.   All right.  And that didn't make sense.  Why
11   would two men kill a four-year-old boy?  Right?
12   A.   I would -- I wouldn't say that right made
13   sense.  I was, like you said, a seasoned investigator.  I
14   had been around.  I had cases that didn't necessarily
15   make sense, but for some reason, it did -- they thought
16   it did, and they committed the crime.
17   Q.   But that's not how you worked as a detective.
18   You wanted to make sense of things.  Right?
19   A.   I think it was making sense that these two
20   young -- these two men had killed this boy.
21   Q.   One of the things you always look for in a
22   case, even if it's not going to be important at trial, is
23   motive.  It's important for your investigation.  Right?
24   A.   Ultimately, not -- not at first, no.
25   Q.   But it's important in you figuring out what

Page 67

1    happened.  Right?
2    A.   Sure.
3    Q.   And so one of the things you must have been
4    thinking was why would these two guys kill a
5    four-year-old.  Right?
6    A.   Not at that time.  The motive came when Scott
7    mentioned Debra Milke.
8    Q.   The motive -- I think you already told us this.
9    The motive came first when he mentioned insurance, right,
10   Debra Milke's insurance?
11       MS. BURGESS:  Foundation.  Form.
12       MS. BERKE:  Misstates testimony.
13   Q.   BY MR. BRUSTIN:  Let me withdraw the question.
14       You must have realized at the time that you
15   had in front of you two men with very -- with little or
16   no criminal histories who you believe had viciously
17   murdered, shot in the head a four-year-old boy.  Right?
18   A.   Correct.
19   Q.   Now, I take it that when you went to -- and
20   withdrawn.
21       And, by the way, your gut was also that
22   Roger Scott was telling you the truth about Debra Milke's
23   involvement.  Correct?
24   A.   Correct.
25   Q.   You also understood, though, that if your gut

Page 68

1    was wrong; in other words, if Scott was not telling the
2    truth, you understood that you would be confronting an
3    innocent woman not only with the violent death of her
4    child but blaming it for her -- blaming her for it in the
5    same sense.  You understood that was a possibility.
6    Correct?
7    A.   No.
8    Q.   Because your gut's never wrong.  Right?
9    A.   No, it's not that.  It's just that Roger Scott
10   was telling the truth.  He took me to the body.  He did
11   other things, and -- and so I believed him.
12   Q.   Okay.  Roger --
13   A.   There was basis to believe him.  The boy was
14   shot.  The boy was in -- in -- in the ravine where he
15   pointed out to.  So...
16   Q.   Okay.  So, in other words -- and Roger Scott
17   did nothing to corroborate Debra Milke's involvement.
18   Correct?  There was no gun, no bullets connecting Debra
19   Milke.  Correct?
20       MS. BURGESS:  Form.
21       THE WITNESS:  Not at that time, no.
22   Q.   BY MR. BRUSTIN:  Okay.  So you understood --
23   withdrawn.
24       Sometimes criminals including murderers lie
25   to you to help themselves.  Right?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
69–72

Page 69

1    A.   Absolutely.

2    Q.   All right.  So certainly you understood that
3    one possibility, even if it was just a distant
4    possibility -- one possibility when you went to Debra
5    Milke is that she was actually innocent.  Right?

6    A.   No.

7    Q.   All right.  Let me ask you -- just take that as
8    a hypothetical now.  You understand what a hypothetical
9    is.  Right?

10   A.   Yes, and I would rather not deal with a
11   hypothetical.

12   Q.   You don't have a choice.  So I want you to take
13   that as a hypothetical, okay, that Debra Milke was in
14   fact innocent, and if she was in fact innocent, what you
15   were doing is you were going to her, you were telling her
16   in one breath that her son had just been murdered and in
17   another breath that she was guilty of it.  Correct?

18        MS. RETTS:  Form.

19        MS. BERKE:  Objection.  Misstates evidence.

20        THE WITNESS:  No.

21   Q.   BY MR. BRUSTIN:  How am I wrong about that?

22   A.   I don't want to listen to a hypothetical that
23   you're making.

24   Q.   Okay.  You don't have a choice.

25   A.   Oh, I can listen to it, but I have a choice of

Page 70

1    how I'm going to answer it, and that is that no --

2    Q.   Are you refusing to answer my hypothetical?

3    A.   I'm not refusing to answer your hypothetical.
4    I just want a little bit more of a background how you --
5    how are you getting this hypothetical?

6    Q.   You don't get any of that.  You're under oath
7    here in answering my questions.

8        MS. BERKE:  He's here to answer the facts of
9    his involvement in the case.

10   Q.   BY MR. BRUSTIN:  Let's take a different case.
11   Let's say it's not Debra Milke.  Let's take a random
12   hypothetical.

13        You've got an innocent woman who -- with a
14   four-year-old son, and you tell her that not only that --
15   not only that her son is dead but you believe she killed
16   him, and it turns out that you're wrong.  How would you
17   expect that woman to react?

18   A.   I wouldn't know.

19   Q.   You're not a psychiatrist.  Right?

20   A.   No.

21   Q.   You have no idea how someone would react to
22   being accused -- to being told that their son is dead and
23   then being told that they killed him.  You have no idea
24   how someone would react to that.  Right?

25   A.   I've only been involved in it once.

Page 71

1    Q.   All right.  And would you agree that that would
2    probably, based on your many years as a homicide
3    detective, be a traumatic experience for a young mother
4    to be told that her son is dead in one breath and that
5    she's being falsely accused of killing him in another.
6    That would be a traumatic event?

7        MS. BERKE:  Objection.  Foundation.

8        MS. RETTS:  Foundation.

9        THE WITNESS:  It could be.

10   Q.   BY MR. BRUSTIN:  And you have no idea because
11   you're not a psychologist how someone's who's confronted
12   with that situation is supposed to react.  Right?

13   A.   I guess -- I guess so.

14   Q.   Any case you've been involved in where a mother
15   was confronted with a death of a child and charged with
16   it falsely?

17   A.   Yes.  The Debra Milke case was not a false, but
18   it was a case that I did where I confronted a mother and
19   that she had killed her son and was arrested for it.  But
20   I also had evidence to prove it.

21   Q.   And you're certain today that she's guilty as
22   you were at the time?

23   A.   Absolutely.

24   Q.   Okay.  Would you agree based on your experience
25   as a police detective, your many years of experience that

Page 72

1    you've told us about, that confronting an innocent woman
2    with the death of her son and then telling her that she
3    was involved in killing him, that would -- certainly
4    might cause somebody to become unglued?

5        MS. BERKE:  Objection.  Vague.  Misstates
6    evidence.

7        MS. RETTS:  Object to form.

8        THE WITNESS:  That's not my experience.

9    Q.   BY MR. BRUSTIN:  Well, do you have any
10   experience?  You've already told us that you're
11   absolutely certain that Debra Milke is guilty.  Right?

12   A.   Yes.

13   Q.   Do you have any experience on telling a mother
14   that her son is dead and then falsely accusing her of
15   killing him?

16   A.   No, I have the opposite feeling.

17   Q.   I'm asking you about the first kind.

18   A.   The first kind.

19   Q.   I'm asking about experience when you've told
20   somebody that their son is dead or their child is dead
21   and that they killed him but you were wrong.  Ever had
22   that experience?

23   A.   No.

24   Q.   Okay.  But certainly if that happened, you
25   would expect that the reaction of the mother might be to



Page 73

1 become unglued. Right?
2        MS. BERKE: Objection. Vague.
3        THE WITNESS: No.
4   Q.  BY MR. BRUSTIN: No?
5        MS. BERKE: Foundation.
6        THE WITNESS: No.
7   Q.  BY MR. BRUSTIN: Would you expect that that
8 would be a recipe for clear thinking?
9        MS. RETTS: Form. Foundation.
10       MS. BERKE: Objection. Vague.
11       THE WITNESS: I don't understand the
12 question.
13  Q.  BY MR. BRUSTIN: Really? If you --
14  A.  Yes.
15  Q.  If you falsely accuse -- if you falsely accuse
16 somebody of murder and tell them that their child is dead
17 at the same time, would you think that that would
18 certainly cause someone probably not to think very
19 clearly?
20       MS. BERKE: Objection. Foundation.
21       MS. RETTS: Form and foundation.
22       MS. BERKE: Misstates evidence.
23       THE WITNESS: That had not been my
24 experience.
25  Q.  BY MR. BRUSTIN: Okay.

Page 74

1        MS. BERKE: Do you need a break?
2        MR. BRUSTIN: Any time, you tell me.
3        THE WITNESS: I'm fine. Thank you.
4        MR. BRUSTIN: Let's mark this, please, as 2.
5        (Exhibit 2 was marked for identification.)
6        MR. BRUSTIN: We have to make some more
7 copies of these.
8        MS. BERKE: What is it?
9        MR. BRUSTIN: We're going to -- let me mark
10 them, all three, and then we'll -- I'll identify them.
11       MS. GREEN: This one will be 3.
12       (Exhibit 3 was marked for identification.)
13       MS. BERKE: Okay. You didn't give it to me.
14       MS. GREEN: Yes, we did.
15       MS. BERKE: No, you did not.
16       MR. BRUSTIN: You want to go off the record
17 and check, or you want to accuse each other?
18       MS. BERKE: I just looked through what she
19 gave me, and I don't have it.
20       MR. BRUSTIN: Okay. My guess is she did,
21 but if we didn't, it was inadvertent. So we'll give it
22 to you.
23       MS. BERKE: You want to come over and look
24 at what she gave me?
25       MR. BRUSTIN: No. Give her another copy.

Page 75

1        MS. BERKE: She didn't give it to me.
2        MR. BRUSTIN: You don't seem to have a good
3 sense of what you have and what you don't.
4        This is 4. You have 4, this one?
5        MS. BERKE: What is it?
6        MR. BRUSTIN: This has been marked 4.
7        (Exhibit 4 was marked for identification.)
8   Q.  BY MR. BRUSTIN: Okay. Mr. Saldate, I'm
9 showing you three documents that have been marked
10 Plaintiff's 2, 3 and 4. Plaintiff's 2 is a presentence
11 report connected with the James Styers trial. Okay?
12  A.  Uh-huh.
13  Q.  I'm going to refer you to specific pages in a
14 minute.
15  A.  Okay.
16       MS. BERKE: I didn't get this document.
17       MS. GREEN: Here.
18       MS. BERKE: Oh, wait. I do have that one.
19       MR. BRUSTIN: That's -- that's --
20       MS. BERKE: Okay.
21       MR. BRUSTIN: That's 2.
22       MS. BERKE: I do have the handwritten
23 document.
24  Q.  BY MR. BRUSTIN: 3 is a handwritten document
25 from James Styers dated 1/4/85, and 4 --

Page 76

1   A.  From James Styers?
2   Q.  I'm sorry?
3   A.  A handwritten document from him?
4   Q.  That's correct, sir. You're going to love it.
5   A.  Oh, okay.
6   Q.  And 4 is a document from a Dr. Berman. It was
7 an evaluation done on Styers in 1990.
8   A.  All right.
9   Q.  So let's take it one at a time. Okay?
10  A.  Fine.
11  Q.  First of all, have you seen any of these
12 documents before today ever?
13  A.  No.
14  Q.  All right. Take a look at -- let's start with
15 2 and take a look at page 6.
16  A.  Page 6. Okay. Employment. Starts with
17 employment.
18  Q.  Just tell me when you're there. I'm going to
19 refer you to exactly where I want you to be.
20       MS. BERKE: He's asking you to clarify the
21 page you're referring to, and he asked if it starts with
22 employment.
23       MR. BRUSTIN: Okay.
24       MS. BERKE: So can you just be cooperative
25 and let him know if that's the page -- correct page.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
77—80

Page 77

1    Q.   BY MR. BRUSTIN:  Okay.  You with me?
2    A.   Yes.
3    Q.   All right.  That's the page, page 6.  I want
4  you to go down where it says "Military."
5    A.   Yes.
6    Q.   Were you aware that James Styers was in the
7  military?
8    A.   Yes.
9    Q.   All right.  Take a look at the second
10  paragraph.  "The defendant maintains that in 1968, while
11  serving his tour of duty in Vietnam, he shot and killed
12  an eight year old Vietnamese child after the child jumped
13  into a military truck transporting troops.  The defendant
14  advised that the child was not armed at the time.
15  However, he was nonetheless not willing to take a chance
16  because it was not uncommon for the Viet Cong to wire
17  children with explosives."
18       So first question:  Were you aware prior to
19  today in reading this that in Vietnam James Styers shot
20  and killed an eight-year-old boy?
21    A.   No.
22    Q.   Now let's take a look at 3.
23    A.   Page 3?
24    Q.   Yes, sir.
25    A.   Okay.

Page 78

1    Q.   This is -- I will represent to you is James
2  Styers' handwriting.  Okay?  With me?
3    A.   Oh, this one here.
4       MS. BERKE:  You -- you said page 3, not
5  Exhibit 3.
6       MR. BRUSTIN:  Apologize.  Exhibit 3.
7       THE WITNESS:  Okay.
8       MS. GREEN:  We're making copies for two.
9       MR. BRUSTIN:  I don't care.
10    Q.   BY MR. BRUSTIN:  Exhibit 3 -- you see where it
11  says, "Current day to day"?
12    A.   Current day to day, yeah.
13    Q.   "Losing sleep because of dreams of Vietnam,
14  seeing kids including my own and wonder if I'm going to
15  do something to hurt them and then remembering the ones I
16  had to kill."
17       Okay?  Have you ever heard that -- seen that
18  before?
19    A.   No.
20    Q.   And this is James Styers saying that in his
21  dreams in 1985, he is seeing kids, including his own, in
22  dreams about killing them.  Right?
23       MS. BERKE:  Objection.  Foundation.
24       THE WITNESS:  It's what it says.
25    Q.   BY MR. BRUSTIN:  And not only that, it says

Page 79

1  "and remembering the ones he had to kill," suggesting
2  that he killed more than one child.  Correct?
3       MS. BERKE:  Objection.  Foundation.
4       THE WITNESS:  I won't suggest anything.  I
5  would just say that that's what he wrote.
6    Q.   BY MR. BRUSTIN:  Well, you -- you're -- you're
7  an educated man.  Right?
8    A.   I have some education, yes.
9    Q.   Is the plain meaning of the sentence that he
10  wrote, "the ones I had to kill," suggest to you as a
11  21-year investigator that "ones" means he killed more
12  than one child?  Would that be a fair reading?
13       MS. BURGESS:  Foundation.  Vague.
14       MS. BERKE:  Objection.  Foundation.
15       THE WITNESS:  I can't necessarily say that
16  was his intention.  I mean --
17    Q.   BY MR. BRUSTIN:  Well --
18    A.   "Ones" would be -- would be several or more
19  than one, but his intention could have been, you know,
20  different.  I mean, I don't know.
21    Q.   Okay.  Let's say you read this back at the time
22  you were investigating the case.  One -- one -- one
23  meaning you would have considered in reading this is
24  that, Oh, my God, James Styers is admitting to having
25  killed multiple children in the past.  Correct?

Page 80

1    A.   No, I would never phrase it like that, but I
2  would think about, yeah, he killed more than one children
3  in his letter as he states, but I would also open -- keep
4  it open that he may or may not have.  May not have been
5  his -- you know, I mean -- from looking at this, it's --
6  I mean, he could have made a mistake.  I don't know
7  because I didn't know anything about it anyways.  So...
8    Q.   Anything else?
9    A.   No.
10    Q.   You sure?
11       MS. BERKE:  Is there a question pending?
12    Q.   BY MR. BRUSTIN:  Okay.  Now let's take a look
13  at Exhibit 4.
14    A.   4.
15    Q.   This is the Court-appointed psych expert for
16  Mr. Styers.
17    A.   Okay.
18    Q.   Take a look at page -- I'm going to use the
19  Bates stamp pages on the bottom right corner.
20    A.   Uh-huh.
21    Q.   19949.  Let me know when you're with me at the
22  second page.
23    A.   Okay.  I'm with you.
24    Q.   All right.  Do you see in the middle of the
25  page where it says, "The patient had recognizable



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
81–84

Page 81

1   stressors"?

2           MS. BERKE:  Which paragraph?

3           THE WITNESS:  Which paragraph?

4   Q.   BY MR. BRUSTIN:  Okay.  Sorry.  The paragraph

5   beginning, "A 12/21/89 Maricopa County Correctional

6   Health Service patient's exam."

7   A.   No, but I -- what paragraph in this page?

8   Q.   Give it to me, and I'll show you.  Yeah, it's

9   double-sided.

10  A.   Oh, I'm sorry.  Apologize.  I didn't know it

11  was double-sided.

12  Q.   "A 12/21/89 Maricopa County Correctional Health

13  Services patient."  Do you see that?

14  A.   Yes, I do.

15  Q.   Okay.  I want to refer you to a specific part

16  of this.

17          First of all, you see in the middle where it

18  says "12/1985"?

19  A.   Yes.

20  Q.   It sounds like -- it says he has a diagnosis of

21  PTSD.

22  A.   Correct.

23  Q.   You see that?  You're familiar with PTSD.

24  Right?

25  A.   Yes, somewhat.

Page 82

1   Q.   And then further down it said -- do you see

2   where it says, "The patient"?

3   A.   Okay.

4   Q.   "The patient had recognizable stressors for

5   PTSD including shooting a young boy in the head when the

6   child went to their truck to shoot them."

7           Do you see that?

8   A.   Yes.

9   Q.   Okay.  So this is a medical document -- a

10  report indicating that not only did he kill a young boy

11  but Styers shot him in the head.  Right?

12          MS. BURGESS:  Foundation.

13          MS. BERKE:  Join.

14          MS. RETTS:  Join.

15          THE WITNESS:  Yes.

16  Q.   BY MR. BRUSTIN:  You making the connection?

17  A.   Yeah, I just saw -- I just saw it, yeah.

18  Q.   Okay.  Make any connection to this case?

19          MS. BERKE:  Objection.  Foundation.

20  Q.   BY MR. BRUSTIN:  Not really?

21  A.   No, not really.  I mean --

22  Q.   Okay.  Now, let's -- so keep this page out.  So

23  you've got this medical report, which is Exhibit 4,

24  suggesting that he shot a young boy in the head.  Right?

25  A.   Yes.

Page 83

1   Q.   And, by the way, it says in this document that

2   the child went to the truck to shoot them.  Right?

3   A.   That's correct.

4   Q.   That contradicts the other report, doesn't it?

5           MS. BURGESS:  Objection.  Form.

6           THE WITNESS:  The report he wrote?  Yes.

7   Q.   BY MR. BRUSTIN:  How does it contradict it?

8   A.   Could have had a bomb or something, I think you

9   said.

10  Q.   Okay.  In other words, it suggests in the one

11  report he's saying he had a reason to kill the kid and

12  another one he didn't.  Right?

13          MS. BERKE:  Objection.  Foundation.

14          MS. RETTS:  Form.  Foundation.

15          MS. BURGESS:  Join in that.

16          THE WITNESS:  May have had a bomb.  I think

17  he's -- he's --

18  Q.   BY MR. BRUSTIN:  Let's be precise.

19  A.   Okay.

20          MS. BERKE:  Let him finish answering your

21  question.

22          MR. BRUSTIN:  Let me be more precise.

23          THE WITNESS:  Okay.

24          MR. BRUSTIN:  I withdraw the question.

25  Q.   BY MR. BRUSTIN:  The first -- so it's

Page 84

1   Exhibit -- and keep the pages open -- Exhibit 2 now, page

2   6.  Keep these pages open so we can move along.

3   A.   Okay.

4   Q.   Page 6, bottom of the second -- the last

5   paragraph.

6   A.   Okay.

7   Q.   It says, "The defendant advised that the child

8   was not armed at the time."  Right?

9   A.   Uh-huh.

10  Q.   That contradicts that the child was going to

11  shoot them.  Right?

12  A.   Yes, it does.

13  Q.   It's a direct contradiction.  Right?

14  A.   Yes.

15  Q.   In other words, it suggests that James Styers

16  lied about -- in one of these interviews, he lied about

17  the reason for killing the child.  Correct?

18          MS. BERKE:  Objection.  Foundation.

19          MS. ODEGARD:  Join.

20          MS. BURGESS:  Do we have an agreement that

21  one objection counts for everyone so we don't have a

22  bunch of joiners?

23          MR. BRUSTIN:  Sure.

24          THE WITNESS:  I'm going back to what you

25  told me, that I wasn't a psychologist and couldn't make



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
85–88

Page 85

1 these determinations before. So this is a
2 psychologist -- a psychiatrist you say that's making
3 these determinations. So I guess it's correct.
4    Q.    BY MR. BRUSTIN: Okay. So let me -- let me
5 give you a summary of what I'm reading here, and you tell
6 me if you agree with me. Okay?
7    A.    Okay.
8    Q.    What I'm reading in these reports is that
9 there's evidence back to 1985 that James Styers -- James
10 Styers killed one or more children in Vietnam. Correct?
11    A.    I don't think there's evidence. I haven't seen
12 no evidence. His testimony you mean? His -- his writing
13 it down? That's not -- would you take someone to trial
14 with that? Of course not.
15    Q.    That's a good point. Let me try a different
16 one.
17          Would you agree that there is information in
18 these documents suggesting that James Styers killed one
19 or more children in Vietnam. Correct?
20    A.    Correct.
21    Q.    And that at least one of those children he shot
22 in the head. Correct?
23          MS. BERKE: Objection. Foundation.
24          THE WITNESS: Correct.
25    Q.    BY MR. BRUSTIN: And --

Page 86

1    A.    One of his statements, yeah, yes.
2    Q.    Information I'm just using now.
3    A.    Yes.
4    Q.    And there's information that after shooting one
5 or more children in the head, he was more recently having
6 dreams about hurting other children. Correct?
7          MS. BERKE: Objection. Foundation.
8          THE WITNESS: That's what he says, yes.
9    Q.    BY MR. BRUSTIN: Including his own children.
10 Correct?
11    A.    That's what he indicates.
12    Q.    Okay. Now, let me ask you some questions about
13 that information. Would you agree that the information
14 that you're reading here fits the psychological profile
15 of somebody who might kill a kid?
16          MS. BERKE: Objection. Foundation.
17          MS. ODEGARD: Form. Vague.
18          THE WITNESS: I'm going back to your
19 statement before me trying to diagnose things that I'm
20 not a psychologist, and I'm not a psychiatrist, and I
21 can't do that.
22    Q.    BY MR. BRUSTIN: Okay. Let's try a different
23 way.
24    A.    Okay.
25    Q.    Let's do what you do do every day as a

Page 87

1 detective.
2    A.    Okay.
3    Q.    Let's say that you had these three reports
4 sitting in front of you the day you got involved in this
5 investigation. You with me?
6    A.    I did not, but I'll go with you.
7    Q.    What would have been your working theory of the
8 case in regard to James Styers?
9          MS. BERKE: Objection. Speculation.
10 Foundation.
11          THE WITNESS: The same as it was at the
12 beginning, that Jim Styers and Roger Scott killed this
13 child.
14    Q.    BY MR. BRUSTIN: Okay. Would your theory --
15 would you agree that if you had gotten this early on,
16 your -- your -- one of your theories would have been this
17 is the kind of person that might kill a four-year-old
18 child?
19          MS. BURGESS: Foundation.
20          THE WITNESS: I would say that it would be
21 just information. That's all it would be, just
22 information, added information.
23    Q.    BY MR. BRUSTIN: Nothing really important?
24    A.    Well, I'm not saying not important. Everything
25 is important to -- but they have degrees, and this one I

Page 88

1 was going to have to decide whether -- you know, I mean,
2 I don't know if I could even introduce these in court.
3 So...
4    Q.    Okay. Well, putting that aside -- it's not
5 your job to introduce things in court. Correct?
6    A.    Well, the county attorney to produce in court.
7    Q.    Right. Your job is to gather evidence and
8 supply it to the DA. Right?
9    A.    Yes.
10    Q.    Would this be important information for the DA
11 to have if you had it?
12    A.    Eventually, yes.
13    Q.    Okay. And why would this be so important?
14    A.    Because he mentions that he killed some
15 children. So...
16    Q.    He kills kids. Right? Is that a common thing
17 to do --
18          MS. BERKE: Objection. Form.
19    Q.    BY MR. BRUSTIN: -- in your experience?
20          MS. BERKE: Objection. Foundation.
21          THE WITNESS: I wouldn't say that. He
22 killed this kid in Vietnam.
23    Q.    BY MR. BRUSTIN: In your experience, do -- in
24 your experience, do people have -- do people who have
25 visions of killing children sometimes kill children?

Page 89

1       MS. BERKE: Objection. Foundation.
2       THE WITNESS: Not my experience. I don't --
3   I have no experience in that.
4       Q.   BY MR. BRUSTIN: All right. How about this:
5   In your experience, do people who kill once -- are they
6   more likely to kill again?
7       MS. RETTS: Foundation. Vague.
8       MS. BERKE: Objection. Foundation.
9       THE WITNESS: I've never had that experience
10  of getting someone who killed more than one person or
11  arresting someone that killed more than one person.
12      Q.   BY MR. BRUSTIN: All right. In your
13  experience, do you think people who have killed children
14  might be more likely to kill children again?
15      MS. BERKE: Objection. Foundation.
16      THE WITNESS: I could only be guessing.
17      Q.   BY MR. BRUSTIN: If you had had this
18  information at the time, would you have considered the
19  possibility, Hey, maybe the reason that James Styers
20  killed this young boy is related to some of the psych
21  issues I'm seeing? Do you think that would have crossed
22  your mind?
23      A.   I didn't know any of the psych issues.
24      Q.   Okay.
25      A.   And -- and -- and the fact was that I had no

Page 90

1   consideration as to motive at that point. I was trying
2   to investigate the case. I found the body. I was
3   directed to the body. These two people have committed
4   this crime. I had no knowledge of anyone else committing
5   a crime with them.
6       Q.   You've already told us under oath that you
7   consider motive at the outset.
8       A.   I don't think I considered motive on the
9   outset. The onset is arresting people that have
10  confessed and that you have evidence on.
11      Q.   Okay. Now I'm asking you something different.
12      A.   Okay.
13      Q.   And I appreciate that.
14      Assuming that you had these documents at the
15  time -- and I know you say -- and I know you didn't, but
16  assuming you had these medical records for James Styers,
17  would you have considered the possibility that perhaps
18  James Styers shooting in the head of Chris Milke may have
19  been related to the psych issues that are described in
20  these documents? Would that have crossed your mind?
21      MS. BERKE: Objection. Asked and answered.
22      MS. RETTS: Foundation.
23      MS. BERKE: Join.
24      THE WITNESS: Cross my mind is pretty wide
25  there. So, I guess so.

Page 91

1       Q.   BY MR. BRUSTIN: I mean, it's -- it's a pretty
2   unique -- it's a pretty unique -- withdrawn.
3       Would you agree that -- withdrawn.
4       Would you agree that the documents you saw
5   suggest, if they're true, a terribly sick man who has
6   killed children before and dreams currently of killing
7   children again?
8       MS. BERKE: Objection. Vague. Foundation.
9       Q.   BY MR. BRUSTIN: Is that a fair
10  characterization?
11      A.   Appears to be.
12      Q.   And based on your -- as you told us -- already
13  told us, one of the things you're always trying to do is
14  figure out how a crime occurred and why. Right?
15      A.   Sure.
16      Q.   Related to that is what's the profile of
17  somebody who might commit this kind of crime, right, one
18  of the things you think about?
19      A.   No. I mean, as I understand profile, FBI-type
20  thing, no. I mean, I wouldn't -- wouldn't even start
21  with that at all.
22      MR. BRUSTIN: Okay. Let's take a
23  five-minute break.
24      THE WITNESS: Okay.
25      THE VIDEOGRAPHER: This ends media No. 1.

Page 92

1   We're off the record at 12:21 p.m.
2       (A recess was held off the record.)
3       THE VIDEOGRAPHER: This begins media No. 2
4   of the video-recorded deposition of Armando Saldate.
5   We're back on the record at 12:38 p.m.
6       Q.   BY MR. BRUSTIN: Mr. Saldate, one of the things
7   you said when I showed you those documents relating to
8   Jim Styers in his history of killing children was whether
9   or not is even true. You recall saying that?
10      A.   Yes.
11      Q.   Do you have any reason to believe that anything
12  I just showed you in these documents regarding Jim Styers
13  is not true?
14      MS. BERKE: Objection. Foundation.
15      THE WITNESS: I really don't care and don't
16  really -- haven't examined documents. If I would have
17  wanted to determine if they were true, I would have
18  contacted other people had I known these were available.
19      Q.   BY MR. BRUSTIN: Right.
20      A.   They weren't available to me.
21      Q.   All right. I want to ask you about not caring,
22  but before I do, tell me about -- the first question you
23  haven't answered. Do you have any reason, as you sit
24  here today, the question whether or not the information
25  in these documents is true?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
93–96

Page 93

1    MS. BERKE:  Objection.  Foundation.

2    THE WITNESS:  No, not particularly.

3    Q.   BY MR. BRUSTIN:  Okay.  And why don't you care?

4    A.   Because it's something that happened or claimed

5    that it happened afterwards that I was involved in the

6    investigation and interview of him.  Had he told me

7    during the interview these facts, I may have cared

8    because it was part of the investigation.  Right now it's

9    not part of the investigation.  It's part of your

10   investigation but not mine.

11   Q.   Okay.  Well, do you care in the sense that

12   these documents might suggest that Debra Milke was

13   innocent?

14   MS. BERKE:  Objection.  Misstates evidence.

15   THE WITNESS:  I know she's not.  So, no, I

16   don't care.

17   Q.   BY MR. BRUSTIN:  Okay.  And would it be fair to

18   say that you were shocked to see the information in these

19   documents?

20   A.   No.

21   Q.   Okay.  Were you surprised?

22   A.   I wouldn't call it that.  I've been surprised

23   by a lot of things in this case, but this, no, I'm not --

24   it's just pieces of paper that are -- I had no idea they

25   existed and were thrown in my face, and here I am.  I

Page 94

1    read them, and I -- that's all I think about them.

2    Q.   Did I give you a fair opportunity to read them?

3    A.   Sure.

4    Q.   Okay.  And these documents -- these pieces of

5    paper that were just thrown in your face -- did they

6    otherwise surprise you in any way?

7    A.   No.

8    MS. BERKE:  You didn't ask him to review the

9    entire documents.  You directed him to specific portions.

10   Are you asking him about those portions?

11   MR. BRUSTIN:  No, I'm only asking about the

12   portions where it talks about Jim Styers killing little

13   kids.  That's all I was asking about.

14   THE WITNESS:  Okay.

15   Q.   BY MR. BRUSTIN:  Would those portions surprise

16   you at all?

17   A.   Not really.

18   Q.   No.  All right.  Now, one of the things you

19   told us earlier is that when you interviewed Roger Scott,

20   you got a gut instinct that he was lying.  That's why you

21   took over the interview for Mills, to get the truth.

22   Correct?

23   A.   Yes.

24   Q.   All right.  Now, fair to say that one of the

25   things you looked as an experienced detective when you

Page 95

1    were interviewing witnesses is assessing their

2    credibility?

3    A.   Yes.

4    Q.   That's about as basic as it gets.  Right?

5    You're looking at a witness.  You're trying to figure out

6    if he's telling the truth.  Correct?

7    A.   Correct.

8    Q.   And it's exactly what you did when you were

9    with -- when you were sitting in the interview room with

10   Mills and he was interviewing Scott, you were observing

11   Scott and trying to determine whether or not he was

12   telling the truth.  Correct?

13   A.   Yes.

14   Q.   Now, fair to say that by 1989 you'd done

15   literally thousands of interviews of suspects and

16   witnesses?

17   A.   I wouldn't say thousands but quite a few.

18   Q.   All right.  And over the years, as you've

19   already told us, you became very experienced and good at,

20   at least in your opinion, of assessing whether or not

21   somebody was telling the truth?

22   A.   Okay.  Yes, I agree with that.

23   Q.   And you would agree that in your experience

24   many people are good liars.  They look you right in the

25   eye.  They -- they seem sincere, and then they lie

Page 96

1    through their teeth.  Right?

2    MS. BERKE:  Foundation.

3    THE WITNESS:  That's correct.

4    Q.   BY MR. BRUSTIN:  And so as an experienced

5    detective, you used other methods to determine whether or

6    not somebody was telling the truth, other things you

7    learned through the years to tell if somebody was telling

8    the truth.  Right?

9    MS. BERKE:  Objection.  Vague.

10   Q.   BY MR. BRUSTIN:  Just generally I'm asking.

11   Well, let me give you an example.

12   A.   Okay.  Please.

13   Q.   I'll give you some examples.  Sure.

14   One of the things you look for when you're

15   interviewing a witness or a suspect is whether or not

16   there are big inconsistencies or contradictions in what

17   they're telling you in their version of events.  Right?

18   A.   Yes.

19   Q.   And so another way of saying it is does the

20   story change in ways that -- that conveniently help the

21   reporter.  Right?  Let me give you an example in this

22   case.

23   In this case, during the first interviews,

24   Scott said to the other officers that he went to the mall

25   with a guy named Phil.  Right?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
97—100

Page 97

1    A.    Correct.

2    Q.    And then when you got him to admit that Phil

3    was made up, he said he actually went to the mall with

4    Styers.  Right?

5    A.    Correct.

6    Q.    But you knew that contradiction changing --

7    when he got caught changing from Phil to Styers suggested

8    that he was lying about bigger things to you.  Right?

9    A.    Yes.

10    Q.    And so that's what I'm talking about.  As an

11    experienced interviewer, one of the things you were

12    looking at is internal contradictions.  Somebody's story

13    changing over time to help themselves.  Right?

14    A.    Absolutely.

15    Q.    That's a good tell.  Right?

16        MS. BERKE:  Objection.  Vague.

17    Q.    BY MR. BRUSTIN:  Is that a fair term to use?

18    I'll use a different one.

19    A.    I'll use -- I'll use a term that I use a lot.

20    They will lie until the truth will do.

21    Q.    Okay.  Would it be fair to say that when you

22    hear contradictions in somebody's version of events,

23    that's a red flag that they're -- that they may be lying

24    about bigger things?

25        MS. BERKE:  Objection.  Vague.

Page 98

1    Q.    BY MR. BRUSTIN:  Is that fair?

2    A.    Sure.

3    Q.    All right.  So one example of telling how

4    somebody lies is big contradictions in their story.

5        Another way that experienced detectives like

6    you assess credibility is common sense.  Does what the

7    person tells you make common sense?

8    A.    Correct.

9    Q.    You're always thinking about that.  Right?

10    A.    Not always but correct.

11    Q.    All right.  And there's a saying related to

12    common sense that I think a lot of police officers use.

13    You correct me if I'm wrong.  Usually the simplest

14    explanation is the right one.  Have you heard that

15    before?

16    A.    I never heard that before, but I find it to be

17    true.

18    Q.    Okay.  And that's something that you're looking

19    for when you're assessing credibility of witnesses and

20    suspects, does their story make sense?

21    A.    Correct.

22    Q.    So, for example, I'll give you a hypothetical,

23    nothing to do with this case.

24        You're at the scene -- at the scene of a

25    homicide of a woman.  Her husband is at the scene.  That

Page 99

1    husband was suspected of beating his former wife to death

2    five years before but was not convicted.  The simplest

3    explanation there is that's probably the killer.  Right?

4        MS. BERKE:  Objection.  Foundation.

5        THE WITNESS:  It would give me some

6    indication, but I don't know if I would just say that

7    that was killer, no.

8    Q.    BY MR. BRUSTIN:  That would certainly be one of

9    your working theories?

10    A.    Working theory, yeah.

11    Q.    Because that's the simplest explanation.  The

12    guy who did it before will more likely do it again.

13    Right?

14    A.    Yes.

15    Q.    Just common sense?

16    A.    Sure.

17    Q.    All right.  Another way you look to see whether

18    or not somebody is lying is that -- does that person have

19    a history of lying about their actions to help

20    themselves.  Right?

21    A.    I most of the time would never have that

22    history before me when I'm interviewing.

23    Q.    Let me give you an example.

24    A.    Okay.

25    Q.    Let's say, for example, you have somebody who

Page 100

1    is either a formal or an informal snitch.

2    A.    Okay.

3    Q.    Right?  And sometimes snitches are trying to

4    help themselves in any way they can and aren't always

5    truthful.  Right?

6    A.    That's correct.

7    Q.    And so one of the things you're looking for in

8    a snitch is a history of whether they've been truthful.

9    Right?

10    A.    Correct.

11    Q.    And so if you're talking to a snitch and a

12    snitch has a history of lying and lying in the same way

13    to help themselves, that is a red flag for you that

14    they're probably not telling the truth?

15    A.    It -- it's a red flag for me that I need to

16    check out the information closer.

17    Q.    Okay.  I guess another way of saying it is when

18    you're assessing somebody who -- for credibility, does

19    that person have a pattern of lying about the same things

20    in the same ways, another way of saying it.  Fair

21    characterization?

22        MS. BERKE:  Objection.  Vague.  Foundation.

23        THE WITNESS:  I think that's fair.

24    Q.    BY MR. BRUSTIN:  All right.  And related to

25    that, you know, if you have a witness who fails to take



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
101–104

Page 101

1  available steps, steps that are easy to take to confirm a
2  story, for example, asking a corroborating witness to
3  leave or erasing a voicemail that has -- that has
4  information that's relevant, that's another red flag that
5  they may not be telling the truth.  Right?
6          MS. BERKE:  Objection.  Vague.  Foundation.
7          MS. RETTS:  Objection.
8          THE WITNESS:  I guess it could be, yes.
9      Q.  BY MR. BRUSTIN:  And those are some of the ways
10  that you used as a police officer to assess credibility,
11  contradictions in stories, contrary to common sense, a
12  pattern of lying.  Those are things you look for.  Right?
13      A.  Absolutely.
14      Q.  Now --
15      A.  Pattern of lying -- of course, I would have to
16  have that experience with --
17      Q.  Sure.
18      A.  -- that person.
19      Q.  Sure.
20          Do you think that that -- the different
21  categories I just gave you -- would that be a fair way
22  for the jury in this civil case to determine whether or
23  not you're telling the truth?
24          MS. RETTS:  Form.
25          THE WITNESS:  A fair way for me -- I don't

Page 102

1  know what fair -- how -- what would be fair to the jury
2  other than my statement that I am telling you the truth.
3      Q.  BY MR. BRUSTIN:  Well, but you've already told
4  us people are good liars.  They lie all the time.  They
5  look you right in the eye.
6      A.  I didn't say on myself.  I said people, and you
7  suggested people, and I agreed.
8      Q.  I know.  I'm asking you something else.
9          You just told us the criteria you used to
10  determine whether or not somebody is telling the truth?
11      A.  Correct.
12      Q.  The jury in this case is ultimately going to
13  have to decide whether you're telling the truth.  Are you
14  with me?
15      A.  Yes.
16      Q.  Now, what I'm asking you is in your view, would
17  it be fair for them to use the same criteria that you use
18  in determining truth, common sense, contradictions?  Is
19  that a fair way for them to determine if you're telling
20  the truth or, as I claim, lying?
21          MS. BERKE:  Objection.  Vague.
22          MS. BURGESS:  Form.  Foundation.
23          MS. BERKE:  Foundation.
24          MS. BURGESS:  Do your job.
25          MS. BERKE:  Right.  There will be a jury

Page 103

1  instruction on credibility assessment.
2      Q.  BY MR. BRUSTIN:  Is it fair?
3      A.  I don't know what would be fair with the jury.
4  I wouldn't be expecting -- even ask the jury to do
5  anything or believe anything other than the truth.
6      Q.  Okay.
7      A.  And they will determine that hopefully again.
8      Q.  Okay.  So you're going to look them right in
9  the eye and tell them your story, and that's why they
10  should believe you're telling the truth.  Right?
11      A.  I'm going to look them in the eye and tell them
12  the truth, yes.
13      Q.  Okay.  Because that's what you always do.
14  Right?
15      A.  Okay.  You say always, fine.
16      Q.  Now, would it be fair to say -- you've already
17  told us that you were -- you had never heard anything
18  about these medical records that I just showed you for
19  Styers.  Correct?
20      A.  That's correct.
21      Q.  And would it be fair to say that you have no
22  reason to believe that Debra Styers knew anything
23  about -- I'm sorry.
24          Would it be fair to say that you have no
25  reason to believe that Debra Milke knew anything about

Page 104

1  Jim Styers killing children in Vietnam.  Correct?
2          MS. BERKE:  Objection.  Foundation.
3          MS. BURGESS:  Objection.
4          THE WITNESS:  No.
5      Q.  BY MR. BRUSTIN:  As far as you know, she knew
6  nothing about it.  Right?
7          MS. BERKE:  Objection.  Foundation.
8          MS. BURGESS:  Form.
9          THE WITNESS:  Right.
10      Q.  BY MR. BRUSTIN:  And you -- you have no basis
11  to believe that Jim Styers told anybody in the world,
12  other than this psychiatrist, about killing children and
13  dreaming about killing other children.  Right?
14          MS. BERKE:  Objection.  Foundation.
15          THE WITNESS:  I really don't -- I don't know
16  whether he did or didn't.
17      Q.  BY MR. BRUSTIN:  Okay.  Would you agree --
18      A.  He didn't tell me.
19      Q.  Okay.  Would it be fair to say that what common
20  sense suggests in this case is that Styers killed Chris
21  because he was compelled to kill children in his mind?
22          MS. BERKE:  Objection.  Foundation.
23          MS. RETTS:  Form.
24          THE WITNESS:  I would have never thought
25  that.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
105–108

---

Page 105

1    Q.    BY MR. BRUSTIN:  Okay.  Until you saw it?
2    A.    Until, of course, you provide this, and that
3  may be --
4    Q.    Think about it this way:  What are the odds of
5  Debra Milke having a close family friend who liked
6  killing children just as she was plotting to kill her own
7  child?  That's a crazy coincidence.  Right?
8    A.    Again, I didn't know about this stuff before.
9  So I wouldn't even -- you know, I mean, if you want me to
10  take a hypothetical, you know, we can, but I didn't know
11  about this stuff, and I don't think -- I don't know of
12  anyone that knew about this stuff.
13    Q.    Now, one of the things you testified to
14  repeatedly during the proceedings involving Debra Milke
15  was that there are many times when you would continue
16  speaking to suspects even after they invoke their right
17  to an attorney.  Correct?
18    A.    Correct.
19    Q.    And the reason you gave for -- for continuing
20  to talk to suspects after they invoke their right to an
21  attorney was because you felt such a strong
22  responsibility to get the truth.  Correct?
23        MS. BERKE:  I'm instructing him to assert
24  his Fifth Amendment rights in response to this
25  questioning in light of the pending Gallegos matter.

---

Page 106

1        MR. BRUSTIN:  Fair enough.
2    Q.  BY MR. BRUSTIN:  Now, you've already told --
3        MR. BRUSTIN:  It doesn't matter.
4        (A discussion was held off the record.)
5        MR. BRUSTIN:  Let's get an agreement on
6  that.  So I'm not going to -- make sure we have an
7  agreement on this.  Because you have not determined yet
8  whether you're going to assert the Fifth Amendment on
9  this, I'm not going to ask foundational questions when he
10  asserts the Fifth on this right now until you've
11  determined he's going to assert the Fifth.  Is that
12  clear?  In other words, I thought what you told me was
13  that you may or may not end up asserting the Fifth on
14  this case?
15        MS. BERKE:  Well, at this point, he is, but
16  if the Gallegos matter concludes and it's over, then he
17  will withdraw it.
18        MR. BRUSTIN:  Okay.  What I'm telling you is
19  right now I'm not going to ask foundational questions
20  about it.
21        MS. BERKE:  Okay.
22        MR. BRUSTIN:  About him -- letting him
23  assert the Fifth until you make a final determination
24  whether you're going to --
25        MS. BERKE:  Okay.  So you will do that at

---

Page 107

1  the next deposition?
2        MR. BRUSTIN:  I'll do it next.
3        MS. BERKE:  Okay.
4    Q.    BY MR. BRUSTIN:  Now, you understood that part
5  of your oath as a police officer is to promise to follow
6  the rules and regulations of the department.  Correct?
7    A.    Correct.
8    Q.    Including the directions of your superiors?
9    A.    Correct.
10    Q.    And were you ever in the military?
11    A.    Yes.
12    Q.    When were you in the military?
13    A.    1969 through '73 in the Reserves.
14    Q.    Okay.  You were never deployed?
15    A.    No.
16    Q.    So certainly you understand how different
17  paramilitary organizations work.  Correct?
18    A.    Sure.
19    Q.    And the police department, like the military,
20  like -- what branch of service were you in?
21    A.    Marine Corps.
22    Q.    Like the Marine Corps is a paramilitary
23  organization.  Correct?
24        MS. RETTS:  Form.
25        THE WITNESS:  Yes.

---

Page 108

1    Q.    BY MR. BRUSTIN:  And you understood that as --
2  as -- as a member of a paramilitary organization, you had
3  an obligation to follow policies and procedures.
4  Correct?
5    A.    Correct.
6    Q.    And direction of your superiors.  Correct?
7    A.    Correct.
8    Q.    Whether you liked it or not?
9    A.    To a point, yes.
10    Q.    Okay.  And part of being an honest police
11  officer means honestly following the rules and
12  regulations of the department.  Correct?
13        MS. BERKE:  Objection.  Vague.
14        THE WITNESS:  When appropriate, yes.
15    Q.    BY MR. BRUSTIN:  When is it appropriate not to
16  follow the rules and regulations of the department?
17    A.    If the sergeant tells you something that's not
18  in the rules and regulations of the department.
19    Q.    Okay.  In other words, if you get a directive
20  that's contrary to the rules and regulations of the
21  department.  Correct?
22        MS. RETTS:  Form.
23        THE WITNESS:  Correct.
24    Q.    BY MR. BRUSTIN:  Can you give me an example?
25    A.    Sure.  I -- I can make up an example

---

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
109–112

Page 109

1 hypothetical like you say.
2    Q.   How about example related to this case?
3    A.   The -- Ontiveros telling me that -- to
4 tape-record it.
5    Q.   Okay.  So when Ontiveros gave you a directive
6 in this case to tape-record the conversation --
7    A.   That's correct.
8    Q.   -- your understanding was that because it
9 wasn't a -- it wasn't required by the department, that
10 was a directive you didn't necessarily have to follow.
11 Correct?
12    A.   That's not true.
13         MS. RETTS:  Form.
14    Q.   BY MR. BRUSTIN:  Okay.  So you tell me what I'm
15 missing.
16    A.   You are missing the fact that Debra didn't want
17 me to.
18    Q.   We're going to get to all that, but I'm --
19 right now I'm just asking about --
20    A.   I'm just telling you --
21         MS. BERKE:  Will you please let him finish
22 his answer.
23         THE WITNESS:  -- that Debra did not want me
24 to, and the directive that Sergeant Ontiveros gave me was
25 to tape-record it.

Page 110

1         However, we have some -- some leeway in
2 determining what's good for the case, and what's good for
3 the case would have been an admission which I got, and it
4 would have been fairly hard, I believe, if I would have
5 taken out the tape recorder after she requested I did not
6 tape-record that interview.
7    Q.   BY MR. BRUSTIN:  Okay.  And, again, we're going
8 to get to all that, but --
9    A.   Okay.
10    Q.   -- right now I want to focus on the directive.
11 What you're suggesting is that if a -- if a supervisor
12 gave you a directive that wasn't part of a policy, you
13 didn't necessarily have to follow it.  Is that right?
14    A.   I didn't say that.
15    Q.   Okay.  So, in other words, what you're telling
16 me is when -- when Ontiveros told you to tape-record the
17 interview with Debra Milke, you had an obligation to
18 tape-record it if she would permit it.  Correct?
19    A.   Correct.
20    Q.   And you took that obligation very seriously?
21    A.   I took that obligation as anything that any
22 supervisor tells me.
23    Q.   Okay.  Now, by the way, I take it that is --
24 that that -- given that you had gotten a directive from
25 Ontiveros to tape the -- tape the interview of Debra

Page 111

1 Milke, when you got back from the interview of Debra
2 Milke and Ontiveros learned that you hadn't taped it, you
3 had a lot of discussion about it?
4    A.   I don't recall.
5    Q.   Well, is it your testimony that Ontiveros never
6 said anything to you?
7    A.   No, my testimony is I don't recall.
8    Q.   Okay.  So, as you sit here today, you have no
9 recollection at all of Ontiveros in any way questioning
10 your decision not to tape-record Debra Milke's interview?
11         MS. RETTS:  Form.
12         THE WITNESS:  I don't recall, but I probably
13 was asked by it.
14         MS. BERKE:  Let's -- let's not speculate.
15         THE WITNESS:  Okay.
16         MS. BERKE:  Let's just go by what you
17 remember.
18         THE WITNESS:  Oh, I don't recall.
19    Q.   BY MR. BRUSTIN:  Okay.
20    A.   I really don't.
21    Q.   What do you think probably happened based on
22 your experience with what you were starting to tell me?
23    A.   He probably asked --
24         MS. BERKE:  Objection.  Speculation.
25 Foundation.

Page 112

1         THE WITNESS:  He probably would ask me, and
2 I would tell him that she refused.
3    Q.   BY MR. BRUSTIN:  Okay.  Now, by the way, by
4 1989 Ontiveros had been your supervisor by how long?
5    A.   He was not my direct supervisor.  He was a
6 supervisor in homicide.
7    Q.   All right.  Certainly, you had worked with him
8 in other cases?
9    A.   Number of cases, yeah.
10    Q.   All right.  And --
11    A.   Where he had directed my help.
12    Q.   Based on your working relationship with
13 Ontiveros, would it be fair to say that he trusted your
14 judgment in regard to investigating cases?
15    A.   I believe --
16         MS. ODEGARD:  Foundation.
17         THE WITNESS:  I believe all the sergeants
18 trusted their men.
19    Q.   BY MR. BRUSTIN:  Okay.  And including you?
20    A.   Including me.
21    Q.   And would it be fair to say that you don't
22 recall Sergeant Ontiveros criticizing anything you did as
23 a detective ever?
24         MS. ODEGARD:  Form.
25         MS. RETTS:  Join.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
113–116

Page 113

1       THE WITNESS:  I don't know.  I --

2    Q.   BY MR. BRUSTIN:  Do you recall any criticism?

3    A.   I don't recall any criticism of me directly,

4    him telling me -- giving me criticism.  I don't recall

5    any, but somebody else could have.

6    Q.   Would it be fair to say that the best you can

7    recall you received uniform praise from your superiors

8    about your investigative activities?

9       MS. BERKE:  Objection.  Vague.  Foundation.

10      THE WITNESS:  Okay.  That's fair.

11   Q.   BY MR. BRUSTIN:  All right.  And so certainly

12   by 1989, the best you can recall, you don't remember any

13   supervisor ever seriously criticizing any -- any -- any

14   investigative task that you had conducted.  Fair to say?

15      MS. RETTS:  Form.  Foundation.

16      THE WITNESS:  Well, we would have

17   discussions, and he would share his point of view, and I

18   would share mine.  And as -- and we would decide what was

19   going to happen, yes.

20   Q.   BY MR. BRUSTIN:  All right.

21   A.   I wouldn't say, you know, they would do

22   anything.

23   Q.   Okay.  Certainly no criticism that you can

24   recall?

25      MS. RETTS:  Form.

Page 114

1    Q.   BY MR. BRUSTIN:  Just different viewpoints?

2    A.   Different viewpoints.

3    Q.   Now, by 1989 you had participated in numerous

4    homicide and other serious felony investigations.

5    Correct?

6    A.   Correct.

7    Q.   And you had testified as a lead detective in

8    numerous homicide and other felony investigations?

9    A.   Several, yeah.  I wouldn't say "numerous."

10   Numerous could be 1200, and I didn't testify to that.

11   So --

12   Q.   Fair to say.  More than 50?

13   A.   More than 50, yes.

14   Q.   All right.  And so I understand you're not a

15   lawyer, but certainly based on your experience in

16   conducting investigations, meeting with county attorneys

17   and testifying at trials and hearings, you generally had

18   an understanding as to what kinds of evidence you

19   collected which got into evidence and what kind didn't.

20   Right?

21      MS. RETTS:  Form.

22   Q.   BY MR. BRUSTIN:  Let me give you an example.

23   A.   Clarify that.

24   Q.   Sure.  Let me give you an example.

25   A.   Okay.

Page 115

1    Q.   When you saw these documents relating to

2    Styers --

3    A.   Yes.

4    Q.   -- you volunteered this isn't going to get into

5    evidence.  Right?

6    A.   Well, yeah, I would determine that, whether it

7    would or would not, but I would discuss it with the

8    county attorney.

9    Q.   Okay.  All I'm suggesting to you is that by

10   1989 you had a good general sense about what kinds of

11   evidence would get in and what kind wouldn't.  Right?

12   A.   Yes.

13   Q.   All right.  So at the time you went to meet

14   Debra Milke, you understood that, according to the

15   information you claim to have gotten from Roger Scott,

16   Debra Milke was not present for the actual murder.

17   Correct?

18   A.   Correct.

19   Q.   And so you knew at that time that there might

20   never be any physical evidence connecting Debra Milke to

21   the murder.  Correct?

22   A.   I didn't know that then.  We had a possibility

23   of insurance being out there.  That's evidence.

24   Q.   Okay.  But certainly --

25   A.   But I mean --

Page 116

1    Q.   -- no murder weapon, nothing like that?

2       MS. BERKE:  Objection.  Foundation.

3       THE WITNESS:  Not that I know of.

4    Q.   BY MR. BRUSTIN:  All right.  Well, you knew at

5    the time that you interviewed Debra Milke that Roger

6    Scott's statements about Debra Milke would likely never

7    get in at a trial against Debra Milke.  Correct?

8    A.   No.

9    Q.   You didn't know that a witness couldn't be

10   forced to incriminate themselves?

11   A.   That -- I misunderstood your question.

12   Q.   Sure.  You knew when you went to interview

13   Debra Milke that the information that Roger Scott gave

14   you about Debra Milke might never make it into her trial?

15   A.   No, I didn't know that.

16   Q.   You didn't know that?

17   A.   No.

18   Q.   You didn't understand that he had a Fifth

19   Amendment right, just like you do, not to incriminate

20   himself?

21   A.   How am I going to guess that?

22   Q.   You didn't know that from other cases?

23   A.   No.

24   Q.   All right.

25   A.   I'm not going to guess about that.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
117–120

Page 117

1    Q.   Well, certainly you understood that in this
2  case in particular, the -- an admission from Debra Milke
3  would be critically important in proving her guilt?
4    A.   It's always important to get a confession.
5    Q.   Okay.  No -- no more important in this case
6  than any other?
7    A.   That's true.
8    Q.   And that's why they flew you down on that
9  helicopter to talk to her.  Right?
10       MS. BERKE:  Objection.  Foundation.
11       THE WITNESS:  That wasn't my decision.
12    Q.   BY MR. BRUSTIN:  It was your decision to go on
13  the helicopter?
14    A.   No, it was not my decision.
15    Q.   Okay.  But you understood that not -- that
16  people higher than your direct supervisors likely made
17  that decision.  Right?
18    A.   They made that decision.
19    Q.   And they made a decision that it was so
20  important for you to speak to Debra Milke quickly that
21  rather than do the three-hour drive, they were going to
22  use a helicopter to get you there.  Correct?
23       MS. ODEGARD:  Foundation.
24       MS. BERKE:  Objection.  Foundation.
25       MS. RETTS:  Foundation.

Page 118

1       THE WITNESS:  I don't know if that was their
2  feeling or not, that there, but I assume so, yes.
3    Q.   BY MR. BRUSTIN:  Okay.  What you assumed was
4  this interview was really important to the chain of
5  command?
6       MS. RETTS:  Form.
7       THE WITNESS:  Every interview is.
8    Q.   BY MR. BRUSTIN:  Well --
9    A.   And I've had several.
10    Q.   You've never had another case where you were
11  flown in a helicopter.  You've already testified to this.
12  I will give you a hint.  You've already testified --
13    A.   I don't need hints, but go ahead.
14    Q.   You've already testified that this is the first
15  and only time you were flown in a helicopter to conduct
16  an interview.  Do you recall that testimony?
17    A.   Probably.
18    Q.   Okay.  And is that true?  Was this the first
19  and only time you were flown in a helicopter to talk to a
20  witness?
21    A.   Yes.
22    Q.   All right.  And the drive was only three and a
23  half hours.  Right?
24    A.   I assume so.  I don't really know.
25    Q.   When you got into that helicopter for the first

Page 119

1  time, did it cross your mind that your superiors thought
2  this was an important witness interview?
3       MS. RETTS:  Form.
4       THE WITNESS:  Correct.
5    Q.   BY MR. BRUSTIN:  Did you -- would it be fair to
6  say that the -- that the murder of Chris Milke was a
7  high-profile homicide?
8    A.   It was.
9    Q.   Have you ever worked on a higher profile
10  homicide?
11    A.   I've worked on several.
12    Q.   Okay.  Before or after?
13    A.   Before and after.
14    Q.   All right.  Fair to say this is one of, if not
15  the most, high-profile --
16    A.   I wouldn't say "the most."  I would say I have
17  worked on several.
18    Q.   Okay.  So this is one of --
19    A.   Yes.
20    Q.   -- the most high-profile homicides you've
21  worked on?
22    A.   No, I would say that -- I didn't say that.
23       MS. BERKE:  Objection.  Misstates the
24  evidence.
25       THE WITNESS:  I said this is one of them,

Page 120

1  yes.
2    Q.   BY MR. BRUSTIN:  That's all I said.
3    A.   No, you said this is the highest.
4       MS. BERKE:  You said -- you're trying to put
5  the words "the most," "the highest" in his mouth, and
6  he's told you it's one among several high-profile cases
7  he's worked.
8    Q.   BY MR. BRUSTIN:  What are the others?
9    A.   I had the paper boy that was killed, and they
10  summoned me to interview this person.
11    Q.   Just want to know the --
12       MS. BERKE:  Yeah, just -- just mention the
13  cases.
14       THE WITNESS:  Okay.
15    Q.   BY MR. BRUSTIN:  Anything else?
16    A.   And a person who killed his wife and was being
17  investigated by a rookie and was directed to interview
18  that person.
19    Q.   Okay.  Let me ask you this -- and I want to
20  just tell you that I'm going to ask the county attorney
21  the same question -- you told us already that when you
22  went to visit Debra Milke and interview her, the first --
23  one of the first things you said to her before she made
24  any admissions was that she was under arrest, and you
25  read her her rights.  Correct?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
121–124

Page 121

1    A.   Correct.

2    Q.   Now, if Debra Milke had not made any

3  admissions, you wouldn't have arrested her.  Correct?

4    A.   That's not correct.

5    Q.   All right.  And --

6    A.   I did arrest her.

7    Q.   Okay.

8    A.   So I mean, I can't just take it back.

9    Q.   But I'm -- I'm asking you something different.

10   A.   Okay.  I'm sorry.

11   Q.   Is it your belief that if Debra Milke -- and I

12  know you claim she made admissions.

13   A.   Uh-huh.

14   Q.   If she had made no admissions, is it your

15  testimony that you would have arrested her, and you

16  believe she would have been prosecuted?

17   A.   Yes.

18   Q.   How?

19   A.   I have Roger Scott's testimony.  I had -- the

20  information that he said or gave me was verified by

21  things we found, things we located because of him, and

22  that's it.

23   Q.   Okay.  And so you believe that the

24  prosecutor -- the county prosecutor would have prosecuted

25  Milke without her admissions?

Page 122

1    A.   I believe that I --

2        MS. BURGESS:  Foundation.

3        THE WITNESS:  -- I would have arrested her,

4  and that would be my decision.

5    Q.   BY MR. BRUSTIN:  You understand that Roger

6  Scott never testified against Debra Milke at trial.

7  Correct?

8    A.   I don't know that.

9    Q.   First you're hearing that is me saying it?

10   A.   Probably.

11   Q.   All right.  I want to read you a description

12  from the Ninth Circuit Court of Appeals decision.  Have

13  you read that decision?

14   A.   Piece of junk, yes.

15   Q.   Okay.  That piece of junk by three of the -- of

16  the highest-ranking federal judges in the Ninth Circuit.

17  Correct?

18       MS. RETTS:  Form.

19       MS. BERKE:  Objection.  Foundation.

20   Q.   BY MR. BRUSTIN:  You understand the Ninth

21  Circuit Court of Appeals is the highest circuit -- is the

22  highest circuit in -- in the state?  Correct?

23       MS. BURGESS:  Objection.

24   Q.   BY MR. BRUSTIN:  Highest court in the state?

25   A.   Yes.

Page 123

1        MS. BERKE:  Highest overturn, then correct.

2    Q.   BY MR. BRUSTIN:  And was very critical of you.

3  Correct?

4    A.   With the information they had, yes.

5    Q.   Okay.  One of the things that was in that

6  opinion -- I'll read it to you.  "In 1990, a jury

7  convicted Debra Milke of murdering her four year old son

8  Christopher.  The judge sentenced her to death."

9        Is that all true?

10   A.   As far as I know, yes.

11   Q.   "The trial was essentially a swearing contest

12  between Milke and Phoenix police detective Armando

13  Saldate, Saldate Junior.  Saldate testified that Milke,

14  25 at the time, had confessed when he interviewed her

15  shortly after the murder."

16       True?

17   A.   True.

18       MS. BURGESS:  Foundation.

19   Q.   BY MR. BRUSTIN:  "Milke protested her innocence

20  and denied confessing."

21       True?

22       MS. BERKE:  Objection.  Foundation.

23       THE WITNESS:  She did what now?

24   Q.   BY MR. BRUSTIN:  Milke --

25       MS. BERKE:  Are you talking about at trial?

Page 124

1        MR. BRUSTIN:  At trial.

2        THE WITNESS:  Oh, at trial, yes.

3    Q.   BY MR. BRUSTIN:  "Milke protested her innocence

4  and denied confessing."

5        True.  Right?

6    A.   True.

7    Q.   "There were no other witnesses or direct

8  evidence linking Milke to the crime."

9        True?

10       MS. BERKE:  You're talking about at trial?

11       MS. BURGESS:  Objection.

12       MR. BRUSTIN:  Yes.

13       THE WITNESS:  At trial?

14       MS. BERKE:  Objection.  Foundation.

15       THE WITNESS:  I wouldn't know that because

16  it would be my opinion that -- or my knowledge that --

17  that Roger Scott's information and what would be used in

18  Debra Milke's.

19   Q.   BY MR. BRUSTIN:  Okay.  "The judge and jury --

20  the judge and jury believed Saldate."

21       True?

22   A.   That's true.

23   Q.   Okay.  And so --

24   A.   Several times, by the way.

25   Q.   Right.  You -- the -- each time the judge and



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
125–128

Page 125

1  jury believed you were telling the truth.  Right?
2      A.    The judge and jury, yes.
3      Q.    And you understood that was the key to her
4  conviction?
5          MS. BERKE:  Objection.  Foundation.
6          THE WITNESS:  No, that's -- a manner to
7  convict someone is they believe you, I guess, but the
8  confession and everything else convicted her.  I didn't
9  convict her.
10     Q.    BY MR. BRUSTIN:  All right.  Now, one of the
11 things you also testified to was that, as far as you knew
12 it, there were no specific guidelines in the Phoenix
13 Police Department regarding the manner in which
14 interrogations or interviews were conducted.  Is that
15 accurate?
16         MS. RETTS:  Foundation.
17         MS. BERKE:  And, again, he's going to assert
18 the Fifth Amendment on that line of questioning based on
19 the Gallegos case status.
20     Q.    BY MR. BRUSTIN:  Now, your understanding as to
21 why you were brought into this case when you were --
22 withdrawn.
23         At the time you were brought into this case,
24 there were as many as 50 officers working the case.  Fair
25 to say?

Page 126

1      A.    I don't know the amount, but I knew there was
2  several.
3      Q.    All right.  And you were brought into the case,
4  as you understood it, because of your ability to get
5  admissions from suspects.  Correct?
6          MS. RETTS:  Foundation.
7          MS. BERKE:  Join.
8      Q.    BY MR. BRUSTIN:  Is that your understanding?
9          MS. RETTS:  Same objection.
10         THE WITNESS:  I'll go that far, yeah.
11     Q.    BY MR. BRUSTIN:  Okay.  They brought you in
12 because they thought you might be able to get admissions
13 from the suspects.  Correct?
14         MS. BURGESS:  Foundation.
15         MS. RETTS:  Foundation.  Vague.
16         THE WITNESS:  Correct.
17     Q.    BY MR. BRUSTIN:  Because you had proven in the
18 past that you were good at that?
19     A.    I'm not going to agree to that.  I'm just -- I
20 just tell you that that's why they brought me in the
21 case.
22     Q.    They brought you in on your day off.  Right?
23     A.    Uh-huh.
24     Q.    There were other detectives there.  Right?
25     A.    And my wife was making cookies.

Page 127

1      Q.    Not just cookies, Christmas cookies?
2      A.    Christmas cookies.
3      Q.    You have a very good memory.  Right?
4      A.    No, not really.
5      Q.    Okay.  So they brought you in on your day off?
6      A.    Yes.
7      Q.    There are already plenty of detectives working
8  the case?
9          MS. RETTS:  Form.
10         THE WITNESS:  Yes.
11     Q.    BY MR. BRUSTIN:  But they chose you.  Right?
12     A.    They did.
13     Q.    Because you're the guy who gets admissions.
14 Right?
15         MS. RETTS:  Form.
16         MS. ODEGARD:  Objection.
17         THE WITNESS:  I can't say that for sure.
18     Q.    BY MR. BRUSTIN:  No.  That's what you believed?
19     A.    I believed it, not that I get an admission but
20 that I'm good in my interviews.
21     Q.    Okay.  And also that you had --
22     A.    Interrogations.
23     Q.    You believe that you had a reputation in the
24 department for somebody that was good at getting
25 admissions.  Correct?

Page 128

1      A.    You know, I've spoken to that several times,
2  and I really still don't understand whether they believed
3  I had a reputation or not.  I myself believe that I was
4  an average detective that worked hard and did what had to
5  be done to get -- get an investigation concluded.
6      Q.    Even if it meant cutting a little -- cutting a
7  few corners.  Right?
8      A.    I don't cut corners.
9      Q.    All right.  We'll get to that.
10     A.    Okay.
11     Q.    Now, you've talked about your style to the
12 extent you have one, which is tell the truth, expect the
13 truth.  Right?
14     A.    Correct.
15     Q.    Another thing that you did stylistically as an
16 interrogator was you -- your style was to let the -- let
17 the suspect talk?
18     A.    That's correct.
19     Q.    In other words, you tried to -- you tried to
20 ask as few questions as possible during an interrogation.
21 You wanted to hear it from the suspect?
22     A.    If that was -- if that would be allowable or --
23 I shouldn't say allowable.  If that would be --
24     Q.    You know what?  Let me be more precise.
25         MS. BERKE:  And wait, wait, wait.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
129–132

Page 129

1      THE WITNESS:  I have a hard time getting to
2  my words.
3      MR. BRUSTIN:  I'm sorry.
4      MS. BERKE:  Again, we're getting into the
5  Fifth Amendment issue, but if you want to be --
6      MR. BRUSTIN:  Okay.  Let me be more
7  specific.
8      MS. BERKE:  -- specific to this case, that's
9  fine.
10     MR. BRUSTIN:  I will.
11     Q.   BY MR. BRUSTIN:  Well, okay.  In this case --
12  well, I'm going to ask it generally.  Your style was to
13  ask very few questions usually at the beginning and at
14  the end and in the middle only to clarify.  Fair to say?
15     MS. BERKE:  Again, his practice for
16  conducting interviews is a topic that we said that he's
17  going to assert the Fifth on based on the Gallegos case.
18     Q.   BY MR. BRUSTIN:  Okay.  Now, one of the things
19  you testified about in this case was that you don't just
20  accept someone saying they're guilty.  You want to know
21  how and why, what happened.  Correct?
22     A.   Correct.
23     Q.   Any experienced detective understands that --
24  that a confession is meaningful based on the details.
25  Right?

Page 130

1      A.   On the truth, yes.
2      Q.   But you want to get as many details --
3  corroborating details from someone confessing as you
4  possibly can about why they did it or where they did it,
5  all those things.  Correct?
6      A.   I get -- try to get the truth.  That's all I
7  try to do, to get the truth and knowing that the truth
8  from their perspective may not be the entire truth but
9  just how they saw it, just like any other witness.
10     Q.   I got that, and you want the truth, but now I'm
11  asking some -- I'm taking in the next step.
12     A.   Okay.
13     Q.   As part of getting the truth -- withdrawn.
14         You understood, for example, that sometimes
15  people confess to crimes they don't commit.  Right?
16     A.   No.
17     Q.   Well, you've testified that you always tape
18  interviews with people with mental illness.  Correct?
19     A.   I don't know if I -- I can't recall that.
20     Q.   Well, you did.
21     A.   Okay, fine.
22     Q.   And let me ask you this:  Is one of the reasons
23  you tape interviews with people with mental illness
24  because people with mental illness might confess to a
25  crime they didn't commit?

Page 131

1      MS. BERKE:  Objection.  Foundation.
2      THE WITNESS:  Might confess to things that
3  don't add up and don't meet the crime.
4      Q.   BY MR. BRUSTIN:  Right.  And so you recognize
5  that there could be reasons why somebody may make an
6  admission that -- about committing a crime that wasn't
7  true?
8      A.   I guess it could be remotely.
9      Q.   Okay.  And in part of your -- your lifelong
10  quest to seek the truth, one of the ways to do that in an
11  interrogation was to get details about what happened.
12  Correct?
13     A.   No, just to get the truth.
14     Q.   Well, if they --
15     A.   If there's involved details that they want to
16  give me, that's fine.
17     Q.   Okay.  But you understood that you're better
18  at -- you're better able to ascertain the truth the more
19  details you get.  Correct?
20     A.   I may ask questions, yes.
21     Q.   Okay.  Well, you do ask questions.  You want to
22  know -- for example, it's not enough for someone to say,
23  I did it.  You want to know how they did it, why they did
24  it, where they did it.  Right?
25     A.   It would be nice to know, yes.

Page 132

1      Q.   And you ask those kinds of follow-up questions
2  to get that information?
3      A.   At times, yes.
4      Q.   Certainly in this case.  Right?
5      A.   I guess, yeah.  You know, I haven't really
6  thought about it, but, yeah, I guess.
7      Q.   You understood that if you could get
8  corroborating details in a confession, that would be
9  powerful evidence to help convict somebody.  Correct?
10     A.   I understood that was the process of the
11  investigation, yes.
12     Q.   And so for a variety of reasons, if you can
13  when you're doing -- when you're interviewing a suspect,
14  you want to get as many details about their involvement
15  as you can, as much as they're willing to tell you?
16     A.   As much as they're willing to tell me and --
17  during their statement, yes.
18     Q.   Okay.  But you asked -- certainly you felt
19  comfortable asking follow-up questions if they were
20  talking to you.  Correct?
21     A.   If I wanted to, yes.
22     MS. BERKE:  Again, we're getting far beyond
23  the Milke case, and I've made it clear he's asserting the
24  Fifth Amendment as to his practices and interviews.
25     Q.   BY MR. BRUSTIN:  Okay.  Another technique that

Page 133

1  you used -- that you used in this case was that you would
2  get very close to the suspect.  Correct?
3     A.   Yes.
4     Q.   Six to 12 inches from their face?
5     A.   Right.
6          MS. BERKE:  You know what?  Do you want me
7  to just keep asserting the Fifth?
8          MR. BRUSTIN:  I'm going to move -- if you
9  move -- if you move to assert the Fifth on this, I will
10 move for sanctions on it.
11         MS. BERKE:  Okay.
12         MR. BRUSTIN:  Are you really going to
13 move -- you think you have a basis to assert the Fifth on
14 this?
15         MS. BERKE:  Because it relates to the
16 Gallegos case, yes.
17         MR. BRUSTIN:  You already got a blanket
18 exception to the Gallegos case.  Are you taking that
19 back?
20         MS. BERKE:  My concern is that if he answers
21 these questions, he'll be waiving his privilege as to the
22 Gallegos case.
23         MR. BRUSTIN:  I already -- I already agreed
24 that he wasn't.  We agreed on the record about an hour
25 ago.

Page 134

1          MS. BERKE:  Well, I don't know that you can
2  agree to that on behalf of a prosecutor.
3          MR. BRUSTIN:  You know, in order to assert
4  the Fifth, it's your job to understand when you can and
5  cannot do it.  You clearly do not.
6          MS. BERKE:  I don't need you to tell me how
7  to do my job.  So he's asserting the Fifth to that.
8          MR. BRUSTIN:  Okay.  And I'll have --
9          MS. BERKE:  You have two more deposition
10 sessions to --
11         MR. BRUSTIN:  I'll do whatever I have to do.
12 That's fine.
13         MS. BERKE:  -- to depose him.
14         MR. BRUSTIN:  Okay.  Then let's stop talking
15 about it.  If you want to assert the Fifth, assert the
16 Fifth.
17    Q.   BY MR. BRUSTIN:  In this case, one of the
18 techniques you used with Debra Milke was to get very
19 close to her.  Correct?
20    A.   Yes.
21    Q.   You looked six to 12 inches away.  Right?
22    A.   Yes.
23    Q.   You look her directly in the eye.  Correct?
24    A.   Correct.
25    Q.   And you make sure she's looking directly in

Page 135

1  your eyes.  Correct?
2     A.   Yes.
3     Q.   Eye contact for you is very important.  Right?
4     A.   Correct.
5     Q.   And through that process, that's how you
6  control the situation.  Fair to say?  You make it clear
7  that you're in charge, and you're only going to accept
8  the truth?
9          MS. BERKE:  Are you talking about in the
10 Milke case?
11         MR. BRUSTIN:  Sure.
12         THE WITNESS:  In this case, that was my
13 direct idea, yes.
14    Q.   BY MR. BRUSTIN:  In fact, it was your
15 intention -- and you testified to this -- that if Debra
16 Milke was not looking you in the eyes, you would have
17 told her to do so.  Correct?
18    A.   Correct.
19    Q.   And you also testified that the first step in
20 getting a confession is to control the situation.
21 Correct?
22         MS. BERKE:  Again, are you talking about --
23         MR. BRUSTIN:  I'm talking about his
24 testimony.
25         MS. BERKE:  Okay.

Page 136

1     Q.   BY MR. BRUSTIN:  You testify that the first
2  step in getting a confession is controlling the
3  situation.  Correct?
4          MS. BERKE:  He's not going to testify about
5  his interrogation practices.
6     Q.   BY MR. BRUSTIN:  Your first step in getting a
7  confession with Debra Milke was controlling the
8  situation.  Correct?
9     A.   Yes.
10    Q.   Now, you understood that obviously it was never
11 appropriate to touch a female suspect during an
12 interrogation.  Correct?
13    A.   That's not correct.
14    Q.   It's okay to touch them?
15    A.   Of course you're not going to touch them.  I
16 never touched her in a way -- I touched her to get her
17 attention to make sure she had her attention towards me.
18    Q.   Okay.
19    A.   That's part of my technique or style you infer.
20    Q.   Okay.  So what you did to make sure that Debra
21 Milke was paying attention to you is that, while you were
22 six to 12 inches away, you put a hand on each one of her
23 knees.  Correct?
24    A.   I recall only one knee, but that's -- you know,
25 I could have.

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
137–140

Page 137

1    Q.    Could have been two?

2    A.    Could have been two.

3    Q.    Okay.  And as far as you were concerned, that
4    was perfectly permissible?

5    A.    Yes.

6    Q.    Okay.  By the way, has anyone ever asked you
7    about that before I did?

8    A.    About?

9    Q.    Putting your hands on Debra's knees when you
10   were six to 12 inches from her face.

11   A.    Are you getting angry?

12   Q.    Oh, I couldn't be more angry.

13   A.    Well, I'm not angry, but -- and you're
14   asking --

15   Q.    This is very personal for me --

16   A.    Really?

17   Q.    -- if that's what you're asking.

18   A.    Then you're the victim.  You're a victim.

19         But anyway repeat the question again.

20   Q.    Sure.

21         When you put your hands on Debra's knees

22         MS. BERKE:  Can you not yell at him?

23         MR. BRUSTIN:  Sure.

24   Q.    BY MR. BRUSTIN:  When you put your hands on
25   Debra's knees from six to 12 inches away, looking at her

Page 138

1    like I'm looking at you -- can you look at me?  When you
2    did that, was it your belief that was perfectly
3    appropriate?

4    A.    Yes.

5    Q.    And nobody ever suggested otherwise to you.
6    Correct?

7    A.    Correct.

8    Q.    Before me?

9    A.    Correct.

10   Q.    I'm the first person that ever told you that it
11   wasn't appropriate to put your hands on Debra Milke's
12   knees when you were accusing her of killing her son?

13   A.    Yes.

14   Q.    Did you ever consider the possibility that
15   touching her knees with your face six to 12 inches from
16   hers might be considered sexual in nature?

17   A.    By you, possibly, but by me, no.

18   Q.    Nobody else -- no reasonable person.  Right?

19   A.    No.

20   Q.    And you certainly weren't attempting -- you
21   certainly weren't attempting to take advantage of her
22   sexually.  Correct?

23   A.    That is correct.

24   Q.    It's laughable.  Right?

25   A.    What's laughable is --

Page 139

1    Q.    That I'm accusing you of it.  Right?

2    A.    Yeah.

3    Q.    Because you wouldn't do that.  Right?

4         MS. BERKE:  Argumentative.  You don't need
5    to answer that.

6    Q.    BY MR. BRUSTIN:  You wouldn't take advantage of
7    somebody sexually.  Right?

8    A.    You know --

9         MS. BERKE:  Objection.

10        THE WITNESS:  -- that's not true.

11        MS. BERKE:  This is not a line of
12   questioning that you --

13        THE WITNESS:  You're -- you're angry.

14   You're taking this personal.  So I mean, I can understand
15   your questioning.

16   Q.    BY MR. BRUSTIN:  You would agree that touching
17   Debra Milke in a sexual way during a custo-- during a
18   custodial interrogation would be the height of
19   immorality.  Correct?

20        MS. BERKE:  Objection.  Vague.

21        THE WITNESS:  I don't know that --

22   Q.    BY MR. BRUSTIN:  Okay.

23   A.    -- because it wasn't a sexual way, and it
24   wasn't anything like that.

25   Q.    Okay.  Any reason why it was never mentioned in

Page 140

1    any report or testimony that you put your hands on her
2    knees when you were talking to her?

3    A.    No.

4    Q.    Can you show me how you put your hands on her
5    knees?  And you say it may have been two.  Right?

6    A.    May have been two.

7    Q.    And you could have been as close as this?

8    A.    You know, 12, 18 inches maybe even but six to
9    18 inches, I guess.  I don't know.

10   Q.    Okay.  Now, because you never -- you never
11   taped unless -- unless you were -- unless you had to, you
12   took copious notes.  Correct?

13   A.    Yes.

14   Q.    Because you knew how important it was to make
15   sure you had an accurate record of what the suspect said
16   to you and what you said to the suspect.  Correct?

17        MS. BERKE:  Are you asking about in the
18   Milke case?

19        MR. BRUSTIN:  In the Milke case.

20        THE WITNESS:  Yes.

21   Q.    BY MR. BRUSTIN:  As in every case.

22        MS. BERKE:  Objection.  He's not --

23        MR. BRUSTIN:  Just assert the Fifth then.

24        MS. BERKE:  Okay.  He's asserting the Fifth.

25        MR. BRUSTIN:  He has to do it.  You know how



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
141–144

Page 141

1  it works?

2          THE WITNESS:  I assert the Fifth Amendment

3  on --

4          MS. BERKE:  On questions regarding

5  interrogation practices based on the pending Gallegos

6  matter.

7      Q.   BY MR. BRUSTIN:  Please say it.

8          MS. BERKE:  He just did.

9          THE WITNESS:  I assert the Fifth Amendment

10  on the advice of my attorney.  That's the first time I've

11  ever said that.  Thank you for letting me at least see

12  how it sounds.

13      Q.   BY MR. BRUSTIN:  Now, in this case, for

14  example, you didn't write your report from your notes

15  until a few days later.  Correct?

16      A.   Day or so.

17      Q.   All right.  And that's another reason -- you

18  don't have a photographic memory.  Right?

19      A.   No, but you said I was real smart.

20      Q.   You have -- you don't have a photographic

21  memory, do you?

22      A.   No, I don't.

23      Q.   Okay.  And so that's another reason -- because

24  you might not write a report for a few days, another

25  reason in this case why you were so careful to take

Page 142

1  careful notes -- you were so careful to take copious

2  notes in Debra Milke -- with Debra Milke's interview.

3  Correct?

4      A.   I wouldn't have known that I wasn't going to do

5  it.  To me, I would have done it the next day.

6      Q.   Okay.  You knew sometimes you don't get to it

7  till --

8      A.   Sometimes I don't get to it.

9      Q.   And so that's one of the reasons why you took

10  careful notes?

11      A.   I took careful notes to make sure the truth was

12  in the report.

13      Q.   Okay.  And you know that you have to take as

14  much time as you need to write down anything important

15  that's said.  Correct?

16      A.   That's correct, but it's notes.

17      Q.   Okay.

18      A.   It's not -- it's not verbatim, but it's notes.

19      Q.   Okay.  But you knew that words -- words matter.

20  Right?

21      A.   Sure.

22          MS. BERKE:  Objection.  Vague.

23      Q.   BY MR. BRUSTIN:  You're careful to get as close

24  to the precise words as you can in anything that's

25  important.  Correct?

Page 143

1      A.   I try to, yes.

2      Q.   Whether it's a suspect or a witness?

3      A.   Correct.

4      Q.   How many pages of notes did you write to create

5  the Debra Milke report?

6          MS. BERKE:  Foundation.

7          THE WITNESS:  I don't remember.

8      Q.   BY MR. BRUSTIN:  It was a couple -- the

9  interview was less than two hours.  Correct?

10      A.   Several pages but I don't know.

11      Q.   Maybe more than 20?

12      A.   Less than 20.

13      Q.   More than ten?

14      A.   I couldn't tell you.

15      Q.   All right.  The interview was approximately --

16          MS. GREEN:  Thirty minutes.

17          MR. BRUSTIN:  Thirty minutes.

18      Q.   BY MR. BRUSTIN:  How much of that 30 minutes

19  did you spend writing?

20      A.   Well, I would write -- make notes as I was

21  talking to her.

22      Q.   All right.  Fair to say that you -- you -- she

23  gave you a lot of information, and you took a lot of

24  notes?

25          MS. BERKE:  Objection.  Vague.

Page 144

1          THE WITNESS:  Notes, yeah.

2      Q.   BY MR. BRUSTIN:  Okay.  And it was your

3  practice and you followed that practice in this case to

4  destroy your notes.  Correct?

5      A.   Yes.

6      Q.   Did anybody ever suggest that wasn't a good

7  idea to you, ever before me?

8      A.   No.  And it was always the practice of

9  detectives at the Phoenix Police Department at that time.

10      Q.   Now, you also knew that some interrogators --

11  is it fair to refer to you as an interrogator?  Is that a

12  fair --

13      A.   I'm a detective.

14      Q.   Okay.  Would it be fair to say that you

15  understood at the time that you interviewed Debra Milke

16  in this case that some detectives had a practice of

17  bringing in witnesses to take notes -- other detectives

18  to take notes when they were interrogating?

19      A.   To -- I don't understand what you mean.

20      Q.   Let me be clear, then.

21      A.   Okay.

22      Q.   If you don't understand, tell me.

23      A.   I don't.

24      Q.   You understood that some detectives would do

25  interviews with a partner or colleague so that the



Exhibit 1

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
145–148

Page 145

1  partner or colleague could take notes while they were
2  interrogating.  Correct?
3      A.   I've seen that, yes.
4      Q.   That's one way -- one way of doing that.
5  Correct?
6      A.   Yes.
7      Q.   And that's -- there's nothing wrong with doing
8  it that way.  Right?
9      A.   No.
10     Q.   Why did you toss your notes?  Why was that
11  something you did?
12     A.   It's --
13         MS. BERKE:  Objection.  Vague.  Misstates
14  evidence.
15         THE WITNESS:  That was something that
16  everybody did.  I mean, we just -- no use keeping the
17  notes around.  I mean, you know, you've got enough
18  paperwork.
19     Q.   BY MR. BRUSTIN:  Now, obviously when you take
20  notes, you would -- withdrawn.
21         The only way you could take notes in an
22  interview -- and I'll give Debra Milke as an example --
23  is to write things down in the order in which they
24  happened.  Correct?
25     A.   At times, but I would reflect to the notes and

Page 146

1  would -- I would remember other things, you know, from
2  something I noted.
3      Q.   All right.  But you understood that timing has
4  meaning.  Correct?
5      A.   Sure.
6      Q.   And so certainly you were -- you were
7  attempting the best you could when interviewing Debra
8  Milke and anyone else in this case to write down notes in
9  the order in which you heard them.  Correct?
10     A.   Correct.
11     Q.   And you would try to do the same thing in your
12  reports, to write down things that happened in an
13  interview in the order in which it happened?
14     A.   Correct.
15     Q.   Otherwise, it would be impossible to keep
16  track.  Right?
17     A.   It would be impossible for people -- attorneys
18  to read it correctly.
19     Q.   Which is very important?
20     A.   Sure it is.
21     Q.   You did the best you possibly could to take
22  notes in chronological order and do your reports in
23  chronological order?
24     A.   I --
25     Q.   Is that right?

Page 147

1      A.   Yeah.
2      Q.   All right.
3      A.   I mean, the best I could.
4         MS. BERKE:  When it's a good time to take a
5  break.
6         MR. BRUSTIN:  That's fine.  Take a lunch?
7         MS. BERKE:  Oh, I don't -- you want to go
8  straight through?
9         MR. BRUSTIN:  No.  We'll take lunch.
10        MS. BERKE:  Well, let me talk to my client
11  about what he wants to do.
12        THE WITNESS:  I cannot -- do we need to have
13  this on tape?
14        MR. BRUSTIN:  Let's go off the record.
15        THE VIDEOGRAPHER:  We're off the record at
16  1:34 p.m.
17        (A recess was held off the record.)
18        THE VIDEOGRAPHER:  We are back on the record
19  at 2 p.m.
20     Q.   BY MR. BRUSTIN:  Okay.  Mr. Saldate, one of the
21  reasons that you remain -- withdrawn.
22        The reason you maintain that Debra Milke is
23  guilty of the crime is that as you described at great
24  length during the hearings and at the trial in this
25  matter, Debra Milke made a number of clear admissions to

Page 148

1  you about the killings.  Correct?
2      A.   Correct.
3      Q.   All in her words.  Correct?
4      A.   Correct.
5      Q.   In narrative form.  Correct?
6      A.   Correct.
7      Q.   And with very few follow-up questions
8  necessary.  Correct?
9      A.   You know, somewhat correct, yeah.
10     Q.   What you testified to was that it was a
11  narrative interview.  You just listened.  Correct?
12     A.   Correct.
13     Q.   She did 80 percent of the talking.  Correct?
14     A.   Correct.
15     Q.   And it wasn't even an interrogation.  It was
16  just an interview or a conversation.  Correct?
17     A.   I would say it was, yes.
18     Q.   And you did under oath.  Correct?
19     A.   I don't remember.
20     Q.   That's -- that's your recollection today?
21     A.   Yes.
22     Q.   That's what happened.
23        And during that time when she was talking,
24  over and over she made admissions to you about her
25  involvement in different aspects of the crime.  Correct?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
149–152

Page 149

1    A.   Correct.

2    Q.   And you understood the importance of getting

3  clear, detailed admissions and documenting them.

4  Correct?

5    A.   I understood to get the truth, yes.

6    Q.   Okay.  And you knew that since you were not

7  taping this interview, it was even more important to make

8  sure that you documented it carefully.  Correct?

9    A.   It's a procedure I use.  So it's not less

10  important or more important.  That's what I do or what I

11  did.

12    Q.   Okay.  Well, you understand when there's a tape

13  recorder, every word gets recorded.  Correct?

14    A.   Yes.

15    Q.   And you couldn't do that when you were taking

16  notes.  Correct?

17    A.   That's correct.

18    Q.   But you did your best to approximate the best

19  you could.  Correct?

20    A.   I --

21    Q.   To be as accurate as you could?

22    A.   That's correct.

23    Q.   You did your very best to write down all of her

24  admissions in your report.  Correct?

25    A.   Correct.

Page 150

1    Q.   And you reported those admissions to the county

2  attorney before trial.  Correct?  You discussed them?

3    A.   Yes.

4    Q.   And you testified about those admissions during

5  the trial and during the hearings.  Correct?

6    A.   Yes.

7    Q.   And you reported those admissions honestly

8  during your interviews with all of the defense lawyers.

9  Correct?

10    A.   Thank you.  Yes.

11    Q.   And it's your position you never lied once

12  about those -- about what happened during that

13  interrogation?

14    A.   That is correct.

15    Q.   Some of the things you said during your

16  testimony was that she admitted everything.  That's true.

17  Correct?

18        MS. BERKE:  Objection.  Vague.

19        THE WITNESS:  From her perspective, I guess,

20  yeah.

21    Q.   BY MR. BRUSTIN:  Okay.  She told you -- one of

22  the things you testified to was that she told you that

23  Styers -- that she asked Styers to kill her son in a

24  normal, even voice.  Correct?  When she said it to you,

25  it was a normal, even voice?

Page 151

1    A.   Yes.

2    Q.   And you found that powerful, just reporting?

3    A.   Just reporting.

4    Q.   All right.  That she -- and obviously given the

5  importance of this interview, you understood to the

6  extent anything wasn't clear you ask clarifying

7  questions.  Correct?

8    A.   I hope I did, yes.

9    Q.   Okay.  That was your intention, and you believe

10  that's what you did?

11    A.   I tried to do.

12    Q.   But -- but it didn't require very much because

13  most of her admissions were in narrative form.  She just

14  laid it out for you.  Right?

15    A.   Basically, yes.

16    Q.   So first I want to do is I want to show you

17  your report that you did.

18    A.   Okay.

19        MR. BRUSTIN:  Let's mark this, please, as

20  Plaintiff's?

21        COURT REPORTER:  5.

22        MR. BRUSTIN:  5.  Thank you.

23        (Exhibit 5 was marked for identification.)

24        THE WITNESS:  Thank you.

25    Q.   BY MR. BRUSTIN:  Okay.  Mr. Saldate, I'm

Page 152

1  showing you what's been marked as Plaintiff's Exhibit 5

2  for identification.  It's Bates stamp pages NSB527

3  through 533.  Could you please tell us what this document

4  is?

5    A.   It's a supplemental homicide report and written

6  by me.

7    Q.   Okay.  And this document was created two days

8  after the interview.  Correct?

9    A.   Apparently, yes.

10    Q.   All right.  Now, I want -- I'm going to ask you

11  a bunch of questions, but for right now I want to focus

12  on a couple of things.

13    A.   That's what we're here for.

14    Q.   Take a look at page -- I'm going to use the --

15  excuse me -- the bottom Bates stamp numbers.

16    A.   Okay.

17    Q.   529.

18    A.   I don't have 529.  Oh, yeah, I have 257.  29,

19  yes.

20    Q.   Double-sided.

21    A.   I was looking at the above number.  I was

22  looking at the above number.  Okay.

23    Q.   Okay.  Let's take a look at the middle

24  paragraph, the one beginning, "Approximately one month

25  ago."



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
153–156

Page 153

1   A.   Okay.

2   Q.   All right.  And I want to say -- you see the

3   sentence that begins, "Because of that," in the middle?

4   A.   Yes.

5   Q.   It says, "Because of that, she then spoke to

6   her friend Jim about helping her" -- I think it says

7   "figure out a way for her child Chris to die."

8        That's what Debra told you.  Correct?

9   A.   Correct.

10  Q.   "Debra said at first it was very hard for her."

11       MS. BERKE:  You missed a line.

12  Q.   BY MR. BRUSTIN:  Oh, I'm sorry.  "Debra said at

13  first she could not tell Jim that she wanted her son

14  Chris killed because it was very hard for her.  Finally

15  she told him that it would be better for her son to die

16  than to grow up like her husband, his father."

17       So is that accurate of -- is that an

18  accurate description of what she told you?

19  A.   Yes.

20  Q.   Okay.  So she told you that although she was

21  struggling with it, she determined in her mind that her

22  son had to die, and she asked Jim Styers to do it.

23  Correct?

24  A.   Correct.

25  Q.   No gray area, a crystal-clear admission.

Page 154

1   Correct?

2   A.   Correct.

3   Q.   And then it says, "Finally she told him that it

4   would be better for her son to die than to grow up like

5   her husband."  Correct?

6   A.   Correct.

7   Q.   Another clear admission.  Correct?

8   A.   Yes.

9   Q.   And this is an admission of motive, correct,

10  why she did it?

11  A.   Yes.

12  Q.   So admission -- clear admissions about

13  planning, clear admissions about motive.  Correct?

14  A.   Yes.

15  Q.   And intent.  Right?

16  Q.   And attempt?

17  Q.   Intent.

18  A.   Oh, intent, yes.

19  Q.   Are all important elements of the crime of

20  homicide.  Correct?

21  A.   Correct.

22  Q.   Two paragraphs down beginning, "I then asked

23  Debra" --

24  A.   Uh-huh.

25  Q.   -- "I then asked Debra if she, Jim and Roger

Page 155

1   had spoken about how they were going to kill Chris, and

2   she told me that they had.  She said that she and Jim

3   spoke about it several times, and she believes that she,

4   Jim and Roger only spoke about it on one occasion."

5        So is that an accurate description of what

6   she told you?

7   A.   Yes.

8   Q.   Again, a clear description of multiple planning

9   sessions to kill her son.  Correct?

10  A.   Correct.

11  Q.   Two with Jim Styers and at least one with Roger

12  Scott?

13  A.   Yes.

14       MS. BERKE:  Where does it say two?

15       MR. BRUSTIN:  Several times.

16       THE WITNESS:  Okay.  Several times.

17  Q.   BY MR. BRUSTIN:  At least two.  Right?  Several

18  could be -- and several is at least two, maybe more?

19  A.   At least two, yes.

20  Q.   Then it says, "Debra said that she did go out

21  with Jim on one occasion with her son and that Jim was

22  going to do it but that something happened, and they

23  decided not to do it."

24       Is that what she told you?

25  A.   Correct.

Page 156

1   Q.   Okay.  In other words, what she told you was

2   that, in fact, she initially had planned on being present

3   for the murder, but it failed for some reason, and she

4   didn't.  Correct?

5   A.   Correct.

6   Q.   Okay.  Then she said -- it says, "I asked Debra

7   if doing it meant to kill him, and she responded yes."

8        In other words, what was happening here is

9   that to make sure there was no gray area, you made sure

10  she was talking about killing her son.  Correct?  That

11  was your follow-up question?

12  A.   Yes.

13  Q.   You were trying to be fair to her.  Correct?

14  A.   Yes.

15  Q.   And then it said, "She said she never knew what

16  method Jim was going to use to do it."

17       Do you see that?

18  A.   Yes.

19  Q.   And that's -- you wrote that because when you

20  asked her -- withdrawn.

21       That's -- that's the information she gave to

22  you.  Correct?

23  A.   Correct.

24  Q.   So we have got admissions, clear admissions

25  according to you on planning, meeting, intent.  Correct?

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
157–160

Page 157

1    A.   Correct.

2    Q.   Also the coverup.  Right?

3    A.   Yes.

4    Q.   And even follow-up questions by you to make

5    sure that these were clean admissions?

6    A.   One follow-up question, yes.

7    Q.   On the next page, it says, "On Saturday

8    morning, she woke up and spoke to Jim.  Jim told her that

9    they were planning to do it today and that he was going

10   to pick up Roger."

11        So, in other words, admitting to you that

12   she knew the day that Jim was going to kill her son.

13   Correct?

14   A.   Correct.

15   Q.   Another clear admission?

16   A.   Yes.

17   Q.   The next paragraph beginning, "Debra said," in

18   the middle of the paragraph, it said, "She said in those

19   occasions she felt disappointed that Jim had not done it

20   yet.  I asked Debra if she was getting angry with Jim and

21   Roger, and she told me that she was not getting angry but

22   was disappointed because the longer they waited, the more

23   influence her ex-husband could put on Chris."

24        She told you that.  Right?

25   A.   Yes, but I didn't locate the -- where, but,

Page 158

1    yes, I --

2    Q.   That's what she told you.  Right?

3    A.   Yeah.

4    Q.   In other words --

5        MS. BERKE:  Do you not know where he was on

6    the report?

7        THE WITNESS:  I don't know where you are in

8    the report, though.  One --

9        MS. BERKE:  Can you maybe direct him to what

10   you just read again?

11       MR. BRUSTIN:  Yeah, it's the second full

12   paragraph on page 530.

13       MS. BERKE:  Middle of the paragraph where it

14   starts, "I asked."

15       THE WITNESS:  Okay.  I see it now.  Thank

16   you.

17   Q.   BY MR. BRUSTIN:  Okay.  That's what she told

18   you.  Correct?

19   A.   She said that she was not getting angry but was

20   disappointed, yes.

21   Q.   Okay.  In other words, she was telling you that

22   she was disappointed that they hadn't killed her son fast

23   enough.  Correct?

24   A.   Correct.

25   Q.   And -- and that the reason she wanted him

Page 159

1    killed faster was because she was worried he was becoming

2    more like her -- like his father?

3    A.   Yes.

4    Q.   Again, planning, intent, motive.  Right?

5    A.   Yes.

6    Q.   Paragraph beginning, "At approximately 3:20,"

7    few paragraphs down -- do you see that?

8    A.   Uh-huh.

9    Q.   "At approximately 3:20 that day, Debra said she

10   received a call from Jim, and he said that he was at the

11   mall.  Debra said she immediately realized that she had

12   done it and that her son was now dead."

13   A.   Correct.

14   Q.   So telling you she knew when she got the call

15   that not only was her son dead but that Jim had killed

16   him.  Right?

17   A.   Correct.

18   Q.   Admitting that to you?

19   A.   Yes.

20   Q.   Those are the important words, that he had done

21   it.  Right?  It's an admission.

22   A.   Okay.

23   Q.   Right?

24   Q.   Okay.  They're important.

25   Q.   And, again, at the bottom of this paragraph,

Page 160

1    "She said she did this because she loved her son and did

2    not want to see him grow up like her ex-husband," another

3    example of her telling you why she had her son killed.

4    Right?

5    A.   Yes.

6    Q.   She's telling you multiple times clearly and

7    unambiguously that she had her son killed because she

8    didn't want him to grow up like her father -- like his

9    father.  Correct?

10   A.   That's correct.

11   Q.   Take a look at 531.  Paragraph says, "Debra

12   also kept telling me," the second from the bottom.  Let

13   me know when you're there.

14   A.   Okay.  "Kept telling me," okay.

15   Q.   You there?

16   A.   Yes.

17   Q.   All right.  "She then told me," second -- see

18   the third sentence?

19   A.   The second paragraph to the bottom?

20   Q.   Second paragraph to the bottom, third sentence

21   in.  "She then told me."

22   A.   Okay.  I got it.  Thank you.

23   Q.   "She then -- she then told me, I worry about

24   Jim.  I asked her why, and she continued and said, Well,

25   you know, because he had to be the one to do it."





ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
161–164

Page 161

1    In other words, what she told you was the
2  reason -- the specific reason why she was worried about
3  Jim is because she had to get him to kill her son.
4  Right?
5    A.  Correct.
6    Q.  Another clear admission, no gray area.  Right?
7    A.  Not that I know of, no.
8    Q.  You wrote it as she told you.  Right?
9    A.  Yes.
10   Q.  What does inculpatory mean?
11   A.  Mean -- I don't know.
12   Q.  Have you heard the term "inculpatory" and
13  "exculpatory," inculpatory meaning evidence tending to
14  show someone is guilty and exculpatory intending to show
15  someone is innocent.
16   A.  Yes.
17   Q.  Okay.  Have you heard those terms?
18   A.  Yes.
19   Q.  Are those terms you used or not?
20   A.  No.
21   Q.  But you're certainly familiar with that
22  evidence.  There's evidence that tends to show someone is
23  guilty and evidence tending to show someone might be
24  innocent.  Correct?
25   A.  Yeah.

Page 162

1    Q.  You agree with that?
2    A.  I would.
3      MS. BERKE:  If you could, just put the
4  report down.
5      THE WITNESS:  I'm sorry.
6    Q.  BY MR. BRUSTIN:  Now take a look at page 532,
7  the paragraph beginning at approximately 2250 hours,
8  second paragraph.
9    A.  Yep.
10   Q.  A few lines down this is you documenting you
11  calling her father.  Do you see that?
12   A.  Yes.
13   Q.  It says, "I explained to her father that Debra
14  had confessed to her involvement and that she had told me
15  that she had done it because she did not want Chris to
16  grow up like his father."
17      This is you telling Debra's father that she
18  made specific admissions not only implicating herself but
19  giving a motive?
20   A.  Correct.
21   Q.  And you had this conversation with the father
22  even before you did the report.  Correct?
23   A.  Correct.
24   Q.  And, in fact, you told the father that she had
25  confessed even before you interviewed him.  Correct?

Page 163

1    A.  I told the father what?
2    Q.  You told the father that Debra had confessed
3  before you ever interviewed the father?
4    A.  I never interviewed him.
5    Q.  You never spoke to the father?
6    A.  No.
7      MS. BERKE:  Well, you spoke --
8      THE WITNESS:  Well, on the phone but that
9  wasn't an interview.
10   Q.  BY MR. BRUSTIN:  Okay.  You never conducted any
11  kind of interview on the phone?
12   A.  No.
13   Q.  It's not that you don't remember; it didn't
14  happen?
15   A.  It didn't happen.
16   Q.  Okay.  So I'm not going to go through the
17  testimony that you gave on this because it's consistent,
18  but I just want to ask you just some general questions.
19      As a general matter, Debra Milke confessed
20  to you, gave you specific admissions about multiple
21  planning meetings to kill her son.  Correct?
22   A.  Correct.
23   Q.  In other words, it was a -- it was a
24  relatively -- withdrawn.
25      She gave you specific admissions about

Page 164

1  agreement to kill her son --
2    A.  Correct.
3    Q.  -- with others?
4    A.  That's correct.
5    Q.  She told you about multiple prior attempts to
6  kill her son?
7    A.  Several attempts, yes.
8    Q.  And about being disappointed that it wasn't
9  happening quickly enough?
10   A.  Yes.
11   Q.  She gave you detailed admissions about helping
12  with the coverup.  Correct?
13   A.  Yes, as far as I know.  I mean, she's -- that's
14  her perspective.
15   Q.  That's what she told you?
16   A.  That's what she told me, yeah.
17   Q.  Right.
18   A.  I don't know for sure that's what --
19   Q.  You just take it and write it down?
20   A.  Okay.
21   Q.  That's all you do?
22   A.  Yeah.
23   Q.  But that's what she told you.  Okay.
24      What she described to you in great
25  specificity was a very cold, calculating conspiracy over



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
165–168

Page 165

1 a long period of time to commit murder of a four-year-old
2 boy. Correct?
3         MS. BERKE: Objection. Vague.
4         THE WITNESS: What she described to me was
5 that she was involved in the killing of her four-year-old
6 son.
7     Q.   BY MR. BRUSTIN: Okay. Well, I'm going to be a
8 little more specific, and I think you've already told me
9 about that. What she described was a carefully planned
10 effort to kill a four-year-old boy with two other people.
11 Correct?
12         MS. BERKE: Objection. Vague. Foundation.
13         THE WITNESS: A plan but I don't know -- I
14 don't know -- I wouldn't say carefully planned because it
15 did go wrong, you know.
16     Q.   BY MR. BRUSTIN: Okay. And she said the whole
17 time after the initial fake crying she was calm and cool.
18 Right?
19     A.   I asked her too, and she did.
20     Q.   And she was calm and cool. Right?
21     A.   Okay.
22     Q.   You agree?
23     A.   Yeah.
24     Q.   What you were seeing before you was a very
25 cold -- what appeared to be based on your experience was

Page 166

1 a very cold, very calculating killer. Correct?
2     A.   What I saw before me was a lady that in her
3 mind justified killing her son would be a benefit to her.
4     Q.   Okay. And she plotted it. Right?
5     A.   Okay. Yeah.
6     Q.   Multiple meetings?
7     A.   Multiple meetings.
8     Q.   Never -- never once described to you any
9 regret. Correct?
10     A.   Not really, no.
11     Q.   The only regret she described to you was that
12 it didn't happen quickly enough. Right?
13     A.   At first, yes.
14     Q.   And these very specific admissions that you
15 just went through in your report, that's what you
16 described to the county attorney before trial. Correct?
17     A.   Yes, I submitted the report.
18     Q.   Okay. And you discussed the contents of the
19 report. Correct?
20     A.   At trial, yeah.
21     Q.   Well, you discussed it in your meeting with the
22 county attorney before you were on the stand in a
23 homicide case. Right?
24     A.   Yes.
25     Q.   Okay. You discussed the substance of your

Page 167

1 report with them?
2     A.   Yes, before trial started, yes.
3     Q.   Okay.
4     A.   My testimony.
5     Q.   In other words, in substance, is everything in
6 this report accurate? Did she make these admissions?
7     A.   Yes.
8     Q.   Something like that. Correct?
9     A.   Is --
10     Q.   That's what he asked. That's what --
11         MS. BERKE: Would you -- would you allow him
12 to answer?
13         THE WITNESS: Yes. I don't recall
14 particularly the verbiage, but, you know, that's what we
15 would do.
16     Q.   BY MR. BRUSTIN: Okay. And you understood from
17 your experience that the admission she gave to you
18 regarding planning, motive, intent, coverup, would all be
19 the key to convicting her and the key to her getting the
20 death penalty. Right?
21         MS. BERKE: Objection.
22         THE WITNESS: No.
23         MS. BERKE: Misstates evidence.
24     Q.   BY MR. BRUSTIN: Never crossed your mind?
25     A.   No. She told me the truth; I wrote down the

Page 168

1 truth.
2         (A discussion was held off the record.)
3     Q.   BY MR. BRUSTIN: So take a look at your book
4 there.
5     A.   Okay.
6         MS. GREEN: First tab.
7     Q.   BY MR. BRUSTIN: First tab.
8     A.   Okay.
9     Q.   Let's take a look at page -- start at page 35,
10 I believe.
11         MS. BERKE: What's the hearing?
12         MR. BRUSTIN: Grand jury, Milke grand jury,
13 12/8/89.
14         MS. ODEGARD: What pages?
15         MR. BRUSTIN: Starting at page 35. No, it's
16 not that. It's the grand jury for --
17         MS. GREEN: It's the third page.
18     Q.   BY MR. BRUSTIN: Now, if you could -- okay.
19 It's page 20 -- let's start with page 28.
20     A.   28, okay.
21     Q.   If you could, read to yourself page 28, line
22 21, through page 30, line 25. Just read those to
23 yourself.
24     A.   Page 31, you said?
25     Q.   Just the top of 31. Have you read that



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
169–172

Page 169

1  already?
2      A.   No, I'm getting --
3      Q.   Just the bottom of 30, I mean.
4      A.   Okay.  The bottom of 30.  Okay.
5      Q.   Okay.  Is that an accurate description of what
6  Debra Milke told you during the interview?
7      A.   Yes.
8      Q.   And according to that description, fair to say
9  that Debra Milke described to you a calm and cool and
10  collected plot to kill her son?
11          MS. BERKE:  Objection.  Vague.
12          THE WITNESS:  She was calm and -- yes, I
13  guess.
14      Q.   BY MR. BRUSTIN:  Okay.  She described multiple
15  planning sessions?
16      A.   Yes.
17      Q.   She never backtracked on her desire to kill her
18  son.  She never had second thoughts about it, never
19  described that to you.  Correct?
20      A.   I believe so.
21      Q.   The only disappointment she ever had was that
22  it wasn't happening quick enough.  Correct?
23      A.   Correct.
24      Q.   And even after it was done, no suggestion of
25  remorse, only efforts to cover it up.  Correct?

Page 170

1      A.   Okay.  Yes.
2      Q.   Is that accurate?
3      A.   Yes.
4      Q.   Okay.  So what she described to you was a cold,
5  calculated, preplanned killing of her four-year-old son?
6          MS. BERKE:  Objection.  Asked and answered.
7  Vague.
8          THE WITNESS:  As I've said before, this was
9  a woman that was in front of me that was confessing to a
10  murder of her son and was attempting also to justify in
11  her mind why she did it.
12      Q.   BY MR. BRUSTIN:  Okay.  And, by the way, how
13  long were your hands on her knees?
14      A.   Just a couple minutes.
15      Q.   Couple minutes.
16      A.   Just until I got her attention.
17      Q.   Okay.  I bet you had her attention -- I bet you
18  got her attention good when you put your hands on her
19  knees and looked right in her eyes and told her son
20  was dead, and she did it.
21          MS. BERKE:  Objection.
22      Q.   BY MR. BRUSTIN:  I bet that did the trick.
23  Right?
24          MS. BERKE:  Objection.  Argumentative.
25          You don't need to answer that.

Page 171

1          THE WITNESS:  I think you're sick, but we'll
2  go on.
3      Q.   BY MR. BRUSTIN:  Let me ask you again.
4      A.   Only because you've taken it personal, and
5  you're angry.  But we'll go on.
6          MS. BERKE:  Let's let him ask another
7  question.
8      Q.   BY MR. BRUSTIN:  Was it your belief that when
9  you put her hands -- your hands on her knees for a couple
10  of minutes and looked directly into her eyes and told her
11  that she had just killed her son, did you feel like you
12  got her attention then?
13      A.   That was my intention.
14      Q.   Did you feel like you were in control?
15      A.   That was my intention.
16      Q.   Okay.  Now, you understood as a basic -- as a
17  basic matter of ethical policing, the last thing you want
18  to do when documenting an interview is to add made-up
19  evidence of guilt.  Correct?  You can't make up facts.
20  Right?
21      A.   That's correct.
22      Q.   And you laugh because you would never do that.
23  Right?
24      A.   I didn't laugh.
25      Q.   Well, you --

Page 172

1      A.   The only person that's laughed here is you
2  several times.
3      Q.   Okay.  But you would never do that.  Right?
4      A.   No.
5      Q.   You would never change information provided to
6  you in important ways to make it seem like someone was
7  guilty when, in fact, it suggested the opposite.  You
8  would never do that.  Right?
9      A.   No.
10      Q.   So, for example, it would never be okay to say
11  that a witness volunteered information if you suggested
12  it.  Right?  You would have to say, I suggested it, and
13  they agreed to it.  Right?
14          MS. BERKE:  Are you talking about the Debra
15  Milke case?
16      Q.   BY MR. BRUSTIN:  You know what?  Let me just do
17  this.
18          You understand from your involvement in the
19  case right before returning to Phoenix, according to you,
20  you -- Debra Milke asked you what happened to Jim, and
21  she -- and -- I'm sorry.
22          According to you, when you were driving back
23  to Phoenix, Debra Milke told you that she was worried
24  about Jim Styers because he had to be the one to do it,
25  and you said, Worry about yourself, not Jim.  Correct?

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
173–176

Page 173

1    A.   Correct.

2    Q.   Now, you understand that, according to Debra

3  Milke, what she actually said to you was that on the way

4  back, she asked you what happened to Jim, and you said,

5  Worry about yourself, not Jim.

6         That's a different version.  Correct?

7    A.   I have never heard it, but, yeah.

8    Q.   Okay.  You would agree that the fact "had to be

9  the one to do it" is what makes that statement

10  incriminating.  Correct?

11    A.   I think the whole interview makes you

12  incriminating.

13    Q.   See, I'm going to focus now -- I'm going to

14  focus you on specific things.  That's what we're going to

15  be doing for the next hour.  So I want to ask you

16  specific questions about specific words that you wrote on

17  documents.  Do you understand?

18    A.   Yes.

19    Q.   Okay.  Now, you claim that she said she denied

20  telling you that she was worried -- she -- I'm sorry.

21         You claim that she told you -- she asked

22  what happened to Jim because she was worried about him

23  because, "He had to be the one to do it."  In other

24  words, admitting that she knew he killed him.  Right?

25    A.   That's correct.

Page 174

1    Q.   And what she says is, she asked you what

2  happened.  She simply asked you what happened to Jim.

3  Now, that statement in and of itself is not

4  incriminating.  Right?

5    A.   She just asked about Jim.

6    Q.   Right, but the statement -- let's be -- let's

7  be really precise here.  When she said, "He had to be the

8  one to do it," that was the incriminating part of that

9  statement.  Correct?

10    A.   That's incriminating parts you said, yes.

11    Q.   Okay.  Now, obviously if she never said it and

12  you made it up, that would be wrong.  Correct?

13    A.   That would be untrue.

14    Q.   And it would be wrong.  Correct?

15    A.   Untrue and wrong.

16    Q.   And be contrary to -- contrary to basic police

17  procedure.  Correct?

18         MS. BERKE:  Objection.  Vague.

19  Argumentative.

20         THE WITNESS:  I don't understand that part.

21    Q.   BY MR. BRUSTIN:  It would be fabricating

22  evidence if you put those words in her mouth when she

23  never said it.  Right?

24    A.   That never happened.

25    Q.   If you did it, that's what it would be,

Page 175

1  fabricating evidence.  Correct?

2    A.   I did not do it, and I'm not going to answer --

3  speculating that I did do something.

4    Q.   Okay.  Because you would never change someone's

5  statement to include a small but significant change like,

6  "He had to be the one to do it."  You wouldn't put that

7  in there if it didn't -- it wasn't said.  Right?

8    A.   No.

9    Q.   That would make --

10         MS. BURGESS:  Foundation.

11         MS. BERKE:  Wait.  That's correct.  You

12  wouldn't do that.  Right?

13         THE WITNESS:  No.  That's correct.

14    Q.   BY MR. BRUSTIN:  Because that would make a

15  harmless statement devastatingly inculpatory.  Right?

16         MS. RETTS:  Form.

17         MS. BURGESS:  Object to form and foundation.

18         MS. BERKE:  Vague.

19         THE WITNESS:  I don't understand what you

20  mean by --

21    Q.   BY MR. BRUSTIN:  All right.  Let me give you

22  another example.

23    A.   Okay.

24    Q.   According to you, Debra Milke told you

25  repeatedly that she did it.  She killed -- she had Chris

Page 176

1  killed because she didn't want Chris to grow up like

2  Mark.  Correct?  That's what you claim she told you?

3    A.   Like Mark and her ex -- she referred to him as

4  ex-husband and father, whatever, yes.

5    Q.   That's what she told you.  Correct?

6    A.   Correct.

7    Q.   According to Debra, what she said to you was

8  that she didn't want Chris to grow up like Mark but never

9  said that's why he had to do it.  She denies saying that

10  part.  Do you see the difference?

11    A.   I see that she denies it now because she's

12  been -- she's doing this -- she's trying -- you know,

13  she's trying to --

14    Q.   Okay.  But those two statements have entirely

15  different meanings.  Correct?  One is -- one is

16  innocuous, and one is inculpatory.  Right?

17    A.   I would say one is truthful, and one is not.

18    Q.   Okay.  But putting that aside -- and I agree

19  one has to be truthful and one not, but in addition to

20  that, if all she said to you was, I didn't want Chris to

21  grow up like Mark, that wouldn't be an admission that she

22  killed him.  Correct?

23         MS. RETTS:  Form.

24         THE WITNESS:  No, I guess not.

25    Q.   BY MR. BRUSTIN:  All right.  Now -- now --



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
177–180

Page 177

1 let's get the picture.
2      MS. GREEN:  6.
3      (Exhibit 6 was marked for identification.)
4      COURT REPORTER:  Exhibit 6.
5      THE WITNESS:  I was a little heavier then,
6 but...
7      Q.   BY MR. BRUSTIN:  I'm sorry.  I didn't hear you.
8      A.   I said I was a little heavier then, but...
9      Q.   Okay.  I will represent to you, Mr. Saldate,
10 that this is --
11      A.   I'm sorry.
12      Q.   -- a still taken from a news video the night
13 that Debra Milke allegedly confessed to you.  Okay?
14      A.   Yes.
15      Q.   Do you recognize that?
16      A.   Yes.
17      Q.   Any reason to doubt that?
18      A.   No.
19      Q.   And this is what you looked like back in 1989.
20 Correct?
21      A.   Correct.
22      Q.   You were a much younger man.  Right?
23      A.   Yeah.
24      Q.   How old were you then?
25      A.   I would have been -- I don't know.  I'm 68 now.

Page 178

1 So I don't know.
2      Q.   Okay.  Well, you were in the prime of your
3 career.  Correct?
4      A.   I was at the end of my career.
5      Q.   All right.  And is this an accurate description
6 of what Debra Milke was wearing on the night that you
7 questioned her?
8      A.   Appears to me, yeah.
9      Q.   Sweater, T-shirt, looks like -- I can't see the
10 pants, but you can see -- you can see the sweater and the
11 T-shirt.  Right?
12      A.   Uh-huh.
13      Q.   Yes?
14      A.   Yes.
15      Q.   Now, if Debra Milke had done anything to
16 attempt to seduce you or use sex to manipulate you during
17 the interview, you would of course have reported it.
18 Correct?
19      A.   Sure, I guess, during the interview, yes.
20      Q.   So, for example, there was never a time when
21 Debra flashed you during the interview, and by that, I
22 mean there was never a time when she lifted up her shirt
23 and showed you her bra, was there?
24      A.   In the car on the way back.
25      Q.   Okay.  So in the car on the way back, Debra --

Page 179

1      A.   It could have been an accident, but I -- you
2 know, I don't know.  I determined she was a very
3 manipulative person.  So that's what --
4      Q.   Okay.  So in the car on the way back to the
5 precinct when you were -- where was she sitting?
6      A.   Next to me.  I was sitting next to her in the
7 back seat.
8      Q.   Okay.
9      A.   There was a deputy driving.
10      Q.   Okay.  And at that point, you could see the
11 picture -- look at the picture with me.
12      A.   Yes.
13      Q.   She took that pink shirt -- right?
14      A.   Uh-huh.
15      Q.   And she lifted it high enough for you to see
16 both -- for you to see her bra?
17      A.   Just part of it, yeah, but not -- I don't think
18 she was wearing the sweater when we were interviewing
19 her.  She put on the sweater as we left.
20      Q.   Okay.  But she was wearing the sweater in the
21 car?
22      A.   Yeah, she was.
23      Q.   Okay.  And so when she pulled up -- when she
24 pulled up her shirt and showed you her breasts --
25      A.   She never did that.

Page 180

1      Q.   I'm sorry.  You just told me she did that.
2      A.   You better read back.  You said "bra," and I
3 said --
4      Q.   I'm sorry.  When she lifted up her T-shirts
5 (sic) and showed you --
6      A.   I'm sure you're not sorry, but go ahead.
7      Q.   So she lifted up her T-shirt and showed you her
8 bra, you determined that that was -- that was a typical
9 act of her being manipulative?
10      A.   Yes.
11      Q.   Trying to use sex to curry favor with you?
12      A.   Yes.
13      Q.   Obviously, the last thing you would expect a
14 grieving mother to do is to show a detective who was
15 interrogating her -- her bare bra?
16      MS. RETTS:  Form.
17      THE WITNESS:  A portion of the bra, yes.
18      Q.   BY MR. BRUSTIN:  What portion of the bra?
19      A.   Just the bottom portion.
20      Q.   Just the bottom portion.  Are you sure about
21 that?
22      A.   Yes.
23      Q.   All right.  In any case, you saw this as an
24 example of her trying to use sex to manipulate you?
25      A.   Yes.

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
181–184

Page 181

1    Q.   But you weren't having any of it.  Right?

2    A.   No.

3    Q.   Okay.  Now, again, though, a woman who would

4  commit such a provocative act, that's evidence that she's

5  guilty.  Right?  She's being manipulative?

6    A.   That's evidence that's her -- her way of

7  getting to people when she was asking me that she

8  wanted -- Do you think I could get released and all this

9  other stuff, and I think that was just another added

10  piece of her wanting to -- to continue her life as she

11  knew it before and that justifying that -- she had

12  justified the fact that the way -- or how -- how her son

13  was killed, by -- who he was killed by.

14    Q.   You remember it like it was yesterday.  Right?

15    A.   No.

16    Q.   It was an unusual act.  Right?

17    A.   I don't remember it like it was yesterday, but

18  I have recalled my recollection by reading the reports.

19    Q.   Okay.  And you -- so you see the picture.  She

20  had to actually lift -- she had to lift -- she would have

21  had to have bunched up her shirt and pulled it all the

22  way up so you could see the bottom of her bra.  Correct?

23    A.   No, she was just -- if I remember right, she

24  was -- she put her hand underneath her blouse and was

25  either scratching or something like that, and that's when

Page 182

1  I could see that.  That's the only thing.

2    Q.   I don't understand now.  You just --

3    A.   Well --

4    Q.   -- told me she pulled up her shirt and showed

5  you the bottom of her bra.

6    A.   That was the ultimate thing, but she had

7  raised -- she had put her -- raised her shirt because she

8  had put her arm -- her hand underneath her shirt and

9  raised the shirt because she was either scratching or

10  something.

11    Q.   Okay.

12    A.   And, you know, I don't know.

13    Q.   And that's never happened before.  Right?  You

14  never had a murder -- a female murder suspect showed you

15  her bra before, have you?

16    A.   No.

17    Q.   It was unusual.  Right?

18    A.   You know, it was just part of it, you know.

19    Q.   Yep.  How come you didn't put it in your

20  report?

21    A.   You know, I -- well, I didn't make notes for

22  one thing on that situation because --

23    Q.   You just described in great detail 30 years

24  later what happened.  Why didn't you put it in your

25  report?

Page 183

1    A.   Because, like I said -- and you could --

2    Q.   You haven't said yet.

3    A.   Well --

4         MS. BERKE:  Will you please --

5         THE WITNESS:  -- you could keep on

6  interrupting me --

7         MS. BERKE:  -- please stop interrupting him

8  and let him answer the question.

9         THE WITNESS:  -- I probably won't be.

10         I said --

11         Now I forgot the question.

12    Q.   BY MR. BRUSTIN:  I'll ask it again.

13         When Debra Milke --

14    A.   Uh-huh.

15    Q.   -- showed you her bra, why didn't you document

16  that act which you believe to be provocative and sexual

17  in nature in any police report?

18    A.   Like I said, I was not taking notes at that

19  time.  Just probably I wrote my -- or dictated my

20  statement with Debra on a Dictaphone.  I just either

21  forgot or just didn't -- for some reason didn't do it.

22    Q.   Okay.  And you forgot until today?

23    A.   Pardon me?

24    Q.   You forgot until today?

25    A.   No, you asked me today.

Page 184

1    Q.   Okay.  Did you tell anybody else about it

2  happening?

3    A.   I don't know.  I don't remember.

4    Q.   Okay.  And so the reason that you didn't put it

5  in your report is because you forgot it happened?

6    A.   I may have.

7         First of all, it's not that important

8  because it was just a gesture by her.  I assumed that

9  this was part of her manipulation, but my assuming and

10  not having evidence to back it up would be --

11    Q.   Huh.  What other reason could Debra Milke have

12  had for showing you her bra?

13         MS. BERKE:  He was in the middle of

14  providing his answer, and you interrupted him again.  And

15  I'm going to ask you again to please let him complete his

16  answers.

17         THE WITNESS:  First of all, she did not show

18  me her bra.  She was -- she did that, and I assumed in my

19  head that it was just another manipulative thing she was

20  going to do.

21    Q.   BY MR. BRUSTIN:  So did you decide not to put

22  it in your report, or did you forget to put it in your

23  report?

24    A.   I -- you know, it could be either way.  I don't

25  remember.



Page 185

1    Q.    What we're seeing right now on the video is an
2  example of you lying in real time, aren't we?
3        MS. BERKE:  Objection.  Argumentative.
4        You don't need to answer that.
5        THE WITNESS:  First of all, I'm not lying.
6  I'm telling you the truth.  Now, if you want to continue
7  to argue about the truth, that's fine but --
8        MR. BRUSTIN:  Let's start with the
9  transcript.
10        MS. GREEN:  Okay.
11        MR. BRUSTIN:  Okay.  I'm sorry.  I need to
12  take a 12 -- 30-second rest room break.
13        THE VIDEOGRAPHER:  We're off the record at
14  2:45 p.m.
15        (A recess was held off the record.)
16        THE VIDEOGRAPHER:  We're back on the record
17  at 2:47 p.m.  This ends media No. 2.  We're off the
18  record at 2:47 p.m.
19        (Exhibit 7 was marked for identification.)
20        (Exhibit 8 was marked for identification.)
21        THE VIDEOGRAPHER:  This begins media No. 3
22  to the video-recorded deposition of Armando Saldate.  We
23  are back on the record at 2:50 p.m.
24    Q.    BY MR. BRUSTIN:  Okay.  Mr. Saldate, I'm
25  showing you two documents now.  7, which is that one, is

Page 186

1  a transcription -- 7 is a transcription of the interview
2  you conducted with Sandra Pickinpaugh.
3    A.    Uh-huh.
4    Q.    Okay?  I'm going to ask you some questions
5  about that.
6        And then Plaintiff's 8 is your report on the
7  interview with Sandra Pickinpaugh.
8    A.    Okay.
9    Q.    Tell me if I'm correct.  Just take a look at 8
10  long enough to tell me if I've described it accurately.
11    A.    Look at 8?
12    Q.    Yeah, look at 8.  That -- did I describe it
13  accurately?  That's your report on the Pickinpaugh
14  interview?
15    A.    Yes.
16    Q.    Okay.  Now, like any other interview, the
17  interview with Sandra Pickinpaugh you were taking notes
18  as she described, and so you get a report.  Correct?
19    A.    Correct.
20    Q.    And you interviewed her on June 30th, 1990.
21  Correct?
22    A.    Correct.
23    Q.    And she actually had her own tape recorder.
24  Right?
25    A.    I didn't know that at that time, but, yes.

Page 187

1    Q.    Okay.  You didn't learn it until sometime much
2  later?
3    A.    Much later.
4    Q.    You learned later that she actually had a
5  mini-cassette recorder?
6    A.    I didn't know that.  I just knew that she had
7  tape-recorded it.  That's all.
8    Q.    Okay.  And certainly using a mini-cassette
9  recorder is a reasonable way to tape an interview.
10  Right?
11        MS. BERKE:  Objection.  Foundation.
12        THE WITNESS:  I don't know.
13    Q.    BY MR. BRUSTIN:  Nothing wrong with that.
14  Right?
15        MS. BERKE:  Form and foundation.
16        THE WITNESS:  That she taped my interview?
17  Nothing wrong with that, no.
18    Q.    BY MR. BRUSTIN:  Okay.  And there's nothing
19  wrong with using a mini-cassette tape recorder.  Right?
20    A.    I don't know where that's an issue, but, no.
21    Q.    Here's -- here's -- here's what I'm getting at:
22  You had a mini-cassette tape recorder.  Right?
23    A.    A mini-cassette tape recorder?
24    Q.    Yes.
25    A.    That I took to --

Page 188

1    Q.    Nope.  It's a mini-cassette tape recorder that
2  you have that you used to create your reports.  Right?
3    A.    No.
4    Q.    Okay.  How did you -- you testified and you
5  just told us about -- about 15 minutes ago that the way
6  you created the report in this case was that you dictated
7  it on a mini-cassette recorder.  Correct?
8    A.    I never said mini-cassette recorder.  I
9  dictated the report.
10    Q.    On a tape recorder?
11    A.    On a dictation machine.
12    Q.    We'll get to it.  You test- -- you testified
13  that you had a mini-cassette recorder during the trial.
14  Are you claiming now you didn't?
15    A.    If I did, I was wrong because I know what I
16  recorded the report on, and that's a Dictaphone or, you
17  know, dictating machine.
18    Q.    A Dictaphone is a small device that you hold in
19  your hand and talk into.  Correct?
20        MS. BURGESS:  Object to form.  Foundation.
21        Are you talking now or 1990?
22        THE WITNESS:  No.
23    Q.    BY MR. BRUSTIN:  In 1990, a Dictaphone was a
24  small -- small recording device that you held in your
25  hand and talked into.  Correct?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
189–192

Page 189

1    A.   No.

2    Q.   What was the device that you used in 1990 to

3    create reports?

4    A.   It was a --

5         MS. BERKE:  Take your hand away from your

6    mouth.

7         THE WITNESS:  Oh, I'm sorry.

8         It was a 8-inch by 6-inch base with a cord

9    and a microphone or what you would speak into, and it

10   contained a tape that I would put in to dictate my

11   reports.

12   Q.   BY MR. BRUSTIN:  Okay.  By the way, did you

13   understand in 1989 that it would be permissible for a

14   detective if he so chose to tape-record any conversation

15   with a suspect without the suspect knowing, anything

16   wrong with that?

17   A.   No, I don't think there is.  I don't know.

18   Q.   There's nothing -- there will be nothing wrong

19   with having a -- a handheld mini -- mini recorder -- you

20   knew -- withdrawn.

21        You knew in 1989 that there were, in fact,

22   mini recorders that you could hold in your hand.  Right?

23   A.   1889 (sic)?  Yes.

24   Q.   Yes.  And as far as you understood it, there

25   would be nothing preventing you from putting that in your

Page 190

1    pocket or underneath the table to tape-record a

2    conversation with a suspect.  Correct?

3    A.   It -- it was not going to be truthful.  So

4    that's what I do.

5    Q.   I understand.  That's the way you looked at it,

6    that you were so connected to the truth you would never

7    lie to a suspect even about taping their conversation.

8    Correct?  You would never do that?

9    A.   I don't say -- never is never, but I said in

10   this case I did not.

11   Q.   Okay.  And the reason is because it wouldn't be

12   truthful?

13   A.   It's because I told her that I was going to

14   tell her the truth.

15   Q.   But you just said -- you just told me that you

16   wouldn't tape somebody without their knowledge because it

17   wouldn't be truthful.  Correct?

18   A.   That's correct.

19   Q.   All right.  But there was nothing preventing

20   you from doing that.  Correct?  You understood that some

21   officers could do that.  Right?

22   A.   No, I wasn't aware of that.

23   Q.   No?  You certainly weren't aware of any

24   procedure or rule or law that would prevent you from

25   doing that.  Right?

Page 191

1    A.   I wasn't aware of it because I never even

2    thought about it.

3    Q.   According to Sandra Pickinpaugh's testimony at

4    the trial, she actually had a mini-cassette recorder, and

5    it was sitting on the kitchen table in between you and

6    her.  Do you recall that?

7    A.   Do I recall her saying that in trial?

8    Q.   Do you recall that happening?

9    A.   No.

10   Q.   Do you have any reason to dispute it?

11   A.   No.

12   Q.   Okay.  And she testified that the only time

13   that the interview paused was when she paused -- she

14   heard a click and turned the mini-cassette tape recorder

15   over on the second side.  Any reason to dispute that?

16   A.   I did not notice it, no.

17   Q.   Okay.  You didn't notice her changing sides?

18   A.   I didn't even know there was one there.

19   Q.   Because that wasn't what you were interested

20   in.  You were going to tell the truth no matter what?

21        MS. BERKE:  Objection.  Vague and

22   argumentative.

23        THE WITNESS:  Tell the truth -- matter --

24   we're talking about Pickinpaugh.  Right?

25   Q.   BY MR. BRUSTIN:  Yeah.

Page 192

1    A.   I didn't take a tape recorder there.

2    Q.   Okay.  And you would never -- withdrawn.

3    A.   I didn't tell her that, you know --

4    Q.   She took the tape recorder is what she said.

5    She taped it.

6    A.   Okay.  Fine.

7    Q.   And you are saying you don't even remember

8    knowing about it?

9    A.   Not knowing it and not caring about it.

10   Q.   Okay.  Because didn't matter.  You were going

11   to tell the truth no matter what?

12   A.   It's not that it didn't matter.  It's just that

13   it's just not very important to me.

14   Q.   Okay.  Now, take a look at Exhibit 7, the

15   transcript, and I'll represent for the record that there

16   are some missing words in the transcript.  And what I

17   propose we do after this is that we -- I've listened to

18   it.  You can make out every word.  I think we should get

19   it to a better court reporter and get it transcribed

20   properly and share the costs, but for right now we'll

21   have to make do.

22        So if you could, turn to page -- I'll use

23   the Bates stamp numbers on the bottom -- 18715.  If you

24   will, read lines 6 through line 25 to yourself.

25        MS. BERKE:  Which page?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
193–196

Page 193

1    MR. BRUSTIN: 18715.
2    Q.  BY MR. BRUSTIN: Actually, read all the way to
3  line 5 on page 31. This is you describing the -- the
4  incident with Debra lifting up her shirt to Sandra
5  Pickinpaugh during the taped interview. Correct?
6    A.  Are you going to let me read it?
7    Q.  Oh, I thought you had. I'm sorry.
8    A.  No. You said 31, to page 31?
9    Q.  31, line 5, just the first five lines.
10   A.  Oh, okay. I just started.
11       Yes.
12   Q.  Okay. So this is you on tape describing to
13  Sandra Pickinpaugh the incident where Debra Milke showed
14  you her breast. Correct?
15       MS. BERKE: Objection. Misstates testimony.
16   Q.  BY MR. BRUSTIN: Do you need to read something
17  else to answer my question?
18   A.  No, I'm trying to refresh my memory.
19   Q.  You just read it. I'm asking you if you need
20  to read something else to answer the question?
21   A.  No.
22   Q.  This is you describing --
23   A.  I don't remember. So I wanted to read --
24  recollect --
25       MS. BERKE: If he needs to read it more than

Page 194

1  one time --
2       MR. BRUSTIN: That's fine.
3       MS. BERKE: -- he's permitted to do that.
4       MR. BRUSTIN: Go ahead. Do it.
5       THE WITNESS: Can I?
6       MR. BRUSTIN: Of course. I was going to say
7  the same thing, but go ahead.
8       THE WITNESS: We did number 28 or 29?
9    Q.  BY MR. BRUSTIN: Very simple. Page 30 -- top
10  of page 30 -- I'm sorry. Page 18715 to line 5 on page
11  18716.
12   A.  I don't see any place where she said she
13  exposed her breast or I said she exposed her breast.
14   Q.  Page 30.
15   A.  Page 30.
16   Q.  Page 18716. "It's working. If he's looking at
17  my breasts, then I may be able to talk myself out of
18  this. Okay. So that's what I'm telling you. That's the
19  type of manipulation she does. She loves that."
20       Do you see that?
21   A.  Okay.
22   Q.  What you're describing to Sandra Pickinpaugh is
23  Debra Milke showing you her breasts. Correct?
24   A.  I may have said that, yes.
25   Q.  Okay. And what you're describing to her is her

Page 195

1  showing you -- lifting up her shirt and showing you her
2  breasts not in the car but at the beginning of the
3  interview. Correct?
4    A.  Yeah, it appears so.
5    Q.  And it's you -- it's you telling Sandra
6  Pickinpaugh that you recognize the significance of what
7  she did, that she was trying to manipulate you. Correct?
8    A.  In my opinion.
9    Q.  Okay. Which one is true, by the way? Did she
10  do it in the car, or did she do it at the beginning of
11  the interview?
12   A.  I can't remember now. I'm --
13   Q.  It's one or the other for sure?
14   A.  Yeah.
15   Q.  All right. And, by the way, obviously, you
16  remembered the incident because you told Sandra
17  Pickinpaugh about it. Right?
18   A.  We were discussing something about her
19  manipulation, and, yes, I brought that up.
20   Q.  Okay. Any reason why you didn't put it in that
21  report, the report of the Sandra Pickinpaugh interview?
22   A.  No reason at all.
23   Q.  Okay. You told her how important you thought
24  it was. Right?
25       MS. BERKE: Objection. Misstates evidence.

Page 196

1       THE WITNESS: I told her that it was
2  important in -- when we were talking about her
3  manipulation and what she -- how she manipulated people.
4       MS. BERKE: And in fairness, just for the
5  record, it sounds like he's responding to something she
6  said, and if you look at 18715, line 18A, it states
7  inaudible. So we don't know what he's responding to that
8  Ms. Pickinpaugh stated.
9    Q.  BY MR. BRUSTIN: And you also described here
10  that it wasn't -- that the reason that she pulled up her
11  shirt was because she was pretending to dry her tears.
12  Correct?
13   A.  Correct.
14   Q.  And that's different than the first version you
15  gave us about five minutes ago. Correct?
16   A.  Yes. I mean --
17   Q.  Just an honest mistake?
18   A.  That she was -- like I said, it happened at
19  either -- I just don't remember. It's been too long.
20   Q.  But you're sure it's one or the other. You
21  didn't lie about it?
22   A.  No, of course not, even though you assume I
23  did.
24   Q.  And the fact that you -- the fact that you
25  didn't put it in the report -- did you forget to put it

Page 197

1 in the report with -- with Debra Pickinpaugh as well --
2 Sandra Pickinpaugh?
3    A.   No, we were talking about something else and,
4 you know, about her manipulation and stuff like that with
5 her sister, and that's what I took it as, a conversation
6 that was between me and her sister, and I didn't -- may
7 have been I just didn't want to -- why cause a rift
8 between sisters. I don't know.
9    Q.   Oh, so your goal here was not to cause a rift
10 between sisters. That's what you wanted to do. You were
11 careful not to do that?
12    A.   I wasn't careful. I just said that may have
13 been my reason not putting it in because it wasn't that
14 important to me, but since we were talking about
15 manipulation and what her sister does, then I just threw
16 that out and --
17    Q.   And, by the way --
18         Go ahead.
19    A.   No, go ahead.
20    Q.   You done?
21    A.   I'm done.
22    Q.   And, by the way, you never thought -- you never
23 knew this was taped. So you didn't think that would ever
24 come out. Right?
25    A.   I never thought it was taped, but I could care

Page 198

1 less if it came out.
2    Q.   I'm not asking what you care about. Your
3 expectation is that it wouldn't have come out because you
4 didn't know it was taped?
5    A.   It's important that I care about something, and
6 I did not care whether she taped it or not.
7    Q.   Okay.
8    A.   Obviously, she did it right in front of me, and
9 I didn't notice it. So I obviously didn't care.
10    Q.   Let me throw out another theory, and you tell
11 me if this makes any sense.
12         The reason that you lied to Sandra
13 Pickinpaugh and told her that Debra pulled up her shirt
14 when that never happened is because you wanted her to be
15 convinced that Debra was actually guilty. Right?
16         MS. BERKE: Objection. Argumentative.
17 Misstates evidence.
18    Q.   BY MR. BRUSTIN: Is that possible?
19    A.   No.
20    Q.   All right. Now, the other thing you made clear
21 in the taped statement -- I'll read it to you again so
22 you don't forget. "If he's looking at my breasts" --
23         MS. BERKE: What page are you on?
24         MR. BRUSTIN: Page 18716.
25    Q.   BY MR. BRUSTIN: "If he's looking at my

Page 199

1 breasts, then I may be able to talk myself out of this."
2 That's what you thought was happening. Right?
3    A.   Yes.
4    Q.   Okay. So what you're describing is that she
5 actually showed you her bra covering her breasts.
6 Correct?
7    A.   No. I only saw the bottom parts of her bra,
8 and that may have been just to clarify -- you know, tell
9 her but not -- that's -- you know, no.
10    Q.   Was -- do you remember any more now? Was it in
11 the car or during the interrogation? Any better memory?
12    A.   Is this an argument over this? I don't want to
13 argue with you.
14    Q.   Any better memory?
15    A.   No.
16    Q.   Okay. And was it because she was wiping fake
17 tears or just pulling up her shirt? Do you remember
18 which one?
19    A.   I don't remember.
20    Q.   It was one of them, though. Right?
21    A.   Yes, it was.
22    Q.   Okay. Now, take a look at Plaintiff's 8, the
23 report. We're going to be focusing on this for the next
24 hour or so. So let's -- let's keep these two exhibits in
25 front of you.

Page 200

1    A.   Okay.
2    Q.   Take a look at page -- I'm doing the Bates
3 stamps in the bottom, okay, the NSB Bates stamps. Let's
4 start with page 611.
5    A.   I don't have 611.
6    Q.   First page. Let me see it. Help you?
7         MS. GREEN: That's the other report. We're
8 on Exhibit 8.
9         MR. BRUSTIN: Oh, yeah, Exhibit 8. Sorry.
10 It's over there somewhere, I think. Put that face down
11 so you don't get confused. I think it may be that one
12 right there. You got to turn it to see the first page.
13 Not that one. It's not that one. It's one of these two.
14 Is that 8?
15         THE WITNESS: 2.
16         MR. BRUSTIN: Try that one, that one in
17 front of you.
18         THE WITNESS: 7.
19         MS. GREEN: It's right on your notebook.
20    Q.   BY MR. BRUSTIN: Oh, it's underneath. Do you
21 see it?
22    A.   Oh, there it is.
23    Q.   Okay. Let's take a look at the paragraph
24 beginning, "Sandra said." Do you see that, last full
25 paragraph?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
201–204

Page 201

1   A.   Uh --
2   Q.   Page -- Exhibit 8, your report, page 611, the
3   first page.
4   A.   Okay.
5   Q.   You see where it says -- it's missing an A.  It
6   says, "Sandra said"?
7   A.   Yes.
8   Q.   Okay.  Read this paragraph to yourself.
9   A.   Okay.
10  Q.   So this is an example --
11       You read it?  You familiar with it?  Okay.
12       This is an -- this is an example of Sandra
13  volunteering to you that Debra Milke was completely
14  self-involved and not interested in herself or her
15  family.  Right?
16  A.   Apparently, yes.
17  Q.   And the key phrase here is, "Sandra said this
18  was strange because usually Debbie didn't think of anyone
19  else and didn't really understand why Debra had called."
20       That's showing that she's self-interested.
21  Right?
22  A.   Yes.
23  Q.   That's -- that's the important part.  Right?
24  A.   It's all important, but it's -- yeah.
25  Q.   That's the part that shows --

Page 202

1       MS. BERKE:  Again, you're interrupting him.
2   Please let him finish his answer.
3       THE WITNESS:  In that paragraph, yes.
4   Q.   BY MR. BRUSTIN:  That's the important part of
5   that paragraph.  Right?
6   A.   Yes.
7   Q.   Otherwise it's just a nice birthday call.
8   Right?
9   A.   I don't know what it is other than what it
10  states there.
11  Q.   Okay.  Now let's look at the tape transcript.
12  Okay?
13  A.   Okay.  Fine.
14  Q.   Take a look at page 18689.
15  A.   Okay.
16  Q.   Now, read lines 3 to lines 11.  Let me know
17  when you're done.
18  A.   From 1 to 11, I'm done.
19  Q.   You're done?
20  A.   Yes.
21  Q.   This is -- this is what you're referring to in
22  the report.  This is what she's -- you're asking about
23  the conversation about the birthday.  Right?
24  A.   Yes.
25  Q.   And what's missing from the taped version?

Page 203

1   A.   The portion I describe in the report as her
2   calling and describing Debbie as a certain type of
3   person.
4   Q.   Okay.  So what -- what's described in the tape
5   is a nice birthday call.  Right?
6   A.   That's correct.
7   Q.   And what you added in the report was that
8   actually it was a self-interested call, and she doesn't
9   care about anybody else.  That's the part you added on
10  your own.  Correct?
11      MS. BERKE:  Form.
12      MS. RETTS:  Join.
13      THE WITNESS:  No.
14  Q.   BY MR. BRUSTIN:  That's the part that you
15  fabricated.  Correct?
16  A.   No.
17  Q.   How did it get there?
18  A.   I wrote it.
19  Q.   Okay.  Is it -- is it because the tape -- was
20  it on the tape and it just doesn't pick it up?
21  A.   I don't know.
22  Q.   What else -- what other explanation could there
23  be?
24  A.   I don't know.
25  Q.   This is an example of you changing the meaning

Page 204

1   of what somebody tells you to make something innocuous,
2   inculpatory, isn't it?
3   A.   It is not.
4       MS. BURGESS:  Objection.  I'm going to
5   instruct -- there are other pages that have additional
6   information on it.
7       MR. BRUSTIN:  Oh, I've read every bit of it.
8       MS. BERKE:  And there are inaudible
9   portions.
10      MS. BURGESS:  -- to page 18695 which has
11  information that comports with the report.
12      MR. BRUSTIN:  Oh, she told --
13      MS. BURGESS:  So allow him to review the
14  entire thing before answering questions that you're
15  asking him.
16  Q.   BY MR. BRUSTIN:  She told you all kinds of bad
17  things about Debra.  Right?
18      MS. BERKE:  Why don't -- if you're going to
19  ask him questions about this --
20      THE WITNESS:  I don't remember.
21      MS. BERKE:  -- why don't we take a break and
22  let him review the entire transcript.
23      MR. BRUSTIN:  Nope.
24      MS. BERKE:  Did you say no?
25      MR. BRUSTIN:  I said no.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
205—208

Page 205

1      MS. BERKE:  Okay.

2      Q.   BY MR. BRUSTIN:  You already told me you

3  reviewed the transcript.

4      A.   You're being argumentative.

5      Q.   You already told me you reviewed the

6  transcript.  Right?

7      MS. BERKE:  He did not review this

8  transcript.

9      THE WITNESS:  No, I haven't even -- I never

10  reviewed the tape or the transcript or anything.

11      Q.   BY MR. BRUSTIN:  All right.  Let's match up

12  this paragraph.  Okay?  The paragraph in your report that

13  I just read to you is clearly your description of that

14  phone call --

15      A.   Uh-huh.

16      Q.   -- about the birthday.  Correct?

17      A.   Yes.

18      Q.   And the only thing that's missing in the tape

19  transcript is the sentence, "Sandra said this was strange

20  because usually Debbie didn't think of anyone else and

21  didn't really understand why Debra had called."

22      MS. BURGESS:  Form.

23      Q.   BY MR. BRUSTIN:  Right?

24      MS. BERKE:  Armando, you're welcome to

25  review the transcript so you can answer the question

Page 206

1  knowledgeable about what's in the interview.  And then

2  answer the question.

3      Q.   BY MR. BRUSTIN:  That's the only thing that's

4  missing.  Right?

5      A.   That is correct.

6      MS. BURGESS:  Form.

7      MS. BERKE:  Go ahead and review the

8  transcript.

9      MR. BRUSTIN:  I'm not having him review

10  anything.  He hasn't asked to do it.  I'm asking about a

11  specific portion of this.  Now --

12      THE WITNESS:  Don't get angry.  Calm down.

13      Q.   BY MR. BRUSTIN:  Look, the only thing I'm angry

14  about is I just feel like it's unfortunate that Debra

15  spent -- Debra spent so many years in prison because of

16  your misconduct.  That's what I'm upset about.

17      MS. BERKE:  Objection.  Argumentative and

18  don't --

19      Armando, don't respond to that.

20      Q.   BY MR. BRUSTIN:  So you can keep asking, but

21  that's going to be my answer each time.

22      Do you have any idea how that sentence--

23  that made-up sentence got in here?

24      A.   No.

25      MS. BURGESS:  Object to form and foundation.

Page 207

1  Misstates the transcript.

2      Q.   BY MR. BRUSTIN:  You would agree --

3      MS. BERKE:  Join.

4      Q.   BY MR. BRUSTIN:  -- that this is exactly what

5  Debra Milke accused you of doing in your untaped

6  interview of her, adding parts -- adding phrases that

7  changes the meaning of words.  That's what she accused

8  you of.  Right?

9      MS. BERKE:  Objection.  Foundation.

10  Argumentative.

11      THE WITNESS:  I don't know what she accused

12  me of.

13      Q.   BY MR. BRUSTIN:  Now, as you told us --

14  withdrawn.

15      Let's take another example.  Let's take a

16  look at -- would you agree -- withdrawn.

17      Would you agree that the statement in the

18  transcript describes a nice birthday call?

19      MS. BURGESS:  Form and foundation.

20      MS. BERKE:  Join.  And, again, he hasn't had

21  the opportunity to read the transcript.

22      Q.   BY MR. BRUSTIN:  The only part of the

23  transcript that talks about the birthday call.

24      A.   Yes.

25      Q.   That's what she's describing.  Right?

Page 208

1      A.   Yeah.

2      Q.   A thoughtful call on her son's birthday.

3  That's what she describes.

4      MS. BERKE:  Objection.

5      THE WITNESS:  Appears so.

6      Q.   BY MR. BRUSTIN:  All right.  Now, take a look

7  at the report, page 612.

8      A.   612.  Okay.  612.

9      Q.   By the way --

10      A.   I'm on 612.

11      Q.   Okay.  Before we get to it, you recall from --

12  from your recollection of the interview with Sandra

13  Pickinpaugh that she had a lot of problems with her

14  sister.  Right?  They weren't very close?

15      A.   I don't think they were very close, no.

16      Q.   She had a lot of bad things to say about her

17  sister.  Right?

18      A.   At times, yes.

19      Q.   But that wasn't enough for you.  You had to add

20  even more, didn't you?

21      MS. BURGESS:  Form and foundation.

22      THE WITNESS:  Is that an accusation or what?

23      Q.   BY MR. BRUSTIN:  Yes, it's a question.

24      A.   No, it's an accusation.

25      MS. BURGESS:  For completeness, I think we

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
209–212

Page 209

1  should all look at the rest of the transcript.
2     Q.   BY MR. BRUSTIN:  Okay.  Let's take a look at
3  the second paragraph on page 612.
4     A.   Okay.
5     Q.   Read it to yourself, please.
6     A.   I've read it.
7     Q.   Okay.  And what you're describing here is
8  Sandra in her own words describing her sister as
9  materialistic and other things.  Right?
10    A.   Yes.
11    Q.   And also saying that she loves her sister but
12  that she has come to realize what her sister actually is,
13  and she feels sorry for her.  Correct?
14    A.   Correct.
15    Q.   In other words, she recognizes that, in fact,
16  her sister's a murderer, but she still loves her.
17  Correct?
18    A.   I can't make that determination.
19    Q.   Was that your understanding of what she was
20  saying to you?
21    A.   No.
22    Q.   When she says she understands what she actually
23  is, what did you understand that to mean?
24    A.   Manipulative.
25    Q.   Okay.

Page 210

1     A.   Using everybody.
2     Q.   All right.  Now, the report makes clear that
3  materialistic, by the way, is her word -- in her own
4  words.  Right?  I just quoted your report.
5     A.   You read my report, but it's not in quotations.
6  So I don't know.  Materialistic, okay.
7     Q.   In her words.  Right?
8     A.   I would assume so, yes.
9     Q.   Not assume so.  That's what you wrote.  Right?
10    A.   That's what I wrote, yes.
11    Q.   Now, take a look at the transcript, page 18700.
12    A.   18700.
13    Q.   Oh, I'm sorry.  Let's start on 18696.  Read to
14  yourself line 17 through page -- the next page, line 4.
15         Are you ready?
16    A.   To 12, page 12.  Right?
17    Q.   Yeah, just the first four lines.
18    A.   Oh, first four lines of page 12.
19    Q.   Who mentioned the word "materialistic"?  Was it
20  you or her?
21    A.   I did.
22    Q.   Wasn't her words.  It was your words.  Right?
23         MS. BERKE:  Objection.  Misstates evidence.
24  Misstates the transcript.
25         THE WITNESS:  It was my word initially.

Page 211

1     Q.   BY MR. BRUSTIN:  Okay.
2     A.   But she used it later.
3     Q.   So you suggested and she agreed to it?
4     A.   I didn't suggest it.  I just used the word.
5     Q.   Okay.  Did you accurately describe that
6  conversation in the report in your view?
7     A.   That she was materialistic.
8     Q.   In her own words, is that accurate?
9     A.   Well, since there's a tape, yes.  It's accurate
10  to the tape, yeah.
11    Q.   But you didn't know there was a tape?
12    A.   No, I'm just -- you were just asking me if --
13    Q.   It wasn't her words.  It was words you
14  suggested to her.  Right?  It was a leading question.
15    A.   I didn't suggest to her --
16         MS. BURGESS:  Form.
17         MS. ODEGARD:  Form.
18    Q.   BY MR. BRUSTIN:  What's a leading question?
19    A.   Huh?
20    Q.   What's a leading question?
21    A.   I wasn't doing -- giving her any leading
22  questions.
23    Q.   What is a leading question, sir?
24    A.   I don't know.
25    Q.   It's a question when you suggest the answer in

Page 212

1  the question, correct, like I've been doing with you
2  today?
3     A.   Yes.
4     Q.   Okay.  And you suggested the word materialistic
5  to her, and then she --
6     A.   I told her -- I gave her the word
7  materialistic.
8     Q.   Okay.  Fair enough.  So it's your testimony
9  here today that you accurately describe the conversation
10  that took place on the tape regarding materialistic in
11  your report?
12    A.   As best I could, yes.
13    Q.   All right.  Now, take a look at page 18700.
14    A.   18700.
15    Q.   Now, this is the -- this is the portion of the
16  tape that refers back to your report on page -- on page
17  612 where you say, "Sandra said this may sound as if she
18  did not like her sister.  However, that was not true.
19  She said she loves her sister, but she has come to
20  realize what her sister -- what her sister actually is,
21  and for the most part, she feels sorry for her."
22  Correct?
23    A.   That's correct.
24    Q.   Okay.  Now, on the tape transcription, you see
25  where it says "she feels sorry for her."  Right?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
213—216

Page 213

1   A.   What line?

2   Q.   Line 20.

3   A.   And 18700?

4   Q.   Oh, it's not on the tape, but it actually -- it
5 actually -- when you listen to the tape, it says that.
6 So look at line 12.

7   A.   I haven't had the opportunity to.

8        MS. BERKE:  So you are saying the transcript
9 isn't accurate?

10       MR. BRUSTIN:  That's what I said at the
11 beginning of this.  There's missing words, but you can
12 actually hear them.

13       THE WITNESS:  I haven't heard the tape.  So
14 I wouldn't know.

15   Q.   BY MR. BRUSTIN:  Okay.  But this is the -- this
16 is the portion -- you could match it up.  This is the
17 portion you're talking about in your report.  Correct?

18   A.   What portion?  The page --

19       MS. RETTS:  Form.

20   Q.   BY MR. BRUSTIN:  Let's do it together.

21   A.   20?

22   Q.   Let's do it together.

23       MS. BERKE:  Please don't point at him.

24   Q.   BY MR. BRUSTIN:  Look up.  Okay.  Take a look
25 at your report.  The paragraph you just read, right, on

Page 214

1 page 612, "She loves her sister, but she has come to
2 realize what her sister actually is" -- it's not going to
3 work with this.  Let's move on.  We'll save this for a
4 better transcription.

5        All right.  Now, let's take a look at your
6 report and page 613, and I want you to read the paragraph
7 beginning, "I then asked Sandra what her relationship
8 with Jim was," second to the bottom paragraph.

9   A.   I see it.

10   Q.   Read that and let me know when you're done.

11   A.   I did finish it.

12   Q.   You did?

13   A.   Yes.

14   Q.   Okay.  So what this paragraph is suggesting in
15 your report is that whereas Sandra made it crystal clear
16 to Jim that she wasn't interested in him romantically,
17 she believed that Jim was in love with Debra and that
18 Debra, unlike Sandra, would use that weakness to
19 manipulate Jim and get what she wants.  Right?

20   A.   Correct.

21   Q.   And that's a -- that's a powerful fact that's
22 consistent with your theory of what happened in this
23 case.  Correct?  She manipulated Jim to get what she
24 wanted?

25   A.   You use these adjectives like -- it wasn't

Page 215

1 powerful.  I mean, it was just a statement she made.

2   It's --

3   Q.   Okay.  And it's a statement she made when you
4 interviewed her, correct, and that's why you wrote it
5 down?

6   A.   That's correct.

7   Q.   And the significance of it is what I just
8 described to you.  Correct?

9   A.   Correct.

10   Q.   And so you would expect to see that tape -- you
11 would expect to see that statement in the taped
12 transcription of the interview.  Correct?

13   A.   Correct.

14   Q.   Any explanation for why it's not there?

15   A.   I wouldn't know.

16       MS. BURGESS:  Form.  Foundation.

17       MS. BERKE:  Form.  He can't answer that
18 question.  You haven't allowed him to read the
19 transcript.

20   Q.   BY MR. BRUSTIN:  I am -- I am -- I am
21 representing to you that it doesn't appear anywhere in
22 the document.

23       MS. BURGESS:  Form.

24       MS. BERKE:  He's not going to take your word
25 for it.  We're taking a break.  If you're going to ask

Page 216

1 him if something is in the transcript, we're going to
2 take a break, and he's going to read the transcript.

3   Q.   BY MR. BRUSTIN:  Let's do this:  Take a look at
4 the transcript at page 8 -- 18695.

5       MS. BERKE:  He's not going to answer any
6 questions --

7       MR. BRUSTIN:  You don't get to tell me that.

8       MS. BERKE:  -- to the effect that is it in
9 the transcript or why isn't it in the transcript when
10 you're not permitting him to read the transcript that he
11 told you he hasn't read before.

12       MR. BRUSTIN:  I don't have to let him read a
13 transcript.  That's your job.

14       MS. BERKE:  If you're going to ask him --

15       MR. BRUSTIN:  No, you just made that up.

16       MS. BERKE:  -- if something is in it --

17       MR. BRUSTIN:  Where did you get that rule?

18 Is that a rule you just made up?  You can't instruct him
19 not to answer.

20       MS. BERKE:  If you're not letting him read
21 the transcript that you're asking him if something is in,
22 I can certainly --

23       MS. GREEN:  He represented he read it.

24       MR. BRUSTIN:  He told us in the beginning he
25 read it.

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
217–220

Page 217

1     MS. BERKE:  He did not represent that he
2  read it, and if he did, he was mistaken.  He has
3  corrected himself and told you that he hasn't read it.
4     MR. BRUSTIN:  Why don't you -- why don't you
5  go ahead and read the transcript so that you and I are on
6  the same page.  Okay?  And it's not time for --
7     MS. BERKE:  Let's go off the record.  Read
8  the entire transcript.
9     Q.   BY MR. BRUSTIN:  Let me ask you this:  Are you
10  going to still be able to sit for five hours today if you
11  read the transcript?
12     MS. BURGESS:  Form.
13     THE WITNESS:  I'll try.
14     MR. BRUSTIN:  Okay.
15     THE VIDEOGRAPHER:  Counsel, are we off?
16     MR. BRUSTIN:  We're off.
17     THE VIDEOGRAPHER:  We're off the record at
18  3:30 p.m.
19     (A recess was held off the record.)
20     THE VIDEOGRAPHER:  We are back on the record
21  at 4:17 p.m.
22     Q.  BY MR. BRUSTIN:  Mr. Saldate, earlier today you
23  told us that you had reviewed the Sandra Pickinpaugh
24  interview.  Is that -- were you mistaken about that?
25     A.  Yes.  I never interviewed Sandra Pickinpaugh.

Page 218

1     Q.   You mean you never reviewed it.  You didn't
2  interview her?
3     A.   No, I didn't review the interview.
4     Q.   So when you said that earlier, that was just a
5  mistake?
6     A.   Yeah, because -- yes, it was.
7     Q.   Okay.  So the first time you reviewed it is
8  now?
9     A.   Yes.  Well, this -- this transcript, yes.
10     Q.   Well, you reviewed it -- you've reviewed it
11  around the time of the trial, but the first time you
12  reviewed it in connection with this case is now?
13     A.   I never reviewed it at the time of trial.
14     Q.   Are you sure about that?
15     A.   Positive.
16     Q.   In any case, you've had a chance to read it
17  carefully now.  Correct?
18     A.   I read it, yes.
19     Q.   Took as much time as you needed.  Right?
20     A.   I read it.
21     Q.   Okay.  Now, let's go back to where we were.
22     A.   Okay.
23     Q.   I was asking you about -- and let's make sure
24  we have everything in front of us.  I'm going off the
25  transcript and report.  Okay?

Page 219

1     A.   Okay.
2     Q.   And I was asking you about the paragraph
3  about -- on page 613 in your report beginning, "I then
4  asked."  Right?  Are you with me?
5     A.   I've been asked --
6     Q.   "I then asked."
7     A.   "I then asked Sandra what her relationship" --
8     Q.   Yes, that's the paragraph we're talking about.
9  Okay?
10     A.   Okay.
11     Q.   Okay.  I want to break this down a little
12  further.
13     First -- I'm sorry.  Let's just take it --
14  do you need to -- are you familiar with this paragraph,
15  or do you need to read it again before I ask you
16  questions about --
17     A.   I've familiar with it.  I read it.
18     Q.   And --
19     (A discussion was held off the record.)
20     Q.   BY MR. BRUSTIN:  All right.  So let's take a
21  look at the report.  In that paragraph, you see it says,
22  "I then asked the" -- first sentence, "I then asked
23  Sandra what her relationship with Jim was, and she said
24  they were very, very close friends."  Do you see that?
25     A.   Yes.

Page 220

1     Q.   Okay.  Keep that in mind and keep that out.
2  Now let's go to the transcript.  It appears that you're
3  referring -- you're referring in your report to the
4  portion of the transcript on page 18695, and let me show
5  you exactly what I mean.  Line 5, "Sure, but none --
6  it -- there were no clues or signs.  You have to
7  understand Jim and I were very, very, very, very close --
8  very, very, very close friends."
9     Do you see that?
10     A.   Yes.
11     Q.   That appears to match up -- that's the portion
12  of the -- that's the portion of the transcript that you
13  were referring to in the report.  Correct?
14     A.   Correct.
15     Q.   Okay.  Now, having reviewed the report and --
16  I'm sorry.  Having reviewed the transcript, I don't see
17  anywhere in the transcript the sentence or the sentences,
18  "She did admit that Jim at one time had thought they
19  could become romantically involved.  However, she
20  immediately told Jim that could not happen, and they
21  would only remain friends."
22     Did you see that anywhere in the transcript?
23     A.   I think I did.
24     Q.   Okay.  Where did you see that?
25     A.   I'm trying to find it.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
221–224

Page 221

1    Q.   It should be right around where the other
2  sentence is.  Right?
3    A.   Not necessarily.
4    Q.   You've already told us you were very careful to
5  go in chronological order.  Do you remember that?
6    A.   That's not me going in chronological order.
7  That's her, you know.
8    Q.   Well, you wrote in the report what she said in
9  the order in which she said it.  Correct?  Right?
10   A.   Yes.
11        MS. BERKE:  I think he's trying to answer
12  your question by referencing the transcript.  So please
13  allow him to do that.
14        MR. BRUSTIN:  Okay.
15        THE WITNESS:  I can't remember where it was
16  at, but I thought I read it, yes.
17   Q.   BY MR. BRUSTIN:  Well, look, you're going to
18  have an opportunity.  Here's what you can do.
19   A.   Okay.
20   Q.   You can look -- we're going to have a big break
21  in between this deposition and your next deposition.  If
22  you -- if you find it, you can raise it on the next
23  deposition.  Okay?
24   A.   Okay.
25   Q.   Any explanation why it wouldn't be there?

Page 222

1    A.   No.
2    Q.   Okay.  Now, the next part of the report says,
3  "I then asked her if Debra would have been as honest
4  towards Jim if he would have thought about becoming
5  romantically involved with Debra.  Sandra then replied
6  that Debra would only use that weakness in Jim and
7  never tell him that she would never want to be involved
8  with him romantically."
9        In other words, what Sandra told you,
10  according to your report, is that Jim was in love with
11  Debra, and Debra used that to manipulate him.  Correct?
12   A.   That's correct.
13   Q.   And I don't see any -- that anywhere in the
14  report.  Any explanation for that?
15   A.   I remember reading it.
16   Q.   Okay.  You want to do the same thing for the
17  next deposition so you have more time?
18   A.   Yes, please.
19   Q.   All right.  Now, let's take a look at the
20  transcript -- the transcript, page 18712, and I want you
21  to read to yourself line 20 on page 18712 all the -- all
22  the --
23        MS. BERKE:  18712.
24        MR. BRUSTIN:  18712, line 20, to 18713, line
25  13.

Page 223

1        THE WITNESS:  Yes, I've read it.
2    Q.   BY MR. BRUSTIN:  Okay.  Now, on the transcript,
3  what Sandra is telling you is that, although she wouldn't
4  put it past Debra to manipulate other men using sex, she
5  didn't think that she would do it with Jim because Jim
6  was a father figure."  Correct?
7    A.   I think it says only close friend.
8    Q.   Let me read the important part.
9    A.   Okay.
10   Q.   "But it's the way you were raised, you know.
11  So whether Debbie used it or not, I really couldn't say
12  because you're talking about Jim.  If you're talking
13  about somebody else and she did that, yeah, I put it -- I
14  put it past her, I really would, but you're talking about
15  Jim.  And you've got to realize that Jim always meant to
16  us -- has always meant to us just like a father, actually
17  a surrogate father.  We never thought about it."
18        So what she's suggesting is that --
19   A.   You're on page?
20   Q.   Page 18713 of the taped transcript.
21   A.   27 -- okay.
22   Q.   Did I give an accurate summary of it, that
23  whereas she wouldn't put it past Debbie -- Debra to
24  manipulate other men, she didn't think she would do it
25  with Jim because he was like a father figure.  Right?

Page 224

1        MS. BERKE:  Objection.  Misstates evidence.
2        THE WITNESS:  Yes, that's what it says.
3    Q.   BY MR. BRUSTIN:  Okay.  Can you explain why
4  that doesn't appear in your report?
5    A.   No.
6    Q.   All right.  You would agree that this statement
7  that Debra -- that Jim was like a father figure to Debra
8  and she doesn't believe that Debra would manipulate him
9  sexually, that directly contradicts the paragraph in your
10  report we just read which says, "I then asked her if
11  Debra could have been as honest towards Jim if he would
12  have thought about becoming romantically involved with
13  Debra.  Sandra then replied that Debra would only use
14  that weakness in Jim and would never tell him that she
15  would never want to be involved with him romantically."
16        That's -- that's -- that contradicts what's
17  in the tape transcript.  Correct?
18        MS. BURGESS:  Form.
19   Q.   BY MR. BRUSTIN:  It's the opposite?
20   A.   Of that -- of that paragraph, but I know I've
21  seen that she --
22   Q.   Let me -- let's focus on that paragraph first.
23  What that paragraph says is the opposite of what I just
24  read to you in the tape transcript.  Correct?
25   A.   Repeat your question, please.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
225–228

Page 225

1   Q.   Sure.
2       The paragraph in the report is -- is exactly
3   the opposite of what I just read you in the taped
4   transcript.  Jim was a father figure, she wouldn't
5   manipulate him as opposed to the report which says that
6   she knew Jim was in love with her, and she would
7   manipulate him.  It's the opposite.  Right?
8       MS. BURGESS:  Form.
9       THE WITNESS:  In that paragraph, yes.
10  Q.   BY MR. BRUSTIN:  Okay.  Now, let me ask you
11  again how was it conceivable that you didn't think it was
12  important to put -- let's assume that you're telling the
13  truth.
14  A.   I don't want to assume anything.
15  Q.   Let's assume that you're telling the truth, and
16  she actually somewhere did say that -- withdrawn.
17      Can you think of any explanation --
18  withdrawn again.
19      Would you agree that the statement that Jim
20  was a father figure and she didn't think Debbie would --
21  Debra would manipulate him sexually -- that's
22  inconsistent with your theory of using Jim to commit the
23  murder.  Correct?
24      MS. BURGESS:  Form.
25      THE WITNESS:  No.

Page 226

1   Q.   BY MR. BRUSTIN:  What's consistent with your
2   theory of committing the murder is what's in the report,
3   which is that Debra knew Jim was in love with her, and
4   she used it to manipulate him.  That's what you put in
5   the report because that helped your case.  Right?
6   A.   No.
7   Q.   Can you think of any explanation in the world,
8   legitimate explanation why a self-proclaimed, meticulous,
9   consciousness detective like you could leave something
10  that significant out of your report, that Jim was a
11  father figure and that she wouldn't manipulate him?
12      MS. BERKE:  Form.
13  Q.   BY MR. BRUSTIN:  Can you explain that?  Why
14  does your report say the opposite?
15      MS. BERKE:  Objection.  Compound.
16      THE WITNESS:  In that paragraph, it does say
17  the opposite.
18  Q.   BY MR. BRUSTIN:  I've read this report many
19  times.
20      MS. BERKE:  He was -- he was still
21  answering.
22      THE WITNESS:  I've only read it once and
23  just recently.
24  Q.   BY MR. BRUSTIN:  Okay.  There's nothing in the
25  report about Jim being a father figure.  Any explanation

Page 227

1   for that?
2   A.   No.
3   Q.   Why wasn't that important enough to put in your
4   report?
5   A.   I don't know.
6   Q.   And nothing in your report about the fact that
7   Sandra didn't think that Debra would attempt to
8   manipulate Jim Styers sexually.  Any reason why that
9   wasn't in your report?
10      MS. BURGESS:  Object to foundation.
11      MS. BERKE:  Join.
12      MS. BURGESS:  Misstates the evidence.
13      THE WITNESS:  No.
14  Q.   BY MR. BRUSTIN:  But it certainly wasn't
15  intentional.  That's your position.  Correct?
16  A.   And I certainly would retain the right to read
17  this carefully -- more carefully and make notations for
18  the next --
19  Q.   That reminds me.  Can I see your notations,
20  please?
21      MR. BRUSTIN:  Lori, I'm asking for his
22  notations.
23      MS. BERKE:  Okay.
24      MR. BRUSTIN:  Make sure you heard.
25      THE WITNESS:  Am I going to get them back?

Page 228

1   Q.   BY MR. BRUSTIN:  You are, after she writes it
2   down.
3       Actually, you know what we'll do instead?
4   There's no need.  Just write it down.  That's fine.
5       Now, would you agree as a matter of --
6   you've already told us how important common sense is in
7   police work.  Right?
8   A.   I think you mentioned that, and I agreed.
9   Q.   Okay.  And you would agree that if Jim was a
10  father figure for Debra, you wouldn't expect that she
11  would try to use him to kill her son.  That doesn't
12  really make common sense, does it?
13      MS. BERKE:  Objection.  Foundation.
14      THE WITNESS:  Makes sense to me.  I mean, it
15  wasn't her father.  So...
16  Q.   BY MR. BRUSTIN:  Would it be fair to say that
17  if Sandra and Debra referred to Jim Styers as a father
18  figure, that would suggest to you as a matter of common
19  sense that they didn't know that he was killing children
20  in Vietnam?
21      MS. RETTS:  Foundation.
22      MS. BERKE:  Join.
23      THE WITNESS:  I'm sure they didn't.  I don't
24  know whether they did know or not.  They said they were
25  very close.  So...

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
229–232

Page 229

1   Q.   BY MR. BRUSTIN:  Now, you made it very clear in
2   your testimony in this case that you don't tape-record
3   unless you -- unless you are forced to do it.  Correct?
4   A.   I don't think I made that very clear.  You
5   asked me and I said I don't tape-record, and I didn't
6   tape-record in this -- in this.
7   Q.   You tape -- you tape -- you testified
8   repeatedly under oath in this case that you don't
9   tape-record unless you have to.  Correct?
10  A.   I may have, yes.
11  Q.   That's your position.  Correct?
12  A.   For this case, yes.
13  Q.   Well, you've testified that you never
14  tape-record in any case unless you're forced to do it.
15  Correct?
16  A.   No.  That's not right.
17      MS. BERKE:  Objection.  Misstates testimony.
18  Q.   BY MR. BRUSTIN:  Or unless there is a person
19  with a mental disability.  Correct?
20  A.   That's correct.
21  Q.   How many cases have you tape-recorded in?
22  A.   I don't recall.
23  Q.   Do you recall any?
24  A.   No, I can't recall.
25  Q.   As you sit here today, you don't recall a

Page 230

1   single one?
2   A.   No.
3   Q.   Okay.  Is it fair to say, to the best of your
4   recollection, you've never tape-recorded an
5   interrogation?
6   A.   I can't use "never" but --
7   Q.   You have no recollection, as you sit here
8   today?
9   A.   I have no recollection.
10  Q.   Now, would it be fair to say that the reason
11  why you testified you would tape for a mentally ill
12  person is because you understood that a mentally ill
13  person may claim later that the statements they made were
14  as a result of their mental illness or -- or coercion,
15  taking advantage of their mental illness?
16  A.   I don't recall that.
17  Q.   Well, tell me why then would be tape for
18  people with mental illness.  What would be the other
19  reason?
20  A.   I mean, that could be a good reason.  I just
21  don't recall it.
22  Q.   All right.  And would it be fair to say that
23  based on your experience as a police officer, what I just
24  described must have been one of the reasons?
25  A.   Could have been, yes.

Page 231

1   Q.   And you understood if you were directed to tape
2   or you were -- or you chose to tape-record, there were
3   many different ways you could do the interviews.
4   Correct?
5   A.   That's fair.
6   Q.   You had large recorders that were in the
7   precinct that you could use?
8   A.   There was some, yes.
9   Q.   You could use a handheld recorder.  Correct?
10  A.   I didn't have one, but, yes.
11  Q.   Okay.  You certainly had 30 people that you
12  could borrow one from.  Right?
13  A.   I don't know about 30.  Maybe a couple people,
14  yeah.
15  Q.   Okay.  Let me ask you this:  Any doubt in your
16  mind that within a matter of minutes you could have
17  gotten a tape recorder before going in to interview Debra
18  Milke?
19  A.   Yes.
20      MS. BURGESS:  Form.
21  Q.   BY MR. BRUSTIN:  In other words, before getting
22  into that helicopter, you could have asked any number of
23  people for a tape recorder and gotten it quickly if you
24  wanted to?
25  A.   If I wanted to, I would have gotten it, and I

Page 232

1   intended to do that in Florence if I needed it.
2   Q.   Okay.  And had you ever done any interrogations
3   in Florence?
4   A.   In Florence?
5   Q.   Yes, sir.
6   A.   Not that I recall.
7   Q.   Okay.  Did you have any contacts in the
8   Florence Police Department?
9   A.   No.
10  Q.   Did you know how many detectives were in the
11  Florence Police Department?
12  A.   I have no knowledge of the Florence police.
13  Q.   So prior to going -- the Pinal County Sheriff's
14  office -- are we referring to the same thing?
15  A.   Yeah.
16  Q.   Okay.  And prior to going to the Pinal County
17  Sheriff's office with Debra Milke -- to interview Debra
18  Milke, had you ever been there before, to the best of
19  your recollection?
20  A.   I don't believe so.
21  Q.   That was the first time you were going there?
22  A.   I believe so.
23      MS. GREEN:  Pinal County jail.  Sorry.
24  Jail/sheriff's office.
25      MR. BRUSTIN:  Okay.



Page 233

1    Q.   BY MR. BRUSTIN:  The place where you went to
2    interview Debra Milke -- you don't recall ever having
3    gone there before?
4    A.   That's correct.
5    Q.   And you don't recall having any knowledge of
6    how many -- how many police officers worked there.
7    Correct?
8    A.   That's correct.
9    Q.   And you had no idea what kind of taping
10   devices, if any, they had.  Correct?
11   A.   That's correct.
12   Q.   Now, by 1989 -- I've done other cases in other
13   places, and my understanding is that by 1989 some police
14   departments were even using videotape by then to do
15   interrogations.  Was that happening in Phoenix at all?
16   A.   Not to my knowledge.
17   Q.   Now, I want to -- I'm going to ask you some
18   questions about your concerns about taping, the reasons
19   why you didn't tape in this case and generally, but
20   before I do, can you tell us are there any benefits, in
21   your view, to tape-recording an interrogation?
22   A.   I just -- I'm sure there is.
23   Q.   Okay.  I'm asking you what they are.
24   A.   Well, just documentation, I guess.
25   Q.   Okay.  Would you agree that when you

Page 234

1    tape-record an interview or interrogation, you have an
2    unimpeachable record of what actually transpired:  What
3    you said to the suspect and what the suspect said to you?
4    A.   I guess.
5    Q.   The tape doesn't lie.  Right?
6    A.   Not that I know of.
7    Q.   Okay.  And so would you agree that for a
8    scrupulously honest detective like you a tape recorder --
9    a tape-recorded version of an interrogation could be a
10   big help because you never do anything wrong?
11   A.   No, I'm -- I tell the truth.
12   Q.   Okay.
13   A.   I don't need a tape recorder to tell me I'm
14   telling the truth.
15   Q.   Okay.  And you've had great success at
16   convincing juries that you're telling the truth.
17   Correct?  You don't need a tape recorder to do that?
18   A.   I've had -- convinced jury -- I don't -- I have
19   had the opportunity to be in trials where the jury
20   understood that I did not tape-record and that I was
21   telling the truth, and they agreed.
22   Q.   Yeah.  You're -- you were good at convincing
23   juries you were telling the truth.  Right?
24       MS. BURGESS:  Form.
25       MS. BERKE:  Objection.  Argumentative.

Page 235

1    Q.   BY MR. BRUSTIN:  I'll withdraw the question.
2        Let me ask you this:  I want to go about --
3    ask you a few more questions about benefits of taping.
4        Would you agree that when you -- when you
5    tape-record an entire interrogation, the suspect can't
6    deny making admissions if, in fact, they made admissions,
7    not plausible?
8    A.   No, they can deny it.
9        MS. BURGESS:  Sorry.  I'm not sure what he
10   said.
11       THE WITNESS:  They could deny it.  I guess
12   you could use the recording to dispute that, but they
13   could deny it, yeah.  I mean...
14   Q.   BY MR. BRUSTIN:  But it's not plausible, right,
15   if you tape-record it?
16   A.   Not really, no.
17   Q.   You would agree that a tape recorder makes it
18   implausible for a suspect to argue that they didn't make
19   admissions if those admissions are on the tape.  Correct?
20       MS. RETTS:  Form.
21   Q.   BY MR. BRUSTIN:  You agree with that?
22   A.   Yes.
23   Q.   In other words, it would have been implausible
24   for Debra Milke to argue that she didn't make the
25   admissions that she did if there was actually a

Page 236

1    tape-recording.  Right?
2        MS. RETTS:  Form.
3        MS. BERKE:  Objection.  Vague.
4        THE WITNESS:  There would have been if she
5    had not denied me to use a tape recorder.
6    Q.   BY MR. BRUSTIN:  And another reason why you
7    might want to tape is that you can't mess -- you can't
8    misrepresent tactics -- withdrawn.
9        That a -- a -- it's very difficult for a
10   suspect to misrepresent tactics that were used --
11   coercive tactics that were used in an interrogation if
12   it's all on tape.  Correct?
13   A.   You're talking about just other investigations,
14   not this one.
15       MS. BERKE:  Objection.  Vague.
16   Q.   BY MR. BRUSTIN:  If it was -- if -- when you
17   tape an interrogation, a suspect can't misrepresent
18   coercion if it's not on the tape.  Correct?
19       MS. BERKE:  Objection.  Vague.
20       THE WITNESS:  Yes.
21   Q.   BY MR. BRUSTIN:  That protects good police
22   work.  Right?
23   A.   That, I don't know, but it's -- yes.
24   Q.   Okay.  You can't say, I wasn't Mirandized if
25   you could hear the Mirandizing on the tape.  Right?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
237–240

Page 237

1    A.    And you can't say she wasn't Mirandized if she
2    admitted she was Mirandized under testimony.
3    Q.    Okay.  Let me try it again.  You got to answer
4    my questions.
5    A.    I was trying to.
6    Q.    Were you really?
7    A.    Yeah.
8    Q.    Okay.
9    A.    I was still trying.
10   Q.    If you tape-record an interrogation and you
11   Mirandize the suspect, the suspect can't plausibly claim
12   they weren't Mirandized.  Correct?  Is that common sense?
13   A.    That's common sense.
14   Q.    All right.  And if -- if -- if you tape-record
15   an interrogation, a suspect can't plausibly claim that
16   you misrepresent words that were spoken on the tape.
17   Correct?
18   A.    I guess, yeah.
19   Q.    But if it's -- if there's no tape, then it
20   becomes your word against the suspect.  Correct?
21   A.    I guess.
22   Q.    And you had a very good track record of your
23   word against the suspect's word.  Right?
24       MS. BERKE:  Objection.  Vague.
25       THE WITNESS:  I have a very good track

Page 238

1    record for telling the truth.
2    Q.    BY MR. BRUSTIN:  Now, I'm not going to ask you
3    any specific examples of any other cases, but I want to
4    ask you generally would it be fair to say that prior to
5    the interrogation of Ms. Milke, you had experience with
6    suspects claiming, right or wrong, that you had acted
7    inappropriately during interrogations?
8       MS. BERKE:  Can you repeat that question,
9    please?
10      MR. BRUSTIN:  Sure.
11   Q.    BY MR. BRUSTIN:  I'm not asking about the
12   specifics, but prior to the interrogation of Ms. Milke,
13   do you agree that you've had experience with suspects
14   claiming, right or wrong, that you had acted
15   inappropriately during interrogations?
16      MS. BERKE:  This is beyond the scope of what
17   you represented you were going to cover today, the Milke
18   investigations, Styers and Scott.
19      MR. BRUSTIN:  So then tell him to plead the
20   Fifth.
21      MS. BERKE:  You could just ask him next
22   time.
23      MR. BRUSTIN:  That wasn't the purpose.  I
24   worried this was going to happen.  We did it as a
25   courtesy to you to try to give you subject matter.  If I

Page 239

1    ask him a foundational question that's general, you
2    should not be instructing him not answer.  If you want to
3    have him plead the Fifth, that's a different matter.
4       We have no obligation to give you the
5    subject matter.  We tried to do it -- we tried to do it
6    responsibly.  There's no reason why he can't answer this
7    general question.
8       MS. BERKE:  Okay.  Read it one more time.
9    Q.    BY MR. BRUSTIN:  Prior to the interrogation of
10   Ms. Milke -- I'll make it even easier for you.
11      Prior to the interrogation of Ms. Milke,
12   would it be fair to say that you had experience with
13   suspects falsely claiming that you had acted
14   inappropriately during interrogations?
15      MS. BERKE:  I'll instruct him not to answer
16   pursuant to the Fifth Amendment due to the Gallegos case.
17      MR. BRUSTIN:  I just said falsely claimed.
18   How could that be -- I'm saying people made up claims
19   against him.  You think you have a basis for him to take
20   the Fifth on that?
21      MS. BERKE:  He's not testifying on that
22   topic.
23      MR. BRUSTIN:  Okay.  All right.
24      Now, could you -- could you have the
25   witness, please, at least plead the Fifth on it then?

Page 240

1       THE WITNESS:  I plead the Fifth Amendment at
2    the request of my attorney.
3    Q.    BY MR. BRUSTIN:  Now, in this case, you already
4    had solid evidence against Scott and Styers before you
5    got to Debra and interviewed her because they took you to
6    the body.  Correct?
7    A.    Correct.
8    Q.    That was rock-solid evidence that they at least
9    were involved.  Correct?
10   A.    That is correct.
11   Q.    And soon after they also took you to the
12   bullets.  Right?
13   A.    Correct.
14   Q.    And you knew that only somebody involved in the
15   crime could possibly give you that information.  Correct?
16   That's as solid as it gets as to Styers and Scott.
17      MS. BERKE:  Did you say they took him to the
18   bullets?
19      MR. BRUSTIN:  Scott.  Scott took him.
20      THE WITNESS:  Yes.
21   Q.    BY MR. BRUSTIN:  You also that -- at that point
22   were hopeful that you would get the murder weapon because
23   Scott said it was at his home?
24   A.    Yes.
25   Q.    And, in fact, it was?



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
241–244

Page 241

1   A.   Yes.

2   Q.   And you knew that the -- getting admissions
3   from Debra about this -- about her involvement might be
4   the key evidence against her at any trial.  Correct?

5   A.   It would be evidence of a confession for her
6   trial, yes.

7   Q.   Okay.  And it might be the only evidence that
8   got into trial.  Correct?

9   A.   I don't know.

10   Q.   All right.  But you knew that it was very
11   important that the -- that whatever she told you,
12   especially if there were admissions, was going to be very
13   important down the road.  Correct?

14   A.   Sure.

15   Q.   Now, you've also told us when you interviewed
16   Debra Milke you thought eye contact was critically
17   important.  Correct?

18   A.   Correct.

19   Q.   You want to always be focusing on them, and you
20   want them focusing on you.  Correct?

21   A.   Not necessarily the eye contact but the
22   attention, how I wanted to get her direct attention.

23   Q.   All right.  You testified today and you've
24   testified previously that it was the eye contact that you
25   thought was important.  Are you now changing your

Page 242

1   testimony?

2   A.   No, but the eye contact meaning the -- never
3   mind.  Yes.

4   Q.   Now, you've also testified that tape-recording
5   distracts from that focus, the focus between you and the
6   suspect.  Can you explain why?

7   A.   Well, I -- I believe that while I was visually
8   changing the tape or something like that, it would -- it
9   would cause a break in our interview, and I just -- I
10   just didn't tape-record it.  There's nothing -- I just
11   didn't.

12   Q.   Now, I'm going to go through every reason you
13   said you didn't tape, but I'm going to start with this
14   one first.

15   A.   Okay.

16   Q.   One reason you said you don't tape is because
17   it distracts, and I'm asking you --

18   A.   And I just answered.

19   Q.   Okay.  So it's turning over the tape that
20   distracts?

21   A.   Turning over the tape, the tape -- hearing the
22   tape running, that person looking at the tape because
23   they know what's going on and they're being taped.  It's
24   very uncomfortable.

25   Q.   Uh-huh.  How do you know if you never taped?

Page 243

1   A.   Pardon me?

2   Q.   How do you know if you've never taped?

3   A.   Well, I know it's uncomfortable.

4   Q.   How?

5   A.   Just common sense.

6   Q.   Okay.  What about surreptitious taping?  Does
7   that distract the suspect, tape-recording when they don't
8   know?

9   A.   It shouldn't.  It shouldn't.

10   Q.   Has it been -- is it common sense that once
11   someone agrees to taping and the tape recorder is going,
12   usually you forget about the tape?

13   A.   I don't know.

14   Q.   Well, you just said -- you just said that,
15   although you haven't taped before, you believe that it
16   distracts because people are focused on the tape and
17   are -- you have to turn the tape over.  Right?

18   A.   That was my statement, yes.

19   Q.   Okay.  And that's just your statement not
20   having done it but just based on common sense?

21   A.   Correct.

22   Q.   All right.  Would it be fair to say that
23   another thing that distracts from your constant six- to
24   12-inch eye contact with the suspect is taking notes?

25   A.   No.

Page 244

1   Q.   No?

2   A.   I always have notes.

3   Q.   I know you always have your notes, but now I'm
4   talking about distraction.

5   A.   It could be, I mean, you know.

6   Q.   When you -- when you take notes, you can't have
7   eye contact.  Correct?

8   A.   No.

9   Q.   And when you take notes, you can't be asking
10   questions.  Correct?

11   A.   Yes.

12   Q.   When you take notes, there are long pauses in
13   the conversation.  Correct?

14   A.   I wouldn't say that, no.

15       MS. BERKE:  Objection.  Vague.

16       BY MR. BRUSTIN:  Well, you took, as you told
17   us, copious notes in this case?

18   A.   That's correct.

19   Q.   In a 30-minute interview.  Correct?

20   A.   That's correct.

21   Q.   So there were long periods of time when you
22   were writing and nobody was talking.  Correct?

23   A.   I was making notes.

24   Q.   Okay.  And that's another --

25   A.   Not verbatim notes but notes.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
245–248

Page 245

1    Q.    And that's -- another way of saying that is
2    it's a distraction. You're writing, you're not looking
3    them in the eye, they're not talking.  Correct?
4    A.    I -- me looking at them in their eyes was not
5    what I wanted.  I wanted her to look at me, and if I
6    distracted myself, I want her attention still devoted to
7    me.
8    Q.    Okay.  So what you're saying now is you wanted
9    her attention devoted to you while your face was down and
10   you were writing notes?
11        MS. BERKE:  Objection.  Argumentative.
12   Q.    BY MR. BRUSTIN:  Is that what you're saying?
13   A.    I'm not saying that.  You're trying to argue
14   that, but I'm not saying that.
15   Q.    Would you agree, as a matter of common sense,
16   that every time you look down and start taking notes it
17   stops the flow of the interrogation?
18   A.    Yes, because I can take notes and talk and
19   just, you know, write down something.
20   Q.    Let me try it again.
21   A.    Uh-huh.
22   Q.    Every time in Debra Milke's interview when
23   you -- when you put your head down and took one of your
24   copious notes, it interrupted the flow of the
25   interrogation -- of the investigation?

Page 246

1        MS. BERKE:  Objection.  Misstates testimony.
2        THE WITNESS:  I don't know that.
3        MS. BERKE:  Can I just ask how much time
4    we're at?
5        MR. BRUSTIN:  Sure.
6        THE VIDEOGRAPHER:  Four hours and 35
7    minutes.
8        MS. BERKE:  Okay.
9    Q.    BY MR. BRUSTIN:  The other thing you testified
10   to was you felt like taping would violate the special
11   trust that you had with suspects.  Correct?
12   A.    In this instance, yes.
13   Q.    And in every instance.  Right?
14   A.    Not every instance.
15   Q.    If it's an important interview, if that person
16   trusts me, so no need for any tape-recording.  I trust
17   the person; they should trust me.  That was your general
18   statement under oath.  Correct?
19   A.    Yes, but that's not every instance.  I didn't
20   say every instance.
21   Q.    Okay.  Didn't tape-record interviews before all
22   this technology.  It inhibited the person talking since
23   knowning conversation in a truthful way, no need for
24   tapes.  That's a general statement.  Right?
25   A.    Yes, correct.

Page 247

1    Q.    And you believe that a tape recorder violated
2    that sacred trust that you had with the suspect.
3    Correct?
4    A.    In this case, yes.
5    Q.    Okay.  Certainly this sacred trust that you and
6    Debra shared?
7    A.    Yes.
8    Q.    When you have two people acting in a trusting
9    manner, there's no need for taping.  Right?
10   A.    It wasn't my experience, no.
11   Q.    All right.  By the way, typically do you find
12   murderers and rapists to be trustworthy?
13   A.    They can be.
14   Q.    All right.  Let me try.  Typically, do you find
15   murderers and rapists to be trustworthy?
16   A.    I think I answered that:  They can be.
17   Q.    Would you say that more often than not they are
18   in your experience, your vast experience?
19   A.    I wouldn't say more often, no.
20   Q.    All right.  Now, you -- it's been your
21   experience that oftentimes, even when people admit to
22   crimes, they often couple those admissions with lies to
23   make themselves look better.  Correct?  That happens all
24   the time?
25   A.    I wouldn't describe them as lies as much as I

Page 248

1    would describe it as their personal perspective of what
2    they did or what they want to do or -- and whether they
3    want to lessen -- lessen the -- the involvement they had.
4    Q.    Oh, I'm not talking about that.
5    A.    Okay.
6    Q.    There is in the world objective truth and
7    objective lies.  Right?
8    A.    I guess.
9    Q.    Do you guess, or do you agree?
10   A.    Okay.
11   Q.    All right.  And you've had experience where
12   it's your belief that people made admissions about their
13   involvement of the crime and then told you intentional
14   lies about the scope of their involvement to make
15   themselves look better.  That's happened before.
16   Correct?
17   A.    Yes, that's happened before.
18   Q.    That's what criminals do sometimes.  Right?
19   A.    Sure.
20   Q.    They lie to lessen their culpability.  Correct?
21   A.    Yes, they do.
22   Q.    They lie just because criminals lie.  Right?
23   A.    I wouldn't make that statement, but, you
24   know...
25   Q.    Is that really a provocative statement, that



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
249–252

Page 249

1  criminals lie?

2      MS. BERKE:  Objection.  Argumentative.

3      THE WITNESS:  I just wouldn't make that

4  statement, I guess.

5      Q.   BY MR. BRUSTIN:  The only real reason not to

6  tape is because you didn't want a clear record of what

7  happened.  Isn't that true?

8      A.   That is absolutely wrong.

9      Q.   All right.  Now, you testified that after some

10  initial lies, Debra became very comfortable with you,

11  felt like it was a friend.  Right?

12      A.   That's what I try to do in all of my

13  interviews.

14      Q.   And that's what you felt happened here?

15      A.   Yes.

16      Q.   That, in fact, you believed that Debra felt

17  that you were the only person who understood her.

18  Correct?

19      A.   I believe so.

20      Q.   And you didn't have to drag anything out of

21  her.  She told it to you because she decided you were the

22  guy she wanted to talk to.  Right?

23      A.   I always try to place myself in that position.

24      Q.   Now I'm asking you about this case --

25      A.   In this case.

Page 250

1      Q.   -- and your testimony, and you believe that's

2  what happened.  You didn't have to drag it out of her.

3  She told it to you because you were the guy she wanted to

4  talk to.  Correct?

5      A.   Yes.

6      Q.   And according to you, what she related to you

7  was that she never ever in her life dealt with anybody as

8  straightforward with her as you were.  Right?

9      A.   Correct.

10      Q.   And that she never dealt with anybody in her

11  life that was as honest with her as you were.  Correct?

12      A.   That's correct.  That's not true, but I mean,

13  that's not saying that it was true.  It's just --

14      Q.   That's what she believed?

15      A.   That's what she said.

16      Q.   So during the interview, in a relatively short

17  time, you built an incredibly trusting relationship.

18  Right?

19      A.   I thought I did.

20      Q.   And she told you you were the only person who

21  understood her.  Correct?

22      A.   Correct.

23      Q.   She couldn't have been more cooperative with

24  you after the beginning.  Right?

25      MS. BERKE:  Put your hands down.

Page 251

1      THE WITNESS:  Huh?

2      MS. BERKE:  Put your hands down.

3      THE WITNESS:  I'm sorry.

4      Q.   BY MR. BRUSTIN:  She couldn't have been more

5  cooperative?

6      A.   I don't know how -- I don't know everything

7  about the case, but, yeah, I would say no.

8      Q.   When she was -- she never said she was tired or

9  wanted to stop talking.  Right?

10      A.   No, I agreed.

11      Q.   She would have kept talking because she liked

12  you and trusted you and thought you were honest.  Right?

13      A.   I presume.

14      Q.   That's -- that's what she expressed to you?

15      A.   Yes.

16      Q.   She never expressed any reservations about

17  talking to you openly and honestly about killing her

18  child?

19      A.   That is correct.

20      Q.   In fact, what you told the jury was that you

21  believed her confession to you was a healing moment for

22  her, and she expressed to you that she got her

23  self-esteem back as a result of talking to you.  Right?

24      A.   Correct.

25      Q.   In other words, what she described to you was

Page 252

1  almost a therapeutic session with you where she was able

2  to confess her sins and feel good about herself.  Right?

3      A.   That was her words, yes.

4      Q.   And after the interview, she expressed to you

5  that she got her self-esteem back in the car.  Right?

6      A.   That's correct.  That's her words.

7      Q.   Still very comfortable with you, seemed almost

8  like friends.  Right?

9      A.   Yes.

10      Q.   She even said she was feeling better after the

11  confession.  Right?

12      A.   Correct.

13      Q.   That it made her feel good.  Right?

14      A.   Yes.

15      Q.   And in the car ride back, she even asked you if

16  you would sit in the back with her because she felt so

17  comfortable with you?

18      A.   That's correct.

19      Q.   By the way, was that before or after you -- she

20  pulled up her shirt?

21      A.   I can't remember.

22      Q.   Okay.  And she continued to talk about her

23  guilty feelings and her guilt in the car with you on the

24  car ride back, just volunteered it.  Right?

25      A.   Yes.

ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
253–256

---

Page 253

1   Q.   In fact, you had such a good relationship going
2   that you didn't even put any handcuffs on her.  You
3   didn't need to.  Right?
4   A.   No.
5   Q.   There was no need for it?
6   A.   No.
7   Q.   You were friends?
8   A.   No, but she was a -- a woman prisoner that's --
9   she had a deputy -- I had a deputy -- armed deputy in
10  front and --
11  Q.   All right.  But according --
12       MS. BERKE:  He wasn't finished answering.
13  Let him finish answering.
14       THE WITNESS:  And I was in the back, and I
15  was also armed, and, no, we didn't have no --
16  Q.   BY MR. BRUSTIN:  All right.  But according to
17  you, she was about as compliant as a woman confessing to
18  murder can be.  Right?
19  A.   She was compliant.
20  Q.   Is that fair?  All right.  And she seemed to
21  want to please you, right, because she trusted you so
22  much?
23       MS. BERKE:  Objection.  Vague.
24       THE WITNESS:  I don't know if she wanted to
25  please me or whether she just wanted to get it off her

---

Page 254

1   chest.
2   Q.   BY MR. BRUSTIN:  All right.  And you testified
3   that you will talk to a suspect as long as they're
4   telling the truth for hours.  Right?
5   A.   Yeah, sure.
6   Q.   There's no limit for you?
7   A.   No limit if -- if it continues and I, you know,
8   believe that had to be done.
9   Q.   All right.  And you weren't in any hurry with
10  Debra.  You had all the time in the world.  Right?
11  A.   No, I didn't have all the time in the world.
12  As you suggested earlier, the people got me a helicopter
13  and wanted me down there right away.  So I mean, in that
14  same thought that you brought out, I would say that I
15  was -- I was probably thinking of getting it over with as
16  quick as possible.
17  Q.   Are you telling me under oath that you weren't
18  willing to spend as much time as it took to get a
19  confession from Debra Milke that she killed her
20  four-year-old son?
21  A.   No, I'm not telling you that.
22  Q.   All right.  And you would have been paid
23  overtime on that project until the cows came home.
24  Right?
25       MS. BERKE:  Objection.  Vague.

---

Page 255

1       THE WITNESS:  I was being paid overtime from
2   the minute I got there.
3   Q.   BY MR. BRUSTIN:  Did you have a Christmas party
4   to go to or something like that?
5   A.   Why would you bring up Christmas?
6       No.
7   Q.   Okay.  You were free to stay there as long as
8   it took.  Right?
9   A.   Obviously, yes.
10  Q.   All right.  And the helicopter was waiting for
11  you.  Right?
12  A.   No.
13  Q.   How did you get back?
14  A.   Drove back.
15  Q.   Okay.  And, again, though, if that
16  interrogation -- if she kept telling you the truth for
17  six hours, you would have stayed for six hours.  Right?
18  A.   Yes.
19  Q.   And she certainly didn't suggest that she
20  wanted to stop ever.  Right?
21  A.   Never.
22  Q.   You felt -- she felt good about talking to you?
23  A.   That's what she said.
24  Q.   Now, at the time that you got the admissions,
25  you understood from your prior experience that it was

---

Page 256

1   likely going to be a swearing match in court between you
2   and Debra Milke about what she said to you during that
3   interrogation.  Correct?
4   A.   No.
5   Q.   Never crossed your mind?
6   A.   Never crossed my mind.
7   Q.   Same way that the death penalty never crossed
8   your mind?
9   A.   Same way.
10  Q.   Okay.
11  A.   I never think of the death penalty.
12  Q.   Never, huh?
13  A.   Well, I mean, you know, it may have come up
14  several times but, you know, with Sandra Pickinpaugh I
15  think it was.
16  Q.   In your interview with Debra Milke in your
17  report, you state --
18  A.   Or Debra.
19  Q.   -- "I told her that she would be charged with
20  first-degree murder and that I was not the judge.
21  However, first-degree murder could carry the death
22  penalty."
23  A.   Okay.
24  Q.   Is that accurate?  You wrote that in your
25  report?

---



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
257–260

Page 257

1   A.   Yeah.
2   Q.   So you did talk to Debra about the death
3   penalty?
4   A.   I may have made that statement, yes.
5   Q.   Well, you may have or you did?
6   A.   Well, if it's written down, I did.
7   Q.   Okay.  And so the death penalty was on your
8   mind because you said it.  Right?
9   A.   It wasn't on my mind.  It was something I was
10  trying to explain to her, what she was being charged
11  because she wanted to get out on bail and get out to go
12  to work the next day and --
13  Q.   You understood that, based on what she told
14  you, she may be put to death.  That's what you said to
15  her.  Right?
16  A.   Yeah, it carries the death penalty, yes.
17  Q.   And you understood that, correct, at the time?
18  A.   That she could get the death penalty?
19  Q.   Yes.
20  A.   Yes.
21  Q.   So when you told us earlier that it never
22  crossed your mind, you didn't know that, that was a
23  mistake or a lie?
24  A.   I -- must have been a mistake because I don't
25  remember that particular statement until you read it.

Page 258

1   Q.   Now, you claim that Debra Milke rejected taping
2   at the beginning before she confessed.  Correct?
3   A.   That's correct.
4   Q.   And you also testified that Debra Milke seemed
5   like a smart, educated woman.  Correct?
6   A.   Yes.
7   Q.   You knew that she had a good job?
8   A.   I knew she had a job, yes.
9   Q.   You also knew from your time in the -- in
10  dealing with Roger Scott and Jim Styers that both Roger
11  Scott and Jim Styers had been asked to give a taped
12  interview.  Correct?
13  A.   I don't know whether -- I know about Roger
14  Scott, but I don't know about the other.
15  Q.   Well, you knew that what happened with Roger
16  Scott was that after he allegedly confessed to you in the
17  car about Debra Milke, there was a taped interview after
18  that conducted by Mills.  Correct?
19  A.   Yes.
20  Q.   You knew that going into Debra Milke's
21  interview.  Correct?
22  A.   I knew that was trying to be -- they were
23  trying to set that up, yes.
24  Q.   All right.  So you knew that there was going to
25  be a tape of Roger Scott repeating his admissions but not

Page 259

1   of Debra Milke.  Correct?
2   A.   That's correct.
3   Q.   So let me ask you this:  You don't like the
4   tape because it distracts.  Right?
5   A.   That's correct.
6   Q.   You already had in your -- in your report, you
7   had multiple admissions from Debra Milke, detailed
8   admissions from Debra Milke.  Correct?
9   A.   Correct.
10  Q.   And you had a witness that couldn't have been
11  more comfortable with you.  Correct?
12  A.   Correct.
13  Q.   Why not ask her if she wants to tape afterward?
14  A.   To tape afterwards?
15  Q.   Why didn't you ask her when you -- after you
16  interrogated her and she gave you those admissions, why
17  didn't you ask her if she wanted to tape at the sheriff's
18  office, why didn't you ask if she wanted to tape in the
19  car, why didn't you ask if she wanted to give a taped
20  statement when you got back to the precinct?
21  A.   Because she made it real clear to me my first
22  contact with her she didn't want to tape.
23  Q.   Okay.  My question is that was when she wasn't
24  making any admissions.  Right?
25  A.   That's the beginning of the interview, yes.

Page 260

1   Q.   Okay.  And then after that, after she softened
2   up and she was your great friend and she trusted you
3   completely and she was putty in your hands, why didn't
4   you ask her again?
5   MS. BERKE:  Objection.  Argumentative.
6   THE WITNESS:  Because she had said she did
7   not want the interview taped, and I assumed that was her
8   decision, and she testified that that was her decision.
9   Q.   BY MR. BRUSTIN:  Okay.  So, in other words, you
10  made a conscious decision that even though you had a full
11  admission and she was putty in your hands, you were going
12  to respect her first denial and not even ask her again.
13  Is that what you're telling us?
14  A.   I don't understand that question.
15  Q.   Let me make it so you do understand it.
16  You -- you've told us when she first -- and
17  we're going to get to this next time, but when she --
18  when she allegedly told you that she didn't want to tape,
19  that was before she was telling you the truth.  Correct?
20  A.   That was at the beginning of the interview,
21  yes.
22  Q.   That was before she was telling you the truth
23  according to you.  Right?
24  A.   That's obvious because it was at the start of
25  the interview.



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
261–264

Page 261

1  Q.  That was before she was telling you the truth.
2  Correct?
3        MS. BURGESS:  Form.
4        THE WITNESS:  Correct.
5  Q.  BY MR. BRUSTIN:  Correct?
6  A.  Correct.
7  Q.  All right.  And after that, according to you,
8  she spilled her guts and trusted you like no other.
9  Right?
10  A.  Yes.
11  Q.  So why not ask her again when she was putty in
12  your hands, Would you mind if we repeated what you just
13  told me on a tape recorder?
14        MS. BERKE:  Objection.  Argumentative.
15        THE WITNESS:  The "putty in your hands" is
16  your words.  I don't know, but in regards to tell --
17  asking her again, I thought, you know, she made a
18  decision, we did it, and that was it.  She was going to
19  jail.
20  Q.  BY MR. BRUSTIN:  Okay.  So is it your
21  testimony -- so you made a conscious decision to respect
22  that decision and not ask her again?
23  A.  Correct.
24  Q.  Did anybody suggest to you to ask her?
25  A.  No.

Page 262

1  Q.  Did you think about having her write a
2  statement?
3  A.  No.
4  Q.  Any other reason why you didn't ask her to tape
5  after the interrogation?
6  A.  I didn't really think about that.  It wasn't
7  important because obviously, as you have pointed out, I
8  don't never tape-record.  So...
9  Q.  Right.  And you've been accused -- prior to
10  interviewing Debra Milke, you had been accused of lying
11  about what happened during interrogations numerous times.
12  Correct?
13  A.  I have been accused of that?
14  Q.  Yes.
15  Q.  By your --
16  A.  By suspects.
17  Q.  By suspects?
18  Q.  Yes.
19  A.  I've -- they may have said something.
20  Q.  Okay.
21  A.  But that doesn't necessarily make it true.
22  Q.  Oh, I understand that, but you knew that that's
23  what suspects sometimes do.  They lie about what you said
24  during interrogations.
25  A.  It wouldn't matter to me because I was going to

Page 263

1  tell the truth.
2  Q.  Did you consider the fact that it might -- it
3  might look odd that Roger Scott gave a confession and had
4  it taped afterward, but you didn't even ask Debra Milke
5  if she wanted it taped?
6  A.  No.
7        MS. BERKE:  Objection.  Misstates evidence.
8  Q.  BY MR. BRUSTIN:  Let me ask you this:  Would it
9  be fair to say that Debra Milke, according to you,
10  suggested by her words and actions during the
11  interrogation that if you had asked her to tape-record a
12  second interview she would have said yes?
13  A.  Do I know that?
14  Q.  Let me say it this way.  I'll try it again.
15  I'll withdraw it.
16        Based on how you described the interrogation
17  and the trust that you built with her, if you had said to
18  her, It would be very helpful for us to tape, assuming it
19  happened as you described it, do you have any doubt that
20  she would have agreed?
21        MS. BERKE:  Objection.  Speculation.
22        THE WITNESS:  My feeling was that she would
23  not agree because she had already said that she did not
24  want it taped.
25  Q.  BY MR. BRUSTIN:  Okay.  And so despite that

Page 264

1  trusting relationship that you built and her desire to
2  please you and her feeling good about talking to you,
3  her -- her -- her statement about feeling good about
4  unburdening herself, you were confident that there was no
5  need to ask her to tape because she was very clear that
6  she didn't want to?
7  A.  That was my judgment.
8        UNIDENTIFIED SPEAKER:  Form.
9        MR. BRUSTIN:  I think this is a good place
10  to stop.
11        MS. BERKE:  Okay.
12        THE WITNESS:  Should I get these to you?
13        THE VIDEOGRAPHER:  This concludes today's
14  deposition of Armando Saldate.  Master videotapes will be
15  maintained by Esquire.  We're off the record at 5:10 p.m.
16        (Whereupon, the proceedings ended at
17  5:10 p.m.)



ARMANDO SALDATE
MILKE vs CITY OF PHONIEX

April 26, 2017
265—268

**Page 265**

```
1              CERTIFICATE OF REPORTER
2   STATE OF ARIZONA    )
                        )
3   COUNTY OF MARICOPA  )
4
5        I, Sommer E. Greene, a Certified Reporter in the
    State of Arizona, do hereby certify that the foregoing
6   deposition was taken before me in the County of Maricopa,
    State of Arizona; that an oath or affirmation was duly
7   administered to the witness, ARMANDO SALDATE, pursuant to
    A.R.S. 41-324(B); that the questions propounded to the
8   witness and the answers of the witness thereto were taken
    down by me in shorthand and thereafter reduced to
9   typewriting; that the transcript is a full, true and
    accurate record of the proceeding, all done to the best
10  of my skill and ability; and that the preparation,
    production and distribution of the transcript and copies
11  of the transcript comply with the Arizona Revised
    Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
12       The witness herein, ARMANDO SALDATE, has
    requested signature.
13       I FURTHER CERTIFY that I am in no way related
    to any of the parties nor am I in any way interested in
14  the outcome hereof.
15
         IN WITNESS WHEREOF, I have set my hand in my
16  office in the County of Maricopa, State of Arizona, this
    5th day of May, 2017.
17
18       Sommer E. Greene
19  ------------------------------
         Sommer E. Greene, RPR, CRR
20       Certified Reporter 50622
21
         /S/
22  _____
    For Esquire Deposition Solutions
23  Registered Reporting Firm No. R1048
24
25
```

**Page 266**

```
1   Milke v. City of Phoenix, et al.
    ASSIGNMENT NUMBER 556493
2
3        DECLARATION UNDER PENALTY OF PERJURY
4        I declare under penalty of perjury that I
5   have read the entire transcript of my deposition taken in
6   the above-captioned matter or the same has been read to
7   me, and the same is true and accurate, save and except
8   for changes and/or corrections, if any, as indicated by
9   me on the DEPOSITION ERRATA SHEET hereof, with the
10  understanding that I offer these changes as if still
11  under oath.
12
13  Signed on the_____day
14  of _____20__.
15
16
17
18  _____
    ARMANDO SALDATE
19
20
21
22
23
24
25
```

**Page 267**

```
1              DEPOSITION ERRATA SHEET
        ASSIGNMENT NUMBER 556493
2
3   Page No.____Line No.___Change to:_____
    _____
4
5   Page No.____Line No.___Change to:_____
    _____
6
7   Page No.____Line No.___Change to:_____
    _____
8
9   Page No.____Line No.___Change to:_____
    _____
10
11  Page No.____Line No.___Change to:_____
    _____
12
13  Page No.____Line No.___Change to:_____
    _____
14
15  Page No.____Line No.___Change to:_____
    _____
16
17  Page No.____Line No.___Change to:_____
    _____
18
19  Page No.____Line No.___Change to:_____
    _____
20
21  Page No.____Line No.___Change to:_____
    _____
22
23  Page No.____Line No.___Change to:_____
24  ARMANDO SALDATE
25  Signature:_____
```

**Page 268**

```
1              DEPOSITION ERRATA SHEET
2        ASSIGNMENT NUMBER 556493
3   Page No.____Line No.___Change to:_____
4   _____
5   Page No.____Line No.___Change to:_____
6   _____
7   Page No.____Line No.___Change to:_____
8   _____
9   Page No.____Line No.___Change to:_____
10  _____
11  Page No.____Line No.___Change to:_____
12  _____
13  Page No.____Line No.___Change to:_____
14  _____
15  Page No.____Line No.___Change to:_____
16  _____
17  Page No.____Line No.___Change to:_____
18  _____
19  Page No.____Line No.___Change to:_____
20  _____
21  Page No.____Line No.___Change to:_____
22  _____
23  Page No.____Line No.___Change to:_____
24  ARMANDO SALDATE
25  Signature:_____
```



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
269—272

Page 269

```
1              UNITED STATES DISTRICT COURT
2                  DISTRICT OF ARIZONA
3
   Debra Jean Milke,                )
4                                    )
             Plaintiff,             )
5                                    )
   vs.                              ) No.
6                                    ) 2:15-cv-00462-ROS
   City of Phoenix; Maricopa        )
7  County; and Detective Armando    )
   Saldate, Jr.; and Sergeant       )
8  Silverio Ontiveros, in their     )
   individual capacities,           )
9                                    )
             Defendants.            )
10 ------------------------------- )
11
12
13
          VOLUME II (PAGES 269 through 534)
14
15         VIDEOTAPED DEPOSITION OF
16
                ARMANDO SALDATE
17
               JUNE 22, 2017
18
                 9:30 A.M.
19
20
21      2929 North Central Avenue, Suite 2100
22              Phoenix, Arizona
23
24    SOMMER E. GREENE, CSR, RPR, CR No. 50622
25
```

Page 270

```
1  APPEARANCES OF COUNSEL
2
3       For Plaintiff:
4          NEUFELD SCHECK & BRUSTIN, LLP
           NICK BRUSTIN, ESQ.
5          AMELIA GREEN, ESQ.
           99 Hudson Street, 8th Floor
6          New York, New York 10013
           212.965.9081
7          nick@nsbcivilrights.com
8          KIMERER & DERRICK, P.C.
           MICHAEL D. KIMERER, ESQ.
9          1313 East Osborn Road, Suite 100
           Phoenix, Arizona 85014
10         602.279.5900
11
       For Defendant Silverio Ontiveros:
12
           HOLLOWAY ODEGARD & KELLY, P.C.
13         SALLY A. ODEGARD, ESQ.
           3020 East Camelback Road, Suite 201
14         Phoenix, Arizona 85016
           602.240.6670
15         sodegard@hoklaw.com
16
       For Maricopa County:
17
           SANDERS & PARKS
18         ROBIN E. BURGESS, ESQ.
           3030 North Third Street, Suite 1300
19         Phoenix, Arizona 85012
           602.532.5783
20         robin.burgess@sandersparks.com
21
22
23
24
25
```

Page 271

```
1  APPEARANCES CONTINUED:
2
3       For Defendant City of Phoenix:
4          STRUCK WIENEKE & LOVE
           CHRISTINA RETTS, ESQ.
5          3100 West Ray Road, Suite 300
           Chandler, Arizona 85226
6          480.420.1605
           cretts@swlfirm.com
7
8       For Defendant Armando Saldate:
9          BERKE LAW FIRM
           LORI V. BERKE, ESQ.
10         1601 North 7th Street, Suite 360
           Phoenix, Arizona 85006
11         602.254.8800
           Lori@berkelawfirm.com
12
13      Also Present:
14         Shannon Murphy, Maricopa County
           Vanessa Buch
15
16         Jeff Burton, Videographer
17
18
19
20
21
22
23
24
25
```

Page 272

```
1                  I N D E X
2
3  WITNESS: ARMANDO SALDATE
4
5  EXAMINATION                            PAGE
6
7  MR. BRUSTIN...................................274
8
9              *     *     *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 273

                    INDEX TO EXHIBITS

EXHIBIT                                              MARKED

Exhibit 20 Missing Person's Report for        325
           Christopher Milke
Exhibit 21 Homicide Report for Christopher    336
           Milke

Exhibit 22 Transcript, December 21, 2009      430
           Interview of Armando Saldate
Exhibit 23 Homicide Report of Deborah McKee   436
Exhibit 24 Arizona Republic Newspaper, Sunday, 478
           September 4, 1988, Sunday's TV
           Listing
Exhibit 25 Arizona Republic Newspaper, Monday, 478
           September 5, 1988 TV Listing

Page 274

1          PHOENIX, ARIZONA
2      JUNE 22, 2017; 9:30 A.M.
3
4          THE VIDEOGRAPHER:  This begins media No. 1,
5  volume 2, to the video-recorded deposition of Armando
6  Saldate.  Our deponent is still under oath.  We are back
7  on the record at 9:42 a.m.
8
9
10
11          ARMANDO SALDATE,
12  called as a witness herein, having been previously duly
13  sworn by the Certified Reporter to speak the whole truth
14  and nothing but the truth, was examined and testified
15  further as follows:
16
17          EXAMINATION
18  BY MR. BRUSTIN:
19     Q.   Mr. Saldate, since your last deposition, what,
20  if anything, have you reviewed?
21     A.   I reviewed a lot of documents.  I don't
22  remember all of them.  I mean, I reviewed deposition.  I
23  reviewed Pickinpaugh's at your request, Pickinpaugh's
24  taping, several cases that I had that you guys brought
25  up.  I don't remember all of them.

Page 275

1     Q.   You were -- in other words, you reviewed the
2  documentation from the cases mentioned in the 9th Circuit
3  opinion?
4     A.   The cases that were mentioned, I think, in your
5  opinion -- or your request.
6     Q.   Okay.  So, for example, you reviewed the 1973
7  sexual assault case?
8          MS. BERKE:  Objection.  Vague.
9          THE WITNESS:  I don't know what you're
10  talking about.
11     Q.   BY MR. BRUSTIN:  Really?
12     A.   Yeah.
13     Q.   Do you remember when you groped the woman in
14  the car in 1973?
15     A.   That's not sexual assault.
16          MS. BERKE:  Objection.  Misstates evidence.
17  Argumentative.
18     Q.   BY MR. BRUSTIN:  I apologize.  Did you review
19  that case?
20          MS. BERKE:  Objection.  Vague.
21          THE WITNESS:  No.
22     Q.   BY MR. BRUSTIN:  Did you review the Reynolds
23  case?
24          MS. BERKE:  Objection.  Vague.
25          THE WITNESS:  The (inaudible.)

Page 276

1     Q.   BY MR. BRUSTIN:  That's it, yeah.  Yes?
2     A.   Yes, I did.
3     Q.   Anything else?
4     A.   I'm sure I reviewed everything, but I don't
5  know.
6     Q.   Fair enough.  How much time did you spend
7  reviewing documents between your last deposition and
8  today?
9     A.   Couple of hours, maybe.
10     Q.   Okay.  Did you have any meetings with your
11  attorney?
12     A.   Yes.
13     Q.   How many times did you meet with your attorney?
14     A.   Four, five times.
15     Q.   Between your last deposition and today?
16     A.   Uh-huh.
17     Q.   How many hours?
18     A.   Well, we really met like seven times, but two
19  of the times we didn't discuss the case.  We discussed
20  other things, and of the five times, we -- maybe four to
21  five hours each day.  The last couple days was just like
22  two -- two hours, two -- I think the last -- one of the
23  last days was about two hours only.
24     Q.   Okay.  And you met two other times where you
25  didn't discuss the case?



Page 277

1    A.   That's right.

2        MS. BERKE:  Object on attorney/client

3   privilege.  You're not entitled to go into what he and I

4   discussed.

5        MR. BRUSTIN:  Okay.  Fair enough.

6    Q.   BY MR. BRUSTIN:  And you reviewed your

7   deposition carefully?

8    A.   I reviewed the deposition.

9    Q.   Okay.  Did you review it carefully?

10   A.   I reviewed it.  All I can say is I reviewed it,

11   you know.

12   Q.   There was a mention in -- there was a mention

13   in -- in one of the records I reviewed that there was an

14   18-month-old baby that went missing from the same complex

15   where Styers lived.  Do you recall anything about that?

16   A.   No.

17   Q.   Do you recall looking into anything about that?

18   A.   No.

19   Q.   Do you recall there being any investigation

20   into any additional crimes that Jim Styers may have

21   committed?

22       MS. RETTS:  Form.

23       MS. ODEGARD:  Join.

24       THE WITNESS:  Not by me.

25   Q.   BY MR. BRUSTIN:  How long were you partners

Page 278

1   with Investigator Chambers?

2        MS. BERKE:  Objection.  Vague.

3        THE WITNESS:  Three or four years, maybe.

4    Q.   BY MR. BRUSTIN:  What years?

5    A.   I want to say '89 to '92.  I mean '89 -- no,

6   I'm sorry -- '87 to '90.

7    Q.   Okay.  And can you explain why he wasn't

8   involved in the Milke case if he was your partner?

9    A.   It wasn't his -- his call.  I mean, it just --

10  sergeants call whoever they want to call.

11   Q.   Okay.  So I take it this assignment that you

12  received in the Milke case was outside the normal course

13  of assignments.  Is that fair to say?

14   A.   No.

15       MS. BERKE:  Objection.  Misstates testimony.

16   Q.   BY MR. BRUSTIN:  All right.  Under what

17  circumstances would you work with Chambers, and under

18  what circumstances would you -- were you not?  In other

19  words, what did it mean for him to be your partner?

20   A.   It meant that we shared things, shared ideas,

21  questions about certain cases that we both had.

22       And the reason I would not usually go with

23  Chambers if it was my sergeant that was calling us out

24  would be because he lived in New River, and that's

25  about -- close to an hour away, more than an hour

Page 279

1   sometimes away, and I lived just in central Phoenix.  So

2   I -- I was able to get there a lot quicker.  And if it

3   was a scene that they thought that we needed to get down

4   to it.

5        And it's hard to make up his own mind why he

6   did it.  I don't know -- really know why.  That reason

7   was told to me one time but -- not told to me but told to

8   Mike Chambers in my presence.

9    Q.   Okay.  And were there cases that you

10  investigated with Mike Chambers?

11   A.   Yes.

12   Q.   Okay.  Were there -- what percentage of your

13  homicide cases during the time that you were partners

14  would you investigate together?

15       MS. BERKE:  Objection.  Foundation.

16       THE WITNESS:  I can't really say.  I can't

17  put a number on it.

18   Q.   BY MR. BRUSTIN:  More than half?

19   A.   No.

20   Q.   Less than half?

21   A.   Yes.

22   Q.   Less than a quarter?

23       MS. BERKE:  Objection.  Foundation.

24       THE WITNESS:  Again, a quarter of what?

25   Q.   BY MR. BRUSTIN:  A quarter of the cases you

Page 280

1   investigated.

2    A.   I don't even know how many cases I

3   investigated, but, you know, I can't -- I can't make a

4   determination, but I know it wasn't a lot because, again,

5   if it was a simple case or a case that needed some quick

6   attention, then they'd call me and not call him, not

7   specifically for that reason.  But when they did call us

8   or call me, I was just there to investigate, and if they

9   called Mike Chambers, my partner, then we would usually

10  ride together after he got there and do -- and jointly

11  help each other in whatever we want to do.

12       He may also be assigned a crime scene

13  investigation.  I may be assigned the witness statements.

14  I may be assigned a case agent.  I may be assigned a lot

15  of things.  I don't know what it was.

16   Q.   I'm sorry, maybe you explained this, but I'm

17  not sure I got it.  Is there any particular reason why he

18  was not assigned in Milke with you?

19       MS. BERKE:  Objection.  Foundation.

20       MS. RETTS:  Foundation.

21       THE WITNESS:  Again, I said I don't know.  I

22  don't know.

23   Q.   BY MR. BRUSTIN:  You don't know.  Okay.

24   A.   My guess is because he lived so far away.

25   Q.   And you think that's the only reason, he was



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
281–284

Page 281

1 far away?
2      MS. BERKE: Objection. Foundation.
3      THE WITNESS: I mean, you know, looking at
4 when I got there, there was enough detectives there.
5      Q.   BY MR. BRUSTIN: There was tons of them.
6 Right?
7      A.   There was several.
8      Q.   Would it be fair to say that there was many
9 detectives present when you got to the -- when you got to
10 the precinct for this case as you've ever seen in any
11 case?
12     A.   No, that wouldn't be fair.
13     Q.   There were a lot, though?
14     A.   There were several detectives that were working
15 on the case.
16     Q.   The report said as many as 40 or 50 officers
17 worked the case. Does that sound about right to you?
18     A.   No.
19     Q.   You think it was less?
20     A.   Far less. I mean, I'm --
21     Q.   Okay. According to Sandra Pickinpaugh, she
22 says -- she testified that you told her that Debra tried
23 to kill herself -- tried to kill her son twice previously
24 including by putting cyanide in his cereal. Did you ever
25 tell Sandra that?

Page 282

1      A.   I don't recall.
2      Q.   Is it possible you did?
3      A.   Possible.
4      Q.   Okay.
5      A.   I don't know.
6      Q.   Did you ever -- did you ever have reason to
7 believe that Debra Milke tried to put cyanide in
8 Christopher Milke's cereal?
9      A.   I don't recall.
10     Q.   Okay. You don't know one way or the other?
11     A.   No.
12     Q.   All right. And did you also tell Sandra that
13 Debra had tried to exchange a sexual favor in return for
14 her freedom while she was driving back to you from
15 Florence to Phoenix?
16     A.   I don't think so.
17     Q.   You don't believe you told her that?
18     A.   No.
19     Q.   By the way, that would be consistent with what
20 you testified to during your last deposition where you
21 told us that during the ride home, Debra lifted up her
22 shirt and showed you part of her bra. Remember that?
23     MS. BURKE: Foundation. Form.
24     THE WITNESS: I remember that.
25     Q.   BY MR. BRUSTIN: You remember testifying to

Page 283

1 that. Right?
2      A.   I remember.
3      Q.   And that -- so if you told Sandra that Debra
4 tried to make a sexual -- ask for a sexual favor, that
5 would have been consistent with what you told us. Right?
6      A.   That wouldn't be consistent.
7      Q.   That's a different thing?
8      A.   I didn't tell you that.
9      Q.   Okay. So you deny telling Sandra that Debra
10 tried to ask for a sexual favor?
11     A.   I don't think I did.
12     Q.   Okay. Now, did you also tell Sandra that you
13 were in possession of a child neglect police report with
14 regard to Debra's treatment of Christopher in Colorado?
15     A.   No, I don't think I did.
16     Q.   Because you didn't have one. Right?
17     A.   Not that I know of.
18     Q.   And did you tell Sandra that Debra was telling
19 other inmates while she was in custody awaiting trial
20 that she had killed Chris and that she would do it again?
21 Did you tell Sandra that?
22     A.   I don't recall that.
23     Q.   Is it possible you told her that?
24     A.   Anything's possible, but I mean, I don't recall
25 it.

Page 284

1      Q.   Okay. The best you recall, you didn't tell her
2 that, or you're not sure?
3      A.   I'm just not sure.
4      Q.   You're not sure?
5      A.   I don't recall it.
6      Q.   Okay. Well, did anybody -- did you have any
7 reason to believe that there was a jailhouse informant
8 who was claiming that Debra confessed?
9      A.   I can't recall that.
10     Q.   Okay. And, obviously, if there were any
11 jailhouse informants who had provided information that
12 Debra confessed, you would expect that information to be
13 fully documented in police reports. Correct?
14     A.   Correct, especially in mine.
15     Q.   You would expect that if there was a jailhouse
16 informant claiming that Debra confessed, that information
17 was known to the police -- you would expect it to be in a
18 police report regardless of which police officer got it.
19 Correct?
20     A.   I would assume so, but, again, I don't recall
21 that incident.
22     Q.   So the best you can recall, no jailhouse
23 informant ever told you anything about Debra. Right?
24     MS. BERKE: Objection. Misstates testimony.
25     THE WITNESS: I don't recall.

Page 285

1    Q.    BY MR. BRUSTIN:  Now, you testified in 2010
2  that you were never disciplined regarding any
3  interrogation you ever conducted.  Is that an accurate --
4  is that accurate testimony?
5    A.    I believe that, but I don't know if it's, you
6  know, true.  I haven't got -- I haven't reviewed my file
7  for over 40-some years.
8    Q.    Well, do you think if you were disciplined for
9  conduct you engaged in during an interrogation, you'd
10  remember it?
11    A.    Absolutely, I think so.
12    Q.    Okay.  So -- so as you sit here today, you know
13  that you were never disciplined --
14    A.    I can't say that.  Like I said, I already
15  answered that question, and that is that I don't think I
16  was, but I can't recall.
17    Q.    Okay.  And you've also told us that if you were
18  disciplined, you'd think you'd recall it.  Correct?
19    A.    I would believe I would.
20    Q.    Okay.  And you have no recollection of it
21  whatsoever?
22    A.    None.
23    Q.    Not in this case, not in any other?
24    A.    I don't understand the last part of the
25  question.

Page 286

1    Q.    You were not disciplined in the
2  interrogation -- for the interrogation in the Milke case,
3  and you've never been disciplined for an interrogation in
4  any other case.  Correct?
5    A.    Not that I know of or recall.
6    Q.    In fact, the best you can recall, you've never
7  been criticized for you interrogation methods by any
8  supervisor.  Correct?
9    A.    That's -- I can't think of a time, no.
10    Q.    Okay.  And you were never criticized by any
11  supervisor for your -- the manner in which you took notes
12  or documented your investigative activities.  Correct?
13    A.    I think that's correct.
14    Q.    Not this case, not ever?
15    A.    I think that's probably correct.
16    Q.    And you also testified that you were not forced
17  to retire when you did.  You simply wanted more time with
18  your family.  Is that accurate testimony?
19    A.    It's not accurate testimony.
20    Q.    Okay.  Why did you retire?
21    A.    Because I had hurt my leg.  I had damaged the
22  leg in an accident, and I was not going to be
23  post-certified any longer because I was having a hard
24  time -- going to -- ended up with a knee replacement, and
25  that's why I retired.

Page 287

1    Q.    Okay.  So when you testified in 2010 at a
2  hearing that the reason you retired was because you
3  wanted more time with your family, that was a lie?
4    A.    I wouldn't say that was a lie.  It may have
5  been a misstatement or something, but it was not a lie.
6    Q.    You forgot that you didn't want to spend more
7  time with your family and that the reason you were
8  retiring was because of an injury?
9    A.    Oh, got to go over and over.
10    Q.    We're going to be very specific about the lie.
11  That's what I'm asking you about.
12    A.    You're not --
13        MS. BERKE:  Objection.
14        THE WITNESS:  -- being very specific.
15        MS. BERKE:  Objection.  Argumentative.
16    Q.    BY MR. BRUSTIN:  Okay.  You testified under
17  oath that you wanted to spend more time with your family.
18    A.    Uh-huh.
19    Q.    And now you told us that wasn't the reason --
20    A.    No.
21    Q.    -- why you wanted to retire?
22        MS. BERKE:  Are you talking about retiring
23  from the Phoenix Police Department?
24        MR. BRUSTIN:  That's right.
25        THE WITNESS:  From the Phoenix Police

Page 288

1  Department?
2    Q.    BY MR. BRUSTIN:  Yes.
3    A.    Oh, yeah, back then, yeah.
4    Q.    Back then it was --
5        MS. BERKE:  You didn't -- in fairness, you
6  didn't make that clear.
7        MR. BRUSTIN:  I did not, that's true.
8    Q.    BY MR. BRUSTIN:  I was asking about retirement
9  from the Phoenix Police Department.
10    A.    Yes, that's correct.
11    Q.    All right.  Now, as you've already testified to
12  at your last deposition, you understood that -- prior to
13  the deposition of Debra Milke, you understood that you
14  had been accused by other suspects of lying about what
15  happened during interrogations.  Correct?
16    A.    No.
17        MS. BERKE:  Objection.  Did you say prior to
18  the deposition of Debra Milke?
19    Q.    BY MR. BRUSTIN:  Prior to your interrogation of
20  Debra Milke.
21    A.    You said deposition, but, okay.
22    Q.    And, please, correct me if I misstate.  I want
23  you to be as careful as you always are.
24    A.    I believe you did misstate it, but --
25    Q.    You're right.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
289–292

Page 289

1    A.   -- I misstate things, you know.

2    Q.   I think you're right.

3         You testified in your last deposition that
4    prior to the interrogation of Debra Milke, you understood
5    that you had been accused by suspects of lying about what
6    happened during interrogations.  Correct?

7    A.   There was some reports.

8    Q.   You understood that people were claiming -- you
9    denied doing it, but you understood that there had been
10   suspects prior to Debra Milke who claimed you lied about
11   what happened during interrogations.  Correct?

12   A.   I believe that was the sense of their
13   complaints.

14   Q.   Okay.  And, in fact, you understood that there
15   had been findings in other cases that you had made
16   misstatements about what happened during your
17   investigations.  Correct?

18        MS. BERKE:  Objection.  Misstates evidence.

19   Q.   BY MR. BRUSTIN:  Let me be more specific if
20   you're not sure.

21   A.   Okay.

22   Q.   For example, you've told us that you reviewed
23   the Reynolds case in preparation for today.  Correct?

24   A.   Yes, correct.

25   Q.   One of the things you reviewed were the

Page 290

1    findings of the Court in connection with the Reynolds
2    case.  Correct?

3    A.   The find--- no, not really.  I -- I reviewed
4    the report that I did, and I really didn't concern that
5    much myself of what the findings of the Court were.

6    Q.   You didn't read what the Court said you had
7    done?

8    A.   I don't think so.

9    Q.   Okay.  You -- regardless, you understand that
10   the Court found prior to your interrogation of Debra
11   Milke that you had made misrepresentations under oath in
12   the grand jury about what you did during your
13   investigation.  Correct?

14        MS. BERKE:  Objection.  Misstates evidence.

15        THE WITNESS:  I don't think I --

16        MS. BERKE:  Foundation.

17        THE WITNESS:  I don't think so.

18   Q.   BY MR. BRUSTIN:  You don't remember that?

19   A.   No.

20   Q.   Okay.  And how about the Rodriguez case?  You
21   remember that case?

22   A.   Uh-huh.

23   Q.   Yes?

24   A.   Yes, I do.

25   Q.   Okay.  And you remember in that case that prior

Page 291

1    to -- in connection with that case prior to the Debra
2    Milke interrogation, you understood that a Court had
3    ordered a redetermination of probable cause based on
4    statements that you had made to the grand jury.  Correct?

5        MS. BERKE:  Objection.

6        THE WITNESS:  That's not totally correct.

7        MS. BERKE:  Misstates evidence.

8    Q.   BY MR. BRUSTIN:  In general, it's correct.
9    Right?

10   A.   I wouldn't even say in general.

11   Q.   Sure.  What did I say that was -- that was
12   inaccurate?

13   A.   Calm down.

14        The fact that the state Court or that the
15   Court found that they needed to be -- or it needed to be
16   sent back wouldn't -- was necessarily not something I
17   said but something that I did not say that would have
18   helped the defendant or something.

19   Q.   That was the case where you claimed there were
20   four shots as opposed to one shot.  Correct?

21   A.   I'm talking about a different case.

22        It was only one shot, and that was an error
23   on the --

24   Q.   Court reporter?

25   A.   -- court reporter.

Page 292

1    Q.   Court reporter made a mistake?

2    A.   Yeah.

3    Q.   Okay.

4    A.   They do that every once in a while.

5    Q.   Okay.  So you said one shot, and the court
6    reporter wrote down four.  That's what happened there?

7    A.   That is correct.

8    Q.   And the Court just made a mistake in their
9    finding?

10        MS. BERKE:  Objection.  Misstates evidence.

11        THE WITNESS:  I think that the Court made a
12   mistake in not reviewing the entire transcript.

13   Q.   BY MR. BRUSTIN:  Okay.  But you understand that
14   what the Court said was that you had misstated how many
15   shots there were.  Correct?

16        MS. BERKE:  Objection.  Misstates evidence.

17        THE WITNESS:  I believe that was their
18   belief, yeah.

19   Q.   BY MR. BRUSTIN:  Okay.  So you understood that
20   prior to interviewing Debra Milke, courts had found that
21   you had made misstatements about what happened during
22   your investigations.  Correct?

23        MS. BERKE:  Objection.  Misstates evidence.

24        THE WITNESS:  There's -- I'm sure there's a
25   few misstatements, but, you know, I don't think there's



Page 293

1  very many and -- in regards to that case, that was not a
2  misstatement.  That was a --
3      Q.   BY MR. BRUSTIN:  Court reporting error?
4      A.   -- court reporting error.
5          MS. BERKE:  Can you please not interrupt
6  him?
7          THE WITNESS:  So I really can't say that I
8  agree with your belief that it was.
9      Q.   BY MR. BRUSTIN:  Well, no.  You're -- you're
10  missing my point.
11         All I'm suggesting to you is that courts,
12  courts of law, judges, made findings -- whether they were
13  right or wrong, they made findings that you had made
14  misstatements under oath in their decisions.  Correct?
15         MS. BERKE:  Objection.  Foundation.
16         THE WITNESS:  You know, I -- we've -- I've
17  ran this over my -- over my memory, and I never was aware
18  of anything that the Court decided because that wasn't my
19  job.  I did my job.  And so I didn't research.  I didn't
20  go into anything that the Court had decided in any of my
21  cases, really.
22      Q.   BY MR. BRUSTIN:  No, I appreciate that
23  clarification, and -- and -- and to follow up on that, to
24  the best of your recollection, no prosecutor ever spoke
25  to you about any of those decisions by the judges.

Page 294

1  Correct?
2      A.   That's correct.
3      Q.   And, to the best of your knowledge, no
4  supervisor in your chain of command ever spoke to you
5  about those decisions by those judges?
6      A.   That's correct.
7      Q.   And, to the best of your knowledge, best of
8  your recollection, nobody from internal affairs or any
9  related units in the department who investigated officer
10  misconduct ever came to you to question you about any of
11  the findings in those Court orders.  Correct?
12         MS. BERKE:  Objection.  Assumes facts not in
13  evidence.
14         THE WITNESS:  That's because there was
15  nothing internal affairs had to investigate.
16      Q.   BY MR. BRUSTIN:  Okay.  And your testimony
17  today is that you were never even informed that those
18  Courts had decided that you made misstatements under
19  oath.  Correct?
20      A.   I was -- that is correct because I was --
21  didn't -- I did not know until I started reading the
22  Court documents.
23      Q.   All right.  So the first time you ever learned
24  that courts had found that you had made misstatements
25  under oath was after we filed a lawsuit against you in

Page 295

1  this case.  Correct?
2      A.   Not after you did it but whoever was doing it
3  before, yeah, before you.
4      Q.   Okay.  In other words, you found out about it
5  in connection with the proceedings to seek Ms. Milke's
6  release long after her conviction.  Is that what you're
7  saying?  Let me withdraw the question.  I'll make it
8  simple for you.
9          Would it be fair to say that you didn't
10  learn about the Court decisions claiming --
11  determining that you made --
12         MS. BERKE:  Put that down.
13      Q.   BY MR. BRUSTIN:  Let me start again.
14         Would it be fair to say that you didn't
15  learn about the Court decisions determining that you had
16  made misstatements under oath until many years after
17  Debra Milke's conviction?
18      A.   I don't think I've made misstatements under
19  oath other than the court reporter's error.
20      Q.   Okay.  And no one ever told you you did?
21      A.   Not that I remember.
22      Q.   Okay.  Now, yesterday Investigator Hamrick
23  testified.  Do you have an understanding as to what he
24  said during his deposition?
25         MS. BERKE:  Objection.  I'm going to object

Page 296

1  on the basis of attorney/client privilege, and he's not
2  divulging anything he's learned from his attorney.
3      Q.   BY MR. BRUSTIN:  Did you speak to Detective
4  Hamrick after his deposition?
5      A.   I haven't seen Hamrick or spoke to him since I
6  retired.
7      Q.   One of the things that he told us is that in
8  his experience as a homicide investigator and
9  investigator generally, he doesn't recall a supervisor
10  ever sitting in on an interrogation.
11         Is that consistent with your memory of how
12  supervision worked in the Phoenix Police Department?
13      A.   Yes.
14         MS. BURGESS:  Foundation.
15      Q.   BY MR. BRUSTIN:  You don't recall a supervisor
16  ever sitting in on one of your interrogations?
17      A.   No.
18      Q.   And would it be fair to say that to --
19  withdrawn.
20         Would it be fair to say that your
21  understanding as to how supervisors, sergeants in your
22  chain of command were reviewing your reports, your
23  written work was simply to ensure that it was completed?
24         MS. BERKE:  Objection.  Vague.
25         MS. RETTS:  Form.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
297–300

Page 297

1    MS. BERKE:  Foundation.
2    THE WITNESS:  I don't know how the paperwork
3  process went.  I mean, I would get my copy, and there was
4  several other copies made.  So I don't know whether the
5  sergeant reviewed my case or not.
6    Q.   BY MR. BRUSTIN:  Fair enough.  To the best of
7  your knowledge -- withdrawn.
8         Would it be fair to say that you don't
9  recall a supervisor ever questioning the substance of
10  what you wrote in one of your police reports?
11    A.   That's true.
12    Q.   And you don't recall a supervisor ever
13  suggesting to you that you reinterview a suspect after
14  reviewing one of your reports?
15    A.   I can't really say for sure because we may have
16  had a discussion of what he may have thought, but I may
17  have given him my impression and my thoughts, and he --
18  and we would decide again.
19    Q.   Sure.  You certainly don't remember any
20  supervisor being critical of anything you wrote in a
21  report.  Correct?
22    A.   I don't think you can describe it as critical
23  or accepting or anything else.  I just never had any
24  supervisor contact me about the report.
25    Q.   Okay.  Well, when I say "critical," what I mean

Page 298

1  is a supervisor saying to you:  You shouldn't have done
2  this.
3         That never happened.  Right?
4    A.   No, I can't recall them saying anything to me
5  like that.
6    Q.   Okay.  Now, as you told us, at my request --
7  well, I don't know if it was my request or your
8  request --
9    A.   It was your request.
10    Q.   All right.
11         -- you reviewed the Sandra Pickinpaugh
12  transcript more carefully?
13    A.   I did.
14    Q.   Okay.  And is there anything you saw in there
15  that you think affected any of your answers?
16    A.   Oh, definitely.
17    Q.   Okay.  Why don't you tell us.
18    A.   First of all, the tape lasted for an hour, and
19  my interview lasted for two hours -- I mean, three hours.
20  So there's two hours missing somewhere.  That would
21  probably be a reasonable explanation why some things are
22  missing, some things are not, in my mind anyway.
23    Q.   Okay.  So it's your testimony today that the
24  reasons certain things didn't appear in the transcript is
25  because they must have happened during other parts of the

Page 299

1  interview?
2    A.   That's correct.
3    Q.   Okay.  And you recall during your last
4  deposition we went through the transcript and we matched
5  it up to your notes, you were able to tell what portions
6  of the transcript matched up to your notes.  Correct?
7    A.   I don't think we had my notes there.
8    Q.   I'm sorry.
9    A.   The transcript.
10    Q.   Your report.  You're being specific, and I
11  appreciate it.
12         You recall that the first thing I did --
13  just in case you were going to do this, the first thing I
14  did was I showed you your report on the interview, and I
15  had you match it up with the portions of the tape that
16  corresponded to your report.
17         Do you remember doing that under oath?
18    MS. BERKE:  Objection.  Argumentative.
19    THE WITNESS:  If you say I did, I did, but I
20  don't recall it.
21    Q.   BY MR. BRUSTIN:  Don't recall it.
22         Nevertheless, your explanation today for the
23  missing information on the tape is that it must have
24  happened during other portions of the interview.  Is that
25  correct?

Page 300

1    A.   That's my only belief that makes sense.
2    Q.   Okay.  And that's your testimony under oath
3  today that's what must have happened?
4    A.   Correct.
5    Q.   Okay.  Now, you recall I showed you in the
6  transcript where you told Sandra that Debra had flashed
7  you during the interrogation by lifting up her shirt to
8  wipe at her eyes and expose her breast.  Do you remember
9  seeing that?
10    A.   I believe I did.
11    Q.   Okay.  And, now, remember you've also testified
12  that the time that Debra was, according to you, fake
13  crying was the time that you had placed your hands on her
14  knees in order to control the situation.  Is that
15  correct?
16    A.   I don't believe I specifically stated that, but
17  it is somehow correct.
18    Q.   Okay.  Not somehow --
19    A.   Somewhat correct.
20    Q.   Your story is that at the time that Sandra --
21  withdrawn.
22         Your story is that at the time that Debra
23  was fake crying, you had your hands on her knees, and it
24  was at that point that she pulled up her shirt to expose
25  her breasts.  Correct?



Page 301

1    A.   I would have to see the report.  I can't recall
2   that specifically, no.
3    Q.   Well, we'll put -- let's put one and one
4   together.  You've already testified under oath that you
5   had your hand on her knees in order to control her while
6   she was fake crying.  Correct?
7        MS. BERKE:  Objection.  Argumentative.
8        THE WITNESS:  No, that's not correct.  To
9   get her attention.
10   Q.   BY MR. BRUSTIN:  At the time that she was fake
11  crying?
12   A.   Yes, but not to control her, to get her
13  attention.
14   Q.   Fair enough, but that's the time that you had
15  your hands on her knees.  Correct?
16       MS. BERKE:  Objection.  Argumentative.
17       THE WITNESS:  To get her attention?
18   Q.   BY MR. BRUSTIN:  Not asking you why you put
19  your hand on her knees.  I don't really care.  I'm asking
20  you about the time when you put your hands on her knees.
21   A.   I've already discussed that with you.
22   Q.   Okay.
23   A.   I said that I didn't recall that was the -- the
24  case but that I put my hand on her knees to get her
25  attention.

Page 302

1    Q.   Did it get -- did it get her attention when you
2   put your hands on her knees?
3    A.   Well, it got her focused in on what I wanted
4   her to do.
5    Q.   Now, we've established that at the time she was
6   fake crying, you had put your hands on her knees to get
7   her attention.  Correct?
8    A.   I don't know if it was during that time that
9   she was fake crying or before.  I don't know.
10   Q.   Right around that time.  Right?
11       MS. BERKE:  Objection.  Foundation.
12       THE WITNESS:  I can't say that.  Unless I
13  see the report where it says it, I mean, I -- I can't
14  necessarily say that it was that time.
15   Q.   BY MR. BRUSTIN:  See, there's no report on it
16  because you didn't put it in your report.  Did you forgot
17  that?
18       MS. BERKE:  Objection.  Vague.
19  Argumentative.
20       THE WITNESS:  Again, like I said, I can't
21  recall.  If you can provide me with a report, I'll read
22  it and agree if that's what I said.
23   Q.   BY MR. BRUSTIN:  Mr. Saldate, the reason I
24  can't provide you with a report is because you didn't put
25  it in your report.  Do you understand that, sir?

Page 303

1        MS. BERKE:  Objection.  Vague.
2        THE WITNESS:  Well, that's -- I can
3   understand that that's probably only the few things that
4   I have never put into a report then because I put in
5   every report how many times I -- they were read their
6   rights, how many times they did this and did that, and
7   for that reason, that's why you know about all this
8   stuff, because I was honest and put everything in my
9   report.
10   Q.   BY MR. BRUSTIN:  And the -- and the only two
11  things that you didn't put in your report perhaps in your
12  whole career was that you put your hands on Debra's knees
13  for a few minutes and that she pulled up her shirt to
14  show you her breasts.  Correct?
15       MS. BERKE:  Objection.  Misstates testimony.
16       MS. RETTS:  Join.
17       THE WITNESS:  That's not correct.  I'm not
18  going to agree with your first -- your statement that
19  every report or everything.  I just told you I answered
20  your question in regards to that I don't -- I did place
21  my hand on her knee to get her attention.
22       Now, what she was doing prior to that or
23  what she did right after that, I told you I can't recall
24  exactly.
25   Q.   BY MR. BRUSTIN:  Okay.  But what you've -- what

Page 304

1   you've also told us is that you never lie to witnesses.
2   Correct?
3    A.   I try never to lie to witnesses.
4    Q.   Okay.  Well, that's a little different.  So
5   that's -- in fact, that's completely different.  What you
6   told us last time is you never lie to witnesses.  Now are
7   you telling us sometimes you lie?
8    A.   I try never to lie to the witness.
9    Q.   Okay.
10   A.   But I try never to lie to witnesses.
11   Q.   All right.  Well, you -- you talked to Sandra
12  just -- just days after you had interrogated Debra Milke,
13  correct, when things were fresh in your mind?
14       MS. BERKE:  Objection.  Misstates evidence.
15       THE WITNESS:  I don't know -- I don't know
16  if it's days or weeks.
17   Q.   BY MR. BRUSTIN:  It was actually more.  It was
18  six months.
19   A.   Misstatement on your part.
20   Q.   It is a misstatement on my part.
21   A.   Thank you.
22   Q.   Do you think in between those six months you
23  forgot that Debra, according to you, had pulled up her
24  shirt to show you her breasts?
25   A.   I may have.  I don't know.



ARMANDO SALDATE Volume II                                    June 22, 2017
MILKE vs CITY OF PHOENIX                                         305–308

Page 305

1    Q.   All right.  Well, you told Sandra -- and I'm
2    reading right from the tape.
3    A.   Uh-huh.
4    Q.   You told Sandra that Debra flashed you during
5    the interrogation by lifting up her shirt to wipe her
6    eyes and expose her breasts, and I take it you stand by
7    that statement today.  Correct?
8    A.   If that's as you're reading it correct.
9    Q.   I'll read it to you.
10        MS. GREEN:  The transcript is Exhibit 7.
11        MR. BRUSTIN:  I don't care.  Just give it to
12   me.
13        MS. BERKE:  Are you using the old transcript
14   or the new transcript?
15        MR. BRUSTIN:  The old transcript.
16   Q.   BY MR. BRUSTIN:  I'll represent there's no
17   change in this.
18        Okay.  Here's what you said to her on page
19   18715.
20        MS. BERKE:  Can you give me a chance to get
21   there?
22        MR. BRUSTIN:  Yes.
23        MS. BERKE:  18715?  Oh, sorry.  Wait just a
24   minute.
25        MS. GREEN:  It's Exhibit 7 from the last

Page 306

1    one.
2         MS. BERKE:  Yeah, I was looking at the wrong
3    exhibit.  Okay.
4    Q.   BY MR. BRUSTIN:  All right.  Line 12: "So me
5    and her are talking, and I'm telling her I'm not going to
6    tolerate that.  She's not going to do it.  She -- dress
7    looked very nice.  She wraps the front of her blouse, and
8    she pulls it up to her eyes.  She didn't have no tears to
9    wipe her tears away.  She didn't have any."
10        Question from you, "Which quickly exposed
11   her" -- there's a noise.  "I really didn't pay that much
12   attention.  I knew you see my job and my position.  I
13   knew what she was doing, but I'm there for information.
14   And she's like trying to see if I --
15        "Answer:  It's working.
16        "Question.  It's working.  If he's looking
17   at my breasts, then I may be able to talk myself out of
18   this."
19        Okay.  So that's what I'm telling you.
20   That's the type of manipulation she does.  She loves
21   that.
22        So what you were telling Sandra is right
23   around the time when you had her hands on her knees, she
24   lifted up her shirt --
25   A.   Wait a minute.  You're -- you're

Page 307

1    misrepresenting that because I didn't hear you read that
2    in that report.
3    Q.   I'll take that out.
4         What you're telling Sandra is that at the
5    beginning of the interview, she pulls up her shirt to
6    show you her breasts.  Correct?
7    A.   I think I did say that as you read it.
8    Q.   Okay.  And, obviously, that was the truth.
9    Right?
10   A.   I guess.
11   Q.   What do you mean you guess?  You always tell
12   the truth.  Right?
13   A.   I try to tell the truth always.
14   Q.   Were you telling the truth there?
15   A.   I said I guess.
16   Q.   Okay.  So your story is that during the
17   interview, you had your hands on Debra's knees for as
18   long as a minute or two, and right around the same time,
19   she pulls up her shirt to show you her breasts --
20   A.   You haven't read anything like that to me.
21   Q.   And you don't write anything down.
22        MS. BERKE:  Objection.  Misstates evidence.
23   Misstates testimony.
24   Q.   BY MR. BRUSTIN:  When Debra showed you her
25   breasts, according to you, during the interview, did you

Page 308

1    think, Maybe I should get a witness here?
2         MS. BERKE:  Objection.  Misstates testimony.
3    Argumentative.
4         THE WITNESS:  I didn't think about anything
5    like that.
6    Q.   BY MR. BRUSTIN:  Okay.  And had anything like
7    that ever happened to you before?
8    A.   Investigation -- I don't recall.  I don't think
9    so.
10   Q.   Do you recall any -- any other female suspect
11   ever showing you their breasts?
12        MS. BERKE:  Objection.  Misstates evidence.
13        THE WITNESS:  Other than my '72 discipline,
14   no.
15   Q.   BY MR. BRUSTIN:  Okay.  So the first time a
16   female suspect showed you her breast was in 1973.  Is
17   that right?
18   A.   That I felt was not by accident, yes.
19   Q.   Okay.
20   A.   I don't know why you guys find these things so
21   funny.  Everybody is smiling and almost laughing.  I
22   don't think it's funny at all.  I'm here because I have
23   to be here, but either way.  I -- I get off --
24        MS. BERKE:  Armando, there's no question
25   pending.  Let's wait for a question.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
309–312

Page 309

1    Q.   BY MR. BRUSTIN:  Keep talking.
2    A.   Go ahead.
3    Q.   All right.  Mr. Saldate, so she lifts up her
4  shirt to show you her breasts, and the only person in the
5  world you ever told about it was Sandra Pickinpaugh, her
6  sister.  Is that correct?
7         MS. BERKE:  Objection.  Misstates evidence.
8  Misstates testimony.
9         THE WITNESS:  I can't really say that.
10    Q.   BY MR. BRUSTIN:  Who else did you tell about
11  Debra Milke lifting up her shirt during the interrogation
12  to show you her breasts?
13         MS. BERKE:  Objection.  Misstates evidence.
14  Misstates testimony.
15         THE WITNESS:  I don't know.  I can't recall
16  that.
17    Q.   BY MR. BRUSTIN:  Do you think when I interview
18  Detective -- Sergeant Ontiveros, he'll remember you
19  telling him?
20    A.   That's your interview of Ontiveros.  I have
21  nothing with that.
22    Q.   Let me try a different explanation.
23         What actually happened is that --
24    A.   No, not actually because you don't know.
25    Q.   Okay.  What actually happened is you told

Page 310

1  Sandra Pickinpaugh that Debra pulled up her shirt and
2  showed you her breasts knowing that was a bold-faced lie.
3  Isn't that true?
4         MS. BURGESS:  Form.
5         THE WITNESS:  Just like I said to begin
6  with, not actually, and it's not totally true.
7    Q.   BY MR. BRUSTIN:  Okay.  Is it partially true?
8    A.   No, "totally" means not true.
9    Q.   Okay.  And the reason that you lied to Sandra
10  Pickinpaugh about her sister living -- lifting up her
11  shirt is because you knew that Sandra had a problem with
12  her sister, and you wanted her -- you wanted to feed the
13  flames so that she would give you more information.
14  Isn't that what you were doing?
15         MS. BERKE:  Objection.  Misstates the
16  testimony.
17         THE WITNESS:  That's not the truth.  That's
18  not a fact.  That may be a belief in your part because
19  you're the defense attorney, but that's not even close.
20  And you cannot provide me with any documents that says
21  that.
22    Q.   BY MR. BRUSTIN:  That is true.  I cannot.
23  There is no document in the world that says that, at
24  least none that's been produced.
25    A.   Maybe because it did not happen.

Page 311

1    Q.   Okay.  Now, what are the different ways --
2  withdrawn.
3         Take a look -- let's get his deposition out.
4  Are you guys -- you can follow along with me.  I'm
5  looking at -- I'm going to be referring to some of these
6  if we need to.  So there's one that says your deposition
7  on it.  Do you see that one?
8         MS. GREEN:  Is that the smaller one?
9    Q.   BY MR. BRUSTIN:  The white one.
10    A.   Thank you.
11    Q.   Why don't you read with me on page 221.
12    A.   Sure talked a long time, didn't we?
13    Q.   Okay.  Now, you see on page 221 this is one of
14  the places where I offered you to take more time to
15  review your transcript, and this was in regard -- about
16  the misstatements about romantic involvement with Jim.
17  Do you recall that?  Did you review this in preparation
18  for today?
19         MS. BERKE:  Objection.  Misstates evidence.
20    Q.   BY MR. BRUSTIN:  Why don't you do this.  Why
21  don't you read to yourself pages 220 and 221.
22         Are you done?
23    A.   Just a couple more paragraphs.
24         Yes.
25    Q.   Do you see this is on page 221, line 8 to 10,

Page 312

1  that's where you -- that's where you're admitting that
2  you wrote in your report what she said in the order in
3  which she said it?  Do you see that?
4    A.   Yes.
5    Q.   That was under oath, and that was truthful
6  testimony.  Right?
7    A.   Yes.
8    Q.   Okay.
9    A.   As was No. 4, line 4.
10    Q.   That's right, and, now, you had a portion here
11  where you're -- I offered you to go and read the
12  transcript to see if you could find anything -- in the
13  transcript, see if you could find anything that changes
14  your answer.
15         Did you find anything other than what you've
16  already told us?
17    A.   I think you misrepresented the answer --
18    Q.   Which --
19    A.   -- because I think you said that -- that she
20  said that Debra would never think of that -- the sexual
21  things because she thought of her (sic) as a father
22  figure.  In fact, in reading this at one point, I read
23  that she didn't say she would never.  She said that she
24  could understand that with other people but not -- she --
25  she -- she could not tell -- I mean, she was not sure



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
313–316

Page 313

1  whether she would do it with Jim or something -- do that
2  with Jim, and I think you misrepresented the last
3  statement, that statement that you actually said you read
4  from the report.
5  Q.   You're lying right now.
6  A.   What?
7  Q.   You're lying right now.
8       MS. BERKE:  Objection.  Foundation.
9  Q.   BY MR. BRUSTIN:  What's on the page.
10  A.   No, I'm not.  You said to me that Debra Milke
11  had -- or Pickinpaugh had said that it was not -- she
12  would not say that because they're a father figure or
13  whatever, and that's not what she said.  She said she
14  didn't think so, but she didn't know.
15  Q.   Let me read it to you.  This is -- okay.
16  Here's what it says.
17       MS. BERKE:  What page are you at?
18       MR. BRUSTIN:  18713.
19       THE WITNESS:  In my depo or --
20  Q.   BY MR. BRUSTIN:  This is the transcript of
21  Sandra Pickinpaugh.  "But it's not -- it's the way we
22  were raised, you know.  So whether Debbie used it -- uses
23  it or not I couldn't really say because you're talking
24  about Jim.  If you're talking about somebody else and she
25  did that, yeah, I'd put it past her, I really would, but

Page 314

1  you're talking about Jim.  And you've got to realize that
2  Jim has always meant to us just like a father, actually a
3  surrogate father.  We never thought about it."
4       So --
5  Q.   Continue, read on, please.
6  Q.   There's nothing else to read.  Do you want to
7  point me to something?
8  A.   Well, if I could see it, I might.
9  Q.   What I just described to you -- what I just
10  read to you out loud is Sandra saying whereas she might
11  see Debra taking sexual advantage of somebody else, she
12  wouldn't do it with Jim.  Correct?
13       MS. BERKE:  Objection.  Misstates evidence.
14       MS. BURGESS:  Foundation.
15       THE WITNESS:  I don't think that's correct.
16  Q.   BY MR. BRUSTIN:  You think it means something
17  else?
18  A.   I think that she said that she didn't -- she
19  didn't say that directly, as you presented it to me the
20  last time.  You misrepresented that, and if you go back
21  to the -- to the tape or the deposition, you'll find that
22  you said that she told you she would never do this or do
23  that.  I forget what the words were, but you -- I think
24  you totally misrepresented that.
25  Q.   Let me read it to you again.  "If you're

Page 315

1  talking about someone else and she did that, yeah, I'd
2  put it past her, I really would."
3       MS. BERKE:  Well, you -- you didn't read the
4  first part this time --
5  Q.   BY MR. BRUSTIN:  But you're talking --
6       MS. BERKE:  -- the part he's referring to.
7  Q.   BY MR. BRUSTIN:  So whether --
8       MS. BERKE:  Start with, "But it's the way we
9  were raised, you know.  So --
10  Q.   BY MR. BRUSTIN:  Fair enough.
11       MS. BERKE:  -- whether Debbie" --
12  Q.   BY MR. BRUSTIN:  Fair enough.
13       So what you're saying is that this doesn't
14  suggest to you that Sandra was telling you Sandra --
15  Debra might do it with somebody else, but she didn't
16  think she would do it with Jim?
17  A.   Didn't think.  Actually, that is what I think
18  she said, but she did not say she would not.
19  Q.   Okay.  Gotcha.
20       Any other -- any other changes you want to
21  add to it?
22  A.   To what?
23       MS. BURGESS:  Form.
24       MS. BERKE:  Join.
25  Q.   BY MR. BRUSTIN:  Anything else that you would

Page 316

1  like to -- after having reviewed the transcript, anything
2  else you would like to add to your explanation as to the
3  differences between what's in the transcript and what's
4  in your report?
5  A.   I -- I -- I have a belief that I will probably
6  be able to review every transcript that we take here and,
7  like I said, I briefly just looked through it, and I read
8  it, and -- but I'm waiting for the end of our depositions
9  to review all of it, and that way I can refer to it in
10  one package.
11       MS. BERKE:  I think he understood you to be
12  referring to the deposition transcript.
13  Q.   BY MR. BRUSTIN:  No, I'm only referring to
14  Sandra Pickinpaugh's transcript.  Is there anything else
15  that you've -- you reviewed in Sandra Pickinpaugh's
16  transcript that you want to bring to our attention as
17  either something I misrepresented to you or something
18  there that shows there wasn't a contradiction between
19  your report and her transcript?
20  A.   Not that I've already brought up.
21  Q.   All right.
22  A.   Can I close it?  Okay.
23  Q.   Yeah, you can close that one.
24  A.   Okay.
25  Q.   Okay.  Now, as I think you've already told us,



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
317–320

Page 317

1  but I just want to orient you, you were at home on
2  December 3rd of 1989 when you were called by Sergeant
3  Ontiveros to come in and work the Milke case. Correct?
4      A.  Assist with the Milke case, yeah.
5      Q.  Who was the lead detective on the Milke case?
6          MS. BERKE:  Objection.  Vague.
7          THE WITNESS:  Who ended up being the
8  assigned case agent?
9      Q.  BY MR. BRUSTIN:  Yes.
10     A.  Me.
11     Q.  Okay.  But you weren't the case agent when you
12  came in?
13     A.  No.
14     Q.  When you came in, you were -- you were -- you
15  were brought in for the specific task of interrogating
16  suspects.  Correct?
17     A.  I don't know that I really can say that was the
18  reason.  I thought that, you know, they were calling me
19  in like they always called me in.
20     Q.  Okay.
21     A.  To assist.
22     Q.  But you came to learn that the reason they had
23  called you in was to interrogate suspects.  Correct?
24         MS. BERKE:  Objection.  Foundation.
25         THE WITNESS:  That -- that I was told to do,

Page 318

1  yes.
2      Q.  BY MR. BRUSTIN:  Well, you understood that the
3  reason they called you in -- withdrawn.
4          Who was the case agent at the time you were
5  called in?  Was it Mills?
6      A.  I would believe it was, but I'm not sure.
7      Q.  Okay.  And so there had already been -- like
8  any other homicide, when it occurs, a case agent's
9  assigned.  Correct?
10     A.  Usually, yes.
11     Q.  And initially you were not the case agent?
12     A.  That's correct.
13     Q.  You were called in on your day off?
14     A.  Correct.
15     Q.  And you came in, and you were asked to conduct
16  interviews of the suspects?
17         MS. BERKE:  Objection.  Misstates evidence.
18         THE WITNESS:  To assist in the interviews of
19  suspects, yeah.
20     Q.  BY MR. BRUSTIN:  Okay.  Well, in fact, what
21  ended up happening is you took over the interviews of the
22  suspects.  Correct?
23         MS. BERKE:  Objection.  Misstates evidence.
24         THE WITNESS:  I did.
25     Q.  BY MR. BRUSTIN:  Okay.  It was clear to you

Page 319

1  that you had the authority to conduct those interviews as
2  you saw fit.  Correct?
3          MS. BERKE:  Objection.  Vague.
4      Q.  BY MR. BRUSTIN:  Let me be more specific.
5          You asked Mills to leave the room --
6  withdrawn.
7          You took over Roger Scott's interrogation
8  from Mills at your discretion.  Correct?
9      A.  That is correct.
10     Q.  And Mills was the case agent?
11     A.  I don't know -- really know that for sure.
12     Q.  All right.  But you certainly understood from
13  whatever source -- whatever source there was, you
14  understood that you had the authority to take over the
15  interrogation?
16         MS. BERKE:  Objection.  Vague.
17         THE WITNESS:  I never thought of it as
18  authority.
19     Q.  BY MR. BRUSTIN:  Okay.
20     A.  I just thought of it as I was there as an
21  investigator, and if I felt that something needed to be
22  done, I would have done it.  And if Bob Mills would have
23  said something else, then we would have discussed it.
24     Q.  The only thing you were focusing on the first
25  day you came into the investigation were conducting

Page 320

1  interviews of suspects.  Correct?
2          MS. BERKE:  Objection.  Misstates evidence.
3          THE WITNESS:  After I got there, yes.
4      Q.  BY MR. BRUSTIN:  Okay.  And that's because
5  that's what you were told to do by Ontiveros.  Correct?
6      A.  Yes, he wanted me --
7      Q.  He brought you in to interview suspects?
8          MS. BERKE:  He wasn't finished with his
9  answer.  Can you let him finish his answer, please?
10         THE WITNESS:  He brought me in to assist
11  Mills in his -- in to helping him interrogate his people.
12     Q.  BY MR. BRUSTIN:  Okay.  And you did more than
13  that.  You took them over.  Correct?
14     A.  I -- I don't like to refer to it that way, but,
15  yeah, I did assume the responsibility of that interview.
16     Q.  Okay.  And that was based on the assignment you
17  received from Ontiveros?
18     A.  That wasn't based on anything Ontiveros told
19  me.  He never told me to go in there and do this or do
20  that.  He said assist Mills in the interrogation of these
21  people.
22     Q.  Did you have an understanding at that point why
23  he brought you in on your day off?
24     A.  Not really, but a lot of sergeants would bring
25  other people in.  Main reason for me is because I live

ARMANDO SALDATE Volume II                                    June 22, 2017
MILKE vs CITY OF PHOENIX                                          321–324

Page 321

1   close.
2      Q.   To your knowledge, were any other investigators
3   brought in on their day off for the case?
4      A.   I don't know.
5      Q.   All right.  Now, as you've -- as you testified
6   previously, when you arrived at the police station about
7   10 a.m., you were briefed.  Correct?
8      A.   Correct.
9      Q.   You were briefed by Ontiveros?
10      A.   Ontiveros and, I think, a missing persons
11   detective, but I don't really recall.
12      Q.   Okay.  And, obviously, once you understood that
13   you were going to be in -- once you understood that you
14   were going to be assisting in interviewing suspects, your
15   goal as a consciousness detective was to get as much
16   information about those suspects as you could.  Correct?
17         MS. BERKE:  Objection.  Vague.
18         THE WITNESS:  That's my responsibility.
19      Q.   BY MR. BRUSTIN:  Of course it is.
20         And so you were interested in learning
21   everything that was happening during the early part of
22   the investigation if it applied to the people you were
23   going to be interviewing.  Correct?
24         MS. BERKE:  Objection.  Vague.
25         THE WITNESS:  I don't -- that's -- I don't

Page 322

1   really understand that question --
2      Q.   BY MR. BRUSTIN:  Sure.  Obviously, if you're --
3   if you're interviewing suspects who you think may have
4   committed very serious crimes, you want to have as much
5   information about those suspects so that when you're
6   interviewing them, you can tell, as you've already
7   testified to previously, whether or not they're telling
8   the truth.  Correct?
9         MS. BERKE:  Objection.  Misstates evidence.
10         THE WITNESS:  That would be nice, yes, but
11   not normally.  You never do.
12      Q.   BY MR. BRUSTIN:  Okay.  But in this case, there
13   were other people doing investigations early in the
14   morning about Styers and Scott.  Correct?
15         MS. BERKE:  Objection.  Foundation.
16         THE WITNESS:  That's correct.
17         MS. BERKE:  Misstates evidence.
18      Q.   BY MR. BRUSTIN:  And, by the way, during your
19   initial briefing in the morning, as you've already
20   testified to, there was no suggestion that Debra Milke
21   was a suspect.  Correct?
22      A.   Correct.
23      Q.   Now, you also testified that there were 40 to
24   50 officers involved in the case prior to your
25   involvement.  Do you deny that testimony?

Page 323

1      A.   No, but I just told you I didn't know how many
2   officers were involved.  You're talking uniform, you're
3   talking mall security, you're talking all kinds of stuff.
4      Q.   If you testified under oath that there were 40
5   or 50 officers involved, that means you knew how many
6   officers there were.  Correct?
7      A.   Why don't you look at me directly.  And I told
8   you already I did not know exactly how many officers were
9   involved.
10      Q.   So I'm reading to you from your sworn testimony
11   back --
12         MS. BERKE:  Please --
13      Q.   BY MR. BRUSTIN:  -- at the time of the
14   investigation --
15         MS. BERKE:  -- don't yell at him.
16      Q.   BY MR. BRUSTIN:  -- where you testifying under
17   oath that 40 to 50 officers were involved.
18      A.   That's correct.  That's what you're saying I
19   read or I did as you're reading it.
20      Q.   So you did know how many officers were
21   involved?
22      A.   I may have known then, but I -- I don't recall,
23   and I told you I didn't recall how many officers were
24   involved.
25      Q.   Certainly your memory was much better back at

Page 324

1   the time of the trial.  Correct?  Withdrawn.
2      A.   20-some years or something, you know.
3      Q.   Withdrawn.
4         Do you think your memory about what happened
5   during the case was better back then than it is today?
6      A.   Of course it was.
7      Q.   All right.  So when you testified back then
8   that there were 40 to 50 officers involved, that's
9   because that's what you believed to be true.  Correct?
10      A.   Yes, uniform officers, mall security, all those
11   people.
12      Q.   Lots of people working this case.  Right?
13      A.   Yes.
14      Q.   Now, at approximately 12:50, that's when you
15   entered the room with Mills who was interviewing Roger
16   Scott.  Correct?
17         MS. BERKE:  Objection.  Foundation.
18         THE WITNESS:  If you're reading that, yes.
19      Q.   BY MR. BRUSTIN:  Okay.
20         MS. BERKE:  If you're wanting him to confirm
21   times, you need to put a report in front of him.
22         MR. BRUSTIN:  I'm not going to waste time if
23   we don't need to.
24         MS. BERKE:  You're going to later say that
25   he answered incorrectly under oath --



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
325–328

Page 325

1     MR. BRUSTIN:  I'm smarter than that.
2     MS. BERKE:  So if you want him to give
3 specific times --
4     MR. BRUSTIN:  No, no, no.  I won't do that.
5     MS. BERKE:  -- of when meetings or
6 interviews started --
7     MR. BRUSTIN:  That would never work.  So I
8 won't do that.
9     Q.   BY MR. BRUSTIN:  The report states that you
10 entered the room at 12:50.  Is that -- is that consistent
11 with your memory?
12    A.   Well --
13        MS. BERKE:  Objection.  Foundation.
14        THE WITNESS:  I can't say it's consistent
15 with my memory because I really don't recall that much
16 about this whole situation because it was a long time
17 ago.  But, in fact, if you're reading something that I
18 told you or a report, then it's obviously true.
19        MR. BRUSTIN:  Let's mark this as 20, please.
20        (Exhibit 20 was marked for identification.)
21    Q.   BY MR. BRUSTIN:  I'm showing you what's been
22 marked --
23        MS. BERKE:  Wait.  Can we wait until they've
24 been distributed?
25        MR. BRUSTIN:  Yeah.  I'm sorry.

Page 326

1        THE WITNESS:  Yes, I see the second
2 paragraph.
3    Q.   BY MR. BRUSTIN:  Got to wait for all the
4 lawyers to get the document.
5    A.   I'm sorry.
6        MR. BRUSTIN:  You know, while we're -- while
7 we're passing out, can we take just a two-minute break,
8 and you can look at this for a minute if you want.
9        THE WITNESS:  Sure.  Yeah.
10        THE VIDEOGRAPHER:  We're off the record at
11 10:41 a.m.
12        (A recess was held off the record.)
13        THE VIDEOGRAPHER:  We are back on the record
14 at 10:44 a.m.
15    Q.   BY MR. BRUSTIN:  Okay.  Mr. Saldate, you
16 recognize Plaintiff's 20, which is Bates-stamped MC0133
17 through 38 is the report you created concerning your
18 interactions with Roger Scott.  Correct?
19    A.   That's correct.
20    Q.   And obviously in this report, like every other
21 report, you were very careful to document your
22 interaction -- each meeting you had with Mr. Scott.
23 Correct?
24    A.   That's correct.
25    Q.   And the substance of what you said to him and

Page 327

1 what he said to you, anything important.  Correct?
2    A.   I would say yeah.  You know, I may have --
3 yeah, I would say I did.  I mean...
4    Q.   Okay.  And obviously this is a report you
5 reviewed in preparation for today.  So you're familiar
6 with it.  Correct?
7    A.   I can't specifically say that this is a report
8 that I reviewed.
9    Q.   You didn't review the Roger Scott report?
10    A.   I reviewed so many reports, I don't remember
11 which reports I read.
12    Q.   Okay.
13    A.   But, again, I just read them.
14    Q.   All right.  Just to orient you, you can see
15 that it makes clear, as you just told us before we took a
16 break, that at 12:50 hours, that's when you came into the
17 interview.  Correct?
18    A.   Correct.
19    Q.   That's when you Mirandized Mr. Scott?
20    A.   Not at 12:50 but, yes, later.
21    Q.   Soon after.  Correct?
22    A.   Correct.
23    Q.   And that's when you took over the interview.
24 Correct?
25    A.   Yes.

Page 328

1    Q.   And that's because in your personal view, the
2 reason you read him his rights is because, as you
3 testified, you wanted to make sure you were protecting
4 Mr. Scott's rights.  Correct?
5    A.   Part of my responsibility.
6    Q.   All right.  And the reason you took over,
7 according to your sworn testimony, is that Mills had not
8 given, in your view, Roger Scott a chance to be truthful.
9 Correct?  That was the reason you took over?
10    A.   I haven't read that yet, but, you know,
11 presumably, I guess.
12    Q.   Okay.  And you believed that Roger Scott would
13 tell you the truth.  Correct?
14    A.   No, I believe that -- I believed I would ask
15 them the truth, and I would phrase -- and the interview
16 would take a different position than what was happening
17 with Milch.
18    Q.   You testified under oath the time -- at the
19 time of the Roger Scott trial that you believed strongly
20 Roger Scott would tell you the truth.  Was that correct
21 testimony?
22        MS. BERKE:  Objection.  Foundation.
23        THE WITNESS:  I -- to be honest with you, I
24 don't know what you're referring to, but I may have
25 believed, yeah, that he would -- that he would tell me

ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
329–332

Page 329

1  the truth, but, you know...

2    Q.   BY MR. BRUSTIN:  That's why you took over the

3  interview.  You thought you would be able to get the

4  truth?

5    A.   Well, I was going to try.

6    Q.   Okay.  And you interrogated Scott a number of

7  times.  In fact, initially there was no confession.  You

8  left him alone in that room twice to give him a break.

9  Correct?

10    A.   Correct.

11    Q.   You stopped the interview twice, first for 15

12  minutes and then for about 30 minutes.  Is that

13  consistent with your recollection approximately?

14    A.   I don't have a time --

15        MS. BERKE:  Can you just refer him to where

16  you're looking?

17        MR. BRUSTIN:  No.

18    Q.   BY MR. BRUSTIN:  Is that generally consistent

19  with what you recall?

20        MS. BERKE:  Objection.  Foundation.

21        THE WITNESS:  Again, the time relationship I

22  would have to read but the exact time --

23    Q.   BY MR. BRUSTIN:  Fair enough.  I don't need

24  exact times.

25    A.   Okay.

Page 330

1    Q.   Fair to say you recall taking at least a couple

2  of breaks where you left him alone to be alone with his

3  thoughts?  Fair to say?

4    A.   Yes.

5    Q.   All right.  And it wasn't until approximately

6  3:35 -- yes, 3:35.  That's 1535.  Correct?

7    A.   Correct.

8    Q.   It wasn't until 1535 when he started making

9  admissions to you.  Correct?

10    A.   Again, the time -- I haven't read time.

11    Q.   Take a look through this.  You can take a look

12  at 135.

13    A.   135, okay.

14    Q.   Do you see at the top of the page it has the

15  time there?

16    A.   I see that.

17    Q.   So it was about 3:35 when he started making

18  admissions to you.  Correct?  Is that correct, sir?

19    A.   Yes, that's what the report says.  That's when

20  we were talking, yes.

21    Q.   All right.  So before 3:35, you had left him

22  alone a number of times while you went out, and you spoke

23  to the other officers.  Correct?

24        MS. BERKE:  Objection.  Foundation.

25        THE WITNESS:  That probably was correct, but

Page 331

1  I could have gone to the bathroom.  I don't know.

2    Q.   BY MR. BRUSTIN:  Well, there was --

3    A.   I mean, sergeants --

4    Q.   Sure.

5    A.   -- would be out there but maybe ask the

6  question.

7    Q.   You testified that you -- the interview --

8  stopped the interview for 15 and then 30 minutes.  Any

9  reason to dispute that?

10    A.   No.

11    Q.   Okay.  And obviously during the time when you

12  stopped interviewing him, you would have been talking to

13  other officers about what, if anything, they learned

14  about Roger Scott.  Correct?

15        MS. BERKE:  Objection.  Foundation.

16        THE WITNESS:  I wouldn't say that's obvious,

17  because I don't recall whether I talked to anybody or

18  whether I went -- the sergeant -- whether the sergeant

19  called me out or knocked on the door or whatever.  I

20  don't know how -- why I --

21    Q.   BY MR. BRUSTIN:  Let me -- let me ask you this.

22    A.   Okay.

23        MS. BERKE:  He -- he wasn't finished

24  answering the question.  Can you please let him finish?

25    Q.   BY MR. BRUSTIN:  Fair to say --

Page 332

1        MS. BERKE:  You interrupted him.

2    Q.   BY MR. BRUSTIN:  I'll -- I'll withdraw the

3  question.

4        MS. BERKE:  Well, you're not going to

5  withdraw it.  He's already stated his answer --

6        MR. BRUSTIN:  I'm going to withdraw the

7  question.

8        MS. BERKE:  -- and you're going to be

9  professional and permit him to finish his answer.

10        Go ahead and finish your answer, Armando.

11        MR. BRUSTIN:  I'm going to withdraw the

12  question.

13        MS. BERKE:  It's too late to withdraw the

14  question.

15        MR. BRUSTIN:  You just made that up.  I'm

16  withdrawing the question.

17        MS. BURGESS:  No, you just made that up.

18        MS. BERKE:  No, you just made it up.

19        Finish your answer, Armando.

20        MR. BRUSTIN:  If you have an objection, make

21  an objection.  No comments over there.  We don't need

22  that.

23        MS. BURGESS:  You know what?

24        MR. BRUSTIN:  Make a -- make a proper

25  objection or don't say anything.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
333–336

Page 333

1     MS. BURGESS:  I'll say what I need to say.
2         MS. BERKE:  And -- and you need to let him
3  finish answering his -- or answering your questions.
4     Q.   BY MR. BRUSTIN:  Finish.  I don't know what
5  you're saying but finish.
6         MS. BERKE:  Did you forget where you left
7  off?  We can have the court reporter read the question
8  back --
9         THE WITNESS:  Please.
10        MS. BERKE:  -- and the beginning of your
11 answer.
12        (The last question was read back by the
13 court reporter.)
14        THE WITNESS:  Took those breaks.
15    Q.   BY MR. BRUSTIN:  Obviously, Mr. Saldate,
16 everybody involved in the case was interested in what
17 Roger Scott had to say.  Is that fair to say?
18        MS. BERKE:  Objection.  Foundation.  Vague.
19        THE WITNESS:  It's fair to say that I was
20 interested.
21    Q.   BY MR. BRUSTIN:  Well --
22    A.   The sergeant was interested.  Probably Bob
23 Mills was interested.  But anybody else, I don't -- I
24 would have never told anybody else.  So I don't think
25 they would be interested.

Page 334

1     Q.   Do you think that everybody understood that
2  Roger Scott was a suspect in the case?
3         MS. BERKE:  Objection.  Foundation.
4     Q.   BY MR. BRUSTIN:  And that's why you were
5  interviewing him?
6         MS. BERKE:  Objection.  Vague and
7  foundation.
8         THE WITNESS:  I don't know.  I can't make
9  that determination.
10    Q.   BY MR. BRUSTIN:  Certainly, Ontiveros and Mills
11 knew it.  Right?
12    A.   Yes.
13    Q.   They were very interested in what was happening
14 in the room with you and Scott.  Right?
15        MS. BERKE:  Objection.  Foundation.
16        THE WITNESS:  They weren't there.  So I
17 guess they were.
18    Q.   BY MR. BRUSTIN:  Do you have any doubt in your
19 mind, even if you don't recall it, that when you left the
20 room, you were briefing Mills and Ontiveros about what
21 you were hearing from Scott, and they were telling you
22 what they were learning?
23        MS. BERKE:  Objection.  Foundation.
24    Q.   BY MR. BRUSTIN:  Fair to say?
25    A.   That's not fair to say because he hadn't told

Page 335

1  me anything when I left the room, but when I came back,
2  I -- at 1535 hours --
3         MR. BRUSTIN:  Okay.  Let's mark this,
4  please, as --
5         MS. BERKE:  Can you please let him finish
6  answering?
7         MR. BRUSTIN:  Are you still talking?  Sorry.
8         THE WITNESS:  Yes.
9         MS. BERKE:  He was still talking, and you
10 need to let him finish answering your questions.
11    Q.   BY MR. BRUSTIN:  Keep talking.
12    A.   At 1535 is when we started getting statements.
13 That was before -- that was after I had taken the breaks
14 with Mr. Scott, and he had basically not told me anything
15 prior to that point.
16    Q.   And you knew he wasn't telling you the truth up
17 to that point?
18    A.   That's what I felt, yes.
19    Q.   And you were trying to find out as much as you
20 could about Roger Scott so that you could get him to tell
21 you the truth.  Right?
22        MS. BERKE:  Objection.  Vague.  Foundation.
23        THE WITNESS:  No, not me -- for me to ask
24 questions about Roger Scott, no, I depend on myself and
25 what I believe and what I see and what I witness and my

Page 336

1  observations.  I don't need somebody else to tell me
2  anything.
3         MR. BRUSTIN:  Okay.  Let's mark that,
4  please, as 21.
5         (Exhibit 21 was marked for identification.)
6     Q.   BY MR. BRUSTIN:  Mr. Saldate, I'm going to show
7  you what is marked as plaintiff's 21 for identification.
8  It's a report Bates-stamped NSB522 through 526, and it's
9  a report created by an officer, Detective Cavanagh.  You
10 know Detective Cavanagh.  Right?
11    A.   I believe I may know him.
12    Q.   Okay.  He's one of the detectives you worked
13 with.  Right?
14    A.   I didn't work with him specifically, but I -- I
15 recall him as being -- becoming an attorney or something.
16    Q.   Okay.  So you know him?
17    A.   I knew of him, yes.
18    Q.   All right.  And so what Detective Cavanagh
19 describes here -- and I can show you -- is that at
20 approximately --
21        Look on page 523.
22    A.   Okay.
23    Q.   At approximately 1215 hours, he interviewed
24 Wilma Scott, Roger Scott's mother, at her home.  You see
25 that?



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
337–340

Page 337

1   A.   Yes.

2   Q.   Okay.  And that was right around the time when

3   you were just starting to get involved in interviewing

4   Roger Scott.  Correct?

5   A.   I believe so.

6   Q.   All right.  And if you take a look at page --

7   yeah, take a look at the last page.  Do you see the

8   first, second paragraph?  Just take a look at those two

9   paragraphs, just those two paragraphs.

10   A.   Okay.

11   Q.   And you see here that Officer -- I'm sorry --

12   Investigator Cavanagh is asking Ms. Scott about whether

13   or not she would be surprised if she were -- if she were

14   to learn that Roger had molested young children.

15   Correct?

16   A.   Correct.

17   Q.   He's asking her whether he's a pedophile.

18   Correct?

19   A.   Yeah, I guess.  He didn't refer to that, but,

20   yes.

21   Q.   All right.  And, obviously, you would expect

22   based on how -- based on the chain of command, you would

23   have expected that Cavanagh was conducting this interview

24   based on direction either from Mills or Ontiveros.  Fair

25   to say?

Page 338

1       MS. BERKE:  Objection.  Foundation.

2       MS. ODEGARD:  Foundation.

3       THE WITNESS:  I wouldn't know.

4       MS. RETTS:  Form.

5   Q.   BY MR. BRUSTIN:  I'm not asking what you

6   remember, what you know.  I'm asking you based on your

7   understanding of the chain of command and how things

8   worked, would you have expected that Detective Cavanagh

9   was interviewing Roger Scott's mother based on direction

10   either from the case agent or from the sergeant in

11   charge?

12   A.   It could from his own sergeant.

13   Q.   Okay.

14   A.   It could be from another uniformed sergeant.

15   Q.   All right.  But obviously somebody asked him to

16   do this.  Right?

17       MS. BURGESS:  Foundation.

18       MS. BERKE:  Join.

19       THE WITNESS:  I would say in part.

20   Q.   BY MR. BRUSTIN:  And if you take a look and you

21   see this report, what's in this report could be helpful

22   information for you -- you to use potentially in

23   interviewing Roger Scott.  Correct?

24   A.   I didn't know anything about the report.  So

25   obviously it wasn't any -- any help to me.

Page 339

1   Q.   Well, obviously, you knew when you spoke to

2   Sergeant Ontiveros that -- withdrawn.

3       Take a look at the last paragraph.  It

4   appears that after the interview Cavanagh went back to

5   620 West Washington.  Correct?

6       MS. BERKE:  Objection.  Foundation.

7       THE WITNESS:  You said the last page?

8   Q.   BY MR. BRUSTIN:  Last -- last page, 526.

9   A.   526.  It says, "I cleared my interview with" --

10   Q.   The last -- the last sentence.

11   A.   I later found the Walgreens at 620 West

12   Washington.

13   Q.   That's where you were.  Right?

14   A.   I was 620 West Washington, but there's a lot of

15   rooms, a lot of, you know, floors.

16   Q.   Okay.

17   A.   And he went to the basement.  So...

18   Q.   And this interview was conducted at 1315 hours.

19   Correct?  That's what it says.  That's 1:15?

20   A.   Uh-huh.

21   Q.   Yes?

22   A.   I would have to look to be specific about

23   times, but...

24   Q.   Last page, second to last paragraph.

25   A.   No, he concluded the interview.

Page 340

1   Q.   Yeah, at 1315 hours?

2   A.   Yeah.

3   Q.   That's 1:15.  Right?

4   A.   Yeah.

5   Q.   And it was more than -- that's more than two

6   hours before you went back into the room and Roger Scott

7   started giving you admissions.  Correct?

8   A.   Yes.

9   Q.   Okay.  And any doubt in your mind that at some

10   point during those two hours between 1315 hours and when

11   you went back in the room with Roger Scott, you would

12   have been made aware of what Cavanagh learned from Roger

13   Scott's mother?

14   A.   There's no doubt in my mind that I was not.

15   Q.   Okay.  You deny knowing anything about this?

16   A.   I deny knowing anything about this.

17   Q.   You had no idea that a detective had already

18   been dispatched to Roger Scott's mother's home and had

19   specifically questioned her about whether Roger Scott was

20   a child molester?

21   A.   That is correct.  I have no -- no idea that he

22   ever -- anyone ever went and interviewed her.

23   Q.   Okay.  You never learned that?

24   A.   Well, I -- ultimately, yes, I learned that, but

25   I don't have -- I don't recall this supplement, and I



Exhibit 1

ARMANDO SALDATE Volume II                                    June 22, 2017
MILKE vs CITY OF PHOENIX                                     341–344

Page 341

1  really don't recall -- I just assumed that somebody did
2  interview her, but I -- I didn't know anything about it,
3  though.
4      Q.   Okay.  You assume that somebody had interviewed
5  her already, though?
6          MS. BERKE:  Objection.  Vague.
7          THE WITNESS:  No, at the end of the case, I
8  knew that somebody had interviewed her.
9      Q.   BY MR. BRUSTIN:  All right.  Now, you recall
10  that -- that the point in time when Roger Scott made
11  admissions to you is when you threatened that if he
12  didn't, you were going to go to his mother's house and
13  question his mother about whether he was a pedophile.
14  Correct?
15         MS. BERKE:  Objection.  Misstates evidence.
16         THE WITNESS:  I don't think that's -- you'll
17  find that I said that he was a pedophile, and I did not
18  threaten her, no.
19     Q.   BY MR. BRUSTIN:  I didn't say you threatened
20  her.
21     A.   You said that.  You want to read back the --
22     Q.   Take a look at --
23         MS. GREEN:  Exhibit 20.
24     Q.   BY MR. BRUSTIN:  -- Exhibit 20.  Okay.
25  Let's -- let's -- let's take a look at page 135.

Page 342

1      A.   Okay.
2      Q.   At page -- okay.  Page 135, the first full
3  paragraph.
4      A.   Okay.
5      Q.   In the middle of the paragraph, you say, "I
6  continued to tell Roger that I was there to get the
7  truth, and Roger finally told me that he would tell me
8  everything I wanted to know."
9          MS. BERKE:  Which page is this on?
10         MR. BRUSTIN:  Page 135.
11     Q.   BY MR. BRUSTIN:  Do you see that where I'm
12  reading from, the middle of the first paragraph towards
13  the bottom.  You see it?
14         MS. BERKE:  I'm not seeing it.
15         THE WITNESS:  I don't see it.
16     Q.   BY MR. BRUSTIN:  So, let me get it for you.
17  Let me show it to you.  Give it back.
18     A.   Thank you.
19     Q.   Right here.  Okay?
20     A.   Okay.
21     Q.   I continued to tell Roger that I was there to
22  get the truth.  Do you see that?
23     A.   Yes.
24     Q.   All right.  And that's when he started to
25  spill.  Right?

Page 343

1          MS. BERKE:  Objection.  Vague.
2          THE WITNESS:  We started discussing it, yes.
3      Q.   BY MR. BRUSTIN:  Well, he started discussing
4  everything that had happened.  Correct?
5      A.   From his standpoint, yes.
6      Q.   Okay.  And he told you as you write in your
7  report that he's going to tell you everything you want to
8  know?
9      A.   Correct.
10     Q.   And as was your process for doing
11  interrogations, you let him talk.  Correct?
12     A.   Correct.
13     Q.   He admitted, for example, that Jim Styers shot
14  and killed Christopher Milke and that they left
15  Christopher Milke in the desert at 99th and Lomax.
16  Correct?
17     A.   In a wash, yes.
18     Q.   He told you that he knew where the body of the
19  child was.  Correct?
20     A.   Correct.
21     Q.   And he told you that Jim Styers shot the child
22  three times in the head.  Correct?
23     A.   Correct.
24     Q.   He told -- he was able to describe for you the
25  location where the body was, and he said he would take

Page 344

1  you there.  Correct?
2          MS. BERKE:  Can you point to where he said
3  shot him three times in the head?
4          MR. BRUSTIN:  No.
5      Q.   BY MR. BRUSTIN:  He told you that he would --
6  he told you he would describe the location, and he told
7  you he would take you there.  Correct?
8          MS. BERKE:  Armando, take your time to look
9  at the report, if you need to refresh your recollection.
10  Don't just assume that what he's telling you is in the
11  report.
12         MR. BRUSTIN:  If you think wasting time is
13  going to help you, it ain't.
14         MS. BERKE:  I'm not wasting any time.
15         MR. BRUSTIN:  I'll go back and get more
16  time.
17         MS. BERKE:  I'm not wasting any time.
18         MR. BRUSTIN:  Ain't gonna save you.
19         MS. RETTS:  Mark that, please.
20     Q.   BY MR. BRUSTIN:  Sir, listen to me, please.
21  Put it down.
22         MS. BERKE:  No, he doesn't have to put it
23  down.
24     Q.   BY MR. BRUSTIN:  Give it to me.  If you need a
25  document to refresh your recollection, ask me for it.  If

ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
345–348

Page 345

1 you could recall it on your own, I want you to tell me.
2 Do you understand?
3   A.   Yes.
4   Q.   Okay.  Now, do you recall Roger Scott telling
5 you that Chris Milke was killed with a .22 caliber
6 revolver?
7       MS. BERKE:  Objection.  Foundation.
8       THE WITNESS:  I would have to review that
9 document.
10   Q.   BY MR. BRUSTIN:  You don't remember that on
11 your own?
12   A.   No.
13   Q.   Okay.  Do you recall Chris -- do you recall
14 Roger Scott telling you all kinds of information about
15 what had happened during the shooting?
16       MS. BERKE:  Objection.  Vague.  Foundation.
17       THE WITNESS:  What kind of information?  He
18 told me what he thought was the truth about the case,
19 yes.
20   Q.   BY MR. BRUSTIN:  He told you generally --
21 you -- withdrawn.
22       He was telling you, at least you believed as
23 best as you could, what happened during the killing.
24 Correct?
25       MS. BERKE:  Objection.  Vague.  Foundation.

Page 346

1       THE WITNESS:  He told me everything -- I
2 believe that he told me everything as he knew it.
3   Q.   BY MR. BRUSTIN:  Okay.  Do you recall him
4 telling you that he didn't think that Jim Styers would do
5 it and that he had talked him out of it several times?
6 Do you recall that?
7       MS. BERKE:  Objection.  Foundation.
8       THE WITNESS:  Vaguely.
9   Q.   BY MR. BRUSTIN:  Okay.  Do you recall him
10 telling you that JS had told him -- Jim Styers had told
11 him that he never liked the kid but that he didn't think
12 Styers would go through with it?  Do you remember him
13 telling you that?
14   A.   Vaguely, yes.
15   Q.   Do you remember him telling you that they had
16 gone out together on several occasions to kill
17 Christopher Milke, but he had been able to talk Styers
18 out of it on previous occasions?
19   A.   I don't totally recall that, no.
20   Q.   Okay.  Take a look at page 135.
21   A.   This is the report you took away from me?
22   Q.   Yes, sir, that's your report.
23   A.   Okay.
24   Q.   Do you feel like I'm being unfair to you?
25   A.   Pardon me?

Page 347

1   Q.   Do you think I'm being unfair to you?
2   A.   I think you're trying to be a bully, but that's
3 okay.
4   Q.   Take a look at the end of the first paragraph.
5   A.   Okay.
6   Q.   "Roger then told me that he didn't think Jim
7 was going to do it and that he had talked him out of it
8 several times."  Your words.  Correct?
9   A.   That is correct.
10   Q.   All right.  That's what he told you.  Right?
11   A.   Correct.
12   Q.   And he also told you that after getting pizza,
13 they had driven to the location that they had preselected
14 for killing Christopher Milke.  Correct?
15       MS. BERKE:  Objection.  Foundation.
16       THE WITNESS:  I believe so.
17   Q.   BY MR. BRUSTIN:  And he also volunteered to you
18 information about the planning of the crime.  He told you
19 for -- and -- and -- withdraw.  Withdraw the question.
20       He told you that after the killing, Roger
21 Scott told you that he picked up Jim Styers, and Jim
22 Styers had told him that he had shot Christopher Milke
23 three times in the head.  Correct?
24       MS. BERKE:  Objection.  Misstates evidence.
25   Q.   BY MR. BRUSTIN:  Take a look at page --

Page 348

1   A.   I --
2   Q.   You can keep this for now.  I don't want you
3 looking unless you need it.  Take a look at page 136, end
4 of the first paragraph.
5   A.   End of the first paragraph.  Okay.
6   Q.   "He then picked up Jim, and Jim immediately
7 told him that he had shot Chris three times in the head."
8       Is that accurate?
9   A.   Yes.
10   Q.   Okay.  You understand that -- withdrawn.
11       That's what he told you?
12   A.   It's on the report, yes.
13   Q.   So that's what he told you.  Correct?
14   A.   That's correct.
15   Q.   Because you only write down what people tell
16 you on reports.  Correct?
17   A.   Yes.
18       MS. BERKE:  Objection.  Vague.
19   Q.   BY MR. BRUSTIN:  All right.  And he told you
20 after the killing, Styers and Scott went to the
21 Metrocenter for an alibi, that he talked about an alibi
22 with Jim Styers, and they went -- and he agreed to go
23 along with it.  Do you recall him telling you that
24 generally?
25   A.   Generally, yes.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
349–352

Page 349

1   Q.   Okay.  And do you recall him telling you that
2   Jim Styers previously had told him they were going to
3   leave the body near the road so that it could be found?
4   A.   I -- yeah, I believe I did remember that.
5   Q.   And he told you that Jim Styers gave him a gun
6   and that the gun was in the closet at his house?
7   A.   I believe that's true.
8   Q.   And he also gave you information about a
9   motive.  He told you that he only went with Jim Styers
10  because he needed $250 to file his Social Security case.
11  Do you recall that?
12  A.   Yeah, I do.
13  Q.   And he said that Christopher Milke, he learned
14  from Jim Styers, had a $5,000 life insurance policy.
15  Correct?
16  A.   I believe so.
17  Q.   And he said that Jim Styers promised to give
18  him $250 if he would help him with the murder.  Correct?
19  A.   I believe that's correct.
20  Q.   He also discussed his financial problems with
21  you.  Right?
22       MS. BERKE:  Objection.  Vague.
23       THE WITNESS:  He may have vaguely -- I
24  vaguely remember him telling me about his financial
25  situation but not discuss problems.

Page 350

1   Q.   BY MR. BRUSTIN:  Okay.  It was your belief at
2   the time that he was doing his best to tell you his
3   version of the truth as to what happened, motive,
4   planning, all of those things.  Right?
5   A.   To the best of his ability, I thought so, yes.
6   Q.   He didn't seem to be holding back in any way.
7   Correct?
8       MS. BERKE:  Objection.  Foundation.
9       THE WITNESS:  I wouldn't know that, but...
10  Q.   BY MR. BRUSTIN:  He seemed --
11  A.   He was there, and I wasn't.
12  Q.   Well, you -- you're a -- you're a good judge of
13  whether people are being honest with you.  Right?  You
14  already told us that.
15  A.   Yes.
16  Q.   Did he seem like he was trying to tell you
17  everything he could about the crime?
18  A.   Yes, but I can't positively say that he did
19  because I'm not him, you know.
20  Q.   All right.
21  A.   I just -- that's why I say that he told me the
22  truth as he knew it or wanted to let me know.
23  Q.   Okay.  And he didn't seem to be holding
24  anything back.  Right?
25       MS. BERKE:  Objection.  Foundation.

Page 351

1       THE WITNESS:  I don't think it was.  I don't
2   think he was, but I wouldn't know, you know.
3   Q.   BY MR. BRUSTIN:  Okay.  And you didn't even
4   have to ask him any follow-up questions.  It was mostly
5   just him talking?
6   A.   I would say that's generally correct.
7   Q.   All right.  Now, as you've testified to
8   previously, there was no mention of Debra Milke in any
9   way during the interview with Roger Scott at the
10  precinct.  Correct?
11  A.   At the precinct, that is correct.
12  Q.   The first mention of Debra Milke's involvement
13  was a comment in the car on the way to the murder scene.
14  Correct?
15  A.   Yes, yes.
16  Q.   And as you testified, while riding in the car,
17  Scott made an offhand statement that Debra Milke was
18  involved in the crime.  Correct?
19       MS. BERKE:  Objection.  Vague.
20       THE WITNESS:  I don't know whether I phrased
21  it that way, but --
22  Q.   BY MR. BRUSTIN:  Sound about right?
23  A.   -- generally, yeah.
24  Q.   Okay.  And you also testified that Roger Scott
25  insisted on talking to you during the drive to the crime

Page 352

1   scene.  Correct?
2       MS. BERKE:  Objection.  Misstates evidence.
3       THE WITNESS:  I think I vaguely remember
4   that he -- of his insistence, yeah.
5   Q.   BY MR. BRUSTIN:  He asked you in general if he
6   could continue telling you what happened, and you said,
7   Fine, you're more than welcome.
8       Does that sound about right?
9   A.   Yeah, I believe so.
10  Q.   And it was on the way to the crime scene when
11  he -- when he gave you information about Debra Milke's
12  involvement.  Correct?
13  A.   Yeah.  The continuation of the interview, yes.
14  Q.   Okay.  And that's the only time you ever spoke
15  to Roger Scott about Debra Milke's involvement, the only
16  time you were present for it.  Correct?
17  A.   Yes.
18  Q.   Is on the way to the crime scene.  Correct?
19  A.   I believe so, yes.
20  Q.   All right.  Now, can you explain why during the
21  period of time -- withdrawn.
22       How long would you say you were speaking to
23  Roger Scott -- withdrawn.
24       Would it be fair to say that it was
25  approximately an hour that you let Roger Scott tell you



Page 353

1  about what happened in terms of the crime?
2        MS. BERKE:  Objection.  Vague.
3        THE WITNESS:  Again, I -- I refer to my last
4  statement.  In regards to time --
5     Q.   BY MR. BRUSTIN:  You don't remember?
6     A.   I don't remember.
7     Q.   All right.  But certainly you gave -- you gave
8  him enough time to tell you what he think -- he thought
9  was important?  He wanted to tell you what his version of
10  the truth, as you say.
11    A.   Yeah.
12    Q.   Is that correct?
13    A.   I believe that I gave him time to just talk to
14  me of what I wrote.
15    Q.   Okay.  Now, can you explain why during this
16  period where Roger Scott was unburdening himself to you
17  he made no mention of Debra Milke's involvement as the
18  architect of the murder?
19        MS. BERKE:  Objection.  Vague.
20        MS. BURGESS:  Foundation.
21        MS. BERKE:  Argumentative.
22        THE WITNESS:  Do I know why?  No.
23    Q.   BY MR. BRUSTIN:  Yeah.  Any explanation why he
24  would leave something like that out?
25        MS. BERKE:  Objection.  Misstates evidence.

Page 354

1        MS. RETTS:  Leading.
2        THE WITNESS:  I have no reason to believe
3  that other than he just didn't want to tell me then.
4     Q.   BY MR. BRUSTIN:  Okay.  But you believed he was
5  being truthful with you.  You think he was trying to
6  protect Debra Milke?
7     A.   I don't know.
8     Q.   Do you think he forgot that Debra Milke was the
9  person who planned the entire crime?
10        MS. RETTS:  Foundation.
11        THE WITNESS:  I doubt that, but I don't
12  know.
13    Q.   BY MR. BRUSTIN:  Okay.  Did you ever ask him
14  that, why he never mentioned Debra Milke the first
15  time --
16    A.   No.
17    Q.   -- he told you what happened during the crime?
18    A.   No.
19    Q.   Did you come to learn during the course of your
20  investigation that Debra Milke and Roger Scott did not
21  know each other very well?
22        MS. BERKE:  Objection.  Foundation.  Vague.
23        THE WITNESS:  I vaguely remember that she --
24  that he had said that his friend was Jim and not Debra.
25    Q.   BY MR. BRUSTIN:  Okay.  And do you remember --

Page 355

1  do you recall coming to learn during the course of your
2  investigation that Roger Scott and Debra Milke didn't
3  really like each other very much?
4        MS. BERKE:  Objection.  Foundation.
5        THE WITNESS:  I don't recall that.
6     Q.   BY MR. BRUSTIN:  Do you recall during the
7  course of your investigation that Roger Scott and Jim
8  Styers were very close friends?
9     A.   Well, I -- I said that before, yes.
10    Q.   Okay.  And you understood that Roger Scott
11  through your investigation didn't have many friends.
12  Right?
13        MS. BERKE:  Objection.  Foundation.
14        THE WITNESS:  I don't think I made an
15  investigation into that.
16    Q.   BY MR. BRUSTIN:  Okay.  Do you think it odd --
17  withdrawn.
18        You've already told us you didn't notice
19  anything odd about Roger Scott.  Correct?
20    A.   I don't think he was an odd person, no.
21    Q.   You didn't notice any psych issues or anything
22  like that?
23        MS. RETTS:  Foundation.
24        MS. BERKE:  Join.
25        MS. ODEGARD:  Join.

Page 356

1        THE WITNESS:  If I had, I would have put it
2  in the report.
3     Q.   BY MR. BRUSTIN:  Okay.  And, obviously, you're
4  trained to look for those kinds of things, whether you're
5  dealing with someone who may have some cognitive issues
6  or some psychiatric issues.  Right?
7        MS. RETTS:  Foundation.
8        MS. BERKE:  Join.
9        THE WITNESS:  Training -- I don't know
10  whether we got training, but my experience would tell me
11  that.
12    Q.   BY MR. BRUSTIN:  Okay.  And nothing in your
13  experience told you that maybe there's something wrong
14  with Roger Scott?
15    A.   Other than my belief that he killed the child?
16    Q.   Yeah.
17    A.   No.
18    Q.   Did it seem odd to you that he was telling you
19  that he killed the child for $250?
20    A.   No.
21    Q.   That didn't seem odd to you?
22    A.   Well, people kill each other for no money.
23  So I mean --
24    Q.   Do people typically kill four-year-old kids for
25  no money?



Exhibit 1

Page 357

1   A.   I'm sure they do.
2        MS. RETTS:  Foundation.
3        MS. ODEGARD:  Join.
4   Q.   BY MR. BRUSTIN:  Never struck you as odd?
5   A.   No.
6   Q.   Never struck you that something was off with
7   this person?
8        MS. RETTS:  Foundation.
9        THE WITNESS:  He instructed me he needed
10  $250 to file for Social Security, and that was what he
11  told me.
12  Q.   BY MR. BRUSTIN:  All right.  Now, during
13  Debra's interrogation, she admitted to you that she was
14  involved at every stage of planning this crime.  Correct?
15       MS. BERKE:  Objection.  Vague.
16       THE WITNESS:  Debra told me that she was
17  involved in every stage?  No, she didn't tell me that.
18  Q.   BY MR. BRUSTIN:  You don't remember going
19  through that last time in your deposition, that you swore
20  that she had made numerous admissions about planning
21  meetings and going to -- going to the scene where they
22  had failed attempts.  Do you remember all those?
23  A.   I remember some of it, yes.
24  Q.   Okay.
25  A.   Vaguely.

Page 358

1   Q.   It was -- you testified that, according to
2   Debra Milke, the murder was her idea.  Correct?
3   A.   I believe so.
4   Q.   And she testified and you testified that,
5   according to her, she had had multiple conversations with
6   Roger Scott about killing her child.  Correct?
7        MS. RETTS:  Form.
8        THE WITNESS:  I don't recall that.
9   Q.   BY MR. BRUSTIN:  Don't recall that?
10       And no explanation why Roger Scott would
11  turn on his best friend, Jim Styers, and make no mention
12  of Debra Milke?
13       MS. BERKE:  Objection.  Misstates evidence.
14       THE WITNESS:  I've already answered that
15  question.  I don't know.
16       MR. BRUSTIN:  All right.  We need to take a
17  five-minute break.
18       THE WITNESS:  Okay.
19       THE VIDEOGRAPHER:  This ends media No. 1.
20  We're off the record at 11:19 a.m.
21       (A recess was held off the record.)
22       THE VIDEOGRAPHER:  One moment.  This begins
23  media No. 2, volume 2, to the video-recorded deposition
24  of Armando Saldate.  We are back on the record at
25  11:31 a.m.

Page 359

1   Q.   BY MR. BRUSTIN:  Mr. Saldate, I think you told
2   us just a few minutes ago, you interviewed Roger Scott
3   first in the precinct and then a second short interview
4   where he mentioned Debra Milke in the car on the way to
5   the murder scene.  Correct?
6        MS. BERKE:  Objection.  Misstates evidence.
7        THE WITNESS:  Well, it was really
8   continuing.
9   Q.   BY MR. BRUSTIN:  Continuing, okay.  But you
10  were careful in your report to make clear what Roger
11  Scott told you in the precinct and what Roger Scott told
12  you in the car.  Correct?
13  A.   Yes, I distinguished them.
14  Q.   It was important for you to document what he
15  said, when he said it and where he said it.  Correct?
16  A.   That's usually my responsibility.
17  Q.   And you did your best to do that?
18  A.   I tried to, yes.
19  Q.   You obviously knew you had to document any
20  meetings that you had with Roger Scott.  Correct?
21  A.   Any conversations that I had that I considered
22  interviews, yes.
23  Q.   Okay.  Any time where you were talking about
24  the substance of the case.  Correct?
25  A.   That's correct.

Page 360

1   Q.   And you deny -- withdrawn.
2        According to you, the first mention of Debra
3   Milke was volunteered by Roger Scott.  In other words,
4   you never suggested to him that Debra Milke was involved.
5   Correct?
6   A.   That is correct.
7   Q.   And you deny suggesting to Roger Scott that
8   Debra Milke was involved.  Correct?
9   A.   That's absolutely correct.
10  Q.   It came from his mouth on his own?
11  A.   That is correct.
12  Q.   All right.  I want to show you what's been
13  marked for identification previously as Exhibit 9.
14       MS. BERKE:  Did you say in this deposition?
15       MR. BRUSTIN:  No, I'm sorry.  This was
16  marked yesterday -- no, it was marked before that.
17       MS. BERKE:  It was marked yesterday.
18  Q.   BY MR. BRUSTIN:  Marked yesterday as Exhibit 9.
19       Now, obviously, you've had a chance to
20  review this document in preparation for your deposition.
21  Correct?
22  A.   No, I have not.
23  Q.   Okay.  So what I'd like you to do -- it's
24  short.  It's two pages.  I'd like you to read it to
25  yourself.  Okay?  Let me know when you're done.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
361–364

Page 361

1    A.    Okay.
2    Q.    You had a chance to read it?
3    A.    Yes.
4    Q.    When is the last time you saw this document?
5    A.    I would say '73.
6    Q.    Okay.  You haven't seen it since then?
7    A.    No.
8    Q.    This was the incident you were referring to
9 earlier today, though.  Correct?
10    A.    Yeah, this was an incident I was recurring -- I
11 was recalling, yes.
12    Q.    You -- this is the incident you volunteered
13 earlier today.  Correct?
14    A.    Yes.
15    Q.    Okay.  Now, just I want to talk about timing
16 first.  Okay?
17        Am I -- am I reading this accurately, that
18 you were -- you received your suspension in -- on
19 September 5th, 1973?
20    A.    That's what it says, yes.
21    Q.    Right.  The fall of 1973?
22    A.    Okay.
23    Q.    Regarding an incident that occurred a few weeks
24 before that.  Right?
25    A.    Correct.

Page 362

1    Q.    All right.  And so in late 1973?
2        MS. BERKE:  Objection.
3        THE WITNESS:  Correct.
4        MS. BERKE:  Misstates evidence.
5    Q.    BY MR. BRUSTIN:  And am I correct, sir, that it
6 was approximately a year and change later when you
7 received your special detail in 1975?
8        MS. BERKE:  Objection.  Vague.
9        THE WITNESS:  Special detail?
10    Q.    BY MR. BRUSTIN:  Sure.  You got a promotion
11 where you had an undercover assignment.  Is that right?
12        MS. RETTS:  Form.
13        THE WITNESS:  Oh, I believe so, yeah.
14    Q.    BY MR. BRUSTIN:  That was --
15    A.    I don't know the time and date but...
16    Q.    Well, you were part of a small undercover team.
17 You were handpicked.  Right?
18    A.    That's correct.
19        MS. RETTS:  Foundation.
20    Q.    BY MR. BRUSTIN:  That was 19- -- that was in
21 early 1975?
22    A.    Yes, by the chief, yes.
23    Q.    You were picked by the chief to be in that
24 special unit.  Correct?
25        MS. RETTS:  Form.

Page 363

1        THE WITNESS:  Correct.
2    Q.    BY MR. BRUSTIN:  And that was early 1975.
3 Correct?
4    A.    Again, I don't want to argue with dates.  It's
5 just that, you know, I don't recall the dates.
6    Q.    Sure.  You became a detective when, later in
7 1975.  Correct?
8    A.    Boy, I don't remember, but it was sometime
9 there.
10    Q.    You testified in your deposition -- last
11 deposition that it was 1975.  Does that refresh your
12 recollection?
13    A.    No --
14    Q.    Sound about right?
15    A.    I'll -- you know, sounds about right.
16    Q.    Okay.  So within a year and a half of this
17 incident, you had received a special detail by the chief.
18 Correct?
19        MS. BERKE:  Objection.  Vague.
20        THE WITNESS:  That's not the detail I'm
21 referring to.  I don't remember it.  1975?
22    Q.    BY MR. BRUSTIN:  You testified you got a
23 special detail in 1975.  You were part of a small
24 undercover team that was handpicked for high-crime areas.
25    A.    Again, I don't refer -- I don't remember the

Page 364

1 time, but, yeah, that is true.
2    Q.    Okay.  So within about a year and a half, you
3 were handpicked by the chief for that unit.  Correct?
4        MS. RETTS:  Form.
5        THE WITNESS:  Yes.
6    Q.    BY MR. BRUSTIN:  And soon after that you became
7 a detective.  Right?
8        MS. BERKE:  Objection.  Vague.
9        THE WITNESS:  (No oral response.)
10    Q.    BY MR. BRUSTIN:  Is that correct, sir?
11    A.    I did become a detective in '75.
12    Q.    Okay.
13    A.    But -- I think anyway.
14    Q.    And the handpicked detail was sometime before
15 that.  Correct?
16        MS. RETTS:  Form.
17        THE WITNESS:  The detail I'm speaking about
18 I think was after that because I was already a detective
19 and --
20        MS. BERKE:  Yeah, you're misrepresenting
21 what his deposition testimony was.
22        MR. BRUSTIN:  Do you have it?
23        MS. BERKE:  I do.
24        MR. BRUSTIN:  What does it say?
25        MS. BERKE:  It says he was on patrol for



ARMANDO SALDATE Volume II                    June 22, 2017
MILKE vs CITY OF PHOENIX                           365–368

Page 365
1   five years.
2           MR. BRUSTIN:  Look at page 19.
3           MS. BERKE:  So -- that's what I'm looking
4   at.  "How long were you on patrol?
5           "Five years maybe.
6           "Okay.
7           "Five to six years.
8           "So we're at about 1974."
9           He says, "'75."
10          In '75, he became a detective.
11          MR. BRUSTIN:  What does it say about that
12  small handpicked detail?
13  Q.   BY MR. BRUSTIN:  There it is.  Okay.  Take a
14  look at page -- on page 19 of your deposition, you're
15  asked, "How long were you on patrol?
16          "Five years maybe.
17          "Question:  Okay.
18          "Five to six years.
19          "Question:  So we're at about 1974?
20          "Answer:  1975.
21          "Question:  Any undercover work during those
22  five years?
23          "Answer:  Very small.
24          "Question:  What were you doing?
25          "We were in a team that was set up by the

Page 366
1   chief of police.  He handpicked six people to be -- to
2   just -- to go to areas where crime is being done and try
3   to suppress it.
4           "Question:  Okay.  And what is your
5   understanding as to why you were handpicked for that
6   assignment?  It sounds like a plum job.
7           "It wasn't a plum job.  It was a job that
8   the chief picked me, but I wouldn't know why."
9           Now, was that a job -- that was a job before
10  you became a detective.  Correct?
11  A.   No.
12  Q.   You think you were already a detective?
13  A.   I misspoke -- I misspoke then because I was
14  picked from the robbery detail to be in this -- in
15  this --
16  Q.   My only question is whether or not you were a
17  detective by the time you had that detail?  That's my
18  only question.  It sounds like you don't know one way or
19  the other.
20          MS. BERKE:  Objection.  Misstates testimony.
21          THE WITNESS:  I do know.  I was a detective
22  in robbery detail.
23  Q.   BY MR. BRUSTIN:  Okay.  So do you remember what
24  year that was?
25  A.   It had to have been -- dates to me are really

Page 367
1   hard.
2   Q.   If you don't remember, that's fine.
3   A.   In the '80s.
4   Q.   Okay.
5   A.   Early '80s.
6   Q.   Fair enough.  On page 20, I asked you, "What
7   happened in 1975?"  Your answer was, "I became a
8   detective."
9   A.   That is correct.
10  Q.   And you said it was based on your evaluations?
11  A.   Yes.
12  Q.   Do you remember if it was early in 1975 or late
13  in 1975?
14  A.   I don't remember.
15  Q.   Okay.
16  A.   I'm sorry.
17  Q.   So within two years of this incident, you were
18  made a detective.  Correct?
19  A.   Of the incident here you gave me?
20  Q.   Yes.
21  A.   Yes.
22  Q.   All right.  Did anybody raise this incident
23  with you in connection with your becoming a detective?
24  A.   I was in a sergeant's interview, and they
25  raised it during that time, and I -- and of course my

Page 368
1   wife would raise it every once in awhile first couple of
2   years, but other than that, no.
3   Q.   I'm sorry.  You were interviewing to become a
4   sergeant?
5   A.   I had taken a test because my partner -- at
6   that time, we were riding together in patrol, and he had
7   taken a test, and I was giving him just the questions and
8   back and forth.  I never did study for it, but I
9   ultimately passed it.  So I had to go to the interview,
10  and that's where it occurred.
11  Q.   Okay.  And what year was that?  I assume --
12  A.   I was in uniform.  So it had to have been
13  before '75.
14  Q.   Before '75.  So somewhere between September of
15  1973 and 1975 when you became a detective?
16  A.   That's correct.
17  Q.   All right.  And during that interview, you were
18  asked about this incident.  What did they say to you, and
19  what did you say to them?
20  A.   I told them I didn't want to talk about it.
21  Q.   Okay.  They asked you what -- they asked you
22  what happened?
23  A.   Yes.
24  Q.   And you wouldn't talk about it?
25  A.   I told them I didn't want to talk about it.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
369–372

Page 369

1    Q.   All right.  And then what happened?
2    A.   They kicked me out of the interview.
3    Q.   So -- is that -- is that your understanding as
4  to the reason why you weren't made a sergeant?
5    A.   I didn't want to become a sergeant.  I -- I
6  just took the test because my buddy was going to take the
7  test, and I quizzed him, and then we were going to go
8  drinking afterwards.  So...
9    Q.   Who was your buddy?
10   A.   John Riley.
11   Q.   Do you still keep in touch with John Riley?
12   A.   I haven't talked to him in years.
13   Q.   Was John Riley your partner in August of 1973?
14   A.   We weren't partners then.  We just -- I call
15 him partner because we took the academy test together --
16 I mean, the police test together.  We just -- we went to
17 the academy together and became friends.
18   Q.   You described -- I thought you just described
19 driving with him and going over questions?
20   A.   No, sergeant's questions.  When we did -- came
21 up -- the sergeant would assign us duties, and I would --
22 I would give him -- study the questions with him after --
23 after work, when we got to the briefing station, and if
24 we were able to ride together like on the wagon, then
25 he -- I would ask him questions then.

Page 370

1    Q.   Okay.  And so you took the test.  You passed
2  it?
3    A.   Uh-huh.
4    Q.   For sergeant.  Right?
5    A.   Yes.
6    Q.   And then you went to an interview --
7    A.   Yes.
8    Q.   -- which is the second step in becoming a
9  sergeant.  Is that right?
10   A.   I don't know what step it is, but, yeah.
11   Q.   Okay.
12   A.   It's after the test.
13   Q.   Okay.  And during the interview, did you tell
14 them you didn't want to be a sergeant?
15   A.   I think that was probably obvious to them when
16 I said I would not discuss that.
17   Q.   Okay.  And is it your understanding that the
18 reason you didn't become a sergeant, whether you wanted
19 to or not -- withdrawn.
20        Is it your understanding that the reason you
21 weren't offered the sergeant position is because you
22 wouldn't answer questions about the 1983 incident?
23        MS. BERKE:  Objection.
24   Q.   BY MR. BRUSTIN:  1973 incident?
25   A.   No, it was because I was number 70-something in

Page 371

1  the sergeant's test, and they only made 52 positions that
2  year, and --
3    Q.   So it's your --
4    A.   -- they -- they kicked me out, but they
5  realized later or as I was told anyway -- I don't know if
6  that's true or not -- that they couldn't really kick me
7  out.  They should have -- they should have continued with
8  the interview and, therefore, gave me the minimum passing
9  interview score, and then I ended up 72 -- I think they
10 had like 200-some people pass it.
11   Q.   Okay.  So your understanding was that you
12 actually passed the interview despite refusing to answer
13 questions about this incident.  Correct?
14   A.   Yes.
15   Q.   And who told you that?
16   A.   My supervisor.
17   Q.   Who was your supervisor that told you that?
18   A.   I think it was Ted McCreary at that time.
19   Q.   Ted McCreary?
20   A.   McCreary.
21   Q.   Okay.  Two Cs?
22   A.   M-c capital C-r-e-a-r-y.
23   Q.   He was a sergeant?
24   A.   He was a sergeant at that time, yes.
25   Q.   Okay.  But your understanding was that, despite

Page 372

1  refusing to answer questions, you passed that interview.
2  The only reason you didn't become a sergeant was because
3  you were too low on the list?
4    A.   Yeah, or too high, I mean.
5    Q.   Too high on the list.  Okay.
6        Other than that time, did anyone else ever
7  mention the 1973 incident, any other supervisors?
8    A.   No, I don't think so.
9    Q.   Okay.
10   A.   I maybe -- when I went to -- when I was told I
11 was going to go to homicide and then didn't for several
12 occasions -- on several occasions, one of the
13 sergeants -- and I don't recall whether it was Bryant or
14 not -- told me that he wanted to talk to me.  He said
15 that, You know, part of it was, you know, your recent
16 actions, your recent suspension and stuff like that.
17        And I said, No problem.
18        So -- and then it took me, oh, four or five
19 years to finally get accepted.
20   Q.   Into homicide?
21   A.   Yeah.
22   Q.   And you believe that the delay in becoming a
23 homicide detective had something to do with the 1973
24 incident?
25   A.   It was told to me, yes.



Page 373

1    Q.    Okay.  What was told to you?

2    A.    Like I said before, that I would not make -- I

3    would not be assigned to homicide because of my

4    suspension.

5    Q.    Okay.  But you were made a detective?

6    A.    We're talking two different times, yeah, but I

7    was made a detective in '75.

8    Q.    Okay.  At the time you were made a detective,

9    did anybody ask you about the 1973 incident?

10    A.    Sergeant Brady did who ended up being my

11    sergeant.

12    Q.    Okay.

13    A.    And --

14    Q.    Was that during the interview for detective?

15          MS. BERKE:  I don't think he was done

16    answering your question.

17          THE WITNESS:  And he -- he asked to talk to

18    me before I joined -- became a detective, and he said

19    that all he wanted to know was the report of my

20    suspension correct and had I read it, and I said, Well,

21    when I was suspended.  And he says, Do you have any

22    objections to it?  And I said, No.  And he said fine.

23          And then later on, several months later, I

24    was -- I was told that I would be a detective in his

25    squad.

Page 374

1    Q.    BY MR. BRUSTIN:  Okay.  So he asked you if

2    everything in the report was accurate, and you said it

3    was?

4    A.    Yes.

5    Q.    And he didn't ask you any more questions about

6    what happened?

7    A.    No.

8    Q.    Okay.  And had you already been promoted to

9    detective at that point, or was -- was it pending?

10          MS. BERKE:  Objection.  Misstates evidence.

11          THE WITNESS:  No, it was pending.

12    Q.    BY MR. BRUSTIN:  Okay.  And so the only

13    question you were asked in connection with whether or

14    not -- withdrawn.

15          The only question you were asked in regard

16    to becoming -- withdrawn again.

17          The only question you were asked about the

18    1973 incident in regard to your becoming a detective was

19    whether or not the memo, Plaintiff's 9, was accurate.

20    Correct?

21    A.    And whether it happened and I said it did, and

22    then he said, Was it accurate?  Was their investigation

23    accurate?  And I said, Yes.

24    Q.    That's the sum total of what you were asked and

25    what you told them before you became a detective?

Page 375

1    A.    Correct.

2    Q.    Okay.  Any other times -- and then Sergeant

3    Brady brought it up in connection later on with your

4    application to go to homicide.  Correct?

5    A.    No.

6    Q.    Sergeant --

7    A.    Bryant.

8    Q.    It's Bryant.

9    A.    Bryant brought it up very casually, that it's

10    probably because of my suspension that has not -- recent

11    suspension -- I think that's the way he put it -- and why

12    I wasn't selected.

13    Q.    Bryant is the one who talked to you about

14    homicide.  Right?

15    A.    Yes.

16    Q.    Okay.  And when did you first seek to be a

17    homicide detective?

18    A.    You don't really seek to become a homicide

19    detective.  You were chosen, and you're chosen by -- by

20    your abilities, your -- you know, how you've handled

21    things and...

22    Q.    When did you speak to Bryant, what year

23    approximately?

24    A.    I think it was probably '81 or '82 that we

25    first -- that he first indicated -- because we had worked

Page 376

1    robbery together as detectives, and he first indicated

2    that -- that if I was interested.

3          MS. BERKE:  Can you put your hand down?

4          THE WITNESS:  I'm sorry.

5    Q.    BY MR. BRUSTIN:  All right.  And you became a

6    homicide detective in 1985.  Correct?

7    A.    '85, yes.

8    Q.    All right.  So you believe that your promotion

9    to homicide detective was held up as a result of that

10    incident?

11    A.    I believe that it was held up that one time,

12    first time, because of that incident.  I was told that

13    directly.

14    Q.    Okay.

15    A.    After that, he would always have meetings with

16    people that had been told that they were up for it and

17    that didn't make it, and he would ask me to come down,

18    and so he could explain, and I told him, Nah, that's all

19    right.  I don't need your explanation.  I'll just -- I'll

20    go when I'm asked to go, and I don't need your

21    explanation why.  So I -- we never talked about it again.

22    Q.    Okay.  Do you have any understanding from any

23    source as to why -- why you became a homicide detective

24    despite the 1973 incident?  What changed, if anything, to

25    your knowledge?



Page 377

1    MS. BERKE: Objection. Foundation.

2    THE WITNESS: I don't think anything

3  changed.

4    Q.   BY MR. BRUSTIN: Okay. Any other discussions

5  with anybody in the department about the 1973 incident?

6    A.   No. Well, I mean, internal affairs, those

7  people.

8    Q.   During the course of the investigation?

9    A.   Yeah, during the course of the investigation.

10    Q.   Okay. We're going to get to that right now,

11  but after that time, after the suspension, any other

12  conversations about it?

13    A.   With who?

14    Q.   Anybody in the world.

15    A.   My wife.

16    Q.   Anybody else?

17    A.   No.

18    Q.   All right.

19    A.   I don't know everybody in the world, but, no.

20    Q.   Okay. Now, you received a five-day suspension,

21  five days off -- off duty. Is that correct?

22    A.   Nonpaid, yes.

23    Q.   Okay.

24    MS. BERKE: Can you move your hands from

25  your mouth?

Page 378

1    Q.   BY MR. BRUSTIN: And did you have any economic

2  ramifications as a result of being suspended?

3    A.   You don't have any money, yes. I had young

4  kids.

5    Q.   Anything else?

6    A.   Yeah, financially I could have used that money.

7    Q.   Okay. How much did it add up to about, five

8  days of pay?

9    A.   I don't know. Back then, I don't know.

10    Q.   Few hundred bucks?

11    MS. BERKE: Objection. Foundation.

12    THE WITNESS: I don't remember.

13    Q.   BY MR. BRUSTIN: Okay. Less than a thousand.

14  Fair to say?

15    MS. BERKE: Objection. Foundation.

16    THE WITNESS: I wouldn't know.

17    Q.   BY MR. BRUSTIN: All right. Any other

18  penalties other than the five-day suspension?

19    MS. BERKE: Objection. Vague.

20    THE WITNESS: Not that I have any knowledge

21  of.

22    Q.   BY MR. BRUSTIN: Did you receive any additional

23  supervision as a result of the incident?

24    A.   No. I mean, I knew several sergeants and

25  several -- the lieutenant that -- at Ed Snouts. I knew

Page 379

1  him very well, and I don't really recall. But I mean,

2  they would have been in a position to tell me don't do it

3  again, don't be -- you know, watch yourself, whatever.

4  But I don't really recall that occurring, but they would

5  have been in a position to tell me that.

6    Q.   You don't remember it happening?

7    A.   No, I don't remember it happening.

8    Q.   Who was your sergeant at the time the incident

9  occurred?

10    A.   Sergeant -- I don't remember.

11    Q.   All right. Fair to say that whoever your

12  sergeant was at the time, you don't recall that sergeant

13  doing anything differently with you regarding supervision

14  after the incident?

15    MS. RETTS: Form.

16    MS. ODEGARD: Join.

17    THE WITNESS: No, I think the internal

18  affairs was clear in saying that my -- my discipline was

19  five days.

20    Q.   BY MR. BRUSTIN: It says on the second page the

21  suspension was initiated by your supervisor, Sergeant

22  Roberts?

23    A.   That was not my supervisor. He was -- Sergeant

24  Roberts heard -- heard the complaint and then asked me

25  about the complaint because my supervisor was on

Page 380

1  vacation. I just can't remember who it was.

2    Q.   Okay. Was Lieutenant Snouts your lieutenant?

3    A.   Yes.

4    Q.   Okay. Any additional supervision from

5  Lieutenant Snouts as a result of this, to your knowledge?

6    A.   Like I said, he was in a position because we

7  were good friends to have, you know, given me some --

8  some, you know -- may have said something to me, but I

9  just don't recall.

10    Q.   Lieutenant Snouts was a good friend of yours?

11    A.   Yes.

12    Q.   At the time?

13    A.   At the time, yes. I haven't seen him in a

14  long, long time, but I'm sure we'd still be friends.

15    Q.   Okay. Someone you socialized with, had a few

16  drinks with every once in awhile?

17    A.   Sure.

18    Q.   Okay. Do you know if Lieutenant Snouts did

19  anything on your behalf to -- in terms of what discipline

20  you received for this incident?

21    A.   No.

22    MS. RETTS: Form.

23    Q.   BY MR. BRUSTIN: Okay. But at the time, he was

24  a good buddy?

25    A.   At the time, he was a friend of mine, yes.

ARMANDO SALDATE Volume II                                    June 22, 2017
MILKE vs CITY OF PHOENIX                                          381–384

Page 381

1    Q.    Was he one of your best friends on the force?
2    A.    No, no.  But he was a lieutenant; I was a
3    patrolman.  We got along very well and drank some beers
4    together, and I think him and his girlfriend visited with
5    me and my wife at one time or another for dinner or
6    something but...
7    Q.    Okay.  And at the time this incident occurred,
8    how old were you in 1973?
9    A.    Twenty-three, I guess.  No, wait a minute.  No.
10   Q.    When were you born?
11   A.    1949.  January 1949.
12   Q.    So you were 24?
13   A.    Twenty-three, 24.
14   Q.    Okay.  And how long had you been on the force?
15   A.    When I got out in -- I was made police officer
16   in January of 1970.  I had gone to academy, though,
17   before that.
18   Q.    Okay.  So three years on?
19   A.    Yeah, as a police officer, yes.
20   Q.    Okay.  And in 1973 at the time of this
21   incident, what were you driving?
22   A.    Car?
23   Q.    Yeah.  What kind of -- what kind of police car?
24   A.    I don't know.
25   Q.    Marked police car?

Page 382

1    A.    Marked police car.
2    Q.    Okay.  And did you have a partner at the time?
3    A.    No, we didn't have partners as uniform.  We
4    rarely have partners.
5    Q.    You were patrolling on your own?
6    A.    Yes.
7    Q.    At the time, would you -- can you estimate what
8    percentage of your duties were traffic violations?
9    A.    It was 50/50, really.
10   Q.    Okay.  And what's the name of the woman who
11   made this complaint?
12   A.    I don't know.
13         MS. BERKE:  Objection.
14   Q.    BY MR. BRUSTIN:  You don't remember --
15         MS. BERKE:  Assumes facts not in evidence.
16   Q.    BY MR. BRUSTIN:  You don't remember first or
17   last name?
18   A.    No.
19   Q.    No idea?
20   A.    No idea.
21   Q.    Approximately how old was she?
22   A.    I don't know that.
23   Q.    Well, do you -- do you think she was 70 or 30,
24   closer to which one?
25   A.    I would say closer to -- a little older than me

Page 383

1    maybe.
2    Q.    Okay.  She was young?
3    A.    I don't know.  You just asked me to say that.
4    So...
5    Q.    Okay.  And what did she look like?
6    A.    I don't really recall now.
7    Q.    Okay.  Did you find her attractive?
8    A.    I must have, but I don't remember.
9    Q.    Remember what color hair she had?
10   A.    No.
11   Q.    Okay.
12   A.    She was Mexican.  So I assume brown.
13   Q.    She was Mexican?
14   A.    Yep.
15   Q.    Did she speak Spanish?
16   A.    I don't know.  I don't think so.  We never
17   discussed that part I don't think.  I don't remember
18   discussing that.
19   Q.    What kind of -- what kind of car was she
20   driving?
21   A.    I don't remember.
22   Q.    You stopped her because she had a faulty
23   taillight.  Correct?
24   A.    That's what the report says.
25   Q.    Okay.  Explain how the stop occurred.  Where

Page 384

1    were you when you saw her?
2    A.    I don't remember.
3    Q.    Okay.  Would it be fair to say that you must
4    have been parked and saw her pass by?
5    A.    I could have been behind her.  I could have
6    been parked.  I don't remember.  I don't know.
7    Q.    All right.  Do you recall whether or not you
8    saw the woman before you pulled her over and what she
9    looked like?
10   A.    No.
11   Q.    No -- no -- no idea whether you did or didn't?
12   A.    No.
13   Q.    Okay.  Now, by the way, back in 1973, were you
14   also careful about following the rules and regulations of
15   the department?
16   A.    Obviously not.
17   Q.    Other than this incident, were you careful
18   about following the rules and regulations of the
19   department?
20   A.    I think I was.
21   Q.    Okay.  In other words, you were very careful
22   about enforcing traffic rules as required by the
23   department?
24   A.    That was my responsibility, yes.
25   Q.    All right.  For example, let me ask you this:

ARMANDO SALDATE Volume II                                    June 22, 2017
MILKE vs CITY OF PHOENIX                                     385–388

Page 385

1  Did you have discretion whether or not to give somebody a
2  ticket for a faulty taillight?
3      A.   Absolutely.
4      Q.   Okay.  You didn't have to do it.  Right?
5      A.   We had repair orders.
6      Q.   Okay.  And you didn't have to pull somebody
7  over for a faulty headlight.  Right?  You had discretion
8  whether or not to do that?
9      A.   I believe so.
10     Q.   Whereas, other violations, like if somebody's
11 driving 90 miles an hour, you don't have discretion.  You
12 have to pull them over.  Correct?
13     A.   If --
14     Q.   Withdraw the question.
15     A.   Okay.
16     Q.   If somebody is driving recklessly, you don't
17 have discretion.  You have to pull them over.  Correct?
18     A.   Well, you have to do some enforcement action,
19 but, you know, you may try to pull them over.  You may
20 try to do a lot of things, but that's -- that's one of
21 the things you would try to do, yeah.
22     Q.   Okay.  Your intention when you pulled this
23 woman over was to -- withdrawn.
24          You pulled her over, and what happened next?
25     A.   Just what the report says.  I don't remember

Page 386

1  independently.
2      Q.   All right.
3      A.   It's 40-some years ago.  You know that.
4      Q.   Well, we're going to get to that.
5      A.   Okay.
6      Q.   As the report says, this happened at
7  approximately 8:40 p.m. at night.  Correct?
8      A.   Yes, I think that's what it was.
9      Q.   And you stopped her at East 100 -- 1100 East
10 Mohave.  Correct?
11     A.   That's what the report says.
12     Q.   And what -- was that where you were patrolling?
13     A.   That was my area of town.
14     Q.   Okay.  Had you ever seen this woman before?
15     A.   No.
16     Q.   And --
17     A.   I mean, not that I know of anyway.
18     Q.   -- you pulled her over for a faulty taillight.
19 Correct?
20     A.   As I answered, yes.
21     Q.   And then you determined that she did not have a
22 driver's license.  Correct?
23     A.   That's what the report says.
24     Q.   And you began writing her two repair order
25 citations?

Page 387

1      A.   Two repair orders, yes.
2      Q.   What's a repair order?
3      A.   It's just a caution that they need to get
4  something fixed, you know, on their car.
5      Q.   And -- but that's a document that goes -- that
6  you file with the department as well.  Correct?
7      A.   Yes, that's one you submit at the end of your
8  shift, yeah.
9      Q.   Okay.  It's a formal -- it's a formal document
10 you submit?
11     A.   Yeah.  It was a document that you -- you -- you
12 had recapped and -- and submitted as part of your duty
13 that night.
14     Q.   Okay.  And is there a fine associated with
15 that?
16     A.   No.
17     Q.   All right.  Now, at the same time, you also
18 learned that there was a probability a traffic warrant
19 for her arrest existed.  Correct?
20     A.   That's what the report says, yes.
21     Q.   Now, in 1973, the way you would do that is by
22 calling in her name and number and receiving information
23 from the dispatcher.  Correct?
24     A.   Yes.
25     Q.   Okay.  So, in other words, somebody from the --

Page 388

1  when you called in her name, they said there was a
2  warrant out for her arrest?
3          MS. BERKE:  Objection.  Foundation.
4          THE WITNESS:  I don't remember but --
5      Q.   BY MR. BRUSTIN:  That's what it says?
6      A.   Pardon me?  Yeah.  It says it in the report.  I
7  don't remember it itself.
8      Q.   Well, that must have been what happened -- what
9  happened, though.  Correct?
10     A.   Okay, wait.  That's what it says in the report,
11 and I agree with the report, yes.
12         MS. BERKE:  Can you read back the last
13 statement he made about what the report states?
14         MR. BRUSTIN:  I think I'm going to clarify.
15 You want to just let me?
16         MS. BERKE:  Sure.
17         MR. BRUSTIN:  Okay.
18     Q.   BY MR. BRUSTIN:  So although you don't
19 specifically remember how you learned there was a warrant
20 out for her arrest, the way you would have learned it is
21 by learning it from the dispatcher.  Correct?
22         MS. BERKE:  Objection.  Misstates evidence.
23         THE WITNESS:  I would say -- I would say so.
24 I mean, I didn't have anybody else with me.
25     Q.   BY MR. BRUSTIN:  Must have been that.  Right?



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
389–392

Page 389

1      MS. BERKE:  Objection.  Foundation.
2      THE WITNESS:  I just -- I said I believe so,
3  but I don't know for sure.
4      Q.   BY MR. BRUSTIN:  What other methods could you
5  have learned it from?
6      A.   Well, the -- the -- the -- every time we stop
7  somebody, of course we would run the plate.  We -- we
8  would tell them we're stopping So-and-So and then the
9  plate, and the dispatch could have had a red flag come up
10  on the plate itself.
11      Q.   Okay.  Dispatcher told you that they believed
12  there was a warrant out for her arrest?
13      A.   I don't --
14      MS. BERKE:  Objection.  Foundation.
15      THE WITNESS:  -- remember that, but I mean,
16  I -- I, you know, surmise that from reading this possibly
17  that could have happened.
18      Q.   BY MR. BRUSTIN:  What else could have happened?
19      A.   That's what I just told you.
20      Q.   I'm asking if there's any other alternative
21  possibilities?
22      A.   I don't know.
23      Q.   Could you think of anything?
24      A.   No.
25      Q.   Okay.  So you're agreeing that what likely

Page 390

1  happened here is that when you called in the plate, they
2  told you there was a warrant out for her arrest?
3      MS. BERKE:  Objection.  Foundation.
4  Misstates evidence.
5      THE WITNESS:  I said that it could have been
6  that, or I could have run her name, but I don't --
7      Q.   BY MR. BRUSTIN:  Okay.
8      A.   -- know whether one, nor do I know that to be a
9  fact because I don't remember.
10      Q.   Okay.  Either way, either you ran her name or
11  you called in the plate, but someone from the station had
12  to have told you that there was a warrant out for her
13  arrest.
14      MS. BERKE:  Objection.
15      Q.   BY MR. BRUSTIN:  That's the only way you could
16  know?
17      MS. BERKE:  Objection.  Foundation.
18  Misstates evidence.
19      THE WITNESS:  I think I -- the report said
20  that the probability a traffic warrant for her arrest
21  existed.  So I can't think of any other reason, no.
22      Q.   BY MR. BRUSTIN:  You can't think of any other
23  way you would have learned that, other than the
24  dispatcher telling you.  Correct?
25      A.   I don't exactly know, but I would say yes.

Page 391

1      Q.   Okay.  Now, you had discretion whether or not
2  to write her a repair order for the -- for not having her
3  license with her and for the broken taillight.  Correct?
4      A.   Yes.
5      Q.   And you used your discretion.  You decided to
6  write it anyways.  Correct?
7      A.   I don't know.
8      Q.   Well, that's what it says.  You just told me
9  you had discretion, but, in fact, you were writing -- you
10  were in the process of writing her out --
11      A.   Process of writing it out, yeah.
12      Q.   Okay.  Did you finish writing them out?  Did
13  you actually --
14      A.   I don't -- I don't know.  I don't remember.
15      Q.   You don't remember, okay.  But although you had
16  discretion as to whether or not to fill out those orders,
17  you had determined that you were going to fill them out,
18  and you were in the process of doing it.  Correct?
19      A.   I can't say that because I don't remember.
20      Q.   It says you commenced writing her two repair
21  order citations.  Is that accurate?
22      A.   That's accurate.
23      Q.   Okay.
24      A.   That's what it says in the report.
25      Q.   So you were in the process of writing her two

Page 392

1  repair orders.  You used your discretion and decided you
2  were going to write her a repair order for the broken
3  taillight and not having her license.  Correct?
4      MS. BERKE:  Objection.  Compound.
5      THE WITNESS:  Correct.
6      Q.   BY MR. BRUSTIN:  You didn't have to do that,
7  but you chose to do that.  Correct?
8      A.   If -- that's what it states in the report.
9      Q.   All right.  Now, then it says you learned there
10  was a probability that there was a warrant for her
11  arrest.  Correct?
12      MS. BERKE:  A traffic warrant.
13      Q.   BY MR. BRUSTIN:  Traffic warrant.
14      A.   That is what the report says, yes.
15      Q.   Okay.  A traffic warrant means that she's
16  supposed to be arrested.  Right?
17      A.   No.
18      Q.   Did you have discretion in 1973 whether or not
19  to arrest somebody if you learned there was a warrant --
20  a traffic warrant out for her arrest?
21      A.   Yes.
22      Q.   You could simply decide not to arrest someone
23  when there was a warrant out for her arrest?
24      A.   Traffic warrant.
25      Q.   Okay.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
393–396

Page 393

1    A.   It's a misdemeanor.  If you felt that that
2  person had -- for some reason was going to take care of
3  it at a later time, and you -- for various reasons, you
4  decide, okay, fine, just take care of it later.
5    Q.   Okay.  So you use your discretion to write her
6  a repair order for the broken light, and you also use
7  your discretion not to do anything about the traffic
8  warrant for her arrest.  Is that correct?
9    A.   That probability that what -- the report says
10  the probability of a traffic warrant for her arrest
11  existed, is correct.
12    Q.   Okay.  Obviously, you could have determined
13  whether or not an actual warrant -- withdrawn.
14        What does probability of a traffic warrant
15  even mean?
16    A.   Okay.  Possibility then.
17    Q.   Okay.  Is there any doubt in your mind that you
18  could have found out in a matter of seconds whether there
19  was actually a warrant for her arrest?
20    A.   Not back in 1973.
21    Q.   No?  You couldn't call the dispatcher and find
22  out?
23    A.   Where am I going to call it from?
24    Q.   In any case, you knew that there was -- you
25  believe -- withdrawn.

Page 394

1        You believe there might be a traffic warrant
2  for her arrest?
3    A.   Might be, yes.
4    Q.   And you use your discretion to do nothing about
5  it.  Correct?
6    A.   That's apparently what the report says.
7    Q.   But you did decide to write her a ticket or a
8  repair order for the broken taillight.  Correct?
9        MS. BERKE:  Objection.  Misstates evidence.
10        THE WITNESS:  The -- I do agree that I had
11  started writing her a ticket.  I don't know if I
12  completed them or didn't, or I don't know whether -- I
13  don't know anything about that.
14    Q.   BY MR. BRUSTIN:  Now, it says here that to show
15  her gratitude -- withdrawn.
16        What is your understanding as to how this
17  complaint came to the attention of the police department?
18    A.   I don't know.
19    Q.   All right.  Was it your understanding that this
20  woman reported it?
21    A.   It was not my understanding.  It was just -- I
22  determined it was a good guess of mine that she probably
23  did.
24    Q.   What other way would this report have come to
25  the knowledge of the police department?

Page 395

1    A.   I don't know.
2    Q.   Can you think of any other way?
3    A.   I don't know.
4    Q.   You understood at the time that she must have
5  reported it.  Correct?
6    A.   I -- I felt that she probably did.
7    Q.   Okay.  You weren't sure, though?
8    A.   No.
9    Q.   Did anybody --
10    A.   How could I be sure?
11    Q.   Did anybody else see what happened?
12    A.   I don't know.
13    Q.   Did you see anybody else in the area?
14    A.   No, I didn't -- but we were in a residential
15  area.
16    Q.   Okay.  All right.  Now, it says, "To show her
17  gratitude for not going to jail on receiving a moving
18  vehicle citation, the woman offered to kiss you."
19    A.   That's what the report says.
20    Q.   Okay.  So is it your testimony that what
21  happened was you decided on your own not to bring her in
22  for the traffic warrant for her arrest?
23    A.   I decided on my own because I was alone, and,
24  yes, I guess I did decide alone.
25    Q.   All right.  Let me -- let me -- let me ask you

Page 396

1  this:  What must have happened is you told this woman
2  that if she would kiss you, you wouldn't take her in.
3  Correct?
4    A.   I've already told you I don't recall this
5  incident that much, and by you telling me isn't it true
6  doesn't make it true.  It's a situation that I can only
7  depend on the report, and the report says different from
8  what you said.
9    Q.   So she simply offered out of the blue --
10  withdrawn.
11        You decided before she offered to kiss you
12  that, although you were going to -- although you were
13  going to write her a -- you were going to write her a
14  ticket for the broken taillight and for not having a
15  license, you, on your own, decided you would use your
16  discretion and not arrest her for the traffic warrant.
17        MS. BERKE:  Objection.
18    Q.   BY MR. BRUSTIN:  Is that your testimony?
19        MS. BERKE:  Objection.  Misstates evidence.
20        THE WITNESS:  I think we -- I've already
21  gone through that, and it says that I'm relaying
22  everything that's on the report, and I agree with
23  everything that's on the report.  I have no -- no
24  question, I have no argument with what's in the report.
25    Q.   BY MR. BRUSTIN:  You mentioned earlier today

ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
397–400

Page 397

1  that this woman showed you her breasts.  Do you remember
2  that?
3     A.  We didn't -- we didn't talk about her then,
4  earlier.
5     Q.  You volunteered it.  Do you remember
6  volunteering that?
7     A.  I don't remember.
8        MS. RETTS:  Form.
9     Q.  BY MR. BRUSTIN:  You forgot that?
10    A.  I don't know.  We can -- I can tell you that I
11 remember it, but I don't.
12    Q.  Okay.
13    A.  You have more than enough to go back to the
14 court reporter and get all that stuff, and if you do,
15 then fine.  And if I said it, I said it.
16    Q.  Okay.  There's nothing about -- here in the
17 report about her exposing her breasts.  That's something
18 you remembered on your own.  Right?
19    A.  No, I don't -- you know, if -- you know, now
20 thinking about it, it was regards to the Pickinpaugh
21 interview, and you asked me if anybody else had exposed
22 their breast, something like that.  And I may have
23 misstated that, yeah, back in the -- but really it would
24 have been a misstatement because I don't -- I wouldn't
25 remember.  Of course, I can't remember that far back, nor

Page 398

1  do I want to remember.
2     Q.  You've told us that this was an incident that
3  you're mortified by.  Correct?
4     A.  That is correct.
5     Q.  And that you've done your very best to -- to do
6  everything to be a better man afterward.
7  Correct?
8     A.  That's correct.
9     Q.  And you're telling me, as you sit here today,
10 you have no recollection whatsoever of what happened with
11 this woman?
12    A.  I have no recollection.
13    Q.  You have no recollection of where on her body
14 you touched her?
15    A.  No recollection.
16    Q.  No recollection of what she showed you?
17    A.  No independent recollection except for the
18 report, and I agree with what the report says because I
19 was given a polygraph for it.
20    Q.  The sexual encounter with this woman while you
21 were on duty is a complete blank in your memory?
22    A.  It's not a complete blank, but it's -- I don't
23 remember specifics about this case.  I remember that I
24 did get the five days off, I remember that I was
25 suspended, and my knowledge of that incident now is from

Page 399

1  reading that report.
2     Q.  Tell me everything you remember about this
3  encounter with the woman.
4     A.  Of what I read in the report.
5     Q.  Tell me what you remember independently.
6     A.  I don't remember anything.
7     Q.  You have no memory of anything that happened
8  with her?
9     A.  I, in fact, tried to block it out of my memory.
10 You know, it wasn't a very -- it wasn't an incident that
11 I don't think you would want to remember or anyone else
12 would want to remember, and I just -- I made it a point
13 not to remember.
14    Q.  Oh, it's an incident I wouldn't want to be
15 involved in.  That's a different thing.
16       I'm asking you about what you remember about
17 this incident happening.
18    A.  I've already told you.
19       MS. BERKE:  Objection.  Asked and answered.
20    Q.  BY MR. BRUSTIN:  You have -- just to be clear,
21 you have absolutely no memory of any interaction you had
22 with this woman?
23       MS. BERKE:  Please don't point at my client.
24       THE WITNESS:  No, I do not.
25    Q.  BY MR. BRUSTIN:  All right.  Now, it says that

Page 400

1  this woman simply to show her gratitude for not going to
2  jail on receiving a moving vehicle citation -- she
3  offered to kiss you.  Is that what happened?
4     A.  That's what the report says.
5     Q.  All right.  So, in other words, you determined
6  you were going to give her a ticket -- two tickets.  You
7  determined that you were going to give her a pass on the
8  traffic warrant for her arrest on your own, and then she
9  volunteered:  I'm going to give you a kiss for that.
10       That's what happened?
11       MS. BERKE:  Objection.  Misstates the
12 evidence.
13       THE WITNESS:  That's what the report says.
14    Q.  BY MR. BRUSTIN:  Does that make any common
15 sense?
16       MS. BERKE:  Objection.  Foundation.  Vague.
17       THE WITNESS:  That's what the report says.
18    Q.  BY MR. BRUSTIN:  Okay.  And you're sticking by
19 the report.  Right?
20    A.  I've never ever complained about the report.
21 I've never ever tried to justify my actions.  I've never
22 ever tried to minimize my actions from what the report
23 says.
24    Q.  All right.
25    A.  Excuse me -- from what the report says, and



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
401–404

Page 401

1  that's what -- I base everything on that report, and I
2  believe it's -- it was truthful back then, and it's
3  truthful now.
4      Q.   Anything else you want to say about that?
5      A.   No.
6      Q.   All right.  You proposed -- I'm reading from
7  the report because the report is the gospel here.  Right?
8          MS. BERKE:  Objection.  Argumentative.
9      Q.   BY MR. BRUSTIN:  All true?
10     A.   Pardon?
11     Q.   The report is the gospel.  It's all true?
12     A.   That's not the gospel.  It wasn't --
13         MS. BERKE:  Objection.  Argumentative.
14  Vague.
15     Q.   BY MR. BRUSTIN:  The report says you proposed
16  that the two of you go to a less conspicuous place, and
17  you suggested 300 East Maricopa Freeway.
18     A.   That's what the report says.
19     Q.   What's 300 East Maricopa Freeway?
20     A.   I think I was referring to the access road on
21  the freeway, but that would be the only thing that that
22  statement brought to mind.
23     Q.   You knew an address to tell her to go to to
24  have a sexual encounter?
25     A.   I'm just --

Page 402

1          MS. RETTS:  Form.
2          THE WITNESS:  I'm just telling you what the
3  report says.
4      Q.   BY MR. BRUSTIN:  Well, you gave her a specific
5  address to go to.  Had you ever gone there with other --
6  other women?
7      A.   No.
8      Q.   This is the only time this happened?
9      A.   Yes.
10     Q.   Okay.  But you knew -- you gave her a specific
11  address to go meet you.  Correct?
12     A.   I suggested an address per the report.
13     Q.   You have no idea what that address is other
14  than a portion of an access road?
15     A.   It's the only thing I can think of.
16     Q.   All right.  And it's your testimony that your
17  proposal that they -- that you go to a less conspicuous
18  place for the kiss had nothing to do with you -- with
19  your decision not to arrest her?
20     A.   That's not in the report.
21     Q.   In other words --
22         MS. BERKE:  You -- can you please let him
23  finish his answer?
24         MR. BRUSTIN:  He did.
25     Q.   BY MR. BRUSTIN:  Do you want to say anything

Page 403

1  other --
2          MS. BERKE:  You cut him off.
3      Q.   BY MR. BRUSTIN:  Do you want to say anything
4  other than it's not in the report?
5      A.   Yes.
6      Q.   Okay.
7      A.   It's not in the report.  Therefore, I don't
8  recall anything that you're saying -- you're talking
9  about.
10     Q.   Because you only recall what's in the report.
11     A.   (No oral response.)
12     Q.   Right?
13         MS. BERKE:  Objection.  Argumentative.
14         THE WITNESS:  Yes, I have said that three or
15  four times.
16     Q.   BY MR. BRUSTIN:  You have.
17     A.   But you keep on bringing it up.
18     Q.   I'm going to keep bringing it up.
19     A.   Oh, okay.
20     Q.   So it's your testimony you deny telling the
21  woman in substance that if she goes with you to that
22  location for a kiss and more, you wouldn't arrest her.
23  Do you deny that's what happened?
24     A.   I don't deny anything.  I'm just agreeing to
25  everything that's on the report.

Page 404

1      Q.   Do you deny that happened?
2      A.   I don't deny anything that is not on the
3  report.
4          MS. BERKE:  That is not on the report or is
5  on the report?
6          THE WITNESS:  That's not -- you know, I deny
7  anything occurring that's not listed on the report.
8          MR. BRUSTIN:  Would you please ask your
9  client to answer my question?
10         MS. BERKE:  What's your question?
11     Q.   BY MR. BRUSTIN:  My question is:  Do you deny,
12  as you sit here today, telling this woman that you would
13  not arrest her if she agreed to go with you for sexual
14  activity?
15     A.   I can't deny that because I don't remember, but
16  it's not in the report.  So I go with the report.
17     Q.   That may have happened.  Right?
18     A.   No.
19     Q.   That didn't happen?
20     A.   I don't know.  But if you're going to put it
21  that way, in a --
22         Never mind.
23     Q.   All right.  Any explanation while -- why this
24  woman would volunteer to kiss you, agree to go to a place
25  that's less conspicuous and then make a report about your

ESQUIRE
DEPOSITION SOLUTIONS

Exhibit 1

ARMANDO SALDATE Volume II                                      June 22, 2017
MILKE vs CITY OF PHOENIX                                            405–408

Page 405

1 conduct after you let her off of a traffic violation?
2          MS. BERKE: Objection. Foundation.
3          THE WITNESS: I don't recall.
4     Q.   BY MR. BRUSTIN: You don't recall that either?
5     A.   (No oral response.)
6     Q.   You don't recall anything?
7     A.   Not about that. It's not in the report. So --
8     Q.   No, it's not in the report. So you don't
9 recall it. Right? Right, sir?
10    A.   That's right, but you keep on bringing it up.
11 So I mean, I don't know why you're trying to --
12    Q.   Okay.
13    A.   -- demean me or what. You're trying to make
14 fun of me or something. I don't know, but...
15    Q.   Okay. The woman agreed, and you followed her
16 to 300 East Maricopa Freeway. Correct? That is in the
17 report.
18    A.   That's what's in the report.
19    Q.   There you leaned inside her car, kissed her and
20 deliberately began making advances and took liberties
21 which amounted to conduct unbecoming an officer. Okay.
22         After you kissed her, what advances did you
23 make on her?
24    A.   I don't recall.
25    Q.   What liberties did you take with her?

Page 406

1     A.   I don't recall.
2     Q.   What parts of her body did you touch?
3     A.   I don't recall.
4          MS. BERKE: Objection. Foundation. Assumes
5 facts not in evidence.
6     Q.   BY MR. BRUSTIN: Sir, you understand that if
7 you do recall what happened and you testify that you
8 don't recall that, that's a lie. You understand that.
9 Correct?
10    A.   Yes, I understand about lies.
11    Q.   You understand you have an obligation if you do
12 remember to tell me what happened. Correct?
13    A.   I would say yes.
14    Q.   Okay. But you have no idea, as you sit here
15 today, what parts of her body you touched. Correct?
16    A.   That is correct.
17    Q.   You have no idea what party -- what parts of
18 her body she exposed to you. Correct?
19    A.   That's correct.
20    Q.   How long were you there for?
21    A.   I don't remember.
22    Q.   Did you get in the car?
23    A.   I don't -- if it's not in the report, I don't
24 recall it.
25    Q.   Okay. It says, next paragraph, "Officer

Page 407

1 Saldate, although" --
2          MS. BERKE: It's not the next sentence.
3          MR. BRUSTIN: I apologize. Next paragraph.
4     Q.   BY MR. BRUSTIN: "Officer Saldate" --
5          Are you with me?
6     A.   Yes.
7     Q.   "Although your actions in this matter were
8 encouraged by the woman involved, the situation became
9 even more aggravated when she offered and you agreed to
10 meet later for the purpose of engaging in an act of
11 sexual intercourse."
12         Do you see that?
13    A.   That's what it says.
14    Q.   Now, obviously, it says -- when it says, "The
15 actions in this matter were encouraged by the woman,"
16 that must be based on what you told the investigators.
17 Correct?
18    A.   That and the polygraph.
19    Q.   Okay. Do you remember during the polygraph
20 them asking you whether or not the woman encouraged your
21 actions?
22    A.   No.
23    Q.   Because that's not in the report. Right?
24    A.   Pardon me?
25    Q.   That's not in the report. Right?

Page 408

1     A.   Don't yell, please.
2          No, I do not recall that.
3     Q.   Okay. So, obviously, the information about the
4 woman encouraging you came from you.
5          MS. BERKE: Objection.
6     Q.   BY MR. BRUSTIN: Correct?
7          MS. BERKE: Objection. Foundation.
8          THE WITNESS: If it's in the report, it's in
9 the report. I don't know what you're talking about.
10 I -- I don't recall it. I don't recall the incident. It
11 was 40-some years ago. I purposely made it a point not
12 to recall the incident many years back.
13    Q.   BY MR. BRUSTIN: Okay.
14    A.   And, therefore, that's my answer.
15    Q.   When did you make it a point not to recall it?
16    A.   Several years later.
17    Q.   Okay. And how did -- how did you go about
18 doing that? How do you make yourself not recall
19 something? How do you do that trick?
20         MS. RETTS: Form.
21         MS. BERKE: Argumentative.
22         THE WITNESS: I don't like you referring to
23 it as a trick because I don't know if it's a trick, but
24 it's regarding -- I just did not want to remember it
25 because the hurt that it caused me psychologically I



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
409–412

Page 409

1 didn't want to remember it, and I just did not remember
2 it.
3    Q.   BY MR. BRUSTIN:  And you still don't?
4    A.   And I still don't.
5    Q.   All right.  Then it says --
6    A.   I'm in a happy place right now.
7    Q.   Okay.  Okay.
8         It says the situation became more aggravated
9 when she offered to meet you later on.  Do you recall it
10 being her offering it or you suggesting it?
11    A.   I don't recall it.  Just what the report says.
12    Q.   Okay.
13    A.   I don't have an argument with the report.
14    Q.   Do you deny lying about her encouraging you to
15 engage in sexual activity?
16         MS. BERKE:  Objection.  Vague.
17         THE WITNESS:  Do I agree?
18    Q.   BY MR. BRUSTIN:  I'm sorry.  Let me be more
19 clear.
20         What actually happened here --
21    A.   No, no.  You don't know what actually happened.
22 So you can't say that, but go ahead.
23    Q.   What actually happened here is you lied to the
24 investigators, and you told them that this woman
25 encouraged the sexual advances.  Isn't that true, sir?

Page 410

1         MS. BERKE:  Objection.  Misstates evidence.
2         THE WITNESS:  I would say it's not true only
3 because it's not in the report.
4    Q.   BY MR. BRUSTIN:  Okay.  Otherwise you don't
5 know one way or the other.  May be true?
6         MS. BERKE:  Objection.  Misstates evidence.
7         THE WITNESS:  I didn't say that.
8    Q.   BY MR. BRUSTIN:  All right.  And you also --
9 what's also true is that you lied to the investigators
10 when you told them that she offered to meet you at a
11 hotel.  Right?
12         MS. BERKE:  Objection.  Misstates evidence.
13         THE WITNESS:  I don't even know where
14 that --
15    Q.   BY MR. BRUSTIN:  Oh, you're right.  There's no
16 hotel there.  I apologize.
17    A.   Oh, I'm sure.  Thank you.
18    Q.   Do you remember who -- who offered to meet who?
19    A.   No.
20    Q.   All right.
21    A.   It's in the report.
22    Q.   All right.  And when you got off duty, you went
23 to the meeting place.  Correct?
24    A.   That's correct.
25    Q.   And she wasn't there?

Page 411

1    A.   That's what the report says.
2    Q.   And your intention was to have sexual
3 intercourse with her.  Correct?
4    A.   That's what the report says.
5    Q.   And that was all in exchange for you not
6 arresting her on the traffic warrant.  Correct?
7         MS. BERKE:  Objection.  Misstates evidence.
8         THE WITNESS:  I don't know if that's -- that
9 doesn't appear to be stated in the report.
10    Q.   BY MR. BRUSTIN:  It's not stated in the report.
11 I'm stating it.  Do you disagree with it?
12    A.   I don't know if I disagree or agree.
13    Q.   You just don't remember?
14    A.   Thank you.
15    Q.   All right.  Now, let me ask a hypothetical.
16    A.   I'm not very good at hypotheticals.
17    Q.   Do your best.
18         Assuming that you had asked this woman to
19 have sexual relations to you -- with you in exchange for
20 your agreement not to arrest her, you would agree that
21 would be a felony.  Correct?
22         MS. BERKE:  Objection.  Misstates evidence.
23 Assumes facts not in evidence.  Foundation.
24         THE WITNESS:  I'm not going to agree with
25 anything like that because it's --

Page 412

1    Q.   BY MR. BRUSTIN:  Would you please --
2    A.   -- it's a perception on your part, and you're
3 making, you know, just -- anyway.
4         MR. BRUSTIN:  Would you please instruct him
5 to answer my question?
6         MS. BERKE:  He's answered your question.
7         MR. BRUSTIN:  You're comfortable with that
8 answer?
9         MS. BERKE:  I am.
10         MR. BRUSTIN:  Let me try it again.
11    Q.   BY MR. BRUSTIN:  I'm asking a hypothetical
12 which I'm allowed to do.
13    A.   And -- fine.
14    Q.   Okay.  I want you to assume that what actually
15 happened here -- withdrawn.
16         Let's take a different case, okay, just a
17 random hypothetical.  Let's say that in 1973 a Phoenix
18 police department offer (sic) pulls over a woman and
19 offers not to arrest her on a traffic warrant in exchange
20 for her having sexual relations with him.
21         In 1973, based on your experience as a
22 police officer and your knowledge of the law, would that
23 be a crime?
24         MS. BERKE:  Objection.  Assumes facts not in
25 evidence.  Foundation.



ARMANDO SALDATE Volume II                                    June 22, 2017
MILKE vs CITY OF PHOENIX                                        413–416

Page 413

1       THE WITNESS:  I would assume so, but I would
2   never -- I don't -- I -- I just can't -- I can't make a
3   decision because I don't know.  I don't know what
4   happened or what didn't happen.
5       Q.   BY MR. BRUSTIN:  Wasn't it your job -- I'm
6   asking you to assume that actually happened as a
7   hypothetical.  Assume that happened as a hypothetical.
8       A.   I can't assume that.
9       Q.   Why not?
10      A.   Because I'm not -- I'm not going to
11  hypothetically assume something just because you say it.
12      Q.   Okay.  Was part of your job as a police officer
13  to understand the law on what constituted various crimes?
14      A.   That was my responsibility to a point.
15      Q.   Okay.  Was it your understanding in 1973 that
16  if a police officer uses his police authority to coerce a
17  woman into having sex with him in exchange for leniency,
18  would that be a crime?
19      MS. BERKE:  Objection.  Foundation.  Assumes
20  facts not in evidence.
21      THE WITNESS:  I assume so, but I don't know
22  what crime it would be or anything like that.
23      Q.   BY MR. BRUSTIN:  Okay.  You'd assume it's a
24  crime and go to jail for it.  Right?
25      MS. BERKE:  Objection.  Foundation.

Page 414

1       THE WITNESS:  I know it's a crime, but I
2   don't know about jail.
3       Q.   BY MR. BRUSTIN:  All right.  Let's go back to
4   the report.
5       A.   Okay.
6       Q.   Next paragraph, when you were interviewed by
7   your supervisors concerning this incident, you
8   specifically denied going to meet the woman after
9   completing the shift.  Do you see that?
10      A.   Yes.  And that's what the report says.
11      Q.   All right.  Now, does this also support the
12  idea that this woman must have made the complaint?
13      MS. BERKE:  Objection.  Foundation.
14      THE WITNESS:  I don't know where it says
15  that.
16      Q.   BY MR. BRUSTIN:  All right.  But you admit to
17  lying to your supervisors about going to meet the woman.
18  Correct?
19      A.   Correct.
20      Q.   And I take it this was the first time in your
21  career that you ever lied to your supervisors, correct,
22  because you told us you never lie?
23      A.   I'm not perfect, but I try never to lie.
24      Q.   So this is the first time you ever lied to your
25  supervisors.  Correct?

Page 415

1       A.   I presume it was.
2       Q.   All right.  In addition, it says you omitted
3   some of the details of the incident regarding the
4   liberties you took with the woman.
5       A.   That's what the report says.
6       Q.   In other words, you lied to them about what
7   sexual activities occurred when you groped her through
8   the window.  Correct?
9       MS. BERKE:  Objection.  Argumentative.
10      THE WITNESS:  I don't think that's what the
11  report says.
12      MS. BERKE:  Wait, wait, wait.  Let me get my
13  objections out.
14      THE WITNESS:  I'm sorry.
15      MS. BERKE:  Objection.  Argumentative.
16  Assumes facts not in evidence and foundation.
17      Q.   BY MR. BRUSTIN:  Wrong word.
18      When you -- when you touched her sexually
19  through the window, you misrepresented to the supervisors
20  what actually happened.  Correct?
21      A.   That's what the report says.
22      Q.   In other words, you lied to them about what
23  sexual activities occurred between the two of you?
24      A.   Not "in other words."  It's listed there in the
25  report.

Page 416

1       Q.   That's the second lie to your supervisors.
2   Correct?
3       A.   I don't know what you're talking about.
4       MS. BERKE:  Objection.  Foundation.
5       Q.   BY MR. BRUSTIN:  Well, the first lie was about
6   going to the hotel -- I'm sorry.  The first lie was about
7   going to meet her to have sex.  Right?
8       A.   Yes.
9       Q.   The second lie was about what actually occurred
10  in the car.  Correct?
11      A.   That's what the report says, yes.
12      Q.   Two lies.  Right?
13      A.   I'm sorry.  Yes.
14      Q.   All right.  Then it says you agreed to a
15  polygraph.  Correct?
16      A.   Yes.
17      Q.   You didn't have to take a polygraph, did you?
18      A.   Yes.
19      Q.   You were forced to take a polygraph?
20      A.   Absolutely.
21      Q.   All right.  You knew when you were --
22  withdrawn.
23      You knew when you were taking the polygraph
24  that you had lied to the -- you had lied to your
25  supervisors about going to meet her to have sex.

Page 417

1  Correct?
2      A.   Correct.
3      Q.   And you knew when you were taking the polygraph
4  that you had lied to the supervisors about what liberties
5  you took with her in the car.  Correct?
6      A.   That's what the report says.
7      Q.   But the reason that you didn't tell them the
8  truth, even after you knew you were going to be hooked up
9  to a polygraph, was because you thought you could beat
10  the polygraph.  Right?
11         MS. BERKE:  Objection.  Assumes facts not in
12  evidence.
13         THE WITNESS:  First of all, just because you
14  believe it, it isn't true.  I didn't know whether I could
15  beat the polygraph or not.  I never -- polygraphs only
16  work on police officers anyway, but I told the polygraph
17  operator everything before we did the polygraph and then
18  passed on everything.
19      Q.   BY MR. BRUSTIN:  So you told -- you told the
20  polygraph examiner the truth before he hooked you up?
21      A.   Yes.
22      Q.   That's something you remember?
23      A.   About the polygraph operator?  I remember that
24  only because that was something that was -- I felt that
25  was a favor by him letting me tell him things that he --

Page 418

1  because he told me that I'd probably -- you know, I
2  definitely was going to get fired if I lied and all that
3  kind of stuff.
4      Q.   So you came clean to him before you were hooked
5  up?
6      A.   Yeah.
7      Q.   And that's something you remember that's not in
8  the report?
9      A.   And that's not in the report, no.
10      Q.   That's the one thing you remember about this
11  incident that's not in the report, that you came clean
12  with the polygraph examiner before you were hooked up?
13      A.   I remember it basically because it was a
14  positive incident in all this thing here that the
15  polygraph operator gave me that good advice and showed
16  interest in me and tried to --
17      Q.   Yeah, I don't care why you remember it.
18      A.   I do.
19      Q.   My point -- my question is the one thing you
20  remember that's not in the report is that you came clean
21  to the polygraph examiner before he hooked you up.
22  Correct?
23      A.   Correct.
24      Q.   That's the only thing you remember about it?
25      A.   Correct.

Page 419

1      Q.   All right.  Here's what it says, though:  What
2  it says is this was discovered later when you were given
3  a polygraph examination.  You then admitted the complete
4  details of your involvement and now realized your actions
5  were grossly improper.  What the report says is that you
6  actually took the polygraph exam?
7      A.   I did.
8      Q.   And you failed it?
9      A.   No, I did not.
10         MS. BERKE:  Objection.  Misstates evidence.
11      Q.   BY MR. BRUSTIN:  Okay.  So your -- it says you
12  were given a polygraph exam.
13      A.   Right.
14         MS. BERKE:  Right.  And what does it say
15  next?
16      Q.   BY MR. BRUSTIN:  So your story is, even though
17  it's not here, you specifically remember telling the
18  polygraph examiner what actually happened?
19      A.   It's not a story.  It's the truth, and that's
20  the procedure of any polygraph operator, which I later
21  found out, that they do ask you to be truthful because
22  they're going to find out no matter what.
23      Q.   Tell me about what happened.  Tell me about
24  that conversation with the polygraph examiner.
25      A.   The only thing I remember is that I was really

Page 420

1  grateful to him for giving me that advice and that --
2      Q.   Tell me what he said to you.
3      A.   I don't remember exactly what he said to me.
4      Q.   Tell me generally what he said to you.
5      A.   Something about telling the truth and that he
6  was soon going to get it anyway because the polygraph
7  doesn't fail and all that stuff, and I had only been on
8  the department three years, and I agreed.  And I thought
9  he was good -- it was good information on his part, and
10  he took interest in me and helped me.  And that's why I
11  remember that part.
12      Q.   And then he gave you the polygraph?
13      A.   Yeah, then I took the polygraph.
14      Q.   And you believe you passed the polygraph?
15      A.   I passed the polygraph.
16      Q.   Any reason why that's not in here?
17         MS. BERKE:  Objection.  Misstates evidence.
18      Q.   BY MR. BRUSTIN:  I'm sorry.  Let me withdraw
19  the question.
20      A.   I'm sorry.  If I hadn't passed the polygraph, I
21  would have been fired.
22         MS. BERKE:  It does say that in here, that
23  he admitted everything in the polygraph examination.
24         MR. BRUSTIN:  Do you know what a polygraph
25  examination is?



Page 421

1    MS. BERKE: I do.
2    Q.   BY MR. BRUSTIN: In a polygraph examination,
3  they asked you a series of yes-and-no questions.
4  Correct?
5    A.   Yes.
6    Q.   And you don't admit -- you don't talk about
7  any -- the only thing you say during a polygraph
8  examination is yes or no. Correct?
9    A.   No --
10    MS. BERKE: Objection. Foundation.
11    THE WITNESS: -- you have an interview
12  before that.
13    Q.   BY MR. BRUSTIN: Okay. You have an interview
14  before; you have an interview after. Right?
15    A.   That is correct.
16    Q.   The only thing you say during a polygraph
17  examination when you're hooked up is yes or no. Correct?
18    MS. BERKE: Objection. Foundation.
19    THE WITNESS: I can't say that's true, but,
20  you know, I have no argument with it other -- you know,
21  if that's what you say. I don't remember.
22    Q.   BY MR. BRUSTIN: You know how polygraph
23  examinations work. Right? You've seen a number of them.
24  Right?
25    MS. BERKE: Objection. Foundation.

Page 422

1    THE WITNESS: I seen mine. I may have
2  witnessed one other one.
3    Q.   BY MR. BRUSTIN: Have you ever seen anybody
4  being asked details during a polygraph examination?
5    MS. BERKE: Objection. Foundation.
6    THE WITNESS: Like I said, I may have only
7  seen one other one, and I don't recall whether they were
8  asking -- in the interview whether they were asking
9  information about it -- about details during, before or
10  after.
11    Q.   BY MR. BRUSTIN: So they may have been asking
12  you about details during the polygraph examination?
13    A.   I can't say that for sure, but, you know,
14  I'm -- the only thing I remember about that polygraph
15  examination is my --
16    Q.   Did you have a special kind of polygraph --
17    MS. BERKE: He was in the middle of
18  providing an answer.
19    Q.   BY MR. BRUSTIN: You know what? Keep going.
20  Keep talking.
21    A.   The only thing I remember about that polygraph
22  is that -- and I kept it -- I don't know how I kept it in
23  my mind because -- but I agree that it was a positive
24  suggestion. It was a positive contact I had with him,
25  and I thought he did me a favor, and that's why I

Page 423

1  remember that part.
2    Q.   Did you have a special kind of polygraph
3  examination where they asked you details, as opposed to
4  yes-or-no questions?
5    MS. BERKE: Objection. Foundation.
6    THE WITNESS: I don't remember. I told you
7  I don't know whether they did or didn't.
8    Q.   BY MR. BRUSTIN: But you've -- how many
9  polygraph examinations have you seen?
10    A.   One.
11    Q.   Okay.
12    A.   Besides mine.
13    Q.   Okay. And what happened during the polygraph
14  examination that you saw is the polygraph examiner
15  designs a number of yes-or-no questions, and he reads the
16  chart as he asks those yes-or-no questions. Correct?
17    MS. BERKE: Objection. Foundation.
18    THE WITNESS: I -- I -- I can't tell you
19  that because I don't know.
20    Q.   BY MR. BRUSTIN: With --
21    A.   I don't remember the polygraph operator. I can
22  tell you whether if I did remember that polygraph test,
23  but I don't know. It wasn't my test.
24    Q.   Sure. What this report says is that you gave
25  them the details about what actually happened after you

Page 424

1  failed the polygraph. Right?
2    A.   It doesn't say that in the report.
3    Q.   It says --
4    A.   Where does it say that I failed?
5    Q.   What it says is this was discovered later when
6  you were given a polygraph examination. You then
7  admitted the complete details of your involvement and now
8  realizes -- you realize your actions were grossly
9  improper.
10    So it's your -- what you -- what your story
11  is is that you admitted the complete details, they gave
12  you the polygraph examination, and you passed it. Is
13  that right?
14    A.   That's correct.
15    Q.   So another thing that you remember in
16  addition -- in addition to the positive experience you
17  have with the polygraph examiner, you also remember that
18  you passed the exam?
19    A.   Well, I don't specifically remember, but I do
20  remember that had I not passed it, I would have been
21  fired.
22    Q.   Okay. So, in other words, it was fine to lie
23  to your supervisors beforehand about going to meet her to
24  have sex, and it was fine to lie to your supervisors
25  about what actually happened in the car as long as you



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
425–428

Page 425

1  passed the polygraph?
2      A.   I don't know what -- I don't know what --
3          MS. BURGESS:  Form.
4          THE WITNESS:  I don't know what you mean by
5  fine.  If you feel it was fine, that's fine, but I
6  didn't -- I -- I just go by what the report says.
7      Q.   BY MR. BRUSTIN:  Well, the report doesn't say
8  anything about you being fired if you didn't pass the
9  polygraph.  That's something else you've added.  Who --
10     A.   No, I know that because it's just I would have
11 been lying under the polygraph, and that's -- every
12 police officer knows that you get fired when you lie
13 under -- you're given a polygraph and you lie on the
14 polygraph.
15     Q.   I never heard that before.  Where did you hear
16 that from?
17     A.   Other police officers.
18     Q.   Okay.
19     A.   That was -- that was just, you know, going on.
20 I mean, they give you -- the polygraph was the last thing
21 you took just like in a -- in the -- when you sign up for
22 it to become a police officer.  If you flunk a polygraph,
23 you don't become a police officer.
24     Q.   Do you have an understanding as to why they
25 gave you a polygraph after you already gave them the

Page 426

1  accurate details of what happened?
2      A.   No.
3      Q.   Why would they do that?
4          MS. BERKE:  Objection.  Foundation.
5          MS. BURGESS:  Join.
6          MS. ODEGARD:  Join.
7          MS. RETTS:  Form.
8          THE WITNESS:  Part of the system, I guess.
9  I don't know.
10     Q.   BY MR. BRUSTIN:  But what you're telling us now
11 is that you admitted to the polygraph examiner exactly
12 what really happened in the car and how you touched her
13 and what she did.  Right?
14     A.   I admitted to what had happened.
15     Q.   Okay.  And you admitted that you had agreed to
16 go meet her after work to have sex.  Right?
17     A.   I don't recall what I agreed to or admitted to,
18 other than that I told him everything, and it's --
19 everything to me is everything that's in this report
20 because I've never had any -- any problem with -- with
21 this report.  I agree on it and never tried to minimize
22 my involvement or anything else.
23     Q.   Now, would you agree that what happened here is
24 that this woman offered -- withdrawn.
25          The woman never showed up to meet you later

Page 427

1  to have sex.  Is that right?
2      A.   The report says no.
3      Q.   And would it be fair to say that one of the
4  reasons you lied to your supervisor about the woman --
5  about going to meet this woman to have sex later on is
6  because you thought it was an insult to your manhood that
7  she didn't show up?
8      A.   I don't remember that at all.
9      Q.   You would -- that never crossed your mind.
10 Right?
11     A.   I just don't remember that at all happening.
12     Q.   How many other women did you similarly sexual
13 assault in addition to this woman?
14         MS. BERKE:  Objection.  Misstates evidence.
15         MS. RETTS:  Form.
16         THE WITNESS:  Are you accusing me of
17 something?  If you're accusing me of something, please
18 let's do it.
19     Q.   BY MR. BRUSTIN:  Okay.  Is this woman in 1973
20 the only woman you ever sexually assaulted?
21         MS. RETTS:  Form.
22         MS. BERKE:  Just, hey, he's pleading the
23 Fifth as to Belinda Reynolds, as you know.  So...
24     Q.   BY MR. BRUSTIN:  Assuming -- aside from your --
25 aside from your sexually assaulting Belinda Reynolds,

Page 428

1  have you --
2          MS. BERKE:  He's not going to answer that
3  question when you preface it --
4          MR. BRUSTIN:  All right.
5          MS. BERKE:  -- assuming he sexually
6  assaulted her.
7      Q.   BY MR. BRUSTIN:  Okay.  Putting aside Belinda
8  Reynolds, yes, whether anything happened with her or not,
9  just putting it aside, did you sexually assault anyone
10 else other than this woman in 1973?
11         MS. ODEGARD:  Form.
12         MS. BERKE:  Objection.  Misstates evidence.
13         MS. RETTS:  Join.
14         THE WITNESS:  I've never sexually assaulted
15 anyone.
16     Q.   BY MR. BRUSTIN:  You didn't sexually assault
17 this woman?
18     A.   No.
19     Q.   What does this report describe?
20     A.   It describes -- it describes a mutual agreement
21 to a point, and then, you know, that's what it does.  I
22 mean, I -- I don't remember the incident itself.  I
23 don't.
24     Q.   You already told us you don't remember whether
25 or not you -- you made -- you made her not being arrested

ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
429–432

Page 429

1 contingent on her giving you sexual favors. Correct?
2        MS. BERKE: Objection. Assumes facts not in
3 evidence.
4        THE WITNESS: That's -- I don't remember any
5 of that.
6    Q.    BY MR. BRUSTIN: You don't remember one way or
7 the other. Right?
8    A.    Well, I can't say that I -- I mean, just
9 because I don't remember doesn't mean that it now agrees
10 with you. It just -- I don't remember.
11    Q.    You don't remember one way or another whether
12 or not you made not arresting her contingent upon her
13 having a sexual encounter with you. Correct?
14    A.    I remember that if I had, it would be in the
15 report.
16    Q.    Unless you lied about it. Right?
17    A.    I'm not going to answer that because it's not
18 really -- I don't lie. I mean, I've never lied
19 regarding this thing other than when -- the first things
20 that you mentioned, and that's it.
21    Q.    Is it your understanding that this woman came
22 in and gave the same account that's in that report?
23        MS. BERKE: Objection. Foundation.
24        THE WITNESS: I don't know.
25    Q.    BY MR. BRUSTIN: You believe she did?

Page 430

1    A.    I don't know.
2        MS. BERKE: Objection. Foundation.
3    Q.    BY MR. BRUSTIN: Nobody ever suggested to you
4 that this woman described a slightly different encounter?
5    A.    I don't know. I don't recall them ever -- I
6 don't even recall the questioning to -- about this whole
7 situation. That's why I refer to the report, and I agree
8 with what the report says.
9        MR. BRUSTIN: Okay. Let's take a
10 five-minute break.
11        THE VIDEOGRAPHER: We are off the record at
12 12:45 p.m.
13        (A recess was held off the record.)
14        THE VIDEOGRAPHER: We are back on the record
15 at 1:36 p.m.
16        (Exhibit 22 was marked for identification.)
17    Q.    BY MR. BRUSTIN: Mr. Saldate, I want to show
18 you what's been put in front of you as Exhibit 22, which
19 is a transcription of the interview that you conducted
20 with -- who is this with -- with Michael Kimerer in
21 connection with the post-trial proceedings in 2009.
22    A.    Uh-huh.
23    Q.    You recall that interview. Correct?
24    A.    Yeah, I recall the interview.
25    Q.    This is the transcription. So first I want to

Page 431

1 refer you to page -- now I'm going by -- I'm going by
2 the -- we'll do the Bates stamps.
3        So go to page 4719, the bottom Bates stamp
4 number. Better yet, let's start on 4718.
5    A.    Okay. I'm there.
6    Q.    Okay. This is the portion where Mr. Kimerer is
7 asking you about the 1973 incident. Okay? Are you with
8 me?
9    A.    Yes.
10    Q.    All right. Take a look at line 23 on page
11 68 -- page 4718.
12        MS. BERKE: Wait. 4718.
13        MR. BRUSTIN: 4718. It's also 68.
14    Q.    BY MR. BRUSTIN: "Question: And I understand
15 in this context, in the context of the interview, if you
16 don't want to go into that, you know, I'm not going to,
17 but based on what you said thus far, you've admitted to
18 that conduct. Is that right? It's not in dispute?
19        "Answer: I have received five days off, and
20 I learned a lot of lessons from those five days off. I
21 lost a house. In fact I lost a lot of things, a little
22 bit of me during that day -- during that period of time,
23 but I've gone and tried to recapture that."
24        Is that what you told Mr. Kimerer?
25    A.    Yes.

Page 432

1    Q.    Is that true?
2    A.    Yes.
3    Q.    You lost a house as a result of the five-day
4 suspension?
5    A.    That's correct.
6    Q.    How come when I asked you that earlier you
7 didn't mention that? You forgot you lost a house?
8    A.    No, you just asked me about -- I just told you
9 I had financial matters. I mean, I don't know what a
10 house has to do with it, but...
11    Q.    You lost a house as a result of being off for
12 five days?
13    A.    That's correct.
14    Q.    What happened?
15    A.    I couldn't make the payment.
16    Q.    How long after your suspension did you lose the
17 house?
18    A.    I don't know. I can't recall.
19    Q.    What was the address of the home?
20    A.    I can't recall that either.
21    Q.    Whose name was the home in?
22    A.    Mine.
23    Q.    Okay. And what street was it on?
24    A.    I don't know.
25    Q.    You don't know what the street was?



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
433–436

Page 433

1    A.   No.  I've had four or five houses.
2    Q.   Is the reason you're not saying the street is
3  because you know you didn't lose a house, and you don't
4  want me to check?
5    A.   You can check if you want.
6    Q.   I'm going to.
7    A.   Good.
8    Q.   You don't remember the street?
9    A.   No.
10    Q.   You don't remember how long after the five-day
11  suspension you lost the house?
12    A.   No, I don't.
13    Q.   And the reason you lost the house is because of
14  the five-day suspension.  That's your testimony?
15    A.   Well, we were tight on payments at that time
16  and financially strapped because my kids were going to
17  Catholic school and stuff and, yes, financial problems.
18    Q.   Based on the five-day suspension?
19    A.   Again, yes.
20    Q.   What was your starting salary when you became a
21  police officer?
22    A.   Five sixty-five a month.
23    Q.   All right.  Go back to page -- the page before.
24  Read to yourself on 4 -- on page 4718 through line 22.
25        Are you done?

Page 434

1    A.   Yes.
2    Q.   All right.  This became public in approximately
3  2009 during the time of the post-trial proceeding.
4  Correct?
5        MS. BERKE:  Objection.  Vague.
6    Q.   BY MR. BRUSTIN:  I apologize.  It was a bad
7  question.
8        The -- the 1973 incident became public in
9  approximately 2009 during the time these proceedings
10  were -- happened?
11    A.   Again, the dates, I don't know, but, you know,
12  I know that became public.
13    Q.   Okay.  It became -- it became public in
14  connection with Debra Milke's post-trial proceedings.
15  Correct?
16    A.   I would presume so.
17    Q.   And you had to have some very painful
18  conversations with your children.  Correct?
19    A.   That's correct.
20    Q.   And you had a very painful conversation with
21  your son who was also a police officer.  Correct?
22    A.   Correct.
23    Q.   And you had a man-to-man conversation with him,
24  and you told him what his dad had done?
25    A.   I don't think I described it that way, but,

Page 435

1  yes, I did.
2    Q.   It says, "They're adults.  I had to tell them
3  what their dad did, and that was difficult, but I'm
4  done."
5    A.   I didn't say that.  You said I had a man-to-man
6  talk with him, and I didn't say that.
7    Q.   Was it a man-to-man talk?
8    A.   No, he's not a man.
9    Q.   He was a police officer.
10    A.   He was not -- not to me.  He's my son.
11    Q.   Okay.  Let's focus on one part.  You said, "I
12  had to tell them what their dad did, and that was
13  difficult."
14    A.   Uh-huh.
15    Q.   Did I read it correctly?
16    A.   Yes.
17    Q.   Okay.  In other words, you described to them
18  what happened with this woman.  Correct?
19    A.   What I could remember from reading the report
20  or what I got from the suspension but briefly.  I didn't
21  tell him everything.  I just told him I had been
22  suspended, and it was a -- I forget how I put it, but I
23  told him I was suspended for five days for inappropriate
24  acts and that basically it's -- you're going to see it on
25  TV, whatever.  I don't know.  You know, and it's going to

Page 436

1  come out.
2        But I don't -- you know, I didn't explain
3  details to them because I, first of all, didn't recall
4  it, and I knew -- the only thing I recall about that
5  incident -- it occurred, and it was my fault.  Don't
6  blame nobody else, and I've taken -- I took my five days
7  off with no problem.
8    Q.   Okay.  It says, "I had to tell them what their
9  dad did."  Right?  That's what it says?
10    A.   And that's how I explained it to you.
11    Q.   Okay.  You explained -- you explained it to
12  them just like you explained it to me?
13    A.   That's correct.
14    Q.   No more details?
15    A.   No more details.
16    Q.   And the reason was because you couldn't
17  remember the details.  Right?
18    A.   Partly true and partly because I don't think
19  they needed to know the details, even if I knew them.
20        (Exhibit 23 was marked for identification.)
21    Q.   BY MR. BRUSTIN:  Okay.  I want to show you
22  what's been marked for identification as Plaintiff's 23,
23  and let me tell you what I did here.
24        So I've created an exhibit which contained
25  the reports and other relevant documents that I think are



Page 437

1  important to ask you about from the Reynolds case.  Okay?
2  And I've created one document, and it's Bates-stamped --
3      A.   What case?
4      Q.   The Reynolds case.
5      A.   I have clarification on that one, too, but --
6      Q.   We'll get to that in a second.  Let me just
7  describe the document first.  This is one of the cases
8  you told me you reviewed.  Right?
9      A.   Yes.
10     Q.   All right.  This exhibit are the documents I
11  want to ask you about, and what I did is I -- so we could
12  follow it quickly is I put a separate set of Bates stamps
13  on the left.  It says Reynolds 1 through Reynolds 111.
14  Okay?  I'm going to be referring to --
15     A.   1 through --
16     Q.   111.
17     A.   111.  Okay.
18     Q.   I'm going to be referring to -- you don't need
19  to look.  I'm going to be referring to those Bates stamp
20  numbers as we talk about them.
21     A.   This one on the left-hand side?
22     Q.   Yeah.
23     A.   Okay.
24     Q.   I didn't include all of the documents that we
25  received on the Reynolds case.  I included the ones I

Page 438

1  want to ask you about.  Okay?
2      A.   Fine.  Thank you.
3      Q.   Now, as you've told me, you did carefully
4  review this case in preparation for today.  Correct?
5          MS. BERKE:  Objection.  Vague.
6          THE WITNESS:  I agree with --
7          MS. BERKE:  Do you mean the entire court
8  file, or what are you referring to?
9          MR. BRUSTIN:  Fair enough.
10     Q.   BY MR. BRUSTIN:  You attempted to prepare
11  yourself for today to testify about this case, correct,
12  your involvement in this case?
13     A.   Yes.
14     Q.   And you read a number of documents concerning
15  this case to refresh your recollection?
16     A.   Yes.
17     Q.   And did reading those documents refresh your
18  recollection about your involvement in the case?
19     A.   Yeah, to a degree, yes.
20     Q.   How much time would you say you spent reading
21  documents about the Reynolds case?  About an hour or two?
22     A.   No, not that long.  Forty minutes, maybe.
23     Q.   Okay.  But certainly you remember this case.
24  Right?
25     A.   Yes, you know, the best I can.

Page 439

1      Q.   Okay.  Good.  I'm going to ask you some
2  questions about it.
3          Now -- oh, I'm sorry.  You said you wanted
4  to make a clarification about this case.  Go ahead and do
5  that.
6      A.   I think it was one regarding -- you were asking
7  me about my ever misstating something, and I did misstate
8  something regarding this case.  It was in regards to
9  the situation where I said that I didn't -- the Court
10  found that I didn't tell them that it was a certain time
11  when, in fact, I said -- I wasn't -- I wasn't clear on
12  that point but -- so...
13     Q.   I'm sorry.  What's the correction you want to
14  make?
15     A.   The correction is I didn't tell you that I had
16  made a misstatement in this case in regards to the
17  portion of -- I -- when I testified, I testified that it
18  was in the evening, and I read it later on, and it was --
19  the little kid said it was around 8 o'clock or something,
20  and I -- for some reason, I didn't tell the Court that,
21  but it was just an error on my part.
22     Q.   Anything else?
23     A.   No.
24     Q.   Okay.  Now, as you've already told us
25  previously, before testifying in a homicide case or a

Page 440

1  courtroom or any time under oath, you're always careful
2  to review the reports that you created in the case to
3  ensure that you have a good recollection about what you
4  did.  Correct?
5      A.   I try to, yes.
6      Q.   Obviously, you know, you told us you always
7  want to be fair and honest about the process.  Correct?
8      A.   I try to be.
9      Q.   And you can't be -- if you're not accurate
10  about your involvement in the case when you testify,
11  that's not fair to the defendant.  Right?
12     A.   That's true.
13     Q.   And being fair and honest is one of the most
14  important things in your life.  Right?
15     A.   It's important but not one of the most
16  important things in my life.
17     Q.   All right.  Now, in any case, any time you
18  testify about a -- and certainly in a homicide
19  investigation, you're always careful to read your reports
20  before testifying.  Correct?
21     A.   I would try to if I had the time, yes.
22     Q.   Now, you understood that when you testify in a
23  grand jury -- withdrawn.
24          You've testified in many grand juries.
25  Correct?



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
441–444

Page 441

1    A.   Several.
2    Q.   Fair to say more than 50?
3    A.   Around that.
4    Q.   All right.  And you understand that when you
5    testify in a grand jury, unlike in a trial or pretrial
6    hearing, there's not going to be any cross-examination.
7    It's just the prosecutor asking you questions?
8    A.   Correct.
9    Q.   And you understand that it's particularly
10   important under those circumstances to be complete and
11   accurate in your responses because if you're not, that
12   could cause an innocent person to be indicted and spend
13   time in jail.  Correct?
14   A.   My testimony being truthful is very important,
15   and that is my responsibility.
16   Q.   And it's very important that when you're -- you
17   understood that if you mis- -- if you misstate evidence
18   in connection with a grand jury, that could conceivably
19   cause an innocent person to spend time in jail?
20   A.   First of all, it would not be intentional; and,
21   secondly, I would expect that the attorney who was
22   conducting the grand jury, if I -- if I misstate --
23   because he has a responsibility to review the facts and
24   review the reports, and I would think that he would then
25   bring up something to me while I'm on the stand.

Page 442

1         You have to remember a lot of these cases --
2    you know, I had a lot of cases, probably more than some
3    others but less than others, but there's misstatements
4    that I could make.  I mean, mistakes I could make, but I
5    don't do it intentionally, nor do I try to do it.
6         But I expect some help from the attorney,
7    the county attorney, if I do make a mistake to -- you
8    know, to show it to me, and I can then say, yes, I made a
9    misstatement and do it.  So...
10   Q.   Now, you understood --
11   A.   Dual responsibility.
12   Q.   Sure, sure, sure.
13        Now, a grand jury -- grand jury testimony is
14   usually early in a case.  Correct?  In other words, it's
15   usually within a matter of days or weeks after an arrest.
16   Correct?
17   A.   Yes.
18   Q.   And at that point in time in the criminal
19   process in Phoenix, you understood that oftentimes a DA
20   who is handling the grand jury may not be nearly as up to
21   speed on the facts as they would be near the time of
22   trial.  Is that fair to say?
23        MS. BERKE: Objection.  Foundation.
24        MS. RETTS: Join.
25        THE WITNESS: No.

Page 443

1    Q.   BY MR. BRUSTIN:  No.  You found that for grand
2    jury -- that grand jury DAs or county attorneys were --
3    usually knew as much about a case at the grand jury stage
4    as they did at trial?
5    A.   In homicide, yes.
6    Q.   All right.  Now, you would agree that an
7    indictment based on false information is a very bad
8    thing?
9    A.   It shouldn't happen, no.
10   Q.   It could lead to an innocent person losing
11   their liberty for -- it could be years to spend in jail
12   before a trial.  Correct?
13        MS. RETTS: Foundation.
14        MS. BERKE: Join.
15        THE WITNESS:  I -- I don't know.  I've never
16   made that big of a misstatement, you know, that I haven't
17   been able to just correct it or the county attorney would
18   correct it and then let -- advise me and give me the
19   opportunity to correct it.
20   Q.   BY MR. BRUSTIN:  Okay.  Now, as you already
21   told us and I just want to make clear, in the Reynolds
22   case, nobody ever came to you after you testified in the
23   grand jury and suggested you had done anything wrong.
24   Correct?
25   A.   Not that I know of.

Page 444

1    Q.   And the first mention -- the first mention of
2    any misstatement didn't occur until many years later, as
3    far as you know.  Right?
4    A.   Many years?  I can't say that for sure.
5    Q.   Okay.
6    A.   I don't know the dates.
7    Q.   Well, the -- the -- the post-trial hearings
8    that led to Ms. Milke's release from prison didn't occur
9    until 2009.
10   A.   So are we talking about Milke, or are we
11   talking about Lamont?
12   Q.   We're talking about Lamont.  Would you defer --
13   is Lamont how you want to refer to it?
14   A.   Oh, I mean, Reynolds but...
15   Q.   Okay.
16   A.   Okay.  Reynolds.
17   Q.   I'm just talking about Reynolds, and nobody
18   ever mentioned that you had done anything wrong in
19   Reynolds until many, many years later.  Right?
20        MS. BERKE: Objection.  Vague.
21        THE WITNESS:  I don't really know what I did
22   wrong.
23   Q.   BY MR. BRUSTIN:  That's different.  I'll get to
24   what you did wrong, but right now I'm asking you about
25   anyone ever told you you did something wrong?


Exhibit 1

ARMANDO SALDATE Volume II                          June 22, 2017
MILKE vs CITY OF PHOENIX                            445–448

Page 445

1    A.   No, that's what I'm saying.  I don't know that
2  I ever did anything wrong.
3    Q.   Okay.  And the first person that questioned you
4  about your conduct in the Reynolds case is me today right
5  now.  Fair to say?
6    A.   I would presume so, but I don't know.
7    Q.   You don't remember anyone -- after you -- after
8  you testified in the grand jury, you don't remember
9  anyone ever questioning your conduct in that case.  Is
10  that fair to say?
11   A.   I think I can agree to that.
12   Q.   All right.  Now, what happened in the Reynolds
13  case is that the victim -- her name was Deborah McKee --
14  was found strangled to death on the floor in her bedroom
15  in her apartment.  Correct?
16   A.   Correct.
17   Q.   And her body was found about 7:45 in the
18  morning on September 6th, 1988?
19   A.   I believe so.
20   Q.   And her three children, ages two, three and
21  five, were at home?
22   A.   I believe so.
23   Q.   And Deborah McKee was a Caucasian woman.
24  Correct?
25   A.   Yes.

Page 446

1    Q.   And the morning the victim's body was found, a
2  number of detectives canvassed the crime scene, and they
3  spoke to witnesses in and around the apartment as is
4  typically done in a homicide like that.  Correct?
5    A.   Correct.
6    Q.   And they were looking for people that might be
7  associated with the victim who could have committed the
8  crime.  Correct?
9    A.   Yeah.
10   Q.   And you came to learn that Deborah McKee, the
11  victim, also worked as a prostitute?
12   A.   I can't say that.
13   Q.   You don't recall that, but obviously if it's in
14  the report --
15   A.   It's in the report now.
16   Q.   -- you would have known it?
17   A.   Yeah.
18   Q.   And multiple witnesses from the apartment
19  complex described seeing Lamont Reynolds a/k/a Cutman in
20  and around the victim's apartment that night.  Correct?
21   A.   I believe so.
22   Q.   Many of them.  Right?
23      MS. BERKE:  Objection.  Vague.
24      THE WITNESS:  I don't know how to describe
25  many, but, yeah, several.

Page 447

1    Q.   BY MR. BRUSTIN:  Okay.  You remember there
2  being numerous?
3    A.   Several.
4      MS. BERKE:  Objection.  Vague.
5    Q.   BY MR. BRUSTIN:  And Reynolds or Cutman was
6  also reported by witnesses to be a member of the Crips
7  who was reported to have terrorized and control of
8  that -- that apartment complex.  Correct?
9    A.   That's correct.  I think I hadn't remembered
10  the Crips part, but you're right.
11   Q.   That ring a bell now?
12   A.   Yes.
13   Q.   He was described as a very bad guy.  Right?
14   A.   Probably was, yeah.
15   Q.   Okay.  And although a lot of people had seen
16  him in and around the apartment -- in that complex area
17  in and -- withdrawn.
18      Although a number of people had seen him
19  near the victim's apartment, nobody could place him in
20  the apartment at the time of the crime of those
21  witnesses.  Correct?
22      MS. BERKE:  Objection.  Foundation.
23      THE WITNESS:  I believe that's correct.
24   Q.   BY MR. BRUSTIN:  The only eyewitness was the
25  young son, the five-year-old?

Page 448

1    A.   Yes.
2    Q.   All right.  Now, the witnesses who described
3  Reynolds or Cutman -- they were consistent in what he
4  looked at.  They described him as -- they described what
5  he was wearing, and they described what he was wearing
6  the night before.  Correct?
7    A.   I believe so.
8    Q.   He was described as a black male.  Correct?
9    A.   I think so.
10   Q.   In his 20s?
11   A.   Yes.
12   Q.   Approximately six-foot three inches tall?
13   A.   I believe that was him.
14   Q.   Muscular?
15   A.   Yes.
16   Q.   A short Afro haircut?
17   A.   I vaguely recall that.
18   Q.   You want to see it or take my word?
19   A.   I'll take your word.  I vaguely recall that.
20   Q.   Okay.  And he was wearing gray short pants?
21   A.   I'd have to see it.  I don't remember.
22   Q.   Okay.  I think that's enough.
23      Do you remember he was wearing white British
24  Knight shoes --
25   A.   Yes.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
449–452

Page 449

1   Q.   -- as described by the witnesses?
2   A.   Yes.
3   Q.   Okay.  That was a consistent description of
4   Cutman or Reynolds from the witnesses who described him.
5   Correct?
6   A.   Yes.
7   Q.   Now, your first involvement in the case was the
8   morning of the murder.  Correct?
9   A.   I believe so.
10   Q.   And there was lots -- there was lots of
11   information right from the beginning of your involvement
12   in the case coming in about this Cutman guy.  Right?
13   A.   Yeah.
14   Q.   And pretty quickly you were able to identify
15   that Cutman was Reynolds?
16   A.   Yes.
17   Q.   And he was the person identified as being in or
18   near the victim's apartment?
19       MS. BERKE:  Objection.  Vague.
20       THE WITNESS:  I believe so, yeah.
21   Q.   BY MR. BRUSTIN:  Do you also recall that early
22   on in the investigation he was identified in another
23   rape?
24   A.   I don't recall that but --
25   Q.   Take a look at -- I'll show you real quick.

Page 450

1   A.   Okay.
2   Q.   Take a look at page 11.  Take a look at the
3   first paragraph.  Now take a look at the third paragraph,
4   the first sentence.  Have you seen enough to refresh your
5   recollection --
6   A.   Yeah.
7   Q.   -- that there was another alleged rape?
8   A.   Yeah.
9   Q.   Okay.  Another woman said she was raped by
10   Cutman.  Right?
11   A.   Yes.
12   Q.   All right.  So it was clear early on in the
13   case that it appeared this Reynolds was the guy who
14   committed the crime.  Correct?  That was your guy?
15   A.   I felt that, yes.
16   Q.   And there were also numerous witnesses who
17   testified that they spoke to the victim the night before.
18   Correct?
19   A.   Several witnesses.  I wouldn't say "numerous."
20   Q.   All right.  For example, a person named
21   Giesler.  I'm sorry.
22   A.   No.
23   Q.   A friend of the victim named Comstock saw the
24   victim alive at 12:30 a.m.  Do you recall that?
25   A.   Deborah.

Page 451

1   Q.   Yeah.  A woman named Diana Rivers at 12:30 a.m.
2   heard yelling.  A person named Giesler saw a black male
3   enter the apartment at 12:30 or 1:00.  Do you remember
4   that?
5       MS. BERKE:  Objection.  Foundation.
6   Q.   BY MR. BRUSTIN:  I'm asking if you remember.
7   I'll show you.
8   A.   I'm trying to get it.
9       MS. BERKE:  If you remember, then you can
10   answer, but if you need to refresh your recollection by
11   looking at the report, just let him know that.
12       THE WITNESS:  Yes, I looked at the report,
13   and I refreshed my memory, yes.
14   Q.   BY MR. BRUSTIN:  And a man named David
15   Mazarosky said that he left the victim's apartment at
16   9:30, and he spoke to her by phone at 10:20.  Do you
17   remember that, page 38?
18   A.   Yes.  Okay.
19   Q.   Do you see that, second paragraph.  At
20   approximately 10:20 p.m., he called her and told her that
21   she had just arrived home.  Do you see that?
22       MS. BERKE:  "He had just arrived."
23   Q.   BY MR. BRUSTIN:  "He had just arrived home."
24   So clear that he's telling you he spoke to the victim at
25   10:20 at night?

Page 452

1   A.   Correct.
2   Q.   All right.  And another -- another person,
3   Anthony Russell, said he saw the victim at 10:30 p.m.  Do
4   you recall that?
5   A.   I can read it.
6   Q.   Page 13.
7   A.   13.
8   Q.   I'll read it to you.  "Anthony stated he last
9   saw the victim at approximately 10:30 p.m. at 9/5/88."
10   Okay?
11   A.   Yes.
12   Q.   And you could look at page 36, Rosie Salazar
13   saying she saw the victim as late as 12:30.  Correct?
14   Big paragraph in the middle saying she saw Debbie about
15   12:30.  Right?
16   A.   12:00 to 12:30, yes.
17   Q.   Okay.  So numerous witnesses saying that they
18   saw the victim alive late at night on the 5th or early
19   morning on the 6th.  Correct?
20   A.   Correct.
21   Q.   So much so that in your first police report,
22   you're confident writing -- and this is on page 4, first
23   line of your first police report.  "At 9/6/88, between
24   0030 hours and 0745 hours, the victim, Deborah McKee, 24
25   years, was strangled to death inside her apartment."  Is

Page 453

1  that correct?
2      A.   That's what I read.
3      Q.   In other words, you concluded based on your
4  witness interviews that the murder occurred sometime
5  after 11:30 at night.  Correct?
6      A.   Apparently I did.
7      Q.   That's the first thing you wrote in your first
8  report in the case.  Correct?
9           MS. BERKE:  Objection.  Misstates evidence.
10          THE WITNESS:  I hate to refer to it as first
11  report and first case, but, yeah, I -- I wrote that, yes.
12     Q.   BY MR. BRUSTIN:  Well, take a look at this.
13  Look at page 4.  Doesn't this appear to be your first
14  report in the case?
15          MS. BERKE:  Are you talking datewise, the
16  date he prepared it?
17     Q.   BY MR. BRUSTIN:  This is the first --
18          MS. BERKE:  This is first in your stack.
19          MR. BRUSTIN:  Fair enough.
20     Q.   BY MR. BRUSTIN:  Do you agree that this is the
21  report of your first involvement in the case?
22          MS. BERKE:  Objection.  Misstates evidence.
23     Q.   BY MR. BRUSTIN:  Just look at page 4.  You
24  don't need to be switching around.  Look at the first two
25  paragraphs.

Page 454

1           MS. BERKE:  He's free to page through it to
2  answer your question to see when he prepared other
3  reports.
4           MR. BRUSTIN:  I'm going to direct him to
5  specific portions, and if that doesn't refresh it, then
6  it doesn't.
7           MS. BERKE:  No, that's -- you're not being
8  fair to the witness.
9           MR. BRUSTIN:  I'm going to be fair to the
10  witness.
11          MS. BERKE:  You're asking him if that was
12  the first report he prepared.
13          MR. BRUSTIN:  I'm going to give him
14  something to read which I think will answer the question.
15     Q.   BY MR. BRUSTIN:  Mr. Saldate, read the first
16  two paragraphs on page 4, just the first two.
17     A.   Yes, I read that.
18     Q.   Okay.  Now, the second paragraph makes clear
19  that in this report you're describing your police
20  involvement in the case.  Correct?
21     A.   Yes.
22     Q.   All right.  This is your first report in the
23  case.  Correct?
24          MS. BERKE:  Objection.  Misstates evidence.
25          THE WITNESS:  I can't be sure of that, but

Page 455

1  it's my first involvement.
2      Q.   BY MR. BRUSTIN:  It's your first involvement.
3           And the first thing you write about your
4  first involvement in the case -- and I misspoke before --
5  is the crime occurred after 12:30 at night.  Correct?
6      A.   Yes.
7      Q.   And that was based on your having interviewed
8  numerous witnesses who consistently reported that it
9  happened after 12:30.  Correct?
10     A.   Correct.
11     Q.   And you found them credible?
12     A.   I presume I did, yeah.
13     Q.   Or you wouldn't have written this.  Correct?
14     A.   That's correct.
15     Q.   So you were investigating a crime that you
16  believed occurred sometime after 12:30 in the morning.
17  Correct?
18     A.   That's correct.
19     Q.   All right.
20     A.   That was my estimation, yeah.
21     Q.   All right.  Now, let's take a look at page --
22  withdrawn.
23          You were the case agent of the case.
24  Correct?
25     A.   Yes.

Page 456

1      Q.   And, obviously, as the case agent in the case,
2  you were reviewing all the reports that were being
3  created by other detectives.  Correct?
4      A.   When time permitted, yes.
5      Q.   Well, certainly before conducting an interview
6  of a suspect or a witness, if that witness or suspect had
7  been interviewed by somebody else when there was a
8  report, you would of course read it.  Correct?
9      A.   No.
10     Q.   No?
11     A.   No.
12     Q.   All right.  Let's take a look at page 19.  This
13  is a description of the person that five-year-old Patrick
14  said he saw kill his mother.  Correct?
15     A.   Yes.
16     Q.   Is that accurate?
17     A.   Yes.
18     Q.   Okay.  And obviously you -- you -- you would
19  have known soon after Patrick Engelhart -- Engelbert --
20  I'm sorry -- gave this description that he was a
21  potential eyewitness in the case.  Correct?
22     A.   I believe I did know that, yeah.
23     Q.   All right.  And obviously you would have
24  reviewed any reports about -- you would have been very
25  interested in any reports regarding what he says he saw.



Page 457

1  Correct?
2      A.   Yeah, but I -- the report wouldn't have been
3  ready by then anyway.
4      Q.   Okay.
5      A.   I may have spoken to Addington or Sergeant may
6  have spoken to him, and he may have told me, but I don't
7  know.
8      Q.   It says the report was ready by September 14th,
9  1988.  Correct?
10         MS. BERKE:  It says it was typed.
11     Q.   BY MR. BRUSTIN:  What has to happen after it's
12  typed?  How long does it take before you get it?
13     A.   Several days sometimes because it has to go to
14  different -- I really don't know the procedure where it
15  goes through, but people review it or whatever.  I
16  don't -- I don't really know that process, but you
17  finally get it.
18         After you review it, then it may go back
19  again for some corrections, and -- and then -- so it may
20  take a few days.
21     Q.   Okay.  And you weren't present for this
22  interview.  Correct?
23     A.   No.
24     Q.   This interview was conducted by Detective
25  Addington?

Page 458

1      A.   Correct.
2      Q.   And you knew Detective Addington.  Correct?
3      A.   I knew of him, and I knew what area he was
4  working, yeah.
5      Q.   You certainly knew what he did in this case.
6  You spoke to him about it.  Right?
7      A.   I may have spoken to him, yeah.
8      Q.   Do you have any doubt in your mind that you
9  spoke to Detective Addington in connection with this
10  case?
11         MS. BERKE:  Objection.  Foundation.
12         THE WITNESS:  I don't want to say a doubt,
13  but I --
14     Q.   BY MR. BRUSTIN:  Let me ask --
15     A.   I'm sure I did --
16         MS. BERKE:  He --
17         THE WITNESS:  I'm sure I did speak with him,
18  but when -- I mean, he was assisting in the interrogation
19  of the boy.  So I must have spoken to him, but I just
20  don't know when.
21     Q.   BY MR. BRUSTIN:  All right.  Do you have any
22  doubt in your mind, even though you don't recall it, that
23  you would have spoken to Detective Addington -- as the
24  assigned detective on this case, you would have spoken to
25  Detective Addington within a day or so of him talking to

Page 459

1  the first eyewitness in the case?
2         MS. BERKE:  Objection.  Foundation.
3         THE WITNESS:  I can believe that I would
4  have talked to him as soon as possible.
5      Q.   BY MR. BRUSTIN:  All right.  Now, let's look at
6  what Patrick describes.  What he describes is a man with
7  an old, wrinkled face.  Correct?
8      A.   He was old due to wrinkles on his face and
9  legs.
10     Q.   That he was tall?
11     A.   Yes.
12     Q.   That he had bushy hair.  Right?
13     A.   Yes.
14     Q.   That the hair ran all the way down his back?
15     A.   Yes.
16     Q.   That he had two specific tattoos and that they
17  were heart-shaped.  Right?
18     A.   Yes.
19     Q.   A very specific description of this person.
20  Correct?
21     A.   For a boy his age, yes.
22     Q.   For anybody.  Right?
23     A.   I can't say anybody, but for his age, he gave a
24  good description.
25     Q.   He also said he had a high woman's voice, a

Page 460

1  woman -- a high voice that sounded like a woman.
2  Correct?
3      A.   That's what he said.
4      Q.   He described a very distinct person, an old
5  black -- an old black man with -- with bushy hair that
6  ran all the way down -- all the way down his back who had
7  two heart-shaped tattoos and spoke like a woman.  Right?
8      A.   Yes.
9      Q.   And he also described the black male as having
10  a large beer belly.  Right?
11     A.   That's correct.
12     Q.   And he also made clear that when he said old,
13  it was old like grandpa.  He had wrinkles?
14     A.   I don't -- well, he had wrinkles.  I don't
15  think he said grandpa.
16     Q.   Take a look at page 23.  He did.
17     A.   Okay.
18     Q.   Question in the middle of the page:  "Old like
19  your grandpa?
20         "Answer:  Yeah.
21         "Who is the oldest person you ever saw?
22         "My grandpa.
23         "And this man was that old or not that old?
24         "He was old.  He had wrinkles on his face
25  and on his legs."

Page 461

1        He's very clear about what he's describing.
2   Right?
3      A.   Apparently, yeah.
4      Q.   He's describing an old man.  Right?
5        MS. BURGESS:  Foundation.
6        THE WITNESS:  Yeah.
7      Q.   BY MR. BRUSTIN:  Okay.  Now, take a look at
8   page 50.  He also described brown shoes.  Is that right?
9   Do you remember that?
10       MR. BRUSTIN:  What page?
11       MS. GREEN:  19.
12     Q.   BY MR. BRUSTIN:  Take a look at 19 again.
13  Brown shoes, either leather or tennis shoes.  Do you see
14  that?  Bottom?
15     A.   Uh-huh.
16     Q.   All right.  Now, first of all, you would agree
17  that the descriptions that you receive about Reynolds
18  couldn't be more different than the description Patrick
19  gave you as the person he saw.  Would you agree with
20  that?
21     A.   You add words like "couldn't be more."  It's
22  different.
23     Q.   It's different in every important way, isn't
24  it?
25       MS. BURGESS:  Object to form.

Page 462

1        THE WITNESS:  Wrinkles -- you indicate he --
2   Lamont Reynolds has had stretch marks on his legs.  So that
3   to a kid could be wrinkles.
4      Q.   BY MR. BRUSTIN:  Lamont Reynolds was 19 years
5   old.
6      A.   Okay.
7      Q.   And this kid describes seeing an old man like
8   his grandpa.  Right?
9      A.   Well, a little kid -- old is -- you know,
10  that's the way he described it, yes.
11     Q.   And Lamont Reynolds had a short Afro.  Correct?
12     A.   Yes.
13     Q.   And he described a man with a bushy Afro that
14  ran down his back.  Correct?
15     A.   That's correct.
16     Q.   And Lamont Reynolds didn't have any
17  heart-shaped tattoos, did he?
18     A.   I don't remember, but I don't believe so.
19     Q.   If I represent to you that the reports made
20  clear he didn't, do you have any reason to dispute that?
21     A.   Is that what you represent?
22     A.   I am.
23     A.   Okay.
24     Q.   And whereas Lamont Reynolds was tall and thin
25  and muscular, he described a man with a beer belly.

Page 463

1   Right?
2      A.   Correct.
3      Q.   And whereas Lamont Reynolds was described as
4   wearing bright White Knight shoes, this person was
5   wearing brown shoes.  Right?
6      A.   That's what he said.
7      Q.   And you would agree it appears that he is
8   describing a different man based on the description?
9      A.   I would agree that he has a different
10  description of what he thought he saw.
11     Q.   There's nothing about the person he describes
12  that matches Lamont Reynolds.  Correct?
13       MS. BERKE:  Objection.  Misstates evidence.
14       THE WITNESS:  I wouldn't say nothing.
15     Q.   BY MR. BRUSTIN:  What matches Lamont Reynolds?
16     A.   He's black.
17     Q.   He's a black?  Anything else?
18     A.   He's in the area, you know.  I don't know.
19     Q.   Would you agree that there are striking
20  dissimilarities between Lamont Reynolds and what this boy
21  describes?
22     A.   There are just some dissimilarities.
23     Q.   Is "striking" a fair term?
24     A.   That's not a fair term.
25     Q.   Okay.  What would be a fair term?  I'll take

Page 464

1   whatever you say.
2      A.   Striking differences.
3      Q.   Okay.  Now, obviously, as an experienced
4   homicide detective, before you interviewed young
5   five-year-old Patrick, you were well aware of the
6   differences in the description.  Correct?
7        MS. BERKE:  Objection.  Foundation.
8        THE WITNESS:  I may have been, yes.
9      Q.   BY MR. BRUSTIN:  Of course you were, weren't
10  you?
11       MS. BERKE:  Objection.  Foundation.
12       THE WITNESS:  I don't remember, but I may
13  have been.
14     Q.   BY MR. BRUSTIN:  All right.  Now, take a look
15  at page 50.
16     A.   Okay.  I'm here.
17     Q.   Take a look at the bottom of the page.  This is
18  an interview that you're present at.  Right?
19     A.   Yes.
20     Q.   This is an interview that is conducted on
21  October 11th.  Correct?
22     A.   That's correct.
23     Q.   Long after the --
24       MS. BERKE:  Wait.  What page are you on?
25       THE WITNESS:  Page 50.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
465—468

Page 465

1    MS. BERKE: It's not October 11th.
2    THE WITNESS: September 12th.
3    MR. BRUSTIN: Oh, I'm sorry. I'm looking at
4  the date on top.
5    Q.   BY MR. BRUSTIN: Is there a reason why this
6  report wasn't typed -- wasn't submitted and typed for a
7  month?
8    A.   I wouldn't know.
9    Q.   Any explanation for that?
10   A.   No. I wouldn't know. I had nothing to do with
11  typing.
12   Q.   It says supplement date 10/11/88. That means
13  that's the date it's submitted. Right?
14   MS. BERKE: Objection. Vague.
15   THE WITNESS: Yeah, I would presume so.
16   Q.   BY MR. BRUSTIN: Why did you wait a month to
17  submit this report?
18   A.   I don't remember waiting a month to --
19   Q.   That's what this document indicates. Correct?
20   MS. BERKE: Objection. Misstates evidence.
21  Foundation.
22   THE WITNESS: Doesn't need to. That just
23  says -- it gives two different dates.
24   Q.   BY MR. BRUSTIN: The portion -- how many of
25  these have you filled out, a thousand?

Page 466

1    A.   I don't know. I don't fill them out really. I
2  just tape them.
3    Q.   Based on your experience with these reports,
4  would you agree that the box where it says supplement
5  date is the date when the report is submitted?
6    MS. BURGESS: Object to form.
7    THE WITNESS: If it's a supplement date, it
8  would be --
9    MS. BERKE: Objection. Foundation.
10   THE WITNESS: -- September 12th, 1988. Why
11  it's 10/11/88, I don't know.
12   Q.   BY MR. BRUSTIN: You don't know why you waited
13  that long. Right?
14   MS. BERKE: Objection. Foundation.
15   THE WITNESS: No, I don't know that --
16  supplement date would be when the supplement was made.
17  Right? And I made this -- it was September 12, 1988,
18  would have been -- and why I -- I don't know whether
19  that's incorrect or -- or maybe they lost the tape for a
20  little bit. I don't know. It was out of my hands.
21   Q.   BY MR. BRUSTIN: Okay. Take a look at the
22  bottom of this page.
23   A.   Okay.
24   Q.   And this is where you ask Patrick to close his
25  eyes and try to picture the man that he saw. Right?

Page 467

1    A.   Uh-huh.
2    Q.   And when you asked Patrick to tell you what he
3  saw -- I'm sorry. Let's go back to the top -- the top of
4  this page. In the second full paragraph, it says,
5  "Patrick then closed his eyes and told us that he was a
6  black man, big and tall. He said he believed he had a
7  blue shirt and blue pants." Right?
8    A.   Yes.
9    Q.   That's a different description than he gave the
10  first time. Right?
11   A.   That's not uncommon for a little kid.
12   Q.   Is that a different description?
13   A.   Yes.
14   Q.   And it's a description that's much -- that's
15  magically much closer to Lamont Reynolds. Correct?
16   MS. BERKE: Objection. Argumentative.
17   THE WITNESS: I don't know if it was -- was
18  or wasn't. I would have to go back to his clothing.
19   Q.   BY MR. BRUSTIN: Mr. -- I will represent to you
20  that Mr. Reynolds wasn't arrested until October 12th,
21  1988. Are you with me?
22   A.   Okay.
23   Q.   Do you think that the fact that this supplement
24  was done on October 11th had anything to do with his
25  pending arrest?

Page 468

1    A.   I wouldn't know.
2    MS. BURGESS: Foundation.
3    Q.   BY MR. BRUSTIN: Do you think this is a report
4  that you submitted a month late because it supported the
5  pending arrest?
6    A.   No.
7    Q.   And you would agree that Patrick's description
8  here is much closer --
9    First of all, is much less specific.
10  Correct?
11   A.   Yes.
12   Q.   And it's closer to Lamont Reynolds. Correct?
13   A.   I'm not -- you start like if I'm going to -- I
14  don't remember that it is, but I'll look at what he was
15  wearing.
16   Q.   You don't need to look at it. You don't
17  remember what I just described, long hair down his back,
18  big beer belly, all those other things. You don't
19  remember that from a minute ago?
20   MS. BERKE: Objection. Argumentative.
21   THE WITNESS: I remember what you said, but
22  I don't know if I can rely on everything you say because
23  you misrepresented several things. So, like, if I can go
24  back, I will.
25   Q.   BY MR. BRUSTIN: Do you think I'm dishonest?

ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
469–472

Page 469

1    A.   I think you may misrepresent things to benefit
2  you and your case, yes.
3    Q.   Do you think I've been dishonest with you?
4    A.   At times, yes.
5    Q.   Okay.  I haven't been fair to you?
6    A.   I -- you don't need to be fair to me.
7    Q.   Have I been fair to you?
8    A.   You don't need to be fair to me.
9    Q.   All right.  Now, take a look at --
10        MR. BRUSTIN:  Okay.  Let's change.
11        THE VIDEOGRAPHER:  This ends media No. 2.
12  We're off the record at 2:20 p.m.
13        (A recess was held off the record.)
14        THE VIDEOGRAPHER:  One moment.  This begins
15  media No. 3, volume 2, to the video-recorded deposition
16  of Armando Saldate.  We're back on the record at
17  2:26 p.m.
18    Q.   BY MR. BRUSTIN:  Mr. Saldate, what were you
19  just reading on your attorney's computer?
20        MS. BERKE:  It wasn't his attorney's
21  computer for the record.
22    Q.   BY MR. BRUSTIN:  What were you just reading on
23  a computer?
24    A.   The TV schedule for September -- for this date
25  anyway.

Page 470

1    Q.   Okay.  Did it provide you any important
2  information?
3    A.   It didn't indicate that there was a Garry
4  Shandling story on -- I mean, a show on that night.
5    Q.   Okay.  I'm going to get to that in a minute,
6  but let's talk about --
7        First, let's talk about timing.
8    A.   Timing.
9    Q.   When Patrick was interviewed the first time,
10  you understand that what he said was he went to bed at
11  8:00 and that he was watching the Garry Shandling show.
12  Correct?
13    A.   That's correct.
14    Q.   And he said he went to bed after the man turned
15  the TV off and left.  Correct?
16    A.   Yes.
17    Q.   And it was clear that he was in his mind
18  describing the person that killed his mother.  Correct?
19    A.   He was describing what?  I'm sorry.
20    Q.   It was clear in his mind and what you believe
21  is that he was describing the person that killed his
22  mother?
23    A.   I believe he was, yes.
24    Q.   All right.
25    A.   I don't know if it was clear in his mind, but I

Page 471

1  believe.
2    Q.   He also makes clear -- he was very specific
3  that he only saw the first part of the Garry Shandling
4  show because it was turned off.  Correct?
5    A.   I believe he said that.
6        MS. BERKE:  What page are you at?
7        MR. BRUSTIN:  Page 25.
8    Q.   BY MR. BRUSTIN:  Question at the bottom: "Did
9  you get to watch all of Garry Shandling?
10        "No, he turned it off.  I only saw the first
11  part."
12        Right?
13    A.   Yes.
14    Q.   Couldn't be more clear that this young man is
15  saying that the crime occurred sometime while he was
16  watching Garry Shandling show between 8:00 and 8:30.
17  Correct?
18    A.   That's what he said.
19    Q.   Okay.  Unusual for a five-year-old to be
20  watching the Garry Shandling show.  Right?
21    A.   Especially since apparently it wasn't on, yeah.
22    Q.   We're going to get to that.
23    A.   Okay.  Sorry.
24    Q.   You think you were the first one to notice
25  that?

Page 472

1    A.   Huh?
2    Q.   You think you were the first one to notice
3  that?
4        MS. BERKE:  Objection.  Foundation.
5        THE WITNESS:  I didn't really think about
6  that.
7        MS. BERKE:  Argumentative.
8        THE WITNESS:  I didn't really think about
9  it.  If you want to be the first one to notice it, I'll
10  give you credit.
11    Q.   BY MR. BRUSTIN:  No, I think you were the first
12  one to notice.
13    A.   No.
14    Q.   But I think it was a long time.
15        Now, you agree it's unusual for a
16  five-year-old to be watching the Garry Shandling show.
17  Right?
18        MS. BERKE:  Objection.  Foundation.
19    Q.   BY MR. BRUSTIN:  It's an adult show?
20        MS. BERKE:  Objection.  Foundation.
21        THE WITNESS:  But he was -- he was living --
22  he was a lot older than what his age -- because of his --
23    Q.   BY MR. BRUSTIN:  But --
24        MS. BERKE:  Let him finish his answer.
25        THE WITNESS:  Because of his living



Page 473

1  conditions and who he lived with, and so he was a little
2  bit older.  He -- you know, he had to survive.  So...
3     Q.   BY MR. BRUSTIN:  It was a tough life he had.
4  Right?
5     A.   I think he was.
6     Q.   He was living with a mother who worked as a
7  prostitute.  Correct?
8     A.   Yes.
9     Q.   There were men coming in and out of the house.
10  Correct?
11     A.   Yes.
12     Q.   Sometimes those men, as you understood it,
13  could be quite aggressive with his mother.
14     A.   Uh-huh.
15     Q.   Right?
16     A.   I presume so.
17     Q.   And he was living -- he was seeing a lot of bad
18  things probably?
19     A.   Yes, I would presume that.
20     Q.   All right.  But what this young man told you is
21  that while he was watching a very specific show, Garry
22  Shandling, that's when this killer came into the house.
23  Correct?
24        MS. BURGESS:  Form.
25        THE WITNESS:  That's what -- that's what he

Page 474

1  says, yeah.  That's what he said.
2     Q.   BY MR. BRUSTIN:  Okay.  Now, obviously, as an
3  experienced homicide detective, you quickly realized
4  while you were investigating this case that what this
5  young man was saying, that the man came and killed his
6  mother at 8:00 to 8:30, was quite different than what
7  everybody else was saying.  Correct?
8     A.   Yes.
9     Q.   All right.  And, obviously, as an experienced
10  investigator, the first thing that must have crossed your
11  mind is perhaps this young man is wrong about the time.
12  Correct?
13     A.   I hate when you give me compliments because
14  then it's -- but that's correct.
15     Q.   And so what any competent -- what any competent
16  person would do at that stage is to check the TV Guide
17  and to say, I wonder if it was really on at 8 o'clock.
18  Right?
19     A.   I would presume, but I didn't.  So...
20     Q.   Oh.  So you presume a competent person would do
21  it; you just didn't do it.  That's your testimony?
22     A.   I'm a competent person, but I didn't do it,
23  believing maybe somebody else was going to do it.  I just
24  don't know why I didn't do it.
25     Q.   Well, who else would do it -- who else would do

Page 475

1  it but the case agent?
2     A.   Well, there's other detectives that were
3  assisting me, the scene investigator, you know,
4  Addington, you know.  I don't know.  I just never asked
5  about it.
6     Q.   You assumed somebody else would do it?
7     A.   I assumed it was going -- that question would
8  be asked, yeah.
9     Q.   Okay.  And as far as you know, nobody did it?
10     A.   I don't know.  I really don't know.
11     Q.   Well, you understood that the only eyewitness
12  in this case was this young boy.  Correct?
13        MS. BERKE:  Objection.  Foundation.
14        THE WITNESS:  I believe that was true.
15     Q.   BY MR. BRUSTIN:  And you understood that except
16  for this young boy, everybody else was saying that the
17  victim was seen alive long after he said he saw the
18  perpetrator leave.  Correct?
19     A.   That's correct.
20     Q.   And you understood as an investigator you were
21  going to have to explain that discrepancy.  Correct?  You
22  were going to have to investigate it?
23     A.   Well, investigate the crime.  So it would
24  explain itself.
25     Q.   You would have to investigate the discrepancy

Page 476

1  between what all the witnesses said, it happening after
2  12:30 and him saying it happened at 8:00.  That was an
3  investigative task for you.  Correct?
4     A.   All that would come with the investigation.
5     Q.   All right.
6     A.   I mean, it would be determined whether he was
7  right or wrong.  I mean, you know, I just took it or
8  Addington just took it for what it was or what he wrote
9  down.
10     Q.   Well, you understood that if the Garry
11  Shandling show was on between 8:00 and 8:30, that
12  would -- that would -- that would lend powerful
13  corroboration to what he was saying.  Correct?
14     A.   Corroboration to what he was saying?
15     Q.   That he was a reliable reporter?
16     A.   That a man shut the TV off and came in?
17     Q.   He tells a story of watching Garry Shandling,
18  the man coming in while it was on and turning it off
19  before it was over and that it happened at 8 o'clock.  If
20  you saw the TV Guide and realized it actually happened at
21  8 o'clock, that would suggest that he was accurate.
22  Correct?
23     A.   To that, yes, to those terms.
24     Q.   And the most basic thing any investigator would
25  do is to go to the newspaper or the TV Guide and look and



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
477–480

Page 477

1  see whether the Garry Shandling show was on.  Correct?
2      A.   I don't know that because I didn't do it.
3      Q.   So your testimony here under oath is that
4  neither you nor anybody else to your knowledge checked
5  the TV Guide?
6      A.   That's correct.
7      Q.   How is that possible?
8          MS. BERKE:  Objection.  Argumentative.
9          MS. RETTS:  Form.
10          THE WITNESS:  I -- I think somebody had
11  mentioned that Garry Shandling wasn't on until late night
12  or something, but I -- I really don't remember anything
13  more about that.  I don't know.
14      Q.   BY MR. BRUSTIN:  You just made that up, didn't
15  you?
16      A.   Huh?
17      Q.   You just made that lie up?
18      A.   Are you calling me a liar?
19      Q.   I am, sir.
20      A.   Well, I called you one, too.  So I guess we're
21  even.
22      Q.   Well, you just said that somebody told you it
23  happened late at night.  That was a lie that you just
24  made up, wasn't it?
25      A.   No.

Page 478

1          MS. BERKE:  Objection.  Argumentative.
2          MR. BRUSTIN:  Let's mark this as 24.
3          (Exhibit 24 was marked for identification.)
4          MR. BRUSTIN:  And this is 25.
5          (Exhibit 25 was marked for identification.)
6          MR. BRUSTIN:  Can I see what you marked as
7  which?
8      Q.   BY MR. BRUSTIN:  Here you go.  Is that one of
9  the days you were looking at on the computer?
10          MS. BERKE:  Can you wait until everybody has
11  his before you start questioning?
12          MR. BRUSTIN:  I apologize.  Yeah.
13          MS. BERKE:  Which is which?
14          MR. BRUSTIN:  24 is Sunday; 25 is Monday.
15  All set?
16      Q.   BY MR. BRUSTIN:  So take a look at Exhibit 25.
17      A.   Okay.
18      Q.   That's what you were just looking at on the
19  computer, correct, the TV Guide for Monday, September
20  5th?
21      A.   This is not what I was looking at.  It was
22  similar to -- it was a TV Guide similar, but it's not
23  this.  This wasn't what I was looking at.
24      Q.   What newspaper did you read in 1988?  Did you
25  read the Arizona Republic?

Page 479

1      A.   Probably.
2      Q.   Okay.  Did you get it delivered to your house?
3      A.   I don't recall.
4      Q.   Did you read the paper every day?
5      A.   No.
6      Q.   Okay.  Did you have a TV Guide in your house?
7      A.   No.
8      Q.   Did you have a TV in your house?
9      A.   Yes.
10      Q.   Okay.  You had to think about that?
11      A.   Huh?
12      Q.   Did you have to think about whether you had a
13  TV in your house?
14      A.   No.
15      Q.   Of course you had a TV in your house.  Right?
16      A.   Obviously you knew.
17      Q.   Did you watch TV in 1988?
18      A.   Not very much.
19      Q.   And you can say with certainty you didn't have
20  a TV Guide in your house?
21      A.   Yeah, I could say for sure.
22      Q.   Okay.  How about the newspaper?  Did you have
23  the newspaper in your house?
24      A.   I probably did.
25      Q.   Okay.  And it may even have been this Arizona

Page 480

1  Republic.  Right?
2      A.   Who knows?
3      Q.   Who knows?
4          Now, if you take a look at Monday,
5  September 5th, and if you go to the times, relevant
6  times, you can look from 8 o'clock through, let's say, 1
7  a.m.
8      A.   Uh-huh.
9      Q.   I will represent to you that the Garry
10  Shandling show does not appear anywhere here.
11          MS. BERKE:  You're on which exhibit?
12          MR. BRUSTIN:  Exhibit 25.  Monday.  Right.
13          MS. RETTS:  That's the wrong date.
14          MR. BRUSTIN:  I gave you the wrong date?
15          MS. RETTS:  I think the crime is the 6th --
16          MR. BRUSTIN:  Yeah.
17      Q.   BY MR. BRUSTIN:  You would agree -- it's
18  confusing, Investigator Saldate, you -- Mr. Saldate, you
19  would agree that the child was reporting that he was
20  watching the Garry Shandling show on September 6th,
21  Monday -- September 5th, Monday, when he saw the
22  perpetrator come to the house.  Correct?
23      A.   I believe so.
24      Q.   All right.  And if you look at the -- this TV
25  Guide all the way through the early morning of the 6th,



Page 481

1 the Garry Shandling show is not here. Correct?
2   A.  I can't find it, no.
3   Q.  All right. So that suggests that perhaps the
4 boy was just wrong, that he -- he didn't -- he wasn't
5 watching the Garry Shandling show when he saw this man.
6 Correct?
7   A.  Yes.
8   Q.  All right. Now, let's take a look at what
9 happened on Sunday night. Sunday, September 4th, is the
10 day before Monday, September 5th. Correct?
11   A.  Yes.
12   Q.  Take a look at 8 o'clock on Sunday,
13 September 4th. What's on TV -- what show relevant to
14 this case is on TV at 8 o'clock on Sunday, September 4th?
15   A.  It's -- it says here it's the Garry Shandling
16 show.
17   Q.  Okay. And then take a look at 9 o'clock.
18   A.  Well, that's the -- the 8 o'clock indicates
19 that it was on a different channel, not ours, because it
20 was Channel 11, and the 9 o'clock shows that it was in
21 our station.
22   Q.  Okay. So it's your testimony that you're
23 certain that the boy's home was not getting Channel 11?
24   A.  I'm relatively certain that Channel 11 and
25 it's -- it's lighter -- it has a white background --

Page 482

1 refers to another location and not Phoenix, and I'm
2 saying that Channel 15 -- it's a Garry Shandling show at
3 9 p.m. with the dark background is a show that would be
4 seen here.
5   Q.  You seem to know a lot about the TV Guide?
6   A.  Huh?
7   Q.  You seem to know a lot about the TV Guide and
8 how it works?
9   A.  You think so?
10   Q.  You know what shows from the TV Guide are in
11 your area. This looks like it's something you read
12 before. Right?
13   A.  I don't know. Is this the TV Guide, or is this
14 the newspaper? You misrepresent that again or --
15   Q.  How do you know which channels based on the
16 newspaper are in which area?
17   A.  Because I just know we didn't have a Channel 11
18 back then, and that was -- and it's a white area. So
19 it's a lighter background. So I know that -- you know, I
20 mean, I can say I did not have TV Guide, but I did look
21 into it.
22   Q.  How do you know a lighter shade means it's not
23 in your area?
24   A.  Just -- that's what I believed.
25   Q.  You just know that from reading either the TV

Page 483

1 guide in the newspaper or the TV Guide. Correct?
2   A.  No, the newspaper probably because I didn't
3 take the TV Guide.
4   Q.  Okay. But you would read the TV -- you would
5 read the TV guide in the newspaper, and that's how you
6 knew that?
7   A.  I would read the TV listings in the newspaper
8 at times probably but not very often.
9   Q.  All right. And here it says -- what it appears
10 is that this young man was watching -- by the way, you're
11 not certain that Channel 11 wasn't available to that
12 household, are you?
13   A.  Well, you just gave me a compliment, saying
14 that I was really up on everything. So I guess, but I
15 can't be certain, no.
16   Q.  Okay. So it looks like the Garry Shandling
17 show was on in that apartment or could have been on in
18 that apartment at 8 o'clock or 9 o'clock, correct, on
19 Sunday, the day before?
20   A.  Yes.
21   Q.  All right. Now, you understood, as you already
22 told us earlier, about ten minutes ago, that there were
23 in your understanding men coming in and out of the house
24 because his mother was a prostitute all the time.
25 Correct?

Page 484

1       MS. BERKE:  Objection. Foundation.
2       THE WITNESS:  I didn't say that. You may
3 have read it, but I didn't say anything about that.
4   Q.  BY MR. BRUSTIN:  When I asked you --
5   A.  You asked me, but I did not say the words that
6 you're trying to attribute to me.
7   Q.  Mr. Saldate, you understood that this boy was
8 living in a household where men were coming in and out.
9 Correct?
10   A.  That's correct. I understood that. I didn't
11 say that to you.
12   Q.  You understood it. Right?
13   A.  That's correct.
14   Q.  All right. And you would agree that it appears
15 what happened from looking at the two TV Guides is that
16 the boy was confused about when he saw the man come in
17 and turn off the TV. It actually happened Sunday and not
18 Monday. Correct?
19       MS. BERKE:  Objection. Foundation.
20       THE WITNESS:  I don't know.
21   Q.  BY MR. BRUSTIN:  Well, let's think about it.
22 Let's talk about --
23   A.  A minute ago you said he was telling the truth,
24 and he did this and did that, and now you're changing
25 your mind and saying he's not.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
485–488

Page 485

1   Q.   I was setting you up.
2   A.   I know that.
3   Q.   So now I want to talk about this.  Are you with
4   me?  Let's focus on this now.
5   A.   All right.  I'm focused.
6   Q.   All right.  You know this case because you were
7   the case -- you were the case agent on it.  Right?
8   A.   I know the case.
9   Q.   Okay.  And you reviewed it in preparation for
10  today.  Right?
11  A.   I looked through it, yes.
12  Q.   Okay.  And you know -- you understand that this
13  was a house where men were coming in and out.  Right?
14  A.   That's what I was told, yes.
15  Q.   Because she was a prostitute?
16  A.   That's what I was told.
17  Q.   And you knew that some of those men were
18  probably overly aggressive with his mother.  Correct?
19       MS. BERKE:  Objection.  Foundation.
20  Q.   BY MR. BRUSTIN:  You expected it?
21  A.   I was told.
22  Q.   All right.  And it appears if you look at the
23  TV Guide that the boy was confused and was describing to
24  you a man who was in his house on Sunday, as opposed to
25  Monday.  Right?

Page 486

1       MS. BERKE:  Objection.  Foundation.
2   Q.   BY MR. BRUSTIN:  Does that make sense?
3   A.   But I didn't know that then.
4   Q.   I know.  I'm not suggesting you did, at least
5   not yet.
6   A.   Oh, okay.  You're setting me up again.  Okay.
7   Q.   You would agree that based on the TV Guide,
8   this suggests that the boy was describing a man he saw
9   come into his house on Sunday, as opposed to Monday.
10  Correct?
11       MS. BERKE:  Objection.  Foundation.
12       THE WITNESS:  My only determination was that
13  I'm -- I apologize.  I'm not answering the question you
14  want me to.
15  Q.   BY MR. BRUSTIN:  You're not.  You need to
16  answer my question.
17  A.   No, the way you want me to, but I'm telling you
18  that I assumed that the young boy was just confused.  I
19  didn't say that he was confused because it was Sunday
20  instead of Monday or whatever day it was.  I'm just
21  saying the boy was confused.
22  Q.   You assumed he was confused because you did
23  look at the TV Guide and you knew it wasn't on.  Correct?
24       MS. RETTS:  Form.
25       THE WITNESS:  I just knew that after -- now,

Page 487

1   right now, I looked at the TV Guide, yeah, that he was
2   confused, and I knew that somebody said it was a Sunday
3   night or something like that that -- not Sunday.  It was
4   a late night that Garry Shandling was supposed to be on
5   or something.  That's the only thing I heard.
6   Q.   BY MR. BRUSTIN:  You done?
7   A.   Are you?
8   Q.   Not even close.
9   A.   Well, me neither.  So go ahead.
10  Q.   All right.  Now, Sunday night -- let's
11  assume --
12  A.   I don't like to be assuming anything.
13  Q.   Let's assume that you're telling the truth and
14  you didn't know anything about the Garry Shandling show
15  on Sunday night.
16  A.   I'm not going to assume that.  I'm going to
17  tell you that it's true.
18  Q.   Let's look at this as new evidence.  Now, you
19  would agree based on what you know about the case, the
20  fact that the boy described someone who looked nothing
21  like Lamont Reynolds, the fact that the boy was very
22  precise about watching the Garry Shandling show and it
23  being turned off during the show, the fact that the show
24  was on either exactly at or right around the time when he
25  said it was on, that would suggest that what happened was

Page 488

1   the boy was describing somebody coming into his house on
2   Sunday night, somebody different than Lamont Reynolds and
3   got confused.  Would you agree with that, sir?
4       MS. BERKE:  Objection.  Foundation.
5       THE WITNESS:  I would not speculate on that.
6   I would just say that the boy was confused.
7   Q.   BY MR. BRUSTIN:  Is my explanation a reasonable
8   explanation?
9   A.   For you, I guess it is.
10  Q.   Is it reasonable to you?
11  A.   No, because I never thought about it other than
12  just to say the boy was confused.
13  Q.   Think about it now.  Is it a reasonable
14  explanation?
15  A.   I don't know whether you're setting me up or
16  not again.  So I can't tell you.
17  Q.   See, you don't get a choice.  You got to answer
18  my questions.
19  A.   I know, but I don't know because you
20  misrepresent things and set me up.  So I don't even know.
21  Q.   So you knew -- the one thing you did know was
22  that the boy was confused.  Correct?
23  A.   That's what I thought, yes.
24  Q.   All right.  And you thought that was possible
25  he may not have really seen the perpetrator.  Correct?



ARMANDO SALDATE Volume II                                      June 22, 2017
MILKE vs CITY OF PHOENIX                                           489–492

Page 489

1   A.   Yes.
2   Q.   And you knew that going into the grand jury.
3   Correct?
4        MS. BERKE:  Objection.  Foundation.
5        THE WITNESS:  Yes.
6   Q.   BY MR. BRUSTIN:  All right.  Take a look at
7   page 45.
8   A.   45.
9   Q.   Actually, take a look at page 46.  This is your
10  interview of Lamont Reynolds.  Correct?  If you want to
11  make sure, you can look at the first page to see that,
12  but I'll represent to you it is.
13  A.   Looking at the first page.
14  Q.   Page 35.  This describes a lot of things, your
15  interview on -- your interview of Lamont Reynolds starts
16  on page --
17  A.   40, right?
18  Q.   I apologize.  Separate report.  Yeah, that's
19  the first page.  Right?
20  A.   Yes.
21  Q.   Okay.  Now, take a look at page 46.
22  A.   I've got it.
23  Q.   Second paragraph:  "I then suggested to Lamont
24  that if he and Fred had been there earlier, he must have
25  gone back at a later time because the oldest child of the

Page 490

1   victim only saw one large, black male enter the
2   apartment."
3        Do you see that?
4   A.   Uh-huh.
5   Q.   It's clear --
6        Yes?
7   A.   Yes, I do.
8   Q.   It's clear from your questioning that you were
9   fully aware of what the young boy had said.  Correct?
10       MS. BERKE:  Can you direct me to where you
11  are, first, second or third paragraph?
12       MR. BRUSTIN:  It's the first full paragraph
13  on page 46.
14       MS. BERKE:  Objection.
15  Q.   BY MR. BRUSTIN:  Is that correct, sir?
16  A.   Where does the sentence start?
17  Q.   "I then" --
18       I'm reading it to you.
19  A.   Okay.
20  Q.   "I then suggested to Lamont that if he and Fred
21  had been there earlier, he must have gone back at a later
22  time because the oldest child of the victim only saw one
23  large, black male enter the apartment."
24       Based on that statement in this report, it's
25  clear that when you asked that question, you knew all

Page 491

1   about what Patrick had said.  Correct?
2        MS. BERKE:  Objection.  Vague.
3        THE WITNESS:  I -- I don't recall that.  I
4   can't recall whether I -- by that statement.
5        MS. BERKE:  And foundation.
6   Q.   BY MR. BRUSTIN:  Take a look at page 40 --
7   A.   I still can't find that area.
8   Q.   -- page 46.
9   A.   Okay.  That's what I was looking for in that
10  comment.
11  Q.   I'm sorry, page 47.
12  A.   Okay.
13  Q.   Last paragraph on 47.
14  A.   Okay.
15  Q.   It says, "I asked" -- the second sentence to
16  the end.  "I asked Lamont if he was now changing his
17  story that he could possibly have gone back after he and
18  Fred left, and Lamont would only say that he actually
19  didn't know because he was just too drunk to remember."
20       Do you see that?
21  A.   Yes.
22  Q.   So this is Lamont Reynolds telling you that he
23  was too drunk to remember what happened.  Correct?
24  A.   That was his statement, yes.
25  Q.   That's what you wrote down as him saying.

Page 492

1   Correct?
2   A.   Yes.
3   Q.   And you didn't write down any reason to
4   question it -- that you had to question it.  Correct?
5   A.   No.
6   Q.   You didn't write in your report that you didn't
7   believe it.  Correct?
8   A.   No.
9   Q.   All right.  Now, 46, second full paragraph on
10  46.
11  A.   Uh-huh.
12  Q.   "Lamont immediately told me that he never saw
13  any kids inside the apartment but then conceded he may
14  have gone back.  However, he was too drunk to remember."
15       Another time when he's telling you he's too
16  drunk to remember.  Correct?
17  A.   That's what he said.
18  Q.   And, by the way, this is your effort to try to
19  get -- to try to explain away the fact that the boy says
20  he saw the man at 8 o'clock.  You're suggesting maybe he
21  came back later.  Correct?
22  A.   That's not my effort --
23  Q.   Right.
24  A.   -- to do anything, to suggest to the kid or
25  anything else.



Page 493

1    Q.    Take a look at page 52.
2    A.    52.
3    Q.    This is the second page of a reinterview with
4  Lamont Reynolds.
5    A.    Okay.
6          MS. BERKE:  What page?
7          MR. BRUSTIN:  52.
8    Q.    BY MR. BRUSTIN:  Now, in this interview -- and
9  I'm going to refer you to the third paragraph.
10   A.    Okay.
11   Q.    The second full paragraph.
12   A.    Second full paragraph?
13   Q.    Yep.  "Lamont described himself as not being
14  drunk and said that he was not smoking weed but was only
15  drinking."
16   A.    Yes.
17   Q.    He's telling you -- he's telling you that he
18  wasn't drunk.  Correct?
19   A.    That's correct.
20   Q.    Different than what he said the first time.
21  Correct?
22   A.    Correct.
23   Q.    Take a look at page 54, last paragraph.  "I
24  finally asked Lamont why he had killed Debbie, and he
25  told me that he had not killed her.  I told him that I

Page 494

1  believed that he had killed her, and I believe the motive
2  was that he was drunk and high on marijuana and was
3  looking for a woman to have sex with."
4          Do you see that?
5    A.    Yes.
6    Q.    So what you're telling Lamont is that even
7  though he says he wasn't drunk, you believe he was drunk.
8  Right?
9    A.    I was kind of setting him up.
10   Q.    You mean you were lying to him?
11   A.    No, just setting him up.
12   Q.    Okay.  You believe when you said it that he was
13  actually drunk, and he was lying about it.  Correct?
14   A.    I was just referring to his first interview,
15  reminding him of his first interview.
16   Q.    You said, "I believe the motive was that he was
17  drunk," and you told me you're always honest with
18  suspects.  Correct?
19         MS. BERKE:  Objection.  Misstates testimony.
20         THE WITNESS:  Yes, I try to be.
21   Q.    BY MR. BRUSTIN:  Okay.  And so when you told
22  Lamont, "I believe that the motive was that he was
23  drunk," that's really what you believed or you wouldn't
24  have said it.  Correct?
25   A.    I was giving him an out.

Page 495

1    Q.    So was it -- was it truthful when you told him
2  you believe that he was drunk?
3    A.    It was -- it was truthful to what he had said
4  before, yes.
5    Q.    Okay.  And made sense to you that that was the
6  motive.  Right?
7    A.    It made sense in that interview and in this
8  part of the interview because I wanted him -- I wanted to
9  give him an out.
10   Q.    Okay.
11   A.    A rational explanation of why he killed her.
12   Q.    But when you said he believed that he was
13  drunk, you really believed he may have been drunk.
14  Right?
15         MS. BERKE:  Objection.  Asked and answered.
16         THE WITNESS:  I don't know.  I don't know
17  whether he was or wasn't drunk, but -- and you can't tell
18  me that I believed something that I don't --
19   Q.    BY MR. BRUSTIN:  These are your words.  I'm
20  reading from your words.  You said, "I believe the motive
21  was that he was drunk."  That's what you wrote.  Correct?
22   A.    I believe that he had killed her and believed
23  the motive was that he was drunk and high on marijuana
24  and was looking for a woman to have sex with.  I was
25  trying to give him a rationale that he had given me the

Page 496

1  interview before and give him a rationale of why he
2  would -- you know, why he did it.
3    Q.    You've already told us that you only tell the
4  truth to suspects.  Correct?
5    A.    I never said that.  I never said I only tell
6  the truth.  I try to tell the truth.  I've never said
7  that.  You misrepresent things that I say.  I did not say
8  I only tell the truth and only -- if I said it, it was a
9  misstatement because I'm not perfect.
10   Q.    Okay.  So here you weren't telling the truth to
11  Lamont Reynolds when you said that --
12   A.    I was giving him a rationalization of how --
13  what he could -- what he could stand on to -- to give me
14  a confession to the murder.
15   Q.    When you said you believed he was drunk, was
16  that truthful?
17   A.    I was setting him up.
18   Q.    Answer my question.  Did you believe that he
19  was drunk?
20   A.    I don't know.
21   Q.    You didn't know one way or the other?
22   A.    No.  I was just depending on his first
23  interview.
24   Q.    So when you said you believed he was drunk,
25  that wasn't truthful because you didn't know one way or



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
497–500

Page 497

1 the other?
2    A.   That --
3    Q.   Listen to my question.  You told -- and I know
4 this because you wrote it in your report.  You told
5 Lamont Reynolds that you believed he was drunk.  When you
6 said that, was that a truthful statement to Lamont
7 Reynolds?
8    A.   No, because I didn't know whether he was or
9 wasn't.
10    Q.   All right.  So you were lying to Lamont
11 Reynolds.  That's your story now?
12    A.   I was setting him up.
13    Q.   And you were setting him up by lying to him?
14    A.   No, I was setting him up by reminding him of
15 his admissions to me the time before.
16    Q.   And when you initially told us that you never
17 lie to suspects, that was a misstatement?
18        MS. BERKE:  Objection.  Misstates testimony.
19        THE WITNESS:  It would have to be because
20 I'm not perfect.  I can't tell you that I never ever.
21 You'd like me to.  You've made several comments about it,
22 but I've -- I can't be -- I'm not perfect.
23    Q.   BY MR. BRUSTIN:  Mr. Saldate, you would agree
24 that --
25    A.   Not necessarily, but go ahead.

Page 498

1    Q.   You would agree that given the discrepancies
2 between Lamont Reynolds and the person that Patrick
3 described seeing, different hair, different body type,
4 different age, it appears that the boy was describing
5 somebody who came in the night before.  Fair to say?
6        MS. BERKE:  Objection to foundation.
7 Speculation.
8        THE WITNESS:  The only way I could make that
9 determination would be to reflect on the TV thing that I
10 read.
11    Q.   BY MR. BRUSTIN:  And that suggests that what I
12 just described to you may be accurate.  Correct?
13    A.   That may be accurate.
14    Q.   All right.  Let's talk about the photo show.
15    A.   Okay.
16    Q.   Now, when you're dealing with a five-year-old
17 and you're interviewing a five-year-old or you are doing
18 a photo array with a five-year-old, you want to make sure
19 that that five-year-old is as comfortable as possible.
20 Fair to say?
21    A.   Correct.
22    Q.   And, obviously, you understood that showing a
23 five-year-old a photo array that may contain the person
24 he saw kill his mother could be an extremely traumatic
25 experience for him?

Page 499

1        MS. BURGESS:  Foundation.
2        MS. BERKE:  Foundation.
3        THE WITNESS:  To show him the -- the photo
4 lineup of -- it could have been traumatic, but I didn't
5 think it was going to be.
6    Q.   BY MR. BRUSTIN:  Why not?
7    A.   He's a kid that had already gone through all
8 this and seen this and had already commented to police
9 and gave his story, and I just thought that talking to
10 him alone would be the best.
11    Q.   You didn't think that it might be traumatic for
12 him to see the person that killed his mommy?
13    A.   Well, I was hoping he would identify the person
14 who had seen -- that killed his mother, yes.
15    Q.   Okay.  And you conducted an interview with him?
16    A.   Yes, I did.
17    Q.   Alone?
18    A.   No, it was -- I think Detective Hamrick was
19 with me.
20    Q.   Grandparents weren't present.  Right?
21    A.   Grandparents were present, but they were
22 standing in the back.
23    Q.   They were in the room?
24    A.   They were outside the room, standing in the
25 back.

Page 500

1    Q.   They weren't in the room, though?
2    A.   I don't think we were in a room.  I think we
3 were outside.
4    Q.   Okay.  They weren't in a place where they could
5 hear what you were saying to him and what he was saying
6 to you.  Correct?
7    A.   I don't know what they could hear.
8    Q.   Well, they certainly weren't in a place to give
9 him comfort.  Right?  He wasn't able to see them?
10    A.   I don't know what he was able to see, but I
11 don't -- I didn't -- they were not involved in the --
12    Q.   You interviewed the boy privately with the
13 other detective?
14    A.   Yes.
15    Q.   And you did the same thing when you did the
16 photo array?
17    A.   Yes.
18    Q.   What was your reason for interviewing the boy
19 privately without -- not being in the presence of his
20 grandparents?
21    A.   It was several reasons.
22        The first reason would be that I -- his
23 grandparents were a little distraught of what happened,
24 and I didn't want them to make a comment or suggestion to
25 him of who he should pick.  I didn't want them to



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
501–504

Page 501

1 actually see the person who had killed, or if he picked
2 somebody, I didn't want them to see the person that he
3 picked out because, you know, they could have revenge or
4 something.
5         Anything could have happened, but I don't
6 think they were just -- they weren't that involved in the
7 case, that I wanted to get them involved.
8    Q.   So one of the reasons you didn't want them
9 involved in the photo array was because they weren't that
10 involved in the case?
11   A.   Well, I mean, they were involved in his -- his
12 welfare and stuff like that, but they weren't -- they
13 weren't there at the killing. They were -- you know.
14   Q.   Why is that a reason not to have them present
15 to give the boy support?
16   A.   Well, I don't think they would be giving the
17 boy support.
18        MS. BERKE: And I'm just going to point out
19 you're misrepresenting that the grandparents weren't
20 present during the second interview. It specifically
21 states that the grandparents were present.
22        MR. BRUSTIN: All right. Let's focus on the
23 photo array.
24        MS. BERKE: Well, do you agree that you've
25 misrepresented that or were mistaken?

Page 502

1         MR. BRUSTIN: Let's focus on the photo
2 array.
3         Yeah, sure, I agree. I misstated.
4         THE WITNESS: Another misrepresentation.
5    Q.  BY MR. BRUSTIN: Another misrepresentation.
6    A.   Okay.
7    Q.   Let's talk about the photo array, though.
8    A.   Okay.
9    Q.   What are the different things you could have
10 done to allow the grandparents to be present for the
11 photo array but also ensure that they couldn't -- that
12 they wouldn't influence the boy's ability to pick
13 somebody?
14   A.   I don't know.
15   Q.   Okay. Well, for example, let me throw
16 something crazy out there. Would you agree that one way
17 you could have done it is you could have had the
18 grandparents far enough away from the photo showing so
19 that they couldn't see the photos themselves but they
20 could still be there to support the boy. Would that have
21 been a possibility?
22   A.   I think that's what we did. I mean, they were
23 behind -- several feet behind us anyway.
24   Q.   So you believe that the grandparents were --
25 were in -- were able to hear what you said --

Page 503

1    A.   I don't know what they were able to hear.
2    Q.   All right. In your report, you write that you
3 wouldn't let the grandparents be present for the photo
4 show because they might influence him.
5    A.   That's correct.
6    Q.   You made them stand somewhere else?
7    A.   No, I made them stand back of course, yeah. I
8 told them to stand back, and I wanted to talk to him
9 alone.
10   Q.   So is it your testimony now that the
11 grandparents were still there giving support to the boy?
12   A.   I don't know what they were giving, but I know
13 that they were somewhere in the background.
14   Q.   Okay. Take a look at page 48.
15   A.   Okay.
16   Q.   By the way, you did the photo array inside the
17 house. Correct?
18   A.   I thought we did it outside but -- you know.
19 Okay.
20   Q.   Take a look at 48.
21   A.   I'm at 48.
22   Q.   Take a look at the first sentence in the last
23 paragraph.
24   A.   Okay.
25   Q.   "Detective Hamrick and myself then contacted

Page 504

1 Patrick at the rear patio of the home while everybody
2 else was inside the home."
3    A.   Okay.
4    Q.   So you took Patrick outside, and his
5 grandparents stayed inside the house. Correct?
6    A.   That's probably -- yes, that's correct, but it
7 wasn't -- we weren't inside when they showed the photo
8 lineup.
9    Q.   But the grandparents weren't there?
10   A.   Apparently not.
11   Q.   You made them stay inside the house?
12   A.   I couldn't make them do anything. I may have
13 asked them to stay inside the house, yes.
14   Q.   Okay. And the photo array was shown outside.
15 Correct?
16   A.   I stated that several times.
17   Q.   Okay. And what you wrote on page 49 --
18   A.   49.
19   Q.   Read 49. It's short.
20   A.   Okay.
21   Q.   -- is that the boy made an ID and you believed
22 he was absolutely positive. Correct?
23   A.   Yes.
24   Q.   All right.
25   A.   Detective Hamrick and I both agreed.



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
505–508

Page 505

1  Q.   Okay.  And what you're describing here is a
2  positive eyewitness identification.  Correct?
3  A.   Yes.  There he is again.
4  Q.   And you're not describing any gray area here.
5  Right?
6       MS. BERKE:  Objection.  Vague.
7       THE WITNESS:  I don't know what that means.
8  Q.   BY MR. BRUSTIN:  You're not -- you're not -- do
9  you remember earlier when you told us that you believed
10 that the boy may not have seen the killer.  You remember
11 that?
12 A.   Yes.
13 Q.   And there's nothing about that here.  Right?
14 What you're describing is a positive ID of the person you
15 believe was the killer.  Correct?
16 A.   Yes.
17 Q.   Nothing about your uncertainties about whether
18 he saw the perpetrator, nothing like that.  Right?
19 A.   Well, that's how an investigation continues.  I
20 mean, that's how it starts, that you don't know anybody.
21 Then you continue -- made to believe that you don't --
22 that isn't the person, and then it goes on and on and on.
23 That's an investigation.
24 Q.   Uh-huh.  How is it possible that this -- this
25 boy made a positive ID of a person -- of the person that

Page 506

1  you believed entered the house on September 6th in the
2  early morning hours when he describes someone who had
3  a -- he was different in every characteristic and who
4  came in during the Garry Shandling show he was watching
5  on Sunday night?
6       MS. BERKE:  Objection.
7  Q.   BY MR. BRUSTIN:  How is it possible that he
8  made an absolutely positive ID?
9       MS. BERKE:  Objection.  Assumes facts not in
10 evidence and foundation.
11      THE WITNESS:  He wasn't -- he was confused
12 at the beginning, and he -- I mean, a picture's a little
13 different.  And he saw the picture, and he said, That's
14 him again.  You know, he may have been confused a lot of
15 things, but, you know, I thought that from the beginning.
16 Q.   BY MR. BRUSTIN:  What you're suggesting in this
17 report is that he made an accurate ID.  Correct?
18 A.   That's correct.
19 Q.   But, in fact, what you believe --
20 A.   No, I said that he made a -- that he appeared
21 to be positive.
22 Q.   Okay.
23 A.   Not that he made an accurate --
24 Q.   Nothing here about reliability, just that he
25 was positive?

Page 507

1  A.   Absolutely positive.
2  Q.   Okay.  And you're suggesting that you believed
3  it was positive?
4  A.   Both Detective Hamrick and I, myself, being
5  absolutely positive.
6  Q.   Okay.  And the grandparents weren't there to
7  see what you said or what he said.  Correct?
8  A.   Who said, Hamrick or --
9  Q.   The grandparents weren't there to see what you
10 said to the boy and what the boy said to you.  Right?
11 A.   No.
12 Q.   Because you made them stay inside?
13 A.   I didn't make anybody do anything.  I asked
14 them to stay inside.
15 Q.   That's why they couldn't hear what you said to
16 the boy and what the boy said to you.  Right?
17 A.   Okay.  That's fair.
18 Q.   So when the boy made an absolutely positive ID
19 of the man who he never saw, nothing strange about that
20 to you?
21      MS. BERKE:  Objection.  Argumentative.
22 Assumes facts not in evidence.
23      THE WITNESS:  Obviously, he saw him because
24 he identified him.  So...
25 Q.   BY MR. BRUSTIN:  You just told us you don't

Page 508

1  think he saw him?
2  A.   I don't know if he saw him or not.  I told you
3  he was confused.  He was confused to begin with.  He's
4  been -- he was confused throughout the whole thing.
5  Q.   Okay.
6  A.   But Detective Hamrick was with me.
7  Q.   Now, do you recall Sergeant Ontiveros being the
8  sergeant in charge of this case?
9  A.   No.
10 Q.   All right.  Let's take a look at page 57.
11      MR. BRUSTIN:  Where are we with time?
12      THE VIDEOGRAPHER:  Four hours and 20
13 minutes.
14 Q.   BY MR. BRUSTIN:  Okay.  Let's take a look at
15 page 57.
16 A.   I've got it.
17 Q.   Have you seen finding from the Court in
18 connection with your testimony in this case?
19 A.   I have -- I have it right here.
20 Q.   Have you seen it before right now?
21 A.   No.
22 Q.   Why don't you take a minute and read it, page
23 57 and 58.  You see there's a finding here that the Court
24 is of the opinion that a fair presentation was not made
25 in connection with the evidence concerning the



Exhibit 1

Page 509

1  identification of the defendant by the victim's son.
2          That's you.  Correct?
3          MS. BERKE:  Objection.  Foundation.
4          THE WITNESS:  That's what it says, yes.
5    Q.   BY MR. BRUSTIN:  Okay.  And this decision is
6  adopting the arguments that were made in the defendant's
7  brief at pages 11 and 12.  Correct?  That's what it says.
8    A.   A portion of it, yes.
9    Q.   And it says portion -- it's more fully outlined
10  in that portion of the defendant's motion under the
11  heading of one contained in pages 8 through 11.  Do you
12  see that?
13    A.   Yes.
14    Q.   And then again it says it's adopting the
15  arguments that the defendants made on page 11 and 12.
16  Correct?
17    A.   As outlined in the portion of defendant's
18  motion.
19    Q.   On 11 and 12.  Right?
20    A.   Yes.
21    Q.   It's agreeing with it.  Right?
22    A.   That it says that?
23    Q.   The Court is agreeing with the arguments that
24  are made in those portions of the brief.  Correct?
25    A.   I don't know what they are, but, yeah.

Page 510

1    Q.   Okay.  And then look at the last page.  It says
2  the Court is also of the opinion that the evidence was
3  not fully and fairly presented with regard to defendant's
4  possible intoxication as outlined in that portion of the
5  motion labeled 5 at page 15, also adopting what's argued
6  at page 15.  Correct?
7    A.   But I don't know what's argued in page 15, but,
8  yeah.
9    Q.   Okay.
10    A.   That's what they say.
11    Q.   Let's take a look.
12          Now, first of all, you testified in the
13  grand jury -- if you look at page 67 --
14    A.   Okay.
15    Q.   -- it appears you could see it says, "On
16  October 18th, 1988, this case was heard by the 103rd
17  grand jury."
18          MS. BERKE:  Wait, what page are we on?
19          MR. BRUSTIN:  Page 67, middle -- middle of
20  the page.
21          MS. BERKE:  Okay.
22          MR. BRUSTIN:  With me?
23          MS. BERKE:  Yep.
24    Q.   BY MR. BRUSTIN:  I just want you to look at
25  that one sentence.  Mr. Saldate?

Page 511

1    A.   Yes.  What about it?
2    Q.   You agree that there was a grand jury on
3  October 18th, 1988?
4    A.   Okay.
5    Q.   And you are the one who testified about the
6  facts of the case.  Correct?
7    A.   Correct.
8    Q.   And that was just weeks after the
9  investigation.  Correct?
10    A.   Yeah, October 15th -- I mean, 18th, yeah.
11    Q.   Very close in time.  Right?
12    A.   Close.
13    Q.   Right?
14    A.   Yes.
15    Q.   While things were still fresh in your mind?
16    A.   If this would be the only case I would have
17  had, yeah, probably would have been.
18    Q.   Are you telling me what happened during the
19  Reynolds investigation wasn't fresh in your mind on
20  October 18th, 1988?
21    A.   I was -- I'm trying to tell you that the
22  freshest thing in my mind was the last homicide I
23  investigated.
24    Q.   All right.
25    A.   I think that's reasonable.

Page 512

1    Q.   What other homicides were you investigating in
2  between your investigation of the Reynolds case --
3    A.   I would have to look.
4    Q.   -- on October 18th, 1988?
5    A.   I would have to look because I took a lot of
6  them.
7    Q.   All right.  And, obviously, as you told us, you
8  would have reviewed your reports for just that reason
9  before you testified in the grand jury.  Correct?
10    A.   Yes, uh-huh.
11    Q.   All the relevant reports.  Correct?
12    A.   I would try to, yes.
13    Q.   All right.  Now, take a look at page 62.
14    A.   62.  I'm glad you refer to those page numbers
15  on Reynolds because it's a lot easier to track than the
16  other ones.
17    Q.   We aim to please.
18    A.   I understand that.
19    Q.   This is one of the pages that was referred to
20  in the order, page 9.  Right?
21    A.   Yes.
22    Q.   Now, what it says is -- see the paragraph
23  beginning, "Actually"?
24    A.   Uh-huh.
25    Q.   Second sentence.  "Detective Saldate misstated



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
513–516

Page 513

1  the facts when he told the grand jury that Patrick could
2  not say what time this event occurred except that it was
3  late at night."
4     A.   That --
5     Q.   "In fact Patrick had told Detective Addington,
6  Saldate's associate, that the man came in at about 8 p.m.
7  and turned off the Garry Shandling show."
8           Now, you agree that, in fact, you did
9  misstate the facts when you told them the only thing the
10  boy said was that it was late at night.  Correct?
11     A.   I agreed to that earlier, and I do agree to it
12  now.
13     Q.   Okay.  You agree that you told the jury that
14  Patrick could only say the event occurred late at night,
15  as opposed to the boy telling you it occurred at 8 p.m.
16  Correct?
17     A.   That is correct.
18     Q.   You don't deny making that statement to the
19  grand jury?
20     A.   No, you know, misstatement, but, yes.
21     Q.   All right.  Now, take a look at the next
22  paragraph.  "Not only did Detective Saldate misstate the
23  evidence to the grand jury, the misstatement in this
24  regard was particularly harmful because Detective Saldate
25  and the prosecution knew that several witnesses had

Page 514

1  reported seeing the victim alive long after 8 p.m."
2           You don't deny that.  Correct?
3     A.   I disagree with their finding but -- that it
4  was -- that it was particularly harmful, but that's what
5  they say.
6     Q.   That's what the judge found?
7     A.   That's what he says, yeah.
8     Q.   Okay.  Anything else you dispute?
9     A.   No, just what he said.
10     Q.   Okay.
11     A.   I don't dispute it.  That's what he said.
12     Q.   Take a look at page 71.
13     A.   Okay.
14     Q.   Take a look at the bottom of the page at page
15  8, another page referred to in the judge's order.
16     A.   Okay.
17     Q.   Last sentence.  "Detective Saldate said the boy
18  could not say the exact time this took place except that
19  it was late at night."  Then it has a grand jury cite,
20  cite page 8.  Do you see that?
21     A.   That's what we talked about before.
22     Q.   And that's an accurate description of what you
23  said to the grand jury.  Correct?
24     A.   Yes.
25     Q.   "Late at night" were your exact words.

Page 515

1  Correct?  It's in quotes.
2           MS. BERKE:  Object to foundation.
3           THE WITNESS:  It's on there.  It's on the
4  report.
5     Q.   BY MR. BRUSTIN:  No basis to dispute it.
6  Correct?
7     A.   I have no dispute with it.
8           MS. BERKE:  Objection.  Foundation.
9     Q.   BY MR. BRUSTIN:  And you would agree that late
10  at night is exactly -- withdraw.
11           You would agree that late at night is
12  completely different than 8 p.m.?
13           MS. BURGESS:  Foundation.
14           MS. BERKE:  Objection.  Foundation.
15           MS. ODEGARD:  Join.
16           THE WITNESS:  To some people, yes.
17     Q.   BY MR. BRUSTIN:  How about to you?  Is late at
18  night different than 8 p.m.?
19     A.   Yeah, I would say so.
20           MR. BRUSTIN:  Let's take just a five-minute
21  break.
22           THE VIDEOGRAPHER:  We are off the record at
23  3:21 p.m.
24           (A recess was held off the record.)
25           THE VIDEOGRAPHER:  One moment.  We are back

Page 516

1  on the record at 3:28 p.m.
2     Q.   BY MR. BRUSTIN:  Take a look at page 71,
3  please.
4     A.   71, okay.
5     Q.   First -- first sentence under heading one.  "As
6  noted in the statement of facts, Detective Saldate
7  testified to the grand jury that the victim's
8  five-year-old son Patrick Engelbert had seen a large,
9  black male break in the back Arcadia door, grab his
10  mother by the hair and leg and drag her upstairs."  Okay?
11           Certainly you agree -- and it's got a cite
12  to the grand jury where you said this.  Certainly you
13  agree that that is what you told the grand jury as to how
14  Patrick Engelbert described the intruder.  Correct?
15           MS. BERKE:  Objection.  Foundation.
16           THE WITNESS:  Yes, it's apparently written.
17     Q.   BY MR. BRUSTIN:  Okay.  And so when you
18  testified in the grand jury, you described him as a
19  large, black male, and you didn't mention any of the
20  other characteristics that Patrick had stated previously.
21  Correct?
22           MS. BERKE:  Objection.  Foundation.
23           THE WITNESS:  That is correct.
24     Q.   BY MR. BRUSTIN:  Even though you knew about
25  them?



ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
517–520

Page 517

1    MS. BERKE: Objection. Foundation.
2    THE WITNESS: I was aware of them, yes.
3    Q.   BY MR. BRUSTIN: And you would agree that
4  large, black male is not even close to the description
5  that the boy gave. Correct?
6    MS. BERKE: Objection. Vague.
7    THE WITNESS: And I -- as I said before, I
8  believed he was confused, but, yes.
9    Q.   BY MR. BRUSTIN: So you knowingly testified
10  that he described a large, black male when you, in fact,
11  knew that what he had described was an old, black male
12  with hair -- with bushy hair down his back, with two
13  distinctive tattoos with hearts in them. You knew that
14  when you said he described a large, black male. Right?
15    A.   And he did, yes.
16    Q.   And so when you told the jury that the boy's
17  description was a large, black male, you knowingly
18  misrepresented information to the grand jury. Correct?
19    A.   I don't think that's a misrepresentation. I
20  said he was a large, black male, that the child said a
21  large, black male, and that's what he was. So --
22    Q.   You knowingly left out --
23    MS. BERKE: You -- you interrupted him
24  again. Please let him finish his answer.
25    MR. BRUSTIN: Do you really want him to

Page 518

1  finish?
2    Q.   BY MR. BRUSTIN: Go ahead, finish. Keep
3  talking.
4    A.   That it was a large, black male and that that
5  included -- that was part of the description. So...
6    Q.   Okay. What you left out knowingly was all of
7  the parts of the description that were different than
8  Lamont Reynolds. Correct?
9    MS. BERKE: Objection. Misstates testimony.
10  Misstates evidence.
11    Q.   BY MR. BRUSTIN: Is that correct, sir?
12    A.   That I intentionally left all that stuff out?
13    Q.   Yes.
14    A.   I don't think it was intentional.
15    Q.   Did you forget?
16    A.   I don't know if I would say I forgot. I just
17  said it was just -- that's what I said.
18    Q.   Is it a coincidence that the only description
19  you gave, large, black male, was -- was consistent with
20  Lamont Reynolds, and all of the many characteristics that
21  you knew about which were inconsistent with Lamont
22  Reynolds were left out? Is that just a coincidence?
23    A.   Large, black male will identify probably
24  thousands of people but --
25    Q.   And that's nothing like the description he

Page 519

1  gave. Right?
2    MS. BERKE: You're again interrupting him.
3  He was in the middle of stating something.
4    THE WITNESS: It's a description of at least
5  a thousand people. It would be -- that could be
6  described as a large, black male, but I identified him as
7  breaking -- breaking in the back door, Arcadia door,
8  grabbed the mother by the hair and leg and dragged her
9  upstairs.
10    Q.   BY MR. BRUSTIN: You were describing the
11  description of what he saw. Correct?
12    A.   Yes.
13    Q.   And you left out all of the factors that are
14  different than Lamont Reynolds. Correct?
15    A.   That are --
16    Q.   Long, black hair, heart-shaped --
17    A.   The description --
18    Q.   Let me finish. Long black hair, heart-shaped
19  tattoos, beer belly, hair down his back, bushy hair, old
20  man -- you left out all of the things that the boy
21  described that didn't match Lamont Reynolds. Correct?
22    A.   Don't yell, please. The situation is that I
23  did not testify to those facts, yes.
24    Q.   Because you knowingly left them out. Correct?
25    A.   I can't say I knowingly left anything out.

Page 520

1    Q.   You've already told us you knew about them, and
2  you didn't say them.
3    A.   But I can't say that I knowingly at that time
4  when I testified left them out.
5    Q.   You were lying to the grand jury. Isn't that
6  true, sir?
7    A.   That is not true, and you know that.
8    Q.   Okay. Now, when you told the grand jury that
9  the boy said only that it was late at night, as opposed
10  to 8 p.m., knowing that the boy said it was 8 p.m., that
11  was a knowing misstatement to the grand jury. Correct?
12    MS. BERKE: Objection. Misstates evidence.
13    THE WITNESS: I wouldn't say it's knowing.
14    Q.   BY MR. BRUSTIN: What would you say?
15    A.   I would say it was a misstatement on my part.
16  I don't think I intentionally did it.
17    Q.   Did you forget that the boy had said 8 o'clock?
18    A.   I may have. I just -- you know, it's a
19  misstatement. Had I remembered, I would have said it,
20  but obviously I didn't, and that was it.
21    Q.   Well, are you saying you forgot it?
22    A.   I would assume so.
23    Q.   What other explanation could there be other
24  than you lied?
25    A.   Well, I'm sure you would come up with several

ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
521–524

Page 521

1  but...
2  Q.   My explanation is that you lied.  Do you have
3  any others?
4  A.   That's wrong.
5  MS. BERKE:  Objection.  Argumentative.
6  Q.   BY MR. BRUSTIN:  What other possibilities are
7  there other than you forgot that he said it was 8 p.m.?
8  A.   That's good enough.
9  Q.   Anything else?
10  A.   I forgot.
11  Q.   Any other reasons why you didn't say it was
12  8 p.m.?
13  A.   No.
14  Q.   Just a mistake, innocent mistake?
15  A.   Innocent mistake.
16  Q.   Same with the description, large, black male,
17  innocent mistake?
18  A.   No, I think that either one of those people
19  were described as large, black male.  So I mean --
20  Q.   Innocent mistake not to -- not to --
21  A.   Include the jury.
22  Q.   -- not to tell the jury the actual description
23  he gave?
24  A.   Yeah, I would say so.
25  Q.   You just forgot?

Page 522

1  A.   I don't know whether I forgot or not.  I just
2  don't -- I just described the male as a large, black
3  male.
4  Q.   That's not how he described him.  So you must
5  have forgotten.  Did you forget that he gave a -- a
6  complete description that was different -- withdrawn.
7  Did you forget that he gave a very detailed
8  description of the man he saw that was much more
9  comprehensive than large, black male?  Did you forget
10  that?
11  A.   No, but I remembered that he was confused.
12  Q.   The reason you didn't say it is because you
13  knew that would suggest to the jury that maybe he made a
14  mistake.  Correct?
15  A.   That's incorrect.
16  Q.   All right.  Take a look at page 72.  Take a
17  look -- start on page 71.  I'm sorry.
18  A.   71.
19  Q.   It says, last word on the page, the, and then
20  page 72.  I'm sorry.  Go back to the first page.  I'll
21  read a little more for you.
22  First it says, "Detective Saldate --
23  Detective Saldate said the boy could not say the exact
24  time this took place except that it was late at night.
25  The boy later picked defendant's photograph from a lineup

Page 523

1  as being the person he saw."
2  Q.   Is that 71?
3  Q.   It goes to 72.
4  So you also told the grand jury that the boy
5  picked the defendant from the photo array.  Correct?
6  A.   Yes.
7  Q.   And then it says, "The grand jury was not
8  advised of any other facts which related to Patrick's
9  statements."  You don't dispute that.  Correct?
10  A.   That's correct.
11  Q.   Take a look at 74.
12  A.   Let me clarify something, if I can.
13  Q.   No.
14  MS. BERKE:  Yes, he can clarify something.
15  MR. BRUSTIN:  I have limited time.
16  Q.   BY MR. BRUSTIN:  What do you want to clarify?
17  A.   I want to clarify the part that -- no, I forgot
18  now.
19  Q.   Okay.  If you think about it, tell me.
20  A.   Okay.
21  Q.   I'll let you do it.
22  A.   Thank you.
23  Q.   74.
24  Q.   74.
25  Q.   Middle of the page.  "Clearly the prosecution

Page 524

1  was presenting this person as the perpetrator of this
2  offense, and the boy was the only eyewitness -- the only
3  witness.  The omitted evidence was certainly of the
4  quality that it would have deterred the grand jury from
5  finding probable cause."
6  Do you see that?
7  A.   That's correct.
8  Q.   You don't dispute that you understood that the
9  prosecution was presenting Lamont Reynolds as the
10  perpetrator and the boy is the only witness.  Correct?
11  MS. BERKE:  Objection.  Foundation.
12  THE WITNESS:  That's correct, but --
13  Q.   BY MR. BRUSTIN:  And when you testified --
14  MS. BERKE:  Wait.  He was not finished.
15  THE WITNESS:  That was correct, but the --
16  you -- you have to understand I was answering questions
17  from the prosecutor.  I wasn't making up my own
18  questions.  The grand jury wasn't a -- a conversation
19  between me and the grand jurors.  It was a question and
20  answer from the prosecutor.
21  Q.   BY MR. BRUSTIN:  And the prosecution was asking
22  you to describe what happened during the lineup.
23  Correct?
24  A.   Yes.
25  Q.   And you never mentioned when you testified to

ARMANDO SALDATE Volume II
MILKE vs CITY OF PHOENIX

June 22, 2017
525–528

Page 525

1  the grand jury that you didn't -- you had doubts about
2  whether the boy had even seen the perpetrator.  Correct?
3        MS. BERKE:  Objection.  Foundation.
4        THE WITNESS:  I was never asked that, no.
5     Q.   BY MR. BRUSTIN:  Did you talk about that with
6  the prosecutor before trial?
7     A.   I don't believe so.
8     Q.   And so what you told the grand jury was that it
9  was a positive ID, and you suggested there was no
10  problems with it.  Correct?
11        MS. BERKE:  Objection.  Foundation.
12  Misstates the evidence.
13        THE WITNESS:  I still don't find any
14  problems with it, that he ID'd him.
15     Q.   BY MR. BRUSTIN:  Okay.  Take a look at page 58.
16     A.   Okay.  58.  Okay.  58.
17     Q.   Findings of the Court says, "The Court is also
18  of the opinion that the evidence was not fully and fairly
19  presented with regard to defendant's possible
20  intoxication," as outlined in that portion of the motion
21  labeled 5 at page 15.
22        Now, let's take a look at page -- what page
23  is it?  Oh, 64.  No, I'm sorry.  Take a look at page 78.
24        This is the page 15 that's referring to the
25  order, and it says, Near the end of the prosecution of

Page 526

1  evidence to the grand jury, a question arose as to
2  whether the defendant was intoxicated.  It has a cite to
3  the grand jury question.
4        MS. BERKE:  It says "presentation," not
5  "prosecution."
6        MR. BRUSTIN:  I'm sorry, presentation.
7     Q.   BY MR. BRUSTIN:  "The juror stated that they
8  were concerned about this because of the effect of A.R.S.
9  section 13-503."
10        You know what section A.R.S. 13-503 is.
11  Right?
12     A.   No.
13     Q.   No idea?
14     A.   No idea.
15     Q.   But certainly you understand you were in the
16  room when they -- when the juror expressed that concern.
17  Correct?
18        MS. BERKE:  Objection.  Foundation.
19        THE WITNESS:  I don't even know what he --
20  what you're talking about.
21     Q.   BY MR. BRUSTIN:  Okay.  Next sentence.
22  "Detective Saldate told the grand jury that the defendant
23  said he had been drinking but was not drunk."
24        Is that what you told the grand jury?
25     A.   Yes.

Page 527

1     Q.   All right.  And when you told that to the grand
2  jury, you understood that not only had the defendant told
3  you that he was drunk, you had told the defendant that
4  you believed he was drunk.  Correct?
5     A.   I didn't necessarily believe he was drunk, but
6  I did tell them that.
7     Q.   Okay.  And you knew that when you gave this
8  testimony that the defendant said he had been drinking
9  but was not drunk?
10     A.   I was aware of that, yes.
11     Q.   You left out the fact that he told you he was
12  drunk, and you told him you believed he was drunk.
13  Correct?
14        MS. BERKE:  Objection.  Misstates evidence.
15        THE WITNESS:  I left out the portion where
16  he said that he was not drunk.
17     Q.   BY MR. BRUSTIN:  You left out the portion that
18  said he was drunk.  Right?
19     A.   And the portion that he said -- when he denied
20  that he was drunk.
21     Q.   You left out the portion where he said that he
22  was drunk and that you believed he was drunk knowingly.
23  Correct?
24        MS. BERKE:  Objection.  Misstates testimony.
25  Misstates evidence.

Page 528

1        THE WITNESS:  I didn't knowingly do anything
2  other than present what the facts were at the time when I
3  was called to grand jury.
4     Q.   BY MR. BRUSTIN:  Okay.  And at the time you
5  were called to the grand jury, the facts were that he
6  told you on one occasion that he was not drunk, and you
7  told him you didn't believe him, and he told you on
8  another occasion that he was drunk.
9        So the facts were he told you two different
10  versions, and you believe that he was drunk.  Correct?
11        MS. BERKE:  Objection.  Misstates evidence.
12        THE WITNESS:  That's not necessarily the way
13  it happened.  That's not the way it states.  It says that
14  I believed -- I told him that I believed he was drunk to
15  give him some rationale of -- to admit why he would have
16  killed her.
17     Q.   BY MR. BRUSTIN:  Let's --
18     A.   I do not believe that I -- I believed -- that
19  doesn't mean that I believed that he was drunk.  I don't
20  know whether he was drunk or not.  I can only just put
21  down what he said.
22     Q.   Okay.  Let's put that aside.
23     A.   Okay.
24     Q.   On one interview, he told you that he was
25  drunk.  Right?

Page 529

1    A.    Correct.

2    Q.    And another interview he told you he wasn't

3 drunk.  Correct?

4    A.    And that he made up other statements.

5    Q.    Correct?

6    A.    Correct.

7    Q.    Okay.  And as you've already told us, you

8 didn't know which one was true.  Correct?

9    A.    Correct.

10    Q.    But you chose to tell the jury only one

11 version.  Correct?

12    A.    I told them the last version because that's

13 what he said that -- when he admitted to other lies.

14    Q.    So you knowingly left out the version where he

15 told you that he was drunk?

16    A.    Yes.

17    Q.    And you knowingly left out -- you knowingly

18 left out the fact that in a report you had written, "I

19 believed he was drunk"?

20        MS. BERKE:  Objection.  Misstates evidence.

21    Q.  BY MR. BRUSTIN:  I'm sorry.  You left out for

22 the grand jury that you had written in a report you told

23 Lamont Reynolds you believed he was drunk, and that was

24 the motive for the murder.  Right?

25    A.    I left that out because I didn't really know

Page 530

1 whether he was drunk or not, but I told him that for

2 that -- for a specific reason of wanting him to confess

3 and give him some rationale or a way out, you know.

4    Q.    You left out the fact that he told you that he

5 was drunk and that you told him that you believed he was

6 drunk because you knew that would hurt the prosecution.

7 Correct?

8    A.    That's not true.

9        MR. BRUSTIN:  That's all I have for today.

10        THE WITNESS:  By the way, I would like to

11 thank you for changing the distances here, for changing

12 the date of my next deal to September -- week of

13 September.  Okay?

14        THE VIDEOGRAPHER:  Counsel, are we done?

15        MS. BERKE:  Yeah.

16        MR. BRUSTIN:  I don't want to thank him for

17 anything?

18        THE VIDEOGRAPHER:  This concludes today's

19 deposition of Armando Saldate.  The master videotapes

20 will be maintained by Esquire.  We are off the record at

21 3:46 p.m.

22        (The deposition ended at 3:46 p.m.)

23

24

25

Page 531

1        CERTIFICATE OF REPORTER

2 STATE OF ARIZONA    )
                      )
3 COUNTY OF MARICOPA  )

4

5    I, Sommer E. Greene, a Certified Reporter in the
State of Arizona, do hereby certify that the foregoing

6 deposition was taken before me in the County of Maricopa,
State of Arizona; that an oath or affirmation was duly

7 administered to the witness, ARMANDO SALDATE, pursuant to
A.R.S. 41-324(B); that the questions propounded to the

8 witness and the answers of the witness thereto were taken
down by me in shorthand and thereafter reduced to

9 typewriting; that the transcript is a full, true and
accurate record of the proceeding, all done to the best

10 of my skill and ability; and that the preparation,
production and distribution of the transcript and copies

11 of the transcript comply with the Arizona Revised
Statutes and ACJA 7-206(j)(1)(g)(1) and (2).

12    The witness herein, ARMANDO SALDATE, has
requested signature.

13    I FURTHER CERTIFY that I am in no way related
to any of the parties nor am I in any way interested in

14 the outcome hereof.

15

16    IN WITNESS WHEREOF, I have set my hand in my
office in the County of Maricopa, State of Arizona, this

17 5th of July 2017.

18

19    ------------------------------
        Sommer E. Greene, RPR, CRR

20        Certified Reporter 50622

21    /S/

22 _____

23 For Esquire Deposition Solutions
Registered Reporting Firm No. R1048

24

25

Page 532

1 Milke v. City of Phoenix

2 ASSIGNMENT NUMBER 597611

3    DECLARATION UNDER PENALTY OF PERJURY

4    I declare under penalty of perjury that I

5 have read the entire transcript of my deposition taken in

6 the above-captioned matter or the same has been read to

7 me, and the same is true and accurate, save and except

8 for changes and/or corrections, if any, as indicated by

9 me on the DEPOSITION ERRATA SHEET hereof, with the

10 understanding that I offer these changes as if still

11 under oath.

12

13 Signed on the_____day

14 of _____20__.

15

16

17

18 _____

19 ARMANDO SALDATE

20

21

22

23

24

25



Page 533

```
1              DEPOSITION ERRATA SHEET

               ASSIGNMENT NUMBER 597611
2
3   Page No.___Line No.___Change to:_____
4   _____
5   Page No.___Line No.___Change to:_____
6   _____
7   Page No.___Line No.___Change to:_____
8   _____
9   Page No.___Line No.___Change to:_____
10  _____
11  Page No.___Line No.___Change to:_____
12  _____
13  Page No.___Line No.___Change to:_____
14  _____
15  Page No.___Line No.___Change to:_____
16  _____
17  Page No.___Line No.___Change to:_____
18  _____
19  Page No.___Line No.___Change to:_____
20  _____
21  Page No.___Line No.___Change to:_____
22  _____
23  Page No.___Line No.___Change to:_____
24  ARMANDO SALDATE
25  Signature:_____
```

Page 534

```
1              DEPOSITION ERRATA SHEET
2              ASSIGNMENT NUMBER 597611
3   Page No.___Line No.___Change to:_____
4   _____
5   Page No.___Line No.___Change to:_____
6   _____
7   Page No.___Line No.___Change to:_____
8   _____
9   Page No.___Line No.___Change to:_____
10  _____
11  Page No.___Line No.___Change to:_____
12  _____
13  Page No.___Line No.___Change to:_____
14  _____
15  Page No.___Line No.___Change to:_____
16  _____
17  Page No.___Line No.___Change to:_____
18  _____
19  Page No.___Line No.___Change to:_____
20  _____
21  Page No.___Line No.___Change to:_____
22  _____
23  Page No.___Line No.___Change to:_____
24  ARMANDO SALDATE
25  Signature:_____
```



Page 535

```
1              UNITED STATES DISTRICT COURT
2                   DISTRICT OF ARIZONA
3
   Debra Jean Milke,              )
4                                 )
           Plaintiff,             )
5                                 )
   vs.                            ) No.
6                                 ) 2:15-cv-00462-ROS
   City of Phoenix; Maricopa      )
7  County; and Detective Armando  )
   Saldate, Jr.; and Sergeant     )
8  Silverio Ontiveros, in their   )
   individual capacities,         )
9                                 )
           Defendants.            )
10 -------------------------------- )
11
12
13
          VOLUME III (PAGES 535 through 834)
14
15         VIDEOTAPED DEPOSITION OF
16              ARMANDO SALDATE
17             NOVEMBER 15, 2017
18              10:00 A.M.
19
20
21        2929 North Central Avenue, Suite 2100
22
              Phoenix, Arizona
23
24     SOMMER E. GREENE, CSR, RPR, CR No. 50622
25
```

Page 536

```
1  APPEARANCES OF COUNSEL
2
3       For Plaintiff:
4          NEUFELD SCHECK & BRUSTIN, LLP
           NICK BRUSTIN, ESQ.
5          AMELIA GREEN, ESQ.
           99 Hudson Street, 8th Floor
6          New York, New York 10013
           212.965.9081
7          nick@nsbcivilrights.com
8       For Defendant Silverio Ontiveros:
9          HOLLOWAY ODEGARD & KELLY, P.C.
           SALLY A. ODEGARD, ESQ.
10         3020 East Camelback Road, Suite 201
           Phoenix, Arizona 85016
11         602.240.6670
           sodegard@hoklaw.com
12
13      For Maricopa County:
14         SANDERS & PARKS
           J. ARTHUR EAVES, ESQ.
15         3030 North Third Street, Suite 1300
           Phoenix, Arizona 85012
16         602.532.5783
17
18
19
20
21
22
23
24
25
```

Page 537

```
1  APPEARANCES CONTINUED:
2
3       For Defendant City of Phoenix:
4          STRUCK WIENEKE & LOVE
           CHRISTINA RETTS, ESQ.
5          3100 West Ray Road, Suite 300
           Chandler, Arizona 85226
6          480.420.1605
           cretts@swlfirm.com
7
8       For Defendant Armando Saldate:
9          BERKE LAW FIRM
           LORI V. BERKE, ESQ.
10         1601 North 7th Street, Suite 360
           Phoenix, Arizona 85006
11         602.254.8800
           Lori@berkelawfirm.com
12
13      Also Present:
14
           Vanessa Buch
15         Katie McCarthy
           Jeff Burton, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 538

```
1                  I N D E X
2
3  WITNESS: ARMANDO SALDATE
4
5  EXAMINATION                              PAGE
6
7  MR. BRUSTIN...................................540
8  MS. BERKE....................................749
9
10            *      *      *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
539–542

Page 539

                    INDEX TO EXHIBITS

EXHIBIT                                        MARKED

Exhibit 61  Homicide Report:  Michael Lastra    566

Exhibit 62  Homicide Report:  Michael Lastra,   682
            by Detective Martinsen

Exhibit 63  Homicide Reports and Testimony      631

Exhibit 64  Runningeagle Homicide Documents,    602
            RUN 001 through 232

Exhibit 65  Rangel Homicide Documents:  Rangel
            001 through 121

Exhibit 66  Belinda Reynolds Documents, BEL REY 704
            001 through 022

Exhibit 67  June 22, 1990 Voluntariness Hearing 716

Exhibit 68  Richard Butts Homicide Report       717

Exhibit 69  Christopher Milke Homicide Report   783

Exhibit 70  Milke Homicide Report:  Notes of    778
            Interview of Roger M. Scott

Exhibit 71  Milke Homicide Report:  Taped       782
            Interview Transcription of Roger M.
            Scott

Exhibit 72  Eleanor Paez Homicide Report:       782
            Notes of Interview of Manuel Yanes

Exhibit 73  Milke Homicide Report:  Interview   826
            of Chris Landry

Page 540

1           PHOENIX, ARIZONA

2       NOVEMBER 15, 2017; 10:00 A.M.

3

4       THE VIDEOGRAPHER:  This begins media number

5   1, volume III, to the continuing video-recorded

6   deposition of Armando Saldate.  We're back on the record

7   at 10:12 a.m.

8

9               EXAMINATION

10  BY MR. BRUSTIN:

11     Q.   Good morning, Mr. Saldate.

12     A.   Good morning.

13     Q.   How are you feeling this morning?

14     A.   Good.

15     Q.   Feeling okay?  You understand you're still

16  under oath?

17     A.   Yes.

18     Q.   How much time have you spent -- withdrawn.

19          What documents have you reviewed in between

20  your last deposition and today in connection with this

21  case?

22     A.   Not that many.  Hartley Jones, Gallegos,

23  Rangel, but we've only spent ten and a half hours.

24     Q.   Reviewing documents?

25     A.   Yeah.

Page 541

1      Q.   Sounds like a lot.  Did you --

2      A.   No, I mean with the attorney.

3      Q.   Oh.  And you were very precise about that.  Ten

4   and a half hours is how much time you spent?

5      A.   I think I'm pretty close to it.

6      Q.   Okay.  And would it be fair to say that when

7   you reviewed those disciplinary -- withdrawn.

8          Would it be fair to say that when you

9   reviewed those case files, that helped jog your memory

10  about your involvement in those cases?

11     A.   Somewhat, yes.

12     Q.   And you're prepared to answer questions about

13  those cases today?

14          MS. BERKE:  Objection.  Vague.

15          THE WITNESS:  I assume so, yeah.

16     Q.   BY MR. BRUSTIN:  Okay.

17     A.   As before.

18     Q.   All right.  How much time -- you said you spent

19  ten and a half hours meeting with your attorney?

20     A.   Yes.

21     Q.   Over --

22     A.   Over three days.

23     Q.   Over three days.  When was that?

24     A.   Last Monday and Tuesday and then Monday.

25     Q.   Okay.  Fair enough.  Would it be fair to say

Page 542

1   that over the course of your career you worked many cases

2   with Detective Chambers?

3      A.   Yes.

4      Q.   And would it be fair to say that although you

5   weren't formal partners, you voluntarily chose to work a

6   number of cases with him and vice versa?

7      A.   That's correct.

8      Q.   He was someone that you liked to work with?

9      A.   Yes.

10     Q.   Would it be fair to call him your partner?

11     A.   We called each other partners.

12     Q.   You did.  You worked closely with one another?

13     A.   Yes.

14     Q.   And certainly that was -- certainly between --

15  many years between 1985 and 1989.  Correct?

16     A.   I don't remember the years, but, yeah, it's

17  close to.

18     Q.   Number of years?

19     A.   Yeah.

20     Q.   Okay.  If it was up to you and you had -- and

21  you had a choice of who to work with, it would always be

22  Chambers.  Correct?

23     A.   That's correct.  But it was never up to me most

24  of the time.

25     Q.   Okay.  But often you'd be paired up with



Page 543

1  Chambers.
2     A.   Yes.
3     Q.   Fair to say?  Now, would it be fair to say that
4  because of the close working relationship that you had
5  with Chambers, when you worked a case with Chambers, you
6  wouldn't always review a report he created and vice
7  versa.  You would trust him to do it on his own?
8         MS. BERKE:  Objection.  Vague.
9         THE WITNESS:  That he created?
10    Q.   BY MR. BRUSTIN:  Yes.
11    A.   I don't think there's really a -- whether he
12  did or didn't, I don't remember.
13    Q.   Well, would it be fair to say that in a case
14  you work with a Chambers, you would create some reports
15  and he would create some reports?  Fair to say?
16    A.   That's correct.
17    Q.   And would it be fair to say that routinely,
18  regularly -- withdrawn.
19         Would it be fair to say that it wouldn't be
20  unusual for you not to review a report that he wrote and
21  vice versa?  You would trust him to do it on his own?
22    A.   I would review any report that he wrote that
23  was my case.
24    Q.   Okay.  You're sure about that?
25    A.   Well, sure.  You know, that's what I would do.

Page 544

1     Q.   Okay.
2     A.   Whether I -- yeah.
3     Q.   Always?
4         MS. BERKE:  Vague.
5         THE WITNESS:  "Always" is a big term.  I
6  don't like to use always.
7         MS. BERKE:  Are you talking before the
8  report's completed or afterward?
9         MR. BRUSTIN:  Fair enough.
10    Q.   BY MR. BRUSTIN:  Would it be fair to say,
11  Mr. Saldate, that in a case you work with him,
12  typically you would write down the things that you did in
13  the investigation, and he would write down the things
14  that he did in the investigation?
15    A.   Yes.
16    Q.   Okay.  Anything important that you did in an
17  investigation you would write down, and anything
18  important that he did in the investigation generally he
19  would write down in his report?
20    A.   Unless we did it together and we -- we said
21  we'd do it or something.
22    Q.   Okay.
23    A.   I'd do it or he'd do it, yeah.
24    Q.   Okay.  But if you did something alone or he did
25  something alone, you'd expect the other would write it

Page 545

1  down.  Correct?
2     A.   Yes.
3     Q.   Now, in a deposition of a woman named Dorothy
4  Markwell, she testified -- who testified at the criminal
5  trial for the prosecution -- you know who I'm talking
6  about?
7     A.   I know the name.
8     Q.   Okay.  She testified that she recalled speaking
9  to you on at least one occasion.
10    A.   All right.
11    Q.   Do you recall how many times you spoke to
12  Dorothy Markwell?
13         MS. BERKE:  Objection.
14         THE WITNESS:  No --
15         MS. BERKE:  Wait, wait.  You have to pause
16  before answering so I can make my objection.
17         THE WITNESS:  I'm sorry.
18         MS. BERKE:  Objection.  Misstates evidence.
19         THE WITNESS:  I never spoke to her.
20    Q.   BY MR. BRUSTIN:  Okay.  So it's not that you
21  don't remember.  It's not that you're not sure if you
22  spoke to her.  What you're saying here under oath is that
23  you never spoke to her.  Correct?
24    A.   Yes.
25    Q.   So Dorothy Markwell when she testified that you

Page 546

1  spoke to her is either mistaken or lying.  Correct?
2         MS. BERKE:  Objection.  Misstates evidence.
3         THE WITNESS:  You like to use that "lying"
4  word, but I don't.  She had to be mistaken.
5     Q.   BY MR. BRUSTIN:  Okay.  She definitely wasn't
6  lying.  She was mistaken?
7     A.   I don't know what that word is.
8         MS. BERKE:  Objection.  Argumentative.
9     Q.   BY MR. BRUSTIN:  You don't know what what word
10  is?
11    A.   Lying.  I don't use it.  You use it all the
12  time.
13    Q.   Okay.  You don't use the word lying?
14    A.   Not when it comes to this, no.  You tend to use
15  it a lot, but I don't.
16    Q.   Okay.  All right.  Now, in any case, Dorothy
17  Markwell is mistaken when she says that she spoke to you
18  because you never spoke to her ever in the history of the
19  world?
20         MS. ODEGARD:  Form.
21    Q.   BY MR. BRUSTIN:  Correct?
22         MS. BERKE:  Vague.  Argumentative.
23         THE WITNESS:  Well, in the history of the
24  world, if we're talking like past lives or something like
25  that, I couldn't tell you.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
547–550

Page 547

1    Q.    BY MR. BRUSTIN:  Oh, I'm sorry.  Do you think
2  this is funny?
3    A.    No.  I'm just telling you --
4    Q.    You think I was talking about past lives?
5    A.    I don't know.  Were you?
6    Q.    I'm not.  What I'm talking about is during your
7  lifetime, have you ever spoken to Dorothy Markwell?
8    A.    Not that I know of.
9    Q.    Take a look at that document right in front of
10  you.
11    A.    This one here.
12    Q.    Yep.
13         MS. BURGESS:  For the record, could you tell
14  us what that is.
15         MR. BRUSTIN:  I will.
16    Q.    BY MR. BRUSTIN:  I'm showing you what's been
17  marked previously as Exhibit 30, which is -- and I'm
18  referring you now to the Bates-stamped page 18597.
19         MS. BERKE:  Before we switch gears, I wanted
20  to say this, but I didn't want to interrupt your
21  questioning previously.
22         Just prior to the deposition starting, we
23  agreed you had four hours and 32 minutes left.  Correct?
24         MR. BRUSTIN:  That's correct.
25         MS. BERKE:  And just so you know, it is my

Page 548

1  intention to ask Mr. Saldate some questions following
2  your questioning.  So if you want to reserve time, you
3  know, if you think you might want to ask questions after
4  that, you may want to consider resuming or reserving some
5  time.
6         MR. BRUSTIN:  I appreciate that.
7         MS. BERKE:  Thanks.
8    Q.    BY MR. BRUSTIN:  All right.  Take a look at
9  page 18597.  Are you with me?
10    A.    Yes.
11    Q.    All right.  Take a look at 14C through E.  Do
12  you see that?
13    A.    I'm looking at it now.
14    Q.    Okay.  And the question I have for you is have
15  you reviewed this policy in preparation for your
16  deposition?
17    A.    No.
18    Q.    Okay.  The first time you recall seeing this
19  in -- withdrawn.
20         Do you recall ever seeing this policy?
21    A.    I don't recall.
22    Q.    All right.  Now, according to this general
23  investigative procedure which is dated 10/89 -- let's
24  take it a step at a time.  Under C, it says, "When a
25  person is advised of his rights, the date, time,

Page 549

1  location, officer's name and the name of the other
2  persons present will be included on appropriate reports,
3  i.e., DR, arrest record, alcohol influence report or back
4  of the officer's copy of the citation."
5         Do you see that?
6    A.    Yeah.
7    Q.    Do you understand that that was the policy of
8  the department as of 1989?
9    A.    That was the procedure, yes.
10    Q.    Okay.  Is there a difference in your mind
11  between a procedure and a policy?
12    A.    Procedure can sometimes be, you know, adapted
13  to something else, depends upon what happens and what's
14  current at the moment.
15    Q.    Okay.  In other words, a procedure in your
16  view, unlike a policy, is more malleable.  In other
17  words, you are allowed to disregard it under certain
18  circumstances.  Is that your testimony, sir?
19    A.    No.
20         MS. BURGESS:  Form.  Foundation.
21    Q.    BY MR. BRUSTIN:  Okay.  So in other words, then
22  what is the difference between a policy and a procedure?
23    A.    Like I said, it's -- a procedure is something
24  they give you some direction for, and you try to follow
25  it unless something happens and something -- you can't do

Page 550

1  it.
2         So -- and a policy would be more of -- you
3  know, more of a directive, but, again, that's -- can be
4  be waived, too.
5    Q.    Okay.  So policy is more strict than a
6  procedure.  Is that a fair way of saying it?
7    A.    That would be fair.
8         MS. RETTS:  Form.
9    Q.    BY MR. BRUSTIN:  Did I say it fairly?
10    A.    Yes.
11    Q.    Okay.  So this is a policy not quite as strict.
12  Correct?  That's your understanding?
13         MS. BERKE:  Objection.  Misstates evidence.
14         THE WITNESS:  A procedure.
15    Q.    BY MR. BRUSTIN:  I'm sorry.  You're right.
16  It's a procedure.  This is a procedure, not a policy so
17  not quite as strict.  Correct?
18    A.    Correct.
19    Q.    And where did you receive a guidance that a
20  procedure is not as strict as a policy?
21    A.    I think probably in the academy or something.
22    Q.    Academy or something.  Okay.  Now, what is an
23  alcohol influence report?
24    A.    A DUI, I would think.
25    Q.    Well, in connection with -- in connection with



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
551–554

Page 551

1   interrogating a suspect, which I understand this to be,
2   would an alcohol influence report refer to an officer's
3   assessment as to whether or not the suspect is under the
4   influence of alcohol, or am I misreading that?
5       A.   No.  You're misreading it.  That's a DUI
6   report.
7       Q.   Okay.  All right.  Now, take a look at
8   procedure D.  "Admonition of rights will be read verbatim
9   from the notification of rights cards distributed by the
10  department."
11          Did you understand that to be the policy as
12  of 10/89?
13      A.   Yes, procedure.
14      Q.   And before?
15      A.   Well, as far as I knew, yes.
16      Q.   Okay.  Don't worry.
17          Next, "When a person wish -- wishes to
18  remain silent or have an attorney present during
19  questioning, interrogation must cease immediately."
20          Do you see that?
21      A.   Yes.
22      Q.   Was that the procedure in 10/89?
23      A.   That's the procedure that's written, yes.
24      Q.   And you understand that to be the procedure
25  long before 10/89.  Correct?

Page 552

1           MS. BERKE:  Objection.  Vague.
2           THE WITNESS:  I don't recall.  I'm sure it
3   was.
4       Q.   BY MR. BRUSTIN:  Okay.  And this procedure --
5   you said this was a procedure, not a policy?
6       A.   It's on the procedure page.
7       Q.   Okay.
8       A.   So I would say it's a procedure.
9       Q.   And is it your testimony that it was your
10  understanding that this procedure as opposed to a policy
11  didn't always need to be followed?
12          MS. RETTS:  Foundation.
13          THE WITNESS:  It was a method of giving you
14  instructions of how to do certain things and give you
15  guidance, but that's all it was.
16      Q.   BY MR. BRUSTIN:  You have not answered my
17  question.  My question was was it your understanding that
18  this procedure did not always need to be followed?
19          MS. RETTS:  Foundation.
20          THE WITNESS:  I can't answer that question
21  the way you state it.
22      Q.   BY MR. BRUSTIN:  All right.
23      A.   Maybe you could restate.
24      Q.   I'll restate it.  I'll read the specific part
25  I'm referring to.  It says, "Interrogation must cease

Page 553

1   immediately."
2       Q.   Did that directive in this procedure need to
3   be followed all of the time to your understanding?
4       A.   Obviously I didn't.
5       Q.   The question was pursuant to the procedure, did
6   it need to be followed, your understanding of the
7   procedure?
8       A.   There was guidance that was given to me, yes.
9       Q.   Okay.  You said guidance.  So in other words,
10  when you say "guidance," that means it didn't necessarily
11  need to be strictly followed.  That was your
12  understanding.  Correct?
13          MS. RETTS:  Form and foundation.
14      Q.   BY MR. BRUSTIN:  -- withdrawn.
15          Very simple.  Either it needed to be
16  strictly followed --
17          MS. BERKE:  Can you not yell.
18      Q.   BY MR. BRUSTIN:  Either it needed to be
19  strictly followed or it didn't.  Which one is it?
20      A.   I don't think I can say exactly.  I mean, it
21  was a procedure.  It was a directive as far -- not a
22  directive.  It was information that was given to you,
23  and, you know, I -- you know, there's no -- there's no
24  punishment assigned to it or anything like that.  So, you
25  know, I don't -- I'm -- I've just answered the best I

Page 554

1   could.
2       Q.   Okay.  So your understanding as of the time of
3   this investigation was that this procedure did not
4   necessarily need to be followed.  Correct?
5           MS. RETTS:  Foundation.
6           THE WITNESS:  It's my understanding that all
7   the procedures in this book were direction and guidance,
8   all.
9       Q.   BY MR. BRUSTIN:  I don't care right now about
10  any other procedure in the world.
11      A.   And that includes this procedure.
12      Q.   All right.  And so as of 19 -- as of the time
13  of this investigation, your understanding was that this
14  was guidance that needed to always be followed.  Correct?
15      A.   I think I've already answered that question,
16  yes.
17      Q.   Okay.  And your understanding was the failure
18  to follow it would not lead to any discipline.  Correct?
19          MS. RETTS:  Form and foundation.
20          THE WITNESS:  I don't see no discipline on
21  the procedure page.
22      Q.   BY MR. BRUSTIN:  Sir, I'm only asking about
23  your understanding.
24      A.   That's my understanding.  I did not see any
25  discipline on the procedure page.  Therefore, I figured

Page 555

1  it wasn't.

2    Q.   Okay.  Now, the next part of this says, "In

3  such cases, if an investigation would appropriately be

4  furthered by continuing the interrogation, the

5  department's legal advisor may be contacted with a

6  supervisor's position and asked to assist."

7        You see that?

8    A.   Yes.

9    Q.   Okay.  Was -- it was your understanding that

10  that was a procedure that needed to be strictly followed

11  or, like all procedures, it was simply guidance?

12        MS. RETTS:  Form and foundation.

13        THE WITNESS:  I think it said may be

14  advised.  So -- "may be contacted."  So I would say that

15  it's a guidance.  That's all it was.

16    Q.   BY MR. BRUSTIN:  Okay.  So your understanding

17  of this procedure was that you were free to continue

18  questioning without contacting a supervisor or a legal

19  advisor.  Is that your reading of this procedure?

20        MS. RETTS:  Form and foundation.

21        THE WITNESS:  Yes, yes.

22    Q.   BY MR. BRUSTIN:  Okay.  And so the language

23  where it says "may be contacted," what you understand

24  this procedure to mean is you could continue to ask --

25  even though this says cease -- "must cease immediately,"

Page 556

1  you were free to continue asking questions without the

2  permission of a supervisor or without the permission of a

3  legal advisor.  Correct?

4        MS. RETTS:  Form and foundation.

5        THE WITNESS:  I'm just reading from what it

6  says.  It said may, I may.

7    Q.   BY MR. BRUSTIN:  Okay.  And that's your

8  understanding -- that was your understanding as of the

9  time of this investigation.  Correct?

10    A.   Correct.

11    Q.   And for years before that.  Correct?

12        MS. RETTS:  Form and foundation.

13        THE WITNESS:  I can't say that.

14    Q.   BY MR. BRUSTIN:  Okay.  In other words, your

15  understanding, despite what's written on this page, was

16  that you had discretion to continue asking a suspect

17  questions after they invoked their right to remain

18  silent?

19        MS. RETTS:  Form and foundation.

20        THE WITNESS:  Despite what it says there?

21  You mean guidance.

22    Q.   BY MR. BRUSTIN:  I'm sorry.  Let me be clear.

23  Notwithstanding what's written on this page, it was your

24  understanding that you were free up to and including the

25  time of this investigation to continue asking a suspect

Page 557

1  questions after they invoked their right to remain silent

2  without getting advice.  Correct?

3        MS. BERKE:  Objection.  Vague.

4        THE WITNESS:  Yes.

5    Q.   BY MR. BRUSTIN:  And up to the time of this

6  investigation, it was your understanding, notwithstanding

7  the language of this procedure, that you were free to

8  continue questioning a suspect after they asked to have a

9  lawyer appointed.  Correct?

10        MS. RETTS:  Form and foundation.

11        MS. BERKE:  Objection.  Vague.

12        THE WITNESS:  Yes.

13    Q.   BY MR. BRUSTIN:  And that's always been your

14  understanding.  Correct?

15        MS. RETTS:  Form.

16        THE WITNESS:  I can't say always.

17    Q.   BY MR. BRUSTIN:  Certainly by the time you were

18  a homicide detective, that was your understanding.

19  Correct?

20        MS. RETTS:  Form and foundation.

21        THE WITNESS:  I -- I can't say that either.

22  I mean, I can't recall when -- first case I took as a

23  homicide detective.  I can't do that.

24    Q.   BY MR. BRUSTIN:  Okay.  So it's your position

25  that in the many instances during your career when you

Page 558

1  continuously -- when you continued asking a suspect

2  questions after they invoked their right to remain

3  silent, you were acting in accordance with the procedures

4  of the Phoenix Police Department.  Correct, sir?

5        MS. RETTS:  Form and foundation.

6        THE WITNESS:  And the county attorney's

7  office, yes.

8    Q.   BY MR. BRUSTIN:  And it's your position that

9  each time in your career when you continued asking a

10  suspect questions after they asked that -- after they

11  asked to speak to an attorney, you were acting in

12  accordance with the procedures of the Phoenix Police

13  Department.  Correct?

14        MS. RETTS:  Form and foundation.

15        THE WITNESS:  And the county attorney's

16  office, yes.

17    Q.   BY MR. BRUSTIN:  Both?

18    A.   Both.

19    Q.   Both the county attorney's office and the

20  Phoenix Police Department blessed your many decisions to

21  continue asking suspects questions after they invoked

22  their right to remain silent.  Correct?

23        MS. RETTS:  Form and foundation.

24        THE WITNESS:  I wouldn't -- blessed.  What

25  does that mean?  I don't -- you know.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
559–562

Page 559

1    Q.   BY MR. BRUSTIN:  You don't know what blessed
2    means?
3    A.   Why do you have to be argumentative all the
4    time?
5    Q.   Do you know what blessed means, sir?
6    A.   No, I don't.
7    Q.   Would it be fair to say that in the many
8    instances when you invoked -- when you continued asking
9    questions of suspects after they invoked their right to
10   remain silent, you believe that decision was approved by
11   both the Phoenix Police Department and by the county
12   attorney's office.  Correct?
13          MS. RETTS:  Form and foundation.
14          MS. BERKE:  Vague.
15          THE WITNESS:  Generally.
16   Q.   BY MR. BRUSTIN:  Okay.  And each time when
17   you -- each time when you continued asking suspects
18   questions after they invoked their right to an attorney,
19   you believe that that decision was generally approved of
20   by the county attorney's office and by the Phoenix Police
21   Department.  Correct?
22          MS. BURGESS:  Foundation.
23          MS. RETTS:  Form and foundation.
24          THE WITNESS:  Correct.
25   Q.   BY MR. BRUSTIN:  And during the course of your

Page 560

1    career, would it be fair to say that you can't think of a
2    single instance when you continue -- when you -- when you
3    spoke to a legal advisor before questioning a suspect
4    after they invoked their right to remain silent or asked
5    for an attorney?  Fair to say?
6    A.   Yes.
7    Q.   And would it be fair to say that during your --
8    during your career, you can't recall a single instance
9    where you spoke to a supervisor before questioning a
10   suspect after they invoked their right to remain silent
11   or asked for an attorney?  Fair to say?
12   A.   I can't say that for sure.
13   Q.   Can't think of a single instance?
14   A.   There may have been one.  I don't know.
15   Q.   Can you think of any?
16   A.   No, I said I can't remember.
17          MS. BERKE:  Mr. Brustin, please don't yell
18   at him.
19   Q.   BY MR. BRUSTIN:  Now, you've made it clear in
20   prior testimony that if you are -- if you are getting --
21   yeah, and would it be fair to say that the best you can
22   recall, nobody -- before this case, nobody has ever
23   criticized you for continuing to question a suspect after
24   they invoke their right to remain silent.  Is that
25   correct, sir?

Page 561

1          MS. RETTS:  Form.
2          MS. BERKE:  Objection.  Vague.
3          THE WITNESS:  I can't say that.
4    Q.   BY MR. BRUSTIN:  Do you remember everybody --
5    do you remember anybody ever criticizing you --
6    A.   The Court has.  The Court has found certain
7    things.
8    Q.   All right.  Now, it's your -- it's your view
9    that if you are getting the truth as you believe it to be
10   from a suspect, it's okay to violate this procedure and
11   continue questioning.  Correct?
12          MS. BERKE:  Objection.
13          MS. RETTS:  Form and foundation.
14          MS. BERKE:  Misstates testimony.  Vague.
15          THE WITNESS:  If I'm getting the truth, that
16   person's already talking.  So the -- I don't understand
17   the question.
18   Q.   BY MR. BRUSTIN:  Take a look at that one --
19   that one, please.
20   A.   Me?
21   Q.   Yeah, please, third tab.  It says "Saldate
22   voluntariness hearing."
23   A.   Okay.
24   Q.   Is that it?  So I'm a little time constrained,
25   as you know, and I've already asked you a bunch of

Page 562

1    questions about the Roger -- your interaction with Roger
2    Scott.  You recall those questions.  Right, sir?
3    A.   It was awhile back.
4    Q.   Okay.
5    A.   I don't recall every question, no.
6    Q.   But you recall me questioning about your
7    interaction with Roger Scott?
8    A.   You may have.
9    Q.   All right.  I asked you questions about your
10   interaction with him at the precinct.  I asked you
11   questions about your interaction with him in the car.
12   The only thing I haven't asked you about is any further
13   interaction you had with him.
14          So I want to just refer you to a page.
15   A.   Okay.
16   Q.   And what I'm showing you now -- this is your
17   testimony from 1990, and by the way, you had a much
18   better memory of things back then.  Right?
19          MS. BERKE:  Can you give us the date in
20   1990?
21          MR. BRUSTIN:  Yeah.  It's the voluntariness
22   hearing from September 10th, 1990.  Okay?
23   Q.   BY MR. BRUSTIN:  And as you've already told us,
24   obviously your memory of this case was better back then.
25   Correct?



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
563–566

Page 563

1    A.    September 11th I got.
2    Q.    Huh.  Mine says September 10th.  Your first
3 page?
4          MS. BERKE:  Third page.
5    Q.  BY MR. BRUSTIN:  Third tab.
6    A.    Okay.  Which it's Saldate voluntariness hearing
7 too.  Okay.  First tab is the 10th, yeah.
8    Q.    And obviously your memory is better then.
9 Right?
10   A.    Sure.
11   Q.    Okay.  So take a look at page 39, and I'm
12 looking at the top right corner numbers, page 39 of
13 the -- of that tab.
14   A.    Okay.
15   Q.    First says -- first answer is, "That's
16 correct," 39.
17   A.    Okay.  I'm trying to get it.
18   Q.    Okay.  So as I said, we talked about your
19 interaction with Roger Scott in the precinct.  We talked
20 about your interaction with Roger Scott in the car.  I
21 want to ask about your interaction after that, and so
22 specifically I'm referring -- page 39, let's start with
23 line 8.
24         "Question:  All right.  On the route back to
25 the police department from 99th and Happy Valley Road,

Page 564

1 did you ride with Roger Scott?
2         "Answer:  Correct.
3         "Question:  Was Detective Mills with you at
4 that time?
5         "Answer.  Correct.
6         "Question:  And approximately, if you know,
7 what time did you arrive back at 620 West Washington?
8         "Answer:  Another 30 or 40 minutes later.
9         "Question:  All right.  Did you have any
10 further follow-up conversation with Roger Scott
11 concerning Debra Milke?
12         "Answer:  There was some, I believe."
13         Now, so Mr. Saldate, where -- do you
14 remember when you got back from the car ride where you
15 met with Roger Scott in the precinct?
16   A.    Where I -- we were together the entire time.
17   Q.    When you got back from the drive and you got
18 back to the precinct you're talking here about asking
19 some questions back at the precinct.  You see what I just
20 read to you?
21   A.    Yeah, but I mean, we were there the entire
22 time.
23   Q.    Okay.
24   A.    We were together.
25   Q.    I know.  When you got back with Mills and Roger

Page 565

1 Scott and you got back to the precinct, before you went
2 to interview Debra Milke, where did you speak to Roger
3 Scott in the precinct the second time you spoke to him in
4 the precinct, so when you got back from the drive?
5    A.    I don't remember.
6    Q.    Okay.  Do you remember how long that interview
7 was back in the precinct, the follow-up interview?
8    A.    I don't.
9    Q.    Approximately 30 minutes?
10   A.    I don't remember if we even had one.  So --
11 interview, I mean, you know.
12   Q.    Here you're describing that you did.  Correct?
13 It says, "There was some, I believe."
14   A.    Yeah, well, that was then.  So I -- now I
15 can't --
16   Q.    Today -- today you don't remember.  Right?
17   A.    I don't remember.
18   Q.    All right.  But obviously in 1990 you had a
19 better memory.  Correct?
20   A.    And I said I believe, yeah.
21   Q.    And you wouldn't have said it happened if it
22 didn't.  Correct?
23         MS. BERKE:  Objection.  Assumes facts not in
24 evidence.  Misstates testimony.
25         THE WITNESS:  I said I believed.

Page 566

1    Q.  BY MR. BRUSTIN:  Okay.  And do you have any
2 recollection today of any meeting with Roger Scott in the
3 precinct when you got back?
4    A.    No, not really.
5    Q.    All right.  But if it was, it was pretty short.
6 You said "not really."  Do you have some vague
7 recollection of that?
8    A.    No.
9         MR. BRUSTIN:  All right.  This has already
10 been marked.  Where is the actual exhibit?
11         MS. GREEN:  This is --
12         MS. BERKE:  No, where is the marked one?
13         MS. GREEN:  He has it.
14   Q.  BY MR. BRUSTIN:  In front of you already -- we
15 premarked this.  I don't have copies of it.
16         MS. GREEN:  I've already given them out.
17         MR. BRUSTIN:  Got you.
18         (Exhibit 61 was marked for identification.)
19   Q.  BY MR. BRUSTIN:  All right.  So it's already
20 been marked as Plaintiff's Exhibit 61, and this is a
21 report that everybody has.  It's a report in the Sherman
22 case, Rolland Sherman case.  Do you remember this case?
23   A.    No.
24   Q.    It's Bates stamped 26009 through 26011.
25         MS. BERKE:  I don't believe this is one of

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
567–570

Page 567

1  the cases mentioned in the second amended complaint, and
2  what you advised us based on the Court's instructions
3  early on is that he was only going to be questioned about
4  cases that were mentioned in the second amended
5  complaint.  So he would have fair notice.
6       MR. BRUSTIN:  We just found this one.
7       MS. BERKE:  I'm going to object to his being
8  questioned about it.  He hasn't even had an opportunity
9  to prepare for that.
10      MR. BRUSTIN:  Are you prohibiting him from
11  answering questions about it?
12      MS. BERKE:  We can talk about it during a
13  lunch break or during a break, and then I'll let you
14  know.
15      MR. BRUSTIN:  I want to do it now.  Are you
16  prohibiting him from answering questions about it?
17      MS. BERKE:  I am because the agreement was
18  that you were going to question him about cases in the
19  second amended complaint.  Judge Silver specifically
20  instructed you to let us know what cases he was going to
21  be questioned about so he could fairly prepare, and this
22  is not one of the cases mentioned.
23      MR. BRUSTIN:  I don't believe that's an
24  accurate description.
25      MS. BERKE:  Well --

Page 568

1       MR. BRUSTIN:  But you're prohibiting him
2  from answering?
3       MS. BERKE:  Yes, I am.
4       MR. BRUSTIN:  Okay.
5       Q.   BY MR. BRUSTIN:  Now, Rangel is one of the
6  cases you recall reviewing.  Correct?
7       A.   Yes.
8       Q.   All right.  Now, generally you recall that the
9  Rangel case involved a shooting of a woman named Kathleen
10  Henderson in 1989.  She was found in a parking lot with
11  four gunshot wounds to the chest.  Correct?
12      A.   Yes.
13      Q.   And it was the victim's fiance, Michael Rangel,
14  who was ultimately charged with the crime.  Correct?
15      A.   Correct.
16      Q.   And you interrogated Mr. Rangel?
17      A.   That's correct.
18      Q.   And where did you do that?
19      A.   At the main station.
20      Q.   Okay.  And this is an interview that you
21  conducted with Detective Fragoso.  Did I pronounce that
22  right?
23      A.   Close.
24      Q.   Okay.  You conducted this interview with
25  Detective Fragoso.  Correct?

Page 569

1       A.   Yes.
2       Q.   Were you the case agent on this case or was
3  Fragoso?
4       A.   Yeah, he was.
5       Q.   Okay.  And do you have an understanding as to
6  why you were called in on this case to interrogate
7  Michael Rangel?
8       A.   I was called into the case because he was --
9  this was one of his first cases he had, and he wanted
10  somebody -- somebody wanted the sergeant -- his sergeant
11  wanted somebody senior to just kind of look over his
12  shoulder while he did it.
13      Q.   Okay.  Well, you weren't called -- you didn't
14  just look over his shoulder.  You were the person who
15  actually conducted the interrogation of the homicide
16  suspect.  Correct?
17      A.   Yes.
18      Q.   All right.  So this was a case that you were --
19  you were -- you were -- would it be fair to say that you
20  were informally supervising a young homicide detective?
21      A.   Yes.
22      Q.   And you understood one of your roles here was
23  to try to show a young homicide detective how to properly
24  conduct a homicide investigation.  Fair to say?
25      A.   Okay.

Page 570

1       Q.   Is that a fair assessment?
2       A.   Okay.
3       Q.   You understood that to be your role, to model
4  good behavior for this young homicide detective?
5       A.   Okay.
6       Q.   You agree with me?
7       A.   Yes.
8       Q.   Now, after initially denying involvement and
9  denying having a gun, Rangel made three -- where's mine?
10  So you can have it in front of you if you need it.
11      A.   Uh-huh.
12      Q.   What is premarked as Exhibit 65, and Exhibit 65
13  is our effort to put together the relevant Rangel
14  documents that we wanted to question you about, and so
15  what we did is we created a separate Bates stamp number
16  on the left.  You see it says Rangel 001 in blue?
17      A.   Uh-huh.
18      Q.   And it goes Rangel 001 through Rangel 121.
19  Okay?
20      A.   Okay.
21      Q.   With me?
22      A.   Yes.
23      Q.   Okay.  Now, if you take a look at page 001 --
24  I'm sorry, 011 through 012 -- I'm sorry -- 11 and 12.
25  Okay?



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
571–574

Page 571

1   A.   Got it.
2   Q.   This is a portion of your report that you
3   created in this case.  Correct?
4        MS. BERKE:  Why don't you take a look and
5   confirm that.
6   Q.   BY MR. BRUSTIN:  Well, if you want to take a
7   look to see if it's your report, I think you should look
8   at page --
9   A.   Yeah, it's my report.
10  Q.   -- 7.  Okay.  Great.
11       Now, this is a document you've already
12  reviewed in preparation for today.  Correct?
13  A.   Yes.
14  Q.   Okay.
15  A.   Generally, yes, all of them.
16       MS. BERKE:  Wait.
17       THE WITNESS:  The ones I had said.
18       MS. BERKE:  Which document?
19  Q.   BY MR. BRUSTIN:  This report.  You reviewed
20  this report.  Right?
21  A.   I reviewed several reports on Rangel.  I don't
22  know if this is one or not.
23  Q.   Did you review the report of your interrogation
24  with Mr. Rangel?  Did you think that was something that
25  was going to be important?

Page 572

1   A.   I -- I believe I did.
2   Q.   Okay.  Great.
3   A.   I'm not sure.
4   Q.   Then I'm going to ask you about it.
5        And you recall from reviewing this report
6   that during this interrogation, Michael Rangel asked for
7   a lawyer on three separate occasions.  Correct?
8        MS. BERKE:  Objection.  Misstates evidence.
9        THE WITNESS:  I don't know the number, no.
10  Q.   BY MR. BRUSTIN:  You don't.  Let's take a look
11  at it.
12  A.   Not --
13  Q.   Take a look at page 001.
14  A.   01.
15  Q.   11, 11.
16  A.   11.
17  Q.   Take a look at the last paragraph.  You put in
18  quotes, "I think I may need an attorney."  Correct?
19  A.   Yes.
20  Q.   I'm sorry, I got ahead of myself.  The
21  paragraph just before that, at 2027 hours, it says,
22  "Michael then said, 'I think I may need an attorney.'"
23  Correct?
24  A.   Yes.
25  Q.   And that is a request for an attorney.

Page 573

1   Correct?
2   A.   No.
3        MS. BERKE:  Objection.  Misstates evidence.
4   Q.   BY MR. BRUSTIN:  I'm sorry.  What is -- that's
5   not a request for an attorney?
6   A.   No.
7   Q.   You didn't understand it that way?
8   A.   I didn't understand it that way because then I
9   told him that was up to him, but, you know, it wasn't up
10  to me.
11  Q.   Okay.  So you didn't understand this to be
12  Michael Rangel requesting an attorney?
13  A.   No.
14  Q.   Okay.  And you continued to question him?
15  A.   Yes.
16  Q.   Okay.  And then in the next paragraph, it says
17  again at 2032 hours, "Michael again said, 'I think I may
18  need an attorney.'"
19       Was that a request for an attorney?
20  A.   No.
21  Q.   Okay.
22  A.   And the same response was -- mine was that I
23  think -- telling him that it was up to him if he wanted
24  an attorney.
25  Q.   Okay.  So that wasn't a request for an

Page 574

1   attorney.  Correct?
2   A.   That's correct.
3   Q.   And why did you put down the time and put it in
4   quotes?
5   A.   Because I put everything down usually.
6   Q.   Okay.  There's two times on this page.  Both
7   refer -- both times refer to the questions about an
8   attorney.  Correct?
9   A.   Yes.
10  Q.   Why did you put the time when they requested --
11  when he said, "I may need an" -- why did you put a time
12  when he says, "I think I may need an attorney"?  Any
13  reason?
14  A.   No.
15  Q.   No reason at all?
16  A.   No.
17  Q.   Why did you put, "I think I may need an
18  attorney" in quotes?
19  A.   Because that's what he said.  Now, had I not
20  put it on there, then we would have probably had more
21  problems, but I put down exactly what he said, and that's
22  what he said.
23  Q.   Okay.  But your understanding was that the
24  procedure we just went through where it says you have to
25  cease questioning when he requests an attorney wasn't

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
575–578

Page 575

1 implicated by the words spoken by Michael Rangel.  Is
2 that correct?
3     A.   He did not request an attorney.  He said, "I
4 may need an attorney."
5     Q.   In other words, the procedure that you just
6 reviewed wasn't implicated by that statement.  Correct?
7         MS. RETTS:  Form.  Foundation.
8     Q.   BY MR. BRUSTIN:  That's your testimony?
9     A.   I don't -- I don't think so.
10    Q.   Okay.  Now, he did it a third time on page 12
11 where it says, "Again, Michael said" -- I'm sorry, I got
12 to put you there.  Middle -- first full paragraph, middle
13 where it says again, "Michael."  Do you see that?
14 "Again, Michael said I think."
15    A.   Okay, I got it.
16    Q.   "Again, Michael said, 'I think I may need an
17 attorney,' and I told him that that was up to him, but I
18 still wanted to know whether it had been an accident."
19 Right?
20    A.   Yes.
21    Q.   Third time he's saying, "I may need an
22 attorney."  Does this third time constitute a request for
23 an attorney in your view?
24    A.   No, he's asking me a question.
25    Q.   Okay.  So how about the combination of the

Page 576

1 three?  Did the three questions together in your view
2 implicate this procedure that we reviewed, Exhibit 30, or
3 no?
4     A.   I think no.  He -- he was trying to make up his
5 mind, and he obviously took -- couldn't make up his mind,
6 and he wanted me to make up his mind for him, but that's
7 up to him.
8     Q.   So none of the three -- none of the three
9 separately or together in your view constituted a request
10 for an attorney.  Correct?
11    A.   That's correct.
12    Q.   And so each time that he requested it, you
13 continued asking questions.  Correct?
14    A.   That's correct.
15    Q.   Now, after he requested an attorney -- after he
16 said he may need an attorney three times, he ultimately
17 broke down and confessed to killing his wife.  Correct?
18    A.   I believe so.
19    Q.   And by his description, the description he
20 gave, it was not a premeditated murder.  It was a murder
21 that was conducted in the heat of passion.  He grabbed
22 the gun from her, he blew up.  Right?  That's what he
23 described.  Correct?
24    A.   Yes.
25    Q.   He clearly described a crime that was committed

Page 577

1 in the heat of passion.  Correct, sir?
2     A.   Yes.
3     Q.   Now, you've told us that you continued asking
4 questions after he said he may need an attorney.
5 Correct?
6     A.   Yes.
7     Q.   And in fact what you asked were substantive
8 questions with the goal of him telling you about his
9 involvement in the crime.  Correct?
10    A.   Of course.
11    Q.   And it's your testimony that each time you
12 asked him questions after he said he may need an
13 attorney, you were acting in correspondence with the
14 procedures of the department.  Correct?
15    A.   That's correct.
16    Q.   And to the best of your memory, nobody told you
17 differently.  Correct?
18        MS. RETTS:  Form.
19        THE WITNESS:  I wouldn't know who would tell
20 me differently.
21    Q.   BY MR. BRUSTIN:  Okay.  Well, there was a
22 supervisor on the case.  Right?
23    A.   Yeah.
24    Q.   He never suggested you did anything wrong.
25 Correct?

Page 578

1         MS. BURGESS:  Form.
2         THE WITNESS:  No.
3     Q.   BY MR. BRUSTIN:  And there were other
4 detectives working on the case.  Correct?
5     A.   Fragoso, yes.
6     Q.   Okay.  He never suggested you did anything
7 wrong.  Correct?
8         MS. RETTS:  Form and foundation.
9         THE WITNESS:  Not that I know of.
10    Q.   BY MR. BRUSTIN:  In fact the teaching lesson
11 here for Fragoso was that even when an attorney -- even
12 when a suspect says, "I may need an attorney," if they
13 say it three times, you're still allowed to ask them
14 questions.  That was the teaching lesson for Fragoso.
15 Correct?
16        MS. RETTS:  Form and foundation.
17        MS. BERKE:  Objection.  Misstates evidence.
18 Argumentative.
19        THE WITNESS:  The teaching lesson, if any,
20 was that Mr. Rangel didn't know whether he wanted an
21 attorney.  He wanted me to make up his mind.  I wasn't
22 about to.  I told him it was up to him to make up his
23 mind, but until he did make up his mind, I continued to
24 ask him questions because that's just like a person that
25 has read his rights and everything and they never ask for



Page 579

1  an attorney.
2    Q.   BY MR. BRUSTIN:  Now, take a look at page 55.
3    A.   55.
4    Q.   Page 55, which is also page 33, this is -- this
5  is the DA speaking on the record.  "After the
6  individual -- after the individual invoked his Miranda
7  rights, during his interview, he then went on to indicate
8  and admitted the killing.  However, there may be Miranda
9  problems concerning that part of the confession."
10        So you would agree that this is the DA
11  stating in court that in fact when the suspect said he
12  may need an attorney, he had invoked his Miranda rights.
13  That's the DA saying this on the record.  Correct?
14    A.   That's not correct.
15        MS. RETTS:  Form and foundation.
16    Q.   BY MR. BRUSTIN:  How -- what did I miss here?
17    A.   "However, there may be Miranda problems."
18  There may be Miranda problems.
19    Q.   Okay.
20    A.   So he is an attorney.  So he is going to look
21  into that --
22    Q.   Okay.
23    A.   -- and decide.
24    Q.   It says "after the individual invoked his
25  Miranda rights."  What does that mean to you, sir?

Page 580

1    A.   Just what it says.
2    Q.   When he requested an attorney.  Correct?
3    A.   But I take it as a whole in that sentence, and
4  he says during his interview, and I'll say admitted the
5  killing.  "However, there may be Miranda problems
6  concerning -- may be Miranda problems concerning that
7  part of the confession."
8    Q.   Okay.  Fair enough.  And the -- what?  I'll get
9  to it.
10        And the DA never said anything to you about
11  anything you may have done wrong in this case.  Correct?
12    A.   I don't think I did anything wrong.
13    Q.   Did the DA suggest to you that you did anything
14  wrong?
15    A.   Not that I know of.
16    Q.   Take a look at page 71.  Okay.  This is the
17  county attorney at page 71.  It says, "Only after the
18  defendant suggested to the officers that he needed to
19  have counsel did the defendant admit that he killed the
20  victim.  These admissions were obtained in a clear
21  violation of Miranda and its progeny, a fact that the
22  defense counsel obviously has recognized."
23        Now, when you read that as a whole, what
24  does it say to you?
25    A.   It says to me that the attorney handling this

Page 581

1  case believes that I violated his Miranda rights.
2    Q.   Okay.  And he believes that it was a clear
3  violation of Miranda.  Correct?
4    A.   I'm not going to say that because I just said
5  that he said that I violated the Miranda rights.
6    Q.   Well, I'm not asking if you're going to say it.
7  He said it.  He said it was a clear violation of Miranda.
8  Right?
9    A.   Yes, he used that wording, yes.
10    Q.   Okay.  And nobody ever said that to you.
11  Right?  You never heard it before -- before me saying it
12  to you, no one ever brought it to your attention.  That's
13  what you're telling us.  Right?
14    A.   The attorney probably, but I don't remember
15  whether he did or didn't.
16    Q.   Well, you said he probably did.  What do you
17  mean?
18    A.   Well, because we talk over the case when it's
19  going to go to trial.
20    Q.   Okay.
21    A.   You know, during courts and stuff like that,
22  and he would tell me what he was going to use, what he
23  wasn't going to use.
24    Q.   Okay.
25    A.   But I don't really recall whether he mentioned

Page 582

1  that or not.
2    Q.   No -- no memory whatsoever of this district
3  attorney saying to you in substance that you clearly
4  violated this suspect's Miranda rights, no memory of
5  that?
6        MS. RETTS:  Form.
7        THE WITNESS:  No memory of that.
8    Q.   BY MR. BRUSTIN:  Okay.  Best you recall, that
9  never happened.  Right?
10        MS. BURGESS:  Foundation.
11        THE WITNESS:  I can't say that.  I don't
12  recall.
13    Q.   BY MR. BRUSTIN:  Well, if you don't have any --
14  fair enough.
15        Now, you were the only witness of the grand
16  jury.  Correct?
17        MS. BERKE:  Objection.  Foundation.
18        THE WITNESS:  I don't know.
19    Q.   BY MR. BRUSTIN:  Take a look at page 27.
20    A.   Okay.
21    Q.   Now, if you look at page 27, it says -- if
22  you -- take a look at page 26 first.
23    A.   Okay.
24    Q.   I'm just trying to figure out how the grand
25  juries worked in Phoenix, and it looks like on page 26



Page 583

1   it's the DA going through the law with -- with the grand
2   jury.  Do you see that?
3      A.   (No oral response).
4      Q.   You have to --
5      A.   Uh-huh.
6      Q.   -- answer you see that?
7      A.   Yes.
8      Q.   Relatively briefly, and then on the next page,
9   it goes right to you, and it says, "The witness will be
10  testifying today as Armando Saldate," and then you start
11  testifying on the next page.  Do you see that?
12     A.   That's --
13     Q.   On page 28.
14     A.   I don't have the bottom part -- you can't
15  really read the bottom part of 27.
16     Q.   I see that, but you can look at the next page
17  and see that you're testifying.  You see?
18     A.   Yes.
19     Q.   So in a very short time period, you're
20  testifying as the -- by the way, do you have any reason
21  to dispute you're only the only witness in the grand jury
22  here?
23          MS. BERKE:  Objection.  Foundation.
24          THE WITNESS:  I don't know.
25     Q.   BY MR. BRUSTIN:  It says, "The witness who will

Page 584

1   be testifying before you today is Detective Armando
2   Saldate."
3          You don't know if there was others after you
4   is what you're saying?
5      A.   That's correct.
6      Q.   Okay.  But typically when you did the grand
7   jury, would you be present in the room for most of the
8   proceedings?
9          MS. BERKE:  Objection.  Foundation.
10         THE WITNESS:  During questioning.
11     Q.   BY MR. BRUSTIN:  Okay.  And so would it be fair
12  to say that in this case where -- you probably were also
13  present when the law was being read --
14     A.   No.
15     Q.   -- just before?
16     A.   No.
17     Q.   They wouldn't call you -- they would call you
18  in.  Okay.
19         Now, during the grand jury questioning, do
20  you recall being asked -- withdrawn.
21         You understood in this case that one of the
22  issues was going to be whether or not -- in terms of what
23  this person will be charged with whether or not this case
24  was premeditated or whether or not it was a
25  heat-of-passion case.  Correct?

Page 585

1          MS. BERKE:  Objection.  Foundation.
2          THE WITNESS:  That I knew that?
3      Q.   BY MR. BRUSTIN:  Yeah, that you understood that
4   was going to be the issue --
5      A.   Well --
6      Q.   -- generally?
7      A.   -- I don't know that technically that was going
8   to be the issue.  I'm not an attorney.  It wasn't in my
9   control anyway.
10     Q.   Oh, of course not, but you generally understood
11  that would -- that would be relevant to charging, whether
12  it was premeditated or heat of passion.  Correct?
13     A.   I would say that's fair.
14     Q.   Okay.  And if you look at page 117 --
15         MS. BERKE:  Which page?
16         MR. BRUSTIN:  117.
17     Q.   BY MR. BRUSTIN:  This is way down the road.
18  This is the -- the presentence report that was done in
19  1990.  I'll represent to you it's from the first page.
20  Okay?  And at the end of this, it says, "Statements of
21  interested parties."
22         Do you see that?
23     A.   Uh-huh, yes.
24     Q.   All right.  And it says, "Phoenix police
25  Detective Saldate concurs with the plea agreement."

Page 586

1          Was it your understanding that typically
2   what would happen in a homicide case is that when there
3   was a plea down the road, you would be consulted?
4      A.   And we would concur just as a form of just
5   regularity.
6      Q.   Yes, you would be consultants, see what you
7   think as a matter of courtesy?
8          MS. RETTS:  Form.
9          THE WITNESS:  They would -- they wouldn't
10  consult us for -- for them making their mind up because
11  they made up their mind already, but they would only
12  consult us to let us know what was happening.
13     Q.   BY MR. BRUSTIN:  All right.  Well, here they
14  actually ask your opinion, and it says -- or at least you
15  gave it.  It says, "Saldate believes the defendant
16  premeditated this murder.  However, it would have been
17  difficult to prove this.  Therefore, he is satisfied with
18  the plea agreement."
19         Any reason to dispute that's what you told
20  them?
21     A.   I don't recall, but, no.  It's written down.
22  So...
23     Q.   No reason to dispute it.  Correct?
24     A.   No.
25     Q.   And so it looks like you were consulted on the



Page 587

1   plea. Correct?
2        MS. RETTS:  Form.
3        MS. BERKE:  Objection.  Misstates evidence.
4        MR. BRUSTIN:  Withdrawn.
5   Q.   BY MR. BRUSTIN:  It looks like you gave your
6   opinion about what you thought about the plea agreement.
7   Correct?
8   A.   That's correct.
9   Q.   And typically that's something that would
10  happen in a homicide case.  When there's a plea, you
11  would be informed about what was happening, and you would
12  be allowed to express your opinion.  Correct?
13       MS. RETTS:  Form.
14       THE WITNESS:  At times, yeah.  I think most
15  of the time, yeah.
16  Q.   BY MR. BRUSTIN:  Generally you're kept in the
17  loop as to what was happening during the criminal
18  procedure, convictions, pleas, things like that.  Right?
19  A.   Yeah, but usually by message more.  We were
20  busy.  You're right.
21  Q.   You told us --
22  A.   I said you're right.
23  Q.   -- you were a man of -- you were a man of great
24  integrity, and you cared greatly about what happened in
25  the cases you worked on.  Right?

Page 588

1   A.   I don't know if I put it that way or not.
2   Q.   Is that a fair way to put it?  You wanted
3   justice to be served, and you were interested to learn
4   when justice was served?
5   A.   I don't think I've ever said that, but I do --
6   I was a police officer and a police detective, and I was
7   assigned a responsibility that I wanted to -- to make
8   sure that it was done to the best of my ability, and it
9   would have been nice to hear what happened.  But in a lot
10  of cases, I never did hear what happened.
11  Q.   But you -- but you did your best to keep up if
12  you could, and you tried to find out what happened.  Fair
13  to say?
14  A.   I never tried to find out what happened, but
15  they would call me if they wanted to let me know.
16  Q.   Okay.  Like this case?
17  A.   A lot of times -- a lot of times when a case
18  was ever, let's say, referred back, I never -- would
19  never even know that.
20  Q.   Okay.  But here you did.  Right?
21  A.   There I did, yes.
22  Q.   All right.  And you gave your opinion that you
23  believed that it was a premeditated murder and not a
24  heat-of-passion murder.  Correct?
25  A.   That was my belief.

Page 589

1   Q.   In other words, your belief was, despite what
2   Michael Rangel told you during his interrogation that it
3   was heat of passion, you didn't believe it.  Correct?
4   A.   That's correct.
5   Q.   You believed it was premeditated and he lied?
6   A.   That's correct.
7   Q.   Is lying a fair word to use there?  Are you
8   comfortable with that, sir?
9   A.   Not really comfortable because you use it so
10  often, but, you know, you can go ahead, sure.
11  Q.   Okay.  Now, let's get back to your grand jury
12  testimony.  In the grand jury testimony on page 45 --
13  A.   Which --
14  Q.   45.
15  A.   Page 45?
16  Q.   Is lying a word that you -- is lying a word
17  that you try not to use in your reports?
18  A.   That's not true.
19  Q.   He's way ahead of us.
20       All right.  Take a look at page 45.  Now,
21  I'm going to try to do this generally without even
22  referring you to the page, and I think you will recall
23  this.
24       You were asked of the grand jury whether or
25  not Rangel mentioned that he had a gun or not.  Do you

Page 590

1   recall that?
2   A.   Not specifically, no.
3   Q.   All right.  Take a look at --
4   A.   I knew we talked about a gun, but I don't know
5   if it was at the grand jury or not.  I just don't know.
6   Q.   All right.  Now, at the grand jury, you
7   understood that you had an obligation to provide --
8   withdrawn.
9        You understood at the grand jury that you
10  had an obligation to answer each question asked of you
11  fully and completely.  Fair to say?
12       MS. BERKE:  Objection.  Misstates evidence.
13       THE WITNESS:  I knew that I had an
14  obligation to answer the questions that were asked of me
15  by the county attorney's office, yes.
16  Q.   BY MR. BRUSTIN:  All right.  So on page -- on
17  page 45 --
18  A.   Uh-huh.
19  Q.   -- question -- are you with me?
20  A.   There's a lot of Qs on there.  Which one?
21  Q.   Top of the page, line 1.
22  A.   Okay.
23       MR. BRUSTIN:  I got it.
24  Q.   BY MR. BRUSTIN:  Question was, "Did you talk
25  with Rangel as to whether or not he had a gun or had



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
591–594

Page 591

1  purchased a gun?"
2      A.   Uh-huh.
3      Q.   And then you say, "Yes, I spoke to him about
4  the fact -- whether he had a gun.  He denied having a
5  gun.  He said that on several occasions that he thought
6  about getting a gun, very seriously thought about getting
7  a gun after a couple of his employees had been shot at
8  from across the street of the Kmart where he has a
9  contract at 16th Street and Roosevelt.  He sweeps that
10  lot.  And he said he thought very seriously after
11  approximately a week later when someone was killed near
12  that lot to get a gun.
13          "Question:  But he denied having a gun?
14          "Answer:  That is correct."
15          Now, if in fact Mr. Rangel admitted to you
16  that in fact he did get a gun, he had a gun, you had an
17  obligation to tell the grand jury.  Correct?
18          MS. BERKE:  Misstates evidence.
19          THE WITNESS:  I was just -- yes.
20      Q.   BY MR. BRUSTIN:  Okay.  In other words --
21      A.   If I knew at that time.
22      Q.   If you knew at that time, of course.
23          So if in fact Mr. Rangel told you at one
24  point in the interview, "I didn't get a gun" but later in
25  the interview he admitted to getting a gun, you had an

Page 592

1  obligation to report that to the grand jury, correct,
2  when you were asked that question?
3      A.   I believe that's correct.
4      Q.   All right.  And you understood that as a
5  general matter -- I know you're not a lawyer, but as a
6  general matter, denying -- Mr. Rangel denying that he had
7  a gun when in fact you could prove he did would be
8  evidence supporting premeditation.  Fair to say?
9      A.   Could be one of the points, yeah.
10      Q.   All right.  Now, now, you were asked another
11  question on page 51.  I'm going to read it to you
12  directly.  It was from a juror.  I'll just read it to
13  you.  Mr. Smith is the juror.
14          "Question:  Did he indicate," meaning
15  Rangel, "that he saw her leave in her car?"
16          MS. BERKE:  Did you say 51?
17          MR. BRUSTIN:  I said 51.  Am I wrong?  I
18  could be wrong.
19      Q.   BY MR. BRUSTIN:  Yeah, I'll read it to you.
20  Top of the page, line 3, Mr. Smith is asking the
21  question.
22          "Did he say that" -- should be asking you.
23  "Did he indicate that he saw her leave in her car?  He
24  did say he saw her driving away.
25          "Answer:  Yes."

Page 593

1          That's the answer you gave.  Correct?
2      A.   Yes.
3      Q.   Now, obviously if plaintiff Rangel gave you a
4  different answer than that during the interview and you
5  recalled it, you were responsible for providing that
6  during that answer.  Correct?
7      A.   He did say that, and that's what the question
8  was, that did he -- he did say he saw her driving away.
9      Q.   Okay.
10      A.   Yes.
11      Q.   So you weren't responsible for saying another
12  portion during the interview that he said in fact he
13  admitted that she didn't drive away.  You weren't
14  responsible for saying that in response to that answer.
15  Is that your testimony?
16      A.   That's correct.
17      Q.   Your only job is to just answer the very
18  specific question that they're asking?
19      A.   That's correct.
20      Q.   So you didn't mislead the grand jury in that --
21  in that answer?
22      A.   No.
23      Q.   In other words, you knew that Rangel had told
24  you something different.  You just didn't think it was
25  responsive to that question.  Right?

Page 594

1          MS. RETTS:  Form.
2          THE WITNESS:  Yes.
3          MR. BRUSTIN:  Okay.  Let's take a break.
4          THE VIDEOGRAPHER:  We are off the record at
5  11:09 a.m.
6          (A recess was held off the record.)
7          THE VIDEOGRAPHER:  One moment.  We are back
8  on the record at 11:19 a.m.
9      Q.   BY MR. BRUSTIN:  Mr. Saldate, just a few more
10  questions about Rangel --
11      A.   Can I make a comment on -- I don't know
12  whether -- it was a question you said about what I was
13  responsible to the grand jury -- I mean answering
14  questions.  Was that -- because I remember Larry Turoff
15  telling me or -- the county attorney telling me that I
16  would not -- I could not answer questions after he had
17  asked for an attorney -- you know, answer the questions
18  from the grand jurors anything about after what -- when
19  he asked -- when he asked for the attorney, which I
20  didn't believe he did.
21          But, you know, when he asked that part, he
22  did tell me I would not be telling anything about that
23  part, anything that happened after that.
24      Q.   Okay.  So in other words, what did happen -- so
25  when you said that Larry Turoff didn't speak to you about



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
595–598

Page 595

1  your violating Miranda, in fact that was wrong.  He did
2  speak to you about it.  Correct?
3        MS. BERKE:  Objection.  Misstates evidence.
4  Misstates testimony.
5        THE WITNESS:  He -- in respect to that
6  portion, yes.  He said that -- that -- and I think he
7  cautioned one juror when a question he asked -- he said,
8  "No, we can't go into that," and that was in regards to
9  that happening after that, but I would just want to make
10  sure that --
11     Q.   BY MR. BRUSTIN:  Oh, it is clear, and you
12  remember that because you had a conversation with your
13  attorney after the break.  Correct?
14     A.   I remembered that when we were trying to read
15  this, and I was trying to get to that portion.  I still
16  haven't found that where that person had --
17     Q.   Okay.
18     A.   -- been questioned by --
19     Q.   Mr. Saldate?
20     A.   Yes.
21     Q.   Are you recalling now that in fact Larry Turoff
22  did tell you that you had violated Miranda, and that's
23  why you couldn't answer questions after?
24     A.   No, he just told me, as I said before, that we
25  would not be going into any of that, and I think he told

Page 596

1  the juror -- and that's what I was looking for before we
2  took the break.
3     Q.   Okay.
4     A.   And --
5     Q.   And you were told that by your attorney during
6  the break.  Correct?
7        MS. BERKE:  Objection.  You can't ask him
8  about anything we talked about.
9     Q.   BY MR. BRUSTIN:  Did you remember that after
10  speaking to your attorney during the break?
11     A.   That I remember what?  I told you --
12     Q.   You just --
13     A.   I told you just before I left this break --
14  before I left this break, I was looking for that part
15  that the juror had asked the question that I couldn't
16  answer.
17     Q.   Okay.  Anything else you recall?  Withdrawn.
18        Take a look at page 34.
19     A.   But either way, I made sure --
20     Q.   There's no question pending.  Take a look at
21  page 34.
22     A.   You asked me if I could recall anything.
23     Q.   There's no question pending.  Take a look at
24  page 34.
25        MS. BURGESS:  Please do not yell at the

Page 597

1  witness.
2        MS. BERKE:  Please don't yell at
3  Mr. Saldate.
4     Q.   BY MR. BRUSTIN:  Now, on page 34, you were
5  asked the question, line 17, "During the course of the
6  investigation into this matter, have you discovered the
7  state of their relationship vis-a-vis the coming
8  marriage?"
9        So you're asking -- you're being asked a
10  question about what their relationship was.  Correct?
11     A.   Uh-huh.
12     Q.   And in the answer, you describe what their
13  relationship was.  Right?
14        MS. BERKE:  Objection.  Vague.
15        THE WITNESS:  Yes, to a degree.
16     Q.   BY MR. BRUSTIN:  And at the end, you say, "And
17  more important was having a very difficult time having or
18  thinking of having to tell his parents."  Right?
19     A.   Correct.
20     Q.   And the reason that was so important is because
21  it suggests premeditation.  Correct?
22        MS. BERKE:  Objection.  Foundation.
23        THE WITNESS:  It was important because he
24  told me.
25     Q.   BY MR. BRUSTIN:  And it was important because

Page 598

1  it suggests premeditation.  Correct?
2        MS. BERKE:  Objection.  Foundation.
3        THE WITNESS:  It was important because he
4  told me.
5     Q.   BY MR. BRUSTIN:  Well, you weren't asked about
6  any conversations with his parents.  You volunteered it.
7  Correct?  You were asked about the -- the state of their
8  marriage.  Correct?
9     A.   And I had spoken to three different persons who
10  had told me that Michael Rangel did not wish to get
11  married.
12     Q.   Sir?
13     A.   Yes.
14     Q.   Listen to my question.
15        MS. BERKE:  He's answering your question.
16  Don't interrupt him.
17     Q.   BY MR. BRUSTIN:  Sir, listen to my question.
18  My question was you asked a question about the state
19  of their relationship.  You answered about the state of
20  the relationship, and then you added more importantly
21  about him having to tell his parents.  Right?
22     A.   I -- it says, "During the investigation into
23  this matter, have you discovered the state of their
24  relationship?"  And that was part of the relationship.
25        MS. BERKE:  Vis-a-vis the coming marriage.

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
599–602

Page 599

1    Q.   BY MR. BRUSTIN:  Ah, got you.  And the reason
2  you volunteered that to the answer is because you knew it
3  suggested a motive for premeditation.  Correct?
4    A.   No.
5    Q.   Never crossed your mind?
6    A.   It may have, but I don't know -- that wasn't
7  the reason.
8    Q.   Okay.  Take a look at page -- I got to skip
9  this.
10       MR. BRUSTIN:  Keep that open.  Mark this
11  page for later.
12    Q.   BY MR. BRUSTIN:  Let's go to Runningeagle.  You
13  remember Runningeagle.  Right?
14    A.   The case or the person?
15    Q.   Remember the --
16    A.   Yes.
17    Q.   Remember both?
18    A.   Sort of, yeah.
19    Q.   Sort of?
20    A.   Yeah.
21    Q.   It was a brutal murder of an elderly couple.
22  Right?
23    A.   Yes, it was.
24    Q.   This one stand out in your mind at all?
25    A.   Sort of.

Page 600

1    Q.   And in this case, you understood early on that
2  there was lots of evidence before you spoke to anybody
3  implicating all three of these people in this horrible
4  crime.  Correct?
5       MS. BERKE:  Objection.  Vague.
6       THE WITNESS:  I don't understand "lots of
7  evidence."  I mean, I was there at the beginning, and I
8  was looking through the case and stuff, yeah.
9    Q.   BY MR. BRUSTIN:  There was forensic evidence
10  tying them to the scenario and many witnesses who saw
11  them there.  Correct?
12    A.   I didn't get results of any forensic evidence
13  while I was there.
14    Q.   Okay.  There were many -- you understood before
15  you spoke to them that there were witnesses that placed
16  them there.  Correct?
17    A.   Yes.
18    Q.   And you understood that -- that stolen
19  merchandise from the house was found on those persons.
20  Correct?
21       MS. BERKE:  Objection.  Foundation.
22       THE WITNESS:  I don't recall exactly that,
23  no.
24    Q.   BY MR. BRUSTIN:  Okay.  You certainly don't
25  dispute that?

Page 601

1       MS. BERKE:  Objection.  Foundation.
2       THE WITNESS:  I have no way to dispute it
3  because I don't recall.
4    Q.   BY MR. BRUSTIN:  Okay.  And one of your
5  goals -- one of your objectives in interrogating these
6  suspects was to sort out who did what.  Correct?
7    A.   That's my job.
8    Q.   All right.  And you understood this was the
9  case, given the nature of the crime, that -- that could
10  lead to the death penalty?
11    A.   Of course.
12    Q.   And who -- who, if anyone, got the death
13  penalty would depend on what their involvement was in the
14  crime.  Correct?
15    A.   That's not my decision.  That's the Court's
16  decision.
17    Q.   But you understood that.
18    A.   Yes.
19    Q.   Correct?  For example, if somebody was simply
20  there as a bystander stealing -- or even involved in
21  stealing but hadn't actually killed either of the two
22  elderly victims, they were less likely to get the death
23  penalty.  You knew that as a general matter?
24    A.   Yes.
25    A.   I'm sorry.  So were -- on the -- which one is

Page 602

1  it?  What's the number on the Runningeagle notebook?
2    A.   67, I think.
3    Q.   All right.  So what we've marked for --
4    A.   64.  I'm sorry.
5       (Exhibit 64 was marked for identification.)
6    Q.   BY MR. BRUSTIN:  Okay.  That's fine.  What
7  we've marked for identification is a series of documents
8  in the Runningeagle case, and we Bates stamped it the
9  same way, 01 through 232.
10       Now, you understand that eventually
11  Runningeagle was sentenced to death and that Tilden
12  received two life sentences.  Correct?
13       MS. BERKE:  Objection.  Foundation.
14       THE WITNESS:  I knew that he was -- he
15  was -- that Runningeagle was sentenced to death, but I
16  don't know about the other one.
17    Q.   BY MR. BRUSTIN:  You knew about Runningeagle?
18    A.   Yeah, but I don't really recall the other one.
19    Q.   Okay.  Now, in the Runningeagle case, you also
20  interviewed Runningeagle with a partner, a detective
21  named Martinsen.  Correct?
22    A.   Correct.
23    Q.   In other words, Martinsen was a witness to that
24  entire interrogation?
25    A.   Yes, I guess.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
603–606

Page 603

1    Q.   And you also interviewed both Orva and Tilden
2  with Detective Martinson?
3    A.   I believe so.
4    Q.   Were you the case agent on this case?
5    A.   Yes.
6    Q.   Okay.  Martinson was assisting you?
7    A.   Yes.
8    Q.   But you conducted all the interrogations.  You
9  were the primary interrogator.  Fair to say?
10       MS. BERKE:  Objection.  Foundation.  Vague.
11       THE WITNESS:  I think I did, yeah.
12    Q.   BY MR. BRUSTIN:  Okay.  Now, when you
13  interviewed Tilden and he requested an attorney, you
14  immediately stopped the questioning and ended the
15  interview.  Correct?
16       MS. BERKE:  Objection.  Foundation.
17       THE WITNESS:  I guess so.
18    Q.   BY MR. BRUSTIN:  You don't recall?
19    A.   Well, I mean, I'd have to look at it.
20    Q.   That's fine.  We'll do it.  Take a look at page
21  13.
22    A.   13.  Okay.
23    Q.   Last -- bottom of the page.  "Corey again said
24  that he did not know what I was speaking about and then
25  requested an attorney.  At this point, the interview was

Page 604

1  ended."
2       Do you see that?
3       MS. BERKE:  What -- which paragraph?
4       MR. BRUSTIN:  Bottom -- the --
5       MS. BERKE:  Okay.
6       MR. BRUSTIN:  Do you see it?
7       MS. BERKE:  Yeah.
8    Q.   BY MR. BRUSTIN:  More importantly, do you see
9  it?
10    A.   The page --
11    Q.   Bottom of the page, page 13.
12    A.   Okay.
13    Q.   It says --
14    A.   "Corey was later taken to Maricopa County."
15    Q.   No, no, no, no.  Right above that.
16    A.   Okay.
17    Q.   "Corey again said that he did not know what I
18  was speaking about and then requested an attorney."
19    A.   Yes.
20    Q.   Do you see that?
21    A.   I see that.
22    Q.   "At this point, the interview was ended, and
23  Detective Martinson and myself left the room."
24       Now, was Detective Martinson a junior
25  detective, or was he an experienced detective?

Page 605

1    A.   He was senior to me.
2    Q.   Senior to you.  Okay.  And why did you decide
3  during this interrogation to stop the interview when he
4  requested an attorney as opposed to asking more
5  questions?
6    A.   Every interview is different.
7    Q.   Okay.  Do you remember what caused you to do it
8  here?
9    A.   No.
10    Q.   Would it be fair to say it may have been that
11  Detective Martinson insisted that because he asked for an
12  attorney you had to stop questioning?
13    A.   No.
14    Q.   That didn't happen?
15    A.   No.
16    Q.   Okay.  You don't remember why you decided that?
17    A.   Every interview is different.  So...
18    Q.   Fair enough.  Now, in the Runningeagle case,
19  you testified that -- and I think I've seen his testimony
20  from before -- that your report was just like a tape
21  recording.  Is that a fair characterization of how you
22  did your interrogation reports?
23       MS. BERKE:  Objection.  Misstates evidence.
24       THE WITNESS:  I don't think I said that.
25    Q.   BY MR. BRUSTIN:  Well, I'll show it to you,

Page 606

1  page 179.  Page 70 -- page 179, line 22, at the bottom.
2  Do you see?
3    A.   Okay.
4    Q.   "Question:  You believe that this in effect
5  would give us the same portrayal as if there was a
6  tape-recorder there of what transpired -- transpired
7  between you and Orva Antone that day.
8       "Answer:  Yes."
9       MS. BERKE:  Well, to put it in context, I
10  think in fairness he needs to review the testimony a
11  little bit before that.
12       MR. BRUSTIN:  You're not doing that.
13    Q.   BY MR. BRUSTIN:  Do you agree with that
14  testimony?
15       MS. BERKE:  Objection.  Foundation.
16    Q.   BY MR. BRUSTIN:  You're referring to your
17  report of the interrogation.
18       MS. BERKE:  Objection.  Foundation.
19    Q.   BY MR. BRUSTIN:  First of all, did you give
20  that testimony?
21       MS. BERKE:  Objection.  Foundation.
22       THE WITNESS:  I just said yes.  I didn't
23  give the testimony, no.  The -- that was the question
24  that was asked, and I said yes.
25    Q.   BY MR. BRUSTIN:  Okay, because that's what you



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
607–610

Page 607

1 attempted to do. You attempted to get everything --
2 everything that a suspect said to you in the order in
3 which they said it in your report. Correct?
4     A. Not always, no. It's -- you jump around in an
5 interview, and he may mention something about, let's say,
6 a piece of evidence and then later on remember something
7 about a piece of evidence, and, you know, I mean, you
8 jump around. Interview -- every interview is different.
9     Q. Okay.
10     A. I mean, it's just the way it is.
11     Q. Okay. So -- so this testimony is not accurate?
12 It wasn't like a tape recording?
13         MS. BERKE: Objection. Foundation.
14         THE WITNESS: Well, even in a tape recording
15 you would jump around because if that person -- if you
16 were tape recording the same conversation as I just
17 related to you, it would be in a different spot than the
18 tape recording would be in.
19     Q. BY MR. BRUSTIN: Right. Whenever he says it,
20 whenever you ask about it, you may jump around in the
21 sequence of events, but you would write it down when he
22 says it and what he says. Right?
23     A. For the most part, yeah, you know, highlight
24 it, and then I -- I put it in the report.
25     Q. Right. You said you write -- you told -- you

Page 608

1 did it many times?
2     A. I didn't write it verbatim.
3     Q. You do the best you can and write everything
4 important in your reports?
5     A. I paraphrase it the best I can.
6     Q. Now, take a look at page 50.
7     A. 50.
8     Q. Line 22. By the way, in this case, like every
9 case, before you testify, you would have reviewed your
10 reports of the relevant interrogations. Correct?
11     A. Given time, yes.
12     Q. Do you have any doubt in your mind that in the
13 Runningeagle case you made time to review the reports
14 before testifying?
15     A. I don't recall, but I mean, given time I would.
16     Q. Okay. And also when you testified on the stand
17 you would have the relevant reports in front of you to
18 refresh your recollection. You do that all the time.
19 Correct?
20     A. The county attorney would reference him and
21 then give them to me if he was referencing a report.
22     Q. Okay. Now, line 22 -- it says, "At some point
23 during the conversation, did he ask to remain silent?
24     "Answer: Yes, he did.
25     "Question: At what point did that occur?

Page 609

1     "Answer: Shortly after we had gone into
2 conversations about psychiatrists and him wanting one, to
3 see a police psychiatrist."
4         Is that truthful testimony?
5     A. I believe it was, yeah.
6     Q. Now, it's clear if you look at page 52, look at
7 lines 18 to 21. Tell me when you've read those, just 18
8 to 22.
9     A. Okay. I got it.
10     Q. It's clear you're reviewing your report on the
11 stand. Correct?
12     A. Yes.
13     Q. All right. Now, you're asked right after
14 that -- at the top of the page 22 you're asked --
15         MS. GREEN: 52.
16         MR. BRUSTIN: What?
17         MS. GREEN: 52.
18         MR. BRUSTIN: 52.
19     Q. BY MR. BRUSTIN: Read to yourself lines 4
20 through 14.
21     A. Okay.
22     Q. Now, this statement, "Just let me fall" or,
23 "Let me fall" is not a straightforward admission. Fair
24 to say?
25         MS. BERKE: A what?

Page 610

1     Q. BY MR. BRUSTIN: A straightforward admission?
2     A. No.
3     Q. But it's -- but it's potentially an inculpatory
4 statement. Fair to say?
5     A. Could be.
6     Q. Okay. And you're making clear in this
7 testimony on lines 4 through 14 that he never made that
8 potentially inculpatory statement before -- withdrawn.
9         You're making clear here that he made that
10 inculpatory statement before he revoked his right to
11 remain silent. Correct?
12     A. Correct.
13     Q. I'm sorry?
14     A. Yes.
15     Q. And on page 59, you clarify again -- what's
16 this one?
17         MS. GREEN: 59.
18     Q. BY MR. BRUSTIN: On page 59, if you look at
19 lines -- read to yourself just line 6 through line 18.
20     A. Okay.
21     Q. You're making clear on the stand that he
22 invoked his right to remain silent just before he asked
23 for an attorney. Correct?
24     A. Yes.
25     Q. And you're making clear that he did not do



Page 611

1  either of those things until about an hour and ten
2  minutes into the interview near the end.  Correct?
3      A.   Correct.
4      Q.   In other words, making clear that all of the --
5  all of the inculpatory statements occurred before he
6  requested an attorney and before he invoked his right to
7  remain silent.  Correct, sir?
8      A.   Correct.
9      Q.   And as you've told us, you were up there with
10  the report on the stand.  Correct?
11      A.   I may have had the report.  I don't know if he
12  gave it to me, yeah.
13      Q.   Well, you just --
14      A.   Yeah, at that point, I did.
15      Q.   Two pages before?
16      A.   Yeah, at that point, I did regarding that --
17  but then the attorney takes it back and --
18      Q.   Oh, you think he took it back?
19      A.   He did.
20      Q.   You don't think you had your report when you
21  were answering questions?
22          MS. BERKE:  Objection.  Foundation.
23      Q.   BY MR. BRUSTIN:  Withdrawn.
24          This -- the portion you just read indicates
25  that you already had it, and you were referring to it.

Page 612

1  Correct?
2          MS. BERKE:  Objection.  Vague.
3      Q.   BY MR. BRUSTIN:  Take a look at it again.  What
4  pages?
5      A.   Number 6 through...
6          MS. BERKE:  Which part are you referring?
7          MR. BRUSTIN:  I'll get it.  52.
8      Q.   BY MR. BRUSTIN:  It's clear from what you're
9  doing here --
10      A.   52.
11      Q.   Line 18 to 22 again.  It's clear from your
12  testimony -- page 52, 18 to 22.  It's clear from the way
13  you're answering this question that you had the report on
14  the stand, and you're referring to it.  Correct?
15      A.   Yes.
16      Q.   Okay.  In other words, it's not that this --
17  it's not that the district attorney brought it down to
18  you.  It's clear that before you answered that question,
19  you had the report in front of you, and you referred to
20  it on your own.  Correct?
21      A.   I don't think so.  It doesn't say that.  I --
22  you know, it says --
23      Q.   You're asked a question --
24      A.   Again, I would have to review my report.
25      Q.   And you do it.

Page 613

1      A.   Well, the report that -- I didn't have it with
2  me.  The report that by asking that the attorney -- the
3  prosecutor would then bring me the report and point out,
4  just like you would as a defense attorney -- point out
5  what areas you want me to read or to -- to, you know --
6  and that's what we did.
7      Q.   Mr. Saldate, I'm going to ask a lot of other
8  officers the same question.  In Phoenix, just like every
9  other police department, when you are testifying about an
10  interrogation, you have your report sitting in front of
11  you to refresh your recollection.  Correct?
12      A.   Not true.
13      Q.   Well, here you did.  Right?  You admitted it
14  now --
15          MS. BERKE:  Objection.  Vague.
16          THE WITNESS:  I didn't say I had the report
17  because it was given to me.  I did not take a report with
18  me to the stand.
19      Q.   BY MR. BRUSTIN:  It says, "Again, I would have
20  to review my report if it's okay to."  Then you review
21  the report, and then you continue answering.
22      A.   But --
23      Q.   Right?
24      A.   I said --
25      Q.   Did I describe the scenario correctly?

Page 614

1      A.   No.
2          MS. BERKE:  He's acknowledged he had the
3  report at that moment.  He is saying that later on he
4  doesn't know if he still had the report.
5          THE WITNESS:  And I did not.
6      Q.   BY MR. BRUSTIN:  You think he may have taken it
7  away?
8      A.   He may have just given it to me first, and then
9  I reviewed it, and then he took it away.
10      Q.   So you reviewed it on the stand to answer the
11  question?
12      A.   Yes, but I didn't have the report with me.
13      Q.   Okay.  He gave it to you?
14      A.   He may have, yeah.
15      Q.   And you reviewed that --
16      A.   That was the standard procedure.
17      Q.   And it was standard procedure for you to review
18  it before the trial as well.  Right?
19      A.   Yeah, I mean, if time permitted, I would always
20  read my reports.
21      Q.   Well, in this case, on page 179, you say,
22  question, line 11:  "Now, I assume, Officer Or Detective,
23  that in preparation for your testimony today that you had
24  an occasion to review that report.
25          "Answer:  Most definitely."



ARMANDO SALDATE Volume III                                    November 15, 2017
MILKE vs CITY OF PHOENIX                                            615–618

Page 615

1        Right?
2   A.   Yes.
3        MS. BERKE: Objection. Vague.
4   Q.   BY MR. BRUSTIN: Making clear that you
5   carefully reviewed the report. Correct?
6        MS. BERKE: Objection. Vague.
7        THE WITNESS: I had occasion to review the
8   report, yes, I did.
9   Q.   BY MR. BRUSTIN: Now, you understood in this
10  case that the argument -- withdrawn.
11       By this time, you had been around the block
12  a few times. You knew how things worked. Right?
13       MS. BURGESS: Form.
14       MS. BERKE: Vague.
15       THE WITNESS: I don't know what block he
16  means.
17  Q.   BY MR. BRUSTIN: Well, the block of what
18  defense lawyers are trying to do when they're questioning
19  you. Right?
20  A.   Possibly.
21  Q.   You understood in this case that what the
22  defense lawyer was trying to suggest is that Runningeagle
23  had invoked his right to remain silent before he made any
24  inculpatory admissions. Correct?
25       MS. BERKE: Objection. Foundation.

Page 616

1        MS. BURGESS: Join.
2        THE WITNESS: I don't know -- I don't
3   remember whether that was the case. I -- I mean, every
4   attorney wants to reach for that. I mean, that's just
5   the way it is.
6   Q.   BY MR. BRUSTIN: The prosecutor on the record
7   made the argument that Runningeagle only invoked his
8   right to remain silent and for an attorney 45 minutes
9   into the interview.
10       MS. BERKE: What page are you at?
11  Q.   BY MR. BRUSTIN: Any doubt -- any doubt in your
12  mind that he received that information from you?
13       MS. BERKE: Objection. Foundation. Can you
14  direct us to what point -- or what page you're referring
15  to?
16       MR. BRUSTIN: No.
17       MS. BERKE: Objection. Foundation.
18       THE WITNESS: He could have got it from the
19  report.
20  Q.   BY MR. BRUSTIN: Okay. Now, take a look at
21  page 15. Now, see in the first paragraph in the top here
22  it says -- the last sentence of the first partial
23  paragraph he says -- withdrawn.
24       "I again told him that I would try to
25  understand, but he replied that he -- that he wanted to

Page 617

1   remain silent."
2        Do you see that?
3   A.   The second full paragraph?
4   Q.   First full paragraph. I'm sorry.
5   A.   Okay. First --
6   Q.   The first partial paragraph --
7   A.   Okay.
8   Q.   -- at the last sentence.
9   A.   It says, "During the interview, Sean
10  occasionally had a smile on his face and never" --
11  Q.   No, this is where I'm looking at, first partial
12  paragraph, last sentence, page -- page 15. "I again told
13  him that I would try to understand, but he replied that
14  he wanted to remain silent."
15       Do you see that?
16  A.   No.
17  Q.   Give me -- give me your document. I've
18  underlined it for you.
19  A.   Thank you.
20  Q.   Do you see it now?
21  A.   Well, when I get the book, yes.
22       Yes, I see it.
23  Q.   Okay. Did I read it accurately?
24  A.   "I again told him that I would try to
25  understand, but he replied that he wanted to remain

Page 618

1   silent."
2   Q.   So I read it accurately?
3   A.   I guess you did, yeah.
4   Q.   Okay. That's the point in the interview when
5   Runningeagle invoked his right to remain silent.
6   Correct?
7   A.   Yes.
8   Q.   Okay. Now, if you go down just a few more
9   paragraphs, you see where it says, "Finally Sean
10  commented," the second last paragraph?
11  A.   Uh-huh.
12  A.   It says, "Finally Sean commented in a louder
13  voice and said 'just let me fall, it must be my destiny,
14  I must fall.'"
15       Do you see that?
16  A.   Yes.
17  Q.   All right. This is the potentially inculpatory
18  statement that he made. Correct?
19  A.   You could say it was inculpatory, yeah.
20  Q.   Okay. And this potentially inculpatory
21  statements comes after he invoked his right to remain
22  silent. Correct?
23  A.   Yes, it does appear there.
24  Q.   All right. And so what happened was you sat on
25  the witness stand with your report in front of you, and



Exhibit 1

ARMANDO SALDATE Volume III                    November 15, 2017
MILKE vs CITY OF PHOENIX                            619–622

Page 619

1  you lied about when -- withdrawn.
2         You sat on the witness stand with your
3  report, and you misrepresented under oath that
4  Runningeagle made the statement, "Just let me fall"
5  before he invoked his right to remain silent.  Isn't that
6  correct, sir?
7         MS. RETTS:  Form.
8         MS. BERKE:  Objection.  Misstates evidence.
9  Argumentative.
10        THE WITNESS:  I must have misstated it, yes.
11    Q.   BY MR. BRUSTIN:  Okay.  So you had reviewed the
12  report most definitely before the trial.  Right?
13        MS. BERKE:  Objection.  Misstates evidence.
14        THE WITNESS:  Yeah.
15    Q.   BY MR. BRUSTIN:  Okay.  And you had it sitting
16  in front of you as you were testifying.  Right?
17        MS. BERKE:  Objection.  Misstates testimony.
18        THE WITNESS:  That's not what I said.
19    Q.   BY MR. BRUSTIN:  You understood that the issue
20  you were being questioned about was when he invoked to
21  remain -- his right to remain silent and when he asked
22  for an attorney.  Correct?
23    A.   Yes.
24    Q.   And you're saying it was simply a mistake when
25  you said that he didn't invoke his right to remain --

Page 620

1  that he invoked his right to remain silent after?
2    A.   Must have -- must have been.
3    Q.   Must have been a mistake?
4    A.   Misstatement.
5    Q.   It wasn't a lie?
6    A.   Of course not.
7    Q.   How was it possible that you reviewed this
8  document, you had it in front of you on the stand and you
9  could make that kind of a mistake?
10    A.   First of all, I didn't say I had it in front of
11  me in front of the stand, and in regards to reviewing it,
12  I don't have a photographic memory.  You know, I was
13  doing a lot of cases, working on a lot of cases, going to
14  a lot of court, and, yes, I reviewed it, and I can -- I
15  made a misstatement.
16    Q.   Couldn't be more clear from this.  Right?
17    A.   More clear that I made a misstatement, yeah.
18    Q.   Couldn't be more clear that he invoked his
19  right to remain silent before he made that admission.
20  Correct?
21    A.   That I made a mistake, yes, I --
22    Q.   It couldn't be more clear from your report that
23  he invoked his right to remain silent before he made the
24  admission.  Correct?
25    A.   That's correct.

Page 621

1    Q.   It's crystal clear.  Right?
2    A.   It's clear.
3    Q.   You can't read this report and not understand
4  that he made that statement only after he invoked his
5  right to remain silent.  Correct?
6    A.   In -- right here, yeah, absolutely.
7    Q.   Well, you read it most definitely before you
8  testified.
9         MS. BERKE:  Objection.  Misstates evidence.
10        THE WITNESS:  Yes.
11        MS. BERKE:  Assumes facts not in evidence.
12  Foundation.
13    Q.   BY MR. BRUSTIN:  And you reviewed the document
14  on the stand to make sure that your memory was accurate.
15  Correct?
16        MS. BERKE:  Objection.  Misstates evidence.
17        THE WITNESS:  I don't see -- see where I
18  reviewed it on the stand, but like I said -- and
19  you're -- but --
20    Q.   BY MR. BRUSTIN:  Are you changing that
21  testimony that you reviewed the document on the stand?
22    A.   I'm not saying that.  I just said I don't
23  remember doing that on the stand that I reviewed the
24  document.
25         Take a look at page 129, page 129, lines 13 to

Page 622

1  20.  This is your trial testimony.  Do you see that?
2    A.   Line 13?
3    Q.   Line 13 to 20.
4    A.   To 20, okay.
5    Q.   Just 13 to 20.
6    A.   Yes.
7    Q.   And, again, at the trial, you're asking
8  permission to review your report that's sitting right in
9  front of you.  Correct?
10    A.   It doesn't say that.  Why do you include that?
11  Why do you intend on putting things that are not in the
12  report?
13    Q.   Is it your testimony that this testimony does
14  not indicate that you had the report sitting in front of
15  you?
16    A.   No, it does not indicate that.  It says I asked
17  him if -- if I could review my report.
18    Q.   Which was sitting in front of you.
19        MS. BERKE:  Objection.  Foundation.
20  Misstates evidence.
21        THE WITNESS:  How do you know that?  Were
22  you there?  Because I can't even recall it was -- that it
23  sat in front of me, but I'm pretty sure that it didn't.
24    Q.   BY MR. BRUSTIN:  You think that he just kept
25  giving it to you when you needed it and then taking it



ARMANDO SALDATE Volume III                          November 15, 2017
MILKE vs CITY OF PHOENIX                                      623–626

Page 623

1   back.  That is what you think happened?
2      A.   That's usually the way it's done --
3      Q.   Is that right?
4      A.   -- because the defense attorney usually likes
5   the person that's testifying to do it from his own
6   recollection and not the report.
7      Q.   You just made that up, didn't you?
8      A.   No.
9          MS. BERKE:  Objection.  Argumentative.
10         MS. RETTS:  Form.
11         THE WITNESS:  Why would you do that?  Why
12  would you say that?
13     Q.   BY MR. BRUSTIN:  Because that's not how it
14  works.
15     A.   Maybe not in New York, but here it does.
16         MS. RETTS:  Foundation.
17         MS. BERKE:  Objection.  Argumentative.
18     Q.   BY MR. BRUSTIN:  So your experience has been
19  that mostly defense lawyers don't want you to have your
20  report?
21     A.   That's correct.
22     Q.   So your belief as to what happened was you did
23  review your report but only when you asked for it?
24     A.   Only -- that's when I asked permission, yes.
25     Q.   Okay.  But you did review the report?

Page 624

1          MS. BERKE:  Objection.  Vague.
2          THE WITNESS:  That part, yes, when I asked
3   permission.  If I had the report, I wouldn't have had to
4   ask for permission.
5      Q.   BY MR. BRUSTIN:  Okay.  So let's go back to
6   page 52.  On page 52, beginning on line 4, you're
7   specifically asked questions about whether he makes the
8   statement, "Just let me -- just let me fall" before or
9   after he invokes his right to remain silent.  Correct?
10     A.   Yes.
11     Q.   Okay.  And ten lines later, beginning on line
12  18, so maybe 20 seconds later, you asked to review your
13  report.  Correct?
14     A.   Yes.
15     Q.   Okay.  So you're asked about when in time he's
16  asked what -- you're asked about when -- withdrawn.
17         Now, according to Runningeagle, his
18  attorney -- Runningeagle also asked for his attorney --
19  his attorney repeatedly during the interview.  He
20  repeated it three or four times.  Did he lie when he said
21  that?
22         MS. RETTS:  Form.
23         THE WITNESS:  I don't know about the number
24  of times, no.
25     Q.   BY MR. BRUSTIN:  Now, in the Runningeagle case,

Page 625

1   you also acknowledged that in order to get Runningeagle's
2   attention, you on several occasions poked him in the
3   chest with your finger.  Correct?
4      A.   Correct.
5      Q.   While you were six to 12 inches from his face?
6      A.   Correct.
7      Q.   And at that time, you were a much younger man.
8   Correct?
9      A.   Yes.
10     Q.   And you weighed 225 pounds.  Correct?
11     A.   About, yeah.
12     Q.   And you testified that it was your belief that
13  you poking him in the chest while six to 12 inches from
14  his face was not a use of force.  Correct?
15     A.   That's correct.
16     Q.   You made -- and nobody --
17     A.   Poking him in the face?
18     Q.   Poking him in the chest.
19     A.   Okay.
20     Q.   That's what I meant to say.  And nobody
21  suggested that you had done anything wrong.  Fair to say?
22         MS. RETTS:  Form and foundation.
23         THE WITNESS:  Yes.
24     Q.   BY MR. BRUSTIN:  Would it be fair to say that
25  poking a suspect in the chest from six to 12 inches away

Page 626

1   is in your view the same as putting your hands on a
2   female -- young female suspect's knees for a period of
3   time?
4          MS. BERKE:  Objection.  Vague.
5          MS. RETTS:  Vague.
6      Q.   BY MR. BRUSTIN:  Same kind of thing?
7          MS. BERKE:  Objection.  Vague.
8          THE WITNESS:  I don't know how that would
9   be.  Two totally different people.
10     Q.   BY MR. BRUSTIN:  Oh, by the way, I forgot to
11  ask you --
12     A.   Okay.
13     Q.   -- during the ten and a half hours that you
14  spent preparing -- preparing for this deposition, did you
15  come to any -- did you have any more memory about the
16  1973 incident with the female motorist other than what
17  was written in that memo?
18     A.   No.
19     Q.   In other words, during that -- during talking
20  about these cases, was your memory jogged in any way
21  about how you inappropriately touched that woman?
22         MS. BERKE:  Objection.  Vague.
23         MS. RETTS:  Form.
24         THE WITNESS:  No.
25     Q.   BY MR. BRUSTIN:  When you went to interview

**Page 627**

1  Debra Milke, Detective Hamrick was there.  Correct?

2          MS. BERKE:  Objection.  Vague.

3          THE WITNESS:  What do you mean by "there"?

4  I mean --

5      Q.   BY MR. BRUSTIN:  Standing outside the door.

6          MS. BERKE:  Objection.  Misstates evidence.

7          THE WITNESS:  He -- when I arrived, he was

8  standing outside the door.

9      Q.   BY MR. BRUSTIN:  Okay.  And certainly if you

10  had chosen to have Detective Hamrick be a witness for the

11  Debra Milke interview, you could have done that.

12  Correct?

13     A.   I guess.  I don't know what he was up to

14  besides what other things he was doing.

15     Q.   Did you have any doubt in your mind that after

16  being flown in a helicopter to interview Debra Milke, if

17  you wanted Detective Hamrick to be a witness to that

18  interview, you had the authority to do it?

19         MS. BERKE:  Objection.  Foundation.

20         THE WITNESS:  I don't know if I have

21  authority to do any -- tell anybody what to do other

22  than --

23     Q.   BY MR. BRUSTIN:  Did you think about asking?

24     A.   Pardon me?

25     Q.   Did you think about asking?

**Page 628**

1      A.   You said telling.

2      Q.   Did you think about asking?  Next question.

3      A.   Okay.  But you said telling the first time,

4  and, no, I didn't.

5      Q.   Okay.  How come?

6      A.   Didn't.

7      Q.   Just never crossed your mind?  Might be good to

8  have a witness?

9      A.   I don't know.  I don't know.

10     Q.   You seem a little uncomfortable.  Are you

11  uncomfortable?

12     A.   I'm uncomfortable with you, yes.

13     Q.   Do you think I'm being mean to you?

14     A.   No, you can be mean all you want.  You try to

15  act like a bully, but you're really not.  You try to --

16  you look towards your people there, and then I can always

17  tell when something's coming up that's going to be a

18  dinger because you look at them, and then you kind of

19  like try to boast yourself up and give me a dinger.  And

20  then you look over there, and they smile or something,

21  and so I -- yeah, you try to act like a bully, and you

22  think you're tough.

23     Q.   You seem uncomfortable now, like maybe you're

24  nervous or something.  I see your hands are shaking.  Do

25  you have something going on?

**Page 629**

1      A.   I have neuropathy.

2      Q.   Okay.  That's what I'm asking.

3          Um --

4      A.   That's why I can't turn the pages so quickly.

5      Q.   Okay.  Fair enough.

6          And as you've already told us, you were a

7  very different person back in 1990.  Right?

8          MS. BERKE:  Objection.  Misstates evidence.

9      Q.   BY MR. BRUSTIN:  None of these health issues

10  you had then.  Right?

11     A.   I had no health issues.

12     Q.   You were healthy as a horse.  Right?

13         MS. BERKE:  Objection.  Vague.

14         THE WITNESS:  I was healthy.

15     Q.   BY MR. BRUSTIN:  So back to the original

16  question.  Why didn't it cross your mind to have a

17  witness in the room with you when you interviewed Debra

18  Milke in this horrific crime?

19     A.   It didn't.

20     Q.   Just never crossed your mind?

21     A.   It didn't.

22     Q.   Okay.  Now, do you remember any communications

23  with a jailhouse snitch named Manuel Figueroa in

24  relation -- who was rooming with Tilden?

25     A.   I don't think so.  I don't know.  I may have,

**Page 630**

1  but I can't recall it.

2      Q.   You remember the Gallegos case.  Correct?

3      A.   The Gallegos case, yes.

4      Q.   It's Gallegos?

5      A.   Gallegos.

6      Q.   And you worked that case with your partner,

7  Chambers.  Right.

8      A.   Yes.

9      Q.   And Sergeant Bryant was on that case.  Right?

10     A.   He was a sergeant, yes.

11     Q.   And Hamrick?  Withdrawn.

12         I forgot to ask you.  Do you recall Mills

13  working on the Runningeagle case?  I found him on some

14  reports.

15     A.   I don't recall.

16     Q.   You don't recall any involvement with him?

17     A.   He may have been.

18     Q.   You just don't remember it?

19     A.   I don't remember.

20     Q.   All right.  To Gallegos.  So let's make sure we

21  have this out.  Do you have the Gallegos -- what number

22  is it?

23     A.   63.

24         MS. BERKE:  Can we just take one second?  I

25  just need to grab a charger.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
631–634

Page 631

1       MR. BRUSTIN:  Let's take a few minutes.
2       THE VIDEOGRAPHER:  This ends media number 1.
3  We're off the record at 12:02 p.m.
4       (Exhibit 63 was marked for identification.)
5       (A recess was held off the record.)
6       THE VIDEOGRAPHER:  This begins media number
7  2, volume III, to the video-recorded deposition of
8  Armando Saldate.  We are back on the record at 12:06 p.m.
9    Q.   BY MR. BRUSTIN:  All right.  Mr. Saldate, you
10  remember the Gallegos case.  Right?
11    A.   Yes.
12    Q.   This was another horrific case, a young -- a
13  young -- a young girl raped and murdered by her
14  relatives.  Correct?
15    A.   Correct.
16    Q.   It's as bad as it gets.  Right?
17    A.   Yes.
18    Q.   One of those that's etched in your mind.  Fair
19  to say?
20    A.   By that time, there was so many things on my
21  mind that I don't think I had any more room.
22    Q.   Okay.
23    A.   Okay.
24    Q.   Now, like the Milke case, fair to say that
25  there was pressure to solve this case?

Page 632

1       MS. BERKE:  Objection.  Misstates evidence.
2  Assumes facts not in evidence.
3    Q.   BY MR. BRUSTIN:  Or no more than any other
4  case?
5    A.   I was given a responsibility, and I tried to
6  take care of it.
7    Q.   All right.  And in this case, you worked with
8  your partner, Chambers.  Correct?
9    A.   That's correct.
10    Q.   You know who the case agent was?
11    A.   Me.
12    Q.   And you brought Chambers in?
13    A.   Well, we usually report as a team, three or
14  four people, and he happened to be my assistant, yes.
15    Q.   All right.  But you were running this case?
16    A.   Yes.
17    Q.   Are you sure?
18    A.   I think so.
19    Q.   All right.  And in this case, you interrogated
20  Gallegos, and Chambers was primarily responsible for
21  Smallwood.  Correct?
22    A.   That's correct.
23    Q.   And pretty early on Gallegos gave you a full
24  confession.  Correct?
25       MS. BERKE:  Objection.  Vague.

Page 633

1       THE WITNESS:  I don't want to state the
2  time, but, yes, he did give me.
3    Q.   BY MR. BRUSTIN:  Okay.  And he implicated
4  Smallwood.  Correct?
5    A.   Correct.
6    Q.   And he implicated Smallwood in great detail.
7  He gave you a lot of details about Smallwood's
8  involvement?
9    A.   And his own, yes.
10    Q.   And you reported in your report and you
11  testified at trial that it was Gallegos who volunteered
12  that Smallwood was involved as opposed to you telling him
13  or suggesting to him that Smallwood was involved.
14  Correct?
15       MS. BERKE:  Objection.  Foundation.
16       THE WITNESS:  It's a pretty detailed thing.
17  I don't -- I don't know.  Probably.  I mean, I don't
18  know.
19    Q.   BY MR. BRUSTIN:  Well --
20    A.   I'd have to read the report.  You don't want me
21  to take the time to do that.
22    Q.   All right.  Well, we could take a look at --
23  withdrawn.
24       You believed -- withdrawn.
25       Even before you interviewed Gallegos, you

Page 634

1  believed -- even before you interviewed Gallegos, you
2  believed -- you suspected that Smallwood was involved in
3  the crime as well.  Correct?
4    A.   Yes.
5    Q.   And you understand -- can I get Gallegos.
6       Take a look at page 8 and 9.
7    A.   Okay.
8    Q.   Now, you remember -- you reviewed this report
9  in preparation for today.  Correct?
10       MS. BERKE:  Objection.
11    Q.   BY MR. BRUSTIN:  This is -- this is your report
12  of the Gallegos interrogation?
13    A.   I reviewed it.
14    Q.   Okay.  And you recall from reviewing it that,
15  according to your report, without any prompting from you,
16  Gallegos described in narrative form Smallwood's
17  involvement in the crime?
18       MS. BERKE:  Objection.  Foundation.
19       THE WITNESS:  I believe he did, but I'd have
20  to review it.
21    Q.   BY MR. BRUSTIN:  Well, you just -- you've
22  already reviewed it in preparation for today.  You can't
23  answer that question?
24    A.   I don't have --
25       MS. BERKE:  Mr. Brustin, in fairness, he



Page 635

1  reviewed a lot of this months ago, not just yesterday.

2       MR. BRUSTIN:  Okay.  Fair enough.

3       MS. BERKE:  Okay.

4  Q.   BY MR. BRUSTIN:  Take a look at page 8, the

5  bottom -- last paragraph, "Michael continued his

6  interview."  If you look at the bottom of page 8 --

7  A.   Yes.

8  Q.   -- to the middle of page 9, this is -- this is

9  him in narrative form describing his involvement and

10  George's involvement.  Correct?

11  A.   That's what it states, yes.

12  Q.   It's care -- it's clear from your report that

13  he volunteered it.  Correct?

14  A.   From those three paragraphs, it says "continued

15  the interview in narrative form."

16  Q.   Okay.  Now, would it be fair to say that

17  Gallegos also gave you details about Smallwood that was

18  consistent with your theory of how Smallwood was

19  involved?

20       MS. BERKE:  Objection.  Vague.

21  Q.   BY MR. BRUSTIN:  Withdrawn.

22       You've already told us that when you go into

23  a case, you form theories of the case, and you think

24  about how things may have happened.  Obviously you're

25  doing that in this case as well.  Correct?

Page 636

1  A.   You -- you try to form some type of narrative

2  but --

3  Q.   So my only question is was -- when Gallegos

4  describes Smallwood's involvement, was that consistent

5  with your theory as to how he was involved?

6  A.   My theory was that they were both involved.

7  How -- what exactly he did I -- you know, I hadn't gone

8  that far.

9  Q.   Okay.  But your theory was that they both

10  molested the girl, and because they were afraid or --

11  because of what they had done, they killed her.  That was

12  your working theory.  Fair to say?

13       MS. BERKE:  Objection.  Misstates evidence.

14       THE WITNESS:  I didn't know they molested

15  her, but, yes, they killed her.

16  Q.   BY MR. BRUSTIN:  Well, you knew there was

17  evidence of sexual assault at the crime scene.  Right?

18  A.   Yeah, but at the point, I didn't know it was

19  them.  I just thought they may have been involved.  It

20  could have very easily been somebody else, too, with

21  them.

22  Q.   Okay.  But your theory was -- the theory --

23  obviously you could be proven wrong.  Your theory was --

24  your working theory was perhaps these two men sexually

25  assaulted her and killed her?

Page 637

1  A.   Yeah, that had been working -- one of the

2  working theories, yeah.

3  Q.   And that's what Gallegos described to you?

4  A.   Yes.

5  Q.   All right.  Now, was there any evidence, to

6  your knowledge, of Smallwood's involvement in this crime

7  other than from Gallegos?

8       MS. BERKE:  Objection.  Foundation.

9       THE WITNESS:  At that point, no.

10  Q.   BY MR. BRUSTIN:  Okay.  Ever?

11       MS. BERKE:  Objection.  Foundation.

12  Q.   BY MR. BRUSTIN:  In other words -- I'll be more

13  specific -- did any member of the family ever give you

14  any information suggesting that Smallwood may have been

15  involved?

16  A.   No.

17  Q.   And would you agree that it's your

18  recollection -- withdrawn.

19       You understand that there was a great deal

20  of forensic testing that was done in this case.  Correct?

21       MS. BERKE:  Objection.  Vague.

22  Q.   BY MR. BRUSTIN:  For example, it was an early

23  DNA case?

24  A.   I believe it was.

25  Q.   And the DNA included Gallegos from the rape

Page 638

1  kit.  Correct?

2  A.   Yeah, I believe it did.

3  Q.   And it excluded Smallwood.  Correct?

4  A.   They found no DNA.

5  Q.   Okay.  And you understand that there was also

6  fingerprints connecting Gallegos in the -- in the little

7  girl's -- incriminating fingerprints from Gallegos.

8  Right?

9  A.   Yes.

10  Q.   But none from Smallwood.  Correct?

11  A.   I don't believe so.

12  Q.   And you understood that there was a hair -- a

13  hair that was found in an incriminating place that was

14  determined to be similar to Gallegos and dissimilar to

15  Smallwood?

16       MS. BERKE:  Objection.  Foundation.

17       THE WITNESS:  At that point, no, I don't

18  think so.

19  Q.   BY MR. BRUSTIN:  All right.  Well, you

20  understand that there was a -- as a general --

21  A.   Forensic.

22  Q.   As a general matter, there was a great deal of

23  forensic evidence pointing towards Gallegos.  Correct?

24       MS. BERKE:  Objection.  Vague.

25       THE WITNESS:  Again, I didn't have that



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
639–642

Page 639

1 information that he --
2  Q.   BY MR. BRUSTIN:  Not suggesting.  You learned
3 later on?
4  A.   Yes.  Okay.  Yes.
5  Q.   And there was no forensic evidence connecting
6 Smallwood?
7  A.   That's correct.
8  Q.   And there was no witnesses connecting
9 Smallwood?
10  A.   That's correct.
11  Q.   And Smallwood was released and never charged?
12  A.   That's correct.
13  Q.   And you under -- by the way, this crime was
14 committed by two teenage boys.  Correct?
15  A.   Yeah, correct.
16  Q.   What?
17  A.   Correct.
18  Q.   And it didn't seem to be planned.  Fair to say?
19     MS. BERKE:  Objection.  Foundation.
20     THE WITNESS:  From the statements, yeah,
21 you're right.
22  Q.   BY MR. BRUSTIN:  And it didn't seem like these
23 boys had done anything to cover their tracks.  Fair to
24 say?  Gallegos's forensics was everywhere.  Correct?
25  A.   Correct.

Page 640

1  Q.   And did you continue to believe that Smallwood
2 was involved in this crime?
3  A.   Yes.
4  Q.   So even though he was released, you believe
5 that Gallegos told you the truth and Smallwood was
6 involved?
7  A.   Yes.
8  Q.   That Smallwood was guilty, too?
9  A.   Yes.
10  Q.   And that a man went free for raping and killing
11 his sister?
12  A.   Correct.
13  Q.   And did you have any discussions with anybody
14 about why there was no forensic evidence implicating
15 Smallwood?
16  A.   No.
17  Q.   Did it cross your mind that if Smallwood had
18 been involved in sexually assaulting this girl, there
19 would have been some forensic evidence connecting him?
20  A.   That's -- no.
21  Q.   But you think he's still guilty?
22  A.   Yes.
23  Q.   In fact there's no doubt in your mind.  Fair to
24 say?
25  A.   I -- I don't have no evidence.  So it has to

Page 641

1 be -- that's just my opinion.
2  Q.   Okay.  And that's based on what Gallegos told
3 you?
4  A.   Gallegos and -- yeah.
5  Q.   And who else?
6  A.   That's about it.
7  Q.   That's the only evidence.  Right?
8  A.   Well, he had to have had help taking the body
9 out there and stuff and coming back in and everything
10 else.  So I believed he -- you know, he was -- he did
11 that at least.
12  Q.   He needed help with the eight year old girl?
13  A.   Yeah.
14  Q.   To carry the body?
15  A.   To carry the body out, open the doors, lock
16 doors and stuff like that, yeah.
17  Q.   She was -- an eight year old girl was too big
18 to carry on his own?
19  A.   He could have carried her, but he would have
20 had to put her down every time he opened the door and he
21 had to lock it and stuff like that.
22  Q.   Okay.
23  A.   Get the key and stuff.
24  Q.   Whatever -- what other investigative stuff did
25 you take to determine whether or not Smallwood was

Page 642

1 involved?
2  A.   Well, we -- we -- forensics and just physical
3 evidence.
4  Q.   Okay.
5  A.   And of course the statement from Gallegos.
6  Q.   Okay.  How about talking to his family members
7 to see if there was anything unusual about Smallwood and
8 his relationship with his eight year old sister before,
9 as you claim, he killed her?
10  A.   I think that was -- those interviews were done
11 by other detectives.
12  Q.   Anything else you did to try to implicate
13 Smallwood other than Gallegos?
14  A.   Not that I recall.
15  Q.   Okay.  And you still maintain that Gallegos
16 volunteered that information.  You didn't suggest it to
17 him?
18     MS. BERKE:  Objection.  Foundation.
19  Q.   BY MR. BRUSTIN:  In other words, Gallegos
20 volunteered that Smallwood was involved.  You didn't
21 suggest to him that it might be good for him to tell you
22 that Smallwood was involved.  Fair to say?
23  A.   That's correct.  I didn't never tell him that.
24  Q.   Same with Roger -- just like with Roger Scott.
25 Right?

ESQUIRE
DEPOSITION SOLUTIONS

Exhibit 1

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
643–646

Page 643

1    A.   That's correct.
2         MS. BERKE:   Just so we're clear, that is
3    correct what?
4         THE WITNESS:   That I did not influence them
5    to tell me anything in what they told me.
6    Q.   BY MR. BRUSTIN:   Any reason to believe that
7    during the commission of this crime 17-year-old
8    Mr. Smallwood wore gloves?
9    A.   Not that I know of.
10   Q.   Or that he wore a condom?
11   A.   No, I think Gallegos said that he couldn't get
12   it up or something like that, and they couldn't make
13   penetration or something.   So...
14   Q.   I'm asking about Smallwood.
15   A.   Yeah, that's what Gallegos said that he -- that
16   Smallwood couldn't get it up, couldn't make penetration.
17   Q.   Okay.   Now, fair to say that, just like with
18   Ms. Milke, Gallegos confessed to you with very little
19   prodding.   He just kind of told you the truth?
20   A.   Yes.
21   Q.   And just like with Milke, he seemed very
22   comfortable with you?
23   A.   Yes.
24   Q.   Seemed to want to tell you the truth?
25   A.   Yes.

Page 644

1    Q.   A lot of people felt like that about you.
2    Right?
3         MS. BERKE:   Objection.   Vague.
4    Q.   BY MR. BRUSTIN:   According to you?
5         MS. BERKE:   Objection.   Vague.
6         THE WITNESS:   Yeah, some people did.
7    Q.   BY MR. BRUSTIN:   People just like to unburden
8    themselves to you, something about you.   Right?
9         MS. BERKE:   Objection.   Vague.   Foundation.
10        THE WITNESS:   I'm a nice guy.   I don't think
11   you realize that, but I am.
12   Q.   BY MR. BRUSTIN:   Now, unlike -- withdrawn.
13        In this case, you had Gallegos -- withdrawn.
14        You document a very detailed confession from
15   Gallegos.   Correct?
16   A.   Correct.
17   Q.   Try -- try to put everything down in the order
18   in which he told you the best you can.   Correct?
19   A.   Best I can.
20   Q.   All right.   And in addition to that, after he
21   gave you that very detailed statement, you asked him to
22   repeat that statement in front of Detective Chambers.
23   Correct?
24   A.   Yes, I think I did.
25   Q.   And that way Detective Chambers could be a

Page 645

1    witness to what he said.   Correct?
2    A.   That was -- I think I did that more because he
3    had not gotten anything from Smallwood, and I wanted him
4    up on the case, and rather than me just telling him, I
5    asked Gallegos, and he said yeah, and he told him
6    everything.
7    Q.   Okay.   So the reason you had him repeat the
8    confession to Chambers was not so he could be a witness
9    to the confession but so that Chambers could be informed
10   about the information on the case.   Is that your
11   testimony?
12   A.   Yes.
13   Q.   You also asked -- according to Gallegos, you
14   said Gallegos was being very open and honest with you.
15   Correct?
16   A.   I believe so.
17   Q.   Seemed to really trust you?
18   A.   I believe so.
19   Q.   And he acknowledged later on making these
20   statements to you.   Correct?
21   A.   Yes.
22   Q.   Never -- never challenged them?
23   A.   That's correct.
24   Q.   And according to Gallegos, you also -- in
25   addition to asking him to repeat the statements to

Page 646

1    Chambers, you also asked him to sign a written statement
2    if he would.   You recall doing that?
3    A.   I may have, yeah.
4    Q.   Okay.   And according -- according to the
5    records, you also asked him -- after he had given the
6    confession and after he had repeated the confession to
7    Detective Chambers, you asked him if he would be willing
8    to tape-record the statement?
9    A.   I may have, yeah.
10   Q.   And he declined?
11   A.   He may have, yes.
12   Q.   And he also declined to give you a written
13   statement.   Correct?
14   A.   He may have.
15   Q.   Okay.   Now, if you take a look at page 85 --
16        MS. BERKE:   Did you say 85?
17        MR. BRUSTIN:   85.
18        BY MR. BRUSTIN:   So page 85 and 80 -- just take
19   a look at page 85.
20   A.   The whole -- the entire page?
21   Q.   No, look at the bottom of 84, line 25 only just
22   through line 13.
23   A.   Okay.
24   Q.   Now, this -- this refreshes your
25   recollection -- withdrawn.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
647–650

Page 647

1         This confirms that in fact you did ask him
2   afterward to tape. Correct?
3      A.   Correct.
4      Q.   And why did you choose to do that in this case?
5   Why did you choose to ask him if -- after he made two
6   confessions, why did you ask him if he would agree to
7   tape?
8      A.   I don't know.
9      Q.   No idea?
10     A.   No idea other than possibly I was thinking of
11  Smallwood not confessing and that maybe I would need that
12  documented very well to -- you know, to implicate him
13  more.
14     Q.   Okay.
15     A.   But I'm not sure.
16     Q.   Okay. And that would make sense. And so when
17  you went -- when you went to interview Debra Milke, you
18  knew that Styers hadn't confessed. Correct?
19     A.   Uh-huh.
20     Q.   Yes? You have to answer out loud.
21     A.   That he had not confessed?
22     Q.   Yes.
23     A.   Yes.
24     Q.   Sorry. When you went to interview Debra Milke,
25  you knew that -- that Styers had not confessed?

Page 648

1      A.   That is correct.
2      Q.   And yet you didn't consider asking Debra Milke
3   after she had confessed to you to agree to a
4   tape-recorded confession for the same reason?
5      A.   No, because she had refused to have me
6   tape-record it to begin with.
7      Q.   Okay. Now, so it's clear -- take a look at
8   page 13.
9      A.   13. Okay. Got it.
10     Q.   It says, third paragraph, "Mike was again
11  contacted in the presence of Detective Chambers. Mike
12  briefly went over his confession with me and Detective
13  Chambers. Mike refused to have his statement
14  tape-recorded because he had already talked to me, to
15  Detective Chambers, and he didn't feel comfortable in
16  having to go through the story again."
17         See that?
18     A.   Yes.
19     Q.   So what happened was after you got the
20  confession, you brought Detective Chambers in. You had
21  him repeat the confession. Correct?
22     A.   Correct.
23     Q.   And then during that same conversation, right
24  after that you asked him if he would be willing to tape
25  it?

Page 649

1      A.   Apparently, yes.
2      Q.   More specifically Gallegos testified that you
3   asked him to sign a statement after the confession, and
4   specifically it was on a yellow legal pad. Were you
5   using a yellow legal pad?
6      A.   I don't recall.
7      Q.   Is that something you typically used?
8      A.   I think so.
9      Q.   Does that refresh your recollection about what
10  happened?
11     A.   It just --
12         MS. BERKE: Objection. Vague.
13         THE WITNESS: It reflects my recollection
14  that that's what we usually used but not about the
15  specifics.
16     Q.   BY MR. BRUSTIN: Okay. You're certainly not
17  disputing that you -- Gallegos when he said you asked --
18  you asked him to write a statement as well?
19     A.   Yeah.
20     Q.   You're not disputing?
21     A.   No.
22     Q.   So with Gallegos you got a confession. Right?
23     A.   Yes.
24     Q.   And you had him repeat the confession.
25  Correct?

Page 650

1      A.   Again, yes.
2      Q.   You had him -- you asked him if he would write
3   that confession and statement and sign it?
4      A.   Again, yes.
5      Q.   And you asked him if he would tape-record it
6   after he'd given it twice. Correct?
7      A.   Again, yes.
8      Q.   Now, the reason you did all those things with
9   Gallegos is because he actually confessed to the crime.
10  Correct?
11     A.   Are you answering my question?
12         MS. RETTS: Form.
13     Q.   BY MR. BRUSTIN: It's called a leading
14  question. I've asked you so many of them, and you've got
15  to be familiar with them.
16     A.   I know you've asked me a lot of them. So --
17     Q.   Yeah. So my question is --
18     A.   Okay.
19     Q.   -- the reason you did -- you took all those
20  steps -- let me be more specific.
21         The reason you took all those steps with
22  Gallegos and not with Milke is because in fact Gallegos
23  actually confessed to the crime. Correct?
24         MS. BERKE: Objection. Misstates evidence.
25         THE WITNESS: I don't know what that means.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
651—654

Page 651

1    Q.   BY MR. BRUSTIN:  In other words, you -- my
2   suggestion is that you misrepresented that Debra Milke
3   confessed to the crime, and that's why you didn't take
4   those steps.  Isn't that true?
5    A.   That's not true.
6    Q.   Who would you say was more comfortable talking
7   to you, Gallegos or Debra?
8        MS. BERKE:  Objection.  Foundation.
9        THE WITNESS:  Every interview's different.
10    Q.   BY MR. BRUSTIN:  Now, another thing you did in
11   this case is you were asked to confront Smallwood.
12   Correct?
13    A.   I believe so.  I'm not totally sure.
14    Q.   Take a look at page 13.  It's your report.
15   Take a look at page 13.  Second paragraph -- it says, "I
16   later contacted Detective Chambers, briefed him of the
17   interview I had had with Mike, and he said that he only
18   obtained denials from George."  Right?
19    A.   Yes.
20    Q.   This is you -- you being as comprehensive as
21   you can.  You're describing your conversations with your
22   partner in between interviews.  Correct?
23    A.   It appears so.
24    Q.   You're trying to be as comprehensive as you
25   can.  Correct?

Page 652

1    A.   It appears so.
2    Q.   You're trying to write then anything that could
3   conceivably be important.  Correct?
4    A.   Appears so.
5    Q.   And, you know, you're even summarizing what
6   your partner told you Smallwood had said.  Correct?
7    A.   Yes.
8    Q.   Because it's important for you to document
9   everything that you think could possibly be important.
10   Correct?
11    A.   For the most part, yes.
12    Q.   All right.  Take a look at page 109.
13   Withdrawn.
14        Let me just ask you straight.  At some point
15   during the day, you brought Gallegos into the room with
16   Smallwood to confront him.  Correct?
17    A.   I believe we did, yeah.
18    Q.   And that's the first time you can recall in
19   your career ever doing that.  Correct?
20    A.   Yes.
21    Q.   And that was your decision.  Correct?  You're
22   the case agent?
23    A.   We probably discussed it, but, yeah, it was my
24   decision.
25    Q.   Okay.  And you determined that that might be a

Page 653

1   good way to get Smallwood to come clean.  Correct?
2    A.   Correct.
3    Q.   Why didn't you write that in your report?
4        MS. BURGESS:  Form.
5        THE WITNESS:  I don't know if I did or
6   didn't.
7    Q.   BY MR. BRUSTIN:  Well, you didn't.  Why didn't
8   you?
9        MS. BERKE:  Objection.  Foundation.
10        THE WITNESS:  I don't know if I did or
11   didn't.
12    Q.   BY MR. BRUSTIN:  I'm representing to you that
13   you didn't.
14    A.   I don't believe you.
15        MS. BERKE:  If you want him to verify that,
16   he needs the opportunity to review his report.
17    Q.   BY MR. BRUSTIN:  Assuming you didn't write it
18   in your report, any reason not to put that in your
19   report?
20    A.   I'm not going to assume anything that --
21   that --
22    Q.   Sir, you're going to assume the answer.  I'm
23   telling you.  I don't have to show you the document.  I'm
24   asking you to assume it's not in your report.  I read it
25   really carefully.  It's not there.  If I'm wrong, it's on

Page 654

1   me.
2        Assuming it's not there, can you think of
3   any reason why it wouldn't be there?
4        MS. BERKE:  He doesn't have to assume
5   anything.
6        THE WITNESS:  This --
7    Q.   BY MR. BRUSTIN:  Are you refusing to answer my
8   question?
9    A.   Yes.
10    Q.   Great.  Let's go to the next question.  Did
11   you -- do you recall testifying that you didn't put it in
12   your report because you didn't think it was significant?
13    A.   I don't recall.
14    Q.   Okay.  Would you agree, sir, that bringing one
15   suspect to confront another suspect for the first time in
16   your career is a significant investigative event?
17    A.   It would have been if something would have
18   happened, but I don't think nothing happened.  So...
19    Q.   Isn't that significant?
20    A.   No.  I mean, if something -- if Smallwood would
21   have said, Hey, he said it, he told the truth, and I'm --
22   I confess, too.  So --
23    Q.   Was --
24    A.   -- that would have been the significant, that
25   part.

ESQUIRE
DEPOSITION SOLUTIONS

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
655–658

Page 655

1    Q.   Is it significant -- that might have been
2  significant to proving that Smallwood was guilty?
3    A.   Yes.
4    Q.   Would it be significant to proving that
5  Smallwood was innocent, that he was confronted by
6  Gallegos and didn't make any admissions?  Could that be
7  significant?
8    A.   Could be.
9    Q.   But that's not what you care about.  You only
10  cared about significance to proving guilt.  Right?
11    A.   My job was to put the guilty person in jail.
12    Q.   Okay.  And so the reason it wasn't significant
13  is because it didn't tend to prove that Smallwood was
14  guilty.  Right?
15    A.   But my job is also not to put innocent people
16  in jail.  So I don't know what you mean by me -- you're
17  assuming facts that -- that I don't know, you know.  Like
18  if you were there or I was -- you know, it was a geared
19  in my head or something, but I don't know.
20    Q.   I have no idea what you're talking about.
21    A.   Well, me neither because I have no idea what
22  you're talking about.
23    Q.   Take a look at page 138.
24    A.   Okay.
25    Q.   Line 15 through line -- line 7 on page 139,

Page 656

1  just quickly review it.
2    A.   I mean, from 15 to what, to --
3    Q.   Line 19 --
4    A.   Line 19.
5    Q.   -- on page 138 --
6    A.   Yeah.
7    Q.   -- to line 7 on page 139.
8    A.   Okay.
9    Q.   Do you see that?
10    A.   Yes.
11    Q.   You're being confronted with the fact that that
12  confrontation between Gallegos and Smallwood is not in
13  your report.  Correct?
14    A.   Correct.
15    Q.   And you're saying that it was fruitless.  So
16  you didn't have to put it in your report.  Correct?
17    A.   Correct.
18    Q.   In other words, you only need to put in your
19  report things that tend to show somebody is guilty.
20  Correct?
21    A.   That's not correct.
22    Q.   Now, take a look at page 167.  This is the
23  judge on the record.
24        MS. BERKE:  I'm sorry.  What page?
25        MR. BRUSTIN:  167.

Page 657

1        THE WITNESS:  Okay.
2    Q.   BY MR. BRUSTIN:  That's not right.
3        Take a look -- withdrawn.  Don't need to
4  look at it.
5    A.   Oh.
6    Q.   Did anybody criticize you in any way for your
7  conduct in Gallegos?
8    A.   Not that I know of.
9    Q.   To your knowledge, did the judge in any way
10  criticize your conduct in Gallegos?
11        MS. BERKE:  Objection.  Foundation.
12        THE WITNESS:  I think he -- I think he said
13  something to the -- something to the confrontation of
14  both of them, but I'm not sure.
15    Q.   BY MR. BRUSTIN:  Do you recall him saying --
16  and I'll read it to you.  Do you recall learning that he
17  said that, "I have a hard time believing that you
18  wouldn't know that the -- that that confrontation was
19  significant enough to put in your report"?
20        MS. BERKE:  Objection.  Foundation.
21    Q.   BY MR. BRUSTIN:  Do you recall something like
22  that?
23    A.   No, I don't recall that.
24    Q.   Do you recall at the time learning about this
25  judge's criticism or not until much later?

Page 658

1        MS. BERKE:  Objection.  Foundation.
2        THE WITNESS:  I don't believe I was present,
3  but -- so -- but I'm not sure.
4    Q.   BY MR. BRUSTIN:  Now, in addition to putting
5  Gallegos in to confront Smallwood, you also spent some
6  time interrogating Smallwood.  Correct?
7    A.   I don't really recall.
8    Q.   Well --
9    A.   I'm not saying I didn't do it.  I just don't
10  recall.  I just --
11    Q.   Take a look -- take a look at page 19.  Okay.
12  Take a look at page 19, the note in the middle paragraph.
13  This is Chambers' report.  Just read that, stating "my
14  original interview with George."  You see that, middle of
15  the page, page 19?
16    A.   Okay.  I see it.
17    Q.   Just read that paragraph.
18    A.   Okay.
19    Q.   Now, this indicates that at 6:40 you began
20  interrogating George Smallwood.  Correct?
21    A.   Yes.
22    Q.   And you interrogated him for 20 minutes,
23  correct, 6:47?
24    A.   Yes.
25    Q.   And then he requested an attorney.  Correct?



ARMANDO SALDATE Volume III                November 15, 2017
MILKE vs CITY OF PHOENIX                   659–662

Page 659

1    A.   Yes.
2    Q.   And then you went on -- you spoke to -- you
3    went on -- you spoke to your partner.  Correct?  You
4    recall that now?
5    A.   That I went and spoke to Mike?
6    Q.   Do you remember that?  I'm asking you.
7    A.   No.  It doesn't say I did.
8    Q.   Okay.  Now, so what happened was you
9    interviewed small -- you also interrogated Smallwood for
10   20 minutes, and he requested an attorney.  Correct?
11   A.   That's correct.
12   Q.   Why isn't that in your report?
13       MS. BERKE:  Objection.  Foundation.
14       THE WITNESS:  What -- why isn't that in my
15   report?
16   Q.   BY MR. BRUSTIN:  Yes, sir.  You interrogated
17   George Smallwood who you believe committed murder and
18   rape for 20 minutes.  He invoked his right to remain --
19   he invoked his right to an attorney, and you wrote
20   nothing about it in your report.  Why is that?
21   A.   Because Chambers wrote it in his report.
22   Q.   So no need for you to put it in your report?
23   A.   No need.
24   Q.   And that was consistent with how you conducted
25   business?

Page 660

1    A.   Like I said previously, yes.
2    Q.   You said that previously?
3    A.   Yes.  We --
4    Q.   On this tape recording?
5    A.   Yes.  On that tape recording.
6        MS. BERKE:  Let him finish his answer,
7    please.
8        THE WITNESS:  That --
9    Q.   BY MR. BRUSTIN:  This tape recording will
10   say -- will show that you didn't -- that you routinely
11   didn't document when you did an interrogation and they
12   requested an attorney as long as it was in someone else's
13   report.  Is that what you are telling us?
14       MS. BERKE:  Objection.  Misstates evidence.
15   Misstates testimony.
16       THE WITNESS:  I don't even understand what
17   you just said.
18   Q.   BY MR. BRUSTIN:  You told us clearly --
19   A.   I said --
20   Q.   -- that you write down everything important
21   that you do.  Was it important when you interrogated
22   Smallwood?
23       MS. RETTS:  Form.
24       THE WITNESS:  Yes.
25   Q.   BY MR. BRUSTIN:  Was it important when he

Page 661

1    requested an attorney?
2    A.   Yes.
3    Q.   Why didn't you put it in your report?
4    A.   Because Michael Chambers put it in his report.
5    Q.   Okay.  Well --
6    A.   And we at times, like I said before, on the
7    tape, if you want to see it -- I said before that -- that
8    I did -- I wrote down everything I did.  He wrote down
9    everything he did unless we decided that, you know, we
10   wanted to, you know, break something up.  He was doing
11   one thing and just include it in his report, or I would
12   include it in my report.
13   Q.   Chambers wasn't in the room for those 20
14   minutes.  Correct?
15   A.   No.
16   Q.   How could Chambers write about what happened
17   during those 20 minutes if he wasn't there?
18   A.   I didn't say he did.  I said you -- you asked
19   if I wrote how come I didn't write the part that he
20   invoked an attorney.
21   Q.   I meant -- I'm sorry.  I'm trying to ask you
22   something differently.
23       My question is since you were the -- you
24   were the only person in the room during those 20 minutes
25   interrogating Smallwood, weren't you the person to

Page 662

1    describe what happened?  The only people who knew what
2    happened are you and Smallwood.  Right?
3    A.   Apparently, yes.
4    Q.   Okay.  But you chose not to put that in your
5    report?
6    A.   I don't believe it was really an interview.
7    Q.   Okay.
8    A.   It was --
9    Q.   Was that fruitless, too?
10   A.   Huh?
11   Q.   Was that fruitless, too?  Didn't lead to any
12   incriminating evidence.  Correct?
13   A.   That's what I would say, yes.
14   Q.   Now, take a look at page 19.
15   A.   Okay.
16   Q.   Take a look at the last paragraph beginning in
17   the middle.  It says:
18       MS. BERKE:  What page?
19       MR. BRUSTIN:  Page 19.
20   Q.   BY MR. BRUSTIN:  It says, "I indicated to him
21   my understanding.  He did not want to answer further
22   questions without a lawyer."
23       You see that?
24   A.   Uh-huh.
25   Q.   Yes?



ARMANDO SALDATE Volume III                    November 15, 2017
MILKE vs CITY OF PHOENIX                                    663—666

Page 663

1    A.   Yes.

2    Q.   "I indicated to him I would not ask further

3    questions.  I indicated to him, rather, I would make a

4    statement to him.  I spoke to him in the situation -- in

5    a situation such as this, it would appear Michael was

6    being truthful, and he, George, was not.  I further

7    indicated with the situation that -- I further indicated

8    with the situation so serious only the truth should ever

9    be told.  Any other statement is like digging a hole.  I

10   further indicated it would make the situation appear even

11   possibly premeditated.  George responded to me saying he

12   may have been involved in Kendall's death but does not

13   recall."

14        Do you see that?

15   A.   Yes.

16   Q.   Okay.  So what happened here is Smallwood

17   invoked his right to an attorney.  Correct?

18   A.   That's correct.

19   Q.   You went out and spoke to Chambers.  Correct?

20   A.   I don't see where it says spoke to Chambers.

21   Q.   How would Chambers know that he invoked his

22   right to an attorney if you didn't tell him?

23   A.   Well, I spoke to Chambers after -- maybe after

24   the interview.

25   Q.   Of course you did.

Page 664

1    A.   That was it right here.

2    Q.   Of course you did.

3    A.   Okay.

4    Q.   And that's how he knew he invoked his right to

5    an attorney, correct, because you told him?

6    A.   Uh-huh.

7    Q.   Yes?

8    A.   Yes.

9    Q.   And then you discuss what you should do next

10   because you were in charge of the case.  Correct?

11   A.   Yes.

12   Q.   And then after he invoked his -- clearly

13   invoked his right to an attorney, you sent Chambers back

14   in to ask further questions, which he did.  Correct?

15        MS. BERKE:  Objection.  Foundation.

16   Misstates -- or assumes facts not in evidence.

17   Q.   BY MR. BRUSTIN:  Maybe I'm not being clear.

18   Was the statement that Chambers made further questioning

19   after he invoked his right to an attorney?

20        MS. BERKE:  Objection.  Foundation.

21        THE WITNESS:  Was the statement that

22   Chambers made --

23   Q.   BY MR. BRUSTIN:  I'll ask it more simply if

24   you're not understanding it.

25   A.   Please.

Page 665

1    Q.   Did Chambers violate the procedure that you

2    reviewed earlier today when he went in and made the

3    statement he did?

4    A.   That he was not going to ask him any questions,

5    yes.

6        MS. RETTS:  Form.

7    Q.   BY MR. BRUSTIN:  That was consistent with the

8    procedure in your view?

9    A.   Yes.

10   Q.   And would it be fair to say that that strategy

11   of going in and making that statement, that's something

12   you discussed before he did it?

13        MS. BERKE:  Objection.  Foundation.

14        THE WITNESS:  I -- I can't say for sure we

15   discussed it because, you know, he was a seasoned

16   investigator, I was a seasoned investigator.  We didn't

17   have to tell each other what we needed to do or wanted to

18   do.

19   Q.   BY MR. BRUSTIN:  You both knew that was the

20   proper next step to convince him not to seek an attorney

21   and to make an admission?

22        MS. RETTS:  Form.

23        THE WITNESS:  I wouldn't say that.

24   Q.   BY MR. BRUSTIN:  The --

25   A.   I mean, your --

Page 666

1    Q.   The statement -- the statement that's

2    documented here is a statement trying to convince him to

3    keep talking.  Correct?

4        MS. RETTS:  Form.

5        THE WITNESS:  No, he's telling him that he

6    knows about the attorney, but he's going to not ask him

7    any questions but make a statement.

8    Q.   BY MR. BRUSTIN:  Okay.  So in your view, the

9    statement he made here was not geared towards getting him

10   to keep talking?

11   A.   I don't believe so.

12        MS. RETTS:  Form.

13   Q.   BY MR. BRUSTIN:  And you chose not to document

14   any of this in your report?

15   A.   Well, I wasn't with Mike when he did that.

16   Q.   Okay.

17   A.   How can I recommend it?

18   Q.   Of course.  How could you?  And he wasn't with

19   you when you interrogated Smallwood just before it.

20   Right?

21   A.   Yeah, but it was nothing.  So he could very

22   easily just include it in his supplement.

23   Q.   It was 20 minutes of nothing?

24   A.   Probably, yeah.

25   Q.   Probably?



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
667–670

Page 667

1    A.   All interviews are different, and they take
2    time.  Sometimes they may take an hour but nothing's
3    said, you know.  So, you know, it's just the way it is.
4    Q.   Okay.
5         MS. BERKE:  I need to grab another pen.  So
6    could we take one second.
7         MR. BRUSTIN:  We're going to --
8         MS. BERKE:  My pen ran out.
9         MR. BRUSTIN:  Why don't we take lunch.
10        THE VIDEOGRAPHER:  We are off the record at
11   12:52 p.m.
12        (A recess was held off the record.)
13        THE VIDEOGRAPHER:  We are back on the record
14   at 1:54 p.m.
15   Q.   BY MR. BRUSTIN:  Okay.  Mr. Saldate, I want to
16   ask you some questions about the Sherman case.
17        Now, do you recall the Sherman case from
18   1989?  Just very briefly, it involved a victim named
19   Michael Lastra who was stabbed and killed allegedly by a
20   man named Rolland Sherman.  Allegedly they were both
21   transients.  Mr. Lastra's throat was slashed.  He went to
22   a nearby restaurant to seek help.  The police found a
23   trail of blood from Lastra to where Sherman was asleep
24   under a cardboard mat, and they also found the bloody
25   knife on Sherman's person.

Page 668

1         Do you recall the case now?
2    A.   No, I do not.
3    Q.   You have no memory of it?
4    A.   No memory of it at all.
5    Q.   What I described to you, though, sounds like a
6    pretty straightforward case.  Right?  You got two
7    transients in a fight, a trail of blood and a knife with
8    the second transient?
9         MS. BERKE:  Objection.  Vague.
10        THE WITNESS:  Yes.
11   Q.   BY MR. BRUSTIN:  Do you find that pretty
12   straightforward?
13   A.   Yes.
14   Q.   And you would expect that it shouldn't be too
15   difficult to -- to -- withdrawn.
16        Would you agree that in your experience as a
17   police detective, a trail of blood from a bloody victim
18   to a second person with a knife on their person is
19   powerful inculpatory evidence?
20   A.   It is.
21   Q.   All right.  Let's take a look at exhibit --
22   what we've marked in front of you as Exhibit 61, which is
23   Bates --
24   A.   Okay.
25   Q.   -- stamped 2609 (sic) through 26011.  You

Page 669

1    recognize this as your report from the Sherman case.
2    Correct?
3    A.   Yes.
4    Q.   Well, from the -- the victim's --
5    A.   Yes.
6    Q.   Have you had a chance to review this over
7    lunch?
8    A.   Yes, I did.
9    Q.   Okay.  Good.  And reading it didn't jog your
10   memory about the case?
11   A.   No, it didn't.
12   Q.   All right.  Based on your review of the report,
13   it appears that in the afternoon you came to the station
14   to interview Mr. Sherman.  Correct?
15   A.   Correct.
16   Q.   And were you able to tell based on the
17   documentation here whether you were the case agent or
18   just assisting?
19   A.   No, I'd have to see the original report and see
20   who was listed as the case agent, but, no.
21   Q.   Okay.  Now, on this page, you said you've
22   reviewed this.  According to the report, you knew that
23   Sherman -- you learned early on that Sherman had been
24   intoxicated at the scene.  Correct?
25   A.   Yes.

Page 670

1    Q.   And so you first asked the uniform officer
2    standing by Sherman at the precinct whether Sherman was
3    still responsible.  Correct?
4    A.   Yes.
5    Q.   And the officer told you yes.  Correct?
6    A.   Correct.
7    Q.   So you knew -- you understood that Sherman was
8    inebriated to some degree.  Correct?
9    A.   He'd been drinking, definitely.
10   Q.   What are the procedures in the rules, by the
11   way, on interrogating somebody who is under the influence
12   of alcohol?
13        MS. RETTS:  Form.
14   Q.   BY MR. BRUSTIN:  Withdrawn.
15        What were the rules as of 1989 in the
16   Phoenix Police Department, if any, on how you were to
17   factor in inebriation in regard to interrogating a
18   suspect?
19        MS. RETTS:  Form.
20        THE WITNESS:  I don't know if there was any
21   rules.  I -- I -- I think it was just a -- the
22   investigator, you know, looking at everything, looking at
23   him, determining how he acted, how other officers acted
24   around him and -- you know, that were around him.  They
25   influenced whether he was or wasn't, you know.

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
671–674

Page 671

1    Q.   BY MR. BRUSTIN:  Okay.  But your understanding
2    was --
3         MS. BERKE:  I don't think he was finished
4    answering the question.  You kind of cut him off.
5         THE WITNESS:  And that they would influence,
6    you know, your decision of what -- what you might do, but
7    ultimately it was the investigator who's doing the
8    questioning that would make the determination of whether
9    that person -- you felt that person was drunk or not, but
10   you just make sure you document everything.
11   Q.   BY MR. BRUSTIN:  Okay.  But assuming you
12   determine in your mind that somebody was drunk, are you
13   still free to interrogate that person?
14        MS. RETTS:  Form.
15        THE WITNESS:  If I felt he was -- you know,
16   a lot of these people, especially, you know, these street
17   people, they -- they're functioning alcoholics.  You
18   know, they can drink a lot and still function in life.
19   Q.   BY MR. BRUSTIN:  Okay.
20   A.   And still function.  So it's just a
21   determination by every detective that has to confront
22   something like that.  It's just he makes his decision and
23   goes on.
24   Q.   Okay.
25   A.   But he also documents the fact that they

Page 672

1    were -- what they appeared like or, you know, anything
2    like that, you know.
3    Q.   But you had discretion in your -- your
4    understanding is you had discretion --
5    A.   Correct.
6    Q.   -- to interview a suspect regardless of how
7    intoxicated they were.  Fair to say?
8         MS. RETTS:  Form.
9         THE WITNESS:  Well, yeah, it was my
10   discretion, yes.
11   Q.   BY MR. BRUSTIN:  Okay.  In other words, there
12   was no level of intoxication -- there was no level of
13   intoxication, to your understanding, that prohibited you
14   from interviewing a suspect.  Fair to say?
15        MS. BERKE:  Objection.  Vague.
16        THE WITNESS:  No, there was -- what would
17   prohibit me is me feeling that it was -- I wasn't going
18   to -- he doesn't understand his rights, doesn't
19   understand this, doesn't understand that if he's drunk.
20        So I mean, that would be my determination,
21   and if I felt that it was just -- you know, no use doing
22   it, then we wouldn't do it.
23   Q.   BY MR. BRUSTIN:  Okay.  So in other words, if
24   you understand somebody was so intoxicated they couldn't
25   fully understand their rights, you would not question

Page 673

1    them?
2    A.   That's correct.
3    Q.   And not just intoxicated, any -- any injury
4    or -- withdrawn.
5         Would you agree that it was your
6    understanding that any injury or -- withdrawn.
7         Would you agree that it was your
8    understanding that if a person had any injury or
9    condition that caused them not to fully understand their
10   rights, you would not question them?
11   A.   Again, that was something that you would
12   individually decide upon --
13   Q.   I'm asking you.
14        MS. BERKE:  He wasn't finished.
15        THE WITNESS:  Me.  I was going to say it.
16        MS. BERKE:  He wasn't finished answering.
17   Q.   BY MR. BRUSTIN:  I don't think you're answering
18   my question.  So let me rephrase the question.
19   A.   Okay.
20   Q.   It was -- you understood there was nothing
21   prohibiting you -- withdrawn.
22        You understood that if a person, in your
23   view, had a condition or an injury that caused them not
24   to understand their rights, you would not question them?
25   A.   That's correct.

Page 674

1    Q.   All right.  Now --
2    A.   For the most part.
3    Q.   What exceptions were to that role?
4    A.   I mean, you know, I talked to the doctor,
5    talked to the nurses or talked -- you know, and make my
6    own assessment, and then, you know -- but everything's
7    different.  Every case is different.  So...
8    Q.   Okay.  If you take a look at the second
9    paragraph on page 260 -- 26009, it says, "At
10   approximately 1315 hours, I was directed by radio to
11   proceed to 601 West Van Buren to assist in this
12   investigation."
13        Does that suggest to you that you were not
14   the case agent?
15   A.   Probably.
16   Q.   Probably?
17   A.   Probably.  And I have a feeling that seeing
18   these other supplements, I think it was Martinson's case.
19   Q.   Okay.  And I'll represent to you that that's
20   our understanding from the document.
21   A.   Okay.
22   Q.   And do you know why you were called in to do
23   the interrogation of Mr. Sherman?
24   A.   Well, Martinson was there.  He did the scene.
25   So there's always more than one detective doing homicide.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
675–678

Page 675

1    Q.   Yeah.  Generally the policy was that the case
2  agent would be doing the interrogation.  Fair to say?
3        MS. BERKE:  Objection.  Misstates evidence.
4        THE WITNESS:  It all depends how much he got
5  involved in it, you know.
6    Q.   BY MR. BRUSTIN:  Um, now, in this case, what
7  happened was you had the police officer read Sherman his
8  rights.  Correct?
9    A.   Yes.
10    Q.   Because you believe that there was a better
11  opportunity for Sherman to listen to his rights being
12  read by the uniform officer.  Correct?
13    A.   Correct.
14    Q.   And you remained outside the room while the
15  rights are being read?
16    A.   Correct.
17    Q.   But you heard him respond no, he didn't
18  understand his rights?
19    A.   That is correct.
20    Q.   And you walked in, and you asked Sherman what
21  he didn't understand about his rights.  Correct?
22    A.   Correct.
23    Q.   And he didn't respond, but he crawled under the
24  table, saying he was trying to find some shade.
25    A.   Correct.

Page 676

1    Q.   Correct?
2        And by this time, this person has stated
3  clearly he doesn't understand his rights.  Correct?
4    A.   Correct.
5    Q.   And is clearly severely intoxicated.  Correct?
6    A.   I don't know if I had made that determination
7  right then and there, but there was still -- I mean, I
8  was just contacting him.  So it was -- you know, it was
9  strange that he wanted to be under the table, but I mean,
10  you know, I still needed a little bit more assessment.
11    Q.   Okay.  Well, pursuant to the procedure we've
12  reviewed earlier today, Exhibit 30, were you required
13  when he told you that he did not understand his rights to
14  cease questioning?
15    A.   I remember that, yes.
16    Q.   Sir, the question is pursuant to the procedure
17  you reviewed this morning, were you required to cease
18  questioning this witness once he told you clearly he did
19  not understand his rights?
20    A.   It was -- it was a procedure, yes.
21    Q.   The procedure required that that be done.
22  Correct?
23    A.   It -- Okay.  I mean --
24    Q.   That's my question.
25    A.   Okay.

Page 677

1    Q.   Did it or not?
2    A.   Well, it's -- the procedure is a -- an
3  instructional thing that gives you some leeway, but, yes,
4  you know.
5    Q.   Okay.
6    A.   I would yes.
7    Q.   Did you have discretion under that procedure
8  when this person said he didn't understand his rights to
9  continue questioning him?
10        MS. RETTS:  Form and foundation.
11        THE WITNESS:  It all depends on what was
12  happening during that time.  I don't know.  I mean, you
13  know --
14    Q.   BY MR. BRUSTIN:  So you had discretion?
15    A.   Yes.
16    Q.   Okay.  You -- the procedure didn't require you
17  to stop questioning?
18    A.   No.
19        MS. RETTS:  Form and foundation.
20        THE WITNESS:  Not as I read it.
21    Q.   BY MR. BRUSTIN:  Not your understanding of that
22  procedure?
23    A.   Yes, correct.
24    Q.   Okay.
25    A.   Thank you.

Page 678

1    Q.   Now, then what happened was Sherman told
2  Saldate that if you closed -- he told you that if you
3  closed the door, he would tell you everything.  Correct?
4    A.   I don't know if he told me or he told
5  Hernandez.
6    Q.   Take a look at page 10.
7    A.   10, okay.
8    Q.   No, I'm sorry.  Look at the bottom of page 9.
9  "The suspect then told me if I was to close the door, he
10  would then tell me everything."
11        He told you.  Correct?
12    A.   Yes, uh-huh, he did.
13    Q.   "I then asked Officer Galindo to step outside
14  the interview room and close the door.  The suspect
15  remained underneath the table and refused to come out but
16  did say that he would tell me everything that had
17  occurred.  The suspect then gave me the following
18  information."
19        Now, that's when he gave you some
20  incriminating conflicting statements about the crime,
21  correct, implicating himself?
22    A.   Yes.
23    Q.   Okay.  So by this time, he's already told you
24  twice that he doesn't understand his rights.  Correct?
25    A.   Yes.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
679–682

Page 679

1    Q.   And you continue questioning.  Correct?
2    A.   Correct.
3    Q.   And after telling you he didn't understand his
4   rights twice from under the table, he admitted to
5   committing the crime.  Correct?
6    A.   Yes.
7    Q.   And you already knew from the crime scene that
8   this person was a vagrant and likely drunk.  Correct?
9    A.   Likely drinking, yes.
10    Q.   Likely drunk is my question.  Do you disagree
11   with that?
12    A.   Yeah, drinking.
13    Q.   Do you think he was likely drunk?
14    A.   No.
15    Q.   You remember that?
16    A.   Pardon me?
17    Q.   You remember that?
18    A.   I was making an assessment of it.  I wasn't
19   completely satisfied that he wasn't drunk, but, you know,
20   I was trying to assess him in the interview and stuff to
21   see whether he was drunk or not.
22    Q.   Mr. Saldate, you already told me you have
23   no memory of this case.  Do you now remember the case?
24    A.   No, I don't remember the case, but I could see
25   it in my report.

Page 680

1    Q.   You could see it in your report that you were
2   not sure if he was drunk or not?  Where does it say that?
3    A.   Because I keep talking to him.
4    Q.   When you just said you weren't sure if he was
5   drunk, you just made that up, didn't you?
6        MS. RETTS:  Form.
7        MS. BERKE:  Argumentative.  Misstates
8   testimony.
9        THE WITNESS:  That's not true.
10    Q.   BY MR. BRUSTIN:  Well, you don't remember the
11   case, and it doesn't say it in your report.  So where did
12   you get that from?
13    A.   Just the report, the general report.  I mean,
14   you know...
15    Q.   Okay.  Later on in the interview, Sherman said
16   he would tell you everything if you gave him a cigarette.
17   Right?
18    A.   I think he told Hernandez that.
19    Q.   And you did.  You went in the room and gave him
20   a cigarette.  Right?
21    A.   I think Hernandez did.
22    Q.   You read him his rights, and again Sherman
23   said, "No, I don't understand them."  Correct?
24    A.   Correct.
25    Q.   And you kept asking questions.  Right?

Page 681

1    A.   Yeah, I think he just asked me to read them,
2   and -- and I wasn't Indian.  So he wanted me to read them
3   in Sioux Indian.
4    Q.   I'm just -- I'm just -- I'm not asking you what
5   you did.  I'm just saying at that time you didn't stop
6   the interview.  You continued questioning him.  Correct?
7    A.   No, it says that he -- he took the cigarette,
8   got -- sat down, and then -- and then he said I wasn't
9   Indian and wanted my rights read in Indian.
10    Q.   You didn't ask him any more questions?
11    A.   I may have but not in that -- not in that
12   paragraph.
13    Q.   Okay.  You said, "I explained to the suspect I
14   could not do that, but I said I believed he did
15   understand his rights and that we would continue the
16   interview."
17    A.   Yes.
18    Q.   Do you see that part?
19    A.   Yes, I do.
20    Q.   So you continued the interview.  Correct?
21    A.   Yes.
22    Q.   So after he said he didn't understand his
23   rights twice, you continued the interview.  Correct?
24    A.   Yes, in between there, yeah.
25    Q.   And then he made more admissions.  Right?

Page 682

1    A.   Yes.
2    Q.   And if you look at page 11, finally when you
3   did the breathalyzer, he showed a .41 alcohol content.
4   Right?
5    A.   Correct.
6    Q.   That's someone who is extraordinarily drunk.
7   Correct?
8        MS. RETTS:  Foundation.
9        MS. BERKE:  Join.
10        THE WITNESS:  Not necessarily.
11    Q.   BY MR. BRUSTIN:  .41?
12    A.   Not for a functional alcoholic.
13    Q.   What's the legal limit?
14    A.   Well, legal limit is .8, but that's -- usually
15   it was a lot higher at times before that, and we're
16   talking about driving a vehicle, you know.
17    Q.   When someone has a .41 alcohol level, does that
18   mean they're drink?
19        MS. BERKE:  Objection.  Foundation.
20        THE WITNESS:  Like I said, I've already
21   answered that.  He's a functioning alcoholic.  It
22   could -- he could withstand that .41.  However, I made
23   sure -- I made sure to run the breathalyzer on him and
24   then to report it, too.
25        (Exhibit 62 was marked for identification.)

Page 683

1    Q.   BY MR. BRUSTIN:  Okay.  Now take a look at
2    page -- Exhibit 62, which is Bates stamped 26024 through
3    26026.
4    A.   Yes.
5    Q.   And this is a report created by the Detective
6    Martinsen.  Correct?
7    A.   Yes.
8    Q.   You knew Detective Martinsen well.  Right?
9    A.   Yes.
10   Q.   You worked with him all the time.  Right?
11   A.   Not all the time but yes.
12   Q.   And this -- did you review this report at
13   lunch?
14   A.   Yes.
15   Q.   And this is a report that was in -- this is a
16   report that was created by Detective Martinsen where he
17   describes the reasons -- he attaches a report describing
18   the reasons why the DA was not going to prosecute this
19   case.  Correct?
20   A.   That's correct.
21   Q.   And in fact, the DA made a decision not to
22   prosecute this case despite the fact that Mr. Sherman was
23   found with a bloody knife and a trail of blood to the
24   victim.  Correct?
25   A.   Correct.

Page 684

1    Q.   And despite the fact that he made admissions to
2    you, according to you, during the interrogation?
3    A.   Yes.
4         MS. BERKE:  For the record, it doesn't
5    indicate whether Martinsen prepared the second and third
6    page, just the first page.
7         THE WITNESS:  He prepared the --
8         MS. BERKE:  I think it might be a county
9    attorney document.  I don't know.
10   Q.   BY MR. BRUSTIN:  I didn't mean to suggest that.
11   What this report suggests is that Martinsen received --
12   A.   This report.
13   Q.   -- pages 25 and 26 and attached it to this
14   report.  Correct?
15   A.   That's correct.
16   Q.   Is that how you read it?
17   A.   Yes.
18   Q.   All right.  And obviously you would expect that
19   the sergeant on this case would be aware of this report
20   and these -- and these documents.  Correct?
21        MS. RETTS:  Form and foundation.
22        THE WITNESS:  I can't say that.
23   Q.   BY MR. BRUSTIN:  That's how things worked.
24   Right?
25   A.   I can't say that.

Page 685

1    Q.   Well, you can say that.  You knew that
2    sergeants reviewed all reports in a homicide case.
3    Right?
4    A.   No, I didn't know that.
5    Q.   That wasn't -- oh, you didn't know that the
6    sergeant on a case reviewed your reports?
7    A.   No.
8    Q.   This is the first time you're hearing that?
9    A.   Yeah.  I mean, you asked me once before, and I
10   said I don't know if they reviewed my reports or not.
11   Q.   Okay.  As far as you knew, maybe no one was
12   reviewing them.  You just had no idea?
13   A.   That's correct.
14   Q.   Did Detective Martinsen share this document
15   with you?
16   A.   This is the first time I've ever seen it.
17   Q.   Take a look at the next page.  Now, here the DA
18   in the case, Stalzer -- do you know Stalzer?  Remember
19   him?
20   A.   I do remember him, yeah.
21   Q.   Okay.  In here, the DA in the case is giving
22   the reasons why they're declining to prosecute this
23   murder.  Correct?
24   A.   Yes.
25   Q.   And the first reason is because the -- because

Page 686

1    Mr. Sherman told you he didn't understand his rights
2    twice.  Right?
3    A.   Correct.
4    Q.   The second reason was because he was so highly
5    intoxicated when he was interviewed.  Correct?
6    A.   That's correct.
7    Q.   The third reason was because he crawled under
8    the table to get out of the light.  3, you see that?
9    A.   Yes.
10   Q.   And 7, it says there's a good possibility that
11   defendants something are inadmissible.  Correct?
12   A.   Correct.
13   Q.   Do you agree that's -- what that probably
14   refers to is the defendant's statements?
15        MS. BERKE:  Objection.  Foundation.
16   Q.   BY MR. BRUSTIN:  Would that be a good guess?
17        MS. BERKE:  Foundation.
18        THE WITNESS:  Numbers --
19   Q.   BY MR. BRUSTIN:  Well, let's --
20   A.   Well, I think part of it -- I would think the
21   whole -- taking it as a whole, that is a fact that the
22   victim's blood alcohol was .27, also high, but, you know,
23   again, he's probably a functioning alcoholic, and -- and
24   number 5 says he's inconsistent how it occurred, and so
25   there was a lot -- there was a lot of things that went



ARMANDO SALDATE Volume III                                November 15, 2017
MILKE vs CITY OF PHOENIX                                          687–690

Page 687

1  into it.
2        But the main portion -- the main reason that
3  it was denied was the fact that I reported his condition,
4  I had him take breathalyzer tests.  I did everything
5  that -- everything I did I reported it and made sure that
6  if -- down the line if his attorney would believe that --
7  that he was too intoxicated like you believe to have said
8  anything, he -- I had the breathalyzer done, and in other
9  words, I did probably the defense's case, but, again,
10  that was my job.
11     Q.    You did the right thing here?
12     A.    Of course.
13     Q.    Okay.  This is an example of a case where you
14  went -- you were acting with honesty and integrity.
15  Correct?
16     A.    I think in all my cases I do that.
17     Q.    All right.  And so you don't read this to
18  suggest that the reason they couldn't go forward with
19  this case is because you continued to question him after
20  he said twice he didn't understand his Miranda rights.
21  You don't read it that way?
22     A.    That's one of the reasons.  That's why he
23  listed seven --
24     Q.    Okay.
25     A.    -- eight reasons.

Page 688

1      Q.    Let me ask you this:  You've already told us
2  that this was a very straightforward case.  Do you
3  remember that?
4      A.    I said it appeared that way, yeah.
5      Q.    Right.  You have a bloody trail and a knife?
6      A.    Yeah.
7      Q.    You don't need a confession to prove somebody
8  committed a murder when you have a bloody trail and a
9  knife.  Right?
10     A.    Boy, I better not go to New York.  They -- I
11  mean, there's a lot of things that could happen that --
12  that may have transpired that -- you know, I mean,
13  somebody could have just thrown the knife at him.
14  There's a lot of things.
15     Q.    No, I'm sure.
16     A.    I do an investigation.
17     Q.    Do you think when I talk to Stalzer he's going
18  to tell me that he actually thought you -- you -- do you
19  think when I talk to Stalzer he's going to tell me that
20  what happened here is you were acting so honestly here
21  that he wasn't able to prosecute the case?  Do you think
22  that's what he's going to tell me?
23     A.    He might.
24     Q.    Okay.  You don't think he's going to tell me
25  that the reason he couldn't prosecute this

Page 689

1  straightforward homicide is because you blatantly
2  violated the suspect's Miranda rights?
3      A.    I think he's going to say that as part of his
4  seven reasons or eight reasons they put down in that
5  report.
6      Q.    Okay.  But your position here is that you did
7  the right thing?
8      A.    I did.
9      Q.    So in other words, when you -- when this
10  suspect told you that he didn't understand his rights
11  twice and when he crawled under the table to speak to
12  you, it was fine to keep asking questions?
13         MS. RETTS:  Form.
14         THE WITNESS:  I did.
15     Q.    BY MR. BRUSTIN:  And it was fine, nothing wrong
16  with that?
17     A.    Well, I did document that he had asked for
18  that, and that's the reason you know it.
19         I did document the fact that he asked for a
20  second time that he didn't understand his questions.
21         I did document that his appearance -- I
22  didn't think he was drunk, but then I did do a
23  breathalyzer on him, had a breathalyzer done on him and
24  provided that information.
25     Q.    Let me ask you this:  If you had punched him in

Page 690

1  the face and then documented it, would that make punching
2  him in the face okay?
3         MS. BERKE:  Objection.  Argumentative.
4         THE WITNESS:  I can't answer that question
5  because it's an assault.  You're not going to assault
6  somebody like that.
7      Q.    BY MR. BRUSTIN:  Is an assault more serious
8  than blatantly violating someone's Miranda rights?
9         MS. BERKE:  Objection.  Argumentative.
10         THE WITNESS:  I don't know about that.
11     Q.    BY MR. BRUSTIN:  Okay.  So I'm going to ask you
12  the same question again.  Is it your testimony that it
13  was appropriate for you to continue questioning this
14  suspect after he invoked his right -- withdrawn -- after
15  he told you twice he didn't understand his rights?
16     A.    Yes.
17     Q.    You stand by your decision to question him?
18     A.    Yes.
19     Q.    You wouldn't -- if you had to go back, you
20  wouldn't do anything differently.  Correct?
21     A.    I don't know that.
22     Q.    But you stand by it?
23     A.    I stand by it.
24     Q.    Now, let's talk a little bit about your work as
25  a constable.  You became a constable back in -- what is

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
691–694

Page 691

1   it -- '91?
2   A.   '90.
3   Q.   '90.  Sorry.  And you remain a constable for
4   how long?
5   A.   Twenty years.
6   Q.   Now, as a constable, could you estimate to me
7   what percentage of your duties were evictions?
8   A.   80 percent maybe, 80 percent.
9   Q.   80 percent.  Okay.  That's a big number.  And
10  would it be fair to say that most of your evictions were
11  in low-income communities?
12  A.   No, they were in the area that I was assigned
13  to do.
14  Q.   And what was the area?
15  A.   It was 7th Street to the freeway from McDowell
16  to Northern.
17  Q.   Okay.  Could you give me that in like -- I
18  don't know.  How many miles is that?
19  A.   Oh, shoot, I don't know.
20  Q.   Approximately?
21  A.   Ten, 12 square miles maybe.
22  Q.   Okay.
23  A.   And that's just an estimate.
24  Q.   Now, I take it as a constable you got to
25  know the people in the community that you were -- that

Page 692

1   you were interacting with.  Would that be fair to say?
2   Their living situations, things like that?
3        MS. RETTS:  Form.
4        MS. BERKE:  Objection.  Vague.
5        THE WITNESS:  No, you -- as a constable, I
6   was assigned an eviction case.  There's nothing that
7   you're going to do right.  You're going to piss off --
8   you know, everybody's going to be pissed off.
9   Q.   BY MR. BRUSTIN:  Got you.  Would it be fair to
10  say that you dealt with a number of low-income housing
11  units in connection with your duties?
12        MS. RETTS:  Form.
13        THE WITNESS:  Not as many as others, other
14  constables.
15  Q.   BY MR. BRUSTIN:  Okay.
16  A.   But, I mean, I did have some areas.
17  Q.   Okay.  Now, did you understand that for some of
18  the people you dealt with, they were using what's called
19  pay-as-you-go electricity systems?
20  A.   Yeah.
21  Q.   You knew how that worked?
22  A.   Yeah.
23  Q.   Okay.  And you knew that a lot of people you
24  came into contact with had used those systems.  Fair to
25  say?

Page 693

1        MS. RETTS:  Form and foundation.
2        THE WITNESS:  Some people did, yeah.
3   They -- especially the ones that were, you know, month to
4   month, you know.
5   Q.   BY MR. BRUSTIN:  Okay.  And you can correct me
6   if I'm wrong, but my understanding of how they would work
7   is that there was no monthly -- no monthly bill.  The
8   power users were given a display unit.  Do you understand
9   that the way it to be -- it worked?  And then they were
10  given a microchip card like an ATM card?
11        MS. BERKE:  Objection.  Foundation.
12        THE WITNESS:  I think so.
13  Q.   BY MR. BRUSTIN:  Okay.
14  A.   I think so.
15  Q.   And the way it worked, there were these --
16  there were pay centers throughout Phoenix that people
17  would go to?
18  A.   Yes.
19  Q.   And the person would put their card in the
20  machine, and that would deposit money into the account
21  for electricity?
22        MS. BERKE:  Objection.  Foundation.
23        THE WITNESS:  I think they would have to
24  deposit money in that card, yeah, yeah.
25  Q.   BY MR. BRUSTIN:  Okay.  And then they would

Page 694

1   take their card to their home, and they would insert that
2   card into a removal -- into a removable display unit at
3   their house to get electricity?
4   A.   That -- I don't really know how it worked after
5   that.
6   Q.   You remember that you -- you remember --
7   A.   I remember the displays and everything.
8   Q.   Okay.
9   A.   But I just don't remember how they got the
10  electricity.
11  Q.   They would tell you how much money you had left
12  on your -- the displays would tell you how much
13  electricity you had in dollars?
14        MS. BERKE:  Objection.  Foundation.
15        THE WITNESS:  I think that's correct.
16  Q.   BY MR. BRUSTIN:  Okay.  And my understanding --
17  you correct me if I'm wrong -- is that the card and the
18  display unit and the account and the meter were all
19  married to each other.  In other words, you could only
20  put money on your card and use it in your house.  Was
21  that your understanding as to how it worked?
22  A.   I don't know.
23  Q.   You don't know.
24        MR. BRUSTIN:  I'm sorry.  Can we take just a
25  one-minute restroom break.



Page 695

1      MS. BERKE:  Uh-huh.

2      MR. BRUSTIN:  Thanks.

3      THE VIDEOGRAPHER:  This ends media number 2.

4  We are off the record at 2:23 p.m.

5      (A recess was held off the record.)

6      THE VIDEOGRAPHER:  This begins media number

7  3, volume III, to the video-recorded deposition of

8  Armando Saldate.  We are back on the record at 2:28 p.m.

9      Q.  BY MR. BRUSTIN:  Okay.  Mr. Saldate, my

10  understanding is that the service of a writ of execution

11  is the actual eviction.  Is that your understanding?

12      A.  No.

13      Q.  No?

14      A.  Execution is different than a restitution.

15      Q.  Okay.  Well, upon -- would you agree that upon

16  service of the writ the tenant is supposed to vacate

17  immediately?

18      A.  They can be, yes.

19      Q.  Okay.  Now, do you know Ron Myers?

20      A.  Yeah, I do.

21      Q.  Okay.  Phil Haslett?

22      A.  I do.

23      Q.  Kevin Jones?

24      A.  I do.

25      Q.  David Alster?

Page 696

1      A.  I do.

2      Q.  Are those people good resources for how

3  evictions work?

4      A.  I was senior to all of them, but I'm sure they

5  can -- everyone does it their own way, you know.  So...

6      Q.  Okay.  Well, according to them, typically when

7  a writ of restitution is served, the tenant has

8  approximately 15 minute -- 15 minutes to vacate the

9  premises before the locks are changed.  Is that

10  consistent with your understanding of how things worked?

11      A.  No.  That's how they may do it, yeah.

12      Q.  They said that's how it was required to be

13  done.  You disagree with that?

14      A.  No, you have discretion.

15      Q.  According to them, tenants were only given more

16  than a few hours in extreme circumstances.  For example,

17  if they were extremely vulnerable, like sick or elderly.

18  Is that consistent with your understanding?

19      A.  No.

20      Q.  The example they gave was that if you have a

21  90-year-old person in a wheelchair with nowhere to go,

22  that might call for an extension.  Your understanding is

23  that you could give an extension any time you wanted?

24      A.  That's my discretion.

25      Q.  You disagree -- if that's what they've said,

Page 697

1  you disagree with it?

2      A.  Yeah, but everybody is different, and everybody

3  has their own responsibility.

4      Q.  Sorry, you're missing my point.  What they said

5  to us is that not everybody had discretion that when a

6  writ of execution was served, the person needed to leave

7  immediately.  You're saying that wasn't the case.

8  Correct?

9      A.  That's correct.

10      MS. BERKE:  Objection.  Assumes facts not in

11  evidence.

12      Q.  BY MR. BRUSTIN:  Now they also said that

13  sometimes the policy -- the property owner may agree to

14  give the tenant a few more days to vacate?

15      A.  That's correct.

16      MS. BERKE:  Objection.  Can I just have an

17  objection to all of this information you got from these

18  people you apparently interviewed, or do you want me to

19  insert my objection every time?

20      MR. BRUSTIN:  You make your objections as

21  you need to.

22      MS. BERKE:  Okay.

23      MS. BURGESS:  I'm going to also object to

24  that being complete hearsay with no documentation or no

25  disclosure and no information to verify it.

Page 698

1      MS. BERKE:  Right.

2      MR. BRUSTIN:  Just make your objection.

3      MS. BERKE:  Okay.  So just pause after each

4  question.

5      THE WITNESS:  Yes, I will.

6      MS. BERKE:  Okay.

7      Q.  BY MR. BRUSTIN:  All right.  And is it your

8  understanding that, according to the constable policies

9  and procedures manual, the rightful possessor may agree

10  to give the other party more time to vacate?

11      A.  Yes.

12      Q.  And when that happens, it would be noted on the

13  writ itself that the property owner had asked for more

14  time?

15      A.  Yes.

16      Q.  Now, do you agree that when you do evictions,

17  typically it was the constable who was solely -- the

18  constable who was solely responsible for the eviction?

19      A.  That's correct.

20      Q.  In other words, it is the constable who

21  actually padlocks the door and ensures that the person is

22  removed?

23      A.  No.

24      Q.  That's not the way it works?

25      A.  No.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
699–702

Page 699

1  Q.  That's not the way you did it?

2  A.  No.

3  Q.  How did it work?

4  A.  Well, if you give them a couple hours, if

5  it's -- an apartment building with a staff of maintenance

6  people, then they would come, and of course they would be

7  able to change the lock immediately.

8  Q.  You wouldn't come back to ensure that that

9  happened?

10  A.  No.  And if there wasn't a -- a maintenance

11  person or whatever, you'd have to call somebody, the

12  maintenance person.  That's what we calls -- we'd get the

13  numbers to the maintenance person that you could call,

14  and they would say, Well, we'll be in there in couple of

15  days to get it done.  And you'd tell them, Okay, I'll

16  give them until whatever, a couple days, and then they

17  will come, and they will change the lock.

18  Q.  Okay.  But it wouldn't be the constable's

19  responsibility to go and make sure that that happened?

20  A.  The constable's responsibility is to serve that

21  writ.

22  Q.  Okay.

23  A.  Once the service has been made, then it's done.

24  Q.  Okay.  So it would not -- just to be clear, it

25  would not be the constable's responsibility -- withdrawn.

Page 700

1       In a situation where somebody was given a

2  few hours to evacuate or to leave, it wouldn't be the

3  constable's responsibility to go there and make sure that

4  they left and the locks were changed?

5  A.  That's true, it would not be.

6  Q.  And in a situation where the person was evicted

7  and given a few days to leave, it would not be the

8  constable's responsibility to go back and ensure that the

9  locks were changed and the person had left?

10  A.  That is correct.

11  Q.  It will be perfectly permissible as a constable

12  to simply serve the writ.  Correct?

13  A.  Serve -- you serve the writ and complete the

14  writ upon service.

15  Q.  That's -- that's your only responsibility?

16  A.  Yes.

17  Q.  And that's how you did things with all your --

18  with all evictions?

19  A.  Yes, most.

20  Q.  You didn't actually change the locks?

21  A.  Oh, at times I would.

22  Q.  You weren't responsible to do that?

23  A.  No, I didn't change it.  You know, the

24  maintenance people were there, and if they -- if the

25  apartment was vacant or something like that and they --

Page 701

1  half the time they would change the locks before I got

2  there.

3  Q.  Okay.  Do you remember the eviction of Belinda

4  Reynolds?

5  A.  No, I don't.

6  Q.  You have no memory of her at all?

7  A.  Not from other than what, you know, this whole

8  thing started.

9  Q.  Well, did this whole thing cause you to

10  remember who she was?

11  A.  No.

12  Q.  Okay.  Let me ask you this:  Did you have sex

13  with any people that you evicted?

14  A.  No.

15  Q.  And when I say "sex," I don't mean sexual

16  intercourse.  I mean sexual contact of any kind.

17  A.  No.

18  Q.  It's not that you don't remember it.  You deny

19  doing it?

20  A.  I deny doing it.

21  Q.  Now, according to Belinda Reynolds, she claimed

22  that when she asked if there was any way she could buy

23  some time, you told her there were other things besides

24  money.  Then you looked towards her private area and made

25  clear you would exchange more time for sex.

Page 702

1  A.  That did not happen.

2  Q.  Okay.  You understood that's her allegation?

3  A.  I -- now I do.

4  Q.  You deny the allegation?

5  A.  I never have read it before.  I mean --

6  Q.  You understand that's her allegation, and you

7  deny it?

8  A.  I deny it.

9  Q.  Okay.  And according to Reynolds, you told her

10  she could remain in her apartment, and when she asked you

11  how do you know somebody else won't come and lock her

12  out, you replied, There's nobody after me, or something

13  to that effect.  You deny saying that to her.  Correct?

14  A.  That never happened.

15  Q.  Okay.  In fact that's not how you did business

16  as a constable.  Your only job as a constable was to make

17  sure the writ was served?

18  A.  That's correct.

19  Q.  So that's not even consistent with how

20  constables did their jobs.  Correct?

21  A.  That's correct.  My -- how I did my job.

22  Q.  Okay.  Now, you would agree that the allegation

23  that Belinda Reynolds makes is similar to the allegation

24  that was made against you in 1973, trading sex in

25  exchange for a favor.  Correct?



Page 703

1        MS. BERKE:  Objection.  Misstates evidence.
2        THE WITNESS:  The only difference is that
3  one occurred, and the other one didn't.
4    Q.    BY MR. BRUSTIN:  Okay.
5    A.    And I admitted to that.
6    Q.    But both are claiming you're trading official
7  leniency for sex.  Correct?
8    A.    That did not occur.
9    Q.    Listen to my question.  Both women are claiming
10  that -- I know you told me only one is true, but both
11  women are claiming that you traded official leniency for
12  sex.  Correct?
13        MS. BERKE:  Objection.  Misstates evidence.
14        THE WITNESS:  I haven't read the report yet,
15  but, you know, I never have read the report.  I didn't
16  even know that until a year later or so.
17    Q.    BY MR. BRUSTIN:  You never read the report?
18    A.    Never.  I have never read it.  I haven't read
19  it yet.
20    Q.    Not even in preparation for today?
21    A.    Nope.
22    Q.    Why not?
23    A.    I didn't have it.
24    Q.    Okay.
25    A.    Nor did I go seek it either.

Page 704

1    Q.    Okay.  Let me show you this one.
2        (Exhibit 66 was marked for identification.)
3        MS. GREEN:  Exhibit 66.
4    Q.    BY MR. BRUSTIN:  Exhibit 66.
5    A.    This is the report?
6    Q.    I'm not sure yet.
7    A.    Yeah, it is.
8    Q.    Let me show you page -- so what's -- this is
9  Exhibit 66, and we've got it Bates stamped.  It's a
10  series of documents.
11    A.    BEL REY or something.
12    A.    Yeah.  It's 1 through --
13    A.    22.
14    Q.    -- 22.  All right.  So I want to show you a
15  couple things in here.
16    A.    Okay.
17    Q.    First, take a look at -- all right.  Take a
18  look at page 1 through 4.  What is this document, sir?
19    A.    It's a police report.
20        MR. BRUSTIN:  Where is the eviction notice?
21    Q.    BY MR. BRUSTIN:  Take a look at page 19.
22    A.    19.
23        MS. BERKE:  What page?
24        MR. BRUSTIN:  19.
25        THE WITNESS:  I got it.

Page 705

1    Q.    BY MR. BRUSTIN:  All right.  This is the writ?
2    A.    That's the writ of restitution, yes.
3    Q.    This is what you served?
4    A.    Yes.
5    Q.    Okay.  And is it your -- is it your handwriting
6  below certificate of service?
7    A.    Yes.
8    Q.    Okay.  And this was served on 5/1?
9    A.    That's correct.
10    Q.    I will represent to you that that was -- that's
11  a Friday.
12    A.    Okay.
13    Q.    And then there's a note at the bottom that
14  says, "Vacate by 8 a.m. Monday."  Right?
15    A.    Correct.
16    Q.    And that's your handwriting, "Vacate by 8 a.m.
17  Monday."  Right?
18    A.    That's correct.
19    Q.    And this is you using your discretion to have
20  her vacate by Monday morning.  Correct?
21    A.    That's correct.
22    Q.    And it's your testimony that you would not have
23  come back to ensure that she was out, correct,
24  necessarily?
25    A.    That's true.

Page 706

1    Q.    And you have no memory as to why you gave this
2  person an extra few days.  Correct?
3    A.    No specific memory to her or the days, but I
4  was giving everybody -- I was giving everybody a day or
5  so.
6    Q.    You gave everybody a couple days?
7    A.    Yeah, it was just --
8    Q.    Just how you did things?
9    A.    Yeah.
10    Q.    Because you're a good guy?
11    A.    If you say so.
12    Q.    Is that right?
13    A.    Well, if you say I am.
14    Q.    I'm asking you.  Is that why you did it?
15    A.    I can't say -- I think I am, but, you know...
16    Q.    So you gave -- you gave everybody a couple of
17  days as a courtesy?
18    A.    At times, yes.
19    Q.    Was it your understanding anybody else was
20  doing that?
21    A.    Everybody was doing that.
22    Q.    Everybody was doing that?
23    A.    Yep.
24    Q.    Everybody including Ron Myers?
25        MS. BERKE:  Objection.  Foundation.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
707–710

Page 707

1     THE WITNESS:  Yeah.
2  Q.  BY MR. BRUSTIN:  And Phil Haslett?
3     MS. BERKE:  Foundation.
4     THE WITNESS:  Yes.
5  Q.  BY MR. BRUSTIN:  And Kevin Jones?
6  A.  Yep.
7     MS. BERKE:  Foundation.
8  Q.  BY MR. BRUSTIN:  They were all doing that, huh?
9  A.  I believe they were.
10  Q.  Regularly giving people a couple days for any
11 reasons?
12  A.  No, for their own reasons.
13  Q.  But regularly doing it?
14  A.  I would say yes.
15  Q.  Okay.  And it was your understanding that
16 people would do it for any number of reasons, not just
17 because somebody was sick or had an emergency.  Right?
18  A.  That's correct.
19  Q.  They could do it any time they wanted to?
20  A.  It was my discretion.
21  Q.  And that's what most people did?
22  A.  Yes.
23  Q.  Now, tell us about your interview with Sergeant
24 Bracke from the Phoenix Police Department regarding the
25 Reynolds case.

Page 708

1  A.  I don't remember that interview ever occurring.
2  Q.  Okay.  So as you sit here today, you don't have
3 any -- any memory of any interview from any Phoenix --
4 withdrawn.
5     Did any police -- did any -- withdrawn
6 again.
7     Did any law enforcement official interview
8 you concerning the allegation that you traded --
9 withdrawn.
10     Again, you'd agree that if in fact you gave
11 Belinda Reynolds more time to stay in her apartment in
12 exchange for sex, that would be a crime?
13  A.  Yes.
14  Q.  Okay.  Now, did any law enforcement official
15 ever interview you regarding those criminal allegations?
16  A.  I don't know if it's an interview, but it
17 was -- I think it was Edwards from the Attorney General's
18 Office.
19  Q.  Okay.  And when was that?
20  A.  Like I say, I want to say it's a year or so
21 after apparently because he's told me it was a year or
22 so.
23  Q.  Okay.
24  A.  But I don't know.
25  Q.  But obviously these are very serious

Page 709

1 allegations.  Correct?
2  A.  He -- he claimed they were, yeah.
3  Q.  No.  They're serious allegations?
4  A.  That he made -- that she made, yes.  I'm sorry.
5  Q.  Okay.  And certainly, especially given your --
6 the allegations that were so painful for you back in '73,
7 I take it that any interview that you had in connection
8 with a claim that you misused your authority for sexual
9 favors, that would be something you'd remember.  Correct?
10  A.  I don't remember this to be honest with you.
11  Q.  Okay.  So you don't remember -- you don't
12 remember what?
13  A.  I don't remember the case itself, and I -- and
14 I specifically deny that any of this, what she's
15 claiming, occurred.
16  Q.  Okay.  I'm -- now I'm asking -- I got that.
17  A.  Okay.
18  Q.  Now I'm asking about interviews you had.  Would
19 it be fair to say if you got interviewed by a police
20 official concerning allegations that you engaged in
21 sexual misconduct, you'd remember that?
22  A.  Yes.
23  Q.  Okay.
24  A.  Like I said, I think it was Edwards or
25 something like that.

Page 710

1  Q.  Okay.  So no -- so nobody from the Phoenix
2 Police Department ever interviewed you?
3  A.  Not that I know of, not that I can remember at
4 all.
5  Q.  Well, I just said that.  You would remember it
6 if it happened.  Right?
7  A.  I would say so.
8  Q.  What was your relationship like with Sarah Rios
9 with Consolidated Management Company?
10  A.  I had none.
11  Q.  Do you know who that is?
12  A.  Not really other than, you know, she was
13 probably a manager or something.  She was something with
14 Consolidated Management, but I had never had a
15 relationship with her or anything else.  I had the direct
16 number to the maintenance guy.
17  Q.  Okay.  Who's -- who was Mr. Thurston, Gregg
18 Thurston?
19  A.  He's an attorney.
20  Q.  Did you hire him in connection with this case?
21  A.  I hired him, yes.
22  Q.  And when did you hire him?
23  A.  Probably the day or day after Mr. Edwards
24 called me.
25  Q.  Okay.  And according to Mr. Edwards' report of



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
711–714

Page 711

1  the conversation he had with Mr. Thurston -- I'm quoting
2  it now -- "Mr. Thurston said that several months ago
3  Phoenix PD detectives had come to Armando Saldate's
4  house -- Armando Saldate's house and interviewed him
5  about this alleged incident."
6       Does that jog your memory about any -- about
7  being interviewed about this?
8  A.  No, I think he's just mistaken.
9  Q.  You think he's mistaken.
10      MR. BRUSTIN:  Off the record, please.
11      THE VIDEOGRAPHER:  We are off the record at
12  2:46 p.m.
13      (A recess was held off the record.)
14      THE VIDEOGRAPHER:  We are back on the record
15  at 2:48 p.m.
16  Q.  BY MR. BRUSTIN:  Okay.  Mr. Saldate, do you
17  remember the convenience store murder involving Eric King
18  and Michael Jones?
19  A.  I do.
20  Q.  Okay.  And that was a late-night robbery of a
21  Short Stop convenience store at gunpoint.  They killed
22  and shot -- they shot and killed a security guard and the
23  store clerk --
24  A.  That's correct.
25  Q.  -- and stole $72?

Page 712

1  A.  Yes.
2  Q.  There was a video camera inside the store that
3  got the entire robbery?
4  A.  Yes.
5  Q.  It was pretty clear that Eric King and Michael
6  Jones were on that tape as the perpetrators?
7  A.  Yes.
8  Q.  And their involvement was also corroborated by
9  multiple witnesses.  Correct?
10  A.  I believe it was.
11  Q.  So you went into this case pretty clear
12  understanding these were the guys that committed the
13  crime?
14  A.  I had evidence that they did, yes.
15  Q.  Okay.  And your -- your goal was to get them to
16  acknowledge it?
17  A.  Of course.
18  Q.  And you interrogated both King and Jones.
19  Correct?
20  A.  Yes, I guess.
21      MS. BERKE:  Are you talking about two
22  different cases or --
23      MR. BRUSTIN:  It's one case, two
24  perpetrators.
25      MS. BERKE:  Okay.

Page 713

1      MR. BRUSTIN:  Eric King and Michael Jones.
2      MS. BERKE:  Well, there's John Paul Hartley
3  Jones.  Is that --
4      THE WITNESS:  No, no, different one.
5  Q.  BY MR. BRUSTIN:  This is Eric King and Michael
6  Jones were the killers here.  Right?
7  A.  Yes.
8  Q.  And do you recall that you were very careful
9  here to ask King to read his Miranda rights back out loud
10  because you thought he might be drunk?
11  A.  Correct.
12  Q.  And any -- obviously, as you've already told
13  us, any time your -- you have someone who may be drunk,
14  you have to be especially careful to make sure they
15  understand their rights.  Correct?
16  A.  Yes.
17  Q.  And according to your report, when Mr. King
18  attempted -- when you attempted to focus Mr. King on the
19  night of the murder, he said, "Look, I know the game.  I
20  know exactly what you're trying to do, but I'm not going
21  to answer any more of your questions."
22  A.  I believe he said that.
23  Q.  Okay.  In other words, he invoked his right to
24  remain silent.  Correct?
25  A.  Probably, yes.

Page 714

1  Q.  And you say "probably."  What -- what does
2  that --
3  A.  It could be interpreted like that, yeah.
4  Q.  Could you interpret that any other way?
5  A.  No, probably not.
6  Q.  Now, you also mentioned in your report that
7  after he invoked his right to remain silent, he said, I'm
8  not -- he said -- he started laughing about the death
9  penalty and saying "probably going to start it over once
10  I get convicted."  Do you recall that?
11  A.  Yes, I do.
12  Q.  Okay.  And although that's not an admission,
13  that's arguably -- that's arguably -- arguably an
14  incriminating statement.  Right?
15  A.  I wouldn't say so.
16  Q.  Oh.
17  A.  You know, he -- you know, he -- I think he was
18  just making it like a joke or something, you know.
19  Q.  A joke during a case where he's being -- is
20  that the kind of joke that you would expect an innocent
21  person to make?
22  A.  I don't think he was innocent, but it's just --
23  he was -- had been drinking.  You know, he knew what was
24  going on.  So he just wanted to throw that out.  So he
25  did.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
715–718

Page 715

1    Q.   It's potentially incriminating.  Right?
2    A.   I don't think he knew that or realized that
3   or --
4    Q.   But you did?
5    A.   Yeah, probably.
6    Q.   All right.  Now, you also write that, "King was
7   very friendly, and for the most part, he appeared to be
8   having a very good time speaking with me."
9    A.   Correct.
10   Q.   It seems like lots of people had a really good
11  time speaking with you.  Would that be a fair
12  characterization of your experience interrogating
13  suspects?
14       MS. BERKE:  Objection.  Misstates evidence.
15       THE WITNESS:  Yes.
16   Q.   BY MR. BRUSTIN:  Okay.  And he was having so
17  much fun that you kept talking to him after he invoked
18  his right to remain silent?
19   A.   Yes, we had a conversation, yes.
20   Q.   All right.  Now, later on he said he knew how
21  the system worked, and he explained that if you wanted to
22  arrest him that you should -- that you should because
23  later on he would talk to his lawyer and that we as
24  police would talk to ours and that maybe later on the
25  lawyers would talk, and he would then talk to us.

Page 716

1    A.   I believe that he made that statement.
2    Q.   In other words, he said, "Arrest me, I want a
3   lawyer."  Correct?
4    A.   He said, "Arrest me."  I mean, I could
5   interpret the fact that he wanted to be arrested and not
6   that he wanted an attorney, but he said his attorney
7   would do that and that he would get one.  So --
8    Q.   Okay.  So you didn't interpret that as him
9   requesting a lawyer?
10   A.   No.
11   Q.   You didn't -- you didn't interpret that as him
12  telling you he wanted to speak to an attorney?
13   A.   No.
14   Q.   Take a look at --
15       MR. BRUSTIN:  What's the number of that one?
16       MS. GREEN:  We haven't marked this yet.
17       MR. BRUSTIN:  67, please.
18       (Exhibit 67 was marked for identification.)
19   Q.   BY MR. BRUSTIN:  Okay.  I've shown you what's
20  been marked as Plaintiff's 67, which is your testimony
21  from the voluntariness hearing.  Okay?
22   A.   Yes.
23   Q.   Now, take a look at -- I'm talking about the
24  Bates stamps now -- page 308 -- 30890, line 8 -- read to
25  yourself line 8 --

Page 717

1    A.   Okay.
2    Q.   30890, lines 8 to 15.
3    A.   8 to 15.
4    Q.   8 to -- I'm sorry.  8 to 18.
5    A.   Okay.
6    Q.   Got it?
7    A.   To 18, yes.
8    Q.   You're making clear that you wrote your
9   supplement in the order -- you wrote what happened in the
10  order in which it was stated to you.  Correct?
11   A.   Yes.
12   Q.   As you always do.  Correct?
13       MS. BERKE:  Objection.  Misstates testimony.
14       THE WITNESS:  I don't say always, but, yeah,
15  for the most part.
16   Q.   BY MR. BRUSTIN:  Well, you have, but that's
17  okay.
18       So now take a look at page 2326.
19       MS. GREEN:  2326.
20       MR. BRUSTIN:  Is that an earlier exhibit?
21  Same exhibit?  No, it's a different exhibit.  2326.
22       MS. GREEN:  This will be 68.
23       (Exhibit 68 was marked for identification.)
24   Q.   BY MR. BRUSTIN:  Take a look at page -- now, I
25  want you to keep both of these in front of you.

Page 718

1    A.   Okay.
2    Q.   First I want you to look at page 20 -- 3881
3   (sic).
4    Q.   38?
5    A.   30881, transcript.
6    Q.   Okay.
7    Q.   Now, you're being asked on page 30 -- 0881 --
8   you're being asked about timing here on page 30881.
9   Correct?
10   A.   The date and time, I guess, yeah.
11   Q.   And you're asked, "How about the approximate
12  time," and you say "5:38 p.m."  Right?
13       MS. BERKE:  It says "5:38 p.m. about."
14   Q.   BY MR. BRUSTIN:  "5:38 p.m. about."  Right?
15   A.   Yes.
16   Q.   And that's because you were looking at that
17  time at the top of your report at page 2327.  Right?
18   A.   Oh.
19   Q.   Keep them both in front of you.
20       MS. GREEN:  Sorry.
21   Q.   BY MR. BRUSTIN:  Put that away.
22       Now look at 2327, the first line of the
23  page.
24   A.   Okay.
25   Q.   At approximately 1738 hours.  Right?



Exhibit 1

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
719–722

Page 719

1    A.   And what are -- what's the question there?
2    Q.   Look at the next page, 17 -- 2327.  Give it to
3  me.  Give me that.  Look at the top of the page.  You see
4  it says approximately 1738 hours?
5    A.   Yes.
6    Q.   The reason you're able to give the approximate
7  time at 5:38 is because you're looking at your report on
8  the stand.  Correct?
9        MS. BERKE:  Objection.  Foundation.
10       THE WITNESS:  I don't know that, no.
11   Q.   BY MR. BRUSTIN:  How could you possibly
12  remember it was approximately 5:38 p.m. if you weren't
13  looking at your report?
14   A.   Well, I said I reviewed it.
15   Q.   Now, take a look -- we'll take a look at that
16  again.  Take a look at page -- take a look at page --
17       MR. BRUSTIN:  Where does it say, "I didn't
18  put an ending time on this."  Is this, "I don't know if I
19  put an ending time on this"?  Where is it?  That's not
20  right then.
21       THE WITNESS:  Are we still at page 17?
22       MR. BRUSTIN:  Hold on.
23       THE WITNESS:  I'm sorry.
24       MR. BRUSTIN:  Let me go off the record for a
25  minute.

Page 720

1        THE VIDEOGRAPHER:  We are off the record at
2  3:01 p.m.
3        (A recess was held off the record.)
4        THE VIDEOGRAPHER:  We are back on the record
5  at 3:02 p.m.
6    Q.   BY MR. BRUSTIN:  All right.  Take a look at
7  30887 for the testimony.  Actually if you could start on
8  page 30886, just read to yourself lines 23 on 30886, line
9  23 at the bottom --
10   A.   Okay.
11   Q.   -- through line 9 on the next page.
12       Okay?
13   A.   Yes.
14   Q.   Okay.  Now, take a look at the report that's
15  right in front of you, and you see the report indicates
16  that in fact it started at 1738 hours.  Correct?
17   A.   Yes.
18   Q.   And at the end of the report, it says it ended
19  at 2108 hours, which is 9:08.
20   A.   Correct.
21   Q.   Now, going back to the testimony -- got the
22  testimony out?
23   A.   Yes.
24       MS. BERKE:  You said it ended at what time?
25       THE WITNESS:  2108.

Page 721

1    Q.   BY MR. BRUSTIN:  2108, which is 9:08.
2    A.   Yes, p.m.
3    Q.   Right.  So it's clear that when you're saying,
4  "I don't know if I put an ending time on this," you're
5  reviewing the report.  You got the start times and the
6  finish times.  Correct?
7    A.   Could you restate the question, please.
8    Q.   Sure.  You're talking about your supplement,
9  and then you're saying, "I don't know if I put an ending
10  time on this," and then you give the start time and the
11  ending time.  You're obviously referring to your report
12  on the stand.  Correct?
13       MS. BERKE:  He's giving his last contact
14  time, not an ending time.
15       MR. BRUSTIN:  Right.  That's what it says in
16  the report, exactly.  It's clear you're looking at your
17  report on the stand to see if it's in there, and it is.
18  Correct?
19   A.   Possibly, yeah.
20   Q.   What other possibility is there?
21   A.   I don't know.
22   Q.   You're being asked about your supplement.
23  Correct?
24   A.   Yes.
25   Q.   And then you're talking about your supplement.

Page 722

1  "I don't know if I put an ending time on this," "this"
2  being the report you're looking at in your hands.  Right?
3    A.   (No oral response.)
4    Q.   Is that correct, sir?
5    A.   That is correct.
6    Q.   Okay.  Now, on page 30885, you're asked at line
7  21 -- on page -- I'm sorry.  On page 30 -- 30884 through
8  3086 (sic), you're asked to describe what happened --
9  what he told you about the homicide.  Correct?
10       MS. BERKE:  What line on 384 -- 30884?
11       MR. BRUSTIN:  The whole thing.
12   Q.   BY MR. BRUSTIN:  But take a look at the last
13  line on 21.  I'm saying take a look at 30885, line 21.
14  Did you ask him specific questions about the homicide?
15   A.   Yes, I did.
16   Q.   And no mention here about him saying he didn't
17  want to answer questions or talking about speaking to a
18  lawyer.  Correct?
19   A.   Not in this area, no.
20   Q.   Okay.  Now take a look at page 30886.
21   A.   Okay.
22   Q.   You're asked, "Question:  Did he ever say he
23  didn't want to answer any questions?"
24       Your answer is, "No."  Correct?
25   A.   Yes.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
723–726

Page 723

1    Q.    And you gave that answer despite the fact that
2    you had the report sitting in front of you making clear
3    that that's exactly what he said.  Correct?
4          MS. BERKE:  Objection.  Misstates evidence.
5          THE WITNESS:  When I said it, I didn't --
6    wasn't reading the report, but if that was -- if it was
7    in front of me but...
8    Q.    BY MR. BRUSTIN:  Are you telling me that you
9    forgot that despite the fact that you had the report
10   sitting in front of you and had reviewed it before --
11   before the trial -- withdrawn.
12         You reviewed the report before the trial.
13   Correct?
14   A.    Correct.
15   Q.    You had it sitting in front of you.  Correct?
16   A.    I don't know that for sure.
17   Q.    Well.  You already told us you did.  You want
18   to dispute that now?
19         MS. BERKE:  Objection.  Misstates testimony.
20         THE WITNESS:  I don't think I told you -- I
21   had -- I referred to it, but I don't say that it was with
22   me all the time.
23   Q.    BY MR. BRUSTIN:  So you knew going into this
24   voluntariness hearing that the fact that he told you he
25   didn't want to answer any questions would be important.

Page 724

1    Right?
2    A.    Yes.
3    Q.    Yet when you were asked, "Did he ever say he
4    didn't want to answer any questions," you said, "No."
5    Correct?
6    A.    Yes.
7    Q.    Now take a look at your report at 2327.  He
8    says, "Look, I know the game.  I know exactly what you're
9    trying to do, but I'm not going to answer any more of
10   your questions."  Right?
11   A.    What paragraph is that, please?
12   A.    It's the third paragraph.
13   A.    Okay.
14   Q.    Third line.  "I know exactly what you're trying
15   to do, but I'm not going to answer any more of your
16   questions," in quotes.  Right?
17   A.    Correct.
18   Q.    Okay.  And so when you said under oath that you
19   were asked the question did he ever -- did he ever say he
20   didn't want to talk to you about it and you said no, that
21   was a lie.  Correct?
22         MS. BERKE:  Objection.  Misstates evidence.
23   Argumentative.
24         THE WITNESS:  It's a misstatement
25   definitely.

Page 725

1    Q.    BY MR. BRUSTIN:  It's a misstatement?
2    A.    But not a lie, not a lie.
3    Q.    Well, how could it be a misstatement if the
4    report was sitting in front of you?
5    A.    I didn't say that.  You said that.  You
6    initially are -- you are telling me that this report was
7    sitting in front of me.  I don't know that.
8    Q.    Okay.
9    A.    I can't even recall that.
10   Q.    So when you said, "I'm not sure what this
11   says" -- take a look again at page --
12   A.    But -- okay.
13   Q.    Before this, 30881, so just four pages
14   before -- I'm sorry -- 30887, one page after -- I'm
15   sorry -- five pages after.  It's clear you had the report
16   sitting in front of you because you say, "I don't know if
17   I put an ending time on this."  Then you say "started at
18   7:38 or 5:38, and my last contact with Eric was 9:08."
19   You're referring to the report.  Correct?
20   A.    For this question, yes.
21   Q.    Okay.  So you think what must have happened is
22   you didn't have that report up there until that answered
23   that question?
24   A.    Yes.
25   Q.    And that's how you made that fundamental --

Page 726

1    fundamental mistake?
2    A.    It was -- it was a mistake.  It was a
3    misstatement, I guess.
4    Q.    The most important question you knew to be
5    asked in this case was when he made admissions in
6    regard -- in regard to when he invoked his right to
7    remain silent.  Correct?  What could be more important in
8    a voluntariness hearing?
9    A.    I agree.
10   Q.    Yet that fundamental question you
11   misrepresented?
12         MS. BERKE:  Objection.  Misstates testimony.
13   Misstates evidence.
14         THE WITNESS:  I did.
15   Q.    BY MR. BRUSTIN:  In a homicide case?
16   A.    Yes.
17   Q.    And you're claiming that was just an innocent
18   mistake?
19   A.    Yes.
20   Q.    Now take a look at page 30893.
21   A.    93 you said.  Okay.
22   Q.    On page 30894, you admit to the misstatement.
23   Correct?
24   A.    What line?
25   Q.    Line 4 through the end.  You see that?



Page 727

1    A.   Yes, I do.

2    Q.   And you try to explain that misstatement away

3 by saying, "After making the entire statement of, 'Look,

4 I know who was playing a game,' yes."  Right?

5        Do you see that?

6    A.   "After making the entire statement of, 'Look, I

7 know who's playing a game,'" that don't even make sense.

8    Q.   Well, let's take a look --

9        MS. BERKE:  That's the question.

10   Q.   BY MR. BRUSTIN:  Take a look back at the --

11   A.   Oh, the question.

12   A.   No, it's the answer.

13   A.   I'm sorry.  That was the answer.  I didn't even

14 make sense.

15   Q.   Look at the question.  The question is, "All of

16 the material contained in your police report after he

17 said, 'I'm not going to answer any more questions' were

18 the things that he said after making the statement.  Is

19 that right?"

20        And you correct him and say, "After making

21 the entire statement of, 'Look, I know who was playing a

22 game, yes.'"

23        Now let's go back to your report.  In your

24 report on page 2 -- 327 in quotes it says, "Look, I know

25 the game.  I know exactly what you're trying to do, but

Page 728

1 I'm not going to answer any more of your questions," and

2 so what you're doing in your testimony is you're trying

3 to explain that because he said, "Look, I know the game,"

4 it's not really invoking his rights.  Correct?

5        MS. BERKE:  Objection.  Misstates evidence.

6        THE WITNESS:  I would say yes.

7    Q.   BY MR. BRUSTIN:  Okay.  In other words --

8    A.   This --

9        MS. BERKE:  He wasn't done answering the

10 question.

11        MR. BRUSTIN:  Oh, I think he was.

12   Q.   BY MR. BRUSTIN:  Do you have some more to say

13 about it?

14   A.   No, I was done.

15   Q.   In other words, you were admitting that you

16 didn't acknowledge -- you didn't acknowledge that he --

17 you were admitting that your answer -- withdrawn.

18        You were admitting that you specifically

19 didn't acknowledge he said, "I'm not going to answer any

20 more of your questions" because it was in the context of,

21 "Look, I know the game."  Correct?

22   MS. RETTS:  Form.

23        MS. BERKE:  Objection.  Misstates evidence.

24        THE WITNESS:  I don't understand that

25 question.

Page 729

1    Q.   BY MR. BRUSTIN:  It was a bad question.

2        What you're acknowledging here is that, in

3 your view, he didn't really -- he didn't really invoke

4 his right to remain silent.  Correct?  That's what you're

5 suggesting?

6    A.   Yes.  I mean, playing a game, it's -- you know,

7 it's not -- I don't think it falls within that revoking.

8    Q.   Okay.  And that's why on direct examination

9 when you were asked the question on page 30886, "Did he

10 ever specifically say he didn't want to talk to you about

11 it," and you said, "No," that's because in context you

12 determined he wasn't really invoking his right to remain

13 silent.  Correct?

14        MS. BERKE:  Objection.  Misstates evidence.

15   Q.   BY MR. BRUSTIN:  That's the reason why you

16 answered the question the way you did.  Correct?

17        MS. BERKE:  Objection.  Misstates evidence.

18        THE WITNESS:  Now, I'm -- I'm sorry.

19   Q.   BY MR. BRUSTIN:  Sure.

20   A.   I'm a little confused about the question.

21   Q.   Sure.  On direct examination, when he asked

22 you, "Did he ever specifically say he didn't want to talk

23 to you about it," and you said, "No," the reason you said

24 no is because you didn't believe it was a clear

25 indication of his right to remain silent.  Correct?

Page 730

1    A.   That's possible.  I -- I really don't recall

2 it, but I mean, that's -- that's possible, yeah.

3    Q.   And based on your answers -- based on your

4 answer on cross-examination, that makes sense.  Right?

5    A.   Yeah.

6    Q.   Okay.  You remember -- let's keep going.  Do

7 you remember the Jones case?  It was a case involving a

8 bunch of teenagers who were driving around -- I'm

9 sorry -- who were involved in the murder of a victim

10 named Chad Butcher, and they were caught driving around.

11 Do you remember that case?

12   A.   Yes.

13   Q.   Okay.  And you recall that Samuel Knott, the

14 driver, was arrested and taken into custody for

15 questioning.  Correct?

16   A.   Yes.

17   Q.   And Jones, who was driving the car, agreed

18 voluntarily to drive the victim's car to the police

19 station.  Correct?

20   A.   Samuel Knott had been driving the car, and then

21 Jones was driving the car?

22   Q.   Jones brought the car.

23   A.   Okay.

24   Q.   He volunteered to bring the car to the police

25 station.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
731–734

Page 731

1    A.    Yeah, but Samuel Knott was driving the car.
2    Q.    That's right.
3    A.    Okay.
4    Q.    And while these people were waiting -- Jones
5    waiting for Knott, they were spotted by you as you were
6    about to interrogate Knott.  Correct?
7    A.    I believe so.
8    Q.    And at that time, you directed that Jones be
9    separated from his friends and placed in a police
10   interview room.  Correct?
11   A.    I -- directed that they all be separated.
12   Q.    Well, you directed that Jones be separated and
13   placed in the police interview room in handcuffs.
14   Correct?
15   A.    No.
16   Q.    Well, you knew he was in handcuffs.  Correct?
17   A.    No.
18   Q.    You never knew he was in handcuffs?
19   A.    No, I did not.
20   Q.    Okay.  Is the first time you learning that
21   Jones was handcuffed in that room is me telling you?
22   A.    No, I read the report.
23   Q.    In preparation for today?
24   A.    Yeah.
25   Q.    But at the time you were investigating the

Page 732

1    case, you had no idea that Jones was handcuffed in that
2    room?
3    A.    No, he was just separated to --
4    Q.    Okay.
5    A.    Yes.
6    Q.    Because if you had known he had been
7    handcuffed, that would have been a big problem because
8    there was no probable cause to arrest him.  Correct?
9    A.    That is correct.
10   Q.    And you knew that.  Correct?
11   A.    Yes.
12   Q.    Okay.  So certainly you never directed him to
13   be handcuffed.  Correct?
14   A.    That's correct.
15   Q.    And you had no knowledge that he was handcuffed
16   or you would have stopped it?
17   A.    That's correct.  He could have left on his own
18   any time.
19   Q.    31084.  Now, which -- did you -- you conducted
20   interrogations of both Jones and Knott, correct, in this
21   case?
22   A.    No, Larry Martinsen did Jones, and I did Samuel
23   Knott.
24        MS. GREEN:  Do you want this?
25        MR. BRUSTIN:  No.  Okay.  Let's move on.

Page 733

1    Q.    BY MR. BRUSTIN:  Let me ask you this,
2    Mr. Saldate:  Were you aware that in this case -- the
3    judge in this case found -- the Court of Appeals found in
4    '92, "Defendant was not isolated and detained by
5    accident.  Detective Saldate admits not only to
6    directing -- directing placement of defendant in the room
7    but also having absolutely no information linking him to
8    any crime at that time.  The police comment did not
9    involve an arguable mistake."
10   A.    I was retired in 1990.  So I don't know.
11   Q.    You had no idea that the judge criticized your
12   conduct?
13   A.    I don't think that's being critical really.
14   Q.    And --
15   A.    I don't think that way.
16   Q.    The trial -- did you hear anything about the
17   crime, saying, "The arrest was a quality of
18   purposefulness, whereas an expedition for evidence
19   admittedly undertaken in the hopes something might turn
20   up is a show of flagrant misconduct."
21   A.    When was that?
22   Q.    This is the trial judge in November of 1990.
23   Have you ever heard about that?
24   A.    I was gone by then.
25   Q.    Did you testify in this case?

Page 734

1         MS. BERKE:  In which --
2         THE WITNESS:  The --
3    Q.    BY MR. BRUSTIN:  In the Jones case?
4    A.    I don't recall.  I would have in the Knott
5    case, I think, only because I did the interview, but
6    Martinsen did the interview for him.  So I don't know.  I
7    really don't recall.
8    Q.    Okay.  I want to ask you some questions about
9    the Yanes case.  Okay?
10   A.    Okay.  Yanes.
11   Q.    You remember Yanes.  Right?
12   A.    Well, I reviewed that report, yes.
13   Q.    Okay.  Let me read you the Ninth Circuit
14   finding, and you tell me if you disagree with anything.
15        In the Yanes case, according to the Ninth
16   Circuit, "Saldate admitted interrogating a suspect who
17   was strapped to a hospital bed and incoherent after
18   apparently suffering a skull fracture.  When interviewed
19   by doctors, the suspect didn't know his own name, the
20   current year or the name of the president."
21        Any part of that that you disagree with?
22   A.    Yes.
23   Q.    Which part?
24   A.    He did not -- they did not know he had a skull
25   fracture until after I left.

Page 735

1    Q.    Anything else you disagree with?

2    A.    Just -- I can't remember everything you read,

3   but that was the main part.

4          MS. BERKE:  Can you put it in front of him,

5   and then he can let you know.

6    Q.    BY MR. BRUSTIN:  I'll read it again.

7    A.    Okay.

8    Q.    "Saldate admitted interrogating a suspect who

9   was strapped to a hospital bed."

10          You admit to that.  Right?

11   A.    Yes.

12   Q.    He appeared to be incoherent.  Correct?

13   A.    Not to me, no.

14   Q.    He didn't appear incoherent to you?

15   A.    And not to the other uniform officer that was

16   there.

17   Q.    "And when interviewed by doctors, the suspect

18   didn't know his own name, the current year or the name of

19   the president."

20          Were you aware of that?

21   A.    No.

22   Q.    Now, your understanding of this case was that

23   Yanes shot his wife while he was drunk in 1982.  Correct?

24   A.    Yes.

25   Q.    Now, when you interrogated Yanes the first

Page 736

1   time, he turned his head away and gave the following

2   statements:  "He mumbled something about Eleanor, and he

3   said he was at the bar, went home, heard a shot, went

4   inside.  He began mumbling again," and it was obvious to

5   you that he had lost the attention of the suspect you

6   mentioned, and you ended the interview.  Correct?

7    A.    Correct.

8    Q.    And then you spoke to Sergeant Bryant.

9   Correct?

10   A.    Yes.

11   Q.    And he directed you to continue the interview

12   despite your assessment of his condition.  Correct?

13   A.    Correct.

14   Q.    Did he tell you why?

15   A.    No, that was his decision.

16   Q.    In other words, you determined that he wasn't

17   competent to give you information.  Correct?

18   A.    I -- he probably wasn't.

19   Q.    Okay.  And Bryant told you, "That's okay,

20   interview him anyways"?

21   A.    Yes.

22          MR. BRUSTIN:  That's good enough.  Let's

23   stop the tape and -- please.  Thank you.

24          THE VIDEOGRAPHER:  We are off the record at

25   3:28 p.m.

Page 737

1          (A recess was held off the record.)

2          THE VIDEOGRAPHER:  We are back on the record

3   at 3:34 p.m.

4    Q.    BY MR. BRUSTIN:  Mr. Saldate, when you retired

5   in July of 1990, the Milke case was still an active

6   investigation.  Correct?

7    A.    Yes.

8    Q.    All right.  And you understood that what

9   happened after you retired was Detective Mills was made

10   the case agent?

11   A.    Yes.

12   Q.    And he had already been quite involved in the

13   investigation.  Correct?

14   A.    He was the original person involved, yes.

15   Q.    All right.  And when he took over, he stepped

16   into your shoes as the case agent going forward.

17   Correct?

18   A.    That's correct.

19   Q.    In other words, he was the person who became

20   responsible for ensuring, along with the supervisors,

21   that any follow-up investigation that needed to be done

22   was done.  Correct?

23   A.    That is correct.

24   Q.    He was responsible for ensuring that everything

25   that had been done already was done properly and didn't

Page 738

1   need any follow-up.  Correct?

2    A.    Yes, for the most part, yes.

3    Q.    He -- he was responsible for becoming the case

4   agent in all the subsequent hearings and trial.  Correct?

5    A.    Correct.

6    Q.    He had a very big responsibility?

7    A.    No bigger than mine when I was there.

8    Q.    Okay.  Well, except that when he became the

9   case agent later in the case, he would be responsible for

10   learning the entire case at that point in time.  Correct?

11   A.    Well, he was there from the beginning.  So he,

12   you know --

13   Q.    But he was responsible for reviewing all the

14   reports.  Correct?

15   A.    He should have, yes.

16   Q.    Okay.  Particularly before he testified at any

17   hearings or trial.  Correct?

18   A.    I would hope so, yeah.

19   Q.    And for example, if he noticed that there were

20   any problems with anything that you had done, you would

21   have expected him to follow up with you.  Correct?

22          MS. RETTS:  Foundation.

23          THE WITNESS:  Yeah.

24   Q.    BY MR. BRUSTIN:  You certainly made yourself

25   available even after you retired to answer questions



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
739–742

Page 739

1  about the case.  Correct?
2  A.   I was subpoenaed a lot, yeah.
3  Q.   Okay.  But certainly if Detective Mills had any
4  questions about anything you had done, you would have of
5  course spoken to him.  Correct?
6  A.   Sure.
7  Q.   Did Detective Mills contact you after you
8  retired?
9  A.   No.
10  Q.   About any of the actions you took in the case?
11  A.   No.
12  Q.   Did you talk to Detective Mills at any time
13  before the trial about the case?
14  A.   I don't think so.
15  Q.   All right.  Do you remember the Conde case?
16  It's the death of a Phoenix police officer.
17  A.   Yes.
18  Q.   Another high-profile case.  Right?
19  A.   Yes.
20  Q.   And you worked that case with Mills as well?
21  A.   Probably, yeah.  I mean, I don't really recall
22  who it was, but -- we had so many officers involved in
23  that case.  So...
24  Q.   Okay.  And this was another case where you
25  interrogated a suspect in a hospital.  Correct?

Page 740

1  A.   Yes.
2  Q.   And at the time you attempted to interrogate
3  Mr. Conde, he was intubated and connected to an
4  intravenous line.  Correct?
5  MS. RETTS:  Form.
6  THE WITNESS:  He was connected to --
7  MS. BERKE:  Misstates --
8  THE WITNESS:  I don't know if he was
9  intubated.
10  Q.   BY MR. BRUSTIN:  Okay.
11  A.   He wouldn't have been able to talk to me.
12  Q.   Okay.  Well, he was -- also appeared to be,
13  based on your report, in pain and drifting in and out of
14  consciousness?
15  A.   I believe so.
16  Q.   And sometimes when you were speaking to him,
17  you had to shake him just to get his attention?
18  A.   I believe so.
19  Q.   And you continued questioning him for a period
20  of time in that state.  Correct?
21  A.   That's correct.
22  Q.   And in your report, you write that you could
23  not determine whether he was responding because he didn't
24  understand his rights or because he was not alert
25  enough -- alert enough to hear them.

Page 741

1  A.   I believe so.
2  Q.   Right?  Now, you understood that either --
3  either one of those reasons would be sufficient for you
4  not to question him further.  Correct?
5  A.   Correct.
6  Q.   Yet you did.  You continued to question him?
7  A.   I did.
8  Q.   And why did you continue to question him?
9  A.   I want to say that I was directed to continue
10  questioning him, but I don't remember who told me to.  It
11  was a sergeant or -- it was a high-profile case where
12  they needed -- a police officer had been killed.
13  Q.   Okay.
14  A.   But I'm not totally sure.
15  Q.   Okay.  And so this was -- another example of a
16  case where you determined that a suspect was not in a
17  state to continue answering questions, but you were
18  directed to do so anyways by a supervisor?
19  A.   I believe that was the case.
20  Q.   Okay.  In other words, you were directed that
21  because this was a high-profile case, it involved the
22  death of a police officer, it was necessary to break the
23  rules?
24  MS. RETTS:  Form.
25  THE WITNESS:  I was just told to do it.

Page 742

1  Q.   BY MR. BRUSTIN:  Okay.  Did I describe it
2  accurately?
3  MS. BERKE:  He was -- he was in the middle
4  of giving his answer.  Can you please let him finish.
5  Q.   BY MR. BRUSTIN:  Did I describe it accurately?
6  MS. BERKE:  Let him finish his answer, and
7  then he will answer your next question.
8  THE WITNESS:  I was -- now I'm all confused.
9  Q.   BY MR. BRUSTIN:  Fair enough.  Let me ask a
10  different question.
11  I'm obviously not using the words they used,
12  but I'm using my own words.  Is my characterization a
13  fair one, that a supervisor determined that because of
14  the nature of the case, it was necessary for you to break
15  the rules?
16  MS. RETTS:  Form.  Foundation.
17  THE WITNESS:  I wouldn't say break the
18  rules, but, you know, yeah, probably right, but, again, I
19  just don't remember whether I was told that directly by a
20  supervisor or not.
21  Q.   BY MR. BRUSTIN:  Okay.  You may have done it
22  yourself or you may have been told by a supervisor?
23  A.   I may have been told by another detective that
24  had contact with the supervisor or something.  I just
25  don't remember.

Exhibit 1

Page 743

1    Q.    Now, you remember the Maler case.  Correct?
2    A.    Yes, the Maler case.
3    Q.    Maler.  Sorry.  That's the case where Maler and
4  his -- Maler and Ross killed a drug dealer in her home.
5  Correct?
6    A.    Correct.
7    Q.    And in this case, during the interview, Maler
8  told you -- Maler told you that he did not want to talk
9  about a murder because he knew that the State could make
10  him swallow a pill for murder.  Correct?
11    A.    Yes.
12    Q.    In other words, he invoked his right to remain
13  silent?
14    A.    Yes.
15    Q.    And you continued to question him.  Correct?
16  Correct?
17    A.    I told him I didn't need his statement, I
18  think, something to that effect, and then --
19    Q.    What you said to him is, "Then I explained that
20  I had good -- good case in him and that I was not there
21  to get his admissions but more important to get his side
22  of the story."
23        Do you remember saying that?
24    A.    Yes.
25    Q.    In other words, you continued to question him.

Page 744

1  Correct?
2    A.    Yes.
3    Q.    And that wasn't true.  You weren't there to get
4  his side of the story.  You were there to get him to make
5  admissions.  Correct?
6    A.    His side of the story, yes.
7    Q.    Well, if his side of the story was I didn't do
8  this, you had no interest in it.  Your interest was in
9  him admitting to the crime.  Correct?
10    A.    Obviously I'm the detective assigned to the
11  case, yeah.
12    Q.    Okay.  And when you told him that you were
13  interested in getting his side of the story, you were
14  telling them -- you were telling him that so that you
15  could get him to keep talking.  Correct?
16    A.    Yes.
17    Q.    Despite his invoking his right to remain
18  silent?
19    A.    Yes.
20    Q.    And he immediately responded that he knew the
21  game that you were trying to play with him and that you
22  were either going to get him a lawyer or cut his
23  girlfriend a deal before he said anything.  Right?
24    A.    Yes.
25    Q.    And in other words, he was saying, As long as

Page 745

1  my girlfriend is not going to be charged in this case, he
2  would talk to you.  Correct?
3    A.    I think his specific thing was that he wanted
4  his girlfriend released.
5    Q.    Okay.  Well, he said he wanted a deal before he
6  said anything.  Correct?
7    A.    Yeah, his girlfriend released.
8    Q.    Okay.  Well, do you think he thought that she
9  was going to get rearrested?
10    A.    He was?
11    Q.    What he was suggesting to you -- you understood
12  what he was asking you?
13    A.    That he wanted her released.
14    Q.    Right.  And not prosecuted.  Correct?
15    A.    He wanted her released.  That's all he told me,
16  and by that time, I indicated in the supplement I had --
17  didn't really care, and I just went on, told the FBI
18  agents what he had said.
19    Q.    Well, I know what you wrote in your report.
20  Now, you understood that you didn't have authority to
21  prevent his girlfriend from being prosecuted.  Correct?
22    A.    That's correct.
23    Q.    Okay.  The only authority you had was to
24  release her that evening.  Correct?
25    A.    I had no authority at all.  She wasn't my

Page 746

1  arrest.  So I don't know.  I -- I didn't even know she
2  was under arrest --
3    Q.    Well, you --
4    A.    -- or in custody or anything like that.
5    Q.    Despite the FBI involvement, you were taking
6  the lead in this investigation.  You did the
7  interrogation because you said it was a death penalty
8  case.  Correct?
9    A.    It's -- I was taking the lead in the murder
10  investigation, but the robbery investigation was Sergeant
11  Baxter and the FBI agents for the bank robberies.
12    Q.    Okay.  Now, you understood when you let his
13  girlfriend go --
14    A.    I didn't do that.
15    Q.    Oh, I'm sorry.  It was the FBI decision
16  completely?
17    A.    Yes, I --
18    Q.    You had no authority?
19        MS. BERKE:  You're interrupting him.  Let
20  him finish his answers.
21        THE WITNESS:  I had no authority, didn't
22  even know where she was at, didn't even know her name.  I
23  didn't know anything about that.
24    Q.    BY MR. BRUSTIN:  Okay.  And it was after Maler
25  requested -- invoked his right to remain silent and after



Page 747

1  he suggested you either have to let his girlfriend go or
2  he wanted a lawyer when he made admissions.  Correct?
3    A.   Yes.
4    Q.   Now, were you aware that the Arizona Court of
5  Appeals found that Maler had made an unequivocal
6  invocation to remain silent and that you were -- the law
7  was clear that you were required to immediately terminate
8  the interview?  Did you ever learn that?
9    A.   When was that done?
10   Q.   That was done in '92.
11   A.   No, I understood that the Court had reviewed
12  the first -- the trial Court had reviewed that I didn't
13  do anything wrong, but after that, I didn't know any -- I
14  didn't keep up with anything.
15   Q.   Now, you remember the Rodriguez case.  That's
16  the case involving the kid being shot on the bike with a
17  shotgun?
18   A.   Yes, I do.
19   Q.   And I asked you -- I actually had asked you a
20  few questions about that in your last deposition.  You
21  remember that?
22   A.   No, I don't, but I'm sure you did.
23   Q.   I think actually what happened is you
24  volunteered some information about it.  In fact what you
25  told us was that the court reporter made a mistake and

Page 748

1  claimed that you said this person was shot four times as
2  opposed to once.  Correct?
3    A.   That's correct.
4    Q.   And you were certain about that.  Correct?
5    A.   Yeah, I'm certain.
6    Q.   That's why you volunteered it.  Right?
7    A.   I don't know why.  I can't say why I told you
8  or not.  I'm being questioned.  I don't know.
9    Q.   Sure.  In 1986, the Court in this case found
10  having -- "The Court, having been informed that the
11  reporter's notes in the transcript of the grand jury both
12  reflect that the testimony of the State's witnesses --
13  witness was that the deceased was shot four times and the
14  Court having been advised by the State and defense
15  counsel in the hearing of this matter that the facts in
16  this case are undisputed that the deceased was shot only
17  one time, it is ordered granting the motion for
18  redetermination of probable cause."
19        In other words, the Court in 1986 found that
20  in fact, as the notes and the transcript indicated, you
21  said four times.  Correct?
22   A.   I will solidly say I did not say four times
23  because I was the one that recovered the shell.
24   Q.   Okay.
25   A.   And I was the one that had indicated in my

Page 749

1  reports that there was one shot fired.
2    Q.   Okay.  So the Court was wrong.  Correct?
3    A.   I think the Court was wrong.
4    Q.   And the court reporter was wrong?
5    A.   I think the court reporter made a mistake.
6    Q.   Okay.  In other words, it's not even possible
7  that you made a mistake.  They made a mistake?
8    A.   It's possible that I made a mistake, but in
9  this case, no.
10   Q.   Okay.  Not possible?
11   A.   Not possible.
12        MR. BRUSTIN:  Okay.  I'm going to stop now,
13  save my time.
14        THE VIDEOGRAPHER:  We are off the record at
15  3:47 p.m.
16        (A recess was held off the record.)
17        THE VIDEOGRAPHER:  We are back on the record
18  at 4:11 p.m.
19
20            EXAMINATION
21  BY MS. BERKE:
22   Q.   You've been questioned at length by plaintiff's
23  counsel about your role in the Christopher Milke death
24  investigation.  Is that correct?
25   A.   That's correct.

Page 750

1    Q.   And that murder took place in December of 1989.
2  Correct?
3    A.   That is correct.
4    Q.   And you were involved in that investigation
5  from that point through the point of your retirement on
6  July 10th of 1990.  Correct?
7    A.   Correct.
8        MR. BRUSTIN:  Objection to the form.
9  Leading.
10   Q.   BY MS. BERKE:  And it's now 2017.  Correct?
11        MR. BRUSTIN:  Objection to the form.
12  Leading.
13        THE WITNESS:  Yes.
14        MR. BRUSTIN:  You have to just give me a
15  second.
16        THE WITNESS:  Oh, I'm sorry.
17        MR. BRUSTIN:  It's okay.
18   Q.   BY MS. BERKE:  What year is it?
19   A.   2017.
20   Q.   And describe your memory of the events of the
21  Milke investigation now as compared to back in 1990,
22  1989.
23        MR. BRUSTIN:  Object to the form.  Vague.
24  Confusing.  Compound.
25        THE WITNESS:  It was a lot better back in



Page 751

1  1990 than it is now.  I mean, it's been many years, and
2  many things have happened.
3      Q.   BY MS. BERKE:  Many life events?
4      A.   Many life events.  So...
5      Q.   A whole other career?
6      A.   Whole other career.  So...
7      Q.   You've also been asked about your involvement
8  in other investigations that took place in the 1980s and
9  through your retirement in July of 1990.  You recall that
10  questioning?
11      A.   Yes.
12      Q.   And is it -- would your answer be the same in
13  terms of your memory of those investigations in -- in
14  2017, more than 27 years later?
15          MR. BRUSTIN:  Objection to the form.
16  Leading.
17          THE WITNESS:  I -- yes, especially the ones
18  that were in the early '80s.  I mean, I -- as I
19  testified, there was some that I couldn't remember at
20  all.
21      Q.   BY MS. BERKE:  Have you done your best to
22  answer Mr. Brustin's questions accurately and to the best
23  of your ability?
24      A.   Yes.
25      Q.   Describe the amount of time you have spent

Page 752

1  reviewing documents from all of these investigations, the
2  Milke investigation, these other investigations, to try
3  to get ready for your deposition.
4      A.   Well, 13 -- ten and a half hours this last --
5  this slot for this last one.  I think the previous one
6  was -- I can't remember, but it's three or four days
7  because he asked me the same questions.  So it will be on
8  the record.  It's been a substantial amount of time that
9  I've spent on it.
10      Q.   And would it be possible to review every
11  document, transcript, grand jury transcript, trial
12  transcript from every one of the investigations you've
13  been involved in as a homicide detective --
14          MR. BRUSTIN:  Objection to form.  Vague.
15  Leading.
16      Q.   BY MS. BERKE:  -- in order to prepare for your
17  deposition today?
18          MR. BRUSTIN:  I'm sorry.  Objection to the
19  form.  Vague.  Leading.  Compound.
20          THE WITNESS:  It would be very difficult to
21  do that.  I mean, I -- I tried, you know, but, you know,
22  I don't have a photographic memory, nor am I the smartest
23  person around.  So...
24      Q.   BY MS. BERKE:  Some of the investigations you
25  were questioned about today, did you review the documents

Page 753

1  in preparation or -- strike that.
2          As to some of the investigations that you
3  were questioned about today, did you review documents
4  from those case files in our meetings that we had just in
5  these past couple weeks?
6      A.   Yes.
7          MR. BRUSTIN:  Objection to the form.  Vague.
8          THE WITNESS:  I'm sorry.
9      Q.   BY MS. BERKE:  Are there some documents from
10  those investigations that were reviewed when you prepared
11  for prior sessions of your deposition?
12          MR. BRUSTIN:  Objection to the form.
13  Leading.
14          THE WITNESS:  Yes.
15      Q.   BY MS. BERKE:  Do you have any health issues
16  that affect your memory?
17          MR. BRUSTIN:  Objection to the form.
18  Foundation.
19          THE WITNESS:  Um --
20          MR. BRUSTIN:  Calls for expert testimony.
21          THE WITNESS:  I had a severe concussion that
22  I'm still being looked at.
23      Q.   BY MS. BERKE:  How did you sustain that
24  concussion?
25      A.   I fell.  We were in, I say, South Dakota.  We

Page 754

1  had gone to see -- visit Mount Rushmore, and I just -- I
2  must have hit something or, you know, a higher thing, but
3  I immediately just went flat on my face, lost
4  consciousness for probably seconds.  Next thing I know,
5  my son was trying to pick me up, and he did.
6          We remained in Colorado for a couple weeks,
7  wanting to -- we were going to stay longer, but, you
8  know, we stayed in Colorado for a couple of weeks, but my
9  wife started to get -- I -- I was getting lost while I
10  was there, and in fact I got lost for half a day in
11  Colorado.
12          I was getting headaches, and just my balance
13  was totally out of it.  I couldn't even -- I couldn't
14  close my eyes or I would fall.
15          So we got back here -- shortly before we
16  were going to leave, I fell again in my son's front yard.
17      Q.   In Colorado?
18      A.   In Colorado.  I hit my chest and my head also
19  again, and I -- then we decided to come home and went to
20  St. Joseph's Hospital.  And then I was assigned to
21  Barrow's Neurological and Dr. Cardenas, and he still
22  won't release me, but he says I'm doing better.
23          I just have problems with word find,
24  especially when I get excited or, you know, I have --
25  word finding is real hard for me to do when I get really



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
755–758

Page 755

1  nervous and stuff or really have to think about it, but
2  I'm doing a lot better now.
3      Q.   Do you still have memory issues, or have those
4  resolved?
5      MR. BRUSTIN:  Objection to the form.
6  Foundation.  Leading.  Calls for expert testimony.
7      THE WITNESS:  I -- I have some -- a memory
8  problem, but I've been really, really conscious about
9  zeroing in on what questions are and -- and also the
10  review of the reports, but, see, I can't seem to -- I can
11  read -- review a report and read it, but it just doesn't
12  seem to last very long, you know, in my mind.
13      Q.   When did this fall occur?
14      A.   This occurred June or July.
15      Q.   Of what year?
16      A.   Of '16.
17      Q.   2016?
18      A.   Yes.
19      Q.   You mentioned the fall occurred at Mount
20  Rushmore, and then you talked about being at your son's
21  home in Colorado.  Can you explain that?
22      A.   Yeah.  It occurred in Mount Rushmore.  I
23  refused to go to a doctor, and my son and my wife were
24  anxiously wanting me to go.  But I just -- I don't go to
25  doctors that much, but then I --

Page 756

1      Q.   Well, how did you get to Mount Rushmore in
2  South Dakota?
3      A.   I went with my son.  My son drove and stuff,
4  and then when we got -- we came back the very next day
5  because of my fall.  And then I didn't think I was
6  suffering from anything other than a couple days later is
7  when it started really affecting me, you know.
8      Q.   And so you and your son had driven from his
9  home in Colorado to Mount Rushmore?
10      A.   He drove, yes.
11      Q.   Okay.  And then after your fall, you went back
12  to his home in Colorado?
13      A.   Yes.
14      Q.   And then returned to Phoenix?
15      A.   Yeah, two weeks later.
16      Q.   Okay.  And then when you were referred by St.
17  Joseph's Hospital to Barrow's Neurological, did you then
18  start receiving treatment there?
19      A.   Yes, I -- I was assigned to therapy of --
20  speech therapy, physical therapy and one other one.
21  She -- therapy that she took my driver's license or
22  wanted to take my driver's license because she didn't
23  want me to drive.  What do they call it, taking my pills
24  and --
25      Q.   Occupational?

Page 757

1      A.   Occupational.
2      Q.   And has that treatment been ongoing since you
3  initially presented to the hospital?
4      A.   It's -- it was ongoing, but I ran out of
5  visits, and I'm waiting for my next visit with
6  Dr. Cardenas.  If he releases me, then I probably won't
7  need it, but if he doesn't, then -- because he wanted me
8  to go again for speech therapy.
9      Q.   If you have given any testimony in this case
10  that's inconsistent with prior testimony that you gave in
11  Ms. Milke's case or any other criminal case that you were
12  involved in the investigation for, was that intentional?
13      MR. BRUSTIN:  Objection to the form.
14  Leading.  Vague.  Argumentative.
15      THE WITNESS:  No.
16      Q.   BY MS. BERKE:  If you have given any testimony
17  in this case that's inconsistent with your testimony in
18  the Milke case or any of the other criminal cases in
19  which you were involved in the investigations, which do
20  you think would be more accurate and why?
21      MR. BRUSTIN:  Objection.  Leading.
22  Compound.  Vague.
23      THE WITNESS:  My reports are definitely more
24  accurate because --
25      MR. BRUSTIN:  Sorry about that.

Page 758

1      THE WITNESS:  My -- my reports and when the
2  incident occurred when I was on the department would be
3  more accurate than now, but, you know, I try the very
4  best I can.  So...
5      Q.   BY MS. BERKE:  And how old are you?
6      A.   Sixty-eight years old.
7      Q.   Do you think your age has any effect on your
8  memory at all?
9      MR. BRUSTIN:  Objection.  Form.  Foundation.
10  Leading.
11      THE WITNESS:  He's checking into that, but I
12  think it does.  I mean, you know, I just -- I think it's
13  just old age.
14      Q.   BY MS. BERKE:  Have you ever knowingly made any
15  false or inaccurate statements in any police report
16  you've prepared?
17      A.   No.
18      MR. BRUSTIN:  Objection to the form.
19  Leading.
20      THE WITNESS:  I'm sorry.
21      MR. BRUSTIN:  Actually I withdraw that.
22      Q.   BY MS. BERKE:  In those instances where you
23  have continued questioning a suspect after that suspect
24  has stated that they didn't want to answer any more of
25  your questions or something to that effect, did you



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
759–762

Page 759

1 record that information in the police report you prepared
2 that the suspect told you that?
3        MR. BRUSTIN: Objection to the form. Vague.
4 Leading.
5        THE WITNESS: Absolutely.
6    Q.    BY MS. BERKE: And so as an example, you were
7 asked about -- hang on just a second.
8        So for example, in the Runningeagle case --
9 it's Exhibit Number 64 -- you stated in your report at
10 RUN015 in the first paragraph, quote, I again told him
11 that I would try to understand, but he replied that he
12 wanted to remain silent, end quote.
13        That's what you recorded in your report.
14 Correct?
15    A.    That is correct.
16    Q.    And if somebody told you that they wanted to
17 remain silent, would you always record that in your
18 report?
19        MR. BRUSTIN: Objection to the form.
20 Leading.
21        THE WITNESS: Yes.
22        MR. BRUSTIN: Mischaracterizes prior
23 testimony.
24    Q.    BY MS. BERKE: If Ms. Milke had told you that
25 she wished to remain silent, would you have recorded that

Page 760

1 in your report of your interview of her?
2        MR. BRUSTIN: Objection. Objection.
3 Leading. Asked and answered.
4        THE WITNESS: Yes.
5    Q.    BY MS. BERKE: Did Ms. Milke ever tell you she
6 wished to remain silent?
7        MR. BRUSTIN: Objection. Asked and
8 answered.
9        THE WITNESS: No.
10    Q.    BY MS. BERKE: Similarly, when a suspect has
11 told you that they wanted an attorney or they believe
12 they might need an attorney, have you always recorded
13 that in your reports?
14    A.    Yes.
15    Q.    And for instance, in the Rangel case, the
16 suspect that you were questioned about today, as
17 Mr. Brustin pointed out, Mr. Rangel stated three times,
18 "I believe I might need an attorney." Correct?
19    A.    That is correct.
20    Q.    And you quoted him as saying that in your
21 report. Correct?
22    A.    I did.
23    Q.    And why is that?
24    A.    Well, it's to be honest to the case. It's --
25 you know, I -- I did it because he has every right --

Page 761

1 that person I'm interrogating has every right to, you
2 know, a fair shake, too.
3    Q.    And is part of what you're trying to do
4 accurately record the information that's being provided
5 to you by the suspect you're interviewing?
6    A.    Yes.
7    Q.    If Ms. Milke had told you that she wanted an
8 attorney, would you have recorded that in your report
9 concerning your interview of her?
10    A.    Absolutely.
11        MR. BRUSTIN: Objection. Leading.
12        THE WITNESS: Absolutely.
13    Q.    BY MS. BERKE: Did she ever request an attorney
14 while you were interviewing her?
15        MR. BRUSTIN: Objection. Asked and answered
16 and leading.
17        THE WITNESS: No.
18    Q.    BY MS. BERKE: Was there ever a discussion with
19 Ms. Milke about the topic of an attorney?
20    A.    There was.
21    Q.    And when did that occur?
22    A.    That occurred on our way back to Phoenix, and
23 she asked me if I would call her father and see if he
24 would get her an attorney. And I did.
25    Q.    And did you do that? And did he agree to get

Page 762

1 her an attorney?
2    A.    He said he wouldn't but that he'd call her
3 mother and that she would take care of that.
4    Q.    Has there ever been an instance where a suspect
5 told you that he or she wished to remain silent or did
6 not want to answer your questions where you did not
7 recite that information in the report you prepared?
8        MR. BRUSTIN: Objection. Form. Leading.
9        THE WITNESS: Never. No, I put it down all
10 the time, every time.
11    Q.    BY MS. BERKE: Any time a suspect has requested
12 an attorney or made a statement to the effect that he or
13 she believes he might need an attorney during an
14 interview or interrogation you're conducting, did you
15 record that information in your report?
16        MR. BRUSTIN: Objection. Leading.
17        THE WITNESS: Yes, I did.
18    Q.    BY MS. BERKE: Have you ever lied under oath?
19    A.    No.
20    Q.    Have you ever made misstatements while
21 testifying under oath?
22    A.    Probably, yes.
23    Q.    Did you ever do that intentionally?
24    A.    No.
25    Q.    When you were a detective, did you try your



Exhibit 1

Page 763

1 best to be fully prepared for questioning in Court?
2     A.    Yes, but there was some time restraints because
3 I was a very busy homicide detective.  I was getting
4 called out a lot specifically because I was close to the
5 downtown area.  I lived there.  I would go home, and, you
6 know, so I -- I was called out a lot.
7     Q.    Describe your workload when you were working as
8 a homicide detective in 1989/1990 time frame.
9     A.    Well, I -- I would take -- I think I took about
10 a hundred -- less -- maybe less than -- 80 to a hundred
11 homicides and then death investigations and suicides, and
12 then I assisted in probably all the rest of them almost,
13 again, because I was always home, and I, you know, would
14 respond.  And so there was a lot of cases.
15     Q.    And how many -- what -- what was your normal
16 workweek in terms of hours involved in a homicide
17 investigation, setting aside testimony in court, just
18 doing your homicide investigations?
19         MR. BRUSTIN:  When?
20     Q.    BY MS. BERKE:  In the 1989/1990 time frame.
21     A.    I worked the hours of 6:00 to 2:00 and had
22 Sunday/Mondays off.
23     Q.    Just Sunday/Monday?
24     A.    Sunday -- no -- yeah, Sunday/Monday.
25     Q.    Okay.

Page 764

1     A.    No -- yeah, it was just Sunday/Monday.  We were
2 working five-day workweeks then.
3     Q.    Okay.  So Sunday/Mondays off, 6:00 a.m. to 2:00
4 p.m., and were there ever times you got called out at
5 night?
6     A.    All the time.
7     Q.    And --
8     A.    I mean, I'd get -- mainly my -- a large portion
9 of my callout was during dinnertime before the night
10 detectives would come on.  I'd get sergeant -- the desk
11 sergeant would call me and says, Armando, can you go take
12 this death investigation for us, you know.  We don't have
13 a night detective available.  They don't come in for a
14 half hour or so.  I said, Sure, I'll go take it, and then
15 come back, and we'd have dinner and stuff.
16     Q.    Were there times where you would be working all
17 night on a homicide investigation and then you have to go
18 testify in court the next day?
19     A.    Absolutely.
20     Q.    Commonly?
21     A.    Commonly.
22     Q.    And so when would you review your reports to
23 prepare for the testimony?
24     A.    Usually just --
25         MR. BRUSTIN:  Objection to the form.  Vague.

Page 765

1         THE WITNESS:  Usually just before I would
2 hit the stand.  You know, I would be reading it as I was
3 going in and tossing it on the prosecutor's desk and
4 taking my seat when I was called.
5     Q.    BY MS. BERKE:  Were you often -- or describe
6 the amount of sleep you had typically before going in to
7 testify in these cases.
8         MR. BRUSTIN:  Object to form.  Leading.
9         THE WITNESS:  I suffer from insomnia.  I
10 usually only get at the most four hours of sleep a night,
11 and that was -- I mean, I work shifts of 30 -- 35, I
12 think.  Thirty-five hours straight was the longest shift
13 I worked without getting a break, you know.  I went from
14 one homicide to another, assisting another homicide
15 because we were backed up.
16     Q.    BY MS. BERKE:  Okay.  So would you be working
17 multiple homicide investigations at one time?
18     A.    Oh, yes, because I would be assisting in
19 others.  I may have taken -- they may have assigned me
20 one case, but I'd be assisting in others.  I'd be making
21 supplementals.  I'd be following up on people that they
22 had assigned me for originally to get their interview but
23 weren't available.  So I had to do that and also
24 follow-ups on my own, you know.
25     Q.    And so were some of the trials in which you

Page 766

1 testified long after you had completed your
2 investigations?
3     A.    The trials would take some time, but, you know,
4 the testimony of grand jury and all the other hearings
5 that come before the trial, they would be rather -- you
6 know, within a couple months.
7     Q.    Okay.  But sometimes would the trials be many
8 months after you completed your --
9     A.    Oh, the trial -- the actual trial would be,
10 yes.
11     Q.    So sometimes when you were preparing for a
12 trial in a case, you're working on other investigations
13 and then reeducating yourselves -- yourself on that
14 case --
15     A.    Yes.
16     Q.    -- that you're testifying in?
17     A.    Yes, that's correct.
18     Q.    So you have a lot to keep in your mind and keep
19 track of.  Correct?
20         MR. BRUSTIN:  Objection to the form.
21 Leading.
22         THE WITNESS:  That -- that is correct.
23     Q.    BY MS. BERKE:  And is that difficult to do
24 sometimes?
25     A.    It was difficult then.  It's more difficult



Exhibit 1

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
767–770

Page 767

1  now.  Difficult then.
2  Q.   If you gave testimony in a grand jury
3  proceeding that was inconsistent with something that was
4  contained in the report you prepared, what did you expect
5  to happen to rectify that?
6  A.   I would expect the prosecutor would have
7  noticed and would have brought that up to my attention
8  and maybe had me correct it.
9  Q.   And did that happen on occasion?
10  A.   On occasion.
11  Q.   And so is one of the reasons you made such
12  detailed reports was so that could assist you in the
13  event you didn't remember something correctly?
14         MR. BRUSTIN:  Objection to the form.
15  Leading.
16         THE WITNESS:  That is correct.
17  Q.   BY MS. BERKE:  What did you expect to happen in
18  a criminal trial if you gave testimony that was
19  inconsistent with something in your report?
20  A.   I think that the prosecutor and the defense
21  attorney would probably have brought it up.
22  Q.   Okay.  And did you ever give testimony
23  inconsistent with your report intentionally?
24         MR. BRUSTIN:  Objection.  Asked and
25  answered.

Page 768

1         THE WITNESS:  Absolutely not.
2  Q.   BY MS. BERKE:  You were asked in the first
3  session of your deposition whether you had reviewed the
4  transcript of Roger Scott, and you responded yes.  What
5  transcript were you referring to that you reviewed?
6  A.   The transcript of Roger Scott's interview with
7  Bob Mills that had been typed up.
8  Q.   Okay.  And just to be more specific, you had
9  been asked what you had reviewed to prepare for your
10  deposition?
11  A.   Yes.
12  Q.   And so the transcript that you reviewed of
13  Roger Scott in preparation for your deposition was the
14  typed transcript of the interview he gave to Detective
15  Mills?
16  A.   That is correct.
17  Q.   And you were also asked if you had reviewed the
18  transcript of James Styers to prepare for your
19  deposition, and you responded yes.
20  A.   I believe that was a misstatement because I
21  don't think I ever reviewed his trial testimony.
22  Q.   Okay.  So you were mistaken?
23  A.   Yes.
24  Q.   You were asked also at page 12 of your
25  deposition if you had reviewed the transcript of Sandra

Page 769

1  Pickenpaugh, and you had responded yes.  What transcript
2  was it that you had reviewed in preparation for your
3  deposition?
4         MR. BRUSTIN:  Objection to form.  Leading.
5         THE WITNESS:  Okay.  The transcript that was
6  prepared, I guess, from the tape recording that she had
7  made of us -- the interview with me.
8  Q.   BY MS. BERKE:  So did you review any of her
9  trial testimony?
10  A.   No.
11  Q.   There was some questioning in your deposition
12  about whether you ever lie to suspects and/or witnesses
13  during interviews or interrogations.  You testified that
14  you tried to be honest with both suspects and witnesses.
15  Do you recall that testimony?
16  A.   Yes.
17         MR. BRUSTIN:  Hold on.
18         THE WITNESS:  I'm sorry.
19         MR. BRUSTIN:  Object to the form.  Leading.
20  Mischaracterizes his prior testimony.
21  Q.   BY MS. BERKE:  Is it improper for a police
22  detective to use trickery and deception in questioning a
23  witness or a suspect?
24         MR. BRUSTIN:  Objection to form.  Leading.
25         THE WITNESS:  No, it isn't.  It just wasn't

Page 770

1  my style.
2  Q.   BY MS. BERKE:  And so generally you tried to be
3  truthful?
4  A.   Generally, yes, I tried to be as truthful as
5  possible.
6         MR. BRUSTIN:  Objection.
7  Q.   BY MS. BERKE:  In interviewing witnesses?
8  A.   In interviewing witnesses.
9  Q.   And suspects?
10  A.   And suspects.
11         MR. BRUSTIN:  You've got to slow down.
12         THE WITNESS:  I'm sorry.
13         MR. BRUSTIN:  That's okay.
14  Q.   BY MS. BERKE:  During your interview of Debra
15  Milke, you told her that both Roger Scott and James
16  Styers had implicated her in Christopher's murder.  Was
17  that accurate?
18         MR. BRUSTIN:  Objection to form.  Leading.
19         THE WITNESS:  No, it was not.
20  Q.   BY MS. BERKE:  How was that inaccurate?
21         MR. BRUSTIN:  Same objection.
22         THE WITNESS:  I had not gotten a confession
23  from James Styers.
24  Q.   BY MS. BERKE:  Confession wasn't what I was
25  talking about.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
771–774

Page 771

1  A.  Or --
2  Q.  Implicating Debra Milke?
3  A.  Oh, yeah.  No, no, it was -- I had not gotten
4  that from him.  So --
5  Q.  From Styers?
6  A.  -- it was a misstatement on my part.
7  Q.  Okay.  But had you gotten that from Roger
8  Scott?
9  A.  I had it from Roger Scott.
10  Q.  So Roger -- it was true that Roger Scott had
11  implicated Debra Milke, but it was untrue that James
12  Styers had implicated her?
13  MR. BRUSTIN: Objection to form.  Leading.
14  THE WITNESS: It was a misstatement, yes.
15  Q.  BY MS. BERKE: I'd like you to take a look at
16  your deposition, the first volume, if I can find it here.
17  MS. BERKE: Is it in front of him?
18  MR. BRUSTIN: I don't think so.
19  MS. GREEN: No, it's not.
20  MR. BRUSTIN: You took it.
21  MS. GREEN: No, we didn't put that in front
22  of him today.
23  MS. BERKE: Okay.
24  MS. GREEN: Or do you want one of our
25  copies?  We have one.

Page 772

1  MS. BERKE: Yeah, that would be great.
2  Thank you.
3  THE WITNESS: Thank you.
4  Q.  BY MS. BERKE: If you take a look at page 114,
5  read to yourself page 114, line 14, to page 115, line 12.
6  MR. BRUSTIN: One -- I'm sorry.  114.
7  MS. BERKE: 114, line 14, to page 115, line
8  12.
9  THE WITNESS: You said page 109 to --
10  Q.  BY MS. BERKE: I'm sorry, no.  114.  Do you see
11  where page 114 is?  Let me know when you get to 114, and
12  I'll remind you of the line.
13  A.  Oh, I see there's four pages in each.  Okay.
14  Q.  Yeah, it's -- different court reporters do them
15  different ways.
16  A.  Okay.
17  Q.  Do you see pages 114 and 115?
18  A.  Yes, I do.
19  Q.  Okay.  Take a look at 114, line 14, and then
20  continue on to 115, line 12.
21  A.  Yes.
22  Q.  So this is some questioning from Mr. Brustin
23  about whether you have an understanding as to what kinds
24  of evidence are collected and what gets into evidence and
25  what doesn't.  Do you recall that?

Page 773

1  A.  Yes.
2  Q.  And you state at page 115 -- well, strike that.
3  Do you see anything inaccurate in the answer
4  you gave on page 115?
5  MR. BRUSTIN: Objection.  Leading.
6  Q.  BY MS. BERKE: Or is it accurate?
7  A.  It appears accurate.
8  Q.  So he's asking you on you're familiar with what
9  kinds of evidence get in -- gets in, and you say that you
10  would determine that, whether it would or would not, and
11  you would discuss it with the county attorney.  Do you
12  see that?
13  A.  Yes.
14  MR. BRUSTIN: Objection.  Leading.
15  Argumentative.
16  Q.  BY MS. BERKE: Do you see that?
17  A.  Yes, I do.
18  Q.  And so are you the one who determines what gets
19  in and what doesn't get into evidence?
20  A.  No.
21  Q.  Okay.  So is that an accurate statement that,
22  "I would determine that, whether it would or would not"?
23  MR. BRUSTIN: Same objection.
24  THE WITNESS: That's not a very accurate
25  statement, but I did include the county attorney.  If he

Page 774

1  wanted it in, he'd get it in.  If he didn't want it in,
2  it wouldn't go in.
3  Q.  BY MS. BERKE: About you don't make a
4  determination as to what goes into evidence?
5  A.  No.
6  Q.  Did you attend any parts of Debra Milke's
7  criminal trial other than the part in which you
8  testified?
9  A.  I don't believe so.
10  Q.  Did you know at the time Debra Milke was
11  convicted that Roger Scott had not testified at her
12  trial?
13  A.  No.
14  Q.  When did you learn that?
15  A.  I think it was the -- at the first meetings
16  we've had.
17  Q.  The deposition?
18  A.  Depositions.
19  Q.  Did you believe that Roger Scott was going to
20  testify at Debra Milke's trial?
21  A.  Yes.
22  MR. BRUSTIN: Objection.  Leading.
23  Argumentative.  Foundation.
24  Q.  BY MS. BERKE: At your --
25  MR. BRUSTIN: Mischaracterizes prior



Page 775

1 testimony.
2    Q.   BY MS. BERKE:  At your first deposition,
3 Mr. Brustin asked you if you agreed with the Ninth
4 Circuit's characterization of the Debra Milke trial that
5 reads as follows:  Quote, The trial was essentially a
6 swearing contest between Milke and Phoenix police
7 Detective Armando Saldate Junior, and you agreed with him
8 that that was correct.
9         Do you have personal knowledge that that was
10 in fact the case?
11    A.   No, I do not have personal knowledge that was
12 the case -- the fact of the case.
13    Q.   Do you know what other evidence was admitted at
14 that trial?
15    A.   Not really because I didn't attend it.  So...
16    Q.   Do you know what the jury based its decision
17 on?
18    A.   No.
19    Q.   Do you know how much weight the jury gave to
20 your testimony?
21    A.   No.
22    Q.   You were asked at your April 26th, 2017
23 deposition whether you agreed with Mr. Brustin that you
24 understood you were brought into the Christopher Milke
25 death investigation because of your ability to get

Page 776

1 admissions from suspects.  Your response was, quote, I'll
2 go that far, yeah, end quote.
3         Can you explain what you meant by that?
4    A.   Well, that was just an understanding on my part
5 of why I was getting called out a lot, but I -- I didn't
6 know that for sure.  But I mean, you know, that's just a
7 belief that I had, and really I don't think it was a
8 strong belief, but it was something that, you know, I did
9 believe.
10    Q.   Did anybody ever tell you that?
11    A.   No, not really.
12    Q.   Did --
13    A.   Not that I can remember anyway.
14    Q.   When you interviewed James Styers, did you get
15 a confession from him?
16    A.   No, I did not.
17    Q.   Did you ever claim to have gotten a confession
18 from him?
19    A.   No, I did not.
20    Q.   When you decided to end your questioning of
21 Debra Milke, did you feel that you had gathered a
22 sufficient amount of information regarding her
23 involvement in Christopher Milke's murder?
24         MR. BRUSTIN:  Objection to the form.
25 Leading.

Page 777

1         THE WITNESS:  Yes.
2         MR. BRUSTIN:  Vague.
3    Q.   BY MS. BERKE:  Did you have access to the
4 recorded interview of Roger Scott at the time you
5 prepared either your synopsis in the Christopher Milke
6 death investigation or your supplement regarding your
7 interview of Debra Milke?
8    A.   No.
9         MR. BRUSTIN:  Object to the form.  Leading.
10         THE WITNESS:  I'm sorry.
11    Q.   BY MS. BERKE:  You didn't?
12    A.   No, I did not.
13    Q.   Did you have access to the transcript of Roger
14 Scott's interview at the time you prepared either your
15 synopsis or your supplement regarding your interview of
16 Debra Milke?
17         MR. BRUSTIN:  Same -- same objection.
18         THE WITNESS:  No, I did not.
19    Q.   BY MS. BERKE:  Did you have access to Detective
20 Mills' supplement regarding his interview of Roger Scott
21 at the time you prepared either your synopsis or your
22 supplement regarding your interview of Debra Milke?
23    A.   No, I did not.
24         MR. BRUSTIN:  Same objections.
25    Q.   BY MS. BERKE:  Take a look at Exhibit 70.

Page 778

1         (Exhibit 70 was marked for identification.)
2    Q.   BY MS. BERKE:  Tell us what that is.
3         MR. BRUSTIN:  I'm sorry.  What exhibit?
4         MS. BERKE:  70.
5         THE WITNESS:  That is a supplemental to the
6 Eleanor Paez homicide listing suspect Manuel Yanes.
7    Q.   BY MS. BERKE:  Oh, gosh.  Is that 70?
8    A.   Sorry.  70 -- oh, Roger Scott --
9    Q.   Okay.
10    A.   -- interview.
11    Q.   So by who?
12    A.   By Detective Mills.
13    Q.   Okay.  So this -- so Exhibit Number 70 is the
14 supplement prepared by Detective Mills summarizing his
15 interview of Roger Scott.  Correct?
16    A.   That is correct.
17    Q.   And it lists -- what does it state that the
18 date and type type -- I'm sorry.  What does it say as to
19 the date and time typed?
20    A.   December 6, 1989 at 3:30 in the morning.
21    Q.   And so that would be the night of the 5th, into
22 the morning of the 6th?
23    A.   That is correct.
24    Q.   And so what happens -- so does that tell you
25 that Detective Mills dictated this supplement?



Page 779

1          MR. BRUSTIN:  Objection to the form.
2  Leading.
3          THE WITNESS:  That tells me that it was
4  typed at that time by the secretary.
5     Q.    BY MS. BERKE:  And do secretaries have
6  identifying numbers like you have a serial number?
7  Right?
8     A.    Yes, they do.
9     Q.    Who -- are you able to tell from Exhibit Number
10  70 who typed this supplement prepared by Detective Mills?
11    A.    Clerk A1608.
12    Q.    And do you know who that is?
13    A.    No, not really.
14    Q.    Okay.
15    A.    Not now anyway.
16    Q.    And so clerk -- the clerk whose designator is
17  A1608 typed Detective Mills' supplement concerning his
18  interview of Roger Scott on December 6th, 1989 at 3:30
19  a.m.  Correct?
20          MR. BRUSTIN:  Objection.  Leading.
21          THE WITNESS:  Yes.
22    Q.    BY MS. BERKE:  And what happens after a
23  supplement is typed?  Take us through the process at that
24  time in 19 -- December of 1989.
25          MR. BRUSTIN:  Objection to the form.

Page 780

1  Compound.  Vague.
2          THE WITNESS:  The supplement is typed by the
3  secretary.  She then returns the supplement -- the typed
4  original copy only and -- to the detective's desk or his
5  slot, and then he will review it.  He will review it
6  immediately if he happens to have the time but -- if he's
7  not there or maybe doing an investigation.
8          But then after he reviews it and makes sure
9  that it corresponds with his notes and his memory, then
10  he would then give it back to the clerk and make any
11  typos or anything, corrections that he saw, and then the
12  clerk would then correct the -- the document and then
13  color code it and then disseminate it.
14    Q.    BY MS. BERKE:  Okay.  Take a look at Exhibit
15  Number 5 in the exhibit notebook, and that is your --
16    A.    In this book -- their book?
17    Q.    Yes.
18    A.    Okay.
19    Q.    That is your supplement from your interview of
20  Debra Milke.  Do you see that?
21    A.    Yes, it is.
22    Q.    And when was that typed?
23    A.    That was typed on December 6, 1989 at 8:40 a.m.
24    Q.    And who typed that report?
25    A.    Clerk number A1724.

Page 781

1     Q.    Do you know who that is?
2     A.    Not no more.  I don't recall it.
3     Q.    Okay.  What days -- you said that your days off
4  were Sunday and Monday?
5     A.    Correct.
6     Q.    And December 3rd was a Sunday, correct,
7  December 3rd, 1989?
8     A.    Yes.
9          MR. BRUSTIN:  Objection to form.  Leading.
10    Q.    BY MS. BERKE:  And so if this was -- and your
11  work hours you said were 6:00 a.m. to 2:00 p.m.?
12    A.    Correct.
13    Q.    Do you know when you dictated the supplement
14  from your interview of Debra Milke that's Exhibit Number
15  5?
16    A.    It would have been the 5th because that would
17  have been my first day back.
18    Q.    So Tuesday, December 5th, 1989?
19    A.    That's correct.
20    Q.    Take a look at Exhibit Number 20 in the
21  notebook, and what is this document?
22    A.    It's the interview of Roger Scott by me, and
23  it's dated -- typed December 6th, 1989 at 1:57 p.m. by
24  clerk A1724.
25    Q.    Okay.  So the same clerk who typed your

Page 782

1  supplement for your interview of Debra Milke then later
2  in the same day, on December 6th, typed your supplement
3  for your interview of Roger Scott.  Correct?
4     A.    Yes.
5     Q.    And then take a look at Exhibit Number 71.
6     A.    Let me be real careful with this book.
7     Q.    That's not in the book.
8     A.    Oh.
9     Q.    That's one of the new ones that's to your
10  right.
11          MR. BRUSTIN:  I'm sorry.  I didn't hear
12  that.
13          MS. BERKE:  71.
14          THE WITNESS:  I'm sorry.
15          (Exhibit 71 was marked for identification.)
16          (Exhibit 72 was marked for identification.)
17          THE WITNESS:  Okay.
18    Q.    BY MS. BERKE:  What is Exhibit 71?
19    A.    It is the -- the supplement that was by
20  Detective Mills of Roger Scott, and it was typed on
21  December 6, 1989 at -- at 8:15 p.m. by clerk 8 -- by
22  clerk A1608.
23    Q.    Okay.  Take a look at this document, and it
24  says, "Taped interview of Roger Scott."  Correct?
25    A.    Correct.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
783–786

Page 783

1    Q.   And so is this the transcript of that taped
2  interview?
3    A.   Yes.
4    Q.   And then take a look at Exhibit Number 69.
5         MR. BRUSTIN:  You need to switch tapes?
6    Q.   BY MS. BERKE:  We're going to go -- before I
7  ask you about this exhibit, we're almost out of
8  videotape.  So we're going to stop here, and then we'll
9  let him switch the tape.
10   A.   That's fine.
11        MS. BERKE:  Okay.
12        THE VIDEOGRAPHER:  This ends media number 3.
13 We are off the record at 4:56 p.m.
14        (A recess was held off the record.)
15        THE VIDEOGRAPHER:  This begins media number
16 4, volume III, to the video-recorded deposition of
17 Armando Saldate.  We are back on the record at 4:59 p.m.
18   Q.   BY MS. BERKE:  Do you have Exhibit 69 in front
19 of you?
20   A.   Yes, I do.
21        (Exhibit 69 was marked for identification.)
22   Q.   BY MS. BERKE:  What is Exhibit 69?
23   A.   It is the original report of the Milke homicide
24 synopsis.
25   Q.   The synopsis?

Page 784

1    A.   Yes.
2    Q.   Okay.  And is this something you prepared?
3    A.   Yes, it is.
4    Q.   And when was this typed?
5    A.   This was typed on December 6, 1989 at 11:50
6  p.m.
7    Q.   And tell me where you're getting that
8  information.
9    A.   On the bottom portion next to my name, to the
10 right of my name.
11   Q.   December 6, 1989 at 2350?
12   A.   Yes, which is 11:50 p.m.
13   Q.   And if you go to the very last page of Exhibit
14 Number 69, if you look at the third paragraph, it states,
15 quote, During Roger's interview, he also admitted
16 conspiring with not only Jim but the victim's mother,
17 Debra Milke, to kill her son, end quote.
18        Did I read that correctly?
19   A.   I can't get to it yet.
20   Q.   Oh.
21   A.   I got it.
22   Q.   Sorry.  So go to the third paragraph.
23   A.   Okay.
24   Q.   And I'm reading where it says, quote, During
25 Roger's interview, he also admitted conspiring with not

Page 785

1  only Jim but the victim's mother, Debra Milke, to kill
2  her son, end quote.
3         Did I read that correctly?
4    A.   That is correct.
5    Q.   And is that accurate information?
6         MR. BRUSTIN:  Objection to form.  Leading.
7         THE WITNESS:  Yes.
8    Q.   BY MS. BERKE:  During what part of your
9  interview of Roger Scott did he implicate Debra Milke?
10        MR. BRUSTIN:  Objection to the form.  Asked
11 and answered.
12        THE WITNESS:  It was during our trip to
13 locate the body, but it was continuous interview from the
14 time I started the interview till we got back.
15   Q.   BY MS. BERKE:  Okay.  So when you refer to your
16 interview of Roger Scott, you're referring to not only
17 what took place at 620 West Washington but also your
18 discussion with him in the car on the way to the crime
19 scene?
20   A.   Yes.
21        MR. BRUSTIN:  Objection to form.  Leading.
22 Asked and answered.
23        THE WITNESS:  I'm sorry.
24   Q.   BY MS. BERKE:  If you go back to Exhibit 5,
25 which is your supplement --

Page 786

1    A.   In the book.
2    Q.   Yes.  Sorry about that.  Your supplement
3  summarizing your interview with Debra Milke.
4    A.   Yes, I got it.
5    Q.   If you go to page 6 of that supplement -- the
6  page numbers are in the top right.
7    A.   Okay.  Okay.
8    Q.   You see at the top part of this page, you're
9  talking about the trip back to Phoenix with Ms. Milke.
10 Do you see that?
11   A.   Yes.
12   Q.   And it states in the next paragraph that, "At
13 approximately 2250 hours, we arrived back in Phoenix."
14        Do you see that?
15   A.   Yes.
16   Q.   What is 2250?
17   A.   That's 10:50 or ten minutes until 11:00.
18   Q.   P.m.?
19   A.   P.m. -- I'm sorry -- yes.
20   Q.   And what did you do once you arrived back in
21 Phoenix with Ms. Milke?
22   A.   We -- I escorted her up to the general
23 investigations bureau and to one of the rooms where I --
24 I told her sit down, and I went and called her father.
25   Q.   And it says here, "She was given a Pepsi, and



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
787–790

Page 787

1  some cigarettes were purchased for her."  Correct?
2     A.  Yes, that's correct.
3        MR. BRUSTIN:  Objection.  Leading.
4     Q.  BY MS. BERKE:  Was that at her -- was that at
5  her request?
6        MR. BRUSTIN:  Objection.  Leading.
7        THE WITNESS:  Yes.
8     Q.  BY MS. BERKE:  And it states, "She then asked
9  me if I could -- if I would call her father, which I
10  did."
11        And so that's what you were just referring
12  to?
13        MR. BRUSTIN:  Same objection.
14        THE WITNESS:  Yes.
15     Q.  BY MS. BERKE:  And tell us about your
16  conversation with her father.
17     A.  I asked him exactly what Debra had asked me to
18  ask him, whether he could get her an attorney or bail her
19  out, and he said no, but that his -- her mother who lived
20  in Switzerland was -- had been notified and was taking
21  care of that.
22     Q.  Do you remember --
23        MR. BRUSTIN:  Sorry.  Object to the last
24  question on hearsay.
25     Q.  BY MS. BERKE:  Do you remember anything else

Page 788

1  you discussed with her father?
2        MR. BRUSTIN:  Same objection.
3        THE WITNESS:  We discussed about what she
4  had done briefly, and that's about it.
5     Q.  BY MS. BERKE:  And do you remember how long
6  your call with him lasted?
7     A.  I'd have to refer to the report here if I
8  could.
9     Q.  Sure.
10     A.  It had to have been at least 30 minutes, 30, 40
11  minutes.
12     Q.  Okay.  And then what did you do after you
13  finished speaking with Debra's father?
14     A.  We were waiting for transport for her to jail,
15  and I believe that took another ten, 15 minutes.  And
16  then she requested that I walk her down to the car.
17     Q.  That was going to be transporting her to jail?
18     A.  That was going to be transporting her.
19        So I then got together with -- I advised a
20  couple other guys that were in the case, you know.  I
21  don't remember who but maybe Sergeant Bryant -- I mean,
22  Sergeant Ontiveros, but that I would be going down to
23  escort her down because she wanted me to go with her to,
24  you know, be -- when she was transported.
25        I told her I couldn't go to the jail with

Page 789

1  her, but I could transport -- you know, go downstairs
2  with her because I had a lot of work to do.
3     Q.  And so what is your best estimate of what time
4  it was when you turned Debra Milke over to the officers
5  who transported her to jail if you assume you --
6     A.  Probably.
7     Q.  -- arrived back in Phoenix with her at 2250,
8  10:50 p.m.?
9     A.  It would have been --
10        MR. BRUSTIN:  Objection.  Leading.
11        THE WITNESS:  It would have been 12:45,
12  maybe 1:00.
13     Q.  BY MS. BERKE:  And while you were waiting with
14  Ms. Milke to be transported, did you have any discussion
15  with her?
16     A.  She wanted to see if she could get out, and
17  I -- you know, asked me if -- I think she asked me
18  whether it was possible for her to get out, and I told
19  her what her dad had said.
20        I -- I then -- I think -- I'm pretty sure I
21  didn't tell her her dad said to "get her a public
22  defender because I don't want to have nothing to do with
23  her," but I didn't tell her that.  But we did converse to
24  the -- you know, the other part.
25     Q.  And did you have any discussion with her

Page 790

1  concerning her employment or work?
2     A.  Yes, she said she needed to go to work and
3  could they just let her out to go to work, and then --
4  you know, she was asking a lot of those questions that
5  were just short of being ridiculous.  But I mean, she --
6  she just was wanting to go to work.  She wanted to -- she
7  didn't think that it was that big a deal, you know.
8        MR. BRUSTIN:  Objection -- I'm sorry -- to
9  the last question.  Leading.
10     Q.  BY MS. BERKE:  Let's go back to the beginning
11  of your interview of Ms. Milke.
12     A.  Okay.
13     Q.  Tell us what you recall when -- well, let's
14  start with when you -- the helicopter landed.  You got to
15  Pinal County.  What did you do once you landed?
16     A.  I thanked God first.
17        MR. BRUSTIN:  Objection.  Asked and
18  answered.
19     Q.  BY MS. BERKE:  Pardon me?
20     A.  I thanked God that I landed because I wasn't
21  very used to being on helicopters, but I walked in and
22  saw Hamrick, and he directed me to where Ms. Milke was.
23        I entered the room, and Ms. Milke was with
24  her aunt -- I believe her aunt -- it was aunt -- I'm not
25  sure totally it was her aunt, I think, and I asked her to

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
791–794

Page 791

1  step outside, and she did.  And probably -- I then
2  probably closed the door shortly after.
3      Q.   Do you know if you closed the door immediately
4  after the other woman left the room?
5          MR. BRUSTIN:  Objection.  Asked and
6  answered.
7          THE WITNESS:  I don't recall.  I really
8  don't.  I mean, I'm sure that it was -- I was doing
9  something at that time, but, you know, I may have had
10  time to go shut the door immediately.  But I don't know.
11  I -- I don't think I did, but, you know --
12      Q.   BY MS. BERKE:  Um --
13      A.   -- I did close it, though.  I did shut the door
14  once we were going to -- you know, once I got all the
15  introductions and stuff like that out of the way.
16      Q.   Do you remember a Pinal County sheriff's deputy
17  being near that room when you arrived?
18      A.   There was somebody there, but I didn't -- you
19  know, I didn't identify myself and have him identify
20  himself.  Hamrick was there.  So I'm sure that he would
21  have gotten his name and et cetera about who he was and
22  what he was doing there.
23      Q.   Tell us what your first discussion was with
24  Ms. Milke when you entered the room where she was.
25      A.   Well, I introduced myself, and she wanted to

Page 792

1  know what I was doing there, what I wanted.  And I told
2  her that I was there for -- because her son had been
3  found dead, and we wanted to talk to her about it.
4      Q.   And so her initial question to you is what did
5  you want?
6      A.   Yes.
7          MR. BRUSTIN:  Objection.  Leading.
8          THE WITNESS:  She was more concerned about
9  what -- I'm sorry.  Go ahead.
10          MR. BRUSTIN:  I was objecting to leading.
11          THE WITNESS:  Okay.
12          MR. BRUSTIN:  Again --
13          THE WITNESS:  She was more concerned about
14  why I was there to talk to her.
15      Q.   BY MS. BERKE:  So the first person to mention
16  Christopher Milke was you?
17      A.   Yes.
18      Q.   And after --
19          MR. BRUSTIN:  Objection.  Leading.  Sorry.
20      Q.   BY MS. BERKE:  After you told Ms. Milke that
21  her son had been found dead, what happened next?
22      A.   Well, she -- you know, she appeared to start
23  sobbing and, you know, getting a little excited, and I
24  could see there was no tears coming out of her eyes.  So
25  I mean, I knew it was just a matter of her trying to, you

Page 793

1  know, set -- you know, set the -- the interrogation into
2  poor me, you know.
3      Q.   Uh-huh.
4      A.   And so -- but I told her right away I didn't --
5  I wasn't going to tolerate that, and I was just there to
6  get her information, and -- and I just wouldn't tolerate
7  that.
8      Q.   Did you advise Ms. Milke of her Miranda rights?
9      A.   I did.
10          MR. BRUSTIN:  Objection.  Leading.  Asked
11  and answered.
12      Q.   BY MS. BERKE:  And when you did that, did she
13  express any lack of understanding or any understanding of
14  the Miranda rights?
15          MR. BRUSTIN:  Objection.  Leading.
16          THE WITNESS:  No, she nodded her head up and
17  down, but then I asked her to please give me -- whether
18  she did or didn't vocally, and she did.
19      Q.   BY MS. BERKE:  What did she tell you?
20      A.   She said yes.
21      Q.   That she understood her rights?
22      A.   Yes.
23          MR. BRUSTIN:  Objection.  Leading.
24      Q.   BY MS. BERKE:  And what happened next, if you
25  recall?

Page 794

1          MR. BRUSTIN:  Objection.  Asked and
2  answered.
3          THE WITNESS:  We were then beginning the
4  interview, and -- and she confessed to the -- her part in
5  the death of her son.  And it was very short because
6  immediately when I told her that I wasn't going to
7  tolerate her pretending to be upset or her pretending to
8  cry -- I was not going to tolerate that.  I was there for
9  a reason.  We're going to get it done, and she was aware
10  of that.
11          I mean, she -- I think it hit her kind of
12  hard as far as -- I don't think no one's ever done that
13  to her, you know.
14      Q.   You testified earlier that you had told her
15  that both Jim Styers and Roger Scott had implicated her
16  in Christopher's death.  Correct?
17          MR. BRUSTIN:  Objection.  Asked and
18  answered.  Leading.
19      Q.   BY MS. BERKE:  You recall testifying to that
20  effect earlier?
21          MR. BRUSTIN:  Same objection.
22          THE WITNESS:  Yes.
23      Q.   BY MS. BERKE:  When in the interview process
24  did you provide that information to her?
25          MR. BRUSTIN:  Same objection.

Page 795

1    THE WITNESS: I was telling her that during
2  that period of time, first the introduction, advising her
3  of her son's death, and then we're getting into what I
4  needed done and what I wanted her to do and what -- I
5  wasn't going to tolerate, you know, her -- her acting
6  like she was, and during that period of time, I think I
7  said that. It was a misstatement of course, but I did
8  say that.
9    Q.   BY MS. BERKE: It was a misstatement in what
10  way?
11    MR. BRUSTIN: Objection. Asked and answered
12  three times now.
13    THE WITNESS: The --
14    MR. BRUSTIN: And leading.
15    THE WITNESS: I never received any
16  information from Styers implicating her.
17    Q.   BY MS. BERKE: Okay. So did you -- so what
18  you're telling us is that the point in time that you told
19  her that James Styers and Roger Scott had implicated her
20  in Christopher's death was very early on in your
21  interview of her?
22    A.   Yes.
23    MR. BRUSTIN: Objection to the form.
24  Leading. Asked and answered. Mischaracterizes his
25  testimony.

Page 796

1    Q.   BY MS. BERKE: And then what happened next in
2  the interview?
3    MR. BRUSTIN: Objection. Foundation.
4    THE WITNESS: Well, I started telling her
5  about he had been found in the desert and that -- and she
6  was more concerned about what had happened to Jim.
7    Q.   BY MS. BERKE: What do you recall about that?
8    A.   I think she was concerned about what -- what
9  happened to Jim as far as where he was at. I mean, is he
10  going to be let go, whatever, and generally that's what
11  it was.
12    And then it's -- we then got into exactly
13  what -- what her involvement was and that, you know, we
14  got into her life of really not wanting Christopher and
15  that she couldn't give him to her -- her ex-husband
16  because he -- you know, that's one of the reasons that
17  was definitely not on the table for her.
18    And we then discussed just basically the
19  entire interview and just -- I mean, the entire -- her --
20  her statement. Like I said, it was rather quick because
21  once she started talking, we just -- you know, she
22  started, and we ended it quick.
23    Q.   What did she tell you about her involvement in
24  Christopher's murder?
25    MR. BRUSTIN: Objection. Asked and

Page 797

1  answered.
2    THE WITNESS: She said that she had known
3  that -- that Roger Scott and Styers were going to take
4  her son out, but at first didn't know -- really didn't
5  know that Scott was involved at first, but Styers had
6  brought him in and that she would get a call from -- from
7  Styers when the job was done, and he would -- he would
8  call her.
9    And when she received that call, which was
10  later that day when she was in Florence, Styers told her
11  that he had lost her son and that he -- he'd been in the
12  bathroom with him or he had to go to the bathroom at
13  Sears at Metrocenter.
14    But she's then -- I mean, she knew that
15  wasn't the reason for the call. She knew that was a
16  point where Roger Styers (sic) was saying it's taken care
17  of.
18    Q.   Roger Styers?
19    A.   I mean, Jim Styers was saying it's been done.
20    Q.   Okay. So he -- she was stating to you that
21  she knew at that point that the murder had taken place?
22    A.   Yes.
23    MR. BRUSTIN: Objection. Mischaracterizes
24  testimony. Leading. Asked and answered.
25    Q.   BY MS. BERKE: And did you have a conversation

Page 798

1  with Ms. Milke about life insurance?
2    MR. BRUSTIN: Objection. Leading.
3    Q.   BY MS. BERKE: And if you need to refresh -- if
4  you can't remember --
5    A.   I will have to. I will have to refresh my
6  memory because I don't really remember that. I mean, I
7  remember, but I don't --
8    Q.   You can go ahead and refresh your recollection.
9    MR. BRUSTIN: I don't mind if you point it
10  out to him in his report.
11    THE WITNESS: Thank you. Because I can't
12  find it.
13    Q.   BY MS. BERKE: If you go to page 3 --
14    A.   Yes, I see it now.
15    Q.   Okay.
16    A.   On the -- it says I asked her about the
17  insurance. She said she did not have any life insurance
18  on him, but she believed that her father who lives in
19  Florence did.
20    Q.   So you asked her if she had life insurance on
21  Christopher. She told you she did not?
22    A.   That is correct.
23    MR. BRUSTIN: Objection. Leading.
24  Mischaracterizes testimony.
25    Q.   BY MS. BERKE: And did you later determine



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
799–802

Page 799

1  whether that was truthful information she provided?

2       MR. BRUSTIN: Objection. Leading.

3       THE WITNESS: From what Roger Scott had

4  said, that he had a 5,000-dollar insurance -- or he said

5  that she had a 5,000-dollar insurance policy on him, that

6  he needed $250 of it because he wanted to apply for

7  disability insurance through Social Security.

8    Q.  BY MS. BERKE: So he -- Debra Milke had told

9  you, you just testified, that she did not have life

10  insurance on Christopher --

11   A.  That's right.

12   Q.  -- but that her father did?

13   A.  Yes.

14       MR. BRUSTIN: Objection. Leading. Asked

15  and answered. Mischaracterizes prior testimony.

16   Q.  BY MS. BERKE: And during the investigation

17  that ensued into Christopher Milke's death, did you ever

18  investigate whether Debra Milke had life insurance on

19  Christopher?

20       MR. BRUSTIN: Objection. Same question you

21  just asked.

22       THE WITNESS: I'm sure I did.

23   Q.  BY MS. BERKE: And do you recall what you

24  learned in that regard?

25       MR. BRUSTIN: Same objection.

Page 800

1       THE WITNESS: No, I don't recall. I'm

2  sorry.

3    Q.  BY MS. BERKE: Okay. Do you recall Debra Milke

4  telling you about the process of planning, if there was

5  one, planning the murder of Christopher Milke?

6       MR. BRUSTIN: Objection. Leading.

7       THE WITNESS: I think she indicated that she

8  had gone out with -- with Styers and Roger Scott who was

9  brought in late in the -- in the -- in the deal but that

10  they always saw cars or they always saw -- you know, it

11  was always an excuse of why they couldn't do it then.

12   Q.  BY MS. BERKE: So did Debra Milke tell you

13  whether she had any conversations with Roger Scott about

14  the plan to murder Christopher?

15       MR. BRUSTIN: Objection. Leading.

16       THE WITNESS: I think finally she did, and I

17  think that her main -- her main contact was Jim Styers of

18  course.

19   Q.  BY MS. BERKE: In order to tell us specifically

20  what she told you in that regard, would you need to refer

21  to your report?

22   A.  Yes.

23   Q.  Okay. I'll direct you to page 3, the last

24  paragraph.

25   A.  Okay. Okay.

Page 801

1       MR. BRUSTIN: Is there a question? I'm

2  sorry.

3       MS. BERKE: He's refreshing his

4  recollection.

5       MR. BRUSTIN: There's no question. Is this

6  a general refreshment?

7       MS. BERKE: No, I did ask a question. Do

8  you want it read back to you?

9       MR. BRUSTIN: I didn't hear it. That's

10  fine.

11       MS. BERKE: Can you read back my last

12  question.

13       (The last question was read back by the

14  court reporter.)

15       THE WITNESS: Yes.

16   Q.  BY MS. BERKE: Okay.

17   A.  And the -- she discussed with Roger and Jim

18  both and that they had planned to -- said that the plan

19  was that Jim was to do it and that he and Roger would

20  then go to Metrocenter and claim that Chris had been

21  lost. She said she never knew what method Jim was using

22  or going to use to do it.

23       MR. BRUSTIN: Objection to the last

24  question. Leading.

25   Q.  BY MS. BERKE: Did you truthfully and

Page 802

1  accurately record in your report that's Exhibit Number 5

2  all of the information that Debra Milke provided to you

3  during your interview of her on December 3rd, 1989?

4       MR. BRUSTIN: Objection. Leading.

5       THE WITNESS: I did.

6    Q.  BY MS. BERKE: At the time you spoke with Debra

7  Milke's father on December 3rd, 1989, did you have any

8  other reports in this investigation?

9       MR. BRUSTIN: Objection. Vague.

10       THE WITNESS: No, I did not.

11   Q.  BY MS. BERKE: Did you know prior to this

12  lawsuit being filed that Debra Milke's purse had been

13  impounded in evidence?

14   A.  No, I did not.

15       MR. BRUSTIN: Objection. Leading.

16       THE WITNESS: I'm sorry.

17   Q.  BY MS. BERKE: Did you ever receive a call from

18  another law enforcement officer at any time while you

19  were employed or -- strike that.

20       Did you ever receive a call from any law

21  enforcement officer while you were working on this

22  investigation advising you that her purse had been

23  impounded by the Pinal County Sheriff's Department?

24       MR. BRUSTIN: Objection. Leading.

25       THE WITNESS: No.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
803–806

Page 803

1    Q.   BY MS. BERKE:  Did you ever receive a call at
2    work from an individual named Robert Soules, S-o-u-l-e-s?
3         MR. BRUSTIN:  Objection.  Leading.
4         THE WITNESS:  No.
5         MR. BRUSTIN:  And beyond the scope.
6    Q.   BY MS. BERKE:  You testified -- there's been a
7    lot of testimony and a lot of questioning about how you
8    go about preparing your reports and the order in which
9    you record information.  You recall that questioning?
10        MR. BRUSTIN:  Objection.  Vague.  Confusing.
11   Leading.
12        THE WITNESS:  I believe I do.
13   Q.   BY MS. BERKE:  And there was -- there were
14   questions about whether your report, your typed report --
15   whether the information recorded in your typed report is
16   always in the same order chronologically in which it was
17   provided to you by the person you were interviewing.  Do
18   you recall that?
19        MR. BRUSTIN:  Objection.  Vague.  Confusing.
20   Leading.  Asked and answered.
21        THE WITNESS:  Yes.
22   Q.   BY MS. BERKE:  And you testified that normally
23   it is in the same order.  Correct?
24   A.   Normally.
25        MR. BRUSTIN:  Same objection.

Page 804

1    Q.   BY MS. BERKE:  And what is the qualifier to
2    that?  When is it -- when are there things that are out
3    of order?
4         MR. BRUSTIN:  Same objection.
5         THE WITNESS:  I think I had pointed out to
6    Mr. Brustin earlier that if a person would -- would,
7    let's say, talk about a gun or a weapon and then after
8    the -- towards the end of the interview, we probably
9    obviously been on another subject, that person would have
10   mentioned that weapon again or maybe reminded me of it or
11   maybe they reminded themselves of what they forgot to
12   tell me, then I would probably -- rather than put it at
13   the end of the thing would coordinate it with the first
14   part of it because that would make sense, you know.
15        I always want to make sure the report makes
16   sense.  I didn't want, you know, a little bit here, a
17   little bit there, you know, where you have to read the
18   report, you know.
19   Q.   BY MS. BERKE:  So when you are dictating your
20   reports, what are you looking at when you're dictating?
21   A.   My notes.
22   Q.   And so if, using your example, someone you're
23   interviewing told you about a gun and you have certain
24   notes on page 2 of your notes about that and then you
25   have -- you went back to that topic later when you're at

Page 805

1    page 10 of your notes, are you saying that you may then
2    insert that information that's on page 10 when you're
3    dictating what's on the earlier page?
4    A.   Yes.
5         MR. BRUSTIN:  Objection.
6         THE WITNESS:  So it will --
7         MR. BRUSTIN:  How is that physically
8    possible?
9         MS. BURGESS:  You made your objection.
10        MR. BRUSTIN:  Oh, my God.
11        THE WITNESS:  Yes.
12        MR. BRUSTIN:  On the tape recording?
13        THE WITNESS:  Tape recording?
14   Q.   BY MS. BERKE:  So there was questioning about
15   Sandra Pickenpaugh.  You recall that?
16   A.   Yes.
17   Q.   And Mr. Brustin had asked you about certain
18   information that was contained on your report that wasn't
19   on the transcript of the recorded -- the recording that
20   Sandra Pickenpaugh provided.  Do you recall that?
21        MR. BRUSTIN:  Objection.  Asked and
22   answered.  Leading.  Vague.  Confusing.
23        THE WITNESS:  Yes.
24   Q.   BY MS. BERKE:  And do you recall how long your
25   interview of Sandra Pickenpaugh lasted?

Page 806

1    A.   A little over an hour and a half, two hours
2    maybe.  It was -- it's lengthy.
3    Q.   Okay.  Why don't we get that information.  Look
4    at exhibit number -- I'm not finding it.  Hang on.  It's
5    Exhibit 8.  Go to Exhibit Number 8, which is your --
6    A.   Okay.
7    Q.   -- supplement of your interview of Sandra
8    Pickenpaugh.  Correct?
9    A.   Yes, it is.
10   Q.   And what time did your interview of her start?
11   A.   12:07 p.m.
12   Q.   And what time did your interview of her end?
13   A.   I'm having a hard time with these pages.  1510
14   hours, which would be 3:10 p.m.
15   Q.   And so if it started at 12:07 and ended at 3:10
16   p.m., how long did that interview last?
17   A.   Two hours and eight minutes.  No, wait a
18   minute.  12:10 p.m.
19   Q.   12:07 to 3:10.
20   A.   12:07 to 3:10 would be three hours -- two hours
21   and 50 some minutes.  Right?
22   Q.   Or perhaps three hours and three minutes?
23   A.   Okay.  Sounds good to me.  I'm not -- math is
24   not my strong point.
25   Q.   Okay.  Do you recall how long the tape



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
807–810

Page 807

1 recording is of the interview?

2    A.   I believe it's less than an hour.

3    Q.   It was substantially less than the total

4 interview time.  Correct?

5         MR. BRUSTIN:  Objection.  Leading.

6         THE WITNESS:  Yes.

7    Q.   BY MS. BERKE:  And so according to your

8 recollection, there's at least two hours missing --

9         MR. BRUSTIN:  Objection.  Leading.

10    Q.   BY MS. BERKE:  -- on the tape.  Correct?

11         MR. BRUSTIN:  Asked and answered.  Leading.

12         THE WITNESS:  I believe so.

13    Q.   BY MS. BERKE:  Something around that?

14    A.   Somewhere around that period.

15    Q.   And so what is your explanation if there is

16 information contained in your supplement summarizing your

17 interview of Ms. Pickenpaugh that isn't on the recording

18 of a portion of your interview you conducted of her?

19         MR. BRUSTIN:  Objection.  Leading.  Asked

20 and answered.

21         THE WITNESS:  It's -- it's rather obvious

22 that she only recorded a portion of our interview, and

23 that may have been because she didn't want to record any

24 more or maybe she just ran out of tape.  I don't know.

25 To be honest with you, I never saw the tapes.

Page 808

1    Q.   BY MS. BERKE:  Okay.  But in terms of --

2 Mr. Brustin had asked you questions about the fact that

3 there were certain pieces of information contained in

4 your supplement that are not on the recording.

5    A.   Yes.

6    Q.   And so what is your explanation as to why

7 they're in your report but not on the tape?

8         MR. BRUSTIN:  Objection.  Leading.  Asked

9 and answered.

10         THE WITNESS:  I believe that's obvious that

11 she did not record the entire statement, and I -- like I

12 had -- I did the whole interview.

13    Q.   BY MS. BERKE:  Okay.  And Mr. Brustin also

14 pointed out the fact that there are portions of your

15 report where one sentence is contained in the recording,

16 the next sentence is not, but then the following sentence

17 is.  Do you know what I'm talking about?

18    A.   Yes.

19         MR. BRUSTIN:  Objection.  Vague.  Confusing.

20 Leading.  Mischaracterizes the testimony.

21 Mischaracterizes the document.

22    Q.   BY MS. BERKE:  And how do you explain that?

23         MR. BRUSTIN:  Same objection.  Foundation

24 now.

25         THE WITNESS:  There's really -- I could have

Page 809

1 either have -- had grouped the information together or

2 that her tape may have, you know, hit a bump or

3 something.  I don't know, but I don't know that much

4 about tape players at that time anyway.

5    Q.   BY MS. BERKE:  Did you make anything up that's

6 in the supplement you prepared for Ms. Pickenpaugh's

7 interview?

8    A.   No.

9    Q.   Did she tell you during the interview you

10 conducted on June 30th of 1990 all of the information

11 that you recorded and attributed to her?

12    A.   Yes.

13    Q.   You were asked in your April 26, 2017

14 deposition if the reason you maintained Debra Milke is

15 guilty of Christopher Milke's murder is that she made a

16 number of clear admissions to you about the killing, and

17 you responded, I believe, in the affirmative.  Is that

18 the only reason you maintain she's guilty of Christopher

19 Milke's murder?

20         MR. BRUSTIN:  Objection.  Leading.

21         THE WITNESS:  Well, her story --

22         MR. BRUSTIN:  Asked and answered.

23         THE WITNESS:  Okay.  Her admission is backed

24 up by Roger Scott's admission, and basically what she

25 said was planned on doing took place.

Page 810

1    Q.   BY MS. BERKE:  Can you say that again?

2    A.   What she -- what she had -- what he -- she and

3 Roger Scott and Styers had planned to do did in fact take

4 place.

5    Q.   Okay.  Are you aware of any other evidence

6 other than simply Debra Milke's admissions to support

7 your belief that she commit -- that she was involved in

8 the murder of Christopher Milke?

9    A.   Roger --

10         MR. BRUSTIN:  Objection.  Leading.  Asked

11 and answered.

12         THE WITNESS:  Roger's statements and that's

13 about it.

14    Q.   BY MS. BERKE:  And the reason you aren't able

15 to provide any further information on that is you weren't

16 at the trial, were you?

17    A.   No, I was not.

18         MR. BRUSTIN:  Objection.  Leading.

19 Argument --

20    Q.   BY MS. BERKE:  You don't know --

21         MR. BRUSTIN:  Hold on.  Leading.

22 Argumentative.  Asked and answered.

23    Q.   BY MS. BERKE:  Do you know what other evidence

24 was admitted at the trial?

25    A.   No, I do not.



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
811–814

Page 811

1    MR. BRUSTIN: Objection. Foundation.
2    Q.   BY MS. BERKE: Did you have any equipment back
3  in 1989 to surreptitiously record interviews of
4  witnesses?
5    A.   I don't believe so, not that I was aware of.
6    Q.   So if you were going to record an interview of
7  a suspect or a witness, describe the device that you had
8  available to use to do that.
9    A.   A tape-recorder, which would have been a
10 cassette tape-recorder, and we had the large, probably
11 four inches wide by ten inches long tape-recorder. It
12 was corded. So it needed to be plugged in.
13   Q.   And so if you were recording a witness or a
14 suspect interview, that would be known by the person
15 you're interviewing. It would be obvious?
16     MR. BRUSTIN: Objection. Calls for
17 speculation. Leading. Mischaracterizes testimony.
18     THE WITNESS: Yes.
19   Q.   BY MS. BERKE: When you told Sandra Pickenpaugh
20 that Debra Milke pulled up her shirt, were you telling
21 the truth?
22   A.   Yes.
23   Q.   Do you have any recollection of having the
24 police report of the neglect incident that occurred in
25 Colorado?

Page 812

1    A.   No.
2      MR. BRUSTIN: Objection. Asked and
3  answered.
4      THE WITNESS: I'm sorry.
5    Q.   BY MS. BERKE: If you did -- if you had
6  received it, what would you have done with it?
7      MR. BRUSTIN: Objection. Calls for
8  speculation.
9      THE WITNESS: I would have obtained a copy
10 of it, attached it to the original report in the
11 identification bureau and impounded it.
12   Q.   Did -- did you know whether a
13 complaint of neglect had been made against Debra Milke in
14 Colorado --
15     MR. BRUSTIN: Objection. Asked and
16 answered.
17   Q.   BY MS. BERKE: -- during your investigation?
18 Let me rephrase the question.
19     Did you know at the time of the
20 investigation into Christopher Milke's death that a
21 complaint of neglect had been made against Debra Milke in
22 Colorado?
23     MR. BRUSTIN: Objection. Leading. Asked
24 and answered.
25     THE WITNESS: A long time after, yes.

Page 813

1    MS. BERKE: Do you guys have the next volume
2  of his depo?
3    MR. BRUSTIN: I think so.
4    MS. BERKE: Thanks.
5    THE WITNESS: Thank you.
6    Q.   BY MS. BERKE: I'm going to have you turn to
7  page 309 of your deposition that took place on June 22nd,
8  2'17 -- 2017. If you look at line 25 on page 309...
9    A.   Line what? I'm sorry.
10   Q.   Line 25. Do you see that? It starts, "Okay,
11 what actually happened"?
12   A.   Yes.
13   Q.   Where Mr. Brustin's accusing you of lying. Do
14 you see that? Starts on the last line of 309 and goes up
15 to 310.
16   A.   Yes.
17   Q.   Um --
18   A.   To line 16.
19   Q.   To line what?
20   A.   I reviewed until line 16 on 310.
21   Q.   Okay. So his question was, "What actually
22 happened is you told Sandra Pickenpaugh that Debra pulled
23 up her shirt and showed you her breast, knowing that was
24 a bold-faced lie. Isn't that true?"
25     And your answer was, "Just like I said to

Page 814

1  begin with, not actually, and it's not totally true."
2    I didn't understand that answer. Can you
3  explain what your answer was to that question?
4      MR. BRUSTIN: Objection. Leading. I
5  understood the answer. Answer it again. Asked and
6  answered.
7    Q.   BY MS. BERKE: When -- when you told Sandra
8  Pickenpaugh that Debra pulled up her shirt, was that
9  accurate information?
10     MR. BRUSTIN: Objection. Asked and
11 answered. Leading.
12     THE WITNESS: Yes.
13   Q.   BY MS. BERKE: And so was it, as Mr. Brustin
14 stated, a, quote, bold-faced lie --
15     MR. BRUSTIN: Objection.
16   Q.   BY MS. BERKE: -- end quote?
17     MR. BRUSTIN: Objection. Leading. Asked
18 and answered. Mischaracterizes his prior testimony.
19     THE WITNESS: No.
20   Q.   BY MS. BERKE: At page 240 of your
21 deposition -- and I apologize; I think that's the prior
22 one -- Mr. Brustin -- well, I'll let you get there first.
23 Go to page 240.
24   A.   Okay.
25   Q.   If you look at line 3, Mr. Brustin asked you,



Exhibit 1

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
815–818

Page 815

1 quote, Now, in this case, you already had solid evidence
2 against Scott and Styers before you got to Debra and
3 interviewed her because they took you to the body.
4 Correct, end quote.
5        And your response was, "Correct," and I
6 don't think there's any dispute here about this, but who
7 is it that took you to the body of Christopher Milke?
8    A.   Roger Scott.
9    Q.   So Styers wasn't involved in taking you to the
10 body?
11   A.   No.
12   Q.   So that was a misstatement by Mr. Brustin?
13   A.   It's kind of hard to believe, but, yes.
14   Q.   And a misstatement by you in saying, "Correct."
15 Correct?
16   A.   Correct.
17   Q.   Okay.  If you look at Exhibit 2 in the exhibit
18 notebook, this is a document that Ms. Milke's attorneys
19 have been asking some witnesses about, and it is a
20 presentence investigation report for James Styers.  Do
21 you see that?
22       MR. BRUSTIN:  We also asked him about that.
23       THE WITNESS:  I see it, yes.
24   Q.   BY MS. BERKE:  Is that something you had
25 available to you at the time you conducted your

Page 816

1 investigation?
2    A.   No.
3    Q.   Take a look at --
4        MR. BRUSTIN:  Objection.  Asked and
5 answered.
6    Q.   BY MS. BERKE:  Take a look at Exhibit Number 3.
7        MR. BRUSTIN:  Leading.
8    Q.   BY MS. BERKE:  Do you recall being questioned
9 about this document early in your deposition?
10   A.   A little but I don't remember that much about
11 it.
12   Q.   Is this a document that you had available to
13 you at the time you conducted your investigation?
14       MR. BRUSTIN:  Objection.  Asked and
15 answered.
16       THE WITNESS:  No.
17   Q.   BY MS. BERKE:  Take a look at Exhibit Number 4.
18 This is a Rule 11.3 Examination of James Styers.  Do you
19 see that?
20   A.   Yes.
21   Q.   Is that a document you had available to you at
22 the time you conducted your investigation?
23       MR. BRUSTIN:  Objection.  Asked and
24 answered.
25       THE WITNESS:  No.

Page 817

1    Q.   BY MS. BERKE:  Take a look at Exhibit Number 20
2 in the exhibit notebook.  It's in the notebook, Exhibit
3 Number 20.
4    A.   Okay.
5    Q.   It should be behind tab 20.  Do you see it?
6    A.   Roger Scott's interview.
7    Q.   Right.  It's your supplement of your interview
8 of Roger Scott.  You see that?
9    A.   Yes.
10   Q.   Okay.  I want to ask you a few questions about
11 the information he provided to you.
12       MR. BRUSTIN:  You know, I just want to make
13 sure.  Could we -- what time is this deposition scheduled
14 to go to?  Are you guys able to stay as long as you need
15 to because I wasn't expecting hours of questioning by
16 you, highly unusual?  I've never seen anyone do it.
17       MS. BURGESS:  That's very common.
18       MR. BRUSTIN:  Really?
19       MS. BURGESS:  Yes.
20       MR. BRUSTIN:  Okay.
21   Q.   BY MS. BERKE:  Tell us generally what happened
22 at the beginning of your interview of Roger Scott.
23   A.   In regards to?
24   Q.   When you were asking him about his involvement
25 in Christopher's murder, did he deny involvement?

Page 818

1        MR. BRUSTIN:  Objection.  Leading.
2        THE WITNESS:  Well, of course when I first
3 started interviewing him, he was still sticking to the
4 story that he had told everybody else about a friend of
5 his, I think, named Phil or something -- wait a minute.
6 Yes, Phil and -- and that he had -- was taken home by Jim
7 Styers, and he was still holding to that story.
8    Q.   BY MS. BERKE:  Okay.  And then at some point,
9 did something change?
10       MR. BRUSTIN:  Objection.  Leading.
11       THE WITNESS:  Well, the interview was then
12 conducted by me -- by myself.
13   Q.   BY MS. BERKE:  Okay.  And tell us what
14 happened.
15       MR. BRUSTIN:  Objection.  Asked and
16 answered.  Leading -- not leading but asked and answered.
17       THE WITNESS:  I was very up front with him
18 and wanting him -- I told him that I didn't believe his
19 story or -- you know, about Phil and, you know -- and he
20 had several detectives out hunting for yearbooks and
21 stuff like that, and I told him I didn't believe it.  And
22 he needed to tell me the truth because, you know, he
23 ain't going to -- he ain't going to put it off on me.
24   Q.   BY MS. BERKE:  Okay.  And did he --
25   A.   Put it over me.

ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
819–822

Page 819

1    Q.    Did he eventually tell you the truth?
2    A.    As he knew it, yeah.
3    Q.    And what did he tell you as it relates to
4    Christopher's murder?
5    A.    He said that him and Jim Styers -- of course
6    they had that conversation with -- you know, with Debra.
7    I mean, they -- you know, he included -- at first, he
8    didn't tell me about Debra, but he said Jim Styers and
9    him had gone to -- I think it was to a pizza place or
10   some type first but later on changed it and that after
11   that Jim Styers took him home, and that changed later and
12   that he didn't know anything about the missing child
13   until he got back to that area.
14         And then I, again, told him that, you know,
15   he wasn't telling the truth, and then he decided that he
16   would go and say that -- that they -- they killed the boy
17   and that -- not they.  Jim Styers killed the boy and
18   that --
19   Q.    Roger told you that?
20   A.    Yes.  And that Roger knew where the body was
21   at.
22         I didn't leave the interview room.  I
23   think -- I don't know who left the interview room --
24   maybe Mills or something to tell the sergeant about it,
25   you know.

Page 820

1          And then the sergeant -- you know, we were
2    getting into the interview, and the sergeant then
3    determined that it was getting close to dark and that we
4    wanted -- he wanted me to take him out there to find the
5    body.
6          Well, I still hadn't finished my interview.
7    So I just continued my interview in the car with him, and
8    he did take us out there, showed us where the body was at
9    and showed us where Styers had thrown out the empty shell
10   casings, showed us where Styers had removed his shoes
11   that he had used and placed them in a Dumpster or a
12   receptacle at Metrocenter.  So we got those, and I mean,
13   I say "we."  I think it was detailed to someone else to
14   do it, but we got the information.
15         And then we went back, and during the drive
16   over to the body, Roger began implicating Debra, and we
17   continued that conversation.  And -- and we got back to
18   the office, and during that time period, I think -- oh,
19   we had stopped for gas, and I think Jim -- Mills or I
20   called the sergeant and told them what we had -- you
21   know, what we discussed.  Probably Mills.  I wasn't
22   really too keen on telling sergeant very much anyway.
23         But anyway it was probably Mills that called
24   and told about it, and then he told us to get down there
25   right away, told him we had to make a couple stops and

Page 821

1    stuff, and we did that.
2          Then we got back, and that's when Ontiveros
3    told me that I'd be going to Florence in a helicopter and
4    that Mills would then interview Roger again and tape the
5    interview.  I said okay.
6    Q.    And so when Roger Scott implicated Debra Milke
7    in Christopher's murder as you're driving to the scene,
8    what specifically did he tell you?
9          MR. BRUSTIN:  Objection.  Leading.  Asked
10   and answered.
11         THE WITNESS:  Well, he started by saying
12   that he -- you know, he -- they weren't the only ones
13   involved in this and that, you know, his mother was, too,
14   and she's the one that, you know, was part of it, too.
15   Q.    BY MS. BERKE:  By "his mother," you mean whose
16   mother?
17   A.    I'm sorry.  Christopher's mother --
18   Q.    Okay.
19   A.    -- was -- Debra was part of this, and he -- you
20   know, she knew about it and stuff like that.
21         And then we decided to continue talking
22   about that, and then, like I said, we ultimately made it
23   back to the station, and I lost contact with Scott
24   because I was waiting in the heliport up at the roof of
25   the police station and waiting for the helicopter.

Page 822

1          And I think probably Mills was doing the
2    interview.  I suspect he was.  I wasn't sure, but I mean,
3    that's what I was told was going to happen, that he was
4    going to do the taped interview of Roger Scott.
5    Q.    Did Roger tell you who initiated the plan to
6    have Christopher killed?
7          MR. BRUSTIN:  Objection.  Leading.
8          THE WITNESS:  I believe he indicated that
9    Debra and Jim -- of course they had -- you know, they
10   had -- Debra had initiated it, but Jim was the main
11   contact.  He was supposed to have done it by himself, and
12   then he doesn't really know -- I don't think he said --
13   specifically said why Jim brought him into the situation
14   other than probably needed a little bit of backup and,
15   you know, a little bit of support.  And he knew that
16   Roger Scott wanted some money, and he told him that he
17   could give him, you know -- him some of that money that
18   he was going to get for the insurance policy.
19   Q.    BY MS. BERKE:  And did Roger tell you why Debra
20   Milke wanted Christopher killed?
21         MR. BRUSTIN:  Objection.  Leading.
22         THE WITNESS:  She said she -- it was his
23   understanding she was never -- she never wanted him to
24   begin with.  They were -- her and her ex-husband were
25   fighting and stuff, and she just -- you know, he was a



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
823–826

Page 823

1 real hard to handle kid and stuff like that.
2    Q.   BY MS. BERKE:  Okay.  Did Roger tell you
3 anything about conversations he had with Jim Styers about
4 the timing of when this would occur?
5        MR. BRUSTIN:  Objection.  Leading.
6        THE WITNESS:  The whole talk was that they
7 were going to be -- they're going to tell everybody they
8 were going to take him to see Santa Claus, and Roger
9 Scott knew that and cooperated with that.
10    Q.   BY MS. BERKE:  Was there any Roger Scott or did
11 Roger Scott share anything with you about any previous
12 attempts or acts to attempt to kill Christopher?
13    A.   He did.  He said --
14        MR. BRUSTIN:  Objection.  Leading.
15        THE WITNESS:  Sorry.  He said that they had
16 gone out, and -- but at one point, Styers initiated there
17 was -- no, there's a car coming, too many cars, too many
18 cars, something to that effect, and that they didn't do
19 it then.
20        And he said it happened a couple times but
21 that Debra was with them during those periods of time,
22 but then for some reason she didn't go the last time.
23    Q.   BY MS. BERKE:  In your report, you state,
24 quote, Roger said that Jim had told him that Debbie was
25 pressuring him into doing it quick and that Jim at one

Page 824

1 time got upset and told Debbie why didn't she do it but
2 that Debbie refused, end quote.
3        Is that accurate that Roger told you that?
4        MR. BRUSTIN:  Objection.  Leading.
5        THE WITNESS:  Yes.
6    Q.   BY MS. BERKE:  Is all of the information you
7 recorded in your supplement that's Exhibit Number 20
8 accurate in terms of the information that Roger Scott
9 provided to you?
10        MR. BRUSTIN:  Objection.  Leading.
11        THE WITNESS:  Yes, it is.
12    Q.   BY MS. BERKE:  And is it accurate in every
13 other regard as far as you know?
14        MR. BRUSTIN:  Same objection.
15        THE WITNESS:  Best of my knowledge, yes.
16    Q.   BY MS. BERKE:  In your deposition that took
17 place on June 22nd, 2017, you were asked if you had any
18 reason to believe that there was a jailhouse informant
19 who was claiming that Debra confessed, and you responded
20 that you couldn't recall that.
21        You also stated that you would expect that
22 if there was a jailhouse informant who provided
23 information that Debra confessed, you would be expected
24 to document that in a police -- a police report.  You
25 recall that testimony?

Page 825

1    A.   Yes.
2    Q.   Following that deposition, did you do anything
3 to investigate whether there had been a jailhouse
4 informant who provided information to you about Debra
5 Milke?
6    A.   Yes, I looked through the information you had
7 on your desk, and I researched it and found that I did
8 interview a Chris Lansing (sic).
9    Q.   Landry?
10    A.   Landry -- I keep saying Lansing -- Landry and
11 that she did -- she was with -- I mean, she had been in
12 the same cell with her, and she did testify that -- that
13 she had made some statements in regards to her
14 involvement.
15    Q.   Okay.  I'm going to have Exhibit Number 73
16 marked, and when you say you had found information on my
17 desk, what specifically was it?
18    A.   The reports, the reports of -- you know, the
19 compiled reports that you had and --
20    Q.   From the Milke investigation?
21    A.   From the Milke investigation, and I started to
22 go through them and found it, and I told you about it
23 and --
24    Q.   What specific report are you referring to?
25    A.   The interview of Chris Landry by me and --

Page 826

1        MS. BERKE:  You said it's 73?
2        (Exhibit 73 was marked for identification.)
3        THE WITNESS:  It is number -- it is marked
4 evidence number 73.
5    Q.   BY MS. BERKE:  Okay.  So take a look at Exhibit
6 Number 73 and tell us specifically what that is.
7    A.   That is a report -- police report that I had
8 completed in regards to my contact with Chris Lansing --
9 Landry.
10    Q.   On what date did you interview Chris Landry?
11    A.   On 20th of June, 1990 at approximately 1850
12 hours.
13    Q.   So that was 20 days before you retired.
14 Correct?
15    A.   Yes.
16    Q.   And the format of this report looks very
17 different than the format of the prior supplements.
18 Correct?
19    A.   That is correct.  It's -- we had gone into a
20 different format referred to as PACE, and this was a
21 document that was completed using that format.
22    Q.   And how -- do you remember how it was that you
23 came to interview Chris Landry?
24    A.   I think that she was referred to me by -- by
25 her attorney, but I'm not -- her attorney was present,



Page 827

1  though.  I would assume it was her attorney.
2      Q.    And where -- where did you go to interview
3  Ms. Landry?
4      A.    I went to the Durango annex, which is a holding
5  area for prisoners that are awaiting court dates.
6      Q.    And who else was present when you interviewed
7  Ms. Landry on June 20th of 1990?
8      A.    Detective Mike Chambers.
9      Q.    And you mentioned her attorney was there?
10     A.    Her attorney Dan Roth.
11     Q.    And was anyone else there?
12     A.    Not that I know of.  I don't indicate anything.
13     Q.    Look at the bottom --
14     A.    Oh, his investigator.
15     Q.    Okay.  So Dan -- her attorney's investigator?
16     A.    Yeah, Dan Roth's investigator.
17     Q.    And what information did she share with you?
18     A.    Well, she would generally go over it with me
19  but that she had been placed in the psychiatric ward and
20  that Debra had a previous cellmate, but that person had
21  left.  So she was placed in there with her and that at
22  first it took a while, but she started getting a little
23  bit more friendly with her, and they started to talk
24  about -- she knew -- the informant knew what -- who she
25  was and why she was in -- in jail for.  But she thought

Page 828

1  that she had -- you know, she said she knew she confessed
2  and whatever and --
3      Q.    Did she make any statement to you that
4  implicated Debra Milke's involvement in Christopher's
5  murder?
6          MR. BRUSTIN:  Objection.  Leading.  Hearsay.
7          THE WITNESS:  If you don't mind, I'm
8  reviewing it.
9      Q.    BY MS. BERKE:  You can review that to refresh
10  your recollection.  That's fine.
11     A.    She said something to the effect that she was
12  feeling -- at this point, she was feeling really bad
13  because her roommate had left -- her cellmate and that
14  she was feeling the same way she felt that morning when
15  she saw her son Chris leave that -- leave and knowing
16  that he would not be back.
17         She said that Debra must have realized what
18  she said and tried to correct it and did.  She -- she
19  played it off as something else and said that she was --
20  felt that same when Chris left that morning, not knowing
21  if he would ever return or not.
22     Q.    So she -- I'm sorry.  Go on.
23     A.    She spoke about her ex-husband Mark and that he
24  had -- she felt he should be punished because he screwed
25  up their marriage and --

Page 829

1          MR. BRUSTIN:  We've been going awhile.
2  Could we take just a minute?
3          MS. BERKE:  Sure.
4          MR. BRUSTIN:  Any estimate, Lori?
5          THE VIDEOGRAPHER:  We are off the record at
6  6:10 p.m.
7          (A recess was held off the record.)
8          THE VIDEOGRAPHER:  We are back on the record
9  at 6:26 p.m.
10         MS. BERKE:  All right.  The attorneys have
11  had a conversation while we were off the record, and we
12  consulted with Mr. Saldate, and we have agreed that we're
13  going to break at this time and reconvene at a later
14  date, possibly December 20th.  We're all going to hold
15  December 20th, but if that doesn't work, we'll
16  reschedule -- we'll finish the deposition on a date that
17  coincides with other depositions in this case.
18         MR. BRUSTIN:  Other depositions that I'm
19  taking.
20         MS. BERKE:  That you're taking.
21         MR. BRUSTIN:  Okay.
22         MS. BERKE:  And you have 20 minutes left?
23         MR. BRUSTIN:  Twenty-seven.
24         MS. BERKE:  Twenty-seven minutes left.  All
25  right.

Page 830

1          THE VIDEOGRAPHER:  This concludes today's
2  deposition of Armando Saldate.  The master videotapes
3  will be taken maintained by Esquire.  We're off the
4  record at 6:26 p.m.
5          (Whereupon the proceedings ended at
6  6:26 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



ARMANDO SALDATE Volume III
MILKE vs CITY OF PHOENIX

November 15, 2017
831–834

Page 831

```
1              CERTIFICATE OF REPORTER
2    STATE OF ARIZONA    )
                         )
3    COUNTY OF MARICOPA   )
4
5         I, Sommer E. Greene, a Certified Reporter in the
     State of Arizona, do hereby certify that the foregoing
6    deposition was taken before me in the County of Maricopa,
     State of Arizona; that an oath or affirmation was duly
7    administered to the witness, ARMANDO SALDATE, pursuant to
     A.R.S. 41-324(B); that the questions propounded to the
8    witness and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
9    typewriting; that the transcript is a full, true and
     accurate record of the proceeding, all done to the best
10   of my skill and ability; and that the preparation,
     production and distribution of the transcript and copies
11   of the transcript comply with the Arizona Revised
     Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
12        The witness herein, ARMANDO SALDATE, has
     requested signature.
13        I FURTHER CERTIFY that I am in no way related
     to any of the parties nor am I in any way interested in
14   the outcome hereof.
15
          IN WITNESS WHEREOF, I have set my hand in my
16   office in the County of Maricopa, State of Arizona, this
     30th of November, 2017.
17
18        Sommer E. Greene
19
          Sommer E. Greene, RPR, CRR, RMR
20        Certified Reporter 50622
21
          /S/
22   _____
     For Esquire Deposition Solutions
23   Registered Reporting Firm No. R1048
24
25
```

Page 832

```
1    Milke v. City of Phoenix, et al.

     ASSIGNMENT NUMBER 684822
2
3         DECLARATION UNDER PENALTY OF PERJURY
4         I declare under penalty of perjury that I
5    have read the entire transcript of my deposition taken in
6    the above-captioned matter or the same has been read to
7    me, and the same is true and accurate, save and except
8    for changes and/or corrections, if any, as indicated by
9    me on the DEPOSITION ERRATA SHEET hereof, with the
10   understanding that I offer these changes as if still
11   under oath.
12
13   Signed on the_____ day
14   of _____ 20__.
15
16
17
18   _____
     ARMANDO SALDATE
19
20
21
22
23
24
25
```

Page 833

```
1              DEPOSITION ERRATA SHEET

          ASSIGNMENT NUMBER 684822
2
3    Page No.____Line No.____Change to:_____
4    _____
5    Page No.____Line No.____Change to:_____
6    _____
7    Page No.____Line No.____Change to:_____
8    _____
9    Page No.____Line No.____Change to:_____
10   _____
11   Page No.____Line No.____Change to:_____
12   _____
13   Page No.____Line No.____Change to:_____
14   _____
15   Page No.____Line No.____Change to:_____
16   _____
17   Page No.____Line No.____Change to:_____
18   _____
19   Page No.____Line No.____Change to:_____
20   _____
21   Page No.____Line No.____Change to:_____
22   _____
23   Page No.____Line No.____Change to:_____
24   ARMANDO SALDATE
25   Signature:_____
```

Page 834

```
1              DEPOSITION ERRATA SHEET
2         ASSIGNMENT NUMBER 684822
3    Page No.____Line No.____Change to:_____
4    _____
5    Page No.____Line No.____Change to:_____
6    _____
7    Page No.____Line No.____Change to:_____
8    _____
9    Page No.____Line No.____Change to:_____
10   _____
11   Page No.____Line No.____Change to:_____
12   _____
13   Page No.____Line No.____Change to:_____
14   _____
15   Page No.____Line No.____Change to:_____
16   _____
17   Page No.____Line No.____Change to:_____
18   _____
19   Page No.____Line No.____Change to:_____
20   _____
21   Page No.____Line No.____Change to:_____
22   _____
23   Page No.____Line No.____Change to:_____
24   ARMANDO SALDATE
25   Signature:_____
```

