1-13

| | | | | 0551 | | WILLIAMS, HERBERT | N | 87-155451 |

H M · HOMICID:

2425 E. Sahuaro Drive · 0745

retired

996-5513
DARREL WILLIAMS · 9810 N. 37 St · 996-4872

2425 E. Sahuaro Drive · 87-155451

12-6-87  0553 hrs · HOMICIDE

SEE BELOW

17. WITNESS OR INVESTIGATIVE LEADS: PERSONS WHO MAY HAVE COMMITTED OR HAVE KNOWLEDGE OF OFFENSE

Cross Index:  1.  Homicide 87-155451A
WILLIAMS, JACQUELINE, W/F,
2425 E. Sahuaro Drive
12-6-87  0553 hrs

Dissemination is restricted to
Criminal Justice Agencies ONLY
Secondary Dissemination to Non
C. J. Agencies is PROHIBITED.

2.  Burglary 87-155449
DAVIS, ROBERT J.
2431 E. Sahuaro Drive; 867-3480
12-6-87

Phx PD          Date: 8-12-93
M. Meislish
Co Atny

3.  Attempt Burglary  87-155469
BOURSELL, JACK
2437 E. Sahuaro
12-6-87  0030-0830 hrs

EXHIBIT  64
WIT: Saldate
DATE: 11-15-17
Sommer Greene, RPR, CRR

DET. SALDATE · C313 · 12-8-87  0807  A1724  SIB · 87-155451

**CITY OF PHOENIX, ARIZONA**
**POLICE DEPARTMENT**

MISCELLANEOUS COMPLAINT
OR CRIME REPORT

**RUN 001**

**000935**
**MILKE_NSB001098**

Exhibit 1H

Page - 2

| TYPE OF REPORT | DATE OF SUPPLEMENT | DR # |
|---|---|---|
| HOMICIDE | 12-6-87 | 87-155451 |

| VICTIM'S NAME | LOCATION OF OCCURRENCE |
|---|---|
| WILLIAMS, HERBERT | 2425 E. SAHUARO DRIVE |

| OFFICER WRITING REPORT'S # | SUPPLEMENT # |
|---|---|
| DET. SALDATE #1875 | 87155451.DOC/ORIGINAL |

| DATE & TIME TYPED | BUREAU | CLERK |
|---|---|---|
| 12-8-87 0915 | GIB | A1724 |

Victim's Injuries:  1.  Five (5) stab wounds to chest and back.
                        Also blunt force injury to the head.

Mortuary:              Altmans Mortuary
                       6812 E. Thomas, 947-9244

I-Bureau:              No record

Victim's Personal Property:  1.  Victim's wallet (impounded)

County Attorney:       1.  PAUL AHLER 256-5780
                           Major Felony Bureau

Suspect #1:            W/M, 16 to 19 years, 6' to 6'2", lean built,
                       dark conservative cut hair
                       Clothing: Dark windbreaker, lighter colored shirt,
                                 shirt tail hanging out the back and dark
                                 pants

Suspect #2:            W/M, 16 to 19 years, 5'9", 170#, dark conservative cut
                       hair
                       Clothing: Dark jacket, possibly a windbreaker and dark
                                 pants

Suspect Vehicle:       White full-size vehicle, N.F.D.

Witness #1:            ███████        A.
                       2417 E. Sahuaro Drive, 971-8715
                       Retired
                       (Observed suspect forcibly entering victim's home,
                       called police, supplied suspect information)
                       Interviewed by DET. J. RAINES

**RUN 002**

000936
MILKE_NSB001099

Exhibit 1H

Page - 3

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE 1875 | 87-155451 |

IL #1:    DAVIS, ROBERT
2431 E. Sahuaro Drive, 992-3403
(Victim of burglary, supplied no further information)
Interviewed by DET. T. MORALES

IL #2:    BOURSELL, JACK
2437 E. Sahuaro Drive
Victim of attempt burglary, supplied no further
information)
Interviewed by OFF. BELCHER

IL #3:    BOUERMAN, FLORENCE
2418 E. Sahuaro, 992-9427
(Was awakened by noise at approximately 6:00 AM,
did not investigate. Had no further information)
Interviewed by DET. J. RAINES

IL #4:    SEAPPATICA, ANGELO
W/M, 82 years
2410 E. Sahuaro, 971-5326
(Heard banging noise, looked out. Saw light colored
vehicle parked in front of victim's home, and no further
information)
Interviewed by DET. J. RAINES

IL #5:    POPICK, JAMES
W/M,
▮▮▮▮▮, 971-2600
▮▮▮▮ ▮▮▮▮ ▮▮ ▮611 hrs, newspaper had arrived, saw
nothing.)
Interviewed by DET. A. SALDATE

IL #6:    WILLIAMS, DARREL
W/M
981▮ ▮▮▮▮ Street, 996-4872 / 996-5513
(Assisted victim with carport sale on Saturday, 12-5-87.
Arrived on 12-6-87 to find police. Is also nephew to
victim.)
Interviewed by DET. A. SALDATE

Stolen Property:    1.    Cardboard shoe box, N.F.D. containing proceeds
from previous day's carport sale, approximately
$50 (including one $10 check from unknown person)

Evidence:    See Evidence Impound

000937
MILKE_NSB001100

Exhibit 1H

Page - 4

| TYPE OF REPORT HOMICIDE | VICTIM WILLIAMS, HERBERT | OFFICER SALDATE 1875 | DR # 87-155451 |
|---|---|---|---|

**Fire Personnel:**   Engine 27
FRED EFFER - Paramedic
(Determined victims were dead)

**Uniform Officers:**   1.   OFFICER D.T. BURRY #2954
600 District/Uniform Patrol
(First to arrive on scene, entered residence, discovered victims)

2.   OFFICER G.P. SHAY #2769
600 District/Uniform Patrol
(Arrived shortly after OFFICER BURRY, entered residence, discovered victims along with OFFICER BURRY)

3.   OFFICER R. BELCHER #4353
600 District/Uniform Patrol
(Secured residence, placed crime scene tape around scene)

4.   SGT. L. JACOBS #3829
600 District/Uniform Patrol
(First supervisor on scene)

5.   LT. J. WATSON #1881
600 District/Uniform Patrol
(Senior uniform supervisor on scene)

**Latent Print Examiners:**   1.   RON DAVIS #A348
Crime Lab/Latent Section
(Processed and photographed scene)

2.   MARK HATCHER #a2863
Crime Lab/Latent Section
(Processed and photographed scene)

3.   GARY STONE #A2842
Crime Lab/Latent Section
(Processed and photographed scene)

**Detectives:**   1.   ARMANDO SALDATE #1875
Homicide Detail/General Investigations Bureau
Case Agent

2.   JAMES RAINES #1624
Homicide Detail/General Investigations Bureau
Assistant Case Agent

**RUN 004**

000938
MILKE_NSB001101

Exhibit 1H

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE 1875 | 87-155451 |

    3.   LARRY MARTINSEN #1336
        Homicide Detail/General Investigations Bureau
        Scene Processor

    4.   RUSS DAVIS #2181
        Homicide Detail/General Investigations Bureau
        Assistant Scene Processor

    5.   SGT. TIM BRYANT #1726
        Homicide Detail/General Investigations Bureau
        Case Supervisor

Attachments:    1.   D.R. 87-155449  - Burglary
              2.   D.R. 87-155469  - Attempt Burglary
              3.   D.R. 87-155451A - Homicide

---

On 12-6-87 at approximately 0635 hrs, HERBERT WILLIAMS, W/M, 71 years, and his wife, JACQUELINE WILLIAMS, W/F, 59 years, were found in their home at 2425 E. Sahuaro Drive, dead from apparent stab wounds to their chests and blunt force injuries to their heads. The suspects are currently unknown, however, a witness did provide a limited description on two white males that were seen forcing entry into the victims' home.

On 12-6-87, at approximately 0745 hrs, I was called at my home by SGT. TIM BRYANT and directed to proceed to 2425 E. Sahuaro Drive to assist in this homicide investigation. Upon my arrival, uniform officers had the entire home at 2425 E. Sahuaro Drive secured with crime scene tape. Present at the scene were SGT. BRYANT, DET. LARRY MARTINSEN, DET. RUSS DAVIS and several uniform officers and supervisors. Upon the arrival of DET. JIM RAINES, a briefing was held as to the involvement of uniform officers. SGT. BRYANT then directed DET. MARTINSEN and DET. DAVIS as scene processors, and directed DET. RAINES and myself as the follow-up investigators. The following is the result of the preliminary investigation held at the scene.

At approximately 0915 hrs, DET. RAINES contacted JANIS SNITKE. JANIS, who lives directly west of the victim's residence, said he was awakened shortly before 6:00 AM by loud noises. He said that he then looked out of his window and noticed a large white vehicle parked in front of his residence, facing eastbound with an open rear trunk. He also observed the back of a white male suspect standing over the trunk. At this time, he then turned his attention back towards the victims' home and noticed a white male attempting to force entry into the victim's carport area. He also believes he heard a male subject saying something to the effect of "bring him back in." He then called 911 and requested the police to respond.

000939
MILKE_NSB001102

Exhibit 1H

Page – 6

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE 1875 | 87-155451 |

After several minutes, he again looked outside and noticed that the suspect vehicle had already left. He continued to wait for police to arrive and later had his wife again call for the police to respond. After the arrival of police, he supplied the first units on the scene with the suspect and suspect vehicle description.

During follow-up investigation at the scene, ROBERT DAVIS of 2431 E. Sahuaro Drive was contacted. MR. DAVIS' home is located directly east of the victims' home and he told officers that sometime during the night, he had been the victim of a burglary inside his garage where burglars removed tools and ate some food items from his freezer. He also told officers that a new 10 speed bicycle was missing from inside his garage and that two 4-barrel carburetors and the air scoop had been removed from a 1972 Dodge Charger that was parked in his driveway that belonged to his son. MR. DAVIS had no knowledge of the homicide next door until he was contacted by officers.

Officers also contacted JACK BOURSELL at 2437 E. Sahuaro. JACK advised officers that he had been the victim of an attempted burglary sometime during the night, and that the suspects attempted to get into his front kitchen window by removing the window screen. JACK said that he did not believe entry was made inside his home, however, a report was taken and the area was dusted for fingerprints.

At approximately 0843 hrs, I contacted DARREL WILLIAMS upon his arrival at 2425 E. Sahuaro Drive. DARREL identified himself as the nephew to the victims HERBERT and JACQUELINE WILLIAMS. DARREL said he had arrived at the home to continue the second day of a carport sale that he had been helping his uncle HERBERT WILLIAMS with at the home. DARREL told me that he had no idea of who could have possibly murdered his aunt and uncle and said to the best of his knowledge, they had not had any disputes with anyone. DARREL said he would contact the rest of the family members, and at this point the family had no preference as to a mortuary but would contact police if the situation changed.

Contact was also made with FLORENCE BOUERMAN at 2418 E. Sahuaro, who told police that she was awakened by some loud noises at approximately 6:00 AM, however, she did not investigate and was not aware that anything had occurred until she saw police in the area.

ANGELO SEAPPATICA, who was contacted at 2410 E. Sahuaro, also said he heard banging noises at approximately 6:00 AM and noticed a light colored vehicle parked in front of the victims' home. He said he did not investigate further and did not become aware that something had occurred until police arrived.

JAMES POPICK, who lives directly across the street from the victims, at 2426 E. Sahuaro Drive, said he left for work at exactly 0611 hrs and noticed that the newspaper was in his driveway. He said he looked around and noticed nothing out of the ordinary and then continued to work.

**000940**
**MILKE_NSB001103**

Exhibit 1H

Page - 7

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE 1875 | 87-155451 |

DET. MARTINSEN, who was the scene processor, then provided DET. RAINES and myself a walk-through of the scene. The scene consisted of a single story block home which was on the south side of Sahuaro and faced north. The bodies of HERBERT and JACQUELINE WILLIAMS were observed on the floor of the washroom on the south end of the carport. DET. MARTINSEN indicated that his preliminary examination revealed that both victims had apparently been stabbed. Later, DET. MARTINSEN examined the bodies closer before they were removed to the Medical Examiner's and established that the victims were not only stabbed, but were both struck about the face and head areas.

DET. MARTINSEN then pointed out several items of evidence, including several shoe prints in the carport area and kitchen area and also on the carport door. We also observed a hole in the carport door directly below the door knob which appeared to have been forcibly made.

The victims' bodies were later removed from the scene by Altmans Mortuary and delivered to the Medical Examiner's Office for their examination. For further details in regards to specific interviews and the scene investigation, see individual supplements.

Investigation Continuing.

000941
MILKE_NSB001104

Exhibit 1H

80-1010
REV. 8/85

ITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

**LATENT PRINT
COMPARISON SUPPLEMENT**

| 1. DATE & TIME | 2. TYPE OF REPORT | 3. LOCATION OF OFFENSE | 4. DR # |
|---|---|---|---|
| 0915 12-18-87 | HOMICIDE | 2425 E. SAHAURO | 87-155451 |

COMPARE PRINTS OF THE FOLLOWING PERSONS WITH LATENT IMPRESSIONS OBTAINED IN THIS D.R.

SIGNATURE _____
(OFFICER MAKING REQUEST)

DIV. OR SECTION _____ G I B - HOMICIDE _____ EXT. _____

| LAST NAME | FIRST | MIDDLE | P.P.D. NO. OR PHY. SICAL DESCRIPTION |
|---|---|---|---|
| EAGLE, | SEAN | BERNARD | ■ |

**FOR LABORATORY BUREAU USE ONLY**

FINGERPRINT CLASSIFICATION

19  M  17 W   I o    17   PP's
    L  3 W   M o o    19

Do NOT write below this line — for Laboratory Bureau use only

RESULTS: " Preliminary Exam "

One latent print on lift # 1 marked,
front of Dozer, has been identified as the
right palm impression of Sean Bernard Eagle.

DATE: 12-18-87    TIME: 0920

_Rubie L. Rose_ , A3318
SIGNATURE OF LATENT PRINT EXAMINER  FC 12-18-97

RUN 008

001014
MILKE_NSB001177

Exhibit 1H

| 1. LABEL AND OF RECOVERY | 2. DAY OF WEEK OF RECOVERY | 3. HOUR OF DAY OF RECOVERY 0-23 | | ORIGINATING DISTRICT | | | |
|---|---|---|---|---|---|---|---|

| 16. VALUE OF PROPERTY RECOVERED OR ADDITIONAL PROPERTY TAKEN | | 7. TYPE OF REPORT HOMICIDE | | 9. DATE OF THIS SUPPLEMENT OR. # 12-20-87 | 87-155451 |
|---|---|---|---|---|---|

8. VICTIM'S NAME (Plus Name if Bus.)    11. LOCATION OF OCCURRENCE

PROPERTY RECOVERED ☐   ADD'L PROP TAKEN ☐

WILLIAMS, HERBERT    2425 EAST SAHUARO

$_____ CURRENTLY GOTTEN ETC   $_____ CUSTOMS
$_____ JEWELRY, PRECIOUS METALS, $_____ AUTOS
$_____ FURS   $_____ MISC

CLEARED BY ARREST OR EXCEPTIONAL ADULT CLEARED    OVER 18 ☐   UNDER 18 ☐   YEAR OLD

PENDING ☐   UNFOUNDED ☐   PREVIOUS CLEARED BY ARREST OR EXCEPTION

ADDITIONAL SUSP, LAST, FIRST, MIDDLE    SOC. SEC. #   SEX   DOB (APPROX.) RESIDENCE

Suspect:     ANTONE, ORVA ASHLEY - I/M,
             5', 120, blk., bro.
             Rt. 1, Box 410, Scottsdale, Az.
             Unemployed
             Mother:  VERA RICHARDS, 300 N. Stapley, Mesa

IL's:        SGT. ANDREWS                      Salt River Indian Reservation Police
             OFF. L. LOPEZ                     Salt River Indian Reservation Police
             OFF. K.N. PROCUNIER  #4014  PPD
             OFF. G.F. WAGONER    #4249  PPD

On 12-19-87 at approximately 7:10 p.m., myself and DET. JIM RAINES met with ORVA
ANTONE at his residence at Route 1, Box 410, Scottsdale, Arizona.  This location
is on the Salt River Indian Reservation and we were accompanied by OFF. L. LOPEZ
of the Salt River Indian Police.  ORVA ANTONE had been contacted after his name
had previously surfaced in interviews of ELEANOR, LOUISA, and CHERYL SIVERTSEN.

Prior to meeting with ORVA ANTONE at his residence, we had contacted SGT. ANDREWS
of the Salt River Indian Police.  SGT. ANDREWS had assigned OFF. LOPEZ to assist
us in locating ORVA and his residence.  When contact was made with ORVA at
his residence, he stepped outside to talk to us.  He was advised at that time
we were investigating the homicide that happened approximately two weeks ago
and had learned that he knew of it.  We told him that we did not know his parti-
cular involvement and it was possible he was a witness.  ORVA ANTONE was asked
if he wanted to accompany us down to our police station to talk about this
incident.  MR. ANTONE was quite cooperative and volunteered to accompany us
to 620 W. Washington in Phoenix.

Prior to leaving the Salt River Indian Reservation with ORVA ANTONE, he directed
us to his parents residence at 300 N. Stapley in an attempt to locate his brother,
MILFORD ANTONE.  MILFORD's name had also surfaced from the same sources.  We
could not locate MILFORD and we proceeded to transport ORVA to our police station.

During the trip from the Salt River Indian Reservation to the Phoenix Police
main station, ORVA was not questioned about this homicide and was not advised
of his Miranda.  Upon arrival at the Phoenix Police main station, ORVA was
turned over to DET. LARRY MARTINSEN and DET. ARMANDO SALDATE to be interviewed.

After the interview was completed by DET. MARTINSEN and SALDATE, ORVA was turned
back over to DET. RAINES and myself.  ORVA was then transported to the first
floor of the main police station where he was turned over to OFF. WAGONER,
#4249, and OFF. PROCUNIER, #4014.  OFF. WAGONER was instructed to administer
a GCI test on ORVA ANTONE.  He was also instructed to obtain an extra sample
for the defense.  OFF. WAGONER was also instructed to obtain 35mm photographs

| PAGE # 1 | OFFICER # # TIME REPORT # # DET. R.E. DAVIS 2181 | DATE & TIME TYPED 12-20-87 1130 GIB a2831 | CLEAR # # 87-155451 |
|---|---|---|---|

CONT'D ON PAGE #  2

CITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

SUPPLEMENTARY
60-1A REV 1-82

001020
MILKE_NSB001183

Exhibit 1H

| 1. LOCATION OF RECOVERY | 2. DAY OF WEEK OF RECOVERY | 3. HOURS OF DAY OF RECOVERY D+2 3 | | ORIGINATING DISTRICT | | | |
|---|---|---|---|---|---|---|---|

| 10. VALUE OF PROPERTY RECOVERED OR ADDITIONAL PROPERTY TAKEN | 7. TYPE OF REPORT HOMICIDE | | 7. DATE OF THIS SUPPLEMENT 12-20-87 | DR # 87-155451 |
|---|---|---|---|---|

VICTIM'S NAME (FIRM NAME F.B.I) WILLIAMS, HERBERT

11. LOCATION OF OCCURRENCE 2425 EAST SAHUARO

| PROPERTY RECOVERED ☐ | ADDT'L PROP. TAKEN ☐ | | CLEARED BY ARREST OR EXCEPTIONALLY CLEARED | OVER 18 YEAR OLD ☐ | UNDER 18 YEAR OLD ☐ |

$_____ CURRENCY, NOTES ETC    $_____ CLOTHING

$_____ JEWELRY, PRECIOUS METALS, $_____ AUTOS

| PENDING ☐ | UNFOUNDED ☐ | PREVIOUSLY CLEARED BY ARREST OR EXCEPTION ☐ |

$_____ FURS    $_____ MISC
ADDITIONAL SUSP: LAST, FIRST, MIDDLE

SOC. SEC #    SEX    DOB (APPROX.) RESIDENCE

of ORVA ANTONE and also obtain his finger and palm prints. After the instructed procedures were accomplished, ORVA ANTONE was booked in the Maricopa County jail charged with two counts of felony murder and one count of burglary, first degree.

| PAGE # 2 | OFFICER WRITING REPORT'# DET. R.E. DAVIS 2181 | DATE & TIME TYPED 12-20-87 1145 | GIB | ASGN a2831 | DR # 87-155451 |
|---|---|---|---|---|---|

CONT'D ON PAGE #  —

CITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

SUPPLEMENTARY
60-7A REV 7-80

RUN 010

001021
MILKE_NSB001184

Exhibit 1H

Page - 1

| TYPE OF REPORT<br>HOMICIDE | DATE OF SUPPLEMENT<br>12/20/87 | DR #<br>87-155451 |
|---|---|---|
| VICTIM'S NAME<br>WILLIAMS, HERBERT | LOCATION OF OCCURRENCE<br>2425 E. SAHUARO | |
| OFFICER WRITING REPORT'S #<br>DET. A. SALDATE #1875 | SUPPLEMENT #<br>87155451.10A | |
| DATE & TIME TYPED<br>12/22/87 - 0530 | BUREAU<br>GIB | CLERK<br>A2563sal |

Interview with SUSPECT #2

INDEX:      TILDE       PRESTON
            I/M,          6'1, 160
            lt. BR/BR, SS
            6350 N. 78 St.             sdale
            EMP:  Scottsdale Community College
                  Security Guard
            Booked #1277477

------------------------------------------------------------------

On 12/19/87, at approximately 1320 hrs., DET. LARRY MARTINSEN and myself
contacted COREY TILDEN, I/M, 5/25/69, at 620 W. Washington. The purpose
for this contact was to interview him in regards to this death
investigation.

Upon our initial contact I removed a standard issue Phoenix Police
Department Miranda card and read verbatim COREY'S Miranda rights from this
card. I then asked COREY if he understood his rights and he replied that
he did. I then offered the card for COREY to read and he again replied
that he understood his rights. COREY then told me that he was a student
at Scottsdale Community College where he also worked part-time as a
security guard. He said his nationality was part Chipewyan and Cherokee
Indian and Irish. I commented to him that he did not look like an Indian
but more like an anglo. He then said that most people think he is white.

I then asked COREY why he had outstanding warrants for his arrest. COREY
then told me that the warrants stemmed from a DWI and also for his failure
to report for his sentencing date on a vehicle theft that he was supposed
to get probation on. I then asked COREY if he had been involved in any
burglaries or any other thefts recently. COREY then told me that he was
studying very hard to become an Architect and that his only concern was to
attend Scottsdale Community College to get his degree. I then asked him
if he was still working as a security guard at the college and he said
that he was fired for shooting a bee-bee gun at the archery targets at
Scottsdale Community College. I asked COREY what he did for entertainment
and he told me that he usually attends parties with friends or go to the
movies. He explained that he recently broke up with his girlfriend and is
currently not going with anyone steady. He then told me he doesn't do
.uge.

**RUN 011**

001168
MILKE_NSB001331

Exhibit 1H

Page - 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

I then asked COREY about his cousin, SEAN and asked him if he could describe him for me. He then replied that SEAN was a little shorter than he was, a lot more stocky and then said that he was a "real good guy". He then followed that statement up with saying that his cousin, SEAN was the type of guy who was involved in sports, weight lifting and in football while he was attending high school in South Dakota. I then asked COREY if SEAN had been in any trouble lately and he said that he knew of some problems SEAN had while he was in South Dakota but that was his past and he did not wish to talk about it. I then asked him if SEAN owned a vehicle and he said that he and SEAN both owned a car together and described it as a 67 Cutlass, yellow and primer gray in color. He then said that they had purchased the car from another security guard at Scottsdale Community College who he identified as FRANK CUTTING. He said the car is currently not running and said it has not been running for approximately one month because the transmission was gone. COREY then said that he does not usually work on the car but that SEAN does.

I then noticed that in COREY'S property there was a date book and began to look through it. COREY then told me that he uses the date book to note his work schedule and other things he wishes to remember. I then began going through the book with him and then noted December 5, 1987 and asked COREY if he had done anything special on that date. COREY repeated the date and then said with a smile, that he had attended the Price Club Christmas Party at the Scottsdale Hilton that day. He went on to say that he had originally purchased two tickets which cost him 8 dollars a piece to go to the party and was planning to take SEAN, however, SEAN did not want to go. He said that night a friend of his by the name of BOB, who he described as being a stocker at the Price Club came by in his Mustang and picked him up to go to the party. He said while at the party he and BOB met PAGE and TINA, who are also employees and commented that they had a very good time. He said after the party they dropped TINA off at her car and then he and BOB went to his house and he estimates that they got there at approximately 2:30 a.m. He said his mother, who he identified as MARLENE was also entertaining friends who he identified as DALLAS, TERRY and a person named GIRLIE. I asked COREY if SEAN was present when he arrived at the home and he said he was not. He continued and said that BOB remained at the home for approximately 1 hour and then left. He said he was up for a little while longer and estimates that he went to sleep at approximately 4:00 a.m. He then commented that SEAN had still not arrived home.

At approximately 8:30 or 9:00 a.m. the same morning, he got up after approximately 5 hours of sleep because he had to be at the Price Club to start work at 10:00 a.m. He said shortly after waking up he walked downstairs and into the kitchen and saw SEAN standing near the sink area. He said SEAN really looked bad, his hair was messed up and only said hi to him and then continued to work. He said he remembers later that day it began to rain and they had to work in the rain most of the day. He said he doesn't recall if he saw SEAN when he returned from work, which he estimates would have been approximately 7:00 p.m.

RUN 012

001169
MILKE_NSB001332

Exhibit 1H

| TYPE OF REPORT HOMICIDE | VICTIM WILLIAMS, HERBERT | OFFICER SALDATE #1875 | DR # 87-155451 |
|---|---|---|---|

I then again asked COREY what kind of trouble SEAN had been in in South Dakota. COREY then again reminded me that he thought SEAN was a great guy who doesn't drink, smoke or do any drugs and that he would not talk about SEAN'S past. He then commented that SEAN'S only concern right now was going to school and his steady girlfriend, who he identified as CHERYL who had been living on the Indian Reservation until recently when she moved in with them. At this point I terminated this first interview with COREY.

During this period of time I was advised that SEAN BERNARD RUNNINGEAGLE had been arrested and became involved in the interview of him. At the conclusion of the interview with SEAN I again went to contact and re-interview COREY.

At approximately 1632 hrs. DET. LARRY MARTINSEN and myself again re-entered the interview room with COREY TILDEN. I then told COREY that his cousin, SEAN RUNNINGEAGLE, had been arrested for the homicide of two elderly people at 2425 E. Sahuaro Drive and that he himself had also been implicated in the murder. COREY replied that he had not been involved in any murder and did not know what I was speaking about. I then told him that SEAN'S girlfriend had identified him as being with SEAN, ORVA ANTONE, and MILFRED ANTONE and also being involved in the murder. He again denied any knowledge in the murder and I again told him that SEAN'S girlfriend had also said that she had seen most of the property inside the the trunk of their vehicle and also said that she believed some of the property had been taken out and put into the storage shed of their home. COREY again said that he did not know what I was speaking about and then requested an attorney. At this point the interview was ended and DET. MARTINSEN and myself left the room.

COREY was later taken to the Maricopa County Jail and booked for 2 counts of murder in the 1st Degree.

INVESTIGATION CONTINUING

RUN-015

001170
MILKE_NSB001333

Exhibit 1H

Page - 1

| TYPE OF REPORT HOMICIDE | DATE OF SUPPLEMENT 12/20/87 | DR # 87-155451 |
|---|---|---|
| VICTIM'S NAME WILLIAMS, HERBERT | LOCATION OF OCCURRENCE 2425 E. SAHUARO | |
| OFFICER WRITING REPORT'S # DET. A. SALDATE #1875 | | SUPPLEMENT # 87155451.10B |
| DATE & TIME TYPED 12/22/87 - 0600 | BUREAU CIB | CLERK A2663sal |

### Interview - SUBJECT #1

INDEX:     RUNNINGEAGLE, SEAN BERNARD
           I/M,         , 5'11, 215
           BK/BR,
           6350 N.         St, Scottsdale
           EMP:  Scottsdale Community College
                 Security Guard
           Booking #1277479

---

On 12/19/87, at approximately 1540        DET. LARRY MARTINSEN and myself
contacted SEAN RUNNINGEAGLE, I.M, 1         at 620 W. Washington.  The
purpose of this contact was to interview him in regards to this death
investigation.

Upon entering the interview room I explained to SEAN that I would read him
his Miranda rights.  He then commented that he knew them and then I
removed a card issued by the Phoenix Police Department and was going to
begin to recite these Miranda warnings to him when SEAN began by memory
reciting the Miranda warnings to me.  After he completed the entire
Miranda warnings I told him that if it was okay I would again read them to
him from my card which I did.  I then asked SEAN if he did understand his
rights and he replied that he did.  I then told SEAN that murder was a
very serious crime and that we had already talked with COREY and SEAN'S
girlfriend and that all I wanted from him was for him to tell me the
truth.  He then calmly told me that he didn't know what to say other than
he was not there and didn't know what I was speaking about.  During the
interview SEAN occasionally had a smile on his face and never raised his
voice or showed any concern about his arrest for murder.

I then asked SEAN if he remembered being fingerprinted when he was
approximately 13 years old and SEAN replied that he was 12 years old when
he was printed.  I then commented that during that time he had a cast on
his left hand and he then said that he could not remember the cast.  I
then explained to him that the fingerprint that were taken from him at
the age of 12 were compared to the prints found at the murder scene and
that they were found to be his.  He then said that the fingerprint had to
be someone elses because it was not his.  I explained to him that without

**RUN 014**

001171
MILKE_NSB001334

Exhibit 1H

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 07-155451 |

a doubt the fingerprint was his and his only comment was that his print
shouldn't be there. I then told him that his print was there and that his
only alternative was to tell me the truth. He then very calmly said that
he'd rather talk to a psychiatrist who would understand him. I then
explained to him that I would make every effort to try to understand him
but that I still needed the truth of what occurred. His voice then
cracked and he said that I really didn't know what occurred to him the
last time he went to jail and that I did not know what he had gone through
when he was younger. I again told him that I would try to understand but
he replied that he wanted to remain silent.

I asked SEAN if I was correct in assuming that he was taking Criminal
Justice courses at Scottsdale Community College because he wanted to be a
Police Officer and SEAN replied that I was right. I then explained to him
that if that was true then he had to be aware that faced with the evidence
against him his only alternative was to tell the truth and admit to what
he actually did. He then said that I should have waited for this
interview until after he finished Justice 1 because if I had he would have
been able to tell me who did what. He then told me that he was a very
compassionate person, did not believe in striking any women, would not
hurt anybody and then said, "Look how big I am, but I'm not the type of
person who would strike back".

I then asked SEAN what he had done that night and he did not respond. I
then asked SEAN if he didn't remember being at CHERYL'S house, leaving and
then picking up COREY and then cruising the area of Deer Valley until he
saw a car with a blower. SEAN then commented that he did not remember any
of that occurring. He then smiled and said, "Maybe some day I'll
remember". I continued to try to illicit a response from SEAN as to the
murder, however, he only smiled and would not comment.

Finally SEAN commented in a louder voice and said, "Just let me fall. It
must be my destiny, I must fall". I told him that it was not my job to
charge him with something he did not do and for that reason I only wanted
him to tell me his involvement. He again said that he must fall and that
he would take all of it because it was his destiny.

In an effort to change the direction of the interview I asked SEAN if he
was a religious person and he would not comment. I then asked him if he
believed in God, Jesus Christ, hell and heaven and he responded that he
did. I asked SEAN if he felt he was going to heaven or hell and he
immediately responded that he was going to purgatory. I told him that I
could not believe someone who had killed two people would go to purgatory
and he immediately said he hadn't done that. I told him for the sake of
argument, even though he said he had not killed anyone, I told him that I
did not believe that someone would still go to purgatory after molesting a
young girl and burglarizing and terrorizing several homes as he had done
several years ago. SEAN became very serious and stared at me and said
that he had not done the things they had claimed he did and if they had
been truthful they would have come to court and told the true story. He
then appeared to be frustrated and then told me that all he wanted to see

RUN 045

001172
MILKE_NSB001335

Exhibit 1H

Page - 3

| TYPE OF REPORT<br>HOMICIDE | VICTIM<br>WILLIAMS, HERBERT | OFFICER<br>SALDATE #1875 | DR #<br>87-165461 |
| --- | --- | --- | --- |

was a psychiatrist and would even see a police psychiatrist because I really did not understand him.

At approximately 1625 hrs. SEAN told me that he wanted an attorney and a psychiatrist and wanted to remain silent.  I continued to explain to him my position but finally at 1632 hrs. he again asked for his attorney and I then terminated the interview.

At approximately 1650 hrs. DET. LARRY MARTINSEN asked to see the bottom of SEAN'S tennis shoes.  He immediately recognized the sole pattern as being the same as was found at the scene of the murder.  He then removed both shoes and later impounded both shoes as evidence.

INVESTIGATION CONTINUING

001173
MILKE_NSB001336

Exhibit 1H

Page - 1

| TYPE OF REPORT HOMICIDE | DATE OF SUPPLEMENT 12-20-87 | DR # 87-155451 |
|---|---|---|
| VICTIM'S NAME WILLIAMS, HERBERT | LOCATION OF OCCURRENCE 2425 EAST SAHUARD | |
| OFFICER WRITING REPORT'S # DETECTIVE R. MILLS #2781 | | SUPPLEMENT # 87-155451.13B |
| DATE & TIME TYPED 12-21-87   2114 | BUREAU G.I.B. | CLERK A2663   LGR |

INTERVIEW:    SIVERTSEN, LOUISA
              L/F
                    667
              sdale, AZ.  990-0871
              Parent:  SIVERTSEN, ELEANOR
                    Same address
              Present during conversation.

On 12/19/87 during the late afternoon hours, I was aware that Det. RUSS DAVIS had contacted female associates of SEAN and CORY TILDEN.  I was unaware of what discussions had taken place or which particular individuals Det. DAVIS had interviewed.

At approximately 1632 hours, I was walking past the office where LOUISA SIVERTSEN and her mother ELEANOR were seated.  I was informed by an officer standing just outside the opened doorway that ELEANOR SIVERTSEN had indicated to this officer that she and her daughter wanted to speak to a detective because they had additional information to provide.

I entered the office where LOUISA & ELEANOR were seated and introduced myself.  LOUISA then stated that she had some additional information that she hadn't told the first detective.  I informed LOUISA that I was willing to listen to anything she had to say in connection with this case.

LOUISA then said that on the evening of Saturday, 12/5/87, she and her sister SHERYL were at ORVA ANTONE's home in Bunnyville on the Salt River Indian Reservation watching videos.  LOUISA explained that ORVA's brother MILFORD was also there along with SEAN TILDEN and another Indian male by the name of TYRONE TONTO.  LOUISA continued by saying that at approximately 11:00 o'clock P.M. she and SHERYL decided that it was starting to get late and they should return home.  It was decided that SEAN would drive LOUISA and SHERYL to their home.

