1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF ARIZONA
2

3   MILKE, et al.,                )
                                  )
4                Petitioners,     )
                                  )
5        vs.                      )    No. CV 98-60-PHX-RCB
                                  )
6   RYAN, et al.,                 )    Phoenix, Arizona
                                  )    January 11, 2010
7                Respondents.     )    9:02 a.m.
                                  )
8   _____ )

9              TRANSCRIPT OF EVIDENTIARY HEARING
          BEFORE THE HONORABLE ROBERT C. BROOMFIELD
10              UNITED STATES DISTRICT JUDGE
    APPEARANCES:
11

12  For the Petitioner Debra       By: Michael D. Kimerer
    Milke:                             Amy Nguyen
                                       Lori Voepel
13                                 KIMERER & DERRICK PC
                                   221 E. Indianola Avenue
14                                 Phoenix, AZ  85012-2002

15  For the Respondents:           By: Julie Ann Done
                                       Kent Cattani
16                                 OFFICE OF THE ATTORNEY GENERAL
                                   1275 W. Washington Street
17                                 Phoenix, AZ  85007

18  For Christopher Milke:         By: Douglas L. Irish
                                   CRIME VICTIM LEGAL ASSISTANCE
19                                 PROJECT
                                   1850 N. Central Ave., Suite 1440
20                                 Phoenix, AZ  85004

21  Court Recorder:                Vicki Reger

22  Transcription Service:         AVTranz
                                   365 E. Coronado Rd., Ste. #100
23                                 Phoenix, AZ 85004-1525

24

25  Proceedings recorded by electronic sound recording, transcript
    produced by transcription services.

**MILKE_NSB012203**
Exhibit 7

```
1                              INDEX

2                        Direct   Cross   Redirect   Recross

3     WITNESSES FOR PETITIONER:

4     Debra Milke
         (By Ms. Voepel)         120                176
5        (By Ms. Done)                    163

6     WITNESSES FOR RESPONDENTS:

7     Constable Armando Saldate
         (By Ms. Done)             8                113
8        (By Mr. Kimerer)                  34

9

10    EXHIBITS:                                   Marked   Received
      Petitioner's:
11    1 through 21                                             7
      22                                           146       146
12
      Respondents:
13    50 through 56                                            7

14

15

16

17

18

19

20

21

22

23

24

25
```

**MILKE_NSB012204**
Exhibit 7

7

```
 1        (Petitioner's Exhibits 1 through 21 Received)

 2        (Respondents' Exhibits 50 through 56 received)

 3           MS. DONE:  Your Honor, we'd also like to invoke the

 4    rule of witnesses to ensure that there's no witnesses in the

 5    courtroom while the other witnesses are testifying.

 6           THE COURT:  Are there any witnesses in the courtroom

 7    who anticipate testifying?  All right, it's the obligation of

 8    counsel then to ensure that no person who anticipates being a

 9    witness comes into court and hears any of the testimony or

10    discusses his or her testimony with anyone else.  It's

11    counsels' responsibility to ensure that.  If counsel sees

12    somebody come in the courtroom, let the Court know immediately.

13           All right.  Pursuant to direction out of the Ninth

14    Circuit, you have the burden, you may proceed at this time.

15           MS. DONE:  Thank you, Your Honor.  And if I could

16    just have a moment to go get my witness, Your Honor.

17           THE COURT:  Sure.

18           THE CLERK:  Please raise your right hand.

19           ARMANDO SALDATE, RESPONDENT'S WITNESS, SWORN

20           THE CLERK:  Thank you.  Please have a seat.

21           THE WITNESS:  Thank you.

22           THE CLERK:  And please speak into the mic.

23           THE WITNESS:  Thank you.

24    //

25    //
```

**MILKE_NSB012209**
Exhibit 7

SALDATE - DIRECT                    8

```
 1                    DIRECT EXAMINATION
 2   BY MS. DONE:
 3   Q    Good morning, sir.
 4   A    Good morning.
 5   Q    Could you state your name for the record please.
 6   A    Armando Saldate, Jr.
 7   Q    Okay.  And we're going to get into this in a little bit,
 8   but I know you have a different position than you did
 9   20-some-odd years ago.  You were a detective and now you're a
10   Constable; do you have a preference of what we call you?
11   A    No, it doesn't matter.
12   Q    Okay.  Would you prefer Constable?
13   A    Whatever is comfortable for you.
14   Q    Okay.  All right.  And Constable Saldate, how long were
15   you a police officer?
16   A    I was a police officer for approximately 22 years,
17   something like that.
18   Q    Okay.  And how long during that period of time were you a
19   detective?
20   A    I think it was 15 years, I think.
21   Q    Okay.  And during that 15 years did you spend any time as
22   a homicide detective?
23   A    Yes, I did.
24   Q    And how many years was that?
25   A    That was from early '84 to 1990.
```

**MILKE_NSB012210**
Exhibit 7

SALDATE - DIRECT                    9

1   Q    And did you leave the Phoenix Police Department at one --

2   A    Yes, I retired.

3   Q    Okay.  And I'm sorry, you were a police officer and a

4   detective with the Phoenix Police Department?

5   A    Yes, ma'am.

6   Q    For all 22 years?

7   A    Yes, ma'am.

8   Q    Okay.  And what date did you leave the Phoenix Police

9   Department?

10  A    I left on July 10th of 1990.

11  Q    Okay.  And did you retire, was that --

12  A    I retired.

13  Q    Okay.  And what do you currently do?

14  A    I am the elected Constable for the Encanto Justice

15  Precinct and I am the Constable.

16  Q    Okay.  And how long have you been doing that?

17  A    I've been doing that since July 11th of 1990.

18  Q    Okay.  So the day after you retired?

19  A    The day after, yes.

20  Q    Okay.  And what does that entail as a Constable?

21  A    Well, there's so many descriptions of the job, but I kind

22  of -- I guess it's like -- like the sheriff with civil orders

23  and civil matters, but we have a smaller precinct.  We have a

24  court precinct that we have to do and we deal with mainly civil

25  matters, such as evictions, summonses, subpoenas, court orders.

**MILKE_NSB012211**
Exhibit 7

SALDATE - DIRECT                10

```
1   Q    Is it similar at all to duties that you had as a detective
2   with the Phoenix --
3   A    No, no.
4   Q    Okay.  You -- do you do any interviews as a Constable?
5   A    No.
6   Q    Okay.  Any interrogations as a Constable?
7   A    No.
8   Q    Okay.  So suffice to say, you haven't done any
9   interrogations or interviews for the last 20 years?
10  A    At least, yes.
11  Q    Okay.  And how many interviews did you do as a detective?
12  A    Oh, I would -- I couldn't imagine.  I mean, I think I
13  estimated around -- I was involved in about 300 homicide
14  investigations as either case agent or assistant and I probably
15  was involved in -- I was in the robbery squad for several years
16  and probably -- it's really hard to say.  I mean, I would say
17  up to -- I mean, more than a thousand probably.
18  Q    Okay.  That's interviews or investigations you were
19  involved in?
20  A    Investigations.
21  Q    Investigations.  And do you know approximately how many
22  interviews you were involved in as a detective?
23  A    I would say maybe half of those or --
24  Q    Okay.  And do you know how many homicide interviews or
25  cases involving --
```

MILKE_NSB012212
Exhibit 7

SALDATE - DIRECT                11

```
1    A     Well, I was involved in -- like I said, I approximated
2    about 300 homicide cases during the time I was at -- in the
3    Phoenix Police Department.  And during that time, my
4    involvement would have been to assist in interviewing witnesses
5    or as a case agent I would have interviewed the suspects and
6    victim.
7    Q    Okay.  Do you know specifically how many, in your best
8    estimate, interviews you did with suspects involving a
9    homicide?
10   A    I would say anywhere from 50 to 75, maybe 100.
11   Q    Okay.  And what kind of officer training did you have to
12   become a police officer?
13   A    I attended the police academy and that was 12 weeks.  We
14   attended class for -- the first -- I believe it was the first
15   six or eight weeks we attended class five days a week.  The
16   second four weeks or maybe five weeks we attended class for
17   three day -- or four days and then on Friday we were sent out
18   to ride with another officer.
19   Q    Okay.  Did you do any training in interviewing, either
20   witnesses or suspects?
21   A    No.
22   Q    Okay.  Not specific training?
23   A    Not specific training to interview.  I mean, we were given
24   what every police officer gets, you know, who, what, when and
25   where and that's part of your supplemental you want to find out
```

**MILKE_NSB012213**
Exhibit 7

SALDATE - DIRECT                  12

```
1    and you're given some guidelines and stuff, but other than

2    that, no.

3    Q    And after you became a police officer, did you do any

4    specific interview training?

5    A    Not that I recall.

6    Q    That you recall?  Okay.

7    A    Pardon me, but I've got to move over -- a little bit away.

8    This monitor is blocking my view there.

9    Q    Sir, have you ever been disciplined as a police officer?

10   A    Yes, I have.

11   Q    Okay.  Do you remember the date of that discipline?

12   A    No, I don't.

13   Q    Okay.  And did that incident at all relate to

14   interrogation techniques?

15   A    No.

16   Q    Okay.  And have you received any commendations or

17   accolades as a police officer?

18   A    Several.

19   Q    And what were those for?

20   A    I was -- several apprehensions while I was a police

21   officer.  I was nominated for police officer of the year.  I

22   received several commendations as a detective, I received the

23   chief -- police chief's award for a homicide investigation I

24   did.

25   Q    Do you remember what investigation that was?
```

**MILKE_NSB012214**
Exhibit 7

SALDATE - DIRECT               13

1   A    No, I really don't.

2   Q    Okay.  That's fine.  And did you conduct your interviews

3   when you were a detective in any specific way or did you have a

4   style?

5   A    Well, every detective that interviews anyone has their own

6   style, has their own -- I mean, we have just general

7   conversations with people with different styles, but my style

8   was -- I don't -- I can't say it was totally different than

9   others, but it was somewhat different.  I knew some -- several

10  detectives that used sort of my style, but you know, my style

11  was just -- it worked for me.

12  Q    And what was your style?  How would you explain it?

13  A    Well, I -- my style was basically to go into an interview

14  room, discuss the issues of what we were there for, and to

15  obtain a confession or the truth or -- as that person knew it

16  and I did it by talking to them, having a conversation.

17  Q    And do you have an estimate as far as how much talking you

18  did versus the suspect or the person you were interviewing?

19  A    Well, the -- as a police officer, you're not -- your job

20  is not to give information, your job is to get information.  So

21  my discussion at first is to let this person know exactly

22  what's going on and what.  And then the conversation was

23  basically I would try to get a narrative from that person I'm

24  interviewing.  And then that would probably be maybe 75, 80

25  percent of the interview, and then I would either end it and,

**MILKE_NSB012215**
Exhibit 7

SALDATE - DIRECT                14

```
1    you know, close up anything.  And in between the interview
2    maybe I would have to refocus that person if they started to
3    stray a little bit in the interview, but I -- you know, it's
4    hard to stay.  Ten percent at the beginning, eighty,
5    seventy-five percent at the middle, and five, ten percent at
6    the end, I -- it's --
7    Q    And the estimates that you're giving us, what --
8    A    The beginning and end are mine and hopefully the other 75
9    to 80 percent would be the person I'm interviewing.
10   Q    And you mean who's speaking?
11   A    Yes.
12   Q    Okay.  And you said if they would stray off a little you
13   would try to get them to focus.  How would you do that?
14   A    I would remind them of what we're discussing and get them
15   focused back into what we needed to do.
16   Q    Okay.  But did you find yourself doing that a lot?
17   A    No, not usually.
18   Q    Okay.  Did you generally tape-record your interviews, sir?
19   A    No.
20   Q    And why not?
21   A    Well, that was before all this technology and stuff.  And
22   I always felt that it inhibited the person that was talking to
23   me to have a tape recorder right in front of their face.  And
24   it just seemed to me that we were going to have a conversation
25   and that conversation was going to be noted by me in a truthful
```

**MILKE_NSB012216**
Exhibit 7

SALDATE - DIRECT                    15

```
1    manner, so there was really no need for tape recording.
2    Q    Okay.  And I'd like to take you to the case of Debra
3    Milke, which is what we're here presently for.  Have you
4    reviewed any of your testimony from that case?
5    A    I've reviewed some of it, yes.  Uh-huh.
6    Q    Okay.  From the Voluntariness Hearing, have you reviewed?
7    A    Voluntariness hearing, I believe I did.
8    Q    Okay.  And then from the trial?
9    A    I've looked at most everything, but I have reviewed the
10   cases that the defense attorney wanted me to review.  I review
11   -- or their submission about those cases.  I've reviewed --
12   Q    Other cases that you've been involved in?
13   A    The other cases that they were speaking about that they
14   asked me during the interview to review, I've reviewed those.
15   But other than that, I just looked over briefly half the other
16   stuff that I, you know.
17   Q    Okay.  And is there anything that you can recall from your
18   review of those that you don't believe was correct in the
19   record or misstates the record?
20   A    No.
21   Q    Okay.  And taking you back to December 3rd, 1989.  Do you
22   remember how that day started for you?
23   A    Somewhat.  I was at home, it was my day off.
24   Q    Do you remember what day of the week it was?
25   A    I think it was Sunday.
```

**MILKE_NSB012217**
Exhibit 7

SALDATE - DIRECT                    16

1   Q     Okay.

2   A     Because my days off were Sunday and Monday.

3   Q     Okay.

4   A     And I think it was Sunday and I was at home alone, my wife

5   had gone to make -- I think it was bake cookies or something

6   with a friend for Christmas.  And I was there and I got a call

7   from Sergeant Ontiveros and asked me if I was available to come

8   in and help him with a case.  And I said, "Oh, sure, I will."

9   Q     And do you remember what time that was?

10  A     Not really.  I know it was in the morning sometime.

11  Q     In the morning, okay.  And I won't take you through the

12  whole events of that day, but at one point during that day did

13  you interview Ms. Milke?

14  A     I did.

15  Q     Okay.  Do you remember approximately when that was?

16  A     It was later that evening, yes.

17  Q     Okay.  Would it refresh your recollection or help you if

18  you had your supplemental report in front of you, sir?

19  A     Absolutely.  I mean --

20  Q     Okay.

21          MS. DONE:  If I could ask that the witness be shown

22  Exhibit 51.  I'm sorry, 50, and it's in the binder with all the

23  exhibits.

24          THE WITNESS:  What page would you like me --

25  //

**MILKE_NSB012218**
Exhibit 7

SALDATE - DIRECT                17

1    BY MS. DONE:

2    Q    We'll just leave it at the front page --

3    A    Okay.

4    Q    -- and if you need to refer to it, yes.

5    A    I see the first line is December 3rd, 1989 at

6    approximately 1953 hours, which would be 7:53 p.m.

7    Q    Okay.  And, sir, what in your opinion is the difference

8    between an interview and an interrogation?

9    A    An interrogation is -- to me, I -- would be

10   confrontational.  It would be a situation where the detectives

11   just is involved in discussing issues that probably weren't,

12   you know, about what was going to happen and stuff and arguing

13   and -- back and forth.  And my interviews were nothing like

14   that.

15   Q    So from your recollection of your interview with

16   Ms. Milke, would you call it an interview or an interrogation

17   in your opinion?

18   A    It was an interview, but more so it was a conversation.

19   Q    Okay.  And was your interview with Ms. Milke

20   tape-recorded?

21   A    No.

22   Q    Did your -- did -- I'm sorry, Sergeant Ontiveros was the

23   person that asked you to interview Ms. Milke, correct?

24   A    That is correct.

25   Q    Okay.  Did he ask you to tape-record the interview?

MILKE_NSB012219
Exhibit 7

SALDATE - DIRECT                    18

1    A    He asked me if I could try to tape-record it.

2    Q    Okay.  Was there a departmental policy in the Phoenix

3    Police Department that required you to tape-record interviews?

4    A    No.

5    Q    Okay.  And why was the interview not tape-recorded?

6    A    Shortly after I got there, we -- I asked her in regards to

7    the tape recording and she said no.

8    Q    Okay.  Did detective -- or Sergeant Ontiveros instruct you

9    to record the interview regardless of what Ms. Milke --

10   A    No, he just --

11   Q    -- response would have been to that question?

12   A    No, he would never have done that.  No.

13   Q    Okay.  And why did you follow her request not to

14   tape-record the interview?

