Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF ARIZONA
 3
    Debra Jean Milke,          )
 4                            )
         Plaintiff,           )
 5                            )
    vs.                       ) No.
 6                            ) 2:15-cv-00462-ROS
    City of Phoenix; Maricopa )
 7   County; and Detective Armando )
    Saldate, Jr.; and Sergeant   )
 8   Silverio Ontiveros, in their )
    individual capacities,    )
 9                            )
         Defendants.          )
10   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ )
11
12
13
         30(B)(6) DEPOSITION OF CITY OF PHOENIX
14
15              TOM VAN DORN
16             NOVEMBER 17, 2017
17                9:00 A.M.
18
19
         1313 East Osborn Road, Suite 100
20
              Phoenix, Arizona
21
22
         SOMMER E. GREENE, CSR, RPR, CR No. 50622
23
24
25
```

Page 2

```
 1   APPEARANCES OF COUNSEL
 2
       For Plaintiff:
 3
         NEUFELD SCHECK & BRUSTIN, LLP
 4        NICK BRUSTIN, ESQ.
          AMELIA GREEN, ESQ.
 5        99 Hudson Street, 8th Floor
          New York, New York 10013
 6        212.965.9081
          nick@nsbcivilrights.com
 7
 8     For Defendant Silverio Ontiveros:
 9        HOLLOWAY ODEGARD & KELLY, P.C.
          SALLY A. ODEGARD, ESQ.
10        3020 East Camelback Road, Suite 201
          Phoenix, Arizona 85016
11        602.240.6670
          sodegard@hoklaw.com
12
13     For Maricopa County:
14        SANDERS & PARKS
          J. ARTHUR EAVES, ESQ.
15        3030 North Third Street, Suite 1300
          Phoenix, Arizona 85012
16        602.532.5783
17
18     For Robert Mills:
19        O'Connor & Campbell
          Daniel J. O'Connor, Jr., Esq.
20        7955 South Priest Drive
          Tempe, Arizona 85284
21        602.241.7002
          Daniel.oconnor@occlaw.com
22
23
24
25
```

Page 3

```
 1   APPEARANCES CONTINUED:
 2
 3     For Defendant City of Phoenix:
 4        STRUCK WIENEKE & LOVE
          CHRISTINA RETTS, ESQ.
 5        3100 West Ray Road, Suite 300
          Chandler, Arizona 85226
 6        480.420.1605
          cretts@swlfirm.com
 7
 8     For Defendant Armando Saldate:
 9        BERKE LAW FIRM
          LORI V. BERKE, ESQ.
10        1601 North 7th Street, Suite 360
          Phoenix, Arizona 85006
11        602.254.8800
          Lori@berkelawfirm.com
12
13     Also Present:
14
          Vanessa Buch
15        Katie McCarthy
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                 I N D E X
 2
 3   WITNESS: TOM VAN DORN
 4
 5   EXAMINATION                        PAGE
 6
 7   MS. GREEN..........................6
 8
 9               *   *   *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 15

TOM VAN DORN                                        November 17, 2017
MIKE vs CITY OF PHOENIX                                       5–8

Page 5

INDEX TO EXHIBITS

EXHIBIT                                    MARKED

Exhibit 81 Amended Notice for Rule 30(b)(6)    36
    Deposition

Exhibit 82 Phoenix Police Department General   120
    Order, Discipline and Misconduct,
    Revised 9/80

Exhibit 83 Defendant's Motion for              197
    Redetermination of Probable Cause,
    State of Arizona v. Ruben Rodriguez

Exhibit 84 Police Department General Order,    244
    Lines of Authority (Supervision)
    Revised 1/85

Exhibit 85 Steven Tingue Homicide Report       273
    Interview of Michael Mahler

Exhibit 86 Mike v. City of Phoenix,            291
    Transmission of Discovery for
    In-camera Inspection Pursuant to
    the Court's order of November 8,
    1991

Page 6

1        PHOENIX, ARIZONA

2        NOVEMBER 17, 2017; 9:00 A.M.

3

4

5        MS. RETTS:  Before we get started, I want to

6    note that, as we discussed, we're going to be prepared to

7    provide additional 30(b)(6) witnesses for those other

8    topics.  So if there are things that you ask that are

9    outside the scope of what he can talk about, it's not

10   that we're not going to produce someone, we just are

11   going to need to produce someone other than today on

12   whatever he might indicate if that comes up today.

13       MS. GREEN:  Sure.  No problem.  I intend to

14   go through the 30(b)(6) notice anyway so we have it clear

15   what he's going to talk about and what he isn't.

16

17            TOM VAN DORN,

18   called as a witness herein, having been first duly sworn

19   by the Certified Reporter to speak the whole truth and

20   nothing but the truth, was examined and testified as

21   follows:

22

23            EXAMINATION

24   BY MS. GREEN:

25       Q.   Hi, I'm Amelia Green.  I'm counsel for

Page 7

1    plaintiff, Debra Milke.

2        A.   Okay.

3        Q.   Could you state your name for the record,

4    please.

5        A.   You bet.  Tom Van Dorn, V-a-n D-o-r-n.

6        Q.   Okay.  And are you currently commander at the

7    Phoenix Police Department?

8        A.   I am.

9        Q.   Okay.  And what division are you in?

10       A.   I oversee community relations.

11       Q.   Okay.  And what is your age?

12       A.   Forty-seven.

13       Q.   Have you ever been deposed before?

14       A.   Yes.

15       Q.   Have you ever been deposed before as a 30(b)(6)

16   witness for the City of Phoenix?

17       A.   No.

18       Q.   Okay.  Tell me about the first time you were

19   deposed.

20       A.   Well, it's several cases throughout my career

21   obviously in various criminal trials and criminal cases,

22   and then I sometimes serve as an expert witness for both

23   the City of Phoenix, Maricopa County and Glendale on

24   matters as search and seizure, false arrest, Section 1983

25   claims, and I've been deposed in one specific case

Page 8

1    involving the Maricopa County Sheriff's Office.

2        Q.   Okay.  So could you approximate the year of the

3    first time you were deposed in any matter?

4        A.   I got hired back in 1995.

5        Q.   Okay.

6        A.   And it's just not uncommon for a police officer

7    as part of their job duties to be deposed in various

8    criminal cases throughout the course of their career.

9        Q.   Right.  I've noted that in this case.  I've

10   seen that in Arizona.  It's pretty -- it's not something

11   we have where I live, but, yeah, I understand that.

12           How about the first time you were deposed as

13   an expert witness?

14       A.   Would have been probably in the past two years.

15   Exact year -- I would have to go home and get on my

16   computer.

17       Q.   And so how many times would you say you've been

18   deposed as an expert witness on behalf of the City of

19   Phoenix?

20       A.   Related to my job duties as a police officer?

21   Never in civil litigation against the City of Phoenix

22   have I ever had to be deposed.  With respect to just my

23   job duties as a police officer, I've been on for 23

24   some-odd years, and so it's got to be quite a few.  It's

25   hard for me to give you a number.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
9–12

Page 9

1   Typically, though, we have a policy.  It is
2   rare to give an actual deposition as an officer from
3   because we have a policy that requires us to submit to
4   defense interviews.
5   Q.   Right.
6   A.   And it's only if you fail to -- neglect to
7   submit to that defense interview, then obviously you have
8   to do a deposition.
9   Q.   Sorry.  Let me clarify.  I had asked you a
10  question about the first time you were deposed in
11  connection with a civil matter.
12  A.   Uh-huh.
13  Q.   And I may have wrongly assumed that those were
14  the times you were an expert witness.  So you have also
15  been an expert witness in criminal matters?
16  A.   No, just as my job duties as a police officer.
17  Expert witness in civil litigation.
18  Q.   So I'm trying to find out the number of times
19  you've been deposed as an expert witness in civil
20  litigation.
21  A.   Okay.  Just one time for deposition.
22  Q.   Okay.  And how about how many times you've
23  testified as an expert witness?
24  A.   I have not had to testify at trial yet.
25  Q.   Okay.  And so one time as an expert witness in

Page 10

1   civil litigation.  Would you please tell me -- tell me
2   more about that case.
3   A.   It was an unreasonable force case against two
4   deputies in the Maricopa County Sheriff's Office.
5   Q.   Okay.  Do you know the case name?
6   A.   Goksoy versus Maricopa County.  G-o-k-s-o-y, if
7   I recall.
8   Q.   And that was two years ago?
9   A.   Yeah.
10  Q.   Or approximately?
11  A.   Approximately within the past two years, yes.
12  Q.   Other than that case, what other times have you
13  been deposed in connection with civil litigation?
14  A.   Just that case.
15  Q.   Okay.
16  A.   Today will be the second time.
17  Q.   Okay.  So when you were mentioning being
18  deposed multiple times, the vast majority of that was
19  when you were a police officer, the typical depositions
20  that happened --
21  A.   Correct.
22  Q.   -- before a criminal case?
23  A.   Correct.
24  Q.   Okay.  And so you mentioned something about
25  you've been deposed on matters relating to search and

Page 11

1   seizure?
2   A.   Uh-huh.
3   Q.   What were you talking about in that regard?
4   A.   Whenever the City of Phoenix and/or Phoenix
5   police officers or I've also done cases as an expert
6   witness for, like I said, the City of Glendale and
7   Maricopa County.  Officially for section 1983,
8   constitutional rights claims, unlawful search and
9   seizure, false arrest, unreasonable use of force.
10  Q.   What about -- sorry.  Go ahead.
11  A.   Yeah.  I just author expert opinions and expert
12  opinion reports related to those types of litigation
13  matters.
14  Q.   Okay.  So you've been deposed as an expert one
15  time, but you've authored multiple expert opinion reports
16  in connection with other civil litigation?
17  A.   Yes.
18  Q.   All right.  About how many times have you
19  offered expert reports in connection with civil
20  litigation?
21  A.   I'm going to say probably about ten times now.
22  I'd have to pull up all the case names for you on my
23  thumb drive at some point.
24  Q.   Okay.  And I'd like to now drill down in those
25  areas of expertise.

Page 12

1   A.   Uh-huh.
2   Q.   So you mentioned search and seizure, and so
3   walk me through an example of an expert -- like an
4   example of the context in which you would be giving an
5   expert report on search and seizure.
6   MS. RETTS:  Form.
7   You can answer.
8   THE WITNESS:  Okay.
9   Again, it just depends on whatever it is the
10  plaintiffs would be alleging as a result of that.
11  Typically a lot of it has to do with leads up to a false
12  arrest, whether or not the officers were justified in the
13  arrest that they made, whether or not they were justified
14  in the initial stop that they may have made.  So it just
15  varies from there.
16  Did reasonable suspicion or probable cause
17  exist for the officer's actions at the time?
18  Q.   BY MS. GREEN:  Okay.  And I apologize.  I
19  actually got a little bit ahead of myself.
20  Since you've only been deposed once in a
21  civil case, I want to go over some of the basic ground
22  rules just to make sure we're clear.
23  So if you don't understand any questions
24  today, just let me know, and I'll rephrase the question
25  for you.  Okay?

EXHIBIT 15

TOM VAN DORN                                    November 17, 2017
MIKE vs CITY OF PHOENIX                                    13–16

Page 13

1    A.   Sure.
2    Q.   And if you don't ask me what I meant or
3    indicate you don't understand, I'm going to assume you
4    understand the question.
5    A.   Okay.
6    Q.   If you need to take a break at any time, just
7    let me know.  I'll just ask that you just answer the
8    pending question and we can take a break.
9    A.   Okay.
10   Q.   And as other attorneys in the room know, I kind
11   of have a problem with this, jumping in and speaking over
12   people a little bit, but I'm going to try my best to not
13   interrupt you when you're answering a question, and then
14   if you could try your best even if you know the answer to
15   the question in your head and you're ready to answer, to
16   wait until I complete my question before you begin your
17   answer, we'll have a clean record, and it will make life
18   a lot easier for the court reporter.  Okay?
19   A.   Sounds good.
20   Q.   And finally your attorney, Ms. Retts -- she may
21   object from time to time.  Unless she explicitly
22   instructs you not to answer the question, you can just
23   answer the question after the objection.
24   A.   Okay.
25   Q.   All right.  So we were talking a little bit

Page 14

1    about your expertise in search and seizure matters
2    including whether or not there's probable cause to
3    initiate a search.  So you've done one expert report on
4    that or more than --
5    A.   I've done multiple expert reports on that.
6    Q.   Okay.  And have all the expert reports you've
7    done been on behalf of the City -- and, again, I'm
8    talking now about the written expert reports, not the
9    time you testified in that other case you told us about.
10   Have they been on behalf of only the City of Phoenix?
11   A.   No.
12        MS. RETTS:  And for "expert reports," could
13   you clarify that they were -- I don't want you to answer
14   if you have given a report and it has not been disclosed,
15   if you know, if you're not able to say because if you're
16   a consulting expert witness versus a disclosed expert
17   witness, if you could, just answer to those that you've
18   been disclosed as an expert witness.
19        THE WITNESS:  Okay.  I don't know the answer
20   to that question, to be honest with you.
21        MS. RETTS:  Okay.
22        THE WITNESS:  I've just obviously been
23   asked -- yes, a vast majority of cases were for the City
24   of Phoenix and then the one with Maricopa County and the
25   one with Glendale.  Whether or not it was disclosed, I

Page 15

1    don't know.
2        MS. RETTS:  Okay.
3        THE WITNESS:  But I authored reports and
4    turned them over to the City attorney's office.
5    Q.   BY MS. GREEN:  Okay.  So you mentioned you
6    provided expert reports on search and seizure, practices
7    and policies.  Could you walk me through some of the
8    other areas you provided expert opinion about?
9    A.   Unreasonable force.
10   Q.   Okay.
11   A.   Like I said, false arrest claims.  I think
12   that's pretty much it, just a vast majority related to
13   the law enforcement profession, law enforcement
14   operations.
15   Q.   Have you -- fair to say you're generally
16   familiar with the policies and procedures of the City of
17   Phoenix Police Department with respect to investigations?
18   A.   Yes.
19        MS. RETTS:  Form.
20   Q.   BY MS. GREEN:  Including practices relating to
21   interrogations?
22   A.   Yes.
23        MS. RETTS:  Form.  During what time frame?
24   Q.   BY MS. GREEN:  In connection with your expert
25   testimony in other matters, what time periods did you

Page 16

1    testify about generally?
2    A.   I can -- I was hired in 1995.  So 1995 to
3    present.
4    Q.   Okay.  In connection with -- that's fine.
5        Are you consulting any of the defendants in
6    this case as an expert?
7        MS. RETTS:  I don't think it's a proper
8    question because if he's consulting as an expert witness,
9    then that would be a consulting expert witness who's
10   privileged.  There's a privilege as to consulting
11   experts.
12   Q.   BY MS. GREEN:  Okay.  All right.  Now I'd like
13   to -- now I'd like to turn to your employment at the
14   Philadelphia Police Department.
15        MS. RETTS:  Form.
16   Q.   BY MS. GREEN:  I'm sorry, the City of
17   Phoenix -- I'm sorry, I have a case involving the
18   Philadelphia Police Department, and I have a case
19   involving Phoenix, and they both go by PPD.  It's very
20   hard for me sometimes.  So I apologize for that.
21        So you're currently employed by the City of
22   Phoenix Police Department?
23   A.   Yes.
24   Q.   Okay.  And you told us you began working there
25   in 1995.  Correct?

EXHIBIT 15

Page 17

1      A.    Correct.

2      Q.    Did you have any other employment with the City

3   of Phoenix prior to that?

4      A.    No.

5      Q.    When you began working for the Phoenix Police

6   Department in 1995, what was your first role?

7      A.    Well, police recruit in the academy.

8      Q.    All right.  So you attended the academy?

9      A.    Correct.

10     Q.    Okay.

11           Graduated from the academy and was sworn in as

12   a police officer and served in the patrol division as a

13   police officer.

14           From there, I served as an administrative

15   officer to the South Mountain Precinct.  Then from there,

16   I applied for an officer position.  At the time, it was

17   the department's -- what we referred to the department's

18   legal unit.

19     Q.    Okay.  Let's -- can you give me approximate

20   years as you're going through this?  No?  Let's take it

21   step by step.

22     A.    I would have to pull up my resume.

23     Q.    That's okay.  We can do it to the best of your

24   recollection.  I know it's an approximation.

25           So you were sworn in as a police officer.

Page 18

1   You were in the patrol division for about how long?

2      A.    Four to five years.

3      Q.    Okay.

4      A.    And then in the legal unit starting around

5   '99/2000 approximately.

6      Q.    Okay.

7      A.    And then served in the --

8      Q.    I'm sorry.  Actually go ahead.

9      A.    And then served in the legal unit for probably

10   eight years or so, and then I went back out to the street

11   as a patrol sergeant, field training sergeant, undercover

12   sergeant for the criminal squad.

13     Q.    So around what year did you go back out as a

14   patrol sergeant?

15     A.    Let's see.  Maybe 2009-ish approximately.

16     Q.    Okay.  And --

17     A.    I don't know if it's been official.  I do have

18   access to my resume.  It's whether or not you want me to

19   be specific on the years or not.

20     Q.    I think it's okay.

21     A.    Okay.

22     Q.    I'm just trying to get a general sense of where

23   you've been.

24           MS. RETTS:  We can always provide that

25   later.

Page 19

1           MS. GREEN:  Okay.

2      Q.    BY MS. GREEN:  So patrol sergeant around 2009.

3   You stayed in that role for how long before you became a

4   field training sergeant?  Again, an approximation.

5      A.    Patrol sergeant just for a few months until the

6   field training sergeant position opened, and I stayed as

7   a field training sergeant for a couple of years.  And I

8   apologize.

9           So then before the undercover assignment,

10   too, then I served in what we call neighborhood

11   enforcement team sergeant, which is still within our

12   patrol division, and that's to conduct follow-up on

13   crimes committed within the precincts.  It's both a

14   uniform and a nonuniform assignment, and then I did the

15   undercover assignment for two to three years in the

16   career criminal squad as a sergeant.

17     Q.    So around what year does that put us?

18     A.    Where does that put me?

19     Q.    Actually it's okay.  Just keep going.

20     A.    Three years, somewhere in there.

21           After that, I tested and became lieutenant.

22     Q.    Okay.  Do you remember the year of lieutenant?

23     A.    2011, 2012 maybe, somewhere in there.

24     Q.    Okay.

25     A.    I was assigned as a patrol lieutenant.  Then

Page 20

1   let's see.  Where did I go from there?  Resource

2   lieutenant which is still all within the patrol division,

3   just a different assignment.

4      Q.    What does a resource lieutenant do?

5      A.    They're in charge of the community action

6   teams, neighborhood enforcement teams, anything that is

7   not specifically patrol related.  We just provide --

8   we're the resource element to the patrol officers for

9   follow-up on investigations, community engagement and

10   outreach and those types of functions.

11     Q.    Okay.

12     A.    And then I was assigned as the investigations

13   lieutenant in the Professions Standard Bureau.  Most

14   people know that as internal affairs.

15     Q.    And what year was that?

16     A.    Maybe '14-ish.

17     Q.    So tell me about the different types of

18   lieutenants in the Internal Affairs Bureau at the time.

19   You said you were an investigations lieutenant --

20     A.    Yeah.

21     Q.    -- as opposed to?

22     A.    Professional standards is comprised of two

23   different details, an inspections detail and an

24   investigative detail.

25     Q.    Okay.

EXHIBIT 15

TOM VAN DORN                                    November 17, 2017
MIKE vs CITY OF PHOENIX                                    21–24

Page 21

1    A.    The inspections detail are pretty much kind of
2    our auditors, for lack of a better term, to assist in
3    data gathering and analysis to identify any gaps that may
4    exist with reporting requirements and to conduct the
5    research for any investigations that may exist.  So I was
6    on the investigation side, though, investigating
7    allegations of misconduct on the part of Phoenix police
8    officers.
9    Q.    Okay.
10   A.    Then from there, commander obviously in
11   February of this year.
12   Q.    And you're not in PSB anymore.  Right?
13   A.    I'm not.
14   Q.    Where are you commander at?
15   A.    Community relations and public affairs.
16   Q.    When you were in the legal unit between 19- --
17   for eight years or so, you said -- sometime around 1999
18   or 2000 you joined -- can you tell me about -- a little
19   bit about your responsibilities there?  Actually
20   withdrawn.
21         At that time, the legal unit was separate
22   from internal affairs or it was the whole thing -- it was
23   all the same thing?
24   A.    They were part of the same division but
25   completely separate job functions.

Page 22

1    Q.    Okay.  What was the name of that division?
2    A.    It was the professional standards and legal
3    support division.
4    Q.    Okay.  Are they now separate today?
5    A.    Yes.
6    Q.    Okay.  So when you were in the legal unit in
7    1999 or 2000, technically you were basically part of PSB
8    at that time as well?
9    A.    No.
10   Q.    No.
11   A.    Completely different chains of command and
12   separate job functions.
13   Q.    Okay.  So tell me about the job function.  Tell
14   me about the general role of the legal unit in that
15   period of time within the entire department.
16   A.    Okay.  Both sworn and nonsworn attorneys
17   provided legal advice to the entire Phoenix Police
18   Department throughout all chains of command, and then we
19   had myself when I started off in the legal unit to assist
20   the attorneys in gathering documents related to civil
21   litigation against the department and the City.  If I
22   were to equate it to anything, I guess legal assistant,
23   for lack of a better term.
24   Q.    So the eight -- entire eight years or so that
25   you were in the legal unit, you were a legal assistant?

Page 23

1    A.    Yeah.
2    Q.    Okay.
3    A.    It did change.
4    Q.    So when you joined the legal unit, you were a
5    legal assistant?
6    A.    Yes.
7    Q.    And your primary responsibilities were
8    gathering documents to respond to Court orders?
9    A.    Correct, subpoenas, public records requests,
10   you name it.
11   Q.    Got it.  And how long did you remain as a legal
12   assistant?
13   A.    It was for a few years until I was admitted
14   into law school in 2001.
15   Q.    And where did you attend law school?
16   A.    Arizona State University.
17   Q.    All right.  And you graduated with a law
18   degree?
19   A.    Yes.
20   Q.    In what year?
21   A.    2004.
22   Q.    And you became a bar attorney in the State of
23   Arizona?
24   A.    Correct.
25   Q.    And what year was that?

Page 24

1    A.    End of 2004/2005.
2    Q.    So you were a legal assistant first, and then
3    what was your next role in the legal unit?
4    A.    Once I became more certified, I served as a
5    legal advisor for the Phoenix Police Department to the
6    police chief in the department.
7    Q.    How many legal advisors were there in the
8    Phoenix Police Department at that time?
9    A.    At the time that I was there, they had two or
10   three.
11   Q.    So you had a fairly large responsibility in
12   that period of time with respect to giving legal advice.
13   If there's only two or three of you --
14   A.    Correct.
15   Q.    -- any legal advice that needs to be given
16   that's being given within the department is either being
17   given by you or one or two other people?
18   A.    Correct.
19        MS. RETTS:  Form.
20   BY MS. GREEN:  And you advised the chief
21   directly?
22   A.    Yes.
23   Q.    Did you -- what type of matters did you advise
24   the chief on?
25   A.    Anything related to the daily operations of law

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
25–28

Page 25

1 enforcement to personnel matters.

2    Q.    Could you give me a few examples?

3    A.    An officer's out on a specific call.  They're a
4 little confused as to what it is they may or may not be
5 able to do under the circumstances or need some guidance
6 with respect.  So they would call up and speak to one of
7 the on-call attorneys at the time, and we would provide
8 them advice.  And then personnel matters related to, you
9 know, discipline or anything of that nature.

10    Q.    So in that role, advising on discipline,
11 disciplinary and personnel matters, you obviously had to
12 familiarize yourself with the Phoenix Police Department
13 policies and procedures with respect to discipline?

14    A.    Yeah, operations orders, personnel rules, the
15 law.

16    Q.    Okay.  And similarly in that role as a legal
17 advisor, you also were very familiar with the general
18 orders and Phoenix Police Department rules and policies
19 with respect to the inappropriate conduct of an
20 investigation of a crime?

21        MS. RETTS:  Form.

22        THE WITNESS:  Well, very knowledgeable in
23 what our policies specifically direct our officers to do
24 under the circumstances.  Obviously there may be times
25 where I gave advice if officers chose to go outside what

Page 26

1 it is the policy has to say.

2        Recognizing that any advice that I gave was
3 simply just that, it was advice.  It was always left to
4 the department head, the police chief at the particular
5 time, to decide which direction or which way the
6 department was going to go in any given specific matter.

7    Q.    BY MS. GREEN:  Okay.  But in order to give that
8 advice, you had to understand what the basic policy
9 was --

10    A.    Correct.

11    Q.    -- as written?

12    A.    Yes.

13    Q.    And that would include the policies regarding
14 interrogations?

15    A.    During the time frame that I've been on the
16 department, yes.

17    Q.    Okay.  And that would also include policies
18 regarding documentation of investigations?

19    A.    Yes.

20    Q.    And that would also include -- withdrawn.

21        And so I think we covered this, but -- so
22 you've never had any other City employment outside the --
23 outside of the Phoenix Police Department?

24    A.    No.

25    Q.    You have had other City employment?

Page 27

1    A.    No.

2    Q.    I'm sorry?

3    A.    City of Phoenix Police Department.

4    Q.    Only?

5    A.    Yes.

6    Q.    Before 1995 when you became a patrol officer,
7 what were you doing?  Was that directly --

8    A.    I was bartender and restaurant manager back in
9 Iowa.

10    Q.    Okay.  Any other law enforcement experience
11 aside from your experience in the Phoenix Police
12 Department that we just talked about?

13    A.    Only as a police explorer back in Des Moines,
14 Iowa.

15    Q.    A police explorer?

16    A.    Uh-huh.

17    Q.    What is that?

18    A.    It's a division of the Boy Scouts of America.
19 The vast majority of police departments in the US have
20 explorers of cadets.  It just allows you as a teenager to
21 gain greater insight into law enforcement profession if
22 you have an interest.

23    Q.    Okay.  And aside from your law school education
24 from 2001 to 2004, I wanted to take a step back and touch
25 on some of your other education.

Page 28

1    A.    Uh-huh.

2    Q.    So when did you graduate from high school?

3    A.    1989.

4    Q.    Okay.  And where did you attend high school?

5    A.    Roosevelt High School in Des Moines, Iowa.

6    Q.    And did you have any college experience?

7    A.    Right after high school?

8    Q.    Yeah.

9    A.    No, I enlisted into the military first.

10    Q.    And what year was that?

11    A.    It would have been '89 through '94, four years
12 active time and two years inactive time.

13    Q.    Okay.  And what part --

14    A.    I was an Army Reserve military police officer.

15    Q.    Okay.  And where did you go after that?

16    A.    After that was over, I started here in 1995.

17    Q.    So were you attending college courses at the
18 same time you were --

19    A.    No, all of my college credits have been while
20 I've been a Phoenix police officer.  So my bachelor's
21 degree -- bachelor's of science was also during my
22 employment with the Phoenix Police Department.

23    Q.    Okay.  And where is your bachelor's degree
24 from?

25    A.    University of Phoenix.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
29–32

Page 29

1    Q.    And what year did you obtain that?

2    A.    All these years.  It would have been around

3  '99/2000, just shortly -- about a year prior to going

4  into law school.

5    Q.    And so I take it you were taking part-time

6  classes at the University of Phoenix while you were also

7  working?

8    A.    Correct.

9    Q.    Okay.  So how many years -- about how many

10  years did that take you to obtain your bachelor's degree?

11    A.    Three to four years.

12    Q.    Okay.  And what is your degree in?

13    A.    So bachelor of science in business management.

14    Q.    And what made you decide you wanted to move

15  from the patrol role that you had to the legal unit in

16  1999?

17    A.    As a child, I wanted to be one of two things

18  when I grew up, either a police officer or a lawyer.  So

19  I just decided to become both.

20    Q.    Got it.  And then why did you decide to go back

21  out to patrol in 2009 as a sergeant?

22    A.    Again, it's balancing my life.  As a kid, I

23  wanted to be both.  I enjoyed my career as much as a

24  police officer as I did now becoming an attorney.  So I

25  just missed the police officer side of my life.  So I

Page 30

1  voluntarily left my position in the legal unit to go back

2  out.

3    Q.    Okay.

4        MS. GREEN:  Tina, regarding your objection

5  to question about whether he's going to be an expert for

6  one of the defendants in this case, I think that goes to

7  his -- that could go to bias and credibility in this

8  matter if you're going to be someone's expert and then

9  also a fact witness.

10        And so I would like to jump back to that and

11  find out whether or not he is going to be an expert in

12  this matter.

13        MS. RETTS:  Well, he's not.  The principle

14  is that you still can't ask about it.  So you can ask

15  him, and he'll say he's not, but --

16        MS. GREEN:  I just thought if somebody is

17  going to be a 30(b)(6) witness and later we'll see an

18  expert report from him -- you can understand why that's a

19  little -- that could cause some concerns.

20        MS. RETTS:  Yeah, I think that doesn't

21  preclude him if you're asking him questions right now

22  that could get into the scope of being a fact witness

23  with expert opinions.  That doesn't preclude him from

24  being that, but he's not going to be a hired expert per

25  se.

Page 31

1        MS. GREEN:  So you're saying you would use

2  him as an unretained expert?

3        MS. RETTS:  Well, it depends on his

4  testimony.  I think 30(b)(6) witnesses are often asked

5  questions that can foray into that.  I don't know what

6  you're going to ask.  So that's kind of a hypothetical

7  scenario.

8        MS. GREEN:  Okay.  So it is possible that

9  you may use him as an unretained expert in this matter

10  based on his testimony today?

11        MS. RETTS:  It could happen.  I don't know.

12  I mean, that's kind of what happens in a 30(b)(6)

13  deposition is that you're asking expert type questions.

14  I mean, that's -- the scope of your 30(b)(6) covers

15  things that could be considered expert-ish.

16        MS. GREEN:  I thought it was just covering

17  what the policies and practices and procedures were in

18  the Phoenix Police Department at a particular time and

19  what the search was for at a particular time.  I didn't

20  realize we were --

21        MS. RETTS:  I don't know what you're going

22  to ask.

23        MS. GREEN:  Okay.

24        MS. RETTS:  Herein lies the problem:  If

25  you're going to stick with just here's what the policies

Page 32

1  are and have him confirm that, but we've gone into a lot

2  of his background and more extensive things, and the

3  preliminary questions that are coming up to this are

4  leading into the suggestion that you might ask him

5  something more broad.

6        So if you're going to stick to things like

7  that, then I'm going to say he's not going to be an

8  expert witness, but I don't think at this point, without

9  knowing what you're asking, that I could cabin myself to

10  say that he doesn't have fact witness expert type

11  opinions.

12        MS. GREEN:  Okay.

13        Let's take a short break, please.  Thanks.

14        (A recess was held off the record from 9:34

15  to 9:39.)

16    Q.    BY MS. GREEN:  Okay.  Now I wanted to turn and

17  talk a little bit about your knowledge of this particular

18  lawsuit.  What is your understanding of this lawsuit?

19        MS. RETTS:  Form.

20        THE WITNESS:  Don't know.  I haven't

21  bothered to look at the summons and complaint.  Obviously

22  just approached by the City attorneys regarding what my

23  role was in gathering documentation back in my early

24  years at the legal unit.

25    Q.    BY MS. GREEN:  Okay.  So you have no sense

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
33–36

Page 33

1 whatsoever about who the plaintiff is?

2    A.    By name, but specifically the facts surrounding

3 it, no.

4    Q.    You have no sense whatsoever regarding the

5 allegations against the City of Phoenix in this lawsuit?

6        MS. RETTS:  Form.

7        THE WITNESS:  No results from her conviction

8 and something involving a former detective with the

9 Phoenix police officers, but the specific allegations you

10 may have alleged against the City, that I do not know.

11    Q.    BY MS. GREEN:  That's what I mean.  I'm trying

12 to find out what you know about the lawsuit.

13    A.    Yes.

14    Q.    So you know that there was -- the plaintiff is

15 Debra Milke.

16    A.    Uh-huh.

17    Q.    Correct?

18    A.    Correct.

19    Q.    You also know that Debra Milke was convicted of

20 a crime?

21    A.    That I do.

22    Q.    Do you know what the crime was?

23    A.    I believe homicide.

24    Q.    Okay.

25    A.    But that's it.

Page 34

1    Q.    You don't know anything else about the crime?

2    A.    No.

3    Q.    You know that her conviction was overturned?

4        MS. RETTS:  Form.

5        THE WITNESS:  I do now.

6    Q.    BY MS. GREEN:  Okay.  So you didn't know that

7 before today?

8    A.    No.

9    Q.    As far as you knew, Debra Milke may still be in

10 prison?

11    A.    Yes.

12    Q.    Suing from prison?

13        MS. RETTS:  Form.  Argumentative.

14        THE WITNESS:  Again, unless you tell me her

15 current status, I have no idea what the current status of

16 Ms. Milke may be.

17    Q.    BY MS. GREEN:  Okay.  And do you know the name

18 of the -- you mentioned that Ms. Milke had made some

19 allegations regarding a former officer.  Do you know the

20 name of that officer?

21    A.    Detective Saldate.

22    Q.    Okay.  Did you have any experience with

23 Detective Saldate during your time at the Phoenix Police

24 Department?

25    A.    I did not.

Page 35

1    Q.    Never seen him come up in the -- in your time

2 in the Professional Standards Bureau?

3        MS. RETTS:  Form.

4        THE WITNESS:  With respect to -- the only

5 thing I can tell you about Detective Saldate at the

6 moment is to start gathering documents related to this

7 litigation back in the day.

8    Q.    BY MS. GREEN:  Okay.  But not familiar with

9 any -- you are not personally familiar with any

10 investigations of him?

11    A.    I am not.

12    Q.    Okay.  Do you know anything about any of the

13 other defendants in this lawsuit?

14    A.    I do not.

15    Q.    So other than that, Ms. Milke is suing in

16 relation to a conviction and this case involves the City

17 of Phoenix and Detective Saldate, you don't have any

18 sense whatsoever of what her claims are against -- with

19 respect to this lawsuit?

20        MS. RETTS:  Form.

21        THE WITNESS:  It has -- related to possibly

22 the interrogation by Detective Saldate of her, and that's

23 pretty much it.  And that gleans from my knowledge,

24 again, of the type of documents and stuff that I gathered

25 back in the day.

Page 36

1    Q.    BY MS. GREEN:  Okay.  And what do you -- what

2 is your understanding of Ms. Milke's allegations with

3 respect to Detective Saldate's interrogation of her?

4    A.    Again, without reading the summons and

5 complaint, just if I go back to remembering and reviewed

6 the letters of course that I -- things that I did back in

7 the day that her statement may have been coerced or

8 something of that nature, but, again, I haven't read her

9 actual allegations against the City of Phoenix.

10    Q.    So you never read the complaint in this matter?

11    A.    I have not.

12    Q.    Okay.

13        (Exhibit 81 was marked for identification.)

14    Q.    BY MS. GREEN:  So I've just marked a document

15 Exhibit 81.

16    A.    Okay.

17    Q.    This is the 30(b)(6) notice of deposition in

18 this matter.

19    A.    Okay.

20    Q.    Or one version of it.  It was amended yesterday

21 to change the time today to 9:00 a.m.  This is the

22 previous version of that I'll represent.

23        And so first off, before I actually get to

24 the document, so you're now aware that the City of

25 Phoenix is a defendant in this matter?

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
37—40

Page 37

1    A.   Yes.

2    Q.   Before today, were you aware of that?

3    A.   Yeah, back when I started gathering documents
4  and when I was assigned to the legal unit.

5    Q.   But this week -- I presume you did some
6  preparation for this deposition?

7    A.   I reviewed my testimony from the Attorney
8  General's Office along with reviewing my letters back to
9  the Court on document requests.

10   Q.   Okay.  So as you were preparing for this
11 deposition today, in the past few weeks or whenever you
12 began your preparation, you were not aware or you did not
13 recall that the City of Phoenix is a defendant in this
14 matter?

15       MS. RETTS:  Form.  Misstates his testimony.

16       THE WITNESS:  I've always known that the
17 City of Phoenix was a defendant in the matter.  Again,
18 the specific allegations against the City of Phoenix by
19 your client, no.

20   Q.   BY MS. GREEN:  Okay.  So before today, you did
21 know the City of Phoenix -- before today, you knew the
22 City of Phoenix is a defendant in this matter?

23   A.   Yes.

24   Q.   Okay.  Because I'll represent to you at the
25 time you were reviewing -- doing that personnel file

Page 38

1  search in 2001, there was no civil lawsuit.

2    A.   Okay.

3    Q.   So I'm just trying to narrow down that you knew
4  that this civil lawsuit implicates the City of Phoenix as
5  a defendant.

6    A.   Okay.  Yes, that I do know.

7    Q.   Okay.  And you understand that as a 30(b)(6)
8  witness, you're here today testifying on behalf of the
9  City of Phoenix?

10   A.   I do.

11   Q.   Okay.  And you understand your testimony is
12 going to be taken as the official position of the City on
13 these matters?

14   A.   Yes.

15   Q.   Okay.  So let's take a look at the 30(b)(6)
16 notice.

17   A.   Okay.

18   Q.   Beginning on page 2.  So have you seen this
19 document before?

20   A.   Yes, counsel for the City showed it to me prior
21 to my coming here.

22   Q.   When did you first see this document?  It's
23 fine.  Estimation --

24   A.   Week and a half, two weeks ago.

25   Q.   Two weeks ago, okay.

Page 39

1        So as Tina mentioned -- as Ms. Retts
2  mentioned on the record earlier, the City has told us
3  they're going to be producing multiple 30(b)(6) witnesses
4  in connection with this matter.  So what I would like to
5  do is go through each of these topics one by one and
6  find -- get your testimony about what you're prepared to
7  testify about here today.

8    A.   Okay.

9    Q.   And what -- your understanding of what you're
10 going to be testifying about here today.

11       So why don't you just read topic 1 to
12 yourself including A through C.

13   A.   Okay.

14   Q.   Are you prepared to testify about this topic
15 today?

16       MS. RETTS:  Form.

17       THE WITNESS:  I can testify as to the fact
18 that whatever policies may have been in existence from
19 1975 to 1990 as to -- the form as to whether or not they
20 would have likely been the policies of the Phoenix Police
21 Department, but I was not employed by the City during
22 that time.

23       I can testify to that -- do they appear to
24 be in the same structure and form as to what a Phoenix
25 Police Department policy would look like.

Page 40

1    Q.   BY MS. GREEN:  So you can look at a page of a
2  policy and say whether or not this is the structure and
3  form of what a Phoenix Police Department policy looks
4  like?

5    A.   Correct.

6    Q.   But you cannot confirm that that was the
7  policy -- if you see the page of the policy, it's your
8  understanding you cannot confirm whether that policy was
9  in effect at the time of the date on the policy?

10   A.   Yeah.

11       MS. RETTS:  Form.

12       THE WITNESS:  Yes.  I can tell you that,
13 again, whatever date is on there likely would have been
14 the policy of the Phoenix Police Department at the time
15 based upon structure and form.

16       MS. RETTS:  As we indicated in
17 correspondence, if you could show him the custodian of
18 records affidavits that were produced with those, then he
19 can verify based upon his experience in the legal unit
20 and how documents are gathered that those are in fact the
21 policies as they were produced by that custodian.

22       MS. GREEN:  In connection with this
23 litigation, you produced approximately a thousand pages
24 of policies in response to our RFP requests and discovery
25 requests.

EXHIBIT 15

Page 41

1    MS. RETTS:  Yes.
2    MS. GREEN:  So we've gotten a lot more
3  policies than something that's been -- if you are talking
4  about those particular --
5    MS. RETTS:  Those particular policies came
6  with the custodian-of-records declaration, and he can
7  tell you this is how it works.  The custodian -- when a
8  request comes in, the custodian will prepare an affidavit
9  that verifies that those are the policies in place.
10    And if you show him the affidavit, he can
11  tell you and verify for certain, yes, these are the
12  policies in addition to the form and structure.  Based
13  upon the custodian-of-records affidavit that's been
14  produced in this litigation, these are the policies and
15  procedures in effect, and that's a one pager that went in
16  front of that entire production.
17    MS. GREEN:  Okay.  If we don't show him the
18  affidavit, he's not prepared to talk about -- to verify
19  any policies.  Is that your representation?
20    MS. RETTS:  I can show him the affidavit.
21    MS. GREEN:  Okay.
22    MS. RETTS:  But he's going to need to see
23  the affidavit.
24    Q.   BY MS. GREEN:  Have you reviewed any -- in
25  preparation to testify today on this topic, have you

Page 42

1  reviewed any policies from 1975 to 1990 regarding these
2  topics?  I'm talking about topics listed in subsections
3  1A through C of Exhibit 81.
4    A.   I have briefly glanced at policies that were
5  produced in connection with this litigation within the
6  past week or so, yes.
7    Q.   You've briefly glanced at policies produced in
8  this litigation?
9    A.   Yes.
10    Q.   In preparation to testify about 1A through C?
11    A.   Again, all I'll be able to specify is would
12  these have been the policies in effect during that time
13  frame.
14    Q.   Okay.  So as we go through this notice today,
15  I'm also interested in getting everything you did to
16  prepare on each of these topics to testify here today,
17  and so I can go through the topics and find out what
18  you're prepared to testify about, but it's coming to me
19  that it might be easier to go through topics, talk about
20  what you're prepared to testify about and talk about what
21  you did to prepare.
22    A.   Uh-huh.
23    Q.   So if that works for you, let's do that with 1A
24  through C.
25    So you just told me that you briefly glanced

Page 43

1  at some policies.  Do you recall any -- the subject
2  matter of the policies that you glanced at?
3    A.   No, I sat down with counsel for the City of
4  Phoenix when I was asked whether or not -- to be looked
5  at as a 30(b)(6) witness and those type of things, to
6  discuss what could I and could I, you know, not testify
7  to based upon my experience and knowledge since I started
8  employment with the City of Phoenix.
9    In that was a notebook about this size that
10  contained several policies and procedures of the Phoenix
11  Police Department.  Did I take the time to read every
12  single page in the notebook?  No I did not.
13    Q.   Did you take the time to try to identify those
14  policies that might cover the topics in subsections A
15  through C?
16    A.   I glanced at the years of the actual policies
17  but did not read every page for the content of the actual
18  policy.
19    Q.   Do you know if what was provided to you in that
20  notebook included policies relevant to subsections A
21  through C, or was it just a notebook of any policy that
22  has been produced in this litigation?  Do you know one
23  way or the other?
24    MS. RETTS:  Form.
25    THE WITNESS:  I did see policies in there

Page 44

1  related to interviews and interrogations and some other
2  things, but, again, I didn't read every single page.
3    Q.   BY MS. GREEN:  So, for example, one thing I
4  know is that some policies have been produced in
5  connection with this litigation regarding evidence
6  collection.
7    A.   Uh-huh.
8    Q.   But evidence collection is not, you know, a
9  topic in 1A through C.  Do you recall if the notebook had
10  evidence collection policies in it?
11    A.   I don't recall.
12    Q.   Okay.  Like essentially I'm trying to figure
13  out whether the notebook you looked at had all the
14  policies that had been produced in this litigation or if
15  you were looking at policies that were actually about
16  these topics specifically, and it seems like you can't
17  tell me one way or the other.
18    A.   I can't.
19    Q.   Okay.
20    A.   Multiple policies were produced within the
21  notebook, but whether they were specific to this or all
22  the policies produced as a result of this litigation,
23  that I can't tell you.
24    Q.   Okay.  Do you recall seeing a Miranda policy in
25  that notebook?

EXHIBIT 15

TOM VAN DORN                                          November 17, 2017
MIKE vs CITY OF PHOENIX                                        45–48

Page 45

1   A.   No.

2          MS. RETTS:   Form.

3   Q.   BY MS. GREEN:   And in preparation to testify

4   here today, you don't recall reviewing any policies

5   regardless of year relating to reading a suspect their

6   Miranda rights in connection with an interrogation or

7   police investigation?

8   A.   I believe one of the policies -- I looked at

9   the bold header, what the title of the policy was called.

10  I believe there was some sort of an interview or

11  interrogation type policy, but as far as what would have

12  been the specific policy during that year, I did not read

13  it page by page, no.

14  Q.   When did you look at this notebook?

15  A.   Within the past week or two.

16  Q.   Okay.  And you looked at it one time?

17  A.   Twice.

18  Q.   Did you take it home with you?

19  A.   It stayed in my office.

20  Q.   Okay.  About how long did you spend with this

21  notebook?

22  A.   Probably two hours.

23  Q.   And as you sit here today, you can't recall one

24  way or the other whether you read the substance of the

25  Miranda policy.  You just recall seeing the heading --

Page 46

1   A.   Correct.

2   Q.   -- relating to interviews?

3   A.   I did not read the entire policy.

4   Q.   Okay.  You don't recall reading any of the

5   policy as you sit here today?

6          MS. RETTS:   Form.

7          THE WITNESS:   No, I did not read the

8   substance of every policy that was produced or shown to

9   me.

10  Q.   BY MS. GREEN:   My question is whether you

11  recall reading the substance of a Miranda policy --

12  A.   No.

13  Q.   -- as you sit here today?  Thank you.

14         Other than seeing the heading conducting

15  interviews or interrogations of witness -- I'm sorry,

16  withdrawn.

17         Other than seeing a heading regarding

18  interviews and interrogation or something of the like, do

19  you recall actually reading the substance of an interview

20  or interrogation policy?

21  A.   Well, I know our current policy, I mean, yeah,

22  throughout the course of my career.  With respect to this

23  litigation, no, I did not read the substance of those

24  policies that were produced from me prior to this

25  deposition.

Page 47

1   Q.   Okay.  Other than spending two hours glancing

2   through that thick notebook, is there anything else you

3   did to prepare for -- to testify regarding topics 1A

4   through C?

5   A.   No.

6   Q.   Okay.

7          MS. RETTS:   1A through C -- we only

8   identified him to verify the policies, not talk about the

9   substance.

10         MS. GREEN:   Just trying to get it clear on

11  the record what -- the preparation that's been done.

12  Q.   BY MS. GREEN:   Okay.  Let's move on to topic 2.

13  Just read it to yourself and let me know when you've had

14  the chance.

15  A.   Okay.

16  Q.   Are you prepared to testify on this topic

17  today?

18         MS. RETTS:   Form.

19         THE WITNESS:   I can testify as to the

20  documents I would produce back when I was assigned to the

21  legal unit, which I do believe there was one associated

22  with whatever training Detective Saldate may have

23  received, but, again, it was just solely me reaching out

24  to gather any documents that may have been in existence

25  at the time the Court order came down.

Page 48

1   Q.   BY MS. GREEN:   Okay.  So you're prepared to

2   testify about what was produced in 2001 when you actually

3   did this search?

4   A.   Correct.

5   Q.   Okay.  In 2013, there were additional searches.

6   Did you review -- for the personnel file and training

7   records, did you review any documents in connection with

8   those searches in order to testify here today?

9   A.   I briefly glanced at the documents I had

10  already produced back in those years that I would have

11  authored those letters.

12  Q.   Okay.  Well, I can represent to you -- and we

13  have some exhibits here later today -- that in 2013 there

14  was an additional search.  I'm sure you recall this whole

15  back and forth.  There was an additional search.  I think

16  you even gave another affidavit at that time, and as a

17  result of that additional search, some additional

18  training materials were found and produced.

19         Do you know if you're prepared to verify

20  those training materials today?

21  A.   Yes, I can verify those.

22  Q.   Have you been prepared to verify any other

23  training materials that have been produced in connection

24  with this litigation?

25  A.   I guess it would depend on which training

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
49–52

Page 49

1  materials you plan to produce.

2  Q.   For example, this past summer we had an

3  unsealing order with the Maricopa County Superior Court

4  where we asked to unseal some records.  That included

5  some training records.  Did you ever look at those?

6  A.   I believe there was one training record

7  included in the notebook provided by city council to me.

8  Q.   Okay.  And I'm happy --

9  A.   That came from that.

10  Q.   Okay.  And I'm happy to keep refreshing your

11  recollection, but when I ask these questions, that's what

12  I'm looking for, everything that you remember that you're

13  prepared to testify about.

14  A.   Uh-huh.

15  Q.   Okay.  Are there any other training materials

16  that you can recall seeing that you are prepared to

17  verify today?

18      MS. RETTS:  Form.

19      THE WITNESS:  Again, without knowing which

20  training materials you plan to show me, it's hard for me

21  to answer that question.

22  Q.   BY MS. GREEN:  So you don't know one way or the

23  other?

24      MS. RETTS:  Form.

25  Q.   BY MS. GREEN:  Is that what you're saying?

Page 50

1  A.   Well, I'm not going to know unless you show me

2  what --

3  Q.   I'm asking what you recall, what's in your head

4  right now.  So do you know whether or not you are able to

5  verify any other training materials as you sit here today

6  right now without me showing you anything else?

7  A.   The possibility exists that I may be able to

8  verify some, and I may not be able to verify some.

9  Q.   Okay.  So you might be able to verify something

10  even if you've never seen it before.  Is that what you're

11  saying?

12  A.   Correct.

13  Q.   Okay.  And are you prepared to talk about the

14  substance of any training Mr. Saldate has received?

15  A.   Other than being able to verify that would it

16  be the training record of Detective Saldate, no, I was

17  not employed by the department at that time.

18  Q.   All right.  How about you read number 3 to

19  yourself, please.

20  A.   Okay.

21  Q.   Are you prepared to testify about this topic

22  today?

23  A.   No.

24  Q.   All right.  You're not prepared to testify in

25  any way regarding this topic.  Correct?

Page 51

1  A.   I would not be able to talk about the

2  supervision oversight of Detective Saldate.

3  Q.   Okay.

4      MS. RETTS:  And we did not designate him as

5  such for 3.

6      MS. GREEN:  I understand that.  I'm just

7  trying to get it clean for the record.

8      MS. RETTS:  I just want to make that clear.

9  I don't want anyone coming back later and saying he's not

10  prepared to talk about a topic we said he couldn't talk

11  about.

12      MS. GREEN:  No problem.  I will represent --

13  and I can add that in in the beginning for these things.

14  Q.   BY MS. GREEN:  I can represent that your

15  attorney never told us you were here to talk about topic

16  number 3.

17      Your attorney did tell us you might be able

18  to testify or you would be able to testify to some extent

19  regarding topic number 4.  So I do want you to read that

20  one next and tell me the understanding of what you're

21  prepared to testify about today.

22  A.   I would say, once again, I could testify

23  probably as to the authenticity of any documents that may

24  have been produced.  Will I have any specific knowledge

25  regarding any allegations or was I involved in the

Page 52

1  investigation of Detective Saldate for any of these

2  incidents?  No, I would not be able to testify about

3  that.

4  Q.   Okay.  What about regarding whether any other

5  documents relating to internal or external allegations of

6  misconduct and such findings excluding the 1973 incident?

7  A.   Again, the possibility exists that I might be

8  able to verify whether or not the documents themselves

9  are actual Phoenix Police Department documents, but

10  regarding the actual substance of those investigations, I

11  would not be able to testify to that as I was not

12  involved in those.

13  Q.   Okay.  Can you tell me what you did to prepare

14  to testify about topic 4 today?  I'm looking for the full

15  extent of your preparation on this topic.

16  A.   Again, it was review documents related back to

17  the time, documents that I had produced related to my

18  time spent in the legal unit with regard to this case.

19  Q.   Okay.  And by that, I take it you mean the

20  division file that you produced in 2001 in response to

21  the Court order?

22  A.   Yeah, documents and the letters I wrote to the

23  attorneys at the time and those type of things.

24  Q.   Okay.  Did you review any other documents in

25  preparation to testify about this topic today?

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
53–56

Page 53

1  A.  Related to this, no.

2  Q.  Did you talk with anyone within the department

3  in preparation to talk -- testify about this topic today?

4  A.  Meaning?

5  Q.  So for example, a 30(b)(6) witness might obtain

6  information and knowledge in multiple ways.  They could

7  review documents.  They could interview various people

8  within their department to gain their knowledge.  They

9  could -- obviously they can have personal knowledge.  You

10  told us you don't have any personal knowledge about this

11  topic.

12  A.  Right.

13  Q.  So I'm just, again, trying to probe a little

14  bit to make sure we covered everything.

15  A.  Okay.

16  Q.  So have you talked to anyone in the department?

17  A.  Yes.

18  Q.  Okay.

19  A.  Our training gear in our homicide unit to do

20  additional check just to, once again, ensure that have

21  all documents been produced related to this, or do we

22  still have things that may be in existence that may be

23  relevant.

24  Q.  All right.  So who did you talk to in the

25  homicide unit?

Page 54

1  A.  Lieutenant Shane Disatell, the homicide

2  lieutenant.

3  Q.  So what did you ask him to do?

4  A.  Do we have old training records related to

5  homicide investigators, and if so, how far back do we go?

6  The answer to that after they conducted their search was,

7  No, we do not.

8  Q.  So they actually searched for Saldate's

9  training file or --

10  A.  They just searched for training materials in

11  general, not specific to Saldate.

12  Q.  Okay.  And beyond asking for training

13  materials, because we're on topic 4, which relates to

14  allegations of misconduct and discipline, et cetera, did

15  you talk to anyone within the department to gain any

16  knowledge to prepare yourself on this topic?

17  A.  Yeah.  Lieutenant Paul Taylor of the

18  Professional Standards Bureau.

19  Q.  Okay.  And what was the extent of that

20  conversation?

21  A.  It was, again, to verify like the records

22  retention for internal investigations and whether

23  or not, again, the department still had records beyond

24  any retention period that may be in existence that could

25  be relevant to this case.

Page 55

1  Q.  Okay.  And did -- what was the result of that?

2  A.  According to him, no documents, no, that are

3  beyond -- we have a five-year retention period.

4  Q.  Did they actually search for the documents, or

5  they just told you what the retention period is?

6  A.  Prior to being an investigations lieutenant, he

7  was an administration sergeant at the time, and one of

8  his responsibilities and stuff like that was to ensure

9  that we're in compliance with state law and the City's

10  records retention schedule.  So we had firsthand

11  knowledge that we didn't have anything beyond the

12  five-year retention period.

13  Q.  But you're not sure whether he actually looked

14  for that particular file?

15  A.  I'm not.

16  MS. RETTS:  Form.

17  Q.  BY MS. GREEN:  Okay.  And did he make a

18  representation to you about the retention period in 1990,

19  or did he make a representation to you about the

20  retention period today?

21  MS. RETTS:  Form.

22  THE WITNESS:  He made a representation to me

23  in our phone call within the past week or two.

24  Q.  BY MS. GREEN:  Okay.  I'm asking you -- I'm

25  sorry, that wasn't a clear question.

Page 56

1  You said he has personal knowledge.  He told

2  you the retention period.  Correct?

3  A.  Correct.

4  Q.  He said he has personal knowledge regarding

5  that retention period?

6  A.  Correct.

7  Q.  And I'm trying to find out -- Detective Saldate

8  retired in 1990.

9  A.  Uh-huh.

10  Q.  So I'm trying to find out if he has personal

11  knowledge about the retention period now and what rules

12  are in place now or if he has personal knowledge about

13  the retention period back in 1990, which would be --

14  A.  That's a question you're going to have to ask

15  him.

16  Q.  So you don't know one way or the other?

17  MS. RETTS:  Form.

18  THE WITNESS:  I can tell you how he

19  answered, what he told me on the phone.  Regarding what

20  was in his head or what he has knowledge of, you'll have

21  to ask him.

22  Q.  BY MS. GREEN:  So you don't know one way or the

23  other whether or not he has knowledge of that?

24  MS. RETTS:  Form.

25  THE WITNESS:  He told me we have no records

EXHIBIT 15

TOM VAN DORN                                        November 17, 2017
MIKE vs CITY OF PHOENIX                             57–60

Page 57

1  in existence beyond the five-year retention period is
2  what he told me on the phone.
3      Q.   BY MS. GREEN:  Okay.
4      A.   What his personal knowledge is in his head --
5  we did not discuss that.
6      Q.   Okay.  Any other preparation or people you
7  spoke to to testify about topic number 4?
8      A.   No, just those three that we mentioned.
9      Q.   I'm sorry.  I think I may have gotten down
10  to -- I think you told me you talked to a lieutenant
11  regarding the training bureau, and then you talked to
12  Paul Taylor in PSB?
13      A.   Talked to a secretary at the training bureau.
14  I don't remember her name off the top of my head.
15  Lieutenant Shane Disatell in the homicide unit and
16  Lieutenant Paul Taylor with the Professional Standards
17  Bureau.
18      Q.   Okay.  Let's take a look at topic 5.  Are you
19  prepared to testify regarding this topic today?
20      A.   No different than number 1.  I could testify as
21  to whether or not they're likely City of Phoenix actual
22  documents.  Regarding the substance, I cannot testify to
23  that.
24      Q.   Okay.  Your attorney represented to us in
25  e-mail, "He will be able to verify and discuss substance

Page 58

1  for this section, and we are designating him as a witness
2  who will speak to this category."
3          Do you have any understanding that you will
4  be able to testify regarding this category today beyond
5  verifying that a policy was in existence?
6      A.   I can verify that it's there.  I can then read
7  the policy and talk to you about how that relates to the
8  policies that have also been in effect during my
9  employment with the City of Phoenix.
10      Q.   Okay.  So to your understanding, you're not
11  prepared to testify fully regarding this topic today?
12          MS. RETTS:  Form.  Foundation.
13          THE WITNESS:  It just depends.  I have to
14  read the actual policy that lets you know whether or not
15  I can testify to it or not.
16      Q.   BY MS. GREEN:  Okay.  But to your understanding
17  right now, you're not sure whether you can testify fully
18  regarding this topic today?
19          MS. RETTS:  Form.
20          THE WITNESS:  No.  If shown these documents
21  during these time periods today, one, I came prepared to
22  testify that I can verify the department -- as to whether
23  or not it was a Phoenix Police Department document.
24          With regard to the substance that's
25  contained in there, I can read that and then let you know

Page 59

1  from that point forward, compare it with my 23 years of
2  experience, and our policies may or may not have changed
3  based on cause law changes, state law changes,
4  administration changes and those types of things.  It
5  just depends on the policy.
6      Q.   BY MS. GREEN:  Fair enough.  Could you tell me
7  what you did to prepare for this topic, like the
8  preparation you did, whether reviewing documents, talking
9  to people, anything?
10      A.   No different than what I have already told you,
11  briefly glanced through a notebook that was provided to
12  me.
13      Q.   Okay.  So that's -- it's that same notebook
14  that was provided to you?
15      A.   Yes.
16      Q.   Do you remember any particular -- like when
17  we're talking about topic 1, you said you remembered
18  seeing an -- like a policy that had an interview heading.
19  Do you remember when you were glancing through that
20  notebook seeing a policy regarding discipline or
21  investigation of misconduct?
22      A.   I think some of the processes as to how they
23  may have conducted investigations were in there but,
24  again, did not read it for substance.
25      Q.   Did you talk to anyone similar to how you had

Page 60

1  talked to that sergeant in the training -- I mean -- I'm
2  sorry, withdrawn.
3          Similar -- withdrawn.
4          Did you speak with anyone in order to
5  prepare yourself to testify about this topic today?
6      A.   Those three individuals that I already
7  mentioned, and that's it.
8      Q.   Okay.
9      A.   Those are the only three people I spoke with.
10      Q.   Did you speak to them specifically about this
11  topic, the policies and practices and procedures in place
12  from 1970 to 1991 pertaining to the investigation,
13  remediation and discipline of Phoenix Police Department
14  officers?
15      A.   I spoke to Lieutenant Paul Taylor who is
16  assigned to our Professional Standards Bureau.  Did we
17  specifically discuss this?  No, we specifically just
18  talked about records that may or may not still be in
19  existence.
20      Q.   How long was that conversation?
21      A.   Ten minutes.
22      Q.   And as far as you can recall, no other
23  preparation --
24      A.   No.
25      Q.   -- for this particular topic?

TOM VAN DORN                                                November 17, 2017
MIKE vs CITY OF PHOENIX                                            61–64

Page 61

1      MS. RETTS:  Form.
2      Q.   BY MS. GREEN:  All right.  Topic 6.  Sorry this
3   is tedious.  We're almost done.
4      A.   I can testify to the authenticity of any
5   documents that may have been produced.  Obviously based
6   upon my knowledge and experience as to how we conduct
7   internal and administrative investigations, I can explain
8   the process for how those things would have been
9   conducted.
10         As far as specific discipline, again,
11  regarding any officer, misconduct or disciplinary actions
12  taken, again, I would just be able to verify the actual
13  documents that are produced.
14     Q.   And did you -- so it seems like what you just
15  said was you're prepared to talk about this topic based
16  on your personal knowledge and experience.  Correct?
17     A.   And verify and likely be able to verify the
18  authenticity of any documents that may have been produced
19  and whether or not they're in fact Phoenix Police
20  Department documents.
21     Q.   Okay.  And when we -- withdrawn.
22         Did you do any specific preparation to talk
23  about this particular topic, topic 6, today?
24     A.   No.
25         MS. RETTS:  Form.

Page 62

1      Q.   BY MS. GREEN:  Did you do any preparation
2   relating to the Brady review that was done in the early
3   2000s by the Phoenix Police Department in order to look
4   through personnel files of officers that the Phoenix
5   Police Department had to turn it over to the Maricopa
6   County Attorney's Office for their Brady list?
7          MS. RETTS:  Form.
8          THE WITNESS:  Preparation, no.  Firsthand
9   knowledge I had, yes.  I was assigned to the legal unit
10  at the time.
11     Q.   BY MS. GREEN:  Did you do anything to refresh
12  your recollection of that firsthand knowledge that you
13  have?
14         MS. RETTS:  Form.
15         THE WITNESS:  Just review the documents that
16  I wrote and produced when I was assigned to the legal
17  unit.
18     Q.   BY MS. GREEN:  Which documents were those?
19     A.   Letters that I wrote pursuant to the Court
20  order, my transcript and my audio testimony to the
21  Attorney General's Office.
22     Q.   Okay.  But you don't recall reviewing any
23  particular documents relating to -- withdrawn.
24         It seems like what you're describing is you
25  reviewed documents relating to your role in this

Page 63

1   litigation.  I would like to find out whether you've
2   reviewed any documents pertaining to the Brady review
3   outside the scope of what you may have said during this
4   litigation in preparation to testify here today?
5          MS. RETTS:  Form.
6          THE WITNESS:  I'm not sure I understand your
7   question.
8      Q.   BY MS. GREEN:  Okay.  No problem.  I'll
9   rephrase it.
10         For example, did you review -- I'm using the
11  term like Brady list.  I think it has a different term,
12  but I can't remember it right now.
13     A.   Okay.
14     Q.   You're familiar with what I'm talking about?
15     A.   Uh-huh.
16     Q.   Did you review a Brady list from any year in
17  time in preparation to talk about this?
18     A.   No.
19     Q.   Okay.  Did you review any -- any documentation
20  relating to the search that was conducted in the early
21  2000s for the creation -- in order -- withdrawn.
22         Did you review any documentation --
23  withdrawn.
24         Did you review any documentation regarding
25  the personnel file search done by the Phoenix Police

Page 64

1   Department in the early 2000s in connection with the
2   first creation of the Brady list?
3          MS. RETTS:  Form.
4          THE WITNESS:  I reviewed the documents that
5   I prepared --
6      Q.   BY MS. GREEN:  Right?
7      A.   -- with respect to this, and that's it.
8      Q.   Nothing else?
9      A.   No.
10     Q.   Okay.  Topic 7.
11     A.   Okay.
12     Q.   And can you also -- go ahead.  I'm trying to
13  speed this up a little.  Can you also look at topic 8,
14  please.
15     A.   Okay.
16     Q.   Are you prepared to talk about topic 7 today?
17     A.   Yes.
18     Q.   And what did you do to prepare to talk about
19  that?
20     A.   Again, a review of all of the records and the
21  documents on what my role and responsibilities were when
22  they were assigned to the legal unit.
23     Q.   And can you walk me through what those
24  documents were?
25     A.   Yeah, letters that I wrote back, the Court --

EXHIBIT 15

TOM VAN DORN                                    November 17, 2017
MIKE vs CITY OF PHOENIX                         65–68

Page 65

1  the initial Court orders by the judge at the time and
2  what my response to the actual Court orders were and,
3  again, my audio and transcript testimony from the
4  Attorney General's Office from the first round of
5  interviews.   That was it.
6      Q.    Did you read anyone else's -- there was some
7  other audio interviews that were done.  Did you read
8  those transcripts?
9      A.   No, I did not.
10         MS. RETTS:  Form.
11     Q.    BY MS. GREEN:  Were you provided with those
12 transcripts?
13         MS. RETTS:  Form.  Vague.
14         THE WITNESS:  I don't recall seeing them in
15 that notebook, no.
16     Q.    BY MS. GREEN:  Okay.  I take it you reviewed
17 your affidavit in connection with that search?
18     A.   I did.
19     Q.    Did you review anyone else's affidavits in
20 connection with those --
21     A.   I did not.
22     Q.    -- that search?
23         Okay.  Any other preparation, anyone you
24 spoke to to gain knowledge on this topic?
25     A.   No.

Page 66

1      Q.    And topic number 8 -- I would like to know the
2  preparation you did to testify about that topic.
3      A.    Again, just comes from my knowledge and
4  experience on what the actual records retention period
5  and destruction of records actually are and whether or
6  not any documents that may be produced -- possibility
7  exists that I can verify those for you that they're
8  actually City of Phoenix and/or Phoenix Police Department
9  documents.
10     Q.    Okay.  And on topic 7, it sounded to me like
11 you were prepared to testify fully about that topic?
12         MS. RETTS:  Form.  I would say subject to
13 our objections that we don't know what the entire
14 contents of the personnel file was as we set forth.  Like
15 he can talk about -- we talked a couple of times -- we
16 don't know what the whole personnel file was, and we
17 can't find anybody who knows where the personnel file is.
18         He can talk about the documents he found,
19 what was available, the categories of documents that will
20 be in a personnel file.
21         We had a discussion several times about the
22 fact that we can't recreate every page of the document of
23 this personnel file.
24         MS. GREEN:  Right.
25     Q.    BY MS. GREEN:  And that's consistent with your

Page 67

1  understanding?
2      A.   Yes.
3      Q.    And on topic 8, are you prepared to testify
4  fully about that topic?
5      A.   Yes.
6      Q.    All right.  So I think we just walked through a
7  lot of your preparation for this deposition.  Is there
8  anything else that we have not yet discussed that you did
9  to prepare to testify here today as a 30(b)(6) witness
10 for the City of Phoenix?
11     A.    Nope.
12     Q.    Okay.  Did you meet -- and I can't ask you
13 about the substance of any conversations you've had with
14 your counsel regarding this deposition, but I just wanted
15 to find out -- I can ask you about things around the
16 bounds of that, like whether you met or not, for how
17 long.  So did you meet with your counsel --
18     A.   Yes.
19     Q.    -- to prepare for this deposition?
20         Okay.  Did you have more than one meeting?
21     A.   No.
22     Q.    When did you have that meeting?
23     A.   In the past week or two.
24     Q.    You can't say whether it was last week or the
25 week before last?

Page 68

1      A.   I can look in my calendar and let you know the
2  date.
3      Q.    As you sit here, you don't recall?
4      A.   I don't recall.  It's just been within the past
5  couple of weeks.
6      Q.    How long was that meeting?
7      A.   Probably about an hour.
8      Q.    Okay.  And you mentioned that you spoke to
9  approximately three people to gain some information to
10 prepare you to testify for this deposition.  Correct?
11     A.    I spoke to three people to ascertain whether or
12 not documents still existed with respect to time frames
13 notated in this motion.
14     Q.    Okay.  In other words, they were conversations
15 relating to document searches, not substance?
16     A.    Correct.
17     Q.    The purpose of the conversation wasn't to learn
18 more about what the discipline policy was in 1986, for
19 example?
20     A.   No.
21     Q.    Other than the records that you produced to --
22 you produced in 2001 in connection with that search for
23 Detective Saldate's personnel file, did you review anyone
24 else's -- any other personnel files in preparation to
25 testify here today?

EXHIBIT 15

TOM VAN DORN                                         November 17, 2017
MIKE vs CITY OF PHOENIX                                        69–72

Page 69

1    A.    No.

2    Q.    Did you -- have you reviewed any testimony in

3    preparation to testify here today?

4    A.    Just my personal testimony -- again, the

5    Attorney General's Office and that.  That's it.

6    Q.    That interview?

7    A.    Uh-huh.

8    Q.    About the search for the files?

9    A.    Yes, about the search for the files.

10   Q.    Okay.  Do you have an understanding --

11   withdrawn.

12        So I take it you didn't review any testimony

13   relating to the depositions that have already been taken

14   in this matter?

15   A.    No.

16   Q.    Do you have an understanding of the deposition

17   testimony that's been given in this matter?

18   A.    I don't even know who they are.

19   Q.    Okay.

20   A.    Who else has given testimony?

21   Q.    Okay.  You have no understanding whatsoever

22   about what any of the defendants or other witnesses have

23   testified about in this matter?

24   A.    I do not.

25   Q.    Okay.

Page 70

1        MS. RETTS:  Mind if we take a bathroom

2    break?

3        MS. GREEN:  Let's take a five-minute break,

4    or if people need longer, let me know.

5        (A recess was held off the record from 10:24

6    to 10:33.)

7    Q.    BY MS. GREEN:  Okay.  So outside the 30(b)(6)

8    topics that we just went through, have you been consulted

9    without giving me any information about the suspect for

10   providing expert knowledge with regard to this case?

11       MS. ODEGARD:  Form.

12       THE WITNESS:  No.

13   Q.    BY MS. GREEN:  Okay.  First, I wanted to -- now

14   getting into the substance of the actual deposition a

15   little bit.

16   A.    Okay.

17   Q.    First, I just want to talk to you a little bit

18   about just generally disciplinary processes and

19   structures based on your personal knowledge.

20       Would you agree that the overall goal of a

21   disciplinary process or system in a police department

22   including the Phoenix Police Department is to ensure that

23   misconduct is reported -- police misconduct is

24   investigated to ensure the remediation of misconduct?

25       MS. BERKE:  Objection.  Compound.

Page 71

1        MS. RETTS:  Form.

2        THE WITNESS:  I would agree that we do

3    investigations on allegations of misconduct to maintain

4    the integrity of the law enforcement profession.

5    Q.    BY MS. GREEN:  Okay.  So the goal is to

6    maintain the integrity of the law enforcement profession

7    generally?

8    A.    Correct.

9    Q.    Okay.  And in order to do so, the disciplinary

10   process is designed to ensure that misconduct is actually

11   reported and then investigated.  Correct?

12       MS. RETTS:  Form.

13       MS. BERKE:  Vague.

14       THE WITNESS:  Well, discipline is designed

15   to obviously correct sustained allegations of misconduct,

16   but it is also by advertising that you have an

17   investigative process.

18       Yes, we encourage the community to report

19   any unprofessional or allegations of misconduct to the

20   department.

21   Q.    BY MS. GREEN:  And you want the community and

22   also officers to report that misconduct?

23   A.    Yes, we do.

24   Q.    And you want to encourage that?

25   A.    Yes.

Page 72

1    Q.    And you also want to make sure any allegation

2    of misconduct is properly investigated?

3    A.    Yes.

4    Q.    Okay.  And certainly that sustained allegations

5    of misconduct receive discipline?

6    A.    Some level of discipline, yes.

7    Q.    Some level of discipline, depending on the

8    severity of the allegation --

9    A.    Correct.

10   Q.    -- and violation?

11   A.    Yes.

12   Q.    And that is critically important to the proper

13   functioning of a police department.  Correct?

14       MS. RETTS:  Form.  Vague.

15       THE WITNESS:  Yeah, you need to have a solid

16   investigative process, again, to maintain the integrity

17   of profession and, you know, to establish legitimacy and

18   transparency with the community because ultimately that's

19   who we serve at the end of the day.

20   Q.    BY MS. GREEN:  Right.  And it's not just

21   transparency and legitimacy to the community.  Right?  I

22   mean, some serious allegations of misconduct, you know,

23   can have even much broader implications.  For example,

24   constitutional violations can lead to -- withdrawn.

25       MS. BERKE:  Can I interrupt for one second.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
73–76

Page 73

1  Do we have our ongoing agreement that an objection for
2  one is an objection for all?
3         MS. GREEN:  Absolutely.
4         MS. BERKE:  Thank you.
5     Q.   BY MS. GREEN:  So for example, you said that
6  you have -- are familiar with the excessive force
7  policies of the Phoenix Police Department?
8     A.   I'm familiar with the use-of-force policy for
9  the Phoenix Police Department.
10    Q.   Okay.  The use-of-force policy for the Phoenix
11 Police Department which certainly covers the issue of
12 excessive force.  Correct?
13        MS. RETTS:  Form.
14        THE WITNESS:  It touches upon the levels of
15 force that are reasonable and necessary under the
16 circumstances and provide guidance to officers.  Going
17 outside the bounds of those may be considered excessive
18 and subject an officer to investigation.
19    Q.   BY MS. GREEN:  Okay.  Exactly.  And so for
20 example, if someone goes -- and what is your
21 understanding of excessive force?
22        MS. RETTS:  Form.
23        THE WITNESS:  Force, anything that is not
24 reasonable and necessary to the totality of the
25 circumstances is excessive.

Page 74

1     Q.   BY MS. GREEN:  Okay.  And so for example, if an
2  officer shoots a suspect and that level of force was not
3  necessary or reasonable under the circumstances, that
4  would be misconduct.  Correct?
5         MS. RETTS:  Form.  Foundation.
6         THE WITNESS:  It could be both criminal as
7  well as administrative misconduct, yes.
8     Q.   BY MS. GREEN:  Right.  And so I guess -- so it
9  could have not only the repercussion of the misconduct
10 not being legitimate or transparent if that misconduct
11 isn't disciplined or investigated in some way, but it
12 also could have the repercussion that someone might die.
13 Would you agree?
14        MS. BERKE:  Objection.  Vague.
15        MS. RETTS:  Form.  Vague.
16        MS. BERKE:  Compound.
17        THE WITNESS:  Well, an officer under your
18 hypothetical could -- if it was deemed not reasonable and
19 necessary could be subjecting themselves to a myriad of
20 things, one, jail time themselves.
21    Q.   BY MS. GREEN:  Right.
22    A.   Civil litigation against the officer and the
23 City and/or termination by their department.
24    Q.   Right.  And the person who was shot might be
25 severely physically injured.  Correct?

Page 75

1         MS. RETTS:  Form.
2         THE WITNESS:  Serious physical injury or
3  death could result in any officer-involved shooting.
4     Q.   BY MS. GREEN:  Right.  So the police -- I
5  assume the police department has its use-of-force policy
6  in place not only for legitimacy and transparency but to
7  prevent something like that from occurring?
8         MS. RETTS:  Form.
9         MS. BERKE:  Objection.  Vague.
10        THE WITNESS:  It explains to officers what
11 are the federal and state laws and case law regarding
12 when it's appropriate to either threaten and/or use
13 deadly physical force.
14    Q.   BY MS. GREEN:  So one of the goals of the
15 use-of-force policy is not to prevent victims of that
16 force from sustaining injuries?
17        MS. RETTS:  Form.
18        MS. BERKE:  Objection.  Vague.
19        THE WITNESS:  The current use-of-force
20 policy starts off with a general statement that we will
21 respect the dignity and rights of all individuals.  From
22 there, the various options that I can use as an officer
23 will articulate basically what the law is in that area.
24        For me to either use and/or threaten deadly
25 physical force, I have to meet certain requirements as an

Page 76

1  officer, and that's what the policy will spell out.
2     Q.   BY MS. GREEN:  Okay.  So I'm just thinking
3  about the goals of the policy.  So you've said to ensure
4  dignity, legitimacy, transparency, but it is not a goal
5  of the use-of-force policy to prevent people who have
6  interactions with officers from being subjected to
7  excessive force.  That's not a goal of the policy.  Is
8  that what you're saying, sir?
9         MS. RETTS:  I'm going to object as outside
10 the scope.  There isn't any reference of excessive force
11 that I remember seeing in here, nor are there any
12 allegations in the --
13        MS. GREEN:  I'm just trying to do some
14 foundational questions about the goal of a disciplinary
15 system, and I was trying to use an example given your
16 objections.  And then it's taken me down this road, but
17 your objection's heard.
18    Q.   BY MS. GREEN:  So --
19    A.   Well, you asked me if it was a goal, the
20 use-of-force policy, with respect to excessive force.  We
21 never have a goal to use excessive force in law
22 enforcement.  So I think I'm misunderstanding your
23 question.
24    Q.   All right.  So it was a goal of the
25 use-of-force policy to prevent persons who have

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
77–80

Page 77

1 interactions from police officers from being subjected to
2 excessive force?
3    A.   Right.
4          MS. RETTS:  Form.  Outside the scope.
5          THE WITNESS:  Our policies don't establish
6 goals, and our policy provides us with what it is we
7 expect by way of behavior from our officers as well as
8 what the law and those types of things are with respect
9 to any area.  We don't have goals with respect to our
10 policies.
11    Q.   BY MS. GREEN:  So you can't -- so you do not
12 feel comfortable confirming that a goal of the Phoenix
13 Police Department use-of-force policy is to prevent
14 people from being subjected to excessive force in their
15 actions with police officers?
16          MS. RETTS:  Form.  Outside the scope.  Asked
17 and answered.
18          MS. BERKE:  Asked and answered.
19          THE WITNESS:  There are not goals within
20 Phoenix Police Department policies.  Again, the
21 use-of-force policy with respect to your hypothetical
22 will articulate when it is appropriate for me to utilize
23 deadly physical force under the circumstances.
24    Q.   BY MS. GREEN:  Is one of the goals of the
25 policy to make sure the officers are complying with the

Page 78

1 state of the law regarding the use of force?
2          MS. RETTS:  I'm going to ask you move on
3 because we're so far outside the scope, and he's answered
4 the question already.
5          THE WITNESS:  The policy is to, yes, provide
6 a statement of the law in respect to that area in use of
7 force.
8    Q.   BY MS. GREEN:  Okay.  And so taking that
9 example, as a general matter, the disciplinary policies
10 and procedures in place at the Phoenix Police Department
11 are -- one of the goals of those policies and procedures
12 is to make sure officers are complying with the law.
13 Would you agree with that?
14    A.   Yes.
15          MS. RETTS:  Form.
16          THE WITNESS:  And any critical incident or
17 use-of-force incident involved by a Phoenix police
18 officer -- it's investigated as a criminal action as well
19 as an internal administrative action.
20    Q.   BY MS. GREEN:  Right.
21    A.   And then both processes go from there.
22    Q.   Even outside the use-of-force policy -- I'm
23 going to move on from that per Tina's request.
24          Even outside the scope of that, just as a
25 general matter, the disciplinary processes and systems

Page 79

1 that are in place at the Phoenix Police Department, one
2 of the goals of those disciplinary processes, procedures,
3 policies is to make sure officers are complying with the
4 law in their interactions with the community?
5    A.   Yes.
6          MS. RETTS:  Form.  Compound.  Vague.
7    Q.   BY MS. GREEN:  And those policies that touch on
8 constitutional rights -- for example, you gave the
9 example of you have knowledge and expertise regarding
10 search and seizures and when there's probable cause to
11 search.  I can give you another example regarding whether
12 you can interrogate a suspect when -- when they don't
13 understand their rights or if they have confirmed they
14 understand their rights or if they haven't confirmed they
15 understand their rights.  Those are just some examples
16 of -- withdrawn.
17          You would agree that some of the Phoenix
18 Police Department policies and procedures have
19 constitutional implications.  Correct?
20          MS. RETTS:  Form.  Vague.
21          MS. BERKE:  Vague.
22          THE WITNESS:  I would agree that our
23 policies and procedures obviously articulate the law with
24 respect to search and seizure, custodial interrogations
25 and other use of force, various constitutional types of

Page 80

1 issues.
2    Q.   BY MS. GREEN:  Right.  And those policies and
3 procedures that articulate the law there, one of the
4 goals is -- and one of the reasons you have those
5 policies and procedures in place is to protect the
6 constitutional rights of those who come into contact with
7 Phoenix Police Department officers?
8    A.   Yes.
9          MS. RETTS:  Form.
10    Q.   BY MS. GREEN:  And so for as long as you've
11 been in the Phoenix Police Department, I take it it's
12 been your understanding that there's been -- it's been a
13 goal to make sure officers are properly reporting
14 misconduct that they witness from other officers.
15 Correct?
16    A.   Yes.
17          MS. RETTS:  Form.
18    Q.   BY MS. GREEN:  And it's been a goal to ensure
19 that any reported misconduct or allege is investigated?
20    A.   Correct.
21          MS. RETTS:  Form.
22    Q.   BY MS. GREEN:  And it's been a goal to make
23 sure that that misconduct is disciplined and handled
24 comprehensively?
25          MS. RETTS:  Form.  Vague.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
81–84

Page 81

1    MS. BERKE:  Objection.  Vague.

2    THE WITNESS:  I'm going to go back because

3  you keep using the word "goal."  Again, the policy exists

4  to put officers on notice as to what we expect of them by

5  virtue of their employment in the Phoenix Police

6  Department, what are their roles and responsibilities if

7  they witness misconduct on the part of a federal officer

8  and et cetera.  So I keep getting confused by your word

9  "goal."

10    Q.   BY MS. GREEN:  Okay.  No problem.

11    And so one of the important parts of the

12  policies is you're informing the officers about their

13  responsibilities and what is expected of them?

14    A.   Yes.

15    Q.   And so it's important for the policies to be

16  clear about what is expected?

17    A.   Correct.

18    Q.   And if there's any confusion about what's

19  expected, it is important for the Phoenix Police

20  Department to update those policies and clarify them

21  further.  Correct?

22    MS. RETTS:  Form.  Vague.

23    THE WITNESS:  We update policies for a

24  myriad of different reasons, to be honest with you.

25    Q.   BY MS. GREEN:  Right.  And one of the

Page 82

1  reasons -- when there's confusion about whether -- what a

2  policy means or how it is to be implemented, that might

3  be a reason you would update the policy.  Correct?

4    MS. RETTS:  Form.  Vague.

5    THE WITNESS:  It's possible if a vast

6  majority of the department is confused by the policy as

7  written as -- versus one officer who may just be confused

8  where you just need to explain it to the officer.

9    Q.   BY MS. GREEN:  Right.  But if it becomes known

10  there's some confusion about the policy, certainly you

11  want to try to get that policy clarified.  Correct?

12    A.   Correct.

13    MS. RETTS:  Form.

14    Q.   BY MS. GREEN:  And any breakdown of the

15  reporting or investigation of misconduct at any level is

16  problematic.  Right?

17    MS. RETTS:  Form.

18    THE WITNESS:  Break down --

19    Q.   BY MS. GREEN:  So for example, if -- withdrawn.

20    So would you -- you would agree, I take it,

21  that investigation of allegations of misconduct and

22  discipline of employees of the Phoenix Police Department

23  needs to happen at every level.  So for example, if

24  officers are engaging in misconduct and that misconduct

25  is sustained, that officer needs to be disciplined.

Page 83

1  Correct?

2    A.   Correct.

3    MS. RETTS:  Form.

4    Q.   BY MS. GREEN:  That also applies to detectives.

5  Correct?

6    MS. RETTS:  Form.

7    THE WITNESS:  It applies to everybody from

8  the police chief on down.

9    Q.   BY MS. GREEN:  Okay.  So supervisors,

10  sergeants, lieutenants, commanders, everyone --

11    A.   The policy exists for every rank within the

12  police department.

13    Q.   Okay.  And so if there's any breakdown in that,

14  for example, only patrol officers are being disciplined

15  when they engage in misconduct, but detectives are not.

16  That would be something that's problematic.  Right?

17    A.   Yes.

18    MS. RETTS:  Form.  Vague.

19    Q.   BY MS. GREEN:  And I think you've spoken about

20  this a little bit.  So currently the internal affairs

21  division is called --

22    A.   Professional Standards Bureau.

23    Q.   Okay.  And so correct me if I'm wrong.  The

24  Professional Standards Bureau is responsible for the

25  investigation and discipline of serious misconduct

Page 84

1  complaints against officers?

2    A.   No, they're responsible for the investigation

3  of allegations of misconduct, and the officers

4  disciplined will either rest with the use-of-force board,

5  the disciplinary review board with the ultimate decision

6  being made by the police chief.

7    The Professional Standards Bureau will

8  classify the level of discipline according to department

9  policy.  The final discipline will always rest with the

10  department head, which is the police chief.

11    Q.   And the current -- let's take the period of

12  time that you've been working at the police department,

13  1995 to present.  In that period of time, does PSB

14  investigate only serious misconduct violations or

15  essentially --

16    A.   Potentially any misconduct that rises to the

17  level of a suspension and above.

18    Q.   So written reprimand and oral reprimand --

19    A.   Are typically investigated by the immediate

20  supervisor of the employee.

21    Q.   Okay.  So if it could rise to a level of

22  suspension and above, then it's over in the hands of --

23    A.   The Professional Standards Bureau.

24    Q.   Okay.  And has that always been called the

25  Professional Standards Bureau since you've been there, or

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
85–88

**Page 85**

1 has it had other names?
2  A.  Since I've been there.
3  Q.  Okay.  Would it used to be called the Internal
4 Affairs Bureau?
5  A.  I don't know.
6  Q.  Okay.
7  A.  That's just how it's commonly referred to.
8  Q.  Okay.  So people refer to it still as internal
9 affairs from time to time?
10  A.  Absolutely.
11  Q.  Okay.  So the Professional Standards Bureau
12 investigates misconduct that could rise where the
13 discipline could rise to levels of suspension.  Correct?
14    MS. RETTS:  Form.
15    THE WITNESS:  They investigate allegations
16 of misconduct that at a minimum could be a suspension up
17 to and including termination.
18  Q.  BY MS. GREEN:  Okay.  And then they enter --
19 withdrawn.
20    They have the -- withdrawn.
21  PSB makes determination whether an
22 allegation is sustained or not or someone else does?
23  A.  No, they make the allegation it's either
24 sustained, exonerated unresolved.  Let's see.  We've
25 got -- let's see -- exonerated, unresolved, sustained.  I

**Page 86**

1 think that's pretty much it.
2  Q.  So that responsibility lies within PSB?
3  A.  Correct.
4  Q.  Okay.  And they make findings as well.  So they
5 don't -- I mean, so -- withdrawn.
6  And they make a recommendation regarding
7 discipline and then it goes to the police chief?
8    MS. RETTS:  Form.
9    THE WITNESS:  Under current procedures, yes
10 they're the investigator.  They will come up with a
11 finding.  If the finding is sustained, they will classify
12 that particular act that has been sustained under current
13 discipline policies and procedures, but it is still a
14 recommendation.
15    The employee still has a lot of different
16 appeal rights they can go through where things can be
17 overturned, changed, et cetera, but the ultimate, should
18 it be sustained throughout the entire process, everything
19 is a recommendation to the police chief with the final
20 decision being made by him or her.
21  Q.  Okay.  And the final decision -- withdrawn.
22  And I take it PSB is a separate division.
23 It's its own separate subdivision of the Phoenix Police
24 Department right now?
25    MS. RETTS:  Form.

**Page 87**

1    THE WITNESS:  Yeah, it is a bureau --
2  Q.  BY MS. GREEN:  Okay.
3  A.  -- that reports directly to the police chief.
4  Q.  Okay.  So it's, for example, not included in
5 the same bureau or division -- I don't know your
6 terminology -- where patrol officers lie --
7  A.  No.
8  Q.  -- or where detectives lie?
9  A.  No.
10  Q.  Okay.
11  A.  They report directly to the police chief.
12  Q.  And, therefore, it's an independent division
13 from those -- those bureaus where -- do you know the
14 names of the bureaus there the patrol division and --
15  A.  Patrol division.
16  Q.  Okay.  And how about the homicide detective?
17  A.  The investigations division, the patrol
18 division, support services division.
19  Q.  Okay.
20  A.  Community affairs division, strategic services
21 division.
22  Q.  Okay.  I'll try and use some of that
23 terminology, but I can't promise all.
24  A.  Each one is overseen by an assistant police
25 chief.

**Page 88**

1  Q.  Okay.
2  A.  However, the Professional Standards Bureau
3 reports directly to the police chief.
4  Q.  Okay.  And would you agree that one reason why
5 serious misconduct is investigated by the separate
6 division, PSB, is you want to take the investigation out
7 of the direct chain of the command of the officer who was
8 being investigated?
9    MS. RETTS:  Form.
10    THE WITNESS:  It depends on the seriousness
11 of the allegation.  We have a lot of investigations that
12 are conducted by the first-line supervisor.  It's not
13 that we want to take them away by any means whatsoever,
14 just depends on was the first-line supervisor on scene of
15 the incident.  There's various factors whether or not PSB
16 will take it or it's invested by the immediate
17 supervisor.
18  Q.  BY MS. GREEN:  I thought we had clarified that,
19 and correct me if I'm wrong.  I'm trying to understand.
20 I'm not very familiar with how it works there.  I thought
21 we clarified that PSB investigates alleged misconduct
22 where the discipline could result at minimum in
23 suspension?
24  A.  Correct.
25  Q.  Okay.  And so that's done by PSB.  Correct?

EXHIBIT 15

Page 89

1   A.   Correct.
2   Q.   So I'm talking about that type of -- and would
3   you agree that alleged misconduct where the discipline
4   can result in at minimum -- withdrawn.
5        Would you agree that serious misconduct --
6   withdrawn.
7        Would you agree that serious alleged
8   misconduct that if sustained could result in a suspension
9   is serious misconduct?
10       MS. BERKE:  Objection.  Vague.
11       MS. RETTS:  Form.
12       THE WITNESS:  I mean, misconduct that rises
13  as we classify it, that could be a suspension up to and
14  including termination.  It could be considered, again,
15  it's just misconduct.  It just depends on the various
16  circumstances.
17  Q.   BY MS. GREEN:  Okay.
18  A.   Our lowest level of suspension is eight hours.
19  Whether or not some people consider that serious or not
20  is probably a subjective opinion.
21  Q.   Okay.  What about your opinion?
22  A.   My personal opinion?
23  Q.   Your personal opinion.
24  A.   Some is likely considered serious, and some
25  it's likely considered not.

Page 90

1   Q.   Give me an example of misconduct that is --
2   could result in an eight-hour suspension that you don't
3   consider to be serious personally?
4        MS. RETTS:  Form.
5        THE WITNESS:  Out of policy traffic
6   accident.
7   Q.   BY MS. GREEN:  Okay.  Can you think of anything
8   else?
9   A.   Off the top of my head, unprofessional custody
10  of a citizen.
11  Q.   You don't consider that serious misconduct?
12  A.   I do not.  It just depends on the circumstances
13  in which it was used at the time.
14  Q.   And do you have an understanding of the reasons
15  why PSB is a separate division from the patrol division
16  or the investigation division?
17       MS. RETTS:  Form.
18       THE WITNESS:  Again, you primarily pretty
19  much remove it to maintain the legitimacy, the
20  transparency and the integrity of the law enforcement
21  profession.  It's a way that we help build trust with the
22  community by having to report directly to the chief and
23  not have to report to anybody else in the organization.
24  Q.   BY MS. GREEN:  Right.  And that was my
25  understanding as well.

Page 91

1        And so I take it that one of the reasons for
2   that is if someone is involved in serious misconduct and
3   their supervisor, for example, is investigating it, there
4   might be concerns of bias by the supervisor, and it may
5   not appear legitimate?
6   A.   It's possible.
7        MS. RETTS:  Form.
8   Q.   BY MS. GREEN:  Okay.  There might also be
9   nepotism concerns?
10       MS. RETTS:  Form.
11       THE WITNESS:  Possibly.
12  Q.   BY MS. GREEN:  And certainly if it's very
13  serious misconduct for which there was a pattern, if
14  that -- if that alleged misconduct is sustained or if
15  that misconduct violation is found, that could also
16  reflect poorly on the supervisor themselves.  Correct?
17       MS. RETTS:  Form.  Vague.
18       THE WITNESS:  It could, yes.
19  Q.   BY MS. GREEN:  So that would be another reason
20  to have a separate division investigating serious
21  misconduct versus the supervisor themselves in charge of
22  the serious misconduct investigations with respect to
23  their subordinates?
24       MS. RETTS:  Form.
25       THE WITNESS:  I'm not sure what you're

Page 92

1   trying get at here.  The Professional Standards Bureau
2   has always been a separate unit, bureau or division in
3   law enforcement.
4   Q.   BY MS. GREEN:  Right.  I'm just trying to get
5   at the reasons why you would have an independent division
6   in the first place?
7   A.   To maintain legitimacy, transparency and trust
8   within the community that we serve.
9   Q.   Right.
10  A.   That's why you have them be solely separate
11  from the rest of the chain of command.
12  Q.   Would you agree that also it protects the
13  integrity of the investigation within the police
14  department as well?  So it's not -- so I take it's not
15  just about looking legitimate; it's about being
16  legitimate, too.  Right?
17  A.   Yes.
18  Q.   And so one of the ways that a misconduct
19  investigation cannot only look legitimate to everybody
20  else but can actually be legitimate is when you have a
21  separate entity investigating that misconduct that won't
22  have -- there won't be any concern with bias or nepotism
23  or any other factors that you might have when the direct
24  supervisor themselves is investigating the serious
25  misconduct?

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
93—96

Page 93

1       MS. BERKE:  Objection.  Vague and compound.

2       MS. RETTS:  Objection.  Vague.

3       THE WITNESS:  Yeah, again, I guess I'm

4 confused as to where you're going as to why PSB exists as

5 a separate division as opposed to having things

6 investigated by an immediate supervisor.

7   Q.   BY MS. GREEN:  I mean, I think --

8   A.   I mean, I've answered as to why Professional

9 Standards Bureau exists, why it is pretty much separate

10 and reports to the police chief.  So what additional

11 answer do you want?

12   Q.   I'm not looking for an additional answer.  I'm

13 looking to provide examples and get your confirmation on

14 whether you think that's one of the reasons it exists or

15 it doesn't.

16      So for example, I don't know a ton about

17 police departments, but I can think of even in the United

18 States government, there's a separate inspector general

19 division.

20   A.   Uh-huh.

21   Q.   I can think about in school systems there might

22 be a separate division that's investigating misconduct,

23 and I'm trying to go through some of the reasons for

24 that.  I'm not trying to be difficult.  I'm just trying

25 to -- it seems kind of obvious to me, but it's hard to

Page 94

1 even get you to confirm these things.  So I'm just trying

2 to make sure I understand it.

3       MS. RETTS:  Form.

4       THE WITNESS:  I've answered four times now

5 why they're a sole and separate division, to maintain the

6 integrity of the profession, to be legitimate and

7 trustworthy within our community.  That continues to be

8 my answer as to why they're a sole and separate division.

9   Q.   BY MS. GREEN:  And how does having a separate

10 division help maintain the integrity of the profession?

11   A.   It allows for more objectivity because those

12 investigators are not directly within the chain of

13 command of the officers involved in the misconduct

14 investigations.

15   Q.   And how does it help maintain the legitimacy of

16 the police department in the eyes of the community?

17   A.   Because, again, they are sole and separate and

18 not directly involved in the chain of command of the

19 immediate officers involved in the allegations.

20   Q.   And so you would agree that if the -- if the

21 police department were structured in such a manner that

22 serious misconduct is being investigated by the chain of

23 command rather than the separate division that the

24 Phoenix Police Department has created to handle these

25 serious investigations, that would be problematic --

Page 95

1       MS. RETTS:  Form and foundation.

2   Q.   BY MS. GREEN:  -- in terms of --

3   A.   I would not agree with that because we hold our

4 supervisors to a higher standard.  So that would require

5 me to actually make the assumption that a patrol sergeant

6 over an officer would be incompetent or not capable of

7 conducting a serious misconduct investigation, and that's

8 just not fair of me to place that upon all the

9 supervisors within the department.  So I won't agree with

10 that statement.

11   Q.   I guess I'm not trying to say that -- anything

12 about a particular supervisor.  I'm just saying sometimes

13 we have structures in place to ensure -- again, we think

14 the best of people, right, but to ensure that doesn't

15 happen.  If we can have a structure in place to make sure

16 we don't have these bias concerns or concerns about

17 objectivity and things like that, that's why I take it

18 what you just explained to me why the department -- the

19 PSB is a separate division.

20   A.   But we expect all supervisors on the police

21 department to be bias free.  So, again, you know, you do

22 have a sole, separate division who is actually tasked

23 with investigating serious allegations of misconduct, but

24 to say that supervisors directly involved over the

25 employees couldn't do the same type of investigations is

Page 96

1 not necessarily true because I expect them to also be

2 bias free on a day-to-day basis in their job.

3   Q.   Okay.  And so it's your testimony here today

4 that if there weren't a separate PSB division and every

5 allegation of misconduct was investigated by the direct

6 supervisor and the PPD was structured in that manner so

7 that took place, this -- that would be equally as

8 effective as the structures that the PPD has in place

9 now?

10       MS. BERKE:  Form and foundation.  Vague.

11       MS. RETTS:  Form.  Vague.

12       THE WITNESS:  No, it's my testimony here

13 today that I would expect any supervisor on the Phoenix

14 Police Department to fairly and impartially investigate

15 any allegation of misconduct on the part of an employee.

16      I do agree that it looks better from a

17 transparency and legitimacy standpoint for departments to

18 continue to maintain an internal affairs/Professional

19 Standards Bureau to look into allegations of misconduct

20 to avoid some of those overriding concerns that the

21 community may have.

22      But I'm not going to sit here and say that,

23 you know, a direct supervisor of an employee is not

24 capable of conducting those because I would hope that

25 they would be.  That is what I expect them as a fellow

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
97–100

Page 97

1  law enforcement officer and a supervisor.
2      Q.    BY MS. GREEN:  Right.  And so that's an
3  expectation, as far as you understand it, the Phoenix
4  Police Department has always had?
5      A.    Absolutely.
6      Q.    Supervisors -- direct supervisors are supposed
7  to investigate any alleged misconduct with respect to the
8  rank of their command?
9      A.    We're all held to the same standard regardless
10  of our rank.
11      Q.    Even if it's just a rumor or it's a complaint
12  from a fellow supervisor, they're supposed to investigate
13  that?
14          MS. RETTS:  Objection.  Form.  Vague.
15          MS. BERKE:  Compound.
16          THE WITNESS:  We have a policy that says you
17  will investigate all allegations of misconduct on the
18  part of any department employee.
19      Q.    BY MS. GREEN:  And that's the responsibility of
20  the supervisor.  Correct?
21          MS. RETTS:  Form.
22          THE WITNESS:  Yes.
23      Q.    BY MS. GREEN:  And that's a strict policy, I
24  take it?
25          MS. BERKE:  Objection.  Vague.

Page 98

1          THE WITNESS:  Yes.
2      Q.    BY MS. GREEN:  There are no exceptions.
3  Correct?
4          MS. RETTS:  Form.
5          THE WITNESS:  Not supposed to be.  You
6  subject yourself to discipline for (inaudible).  We take
7  allegations of misconduct serious.  Whether or not the
8  allegation is sustained or resolved or exonerated, we
9  have to wait and see, but you will look into the actual
10  allegation on the part -- that any community member
11  makes.
12      Q.    BY MS. GREEN:  And not just community members
13  but any allegations that --
14      A.    By a fellow officer.
15      Q.    By the county attorney?
16      A.    Yeah.
17      Q.    By a Court?
18      A.    Uh-huh.
19      Q.    And if the supervisor -- as far as you know,
20  it's always been if the supervisor doesn't do that -- and
21  by "that," I mean investigate an allegation of misconduct
22  that they become aware of -- that supervisor themselves
23  is engaging in misconduct?
24      A.    Correct.
25          MS. BERKE:  Objection.  Form.  Vague.

Page 99

1  Foundation.
2          MS. RETTS:  Vague.
3      Q.    BY MS. GREEN:  And as far as you know, that's
4  always been the policy of the Phoenix Police Department?
5          MS. BERKE:  Foundation.
6          MS. RETTS:  Form.  Foundation.
7          THE WITNESS:  I would testify it's been the
8  policy since I've been employed.
9      Q.    BY MS. GREEN:  Is there any doubt in your mind
10  that before 1995 that was a responsibility of a
11  supervisor within the Phoenix Police Department to
12  investigate allegations of misconduct of people in their
13  rank which they became aware?
14          MS. RETTS:  Form and foundation.
15          THE WITNESS:  In a perfect world, I would
16  like to think it's always existed, but I would have to go
17  back and look at the policies prior to my employment with
18  the department.
19      Q.    BY MS. GREEN:  Is there any doubt in your mind
20  as you sit here today regarding that?
21          MS. RETTS:  Asked and answered.
22          MS. BERKE:  Asked and answered.
23          THE WITNESS:  Again, I would have to go back
24  to the policy.  I would hope that it does exist because
25  that's the standard that I hold myself to and those types

Page 100

1  of things.  Whether it existed prior to my employment,
2  we'll have to look at the policy and see.
3      Q.    BY MS. GREEN:  So it would need to be written
4  in a policy explicitly as far as you're concerned for --
5  withdrawn.
6          It would need to be written in a policy that
7  a supervisor is responsible for investigating allegations
8  of misconduct of those in their rank for you to confirm
9  that before 1995 that was the practice of the Phoenix
10  Police Department?
11          MS. RETTS:  Form.
12          MS. BERKE:  Objection.  Vague.
13          THE WITNESS:  I can't sustain something that
14  doesn't exist in the policy.
15      Q.    BY MS. GREEN:  Do you have any reason to
16  believe today -- I understand you're saying you want to
17  see the policy, and we're going to get to the policies.
18          Do you have any reason to believe today, as
19  you sit here today, that you can think of that that
20  wasn't the policy before 1995?
21      A.    I can't answer that question.
22          MS. RETTS:  Form.
23      Q.    BY MS. GREEN:  I'm asking do you have any
24  reason in your head -- anything that you're thinking of
25  right now?

EXHIBIT 15

Page 101

1    A.    I'm telling you I can't answer that question
2   without seeing the policy.
3    Q.    And why not, sir?
4    A.    Huh?
5    Q.    Why not?
6    A.    Because I don't know what the policies were
7   with regard to substance prior to my employment with the
8   department.
9    Q.    I'm asking you if you have any reason as you
10  sit here today --
11   A.    I told you in a perfect world I would like to
12  believe that it existed.  Whether or not it has in fact
13  existed prior to my employment with the department, I
14  cannot answer that question now.
15   Q.    Do you have any reason as you sit here today to
16  think that wasn't the policy?
17        MS. RETTS:  Asked and answered.
18        MS. BERKE:  Asked and answered.  Foundation.
19        THE WITNESS:  I cannot answer that question.
20   Q.    BY MS. GREEN:  So you can't tell me whether
21  right now you can think of anything from your knowledge
22  or discussions of Phoenix Police Department specifically
23  that causes you to question whether or not it was a
24  policy of the Phoenix Police Department before 1995 to --
25   A.    I would think like to think it existed --

Page 102

1    Q.    Excuse me, sir.  Excuse me, sir.  Whether or
2   not it was a policy or procedure or practice before 1995
3   for supervisors to investigate allegations of misconduct
4   in their complaint, you can't tell me right now whether
5   as you sit here today you're thinking of something that
6   makes you think that may not have been the policy?
7        MS. BERKE:  Vague.  Foundation.
8        MS. RETTS:  Asked and answered.  Compound.
9        THE WITNESS:  Going back to your
10  hypothetical was your question.  Now, if you're changing
11  your question to whether or not supervisors prior to 1995
12  investigated allegations of misconduct, the answer to
13  that question will be yes.
14   Q.    BY MS. GREEN:  Okay.  So it is your
15  understanding that supervisors prior to 1995, as far as
16  you know -- I understand you weren't here in 1995 -- but
17  were responsible for investigating allegations of
18  misconduct of those in their rank?
19   A.    That is correct.
20   Q.    Okay.  So I take it that the Phoenix Police
21  Department, just like any other Phoenix Police
22  Department -- any other police department in a major
23  metropolitan area, has quite a few policies in place
24  regarding a variety of subject areas or topics.  Correct?
25        MS. RETTS:  Form.

Page 103

1        MS. BERKE:  Objection.  Foundation.
2        THE WITNESS:  Correct.
3    Q.    BY MS. GREEN:  So just to give some examples,
4   take it the Phoenix Police Department has policies on
5   dress code?
6    A.    Yes.
7    Q.    Policies and procedures on collection of
8   evidence?
9    A.    Yes.
10   Q.    Policies and procedures on how to make an
11  arrest?
12   A.    Yes.
13   Q.    Interrogations?
14   A.    Yes.
15   Q.    Use of force?
16   A.    Yes.
17   Q.    A number of policies on a number of different
18  topics?
19        MS. RETTS:  Form.
20        THE WITNESS:  Correct.
21   Q.    BY MS. GREEN:  Okay.  And some of these -- I
22  also take it that some policies are discretionary in that
23  they're suggested practices, like the policy itself says
24  we suggest you do this?
25        MS. RETTS:  Form.  Vague.

Page 104

1        THE WITNESS:  You can deviate from policy if
2   it's in the best interest of the community and the
3   circumstances at the time.  It just depends.
4    Q.    BY MS. GREEN:  Okay.  And I take it some
5   policies themselves have that discretionary language in
6   there?
7    A.    There is certain discretionary type language,
8   may versus shall.
9    Q.    Okay.  And other -- like you just said, that
10  shall language, other policies lay out mandatory
11  requirements.  Right?
12   A.    Correct.
13   Q.    And typically if a policy is written in a way
14  that has that mandatory type language and requirement,
15  it's an indicator that the policy is important?
16   A.    Yes.
17   Q.    So -- and typically if certain misconduct --
18  strike that.
19        Typically if certain conduct is expressly
20  prohibited in the policy and if it's later found to have
21  occurred, discipline for that misconduct is also
22  required?
23        MS. BERKE:  Objection.  Vague.
24        MS. RETTS:  Form.  Foundation.  Vague.
25        THE WITNESS:  Yeah, some level of

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
105–108

Page 105

1  discipline, yes.
2      Q.    BY MS. GREEN:  Some level of discipline which
3  is also determined by policy to a certain extent.
4  Correct?
5      A.    To a certain extent.
6      Q.    For example, we've talked about excessive
7  force.  Excessive force of any kind must be disciplined.
8  Right?
9          MS. RETTS:  Form.
10          THE WITNESS:  Well, again, it's going to be
11  disciplined.  The level of discipline will, again, be
12  made by the chief.
13      Q.    BY MS. GREEN:  Right.  I'm not talking about
14  the level of discipline right now.  I'm going to drill
15  down to that a little bit later.  I'm just talking about
16  things that must be disciplined.  You gave me your
17  definition of excessive force before.
18      A.    Uh-huh.
19      Q.    I have that definition in my head, and the
20  court reporter took it down.  Excessive force must be
21  disciplined.  Correct?
22      A.    That's not what I said.  Excessive force is
23  force that is unreasonable and necessary.  So that was
24  the definition that I hope she took down.
25      Q.    It's unreasonable and necessary?

Page 106

1      A.    Excessive force is defined as all force that is
2  unreasonable and necessary under the totality of the
3  circumstances.  That is excessive force.
4      Q.    I'm sorry.  Could you say that one more time.
5  I'm having trouble hearing you.
6      A.    Excessive force is any force that I may use
7  that is unreasonable and unnecessary under the totality
8  of the circumstances.
9      Q.    Right.  That was my understanding of what you
10  said.  So if someone engages in excessive force and the
11  police department finds that they have done that, that
12  individual must be disciplined?
13          MS. RETTS:  Form and foundation.  Outside
14  the scope.
15          MS. BERKE:  Vague.
16          THE WITNESS:  I wouldn't say must.  Should
17  be disciplined.
18      Q.    BY MS. GREEN:  Why?
19          MS. RETTS:  Outside the scope.
20          THE WITNESS:  (No oral response).
21      Q.    BY MS. GREEN:  You can answer.
22      A.    They should be disciplined.  Again, that
23  decision is with the chief.  I can't sit here and tell
24  you what every chief is going to do under the
25  circumstances.

Page 107

1      Q.    So the Phoenix Police Department chief in their
2  own discretion determines whether or not -- if someone
3  engages in excessive force whether or not they're
4  disciplined?
5      A.    Discipline decisions are made by the police
6  chief.  And what each individual chief does I can't tell
7  you.
8      Q.    Okay.  The fabrication of evidence by an
9  officer or detective -- I take it that if there's an
10  allegation of that type of conduct, it's a very serious
11  allegation.  Correct?
12      A.    Yes.
13      Q.    I take it if there's an investigation of that
14  allegation and that allegation is sustained, under police
15  department rules and regulations, as you understand it,
16  must that officer be disciplined?
17          MS. RETTS:  Form.
18          THE WITNESS:  That officer will be
19  disciplined if it is sustained, yes.
20      Q.    BY MS. GREEN:  Okay.  But with excessive force
21  it's just should?
22      A.    No, that officer will be disciplined, yes.
23      Q.    Okay.  Similarly with respect to sexually
24  assaulting a witness or a suspect, if that --
25      A.    It's both a crime as well as administrative

Page 108

1  discipline.
2      Q.    Right.  And with crimes, I would take it -- how
3  does that work?  Does that get deferred to the police
4  chief as well or it goes to the DA, the county attorney,
5  too?
6          MS. RETTS:  Form.
7          THE WITNESS:  You have a squad within the
8  Phoenix Police Department, the special investigations
9  bureau that investigates allegations of criminal
10  misconduct on the part of all City employees.
11      Q.    BY MS. GREEN:  Okay.  And that would also go to
12  PSB as well?
13      A.    Two different investigations, one concerning
14  your employment with the City and the other concerning
15  whether or not criminal charges will be filed against
16  you.
17      Q.    Okay.  And let's stick with PSB.  If that
18  allegation of sexual assault is sustained, as far as you
19  know, it's always been that that officer must be
20  disciplined?
21          MS. BERKE:  Objection.  Foundation.
22          MS. RETTS:  Form and foundation.
23          THE WITNESS:  Under current policy, what I
24  will tell you is you will be terminated for that type of
25  behavior.

EXHIBIT 15

TOM VAN DORN                                                November 17, 2017
MIKE vs CITY OF PHOENIX                                         109–112

Page 109

1    Q.    BY MS. GREEN:  Okay.
2    A.    That is a crime, a felony crime at that.
3    You'll be sustained on the elements of a felony crime,
4    which is termination.
5    Q.    And do you have any reason to believe that it
6    was any different before 1995?
7          MS. BERKE:  Foundation.
8          MS. RETTS:  Foundation.
9          THE WITNESS:  Again, I would hope not.  I
10   would just have to see the policy.
11   Q.    BY MS. GREEN:  And I'm sorry we're going to go
12   through this again, but do you have any reason as you sit
13   here today based on your knowledge of -- I'm not asking
14   you to make an affirmative representation.  Let's be
15   clear about this.  I'm not asking you to say -- I know
16   you said you didn't work here before 1995.  We're clear
17   on that.  I'm not asking you to say that before 1995 this
18   was the policy without looking at the policy.
19         I'm asking you if based on your knowledge
20   and experience you have any reason to think as you sit
21   here today that that was not the policy?
22   A.    And you're asking me for my opinion, and I'm
23   telling you I would hope that it would not be.  I would
24   hope that that was still the policy back in the '60s, the
25   '70s, the '80s.  Can I tell you specifically?  I cannot.

Page 110

1    Q.    But I'm asking you --
2    A.    You're asking me for my opinion, and I just
3    gave it to you.
4    Q.    I'm asking you whether you can think of
5    anything --
6    A.    My opinion.
7    Q.    -- to question -- no, whether you can think of,
8    oh, yeah, I heard before in 1985 they didn't do that, for
9    example.  They sexually assaulted people and didn't
10   require any discipline.  Is there anything in your head
11   like that right now?
12         MS. RETTS:  Form.
13         THE WITNESS:  I would hope not.
14   Q.    BY MS. GREEN:  But you don't know whether --
15   A.    I would hope that they did -- I would hope they
16   discipline people if they engaged in that type of
17   behavior, but we will have to look at the specific policy
18   as to whether they did or not.
19   Q.    So there is a doubt in your mind as you sit
20   here today whether or not that type of behavior would
21   have been disciplined in the 1980s?
22         MS. RETTS:  Form.  Asked and answered.
23         THE WITNESS:  Without knowing the discipline
24   policy that existed in the '80s, I can't tell you what
25   they did back then.

Page 111

1    Q.    BY MS. GREEN:  You can tell me, sir, what you
2    know and your knowledge.  You can.
3    A.    I can tell you from 1995 to the present, if
4    that type of behavior existed, you will be terminated
5    from the police department.
6          Again, I can tell you I would hope that they
7    did the exact same thing if that behavior occurred in
8    1980.  Whether or not elements of a felony was a cause
9    for discipline in the 1980s, without seeing the policy, I
10   cannot give you that answer.
11   Q.    When you joined the police department in 1995,
12   were there people who were working there in the 1980s?
13   A.    Yes.
14   Q.    For example, when you were in patrol in 1995,
15   from 1995 to 1999, you worked with some officers who were
16   there in the 1980s.  Right?
17   A.    Yes.
18   Q.    You talked to them from time to time.  Correct?
19   A.    Yes.
20   Q.    You've been in the police department quite
21   awhile, now, what, 23 years?
22   A.    Uh-huh.
23   Q.    You've been in the legal unit.  Right?
24   A.    Yes.
25   Q.    You've been in PSB?

Page 112

1    A.    Yes.
2    Q.    Even though you've only been there in 1995, you
3    have quite a bit of knowledge about the Phoenix Police
4    Department.  Correct?
5    A.    Yes.
6    Q.    You've served at the pleasure of the police
7    chief to provide legal advice.  Correct?
8    A.    Yes.
9    Q.    So I'm asking you, as you sit here today, based
10   on all that experience, whether you have any reason to
11   believe that someone who -- that if someone was found to
12   have sexually assaulted a witness or suspect, they would
13   not have been disciplined.  I'm asking you as you sit
14   here today based on that knowledge and experience, all of
15   that knowledge and experience.  It's a yes-or-no
16   question.
17         MS. BERKE:  Foundation.
18         MS. RETTS:  I'm going to have you stop and
19   let me object.  He's here as a 30(b)(6) witness to talk
20   about the position of the department.  What you're asking
21   him is a question that's outside the scope of a 30(b)(6)
22   witness.  You're asking about his personal knowledge and
23   his personal opinion and rumors, innuendo, et cetera.
24         If you want to ask him outside the scope and
25   have him testify about what his personal opinion is, but

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
113–116

Page 113

1  he's stated multiple times that he cannot answer those
2  types of questions as a 30(b)(6) witness on the basis
3  that he does not know what the policy was at the time.
4       So if we're here to talk about policies on
5  behalf of the City of Phoenix, he needs to be shown a
6  policy.  His reasons to believe that may be personal to
7  him or his personal opinions are not made as a 30(b)(6)
8  witness.
9       MS. GREEN:  He is in fact here today to
10  testify about his personal knowledge about some of the
11  topics, Tina.  That's been made very clear by you
12  multiple times.  You said he may have some personal
13  knowledge on some of these things, and he can testify
14  about it.  You even said that in your e-mail to me to the
15  extent he has personal knowledge.
16       So make your objection for the record, and
17  he can answer the question to the best of his knowledge.
18  If you want to take it up on whether it's admissible or
19  something like that later, we can.
20       But he's here as a witness, and I'm going to
21  ask him the questions that I'm going to ask, and this is
22  certainly relevant.  And you've produced him -- you
23  represented to me that you produced him as a witness on
24  disciplinary policies from 1970 to 1990.  You said he
25  would be the witness to testify regarding those topics,

Page 114

1  and he's coming here today and said he cannot testify
2  regarding those topics, but since he is here, I would
3  like to ask him if he has any reason to believe it was
4  any different, and so that's what I intend to do.
5       MS. RETTS:  That's not as a 30(b)(6)
6  witness.  That's the problem.  He's told you he can look
7  at and verify, which he's not -- not been shown to him.
8  You can say based upon his knowledge and experience and
9  if he went back and looked at the policy, but what you're
10  asking him to do is go outside the scope of a 30(b)(6) as
11  to his knowledge.
12       What he thinks, what he speculates about --
13       MS. GREEN:  His personal knowledge in the
14  legal unit and the PSB, advising the police chief, that
15  is relevant, Tina, but --
16       MS. BERKE:  He's told you he has no personal
17  knowledge as to prior to 1995.
18       MS. GREEN:  He does have personal knowledge
19  based on his understanding of the way the department
20  works from his 23 years of experience including
21  experience in the legal unit as a legal -- direct legal
22  advisor to the police chief and including in the PSB.
23       MS. RETTS:  Which he's spoken about --
24       MS. GREEN:  So make your objection for the
25  record, and he can answer the question.  It's fine.  He's

Page 115

1  here.  He can answer the question, and we'll move on.
2       MS. RETTS:  If he can answer the question
3  outside the scope of a 30(b)(6) and based upon his
4  personal knowledge --
5       MS. GREEN:  We can make those arguments
6  later, Tina.  It works with any other objection.
7       MS. RETTS:  Not with a 30(b)(6).  That's the
8  distinction.  A 30(b)(6) works distinctly different than
9  a normal witness.  He has answered that he cannot speak
10  through the department on those things unless he's shown
11  a policy.
12       Now, I'm willing to let him answer based on
13  his personal knowledge if that is not designated as a
14  30(b)(6) because thinking of any reason that he might
15  have when he has already told you that he wasn't here,
16  didn't have the knowledge and can't -- cannot answer the
17  question without verifying in the policy.  Four times
18  he's told you that.  That's when we need to move on.
19       MS. GREEN:  He's not responding to the
20  question.  I'm not asking him what the policy was.  I'm
21  asking if he has any reason to believe it was different.
22       MS. RETTS:  You're asking him to speculate
23  on behalf of the City.
24       MS. GREEN:  I'm asking him based on his
25  experience whether or not he has any reason to believe it

Page 116

1  was different.  He can answer that question.  You
2  produced him for this topic.  He can answer the question.
3       You can make the objection on the record as
4  you have, and if it's inadmissible later or can't be used
5  later, we can brief it and do whatever else you want to
6  do.
7       But I mean, this is -- this is a deposition.
8  I can ask the questions, particularly questions relevant
9  to the topic that you represented he was produced for.
10       MS. RETTS:  We have a disagreement about
11  that.
12       MS. GREEN:  That's fine.  The disagreement's
13  on the record.
14       MS. RETTS:  You can ask him again if you
15  want to try to rephrase it, but he's already answered it
16  four times.
17       MS. GREEN:  He hasn't answered the question,
18  Tina.
19  Q.    BY MS. GREEN:  So I will ask it again.
20  A.    Okay.
21  Q.    And this is a very simple question.  It's not a
22  trick question.  I didn't think it would be particularly
23  tough for anyone here, but apparently it is.
24       But you've told me that from 1995 forward,
25  if it's found that an officer sexually assaulted a

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
117–120

Page 117

1  witness or suspect, that behavior must be disciplined.
2  Correct?
3        MS. BERKE:  Objection.  Argumentative.
4        THE WITNESS:  Yes, should be disciplined or
5  will be disciplined.  We'll go with that.
6     Q.   BY MS. GREEN:  Will be disciplined?
7     A.   Correct.
8     Q.   There's no discretion?
9     A.   Well, again --
10       MS. RETTS:  Form.
11       THE WITNESS:  -- that's up to the police
12  chief at the end of the day.
13    Q.   BY MS. GREEN:  Well, what are you saying --
14    A.   Because all discipline is decided by the police
15  chief.
16    Q.   But under the policy, as far as you understand
17  it, it will be disciplined.  Correct?
18    A.   It will be classified by professional standards
19  as the elements of a felony and a sustained allegation if
20  it was proven what that level of discipline will be will
21  be decided by the police chief.
22    Q.   Is there any question in your mind if it's
23  classified as a felony and a sexual assault occurs and
24  that's found that the police chief would make some level
25  of discipline?

Page 118

1     A.   The police chief will make a level of
2  discipline, yes.
3     Q.   Okay.  So it will be disciplined?
4     A.   It will be disciplined.
5     Q.   Okay.  Now I'm asking you as you sit here
6  today, based on your 23 years of experience in the police
7  department and your knowledge of the police department
8  including serving as a legal advisor to the police chief
9  and including working in the legal unit for eight years
10  and including working in PSB for a period of time whether
11  you have any reason to believe that was different before
12  1995?
13       MS. RETTS:  Outside the scope.
14       THE WITNESS:  You're asking me for my
15  opinion.  I told you I would hope that it did exist
16  because that was a serious allegation and one we do not
17  tolerate in this profession.
18       Whether or not that specific hypothetical
19  you gave me was in the discipline policy prior to my
20  employment, I cannot answer that for you without looking
21  at those specific policies.
22    Q.   BY MS. GREEN:  And so as far as you know, if
23  something is not explicitly in the discipline policy --
24    A.   I can't sustain --
25    Q.   -- there's no discipline?

Page 119

1     A.   I can't sustain misconduct for a policy that
2  does not exist.
3     Q.   So if something has occurred and I'm talking
4  between 1995 to present and it's not explicitly stated in
5  the discipline policy as being misconduct, there's no
6  discipline?
7        MS. RETTS:  Form.
8        THE WITNESS:  It's going to vary.  So you go
9  to that -- let's go back to your hypothetical then.
10  Let's say that your -- if an officer sexually assaulted
11  somebody was not in any specific policy prior to my
12  employment -- let's say that didn't exist in 1980.  Was
13  there another portion of the policy in which if sustained
14  they could still discipline an officer for it?
15  Potentially, neglect of duty, unprofessionalism.  There's
16  various different categories.
17       So even though it may not be specifically
18  mentioned, you can look into other areas to sustain an
19  employee.
20    Q.   BY MS. GREEN:  But as far as you know, it has
21  to fit within one of those other broad areas for
22  discipline?
23       MS. RETTS:  Form.
24       THE WITNESS:  You can't sustain anything
25  that doesn't exist in a policy.

Page 120

1     Q.   BY MS. GREEN:  But some of these broader areas,
2  for example?
3     A.   Can be subjective.
4     Q.   Office -- unbecoming of an officer, behavior
5  unbecoming of an officer could include sexual assault?
6     A.   Yes, it could.
7     Q.   Even if sexual assault isn't written in the
8  policy, which is a question in your mind pertaining --
9  before 1995?
10       MS. RETTS:  Form.
11       THE WITNESS:  Whether or not that crime was
12  specifically listed in a policy prior to 1995, I cannot
13  answer that without going through the policies.
14    Q.   BY MS. GREEN:  Okay.  We're going to finally
15  get to the policies we wanted to see.
16       MS. GREEN:  We're going to mark this as 82.
17       (Exhibit 82 was marked for identification.)
18    Q.   BY MS. GREEN:  All right.  So the document that
19  has been marked as Exhibit 82 -- it is -- well, can you
20  tell me what it looks like to you?
21    A.   Yeah, it's the Phoenix Police Department
22  general order related to discipline and misconduct
23  investigations.
24    Q.   Okay.
25    A.   1980.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
121–124

Page 121

1    Q.   Okay.  So I'll represent to you what I did
2    was -- this actually includes the portions of the general
3    order spanning multiple years.
4    A.   Okay.
5    Q.   So in this litigation, the City has produced to
6    us -- we asked for the discipline policies, and they
7    produced to us about a 300-page document with various
8    pages of discipline policies totally out of order.
9         So what I tried my best to do is create a
10   document that had a complete set of pages from 1980, a
11   complete set of pages from 1985 and a complete set of
12   pages from the order from 1991.  Unfortunately based on
13   what was produced to us, thinking -- for example, 1980 we
14   were missing a page, and sometimes it has this revised
15   language at the top like -- like, for example, 1980 we
16   never got a complete policy of what was in place on 980.
17        So if you flip to the second page, you'll
18   see --
19   A.   Page 3.
20   Q.   Page 3 is 380.  I just looked for a page 3 I
21   could find, and that's what we had.  And then page 4 is
22   780.  That's what was produced to us.
23        So I did my best to recreate what the policy
24   would be in 1980, and then what we did -- when we put
25   these three recreations of policies together, I put a

Page 122

1    Bates stamp at the bottom corner in blue.  It's called
2    discipline 001.
3    A.   Okay.
4    Q.   And it goes through discipline 36, and, again,
5    I just did my best to try and recreate a complete policy.
6    A.   Okay.
7    Q.   I apologize, but we just didn't receive them in
8    that manner.
9         MS. RETTS:  Just for the record, the way
10   they had been produced was the pages were in to show how
11   they changed each page in the various versions.  So it
12   would be page 1 and then all the versions of it and page
13   2, all the versions of it, and page 3, all the versions
14   of it.
15        MS. GREEN:  Okay.  I'm not sure if that's
16   true.  I just know that I'll take your representation of
17   that.  I just know we didn't get a complete 1980 policy,
18   a complete 1985 policy, a complete, you know, 1991 policy
19   in order.
20        So I just -- for the purposes of this
21   deposition, I thought it would be helpful to have the
22   policy all together so you could see page 2, page 3 as
23   you're reading through without having to flip multiple
24   ways.  Does that make sense?
25        THE WITNESS:  It makes sense.  I guess I

Page 123

1    have a question then after listening to City's counsel
2    versus the documents you're producing here.
3         So when we -- if we wanted to specifically
4    look at what policy was in effect for 1980 and those
5    types of things, then, you know, if they did page 1, page
6    2, page 3, whatever --
7    Q.   BY MS. GREEN:  Right.
8    A.   For 1980 --
9    Q.   We would be here all day if we did every page
10   1, page 2 to verify.  So I just tried to take an '80
11   policy, an '85 policy and a '91 policy, which they
12   didn't -- so we could see how they changed over time in
13   the time period, if you see what I'm saying.
14        And, you know, you can do what you can with
15   the exhibit.  We're trying to make it as easy as
16   possible.
17   A.   Yeah.  But the revision dates are the part
18   that's going to be confusing for me because it looks like
19   this particular policy -- let's just go with policy B2
20   that you're producing for me -- looks like it was revised
21   in September of '80, looks like there was some level of
22   revision in March of '80, looks like there was some level
23   of revision in 7 of '80.
24   Q.   We did our best to put all the revision dates
25   there.  The reason there is no September '80 revision for

Page 124

1    page 3 is because one wasn't produced to us.  So when we
2    had things of the same revision level, we did put it
3    together.  So you'll see in the '85 policy most of them
4    had the April '85 revision date, but on page discipline
5    11, we don't have that because they didn't give us an
6    April '85 revision date.  So, again, I'm just doing the
7    best I can with what was produced.
8         MS. RETTS:  Form.
9         THE WITNESS:  Okay.  I'll testify to the
10   policy applicable to then.
11        MS. GREEN:  Okay.  And, Tina, perhaps we
12   could get a stipulation at some point about some of the
13   other pages.  I just couldn't put a 300-page exhibit
14   today together to go through with him.  I thought this
15   made more sense.
16        MS. RETTS:  Okay.  We'll try to follow along
17   the best we can with what -- because I'm not sure in
18   looking through that it is actually not the case that we
19   don't have a complete one, but we can talk about --
20        MS. GREEN:  We spent a lot of time putting
21   this together, believe me.  I'm happy to represent that.
22   If that's incorrect and you guys do have a complete one
23   and you didn't produce it, that would be great if you
24   could produce the rest of it.  That will be actually
25   fantastic.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
125–128

Page 125

1    Q.   BY MS. GREEN:  For the purposes of questioning,
2    I'm going to be referring to the 1985 policy which starts
3    on discipline 8.
4         MS. BERKE:  I'm sorry.  What page?
5         MS. GREEN:  I'm sorry.  I'm on page Bates
6    stamp discipline 8.
7         MS. BERKE:  Okay.
8         THE WITNESS:  Okay.
9    Q.   BY MS. GREEN:  If you just look at section 1 at
10   the top of the page, so according to this policy,
11   employees must be disciplined for the commission or
12   omission of any act that is prohibited or required.
13   Correct?
14   A.   Employees are subject to disciplinary action,
15   yes.
16   Q.   Okay.  It's your understanding of this policy
17   that if an employee commits an act that is prohibited or
18   omits an act that is required, is discipline
19   discretionary?
20   A.   You're subjecting yourself to possible
21   discipline --
22   Q.   Okay.
23   A.   -- that will be decided by the police chief.
24   Q.   Okay.  And you're sure it will be decided by
25   the police chief even though you haven't seen that in the

Page 126

1    policy?
2    A.   We can go through this policy.  Right now under
3    current practices all discipline has been decided by the
4    chief.
5    Q.   Now I'm asking you about the 1985 policy.
6    A.   All right.  Give me a second to go through
7    every page.
8    Q.   Let's take ten minutes, and you can read just
9    the 1985 pages.
10   A.   Okay.
11        MS. GREEN:  That might make things go
12   faster.  We can go off the record.
13        (A recess was held off the record.)
14        MS. RETTS:  So on discipline 16, there's a
15   page 8.1.  At the top, it's discipline 16, and at the
16   top, it's 8.1.  Do you see that?  7/85.
17        MS. GREEN:  Uh-huh.
18        MS. RETTS:  If you look back to the prior
19   page, discipline 15, there is no 8.1 in the revised
20   version 485 because the information appearing on 8.1
21   actually appears on page --
22        MS. GREEN:  Is the City capable of producing
23   us complete policies in order for any particular period
24   of time, for example, the 485 1985 policy, so we don't
25   have to have this dispute?

Page 127

1         MS. RETTS:  I think we did produce them
2    complete.  I think that's what I'm trying to explain.  It
3    appears that they're not complete because you may be
4    thinking, hey, there's an 8.1.  The reason it was done in
5    the order it was done is to show -- so here there's no
6    8.1 on the 485 because 8.1 is here.  The text is still
7    here.  So 8.1 shows up because it goes on to the next
8    page.  So you have to track through the way it was
9    produced to see that because they are complete.
10        MS. GREEN:  Is the City capable of producing
11   them to us in order and in your understanding of how they
12   are complete?
13        MS. RETTS:  Yeah, I mean, I can pull them
14   out that way.
15        MS. GREEN:  It might be worth considering to
16   avoid these types of issues, but we can talk about it
17   later.  Thank you for that clarification because you guys
18   certainly know your policies better than I do.
19   Q.   BY MS. GREEN:  Okay.  Commander Van Dorn, have
20   you had an opportunity to read the 1985 portions of the
21   Exhibit 82?
22   A.   Yes.
23   Q.   Had you read these pages before today?
24   A.   No.
25   Q.   Okay.  Do you know if you were provided these

Page 128

1    pages in preparation to testify here today?
2    A.   These specific pages, I don't know.
3    Q.   Could you refer back to Exhibit 81, the
4    30(b)(6) notice.
5    A.   Which paragraph?
6    Q.   Paragraph 5.
7    A.   Okay.
8    Q.   Regarding paragraph 5, your counsel represented
9    to me that you would be able to verify and discuss the
10   substance for this section and that the City was
11   designating you as a witness who will speak to this
12   category.  Were you aware of that before today?
13        MS. RETTS:  Form and foundation.
14        THE WITNESS:  I was aware of the fact that,
15   yeah, I could look at policies and tell you -- talk about
16   the actual substance of it, yes.
17   Q.   BY MS. GREEN:  Were you aware of the fact the
18   City of Phoenix has designated you as a witness to verify
19   and discuss the substance of policies relevant to section
20   5 --
21   A.   Yes.
22   Q.   -- today?
23   A.   Yes.
24   Q.   Okay.  Are you prepared today to verify and
25   discuss policies, procedures, rules, regulations, customs

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
129–132

Page 129

1  or practices, whether written or oral, and any
2  modifications thereto in place for 1970 to 1991
3  pertaining to the investigation, remediation and/or
4  discipline of PPD officers and detectives with respect to
5  internal or external allegations, complaints or findings
6  of misconduct?
7     A.   Yes.
8         MS. RETTS:  Form, and I would also note we
9  had an objection on the time frame, and you guys agreed
10  to limit it to '85.
11         MS. GREEN:  I don't recall agreeing to that.
12         MS. RETTS:  There is -- we had multiple
13  discussions about it.  So I'm going to lodge an objection
14  then because we have policies going back to 1985.  That's
15  as far back as we can go as we discussed before.
16         MS. GREEN:  You produced to us 1980
17  policies.
18         MS. RETTS:  For '80, for policies that we
19  produced, but we couldn't go back to '70.  For the years
20  we produced -- and I remember that we had -- I'll try to
21  find it right now.  There was an objection we lodged
22  regarding the scope of the time frame, and the
23  plaintiff's position was that it would go back to when
24  Saldate was a detective, and my recollection is that that
25  was 1985.

Page 130

1         MS. GREEN:  Okay.  So that's fine.  I don't
2  recall agreeing to 1985, and we have the 1980 policies.
3  You also produced '81 and '82 policies.
4         MS. RETTS:  If we have them, he can speak
5  about them.  The problem is for -- the objection was for
6  the policies we don't have.
7         MS. GREEN:  Okay.
8         MS. RETTS:  Right.
9         MS. GREEN:  In this exhibit, there's only
10  policies you gave us.  I'm just going to keep going, and
11  your objection is on the record.
12         MS. RETTS:  Right.
13     Q.   BY MS. GREEN:  So I'll have to reask that
14  question.
15         Is it -- are you prepared today to verify
16  and discuss the substance of any PPD policies,
17  procedures, rules, regulations, customs or practices,
18  whether written or oral, and any modifications thereto in
19  place from 1980 to 1991 pertaining to the investigation,
20  remediation and/or discipline of PPD officers and
21  detectives with respect to internal or external
22  allegations, complaints or findings of misconduct?
23         MS. RETTS:  Form.
24         THE WITNESS:  Yes.
25     Q.   BY MS. GREEN:  But you did not read a single

Page 131

1  discipline policy before you came here today?
2     A.   No.
3         MS. RETTS:  Form.  Argumentative.
4     Q.   BY MS. GREEN:  How are you prepared to testify
5  on this topic if you didn't bother to read a single
6  discipline policy from that period of time and you didn't
7  start working at the Phoenix Police Department until
8  1995?
9         MS. RETTS:  Form.  Argumentative.
10         THE WITNESS:  Because I'm able to sit here
11  and tell you today that these are the Phoenix Police
12  Department's policy based upon their structure and form
13  and based upon my 23 years with the Phoenix Police
14  Department.
15         In reading this policy, not much has changed
16  from 1985 to present day as to how we conduct misconduct
17  investigations.
18     Q.   BY MS. GREEN:  You're prepared to testify that
19  nothing has changed?
20         MS. RETTS:  Form.  Misstates testimony.
21         THE WITNESS:  Not much has changed.
22     Q.   BY MS. GREEN:  I'm sorry.  I didn't hear that.
23  So could you please take me through the specific
24  preparation you did before today to testify on this
25  topic?

Page 132

1         MS. RETTS:  Form.  Foundation.  Asked and
2  answered.
3         THE WITNESS:  I thought we covered that at
4  the very beginning.
5         MS. GREEN:  I'd like to go through it one
6  more time because you refused to answer any questions
7  about the 1985 policy before I gave you an opportunity to
8  sit here and read it, and so I'm wondering what -- I
9  would like to go through one more time the preparation
10  you did here today, so if we need to make a motion to the
11  Court for the production of another witness because of
12  the lack of preparedness of this witness, we have it very
13  clearly on the record.
14         MS. RETTS:  Amelia, I would ask that you
15  just start asking the questions because we're spending an
16  inordinate amount of time talking about his preparation
17  when he hasn't refused to answer anything.
18         So you can talk about his preparation
19  question after question after question, but he's not
20  saying that he can't answer them.
21         I mean, as we've discussed multiple times,
22  we can't find people who were there at the time.  So they
23  are going to have to verify policies and procedures as
24  they exist in the written form and that, you know, this
25  has been an ongoing discussion we've had because of the

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
133–136

Page 133

1  length of time this has happened.
2          So if you want to ask him the questions,
3  he's here to ask them.  We've spent three hours talking
4  about preparation.  He can answer the questions, and if
5  you have a problem with him not being able to answer a
6  question, we can go from there.
7      Q.    BY MS. GREEN:  How can you testify not much has
8  changed from 1985 until now if you haven't looked at any
9  of the policies before today?
10     A.    Because I just read this policy.
11     Q.    Okay.  Can you testify regarding any other
12  things -- any other years or revisions other than what
13  you've just read because I gave you an opportunity to
14  read it here today?
15     A.    If given the opportunity to read them, yes, I
16  can.
17     Q.    So unless given an opportunity to read the
18  complete policy, you are not prepared to testify about a
19  policy?
20     A.    I will not testify as to the substance of any
21  policy without being given the opportunity to read, that
22  is correct.
23     Q.    Okay.  Did you have the opportunity to read
24  those policies before today?
25     A.    I don't recall exactly how many policies

Page 134

1  counsel provided me before today's deposition.
2      Q.    Did you believe it was important to read any
3  policy regarding discipline covering this time period in
4  order to testify about topic 5 today?
5          MS. RETTS:  Form.
6          THE WITNESS:  No.
7      Q.    BY MS. GREEN:  You did not believe that was
8  important?
9      A.    No.  Ma'am, again, I didn't know what questions
10  you would be asking for the deposition.
11     Q.    What has changed?  You said not much has
12  changed between the 1985 excerpts that I provided you and
13  give you the opportunity to read today and the policies
14  now.
15     A.    Not much has changed regarding the process of
16  how we investigate allegations of misconduct -- has
17  changed between 1995 and present day.  We still have
18  disciplinary review boards, we still have line level
19  supervisors, we still have professional standards.  The
20  process has not changed drastically from 1985 to present
21  day.
22     Q.    Okay.  What has changed?
23     A.    Well, if you want to go back to that
24  hypothetical you presented prior to us going on break
25  regarding sexual assault, you asked me specifically if I

Page 135

1  knew whether or not that existed.  So if I look at that
2  and I look at 1985 policy, it appears we just classified
3  it and investigated it as commission of a crime.  But the
4  words specifically sexual assault do not appear in the
5  1985 policy.
6      Q.    And it does now in the policy -- current day
7  policy?
8      A.    I think we just included it as not commission
9  of a crime but elements of a felony because we don't wait
10  for a conviction.  We allow it to discipline now based on
11  probable cause as well.
12     Q.    Can you think of anything else that has changed
13  between 1985 and now based on your reading of the policy
14  during the break?
15         MS. RETTS:  Form.
16         THE WITNESS:  Well, again, the current
17  policy has many different categories and those types of
18  things.  A lot of the categories appear to be the same
19  from 1985 until now.  We have likely added from 1985
20  until now different categories as times have changed
21  throughout the course of years that we also will
22  discipline our officers for.
23         With regard to the actual process of how we
24  investigate allegations of misconduct, it appears we
25  pretty much go about investigating things in the exact

Page 136

1  same manner.
2      Q.    BY MS. GREEN:  Okay.  Can you tell me anything
3  specific that has changed from this policy you were just
4  given an opportunity to read for the first time here
5  today and the policy now --
6          MS. RETTS:  Form.
7      Q.    BY MS. GREEN:  -- other than --
8      A.    You bet.  We don't use partially sustained
9  anymore in today's policy.  Looks like they did in 1985.
10     Q.    Okay.  Can you think of anything else?  Fair to
11  say you have to flip through the policy again because you
12  didn't review it before today?
13         MS. RETTS:  Form.  Argumentative.
14         MS. BERKE:  Argumentative.
15         THE WITNESS:  That's correct.  I didn't
16  review it before today.  I answered that.
17     Q.    BY MS. GREEN:  So you're not able to tell me as
18  you sit here right now without carefully reviewing the
19  policy again whether anything else has changed between
20  1985 and now?
21         MS. RETTS:  Argumentative.  And I don't
22  think he could do that without --
23         THE WITNESS:  I wasn't hired until 1995.
24         MS. RETTS:  He can't memorize that.
25         THE WITNESS:  If you want me to sit here and

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
137–140

Page 137

1 read '85, '86, '87 all the way through 2016, then, yes, I
2 can answer those questions for you.
3     Q.   BY MS. GREEN:  Well, you didn't read any
4 policy --
5     A.   That's not true.
6     Q.   -- in preparation to testify here today.
7          MS. RETTS:  Form.
8          THE WITNESS:  Again, I don't know what all
9 policies have been provided between both sides here.
10 So...
11     Q.   BY MS. GREEN:  You did not read any discipline
12 policy in preparation to testify here today?
13          MS. RETTS:  Form.
14          THE WITNESS:  No.
15     Q.   BY MS. GREEN:  Even though you knew you were
16 here to testify regarding discipline policies?
17     A.   Yes.
18          MS. RETTS:  Form.
19          THE WITNESS:  Because, again, I do have the
20 knowledge and the expertise to be able to explain the
21 processes of the Phoenix Police Department to take a look
22 at this document and explain to you that it is an actual
23 document of the Phoenix Police Department and how they
24 would have investigated things back in 1995 since -- '85
25 since that's the policy we're on.

Page 138

1     Q.   BY MS. GREEN:  But you didn't attempt to
2 prepare to do that before today?
3          MS. RETTS:  Form and foundation.
4          THE WITNESS:  I wasn't asked to do that.
5     Q.   BY MS. GREEN:  You intended to review every
6 policy between 1985 and now if we produced it to you as
7 an exhibit as you sat here today in order to answer
8 questions about that topic?
9          MS. RETTS:  Form.
10          THE WITNESS:  I was not asked to review the
11 substance of any policies prior to my deposition today.
12     Q.   BY MS. GREEN:  Fair enough.  Okay.  I'd like to
13 direct you back to what I previously directed you to on
14 page Bates stamp discipline 008.
15     A.   Okay.
16     Q.   Now, regarding section 1, according to this
17 policy, is it required for employees to be disciplined
18 for the commission or omission of any act that is
19 prohibited?
20     A.   Employees are subjecting themselves to
21 discipline for sustained allegations of misconduct in any
22 of the categories as outlined in this policy.
23          MS. RETTS:  Form.
24     Q.   BY MS. GREEN:  Oh.
25     A.   If you further read through the policy, the

Page 139

1 process is still the same today.  Everything is a
2 recommendation to the police chief with the exception of
3 minor violations which is also true today, oral or
4 written reprimand violations.
5     Q.   Okay.  Fair enough.  So when this policy says,
6 "Employees are subject to disciplinary action for the
7 commission or omission of any act that is prohibited or
8 required," that means if an employee, for example,
9 commits an act that is prohibited, whether or not they
10 will be disciplined is a matter that is at the discretion
11 of the police chief?
12     A.   It is up to the police chief.
13     Q.   And that would include whether or not --
14 withdrawn.
15          So for example, if a detective uses
16 excessive force in order to coerce a suspect to confess
17 to a crime and that allegation of misconduct is
18 sustained, whether or not that officer will be
19 disciplined is a matter at the discretion of the police
20 chief?
21     A.   Yes.
22          MS. BERKE:  Objection.  Vague.
23          THE WITNESS:  Yes, you are subjected to
24 discipline.  Various recommendations will be made to the
25 police chief regarding the level of discipline that

Page 140

1 people think you should receive, and then the ultimate
2 decision will rest with the police chief.
3     Q.   BY MS. GREEN:  Okay.  Are there any limits on
4 that discretion of the police chief?
5          MS. RETTS:  Form.
6          THE WITNESS:  There could be various
7 different things.  I mean, you know, the police chief
8 works with the City manager.  The City manager works with
9 the city council.  So there's a system of checks and
10 balances.  So the decision is made by the police chief,
11 but the police chief also has a boss.
12     Q.   BY MS. GREEN:  Tell me a little bit more about
13 that as it relates to this policy in 1985.  So if --
14     A.   Well, you've got to let me find the Bates
15 number page here.  If you look through the DRB and
16 everything else, everything is an advisory recommendation
17 through the police chief.
18     Q.   Okay.  If you want to direct me to a particular
19 page --
20     A.   Okay.
21     Q.   -- go for it.
22     A.   All right.  Let's start with discipline 013.
23 Since we seem to be focusing on suspensions and above,
24 we'll start off with 2 -- I2.  "If the recommended
25 discipline involves suspension without pay, reduction in

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
141–144

Page 141

1  rank or dismissal, the recommendation will be forwarded
2  to the division commander."  A division commander is an
3  assistant police chief.  "If the division commander
4  agrees with the recommendation" --
5      Q.   I'm sorry, I'm not following where you are.
6      A.   Discipline 013 --
7      Q.   Okay.  Got it.
8      A.   -- to I2.
9      Q.   Got it.
10     A.   I read the first paragraph.  So we're on number
11  3.  "If the division commander agrees with the
12  recommendation for suspension or dismissal, they will
13  then forward that report to the DRV chair," which is then
14  outlined in number 3, a disciplinary review board.
15          All right.  It explains the make-up of who
16  serves on that board, what the process of that board will
17  be, and then if you flip over to discipline page 014,
18  3B -- I'm sorry -- 3C at the top, "After review, the
19  board will arrive at a recommendation including the
20  number of hours and cases of submission and submit it to
21  the division commander."
22          All right.  Goes back up and then it says or
23  they can submit the matter directly to the police chief.
24  So...
25     Q.   Okay.

Page 142

1      A.   So what's your question?
2      Q.   My question to you is when you told me that
3  whether or not a person is disciplined for using
4  excessive force to coerce a suspect that is at the
5  discretion of the police chief --
6      A.   Uh-huh.
7      Q.   -- my question is what are the limits on that
8  discretion, if any?
9          MS. BERKE:  Objection.  Vague.
10         MS. RETTS:  Form.  Asked and answered.
11         THE WITNESS:  I don't know.  I suppose it
12  works for whatever particular City manager that police
13  chief works for at the time whether or not that
14  particular manager places any limits on the discretion of
15  the chief.
16     Q.   BY MS. GREEN:  Okay.  So in 1985, the only
17  discretion -- withdrawn.
18         In 1985, the only limits on the discretion
19  of the police chief to choose whether or not an employee
20  would be disciplined for using excessive force to coerce
21  a suspect was the City manager?
22     A.   Well, they work for the City manager.  Whether
23  or not the City manager in 1985 took away some
24  discretionary authority from the chief, I can't answer
25  that question for you.

Page 143

1      Q.   Okay.
2      A.   Or if they allowed them to just make the
3  decisions.
4      Q.   Okay.
5      A.   So...
6      Q.   So as far as you know, it may -- it is the
7  case -- withdrawn.
8          Did you see any reference to the City
9  manager when you read this policy over the break?
10     A.   No.
11     Q.   And you're here to testify about the substance
12  of these policies.  Correct?
13     A.   Correct.
14     Q.   So as far as you know, in 1985, if an officer
15  used excessive force to coerce a suspect to confess
16  whether or not that officer would be disciplined was at
17  the complete discretion of the police chief.  Correct?
18         MS. RETTS:  Form.  Asked and answered.
19         MS. BERKE:  Vague.
20         THE WITNESS:  The recommendations for
21  discipline will be made to the chief.  Yes, then the
22  chief will make the decision as to what the discipline
23  will be.  Again, whoever was the police chief in 1985, I
24  don't know if specific limits were placed on that police
25  chief by the City manager at the time or not.

Page 144

1      Q.   BY MS. GREEN:  You don't have any information
2  as you sit here today suggesting there were any limits.
3  Correct?
4      A.   Correct.
5      Q.   Okay.  I would like to take another example.
6  In 1985, if a police officer sexually assaulted a suspect
7  during an interrogation, whether or not that officer
8  would be disciplined was at the complete discretion of
9  the police chief.  Correct?
10         MS. RETTS:  Form.
11         MS. BERKE:  Objection.  Vague.
12         THE WITNESS:  The officer -- if a sustained
13  allegation of that came out just like we discussed
14  previously, the officer is subjecting themselves to
15  discipline.
16         What that level of discipline would be would
17  be no different than it is today.  It would go through
18  these various processes.  Recommendations for what that
19  discipline would be would be to the police chief, and
20  then the police chief would decide what they are going to
21  do from there.
22         Specific to your sexual assault, I don't see
23  the words sexual assault, but I do see back in 1985 any
24  commission of a crime will be investigated by the Phoenix
25  Police Department.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
145–148

Page 145

1   Q.   It would be investigated.  Correct?
2   A.   Uh-huh.
3   Q.   But whether or not any discipline would be
4   applied would be at the complete discretion of the police
5   chief?
6   A.   Yes.  They are the department head for the
7   police department.
8   Q.   Okay.  So the police chief was not --
9   withdrawn.
10       MS. GREEN:  Let's take a quick three-minute
11  break.
12  A.   Okay.
13       (A recess was held off the record.)
14  Q.   BY MS. GREEN:  I want to direct you to page 10
15  of the policy.
16  A.   Discipline 10?
17  Q.   Discipline 10, yes.  I'm sorry.  Any Bates
18  stamps I refer to are going to be discipline 10.
19  A.   Okay.
20  Q.   The discipline Bates stamped in the bottom left
21  corner.
22  A.   Okay.
23  Q.   If you just read 2 under misconduct
24  investigations.
25  A.   Okay.

Page 146

1   Q.   So under this policy, any and all allegations
2   of misconduct must be fully investigated.  Correct?
3   A.   Yes.
4   Q.   And that includes --
5   A.   That includes all.
6   Q.   That includes all.  So that would include minor
7   violations of the policy.  Correct?
8   A.   It says all alleged or suspected.  So it would
9   include all.
10  Q.   Okay.  So that would include minor violations
11  of the policy.  Correct?
12  A.   Yes.
13       MS. RETTS:  Form.
14       THE WITNESS:  All.
15  Q.   BY MS. GREEN:  That would include violations of
16  the police department policies that implicate
17  constitutional rights?
18  A.   Yes.
19       MS. RETTS:  Form.
20  Q.   BY MS. GREEN:  That would include allegations
21  of conduct -- misconduct that might rise to the level of
22  a crime?
23  A.   Yes.
24  Q.   And also looking at page 10 of the policy -- of
25  discipline 10, the policy also expressly requires written

Page 147

1   notification to officers when they are being investigated
2   for alleged misconduct.  Correct?
3   A.   Correct, and the same is true today.
4   Q.   So as far as you know back from 1985 to now,
5   when an officer is being investigated for any reason, the
6   officer receives written notification of it?
7   A.   Correct.
8   Q.   Okay.  And it should go without saying, but if
9   an officer is disciplined in any way, they're also going
10  to know about that.  Correct?
11  A.   Yeah.  They're going to get a discipline
12  notice.
13  Q.   They're going to get a discipline notice, okay.
14  And similarly if you look to discipline 22 --
15  A.   Okay.
16  Q.   -- number 9, unsatisfactory performance --
17  A.   Correct.
18  Q.   -- the policy also requires that officers be
19  advised if they're performing in an unsatisfactory
20  manner.  Correct?
21       MS. RETTS:  Form.
22       THE WITNESS:  Yes, and the same is true
23  today, too.
24  Q.   BY MS. GREEN:  So from 1985 to now, an officer
25  should know not only if they're being investigated but

Page 148

1   also if their performance is unsatisfactory in any way?
2   A.   Correct.
3       MS. BERKE:  Objection.  Vague.
4   Q.   BY MS. GREEN:  The policy requires them to be
5   informed?
6   A.   Yes.
7   Q.   Okay.  And would you agree that it's important
8   for an officer to be informed for a number of reasons?so
9   I'll give you an example.  One, an officer should know if
10  they're being investigated because they have certain
11  due-process rights themselves.  Right?
12  A.   Yes, they do.
13  Q.   And they should be able to avail those
14  procedures in place when they're being investigated?
15  A.   Yes.
16  Q.   Another reason an officer should know when
17  they're being investigated or if their performance is
18  unsatisfactory is because that type of information is
19  relevant to whether or not they might be able to get a
20  promotion.  Correct?
21  A.   Yes.
22  Q.   Okay.  And as far as you know, you have no
23  reason to believe from 1985 to now that hasn't changed?
24  A.   Correct.
25  Q.   Okay.  If you turn to page 10 of the policy --

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
149–152

Page 149

1  discipline 10.  Sorry, I directed you to the wrong page.
2  Give me a second.  Apologies.
3          Turn to page discipline 20, please.
4      A.    20 you said?
5      Q.    Yeah.
6      A.    Okay.
7      Q.    Section 5A.  So according to this section, if
8  an officer is investigated and an allegation against them
9  has been sustained or partially sustained, a copy of that
10  disciplinary report is going to be placed in their
11  division file.  Correct?
12      A.    Department and division file.
13      Q.    Okay.  Can you tell me the difference between a
14  department file and a division file?
15      A.    Yeah, yeah.  We actually have three different
16  files.  In all honesty, here they were obviously focusing
17  on those two, but no different than back in the day.
18  When I supplied documents to the Court, the division file
19  is what rests with the employee's immediate supervisor.
20          Then you have the department file, which is
21  housed out of the department's fiscal management bureau,
22  and then you have your overall City of Phoenix personnel
23  file, which is housed over the City of Phoenix human
24  relations department.
25          In an ideal world, all three would be

Page 150

1  consistent and contain the exact same documentation.
2  However, that's simply not the case because of a
3  decentralized system.  So those are the three different
4  personnel files that we have.
5          So in this particular case, though, in 1985,
6  it just looked like all they were requiring was that the
7  disciplinary notice be placed in both departments as well
8  as the division file.
9      Q.    Okay.  And so if -- a report regarding the same
10  finding -- you refer to that as a disciplinary notice in
11  the PPD?
12          MS. RETTS:  Form.
13          THE WITNESS:  The discipline notice may
14  contain a sustained allegation of what that was for.
15  Typically, though, that's the investigation.  The
16  discipline notice is just on such and such date and time
17  an allegation of such was sustained against you and
18  here's your discipline.
19          MS. GREEN:  Okay.  And so in this policy,
20  5A, it says a copy of the disciplinary report will be
21  placed in the employee's department and division files.
22      A.    Right.
23      Q.    So if the employee is disciplined, their
24  department and division file under the policy must
25  reflect --

Page 151

1      A.    Should have a copy of that, yes, that
2  discipline in both of those files.
3      Q.    And that's a requirement under the policy?
4      A.    Yes.
5      Q.    And I take it one of the reasons that the
6  disciplinary report is put in the department and division
7  file is so that when an employee, for example, is up for
8  promotion, folks within the department are aware if they
9  had any discipline in the past?
10          MS. RETTS:  Form.
11          THE WITNESS:  Various, promotions, transfers
12  to specialty details, you name it.
13      Q.    BY MS. GREEN:  Right.  And I take it that's
14  typically what a supervisor will look to when they're
15  trying to get basic information on that person's
16  disciplinary history?
17          MS. RETTS:  Form.  Foundation.
18          THE WITNESS:  It is a factor that we look
19  into, one of many factors that we look into.
20      Q.    BY MS. GREEN:  Right.  And they will look at --
21  the disciplinary report is going to tell them what
22  occurred?
23      A.    Uh-huh.
24      Q.    And so, for example, I take it the disciplinary
25  report is going to have the allegations of misconduct?

Page 152

1      A.    It's going to have the allegation it was
2  sustained and then what was the level of discipline.
3      Q.    Okay.  And I take it because that's what the
4  supervisor is looking at, it's also going to have some of
5  the investigative steps that were taken with respect
6  to --
7      A.    No, that is the investigative report which
8  would be housed over in internal affairs.  It's not a
9  part of the file, just the actual discipline notice.  If
10  they wanted more detail about the sustained allegation,
11  then they would have to go and review the entire file
12  over at Professional Standards Bureau.  This is just a
13  discipline notice, not the entire investigative report.
14      Q.    Would the disciplinary report -- I take it the
15  disciplinary report at the very least would have some
16  information regarding the investigation that was done to
17  sustain the allegation?
18      A.    Yeah, it will tell you on such and such date
19  and time, sustained allegation of --
20      Q.    Okay.
21      A.    -- existed against you, but if you want the
22  full facts as to what that -- like unprofessional
23  conduct, sustained, eight-hour discipline.  If I want to
24  know what the actual facts of that unprofessional conduct
25  was or something like that, you need to refer to the

EXHIBIT 15

TOM VAN DORN                                      November 17, 2017
MIKE vs CITY OF PHOENIX                                    153–156

Page 153

1   investigative report --
2       Q.   So --
3       A.   -- or they --
4       Q.   -- it's just a one-line report?
5       A.   For the most part.  It just depends.  Each
6   supervisor could pretty much do it different.  Some may
7   include an actual sentence.  On such and such date and
8   time, you used a cuss word against Ms. Jones which
9   resulted in a sustained allegation of unprofessional
10  conduct, eight-hour suspension.
11           Obviously if you want all the interviews by
12  Ms. Jones, any other witnesses, any other actual details,
13  you've got to go back to the investigation itself.
14      Q.   And if it's serious misconduct, you would take
15  it -- I take it the investigation would be more
16  comprehensive.  Correct?
17      A.   Oh, yeah.
18      Q.   So the disciplinary report would also be more
19  comprehensive?
20           MS. RETTS:  Form.
21           THE WITNESS:  No, the disciplinary report
22  itself is just this one document saying date and time,
23  what all policy violations did I violate.  What general
24  orders, what operations orders, what City of Phoenix
25  personnel rules and what was the level of discipline that

Page 154

1   I received for sustained allegations.  That is what goes
2   in the file.
3            If you want the actual facts of the
4   investigation, you've got to go back to the PSB report.
5       Q.   BY MS. GREEN:  And does it have every
6   allegation that was made and those that were sustained
7   and those that were not sustained?
8       A.   No, because you're only going to get discipline
9   for sustained allegations.  The discipline notice is only
10  going to contain those that were sustained.
11      Q.   And as you sit here today, you're certain that
12  what you're referring to as a discipline notice is the
13  same as what this policy is referencing as a disciplinary
14  report?
15      A.   Well, I'd have to see an actual discipline
16  report, and I can tell you, based upon my knowledge that
17  discipline reports in my 23 years, that is the process
18  for what they look like.
19      Q.   So you're not sure one way or the other whether
20  they looked any differently back in the 19- --
21           MS. RETTS:  Form.
22           THE WITNESS:  They could have attached the
23  entire investigation back in the day if they wanted to.
24  Not going to because obviously you're talking about an
25  employee's file.  You're not going to house an entire

Page 155

1   investigation in an employee's personnel file.  That's
2   why there's records retention periods for the
3   Professional Standards Bureau.  You're going to get the
4   one-/two-page document of date and time and what the
5   discipline was.
6       Q.   BY MS. GREEN:  But you're not sure one way or
7   the other what those documents -- what a disciplinary
8   report looked like back in the 1980s when it was put in
9   someone's file?
10           MS. RETTS:  Form.
11           THE WITNESS:  It wasn't the entire
12  investigation.
13      Q.   BY MS. GREEN:  Right, but you're not sure
14  whether the disciplinary report is the same as what
15  you've been referring to as a disciplinary notice here
16  today?
17           MS. RETTS:  Form.
18           THE WITNESS:  No.
19      Q.   BY MS. GREEN:  Okay.  Okay.  I want to ask you
20  some questions about what type of misconduct might
21  warrant discipline or certainly -- certainly --
22  withdrawn.
23           I want to ask you some questions about
24  particular types of conduct and --
25      A.   Conduct or misconduct?

Page 156

1       Q.   Well, particular types of conduct, and I want
2   to find out from you whether or not that -- an allegation
3   of that type of conduct would warrant an investigation.
4   Okay?
5       A.   Well, I think we've established -- we
6   investigate all allegations of misconduct or perceived
7   misconduct.
8       Q.   Okay.
9       A.   That's what the policy requires us to do.
10      Q.   Okay.
11      A.   So you're welcome to go ahead and list off
12  everything, but I'm going to tell you right now it would
13  be yes to every single one of them.
14      Q.   Okay.  Thanks for that, and by -- and you're
15  talking about any and all allegations of alleged
16  misconduct by a citizen or other officer?
17      A.   That's correct.
18      Q.   Okay.
19      A.   That's what our policies require.
20      Q.   Okay.  And so we deposed a former homicide
21  detective, Antonio Morales, a little while ago.  I'm sure
22  you're probably familiar with him because he was a
23  spokesperson at the police department at a certain point
24  in time.
25      A.   I know the name.

EXHIBIT 15

TOM VAN DORN                                          November 17, 2017
MIKE vs CITY OF PHOENIX                                        157–160

Page 157

1      Q.   Okay.  Are you familiar with him and his role
2   as a spokesperson for the police department?
3      A.   No.
4      Q.   Okay.  But you're familiar with the name?
5      A.   The name.
6      Q.   Okay.  And he had told us that he believed you
7   had to be very careful with a female suspect when you're
8   in an interrogation not to do anything that could be seen
9   as sexually coercive when you're conducting that
10  interrogation.  Okay?
11     A.   Okay.
12     Q.   So for example, he said he absolutely
13  understood as a homicide detective back in the 1980s that
14  he would never be able to place his hands on a female
15  suspect in any way that could be seen as sexual.
16          MS. RETTS:  Form.
17     Q.   BY MS. GREEN:  Okay?
18     A.   Okay.
19     Q.   Based on your understanding of the 1985
20  discipline policy, would you agree that if someone
21  alleged that a homicide detective placed their hands on a
22  female suspect in a manner that could be seen as sexual,
23  that allegation would warrant investigation?
24          MS. BERKE:  Objection.  Vague.
25          MS. ODEGARD:  Form.

Page 158

1          MS. RETTS:  Objection.  Vague.  Form.
2          THE WITNESS:  If I'm going to go by your
3   exact words, that as perceived as sexual, then, yes,
4   likely will be investigated.  Simply placing your hand on
5   a female, not so sure.
6          MS. BY MS. GREEN:  Okay.
7      A.   But since you're throwing sexual in there, you
8   bet.
9      Q.   All right.  So I'll get more specific.  So we
10  deposed an officer named Detective Hamrick quite awhile
11  back.  Are you familiar with him?
12     A.   No.
13     Q.   Okay.  He said that he would never put his
14  hands on a young female suspect's knees for a minute
15  during an interrogation while six to 12 inches from their
16  face.  He said that behavior was just wrong and could be
17  sexually suggestive.  He said that, based on his
18  experience, you couldn't be a homicide detective in 1989
19  and think that type of behavior was appropriate.  Okay?
20     A.   Okay.
21     Q.   If that type of behavior was alleged in 1989,
22  is that something -- withdrawn.
23          If that type of behavior was alleged --
24  withdrawn.
25          If it were alleged that a homicide detective

Page 159

1   engaged in that type of behavior during an interrogation
2   back in the 1980s, would you agree with Detective Hamrick
3   that that was inappropriate conduct?
4          MS. BERKE:  Objection.  Vague and
5   foundation.
6          MS. RETTS:  Form.  Vague.
7          THE WITNESS:  I mean, I'll just have to go
8   by what the detective says.  Bottom line is I've been
9   trained -- we don't touch suspects during custodial
10  interrogation.  So I would agree with that.
11     Q.   BY MS. GREEN:  Okay.
12     A.   The allegation of misconduct, our policy -- you
13  got to investigate it.  Whether or not it was considered
14  sexual back then, you got to let those people decide
15  that.
16     Q.   Okay.  So if that allegation were made, it
17  would certainly require investigation?
18          MS. RETTS:  Form.
19          THE WITNESS:  Yeah, we investigate all
20  allegations of misconduct.  So if the detective touched
21  somebody in a sexual way and that information was brought
22  forward and somebody wanted to make a complaint, it needs
23  to be investigated.
24     Q.   BY MS. GREEN:  Okay.  And that would include if
25  someone made a complaint that during interrogation a

Page 160

1   detective was within six to 12 inches of a young female
2   suspect's face with her back against the wall with his
3   hands on her knees for at least a minute?
4          MS. BERKE:  Objection.  Vague.  Foundation.
5          MS. ODEGARD:  Vague.
6          MS. RETTS:  Foundation.
7          THE WITNESS:  I guess it depends on what's
8   alleged.  You keep throwing the word "sexual" in there,
9   then you don't throw it in there.  So if we just want to
10  go with I'm six to 12 inches away from your face, back
11  against the wall with my hands on your leg and there's no
12  allegation it's being done in a sexual way, I don't know
13  if that is misconduct under this policy --
14     Q.   BY MS. GREEN:  So you don't one way or the
15  other --
16     A.   -- from back in 1985.
17     Q.   Okay.  So if someone made that allegation as a
18  complaint with respect to how an officer treated them
19  during an interrogation, is that an allegation that would
20  be investigated?
21          MS. BERKE:  Objection.  Vague.  Foundation.
22          MS. RETTS:  Vague.
23          THE WITNESS:  You're giving me two different
24  examples.  In a sexual way, yes.  In your other example
25  where you did not use the sexual, it may not be a

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
161–164

Page 161

1  violation of policy requirement investigation.
2      Q.    BY MS. GREEN:  So the complaint -- I just want
3  to get this straight.  So the complaint would have to
4  have the word "sexual" in it for --
5      A.    Inappropriate.  Someone has to allege some
6  level of misconduct.  Simply placing your hand on a
7  suspect's knee without an allegation of any other
8  misconduct may not be misconduct.
9      Q.    Well, that wasn't my example, sir.  My example
10  was if a suspect launched a complaint that they believe
11  they were treated inappropriately during an interrogation
12  because the officer was six to 12 inches from their face
13  and the female suspect was -- had her back against the
14  wall and the officer had his hands on her knees for a
15  minute or more, would that complaint require
16  investigation?
17          MS. BERKE:  Objection.  Vague.  Foundation.
18          MS. RETTS:  Vague.
19          THE WITNESS:  It would be now because now
20  you inserted the word "inappropriate."  You didn't use
21  the word inappropriate in your previous hypothetical.
22      Q.    BY MS. GREEN:  Okay.  So it would be -- so as
23  long as someone alleged that it were inappropriate --
24      A.    Correct.
25      Q.    -- that would be investigated?

Page 162

1      A.    Yes.
2      Q.    What about if there were never a complaint by
3  the suspect themselves but the supervisor observed it?
4  Is that something that you would think would at least be
5  investigated?
6          MS. BERKE:  Objection.  Vague.  Foundation.
7          MS. RETTS:  Foundation.
8          THE WITNESS:  If someone brought it forward
9  as a complaint, then, yes, it would be investigated.
10      Q.    BY MS. GREEN:  If the suspect -- I want to
11  forget about a complaint.  Would that conduct violate the
12  policy that you just read?
13          MS. ODEGARD:  Object to form.
14          MS. RETTS:  Form.
15          MS. BERKE:  Vague.  Foundation.
16          THE WITNESS:  Which hypothetical are you
17  referring to?
18      Q.    BY MS. GREEN:  Fair point.  So I'll give you
19  the hypothetical again.  Would a detective -- withdrawn.
20          Would it be a violation of the 1985 policy
21  that you just read for a detective during an
22  interrogation to place his hands on a young female
23  suspect's knees for a minute or more while his face is
24  six to 12 inches from her face and her back is against
25  the wall?

Page 163

1          MS. RETTS:  Form.  Vague.
2          THE WITNESS:  I'm not seeing where the
3  misconduct is right now unless you want to look at the
4  unprofessionalism type things.
5      Q.    BY MS. GREEN:  Let's look at the
6  unprofessionalism type things.
7          MR. BRUSTIN:  Let's take one second.  I
8  apologize.
9          MS. BERKE:  What time do you want to break
10  for lunch?
11          MS. GREEN:  Let's just break now.
12          (A recess was held off the record.)
13      Q.    BY MS. GREEN:  Commander Van Dorn, I just
14  wanted to get back to where we left off.  I just have a
15  couple more questions on this point, and then I'll move
16  on.
17      A.    Okay.
18      Q.    So we were talking about -- well, I'm not even
19  going to make it a hypothetical.  Okay?
20      A.    Okay.
21      Q.    In the 1980s, if a homicide detective who was
22  interrogating a female suspect puts his hands on her
23  knees for a minute or more while he is within six to 12
24  inches of her face and she is sitting against a chair and
25  her back is up against a wall and a supervisor becomes

Page 164

1  aware of that, under this discipline policy, Exhibit 82,
2  what is the supervisor required to do, if anything?
3          MS. RETTS:  Form.  Vague.
4          MS. BERKE:  Join.
5          THE WITNESS:  I think it would depend again,
6  too, as to whether or not the supervisor under the
7  circumstances felt that the employee engaged in an act of
8  misconduct as defined by policy.
9      Q.    BY MS. GREEN:  Okay.  So my question to you is,
10  is that conduct itself conduct which warrants discipline?
11          MS. RETTS:  Form.  Vague.
12          THE WITNESS:  And if we go back, I know that
13  was kind of your question prior to us going on break.  In
14  those types of things and looking at it and you looked at
15  the various different types of misconduct outlined in the
16  policy, there is no -- obviously you don't see that
17  specific action by an employee articulated in this
18  discipline policy.
19          What you will see, though -- and let's go
20  back to -- what page was it -- on your 1985 update.  So
21  if we go to discipline 008 and 009, starting with 1C, in
22  looking at that, under your circumstances, what I could
23  look at it for is we could look at subsection 1C,
24  subsection 8.
25      Q.    BY MS. GREEN:  What page are you on?

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
165–168

Page 165

1    A.   D009, 1C8.  So if the supervisor at the time
2   felt that that action by that officer under your example
3   was conduct unbecoming of an employee that could
4   discredit the department, then, yes, they would launch an
5   investigation, but if that supervisor at the time did not
6   feel that that action by the employee would bring
7   discredit upon the department, there may not be anything
8   to investigate.
9    Q.   Okay.  So whether or not that conduct would be
10   investigated is dependent solely on whether or not the
11   supervisor made an independent determination that that
12   conduct would discredit the department?
13       MS. RETTS:  Form.  Misstates testimony.
14       THE WITNESS:  Two things.  It could be the
15   person that obviously had their hand placed upon them
16   could bring forth an allegation that they feel there is
17   misconduct, in which case you need to investigate it.
18       Two, if the supervisor observed it, it is
19   subjective.  Would I as a supervisor under those
20   circumstances feel that what the employee did under that
21   was conduct unbecoming that would then discredit.
22    Q.   BY MS. GREEN:  Okay.  Thank you.
23       So I'm now talking about -- you said two
24   things.  I'm not talking about the first thing.
25    A.   Okay.

Page 166

1    Q.   I'm only talking about if the supervisor became
2   aware of the conduct I described.  Okay?
3    A.   Uh-huh.
4    Q.   And what you're saying is -- and correct me if
5   I'm wrong -- if the supervisor became aware that a
6   homicide detective while interrogating a young female
7   suspect while he had both hands on her knees for a minute
8   or more, was six to 12 inches from her face during the
9   interrogation and her back was up against the wall, that
10   is not conduct that requires discipline under the policy?
11       MS. RETTS:  Form.  Vague.
12       THE WITNESS:  It's subjective to what that
13   individual supervisor would have thought at the time
14   because there is -- if you look in here, thanks to
15   investigate employees 4 in 1985, all of these different
16   categories, you will not see one in here that says police
17   officers will not place their hands on the knees while
18   interrogating a suspect.
19    Q.   BY MS. GREEN:  Okay.  So that conduct was
20   simply within the supervisor's discretion as to whether
21   or not it should even be investigated?
22    A.   Yes.
23       MS. RETTS:  Form.
24       THE WITNESS:  And likely would obviously
25   have taken place, supervisor discussion with the

Page 167

1   lieutenant or whoever the case may be, but it would be
2   purely subjective enough to them as to whether or not
3   they felt the actions were unbecoming.
4    Q.   BY MS. GREEN:  If the supervisor did not
5   investigate that conduct, that would be no problem under
6   the policy?
7       MS. RETTS:  Form.
8       MS. BERKE:  Objection.  Vague.
9       THE WITNESS:  Well, then it just depends,
10   okay, did anybody of higher rank feel that the supervisor
11   neglected their duty because a higher rank felt that the
12   conduct by the original employee could have been conduct
13   unbecoming.
14    Q.   BY MS. GREEN:  Well, you just told me whether
15   or not the conduct would be investigated was solely
16   within the subjective discretion of the supervisor.
17       MS. RETTS:  Form.
18    Q.   BY MS. GREEN:  Correct?
19    A.   You're getting confused.  So your first
20   question was by the supervisor.  Your second question was
21   then whether or not that supervisor decides not to
22   investigate, no investigation was going to take place.
23   That may not be true because a higher rank may feel then
24   that that lower level supervisor neglected their duties
25   in conducting an investigation.

Page 168

1    Q.   Okay.  So the conduct of a homicide detective
2   being within six to 12 inches of a young female suspect's
3   face while he's touching both of her knees and while her
4   back is up against the wall, that is not necessarily
5   excessive or inappropriate touching?
6       MS. BERKE:  Objection.  Vague.  Compound.
7       MS. RETTS:  Form.  Vague.
8       THE WITNESS:  As defined by the policy that
9   existed in 1985, no, unless you want to look at it in
10   that specific category which then is going to be very
11   subjective.
12    Q.   BY MS. GREEN:  Right.  So it's not
13   subjective -- I'm sorry.
14    A.   No, it is subjective.
15    Q.   Apologies.  Right.  So it is subjective, and,
16   therefore, that conduct is not necessarily inappropriate
17   under the policy.  Correct?
18       MS. RETTS:  Form.
19       THE WITNESS:  Not necessarily.
20    Q.   BY MS. GREEN:  And so I want to touch back on
21   because it's subjective and in a supervisor's discretion,
22   if the supervisor decides that that conduct is not --
23   does not require investigation, there would be no
24   discipline for that supervisor.  Correct?
25       MS. RETTS:  Form.  Misstates testimony.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
169–172

Page 169

1     MS. BERKE:  Objection.  Vague.

2     THE WITNESS:  No, that's completely
3  inaccurate because, again, that supervisor works for
4  other individuals.  So if a higher ranking person in this
5  case will go -- our ranks, as you well know as you
6  learned through this process, officer, sergeant,
7  lieutenant, commander assistant chief, chief.

8     So if that sergeant over the homicide
9  detective in their subjective opinion did not feel the
10  actions of the officer was a violation of policy
11  requiring an investigation, that may not mean that that
12  lieutenant over that sergeant agrees with the decision
13  that was made by the sergeant.

14     So now the sergeant may choose to have an
15  investigation against both the supervisor as well as the
16  detective for those actions, the supervisor for failing
17  to take action.  So it just depends.  It is subjective.

18     Q.   BY MS. GREEN:  Is there anywhere in this policy
19  where the sergeant would become aware of that conduct if
20  the supervisor doesn't investigate it?

21     MS. RETTS:  Form.

22     MS. BERKE:  You mean the --

23     THE WITNESS:  I don't understand your
24  question.

25     Q.   BY MS. GREEN:  Apologies.  I'll rephrase.

Page 170

1     Where in the policy does it provide for the
2  sergeant's supervisor to learn of conduct that the
3  sergeant decides does not require investigation?

4     MS. BERKE:  Form.  Vague.

5     MS. RETTS:  Form.

6     THE WITNESS:  I don't understand your
7  question.

8     Q.   BY MS. GREEN:  I'm trying to find out, based on
9  the hypothetical, you said it was in the supervisor's
10  discretion whether or not to investigate the conduct I
11  described to you.

12     A.   Uh-huh.

13     Q.   And I'm trying to find out if the supervisor in
14  their discretion decides that it's not a violation of the
15  policy and does not require investigation as it's in
16  their discretion to do, how then the supervisor's
17  supervisor would learn about the conduct because no
18  investigation was initiated.  Correct?

19     MS. RETTS:  Form.

20     THE WITNESS:  Conversations can take place.
21  I could be a lieutenant sitting around with a bunch of
22  detectives, and maybe that conduct gets explained to me.
23  I go and question the sergeant, Hey, were you made aware
24  of this?  The sergeant said, Yes, I was, didn't feel it
25  was a violation of policy.  I could disagree as the

Page 171

1  sergeant's supervisor now and say, No, I don't think you
2  did your job either.  I do feel that it is a violation of
3  our policy, in which case I can now initiate an
4  investigation against both the sergeant and the
5  detective.

6     Q.   BY MS. GREEN:  Does anything in the policy
7  provide for that?

8     MS. RETTS:  Form.

9     THE WITNESS:  Every single person in the
10  police department is held to what's in this policy.  So
11  just because the sergeant didn't feel -- if the sergeant
12  by omission did not do their job as we require them to do
13  as a supervisor, yeah, a higher ranking individual can
14  ask for an investigation.

15     Q.   BY MS. GREEN:  But you just told me it's in the
16  supervisor's complete discretion to determine whether or
17  not the conduct is --

18     A.   It depends on --

19     Q.   Requires discipline.  Correct?

20     A.   It depends on who it was brought to.

21     Q.   I'm talking about -- I'll just go back one
22  second.

23     A homicide detective six to 12 inches from a
24  young female suspect with his hands on both of her knees.

25     A.   Uh-huh.

Page 172

1     Q.   And her back is up against the wall.

2     A.   Yep.

3     Q.   The supervisor becomes aware of it.

4     A.   Okay.

5     Q.   And in his discretion, as you've told me he
6  has, he determines no investigation is required.

7     A.   Correct.  If that's what that supervisor
8  decided, then, no.  However, if another department
9  employee or another higher ranking individual is then
10  made aware of those circumstances and feels that there is
11  a violation in policy, they can initiate an investigation
12  against both the supervisor as well as that detective.

13     Q.   Okay.  And is there any formal mechanism for
14  the supervisor's supervisor to become aware of the fact
15  that the conduct was not investigated?

16     MS. RETTS:  Form.

17     MS. BERKE:  Vague.

18     THE WITNESS:  Unless somebody brings it to
19  their attention or they happen to find out on their own.

20     Q.   BY MS. GREEN:  Right.  So essentially they --
21  it would just be a matter of happenstance if that conduct
22  is investigated?

23     MS. RETTS:  Form.

24     THE WITNESS:  It could be.  In homicide
25  investigations, the results of an interrogation for the

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
173–176

Page 173

1  most part are briefed throughout the entire chain of
2  command because you're talking about a serious crime.
3      Q.   BY MS. GREEN:  Okay.  And the results of an
4  investigation being briefed without -- throughout the
5  entire chain of command would include whether or not the
6  investigation led to prosecution.  Correct?
7      A.   Yeah.
8      Q.   And it would include whether or not the suspect
9  was released because -- withdrawn.
10         So I just want to give a few more examples.
11  Would you agree under this discipline policy that we've
12  been talking about today that a police officer having sex
13  or sexual contact with someone who is pulled over for any
14  reason would require discipline?
15         MS. RETTS:  Form.
16         THE WITNESS:  Because you're using the
17  word -- an allegation of a sexual contact, the answer
18  would be yes.
19      Q.   BY MS. GREEN:  I'm not using the word
20  allegation.
21      A.   No, you just the word sexual.  So I say yes,
22  that would be investigated.
23      Q.   Okay.  So you would agree that if a police
24  officer has sex with -- withdrawn.
25         You would agree that if a police officer has

Page 174

1  sex or sexual contact with a person he pulls over for any
2  reason, a full investigation is required?
3         MS. RETTS:  Form.  Vague.
4         THE WITNESS:  If you engage in a sex act
5  while in performance of your duties, that would be
6  investigated.
7      Q.   BY MS. GREEN:  Okay.  And there's no discretion
8  in that regard?
9      A.   Huh?
10      Q.   There's no discretion as --
11      A.   No, not -- once it's brought to somebody's
12  attention, no.  In order for these things to be
13  investigated, someone has to bring it forward or the
14  evidence has to be brought to us.
15      Q.   Or the supervisor can become aware in the
16  process of their supervision.  Correct?
17      A.   If they fail to do an investigation when
18  they're supposed to, then they subject themselves to an
19  investigation for failing to do their job as a
20  supervisor.
21      Q.   Okay.  If the supervisor fails to initiate an
22  investigation when they become aware of any misconduct
23  whatsoever, they, too, are subjected to discipline under
24  the discipline policy?
25      A.   Correct.

Page 175

1         MS. RETTS:  Form.  Vague.
2      Q.   BY MS. GREEN:  And I think you also would agree
3  then if an officer trades leniency in exchange for a
4  sexual favor of any kind during the performance of their
5  duties, that conduct would also require a full
6  investigation?
7      A.   Yes.
8         MS. BERKE:  Objection.  Vague.
9      Q.   BY MS. GREEN:  And you would also agree if an
10  officer trades leniency in exchange for a sexual favor
11  and the investigation sustains the allegation or finds
12  that the conduct took place, discipline would be
13  required?
14         MS. BERKE:  Objection.  Vague.
15         MS. RETTS:  Form.
16         THE WITNESS:  We're not empowered to give
17  leniency or benefit in the criminal justice system.
18  That's the prosecutor's office.
19      Q.   BY MS. GREEN:  You would agree that's not just
20  a policy violation.  That's a crime as well?
21         MS. BERKE:  Objection.  Form and foundation.
22  Vague.
23         MS. RETTS:  Foundation.  Vague.
24         THE WITNESS:  Yeah, it very well could be.
25      Q.   BY MS. GREEN:  As a legal advisor to the police

Page 176

1  department for several years, would you consider an
2  officer exchanging leniency, for example, deciding not to
3  write someone a ticket in exchange for a sexual favor to
4  be a crime?
5         MS. BERKE:  Objection.  Vague.  Foundation.
6         THE WITNESS:  Not a crime.  There is no
7  crime there.  I have discretion to write a ticket or not
8  write a ticket.  The sexual favor or something like
9  that -- sexual favors is not a crime.  Sexual assault,
10  sexual abuse and those things are.
11         So you likely still have an administrative
12  investigation that will be done that could subject you to
13  any levels of discipline up to and including termination.
14  Whether or not there's a crime there, I don't see one
15  right now.
16      Q.   BY MS. GREEN:  I'm talking about a very
17  explicit quid pro quo exchange.  If you have sex with me,
18  I won't arrest you, for example.
19         MS. BERKE:  Objection.  Vague.
20         MS. RETTS:  Form.
21      Q.   BY MS. GREEN:  So if an officer says to a
22  person he's pulled over who he knows he has -- he --
23  strike that.
24         If an officer pulls someone over and tells
25  them, I won't arrest you if you give me some sexual favor

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
177–180

Page 177

1 or otherwise have sex with me, is that conduct a crime?
2        MS. BERKE: Objection.  Misstates evidence.
3        MS. RETTS: Form.  Vague.
4        MS. BERKE: Foundation.
5        THE WITNESS: Potentially could be.  If you
6 look at the wording of our prostitution statute, it could
7 fall under that.
8    Q.   BY MS. GREEN:  What do you think it depends on
9 as to whether or not it could be a crime?
10        MS. BERKE: Objection.  Vague.
11        THE WITNESS: I would have to go look up
12 every crime that exists in our criminal code to give you
13 an answer to that question.
14        Off the top of my head, it could fit within
15 our prostitution statute.  Whether or not it fits into
16 other government-related statutes, I would have to go
17 through every Title 13 criminal code that we have in
18 order to answer the question.
19    Q.   BY MS. GREEN:  As a former legal advisor to the
20 police chief, you're not --
21    A.   I would do my research as a lawyer and provide
22 the chief with their options as to whether or not it was
23 a crime.  I don't just do it off the top of my head.
24    Q.   So it could be a crime?
25    A.   It could be a crime.

Page 178

1    Q.   But it would certainly require serious
2 discipline if the conduct required --
3    A.   It would require an investigation, all right.
4    Q.   All right.  It would require a serious
5 investigation.  Correct?
6    A.   It would require an investigation.
7        MS. RETTS: Form.
8    Q.   BY MS. GREEN:  If an officer tells a young
9 female suspect -- apologies.
10        If an officer pulls someone over and says, I
11 won't arrest you if you give me a sexual favor or have
12 sex with me, under the 1985 policy, would that require a
13 serious investigation?
14    A.   We don't classify them as serious
15 investigations.  It requires an investigation.
16    Q.   Would it require -- what --
17    A.   It may be a serious violation of policy.  It's
18 not a serious investigation.
19    Q.   Okay.
20    A.   We have various levels of discipline in here.
21 We classify things, class 1s, class 2s, class 3s.
22    Q.   If that were found, what type of discipline
23 would be required?
24        MS. RETTS: Form.  Vague.
25        MS. BERKE: Objection.  Vague.

Page 179

1        THE WITNESS: For that one?
2    Q.   BY MS. GREEN:  Yes.
3    A.   Under the 1985 policy, you would have to go
4 back and decide where they fit that, and then we would
5 have to go to where they classify it at the time.
6    Q.   Let's do that.  I want to figure out under the
7 1985 policy --
8    A.   Where that fits?
9    Q.   -- what type of discipline is required by the
10 Phoenix Police Department.
11    A.   Well, we could look at neglect of duty.  It
12 might fit that one.
13    Q.   I'm sorry.  Let me finish my question just so
14 you know what you're looking for.
15        Under the 1985 policy, if it's found that a
16 police officer tells a person he pulls over that, I will
17 not arrest you if you provide me with a sexual favor, and
18 then carries that out and doesn't arrest the person, what
19 type of discipline is required if that conduct is found
20 to have occurred?
21        MS. RETTS: Form.
22        MS. BERKE: Objection.  Vague.  Misstates
23 evidence.
24        THE WITNESS: Now we go to your allegations,
25 look at the 1985 policy.  You could fit it under multiple

Page 180

1 probable different things here.  So let's go with C2.
2 Neglect of duty could be a violation.
3        1C5, failure to honestly report all facts
4 pertaining to an investigation that the officer conducted
5 could be another violation.
6        1C6, relating a false, deceptive or
7 misleading account of an incident or fact of issue in an
8 investigation or a matter of concern of the department.
9    Q.   BY MS. GREEN:  Sir, my question is what type of
10 discipline is required if the conduct is found?
11    A.   Okay.  Now let me answer --
12        MS. RETTS: Well, I think you're
13 interrupting him because he's trying to explain it.
14        THE WITNESS: Let me answer your question
15 because it depends on how many different sustained
16 allegations I want to do here.
17    Q.   BY MS. GREEN:  I'm just --
18    A.   So you wanted me to let you finish.  So please
19 let me finish.
20    Q.   Okay.  I just want to make sure you understand
21 my question.
22    A.   I do.
23        1C13 could fit under immorality back in
24 1985.
25        8, obviously conduct unbecoming an employee

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
181–184

Page 181

1  that would bring discredit upon the department.
2          Number 20, engaging in conduct or activity
3  that unreasonably disrupts or undermines the efficient
4  operations of the department or its lawful objectives.
5          Now, provided that we then decided to go
6  ahead and sustain the employee and do every single one of
7  those investigations, all right, you're going to go how
8  we conduct misconduct investigations.
9          Under today's policy, what I can tell you
10  sustained in all of those would be a class 3 violation
11  subjecting them to termination.  So you would go before
12  the chief.
13     Q.    Just to clarify, I'm not asking about today'
14  policy --
15     A.    Okay.
16     Q.    -- on these questions.  I'm asking about the
17  time period that you're here to testify about under the
18  30(b)(6) notice.
19     A.    So it looks like what they would have done then
20  is do the investigation and send it to the disciplinary
21  review board to make a recommendation to the police
22  chief, and the police chief would make the final decision
23  on what's going to be done with that employee.
24     Q.    Okay.  So in that instance, no particular type
25  of discipline is required if the conduct was found to

Page 182

1  have actually occurred?
2          MS. RETTS:  Form.  Misstates evidence.
3     Q.    BY MS. GREEN:  For example, it could have been
4  an oral reprimand, it could be written reprimand, it
5  could be suspension of any period of time up to 240
6  hours.  It could be dismotion -- demotion or dismissal.
7  It's all at the discretion of the police chief.  Correct?
8          MS. RETTS:  Form.  Vague.
9          THE WITNESS:  Now, if you look at number
10  12," If an investigation sustains an allegation against
11  an employee, a supervisor will recommend the disciplinary
12  action he feels should be taken.  If the recommendation
13  is for suspension, the supervisor will not specify the
14  number of hours.  The supervisor will provide a brief
15  summary of any disciplinary action received by the
16  accused and of any unacceptable performance of duty by
17  the employee.  Supervisors will then classify cases into
18  one of the following categories."
19          Then after that, obviously if under my
20  example and your hypothetical you were sustained in all
21  of those, it's not going to fit into the oral or written
22  reprimand category because you're sustaining multiple
23  violations.  So you're looking at the dismissal category,
24  and then you proceed from that point forward to the DRV
25  and to the chief.

Page 183

1     Q.    BY MS. GREEN:  So I wasn't -- you added the
2  proviso assuming all the violations that you noted were
3  sustained.  I'm only interested in if any violation is
4  sustained.  So I'm interested in if that conduct, a quid
5  pro quo exchange or not arresting someone if they have
6  sexual contact with the officer, what is the minimum
7  discipline required under the policy?
8          MS. BERKE:  Objection.  Misstates evidence.
9  Vague.
10          THE WITNESS:  Your quid pro quo under your
11  hypothetical is not specifically listed.  That's why I
12  gave you all the different categories the conduct could
13  fit into.
14     Q.    BY MS. GREEN:  Exactly.  So I guess what I'm
15  saying is it's totally discretionary.  It could be an
16  oral reprimand if only one violation is found, or it
17  could go all the way up to termination if all the
18  violations you listed are found.  Correct?
19          MS. RETTS:  Form.  Misstates evidence.
20          THE WITNESS:  Given those circumstances, I
21  can tell you as a matter of practice it's not going to be
22  an oral reprimand, not in 1985.
23     Q.    BY MS. GREEN:  And you can tell me that even in
24  the 1980s?
25     A.    Yeah.

Page 184

1     Q.    How about written reprimand?  Would a written
2  reprimand suffice?
3     A.    Under your hypothetical, no.
4     Q.    Okay.  So under my hypothetical, would it
5  require immediate termination of the officer?
6          MS. BERKE:  Objection.  Foundation.
7          THE WITNESS:  It's possible.  It's up to the
8  chief.
9     Q.    BY MS. GREEN:  I'm looking -- anything beyond
10  written reprimand, it's totally up to the chief.
11  Correct?
12          MS. BERKE:  Form.
13          MS. RETTS:  Misstates evidence.
14          THE WITNESS:  Ask your question again,
15  please.
16     Q.    BY MS. GREEN:  Anything beyond reprimand is up
17  to the chief?  Withdrawn.
18          So you told me -- you just told me --
19  correct me if I'm misunderstanding -- that a quid pro quo
20  exchange, I won't arrest you in exchange for some sort of
21  sexual contact, you think it would be discipline --
22     A.    Rising to a suspension up to a termination.  It
23  would not be an oral or written reprimand.
24     Q.    So -- and, again, suspension for what period of
25  time?

EXHIBIT 15

TOM VAN DORN                                           November 17, 2017
MIKE vs CITY OF PHOENIX                                        185–188

Page 185

1          MS. BERKE:  Objection.  Foundation.
2          MS. RETTS:  Form.
3          MS. BERKE:  Vague.
4          THE WITNESS:  It just depends.  Up to the
5    chief or a recommendation of the DRV.
6    Q.    BY MS. GREEN:  Okay.  So it could be a
7    suspension -- under this hypothetical and under this
8    policy we've been looking at, it's a suspension from one
9    hour up -- a one-hour suspension up until dismissal?
10   A.    I don't think they started at one.  I thought
11   they all started at eight and up to 240 and termination.
12   Q.    Well, take a look at page 8.  It just says up
13   to 240.
14   A.    I can't answer.  Maybe they did.  Since 1995,
15   since I've been on, they all started a minimum of eight
16   hours up to 240.
17   Q.    Okay.  So under this policy, a quid pro quo
18   exchange, I won't arrest you in exchange for a sexual
19   favor, would require discipline -- would require
20   discipline of a one-hour suspension or --
21   A.    It would require a suspension.  I can't --
22         MS. BERKE:  Objection.  Misstates testimony.
23   Vague.  Form and foundation.
24         MS. RETTS:  Form.
25         COURT REPORTER:  Let her finish her question

Page 186

1    and then let them object so I can get their objections on
2    the record.
3          THE WITNESS:  Okay.
4          MS. BERKE:  And misstates evidence.
5    Q.    BY MS. GREEN:  So it would require a suspension
6    of at least one hour or more.  Correct?
7          MS. BERKE:  Same objections.
8          THE WITNESS:  I don't know how many hours
9    they set it at back in the day.
10   Q.    BY MS. GREEN:  I'm asking you about this policy
11   right in front of you.
12   A.    Which paragraph?
13   Q.    I'm asking -- you referred me to 14.  So you're
14   here to talk about the policy, and I'm asking you about
15   it.  So --
16   A.    Ma'am, if I may stop you for a minute, there's
17   no need for you to be argumentative.  Just ask me your
18   questions.
19   Q.    I'm sorry.  I'm not trying to be argumentative.
20   A.    Okay.  That's how it's coming across.
21   Q.    I apologize.
22   A.    I want that specified for the record as well.
23   Q.    Please do.  I apologize for that.
24         So under this policy, a quid pro quo
25   exchange, arrest, I won't arrest you if you provide me

Page 187

1    with a sexual favor, requires minimum discipline of a
2    suspension of one hour or more?
3          MS. BERKE:  Objection.  Misstates evidence.
4    Foundation.
5          MS. RETTS:  Asked and answered.
6          THE WITNESS:  I'm not seeing where you're
7    getting one hour in the document that I referred you to.
8    Q.    BY MS. GREEN:  It doesn't have a minimum.
9    A.    Right.
10   Q.    So I just --
11   A.    You're asking me one hour or more.  I don't see
12   the one hour.  I'm telling you it rises to the level of a
13   suspension and above.
14   Q.    Okay.
15   A.    How many hours, I couldn't tell you.
16   Q.    Okay.  Thank you.
17         More questions about different conduct and
18   what the policy requires with respect to that conduct.
19   A.    Okay.
20   Q.    So I take it if a detective knowingly falsifies
21   information or misleads in a police report, that type of
22   behavior requires discipline.  Correct?
23         MS. BERKE:  Objection.  Vague.
24         MS. RETTS:  Form.
25         THE WITNESS:  It's first both a crime and

Page 188

1    requires an investigation, yes.
2    Q.    BY MS. GREEN:  And it requires a full
3    investigation.  Correct?
4          MS. RETTS:  Form.
5          MS. BERKE:  Vague.
6          THE WITNESS:  It requires an investigation.
7          MS. ODEGARD:  Vague.
8    Q.    BY MS. GREEN:  Not a complete investigation?
9          MS. BERKE:  Objection.  Vague.
10   Argumentative.
11         THE WITNESS:  It requires an investigation.
12   What's a full or complete investigation?
13   Q.    BY MS. GREEN:  An investigation until they
14   reach a finding one way or the other.
15   A.    It's an investigation that requires an
16   investigation.
17   Q.    Something, I guess, for example, I'm thinking
18   in my head -- the reason why I said full, I'm thinking in
19   my head, you know, maybe they begin the investigation and
20   decide to stop investigating it, but they don't come to a
21   conclusion.  I would think of that as an incomplete
22   investigation versus a full investigation of the
23   misconduct.
24   A.    Well, an administrative investigation is going
25   to have some level of conclusion.  Whether it's

EXHIBIT 15

TOM VAN DORN                                                 November 17, 2017
MIKE vs CITY OF PHOENIX                                          189—192

Page 189

1    exonerated, sustained, unresolved, it looks like they
2    have partially sustained, whatever the case may be back
3    in 1985.
4       Q.   So it requires an investigation to the level
5    that they reach a conclusion and finding.
6       A.   Yes.
7       Q.   Correct?  And then if the misconduct is found
8    to have occurred, it requires discipline.  Correct?
9       A.   Yes.
10      Q.   And the same goes for knowingly falsifying
11   information or providing misleading information when an
12   officer is testifying regarding his investigation.
13   Correct?
14           MS. BERKE:  Objection.  Vague.
15           MS. RETTS:  Form.  Vague.
16           THE WITNESS:  That is both a crime as well
17   as a violation of a policy.
18      Q.   BY MS. GREEN:  And I'm just going to ask the
19   same question.  It requires an investigation --
20      A.   Yes.
21      Q.   -- leading to a finding --
22      A.   Yes.
23      Q.   -- one way or the other whether or not that
24   occurred?
25      A.   Yes.

Page 190

1       Q.   And it also requires -- if there's a finding
2    that the conduct did occur, it requires discipline?
3       A.   Yes.
4       Q.   And I think you mentioned this before but that
5    when we're talking about misleading in the report, this
6    would include failing to document the complete statement
7    that a suspect made.  Correct?
8            MS. BERKE:  Objection.  Form.  Vague.
9            MS. RETTS:  Vague.
10           THE WITNESS:  Yes.
11      Q.   BY MS. GREEN:  And similarly, failing to
12   document the complete statement that a witness made.
13   Right?
14      A.   Yes.
15           MS. BERKE:  Same.  Vague.
16           Can you just pause for a moment so we can
17   assert our objections?
18           THE WITNESS:  I keep forgetting.
19           MS. BERKE:  That's okay.
20           THE WITNESS:  I'll wait about four seconds
21   after every question.
22           MS. BERKE:  One thousand one, one thousand
23   two.
24           THE WITNESS:  I know, right.
25      Q.   BY MS. GREEN:  By the way, under this policy,

Page 191

1    we were talking about an investigation, be it -- what's
2    required in an investigation?
3            MS. BERKE:  Objection.  Vague.
4            THE WITNESS:  In an administrative
5    investigation?
6       Q.   BY MS. GREEN:  Yes, like we're talking -- I'm
7    talking about, you know, falsifying or providing
8    misleading information in a report or on the stand right
9    now.  So if that type of conduct is going to be
10   investigated, what would that investigation include?
11      A.   Okay.
12           MS. RETTS:  Form.
13           THE WITNESS:  All right.  Obviously we'd
14   have to pull the court transcript.  Yeah, you know,
15   the -- first of all, the testimony needs to be brought to
16   our attention.  I'm assuming by -- somebody has brought
17   it to our attention.
18           From there, obviously the first thing you're
19   going to do is request the records from the Court,
20   request all of the police reports related to the
21   testimony or related to the actual case, you know,
22   compare it to.
23           And what witnesses do you have.  You got to
24   interview everybody that's involved and then just, you
25   know, conduct it from there, and does it appear that

Page 192

1    based, you know, on the evidence, did the employee in
2    fact either lie or mislead in their testimony.
3       Q.   BY MS. GREEN:  Okay.  And I take it you would
4    also interview the officers themselves as well?
5       A.   Yes.
6       Q.   Great.  And if we're talking about providing
7    misleading or untrue information on the stand, I take it
8    that the investigation would need to include a
9    determination of whether that was just a mistake or if it
10   was intentional.  Right?
11      A.   Yes.
12      Q.   And how do you determine whether or not
13   something is a mistake?  Is there a standard of proof?
14      A.   Not necessarily.  Again, it's going to be based
15   upon all of the interviews, the documents and those types
16   of things as to, okay, did the employee obviously testify
17   to intentionally create something, or was it just, okay,
18   they just forgot.
19           So, you know, it's very hard to give you an
20   exact answer on that one.  You just have to go through
21   the entire case in all of the different facts and
22   evidence that you have when that type of an allegation is
23   brought forward.
24      Q.   Okay.  And remind me, who, again, under this
25   policy is looking at this evidence and making that

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
193—196

Page 193

1 determination.

2 A. Under this one, it looks like it's either going

3 to be -- for your hypothetical purposes, the Professional

4 Standards Bureau is going to take it because you're

5 talking about perjury, which is also a crime. So that's

6 going to probably throw it under the Professional

7 Standards Bureau.

8 Q. Can you show me where that is in the 1985

9 policy?

10 A. Yeah.

11 Q. Because if I could direct you to page 10 --

12 A. Okay.

13 Q. -- it seems to me my reading of the policy was

14 that type of investigation is done by the supervisor.

15 For example, section 2A2, "If the police department

16 supervisor conducts a disciplinary investigation that may

17 lead to demotion, suspension or discipline, the

18 supervisor shall inform the employee in writing."

19 If you look on page discipline 11 -- I'm

20 sorry, at the very bottom of discipline 10 going into 11,

21 it discusses all the steps a supervisor takes when making

22 an investigation and, similar to some of the steps you

23 were telling me about, taking statements from witnesses.

24 A. Okay. Then, yeah, I'll go back on the record.

25 It looks like they didn't have a Professional Standards

Page 194

1 Bureau back then. So they put that responsibility back

2 on the first line supervisor.

3 Q. Okay. But I take it that your reference to --

4 it would probably go to -- now it would probably go to

5 the Professional Standards Bureau. Right?

6 A. Yes.

7 Q. And that's because it's a serious violation

8 that could result --

9 A. Serious allegation.

10 Q. Serious allegation that could result in

11 criminal charges?

12 A. Yes.

13 Q. But back then, the direct supervisors just

14 investigated that type of stuff?

15 A. It looks that way.

16 MS. RETTS: Form.

17 Q. BY MS. GREEN: Or at least that appears what

18 happens to be in the normal course of events?

19 MS. BERKE: Form and foundation. Vague.

20 THE WITNESS: It appears that's their policy

21 back in 1985, yeah, with the employee's immediate

22 supervisor.

23 Q. BY MS. GREEN: And let's continue on this

24 example of providing misleading or untrue information on

25 the stand.

Page 195

1 A. Okay.

2 Q. In that -- actually withdrawn.

3 You said that you weren't -- there was --

4 strike that.

5 Is there generally a standard of proof and

6 investigations as a general matter?

7 A. There is now, preponderance of the evidence.

8 Q. Is there a standard of proof regarding

9 investigations in this policy?

10 A. I don't see one articulated in this policy.

11 Q. Okay. So it's totally at the supervisor's

12 discretion whether or not the -- to make the

13 determination whether there's sufficient evidence to

14 determine that the misconduct occurred?

15 A. It appears that. I'm not seeing anything in

16 the policy that provides them guidance on when to sustain

17 or not sustain an allegation, whereas now we do have an

18 evidentiary standard.

19 Q. All right. But back then there wasn't?

20 A. Doesn't appear to be.

21 Q. Under this -- so let me take a --

22 A. If we can go back to that question, go back to

23 discipline 12. Don't ask me what this means, but it

24 appears under 2G sufficient evidence is the standard that

25 it appears that they went by.

Page 196

1 Q. And if I'm looking at 2G, it says, "An employee

2 is guilty of the commission of a crime," and it's about

3 an arrest. So it's not -- my reading of it when I went

4 through it was it wasn't a standard --

5 A. For admin?

6 Q. -- for, you know, discipline generally. It's

7 just a standard for commission of a crime.

8 A. Okay.

9 Q. And also I'd be interested to get your

10 understanding of what sufficient evidence means here.

11 What standard is that?

12 A. No idea because we use probable cause

13 obviously. I don't know how they would define sufficient

14 evidence unless that was meant to be -- like I said, I

15 can only testify now, you know, is there probable cause

16 to believe that an element of the crime occurred.

17 Q. Right. That's now, but I'm talking --

18 A. Yeah.

19 Q. Again, the rest of my questions are going to be

20 in the period that you're going to testify about or

21 unless I explicitly tell you it's not, and so this

22 sufficient evidence standard in G does not appear to be a

23 standard for general investigations, does it?

24 A. No.

25 MS. GREEN: Okay. I want to mark an exhibit

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
197—200

Page 197

1  now.
2        COURT REPORTER:  83.
3        (Exhibit 83 was marked for identification.)
4    Q.  BY MS. GREEN:  83.  It's actually quite short.
5  Why don't you just go ahead and read the text there at
6  the bottom and let me know when you're finished.
7    A.  Okay.
8    Q.  So this exhibit is a decision from the Maricopa
9  County Superior Court on a defendant's motion requesting
10  a redetermination of probable cause after a grand jury
11  hearing.
12    A.  Uh-huh.
13    Q.  I'll give you a little bit of the background.
14  Homicide detective was on the stand testifying about the
15  suspect's injuries, and he -- the allegation was made by
16  the defense that the homicide detective intentionally
17  misstated that the victim had been shot four times when
18  in fact the homicide detective knew that the victim had
19  been shot only one time, and the State responded, I
20  think, there was a mistake in reporting or something of
21  that nature, that the detective actually didn't say that
22  or it was just an error in the transcript.
23        In here, you'll see the Court is making --
24  you would agree the Court is making a determination that
25  the detective did in fact say the victim was shot four

Page 198

1  times --
2        MR. EAVES:  Objection.  Form.  Foundation.
3  Misstates facts in evidence.
4        MS. BERKE:  Join.
5    Q.  BY MS. GREEN:  Well, it says -- let me know if
6  I'm reading this correctly -- "The Court having been
7  informed that the reporter's notes and the transcript of
8  the grand jury both reflect that the testimony of the
9  State's witness was that the deceased was shot four times
10  and the Court having been advised the State and defense
11  counsel in the hearing of this matter that the facts in
12  this case are undisputed that the deceased was shot only
13  one time, it is ordered granting the motion for
14  redetermination of probable cause."
15        MR. EAVES:  Objection.  Amelia, can I have a
16  standing objection to questioning of this document of
17  this witness so I don't have to do it every time, or I
18  can object to every question you ask if you'd like.
19        MS. GREEN:  Sure.  You're going to have a --
20        MR. EAVES:  I can have a standing objection.
21  That's the sure?
22        MS. GREEN:  Yeah, to this document, of
23  course.
24        MR. EAVES:  Thank you.
25    Q.  BY MS. GREEN:  If a supervisor became aware of

Page 199

1  this finding by the Court, would that be something that
2  would require investigation?
3        MS. BERKE:  Objection.  Misstates evidence.
4  Assumes facts not in evidence.  Foundation.  Vague.
5        THE WITNESS:  I guess depends on what's the
6  allegation.  Was it brought to the supervisor, the
7  allegation that the detective lied on the stand?  I mean,
8  you're going to have to tell me.  I mean, this is brought
9  to my attention that, okay, the transcript shows that a
10  detective testified that this person was shot four times.
11  Both the State and defense counsel stipulate obviously
12  that, no, the person was only shot one time.  So where is
13  the allegation against the --
14    Q.  BY MS. GREEN:  I'm not talking about an
15  allegation.  I'm talking about conduct.
16    A.  Okay.
17    Q.  So we talked a little bit about untrue
18  statements on the stand needing to be investigated.
19    A.  Is that the allegation?  That's what I'm asking
20  you.
21    Q.  I'm not asking about an allegation.  I'm asking
22  about conduct, and I'm going to tell you what the conduct
23  is.  Okay?  Okay?
24    A.  Ask your question.
25    Q.  The conduct is an officer testifying on the

Page 200

1  stand that the victim was shot four times when in fact
2  the victim had only been shot once.  Would that conduct
3  require an investigation if the supervisor became aware
4  of it?
5        MS. BERKE:  Objection.  Misstates evidence.
6        THE WITNESS:  Possibly.
7        MS. BERKE:  Foundation.
8        MS. RETTS:  And vague.
9        MS. BERKE:  Pardon me?  And vague.
10    Q.  BY MS. GREEN:  Okay.  Possibly.  And what more
11  information do you need to know to find out whether or
12  not --
13    A.  What's the allegation against the officer?
14    Q.  There is no allegation.
15    A.  Okay.
16    Q.  It's the supervisor becoming aware of conduct.
17    A.  Then my answer remains possibly.
18    Q.  Okay.  What more information do you need to --
19  you would agree, sir, that investigations can be
20  initiated even if a citizen doesn't launch a complaint
21  about an officer.  Correct?
22    A.  Yes.
23    Q.  Okay.  For example, if the supervisor becomes
24  aware of something that he believes requires
25  investigation.  Right?

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
201—204

Page 201

1    A.   But then you're asking me to opine whether or
2 not I think there's an allegation of misconduct here.  So
3 that's what I have to look into.
4    Q.   No, I'm not talking about allegation -- I'm not
5 talking about allegations.
6    A.   Okay.  Well, then I'm really confused by your
7 question.  So I'm a supervisor who receives this in our
8 office now, and you're asking me what I would do with it?
9    Q.   No, I'm asking you about conduct.  Okay?
10    A.   Okay.
11    Q.   I'm asking you -- there's no allegation by any
12 citizen.
13    A.   Okay.
14    Q.   The supervisor becomes aware that a detective
15 in a grand jury proceeding testified the victim was
16 shot four times when in fact the victim was only shot
17 once.  Is that conduct that would require -- that the
18 supervisor would be required to investigate?
19         MS. RETTS:  Form.  Vague.  Missing
20 information in the hypothetical.  Misstates evidence.
21 Assumes facts not in evidence.
22         THE WITNESS:  My answer still remains
23 possibly.
24    Q.   BY MS. GREEN:  Okay.  And my question to you is
25 possibly what other information do you need?  And, again,

Page 202

1 in this hypothetical, there is no allegation.  It's just
2 the supervisor becoming aware of the conduct.
3         What other information do you need to
4 determine whether or not the conduct requires
5 investigation?
6         MS. RETTS:  Form.  Vague.
7         THE WITNESS:  Going to the employee and
8 asking them about this.  Hey, I received this.  It says
9 you testified four times.  The State and defense counsel
10 are stipulating that the victim was only shot one time.
11 Why is that?
12    Q.   BY MS. GREEN:  Okay.  And when you do that,
13 what information do you need to determine whether or not
14 an investigation should be launched?
15    A.   Depends on the employee's response.
16    Q.   I'm asking you what response do you need for an
17 investigation to be launched?
18    A.   Something that would be possibly a violation of
19 department policy.  Depends on how the employee's going
20 to respond.
21    Q.   Can you give me an example of how an employee
22 would respond that would require investigation, further
23 investigation?
24         MS. RETTS:  I would just object first to the
25 fact that this is November -- this is dated November

Page 203

1 20th, 1986, and there is a 9/86 policy.  So to the extent
2 there are any differences to that, we need to be looking
3 at the '85 version of the policy.
4    Q.   BY MS. GREEN:  Okay.  What information would
5 you need -- what -- so what information would the
6 supervisor need to determine whether or not that conduct
7 requires further investigation?
8    A.   I need an allegation of misconduct to
9 investigate it.
10    Q.   Okay.  So just want to get this straight and
11 make sure it's perfectly clear.  If a -- if a detective
12 testifies in a grand jury hearing that the victim was
13 shot four times when in fact the victim was shot one
14 time, that conduct does not need to be investigated
15 unless someone makes an allegation that this was
16 misconduct?
17         MS. RETTS:  Form.  Misstates testimony.
18 Vague.
19         THE WITNESS:  Or if I was a supervisor and
20 feel there is misconduct, then I could start the
21 investigation.
22    Q.   BY MS. GREEN:  I'm talking about when
23 investigation would be required.  So --
24    A.   There has to be a violation of policy first
25 before I initiate an investigation against an employee.

Page 204

1    Q.   Okay.  So when would -- so then if the
2 supervisor simply becomes aware of this -- and, again,
3 I'm talking about someone -- a detective testifying on
4 the stand that the --
5    A.   I'm fully aware of what you keep repeating in
6 this --
7    Q.   I just want to make sure I'm clear.
8    A.   No, you're perfectly clear.
9    Q.   Okay.
10    A.   I just keep giving you the same answer over and
11 over.
12    Q.   Okay.  So you're clear on the conduct I'm
13 talking about?
14    A.   Clear on that conduct.
15    Q.   Okay.  Great.  I won't repeat it any further.
16         If the supervisor becomes aware that
17 occurred, no investigation is necessarily required?
18    A.   And my answer was possibly.  It depends on
19 whether or not I feel there's a violation of the
20 department policy.
21    Q.   So because it's possible, it could be one way
22 or the other, it's not necessarily required.  Correct?
23    A.   Not necessarily required.
24    Q.   Okay.  Thank you.
25    A.   That's why I answered possibly.

*800.211.DEPO (3376)*
*EsquireSolutions.com*

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
205–208

Page 205

1    Q.    Okay.  I want to give you another example.  If
2  a supervisor becomes aware that during a Court hearing
3  the officer testifies that the suspect made admissions
4  with respect to a crime before the suspect invoked his
5  Miranda rights --
6    A.    Okay.
7    Q.    -- when in fact the officer's report reflects
8  that the suspect only made admissions after he invoked
9  his Miranda rights, is that conduct which requires
10  investigation under this policy, Exhibit 82?
11    A.    Possibly.
12        MS. RETTS:  Form.
13        MS. BERKE:  Objection.  Vague.  Foundation.
14    Q.    BY MS. GREEN:  Okay.  So again, an
15  investigation -- withdrawn.
16        So, again, when a supervisor becomes aware
17  of that information under this policy in Exhibit 82, an
18  investigation of that conduct is not necessarily
19  required?
20    A.    No, it's possible, depends on the facts.
21        MS. GREEN:  Okay.  Let's take a five-minute
22  break.
23        THE WITNESS:  Okay.
24        (A recess was held off the record.)
25    Q.    BY MS. GREEN:  Now I'd like you to turn to

Page 206

1  what's been previously marked as Exhibit 30.  It's in the
2  marked exhibit notebooks that you have there.
3    A.    Okay.
4    Q.    You can keep the discipline policy.
5    A.    Before we move on with respect to the
6  discipline policy, because you asked me the question
7  about whether internal affairs in 1985 and stuff existed,
8  there was an internal affairs.  If you look at just for
9  the record discipline 010 --
10    Q.    I'm sorry.  I need to get it out.  Give me one
11  second.
12        Okay.  I'm there.
13    A.    Okay.
14    Q.    I'm sorry.  I'm on the wrong page.
15    A.    Discipline 010.  If you look at 2A1, any
16  employee under investigation by internal affairs, so it
17  appears they obviously did have an internal affairs
18  section back then.  How they divided up who was going to
19  investigate, I don't specifically see in here unless it
20  existed in another policy from 1985.
21        But it does appears they had both internal
22  affairs investigators along with the first-line
23  supervisor of the employee.
24    Q.    So based on your reading of the policy, the
25  policy makes clear that supervisors can also conduct

Page 207

1  discipline investigations that could lead up to
2  termination, demotion, suspension, et cetera?
3    A.    It's possible unless, again, there's another
4  policy outside of this general order that dictates what
5  internal affairs was going to take as opposed to what the
6  line level supervisor -- because what I can equate it to
7  now is, again, don't know if it exists anywhere else, but
8  now the employee's immediate supervisor can only
9  investigate minor violations of policy.  Everything else
10  is handled by professional standards or internal affairs.
11    Q.    Okay.  Turn to page discipline 10.
12    A.    Okay.
13    Q.    Section 2A2, which I directed you to before
14  when we were talking about this.  2A2 makes clear that a
15  supervisor can conduct a disciplinary investigation that
16  can lead to demotion, suspension or discharge.  Correct?
17    A.    Yeah.  So it appears that, yes, but, again,
18  internal affairs is nothing but supervisors.  So...
19    Q.    Well, this policy makes clear that the direct
20  supervisor of an officer can conduct --
21    A.    Or look at 1.  It could also be the internal
22  affairs supervisor.  How they're delineated I can't tell
23  you.
24    Q.    Again, I hate to be doing this again because we
25  already went through it the last time this question came

Page 208

1  up.  Discipline 10, section B --
2    A.    Uh-huh.
3    Q.    -- if you read that and go on to the next page,
4  to section 2C, which talks about all the things a
5  supervisor will do in an investigation --
6    A.    Right.
7    Q.    -- and then section 2D, which says, "When
8  violations involve minor rules, supervisors aren't
9  required to comply with 2C," the policy makes clear that
10  a supervisor can conduct an investigation of a violation
11  that result in demotion, discipline, et cetera?
12    A.    That appears to be possible, but internal
13  affairs investigators are supervisors on the police
14  department.  So this isn't telling me employee's
15  immediate supervisor.  This is telling me supervisor.
16        So yes, to answer your question, it could be
17  the employee's immediate supervisor, but it could also be
18  a supervisor assigned to the Internal Affairs Bureau.
19        MS. RETTS:  Form.
20    Q.    BY MS. GREEN:  It doesn't say a supervisor
21  assigned to the Internal Affairs Bureau, sir.  It says a
22  supervisor.
23    A.    Right, but I'm telling you there are
24  supervisors -- any sergeant on the police department is
25  considered a supervisor.  It doesn't say the employee's

EXHIBIT 15

TOM VAN DORN

November 17, 2017

MIKE vs CITY OF PHOENIX

209—212

Page 209

1 immediate supervisor. Once you take a promotional exam,

2 you are considered a supervisor on the police department.

3 Like right now on the Professional Standards

4 Bureau, the lowest level rank that exists is a sergeant.

5 They are all supervisors within the Phoenix Police

6 Department.

7 Q. Sir, I'm not asking you about right now. I'm

8 asking about what you're here to testify about today.

9 Okay?

10 A. And that will be my testimony to that, too. We

11 will have to go back and take a look at the hierarchy as

12 to whether or not were they all supervisors in internal

13 affairs because, again, the policy doesn't state

14 immediate supervisor.

15 So I will concede that under yours it could

16 be the employee's immediate supervisor, or it could have

17 just been a supervisor on the department.

18 Q. So under this policy, an immediate supervisor,

19 a supervisor of any kind has the authority to conduct a

20 serious misconduct investigation?

21 A. To conduct an investigation.

22 Q. To conduct an investigation of not just minor

23 rules if you refer to 2D, okay, but violations of other

24 rules that are not minor. Correct?

25 MS. RETTS: Form.

Page 210

1 THE WITNESS: We just call it an

2 investigation. That's what I'm going to testify to. You

3 keep calling it a serious investigation. My testimony

4 will just be that it's an administrative investigation.

5 Q. BY MS. GREEN: Your testimony would also be,

6 sir, under 2A2, could conduct an investigation that may

7 lead to demotion, suspension or discharge. Correct?

8 A. That is the finding. It's an administrative

9 investigation that could lead to discipline.

10 Q. Excuse me. Would you please look to 2A2.

11 A. I did, but I'm not going to change my

12 testimony. I will call it an investigation. You can

13 refer to it as a serious investigation.

14 Q. And I'm no longer referring to it as a serious

15 investigation. I'm talking about a, quote, disciplinary

16 investigation that may lead to demotion, suspension or

17 discharge. Correct?

18 A. What was the question?

19 Q. The question is a supervisor of any kind

20 including an immediate supervisor under this policy

21 conducts a disciplinary investigation that may lead to

22 demotion, suspension or discharge?

23 MS. RETTS: Form. Misstates the policy.

24 MS. ODEGARD: Form.

25 MS. BERKE: Join.

Page 211

1 THE WITNESS: A supervisor regardless of

2 immediate or on the department was able to conduct that

3 investigation, yes.

4 Q. BY MS. GREEN: Okay. And -- all right. Let's

5 look at -- you're at Exhibit 30. Let me get there. This

6 one is Bates stamped a little bit differently. It's just

7 a variety of Bates stamps. It was an excerpt exhibit

8 that was provided previously.

9 A. Okay.

10 Q. I want you to turn to the portion of the

11 exhibit Bates stamped 18597. I think it may be the last

12 page.

13 A. Page 19 at the top.

14 Q. Page 19 at the top, exactly.

15 A. Okay.

16 Q. Did you review this exhibit in preparation to

17 testify here today?

18 A. No.

19 Q. Okay. By looking at this document, can you

20 verify that this was a policy that was in place in the

21 Phoenix Police Department in October 1989?

22 A. Yes, it's in the same structure and form as

23 Phoenix Police Department general investigative

24 procedures.

25 Q. Okay. Why don't you read -- you see 14 at the

Page 212

1 top of that page?

2 A. I do.

3 Q. It looks like section 14.

4 A. Yes.

5 Q. Why don't you read A through E there of section

6 14 there.

7 A. Okay.

8 Q. As I mentioned before, we had some previous

9 depositions in this case of various former police -- PPD

10 detectives and one sergeant.

11 A. Okay.

12 Q. And specifically with respect to section E, we

13 asked them some questions.

14 Are you familiar with Silverio Ontiveros?

15 A. Yeah, he was an assistant chief early on in my

16 career.

17 Q. At one point, he was also a sergeant in the

18 homicide division. I'll represent that to you.

19 A. Okay.

20 MS. RETTS: Just a point of clarification

21 quickly, are you going to be asking him the substance of

22 this or asking him this vis-a-vis the disciplinary

23 policy?

24 MS. GREEN: I'm interested in the discipline

25 that happens when this policy is violated.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
213–216

Page 213

1      MS. RETTS:  Okay.
2      Q.   BY MS. GREEN:  Okay?
3      A.   Okay.
4      Q.   But it's kind of hard to do it without having
5   the other policy.
6      A.   I guess my question is since we're on 1989, do
7   we have the discipline policy from 1989?
8      Q.   We do not.
9      A.   So because it very well may not be 1985, but it
10   could have been a violation of the policy in 1989.
11      Q.   Okay.  No problem.  We do have the 1985, and we
12   have the 1990.  So assume -- 1991.  I'm sorry.  So we can
13   look back and compare, but I'm fine questioning you about
14   the 1985 policy right now.
15      MS. RETTS:  There's an '86, too, that was
16   produced.
17      MS. GREEN:  I'm talking about what we have
18   as an exhibit here.  I'm not entering all 300 pages as an
19   exhibit here today.
20      THE WITNESS:  Okay.  So subsection E.
21      Q.   BY MS. GREEN:  Okay.  So you know Ontiveros as
22   a former assistant police chief?
23      A.   Uh-huh.
24      Q.   So when I asked him about subsection E of this
25   policy, is that it was his understanding that an

Page 214

1   interrogation must cease immediately if a suspect
2   indicated they wanted an attorney or wanted to remain
3   silent.  It was -- he said it was his understanding in
4   1989 and was also his understanding as far back as he can
5   remember with respect to the department.
6      A.   Okay.
7      Q.   He also testified this was a very strict
8   policy, the policy said -- which says the interrogation
9   must cease immediately.  There was no gray area.  Okay?
10      We also -- I mentioned Detective Hamrick.
11   You said you're not familiar with him.  I asked him about
12   this policy, and he said it was his understanding of the
13   policy that continuing to question someone after they
14   invoke their rights to remain silent or request an
15   attorney was expressly prohibited.
16      Do you have any reason to dispute the
17   testimony of Ontiveros or Detective Hamrick that I just
18   summarized to you?
19      MS. ODEGARD:  Object to form.  Misstates
20   testimony.
21      MS. BERKE:  Join.
22      MS. RETTS:  Outside the scope.
23      THE WITNESS:  No.
24      Q.   BY MS. GREEN:  And based on your experience in
25   the Phoenix Police Department, has it been your

Page 215

1   experience and understanding that it's always been a
2   strict policy of the PPD that if a suspect invokes their
3   Miranda rights, the interrogation must cease?
4      A.   Correct.
5      Q.   And here this -- the policy I referred you to,
6   section 14E, talks about getting a legal advisor.  So I
7   had understood that to be the exception to the policy.
8   If you want to continue questioning, you have to contact
9   a legal advisor in order to do so.
10      A.   You do to probably understand what your options
11   are, i.e., silence.  Wait a reasonable period of time and
12   you can recontact the suspect.  So they probably wanted
13   to know what their options are.  So they put that in
14   there for guidance.
15      Q.   Right.  But otherwise if you don't do that, you
16   have to cease the interrogation.  Correct?
17      MS. RETTS:  Form.
18      THE WITNESS:  You have to cease immediately
19   the minute they invoke one of their two rights.
20      Q.   BY MS. GREEN:  Right.  So I'm just confirming
21   there's no discretion in that policy.  There's no gray
22   area.  If someone invokes their rights, the interrogation
23   must cease immediately?
24      A.   Yes.
25      MS. BERKE:  Form.

Page 216

1      Q.   BY MS. GREEN:  Okay.  And as far as you know,
2   that was true as far back as 1970.  Correct?
3      MS. BERKE:  Objection.  Foundation.
4      MS. RETTS:  Form and foundation.
5      THE WITNESS:  Miranda was decided in 1966.
6   So, yes.
7      Q.   BY MS. GREEN:  Okay.  And certainly by 1985,
8   the year we've been talking quite a bit about here today?
9      A.   Yeah.
10      Q.   Okay.  And so because -- and now tying back to
11   the discipline policy, what you're here to testify about
12   today, because that is such a strict policy, if an
13   officer violates that policy, the supervisor must
14   investigate it.  Right?
15      A.   If it's brought to their attention, yes.
16      MS. RETTS:  Form.
17      Q.   BY MS. GREEN:  If a supervisor becomes aware of
18   a violation of that policy by an officer in their rank,
19   they have to investigate it.
20      MS. RETTS:  Form.
21      THE WITNESS:  By policy, they are supposed
22   to investigate it.  I can't tell you if supervisors
23   choose to abide by policy or not, but by policy, yes,
24   they are supposed to investigate it.
25      Q.   BY MS. GREEN:  And under the policy, there's no

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
217—220

Page 217

1  discretion in whether or not the supervisor investigates
2  it if they become aware of that conduct. Correct?
3        MS. RETTS:  Form.
4        MS. ODEGARD:  Form.
5        THE WITNESS:  Again, I can tell you they're
6  supposed to investigate it. Whether or not they do,
7  can't tell you.
8     Q.   BY MS. GREEN:  Right.  I'm just talking about
9  the policy.  So under the policy, it's not discretionary?
10    A.   To investigate?
11    Q.   Right.
12    A.   Under the policy, no, they're supposed to
13  investigate.
14    Q.   Okay.  And if a supervisor becomes aware of a
15  violation of this Miranda policy and chooses not to
16  investigate it, that supervisor has violated --
17    A.   Policy as well.
18    Q.   And that supervisor -- if that supervisor's
19  supervisor becomes aware of that, the supervisor --
20    A.   Can investigate that supervisor.
21    Q.   Right.  So they're also subject to
22  investigation?
23    A.   Correct.
24    Q.   And I take it from kind of the way we've been
25  discussing this that the department has always, as far as

Page 218

1  you know, taken Miranda violations very seriously?
2     A.   Yes.
3     Q.   And one of the reasons for that -- correct me
4  if I'm wrong -- is because -- one -- withdrawn.
5        One of the reasons for that is because the
6  Miranda implicates a suspect's constitutional rights.
7  Right?
8     A.   That's correct.
9     Q.   Okay.  And when it comes to policy violations
10  that could lead to constitutional violations, the
11  department knows it needs to take those violations very
12  seriously?
13    A.   Yes.
14    Q.   And that's true, again, as -- your
15  understanding as far as you can remember back?
16    A.   Yes.
17    Q.   Okay.  And --
18    A.   Otherwise it defeats the purpose of why we take
19  our oath. So...
20    Q.   Okay.  Exactly.
21        And I take it there's no magic words that
22  need to be used by a suspect to invoke their rights?
23        MS. BERKE:  Objection. Vague. Foundation.
24        MS. RETTS:  Form.
25    Q.   BY MS. GREEN:  For example --

Page 219

1        MS. RETTS:  Outside the scope.
2     Q.   BY MS. GREEN:  -- if a suspect says, I think I
3  want an attorney during an interrogation, that type of
4  language is an implication under the policy.
5        MR. EAVES:  Calls for a legal conclusion.
6        MS. BERKE:  Objection. Vague.
7        MS. RETTS:  Outside the scope.
8        MS. BERKE:  Foundation.
9     Q.   BY MS. GREEN:  That's not an implication?
10    A.   Do you want my expert legal opinion now on
11  that?
12    Q.   No, I'm talking about whether or not that would
13  require a suspect using -- I'm still talking about the
14  policy.
15    A.   Suspect using that language, would they have to
16  stop immediately, is that your question?
17    Q.   Yeah, under this policy, Exhibit 30, the one
18  we've been talking about, 14E.
19        MS. BERKE:  Objection. Vague. Foundation.
20        MS. RETTS:  Outside the scope.
21        THE WITNESS:  What did you invoke --
22  repeat what you asked or what you wanted to invoke.
23    Q.   BY MS. GREEN:  I think I may want an attorney.
24        MS. BERKE:  Objection. Vague.
25        THE WITNESS:  No, I'm not required to cease

Page 220

1  questioning immediately.
2     Q.   BY MS. GREEN:  Okay.  What about I would like
3  to have an attorney?
4        MS. BERKE:  Objection. Vague.
5        THE WITNESS:  No, I'm not required to cease
6  questioning immediately.
7     Q.   If a suspect during an interrogation says, I
8  would like to have an attorney, under this policy, you're
9  not required to cease questioning immediately?
10    A.   Your question is just different on this one.
11  So on the second time, yes, I would need to cease
12  questioning.
13        Under your previous questioning, I think I
14  want an attorney, I'm not required to cease questioning.
15    Q.   If someone says, I think I want an attorney,
16  under this policy, 14E, not required to cease
17  questioning?
18    A.   No, it's not a clear invocation of the right to
19  an attorney.
20    Q.   Okay.  And does the policy, from what you can
21  see on the page, lay out the implication has to be clear
22  versus not clear?
23        MS. RETTS:  Form.
24        THE WITNESS:  You're talking about policy.
25    Q.   BY MS. GREEN:  Yes.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
221–224

Page 221

1    A.    And you're talking about training and stuff
2  that the officers received, and even the law back then,
3  no, I would not have to quit questioning.
4    Q.    No, sir, I'm not talking about training, and
5  I'm not talking about the law back then.  I'm talking
6  about this policy only.
7    A.    Okay.
8    Q.    Okay?
9    A.    Then my answer is no, I don't have to stop
10  questioning under that fact pattern you gave.
11    Q.    Okay.  So, I think I may need an attorney, fact
12  pattern, don't have to cease questioning under the
13  policy?
14    A.    No.
15    Q.    No problem?
16    A.    No.
17    Q.    If the suspect says, I would like an attorney,
18  you have to --
19    A.    I'd have to.
20    Q.    What about, I want an attorney?
21    A.    Yes, you have to stop.
22    Q.    And let's do some examples with the right to
23  silence.
24    A.    Okay.
25    Q.    If the suspect says, I don't want to talk to

Page 222

1  you anymore?
2    A.    I have to stop.
3    Q.    Okay.  And what about if the suspect says, I
4  don't understand my rights?
5    A.    Well, the burden is upon me to prove that the
6  confession is knowingly, intelligently and voluntarily
7  given.  So I would stop and ask you, Okay, what is it
8  that you don't understand?  And if I continue to feel as
9  a police officer that they don't understand, then I don't
10  ask them any questions.
11    Q.    Okay.  And so under this policy, if a suspect
12  says that they don't understand the rights, the officer
13  is not required to cease questioning the suspect?
14        MS. RETTS:  Form.
15        THE WITNESS:  That's nothing to E that
16  you're going through.  Now, this whole -- you want me to
17  go review all of 14 because it's all through G?  So let
18  me review the entire thing and see.  You're asking me
19  specifically about E.
20    Q.    BY MS. GREEN:  14 --
21    A.    Right.
22    Q.    -- A through E, yeah.
23    A.    And your question was if they don't understand
24  the rights?
25    Q.    Yeah.

Page 223

1    A.    Okay.  If they don't understand, they don't
2  understand.  So I don't get to question them.  A waiver
3  of Miranda has to be knowingly, intelligently and
4  voluntarily given.  They can't give it if they don't
5  understand.
6    Q.    Okay.  So under this policy, if someone --
7    A.    Then I don't ask questions if they don't
8  understand.
9    Q.    I'm sorry.  Just want to make sure I'm clear.
10        Under this policy, if a suspect says, I
11  don't understand my rights, the interrogation is supposed
12  to cease immediately?
13    A.    Yeah.
14        MS. RETTS:  Form.
15    Q.    BY MS. GREEN:  I'm just talking about the page
16  we've been on.  I'm not talking about any other pages.
17    A.    This policy -- this section right here, 14A
18  through G, does not answer your question.
19    Q.    Okay.  So under this policy, if a suspect says
20  that they don't understand their rights, an officer is
21  not required to cease questioning?
22    A.    This policy does not answer your question.
23        MS. RETTS:  Form.
24    Q.    BY MS. GREEN:  So under this policy -- so I
25  take it what you're saying is the policy -- this

Page 224

1  particular policy that we're looking at does not tell an
2  officer that they need to cease questioning when a
3  suspect says they don't understand their rights?
4    A.    It does not.
5        MS. RETTS:  If I can clarify, this page of
6  the policy because there's clearly multiple pages?  So
7  this page --
8        THE WITNESS:  She asked me specifically this
9  page.
10        MS. GREEN:  That's what I clarified before,
11  yeah.
12    Q.    BY MS. GREEN:  And are you aware of any other
13  policies in place back in 1989 that would have required
14  questioning to cease if a suspect said they don't
15  understand their rights?
16        MS. RETTS:  Form.  Outside the scope.
17        THE WITNESS:  Yeah, yeah, there's going to
18  be training outlines and everything else that exists that
19  explain what we're supposed to do under those
20  circumstances.
21    Q.    BY MS. GREEN:  Okay.  Tell me about that
22  training.
23        MS. RETTS:  Outside the scope.  He can
24  verify training, but he can't speak to the specifics of
25  the training back in 1989.

EXHIBIT 15

Page 225

1       MS. GREEN:  He just told me he knows there
2   to be training outlines back then.  So I'm trying to get
3   the information that he knows about.
4           THE WITNESS:  There are training outlines
5   with respect to interrogation law that would have existed
6   back in 1989.
7   Q.   BY MS. GREEN:  Okay.  So back in 1989, if --
8   based on police department training, if a suspect said, I
9   don't understand my rights, the officer was required to
10  cease questioning?
11          MS. RETTS:  Form.  Vague.
12          THE WITNESS:  I can't answer that question
13  for '89.  I can tell you that was the law when I came on
14  in 1995 to the present.
15  Q.   BY MS. GREEN:  Well, I'm not talking about
16  1995.
17  A.   And I told you I can't answer that question for
18  you then if it was 1989.
19  Q.   Okay.  So you don't know in 1989 whether or not
20  an officer was required to cease questioning if a suspect
21  said they don't understand their rights?
22  A.   I do not.
23          MS. RETTS:  Form.  Outside the scope.
24  Q.   BY MS. GREEN:  Okay.  And you did not attempt
25  to prepare to testify on that topic today?

Page 226

1           MS. RETTS:  He wasn't designated to testify
2   on that topic today.
3           THE WITNESS:  No.
4   Q.   BY MS. GREEN:  I wanted to show you an exhibit
5   that's previously been marked as Exhibit 65.  Just so you
6   know, this case has a number of -- in this case, we've
7   received discovery on a number of homicide investigations
8   in the prosecution of suspects with respect to those
9   homicide investigations.
10  A.   Okay.
11  Q.   And you're familiar with the first page of this
12  exhibit?
13  A.   Uh-huh.
14  Q.   It's a --
15  A.   Supplement.
16  Q.   Supplement to a departmental report?
17  A.   Yes.
18  Q.   What police officers fill out?
19  A.   As part of the investigation.
20  Q.   As part of the investigation.
21          Okay.  And so this -- this is a case where
22  the suspect -- his last name was Rangel.  The victim's
23  name was Kathleen Henderson.  We put together some
24  excerpts from the DR and also the court proceedings, and
25  so that's what this exhibit is.

Page 227

1           But I'm just going to direct you to a few
2   pages.  Okay?
3   A.   Okay.
4   Q.   I would like to direct you to -- first to page
5   10, and again, I'm referring to the Bates stamps down at
6   the bottom.
7   A.   Okay.
8   Q.   Actually --
9   A.   Your Bates stamp or the Milke Bates stamp?
10  Q.   I'm sorry, the blue Bates stamps at the left.
11  A.   Okay.
12  Q.   And actually, first, I wanted you to look at
13  page 7 just so you can see the first page of the report
14  that I'm going to be referring you to.
15          So correct me if I'm wrong.  This appears to
16  be Detective Saldate's report, a report written by
17  Detective Saldate?
18  A.   Yes.
19  Q.   And if you look at the first text paragraph --
20  A.   Right.
21  Q.   -- it says, "At approximately 1840 hours,
22  Michael Rangel was interviewed by Detective Fragoso and
23  myself."
24  A.   Uh-huh.
25  Q.   So this was a report of a suspect interview.

Page 228

1   Okay?
2   A.   Okay.
3   Q.   And so I just want to direct you to a couple
4   pages.
5   A.   Okay.
6   Q.   So page 11.
7   A.   Okay.
8   Q.   If you just read for me the bottom two
9   paragraphs and let me know when you're done.
10  A.   These two right here?
11  Q.   Yeah.
12  A.   Okay.
13  Q.   And then if you will look at the following
14  page, Rangel 12.
15  A.   Okay.
16  Q.   The first full paragraph on that page, and you
17  can -- you can start reading in the middle, again,
18  Michael and I think -- "Michael said I think."
19  A.   Okay.  So I finished that one.  Where do you
20  want me to start in here.
21  Q.   That's it.  You read through the rest of that
22  paragraph?
23  A.   Just this one here?
24  Q.   Yep.  And so am I correct that this is a report
25  of a detective who was conducting an interrogation, and

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
229–232

Page 229

1 the suspect said, I think I may need an attorney, three
2 times.
3    A.   Uh-huh.
4        MS. RETTS:  Form.  Foundation.
5    Q.   BY MS. GREEN:  Or at least where I showed you
6 there were three different times that the suspect said, I
7 think I may need an attorney, and the interrogation
8 continued after the suspect said, I think I may need an
9 attorney each time.
10   A.   Right, yes.
11   Q.   And I'll represent to you that after the
12 interrogation continued, the suspect ultimately made some
13 admissions relating to the crime.
14   A.   Okay.
15   Q.   Based off what you've told me today, these --
16 continuing the interrogation -- so continuing the
17 interrogation after the first time that the suspect said,
18 I think I may need an attorney, was not a violation of
19 Phoenix Police Department policy -- Miranda policy that I
20 showed you a little earlier?
21   A.   Correct.
22       MS. RETTS:  Form.  Outside the scope.
23       THE WITNESS:  Sorry.
24   Q.   BY MS. GREEN:  And continuing the interrogation
25 after the second time the suspect said, I think I may

Page 230

1 need an attorney, was not a violation of the Phoenix
2 Police Department Miranda policy that I showed you?
3        MS. RETTS:  Same objection.
4        THE WITNESS:  Correct.
5    Q.   BY MS. GREEN:  And continuing the interrogation
6 after the third time that the suspect said, I think I may
7 need an attorney, was not a violation of the Phoenix
8 Police Department policy that I showed you?
9        MS. RETTS:  Same objection.
10       THE WITNESS:  Correct.
11   Q.   BY MS. GREEN:  Therefore, I take it that none
12 of the -- continuing the interrogation, despite three
13 instances of the suspect saying, I think I may need an
14 attorney, was not conduct that required discipline under
15 the Phoenix Police Department discipline policies at that
16 time?
17       MS. RETTS:  Form.  Misstates the quote.
18       THE WITNESS:  Again, I'm going to clarify it
19 for the record that this case exists in 1989.  You've
20 asked me to look at a policy that existed in 1985.  Under
21 the policy you want me to refer to, no, there was no
22 violation of a policy that would have required an
23 investigation.
24   Q.   BY MS. GREEN:  And under that policy, it's okay
25 to say -- to say -- and under the discipline policy that

Page 231

1 you've looked at today, it's okay in response to
2 saying -- strike that.
3        So under the discipline policy you looked at
4 today, there's nothing wrong with a detective telling a
5 suspect after he says, I think I may need an attorney,
6 that it was up to him if he wanted an attorney, but I was
7 going to -- I was still convinced that he killed Kathy
8 and then to continue questioning?
9        MS. RETTS:  Form.  Asked and answered.
10       THE WITNESS:  There's no violation of
11 policy.
12   Q.   BY MS. GREEN:  Okay.  No violation of policy,
13 no investigation required.  Correct?
14   A.   Correct.
15   Q.   Okay.  And the fact that -- whether it's one
16 saying, I think I may need an attorney, once and
17 continuing to question or, I think I need -- or the
18 suspect saying, I think I need an attorney, three times
19 and continuing to question, there's no difference?
20   A.   No violation of policy.
21   Q.   No violation of policy, no investigation
22 required?
23   A.   Correct.
24       MS. GREEN:  Okay.  Let's take a three-minute
25 break.

Page 232

1        THE WITNESS:  Okay.
2        (A recess was held off the record.)
3    Q.   BY MS. GREEN:  All right.  I wanted you to turn
4 to page 71 of that same exhibit that's in front of you,
5 Rangel 71.
6    A.   Okay.
7        MR. EAVES:  You might want to unmute.
8    Q.   BY MS. GREEN:  It's Exhibit 65, page Rangel 71.
9    A.   Okay.
10   Q.   If you look at page 70, it's a response -- a
11 State brief of -- a brief filed by the State in this
12 matter.
13   A.   Okay.
14   Q.   And if you will, start by reading in the first
15 paragraph that says, "Only after."
16       MS. RETTS:  Did you say this was the
17 State's?
18   Q.   BY MS. GREEN:  And read until the end of the
19 paragraph.
20   A.   Okay.
21   Q.   So here the State is saying that the suspect's
22 admissions were obtained in a clear violation of Miranda
23 and its progeny, a fact that defense counsel has
24 obviously recognized.  So here the State is conceding
25 that the suspect's admissions were obtained in violation

EXHIBIT 15

TOM VAN DORN                                          November 17, 2017
MIKE vs CITY OF PHOENIX                                        233–236

Page 233

1   of Miranda.

2        MS. ODEGARD:  Form.

3        Q.    BY MS. GREEN:  I will represent to you they're

4   referring to the admissions that came out of that

5   interrogation that we were looking at Saldate's report.

6        A.    Okay.

7        Q.    If the supervisor becomes aware of this, that

8   the State feels that the suspect's admissions were

9   obtained in a clear violation of Miranda, would

10  discipline be required in that instance?

11       MS. RETTS:  Form.  Foundation.

12       THE WITNESS:  Possibly.  I disagree with

13  this attorney in what he wrote in this motion.  So the

14  answer is possibly.

15       Q.    BY MS. GREEN:  Okay.  And what does it depend

16  on?

17       A.    Because this is the opinion of a county

18  attorney who is solely and completely and separate from

19  the Phoenix Police Department and their lawyers.  All

20  right.

21       We have -- we agree to disagree on things

22  all the time.  I work on probable cause, preponderance of

23  the evidence standard.  They work on a beyond a

24  reasonable doubt standard.

25       So this could have been brought to the

Page 234

1   supervisor's attention, and then after sitting around and

2   consulting, there may or may not have been an

3   investigation depending upon whether or not we agreed

4   with this lawyer and their opinion.

5        Q.    So if this was brought to the supervisor's

6   attention, there would not necessarily be an

7   investigation?

8        A.    Like I said, whether we agreed or disagreed

9   with it would depend on whether or not there would be an

10  investigation.

11       Q.    There would only be an investigation if the

12  supervisor agreed with the county attorney's assessment?

13       MS. RETTS:  Form.

14       THE WITNESS:  If we agreed with this county

15  attorney and agreed it was a violation of policy.

16       Q.    BY MS. GREEN:  Okay.  And you've already told

17  me it wasn't a violation of the policy?

18       A.    Correct.

19       Q.    So there would not be an investigation even if

20  the supervisor became aware that the State had this

21  position?

22       A.    Again, this document would come back.  It would

23  be discussed with the supervisor and likely the chain of

24  command and probably the in-house legal counsel, whoever

25  it was and stuff at that time to see whether or not we

Page 235

1   agree with the statements of this lawyer on whether or

2   not an investigation needs to be completed.

3        Q.    Okay.  Now I want to refer you to an exhibit

4   that's been marked 64.

5        A.    Okay.

6        Q.    Exhibit 64 is the Runningeagle documents.

7        A.    Okay.

8        Q.    Similar to the last set of documents I showed

9   you.  It's just about a different case involving a

10  different victim, suspect in another homicide case.

11  We --

12       MS. GREEN:  I'm sorry.

13       MS. BERKE:  Nothing.

14       Q.    BY MS. GREEN:  Does it have 64 at the bottom

15  there?

16       A.    Yes.

17       Q.    Just want to make sure I'm on the right

18  exhibit.

19       So I will refer you to page blue Bates stamp

20  RUN14, and I'll represent to you this is Detective

21  Saldate's report of suspect, his interview or

22  interrogation of suspect by the last name Runningeagle.

23       A.    Okay.

24       Q.    Okay.  If you refer to page RUN15 --

25       A.    Okay.

Page 236

1        Q.    -- and then the first paragraph that's on that

2   page, the line that begins, "I then explained to him that

3   I would make every effort to try to understand him."  If

4   you read to the end of the paragraph -- I'm sorry -- not

5   the first full paragraph, the first, I think, complete

6   paragraph.  "I then explained to him that I would try

7   to -- I would make every effort to try to understand

8   him."

9        Are you seeing where I am?  Should I point

10  you to it?  I can point you to it.  I think it's in this

11  paragraph somewhere.

12       A.    Okay.

13       Q.    Are you done reading that?

14       A.    No.

15       Q.    So at the very end of that paragraph, it says,

16  "I then told him that I'd tried to understand, but he

17  replied that he wanted to remain silent."

18       A.    Uh-huh.

19       Q.    So if the suspect replied that he wanted to

20  remain silent, would that be a violation of the Miranda

21  policy that we discussed?

22       A.    I'm going to have to go back and look whether

23  or not Miranda rights were even advised.  I'm not going

24  to answer that question until I know whether or not this

25  person or suspect was advised of their Miranda rights.

EXHIBIT 15

TOM VAN DORN                                        November 17, 2017
MIKE vs CITY OF PHOENIX                                      237–240

Page 237

1    Q.    Look on page RUN14.
2    A.    Okay.
3    Q.    Upon -- the second paragraph, "Upon entering
4    the interview room, I explained to Sean that I could read
5    him his Miranda rights."
6          Are you satisfied he was advised of his
7    Miranda rights based on what is written in that
8    paragraph?
9    A.    I am now because he clarified that he did in
10   fact read it without the suspect.  So, yes.
11   Q.    So him continuing to interview the suspect
12   after he replied he wanted to remain silent, I take it
13   that would violate the Miranda policy that we've been
14   discussing in the Exhibit 30?
15         MS. RETTS:  Form and foundation.
16         THE WITNESS:  Again, for the record --
17         MS. RETTS:  Outside the scope.
18         THE WITNESS:  I'm sorry.  Again, for the
19   record, I want to point out in this case you're asking me
20   to review what occurred in 1987.  The policy you were
21   asking me to review was in 1985.  Under the policy in
22   1985 you asked me to review, I would agree with you it is
23   a violation of department policy.
24   Q.    BY MS. GREEN:  Okay.  And I'll represent to you
25   that we didn't get a 1987 policy with that page.  We got

Page 238

1    a 1986 one, a 1989 one.
2    A.    It doesn't change my answer.
3    Q.    We got a 1990 one and 1991 one, and they all
4    had that exact same language, but I'm noting that.
5          So this policy that you see -- you've been
6    provided with, that would be a violation of that policy?
7    A.    It would be in violation of the policy in
8    effect in 1985, yes.
9    Q.    The one that you've been looking at?
10   A.    Correct.
11   Q.    Okay.  And, therefore, that would require
12   discipline if the supervisor became aware of this
13   conduct.  Correct?
14   A.    Yes.
15   Q.    And it would require an investigation of the
16   conduct.  Correct?
17   A.    Yes.
18   Q.    And what type of discipline -- what type of
19   discipline would this warrant under the policy?
20         MR. EAVES:  Foundation.  Speculation.
21         THE WITNESS:  I don't think that policy
22   classifies whether this would fit into their version of a
23   matrix.
24   Q.    BY MS. GREEN:  I'm asking now about Exhibit 82,
25   the discipline policy that we've been referring to today.

Page 239

1    A.    Correct.
2    Q.    I'm asking about the type of discipline that if
3    the conduct that's described in the report was found to
4    have occurred would be received?
5    A.    Correct.
6          MS. RETTS:  Asked and answered.
7          THE WITNESS:  And like counsel did, I would
8    be speculating because that policy doesn't tell me when a
9    violation of this -- where it fits within their
10   discipline.
11   Q.    Okay.  And if I represent to you
12   that just looking at this -- so looking at this policy,
13   based on what you've seen, you can say that the conduct
14   is supposed to be disciplined if it's found, but the
15   level of discipline could be anything ranging from
16   supervisory counseling to dismissal?
17         MS. RETTS:  Form.  Vague.
18         THE WITNESS:  I'm not sure whether they
19   would classify it.  If you look at the policy in 1985, I
20   don't see where Miranda is even mentioned in here.  So I
21   don't know whether they would classify it.
22   Q.    BY MS. GREEN:  You don't know whether they
23   would have classified it.  So are you --
24   A.    An investigation will be there.  Where they
25   would classify it is not specified in this policy.

Page 240

1    Q.    Okay.  And if it's not specified -- so you
2    don't -- you don't know what type of discipline would be
3    warranted for continuing to question a suspect?
4    A.    Not 1985.
5    Q.    Okay.  And you were not prepared to testify on
6    that topic today?
7          MS. RETTS:  Form.  Vague.
8    Q.    BY MS. GREEN:  You did no preparation to learn
9    what type of discipline --
10   A.    That existed in 1985, no.
11   Q.    Okay.  Looking from the face of the policy,
12   it's very possible -- withdrawn.
13         Can you tell us, despite having not been
14   prepared to testify about it, whether or not there would
15   be an investigation of the conduct that's described in
16   the report that you looked at?
17         MS. RETTS:  Form.  Asked and answered.
18         THE WITNESS:  Yes, there should be an
19   investigation.
20   Q.    BY MS. GREEN:  Okay.  And you can tell me that
21   based on this policy.
22   A.    Correct, if I put everything together because
23   you showed me, okay, a policy from 1989 that was -- let's
24   go back.
25         So you've given me a DR to read because I'm

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
241–244

Page 241

1  going to clarify for the record from 1987 in which
2  Detective Saldate apparently continued interrogation
3  after a person wanted to remain silent.
4          You then asked me to compare that conduct to
5  a policy from 1989 and whether or not it was a violation
6  of subsection E on this page.  I am telling you that,
7  yes, under that, that is correct.
8          Then you want me to go back and classify
9  what level of discipline that would be from a policy that
10  existed in 1985, and to do so would be to speculate.  So
11  I don't have an answer to your question.
12     Q.    And you weren't prepared to testify on any
13  policy and -- any discipline policy in any particular
14  year when you came here today?
15          MS. RETTS:  Form.  Misstates testimony.
16          THE WITNESS:  That would be incorrect.
17     Q.    BY MS. GREEN:  Okay.  How were you prepared?
18     A.    Because I'm prepared to explain the process of
19  the disciplinary process of the Phoenix Police Department
20  to you.
21     Q.    Okay.
22     A.    How they classify --
23     Q.    But you didn't do any specific preparation to
24  talk about the discipline policies from 1985 to 1991.
25  Correct?

Page 242

1          MS. RETTS:  Form.  Misstates testimony.
2          THE WITNESS:  I didn't read those policies
3  prior to this deposition.
4     Q.    BY MS. GREEN:  Right.  And so you can't --
5  you're saying on the record you can't tell me about any
6  policy unless I direct you to the specific page because
7  you simply don't know?
8          MS. RETTS:  Form.  Misstates testimony.
9          THE WITNESS:  No, I do know.  Give me the
10  policy to read and ask me questions, and I'll be able to
11  answer those questions for you.
12     Q.    BY MS. GREEN:  You don't know as you sit here
13  today without me directing you to a specific page?
14     A.    That's what I just said.
15          MS. RETTS:  Form.  Argumentative.
16          THE WITNESS:  I'm going to make a point of
17  clarification for the record since you continue to keep
18  bringing it up that Phoenix Police Department policies
19  back then and even more so now -- the pages are in the
20  hundreds and right now are well over 1300.  It would be
21  completely impossible for me to have every single policy
22  memorized verbatim.
23     Q.    But you've already told me you didn't even look
24  at the substance of any discipline policy to prepare to
25  testify --

Page 243

1     A.    Prior to this deposition, no.
2     Q.    Thank you very much.
3     A.    I assumed they would be provided during this
4  deposition.
5     Q.    Okay.  And you weren't asked to read any
6  particular discipline policies?
7          MS. RETTS:  No, do not answer that.
8          THE WITNESS:  Okay.
9          MS. RETTS:  It's attorney/client privilege.
10     Q.    BY MS. GREEN:  Okay.  Take a look at page
11  discipline 10.
12     A.    In 1989 or 1985?
13     Q.    You have a document that's been marked as
14  Exhibit 82 with Bates stamps in blue in the bottom left
15  corner, and I'm asking you to turn to page discipline 10
16  of that document.
17     A.    Correct.  Thank you.  I just wanted to clarify
18  because you also asked me to review this policy right
19  here.
20     Q.    No problem.  I'm happy to clarify.
21     A.    Page 10.
22     Q.    Okay.  At the bottom of page 10, it says -- in
23  section B at the very bottom, it says, "Supervisors will
24  assume the duties and obligations of their rank in the
25  investigation of employees under their command, discover

Page 244

1  inefficiency or misconduct at its early stages."
2     A.    Okay.
3     Q.    So would you agree that based on this policy
4  the -- it puts the onus on the supervisor to make sure
5  that they're supervising at a level that they can
6  discover inefficiency or misconduct that's taking place
7  with respect to their rank?
8     A.    Yeah.  That onus still exists today.
9     Q.    Okay.  So as far as you know, from 1985 to
10  today, that onus -- that was a responsibility of the
11  supervisor?
12     A.    Correct.
13     Q.    Okay.  And let me show you one more thing.
14          MS. GREEN:  I would like to mark this as the
15  next exhibit.
16          COURT REPORTER:  Exhibit 84.
17          (Exhibit 84 was marked for identification.)
18     Q.    BY MS. GREEN:  This, similarly to Exhibit 82,
19  is simply a compilation of a couple of pages that you
20  received from the City of Phoenix.
21     A.    Okay.
22     Q.    I want you to turn to page that's Bates stamped
23  in blue lines of authority, page 2.
24     A.    Okay.
25     Q.    And section 2-2, would you agree it says,

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
245–248

Page 245

1    "Supervisors will actively direct and supervise its
2    subordinates to ensure that they perform their duties
3    efficiently."
4        A.   Yes.
5        Q.   And it also says under A1, "They will monitor
6    subordinate's activities and assume command of any
7    situation involving subordinates when needed."
8        A.   Yes.
9        Q.   Okay.  So when putting this -- what I just read
10   to you from Exhibit 84 together with 82, again, it's just
11   indicating that supervisors have the opportunity -- the
12   obligation to actively monitor and supervise those in
13   their rank.  Correct?
14       A.   Yes.
15           MS. RETTS:  Form.
16       Q.   BY MS. GREEN:  And I take it a basic part of
17   every supervisor's job is to review the reports, the
18   police reports of those in their rank.  Correct?
19           MS. RETTS:  Form.  Outside the scope.
20           MS. ODEGARD:  Foundation.
21           THE WITNESS:  Randomly review, yes.
22       Q.   BY MS. GREEN:  Randomly review.  Okay.  And so
23   one way that supervisors can implement this policy and
24   monitor and actively supervise is by reviewing the
25   reports of those in their rank?

Page 246

1        A.   Yes.
2            MS. RETTS:  Form.  Outside the scope.
3        Q.   BY MS. GREEN:  And would you agree that that's
4    a key way that a supervisor can determine whether or not
5    an officer's breaking any rules?
6            MS. RETTS:  Form.  Vague.
7            MS. ODEGARD:  Form.  Vague.
8        Q.   BY MS. GREEN:  For example, if a supervisor
9    reads an officer's report randomly and notices some red
10   flags, then they can -- then the onus is on them to
11   investigate those red flags and figure out what's going
12   on?
13           MS. ODEGARD:  Form.  Vague.
14           MS. BERKE:  Objection.  Vague.
15           MS. RETTS:  Object to form.  Vague.
16           THE WITNESS:  Yes.
17       Q.   BY MS. GREEN:  And under the discipline policy,
18   the fact that supervisors review the reports and officers
19   know that they're reviewing the reports can help ensure
20   that officers aren't engaging in misconduct.  Correct?
21           MS. ODEGARD:  Form.
22           MS. RETTS:  Form.  Vague.
23           THE WITNESS:  Yeah.  I mean, I guess it's
24   just misconduct as it relates to, you know, violations of
25   department policy.  And to go back to your previous

Page 247

1    question, they did.
2            I mean, what is red flags?  I mean, is red
3    flag misconduct as defined by department policy?  So I
4    guess I should change my answer to, yeah, the possibility
5    exists during the random review of police reports.  If I
6    see something that is out of department policy, I should
7    initiate an investigation.
8        Q.   BY MS. GREEN:  Okay.  And one supervisor in
9    homicide in the 1980s, Sergeant Ontiveros, told us that
10   it was his responsibility as a supervisor to read every
11   report.  Do you disagree with that testimony?
12           MS. RETTS:  Form and foundation.  Outside
13   the scope.
14           THE WITNESS:  I have no reason to believe
15   that he didn't.  Some supervisors may read all of their
16   employees' reports.  Department policy doesn't require
17   them to.
18       Q.   BY MS. GREEN:  Okay.  Department policy does
19   not require a supervisor to read every report of those in
20   their rank?
21           MS. RETTS:  Form.  Outside the scope.
22           THE WITNESS:  I'll limit my testimony to me
23   being hired on the department, and, no, we do not require
24   our supervisors to read every report.
25       Q.   BY MS. GREEN:  Okay.

Page 248

1        A.   Whether or not there's a policy in all of these
2    documents that you've given me that requires supervisors
3    in the '80s to do so, we'd have to go through there.
4        Q.   So as far as you know, both today and back in
5    the 1980s, supervisors were not required to read every
6    report?
7        A.   To the best of my knowledge, that's correct.
8        Q.   Okay.  Now, talking about red flags, if a
9    supervisor is reading the report that I referred you to
10   in the Rangel case -- and just to refresh your
11   recollection, that's the one where the suspect said, "I
12   think I may need an attorney," three times -- is that
13   something you would consider a red flag that requires a
14   supervisor to actively monitor or supervise a little bit
15   more because the officer continued questioning after
16   that?
17           MR. EAVES:  Misstates facts.
18           MS. ODEGARD:  Form.  Foundation.  Vague.
19           MS. RETTS:  Form.
20           THE WITNESS:  Are you asking me is it a red
21   flag, or is there misconduct associated with it?
22       Q.   BY MS. GREEN:  I'm asking if it's a red flag?
23           MS. RETTS:  Form.
24           THE WITNESS:  It's a red flag.
25       Q.   BY MS. GREEN:  And would you say when a

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
249–252

Page 249
1  supervisor reads a report and sees a red flag, they
2  should investigate that red flag to ensure there's no
3  actual misconduct?
4      A.  No.  I would disagree with your statement.
5      Q.  Okay.  So if you see a red flag in the report,
6  there's no need to investigate?
7      A.  No need to launch an investigation until I do
8  more fact finding.
9      MS. RETTS:  Form.
10     Q.  BY MS. GREEN:  So to you, fact finding is not
11 an investigation?
12     A.  No.
13     Q.  What is it?  What would it entail?
14     A.  An investigation is actually putting an
15 employee on notice that I'm initiating an investigation
16 against you for violation of department policies.  A red
17 flag is not doing that process.
18     Q.  Okay.  So if a supervisor sees a red flag --
19 correct me if I'm wrong -- you just said they should
20 probably do some more fact finding.  Correct?
21     A.  Correct.
22     Q.  What would that fact finding include?
23     A.  Be sitting down and talking with the officer
24 and those types of things, say, Hey, referring back to
25 the report you've asked me to refer back to, I see that

Page 250
1  this person made this statement that, I may need a
2  lawyer, I may need a lawyer, you know, why didn't you
3  bother to stop and clarify whether or not the person
4  wanted a lawyer.
5      It's still not a violation of policy, but it
6  could be a training issue that I want me and my employee
7  to sit down and have a conversation about.
8      Q.  Okay.  And so if the officer says, I didn't
9  stop because the policy didn't -- told me I don't have to
10 stop, no further investigation needed.  Right?
11     A.  Correct.
12     Q.  Okay.  And if the officer says, I didn't stop
13 because I didn't think he wanted an attorney, no further
14 investigation needed.  Correct?
15     A.  Yeah.  It's no violation.  Policy wasn't a
16 violation of the law.
17     Q.  If an officer sees a red flag like that such
18 that we saw in the Rangel report, they simply need to --
19 withdrawn.
20     If an officer sees a red flag such that we
21 saw in the Rangel report, the supervisor simply needs to
22 approach the officer and ask why they did that, and if
23 the officer explains that it wasn't a policy violation,
24 no further fact finding is needed?
25     MS. RETTS:  Form.  Vague.

Page 251
1      THE WITNESS:  The answer is maybe.  I could
2  sit there as a supervisor and read that report and say I
3  don't need to go have a conversation with my employee
4  because there's no violation of policy, nor do I feel
5  that they violated the law.
6      Q.  BY MS. GREEN:  Okay.  So a supervisor doesn't
7  need to investigate a red flag?
8      MS. RETTS:  Form.  Vague as to red flag.
9      THE WITNESS:  It's a red flag.  It's not an
10 investigation.
11     Q.  BY MS. GREEN:  Okay.  And a supervisor need not
12 do any fact finding if they see a red flag and don't
13 think it's a big deal.  Right?
14     MS. RETTS:  Form.  Vague.
15     THE WITNESS:  I think it depends on what
16 that red flag is.  I can't give you a 100 percent answer
17 which I know is what you're striving for.
18     Q.  BY MS. GREEN:  And the, I think I may need an
19 attorney, in Rangel, the supervisor need not necessarily
20 do any fact finding with respect to that red flag if they
21 read it in the report?
22     MS. RETTS:  Form.  Vague.
23     THE WITNESS:  Need not.  Would I, yes.
24     Q.  BY MS. GREEN:  But under the policy in the
25 1980s, they are not required to do any fact finding?

Page 252
1      A.  No.
2      Q.  Again, as a discipline policy that I referred
3  you to, discipline 10, indicating that, "The supervisors
4  will assume the duties and obligations of their rank in
5  the investigation of employees under their command to
6  discover inefficiency or misconduct in its early stages,"
7  would you agree that that would include activities such
8  as directly observing the police work of subordinates?
9      A.  Yes.
10     Q.  And if there are red flags in the reports, you
11 would agree -- if a supervisor determines there are red
12 flags in a report, you would agree the supervisor under
13 the policy should at the very least engage in more active
14 supervision of that particular person in their rank?
15     MS. ODEGARD:  Object to form.  Vague.
16     MS. RETTS:  Object to form.  Vague.
17     THE WITNESS:  If there's potential red
18 flags, it would require me to do more fact finding.
19     Q.  BY MS. GREEN:  Okay.  So for example, if a
20 supervisor sees a red flag with respect to an
21 interrogation after -- when they read an officer's report
22 regarding an interrogation, you would expect that the
23 supervisor might begin to sit in on that officer's
24 interrogation just to make sure that they are doing
25 things properly?

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
253–256

Page 253

1          MS. RETTS: Form and foundation. Outside
2   the scope.
3          MS. ODEGARD: Join.
4          THE WITNESS: It's subjective. It's up to
5   the individual supervisor.
6   Q.   BY MS. GREEN: So it's up to the individual
7   supervisor the level of active supervision they do when
8   they see red flags?
9          MS. RETTS: Form and foundation. Outside
10  the scope.
11         THE WITNESS: Yeah. I'm --
12  Q.   BY MS. GREEN: The policy doesn't require --
13  A.   I'm provided with my duties and
14  responsibilities, it's up to me to comply to that. Do I
15  have a specific responsibility where I have to sit in my
16  employees' interrogations? No, I don't.
17  Q.   It's the supervisor's discretion to do what
18  they feel like they need to do to comply with that
19  policy?
20  A.   Uh-huh.
21  Q.   And so --
22         MS. BERKE: Is that a yes?
23         THE WITNESS: Yes. Sorry.
24  Q.   BY MS. GREEN: Is it in the supervisor's
25  discretion to trust that their detectives are following

Page 254

1   the rules and policies and procedures?
2   A.   Yes, I have that discretion.
3          MS. RETTS: Form. Outside the scope.
4   Q.   BY MS. GREEN: Okay. So a supervisor has the
5   discretion to trust that what the detective wrote in the
6   report is accurate?
7   A.   Yes.
8          MS. RETTS: Form.
9   Q.   BY MS. GREEN: If a single detective notifies a
10  sergeant that another detective is bending the rules and
11  violating the Miranda policy, would that supervisor have
12  an obligation to investigate that complaint?
13         MS. ODEGARD: Form. Vague.
14         MS. RETTS: Form. Vague. Lacks sufficient
15  facts.
16         THE WITNESS: If we go back to that,
17  bringing forth an allegation of misconduct requires it to
18  be investigated.
19  Q.   BY MS. GREEN: Any allegation of misconduct
20  that any officer brings to their supervisor must be
21  investigated under the policy?
22  A.   Under the policy, yes.
23  Q.   Okay. And if a supervisor doesn't investigate
24  that allegation, they are themselves subject to
25  discipline?

Page 255

1   A.   Again, yes.
2   Q.   Okay. And when an officer is super -- I think
3   we talked a little bit earlier today about your
4   definition of supervisors, and you were saying there
5   might be multiple supervisors for any particular officer.
6   A.   Uh-huh.
7   Q.   Correct?
8   A.   Correct.
9   Q.   And so in Exhibit 82, page discipline 10,
10  section B --
11  A.   82, page 10, section B, okay.
12  Q.   So that's not just referring to someone's
13  immediate supervisor, but anyone who supervises another
14  officer has that obligation?
15  A.   Correct.
16  Q.   So for example, it's my understanding that in
17  the homicide unit in the 1980s, there were three squads?
18  A.   Okay.
19  Q.   Each with a sergeant in charge of that squad.
20  However, a sergeant in charge of one squad might
21  supervise a detective on a different sergeant's squad in
22  a particular investigation?
23  A.   Correct.
24  Q.   That supervisor's obligation with respect to
25  supervision and investigating misconduct is no different

Page 256

1   than that person's squad supervisor. Correct?
2   A.   Correct.
3   Q.   Okay. Now I want to direct you to exhibit --
4   what's been previously marked as Exhibits 61 and 62.
5          And, by the way, before we get back to
6   that --
7   A.   Okay.
8   Q.   I'm sorry. I just have one quick follow-up
9   question regarding Exhibit 64, and this is the one,
10  again, on page 15. I think it's the small -- the white
11  notebook in front of you.
12  A.   Okay. What page?
13  Q.   Bottom left Bates stamp RUN15.
14  A.   Okay.
15  Q.   This is the one where we had previously
16  confirmed that the officer, according to his report, read
17  the suspect his Miranda rights and that the suspect said
18  he wanted to remain silent?
19  A.   Yes.
20  Q.   You had told me you weren't sure on the
21  discipline that would be required for this -- you told me
22  this would have to be investigated?
23  A.   Correct.
24  Q.   But you told me you weren't sure of the
25  discipline that would be required under the policy in

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
257–260

Page 257

1  this year?

2          MS. RETTS:  Form.  Misstates testimony.

3          THE WITNESS:  I would not be able to tell

4  you what the level of classification was, correct.

5      Q.   BY MS. GREEN:  Okay.  And the level of

6  classification helps determine the level of discipline.

7  Right?

8          MS. RETTS:  Form.

9          THE WITNESS:  It's kind of the reverse.

10     Q.   BY MS. GREEN:  Okay.  My question is -- and I

11  can ask it again.  Do you know the level of discipline

12  that would be required under -- for this violation in

13  this year?

14         MS. RETTS:  Form.

15         THE WITNESS:  I don't because I don't know

16  where they would have classified it because there is no

17  specific classification for this subsection that you

18  asked me to review.

19     Q.   BY MS. GREEN:  Okay.  Do you know the level of

20  discipline that would be required in any year?

21     A.   Yes.

22     Q.   Okay.  What year is that?

23     A.   Right now?

24     Q.   Okay.  What type of discipline would be

25  required right now?

Page 258

1      A.   For a violation of this type, a constitutional

2  rights violation, you're probably looking at class 3,

3  which would put you in a Loudermill hearing, which is a

4  termination hearing before the police chief.

5      Q.   Okay.  So right now a violation of this nature

6  could lead to termination?

7      A.   Correct.

8      Q.   Okay.  Even a single violation?

9      A.   Correct.

10     Q.   And is there a minimum level of discipline that

11  is required if the violation is actually found to have

12  occurred?

13     A.   No.  Every case is unique.  It's on a

14  case-by-case basis.  When you take a look at the

15  sustained allegations and then we sit there and classify

16  it, we have a specific policy that tells us whether to

17  classify or discipline.

18     Q.   I'm asking you about this particular violation,

19  a single violation in this report.  If there's a minimum

20  level of discipline, that would be required under the

21  policy now?

22         MS. RETTS:  Form.  Vague.

23         THE WITNESS:  This could subject you to

24  termination is what I told you.  It could also be --

25     Q.   BY MS. GREEN:  That's the maximum level of

Page 259

1  discipline.  Right?

2      A.   Uh-huh.

3      Q.   Do you know if there's a minimum level of

4  discipline now?

5      A.   For this, without looking at the specific

6  policy again right in front of me because it's this long

7  and those types of things, you're talking about a

8  constitutional rights violation.  So you're likely

9  looking at a minimum of a suspension and up.  You're not

10  looking at a written reprimand or an oral reprimand here.

11     Q.   Do you have any reason to believe that was

12  different back in the 1980s?

13         MS. RETTS:  Form.

14         MS. BERKE:  Foundation.

15         THE WITNESS:  It wasn't specifically in that

16  policy back then.

17     Q.   BY MS. GREEN:  Right.  So help me figure this

18  out.  If it's not specifically in the policy -- so the

19  policy that I showed you -- and if it's easier for you,

20  refer you to the 1991 policy.

21         So Exhibit 82, page discipline 23, just

22  number 1, "Employees are subject to disciplinary action

23  for the commission or omission of any act that is

24  prohibited or required."

25     A.   Uh-huh.

Page 260

1      Q.   And if you look at page discipline 8 --

2      A.   Okay.  Are we sticking with the violations in

3  1991, or are we going back to the '80s now?

4      Q.   I'm going back to the '80s and showing you that

5  same language to try and --

6      A.   That language was in '91.  That language may or

7  may not be in number 8, which is a policy --

8      Q.   I understand that.  You made that perfectly

9  clear on the record.  I'm showing you what's in this

10  exhibit.

11     A.   I'm clarifying for myself for the record.

12     Q.   I understand that.  So if you look back at

13  that, discipline number 8, page 1 -- I mean, number 1,

14  "Employees are subject to disciplinary action for the

15  comission or omission of any act that is prohibited or

16  required?

17     A.   Correct.

18     Q.   -- would you agree that's the same language?

19     A.   Yes.

20     Q.   So you would agree that the policy violation

21  that's for continuing to interview after the suspect

22  reported -- after the suspect invoked their right to

23  remain silent would be subject to discipline under both

24  the '85 policy and the 1991 policy I showed you?

25         MS. RETTS:  Form.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
261–264

Page 261

1    THE WITNESS: Subject to discipline, yes.

2    Q.    BY MS. GREEN:  Okay.  And is there any doubt in

3    your mind that under these policies discipline would not

4    be required?

5    A.    If sustained, discipline would likely be

6    required.

7       MS. RETTS:  Form.

8    Q.    BY MS. GREEN:  What do you mean by "likely"?

9    A.    If sustained, discipline would be required.

10   Q.    Okay.  And why don't I direct you to, again,

11   start at page discipline 8C.

12   A.    Uh-huh.

13   Q.    And then you can go through discipline 9 and

14   just skim over the different categories.

15   A.    Uh-huh.

16   Q.    And then I'll ask you to do the same thing with

17   respect to the 1991 policy.

18   A.    Okay.

19   Q.    And I can direct you to those pages once you've

20   had a chance to skim the '85 pages.  Let me know and I'll

21   get you to that page.

22   A.    No, I'm fine.

23   Q.    You've looked at the '91 pages, too?

24   A.    Okay.

25   Q.    I think that's discipline 24.

Page 262

1    A.    Uh-huh.

2    Q.    Based on this '91 policy and the '85 policy and

3    these subsections, policy violations --

4    A.    Okay.

5    Q.    -- can you tell me what type of discipline

6    would be required for the Miranda violation that you've

7    confirmed?

8    A.    No.

9       MS. RETTS:  Form.  Asked and answered.

10   Q.    BY MS. GREEN:  Okay.  So the policy doesn't

11   indicate what type of discipline is required?

12   A.    No.

13   Q.    Okay.  And would you find out where the

14   discipline has been required anywhere else other than the

15   discipline and misconduct general order, or like is there

16   any other orders you're aware of that talk about the

17   required discipline?

18   A.    Could be -- internal affairs manuals could

19   provide guidance.  There could be other things in

20   existence that I haven't reviewed or anything else that

21   told them where to classify it back in the day.

22   Q.    Okay.  I'll represent to you that we asked for

23   the documents from back in the day that talked about

24   discipline within the PPD --

25   A.    Okay.

Page 263

1    Q.    -- and we were only -- this is the discipline

2    policy we were provided with.

3    A.    Okay.

4    Q.    Would you expect to also have other policies

5    other than the order that talk about -- the discipline

6    and misconduct order that talk about the required

7    discipline?

8       MS. RETTS:  Form and foundation.

9       THE WITNESS:  I don't know what all

10   documents you've requested in this particular case aside

11   from the policies.  I don't know if you've requested

12   bureau manuals, training manuals that provide additional

13   guidance on how we classify discipline.  So I'm not able

14   to answer that question for you.

15   Q.    BY MS. GREEN:  Okay.

16   A.    I'll answer it specific to this policy.  It

17   does not tell me where to classify this violation.

18   Q.    Okay.  So as the 30(b)(6) witness here today to

19   talk about discipline policies, practices, procedures

20   from -- at some point in the 1980s to 1991, you're not

21   sure one way or the other whether there would have been

22   any other document that talks about the type of

23   discipline that's required for a Miranda violation?

24      MS. RETTS:  Form and foundation.

25      THE WITNESS:  There could be additional

Page 264

1    documents, yes.

2    Q.    BY MS. GREEN:  Right.  But you're not sure?

3    A.    I'm not sure.

4       MS. RETTS:  And, Amelia, I'll note for the

5    record that herein lies the problem we've been trying to

6    raise over the last few months.  We can't find people

7    from back in that time who would have had personal

8    knowledge.

9       So what we've been able to do to this point

10   is to find somebody to talk about what the policies that

11   we have found have been able to say.  We've looked.  We

12   can't find any additional policies, and you can ask him

13   about his conversations he's had to try to find more

14   things.  But that's the status of where we are because of

15   the time that has passed.

16   Q.    BY MS. GREEN:  Okay.  I think I've given you

17   Exhibit 61 and 62, and I'm ready to talk about those now

18   if that's okay.

19   A.    Sure.

20   Q.    Exhibit 61 -- you'll just see it's just another

21   report from Detective Saldate.

22   A.    Okay.

23   Q.    If you'll read the first two paragraphs of that

24   first page of the exhibit, please.

25   A.    Okay.

EXHIBIT 15

TOM VAN DORN                                        November 17, 2017
MIKE vs CITY OF PHOENIX                                    265–268

Page 265

1    Q.   Just let me know when you're done.
2    A.   Okay.
3    Q.   Turn to the next page.
4    A.   Hold on.
5    Q.   I'm sorry.  On page 2, if you look to the next
6  to last paragraph, the sentence that begins about in the
7  middle of the paragraph, "I then read him his Miranda
8  rights by card and asked him if he understood them."
9    A.   Okay.
10   Q.   And then if you look at Exhibit 30 in the big
11 notebook that's open in front of you, I think you
12 probably already have it open to the page.
13   A.   Okay.
14   Q.   So this report was -- Exhibit 61 was written in
15 October of 1989.  You have in front of you the -- a
16 policy dated October 18, '89 and begins, "Admonition of
17 rights."  Could you read just -- let's go again back to
18 Milke NSB18597.
19   A.   Okay.
20   Q.   14A through E.
21   A.   Okay.
22   Q.   Is what is described in this report a violation
23 of this policy?
24   A.   As written, no.
25   Q.   Is it a violation of this policy any other way?

Page 266

1  You qualified it with "as written."
2    A.   Yeah.  I'd have to go through the entire
3  policy.  You've asked me to look at this one section.
4    Q.   So why don't you read the page before that,
5  too, and I'll represent to you these are the only
6  policies on admonition of rights that we've been
7  provided, and I think it's the only policy -- I'll
8  represent that to you, and then you can --
9    A.   Okay.
10   Q.   So go ahead and review the previous page.
11   A.   If you want to represent to me this is the only
12 policies we have on the Phoenix Police Department in
13 1989 -- I'm using your words -- that these are the only
14 policies that exist on the admonition of a person's
15 rights in 1989, then I will answer the question.
16   Q.   I can't represent that.
17   A.   Well, then without reading C5, I'm not going to
18 answer it.
19   Q.   I'm going to say this has been what is provided
20 to us, the only policies that have been provided to us.
21 Could you please read the previous page --
22   A.   Then my answer is going to be specific to this
23 page in subsection E you've asked me to review, and, no,
24 this is not a violation of policy.
25   Q.   I'm asking you to review an additional page.

Page 267

1    A.   There's A through G on page 1914, A through G,
2  comparing it to the supplement report you've asked me,
3  there's not a violation of department policy.
4    Q.   Okay.  And, sir, I'm asking you to review an
5  additional page if that's all right.
6    A.   Which page?
7    Q.   The previous page.  So if you move this
8  notebook --
9    A.   Uh-huh.
10   Q.   -- and review admonition of rights, beginning
11 there.
12   A.   Okay.
13   Q.   So it's the previous page to what I had asked
14 you to review.
15   A.   Okay.
16   Q.   Now that you read that previous page, do you
17 believe what is described in Exhibit 61 is a violation of
18 the 1989 policy regarding admonition of rights?
19       MR. EAVES:  Objection.  Foundation.
20 Speculation.  Calls for a legal conclusion.
21       THE WITNESS:  It is not a violation of
22 operations or C5, subsection 14.  I cannot say it's not a
23 violation of another Phoenix Police Department policy.
24   Q.   BY MS. GREEN:  And can you say whether it's a
25 violation of the Phoenix Police Department policy right

Page 268

1  now?
2    A.   Yes, it should be because, again, you don't ask
3  somebody any questions who doesn't understand their
4  rights.
5    Q.   Okay.
6    A.   And that's how we're trained.
7    Q.   Okay.  And as far as you know, that's how folks
8  were trained back in the 1980s as well?
9    A.   Correct.
10       MS. RETTS:  Form and foundation.  Outside
11 the scope.
12   Q.   BY MS. GREEN:  And for a suspect to be
13 disciplined -- I mean -- withdrawn.
14       For an officer to be disciplined with
15 respect to that conduct, it has to be an explicit
16 violation of some written policy or manual or something
17 of that nature?
18   A.   You can't discipline somebody for something
19 that doesn't exist.
20   Q.   Okay.  And so let me -- so unless there's a
21 policy -- a written policy that says you cannot continue
22 to question a suspect when they say they don't understand
23 their rights, an officer would not be subject to any
24 discipline?
25   A.   No.  And I believe I provided you examples as

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
269–272

Page 269

1  to when we still can proceed with an investigation in
2  previous testimony.
3      Q.    Okay.  Could you refresh my recollection of
4  those examples because I don't remember them.  Sorry.
5      A.    Neglect of duty, failure to complete my duties
6  of anything that could prove discredit upon the police
7  department, unprofessionalism, failure to abide by
8  training requirements.
9      Q.    So what you've read here in Exhibit 61 --
10     A.    Could be considered neglect of duty because I
11  have been trained to not question a suspect who does not
12  understand their rights.
13     Q.    When suspect responds no to understanding his
14  rights once and then a detective then interviewed --
15  enters the room having heard that and asks him what he
16  didn't understand about his rights and the suspect
17  refuses to respond and then crawls underneath the table
18  and then subsequently the suspect is read his rights
19  again and the suspect immediately says no to the question
20  asked if he understood them, that was not a violation of
21  the 1989 Miranda policy that you've reviewed here today?
22          MS. RETTS:  Form.
23          MS. BERKE:  Asked and answered.
24          MS. RETTS:  Vague.
25          THE WITNESS:  Again, it is not a violation

Page 270

1  of operations order C5, paragraph 14, A through G.
2  However, it could still be a violation of another Phoenix
3  Police Department policy, i.e., go to the discipline
4  policy.  It could still be considered neglect of duty
5  because we train our officers to not ask questions when
6  somebody does not understand their rights.
7      Q.    BY MS. GREEN:  Okay.  I'd like you to take a
8  look at Exhibit 62.
9      A.    Okay.
10     Q.    Okay.  Just read the information on the first
11  page.  Let me know when you're finished.
12     A.    Okay.
13     Q.    So my understanding is that this is a report
14  from a detective named Detective Martinson --
15     A.    Okay.
16     Q.    -- who is in this case indicating that the
17  deputy county attorney declined prosecution because
18  there's no likelihood of conviction.
19     A.    Correct.
20     Q.    And then he says, "See attached charging
21  transmittal form for further details."
22     A.    Okay.
23     Q.    Can you look at the next page which -- correct
24  me if I'm wrong -- begins with, "Charging transmittal
25  form"?

Page 271

1      A.    Okay.
2      Q.    And it provides -- and it says "no likelihood
3  of conviction."  Correct?
4      A.    Correct.
5      Q.    And it provides a number of reasons for no
6  likelihood of conviction?
7      A.    Correct.
8      Q.    And it says, "Defendant said he did not
9  understand his Miranda rights."
10     A.    Correct.
11     Q.    And it also says, "Defendant highly intoxicated
12  when interviewed."
13     A.    Correct.
14     Q.    And based on this exhibit, it appears it was
15  transmitted to the Phoenix Police Department?
16     A.    Yes.
17     Q.    In fact, one of the detectives on the case
18  attached it to one of his supplemental reports?
19     A.    Yes.
20     Q.    If a supervisor reviewed this report, would you
21  expect the detective who continued questioning the
22  suspect to be disciplined in any way?
23     A.    To be investigated and potentially disciplined
24  if I received this, yes.
25     Q.    Okay.  What about in the 1980s?

Page 272

1      A.    Yes.
2      Q.    So an investigation would be required?
3      A.    Yes.
4      Q.    And if the allegations were sustained -- I'm
5  sorry.  If the conduct was found to have occurred,
6  discipline should have also happened?
7      A.    If it was sustained, yes.
8      Q.    Okay.  And here the prosecutor's describing
9  that the suspect couldn't be prosecuted at all because of
10  the detective's conduct.  Correct?
11          MS. BERKE:  Objection.  Misstates evidence.
12          MS. RETTS:  Form and foundation.
13          THE WITNESS:  I would disagree with that.
14  They've cited no reasonable likelihood of conviction.
15  That doesn't mean that the case can't still be
16  prosecuted.
17     Q.    BY MS. GREEN:  It appears the prosecutor
18  decided not to continue prosecuting the case in part
19  because of a Miranda violation.  Correct?
20          MS. RETTS:  Form and foundation.  Outside
21  the scope.
22          THE WITNESS:  Yeah, and I don't know --
23  aside from seeing these exact reasons, you know, again,
24  could the case still have been prosecuted based on
25  additional evidence other than what the person may have

EXHIBIT 15

TOM VAN DORN                                      November 17, 2017
MIKE vs CITY OF PHOENIX                                    273–276

Page 273

1    talked to in Miranda?  So I don't know without reading
2    all of the exact reasons why he felt that there was no
3    reasonable likelihood of conviction.
4            Just because a statement gets tossed out
5    does not mean a person still can't be prosecuted.
6    Q.   BY MS. GREEN:  Okay.  But if a supervisor was
7    reading -- you would expect a supervisor if they were
8    properly supervising under the discipline policy which
9    you've already told us requires supervisors to actively
10   supervise and monitor the activities of those in their
11   rank, you would expect them to at the very least launch
12   an investigation on the basis of this document.  Correct?
13           MS. RETTS:  Form.  Asked and answered.
14           MS. ODEGARD:  Object to form.
15           THE WITNESS:  Yes.
16   Q.   BY MS. GREEN:  And if the supervisor did not,
17   that supervisor would also be engaging in misconduct.
18   Correct?
19           MS. ODEGARD:  Object to form.  Vague.
20           MS. RETTS:  Form.
21           MS. GREEN:  Let's take a quick break.
22           (A recess was held off the record.)
23           MS. GREEN:  Can you mark this, please.
24           (Exhibit 85 was marked for identification.)
25   Q.   BY MS. GREEN:  I just handed you what's been

Page 274

1    marked as Exhibit 85.
2    A.   Okay.
3    Q.   Yet again it's a report by Detective Saldate
4    with respect to a suspect interrogation.  His name is
5    Michael Mahler.
6    A.   Okay.
7    Q.   I want you to read the bottom two paragraphs on
8    the first page of the exhibit, please -- I'm sorry -- the
9    next to last --
10   A.   The third paragraph?
11   Q.   Yeah, the third paragraph is fine.
12   A.   Okay.
13   Q.   Okay.  In this case, when the suspect told
14   Detective Saldate, quote, he did not want to talk about a
15   murder because he knew that the State could make him
16   swallow a pill for murder, would that be an invocation of
17   the right to remain silent under the admonition-of-rights
18   policy that I've showed you here today?
19   A.   No.
20   Q.   Okay.  Why not?
21   A.   Because he's not saying he doesn't want to talk
22   to the officer about anything or invoking his complete
23   right to remain silent.  He's just saying he doesn't want
24   to talk about that murder.
25   Q.   Okay.  And so in this instance, if a supervisor

Page 275

1    became aware of this -- and so -- withdrawn.
2            So when Detective Saldate then says to the
3    suspect, "I then explained to him that I had a good case
4    on him and that I was not there to get his admissions but
5    more important to get his side of the story" --
6    A.   Are we still in paragraph 3?
7    Q.   We're now in paragraph 4.
8    A.   Okay.
9    Q.   I'm sorry.  Why don't you take a chance to read
10   it.
11   A.   Thank you.
12   Q.   Honestly just the first two sentences is fine.
13   A.   Okay.
14   Q.   So when Detective Saldate in response to the
15   suspect saying he did not want to talk about a murder
16   because he knew that the State could make him swallow a
17   pill for murder and then Saldate responded that, "I had a
18   good case on him and that I was not there to get his
19   admissions but more important to get his side of the
20   story," that would not be a violation of the 1989 Miranda
21   policy that you've reviewed here today?
22   A.   No.
23           MS. RETTS:  Form.
24           THE WITNESS:  Sorry.
25   Q.   BY MS. GREEN:  Okay.  Therefore, no

Page 276

1    investigation would be required?
2    A.   Correct.
3    Q.   And certainly no discipline would be required?
4    A.   No investigation, no discipline.
5    Q.   Okay.  And does that remain true to this day of
6    Phoenix Police Department policies to the best of your
7    knowledge, that no investigation of this conduct we've
8    been talking about would be required?
9            MS. RETTS:  Form.
10           THE WITNESS:  For this?
11   Q.   BY MS. GREEN:  Yes.
12   A.   Yeah, there's no violation of department policy
13   here.
14   Q.   Okay.  Even the policy today, no violation?
15   A.   No, no.  That being said, we've gone to a
16   completely computerized system and stuff now.  So let me
17   explain how we do things today since that was your
18   question.
19   Q.   Sure.
20   A.   We have what's called IA Pro which allows us to
21   do what we call blue team entries.  So it's not a
22   full-blown investigation, but it's a computer system that
23   allows supervisors and officers to make documentation in
24   entries on anything that we may want to choose to make in
25   department entries.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
277–280

Page 277

1    So in this day and age, I may still sit here
2  and say, Hey, while we're reviewing police report
3  whatever, everything else, I noticed that this particular
4  statement was made, not seeing a violation of stuff here
5  if I feel it needs to go into the system.
6    Q.   Okay.  But you have not just described an
7  investigation.  Correct?
8    A.   No.
9    Q.   Therefore, today if someone -- if this occurred
10  today, it would not be a violation of Phoenix Police
11  Department policy?
12    A.   No.
13    Q.   And there would be no investigation of the
14  conduct?
15    A.   No formal investigation but a record will exist
16  that I still may have read this, and these were my
17  observations and those types of things as a supervisor in
18  the internal affairs system that we have on file.
19    Q.   Okay.  So there might be a record of
20  observation but no investigation of the conduct?
21    A.   Correct.
22    Q.   Okay.  And so fair to say, as far as you
23  understand it, nothing has changed between 1989 and today
24  regarding whether or not the type of conduct that's
25  described in Exhibit 85 would be investigated?

Page 278

1    MS. RETTS:  Form.
2    THE WITNESS:  I don't -- I don't see a
3  violation of department policy in this report that you've
4  given me.
5    Q.   BY MS. GREEN:  Right.  Based on what you've
6  read in the report regarding the suspect saying he did
7  not want to talk about a murder because he knew the State
8  could make him swallow a pill for murder and the officer
9  responding he's not there to get admissions but more
10  important to get his side of the story and continuing to
11  talk to him after that, no violation in 1989 up -- and
12  you have no reason to believe that it would have been a
13  violation -- a violation at any point between 1989 and
14  today of the department's Miranda policy?
15    MS. RETTS:  Form.
16    THE WITNESS:  No reason to believe, no.
17    Q.   BY MS. GREEN:  Okay.  I want you to refer now
18  to what's been previously marked as Exhibit 68, again,
19  another report from Detective Saldate.  This one has
20  supplement date 12/29/1989.  It relates to his interview
21  of suspect Eric John King.  I want to direct you to the
22  second page of this exhibit.  First, I will direct you to
23  the first paragraph on that second page.
24    A.   Okay.
25    Q.   Kind of down towards the bottom of the

Page 279

1  paragraph, it says, "I then asked Eric to read the
2  Miranda rights out loud to me.  He did without any
3  problem."  Okay?
4    A.   Well, I'm going to read the whole paragraph
5  then.  Not going to give an opinion based upon one
6  sentence.
7    Okay.
8    Q.   Would you agree that this report indicates that
9  the officer read the suspect his Miranda rights?
10    A.   Yes, he did.
11    Q.   Now I want to direct you to the third paragraph
12  on the page.
13    A.   Okay.
14    Q.   Just the first sentence.
15    A.   Okay.
16    Q.   The suspect says, "Look, I know the game.  I
17  know exactly what you're trying to do, but I'm not going
18  to answer any more of your questions."
19    A.   Yes.
20    Q.   Would that be considered an implication of the
21  right to silence under the 1989 admission-of-rights
22  policy that I've showed you today?
23    A.   Yes.
24    MS. RETTS:  Form.
25    THE WITNESS:  It's clearly invoking his

Page 280

1  right to remain silent.
2    Q.   BY MS. GREEN:  So under the 1989 policy I
3  showed you today -- we've talked about it at length.
4    A.   Yes, we have.
5    Q.   After that, the officer was supposed to cease
6  questioning immediately under that policy.  Correct?
7    A.   Under the policy, yes.
8    Q.   And, therefore, if you did not cease
9  questioning immediately or cease the interrogation
10  immediately or cease the interview immediately, he
11  violated the Phoenix Police Department policy at that
12  time.  Correct?
13    A.   Yes.
14    MS. RETTS:  Form.
15    Q.   BY MS. GREEN:  And that violation of the
16  Phoenix Police Department policy, if an officer --
17  withdrawn.
18    That violation of Phoenix Police Department
19  policy -- if the supervisor became aware of it, for
20  example, by reading this report, the supervisor was
21  required to investigate that officer.  Correct?
22    A.   Yes, would have investigated it.
23    Q.   And what would that investigation entail?
24    MS. RETTS:  Form.
25    THE WITNESS:  No different than we talked

EXHIBIT 15

TOM VAN DORN                                    November 17, 2017
MIKE vs CITY OF PHOENIX                                  281–284

Page 281

1   about before, obtaining a copy of the police report,
2   interviewing the officer, interviewing the defendant and
3   gathering a bunch of documents and proceeding with the
4   investigation from there.
5       Q.   BY MS. GREEN:  Okay.  So at the very least, the
6   investigation would entail reviewing the report.
7       A.   Uh-huh.
8       Q.   Correct?  It would entail interviewing the
9   officer.  It would entail interviewing anyone else who
10  might have knowledge about this particular issue?
11      A.   Correct.
12      Q.   Can you think of anything else the
13  investigation would entail?
14          MS. RETTS:  Form.
15          THE WITNESS:  Specific to that allegation?
16      Q.   BY MS. GREEN:  Yeah, investigating this policy
17  violation.
18          MS. ODEGARD:  Form.  Foundation.
19          MS. RETTS:  Form.
20          THE WITNESS:  Specific to this violation?
21      Q.   BY MS. GREEN:  Yes, sir.
22      A.   I can't think of anything else that would
23  necessarily be needed.
24      Q.   And if the officer admitted that what he
25  indicated in his report is in fact what did occur, the

Page 282

1   supervisor would be required to discipline that officer.
2   Correct?
3           MS. RETTS:  Form.
4           THE WITNESS:  The supervisor would be
5   required to sustain the allegation, and then from there,
6   the discipline would be decided by the chain of command
7   and ultimately by the police chief.
8       Q.   BY MS. GREEN:  Okay.  And that --
9       A.   And we've already covered that I cannot answer
10  what the level of discipline would be for a Miranda
11  violation.
12      Q.   But we also discussed that a Miranda violation
13  is a serious constitutional violation.  Correct?
14      A.   Under today's policies, yes.
15      Q.   Okay.  But you can't tell me one way or the
16  other whether or not it's a serious policy violation
17  under the policies back then?
18      A.   Because it's not specifically mentioned.
19  There's only 20 different categories that are listed.  I
20  can't tell you where they would have classified a
21  violation of this E in those 20 categories back in the
22  1980s.
23      Q.   So on the basis of this policy, Exhibit 82, you
24  can't tell me anything about the level of discipline that
25  would be used when this violation was sustained?

Page 283

1       A.   That continues to be my testimony with all of
2   these cases.  I do not know where they classified Miranda
3   policy violation in the 1980s in one of those 20
4   categories.  They could have put it in neglect of duty.
5   They could have put it into unprofessionalism.  I don't
6   know what the level of classification was.
7       Q.   Okay.  And the policy doesn't tell you anything
8   about that?
9       A.   It does not.  This specific policy, no.
10      Q.   Fair to say then the policy does not require
11  any particular level of discipline.  Correct?
12      A.   This specific policy appears to not have a
13  level of discipline classification.
14      Q.   Do you have any reason to believe as you sit
15  here today that back in the 1980s such a violation --
16  such a Miranda violation would only be disciplined with
17  an oral reprimand or a written reprimand?
18          MS. RETTS:  Form.  Foundation.
19          THE WITNESS:  Again, I would hope not, but I
20  can't tell you what they did back in the 1980s.
21      Q.   BY MS. GREEN:  Okay.  And what about multiple
22  sustained Miranda violations?  Would you expect in the
23  1980s on the basis of this policy multiple sustained
24  Miranda violations would lead to termination?
25          MS. BERKE:  Foundation.

Page 284

1           MS. RETTS:  Form.  Vague.  Vague as to
2   period of time.
3           THE WITNESS:  I would hope that multiple
4   violations, yes, would result in likely termination from
5   the department.  That is my personal opinion.  What they
6   did back in the day, I cannot answer that question.
7       Q.   BY MS. GREEN:  Today, based on your experience
8   in the department, would multiple sustained Miranda
9   violations result in termination?
10      A.   Knowing the police chief like I do right now,
11  the answer to that question is likely yes.
12      Q.   Just likely yes.  You're not sure one way or
13  the other?
14      A.   I'm not the police chief, ma'am.
15      Q.   So today it's totally at the discretion of the
16  police chief?
17      A.   Correct.
18      Q.   If someone is terminated, it's completely at
19  the discretion of the police chief?
20      A.   She's the only one that can terminate you.
21      Q.   Okay.  Do you have any reason to believe that
22  back in the 1980s multiple sustained Miranda violations
23  would not lead to termination?
24      A.   Again, I do not know how they classified
25  Miranda violations back in the 1980s.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
285—288

Page 285

1    Q.    Do you have any reason to believe that multiple
2    sustained violations back in the late 1980s would not
3    have led to termination?
4        A.    I don't know how they classified violation of
5    Miranda back in the 1980s to know what the level of
6    discipline would have been.
7        Q.    What steps would you take to find that
8    information out?
9        A.    Find me somebody who worked in the internal
10   affairs unit of the police department in the 1980s and
11   you would have to ask them or I would have to ask them
12   that question.
13       Q.    So you think somebody who worked in the police
14   department in the 1980s would be able to answer that
15   question?
16       A.    Yes.
17           MS. ODEGARD:  Form.
18           MS. RETTS:  Form and foundation.
19           THE WITNESS:  Should be able to answer that
20   question, yes.
21       Q.    BY MS. GREEN:  Is there anything else you would
22   do if you were trying to find out the answer to that
23   question?
24       A.    No.  Find people who worked there.
25       Q.    There's not a particular document you would

Page 286

1    look for or anything like that?
2        A.    Other than policies and procedures and what's
3    already been produced.  So it's still not going to
4    answer.  If they don't tell me, then I don't know how
5    they classified things.  You're going to have to refer to
6    specific individuals employed by the department back then
7    if there's nothing to read to let me know where it was
8    classified.
9        Q.    Okay.  Do you have any reason to believe they
10   actually did classify things the way you're describing
11   right now?  So you've talked about this classification
12   system quite a bit, and it seems like there is a pretty
13   set classification system right now.  Correct?
14       A.    They clearly had to classify something because,
15   again, you got suspensions, oral, written reprimands,
16   terminations, demotions.  So there had to be some level
17   of classification back then.
18       Q.    But you described, for example, this would be a
19   level 3 violation?
20       A.    Uh-huh.
21       Q.    And that's the way it works, I assume?
22       A.    Class 3 violation.
23       Q.    Class 3.  They have different classes that are
24   numbered.  Correct?
25       A.    Correct.

Page 287

1        Q.    Do you have any reason to believe that back in
2    the 1980s there were different numbered classifications
3    that lead to a particular type of discipline if your
4    conduct is found to have applied to that level of
5    classification?
6        A.    Well, clearly, no, the policies don't indicate
7    any level of class.  It just indicates what they would
8    discipline people for up to and including termination,
9    but it doesn't tell me for every specific policy
10   violation where they classify things like it does now.
11       Q.    But you have no reason to believe that they
12   classify things like they do now -- they classify things
13   back in the 1980s the way they do now, do you?
14       A.    Completely different systems.
15       Q.    Right.  So when you're saying, I need to know
16   how they classified things back in the 1980s, you're not
17   actually sure that they in fact did classify things at
18   different levels, 1 through 4, for example, back in the
19   1980s.  Correct?
20       A.    I didn't use 1 through 3 in the 1980s example.
21   What I told you is they classified things as oral,
22   suspensions, demotions, terminations and those things.
23   That is a classification.  Doesn't mean that it fits
24   within -- a class 1 right now is eight- or 24-hour
25   suspension.  Our class 2 is a 40-, 80-, 120-hour

Page 288

1    suspension.  A class 3 is a 240 hour or a termination.
2           Just because you don't see class 1, 2 and 3
3    doesn't mean that those classifications didn't exist.
4    They just didn't put them in that order because you will
5    still see written reprimands, oral reprimands,
6    terminations, demotions, suspensions.
7        Q.    But it may well be, for example, that this
8    policy is the only policy that was in place back then,
9    and there was no specific if this occurs, this happens.
10   If, for example, a Miranda violation occurs, it's a
11   written reprimand classification or above, or if an
12   excessive-force violation occurs, it is suspension or
13   above.  It may well be based on this policy that it was
14   simply in the supervisor's discretion.  Right?
15           MS. RETTS:  Form and foundation.
16           THE WITNESS:  That's what I testified to.  I
17   cannot tell you how they classified the level of
18   discipline.
19       Q.    BY MS. GREEN:  And I can -- I can actually show
20   you -- how about you turn to page discipline 12.
21       A.    Just to clarify, '89, '85?  What year are we
22   going here?
23       Q.    I'll show you the same page on '91.
24       A.    What exhibit are you on, ma'am?
25       Q.    Exhibit 82.

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
289–292

Page 289

1    A.    Okay.  Discipline 12.

2    Q.    You see H?  "If an investigation sustains an

3  allegation against an employee, a supervisor will

4  recommend the disciplinary action he feels should be

5  taken.  If the recommendation is for a suspension, a

6  supervisor will not specify the number of hours."

7    A.    Okay.

8    Q.    So it seems like it's up to the supervisor to

9  determine the -- level of discipline that should be

10  recommended --

11    A.    That's what I testified to.  They're making a

12  classification determination.

13    Q.    Right.  So it may well be it's completely in

14  the supervisor's discretion.  There's nothing in the

15  policy that says this violation leads to this type of --

16    A.    If you notice, it's a recommendation.

17    Q.    Right.  And I'm asking you something different.

18  It may well be, based off what you've seen here today,

19  that it's completely within the supervisor's discretion,

20  and there is no set classification system for a

21  particular violation?

22    A.    I would disagree with your statement.

23    Q.    Okay.  What in these documents have you seen

24  that makes you disagree with that statement?

25    A.    Because, again, it is a recommendation from the

Page 290

1  supervisor to higher level chains of command that could

2  either accept that recommendation or change the

3  recommendation and go with a higher or lesser decision.

4    Q.    Right.  But it's all discretionary.  There is

5  no particular classification system.  Correct?

6        MS. RETTS:  Form and foundation.

7        THE WITNESS:  They're still making a level

8  of classification, yes.

9    Q.    BY MS. GREEN:  But there's no particular system

10  that says this violation leads to a particular

11  discipline.  It's discretionary decisions?

12        MS. RETTS:  Asked and answered.

13  Argumentative.

14        THE WITNESS:  Yes.

15    Q.    BY MS. GREEN:  Now, you were involved in -- I

16  think we've already talked about the search for Detective

17  Saldate's personnel file back in 2001.

18    A.    Uh-huh.

19    Q.    And you've reviewed your documents -- I'm

20  sorry -- the documents relating to that search and your

21  involvement in that search in preparation to testify here

22  today.  Correct?

23    A.    I reviewed the letters that I wrote when I

24  would have turned over the documents.  I did not go back

25  and rereview the actual documents I produced with my

Page 291

1  letter.

2    Q.    Okay.  And you reviewed -- you mentioned to me

3  you reviewed the Court order as well --

4    A.    Yes.

5    Q.    -- requiring the production of the documents?

6    A.    Yes.

7        MS. GREEN:  I'm going to mark this as

8  Exhibit 86.

9        (Exhibit 86 was marked for identification.)

10        MR. EAVES:  How much longer do you have?

11        MS. GREEN:  I'm going to try to finish a

12  little bit after 5.  I'm just going to do a couple

13  questions on the personnel file, and I'll be done for

14  today.

15        I'm ending because Artie asked that we stop

16  at 5:00.  I'm not done with my questioning.  So if you

17  guys want to comply with his request to stop at 5:00, I

18  was going to do that, and Mr. Van Dorn said he needed to

19  stop at 5:30 as well.  So we'll just --

20        MS. BERKE:  How much time do you have left?

21        MS. GREEN:  I'm not sure.  We're going to be

22  asking for more than seven hours with this witness given

23  the scope of the 30(b)(6) notice and given the number of

24  topics.

25        MR. EAVES:  We need to make a record of the

Page 292

1  break times today and how much off-the-record time we've

2  had in light of that.

3        (A discussion was held off the record.)

4        MR. EAVES:  What do you guys want to do?

5        MS. GREEN:  After Artie indicated he had to

6  leave at 5:00 p.m. today, we determined we were going to

7  stop at 5:00 p.m.

8        MS. RETTS:  So you've got a minute left

9  then.  Are you going to question him?

10        MS. GREEN:  Yeah, I'm going to do a few more

11  questions on this.  I'm not going to stop at exactly 5:00

12  p.m. because I would like to get through this portion.

13  The reason I'm doing a few more questions on this is

14  because he told me he didn't review the documents that

15  were produced.  I would have expected he had since he's

16  here to testify on this topic.

17        So I'm giving him the exhibits so he can

18  take a look at it.  Had he reviewed them, we could

19  probably be done by now.

20    Q.    BY MS. GREEN:  Have you --

21    A.    Yep.

22    Q.    Have you had a chance to take a look through

23  Exhibit 86?

24    A.    Yes, yes.

25    Q.    So these are the documents that were produced

EXHIBIT 15

Page 293

1  to the Court in 2001 with regard to that Court order that
2  you indicated that you reviewed?
3     A.   Yes.
4     Q.   And I'm sorry.  The documents are quite dark,
5  but there is a separation notice within the documents.
6  I'm sorry.  I can't tell you the Bates number.  It's
7  been -- it's gotten blacked out.  If you look for a
8  separation notice, though, it's a few pages in.
9     A.   Yeah, the employee separation report --
10  separation notice.
11     Q.   Oh, yeah, after the separation report, yes --
12     A.   Okay.
13     Q.   -- the separation notice.
14     A.   Yes.
15     Q.   Since you haven't reviewed these documents in
16  connection -- in order to prepare to testify about your
17  production of the personnel file in 2001, I can represent
18  to you and you can take a look after we're done today in
19  case you want to confirm that this is the only
20  disciplinary document that was produced back in 2001.
21  Okay?
22     A.   Okay.
23     Q.   Detective Saldate has testified in the past
24  that this separation notice and the discipline
25  surrounding this separation notice is the only discipline

Page 294

1  that he received during his career at the Phoenix Police
2  Department.
3     A.   Okay.
4     Q.   Do you have any reason to dispute that as you
5  sit here today?
6     A.   I don't.
7        MS. GREEN:  Okay.  That's it.
8        Oh, actually, for the record, I'll just
9  indicate that we intend -- we have more questioning, and
10  we intend to continue the deposition.  We're stopping at
11  5:00 p.m. today because counsel for the County let us
12  know after the lunch break that he had to end at 5:00
13  p.m. today.
14        We -- given the expansive amount of topics
15  in our 30(b)(6) notice, we intend to continue the
16  30(b)(6) deposition including the 30(b)(6) deposition of
17  Commander Van Dorn, and we've discussed with counsel for
18  the City that at least two other witnesses will be
19  produced with respect to this 30(b)(6) deposition as
20  well.
21        MS. RETTS:  I would like to note we may
22  produce two.  If we can find one person, we will for the
23  other topics that weren't identified.  Are you intending
24  to question him if we move forward on another date on --
25  which topics on the 30(b)(6)?

Page 295

1        MS. GREEN:  I can't let you know that right
2  now.
3        MS. RETTS:  All right.
4        MS. GREEN:  I'm not sure right now, but we
5  can -- I'm happy to meet and confer about it before a
6  further date.
7        MS. RETTS:  I would just like to note --
8  have the court reporter note for the record the number of
9  breaks that were taken, and there was extensive
10  questioning on preparation when the witness was here
11  ready to answer questions, an inordinate amount of time
12  spent on preparation that could have been better served
13  asking and answering questions about policies and
14  procedures and topics that were designated for today.
15        MR. EAVES:  For the record, the depo started
16  at 9 o'clock today.  We took a 45-minute break for lunch
17  and breaks approximately every 30 minutes for counsel to
18  go outside and ask, I'm assuming, Nick Brustin questions
19  on what to do next, and it's been a very, very lengthy
20  process throughout the day.
21        MS. GREEN:  We took a 45-minute break for
22  lunch upon agreement of all counsel.
23        MR. EAVES:  We did, that's true.
24        MS. RETTS:  Which was the only break that we
25  had specifically requested minus maybe one bathroom

Page 296

1  break, and so we'll reserve the right to do follow-up
2  questions of this witness depending on what the Court
3  orders.  Thank you.
4        (Whereupon the proceedings ended at
5  5:04 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT 15

TOM VAN DORN
MIKE vs CITY OF PHOENIX

November 17, 2017
297–300

Page 297

```
1              CERTIFICATE OF REPORTER
2    STATE OF ARIZONA      )
                           )
3    COUNTY OF MARICOPA    )
4
5        I, Sommer E. Greene, a Certified Reporter in the
     State of Arizona, do hereby certify that the foregoing
6    deposition was taken before me in the County of Maricopa,
     State of Arizona; that an oath or affirmation was duly
7    administered to the witness, TOM VAN DORN, pursuant to
     A.R.S. 41-324(B); that the questions propounded to the
8    witness and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
9    typewriting; that the transcript is a full, true and
     accurate record of the proceeding, all done to the best
10   of my skill and ability; and that the preparation,
     production and distribution of this transcript and copies
11   of the transcript comply with the Arizona Revised
     Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
12           The witness herein, TOM VAN DORN, has
     requested signature.
13           I FURTHER CERTIFY that I am in no way related
     to any of the parties nor am I in any way interested in
14   the outcome hereof.
15
             IN WITNESS WHEREOF, I have set my hand in my
16   office in the County of Maricopa, State of Arizona, this
     2nd of December, 2017.
17
18
19   ------------------------------
             Sommer E. Greene, RPR, CRR
20           Certified Reporter 50622
21
     /S/
22   _____
     For Esquire Deposition Solutions
23   Registered Reporting Firm No. R1048
24
25
```

Page 298

```
1    Debra Milke v. City of Phoenix, et al.
     ASSIGNMENT NUMBER 684841
2
3           DECLARATION UNDER PENALTY OF PERJURY
4           I declare under penalty of perjury that I
5    have read the entire transcript of my deposition taken in
6    the above-captioned matter or the same has been read to
7    me, and the same is true and accurate, save and except
8    for changes and/or corrections, if any, as indicated by
9    me on the DEPOSITION ERRATA SHEET hereof, with the
10   understanding that I offer these changes as if still
11   under oath.
12
13   Signed on the_____ day
14   of _____ 20__.
15
16
17
18   _____
     TOM VAN DORN
19
20
21
22
23
24
25
```

Page 299

```
1              DEPOSITION ERRATA SHEET
               ASSIGNMENT NUMBER 684841
2
3    Page No.___ Line No.___ Change to:_____
4    _____
5    Page No.___ Line No.___ Change to:_____
6    _____
7    Page No.___ Line No.___ Change to:_____
8    _____
9    Page No.___ Line No.___ Change to:_____
10   _____
11   Page No.___ Line No.___ Change to:_____
12   _____
13   Page No.___ Line No.___ Change to:_____
14   _____
15   Page No.___ Line No.___ Change to:_____
16   _____
17   Page No.___ Line No.___ Change to:_____
18   _____
19   Page No.___ Line No.___ Change to:_____
20   _____
21   Page No.___ Line No.___ Change to:_____
22   _____
23   Page No.___ Line No.___ Change to:_____
24   TOM VAN DORN
25   Signature:_____
```

Page 300

```
1              DEPOSITION ERRATA SHEET
2              ASSIGNMENT NUMBER 684841
3    Page No.___ Line No.___ Change to:_____
4    _____
5    Page No.___ Line No.___ Change to:_____
6    _____
7    Page No.___ Line No.___ Change to:_____
8    _____
9    Page No.___ Line No.___ Change to:_____
10   _____
11   Page No.___ Line No.___ Change to:_____
12   _____
13   Page No.___ Line No.___ Change to:_____
14   _____
15   Page No.___ Line No.___ Change to:_____
16   _____
17   Page No.___ Line No.___ Change to:_____
18   _____
19   Page No.___ Line No.___ Change to:_____
20   _____
21   Page No.___ Line No.___ Change to:_____
22   _____
23   Page No.___ Line No.___ Change to:_____
24   TOM VAN DORN
25   Signature:_____
```

EXHIBIT 15

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

--oOo--

Debra Jean Milke,                    )
                                     )
                                     )
Plaintiff,                           )
                                     )
    vs.                              )        Case No.
                                     ) 15 Civ. 462-PHX-ROS
City of Phoenix, et al.,             )
                                     )
                                     )
Defendants.                          )
_____    )

DEPOSITION OF TOM VAN DORN

individually and as the 30(b)(6) of City of Phoenix

April 26, 2018

9:08 a.m.

1313 East Osborn Road, Suite 100

Phoenix, Arizona

Sandra L. Munter, CSR No. 50348

## Page 2

1          DEPOSITION OF TOM VAN DORN,
2      individually and as 30(b)(6) of City of Phoenix,
3  was taken on April 26, 2018, commencing at 9:08 a.m., at
4  KIMERER & DERRICK, P.C., 1313 East Osborn road, Suite 100,
5  Phoenix, Arizona 85014, before Sandra L. Munter, Certified
6  Reporter No. 50348 for the State of Arizona.
7
8  APPEARANCES
9  For the Plaintiff, Debra Jean Milke:
10      BY:  NICK J. BRUSTIN, ESQ.
                 and
11           KATIE McCARTHY, ESQ.
         NEUFELD SCHECK & BRUSTIN, LLP
12       99 Hudson Street
         8th Floor
13       New York, New York 10013
         212.965.9081
14       nick@nsbcivilrights.com
15  For the Defendant, City of Phoenix:
16      BY:  CHRISTINA RETTS, ESQ.
         WIENEKE LAW GROUP, PLC
17       1095 West Rio Salado Parkway
         Suite 209
18       Tempe, Arizona 85281
         602.715.1868
19       cretts@wienekelawgroup.com
20  For the Defendant Armando Saldate:
21      BY:  LORI V. BERKE, ESQ.
         BERKE LAW FIRM
22       1601 North Seventh Street
         Suite 360
23       Phoenix, Arizona 85006
         602.254.8800
24       lori@berkelawfirm.com
25

## Page 3

1  For the Defendant Silverio Ontiveros:
2      BY:  SALLY A. ODEGARD, ESQ.
         HOLLOWAY ODEGARD & KELLY, P.C.
3       3020 East Camelback Road
         Suite 201
4       Phoenix, Arizona 85016
         602.240.6670
5       sodegard@hoklaw.com
6  For the Defendant Maricopa County:
7      BY:  NICOLE M. STEWART, ESQ.
         SANDERS & PARKS
8       3030 North Third Street
         Suite 1300
9       Phoenix, Arizona 85012-3099
         602.532.5698
10      Nicole.Stewart@SandersParks.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1                I N D E X
2   WITNESS:
3  TOM VAN DORN
4              EXAMINATION
5                                             Page
6  By Mr. Brustin                               6
   By Ms. Retts                               325
7
8            E X H I B I T S
9  Number                                     Page
10   110     State v Staatz                    23
            159 Ariz. 411 (1988)
11          (6 pages)
12   111     Law Enforcement Officers' Manual  68
            C_027497 - 027600
13
14   112     Second Amended Notice of Rule     93
            30(b)(6) Deposition For The
15          City of Phoenix
            (7 pages)
16   113     State v Finehout                  244
            136 Ariz. 226 (1983)
17          (5 pages)
18   114     Reporter's Transcript of          309
            Proceedings
19          Volume V of VII-Trial
            June 6, 1983
20          MILKE_NSB031669-31737
21   115     Phoenix Police Academy            330
            Class 84 Roster
22          July 22, 1969
            (35 pages)
23
24
25



EXHIBIT 15

TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                           5–8

Page 5

                    RECESSES
                                                    Page
(Recess at 10:39 a.m.; resumed at 10:51 a.m.)        93
(Recess at 12:35 p.m.; resumed at 1:21 p.m.)        184
(Recess at 2:29 p.m.; resumed at 2:39 p.m.)         234
(Recess at 2:56 p.m.; resumed at 2:46 p.m.)         246
(Recess at 5:09 p.m.; resumed at 5:19 p.m.)         324

Page 6

1            DEPOSITION OF TOM VAN DORN
2      individually and as 30(b)(6) or City of Phoenix
3               April 26, 2018
4
5                 TOM VAN DORN,
6   the witness herein, having been first duly sworn, was
7   examined and testified as follows:
8
9                 EXAMINATION
10  BY MR. BRUSTIN:
11       Q    Is it Commander --
12       A    Yes.
13       Q    -- Van Dorn?
14       Good morning, Commander.  My name is Nick
15  Brustin.  I'm one of the attorneys for the plaintiff.  I'll
16  be questioning you today.
17       A    Okay.
18       Q    You've been the legal adviser for how long?
19       A    I'm no longer the legal adviser.  I was for --
20  always refer to my resume -- like seven, eight years.
21            MS. BERKE:  Now we can't hear him.  Turn the
22  fan off, please.
23            (An off-the-record discussion ensued.)
24       Q    (By Mr. Brustin) Okay.  What years were you the
25  legal adviser?  And I'll try not to be repetitive, I really

Page 7

1   will.
2        A    I was assigned to the legal -- let me clarify
3   your actual question there.
4            Actual status as a legal adviser, obviously,
5   wasn't until I graduated law school and became a member of
6   the bar, but I was assigned to the legal unit for years
7   prior to that --
8        Q    Okay.
9        A    -- acting kind of as a legal assistant and those
10  types of things.  Let's see.  Went to law school 2001
11  through '04, so roughly end of 2004, beginning of 2005.
12  Then I think I made the decision to go back out to the
13  street around 2009-ish.
14       Q    Okay.  So you don't have any current role with
15  the legal department?
16       A    I mean, I still will work with, obviously, our
17  internal legal department.  I still teach our legal classes
18  at the academy when my schedule allows.  And that's pretty
19  much it, but as far as providing day-to-day legal advice
20  like I used to, no.
21       Q    When you were there beginning, I think you said,
22  around '95, '97?
23       A    I started with the department in '95.
24       Q    Okay.  So when were you first an assistant in the
25  legal department?

Page 8

1        A    It would have been around '98, maybe 1999.
2        Q    Who was the legal adviser at that time?
3        A    Lieutenant Eric Edwards and Lieutenant Bob
4   Kavanagh.  Both are retired now.
5        Q    Have you talked to either of them in preparation
6   for today?
7        A    I have not.
8        Q    Why not?
9        A    No reason to.
10       Q    Okay.  Do you know what years, just approximate,
11  if you know, what years Edwards and/or Kavanagh were legal
12  advisers in the department before 1998?
13       A    I don't know when they started as the legal
14  advisers.  They were the legal advisers when I got hired in
15  '95.  How long they had been there in that assignment, I
16  don't know.
17       Q    Even by estimate?
18       A    No.  I think they both retired at about 20, 25
19  five years of service, but when they assumed -- again, like
20  me, both of them started off as police officers and ended up
21  going to law school.
22       Q    They are both lawyers?
23       A    Yes.
24       Q    Do you know any other legal, prior -- any other
25  legal advisers prior to your time there?



TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                           9–12

Page 9

1    A    Prior to my time?  I think Earl Campbell was one.
2  I didn't know him, but I think that was one.  Prior to that,
3  I don't know, sir.
4    Q    Currently, what is your current assignment?
5    A    Commander of the Black Mountain Precinct.
6    Q    Now, when you were the legal adviser, obviously
7  you were responsible for knowing the law as it relates to
8  police matters, correct?
9    A    Yes.
10    Q    In fact, that was your primary responsibility?
11    A    Yes.
12    Q    When you were legal adviser, am I correct that
13  that was your sole responsibility, you didn't have any --
14  that wasn't a part-time job, that was your --
15    A    It was full time.
16    Q    Full time.
17       So I take it that any legal questions that came
18  up in the department, whether it be on a case or an
19  employment matter, you were consulted?
20    A    Correct.
21    Q    Did you have a staff?
22    A    Yes.  We had a legal secretary.  And then we had
23  officers/detectives that worked for us that would assist
24  outside counsel and the city attorney's office in gathering
25  documents for litigation and those types of matters.

Page 10

1    Q    Did you have any legal assistants?
2    A    I did not, no.
3    Q    All the legal work you did by yourself?
4    A    Correct.
5    Q    Did you have any outside counsel that you were,
6  you were able to consult with?
7    A    Yeah, we worked with outside counsel on a myriad
8  of cases against the City of Phoenix.
9    Q    Okay.  But as the legal adviser, one of your jobs
10  was to ensure that you understood the contours of any law
11  that the police department would be utilizing, correct?
12       MS. RETTS:  Form.
13       THE WITNESS:  Yes.  My job is to be familiar
14  with, obviously, with criminal procedure, criminal law,
15  constitutional law, yes.
16    Q    (By Mr. Brustin) Not just familiar, to know it
17  cold, right?
18    A    Correct.
19       MS. RETTS:  Form.
20    Q    (By Mr. Brustin) Because you had to know it well
21  enough to advise others on how to implement it, correct?
22    A    Correct.
23    Q    And you had to know it well enough to ensure that
24  the training of the department complied with the law,
25  correct?

Page 11

1    A    Yes.
2    Q    That's an essential component of your job as
3  legal adviser, correct?
4    A    Correct.
5    Q    You want to make sure that you are training
6  police officers to understand --
7       You want to make sure that you are training
8  police officers to ensure that, through training, they are
9  complying with the laws of Arizona and the United States,
10  correct?
11    A    Correct.
12    Q    Perhaps no more important job than that as legal
13  adviser, correct?
14       MS. RETTS:  Form.
15       THE WITNESS:  Correct.
16    Q    (By Mr. Brustin) You understood, as legal adviser,
17  that there were certain key legal issues that would come up
18  again and again in policing, correct?
19    A    Yes.
20    Q    For example, Fourth Amendment rights in relation
21  to use of force, critical area for you to know well,
22  correct?
23    A    Yes.
24    Q    And that's an area you have to understand the
25  relevant case law to understand the contours of what's

Page 12

1  permissible and impermissible conduct, correct?
2    A    Yes.
3    Q    And that was a big part of your job to understand
4  that?
5    A    Yes.
6    Q    It's no secret where those, where that law is
7  contained.  It's contained in a variety of cases, starting
8  with the Supreme Court and going down to the Arizona Supreme
9  Court and lower courts, correct?
10       MS. RETTS:  Form.
11       THE WITNESS:  Both in the courts and in state
12  and federal law, yes.
13    Q    (By Mr. Brustin) Okay.  And in addition to use of
14  force, another common area, important area that you had to
15  be very familiar with was the law relating to identification
16  procedures?
17    A    Yes.
18    Q    And what would constitute an unduly suggestive
19  procedure and what would not, correct?
20    A    Correct.
21    Q    And you had to ensure that the training on those
22  issues was consistent with the law?
23    A    My job wasn't to ensure that the training was
24  consistent, my job was to give advice.  What they did with
25  the advice from there was not my responsibility.

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
13–16

Page 13

1   Q    Your job was to ensure that the people that
2   provided the training clearly understood what the law
3   permitted and did not permit, correct?
4        A    Correct.
5        Q    And your expectation was that the trainers would
6   be training police officers to ensure that they complied
7   with the law?
8        A    Yes.
9        Q    And obviously your recommendation in regard to
10  legal matters and training was that the training should
11  ensure that officers not even come close to the line in
12  regard to important legal rights.  Fair to say?
13           MS. RETTS:  Form.  Vague.
14           MS. BERKE:  Objection.  Vague.
15           THE WITNESS:  Well, training needs to be in
16  line and consistent with what the law was at the time, yes.
17       Q    (By Mr. Brustin) In other words, if there was any
18  gray area, your recommendation, in a law, your
19  recommendation would be that they should train police
20  officers to err on the side of not violating the law,
21  correct?
22           MS. RETTS:  Form.
23           MS. BERKE:  Objection.  Vague.
24           THE WITNESS:  That's why the legal unit
25  existed, for those gray areas in the law, for them to be

Page 14

1   able to consult with us, to be able to provide the best
2   guidance that we possibly could, given the circumstances.
3        Q    (By Mr. Brustin) Right.  And your guidance would
4   be, if there's gray area, that police officers should stay
5   on the right side of the gray area, correct?
6           MS. RETTS:  Form.  Vague.
7           MS. BERKE:  Objection.  Vague.
8           THE WITNESS:  It guess it would just depend
9   on what the actual particular issue is.  I mean, there's a
10  lot of gray in the law that is subject to interpretation.  I
11  can't give you an exact answer to that question.
12           MS. BERKE:  Is objection for one objection
13  for all?
14           MR. BRUSTIN:  Sure.
15       Q    (By Mr. Brustin) Let me be more specific in why
16  I'm asking this question so maybe you can, maybe -- let me
17  ask it more specifically.
18           Police officers are typically not lawyers, right?
19       A    Correct.
20       Q    And so in a situation on the street or in the
21  precinct where they have to make decisions, they don't
22  necessarily have the ability to navigate the contours of
23  gray areas of the law, correct?
24           MS. RETTS:  Form.  Foundation.
25           THE WITNESS:  Not sure I --

Page 15

1        What do you mean by that?
2        Q    (By Mr. Brustin) In other words, you want to put,
3   you want to provide as specific guidance as you can to
4   police officers to ensure that they don't violate the law,
5   correct?
6        A    Correct.
7        Q    Because they are not lawyers?
8        A    Correct.
9        Q    Another important area of the law that you have
10  to understand is the laws relating to interrogations,
11  correct?
12       A    Correct.
13       Q    Another -- it's another area that has
14  constitutional implications, correct?
15       A    Correct.
16       Q    And as part of that, the Miranda rights are very
17  important?
18       A    Yes.
19       Q    The law on Miranda is very important?
20       A    Yes.
21       Q    And very basic, right?
22       A    Yes.
23           MS. RETTS:  Form.
24       Q    (By Mr. Brustin) And the law on Miranda is
25  important because not only does Miranda get implicated

Page 16

1   routinely in police work, the failure to follow Miranda
2   could have serious implications, constitutional
3   implications, correct?
4           MS. RETTS:  Form.
5           THE WITNESS:  It could.  It could cause
6   statements to be suppressed.
7        Q    (By Mr. Brustin) Oh, it can also cause -- it can
8   conceivably cause, if not followed, could cause innocent
9   persons to go to prison, correct?
10           MS. RETTS:  Form.  Foundation.
11           THE WITNESS:  The possibility exists.  It
12  depends on if there's additional evidence outside of the
13  statements that were in violation of Miranda as to whether
14  or not the conviction would still follow through.
15       Q    (By Mr. Brustin) Well, one of the reasons why
16  Miranda law and following Miranda law is important is to
17  ensure that suspects' constitutional rights are being
18  protected, correct?
19       A    Their custodial confessions, yes.
20       Q    Do you agree with what I just said?  It's
21  important --
22           One of the reasons it's important to follow the
23  law in Miranda is to ensure that suspects' constitutional
24  rights are being protected?  Would you agree with that?
25       A    With respect to Miranda, yes.

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
17—20

Page 17

1    Q    And that's why the department created strict
2    policies and procedures in regard to Miranda, correct?
3         MS. RETTS:  Form.
4         THE WITNESS:  Yes.
5    Q    (By Mr. Brustin) And so given how important
6    Miranda rights are to police work and -- withdrawn.
7         You would agree that, given the importance of the
8    law and Miranda, it is especially important for you to
9    understand the contours of Miranda when you're providing
10   advice on how to implement it?
11   A    Yes.
12   Q    That's one of the most important parts of your
13   job?
14        MS. RETTS:  Form.
15        THE WITNESS:  It's, yeah, one of several
16   important factors of my job.
17   Q    (By Mr. Brustin) Take a look at -- you're familiar
18   with -- let's mark the --
19        What exhibit is that?  Have we marked it yet?
20        (An off-the-record discussion ensued.)
21   Q    (By Mr. Brustin) Oh, okay.  If you could take a
22   look at Exhibit 30.  And I've got some binders here in front
23   of you.
24   A    Volume One?
25   Q    I think it's --

Page 18

1         It is.
2         MS. BERKE:  Did you say 30?
3         MR. BRUSTIN:  Yeah, I did.
4         THE WITNESS:  Let me grab my glasses, if you
5    don't mind.  Not getting any younger.
6         (An off-the-record discussion ensued.)
7         THE WITNESS:  Exhibit 30?
8    Q    (By Mr. Brustin) Yeah.  I'll show you this real
9    quick.
10        Exhibit 30, just take a look at --
11        You're familiar with this policy?  You went
12   through this last time, right?
13   A    The lines of supervision?
14   Q    Yeah.
15   A    Lines of authority?  Yes.
16   Q    Yeah.  It's a compilation of policies.  So, for
17   example, if you take a look at 18588 -- I'm going by Bates
18   stamps at the bottom right.
19   A    Okay.
20   Q    And this is one of the general investigative
21   procedures I think you went through.  If not, it's certainly
22   one you're --
23   A    Yes --
24   Q    -- familiar with, correct?
25   A    -- it looks familiar.

Page 19

1    Q    One of the references here, on page 18588, talks
2    about -- and you see it's under 7 B-4, the ALEOAC manual?
3    A    Yes.
4    Q    Is there -- is there -- you guys call it -- what
5    do you call that, the --
6    A    ALEOAC.
7    Q    ALEOAC?  Because you're familiar with that,
8    right?
9    A    I am familiar with it, yes.
10   Q    And this is a manual that's used for training
11   purposes, correct?
12   A    It was a manual that was used back in the day.
13   It was not a manual that was used when I got hired in 1995.
14   Q    Gotcha.
15        It was used -- do you know when it was used?
16   A    The exact years, I don't, sir.
17   Q    So it was used before 1995 for some period of
18   time?
19   A    Correct.
20   Q    And you don't know whether that was from 1970 to
21   1995?  1980 to 1995?
22   A    I don't.
23   Q    You have no idea?
24   A    No.
25   Q    Make any efforts to figure that out?

Page 20

1    A    The years that this was would have been --
2    Q    Yes, sir.
3    A    I did not.  I was provided a copy of the manual,
4    which came at a request that I made of the training bureau
5    to look for additional documents related to this case.
6    Q    Gotcha.  Now --
7         Okay.  Now, let's take a look at --
8         One of the things you told us in your deposition
9    was that -- remember you looked at the Rangel case?
10   A    I remember the name.
11   Q    Let me have you take a look at it, just so we're
12   all on the same page.  And that's Exhibit 65.
13   A    Same volume, or?
14   Q    Different volume.
15   A    Okay.
16        MS. BERKE:  Did you say 65?
17        MR. BRUSTIN:  I did.
18   Q    (By Mr. Brustin) As you're looking for it, as a
19   reminder, this is the case where the woman was found with
20   four gunshot wounds in the chest and the victim's fiance was
21   the suspect.  He was interrogated by Detective Saldate.
22   A    Okay.
23   Q    Do you recall this case now?
24   A    Yes.
25   Q    Just to refresh your recollection, to make sure



TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                          21—24

Page 21

1   we're on the same page, take a look at page 11 and 12, you
2   can see the report that the interrogation --
3        Which Bates stamp?
4        These are the left-hand, left-side Bates stamps.
5   A   Oh, okay.
6   Q   Page 11 and 12.
7   A   Okay.
8   Q   I just want to show you this enough to refresh
9   your recollection about looking at it.
10  A   Okay.
11  Q   You recall this is the case where three times the
12  suspect said, "I think I may need a lawyer"?
13  A   Yes.
14  Q   Do you remember this case?
15  A   Yes.
16  Q   Okay.  And what -- your testimony under oath, in
17  regard to this case, was that saying three times "I think I
18  may need an attorney" was not conduct that required
19  discipline under the Phoenix Police Department disciplinary
20  policy.  Do you recall that testimony?
21  A   Yes.
22  Q   And, more specifically, your testimony was that
23  those three invocations were not invocations of Miranda
24  sufficient to implicate the policy.  Do you recall that?
25  A   I don't remember --

Page 22

1        MS. RETTS:  Form.
2        THE WITNESS:  -- what my exact words were.
3   However, "I think I may need a lawyer" or "I think I want to
4   remain silent," you know, equivocal assertions, yeah,
5   nothing that would have triggered a misconduct
6   investigation.
7   Q   (By Mr. Brustin) Nothing that violates Miranda?
8   A   Correct.
9   Q   Okay.  So now I want you to take a look --
10       Are you familiar with the case State v. Staatz?
11  A   I am not, sir.  Not off the top of my head, no.
12  Q   That is an Arizona Supreme Court decision on
13  Miranda.
14       Okay.
15  Q   And obviously Arizona Supreme Court decisions on
16  Miranda are very important for you to understand, correct?
17  A   Yes.
18  Q   And this was a Supreme Court decision from 1988,
19  correct?
20  A   Okay.
21  Q   No question that if there was a Supreme Court
22  decision specifically on Miranda, you would have been aware,
23  you should have been aware of it, correct?
24       MS. RETTS:  Form.
25       THE WITNESS:  Yeah, I guess it would just

Page 23

1   depend.  It's impossible for me to know every single case
2   that exists out there.
3   Q   (By Mr. Brustin) Well, is it impossible for you to
4   know every Supreme Court case that deals -- every Arizona
5   Supreme Court case that deals with Miranda?
6        MS. RETTS:  Form.
7        THE WITNESS:  I'm not sure I know every
8   single Supreme Court case that exists with respect to --
9   Q   (By Mr. Brustin) Let me show you this one.
10       Do we have that as an exhibit?
11       MS. BERKE:  What's the citation on it?
12       MR. BRUSTIN:  State v. Staatz, 159 Arizona
13  411, 1988.
14       (An off-the-record discussion ensued.)
15       MR. BRUSTIN:  I think let's mark it.
16       (Deposition Exhibit No. 110 was marked for
17  identification.)
18  Q   (By Mr. Brustin) Take a look at page three of
19  this.  Do you recognize this decision?
20  A   Not off the top of my head, no.
21  Q   You recognize it as a Supreme Court decision,
22  correct?
23  A   Arizona Supreme Court decision?
24  Q   Yes.  That's the highest court in Arizona, right?
25  A   Correct.

Page 24

1   Q   That, along with the Supreme Court of the United
2   States, are the courts that are most important to you, as a
3   legal adviser, correct?
4        MS. RETTS:  Form.
5        THE WITNESS:  Well, state courts, the Ninth
6   Circuit, and the U.S. Supreme Court.
7   Q   (By Mr. Brustin) Okay.  So -- I'm sorry.
8        So the Arizona Supreme Court, Ninth Circuit, and
9   the United States Supreme Court are the three most important
10  courts for you to be aware of, correct?
11  A   Correct.
12  Q   All right.  Take a look at page, at the third
13  page of this printed document.
14  A   Okay.
15  Q   And I want you to read to yourself where it says,
16  "We have adopted," at the bottom.  Do you see that?
17  A   Yes.
18  Q   The last full paragraph in the left column, all
19  the way through the top of the first paragraph on the next
20  page.
21  A   Okay.
22       Okay.
23  Q   You read it?
24  A   Yes.
25  Q   And this makes clear, this case makes clear that

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

TOM VAN DORN  30(b)(6)                                      April 26, 2018
Debra Jean Milke vs City of Phoenix                        25–28

Page 25

1  when there is an equivocal request for a lawyer, like "Maybe
2  I should be talking to a lawyer," the Supreme Court of
3  Arizona has ruled that, "Although the defendant's statement
4  may not have risen to the level of an affirmative invocation
5  of counsel, it was sufficient to require police to either
6  cease questioning or clarify the questioning," correct?
7      A   Yes.
8      Q   In other words, this is exactly the opposite of
   what you testified to under oath, correct?
10         MS. RETTS:  Form.
11         THE WITNESS:  Not sure that's what it was.  I
12  believe, also, I did state in my deposition that we also do,
13  as part of our training and stuff, tell our officers that if
14  you're not sure what it is that the suspect is asking you,
15  to go ahead and clarify the question.  I believe that was
16  part of my deposition testimony as well.
17      Q   (By Mr. Brustin) Let me be very clear with you,
18  and let's see if you can just make a straight-forward
19  admission:  You misstated the law during your deposition,
20  correct?
21         MS. RETTS:  Form.  Foundation.
22  Argumentative.
23         THE WITNESS:  I'm not going to answer that
24  question.
25      Q   (By Mr. Brustin) You are going to answer that

Page 26

1  question.
2         Did you misstate the law during your deposition?
3         MS. RETTS:  Argumentative.
4         THE WITNESS:  I don't think I did, no.
5      Q   (By Mr. Brustin) Okay.  So your -- your statement,
6  your testimony is that the case you just read is consistent
7  with your testimony from the first deposition?
8         MS. RETTS:  You need to take your tone down.
9  It's argumentative.  You need to revise your tone.  We're
10  not going to sit through a deposition where this continues
11  to occur.
12      Q   (By Mr. Brustin) Answer the question, sir.
13      A   I don't believe I misstated the law, no, sir.
14      Q   Your testimony -- that's not my question.
15         My question is:  You believe your testimony in
16  the first deposition is consistent with the Supreme Court
17  language I just read to you?
18         MS. RETTS:  Form.  Argumentative.
19         THE WITNESS:  I don't believe I misstated the
20  law in my previous deposition, sir.
21      Q   (By Mr. Brustin) Okay.  Let me do it again.
22         Do you understand what the word "consistent"
23  means?
24         MS. RETTS:  Argumentative.
25         THE WITNESS:  My answer is going to stay the

Page 27

1  same.
2      Q   (By Mr. Brustin) What does the word "consistent"
3  mean?
4      A   My answer is going to stay the same.
5      Q   What does the word "consistent" mean?
6         Answer my question.
7      A   My answer is going to stay the same.
8         MS. RETTS:  Argumentative.
9         MR. BRUSTIN:  Tell him to answer my question.
10         MS. STEWART:  I'm not going to tell him to
11  answer the question.  You are --
12         MS. BERKE:  Badgering him.
13         MS. RETTS:  You're badgering him.  He has
14  answered the question.  You just don't like the answer to
15  the question.
16         MR. BRUSTIN:  Tina, I asked him a new
17  question.  I asked him what "consistent" means.  I can ask
18  him that.
19         MS. RETTS:  It's the same point.
20         MR. BRUSTIN:  I can do anything any way I
21  want to do it, and he's going to answer my questions or
22  he'll be sanctioned.
23         MS. RETTS:  That's not true.  You can't do
24  anything the way you want to do it.  You're harassing him.
25         MR. BRUSTIN:  I'm not.  I'm just --

Page 28

1         MS. RETTS:  Your tone --
2         MR. BRUSTIN:  -- asking a question.
3         I'm sorry, I'm going to tone it down.
4      Q   (By Mr. Brustin) Sir, what does the word
5  "consistent" mean?
6      A   It means to give the same answer.
7      Q   Okay.  And you're familiar with using the --
8         You're familiar with the term "consistent" from
9  law school, right?
10      A   Yes.
11      Q   That's a way of describing legal issues, is this
12  case consistent with another case, right?
13      A   One of several examples.
14      Q   You gave testimony in your first deposition about
15  the law and Miranda, correct?
16         MS. RETTS:  Form.  Misstates testimony.
17         THE WITNESS:  Yes.
18      Q   (By Mr. Brustin) And what you said was,
19  specifically, that an ambiguous statement requesting a
20  lawyer was not a Miranda violation, correct?
21         MS. RETTS:  Form.  Misstates testimony.
22         THE WITNESS:  I don't recall my exact
23  statement, sir.
24      Q   (By Mr. Brustin) So my question is was your
25  testimony in your first deposition consistent with the

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
29–32

Page 29

1  Supreme Court case I just read to you?
2       MS. RETTS:  Asked and answered.
3       THE WITNESS:  Yeah, I don't believe I
4  misstated the law in my first deposition --
5   Q   (By Mr. Brustin) So you're --
6       THE WITNESS:  -- as it relates to Miranda.
7   Q   (By Mr. Brustin) Fair enough.
8       So you are refusing to answer my question --
9   A   I'm not refusing.
10  Q   I'm not done asking my question.
11      MS. RETTS:  He was not done.  He was not done
12  speaking.
13      THE WITNESS:  I am not refusing to answer
14  your question, sir.
15  Q   (By Mr. Brustin) Okay.  My question is different.
16  My question is:  Was your testimony consistent about the law
17  in your first deposition with the Supreme Court case I just
18  read to you?
19  A   I believe it was because, again, in my first
20  deposition, I also did tell counsel at the time that if we
21  are unsure what it is that the suspect is asking us, yes, we
22  do need to stop and clarify that for them.
23  Q   Okay.  And you know in Rangel, that that's not
24  what Saldate did.  Want to take a look at it?
25      MS. RETTS:  Form.

Page 30

1       THE WITNESS:  I don't need to look at it
2  again.  I'm familiar with the case.
3   Q   (By Mr. Brustin) Okay.  So you know what happened
4  is that, according to the written report -- and by the way,
5  we have no, we have no idea whether or not the written
6  report is true or not.  We just know that Saldate wrote it,
7  correct?
8       MS. BERKE:  Foundation.
9       THE WITNESS:  Yeah, I don't know what was in
10  his mind at the time.
11  Q   (By Mr. Brustin) Okay.  Well, what we do know is
12  that in the written report, Saldate notes that there is
13  three times a request for an attorney that is just like the
14  request that you just read in Staatz, correct?
15      MS. RETTS:  Form.
16      MS. BERKE:  Objection.  Misstates evidence.
17      THE WITNESS:  I'm sorry, repeat your
18  question.
19  Q   (By Mr. Brustin) Sure.
20      Do you see the request on page Rangel 11?  "I
21  think I may need an attorney."
22      Do you see that?
23  A   Correct.
24  Q   And in Staatz it says, "Maybe I should be talking
25  to an attorney."  Right?  In fact, the statement in Staatz

Page 31

1  is more equivocal than the statement in Rangel.  Would you
2  agree with that?
3       MS. RETTS:  Form.
4       THE WITNESS:  With respect to "Maybe I need a
5  lawyer"?
6   Q   (By Mr. Brustin) Yeah.
7   A   Yeah, it's an equivocal assertion.
8   Q   It's the same, right?
9   A   Close enough.
10  Q   Okay.  And three times there's an equivocal --
11  there's an ambiguous assertion in Rangel, correct?
12  A   Yes.
13  Q   And on each time, contrary to Staatz, Saldate
14  continues to question, correct?
15  A   Correct.
16      MS. RETTS:  Form.
17  Q   (By Mr. Brustin) And on each time, contrary to
18  Staatz, Saldate doesn't make any effort to clarify whether
19  or not the suspect actually wants a lawyer, correct?
20      MS. RETTS:  Form.  Misstates the police
21  report.
22  Q   (By Mr. Brustin) Want to look?
23  A   Well, I think, whether or not in relation to
24  Staatz, the repeated attempt of equivocal assertion, I mean,
25  here it occurred three times in Rangel.  Whether or not the

Page 32

1  courts would feel that that is, you know, what their advice
2  is right here, you have to ask the courts.
3   Q   Oh, no, no, no.  I'm sorry.  I want to ask you
4  because you're the legal adviser.
5   A   No, I'm not the legal adviser anymore.  I was
6  back in those time periods that we stated.
7   Q   And you're not testifying on behalf of the city
8  as the former legal adviser, right?
9   A   I'm testifying on behalf of the city as a Rule
10  30(b)(6), not as a legal adviser for the department.
11  Q   Okay.  As you've already told us, very simply,
12  one of your jobs as legal adviser was to interpret the law,
13  correct?
14  A   During the time periods that we stated, yes.
15  Q   Okay.  And you're still a lawyer, right?
16  A   Yes.
17  Q   You still active?
18  A   Yes.
19  Q   All right.  So that's what I'm going to ask you
20  to do.  I'm asking you to interpret the law in Miranda,
21  which is the subject this deposition.  Okay?
22      MS. RETTS:  No, he's not --
23      THE WITNESS:  It's no longer my job to
24  interpret the law.
25  Q   (By Mr. Brustin) All right.  So take a look again

EXHIBIT 15

TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                           33–36

Page 33

1  at Staatz.  And Staatz is very --
2        Is what you just read on -- is what you just read
3  in the Staatz case in any way confusing?
4        MS. RETTS:  Form.  Outside the scope.
5     Q    (By Mr. Brustin) It's a very, very straightforward
6  description of the law on Miranda, correct?
7        MS. RETTS:  Form and foundation.
8        THE WITNESS:  No.  You want to equate the
9  fact that Detective Saldate continued after three times.
10  The court doesn't put a specific number in this case.
11    Q    (By Mr. Brustin) Well, in --
12    A    "Repeated attempts" is what they state.  So
13  whether or not the court would hold that what Saldate did in
14  Rangel is repeated attempts, that goes with their decision.
15  That's up for the court to decide.
16    Q    Okay.  So let's go back to Staatz.
17        (An off-the-record discussion ensued.)
18    Q    (By Mr. Brustin) Yeah.  And if you take a look at
19  the Staatz case, just where you were, where does it say
20  anything about repeated attempts here?
21    A    "When the request is ambiguous, police must cease
22  questioning or attempt to clarify defendant's request."
23    Q    So what this is making clear is that any time,
24  any time that a suspect makes even an ambiguous request for
25  counsel, the law is you must cease questioning and, at most,

Page 34

1  clarify whether they are actually requesting a lawyer,
2  correct?
3        MS. RETTS:  Form.  Outside the scope.
4        THE WITNESS:  Depends on, you know, the
5  interpretation of ambiguous.  So whether or not Detective
6  Saldate at the time thought that his assertion was ambiguous
7  or not, you would have to ask Detective Saldate.
8     Q    (By Mr. Brustin) It says, in Staatz, "Maybe I
9  should be talking to a lawyer," right?
10    A    Right.
11    Q    And in Rangel, it says, "I think I may need an
12  attorney."
13    A    Okay.
14    Q    Would you agree that that language is right on
15  point --
16        MS. RETTS:  Form.
17    Q    (By Mr. Brustin) -- in legalese?
18        MS. RETTS:  Form.  Outside the scope.
19        THE WITNESS:  It very well could be
20  ambiguous.  I don't know what it is that the person is
21  asking of me.
22    Q    (By Mr. Brustin) So it's ambiguous as to whether
23  or not "may need an attorney" would be sufficiently similar
24  to "Maybe I should be talking to a lawyer" to implicate the
25  law of Staatz?

Page 35

1        MS. RETTS:  Form.  Outside the scope.
2        THE WITNESS:  Potentially implicate the law
3  of Staatz.
4     Q    (By Mr. Brustin) Okay.  Let's go back to Staatz.
5  We're going to spend a little time on this.
6     A    Okay.
7     Q    You would agree that the Staatz decision is
8  crystal clear, if there is an ambiguous request for an
9  attorney, the police officer must immediately cease
10  questioning, correct?
11        MS. RETTS:  Form.
12        THE WITNESS:  That it's absolutely clear?
13    Q    (By Mr. Brustin) Yes, sir.  Crystal clear, what we
14  just read together.
15    A    Okay.  It's what the court held.
16    Q    The court held clearly, any time there's an
17  ambiguous request for an attorney, cease questioning,
18  correct?
19        MS. RETTS:  Form.
20        THE WITNESS:  With respect to this particular
21  case, yes.
22    Q    (By Mr. Brustin) Okay.  Now, do you see that first
23  sentence, where it stays, "We have adopted the position that
24  when the request is ambiguous," do you see that?
25    A    Uh-huh.

Page 36

1     Q    What does it mean to you when it cites to other
2  cases after that?
3     A    That there are additional cases that follow.
4  There's --
5     Q    That support that, right?
6     A    There's a lot of different cases throughout the
7  State, the Ninth Circuit, and the Supreme Court.  So the
8  advice that we give is not solely based on one particular
9  decision out of the state Supreme Court.
10    Q    Do you think --
11    A    I will keep it limited to the Staatz case, if you
12  want to keep the questions specific to this case and not all
13  of the other Miranda cases that exist --
14    Q    Do you think I don't know the law?
15    A    -- so.
16        MS. RETTS:  Argumentative.
17        THE WITNESS:  I'm not going to answer that
18  question, sir.
19    Q    (By Mr. Brustin) Let's go back to my first
20  question.  Just a very basic, third-year legal law school
21  question.
22        MS. RETTS:  Come on.
23    Q    (By Mr. Brustin) The question here says, "We have
24  adopted the position that when the request is ambiguous,
25  police must cease interrogation."

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

TOM VAN DORN  30(b)(6)                                                April 26, 2018
Debra Jean Milke vs City of Phoenix                                          37–40

Page 37

1         As a matter of reading legal cases, the cases
2  that are cited afterward support that position, correct?
3         MS. RETTS:  Objection.
4         MS. BERKE:  Objection.  Argumentative.
5         THE WITNESS:  First, I'm going to go on the
6  record that I'm going to end this deposition, because I'm
7  not required to be subpoenaed here, if your tone does not
8  change.  I will walk out of this room --
9         MR. BRUSTIN:  Okay.
10        THE WITNESS:  -- and let you, the lawyers,
11  and the court figure it out from there.
12    Q   (By Mr. Brustin) All right.  So --
13        MS. RETTS:  And I would add to that that your
14  tone is very condescending.  There's no need to be rude to
15  him.  He's sitting here answering your questions without
16  responding with tone, but you are getting amped up.
17        MR. BRUSTIN:  Oh, I disagree with that
18  completely.
19    Q   (By Mr. Brustin) Let's go back to this sentence.
20        MS. RETTS:  Do you have an audio recording?
21        COURT REPORTER:  I do.
22        MS. RETTS:  Thank you.
23    Q   (By Mr. Brustin) Let's go back to that -- let's go
24  back to this first sentence.  I just want to ask you about
25  reading a case.

Page 38

1         When you have cites after a proposition, the
2  proposition here is that any time there's an ambiguous
3  request, police must cease interrogation.  That's the legal
4  proposition, correct?
5         MS. RETTS:  Form.  Outside the scope.  He's
6  not testifying as a legal adviser.
7         THE WITNESS:  There are additional state
8  cases that are there.  But again, I'll go on record and
9  state that there are other cases that follow in line with
10  the Miranda decision out of the Ninth Circuit and Supreme
11  Court, along with the state court decisions, that we, as
12  legal advisers, will take into account before we give
13  advice.
14    Q   (By Mr. Brustin) I understand.
15        So are you telling me that there are cases, there
16  are cases for the relevant time periods, which is 1982 to
17  1995 -- is that what we said?  1982 to 1995.  Are there
18  cases from that time period which contradict the proposition
19  I just read to you, which is we have -- withdrawn.
20        Are there cases from that time period that are in
21  any way inconsistent with the proposition that I just read
22  to you?  "We have adopted the position that when the request
23  is ambiguous, police must cease interrogation or attempt to
24  clarify defendant's request."
25        Are you aware of any inconsistent case law?

Page 39

1         MS. RETTS:  Form.  Outside the scope.
2         THE WITNESS:  There are various cases out
3  there with equivocal assertions, you know, that I can
4  continue on with my interrogation if there's an equivocal
5  assertion.  Yes, I would agree with you that with respect to
6  this, which is also consistent with my first deposition
7  testimony, is if it is unclear what the suspect is
8  asserting, that we have a responsibility to stop and
9  clarify.
10    Q   (By Mr. Brustin) Okay.  So I'm sorry.  So there
11  are cases that say it is permissible to continue, for a
12  police officer to continue questioning a suspect when there
13  is an equivocal request for counsel?
14    A   That misstates my testimony.  What I told you is
15  there are numerous cases that deal with equivocal
16  assertions.
17    Q   I'm asking --
18    A   And part of the training, as the, as part of the
19  legal adviser stuff and the way that we train at the academy
20  is that they say "I might want a lawyer" or "I might want to
21  remain silent" and it's going to continue, but that's what
22  they're saying, then yes, you need to stop and clarify what
23  it is that the suspect is asking.  That is, I believe,
24  consistent with this decision.
25    Q   I'm sorry.  I'm asking you something different.

Page 40

1         Are you aware of any decisions that are
2  inconsistent with this statement of the law that when there
3  is an ambiguous request for counsel, interrogation must
4  cease immediately?
5    A   Off the top of my head, sir --
6         MS. RETTS:  Form.  Foundation.  Outside the
7  scope.
8         THE WITNESS:  Off the top of my head right
9  now, I can't tell you, sir.
10    Q   (By Mr. Brustin) Okay.  Do you believe that there
11  are and you just can't think of them?
12    A   There very well may be.  I can't answer that
13  question.
14    Q   Do you have any vague recollection of ever seeing
15  them?
16        MS. RETTS:  Argumentative.  Asked and
17  answered.  Outside the scope.
18        THE WITNESS:  I can't answer that question.
19    Q   (By Mr. Brustin) Okay.  So I think we've clarified
20  something now.  What you've told me is that pursuant to
21  training and the law -- withdrawn.
22        What Staatz says, Supreme Court decision from
23  1988 says is that when there's even an ambiguous request for
24  an attorney, the questioning must cease immediately,
25  correct?

TOM VAN DORN  30(b)(6)                                          April 26, 2018
Debra Jean Milke vs City of Phoenix                                    41–44

Page 41

1          MS. RETTS:  Form.
2          THE WITNESS:  Our training is consistent,
3  yes.
4      Q   (By Mr. Brustin) I didn't ask that.  I'm asking
5  about Staatz.
6          What Staatz says is that when there's an
7  ambiguous request for an attorney, questioning must cease
8  immediately, correct?
9          MS. RETTS:  Form.  Outside the scope.
10         THE WITNESS:  I will read directly from here,
11  if that's what you want me to read --
12     Q   (By Mr. Brustin) Uh-huh.
13     A   -- is what the decision is.
14     Q   What I'm asking you to say --
15     A   You're repeating the decision, so.
16     Q   I'm asking you if I'm accurately --
17     A   That is what the court held.
18     Q   That's all I'm asking you, that's what the court
19  held.
20         And, obviously, that's the law of the land,
21  right?
22         MS. RETTS:  Form.  Outside the scope.
23         THE WITNESS:  It's not the law of the land.
24  It's not the United States Supreme Court, it's the Arizona
25  Supreme Court.

Page 42

1      Q   (By Mr. Brustin) And what happened in Rangel is
2  that there were three equivocal requests for counsel,
3  ambiguous requests for counsel, correct?
4          MS. RETTS:  Form.
5          THE WITNESS:  Correct.
6      Q   (By Mr. Brustin) And pursuant to Staatz, what had
7  to happen was Saldate had to cease questioning, correct?
8          MS. RETTS:  Form and foundation.  Outside the
9  scope.
10         THE WITNESS:  Possibly not.  It depends on
11  whether or not there were Ninth Circuit or U.S. Supreme
12  Court cases that existed at the time that said that he
13  didn't have to.
14     Q   (By Mr. Brustin) Okay.  Well, I'm showing you
15  Staatz, and I'm understanding your caveat that maybe I
16  missed a Ninth Circuit case that's completely contradictory.
17  But assuming that Staatz is the law, you would agree that
18  pursuant to Staatz, what Saldate had to do here was cease
19  questioning each and every time there was an ambiguous
20  request for counsel, correct?
21         MS. BERKE:  Objection.  Asked and answered.
22         THE WITNESS:  If you want to go pursuant to
23  Staatz as the law of the land, the answer to your question
24  then would be yes.
25     Q   (By Mr. Brustin) Okay.  And the only thing under

Page 43

1  Staatz that Saldate would have been permitted to do, each
2  time he requested counsel, was to ask questions about
3  whether or not that was a true invocation, true request for
4  a lawyer, correct?
5          MS. BERKE:  Objection.  Misstates evidence.
6          MS. RETTS:  Form.  Outside the scope.
7          (An off-the-record discussion ensued.)
8          THE WITNESS:  Ask your question again.
9      Q   (By Mr. Brustin) Sure.
10         Pursuant to Staatz, what Saldate was required to
11  do each and every time there was an ambiguous request for an
12  attorney was, at most, clarify whether or not the suspect
13  really wanted an attorney, correct?
14         MS. RETTS:  Form.  Outside the scope.  This
15  is a legal issue for the court.
16         THE WITNESS:  Okay.  And, again, if Staatz
17  was the law of the land, then yes, Detective Saldate should
18  have stopped and clarified what Mr. Rangel was asking at the
19  time.
20     Q   (By Mr. Brustin) Okay.  And let me ask you this.
21  Given your role as a legal adviser, will you take it upon
22  yourself to, after this deposition, to do some research and
23  see if, perhaps, I missed a case?
24         MS. RETTS:  Form.  Improper question.
25         THE WITNESS:  Only if it's required as part

Page 44

1  of this actual case.
2      Q   (By Mr. Brustin) I mean, are you concerned that
3  you may have been mistaken about the nature of the law?
4          MS. RETTS:  Form.  Argumentative.  Outside
5  the scope of the deposition.
6          THE WITNESS:  No.  Because, again, I believe
7  that in my first deposition, I did clarify that when a
8  suspect makes repeated attempts, even with equivocal
9  assertions such as that, we have a responsibility to stop
10  and clarify what it is.
11     Q   (By Mr. Brustin) All right.  Anyway, getting back
12  to Rangel, so you would agree that when you reviewed this
13  document, it was very clear that Saldate did not cease
14  questioning, correct?
15         MS. RETTS:  Form.
16         THE WITNESS:  Correct.
17     Q   (By Mr. Brustin) And there's no suggestion in this
18  report that he made any effort to clarify whether or not the
19  suspect really wanted an attorney, correct?
20         MS. RETTS:  Form.  Foundation.
21         THE WITNESS:  Correct.
22     Q   (By Mr. Brustin) Instead, what Saldate did here
23  was to continue interrogating, correct?
24     A   Yes.
25     Q   And he did that three times, correct?

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
45–48

Page 45

1    A    I don't remember how many times.  I know the
2  suspect --
3    Q    Three invocations?
4    A    Okay.
5    Q    Three continuing interrogations, right?
6         MS. BERKE:  Objection.  Misstates --
7         THE WITNESS:  Three equivocal --
8         MS. BERKE:  -- evidence.
9         THE WITNESS:  -- assertions, continued with
10  interrogation.
11    Q    (By Mr. Brustin) All in direct violation of
12  Staatz, correct?
13         MS. RETTS:  Form.  Foundation.
14         THE WITNESS:  Again, specific to the Staatz
15  case, correct.
16    Q    (By Mr. Brustin) Are you familiar with the State
17  versus Inman (phonetic) case from 1986, Court of Appeals
18  case from 1986?
19    A    Not off the top of my head.
20    Q    And in the Inman case, and I'm quoting, "At the
21  very least, Inman's question was an ambiguous request for
22  counsel that, without more, should have stopped all
23  questioning except that which would have been necessary to
24  clarify whether she wanted a lawyer before questioning."
25         Now, assuming I read that correctly, would you --

Page 46

1  assuming that I correctly quoted that case, would you agree
2  that that is completely consistent with what I just read to
3  you from Staatz?
4         MS. RETTS:  Form.  Foundation.  Outside the
5  scope.  He's not here to testify as a legal adviser or
6  testify as to the law.  The court is the one who sets the
7  law.
8         THE WITNESS:  Read what you read to me.  I
9  know it's related to Staatz, but read me what you read
10  again.
11    Q    (By Mr. Brustin) Sure.
12         "At the very least, Inman's question was an
13  ambiguous request for counsel that, without more, should
14  have stopped all questioning except that which would have
15  been necessary to clarify whether she wanted a lawyer before
16  questioning."
17    A    I'm not sure --
18         MS. RETTS:  Same objection.  And he does not
19  have the case before him so --
20         THE WITNESS:  I'm not sure what Inman's
21  request was, sir, in order for me to be able to give you an
22  answer to that question.
23    Q    (By Mr. Brustin) The request was, and I'm also
24  quoting, "When a lawyer -- "Asking when a lawyer could be
25  appointed or whether a lawyer could be appointed."

Page 47

1    A    That was Inman's request?
2    Q    Consistent with Staatz, correct?
3    A    I don't believe so, no.
4         MS. RETTS:  Objection.  Form.
5    Q    (By Mr. Brustin) Oh, so you think Inman is
6  inconsistent with Staatz?
7    A    Not going to say inconsistent, I believe the
8  facts appear to be different.
9    Q    All right.  Now, you also told us that the
10  disciplinary policy, the 1985 disciplinary policy -- and
11  let's go to that, which is Exhibit 82.
12         If you would --
13         (An off-the-record discussion ensued.)
14    Q    (By Mr. Brustin) I'm sorry, I misspoke.  I wanted,
15  actually, Exhibit 30.  I apologize.
16    A    Exhibit 30?
17    Q    Yeah.
18         (An off-the-record discussion ensued.)
19    Q    (By Mr. Brustin) Take a look at page 18597.
20    A    Okay.
21    Q    You remember you went through 14 E and F?
22    A    I'll be --
23         MS. BERKE:  I'm trying to figure out where we
24  are.
25         MR. BRUSTIN:  Exhibit 30.

Page 48

1         MS. BERKE:  Oh.  I thought you said --
2         MR. BRUSTIN:  I did, and then I switched it.
3  Sorry.
4         Exhibit 30, page 18597.
5    Q    (By Mr. Brustin) Now, you recall, Commander, going
6  through this, correct?
7    A    Yes.
8    Q    And, in particular, you spent a lot of time going
9  through Section E, correct?
10    A    One of several, yes.
11    Q    Section E is the police procedure that was
12  designed to ensure compliance with Miranda, correct?
13    A    Correct.
14    Q    And, obviously, your understanding was that this
15  procedure was drafted in accordance with the law on Miranda,
16  correct?
17         MS. RETTS:  Form.
18         THE WITNESS:  Yeah.  This particular, yes,
19  but then you see here where it's "Contact the legal adviser
20  if you have any additional questions."
21    Q    (By Mr. Brustin) Okay.  But certainly the
22  enforcement of this procedure, what's most critical, is that
23  it be consistent with the law and Miranda, correct?
24         MS. RETTS:  Form.
25         THE WITNESS:  I believe it recites the basic



EXHIBIT 15

TOM VAN DORN  30(b)(6)                                                  April 26, 2018
Debra Jean Milke vs City of Phoenix                                    49–52

Page 49

1   tenets of what Miranda is, yes.

2       Q    (By Mr. Brustin) But compliance with this

3   procedure is compliance with the law, correct?

4           MS. RETTS:  Form.

5           THE WITNESS:  Again, I believe it recites the

6   basic tenets, which, yes, we are required to do as it

7   relates to Miranda.

8       Q    (By Mr. Brustin) Well, you're required to follow

9   the law on Miranda, correct?

10   A    Yes.

11      Q    And your policies are required to track the law

12  on Miranda, correct?

13          MS. RETTS:  Form.

14          THE WITNESS:  Yes.

15      Q    (By Mr. Brustin) In other words, you can never

16  have a police policy that violated Miranda law, right?

17   A    Correct.

18      Q    All the training on complying with policies on

19  Miranda had to be consistent with the law, correct?

20   A    Yes.

21          MS. RETTS:  Form.

22      Q    (By Mr. Brustin) Critically important, right?

23   A    Yes.

24          MS. RETTS:  Form.

25      Q    (By Mr. Brustin) And so obviously the

Page 50

1   implementation of this policy had to be consistent with the

2   law on Miranda, correct?

3           MS. RETTS:  Form.

4           THE WITNESS:  Yes.

5       Q    (By Mr. Brustin) Okay.  And so assuming that

6   Staatz was the law of the land, in 1989 when the Rangel case

7   occurred, when Saldate continued to question this suspect,

8   after three ambiguous invocations of his right to counsel,

9   he violated this procedure, correct?

10          MS. RETTS:  Form.  Foundation.

11          THE WITNESS:  Again, no.  So we take a look

12  at the policy, when a person wishes to remain silent or have

13  an attorney present, interrogation must cease immediately.

14  That is not what occurred in the Rangel case.  You had the

15  equivocal assertions, in which case, if we go back to your

16  Staatz, which is the law of the land and that's the only

17  case I'm going to consider with respect to your question,

18  then yes, I would agree with you that he should have stopped

19  and clarified or ceased his interrogation.

20      Q    (By Mr. Brustin) And that's all I'm asking you.

21          Assuming that I'm right and that Staatz was the

22  law of the land in 1989, then Saldate would have violated

23  this procedure, correct?

24          MS. RETTS:  Form.

25          MS. BERKE:  Objection.  Foundation.

Page 51

1           THE WITNESS:  Again, this policy states when

2   a person wishes to remain silent or have an attorney

3   present.  That is not what occurred in the Rangel case.

4       Q    (By Mr. Brustin) Okay.  So in other words, the

5   policy of the Phoenix Police Department was that an

6   ambiguous invocation of the right to counsel doesn't

7   implicate the policy, correct?

8           MS. RETTS:  Form.

9           THE WITNESS:  That is not my testimony.  I'm

10  telling you, I'm reading to you exactly what our policy

11  stated in 1989.

12      Q    (By Mr. Brustin) Okay.  And so -- and this is the

13  policy to enforce Miranda?

14          MS. RETTS:  Form.

15          THE WITNESS:  Again, when there is a clear

16  assertion of the right to remain silent or an attorney,

17  questioning must cease.  This policy does not address the

18  equivocal assertion.

19      Q    (By Mr. Brustin) Okay.  So if the -- so in other

20  words, in the Phoenix Police Department, certainly in 1989,

21  it was the policy of the department that if the assertion

22  was not unequivocal, you didn't violate the policy?

23          MS. RETTS:  Form.

24          THE WITNESS:  Correct.  I mean, unless that's

25  in here somewhere else, yeah.

Page 52

1       Q    (By Mr. Brustin) Okay.  So in other words, if

2   there was an ambiguous assertion of the right to counsel or

3   ambiguous assertion of the right to remain silent, it was

4   permissible, under the policy, for the police to continue

5   questioning?

6           MS. RETTS:  Form.

7           THE WITNESS:  That's why the second line of

8   the sentence there is to consult with a legal adviser.  So

9   if questions came about as to whether or not you could or

10  could not continue with the interrogating, then contact the

11  legal adviser.

12      Q    (By Mr. Brustin) I'm asking you a very simple

13  question.

14   A    It may seem simple to you.

15      Q    Okay.  Well, I'm asking you whether or not what

16  Saldate did in Rangel would have violated this policy.

17          MS. RETTS:  Form.  Outside the scope.

18          THE WITNESS:  No.

19      Q    (By Mr. Brustin) Okay.  And it would not, even

20  assuming Staatz was law of the land?

21   A    Would not have violated --

22          MS. RETTS:  Outside the scope.

23          THE WITNESS:  -- subsection E.

24      Q    (By Mr. Brustin) Yes.

25   A    May have violated another portion of the policy

TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                       53–56

Page 53

1  somewhere else.
2      Q    Okay.  But subsection E is the procedure that is
3  designed to enforce Miranda, correct?
4          MS. RETTS:  Form.
5          THE WITNESS:  May not be the whole procedure.
6      Q   (By Mr. Brustin) It's one procedure, correct?
7      A    One of several that could be listed in this
8  voluminous amount of policies that are sitting here.
9      Q    So we're going to get to that problem in just a
10  second, but right now, Section E is one procedure that you
11  know, as a legal adviser, is designed to enforce Miranda,
12  correct?
13          MS. RETTS:  Form.  He is not here testifying
14  as the legal adviser.
15      Q   (By Mr. Brustin) I'm sorry.  You know from your
16  experience as a legal adviser, that Section 14-E is one of
17  the procedures in the department that was designed to
18  enforce Miranda, correct?
19          MS. RETTS:  Form.  He does not know that from
20  his job as a legal adviser because he wasn't a legal adviser
21  during the time that this was in place.
22          THE WITNESS:  I can sit here and tell you,
23  read for you exactly what you're doing, tell you this is
24  what the department had as its policy in 1989.
25      Q   (By Mr. Brustin) So you can't even tell me that

Page 54

1  this was the policy -- so let me ask -- let me do it like
2  I'm a police officer and I come to you and I say,
3  "Commander, is there a policy in the department that gives
4  me any guidance on how to follow Miranda?"
5      A    Yes.
6      Q    "And which policy would that be, Commander?"
7      A    I can't recite it for you off the top of my head.
8  We'll go to the operations orders and look it up.
9      Q    "It's 1989 and I'm looking for a policy and I
10  notice that 14-E seems to address Miranda.  Can you take a
11  look at it and tell me if I'm right?"
12          Would that be a fair question from an officer to
13  you?
14      A    Yes.  That is one subsection that may exist,
15  again, in a myriad of policies that we have on the
16  department.
17      Q    And that would be your advice to a detective that
18  came to you and asked you which policies implicate -- which
19  policies help me -- help me decide how I -- how I -- how I
20  am to ensure that Miranda rights are protected?
21          MS. RETTS:  Form.  Argumentative.  Misstates
22  testimony.
23          THE WITNESS:  My job is to conduct the
24  research before providing an answer.  It's not my job to
25  have the answer to everybody's questions on a day-to-day

Page 55

1  basis without doing research.
2      Q   (By Mr. Brustin) Fair enough.
3          What research have you done before today to
4  determine all of the policies and procedures that were in
5  place between 1982 and 1985 on Miranda?
6      A    I have glanced through all of the policies and
7  procedures, just like I did in my first deposition, to be
8  able to tell you were these the policies and procedures at
9  the time that they existed.
10      Q    So your review was a brief glance?
11      A    Yes.
12          MS. RETTS:  Form.
13      Q   (By Mr. Brustin) Okay.  And during your brief
14  glance, did you see any other policies and procedures, other
15  than 14-E, that related to the implementation of Miranda?
16      A    Yeah.  I believe we had ALEOAC manuals that I've
17  been asked to take a look at.  I believe we have training
18  outlines I've been asked to take a look at, on top of these
19  general orders I've been asked to take a look at.
20      Q    I'm asking you about Miranda.  Have you seen --
21  have you seen other documents relating to the implementation
22  of Miranda?
23      A    Yeah.  Training materials.  The ALEOAC manual.
24      Q    Okay.
25      A    Different things.

Page 56

1      Q    Okay.  So let me start with policy, because you
2  know the difference between policy and training, right?
3      A    Uh-huh.
4      Q    Training is to help you implement policy, right?
5      A    Yes.
6      Q    Help you understand policy, right?
7      A    Yes and no.
8      Q    How is training not meant to help you understand
9  policy?
10          MS. RETTS:  Form.
11          THE WITNESS:  Because policy and training are
12  two different things.
13      Q   (By Mr. Brustin) I agree.  So now let me start
14  with asking you about policy.
15          What other policies, during your brief glance
16  through the materials, did you notice on Miranda, other than
17  14-E?
18      A    I can't give you an answer to that question.
19  I've reviewed so many different policies.  You want me to
20  tell you specifically whether or not E is the sole policy
21  that deals with Miranda in 1989, I can't do that for you.
22      Q    No.  What I want you to tell me, so I don't have
23  to go to the court to get more information, is I want you to
24  tell me is that, are there any other policies that you
25  reviewed which provide guidance on the implementation of

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

Page 57

1 Miranda?

2   A   There may be.

3   Q   And I'm asking you to tell me what they are.

4   A   There may be.  I can't tell you off the top of my

5 head.  I'm telling you there may be, and that's the answer

6 to my question.

7   Q   Okay.  Well, I'm going to ask you some more

8 questions.

9       During your brief glance, do you recall noticing

10 any other policies that touched on Miranda?

11   A   Not off the top of my head, but there very well

12 may be.

13   Q   Okay.  So you don't remember --

14       When did you do this brief glance?

15   A   Prior to my first deposition.

16   Q   Did you do a second brief glance after your first

17 deposition?

18   A   Additional materials that I was asked to review

19 prior to this deposition.

20   Q   Okay.  And during your brief glance in just the

21 last couple of months, do you recall seeing any other

22 policies that related to Miranda?

23   A   There very well may be.  I can't give you a

24 definitive answer to your question.

25   Q   My question is a little different.  My question

Page 58

1 is -- and I'm asking you about your memory now.  And as you

2 sat and you glanced through them, you were looking, one of

3 the things you were looking for, because you knew it was

4 important to this case based on the notice we sent you, was

5 Miranda, right?

6   A   Yes.

7   Q   Okay.  You knew we were looking for information

8 on Miranda, right?

9   A   Yes.

10   Q   And when you did your brief glance, do you

11 remember thinking hey, here's another policy on Miranda?

12   A   Again, I was asked to review a lot of different

13 documents, so yes, there very well may be.  I can't give you

14 a specific answer to your question.

15   Q   Okay.  So as you sit here today, you think there

16 are other policies on Miranda, but you just can't tell me

17 what they are?

18       MS. RETTS:  That's not what he said.

19       THE WITNESS:  There very well may be.  That's

20 not my answer to your question.  There very well may be

21 other policies that I did review that I can't remember right

22 now.

23   Q   (By Mr. Brustin) I don't understand what that

24 means.  I don't understand "There very well may be."  Does

25 that mean that you have a vague recollection of seeing them,

Page 59

1 but you can't specifically tell me what they are?  Or does

2 that mean you have no recollection, one way or another, of

3 whether you saw them?  That's what I'm trying to understand.

4   A   Well, sir, let's take a look at the volumes of

5 documents that are seated on this table.

6   Q   Oh, that's the last thing I'm going to do.

7   A   Okay.  Nine hours in the first deposition, you

8 want me to give you a definitive answer as to whether or not

9 this is the sole policy or if I recall seeing other

10 policies.

11   Q   Oh, no --

12   A   There's no way for me to give you a direct answer

13 to that question.  There very --

14   Q   Oh, no.  I'm sorry.

15   A   Let me finish my answer.

16       There very well may be.

17   Q   What I'm suggesting is that when you reviewed

18 these documents before, that was your job to do it.  And

19 then I'm asking you whether or not you completed that job.

20 That's what I'm asking you.

21       MS. RETTS:  That was not what you were asking

22 him, but.

23       THE WITNESS:  Again, my answer is:  There

24 very well may be other documents I've reviewed that address

25 Miranda that I can't remember right now.

Page 60

1   Q   (By Mr. Brustin) Okay.  But one more question on

2 this.

3       Do you recall, as you were reviewing from

4 Miranda, noticing, even though you can't tell me what the

5 specific policy is, hey, there's another policy on Miranda?

6   A   There very well may be.  I can't give you a

7 definitive answer to that question.

8   Q   All right.  Now, you agree that certainly this is

9 a policy designed to implement Miranda, correct?

10   A   This is a policy that tells officers what they

11 must do if a suspect asserts their right to remain silent or

12 the right to an attorney.

13   Q   Okay.  And you would agree that it's critically

14 important that this policy, given what you just described,

15 tracks the law, correct?

16   A   Yes.  Policy should state the law.

17   Q   And the law says that an ambiguous request for an

18 attorney is a request for an attorney that requires ceasing

19 questioning, correct?

20   A   If we go again --

21       MS. RETTS:  Form.  Foundation.

22       THE WITNESS:  -- by the fact that you want

23 Staatz to be the law of the land, then, yes, I would agree.

24   Q   (By Mr. Brustin) Okay.  And pursuant to Staatz, if

25 Staatz is the law of the land, then an ambiguous request for



EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
61–64

Page 61

1  an attorney would violate this policy, correct?
2      A    That's not what this --
3          MS. RETTS:  Form and foundation.
4          THE WITNESS:  -- policy states, no.
5      Q    (By Mr. Brustin) Okay.  So assuming that Staatz is
6  the law of the land, this policy permits questioning when
7  there's an ambiguous request for an attorney, contrary to
8  the law?
9      A    This policy --
10         MS. RETTS:  Form and foundation.
11         THE WITNESS:  -- doesn't address the Staatz
12  case decision.
13     Q    (By Mr. Brustin) This policy, according to you,
14  permits questioning when there's an ambiguous request for an
15  attorney, correct?
16     A    Not what I stated.  The policy states that
17  officers must cease questioning if the suspect asserts their
18  right to remain silent or the right to a lawyer.
19     Q    Okay.  And so I'm going to do it the same way
20  again.
21         I'm Detective Saldate and I come to you in 1989,
22  and I say, "Commander, I need some assistance on how to
23  interpret this policy."
24         That's a fair question for a detective, right?
25     A    Yes.

Page 62

1      Q    Okay.  And I say to you, "Commander, when a
2  suspect makes an ambiguous request for an attorney, when he
3  says 'I think I may need a lawyer,' pursuant to this policy,
4  am I allowed to keep questioning that suspect?"
5          What's your answer, sir?
6          MS. RETTS:  Form.
7          THE WITNESS:  My answer would be, "Detective
8  Saldate, our policy does not address ambiguous statements.
9  Let me conduct research, and I'll provide you the answer."
10     Q    (By Mr. Brustin) What would your answer be?
11     A    Again, if you want me to go by Staatz being the
12  law of the land, provided he's already conducted that
13  interrogation and he didn't ask me for that advice prior to,
14  then I would say that yes, you had an obligation to go ahead
15  and stop your questioning and clarify what it is the suspect
16  was asking you.
17     Q    That's an excellent clarification.
18         So let's say Saldate comes to you and says, "I've
19  had a situation with ambiguous invocation of a right to
20  counsel, I want to know what I should do going forward
21  pursuant to this policy.  So pursuant to this policy, if a
22  suspect says to me, 'I think I may need a lawyer,' pursuant
23  to this policy, am I allowed to keep questioning that
24  suspect, or do I violate this policy?"
25         MS. BERKE:  Asked and answered.

Page 63

1          THE WITNESS:  Our policy does not address
2  ambiguous statements.  So, again, I would provide my advice
3  based upon the fact that you want me to hold Staatz as the
4  law of the land.  And, "Yes, Detective Saldate, you should
5  have stopped your questioning at that time."
6      Q    (By Mr. Brustin) Okay.  So just to be clear,
7  despite Staatz and despite Inman, it is your position that
8  what Saldate did in Rangel does not violate 14-E in
9  Exhibit 30 on page 18597, correct?
10     A    Correct.
11         MS. RETTS:  Form.
12         THE WITNESS:  That's correct.  The policy --
13  our policy, in 10 of '89, does not address ambiguous
14  statements made by a suspect.
15     Q    (By Mr. Brustin) Fair enough.
16         And you stand by your testimony that not only did
17  it not violate the policy, it did not even require further
18  investigation into Saldate's conduct, correct?
19         MS. RETTS:  Form.  Misstates evidence.
20         THE WITNESS:  Again, we have a lot of
21  different policies and procedures, so while he may not have
22  violated Subsection E, we have other categories in which
23  there could have been possible misconduct for consideration.
24     Q    (By Mr. Brustin) Okay.  What other policies and
25  procedures did Saldate violate when he continued to question

Page 64

1  the suspect in this case after three ambiguous invocations
2  to the right to counsel?
3          MS. BERKE:  Objection.  Misstates testimony
4  and evidence.
5          THE WITNESS:  Again, if you want me to hold
6  Staatz as the law of the land --
7      Q    (By Mr. Brustin) Yes, sir.
8      A    Okay.  Provided that he went through all of
9  those, we could look at neglect of duty, unprofessional
10  conduct, a myriad of other issues.  I would have to go back
11  and have to review these policies on other categories that
12  we can take a look at.
13     Q    In other words, you can't answer my question?
14         MS. RETTS:  Form.
15         THE WITNESS:  I did answer your question.
16     Q    (By Mr. Brustin) Well, no.  I want to know what
17  policies are violated.  You gave me one.  You said neglect
18  of duty.
19         MS. BERKE:  No, he said he would look at
20  that, he didn't say he violated that.
21         MR. BRUSTIN:  You're absolutely right.  He
22  did not say that.
23         MS. RETTS:  And, in conjunction with our
24  discussions that we had regarding the scope of this
25  deposition, this is specifically an area that I talked about

EXHIBIT 15

Page 65

1  that he cannot say what the outcome of a disciplinary
2  investigation was.  He can say that this would have been --
3          MR. BRUSTIN:  Not the question.
4          MS. RETTS:  That is the question.
5          MR. BRUSTIN:  Absolutely not.
6          MS. RETTS:  Would he have been disciplined,
7  what would he have violated --
8          MR. BRUSTIN:  I'm asking him which policies
9  are implicated.  That's all I'm asking.
10          MS. RETTS:  No, you asked what policy did he
11  violate.  He can't say that without a full PSB
12  investigation.
13          MR. BRUSTIN:  You know what, that's fair.
14      Q   (By Mr. Brustin) Which policies are implicated?
15  You said neglect of duty is potentially implicated.  What
16  else?
17      A   Sir, again, let's take a look at the volumes of
18  documents.  Our policies -- let me finish my answer.
19          Our policies and procedures are well over 1300
20  pages.  There's no way for me to possibly have any of that
21  memorized, again, without conducting research.  So if we
22  want to sit here and go through every one of these notebooks
23  so you can compile that list, then let's do that.
24      Q   Just so you understand, my position is that
25  should have happened before today, but the last thing we're

Page 66

1  going to do is do that today.
2      I want to know, as you sit here today, whether
3  you can tell me, other than neglect of duty, what other
4  policies and procedures may have been implicated, and it
5  sounds like you cannot?
6          MS. RETTS:  Form.
7          THE WITNESS:  A full and complete list, no, I
8  cannot.
9      Q   (By Mr. Brustin) Okay.  I didn't ask for a full
10  and complete list.  What I've asked for --
11      A   I gave you a few examples, so aside from that,
12  no, I cannot.
13      Q   So you gave me neglect of duty.  I didn't write
14  down the second.  What else?
15      A   Perhaps unprofessional conduct.
16      Q   What else?
17      A   Training material.  I mean, I don't know.  Again,
18  without going through it, I've given you two things to
19  answer your question.
20      Q   Okay.  Well, I'm, as you can tell, I'm not easily
21  satisfied.  I want every single one you remember.
22      A   Well, that's what I remember.
23      Q   Okay.  Is that -- so the only two, as you sit
24  here, that you can remember are neglect of duty and
25  unprofessional conduct?

Page 67

1      A   Off the top of my head, without going through all
2  of these materials to be able to provide you with a
3  complete, comprehensive list to answer your question, that
4  is correct.
5      Q   Okay.  Let's go through them.
6      Why would the conduct that you just --
7      Why would the conduct that you just saw in Rangel
8  potentially implicate neglect of duty?
9      A   Because, again, if Staatz was the law of the land
10  and he sought the advice and he continued to question, all
11  right, he is neglecting his basic duty as a police officer
12  to not violate somebody's constitutional rights.
13      Q   I'm sorry, there's no suggestion he sought
14  advice, right?
15      A   No.
16      Q   So just different hypothetical -- not
17  hypothetical, different fact, the fact as to what Rangel
18  actually says.
19      Based on what you read in Rangel, why is that
20  potentially neglect of duty?
21          MS. RETTS:  Form.
22          THE WITNESS:  Yeah, again, if you want me to
23  go back to your hypothetical that Staatz was the law of the
24  land, then what Detective Saldate would have done was
25  neglect his duties as a police officer.

Page 68

1      Q   (By Mr. Brustin) By violating the law?
2      A   Potentially violating the law.  Again, you want
3  me to hold Staatz as the law of the land.
4      Q   Take a look at --
5          (An off-the-record discussion ensued.)
6          (Deposition Exhibit No. 111 was marked for
7  identification.)
8      Q   (By Mr. Brustin) This is one of the manuals that
9  you reviewed in preparation for today, correct?
10      A   This is one of the manuals that was provided to
11  me.  Did I read it verbatim page by page?  No, I did not.
12          MS. RETTS:  For clarity, this is not the
13  whole manual.  It's just the statements.
14      Q   (By Mr. Brustin) I'm sorry.  What I'm showing you
15  is -- what am I showing -- Chapter 16 on statements from the
16  manual that was provided to us.
17      A   Okay.
18      Q   This is from 1986, correct?
19      A   Yes.
20      Q   This is something you reviewed in preparation for
21  today?
22      A   This is a document that I was, looked at.  Did I
23  read it verbatim page by page, sir?  No, I did not.
24      Q   All right.  Take a look at page 27556.
25      A   556?



TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                      69–72

Page 69

1    Q   Yeah.

2    A   Okay.

3    Q   You know what, I'm going to skip this.  Let's
4  move on.

5    A   Okay.

6    Q   All right.  Before I get to any more specifics, I
7  want to know --

8        MS. BERKE:  The one you just marked, was that
9  111?

10       MR. BRUSTIN:  Yeah.

11   Q   (By Mr. Brustin) I want to ask you some questions
12  about your preparation in between your last sitting for the
13  deposition and today.  Okay?

14   A   Okay.

15   Q   So, first of all, I want to know every single
16  document that you've read in between your last deposition
17  and today in preparation for today.

18   A   I went through my first deposition.  I briefly
19  reviewed -- again, not every single page -- was it Sergeant
20  Tim Bryant's deposition?

21       MS. RETTS:  (Inaudible response.)

22       THE WITNESS:  That's it, document-wise.

23   Q   (By Mr. Brustin) How much time did you spend
24  reviewing documents?

25   A   Two to three hours.

Page 70

1    Q   And did you have any meetings in preparation for
2  today with counsel?

3    A   Yes.

4    Q   How many meetings did you have?

5    A   One.

6    Q   How long was that?

7    A   Sorry, two.

8    Q   How long were those meetings?

9    A   Hour, hour and a half.

10   Q   Each one?

11   A   Yes.

12   Q   Who was present for those meetings?

13   A   At the first meeting, it was me; counsel,
14  Ms. Retts; Retired Commander/Retired Police Chief of
15  Chandler Sherry Kiyler; and Retired Sergeant Richardson was
16  at the first meeting.  And at the second meeting, it was
17  counsel, Ms. Retts; and Retired Commander Jim Humphrey.

18   Q   Okay.  And when you read Sergeant Bryant's
19  deposition, was there a --

20   A   Let me add one additional thing.

21       For review, also reviewed or watched the videos
22  of Maricopa County Bill Montgomery and the press conference
23  related to the Milke case.

24   Q   Did watching that video in any way inform your,
25  inform you in regard to the topics for this 30(b)(6)

Page 71

1  deposition?

2    A   No.

3    Q   Okay.  And what, if anything, did you learn of
4  relevance in regard to this 30(b)(6) deposition from
5  reviewing the Bryant deposition?

6        MS. BERKE:  Form.

7        THE WITNESS:  Learn anything other than what
8  he felt, you know, was his roles and responsibilities at the
9  time as a homicide supervisor.

10   Q   (By Mr. Brustin) Okay.  How long did you spend
11  reviewing Bryant's deposition?

12   A   Maybe an hour.

13   Q   So no way you could have read the whole thing in
14  an hour?

15   A   I didn't read it verbatim, no.

16   Q   You just skimmed it?

17   A   Yes.

18   Q   Anything in there that you read that you
19  specifically disagreed with?

20   A   Nothing that's coming to mind off the top of my
21  head.

22   Q   All right.  Anything else you did to prepare for
23  your testimony here today?

24   A   Yeah, obviously was able to sit down and ask
25  questions of some of our retirees to try to gain better

Page 72

1  knowledge of how it was that the department operated back
2  during that time period or during certain time periods that
3  they were, like, for example, Sherry Kiyler was the homicide
4  lieutenant at the time, Sergeant Richardson --

5    Q   Are you talking about the meetings you had with
6  counsel?

7    A   Meetings I had where counsel was present where we
8  brought in retirees, yes.

9    Q   Those meetings were designed to help you gather
10  information for today?

11   A   Yes.

12   Q   Okay.  Did you have any meetings outside the
13  presence of counsel?

14   A   No.

15   Q   Tell me what was discussed during those meetings.

16   A   Again, it was nothing more than okay, can you
17  explain to me, like with respect to internal investigations,
18  what was kind of the pattern or the practice as to how we
19  conducted those back during the time period.

20   Q   It was a bad question.  Let's talk about the
21  first meeting.

22       Who was present for the first meeting?

23   A   Sherry Kiyler and Sergeant Richard, Retired
24  Sergeant Richardson.

25   Q   Richardson.



EXHIBIT 15

Page 73

1    Okay.  Who's Sherry Kiyler?
2    A    She retired as a Phoenix police commander.  She
3  was the former lieutenant of the homicide bureau.  Then she
4  was the Chandler police chief after she left Phoenix.
5    Q    All right.  And you mentioned that meeting took
6  about an hour and a half?
7    A    Yes.
8    Q    And how long was it interviewing Sherry Kiyler?
9    A    Well, we were all present for about an hour and a
10  half.  It was going around the room to try to gain a better
11  understanding of how the department operated during those
12  time periods.
13    Q    What information did you get from Sherry Kiyler?
14    A    A better understanding of how they investigated
15  certain cases, what was her role as a homicide lieutenant in
16  certain cases.
17    Q    I want to know what she told you.
18    MS. RETTS:  That's what he's telling you
19  right now.
20    Q    (By Mr. Brustin) I want as specific as you can.
21  What did she tell you about -- give me everything she told
22  you.
23    A    She gave me a general gist as the homicide
24  lieutenant, she had the overall responsibility of overseeing
25  the sergeants, the detectives, and the various homicide

Page 74

1  investigations that occurred during her time period; that
2  there, you know, any personnel-related matters that could
3  come to her attention that she would have to deal with as a
4  lieutenant, how did we conduct department investigations
5  during that time.
6    Q    What time?
7    A    I don't remember the exact years that she was the
8  investigations, or homicide --
9    MR. BRUSTIN:  If you can represent, I would
10  appreciate it.
11    MS. RETTS:  I think, and I would have to go
12  back to my notes, but '86 to '91-ish or '92-ish.
13    Q    (By Mr. Brustin) Okay.  And during that
14  approximate time period, '86 to '91 or '92-ish, what did she
15  tell you was the procedure for conducting investigations?
16    A    No different than kind of the way that we do
17  investigations today.  Everybody is pretty much -- you know,
18  from the time that, you know, you get called out to a
19  homicide, rules and responsibilities are assigned.  As cases
20  continue to progress, that they would sit down and have
21  conversations about those various cases, conversations with
22  county attorney's office related to additional follow-up
23  that may need to be conducted.  Just kind of overall,
24  general investigative procedures.
25    Q    Okay.  I misunderstood.  You're talking about

Page 75

1  actual investigations of crimes?
2    A    Of crimes.
3    Q    Not investigations of misconduct?
4    A    No.  We also did have conversations about that
5  because, as a supervisor, obviously personnel issues or
6  alleged misconduct would come to her attention as a
7  lieutenant.  Then how they would deal with it back then,
8  whether or not it would be investigated by the employee's
9  immediate supervisor, or if it was conduct that would be
10  investigated by internal affairs.
11    Q    What did she tell you?
12    A    She had various issues that alleged misconduct
13  would come to her attention, and there were times where it
14  stayed in house and was handled by the employee's chain of
15  command or sometimes it went over to the professional
16  standards.
17    Q    That was at her discretion?
18    MS. RETTS:  Form.
19    THE WITNESS:  Well, not at her sole
20  discretion.  I mean, she works for bosses and things, too.
21  So, again, none of these are ever decided by one individual
22  on misconduct investigations.
23    Q    (By Mr. Brustin) Did she tell you what would
24  happen if there was a knowing Miranda violation, who would
25  investigate that?

Page 76

1    A    No.  We didn't get that specific.
2    Q    Okay.  Did you get any more specific about what
3  kinds of allegations would be investigated by the chain of
4  command and what kinds of investigations would be
5  investigated by internal affairs?
6    A    We just left it with alleged misconduct.
7    Q    So in other words, you didn't get anything more
8  specific from her about who would do investigations, other
9  than sometimes internal affairs did it and sometimes
10  supervisors did it?
11    A    It depended on the severity of the alleged
12  allegation as to who would investigate it.  Again, we just
13  had general conversation about that.
14    Q    Okay.  And what kinds of allegations would
15  internal affairs investigate between 1986 and '91 and what
16  kind of allegations would supervisors investigate?
17    A    Again, your lower-level alleged misconduct
18  investigations would be investigated typically, no different
19  than they are today, by the employee's immediate supervisor.
20  Any serious alleged misconduct would go to internal affairs.
21    Q    So in other words -- you correct me if I'm
22  wrong -- certainly any conduct that could lead to suspension
23  or termination was investigated by internal affairs between
24  1986 and 1991?
25    A    She didn't say that specifically.  I believe that



EXHIBIT 15

Page 77

1  is the policy or was the policy of the department, that
2  those serious allegations are investigated by internal
3  affairs.
4      Q     Would that be a fair characterization of what she
5  told you?
6      A     We talked in general terms.  We didn't get that
7  specific.
8      Q     Why didn't you get that specific?
9      A     I didn't feel the need to get specific.
10     Q     All right.  So you also talked about how crimes
11  were investigated between 1986 and 1991, correct?  And one
12  of the things you just told me was that there was a lot of
13  communication between the homicide unit and the county
14  attorney's office about a case, correct?
15     A     She said that, yes, they would have conversations
16  about criminal cases with the prosecutors.
17     Q     Okay.  And I take it your understanding, based on
18  your communication with her, was that there would be regular
19  communication between the line detectives and the county
20  attorney's office during the course of a criminal
21  prosecution, correct?
22     A     Yes.
23     Q     And that there would also be regular
24  communication between the supervisors and homicide and the
25  county attorney's office regarding cases that were being

Page 78

1  prosecuted that involved their detectives, correct?
2      A     I don't recall her using the word "regular."  She
3  used the word "communication."
4      Q     Was it your impression that there was regular
5  communication between the chain of command in homicide and
6  county prosecutors -- and the county prosecutors regarding
7  homicide cases?
8      A     It's my impression that there was communication
9  involved in those, yes.
10     Q     And you have no -- you can't give me any better
11  answer about how regular that communication was?
12     A     I cannot.
13     Q     Because you did not ask?
14     A     I did not.
15     Q     Did she give you any more specific details about
16  supervision of homicide cases between 1986 and 1991?
17     A     No, other than just in general terms.  Again, you
18  have obviously the detectives, the supervisor, the sergeant,
19  who would assign the responsibilities, whether it was
20  interviewing victims, witnesses, potential suspects, the
21  scene, and those things.  It was just general, is it still
22  somewhat consistent with how we conduct business today.
23     Q     Okay.  Well, did you ask her any specific
24  questions about day-to-day supervision of detectives during
25  homicide cases?

Page 79

1      A     I did not.
2      Q     So, for example, you didn't ask her any questions
3  about whether, between 1986 and 1991, supervisors were
4  required to review homicide inspectors' reports?
5      A     I did not ask that specific question.
6      Q     So you have no -- withdrawn.
7          Is it still your testimony that there was no
8  requirement that you're aware of between 1982 and 1995 that
9  supervisors review homicide inspectors' reports?
10     A     That is still my testimony.  I have not been able
11  to learn whether or not it was in fact required, no.
12     Q     Okay.  And wouldn't one way to have learned it
13  would have been to ask the homicide lieutenant that you were
14  meeting with about whether or not they were requiring that
15  their supervisors review every report?
16     A     Could have been.
17     Q     Why didn't you do that?
18     A     Because I didn't do it.
19     Q     Who else did you meet with?
20     A     On that day, Retired Sergeant Richardson.
21     Q     What was the point of meeting with Richardson?
22  What information did he have for you?
23     A     Pretty much the exact same information that, at
24  that time, Lieutenant Kiyler had.  Just, again, what was the
25  overall investigative procedures for homicides during the

Page 80

1  time periods that you were there.
2      Q     And did they -- did Richardson give you any more
3  specific information about day-to-day supervision of
4  homicide inspectors?
5          MS. RETTS:  Form.
6          THE WITNESS:  Not that I recall.
7      Q     (By Mr. Brustin) Nothing about how often or when
8  they reviewed reports?
9      A     He said that, yeah, it was his responsibility to
10  occasionally review reports, but that was pretty much it.
11     Q     Are you aware, as you sit here today, that
12  Ontiveros testified that he was required to review every
13  single report that a homicide inspector created?
14         MS. RETTS:  Form.  Misstates testimony.
15         THE WITNESS:  I do recall that coming up in
16  my first deposition, yes.
17     Q     (By Mr. Brustin) Okay.  And so you recognize that
18  that is in conflict with your understanding of the rules and
19  regulations of the department, correct?
20         MS. RETTS:  Form.
21         THE WITNESS:  It's not my understanding.
22  Again, I have not been able to see policy or procedure that
23  required our supervisors to do that.  I understand that was,
24  you know, Ontiveros's testimony, but I still have yet to be
25  able to see or provide, in the search that I've conducted,



TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                      81–84

Page 81

1  anywhere where that was a policy of the Phoenix Police
2  Department.
3      Q    (By Mr. Brustin) Would the right person to ask
4  that question to be the homicide lieutenant?
5          MS. RETTS:  Form.
6          THE WITNESS:  Well, she was the homicide
7  lieutenant for a period of time.
8      Q    (By Mr. Brustin) Wouldn't it be important to know
9  what her understanding of the rules were during that period
10  of time?
11         MS. RETTS:  Form.
12         THE WITNESS:  I didn't see the need myself
13  personally, no.
14     Q    (By Mr. Brustin) Okay.  Isn't that an important
15  question in regard to supervision, whether or not
16  supervisors were responsible for reviewing every report?
17         MS. RETTS:  Form.
18         THE WITNESS:  Again, I don't know whether it
19  was during that time period or not.
20     Q    (By Mr. Brustin) Do you have an understanding,
21  based on -- I assume you've had training on other police
22  departments and with training outside the department that
23  involved other police departments, fair to say, during your
24  career?
25     A    Yes.

Page 82

1      Q    You've been to a variety of trainings, right?
2      A    Yet.
3      Q    And based on that training, was it your
4  experience that in other police departments, metropolitan
5  police departments, typically supervisors would have a
6  sign-off portion of every report the homicide detective
7  created?
8      A    I can't say that I received that training in my
9  23 years for our departments, no.
10     Q    Are you familiar, as a general matter, that many
11  police departments require that detective supervisors sign
12  off on detective reports?
13     A    I'm not familiar with that, no.
14     Q    Okay.  The first you've ever heard of that is me
15  saying it to you?
16     A    Yes.
17     Q    Your understanding --
18     A    With respect to every report, yes.  Are
19  supervisors, I'm sure, in my, again, 23 years of law
20  enforcement experience, required to, you know, randomly read
21  departmental reports?  Yes.  We still have that requirement
22  to this day.
23     Q    Sure.  Your understanding is that in other
24  departments, there's that same random read requirement?
25     A    Absolutely.

Page 83

1      Q    So you would be surprised, for example, to learn
2  that in New York City, homicide supervisors are required to
3  actually sign off and review every report?
4      A    Not surprised.  It's just I don't know what their
5  procedure is.
6      Q    And you would be surprised to learn that happened
7  in L.A.?
8      A    Not surprised, but I don't know what the
9  procedure is.
10     Q    All right.  Who else did you meet with?
11     A    That was the first meeting.  So the second
12  meeting, which we did last week, was with Retired Commander
13  Jim Humphrey, former professional standards bureau
14  commander.
15     Q    During your last deposition, you testified
16  specifically that there was no requirement that supervisors
17  read a report, correct?
18     A    Yes.  I have not been provided anything to be
19  able to say they were required to read every report back in
20  the day.
21     Q    And to your knowledge, that was never a
22  requirement, based on your research?
23     A    Correct.
24     Q    Who is Jim Humphrey again?
25     A    Retired Phoenix police commander and served as

Page 84

1  the commander of our professional standards bureau.  Again,
2  don't remember the exact years.
3      Q    All right.  How long did you meet with him?
4      A    Hour, hour and a half, max.
5      Q    What did you discuss with him?
6      A    Just to gain a better understanding of how
7  internal affairs investigations were conducted back during
8  his time period as the commander of PSB.
9      Q    What was the time period?
10         MS. RETTS:  So he was training, also, so he
11  was training at the academy, and then he went to PSB.  I
12  don't remember what years he was commander because he was in
13  PSB before he was commander, but it would have been during
14  the relevant time frame of this case, like '85, '91-ish.  So
15  he's got -- there are two parts, training and -- I just
16  don't know when his title changed.  He was there, but I
17  don't -- and it was Major back then, Major Commander.
18     Q    (By Mr. Brustin) So what years overall do you
19  think he was there, approximately?
20     A    It was during this time period, I remember seeing
21  that, because he specifically remembers these cases.
22     Q    Okay.  So what information did he give you
23  relevant to this case?
24     A    Gained a better understanding -- because, again,
25  in my first deposition, you know, going back and learning

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
85–88

Page 85

1 the various ways that they, how they conducted
2 administrative investigations, he clarified as to who the
3 discipline decision-makers were during that time period.
4        Then he would also, you know, pretty much stated
5 that he was not aware, during his time as the commander
6 major of internal affairs, any allegation coming forward of
7 misconduct with respect to Detective Saldate.  I think that
8 was --
9    Q    I'm sorry, what was the last thing you said?  I
10 missed it.
11    A    That it was never brought to his attention, as
12 the commander of internal affairs, any misconduct on the
13 part of Detective Saldate or others within the homicide
14 bureau at that time.
15    Q    Okay.  So what he told you was that during the
16 time that he was involved in internal affairs, he never saw
17 any allegations of misconduct against Saldate, correct?
18    A    He was never made aware of any allegations of
19 misconduct by Detective Saldate.
20    Q    How is that different than what I just said?
21    A    I'm just giving you my answer.
22    Q    I want to make sure it's not different than what
23 I just said.  I want to make sure I'm not missing something.
24    A    My answer may not be the same as yours.
25    Q    That's why I'm asking, and I'm asking if you can

Page 86

1 answer my question.
2        So he told you he never saw any allegations of
3 misconduct against Saldate, correct?
4    A    And my answer was he was never made aware of any
5 allegations of misconduct on the part of Detective Saldate.
6    Q    So what allegations of misconduct against Saldate
7 did he see?
8    A    He was not made aware of any allegations of
9 misconduct on the part of Detective Saldate.  So that being
10 my answer, he didn't see any misconduct allegations on the
11 part of Detective Saldate.
12    Q    Okay.  And he did not see or was not made aware
13 of any allegations of misconduct by any homicide
14 investigator, correct?
15    A    I believe he told us he was not made aware of any
16 allegations of misconduct on the part of any homicide
17 detective during that time period.
18        (An off-the-record discussion ensued.)
19    Q    (By Mr. Brustin) And that would include Inspector
20 Morales?
21        MS. BERKE:  Objection.
22        THE WITNESS:  I remember Detective Morales's
23 name coming up.  I just don't remember what he said with
24 respect to Detective Morales.
25    Q    (By Mr. Brustin) He said something about Morales,

Page 87

1 but you can't remember?
2    A    He knows that Morales was part of the homicide
3 bureau at the time, but I don't remember what he said.
4    Q    So what other information did he provide to you
5 about the procedure for investigating misconduct?
6    A    He clarified that, unlike today, our internal
7 affairs obviously not only conducts the investigations but
8 will provide a findings to those investigations.  Back then
9 that was not the role of internal affairs.
10        They were nothing more than a fact finder to
11 administrative investigations.  Then from there the
12 investigation was given to the chief of police and to the
13 division commander or the assistant chief.  And it was them
14 who made the determination on what the findings of the
15 administrative investigation would be.  And it was those
16 individuals that, then, would also decide the discipline, if
17 they sustained an allegation.
18    Q    That is a big difference.
19        So it's your understanding that between 1982 and
20 1995, the time period in question, internal affairs' only
21 role was to make recommendations to the chief of police?
22    A    That's not what I said.
23        All right.  What Commander Humphrey told me,
24 their job was nothing more than a fact finder.  They didn't
25 make any recommendations whatsoever.  Once they conducted

Page 88

1 the investigation, it was then given to the chief.
2    Q    So between 1982 and 1995, the chief of police had
3 sole discretion as to whether or not to make a finding of
4 misconduct, correct?
5    A    I would have to go back again.  What he stated to
6 me was during the time period that he was in PSB, and I
7 don't remember what the time period was.
8        MR. BRUSTIN:  Does it cover all that I said?
9 No.
10        MS. RETTS:  At least '91.  I don't know...
11    Q    (By Mr. Brustin) 1982.  I'm sorry.  I've got the
12 wrong scope.  I was thinking of county.  1982 to 1991.
13        So between 1982 and 1991, what he told you is
14 that the chief had sole discretion in regard to findings of
15 misconduct, correct?
16    A    No.  What he said was the investigation, once
17 they conducted it, was given to the police chief, who then
18 would give it to the appropriate assistant chief over that
19 employee.  Then they would sit there, and they were the ones
20 that would make the finding as to whether or not the
21 allegation would be sustained or not sustained.  And then
22 they would also decide the level of discipline.
23    Q    I'm talking about chain of command.  In the chain
24 of command, between 1982 and 1991, it was the chief who was
25 ultimately responsible for determining whether or not an



TOM VAN DORN  30(b)(6)                                                                April 26, 2018
Debra Jean Milke vs City of Phoenix                                                  89—92

Page 89

1  allegation was sustained or not sustained, correct?
2       MS. RETTS:  Form.
3       THE WITNESS:  Or the assistant chief.  The
4  chief or the assistant chief.
5    Q   (By Mr. Brustin) The chief could delegate it, but
6  it's the chief's responsibility?
7    A   The chief has the ultimate say on any discipline
8  on the department.
9    Q   All right.  And the same was true --
10      It was the chief or assistant chief's role to
11  determine whether or not a finding would be sustained or
12  not?
13   A   Correct.
14   Q   And it was the chief or assistant chief's
15  responsibility, solely, to determine what discipline, if
16  any, would be meted out, assuming there was a finding of
17  misconduct, correct?
18   A   Discipline and/or if they were going to go ahead
19  and send it to the disciplinary review board to make a
20  recommendation to them.
21   Q   But both of those things were solely in the
22  discretion of the police chief and the assistant?
23   A   Correct.
24   Q   And I take it that your testimony is still that
25  there was no standard of review at that time?

Page 90

1       MS. RETTS:  Form.
2       THE WITNESS:  What do you mean by "standard"?
3    Q   (By Mr. Brustin) In other words, there wasn't --
4  in deciding whether or not a claim would be sustained, the
5  police chief or the assistant chief were not required to
6  determine it by preponderance of the evidence, for example.
7    A   Yeah, no evidentiary standard.  It was to compare
8  the facts to department policy and then make their decision.
9    Q   And they had complete discretion on that?
10   A   Correct.
11   Q   There's no standard of, no standard for -- there
12  was no standard set out for making that determination?
13      MS. RETTS:  Form.
14      THE WITNESS:  To my knowledge, there was no
15  standard for that.  I mean, that was not a question that I
16  would have asked somebody from back in the day, what
17  standard they may or may not have applied.
18   Q   (By Mr. Brustin) In your last deposition, you
19  said, to your knowledge, there was no standard, correct?
20   A   And I think that's consistent with what I said.
21   Q   And the same would be true for discipline.  They
22  had complete discretion to determine whether or not to
23  discipline, to discipline an officer and at what level,
24  correct?
25   A   Yes.

Page 91

1       MS. RETTS:  Form and foundation.
2       One caveat is that we cannot find the PSB
3  manual.  There would have been a PSB manual at the time.  So
4  if that was set out there, we don't have it.  We haven't
5  been able to locate it.  We asked Commander Humphrey to look
6  for it, in case he squirreled it away in his personal
7  effects.  He has not located it.  So just with that caveat,
8  we just can't say.
9       MR. BRUSTIN:  No, I appreciate that.
10   Q   (By Mr. Brustin) So my question is more specific.
11      Their memory, in talking to them, was that the
12  chief of the police had complete discretion in regard to
13  sustaining -- or not sustaining, findings and regard to
14  meting out discipline?
15   A   He didn't say complete discretion.  He just said
16  that those decisions were made by them and not by PSB.
17   Q   And he never suggested any standard?
18   A   No.
19   Q   All right.  So, for example, it's your
20  understanding that if, for example, an officer intentionally
21  violated Miranda, it would be within the chief's discretion
22  to terminate that employee?
23   A   It would have been the chief that would decided
24  the discipline, yes.
25   Q   That would be one possible result?

Page 92

1    A   Yes.
2    Q   Suspended that employee?
3    A   Yes.
4    Q   Or provide more training for that employee?
5    A   Possibility.
6    Q   Or do nothing?
7    A   Possibility.
8    Q   That would be their complete discretion?
9    A   Possibility.
10   Q   And you would agree that, to the extent that they
11  evaluated an allegation -- withdrawn.
12      To the extent that internal affairs conducted a
13  fact-finding investigation and the chief of police or his
14  assistant determined, for whatever reason, that the
15  allegation should not be sustained and that no discipline
16  should be meted out, that would not go into the employee's
17  file, correct?
18      MS. RETTS:  Form.
19      THE WITNESS:  Not true, because the
20  investigation would still exist.  It would have followed
21  whatever retention periods at the time, in addition to any
22  documentation that may have existed at the time with regard
23  to that chief's decision.
24      So there would still be some documentation of
25  that.  Whether or not it went into one of their three files



TOM VAN DORN  30(b)(6)                                        April 26, 2018
Debra Jean Milke vs City of Phoenix                          93–96

Page 93

1  that we have, I don't know, sir.  It would still be on file
2  with PSB, though.
3      Q    (By Mr. Brustin) All right.  But certainly a
4  sustained violation would be retained for a much longer
5  period of time, correct?
6          MS. RETTS:  Form.
7          THE WITNESS:  I don't know what the retention
8  period was.  So whether it was sustained or not sustained,
9  there had to have been some sort of a record retention
10  period at the time.
11      Q    (By Mr. Brustin) Did you meet with anybody else?
12      A    No.  That was it.
13          Can I use the restroom?
14          MR. BRUSTIN:  Of course.  Let's take a
15  five-minute break.
16          THE WITNESS:  Thank you.
17          (Recess was taken at 10:39 a.m.; resumed at
18  10:51 a.m.)
19          (Deposition Exhibit No. 112 was marked for
20  identification.)
21          (Mr. Kimerer enters the deposition room.)
22      Q    (By Mr. Brustin) Okay.  Commander, I want to show
23  you what's been marked for identification as Plaintiff's
24  112.
25      A    Okay.

Page 94

1      Q    This is our Amended Notice of Deposition, in
2  other words, the subject matters you were being called to
3  testify here to on behalf of the city.  I take it this is a
4  document you reviewed?
5      A    Yes.
6      Q    Okay.
7          (An off-the-record discussion ensued.)
8      Q    (By Mr. Brustin) You understood that this would be
9  the areas of questioning for today?
10      A    Certain.  Not all of them, I don't believe, are
11  related specifically to my testimony but some of them, yes.
12      Q    And you understood it was your job to gather as
13  much information on these topics as you could, correct?
14      A    Yes.  It's my job to be familiar with policies
15  and procedures, yes.
16      Q    Let me ask you it again:  You understood it was
17  your job to be as familiar about the subject matters that we
18  listed on this Notice of Deposition as you could, correct?
19      A    Yes.
20      Q    All right.  And the first topic that we asked was
21  for policies, procedures, rules, and regulations in place
22  between 1982 and 1990 concerning, among other things,
23  Miranda, correct?
24          MS. RETTS:  Form.
25          THE WITNESS:  Yes.

Page 95

1      Q    (By Mr. Brustin) And, as you've already told us,
2  you made no effort to do that, correct?
3          MS. RETTS:  Form.  Misstates testimony.
4          THE WITNESS:  That's not what I said.
5      Q    (By Mr. Brustin) Okay.  You told us that you
6  glanced through the policies, correct?
7          MS. RETTS:  Form.
8          THE WITNESS:  Correct.
9      Q    (By Mr. Brustin) What this notice requests is that
10  you testify about all of the policies and procedures that
11  relate to, among other things, Miranda, correct?
12          MS. RETTS:  Form.
13          THE WITNESS:  Don't believe it says that I
14  have to have those memorized.
15      Q    (By Mr. Brustin) You had to be prepared to testify
16  about what the policies and procedures are.  That's what it
17  says, right?
18      A    Be able to testify because we have the policies
19  and procedures here in front of me in order to be able to
20  provide that testimony.
21      Q    Okay.  I got it.
22          You didn't understand that that meant you had to
23  read, beforehand, the policies and procedures and determine
24  which ones applied, correct?  That wasn't your
25  understanding?

Page 96

1          MS. RETTS:  Form.  Argumentative.  You're --
2          THE WITNESS:  That was not --
3          MS. RETTS:  -- misstating testimony.
4          THE WITNESS:  -- explained to me.
5          MS. RETTS:  That is not what he said.  He
6  cannot memorize 1300 pages of documents.
7      Q    (By Mr. Brustin) Okay.  Just so we're clear,
8  before I make my motion to the court, you did not understand
9  that your job was to review the policies and procedures and
10  determine which ones implicated Miranda, correct?
11          MS. RETTS:  Form.  Misstates testimony.
12          THE WITNESS:  Yeah.  I was not informed that
13  I was required to have memorized every policy and procedure
14  in the Phoenix Police Department during this time period,
15  no.
16      Q    (By Mr. Brustin) Well, another way you could have
17  done it, other than memorizing it, was you could have sat
18  down with the policy and procedure manual and you could have
19  had a little pad, like I have here, and then as you were
20  reading it, you could have written down the number of the
21  policy that you thought applied to Miranda, right?
22          MS. RETTS:  Form.
23          THE WITNESS:  Well, that's how you think I
24  should act.
25      Q    (By Mr. Brustin) Would that have been something

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018

97—100

---

Page 97

1  you could have done?
2          MS. RETTS:  Form.  That's not the requirement
3  of a 30(b)(6) witness.  He's not incapable of answering your
4  questions, he's incapable of memorizing the content.  He has
5  not been unable to answer anything today, nor was he unable
6  to answer anything before.  So, I mean, it's a waste of time
7  to continue to go through this.  Just ask him the questions.
8          MR. BRUSTIN:  Okay.
9          MS. RETTS:  No witness can memorize the
10  volume of documents that are present on this table.
11          MR. BRUSTIN:  Just because you say words --
12          No, I'm not going to get into it.
13      Q    (By Mr. Brustin) And I'm trying to suggest another
14  way that you could have done your job without memorizing.
15  And one thing you could have done, when you read the
16  policies and procedures, is you could have jotted down the
17  ones you thought applied to Miranda, right?
18          MS. RETTS:  Form.
19          THE WITNESS:  And I appreciate that's how you
20  think I should have done my job, but that's not how I did my
21  job.
22      Q    (By Mr. Brustin) Okay.  And would that have been
23  possible for you to do?
24          MS. RETTS:  Form.
25          THE WITNESS:  I appreciate that's how you

---

Page 98

1  think I should have done my job, but that's not how I did my
2  job.
3      Q    (By Mr. Brustin) My question, sir, is:  Would that
4  have been possible for you to do?
5          MS. RETTS:  Form.  Exceeds the requirements
6  of Rule 30(b)(6).
7          THE WITNESS:  Could it have been possible?
8  Yeah, but it's something I did not do.
9      Q    (By Mr. Brustin) I understand.
10          All right.  And the only thing that you did to
11  determine what policies and procedures applied to Miranda
12  was to briefly glance through the procedures, correct?
13          MS. RETTS:  Form.  Misstates his testimony.
14  He testified extensively in his prior deposition about his
15  experience as well.
16      Q    (By Mr. Brustin) I'm just talking -- all I'm
17  talking about is Miranda policy.
18      A    Again, yes, I briefly glanced through them and
19  then we go through them and I can sit here and answer
20  questions when they are put in front of me.  Did I memorize
21  them and read them verbatim page by page, 1300, 1500 pages
22  of documents here?  No, I did not.
23      Q    The only thing you did to familiarize yourself
24  with policies related to Miranda was to briefly glance
25  through the policies, correct?

---

Page 99

1          MS. RETTS:  Form.  Misstates testimony.
2          THE WITNESS:  Through policies, through
3  training records, through personnel files, through ALEOAC
4  manuals, yes.
5      Q    (By Mr. Brustin) And as you sit here today, you
6  can't tell me one single policy that relates to Miranda?
7          (Mr. Kimerer departs the deposition room for
8  the remainder of the deposition.)
9          MS. RETTS:  Misstates testimony.  He has
10  testified --
11      Q    (By Mr. Brustin) Other than the one --
12          MS. RETTS:  -- extensively on this.
13      Q    (By Mr. Brustin) -- we talked about?
14      A    We've gone through several different policies
15  throughout the course of the years in the Phoenix Police
16  Department, as it relates to Miranda.
17          (An off-the-record discussion ensued.)
18      Q    (By Mr. Brustin) Take a look at number four.  What
19  did you do to prepare yourself to testify about number four?
20          By the way, before you do that -- I apologize --
21  did you review the letter that we had attached to the
22  30(b)(6) notice?
23      A    Not that I recall.
24      Q    Okay.  Go ahead.  I'm sorry.
25      A    Okay.  What was your question, specifically?

---

Page 100

1      Q    What did you do to prepare yourself to testify
2  about the subject in number four?
3      A    Well, we went through a lot of those, pretty much
4  all of those cases during my first deposition.  What have I
5  done since the first deposition between then and now, we
6  pretty much have already covered.
7      Q    The people you interviewed, did you talk to them
8  about any of the matters in number four?
9      A    Aside from just the generals as to whether or
10  not, does anybody recall whether or not any allegations of
11  misconduct were brought forth on the part of Saldate, I
12  think that was pretty much it in the people we talked with.
13      Q    That doesn't have anything to do with number
14  four, correct?
15          MS. RETTS:  Yes, it does.
16          MR. BRUSTIN:  No, it doesn't.
17      Q    (By Mr. Brustin) Four is specifically referring to
18  cases listed in 3-A through 3-I, and the question is --
19          MS. RETTS:  We had a discussion about this
20  wherein I specifically told you that there was no
21  possibility that anybody could testify to the specifics of
22  the investigations.  They could testify that here are the
23  policies, here are the procedures, and you said fair enough.
24          MR. BRUSTIN:  I'm asking if they discussed
25  it.  That's all I'm asking.

---

EXHIBIT 15

TOM VAN DORN  30(b)(6)

Debra Jean Milke vs City of Phoenix

April 26, 2018

101—104

Page 101

1    Q    (By Mr. Brustin) Did you talk to them about those
2  cases?
3    A    I believe we talked about whether or not people
4  were still alive that could provide testimony with regard
5  those actual cases.  Did we discuss these specific cases in
6  depth?  No.
7    Q    Did you discuss these specific cases at all?
8    A    No.
9    Q    Did you discuss these specific cases with
10  anybody?
11    A    No.  Aside from my first deposition, no.
12    Q    All right.  Take a look at number six.
13    A    Okay.
14    Q    Now, you understand that, in your first
15  deposition, you told us that your understanding of policy
16  and procedure between 1973 and 1991 was that supervisors
17  were responsible for investigating allegations of misconduct
18  by homicide investigators, correct?
19        MS. RETTS:  Form.  Misstates testimony.
20        THE WITNESS:  Yeah, I believe that during my
21  deposition, that wasn't my sole statement.  It was first
22  line supervisors, internal affairs, professional standards.
23  You know, there's various different mechanisms for
24  administrative investigations.
25    Q    (By Mr. Brustin) All right.  And during your

Page 102

1  preparation for today, what you learned, from dealing with
2  people who were in internal affairs at the time and
3  lieutenants from the homicide division, was that any serious
4  misconduct was in fact investigated by internal affairs and
5  not the supervisor?
6    A    Yeah, that was their recollection is that it
7  would be investigated by PSB.
8    Q    All right.  But you haven't seen any policies or
9  procedures that in any way validate that memory, correct?
10        MS. RETTS:  Form.
11        THE WITNESS:  That invalidates testimony?  We
12  have to go back to my first deposition and the various ways
13  that admin investigations are done.  I can just tell you,
14  based upon my conversations, what they told me.  To give you
15  a definitive answer to your question, I can't.
16        MR. BRUSTIN:  All right.
17        (An off-the-record discussion ensued.)
18    Q    (By Mr. Brustin) Now, just to be clear, would it
19  be fair to say that you did not go back and read anything in
20  the policy notebook in between your first deposition and the
21  second deposition?
22        MS. RETTS:  Form.
23        THE WITNESS:  Correct.  I didn't have these
24  with me.
25    Q    (By Mr. Brustin) And in between your first and

Page 103

1  second deposition, you did not spend any time reading any
2  policies on discipline, correct?
3    A    Related specifically to this case, no.
4  Obviously, in my role as a commander of a precinct, yeah,
5  I've had to review current policy on discipline.
6    Q    Not in this case?
7    A    No, not in this case.
8    Q    Now, you understood --
9        You told us in your last deposition that under
10  both the 1985 and 1991 policy, a violation for continuing to
11  interview a suspect, who invokes his right to silence, would
12  subject that person to discipline, correct?
13    A    Repeat the first part of that.
14    Q    Sure.
15        Under both the 1985 and the 1991 version of the
16  policy on Miranda for continuing to interview suspects who
17  invoke the right to silence, they would be subject to
18  discipline.  Do you recall that testimony?
19        MS. RETTS:  Form.
20        THE WITNESS:  Should be subjected to an
21  investigation and discipline, yes.
22    Q    (By Mr. Brustin) Okay.  But now, what you've told
23  us today, is that based on your new research, the chief of
24  police had complete discretion to, for any reason, not
25  sustain allegations of the Miranda violation, correct?

Page 104

1    A    Yes.  Those decisions were made by the chief and
2  the assistant chief.
3    Q    And if they chose not to issue any discipline
4  even when it was sustained, they were completely free to do
5  that?
6    A    Provided that they received an investigation to
7  begin with, yeah, that was their ultimate decision.
8    Q    They could choose just not to punish the
9  violation?
10    A    Correct.
11    Q    Which what you described was a very serious
12  violation that should require suspension or termination,
13  correct?
14        MS. RETTS:  Form.
15        THE WITNESS:  It is my personal opinion that
16  sustained allegations of constitutional rights violations,
17  at a minimum, should require at least a suspension.
18    Q    (By Mr. Brustin) Okay.  And certainly repeated
19  should require termination?
20        MS. RETTS:  Form.
21        THE WITNESS:  My personal opinion, yes.
22    Q    (By Mr. Brustin) And that would have been your
23  advice to the legal adviser?
24        MS. RETTS:  Form.
25        THE WITNESS:  Yeah, if I would have asked for

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
105–108

Page 105

1  the advice at the time, depending -- yeah, again, I can't
2  give you a 100 percent answer.  Repeated violations by the
3  same person, my advice would have been, obviously, look at
4  the personnel rules and perhaps make that recommendation,
5  yes.
6      Q    (By Mr. Brustin) And today, your understanding of
7  the policy is that a knowing violation of Miranda would
8  require suspension or termination, correct?
9      A    Yeah, a knowing or intentional violation, yeah,
10  right.  It's just level of suspension and above, yeah.
11      Q    Okay.  And, in other words, one knowing or
12  intentional violation of Miranda today would require
13  suspension or termination, correct?
14      A    Likely.  An intentional violation, yes.
15      Q    And an intentional violation of Miranda today,
16  multiple intentional violations of Miranda, say two or more,
17  would certainly require termination, correct?
18      A    That would be up to the police chief.  It's
19  possible.
20      Q    Presumably?
21      A    It's possible.
22      Q    In other words, if a --
23      A    Still up to the chief --
24      Q    Right.
25      A    -- so.

Page 106

1      Q    But you would expect that to happen?
2      A    Well, I don't get to make those decisions.  We
3  have to ask the chief.
4      Q    Okay.  And based on your preparation for this
5  deposition, you have no reason to think that the discipline
6  would have been any different for a knowing violation of
7  Miranda in 1982, for example?
8          MS. BERKE:  Objection.  Vague.
9          THE WITNESS:  Yeah, I believe in my first
10  statement, I would hope that it would, but I couldn't, you
11  know, tell you exactly --
12      Q    (By Mr. Brustin) Okay.
13      A    -- back then, what was in that chief's mind.
14      Q    But I'm asking you something a little different.
15          Based on your review and the seriousness of the
16  misconduct, as you know it, pursuant to the law, you have no
17  reason to believe that discipline would have been any
18  different in 1982, correct?
19      A    I would --
20          MS. RETTS:  Form and foundation.
21          THE WITNESS:  -- hope not.
22      Q    (By Mr. Brustin) And the same would be true for
23  1985, correct?
24      A    I would hope not.
25      Q    And the same would be true for 1990, correct?

Page 107

1      A    I would hope not.
2      Q    And 1995, correct?
3      A    I would hope not.
4      Q    You would expect, given the severity of a knowing
5  violation of Miranda, that the same discipline that would be
6  meted out today would have been meted out back then?
7          MS. RETTS:  Objection.  Vague.
8          THE WITNESS:  I would hope so.
9      Q    (By Mr. Brustin) In other words, you know, as a
10  lawyer who has expertise in these areas, that the Miranda
11  rights were, the contours of the Miranda rights were well
12  established long before 1982?
13      A    Yes.  I believe Miranda was 1968 or '69, so.
14      Q    And given the seriousness of a knowing Miranda
15  violation, you would expect that a detective who violated,
16  knowingly violated Miranda, let's say in 1989, in addition
17  to facing suspension or termination, might also face
18  demotion?
19          MS. RETTS:  Form.
20          THE WITNESS:  Well, detective is not a
21  separate rank within the Phoenix Police Department, so
22  there's nothing to demote a detective to.
23      Q    (By Mr. Brustin) All right.  Let me be more
24  specific.
25          Being a homicide detective is a privilege.  Fair

Page 108

1  to say?
2      A    I would agree.
3      Q    In fact, I take it that in the Phoenix Police
4  Department, like most major metropolitan police departments,
5  being a homicide detective is the brass ring for a
6  detective?
7          MS. BERKE:  Objection.  Vague.
8          MS. RETTS:  Form.
9          THE WITNESS:  Yeah, I mean, it's a good
10  position.
11      Q    (By Mr. Brustin) Okay.  And certainly you would
12  expect that one ramification of a misconduct as serious as a
13  knowing violation of Miranda, for a homicide detective,
14  would be demotion from being a homicide detective.  Fair to
15  say?
16          MS. RETTS:  Form.
17          THE WITNESS:  Not a demotion.  Subjecting
18  yourself to being removed from the unit.
19      Q    (By Mr. Brustin) You agree that that would be one
20  potential ramification?
21      A    Correct.
22      Q    Certainly you would expect that a homicide
23  detective, who knowingly violated Miranda on more than one
24  occasion in 1989, would be, among other things, would be
25  removed from the homicide division?

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

TOM VAN DORN  30(b)(6)                                April 26, 2018
Debra Jean Milke vs City of Phoenix                   109–112

Page 109

1     MS. RETTS:  Form.
2          THE WITNESS:  I would hope that, if
3  sustained, that there were intentional acts, that that would
4  have occurred.
5      Q    (By Mr. Brustin) And you would expect -- And
6  that's based on your -- that's based on -- withdrawn.
7          That's what would happen today?
8      A    Again, those ultimate decisions are not made by
9  me.  But, yes, knowing, my 23 years of being on the Phoenix
10  PD, yes, I would hope that would occur.
11      Q    That's what you would have expected to happen
12  back in 1989?
13      A    I would hope that that would have occurred.
14      Q    And you would expect that that's what would have
15  occurred, based on your review and preparation and
16  experience for today?
17          MS. RETTS:  Form.
18          THE WITNESS:  Well, since the first
19  deposition to now, obviously, it has been clarified as to
20  who's making those decisions because I will admit that when
21  you go back and look at the policies, they still were
22  somewhat vague back then.  So it was nice being able to
23  clarify, from somebody in charge of that bureau at the time,
24  as to who were the decision-makers in charge.
25      Q    (By Mr. Brustin) But you've seen nothing to

Page 110

1  suggest, you've seen nothing and you've learned nothing to
2  suggest that that type of serious misconduct would have been
3  treated any differently back in 1989, correct?
4      A    Correct.
5      Q    And I think, as Ms. Retts pointed out, you have
6  not been able to locate any of the internal affairs manuals?
7      A    Correct.
8      Q    And remind me again, what have you done to try to
9  do that?
10      A    Well, even prior to my first deposition, I
11  reached out to, it was Lieutenant Paul Taylor, who's
12  currently in professional standards, to have him do an
13  initial check to make sure we didn't have anything stored in
14  boxes in storerooms or archives or anything for you.
15          Then with Commander Jim Humphrey here recently,
16  he wasn't aware.  Again, he was going to check and see if he
17  had anything in his personal files that may still be
18  relevant to this case or help us out.
19      Q    Okay.  Now, you also told us, at your last
20  deposition, that you thought there were training outlines
21  with respect to conducting interrogations that would have
22  existed back in 1989?
23      A    Correct.
24      Q    And you were aware that numerous officers have
25  testified in this case, numerous detectives have testified

Page 111

1  that they received no training on interrogations.  Are you
2  aware of that?
3      A    Yeah.  I do recall some of them stating that,
4  yes.
5      Q    Do you think they were mistaken?
6      A    Yes.
7      Q    You do?
8          So you think that all of those officers that
9  testified that they didn't receive training on
10  interrogations actually did?
11      A    Correct.
12      Q    And that would include Saldate?
13      A    Yes, because he would have received the training
14  in the academy on the basic tenets of Miranda at the time.
15      Q    I'm sorry.  I think they all agreed to that.  But
16  any training after that?
17      A    Oh, then I -- no reason to doubt their testimony,
18  if that's their testimony.
19      Q    You said that you thought there were training --
20  and I thought you were referring to something other than
21  basic training, but maybe you weren't.  You said you thought
22  there were training outlines, with regard to interrogation,
23  that would have existed back in 1989.  Were you referring to
24  basic training?
25      A    Basic training.

Page 112

1      Q    That's all you were referring to?
2      A    Yes.
3      Q    In other words, you were not aware of any
4  training that was provided to detectives?
5      A    No.
6      Q    Now, going back to the basic training, you
7  believe that there was -- you can't say whether or not the
8  detectives, like Saldate, who were homicide detectives in
9  1989, what training they received on Miranda, correct?
10          MS. RETTS:  Form.
11          THE WITNESS:  I don't know --
12          MS. RETTS:  Misstates evidence.
13          THE WITNESS:  -- what additional training
14  they received outside of basic training, but I do believe we
15  went through Detective Saldate's training record or his
16  academy class schedule from the time he was there.  And from
17  the first deposition to now, obviously I've been provided
18  that ALEOAC manual which shows the training on, you know,
19  interrogation law or legal aspects that they were provided
20  in the academy.
21      Q    (By Mr. Brustin) Okay.  And, obviously, to the
22  extent that there was any change in the law in regard to
23  Miranda, I take it that it was your understanding that the
24  Phoenix Police Department was ensuring that officers were
25  trained on that, correct?

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018

113–116

Page 113

1   MS. BERKE:  Objection.  Foundation.

2   THE WITNESS:  Correct, the legal unit was
3   responsible for keeping and is still responsible for keeping
4   the department updated on case law changes.

5   Q   (By Mr. Brustin) Okay.  So have you been able to
6   locate any actual training that you believe Saldate would
7   have received?

8   A   I have not, no.

9   Q   What efforts have you made to do that?

10   A   Again, reaching out to the current homicide
11   lieutenant, Shane Disautel to find out, once again, do we
12   have anything in storage or anything going back to these
13   relevant time periods to be able to produce for you.  They
14   conducted that search, the answer is no.

15   We reached out to the academy, and I think it was
16   the second request to the academy where we ended up coming
17   across this ALEOAC manual.  So it was just me making calls
18   to current employees in the department to, once again,
19   double-check our records to make sure we're producing
20   everything we can possibly produce for you.

21   Q   Now, you said something earlier that I want to go
22   back to, which was you didn't memorize the policy and
23   procedure manual.

24   A   No.

25   Q   Nobody could do that, right?

Page 114

1   A   No.

2   Q   And, certainly, you didn't expect police officers
3   to do that, correct?

4   A   No.

5   Q   And the way I assume the Phoenix Police
6   Department worked during the relevant times periods, which
7   we had as 1982 to 1991, was to ensure that officers were
8   trained on the conduct, permissible conduct and conduct that
9   would violate police procedure, correct?

10   MS. RETTS:  Form.

11   THE WITNESS:  You get a class in the academy,
12   then through your field training process, you know, as
13   things come up, yeah.  But you're advised on your basic role
14   and responsibilities in this job.

15   Q   (By Mr. Brustin) Right.

16   A   But there may be some things that exist out
17   there, as a law enforcement officer, that you didn't get
18   trained on in the academy or trained on in field training,
19   now you're faced with a new scenario, you have no idea, but
20   yet we may have a policy that provides you with that
21   guidance, so they refer to that policy.

22   Q   All right.  But the way that you train, for
23   example, officers on interrogations -- let me take another
24   example.

25   The way you would train officers on

Page 115

1   identification procedures would be to provide them a course
2   whereby you would train them on the contours of the law,
3   correct?

4   A   Yes.

5   Q   And what they can and cannot do to comply with
6   the law?

7   A   Yeah, taught that in the academy.

8   Q   And make it clear to them that if they don't
9   follow that training, there will be serious consequences,
10   correct?

11   A   That you may be subjecting yourself to discipline
12   or investigation.

13   Q   Did I say it accurately?  What you train them in
14   is if you don't do this the right way, there will be serious
15   consequences?

16   A   You used the word "serious," I'm going to use the
17   words "may be subjecting yourself to an investigation or
18   discipline."

19   Q   But would it be fair to say that what you tell
20   them is that if they knowingly violate important policies
21   and procedures that protect constitutional rights, they will
22   be punished?

23   A   If you knowingly and intentionally violate
24   constitutional rights of citizens, yes, there will be
25   consequences.

Page 116

1   Q   Okay.  And you tell them, so they don't do it,
2   what those consequences might be?

3   A   Correct.

4   Q   You could be suspended, right?

5   A   Correct.

6   Q   You could be terminated?

7   A   Correct.

8   Q   And that would be the same with Miranda, that's
9   the kind of training you provide to them.  Here's what you
10   can and cannot do, correct?

11   A   Yes.

12   Q   And if you knowingly violate Miranda, the
13   consequences will be severe?

14   A   Yes.

15   Q   If you knowingly violate Miranda, you could be
16   suspended, correct?

17   A   Yes.

18   Q   If you knowingly violate Miranda, you could be
19   terminated?

20   A   Yes.

21   Q   That's the training, although you can't find the
22   actual training, that's the training you understood that
23   Saldate received, right?

24   MS. BERKE:  Foundation.

25   MS. RETTS:  Form.



EXHIBIT 15

TOM VAN DORN  30(b)(6)                                      April 26, 2018
Debra Jean Milke vs City of Phoenix                        117–120

Page 117

1      THE WITNESS:  No.  The testimony is, again,
2  if you knowingly do it, you may be subjecting yourself to
3  discipline.  Whether or not those ramifications were, you
4  know, like you said, yeah, it could be a suspension, could
5  be a termination or both.  Again, it's still going to be
6  made by the chief, but you know the consequences.
7      Q    (By Mr. Brustin) That wasn't a good question.  I'm
8  trying to do too many things at once.
9          You've told us you couldn't find the actual
10  training Saldate received.
11     A    No.
12          MR. BRUSTIN:  Form.
13     Q    (By Mr. Brustin) Despite not being able to find
14  it, based on your knowledge of the department and the work
15  you've done to prepare yourself today, it's your
16  understanding that, in fact, Saldate was trained on Miranda,
17  correct?
18          MS. BERKE:  Objection.  Foundation.
19          THE WITNESS:  Don't think we found the actual
20  training outlines that he was trained from, but I think we
21  found the class schedule showing the classes he was trained
22  on.
23     Q    (By Mr. Brustin) So you have no doubt, as you sit
24  here today, that in fact he did receive Miranda training,
25  correct?

Page 118

1      A    It's -- yes, I recall, I believe, in some of the
2  categories, the way they did things back then, he should
3  have received Miranda training in the academy.
4      Q    In other words, you have no reason to believe he
5  didn't?
6      A    Correct.
7          MS. BERKE:  Objection.  Foundation.
8      Q    (By Mr. Brustin) And it would be your expectation
9  that that training would have included training on what the
10  law required, correct?
11          MS. BERKE:  Foundation.
12          THE WITNESS:  The law required at the time,
13  yes.
14     Q    (By Mr. Brustin) Okay.  And certainly to the
15  extent there was any relevant changes in what the law
16  required, you would expect him to have been trained after
17  that, correct?
18          MS. BERKE:  Objection.  Foundation.
19          THE WITNESS:  Again, I would hope that the
20  department was keeping the detectives updated on the law,
21  yes.
22     Q    (By Mr. Brustin) Okay.  But in any case, when
23  Saldate was trained on Miranda, you would have expected that
24  the training would have been completely consistent with the
25  law on Miranda, correct?

Page 119

1          MS. BERKE:  Objection.  Foundation.
2          THE WITNESS:  Again, I would hope that it
3  would have been up to date as to what the law was at the
4  time that he was, you know, existed or at the time of this
5  relevant time period.
6      Q    (By Mr. Brustin) So, for example, if Staatz was
7  the relevant law when he was trained, you would have
8  expected that he would have been trained on the teaching of
9  Staatz, correct?
10          MS. BERKE:  Objection.  Foundation.
11          MS. RETTS:  Form.
12          THE WITNESS:  I would have hoped that he
13  received, yes, that by way of the legal unit and a law
14  bulletin or something.
15     Q    (By Mr. Brustin) And you would have expected that
16  training to include, the Miranda training, you would expect
17  it to include training that if a police officer knowingly
18  violates the law on Miranda, there will be serious
19  consequences, correct?
20          MS. BERKE:  Objection.  Vague.  Foundation.
21          THE WITNESS:  Ask your question again.
22     Q    (By Mr. Brustin) Sure.
23          Your expectation would be that Saldate was
24  trained, that if he knowingly violates Miranda, as set out
25  by the law, there will be serious consequences?

Page 120

1          MS. BERKE:  Objection.  Vague.  Foundation.
2          THE WITNESS:  There should be serious
3  consequences if he knowingly and intentionally violated the
4  law.
5      Q    (By Mr. Brustin) But that would be part of
6  training to let him know that if you do this, there will be
7  consequences, correct?
8          MS. BERKE:  Objection.  Vague.
9          THE WITNESS:  No.  It would have been part of
10  department policy that would have put him on notice that if
11  you intentionally violate somebody's constitutional rights,
12  you're subjecting yourself to discipline.  It would not have
13  been part of training.  Training would have been to just
14  train him on what the law of Miranda was at the time.
15     Q    (By Mr. Brustin) So training also, maybe not
16  specifically for Miranda, but training generally includes a
17  lesson that if you violate important rules, there will be
18  consequences, correct?
19     A    No.  That --
20          MS. BERKE:  Objection.  Vague.  Foundation.
21          THE WITNESS:  No.  That is not how we train
22  our employees.
23     Q    (By Mr. Brustin) How is it made clear to your
24  employees that if they violated training on important
25  constitutional rights, there will be serious ramifications?

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
121–124

**Page 121**

1    MS. RETTS: Form.
2         THE WITNESS:  Employees are trained on the
3    discipline policy of the department and what could subject
4    them to investigations.  But on the case law update, we
5    don't go back and review or include a paragraph that says,
6    okay, here's the case law change, if you knowingly violate
7    this, you may be subjected to this.  We don't include that
8    as part of that update.
9    Q    (By Mr. Brustin) I'm not asking you about that.
10   I'm asking you something different.
11        As a general matter, when police officers receive
12   training, as far back as -- withdrawn.
13        Your understanding was that when police officers
14   receive training, they are also told that if they violate
15   important training, for example, training on interrogations,
16   training on Miranda, training on other constitutional
17   rights, there will be serious ramifications, correct?
18        MS. BERKE: Objection. Vague. Compound.
19   Q    (By Mr. Brustin) So how --
20   A    Let me answer your first question first.
21   Q    You said no.
22   A    No, that's not what I said.  Let them make their
23   objections, then I was going to answer your question, all
24   right, is you are taught that if you intentionally violate
25   the law or violate department policy, you may be subjecting

**Page 122**

1    yourself to an investigation and could receive discipline.
2    Q    Nothing more specific than that?
3         MS. RETTS: Form.  Misstates testimony.
4         MS. BERKE: Vague.
5         THE WITNESS:  Yeah, I mean, again, do we
6    provide them training on what does the discipline policy
7    state, yes, but do we bring in, you know, aside from the
8    categories that are listed in there, no.
9    Q    (By Mr. Brustin) Okay.  But you would agree that
10   the primary mechanism by which the Phoenix Police Department
11   has always ensured that officers comply with Miranda is
12   through training?
13        MS. BERKE: Objection. Foundation. Vague.
14        MS. RETTS: Form. Foundation.
15        THE WITNESS:  Yeah.  I would hope that they
16   train them, yeah, on the law of Miranda.
17   Q    (By Mr. Brustin) Okay.  And that training would,
18   of course, track the actual law, correct?
19        MS. BERKE: Objection. Foundation.
20        THE WITNESS: It should track the law, yes.
21   Q    (By Mr. Brustin) Well, you're not aware of any
22   situation where the Phoenix Police Department ever provided
23   training that was inconsistent with the law.  Fair to say?
24   A    I would hope that they didn't, but again, I
25   wasn't employed by them back then.  Nothing I've reviewed to

**Page 123**

1    date leads me to believe that they were negligent in that
2    responsibility.
3    Q    Okay.  And I take it that in Phoenix, like other
4    police departments I'm familiar with, when there are
5    developments in the law on important issues, police officers
6    receive in-service training, correct?
7         MS. BERKE: Objection. Vague. Foundation.
8         THE WITNESS:  We do receive in-service
9    training, however, it is not always to go over changes in
10   criminal code or case law.
11   Q    (By Mr. Brustin) I understand.  But when there
12   are, in fact, changes or clarifications on important
13   criminal procedures, that's one of the areas where there is
14   in-service training, correct?
15        MS. RETTS: Form.
16        THE WITNESS:  The Phoenix Police Department
17   does not provide that during in-service training.  The legal
18   unit sends out their own individual law change updates or
19   case law, you know, case law updates.
20   Q    (By Mr. Brustin) That police officers are
21   responsible to read and follow?
22   A    Correct.
23   Q    Okay.  That's the method and, obviously, it's
24   critically important that the Phoenix Police Department
25   inform police officers in some manner when there is a change

**Page 124**

1    in the law, correct?
2         MS. RETTS: Foundation.
3         THE WITNESS:  Yes.
4    Q    (By Mr. Brustin) So you can't hold officers
5    responsible for following the law, if you don't tell them
6    what the law is, right?
7    A    Correct.
8    Q    So certainly if there was any change in the law
9    on something as important as Miranda, that would be
10   communicated to the chain of command in some manner,
11   correct?
12   A    It would be put out for the entire department,
13   yes.
14   Q    Okay.  And obviously it's made clear to police
15   officers that any change in the law that implicates, that
16   would implicate a suspect's constitutional rights, they are
17   required to follow?
18        MS. BERKE: Objection. Vague. Foundation.
19        THE WITNESS:  Yes.
20   Q    (By Mr. Brustin) All right.  Let's take a look
21   at -- which one is this?  Exhibit 82.  What page is this?
22        (An off-the-record discussion ensued.)
23        THE WITNESS:  82, sir?
24   Q    (By Mr. Brustin) Yes.
25   A    Okay.

EXHIBIT 15

TOM VAN DORN  30(b)(6)                                                April 26, 2018
Debra Jean Milke vs City of Phoenix                                  125–128

Page 125

1    Q    All right.  This is a compilation of disciplinary
2    policies that you reviewed last time.  Do you recall?
3    A    Yes.
4    Q    All right.  If you could take a look at page one.
5    A    Okay.
6    Q    This policy indicates that in 1980, the policy of
7    the department was that allegations of misconduct would be
8    investigated by a supervisor, correct?
9    A    Let me read through page one.
10   Q    Just 1-A.
11   A    Yes.
12   Q    And did you learn anything different from your
13   interviews in the last couple of weeks?
14   A    Again, I don't recall the specific periods that
15   Commander Humphrey was there.  Again, I do recall him saying
16   that, you know, serious allegations of misconduct were
17   primarily handled by internal affairs.
18   Q    Pursuant to this policy in 1980, this suggests
19   that any allegations of misconduct, including serious
20   allegations, are investigated by a supervisor, correct?
21       MS. RETTS:  Form.  Foundation.
22       THE WITNESS:  Well, it says alleged
23   misconduct.  It doesn't specify serious versus nonserious,
24   so alleged misconduct.  Yeah, it appears that in 1980, any
25   alleged misconduct was perhaps handled by the immediate

Page 126

1    supervisor.
2    Q    (By Mr. Brustin) All right.  Now, take a look at
3    eight.  This is the 1985 policy.
4    A    Okay.
5    Q    This policy also makes clear that any alleged
6    misconduct is investigated by the supervisor, correct?
7       MS. RETTS:  Form.  Foundation.
8       THE WITNESS:  Again, it just says alleged
9    misconduct, so it doesn't specify whether serious versus not
10   serious.  Investigated by the immediate supervisor.
11   Q    (By Mr. Brustin) If it doesn't specify, what that
12   means is any misconduct, correct?  That's how you read a
13   policy?
14       MS. RETTS:  Form.
15       THE WITNESS:  You want me to give you a
16   100-percent answer, all right, we'll have to ask people back
17   in that day.  Just because you have a policy that says
18   alleged misconduct will be investigated immediately by the
19   supervisor, doesn't mean that management decisions were not
20   made for it to still go over to internal affairs to be
21   investigated.
22   Q    (By Mr. Brustin) I'm first asking you to interpret
23   a policy, which is something you do all the time, correct?
24   A    Uh-huh.
25   Q    Yes?

Page 127

1    A    Right.  And I am interpreting this for you.
2    Q    And the only way to interpret this policy, just
3    this document, is that any alleged misconduct is
4    investigated by the supervisor, correct?
5    A    I disagree with you.
6       MS. RETTS:  Form.
7    Q    (By Mr. Brustin) What other interpretation could
8    there be of this document?
9    A    The one I just gave you.
10   Q    But it doesn't say that.
11   A    May not say it, but I can't tell you that that's
12   not what management did.  Management may very well decide
13   that the alleged misconduct can be investigated by internal
14   affairs.
15   Q    Pursuant to policy it suggests that any alleged
16   misconduct is investigated by a supervisor, correct?
17   A    Let me specify, there's other portions of
18   department policy that allow supervisors to deviate, if in
19   the best interest of the community and the best interest of
20   the City of Phoenix.  So there may have been decisions made
21   back in 1980, 1985, that regardless of what this paragraph
22   states, it was within management's prerogative to deviate
23   and have it go over to internal affairs.
24   Q    The clear meaning of this paragraph is that any
25   alleged misconduct is investigated by supervisors, correct?

Page 128

1       MS. RETTS:  Form and foundation.
2       THE WITNESS:  I just provided you with that
3    answer.
4    Q    (By Mr. Brustin) The clear --
5    A    Just because this paragraph states this, does not
6    mean that in the other 1300 pages, it gives me the right, as
7    management, to deviate from department policy and allow
8    things, other misconduct investigations to go to internal
9    affairs.
10   Q    I'm going to ask you about the other 1300 pages
11   in a minute, but right now I'm asking you about this policy.
12   And this policy says that any alleged misconduct is
13   investigated by a supervisor, correct?
14       MS. RETTS:  Form.  Foundation.
15       THE WITNESS:  If we didn't have 1300 other
16   pages and this was the only page of the Phoenix Police
17   Department policy, one page, I will agree with you.
18   Q    (By Mr. Brustin) Okay.  Now, tell me what other
19   policies from 1985 suggest that, in fact, this is wrong and
20   serious allegations of misconduct are actually investigated
21   by -- withdrawn.  Let me ask you this first.
22       You would agree that what the internal -- what
23   the people you interviewed told you was inconsistent with
24   this policy?
25       MS. RETTS:  Form and foundation.



TOM VAN DORN  30(b)(6)                                         April 26, 2018
Debra Jean Milke vs City of Phoenix                                129–132

Page 129

1    THE WITNESS:  Correct.
2        MS. RETTS:  And I would just note the caveat
3    that we do not have of the PSB manual, so we're missing --
4        MR. BRUSTIN:  You've made that clear.
5        MS. RETTS:  Well, I mean, the ALEOAC, it's
6    600 pages.
7        MR. BRUSTIN:  We have a clear policy here.
8        MS. RETTS:  Yeah, but the ALEOAC is 600 pages
9    referenced.  This policy can't be --
10       MR. BRUSTIN:  So that's for you to argue.  I
11   hear you, but I've got a policy.  I can only ask about what
12   I have.
13   Q    (By Mr. Brustin) So we've got a clear policy here
14   that's inconsistent with what they told you, correct?
15       MS. RETTS:  Form.  Foundation.  Misstates
16   evidence.
17       THE WITNESS:  Yeah, one page of a 1300-page
18   policy.
19   Q    (By Mr. Brustin) Are you aware of any other
20   policies that you've seen that suggest that in fact serious
21   allegations of misconduct are not investigated by
22   supervisors but are in fact investigated by internal
23   affairs?
24       MS. RETTS:  Form and foundation.
25       THE WITNESS:  Yes.  I told you that somewhere

Page 130

1    else, probably in that 1300 pages, no different than today,
2    that management reserves the right to deviate from any
3    department policy, if in the best interest of the community
4    and the best interest of the city.
5    Q    (By Mr. Brustin) Where is that, sir?
6    A    Okay.  Well, let's go, find me the 1300 pages
7    that existed in '85 --
8    Q    You can't tell me today?
9    A    -- so.
10       No.  I don't memorize 1300 pages of documents,
11   sir.
12   Q    Okay.  Other than that general permission to
13   deviate, is there any other policy you're aware of from 1985
14   which suggests something different than what's stated on
15   page 08?
16       MS. RETTS:  Form.  Foundation.  Incomplete.
17   You're reading from one piece.  The next pages talks about
18   it.
19       MR. BRUSTIN:  Show me.  Where?
20       MS. RETTS:  It talks about internal affairs.
21   An employee under investigation by internal affairs, called
22   for an interview.  So it speaks specifically as to internal
23   affairs, under misconduct investigations 281.
24       THE WITNESS:  Page ten.
25       MS. RETTS:  Employee under investigation by

Page 131

1    internal affairs.  It speaks specifically to internal
2    affairs investigations.
3    Q    (By Mr. Brustin) There's nothing on page ten that
4    changes the requirement on page eight that supervisors
5    investigate all allegations of misconduct that come to their
6    attention, correct?
7        MS. RETTS:  Form.  Foundation.  Vague as to
8    supervisor.
9        THE WITNESS:  I will clarify for you.
10   Investigated by a supervisor.  All right.  Internal affairs
11   is comprised of supervisors.  So it doesn't say the
12   employee's immediate supervisor, it just says a supervisor,
13   which is anybody at the rank of sergeant and above, sir --
14   Q    (By Mr. Brustin) Ah, so that's what this means?
15   A    -- so.
16   Q    Is that what this means?
17   A    Needs to be investigated by somebody of a higher
18   rank.
19   Q    Did you just figure that out?
20   A    No, I didn't just figure that out.  I'm telling
21   you what it says.  That's the same thing that exists today.
22   Q    Okay.  So this doesn't require the immediate
23   supervisor --
24   A    No.
25   Q    -- to.  When you said that before, that was

Page 132

1    wrong?
2    A    That's not what I said.  Some cases are
3    investigated by an immediate supervisor.  Not all cases are
4    investigated by the immediate supervisor.  It just requires
5    that a supervisor, somebody of higher rank, conduct an
6    investigation.
7    Q    Okay.  And you haven't seen any of the
8    policies -- you've not seen any policies that lay out what
9    kinds of misconduct are to be investigated by immediate
10   supervisors and what kinds of misconduct are to be
11   investigated by internal affairs, correct?
12   A    No, just by what Commander Humphrey told us how
13   they did it back in the day.
14   Q    Okay.  So take a look at page 25, A-1.  Under
15   A-1, it says any employee under investigation by the
16   internal affairs bureau or a police department supervisor.
17   A    Uh-huh.
18   Q    So this policy is specifically differentiating
19   between a police department supervisor and internal affairs,
20   correct?
21       MS. RETTS:  Form.
22       THE WITNESS:  What do you mean?  It's an
23   "or."
24   Q    (By Mr. Brustin) Right.
25   A    Either under investigation by IA or under

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
133–136

Page 133

1  investigation by a department supervisor.

2      Q    Right.  So it's specifically distinguishing

3  investigations by a police department supervisor or internal

4  affairs?

5      A    I think counsel pointed out that the previous

6  policy did the same thing.

7      Q    You're missing my point.

8      A    What's your question?

9      Q    Well, the question is a very simple one.

10         Under this provision, it's differentiating

11  between internal affairs investigations and police

12  department supervisor investigations, correct?

13      A    Here.  No different than in any other policy.

14  Same thing.

15      Q    It's saying there's something called a police

16  department supervisor investigation, and there's something

17  called an internal affairs investigation, correct?

18      A    Well, then let me explain to you because this is

19  where counsel at the last deposition got confused.  Let me

20  finish, all right?

21      Q    I'm pretty sure she wasn't, but go ahead.

22      A    Really?

23      Q    Positive.  Go ahead.

24      A    So she is 100-percent familiar with how we do

25  things on the Phoenix Police Department?

Page 134

1      Q    Well, that's not what I meant.

2      A    Okay.  Then can I answer my question now?

3      Q    Sure.

4      A    All right.  Immediate supervisor, possibly.  A

5  department supervisor, sometimes.  And internal affairs.

6  The process is still the same today.

7      Q    All right.  So you haven't answered my question,

8  so I'm going to ask it again.

9         This is differentiating between an internal

10  affairs bureau investigation and a police department

11  supervisor investigation, correct?

12      A    No different than in the previous policy

13  reviewed.  They're just not in the same paragraph.

14      Q    I'm not asking about the previous policy.  I just

15  want to ask you about this.  It's different -- just look at

16  it.

17      A    It's not different than the other policy we just

18  reviewed.

19      Q    Am I giving you an accurate statement of what it

20  says?  It's differentiating between an internal affairs

21  bureau investigation and a police department supervisor

22  investigation.

23      A    Two different investigations.

24      Q    Right.  And it's telling you they are two

25  different ones, right?

Page 135

1      A    It's just telling you who's going to investigate.

2      Q    And in the policy, if we go back to the policy on

3  page 23, it says general order, discipline, misconduct, and

4  investigation of citizen complaints, right?

5      A    Okay.  On 23, right?

6      Q    Yes.

7      A    Okay.

8      Q    Then it talks about disciplinary action was

9  covered here?

10      A    Okay.

11      Q    Any violation of rules and procedures, right?

12      A    Uh-huh.

13      Q    And then it says any misconduct will immediately

14  be investigated by a supervisor, right?

15      A    A supervisor or, flip over to the page, by

16  internal affairs.  The process is no different today.

17      Q    But it doesn't say, in the policy, supervisor or

18  internal affairs, it just says supervisor.

19      A    Look at the policy as a whole from 1991.  You

20  want to take one paragraph, make it inconsistent with this.

21  What this tells me is that, look, we did investigations by

22  either an immediate supervisor or by the internal affairs

23  department.

24      Q    But what this policy says is that the supervisor

25  has to investigate.

Page 136

1      A    A supervisor or, let's flip the page, and go with

2  or internal affairs.

3      Q    It doesn't say -- the next page only says an

4  employee under investigation by internal affairs.  It

5  doesn't say investigate.

6         MS. RETTS:  Form.  Argumentative.

7         THE WITNESS:  Well, under investigation means

8  I would be investigating.

9      Q    (By Mr. Brustin) Okay.  All right.  Take a look at

10  page -- let's go back to page -- let's start with 1985.

11  Let's look at page ten.

12      A    Okay.

13      Q    B.  Read B to yourself on the bottom and let me

14  know when you're done.

15         Commander, you see the problem?

16         MS. RETTS:  Form.  Argumentative.

17         MS. BERKE:  Vague.

18         THE WITNESS:  What's your question, sir?

19      Q    (By Mr. Brustin) This makes very clear that the

20  supervisors they are talking about are line-level

21  supervisors, correct?

22         MS. RETTS:  Form.

23         MS. BERKE:  Vague.

24         THE WITNESS:  Again, I'm going to answer that

25  take a look at the policy as a whole.  It appears to allow

TOM VAN DORN  30(b)(6)                                          April 26, 2018
Debra Jean Milke vs City of Phoenix                            137–140

Page 137

1  for multiple different investigations to be conducted by the
2  department.  Yes, this paragraph says employee's immediate
3  supervisor.  But in the same policy of the same year, it
4  says internal affairs.  Same policy, same year, it says
5  department supervisor.
6        So are there inconsistencies, but yes,
7  however, it still allows any one of those people to conduct
8  an investigation on our department.
9     Q    (By Mr. Brustin) Okay.  Let's go back to B again.
10  We'll just take a step at a time.
11       B makes it crystal clear that a direct
12  supervisor, who becomes aware of an allegation of
13  misconduct, must investigate, correct?
14       MS. RETTS:  Form.
15       THE WITNESS:  If I'm going to sit here and
16  say that B is the only policy we have on the Phoenix Police
17  Department, the answer to your question is yes.  But B is
18  not the only portion of this policy that existed in 1985.
19    Q    (By Mr. Brustin) In fact it says supervisors will
20  not look to higher authority to initiate investigations.
21  They have to do it themselves, right?
22       MS. RETTS:  Form.
23       THE WITNESS:  Again, if B was the only
24  portion of this policy that existed, I would agree with you,
25  but it's not the only portion of this policy that existed in

Page 138

1  1985.
2     Q    (By Mr. Brustin) Did I accurately describe what B
3  says?
4        MS. RETTS:  Form.
5        THE WITNESS:  You accurately described B
6  specific, with neglecting the other portions of the policy
7  that are also in place.
8     Q    (By Mr. Brustin) Okay.  So it's your belief that
9  in 1985 it was sufficient for a supervisor to simply, when a
10  supervisor became aware of an allegation of serious
11  misconduct, despite what it says in B, they would satisfy
12  their responsibility by simply referring it to internal
13  affairs?
14    A    Or having conversations and having them do that
15  themselves or having another department supervisor do it.
16  Bottom line is, regardless, we have a responsibility to
17  investigate, regardless of who's going to conduct the
18  investigation.  That's what the community expects.
19    Q    All right.  Let me try it a different way.
20       You would agree that what 2-B says, here on page
21  ten, is that supervisors are critical in the chain of
22  command for investigating officer misconduct.  Fair to say?
23    A    Correct.
24       MS. RETTS:  Form.
25    Q    (By Mr. Brustin) And this is making it crystal

Page 139

1  clear to supervisors that they have an absolute obligation
2  to investigate any allegations of misconduct, correct?
3        MS. RETTS:  Form.  Incomplete.  Vague.
4     Q    (By Mr. Brustin) You know what, I'll withdraw.
5        They make it -- this makes it crystal clear that
6  a supervisor has to address any allegation of misconduct for
7  one of their officers, correct?
8        MS. RETTS:  Form.  Incomplete.
9        MS. BERKE:  Form.
10       THE WITNESS:  It says they will assume the
11  duties and responsibilities and obligations of their rank in
12  the investigation of an employee under their command to
13  discover inefficiency or misconduct at its earliest stage.
14    Q    (By Mr. Brustin) And the purpose of this is to
15  make it clear to supervisors that they have to take any
16  allegation of misconduct very seriously, right?
17    A    Or have a responsibility to look for any
18  inefficiency on the part of their employees.
19    Q    That would be a way of taking it seriously,
20  right?
21    A    Depends upon the nature of the allegation.
22    Q    Take a look at --
23       (An off-the-record discussion ensued.)
24    Q    (By Mr. Brustin) Take a look at page 12.
25    A    Okay.

Page 140

1     Q    And G is specific direction to a line-level
2  supervisor as to how to investigate employee misconduct and
3  what to do with their investigation, correct?
4        MS. RETTS:  Form.  Foundation.  Incomplete.
5        THE WITNESS:  G states an investigating
6  supervisor.  Doesn't say the employee's immediate
7  supervisor.
8        MR. BRUSTIN:  Give me H.
9     Q    (By Mr. Brustin) G and H.  This is both guidance,
10  it's guidance with how you investigate and what to do with
11  the investigation, right?
12    A    It says an investigating supervisor, doesn't
13  specify the employee's immediate supervisor.
14    Q    And you don't think that's what it means here,
15  based on what you've read in the previous case?
16    A    Investigating supervisor is anybody of the rank
17  of sergeant and above.
18    Q    So you don't think it means the immediate
19  supervisor?
20    A    Not in this particular paragraph, no.
21    Q    Don't you have to read it in the context of what
22  comes before it?
23    A    Take a look at the policy as a whole.  Again,
24  what I'm telling you, the Phoenix Police Department allows
25  investigations by an immediate supervisor, any supervisor on



EXHIBIT 15

TOM VAN DORN  30(b)(6)                                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                                          141–144

Page 141

1  the police department, or internal affairs.  And in my
2  conversations with Commander Humphrey, that's what existed
3  at the time as well.
4      Q    Okay.  I think we can agree on something.  I
5  think we can agree on this, that it's, the policy makes it
6  crystal clear that supervisors are responsible for ensuring
7  that any allegation of misconduct is investigated, correct?
8        MS. RETTS:  Form.
9        MS. BERKE:  Form.
10        THE WITNESS:  Any supervisor on the
11  department, yes.
12      Q    (By Mr. Brustin) Okay.  And direct supervisors are
13  responsible for supervising such that they will uncover
14  misconduct where appropriate?
15        MS. RETTS:  Form.  Vague.
16        THE WITNESS:  I don't think they set out to
17  uncover misconduct on the part of their employees.  It's
18  part of their duties and responsibilities, whether it's
19  reviewing reports, ensuring they show up on time, et cetera,
20  it may come to them.  But do I sit there and go out and
21  intentionally look to see if my employees are committing
22  misconduct, no.
23      Q    (By Mr. Brustin) It's your job, as a supervisor,
24  and it was in '85, under this policy, to ensure that if your
25  officers are engaging in misconduct, you are supervising in

Page 142

1  such a way as to uncover it, correct?
2        MS. RETTS:  Form.
3        THE WITNESS:  If it was brought to my
4  attention, I have a responsibility to investigate.
5      Q    (By Mr. Brustin) That's totally different.  You
6  are responsible as a supervisor, pursuant to the policy, to
7  ensure that you are supervising in such a way as to uncover
8  any misconduct, correct?
9        MS. RETTS:  Form.
10        THE WITNESS:  I don't believe that's what it
11  states, no.  It's my responsibility as a supervisor to do my
12  job as a supervisor, and if I come across misconduct, to
13  investigate it.  It's not my job to specifically go out and
14  see if the employee is committing misconduct.
15      Q    (By Mr. Brustin) Maybe it's just semantics.
16  It's your job as a supervisor to ensure that the
17  chain of command is complying with policy and procedure,
18  correct?
19      A    It is everybody's job to ensure we're complying
20  with policy and procedure.
21      Q    It's your job as a supervisor to ensure that your
22  direct charges are complying with policy and procedure,
23  correct?
24        MS. RETTS:  Form.
25        MS. BERKE:  Form.

Page 143

1      Q    (By Mr. Brustin) It's one of your jobs?
2      A    One of my jobs, yes.
3      Q    And you are responsible for providing them
4  sufficient supervision to make sure that you are monitoring
5  whether or not they are complying with policy and procedure,
6  correct?
7        MS. RETTS:  Form.
8        MS. BERKE:  Vague.
9        THE WITNESS:  I'm not sure I understand your
10  question.
11      Q    (By Mr. Brustin) Okay.
12      A    It's part of my day-to-day responsibilities to
13  ensure that my employees are complying with department
14  policy, yes.
15      Q    A homicide lieutenant or sergeant has to
16  supervise their detectives in such a way that they are
17  monitoring them to ensure that they are complying with
18  policy and procedure, correct?
19      A    Yes.
20        MS. RETTS:  Form.
21        (An off-the-record discussion ensued.)
22      Q    (By Mr. Brustin) Now, in your last deposition you
23  told us that the 1985 policy puts the onus on supervisors to
24  make sure that they are supervising at a level that can
25  discover inefficiency and misconduct in their rank.  Do you

Page 144

1  recall that?
2        MS. RETTS:  Form.
3        THE WITNESS:  That's what this states right
4  here on this page, yes.
5      Q    (By Mr. Brustin) And supervisors had had that
6  responsibility, as you told us, certainly from 1985 to the
7  present, correct?
8      A    Yes.
9      Q    And I take it that it's your position that there
10  is nothing, nothing more specific in regard to guidance
11  provided to supervisors as to how they accomplish that goal?
12        MS. RETTS:  Form.  Vague.
13        THE WITNESS:  I can't say that.  There again,
14  there are other portions of the policy that explain the code
15  of conduct, rules and regulations.  As a supervisor, you
16  know, you're expected to know those things.
17      Q    (By Mr. Brustin) Okay.  One of the areas we've
18  asked for in this 30(b)(6) deposition is what supervision
19  was required to be provided in the relevant time periods,
20  1982 to 1991, of people in Saldate's position, homicide
21  detectives.
22      A    Okay.
23      Q    Other than this mandate, 1985 mandate, is it your
24  testimony you're not aware of any other guidance, specific
25  guidance, as to the manner in which they are required to



TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
145–148

Page 145

1 supervise, correct?

2          MS. RETTS:  Form.  Foundation.  Misstates the
3 scope of 30(b)(6).  Outside the scope.

4          THE WITNESS:  Yeah, I mean, this is alleged
5 misconduct investigations.  There are other things that
6 exist that tell them what are the other responsibilities
7 they have to do as a supervisor.

8    Q    (By Mr. Brustin) Let me give you an example.  You
9 told us that supervisors are required to randomly review
10 reports of detectives, correct?

11    A    Correct.

12    Q    And supervisors between 1982 and 1991, to your
13 knowledge, had complete discretion as to when and how to
14 review reports, correct?

15    A    It's what I've been told, yes.

16    Q    Okay.  In other words, a supervisor in 1985 had
17 the discretion to review zero reports from a homicide
18 detective if they thought they were doing their job
19 appropriately, correct?

20          MS. RETTS:  Form.

21          THE WITNESS:  Not what I've been told.

22    Q    (By Mr. Brustin) Okay.

23    A    The expectation that they would review zero
24 reports would make you negligent, in my opinion, as a
25 supervisor.  And my discussions with, again, Lieutenant

Page 146

1 Kiyler and all them, that would have been an unacceptable
2 practice for them not to review any report by their
3 employees.

4    Q    (By Mr. Brustin) Okay.  So then what was the
5 custom?  How often did you have to review reports by
6 homicide detectives?

7    A    That's a question you'll have to ask Lieutenant
8 Kiyler.

9    Q    So you didn't -- you didn't obtain that --

10    A    I didn't ask her that question.

11    Q    So you don't know whether or not, for example --
12 withdrawn.

13          Would it be fair to say, to your knowledge,
14 lieutenants were free to review one report in every five
15 cases that a homicide detective worked on?

16          MS. RETTS:  Form.  Foundation.  Outside the
17 scope.

18          THE WITNESS:  Yeah, specifically how many
19 number they chose for themselves, I can't answer that
20 question.

21    Q    (By Mr. Brustin) All right.  And to your
22 knowledge, there was no specific requirement placed on
23 supervisors as to when and how they were to review reports
24 between 1982 and 1991, correct?

25          MS. RETTS:  Form.  Foundation.  Outside the

Page 147

1 scope.

2          THE WITNESS:  There could be a bureau manual
3 or something that existed at the time that would have
4 answered those questions.  Nothing I've been able to review.

5    Q    (By Mr. Brustin) Okay.  You've not received any
6 information from any source suggesting that there was more
7 specific guidance provided to supervisors about the manner
8 in which they were to supervise, correct?

9          MS. RETTS:  Outside the scope.

10          THE WITNESS:  Other than the questions or the
11 conversations or questions that I had with Lieutenant Kiyler
12 in that matter.

13    Q    (By Mr. Brustin) Okay.  And Lieutenant Kiyler
14 didn't provide you any more specific information about how
15 often or in what manner supervisors were responsible for
16 reviewing homicide detective reports between 1982 and 1991?

17    A    No.

18          MS. RETTS:  Form.  Outside the scope.

19    Q    (By Mr. Brustin) And so as you sit here today,
20 you're not aware of any, any guidance that was provided to
21 supervisors as to what "randomly review reports" means?

22    A    No.

23          MS. RETTS:  Form.  Outside the scope.

24    Q    (By Mr. Brustin) And you're aware that Sergeant
25 Ontiveros testified that the role of supervisors, per

Page 148

1 management policies, was to review reports within 30 days,
2 correct?

3    A    I understand that's his opinion, yes.

4    Q    And you've not seen any evidence that that was
5 the custom or practice, correct?

6    A    Correct.

7          MS. RETTS:  Form.

8    Q    (By Mr. Brustin) And you're aware that Sergeant
9 Ontiveros testified that every time he reviewed a report, he
10 did paperwork indicating that he reviewed that report,
11 correct?

12          MS. RETTS:  Form.  Outside the scope.

13          MS. BERKE:  Form.

14          THE WITNESS:  I don't recall all of his
15 statements.  If you tell me that's what he said, okay.

16    Q    (By Mr. Brustin) And you're not aware of any
17 evidence suggesting that in fact, in the relevant time
18 period, 1982 to 1991, there was any requirement that
19 lieutenants, that supervisors create paperwork when they
20 reviewed a report?

21    A    Correct.

22          MS. RETTS:  Form.  Outside the scope.

23    Q    (By Mr. Brustin) Now, have you been able to
24 gather --

25          What did I do with --

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
149–152

Page 149

1        (An off-the-record discussion ensued.)
2   Q    (By Mr. Brustin) Okay.  Another area that you
3   understood we would be asking you about today is the
4   promotion process, correct?
5        MS. RETTS:  That is not in here.
6        THE WITNESS:  No.  Not my understanding.
7        MS. RETTS:  It is not in here.
8   Q    (By Mr. Brustin) Well, you understand that
9   promotions are part of supervision and discipline, correct?
10       MS. RETTS:  Form.  That is outside the scope.
11  That is not within this category.  Category six says
12  regulations, customs, or practices between '73 and '91
13  pertaining to the investigation, remediation, supervision,
14  discipline, specifically with respect to internal or
15  external allegations, complaints, or findings of misconduct
16  which the PPD becomes otherwise aware of.
17  Q    (By Mr. Brustin) I'm sorry.  All I want to ask
18  questions about is the effect of discipline on promotion, if
19  you know it, which I think is at least -- I agree it wasn't
20  specifically stated there.  So if you don't know, you can
21  tell me, but I just want to ask you some questions.
22  A    Okay.
23       MS. RETTS:  So can I just have a standing
24  objection that it's outside the scope to this area?
25       MR. BRUSTIN:  I'm not agreeing, but that's

Page 150

1   fine.
2        MS. RETTS:  Right.  I want it, otherwise
3   you're going to hear it to every question.
4        MR. BRUSTIN:  That's fine.
5   Q    (By Mr. Brustin) Do you have an understanding as
6   to the criteria that was used in the promotion process in
7   the early '80s?
8   A    I do not.
9   Q    Do you have an understanding as to the promotion
10  process for the detectives today?
11  A    Yes.
12  Q    And is it your --
13  A    Let me clarify, it's not a promotion.  A
14  detective is a police officer.  It's not an actual
15  promotion, it's an assignment.  A promotion would be going
16  from police officer to sergeant, sergeant to lieutenant, et
17  cetera.
18  Q    Okay.  Police officer to detective is not a
19  promotion?
20  A    It's not considered a promotion by today's
21  standards.  May have been back in the day.  In other police
22  departments, it's my understanding that it is considered a
23  promotion, it's not in the Phoenix Police Department.
24  Q    Is it your testimony you don't think it was a
25  promotion back in the day or that you just don't know?

Page 151

1   A    My understanding of the history of the Phoenix
2   Police Department, that we have never considered it.  With
3   100-percent certainty that they didn't back then, I cannot
4   answer.
5   Q    Are you familiar with the assignment process from
6   police officer to detective today?
7   A    Yes.
8   Q    And as part of that process, does the -- does the
9   chain of command consider prior discipline?
10  A    Yes.
11  Q    And would it be fair to say that as part of the
12  process for assignment from police officer to detective,
13  discipline is, prior discipline is an important component of
14  the process?
15       MS. RETTS:  Form.  Foundation.
16       THE WITNESS:  Depends on what the discipline
17  was for.
18  Q    (By Mr. Brustin) Would it be fair to say that any
19  prior serious discipline -- withdrawn.
20       Would it be fair to say that any prior discipline
21  for serious misconduct would be an important part of the
22  assignment process today from police officer to detective?
23       MS. RETTS:  Form.
24       THE WITNESS:  It would be one of many
25  considerations as to whether or not the person would get an

Page 152

1   opening in homicide, yes.
2   Q    (By Mr. Brustin) Would it fair to say that any,
3   any misconduct that included moral turpitude would, of
4   course, be an important part of the assignment process from
5   police officer to detective today?
6        MS. RETTS:  Form.  Foundation.  Outside the
7   scope.
8        THE WITNESS:  Perhaps yes and perhaps no.
9   There are employees that are convicted of a crimes of moral
10  turpitude that are still police officers and it may not
11  affect their ability to achieve a certain assignment within
12  the department; i.e., we have misdemeanor, officers who have
13  been convicted of misdemeanor assault on the department,
14  which some can consider a crime of moral turpitude.  It may
15  or may not have a reflection if they choose to compete for
16  homicide.  May not automatically disqualify them.
17  Q    (By Mr. Brustin) Oh, I'm not suggesting that.  I'm
18  suggesting that it would be carefully scrutinized as part of
19  the process.
20  A    It would definitely be a part of the evaluation
21  process.
22  Q    And you have no reason to believe that was any
23  different back in the '80s and '90s.  Fair to say?
24       MS. RETTS:  Form.  Foundation.  Outside --
25       THE WITNESS:  I would hope not.



EXHIBIT 15

TOM VAN DORN  30(b)(6)                                     April 26, 2018
Debra Jean Milke vs City of Phoenix                        153–156

Page 153

1          MS. RETTS: -- the scope.

2          (An off-the-record discussion ensued.)

3      Q    (By Mr. Brustin) Would it be fair to say that

4  although the -- I think you've already told us this, but

5  although the, going from detective to homicide detective is

6  obviously just an assignment, it's a highly sought-after

7  assignment?

8          MS. RETTS: Form. Foundation.

9          THE WITNESS: Yeah, if you choose to pursue

10 detective, obviously homicide is considered a prestigious

11 place to work, yes.

12     Q    (By Mr. Brustin) Okay. And at least today, you

13 would expect that a detective who was trying to be

14 reassigned to homicide detective, to the extent that they

15 had prior serious misconduct that was sustained, that would

16 be part of that evaluation?

17         MS. RETTS: Form. Foundation.

18         THE WITNESS: Absolutely, because of Brady, I

19 mean, so there's, it would be a part of the evaluation

20 process if they applied, for sure.

21     Q    (By Mr. Brustin) Okay. You have no reason to

22 believe that was any different in 1980 or 1990. Fair to

23 say?

24     A    I would hope not.

25         MS. RETTS: Form. Foundation. Outside the

Page 154

1  scope.

2      Q    (By Mr. Brustin) Let's take a look at Exhibit 87.

3  Here, I got it.

4          MS. BERKE: What time are you planning to

5  break for lunch?

6          MR. BRUSTIN: I don't know, 15, 20 minutes.

7          THE WITNESS: I have it.

8          Operations?

9      Q    (By Mr. Brustin) Yeah. Are you familiar with this

10 general operations order?

11     A    Without reading it in full detail, yes. It

12 appears to be the same structure form of an operations order

13 of the Phoenix Police Department.

14     Q    All right. If you could take a look at --

15         MS. RETTS: Just FYI, so you know, that might

16 short circuit, this corresponds with a change with PACE.

17 PACE came online in 1991, so this policy corresponds with

18 the implementation of PACE, the, you know, the

19 computerized --

20         THE WITNESS: Yeah.

21     Q    (By Mr. Brustin) Okay. Let's take a look at page

22 14501.

23     A    Okay.

24     Q    And this is a policy that deals with turndowns,

25 correct?

Page 155

1      A    This particular page?

2      Q    Yeah.

3      A    Submission for complaint. It appears it's a

4  policy for -- yeah, how we are to submit complaints to the

5  county attorney's office or city prosecutor. On this one

6  page, without going to other pages, it appears to address

7  any turndowns received by them.

8      Q    What are turndowns?

9      A    Turned down by the prosecutor, typically with a

10 notation as to why they are turning the case down for

11 prosecution. Is it just in furtherance they just need

12 additional things before they can file a charge, is it

13 they're turning it down for a variety of reasons.

14     Q    This policy describes a variety of ways in which

15 the prosecutor's office and the police department

16 potentially communicate regarding turndowns, correct?

17     A    Yeah. One of several ways. I mean, they

18 communicated, you know, by phone, in writing, or through a

19 formal process of receiving the case back with case notes

20 from the prosecutor.

21     Q    It gives a variety of ways it could happen?

22     A    Yes.

23     Q    That's consistent with your understanding of how

24 it worked, that there would be --

25     A    Yes.

Page 156

1      Q    -- when there's a turndown, that's an important

2  event?

3      A    Yes.

4      Q    It's an important event for the prosecutor's

5  office and it's an important event for the police

6  department, correct?

7          MR. BRUSTIN: Form. Outside the scope.

8      Q    (By Mr. Brustin) And this is a policy that deals

9  with how to handle that important event, correct?

10     A    Yes.

11     Q    If you take a look at number nine, if you could

12 read that, then I'll ask you some questions about it. So

13 7-A -- I'm sorry, 7-A-9 on the next page, 14504.

14     A    Okay.

15     Q    And so 7-A-9 is specific instruction that when a

16 turndown implicates any potential misconduct, that

17 misconduct has to be addressed, correct?

18         MS. RETTS: Form.

19         THE WITNESS: Well, the policy requires that

20 some sort of appropriate or corrective action be taken. It

21 could result in a potential investigation. It could result

22 in a training issue.

23     Q    (By Mr. Brustin) You're getting ahead of me.

24         All I'm asking -- and maybe I didn't ask it

25 clearly -- is that this deals with what happens when a

EXHIBIT 15

TOM VAN DORN  30(b)(6)                                April 26, 2018
Debra Jean Milke vs City of Phoenix                   157–160

Page 157

1  turndown implicates potential misconduct by an officer,
2  correct?
3      A    Yes.
4      Q    And what it says is, presumably, I think this is
5  what you're saying, is that if there's an allegation of
6  misconduct, that allegation of misconduct has to be
7  addressed, as any allegation of misconduct would be,
8  pursuant to policy and procedure, correct?
9      A    Should.
10     Q    That's what this is telling you?
11     A    Or it says or training conducted.  So I guess
12  it's just going to depend on what is it being turned down
13  for.
14     Q    Right.  In other words --
15     A    Right.  So the lieutenant has to take it,
16  evaluate it, okay, do we have actual misconduct or do we
17  have just a training issue --
18     Q    Right.
19     A    -- intentional versus not.
20     Q    That would be determined by, you know, other
21  policies and procedures in the department, correct?
22     A    Yes, uh-huh.
23     Q    So if it was a, if it was the type of -- if it
24  was the type of allegation of misconduct that required
25  investigation and discipline, then that would happen,

Page 158

1  correct?
2      A    Presumably, yes.
3      Q    Okay.  And the specific examples they give here
4  are conducting an unlawful search?
5      A    Yes.
6      Q    Failing to properly administer the Miranda
7  warnings?
8      A    Yes.
9      Q    And so this is specific, this is specific
10  information given to supervisors that if turndowns contain
11  allegations of misconduct, they have to be handled according
12  to policy and procedure of the department, correct?
13         MS. RETTS:  Form.
14         THE WITNESS:  I think I understand your
15  question.  So when we receive it from the prosecutor as to
16  why they turned it down, if there's an allegation, of these
17  examples -- we use some, I'm sure there's more examples --
18  but if we use that, that there's a Fourth Amendment or Fifth
19  Amendment violation, then yes, there should be some sort of
20  investigation or some sort of training that should be
21  provided.
22     Q    (By Mr. Brustin) Okay.  And, obviously, if there
23  was an allegation of an -- if there was an allegation
24  suggesting an intentional Miranda violation, then the
25  policies and procedures implicating that violation --

Page 159

1      A    Would be investigated.
2      Q    -- should be investigated?
3          That's what this is saying, right?
4      A    Yes.
5      Q    And one of the examples here is Miranda
6  violations?
7          MS. BERKE:  Objection.  Vague.  Misstates
8  evidence.
9      Q    (By Mr. Brustin) Right?
10     A    Yeah.  Yes.
11     Q    Okay.  Now, we --
12     A    Or, I'm sorry.  To clarify, failing to properly
13  administer Miranda is the example given in this paragraph.
14     Q    And, obviously, that's another kind of Miranda
15  violation?
16         MS. RETTS:  Form.
17         THE WITNESS:  It is a form of a Miranda
18  violation, yes.
19     Q    (By Mr. Brustin) Right.  And, obviously --
20  withdrawn.
21         Ms. Retts was talking about a computer system
22  that was implemented in 1990?
23         MS. RETTS:  Form.
24         THE WITNESS:  Yes, PACE.
25     Q    (By Mr. Brustin) And, obviously, it's your

Page 160

1  understanding that before 1990, there was a noncomputerized
2  mechanism for keeping track of this kind of information.
3  Fair to say?
4      A    That is my understanding, yes.
5      Q    Do you know what that procedure was?
6      A    I do not.
7          MS. RETTS:  Outside the scope.
8      Q    (By Mr. Brustin) Would it be fair to say that this
9  is another way, pursuant to policy, for supervisors to
10  monitor police officers for compliance with policy and
11  procedure?
12         MS. RETTS:  Form.  Foundation.  Outside the
13  scope.
14         THE WITNESS:  I think it's part of the system
15  of checks and balances that are in place.
16     Q    (By Mr. Brustin) Better way of saying it.
17         One component of the system of checks and
18  balances for, let's say, homicide detectives, is reviewing
19  their reports, correct?
20         MS. RETTS:  Foundation.
21         THE WITNESS:  Yes.
22     Q    (By Mr. Brustin) Another component for, of checks
23  and balances for homicide detectives is reviewing turndowns?
24     A    Yes.
25         MS. RETTS:  Same objection.

EXHIBIT 15

TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                           161–164

Page 161

1    Q   (By Mr. Brustin) Another component of checks and
2  balances for homicide detectives would be communication with
3  district attorneys, county attorneys, who are prosecuting
4  cases to ascertain the conduct of police officers in their
5  view, correct?
6        MS. RETTS:  Form.
7        THE WITNESS:  Trying to get what -- so yeah.
8    Q   (By Mr. Brustin) I'm sorry.  Another, another
9  check and balance on homicide detectives would be
10 communication with prosecutors about their view of
11 investigations done by Phoenix police officers, correct?
12   A   Yes.
13       MS. RETTS:  Form.
14       (An off-the-record discussion ensued.)
15   Q   (By Mr. Brustin) All right.  So let's take a look
16 at Exhibit 64.  Do you recall being asked some questions
17 about the Running Eagle case in the first deposition?
18   A   I recall being asked about that line of cases
19 that was on your 30(b)(6) notice, yes.  Specifically what
20 the questions were, no, but I recall being questioned, yes.
21   Q   You recall the Running Eagle case was the case
22 where you reviewed a report and you saw a clear invocation
23 of the right to remain silent.  Do you recall that?
24       MS. RETTS:  Form.
25   Q   (By Mr. Brustin) You know what, I'll show you so

Page 162

1  we're on the same page.
2        If you take a look at 15.
3    A   Okay.
4    Q   I'm going by Bates stamp to the left.
5    A   Okay.  The underline?
6    Q   Yeah.  You can see that -- if you look at 14,
7  first --
8    A   Okay.
9    Q   -- you can see that this is a report created by
10 Saldate concerning his interrogation or interview of Shawn
11 Running Eagle.
12   A   Okay.
13   Q   And you can see on page 15 --
14   A   Okay.
15   Q   -- end of the first partial paragraph, last
16 sentence, "I again told him that I would try to understand,
17 but he replied that he wanted to remain silent."
18   A   Correct.
19   Q   Do you see that?
20   A   Yes.
21   Q   And that's a clear invocation of his right to
22 remain silent, correct?
23   A   Appears to be to me.
24   Q   And as you told us, contrary to the law on
25 Miranda and policy and procedure, Saldate continues to ask

Page 163

1  questions, correct?
2        MS. RETTS:  Form.
3        THE WITNESS:  I will take your word for it
4  that that's how I testified.  Whether or not he asked
5  questions related to getting an incriminating response or
6  other questions, I'd have to read through this, but, yes.
7    Q   (By Mr. Brustin) I'll make it simple --
8    A   It does appear he did ask additional questions.
9  What they were designed to do, I don't know.
10   Q   Well, no.  I want to look specifically, take a
11 look -- skip the first paragraph, go to the next paragraph,
12 where the interrogation continues.
13   A   Okay.
14   Q   "I then asked."
15   A   Okay.
16   Q   That's interrogation, correct?
17   A   Yes.
18   Q   Now, I want to show you --
19       (An off-the-record discussion ensued.)
20   Q   (By Mr. Brustin) But, first, I want to ask you,
21 obviously any supervisor who reviewed this report, who read
22 it, would know that there's a clear Miranda violation,
23 correct?
24       MS. RETTS:  Form.  Foundation.  Outside the
25 scope.

Page 164

1        THE WITNESS:  I would hope they do.
2    Q   (By Mr. Brustin) Okay.  And so what must have
3  happened here is that this wasn't one of the random reports
4  that his supervisor reviewed, correct?
5        MS. RETTS:  Form.  Foundation.
6        THE WITNESS:  I don't know.
7    Q   (By Mr. Brustin) Let me withdraw the question.
8    A   Yeah.
9    Q   There's two possibilities here.  There's a few
10 possibilities.  One possibility is that this wasn't one of
11 the random reports that a supervisor reviewed, right?
12       MS. RETTS:  Form.  Foundation.
13       THE WITNESS:  Could be.
14   Q   (By Mr. Brustin) Another possibility is that the
15 supervisor reviewed this report, saw that there's a Miranda
16 violation, and took no action, correct?
17       MS. RETTS:  Form.  Foundation.
18       THE WITNESS:  Could be.
19   Q   (By Mr. Brustin) Well, we know there was no action
20 taken based on your review, correct?
21   A   Based on what has been provided to me, correct.
22   Q   All right.  And, obviously, if that's what
23 happened, if a supervisor was aware of this Miranda
24 violation and failed to take appropriate action, whether
25 investigating it himself or ensuring it was investigated,

TOM VAN DORN  30(b)(6)                                      April 26, 2018
Debra Jean Milke vs City of Phoenix                        165–168

Page 165

1  they would be subject to discipline.
2          MS. RETTS:  Form.  Foundation.
3          THE WITNESS:  Yes.  They may also be
4  subjecting themselves to an investigation and possible
5  discipline.
6     Q   (By Mr. Brustin) And by the way, this isn't an
7  allegation of misconduct, this is an admission of
8  misconduct?
9          MS. RETTS:  Form.  Foundation.
10         THE WITNESS:  Well, no, this is a criminal
11  case.  This is not an admission by the detective that, you
12  know, he engaged in intentional misconduct.
13    Q   (By Mr. Brustin) I'm sorry.
14    A   You've got to keep the two separate.
15    Q   I'm sorry.  This document contains direct
16  evidence that Saldate, in fact, violated Miranda?
17         MS. RETTS:  Form.  Foundation.
18         THE WITNESS:  Yeah, this document appears to
19  show that he continued to question the suspect, even after
20  he invoked his right to remain silent, in violation of
21  Miranda.
22    Q   (By Mr. Brustin) Okay.  And by the way, writing
23  down that you violated Miranda doesn't in any way mitigate
24  the fact that you violated Miranda, right?
25         MS. RETTS:  Form.  Vague, as to "violate."

Page 166

1          THE WITNESS:  What do you mean by that?
2     Q   (By Mr. Brustin) Writing down that you violated
3  Miranda doesn't in any way lessen the Miranda violation,
4  correct?
5          MS. RETTS:  Form.
6          MS. BERKE:  Objection.  Vague.
7          THE WITNESS:  I don't see where he said he
8  violated Miranda.  It says he documented what occurred in
9  that room that day.
10    Q   (By Mr. Brustin) Okay.  Fair enough.
11         In any case, if you take a look down, just a
12  couple paragraphs after he's invoked his right to silence,
13  it says, do you see where it says, "Finally Shawn"?
14    A   Yes.
15    Q   "Finally Shawn commented in a louder voice and
16  said, quote, 'Just let me fall.  It must be my destiny.  I
17  must fall.'"
18         And, obviously, that is a potentially inculpatory
19  statement, correct?
20         MS. RETTS:  Form.
21         MS. BERKE:  Objection.  Misstates evidence.
22  Foundation.
23         THE WITNESS:  I don't know enough about the
24  case to say whether it is or isn't, sir.
25    Q   (By Mr. Brustin) You certainly have no reason to

Page 167

1  dispute Saldate if he said he thought it was a potentially
2  inculpatory statement, correct?
3          MS. RETTS:  Objection.  Foundation.
4  Misstates testimony.
5          THE WITNESS:  I think he just wrote down
6  exactly what the guy quoted.
7     Q   (By Mr. Brustin) I'm sorry, but you have no reason
8  to dispute Saldate if he said he believed, based on his
9  investigation, that that was a potentially inculpatory
10  statement?
11         MS. BERKE:  Objection.  Misstates testimony.
12         THE WITNESS:  I don't see where he states
13  that.
14    Q   (By Mr. Brustin) He doesn't.  I'm telling you he
15  stated it in his deposition.  I'm sorry.  He's testified to
16  that and I'm asking you to assume and I'm not going to show
17  it to you --
18         MS. BERKE:  Misstates testimony.
19    Q   (By Mr. Brustin) -- but assuming he said that,
20  that it was in fact in his view an inculpatory statement,
21  you have no reason to dispute that, correct?
22         MS. BERKE:  Objection.  Misstates testimony.
23         THE WITNESS:  Assuming that was his
24  testimony, then that's his testimony.  I have no reason to
25  dispute that.

Page 168

1     Q   (By Mr. Brustin) Well, you have no reason to
2  dispute that this is, in fact, an inculpatory statement?
3          MS. BERKE:  Objection.  Foundation.
4          MS. RETTS:  Asked and answered.  Foundation.
5          THE WITNESS:  I don't know enough about the
6  case to say whether or not it is.  That's for Detective
7  Saldate to answer.
8     Q   (By Mr. Brustin) Okay.  Now, you would agree that
9  it is critically important for homicide detectives to be
10  completely honest and candid when they testify in criminal
11  matters?
12         MS. RETTS:  Form.
13         THE WITNESS:  Yes.
14    Q   (By Mr. Brustin) And you would agree that one of
15  the -- you understand, from your experience in the
16  department, that one of the roles of homicide detectives is
17  to testify in something that's called a voluntariness
18  hearing?
19    A   Yes.
20    Q   And a voluntariness hearing is a hearing that is
21  designed to determine whether or not a potentially
22  inculpatory statement will be admitted into evidence,
23  correct?
24         MS. RETTS:  Form.
25         THE WITNESS:  One of several things that

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
169–172

Page 169

1  occur at a voluntariness hearing, yes.
2      Q      (By Mr. Brustin) And you would expect, given what
3  you just saw on page 15, that to the extent anybody was
4  trying to admit the statement, "Just let me fall, it's my
5  destiny, just let me fall," there would, at a minimum, have
6  to be a voluntariness hearing, right?
7          MS. BERKE: Objection. Vague.
8          MS. RETTS: Objection. Form. Foundation.
9          THE WITNESS: I don't know the answer to
10  that. Look at this entire case, I have to read the entire
11  case to answer.
12      Q      (By Mr. Brustin) Oh, I don't think you do.
13          You would agree that, just from reading this
14  report, you understand, as former legal adviser, that any
15  statement made, that any statement made after a clear
16  invocation of the right to remain silent, typically wouldn't
17  be admitted?
18          MS. RETTS: Objection. Form. Foundation.
19  Outside the scope.
20          THE WITNESS: You can have questions, even
21  post-violation of Miranda, that are not Miranda-related or
22  crime-related questions designed to elicit that
23  incriminating response.
24      Q      (By Mr. Brustin) But this clearly is.
25          MS. BERKE: Objection. Foundation. Vague.

Page 170

1  Asked and answered.
2          THE WITNESS: I don't know the answer to that
3  question. That's for Detective Saldate. I can't answer
4  that question for you.
5      Q      (By Mr. Brustin) Okay. Take a look at 51.
6      A      Same tab?
7      Q      It's the same file.
8      A      Okay.
9      Q      This is now, I'll represent to you, is the
10  voluntariness hearing.
11      A      Okay.
12          MR. BRUSTIN: Where's the first page of it?
13          (An off-the-record discussion ensued.)
14      Q      (By Mr. Brustin) I will represent to you that this
15  is a voluntariness hearing.
16      A      Okay.
17      Q      Okay. Now, do you see on line 11, this is
18  questioning from the prosecutor of Detective Saldate.
19      A      Okay.
20      Q      And read to yourself lines 11 to line 19 -- to
21  23, I'm sorry.
22      A      Okay.
23      Q      You know what, I was wrong again. Line 25.
24      A      Okay.
25      Q      And I will represent to you that Saldate here is

Page 171

1  referring to the report that you just reviewed.
2      A      Okay.
3      Q      And that makes sense?
4          MS. BERKE: Objection. Foundation.
5          MR. BRUSTIN: Wait, you're saying that's not
6  what he was referring to? You don't remember that?
7          MS. BERKE: It doesn't say that.
8          MR. BRUSTIN: You don't remember that?
9      Q      (By Mr. Brustin) So in any case, what he was
10  referring to was his report on this case. And that would
11  make sense, right?
12          MS. BERKE: Objection. Foundation.
13          MS. RETTS: Foundation. Outside the scope.
14          THE WITNESS: If you want me to take what it
15  is you're telling me as truth, then we can proceed from
16  there. I don't know whether it is or not, so.
17      Q      (By Mr. Brustin) Okay. Well, I would like you to
18  take it as true, that that's the report he's referring to.
19      A      Okay.
20      Q      His interview of Running Eagle and --
21          You need a minute?
22      A      No, I'm fine. Go ahead.
23      Q      -- his interview of Running Eagle, and that's the
24  subject of the voluntariness hearing. Okay?
25      A      Okay.

Page 172

1      Q      Now, and what you just read, assuming that's the
2  report in question, it appears that on the stand, he's
3  looking at his report to refresh his recollection, correct?
4      A      Yes. It appears he did.
5      Q      And he's specifically looking at his report to
6  refresh his recollection about whether or not Running Eagle
7  indicated he wanted to remain silent?
8          MS. BERKE: Objection. Misstates evidence.
9          THE WITNESS: One more time, sir.
10      Q      (By Mr. Brustin) He's specifically reviewing his
11  report to refresh his recollection about whether they had a
12  conversation after he had asked to remain silent, correct?
13          MS. RETTS: Form. Foundation.
14          THE WITNESS: With respect to this page, yes.
15      Q      (By Mr. Brustin) Okay. And even more
16  specifically, he's reviewing his recollection to see if
17  there are any statements that were made after he asked to
18  remain silent?
19      A      Correct.
20      Q      And it appears that he looks at his report,
21  right?
22      A      Yes.
23          MS. RETTS: Foundation.
24      Q      (By Mr. Brustin) And says no, no statements were
25  made after he asked to remain silent, correct?

TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                      173–176

Page 173

1          MS. RETTS:  Form.

2          THE WITNESS:  He said no, he did not.

3     Q    (By Mr. Brustin) Well, that's what it means,

4   right?

5          MS. BERKE:  Objection.  Foundation.

6          THE WITNESS:  I'm reading how the detective

7   answered.

8     Q    (By Mr. Brustin) Is that how you understand it?

9          MS. RETTS:  Foundation.  Outside the scope.

10         THE WITNESS:  Detective Saldate stated he did

11  not make any additional statements.

12    Q    (By Mr. Brustin) Take a look at page 22 -- I'm

13  sorry, wrong page number.  52.

14    A    Okay.

15    Q    If you can read to yourself line four all the way

16  to line 24.

17    A    Okay.

18         Okay.

19    Q    And you agree that here Saldate is clearly

20  stating that Running Eagle made the statement "Just let me

21  fall" before he invoked his right to remain silent, correct?

22         MS. RETTS:  Form.  Foundation.  Outside the

23  scope.

24         THE WITNESS:  That is what this states, yes.

25    Q    (By Mr. Brustin) Okay.  And this page you just

Page 174

1   read also makes clear that he reviewed his report again for

2   a second time, correct?

3     A    Correct.

4          MS. RETTS:  Form.

5     Q    (By Mr. Brustin) Now, keep this page out, and if

6   you just turn back to page 15 --

7     A    Okay.

8     Q    -- you would agree that Saldate's testimony --

9   withdrawn.

10         Assuming this is the report he was reviewing, you

11  would agree that Saldate's testimony directly contradicts

12  his report, correct?

13         MS. RETTS:  Form.  Foundation.  Outside the

14  scope.

15         THE WITNESS:  I cannot answer that question.

16  What I can say is that in the report, the statement appears

17  to fall in chronological order after the suspect invoked his

18  right to remain silent.  In his testimony, though, however,

19  he states that it was made prior to the suspect invoking.

20    Q    (By Mr. Brustin) That's a fair characterization.

21         You would agree that assuming that the report is

22  in chronological order, there's no question that the

23  statement was made after he invoked his right to remain

24  silent, correct?

25         MS. BERKE:  Objection.  Foundation.

Page 175

1          MS. RETTS:  Form and foundation.

2          THE WITNESS:  Correct.  If the report was

3   written in chronological order, the way the events happened,

4   it appears that the statement was made after he invoked his

5   right to remain silent.

6     Q    (By Mr. Brustin) Okay.  And that would be directly

7   inconsistent with his testimony at the trial?

8          MS. BERKE:  Objection.  Foundation.

9          MS. RETTS:  Form.  Foundation.

10    Q    (By Mr. Brustin) The voluntariness hearing.

11    A    If that is what occurred, then correct.

12    Q    Okay.  And your understanding is that typically

13  detectives write the reports in chronological order,

14  correct?

15         MS. BERKE:  Form and foundation.

16         MS. RETTS:  Foundation.  Outside the scope.

17         THE WITNESS:  Sometimes yes, sometimes no.

18    Q    (By Mr. Brustin) Okay.  You have no reason to

19  dispute Saldate, when he testified that, in fact, he did

20  write his reports in chronological order, correct?

21         MS. RETTS:  Objection.  Misstates testimony.

22         THE WITNESS:  If that's how he testified --

23         I'm sorry, I've got to give them time to

24  object.

25         I really am trying my best for you, ma'am.

Page 176

1          No reason to dispute that, if you tell me

2   that's how, what he stated.

3     Q    (By Mr. Brustin) Okay.  And you would agree that

4   with nothing more, the contradiction you just saw, after

5   Saldate reviewed this report two times on the stand, is a

6   troubling contradiction?

7          MS. BERKE:  Objection.  Foundation.

8          MS. RETTS:  Form.

9          THE WITNESS:  If that is how Detective

10  Saldate stated, that he writes in chronological order, this

11  is his testimony.  And looking at it, it appears the

12  statement was made after the suspect invoked his right to

13  remain silent.

14    Q    (By Mr. Brustin) Okay.  And, certainly, you would

15  expect that this kind of -- withdrawn.

16         You would certainly expect that if there was a

17  voluntariness hearing about the admissibility of that

18  inculpatory statement, you would expect that Officer Saldate

19  would be fully familiar with his report, correct?

20         MS. RETTS:  Foundation.

21         THE WITNESS:  I would hope that Detective

22  Saldate reviewed his report prior to showing up at the

23  voluntariness hearing, but if he needed to, it's not

24  uncommon to have to refer to our report to, you know,

25  refresh our memory on the stand as well.



TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                      177–180

Page 177

1    Q   (By Mr. Brustin) But you would agree that nothing
2   could be more important at a voluntariness hearing in this
3   case, given the report you just read, than the timing of
4   when he invoked his right to remain silent, correct?
5        MS. RETTS:  Form.  Foundation.
6        MS. BERKE:  Objection.  Outside the scope.
7        THE WITNESS:  If he received previous notice
8   as to what the voluntariness hearing was about, so if it was
9   a motion to suppress statements made, yeah, I would hope
10  that, again, he reviewed his report prior to going over to
11  see how that interrogation took place.
12   Q   (By Mr. Brustin) All right.  And you would agree
13  there would be nothing -- given the subject of this
14  voluntariness hearing and the report, nothing could be more
15  important than the timing of when he invoked his right to
16  remain silent, right?
17       MS. BERKE:  Objection.  Form.  Foundation.
18       THE WITNESS:  Agreed.
19   Q   (By Mr. Brustin) And you would agree that there
20  would need to be -- given this testimony under oath, there
21  would need to be a full investigation as to whether or not
22  Saldate made a knowing misstatement about the facts of the
23  case, correct?
24       MS. RETTS:  Form.  Foundation.
25       THE WITNESS:  If this was brought to the

Page 178

1   department's attention by a supervisor, then yes, there
2   should have been an investigation.
3    Q   (By Mr. Brustin) And the investigation would be to
4   determine exactly what I just described, whether or not this
5   was somehow a mistake, right?
6    A   Mistake, intentional, negligent, whatever.
7    Q   Right.  And certainly if this was intentional, if
8   it was determined this was intentional -- in other words,
9   let me ask you this.
10       You would agree that if in fact Saldate wrote his
11  report chronologically, came to a voluntariness hearing
12  about that report --
13   A   Okay.
14   Q   -- and then testified that the statement was
15  made, the statement "Just let me fall" was made before he
16  invoked his right to remain silent, after viewing that
17  report two times on the stand, that would be very powerful
18  evidence that his misstatement was knowing, correct?
19       MS. BERKE:  Form.  Foundation.
20       MS. RETTS:  Form and foundation.
21       THE WITNESS:  It would be something that we
22  consider as part of the investigation.
23   Q   (By Mr. Brustin) All right.  And given the facts
24  that I just gave you, if those are true, it's hard to think
25  of an innocent explanation for that testimony.  Fair to say?

Page 179

1        MS. BERKE:  Objection --
2        MS. RETTS:  Form.  Foundation.
3        MS. BERKE:  -- foundation.  Misstates
4   evidence.
5        THE WITNESS:  Difficult for me to answer that
6   question because I don't know Detective Saldate's intent.
7   Like you said, was it intentional?  Was it a training issue
8   because it was just negligent?  You know, I don't know.
9    Q   (By Mr. Brustin) And that's why I'm asking you to
10  assume some facts.  Okay?
11   A   Okay.
12   Q   I'm asking you to assume some facts before
13  answering that question.  And the facts I'm asking you to
14  assume are these:  That in fact his report was written in
15  chronological order.
16   A   Okay.
17   Q   Okay?  And in fact the statement was made after
18  he invoked his right to remain silent, and as indicated by
19  the testimony, he reviewed that report twice in the context
20  of that testimony.  That would be very powerful evidence
21  suggesting that his statement about the timing was knowing?
22       MS. BERKE:  Objection.  Foundation.
23       MS. RETTS:  Form.
24       THE WITNESS:  Assuming those are the facts,
25  again, yes, it would definitely be considerations whether or

Page 180

1   not to initiate an investigation.
2    Q   (By Mr. Brustin) And given those facts, it would
3   be hard to think of an innocent or even negligent
4   explanation, if those facts are true?
5        MS. BERKE:  Objection.  Foundation.
6        MS. RETTS:  Outside the scope.
7        THE WITNESS:  Assuming those are the facts,
8   then, yeah, sure.
9        (An off-the-record discussion ensued.)
10   Q   (By Mr. Brustin) Now, understand that pursuant
11  to --
12       (An off-the-record discussion ensued.)
13   Q   (By Mr. Brustin) Certainly in 1987, it was crystal
14  clear under the law that police officers were strictly
15  prohibited from using any physical force in interrogations?
16   A   Yes.
17       MS. RETTS:  Form.  Foundation.  Outside the
18  scope.
19   Q   (By Mr. Brustin) It's about as basic as it gets,
20  right?
21   A   Yes.
22       MS. BERKE:  Objection.  Vague.
23   Q   (By Mr. Brustin) So any physical force, any
24  physical force in an interrogation would be coercion?
25       MS. RETTS:  Form.  Foundation.  Outside the

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
181—184

Page 181

1  scope.

2          MS. BERKE:  Objection.  Vague.

3          MR. BRUSTIN:  Let me withdraw the question.

4  That's a bad question.

5    Q    (By Mr. Brustin) Any physical force would be a

6  serious violation of Phoenix Police Department policy and

7  procedure certainly by 1987?

8          MS. RETTS:  Form.  Foundation.  Outside the

9  scope.

10          MS. BERKE:  Objection.  Vague.  Foundation.

11          THE WITNESS:  Are we talking actual force, or

12  are we talking touching somebody?

13    Q    (By Mr. Brustin) I'll be more specific.

14          Obviously, if a police officer sat six to 12

15  inches from a suspect's face and repeatedly poked that

16  suspect in the chest while interrogating him, that would be

17  illegal physical force, correct?

18          MS. BERKE:  Objection.  Foundation.

19          MS. RETTS:  Form.  Foundation.  Outside the

20  scope.

21          THE WITNESS:  I think it would go to the

22  issue of voluntariness for sure, with regard to any

23  statements that were made as a result of those actions.

24    Q    (By Mr. Brustin) But that conduct of poking a

25  suspect, while within six to 12 inches from their face,

Page 182

1  would be a violation of police department policy on use of

2  force, correct?

3          MS. BERKE:  Objection.  Foundation.

4          MS. RETTS:  Form.  Foundation.  Outside the

5  scope.  This doesn't have anything on use of force.

6          THE WITNESS:  In my experience, it would be

7  unreasonable to utilize that tactic to secure a confession

8  from a suspect.

9    Q    (By Mr. Brustin) And by the way, I'm not talking

10  about something that's a close call, right?  You're not

11  allowed, pursuant to policy and procedure, to poke a suspect

12  in the chest while interrogating them, correct?

13          MS. BERKE:  Objection.  Foundation.

14          MS. RETTS:  Form.  Foundation.  Outside the

15  scope.

16          THE WITNESS:  In the training that I have

17  received, that is correct.

18    Q    (By Mr. Brustin) And anyone who did that would --

19  anybody -- any police officer who did that, policy and

20  procedure would require that they be investigated for that

21  conduct, correct?

22          MS. BERKE:  Objection.  Vague.

23          MS. RETTS:  Form.  Foundation.

24          THE WITNESS:  If they were -- no different

25  than me not being allowed to do it, if they were not allowed

Page 183

1  to do it back in that day, too, I would agree.

2    Q    (By Mr. Brustin) And based on your understanding

3  of the law on voluntariness, you have no reason to expect

4  that the rules and regulations were any different in 1987,

5  correct?

6    A    I would hope.

7          MS. RETTS:  Foundation.

8    Q    (By Mr. Brustin) You would expect that any -- if

9  it came to the attention of any supervisor that a homicide

10  detective, during the course of an interrogation, sat within

11  six to 12 inches of a suspect that they were interrogating

12  and while interrogating them, repeatedly poked them in the

13  chest with their finger, that would have to be investigated

14  and, if true, disciplined, correct?

15          MS. BERKE:  Objection.  Misstates evidence.

16  Foundation.  Vague.

17          MS. RETTS:  Form.  Foundation.  Incomplete.

18  Outside the scope.

19          MS. BERKE:  Form.

20          THE WITNESS:  Sitting within six to 12

21  inches, not so much.  The repeated poking of an individual,

22  yes.

23    Q    (By Mr. Brustin) During an interrogation?

24    A    During an interrogation.

25    Q    Actually, there's no circumstances, other than

Page 184

1  self-defense, when it would be appropriate for a police

2  officer to poke a suspect in the chest, right?

3          MS. BERKE:  Objection.  Foundation.  Vague.

4          MS. RETTS:  Form.  Foundation.  Lacks the

5  totality of the circumstances.

6          THE WITNESS:  Absent self-defense or defense

7  of others, I do not see a reason.

8          MR. BRUSTIN:  Why don't we break now for

9  lunch.

10          (Recess was taken at 12:35 p.m.; resumed at

11  1:21 p.m.)

12    Q    (By Mr. Brustin) All right.  I want to ask you

13  some questions about the King case.

14    A    Okay.

15    Q    That's the case from 1989.

16          Before I do, I meant to ask you, did you have any

17  communications with any of the attorneys, other than

18  Ms. Retts, during lunch?

19    A    No.

20          Oh, yeah.  Lori.

21    Q    About, anything about the case?

22          MS. RETTS:  Form.

23    Q    (By Mr. Brustin) I'm sorry.  Did you have any

24  discussions about the substance of your testimony here?

25          MS. RETTS:  Form.

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
185–188

Page 185

1        THE WITNESS:  Regarding?
2     Q    (By Mr. Brustin) Anything to do with this case.
3     A    Yes, we had discussions about this case.
4     Q    What did you talk about?
5     A    Regarding the testimony prior to us just going to
6  lunch.
7     Q    I'm not interested in -- I'm not asking about any
8  personal conversations or friendly conversations.
9     A    Likely questions that they would be asking me
10  when it got to their turn to ask me questions.
11     Q    And what did she tell you she would be asking
12  you, and what did you say to her?
13     A    She would be asking me to clarify, based upon
14  whatever questions she has, regarding this testimony right
15  here from the voluntariness hearing.
16     Q    Did she provide you any information about what
17  she would be asking?
18     A    She asked me that she would like me to clarify --
19  she read further on in the voluntariness hearing pages so
20  that she would be asking me to clarify or give my opinion
21  based upon -- again, she didn't tell me the specific
22  questions she was going to ask me, she just said she would
23  have additional questions based upon her reading further on
24  in the voluntariness hearing.
25     Q    Did she suggest to you that she had a different

Page 186

1  take on what had happened?
2     A    Yes.
3     Q    What did she tell you?  I'm trying to get
4  everything she told you.
5     A    Okay.  That, yeah, that there may be a different
6  explanation, other than the one that you wanted me to assume
7  the facts on.
8     Q    Did she suggest an explanation to you --
9     A    No.
10     Q    -- of what she might be asking you about?
11     A    Suggest an explanation as far as?
12     Q    Did she mention what her theory was as to what
13  had happened?
14        MS. RETTS:  Form.
15        THE WITNESS:  Yes.
16     Q    (By Mr. Brustin) That's what I'm asking you.  What
17  did she tell you?
18     A    Then ask that question.  You didn't
19  specifically ask me --
20     Q    Tell me everything she told you about, that
21  related in any way to the case.
22     A    That there was a plausible theory -- I don't
23  remember exactly how she worded it, though, as far as the
24  order and how there could have been some confusion as to the
25  first time he reviewed his report versus the second time he

Page 187

1  reviewed it.
2     Q    Okay.  So in other words, what she was suggesting
3  to you was a way that Saldate could have been mistaken as
4  opposed to lying?
5        MS. RETTS:  Form.
6        THE WITNESS:  Correct.
7     Q    (By Mr. Brustin) How long did you spend going
8  through that with her?
9     A    Five to ten minutes.
10     Q    Did it seem convincing to you?
11     A    I didn't assume it convincing one way or the
12  other.  She just told me she would ask me questions no
13  different than you asked, and I said okay.
14     Q    Any other areas she told you, she was trying to
15  explain to you how we were mistaken?
16     A    No.
17     Q    Would you agree that one thing you would be
18  interested in determining Saldate's state of mind is what he
19  actually said happened?
20        MS. RETTS:  Form --
21        THE WITNESS:  Yes.
22        MS. RETTS:  -- as to when.
23     Q    (By Mr. Brustin) Either testimony today or from
24  the past.
25        MS. RETTS:  Form.

Page 188

1        THE WITNESS:  I think it would help me
2  probably be able to answer some questions for you better.
3     Q    (By Mr. Brustin) Okay.  Let's talk about King.  So
4  King is a convenience store robbery on December 27th, 1989.
5  Have you reviewed any documents about the King case?
6     A    We may have done it in my first deposition but
7  nothing since then.
8        (An off-the-record discussion ensued.)
9        THE WITNESS:  I think we went through all the
10  cases that were in your 30(b)(6) in my first deposition, to
11  some degree.  To some degree.
12        (An off-the-record discussion ensued.)
13     Q    (By Mr. Brustin) All right.  So let's look at
14  Exhibit 68.  I'm being told that you did in fact go through
15  a bit of this before, so I just want to refresh your
16  recollection before I go further.
17     A    Okay.
18     Q    So if you could take a look at page -- Exhibit
19  68, page 2327.
20     A    I don't see a -- I see a 2163 through 65.
21     Q    I'm sorry, it's the bottom date.
22     A    Oh, the Milke date.  Okay.
23        2327.
24     A    Yeah.
25     A    Got it.

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
189–192

| Page 189 | Page 191 |
|---|---|
| 1  Q   Now, take a look at the third paragraph, the | 1  the -- |
| 2  first sentence.  Read that, the long one. | 2       MS. BERKE:  Objection.  Foundation. |
| 3  A   Okay. | 3       MS. RETTS:  -- scope as to -- |
| 4  Q   And as you told us in the last deposition, this | 4       THE WITNESS:  Yes. |
| 5  is a clear invocation of his right to remain silent, | 5       MS. RETTS:  -- objections posed. |
| 6  correct? | 6  Q   (By Mr. Brustin) And that, as you've told us, |
| 7       MS. RETTS:  Form. | 7  would require, typically, suspension up to termination, |
| 8       THE WITNESS:  I don't remember exactly how I | 8  correct? |
| 9  testified, but yes, it appears to be an invocation of | 9       MS. RETTS:  Form.  Foundation. |
| 10  silence, yes. | 10       MS. BERKE:  Foundation. |
| 11  Q   (By Mr. Brustin) Okay.  And then there's no | 11       MS. RETTS:  As I indicated previously on our |
| 12  question there's continuing interrogation, correct? | 12  conference, we don't have the people to be able to say, |
| 13       MS. RETTS:  Form. | 13  hypothetically, what the discipline would have been. |
| 14       THE WITNESS:  Give me a quick sec to go | 14       MR. BRUSTIN:  Fair enough. |
| 15  through this. | 15       MS. RETTS:  So he can testify -- |
| 16       Yes, it appears they continued. | 16       MR. BRUSTIN:  I'll withdraw the -- let me |
| 17  Q   (By Mr. Brustin) Clear documentation of a Miranda | 17  change the question. |
| 18  violation, correct? | 18  Q   (By Mr. Brustin) You've already talked to us about |
| 19       MS. RETTS:  Form.  Foundation. | 19  the limits of your knowledge of potential discipline. |
| 20       THE WITNESS:  Well, again, it's documentation | 20  Certainly today, this violation would be subject to |
| 21  of what apparently occurred in that interview room.  I mean, | 21  discipline, including suspension up to termination, correct? |
| 22  nowhere in here do I see Detective Saldate once again saying | 22       MS. RETTS:  Form.  Foundation. |
| 23  he's intentionally violating Miranda. | 23       THE WITNESS:  This, under this day and age? |
| 24  Q   (By Mr. Brustin) Sorry.  Clear evidence of a | 24  Yes. |
| 25  Miranda violation, correct? | 25  Q   (By Mr. Brustin) And as you told us, no reason to |

| Page 190 | Page 192 |
|---|---|
| 1       MS. RETTS:  Form. | 1  think that that was any different back in 1989? |
| 2       THE WITNESS:  Again, it's a piece to | 2       MS. BERKE:  Objection.  Foundation. |
| 3  consider, for sure.  I mean, it's what occurred in that | 3       MS. RETTS:  Form.  Foundation.  Assuming it |
| 4  room, so yeah.  Any statements made thereafter could be | 4  was sustained. |
| 5  found in violation of Miranda. | 5       THE WITNESS:  Yeah.  Again, discipline back |
| 6  Q   (By Mr. Brustin) If this accurately documents what | 6  then was different than discipline today.  However, should |
| 7  happened in the regard to Miranda, this would be a clear | 7  there have been an investigation, if it was brought to the |
| 8  violation of PPD policy, correct? | 8  department's attention, no different than it would be today, |
| 9       MS. RETTS:  Form.  Foundation. | 9  yes. |
| 10       THE WITNESS:  It would be a clear violation | 10  Q   (By Mr. Brustin) And as you told us repeatedly |
| 11  of Miranda. | 11  this morning, the discipline should have been the same? |
| 12  Q   (By Mr. Brustin) It's a clear violation of the | 12       MS. BERKE:  Objection.  Foundation. |
| 13  policy? | 13       MS. RETTS:  Form.  Foundation. |
| 14       MS. RETTS:  Form. | 14       THE WITNESS:  I would hope so.  Again, all I |
| 15       MS. BERKE:  Objection.  Foundation. | 15  was told is that the discipline was made by the chief back |
| 16  Q   (By Mr. Brustin) He's invoking his right to remain | 16  then in the day. |
| 17  silent and continues to interrogate him, correct? | 17  Q   (By Mr. Brustin) Okay.  And now if you take a |
| 18  A   Yes.  So you'd have potential investigation, yes. | 18  look -- |
| 19  Q   I'm not asking about potential investigation, I'm | 19       (An off-the-record discussion ensued.) |
| 20  asking you something different. | 20  Q   (By Mr. Brustin) Take a look at Exhibit 67. |
| 21       Assuming this accurately describes what happened, | 21  A   Okay.  Voluntariness hearing? |
| 22  that he invoked his right to remain silent, as documented, | 22  Q   Yeah, from the same case.  You can see that from |
| 23  and he continued to interrogate him.  That's a clear | 23  the title, right? |
| 24  violation of PPD policy, correct? | 24  A   Yes. |
| 25       MS. RETTS:  Form.  Foundation.  Outside | 25  Q   Okay. |



EXHIBIT 15

TOM VAN DORN  30(b)(6)

April 26, 2018

Debra Jean Milke vs City of Phoenix

193–196

Page 193

1         MS. BERKE:  Where are we?

2         MR. BRUSTIN:  67.

3     Q    (By Mr. Brustin) And I'll represent to you this is

4  a voluntariness hearing concerning that interview.  Okay?

5     A    Okay.

6     Q    And obviously, again, you would have expected

7  Saldate, before testifying in that hearing, to be fully

8  familiar with his report, correct?

9     A    Yes.

10    Q    You saw it was only a three-page report, right?

11    A    Well, with respect to the interrogation of this

12 individual, it's only three pages.  I'm sure there was many

13 more.

14    Q    Well, not many more pages about -- I mean, this

15 is a voluntariness hearing about that interrogation.

16    A    Okay.  Are you representing to me that this is

17 solely regarding statements and no other legal issues?

18    Q    I can't do that, but I can tell you it's a

19 voluntariness hearing and that that -- I think that's the

20 only issue.

21    A    If it was the only issue, then I'll agree with

22 you.

23    Q    Okay.  But certainly in a voluntariness hearing

24 concerning interrogation, that's a critical document for him

25 to review?

Page 194

1     A    Yes.

2         MS. RETTS:  Form.  Foundation.

3     Q    (By Mr. Brustin) You would expect him to be fully

4  familiar with it?

5     A    Yes.

6         MS. RETTS:  Same objections.

7     Q    (By Mr. Brustin) Now, take a look at page 30886.

8     A    Okay.

9     Q    If you could look at -- you know what, let's

10 start with page 30885.  If you can read to yourself lines 21

11 through 30886, line 13.

12    A    Okay.

13    Q    Now, if you need to, you can, but hopefully you

14 won't, you would agree that his testimony here about whether

15 or not the suspect ever said he didn't want to answer any

16 questions directly contradicts what he writes in his report,

17 correct?

18        MS. RETTS:  Form. foundation.

19        THE WITNESS:  Yes.

20    Q    (By Mr. Brustin) Crystal clear, right?

21        MS. RETTS:  Same objections.

22        THE WITNESS:  Yes.

23    Q    (By Mr. Brustin) And on its own, that's a very

24 troubling statement by a homicide detective in a

25 voluntariness hearing concerning admissibility of statements

Page 195

1  in that interview, correct?

2         MS. RETTS:  Form and foundation.

3         MS. BERKE:  Join.

4         THE WITNESS:  Provided that there is no other

5  explanation given in the remaining pages, yes.

6     Q    (By Mr. Brustin) All I said was on its own, that's

7  a very troubling statement, correct?

8         MS. RETTS:  Form.

9     Q    (By Mr. Brustin) There could be an explanation,

10 but it's a very troubling statement?

11    A    It's of concern, yes.

12    Q    And the concern would be whether or not Saldate

13 made a knowing misrepresentation, correct?

14    A    Yes.

15    Q    Now, take a look at page 23.  If you could read

16 to yourself line 6 --

17    A    Okay.

18    Q    -- to line 18.

19    A    Okay.

20    Q    And you see the question that says, "How long was

21 your interview?"  "20, 30 minutes maybe.  I don't know if I

22 put an ending time on this."

23        It appears that he's referring to a document,

24 correct?

25        MS. RETTS:  Foundation.

Page 196

1         THE WITNESS:  I don't know if he's referring

2  to an actual document or if he just didn't put an end time

3  in the actual document that we reviewed here, these three

4  pages.

5     Q    (By Mr. Brustin) All right.

6     A    I don't know how to interpret it as he just made

7  a mistake by not putting an end time on this one, or.

8     Q    Sure.  Let me see if I can clear it up for you.

9         You're looking at the testimony.  Now take a look

10 at the report.

11    A    Okay.

12    Q    And if you look at the first page, what time does

13 it show that the interview started?

14    A    1738 or 5:38 p.m.

15    Q    Okay.  And then if you take a look at the last

16 page, what time does it end?

17    A    It says at 2108 hours, he returned to the

18 interview room and made contact with Erik and told him he

19 was under arrest.

20    Q    Okay.  So it appears either he has a photographic

21 memory of the exact start time and finish time, or that the

22 "this" he's referring to here is the report, correct?

23        MS. RETTS:  Form.  Foundation.

24        MS. BERKE:  Objection.  Foundation.

25        THE WITNESS:  Let me ask --



TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
197–200

Page 197

1    Q    (By Mr. Brustin) Let me withdraw.

2    A    Okay.

3    Q    Would it be a fair conclusion from this, a fair

4   inference from this that the "this" he is referring to is

5   his report and he's looking at the times?

6          MS. BERKE: Objection.  Foundation.

7          MS. RETTS:  Foundation.

8          THE WITNESS:  Yeah, I believe he's asked what

9   time it started and what time it ended and then he offers an

10  explanation about that.  His interview only lasted a certain

11  period of time, and then there was another interview by an

12  additional detective that could account for, what is that,

13  four hours, approximately.

14    Q    (By Mr. Brustin) It appears when he says, "I don't

15  know if I put an ending time on this," and then he gives the

16  times, it appears that he is referring to that report which

17  has those times, correct?

18          MS. BERKE: Objection.  Foundation.

19          THE WITNESS:  No.  It could also mean to

20  interpret that he didn't put an end time on when his

21  interrogation ended.  It looks to me like he has clarified

22  that, overall, the interrogation between both he and this

23  other detective, lasted from 1738 to 2108 hours.

24    Q    (By Mr. Brustin) But that's all in the report.

25          MS. BERKE: Objection.  Foundation.

Page 198

1    Q    (By Mr. Brustin) I'm just trying to make a very

2   simple point.  It appears that he's saying "I'm looking at

3   ending time on this."  He's talking about a report, and he's

4   referring to specific times in that report.

5          MS. BERKE: Objection.  Foundation.

6          MS. RETTS:  Foundation.

7          THE WITNESS:  No.  To me, I interpret that as

8   he didn't put an end time on when his interrogation of the

9   suspect ended, not the report.  He did stop at 1738.  He did

10  not specify in that report when he ceased his portion of the

11  interrogation, is how I interpret that.

12    Q    (By Mr. Brustin) But he's looking at something to

13  get the times, right?

14          MS. RETTS:  Foundation.

15          MS. BERKE: Objection.  Foundation.

16          THE WITNESS:  Tell me how I interpret it.

17  You interpreted it --

18    Q    (By Mr. Brustin) Doesn't it suggest to you --

19  well, he interpreted it as well, but doesn't it suggest to

20  you he's reviewing something on the stand?

21          MS. RETTS:  Form.  Argumentative.

22          MS. BERKE:  Foundation.

23          MS. RETTS:  Asked and answered.

24          THE WITNESS:  Yeah, I interpret his statement

25  to mean that he forgot to put the end time of when his

Page 199

1   interrogation of this suspect concluded.

2          MR. BRUSTIN:  Okay.

3          (An off-the-record discussion ensued.)

4    Q    (By Mr. Brustin) Okay.  Now, take a look at page

5   721.

6          MS. BERKE:  What are we looking at?

7          MR. BRUSTIN:  Saldate's deposition, Volume

8   III.

9          THE WITNESS:  This little page number up

10  here?

11    Q    (By Mr. Brustin) Yeah.

12          MS. BERKE:  71?

13          MR. BRUSTIN:  721.

14          THE WITNESS:  Okay.

15    Q    (By Mr. Brustin) Now, you can see, if you go back

16  even further on 720, you see that I'm asking specifically

17  about this testimony.

18    A    Okay.

19    Q    Do you see that?

20    A    Yes.

21    Q    Let me know if you do.

22    A    I do.

23    Q    So then I'm going to skip over to 721, and it

24  says question, on line eight:

25          "Sure.  You're talking about your

Page 200

1   supplement, and then you're saying I don't

2   know if I put an ending time on this and

3   then you give the start time and the

4   ending time.  You're obviously reporting

5   -- referring to your report on the stand,

6   correct?

7      Right.

8      That's what it says in the report

9   exactly.  It's clear you're looking at

10  your report on the stand to see if it's in

11  there, and it is, correct?

12      Answer:  Possibility, yeah --

13  possibly, yeah.

14      Question:  What other possibility is

15  there?

16      Answer:  I don't know.

17      You're being asked about your

18  supplement, correct?

19      Yes.

20      And then you're talking about your

21  supplement.

22      I don't know if I put an ending time

23  on this.

24      This being the report you're looking

25  at in your hands, right?  Is that correct,



EXHIBIT 15

TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                      201–204

Page 201

1    sir?
2       That is correct."
3       So it appears that Saldate is acknowledging that
4   he's reviewing his report, correct?
5          MS. RETTS:  Foundation.
6          MS. BERKE:  Misstates testimony.
7          THE WITNESS:  Right, yeah, he's reviewing his
8   report, yes.
9    Q    (By Mr. Brustin) The report that we just referred
10  to?
11  A    Correct.
12         MS. RETTS:  Form and foundation.
13   Q    (By Mr. Brustin) On the stand?
14  A    Correct.
15   Q    That was my only point to you.  And so it appears
16  that when he made the statement on page -- and we're going
17  back to the testimony now.  When he made the statement that
18  he never invoked his right to remain silent, he actually had
19  the report sitting in front of him, correct?
20         MS. RETTS:  Form.
21         THE WITNESS:  Yes.
22   Q    (By Mr. Brustin) And that's even more troubling,
23  correct?
24         MS. RETTS:  Foundation.
25         THE WITNESS:  Well, again, you know, the

Page 202

1   voluntariness hearings I do, that even though it's there in
2   front of me, I'm allowed to refer to it but my testimony,
3   you know, did he ask to refer to his report to refresh his
4   memory?  I don't recall.
5    Q    (By Mr. Brustin) Well, no.  That's what he's
6   saying it looks like he's doing on the next page, right?
7   That's what I just read to you.  It appears that when he's
8   stating the start times, he's referring to his report.
9          MS. RETTS:  Foundation.
10         THE WITNESS:  Well, I guess I need to go back
11  further to see did he ask for the prosecutor to provide his
12  report to refresh his memory.  Typically, we're not allowed
13  to just take our reports up and read from our report.
14   Q    (By Mr. Brustin) You certainly have no reason to
15  dispute Saldate if he says he thinks he was reviewing his
16  report, correct?
17         MS. RETTS:  Form.
18         THE WITNESS:  If he says he was reviewing his
19  report, then no, I have no reason to disagree.
20   Q    (By Mr. Brustin) Okay.  And, obviously, if he's
21  sitting up there reviewing his report within seconds of
22  saying that he never said he didn't want to answer
23  questions, that would be even more troubling, correct?
24         MS. RETTS:  Form.  Foundation.
25         THE WITNESS:  It would be a concern, yes.

Page 203

1    Q    (By Mr. Brustin) Okay.  And you would agree that
2   based on what you just read, this should have been carefully
3   investigated by the PPD to determine -- withdrawn.
4       Assuming this was made known to the PPD, this is
5   conduct that should have been carefully investigated to
6   determine whether or not this statement was a knowing
7   misstatement or something less than that, correct?
8          MS. RETTS:  Form.  Foundation.  Misstates the
9   evidence as to period of time Saldate was an employee.
10         THE WITNESS:  Yes, if it was brought to the
11  department's attention and he was still employed by the
12  Phoenix Police Department, then yes, it should have been
13  investigated.
14   Q    (By Mr. Brustin) Okay.  And if it was a knowing
15  misstatement, it might be a crime?
16         MS. BERKE:  Objection.  Foundation.
17         THE WITNESS:  Correct.
18         (An off-the-record discussion ensued.)
19   Q    (By Mr. Brustin) Take a look at page 725.
20  A    Okay.
21   Q    726, sorry.
22  A    Okay.
23   Q    Page 726.
24         "Question:  The most important
25         question you knew to be asked in this case

Page 204

1       was when he made admissions in regard, in
2       regard to when he invoked his right to
3       remain silent, correct?  What could be
4       more important in a voluntariness hearing?
5       Answer:  I agree.
6       Question:  Yes -- yet that
7       fundamental question you misrepresented?
8       Answer:  I did.
9       In a homicide case?
10      Answer:  Yes.
11      Question:  And you're claiming that
12      was just an innocent mistake?
13      Answer:  Yes."
14  A    Okay.
15   Q    You would agree that testimony is very troubling,
16  correct?
17         MS. RETTS:  Form.  Foundation.
18         THE WITNESS:  I would agree it's of concern,
19  yes, sir.
20   Q    (By Mr. Brustin) Okay.  Because it's hard to
21  imagine how an experienced homicide investigator, like
22  Saldate, could testify in a voluntariness hearing about a
23  statement and not remember that the suspect invoked his
24  right to remain silent, correct?
25         MS. BERKE:  Objection.  Foundation.



TOM VAN DORN  30(b)(6)                                              April 26, 2018
Debra Jean Milke vs City of Phoenix                                    205—208

Page 205

1          MS. RETTS:  Form.  Foundation.

2          THE WITNESS:  I don't know how to answer that

3    on behalf of Detective Saldate.  If I look at it from an

4    objective, reasonable officer standard, it would be of

5    concern, yes.

6     Q    (By Mr. Brustin) Take a look at page 393 and --

7    I'm sorry.  30893 and 30894.  This is Saldate on

8    direct examination.

9     A    Okay.

10     Q    On cross-examination.

11     A    893 and 4?

12     Q    Yeah.  And I want you just to read to yourself

13    line 25 on page 93 --

14     A    Okay.

15     Q    -- through line 17 on the next page.

16     A    Okay.

17     Q    Now, this is Saldate acknowledging that it's a

18    misstatement, correct?

19     A    This is Saldate admitting that he continued to

20    question after that statement was made by the suspect.

21     Q    Right.  And in fact I misspoke.  He's not

22    acknowledging it's a misstatement, is he?

23          MS. BERKE:  Objection.  Foundation.

24          MS. RETTS:  Form and foundation.

25          THE WITNESS:  He's not testifying here that

Page 206

1    it was a misstatement.

2     Q    (By Mr. Brustin) Okay.

3     A    He is stating that he continued to question after

4    the suspect invoked.

5     Q    In fact, he is making it clear here, he says,

6    "After that statement, yes, that's correct," right?

7          MS. RETTS:  Form.  Vague.

8     Q    (By Mr. Brustin) Let me read the question to you.

9          It says, "And after he told you he wasn't going

10    to answer" --

11          MS. BERKE:  Where are you?

12          MR. BRUSTIN:  Line 13, Page 94 -- 30894.

13     Q    (By Mr. Brustin) "Question:  And after he told you

14    he wasn't going to answer any more questions, you continued

15    to question him.  And it was after that, that he made all of

16    these statements about the death penalty; isn't that right?

17          "Answer:  After that statement, yes, that's

18    correct."

19          THE WITNESS:  Okay.

20     Q    (By Mr. Brustin) So, in other words, Saldate is

21    not adopting the question posed to him, correct?

22          MS. RETTS:  Form.  Foundation.  Vague.

23          THE WITNESS:  Well, I think he's given an

24    answer to did you continue to question this guy after he

25    invoked his right to silence, and he states yes, he did.

Page 207

1     Q    (By Mr. Brustin) Okay.  But he's not acknowledging

2    that in fact he said -- he's not acknowledging that he

3    invoked his right to silence.

4          MS. BERKE:  Objection.  Misstates testimony.

5          MS. RETTS:  Form.  Foundation.

6     Q    (By Mr. Brustin) Let me ask you this.

7     A    Yeah --

8     Q    Let me ask you --

9     A    I guess I'm a little confused as to --

10     Q    It's subtle, but let me ask you if you agree with

11    this.

12          In reading this, does this suggest that Saldate

13    understood what was in his report and said it anyway?

14          MS. BERKE:  Objection.  Foundation.

15          MS. RETTS:  Form.  Foundation.

16          THE WITNESS:  Going back to the prior pages

17    reviewed, it appears he provided testimony that he, that the

18    suspect didn't make any statements to remain silent.  And

19    then here it appears that he acknowledges that, okay, it's

20    in my report, he did, and I continued to question.

21          Is that fair?

22          (An off-the-record discussion ensued.)

23     Q    (By Mr. Brustin) Okay.  Now, based on your

24    understanding of policy and procedure and training, have you

25    ever heard of a suspect being asked to confront another

Page 208

1    suspect during the course of an interrogation?

2          MS. RETTS:  Form.  Foundation.  Vague.

3          THE WITNESS:  In my 23 years, no.  I have --

4    may have wanted to know what other suspects in other holding

5    rooms are saying about the case, but I've never, in my 23

6    years of experience, had one suspect ask me to allow them to

7    confront another suspect.

8     Q    (By Mr. Brustin) Or even more, have a police

9    officer suggest that one suspect confront another suspect.

10    You've never heard of that happening?

11     A    No.

12     Q    That would be an extraordinarily unusual

13    interrogation method.  Fair to say?

14          MS. BERKE:  Objection.  Vague.

15     Q    (By Mr. Brustin) In your experience.

16     A    In the way I've been trained, yes.

17     Q    Okay.  And are there some legal problems --

18    withdrawn.

19          Are there some problems that you can think of,

20    some concerns you would have as the former legal adviser,

21    with that type of a procedure?

22          MS. RETTS:  Form.  Foundation.  Outside the

23    scope.

24          THE WITNESS:  Yes.

25     Q    (By Mr. Brustin) What would be some of the

TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                       209–212

Page 209

1  concerns?

2          MS. RETTS:  Same objection.

3          THE WITNESS:  Intimidation.  Obviously, you

4  just never know, you know, what the reasons are behind

5  wanting, okay, one suspect wanting to confront another

6  suspect, especially when both are in police custody.

7  There's an intimidation factor.  It could be a means to also

8  make sure they are wanting to get on the same page.  I mean,

9  there's just a host of factors that could be a problem, not

10  to mention it's just, you know, you have the right to

11  confront your accused and those types of things, it could

12  pose problems down the road at trial.

13      Q    (By Mr. Brustin) Okay.

14      A    A myriad of different things could occur.

15      Q    Okay.  And so certainly you would expect if any

16  officer employed that technique of allowing a suspect, one

17  suspect to talk to another suspect in an effort to get a

18  confession, you would certainly expect that procedure to be

19  fully documented?

20         MS. RETTS:  Form.  Foundation.

21         THE WITNESS:  If they utilized that,

22  absolutely.

23      Q    (By Mr. Brustin) At a minimum?

24      A    Yes.

25      Q    And certainly any competent detective, you would

Page 210

1  expect that any detective acting in good faith, who employed

2  that procedure, would certainly document that happening?

3      A    Yes.

4          MS. RETTS:  Form.  Foundation.  Asked and

5  answered.

6      Q    (By Mr. Brustin) Unless, of course, they didn't

7  want people to know about it?

8          MS. RETTS:  Same objection.

9          MS. BERKE:  Objection.  Outside the scope.

10         THE WITNESS:  That's reasonable.

11      Q    (By Mr. Brustin) Okay.  So let's talk about the

12  Gallegos case.

13      A    Okay.

14      Q    It's Exhibit 63.

15         (An off-the-record discussion ensued.)

16      Q    (By Mr. Brustin) Just for your information --

17  yeah, this is a -- this is a particularly horrible case

18  involving an eight-year-old girl who was molested and

19  killed, allegedly -- or, actually I think he was

20  convicted -- by Michael Gallegos.  And it was also alleged

21  that her step -- her brother was also involved, George

22  Smallwood.  Okay?

23      A    Okay.

24      Q    And this a case investigated by Saldate and his

25  partner, Officer Chambers.

Page 211

1      A    Okay.

2      Q    Do you know who Inspector Chambers is?

3          MS. RETTS:  Detective.  Sorry, you keep

4  saying "inspector."

5          MR. BRUSTIN:  That's my other case.

6          THE WITNESS:  I'm familiar with his name, as

7  a result of this.

8          MR. BRUSTIN:  I've been saying that every day

9  for five weeks.  Detective.

10      Q    (By Mr. Brustin) Okay.  And if you take a look at

11  page six -- I'm going by the Bates stamp on the left now --

12      A    Okay.

13      Q    -- you see that this is Saldate's report of his

14  interrogation with the defendant Gallegos.

15      A    Okay.

16      Q    And I will represent to you, according to this

17  report, Gallegos made a complete confession of his

18  involvement and also, according to this report, implicated

19  his brother or stepbrother, Mr. Smallwood.

20      A    Okay.

21      Q    Now, among other things, he describes the

22  sexual assault of the child.  He describes where they took

23  the body, where it was subsequently found.  And if you take

24  a look at -- according to Saldate, he had Mr. Gallegos

25  repeat the confession after he gave it initially.  Okay?

Page 212

1      A    Okay.

2      Q    Now, certainly pursuant to policy and training,

3  that would be consistent with policy and training, correct,

4  that you would, once you get a statement of admission from a

5  suspect, you would ask them to repeat it?

6      A    Yeah.

7          MS. RETTS:  Form.

8          THE WITNESS:  Sorry.  Yeah, you're going to

9  continue to question along those lines and try to, once --

10  yes.  It's typical.

11      Q    (By Mr. Brustin) And the other thing that Saldate

12  told us is that after he got this, these admissions from

13  Gallegos, he asked Mr. Gallegos if he would write the

14  confession out himself and sign it.

15      A    Okay.

16      Q    And that would also be entirely consistent with

17  policy and training, correct?

18      A    Yes.

19      Q    Always better, if possible, if you have a suspect

20  who is willing to write a statement in their own words and

21  sign it, that's much better than a police officer's report,

22  correct?

23         MS. RETTS:  Form and foundation.

24         THE WITNESS:  Yes.

25      Q    (By Mr. Brustin) And that's been true as far back

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
213–216

Page 213

1  as you know?
2      A   Yes.
3      Q   Right?  And, again, for a homicide detective,
4  that's a very basic step, correct?
5          MS. BERKE:  Objection.  Form.
6          MS. RETTS:  Form.  Foundation.
7          THE WITNESS:  Basic step to ask a person to
8  do that, yes.
9      Q   (By Mr. Brustin) Right.  You can't force a person
10  to write a statement and sign it, but you always want to try
11  to do that if you can, correct?
12     A   Yes.
13         MS. RETTS:  Form.  Foundation.
14     Q   (By Mr. Brustin) And so Saldate's conduct in this
15  case was entirely consistent with his training, correct?
16         MS. BERKE:  Objection.  Foundation.
17         THE WITNESS:  Yes.
18     Q   (By Mr. Brustin) And it's particularly important
19  to ask a suspect, who's made admissions to a serious crime,
20  if they will write out a confession and sign it, if they
21  appear to be compliant?
22         MS. RETTS:  Form.
23         THE WITNESS:  If they appear to be?
24     Q   (By Mr. Brustin) In other words, if they're -- if
25  they're being compliant during the interrogation, if they

Page 214

1  are volunteering information, right?
2      A   Okay.
3      Q   Would you agree with that?
4          MS. BERKE:  Objection.  I'm sorry, can you
5  just repeat back the question.
6          MR. BRUSTIN:  It wasn't a good question.  Let
7  me just withdraw it.
8      Q   (By Mr. Brustin) And according to Saldate, in
9  addition to asking him if he would write a confession and
10  sign it, he also asked him if he could tape-record the
11  statement?
12     A   Okay.
13     Q   And that would obviously be consistent with
14  department policy, certainly in the time of this case, which
15  is 1990, correct?
16         MS. BERKE:  Objection.  Foundation.
17         THE WITNESS:  Yes.
18     Q   (By Mr. Brustin) And training, correct?
19     A   Yes.
20     Q   That's something that you would expect any police
21  officer to ask a witness who gave a confession, correct?
22         MS. BERKE:  Objection.  Foundation.
23         MS. RETTS:  Form.  Foundation.
24         THE WITNESS:  Yes.
25     Q   (By Mr. Brustin) Obviously always much better to

Page 215

1  have a taped statement from a suspect than a written report
2  from a police officer, correct?
3          MS. RETTS:  Form.  Foundation.
4          THE WITNESS:  Yeah.  A taped confession or
5  written confession, as opposed to paraphrasing by an
6  officer, yes.
7      Q   (By Mr. Brustin) Right.  And he even said here
8  that he asked him -- he asked -- he asked him twice,
9  including after he gave the entire confession.  And that's
10  also consistent with policy and procedure, correct?
11         MS. RETTS:  Form.
12         MS. BERKE:  Foundation.
13         THE WITNESS:  To the best of my knowledge.
14     Q   (By Mr. Brustin) In other words, if you're a
15  homicide detective, you've got a confession to a terrible
16  homicide, you want to do everything reasonably possible to
17  try to get a taped statement, if you can, correct?
18         MS. RETTS:  Form.  Foundation.
19         MS. BERKE:  Vague.
20         THE WITNESS:  That's the best way to do it,
21  yes.
22         (An off-the-record discussion ensued.)
23     Q   (By Mr. Brustin) And in this case, in addition to
24  asking --
25         In this case, he asked him to write the

Page 216

1  confession, he asked him twice if he would tape-record it,
2  and the suspect said no, which is not unheard of, correct?
3      A   Correct.
4      Q   And in addition, he also had his partner come in
5  and he asked Gallegos to repeat the confession to his
6  partner?
7      A   Okay.
8      Q   That would be also consistent with training and
9  procedure to have another witness to the confession,
10  correct?
11         MS. BERKE:  Objection.  Foundation.
12         MS. RETTS:  Form.
13         THE WITNESS:  It's good to have another
14  witness there, yes.
15     Q   (By Mr. Brustin) And all various methods that
16  homicide detectives were trained to utilize in order to get
17  the best evidence of a confession possible, correct?
18         MS. BERKE:  Objection.  Vague.  Foundation.
19         MS. RETTS:  Form.  Foundation.
20         THE WITNESS:  Some of several different best
21  ways to do it, yes.
22     Q   (By Mr. Brustin) But those are three typical ways
23  that you would expect an experienced homicide detective to
24  attempt to utilize?
25         MS. BERKE:  Objection.  Vague.  Foundation.

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
217–220

Page 217

1     MS. RETTS:  Form.  Foundation.
2     THE WITNESS:  If all those things were
3 available, yes, absolutely.
4     Q   (By Mr. Brustin) And, obviously, you would agree
5 it was made clear to police investigators by 1990 that
6 pursuant to training and policy, that it was much preferred
7 to have a taped or handwritten, signed statement than a
8 police report in a confession, correct?
9     MS. BERKE:  Objection.  Foundation.
10     MS. RETTS:  Form.  Foundation.
11     THE WITNESS:  I would hope so.  I can't say
12 for sure.  Nothing that I've been provided lets me know
13 that, hey, this is how we preferred to do it.  Again, there
14 may be a bureau manual that specified that.  But, yeah, I
15 would agree with you that those are acceptable methods that
16 should be used in any investigation, whether it's homicide
17 or any others.
18     (An off-the-record discussion ensued.)
19     Q   (By Mr. Brustin) Okay.  So if you take a look --
20     A   Still on the same tab?
21     (An off-the-record discussion ensued.)
22     Q   (By Mr. Brustin) Okay.  So let me show you page
23 54 -- I'm sorry, page 106, left-hand Bates stamp.
24     A   Okay.
25     Q   Let me know when you're there.  And if you could

Page 218

1 read to yourself --
2     A   Okay.
3     Q   -- page 106, line four --
4     A   Okay.
5     Q   -- to page 108 --
6     A   Okay.
7     Q   -- I'm sorry, all the way to page 109.
8     A   Okay.
9     Q   Nope, 110, line one.
10     Read to Line 16 on page 110, I'm sorry.
11     A   Okay.
12     Okay.
13     Q   So this is an example of Saldate being
14 cross-examined on the stand about his undocumented,
15 unrecorded efforts to have one suspect in a murder case
16 confront another suspect, correct?
17     A   Yes.
18     Q   And you would agree that Saldate's explanation
19 that he didn't document it because he didn't think it
20 significant is a highly suspect explanation.  Fair to say?
21     MS. BERKE:  Objection.  Foundation.  Vague.
22     THE WITNESS:  Yeah, he didn't think it
23 significant because it wasn't confrontational, in his
24 opinion.
25     Q   (By Mr. Brustin) You would agree that that's a

Page 219

1 highly suspect explanation, correct?
2     MS. RETTS:  Form.  Foundation.
3     MS. BERKE:  Objection.  Foundation.
4     THE WITNESS:  I would agree it's of concern.
5     Q   (By Mr. Brustin) Okay.  That it's hard to imagine
6 how an experienced homicide investigator could -- withdrawn.
7     Saldate also testified this is the first time in
8 his career he ever employed this method.  I'll represent
9 that to you.  Not here, he testified in his deposition.
10     A   If that's what he said, okay.
11     Q   And you would agree that, given what he described
12 happening on cross-examination, when confronted with it, you
13 would expect that any trained homicide inspector, like
14 Saldate in 1990, would understand that that type of
15 confrontation was certainly significant enough to document?
16     MS. BERKE:  Objection.  Foundation.
17     MS. RETTS:  Form.  Foundation.  Outside the
18 scope.
19     THE WITNESS:  I would agree with you that it
20 should have been documented.  For whatever reasons, it
21 appears he just didn't feel the need to do so.
22     Q   (By Mr. Brustin) And you would agree that that,
23 that's an extraordinary explanation?
24     MS. BERKE:  Objection.  Foundation.
25 Argumentative.  Vague.

Page 220

1     MS. RETTS:  Form.  Foundation.  Outside the
2 scope.
3     THE WITNESS:  It's of concern.
4     Q   (By Mr. Brustin) Okay.  And certainly if the PPD
5 had been made aware that Saldate and Chambers failed to
6 document one suspect confronting another suspect in a
7 homicide case in the station, because they didn't think it
8 was significant, that would have to be carefully
9 investigated, determined whether or not there should be
10 discipline, correct?
11     MS. RETTS:  Form.  Foundation.  Vague as to
12 time period of whether he was an employee.
13     THE WITNESS:  If it was brought to the
14 department's attention and, again, if Saldate at this time
15 period was employed by the department, yes, it should have
16 been investigated and gone through the process.
17     Q   (By Mr. Brustin) You said if he was employed by
18 the department.  You would agree that even after Saldate --
19 we know from Milke, even after Saldate retired, he testified
20 in cases that he had been an investigator in, correct?
21     A   I would assume he did, yes.
22     Q   And he also, to your knowledge, received a
23 pension, correct?
24     A   Yes.
25     MS. RETTS:  Foundation.

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
221–224

Page 221

1    Q    (By Mr. Brustin) And you would agree that to the
2  extent that Saldate engaged in misconduct that was
3  sustained, that was not brought to the department's
4  attention -- withdrawn.
5        To the extent that Saldate engaged in misconduct
6  while he was on the job, which wasn't discovered until he
7  was off the job, one possible ramification for that could
8  have been he would lose his pension?
9        MS. BERKE:  Objection.  Form and foundation.
10       MS. RETTS:  Form.  Foundation.  Outside the
11  scope.
12       THE WITNESS:  That would have been completely
13  solely separate from the Phoenix Police Department.  That
14  investigation would have been done by the Public Safety
15  Personnel Retirement System, not by Phoenix PD.  He was no
16  longer a city employee.
17   Q    (By Mr. Brustin) Understood.
18       If misconduct came to the attention of the PPD
19  after his retirement concerning conduct that he engaged in
20  prior to his retirement, would that information be passed on
21  to that entity?
22       MS. BERKE:  Objection.  Vague.  Foundation.
23  Outside the scope.
24       THE WITNESS:  Possibly yes, possibly no.
25       (An off-the-record discussion ensued.)

Page 222

1    Q    (By Mr. Brustin) Were there any -- was there any
2  remedy available to the Phoenix Police Department for
3  officers who engaged in misconduct in connection with
4  criminal proceedings after their retirement?
5        MS. BERKE:  Foundation.  Outside the scope.
6  Vague.
7        THE WITNESS:  Nothing that I'm aware of, no.
8        (An off-the-record discussion ensued.)
9    Q    (By Mr. Brustin) And so is it your testimony that
10  there would be no duty to investigate allegations of
11  misconduct by a police officer after his retirement?
12       MS. RETTS:  Form.  Foundation.
13   Q    (By Mr. Brustin) Let me clear it up.  Sorry.
14       Is it your testimony that there would be no duty
15  to investigate misconduct committed by a police officer in a
16  criminal proceeding after his retirement?
17       MS. RETTS:  Form.  Foundation.  Vague.
18       THE WITNESS:  There is an ongoing duty to
19  provide any exculpatory information or evidence of
20  misconduct.  There would not be an investigation.  However,
21  if we learned of potential misconduct while they were an
22  employee, even though they are no longer an employee, and
23  criminal cases are still ongoing, yes, we have an ongoing
24  duty to continue to provide those things for the
25  prosecutor's office.

Page 223

1    Q    (By Mr. Brustin) Okay.  So I understand that.  So
2  if, for example, you were made aware of this --
3        If this testimony was brought to the attention of
4  the PPD in 1990 after Saldate retired, that information
5  would have to be provided to the county attorney's office as
6  possible Brady material?
7        MS. BERKE:  Objection.  Foundation.
8        THE WITNESS:  This is a voluntariness
9  hearing, so I would hope the county attorney's office
10  already knows about it.
11   Q    (By Mr. Brustin) Okay.  Well, certainly the lawyer
12  that's there knows about it?
13   A    Right.
14   Q    Okay.  And would there be any duty -- withdrawn.
15       Obviously, it would be more clearly Brady
16  material if it was determined that Saldate intentionally
17  failed to document this unusual procedure, correct?
18       MS. BERKE:  Objection.  Form.  Foundation.
19  Outside the scope.
20       THE WITNESS:  Yes.  Of the categories of
21  Brady material, yes, it is possible it would fit into one of
22  those that you have to disclose.
23   Q    (By Mr. Brustin) As part of the Phoenix Police
24  Department's Brady obligation in 1990, is it your testimony
25  that there would have been no obligation to investigate this

Page 224

1  testimony to determine the degree of misconduct?
2        MS. RETTS:  Foundation.  Outside the scope.
3        MS. BERKE:  Objection.  Foundation.  Assumes
4  facts not in evidence.  Vague.  Outside the scope.
5        THE WITNESS:  Brady really was not brought to
6  the forefront in the Phoenix Police Department until after I
7  was employed, to be quite honest with you.  So how they did
8  it back then and what rules they applied to Brady material,
9  I think, are completely different.
10   Q    (By Mr. Brustin) Let me just ask you straight,
11  then.
12       To your knowledge, would there have been any duty
13  on the part of the Phoenix Police Department to investigate
14  the evidence of misconduct in the testimony you just read,
15  if it was provided to the Phoenix Police Department after
16  his retirement?
17       MS. BERKE:  Objection.  Foundation --
18       THE WITNESS:  Not if he --
19       MS. BERKE:  Wait, wait, wait.
20       Objection.  Foundation.  Misstates evidence.
21  Vague.
22       THE WITNESS:  All right.  He's no longer an
23  employee of the department, so we're not going to initiate
24  an investigation, but we would definitely ensure that the
25  prosecutor's office would be made aware of this, which they

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
225–228

Page 225

1  should already be, anyway, it's a voluntariness hearing.
2         (An off-the-record discussion ensued.)
3     Q    (By Mr. Brustin) Now, after his retirement, I
4  don't know if you know this, but Inspector Saldate became a
5  constable in Maricopa County.
6     A    Okay.  I'll take your word for it.
7     Q    Would there be any obligation or practice, would
8  it be the practice or obligation of the Phoenix Police
9  Department to pass on any evidence of misconduct by
10  Detective Saldate to his new employer, Maricopa County?
11         MS. BERKE: Objection.  Form.  Assumes fact
12  not in evidence.  Vague.
13         MS. RETTS:  Form.  Foundation.  Outside the
14  scope.
15         THE WITNESS:  That is an employment decision
16  not related to a criminal case, so, no, I do not believe
17  there's any obligation on the part of the Phoenix Police
18  Department to provide that information to the county.
19     Q    (By Mr. Brustin) Okay.  So just to be clear, if in
20  fact this evidence concerning the Gallegos investigation
21  that you just read, testimony you read, was brought to the
22  attention of the Phoenix Police Department after Saldate's
23  retirement, there would be absolutely nothing pursuant,
24  nothing the PPD would need to do pursuant to policy and
25  procedure, correct?

Page 226

1         MS. RETTS:  Form.  Foundation.
2         MS. BERKE:  Objection.  Vague.
3         MS. RETTS:  You mean employment
4  administratively?  Do you mean --
5     Q    (By Mr. Brustin) Nothing.  There would be no
6  action that needed to be taken against Saldate if this
7  information was brought to your attention after his
8  retirement?
9         MS. BERKE: Objection.  Foundation.  Vague.
10         MS. RETTS:  Outside the scope.
11         THE WITNESS:  No investigation because he's
12  no longer an employee.  However -- and again, I don't know
13  how they did it back then.  Under today's standards, though,
14  what I can tell you is if it still touches upon a Brady
15  issue, something like that, we would likely notify AZPOST
16  with regard to the peace officer certification status.  How
17  they did it back in this day, that I don't know.
18     Q    (By Mr. Brustin) All right.  Okay.
19         (An off-the-record discussion ensued.)
20     Q    (By Mr. Brustin) Now, you would agree that in the
21  event -- withdrawn.
22         You would agree that when -- withdrawn.
23         Take a look at page 19 of exhibit --
24     A    Same tab?
25     Q    Same tab, 63.

Page 227

1     A    Okay.
2         119?
3     A    No.  19.
4     A    Okay.
5     Q    So just so you're clear, if you look at -- this
6  is a long report.  It begins on page 14, and this is
7  Chambers' report of the interviews of Smallwood.
8     A    Okay.
9     Q    Now, if you take a look at page 19, okay, if you
10  take a look, it says Note.
11     A    Okay.
12     Q    And it says in that, "I exited the interview
13  room."
14         Do you see that?
15     A    I see, "In my original interview with George."
16  Is that where we're starting?
17     Q    Yeah.  Then it goes down and says, "I exited the
18  interview room."
19     A    Okay.  Yes.
20     Q    Saldate began speaking with George at about six,
21  it looks like 40, maybe it's ten p.m.?
22     A    Okay.
23     Q    And remained with him until 7:00 p.m.
24     A    Okay.
25     Q    George indicated to Saldate at that time he did

Page 228

1  not want to answer anymore questions without a lawyer.
2     A    Okay.
3     Q    In other words, this is again making clear that
4  George invoked his Miranda rights, correct?
5         MS. BERKE:  Form.
6         THE WITNESS:  It depends.  This is what
7  George ended up telling Detective Chambers.  Whether or not
8  that is in fact what Detective -- or that George told
9  Detective Saldate and those two detectives are in
10  disagreement, I don't know.
11     Q    (By Mr. Brustin) I'll represent to you Detective
12  Saldate admitted in his deposition that's exactly what
13  happened.
14     A    Okay.
15     Q    Okay.
16     A    Now I'll take your word for it.
17     Q    All right.  If you take a look at 19, it then
18  says --
19         (An off-the-record discussion ensued.)
20     Q    (By Mr. Brustin) So then after that, in the next
21  paragraph --
22     A    Okay.
23     Q    -- if you go down four lines, five lines, it
24  says, "I indicated to him."
25     A    Okay.



TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
229–232

Page 229

1    Q    This is Chambers speaking, it's his report, "I
2  indicated to him my understanding that he did not want to
3  answer further questions without a lawyer.  I indicated to
4  him I would not ask further questions.  I indicated to him,
5  rather, I would make a statement to him."
6         Okay?  Then why don't you read the rest of the
7  paragraph yourself.
8    A    Okay.
9    Q    And this is an example of Chambers interrogating
10  a suspect after he invoked his right to remain silent,
11  correct?
12         MS. RETTS:  Form.  Foundation.
13         THE WITNESS:  It's Chambers providing a
14  statement -- and I forget.  This is going back to the lawyer
15  in me and those types of things, the Christian burial speech
16  case, I don't remember the name of it, forget when it was
17  decided, where the court kind of held that even though he
18  may not be asking direct questions, simply even though I put
19  this person on notice I'm not going to ask any more, if I'm
20  going to sit there, though, and recite some sort of a speech
21  in the presence of you after you have invoked, designed to
22  elicit an incriminating response, that could be held in
23  violation.
24    Q    (By Mr. Brustin) Oh, there's no question this
25  would be a violation of Miranda, correct?

Page 230

1    A    I just don't know when that case was decided.
2    Q    Okay.  But assuming that case was decided
3  before -- and I can represent to you that there is law on
4  that before 1990 --
5    A    Okay.
6    Q    -- you would agree that's a clear violation of
7  Miranda, correct?
8         MS. BERKE:  Objection.  Foundation.
9         MS. RETTS:  Foundation.
10         THE WITNESS:  Again, questions of law being
11  decided by the court, yes, I would agree with the law at the
12  time, this appears to be a violation.
13    Q    (By Mr. Brustin) Okay.  And that you would agree
14  that both Saldate and Chambers, who were conducting these
15  interrogations together, would be equally responsible for
16  that Miranda violation, correct?
17         MS. BERKE:  Objection.  Misstates evidence.
18  Where does it state Saldate is in there with him?
19    Q    (By Mr. Brustin) Do you agree, sir?
20         MS. BERKE:  Misstates evidence.
21         MS. RETTS:  Objection.  Foundation.
22         THE WITNESS:  I agree that this portion of
23  the paragraph that you had me read involves Detective
24  Chambers.  I don't see where it involves Detective Saldate.
25    Q    (By Mr. Brustin) I'm sorry.  You saw that Saldate

Page 231

1  was the one who he invoked his right to remain silent to.
2  That's what it says above, correct?
3    A    Above.
4    Q    And I'll represent to you that Saldate and
5  Chambers are working this case together and, at various
6  times, are interviewing both suspects, correct?
7    A    But what I'm not getting from this is whether or
8  not they continued to be in the same room at the time this
9  examiner comes in and Chambers is doing this.
10    Q    Does that matter?  In other words, as long as
11  Saldate --
12    A    If I go back to your question, because you're
13  implicating both detectives, it matters to me.
14    Q    Fair enough.
15         As long as Saldate knows that his partner is
16  interrogating this suspect after he invoked his right to
17  remain silent, Saldate is equally responsible, correct?
18         MS. BERKE:  Objection.  Vague.  Foundation.
19  Assumes facts not in evidence.
20         MS. RETTS:  Outside the scope.
21         THE WITNESS:  If Detective Saldate was in
22  fact put on notice that his partner was intentionally
23  violating Miranda rights, then yes, Detective Saldate, there
24  are concerns for Detective Saldate as well.
25    Q    (By Mr. Brustin) He's equally responsible as if he

Page 232

1  was in there, correct?
2         MS. BERKE:  Objection.  Vague.  Foundation.
3         MS. RETTS:  Form.  Foundation.  Asks for a
4  legal --
5         THE WITNESS:  Equally responsible as in what
6  sense?
7    Q    (By Mr. Brustin) As if he asked the questions
8  himself.
9    A    Okay.  But from a civil liability standpoint?
10  From a criminal prosecution standpoint?
11    Q    From a procedure standpoint.
12         MS. BERKE:  Objection.  Vague.
13    Q    (By Mr. Brustin) Phoenix Police Department
14  procedure standpoint.
15         MS. BERKE:  Objection.  Vague.  Foundation.
16  Outside the scope.
17         THE WITNESS:  I think Detective Saldate has a
18  duty to bring it forth to somebody that his partner is doing
19  that.  Whether or not the court at trial is going to hold
20  Detective Saldate just as responsible as Chambers, I don't
21  know.
22    Q    (By Mr. Brustin) Fair.
23         (An off-the-record discussion ensued.)
24    Q    (By Mr. Brustin) Now, obviously you need a break?
25    A    No.  I promise you when I'm looking at my watch,

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
233–236

---

Page 233

1  I'm not checking the actual time.  However, going -- it's
2  just we have a lot going on in the city, so I'm making sure
3  it's nothing important that I have to break for, so.
4      Q    Let me know if you do.
5      A    I will.
6      Q    Now, as I think we already mentioned, you saw
7  evidence that in fact Saldate conducted a 20-minute, based
8  on the report, conducted a 20-minute interview of Smallwood
9  in which at some point he invoked his right to remain
10  silent, correct?
11     A    Yes.  I believe we just read that.
12     Q    Okay.  Certainly pursuant to policy and training,
13  you would have expected Saldate to create, at a minimum, a
14  report of his 20-minute interrogation of this murder
15  suspect, correct?
16         MS. RETTS:  Form and foundation.
17         THE WITNESS:  He should have created his own
18  report and/or asked his partner on this case:  I need you to
19  document this.
20     Q    (By Mr. Brustin) Would that have been sufficient
21  to simply ask his partner to document his 20-minute
22  interview?
23     A    Yes.  And we do that to this day.
24         MS. BERKE:  Good time for a short five-minute
25  break?

Page 234

1          MR. BRUSTIN:  Sure.
2          (Recess was taken at 2:29 p.m.; resumed at
3  2:39 p.m.)
4      Q    (By Mr. Brustin) I want to ask you a few follow-up
5  questions on the Mahler case, which you were also asked
6  about in your last deposition.
7      A    Okay.
8      Q    Take a look at Exhibit 85.
9          (An off-the-record discussion ensued.)
10         THE WITNESS:  Mahler or Rangel?
11     Q    (By Mr. Brustin) Mahler.  85.
12     A    Oh, 85.
13         (An off-the-record discussion ensued.)
14     Q    (By Mr. Brustin) Before I show you that, let me
15  show you --
16         You would agree, take a look at page --
17  Exhibit 85 --
18         (An off-the-record discussion ensued.)
19     Q    (By Mr. Brustin) Okay.  Look at page 2298, the
20  first page.  Look at the --
21     A    Okay.
22     Q    -- second-to-the-last paragraph.
23     A    Okay.
24     Q    It says --
25         Do you see the middle of the paragraph, it says,

Page 235

1  "I then identified myself"?
2      A    Yes.
3      Q    "I then identified myself and explained to him
4  that I was a homicide detective investigating him for a
5  murder which occurred in Phoenix on November 8th, 1989.
6  Michael immediately told me that he was a four-time loser,
7  aware of any games that police like to play, and that he was
8  not going to be fooled.  He then said that he did not want
9  to talk about a murder because he knew that the State could
10  make him swallow a pill for murder."
11     A    Okay.
12     Q    And I think you told us, during your first
13  deposition, that this was not a clear invocation of his
14  right to silence?
15     A    Correct.
16     Q    In other words, it was a statement that was
17  susceptible to more than one interpretation, correct?
18     A    Correct.
19         MS. BERKE:  In fairness, his testimony wasn't
20  that's it's not a clear invocation.  He said it's not an
21  invocation.
22         MR. BRUSTIN:  Well, you're nothing if not
23  fair.
24     Q    (By Mr. Brustin) And, in other words, what you're
25  saying is under the law on Miranda, this didn't require him

Page 236

1  to stop questioning, correct?
2      A    I do not believe it did, no.
3      Q    All right.  And this case was in 1990, correct?
4      A    Yes.
5      Q    And when he said "I did not want to talk about a
6  murder," it wasn't clear enough that he was invoking his
7  right to silence, correct?
8      A    Correct.
9      Q    You would agree that if he said -- withdrawn.
10         I want to read to you from State v Finehout,
11  which is 1983, Supreme Court, Arizona.
12     A    Okay.
13     Q    "The State contends that, 'Ain't going to say
14  anymore,' is in context ambiguous."
15         Would you agree with that?
16         MS. RETTS:  Form.  Did you say "un" or
17  "ambiguous"?
18         MS. BERKE:  Foundation.
19     Q    (By Mr. Brustin) "Ambiguous."
20     A    "Ain't going to say anymore"?  Yes.
21     Q    It's ambiguous in the same way that in Mahler,
22  Mr. Mahler said "Did not want to talk about a murder,"
23  correct?
24     A    I disagree.
25     Q    How is it different?  How is it different in

Page 237

1  terms of ambiguity?
2      A    Here he says he doesn't want to talk about a
3  murder.  In that first case or that case that you actually
4  said it, "I don't want to talk anymore."  All he's telling
5  me is he doesn't want to talk about a murder.
6      Q    Okay.  In Mahler, it says, "Even if the
7  defendant's assertion is susceptible to more than one
8  interpretation, the limit of permissible continuing
9  interrogation immediately after the assertion would be for
10  the sole purpose of ascertaining whether the defendant
11  intended to invoke his right to silence or to waive this
12  right.  In the instant case, the defendants" -- withdrawn.
13  I'll end it there.
14          And you would agree that that's exactly the
15  situation here, as you just told us, that the statement "did
16  not want to talk about a murder" was susceptible to more
17  than one interpretation?
18      MS. RETTS: Form.
19          THE WITNESS:  It's susceptible to more than
20  one interpretation, yes.
21      Q    (By Mr. Brustin) And one interpretation would be
22  he's invoking his right to silence, correct?
23      A    That's your interpretation, yes.
24      Q    Are you telling me that one reasonable
25  interpretation of "I don't want to talk about a murder" is

Page 238

1  that he's invoking his right to silence?
2      A    That's not my interpretation.
3      Q    That wouldn't be one reasonable interpretation?
4      A    It could be a possible, it's not mine.
5      Q    Well, the whole idea of susceptible to more than
6  one means that there's more than one, right?
7      A    We agree.  I answered that question for you.
8      Q    Okay.  And one interpretation that would be
9  reasonable here is that he doesn't want to talk about the
10  murder he's being asked for, he's invoking his right to
11  silence, right?
12      MS. RETTS: Form.  Foundation.
13          THE WITNESS:  He doesn't want to talk about a
14  murder.  He doesn't say specific to this murder.  He just
15  doesn't want to talk about murder.
16      Q    (By Mr. Brustin) Let's take a look at the report.
17      A    He told him he was a homicide detective.  He
18  doesn't want to talk about a murder.
19      Q    Let me read it to you.  "I explained to him that
20  I was a homicide detective investigating him for a murder
21  which occurred in Phoenix on November 8th, 1989."
22      A    Okay.
23      Q    He's telling him he's investigating him for a
24  specific murder, correct?
25      A    Yes.

Page 239

1      Q    And then the next thing he says is that he was a
2  four-time loser, aware of any games, and that he was not
3  going to -- he said that he did not want to talk about a
4  murder because he knew the State could make him swallow a
5  pill for murder.
6      A    He said he didn't want to talk about a murder, he
7  didn't say he didn't want to talk about this murder.
8      Q    But he's being asked about this murder, specific
9  murder.
10      MS. RETTS: Form.  Foundation.
11          THE WITNESS:  That's how you interpreted it.
12  I'm telling you how I interpreted it.
13      Q    (By Mr. Brustin) Well, there's no other way to
14  interpret the fact that he's being told I'm here
15  investigating him for a murder which occurred in Phoenix on
16  November 8th, 1989, right?
17      MS. RETTS: Form.  Foundation.
18          THE WITNESS:  We'll have to agree to
19  disagree.
20      Q    (By Mr. Brustin) No, we won't.  How could you --
21  what other way is there --
22          What other way is there to interpret the
23  statement that he was there investigating him for a murder,
24  investigating him for a murder which occurred in Phoenix on
25  November 8th, 1989, that he was investigating him -- that he

Page 240

1  was talking to him about a specific murder?
2      MS. RETTS: Form.  Foundation.  He's answered
3  the question.
4      MS. BERKE:  Argumentative.
5      MS. RETTS:  It's incomplete.  I mean, right
6  above there it says robbery detail and several FBI agents
7  who are investigating Michael Mahler for several bank
8  robberies.
9      Q    (By Mr. Brustin) Is a bank robbery a murder?
10      A    I'm going to continue my answer to your actual
11  specific question is he put him on notice that he was there
12  to question him about this murder.  This person replied, "I
13  don't want to talk about a murder."  He didn't say he didn't
14  want to talk about this specific murder.  Again, it's
15  susceptible to more interpretations.  That's my
16  interpretation.
17      Q    Okay.  Well, you don't --
18          But the law says if it's susceptible to more than
19  one interpretation -- you would agree -- I'm sorry, you
20  would agree that one reasonable interpretation would be that
21  he's invoking his right to remain silent, correct?
22      MS. RETTS: Form.  Foundation.
23          THE WITNESS:  One, yes.
24      Q    (By Mr. Brustin) Okay.  And what the law I just
25  read to you says is if there is more than one reasonable

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
241–244

Page 241

1  interpretation, if it's susceptible to multiple
2  interpretation and one interpretation would be he's invoking
3  his right to remain silent, the law is crystal clear, you
4  have to stop questioning, correct?
5        MS. RETTS:  Form.  Foundation.
6        THE WITNESS:  Read me the whole of your court
7  case again.
8     Q   (By Mr. Brustin) I'll read you two.
9     A   Before you do, I want to go on the record and say
10  just, once again, for the record, that the Arizona Supreme
11  Court is not the sole decision-making authority when it
12  pertains to constitutional rights violations.  There could
13  be other cases from the Ninth Circuit and State Supreme
14  Court.  So if you want to hold just this one case out to be
15  the law of the land, that's how I will answer additional
16  questions.
17     Q   I'm asking you to assume that this is the law of
18  the land.
19     A   Law of the land.  Okay.
20     Q   Okay.  "Even if the defendant's assertion is
21  susceptible to more than one interpretation, the limit of
22  permissible continuing interrogation immediately after the
23  assertion would be for the sole purpose of ascertaining
24  whether the defendant intended to invoke his right to
25  silence or to waive this right."

Page 242

1        MS. RETTS:  Form.  Foundation.  Outside the
2  scope.
3     Q   (By Mr. Brustin) That's a very clear statement in
4  Finehout that if there is multiple susceptible
5  interpretations, you have to stop questioning and, at most,
6  can clarify whether he's invoking his right, correct?
7        MS. RETTS:  Foundation.
8        THE WITNESS:  I don't recall you reading that
9  portion of it, that I have to stop questioning.
10     Q   (By Mr. Brustin) Okay.  I did.  It says, "Even if
11  the defendant's assertion is susceptible to more than one
12  interpretation, the limit of permissible continuing
13  interrogation, immediately after the assertion, would be for
14  the sole purpose of ascertaining whether the defendant
15  intended to invoke his right to silence or to waive his
16  right."
17     A   That doesn't tell me I have to cease questioning.
18     Q   Well, it says the only questioning you can do is
19  to ascertain whether he's waiving his right.
20     A   It's not telling me, then, that I have to stop.
21  That's cease questioning.
22     Q   What other -- how other way could you understand
23  that?
24        MS. RETTS:  Argumentative.
25        THE WITNESS:  What I just explained to you.

Page 243

1     Q   (By Mr. Brustin) Okay.  So it says, "Continuing
2  interrogation immediately after the assertion would be for
3  the sole purpose of ascertaining whether the defendant
4  intended to invoke his rights."  That means the only
5  questioning you can do is for the purpose of determining
6  whether he invoked his right, correct?
7        MS. RETTS:  Form.  Foundation.  Outside the
8  scope.
9        THE WITNESS:  Yeah, I don't interpret it that
10  way, no.
11     Q   (By Mr. Brustin) How do you interpret it?
12     A   I told you, that I can continue questioning.
13     Q   About anything?
14     A   Hmm?
15     Q   About anything?  Even though it says, "The limit
16  of permissible continuing interrogation immediately after
17  the assertion would be for the sole purpose of ascertaining
18  whether the defendant intended to invoke his right to
19  silence."
20     A   Before I provide you another one, if you want to
21  provide me a copy of the case, I'll read it, and then I'll
22  answer your question.
23     Q   Okay.  I'll do that.
24        (An off-the-record discussion ensued.)
25        MR. BRUSTIN:  Let's mark this, please, as...

Page 244

1        (Deposition Exhibit No. 113 was marked for
2  identification.)
3        (An off-the-record discussion ensued.)
4     Q   (By Mr. Brustin) Take a look at page three, the
5  bold paragraph, right-hand column.  This is 113, it's State
6  versus Finehout, 136 Arizona 226, 1983.
7     A   And I'm going to, because again, the fact pattern
8  in this actual departmental report versus the fact pattern
9  in this actual case that you want me to provide you with an
10  answer to are two different things.  In the court case is
11  what I don't want -- "Perhaps I don't want to talk to you
12  anymore," which is ambiguous.  Here the statement was, "I
13  don't want to talk about a murder."  Two completely separate
14  fact patterns, so for me to give you an opinion, I want to
15  read the entire case myself before I give it to you.
16     Q   No.  I'm only asking about one specific part of
17  this, and I do it at my own peril.
18        So all I want to know is the meaning of this
19  language, which is not specific to the language in this
20  case.  What it says is, read it, "Even if the defendant's
21  assertion is susceptible to more than one interpretation,
22  the limit of permissible continuing interrogation
23  immediately after the assertion would be for the sole
24  purpose of ascertaining whether the defendant intended to
25  invoke his right to silence."

TOM VAN DORN  30(b)(6)                                            April 26, 2018
Debra Jean Milke vs City of Phoenix                                   245–248

Page 245

1          MS. RETTS:  Form.  Foundation.  Outside the
2    scope.  He's not here as a legal adviser or to interpret
3    case law or comment on it.
4       Q    (By Mr. Brustin) It's a very, very clear statement
5    of the law, correct?
6          MS. RETTS:  Same objection.
7          THE WITNESS:  I would disagree.  Everything
8    in the law can be argued differently.
9       Q    (By Mr. Brustin) This is a clear statement that
10   the only permissible questioning, when there is ambiguity,
11   is questioning to clarify whether he's actually invoking his
12   right.  That's what it says, correct?
13         MS. RETTS:  Same objection.
14         THE WITNESS:  You and I can respectfully
15   agree to disagree.
16      Q    (By Mr. Brustin) Okay.
17         (An off-the-record discussion ensued.)
18      MR. BRUSTIN:  All right.  Let's move on.
19      Q    (By Mr. Brustin) So in your view still, after
20   seeing this case law, no violation of Miranda, correct, in
21   Mahler?
22      A    Correct.  We'll have to agree professionally to
23   disagree on that.
24      Q    It's not about me anymore.  I'm asking about your
25   position.

Page 246

1          No violation of PPD policy, correct --
2          MS. RETTS:  Form.  Foundation.
3       Q    (By Mr. Brustin) -- in Mahler, that you've
4    observed?
5       A    Does not appear to be, no.
6       Q    After reviewing the case?
7       A    Correct.
8          (Interruption in the proceeding.)
9       MR. BRUSTIN:  I've got to take this.  Sorry,
10   guys.
11         (Recess was taken at 2:56 p.m.; resumed at
12   3:15 p.m.)
13      Q    (By Mr. Brustin) Just to close the loop on Mahler,
14   in your view, based on what you saw in the report, no need
15   to investigate Saldate's conduct in regard to PPD policy in
16   that case, correct?
17      A    Let me clarify, while you were on the phone, I've
18   obviously taken a look at this paragraph in the case and
19   reading what it was in Mahler, so my answer to your question
20   is this:
21         In the particular case you asked me to review, it
22   was the State that contended that the statement made was
23   ambiguous and the court disagreed.  I actually agree with
24   the court.  All right.  A statement of "I ain't going to say
25   anymore" is not ambiguous, in my opinion.  However, in the

Page 247

1    Mahler case, I do feel that this is ambiguous.  So, no, I
2    would not apply or say that this detective had to cease
3    questioning from that point.
4       Q    Okay.  So just to be clear -- and I appreciate
5    the clarification --
6       A    Yeah.
7       Q    -- no violation of PPD policy in your view,
8    correct?
9       A    In my view, correct.
10      Q    No need to investigate for violation of PPD
11   policies, correct?
12      A    Correct.
13      Q    And no violation of the law?
14      A    Correct.
15      Q    Okay.  Let's take a look at the Conde case.
16         (An off-the-record discussion ensued.)
17      Q    (By Mr. Brustin) Take a look at Exhibit 9.
18      A    Okay.
19      Q    Have you had a chance to review Exhibit 9 prior
20   to today?  This is findings regarding Saldate's misconduct
21   in connection with a female motorist from 1973.
22      A    Yeah, I mean, we went over it in the first
23   deposition.  I did briefly -- it was an attachment in my
24   deposition that I received from counsel, so I briefly
25   glanced at it again before today.

Page 248

1       Q    Okay.  And you would agree that this, this
2    separation notice describes very serious misconduct by
3    Saldate, correct?
4          MS. RETTS:  Form.  Foundation.  And just
5    subject to the caveat that we discussed, and you can ask him
6    questions about what he did to search for people, but we
7    don't have anybody alive or who knew about this at this time
8    and subject to the caveat that we don't have the underlying
9    investigation for it.
10         MS. BERKE:  And vague.
11         THE WITNESS:  It's my understanding, without
12   going back and rereading the whole thing or something like
13   that, that there was also disagreement between Saldate and
14   the woman as to whether or not this was an exchange for
15   sexual favors.  I know that -- obviously he received --
16      Q    (By Mr. Brustin) You should read it.
17      A    Read the whole thing?
18      Q    Read it.
19      A    Okay.  Thank you.  It's not that long.
20         (An off-the-record discussion ensued.)
21         THE WITNESS:  Okay.  We're good.
22      Q    (By Mr. Brustin) Had a chance to read it?
23      A    Yeah.
24      Q    And --
25         MS. BERKE:  Can you please wait, as I asked.

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
249–252

Page 249

1         (An off-the-record discussion ensued.)
2    Q    (By Mr. Brustin) You've had a chance to read it,
3  correct?
4    A    Yes.
5    Q    And putting aside any disputes about what
6  happened, just based on this document, it describes
7  extraordinarily serious misconduct, correct?
8         MS. BERKE:  Objection.  Foundation.
9         THE WITNESS:  Yes.  And, in fact, I do
10  believe that it's stated in here as to -- whoever prepared
11  this, because I can't read those, that this is intended to
12  impress upon you the seriousness of your action.
13    Q    (By Mr. Brustin) Okay.  And certainly today, this
14  type of conduct would certainly lead to termination,
15  correct?
16         MS. RETTS:  Form and foundation.  Outside the
17  scope.
18         THE WITNESS:  For a variety of reasons.  And
19  let me explain to you.  And again, I don't know how they did
20  it.
21         If this were to have occurred today, it also
22  appears that in this notice, that the omission of certain
23  things would be separate allegations under today's policy,
24  that we do take serious, would subject you to possible
25  termination, yes.

Page 250

1    Q    (By Mr. Brustin) Okay.  And in addition to the
2  inappropriate conduct with the woman, it's clear that on at
3  least two occasions during the course of this official
4  investigation, Saldate lied, correct?  There was a finding
5  of that?
6         MS. BERKE:  Form.  Vague.
7         THE WITNESS:  I know there's a finding of an
8  omission.  "You omitted particular details."  And then --
9  then "you specifically denied."  So I guess if you want to
10  categorize that as a lie, sure.
11    Q    (By Mr. Brustin) Would be fair, right?
12         MS. RETTS:  Form.  Foundation.
13         THE WITNESS:  Yes.
14    Q    (By Mr. Brustin) Okay.  And you would expect
15  that -- withdrawn.
16         I take it that, given your experience in the
17  department, you're surprised that he only received a short
18  suspension for this.  Fair to say?
19         MS. BERKE:  Objection.  Vague.
20         MS. RETTS:  Foundation.
21         THE WITNESS:  Under today's standards, this
22  would not have happened.  Again, discipline was decided by
23  the chief back in the day, so I'm told, so this must be how
24  they decided it back then.
25         (An off-the-record discussion ensued.)

Page 251

1    Q    (By Mr. Brustin) All right.  And certainly you
2  would expect, as I think we discussed earlier, in 1985 --
3  withdrawn.
4         In the 1980s, first when Saldate was assigned as
5  a detective, you would have expected that this document,
6  these findings, would have been carefully reviewed in
7  connection with that assignment.  Fair to say?
8         MS. RETTS:  Form.  Foundation.  Outside the
9  scope.
10         THE WITNESS:  Possibly yes, possibly no.  At
11  some point in time, no different than it is today, you can
12  only take a look at an employee's past for a set number of
13  years.  And I want to say in some cases it's three, some
14  cases it's five.  So had he applied to homicide in 1985,
15  this is from 1973, I may not have been allowed as a
16  supervisor to consider that when he applied for this
17  assignment.
18    Q    (By Mr. Brustin) Okay.  Now, according to
19  Detective Saldate and his testimony, he was specifically
20  questioned about this incident in his interview to become a
21  homicide detective.
22    A    Okay.
23    Q    You certainly have no reason to dispute that,
24  correct?
25    A    That's his testimony?

Page 252

1         MS. RETTS:  Form.  Foundation.  Outside the
2  scope.
3    Q    (By Mr. Brustin) And assuming that that's truthful
4  testimony, that suggests to you that in fact they did
5  consider the findings in connection with this incident.
6  Fair to say?
7         MS. BERKE:  Objection.  Foundation.
8         MS. RETTS:  Outside the scope.
9         THE WITNESS:  He was questioned.  Whether or
10  not they considered the findings, I don't know.  You would
11  have to let me know if he testified to that.
12    Q    (By Mr. Brustin) I'm sorry.  I missed the dates.
13  He became a detective in the late '70s.  He became a
14  homicide detective in 1982.
15    A    Okay.
16    Q    So let me go back.
17         Certainly you have no reason to dispute --
18  withdrawn.
19         Assuming that Saldate was in fact questioned
20  about this incident in 1982 during the promotion process,
21  during the assignment process to homicide detective, it
22  appears that they did consider this incident.  Fair to say?
23         MS. BERKE:  Objection.  Foundation.
24         MS. RETTS:  Outside the scope.
25         THE WITNESS:  They likely considered the

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
253–256

Page 253

1  facts when he applied for the assignment, one of many,
2  several factors.
3      Q   (By Mr. Brustin) Okay.  Now, you would agree that
4  there appears to be -- withdrawn.
5      Even in 1973, based on your knowledge of internal
6  affairs, your knowledge of the disciplinary process, you
7  would expect that, back then, there would have been a number
8  of additional documents that would have been generated in
9  connection with this investigation, other than this report,
10  correct?
11     A   Yes.  It is my understanding, no different back
12  then, different from today, there should be an actual
13  investigation that coincides with this separation notice.
14     Q   Okay.  And although that's not available today,
15  you would expect that those additional documents would
16  likely have been available in 1982.  Fair to say?
17         MS. RETTS:  Form.  Foundation.  Misstates the
18  evidence.
19         THE WITNESS:  Yeah, I don't know what the
20  retention period was for internal affairs investigations
21  back in the '70s.  I don't know.
22     Q   (By Mr. Brustin) Have you attempted to look for
23  that?
24         MS. RETTS:  Form.
25         MR. BRUSTIN:  Can you -- do you --

Page 254

1         MS. RETTS:  I do know what it is.
2         MR. BRUSTIN:  Can you tell me?
3         MS. RETTS:  Yes.  So Humphrey told us that
4  the retention period was five years, per the MOU.  We're
5  trying to get the MOU from the union, if they still have it,
6  that it was a requirement that after five years, all the PSB
7  investigations themselves be shredded, which is the same
8  that it is now.
9         That does not mean that the separation notice
10  does not still exist, it is that the underlying documents
11  for the retention don't, but this still stays for a period,
12  and we are not certain how long.
13         MR. BRUSTIN:  Okay.
14         THE WITNESS:  Five years is still today too.
15     Q   (By Mr. Brustin) And by the way, you've been --
16         (An off-the-record discussion ensued.)
17     Q   (By Mr. Brustin) Five years after retirement,
18  correct?
19     A   No.  No.
20         MS. RETTS:  No.  The MOU at the time said
21  five years after the conclusion of the PSB investigation,
22  that the supporting documents underneath this.  That does
23  not mean that this goes away but that the backup for it, per
24  the MOU with the union.  That's what Humphrey indicated.
25  We're trying to obtain the MOU.  City of Phoenix does not

Page 255

1  have the MOU.
2         MR. BRUSTIN:  All right.  Let me get this on
3  the record, then.
4     Q   (By Mr. Brustin) Commander, your understanding,
5  based on your research for your testimony here, is that in
6  1973, there would be a five-year retention policy for the
7  supporting documents for Exhibit 9; is that correct?
8     A   Let's see here.  Yeah, so it looks like this
9  alleged conduct occurred on August 15th of 1973.  Yes, there
10  should be an investigation, it would have been purged, then,
11  five years from that date.
12     Q   Okay.  And you would have --
13         And was that, was that same policy in place in
14  the '80s?
15     A   To the best of my knowledge and in the
16  conversations I had, yes, that has been the policy back then
17  and even exists now.
18     Q   Okay.  So any investigations of misconduct in the
19  '80s, other than findings, the supporting documentation
20  would have been destroyed in five years?
21     A   The investigation had a five-year retention
22  period.  There may have been supporting documentation
23  similar to this that wouldn't contain the full
24  investigation; i.e. everybody's interviews, all of the
25  attachments, but contain a synopsis and what the discipline

Page 256

1  is.
2     Q   Okay.  Now --
3         (An off-the-record discussion ensued.)
4     Q   (By Mr. Brustin) Now, you would agree that
5  although this document itself describes, as you told us,
6  very serious misconduct on its own, it also leaves a number
7  of questions unanswered about what happened.  Fair to say?
8     A   What it does --
9         Go ahead.
10         MS. RETTS:  Form.
11         THE WITNESS:  What it doesn't tell me is what
12  were statemented made by the parties during interviews,
13  correct.
14     Q   (By Mr. Brustin) Most importantly, you would want
15  to know what does, what did the, what did the woman say
16  happened, correct?
17     A   Yes --
18         MS. RETTS:  Form.
19         THE WITNESS:  -- I would want to know that.
20     Q   (By Mr. Brustin) And you would agree that
21  certainly, as you've described earlier, that would be
22  important information to know, if it existed, during the
23  assignment process from police officer to detective?
24         MS. RETTS:  Form.  Foundation.  Outside the
25  scope.



EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
257–260

Page 257

1    THE WITNESS:  Perhaps.  As a supervisor, this
2  is good enough for me to know that, okay, you engaged in
3  this conduct.  We disciplined you.  So this is going to be
4  one fact I consider when comparing you against all the other
5  candidates as to whether or not I think you're the best
6  person for the job.
7    Q    (By Mr. Brustin) I can even be more specific.  You
8  would agree that one question you would have in regard to
9  this is -- withdrawn.
10       You would agree that when you read this document,
11  it doesn't appear to make sense that what Saldate admits to
12  doing is what actually happened.  Would you agree with that?
13       MS. BERKE:  Objection.  Foundation.
14       MS. RETTS:  Form.  Foundation.  Outside the
15  scope.
16       THE WITNESS:  I think what this document
17  tells me, in reading it, is one, he engaged in actions that
18  violated department policy; two, he omitted certain pieces
19  of information; and three, that he possibly was not truthful
20  to his supervisor when asked.  Then he received his
21  discipline.  I think, then, if he's competing for me in
22  homicide, I have the information I need to know as to
23  whether or not I want him.
24    Q    (By Mr. Brustin) I'm going to be more specific.
25       When you read this document, one question you

Page 258

1  would have, as an experienced investigator, experienced with
2  rules and regulations of the department, would be did this,
3  did this woman actually claim that Saldate did a favor for
4  her and in return she offered a sexual favor, she offered to
5  meet him at a hotel afterward, she didn't show up, and then
6  she complained about it.  That's a very odd story, right?
7       MS. BERKE:  Objection.  Misstates evidence.
8       MS. RETTS:  Form.  Foundation.  Outside the
9  scope.
10       MS. BERKE:  Is there a reference to a hotel
11  in there?
12       THE WITNESS:  Again, in what context are you
13  asking me --
14    Q    (By Mr. Brustin) Here's what I'm asking you.  If
15  you were making the assignment from homicide to homicide,
16  one question you would have is, is what really happened here
17  that Saldate was the person who offered to give this woman a
18  break in return for a sexual favor, as opposed to the woman
19  offering a sexual favor after she already gave her a break?
20  That would be the obvious question, right?
21       MS. RETTS:  Form.  Foundation.  Outside the
22  scope.
23       MS. BERKE:  Objection.  Misstates evidence.
24  Assumes facts not in evidence.  Foundation.
25       THE WITNESS:  To make sure I understand

Page 259

1  you --
2    Q    (By Mr. Brustin) If you don't understand, I want
3  to be clear.
4    A    Right.  Let me ask you the question first, so I
5  understand.
6       You're asking me if I'm the one that is in charge
7  of making the assignment, okay, so if Detective Saldate and
8  numerous other detectives are competing for a position and I
9  am the boss, your question to me is whether or not I would
10  think it important to know what her interview actually was?
11    Q    Yes.
12    A    Whether or not it was her that actually solicited
13  or it was Detective Saldate that solicited.  It that your
14  question?
15    Q    Yes.
16    A    Okay.
17       MS. RETTS:  Same objections.
18       MS. BERKE:  Same objections.
19    Q    (By Mr. Brustin) Let me withdraw the question.
20    A    Okay.
21    Q    You would agree that it is even more serious
22  misconduct if Saldate asked for a sexual favor in return for
23  official leniency, correct?
24       MS. RETTS:  Form.  Foundation.  Outside the
25  scope.

Page 260

1       MS. BERKE:  Objection.  Misstates evidence.
2  Assumes facts not in evidence.  Foundation.
3       THE WITNESS:  I agree it adds an additional
4  level of seriousness if it was initiated on the part of the
5  detective.
6    Q    (By Mr. Brustin) That makes it a crime?
7       MS. BERKE:  Form.  Foundation.
8       MS. RETTS:  Form.  Foundation.  Outside the
9  scope.
10       THE WITNESS:  Yes, it may possibly be a
11  crime.
12    Q    (By Mr. Brustin) Okay.  And so an obvious question
13  that you would have in looking at this document is whether
14  in fact the woman claimed that she offered the sexual favor
15  after Saldate gave her a break or whether or not Saldate
16  asked for a sexual favor in return for a break, correct?
17       MS. BERKE:  Wait, can you read that question
18  back.
19       (The requested portion of the transcript was
20  read by the court reporter.)
21       MS. BERKE:  Objection.  Assumes facts not in
22  evidence.  Foundation.  Outside the scope.
23       THE WITNESS:  I would want to know, but this
24  also tells me what the results of the investigation were, in
25  that, right here in this one sentence, "Officer Saldate,



TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                      261–264

Page 261

1 although your actions in this matter were encouraged by the
2 woman," so, again, at some point during the course of that
3 investigation, somebody found that the actions were
4 initiated by the woman.
5     Q    (By Mr. Brustin) Okay.
6     A    So it answers that question for me as to who did
7 what.
8     Q    You'd be satisfied with that?
9     A    Yeah.  Somebody did the investigation.  I mean,
10 you have to rely upon, you know, again, whoever did the
11 investigation and what their findings were.
12     Q    All right.  Certainly, if the information was
13 available, you would want to read it, correct?
14     A    Not necessarily.
15          MS. RETTS:  Form and foundation.  Outside the
16 scope.
17     Q    (By Mr. Brustin) You're not suggesting that you
18 wouldn't want to read what this woman claimed happened,
19 correct?
20          MS. RETTS:  Argumentative.  Outside the
21 scope.  Foundation.
22          MS. BERKE:  Asked and answered.
23          THE WITNESS:  To this day, no, it is not
24 common for us to go back and want to listen to every
25 interview on investigations.  If we have an employee that's

Page 262

1 competing for a process, I want to know have they ever been
2 under investigation, if so, what were those findings, and
3 whether or not they received discipline.
4          Do we physically, as supervisors, go down,
5 since I have been on the Phoenix Police Department, and read
6 the entire investigation, listen to every interview, no.  We
7 trust what the investigators have done with respect to their
8 job.
9     Q    (By Mr. Brustin) You would agree, this is an
10 extraordinary finding to have for an officer who's applying
11 to be a detective, correct?
12          MS. RETTS:  Form and foundation.  Outside the
13 scope.
14          MS. BERKE:  Objection.  Vague.
15          THE WITNESS:  It's a serious allegation
16 against a detective, yes.
17     Q    (By Mr. Brustin) It's a serious finding against
18 the detective?
19          MS. RETTS:  Same objection.
20          THE WITNESS:  Again, as noted in here, they
21 do tell him, it is a serious finding, yes.
22     Q    (By Mr. Brustin) This is not a typical -- this
23 would not be typical in the assignment process, when you
24 have a police officer, who is applying to be a detective and
25 then a homicide detective, to have this kind of misconduct

Page 263

1 in their history, correct?
2          MS. RETTS:  Form.  Foundation.  Outside the
3 scope.
4          THE WITNESS:  I would hope not, but clearly
5 it did.
6     Q    (By Mr. Brustin) Okay.  Certainly you would
7 have -- according to Saldate, in 1975 he applied to be a
8 detective.  And based on your research on the -- based on
9 your research on the retention policy, you would expect that
10 the supporting documentation for this finding would have
11 been in the file, correct?
12     A    It's my understanding, in talking with Commander
13 Humphrey, that the five-year retention period would have
14 been in existence.  So, yeah, '73 to '75, the full
15 investigation should have been housed somewhere.
16     Q    Now, we're going to be looking at exhibit --
17          (An off-the-record discussion ensued.)
18     Q    (By Mr. Brustin) -- Exhibit 23, which is the
19 Reynolds case, which you have not been asked about.  Okay?
20     A    23?
21     Q    Yeah.
22     A    Englebert?
23     Q    Yeah, that's the victim.
24     A    Then I see investigate leads, Harrison and
25 Englebert, as well?

Page 264

1     Q    Yeah.  That's the right file.
2     A    Okay.  Cool.
3     Q    So let's start with the court order, which is --
4 well, let me tell you the basic facts of this case.
5          So this is a case from 1988.  The victim was
6 found -- the victim, who was a prostitute, was found
7 strangled to death in her bedroom apartment.  There was
8 substantial evidence that pointed to a man named Lamont
9 Reynolds as the perpetrator.  This happened in her apartment
10 building.  And multiple witnesses reported seeing the victim
11 alive after midnight.  Okay?
12     A    Okay.
13     Q    Her five-year-old son was also a witness.  He
14 said that he saw the perp come into the house and leave the
15 house by 8:00 p.m.  And he said that he knew it was 8:00
16 p.m. because he had been watching the Garry Shandling Show,
17 and he claimed the person who hurt his mother turned the
18 show off on his way out.
19     A    Okay.
20     Q    Okay.  So let me start with page 57 of this
21 exhibit.  Just so you understand, what we try to do is we
22 tried to put together the most relevant documents in one
23 exhibit from this large homicide investigation so we can
24 question people about it.
25          MS. BERKE:  Can I just ask a question?  Did

TOM VAN DORN  30(b)(6)

April 26, 2018

Debra Jean Milke vs City of Phoenix

265–268

Page 265

1  you represent that the boy said it was 8:00?  He gave the
2  time of 8:00?
3          MR. BRUSTIN:  That is what I said.
4          MS. BERKE:  Can you show you us where that
5  is?
6          MR. BRUSTIN:  Yeah, I'm going to take my time
7  to show you where that is, right.  So the answer is no, I
8  can't.  Why would I do that?
9          MS. BERKE:  Because I don't believe that's
10  accurate.
11          MR. BRUSTIN:  Well, then, make your
12  objection.  What am I -- I'm going to show you something?
13          MS. BERKE:  Misstates evidence.
14          MR. BRUSTIN:  So then make your objection.
15          MS. BERKE:  Okay.  But you have an obligation
16  to provide accurate information to the witness.
17          MR. BRUSTIN:  Oh, my god.  Just make your
18  objection.
19          MS. RETTS:  Well, you do.
20          MR. BRUSTIN:  So make your objection.  You
21  weren't going to do that.  It's approximately 8:00.  I'm
22  just trying to give him a description of the case.  If I'm
23  going to ask him anything specific, you know me, I'm going
24  to go to the record.
25          MS. BERKE:  But your whole line of

Page 266

1  questioning is about the time, which makes it a pertinent
2  issue.
3          MR. BRUSTIN:  That's what you think.  That's
4  not even -- I'm not even going to ask him about it.  Don't
5  worry so much.
6          MS. BERKE:  Well, I don't think it's
7  appropriate to misrepresent the facts to the witness.
8          MR. BRUSTIN:  Okay.  So you made your
9  objection.
10      Q    (By Mr. Brustin) Okay.  Let's take a look at page
11  57.
12      A    Okay.
13      Q    This is, I will represent to you, is a court
14  order that was issued in this case by the judge.
15      A    Okay.
16      Q    See, it looks like that, right?
17      A    Yes.
18      Q    Okay.  And what it says here is that the
19  defendant was denied his right to due process and a fair and
20  impartial presentation of the evidence by the manner in
21  which the proceeding was conducted, correct?
22          That was not fair.  Let me read the whole thing.
23      A    All right.
24      Q    "It is ordered granting the motion, the Court is
25  of the opinion" --

Page 267

1          So this is a motion for finding of probable
2  cause.  Okay?  And it says, "It is ordered granting the
3  motion, the Court is of the opinion that with regard to
4  certain aspects of the presentation made to the Grand Jury,
5  the defendant was denied his right to due process and a fair
6  and impartial presentation of the evidence by the manner in
7  which the proceeding was conducted."
8          Very serious finding, correct?
9          MS. RETTS:  Form.  Foundation.
10          THE WITNESS:  Yeah.  Denied his right to due
11  process, yes.
12      Q    (By Mr. Brustin) Then it says, "In particular, the
13  Court is of the opinion that a fair presentation was not
14  made in connection with the evidence concerning the
15  identification of the defendant by the victim's son, Patrick
16  Englebert, as more fully outlined in that portion of
17  defendant's motion under the heading of one, contained at
18  pages eight through 11."
19      A    Okay.
20      Q    And you would agree what appears to be happening
21  here is that the judge is making a finding about, making a
22  finding and adopting the reasoning that's contained in
23  defendant's motion on certain pages, correct?
24      A    Court finding that there was not a fair
25  presentation made in connection with the evidence concerning

Page 268

1  the identification of the defendant.
2      Q    As adopting the reasoning that's contained in the
3  portion of defendant's motion on a certain pages, correct?
4  That's what it says?
5      A    Yes.
6      Q    You've seen that before, correct?
7      A    Have I seen those pages?
8      Q    No.  You've seen judges do shorthand of referring
9  to portions of a motion that they're adopting?
10      A    Yes.
11      Q    Now, if you take a look at 71, if you want, for
12  clarification, you can look at -- I will represent it to
13  you.
14          This is a portion of defendant's brief that the
15  order was referring to.  It's heading one, pages eight to
16  11.
17      A    Okay.
18      Q    Do you see that?
19      A    Yes.
20      Q    Now, if you could just read to yourself pages --
21          (An off-the-record discussion ensued.)
22      Q    (By Mr. Brustin) If you could read to yourself
23  page eight, that paragraph at the bottom, all the way
24  through, through the first paragraph on page ten.
25      A    Okay.  But the court made its ruling on pages

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
269–272

Page 269

1  eight through 11.

2    Q    Okay.  You can read that, if you want.

3    A    Okay.

4    Q    Now, you would agree that this, the judge is
5  adopting a finding or making a finding that Saldate made a
6  misstatement under oath concerning a material issue in the
7  case, correct?

8        MS. RETTS:  Form.  Foundation.  Outside the
9  scope.

10       THE WITNESS:  Yes.

11   Q    (By Mr. Brustin) Okay.  And that is a very serious
12  finding, correct?

13       MS. BERKE:  Objection.  Foundation.  Vague.

14       THE WITNESS:  Misstating the evidence?

15   Q    (By Mr. Brustin) Yes.

16   A    Yes.

17   Q    And this would require, if it came to the
18  attention of the PPD, again, a careful investigation to
19  determine whether or not this misstatement of the evidence
20  was intentional or something less than that, correct?

21   A    Yes.  And let me go back.  I agree with you, it
22  is of concern.  Whether or not it was intentional versus
23  negligent, correct.

24   Q    Well, it would be critical to determine, if it
25  came to the attention of the Phoenix Police Department, is

Page 270

1  whether in fact this was intention?

2    A    Correct.

3    Q    And the factors that you would consider in
4  determining whether it would be intentional, pursuant to
5  investigation, would be to get a statement by Saldate,
6  correct?

7    A    Yes.

8    Q    And to determine what his version of the events
9  was and whether or not that supported this being intentional
10  or something less than that?

11   A    Correct.

12   Q    And it would also, given the serious nature of
13  these findings, it would also require interviewing other
14  people involved in this transaction.  Fair to say?

15   A    Yeah.  The prosecutor.  Exactly, yes.

16   Q    The prosecutor, his partner, perhaps witnesses,
17  correct?

18   A    Yes.

19   Q    Perhaps the boy?

20   A    Yes.

21   Q    And another factor that you would consider in
22  whether this was a mistake or something -- withdrawn.

23       Another factor you would consider in determining
24  whether or not this was intentional or something less than
25  that, would be how close in time was this testimony to the

Page 271

1  investigation?

2    A    Yes.  That could be a factor as well.

3    Q    And another factor you would consider in
4  determining whether this was intentional is whether or not
5  there were other misstatements that were made during the
6  course of his testimony in this case, correct?

7    A    Yes.  I would agree that could be an additional
8  factor.

9    Q    Okay.  So now if you take a look at --

10       (An off-the-record discussion ensued.)

11   Q    (By Mr. Brustin) Take a look at 58.

12   A    Tab 58 or page 58?

13   Q    Page 58.  Same tab.

14   A    Okay.

15   Q    And you see it says, "The Court is also of the
16  opinion that the evidence was not fully and fairly presented
17  with regard to defendant's possible intoxication, as
18  outlined in that portion of the motion labeled five at page
19  15."

20   A    Okay.

21   Q    So, again, this is the court making a finding of
22  a due process violation and adopting to the reasoning of
23  this brief, correct?

24       MS. RETTS:  Form and foundation.

25       THE WITNESS:  Yeah.  This is the court's

Page 272

1  opinion.

2    Q    (By Mr. Brustin) Now, let's take a look at that
3  portion of the brief --

4    A    Okay.

5    Q    -- which is --

6        (An off-the-record discussion ensued.)

7    Q    (By Mr. Brustin) -- 78.

8    A    Okay.

9    Q    If you could read to yourself Section 5 on page
10  15 and the top of 16, please.

11   A    Okay.

12   Q    And, again, this is another serious finding of a
13  misrepresentation by Saldate by the court, correct?

14       MS. BERKE:  Objection.  Foundation.

15  Misstates evidence.  Beyond the scope.

16       THE WITNESS:  Was it an omission or was it
17  testimony?

18       Okay.

19   Q    (By Mr. Brustin) So this would be another example
20  of something that needed to be fully investigated by the PPD
21  to determine whether there was a knowing misstatement or
22  omission or whether it was something less than that,
23  correct?

24       MS. BERKE:  Objection.  Foundation.  Beyond
25  the scope.



EXHIBIT 15

800.211.DEPO (3376)
EsquireSolutions.com

TOM VAN DORN  30(b)(6)                                                      April 26, 2018
Debra Jean Milke vs City of Phoenix                                        273–276

### Page 273

1       MS. RETTS:  Form.

2       THE WITNESS:  If brought to the department's

3  attention, yes, it is of concern and we should have looked

4  at it.

5    Q    (By Mr. Brustin) And obviously it's even more

6  important in connection with the combination of the two

7  misstatements, it becomes even more important to fully and

8  comprehensively investigate it, correct?

9       MS. BERKE:  Objection.  Foundation.

10  Misstates evidence.  Beyond the scope.

11       THE WITNESS:  Agreed.  A finding by a court

12  of multiple misstatements related in one particular case

13  would definitely be of concern.

14    Q    (By Mr. Brustin) As you've already told us, there

15  are a variety of mechanisms by which the PPD, you would

16  expect the PPD to obtain a finding like this from the county

17  attorney's office back in 1990, correct?

18    A    Yes.  In my conversation with Commander Humphrey,

19  he even stated that he went to lunch with and routinely went

20  to lunch with the county attorney's office.  And they

21  discussed a multitude of different things --

22    Q    Okay.

23    A    -- so.

24    Q    And certainly you would expect that something

25  like this would have been brought to the attention of the

### Page 274

1  PPD when it happened, correct?

2    A    Should have been brought to the attention.

3  According to Commander Humphrey, it was not brought to the

4  attention of the PPD by the county attorney's office.

5    Q    Okay.  So Commander Humphrey did not remember

6  learning of this incident?

7    A    Correct.

8       (An off-the-record discussion ensued.)

9    Q    (By Mr. Brustin) Now, let me represent to you

10  that, according to Detective Saldate, he knowingly left out

11  the version of events where Reynolds told him that he was

12  drunk and only included the version of events when he told

13  him he wasn't drunk.

14       MS. BERKE:  Objection.  Misstates testimony.

15    Q    (By Mr. Brustin) You would agree that based on the

16  court's finding, that would be evidence supporting that this

17  was intentional misconduct, correct?

18       MS. RETTS:  Foundation.

19       MS. BERKE:  Objection.  Foundation.

20  Misstates testimony.

21       THE WITNESS:  If that is what Detective

22  Saldate testified to, then it appears, yes, he intentionally

23  omitted information.

24    Q    (By Mr. Brustin) And obviously one of the things

25  that the PPD was looking for in connection with officer

### Page 275

1  misconduct was patterns of misconduct, correct?

2       MS. BERKE:  Objection.  Vague.

3       MS. RETTS:  Form.

4       THE WITNESS:  When an allegation is brought

5  forward, you'll look at an individual's past to see if there

6  is a pattern, yes.

7    Q    (By Mr. Brustin) Because what's the most serious

8  problem for a police department is if you have a police

9  officer who's engaging in a pattern of serious misconduct.

10  Fair to say?

11       MS. RETTS:  Form.  Foundation.

12       THE WITNESS:  Agree.  That is of concern.

13    Q    (By Mr. Brustin) So, for example, a pattern of

14  Miranda violations is a much more serious problem than a

15  single Miranda violation, correct?

16       MS. BERKE:  Objection.  Vague.

17       MS. RETTS:  Form.

18       MS. BERKE:  Foundation.

19       THE WITNESS:  Sustained allegations of

20  Miranda violations over repeated periods of time or in a

21  pattern would be a problem, yes.

22    Q    (By Mr. Brustin) Okay.  And a pattern of making,

23  of intentionally misstating evidence would be more serious

24  than a single incident of intentionally misstating evidence?

25       MS. BERKE:  Objection.  Vague.  Foundation.

### Page 276

1       THE WITNESS:  Yes.  Again, if brought to the

2  attention of the department, there was an investigation,

3  they were sustained, and there are multiple patterns, yes

4  that is a problem.

5    Q    (By Mr. Brustin) All right.  Well, the fact of the

6  pattern is the problem, it's your job to investigate them

7  and sustain them, correct?

8       MS. RETTS:  Form.  Argumentative.

9  Foundation.

10       MS. BERKE:  Objection.  Vague.

11       THE WITNESS:  Just to say unresolved,

12  exonerate.  Just you never know which way the investigation

13  is going to go.

14    Q    (By Mr. Brustin) Okay.  And, obviously, a pattern

15  of knowing misrepresentations under oath is even more

16  serious than a single misrepresentation under oath?

17       MS. RETTS:  Asked and answered.

18       THE WITNESS:  Well, it could be both an

19  administrative issue as well as a criminal issue when it's

20  under oath.  Perjury.

21    Q    (By Mr. Brustin) Okay.  And in making

22  determinations about whether or not an officer engaged in a

23  particular act of misconduct, one factor you would consider

24  is whether or not they engaged in the same type of

25  misconduct in the past, correct?

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018

277–280

Page 277

1    MS. RETTS:  Form and foundation.

2    MS. BERKE:  Vague.

3    THE WITNESS:  Yes.  You will look to their

4  past to see if they have additional issues from the past, on

5  top of the current investigation.

6    Q    (By Mr. Brustin) You look at that for reasons

7  including that a pattern of the same violation in the past

8  tends to show that they engaged in the current violation,

9  correct?

10    MS. RETTS:  Form.  Foundation.

11    THE WITNESS:  Tends to show that, yeah, there

12  could be an issue with this employee.

13    Q    (By Mr. Brustin) For a variety of reasons, you're

14  looking for patterns of misconduct, both when investigating

15  and disciplining officers, correct?

16    MS. BERKE:  Vague.  Foundation.  Outside the

17  scope.

18    THE WITNESS:  I'm not looking for.  I will

19  look to their past because it will already be on file as to

20  what they have in their past on top of what it is I'm doing

21  to this day.

22    Q    (By Mr. Brustin) And you have every reason to

23  believe that was also the case in 1982 to 1991, correct?

24    A    Yes.

25    MS. BERKE:  Objection.  Foundation.

Page 278

1    THE WITNESS:  Sorry.

2    Yes.

3    MS. RETTS:  For timing purposes, do you have

4  an idea of how long you have, just so we can -- because you

5  said you had to leave at a certain time.

6    MR. BRUSTIN:  No, I don't.  Not today.  I'm

7  good.

8    MS. RETTS:  I thought you said you had leave

9  by 11.

10    MR. BRUSTIN:  Yeah.

11    MS. RETTS:  Then you have to be there --

12    THE WITNESS:  We're not going to go until

13  10:00.

14    MS. RETTS:  Well, I don't know.  I don't know

15  how much you have left.

16    MR. BRUSTIN:  No, no.  I'm going to be five

17  or thereabouts.

18    MS. RETTS:  Okay.

19    (An off-the-record discussion ensued.)

20    Q    (By Mr. Brustin) Take a look at page --

21    A    Same tab?

22    Q    No. 65, page 82.

23    A    Okay.

24    Q    If you could read page 82 to yourself.

25    MS. BERKE:  Exhibit 65?

Page 279

1    MR. BRUSTIN:  Yeah.

2    MS. BERKE:  Oh.

3    (An off-the-record discussion ensued.)

4    THE WITNESS:  Okay.

5    Q    (By Mr. Brustin) Now, this is a finding throwing

6  out -- this is a court order throwing out a finding of

7  probable cause in a murder case, correct?

8    MS. RETTS:  Foundation.

9    MS. BERKE:  Objection.  Vague.

10    THE WITNESS:  Defendant's motion to remand.

11  Yes.

12    Q    (By Mr. Brustin) Okay.  A very serious finding,

13  correct?

14    MS. BERKE:  Objection.  Foundation.

15  Misstates evidence.

16    THE WITNESS:  I'm sorry, what was your

17  question?

18    Q    (By Mr. Brustin) It's a very serious finding by

19  the court?

20    MS. BERKE:  Objection.  Misstates evidence.

21    MS. RETTS:  Foundation.

22    THE WITNESS:  Agreed.

23    Q    (By Mr. Brustin) And you would agree that to the

24  extent this finding was based on misrepresentations by

25  Detective Saldate under oath and it came to the attention of

Page 280

1  the Phoenix Police Department, that would also have to be

2  carefully investigated?

3    MS. BERKE:  Objection.  Misstates evidence.

4  Foundation.  Outside the scope.

5    THE WITNESS:  I don't see where the court

6  found that the detective made any misstatements.  It was not

7  presented to the Grand Jury by the prosecutor, so.  However,

8  if you want me to answer your question that, again, this

9  court made an actual finding that our detective made

10  misstatements, yes, that would be of concern to the

11  department.

12    Q    (By Mr. Brustin) That's not what I'm saying.  What

13  I'm saying is if this finding was based on

14  misrepresentations based on Saldate and that --

15  misrepresentations by Saldate, and that came to the

16  department's attention, that would be something you would

17  investigate, correct?

18    MS. BERKE:  Objection.  Misstates evidence.

19  Foundation.

20    THE WITNESS:  That's not --

21    MS. BERKE:  Wait.  Remember, I need to get my

22  objections.

23    Objection.  Misstates evidence.  Foundation.

24  Beyond the scope.

25    THE WITNESS:  That is not what the court



TOM VAN DORN  30(b)(6)                                   April 26, 2018
Debra Jean Milke vs City of Phoenix                         281–284

Page 281

1 found.  There's nothing, any mention in here of Detective
2 Saldate.
3      Q   (By Mr. Brustin) Assuming that Saldate was the
4 only witness who provided evidence on this issue, would that
5 change your answer?
6          MS. BERKE:  Objection.  Misstates evidence.
7 Foundation.
8          THE WITNESS:  No.
9          (An off-the-record discussion ensued.)
10     Q   (By Mr. Brustin) Let's take a look at Exhibit 83.
11     A   Okay.
12     Q   Exhibit 83, take a look at --
13         MS. RETTS:  Out of curiosity, do you know, on
14 the bottom, these are your documents, at the bottom it says
15 page -- is that one or seven?  Do you know if there were
16 other pages?
17         MR. BRUSTIN:  No idea.
18     Q   (By Mr. Brustin) Take a look at the first page
19 here, 12594.
20     A   Okay.
21     Q   Do you see that?
22     A   Yes.
23     Q   And take a minute and read this.  It's short.
24     A   Okay.
25         Okay.

Page 282

1      Q   Again, this is a finding throwing out a
2 determination of probable cause and granting the motion for
3 redetermination, correct?
4          MS. BERKE:  Objection.  Misstates evidence.
5 Vague.
6          THE WITNESS:  It is an order granting the
7 redetermination of probable cause, yes.
8      Q   (By Mr. Brustin) In other words -- but that
9 necessarily includes dismissing the initial granting of
10 probable cause?
11     A   Yes.
12     Q   And I will represent to you that the state's
13 witness in this case was Detective Saldate.
14     A   Okay.
15     Q   Okay?  Now, assuming Detective Saldate was the
16 state's witness in this case and assuming that this came to
17 the attention of the Phoenix Police Department, this order
18 would require the Phoenix Police Department to investigate
19 Detective Saldate to determine whether or not his statement
20 that there was four shots, as opposed to one shot, was
21 intentional or something less than that, correct?
22         MS. BERKE:  Objection.  Foundation.
23 Misstates evidence.
24         THE WITNESS:  It is possible it could be of
25 concern, yes.

Page 283

1      Q   (By Mr. Brustin) And it is possible it wouldn't be
2 of concern?
3          MS. RETTS:  Foundation.
4          THE WITNESS:  Again, if it was brought to our
5 attention.  Here both defense counsel in this state, you
6 know, agreed that it was one shot.  So whether or not they
7 would have brought it to the department's attention, but if
8 they did, then yes, we will look at it to see was this an
9 intentional misstatement made by you or was it just you
10 forgot.
11     Q   (By Mr. Brustin) Well, there's no question it's
12 important.  If Saldate testified that there was four shots
13 and in fact there was one and that was the reason why they
14 required a redetermination of probable cause, at a minimum,
15 you would have to investigate to determine whether that was
16 intentional, correct?
17         MS. BERKE:  Objection.  Misstates evidence.
18 Foundation.
19         THE WITNESS:  Possibly, if it was brought to
20 our attention.
21     Q   (By Mr. Brustin) Okay.  Is there any --
22         If it was brought to your attention, why do you
23 say possibly?  Of course you would investigate that,
24 correct?
25         MS. RETTS:  Asked and answered.  Foundation.

Page 284

1          THE WITNESS:  We will look into it.
2 Explaining the investigative process both back then, in
3 talking with Commander Humphrey and now, we conduct fact
4 finding, which isn't actually putting a number on and
5 initiating a formal misconduct investigation on the
6 employee.
7          It would be of concern.  We would conduct our
8 initial finding to determine do we think it was intentional,
9 do we think it was a mistake.  Then perhaps we would proceed
10 forward with an investigation.
11         (An off-the-record discussion ensued.)
12     Q   (By Mr. Brustin) Let me show you Exhibit 93, which
13 I think it's underneath that one.
14     A   Okay.
15     Q   This is from the Jones case, which is a case
16 involving -- this is a case involving Defendant Jones and
17 several other teenagers were involved, allegedly, in an
18 armed robbery and murder of someone in March of 1990.
19     A   Okay.
20     Q   Jones and four others were pulled over for riding
21 around in a car.  The driver was arrested and taken into
22 custody.  Jones volunteered to drive the car to the police
23 station.  And then Jones and the other teenagers volunteered
24 to wait in the waiting area while Saldate interrogated Knott
25 (phonetic).  Saldate at some point saw the group in the

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
285—288

Page 285

1  waiting room and directed a uniformed officer to put Jones
2  in an interrogation room.  Jones was placed in an
3  interrogation room.  The uniformed officer handcuffed him to
4  a table.  And then Martinson, another detective,
5  interrogated Jones, who confessed and took police to the
6  body.  Okay?
7     A    Okay.
8     Q    Now, if you take a look at Exhibit 93 and if you
9  can read to yourself, the order -- Jesus, hold on a second.
10        Why don't you read this.  I guess you have to
11  read the whole order.
12    A    Okay.
13    Q    No, you can just read -- you see this is an
14  order --
15        Let's go to the finding, first.
16    A    It's a motion to suppress.
17    Q    Motion to suppress.  You see the finding on page
18  12505, third page?
19    A    Which paragraph, sir?
20    Q    Very last paragraph.  "Now, therefore it is
21  ordered granting defendant's motion to suppress."
22    A    Okay.
23    Q    The motion to suppress is granted.
24        Now, if you could take a look at paragraph 8 --
25    A    Okay.

Page 286

1     Q    -- it says, "While defendant Jones was waiting
2  with his companions for the completion of Mr. Knott's
3  interview, which was being conducted by Detective Armando
4  Saldate, at the direction of Detective Saldate, he was
5  separated from his two companions and placed in a police
6  interview room.  He was handcuffed to a table in that room."
7     A    Okay.
8     Q    "Nine, at this time the defendant's liberty was
9  clearly restrained and he was under arrest, even though he
10  had not been advised of such by the police and even though
11  officers subjectively believed that the defendant had not
12  been arrested."
13        "Ten, at this time the State conceded there was
14  no probable cause to arrest defendant."
15        Now, you would agree that if this had been
16  brought to the attention of the Phoenix Police Department in
17  1990, there would have been an investigation into Detective
18  Saldate's conduct in this case, correct?
19        MS. BERKE:  Objection.  Foundation.
20        MS. RETTS:  Form.  Foundation.  Improper as
21  to time period as he retired in July, this is December.
22        THE WITNESS:  It is possible, yes.
23    Q    (By Mr. Brustin)  Now, obviously this would be even
24  more serious if the PPD learned that not only did this lead
25  to the suppression of this evidence, it led to the

Page 287

1  termination of this prosecution of this defendant, correct?
2        MS. BERKE:  Objection.  Foundation.
3        MS. RETTS:  Outside the scope.
4        THE WITNESS:  That I don't know.
5        (An off-the-record discussion ensued.)
6     Q    (By Mr. Brustin)  Go to Exhibit 94.  Let's take a
7  look.  This is the Court of Appeals decision in the same
8  case.  Let's look at 499.
9     A    Okay.
10        MS. BERKE:  Which exhibit?  96?
11        MR. BRUSTIN:  Yeah.  94.  Page 499.
12    Q    (By Mr. Brustin)  Read to yourself, the bottom of
13  page four, beginning with "Applying these factors," to the
14  first sentence in the first full paragraph on page five.
15    A    Last paragraph on page four, first paragraph on
16  five?
17    Q    Yeah.
18        No, I'm sorry.  Read all the way through the
19  bottom of page five.
20    A    Okay.
21    Q    You would agree this appellate decision is making
22  a much more specific finding of specific misconduct by
23  Detective Saldate, correct?
24        MS. BERKE:  Objection.  Misstates the
25  evidence.

Page 288

1        MS. RETTS:  Form.  Foundation.  Misstates the
2  evidence.
3        THE WITNESS:  That is what the court found,
4  but like the state, I also disagree with certain portions of
5  the appellate court decision.
6     Q    (By Mr. Brustin)  Okay.  But this is an appellate
7  court decision making specific findings of specific
8  misconduct by Saldate, correct?
9        MS. BERKE:  Objection.  Misstates evidence.
10        MS. RETTS:  Foundation.
11        THE WITNESS:  That is the finding by the
12  Court of Appeals.
13    Q    (By Mr. Brustin)  Okay.  And, obviously, the
14  Phoenix Police Department takes Court of Appeals findings
15  regarding their officers very seriously, correct?
16        MS. BERKE:  Form.  Foundation.
17        THE WITNESS:  If you're asking for my legal
18  opinion, it is possible I will take this into consideration
19  as to whether or not we do an investigation.
20    Q    (By Mr. Brustin)  Is it possible you wouldn't?
21    A    Yes, because I could disagree with this, so I may
22  or may not.
23    Q    Okay.  So, in other words, what you're saying --
24  and let's make sure we're clear on the facts here because by
25  this time, Saldate has retired.  Okay?  Well, let's assume

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
289–292

Page 289

1  he was still on the job.

2    A   Okay.

3    Q   If he was still on the job, would this finding by

4  the appellate court require, if it came to the attention of

5  the PPD, an investigation into the conduct of Saldate in

6  this case?

7    A   It would require me to evaluate whether or not it

8  would even warrant an investigation.  It may not require an

9  automatic investigation.

10    Q   Okay.  And your testimony is, though, that given

11  he had already retired, pursuant to the policies and

12  procedures of the police department, it would not require

13  any investigation whatsoever, correct?

14        MS. BERKE:  Objection.  Misstates testimony.

15        THE WITNESS:  Correct.  I can't investigate

16  an employee that no longer works for the city,

17  administratively investigate an employee that no longer --

18    Q   (By Mr. Brustin) Right.

19    A   -- works for the city.

20    Q   And there would not be any responsibility, given

21  that Saldate had retired, to take any action whatsoever were

22  this to come to the attention of the PPD after his

23  retirement, correct?

24        MS. RETTS:  Form.  Vague as to any action.

25        THE WITNESS:  With respect to this decision,

Page 290

1  no, I do not see any additional requirement on the part of

2  department.

3        (An off-the-record discussion ensued.)

4    Q   (By Mr. Brustin) Take a look at Exhibit 62.

5    A   Okay.

6    Q   If you could read to yourself, please, on page

7  26025, which is the second full page.

8    A   Okay.

9    Q   Actually, you can read the first, read the first

10  two pages.  It explains what the second page is.

11    A   Just the first two pages?

12    Q   Yeah.

13    A   Okay.

14    Q   So you would agree this appears to be a turndown

15  report that was provided to the Phoenix Police Department,

16  correct?

17    A   Yes.

18    Q   And there's a memo that's created about this

19  turndown report?

20    A   Yes.

21    Q   And that's what you would expect to happen, to

22  make sure that it's documented that it came in?

23    A   Yes.

24    Q   And a turndown report is an important document,

25  for a variety of reasons, as you described earlier, correct?

Page 291

1    A   Yes.

2    Q   It implicates a number of potential investigative

3  steps that have to be taken, correct?

4        MS. RETTS:  Form.  Foundation.

5        MS. BERKE:  Objection.  Vague as to time

6  frame.

7        THE WITNESS:  Well, it articulates the

8  opinion of the county attorney as to why they're turning

9  down the case at the present time.  Doesn't mean it can be

10  refiled.

11    Q   (By Mr. Brustin) Okay.  And I'll represent to you

12  that this case was never refiled.

13    A   Yes.

14    Q   And if you would take a look at the next page, so

15  26025.

16    A   Okay.

17    Q   And you recall this is the Sherman case.  You

18  remember reviewing this, the report Saldate created in this

19  case and agreeing that it was a clear violation of Miranda

20  when he continued to interrogate the suspect?

21        MS. RETTS:  Form.  Foundation.

22        THE WITNESS:  I'm sorry, this form is not

23  created by Detective Saldate.

24    Q   (By Mr. Brustin) I understand.

25        You remember reading Saldate's report of his

Page 292

1  interrogation of this suspect and you told us what is

2  described as the violation of current PPD policy.  Do you

3  recall that?

4    A   Today or in a previous deposition?  We've gone

5  through a lot of cases of Detective Saldate's.

6    Q   I know.  In a previous deposition.  In fact, more

7  specifically, you testified that back in the '80s, officers

8  were trained that you don't ask somebody any questions who

9  don't understand their rights.  Do you recall that?

10        MS. RETTS:  Form.  Vague.

11        THE WITNESS:  I don't recall --

12        MS. BERKE:  What page are you referring to of

13  his deposition?

14        MS. RETTS:  That was page 268.

15    Q   (By Mr. Brustin) I'm summarizing your prior

16  testimony.  Do you recall that report?

17    A   I don't, off the top of my head.

18    Q   Where the -- do you recall when the suspect

19  crawled under the table because he was so drunk?

20        MS. BERKE:  Objection.  Misstates evidence.

21        THE WITNESS:  I just read that.

22    Q   (By Mr. Brustin) Let me just try to do it without

23  going to it.  I want to try to save time.

24        You would agree that in connection with that

25  report, this turndown report, a number of factors in these,

EXHIBIT 15

TOM VAN DORN  30(b)(6)                                        April 26, 2018
Debra Jean Milke vs City of Phoenix                               293–296

Page 293

1 in this turndown report suggest potential policy violations
2 by Detective Saldate, correct?
3          MS. BERKE: Objection. Foundation.
4          THE WITNESS: Potential, yes.
5     Q    (By Mr. Brustin) And this would require an
6 investigation by the PPD into Saldate's conduct, along with
7 that report that he created, correct?
8          MS. BERKE: Objection. Foundation.
9          THE WITNESS: It may require an
10 investigation, yes.
11    Q    (By Mr. Brustin) And you say it may require one?
12    A    Yeah.
13    Q    If you told us that you believe the report
14 violated PPD policy, this would be another document
15 suggesting there should be an investigation, correct?
16         MS. BERKE: He told you he doesn't remember
17 what the report says.
18         MR. BRUSTIN: Shh.
19         MS. BERKE: No.
20         MR. BRUSTIN: Just object.
21         MS. BERKE: You're not being fair to the
22 witness.
23         MR. BRUSTIN: You don't get to talk. You
24 surely don't get to talk about being fair.
25         MS. RETTS: You can't tell her she doesn't

Page 294

1 get to talk.
2          MR. BRUSTIN: She can make an objection. She
3 just started talking. She can't do that. Be a lawyer.
4 Make an objection.
5          (An off-the-record discussion ensued.)
6          THE WITNESS: I think I can answer your
7 question, if you want me to, unless you want to ask me a
8 different one.
9     Q    (By Mr. Brustin) Try to answer my question, and if
10 not, I'll ask you a different question.
11    A    I previously testified that may require an
12 investigation. Again, like I stated earlier in my
13 testimony, the first thing I'm going to do is again take
14 this, after being put on notice by the county attorney's
15 office, go back to the actual report, review it myself, then
16 make the determination as to whether or not I'm going to do
17 an investigation.
18    Q    All right. At a minimum, you would agree that
19 simply this report, this turndown report, would require a
20 very careful evaluation of Saldate's conduct to determine
21 what steps need to be taken next, correct?
22         MS. BERKE: Objection. Misstates testimony.
23         THE WITNESS: It would require me to go back
24 to Detective Saldate's report to determine whether or not I
25 need to initiate an investigation of misconduct.

Page 295

1     Q    (By Mr. Brustin) Fine.
2          All right. Exhibit 11 now.
3          (An off-the-record discussion ensued.)
4          THE WITNESS: Okay.
5     Q    (By Mr. Brustin) Take a look at page --
6          All right. So this case, it was a high-profile
7 case in 1988 --
8     A    Okay.
9     Q    -- where bank robbers shot and killed an off-duty
10 PPD officer, Kenneth Collins. You might remember that case.
11    A    I do.
12    Q    And Ismael Conde was ultimately convicted for
13 that crime.
14    A    Okay.
15    Q    And Ismael Conde, along with another accomplice,
16 robbed a bank, and when they were fleeing, Kenneth Collins,
17 an off-duty officer, and the bank security guard opened fire
18 on Conde and his accomplice. The robbers exchanged gunfire
19 with Collins, and Collins was killed. When Conde was
20 ultimately apprehended, the police shot him and he was taken
21 to the hospital. And Saldate interrogated Conde twice
22 during this investigation, once in the hospital and later at
23 the Maricopa County Medical Center. So let me show you
24 Exhibit 11 --
25    A    Okay.

Page 296

1     Q    -- which is Saldate's report of --
2          Well, Exhibit 11, page 1525 and page 1526.
3     A    Okay.
4     Q    Take a look at the first paragraph on 1525.
5     A    Okay.
6     Q    This first paragraph makes clear that Saldate's
7 intent here is to conduct an interview regarding this death
8 investigation of the officer, correct?
9          MS. RETTS: Form.
10         THE WITNESS: I'm sorry. The question again,
11 sir?
12    Q    (By Mr. Brustin) Yeah. It makes clear in the
13 first paragraph of this report that his purpose here is to
14 conduct an interview in regard to the death investigation?
15    A    Yes.
16    Q    It's of Ismael Conde, which is the suspect,
17 number one, it says on top?
18    A    Yes.
19    Q    Okay. Then if you take a look -- Take a look at
20 the third full paragraph. Read that to yourself.
21    A    Third paragraph?
22    Q    Yeah.
23    A    Okay.
24    Q    Okay. And you would agree that what Detective
25 Saldate is describing here is a suspect who could not be

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
297—300

Page 297

1  interrogated, correct?

2          MS. BERKE:  Form.  Foundation.

3      Q   (By Mr. Brustin) Let me be more specific.

4          He's describing a suspect who Saldate believes

5  could not understand his rights, was not alert enough to

6  hear them, correct?

7          MS. BERKE:  Objection.  Foundation.

8          MS. RETTS:  Form.

9          THE WITNESS:  Based upon what it is that I

10  just read here and how this detective articulated it, it

11  does not appear that this person understood what was being

12  asked by the detective.

13      Q   (By Mr. Brustin) And more specifically, it appears

14  that that was Saldate's conclusion, correct?

15          MS. RETTS:  Form.  Foundation.

16          THE WITNESS:  I don't --

17      Q   (By Mr. Brustin) Let me read it to you.  "I could

18  not determine whether he was responding because he did not

19  understand his rights or because he was not alert enough to

20  hear them."

21          Either of those bases would be a -- either of

22  those reasons would be sufficient under Miranda not to

23  continue interrogating, correct?

24          MS. RETTS:  Form.  Foundation.

25          THE WITNESS:  I would agree, based upon my

Page 298

1  training, yes.

2      Q   (By Mr. Brustin) And what he's describing here is

3  a clear Miranda violation, if he continues to interrogate

4  him, correct?

5          MS. BERKE:  Objection.  Foundation.

6          MS. RETTS:  Form.

7          THE WITNESS:  Based upon the training that I

8  received, any attempt to interrogate this suspect and obtain

9  statements could be possibly in violation of Miranda.

10  Miranda is a two-part process.  You've got to have custody,

11  and then the interrogation.  So we're going to first focus

12  on whether or not this person was in custody.  Doesn't

13  appear that he was in law enforcement custody, so I'm not

14  even sure that Miranda rights had to be advised, even though

15  that he did.

16      Q   (By Mr. Brustin) Let me make sure I'm clear here.

17          This is a person who was in the hospital

18  suspected of just killing a police officer, correct?

19      A   Yes.

20          MS. BERKE:  Objection.  Foundation.

21      Q   (By Mr. Brustin) Do you have any doubt in your

22  mind that this person was in custody?

23          MS. BERKE:  Objection.  Foundation.

24          MS. RETTS:  Form.  Foundation.  Asked and

25  answered.

Page 299

1          THE WITNESS:  He's in a hospital.  I don't

2  know if he's in law enforcement custody or not.  That's not

3  necessarily law enforcement custody.  Did they station a

4  police officer outside of his room, which may make it more

5  custodial?  Did we not do that?  We allowed his family

6  members to come and go?  It may not be.  Because if he was

7  in full-blown police custody, they're not going to let

8  family come in and out of the room.

9      Q   (By Mr. Brustin) He was shot by the police after

10  shooting a police office.

11      A   This also states we allowed family members to

12  continue to visit him and go in and out of the room.  So for

13  Miranda purposes, it requires law enforcement custody.  So

14  before I can even answer your question, I need to make a

15  determination if he's in law enforcement custody.

16      Q   So it's possible, in your view, that he wasn't in

17  custody?

18      A   Correct.

19      Q   All right.  Now, assuming he was in --

20          Certainly you would expect Saldate, at the time,

21  to know whether he was in custody, correct?

22      A   I would hope that he would, yes.

23      Q   All right.  And assuming he was in custody, you

24  would agree this is a clear Miranda violation, certainly in

25  1988?

Page 300

1          MS. BERKE:  Objection.  Foundation.

2          MS. RETTS:  Form.  Misstates the evidence.

3          THE WITNESS:  I would agree that any

4  interrogation, there are likely going to be voluntariness

5  issues associated with it, given this person's condition.

6      Q   (By Mr. Brustin) I'm sorry.  It would be a clear

7  violation of PPD policy in 1988 to continue interrogating

8  him under these circumstances, assuming he was in custody?

9          MS. BERKE:  Objection.  Misstates evidence.

10  Foundation.

11          MS. RETTS:  Asked and answered.

12          THE WITNESS:  If sustained, after an

13  investigation, yes, it would be a violation.

14      Q   (By Mr. Brustin) Well, you don't need any

15  investigation.  What he's saying here, assuming he was in

16  custody, what he's saying here is I could not determine

17  whether he was responding because he did not understand his

18  rights or because he was not alert enough to hear them.

19  He's admitting two bases for implicating Miranda, correct?

20      A   Well, again, I don't know if we satisfied the

21  first part of Miranda.

22      Q   I'm asking you to assume that.

23      A   If you want me to make the automatic

24  assumption --

25      Q   He's in custody.



TOM VAN DORN  30(b)(6)                                        April 26, 2018
Debra Jean Milke vs City of Phoenix                          301–304

Page 301

1    A    -- this person is in custody and that Detective
2  Saldate knew he was in custody --
3    Q    Yes.
4    A    -- and he's going to interrogate him --
5    Q    Yes.
6    A    -- all right, he needs to advise him of Miranda.
7  That I will agree with.
8    Q    If in fact all that is true and he says --
9    A    And draws this conclusion?
10   Q    Yes.
11   A    And he continues to do so?
12   Q    It's a violation of policy?
13   A    Yeah, it's possible it's a violation of policy.
14   Q    And then it's not possible, it is, correct?
15        MS. BERKE:  Objection --
16        MS. RETTS:  Form.  Foundation.
17        MS. BERKE:  -- foundation.
18        MS. RETTS:  Misstates evidence.
19        MS. BERKE:  Asked and answered.
20        THE WITNESS:  It very well could be a
21  violation of -- yes, it's a possibility it's a violation of
22  policy.
23   Q    (By Mr. Brustin) I don't understand why you're
24  using the word "possibility."  How is it not a violation of
25  policy, assuming that he's in custody and assuming this is

Page 302

1  what he determined?
2        MS. RETTS:  Form.  Foundation.  Asked and
3  answered.
4        THE WITNESS:  Assuming all of those facts in
5  a perfect world, then yes, there's going to be a violation
6  of policy.  But I'm going back on the record and stating
7  why.
8        It's an automatic assumption that Detective
9  Saldate knew that this individual was in custody --
10   Q    (By Mr. Brustin) I said that.
11   A    I'm not done.
12        -- and two, that he set out to conduct a
13  custodial interrogation; and three, that that was his
14  conclusion; and that four, he set out to intentionally
15  continue to interrogate this individual.  Then yes, on all
16  of those factors alone, I will agree with you, is a
17  violation of department policy.
18   Q    Let's take care of the fourth factor.
19        Take a look at what happens after he says he did
20  not understand his rights or because he was not alert
21  enough.  What does he do next?
22        Read the rest of the report, two pages.
23        MS. BERKE:  Why don't you have him read the
24  entire report.
25        MR. BRUSTIN:  I just said that.

Page 303

1        MS. BERKE:  You said "the rest."  He hasn't
2  read the second paragraph of the report.  You directed him
3  directly to the third paragraph.
4    Q    (By Mr. Brustin) Sure.  Read the whole report.
5    A    Am I reading this one, too, or just the first two
6  pages?
7    Q    Just the first two pages.
8    A    Okay.
9        Okay.  So what Saldate is describing here, after
10  reading his Miranda rights, is continued questioning
11  arguably with a goal of getting an admission, correct?
12   A    It appears some of the questions were designed to
13  get incriminating statements from him, yes.
14   Q    And also, as you're reading, additional evidence
15  that this is not a person who can understand his rights,
16  correct?
17        MS. RETTS:  Form.  Foundation.
18        THE WITNESS:  It is my opinion, based upon
19  the way that it is documented, yes, I would have concerns as
20  to whether or not this person understood his rights.
21   Q    (By Mr. Brustin) And, certainly, you would expect
22  that any supervisor who reviewed this report would have lots
23  of questions for Saldate about his conduct, correct?
24        MS. BERKE:  Objection.  Vague.
25        MS. RETTS:  Foundation.

Page 304

1        THE WITNESS:  If a supervisor reviewed this
2  report, I would expect them to have concerns over this, yes.
3    Q    (By Mr. Brustin) They would have concerns about
4  whether or not in fact Saldate violated PPD policy by
5  continuing to question the suspect, correct?
6        MS. RETTS:  Form.  Foundation.
7        THE WITNESS:  I think they would have
8  concerns both from should this proceed to a criminal trial
9  standpoint as well as administrative, you know, discipline
10  or investigations.
11        (An off-the-record discussion ensued.)
12   Q    (By Mr. Brustin) And obviously the potential
13  violation of policy here is the policy on Miranda, correct?
14   A    Yes.
15        (An off-the-record discussion ensued.)
16   Q    (By Mr. Brustin) So let's take a look at Exhibit
17  72.  Let me tell you about this case.  This is the Yanes
18  case.  Yanes was a suspect in a November 1982 murder of his
19  common law wife.  Witnesses reported seeing Yanes in a
20  tavern, acting drunk and belligerent.  He left the bar.
21  Returned later yelling that someone had just shot his wife.
22  He ultimately lead people in the bar to his wife lying on
23  the floor, bleeding from a gunshot wound.  Yanes got into a
24  fight with someone who attempted to help his wife.  Yanes
25  had his head slammed into the floor, head first.  When

TOM VAN DORN  30(b)(6)                                                April 26, 2018
Debra Jean Milke vs City of Phoenix                                  305–308

Page 305

1  police arrived, the victim was dead and Yanes was laying on
2  the floor, unconscious, bleeding from his head.  Yanes was
3  ultimately taken to the hospital for treatment of his
4  injuries.  Saldate interrogated Yanes at the hospital, even
5  though Yanes was strapped to a hospital bed in critical
6  condition.
7      A    Okay.
8      Q    So now let me show you exhibit --
9          MS. BERKE:  Critical condition?
10         MS. RETTS:  Form.
11         MS. BERKE:  Objection.  Misstates evidence.
12     Q    (By Mr. Brustin) I'm sorry, he was strapped to a
13  hospital bed for treatment.
14     A    Okay.
15         MS. BERKE:  What exhibit is it?
16         THE WITNESS:  It's 72.
17         MS. BERKE:  Okay.  Thank you.
18     Q    (By Mr. Brustin) All right.  Let me just show you
19  this.  I think this was Exhibit 107.  I think this was 107,
20  but it's Bates stamped page NSB 800.  And it's a report by
21  Detective Ron Kwaiff (phonetic).  Okay?  Take a minute and
22  read this.  I want to show you this at the same time.  Read
23  it and let me know when you're done and I'll take it back.
24         (An off-the-record discussion ensued.)
25     Q    (By Mr. Brustin) Sorry.  So you would agree that

Page 306

1  this report makes clear that Saldate informed others that he
2  believed Yanes was drunk?
3      A    That's what that --
4          MS. BERKE:  Objection.  Foundation.
5          THE WITNESS:  Oh, sorry.
6          That's what that report states.
7      Q    (By Mr. Brustin) Now take a look at --
8          (An off-the-record discussion ensued.)
9      Q    (By Mr. Brustin) -- Exhibit 72.  You there?
10     A    Yes.
11     Q    Why don't you read from at approximately 045
12  hours, do you see that in the middle of the page?
13     A    Yes.
14     Q    Read that all the way to where it says, "Suspect
15  Yanes began to mumble," in the next, middle of the page.
16     A    Okay.
17         Okay.
18     Q    You would agree that based on what you just read,
19  this report describes a suspect who appears not to
20  understand his Miranda rights, correct?
21         MS. RETTS:  Form.  Foundation.
22         MS. BERKE:  Objection.  Foundation.
23  Misstates evidence.
24         THE WITNESS:  I disagree with that, but I
25  have to return this text.  My alarm is going off in my

Page 307

1  house.
2          (An off-the-record discussion ensued.)
3          THE WITNESS:  Okay.  Go ahead, sir.
4          (An off-the-record discussion ensued.)
5      Q    (By Mr. Brustin) Do you agree that this is a
6  suspect for whom the only questioning that can occur, given
7  what you just read, is whether or not he actually
8  understands his rights?
9          MS. RETTS:  Form.  Foundation.
10         THE WITNESS:  Based upon what I have read
11  thus far, in this small portion, it appears that the
12  detective articulated, or at least wrote out, that this
13  person understood their rights.
14     Q    (By Mr. Brustin) Okay.  And is that consistent
15  with what he's describing?
16         MS. BERKE:  Foundation.
17         THE WITNESS:  Describing by?
18     Q    (By Mr. Brustin) A suspect mumbling in English and
19  Spanish.
20     A    But then also being asked directly whether or not
21  he understands his rights, answers yes.
22     Q    Okay.  So there's no further questioning that
23  needs to be done with this suspect before interrogating him?
24         MS. RETTS:  Form.
25         THE WITNESS:  He notes, I believe -- didn't

Page 308

1  we see the intoxication level?  We know that's going to go
2  to the voluntariness issue.  It would have been nice but not
3  necessarily required for him to find out perhaps that level
4  of intoxication.  But mumbling in and of itself, no.
5      Q    (By Mr. Brustin) And the combination of believing
6  that he's drunk and mumbling wouldn't require clarification
7  as to whether or not he understood his rights, correct?
8      A    I believe that the detective actually did a good
9  job in trying to clarify that, both asking in both English
10  and in Spanish and asking additional questions.  He didn't
11  just -- I believe he did factor in those things.  Mumbling
12  and intoxication, but yet he was trying to get to whether or
13  not this person would understand him.  So he asked him in
14  English and in Spanish and some additional questions and he
15  answered yes.
16     Q    All right.  Continue reading to the next three
17  paragraphs.
18     A    Just the rest of this page?
19     Q    Yeah.
20     A    Okay.
21     Q    You would agree that in the next paragraphs
22  there's additional information that he may not understand
23  his rights.  He appears, he's mumbling something about
24  Eleanor.  He arguably loses consciousness, right?
25         MS. BERKE:  Objection.  Foundation.



EXHIBIT 15

TOM VAN DORN  30(b)(6)                                          April 26, 2018
Debra Jean Milke vs City of Phoenix                              309—312

Page 309

1  Misstates evidence.
2         THE WITNESS:  Yeah.  I don't see anything in
3  here about his losing consciousness.  I agree there is an
4  additional statement in here that he was mumbling something
5  about Eleanor.  But then also in response to direct
6  questions being asked by the detective, he provided
7  responses to those.  So it's a combination of things.
8     Q    (By Mr. Brustin) Second-to-last paragraph, "At
9  this point, suspect Yanes turned his head away from me and
10 began to mumble about wanting to see Eleanor.  I attempted
11 to get his main attention and asked him what had happened."
12        More suggestion he may not be coherent, correct?
13        MS. BERKE:  Objection.  Foundation.
14        MS. RETTS:  Form.  Foundation.  Misstates
15 evidence.
16        THE WITNESS:  Just mumbling about wanting to
17 see Eleanor.  So, and, again, in response to direct
18 questions, he provided answers.  So it's a combination.  So
19 not one that I would necessarily consider, so far, based
20 upon what I have read, where the detective would need to
21 stop.
22        (An off-the-record discussion ensued.)
23        (Deposition Exhibit No. 114 was marked for
24 identification.)
25    Q    (By Mr. Brustin) Okay.  I'm going to show you some

Page 310

1  more transcript from the criminal proceedings from 1983
2  regarding this case.  Specifically, I want to refer you to
3  page 31677.
4     A    Okay.
5     Q    And if you could read page -- line nine on that
6  page.
7         MS. RETTS:  Who's testifying?
8         MR. BRUSTIN:  Is this --
9         (An off-the-record discussion ensued.)
10        MS. RETTS:  Is this Thomas Kolb testifying?
11    Q    (By Mr. Brustin) Yeah, this is the doctor
12 testifying, treating doctor.  Read page 31677, line nine, to
13 page 31678, line 18.
14    A    Just to clarify, this was the doctor that was
15 treating Mr. Yanes at the time?
16    Q    Yes.
17    A    677 through 678, what line?
18    Q    Line 18 on the next page.
19    A    Okay.
20        MS. RETTS:  Does it say in here what time
21 frame this is referring to?
22        MR. BRUSTIN:  Yeah, it does on the next page.
23        THE WITNESS:  Okay.
24    Q    (By Mr. Brustin) Now, you would agree --
25        By the way, Saldate interviewed him 30 minutes

Page 311

1  before 1:00, according to the report.  Okay?
2         MS. BERKE:  Interviewed "him" who?
3     Q    (By Mr. Brustin) I'm sorry, interviewed Yanes ten
4  minutes before, 0051 hours.
5     A    Okay.  Make sure I understand you.  So Detective
6  Saldate interviewed Mr. Yanes before the doctor went in and
7  did his evaluation?
8     Q    Yes.
9     A    Okay.
10    Q    That's what the testimony suggests, correct?
11        In the report it indicates that Saldate's talking
12 to him at 10:51.
13    A    But it doesn't tell me what time the doctor
14 conducted his evaluation.
15    Q    It does on the next page, correct?  It says on
16 page 31678.
17    A    His notes for the record were at 3:30.  Doesn't
18 tell me --
19    Q    Then he says, "I would say it was probably about
20 1:00 in the morning."
21        MS. RETTS:  Well, in fairness, he says, "I'd
22 just have to be guessing, but."
23    Q    (By Mr. Brustin) Okay.  It appears --
24        Okay.  His guess is 1:00 in the morning, correct?
25    A    Here, yes.

Page 312

1     Q    And it's approximately the same time as Saldate
2  is interviewing him, correct?
3         MS. RETTS:  Form.
4         MS. BERKE:  Objection.  Foundation.
5     Q    (By Mr. Brustin) See, at the top it says 0051, top
6  of the interview report.
7     A    Looks like that Detective Saldate arrived at the
8  hospital at 0045 hours, which is approximately 15 minutes to
9  when the doctor conducted the evaluation.  Doesn't tell me,
10 though, that --
11    Q    Look at that first paragraph, on November 24th at
12 0051 hours.
13    A    Okay.  So nine minutes prior to the doctor going
14 in.
15    Q    It's approximately the same time, correct?
16    A    Okay.
17        MS. BERKE:  Form.  But the doctor is
18 guessing.
19        MS. RETTS:  You can't establish a time line
20 based on a guess.
21    Q    (By Mr. Brustin) What the doctor is describing is
22 somebody who is in serious condition, correct?
23        MS. BERKE:  Objection.  Foundation.
24        THE WITNESS:  It is the doctor's opinion that
25 he appears to have suffered some sort of a head injury.

TOM VAN DORN  30(b)(6)

April 26, 2018

Debra Jean Milke vs City of Phoenix

313—316

Page 313

1    Q    (By Mr. Brustin) And what the doctor is

2   describing --

3        A    Doesn't tell me the seriousness.  What his

4   testimony tells me is that his observation leads him to

5   believe that this individual suffered a head injury.

6        Q    And he's providing factual information suggesting

7   somebody who might not be able to understand his rights,

8   correct?

9            MS. BERKE:  Objection.  Foundation.

10            THE WITNESS:  I don't see that anywhere in

11   here.  It says it was not a life-threatening head injury,

12   but it was apparent he had a significant head injury.

13   Nowhere in there does it state that this person is incapable

14   of understanding his rights.

15        Q    (By Mr. Brustin) I didn't say it stated that.

16   What it says is he was disoriented, he didn't know who he

17   was, where he was, what year it was, who the president was.

18   That suggests factually somebody who can't understand his

19   rights, correct?

20            MS. RETTS:  Form.  Foundation.

21            THE WITNESS:  Possibly under the doctor's

22   opinion.  Whether or not it's the same opinion of Detective

23   Saldate, no.

24        Q    (By Mr. Brustin) But that's factual information

25   suggesting this is someone who is not capable of

Page 314

1   understanding his rights, correct?

2            MS. BERKE:  Objection.  Foundation.

3            MS. RETTS:  Foundation.

4            THE WITNESS:  Two different standards.  As it

5   relates to Miranda, it's only up to the officer to make the

6   determination.

7        Q    (By Mr. Brustin) Now, assuming that there was a

8   finding in this case that the defense lawyer was ineffective

9   because he failed to argue that Yanes wasn't competent to

10   give a statement and assuming that on retrial, the trial

11   court suppressed those statements specifically because he

12   couldn't understand his Miranda rights, would that change

13   your testimony about whether the conduct of Detective

14   Saldate would need to be investigated pursuant to PPD

15   policy?

16            MS. BERKE:  Objection.  Incomplete.

17   Foundation.  Misstates evidence.

18            THE WITNESS:  It is possible that we would

19   have to look at whether or not there was a Miranda

20   violation.

21            (An off-the-record discussion ensued.)

22        Q    (By Mr. Brustin) All right.  Last thing.

23            (An off-the-record discussion ensued.)

24        Q    (By Mr. Brustin) All right.  Let's take a look at

25   Exhibit 52.  Close but not quite.

Page 315

1        A    Okay.

2            MS. BERKE:  What exhibit?

3            MR. BRUSTIN:  Exhibit 52.

4        Q    (By Mr. Brustin) Have you seen this article before

5   preparation for today?

6        A    I believe it came up, but I was not asked to read

7   it in my first deposition, but it was mentioned.

8        Q    Can you just read it?  It's short.

9        A    You bet.

10            Okay.

11        Q    Now, you would agree that these are very

12   troubling allegations made by Mr. Morales in this article,

13   correct?

14            MS. RETTS:  Foundation.

15            THE WITNESS:  This is the opinion of

16   Detective Morales.  In my interviews with Lieutenant Kiyler

17   and Commander Humphrey, they will disagree with this that no

18   detectives brought forth any of these allegations to the

19   commander in this time period.

20        Q    (By Mr. Brustin) Okay.  So what they're telling

21   you is that Mr. Morales is lying?

22        A    Correct.

23        Q    Okay.  Now, let's assume that he's not lying.

24   Let's assume he's telling the truth.

25        A    Okay.

Page 316

1        Q    Okay?  Assuming he's telling the truth, these are

2   very serious allegations, correct?

3            MS. BERKE:  Objection.  Misstates evidence.

4            MS. RETTS:  Foundation.

5            THE WITNESS:  Making the assumption that this

6   is the truth, yes, it would be serious allegations.

7        Q    (By Mr. Brustin) In other words, if in fact

8   Morales is accurately describing that multiple people made

9   complaints to supervisors about Saldate and his partners,

10   and his partner violating the rules in regard to

11   interrogations, that's a very serious allegation, correct?

12            MS. RETTS:  Form.  Foundation.  Outside the

13   scope.

14            THE WITNESS:  Again, if I'm making the

15   automatic assumption that what he is saying is 100 percent

16   true, yes.

17        Q    (By Mr. Brustin) Okay.  And by the way, in fact,

18   you have seen evidence today and during your last deposition

19   of multiple violations of Miranda by Detective Saldate and

20   his partner Chambers in their reports, correct?

21            MS. RETTS:  Form.  Foundation.  Outside the

22   scope.

23            THE WITNESS:  I have read various court

24   orders and those types of things that appear to suggest

25   there may be Miranda violations that would cause the

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
317—320

Page 317

1  department concern, but yes, we may have to look into.

2       Q    (By Mr. Brustin) Okay.  I'm going to try that

3  again because maybe you forgot what you said under oath.

4       You have repeatedly told me that you have seen

5  reports of -- reports indicating that Saldate knowingly

6  violated Miranda, correct?

7       MS. RETTS:  Form and foundation.  Misstates

8  testimony.

9       MS. BERKE:  Objection.  Argumentative --

10      THE WITNESS:  I believe that misstates my

11  testimony.

12      MS. BERKE:  Wait, wait.

13      THE WITNESS:  I'm sorry.

14      MS. BERKE:  Objection.  Argumentative.

15  Foundation.  Misstates testimony.

16      THE WITNESS:  I believe that misstates my

17  testimony, sir.

18      Q    (By Mr. Brustin) You've seen multiple reports

19  where you've acknowledged that if the report is true,

20  Saldate admitted to violations of PPD policy on Miranda,

21  correct?

22      MS. BERKE:  Objection.  Misstates testimony.

23  Foundation.

24      THE WITNESS:  Yeah.  For me to say -- no, I

25  believe you misstate my testimony.  This is not true for

Page 318

1  every single case that we have gone through here today.

2       Q    (By Mr. Brustin) I agree with that, too, but

3  you've seen numerous cases where that is true, correct?

4       MS. BERKE:  Objection.  Vague.  Foundation.

5  Misstates testimony.

6       THE WITNESS:  Yes, there may have been some

7  cases where I made that conclusion.

8       Q    (By Mr. Brustin) Okay.  And that's exactly what

9  Morales is saying, that there were complaints about him

10  violating rules and regulations regarding interrogations?

11      MS. BERKE:  Objection.  Vague.  Foundation.

12  Misstates evidence.

13      THE WITNESS:  That is Morales's opinion.  The

14  chain of command at the time disagrees with Morales that any

15  of this was ever brought to their attention.

16      Q    (By Mr. Brustin) And I'm understanding that.  I

17  hear you.  But what I'm saying is Morales is right, you

18  would agree with Morales that in fact there was a lot of

19  evidence of Saldate violating rules and regulations on

20  Miranda during this time period?

21      MS. BERKE:  Objection.  Vague.

22      THE WITNESS:  I don't agree with Morales on

23  that, no.

24      Q    (By Mr. Brustin) But you did agree already under

25  oath 20 times.

Page 319

1       MS. RETTS:  Argumentative.  Misstates his

2  testimony.

3       THE WITNESS:  I find it amazing that you can

4  put a number on it.  I said I may have agreed with you on

5  certain cases.  That's not to say that I agree with

6  Detective Morales.

7       Q    (By Mr. Brustin) Do you want me to list the cases

8  where you agreed?

9       A    Sure.

10      Q    Do you remember Running Eagle?

11      A    I do.

12      Q    Do you remember Rangel?

13      A    I do.

14      Q    Do you remember King?

15      A    I do.

16      Q    Do you remember Gallegos?

17      A    Yes.

18      Q    That's four right there, right?

19      A    Okay.

20      MS. RETTS:  Form.  Foundation.

21      Q    (By Mr. Brustin) And that's a pattern of

22  misconduct, right?

23      MS. BERKE:  Objection.  Misstates evidence.

24      THE WITNESS:  And I believe my statement to

25  you is I never drew the conclusion that he intentionally

Page 320

1  violated Miranda.  What I said to you was it would be of

2  concern to the department and something that we may have to

3  look into, was my testimony.

4       Q    (By Mr. Brustin) You may have wished you said

5  that, but that's not what you said.

6       MS. BERKE:  Objection.  Argumentative.

7       Q    (By Mr. Brustin) In any case, you would agree that

8  if in fact Morales accurately describes multiple people

9  complaining about Saldate's and his partner's conduct during

10  interrogations, those allegations had to be fully

11  investigated, correct?

12      MS. RETTS:  Form.  Foundation.  Outside the

13  scope.

14      THE WITNESS:  If what Detective Morales is

15  saying is 100 percent accurate and you want me to make that

16  assumption and it was brought to any supervisor's attention

17  in the Phoenix Police Department, yes, it would require us

18  to look into it and probably conduct an investigation.

19      Q    (By Mr. Brustin) And if in fact he is truthfully

20  describing what the response was from those supervisors, the

21  comment from the supervisors would also have to be

22  investigated for misconduct, correct?

23      MS. RETTS:  Same objection.

24      THE WITNESS:  Again, if Morales is 100

25  percent accurate and that's the assumption you want me to

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
321–324

Page 321

1  make and it was brought to the supervisors' attention and
2  the supervisors neglected their responsibility, then yes,
3  the supervisors are -- would also be placing themselves
4  under possible investigation.
5      Q    (By Mr. Brustin) All right.  And why -- when you
6  guys talked about this in your meeting, did anybody have any
7  theories as to why Detective Morales would make something
8  like this up?
9      A    I don't recall that being a part of the
10  conversation, no.
11      Q    And Detective Morales, for a long time, was the
12  department spokesperson, correct?
13      A    Correct.
14          MS. RETTS:  Form.
15      Q    (By Mr. Brustin) And that was an important job,
16  correct?
17          MS. RETTS:  Form.  Foundation.
18          THE WITNESS:  Our PIOs, yes, that is an
19  important position in the department.
20      Q    (By Mr. Brustin) Somewhat like the legal adviser?
21  Well, withdrawn.
22          MS. RETTS:  I would not call the PIO the same
23  as a legal adviser.
24      Q    (By Mr. Brustin) The department spokesperson is
25  responsible for stating the position of the department on

Page 322

1  matters of importance publicly?
2          MS. RETTS:  Form.  Foundation.  Outside the
3  scope.
4          THE WITNESS:  Well, in their assignment as
5  the PIO, correct.
6      Q    (By Mr. Brustin) That's a position of great
7  responsibility?
8          MS. RETTS:  Form.  Foundation.  Outside the
9  scope.
10          THE WITNESS:  Yes.
11      Q    (By Mr. Brustin) And Detective Morales was
12  entrusted with that responsibility?
13          MS. RETTS:  Same objection.
14          THE WITNESS:  Yeah.  During what time frame,
15  I don't know what time he was there.  But, yes, as his job,
16  that was his job.
17      Q    (By Mr. Brustin) Are you aware of any red flags in
18  Detective Morales's past that might cause him to lie about
19  something like this?
20          MS. RETTS:  Outside the scope.  Foundation.
21          THE WITNESS:  I believe in our meeting with
22  Sherry Kiyler and Bill Richardson, he threw out some theory,
23  I just don't recall what it was, as to why Detective Morales
24  may have written this op ed article.  I just don't recall
25  exactly what the dynamics were of the employees in the unit

Page 323

1  at the time, exactly what his reasoning was.  But he did
2  offer up a theory as to why Detective Morales may have
3  authored this op ed.
4      Q    (By Mr. Brustin) Okay.  And, but you have no
5  recollection about what that, anything about what that
6  theory was?
7      A    I don't.  There appeared to be some hostility
8  between Detective Morales and other detectives at the time.
9      Q    Which detectives were hostile with Detective
10  Morales at the time?
11      A    I don't remember the names.
12      Q    Did he have a problem with Detective Saldate, to
13  your knowledge?
14      A    Did who?
15      Q    Morales.
16      A    Detective Morales?  Again, I don't remember
17  exactly what Sergeant Richardson said.  He just offered that
18  up as a possible reason as to why Detective Morales decided
19  to write this.
20          (An off-the-record discussion ensued.)
21      Q    (By Mr. Brustin) I want to be clear.  If in fact
22  Morales is describing accurately multiple detectives
23  reporting misconduct by Saldate and his partner to
24  supervisors, those allegations had to be investigated
25  pursuant to PPD policy and procedure, correct?

Page 324

1          MS. RETTS:  Form.  Foundation.
2          THE WITNESS:  If I am making the assumption
3  that his statement here is 100 percent accurate and that
4  that did in fact occur, correct.
5      Q    (By Mr. Brustin) And the same is true if his
6  statement about -- withdrawn.
7          And assuming that the response from the
8  supervisors was as described, if that came to the attention
9  of the PPD, the conduct of the supervisors would also have
10  to be investigated, correct?
11          MS. RETTS:  Form and foundation.
12          THE WITNESS:  Again, making the assumption
13  that this is 100 percent the truth, correct.
14      Q    (By Mr. Brustin) And certainly if sustained, if
15  that actually happened, the supervisors did what he
16  described, that would be potentially serious misconduct
17  requiring suspension up to termination, correct?
18          MS. RETTS:  Form and foundation.  Outside the
19  scope.
20          THE WITNESS:  Yes.  If sustained, that could
21  be a range of discipline they are subjecting themselves to.
22          MR. BRUSTIN:  Okay.  That's all I have.
23          MS. BERKE:  Okay.  Then let's take a break.
24          (Recess was taken at 5:09 p.m.; resumed at
25  5:19 p.m.)

EXHIBIT 15

TOM VAN DORN  30(b)(6)

Debra Jean Milke vs City of Phoenix

April 26, 2018

325–328

Page 325

1 MS. RETTS:  So based on the length of time, I
2 just want to put on the record that based on the length of
3 time that we've been going today and the court reporter's
4 been working very hard but her hands are getting tired, we
5 have all agreed that I'm just going to ask some questions
6 relative to his preparation to address just those things
7 briefly and then substantive questioning will resume on
8 another date for the follow-up for the defendants.
9 MR. BRUSTIN:  Agreed.
10
11 EXAMINATION
12 BY MS. RETTS:
13 Q  Commander Van Dorn, can you look at Exhibit 112.
14 A  Okay.
15 MR. BRUSTIN:  Where is my 112?
16 THE WITNESS:  The one we marked today.
17 30(b)(6) notice.
18 MR. BRUSTIN:  I don't need it.
19 Q  (By Ms. Retts) As part of your preparation for the
20 first deposition, 30(b)(6) deposition, and your preparation
21 to testify today, did that include your personal experience
22 and review of the documents and interview that you gave
23 relative to all of the efforts that were made to locate
24 documents relating to the Milke case during the pendency of
25 the criminal proceedings in around the 2000s?

Page 326

1 MR. BRUSTIN:  Objection to form.  That was a
2 mouthful.
3 MS. RETTS:  I was trying to get it done fast.
4 THE WITNESS:  Yes.
5 Q  (By Ms. Retts) Okay.  Do you recall being
6 interviewed by Ms. Milke's lawyers where you gave a lengthy
7 interview about your efforts that you undertook to search
8 for policies and procedures, training, and any employment
9 materials related to Mr. Saldate's employment?
10 A  Yes.
11 Q  And in addition to that, you made a personal
12 request of the homicide lieutenant to conduct an additional
13 search last year in preparation for your deposition to
14 determine whether or not there might potentially have been
15 anything out there that was missed?
16 A  Yes.
17 Q  That included searching closets, store rooms,
18 those type of efforts?
19 A  Yes.  That's what he told me.
20 MR. BRUSTIN:  Objection to form.  Sorry.
21 Q  (By Ms. Retts) You also personally reached out to
22 Lieutenant Paul Taylor, who is in charge of PSB right now?
23 MR. BRUSTIN:  Objection to the form.
24 THE WITNESS:  Lieutenant Paul Taylor is one
25 of a couple investigations lieutenants assigned to the

Page 327

1 Professional Standards Bureau.  Commander Chuck Lauren is
2 the commander that oversees the bureau itself.
3 Q  (By Ms. Retts) Do you recall Lieutenant Taylor
4 recounting to you that he was personally involved when he
5 came to PSB a number of years ago in inventorying the
6 documents that existed at that time?
7 MR. BRUSTIN:  Objection to the form.
8 Leading.
9 THE WITNESS:  Yes.  And while he is -- let me
10 go back and clarify.
11 While he is a current lieutenant with the
12 Phoenix Police Department and assigned as an investigations
13 lieutenant, he has also served as a sergeant, the
14 administrative sergeant, in the Profession Standards Bureau
15 as well.  So yes, he was very familiar with multiple
16 requests to search for documents throughout this case, in
17 addition to my last request late last year to say go check
18 one more time.
19 Q  (By Ms. Retts) What did he tell you about the age
20 of the materials that existed currently with PSB?
21 A  That PSB investigations have a retention period
22 of five years.
23 Q  And did he tell you that he had personal
24 knowledge that there was nothing there from the time period
25 involved in the notice in question?

Page 328

1 A  He stated that we no longer have documents that
2 exist for this time period.
3 Q  You also personally reached out to the training
4 bureau for them to conduct another search for materials
5 relating to Saldate?
6 A  Yes, I did.
7 Q  And they were able to locate his academy training
8 records, do you recall that?
9 A  Yes.
10 MR. BRUSTIN:  Objection.  Leading.
11 Q  (By Ms. Retts) As part of the contact with
12 Commander Humphrey, I think they called him Major back
13 there, your interview with him, did he review those training
14 materials?
15 A  Yes, he did.
16 Q  And he indicated, through his review, that there
17 would have been training classes in the academy time frame
18 that covered Miranda?
19 A  Yes.  He identified various classes on Detective
20 Saldate's class schedule in which Miranda may have been
21 discussed or taught.
22 (An off-the-record discussion ensued.)
23 Q  (By Ms. Retts) Did he tell you whether he had
24 personal knowledge about the training based upon his
25 experience working within the training bureau?

TOM VAN DORN  30(b)(6)                                    April 26, 2018
Debra Jean Milke vs City of Phoenix                         329–332

Page 329

1    A    Yes, because I believe he was also assigned to
2   the training bureau at some point in time in his career, so
3   he was familiar with the overall training process.
4        MS. RETTS:  All right.  I'm not sure how to
5   do this, other than this.  I don't have copies for everyone.
6        MR. BRUSTIN:  What is it?
7        MS. RETTS:  This is the -- this is not the
8   Bates labled version, but this is the academy roster.
9        MR. BRUSTIN:  Why don't you just make copies
10  and ask him at the next deposition.
11       MS. RETTS:  Well, because this is the
12  original, so.
13       MR. BRUSTIN:  You're going to make copies and
14  give it to us afterward?
15       MS. RETTS:  Yeah.
16       MR. BRUSTIN:  I don't care if you use it and
17  then give it to us after.
18       MS. RETTS:  Do you want to mark the original?
19       MR. BRUSTIN:  Whatever you want to do.
20       MS. RETTS:  Let's just mark the original.
21       MS. McCARTHY:  And that wasn't in your
22  production?
23       MS. RETTS:  It was produced in our production
24  but the copy that I used with him didn't have Bates numbers
25  on it.

Page 330

1        MS. McCARTHY:  Okay.
2        (Deposition Exhibit No. 115 was marked for
3   identification.)
4    Q    (By Ms. Retts) Can you take a flip through there,
5   and I want to ask you if you remember Commander Humphrey
6   going through this document and writing X's next to the
7   classes that he believed related to Miranda and
8   interrogation.
9    A    Correct.  When we sat down and met with him, you
10  handed him this document, asked him to identify all the
11  various classes in which Miranda may have been discussed
12  and/or taught, and that's what he did.  He marked X's next
13  to those classes, based upon his experience.
14   Q    Did he also go through and identify the
15  individuals who taught those specific classes and recount
16  that those folks were deceased?
17   A    He did.  I believe he had firsthand knowledge
18  that some were deceased, and he was going to check and see
19  if others may be alive still.
20   Q    If you'll look at Exhibit 112 again, category
21  three --
22   A    Okay.
23   Q    -- do you recall that Chief Kiyler and Sergeant
24  Richardson were provided with a copy of this document and
25  asked to review number three?

Page 331

1        MR. BRUSTIN:  Objection.  Leading.
2        THE WITNESS:  Yes.  Both Sherry Kiyler and
3   Bill Richardson were provided a copy of this document and
4   asked to assist counsel perhaps in identifying additional
5   individuals that could testify on behalf of the city to
6   answer questions, were they aware of any additional
7   documents that may exist in response to some of these
8   categories.
9    Q    (By Ms. Retts) What did Chief Kiyler tell you with
10  respect to there being any investigations that she was aware
11  of concerning Saldate?
12   A    She said that there were no investigations, to
13  the best of her knowledge, that was ever brought to her
14  attention or that she was aware of regarding Detective
15  Saldate.
16   Q    Was that the same as it relates to Sergeant
17  Richardson?
18   A    Yes.
19   Q    Was that the same as it relates to Commander
20  Humphrey?
21   A    Yes.  All three of them stated the same thing, at
22  separate times.
23   Q    Did Chief Kiyler have any knowledge of the 1973
24  incident involving Saldate?
25   A    She stated she did not.

Page 332

1    Q    Did Sergeant Richardson have any knowledge of the
2   1973 incident involving Saldate?
3    A    In my meeting with him, he said he did not.
4    Q    Did Commander Humphrey indicate whether he had
5   any knowledge concerning the 1973 incident involving
6   Saldate?
7    A    He said he did not.  In fact, he was surprised
8   that we even found that document.
9    Q    You have personal experience in working in the
10  Professional Standards Bureau; is that correct?
11   A    Yes.
12   Q    Can you describe that for us.
13   A    Yeah, when I was the rank of lieutenant, I was
14  the investigations lieutenant assigned to the Professional
15  Standards Bureau for a little over a year.
16   Q    And you were familiar with the policies and
17  procedures of the department during that time?
18   A    Yes.
19   Q    So in your review of policies and procedures in
20  this case related to the 1984 to 1991 time frame, based upon
21  that experience, was it easier for you to quickly go through
22  those policies and determine if there were any changes?
23   A    Yeah.  In addition to the review that I conducted
24  for the first deposition, on top of my meetings with people
25  that served in the Professional Standards Bureau from the

EXHIBIT 15

**Page 333**

1  past, on top of my current knowledge of how things are

2  conducted, yes.

3      Q    As it relates to category seven, did Commander

4  Humphrey provide you with information about whether any of

5  the information that would be responsive to that would still

6  exist in paper format?

7      A    I believe he said, again, he was going to just

8  reach out to other individuals who may have knowledge of

9  and/or check his own personal files to see if any documents

10  existed during that time frame.

11     Q    Did he also indicate that there was a five-year

12  retention schedule that would have resulted in the shredding

13  of investigations, the backup investigations, during the

14  time frame in question?

15     A    Yes.  He stated that investigations had a

16  five-year retention period because of labor agreements.

17     Q    Was he able to remember any specifics relating to

18  investigations that would have fallen in the category of

19  No. 7?

20     A    In general or as it relates to Detective Saldate?

21     Q    Both.

22     A    Okay.  Don't specifically recall him mentioning.

23  He told us that he wasn't aware of any investigations that

24  existed with respect to Detective Saldate, period.  And then

25  I don't know if he threw out examples involving other

**Page 334**

1  officers.  I just don't remember.

2      Q    You testified earlier that he stated that he met

3  regularly with the county attorney.  Did he set forth his

4  personal feelings about what the county attorney -- not the

5  county attorney himself but the county attorney's

6  prosecutors, what he felt they would have communicated to

7  him during that time based upon their relationship?

8          MR. BRUSTIN:  Objection to form.  Vague.

9  Leading.

10         THE WITNESS:  Yes.  He said because of the

11  good working relationship he had with the county attorney's

12  office, the fact that they routinely went to each other,

13  routinely communicated, that if the prosecutors would have

14  issues or concerns, that they would have very gladly shared

15  that with him.

16         MS. RETTS:  I think that's all I'm going to

17  have for today.  Wrap it up for us.

18         MR. BRUSTIN:  Okay.  So we'll reconvene.

19         (Deposition concluded at 5:32 p.m.)

20

21

22

23

24

25

**Page 335**

1                  CERTIFICATE OF REPORTER

2

3  STATE OF ARIZONA  )
                      ) ss:
4  COUNTY OF MARICOPA )

5          I, Sandra L. Munter, a Certified Reporter in

6  the State of Arizona, do hereby certify that the foregoing
   Deposition was taken before me in the County of Maricopa,

7  State of Arizona; that an oath or affirmation was duly
   administered to the witness, Tom Van Dorn, pursuant to

8  A.R.S. 41-324(B); that the questions propounded to the
   witness and the answers of the witness thereto were taken

9  down by me in shorthand and thereafter reduced to
   typewriting; that the transcript is a full, true, and

10  accurate record of the proceeding, all done to the best of
    my skill and ability; and that the preparation, production,

11  and distribution of the transcript and copies of the
    transcript comply with the Arizona Revised Statutes and ACJA

12  7-206(J)(1)(g)(1) and (2).

13          The witness herein, Tom Van Dorn, has
    requested signature.

14          I FURTHER CERTIFY that I am in no way related

15  to any of the parties, nor am I in any way interested in the
    outcome hereof.

16          IN WITNESS WHEREOF, I have set my hand in my

17  office in the County of Maricopa, State of Arizona, the 4th
    day of May, 2018.

18

19          _____

20          Sandra L. Munter
            Certificate No. 50348

21

22

23          /s/
    For Esquire Deposition Solutions

24  Registered Reporting Firm No. R1048

25

**Page 336**

1                  ESQUIRE ERRATA SHEET

2

3  Esquire Job ID: J2128400

4  Case Caption: Milke v City of Phoenix

5

6          DECLARATION UNDER PENALTY OF PERJURY

7

8  I declare under penalty of perjury that I have

9  read the entire transcript of my Deposition taken

10  in the above-captioned matter or the same

11  has been read to me and the same is true and

12  accurate, save and except for changes and/or

13  corrections, if any, as indicated by me on the

14  DEPOSITION ESQUIRE ERRATA SHEET hereof, with the

15  understanding that I offer these changes as if still

16  under oath.  Signed on the _____ day of

17  _____, 20___.

18

19

20  _____

21  TOM VAN DORN

22

23

24

25

TOM VAN DORN  30(b)(6)
Debra Jean Milke vs City of Phoenix

April 26, 2018
337–338

Page 337

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25    TOM VAN DORN
```

Page 338

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25    TOM VAN DORN
```



EXHIBIT 15

**Page 339**

```
 1
 2              UNITED STATES DISTRICT COURT
 3                 DISTRICT OF ARIZONA
 4
    Debra Jean Milke,              )
 5                                 )
         Plaintiff,                )
 6                                 )
    vs.                            ) No.
 7                                 ) 2:15-cv-00462-ROS
    City of Phoenix; Maricopa      )
 8  County; and Detective Armando  )
    Saldate, Jr.; and Sergeant     )
 9  Silverio Ontiveros, in their   )
    individual capacities,         )
10                                 )
         Defendants.               )
11  ------------------------------  )
12
13
             VOLUME III, Pages 339 through 451
14
             VIDEOTAPED DEPOSITION OF
15
16                 TOM VAN DORN
17                AUGUST 28, 2018
18                   2:10 P.M.
19
20             3020 East Camelback Road
21                Phoenix, Arizona
22
23      SOMMER E. GREENE, CSR, RPR, CR No. 50622
24
25
```

**Page 340**

```
 1  APPEARANCES OF COUNSEL
 2
 3       For Plaintiff:
 4           NEUFELD SCHECK & BRUSTIN, LLP
             AMELIA GREEN, ESQ.
 5           KATIE MCCARTHY, ESQ.
             99 Hudson Street, 8th Floor
 6           New York, New York 10013
             212.965.9081
 7
 8       For Defendant Silverio Ontiveros:
 9           HOLLOWAY ODEGARD & KELLY, P.C.
             SALLY A. ODEGARD, ESQ.
10           3020 East Camelback Road, Suite 201
             Phoenix, Arizona 85016
11           602.240.6670
             sodegard@hoklaw.com
12
13
         For Maricopa County:
14
             SANDERS & PARKS
15           NICOLE STEWART, ESQ.
             3030 North Third Street, Suite 1300
16           Phoenix, Arizona 85012
             602.532.5783
17           Nicole.Stewart@sandersparks.com
18
19
20
21
22
23
24
25
```

**Page 341**

```
 1  APPEARANCES CONTINUED:
 2
 3
 4       For Defendant City of Phoenix:
 5           WIENEKE LAW GROUP
             CHRISTINA RETTS, ESQ.
             1095 West Rio Salado Parkway, Suite 209
 6           Tempe, Arizona 85281
             480.715.1868
 7           cretts@swlfirm.com
 8
         For Defendant Armando Saldate:
 9
10           BERKE LAW FIRM
             LORI V. BERKE, ESQ.
             1601 North 7th Street, Suite 360
11           Phoenix, Arizona 85006
             602.254.8800
12           lori@berkelawfirm.com
13
    Also Present:
14
             Barb Del'Ve, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

**Page 342**

```
 1                    I N D E X
 2
 3  WITNESS: TOM VAN DORN
 4
 5  EXAMINATION                           PAGE
 6
 7  MS. RETTS.....................................344
 8  MS. BERKE.....................................357
 9  MS. GREEN.....................................415
10
11              *      *      *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 15

Page 343

                    INDEX TO EXHIBITS

EXHIBIT                                              MARKED

Exhibit 230 October 3, 1990, Portion of      357
            Reporter's Transcript of
            Proceedings

Exhibit 231 April 26, 2017, Portion of Armando 357
            Saldate's Deposition Testimony
Exhibit 232 June 22, 2017, Portion of Armando 357
            Saldate's Volume II Deposition

Exhibit 233 June 22, 2017, Portion of Armando 368
            Saldate's Volume II Deposition,
            Page

Exhibit 234 November 15, 2017, Portion of    369
            Armando Saldate's Volume III
            Deposition

Exhibit 235 8-29-86 Michael Robles Homicide  369
            Report
Exhibit 236 Phoenix Police Department
            Police Report, Robles Homicide   369

Page 344

1          PHOENIX, ARIZONA
2          AUGUST 28, 2018
3
4
5          THE VIDEOGRAPHER:  Good afternoon.  This
6  begins Volume III to the deposition of Tom Van Dorn in
7  the matter of Debra Jean Milke versus the City of
8  Phoenix, et al.  Today's date is August 28th, 2018, and
9  the time is 2:10 p.m.  We're now on the record.
10
11
12          TOM VAN DORN,
13  called as a witness herein, having been first duly sworn
14  by the Certified Reporter to speak the whole truth and
15  nothing but the truth, was examined and testified as
16  follows:
17
18          EXAMINATION
19  BY MS. RETTS:
20     Q.   Commander, I'm going to have you look at what
21  has been marked in this case as Exhibit 30.
22     A.   Okay.
23     Q.   And for reference, the bottom Bates number is
24  MILKE_NSB018588.
25     A.   Okay.

Page 345

1     Q.   And if you will look at the --
2          MS. GREEN:  If you'd give me a second, I
3  just want to turn to the exhibit, please.
4          MS. RETTS:  Yeah.
5          MS. GREEN:  Can you please repeat the Bates
6  number?
7          THE WITNESS:  Yes.  MILKE_NSB018588.
8          MS. GREEN:  Okay.
9     Q.   BY MS. RETTS:  All right.  I'm going to have to
10  share with you because --
11     A.   Okay.
12     Q.   -- that's my copy too.  And that is -- what
13  we're looking at is the Phoenix Police Department
14  operations order number C-5 from 10/1989.  Do you agree?
15     A.   Yes.
16     Q.   And under the section of interrogations, in
17  that policy, it directs that officers should refer to the
18  ALEOC manual, chapter 16, statements, for information
19  regarding the legal and practical aspects of interviewing
20  and interrogation.
21          Do you see that in section 4?
22     A.   I do.
23     Q.   And that policy, then, is incorporating by
24  reference the ALEOC manual.  Would you agree?
25     A.   Yes.

Page 346

1          MS. GREEN:  Objection to form.
2     Q.   BY MS. RETTS:  I'll have you look at what's
3  been marked previously as Exhibit 116 -- sorry -- 111.
4  And if you will just flip through that document and
5  confirm for me that that is the ALEOC manual section on
6  statements that's incorporated through the Phoenix Police
7  Department policy.
8          MS. GREEN:  Is this Exhibit 116 or 111?
9          MS. RETTS:  Exhibit --
10          THE WITNESS:  111.
11          MS. RETTS:  -- 111.
12          THE WITNESS:  Yes, that is a portion of the
13  manual.
14     Q.   BY MS. RETTS:  And if an officer or detective
15  were to have any questions about the specifics of
16  interrogations or the law, that would be a resource that
17  they would be expected to utilize by the Phoenix Police
18  Department?
19          MS. GREEN:  Objection to form.
20          THE WITNESS:  Yes.
21     Q.   BY MS. RETTS:  All right.  Would you agree with
22  the proposition that the Phoenix Police policies do not
23  set the bounds of constitutional law?
24          MS. GREEN:  Objection to form.
25          THE WITNESS:  That would be correct.



Page 347

1    Q.   BY MS. RETTS:  And sometimes policy takes a
2   while to catch up with developments in the law, which is
3   why the police department uses law bulletins to push out
4   to the department changes in the law?
5        MS. GREEN:  Objection to form.
6        THE WITNESS:  That is correct.  I mean, if
7   you take a look at our operations manual, it's over a
8   thousand pages long, and any time that there's a law
9   change or a case law change, we rely upon additional
10   resources within the department, such as the department's
11   legal unit, to push out additional updates until we
12   update the actual operations manual.
13    Q.   BY MS. RETTS:  Now, if there had been an
14   allegation of violation of Miranda law and an -- and an
15   IA investigation or PSB investigation, whatever it was
16   referred to at the time, were initiated, would one of the
17   things that would be looked into be the status of
18   Miranda law at the time?
19    A.   Yes.
20        MS. GREEN:  Objection to form.
21        If you don't --
22    Q.   BY MS. RETTS:  And --
23        MS. GREEN:  -- mind, would you just pause
24   for a second so I can get my objections --
25        THE WITNESS:  You bet.

Page 348

1        MS. GREEN:  -- on the record?
2        Thank you very much.
3    Q.   BY MS. RETTS:  And in the analysis of whether
4   there had been any alleged violation, would the law be
5   the most important thing that would be looked at?
6        MS. GREEN:  Objection to form.
7        THE WITNESS:  It would be a factor that we
8   would look at, yes.
9    Q.   BY MS. RETTS:  And a few of the resources that
10   could be utilized would be the County attorney to look --
11   to ask the County attorney's position on the law and what
12   had occurred.  Would you agree?
13    A.   Yes.
14    Q.   And the legal advisor for the Phoenix Police
15   Department could be utilized to look at the specifics of
16   the circumstance and determine what that legal advisor's
17   position was?
18    A.   Yes.
19    Q.   And in an internal affairs investigation or PSB
20   investigation that involved Miranda, would you have an
21   expectation that as part of that investigation, steps
22   like that would be taken to determine what the status of
23   the law was at the time?
24        MS. GREEN:  Objection to form.
25        THE WITNESS:  Yes.

Page 349

1    Q.   BY MS. RETTS:  Now, you were asked some
2   questions over the course of your two volumes of
3   deposition about certain select case law.  Do you recall
4   those lines of questioning?
5    A.   Yes.
6    Q.   In a deposition, you would agree that you don't
7   have the opportunity to conduct an extensive review of
8   case law to see if there are any other cases out there
9   that might address the specifics of the issue that
10   you're -- you're questioned about?
11    A.   Not during these depositions, no.
12    Q.   As -- if there had been a disciplinary
13   investigation involving an alleged violation of the law,
14   though, you would have expected that there would be a
15   detailed analysis of case law, whether that be through
16   the legal advisor doing it or through contacting the
17   County attorney, to determine what the full scope of case
18   law was relative to an issue.
19        MS. GREEN:  Objection to form.
20    Q.   BY MS. RETTS:  Would you agree?
21    A.   Yes.
22    Q.   As part of your review of documents, you looked
23   at the County attorney's press conference that was given
24   where the County attorney discussed the cases that have
25   been alleged to be misconduct in this case.  Do you

Page 350

1   recall that?
2    A.   Yes.
3    Q.   As part of your review of that press
4   conference, did any of the information that you reviewed
5   suggest that the County attorney had concluded that there
6   had been misconduct on the part of Detective Saldate?
7        MS. GREEN:  Objection to form.
8        THE WITNESS:  No.  I believe Mr. Montgomery
9   stated that he did not feel that there was any misconduct
10   on the part of the detective.
11    Q.   BY MS. RETTS:  So if there had been any type of
12   allegation of misconduct that was ever brought forward to
13   the police department involving Detective Saldate, would
14   the County attorney's position have been important in
15   that analysis?
16        MS. GREEN:  Objection to form.
17        THE WITNESS:  It would have been a factor
18   had somebody brought forth that we would have looked
19   into, yes.
20    Q.   BY MS. RETTS:  In all the documents that you
21   reviewed and discussions that you had with individuals to
22   prepare for your deposition, did anyone indicate that any
23   of the allegations involving Detective Saldate that were
24   addressed in the press conference were ever brought
25   forward to the police department in the form of a



EXHIBIT 15

TOM VAN DORN  Volume III                              August 28, 2018
Milke vs City of Phoenix                                      351–354

Page 351

1   complaint?

2      A.   Not to my knowledge, no.

3      Q.   Would you agree that officers and detectives,

4   when they testify, often have to rely upon the County

5   attorney to give them direction as to what they may or

6   may not testify about in either a grand jury or at trial?

7          MS. GREEN:  Objection to form.  Foundation.

8          THE WITNESS:  We do work with them on a

9   variety of cases, yes.

10     Q.   BY MS. RETTS:  So, for example, if there had

11  been a motion in limine that was granted in a court

12  proceeding, you would have the expectation that the

13  County attorney would give instruction to the officer

14  about what he could and could not say to make sure there

15  was compliance with that Court order.  Would you agree?

16     A.   Correct.

17     Q.   So if a detective were to follow the County

18  attorney's advice on that point and avoid that area where

19  it was his understanding where he could not go into, you

20  would agree that that would not be misconduct on the part

21  of the detective?

22         MS. GREEN:  Objection to form.

23         THE WITNESS:  Correct.

24     Q.   BY MS. RETTS:  It's -- it's appropriate and, in

25  fact, expected for the detectives and officers to follow

Page 352

1   the directives given by the County attorney to them with

2   regard to evidence and things that they may or may not

3   discuss through their testimony?

4      A.   Yes.

5      Q.   Now, if a detective was before a grand jury and

6   was told before that grand jury proceeding that he was

7   not to cover a specific area and the County attorney gave

8   him that directive, would it be your expectation that the

9   -- the detective adhere to that?

10         MS. GREEN:  Objection to form.

11         THE WITNESS:  Yes.

12     Q.   BY MS. RETTS:  And if the detective did, in

13  fact, adhere to that directive, you would agree that it

14  would not be misconduct for him to follow that directive?

15         MS. GREEN:  Objection to form.

16         THE WITNESS:  Yes.

17     Q.   BY MS. RETTS:  Now, internal affairs

18  investigations or professional standards bureau

19  investigations, they -- as they go through the process,

20  there are an immense amount of interviews and documents

21  and investigation that is conducted before a finding is

22  made.  Would you agree?

23         MS. GREEN:  Objection to form.

24         THE WITNESS:  Yes.

25     Q.   BY MS. RETTS:  In the course of your

Page 353

1   deposition, you were shown a few select pieces from

2   differing case files.  Do you remember that happening

3   throughout your deposition?

4      A.   Yes.

5      Q.   Based upon your experience in working in

6   professional standards bureau, would there ever have been

7   a decision rendered based upon the limited amount of

8   information that you were provided during your

9   deposition?

10     A.   No.

11     Q.   So the typical internal affairs investigation

12  or PSB investigation would have included multiple

13  interviews with any relevant witnesses.  Would you agree?

14     A.   Yes.

15     Q.   It would include interviewing the detective or

16  officer who was involved?

17     A.   Yes.

18     Q.   It may include interviewing the County

19  attorney?

20     A.   Yes.

21     Q.   It may include speaking with the legal advisor

22  from the Phoenix Police Department to address any matters

23  of law that were relevant?

24     A.   Yes.

25     Q.   May include looking at evidence?

Page 354

1      A.   Yes.

2      Q.   And it may include looking at any relevant

3   grand jury testimony, provided it wasn't sworn.  Would

4   you -- it wasn't sealed.  Would you agree?

5      A.   Yes.

6      Q.   In your experience, does the police department

7   routinely get copies of grand jury testimony?

8          MS. GREEN:  Objection to form.  Foundation.

9          THE WITNESS:  Routinely, no.  It has

10  happened over the course of my career where somebody has

11  alleged whether or not an officer's been untruthful on

12  the stand, and we do look at it from an administrative

13  policy standpoint.

14     Q.   BY MS. RETTS:  And when that has occurred, has

15  that been the County attorney who has made that referral

16  to the Phoenix Police Department?

17     A.   The County attorney and/or a -- potentially a

18  judge in a later case as it progressed.

19     Q.   Is it your experience that grand jury testimony

20  is generally sealed?

21     A.   Yes.

22     Q.   So unless a judge or a prosecutor were to

23  provide a copy to the Phoenix Police Department, it would

24  remain sealed?

25         MS. GREEN:  Objection to form.  Foundation.



EXHIBIT 15

Page 355

1    THE WITNESS:  It's my understanding, yes.
2    Q.   BY MS. RETTS:  And if there were an allegation
3  about what occurred in a grand jury and whether a
4  detective was allegedly untruthful, would it be important
5  to review the grand jury testimony in its entirety?
6    A.   Yes.
7    Q.   And it would not be sufficient to simply look
8  at what the defendant might have alleged occurred in that
9  grand jury testimony versus actually looking at what
10  occurred?
11    MS. GREEN:  Objection to form.
12    THE WITNESS:  I think from an administrative
13  investigative standpoint, we'd still look at both.
14    Q.   BY MS. RETTS:  When a -- if you were looking at
15  an allegation that there was a Miranda violation, would
16  it be important in the course of a professional standards
17  bureau investigation to determine whether the violation
18  alleged to have occurred by the officer was knowing?
19    A.   Yes.
20    Q.   And would you agree that part of that would be
21  to look at whether the officer's belief about whether the
22  suspect invoked their right to counsel or right to
23  silence was reasonable?
24    A.   I'm sorry.  Can you repeat that one?
25    Q.   So one of the things in looking at whether

Page 356

1  there was a knowing violation would be whether the
2  officer was reasonable in their belief about whether
3  there had been an invocation or not?
4    A.   Yes, that's correct.
5    Q.   So the -- you would need to look at whether the
6  officer reasonably believed that there was an invocation
7  or maybe that there wasn't an invocation?
8    A.   Yeah, I think, you know, the officer has to
9  decide, okay, you know, did they invoke their right to
10  silence or their right to a lawyer before deciding
11  whether or not to proceed.
12    Q.   And, in fact, Miranda law -- throughout the
13  course of Miranda, there have been courts that even --
14  have even disagreed on whether something is in violation
15  or something isn't a violation?
16    A.   Yes.
17    Q.   And that would be the reason why it would be
18  important to look at why -- whether the officer was
19  reasonable?
20    A.   Agreed.
21    MS. RETTS:  I don't have anything further.
22    THE WITNESS:  Okay.
23    MS. BERKE:  Want to switch?  I better move
24  over because I have a lot of exhibits.
25    MS. RETTS:  Okay.

Page 357

1    (A discussion was held off the record.)
2    (Exhibit 230 was marked for identification.)
3    (Exhibit 231 was marked for identification.)
4    (Exhibit 232 was marked for identification.)
5    MS. ODEGARD:  Lori, what was the number?
6    MS. GREEN:  Can I ask what you're handing
7  out?
8    MS. BERKE:  Exhibits.
9    MS. GREEN:  These are exhibits you intend to
10  use throughout the course of questioning?
11    MS. BERKE:  They are exhibits I intend to
12  use right now.
13    MS. GREEN:  Will you be marking these
14  separately, for the record?
15    MS. BERKE:  They are marked separately.
16
17
18    EXAMINATION
19  BY MS. BERKE:
20    Q.   Commander Van Dorn, I'm showing you what's been
21  marked as Exhibit Nos. 230, 231 and 232.
22    MS. GREEN:  Can you please tell me, my
23  number that I received, I don't think it has any numbers
24  on it.
25    MS. BERKE:  Right.

Page 358

1    MS. GREEN:  Will you please let me know
2  which is which --
3    MS. BERKE:  Yes, I will.
4    MS. GREEN:  -- before you start questioning
5  Commander Van Dorn about --
6    Q.   BY MS. BERKE:  Commander --
7    MS. GREEN:  -- the documents --
8    Q.   BY MS. BERKE:  Commander --
9    MS. GREEN:  -- please.
10    Q.   BY MS. BERKE:  Commander Van Dorn, you recall
11  testifying back in November at your deposition about the
12  issue of Detective Saldate putting his hands on Debra
13  Milke's knees.  Correct?
14    A.   Yes.
15    Q.   And --
16    MS. GREEN:  Excuse me, could you please let
17  me know which ones are marked 230, 231 and 232?
18    MS. BERKE:  I will let you know as I use
19  them.  Okay, Amelia?
20    MS. GREEN:  Okay.
21    MS. BERKE:  Can you just please stop
22  interrupting me?
23    MS. GREEN:  You're not -- you're not willing
24  to let me know right now what the numbers are?
25    MS. BERKE:  When I put an exhibit before



TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
359–362

Page 359

1  him, I will let you know the number.  Okay?
2      Q.   BY MS. BERKE:  And --
3          MS. GREEN:  Okay.  I'm noting for the record
4  that an exhibit is before him right now.
5          MS. BERKE:  Okay.  Thank you.
6      Q.   BY MS. BERKE:  Commander Van Dorn, you recall
7  being questioned by Ms. Green and she tried to get you to
8  agree that it would be misconduct for a detective to
9  place their knees on the -- or their hands on the knees
10 of a suspect.  Do you remember that line of questioning?
11         MS. GREEN:  Objection to form.
12         THE WITNESS:  I remember the issue coming
13 up, yes.  The exact how many questions and what
14 specifically, I don't recall off the top of my head.
15     Q.   BY MS. BERKE:  There were questions about
16 whether that would be sexual in nature and what you --
17 what you testified to is you would have to know more
18 facts.  You would have to know the facts of what
19 occurred.  Correct?
20     A.   Correct.
21     Q.   So I'm going to put the facts before you of
22 what occurred in this case.  Okay?  I'm going to show you
23 first what's been marked as Exhibit Number 230.  And this
24 is testimony from Debra Milke's criminal trial on
25 October 3rd of 1990.

Page 360

1      A.   Okay.
2      Q.   Do you see that?
3      A.   I do.
4      Q.   Okay.  And it's pages 52 and 53.  And I'd like
5  to direct your attention to line 52 -- I'm sorry -- page
6  52, line 13.
7      A.   Okay.
8      Q.   And read from there through page 53, line 9 --
9      A.   Okay.
10     Q.   -- or I'm sorry, line 12.  Okay?
11     A.   Okay.
12     Q.   You can just read it to yourself.
13     A.   Okay.
14     Q.   And you would agree that that is Debra Milke's
15 description of what occurred in terms of the hands on the
16 knees.  Correct?
17     A.   Yes.
18         MS. GREEN:  Objection --
19     Q.   BY MS. BERKE:  And --
20         MS. GREEN:  -- to form.
21     Q.   BY MS. BERKE:  And what she testified happened
22 was that the only physical contact there was between her
23 and Detective Saldate was touching of the knees.
24 Correct?
25         MS. GREEN:  Objection to form.

Page 361

1          THE WITNESS:  Yes.
2      Q.   BY MS. BERKE:  And what she told the jury was
3  that he pulled his chair in front of her and he was
4  sitting in the chair.  He asked her how old she was and
5  she told him that she was 25.  Correct?
6      A.   Yes.
7      Q.   And he told her that he has a daughter about
8  her age and he understands how she feels.  Correct?
9      A.   Yes.
10     Q.   And then he leaned forward, put both of his
11 hands on her knees and said, "You can trust me.  I'm your
12 friend.  I'm here to help you," and then he removed his
13 hands.  Correct?
14     A.   Yes.
15     Q.   So you would agree that the touching of the
16 knees was a very brief encounter.  Correct?
17         MS. GREEN:  Objection to form.
18     Q.   BY MS. BERKE:  According to Ms. Milke's
19 description?
20     A.   I would agree.
21     Q.   And then she's asked if he ever touched her
22 again and she said, "Not until we left -- until we left
23 the jail.  We were walking out," and he led her to the
24 car holding her arm.  Correct?
25     A.   Yes.

Page 362

1      Q.   And is that typical for a police officer to do
2  when taking someone into custody?
3      A.   So now take a look at Exhibit No. 231.  And
4      Q.   So now take a look at Exhibit No. 231.  And
5  this is testimony from Armando Saldate's deposition.  And
6  I'd like you to read -- um, this is from his deposition
7  on April 26th, 2017.
8          MS. GREEN:  Oh, I think there are two in
9  front of me.  I don't know if there intend to be two.
10         MS. BERKE:  From the same date?
11         MS. GREEN:  I think so.  Not sure.  I mean,
12 yes, they're two from the same date.  Are -- are there
13 supposed to be?  Maybe I just got --
14         MS. BERKE:  No.
15         MS. GREEN:  Maybe I got two copies.  Is
16 someone missing a copy?
17         MS. BERKE:  One should be June 22nd.
18         MS. GREEN:  Oh.
19         MS. BERKE:  I think I gave you two copies of
20 each.
21         MS. GREEN:  Oh, okay.  Sorry about that.
22         MS. BERKE:  So that you and your partner
23 could each have one.
24         MS. GREEN:  Did not realize.
25     Q.   BY MS. BERKE:  Okay.  So Exhibit No. 231 is

EXHIBIT 15

TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
363—366

Page 363
1  Detective Saldate's testimony from April 26th, 2017.  Do
2  you see that?
3     A.   Yes.
4     Q.   And if you look at page 170, line 12,
5  Ms. Milke's attorney, Mr. Brustin, asks Detective Saldate
6  how long his hands were on her knees.  And he said, "A
7  couple minutes."  Correct?
8     A.   Yes.
9     Q.   And he said -- and then Mr. Brustin says, "A
10  couple minutes," and Detective Saldate says, "Just until
11  I got her attention."  Correct?
12     A.   Yes.
13     Q.   And then turn to the next page, 171, line 8.
14  Mr. Brustin asks Detective Saldate, quote, Was it your
15  belief that when you put your hands -- your hands on her
16  knees for a couple of minutes and looked directly into
17  her eyes and told her that she had just killed her son,
18  did you feel like you got her attention then?  And he
19  responds, quote, That was my intention, end quote.
20        Did I read that correctly?
21     A.   Yes.
22     Q.   And then take a look at Exhibit No. 232.  That
23  is Detective Saldate's deposition testimony from
24  June 22nd, 2017.  And, again, he's asked questions by
25  Mr. Brustin about the hands on the knees.  Do you see

Page 364
1  that?
2     A.   Yes.
3     Q.   And if you look at page 301, line 10, why don't
4  you just read that to yourself, 301, line 10, through
5  302, line 9.
6     A.   (Witness complies.)
7        Okay.
8     Q.   And would you agree that Detective Saldate's
9  explanation again as to why he put his hands on her knees
10  was to get -- simply to get her attention?
11     A.   Yes.
12     Q.   Now, I want you to assume that neither
13  Ms. Milke nor the attorneys representing her in her
14  criminal case ever lodged a complaint with the Phoenix
15  Police Department about Detective Saldate's having put
16  his hands on her knees.  Okay?
17     A.   Okay.
18     Q.   And there was never any claim by her during her
19  criminal case that his having done so was sexual in
20  nature.
21     A.   Okay.
22     Q.   Now, based on all of that and your review of
23  her testimony and Detective Saldate's testimony, was
24  there anything improper about Detective Saldate having
25  placed his hands on Ms. Milke's knees?

Page 365
1        MS. GREEN:  Objection to form.
2        THE WITNESS:  Based upon everything I've
3  read, no.
4     Q.   BY MS. BERKE:  So it would not be misconduct?
5     A.   It -- correct.  It would not be misconduct
6  based upon the documents I've read.
7     Q.   You were also asked at your deposition
8  questions about the Rodriguez case.  That's the case --
9  don't worry, I'll remind you what the cases are about.
10     A.   Thank you.
11     Q.   The Rodriguez case is the case where the
12  transcript from the grand jury proceeding reflected that
13  Detective Saldate had testified that the decedent had
14  been shot four times when, in fact, he had only been shot
15  one time.  Do you recall talking about that case?
16     A.   I do.
17     Q.   So I'm going to show you Exhibit No. 83 which
18  you were asked about.  Or actually it should be right
19  here.
20     A.   Okay.
21     Q.   And Ms. Green asked you to agree that what the
22  Court was concluding is that Detective Saldate in fact
23  said the victim was shot four times.  You recall that
24  from your testimony, being asked that?
25        MS. GREEN:  Objection to form.

Page 366
1        THE WITNESS:  Yes.
2     Q.   BY MS. BERKE:  Now, what the Court says in
3  Exhibit No. 83 is that both the reporter's notes and the
4  transcript of the grand jury reflect that the State's
5  witness, which we know was Detective Saldate, test-- --
6  that the testimony of Detective Saldate was that the
7  decedent was shot four times.  Correct?
8     A.   Correct.
9     Q.   And so what the Court is saying is that that is
10  what the court reporter typed.  Correct?
11        MS. GREEN:  Objection to form.
12        THE WITNESS:  I'm -- yes.
13     Q.   BY MS. BERKE:  So if the court reporter's notes
14  matched the transcript, all the Court is saying the
15  transcript accurately reflects what the court reporter
16  typed?
17     A.   Correct.
18     Q.   That doesn't mean necessarily that that's what
19  Detective Saldate stated when he was testifying.
20  Correct?
21     A.   Correct.
22     Q.   Because even court reporters can make mistakes.
23  Correct?
24     A.   Yes.
25     Q.   And have you known that to be the case?



EXHIBIT 15

Page 367

1   A.   Yes.
2   Q.   And you would agree that detectives who testify
3  in grand jury proceedings and other police officers don't
4  have the benefit like we do in depositions where they get
5  to review the transcripts from their testimony and make
6  any corrections.  Correct?
7   A.   Correct.
8   Q.   So if a court reporter incorrectly types
9  something in a transcript, the detective is not going to
10  be able to correct that or know about it.  Correct?
11   A.   Correct.  The best you can do is bring it to
12  the County attorney's attention.
13   Q.   But the -- the detective wouldn't be able to do
14  that because the detective would never see it?
15   A.   Wouldn't see it, correct.
16   Q.   And you were asked about whether if you
17  learned -- or if internal affairs learned about this
18  issue, whether an investigation should be conducted, and
19  you testified that if it was investigated, you would need
20  to look at what the officer had to say as to why the
21  testimony on the transcript said four shots when it was
22  actually one.  Correct?
23   A.   Correct.
24   Q.   And you weren't provided anything by
25  Ms. Milke's attorneys in terms of what Detective Saldate

Page 368

1  had to say about that issue, were you?
2   A.   I was not.
3   Q.   Okay.  I'm going to afford you the opportunity
4  to look at what Detective Saldate had to say on that
5  issue.  I'm showing you what's been marked as Exhibit 233
6  to your deposition.
7        (Exhibit 233 was marked for identification.)
8   Q.   BY MS. BERKE:  And this is a portion of
9  Detective Saldate's testimony from his deposition on
10  June 22nd of 2017.  Do you see that?
11   A.   Yes, ma'am.
12   Q.   And he's asked about the Rodriguez case, which
13  is the case we were just discussing, on page 290,
14  starting at line 20.  So I would ask you to read that
15  through the end of this portion of transcript to
16  yourself, and then I'll ask you about it.
17   A.   (Witness complied.)
18        Okay.
19   Q.   Okay.  And then I'll actually have you review
20  one more exhibit, and this is Exhibit 234.  It's
21  additional testimony from Detective Saldate on the same
22  topic from November 15th, 2017.  So take a look at that.
23   A.   Okay.
24        MS. GREEN:  I have not received 234, I don't
25  think.

Page 369

1        MS. BERKE:  Didn't I just hand it to you?
2        MS. GREEN:  I think I was -- received 233.
3        MS. BERKE:  It's in front of you.
4        (Exhibit 234 was marked for identification.)
5        (Exhibit 235 was marked for identification.)
6        (Exhibit 236 was marked for identification.)
7   Q.   BY MS. BERKE:  All right.  So having reviewed,
8  have you -- or are you done reviewing it yet?  Sorry.
9   A.   I'm almost done.
10   Q.   Okay.  Sorry about that.
11   A.   Okay.
12   Q.   Having reviewed Exhibits 233 and 234, do you
13  now have an understanding as to Detective Saldate's
14  position as to how that discrepancy occurred?
15   A.   Yes.
16   Q.   And what is his explanation?
17   A.   That the court reporter made a mistake in his
18  testimony.
19   Q.   In transcribing his testimony?
20   A.   In transcribing his testimony.
21   Q.   Okay.  So take a look at Exhibit No. 235.  And
22  this is part of the departmental report for the homicide
23  we're discussing.  Okay?
24   A.   Okay.
25   Q.   And --

Page 370

1        MS. GREEN:  I've received two documents that
2  are part of the departmental report.  Could you please
3  identify the Bates numbers so --
4        MS. BERKE:  Sure.
5        MS. GREEN:  -- I can understand what you're
6  asking --
7        MS. BERKE:  So --
8        MS. GREEN:  -- the witness about.
9        MS. BERKE:  -- Exhibit 235 is
10  MILKE_NSB000847 -- I'm sorry, it's -- it's -- I think the
11  pages are reversed.  It doesn't really matter.  On
12  MILKE --
13        MS. GREEN:  The one that starts with 847?
14        MS. BERKE:  Amelia, can you just let me
15  correct it -- you're -- you're interrupting me
16  continually.  I would appreciate your not --
17        MS. GREEN:  I'm not interrupting.
18        MS. BERKE:  Okay.
19        MS. GREEN:  I'm just trying to clarify what
20  exhibit is --
21        MS. BERKE:  Okay.  But just --
22        MS. GREEN:  -- in front of me.
23        MS. BERKE:  -- please stop interrupting me.
24   Q.   BY MS. BERKE:  Commander Van Dorn, Exhibit No.
25  235 has two pages and it's MILKE_NSB000847 and 846.

EXHIBIT 15

Page 371

1 Correct?
2    A.   Yes.
3    Q.   And on 847, if you go down to where you see the
4 reference to Sergeant Lease.
5    A.   Okay.
6    Q.   It states, quote, Sergeant Lease then explained
7 that on 18th Street, south of Pecan, near the alley was a
8 field officer who had located an expended shotgun casing.
9 Correct?
10   A.   Yes.
11   Q.   And that would suggest one shot.  Correct?
12   A.   Yes.
13   Q.   And then if you look at MILKE_NSB000846, go to
14 the very bottom of the page, it states, quote, On 8/29/86
15 at approximately 2305 hours, Rosondo Rodriguez --
16        What does MM mean?
17   A.   Mexican male.
18   Q.   Oh.
19        -- Mexican male, 17 years old, shot
20 Michael M. Robles, Mexican male, 17 years old, once in
21 the back with a shotgun while in the area of 1753 East
22 Pecan.
23        Did I read that correctly?
24   A.   Yes.
25   Q.   And that would again indicate that there was

Page 372

1 only one shot.  Correct?
2    A.   Yes.
3    Q.   Now, the prosecutor would have been at this
4 grand jury proceeding asking Detective Saldate questions.
5 Correct?
6    A.   Yes.
7    Q.   And when Detective Saldate testified as to the
8 number of shots that had been fired, if Detective Saldate
9 had, in fact, said four, as the court reporter
10 transcribed, then the prosecutor should have directed
11 Detective Saldate to this information in the report and
12 asked him to correct his testimony.  Correct?
13        MS. GREEN:  Objection to form.
14        THE WITNESS:  I would agree.
15        MS. GREEN:  Foundation.
16        THE WITNESS:  Sorry.  I would agree.
17   Q.   BY MS. BERKE:  And police reports are generally
18 very voluminous.  Correct?
19   A.   In homicide investigations, yes.
20   Q.   And it's a lot for a detective to remember.
21 They're working on a number of different homicides.
22 Correct?
23   A.   Yes.
24   Q.   And you would expect the prosecutor to know --
25 to be very, very familiar with what's in the homicide

Page 373

1 report.  Correct?
2    A.   Yes.
3    Q.   And it's reasonable for a police detective to
4 expect the prosecutor to point the detective to a portion
5 of the report when -- to enable the detective to correct
6 his testimony if, in fact, he gives incorrect testimony
7 about a point?
8    A.   Yes.  They provide our reports to us on a
9 continuous basis to refresh our memory given the volume
10 of calls and cases that we take on.
11   Q.   The fact that the prosecutor did not -- I
12 mean -- strike that.
13        That would be a pretty significant
14 discrepancy, saying that the victim had been shot four
15 times when he was only shot once.  Correct?
16   A.   Yes.
17   Q.   And something that a prosecutor prosecuting the
18 homicide should certainly pick up if, in fact, Detective
19 Saldate testified that he was shot four times?
20   A.   I would agree.
21   Q.   And so would that suggest to you that perhaps
22 this was a court reporter error?
23   A.   Yes, that's a definite explanation.
24   Q.   And certainly there's no evidence of any
25 misconduct on the part of Detective Saldate in giving his

Page 374

1 testimony before the grand jury.  Correct?
2        MS. GREEN:  Objection to form.
3        THE WITNESS:  Based upon everything I read,
4 no, it does not appear to be any misconduct.
5    Q.   BY MS. BERKE:  And have you seen any evidence
6 that Detective Saldate intentionally provided false
7 testimony in the Rodriguez grand jury proceeding?
8    A.   No, I have not.
9    Q.   And if you had been provided just the
10 information I showed to you today and nothing else, would
11 you have recommended that PSB or internal affairs conduct
12 an investigation of Detective Saldate in connection with
13 this case?
14   A.   I mean, it would depend on -- as to how the
15 information came to us, first and foremost.  You know,
16 how was it brought to our attention as to whether or not
17 we would have done an investigation.  It would have been
18 just reviewing all of these different documents, just
19 like we just did, talking to Detective Saldate himself
20 and determining whether or not to proceed forward with an
21 investigation.
22   Q.   Okay.  So if there was no complaint brought
23 forward against Detective Saldate and his supervisor just
24 happened to be reviewing the documents that I've placed
25 before you today, there wouldn't be any reason for the


EXHIBIT 15

TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
375–378

Page 375

1  supervisor to initiate any kind of an investigation?
2      A.    Again, unless that supervisor had his grand
3  jury transcript, which probably he did not, no.
4      Q.    But even if he had the grand jury transcript
5  but he also had Detective Saldate's explanation that the
6  court reporter got it wrong and that the prosecutor
7  didn't correct him about it and there was no complaint by
8  the prosecutor, the Court, the defense attorney even that
9  Detective Saldate had intentionally provided false
10  testimony, would there be any reason for a supervisor to
11  initiate an investigation --
12          MS. GREEN:  Objection to form.
13      Q.    BY MS. BERKE:  -- in this instance?
14      A.    No, there wouldn't.
15      Q.    And what the Court did here -- strike that.
16          We know that the transcript stated that the
17  deceased had been shot four times.  Correct?
18      A.    Correct.
19      Q.    And we know that, in fact, he had only been
20  shot one time.  Correct?
21      A.    Correct.
22      Q.    And so the safest thing for the Court to do and
23  the appropriate thing for the Court to do to ensure that
24  the defendant received a fair trial was to remand to the
25  grand jury for a redetermination of probable cause.

Page 376

1  Correct?
2      A.    Correct.
3      Q.    And just the fact that a case is remanded for a
4  redetermination of probable cause doesn't mean that there
5  has been misconduct by a police officer or anyone else
6  involved in the case.  Correct?
7      A.    Correct.
8      Q.    Are you familiar with the case Harris versus
9  New York?
10      A.    Not off the top of my head.
11      Q.    I'm going to place it before you.
12      A.    Okay.
13      Q.    It's Exhibit No. 96.
14      A.    Okay.
15      Q.    Have you -- why don't we just take a moment for
16  you to --
17      A.    Review it?
18      Q.    -- briefly review it.
19      A.    Okay.  Okay.
20      Q.    Before I ask you about this case, I want to go
21  back to the Rodriguez case.
22      A.    Okay.
23      Q.    So if there was an allegation of misconduct,
24  one of the things that a supervisor would want to do
25  would be to review the entire transcript from the grand

Page 377

1  jury proceeding.  Correct?
2      A.    Correct.
3      Q.    And so if Detective Saldate had at other times
4  during his testimony referred to, quote, a shot, end
5  quote, that would be further evidence that the court
6  reporter had made an error when typing four shots.
7  Correct?
8      A.    I --
9          MS. GREEN:  Objection to form.
10          THE WITNESS:  Yes, I would agree.
11      Q.    BY MS. BERKE:  And that would be something that
12  would factor into the analysis as to whether Detective
13  Saldate's explanation was reasonable?
14      A.    Correct.
15      Q.    So let's look at Exhibit No. 96, Harris versus
16  New York.  In that case, what the United States Supreme
17  Court held is that even if a statement is taken in
18  violation of Miranda, as long as the statement was
19  voluntary, it can be used for impeachment purposes should
20  the defendant testify.  It cannot be used in the State's
21  case in chief, but it could be for impeachment purposes.
22  Correct?
23      A.    Correct.
24      Q.    And so would it be misconduct for a detective
25  to continue questioning after Miranda's invoked if that

Page 378

1  detective had been told by the County attorney, It's okay
2  to continue questioning as long as they don't later seek
3  to use it in their case in chief and only use it for
4  impeachment purposes?
5      A.    No, it would not --
6          MS. GREEN:  Objection to form.
7          THE WITNESS:  No, it would not be misconduct
8  under those circumstances.
9      Q.    BY MS. BERKE:  And you would -- or strike that.
10          Would it be reasonable for the detective to
11  act in accordance with what the County attorney has told
12  him is acceptable in that regard?
13      A.    Yes.
14      Q.    I'm going to show you Exhibit Nos. 61 and 62
15  that were discussed during your last deposition and this
16  is the Sherman case.  This is the case where the suspect
17  who was questioned by Detective Saldate was intoxicated.
18  He had crawled under a table, and he said that he didn't
19  understand his rights.  Do you recall that?
20      A.    Yes.
21      Q.    And so Exhibit No. 61 is the report that
22  Detective Saldate prepared.
23          Exhibit 62 is the turndown memo that the
24  County attorney assigned to the case, Deputy County
25  Attorney Lou Stalzer had written setting forth the



EXHIBIT 15

Page 379

1 reasons that he was not going forward with the case.  Do
2 you recall discussing that?
3     A.   Yes.
4     Q.   And the reason the deputy County attorney
5 decided not to proceed with the prosecution is that there
6 was no likelihood of conviction.  Correct?
7     A.   Correct.
8     Q.   And he listed eight reasons why there was no --
9 or why he was not proceeding with the prosecution.
10 Correct?
11    A.   Yes.
12    Q.   And I'm referring to the second page of Exhibit
13 No. 62.
14    A.   Uh-huh.
15    Q.   Are you there?
16    A.   Yes.
17    Q.   And in No. 1, he states that the defendant said
18 he did not understand his Miranda rights.  Correct?
19    A.   Correct.
20    Q.   And No. 2 states that the defendant was highly
21 intoxicated when he was interviewed.  Correct?
22    A.   Correct.
23    Q.   Now, had Detective Saldate stopped the
24 questioning when the suspect told him that he didn't
25 understand his rights, the prosecution would have been in

Page 380

1 no different position than it was with Detective Saldate
2 having continued questioning the suspect.  Correct?
3         MS. GREEN:  Objection.  Form.
4         THE WITNESS:  Correct.  You know, when it
5 comes to Miranda and, you know, voluntary or custodial
6 confessions, it just means that, you know, obviously if a
7 prosecutor felt that there was a Miranda violation, so
8 the confession is out, they could still proceed forward
9 with actual prosecution in the case if they feel they
10 have enough evidence to seek a conviction.
11    Q.   BY MS. BERKE:  Exactly.  So would you agree
12 that the fact that the prosecutor wouldn't be able to use
13 anything that the suspect told Detective Saldate that was
14 recorded in his report didn't cause the State to be
15 unable to move forward with the prosecution?
16        MS. GREEN:  Objection to form.
17        THE WITNESS:  Correct.  It would not stop
18 them if they felt they could still get a --
19    Q.   BY MS. BERKE:  Right.
20    A.   -- conviction based upon additional evidence
21 aside from the -- the confession or the statements that
22 were made in violation of Miranda.
23    Q.   Right.  So, in other words, if Detective
24 Saldate had stopped speaking with the suspect immediately
25 upon his saying he didn't understand his rights, the

Page 381

1 outcome would have been the same based on this memo.
2 Correct?  The prosecution would not have moved forward?
3     A.   Correct.
4     Q.   Because the prosecutor felt that there wasn't
5 sufficient evidence to go forward with the prosecution
6 irrespective of what the suspect told or didn't tell
7 Detective Saldate?
8         MS. GREEN:  Objection.  Form.
9         THE WITNESS:  Correct.  The prosecutor here
10 cites additional factors aside from the Miranda issue as
11 to why he did not take the case forward for prosecution.
12    Q.   BY MS. BERKE:  Okay.  Would you agree that the
13 contours of Miranda are not always black and white?
14    A.   They're definitely not black and white.
15    Q.   And there's a huge amount of case law out there
16 interpreting and clarifying Miranda.  Correct?
17    A.   Correct.
18    Q.   And reasonable legal minds can differ as to
19 whether the right to remain silent or the right to
20 counsel has been invoked?
21    A.   Correct.
22    Q.   And so would you agree that the important thing
23 for a detective to do when conducting an interrogation is
24 truthfully and accurately reciting his observations and
25 what was stated during the interrogation so that the

Page 382

1 lawyers, the defense attorney and the prosecutor and the
2 Court can then sort through all of that and decide
3 whether a statement comes in or is excluded or whether a
4 statement was voluntary?
5     A.   Correct.
6     Q.   And during your deposition that took place over
7 the course of two different days in November of 2017 and
8 April of 2018, were you presented with any evidence that
9 Detective Saldate did not truthfully and accurately
10 recite what was stated by a suspect or what he observed?
11    A.   All of his reports that I reviewed were pretty
12 thorough as to what occurred in the interview rooms.
13    Q.   And you didn't see evidence that anything he
14 stated in those reports was false?
15    A.   Correct.  I wasn't provided with anything to --
16 to indicate otherwise.
17        THE WITNESS:  Are we at a point where we
18 could pause for the rest room?
19        MS. BERKE:  Absolutely.
20        THE WITNESS:  Thank you.
21        THE VIDEOGRAPHER:  We're off the record at
22 3:05.
23        (A recess was held off the record.)
24        THE VIDEOGRAPHER:  We're back on the record
25 at 3:09.



EXHIBIT 15

TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
383—386

Page 383

1    Q.   BY MS. BERKE:  Commander Van Dorn, you were
2  asked by Ms. Retts about Exhibit 30 and specifically
3  operations order C-5 earlier.  And she read to you the
4  portion regarding the ALEOC manner.  And it states that,
5  quote, Officers should refer to their ALEOC manual,
6  chapter 16, statements, for information regarding the
7  legal and practical aspects of interviewing and
8  interrogating.  Correct?
9    A.   Correct.
10    Q.   And so if you could take a look at Exhibit No.
11  11 -- or 111.  I'll grab it for you.
12    A.   Okay.
13    Q.   If you go to the page that's Bates-numbered
14  C_027521, I'll ask you some questions about that.
15    A.   Okay.
16    Q.   Do you see that this is the portion of the
17  ALEOC manual dealing with statements which officers are
18  required to refer to when interviewing suspects?
19    A.   Yes.
20    Q.   And if you look at section B on the page I just
21  referenced, it's entitled "Condition of the Suspect."
22  Correct?
23    A.   Correct.
24    Q.   And the first paragraph states, quote,
25  Generally, the Courts are reluctant to rule that a

Page 384

1  statement is involuntary based solely on the condition of
2  the suspect, end quote.
3        Did I read that correctly?
4    A.   Yes.
5    Q.   And then if you turn to the next -- or I'm
6  sorry.  Yeah, if you turn to the next page, No. 2, it
7  deals with intoxication or withdrawal.  Do you see that?
8    A.   Yes.
9    Q.   And it states, quote, The Courts in Arizona
10  have never ruled a statement involuntary based solely
11  upon intoxication or withdrawal, end quote.
12        Did I read that correctly?
13    A.   Yes.
14    Q.   And then it even cites to some appellate
15  decisions.  Correct?
16    A.   Yes.
17    Q.   And if you turn to the next page, it's talking
18  about the State v. Magbee -- or I'm sorry -- State v.
19  Clark case.  Do you see that?
20    A.   Yes.
21    Q.   And I'm looking next to example and it's
22  talking about Clark.  Do you see that?
23    A.   Yes.
24    Q.   It states, quote, Clark, who had been drinking
25  all day, killed his wife.  He was later stopped for DWI.

Page 385

1  Upon seeing blood on Clark's shirt, the officer asked
2  where it came from.  The defendant responded that his
3  wife had her teeth pulled and had been crying on his
4  shoulder.  A breathalyzer test showed a reading of .38.
5  The Court, in ruling the statement voluntary, said
6  certainly any man who can manufacture the above excuse
7  has the control over his mental facilities to understand
8  what he is saying, end quote.
9        And that's taken from the State v. Clark
10  case.  Correct?
11    A.   Yes.
12    Q.   And so a detective who would refer to this and
13  see that he's dealing with what he believes to be an
14  intoxicated suspect, the fact of that intoxication would
15  not necessitate stopping the interrogation.  Correct?
16      MS. GREEN:  Objection to form.
17      THE WITNESS:  Correct.  Intox- -- voluntary
18  intoxication by individuals does not render any and all
19  statements made to us involuntary as a matter of law.
20    Q.   BY MS. BERKE:  And if you go back to Exhibit
21  No. 61 -- well, but intoxication may be some -- one of
22  many factors you look at.  Correct?
23    A.   Correct.
24    Q.   And so it's appropriate, then, to probe the
25  suspect to find out what he had been drinking, how much

Page 386

1  and to -- to do the most reliable thing, a detective
2  would administer a breathalyzer so that we know precisely
3  what the suspect's blood-alcohol level was.  Correct?
4    A.   For interrogation purposes, we can ask.  We
5  can't force anybody on the breathalyzer stuff.  But,
6  yeah, we're going to sit there and determine, again,
7  it's -- it's our job to prove that any statements made
8  were knowingly, intelligently and voluntarily given.
9        So when it comes to intoxicated individuals
10  you're going to probe, how intoxicated is that individual
11  to ensure that they understand what it is that's going
12  on.
13    Q.   And an extra thorough detective would request
14  consent to do a breathalyzer test so that the detective
15  can uncover that information so that down the road, both
16  the defense attorney for the suspect, if he's charged,
17  and the prosecutor can take that information and make
18  whatever arguments they want to make to the Court
19  regarding voluntariness.  Correct?
20    A.   Correct.
21    Q.   And so if you look at Exhibit No. 61, which is
22  Detective Saldate's report concerning his interview or
23  interrogation of Rolland Sherman, you'll see in the very
24  last paragraph, Detective Saldate states that Mr. Sherman
25  was taken to another location where a breathalyzer was



TOM VAN DORN  Volume III                                    August 28, 2018
Milke vs City of Phoenix                                              387—390

Page 387
1  administered, and it indicated that Mr. Sherman had a .41
2  alcohol content.  Correct?
3     A.  Correct.
4     Q.  And that's very close to the alcohol content of
5  Mr. Clark.  Correct?
6     A.  Correct.
7     Q.  And so an alcohol -- a blood alcohol -- or
8  strike that.
9        There would be nothing in the law that would
10  have guided Detective Saldate or suggested to Detective
11  Saldate that there was anything improper about his
12  continuing an interrogation of this man due to his
13  intoxication.  Correct?
14     A.  No.  Again, Detective Saldate -- I mean, an
15  intoxicated individual, he just has to show that
16  regardless of this individual's intoxication level is
17  what is being told to him still, you know, knowingly,
18  intelligently and --
19     Q.  Right.
20     A.  -- voluntarily being made.
21     Q.  Right.  And so --
22     A.  If Detective Saldate didn't feel that a .41 BAC
23  was prohibiting him from being able to still render
24  voluntary statements, then he could still proceed with
25  his interrogation or his interview.

Page 388
1     Q.  Right.  But Detective Saldate didn't know until
2  the conclusion of his interview that the blood-alcohol
3  level was .41.
4     A.  Okay.
5     Q.  But would you agree that it -- he was doing a
6  service for the suspect to have a blood alcohol test
7  administered so that if it was at such a level that this
8  subject would have a viable defense that he was so
9  intoxicated he couldn't have understood, he'd have that?
10     A.  Yes.
11     Q.  Okay.  Can I just get that one back, 111?
12     A.  The manual?
13     Q.  Yeah.
14        You were asked some questions at your prior
15  deposition about the Runningeagle case.  Do you recall
16  that?
17     A.  Recall the name, yes.  Just a few more facts
18  helps jog my memory.
19     Q.  Okay.
20     A.  A lot of different homicide cases.
21     Q.  Okay.  I'm going to show you Exhibit No. 64.
22     A.  Okay.
23     Q.  You were asked questions about testimony that
24  Detective Saldate gave at the voluntariness hearing.  And
25  it was regarding when Mr. Runningeagle stated that he

Page 389
1  wanted to remain silent as compared to when he made the
2  statement, "Just let me fall."  Do you remember that
3  testimony?  And if you don't, I can show it to you.
4     A.  Yeah, I'm going to have to have you show it to
5  me.
6        MS. BERKE:  Let's go off the record for a
7  second.
8        THE VIDEOGRAPHER:  We're off the record at
9  3:19.
10        (A recess was held off the record.)
11        THE VIDEOGRAPHER:  We're back on the record
12  at 3:21.
13     Q.  BY MS. BERKE:  Just to refresh your
14  recollection about your deposition testimony concerning
15  the Runningeagle case, I'm going to have you read pages
16  173 through 179 of your April 26th, 2018, deposition.
17  Okay?
18     A.  Okay.
19     Q.  173 through 179.  Take your time.
20     A.  Okay.
21     Q.  All right.  So in that line of questioning
22  regarding Runningeagle, Mr. Brustin showed you a portion
23  of Detective Saldate's report from his interview of Sean
24  Runningeagle.  Correct?
25     A.  Yes.

Page 390
1     Q.  And he showed you page 15 from Exhibit 64.
2  Correct?
3     A.  Yes.
4     Q.  And he directed you to the last sentence of the
5  first paragraph on that page that states, "I again told
6  him that I would try to understand, but he replied that
7  he wanted to remain silent," end quote.  Correct?
8     A.  Yes.
9     Q.  And then he directed you down below three
10  paragraphs down where it says, quote, Finally, Sean
11  commented in a louder voice and said, quote, just let me
12  fall, it must be my destiny, I must fall.  Correct?
13     A.  Yes.
14     Q.  And he asked you about that portion of the
15  report in connection with testimony that Detective
16  Saldate gave at the voluntariness hearing where Detective
17  Saldate testified that he did not make any statements --
18  that Mr. Runningeagle did not make any statements to him
19  after the time he had asked to remain silent.  Do you
20  recall that?
21     A.  Yes.
22     Q.  And Mr. Brustin asked you the question,
23  quote -- and this is page 178 of your April 26th
24  deposition, line 10, "You would agree that if, in fact,
25  Saldate wrote his report chronologically, came to a



TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
391—394

Page 391

1 voluntariness hearing about that report and then
2 testified that the statement was made -- the statement
3 just let me fall was made before he invoked his right to
4 remain silent, after viewing that report two times on the
5 stand, that would be powerful evidence that his statement
6 was knowing.  Correct?"
7         And you responded that that was something
8 you would consider.  Right?
9    A.  Yes.
10    Q.   And then at page 180 of your deposition, he --
11 he asked you quote, And given those facts, it would be
12 hard to think of an innocent or even negligent
13 explanation if those facts are true, end quote.  Correct?
14 That's what he asked you?
15    A.  Yes.
16    Q.   And your response was, "Well, assuming those
17 are the facts, then yeah, sure."  Correct?
18    A.  Correct.
19    Q.   Now, Mr. Brustin didn't show you the following
20 page of Detective Saldate's report on his interview of
21 Mr. Runningeagle, which is on RUN_16, did he?
22    A.  Not that I recall.
23    Q.   That's Exhibit 64.  If you turn to RUN_016,
24 you'll see that that's the last part of Detective
25 Saldate's report of his interview of Mr. Runningeagle.

Page 392

1 Correct?
2    A.  Okay.  Yes.
3    Q.   And if you look at the middle paragraph that
4 starts "At approximately," you see it says, quote, At
5 approximately 1625 hours, Sean told me that he wanted an
6 attorney and a psychiatrist and wanted to remain silent.
7 I continued to explain to him my position, but finally at
8 1632 hours, he again asked for his attorney, and I then
9 terminated the interview.
10        Did I read that correctly?
11    A.  Yes.
12    Q.   And so there was discussion during
13 Mr. Brustin's questioning of you where you agreed with
14 Mr. Brustin that in reviewing Detective Saldate's
15 testimony, it was clear he was referencing his report in
16 answering the questions.  Correct?
17    A.  Yes.
18    Q.   Would you agree that if the por- -- the portion
19 of the report that Detective Saldate was referencing when
20 responding to that question was this last page of his
21 report, his testimony that the statement "Just let me
22 fall" was made before Mr. Runningeagle stated to him that
23 he wanted to remain silent and that he did not make any
24 other statements after he made that statement?
25    A.  I guess I'm a bit confused by the question.

Page 393

1    Q.   Okay.  Sure.  I'll -- I'll reask it.
2    A.  Yeah.
3    Q.   So Mr. Brustin -- if you turn to RUN_015.
4    A.  Okay.
5    Q.   Mr. Brustin --
6    A.  Right.
7    Q.   -- was referring -- Mr. Brustin was referring
8 you to the sentence where he told Detective Saldate that
9 he wanted to remain silent.  And the statement "Just let
10 me fall" was made after that.  Correct?
11    A.  Correct.
12    Q.   And so the point Mr. Brustin was trying to make
13 with you was that when Detective Saldate testified that
14 Mr. Runningeagle told him he wanted to remain silent,
15 that occurred after the "Just let me fall" statement that
16 Detective Saldate was intentionally misstating what had
17 occurred.  You recall that line of questioning?
18    A.  Yes.
19    Q.   Now, if the portion of the report that
20 Detective Saldate was referencing when answering those
21 questions at the voluntariness hearing was the second
22 page of his report, which is RUN_16, where he also notes
23 that Mr. Runningeagle told him he wanted to remain
24 silent, if that was what he was referring to, then his
25 testimony that the statement "Just let me fall" was made

Page 394

1 prior to saying I want to remain silent would have been
2 accurate.
3    A.  Yes.
4    Q.   Correct?
5         And Detective Saldate's testimony -- if you
6 go to RUN_51, which is Detective Saldate's testimony from
7 the voluntariness hearing at line 20, he's asked the
8 question, "Did he make any statements to you after the
9 time that he had asked to remain silent?
10        "Answer:  If I may, can I refresh my memory
11 with my report?"
12    Mr. Ahler says, "Yes, if it would assist
13 you."  Detective Saldate obviously references his report
14 and says, "No, he did not."  So he's saying he did not
15 make any statements after he asked to remain silent.
16        And if the portion of the report that
17 Detective Saldate was referring to was that paragraph on
18 RUN_016 where he noted that Mr. Runningeagle said, I want
19 to remain silent, Detective Saldate's testimony would
20 have been accurate.  Correct?
21        MS. GREEN:  Objection to form.
22        THE WITNESS:  Correct.
23    Q.  BY MS. RETTS:  And so when presented with the
24 complete report that Detective Saldate prepared, you now
25 have evidence that Detective Saldate's testimony that the



TOM VAN DORN  Volume III                                   August 28, 2018
Milke vs City of Phoenix                                         395–398

Page 395

1  "Just let me fall" statement was made before
2  Mr. Runningeagle invoked his right to remain silent --
3  strike that.  Let me start that question over.
4        So you now have been presented with evidence
5  when you have the complete report that Detective
6  Saldate's statement that the -- at the voluntariness
7  hearing that the "Just let me fall" statement was made
8  before Mr. Runningeagle invoked his right to remain
9  silent could have been mistaken and not an intentional
10  misrepresentation.  Correct?
11        MS. GREEN:  Objection to form.
12  Q.  BY MS. BERKE:  In a --
13  A.  I'm trying to review --
14  Q.  Okay.
15  A.  -- the report as to when his Miran- -- at what
16  time --
17  Q.  Right.
18  A.  -- his Miranda rights --
19  Q.  So --
20  A.  -- were advised as to when Mr. Runningeagle
21  made his --
22  Q.  But let me clarify.
23        So in the report that Detective Saldate
24  prepared, he notes on two separate occasions
25  Mr. Runningeagle telling him that he wanted to remain

Page 396

1  silent.  Correct?
2  A.  Yes.
3  Q.  And it's possible, isn't it, that when
4  Detective Saldate was referring to his report in
5  answering questions, he simply forgot or didn't know
6  about that first notation of it and was referring to the
7  notation on RUN_16, where he records that
8  Mr. Runningeagle stated he wanted to remain silent?
9  A.  Yes, that's possible.
10  Q.  So would you agree that there is a plausible
11  basis for concluding that Detective Saldate was mistaken
12  and not making an intentional misrepresentation when he
13  testified that the "Just let me fall" statement was made
14  before Mr. Runningeagle said that he wanted to remain
15  silent?
16        MS. GREEN:  Objection to form.
17        THE WITNESS:  Yes, that's possible.
18  Q.  BY MS. BERKE:  And, in fact, take a look at
19  RUN_032.
20  A.  Okay.
21  Q.  You'll see that there are three attorneys
22  participating in this voluntariness hearing.  Correct?
23  A.  Correct.
24  Q.  You have Paul Ahler, the Deputy County
25  Attorney.  That's the prosecutor.  Correct?

Page 397

1  A.  Yes.
2  Q.  You have Baltazar Iniguez who is the --
3  Mr. Runningeagle's attorney?
4  A.  Yes.
5  Q.  And you have Roland Steinle who's defendant --
6  codefendant Tilden's attorney.  Correct?
7  A.  Yes.
8  Q.  So you have three attorneys at this hearing who
9  all have Detective Saldate's report that he's being
10  questioned about.  Correct?
11        MS. GREEN:  Objection to form.  Foundation.
12        THE WITNESS:  Yes.
13  Q.  BY MS. BERKE:  And none of them raise the issue
14  of Detective Saldate being incorrect about when this --
15  the let me -- please -- or "Just let me fall" statement
16  was made in comparison to Mr. Runningeagle saying that he
17  wanted to remain silent.  I'll represent that -- to you
18  that that's the case.
19  A.  Not that I recall in that transcript --
20  Q.  Right.
21  A.  -- no.
22  Q.  Okay.  And wouldn't that be even further
23  evidence that all of them, Detective Saldate, the
24  prosecutor and the two defense attorneys, were all
25  similarly mistaken on that issue because they're all

Page 398

1  referencing the page of Detective Saldate's report that
2  is RUN_016?
3        MS. GREEN:  Objection to form.
4        THE WITNESS:  Correct.
5  Q.  BY MS. BERKE:  In other words, if none of the
6  attorneys pointed out to Detective Saldate that, in fact,
7  Mr. Runningeagle made the let me fall statement after he
8  had stated that he wanted to remain silent, that would
9  suggest that they were all looking at RUN_016 when
10  Detective Saldate was being asked that question.
11  Correct?
12        MS. GREEN:  Objection to form.  Foundation.
13        THE WITNESS:  Correct.
14  Q.  BY MS. BERKE:  Otherwise one of them would have
15  gotten up and said, Detective Saldate, I want to refer
16  you to the page of your report that reflects that he had
17  made that statement that he wanted to remain silent prior
18  to the "Just let me fall."  Correct?
19  A.  Yes.
20  Q.  So Exhibit No. 64 is just a portion -- well,
21  strike that.
22        You would agree that a detective can be
23  confused by a question that's asked of him in a court
24  proceeding.  Correct?
25  A.  Yes.



TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
399—402

Page 399

1    Q.   And have every intention of giving accurate
2  testimony but be mistaken and given incorrect testimony.
3  Correct?
4    A.   Yes.
5    Q.   And if that happens, you would expect the
6  prosecutor and/or the defense attorney to bring that to
7  the detective's attention?
8    A.   Correct.
9    Q.   And the fact that a detective gives inaccurate
10  testimony is not in and of itself evidence that there's
11  intentional misrepresentation.  Correct?
12    A.   Correct.
13    Q.   You were also asked questions at your
14  deposition about the fact that when Detective Saldate was
15  interviewing Mr. Runningeagle, he poked him in the chest.
16  Do you remember that questioning?
17    A.   Yes.
18    Q.   Mr. Brustin asked you, quote -- at page -- or
19  sorry, at page 183 of your deposition that took place on
20  April 26th, 2018 --
21         Do you have 183?
22    A.   I do.
23    Q.   Okay.  Line 8.  "You would expect that any --
24  if it came to the attention of any supervisor that a
25  homicide detective, during the course of an

Page 400

1  interrogation, sat within six to 12 inches of a suspect
2  that they were interrogating and while interrogating them
3  repeatedly poked them in the chest with their finger,
4  that would have to be investigated and if true
5  disciplined.  Correct?"
6         And you stated, "Sitting with -- within six
7  to 12 inches, not so much.  The repeated poking of an
8  individual, yes."  And then he says, "During an
9  interrogation?"  And you respond, "Actually, there's no
10  circumstances other than self-defense when it would be
11  appropriate for a police officer to poke a" -- I'm sorry.
12  That was a question.
13         Mr. Brustin then said, "Actually, there's no
14  circumstances other than self-defense when it would be
15  appropriate for a police officer to poke a suspect in the
16  chest.  Right?"
17         And your answer was, "Absent self-defense or
18  the defense of others, I do not see a reason."
19         And that was your testimony.  Correct?
20    A.   Yes.
21    Q.   Now, you didn't have the benefit when you gave
22  that answer of having Detective Saldate's explanation as
23  to why he poked Mr. Runningeagle in the chest, did you?
24    A.   Correct.
25    Q.   Mr. Brustin didn't provide that to you, did he?

Page 401

1    A.   Not that I recall, no.
2    Q.   Okay.  Well, I'm going to provide that to you.
3  So take a look at page RUN_056.  And this is Detective
4  Saldate's testimony at the voluntariness hearing.
5    A.   Okay.
6    Q.   And start at line 5 and go to line 3 on the
7  next page.  And you can just read it to yourself.
8    A.   Okay.
9    Q.   And so what you learned from this testimony of
10  doc- -- of Detective Saldate is that the reason he poked
11  Mr. Runningeagle in the chest was to get his attention
12  because his attention had been drawn to something else.
13  Do you see that?
14    A.   Yes.
15    Q.   And then I'm going to have you look at
16  Detective Larry Martinsen's testimony.  I'll represent to
17  you that Detective Martinsen sat in on the interview with
18  Runningeagle --
19    A.   Okay.
20    Q.   -- and he was also asked about that.  So if you
21  go to RUN_072.
22    A.   Okay.
23    Q.   Do you see where it says direct examination?
24    A.   Yes.
25    Q.   And it says I'm Larry Martinsen?

Page 402

1    A.   Yes.
2    Q.   And go to the next page, RUN_073 and then read
3  from -- to yourself from line 14 through line 18 on the
4  next page.
5    A.   Okay.
6    Q.   And you would agree that Detective Martinsen
7  described it as not being any use of force, it was more
8  or less a touching, an attention-getting maneuver.
9  Correct?
10    A.   Correct.
11    Q.   Now, most importantly, I want you to review the
12  Court's ruling on the voluntariness issue and
13  specifically the portion of the Court's ruling addressing
14  the poking in the chest.  And that is found at RUN_103.
15  And I'd like you to read to yourself line 4 on RUN_103
16  through line 17 on 104.
17    A.   Okay.
18    Q.   You would agree that the Court determined --
19  well, the Court found his statements to be voluntary.
20  Correct?
21    A.   Yes.
22    Q.   And the Court found that there didn't seem to
23  be any indication that the touching was anything beyond a
24  means of getting Mr. Runningeagle's attention, and the
25  Court even noted that given his ability during the



EXHIBIT 15

TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
403–406

Page 403

1  questioning at the voluntariness hearing, it seemed that
2  Mr. Runningeagle does have a tendency to divert and get
3  on to tangential manners, and so the Court was basically
4  saying she had observed the same thing that Detective
5  Saldate had experienced.  Correct?
6     A.   Correct.
7     Q.   That led him to poke Mr. Runningeagle in the
8  chest.  Correct?
9     A.   Correct.
10    Q.   Now, based on the testimony and Court ruling
11 that you were allowed to read today, do you have an
12 opinion as to whether it was inappropriate in any way for
13 Detective Saldate to poke Mr. Runningeagle in the
14 chest --
15       MS. GREEN:  Objection to form.
16    Q.   BY MS. BERKE:  -- in the manner that he did?
17       MS. GREEN:  Foundation.
18       THE WITNESS:  No.  It appears that the Court
19 ruled that it was not force and that it was just used
20 as -- in an attention-getting manner.
21    Q.   BY MS. BERKE:  And so it was not misconduct?
22    A.   Correct.
23    Q.   And would it have been helpful at your
24 deposition on April 26th, 2018, when answering
25 Mr. Brustin's questions about whether there was anything

Page 404

1  improper about what Detective Saldate had done in terms
2  of poking Mr. Runningeagle in the chest, to have
3  Detective Saldate's explanation, Ms. -- Detective
4  Martinsen's observations and the Court's determination on
5  that issue?
6     A.   Yeah, when doing a --
7        MS. GREEN:  Objection to form.
8        THE WITNESS:  Go ahead, ma'am.
9        MS. GREEN:  Objection to form.  Thank you.
10       THE WITNESS:  You bet.
11       Yeah, it's important that we have all of the
12 facts when doing an administrative investigation if
13 we're, you know, making a determination whether or not
14 misconduct occurred.
15    Q.   BY MS. BERKE:  Right.  You need -- you need the
16 full universe of information which you were not provided
17 at your deposition.  Correct?
18    A.   Correct.
19    Q.   You were asked some questions about the King
20 case by Mr. Brustin at your deposition.
21    A.   That's my deposition.  Go back over there.
22    Q.   On April 26th of 2018.
23    A.   Okay.
24    Q.   I'm going to give you Detective Saldate's
25 report from his interrogation of Mr. King, which is

Page 405

1  Exhibit No. 68.
2     A.   Okay.
3     Q.   And you were asked questions about the second
4  page of his report.  In the bottom right-hand corner,
5  it's MILKE_NSB002327.  And you were directed by
6  Mr. Brustin to the sentence that reads, quote, Look, I
7  know the game, I know exactly what you're trying to do,
8  but I'm not going to answer any more of your questions,
9  end quote.
10       Did I read that correctly?
11    A.   I'm trying to find it here.
12    Q.   Oh, sure.
13    A.   Yes.
14    Q.   It's -- I'll show you.
15    A.   This one doesn't have the --
16    Q.   It's the -- oh, I'm -- I apologize for that.
17    A.   -- marked --
18    Q.   So if you go to the second page of his report,
19 the sen- -- the paragraph that starts out "I then
20 attempted."
21    A.   Okay.
22    Q.   And it's the next sentence.  Or just -- just
23 read from the beginning of the paragraph through the end
24 of the quote.
25    A.   Okay.

Page 406

1     Q.   He says, "I then attempted to focus in on where
2  Eric was the night of the murder, and he immediately told
3  me, quote, Look, I know the game, I know exactly what
4  you're trying to do, but I'm not going to answer any more
5  of your questions."
6        Do you recall being asked about that at your
7  deposition?
8     A.   Yes, I do remember being asked about the King
9  case.
10    Q.   And if you look at Exhibit No. 67, that is
11 Detective Saldate's testimony at the voluntariness
12 hearing.  And he was asked the question at
13 MILKE_NSB030886, at line 11, quote, Did he ever say he
14 didn't want to answer any questions?  And he responded,
15 "No."
16       Do you see that?
17    A.   Yes.
18    Q.   If you're asked the question did a suspect say
19 or tell you that they didn't want to answer any
20 questions, wouldn't the logical place to look for that be
21 the beginning of the report after you read the Miranda
22 rights?
23    A.   I'm sorry.  What was --
24    Q.   Wouldn't the logical place to look, if you're
25 asked the question did the defendant tell you he did not



EXHIBIT 15

TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
407–410

Page 407

1 want to answer any questions, be right after you read him
2 the Miranda rights?
3    A.   One place I would look, yes.
4    Q.   Right.  And so when Detective Saldate answered
5 no to that question, you would agree that it was -- it's
6 possible he was simply mistaken when he gave that answer.
7 Correct?
8         MS. GREEN:  Objection to form.
9         THE WITNESS:  Yes, he could have been
10 mistaken.
11    Q.   BY MS. BERKE:  And, in fact, if you go to -- on
12 Exhibit No. 67, further down in his testimony, when he's
13 being questioned by the prosecutor -- or I'm sorry -- by
14 the defense attorney, Ms. Wisdom, if you go to the bottom
15 of MILKE_NSB030893, she says, "Now, you told us on direct
16 examination that he never said he didn't want to answer
17 any more questions.  Is that right?"
18         And he says, "Correct."
19         And she actually asked it a little different
20 way, correct, because the question had been asked any
21 questions, not any more questions.  Correct?
22    A.   Right.
23    Q.   And then she states, "Now, in your report --
24 let me read from your report, quote, Look, I know the
25 game, I know exactly what you're trying to do, but I'm

Page 408

1 not going to answer any more of your questions.  Is that
2 what he said?"
3         And Detective Saldate responded, "Yes."
4         Correct?
5    A.   Correct.
6    Q.   And then he truthfully testified that he
7 continued to question Mr. King after that.  Correct?
8    A.   Correct.
9    Q.   And so what's supposed to happen when a
10 detective mistakenly gives incorrect information in his
11 testimony occurred here.  The defense attorney directed
12 him to his report and he corrected his testimony.
13 Correct?
14    A.   Correct.
15    Q.   And that's precisely how the system is supposed
16 to work, because we know detectives are not perfect.
17 Correct?
18    A.   Correct.
19    Q.   And if Detective Saldate had been asked by a
20 supervisor why it is he responded no to the question did
21 he ever say he didn't want to answer any questions, if he
22 told his supervisor he was simply mistaken, that would
23 not be misconduct.  Correct?
24         MS. GREEN:  Objection to form.
25         THE WITNESS:  It's hard to answer that

Page 409

1 question because, I mean, we have -- again, as you know,
2 we have different forms -- I mean, misconduct that's
3 going to warrant a suspension versus misconduct that's
4 going to warrant a counseling or a coaching.  So it could
5 one of those that, Yes, Detective, you made a mistake,
6 but I'm still going to put -- place it in your notes as
7 an official -- you know, whatever you want to call it.
8    Q.   BY MS. BERKE:  Right.
9    A.   We have various finding levels.  I'm sorry.
10    Q.   And the coaching would be, You need to make
11 sure you carefully review your reports --
12    A.   Correct.
13    Q.   -- and are very familiar with the contents so
14 that you don't make mistakes in your testimony.  Correct?
15    A.   That would be correct.
16    Q.   But the -- the determination wouldn't be based
17 on everything you've been provided that he intentionally
18 made a false statement under oath?
19         MS. GREEN:  Objection to form.
20         THE WITNESS:  That's correct.
21         Sorry.
22    Q.   BY MS. BERKE:  And -- now, this testimony as
23 you'll see on the front of Exhibit No. 67 was given on
24 June 22nd of 1990.
25    A.   Correct.

Page 410

1    Q.   And Detective Saldate retired on July 1 of
2 1990.  So by the time any supervisor would have learned
3 of any mistakes in his testimony, it would have been
4 postretirement.  Correct?
5    A.   Correct.
6    Q.   And I think you testified in your last
7 deposition that investigations are not conducted for
8 postretirement incidents.  Correct?
9    A.   Correct.  I --
10    Q.   There'd be no reason --
11    A.   I had no authority over that individual once
12 they retire or leave the department.
13    Q.   You would agree that back in 1989 and 1990,
14 there was no operations order, policy, no written
15 documentation within the City of Phoenix that required --
16 required audio-recording of interviews of suspects.
17 Correct?
18         MS. GREEN:  Objection to form.
19         THE WITNESS:  Not that I recall or had been
20 made aware of, no.
21    Q.   BY MS. BERKE:  And, similarly, there were no
22 written policies, operations orders or any other
23 documentation requiring detectives to ask a suspect who
24 confesses to a crime to write out a confession.  Correct?
25    A.   Not that I recall.



TOM VAN DORN  Volume III                                      August 28, 2018
Milke vs City of Phoenix                                       411–414

Page 411

1    Q.   And you would agree that in 1989, most suspect
2    interviews were not being audio-recorded.  Correct?
3    A.   That is my understanding.  Correct.
4    Q.   And you would agree that back in 1989 and 1990,
5    detectives had not been trained to use audio-recordings
6    in suspect interviews.  Correct?
7         MS. GREEN:  Objection to form.  Foundation.
8         THE WITNESS:  That is my understanding.
9    Correct.
10   Q.   BY MS. BERKE:  And you would agree that back in
11   1989 and 1990, there was no policy or operations order or
12   any other written document requiring detectives to have a
13   witness in an interrogation room or -- or location of an
14   interrogation to be a witness to what transpired during
15   the interrogation?
16        MS. GREEN:  Objection to form.  Foundation.
17        THE WITNESS:  That's correct.  It's my
18   understanding there was not one.
19   Q.   BY MS. BERKE:  You were asked some questions
20   about an investigation involving a man named -- with the
21   last name Gallegos.  Do you recall that line of
22   questioning?
23   A.   I recall the last name.
24   Q.   It's Michael Gallegos.  And he was charged with
25   the murder of a young girl.  And an individual named

Page 412

1    Smallwood was also suspected of being involved but
2    ultimately was not charged.  Do you remember discussing
3    that?
4    A.   Yes.
5    Q.   And you recall that Mr. Gallegos, during his
6    interrogation by Detective Saldate, confessed to the
7    murder.  Correct?
8    A.   Correct.
9    Q.   And Mr. Smallwood did not confess and -- and
10   denied involvement in it?
11   A.   Correct.
12   Q.   And Mr. Gallegos implicated Mr. Smallwood in
13   the murder and Detective Chambers and Detective Saldate
14   put the two men in the same room to have a conversation
15   to see if Mr. Smallwood, after speaking with
16   Mr. Gallegos, would admit to his involvement in the
17   crime.  Correct?
18        MS. GREEN:  Objection to form.
19        THE WITNESS:  Correct.
20   Q.   BY MS. BERKE:  And you were asked questions
21   about the fact that Detective Saldate never documented
22   the interaction between Mr. Smallwood and Mr. Gallegos.
23   You recall that testimony?
24   A.   Yes.
25   Q.   So, um, Detective Saldate is the detective who

Page 413

1    interviewed Mr. Gallegos, and he prepared a report
2    regarding that interrogation?
3    A.   Yes.
4    Q.   Detective Chambers conducted most of the
5    interrogation of Mr. Smallwood and prepared the
6    supplement regarding that interrogation.  You recall
7    that?
8    A.   Yes.
9    Q.   And you'll recall that for about 20 minutes,
10   Detective Saldate questioned Mr. Smallwood, and Detective
11   Saldate communicated to Detective Chambers what
12   Mr. Smallwood had said and -- and Detective Chambers
13   included that information in his report.  Correct?
14   A.   Yes.
15   Q.   And your testimony was that it's appropriate
16   for only one of two officers who are present for an
17   interview to prepare a report regarding that interview.
18   Correct?
19        MS. GREEN:  Objection to form.
20        THE WITNESS:  Yes.  As long as the
21   interaction is being documented --
22   Q.   BY MS. BERKE:  Right.
23   A.   -- it's sufficient.
24   Q.   So as long as the second -- so as long as the
25   second detective involved has additional information and

Page 414

1    communicates that and it gets put in the report of the
2    other detective, that's acceptable?
3    A.   Yes.
4    Q.   If both detectives are present for the duration
5    of the interview, then there's no information for the
6    second detective to provide, the first one can simply
7    draft the report?
8    A.   Correct.
9    Q.   Now, because the purpose of putting
10   Mr. Gallegos and Mr. Smallwood in a room together after
11   Mr. Gallegos -- Gallegos had already confessed, and the
12   purpose was to see if Mr. Smallwood admit -- would admit
13   to his involvement, it is Detective Chambers who should
14   have documented that interaction in his report.  Correct?
15        MS. GREEN:  Objection to form.
16        THE WITNESS:  One of the two should have
17   documented it.  I mean, it could have been either/or.
18   Q.   BY MS. BERKE:  But it would have been more
19   material to the interrogation of Mr. Smallwood since
20   Mr. Gallegos had already confessed to the crime.
21   Correct?
22   A.   Well, if Detective Chambers was interviewing
23   Mr. Smallwood and he put him in the room, then, yeah, he
24   would logically be the one that would document it in his
25   report.



EXHIBIT 15

TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
415–418

Page 415

1    Q.   Okay.
2         MS. BERKE:  Can we take a short break?
3         THE VIDEOGRAPHER:  We're off the record at
4    4:03.
5         (A recess was held off the record.)
6         THE VIDEOGRAPHER:  We're back on the record
7    at 4:13.
8         MS. BERKE:  All right.  I'm just going to
9    wrap up my questioning.  You had asked for 30 minutes.
10   So in an effort to get Commander Van Dorn out of here
11   reasonably close to when we said we would be finished and
12   we have Mr. Richardson coming back at 4:30, I'll just end
13   my questioning and you can have 30 minutes.  You agreed
14   to 30 minutes.  Right?
15        MS. GREEN:  Sure.
16        MS. BERKE:  Okay.
17        MS. GREEN:  Thanks, Lori.
18
19             EXAMINATION
20   BY MS. GREEN:
21   Q.   Hi, Commander Van Dorn.  How are you doing?
22   A.   Good.  How are you?
23   Q.   Good.
24        First, I want to just quickly go over
25   anything that you've reviewed relevant to this case since

Page 416

1    your April 2018 deposition.
2    A.   Okay.
3    Q.   Have you reviewed any additional documents
4    between now and today to prepare for this deposition
5    today?
6    A.   I just briefly re-reviewed my deposition from
7    that day, and that's pretty much it.
8    Q.   Okay.  No other policies or procedures?
9    A.   No.
10   Q.   Did you meet with any additional former or
11   current PPD employees to prepare yourself to testify here
12   today?
13   A.   No.
14   Q.   Okay.  So, essentially, the knowledge you had
15   at your April 2018 deposition regarding policy and the
16   procedure of the PPD is the same knowledge you have
17   sitting here today?
18   A.   Yeah, I think I had, you know, back in April,
19   some additional knowledge because I had met with PPD in
20   place prior to that.
21   Q.   Okay.
22   A.   But since the April one, no, I have not met
23   with anybody else.
24   Q.   Okay.  So, in fact, regarding PPD policy and
25   procedure and internal affairs investigations, your

Page 417

1    testimony in April may have even been even more accurate
2    because it was fresh in your head exactly what Kiyler and
3    Humphrey told you, for example?
4    A.   Correct.
5         MS. RETTS:  Form.
6    Q.   BY MS. GREEN:  Okay.  And have you had any
7    meetings with Ms. Retts since your April 2018 deposition?
8    A.   No.  Just staff with her office to schedule
9    this deposition.
10   Q.   Okay.  Have you met with any lawyers at all to
11   prepare for this deposition today?
12   A.   No.
13   Q.   Okay.  And I meant since the time of your April
14   deposition.
15   A.   No.
16   Q.   Okay.  Now, you understood that you were
17   produced as a 30(b)(6) witness to talk about a particular
18   time period for the purposes of this deposition, which
19   has now extended over the course of three days.  Correct?
20   A.   Yes.
21   Q.   And that time period was the 1980s and -- in
22   the 1980s and early 1990s?
23   A.   Yes, ma'am.
24   Q.   And in your initial dep- -- depositions, you've
25   said a number of times you weren't actually in the PPD

Page 418

1    until 1995.  That's when you joined the police academy.
2    Correct?
3    A.   Correct.
4    Q.   And so to the extent today Ms. Retts asked you
5    a number of questions about internal affairs
6    investigations --
7         Do you recall that questioning?
8    A.   Yes.
9    Q.   But she didn't clarify the time period she was
10   speaking about.  Correct?
11   A.   Correct.
12   Q.   So when you were answering those questions, you
13   were answering based on your knowledge of internal
14   affairs investigations today.  Correct?
15        MS. RETTS:  Form.
16        THE WITNESS:  Based upon my knowledge of
17   internal investigations since I've been employed by the
18   department and based upon my conversations I had with
19   Commander Kiyler and Jim Humphrey in preparation for the
20   April deposition.
21   Q.   BY MS. GREEN:  Okay.  And we went through
22   your -- with your -- with your -- withdrawn.
23        In your last deposition, we actually went
24   through, in excruciating detail, all your conversations
25   with Kiyler and Humphrey.



TOM VAN DORN  Volume III                                    August 28, 2018
Milke vs City of Phoenix                                    419–422

Page 419

1    A.   Yes, we did.
2    Q.   So if we're not -- you told us everything you
3    recalled about those conversations.  Correct?
4    A.   Correct.
5    Q.   So if that didn't come up in your past
6    deposition, anything that you were saying today is based
7    on your present-day knowledge of what happened with
8    respect to investigations?
9         MS. RETTS:  Form.
10        THE WITNESS:  Based upon collectively those
11   conversations plus my almost 24 years.
12   Q.   BY MS. GREEN:  So, for example, you talked
13   about the County attorney being contacted in
14   investigations.  You did not mention that in your last
15   deposition, about being something Humphrey or Kiyler told
16   you.  So that was based on your current-day knowledge.
17   Correct?
18        MS. RETTS:  Form.
19        THE WITNESS:  Correct.
20   Q.   BY MS. GREEN:  Okay.  And give another -- a
21   number of other details, to the extent it's detail
22   additional to what you represented Kiyler or Humphrey
23   told you in your last deposition, it would be based on
24   your current, present-day knowledge.  Correct?
25        MS. RETTS:  Form.

Page 420

1         MS. BERKE:  Objection.  Vague.
2         THE WITNESS:  It depends.  What are you
3    referring to?
4    Q.   BY MS. GREEN:  When -- have you ever sat in on
5    an internal affairs investigation?
6    A.   I was the investigative lieutenant for internal
7    affairs.
8    Q.   Okay.  And when was that?
9    A.   Oh, I've got to go back to my resume.  Hold on.
10   Let me -- let me --
11   Q.   Just --
12   A.   -- flash back.
13   Q.   Just the general time frame is fine.
14   A.   Would have been in the past five to six years.
15   Q.   Okay.  And before the 2000s, you never sat in
16   on an internal affairs investigation?
17   A.   No.
18        MS. RETTS:  Form.
19   Q.   BY MS. GREEN:  Okay.
20   A.   Not as an investigator, no.
21   Q.   Okay.  You sat on other internal -- you sat in
22   on internal affairs investigations before the 2000s?
23   A.   No.
24   Q.   Okay.  You qualified not as an investigator, so
25   I just wanted to make sure.

Page 421

1    A.   Yeah.
2    Q.   Now, you told us in your past deposition that
3    to determine if something actually requires discipline or
4    is misconduct, it requires an -- an investigation.
5    Correct?
6    A.   It requires that an allegation be brought
7    forward to determine if you're going to do an
8    investigation.
9    Q.   Right.  But to the extent something is -- to
10   the extent a supervisor sees something that needs that --
11   and they determine it needs to be investigated, you can
12   only determine whether or not -- misconduct has -- like
13   the purpose of the investigation is to determine whether
14   or not any misconduct has occurred.  Correct?
15        MS. RETTS:  Form.
16        THE WITNESS:  We do administrative
17   investigations based upon the seriousness of the
18   allegation.  Not every allegation always requires a
19   full-blown investigation.  It just depends on the nature
20   of the allegation.
21   Q.   BY MS. GREEN:  And if something does require an
22   investigation, the purpose of the investigation is to
23   determine whether there's been a policy violation or some
24   sort of misconduct.  Correct?
25        MS. RETTS:  Form.

Page 422

1         THE WITNESS:  Whether or not there's a
2    policy violation, yes.  That's the only thing that you
3    can hold people accountable for administratively.
4    Q.   BY MS. GREEN:  Okay.  And under the police
5    department, as far as you know, policy vio- -- any
6    violations of policy, police officers are supposed to be
7    held accountable for those violations?
8         MS. BERKE:  Objection.  Vague.
9         THE WITNESS:  We're held accountable to the
10   policies and procedures of the department, yes.
11   Q.   BY MS. GREEN:  Okay.  And so if you violate a
12   policy that requires some investigation if that -- if
13   that misconduct is sustained discipline.  Correct?
14        MS. BERKE:  Objection.  Vague.
15        MS. RETTS:  Form.  Foundation.
16        THE WITNESS:  Not always.  There's a caveat
17   now.  Now I can't -- again, going back to the time period
18   as -- that's 30(b)(6), there is a caveat now.  It's
19   within a supervisor's prerogative.  Myself, as an
20   example, as a commander, that if I feel that even though
21   policy may say something, that if deviation from policy
22   is in the best interest of the community and the City of
23   Phoenix, I'm allowed to deviate from that policy.
24   Q.   BY MS. GREEN:  Okay.  Are you aware of any
25   caveat in the time period that you were called to testify

TOM VAN DORN  Volume III                                    August 28, 2018
Milke vs City of Phoenix                                         423–426

Page 423

1 here today, as you sit here today?
2    A.   I haven't been provided the entire operations
3 manual that was in effect back in that day.  Just things
4 that were specific to this litigation.
5    Q.   So -- all right.  I'm just asking if -- are you
6 aware of anything --
7    A.   Not off the top of my head.
8         COURT REPORTER:  One at a time.
9    Q.   BY MS. GREEN:  Um, are you aware of anything in
10 particular based on what you've reviewed, as you sit here
11 today?
12   A.   No.
13   Q.   Okay.  Now, I would like to show you some
14 deposition testimony from April -- withdrawn.
15        I would like to show you some deposition
16 testimony that you gave in November 2017.
17   A.   Okay.
18   Q.   So I'm handing your -- your transcript from
19 November of 2017.  And I think I actually already have it
20 turned to -- actually, I'm sorry.  Let me turn it for
21 you.
22   A.   Okay.
23   Q.   I'm going to turn to page 214 -- or 213.
24   A.   Okay.
25   Q.   If you would read from the bottom of page 213,

Page 424

1 lines 24 and 25, through to 215, line 24.  And let me
2 know when you're done.
3    A.   Okay.
4         MS. BERKE:  Page again?
5         THE WITNESS:  Page 213.
6         MS. GREEN:  213, lines --
7         THE WITNESS:  Line 24.
8         MS. GREEN:  24 to 25 to the bottom of page
9 215.
10        MS. BERKE:  In April?
11        MS. GREEN:  This is November 17th, 2017.
12        MS. BERKE:  Okay.
13        THE WITNESS:  Okay.
14   Q.   BY MS. GREEN:  So you would agree that I asked
15 you, "And based on your experience in the Phoenix Police
16 Department, has it been your experience and understanding
17 that it's always been a strict policy of the PPD that if
18 a suspect invokes their Miranda rights, the interrogation
19 must cease?"
20        And you answered, "Correct"?
21   A.   Yes.
22        MS. BERKE:  Form.
23   Q.   BY MS. GREEN:  And that's still your
24 understanding today, correct, of the policy?
25   A.   Not correct.  I mean, going back -- and if you

Page 425

1 want me to clear this portion of my deposition, yes.
2         If somebody invokes their right to silence
3 or their right to a lawyer, I should stop questioning.
4 However, again, in the case that defen- -- defendant's
5 counsel brought up and those types of things, too, is in
6 consultation, that's why you see that in there, if you
7 want to continue questioning, contact legal advisor.
8         And in cooperation with the County attorney
9 if you choose to continue questioning, then it's for
10 impeachment purposes only and can't be used as part of
11 the State's prosecution in chief.
12   Q.   BY MS. GREEN:  Okay.  So just so I make sure I
13 understand it, you're supposed to cease questioning --
14   A.   Correct.
15   Q.   -- but if you --
16   A.   And if you want to continue questioning, then
17 reach out to the legal sources --
18   Q.   Right.
19   A.   -- to ensure, okay, why is it you want to
20 continue questioning.
21   Q.   Right.  So you may only continue questioning if
22 you confer with a legal resource?
23   A.   If you're aware --
24        MS. BERKE:  Form.
25        THE WITNESS:  I'm aware that that is the

Page 426

1 law.
2    Q.   BY MS. GREEN:  Right.
3    A.   So I'm going to probably, yeah, discuss that
4 with the County attorney's office before I would go
5 forward.
6    Q.   Right.  And that was your understanding of the
7 policy, and, in fact, it was written in the policy
8 that -- that you were provided, Exhibit 30?
9         MS. RETTS:  Form.
10        THE WITNESS:  Yes.
11   Q.   BY MS. GREEN:  And are you aware of any
12 training that contradicts that policy, as you sit here
13 today?
14        MS. RETTS:  Form.
15        THE WITNESS:  Not a -- training by way --
16 that tells me to -- to stop?
17   Q.   BY MS. GREEN:  No.  Training that tells you --
18 withdrawn.
19        Are you aware of any training from the time
20 period that we're talking about today that tells police
21 officers and detectives that you can contradict this
22 policy and continue questioning after an invocation of
23 rights without contacting a legal advisor?
24        MS. RETTS:  Form.
25        THE WITNESS:  There could be.  I'm just not

TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
427–430

Page 427

1  aware.

2  Q.   BY MS. GREEN:  Okay.  And you would agree that

3  it's very important for police department training to be

4  consistent with, um, the policies.  Correct?

5        MS. RETTS:  Form.

6  Q.   BY MS. GREEN:  Of the police department?

7  A.   Well, yeah.  Training and policies kind of go

8  hand in hand, yes.

9  Q.   Okay.  Now, I'd like to --

10       MS. GREEN:  Can you bring out 111?

11  Q.   BY MS. GREEN:  I'd like to show you -- oh,

12  withdrawn.

13       Now, if a -- if an officer -- if a person

14  invokes their Miranda rights and the officer does not

15  write that down in the report or ensure it's documented

16  in some way, that would be a policy violation.  Correct?

17       MS. RETTS:  Form.  Foundation.

18       THE WITNESS:  It could be, yes.

19  Q.   BY MS. GREEN:  Okay.  And violating the Miranda

20  policy that we've just gone through is a separate policy

21  violation.  Correct?

22       MS. RETTS:  Form.

23       THE WITNESS:  What do you mean by a separate

24  policy violation?

25  Q.   BY MS. GREEN:  So it's a policy violation not

Page 428

1  to write down a Miranda invocation.  Correct?

2  A.   Do --

3        MS. BERKE:  Objection.  Misstates testimony.

4        THE WITNESS:  Yeah.  I mean, do you have a

5  specific policy you want me to review to see if it's a

6  violation of our policies?

7  Q.   BY MS. GREEN:  I'm just asking based on your

8  understanding.  Is it your understanding that you're

9  supposed to document Miranda invocations?

10  A.   Yes, we are supposed to --

11  Q.   Okay.

12  A.   -- document when we advise somebody of the

13  Miranda rights.

14  Q.   I'm sorry.  Miranda invocations?

15  A.   Yes.

16  Q.   Okay.  And so the documentation of a Miranda

17  invocation is a separate issue from whether there was a

18  Miranda violation.  Correct?

19       MS. RETTS:  Form.

20  Q.   BY MS. GREEN:  In other --

21  A.   I'm not --

22  Q.   Withdrawn.

23  A.   -- understanding.

24  Q.   Yeah.  So -- so we've established you're

25  supposed to document when someone invokes their Miranda

Page 429

1  rights?

2  A.   Correct.

3  Q.   Okay.  And if you don't do that, that could be

4  a policy violation.  Correct?

5        MS. RETTS:  Form.  Foundation.

6        THE WITNESS:  Potentially, yes.

7  Q.   BY MS. GREEN:  Okay.  So setting that aside, if

8  some -- aside -- setting a documentation aside --

9  A.   Okay.

10  Q.   -- if in the context of an interrogation, I

11  invoked my Miranda rights and you continue to question me

12  without seeking guidance from a legal advisor or

13  something, therefore, violating the Miranda policy, that

14  would be a separate policy violation.  Correct?

15       MS. RETTS:  Form.  Foundation.

16       THE WITNESS:  Again, possibly.  Like I told

17  you before, because I haven't reviewed the --

18  Q.   BY MS. GREEN:  Right.

19  A.   -- thousand some-odd pages, it could be within

20  a supervisor's prerogative back in that time period, you

21  know, to have decided that, you know, it was in the best

22  interest of the department after consulting with the

23  County attorney that it didn't need to be documented.

24  Q.   I'm talking about it -- I'm sorry.  I'm not

25  talking about documentation anymore.  We had set that

Page 430

1  aside.

2  A.   Right.

3  Q.   I'm talking about if someone invokes their

4  Miranda rights --

5  A.   And you're asking me about a policy violation.

6  Q.   -- and the detective continues to --

7  A.   Right.  But I didn't review the entire policy

8  manual for each one of those time periods, and it's over

9  a thousand pages.  So you want me -- I can't give you a

10  specific answer to that question because if you want me

11  to go through a thousand pages for each year, then we

12  could go through that.

13  Q.   I'm just talking about your understanding of

14  the policy you just agreed to your testimony that you

15  understood there was supposed to be -- there was a policy

16  in place that if someone continues questioning that

17  you're supposed -- I mean -- withdrawn.

18       If someone invokes their right to silence or

19  right to attorney, you're supposed to cease interrogation

20  or --

21  A.   And what I'm telling you is --

22  Q.   -- contact -- okay.

23  A.   -- there could be another portion of the policy

24  that allows a decision to be made that that does not have

25  to occur.



EXHIBIT 15

TOM VAN DORN  Volume III
Milke vs City of Phoenix

August 28, 2018
431–434

Page 431

1   Q.   Are you -- are --
2   A.   So my answer remains to you:  It's possible you
3   can be correct, but it's also possible that they didn't
4   have to.
5   Q.   Are -- are you aware of that, as you sit here
6   today?
7   A.   No, ma'am.
8   Q.   Okay.
9   A.   I told you it's possible because, again, our --
10  Q.   It's okay.
11  A.   -- policy manual --
12  Q.   I'm just asking --
13  A.   -- is over a thousand pages.
14  Q.   I'm just asking are you aware --
15  A.   Right.
16  Q.   -- of anything as you sit --
17  A.   And --
18  Q.   -- here today.
19  A.   -- I'm going to just stick with it's possible.
20  Q.   Are you aware of anything as you sit here
21  today?
22  A.   It's possible.
23       COURT REPORTER:  One at a time.
24       MS. GREEN:  I'm sorry.  Could you please
25  let --

Page 432

1       COURT REPORTER:  You're talking over each
2   another.
3       MS. GREEN:  -- let me complete my question.
4       MS. BERKE:  Well, you're interrupting him as
5   well.  I think you should both kind of pause.
6   Q.   BY MS. GREEN:  Are you aware, as you sit here
7   today, of any policies that give someone instructions
8   different than the policy that you previously reviewed
9   that says when someone invokes their right to silence or
10  their right to attorney, they're supposed to cease
11  questioning, and if they wish to continue, they should
12  contact a legal advisor?  I'm just asking are you --
13  A.   Okay.
14  Q.   -- are you aware of --
15  A.   If you want me to stay specific to that one
16  policy without reviewing a thousand other pages of policy
17  that existed at the time, holding that one single
18  section, then I will agree with you.
19  Q.   Okay.  So you're not aware of another policy --
20  you said you would agree with me, but the question was
21  are you aware, so I just want to make sure I'm clear.
22  A.   Okay.
23  Q.   You're not aware, as you sit here today, of
24  another policy?
25       MS. RETTS:  Form.  Foundation.

Page 433

1       THE WITNESS:  Okay.  I'm going to stick
2   with -- again, if you want me to just say that that is
3   the only portion of the policy and that there weren't
4   other policies that allowed for deviation, then I will
5   agree with you.
6   Q.   BY MS. GREEN:  And what would you agree with,
7   sir?
8   A.   The question you asked me.
9   Q.   Okay.
10  A.   That that would be a violation of policy --
11  Q.   Okay.
12  A.   -- for them to have continued without
13  consulting with a legal person.
14  Q.   Okay.  Thank you.
15       And, therefore, writing a Miranda viol- --
16  writing in your police report a Miranda violation does
17  not excuse violating the policy on Miranda.  Correct?
18       MS. RETTS:  Form.  Foundation.
19       MS. BERKE:  Vague.
20       THE WITNESS:  Incorrect.  If the law allowed
21  for it at the time, then there would still be no
22  misconduct, regardless if it was written in policy.
23  Q.   BY MS. GREEN:  I'm sorry.  It -- that wasn't a
24  clear question.  I wasn't talking about if it was written
25  in policy.  I was saying if a detective writes in their

Page 434

1   police report that they have, um, engaged in a Miranda
2   policy violation or facts setting forth that they've
3   engaged in -- in a Miranda policy violation, the fact of
4   writing the Miranda violation down does not excuse the
5   violation of the Miranda policy.
6       MS. RETTS:  Form.  Foundation.
7   Q.   BY MS. GREEN:  Correct?
8   A.   And I answered your question that there may be
9   no violation of the Miranda policy if it was lawful for
10  the detective to have done that at the time.
11  Q.   My question's just about writing something down
12  or --
13  A.   But then you're tying it back to whether or not
14  it's a violation of policy.
15  Q.   Right.  I'm just -- I'm asking you to assume
16  someone has written out a violation of policy and you can
17  assume a violation of the law as well, if you want, if
18  that makes you more comfortable.  So I'm asking you to
19  assume that someone has documented that in their police
20  report conduct such that it would be a violation of
21  law -- policy on Miranda and a violation of the law on
22  Miranda.  Okay?  Is that -- is that okay to assume?
23  A.   No, it's not.
24       MS. BERKE:  Objection.  Vague.
25       THE WITNESS:  It's a complicated question I



EXHIBIT 15

Page 435

1  don't even understand.
2      Q.   BY MS. GREEN:  I'm asking you to assume for the
3  purposes of this deposition that someone has -- a
4  detective has written in their police report conduct that
5  is a violation of the PPD's Miranda policy and a
6  violation of the law on Miranda.  Okay?
7      A.   Okay.
8      Q.   And --
9      A.   Assume that both are violation of policy and a
10  violation of the law --
11     Q.   Yes, sir.
12     A.   -- in your question?
13     Q.   Yes, sir.  The fact that they've written that
14  violation of policy and law in the report does not excuse
15  the PPD from investigating the Miranda violation and
16  violation of law.  Correct?
17          MS. RETTS:  Form and foundation.
18          MS. BERKE:  Objection.  Vague.
19          THE WITNESS:  If the officer violated both
20  policy and the officer violated the law, there would be
21  an investigation.
22     Q.   BY MS. GREEN:  Okay.  So the fact that they
23  wrote it down in their police report doesn't excuse that
24  type of conduct?
25          MS. RETTS:  Form.  Foundation.

Page 436

1          THE WITNESS:  Again, if the officer vi- --
2  you want me to assume that the officer has violated
3  policy and violated the law, then there would be an
4  investigation.
5      Q.   BY MS. GREEN:  Okay.  So it -- it does not
6  excuse that type of conduct?
7          MS. RETTS:  Form.  Foundation.
8      Q.   BY MS. GREEN:  The fact of writing it down, I'm
9  getting at the point of --
10     A.   If both are a violation of policy and unlawful
11  for the officer to do, then there is no excuse for that
12  conduct.
13     Q.   Okay.  All right.  Now, I'd like to show you
14  what has been previously marked as Exhibit 111.  It's the
15  ALEOC manual --
16     A.   Okay.
17     Q.   -- that you referred to earlier today.  Do you
18  remember being referred -- referred to this manual?
19     A.   Yes.
20     Q.   Okay.  Now -- and I believe you testified that
21  the policy you read incorporated the ALEOC manual?
22     A.   Correct.  There was an operations order -- I
23  believe it was C-5 -- that incorporated this as part
24  of --
25     Q.   Right.

Page 437

1      A.   -- the Miranda policy.
2      Q.   And so it's your understanding that the ALEOC
3  manual was -- withdrawn.
4          I think you testified before that Miranda is
5  complicated and there are a lot of cases and a lot of
6  laws on Miranda.  Correct?
7      A.   Yes.
8      Q.   And so certainly there was no expectation that
9  a detective know every single case on Miranda?
10     A.   No.  That's why they have this manual.
11     Q.   Right.  And it was supposed to provide them
12  with guidance on the law, but, ultimately, detectives
13  aren't lawyers or not supposed to be acting as lawyers in
14  the performance of their duties.  Correct?
15          MS. RETTS:  Form.
16          THE WITNESS:  Well, that's not true.  I'm a
17  lawyer and a cop, so I kind of act as both in the
18  performance of my duties.
19     Q.   BY MS. GREEN:  I'm talking about detectives.
20  Homicide detectives are not acting as lawyers in the
21  performance of their duties as homicide detectives?
22     A.   Well, we actually have other lawyers that are
23  actually detectives on the Phoenix Police Department, so
24  do you want to state specific to Detective Saldate and
25  whether or not he was a lawyer?

Page 438

1      Q.   I'm not asking whether or not a detective can
2  be a lawyer or vice versa.  I understand you're a lawyer.
3  I'm just saying when they're in performance of their --
4      A.   But you're asking whether or not I do both in
5  the performance of my duties, and I do.
6      Q.   I was asking about homicide detectives and
7  performing homicide detective duties --
8      A.   Right.
9      Q.   -- they are not --
10     A.   We have lawyers who are also homicide
11  detectives.
12     Q.   They're not charged with investigating a
13  homicide to -- investigation acting as a lawyer?
14     A.   Well, they're going to combine their knowledge
15  of both in the investigation, their knowledge of the law
16  as it pertains to search and seizure or custodial
17  interrogations as well as their experience in being a
18  police officer.
19     Q.   Okay.  So --
20     A.   So I --
21     Q.   -- it's your testimony that homicide det- --
22     A.   -- I -- I -- I can't tell you that they don't
23  because we have lawyers who are also cops in our
24  homicide --
25     Q.   I'm asking what they were, like, charged to do



EXHIBIT 15

TOM VAN DORN  Volume III                                    August 28, 2018
Milke vs City of Phoenix                                              439–442

Page 439

1   in performing their duties.
2          MS. RETTS:  Form and foundation.
3          THE WITNESS:  Well, and I told you as a
4   lawyer who's also a cop, I'm able to incorporate both
5   because I have a lot more legal knowledge that I can tie
6   in with being a police officer in the performance of my
7   duties.
8      Q.   BY MS. GREEN:  Okay.  And so this is supposed
9   to be -- this manual provides some information on the
10  law.  Correct?
11     A.   Correct.
12     Q.   And guidance to help give officers an
13  understanding of the law.  Correct?
14     A.   This specific section, yes.  Guidance in the
15  area of custodial interrogation.
16     Q.   Okay.  If you turn to C_027510.
17     A.   Okay.
18     Q.   Okay.  You see 6 at the top?  It says, "If the
19  defendant asserts his right to an attorney, he may not be
20  questioned on any matter until counsel's obtained."
21  Correct?
22     A.   Correct.
23     Q.   So this is guidance that detectives were
24  provided as it relates to the Miranda policy.  Correct?
25     A.   Correct.

Page 440

1      Q.   Now -- and, again, you would not expect this
2   manual to provide directly contradictory guidance to the
3   policy.  They're supposed to be read together.  Correct?
4          MS. RETTS:  Form.
5          THE WITNESS:  This is to provide knowledge
6   of the law with respect to custodial interrogation,
7   yeah --
8      Q.   BY MS. GREEN:  Okay.
9      A.   -- which is just used in conjunction with
10  policy.
11     Q.   Okay.  So you would expect a detective to
12  understand this but to follow the policy, correct, to the
13  extent it's clear?
14     A.   If a --
15         MS. RETTS:  Form.
16         THE WITNESS:  If a detective is confused
17  about whether or not they can proceed forward, you know,
18  this provides them with legal guidance on whether or not
19  they can.
20     Q.   BY MS. GREEN:  Okay.  If you turn to C_27521.
21     A.   Okay.
22     Q.   Okay.  If we could just read the note at the --
23  the middle of -- actually, why don't you read from the
24  bottom of C_275 -- or, actually, it just has at the
25  bottom of the prior page -- it has Miranda warnings at

Page 441

1   the bottom.
2      A.   Uh-huh.
3      Q.   I just want to direct you to that.
4      A.   Okay.
5      Q.   But we're talking about Miranda warnings and
6   just read up until you get to B.
7      A.   Okay.
8      Q.   You would agree that this provides some
9   information about the admissibility of statements in a
10  suspect interrogation in court.  Correct?
11         MS. RETTS:  Form.
12         THE WITNESS:  When a suspect chooses to take
13  the stand.
14     Q.   BY MS. GREEN:  Okay.
15     A.   That's what this refers to this case, yes.
16     Q.   Okay.  When a suspect chooses to take the stand
17  in court?
18     A.   Right.
19     Q.   This section does not instruct officers to
20  violate the PPD policy by continuing to interrogate
21  with -- once a Miranda invocation has been made without
22  contacting a legal advisor.  Correct?
23         MS. RETTS:  Form.
24         THE WITNESS:  This provides guidance on the
25  law with respect to what it is that the officer can do,

Page 442

1   and so I'm confused by your question as to --
2      Q.   BY MS. GREEN:  I'm just saying -- yeah,
3   you're -- I think -- I think we're on the same page.
4   You're saying this provide -- I'm saying this provides
5   that an -- helps officers understand what the law is --
6      A.   And I think what you're wanting me to do,
7   again, is to go back and assume, is what you want to do,
8   because it's how you seem to be.
9          So if you want me to assume that the
10  detective has violated that little consult with a legal
11  advisor, one little mini section and that there's no
12  other exceptions in a thousand pages and assume that
13  there's a violation of the law, then, yes, I would agree
14  with you.
15     Q.   Okay.  I'm -- I was just actually asking a
16  question about your interpretation of this document.
17     A.   Right.
18     Q.   Because you were produced to help us interpret
19  those document -- these documents.  And my question was,
20  do you -- is there -- this doc- -- withdrawn.
21         This section that you just read -- and I'm
22  just only interested in this section -- your reading of
23  it is not one such that it instructs officers to continue
24  interrogating someone after they've invoked their right
25  to silence or their right to an attorney.  That's not



EXHIBIT 15

TOM VAN DORN  Volume III                                        August 28, 2018
Milke vs City of Phoenix                                                   443–446

Page 443

1   what this section is doing.  Correct?
2      A.    This states the law that in the -- this limited
3   circumstances, I am allowed to do that.
4      Q.    Okay.  What are the limited circumstances
5   you're allowed under this -- in this section, what are
6   the limited circumstances that you're -- this says that
7   you're --
8      A.    It's --
9      Q.    -- allowed to continue asking questions
10  after --
11     A.    Okay.
12     Q.    -- an attorney?
13     A.    A statement which is voluntary but in violation
14  of Miranda can still be used against a defendant if a
15  defendant chooses -- decides to testify.  The reason is
16  that the statement taken in violation of Miranda is still
17  reliable or truthful.
18         So even if I have a policy that tells me to
19  not continue questioning, if I still obtained a statement
20  in violation of Miranda but it is still voluntary, all
21  right, there may still be no policy violation then
22  because the law still allows me as an officer to do that.
23     Q.    So your reading is this policy does instruct
24  officers to continue interrogating after invocation of
25  the right to silence or an invocation of a right to an

Page 444

1   attorney in contradiction of the policy?
2      A.    This is not the --
3         MS. RETTS:  Form.
4         THE WITNESS:  -- Phoenix Police Department's
5   policy.
6      Q.    BY MS. GREEN:  Okay.
7      A.    This is the training manual that provides
8   guidance on the law.
9      Q.    Okay.
10     A.    So this is instructing me on what the law is
11  specific to this type of an issue.
12     Q.    Okay.  So there's no instruction here that
13  changes the Phoenix Police Department policy, as you
14  understand it?
15     A.    No.  What this does is tell me what I can
16  lawfully do under those circumstances.
17     Q.    Okay.  And you're talking about what a
18  prosecutor can do when someone testifies in court or what
19  someone can do in an interrogation?  I'm actually
20  interested in what a detective, what this -- whether or
21  not this tells a detective that they can continue
22  interrogating after a Miranda invocation.  And if it
23  doesn't speak to it, that's okay.  I'm just trying --
24     A.    This is providing the detective guidance that
25  it is lawful, that even if a statement is obtained in

Page 445

1   violation of Miranda but is still voluntary and the
2   defendant chooses to testify at trial, it may still be
3   admissible for impeachment purposes.
4      Q.    But it doesn't tell the -- give -- provide the
5   detective with guidance that they should continue
6   interrogating after a Miranda violation?
7      A.    It does not --
8         MS. RETTS:  Form.
9         THE WITNESS:  -- state that here, but it
10  doesn't state that the detective has to stop either.
11     Q.    BY MS. GREEN:  Okay.  So it --
12     A.    Doesn't tell them that they can and it doesn't
13  tell them that they can't.
14     Q.    Okay.  And so if the policy -- so this doesn't
15  contradict the policy which says that -- which is
16  mandi- -- manditorially and says interrogation must cease
17  unless you consult with a legal advisor?
18     A.    And, again, if you want me to assume that one
19  section is what tells them and there's nothing else in a
20  thousand pages that allows for the deviation, then I will
21  agree with you.
22     Q.    Okay.  Thank you, sir.
23     A.    You bet.
24         MS. RETTS:  Are you finished?
25         THE VIDEOGRAPHER:  Is that it?

Page 446

1         MS. RETTS:  And the witness will read and
2   sign.
3         THE VIDEOGRAPHER:  This concludes the
4   deposition.  We're off the record at 4:45.
5            (Whereupon, the proceedings ended at
6   4:45 p.m.)

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 15

Page 447

CERTIFICATE OF REPORTER

STATE OF ARIZONA    )
                    )
COUNTY OF MARICOPA  )

     I, Sommer E. Greene, a Certified Reporter in the
State of Arizona, do hereby certify that the foregoing
deposition was taken before me in the County of Maricopa,
State of Arizona; that an oath or affirmation was duly
administered to the witness, TOM VAN DORN, pursuant to
A.R.S. 41-324(B); that the questions propounded to the
witness and the answers of the witness thereto were taken
down by me in shorthand and thereafter reduced to
typewriting; that the transcript is a full, true and
accurate record of the proceeding, all done to the best
of my skill and ability; and that the preparation,
production and distribution of the transcript and copies
of the transcript comply with the Arizona Revised
Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
     The witness herein, TOM VAN DORN, has
requested signature.
     I FURTHER CERTIFY that I am in no way related
to any of the parties nor am I in any way interested in
the outcome hereof.

     IN WITNESS WHEREOF, I have set my hand in my
office in the County of Maricopa, State of Arizona, this
11th of September, 2018.

                    _Sommer E. Greene_

                    --------------------------------
                    Sommer E. Greene, RPR, CRR
                    Certified Reporter 50622

     /S/

_____
For Esquire Deposition Solutions
Registered Reporting Firm No. R1048

Page 448

Milke v. City of Phoenix, et al.
ASSIGNMENT NUMBER 2608298

     DECLARATION UNDER PENALTY OF PERJURY

          I declare under penalty of perjury that I
have read the entire transcript of my deposition taken in
the above-captioned matter or the same has been read to
me, and the same is true and accurate, save and except
for changes and/or corrections, if any, as indicated by
me on the DEPOSITION ERRATA SHEET hereof, with the
understanding that I offer these changes as if still
under oath.

Signed on the_____day

of _____20__.

_____

TOM VAN DORN

Page 449

          DEPOSITION ERRATA SHEET
            ASSIGNMENT NUMBER 2608298

Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
TOM VAN DORN
Signature:_____

Page 450

          DEPOSITION ERRATA SHEET
            ASSIGNMENT NUMBER 2608298

Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
Page No.____Line No.____Change to:_____
_____
TOM VAN DORN
Signature:_____