I asked LOUISA approximately how long she and the others had stayed at ORVA's.  She indicated she wasn't sure exactly how long, however, they had watched three videos each being approximately one hour long.

LOUISA stated that SEAN drove she and SHERYL home arriving shortly after 11:00 P.M.  After arriving home, LOUISA, SHERYL, and SEAN continued

**RUN 017**

001162
MILKE_NSB001325

Exhibit 1H

Page - 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | R. MILLS | 87-155451 |

watching videos until the early morning hours of 12/6/87. LOUISA approximated that it was about 2:30 A.M. when their mother told SEAN to go home. LOUISA said that SEAN left and she went to bed shortly thereafter.

At this point I asked ELEANOR SIVERTSEN approximately what time she had asked SEAN to go home. She estimated as had LOUISA that it was approximately 2:30 A.M. on the morning of 12/6/87.

ELEANOR then indicated that she received a phone call at approximately 3:30 A.M. on the morning of 12/6/87 and it was CORY TILDEN asking for SEAN. ELEANOR said that she told CORY that SEAN had left approximately an hour ago.

I asked LOUISA when she next saw SEAN and she indicated that it was on the morning of 12/6/87 shortly before 9:30 A.M. LOUISA said she had a short conversation with SEAN during which he related that after leaving LOUISA's home, he had gone back to ORVA's and saw MILFORD and TYRONE there.

I then asked LOUISA if while talking to SEAN he had mentioned obtaining any jewelry, car parts or tools. LOUISA said that none of those items ever came up in the conversation. I then asked LOUISA if SEAN carried a knife and she indicated that SEAN always carries a large hunting knife between the front seats of his car. LOUISA said that she last saw the knife on the morning of 12/6/87 shortly after 9:00 A.M. when she was inside the car. I asked LOUISA to describe the knife for me and she indicated that the blade was approximately six to seven inches long and the handle was black. She said on the end of the handle was a compass and on the inside of the handle was fire starting equipment that she thought may have been a flint and steel.

I asked LOUISA while riding in the car if she had seen any car parts, jewelry or tools that she had not noticed during the evening of 12/5, she indicated that the car was rather junky and had a lot of trash on the inside. She said she did not see anything unusual about the vehicle on the morning of 12/6/87.

I then asked LOUISA to describe ORVA ANTONE for me. She stated he was an Indian male approximately 20 years old, five foot tall, 120 pounds with a muscular upper body for his size. She described his hair as neck length with a tail and black in color. He stated he had a dark complexion and acne. As to where ORVA lived, LOUISA said that he lived in Bunnyville on the Reservation. I asked LOUISA to describe MILFORD for me and she said that MILFORD was an Indian male, 21 years old, approximately 5'1, 115 pounds with black neck length hair, dark complexion and acne. She stated that MILFORD and ORVA looked very much alike, however, MILFORD is slightly taller and less muscular in the upper body. I then asked LOUISA to describe TYRONE TONTO for me. She stated that he is not a resident of the Salt River Reservation and only comes there sporadically. She stated that he is a San Carlos Apache and lives on the San Carlos Reservation. She

001163
MILKE_NSB001326

Exhibit 1H

| TYPE OF REPORT HOMICIDE | VICTIM WILLIAMS, HERBERT | OFFICER R. MILLS | DR # 87-155451 |
|---|---|---|---|

described him as an Indian male, 22 years old, 5'10 to 6', approximately 185 pounds with black hair to the shoulder or slightly longer.  LOUISA said she had not seen TYRONE since the evening of 12/5/87 and presumed that he had gone back to the San Carlos Reservation.

I asked LOUISA if SEAN on the morning of 12/6/87 had mentioned anything about burglarizing homes or assaulting people and she indicated that during their short conversations, he never mentioned anything of that sort.

At 1655 hours, I ended my conversation with LOUISA and her mother, ELEANOR.

001164
MILKE_NSB001327

Page - 1

| TYPE OF REPORT<br>HOMICIDE | DATE OF SUPPLEMENT<br>12-20-87 | DR #<br>87-155451 |
|---|---|---|
| VICTIM'S NAME<br>WILLIAMS, HERBERT | LOCATION OF OCCURRENCE<br>2425 EAST SAHUARO | |
| OFFICER WRITING REPORT'S #<br>DETECTIVE R. MILLS #2781 | | SUPPLEMENT #<br>87-155451.13C |
| DATE & TIME TYPED<br>12-21-87   2216 | BUREAU<br>G.I.B. | CLERK<br>A2663   LGR |

SEARCH WARRANT SUPPLEMENT:

SEARCH WARRANT #1

AFFIANT:   Det. R. MILLS #2781
FINDER:    Det. R. MILLS #2781

ASSISTING DETECTIVES:     DET. A. SALDATE
                          DET. L. MARTINSEN

JUDGE:   A. DAVID BRAUN, East Phoenix #1
         Signed 12-19-87, 10:37 P.M.
         Served 12-19-87, 11:05 P.M.

SEARCH WARRANT #2

AFFIANT:   DET. R. MILLS #2781
FINDER:    DET. R. MILLS #2781

JUDGE:   A. DAVID BRAUN, East Phoenix #1
         Signed:   12-20-87
         Served:   12-20-87

Property from Search Warrant #1:

1.   large knife with black handle
2.   tire iron
3.   miscellaneous papers to SEAN RUNNING EAGLE
4.   screwdriver
5.   open and box end wrenches
6.   hack saw
7.   Craftsman Metric wrenches
8.   valve cover nuts
9.   Craftsman torque wrench
10.  blue bicycle seat
11.  socket set
12.  tan and brown wallet
13.  miscellaneous tools, screwdrivers, pliers, punch
14.  set of wrenches - large

**RUN 020**

001165
MILKE_NSB001328

Exhibit 1H

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | R. MILLS | 87-155451 |

15.  green tool box and tools
16.  electrical cords
17.  two carburetor
18..  two jack stands
19.  Murry Adagio 12 speed bicycle
20.  front bicycle tire and wheel
21.  flashlight
22.  shoes with dimple pattern, Reebok
23.  two bolt cutters
24.  hood scoop
25.  shoe box - red
26.  Craftsman screwdriver
27.  flashlight
28.  black shoes with horizontal line sole

Property From Search Warrant #2:

1.  1976 Oldsmobile AZ. license PJQ-653

On 12/19/87 after speaking with Detectives SALDATE and MARTINSEN, I had amassed sufficient information to prepare a search warrant for the home at 6350 N. 78th Street #262. Armed with that search warrant after it was duly signed at 10:37 P.M. on 12/19/87, I proceeded to the located indicated and executed the warrant at approximately 11:05 P.M. Upon my arrival at the home, I contacted Officer KEN HOGAN who had been instructed several hours earlier to secure the residence pending the issuance of the search warrant.

I contacted MARLENE TILDEN the occupant and resident of the home and informed her of my name and the fact that I possessed a search warrant for the residence. At that time I handed her a copy of the search warrant outlining the items sought and the locations to be searched.

Subsequent to informing MARLENE as to what would occur, I proceeded in the search and obtained twenty-eight items as listed earlier in this supplement.

On the morning of 12/20/87 at approximately 0130 hours, I supplied MARLENE TILDEN with a copy of the items taken then surrendered the home to her.

The items were returned to 620 W. Washington and secured in the main police station.

On the afternoon of 12/20/87, I drew a second search warrant to specifically look in the 1967 Oldsmobile for signs of blood. After the search warrant was signed, I proceeded to 6350 N. 78th Street #262 where I

001166
MILKE_NSB001329

Exhibit 1H

Page - 3

| TYPE OF REPORT HOMICIDE | VICTIM WILLIAMS, HERBERT | OFFICER R. MILLS | DR # 87-155451 |
|---|---|---|---|

instructed that the vehicle be taken and towed to 620 W. Washington. The vehicle was seized at approximately 1725 hours.

The vehicle was towed to 620 W. Washington where it was placed in an evidence cage in the basement pending forensic examination.

**RUN 022**

001167
MILKE_NSB001330

Exhibit 1H

| TYPE OF REPORT<br>HOMICIDE | DATE OF SUPPLEMENT<br>12/20/87 | DR #<br>87-155451 |
|---|---|---|
| VICTIM'S NAME<br>WILLIAMS, HERBERT | LOCATION OF OCCURRENCE<br>2425 E. SAHUARO | |
| OFFICER WRITING REPORT'S #<br>DET. A. SALDATE #1875 | | SUPPLEMENT #<br>87155451.10C |
| DATE & TIME TYPED<br>12/22/87 - 0630 | BUREAU<br>QIB | CLERK<br>A2563sal |

Interview - SUSPECT #3

INDEX:            ASHLEY

BK/BR,
Rt. 1 Box 410, Scottsdale
Unemployed
Booking #1277547

--------------------------------------------------------------

On 12/19/87, at approximately 1945 hrs., DET. MARTINSEN and myself
contacted ORVA ANTONE, I/M, 8/13/67 at 620 W. Washington. The purpose of
this contact was to interview ORVA as to his involvement in this homicide
investigation.

Upon my contact with ORVA I identified DET. MARTINSEN and myself and then
removed a Miranda rights card issued by the Phoenix Police Department and
read ORVA'S Miranda rights to him verbatim. I then asked ORVA if he
understood his rights and he then responded by saying yes. ORVA appeared
to smell of alcohol and I asked ORVA if he had been drinking and he
replied that he had only had one beer earlier. He also said that he had
finished half the year of the 11th grade, had been an average student, had
never been advised of his rights nor been arrested before.

I began by telling ORVA that his name had been mentioned as being involved
with SEAN and COREY and possibly his brother MILFORD in a situation where
some items were stolen and two people were killed. ORVA immediately said
that he recalled being with SEAN, COREY and his brother MILFORD but that
he and MILFORD were drunk that night and he did not remember anything. I
explained to ORVA that his explanation about being too drunk to remember
would normally be sufficient on minor cases, however, we were speaking
about a murder and that it would be to his benefit to remember everything
he did that night. ORVA said he understood and would try to remember
everything.

I then asked ORVA if he remembered being with SEAN, COREY and his brother,
MILFORD late one night in COREY'S car and he immediately replied that he
believed it was SEAN'S car. He said that they were cruising around
stening to the radio and drinking when they decided to go to SEAN'S

RUN 023

001174<br>MILKE_NSB001337

Exhibit 1H

| TYPE OF REPORT HOMICIDE | VICTIM WILLIAMS, HERBERT | OFFICER BALDATE #1875 | DR # 87-155451 |
|---|---|---|---|

house and use the jacuzzi. He said that later they left SEAN'S house, went cruising again and then at one point they stopped because SEAN said that they needed some gas. He said that he and his brother MILFORD remained in the car and he believes he was sitting in the right front passenger seat. I asked ORVA if they stopped at a gas station and he replied that they had not. I asked them if they had removed gas from other vehicles and he replied that they had. He then said that later they dropped him off at home.

I immediately told ORVA that he was not telling me the truth because I know that they had gone to CHERYL'S house and then had done something later on that night. ORVA then smiled and said, "Oh yeah, okay, that's right". ORVA then said that he was at CHERYL'S house and remembered his brother, CHERYL, LISA, who is CHERYL'S sister and SEAN being with him. He said that he and SEAN and his brother MILFORD then left CHERYL'S house and he believes he was seated in the right front seat. He said he remembers that they were cruising and listening to the radio and the next thing he remembers was that CORRY was also in the car. He said he remembers this because he and COREY were arguing, however, he does not remember what they were arguing about. He said that he remembers stopping at SEAN'S house and believes that they may have picked up COREY there, however, he was not sure. Shortly after leaving SEAN'S house they stopped and SEAN said that they needed some gas. I asked ORVA if they were going to siphon gas from other cars and he replied that COREY and SEAN got out of the car and did exactly that. He said he remained in the car with his brother talking and at this time he believes he was in the back seat.

A short time later COREY and SEAN returned to the car and they again left cruising listening to the radio. He then remembers again stopping somewhere and remembers SEAN and COREY getting out. He said his brother MILFORD was passed out in the back seat and that he remained in the back seat also, for several minutes. He finally got out of the car and noticed that SEAN was working on someone else's car. ORVA then described them parking in front of a house and then said that SEAN was working on a car in the driveway of another house. He said he then noticed the trunk of their car open and COREY standing by it. He said he remained standing by the car and observed COREY walk away from the car and then observed him standing next to SEAN while SEAN worked on another car. I asked ORVA how he knew SEAN was working on the car and he replied that the hood of the car was up. He then saw COREY walk back towards their car but did not notice if he had anything in his hands.

ORVA then said the next thing he realized was that SEAN was standing in front of the yard away from the car he was working on, talking to a white man. He then observed SEAN hit this white man with his fist. He said he then walked over to where SEAN was and then noticed COREY was standing next to him. He said he told SEAN to leave the man alone and then was hit by COREY. I asked ORVA why COREY hit him and he replied that he did not know. He then said that he believes SEAN had his knife because he had been using it to work on the car. He said he thought he saw COREY with a screwdriver but then saw him drop it and then he picked it up and later


RUN 024

| TYPE OF REPORT HOMICIDE | VICTIM WILLIAMS, HERBERT | OFFICER SALDATE #1875 | DR # 87-155451 |

put it in the trunk of their car.  ORVA then said that the next thing he
knew they were all in the car and they then dropped him back home.

I again told ORVA that he was not telling me the entire truth and asked
him if he remembered SEAN or COREY giving him some beer on the way home
and he replied that he remembered COREY giving him some cheap beer which
he identified as Strohs, on the way home, but he did not know where they
had gotten it from.  I then asked him if he remembered SEAN taking
anything from the car he was working on and ORVA said, "Yeah, I think so".
I then asked ORVA if this part was a carburetor and he replied that he
remembered two carburetors that SEAN gave him to take to the car.  He said
he put both carburetors on the hood of SEAN'S car and later remembers
walking back to the car where SEAN was working.  He said he does not
remember going inside a garage but remembers being told by COREY and SEAN
to take several items to their car.  He said he specifically remembers a
green bike which had two flat tires, a big sprocket and some gears.  He
said he walked over to their car and that the trunk was open and he was
going to put the bicycle in it, however, it did not fit.  He said he then
removed pliers from SEAN'S trunk and removed the front tire and placed the
bicycle in the trunk.

I then asked ORVA if he could recall any other items that he placed in the
trunk and he said that he remembers a tool box.  I then asked ORVA if he
remembered a floor jack and he replied that he did.  He said that SEAN
gave him the floor jack and told him to take it to the car and when he got
there he had to take the bicycle out which he had put in and the tool box
which he also had put in and as he was trying to the put the floor jack
in, which he described as very heavy, he dropped it into the trunk area.
He said that he then put the tool box back in and then the bicycle.  After
doing this he said that he then walked back to where SEAN was working on
the car.

ORVA then said that he does not recall what he was carrying but he
believes that it was very heavy and was walking from the car where SEAN
was working to their car when he heard a lady yelling.  He said that he
then heard SEAN yelling at the lady to leave him (ORVA) alone and then
noticed SEAN talking to a man in the front yard.  He said when he got to
the trunk area COREY, who had been standing there earlier, then walked
over to where SEAN was arguing with a man.  ORVA said he thinks COREY
started yelling at the lady and that the lady was yelling at him.  He said
COREY was carrying a long heavy black flashlight which he knew belonged to
COREY.  He said he saw the lady walking towards the house when COREY hit
her with the flashlight.  I then asked ORVA to point out where COREY hit
the lady and ORVA then pointed towards the back of his own ear on the left
side of his head.

ORVA was asked to give me a description of the man and lady he had seen
arguing with SEAN and COREY and he replied that he could not.  I asked
ORVA if he could tell me their ages and ORVA said he could not.  I asked
ORVA if he could tell me how tall the man was and he said that he believed
that he was the same size as SEAN.  I finally asked ORVA if he could tell

001176
MILKE_NSB001339

Page - 4

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

me what they were wearing and he said he didn't know but he thought maybe
the lady was wearing a dress or something. ORVA then told me that the man
kept telling COREY and SEAN to just leave.

ORVA said he then got back into the car to check how his brother was and
he noticed that his brother was still passed out in the back seat. He
said he then got back out of the car and heard the woman yelling to SEAN
and COREY to leave her alone. He said that COREY was standing next to her
and that he observed COREY hit her first with his hand and then with the
flashlight. ORVA then said that he thinks that SEAN first had the
flashlight because he thinks SEAN was using it to work on the car. I then
asked ORVA if he could describe COREY'S actions any better and he said
that COREY was standing next to the lady and it looked like COREY was
going to walk away but then he quickly turned and swung the flashlight at
her striking her on the head. He said he heard the lady yell but he
doesn't know what she said but he thinks she probably told him not to hit
her again.

I then asked ORVA if SEAN still had the knife in his hand when he was
talking to the old man and he said that SEAN had grabbed the knife and was
holding the handle of the knife in his hand with the blade pointed up
along his forearm. He then described the knife as being about a foot long
and said it was a big knife.

ORVA then remembered that the woman looked older and said she had a
squeaky voice. He remembers that because she kept yelling at them to get
out of here and to leave them alone.

I asked ORVA what COREY and SEAN were wearing that night and he said that
COREY had his black jacket and SEAN was wearing a grayish shirt but that
his jacket was still in their car. ORVA said that he was wearing levis, a
dark shirt and his boots.

At this point I told ORVA to again go over the sequence of events and I
told him that I was somewhat confused. He then told me that he was trying
to remember everything and would try hard to tell me the truth. I then
asked ORVA if the man and the lady came out of the house where SEAN was
working on the car and he said that the man and the woman had to come out
of the house next door to the house where SEAN was working on the car.
DET. MARTINSEN then drew a simple diagram depicting two homes, the front
yards, the driveway areas and then drew a car in one of the homes and then
drew another car parked in the street in front of the home next to it. I
then asked ORVA if this was the way he remembered it and he replied that
it was. ORVA then pointed to the house next to the house where the car
was parked in the driveway which would have been the WILLIAMS' residence
and then pointed toward the driveway and said that the man came out of
this house. He said that the man came out first and walked across the
front yard toward SEAN who was working on the car. He said at that time
he and SEAN were standing next to the car, with the hood up. He said he
first saw the man walking towards them and asking them what they were
doing. He said he immediately began to walk away from the car and back to

**001177**
**MILKE_NSB001340**

Exhibit 1H

Page - 6

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

their car and then noticed COREY, who had been by their car, walking
towards the old man from behind. ORVA said that he thought he had gotten
a lot of the stuff loaded in their trunk before the man came out. He said
he thinks he heard the man tell SEAN that they better leave or he was
calling the police. He said he then observed COREY walk up next to the
man and that the man appeared to shove COREY away. The man then turned
around and was going to walk away when COREY grabbed him and hit him with
his hand. He said the man continued to walk towards the driveway. He
then saw SEAN and COREY walking behind the man and SEAN and COREY were
talking to each other. He saw COREY had the flashlight in his hand and
SEAN had the knife by the handle with the blade pointing upward along his
forearm.

ORVA said that he thinks the man got to the driveway when he heard a lady
coming out of the house and then he said, "The lady and the old man began
talking". It should be noted that this is the first time that ORVA
described the man as old.

ORVA said that he was at the open trunk of their car when he saw COREY and
SEAN now talking to the man and the woman in the driveway. He said COREY
still had the flashlight and SEAN still had the knife. He said he thinks
that SEAN and COREY were arguing with the man and the lady. He said he
realised that they had been stealing stuff off the car and other items but
that he just wanted to leave so he walked over to where they were and told
them, "lets go". He said he doesn't know whether it was COREY or SEAN
that told him to just get away. He said he then saw COREY turn and appear
to start walking away when he quickly turned and swung the flashlight,
which he had in his hand, hitting the lady on the head. I again asked him
to point out where COREY hit the lady and he then pointed to his own head
on the left side and pointed towards the back of the ear. He said as soon
as COREY hit the lady the man came over to them yelling at COREY to leave
her alone. He then heard the man yell at SEAN to put the knife away. He
said he then seen SEAN teasing the man with the knife, thrusting the knife
back and forth towards him. He heard the man tell them to just get out of
there and as SEAN was teasing the man with the knife he saw SEAN drop it
but he then quickly picked it up and he thinks he struck the man on the
face with the knife handle.

I asked ORVA what the lady was doing and he said that he thought she had
fell to the driveway but the next thing that he knew that she was standing
holding her face and yelling at them to leave. I asked ORVA if he could
tell me where in the driveway this was occurring and he said that there
was a car in the driveway and that they were towards the back of the car.
ORVA said all he wanted to do was leave and again said that he realized
they were stealing stuff but he did not want to get involved with COREY
and SEAN and the man and woman. He said he then began to walk back
towards their car and heard SEAN yelling at COREY to give him the
flashlight. He said he heard also more arguing and yelling from COREY and
SEAN and when he reached the trunk area of their car he stood there for a
moment and then looked back and saw SEAN and COREY but did not see the man
and the woman. He said he then got into the car in the back seat, waited

**RUN 027**

001178
MILKE_NSB001341

Exhibit 1H

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

for a moment and then observed SEAN and COREY run to the car and heard
COREY telling SEAN, "lets go, lets go". He said SEAN started the car and
then drove a short distance and he believes that SEAN turned the car
around and believes he may have hit something. He said he then remembers
driving real fast for a short distance and then remembers going around a
sharp curve. He said that when SEAN got into the the car he threw his
large knife, which he had been carrying on the dashboard, and that when
COREY got into the car he threw his flashlight towards him in the back
seat. He said the flashlight hit him and he immediately threw it back
towards the front seat at COREY. He said he remembers SEAN and COREY were
laughing real hard. I asked ORVA what they may have been laughing about
and he said he didn't know.

I again asked ORVA if this was all he could remember and he then said,
with a smile, "Well the lady did kick me". I then asked him to explain
and he said that while SEAN and COREY were having the argument with the
man and the lady he remembered that he had gone back to the car to pick up
something and was returning with it when he tripped and fell against
COREY'S legs. He said that he then felt someone kicking him and he thinks
that the lady may have kicked him because COREY was standing next to her
arguing with her when he fell. I then asked ORVA if it could have been
possible that COREY kicked him rather than the lady and he thought for a
moment and said, "Yeah, you're probably right it was probably COREY that
kicked me". He said he remembered falling several other times and
explained that he was pretty drunk during this time.

DET. MARTINSEN then asked him if he remembers ever going inside the house
that belonged to the man and the lady and ORVA replied that he remembers
standing inside on the door step but never went inside. ORVA then said
that he did see COREY and SEAN inside the home but that he did not know
what they were doing. I then asked him if he remembered seeing a hole in
the door and he then said, "SEAN made the hole in the door with a bar he
got from next door but I think the people were still inside". DET.
MARTINSEN then asked ORVA again if he remembers being inside the home and
he said that he remembered CORRY and SEAN being inside and that he walked
to the door that was open. He said that COREY then walked out and before
he knew it COREY was behind him and then pushed him inside the house. He
said he only got inside the doorway and remembers that there was a cabinet
on the right side of the door and also remembers a light shining from
somewhere on the left side of the room. I asked him if he saw the man and
the woman lying on the floor and he said that he did not think he saw
anyone on the floor and was only at the doorway for just a moment. He
said when he stepped out, COREY again walked back inside the home and he
then walked back towards their car. He said he remained outside the car
by the trunk for a short while and then he got into the back seat and
waited for COREY and SEAN.

DET. MARTINSEN then asked COREY if he was aware of any news accounts of
the murder that COREY and SEAN committed. ORVA said that he did not know
that SEAN and COREY had killed the man and the woman and that he really

RUN 028

Exhibit 1H

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|----------------|--------|---------|------|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-165451 |

didn't know what had happened to them.  He said he hadn't watched TV and
doesn't receive the paper and was not aware of the murder until today.

I asked ORVA if this was all he could remember and he said that it was.
At this point I had ORVA taken to the breathalizer room and had a
qualified officer run a breathalizer on him after observing him for the
required 20 minutes.  A sample of ORVA'S breath was taken which measured
.00 on the machine.  Another sample was also taken for the defense and
impounded as evidence.  ORVA was then fingerprinted and then transported
to the Main Jail for booking.

INVESTIGATION CONTINUING

001180
MILKE_NSB001343

Exhibit 1H

07-99026



1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2            IN AND FOR THE COUNTY OF MARICOPA

3

4  STATE OF ARIZONA,

5          Plaintiff,

6     vs.            No. CR-87-11508

7

8  SEAN RUNNING EAGLE, and
   COREY TILDEN,

9          Defendants.

10

11

12

13                 Phoenix, Arizona
                June 20, 1988

14

15

16  BEFORE:  The Honorable GLORIA G. YBARRA, Judge

17

18

19          REPORTER'S TRANSCRIPT OF PROCEEDINGS

20                 Motions

21

22

23  **ORIGINAL**

24  PREPARED FOR APPEAL
    For Supreme Court

25

                       LYDIA ESTRADA
                       Official Court Reporter

_Stamps:_

FILED ____ LODGED
RECEIVED ____ COPY
JAN 0 5 1999
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ D DEPUTY

CIV 98-1903 PHX PGR

FILED
APR 28 1989
NOEL K. DESSAINT
CLERK SUPREME COURT
BY

1989 APR 26 PM 12:48
FILED

DISCOVERY AND CONFIDENTIAL MATERIAL
SALDATE000581

**RUN 030**

SUPERIOR COURT

Exhibit 1H



NOTES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**RUN 031**

SUPERIOR COURT

SALDATE000582

Exhibit 1H

2

```
 1    APPEARANCES:

 2                    PAUL AHLER
                      Deputy County Attorney
 3                    For the State

 4

 5                    BALTAZAR INIGUEZ
                      Attorney at Law
 6                    For the Defendant Running Eagle

 7
                      ROLAND STEINLE
 8                    BRENT GRAHAM
                      Deputy Public Defenders
 9                    For the Defendant Tilden

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**RUN 032**

SALDATE000583

SUPERIOR COURT

Exhibit 1H

3

I N D E X

| WITNESS | DR | CR | RDR | RCR |
|---|---|---|---|---|
| Armando Saldate | 14 | 24 | 35 | |
| Larry Martinsen | 42 | 44 | 49 | 50 |
| Sean Running Eagle | 51 | 61 | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SALDATE000584

Exhibit 1H

4

```
 1                                      Phoenix, Arizona
                                        June 20, 1988
 2

 3

 4              (Whereupon, the following proceedings took place

 5      in open court.)

 6              THE COURT:  CR-87-11506.  State vs. Sean Running

 7      Eagle and Corey Tilden.

 8              MR. AHLER:  Paul Ahler for the State.

 9              MR. INIGUEZ:  Baltazar Iniguez appearing for

10      Running Eagle.

11              MR. STEINLE:  Roland Steinle from Public

12      Defender's.  I will be assisted throughout the trial by

13      Brent Graham, Your Honor.

14              THE COURT:  I am sorry to keep you waiting so

15      long.  I appreciate your understanding.

16              I also need to address the Motion in Limine.

17      As I previously indicated to you I expected to have a

18      ruling for you earlier.  It has caused me more difficulty

19      than I had anticipated.  But I have come to a ruling.

20      It's not as yet in written form and it will be, but let

21      me just go over it with you at this time.  It's not an

22      across the board ruling in terms of not everything has

23      been eliminated or left in either way.

24              So let me first go into the statements that

25      were made by Defendant Running Eagle to Sheryl Sivertsen
```

Exhibit 1H

5

1    implicating both herself and Tilden.  What I have

2    determined on the basis of the law that has been provided

3    and the Rules of Evidence as what is most appropriate in

4    keeping with a fair trial, is that any references to

5    Corey Tilden be redacted, eliminated in any way.  It

6    would implicate Mr. Tilden.  They will be admissible as

7    against Running Eagle.  What I would like to have is a

8    form presented to the Court that will indicate what

9    references will be redacted as well as a proposed form of

10   a cautionary instruction to the jury.

11           With regards to the statements made by Corey

12   Tilden to Sean Running Eagle and Sheryl Sivertsen

13   implicating both himself and Defendant Running Eagle,

14   those are going to be admissible as against both

15   defendants as adopted admissions.  As I said, I will have

16   probably more detail in the written ruling.

17           And let's see.  The statements that

18   Defendant Running Eagle made to Paul Farina, the

19   statements initially made to Paul Farina with regard to

20   the fact that he and Defendant Tilden had gotten into a

21   fight, that will also be redacted with regard to Corey

22   Tilden.  Again, presented in a manner that will not in

23   any way implicate Mr. Tilden.  Those are the initial

24   statements made.

25           My understanding from the motions that have

**RUN 035**

SUPERIOR COURT

Exhibit 1H

6

1   been presented is that there are later questions that Mr.

2   Farina asked that were in the presence of both Running

3   Eagle and Tilden with regards to what Mr. Running Eagle

4   had said earlier.  Those are going to be allowed as to

5   both defendants.

6              I think I have covered all.  Is there

7   anything in that that I did not cover?

8              MR. STEINLE:  No, Your Honor.  There are a

9   number of motions that we need to take care of at this

10  time, then I want to just briefly go over them to see if

11  I have everything that has been filed today.  I have --

12  excuse me -- from Defendant Tilden a Motion to Allow

13  Participation of Counsel in Voir Dire, Individual Voir

14  Dire, for Permission to Submit Written Voir Dire

15  Questions to the Jury Panel, an additional motion along

16  the same lines, Motion to Supplement the Jury Voir Dire

17  Inquiry, and a supporting brief.  There is also a

18  memorandum filed by the State in support of the use of a

19  prior conviction.  And the request for a hearing with

20  regards to Rule 609 was filed on behalf of Mr. Tilden.

21             Is there anything that I had not listed that

22  I should have at this point?

23             Mr. Ahler?

24             MR. AHLER:  I don't have copies of the first

25  motion you said concerning Counsel's Participation in

**RUN 036**

SALDATE000587

SUPERIOR COURT

Exhibit 1H

7

1    Voir Dire.

2              MR. STEINLE:  That was part of my packet on voir

3    dire at the end of my questions.

4              MR. AHLER:  I didn't get those either.

5              THE COURT:  Do you have any extras with you?

6              MR. STEINLE:  Judge, I don't seem to have that.

7    I don't have my file folder that says voir dire, so for

8    some reason it was -- I will have to look back at the

9    office.  I can get a copy of it.  I know where it is.  I

10   thought it was all sent over to Mr. Ahler.

11             THE COURT:  Okay.  Both Motion to Supplement and

12   Motion to Allow Participation, you think somebody could

13   bring them over right away or --

14             MR. STEINLE:  Judge, I would have to go back and

15   look.

16             THE COURT:  How about if I give Mr. Ahler's my

17   copies at this point.  You can review them.  We can take

18   a break in a few minutes and you can review those.  But

19   there is some other things that we need to take care of

20   in any event before that.  My understanding from my

21   bailiff is that you anticipate at this point a five week

22   trial.  Is that correct?

23             MR. STEINLE:  Judge, there is 35 potential

24   witnesses listed by the State.  We have the 4th of July

25   weekend.  If we are going to work on schedule, basically

**RUN 037**                                    SALDATE000588

                    SUPERIOR COURT

                                                    Exhibit 1H

8

1    afternoons sessions, which has been my experience with

2    the Court, and anything on that, the time schedule in the

3    afternoon, we can.  I guess the only guide I have is

4    Carlos Rios had eight or nine witnesses and we went

5    almost two weeks in that trial.  If we have 35 witnesses,

6    even though some of them are very short, there were short

7    ones in that one, too.  I think we are realistically

8    talking at least four to five weeks.

9            THE COURT:  All right.  You say 35 State

10   witnesses?

11           MR. STEINLE:  State witnesses.

12           THE COURT:  Mr. Ahler, would you concur in

13   approximately a five week trial?

14           MR. AHLER:  Four weeks is probably a little bit

15   more accurate.  In that range, I think we would be

16   looking at.

17           THE COURT:  So we certainly need at least four

18   alternates?

19           MR. AHLER:  That's correct.

20           THE COURT:  All right.  There is some difficulty

21   in that number of jurors in terms of how many people can

22   fit into our jury room.  I will have to look into the

23   possibility of transferring courtrooms.  But that is

24   something I won't be able to tell you probably until

25   tomorrow.  At this point we will still be meeting here.

**RUN 038**                                      SALDATE000589

SUPERIOR COURT

Exhibit 1H

9

1          Is there -- let's see.  Can we proceed at

2    this time with with the 609?

3          MR. AHLER:  I believe we previously argued that

4    to the Court and submitted it on the basis of the

5    memorandum.  If the Court needs additional argument on it

6    I am prepared to argue it.

7          THE COURT:  I am going to need some refreshing

8    on this because I really can't tell you that I recall

9    everything on it.

10          Mr. Ahler?

11          MR. AHLER:  The Defendant Tilden has a prior

12    theft conviction, Class 6 open ended felony.  It's out of

13    the Superior Court of Maricopa County.  Roughly the date

14    of conviction is February of 1988.  He had a warrant out

15    for his arrest for that offense at the time he was picked

16    up on this charge.  Subsequent to his being taken into

17    custody he was sentenced on that theft.  The Court has an

18    understanding of the basic facts in this case.  I think

19    that that prior conviction is relevant to the issue of

20    credibility, and that should Mr. Tilden take the stand,

21    the State should be allowed to impeach him with it.

22          THE COURT:  Mr. Steinle?

23          MR. STEINLE:   Judge, in my memorandum I pointed

24    out the factors from State vs. Mahoney, United States vs.

25    Mahoney.  One of the factors or two of the factors that I

10

1   would point out are in Mahoney.  The Court says as a

2   general rule those convictions which are the same crime

3   should be admitted sparingly.

4           This is basically an allegation of a murder

5   committed during the course of a number of theft,

6   burglaries in the neighborhood.  To allow the State to

7   impeach him with the fact that he has been convicted of a

8   theft, would be of the same or similar character to the

9   allegations in the indictment here.

10          The second is that the fact that I asked the

11  Court to point out the importance of the defendant's

12  testimony in this matter.  We expect to have Corey Tilden

13  testify.  I believe in his defense his testimony would be

14  absolutely important.  Because at best what the case the

15  State has is a circumstantial case, plus the statements

16  of one Orva Antone, who was given kind of a good deal in

17  this matter.

18          So it's my view that if you look at the

19  factors listed in Mahoney and the discussions in

20  Weinstein about those factors, that those two factors

21  would weigh heavily in Corey Tilden's favor to have his

22  prior conviction excluded.

23          THE COURT:  Anything else, Mr. Ahler?

24          MR. AHLER:  Just to point out that I think the

25  credibility is an issue.  I think it becomes even more

**RUN 040**                                    SALDATE000591

SUPERIOR COURT

Exhibit 1H

11

1    important that the jury have all evidence at it's

2    disposal that is legally admissible.  His prior

3    background as far as the theft conviction and it's

4    statement as to his possible credibility as a witness, I

5    think is fundamentally important here.  I think the

6    recency of the conviction in terms of this offense also

7    dictates for it's admission, and we would ask you to

8    admit.

9              THE COURT:  The prior conviction of Corey

10   Tilden, February 1988, will be allowed to be admitted.

11   It does appear that it falls within the Rule 609, and

12   it's probative value would outweigh any prejudicial

13   effect to the defendant.

14              Is the only thing left then the voir dire?

15        MR. AHLER:  Judge, I don't know you mentioned,

16   but I had included in my list of items to the Court a

17   memorandum reference a death qualification of the jury.

18              THE COURT:  I don't have that.  My secretary had

19   been keeping a file folder with the motions in this case

20   separate.

21              MR. AHLER:  I had filed that back on May 18 of

22   '88.  I have a copy here.

23              THE COURT:  Oh, oh.  Okay.  I do.  I'm sorry.  I

24   do have that.  I was looking for a different caption.

25              MR. AHLER:  I think we need to consider that

**RUN 041**                                    SALDATE000592

SUPERIOR COURT

Exhibit 1H

1    along with these other motions that defense has made.

2              THE COURT:  Why don't we do this then.  You

3    probably haven't had a chance to look at the packet that

4    was provided.  Do you want to take about 10 minutes 10,

5    15 minutes to look at that and we will come back?

6              Mr. Iniguez?

7              MR. INIGUEZ:  Yes, ma'am.  I believe a

8    voluntariness hearing has been filed by the State.

9    That's the reason I didn't file the same motion, because

10   it was as to my client.  I believe that would certainly

11   need to be heard before the trial.

12             THE COURT:  You have witnesses ready to go at

13   this time on that?

14             MR. AHLER:  Yes, I do.

15             THE COURT:  Well you want to do that now?  That

16   is fine.  We can do that and later the voir dire

17   questions.

18             MR. INIGUEZ:  At the Court's discretion.

19             THE COURT:  Mr. Steinle?

20             MR. STEINLE:  As I said before, I withdraw any

21   challenge to the voluntariness of the statements made by

22   Corey Tilden.  I am not asking that the State put on any

23   kind of hearing.  We have no challenges.  I will attempt

24   to elicit his statements if the State doesn't, so --

25             THE COURT:  These would be the --

**RUN 042**                                    SALDATE000593

SUPERIOR COURT

Exhibit 1H

13

1          MR. STEINLE:  Statements to the police

2    subsequent to their arrest made to the police officers in

3    the police station.

4          THE COURT:  Mr. Running Eagle has made

5    statements as well at that time then?

6          MR. INIGUEZ:  There are some statements by Mr.

7    Running Eagle.

8          THE COURT:  All right.  Call your first witness

9    then.

10         MR. AHLER:  State would call Armando Saldate.

11         THE COURT:  Mr. Steinle, your position at this

12   time, you will be cross-examining on direct examination

13   of this witness?

14         MR. STEINLE:  No.

15         THE COURT:  You simply won't be opposing it?

16         MR. STEINLE:  Would the Court mind if I excuse

17   my -- I will go back and see if I can find the voir dire

18   questions.

19         THE COURT:  That is fine.

20

21              ARMANDO SALDATE, JR.,

22   called as a witness herein, having been first duly sworn,

23   was examined and testified as follows:

24

25

**RUN 043**                              SALDATE000594

                  SUPERIOR COURT

                                          Exhibit 1H

14

```
 1                      DIRECT EXAMINATION

 2     BY MR. AHLER:

 3               Q.   Tell us your name, please.

 4               A.   Armando Saldate, Jr.

 5               Q.   Your occupation?

 6               A.   I am a Phoenix Police Officer.

 7               Q.   Your present assignment?

 8               A.   I am currently assigned as detective to the

 9     homicide detail.  Have been for several years.