15   A    I basically didn't want to record it anyway.  I think it's

16   a detriment to my interview, but other that that, I mean that

17   was her decision.

18   Q    And "detriment to your interview" is that because --

19   A    To conversation that we were going to have.

20   Q    What you testified to earlier?

21   A    Yes.

22   Q    Okay.  Did you take a tape recorder with you?

23   A    No.

24   Q    And if she had said yes, she wanted the interview

25   tape-recorded, what would you have done at that point?

**MILKE_NSB012220**
Exhibit 7

SALDATE - DIRECT                    19

1   A    I would have found one.  I mean, we were at a police
2   station, so.
3   Q    Okay.  And how long ago was this interview, Constable?
4   A    1989, so it's 21 years ago.
5   Q    Okay.  And do you remember how your interview with
6   Ms. Milke started?
7   A    Very cordial.  I came in, I introduced myself.  There was
8   somebody else with her.  I asked that person to step out and I
9   told her who I was and identified myself with my badge.  And it
10  was -- it began very cordial.
11  Q    So when you walked in did you know there was two ladies in
12  the room?
13  A    There was two ladies, yes.
14  Q    And did you know which one of them was Ms. Milke?
15  A    I believe I said, "Debra Milke?" -- and the lady either
16  motioned or -- to Debra Milke.  That's how I -- I think that's
17  how I determined who was Debra Milke.
18  Q    Had you ever met Ms. Milke before?
19  A    No, I hadn't.  No, I hadn't.
20  Q    Okay.  And so you introduced yourself and what did you do
21  after that?
22  A    Well, I introduced myself and the lady excused herself.
23  And we were there sitting together and I told her about why I
24  was there.  I then --
25  Q    And what was that that you told her?

AVTranz
E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

MILKE_NSB012221
Exhibit 7

SALDATE - DIRECT                    20

1    A    I think I told her I was there investigating the death of
2    her son, who had been shot -- found shot.
3    Q    Okay.  And then what happened?  What was said?
4    A    I told her that -- I read her rights and we proceeded from
5    there.
6    Q    Do you recall what her reaction was when you first started
7    talking to her?
8    A    I think she said a couple words were what, what and then
9    she moaned some other words, I couldn't make them out.  She
10   appeared to be a little excited and I told her that we had a
11   job there to do and -- I knew had a job to do, so I told her I
12   wouldn't tolerate that, we got to get going and start talking
13   about what needs to be talked about.
14   Q    Okay.  And you said at that point you read her her rights?
15   A    Her rights, yes.
16   Q    Are you referring to her Miranda rights?
17   A    Her Miranda rights, yes.
18   Q    Okay.  And did you read them from memory or --
19   A    No, I had my badge case out.  I took out a card from my
20   badge case, a white little card, and then read them from that
21   card.
22   Q    And you kept that card in your badge case, you said?
23   A    I usually kept in my badge case, yeah.  In that instance I
24   had it in my badge case, yes.
25   Q    Okay.  And if I could have the witness turn to Exhibit 51,

**MILKE_NSB012222**
Exhibit 7

SALDATE - DIRECT                    21

1    please.  And the second page of that exhibit.  Can you see that

2    writing?  I know it's rather small.

3    A    Yes, uh-huh.

4    Q    Okay.  And can you see the REV at the top of the top one?

5    A    Yes, it's PPD Number 29, Revised 11/87.

6    Q    Okay.  Do you have any reason to believe that you did not

7    have a current Miranda card in your badge case at the time you

8    advised Ms. Milke of her Miranda?

9    A    No, I would have that --

10   Q    You would have that one?

11   A    Uh-huh.

12   Q    And the second Miranda card that is on this exhibit, what

13   is the REV date of that?

14   A    It appears 5/98.

15   Q    So if there -- assuming there had been no revisions

16   between -- the Miranda card between 11/87 and 5/98, do you have

17   any reason to believe that you would not have had a copy of the

18   top Miranda card in your wallet?

19   A    No, I mean I would have had a copy of the top one.  Of

20   course not the bottom one, but the top one for sure.

21   Q    Okay.  And Constable Saldate, could you read that warning

22   to us?

23   A    Certainly.

24   Q    Is that the warning you would have read to Ms. Milke?

25   A    Yes, right off the card, yes.

**MILKE_NSB012223**
Exhibit 7

```
                      SALDATE - DIRECT              22
 1   Q     Okay.
 2   A          "You have the right to remain silent.
 3               Anything you say can be used against you in
 4               a court of law.  You have the right to the
 5               presence of an attorney to assist you prior
 6               to questioning and to be with you during
 7               questioning if you so desire.  If you cannot
 8               afford an attorney, you have the right to
 9               have an attorney appointed for you prior to
10               questioning.  Do you understand these rights?"
11   Q     Okay.  And you have any reason to believe that you did not
12   read those words verbatim off that card to Ms. Milke?
13   A     No, that's what I did.
14   Q     Okay.  And at the bottom of that card it says date, DR and
15   then you've got the number sign and OFF initials.  Do you know
16   what those are?
17   A     Some officers used it to note the date that they did these
18   rights cards, the DR number off that -- what it pertained to --
19   what report number it pertained to and then their own officers'
20   initials.
21   Q     Was there any department policy in the Phoenix Police
22   Department that required you to fill in that information?
23   A     No, no, absolutely not.
24   Q     Okay.  Did - was it your habit or custom to fill in that
25   information?
```

**MILKE_NSB012224**
Exhibit 7

SALDATE - DIRECT                23

1   A     No, because I was going to supplement it and I would note

2   it on my pad that -- during the investigation of how many --

3   because I would read, you know, some cases would take two or

4   three times that you would read these rights to different

5   people and these -- this was mainly done for field officers

6   that would happen to read the rights to someone during their

7   field investigation and then they would submit this to us via

8   property impound.

9   Q     Okay.

10  A     And then we would be able to tell that, you know -- or the

11  Court or someone would have information that they did read them

12  their rights.

13  Q     Okay.  And was there department policy in the Phoenix

14  Police Department requirement to impound the card with each

15  suspect you read it to?

16  A     No.  Some card -- some officers just attach it to their

17  report and send it in.

18  Q     But there was no requirement --

19  A     No --

20  Q     -- to impound the card each time?

21  A     -- absolutely not.

22  Q     And you don't still have that card, do you?

23  A     No, I don't.

24  Q     That you read to Ms. Milke?  Okay.  What was Ms. Milke's

25  response after you read?

**MILKE_NSB012225**
Exhibit 7

SALDATE - DIRECT                24

1   A    She first nodded her head and I explained to her that I

2   needed her to verbalize what -- whether yes or no, and she said

3   yes.

4   Q    And the yes or no response was in response to?

5   A    To my question, "Do you understand these rights?"

6   Q    Okay.  Did you have any other questions that you asked

7   after that?  As far as her Miranda rights were concerned.

8   A    No.

9   Q    Were you required to ask Ms. Milke if she waived her

10  rights?

11  A    Not specifically, no.

12  Q    Do you know if there was any department policy in the

13  Phoenix Police Department that required you to ask her if she

14  waived these rights?

15  A    No, it's pretty self-explanatory on the rights card.

16  Q    Okay.  And while you were in a detective in your 22 years

17  as being a detective, were you ever given a Miranda card that

18  had both questions, "Do you understand these rights and do you

19  agree to waive these rights"?

20  A    Never.

21  Q    Okay.  And the second card, with the revision of 5/98, do

22  you see that second question on that card?

23  A    Yes.

24  Q    I'm sorry, the second question, do you agree to waive

25  these rights?

**MILKE_NSB012226**
Exhibit 7

SALDATE - DIRECT                    25

1   A    The last card, it's 5 of 98 --

2   Q    Yes.

3   A    -- it says, "Do you understand these rights?"

4   Q    Correct.  Is that the last question on that card?

5   A    That is.

6   Q    And there's no question on that card that states, "Do you

7   agree to waive these rights?"

8   A    That is correct.

9   Q    Okay.  Did you have any substantive conversation regarding

10  the case with Ms. Milke before you read her Miranda rights?

11  A    No.

12  Q    And you stated that after you read her Miranda rights she

13  first moved her head up and down and then you stated you needed

14  a verbal response and then she said yes?

15  A    That's correct.

16  Q    Did the Miranda advisement card look any different than

17  this, in that did it have a place for suspect to sign?

18  A    No.  No.

19  Q    Okay.  Did you ever see a Miranda advisement card that had

20  a place for a suspect to sign?

21  A    The other card I ever seen is the one that's revised

22  11/87, and of course I'm looking at, for the first time, the

23  5/98, but that's the only card I ever knew of.

24  Q    Was there ever any other cards that you knew about besides

25  your Miranda card that you carried you said in your badge case

**MILKE_NSB012227**
Exhibit 7

SALDATE - DIRECT                    26

```
1    wherein a suspect could sign acknowledging that they understood
2    their rights?
3    A    No.
4    Q    You never used one when you were a detective?
5    A    Didn't know there one -- one existed.
6    Q    Okay.  Do you have any reason to believe that Ms. Milke
7    did not understand her rights?
8    A    No.
9    Q    When she said yes to you after you asked for a verbal
10   response, there --
11   A    No.
12   Q    -- was there any indication that she did not understand
13   those rights?
14   A    No.
15   Q    How would you characterize Ms. Milke's emotional state at
16   that point?
17   A    She was excited.  I mean, you know, I -- she was starting
18   to cry like and -- she was trying to show some emotion that I
19   felt it probably wanted to maybe -- thought maybe I'd just, you
20   know, would stop for awhile or something like that and that
21   probably -- I kind of figured that that's what she wanted me to
22   do and I kind of give her a little bit of think-time during
23   that period of time, but she was excited but she wasn't -- she
24   knew what was going on, probably more so than I did, because of
25   course, you know, but I would say that we had a very composed
```

MILKE_NSB012228
Exhibit 7

SALDATE - DIRECT                    27

1    conversation after that.

2    Q    Okay.  And you use the term "cry like", what do you mean

3    by that, sir?

4    A    Well, she started to kind of like feign that she was

5    crying, but there's no tears coming out of her eyes or anything

6    like that.  She was more -- it appeared to me she was just kind

7    of trying to gain some time -- some thought time, some thought

8    process.  She was going to do some thought process -- it

9    appeared in my mind that she was going to do some thought

10   process of how she's going to either answer my questions, how

11   she's going to confront the situation.

12   Q    Okay.  To your recollection, did Ms. Milke ask any

13   questions about her son?

14   A    No.

15   Q    Did she ask how he was murdered?

16   A    No.

17   Q    Did she ask where he was found?

18   A    No.

19   Q    Anything?

20   A    No.

21   Q    How long was your interview with Ms. Milke?

22   A    Thirty or so minutes, something like that.

23   Q    And to the best of your recollection, did you lie to

24   Ms. Milke in your interview with her?

25   A    No.

**MILKE_NSB012229**
Exhibit 7

SALDATE - DIRECT                28

1    Q    And I believe in -- did you try to relate yourself to

2    Ms. Milke at all during the interview?

3    A    To relate myself to -- I don't understand the question,

4    I'm sorry.

5    Q    To put yourself on a level with Ms. Milke?

6    A    Well, during all my interviews I tried to place myself in

7    a position where that person is comfortable with me and that

8    person will tell me what we need to be -- I mean, what actually

9    happened, what transpired and their involvement in this crime

10   that they have -- that I've come in contact with them with.

11   And that's basically what I try to do.

12          She at one time -- or several times said, "Do you

13   understand," or -- and I said, "Well, you know, I don't

14   understand -- I don't" -- but I understood, you know, "That's

15   what you wanted to do."  I mean, you know, but that's -- in

16   other words I wasn't confronting her with the issue of what she

17   did, why she did it and the morals and everything else about

18   what she did.  My whole situation was to be there, to interview

19   her, to have a conversation and get the truth from her.

20   Q    And how old was Ms. Milke at the time, do you recall?

21   A    No, I don't.

22   Q    Okay.  Was there any indication to you that Ms. Milke had

23   any mental deficiency or inability?

24   A    Not to me, no.

25   Q    And in your opinion as a detective for 22-some-odd years,

**MILKE_NSB012230**
Exhibit 7

SALDATE - DIRECT                    29

1    how would you rate Ms. Milke's intelligence?

2    A    She's very intelligent.

3    Q    Did Ms. Milke ever deny that she was involved with the

4    murder of her son, Christopher?

5    A    No.

6    Q    She ever insist that she was not involved?

7    A    No.

8    Q    And did you hit or strike Ms. Milke during the interview?

9    A    No.

10   Q    Did you threaten her during the interview?

11   A    No.

12   Q    Do you recall making any promises to her during the

13   interview?

14   A    No.

15   Q    During the interview, did Ms. Milke ever ask for an

16   attorney?

17   A    No, she did not.

18   Q    If Ms. Milke had asked for an attorney, what would you

19   have done?

20   A    I would have noted it on the supplemental and on my --

21   well, first my pad and then the supplemental later on, as I had

22   many times with other interviews I had.

23   Q    So there's been other cases where someone has asked for an

24   attorney?

25   A    Absolutely.  You know, there are many cases that I've

MILKE_NSB012231
Exhibit 7

SALDATE - DIRECT                    30

1   investigated that I've confronted people that -- and they've

2   asked for an attorney or they've refused to talk to me and

3   that's about it, you know.

4   Q    And in those cases did you note in your report that they

5   requested an attorney?

6   A    Absolutely.

7   Q    Okay.  And may the interview have continued after that?

8   A    I would say conversation would continue only if that

9   person -- I would sit there and do my paperwork and if that

10  person would ask me something, we may have -- start

11  conversation about something and if it would lead back to the

12  situation I was in there for originally, I would sit there and

13  talk to them, yes.

14  Q    Okay.  So you have done this in other cases?

15  A    Yes.  Uh-huh.

16  Q    Have you ever said that you haven't done in this in other

17  cases?

18  A    That I haven't done?

19  Q    Have you ever contended that you have not --

20  A    No, not that I know of.

21  Q    -- noted in your report that the person asked for an

22  attorney, but then continued the interview if they wanted to

23  talk some more?

24  A    No, I've been very truthful and forward on that -- in

25  regards to that manner.

MILKE_NSB012232
Exhibit 7

SALDATE - DIRECT                    31

1   Q     And do you recall if this is how you testified at the

2   Voluntariness Hearing?

3   A     I believe I did, yes.

4   Q     Do you recall being asked about the Sean Runningeagle case

5   at the Voluntariness Hearing?

6   A     Yes.

7   Q     And do you recall if you stated that that is what occurred

8   in the Sean Runningeagle case?

9   A     Yes.

10  Q     Okay.  So you've never contended that no, you didn't do

11  this; note that the person requested an attorney in your report

12  and then continued the interview?

13  A     It would be a lie because I would never do that.

14  Q     And did you lie in your report?

15  A     No.

16  Q     In Ms. Milke's case?

17  A     No, absolutely not.

18  Q     Did you ever lie about what you were told in an interview?

19  A     I put down exactly what the interview took place and now

20  to paraphrase the interview, I may put out a word, you know,

21  that may not, you know -- but no, I do not lie in my

22  interviews.

23  Q     You would never intentionally lie?

24  A     Absolutely not.

25  Q     And why not?

**MILKE_NSB012233**
Exhibit 7

SALDATE - DIRECT                    32

1    A    Because the truth matters.  Whether that person is telling

2    me that they didn't do that or whether that person is telling

3    me that -- a totally different situation or different story. I

4    mean, the bottom line is that police officers are -- I mean,

5    we're out to seek the truth.  I mean, we -- especially in a

6    homicide investigation where only person knows it or several

7    people, but on the -- on the suspect side, because usually the

8    victim is not living and therefore can't say anything for

9    themselves.

10   Q    And would you ever put your position on the line to lie on

11   an interview?

12   A    Absolutely not.  I've told many a young officer -- I've

13   taught at the academy and I've told them that there's no issue,

14   no person, no suspect that is bigger or more important than

15   your integrity.

16   Q    Did you have anything to gain with Ms. Milke's arrest?

17   A    Absolutely not.

18   Q    And you stated earlier that you retired from the Phoenix

19   Police Department in 1990?

20   A    1990, yes.

21   Q    Were you forced to retire from the Phoenix Police

22   Department?

23   A    Absolutely not.

24   Q    And why did you choose to retire?

25   A    I left right out the front door, the same door I came in.

MILKE_NSB012234
Exhibit 7

SALDATE - DIRECT                    33

1   My son had gone to college, my daughters were out of the house,

2   I was receiving a -- back then, of course, we used pagers, but

3   I was receiving more pages from my wife than I was from anyone

4   else.  I had spent several years on the police department, I

5   had worked various details that consisted of me being gone from

6   the home and from my wife and, you know, we talked about it and

7   I think it was the right thing for me to do, to spend more time

8   at home.