10               Q.   How long have you been a police officer?

11               A.   Been a police officer since June of '69.

12               Q.   And how long have you been with the

13     homicide?

14               A.   April of 1986.

15               Q.   Det. Saldate, were you involved in the

16     investigation of the murder of Jacqueline and Herbert

17     Williams that occurred on December 6, 1987?

18               A.   Yes, I was.

19               Q.   What was your role in that investigation?

20               A.   I was assigned the case agent, the person

21     responsible for that investigation.

22               Q.   What were your duties as the case agent?

23               A.   My duties were initially to make the initial

24     investigation, follow up any leads, and subsequently make

25     arrests to that case.
```

**RUN 044**                                          SALDATE000595

                        SUPERIOR COURT

Exhibit 1H

15

1           Q.   Directing your attention to December 19,

2    1967, did you interview an individual by the name of Sean

3    Running Eagle in connection with that murder

4    investigation?

5           A.   Yes, I did.

6           Q.   Is Mr. Running Eagle in the courtroom today?

7           A.   He certainly is.

8           Q.   Could you identify him for the record,

9    please?

10          A.   Sitting in the jury box wearing the jail

11   clothing, blue jail clothing, dark hair.

12          MR. AHLER:   Could the record reflect that the

13   officer has identified Mr. Running Eagle?

14          THE COURT:   The record will so reflect the

15   identification.

16   BY MR. AHLER:

17          Q.   Where did you interview Mr. Running Eagle?

18          A.   The interview took place at the Main

19   Station, at 620 West Washington, the second floor.   One

20   of the interview rooms.

21          Q.   What time did it begin?

22          A.   I assume it began -- I would have to look at

23   my report.   But something like 1800 or 1900 hours.   If

24   you allow me to look at my report to give the exact time.

25          Q.   Would that refresh your memory?

**RUN 045**

SALDATE000596

SUPERIOR COURT

Exhibit 1H

16

```
 1              A.  Yes, it would.

 2              Q.  Okay.

 3              A.  Exactly 1540 hours, which is military time

 4     for 3:40 p.m.

 5              Q.  Was anyone else present besides yourself and

 6     Mr. Running Eagle during that interview?

 7              A.  Det. Larry Martinsen.

 8              Q.  Was the Defendant Running Eagle under arrest

 9     at the time that you interviewed him?

10              A.  Yes, he was.

11              Q.  When had he been placed under arrest?

12              A.  He had been placed under arrest earlier that

13     day by our special assignment unit who had picked him up.

14              MR. INIGUEZ:  Objection, Your Honor.  There is a

15     lack of foundation as to that last answer.

16              THE COURT:  Overruled.

17     BY MR. AHLER:

18              Q.  Can you tell us the basis for their

19     arresting the Defendant Running Eagle on the 19th?

20              A.  Yes.  He had been identified by fingerprints

21     as being at the scene of the homicide.

22              Q.  Prior to interviewing the defendant did you

23     advise him of his Miranda Rights?

24              A.  Yes, I did.

25              Q.  How did do you that?
```

**RUN 046**                                        SALDATE000597

SUPERIOR COURT

Exhibit 1H

17

1        A.   I read the Miranda Rights that are issued to

2    us by a small card by the Phoenix Police Department,

3    verbatim to him.  However, prior to that he repeated the

4    rights to me.

5        Q.   Do you have that card with you?

6        A.   I probably have a card similar to that, yes.

7        Q.   Could you please tell us what rights you

8    read to the defendant prior to questioning him?

9        A.   Yes.  This is the rights cards that is

10   issued by the Phoenix Police Department, which is exactly

11   the one I read Mr. Running Eagle.  The first right --

12   it's broken into five sections.

13       The first one is, "You have the right to

14   remain silent.  Anything you say can be used against you

15   in a court of law.  You have the right to the presence of

16   an attorney issued prior to questioning, to be with you

17   during questioning if you so desire.  If you cannot

18   afford an attorney you have the right to have an attorney

19   appointed for you prior to questioning."

20       And the last part is, "Do you understand

21   these rights?"

22       Q.   And what was Mr. -- strike that.  Did

23   anything unusual happen during the time that you were

24   reading the Defendant Running Eagle these rights?

25       A.   As I reviewed the card, was going to read

**RUN 047**                                SALDATE000598

SUPERIOR COURT

Exhibit 1H

18

1    him his rights he then by memory repeated the rights to

2    me.

3            Q.  Did he repeat all of them?

4            A.  Yes, he did.

5            Q.  Did you continue to read the rights or what

6    did you do when he began?

7            A.  I waited until he finished, then I told him

8    I would again read his rights from the card.  And he said

9    fine and I did.  He responded that he understood them

10   after listening to them.

11           Q.  Did you advise Mr. Running Eagle at that

12   time why he was under arrest?

13           A.  Yes, I did.

14           Q.  What did you tell him?

15           A.  I advised him he was under arrest for

16   murder, and he advised me that he didn't know what I was

17   speaking about, and was not there.

18           Q.  What did you do at that point?

19           A.  I told Sean that I wanted the truth from

20   him.  And he again said -- didn't say anything at that

21   point.

22               I then began telling him about his

23   fingerprints.  That I had made his fingerprints at the

24   scene of the homicide, or that one of our technicians

25   had.  And then had him recall when he was fingerprinted

**RUN 048**                                    SALDATE000599

                        SUPERIOR COURT

                                              Exhibit 1H

19

1      at the age of 13 years old.

2                  Sean then told me it wasn't at the age of

3      13, he was 12.

4                  Then I told him that that during that time

5      he had a cast on his one arm.  However, we did obtain his

6      palmprint or the other hand.

7                  He said he didn't recall the cast, but that

8      he did recall being printed.  And I told him that that

9      fingerprint was made by one of our technicians to the

10     homicide scene.

11             Q.  What was his response when you questioning

12     him concerning finding this fingerprint at the scene of

13     the homicide?

14             A.  He continually said that print could not

15     have been his, and definitely was not his.

16             Q.  What happened next?

17             A.  We spoke about his fingerprint being there,

18     and continued with that.  And he continued to deny it.  I

19     then asked him if it was true.  I had been told earlier

20     that he was taking justice courses, Criminal Justice

21     courses at Scottsdale Community College and was wanting

22     to be a police officer.  He said it was true.

23                 I then told him that -- then he understood

24     that faced with all the facts of evidence that we had,

25     being that his fingerprints was there, Sheryl, I had

**RUN 049**                                          SALDATE000600

                        SUPERIOR COURT

                                                    Exhibit 1H

20

1    talked to Sheryl, I had talked to Sean, that it would

2    probably be important for him, best for him to tell us

3    the truth and exactly what had occurred, what was his

4    involvement in the murder.  And he indicated that,

5    something to the effect that he hadn't finished all of

6    his justice courses or something like that.  Probably

7    would have -- if he had, he probably would have told me

8    everything he wanted to know.  But that at the time he

9    hadn't finished all his justice courses.

10             We then continued into, I believe, where he

11   had been that night.  I think that's where we continued

12   to, and he didn't respond.  I pointed particularly to the

13   night in December, and he said he still would not

14   respond.  He finally said that -- oh, I then commented if

15   he remembered being at Sheryl's house, whether he also

16   remembered leaving Sheryl's house late that night, going

17   to Corey's, picking up Corey, then going around Deer

18 . Valley area and cruising around that area until he seen a

19   car with a blower on it.  And he stopped and he again

20   commented that he didn't remember anything like that

21   occurring.

22             Q.  At some point during the conversation did he

23   ask to remain silent?

24             A.  Yes, he did.

25             Q.  At what point did that occur?

**RUN 050**                                    SALDATE000601

                    SUPERIOR COURT

                                              Exhibit 1H

21

1          A.   Shortly after we had gone into conversations

2     about psychiatrists and him wanting one, to see a police

3     psychiatrist.

4          THE COURT:  Mr. Ahler, let me interrupt you for

5     just one second.  I should have done this earlier.  I

6     would like to have Mr. Running Eagle seated next to his

7     Attorney Iniguez so he can confer with him.

8          MR. INIGUEZ:  Thank you, Judge.

9          THE COURT:  Mr. Ahler?

10    BY MR. AHLER:

11         Q.   What did the Defendant Running Eagle tell

12    you that would indicate that he wanted to remain silent?

13    What words did he use?

14         A.   I believe he said he just wanted to remain

15    silent.

16         Q.   Did you continue to have a conversation with

17    him after he had asked to remain silent?

18         A.   Yes, I did.  I continued to speak with him,

19    and finally he told me that he wanted his attorney.

20         Q.   Did he make any statements to you after the

21    time that he had asked to remain silent?

22         A.   If I may, can I refresh my memory with my

23    report?

24         MR. AHLER:  Yes, if it would assist you.

25         THE WITNESS:  No, he did not.

**RUN 051**

SALDATE000602

SUPERIOR COURT

Exhibit 1H

22

1    BY MR. AHLER:

2         Q.   I am sorry.

3         A.   No, he did not say anything after that.

4         Q.   Did Mr. Running Eagle ever make any comments

5    to you to the effect, "Just let me fall.  It must be my

6    destiny.  Let me fall"?

7         A.   Yes, he did.  That was prior to him saying

8    he wanted to remain silent.  He indicated -- he became

9    very loud at that point.  He indicated to me that he

10   wanted to fall.  Let him fall.  It's his destiny to fall.

11   I explained to him it was not my position to charge him

12   with anything that he was not involved in.  But he

13   continued to say that it was his destiny that he should

14   fall.

15        Q.   Do you recall what initiated that type of

16   response from him?

17        A.   I don't understand your question.

18        Q.   Do you recall what question it was that you

19   asked him that caused him to make that statement to you?

20        A.   Again, I would have to review my report.  If

21   it's okay to -- I asked him, I was trying to get to

22   elicit a response from him as to the murder.  But he

23   would only smile.  Then he continued in a louder voice,

24   said that he just wanted to fall.

25        Q.   How long did this interview last?

**RUN 052**                                    SALDATE000603

SUPERIOR COURT

Exhibit 1H

23

1          A.  Well, the interview was terminated at 1625

2     hours, or 1650 hours.

3          Q.  Why was it terminated at that point in time?

4          A.  Terminated because Mr. Running Eagle wanted

5     an attorney.

6          Q.  At any time during the questioning of Mr.

7     Running Eagle did you make him any promises in exchange

8     for him talking to you?

9          A.  No, I did not.

10          Q.  Did you make any threats against him?

11          A.  No, I did not.

12          Q.  Did you use any force against him to get him

13     to talk to you?

14          A.  No, I did not.

15          MR. AHLER:  Your Honor, this is all the

16     questions I have in regards to Defendant Running Eagle.

17     I do want to bring out for the record the statements made

18     by Tilden, also.  If you want I can have Mr. Iniguez

19     cross at this time,

20          THE COURT:  I think that might be appropriate.

21     Partly because Mr. Steinle is not here to allow the

22     cross.  Then you can get on the record the other

23     statements.

24          MR. AHLER:  Okay.

25          THE COURT:  Mr. Iniguez?

**RUN 053**

24

1           MR. INIGUEZ:  Thank you.

2

3                     CROSS-EXAMINATION

4      BY MR. INIGUEZ:

5           Q.  Officer, how many murder cases have you

6      worked on so far?

7           A.  Approximately 20.  Twenty that I --

8      approximately 20 that I have been assigned as case agent.

9      I worked on approximately -- this would only be a guess,

10     40.

11          Q.  Okay.  In this particular case would it be

12     fair to say that it was a very important aspect of this

13     case to try to elicit some information from Mr. Running

14     Eagle?

15          A.  Mr. Iniguez, every case where it's a

16     criminal matter, it's very important to elicit a

17     confession from the suspect.

18          Q.  Yes.  But in some cases you may have 10 or

19     15 eyewitnesses, or it may have been a family matter or

20     you may have had a number of other pieces of evidence.

21     In this case isn't it true that the only thing you had

22     when you initiated this contact with Sean was a print, a

23     fingerprint of some sort?

24          A.  That in regards to the palmprint, that was

25     the only thing other than testimony or evidence from

**RUN 054**                                SALDATE000605

                    SUPERIOR COURT

Exhibit 1H

1    Sheryl that he was present, and Orva, of course.

2    However, again, I would have to disagree with you because

3    I think I have worked burglary, I have worked several

4    other areas of police work in uniform, also.  I have

5    always thought that it's very important to get a

6    confession from someone.  You know, you try so hard to

7    elicit that confession.

8         Q.  Now, trying very hard to elicit the

9    confession, you discussed with Sean his involvement for

10   how many hours?  You read us earlier your starting time

11   and your ending time.  You read those two.  You would

12   probably figure out --

13        A.  An hour and 10 minutes.

14        Q.  Right.  Now, you have been testifying for

15   about 10 or 15 minutes you think?

16        A.  Correct.

17        Q.  So you two or you three -- I'm sorry, Det.

18   Martinsen was in the room also.  Is that right?

19        A.  Yes.

20        Q.  And he was also asking questions.  Is that

21   correct?

22        A.  I don't believe so.

23        Q.  He didn't ask a single question the whole

24   time you were there?

25        A.  I wouldn't say that he didn't ask a single

**RUN 055**

SALDATE000606

SUPERIOR COURT

Exhibit 1H

1    question.  However, if he did it was just a few.

2          Q.  Okay.  So you were doing most of the

3    questioning?

4          A.  I was doing the questioning, yes.

5          Q.  During the course of your questioning did

6    you at any time hit Sean in the head or the chest?

7          Q.  I hit him with a finger.

8          Q.  You hit him with a finger?

9          A.  I wouldn't say hit him, I poked him with my

10   finger, yes.

11         Q.  In the chest?

12         A.  On several occasions, yes.

13         Q.  On several occasions?  Was that your

14   frustration or was he attacking you?

15         A.  Not either one.  It was my way of trying to

16   get his attention.  His attention was drawn to something

17   else, obviously, and his smiling, that I wanted to get --

18   draw his attention to what I was speaking about, not

19   something else that he was thinking about.

20         Q.  Did you for any length of time consider that

21   your poking him continuously would have been interpreted

22   by him as force?

23         A.  Of course not.

24         Q.  And were you angry when you were poking him

25   in the chest?

27

1          A.   During -- no, I was not.  But during my
2     interview --
3          Q.   Were you smiling?
4          A.   If you let me explain, Mr. Iniguez, and
5     answer your question.  During my interview --
6          Q.   You already answered my question, sir.  You
7     said no.  I asked you if you were smiling.  You said no.
8     That was the answer.
9          MR. AHLER:  Your Honor, I am going to object.
10    He is arguing with the witness.
11         THE COURT:  The question has been answered.  You
12    may proceed to another question.
13    BY MR. INIGUEZ:
14         Q.   During the course of this poking about how
15    many different times do you feel you poked him in the
16    chest with your fingers?
17         A.   Several times.
18         Q.   And how many times did he poke you in your
19    chest with his finger?
20         A.   None.
21         Q.   In fact, if he had poked you in your chest
22    with your finger you probably would have taken him to the
23    ground and handcuffed him.  Is that correct?
24         A.   I wouldn't speculate on that, Mr. Iniguez.
25         Q.   You don't allow people to poke you in the

**RUN 057**                              SALDATE000608

SUPERIOR COURT

Exhibit 1H

28

1    chest while you are questioning them, do you?

2              A.   Depends on what I am getting out of them.

3    If I am getting a confession they can poke all day.

4              Q.   If you are not getting a confession then you

5    may poke all day?

7

6              A.   It depends on whether it's needed to get his

7    attention to what I wanted to speak about.  If his memory

8    or if his attention span is somewhere else I may poke

9    them on the chest.  I may poke them on the arm trying to

10   get him diverted to that part where I want his attention

11   to be.

12             Q.   Did you at any time think of asking him,

13   just pay attention when I am speaking to you, rather than

14   putting your finger in his chest?

15             A.   I think that was mentioned during the time I

16   was poking him in the chest.

17             Q.   That didn't -- was this report in your

18   police report, sir?

19             A.   No, it was not.

20             Q.   How far from Sean Running Eagle were you

21   while you were questioning him most, during most of the

22   interrogation, in feet or inches?

23             A.   I try to stay within six to 12 inches from

24   someone I am talking to.

25             Q.   So would you say that right now I am 12

**RUN 058**                                    SALDATE000609

                    SUPERIOR COURT

Exhibit 1H

29

1    inches away from his face?

2           A.   At the most, yes.

3           Q.   So is it possible you were this close to

4    him?

5           A.   Very definitely.

6           Q.   Okay.  And for the record, I would like to

7    reflect that I am sitting right by Mr. Sean Running

8    Eagle, approximately, as the police officers agree, six

9    inches to 12 from his face.  Did Mr. Running Eagle ask

10   you for an attorney right away when you started

11   questioning him?

12          A.   No, he did not.

13          Q.   About how many minutes had passed, if you

14   remember, before he asked for an attorney?

15          A.   It was shortly before we terminated the

16   interview that he asked for an attorney.  He had asked to

17   remain silent, however, did not ask for an attorney.

18   Shortly after that he asked for his attorney.

19          Q.   Okay.  About how many minutes after the

20   interview commenced that he asked to remain silent?

21          A.   Again, just shortly before he asked for an

22   attorney.  I would say the interview took an hour and 10

23   minutes.  Maybe an hour when he asked to remain silent

24   and we continued to talk or I continued to talk and try

25   to elicit statements from him and he refused.  Of course

**RUN 059**                                    SALDATE000610

SUPERIOR COURT

Exhibit 1H

30

1   ne said he was going to remain silent, then said he

2   wanted an attorney.

3          Q.   When you said he remained silent, did you

4   tell him he had the right to remain silent?

5          A.   Mr. Iniguez, we had already gone by the

6   Miranda Rights.   He had expressed or told me his Miranda

7   Rights.   I read the Miranda Rights.   Part of them are

8   that he has a right to remain silent.   That is what he

9   explained to me later on.

10          Q.   When he asked you that he wanted to remain

11   silent, did you and Det. Martinsen get up and leave the

12   room and quit questioning him?

13          A.   No.

14          Q.   How many times -- isn't it true about three

15   times he asked you not to be questioned anymore and you

16   continued?

17          A.   No.   He only asked to remain silent on one

18   occasison.   That was when -- shortly before he asked for

19   an attorney.   He did remain silent.   He is correct, he

20   did remain silent and I continued to talk to him.

21          Q.   Isn't it true that these statements that you

22   have just testified to that he made, in particular, the

23   statement, "Let me fall.   It's my destiny", isn't it true

24   that that statement was made after he requested to remain

25   silent?

**RUN 060**                              SALDATE000611

SUPERIOR COURT

Exhibit 1H

31

1          A.   No, it's not.

2          Q.   Okay.  Is it also not true that this

3   statement was made after he requested to speak with an

4   attorney?

5          A.   No.  He had made that statement before.

6          Q.   Okay.  How long is this interview room where

7   he was being interviewed?  Do you remember?

8          A.   I don't know the exact measurements.  I

9   would say four by six or five by eight room maybe.

10  Something to that.  I am sure you have seen those rooms

11  before.

12         Q.   Was Mr. Running Eagle crying during his

13  interview?  Did he have tears in his eyes?

14         A.   At one point he did have tears in his eyes.

15         Q.   And did you have the equipment to tape this

16  conversation should you have desired to?

17         A.   Definitely.

18         Q.   Is there a reason why you didn't tape this

19  conversation?

20         A.   Certainly.

21         Q.   Why was that?

22         A.   I don't believe it's very good, a taped

23  confession or an interview with someone, especially since

24  it involves such a serious crime.  Because I think it

25  hinders that person from coming out, discussing what he

**RUN 061**                                     SALDATE000612

SUPERIOR COURT

Exhibit 1H

32

1    really wants to say.  I think maybe that tape kind of

2    keeps them from wanting to talk to us.

3                 Q.  Yes, sir.  Is it true, Mr. Saloate, that at

4    some point during the interview you told Mr. Running

5    Eagle, "I want to see you go to the gas chamber.  I want

6    to see you die"?

7                 A.  No, it's not.

8                 Q.  Is it also true that when you were poking

9    him in his chest you were asking him, is this how you did

10   it?  Is this how you did it?

11                A.  I may have said that, yes.

12                Q.  So then is it fair to say that it wasn't

13   just an interrogation, it was more also an accusation

14   between you and Mr. Running Eagle?

15                A.  I think any interrogation at one point or

16   another becomes accusatory.  At one point you do accuse a

17   person.  I had earlier done it.  Almost every

18   interrogation that you have a suspect you become

19   accusatory and accuse him of doing that crime, of course.

20                Q.  Are you telling this Court that in every

21   interrogation you accuse the person being interrogated of

22   committing the crime?

23                A.  I said in almost every interview that you

24   have you become -- the interview does point in that

25   direction of accusatory.  That you accuse that person of

**RUN 062**                                    SALDATE000613

                        SUPERIOR COURT

                                              Exhibit 1H

33

1    committing an offense to see what he responds.

2         Q.  In this particular interrogation do you

3    remember his immediate response when you told nim he did

4    it, and put your finger into his chest?

5         A.  Most of the time that we are speaking in

6    regards to the homicide, the actual killing of the

7    Williams, Mr. Running Eagle remained very calm, very

8    quiet, usually was just smiling. So I really couldn't

9    elicit that much of response from him.

10        Q.  Excuse me.  I think my question was, do you

11    remember his response immediately following your poking

12    him in the chest and asking him?

13        A.  I think it was none.

14        Q.  Okay.  Did you tell Mr. Running Eagle

15    anything that someone else had said that you knew was

16    false, like did you tell him, "Corey already confessed.

17    He told me you guys did it", or did you tell him that

18    "Orva had already told us you did it", or anything of

19    that type?

20        A.  No, I did not.  I had told Sean that I had

21    spoken to Corey and I had already spoken to Sheryl.  That

22    was my only indication that I had spoken to either one of

23    them.

24        Q.  Did you tell Mr. Running Eagle that Sheryl

25    had told you that she did not want to have anything to do

**RUN 063**

Exhibit 1H

34

1    with Mr. Running Eagle anymore?

2                 A.   Of course not.

3                 Q.   Is there any other type of force either

4    verbal or physical that was used there that day by either

5    you or someone else from the police department that you

6    have not discussed here today?

7                 A.   I don't think no more was used, Mr. Iniguez.

8    I think that's your opinion that force was used.

9                 Q.   It's correct, is it not, that you have

10   testified that you poked Mr. Running Eagle in the chest

11   several times with your finger during the interview?

12                A.   That's correct.

13                Q.   How much do you weigh, Mr. Saldate?

14                A.   About 225.  But my finger doesn't weigh that

15   much.

16                Q.   But you didn't take your finger off your

17   body when you poked him with it?

18                A.   No, I did not.

19                Q.   You are aware, are you not, Mr. Saldate,

20   that a person can put considerable pressure to another

21   individual with the use of one finger.  Isn't that true?

22                A.   A person could, yes.

23                MR. INIGUEZ: I have no further questions.

24                THE COURT:  Mr. Ahler?

25

**RUN 064**                                    SALDATE000615

                        SUPERIOR COURT

Exhibit 1H

35

1                     REDIRECT EXAMINATION

2       BY MR. AHLER:

3               Q.   When you poked him with your finger in the

4       chest, did you injure him in any way?

5               A.   No, I did not.

6               MR. INIGUEZ:   Objection.   That calls for

7       speculation.

8               THE COURT:   I'm sorry.   I didn't hear the last

9       part of the question.

10      BY MR. AHLER:

11              Q.   When you poked Mr. Running Eagle in the

12      chest with your finger, did you injure him?

13              A.   No, I did not.

14              THE COURT:   Just for the record, the objection

15      is overruled.

16      BY MR. AHLER:

17              Q.   Did he ever complain to you that you were

18      hurting him?

19              A.   No, he did not.

20              Q.   Did he ever ask to see a doctor?

21              A.   No, he did not.

22              Q.   What was his response when you were poking

23      him in the chest with your finger?

24              MR. INIGUEZ:   Objection.   That has been asked

25      and answered.

**RUN 065**

SALDATE000616

SUPERIOR COURT

Exhibit 1H

36

1              THE COURT:  Overruled.

2              THE WITNESS:.  He would look at me, and again

3    would usually not say nothing.  But at least he would

4    look at me.  I would get his attention.

5    BY MR. AHLER:

6              Q.  Why did you feel it necessary to poke him in

7    the chest with your finger?

8              A.  That was just a response of mine to try to

9    get his attention.  It worked the first time so I

10   continued to do it.

11             Q.  Did this defendant ever indicate to you that

12   he was intimidated of you?

13             A.  No, I don't believe so.

14             MR. INIGUEZ:  Objection.  Irrelevant.

15             THE COURT:  Overruled.

16             MR. AHLER:  I don't have anything else

17   concerning the statement by Running Eagle, Your Honor.

18             THE COURT:  Do you have anything else, Mr.

19   Iniguez?

20             MR. INIGUEZ:  No, ma'am.

21             THE COURT:  You wanted to deal with Mr. Tilden's

22   statements as well.  Mr. Ahler indicated he wanted to

23   elicit the statements that Mr. Tilden made for the

24   record.

25             MR. STEINLE:  That is fine with me.

37

1    BY MR. AHLER:

2            Q.   Det. Saldate, did you also interview Corey

3    Tilden on December 19, 1980?

4            A.   Yes, I did.

5            Q.   Where was that interview conducted?

6            A.   Conducted at 620 West Washington, the second

7    floor in the interview room.

8            Q.   Was that interview conducted before or after

9    you interviewed Defendant Running Eagle?

10           A.   That was before.

11           Q.   And what time did that interview begin?

12           A.   1:20, I believe.

13           Q.   Had you also prior to the time of

14   interviewing Mr. Tilden, had you interviewed Sheryl

15   Sivertsen?

16           A.   Prior to interviewing Tilden did I interview

17   Sheryl Sivertsen?

18           Q.   Yes.

19           A.   I don't believe so.

20           Q.   And who was present during the interview

21   with the Defendant Tilden?

22           A.   Myself and Det. Martinsen.

23           Q.   Was defendant Tilden in custody at that

24   time?

25           A.   Yes, he was.

**RUN 067**

SALDATE000618

SUPERIOR COURT

Exhibit 1H

38

1          Q.  Did you advise him of his rights prior to

2     the time that you interviewed him?

3          A.  Yes, I did.

4          Q.  How did you do that?

5          A.  By cards that are issued by the Phoenix

6     Police Department.

7          Q.  Is that the same card you read into the

8     record earlier in regards to the Defendant Running Eagle?

9          A.  It's a same card that's issued, yes.

10         Q.  Did you read him all of those same rights?

11         A.  That's correct.

12         Q.  Did Defendant Tilden indicate to you that he

13    understood those rights?

14         A.  He said he did.

15         Q.  How many interviews were there with

16    Defendant Tilden on that date, to your understanding?

17         A.  I believe we had two interviews with him.

18         Q.  Was Det. Martinsen with you at both

19    interviews?

20         A.  Yes, he was.

21         Q.  Can you tell us now long the first interview

22    lasted?

23         A.  The first interview lasted almost until

24    shortly before we had contacted Sean Running Eagle.

25         Q.  Did you discuss with him during that first

**RUN 068**                                    SALDATE000619

SUPERIOR COURT

Exhibit 1H

39

1    interview any facts concerning the homicide of the

2    Williamses?

3             A.   I confronted him with some facts regarding

4    the homicide, and confronted him with what he had done

5    that night.  And he related to me what he had done that

6    night when he saw Sean.  Approximately what time he saw

7    him and what he had done the next day, and basically

8    about Sean's backgrounds, which he told me.  That is

9    basically it.  Then later on we confronted him with the

10   facts for the interview with Sheryl, and that we had also

11   had Sean in custody.

12            Q.   Prior to the first interview had you read

13   him his rights?

14            A.   Yes.

15            Q.   Did he indicate to you he understood those

16   rights?

17            A.   Yes.

18            Q.   During that first interview did he at any

19   time invoke his rights either by asking to remain silent

20   or asking for an attorney?

21            A.   No, he did not.

22            Q.   At any time during that first interview did

23   you use any force against him?

24            A.   No, I did not.

25            Q.   Make any threats?

**RUN 069**

SALDATE000620

SUPERIOR COURT

Exhibit 1H

40

1          A.   No, I did not.

2          Q.   Did you make him any promises?

3          A.   No, I did not.

4          Q.   When did the second interview begin?

5          A.   Second interview began shortly after

6    speaking with Sean.  If you want the exact time I will

7    refer to my report if it's okay.

8          Q.   All right.

9          A.   Approximately 1632 hours.

10         Q.   How long did that interview last?

11         A.   That was a very short interview.  Probably

12   lasted five to 10 minutes.

13         Q.   Did you re-advise him of his rights at the

14   second interview?

15         A.   No, I did not.

16         Q.   Did he make any statements to you during

17   that second interview reference the homicide

18   investigation you were conducting?

19         A.   He denied being involved in the homicide

20   investigation.

21         Q.   Did that -- at what point in time did the

22   second interview with Mr. Tilden terminate?

23         A.   Again, I only estimate five to 10 minutes

24   later.

25         Q.   Any time during that second interview did

**RUN 070**                                      SALDATE000621

SUPERIOR COURT

Exhibit 1H

41

1    you make Mr. Tilden any promises?

2                    A.   No, we did not.

3                    Q.   Did you use any force or make any threats

4    against him?

5                    A.   No, we did not.

6                    MR. AHLER:   I have no further questions in

7    connection with the Defendant Tilden's interview.

8                    THE COURT:   Mr. Steinle, anything you wanted to

9    elicit for the record at this time?

10                   MR. INIGUEZ:   Not in terms of voluntariness,

11   Your Honor.

12                   THE COURT:   My understanding, there is not going

13   to be no opposition?

14                   MR. STEINLE:   There is no challenge to the

15   voluntariness.

16                   THE COURT:   Thank you.   Is there anything else

17   from this witness?

18                   MR. AHLER:   No more testimony.

19                   THE COURT:   You may step down.

20                   THE WITNESS:   Thank you.

21                   THE COURT:   You intending to call any of the

22   other witnesses present as to Mr. Running Eagle's

23   interrogation?

24                   MR. AHLER:   Just one second, Your Honor.

25                        Your Honor, I would like to call Det.

**RUN 071**

SUPERIOR COURT

SALDATE000622

Exhibit 1H

42

1    Martinsen for just a couple of questions.

2            THE COURT:  All right.  Detective?

3

4                    LARRY MARTINSEN,

5    called as a witness herein, having been first duly sworn,

6    was examined and testified as follows:

7

8                    DIRECT EXAMINATION

9    BY MR. AHLER:

10           Q.  State your name, please.

11           A.  I am Larry Martinsen.

12           Q.  Your occupation?

13           A.  I am a police officer with the City of

14   Phoenix.

15           Q.  Det. Martinsen, are you also assigned to the

16   homicide detail?

17           A.  Yes, sir.

18           Q.  How long have you been with that detail?

19           A.  I was originally assigned in January of

20   1979, and I was absent for 10 months and reassigned.

21           Q.  Did you have any -- were you assigned any

22   responsibility in connection with the murder of

23   Jacqueline and Herbert Williams on December 6, 1987?

24           A.  Yes, I was.

25           Q.  What was your responsibility in connection

**RUN 072**                                    SALDATE000623

                    SUPERIOR COURT

Exhibit 1H

43

1   ·  with that case?

2          A.   I conducted the scene investigation on the

3   date, the original date of the homicide, and assisted

4   Det. Saldate in follow-up investigations.

5          Q.   Were you present with Det. Saldate on

6   December 19, 1987, at the Phoenix Police Station during

7   the interview of Defendant Sean Running Eagle?

8          A.   Yes, I was.

9          Q.   How long did that interview last, total

10  interview?

11         A.   It started at 3:40 p.m.  It concluded at

12  1632, which is 4:32 p.m., which is eight minutes less

13  than an hour.

14         Q.   Do you recall Det. Saldate at some point in

15  · the interview touching the defendant in his chest with

16  his finger?

17         A.   I do.

18         Q.   Did you perceive any injuries on the

19  defendant as a result of being touched by Det. Saldate?

20         A.   No, sir.

21         Q.   Could you describe for us how much force was

22  used by Det. Saldate when he he touched him with his

23  finger?

24         A.   I wouldn't perceive that it was any force at

25  all.  It was more or less a touching as he described, an

**RUN 073**

SALDATE000624

Exhibit 1H

44

1    attention-getting maneuver.

2          Q.   Did the Defendant Running Eagle complain of

3    any injuries at that time, that he was being injured by

4    Det. Saldate?

5          A.   No, he didn't.

6          Q.   Did you perceive any response from the

7    defendant at the time that Det. Saldate was touching him

8    in the chest?

9          A.   Initially, yeah.   There was somewhat

10   surprise in Running Eagle's face.   I don't think he

11   expected anyone maybe to touch him during an interview.

12   And his initial response was a little bit of a surprise.

13   It just kind of set him back a little bit.   I think the

14   fact that he was touched.   But beyond that, no, there

15   were no additional obvious responses.

16          MR. AHLER:   No other questions.

17          THE COURT:   Mr. Iniguez?

18          MR. INIGUEZ:   Yes, Your Honor.   Thank you.

19

20                      CROSS-EXAMINATION

21   BY MR. INIGUEZ:

22          Q.   Officer Martinsen, you work with Det.

23   Saldate.   Is that correct?

24          A.   I do.

25          Q.   You work on the same team, so-to-speak.   Is

**RUN 074**                              SALDATE000625

                  SUPERIOR COURT

                                          Exhibit 1H

45

1    that fair?

2           A.   We are both in the same squad, in the same

3    detail.  We aren't partners in every case.  We don't have

4    permanent partners within our detail.

5           Q.   Okay.  And you didn't take Sean's shirt off

6    to see if there had been any marks left by Det. Saldate

7    poking him in the chest, did you?

8           A.   I didn't see any in it.  No, I didn't.

9           Q.   My question, sir, is, did you do it, not did

10   you see any doing it.

11          A.   No, I didn't.

12          Q.   You didn't call a doctor to inspect him to

13   see if he had been in any way injured by Mr. Saldate, did

14   you?

15          A.   Sure didn't.

16          Q.   You didn't also ask him if he wanted to see

17   some medical person regarding his being poked in the

18   chest, did you?

19          A.   Never crossed my mind, sir.

20          Q.   It's true, is it not, that you were also

21   doing part of the questioning that afternoon?

22          A.   I may have asked a couple of questions.

23   Actually I sat off to the side, a couple of three feet.

24   I was listening to the interview and I took some notes.

25          Q.   Do you have your notes here today?

**RUN 075**

SALDATE000626

SUPERIOR COURT

Exhibit 1H

46

1          A.   No, I don't.

2          Q.   Can you please produce those notes for us

3    for trial?

4          A.   No, I can't.

5          Q.   Why not?

6          A.   They have been destroyed.

7          Q.   Is that a policy of yours to destroy your

8    notes, or is that something that you did in this case

9    that you don't do in any others?

10          A.   It's a policy.

11          Q.   Don't you think it would be important for

12    this defendant to have a copy of the notes you took that

13    day?

14          A.   No.

15          Q.   Don't you think that he or someone in his

16    behalf might want to see what was actually written down

17    that day as opposed to what is in the report?

18          A.   I am satisfied that the notes are reflected

19    adequately in the police reports, and I think the

20    interview is represented in the police report.  And for

21    that reason I don't think they would be of any benefit.

22          Q.   When you are interviewing him you were aware

23    that you were interviewing him for the State.  Is that

24    correct?

25          A.   Yes, sir.

**RUN 076**                                          SALDATE000627

SUPERIOR COURT

Exhibit 1H

47

1          Q.   And you were aware that you may possibly be

2    coming to trial on this particular matter.  Is that

3    right?

4          A.   Yes, sir.

5          Q.   When you wrote your report you had that in

6    mind, did you not?

7          A.   Actually the report regarding the interview

8    was not made by myself.  But that is a thought when other

9    reports are being prepared that we expect to go to trial,

10   yes.

11         Q.   And when you took those notes, you were

12   taking down what Mr. Running Eagle was saying then to

13   some of the questions being asked by Mr. Saldate.  Is

14   that not correct?

15         A.   Yes, it is.

16         Q.   When you wrote your report is it not fair to

17   say that it was sometime afterwards when your mind was

18   less clear about what had actually been said?

19         A.   The report wasn't written the same day.

20         Q.   Right.

21         A.   But it was written soon after.

22         Q.   And in fact in this case you just testified

23   that you didn't even write the report.  It was written by

24   a third person, probably Mr. Saldate.  Is that correct?

25         A.   It is.

**RUN 077**

SALDATE000628

SUPERIOR COURT

Exhibit 1H

48

1          Q.   But you didn't take the notes of Mr. Saldate

2    regarding the report that Mr. Saldate wrote.  I'm sorry,

3    strike that.

4               You did take the notes regarding the report

5    that Mr. Saldate wrote.  Is that correct?

6          A.   I did.

7          Q.   Mr. Saldate didn't have independent notes or

8    did he?

9          A.   I am not aware that he had a lot of

10   independent notes.

11         Q.   Now, Officer Martinsen, it's not your policy

12   also to poke people in the chest when you are

13   interrogating them or interviewing, is it?

14         A.   Ask the question again, sir.

15         Q.   It's not your policy while you are

16   interrogating people to put your finger into their chest

17   or poke them in the chest or touch them in the chest with

18   your finger while you are interrogating them, is it?

19         A.   I have touched people during interrogations,

20   yes.

21         Q.   One of your practices?

22         A.   I don't know if any particular maneuver is

23   practiced.  Whether I touch them on the shoulder, grab

24   them by the arm, if I feel I need to touch them to get

25   their attention.  Or if it's maybe stroke them on the arm

**RUN 078**                          SALDATE000629

SUPERIOR COURT

Exhibit 1H

49

1    to console them or whatever.  I don't have any aversions

2    to touching a person during an interview.

3          Q.  Isn't it true that it would be very easy for

4    someone to take some poking in the chest as intimidation

5    or force?

6          A.  I don't think so.

7          MR. INIGUEZ:  I have no further questions.

8          THE COURT:  Mr. Ahler?

9

10                   REDIRECT EXAMINATION

11    BY MR. AHLER:

12          Q.  Did you retain your notes prior to the time

13    that the reports were written?

14          A.  Yes.

15          Q.  What point in time are the notes destroyed?

16          A.  When the report is proofread.  After the

17    typist is through with it, we proofread it, make sure

18    that we are satisfied with it.  And after that point the

19    notes are destroyed.

20          Q.  Do you compare the notes with the actual

21    typewritten copy, the Departmental Report?

22          A.  Yes.

23          MR. AHLER:  No other questions, Your Honor.

24          MR. INIGUEZ:  I just have one, ma'am, if I may.

25

**RUN 079**

SALDATE000630

SUPERIOR COURT

Exhibit 1H

1                    RE-CROSS EXAMINATION

2    BY  MR.  INIGUEZ:

3           Q.  Officer, it's a fact though that the notes

4    are not entirely embodied in the reports that are written

5    afterwards.  Is that correct?

6           A.  The notes are not the verbatim copy of the

7    report.  They are just that, they are notes.

8           Q.  Right.

9           A.  To refresh one's memory.

10          Q.  And it's true that you are the only one that

11   has to be satisfied at that point in what you wanted in

12   the report is in the report based on what your notes told

13   you.  Is that correct?

14          A.  Myself and Det. Saldate.

15          Q.  So it's possible then that in your notes

16   there would have been something written in there that you

17   for some reason chose not to include in your report.

18   Isn't that correct?

19          A.  Well, there might be doodling or

20   observations, whatever.  I am not going to say that every

21   particular sentence or on observations that I made in my

22   notes will go into the report.  Yes, I will concede that.

23          MR. INIGUEZ:  Thank you.  No further questions.

24          THE COURT:  Mr. Ahler, anything else?

25          MR. AHLER:  No.

**RUN 080**                              SALDATE000631

                         SUPERIOR COURT

Exhibit 1H

51