9   Q    Okay.  Because you would get called out at any time?

10  A    I -- during the last five years of my tenure on homicide,

11  there was not a Christmas or a Thanksgiving that went through

12  that I did not get called out for work.

13  Q    Okay.  And, in fact, on this case you got called out on

14  your day off?

15  A    Yes, ma'am.

16  Q    Okay.  And at any time on December 3rd, 1989, do you

17  recall Ms. Milke asking for any attorney?

18  A    Absolutely not.

19  Q    Okay.  Did Ms. Milke -- do you recall her ever asking you

20  to call her father?

21  A    Yes, she did.

22  Q    Okay.  And did she refer to an attorney at that time?

23  A    She -- this was our conversation that we had on the way

24  back, that she was asking various questions of, you know, "Do

25  you think I could go home tomorrow or do you think I'm going to

**MILKE_NSB012235**
Exhibit 7

SALDATE - DIRECT/CROSS          34

1   be put on probation or do you think that -- would you call my

2   dad and maybe he could get me an attorney," stuff like that.

3   But that was afterwards.

4   Q   Okay.  So it was just in reference to, "Can you call my

5   dad about an attorney?"

6   A   Yes.

7   Q   Which did she ever ask you, "I want an attorney"?

8   A   No.

9   Q   "I need an attorney"?

10  A   Absolutely not.

11  Q   Okay.

12          MS. DONE:  If I could just have a moment, Your Honor?

13          THE COURT:  You may.

14      (Counsel Confer)

15          MS. DONE:  Your Honor, we have no further questions

16  at this time.

17          THE COURT:  Who for the Petitioner?  Mr. Kimerer.

18                  CROSS-EXAMINATION

19  BY MR. KIMERER:

20  Q   Good morning, Constable Saldate.

21  A   Good morning.

22  Q   Now prior to coming here today, I think you've indicated

23  that you've reviewed prior statements that you have made in

24  this case?

25  A   Yes, just briefly reviewed them.

MILKE_NSB012236
Exhibit 7

SALDATE - CROSS                35

1    Q    That would include your supplemental report, the interview

2    done by defense attorney Ken Ray when this case was going on,

3    the Voluntariness Hearing and your trial testimony?

4    A    I think the interview with Ray and I briefly went over the

5    other things.

6    Q    But you did look at those and you know those were

7    statements you made previously; is that correct?

8    A    Specific statements in there?

9    Q    Yes.

10   A    You know, I'd have to refer back to it, but yes, I

11   referred to generally the reports.

12   Q    And these are the same statements that are all part of the

13   appellate record in this case, you understand that, do you not?

14   A    Apparently, yes.

15   Q    Okay.  Now when I interviewed you on December 21st, 2009

16   you indicated that, based upon your review of everything, there

17   is nothing to add or new -- no other evidence than what was

18   said before; is that correct?

19   A    From my memory of 22 years ago, yes.

20   Q    And as you testify here today, and I think you've already

21   testified to that, you said there's really no new evidence,

22   other than what was said before in all of those statements that

23   you made?

24   A    Not that I'm aware of, no.

25   Q    Now as I understand it by your testimony, you were an

**MILKE_NSB012237**
Exhibit 7

SALDATE - CROSS                36

1    experienced detective?

2    A    I felt I was, yes.

3    Q    You started in working in 1969 as a patrolman?

4    A    Yes.

5    Q    And you started homicide I think in 1986; is that right?

6    A    I started homicide in '84, actually.

7    Q    Okay.

8    A    I was given a position in forgery as a non- -- I was

9    actually given that position, but I didn't receive any forgery

10   cases.  I worked actually in homicide, but that position of

11   mine was being paid through a forgery position, so I had to

12   report to the forgery guy and then I would work homicides.

13   Q    So it was basically the internal administrative procedures

14   of how you were assigned, but you did homicide work?

15   A    Yes, that is correct.

16   Q    From '84 on.  And part of that homicide work included

17   interview witnesses and doing interrogations of people; is that

18   right?

19   A    Yes.

20   Q    And you had taken different courses during that period of

21   time?

22   A    Regarding interviews?  No.

23   Q    No, I didn't ask you about interviews.  You've taken

24   basically courses about police training and things like that?

25   A    Oh, absolutely, yes.

MILKE_NSB012238
Exhibit 7

SALDATE - CROSS                    37

1   Q    And as a matter of fact, you taught at the police academy

2   for four-and-a-half years as I understand it?

3   A    Yes.

4   Q    And you certainly had knowledge during this time about

5   Miranda and the law of Miranda and what you should do and --

6   A    General knowledge, yes.

7   Q    -- and the procedures you should follow?

8   A    Yes.

9   Q    And there are guidelines set forth by the Phoenix Police

10  Department that set forth guidelines as what you should do when

11  you interrogate a suspect?

12  A    To interview them, yes.

13  Q    Okay.  And I think --

14  A    I don't know them specifically now, but yes.

15  Q    And I understand that you were probably involved in --

16  possibly about 300 homicides?

17  A    Yes, where I was involved, yes.

18  Q    Now when was it that you stopped being a patrolman and

19  became an investigator?  Do you remember when that would have

20  been?

21  A    '75, maybe.  1975.

22  Q    But part of becoming an investigator, they do give you

23  special training as an investigator, don't they?

24  A    No, not back then.

25  Q    Okay.  You didn't go to investigator training school?

**MILKE_NSB012239**
Exhibit 7

SALDATE - CROSS                    38

1   A    No.

2   Q    Are you saying there was no school back then?

3   A    There was no school back then.

4   Q    And are you saying that the manual back then didn't refer

5   to going to investigator training school?

6   A    Not in 1975, no.

7   Q    Not in '75.  But did you get training in investigation

8   through courses and hands-out (sic), things of that nature?

9   A    Sure, absolutely.

10  Q    Now I think you've testified previously you knew the law

11  regarding Miranda and you knew the law about how to handle

12  interrogation; is that right?

13  A    I knew the law.  I'm not an attorney, sir, but I did know

14  generally the policies regarding Miranda, yes.

15  Q    And like you've indicated, you did receive police handouts

16  about Miranda and about the law?

17  A    That is correct, yes.

18  Q    Now you were aware, were you not, that when someone

19  invoked their rights you were supposed to stop interrogating

20  them?

21  A    Interrogate -- the interview process?  I knew that --

22  Q    You were supposed to have stopped asking them questions at

23  that point.

24  A    Yes.

25  Q    And you knew that was a law then?

**MILKE_NSB012240**
Exhibit 7

SALDATE - CROSS                    39

1   A    I don't think it was a law.  I think it was a -- something

2   that -- I mean, I have said this to you before, there's nothing

3   that would constitute me walking out of the room, placing a big

4   X on that door and telling no one could ever talk to this

5   person again because they asked for an attorney.  That would be

6   ridiculous because that person would need to go to the bathroom

7   or that person may want to do something, I mean.  So no, I

8   would not talk to them and if we did have a conversation with

9   them, or if I did continue that conversation, I knew it wasn't

10  going to be used in court.  I knew that he had asked for an

11  attorney and I duly would note that, that he had asked for an

12  attorney.

13  Q    So you know if someone were to ask for an attorney that

14  you were not supposed to ask them anymore questions after that?

15  A    I wasn't supposed to ask them anymore -- I don't know if

16  that's a correct statement.  I think that a better statement

17  would be that I was aware that whatever they may say after that

18  would not be useable in court, and no, I did not ask them

19  specific questions after that -- after they had asked for their

20  attorney.

21  Q    So as I understand it, what you believe is that if someone

22  asks for an attorney, you -- that didn't mean you had to stop

23  altogether talking with them; is that right?

24  A    I believed it had to stop me from asking specific

25  questions about that case.

**MILKE_NSB012241**
Exhibit 7

SALDATE - CROSS                    40

1   Q    So you had to stop asking questions at that point?

2   A    Specific questions about that case.

3   Q    But there are many times when people would ask for

4   attorneys, you would still have a conversation with them

5   afterwards, wouldn't you?

6   A    Yes.

7   Q    And did you understand that the proper procedure is to

8   break off any further interview after a person asks for an

9   attorney?

10  A    "The proper procedure was to break off the interview" -- I

11  don't understand what that means.

12  Q    Well, that means --

13  A    You mean to terminate the interview totally and not to --

14  Q    Yes.

15  A    -- to ever talk to this person again?

16  Q    Yes.

17  A    No, that wouldn't be the procedure, no.

18  Q    You don't believe --

19  A    That wouldn't be my procedure.

20  Q    That wouldn't be your procedure?

21  A    No, because if that person wanted something, that person

22  needed something, I definitely just -- I wouldn't just say

23  "Excuse me, but I cannot talk to you."  "Well, I need a doctor,

24  I need water, I need to go to the bath-" -- "I'm sorry, you

25  asked for an attorney."

**MILKE_NSB012242**
Exhibit 7

SALDATE - CROSS                    41

1    Q    Okay.  Now if a person continues to talk in that situation

2    then you continue to listen; is that right?

3    A    Absolutely.

4    Q    Okay.  And you will continue to still ask questions then

5    too?

6    A    If the conversation would go back to what our interview

7    was about yes, of course.

8    Q    Yeah.  And I think you've testified before that you

9    continue talking after rights are invoked, but you know they

10   can't be used?

11   A    Yes.

12   Q    Okay.  And that would have been your practice in terms of

13   interrogation, right?

14   A    My practice?  I wouldn't describe it as being my practice.

15   I would describe it as, if a person wanted to continue a

16   conversation with me, I would continue a conversation with

17   them, knowing that, of course, the only reason you would know

18   -- the defense attorney would know that they requested an

19   attorney would be because I put it in my supplemental.  And

20   therefore, that -- from that point on nothing they could say

21   would be used in court.

22   Q    Okay.  Now I believe you've testified before that if a

23   person asks for an attorney, you don't believe you have to

24   cease questioning them at that point?

25   A    Questioning them regarding that incident, yes.  And if I

**MILKE_NSB012243**
Exhibit 7

SALDATE - CROSS                42

1   do happen to ask a question regarding that incident, that it
2   will not be used in court and will not be legal, no.
3   Q    But you have gone ahead and continued to ask them
4   questions?
5   A    I -- during several instance that we have -- I have sat
6   there and we have started a conversation and it went back to
7   the original incident, and yes, I would ask questions because I
8   was there to, you know, get the truth.
9   Q    Okay.  And that seems to be a theme of all of your cases,
10  and in this case too, based upon the testimony and all the
11  statements you've made, that you always indicate that you're
12  there to get the truth; that's your job.
13  A    Well, I feel comfortable with the fact that, as a police
14  officer, we're truth seekers.  I mean, we are out there to seek
15  the truth and to me as a police officer, and as a person, the
16  truth does matter.
17  Q    And so to -- in the quest to get the proof, you believe
18  then if someone did ask for an attorney you don't have to cease
19  your questioning?
20  A    I don't believe that question -- in my quest to get the
21  proof, I don't believe you meant it that way, but because if
22  that's the way you mean it, that's absolutely wrong.
23  Q    Okay.
24  A    And in my quest to get the truth, that -- eventually if
25  that person was to start a conversation with me again while I'm

MILKE_NSB012244
Exhibit 7

```
                    SALDATE - CROSS               43
```

1   writing there -- sitting there writing my notes and stuff, yes,

2   I would continue conversing with that person, but -- and I

3   would note that in the supplemental.  Of course, my -- that

4   notation would be after I noted that she had asked, or he would

5   ask, for an attorney.

6   Q    Constable Saldate --

7             MR. KIMERER:  Would you show Constable Saldate

8   Exhibit 56?

9             THE WITNESS:  Is it in this book, sir?

10  BY MR. KIMERER:

11  Q    I don't know if it's in that book or not.  It's your

12  testimony --

13  A    Yeah, it's 56.

14  Q    -- it would be Exhibit 56.

15  A    Yes.

16  Q    Do you see that?  And I'd ask you to look at Page 39.

17  A    39, I have it.

18  Q    And Line 5 of that exhibit.

19  A    Two, three.

20  Q    Do you see that?

21  A    The question?

22  Q    Yes.  Let me read that question to you.  And this is at

23  your testimony at the trial -- this is what this testimony

24  comes from?

25  A    Yes, that's what it says.

**MILKE_NSB012245**
Exhibit 7

SALDATE - CROSS            44

```
 1   Q    And here it says,
 2              "Is it your understanding that if an
 3              individual who is being interrogated by
 4              you says that he would like to speak to
 5              an attorney before answering any questions,
 6              or words to that effect, is it your
 7              understanding that you cease questioning?"
 8   And you say, "No."
 9   A    In the context as I related to you just a few minutes ago.
10   Q    And that's what it says?
11   A    Yes.
12              MR. KIMERER:  And would you give Detective Saldate
13   Exhibit Number 19, please.
14              THE WITNESS:  That I don't have.
15   BY MR. KIMERER:
16   Q    I don't know if you have 19 there in front of you --
17   A    No, it starts with 50.
18   Q    And do you have that exhibit before you right now?
19   A    Yes, I'm just going to briefly --
20   Q    Uh-huh.
21   A    Yes, uh-huh.
22   Q    Now you've indicated on your direct examination here that
23   you really don't do interrogations like other police officers,
24   but you do interviews?
25   A    I refer to them as interviews, yes.
```

**AVTranz**

E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

**MILKE_NSB012246**
Exhibit 7

SALDATE - CROSS                45

1    Q    So your style, you say, is an interview style?

2    A    That's correct.  Conversation style.

3    Q    Okay.  But you don't deny you do interrogations of people?

4    A    I've done interrogations, yes, where it's confrontational

5    and -- in situations where they -- where that person obviously

6    doesn't want to have any conversation with that and that turns

7    into an interrogation, yes.

8    Q    Now if you would look at Page 920 of Exhibit 19, please.

9    A    Okay.  Okay.

10   Q    And there I -- and this is from the Departmental General

11   Investigative Procedures back in October of 1989.  And it talks

12   about interviews and interrogations, if you look at the bottom

13   of Page 920.

14   A    (b).

15   Q    Do you see that?

16   A    7(b), yes.

17   Q    Yes.  And there it says, under 7(b)(1),

18            "An interview is normally conducted with

19            the victim or a witness and is an attempt to

20            collect any and all facts relating to an incident.

21            An officer should conduct the interview as soon

22            as possible" --

23   and it goes on and tells you what you should do in an interview

24   situation.  And I turn you to Page 921; is that correct?

25   A    That's correct.

**MILKE_NSB012247**
Exhibit 7

SALDATE - CROSS                    46

1    Q    Now on Page 921, under Paragraph 7(b) it talks about

2    interrogations and it defines those, doesn't it?

3    A    7(b)(2), yes.

4    Q    Yes. And here it says, under interrogations, "An

5    interrogation is normally conducted with the suspect and is a

6    one-way flow of information."  And then it refers that you

7    should check out the information about Miranda warnings.  It

8    says, "If the suspect does not request an attorney, attempt to

9    interrogate him."  And it says,

10            "All suspects should be interrogated,

11            even if the suspects were caught during

12            the commission of a crime and document

13            everything said by the suspect.  He may

14            contradict himself, which will help

15            impeach his testimony later."

16   Is that what it says?

17   A    Yes.

18   Q    And doesn't it also say in (c) of that paragraph that

19   officers should keep an open mind and allow for the possibility

20   that the suspect did not commit the crime; is that right?

21   A    Yes.  Yes.

22   Q    Now in connection with the investigation here of Debra

23   Milke, you were involved in an interrogation by this definition

24   of Debra Milke, not an interview?