```
 1                THE COURT:  You may step down, Detective.

 2                THE WITNESS:  Thank you, Your Honor.

 3                THE COURT:  Did you have any further witnesses?

 4                MR. AHLER:  No, Your Honor.

 5                THE COURT:  Mr. Iniguez, do you have any

 6      witnesses?

 7                MR. INIGUEZ:  Mr. Running Eagle would like to

 8      take the stand, Your Honor.

 9

10                     SEAN RUNNING EAGLE,

11      called as a witness herein, having been first duly sworn,

12      was examined and testified as follows:

13

14                     DIRECT EXAMINATION

15      BY MR. INIGUEZ:

16           Q.  Would you please state your name.

17           A.  Sean Running Eagle.

18           Q.  Mr. Running Eagle, how old are you?

19           A.  Nineteen.

20           Q.  Nineteen?

21           A.  Yes.

22           Q.  Do you remember being questioned on December

23      19, I believe?

24           A.  Yes, I do.

25           Q.  By some detectives from the police
```

**RUN 081**

SALDATE000632

SUPERIOR COURT

Exhibit 1H

52

1   department?

2            A.   Yes, I do.

3            Q.   Are any of them in court here today?

4            A.   Yes, they are.

5            Q.   Are they the two gentlemen sitting here, are

6    to the right of where I am sitting from Mr. Ahler, the

7    prosecutor?

8            A.   For me it's to the left.

9            Q.   Right.

10           A.   Yes, they are

11           Q.   To your left.   Do you remember which one of

12   them did most of the interrogations, if any of them did?

13           A.   Yes, I do.

14           Q.   Excuse me.   One question at a time.   Would

15   that be Mr. Saldate?

16           A.   If he is the one right there.

17           Q.   If he is the one sitting right now at

18   counsel table with the white sleeve shirt and black

19   notebook in his hands.

20           A.   Yes, he is.

21           Q.   Did Mr. Saldate introduce himself when he

22   questioned you?   Did he say, I am Det. Saldate from the

23   Phoenix Police Department, for example?

24           A.   Yes, he did.

25           Q.   What did he say next to you?

53

1          A.   He pulled up a chair.

2          Q.   What did he say next to you?  If you

3   remember.  If you don't, say you don't remember.

4          A.   I am unsure.

5          Q.   Okay.  As Mr. Saldate started questioning

6   you were you in a sitting, standing, or prone position?

7          A.   I was sitting down just directly -- he was

8   like straight across from me.

9          Q.   Were your hands cuffed or uncuffed?

10         A.   They had uncuffed them.

11         Q.   Okay.

12         A.   They had their back to the door.

13         Q.   They had their back to the door, your hands

14   uncuffed?

15         A.   Yes.

16         Q.   What were you wearing, street clothes or

17   were you in jail clothes by then?

18         A.   Still in street clothes.

19         Q.   What did Mr. Saldate ask you?  Again, you

20   don't remember the specific statement?

21         A.   Okay.  He said, first he said, "I am going

22   to have to read you your Miranda rights."

23              And I did in fact read from memory the

24   Miranda Rights.  Basically everybody can read them.

25         Q.   You mean recite from memory, right?

**RUN 083**

54

1          A.   Yes.   Recite from memory from television.

2          Q.   Okay.   What happened after you recited the

3     Miranda Rights from memory?

4          A.   Then he pulled out his card and said

5     something like, "Well, I am still going to have to."   And

6     he read them.

7          Q.   Okay.   After the Miranda Rights episode,

8     what happened next?

9          A.   He said, "You are being charged with

10    murder."

11              Then after that I said -- I was, you know,

12    surprised because I thought I was being arrested for

13    speeding tickets and failure to have proof of insurance

14    in my car at first.   But -- okay.

15         Q.   Did you at some point in that area of the

16    conversation with him, advise him that you did not want

17    to speak to him or that you wanted to talk to a lawyer?

18         A.   I told him I didn't know what he was talking

19    about.   I didn't have no knowledge of what was going on.

20         Q.   Okay.   Answer my question, please.   Did you

21    at that --

22         A.   Yes, I did.

23         MR. INIGUEZ:   Your Honor it's my objection.

24         MR. AHLER:   I am going to object.   He is leading

25    his own witness.   I think that's improper.   He ought to

**RUN 084**                                SALDATE000635

SUPERIOR COURT

Exhibit 1H

55

1    let the man answer the question, not try to lead him

2    where he wants him to go.

3              MR. INIGUEZ:  Your Honor, if I may, please, if

4    the question is not responsive it's certainly my

5    objection to make.

6              THE COURT:  We have two objections here.  The

7    objection of the State is sustained as to the leading

8    nature of the question.  You may proceed.

9    BY MR. INIGUEZ:

10             Q.  Mr. Running Eagle, I will ask you the

11   question again.  Did you at that portion of the

12   conversation ask Mr. Saldate that you wanted to remain

13   silent or that you wanted an attorney?

14             A.  I said I wanted to speak to an attorney.

15   Specifically, my attorney.

16             Q.  Thank you.  Do you know about how long the

17   conversation had gone before you said that to him?

18             A.  I believe about a minute to a

19   minute-and-a-half.

20             Q.  Now, is it your recollection then that after

21   a minute-and-a-half of this conversation, what did you

22   say, if you remember, specifically?

23             A.  I had asked for my lawyer and I wish -- I

24   started to remain silent, and I did.  He turned and

25   looked to the other officer and then turned and looked

**RUN 085**

SUPERIOR COURT

SALDATE000636

Exhibit 1H

56

1    back to me and says, "Sean, do you remember back when you

2    were 13 when you had --" well, it had to do with

3    something back in my childhood.

4          Q.  What did you say in response to that

5    question?

6          A.  I said, "No, I don't."

7          Q.  And at any time again you mention your

8    desire to remain silent or for an attorney?  When did

9    that take place?

10         A.  It was after he started to talk to me about

11    the past.  I mean, way past.  I started to get very

12    emotional, where I did not wish to speak to him.  I

13    didn't feel like he should be forcing me into this when

14    actually I wanted to remain silent.

15         Q.  Why do you say forcing me?

16         A.  Well, the force was first initiated by the

17    guys pointing the guns at me.  I am not used to that.

18         Q.  Excuse me.  No one was pointing guns at you

19    in that room, were they?

20         A.  No, they were not.  This is before I had

21    entered the room.

22         Q.  Okay.  Again, answer any questions referring

23    to inside the interrogation room after he mentioned some

24    things about your past.

25         A.  Yes.  I said I would like to see my

**RUN 086**

SALDATE000637

SUPERIOR COURT

57

1    attorney.  And I couldn't figure out why he wouldn't let

2    me be quiet, you know, let me make my phone call.

3           Q.  Are you sure that you didn't ask for your

4    attorney towards the end of this interview?

5           A.  I asked for an attorney approximately three,

6    four times.

7           Q.  Regarding the poking in the chest with a

8    finger, would you please tell the Court how that

9    happened, as far as you remember it?

10          A.  Okay.  I can demonstrate it if it would be

11   possible to do.

12          Q.  Go ahead.  Describe it.  If you can't

13   describe it without demonstration, then you ask the

14   Court.

15          A.  Okay.  He said -- I was pretty quiet at this

16   time.  And he had took what they call the blade of your

17   hand, and sort of all of a sudden just hit me into the

18   chest.  And as he started going across with his hands he

19   said, "Is this how you did it, Sean?  Is this how you did

20   it".

21          Q.  What did you say?

22          A.  I said no.  Then I looked at the other

23   officer like why was in my mind.  Why is he doing this?

24          Q.  Did you feel intimidated?

25          A.  Yeah.

**RUN 087**

SALDATE000638

SUPERIOR COURT

Exhibit 1H

58

1          Q.   Did you feel threatened?

2          A.   Very much.

3          Q.   What happened next?

4          A.   Then I didn't really understand what was

5     going on.   Because I didn't understand.   I didn't know

6     what was -- well, I didn't know about this incident that

7     they were accusing me of.

8          Q.   What did he ask you, if anything, after

9     that?

10         A.   He said something like, "Did you hear a

11    scream?   Did you hear them scream?   What did they say

12    when they were dying?"   And I can't answer that.   I don't

13    know.   I wasn't there.

14         Q.   What, were you hit again in the chest at

15    some point?   Do you know?   Do you remember?

16         A.   About three or four different times.   And

17    that was, he only hit, did that one time, like I said.

18    But the rest of them were pokes and they were very --

19    like sharp pokes, forceful pokes.

20         Q.   And what other questions did he ask you, if

21    you remember?

22         A.   He said something to me, "Your cousin said

23    that you were cruising around Deer Valley."

24              I said, "If I remember right."   I replied

25    like, "I don't remember.   I wasn't -- we didn't cruise

59

1    that night."

2            Q.   Were you sober on the 19th when you were

3    being questioned by Officer Saldate?

4            A.   Yes, I was.

5            Q.   Is there anything else that happened in this

6    interrogation that you feel -- made you feel either

7    threatened or intimidated, that we have not discussed in

8    your direct?

9            A.   Two occasions he said that, "I want to see

10   you go to the gas chamber."  And he said, "I want to see

11   you beg for your life."

12           Q.   Is there anything else that happened in that

13   room that you can remember at this time?

14           A.   He told me that at some point in there, that

15   my fiance, which she basically is no longer my fiance at

16   this time.

17           Q.   Is that the way it was said to you?

18           A.   No.  Okay.

19           Q.   Do you remember exactly the words?

20           A.   Yes.  The exact words were like -- they were

21   that "Sheryl does not want to have nothing to do with you

22   anymore."

23           Q.   Anything further either in touching or in

24   words?

25           A.   There was an occasion where they came in,

**RUN 089**

SALDATE000640

SUPERIOR COURT

Exhibit 1H

60

1    after they had left, and didn't really give me a chance

2    to take my own shoes off.  They more or less grabbed them

3    shoes off of me and started laughing.  Walked out of

4    there.

5              Q.   This is during the same interrogation?

6              A.   During the same interrogation, but after

7    they had left and came back.

8              Q.   Did they ask you for your shoes before they

9    took them?

10             A.   They really didn't give me a chance.  They

11   just grabbed them.

12             Q.   You said they were laughing?

13             A.   Yeah.  They were laughing.

14             Q.   Were they speaking any words that you could

15   near or understand?

16             A.   No.  They pretty much left.

17             Q.   Did Det. Martinsen ask you any questions

18   during the interrogation?  That's the gentleman sitting

19   behind Mr. Saldate.

20             A.   I don't really recall.  The only one I can

21   remember is him, because of all of the force he was

22   using.

23             Q.   Him?  You mean Mr. Saldate?

24             A.   Yes.

25             MR. INIGUEZ:  I have no further questions.

**RUN 090**                                          SALDATE000641

                        SUPERIOR COURT

Exhibit 1H

61

1              THE COURT:  Mr. Ahler?

2

3                         CROSS-EXAMINATION

4    BY MR. AHLER:

5              Q.  Sir, you understood your rights when they

6    were read to you that day, didn't you?

7              A.  Basically, no.

8              Q.  In fact, you understood them so well that

9    you repeated them to Det. Saldate even before he had

10   finished reading them.  Isn't that true?

11             A.  No.  Eight-year-olds can recite the Mirandas

12   from television.

13             Q.  You recited them to him, didn't you?

14             A.  From memory.

15             Q.  You recited the rights from memory to Det.

16   Saldate?

17             A.  Off the television, yes.

18             Q.  You were in fact going to college at this

19   time, weren't you?

20             A.  Yes, I was.

21             Q.  You were taking Criminal Justice courses,

22   weren't you?

23             A.  No, I wasn't.

24             Q.  You understood your rights, didn't you?

25             A.  No, I didn't.

**RUN 091**                                    SALDATE000642

                      SUPERIOR COURT

                                              Exhibit 1H

62

1          Q.   Didn't you tell Det. Saldate after he read

2     from the rights card that you understood those rights?

3          A.   I don't believe so.  I said maybe.  And he

4     might have took it in his own definition of what I said.

5          Q.   In fact, sir, you talked to him for quite a

6     while before you ever told him that you wanted to remain

7     silent.  Isn't that true?

8          A.   I didn't talk to him.  He more or less tried

9     to get me to say things that were not true.

10          Q.   You told him, didn't you, Mr. Running Eagle,

11     that you had never been to that address on Sahuaro

12     before?

13          A.   Sahuaro?  I don't exactly know where it's at

14     because I travel all over the city.

15          Q.   You told Det. Saldate you had never been

16     there, correct?

17          A.   I might have.  I am unsure.

18          Q.   He told you that your palmprint was found

19     inside the Williams' house, didn't he?

20          A.   Yes, he did.

21          Q.   You told him that couldn't have been your

22     palmprint because you were never there.  Isn't that true?

23          A.   Not really.

24          Q.   What did you mean not really?

25          A.   What I mean by not really is, I do not

**RUN 092**                                SALDATE000643

SUPERIOR COURT

Exhibit 1H

63

1    exactly know these people. If you showed me a

2    photograph, which I might or might not be able to

3    identify them. But I know a lot of people in the city.

4         Q.  You told Det. Saldate and Martinsen that

5    that could not have been your print inside their house.

6    Isn't that true?

7         A.  My response to that would be, if I was

8    unsure of the people, then I can't exactly tell you

9    whether that is my prints or not. He never did give me

10   the location or the address, if that would have helped.

11        Q.  Do you know Jacqueline Williams?

12        A.  The names I do not know.

13        Q.  Do you know Herbert Williams?

14        A.  The names I do not know. Were you ever in

15   their house?

16        A.  I don't know. That is what I am trying to

17   get across to you.

18        Q.  Were you ever at 2425 East Sahuaro in

19   Phoenix?

20        A.  The address doesn't sound familiar, but once

21   again, I said if you give me a map I might be able to

22   say.

23        Q.  Do you -- did you make the following

24   statement to Det. Saldate and Martinsen during that

25   interview, "Just let me fall. It must be my destiny.  I

**RUN 093**                                    SALDATE000644

                    SUPERIOR COURT

                                              Exhibit 1H

64

1    must fall"?

2              A.    The way they were treating me I sure felt

3    like it.

4              Q.    Did you make that statement?

15

5              A.    They more or less made it for me by their

6    actions.

7              Q.    Did you say those words?

8              A.    I don't know him if they were exactly.

9              Q.    What words did you say?

10             A.    Unsure.  Why has this become a war between

11   me and you?

12             MR. AHLER:  Your Honor, could you direct this

13   witness to answer the questions?

14             THE COURT:  Mr. Running Eagle, this is not the

15   time for you to be making statements.  If you will just

16   answer the questions that are put to you by the attorney.

17   If there is an objection to be made, anything

18   argumentative, for example, your attorney will make that

19   for you.

20             THE DEFENDANT:  Okay.  Sorry.

21   BY MR. AHLER:

22             Q.    Under what circumstances would you have ever

23   been at the Williams' house?

24             A.    I do yard work, I like to do odd jobs, I

25   like to -- sometimes people would have me move furniture.

**RUN 094**                            SALDATE000645

                    SUPERIOR COURT

Exhibit 1H

65

1          Q.   Do you recall having a conversation with the

2     detectives about your classes at Scottsdale Community

3     College?

4          A.   Yes, I did.

5          Q.   Isn't it a fact, Mr. Running Eagle, that all

6     of these statements were made prior to the time that you

7     asked to remain silent, and you asked for an attorney?

8          A.   Could you restate that question?

9          Q.   Conversations you had with these detectives

10    about your fingerprints being at the scene of this

11    homicide were made before you asked for your rights.

12    Isn't that true?

13         A.   No.  After.  They were forcing me.

14         Q.   You say that the touching on your chest

15    intimidated you?

16         A.   It's not alone the touching, but you forget

17    that they more or less hit me, and more or less went

18    across to use mental force.  And I am not -- you might

19    say I don't -- I am not into that kind of stuff.

20         Q.   You didn't suffer any injuries as a result

21    of being touched on the chest, did you?

22         A.   Now what would you might say are injuries to

23    injuries.

24         Q.   You didn't need any medical attention, did

25    you?

**RUN 095**

SALDATE000646

SUPERIOR COURT

Exhibit 1H

66

1          A.   Medical?  I don't -- I was under so much

2     stress and agony that I couldn't tell.

3          Q.   You didn't have any marks on your body, did

4     you?

5          A.   Yes, I did.  But I felt there is nothing I

6     can do about it.  They were slight, if that is what you

7     want to know.

8          Q.   The interview that these detectives had with

9     you is a very short interview, wasn't it?

10         A.   No.

11         Q.   In fact, didn't it only last about 40

12     minutes?

13              MR. INIGUEZ:  Objection.  That is misstating

14     what is in evidence already as 52 minutes.

15     BY MR. AHLER:

16         Q.   It lasted less than an hour, didn't it?

17         A.   Okay.  You guys arrested me in the

18     afternoon.  You had me sitting in that room a couple of

19     hours.  I had not eaten breakfast nor lunch.  Under a lot

20     of pressure from you guys it felt like all day.

21         Q.   The actual interview when they were talking

22     to you lasted less than an hour, didn't it?

23         A.   I don't know.

24         Q.   Now --

25         A.   I know from your reports, but those are your

**RUN 096**                                    SALDATE000647

                          SUPERIOR COURT

Exhibit 1H

67

1     reports.  You write the reports.

2              Q.   How long would you say it lasted?

3              A.   The way I felt it lasted was a day.

4              Q.   These officer never displayed any weapons to

5     you, did they?

6              A.   At what time?

7              Q.   During the time that Det. Saldate and

8     Martinsen were interviewing you.

9              A.   They had them with him.  I believe they had

10    them with him.  Just knowing that they are police

11    officers, and, you know, that they got guns is enough to

12    intimidate you.

13             Q.   They didn't threaten you with their guns,

14    did they?

15             A.   If I poked him in the chest he most likely

16    would have.

17             Q.   Sir, they didn't threaten you with their

18    guns, did they?

19             A.   Through common knowledge they did.

20             Q.   Did they pull the guns out of the holster

21    and point them at you?

22             A.   I didn't touch them so that I wouldn't give

23    them a chance to do that.  Because if I poked him, I

24    touched him, I wouldn't be sitting here right now.  I

25    would be someplace else, like six feet under.  They won't

**RUN 097**

SUPERIOR COURT

Exhibit 1H

66

1     give you a chance.

2               Q.   Sir, they didn't indicate to you that they

3     were going to take their guns out if you didn't talk to

4     them, did they?

5               A.   They had this attitude where they can touch

6     you, you can't touch them.   If you touch them they will

7     shoot you.

8               Q.   Sir, you indicated that even though you

9     recited the Miranda Rights to Det. Saldate, you didn't

10    really understand them?

11              A.   I didn't really understand them.

12              Q.   You had heard those rights before that day,

13    hadn't you?

14              A.   Before that day on television shows, on

15    numerous occasions.   I never really understood the

16    Miranda Rights until I have been in here and I have been

17    reading.

18              Q.   You probably had been read the Miranda

19    Rights before December 19, hadn't you?

20              A.   What day?

21              Q.   Let's talk about back when you were 13.   You

22    had been read your Miranda Rights back when you were a

23    juvenile on more than one occasion, hadn't you?

24              A.   I am unsure.   Can you describe them a little

25    better?

**RUN 098**                                    SALDATE000649

                    SUPERIOR COURT

Exhibit 1H

69

1              MR. AHLER:  I have no other questions.

2              MR. INIGUEZ:  I have nothing further, Your

3       Honor.

4              THE COURT:  You may step down, Mr. Running

5       Eagle.

6              THE WITNESS:  Thank you.

7              THE COURT:  Do you wish to call any further

8       witnesses, Mr. Iniguez?

9              MR. INIGUEZ:  No, Your Honor, we do not.

10             THE COURT:  Mr. Ahler, you have any rebuttal?

11             MR. AHLER:  No.

12             THE COURT:  You wish to make any comments at

13      this time?

14             MR. AHLER:  Yes, I do.

15             Your Honor, I think the issue here is one of

16      credibility, whether you want to believe the officer's

17      testimony or his.  They are obviously quite different.

18      The officers admitted to touching him.  I don't think

19      there is any indication though that there was any undue

20      force or that that caused him in any way to give a

21      statement he otherwise not have given.  These officers

22      are only with him 45 minutes at the point in time where

23      he invoked his right to remain silent, asked for an

24      attorney.  They stopped.

25             Up until that time he made a number of

**RUN 099**

SALDATE000650

SUPERIOR COURT

Exhibit 1H

1    statements.  Those statements should be admissible.  He
2    knew his Miranda Rights not only from being read them to
3    him that day, but he recited them back to the officers.
4    His statement now that he didn't understand them simply
5    is not credible.  He knew what his rights were.  He had
6    been read his rights before that day.  He knew exactly
7    what they were.  I would ask you to admit statements made
8    prior to the time he invoked his rights.
9              THE COURT:  Mr. Iniguez?
10             MR. INIGUEZ:  Well, Your Honor, I believe from
11   the testimony it has been extremely clear to this court
12   that while Mr. Running Eagle was read his rights, the
13   method of interrogation was a little different than what
14   we would like for interrogation to be without force.  I
15   do believe that many people can recite their rights from
16   television.  There are many police shows on television
17   these days.  They are very popular for some reason, and
18   that the average person gets to hear them on television.
19   I believe you can teach a parrot to say the Miranda
20   rights.  That doesn't mean he understands them.  I
21   believe the average citizen in our streets does not
22   understand what the Miranda Rights mean.  That a person
23   being able to say the phrases that are written in the
24   card does not impart on to them there the significance
25   and the importance and the signification of the rights

**RUN 100**                                    SALDATE000651

SUPERIOR COURT

Exhibit 1H

71

1   themselves.

2              However, in this particular case I don't

3   think that that is really what the problem is with this

4   interrogation.  I believe that a police officer being six

5   inches away from the person's face, poking his hand into

6   his chest is a method of getting attention.  Is unduly

7   intimidating and is force.  More so than what was

8   required to get Mr. Running Eagle's attention.

9              They were in a room that was about six feet

10  by eight feet or something of that nature, a very small

11  room.  So that it wouldn't have been very difficult.  He

12  was the only one in the room besides the two detectives.

13  It would not have been very difficult to get his

14  attention through verbal communication.  I don't think

15  putting his hands on him was required.  I do think that

16  had -- even though the police, Mr. Saldate may not have

17  intended it to happen, I believe the action itself of

18  poking a person in the chest and being six inches away

19  from his face, that would have a significantly

20  intimidating factor.

21             I remember from my Marine Corps days if

22  someone gets in your face six inches away it all by

23  itself intimidates.  Then if they start poking you, the

24  poking and the nearness has a way of making the

25  conversation totally different than when you have

**RUN 101**                          SALDATE000652

SUPERIOR COURT

Exhibit 1H

72

1    somebody sitting across the room at you, looking at you

2    calmly, asking you questions.

3              In this particular situation, that coupled

4    with the fact that at some point Mr. Running Eagle said,

5    "I want to remain silent", and the conversation

6    continued, I believe those two matters certainly combined

7    do make this interrogation less than voluntary for the

8    reasons I stated.

9              I know Mr. Running Eagle was taking some

10   classes at Glendale -- at Scottsdale Community College.

11   I do not know that those classes taught him the meaning

12   of the Miranda Rights. And because of his age of 19, I

13   know that Mr. Ahler mentioned that he had had his rights

14   read before.  Possibly one of the times was when he was

15   13.  I would venture to say that when he was 13 that

16   would have been a significant time ago.  He may have

17   forgotten, even if he was explained, what they meant and

18   was able to understand them at that age.

19              For the reasons I have stated, we request

20   that this Court not allow the statements in.  In

21   particular, the one regarding that his -- "It was his

22   destiny at fault.  It's my destiny.  Let me fall", or "I

23   must fall."  I think it's an ambiguous statement at best.

24   But because of the methods of which the questioning was

25   conducted, I do believe it was as a result of threat and

**RUN 102**                          SALDATE000653

SUPERIOR COURT

Exhibit 1H

73

1.  intimidation, not a voluntary statement.

2.          THE COURT:  Anything else, Mr. Ahler?

3.          MR. AHLER:  No.

4.          THE COURT:  The Court has considered the

5.  testimony of all of the witnesses, that with regards to

6.  the voluntariness of the statements made.  The Court

7.  finds that the defendant was advised specifically of the

8.  charges that he had been charged with at that time, that

9.  the defendant prior to the completing of the reading of

10. Miranda Rights by Det. Saldate recited the Miranda Rights

11. from memory.  Had Det. Saldate failed at that point to go

12. further in review of the Miranda Rights, perhaps there

13. may have some basis for finding that the defendant

14. Running Eagle wouldn't have understood.  But Det. Saldate

15. did the prudent and right thing by proceeding with that,

16. in any event, despite Running Eagle's obvious

17. memorization of those rights.

18.          It does appear to come down to an issue of

19. credibility in this case.  It's obvious that Defendant

20. Running Eagle is an intelligent young man, that he

21. understood those rights.  It's further clear that

22. although the method of interrogation may not have been

23. perfect, not one that I would recommend that the police

24. use in terms of touching the defendant, there doesn't

25. seem to be any indication that the touching was anything

**RUN 103**

SALDATE000654

SUPERIOR COURT

Exhibit 1H

74

1    beyond a means of getting Mr. Running Eagle's attention.

2    And given his inability during the questioning of him

3    during this hearing, it seems that Mr. Running Eagle does

4    have a tendency to divert and get on to tangential

5    matters.

6              The Court therefore finds that given the

7    circumstances, again, although there wasn't a exactly

8    perfect interrogation in light of the touching of the

9    defendant, that the overall conducting of the

10   interrogation was appropriate.  There were no promises,

11   no threats, no force.

12             I would, for the record, note that I have

13   reviewed the description provided in the file of Mr.

14   Running Eagle, and he is 5'11", 215 pounds.  Had this

15   been, for example, Mr. Antone at 5', 120, perhaps there

16   may have been a different atmosphere in that room.  The

17   description appears to be accurate.

18             For all of the findings I have given, the

19   Court finds that the statements were knowingly,

20   intelligently, voluntarily made, and will be admissible.

21             Now at this time what I would like to do is

22   take a break, allow Mr. Ahler to review the packet that

23   Mr. Steinle has been able to provide.  We will take a

24   short break and come back into the courtroom in about 15

25   minutes.

**RUN 104**                                    SALDATE000655

                       SUPERIOR COURT

                                          Exhibit 1H

75

1          MR. STEIMLE:  Judge I got an extra copy, so Mr.

2    Ahler can return the Court's copies.

3          THE COURT:  Thank you.

4

5          (Whereupon, a short recess was taken.)

6

7          THE COURT:  Let the record reflect that counsel

8    and the defendants are present.

9               The only thing that we have left is the voir

10   dire questions.  Let's first deal with the requested from

11   the Defendant Tilden's request for a written jury

12   questionaire.

13              Mr. Ahler, have you had an opportunity to

14   look at the packet with regards to the voir dire?

15         MR. AHLER:  I had a very limited chance to

16   review this.  I would object to using a written script in

17   this particular case.  I have gone through these

18   questions.  I don't think the majority of them are any

19   different from the questions that the bench would

20   normally ask of prospective jurors.  I don't see that

21   that much good is done in this case by using a written

22   type of format.  So I do have an objection basically to

23   submitting a written list of questions to the jury to be

24   completed prior to the time they come in here.  I think

25   we can save time and still do more than an adequate and

**RUN 105**

Exhibit 1H

1    fair job by just simply having the Court ask the

2    prospective jurors all the questions.  I think the rules

3    are set up for that.  I think they are set up that way

4    for a reason.  I don't think there is any reason to get

5    away from that procedure in this case.

6              I do have also objection to a number of

7    these questions,

8              THE COURT:  That are included in the

9    questionaire?

10             MR. AHLER:  Yes.

11             THE COURT:  Let's deal with the idea of a

12   questionnaire first.

13             Mr. Steinle, with regards to just the

14   general idea of the questionnaire, what purpose do you

15   believe would be served by having the jury -- the jurors

16   fill out the questionnaires as opposed to simply asking

17   these same questions directly from the bench?

18             MR. STEINLE:  Judge, I guess from a lawyer's

19   point of view you get an opportunity to review the

20   written responses to the questions at a time where you

21   can go through and reflect upon the responses rather than

22   taking the oral responses from the majority of jurors.

23   The problem that you have in the way that it's proposed

24   under the rules is the Court asks general questions of

25   everybody.  What you try to do is find someone who would

**RUN 106**

SALDATE000657

SUPERIOR COURT


1    experience has been that what you got to do is get each

2    juror down, you got to talk to each juror individually to

3    find out the real feelings on sitting in cases as

4    difficult as this case is going to be.

5           Now, either you can do it in written form by

6    having all the jurors sit down and write out their

7    responses, letting the lawyers look at the responses, or

8    you can do it the traditional way.  But somewhere during

9    the traditional way I am asking the Court individually,

10   take each juror, talk to them outside the presence of the

11   other jurors to find out whether or not they have any

12   problems sitting on this case, or anything in their

13   backgrounds causes them any concern.  In that regard it

14   has been my experience when you take the jurors

15   one-on-one where they answer the general questions in the

16   affirmative, all of a sudden they get back in chambers

17   with the lawyers, all of a sudden they have all of these

18   reservations that they haven't expressed in open court.

19          Now, again, I propose one method of doing it

20   would be through a written questionnaire where a person

21   in the privacy handwritten statement put down maybe some

22   reservations that they may have.  Or in the alternative

23   if you are going to conduct the standard voir dire,

24   somewhere along the line individually question each

25   juror, find out whether there is something there that

**RUN 108**                                    SALDATE000659

SUPERIOR COURT

Exhibit 1H

79

 1     they would like to make the lawyers aware of.

 2               This is -- my client is charged with a

 3     number of things but two first degree murder counts.  The

 4     State is asking that they be death qualified.  The State

 5     is asking for the death penalty.  I am trying to find a

 6     way to find out whether or not the people sitting on this

 7     panel will be fair and objective.  The only two ways I

 8     know of doing that is to either get each individual juror

 9     to fill out a written questionnaire, or in the

10     alternative do an individual voir dire of the jury panel

11     hoping that they will be open and candid in their

12     responses.

13               THE COURT:  Let me ask you this.  With regards

14     to an individual voir dire, you speaking in terms of

15     going over every single question, or having all of the

16     questions asked with an individual voir dire after, with

17     any specific concerns you may have as a result of

18     questioning that were asked in court?

19               MR. STEINLE:  Well, in terms of the general

20     questions that the Court goes over on a general basis,

21     you know, those can be in the pattern.  But somewhere

22     along the line take each juror individually, bring them

23     to chambers, ask them whether or not there is anything

24     that the Court has asked in open court that they wish to

25     talk to in private.  Then ask them a couple of other

**RUN 109**

SALDATE000660

Exhibit 1H

1    questions in terms of the death qualifying questions,

2    whether or not they personally, now that they are outside

3    the presence of the other members of the jury panel, feel

4    they can sit on a death case or if they have some

5    reservations.  Just some kind of ability that each juror

6    can, once they are outside of the group, express whatever

7    concerns they may have about their ability to sit in this

8    case.  Because as I said, we do it through a negative.

9    We want people to stand up, say, yes, I will respond to

10   that question.  But my experience has been 60 percent of

11   the people never raise their hands.

12           Or in the Comer case in January, we had 10

13   people who claim that they had heard or read something in

14   the newspapers in terms of the general questions.  They

15   said to Judge Reinstein, they don't see where it would

16   affect their ability to sit.  At the end of it I asked

17   the Court, take those 10, find out specifically what they

18   read, what they heard, what they saw, and what opinions

19   they formed.  Of the 10 that are brought back in chambers

20   six, before we even asked them questions, said maybe I

21   ought not sit.  In all then the Court went into a long

22   questioning process.

23           In one case we found that someone who had

24   read about the Comer case read all the articles, all the

25   newspapers articles, went out to Apache Lake to talk to

**RUN 110**                          SALDATE000661

SUPERIOR COURT

Exhibit 1H

81

1    the Forest Service because she had a woman's fishing

2    group that fished out there and she bought a gun to take

3    with her when she went out there.  And she was satisfied

4    after talking to the Forest Service that they caught the

5    right guy in terms of the general terms of open court.

6    All she said is yeah, she read some articles, but she

7    could set aside her opinions.

8                  Now, I can't tell you what kind of panel we

9    are going to get, but I am trying to find a means of

10   people can without standing up in front of a bunch of 40

11   or 50 or 60 other people express their opinions that will

12   affect their ability to sit on this jury panel.  That was

13   the purpose of first a questionnaire that they could fill

14   out.  And if not the questionnaire, of some ability

15   during the course of jury selection where we would have

16   individual questions to the jurors and individual cases

17   so that these people can honestly express whatever

18   reservations.  I think it benefits both the State and the