25   A    No, it was an interview, sir.

**MILKE_NSB012248**
Exhibit 7

SALDATE - CROSS                47

1   Q    Okay.  So you're saying that this standard doesn't apply
2   to you?
3   A    It's not -- first of all, it's not a standard.  Second of
4   all, it indicates --
5   Q    Excuse me, Constable Saldate.  It says in here what an
6   interview and what an interrogation is.  And it says when you
7   have a suspect, that becomes an interrogation.  Are you telling
8   us that's not the way it is?
9   A    May I read something for you, sir?  (b)(7) it says, "The
10  ability to conduct a successful interviews and interrogations
11  is an acquired skill."
12  Q    I under- --
13  A    I had an acquired skill of interviewing people in a
14  conversational manner to elicit their confessions.  That was my
15  way of doing things.  Now if you wish to call it an
16  interrogation -- my interview an interrogation, fine, you can
17  call it interrogation.  If you want me to agree that it's an
18  interrogation in regards to this policy, fine, I'll agree to
19  that.  But in my mind, and in my experience, and in me doing
20  this it is an interview.  It is a conversation that I have with
21  people.
22  Q    Okay.  So what you're describing then is a specific style
23  unique to you, not what's standard by procedures; is that
24  correct?
25  A    Well, I don't know if anything is standard.

**MILKE_NSB012249**
Exhibit 7

SALDATE - CROSS               48

1   Q    But -- Constable Saldate, I've looked at all of your

2   transcripts.  You consistently say you have a unique style and

3   it's always this conversational style and you call it an

4   interview; isn't that right?

5   A    That is correct.

6   Q    Okay.  So that's how you describe what your interview or

7   technique is and there's really no distinction as it goes in

8   your mind; isn't that right?

9   A    There's a distinction as far as interviewing and

10  interrogation.  There's obviously not a distinction with you

11  and I'll agree if that's what you want me to do, that if you

12  want to call it an interrogation, I will call it an

13  interrogation.

14  Q    All I'm asking you to do is to acknowledge the policy says

15  if you interview a suspect, it's an interrogation.  And when

16  you interviewed Debra Milke she was a suspect in your mind;

17  isn't that right?

18  A    That's correct.

19  Q    Thank you.  Now as I understand it, you were assigned to

20  this case on December 3rd, 1989?

21  A    That is correct, sir.

22  Q    And you were home and you were really off duty?

23  A    That is correct.

24  Q    And it was Detective Ontiveros that called you in help

25  with the investigation?

MILKE_NSB012250
Exhibit 7

SALDATE - CROSS                    49

1   A     Sergeant Ontiveros, yes.

2   Q     Sergeant Ontiveros.  And he was your supervisor in this

3   case?

4   A     He was not.  In this case he was, he was the acting

5   supervisor -- my acting supervisor because I was working under

6   him.

7   Q     Now during this period of time there had already been an

8   ongoing investigation that had been lasting for a couple of

9   days; is that right?  Before you became involved.

10  A     Apparently, yes.

11  Q     And when you got there, you immediately got some type of a

12  debriefing as to what was going on and who should do what?

13  A     Basically, yes.

14  Q     And that point in time you arrived at the Phoenix Police

15  Station right here on --

16  A     The main station, yes.

17  Q     -- Washington?

18  A     Uh-huh.

19  Q     And you learned through Sergeant Ontiveros that Detective

20  Mills had been talking to people in the case or making

21  interviews?

22  A     That's correct.

23  Q     And two people that the focus was on, or this people that

24  were being interviewed that were still at the station, were Jim

25  Styers and Roger Scott, who are co-defendants in this case;

MILKE_NSB012251
Exhibit 7

SALDATE - CROSS                    50

1   isn't that right?

2   A    I would say that.  I probably didn't know their exact

3   names, but yes, uh-huh.

4   Q    But they were there?

5   A    Yes, that's correct.  Yes.

6   Q    And when you got to the station house, you found out they

7   were there at the station house; is that right?

8   A    There was two people there, yes.

9   Q    And you were brought in as the homicide detective on the

10  case?

11  A    Bob Mills was the homicide detective.

12  Q    And so homicide had already been assigned the case at that

13  point in time?

14  A    Apparently because Sergeant Ontiveros called me.

15  Q    Okay.  And Sergeant Ontiveros wanted to help -- you to

16  come in and help with doing interviews; is that right?

17  A    That is correct.

18  Q    And during the debriefing I guess you learned the fact --

19  some of the facts of the case.  There had been a missing child?

20  A    Yes.

21  Q    And you had learned that there had been somewhat of --

22  already a lengthy investigation?

23  A    I wouldn't call it an investigation, but yes, uh-huh.

24  They were looking into where the child was or trying to find

25  the child, yes.

**MILKE_NSB012252**
Exhibit 7

```
                        SALDATE - CROSS                    51
```

1    Q     Okay.  At the Voluntariness Hearing you testified that

2    when you got there and were debriefed that the investigation

3    had been lengthy up to then; is that correct?

4    A     Yes.

5    Q     And you learned at that point in time there were two other

6    defendants, one being Jim Styers and Roger Scott; isn't that

7    correct?

8    A     I knew there was two defendants there claiming that --

9    about the child.

10   Q     Okay.  And Styers, as I understand it according to your

11   prior testimony, had been there since 3:00 or 4:00 on the

12   afternoon of December 2nd at the police station?

13   A     Probably, yes.

14   Q     And Roger Scott had been there since midnight of that day.

15   A     Okay.

16   Q     Okay.  And you got there at approximately 9:00 in the

17   morning.

18   A     On Sunday morning, yes.

19   Q     Okay.  And Sergeant Ontiveros wanted both you and Mills to

20   re-interview Scott and Styers; isn't that right?

21   A     Yes.

22   Q     And I believe that you were to interview initially Styers

23   and Mills was going to continue interviewing Scott.  Is that

24   what the plan was at that point?

25   A     I don't recall.

**MILKE_NSB012253**
Exhibit 7

SALDATE - CROSS                    52

1    Q    Okay.

2    A    If that's what it says in the supplemental, I'm sure --

3    Q    Yeah, and is that -- basically you don't recall at this

4    time that that was to happen?

5    A    I don't recall at this time, no.

6    Q    But you do recall you were -- you interviewed Styers

7    first?

8    A    I think I did, yes.

9    Q    Okay.  And I believe you spent about an hour with Styers?

10   A    I don't recall exact time period, but --

11   Q    But it could have been that?

12   A    Yes, absolutely.

13   Q    You're not disputing that?

14   A    No.

15   Q    Now during that time period, and during that debriefing,

16   there was no information whatsoever about Debra Milke, was

17   there?

18   A    No.

19   Q    Other than she was the mother of this child?

20   A    I probably didn't even know that.

21   Q    You didn't even know that?

22   A    Probably not.

23   Q    So you weren't successful in your interview of Styers of

24   getting any type of incriminating information; is that correct?

25   A    That's correct.

**AVTranz**

E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

**MILKE_NSB012254**
Exhibit 7

SALDATE - CROSS                  53

1   Q    And you then decided that you would go to Mills and see if
2   you could interview Roger Scott.
3   A    Okay.  Yeah, I --
4   Q    That's right?
5   A    -- presume that's the way it would happen, yeah.
6   Q    So after spending about an hour with Styers, you went over
7   to Mills and talked -- you asked him to come out and you talked
8   to him and then you went back into the interview so you could
9   interview Scott.  Do you remember that?
10  A    Yes.
11  Q    And did Mills go back into the room with you?
12  A    He may have.
13  Q    Uh-huh.  And you may have also gone in there by yourself?
14  A    I may have also.
15  Q    Okay.  Now you in your prior testimony, I noted, were
16  somewhat critical of the style or the investigation style that
17  Detective Mills would use; isn't that right?
18  A    It was a different style than I used, yes.
19  Q    And you believed that your style would be more effective
20  with Scott; isn't that right?
21  A    That's correct.
22  Q    And you believed that you needed -- as you quoted, you
23  needed to get down to facts with Scott.
24  A    That's correct.
25  Q    And you believe that Detective Mills had not given him the

MILKE_NSB012255
Exhibit 7

SALDATE - CROSS                54

1   opportunity to be truthful.  That is what you testified to

2   before.

3   A    That is correct.

4   Q    And when you interview someone, you expect them to tell

5   you the truth.

6   A    That's correct, as they know it.

7   Q    At this point when you went in to see Roger Scott, you had

8   no hard evidence of his involvement, did you?

9   A    No.

10  Q    You just had assumptions and suspicions at that point?

11  A    Yes.

12  Q    And you don't believe that Detective Mills, and I quote

13  from your testimony, "Afforded him the time or method to be

14  truthful and I was going to do that."  Is that correct?

15  A    That is correct.

16  Q    And you indicated that on of Mills' problems was, is that

17  he wouldn't confront the person, he wouldn't challenge him and

18  your style would be that you would confront him and challenge

19  him.

20  A    I would challenge him with the truth, yes.

21  Q    Now when you say you challenge him with the truth, what

22  was the truth you had at that time were your suspicions and

23  assumptions; isn't that right?

24  A    Assumptions that these two individuals were involved in

25  the disappearance of a little boy, yes.

MILKE_NSB012256
Exhibit 7

```
                         SALDATE - CROSS                55
 1    Q    Okay.  So those were -- that's all you had?
 2    A    Yes.
 3    Q    No hard facts or anything like that.  And I think you
 4    indicated that when you went into see Roger Scott you had a gut
 5    suspicion that he was involved, so you automatically read him
 6    his rights; isn't that right?
 7    A    I probably did.
 8    Q    And you indicated that you were there to get the truth and
 9    you were going to challenge him if he was going to be lying to
10    you in any way?
11    A    I was not going to listen to his lies, yes.
12    Q    As a matter of fact, that's what you did.  You started
13    talking to him and you felt he was lying to you and you said,
14    "I won't tolerate your lies."  Isn't that right?
15    A    That's correct.
16    Q    "I'll only tolerate the truth from you"?
17    A    Yes.
18    Q    And it took you some time before you felt he finally told
19    you the truth?
20    A    Some time, I guess, yes.
21    Q    Okay.  Now I think you testified in -- when you
22    interviewed Scott in your style is that you use your gut and
23    what your gut reaction is in these cases?
24    A    I have.  And in -- that's -- I guess in lawyer's term, I
25    guess it would be my experience.
```

**MILKE_NSB012257**
Exhibit 7

```
                        SALDATE - CROSS                56
```

1    Q    Okay.  And so you go into Scott here by yourself, you

2    confront him, and you say you directly look at the person;

3    isn't that right?

4    A    Correct.

5    Q    And you basically -- this was an interrogation room at the

6    police station?

7    A    Yes.

8    Q    And you get basically in his face, you said about 6 to 12

9    inches away from a person?

10   A    That's correct.

11   Q    And that's been your style?

12   A    Yes.

13   Q    And you expect them to look at you?

14   A    Yes.

15   Q    And if they don't look at you, you say, "I want you to

16   look at me"?

17   A    Yes.

18   Q    You want to have eye contact with them?

19   A    Absolutely.

20   Q    And you want to be in their space, within 6 to 12 inches?

21   Yes?

22   A    I want to be 6 to 12 inches away from them, yes.

23   Q    Yes.  Okay.

24   A    I don't know if that's described as their space, but --

25   Q    Now you want to get the truth basically as your gut tells

**MILKE_NSB012258**
Exhibit 7

SALDATE - CROSS                57

1   you what the truth is?

2   A    No, not necessarily.  The stories that they had been --

3   that I had listened to were obviously not the truth and I

4   intended to get the truth.

5   Q    Okay.  I think, as a matter of fact, in the Voluntariness

6   Hearing, I think you even said, "I will get the truth as far as

7   what you feel is the truth and that's what I'm after."

8   A    Absolutely.  I mean, that's -- I'm a detective.  I'm a

9   truth seeker.  I'm -- you know, I'm there to get the truth,

10  write it down, document it, and go to court.

11  Q    Okay.  And you say repeatedly in other statements that

12  your style never changes.

13  A    I think I -- it said -- "never" is a hard word to use, but

14  for the most part, no.

15  Q    Okay.  And just like you've testified here today, you've

16  indicated you feel your job is to get the truth and what you

17  believe is the truth and you're not a judge or a lawyer.

18  That's for the judges and the lawyers to ferret out the

19  procedures; is that right?

20  A    I believe I've said I'm there to get the truth as that

21  person knows it, because the truth to everyone can be

22  different.

23  Q    I think you testified once at the interview in this case

24  in the trial that's part of the record here of Ken Ray, you

25  told him, "I'm there to get the truth; the confession.  That's

MILKE_NSB012259
Exhibit 7

SALDATE - CROSS                    58

1    my job."

2    A    That's correct.

3    Q    Okay.

4    A    Obviously.

5    Q    And you also told him, "I'm not a judge nor a lawyer, I'm

6    there to get the truth."

7    A    That is correct.

8    Q    And you said your style never changes, your tone of voice

9    never changes, and basically your description of how you take

10   control of the situation doesn't change?

11   A    I wouldn't use "never," but yes.

12   Q    Okay.  And one of the things that you have described as

13   why your technique works so well and why you have so much

14   success in this cases, is that you go in there and tell them

15   I'm going to be honest and truthful with you and I want you to

16   be honest and truthful with me, or words to that effect?

17   A    Words to that effect, yes.

18   Q    But that is basically your philosophy of how an

19   interrogation should be done?

20   A    That's how it starts and as long as that person is

21   truthful and honest with me, I will continue to be truthful and

22   honest with that person.

23   Q    Okay.  And you indicate you don't really get angry, but --

24   A    Oh, I have gotten angry, but again, you seem to indicate

25   that I receive confessions on all these cases I was ever

**MILKE_NSB012260**
Exhibit 7

SALDATE - CROSS                59

1  involved in and I've told you before, if anything I'm probably
2  50/50.
3  Q    Okay.  But you do get angry if they don't tell you the
4  truth.  You say, "I won't tolerate this, I won't tolerate
5  lies."
6  A    As an experienced investigator, knowing some of the facts,
7  I can determine what is or what is not headed for the truth,
8  and yes, I will tell them that.
9  Q    And I think you've stated before that you have an
10 intolerance with lies.
11 A    Yes.
12 Q    And don't you indicate, or have a believe in your
13 experience as a police officer is that people that you
14 confront, they really want to tell you the truth?
15 A    I believe, when I got into an interview room, that I want
16 to place myself in a position where that person wants to tell
17 me what happened.  I try to put myself in that position and
18 that's what I do.
19 Q    Yeah.  I think at one time you said, "I'm less tolerant
20 when people tell lies because I have to get the truth."
21 A    Okay.
22 Q    And there have been interrogations that you have conducted
23 where you have repeatedly told people that if they start
24 straying or moving off of where you think they should be, that
25 you're not going to tolerate this and you want the truth from

**AVTranz**
E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

**MILKE_NSB012261**
Exhibit 7

SALDATE - CROSS                 60

1   them; isn't that right?

2   A    That's correct.

3   Q    Okay.  And you tell them you don't want them to minimize

4   their involvement and that you are only going to accept the

5   truth from them, right?

6   A    That is correct.

7   Q    And you've said, "I'm not going to sit there and listen to

8   a bunch of lies.  If you're going to lie to me, I'll just walk

9   out of here."  Isn't that right?

10  A    Those are the words, but you --

11  Q    Okay.

12  A    -- attempting to scream and I wouldn't do that, no.

13  Q    Okay.  So let me go back now to the station house in

14  Phoenix where you went to interview Roger Scott.

15  A    Yes.

16  Q    And when you realized that Mills wasn't having any success

17  with getting any information from Roger Scott, you felt your

18  style would be more effective with him; is that right?

19  A    Correct.

20  Q    And so you went into the interview and you immediately

21  told Scott, "You're not telling me the truth."

22  A    I wouldn't want to use "immediately," but yes, that's

23  correct.

24  Q    And you told him that you weren't going to listen to his

25  lies?

**MILKE_NSB012262**
Exhibit 7

SALDATE - CROSS                    61

1    A    That is correct.

2    Q    And you read him his Miranda warnings?

3    A    Correct.

4    Q    Now eventually Scott did make incriminating statements

5    based -- during your interrogation of him?

6    A    Yes, he did more than that, but yes.

7    Q    Okay.  One of the things that you confronted Scott with at

8    that time that you had learned about was that his mother was

9    very sick, correct?

10   A    Possibly, yes.

11   Q    And you told him, you know, unless you got the truth, you

12   were going to have to send officers to his mother's house to

13   get -- didn't you tell him that?

14   A    I really don't recall.  If that's in the supplemental, I

15   probably did.

16   Q    That was in your Voluntariness Hearing statement at Page

17   28, 5 to 10, you indicated that you would send somebody to his

18   house.