19   defendants.  Because in this case to be as interested in

20   making sure that the people who sit in this jury won't

21   make the decision because of a fear to impose first

22   degree murder because of the death penalty.  Now so they

23   have as much interest in doing an individual voir dire as

24   I think we do in this case.

25                  THE COURT:  Mr. Iniguez?

82

1              MR. INIGUEZ:  Your Honor, for the reasons that

2      Mr. Steinle has stated, I concur with the motion that he

3      has filed in this Court.

4              THE COURT:  Do you have preference on a written

5      versus an individual?

6              MR. INIGUEZ:  Your Honor, to be honest with you

7      we just got this a few minutes ago.  I haven't had an

8      opportunity to carefully review both, as one opposed to

9      the other.  I do believe that a written statement in some

10     situations would be better.  However, I have seen both of

11     the questions.  Most of the questions I think are very

12     relevant, and I think that the jurors would feel a little

13     bit more at ease in filling out a written statement

14     regarding these concerns.  However, I do think that the

15     second alternative that Mr. Steinle has proposed would

16     also suffice, cover the State and the Defendant's

17     interests in a fair trial here.

18              THE COURT:  Mr. Ahler?

19              Excuse me, I have some concern about the

20     amount of attention that this case has gotten.  I had

21     assumed that because it has been some time ago, not that

22     long, that maybe attention would have subsided.  That has

23     not been the case in terms of the number of calls that I

24     have been getting to my office from media and other

25     people.  That gives me some idea that there has been some

**RUN 112**                                    SALDATE000663

SUPERIOR COURT

83

1    interest in the past and there will continue to be.

2            Given the seriousness of the charges both,

3    from both sides, my preference would be to in abundance

4    of caution do one or the other, either the written or the

5    individual. And given the two, I am going to do one or

6    the other. My preference is to do the individual. And

7    the reason is, I would like to do, first of all, the

8    traditional in court asking of all the questions.

9            And as Mr. Steinle already notes with

10    regards to some questions I do ask jurors if they are

11    interested in coming back to chambers if there is

12    something, like for example if they have been victims of

13    a particular crime, or they feel they cannot discuss it

14    in open court, or if they themselves have been charged

15    with anything other than a traffic offenses. And in some

16    of those I found also that they may have been quiet and

17    subdued in the answers they gave in court, while in

18    chambers their answers were considerably more detailed,

19    and had more impact to whether or not they should be

20    jurors or not.

21            We are going to be moving tomorrow to 402

22    for jury selection. I haven't yet figured out where

23    exactly I am going to be able to have a chambers there.

24    The number of jurors that we are going to be calling is

25    80. There is no way I can sit 80 people in here. So

**RUN 113**

SALDATE000664

SUPERIOR COURT

Exhibit 1H

84

1    that is what we will need to do.  If we did a written one

2    the other problem with that is having it prepared, ready

3    to be handed out tomorrow.  That is my second choice,

4    anyway.  You probably have that on word processing,

5    right?

6              MR. STEINLE:  Well, I could delete it on word

7    processing, but if the Court is leaning towards one, I

8    prefer the individual as opposed to the written, so --

9              MR. AHLER:  I am not exactly sure what the Court

10   means by individual.

11             THE COURT:  Let me -- what I -- maybe it's not

12   what Mr. Steinle has indicated.  What I would propose to

13   do is go through all of the questions that you would like

14   me to ask, and those that have been submitted by the

15   defense.  Did the State submit some as well?

16             MR. AHLER:  I submitted some questions reference

17   death qualification.

18             THE COURT:  Death qualification.  I would ask

19   almost all of the questions in open court, with the

20   exception of some that you can tell in advance are going

21   to be sensitive, or otherwise difficult to answer in open

22   court.  As examples, as I said, what I would do is

23   indicate we are going after the majority of the

24   questions.  We will take each person individually, talk

25   with them on those questions that are the sensitive ones,

**RUN 114**                                    SALDATE000665

SUPERIOR COURT

Exhibit 1H

1    plus perhaps ask some sort of general.  Is there any of

2    the questions that have been previously asked that you

3    felt you were unable to talk about in open court, or is

4    there anything else that you thought about that the

5    attorneys and the Court need to know about.  That is what

6    I mean by individual.

7              MR. STEINLE:  What you are saying is you will

8    get down to the striking panel?

9              THE COURT:  Right.

10             MR. STEINLE:  Whatever it be, 20 or 25 people

11   that we are going to have to work with, and then you will

12   take each one of those people and save possibly the death

13   penalty questions, possibly the pretrial publicity

14   questions, and the general question, is there anything

15   else that you want to tell us.  You will take each one

16   into chambers individually and talk to them?

17             THE COURT:  Right.  I think that's the most

18   efficient.  Initially what I thought is you meant we take

19   one at time, ask them every single question that has been

20   proposed.  That would be just an incredible time

21   consumer.  I don't think we would accomplish anything

22   necessarily.  But I think doing it this way where you

23   weed out all of those, for example, that right away have

24   said it's much too long, I can't sit, I have vacation

25   problems, get through all of those types of questions

**RUN 115**

SUPERIOR COURT

86

1    first. And the general one's, the one's that aren't

2    going to be difficult for anybody, then go back in and we

3    may end up having people who have said, back to some

4    innocuous question, I have some other problems. But at

5    least we will use that individual at the end to where we

6    are down to pretty much what our panel is going to be.

7    Does that make sense?

8         MR. AHLER: Sounds to me like the system you are

9    proposing, Your Honor, is different from the one Mr.

10    Steinle is proposing. The way I anticipate this, if we

11    have 12 trial jurors, possibly four alternates, each side

12    is entitled to 10 strikes. We are talking about a

13    potential jury panel of 36 people to begin with. Are you

14    talking about bringing every one of those persons

15    individually in, after asking them general questions and

16    asking them other questions?

17         THE COURT: Right. But only after we have

18    probably eliminated a lot of people due to time problems

19    or to other things to where we are close to the end of

20    all of the questions, where you will have eliminated most

21    people that have problems. And, you know, we may end up

22    having to call more people after our individual meetings,

23    but --

24         MR. AHLER: I guess my question is what

25    questions are we going to submit to the jurors

**RUN 116**

SALDATE000667

Exhibit 1H

67

1    individually as opposed to --

2            THE COURT:  Right.  Well, you gave some

3    examples.  What I would propose to do in that regard is

4    to agree ahead of time what questions are going to be.

5    It may be that as we get through the majority of the

6    questions something else may come up.  But I think a

7    general question to individuals, is there anything else

8    that you might have not wanted to talk about in court is

9    going to bring out the most important things or telling

10   things that may not have been brought out in open court.

11   So I don't think there will be a whole lot of questions.

12           MR. STEINLE:  Judge, it seems to me in terms of

13   the questions that ought to be done individually, I think

14   pretrial publicity has to be one of them because I don't

15   think because you can then ask the immediate follow-up

16   questions, did you heard anything, what did you hear,

17   where did you hear it, is much more conducive to the

18   individual questions than it is to the group.  The death

19   penalty question I think in terms of the State is also

20   one that the State is going to want to have individually.

21   Ask each member of the jury panel as they come through,

22   rather than a general question.

23           THE COURT:  Well, I will tell you what.

24   Let's -- I am going do it this way in terms of the

25   general, then an individual.  That is, we will do it that

**RUN 117**

Exhibit 1H

88

1    way as opposed to the written questionnaire.

2            Now, what I would like you to do is since

3    Mr. Iniguez and Mr. Ahler you just gotten this packet, I

4    would like for you now to go through those, and we can

5    meet over the noon hour.  Is that a problem for anybody?

6            MR. INIGUEZ:  What time?  You know, I have a

7    trial in Judge Rose's court going on every morning.

8            THE COURT:  No, I didn't know that.

9            MR. INIGUEZ:  I believe he called you on that

10   some month ago when I filed a Motion to Continue in his

11   court.  I am in trial in Judge Rose's court from 9:00 in

12   the morning until he breaks.  Today it was about 12:30.

13   But I can be here, I am sure, by 1:00, if you wanted to

14   meet at 1:00, 1:15.

15           THE COURT:  I was thinking earlier.  I was

16   thinking like noon.  Where are you having this trial?

17           MR. INIGUEZ:  In -- what is it, 3225 West

18   Durango, the Juvenile Court Center.

19           THE COURT:  Well, what we can do is meet at

20   1:00.  I can just tell the jury commissioner we are going

21   to want them to send up the panel about -- it shouldn't

22   take us more than an hour, I wouldn't think.  At 2:00

23   o'clock.  We can just decide then exactly what the

24   questions are going to be.  If you will tell me ahead of

25   time if there is anything that you can agree upon before

**RUN 118**                                    SALDATE000669

                    SUPERIOR COURT

Exhibit 1H

69

1    that will save us a lot of time. If we can just do that,

2    I think we can get through some pretty quickly.

3              I know that it's going to take a long time

4    to make a jury, not just because of doing it

5    individually, but because of vacations. And that is just

6    the way that it goes. But we need to get started. I

7    rather do that than do a written.

8              MR. INIGUEZ: That is fine.

9              MR. STEINLE: That is fine.

10             MR. INIGUEZ: Yes, ma'am.

11             THE COURT: You can be here at 1:00 o'clock.

12    Know that we will be picking the jury in 402 in the

13    Central Court Building.

14             MR. STEINLE: You want us to meet here?

15             THE COURT: We will do it here in chambers. I

16    am not sure where to tell you I am going to have chambers

17    over there.

18             MR. AHLER: You anticipate we will do the whole

19    trial over there or just jury selection or whatever?

20             THE COURT: Same thing Judge Dann asked me. One

21    of the problems I am having with the number of alternates

22    we need. My jury room is tiny. I wanted to have my

23    bailiff check out that other jury room to see if it will

24    be any better.

25             MR. STEINLE: Judge, I can indicate to the Court

**RUN 119**

SALDATE000670

SUPERIOR COURT

Exhibit 1H

90

1   now that I talked to your bailiff earlier. We need a

2   bigger table.

3          THE COURT: We do have a bigger table available

4   over there. Now that may need to be moved over here if

5   we end up coming back here for trial. I told Judge Dann

6   what I would do is sort of see now comfortable it was or

7   uncomfortable, one way or the other. We can have that

8   certainly if we need it. That is what it is there for.

9   So the bigger table will be there for tomorrow.

10         MR. STEINLE: The other thing I would ask the

11  Court, if the Court could have some extra pads available.

12         THE COURT: Those kind of pads on the easel?

13         MR. STEINLE: Yes.

14         THE COURT: Is there anything else? Okay. I

15  assume there is a podium over there.

16         Anything else in terms of equipment that you

17  might need?

18         MR. STEINLE: No. Just if I had a couple of

19  extra pads I could take one, then I wouldn't have to

20  worry about getting here early to work those up. We can

21  just change the pads.

22         THE COURT: That won't be a problem. We will

23  get that for you tomorrow.

24         Mr. Ahler, anything you need?

25         MR. AHLER: Not right now, Your Honor.

**RUN 120**                                    SALDATE000671

Exhibit 1H

91

1            THE COURT:  All right.  Okay.  Then see you

2      tomorrow at 1:00 o'clock.

3                  Thank you.

4

5

6                    *        *        *        *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**RUN 121**

SALDATE000672

SUPERIOR COURT

Exhibit 1H

I ___Lydia Estrada___, do
hereby certify that the foregoing pages constitute a full,
accurate typewritten record of my stenographic notes
taken at said time and place, all done to the best of my
skill and ability.

DATED this 24th day of April, 1989.

Lydia Estrada
Official Court Reporter

SALDATE000673

Exhibit 1H

16

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4

STATE OF ARIZONA,                    )
5                                    )
          Plaintiff,                 )
6                                    )
     vs.                             )
7                                    )      No. CR-87-11508
SEAN RUNNINGEAGLE,                   )      CR-89-0048-AP
8    COREY TILDEN,                   )
                                     )
9          Defendants.               )
     _____)      CR-89-0048-AP

10                                          FILED

11                                          APR 13 1989

12                                          NOEL K. DESSAINT
                                            CLERK SUPREME COURT
                                            BY

13                        Phoenix, Arizona
                            July 18, 1988

14

15

16   BEFORE:  The Honorable GLORIA G. YBARRA, Judge

17

18              REPORTER'S TRANSCRIPT OF PROCEEDINGS

19

20                        Jury Trial

21

22

23

24   ORIGINAL

25   PREPARED FOR APPEAL            LYDIA ESTRADA
     For Supreme Court              Official Court Reporter

                                    AND CONFIDENTIAL MATER

18

1          THE COURT:  I am sorry, counsel.  I think I

2     failed, for the record, to say the number of that

3     exhibit.  What ws that?

4          MR. AHLER:  130 and 131, Judge.

5          THE COURT:  Did you move both of them in?

6          MR. AHLER:  Yes, I did.

7          THE COURT:  130 and 131 will be admitted.

8

9               DIRECT EXAMINATION

10    BY MR. AHLER:

11         Q.  Tell us your name, please.

12         A.  Armando Saldate.

13         Q.  Your occupation?

14         A.  I am a Phoenix Police officer.

15         Q.  Det. Saldate, are you assigned to any

16    particular unit or --

17         A.  I am currently assigned as a detective to

18    the Homicide Detail.

19         Q.  How long have you held that position?

20         A.  Over two years.

21         Q.  Bow long have you been with Phoenix Police

22    Department?

23         A.  Since 1969.

24         Q.  What did you do before you worked Homicide?

25         A.  I worked Robbery for about eight years.  In

Exhibit 1H

1    between there I had some Undercover Work for about eight

2    months.  I worked Forgery, I worked Burglary Detail, then

3    I worked Uniform Detail.

4           Q.  Did you acquire any duties in regards to the

5    investigation and to the murder of Jacqueline and Herbert

6    Williams?

7           A.  Yes.  I was assigned the case agent for that

8    homicide case.

9           Q.  When did you first become involved in that

10   case?

11          A.  The morning the bodies were discovered.

12          Q.  And can you tell us what your duties are as

13   the case agent?

14          A.  The case agent responsibilities are trying

15   to gather all the supplements together, coordinate all of

16   the investigation totally, and ultimately make the

17   arrest.

18          Q.  Were you involved with the scene

19   investigation at all?

20          A.  Very briefly.  I was given a cursory view of

21   the scene by Det. Martinsen.

22          Q.  Were you involved in the interview of

23   defendant Sean Running Eagle in connection with this

24   case?

25          A.  Yes, I was.

20

1          Q.   When did that interview take place?

2          A.   Took place on the 19th of December, 1987.

3          Q.   Where did it take place?

4          A.   Took place at the Main Police Station, at

5    620 West Washington.

6          Q.   Were you involved in his actual arrest in

7    connection with this case?

8          A.   No, I was not.

9          Q.   What time did you start your interview with

10   Mr. Running Eagle?

11         A.   Approximately 1540 hours, which would

12   translate to 3:40 p.m.

13         Q.   Was anyone else present during the interview

14   besides yourself and defendant Running Eagle?

15         A.   During the entire time Det. Martinsen was

16   present.

17         Q.   Did you advise him of his Miranda Rights

18   before you started questioning him?

19         A.   Yes, I did.

20         Q.   Did you do that from memory or from a

21   written card?

22         A.   I upon making contact with Mr. Running

23   Eagle, I removed a card from my wallet that is issued by

24   the Phoenix Police Department.  Was going to begin to

25   read the Miranda Rights to him.

**RUN 126**                    SUPERIOR COURT            MILKEANSB075507

Exhibit 1H

21

1          Q.  Do you have the card with you?

2          A.  I do.

3          Q.  Could you read to him the rights that you

4  read to him on the afternoon of December 19th, 1987?

5          A.  Certainly.  The rights card is a standard

6  issued from the Phoenix Police Department.  Has a Spanish

7  version on the back and the English version on the front.

8  It states, "You have the right to remain silent.

9  Anything you say can be used against you in a court of

10  law.  You have the right to the presence of an attorney

11  to assist you prior to questioning, to be with you during

12  questioning, if you so desire.  If you cannot afford an

13  attorney you have the right to have an attorney appointed

14  for you prior to questioning.

15          Do you understand these rights?"

16          Q.  Did you read all of these rights to

17  defendant Running Eagle before you started questioning

18  him?

19          A.  Yes, I did.

20          Q.  Is the defendant Running Eagle in the

21  courtroom today?

22          A.  Yes, he is.

23          Q.  Could you identify him for the record,

24  please?

25          A.  He is the --

1          MR. INIGUEZ:  We will stipulate to

2     identification.

3          THE COURT:  The record will reflect the

4     identification of the defendant Running Eagle.

5     BY MR. AHLER:

6          Q.  Can you tell us what, if anything, happened

7     during the night you started to read him his rights?

8          A.  I first removed the card from my wallet, was

9     going to start reading him his rights as I just did.

10    Then Mr. Running Eagle by memory recited the rights out

11    loud to me.  The exact rights that I was going to read

12    him.  I told him that was fine.  However, I still went

13    ahead and read him his rights again and asked if he

14    understood them.  He said he did.

15         Q.  Did you advise him he was under arrest

16    before you questioned him?

17         A.  Yes, I did.

18         Q.  What did you tell him?

19         A.  I told him he was under arrest for murder.

20         Q.  How did you start your conversation after

21    you had read him his rights?

22         A.  I explained to him that he was under arrest

23    for murder.  I told him it was a very serious crime he

24    committed.  I then told him that we identified his

25    fingerprints at the crime scene.  And he immediately,

MILKE/NSB045509

23

1    very calmly, said that they were not his.

2              Q.  What was -- how long did this interview last

3    with defendant Running Eagle?

4              A.  Forty-five minutes to an hour.

5              Q.  What was his demeanor like during this

6    interview?

7              A.  Very calm.  On most occasions very calm,

8    smiled.  He was very quiet.

9              Q.  Did you have information prior to the time

10   that you started his interview that his palmprint had

11   been found inside the Williams' home?

12             A.  Yes, I did.

13             Q.  Did you ask him what he was doing the night

14   of December 5th, 1987?

15             A.  I did.  And I basically told him, asked him

16   what he had done. I believe he said he couldn't recall

17   that or he told me that -- if you don't mind, I can

18   refresh my memory with my report.

19             Q.  Would that assist you in remembering exactly

20   what he said?

21             A.  Yes, it would.

22             Q.  Okay.

23             A.  I asked him if he was in a certain area, and

24   he told me that he was not during that period of time.

25             Q.  You recall him making any statements to you

**RUN 129**                    SUPERIOR COURT          MIENEATSB04B510

Exhibit 1H

1    right after the time that you asked him about where he

2    was on the night of December 5th?

3            A.  Yes, I do.

4            Q.  What did he say to you?

5            A.  At this point he became -- his voice became

6    a little louder.  He said something to the effect, "Just

7    let me fall.  It must be my destiny.  I must fall."

8            Q.  Did you inquire of him what he meant by

9    that?

10           A.  Definitely.  I told him that it was not my

11   job to ensure that he fall, but just to get the truth.

12   He again repeated that he must fall.

13           Q.  Were Mr. Running Eagle's tennis shoes taken

14   from him at any time during the course of that interview?

15           A.  I believe Det. Martinsen went back and

16   removed Mr. Running Eagle's shoes from him.

17           Q.  Were you involved with the interview of Orva

18   Antone?

19           A.  Yes, I was.

20           Q.  When did that interview take place?

21           A.  That interview took place shortly after Mr.

22   Running Eagle's interview, several hours afterwards.

23           Q.  Was it on the same night?

24           A.  Yes, it was.

25           Q.  Where did the interview take place?

**RUN 130**                         SUPERIOR COURT              MIBMEANSB0455511

Exhibit 1H

1          A.   It took place at 620 West Washington, at the

2    Main Police Station.

3          Q.   Who was present during that interview?

4          A.   During the entire interview Det. Larry

5    Martinsen was present.

6          Q.   Was Mr. Antone under arrest at that time

7    when he was first brought in?

8          A.   When he was first brought in he was under

9    arrest, yes.

10         Q.   Did you also advise Mr. Antone of his

11   Miranda Rights?

12         A.   Yes, I did, using the same card.

13         Q.   How long did the interview with Orva Antone

14   last that night?

15         A.   Hour or more.

16         Q.   Were any deals made with Mr. Antone at that

17   time?

18         A.   Definitely not.

19         Q.   Did you explain to Mr. Antone what you were

20   investigating before you started to interview him?

21         A.   Yes, I did.

22         Q.   What did you tell him?

23         A.   I told him I was investigating a murder.

24   That he had been arrested for murder.

25         Q.   How did you initiate your interview with Mr.

1    Antone?

2              A.  My interview was initiated again by reading

3    him his rights card, which I did, and asked him if he

4    understood.  Then got a little bit of background on him.

5              Q.  Could you tell at all if he had been

6    drinking prior to the time that you started interviewing

7    him?

8              A.  I don't believe we could tell as much as I

9    did ask him.  He said that he had had a beer earlier

10   during the day.  And the test would have been done on

11   him.

12             Q.  What was Mr. Antone's attitude like during

13   the course of that interview?

14             A.  I believe Mr. Antone was at first -- began

15   to be -- was evasive at first, but later became very

16   cooperative.

17             Q.  How were you able to direct him to the

18   specific night in question and ask him about where he may

19   have been and what he may have done that night?

20             A.  Up to that point I had interviewed several

21   other persons, and I specifically asked him to focus in

22   on the night when he was with Corey and Sean, and

23   possibly Sheryl's house.  And that is how we focused in

24   on that particular night.

25             Q.  Did you ask him questions concerning whether

**RUN 132**                    SUPERIOR COURT            MIEMEANSB0#5513

1   he had been riding around with them that night?

2            A.  Yes, I did.  And that was included.  That

3   included also focusing in on that particular night,

4   whether he had remembered riding around that particular

5   night.

6            Q.  You indicated that initially he was somewhat

7   evasive.  Can you tell us what you mean?

8            A.  I may have used the long word evasive as

9   much as Mr. Antone at first tried to minimize his

10  position, which is very common.  They try to minimize his

11  involvement, and later became very cooperative with me

12  and told us the truth.

13           Q.  Did you give Mr. Antone any information

14  about the property that was stolen from the Davis' house?

15           A.  No, I did not.

16           Q.  Did you give him any information concerning

17  the property that may have been taken from from Mr. and

18  Mrs. Williams' house?

19           A.  No, I did not.

20           Q.  Did Mr. Antone tell you who he had been with

21  that night that they were use cruising around?

22           A.  Yes, he did.

23           Q.  What did he tell you?

24           A.  He told me that he had been with Sean and

25  his brother Milford.  And that sometime after they were

**RUN 133**                    SUPERIOR COURT              MILKEANSBO85514

28



1    cruising, he said he realized that Corey was in the car.

2    He said he had been drinking.  He said he believed he

3    went to Corey's house and picked him up.

4              Q.  Did he indicate whose car they were in?

5              A.  He indicated to me it was Sean's car, but

6    actually it belonged to Corey and Sean.

7              Q.  Did he tell you whether they were cruising

8    after all four people were in this car?

9              A.  He said they were cruising in the general

10   area.  Never specifically said an hour, I believe, but he

11   said that they were cruising, listening to the radio at

12   one point.  He indicated something to the fact that they

13   needed gas or he realized they needed gas, and he said

14   that they stopped at a location, residential area.  And

15   he said that Corey and Sean got out of the car.

16             I specifically asked him if it was to siphon

17   gas.  He said it was.  Then got back in and they again

18   went cruising, listening to the radio.  During this time

19   he said him and Milford were in the back seat, Sean was

20   driving, Corey was the passenger.

21             Q.  Were you involved in the execution of the

22   search warrant at the residence of Tilden and Running

23   Eagle on the night of December 19th?

24             A.  I assisted, if that is what you want.  Yes,

25   sir.

Exhibit 1H

1        Q.  Were you present when the trunk of the car
2   was opened and certain items were taken out of it?
3        A.  I was present either at that time or shortly
4   after the trunk was opened.
5        Q.  You recall if there were any gas cans in the
6   trunk of that car?
7        A.  I believe there was.  I am not sure.
8        Q.  Was there any hose?
9        MR. INIGUEZ:  Excuse me, Your Honor.  I believe
10  the witness' answer was muffled by his next question.  I
11  believe he said I am not sure.
12       THE COURT:  Would you repeat the last part?
13       THE WITNESS:  I said I don't believe there was,
14  but I am not sure.  Again, I have to say -- again, I was
15  just there shortly after that truck was stopped.
16  BY MR. AHLER:
17       Q.  Did Mr. Antone describe for you the location
18  where they stopped the last time?
19       A.  He said it was a residential area.  He said
20  they stopped in front of a house and that Corey and Sean
21  got out of the car, and went to another house.  Not the
22  house they stopped in front of, but another house.  He
23  said something to the effect that Sean was working on the
24  car.  And I think we asked him how he knew that.  He said
25  the hood of the car or the other car was up.

Exhibit 1H

1          Q.  Did he describe what he did after he saw the

2    defendant Running Eagle working on this car?

3          A.  He said he got out of the car shortly

4    thereafter, and walked over to the car, stood by Sean as

5    he was working on the car.

6          Q.  Did he describe to you his actions after

7    going to the house?

8          A.  He said he was there at the car.  A short

9    time later a man came out of the house to which they were

10   parked in front of, walked towards them.  He made a

11   comment that he had already put a lot of stuff in the

12   trunk at that point.

13         Q.  Did he describe to you the stuff that he put

14   in the trunk of Running Eagle's car?

15         A.  He said it was -- one of the things was a

16   tool box, a floor jack, he said that he put in a bicycle.

17   But first the bicycle wouldn't fit so he had to take some

18   pliers out of a tool box, take the front wheel off of the

19   bicycle, then put the bicycle in it.  Later on he

20   described this carburetor.  I asked him if it was a

21   carburetor.  He said no, there was two carbeurators that

22   he took to the trunk.

23         Q.  Did he describe to you the man that came out

24   from the house next door?

25         A.  At one point he described him as an older

31

1     man.

2              Q.  Did he tell you where this man was when he

3     first saw him?

4              A.  He said that they were at the car and the

5     man was walking across the front yard of the house they

6     were parked in front of.  He said the man approached Sean

7     and told him that -- told both of them that they better

8     leave or he was going to call the police.  He said he

9     immediately then walked away from Sean in the car, headed

10    back towards their car.

11             Q.  Did he describe to you the confrontation, if

12    any, that may have occurred between the old man and

13    Running Eagle and Tilden?

14             A.  Yes, he did.

15             Q.  What did he tell you in that regard?

16             A.  He said once he got back to the car, Corey

17    who had been by the their car originally, then started to

18    to walk back towards Sean, which would make him walking

19    behind the old man.  He said at that point Sean and Corey

20    were in the front yard talking to this old man.  And he

21    once described Corey as either pushing this old man, then

22    the old man pushing him back, telling him that he was

23    going to call the police.  Then said that Corey struck

24    the old man.  The old man immediately turned away from

25    them, and was walking towards the driver, towards the

**RUN 137**                    SUPERIOR COURT              MIBKED/NSB0495518

32

1    front of the house.  He said he saw Corey and Sean

2    walking behind the old man, but that they were conversing

3    between themselves as the old man walked in front of

4    them.  The old man continued to, what he described as a

5    driveway or said it was a driveway.  I specifically asked

6    him what area.  He said there was a car parked in the

7    driveway and they were at the back of the driveway or the

8    back of the car.  He said at that point he remembers

9    hearing a lady's voice.  He heard a lady come out, then

10   the confrontation took place between the lady, the man,

11   Corey, Sean, now being four people.

12          Q.  Did he describe to you whether Sean Running

13   Eagle and Tilden had anything in their hands the time the

14   confrontation took place?

15          A.  At one point he told me that Sean had his

16   knife with him.  He said he was carrying a large knife

17   with him.  He said he had taken it out of the car to work

18   on the car.  He said he had the knife in a fashion

19   holding the knife handle, but with the blade pointing up

20   towards the back part of his arm.  He said that Corey at

21   one time was armed with possibly a screwdriver, but he

22   stopped it.  Then later said Corey was armed with a

23   flashlight, a large black flashlight that he knew

24   belonged to Corey.

25          Q.  Mr. Antone relate to you whether he observed

**RUN 138**            SUPERIOR COURT              MILKE/NSB095519

Exhibit 1H

33

1    Running Eagle do anything with this knife?

2            A.   During this confrontation, Corey and Sean,

3    he said that Sean at one time, the knife in his hands

4    with the blade pointed outwards this time, towards the

5    old man, he said he thrust at the old man. Was as if he

6    was playing with him or kidding with him, and just

7    lunging at him. The old man kept telling him to put the

8    knife away. He said at one time Sean dropped the knife

9    and he picked it up quickly, then struck the old man with

10   the handle of the knife on the face.

11           Q.   Did he see or did he relate to you anything

12   that Tilden did?

13           A.   He recalled Tilden holding the flashlight.

14   He recalls the lady apparently telling them to leave her

15   husband alone, telling Sean to put the knife down,

16   telling them to just leave, to get out of there, to leave

17   them alone.

18           He remembers that Corey was holding the

19   flashlight in his right hand. Corey, as he described it,

20   made a turn as if he was going to walk away from the

21   lady, but instead he quickly spinned and struck the lady

22   on the side of the head with the flashlight he was

23   holding.

24           Q.   Did he describe the flashlight to you?

25           A.   He said a large black flashlight that Corey

Exhibit 1H

1    had.

2                Q.  Did you have any conversation up until that

3    time about such an object?

4                A.  Yes, we did.

5                Q.  Who had you gotten that information from?

6                A.  I believe Sheryl Sivertsen had told us that

7    Corey had a large black flashlight that they used.

8                Q.  Did Mr. Antone describe to you where Tilden

9    hit the woman?

10               A.  Yes, he did.  He pointed out.  I asked him

11   if he remembered where.  He pointed to the left part of

12   the head, just above the ear.  He said he believe he hit

13   the lady just above the ear, towards the back of the

14   head.

15               Q.  Mr. Antone relate to you any information

16   concerning Running Eagle and Tilden's entry into these

17   people's home?

18               A.  He said at one point he, after seeing Corey

19   hit this lady, he did go and check on his brother to see

20   if he is was still passed out.  And he was.  He said

21   something else happened.  He then realized, looked

22   towards the driveway again, and at that point he saw only

23   Corey and Sean at the driveway, and the man and the woman

24   were gone.

25               Later on at one point he asked him about the

35

1    hole in the door, and he recalled that Sean had made that

2    hole in the door with a piece of iron that he had

3    obtained from the house next door. He then tried to

4    focus him in on entering the house, or did he ever enter

5    the house, or did anyone enter the house. And he said

6    that he walked over to the driveway, and he seen Corey

7    standing outside. He didn't see Sean anymore.

8           He then walked up to the doorway and he says

9    that he believes Corey may have pushed him into the

10    doorway. He recalls it was dark inside that room. He

11    recalls there was lights coming from the west, possibly

12    an opening, in a door opening. He recalls cabinets to

13    the side hanging on the wall. He recalls Corey and Sean

14    later entering past him into the house. He said he only

15    enter the doorway, then exited.

16           Q.  Did he describe to you how they had left the

17    area?

18           A.  He said after he did this he walked back to

19    the car. Said that he realized they were stealing stuff,

20    but that he just wanted to get out of there. He said he

21    got into the car, and Milford was still passed out in the

22    back seat.

23           He said within seconds Corey and Sean come

24    running to the car. They both get in the car. They are

25    laughing for some reason. He doesn't know why they are

**RUN 141**

MILWAUKEE/MSB0015522

Exhibit 1H

1    laughing.  He says that Sean throws a knife on top of the

2    dashboard, and Corey immediately throws the flashlight he

3    had been carrying to the back seat.  Obviously it strikes

4    him.  He then throws it back at Corey.

5              He remembers the car making a U-Turn, and

6    accelerating, going around a corner.  He thought maybe

7    they hit something.  He wasn't sure.  Then they left the

8    area.

9              Q.  Did he describe to you having any alcohol on

10   the way to his house?

11             A.  At one time e we asked him about that.  He

12   remembered that Sean or Corey, after they left they threw

13   him back a beer which he believed it was cheap beer.  He

14   called it Strohs beer.  He said he recalled getting back

15   home, everybody getting off, then bringing some more beer

16   and maybe eating something.  Back home, meaning the

17   Reservation.

18             Q.  Did you make any promises to Mr. Antone when

19   you interviewed him on the night of the 19th?

20             A.  Definitely not.

21             Q.  Was he charged that night?

22             A.  Yes, he was.

23             Q.  What was he charged with?

24             A.  Charged with first degree murder.

25             MR. AHLER:  I have no further questions.

37

```
 1              THE COURT:  Mr. Iniguez?