19   A    To interview his mother?

20   Q    Or over to his mother's house.

21   A    To interview his mother?

22   Q    Uh-huh.

23   A    Yeah, I probably did.

24   Q    And after that he was very concerned about that because of

25   her health, wasn't he?

MILKE_NSB012263
Exhibit 7

SALDATE - CROSS                    62

1   A    I -- if she had bad health, I'm sure he was concerned.

2   Q    Okay.  Well, he expressed concern to you during that

3   interview about --

4   A    I believe he did.

5   Q    Yes.  And he -- after that was when he made incriminating

6   statements to you about his involvement?

7   A    It was during that time, yes.

8   Q    It was afterwards according --

9   A    Afterwards, yes.  I mean, but it was not right afterwards,

10  but I mean, yes it was that time.

11  Q    Okay.  And when you got that information from him, he told

12  you about his involvement and he told you about the involvement

13  of Mr. Styers?

14  A    Correct.

15  Q    And that is the first time in this entire case that you

16  had any real evidence that there was certainly a murder here?

17  A    At that point we were looking -- we were investigating the

18  disappearance of a little boy and the explanations of these two

19  individuals were totally way out.

20  Q    Okay.

21  A    And, yes.

22  Q    Now, but the only first information that would have been

23  incriminating came from Roger Scott in this interview that you

24  had with him?

25  A    Yes.

**MILKE_NSB012264**
Exhibit 7

SALDATE - CROSS                63

1  Q    And during that interview nothing at all was mentioned of

2  Debra Milke, was it?

3  A    No.

4  Q    Now I think you've indicated in your testimony that the

5  interview -- by the time you got incriminating statements it

6  had taken, you know, an hour to get Scott to incriminate

7  himself.  Is that about right?

8  A    It -- you mean the interview took?

9  Q    Yeah, uh-huh.  The interview took a little bit over that,

10 but it took you about an hour before he finally broke and said

11 he was involved?

12 A    Before Roger told the truth --

13 Q    Yes.

14 A    -- yes.

15 Q    And once he did that, and you got those incriminating

16 information, you wanted him to take you to the scene?

17 A    Absolutely.

18 Q    And you and Detective Mills then went with Roger Scott in

19 a car and drove to where the body of the victim was found?

20 A    That's correct.

21 Q    And he showed you where that body was?

22 A    That's correct.

23 Q    And I believe you've testified before that before you got

24 there, while you were riding in the car with Scott, you and

25 Mills, Scott made some kind of a comment -- or offhand comment

MILKE_NSB012265
Exhibit 7

```
                          SALDATE - CROSS                    64
```

1    that Debra Milke was also involved in this.

2    A    That is correct.

3    Q    But there were no details, it was just an indication she

4    was involved?

5    A    There was no details because we had left the interview

6    early, so there would have been had I been given the

7    opportunity to interview Mr. Scott.

8    Q    But you didn't interview him at that time.  You went to

9    the scene and found the body, right?

10   A    That's correct, yes.

11   Q    And you indicated, though, to your Sergeant Ontiveros,

12   that you had received some indication from Robert Scott that

13   maybe Debra Milke was involved in this.

14   A    Yes.

15   Q    And based on that, Sergeant Ontiveros made arrangements

16   for you to go interview Debra Scott (sic)?

17   A    That's correct.

18   Q    As a matter of fact, he even got you a helicopter so you

19   could fly --

20   A    That was not my idea, no.

21   Q    Okay.

22   A    But he did.

23   Q    And so special arrangements were made for you to go there

24   and talk with her?

25   A    Yes.

**MILKE_NSB012266**
Exhibit 7

SALDATE - CROSS                    65

1   Q    And he also sent ahead of you other officers to get Debra

2   at her father's house and take her to the police station in

3   Florence?

4   A    I didn't know that activity, but I knew other officers

5   were going, but I didn't know exactly what they were going to

6   do.

7   Q    But you knew the arrangements had been being made and

8   things like that?

9   A    Arrangements were being made for -- to contact her and

10  allow me to be interview -- allow me later to interview her.

11  Q    And you knew that that interview was going to be at the

12  sheriff's office jail --

13  A    Pinal County Sheriff's Office.

14  Q    -- in Pinal County?

15  A    Yes, uh-huh.

16  Q    And you were aware that they had already taken her there

17  and that's where you would be going to see her there to

18  interrogate her?

19  A    Yes.

20  Q    And during this period in time instructions are given that

21  no one else talks to Debra Milke, you're going to be the only

22  one that talks with her.

23  A    By who?

24  Q    By any police officer.  Nobody else was going to talk to

25  her, that was the instruction from Sergeant Ontiveros, wasn't

MILKE_NSB012267
Exhibit 7

SALDATE - CROSS                66

1   it?

2   A    I wouldn't know that, but that would be the protocol, as

3   far as I'm the case agent and that would be the protocol that

4   the case agent interviews the suspects.

5   Q    And I believe you testified to that?

6   A    That it was --

7   Q    Or that it was the protocol?

8   A    Absolutely, yes.

9   Q    That no one else should talk to her?

10  A    No, given the fact that if I would have been sent to

11  Florence, I would have not talked to her, it would have been

12  Detective -- I think it was Jack Hambric who went there.  It

13  would have been his responsibility.

14  Q    Okay.  And Detective Hambric was already there?

15  A    Yeah, but I didn't know that until I got there.

16  Q    Okay.  And when you went there your job was to get her to

17  confess?

18  A    My job was to get the truth from her, yes.

19  Q    Okay.  And at that point she had been isolated at the

20  jail?

21  A    Don't know that.

22  Q    Okay.  Now Sergeant Ontiveros instructed you, when he gave

23  you instructions to go and interrogate her, that you should

24  take a tape recorder and record the conversation.

25  A    That's false.

**MILKE_NSB012268**
Exhibit 7

```
                        SALDATE - CROSS              67
 1    Q     He didn't tell you that?
 2    A     He didn't instruct me to.  He asked me if -- to
 3    tape-record it, but I don't know if it's instruct me to do
 4    that.
 5    Q     Well, in your Voluntariness Hearing, at Page 52, Lines 10
 6    to 12 --
 7    A     What would -- I --
 8    Q     Let me just quote what I have written here --
 9    A     Okay.
10    Q     -- and you tell me if this refreshes your recollection.
11    "I had asked by Supervisor Ontiveros to record it.  If the
12    decision was left up to me, I would not have recorded it."
13    A     I would like to see that entire statement, sir, if I
14    could.
15    Q     Let's -- would you look at 52 -- Page 52 of your
16    Voluntariness Hearing --
17    A     I --
18    Q     -- and I believe that is Exhibit 52 and look at Page -- I
19    think 10 to 12 of that.  I want to make sure I have the right
20    one.
21    A     What page?
22    Q     Hold on, I have it written down here.
23          (Counsel Confer)
24    BY MR. KIMERER:
25    Q     Well, it's a coincidence.  I have both the exhibit -- it's
```

**MILKE_NSB012269**
Exhibit 7

SALDATE - CROSS                68

1    Exhibit 52, Page 52, Lines 10 to 12, and let me read it to you.

2    A    Well, let me get to the page, sir.  And what line are you

3    starting on, sir?

4    Q    Okay.

5    A    What line?

6    Q    Pardon?

7    A    What line are you beginning?

8    Q    Line 10 to 12.

9    A    Okay.

10   Q    And actually, look at the question before that, starting

11   at Line 8 and let me read that to you.

12   A    Okay.

13   Q    "Isn't it true, sir" -- referring to you -- "that you had

14   every intention in the world of not recording this

15   conversation?"  Your answer, "I had been asked by my supervisor

16   to record it.  If it was up to me, that decision left up to me,

17   I would not have recorded it."  Is that what that says?

18   A    Correct.

19   Q    Thank you.  And, in fact, your supervisor -- it was

20   strongly suggested that the interrogation should be recorded?

21   A    I wouldn't use "strongly" and, in fact, his suggestion or

22   my inclination not to use the tape recorder was sort of moot,

23   because it was her decision not to.  So I don't think that

24   either one of our decisions really mattered in this case.

25   Q    I will have you look at your testimony at the trial from

**MILKE_NSB012270**
Exhibit 7

```
                        SALDATE - CROSS              69
```

1   Exhibit 55.

2   A    55, okay.

3   Q    And --

4   A    Page?

5   Q    And on line -- Page 62.

6   A    Okay, 62.  Okay.

7   Q    And it says in there, you have been -- Lines 19 to 21.  "I

8   have in the past been suggested strongly" -- and this is in

9   reference to tape recording -- "and even though I complain

10  about it, I do it."  Is that what it says?

11  A    I --

12  Q    Page -- Lines --

13  A    I have to read a little bit further --

14  Q    Well, just -- I'm reading to you.  Is that what that says

15  in that transcript?

16  A    Well, sir, that -- I have been in the past, it doesn't say

17  anything about recording.  Can I read --

18  Q    Please answer my --

19  A    Can I --

20  Q    Constable Saldate, I've asked you a question.  I have read

21  that to you, I've asked you to read it with me.  Is that what

22  it says?

23  A    It says, yes, but --

24  Q    Okay.  Thank you.  That's all --

25  A    -- it doesn't indicate about a recording, sir.

**MILKE_NSB012271**
Exhibit 7

SALDATE - CROSS                    70

1   Q     -- I'm asking you, is that what it says?

2   A     But it doesn't indicate about a recording.

3   Q     Well, that's what it says.

4   A     That's what it says.

5   Q     Now you don't have a tape recorder of your own?

6   A     No.

7   Q     And it's your practice never to use a tape recorder?

8   A     Correct.

9   Q     And you were instructed to tape-record this conversation,

10  you could have gotten a tape recorder from the Phoenix Police

11  Department?

12  A     I was asked to tape-record the conversation, yes.

13  Q     Yeah.  And tape recorders were available in Phoenix at the

14  police department?

15  A     Right.  I'm sure they were.

16  Q     You did not ask for one or take one with you?

17  A     No.

18  Q     And there were tape recorders there at the sheriff's

19  office when you were there, as far as you know?

20  A     I presume there were.

21  Q     So there was nothing that would hinder you from getting a

22  tape recorder if you wanted to?

23  A     If I would have wanted to get a tape recorder, no.

24  Q     But in this case you had made the decision not to tape

25  because that was your practice?

MILKE_NSB012272
Exhibit 7

SALDATE - CROSS                    71

1    A    No, I asked her if she wanted it taped and she said no, so

2    that was -- it may have agreed with my practice, but it was a

3    situation I didn't even have to confront because she had said

4    no.

5    Q    Now is that your standard practice, that every time you

6    interview any suspect and interrogate them, one of the first

7    things you ask them is, "Do you want me to tape-record this?"

8    A    No.

9    Q    But you indicate in this case that's what she did and she

10   said --

11   A    I was asked by Sergeant Ontiveros to do that interview --

12   Q    Okay.

13   A    -- with a tape recorder, if I could.

14   Q    Okay.

15   A    So I asked her.

16   Q    Now I think you testified here today, and have previously,

17   that in your mind a tape recorder is an obstacle for you to get

18   the truth; is that right?

19   A    That's my belief, yes.

20   Q    Okay.  It prevents the person from feeling, I think you

21   described, comfortable?

22   A    That's my belief, yes.

23   Q    And when that happens, you can't get a good interview or

24   interrogation; is that right?

25   A    That is my belief, yes.

**MILKE_NSB012273**
Exhibit 7

SALDATE - CROSS                72

1   Q    Now by not having a tape recorder, that also prevents

2   anyone else from hearing an actual and accurate account of that

3   interview too, doesn't it?

4   A    I presume it does.  However, I will document the report.

5   Q    Just answer the question.  So you're now on your way to

6   Florence, Arizona to interview Debra Milke; is that right?   In

7   a helicopter.

8   A    Yes.

9         THE COURT:  Excuse me, Mr. Kimerer.  We have to take

10  a break at some point since I --

11        MR. KIMERER:  This would be a good time to take a

12  break, Your Honor.

13        THE COURT:  All right.  Let's do that.  I do have

14  those other two matters.  I don't know whether the 11:00 --

15  we're going to get to it, so we'll take a break as far as you

16  all are concerned until 11:00, and at that point I'll let you

17  know whether I'm doing the other matter or whether we're going

18  to proceed at that point.

19        MR. KIMERER:  Very well.  Thank you very much, Your

20  Honor.

21        THE WITNESS:  Mr. Kimerer, do you want me to leave

22  this here?

23        THE CLERK:  All rise.

24        MR. KIMERER:  Probably should.

25        THE WITNESS:  Okay.

MILKE_NSB012274
Exhibit 7

SALDATE - CROSS                73

1          MR. KIMERER:  Thank you, Constable.

2      (Recess)

3          THE COURT:  Please be seated.  Mr. Kimerer, the

4   record show the presence of the counsel and Petitioner.  In

5   order not to try to avoid interrupting your cross-examination

6   I'd like to keep going through -- how long do you anticipate

7   you'll be?  I won't hold you to it.

8          MR. KIMERER:  I would think I would be another hour,

9   Your Honor.

10         THE COURT:  Why don't we press on and try to finish

11  up your cross --

12         MR. KIMERER:  Thank you very much, Your Honor.

13         THE COURT:  -- so we don't take another break in

14  between.  Thank you.

15  BY MR. KIMERER:

16  Q    Constable Saldate, at the break I think I left you in a

17  helicopter on your way to Florence.  Was that about right?

18  A    Yeah, and it wasn't a very comfortable position, no.

19  Q    As a matter of fact, I think you testified you don't like

20  being in a helicopter, correct?

21  A    I don't like being in a helicopter.

22  Q    Okay.  Now sometime between the time you got in the

23  helicopter and between the time you arrived at Florence, you

24  had made a decision that you were going to arrest Debra Milke;

25  is that right?

**MILKE_NSB012275**
Exhibit 7

SALDATE - CROSS                74

1   A    I believe that's correct.

2   Q    Okay.  And that was based solely on this bit of

3   information that you got from Scott when you went to the scene?

4   A    From his whole interview, yes.

5   Q    Well, you didn't have his whole interview at that point,

6   you just had --

7   A    The interview that I had, yes.

8   Q    Pardon?

9   A    The interview that I had conducted with him, yes.

10  Q    Your interview conducted, but at the station there was no

11  information about Debra Milke during that interview?

12  A    Not during that interview, no.

13  Q    Right.

14  A    But --

15  Q    The first time Debra Milke's name was mentioned to you by

16  Scott was on your way to the crime scene, right?

17  A    That's correct.

18  Q    And that wasn't very much information, as you've reported

19  before?

20  A    Yes.

21  Q    So with that piece of information you get, on

22  instructions, into a helicopter and you fly to Florence?

23  A    Yes.

24  Q    And somewhere en route you make the decision, as you've

25  just testified to, that you were going to arrest Debra Milke?

**MILKE_NSB012276**
Exhibit 7

SALDATE - CROSS                    75

1   A     Probably, yes.

2   Q     Now at that point there was no physical evidence to

3   connect her to the crime?

4   A     No.

5   Q     And Styers certainly had not said she was implicated in

6   the crime?

7   A     No.

8   Q     And you still didn't have a full statement from Scott?

9   A     But his information I did have from him was reliable.

10  Q     Okay.  Well, it was that bit of information that you got

11  when you went to the crime scene, right?  That's all you had.

12  A     From Scott?

13  Q     Uh-huh.  Other than your interview before then when Debbie

14  wasn't mentioned.

15  A     That is correct, but the information from the crime scene,

16  yes, that there was a crime scene out there.

17  Q     Okay.

18  A     That the little boy was shot and that stuff.

19  Q     Okay.  That was at the crime scene, but the first time you

20  hear about Debra Milke is when you are driving with Scott

21  there; is that right?

22  A     That is correct.

23  Q     And somewhere at that time or on your way to Florence, you

24  believe that the truth in this case was that Debra Milke had

25  committed the crime or was involved in the crime; isn't that

**MILKE_NSB012277**
Exhibit 7

SALDATE - CROSS                76

1  right?

2  A    I believe I had reliable information that that was

3  correct.

4  Q    And that's -- based on that, you made a decision to go

5  ahead and arrest her?

6  A    And read her her rights, yes.

7  Q    Okay.  And as a matter of fact, the full statement from

8  Scott, as I recall, and I think you testified to this, he was

9  actually being -- giving a full statement to Mills at the

10 police station as you were on your way to Florence?

11 A    That is correct.

12 Q    And that tape -- and that statement from Roger Scott, that

13 was tape recorded by Mills, wasn't it?