 2

 3                   CROSS-EXAMINATION

 4   BY MR. INIGUEZ:

 5              Q.  Officer Saldate, Det. Saldate, it's true, is

 6   it not, conversation you had with Orva Antone didn't go

 7   nearly as smoothly as you laid it out here today in front

 8   of this jury.  Isn't that true?

 9              A.  The conversation took over an hour.  And I

10   just paraphrased most of the statements, yes.

11              Q.  Well, isn't it true that I listed out a

12   number of things that he told you during your interview?

13   Is that right?

14              A.  I would have to listen to an example, Mr.

15   Iniguez.

16              Q.  Okay.  For example, the first time you asked

17   him a question regarding where he was or what happened

18   between Sean and Running Eagle, or Sean Running Eagle and

19   Corey, you said he was too drunk.  He didn't remember.

20   True?

21              A.  I believe he -- I said that he was somewhat

22   evasive at the beginning of the interview.

23              Q.  Don't you think somewhat evasive is a little

24   bit of an understatement here?

25              A.  I believe I said that it was probably an
```

**RUN 143**              SUPERIOR COURT              MIEMD/NSB0P6524

1   overstatement.  I thought maybe he was trying to,

2   moreorless trying to minimize his involvement, as which

3   is usual.

4          Q.   True.  Going back to this minimize his

5   involvement, isn't that what Sean was doing when you

6   first started talking to him?

7          A.   I believe so.  I asked him, I told him that

8   I had his fingerprints at the scene.  Him telling me that

9   they were not there is not minimizing it.  That's just

10  complete denial.

11         Q.   Isn't it minimizing when you say his

12  fingerprints weren't there?  Isn't it making him, trying

13  to make himself less culpable or less involved with the

14  crime?

15         A.   Again, I would have to say just pure denial

16  on his part rather than minimizing it.

17         Q.   Okay.  You didn't ask him under what

18  circumstances his fingerprints were found or anything of

19  the fact, did you, when you were talking to Sean?

20         A.   I told him he was under arrest for murder,

21  and his fingerprints were found at the murder scene.

22         Q.   Okay.  Well, you also accused him of a

23  number of things, didn't you?  You told him that you

24  talked to his girlfriend and his girlfriend had told you

25  what happened, didn't you?

```
 1              A.  That is also not an accusation.  That is the
 2      truth.  I told him I had spoken to his girlfriend
 3      already.  That his girlfriend had given me a statement.
 4              Q.  All right.  And while you are talking to
 5      Sean, it's true that you were sitting, oh, about six
 6      inches from his face while you were questioning him?
 7              A.  When I handle an interview it's -- I try to
 8      stay no further than 12 inches from a person.  Yes.
 9              Q.  I will ask you that question again.  Isn't
10      it true that while you were talking to Sean your face was
11      about six inches from his as you were talking to him?
12              A.  The only estimation I can give you, that no
13      less or no more than 12 inches that I try to stay away
14      from a person.  And that is what I did with Sean.
15              Q.  Wait a minute.  You said no less.  Was that
16      an error?
17              A.  No more.
18              Q.  From 12 inches all the way up as we can.
19      Typically right on his face?
20              A.  Certainly.
21              Q.  In fact, you were poking your finger into
22      his chest as you were talking to him, were you not?
23              A.  At one point I did touch his checst with my
24      finger to get his attention, yes.
25              Q.  Isn't it true at several points you touched
```

Exhibit 1H

40

1     your finger to his chest to get his attention?

2              A.   As much as I recall Mr. Running Eagle, I did

3     have to get his attention several times, yes.

4              Q.   Right.   Your method of getting his attention

5     was to stick your finger into his chest area and poke

6     him?

7              A.   I think the description is a little off.   My

8     way of doing it was to tap him on the chest, telling him

9     that I wanted his attention.   And, yes, that is the way I

10    did it.

11             Q.   How much do you weigh, Officer Saldate?

12             A.   227 pounds.

13             Q.   Oh.   You are not telling me that you are

14    tapping him like this, are you?

15             A.   No, definitely not.   I don't think I could

16    have gotten his attention that way.

17             Q.   Right.   You were very interested in getting

18    his attention.   Is't that true?

19             A.   Definitely.

20             Q.   How long was he in jail all together in that

21    little holding room?

22             A.   I would estimate no more than two hours.   We

23    spoke for approximately 45 minutes to an hour.   And at

24    the outset no more than two hours.   That is just an

25    estimate.

**RUN 146**                    SUPERIOR COURT          MIAMI-NSB005527

41

1    Q.  Okay.  And as you were talking to Sean,

2   earlier you made a statement about him saying, "It must

3   be my destiny.  Let me fall."

4        Now, I think the prosecutor asked you if you

5   had asked him what he meant by that.  I didn't

6   particularly understand your answer to how you asked him

7   to explain that to you.  Would you tell us that again?

8    A.  I believe Mr. Ahler asked me if I asked him

9   to explain.  I didn't really need to explain because I

10  kind of understood what he meant.  But I told him that it

11  was not my position to just let him fall.  It was my

12  position as detective to obtain the truth and to get a

13  statement from him.  That is what I wanted to do.

14   Q.  Well, let's go back to that once more.  You

15  just told me you knew what he meant.  In other words, did

16  you not ask him what he meant?  Isn't that true?

17   A.  That is true.

18   Q.  Now, your own mind made up a reason or a

19  response -- not a response, a reason for what he meant.

20  Is that true?  In your own mind you came to the

21  conclusion without asking him?

22   A.  No.  He refused plain English.  I

23  interpreted that English.  And as I saw it, yes.

24   Q.  He said, "Let me fall."  Those are his exact

25  words, right?

**RUN 147**

SUPERIOR COURT

MIEXDEANSBO05528

Exhibit 1H

42

1           A.  "Just let me fall.  It must be my destiny."

2           Q.  Okay.  Your statement to this jury is that

3    you didn't have to ask him what he meant.  You knew that.

4    Is that what you are saying?

5           A.  Let's see.  I interpreted those words to

6    mean that he needed to fall.

7           Q.  Right.  By that I guess to you it means

8    conviction.  Is that what you are saying?

9           A.  That may have been, yes.

10          Q.  But he never told you that.  Isn't that

11   true?

12          A.  No.

13          Q.  Nor did you ask him if that is what he

14   meant?

15          A.  No.

16          Q.  Now, in regards to making Orva a deal, you

17   mentioned the gas chamber to Orva while you were talking

18   to him, didn't you?  You dropped a little hit in there

19   that there might be a gas chamber involved in this

20   situation, didn't you?

21          A.  I don't believe so.  I don't believe so.

22          Q.  So if Orva said you mentioned the gas

23   chamber while you were talking to him, is he mistaken?

24          A.  He may be.  I don't believe I said a gas

25   chamber.  However, I did tell him he was under arrest for

**RUN 148**                    SUPERIOR COURT              MISAKEANSB0015529

Exhibit 1H

43

1    first degree murder.

2         Q.   And did you tell him it would go better if

3    he would cooperate?

4         A.   Never.

5         Q.   Never?

6         A.   Never.

7         Q.   Officer Saldate, it's not your function to

8    offer deals to people, is it?

9         A.   It's not only not my function, I don't have

10   the authority to do that.

11        Q.   Right.  Thank you.  That was my next

12   question.  In fact, you don't have the authority.  Even

13   if you gave a deal, you couldn't stick with it.  Isn't

14   that true?

15        A.   I would never give a deal since I don't have

16   the authority to do it.

17        Q.   Right.  That's the County Attorney, Mr.

18   Ahler's function.  Is that right?

19        A.   That's correct.

20        Q.   So one of the reasons you didn't offer Orva

21   a deal is because you didn't offer him a deal that could

22   have stuck, right?

23        A.   First of all, I never thought of offering a

24   deal at that point.  Orva was under arrest for first

25   degree murder as well as Corey and Sean.  They were all

**RUN 149**                    SUPERIOR COURT            MILKE/NB907530

44

1    under arrest for first degree murder.  My position is to
2    write the report, to gather the evidence, to submit it.
3            Q.  Were you involved with the arrest of Corey
4    Tilden?
5            A.  No, I was not.
6            Q.  Were you aware of who was?  Were you aware
7    of who it was that arrested Corey Tilden?
8            A.  I may have been then but I am not now now.
9    It had to be our -- some special assignment unit that we
10   may have put on.
11           Q.  When Sean was arrested you were involved
12   with that, weren't you?
13           A.  Not directly.
14           Q.  You with pulling the strings from the
15   station down here at 7th Avenue and Washington, right?
16           A.  I would say that I was directing units to do
17   as I asked them to do, yes.
18           Q.  Do you direct the units to do what you ask
19   them to do regarding the arrest of Corey Tilden?
20           A.  I believe we were, yes.
21           Q.  You were on radio communication with these
22   folks, weren't you?
23           A.  We were in the office.  They were out in the
24   field.  We had already instructed them.  Corey had.  Yes,
25   we had instructed them to arrest them, yes.

**RUN 150**                    SUPERIOR COURT          MI&MCEANSBO15531

Exhibit 1H

45

1         Q.  To your knowledge was Corey arrested along

2  with someone else or picked up with someone else?

3         A.  Again, I don't remember.  I wasn't there.

4         Q.  Isn't it true there was some Anglo youngster

5  that was with Corey the time that Corey was arrested?

6         A.  Again, I'm sorry.  I don't remember.

7         Q.  But you do remember that they brought Mrs.

8  Sivertsen and her two daughters rather upset to your

9  station and you questioned them, did you not?

10        A.  We questioned Ms. Sivertsen and her two

11  daughters.

12        Q.  They were brought to you, right?

13        A.  That's correct.

14        Q.  That is, after they were brought to you at

15  620 West Washington, you questioned them.  Is that right?

16        A.  That's correct.

17        Q.  And you don't remember questioning anybody

18  that may have been brought in with Corey Tilden, do you?

19        A.  No, I do not.

20        Q.  In fact, no one was brought in with Corey

21  Tilden, were they?

22        A.  Again, I have to stay that I don't remember.

23  I wasn't present in court until he was arrested.

24        Q.  But you were present when he was brought

25  down to the station?

Exhibit 1H

46

1        A.   Yes, I was.

2        Q.   No one else was brought down there with him,

3   were they?

4        A.   I was told Corey Tilden was in an interview

5   room, directed into that interview room, and no one else

6   was in that interview room but Corey Tilden.

7        Q.   Okay.  Does the name Sean Running Eagle ring

8   a bell to you?

9        A.   No, it does not.

10       Q.   Okay.  Now, Officer Saldate, you mentioned

11   you made a brief inspection of the crime scene being led

12   by Det. Martinsen.  Is that correct?

13       A.   Yes.

14       Q.   So you didn't do any of the technical work

15   or directed any of the technical work out there,

16   fingerprints, photos, et cetera.  Is that correct?

17       A.   That's correct.

18       Q.   In this case have you been present -- no,

19   sorry.  You weren't present during the testimony of Orva

20   Antone.  Is that right?

21       A.   I have not been in the courtroom at all

22   until today.

23       Q.   Right.  Now, Officer Saldate, when Sean was

24   arrested did you ask him if he had been drinking anything

25   prior to questioning him?  You didn't, did you?

Exhibit 1H

47

1          A.   Please, let me think first.

2               I don't believe I did.

3          Q.   You didn't ask him if he was under the

4     influence of any drugs or medication, did you?

5          A.   I don't believe I did.

6          Q.   You didn't even ask him if he was too

7     frightened to speak to you.  Is that right?

8          A.   No, I did not.

9          Q.   And when you asked him, did he seem

10    concerned about the questions you were asking him?

11         A.   No.

12         Q.   Did he seem rather nonchalant about it?  You

13    mentioned he was smiling before.

14         A.   That is the description, yes.

15         Q.   You have questioned people that smile out of

16    nervousness, haven't you?

17         A.   I don't know how to answer that.  I am sure

18    I question people that smiled, but I don't know if I

19    asked them if it's out of nervousness or not.

20         Q.   You attended schools in training in

21    questioning people, haven't you, Officer?

22         A.   No, I have not.

23         Q.   You are a Detective for the Phoenix Police

24    Department, and in your training you have never been

25    taught how to question people?

**RUN 153**

*SUPERIOR COURT*

MILKE-RSBO05534

Exhibit 1H

48

1          A.   No, I have not.

2          Q.   The Police Academy doesn't have an

3    organization in their academy that tells you how to

4    question people?

5          A.   That is 1969 when I went to the polce

6    academy.  At that time interview techniques were not

7    readily available at that time.  I have never attended an

8    interview school.  I have never gone to any seminars

9    regarding interviews.  Interview techniques I have picked

10   up have been from myself reading books and seeing other

11   people do them, interviews.

12         Q.   But you are not telling me in part of your

13   training and your police training when you started that,

14   they didn't tell you how to question people, didn't show

15   you at least something about questioning people?

16         A.   If they did I can't recall.  I don't believe

17   they went into that.  The only thing they focused in in

18   1969 was, basically because I was going to be a uniformed

19   officer, was how to talk to people, give them a ticket.

20   I think that is the only thing they focus on.

21         Q.   They didn't have any aspect of your training

22   to asking people questions or testifying in court or

23   answering questions to people who are questioning you?

24         A.   Now regards to testifying in court I believe

25   they had a brief instruction of that, of testifying in

**RUN 154**                    SUPERIOR COURT

MISMEANSB0705535

Exhibit 1H

49

1    court, but it was very brief.

2               Q.   Now, when Sean was being questioned by you,

3    did you have a pad and paper out?  Were you able to take

4    notes?

5               A.   No.

6               Q.   Was Det. Martinsen or anybody else taking

7    notes?

8               A.   Det. Martinsen was taking notes.

9               Q.   Did you ask Sean if he wanted a pad and

10   pencil so he could take some notes?

11              A.   No, I did not.

12              Q.   Don't you think it would have helped him

13   remember what he said if he would have been able to write

14   it down?

15              A.   No.

16              Q.   You don't think it helps people to write

17   down what they said?  It helps them in the future to

18   remember it if they write down what they are talking?

19              A.   What question do you want me to answer?

20              Q.   Do you think it helps people to remember

21   later what they have said to you if they write it down at

22   the time they are talking to you?

23              MR. AHLER:   Objection.   Irrelevant.   Calls for

24   speculation.

25              THE COURT:   Overruled.

**RUN 155**                    SUPERIOR COURT              MIEKEANBBOPB536

50

1          THE WITNESS:  I am sure it does.  Yes.

2    BY MR. INIGUEZ:

3          Q.  Did you ask him if he wanted a pad of paper

4    and a pen to write down the things you guys were talking

5    about?

6          A.  Again, no.

7          Q.  This conversation wasn't taped.  Is that

8    correct?

9          A.  No, it was not.

10          Q.  You have taping facilities at the police

11    station, did you not?

12          A.  We have tape recorders available, yes.

13          Q.  It's your choice not to tape these

14    conversations?

15          A.  That's correct.

16          Q.  Don't you think the jury could get a very

17    accurate portrayal of the questions and answers if you

18    were to play the exact same tape that that was being

19    produced at the time you were questioning the person?

20          A.  I don't believe so.

21          Q.  No?

22          A.  No.

23          Q.  Why wouldn't the jury get a good statement

24    if you were actually taping the statement that was being

25    given?

**RUN 156**                    SUPERIOR COURT            MI&KB/NSB015537

51

1          A.   If Mr. Running Eagle was definitely giving

2     me a statement, telling me about what occurred, yes, then

3     definitely the jury would sit here and listen to it.

4          Q.   Stop.  Are you telling me, Officer, that if

5     he was telling you what you wanted to hear you would have

6     taped it, but if he is not, you won't tape it?

7          A.   No.  What I am telling you is that a tape

8     sometimes or most of the time is, my opinion, if you use

9     a tape, all it does is causes that person to feel

10    uncomfortable, causes that person not to relate to you

11    exactly what he may want to tell you, because it's being

12    taped.  He feesl some fear over that tape player.  For

13    that reason I don't use a tape player.  I believe a

14    one-on-one contact with a person, if you are honest and

15    concerned about that person and you approach him with

16    that, I think that that person feels comfortable.  He

17    feels like he can tell you what happened, and he feels

18    that you and him can have a one-on-one conversation just

19    like it would be out in the street with a friend or

20    someone else.

21         Q.   Now, Officer, Detective, you are not trying

22    to tell me here that getting in his face no more than 12

23    inches away, putting your finger in his chest every time

24    you don't think you have his attention, is a way of

25    making him feel comfortable in talking to you like

**RUN 157**                    SUPERIOR COURT              MIEKEANSB016538

52

1    friends on the street, are you?

2         A.   I think you are trying to mischaracterize my

3    interview..   The poking at his chest or putting my finger

4    on his chest, the interview took 45 minutes.   My putting

5    my finger on his chest may have took a whole minute of

6    that 45 minutes.   My talking to him close to him, being

7    close, face-to-face, is a way that I have to ensure that

8    person that I am being honest with that person, that I am

9    being sincere with that person, that I want them to tell

10   me the truth and that is all I want to hear.   And I want

11   him to focus away from anything else that might be in

12   that room, including Det. Martinsen, including any paper,

13   pads, pencils.   I want him to look at me straight in the

14   eye, tell me the truth, know that I am sincere when I ask

15   for it.

16        Q.   Now, Officer, or Detective, if I was to

17   question you six inches from your face you would feel

18   much more uncomfortable than if I question you from where

19   I am sitting, wouldn't you?

20        A.   I don't think it's uncomfortable as much as

21   we are in a different arena than me and Sean were.   Now,

22   in the arena that we are in, sir, you are asking me

23   questions of something that occurred to me or something I

24   witnessed sometime.   I am here before the jury.   If you

25   would like to get within six inches to me, that is fine

Exhibit 1H

53

1    with me.  I don't think it would be beneficial to you.

2    But if that is what you would like to do, fine.  But in

3    the arena where I was at with Sean, I wanted him to be

4    himself, me and him.  For him to know I was sincere.  For

5    him to know what I wanted.  For him to look back at me,

6    tell me exactly what occurred.  We are talking about a

7    murder.  We are talking about a serious crime.  We are

8    talking about a serious event.

9           Q.  But isn't it true that if I stand six inches

10   away from your face you get more uncomfortable than if I

11   stand 12 feet away from you?

12          MR. AHLER:  Objection.  It has been asked and

13   answered.

14          THE COURT:  Sustained.

15   BY MR. INIGUEZ:

16          Q.  Officer, Det. Martinsen that room where you

17   were at, there weren't any other toys or pictures or

18   television on.  Isn't that true?

19          A.  That's correct.

20          Q.  You also already told me you didn't give him

21   a pad or pencil to distract him.  Isn't that true?

22          A.  That's correct.

23          Q.  The only other human-being in that room

24   besides you was Det. Martinsen.  Isn't that true?

25          A.  I tried to minimize his presence.  That is

**RUN 159**                    SUPERIOR COURT              MIEME-NSB0TS540

54

1    true, yes.

2           Q.  Right.  So you haven't testified that Sean

3    kept breaking away looking at the wall or looking at his

4    shoes or trying to not pay attention to you.  Isn't that

5    true?

6           A.  That is correct.

7           Q.  So isn't it a fact that your technique is

8    used by you mostly because it intimidates the person, it

9    creates an aura of your presence being all over them, and

10   it's easier for you to control the person and get what

11   you want from them?

12          A.  My techniques, again, is not intimidation.

13   Intimidation is yelling and screaming and pounding on the

14   table.  That's not my technique, Mr. Iniguez.  My

15   technique is being face-to-face with that person, to tell

16   him the truth, for him to want -- I want him to tell me

17   the truth.  That is all I know.

18          Q.  Well, it's true, isn't it, that there were

19   different types of intimidation.  Is that true?

20          A.  I am sure there is intimidation also of

21   every kind, yes.

22          Q.  Would you venture to say that the presence

23   of a 225 pound man, six inches away from your face,

24   poking his finger in your chest, asking you some

25   questions after question, could that have an intimidating

55

1    effect on a person?

2            Q.  Again, I think you are mischaracterizing the

3    poking in the chest.  Took maybe minutes of the 45

4    minutes.

5            Q.  My question was, can what I have just

6    described have a tendency to be intimidating to a person

7    whether you are doing it or not?

8            MR. AHLER:  Your Honor, I object.

9    Argumentative.  Calls for speculation.

10           THE COURT:  Overruled.

11           THE WITNESS:  My intention was not intimidation.

12   BY MR. INIGUEZ:

13           Q.  Again, sir, I hate to cut you off.  My

14   question is, do you think that a person being six inches

15   from another person's face, 225 pounds, leaning in his

16   face, putting his hands or poking him or touching him in

17   the chest with his finger, anyway you characterize this

18   aspect of it, do you feel a personal might find that

19   intimidating?

20           A.  He may find it intimidating.

21           Q.  Were you ever in the Marines?

22           A.  Yes, I was.

23           Q.  Do you remember boot camp?

24           A.  Yes, I do.

25           Q.  How far away were the instructors from your

56

1    face?

2              A.   Sometime very close.

3              Q.   Real close is very intimidating, isn't it?

4              A.   At times, yes.

5              Q.   They meant it to be, didn't they?

6              A.   Yes.   However, it's a different arena than

7    we are in now.

8              Q.   I understand.   Now, Officer, when you talked

9    to Orva Antone --

10             A.   Yes, sir.

11             Q.   -- did you write a report?

12             A.   Yes, sir.

13             Q.   Or did Det. Martinsen write a report?

14             A.   That report was written by me, sir.

15             Q.   When you wrote your report, how long after

16   you spoke with him did you write it?

17             A.   The next day.

18             Q.   You said you had taken no notes.   Is that

19   right?

20             A.   No.

21             Q.   No, you didn't take notes, or no, that's not

22   right.

23             A.   No, I did not take notes.

24             Q.   Did Det. Martinsen take notes?

25             A.   Yes, he did.

**RUN 162**                    SUPERIOR COURT           MI&KBANSB015543

Exhibit 1H

1          Q.   Did you have those notes available when you

2    wrote your report?

3          A.   Yes.

4          Q.   Are those notes available?

5          A.   No.

6          Q.   Why?

7          A.   Those notes were reviewed by me.  After the

8    typed supplement that I wrote was reviewed by me, those

9    notes -- this supplement depicts my notes, and my memory,

10   and for that reason those notes were destroyed.

11         Q.   Now, don't you think that we would be able

12   to look at your notes and tell exactly -- since you

13   didn't record the statement, don't you think those notes

14   would be useful to see what you talked about?

15         A.   No, I do not, since the notes are in my

16   supplemental.  That is my supplemental.

17         Q.   Isn't it true that the important parts of

18   the notes, the notes that you feel should be transcribed

19   or transferred over into the reports are in there, but

20   not every item in your notes would be found in your

21   report?

22         A.   Every item that has anything to do with this

23   case on my notes, or in this case, or Det. Martinsen's

24   notes, would be reflected in my supplemental.

25         Q.   Isn't it more fair to say, Officer, that

**RUN 163**                    SUPERIOR COURT              MILKE/NSB015544

58

1    every note that helps your case would be in the report?

2              A.   It would be very unfair to say.

3              Q.   So in other words, you think that you would

4    have put every single item that was on your notes,

5    whether you thought it was important, whether you

6    thhought it was helpful for this side or helpful for the

7    other side?

8              A.   Mr. Iniguez, any time I write a report, any

9    time I take a statement, my concern is not for your side

10   or Mr. Ahler's side.  If that is important, you guys to

11   decide later on.  My decision is only to report the facts

12   as they are told to me by that person.

13             Q.   Well, it's true that you're the

14   investigator.  Isn't that true??

15             A.   Phoenix Police Detective, yes, sir.

16             Q.   As an investigator of the crime isn't it

17   your aim when you are out there to make your case?

18             A.   Just because I am a detective I still have

19   integrity, Mr. Iniguez.  I write down everything that is

20   told to me.

21             Q.   I don't doubt your integrity, Mr. Saldate.

22   As you know I have known you for a while.

23             A.   Yes, you have, sir.

24             Q.   What I am talking about is, your

25   professional responsibilities.  Isn't it true you are

**RUN 164**                          SUPERIOR COURT            MILKE/NSB0715545

59

1    responsible for this case?

2              A.   Yes, I am.   But my professional

3    responsibility is to report what is told to me, not to

4    manufacture items or delete items.

5              Q.   Well, isn't it true that when Orva was

6    telling you what happened, at some point he told you that

7    Corey struck the man?   Isn't that true?

8              A.   At one point he mentioned something to Corey

9    striking someone, yes.

10             Q.   Right.   You didn't testify on direct as to

11   that.   Is that correct?

12             A.   There were several things that Orva told me.

13   I, again, paraphrased his statement.

14             Q.   Right.   Isn't it true in talking to Orva,

15   would it be fair to say that you told him, "Tell us what

16   happened."

17             He says, "I am too drunk to remember."

18             Then you said that, "This is too important

19   of a case.   We can't have an answer like that in a case

20   like this.   This is too serious.   You got to do better

21   than that."

22             Isn't that true?

23             A.   That is true.

24             Q.   You didn't testify to that on direct either,

25   did you, Detective?

Exhibit 1H

60

1         A.   That was not asked for me -- again, I just

2    paraphrased his statement.

3         Q.   And in fact there were many -- well, at

4    least several times during your interview of Orva that

5    you told him something similar like, I don't believe

6    that.  You are going to have to do better than that.

7    Isn't that true?

8         A.   That is true.

9         Q.   You went through days of, "I don't believe

10   that."

11        He would feed you a little more and a little

12   more as you went through these.  You got to do better.

13   You got to do better.  He would keep doing better.  Isn't

14   that true?

15        A.   I don't think you saying feeding me is

16   correct.  I think as I stated before, I think he tried to

17   minimize his involvement as often done.  And as I told

18   him or I continued to tell him that I did not believe a

19   certain area.  Then he realized that I knew probably more

20   than he thought I knew.  For that reason decided to tell

21   me the truth.

22        Q.   In fact, Detective, isn't it true when you

23   started with this you told him, "I want you to tell me

24   what happened that night when you were with Sean and

25   Corey."  Isn't than true?

**RUN 166**                    SUPERIOR COURT        MIAMP/NS90019547

Exhibit 1H

61

1          A.   I believe I have testified to that, yes.

2          Q.   Right.  You didn't go up and say, "Now,

3    Orva, I would like to know if you were with Sean and

4    Corey", true?  You started out with the other notion,

5    "Tell me what happened when you were with them"?

6          A.   That's correct.

7          Q.   In fact, isn't it true you told them a

8    number of things, and it is very possible that he found

9    out these people were dead from you?

10         A.   That's negative.  That is no.  No way.

11         Q.   You think that he saw?

12         A.   Pardon?

13         Q.   If Orva testified that you told him or that

14   you insinuated or somehow he insinuated that Sean and

15   Corey had killed these people, would he be incorrect?

16         A.   I never told Orva that Sean and Corey had

17   killed these people, representing to that statement.  I

18   did tell Orva that he was under arrest for first degree

19   murder.  We were relating to the time that he was with

20   Sean and Corey.  And I am sure Orva's not a dumb person,

21   or I would assume that these people were dead or he

22   wouldn't be arrested for murder, first degree.

23         Q.   You talked to Orva for a while.  You just

24   said Orva is not a dumb person?

25         A.   I don't believe he is, no.

**RUN 167**                      SUPERIOR COURT            MILKEANSBO15548

1          Q.   Did you have the impression that Orva was an

2    intelligent person?

3          A.   That is probably using the standard of the

4    independent answer on that.  I have come across -- I

5    would say he is not stupid.  He is probably not a very

6    intelligent person, but he is not stupid.  He is not

7    dumb.

8          Q.   Would you say that Orva has maybe some

9    learning disabilities?

10         A.   He may be slow, yes.

11         Q.   It's true that you thought he was a little

12    slow, isn't it?

13         A.   Yes.

14         Q.   And were you present at the time that the

15    offer was made to him by the State regarding pleading

16    guilty to burglary and dismissing the murders?

17         A.   No, I was not.

18         Q.   Was that discussed with you?

19         A.   I believe Paul did discuss that with me at

20    one point.

21         Q.   Now, would it be fair to say that out of all

22    of Orva's statements there were several different

23    statements and different things are said in those

24    statements?

25              MR. AHLER:  Objection.  Foundation.

**RUN 168**                              SUPERIOR COURT         MILNE/NSB0075549

Exhibit 1H

1              THE COURT:  Sustained.

2    BY MR. INIGUEZ:

3              Q.  Well, you spoke to Orva.  Is that true?

4              A.  That is correct.

5              Q.  Did he make several different statements to

6    you?

7              MR. AHLER:  Objection.  Foundation.  The

8    question is way too broad.

9              THE COURT:  The objection is sustained on the

10   broadness of the question.  You need to be more specific.

11             MR. INIGUEZ:  Yes, Your Honor.  I apologize.

12   BY MR. INIGUEZ:

13             Q.  Det. Saldate, regarding this incident, you

14   spoke to Orva.  Is that true?

15             A.  Did I speak specifically about this to Orva?

16             A.  Yes.

17             Q.  Yes, I did.

18             Q.  December 19th, 1987?

19             A.  Yes, I did.

20             Q.  During that conversation where you were and

21   he and Det. Martinsen, about at 620 West Washington, did

22   he not make several different statements to you?

23             A.  I have a problem with different, since all

24   of the statements we're concerned about that night.  So

25   they weren't really different to say at night.  They were

64

1    somewhat not as complete as others.

2            Q.   Okay.  Let me put an example for you.  First

3    he said, "I am too drunk.  I don't remember", right?

4            A.   That's correct.

5            Q.   Then he says, "Well, we were riding around.

6    We got some gas and they took me home", right?

7            A.   That's correct.

8            Q.   Then he said, "Then we went to a party at

9    Lisa's house after riding around.  Then they took me

10   home."  Isn't that right?

11           A.   I don't remember that one, but if you are

12   reading from the report, I am sure it's there.

13           Q.   Well, regardless of the record isn't that

14   possible he said that to you?

15           A.   I don't believe he said that to me.

16           Q.   So you don't think --

17           A.   But, again, it's in the report.

18           Q.   Okay.  Then he told you, "No, no, no.  We

19   were riding around and we stopped at this house, and

20   Corey and Sean got out."  And then at one point he told

21   you Sean hit the man with the handle of the knife in the

22   face.  Is that true?

23           A.   That's true.

24           Q.   At no time he told you that Corey hit the

25   man.  Is that true?

65

1          A.   That's true.

2          Q.   At another point he told you that the only

3    violence that he witnessed was Corey hitting the lady in

4    the back of the head with a flashlight?

5          A.   That is not true as you phrased it.   He did

6    state that Corey did hit the lady with the flashlight.

7          Q.   Didn't he retract while talking to you some

8    of the statements regarding Sean hitting the man or Corey

9    hitting the lady, either one of those?

10         A.   I don't believe he retracted.   I believe it

11   was his version changed at that point.   But, again, I

12   don't think we can say that, you know.   Orva was trying

13   to remember these different things, different things

14   occurring at different times.   I don't think -- I don't

15   think he retracted those items because I think that it

16   very -- could have easily happened, although those items

17   very easily could have happened at different times.   But

18   Orva's remembering these things were difficult for him.

19         Q.   Is it also true that some of these items may

20   not have happened based on his particular statements?

21         MR. AHLER:   Objection.   Vague.   Overbroad.

22         THE COURT:   Sustained.

23   BY MR. INIGUEZ:

24         Q.   Isn't it true, Officer, based on what Orva

25   told you about what happened that night, there were some

Exhibit 1H

66

1      statements that contradicted others?

2                   MR. AHLER:  I am going to renew my objection.

3      It's too vague.  Why doesn't he ask the question to get

4      to the answer.

5                   THE COURT:  The question is overruled.  The

6      objection is overruled.

7                   MR. INIGUEZ:  Go ahead.

8                   THE WITNESS:  Could you repeat the question?

9      BY MR. INIGUEZ:

10                  Q.  Isn't it true based on the conversation you

11     had with Orva that evening of December 19th, some of his

12     statements contradicted others?

13                  A.  Well, his first statement that he was too

14     drunk to remember, then his later statement that he did

15     remember, yes.  I guess they did contradict each other,

16     yes.

17                  Q.  Thank you.  Isn't it true that based on your

18     conversation with him it was impossible for you to

19     decipher after you were finished talking to him which

20     parts were true and which parts were not?

21                  A.  No.  I wouldn't characterize that.  My

22     interview with him was me trying to decipher which was

23     true and which was not true.  I wouldn't characterize

24     that at all.

25                  Q.  Okay.  So you feel that during the course of

**RUN 172**                          SUPERIOR COURT          MIEKEANSBO75553

67

1    the interview you were able to pick out the things that

2    he was telling you that were incorrect, and pick out the

3    things that he was telling you that were correct.  Is

4    that what you are telling us?

5          A.  I believe that Orva told me everything he

6    could remember, and that everything he told me was the

7    truth.

8          Q.  Okay.  Then my next question, Orva never

9    told you that Sean stabbed anybody, did he?

10         A.  I believe Orva never put himself in a

11    position to be able to observe that.

12         Q.  Yes or no?  Orva never told you that he saw

13    Sean stab anyone that day, did he?

14         A.  That's correct.

15         Q.  In fact, Orva told you, Detective, that he

16    was standing right in the same laundry room where -- you

17    know, from your own eyesight, that they found the two

18    victims.  Isn't that true, sir?

19         A.  At the doorway, yes, sir.

20         Q.  Isn't it true he told you that Corey pushed

21    him in the doorway?

22         A.  Yes, he did.

23         Q.  Do you know, the doorway was where they

24    found the two people?  Isn't that true?

25         A.  It was in the laundry room, yes.

**RUN 173**             SUPERIOR COURT        MILKE-N690729554

Exhibit 1H

68

1      Q.  You are aware they had to move the body of

2  the arm of one of the victims, I believe Ms. Williams, to

3  open the door?  Is that right?

4      A.  Again, I don't know that, Mr. Iniguez,

5  because when I got there and got the cursory review of

6  the scene, that had already been done.

7      Q.  But it wouldn't surprise you if that was

8  true, would it?

9      A.  Of course not.

10     Q.  And he also told you, and you testified that

11 you thought what he told you was true on that seconds

12 later.  Isn't it true that he told you that only seconds

13 later?  Sean came running behind him, got in the car and

14 threw the knife on the dashboard?  Isn't that what you

15 testified to today?

16     A.  That's correct.

17     Q.  Now, at this point I don't remember whether

18 you asked him or whether he told you how many seconds

19 later?

20     A.  He characterized seconds later.  Sometime

21 later.

22     Q.  Det. Saldate, you testified early that Sean

23 denied having left his palmprint at that house.

24     A.  That's correct.

25     Q.  Did you give him the address?

**RUN 174**                    SUPERIOR COURT        MI&MEANSSD075555

69

1   A.   Pardon me?

2   Q.   Did you give him the address of the home?

3   A.   I believe at one point we did.

4   Q.   That's written in your report?

5   A.   I don't know it is or isn't.

6   Q.   Would you look, please?

7   A.   Certainly.

8   A.   No, it's not.

9   Q.   So is it fair to say that he didn't know the

10  address of the place that you were referring to at the

11  time you were talking to him?

12  A.   When you asked that question it was only by

13  my memory that I believe we did.   But it's very possible

14  that we didn't.

15  Q.   Okay.   And you didn't take him to the scene,

16  did you?

17  A.   No, I did not.

18  Q.   You didn't show him the dryer, did you?

19  A.   No.

20  Q.   You didn't ask him if he had been there

21  before by taking him to that area and showing it to him.

22  Is that correct?

23  A.   I asked him out of the Deer Valley area if

24  he recalls cruising around the Deer Valley area.   That he

25  was with Corey, and they saw the car with carburetors.   I

**RUN 175**                     SUPERIOR COURT              MIXED/NSB073556

Exhibit 1H

70

1    remember specifically telling him the Deer Valley area.

2    He said he didn't remember anything like that.

3            Q.  And, Det. Saldate, you are the case agent in

4    this particular case.  Is that true?

5            A.  That's correct, sir.

6            Q.  Did you ask questions of Orva regarding

7    Tyrone Tonto?

8            A.  No.

9            Q.  Why not?

10           A.  I don't know who Tyrone Tonto is.

11           Q.  To date have you heard that name before?

12           A.  I believe I have heard that name mentioned,

13   but, again, I don't know how that came into play in this

14   case.

15           Q.  Okay.  Do you remember talking to Mr.

16   Snitke?

17           A.  Yes.

18           Q.  Mr. Snitke says he saw someone over six

19   feet, possibly over 6'2" with black hair running away

20   from the Williams' home.  Is that correct?

21           A.  I saw him in the carport, then again leaving

22   the carport, crossing towards the front of the garage.

23           Q.  Right.  Have you been able to decipher this

24   case, or get in your mind fixed who you think that is,

25   Det. Saldate?

Exhibit 1H

1           A. It would only be my opinion. I believe that

2  is Corey Tilden.

3           Q. Did you talk to the man in regards to where

4  this person was last seen?

5           A. Yes.

6           Q. Where was that person last seen, according

7  to what you remember?

8           A. When I remember he saw him running from the

9  opening of the driveway, towards the front of the house,

10  across the front of the house. Of course I got to that

11  same position where he said he was in his own house. I

12  climbed up to the chest of drawers where he was, and at

13  that time he could only visibly see that person from the

14  opening of the driveway, and probably three to six feet

15  east of that driveway opening.

16           Q. He didn't say that he saw this person get in

17  a car of any type, did he?

18           A. I don't believe he did, no.

19           Q. He did testify he saw the car drive away in

20  the opposite direction. Is that correct?

21           A. I don't believe so.

22           Q. Isn't it true that this man said he saw this

23  person running in one direction, the car was facing in

24  the other direction?

25           A. He did say that he saw a car facing in the

MIKE ANDBO079558

72

1     other direction.  The man running eastbound, the car was
2     facing westbound.
3            Q.  Okay.  Then the car took off.  So also it's
4     your testimony Mr. Snitke didn't know which way the car
5     took off?
6            A.  Mr. Snitke was at his room, came back, and
7     the car was gone.
8            MR. INIGUEZ:  Okay.  I have no more questions.
9            THE COURT:  We will take our afternoon recess at
10    this time.
11            Ladies and gentlemen, please do not discuss
12    the case among yourselves or with anyone else.  Come back
13    here in 15 minutes.
14
15            (Whereupon, a short recess was taken.)
16
17            THE COURT:  Let the record reflect the presence
18    of the jury, counsel, the defendant.
19
20                        CROSS-EXAMINATION
21    BY MR. STEINLE:
22            Q.  Det. Saldate, this interview with Orva
23    Antone, you filed a report, did you not?
24            A.  Yes, I did.
25            Q.  Questions that co-counsel asked you you have

Exhibit 1H

73

1   indicated that you endeavored to write a complete report.

2   Is that correct?

3           A.   That's correct.

4           Q.   A balanced report?

5           A.   That's correct.

6           Q.   Show you what has been marked for

7   identification as Exhibit 153.  If you look through this,

8   tell me whether that is a Xeroxed copy of the report that

9   you filed?

10          A.   Yes, it is.

11          Q.   Now, I assume, Officer, or Detective, that

12  in preparation for your testimony today that you had an

13  occasion to review that report?

14          A.   Most definitely.

15          Q.   After reviewing the report, based upon your

16  recollection of your interview with Mr. Antone, is there

17  anything in addition to what you recall that is not in

18  that report?

19          A.   Not that I recall.

20          Q.   Okay.  You said that it's a report?

21          A.   It's a statement that was given to me.

22          Q.   You believe that this, in effect, would give

23  us the same portrayal as if there was a tape recorder

24  there of what transpired between you and Orva Antone that

25  day?

**RUN 179**                    SUPERIOR COURT            MIAMI NSB079560

74

1          A.   Yes.

2          Q.   Okay.  Now, I believe in your direct

3     testimony -- why don't you hang on to that.  I think I

4     have another copy.

5          A.   Certainly.

6          Q.   That in response to a question about the

7     car, that Orva said that it was Sean and Corey's car.  Is

8     that correct?

9          A.   I believe so.

10         Q.   I would ask you to look at the bottom of

11    page one of your report, last paragraph, where you ask

12    him whether or not he remembered being with Sean and

13    Corey and his brother Milford late one night in Corey's

14    car.  Would you tell me what you have in your report in

15    terms of his response to that statement?

16         A.   He said, "I believe it was Sean's car."

17         Q.   You said immediately that he believed it was

18    Sean's car?

19         A.   That's correct.

20         Q.   So it was Sean's car that he said that he

21    was cruising in, not Corey and Sean's car?

22         A.   That's correct.

23         Q.   Now, where did he say that he was that

24    evening?  What was he doing at this point of your

25    interview when he was cruising?  What did they do earlier

**RUN 180**                      SUPERIOR COURT        MILKE-NSB0T5561

75

1   that night?  Did you ask him that question?

2                   A.  Of where they were at earlier?

3                   Q.  Right.  I am talking about -- now we are at

4   the point where we are talking about where he directs you

5   in terms of whose car it is.  Did you ask him where they

6   were?

7                   A.  Rephrase it a little bit, Detective.  Did he

8   say he had been at the jacuzzi at Sean's house earlier?

9                   A.  I believe he did mention that, yes, sir.

10                  Q.  Then they went out cruising and they dropped

11  him off.  Is that correct?

12                  A.  That's correct.

13                  Q.  Now, up to this point of your interview what

14  was your belief as to what Milford did that night?

15                  A.  Up to this point in my interview with Orva?

16                  Q.  Right.  What was Milford doing while they

17  were cruising around?

18                  A.  He was present.

19                  Q.  He was present.  Was he awake or was he

20  passed out?

21                  A.  Up to this point he was there.  He was

22  obviously not passed out at this time.

23                  Q.  Okay.  So when you are talking to Orva at

24  this point of your interview, it's your assumption that

25  when he told you earlier that both he and Milford were

**RUN 181**                    SUPERIOR COURT            MILMP-NSB075562

76

1    passed out, that that was inaccurate as to both himself

2    and as to Milford?

3         A.   I assumed that, yes.

4         Q.   So at this point of the interview did you

5    ask what Milford was doing?

6         A.   No.

7         Q.   Were you interested in finding out what

8    Milford was doing at this point in time?

9         A.   Certainly.

10        Q.   Now, at the end of this conversation you

11   tell Orva that you don't believe him.  Is that correct?

12        A.   At this first phase, yes, that's correct.

13        Q.   Right.  You then say, I know that you were

14   at Sheryl's house.  Is that correct?

15        A.   Something to that effect, yes.

16        Q.   That's because you had interviewed Cheryl

17   Sivertsen prior to this.  Is that correct?

18        A.   That's correct.

19        Q.   Had you been briefed up to this point in

20   time by Det. Mills as to what Lisa Sivertson had said?

21        A.   I don't believe so.

22        Q.   So you weren't aware at this point in time

23   of the existence of a human-being called Tyrone Tonto?

24        A.   No.

25        Q.   Okay.  But you did know that they were at

**RUN 182**

SUPERIOR COURT

MILKEANSB075563

Exhibit 1H

77

1   Sheryl's house earlier in the evening?

2        A.  That's correct.

3        Q.  Okay.  At this phase of your interview, tell

4   me how he described to you, how Corey appeared on the

5   scene?  Could he recall how Corey appeared?

6        A.  He could not recall.

7        Q.  Corey kind of just appeared out of thin air,

8   right?

9        A.  He assumes that they may have stopped by the

10   house to to pick them up.

11        Q.  Now, at this point he said in your report,

12   in the top of the second page, the first full paragraph,

13   don't you have in here, he says that he remembers

14   cruising and listening to the radio.  The next thing he

15   remembers is Corey was also in the car?

16        A.  That's correct.

17        Q.  And he remembers this because he and Corey

18   were arguing?

19        A.  That's correct.

20        Q.  Does he tell you where Corey comes from?

21        A.  He says he believes that they stopped at

22   Sean's house and they may have picked up Corey there.

23        Q.  But he is not sure?

24        A.  No.

25        Q.  So at this point in time Orva Antone still

78

1    can't tell you where Corey Tilden comes from?

2              A.  That's correct.

3              Q.  Now, this takes into account that you told

4    him originally, that you knew that he was with Corey and

5    Sean?

6              A.  That's correct.

7              Q.  Orva Antone never told you that he was with

8    Corey and Sean, did he, until you told him that he was?

9              A.  Go back to your first page, last paragraph.

10   Who was the first person that mentioned the words Corey

11   Tilden as being cruising that night with Sean Running

12   Eagle, you or Orva Antone?

13              A.  I did.

14              Q.  So up until that point Orva Antone never

15   spoke about Corey Tilden?

16              A.  That's correct.

17              Q.  Did you tell him that he was under arrest

18   for two counts of first degree murder or one count?

19              A.  I just told him he was under arrest for

20   first degree murder.

21              A.  Did he seem surprised?

22              A.  I guess you can describe it described.

23              Q.  What did he say?

24              A.  He didn't say anything.  He just appeared to

25   be surprised.  He just asked what he was there for.  I

**RUN 184**                    SUPERIOR COURT        MIAMI-NATION075565

Exhibit 1H

1   think he was contemplating what he was there for when I

2   told him he appeared to be surprised.

3        Q.  Surprised to the point like, "Murder?  I

4   haven't been involved in any murders."

5        A.  He never said that, no.

6        Q.  You read through the entire statement here.

7   Does he ever once say in here that he witnessed the

8   murder?

9        A.  No.

10        Q.  As a matter of fact, the last sentence of

11   this report indicates that he doesn't even know that the

12   people were murdered.

13        A.  That's correct.

14        Q.  When you challenged him, you said he was

15   under arrest for murder, did he say, "I don't know

16   anything about a murder?"

17        A.  No.

18        Q.  So he never denied knowing, the knowledge

19   that the murder had occurred?

20        A.  I guess not, no.

21        Q.  In your words, he attempted to do nothing

22   more than throughout the interview, to minimize his own

23   involvement in the murder?

24        A.  That's correct.

25        Q.  He was involved in the murder, was he not,

80

1    felony murder?

2              A.   That's correct.

3              Q.   At the end of this next page, you again at

4    the top of page three tell Orva that he is not telling

5    you the entire truth.   Is that correct?

6              A.   That's correct.

7              Q.   In this part of the interview you talk about

8    items that he has taken and put in the car, do you not?

9              A.   I talked to him about remembering some beer.

10             Q.   But later on in the paragraph don't you ask

11   him whether or not he remembers going inside the garage?

12             A.   I asked him if he remembered taking anything

13   from the car, and he said, "Yeah, I think so."

14                  I then asked him if he remembered this part

15   with a carburetor.   He replied, no, he remembered two

16   carburetors.

17             Q.   But up to this point of the interview he

18   didn't say anything to you about the carburetors, had he?

19             A.   No.

20             Q.   You brought up the word carburetor, did you

21   not?

22             A.   I brought up one car.   He said, "No, two

23   cars."

24             Q.   Up to this point he said he didn't

25   specifically recall what parts of the car he had taken.

**RUN 186**                 SUPERIOR COURT        MILKEANSB075567

Exhibit 1H

81