14 A    I believe it was.

15 Q    Now when you got to Florence, the helicopter landed at the

16 hospital, right?

17 A    You know, somewhere in that vicinity.  I really don't

18 remember that much about it.

19 Q    And then you went to the Pinal County Jail from there?

20 A    I -- yes, uh-huh.

21 Q    And according to your report, it took you about eight

22 minutes to get from the hospital to the jail?

23 A    Okay.

24 Q    So you really didn't talk to anyone before that, didn't

25 have any discussions with anyone before you got to the jail?

**MILKE_NSB012278**
Exhibit 7

SALDATE - CROSS                77

1   A    Other than a deputy of Pinal County that took me there.

2   Q    Okay.  You didn't have a tape recorder, you testified to

3   that.

4   A    That's correct.

5   Q    And when you got there, Detective Hamblin from the Phoenix

6   Police Department was there?

7   A    Yes, he was.

8   Q    And when you walked into the station you found -- you were

9   told or someone indicated to you that Debra Milke was in a room

10  in the police station?

11  A    That's correct.

12  Q    And I think at the time you described the room maybe being

13  by 10 to 15.  It was not the normal investigation room, it was

14  larger room than that; that's right?

15  A    That's correct.

16  Q    And you took in the room with you a pen and a notepad.

17  A    Correct.

18  Q    And you said that you went directly to the room.  You

19  didn't stop anywhere else?

20  A    I don't believe I did.  I may have, but I don't believe I

21  did.

22  Q    And you felt at that point, according to your prior

23  testimony, that you were confident that you were going to get a

24  confession from her?

25  A    In any interview that I'm involved in, I'm confident that

**MILKE_NSB012279**
Exhibit 7

SALDATE - CROSS                78

1    I'm going to get the truth from that individual.

2    Q    Well, you did testify you feel confident you will get a

3    confession.

4    A    Okay, if that's -- yeah.

5    Q    And one of the first things you do, which is part of your

6    style and any good police detective, is that you try to control

7    the situation, right?

8    A    Yes.

9    Q    And first you had to go into the room and determine who

10   Debra Milke was?

11   A    I didn't know that until I got to the room, yes.

12   Q    Right, because you had never seen her before?

13   A    That's correct.

14   Q    And so you went in the room and she was there with

15   somebody you described to in your reports and in your testimony

16   as an aunt.

17   A    I believe that's what it was.

18   Q    Now had you since learned that that was not an aunt, that

19   was actually a friend of hers that worked at the Department of

20   Corrections?  A friend of her father's?

21   A    No.

22   Q    But when you got there you opened the door -- she was in a

23   room, you opened the door, went in?

24   A    I presume I did, yeah.

25   Q    Okay.  And there were two women there?

**MILKE_NSB012280**
Exhibit 7

```
                        SALDATE - CROSS              79
 1    A     Correct.
 2    Q     One was Debra Milke and the person you described as an
 3    aunt.
 4    A     That's correct.
 5    Q     And you asked the aunt to leave?
 6    A     Yes.
 7    Q     And it's your style that you want a one-on-one situation
 8    when you're interviewing somebody -- you're interrogating them?
 9    A     Yes, during my interviews I want a one-on-one, yes.
10    Q     Okay.  And you shut the door; is that right?
11    A     Yes.
12    Q     And you were alone in the room with Debbie Milke at that
13    point?
14    A     That's correct.
15    Q     Just the two of you.  And she was sitting in a chair with
16    her back up against the wall?
17    A     I don't recall that.
18    Q     Okay.
19    A     I know she was sitting in a chair, but I don't recall
20    whether she was against the wall or not.
21    Q     Okay.  And you pulled up another chair and put it in front
22    of her?
23    A     Correct.
24    Q     And you said you looked eye-to-eye, which is your style,
25    with her?
```

**MILKE_NSB012281**
Exhibit 7

```
                    SALDATE - CROSS                80
```

1    A    Correct.

2    Q    And you were about 6 to 12 inches away from her?

3    A    Yes.

4    Q    Is that right?  And you told her, generally, we were going

5    to talk, correct?

6    A    Correct.

7    Q    And that's the way you wanted the situation, isn't it?

8    A    Yes.

9    Q    And as you were looking at her eye to eye, was it at that

10   point that you said, "I'm going to deal with you honestly and I

11   want you to deal honestly with me," or words to that effect?

12   A    Probably.

13   Q    And did you indicate that you're there to get the truth

14   and the confession and that's my job?

15   A    Probably.

16   Q    And your first words to Debbie were, you introduced

17   yourself, correct?

18   A    Correct.

19   Q    You showed her your badge?

20   A    Correct.

21   Q    And you told her at that point that her son had been

22   murdered and was shot.

23   A    I think I put it, he had been found shot to death.

24   Q    Found shot to death.  And all right, after that you

25   indicated that, and I'm arresting you for being involved in

**MILKE_NSB012282**
Exhibit 7

SALDATE - CROSS                    81

1    that crime.

2    A     Probably, yes.

3    Q     You told her that --

4    A     Yes.

5    Q     -- right up front?

6    A     Yes.

7    Q     And I think you described in your reports and other

8    testimony that she began to scream and yell and make noises?

9    A     Correct.

10   Q     And you said, "I won't tolerate that"?

11   A     That is correct.

12   Q     And you, I think, have described it you made the decision

13   that she was making this up or she was feigning it; that was

14   your opinion?

15   A     That's correct.

16   Q     And that was because you said you didn't see tears?

17   A     That's correct.

18   Q     But other than that, she seemed to be very agitated, she

19   was very upset?

20   A     Yeah, I guess.

21   Q     And would you describe her as emotionally distraught?

22   A     No, I wouldn't say that.

23   Q     And would you describe her as being hysterical?

24   A     I don't know.  I don't recall.  If it's in the report, I

25   guess I did.

**MILKE_NSB012283**
Exhibit 7

SALDATE - CROSS                82

1   Q    Yeah, you -- did you make the statement, I think in your

2   report, where you said,

3              "She tried to lie to me and feign

4              emotions, yelling, hysterics would drive

5              me away, cause me to leave the room if I

6              didn't -- if she didn't do that, so I

7              handled it.  She understood I handled it."

8   Do you remember making that statement?

9   A    Yes.

10  Q    And you told her, "I'm only here to deal with you at the

11  truth and nothing else.  And if you -- and I won't tolerate any

12  lies."

13  A    Correct.

14  Q    And at that point you had already made up your mind that

15  she was guilty before she had said anything?

16  A    I had made up my mind from the reliable evidence that I

17  had obtained that she was guilty, yes.

18  Q    Okay.  Well, you had made a decision to arrest her?

19  A    Yes.

20  Q    That's certainly because you thought she was guilty,

21  correct?

22  A    I agreed.

23  Q    Okay.  Would you please take a look at Exhibit 19.

24  A    Oh, this -- 19.  What page, sir?

25  Q    Under Page 921.

**MILKE_NSB012284**
Exhibit 7

SALDATE - CROSS                    83

1   A     Okay.

2   Q     And I'm referring you to 7(b)(3), and I'm going to read

3   that to you.  Excuse me, 7(b)(2)(c) and this is your policy and

4   guideline from the Phoenix Police Department.  It says there,

5   "Officers should keep an open mind and allow for the

6   possibility that the suspect did not commit the crime."  Is

7   that right?  Is that what it says?

8   A     That's what it says, yes.

9   Q     Thank you.  But you had made up your mind that Debra was

10  guilty and that you weren't going to tolerate any lies from

11  her?

12  A     If I may, "Officers should keep an open mind and allow for

13  the possibility that the suspect did not commit the crime."

14  That is given that -- that situation is that -- that --

15  Q     But just --

16  A     -- if I wasn't taken to a --

17  Q     Detective Saldate --

18  A     -- to see a body that was killed --

19  Q     Constable Saldate, please just answer my question.  You

20  don't need to volunteer for me right now, okay?

21  A     Okay.

22  Q     Because I think in the grand jury transcript you said you

23  walked in the room she began to yell, cry and scream.  Is that

24  what you testified to before the grand jury?

25  A     I don't recall that.  I don't know.  I don't have it with

**MILKE_NSB012285**
Exhibit 7

SALDATE - CROSS                84

1   me.

2   Q    Okay.  But you certainly said she was yelling and you've

3   certainly described in other testimony she was screaming.

4   A    I may have, yes.

5   Q    But you had made a decision on your opinion -- based on

6   your opinion that she was feigning this because you didn't see

7   any tears?

8   A    That was part of it, yes.

9   Q    Okay.  Well, before that's what you said the only basis

10  for your opinion was that you didn't see any tears?

11  A    Well, I mean, that was part of it.  I mean, I had a gut

12  feeling, so --

13  Q    Oh, so besides tears it was a gut feeling you had?

14  A    And a five- -- and a four-year-old boy that's been shot in

15  the head, yes.

16  Q    I understand that, but I'm talking about your observation

17  that you said she was feigning.

18  A    Well, it appeared to me from my experience, yes.

19  Q    Okay.  I think you said that in your opinion she tried to

20  lie; she tried to feign those emotions; she was thinking that

21  her yelling, her hysterics, "would drive me away and could make

22  me leave the room."  I think you kind of testified to that

23  today too; isn't that right?

24  A    I think that's true.

25  Q    But you handle it, you said, and you handle it by

**MILKE_NSB012286**
Exhibit 7

SALDATE - CROSS                85

1   indicating to her repeatedly in your style, as you're sitting

2   there right in front of her face, eye to eye, that "I won't

3   tolerate lies, I only want the truth."  Kept telling her that?

4   A    I kept using those words.

5   Q    Yes.  Now very early too, you also showed her the rights

6   card -- you took the rights card out, your Miranda card?

7   A    Yes.

8   Q    And you then read her rights verbatim from that card?

9   A    That's correct.

10  Q    And there's nothing on that card that ask her if she

11  waives those rights?

12  A    No.

13  Q    There is just only the statement on there, "Do you

14  understand these rights?"

15  A    Correct.

16  Q    Now after you read the rights to her, I think you've

17  indicated she nodded or head and you said you needed a verbal

18  response and you say she said yes.

19  A    That's correct.

20  Q    And you say at that point in time, too, you also asked her

21  if she wanted an attorney -- I mean, wanted it tape-recorded?

22  A    Yes, in that period of time, yes.

23  Q    Right after you read the rights to her?

24  A    I believe so.

25  Q    And you're saying she said, no that she didn't want it

**MILKE_NSB012287**
Exhibit 7

SALDATE - CROSS                 86

1   tape-recorded?

2   A    That's correct.

3   Q    Now you're aware that she's saying no, I wanted an

4   attorney?

5   A    Pardon me?

6   Q    You're aware that's her testimony, she said, "I said no, I

7   want an attorney."  You know that's what she testified to?

8   A    That's not true.

9   Q    Well, do you know if that's what she testified to?

10  A    No, I don't.

11  Q    Okay.  Your decision if it's true or not is what you

12  decide, correct?  You decided that it wasn't true.

13  A    That she wanted an attorney?

14  Q    No, the statement we're talking about.

15  A    The statement we're talking about had nothing to do with

16  an attorney.  The statement we're talking about has to do with

17  -- not her statement, I'm talking about my statement.

18  Q    Okay.

19  A    My statement has to do with the tape recording.

20  Q    Well --

21  A    That is it.

22  Q    Well, all I'm trying to establish here, Constable Saldate,

23  is that you are claiming that when you read her rights, she

24  nodded her head and articulated yes.  Her testimony, and her

25  claim is, "I did not nod and what I said was, when he asked if

MILKE_NSB012288
Exhibit 7

SALDATE - CROSS                    87

1   I wanted it -- when you wanted it tape recorded, I said no, I

2   want an attorney."  You understand that's her testimony and

3   what she says?

4   A    I don't know what she said, sir.

5   Q    Okay.  You never looked at her testimony?

6   A    No.

7   Q    You -- did you sit through the trial as the case

8   investigator?

9   A    Correct.

10  Q    So did you hear her testify during trial?

11  A    For the most part, yes.

12  Q    And you don't remember her saying that?

13  A    No.

14  Q    So what --

15  A    I do remember her corroborating most of what occurred in

16  that interview.

17  Q    Well, what she -- well, there are two key things in that

18  testimony she didn't corroborate.  Number one, she said, "I

19  asked for an attorney," right?  According to her.

20  A    I don't recall that.

21  Q    Okay.

22  A    I really don't.

23  Q    And she also said, "I didn't do this; I didn't confess."

24  That's substantial difference; isn't that right?  You said she

25  did, she says she didn't.

**MILKE_NSB012289**
Exhibit 7

SALDATE - CROSS                88

1    A    That's her statement now, yes.

2    Q    Well, that was her statement at the trial, Detective

3    Saldate, that you sat through.

4    A    I'm not talking about --

5              MS. DONE:  Your Honor, we would object that he's

6    telling the witness what her statements were at the trial and

7    not asking any questions.

8              THE COURT:  Overruled.

9              THE WITNESS:  Pardon me?

10   BY MR. KIMERER:

11   Q    Was that her statement at the trial?

12   A    Her statement?  I don't know, sir.

13   Q    Well, you --

14   A    I don't recall.

15   Q    You don't recall her denying that she confessed during the

16   trial?

17   A    She denied confessing during the trial?  I don't recall.

18   Q    And you don't recall that she says, "No, I asked for an

19   attorney"?

20   A    I don't recall that either.

21   Q    Now you know what the procedures are if someone asks for

22   an attorney, I think we've talked about that a little bit and

23   you indicated, you know, your practice is you would still go on

24   and keep talking to them; is that right?

25   A    I've indicated that I would sit there, do my paperwork,

MILKE_NSB012290
Exhibit 7

SALDATE - CROSS          89

1   and if the conversation started again, yes.

2   Q    Okay.  I'd like you to take a look at General

3   Investigative Procedures, Exhibit 19 again, Page 930.

4   A    Page 930.

5   Q    And I'd like to you have look on that page from Paragraph

6   -- starting 14, Paragraph E, which I'm going to read to you

7   know.  Did you find that?

8   A    Yes.

9   Q    And this is a policy of the Phoenix Police Department at

10  that time.

11          "When a person wishes to remain silent or

12          have an attorney present during questioning,

13          interrogation must cease immediately.  In

14          such cases, if an investigation would

15          apparently be furthered by continuing the

16          interrogation, the Department's legal advisor

17          may be contacted with a supervisor's permission

18          and asked to assist."

19  That was the policy then?

20  A    Apparently, yes.

21  Q    Okay.  Now you're saying you didn't have to follow that

22  policy here because you're claiming she never invoked her

23  rights, right?

24  A    That is correct.

25  Q    And you've also said earlier, you really didn't follow

MILKE_NSB012291
Exhibit 7

SALDATE - CROSS                90

1    this policy anyway?

2    A    I didn't say that.

3    Q    You said --

4    A    You just read me this policy.  I didn't even know this

5    policy existed until you just read it.

6    Q    Okay.  Even though it's dated back in October of 1989?

7    You were in the Phoenix Police Department in October of 1989,

8    weren't you?

9    A    I believe I was, sir.

10   Q    Yes.  And that was --

11   A    And let me explain to you, if I would, rather than --

12   Q    No, you don't need to explain it.  I just asked you a

13   question.  All you need to do is answer my questions.

14   A    Well, it --

15   Q    You'll have a chance to explain on redirect.

16   A    Okay.

17   Q    And you did not ask her directly the question, "Do you

18   waive these rights?"

19   A    I read her her rights from the card and asked her if she

20   understood her rights.

21   Q    But you did not ask this question, "Do you waive these

22   rights?"

23   A    No.

24   Q    And you didn't get anything from her in writing about

25   waiving her rights at that time?

**MILKE_NSB012292**
Exhibit 7

SALDATE - CROSS                91

1   A    No.

2   Q    You didn't have her sign anything to waive her rights?

3   A    There was no document that I know of that we had available

4   to us, or since then, that we would have a suspect sign that

5   they were waive their rights.

6   Q    Well, you had your rights card and you read it to her,

7   didn't you?

8   A    That's correct.

9   Q    And isn't there places on there to initial for the rights

10  card?

11  A    It's for the officer to initial.

12  Q    Okay.  But a lot of officers would go ahead and have a

13  person sign that too.

14  A    I never knew that ever happened, sir.

15  Q    So that never happened with your cases?

16  A    Never happened with my case or any other case I was

17  involved in.