```
 1    Is that correct?
 2         A.   I don't believe so.   What are you referring
 3    to?
 4         Q.   I will go over something else.   I will go
 5    back, see if I can find it.
 6         A.   All right, sir.
 7         Q.   The original was, "Do you remember going
 8    inside the garage to get the bicycle out?"
 9         "No."
10         What did he say about that?
11         A.   He said he specifically remembers a green
12    bike, had two flat tires on it.
13         Q.   Can you back up a second?   He said he didn't
14    remember going inside?
15         A.   I'm sorry.   Does not remember going inside
16    the garage, but remembers being told by Corey and Sean to
17    take several items to their car.
18         Q.   And he specifically remembers the green
19    bike?
20         A.   Yes.
21         Q.   So it's your impression he told you that
22    Corey and Sean told him to take the bike?
23         A.   Yes.
24         Q.   When he told you about the flashlight that
25    Corey had struck him with, had you executed the search
```

SALDAT 0740

SUPERIOR COURT

MILKE_NSB015568

Exhibit 1H

82

1    warrant?

2         A.   Had I?

3         Q.   Yes.

4         A.   Up to this point?

5         Q.   Yes.

6         A.   No.

7         Q.   After you executed the search warrant did

8    you talk to Orva again?

9         A.   No.

10        Q.   Did you show him Exhibit 115 and 114, ask

11   him which one of those that Corey used to hit the person

12   with?

13        A.   No.

14        Q.   Orva had waived his right to counsel at the

15   point in time that you interviewed him, did he not?

16        A.   Correct.

17        Q.   In your words he was being very cooperative

18   at the end.  Isn't that correct?

19        A.   Corect.

20        Q.   You seized two flashlights from the house,

21   did you not?

22        A.   Correct.

23        Q.   Did you show them to Orva?

24        A.   No.

25        Q.   To your knowledge has anybody showed those

Exhibit 1H

83

```
 1    flashlights to Orva, asked him which one Corey used to
 2    strike the woman?
 3              A.   No.
 4              Q.   Now, you are the case agent, are you not?
 5              A.   That's correct.
 6              Q.   You are the ones that direct all other
 7    police officers to do various things?
 8              A.   That's correct.
 9              Q.   Orva Antone was in custody, was he not?
10              A.   That's correct.
11              Q.   You had a right to go back and ask him to
12    talk to you again, did you not?
13              A.   Not correct.
14              Q.   Why not?
15              A.   He had been formally charged.  It's our
16    policy once he is formally charged he would get an
17    attorney.  And it is suggested by the County Attorney's
18    Office that we don't talk to them.
19              Q.   He made a deal with the State of Arizona,
20    did he not?
21              A.   That was later, sir.  That was with Paul
22    Ahler.
23              Q.   Mr. Ahler interviewed him, did he not?
24              A.   I assume so, yes.
25              Q.   Were you there when he was interviewed?
```

Exhibit 1H

84

1          A.  Yes, I was.

2          Q.  Did you bring the two flashlights from

3    evidence and ask Orva Antone whether or not he could

4    identify one of the two?

5          A.  No, I did not.

6          Q.  Now, when you were interviewing Orva at this

7    point of the interview, the middle of the interview, did

8    you ask Orva what kind of clothes he had on?  Direct your

9    attention to the middle of page four of your report.

10         A.  Page four, sir?

11         Q.  Page four.  Second to last paragraph.

12         A.  "I asked Orva what Corey and Sean were

13   wearing."  Is that the paragraph?

14         Q.  Yes.  And then the last sentence.

15         A.  "Orva said he was wearing Levi's, dark shirt

16   and his boots."

17         Q.  And his boots?

18         A.  Boots.

19         Q.  I show you Exhibit Number 140.  Are these

20   the boots that he was wearing that night?  Did you ask

21   him?

22         A.  Those aren't boots, sir.

23         Q.  Well, those are the boots that he had on the

24   night you talked to him, right?

25         A.  I talked to him on the 19th.

**RUN 190**                      SUPERIOR COURT        MIEMEANSB0165571

Exhibit 1H

85

1          Q.  Right.  On the 19th he was wearing those

2     tennis shoes, was he not?

3          A.  Yes, sir.

4          Q.  Did you ask him whether or not he was

5     wearing boots or those tennis shoes?

6          A.  I asked him what he was wearing.  He told me

7     he was wearing boots, sir.  If he is wearing tennis

8     shoes, no reason to ask him if those are boots.  I --

9          Q.  Okay.  Did you ask him what boots he was

10    wearing?

11         A.  No, I did not.

12         Q.  You seized my client's shoes, did you not?

13         A.  Yes.

14         Q.  You seized Mr. Running Eagle's shoes, did

15    you not?

16         A.  Yes.

17         Q.  You seized those shoes, did you not?

18         A.  Yes.

19         Q.  Did you seize the boots that Orva Antone had

20    on the night that he was at the murder scene?

21         A.  No.

22         Q.  Did you ever execute a warrant for those

23    boots?

24         A.  No.

25         Q.  Did you ever execute a warrant to find the

**RUN 191**                    SUPERIOR COURT          MICKEY NELSON 5572

Exhibit 1H

86

1      boots or the shoes worn by Milford Antone that night?

2              A.   No.

3              Q.   After this point in time you again tell Orva

4      Antone that you don't think he is telling you the full

5      truth, don't you?

6              A.   Correct.

7              Q.   What does he tell you?  Does he have to try

8      a little harder to tell the truth?

9              A.   To try a little harder to remember to tell

10     me the truth, yes.

11             Q.   You go back over the sequence again.   Is

12     that correct?

13             A.   Correct.

14             Q.   At this point in time does he tell you he

15     went inside the house?

16             A.   Yes.  Later on I believe he tells me.

17             Q.   But I think though, doesn't he tell Det.

18     Martinsen when Martinsen asked him?

19             A.   Martinsen asked, yes.

20             Q.   He specifically denied going in the house,

21     did he not?

22             A.   That's correct.

23             Q.   After being challenged he then admitted,

24     yes, he went in but he was pushed in, right?

25             A.   He said he was standing inside the door step

Exhibit 1H

87

1    but he said he never went in.  That's correct.  Corey

2    pushed him inside the house.

3                Q.  You had been in the house, had you not?

4                A.  Yes.

5                Q.  Did you suggest to Orva Antone there was

6    cupboards on the right side and a light on the left-side?

7                A.  No, I did not.

8                Q.  That came out of his mouth, did it not?

9                A.  That's correct.

10                Q.  Did you suggest to Orva Antone that the

11    fatal blow to Mrs. Williams came behind the left ear?

12                A.  No, I did not.

13                Q.  He brought that up, did he not?

14                A.  That's correct.

15                Q.  Now, you went inside the house, did you not?

16                A.  Briefly, yes.

17                Q.  Were the bodies still inside the house when

18    you went in there?

19                A.  They were still inside the washroom, yes.

20                Q.  If someone walked in that washroom or that

21    laundry room far enough to see there was a kitchen on the

22    left side, would they have not seen the bodies?

23                A.  I don't know.

24                Q.  Did you look at the footprints out in the

25    front yard?

Exhibit 1H

88

1          A.  Briefly, yes.

2          Q.  Did you see any sign of the gravel in the

3    front yard of a confrontation or someone falling down?

4          A.  I didn't look that closely, sir.

5          Q.  Okay.  That was Det. Martinsen's duty.

6          A.  Again, that was Det. Martinsen or another

7    scene detective over there.

8          Q.  Okay.  The scene was basically Det.

9    Martinsen and some other officers.  Is that correct?

10          A.  That's correct.

11          Q.  When is the first time you became aware of a

12    person by the name of Tyrone Tonto?

13          A.  Probably just before our deposition or just

14    during our deposition.

15          Q.  What month was that?

16          A.  I don't know, sir.  Several months ago.

17          Q.  As I understood your Direct Examination, as

18    case agent you receive and review all D.R.'s submitted?

19          A.  That's correct.

20          Q.  Show you what has been marked for

21    identification as Exhibit Number 154.  Ask you whether or

22    not that report was one of the reports that was submitted

23    to you in your capacity as case agent?

24          A.  Well, it's titled with the victim's name,

25    the location, D.R. number.  I assume it was.

**RUN 194**                    SUPERIOR COURT          MILKE_NB8075575

1          Q.  Can you tell me the date that that report

2    was typed?

3          A.  December 21st, 1987.

4          Q.  December 21st, 1987.  Is that correct?

5          A.  That's correct.

6          Q.  When a detective in this case submitted a

7    report, who do they submit them to?

8          A.  Submit them to me.

9          Q.  Did you review the report?

10         A.  I reviewed very many reports, yes.

11         Q.  Did you review that report?

12         A.  I probably did, yes.

13         Q.  Would you look through it, tell me whether

14   or not Tyrone Tonto's name appears?

15         A.  Yes, it does.

16         Q.  A description of Tyrone Tonto also appears,

17   does it not?

18         A.  Yes.

19         Q.  Now, that was an interview with Lisa

20   Sivertsen, was it not?

21         A.  That's correct.

22         Q.  Did you go out to San Carlos Apache

23   Reservation and look for Tyrone Tonto?

24         A.  No, I did not.

25         Q.  Did you obtain the fingerprints from the

**RUN 195**                    SUPERIOR COURT          MIKE ANSBO15576

90

1    Prescott Police Department that was submitted to the Lab?

2           A.   No, I did not.

3           Q.   Have you ever attempted to contact Tryrone

4    Tonto?

5           A.   No, I have not.

6           Q.   You know, do you not, as case chief agent,

7    that Tyrone Tonto was, Sean Running Eagle, Miltone Antone

8    Orva Antone and Liza Sivertson, the five, do you not?

9           A.   Earlier in the evening that report states.

10          Q.   They were all over at Orva Antone's house.

11   Isn't that correct?

12          A.   Again, you removed that report from me so

13   quickly I couldn't see it.  But apparently they were

14   together until 11:00 o'clock.

15          Q.   Based upon that report?

16          A.   Correct.

17          Q.   Now, I believe in your testimony on Direct

18   Examination, or I think Cross-Examination from counsel,

19   you believe that the person who was 6 foot tall and Mr.

20   Snitke saw was my client, Corey Tilden.  Isn't that

21   correct?

22          A.   Correct.

23          Q.   Did you ever consider Tyrone Tonto as being

24   that person?

25          A.   No.

**RUN 196**                    SUPERIOR COURT          MIAKEANBBN018577

91



1          Q.  Now, when Mr. Snitke did the re-enactment,

2    they put Det. Martinsen there first, and they said Det.

3    Martinsen was too short, right?

4          A.  Correct.

5          Q.  Then they put Det. Wheelis.  Isn't that

6    correct?

7          A.  Correct.

8          Q.  They said he was slightly taller than Det.

9    Wheelis?

10         A.  Correct.

11         Q.  Is my client taller or shorter than Det.

12   Wheelis?

13         A.  I don't know.  How tall is your client?

14         Q.  You did the interview, did you not, of my

15   client?

16         A.  6'1".  I just could see from the interview,

17   yes.

18         Q.  How tall is Det. Wheelis?

19         A.  6'2", I believe.

20         Q.  So my client is shorter than Det. Wheelis?

21         A.  Yes.

22         Q.  Mr. Snitke said the person that he saw was

23   taller than Det. Wheelis.

24         A.  Correct.

25         Q.  You interviewed Milford Antone, did you not?

Exhibit 1H

92

1          A.  I did.

2          Q.  Do you have a copy of your supplemental

3     report you submitted after your interview with him?

4          A.  I do not.

5          Q.  What happened to it?

6          A.  Supplemental was never done.

7          Q.  Supplemental was never done of Milford

8     Antone?

9          A.  No.

10         Q.  You did one on Lisa Sivertson?

11         A.  Correct.

12         Q.  There was one done on Sean Running Eagle?

13         A.  Correct.

14         Q.  There was one done on Corey Tilden?

15         A.  Correct.

16         Q.  One done on Orva Antone?

17         A.  Correct.

18         Q.  One wasn't done on Milford?

19         A.  That's correct.

20         Q.  Did you get Milford's shoes?

21         A.  No.

22         Q.  Did you ask him to tell you what shoes he

23     had on that night?

24         A.  No.

25         Q.  What did he tell you he did that night?

**RUN 198**                        SUPERIOR COURT        MIEME/NSB075579

Exhibit 1H

93

1          A.  He said he remembers being with Sean and his
2     brother, but that he passed out and was drinking a lot,
3     doesn't recall anything occurring that night.  He then
4     remembers being back at his house.
5          Q.  When Milford was interviewed you told
6     Milford that that wasn't good enough, didn't you?  I
7     mean, when you talked to Orva, when Orva said he was
8     passed out, you told Orva that that wasn't good enough,
9     correct?
10         A.  That's correct.
11         Q.  Did you say that to Milford?
12         A.  I did challenge Milford in regards to what
13    he was telling me.  However, he said he was passed out.
14    He just could not remember anything.
15         Q.  Was he arrested?
16         A.  No.
17         Q.  Did he come in voluntarily?
18         A.  He was contacted at the Indian Reservation.
19         Q.  Can you tell me when he was interviewed?
20         A.  I believe the 14th of January.
21         Q.  Was Sean Running Eagle, Corey Tilden and
22    Orva Antone indicted by that point in time?
23         A.  I would have to look at the indictment, sir.
24    I don't know.
25              MR. STEINLE:  Judge, I would move Exhibit 153

Exhibit 1H

1    into evidence.  I have no further questions.

2              THE COURT:  Mr. Ahler?

3              MR. AHLER:  I am not sure which one 153 is.

4              MR. STEINLE:  The Orva Antone report.

5              MR. AHLER:  I have no objection to that.

6              MR. INIGUEZ:  No objection.

7              MR. STEINLE:  Judge on this, on this one I have

8    some markings on it.  I withdraw it and put a clean copy

9    in.  I won't do anything at this point because of the

10   markings.

11             THE COURT:  Exhibit 153 will be admitted.

12             Mr. Ahler?

13

14                   REDIRECT EXAMINATION

15   BY MR. AHLER:

16        Q.  Just a couple of questions.

17             Det. Saldate, when you interviewed Running

18   Eagle on the 19th, did you have any difficulty

19   understanding him?

20        A.  No.

21        Q.  You have any difficulty in his responses

22   understanding what he was saying when he would respond to

23   your questions?

24        A.  No.

25        Q.  Were the fingerprints of Milford Antone

1    obtained, to your knowledge?

2              MR. INIGUEZ:  Objection.  Lack of foundation.

3              THE COURT:  Overruled.

4              THE WITNESS:  I want to say yes, but I would

5    have to refer to the supplemental prints.

6              MR. INIGUEZ:  I would object to that answer,

7    request that it be stricken from the record, the jury be

8    instructed not to regard that statement.

9              THE COURT:  Is it something that you need to

10   refresh your recollection?

11             THE WITNESS:  I would have to refresh my

12   recollection with the print, statements that we made

13   print forms.

14             MR. AHLER:  I withdraw it.

15             THE COURT:  All right.

16             MR. AHLER:  I will save the question for the

17   latent print examiner.  I don't have any additional

18   questions, Your Honor.

19             THE COURT:  You may step down, Officer.

20             Ladies and gentlemen, we are going to take

21   our evening recess at this time.  Please remember not to

22   discuss the case among yourselves or with anyone else.

23   Sorry about the long delay for today.  We hope to get

24   through more efficiently tomorrow.  See you tomorrow at

25   1:30.

**RUN 201**              SUPERIOR COURT'        MILKE_WSBU15582

Exhibit 1H

*18*

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2               IN AND FOR THE COUNTY OF MARICOPA

3

4

STATE OF ARIZONA,            )
5                            )
         Plaintiff,          )
6                            )
     vs.                     )          NO. CR-87-11508
7                            )          CR-89-0048-AP
SEAL RUNNING EAGLE, and      )
COREY TILDEN,                )
8                            )
         Defendants.         )          CR-89-0048-AP
9     _____)

10                                      FILED
                                        APR 21 1989
11                                      NOEL K. DESSAINT
                                        CLERK SUPREME COURT
12                                      BY

13                         Phoenix, Arizona
                             July 21, 1983
14

15

16     BEFORE:  The Honorable GLORIA G. YBARRA, Judge

17

18

          REPORTER'S TRANSCRIPT OF PROCEEDINGS
19

20                         Jury Trial

21

22

23

24  ORIGINAL

25  PREPARED FOR APPEAL              LYDIA ESTRADA
      For Supreme Court             Official Court Reporter

DISCOVERY AND CONFIDENTIAL MATERIAL.

SUPERIOR COURT

Exhibit 1H

64