18  Q    Well, do you know all the other cases, Detective Saldate?

19  A    I'm pretty well familiar with a bunch of cases.

20  Q    Good, because we'll get to those later.

21  A    Oh, fine.

22  Q    So after you read the rights, you immediately then started

23  interrogating her?

24  A    The interview continued, yes.

25  Q    And basically that's when you elicited what you said were

*AVTranz*
E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

**MILKE_NSB012293**
Exhibit 7

SALDATE - CROSS                92

1    incriminating statements from her?

2    A    That's correct.

3    Q    And you indicated in the interview, I think you had with

4    me recently, that you went ahead and kept asking her questions,

5    but she would still try to get off track and you would have to

6    say, "Look, I won't tolerate lies," right?

7    A    She would get off track and I would try to refocus her

8    back on to what we were talking about.

9    Q    And the way you refocus people as you're sitting here

10   about 6 to 12 inches from them is to tell them, "I won't

11   tolerate lies."  Isn't that the way you did it?

12   A    Not all the time, no, but that -- I would try to refocus

13   that person -- in other words, we didn't want to talk about

14   something else, we were talking about the case.

15   Q    But that's what you did here, isn't it?

16   A    For the most part, yes.

17   Q    So really what we have here in this situation, it's a

18   situation where it's your word against her word?

19   A    If you're asking my opinion of what we have here, is I'm

20   telling the truth and she is now denying it because she's on

21   trial.

22   Q    Okay.  Okay.  So you are saying you're telling the truth

23   and --

24   A    That is correct.

25   Q    -- you're saying she's lying?

**MILKE_NSB012294**
Exhibit 7

SALDATE - CROSS                    93

1   A    If that's -- if you're asking me for my opinion of what we

2   have here, yes, that's what I believe.

3   Q    But basically this is a situation where it's really your

4   word against hers?

5   A    Well, as a police officer and investigator and -- yes,

6   it's my word, as a police officer and investigator of that

7   case, against her word.  It wasn't that night, but it was -- it

8   is now, yes.

9   Q    So you believe that a word of a police officer should be

10  given more credibility than the word of a suspect in a case?

11  A    I believe the truth gives its own credibility.

12  Q    Well, you keep talking about the truth and the truth was

13  what you believed to have happened before you ever got there,

14  wasn't it?

15  A    The truth was when I obtained the interview from Debra

16  Milke.  That is what the truth, as far as she knew it, was.

17  Q    We've been testifying this morning and you said you went

18  there to get the truth, you had already believed that she was

19  guilty when you got there.

20  A    I had a four-year-old boy that's been shot, sir.

21  Q    Well, I understand you had a four-year-old boy shot --

22  A    And that information was reliable because that

23  four-year-old boy was there.  He was shot, he was at a location

24  where this person said he was, and that's how I made the

25  reliability of that information to be truthful.

**MILKE_NSB012295**
Exhibit 7

SALDATE - CROSS                94

1   Q    But --

2   A    So when I went to Florence, I relied on that information

3   and the evidence of that little boy being there to make my

4   determination.

5   Q    But the only evidence you had at that point was what Roger

6   Scott had told you and you said it was just a very small amount

7   of words that implicated her.  That's all you had about her.

8   A    Sir, it would be unfair to her -- it would have been

9   unfair for me to go into that room and not place her under

10  arrest with the information and the evidence that I had.  I

11  could have gone in there and just talked to her, you mean, and

12  just tried to get her to confess?  No, I think it was my

13  responsibility to tell her she was under arrest, to tell her

14  the gravity of this situation, and to express to her that I

15  wanted the truth.

16  Q    Okay.

17  A    And that's what I did.

18  Q    Well, Constable Saldate, you went into that room and you

19  told her that she was under arrest, right?

20  A    Correct.

21  Q    You told her that you wanted her to be honest with you,

22  correct?

23  A    That's correct.

24  Q    And you wanted to be -- and you were always going to be

25  honest with her, right?

MILKE_NSB012296
Exhibit 7

SALDATE - CROSS                95

1   A     Yes.

2   Q     And you told her that you were there to get the truth?

3   A     Correct.

4   Q     You told her immediately when she started feigning tears

5   according to you, you said you would not tolerate crying.

6   Isn't that what you said?

7   A     That's correct.

8   Q     You told her, "I'm here to get the truth from you," right?

9   A     Yes.

10  Q     And you said, "I will be truthful with you," and that's

11  your approach; isn't that right?

12  A     That is generally my approach, yes.

13  Q     Yes.  And you told her -- right at the start of the

14  interview, one of the first things you told her, that she had

15  been implicated in this case by James Styers and Roger Scott;

16  isn't that right?

17  A     That's correct.

18  Q     Now that wasn't the truth, was it?

19  A     No, it wasn't.  Well, it was a mistake on my part by

20  including Jim Styers, yes.

21  Q     You answered my question.  Styers had not implicated her?

22  A     That's correct.

23  Q     And that was in your report --

24  A     That --

25  Q     -- your supplemental report?

**MILKE_NSB012297**
Exhibit 7

SALDATE - CROSS                96

1   A    That's correct.

2   Q    And so that was inaccurate, as far as your report goes; is

3   that right? Is that what you're saying me?

4   A    You're asking me if I misspoke, yes.

5   Q    Okay.  Thank you.  Now I believe this interrogation lasted

6   for about 30 minutes, total time?

7   A    Approximately, I guess.

8   Q    Okay.  And you said that you had to keep her focused?

9   A    During this whole time, no.  There was times that she -- I

10  had her refocus back to what we were talking about.

11  Q    Okay.  And I think you said that every time she -- if she

12  started going sideways, "I won't tolerate that type of

13  behavior; I just want the truth"?

14  A    That's correct.

15  Q    And so you kept her focused by telling her, "I won't

16  tolerate the truth?"  Or, "I won't tolerate anything but the

17  truth," excuse me.

18  A    Yeah, what's wrong with that?

19  Q    And you indicated that you believed "She knew I was going

20  to tell her the truth."

21  A    Yes.

22  Q    "And she knew I would not lie to her and she knew that."

23  A    Yes, that's how you build a relationship during an

24  interview.

25  Q    Uh-huh.  And even though that -- you still put in your

**MILKE_NSB012298**
Exhibit 7

SALDATE - CROSS              97

1  supplemental report that you lied to her about being implicated

2  by two individuals; is that right?

3  A   I put that in my supplemental report?  I did not put that

4  in my supplemental report.

5  Q   Well --

6  A   You're phrasing it that way, but I did not put that in my

7  supplemental report.

8        MR. KIMERER:  Excuse me just a second, Your Honor,

9  while I get the supplemental report.

10 BY MR. KIMERER:

11 Q   Would you look at Exhibit 50, please?

12 A   Sure.  What page, sir?

13 Q   Look at Page 1, and that is your supplemental report.

14 A   Yes.

15 Q   And I'm down in the last paragraph and in statement -- in

16 that report says, and here I will read it to you,

17        "I then told her that she had been

18        implicated in the murder by Jim and Roger.

19        I then told her to be quiet while I removed

20        her Miranda rights card from my identification

21        badge case and read her her right -- her

22        Miranda rights verbatim from the card."

23 Is that what your report says?

24 A   Yes.  That isn't close to what you were presenting it as.

25 Q   That's what the report says?

**MILKE_NSB012299**
Exhibit 7

SALDATE - CROSS                    98

1    A    But it wasn't close as you were presenting it.

2    Q    And I think you've testified before that when you go into

3    an interview room you want the truth -- "I want the truth."

4    Have you said that many times?

5    A    Yes.

6    Q    Now did you say that that particular day that you were

7    probably less tolerant of Debbie because you had been working

8    12 hours and had to work on your day off?

9    A    That was a pretty common thing.  I don't think that's --

10   Q    Well, did you make the statement that you were less

11   tolerant with her because of that?

12   A    I may have, but I -- you know, I was used to working many

13   hours and on my days off, but I may have said that.

14   Q    You don't deny saying it?

15   A    Probably.  If it's in the report, probably I did say that.

16   Q    Well --

17   A    Or an interview or whatever.

18   Q    Would you look at your Voluntariness Statement, and I'm

19   talking about Exhibit 52, please.

20   A    52.  Okay.  What page?

21   Q    Page 26 and look at Lines 2 through 8, and I'll read those

22   to you.

23            "I consider myself to be intolerant with lies.

24            I consider myself to be less and in this

25            situation, you have to understand that it was

MILKE_NSB012300
Exhibit 7

SALDATE - CROSS                    99

```
 1              my day off.  I had been up 12 hours working

 2              on this case, so probably there was a

 3              little problem there that I was less

 4              tolerant."

 5       Is that what it says?

 6  A    In response to a question about during interviews --

 7  general interviews, yes.

 8  Q    Okay.  But that's what it says?  What I just read.

 9  A    In response to Mr. Ray's question of general interviews,

10  yes.

11  Q    No, that was in response --

12  A    To --

13  Q    -- to that particular day because you had been working 12

14  hours.

15  A    "Q.  Do you consider yourself an intolerant individual

16  during interviews?"

17  Q    Okay.  Well, let's --

18  A    That was the question and that's how I answered it, yes.

19  Q    Okay.  Let's go back to Line 4.  And you're referring to

20  the Debra Milke case.  "I had been up 12 hours working on this

21  case."  That's Debra Milke's case, correct?

22  A    That is correct.

23  Q    "So probably there was a little problem there that I was

24  less tolerant."  Is that right?

25  A    Okay.
```

**MILKE_NSB012301**
Exhibit 7

SALDATE - CROSS                    100

1  Q    Thank you.  Now when you got the incriminating statements

2  from Debra Milke -- that you claim you got from Debra Milke,

3  you didn't tape-record them?  Answer just yes or no.

4  A    For the fifth time, no, I think.

5  Q    Okay.

6  A    The fifth time.

7  Q    And did you think it would be a good idea to memorialize

8  what she had said?

9  A    I did.

10 Q    Well, other than taking notes, did you memorialize it --

11 what happened in that room?

12 A    Yes, with -- yes, with Report Number 89-179406(a).

13 Q    So what you are telling us is that, I was in the room with

14 her, I was one-on-one, I was there for 30 minutes, her back was

15 up against the wall, or she was in a chair --

16 A    I never said that, you said that, sir.

17 Q    Okay.  But she was in a chair, you pulled your chair up in

18 front of her where you were 6 to 12 inches from her?

19 A    Correct.

20 Q    You said, you won't tolerate lies, you read her her

21 rights, you didn't tape-record the situation at that point in

22 time, but you had asked her if -- according to you, you asked

23 her if she wanted it tape-recorded and you said -- she said,

24 according to what you're saying.

25 A    Okay.  Correct.

MILKE_NSB012302
Exhibit 7

SALDATE - CROSS                101

1    Q     Okay.  Now the only thing you kept while you were in that

2    room of any memorialization of this or any document of this was

3    your handwritten notes, right?

4    A     While I was in the room?

5    Q     Yes.

6    A     Yes, I had not done the supplemental, no.

7    Q     Okay.  You didn't have anything else other than your

8    notes?  No tape recorder?

9    A     That's correct.

10   Q     No video?  You didn't have one of the other -- you had

11   Detective Hambric standing outside the door with you, did you

12   bring him in with you so he could witness her confession?

13   A     No.

14   Q     Did you think it would be a good idea to bring him in so

15   you would have somebody else, other than just you, confirming

16   that what you're telling us is true?

17   A     No.

18   Q     So you didn't ask Detective Hambric to come in after you

19   had gotten this confession and have her repeat it with both of

20   you present?

21   A     Again, no.

22   Q     And the only thing you had then were your handwritten

23   notes?

24   A     Correct.

25   Q     And you're saying here now, the way you corroborate this

MILKE_NSB012303
Exhibit 7

SALDATE - CROSS                    102

1   case, or document it, is you take those notes, correct, and

2   then you take them back to the station, or wherever you go, and

3   then you dictate those notes to a report, which is what you're

4   referring to here?

5   A    Correct.

6   Q    And so did you keep those notes?

7   A    No.

8   Q    So you destroyed the notes right afterwards?

9   A    It's -- yes.

10  Q    Right after you dictated them?

11  A    No.

12  Q    You didn't destroy the notes after you dictate that for

13  your report?

14  A    No.

15  Q    You got your report back and then destroyed your notes?

16  A    Absolutely.

17  Q    Now when you left the room there were other detectives or

18  other people out there and things like that, correct?

19  A    From my -- what I recall, I think Detective Hambric was

20  the only one out there that I saw -- that I can remember

21  anyway.

22  Q    Okay.  But you, I think, have indicated through your

23  report and through your other testimony that at that point, you

24  know, you had gotten Debra calmed down and you had established

25  a rapport with her and she was now your friend; is that right?

MILKE_NSB012304
Exhibit 7

SALDATE - CROSS                103

1   A    I believe we had a good relationship going with her, yes.

2   Q    That's right.  And you didn't put handcuffs on her, right?

3   A    No.

4   Q    And she -- and I think you even indicated that she asked

5   you to sit next to her when you rode in the police car back to

6   Phoenix?

7   A    That is correct, sir.

8   Q    And I think you said that too?

9   A    That is correct.

10  Q    Okay.  Since she was so cooperative, didn't you think it

11  would be good to get -- tape-record her confession or at least

12  have her write something down or sign something that said she

13  waived her rights?

14  A    I -- you'll have to break that question up a little more.

15  Q    Okay.  I know I -- it was a compound question.  I

16  apologize.  First let's talk about waiving her rights.  Didn't

17  you think it would be good to get her to sign something to say

18  she had waived her Miranda rights, especially when she was so

19  cooperative?

20  A    I felt she did waive her rights, sir.

21  Q    Okay.  But she -- you never asked her if she waived her

22  rights?

23  A    I asked her if -- that she could remain silent, was one of

24  the first questions on the rights card and --

25  Q    Okay.  I --

*AVTranz*

E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

**MILKE_NSB012305**
Exhibit 7

SALDATE - CROSS                104

1   A     -- I asked her if she understands and she said yes.

2   Q    Interrupt -- let me -- listen to my question, please.  I'm

3   asking you the question, did you ask her the question whether

4   she waived her rights?

5   A    If you're asking me whether I used that specific language,

6   no, I did not.

7   Q    Okay.  And I believe when you wrote your report up from

8   your notes, you indicated you paraphrased things?

9   A    Absolutely, yes.

10  Q    Okay.  And generally you say that your interview notes are

11  pretty -- they comport with your -- or excuse me, your

12  supplement comports with what your notes say?

13  A    I make sure of that, yes.

14  Q    And this was an interview of approximately 30 minutes?

15  A    Yes.

16  Q    And I think your supplement is what, about 10, 11 pages

17  long?

18  A    I don't know.

19  Q    Okay.

20  A    If you want me to count, I will.

21  Q    No, you don't need to do that.  So other than your report,

22  there is nothing that corroborates what you're saying today

23  about Debra Milke waiving her rights?

24  A    My sworn testimony corroborates that, sir.

25  Q    Okay.  Your sworn testimony, correct?

**MILKE_NSB012306**
Exhibit 7

SALDATE - CROSS                105

1  A    That's correct.

2  Q    But there's nothing else?  That's right?

3  A    No tape recording and no video, no.

4  Q    And nothing signed by her?  No paperwork?

5  A    That I don't know -- I didn't know anything about, so no I

6  don't have one.  I don't have a paper that she said she waived

7  her rights, no.

8  Q    Well, you have control of the situation there, don't you?

9  That's -- you were in control of that room with her in it?

10 A    Yes.

11 Q    Uh-huh.  And you never gave her the opportunity to write

12 anything?  Never asked her if she wanted to write anything

13 down?

14 A    No.

15 Q    Now, Detective Saldate, I believe that at your interview

16 that we had recently in my office, we asked you to review and

17 look at some other cases where you had been involved in

18 interrogations or in some type of police action, correct?

19 A    Yes.

20 Q    And have you had a chance to look at those cases?

21 A    Yes, I reviewed them.

22 Q    Do you remember the case of State versus Mahler?

23 A    I think it was pronounced Mahler, but --

24 Q    Mahler, okay.

25 A    -- I went through that and --

MILKE_NSB012307
Exhibit 7

SALDATE - CROSS                    106

1   Q    So you do remember it?

2   A    I remember the case, the name and stuff.

3   Q    Okay.

4   A    It was somewhere in Tucson, but I don't recall from

5   reading what I have was given to read, no I don't recall the

6   total case.