```
 1    wouldn't she?
 2            A.   If she could remember.  Sometimes she
 3    wouldn't.
 4            Q.   You wrote those answers down as best you
 5    could in chronological order as she gave them to you,
 6    correct?
 7            A.   I tried to.
 8            MR. AHLER:   Thank you.  No further questions.
 9            THE COURT:   You may step down.
10
11                      (Witness excused.)
12
13            MR. AHLER:   Det. Saldate.
14
15                      ARMANDO SALDATE, Jr.,
16    called as a witness herein, having been previously duly
17    sworn, was examined and testified as follows:
18
19                      DIRECT EXAMINATION
20    BY MR. AHLER:
21            Q.   State your name, please.
22            A.   Armando Saldate, Jr.
23            Q.   Det. Saldate, you previously been sworn?
24            A.   I have.
25            Q.   Det. Saldate, do you recall talking to
```

SUPERIOR COURT

MILKE-NG8075584

Exhibit 1H

1    Marlene Tilden the night of -- what would be the early

2    morning hours of December 20th, 1987?

3                A.    I do.

4                Q.    Where did you talk to Mrs. Tilden at?

5                A.    I talked to her inside the living room of

6    their condominium.

7                Q.    At what time?

8                A.    A couple of minutes before 1:00.

9                Q.    And why were you at her condominium at that

10   time?

11               A.    I was present when other officers were

12   executing a search warrant at that location.

13               Q.    Had the house been secured prior to the time

14   that you arrived there?

15               A.    It had.

16               Q.    Can you explain to the jury what is involved

17   in securing a residence under these circumstances?

18               A.    Under these circumstances we had sent some

19   officers to that location to secure the residence, that

20   being that nothing left the residence, nothing entered

21   the residence from the time that the officers arrived

22   until we arrived with the search warrant.

23               Q.    Is there a procedure you have to follow to

24   actually get the search warrant?

25               A.    Yes, there is.

**RUN 204**

SUPERIOR COURT

MILKE/NSBU15585

Exhibit 1H

1        Q.   What do you have to do?

2        A.   We file an affidavit stating the facts as we

3    believe them to be.  We then present them to a Judge.

4    The Judge then reads those facts, he then either says he

5    agrees with us, and if so, he gives us a search warrant.

6    If he doesn't, then we don't get the search warrant.  In

7    this occasion we put the facts down on that affidavit.

8    The facts were then presented to a Judge, and he agreed

9    that we did have enough probable cause and gave us a

10   search warrant.

11       Q.   Was anyone else present during the time that

12   you interviewed Mrs. Tilden?

13       A.   There were several officers walking back and

14   forth.  There was probably no one that close to hear what

15   we were saying.  They may have heard several sentences,

16   but I don't think they could have heard the gist of the

17   conversation we had.

18       Q.   Were officers actually executing a warrant

19   at the time you were talking to them?

20       A.   That's correct.

21       Q.   Did you ask Mrs. Tilden about her possible

22   whereabouts on the night of December 5th?

23       A.   Yes, I did.

24       Q.   Was she able to remember that particular

25   day?

SUPERIOR COURT

MIAMP N590T8586

Exhibit 1H

-7

1          A.   Not at first.

2          Q.   Did you use any sort of -- or did you use

3     any other facts to perhaps assist her to remember that

4     night?

5          A.   Well, I tried to focus in on that particular

6     night because I knew Corey Tilden had to go to a Price

7     Club party as he had told me earlier.  So I suggested to

8     her that night that Corey had to go to the Price Club

9     party.  She immediately remembered that December night.

10         Q.   Did you ask her where she was the early

11    morning hours of December 6, 1987?

12         A.   Yes, I did.  She said she was at home.

13         Q.   Did she indicate who she was with, or if she

14    was with anyone?

15         A.   She said she was with several persons at her

16    home, one of which she identified as Dallas.

17         Q.   Did she identify the other person to you at

18    that time?

19         A.   No, she did not.

20         Q.   Did she indicate to you whether or not she

21    had seen Corey Tilden in the early morning hours of

22    December 6, 1987?

23         A.   She did.

24         Q.   When did she first see Corey Tilden?

25         A.   She said she couldn't estimate the time

SUPERIOR COURT

**RUN 206**                                    MIAMI-NSB0076587

Exhibit 1H

1    period when she saw him in those early morning hours.

2    She said later that it had to have been, or it had to

3    have been before 3:00 a.m. because she did mention that

4    her and friends, Dallas, among other people, were leaving

5    the home at 3:00 a.m.  So it had to be earlier than that.

6            Q.  Did she indicate if Corey Tilden was with

7    anyone when she saw him?

8            A.  She said that Corey had arrived with a

9    friend of his from the Price Club who had dropped him off

10   at her home.  She said the friend remained maybe several

11   minutes, then left.  And Corey remained there at the

12   home.

13           Q.  Did she tell you whether she saw Sean

14   Running Eagle on the morning of December 6, 1987?

15           A.  She said that a short time after Corey

16   arrived, Sean arrived.  He was driving the car.  And she

17   said that for some reason she had a feeling that Sean may

18   have had some people in the car.  She indicated that Sean

19   parked the car in the driveway, along the side of their

20   condominium.

21           Q.  Did she mention anything to you about Sean's

22   condition at the time she saw him?

23           A.  She said Sean came in by himself into the

24   apartment, and described Sean as having been drinking.

25   And then made the comment that she knew Corey had been

SUPERIOR COURT

**RUN 207**

MIKE N580769588

Exhibit 1H

1    drinking.  Then described their intoxication by saying
2    that they were "tuned up".  I think that is the words she
3    used.

4         Q.  Did she indicate to you what happened after
5    Sean arrived at the condominium?

6         A.  She said that she and Dallas, the friend
7    that she did identify, had decided to take another friend
8    who was drunk, as she described it, to a restaurant.  And
9    they -- I believe she said it was 16th Street and
10   Camelback, the Denny's.  And that they took that
11   individual, too.  She estimated the time period as being
12   around 3:00 a.m. in the morning.

13        Q.  Did she indicate to you what time she had
14   returned from Denny's?

15        A.  Yes, she did.  She told me at first that
16   they arrived back between 5:30 in the morning to 6:00
17   a.m. in the morning.  Then she changed her story and
18   said, "Well, we went to Dallas' house first, started
19   coming home from the restaurant.  But we still arrived
20   around 5:30 or 6:00 a.m."

21             I asked her if it could have been later.
22   She said she didn't believe so.  But still it was
23   daylight.

24        Q.  Did she indicate who was present when she
25   arrived back at the condominium after going to Denny's

Exhibit 1H

1     and Mr. Howard's house?

2          A.   She told me that when her and Dallas arrived

3     back at the house, that Corey and Sean were present at

4     the house, and that Corey and her son asked her if she

5     could or he could go use her bedroom to sleep in.   And

6     she said he does that often.   Then instructed her to get

7     him up early, around 9:00 o'clock, because he had to go

8     to work.

9          MR. AHLER:   I have no further questions.

10          THE COURT:   Mr. Iniguez?

11

12                    CROSS-EXAMINATION

13     BY MR. INIGUEZ:

14          Q.   Det. Saldate, you just mentioned something

15     about it was still light outside.   That sort of caught my

16     attention.   Did that mean it had been light before?

17          A.   She said it was light outside.   That is how

18     she said it.

19          Q.   Do you remember this time of the year, Det.

20     Saldate?   Can you pick up in your mind if I ask you, was

21     it light at 6:30?   Can you tell me yes or no?

22          A.   I can't tell you.   It's wintertime, I know,

23     of course.

24          Q.   Let me ask you this.   You re-enacted this

25     matter with Mr. Snitke, I believe?

SUPERIOR COURT

**RUN 209**

MILKE_N680765590

1        A.   Yes.

2             Q.   You used the same time of day, didn't you,

3        so you could do it as well as possible to what Mr. Snitke

4        had told you had been the approximate time that he had

5        seen these people?

6             A.   The same time of day that Mr. Snitke told

7        us, yes.

8             Q.   So you went back a few days later as close

9        to that time of the morning as possible. Is that right?

10            A.   I don't know what the exact time frame was

11       for Mr. Snitke.

12            Q.   It would be fair to say it was before 6:00,

13       right?

14            A.   I would say yes.

15            Q.   Was it dark?

16            A.   It was dark.

17            Q.   Do you remember how long it stayed dark

18       after you were at Mr. Snitke's? Was it light by the time

19       you left or was it still dark when you left?

20            A.   It was still dark when we left.

21            Q.   So now, using all of that as a time frame or

22       as a reference, Mr. Saldate, can you tell me what -- you

23       think it was at about 6:30 in the morning when she said

24       she arrived home from Denny's? Do you think it would

25       have been dark or light?

SUPERIOR COURT

MILKE/NB90783591

Exhibit 1H

```
 1          A.  I on that day, I don't know.  I can't
 2    specifically say.  I just know what she told me.  It
 3    wasn't 6:30, it was between 5:30 and 6:00 a.m. in the
 4    morning.  I don't recall that actual day.  But in the
 5    case of Mr. Snitke, we probably refrained from 30 to 45
 6    minutes.  And it was still dark when we left.  I believe
 7    we started at 5:00 or 5:30.
 8          Q.  Now, when you spoke to Ms. Tilden she was
 9    very upset, wasn't she?
10          A.  I wouldn't describe her that way, no, at
11    all.
12          G.  You had just come into her house with a
13    whole bunch of ununiformed officers and you had -- you're
14    executing a warrant.  Is that right?
15          A.  By the time I got there, spoken to her, the
16    apartment or the condominium had already been secured,
17    and any excitement or any surprises had already been over
18    with.
19          Q.  Okay.  So if she had been excited she was
20    calmed down by the time you got in there.  Is that what
21    you are saying?
22          A.  That appeared to me, yes.
23          Q.  How long before the other officers executed
24    the warrant did you arrive?  Do you know?
25          A.  From the time we secured -- I arrived when
```

SUPERIOR COURT

**RUN 211**

MIKE_NS9019592

Exhibit 1H

```
 1    we began to execute the warrant.  However, at the time we

 2    secured that condominium, it may have been an hour more,

 3    I don't know.

 4              Q.  You didn't ask her at the time you started

 5    questioning her whether she had been drinking, did you,

 6    like alcohol?

 7              A.  For some reason I want to say she had a

 8    coffee cup in her hands, but I am not sure.  I did not

 9    ask her about drinking any alcohol.

10              Q.  Did you tell ask her if she had taken any

11    drugs or medication which would have made it difficult or

12    harder for her to understand and answer your questions?

13              A.  She had --

14              Q.  I asked you if you asked her that question?

15              A.  No.

16              Q.  Was she in a bath robe?

17              A.  No.

18              Q.  What was she wearing?  Do you know?

19              A.  I want to say, I believe she was wearing

20    Levi's.  And a yellow nightgown at one time.  Then

21    because of us opening the door often, I believe it became

22    cold, and she put on a house coat.  I believe that is the

23    way it occurred.

24              Q.  Did she tell you she had just come out of

25    the shower when you arrived?
```

SUPERIOR COURT

**RUN 212**

Exhibit 1H

1        A.   I didn't know.

2        Q.   Did someone else come in the house some

3   minutes or time before you entered yourself?

4        A.   Oh, yes.   The home had been secured, like I

5   said, an hour before I had gotten there or more.

6        Q.   Would you tell the jury, and at least

7   myself, you said earlier that you were there when the

8   warrant was executed, but then you went in after the

9   residence was secured.   Is that what you said, Mr.

10  Salgate?

11       A.   Let me explain a little bit, if I may.   At

12  times when we find probable cause on a residence like we

13  have on this residence, it takes some time to get the

14  search warrant.   We have to actually write it out, or in

15  our case we tape it on a tape.

16       We then give it to our section who then types

17  it.   We then get the typewritten form, take it to the

18  Judge, the Judge reads it, examines it, makes sure we

19  have enough probable cause.   Three steps.

20       It's then at that point we go out to serve

21  the warrant.   Prior to that, if we believe we have

22  probable cause, we will secure the residence so evidence

23  that we feel is there will be there when we get there.

24  Other evidence that may not be there will not find its

25  way there, so we won't find it and it won't be tainted.

SUPERIOR COURT

Exhibit 1H

1    We want everything to remain, as we want to serve the

2    search warrant at, and find things as they were.  Not

3    change those.  That is why we secure the residence.  We

4    don't move anything, we don't arrest anyone, we just

5    secure the residence.  No one takes anything out, no one

6    brings anything in.  That is, when I say secure, that is

7    what we did.

8              I then, or other officers then went out and

9    got the search warrant, then we proceeded to serve such

10   warrant after the Judge, of course, signs it.

11             Q.  Were you one of the people who went to the

12   Judge on the warrant?

13             A.  No.

14             Q.  So you arrived at the scene waiting for the

15   warrant to come to you?

16             A.  I was in the office.  I left when the

17   warrant was going to be served.

18             Q.  That was, I guess, basically the same night

19   Corey and Sean were arrested.  They were arrested on the

20   19th, sometime in the afternoon?

21             A.  It was just after noon.

22             Q.  It was that same --

23             A.  Yes.

24             MR. INIGUEZ:  I have no further questions.

25

SUPERIOR COURT

**RUN 214**

MRAK2_NSBU15595

Exhibit 1H

CROSS-EXAMINATION

BY MR. STEINLE:

1

2

3     Q.  Officer Saldate, in your questions to Mr.

4  Iniguez you said you don't recall specifically what time

5  your re-enactment was?

6     A.  I don't know.

7     Q.  Here is a copy of your supplemental.  Will

8  you review it, tell me, you did the supplemental, did you

9  not?

10    A.  Yes, I did.

11    Q.  And does it not say inside the supplemental

12  specifically what time you began your interview during

13  this re-enactment?

14    A.  Yes, it does.

15    Q.  What time is it?

16    A.  It's right in the middle of what I

17  estimated.  It's at 0545.  I believe I told Mr. Iniguez

18  it was between 5:30 and 6:00.

19    Q.  And it's your recollection that the entire

20  tiem that you were there in terms of the re-enactment, it

21  was dark outside?

22    A.  That's correct.

23    Q.  Now, your interview with Mrs. Tilden, she

24  was absolutely insistent that she got home before 6:00

25  o'clock in the morning.  Isn't that correct?

Exhibit 1H

77

1      A.   Yes.   Between 5:50 and 6:00 p.m.

2      Q.   But you specifically questioned her about

3  6:00 o'clock and she said it could not have been later

4  than 6:00 a.m.?

5      A.   That's correct.

6      Q.   She was attempting to place both Corey

7  Tilden and Sean Running Eagle at the condominium before

8  6:00 a.m.  Isn't that right?

9      A.   I don't understand the question.

10     MR. INIGUEZ:   I object to the form of the

11  question.  He is attempting to place Sean there.

12     THE COURT:   The objection is overruled.

13  BY MR. STEINLE:

14     Q.   When Mrs. Tilden is telling you what

15  happened on the 5th and the 6th, the early morning hours

16  of the 6th, and she is talking to you, she is telling you

17  specifically that both Corey Tilden and Sean Running

18  Eagle are at the condominium in Scottsdale at 6:00 a.m.

19  on the 6th?

20     A.   Yes.

21     Q.   Now, you're familiar with what time the

22  original call came in on the 911, weren't you?

23     A.   I would have to refresh my memory.  Is there

24  something I could read on that?

25     Q.   Go ahead.  Do you need some notes?

SUPERIOR COURT

MILLER_NRE307S597

Exhibit 1H

13

1          A.   The face sheet of the report would help me,
2     sir.
3               Q.   Would Det. Martinsen be able to give you a
4     copy of it?
5               A.   I am sure he would be able to be.  I believe
6     the call came in sometime between -- estimation of 5:53
7     a.m.
8               Q.   Okay.  Now, is it safe to say there is a
9     fair amount of media attention given to the double
10    homicides in the fact that the 911 operator had not been
11    called?  I mean, had not sent out the right call?
12              A.   Yes, it would be.
13              Q.   And my client was not arrested until
14    December 19th?
15              A.   That's correct.  Was Mrs. Tilden cooperative
16    in terms of giving you a name of Dallas Howard and an
17    address where to find Dallas so you could go interview
18    him and confirm the information that she had given you?
19              A.   She gave me the name of Dallas.  I believe
20    we may have got that information later.  But she was
21    cooperative.
22              Q.   But did she say that, "I was with Dallas
23    Howard and he lives on 6th Avenue and Coulter"?
24              A.   No.
25              Q.   So you couldn't go on the 20th and interview

SUPERIOR COURT

MILKE-NB3079598

Exhibit 1H

1   Dallas Howard to find out whether or not what Marlene

2   Tilden told you in reference to Sean and Corey being home

3   at these time were true, could you?

4            A.   No.

5            Q.   And there was another man by the name of Jim

6   Bonga.  Did she give you that name?

7            A.   No.  She said she was with several other

8   people but did not want to identify the rest of the

9   people that were there at that time.

10           Q.   You couldn't go to these other people and

11   confirm what she had told you.  Isn't that correct?

12           A.   That's correct.

13           Q.   So what she basically was trying to do was

14   to provide you with some information about her son and

15   Sean Running Eagle, but wouldn't give you any information

16   that would help you confirm the information that she had

17   given you in this interview?

18           A.   I guess so.  Yes.

19           Q.   She didn't know who brought Corey home,

20   right?

21           A.   She said a friend from work brought Corey

22   home.

23           Q.   Didn't give you a name, did she?

24           A.   No, she did not.  She may have not known it.

25   I don't know.

```
 1              Q.  She did not give you Dallas Howard's full
 2   name that day, did she?
 3              A.  I believe she just told me Dallas, yes.
 4              Q.  She refused to identify the other person?
 5              A.  Yes.
 6              Q.  Now, she then indicated she thought somebody
 7   was in Sean's car.  Is that correct?
 8              A.  That's correct.
 9              Q.  She used the term somebody?
10              A.  That's correct.
11              Q.  But she couldn't tell you anything more
12   about that person?
13              A.  No.  She said the car was parked along the
14   driveway, along the side of the condominium, which of
15   course you couldn't see.
16              MR. STEINLE:  I have nothing further.
17              THE COURT:  Mr. Ahler?
18              MR. AHLER:  No further questions.
19              THE COURT:  You may step down.
20
21                        (Witness excused.)
22
23              THE COURT:  We will take a short recess at this
24   time.
25              Ladies and gentlemen, please remember not to
```

SUPERIOR COURT

MISKE/NSB075600

Exhibit 1H

JUDITH ALLEN, CLERK
BY _____ DEP.
_____
FILED

1988 APR -6 PM 4: 12

THOMAS E. COLLINS
MARICOPA COUNTY ATTORNEY

Paul Ahler
Deputy County Attorney
Bar ID #:  005379
111 West Monroe, Suite 1800
Phoenix, AZ  85003
Telephone:  602 256-5780
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

_____

| | |
|---|---|
| STATE OF ARIZONA, ) | NO. CR 87-155451 |
| Plaintiff, ) | |
| ) | REQUEST FOR VOLUNTARINESS |
| vs. ) | HEARING |
| ) | |
| SEAN BERNARD RUNNINGEAGLE (A)) | (Evidentiary Hearing |
| ) | Requested) |
| COREY PRESTON TILDEN (B) ) | |
| Defendants. ) | Assigned to the Honorable |
| ) | Gloria Ybarra |

COMES NOW the State of Arizona, by and through the under-
signed counsel, respectfully, requests that the Court conduct a
pre-trial hearing to determine the voluntariness of statements
made by defendant's Runningeagle and Tilden to law enforcement
personnel.  The State submits that said statements were taken in
compliance with Miranda v. Arizona and that there was no force,
threats, or promises used to induce said statements.

Respectfully submitted this 6th day of April, 1988.

THOMAS E. COLLINS
MARICOPA COUNTY ATTORNEY

BY _____
   Paul Ahler
   Deputy County Attorney

**RUN 220**

SALDATE0005700

Exhibit 1H

Copy of the foregoing mailed/
delivered this _6+L_ day of
April, 1988, to:

The Honorable Gloria Ybarra
Judge of the Superior Court

Roland Steinle
Deputy Public Defender
132 S. Central
Phoenix, Arizona 85003
Defense Attorney for Tilden

Baltazar Iniquez
394 N. Third Avenue
Phoenix, Arizona 85003
Defense Attorney for Runningeagle

BY _____
    Paul Ahler
    Deputy County Attorney

PA:jd
45.1

SALDATE0005

Exhibit 1H

| OFFICE DISTRIBUTION | |
|---|---|
| CHANGE OF VENUE | |
| JURY FEES | |
| REMANDS | |
| | |
| | |
| | |
| | |

**SUPERIOR COURT OF ARIZONA**
MARICOPA COUNTY

RECEIVED   PROCESSED

JUN 24 '88   JUN 27 '88

CLERK OF THE COURT

RC04-99822    June 20, 1988    HON. GLORIA G. YBARRA    L. Davis
Code            Date         Judge/Commissioner/Pro Tem      Deputy

NO. ___CR87-11508___

STATE OF ARIZONA

Vs.

SEAN RUNNINGEAGLE (A)
COREY TILDEN (B)

County Attorney
By:  Paul Ahler

MCSO

Baltazar Iniguez

Roland Steinle

      2:16 p.m.  This is the time set for hearing
Motions.  State is represented by the above-named counsel.
Defendants are present and represented by the above-named
counsel.

      Court Reporter Lydia Estrada is present.

      The Court advises Counsel of her ruling on
Motion in Limine and that a written ruling will be provided at
a later date.

      Argument is heard regarding 609 Hearing.
Prior conviction of Corey Tilden will be permitted as stated on
the record.

      The Court proceeds to Voluntariness Hearing.

      State's Case:

      Armando Saldate, Jr., is sworn and testifies.

      This witness is excused.

      Larry Martinsen is sworn and testifies.

      This witness is excused.

      (CONTINUED)

Exhibit 1H



OFFICE DISTRIBUTION

| CHANGE OF VENUE | |
| JURY FEES | |
| REMANDS | |
| | |
| | |
| | |

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED    PROCESSED

JUN 24 '88    JUN 27 '88

WANGENFELD    Dist. Cts.

CLERK OF THE COURT

RC04-99822    June 20, 1988    HON. GLORIA G. YBARRA    L. Davis
    Code          Date         Judge/Commissioner/Pro Tem         Deputy

NO.  CR87-11508


STATE Vs. RUNNINGEAGLE                    (CONTINUED)
        TILDEN



                    State's case rests.

                    Defendant's Case:

                    Sean Runningeagle is sworn and testifies.

                    This witness is excused.

                    Defendant's case rest.

                    3:41 p.m.  Argument by Counsel for the State.

                    3:43 p.m.  Argument by Counsel for the defendant.

                    THE COURT FINDS that the statements were
knowingly, intelligently and voluntarily made and will be
admissible.

                    3:50 p.m.  Court stands at recess.

                    4:15 p.m.  Court reconvenes. Respective counsel
and defendants are present.

                    Court Reporter Lydia Estrada is present.

                    Court and Counsel go over Voir Dire questions
at this time.

                    4:36 p.m.  Court stands at recess until 1:00 p.m.
on June 21, 1988.

Exhibit 1H

further highlights the unreasonableness of the state court's decision." *Wiggins*, 539 U.S. at 528. For these reasons, the Court should grant Runningeagle's Petition for Writ of Habeas Corpus on this claim under 28 U.S.C. § 2254(d).

## CLAIM THREE

### THE STATE'S FAILURE TO DISCLOSE EXCULPATORY INFORMATION INVOLVING MANUEL MELENDEZ CONSTITUTED A *BRADY* VIOLATION, AND THUS A VIOLATION OF RUNNINGEAGLE'S CONSTITUTIONALLY-PROTECTED DUE PROCESS RIGHTS.

The district court's determination that Runningeagle's due process rights were not violated by the State's failure to disclose evidence is erroneous because the state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). The state court's rejection of this claim was also based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.[41] 28 U.S.C. § 2254(d)(2). Because the state court failed to resolve the merits of this claim, the district court reviewed it *de novo* because there is no state court decision for the court to accord deference. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

---

[41]An "unreasonable determination of the facts" occurs when a state court's conclusion or characterization of evidence is unsupported by the record, when the process employed is defective, or when no finding is made at all. *Taylor*, 366 F.3d at 999.

- 65 -

SALDATE001224

Exhibit 1H

The prosecutor improperly withheld information it had obtained from Manuel Figueroa Melendez, a cellmate of Runningegale's co-defendant Corey Tilden, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* requires the prosecution to disclose evidence that is potentially favorable to the defendant and material to either guilt or punishment. *Brady*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667, 674 (1985). In *Kyles v. Whitley*, 514 U.S. 419, 435 (1995), the Supreme Court explained that materiality is evaluated by determining whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome. A failure by the prosecution to turn over evidence that is potentially favorable to the defendant constitutes a due process violation. *Brady*, 373 U.S. at 86.

The prosecution in this case suppressed potentially exculpatory evidence, and the district court's conclusion that *Brady* relief is not warranted is erroneous. (Dist. Ct. Doc. No. 132 at 20, ER 20.) Specifically, law enforcement officers and investigators had multiple conversations with Melendez, an individual who was not involved with the crimes at issue in this case and who had significant information that another individual had committed the crimes without Runningeagle's involvement. This classic *Brady* material was never disclosed to Runningeagle.

- 66 -

SALDATE001225

Exhibit 1H

### A.    THE STATE FAILED TO DISCLOSE EXCULPATORY EVIDENCE IN ITS POSSESSION TO RUNNINGEAGLE'S COUNSEL.

While incarcerated at the Maricopa County jail, Melendez shared a cell with Corey Tilden, Runningeagle's co-defendant.  (ROA 417 Ex. D at 8, ER 1625.)  As Runningeagle has now learned, Tilden described to Melendez in great detail the crimes at issue in this case: "he has spoke to me about the case completely.  He had confided in me."  (ROA 417 Ex. D at 8, ER 1625.)  Following these conversations with Tilden, Melendez contacted law enforcement investigators and the prosecutor's office about Tilden's admissions regarding his primary and leading role in the crimes.  (ROA 417 Ex. D at 6-8, ER 1625.)  Between January and April of 1988, detectives and members of the Maricopa County Attorney's Office interviewed Melendez between three and five times.  (ROA 417 Ex. D at 6-9, 87, ER 1625.)  The prosecutor informed Tilden's counsel at the public defender's office that the prosecution was investigating information provided by Melendez that inculpated Tilden and determining whether Melendez was in a position to testify against Tilden.  (ROA 89, ER 2442.)  Runningeagle's attorney did not receive a similar notice.  The public defender's office, which represented both Melendez and Tilden, screened itself off from any additional involvement in Melendez's case to prevent a conflict of interest.  (ROA 89, ER 2442; ROA 90, ER 2441.)  As the State's preparation for trial progressed, another of Runningeagle's co-defendants, Orva Antone, eventually

- 67 -

Exhibit 1H

agreed to cooperate, and the State declined to call Melendez as a witness.  (ROA 417 Ex. D at 9, ER 1625; ROA 90, ER 2441.)

During pretrial proceedings, Runningeagle's counsel filed a motion for discovery requesting "all material or information which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce his/her punishment therefore." (ROA 84, ER 2461.)  The prosecution did not disclose its conversations with Melendez, its notes from its conversations with Melendez, nor even the existence of a witness who implicated Tilden but not Runningeagle.

The record in this case leaves no doubt that Melendez's statement's differed materially from the testimony given by Orva.  Of particular relevance, Melendez's statements implicated only Tilden in the actual killing of the victims.  In fact, Melendez believed the prosecution opted not to rely on him in the prosecution of Tilden or Runningeagle because he could give the prosecution only evidence as to Tilden's guilt and could not implicate the other two co-defendants:  "it was specifically expressed to me by the prosecution and the homicide detectives that they wanted to make the three people—they didn't want any one of them to turn over on any one person.  They'd rather have the information to develop it, and they wanted to convict all three of the charges." (ROA 417 Ex. D at 9, ER 1625.)

After meetings with Melendez, the prosecution began making notes reflecting

- 68 -

**RUN 227**

SALDATE001227

Exhibit 1H

the fact that Tilden, not Runningeagle, was the killer. (Dist. Ct. Doc. No. 115 Ex. N, ER 555.)[42]  Kyle Marie Wesendorf, an attorney working on Runningeagle's first habeas petition, reviewed the file maintained by the Maricopa County Attorney's Office to mark any documents she and her co-counsel did not have and to request copies of the documents. Contained in the file in the Maricopa County Attorney's Office were notes written on a legal pad that said, "TILDEN THE KILLER." (Dist. Ct. Doc. No. 115 Ex. N, ER 555.)  Runningeagle's attorneys requested a copy of the notes, but when the Maricopa County Attorney's Office copied the notes and provided them to Runningeagle's attorneys, the "TILDEN THE KILLER" note was not included. (Dist. Ct. Doc. No. 115 Ex. N, ER 555.) To this day, Runningeagle has not received any materials from Respondents regarding the information obtained from Melendez during the interviews.

---

[42]Runningeagle submitted the Wesendorf affidavit in his Merits Brief re: Sentencing Claims and Requests for Evidentiary Development, filed July 21, 2006. (Dist. Ct. Doc. No. 115, ER 169.)  Pursuant to the district court's order dated November 27, 2007, the court declined to expand the record to include the affidavit, and thus did not consider this evidence when it denied Runningeagle habeas corpus relief. (Dist. Ct. Doc. No. 132, ER 20.)  Runningeagle nevertheless maintains that this affidavit—and all other exhibits included in the Merits Brief re: Sentencing Claims and Requests for Evidentiary Development—are part of the record on appeal. *See* Fed. R. App. P. 10(a)(1) (providing that the record on appeal consists of original papers and exhibits filed in district court). *See also Schlup v. Delo*, 513 U.S. 298, 308 n.18 (1995) (noting that exhibits attached to a habeas petitioner's motion to supplement the record were "part of the record on appeal," even though the district court denied the motion to supplement).     .

- 69 -

Exhibit 1H

**B.  THE STATE'S FAILURE TO DISCLOSE THIS EXCULPATORY
INFORMATION TO RUNNINGEAGLE VIOLATED HIS RIGHTS
UNDER *BRADY* AND RUNNINGEAGLE IS ENTITLED TO RELIEF.**

The prosecution's strategic decision not to rely on Melendez as a witness did

not excuse the prosecution from its *Brady* obligations to disclose to Runningeagle the

existence of a witness who implicated only Tilden and the state courts' decision

otherwise constitutes both an unreasonable application of the law and an

unreasonable determination of the facts.  In light of the state court's unreasonable

determination of the facts, the decision is also an unreasonable application of clearly

established law. *See Williams*, 529 U.S. at 408 ("[A] state-court decision involves an

unreasonable application of [Supreme] Court[] precedent if the state court identifies

the correct governing legal rule from this Court's cases but unreasonably applies it

to the facts of the particular state prisoner's case.").  As the Supreme Court has made

clear, "partial reliance on an erroneous factual finding further highlights the

unreasonableness of the state court's decision." *Wiggins*, 539 U.S. at 528.

Indeed, there is little doubt that the testimony of a witness who implicated only

or primarily Tilden would have materially undermined the testimony of Orva, who

testified that both Runningeagle and Tilden were culpable. *Giglio v. United States*,

405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959))

("When the 'reliability of a given witness may well be determinative of guilt or

- 70 -

SALDATE001229

innocence,' non-disclosure of evidence affecting credibility falls within this general rule."). The State's failure to disclose its notes from interviews with an exculpatory witness prior to trial, and its failure to disclose even the existence of this witness, presents a classic *Brady* claim. Runningeagle was prejudiced because evidence exists suggesting that Tilden was solely or primarily responsible for the crimes at issue, and the State suppressed that evidence.

The state court summarily denied relief as to the *Brady* claim without analysis. The district court denied relief as to this claim, concluding that Melendez's utility as an exculpatory witness was merely speculative. (Dist. Ct. Doc. No. 132 at 20; Apx. 21.) (ER 20.) More precisely, the district court reasoned that Runningeagle cannot establish *Brady* prejudice because the harm resulting from the prosecution's improper failure to disclose Melendez's existence is merely speculative.

The district court relies exclusively on *Wood v. Bartholomew*, 516 U.S. 1 (1995), to justify its decision that Runningeagle cannot show "that the outcome of his trial or sentencing would have been affected." (Dist. Ct. Doc. No. 132 at 20, ER 20.) However, *Bartholomew* is inapposite. The Court in *Bartholomew* held that the prosecution's failure to disclose an exculpatory polygraph result is not a *Brady* violation because the polygraph result is inadmissable under state law. 516 U.S. at 4. In contrast, in Runningeagle's case, the testimony of Melendez as impeachment

- 71 -

**RUN 230**

SALDATE001230

Exhibit 1H

or as independent exculpatory evidence is admissible evidence. *Cf. Bartholomew*, 516 U.S. at 6 (stressing that "polygraph results were inadmissible under state law, even for impeachment purposes"). *Bartholomew* is not instructive in analyzing Runningeagle's case.

Moreover, the district court's conclusion that the content of Melendez's statements is merely speculative is overstated. Although the exact details of Melendez's statements are still being withheld by Respondents, the record in this case leaves no doubt that Melendez's statements implicated only Tilden—not Runningeagle—in the actual killing of the victims. Importantly, it is Respondents' gamesmanship that is causing speculation. The speculation would cease if Respondents would provide Runningeagle's counsel copies of the interview notes from their multiple meetings with Melendez, which to this day counsel has not received. This Court should therefore grant evidentiary development on this claim. Runningeagle requests notes, transcripts, and/or recordings of the interviews with Melendez and depositions of individuals involved in the interviews.[43]

---

[43]This claim was denied by the state courts without an evidentiary hearing despite Runningeagle's requests. The post-conviction court's complete lack of analysis on these claims compels the conclusion that it unreasonably applied both the law and the facts under the AEDPA. *Taylor*, 366 F.3d at 998-1000. Because no factual findings were made, but only broad legal conclusions, there are no factual findings to defer to under the AEDPA. *Id.* at 999-1001 (holding that a state court decision is an unreasonable determination of the facts if "no finding was made by the

- 72 -

SALDATE001231

Exhibit 1H

In sum, for the reasons discussed above, the district court's denial of this claim was erroneous. It does not require speculation to recognize that the existence of a witness who implicates one co-defendant to the exclusion of another is material and exculpatory, and the state's failure to disclose such a witness is prejudicial and a *Brady* violation. This Court should therefore grant Runningeagle relief on this *Brady* claim because he has shown both an unreasonable application of clearly established federal law and an unreasonable determination of the facts.

## CLAIM FOUR

### PROSECUTORIAL MISCONDUCT DURING RUNNINGEAGLE'S TRIAL RESULTED IN A VIOLATION OF HIS RIGHT TO DUE PROCESS.

During Runningeagle's trial, the prosecutor made "comments [that] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). The prosecutor deprived Runningeagle of his right to a fair trial not only by making inflammatory remarks directed at Runningeagle, but also by improperly vouching for

---

state court at all"; in this situation, "there is nothing to which the presumption of correctness can attach"). If, as here, the appellate court cannot discern the reasoning behind the fact-finding process in state court, because no effort is made to explain or reconcile inconsistencies, the state court factual findings must be set aside and the federal court may then have to make new findings. *Id.* at 1007-08, 1014; *see, e.g, Jones*, 114 F.3d at 1013 (stating that when the facts were not developed at a hearing in state court, a federal evidentiary hearing should be held, in order to determine whether the petitioner qualifies for habeas relief under the AEDPA).

- 73 -

SALDATE001232

Exhibit 1H



# <u>Runningeagle</u>
# <u>documents</u>

*Milke v. City of Phoenix et. Al*



Milke: Runningeagle documents