7   Q    Okay.

8        MS. DONE:  Your Honor, we would object to any

9   questioning on the <u>Mahler</u> case because it happened after Debra

10  Milke was interviewed by Detective Saldate.  So if they're

11  trying to prove a pattern, this happened after.

12       MR. KIMERER:  This was a case, Your Honor, one month

13  after his interrogation of Debra Milke, and it goes to

14  Mr. Mahler unequivocally invoking his right to remain silent

15  and Mister -- Constable Saldate going ahead and continuing to

16  interrogate him.  And the Court of Appeals chastised his

17  conduct and indicated that,

18            "Officer Saldate's intent was clear.  As he

19            testified, he wanted additional statements from

20            Mahler and this conduct belied Mahler's right to

21            remain silent."

22  I believe it goes to bias and credibility of this witness, Your

23  Honor.

24       THE COURT:  I'll allow some inquiry into, but not

25  extended.

**MILKE_NSB012308**
Exhibit 7

SALDATE - CROSS                107

1          MR. KIMERER:  Now these cases, and I'm referring to

2    Your Honor, have been introduced into evidence and they're

3    already in evidence.  And I can -- there's about seven or eight

4    here, and I can go through each one of them, but the Court will

5    have those cases in front of it and can take a look at those,

6    but I can go through them with him.

7          THE COURT:  Which ones are they?

8          MR. KIMERER:  They are Mahler --

9          THE COURT:  Give me an exhibit number.

10         MR. KIMERER:  The exhibit number of those cases --

11   let me find the exhibit list here.  Let me see what I did with

12   my list.  They are Exhibits 7 through 17.  And I can basically

13   ask one sentence about each case and be through with my

14   cross-examination.

15         THE COURT:  And these are part of the exhibits that

16   were stipulated into evidence --

17         MR. KIMERER:  Yes, they are.

18         THE COURT:  -- at the beginning of the proceeding?

19         MR. KIMERER:  Yes.

20         MS. DONE:  Yes.

21         THE COURT:  Overruled.  You may.

22   BY MR. KIMERER:

23   Q    Anyway, in the Mahler case your conduct was chastised

24   because you went ahead and interrogated someone after they

25   invoked their rights; isn't that right?

**MILKE_NSB012309**
Exhibit 7

SALDATE - CROSS                108

1   A    I don't know that.

2   Q    Okay.  And then the next case is State versus King.  Do

3   you remember that case?

4   A    Again, from reading the little bit that was given to me, I

5   remember a little bit of it, but not much.

6   Q    And that was another place where someone invoked their

7   right, said that they didn't want to talk anymore and you

8   continued to take statements from them?

9   A    Probably.

10  Q    Okay.  And then there was the Runningeagle case, and I

11  think you were cross-examined about that case during the

12  Voluntariness Hearing.  Do you remember that?

13  A    Correct.

14  Q    And there again, he invoked his right to remain silent and

15  you continued to question him, didn't you?

16  A    I stayed in the room and we continued to talk, yes.

17  Q    And in the Rangel case, State versus Michael Rangel, in a

18  murder case.  That's four months after your interrogation of

19  Debra.  Rangel requested an attorney three different times

20  during the interrogation, but his requests were ignored and the

21  Court found there that was a violation of the Fifth Amendment.

22  Did you go into that case?

23  A    I -- without that case, I wouldn't know whether that's

24  true or not.

25  Q    Well, we give you materials to review, which you said you

MILKE_NSB012310
Exhibit 7

SALDATE - CROSS                    109

1   reviewed --

2   A    And that's not -- that is not the case, sir.  You just

3   made some creative statements on those cases, but that doesn't

4   mean that's totally true out of -- it could be out of context

5   that you wrote that information down.

6   Q    In other words, those are -- the exhibits will speak for

7   themselves, correct?

8   A    Apparently they will.

9   Q    Okay.

10  A    And that is the same with the Attorney General's Exhibits.

11  Q    Now there is also the Conde case too, where a man was in

12  an intensive care unit, while incubated on IV lines and in pain

13  and drifting out of consciousness and you went ahead and got a

14  statement from him and the Court ruled that was an involuntary

15  statement, didn't they?

16  A    He was never in intensive care.  He was hooked to IVs, but

17  he was never in intensive care and I did get a statement from

18  him, yes.

19  Q    Yeah, but the Court of Appeals indicated he was in

20  intensive care?

21  A    I don't know that, sir.  That's for you and the Attorney

22  General to argue.

23  Q    That was also -- and there is a Yanes case where

24  statements that you took from Mr. Yanes were also suppressed

25  because he was being treated, was incoherent, suffered from a

**MILKE_NSB012311**
Exhibit 7

SALDATE - CROSS                110

1  brain hemorrhage and a contusion, and you went ahead and got a

2  statement from him at that time?

3  A    I wouldn't know that, sir.  That's just --

4  Q    Suppressed.

5  A    -- from what you wrote down on that brief.

6  Q    Okay.  Well, then there's the Jones case, which also talks

7  about you taking a juvenile and having someone else handcuff

8  him in a room where he was interrogated without any probable

9  cause to arrest him and all of those statements were

10  suppressed.  Do you remember that?

11  A    That's not even close to what happened, sir, but that is

12  what you elaborated to in that brief, yes.

13  Q    Let me quote to you what the Court stated, okay?

14  A    Well, I don't know if that Court stated that or not, sir.

15  I don't see that, so.

16  Q    Okay.  Well, let me tell you what the Court stated.

17  A    That's your version, yes, go ahead, please.

18  Q    No, it's the Court's version.  Excuse me --

19  A    Well, I don't know that.

20  Q    -- let me read it to you.

21  A    Okay, fine.

22  Q        "Defendant was not isolated and detained

23            by accident.  Detective Saldate admits not

24            only to directing placement of Defendant in

25            the room, but of also having absolutely no

AVTranz
E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

MILKE_NSB012312
Exhibit 7

SALDATE - CROSS                111

1          information linking him to any crime at

2    that time."

3    That's what the Court said.

4    A    That's what you say.

5    Q         "This was a purposeful arrest lacking

6              improbable cause for the improper motive of

7              investigation.  The manner of the detention,

8              handcuffing a juvenile alone to a desk in a

9              locked room, increased the flagrancy of the

10             illegal detention and the coercive nature of

11             the result and confession."

12   That's what the Court said?

13   A    That's what you're saying now, yes.

14   Q    Okay.  I think early in your interrogation today -- or

15   your direct examination today a question was asked of you about

16   a prior disciplinary record.  Do you remember that?

17   A    I do.

18   Q    And I believe that disciplinary record has been introduced

19   into evidence as Exhibit --

20         MR. KIMERER:  Excuse me, Your Honor, as I find the

21   right exhibit.

22   BY MR. KIMERER:

23   Q    -- 18.

24         MR. KIMERER:  And would you hand Exhibit 18 to

25   Detective Saldate, please?

**MILKE_NSB012313**
Exhibit 7

SALDATE - CROSS                112

1   BY MR. KIMERER:

2   Q    Now, Detective Saldate, this is a disciplinary record

3   concerning you, where a suspension was imposed back in 1973

4   when you were a patrol officer; is that right?

5   A    Correct.

6   Q    And at that point in time, you were being disciplined

7   because you had stopped a woman in the car, found out there was

8   a warrant for her arrest, and basically exchanged -- or made

9   advances sexually to her, right?

10        MR. CATTANI:  Your Honor, we object to this line of

11  questioning.  The incident in question doesn't have anything to

12  do with interviewing or interrogating suspects and this Court

13  has already conducted an in-camera review of this incident and

14  we object on that basis.

15        MR. KIMERER:  Your Honor, I will say in response,

16  this goes to credibility and bias and about this man's ability

17  to tell the truth, because according to the disciplinary record

18  in this, when he was confronted with this information, what he

19  did, he first lied about it.  Then they put him on a polygraph,

20  and after he was placed on a polygraph, he then admitted that

21  he had lied.  And he not only had lied initially, but even he

22  lied before they put him on the polygraph.  And they found, in

23  that particular case, actions such as those --

24        THE COURT:  I'll sustain the objection.  It's too

25  remote in time and off the subject.

**MILKE_NSB012314**
Exhibit 7

SALDATE - REDIRECT                      113

1            MR. KIMERER:  Very well.  I have no other questions,
2    Your Honor.  Thank you.
3            THE COURT:  How long do you anticipate -- well, first
4    do you have any redirect?
5            MS. DONE:  Yes, I do, Your Honor.
6            THE COURT:  About how long do you anticipate?
7            MS. DONE:  Perhaps 20 minutes, Your Honor.
8            THE COURT:  Twenty minutes --
9            THE WITNESS:  That's fine with me, Judge.
10           THE COURT:  -- any problem, counsel?  All right.
11   Let's proceed.
12                    REDIRECT EXAMINATION
13   BY MS. DONE:
14   Q    When we were talking earlier this morning and I asked you
15   about your definition or your opinion between in an
16   interrogation -- when I asked you that and you explained what
17   the difference was, were you talking about what was written in
18   the police procedures or your style?
19   A    My style.
20   Q    Thank you.  Mr. Kimerer asked you when you were
21   interviewing Roger Scott, you talked about your gut when you
22   interviewed Roger Scott?
23   A    Yes.
24   Q    And so you went in there with a gut feeling that Roger
25   Scott was not telling the truth?

**MILKE_NSB012315**
Exhibit 7

SALDATE - REDIRECT                114

1   A    From my experience of what I had witnessed before that,

2   yes.

3   Q    Okay.  And in your opinion, in this instance, did your gut

4   pan out?

5   A    Yes.

6   Q    After you interviewed Roger Scott?

7   A    Yes.

8   Q    After you interviewed Roger Scott, didn't in fact Roger

9   Scott take you to the location of Christopher Milke's body?

10  A    He did.

11  Q    And so based on him taking you to that location, that

12  confirmed your -- what you already knew in your gut --

13  A    Yes.

14  Q    -- when you were talking to Roger Scott, correct?  Did you

15  ever yell at Ms. Milke during your interview with her?

16  A    No.

17  Q    And is that because "that wasn't my style"?

18  A    That's not the way I handled interviews, no.

19  Q    And again going back to your interview with Roger Scott,

20  do you recall the area where Christopher Milke's body was

21  found?

22  A    I do.

23  Q    Was it a remote area?

24  A    It is, yeah.  Was.

25  Q    Okay.  And in your testimony, and it's Exhibit 55, Page

MILKE_NSB012316
Exhibit 7

SALDATE - REDIRECT                    115

1    55, I believe you referred to it as a ravine wash area?

2    A    Correct.

3    Q    So do you think someone who did not know what had occurred

4    in this case would have known that that body was there?

5    A    Absolutely not.

6    Q    Thank you.  And Mr. Kimerer asked you about recording

7    Ms. Milke's interview?

8    A    That's correct.

9    Q    And he referred you to Exhibit 52, Page 52, and I believe

10   he started on Line 8, and it says, "Isn't it true, sir, that

11   you had every intention in the world of not recording that

12   conversation?"  Does that -- I'll wait until you get to that.

13   A    52, page what?

14   Q    52.

15   A    Okay.  Line?

16   Q    I believe he started on Line 8.  And does the testimony

17   then continue on Line 15?

18   A    Okay.

19   Q    And were you asked, "You chose not to record it; isn't

20   that true, sir?"  And what was your response?

21   A    "She said she didn't want it recorded."

22   Q    So it was Ms. Milke that made the decision not to have the

23   interview recorded, correct?

24   A    Yes.

25   Q    And in your opinion, why do you think Ms. Milke didn't

MILKE_NSB012317
Exhibit 7

SALDATE - REDIRECT                116

1    want the interview recorded?

2    A    I think that it's a -- Ms. Milke was a manipulator -- had

3    been a manipulator.  And I think manipulating people --

4            MR. KIMERER:  Your Honor, I'm going to object.  He's

5    asking for a total opinion about what he -- his opinion is.

6            THE COURT:  It's a little late.  She's already --

7    he's already started his answer.  You may complete your answer.

8            THE WITNESS:  As a manipulator, you don't want any

9    evidence of what your manipulation or what the manipulation was

10   or was going to be, and that's when I -- I think that's what --

11   that's why she didn't want it recorded.

12   BY MS. DONE:

13   Q    So in your opinion, you thought she was trying to

14   manipulate you during the interview?

15   A    I think her -- I think it was -- she was -- yes.

16   Q    Thank you.  And although it might not be your practice not

17   to record, you would do it if you were ordered or instructed

18   to?

19   A    Absolutely.

20   Q    And if the suspect had said, "Yes, I want it recorded,"

21   you would have recorded it?

22   A    Absolutely.

23   Q    Okay.  And Mr. Kimerer asked you about the Phoenix Police

24   Procedures, Exhibit 19 and referred you to Bates Stamp 00921.

25   Give you a minute to turn there.

**MILKE_NSB012318**
Exhibit 7

```
                    SALDATE - REDIRECT              117
 1   A     Yes.  Yes.
 2   Q     And he talked to you about 7(b)(c) where it states
 3   officers should keep an open mind and allow for possibility
 4   that the suspect did not commit the crime.
 5   A     Correct.
 6   Q     At that point you already had information from Roger
 7   Scott, correct?
 8   A     Yes, reliable information.
 9   Q     And reliable because he took you to the exact location of
10   the body, correct?
11   A     Yes.
12   Q     And then implicated Debra Milke, stating she was involved?
13   A     Correct.
14   Q     So again, your gut feeling was confirmed by Roger Scott?
15   So --
16   A     And the evidence that I found at the location of the crime
17   scene.
18   Q     So to keep an open mind at that point, with the
19   information you had --
20   A     It would have been hard.
21   Q     Thank you.  He also referred you to Exhibit 19, 14(e) --
22   let's find the page, I'm sorry.
23           MS. DONE:  I'm sorry, Your Honor.
24           THE WITNESS:  I believe you're referring to 15-927?
25   //
```

**MILKE_NSB012319**
Exhibit 7

SALDATE - REDIRECT                118

1  BY MS. DONE:

2  Q    Thank you.  Here we go, yes.  I'm sorry, I'll move to the

3  next question.

4          Is there a requirement to have a suspect sign a

5  rights card?

6  A    None that I know of, now or since.

7  Q    Even if other officers had done it, was there any

8  requirement that you know of in the Phoenix Police Department

9  to do it?

10  A    I don't know of no requirement and I've taken a lot of

11  police reports and I've never come across a waiver of rights,

12  or as Mr. Kimerer wants to put it, a waiver of rights signed by

13  a suspect here in Arizona.

14  Q    Okay.  And Mr. Kimerer asked you about some other cases

15  that you've been involved in?

16  A    That's correct.

17  Q    In the State versus Runningeagle case that we spoke about

18  on direct examination also, did you note in your report that

19  Mr. Runningeagle had invoked his right to remain silent or

20  right to an attorney?

21  A    Absolutely.

22  Q    Okay.  In the State versus King case, do you recall if you

23  noted in your report whether Mr. King had invoked his rights?

24  A    Absolutely.  That's why Mr. Kimerer knew.

25  Q    And is there any reason to believe that if Ms. Milke had

**MILKE_NSB012320**
Exhibit 7

SALDATE - REDIRECT              119

1   invoked her rights in this case that you would have not noted

2   it in your report?

3   A    None whatsoever.

4   Q    So if she had said, "I want an attorney," you would have

5   noted it?

6   A    That would have been the end of it.

7          MS. DONE:  If I could just have a minute, Your Honor.

8      (Counsel Confer)

9          MS. DONE:  Your Honor, we have no further questions.

10          THE COURT:  Thank you.  You may step down, sir.

11          THE WITNESS:  Thank you, Your Honor.

12          THE COURT:  Any reason the witness shouldn't be

13   excused?

14          MR. KIMERER:  No reason, Your Honor.

15          MS. DONE:  None from us, Your Honor.

16          THE COURT:  You're excused and free to leave at this

17   time.

18          THE WITNESS:  Thank you.

19          THE COURT:  Did the Respondent have any further

20   evidence?

21          MS. DONE:  No, Your Honor.

22          THE COURT:  Well, let's take about an hour.  It's

23   12:30, we'll reconvene at 1:30.

24          MR. CATTANI:  Thank you, Your Honor.

25      (Recess)

**MILKE_NSB012321**
Exhibit 7