2

1                             Phoenix, Arizona
                             May 3, 1990

2                             3:13 p.m.

3

4          INTERVIEW OF ARMANDO SALDATE, JR.

5

6  BY MR. RAY:

7        Q.    Today's the 26th of June, 3:13 in the

8  afternoon, in the office of the Deputy County Attorney

9  Noel Levy.  Present is Armando Saldate?

10       A.    Armando Saldate, Jr.

11       Q.    You're not the only Saldate on the force, are

12  you?

13       A.    Yes, I am.

14       Q.    You are.  We had a case before together, the

15  Hermenez (phonetic) case or was it Jimenez (phonetic)?

16       A.    You're talking about Ed Sullivan and Jose

17  Hemanato (phonetic)?

18       Q.    No.  That little five-year-old, homicide

19  case?

20       A.    Five-year-old, homicide case.

21       Q.    Five-year-old girl was stabbed who --

22       A.    I worked a little bit on that.

23       Q.    Did you, okay.

24       A.    It wasn't my case, though.

25       Q.    Are you the case agent on this?

EXHIBIT 1
WIT: Saldate
DATE: 4-26-17
Sommer Greene, RPR, CRR

MILKE_NSB018092

5

1    supplemental.

2         Q.    Okay.  And it's in the recorded transcript --

3    the transcript of the recorded --

4         A.    That's correct.

5         Q.    All right.  The interviews with Styers and

6    with Scott both were recorded; is that right?

7         A.    Interviews, what interviews?

8         Q.    The interviews at the police station.

9         A.    That I did?

10        Q.    Yeah.

11        A.    Oh, no.

12        Q.    In these reports I'm given transcripts of

13   certain recorded conversations, and one of the recorded

14   conversations, at least with Scott, was when he had

15   admitted, or said that Debra was involved in this --

16        A.    That's correct.

17        Q.    -- conspiracy.  All right.  Were there any

18   other unrecorded interviews that you had with --

19        A.    Wait a minute now.

20        Q.    -- Scott?

21        A.    We've got a mistake here.

22        Q.    Okay.

23        A.    I never recorded any interviews.

24        Q.    Okay.  Were you present during --

25        A.    No.

MILKE_NSB018093

Exhibit 1A

7

1  urgency at all in getting down to Florence?

2       A.    Oh, of course there's urgency.  I mean we've

3  been working on it all day long.  Sure there's urgency,

4  you know.  We had the -- we had the equipment and we used

5  it.

6       Q.    Okay.  Did you call ahead before leaving to

7  have the sheriffs at Pinal County go out and pick her up?

8       A.    I sent Detective -- yeah, I sent Detective

9  Hammerick also out there.

10      Q.    Okay.  But you did call the Pinal County

11  Sheriffs and request that they go out to Richard Sadicks

12  house and pick up Debra Milke?

13      A.    I believe that's where it occurred, yeah.

14      Q.    Okay.  Did you tell them to place her under

15  arrest at that time?

16      A.    I think -- first of all, I'm not the one that

17  called.

18      Q.    Okay.

19      A.    I really don't know what transpired there.  A

20  supervisor called and had that done.

21      Q.    Okay.  When you got to Florence was she

22  already at Pinal County?

23      A.    Yes.

24      Q.    Where was she located within the building?

25      A.    In an office.  I think they use it for

MILKE_NSB018094

Exhibit 1A

8

1    medical treatment.  It's an office right there.

2         Q.    Okay.

3         A.    A large room.

4         Q.    It's in behind the locked doors?

5         A.    Large room.  Larger than Noel Levy's office,

6    I'm sure.

7         Q.    And is it back in behind the jail doors?

8         A.    Yes.

9         Q.    A long hallway that runs there and then as

10   you go in --

11        A.    Anybody that goes -- anybody that goes in to

12   talk to the Pinal County has to go beyond the jail doors.

13        Q.    Okay.

14        A.    And they have to go back there, yeah.

15        Q.    It wasn't in one of the outer offices towards

16   the -- towards the east side?

17        A.    It was towards the east -- I don't know.  I

18   don't remember now.  I remember we went behind the doors

19   and it was in the medical facility there, and she was

20   sitting there with her aunt and so --

21        Q.    Did you go through the main office doors on

22   the east side, or did you go around off to the north side?

23        A.    I don't really remember.

24        Q.    Okay.  Your report indicates that when you

25   got into the medical offices there was Debra and someone

Exhibit 1A

11

1        I walked in, introduced myself.  They said,

2  "Hi, how you doing?"  And I asked the aunt to step out.

3  She said, "Oh, yeah, fine."  Very nice, very cordial.  And

4  Debra seemed to be very nice and cordial at first, also.

5        Q.    Then what happened?

6        A.    And remained there -- and remained that way,

7  to be honest with you.

8        Q.    Okay.  Did she seem interested, like perhaps

9  you had some news to give her or something, like anxious

10  to hear what you would have to say?

11        A.    I don't know if she appeared that way, but

12  she just sat there and said, "Oh, hi."  And I entered and

13  I introduced myself.

14        And I'm sure that -- Detective Hammerick said

15  that he told her that I was en route and that I wanted to

16  talk to her, so I'm sure that she knew that I wanted to

17  talk to her.

18        Q.    Right.  But it was clear from the moment that

19  you entered in there that she had no idea that the boy had

20  been found?

21        A.    I don't know if I can make that statement,

22  because I don't know what was in her mind.

23        Q.    Okay.  How did she react when you told her

24  that the boy had been found?

25        Let me back up.  Did you -- when you told her

MILKE_NSB018096

Exhibit 1A

12

1   the boy had been found, did you couple your statement

2   together with "found dead," or did you just tell her that

3   the boy had been found?

4         A.    I think I told her that her son had been

5   found and that he was dead.  But if you don't mind, if I

6   could --

7         Q.    Please.

8         A.    That he had been found shot to death.

9         Q.    Okay.  So, she was just immediately given the

10  gorey details all in one spoonful, as it were?

11        A.    What?  What was that?  Immediately given the

12  gorey details --

13        Q.    That's right.

14        A.    -- that her son had been found shot to death?

15  No, I did not give her gorey --

16        Q.    Sum and substance.

17        A.    -- details.  I did not give her gorey

18  details.  I told her the facts.

19        Q.    The reason I was asking is because if you had

20  told her that her son had been found, I want -- and that

21  alone, I wanted you to tell me what her reaction was.

22  But --

23        A.    No.

24        Q.    You told her, found shot to death, and then

25  you describe that she immediately began to yell out,

MILKE_NSB018097

Exhibit 1A

13

1    "What?  What?"

2          A.    That's correct.

3          Q.    All right.  Describe her demeanor in saying

4    those words, "What?  What?"

5          A.    Excited.  She sounded somewhat excited.

6    She -- she remained seated.  I was seated next to her.

7    And she yelled, "What?  What?"  And sounded excited.  And

8    that was about it.

9          Q.    Did she have a look of surprise on her face?

10          A.    No.  I don't think she ever had a look of

11    surprise.  Excitement, anxious, later on somewhat

12    embarrassed, but never surprised.

13          Q.    Did she appear angry at any time?

14          A.    Not towards me.

15          Q.    Okay.

16          A.    She seemed concerned at times about herself

17    and one time about Jim.  And after we got beyond the first

18    portion of the interview she was calm.  She was kind of

19    relieved.  Very quiet, calm, told me everything in a quiet

20    voice, very calm voice.

21                But surprised, I'd never -- I wouldn't use

22    surprised.

23          Q.    Okay.  Your report says that she yelled out

24    the words, "What?  What?"  She then started to scream and

25    make noises as if she was crying, but no tears were

Exhibit 1A

14

1   visible.  What was she screaming?

2          A.     Noises.  You know, she was saying, "What?

3   What?"  And, you know, I was -- I don't know what.  I

4   couldn't make them out.  I don't know what they were.

5          Q.     How -- could you describe it for me as best

6   you can?

7          A.     Just noises, just, you know, I don't know if

8   they were just syllables of words that she was using.

9   I -- I don't know.  I can't --

10          Q.     Did she ever say, "Oh, my God," or anything?

11          A.     No.  No.  That would be in my supplement if I

12   could understand them.  No.  They were just noises.

13          Q.     Was she acting hysterical?

14          A.     No.

15          Q.     You indicate that you were not going to

16   tolerate her crying?

17          A.     That's correct.

18          Q.     All right.  Her making these noises and

19   screaming, you told her you were not going to tolerate

20   that; is that what you were saying?

21          A.     That's correct.

22          Q.     All right.  A person who has just been told

23   that her son has been found shot to death, you don't

24   characterize whatever she was -- her reaction as being

25   consistent with anything you have seen before?

MILKE_NSB018099

Exhibit 1A

15

1    A.    A person that had conspired to have her son

2 killed, and now has been found out, and now is being

3 interviewed, and now is making noises and saying, "What?

4 What?" And trying to cry and no tears are coming out,

5 there is no emotion from her.

6          There is only an action, or reactions, for me

7 to believe that she's trying somehow to pull some emotion

8 from herself and exhibit that emotion so I may feel for

9 her. No, I could not tolerate that, and that's what

10 happened.

11   Q.    Okay.  Then you advised her that she was

12 under arrest?

13   A.    Correct.

14   Q.    And you relate she became very excited.

15 Again, was she going through the same routine again, then,

16 as you just described?

17   A.    She was then excited because of what I just

18 told her about her being under arrest.

19   Q.    What you've got to understand, Detective, is

20 that we don't have a video of what is going on, so we

21 need -- I need to be able to visualize this as best I can

22 with whatever you will describe for me.

23   A.    And I'll try to.

24   Q.    I appreciate that.

25   A.    As long as you -- but anyway, excited by the

MILKE_NSB018100

Exhibit 1A

16

1   facts of what I told her that she was under arrest and

2   then we were concerned -- or she became concerned and

3   excited about, not the fact that her son had been found

4   shot, but, in fact, what I had said about her being under

5   arrest.  She was excited.  And, probably, that wasn't the

6   best word to use.

7              She was -- wanted to know what I meant by

8   being under arrest.  I told her she was under arrest, and

9   that's basically it.  She just showed a little bit -- she

10  went from trying to -- to fake some emotion, to all of a

11  sudden excitement to, "What do you -- what do you mean?

12  What -- what are you saying?  What?  What?  What?  What?

13  What?"  Those are the emotions she showed.

14       Q.    You went on to tell her that she had been

15  implicated in the murder by Jim and Roger?

16       A.    Yeah.

17       Q.    Okay.  Clearly Roger had made a statement?

18       A.    Right.

19       Q.    But had Jim made any statements to implicate

20  her in this?

21       A.    No.

22       Q.    In this at all?

23       A.    No.

24       Q.    All right.  Did you say that, Jim and Roger,

25  for a reason?

MILKE_NSB018101

Exhibit 1A

17

1          A.     No.

2          Q.     When you said that --

3          A.     I read that later on and I checked it with my

4    notes, and that's exactly what I said.  The only thing I

5    can say is that at that point my mind was set, you know, I

6    had already -- well, not -- I shouldn't say set, but I

7    knew that Jim and Roger were involved and may have said

8    that because those were the other two people that were

9    involved.

10         Q.     It was clear that Jim and Roger, obviously,

11   were involved.  I mean Roger's the one that took everybody

12   out there to where the body was found; isn't that right?

13         A.     Yes.

14         Q.     And what was it about Jim that led you to

15   believe that he definitely was involved, other than

16   Roger's statement, if you know of anything?

17         A.     No, right off the mat, I don't.

18         Q.     Okay.

19         A.     I haven't reviewed that part of the report.

20         Q.     All right.  Then you advised her of her

21   Miranda rights.  Was she still acting excited or --

22         A.     I had -- I had told her by that time to calm

23   down.

24         Q.     How much time did you give her to calm down

25   before you read her her rights?

MILKE_NSB018102

Exhibit 1A

18

1    A.    Couple of seconds.

2    Q.    Did she immediately calm down upon you're

3  telling --

4    A.    Sure did.

5    Q.    -- her to do so?

6    A.    Sure, definitely.

7    Q.    She didn't whimper, moan, sniffle?

8    A.    She -- in fact, it was the opposite.  It was

9  almost like shutting a faucet.  And it wasn't -- and I

10  don't mean that by her -- as if she was crying and tearing

11  or anything like that, but her emotions were -- were --

12  were -- were just, I mean they came out.  I shut the

13  faucet off, the emotions ended.  I read her her rights,

14  and then we went on from there.

15    Q.    As you told her to calm down and you weren't

16  going to tolerate this and so forth, was she looking

17  straight into your face, or was she looking away from you?

18    A.    Directly.

19    Q.    Okay.  Did her facial expressions change as

20  she was looking at you when you told her she was under

21  arrest for the death of her son?

22    A.    Like I said, she, before that, had been going

23  through these other emotions, or feigning these other

24  emotions, and then I told her that, and then she became

25  excited and more attentive to what I was saying about

MILKE_NSB018103

Exhibit 1A

19

1  being under arrest.

2         And then her facial expressions were, if

3  anything, were of I got her attention.  And before it was

4  the -- before, she was more concerned about her actions

5  and how she was going to portray or follow-up these

6  actions.

7         And as soon as I told her about being under

8  arrest she immediately became very aware of what -- of

9  what we were talking about, very excited, was very

10  attentive to what I said at that point as to what I told

11  you.

12         Q.    Were you aware at the time of this interview

13  (inaudible) how long she had been awake or up?

14         A.    No.

15         Q.    You were aware that, at least up to some

16  point in time, she had been at her apartment, in and out

17  of the presence of various investigating officers.  Were

18  you aware of that?

19         A.    I was aware that -- I was aware that this

20  investigation had taken a long period of time.

21         Q.    Roughly how long before the time the body was

22  found, if you know?

23         A.    Roughly, I don't know.  I don't know.  I

24  don't even know the time of the missing persons report,

25  other than me referring to it.

MILKE_NSB018104

Exhibit 1A

20

1     Q.    Okay.

2     A.    Because I didn't get involved in it.  I was

3 involved later.

4     Q.    Now, in responding to whether or not she

5 understood her Miranda rights you indicate that she moved

6 her head up and down.  Did she ever verbalize her

7 response?

8     A.    Yes.

9     Q.    And she said the word "yes"?

10    A.    If you go on to the next sentence it probably

11 does.

12    Q.    All right.  Then she starts going back

13 through some more emotions again.

14    A.    Uh-huh.

15    Q.    Is that before you say anything to her,

16 again, after reading the rights?

17    A.    Correct.

18    Q.    All right.  Now are these, or this is more

19 like the same type of emotions she initially exposed,

20 rather than the excited emotions?

21    A.    Same kind of emotions that she was faking the

22 first time, she started again.

23    Q.    And you, again, had to tell her that you were

24 not going to tolerate that?

25    A.    That's correct.

MILKE_NSB018105

Exhibit 1A

21

1      Q.    Were you being strong in your statement to

2   her that you're not going to tolerate this, like you were

3   talking to your child or something, that I'm not going to

4   tolerate that, shake your finger or anything?

5      A.    No, I don't do that.  I told her I would not

6   tolerate it.  I don't yell, I don't scream.  I'm very to

7   the point.  I look at the person.  I'm not going to

8   tolerate this, and that's exactly the way I told her.  I

9   didn't raise my voice.  It's just -- I think it's more

10   important what you say, than how you say it.

11      Q.    At any time during the course of this

12   interview did she suggest that she wanted to speak with an

13   attorney?

14      A.    No.

15      Q.    At any time did she suggest she wanted to

16   speak with anyone else, her father, someone else?

17      A.    No.

18      Q.    A priest?

19      A.    In fact, she did not want to talk -- she was

20   very emphatic about the fact that her parents or her

21   relatives would not like her, and it was -- I think it was

22   she liked when I listened to her.  She liked the way we

23   sat there and talked.  She was very comfortable with me.

24   She -- I think that she felt I was a friend.

25      Q.    Did you do anything to get her to feel

MILKE_NSB018106

Exhibit 1A

22

1   comfortable with you?  Did you tell her, "It's going to be

2   all right, Debra"?  It's going to be all right, or

3   anything like that, anything to --

4          A.     Did I --

5          Q.     -- to settle her down and make her believe

6   that you're on her side?

7          A.     No, I --  Debra knew from the very minute I

8   got there that she was under arrest.  Debra knew through

9   the interview that she was going to jail.  Debra knew, and

10  that's probably why she felt comfortable with me.

11             Debra knew from the very minute I got in

12  there that I was going to be honest with her.  I told her

13  that I only wanted the truth, that's all I was there for.

14  I was not going to listen to anything else but the truth.

15             I was very calm.  I don't never raise my

16  voice.  I sit in front of a person.  I'm there to listen

17  to them.  I'm there to listen to the truth.  I'm not there

18  to listen to a bunch of lies.  She knew that.  She felt

19  very comfortable with that.

20             She knew she was in trouble.  She knew that.

21  I never tried to minimize what she said.  In fact, she

22  asked me several times in the interview if I understood

23  her.  If I understood what she did.  And several times

24  I -- at least several times I told her I understand what

25  you're telling me.  I don't condone what you did.  But,

COPPERSTATE REPORTING SERVICE, INC.   MILKE_NSB018107

Exhibit 1A

23

1   yeah, I understand what you're telling me.

2          I didn't -- I didn't get angry with her.   I

3   never got angry with her.   And I think that was what she

4   felt comfortable with, because she had this feeling from

5   the very beginning that everyone was going to be angry

6   with her, her parents and her family were going to be

7   angry with her.   People in jail were going to be angry

8   with her, but that I was the only person, and, again, she

9   felt, understood her.

10         But I corrected her and told her, "No, I

11  don't understand what you did.   I understand what you're

12  telling me, but I don't understand what you did or why you

13  did it."   And that's why I think at that point during this

14  interview we got along.   She was very comfortable with me.

15      Q.      Did she specifically tell you that she and

16  Roger and Jim conspired to have this little boy killed, or

17  did you tell her that that's the information that you had

18  gathered thus far?

19      A.      Let me explain the interview.

20      Q.      Okay.

21      A.      I asked during the interview -- during my

22  interviews that I hold I ask very little questions.   And

23  most of the questions that I do ask are usually at the

24  beginning of the interview and usually at the end of the

25  interview.   Sometimes I -- there may be questions in the

MILKE_NSB018108

Exhibit 1A

24

1   middle, but only because I may be confused at one point

2   and may want to ask her to -- her or anyone else, to

3   clarify it.

4           The interview with Debra was of narrative

5   form.  I sat there and I listened to Debra.  I may -- may

6   have been one of the only people that would -- at that

7   point, may have been one of the only people that had

8   listened to Debra.  Not trying to condemn her, but I sat

9   there and I listened to her.  She would talk to me and

10  what -- she knew what she did.

11          She knew what she was telling me.  And as I

12  was hearing it she would try to -- try to make areas not

13  seem as important, but I would stop her and I'd tell

14  her -- like I told her from the beginning, I told her from

15  the beginning, I said, "When you -- when you're talking to

16  me, or when I'm listening to you, when we're having this

17  interview, I do not want you to minimize your

18  involvement."

19          She knew that.  I like to go on an interview

20  with someone with them knowing the rules.  These are the

21  rules.  It's my interview and these are the rules.  And

22  this is what we're going to do.  I'm not going to sit here

23  and listen to a bunch of lies.  If you're going to lie to

24  me, I'll just walk out or leave.  And lie to somebody

25  else.  I don't get angry, though.

MILKE_NSB018109

Exhibit 1A

25

BY MR. LEVY:

Q.      While we're in this transition, I don't know whether we picked you up Detective Saldate, because you moved in your chair and you said something, "I never tried to condemn her"?

A.      That's correct.

Q.      And never meaning (in audible) --

A.      I don't -- and just to emphasize that point, only because I have been doing this for awhile, and that may have been another reason why, even though I told her that I didn't understand what she did, but I understood what she was telling me, my tone of voice, my actions, were never ever -- would never have even come across to her as being -- trying to -- as if I was -- if I was angry with her, as if I was trying to condemn her if I didn't like what she did, because at that point I wasn't even thinking of what she did.

I was thinking of Debra.  She was the main person I was thinking of, and she was talking to me, and I was feeling for her.  Feeling for her because of what she thought the reasons were why she did it.  I felt bad for her, but in no way did I condone them, and in know way did she think I condoned them, and that's -- that may have been, as I said before, probably why me and Debra got along.

Exhibit 1A

26

1    I think she had probably never dealt with a

2    person who dealt with her as straightforward as I did, and

3    with such honesty as I did, because I told her right off

4    the bat, anything -- you can ask me anything and I will --

5    I will tell you the truth.

6    And when I tell a person that, I expect that

7    from that person.  When they tell me something I expect

8    them to tell me the truth.  And I think that's the kind of

9    involvement that's -- the interaction we were having,

10   interaction me and Debra were having.  We were sitting

11   close to each other.  Looking at each other constantly,

12   eye-to-eye.  Never ever -- I never took my eyes off her.

13   And she never took her eyes off me.

14   During the period -- during this latter part

15   of the interview, she was extremely attentive to me as I

16   was to her.  We sat there and she told me things that I'm

17   sure were very difficult, but that she told -- as she said

18   at the very last, she was -- she seemed to be getting her

19   self-esteem back.  She seemed to be feeling better,

20   because I think she honestly sat down and with another

21   human being told someone how she felt.  Told someone, and

22   admitted to someone that she had made a bad judgment call,

23   as she called it at one point.

24   Told someone that that even though she did

25   conspire to kill him, she had reasons for it.  Reasons

MILKE_NSB018111

Exhibit 1A

27

1   that may have not been good for me or you, but reasons

2   that were very good for her at that time, at that night,

3   and even more the day before, when she knew that Chris was

4   leaving to be killed.

5         And after the interview she felt comfortable.

6   I think she was relaxed.  She was comfortable.  She was --

7   she was comfortable with me, as I was with her.  We sat.

8   She asked to sit in the back.  She -- I told her she was

9   going to have to sit in the back seat of the police car

10  that the -- there's the screen there.  She says, "Could

11  you sit back here with me?"  I said, "Fine, sure.  I'll

12  sit back there with you."  And we talked about general

13  stuff on the way back in.

14        But I think when I went into that interview

15  Debra was very confused.  She was confused as to what she

16  had done.  She was confused about, and kind of

17  apprehensive about what I was going to ask her.  But after

18  the interview, she felt very relaxed.  She felt as though,

19  and you could see it, you could see it in her face.  She

20  felt like if somebody had just come and taken this big

21  load off her shoulders.

22        And not only did this person take this load

23  off her shoulders by arresting her, because that probably

24  could have happened, I could have gone down there,

25  arrested her, never ever talked to her, got angry with --

COPPERSTATE REPORTING SERVICE, INC.

**MILKE_NSB018112**

Exhibit 1A

28

1   at her, told her, you so and so, you killed your own kid

2   and, you know, been angry with her, as maybe some of the

3   public has been, and could have put her in jail, and she

4   probably, well, probably could have felt a little bit what

5   she felt that night at the end of my interview.  She could

6   have said, "Well, at least it's over with."

7          But at the end of my interview with her,

8   because I did take the time to talk to her, I did take the

9   time to listen to her, because if you were to break it

10  down in percentages, I talk ten percent of the time at the

11  beginning.  She talked 80 percent of the time in the

12  middle, and then I talked ten percent of the time at the

13  end.

14  BY MR. RAY:

15          Q.    During that 80 percent period of time did she

16  ever have any period of emotional breakdown?

17          A.    No.

18          Q.    She remained calm and straightforward

19  throughout that?

20          A.    She remained calm.  She had some concern, no

21  emotion at all.  After the initial stuff she remained

22  calm.  She was concerned.  She, I say, show of emotion.

23  She felt -- she felt sad.  She felt sad about her family.

24  She felt sad about Jim at one point.

25          But as that started, and as you can tell in

MILKE_NSB018113

Exhibit 1A

29

1    the interview, as that went from the beginning -- and this

2    interview has several areas, it went from at the

3    beginning, herself.   She was concerned about herself.

4              Q.    I notice that at the very third paragraph on

5    the second page went, basically, she's starting to tell

6    you about -- you want her to tell you about her

7    involvement in this case and not to minimize it, and so

8    forth.   So she starts back at high school.   What's

9    happening there?

10             A.    Because she wanted -- it's --

11             Q.    That's going back quite a ways, don't you

12   think?

13             A.    True.

14             Q.    Yeah.

15             A.    But as she indicates in her interview about

16   high school, that's when she liked herself.   And if you're

17   meeting someone, as she was meeting me, and I think she --

18   me and her liked each other, as she said, she realized

19   that this person in front of her was going to listen to

20   her.

21             And -- and this person she was going to have

22   to tell this person -- and I say, have to tell, not

23   because I was forcing her, but she felt compelled to tell

24   me what had happened.   She wanted -- and that's why -- and

25   I look at this interview and I think about the interview,

MILKE_NSB018114

Exhibit 1A

31

1  And then she had the child, something she didn't want to

2  have.  And then she, again, made some bad decisions, and

3  then the conspiracy.

4      Q.    What is the second set of bad decisions?

5  Does that have to do with Mark still?

6      A.    Well, her decision at first was she got

7  involved with Mark.  She became pregnant.  She made a

8  decision she wanted to abort the pregnancy.  She then

9  decided, no, that's going to hurt too much.  I'm not going

10  to abort the baby, knowing that she -- in no way, could

11  she deal with kids.  And then she decided to keep the

12  child, mother instinct, whatever.

13         And then she went from there to -- to

14  continuing to let the child go with Mark.  And her -- that

15  problem area.  And then she became involved with, or

16  came -- became possessed with the fact that not only did

17  Mark hurt her and did bad things to her, but now he's

18  doing these things to this kid.  Not physical or anything

19  else, but he -- the kid was becoming just like Mark.

20         So then she became possessed with the fact

21  that she can't have that, that she can't tolerate that.

22  So then she made that decision, or that bad judgment call,

23  as she once put it.  So she went from her caring for

24  herself, her caring for Mark, not caring for Mark, her

25  caring for the child, then caring too much for the child

MILKE_NSB018115

Exhibit 1A

32

1   to the point where she was telling me everything, and told

2   me everything that had happened, and she admitted

3   everything.

4           Then all of a sudden, after that was all out,

5   seemed like she had already told me everything about that,

6   that's not a problem anymore.  I mean it's a problem, but

7   it's a -- she feels good about telling someone.  She told

8   me.

9           Now she goes from that stage to, as she put

10  it before, she even said, "Now I'm feeling a little bit

11  better about myself.  I'm having -- seems like I'm getting

12  a little bit of my self-esteem back."  Before she made

13  that statement I could tell that she was feeling a lot

14  better for herself, because now she's not concerned about

15  Mark, she's not concerned about her problems she had with

16  Mark.  She's not concerned about high school.  She's not

17  concerned about what she did with Chris, but now what's

18  going to happen to her.

19          See, now she's looking forward.  She's

20  looking beyond this day.  Because before I got there she

21  was -- she was living minute by minute, because sooner or

22  later they're going to find out.  She don't know what's

23  happening.  She's in Florence.  She left Jim and Roger

24  down here hoping they would do what they had to do, not

25  knowing that Roger would turn around and admit it.

Exhibit 1A

33

1      So she is now concerned about the future.

2   But before then she was looking at the present and what

3   she had done.  Now she's okay.  I have already told him

4   what I done.  It's bad, but it isn't that bad no more

5   because he didn't get up.  He didn't start standing up and

6   yelling at me like my dad would have or maybe somebody

7   down the street.

8      She felt -- and I -- and she talked to me

9   several times and I tried to correct her and tell her I

10  did not understand, but she felt I understood.  I

11  understood what she -- why she did it.

12     So now she's caring about herself.  She's

13  caring about what's going to happen to her tomorrow.  Is

14  she going to be able to go to her job.  She really likes

15  her job.  Can I get probation for life?  Not that she was

16  trying to minimize what she had done, because she knew

17  that she was going to get punished.  She knew that right

18  off the bat.  I told her.

19     She knew going in, and she knew at the very

20  last and in the middle, several times, what was going to

21  happen, because she asked and I told her.  And she knew

22  that I was going to tell her the truth.  And when I told

23  her something she knew it was the truth.

24     Because I told her, I looked her straight in

25  the eye and she looked directly back and knew that I was

Exhibit 1A

34

1 telling her the truth.  I would not lie to her.  And she

2 knew that.  So she became concerned about what's going to

3 happen to me now.  Because, like any other problems, when

4 you tell somebody -- when you're a little kid -- and

5 that's what I think happened, when she was a little kid.

6          And it's just like when you're a little kid

7 and you steal something, you're really, really uptight.

8 But then you tell your mom or your dad you stole

9 something, and no matter how he reacts, afterwards you

10 feel more comfortable with it, and you're not concerned

11 about, Golly what if -- when he finds out, what is he

12 going to do to me, or what's going to happen to me.  I'll

13 probably never live through the night.

14          But now you're more concerned about, God,

15 wonder what --

16               (End of Side 1)

17     -- though it was a very serious thing she did, it

18 was already out in the open now.  So, it's something back

19 here, you know, it's behind me now.  He already knows

20 about it, because we talked about it, me and this guy

21 right here, me and this detective.  We talked about it,

22 you know, and he still likes me, because he -- he is still

23 listening to me.  He's still talking to me.

24          And now that's behind us, and now I'm going

25 to ask this guy -- and now I'm concerned about what's

35

1  going to happen to me tomorrow.  What's going to happen to

2  me?  Am I going to get probation?

3          And then she goes from, what's going to

4  happen to me now, to the point of she's feeling a lot

5  better now.  Well, maybe -- maybe I have a little bit of

6  control of what's going to happen to me, or maybe since he

7  was such a nice guy and listening to me, maybe I can

8  suggest things to him that might happen to me that -- that

9  might work out better for me.

10          So that's when she suggested lifetime

11  probation and do you think they'll let me go back to work

12  tomorrow?  Or that kind of stuff.  So she -- she was

13  real -- at the very -- at the very end -- at the very end,

14  feeling very comfortable in saying, "Oh, shit.  Now what

15  am I going to do?  Now what's going to happen to me?"  And

16  that's what we discussed.

17          And she knew that there is nothing I could

18  do.  She knew that from the beginning.  And that's what

19  she's dealing with now.  And that's what she has to deal

20  with.  Not about whether she did it or not, because she

21  can tell you, she can tell you, she can tell the

22  attorney -- I mean the judge, she can tell anybody, the

23  jury, anything at this point that she wants.

24          But what happened that night during our

25  interview was -- I -- or she met up with someone, and I

MILKE_NSB018119

Exhibit 1A

36

1    was the case agent, whether this was fate or not, I was

2    assigned to the case.  I was assigned to interview her.

3    She met up with somebody that was not going to listen to

4    two or three words, start yelling, screaming, but was

5    going to sit there and listen to what she had to say and

6    be very honest with her, not tell her a bunch of stories

7    of, "Oh, well, yeah.  I understand you.  Yeah, I -- well,

8    hell, I'd do the same thing, too," or -- she knew that.

9              When she spoke to me she knew within minutes

10   that I wasn't going to fall for that -- that stuff that

11   she was blowing out to begin with.  She realized, and

12   in -- maybe in a way had respect for me and knew that she

13   wasn't going to lie to me because I wasn't going to listen

14   to her.

15             But I wasn't, also, going to condemn her for

16   whatever she told me.  And that's why the interview took

17   place the way it did.  She told me what happened.  I

18   didn't -- I didn't drag it out of her.  She sat there and

19   just kind of decided that this is the guy I want to tell

20   everything to, and did.

21        Q.    Did you have any information about her

22   background before you went in to speak with her?

23        A.    No, none.

24        Q.    Any knowledge about anything about her?

25        A.    None.

MILKE_NSB018120

Exhibit 1A

37

1    Q.    Was there something -- you have been on the

2    force what, 20 --

3         A.    21 years.

4         Q.    Was there something just about her that you

5    knew, just almost immediately upon seeing her, that this

6    style of investigative technique was going to work with

7    her?

8         A.    No.  My style never changes.  It never

9    changes.  My tone of voice never changes.  I approach

10   every interview knowing I don't care how serious the crime

11   is.  And I have been involved within homicide for the past

12   four years, four and a half years.  I approach every

13   interview believing that that person that's sitting across

14   from me, no matter how bad the crime is, wants to tell

15   someone.

16        And I believe that sometimes, and the biggest

17   problem that people have, I think, is that they don't

18   understand that when your lips are moving you can't hear

19   anything.  So what I do is I talk ten percent of the time,

20   let them talk 80 percent of the time, because I'm a good

21   listener.

22        Me and you could sit here and we could talk

23   all day long and I'll listen to you.  I may go to an

24   interview -- I have interviews with people that do not

25   confess to me.  I may have an interview with someone that

MILKE_NSB018121

Exhibit 1A

38

1   will never confess to me, but we will sit there and talk

2   for four or five hours --

3           Q.      During the course of a situation like that --

4           A.      -- during the course of an interview.

5           Q.      -- will you tell them that, you know, "Look,

6   I know what you're telling me just isn't true"?

7           A.      I will tell them.  I'm -- I'm very honest.  I

8   will tell them immediately if -- if they are lying to me

9   I'll tell them, "You're lying to me.  I don't need to

10  listen to that."

11              Now, if you want to talk -- if that person

12  wants to talk about how tall that building is over there

13  we may sit here and talk for hours about how tall that

14  building is, and I'll tolerate that.  We can sit here and

15  talk, as long as we're talking and he's telling me the

16  truth, because he can see that building's tall and I can

17  see that building's tall.

18              But if he starts telling me that building's

19  only about four foot high, I'm not going to sit here and

20  listen to him.  So, as long as we can sit and have a

21  conversation and we mutually agree that you're not trying

22  to bullshit me and I'm not going to bullshit you, then we

23  will have a conversation for hours.

24          Q.      Have you found that technique of

25  investigation to be successful?

MILKE_NSB018122

Exhibit 1A

39

1   A.    It's not a technique.   I have -- that's

2   that's me.

3   Q.    I mean, there are different techniques you

4   know; is that right?

5   A.    There's different techniques, and I'm asked

6   this all the time about, well, what schools did you go to

7   for interview techniques?   Did you go to -- I have never

8   been to an interview school, because I don't have problems

9   talking to people and people don't have problems

10  understanding me.   They don't have problems knowing where

11  I'm coming from.   I'm very straightforward.   I never -- I

12  say "never," I should never say never, but I don't -- I

13  don't get angry at someone.

14          If you're going to tell me a lie, I'm going

15  to tell you it's a lie.   But I'm not going to get angry at

16  you.   I've handled a lot of high profile cases where

17  people have done some heinous things to other people,

18  adults to kids, but I never, ever -- and that's when I can

19  honestly say never -- go into an interview room with a

20  preconceived thought that this guy or this girl is the

21  biggest asshole there ever was, with the preconceived

22  thought that I don't like this person, because I try to

23  just deal with that person one on one, as I did with

24  Debra, and not interject the fact of what she did.

25          And I did not interject the fact myself of

MILKE_NSB018123

Exhibit 1A

40

1   what she did.  I did not say, "Well, you killed your kid,"

2   and all this other stuff, and you went there, you know.  I

3   told her what I was investigating.

4           But it's -- it's her job.  It's her job.

5   It's her feelings.  It's what she wants to do, to tell me

6   what she did and why she did it.  Don't necessarily mean

7   I'm going to understand it, like I told her, but I'm not

8   going to condemn her for it, not like I'm not even going

9   to condemn her now.

10          Q.    What -- I take it, then, when you spoke to

11  Roger Scott you basically did the same type of --

12          A.    Exactly.

13          Q.    -- demeanor and so forth?

14          A.    Exactly.

15          Q.    What do you think it was that caused him to

16  change his story now, from what it had been previously and

17  all along up to that point?

18          A.    I'll tell you exactly what it was.  I told

19  him that he wasn't telling the truth and that I didn't

20  believe him.  Other officers were sitting there with him

21  listening to what he said, knowing that it wasn't the

22  truth, and I wasn't going to do that.

23          When I walked in with Roger and heard him say

24  a couple of things and heard him generally go over the --

25  I stopped him and I said, "That ain't the truth."  Just

**MILKE_NSB018124**

Exhibit 1A

41

1   like I told Debra.  And I wasn't going to listen to him.

2   And I --

3        Q.    (Inaudible) you told Roger that -- did you

4   have any evidence to suggest that he was not telling the

5   truth, or was --

6        A.    Factual evidence, or just my gut feeling?

7        Q.    Factual evidence.

8        A.    No.

9        Q.    No.  But you're gut feeling was that --

10       A.    I had a gut feeling.

11       Q.    -- that he wasn't telling the truth?

12       A.    Definitely wasn't telling the truth.

13       Q.    So your straightforward, in a calm --

14       A.    Very straightforward.

15       Q.    -- almost a monotonous tone of voice, told

16   him, "Roger, your story is not the truth"?

17       A.    I wish you wouldn't use monotonous, though,

18   there Ray, it makes me feel bad, you know.

19       Q.    Me too.  Monotonous.  I should say --

20       A.    I have been told that's exactly right.  My

21   interviews have been -- have been described as being -- my

22   voice as being very monotone, and very -- that's true,

23   but --

24       Q.    And I'm not condemning you for that.

25       A.    -- but the fact of the matter is, I don't

COPPERSTATE REPORTING SERVICE, INC.

**MILKE_NSB018125**

Exhibit 1A

42

1   change my -- no matter if I'm talking to (inaudible) or

2   talking to Styers -- and when I talked to Styers I did the

3   same thing.  Styers didn't tell me the truth.  I knew he

4   wasn't telling me the truth.  I wasn't going to listen to

5   him (inaudible) at the end of the interview, you know.

6          Q.    He didn't -- he didn't turn around like Debra

7   did and like Scott did?

8          A.    Not all -- not all people do.  And I don't do

9   it for them to do that.  I don't -- I mean that's just --

10  I mean that's what used car dealers do, you know, or used

11  car salesmen do.  Well, I don't want this, and then they

12  expect you to walk away, and then you're going to come

13  back, or he's going to come back.

14          I don't do that.  If the person tells me --

15  if me and that person cannot talk, and he's lying to me,

16  I'm not going to listen to it, I'm going to leave.  That's

17  the end of it.

18          I don't tell a person that I'm going to not

19  listen to it or not tolerate it to get her to tell me

20  things.  I don't do that for that reason.  I'm telling her

21  for the honest to God's truth, this is what's going to

22  happen.  This is it.  I'm going to sit here and I'm going

23  to talk to you, but I'm not going to listen to lies, and

24  I'm not going to tolerate her.

25          And in her instance, trying to feign an

Exhibit 1A

43

1    emotion that -- to try to get a little bit of sympathy

2    from me and try to -- for her.  And she was feigning this

3    emotion to try to -- to try to buy herself some time,

4    because --

5         Q.    Time to do what?

6         A.    To think --

7         Q.    Okay.

8         A.    -- what is she going to say next.  And when I

9    tell these people this, that's what I mean.  I don't do it

10   to try to get them to admit or to cop or to confess.  I'm

11   there to get the truth, the confession.  Sure, that's my

12   job.

13           The truth comes with -- if I get the truth,

14   and if they tell me, "Look, I honestly did not do this.  I

15   honestly am not involved in this."  And if I honestly feel

16   that's the truth, that's the truth.

17           I get -- I go there to get the truth.  That's

18   what I deal with, and that's why I have no problem with

19   sitting there and listening to what they say.  And I know

20   some officers do -- I know some officers, some detectives

21   go over there to get a confession.  To get this guilty

22   bastard so they can do him.  That's not me.  I go in there

23   to get the truth.  When I go into an interview room I want

24   the truth, the truth.

25         Q.    What I'm gathering, I'm gathering that while

MILKE_NSB018127

Exhibit 1A

44

1  on occasion there may be some facts that you already know

2  thereby to judge whether he's telling you the truth or

3  not, many times you operate from a gut instinct as to

4  whether it's true or not?

5      A.   Many times you have to.  I wasn't there.

6  That person knows, or that person conspired.  In Debra's

7  case she knows what was going to take place.  I don't

8  know.  So whatever facts or fingerprints, whatever

9  evidence I may have, it may not tell the entire truth

10 until that person -- if that person elects to tell me,

11 then we'll know the truth from her perspective.  Not

12 necessarily the entire truth, but from her perspective, as

13 she knows or as she feels the truth is.

14      Q.   When you were interviewing Scott, and you

15 told him that he wasn't telling you the truth, how did you

16 know that what he said afterwards turned out -- was in

17 fact, the truth, and sufficient so that you had, you and

18 your supervisor, whatever, had in mind that you were going

19 down to arrest Debra?

20      A.   You never know if it's the entire truth, like

21 I said a minute ago.  It's from their perspective.  It's

22 from what that person feels, how that person saw it

23 develop, and how that person kind of looked at it, did

24 determine, well, yeah, this is the truth.  This is what he

25 said and this is what she's saying and that's how he's

MILKE_NSB018128

Exhibit 1A

45

1    interpreting what happened.

2              And from what he told me, I felt he was

3    telling me the truth as he knew it.  Now, there may be

4    some factual errors, but there will be factual errors in

5    Debra's story.  There will be factual errors in Jim's

6    story, as there will be in Roger's story, because they're

7    all looking at it from a different perspective.

8         Q.    What I'm getting at, though, is that up until

9    he said that, Debra was not a suspect at all, was she?

10        A.    No.

11        Q.    And you knew that the story that Roger had

12   been giving, in your gut at least, was just not right?

13        A.    Was not the truth.

14        Q.    And so he comes off with another story that

15   implicates Debra as being a participant in some

16   conspiracy?

17        A.    Right.

18        Q.    Did you have a doubt in your mind that what

19   he was then telling you was the truth?

20        A.    No.  When Scott and I sat down and talked,

21   ultimately talked, after we got stuff out of the way, I

22   felt that Scott was telling me the truth.  And I judge

23   it -- I judge a lot by whether I know -- whether I feel

24   that that person is believing that I'm telling them the

25   truth, because I think that's when you can really --

**MILKE_NSB018129**

Exhibit 1A

46

1    that's when you can really judge an interview, when that

2    person is comfortable understanding that you're telling

3    them the truth, and not until then will they feel

4    comfortable with telling you the truth.

5            And I think we've gotten to that stage.  He

6    told me the truth.  He understood I was telling him the

7    truth.  The same way it happened with Debra.  She tried to

8    lie.  She tried to feign these emotions, thinking that her

9    yelling, her hysterics, would drive me away, would maybe

10   cause me to leave the room for her to calm down, for her

11   to be thinking.  But it didn't.  I -- I was confronted

12   with that.  I handled it.  She understood that I handled

13   it.

14           And when she understood that I handled it she

15   began to believe me and was -- and, I think, felt that I

16   was going to tell her the truth, was going to deal with

17   her on the truth and nothing else.  Then she felt at that

18   point comfortable to tell me the truth.  And that's the

19   basis of any of my interviews.  That's how I deal with

20   them.

21      Q.    In reviewing the notes that you have in your

22   report that you made of the interview with Debra, is there

23   anything that you have noted that is either absent or

24   inaccurate?

25      A.    No.  And I reviewed that supplemental briefly

Exhibit 1A

47

1   before I came over.  I hadn't before, but -- I mean I had

2   several types before, but not in recent history, not

3   within a month or so.  And it's -- everything's there as I

4   remember it.

5           MR. RAY:  Let's take about a five-minute break.

6   I'm about to bust.

7           MR. SALADATE:  It's hot in here.

8                   (Recess was taken.)

9           MR. SALDATE:  When you're talking about it, you

10  know, I get excited, because I can almost picture us

11  having this conversation with Debra, you know.  She's a

12  good girl.

13  BY MR. RAY:

14      Q.   I wish that I could, you know, technology was

15  so far in advance where I could get inside your head and

16  visualize it just as you have visualized it, because I

17  apologize now, because the questions that I ask you

18  clearly are -- I'm trying to grasp for your vision in this

19  situation.

20      A.   Well, I try my best.

21      Q.   Well --

22      A.   I hope you understood.

23      Q.   You've done well.  I appreciate it.  You

24  never before in your life ever met Debra before that

25  occasion?

MILKE_NSB018131

Exhibit 1A

48

1          A.     Never.

2          Q.     Or Roger Scott?

3          A.     Never.

4          Q.     Or Styers?

5          A.     Never.

6          Q.     How about Mark Milke?

7          A.     Never.

8          Q.     After Debra gave you this interview, have you

9    conducted any additional investigations of any kind

10   concerning this case?

11         A.     Certainly.

12         Q.     Okay.

13         A.     I mean --

14         Q.     Can you outline for me roughly?

15         A.     I have to go through the supplementals

16   because it's a lot of, you know.

17         Q.     Well, is there anything that you have done

18   that's not contained in the supplementals?

19         A.     That I have -- that I have not yet

20   supplemented?

21         Q.     Yeah.

22         A.     Yes.  I've interviewed Ernie Sweat

23   (phonetic).

24         Q.     Okay.

25         A.     I have interviewed -- I should have brought

MILKE_NSB018132

Exhibit 1A

49

1   my notebook or my pad.  This isn't my notepad.  And I --

2   this is just a case, showing people that I've interviewed.

3   I've done search warrants.  I have done -- talked to -- I

4   can't say I talked to Mark Milke.  Talked to her mother, I

5   think that may be in here.

6        Q.    Her natural mother?

7        A.    Yeah.  I think that's in here.  I may have

8   interviewed with her (inaudible) in the supplemental.  I

9   didn't switch those.  She came here.  I talked to her.  I

10  talked to her sister.

11       Q.    Is that when she back to, his mother, was

12  that when she came here to pick up the car?

13       A.    Right, right.

14       Q.    Okay.

15       A.    I talked to Martin Milke's dad.  I talked to

16  Mr. Sadick.  I talked to all the (inaudible).  I talked

17  to -- what was her name?

18       Q.    Chris Landry?

19       A.    Chris Landry.

20       Q.    Chris Landry is who?

21       A.    The girl that used to be an inmate with

22  Debra.  I talked to an -- I don't remember the other girl.

23       Q.    What did Chris Landry have to tell you?

24       A.    Well, I haven't -- the supplemental is still

25  not ready, and I don't have my notes with me, but

**MILKE_NSB018133**

Exhibit 1A

50

1  generally she just told me that -- that she talked to

2  Debra about the incident, that Debra had told her that Jim

3  Styers had concealed some letters, or sent some letters to

4  his sister.  I have since got those letters.

5            She told -- Debra said several things about

6  you to her, to Chris.  Several things about the

7  investigation.  Who did the investigation?

8        Q.    Fowler?

9        A.    Fowler, Curt Fowler, about him.

10       Q.    Was that interview recorded?

11       A.    No.

12       Q.    Okay.

13       A.    It was not recorded.  But the supplement will

14  be forthcoming.  Noel doesn't even have my supplement.

15  I've been really busy.

16       Q.    We've all been busy.  I understand.

17       A.    I know it.  And we're all busy, no doubt.

18       Q.    I think they're winning and we're losing.

19       A.    I don't have my notes with me, so, you know.

20       Q.    Sure.  I don't have the interview on Swetner?

21       A.    No.  It's sitting -- now that interview is

22  sitting on my desk.  But, you know, I've been checking to

23  this and that and so on.

24       Q.    Is anything -- does Chris Landry suggest --

25  well, Chris Landry, she was in jail for something or

COPPERSTATE REPORTING SERVICE, INC.

**MILKE_NSB018134**

Exhibit 1A

51

1    other, I presume?

2          A.    Yes.

3          Q.    Was she looking to cut a deal?

4          A.    No.

5          Q.    To testify?

6          A.    Her attorney was looking to cut a deal.

7          Q.    Who was her attorney?

8          A.    Dan Roth.

9          Q.    Did Landry say that my client admitted this

10   crime?

11         A.    She said that your client -- how'd that go?

12   I want to make sure I get this correct because --

13   something about Landry being there when one of her friends

14   was leaving and she said something to the effect that, I

15   feel like that day when I knew that -- when I -- when

16   Chris was leaving and I knew I was never going to see him

17   again, something to that effect, and made some other

18   general statements, too, but --

19         Q.    Okay.

20         A.    -- you'll have the supplemental too, that

21   comes in the supplemental that was applied.

22         Q.    All right.

23         A.    That's been very recent, so that's why that

24   supplemental is not ready.

25         Q.    Have you had occasion to interview or speak

MILKE_NSB018135

Exhibit 1A

52

1   with any other inmates, other than Chris Landry, relating

2   to either Debra or Styers or Scott?   It is my

3   understanding there was a guy named Wada (phonetic) and a

4   guy named Johnson?

5        A.     Yeah, right.   That's -- I don't know those

6   people.   Never have talked to those people.

7        Q.     Okay.   Any others?

8        A.     No.

9        Q.     All right.   When did this --

10        A.     I know the names that you mentioned.

11        Q.     Oh, do you?

12        A.     I know Levy has mentioned those names and

13   asked me.

14        Q.     Okay.   When did the information concerning

15   insurance come up in the course of your investigation?

16        A.     Now we're way behind the case.   Tell me at

17   what point.   What do you mean?

18        Q.     When is it, during the course of your

19   investigation of this case, did it come to your attention

20   that there was maybe an insurance policy on this boy?

21        A.     Prior to talking with Debra.

22        Q.     Okay.   Who gave you that information?

23        A.     Roger Scott.

24        Q.     Roger Scott.

25        A.     As indicated, I think, in one of my

MILKE_NSB018136

Exhibit 1A

53

1   supplementals.

2       Q.    Was any effort by anyone made to confirm or

3   disaffirm the existence of insurance?

4       A.    Yes.

5       Q.    Before speaking to Debra?

6       A.    Before?

7       Q.    Yes.

8       A.    No, impossible.  It's on a Sunday.

9       Q.    All right.  And Roger told you that the

10  insurance that was in place was a policy that Debra had?

11      A.    Correct.

12      Q.    Mark has went off on this tangent saying that

13  this insurance was not Debra's policy, but rather was

14  Grandfather Sadick's policy.

15      A.    That's what he said, yes.

16      Q.    Where's Mark coming from on this?

17      A.    I don't know.  I don't know that Mr. Sadick

18  does have an insurance policy on the kid, but I don't know

19  what -- where Mark's coming from.  I wouldn't be the

20  person to ask, because I wouldn't know.

21      Q.    I don't know that Mark's the person to ask

22  either.  Did, in your conversations with Debra, either as

23  you relate them here or otherwise, was the subject of

24  insurance ever mentioned or discussed?

25      A.    Yes, yes.

Exhibit 1A

54

1       Q.    And did -- was that discussed when?

2       A.    In my supplemental.  And she denies it.

3       Q.    Okay.  Did she deny the existence of

4 insurance, or deny that that was the motive?

5       A.    She denies the existence of having insurance

6 on him, but mentions that her father had insurance.  She

7 denies that -- that was not her motivation, but very

8 possibly could have been the motivation for Jim Styers and

9 Roger Scott.

10      Q.    Okay.  Did you participate in the execution

11 of any search warrant at Styers residence?

12      A.    I did not.

13      Q.    Have you looked at the physical evidence in

14 this case?

15      A.    I have looked at some.

16      Q.    There's, somewhere in there --

17      A.    Most of it was impounded and if anything I've

18 looked at, would be pictures.

19      Q.    What about this -- apparently there's a

20 notebook or something that has mention of cyanide.  Did

21 you see anything?

22      A.    No, I don't know about that.

23      Q.    Okay.

24      A.    I'm sure there is.  It's mentioned in the

25 report, but I don't -- I did not actually see that.  And I

MILKE_NSB018138

Exhibit 1A

55

1    understand you want to see the property, so you'll --

2         Q.    Yeah.

3         A.    -- you'll have to make an appointment.

4         Q.    All right.

5         A.    Because it's going to take, from the time we

6    get there to the time you look at everything, it's going

7    to take -- it's going to take a day.  It's going to take

8    six hours minimum, maybe the entire day.

9         Q.    Fine.

10        A.    So plan for that time.

11        Q.    Set aside a day, then?

12        A.    Because I -- I say that only because I don't

13   know what's totally in there.  I mean I've got the

14   reports, but I don't know how it's packaged.  I don't

15   know.

16        Q.    You say that you served a search warrant to

17   get letters that apparently were Debra's letters?

18        A.    Yes.

19        Q.    Will that be part of the stuff so we can

20   see --

21        A.    Correct.

22        Q.    All right.

23        A.    I supplied, or will supply all that

24   information as soon as it's complete.

25        Q.    And apparently there was some problems

MILKE_NSB018139

Exhibit 1A

56

1  involving Mark that apparently involved you, also, that

2  had to do with these phone conversations?

3      A.   I don't know what that means.

4      Q.   I don't either.

5      A.   I really don't.  I don't know.  Phone

6  conversation with --

7      Q.   Well, Mark, in one of his unsolicited

8  arrivals at my office, had said that Saldate jacked him

9  around.  And in speaking with Mr. Sadick, Mr. Sadick says

10 he made a phone call to you and had Mark jacked around.

11     A.   That is not true.  Me and -- Mark didn't

12 necessarily get along with me.  And Mark, I handled him

13 the same way.  He doesn't really deal very well with the

14 truth, so we can't get along.  He mentioned something

15 about phone calls, threats.  He made a police report.  Is

16 that what you're talking about?

17     Q.   Yes.

18     A.   If that's -- if that's what, you know, I

19 don't know.  I have difficulty knowing what Mark's

20 (inaudible) -- He made a police report, and I think I gave

21 you a copy of the police report at the time you asked for

22 it.

23          He made a police report saying that Mr.

24 Sadick had threatened him.  I called -- when I received

25 that police report I -- from another detective in another

57

1   area -- I called Mark Milke to confirm or verify this

2   information.

3            Mark Milke's dad told me he was not there.  I

4   told Mark Milke's dad that -- what I wanted to talk to him

5   about and that I understood there's some threats and stuff

6   like that, and he told me in -- he told me, he says, "Hey,

7   please keep this confidential, but to be honest with you,

8   Mr. Saldate, if anybody did any threatening it was Mark

9   against Mr. Sadick.  But I don't want Mark to know that,

10  because he is my son.  But I don't want Sadick to get in

11  trouble either."

12           I said, "Fine.  I'll call Mr. Sadick."  I

13  told Mr. Sadick what I found out.  He told me Mark had

14  reported to internal affairs, his internal affairs.  They

15  had begun a complete investigation, and, of course, they

16  didn't find anything.  And that was the end of it.  Mr.

17  Sadick never called me.  I never had that much contact

18  with Mr. Sadick.

19           Q.    You never ever --

20           A.    He called me.

21           Q.    That's the information he gave me --

22           A.    That's totally untrue.

23           Q.    -- that you refused to have it recorded,

24  also.

25           A.    That's totally untrue.  He -- I have never

**MILKE_NSB018141**

Exhibit 1A

58

1  had a conversation with Sadick to the point where, you

2  know -- the only time I ever called Mr. Sadick was to

3  advise him of something.  I advised him about his

4  daughter's arrest.  At the insistence of Debra I called

5  him.  I have never had -- I have never even seen the man

6  face to face, so I wouldn't know what he looks like.

7       Q.   Are you aware of the incident involving Mark

8  out in San Diego, what the circumstances where with that?

9       A.   I'm aware by some detective calling me

10 because he got my name from an Enquirer article that Mark

11 had in his pocket when he was arrested.  And this

12 detective told me that he had arrested Mark, was taking

13 him to some hospital, because sounded to him like he

14 needed some help.  And I says, you want to let me know

15 that this was happening.

16          From my understanding, as I understand it,

17 from what I heard, Mark feels that I'm the one that had

18 him arrested.  That's totally untrue.  I was called by

19 this detective.  He got my name from the article he was

20 carrying in his back pocket.  This article was taken from

21 him after he had already been placed under arrest.

22       Q.   What was he arrested for?  Do you know?

23       A.   Briefly, as I remember it, and I don't, to be

24 honest with you, I didn't really -- I don't care to

25 remember, but -- it's really not that important to me, you

**MILKE_NSB018142**

Exhibit 1A

59

1   know, but something about him having a weapon, and I don't

2   know if it was a gun or a knife or sword, or -- for some

3   reason I don't recall, but it was a weapon.  I remember it

4   was a weapon.

5           The night before they took it away from him,

6   then he went, with another weapon, to the police

7   department to get it.  And he was irrational, as far as

8   talking about his baby being killed by his -- by somebody.

9   And he had the article and he said something about

10  whatever, you know.  Ultimately he got arrested because he

11  was abusive or whatever.

12          And then during that time he became -- he

13  acted kind of weird and the San Diego officers, I guess

14  uniformed officers as I understand it, I'm not totally

15  sure, but as I understood it, became concerned about his

16  welfare and decided to take him to a hospital, rather than

17  to jail.

18          And after they decided to do that he was

19  looking through his papers, found this article, and lo and

20  behold, I guess it was true what he was talking about,

21  found my name and decided he would call me, because,

22  fairly, he was making those accusations there that I

23  was -- I had apparently called over there to get him

24  arrested, when I didn't even know anything about it.

25          Q.    In any of the investigations that you have

MILKE_NSB018143

Exhibit 1A

60

1    done up to this point, do you have any information

2    connecting Mark Milke to Roger Scott?

3            A.    None.

4            Q.    None whatsoever?

5            A.    None.

6            Q.    In any of the conversations you had with

7    Mark, has Mark admitted he had met or knew Roger Scott?

8            A.    I have only spoke to Mark one time, and

9    probably spent -- with one or two other guys, but that

10   wasn't an interview, that was just -- and I don't think he

11   ever mentioned anything about Scott.  He knew Jim.  He

12   knew Scott was Jim's friend.  He knew, in that context, he

13   knew about Scott.  Never knew nothing else.

14           Q.    The thing that I found interesting was in

15   Detective -- I think it's Detective DeMakas (phonetic)?

16           A.    DeMakas (phonetic).

17           Q.    Yeah.  He indicates that when, in his

18   supplement, he indicates that when he went to talk to

19   Henry Milke he -- Henry refused to disclose the phone

20   number as to where Mark was in Texas.

21                 When he went and spoke to Ilse Milke she did

22   the same thing.  But ultimately, I guess, Ilse dialed the

23   phone, gave it to the detective, he spoke to Mark and

24   spoke to Mark about the disappearance, and Mark says he

25   had no reason to suspect foul play against Styers, but

Exhibit 1A

61

1   didn't think too much about his friend Scott.

2          And yet, apparently, at least in the report,

3   is silent about any mention about foul play or anything

4   else.  His boy hasn't even been found yet.

5          A.    Well, police, you know, are always thinking

6   of foul play.  And that could be an alternative to him

7   being lost.  In regards to the mother and father not

8   saying anything about Mark, he had a reputation of being

9   involved in traffic offenses, warrants, that kind of stuff

10  and parents, you know, they know their son and they may

11  have just thought that the police were laying a line on

12  them just so they could find out where her son was so they

13  could book him on a warrant or something like that.

14          That's just common, you know.  That's common

15  with parents not wanting to tell the police where their

16  kid's at, especially with a background that Mark had, you

17  know, not a violent background, but more of a warrants and

18  that kind of stuff, traffic stop, traffic kind of stuff,

19  you know, and so on, the DWIs and that kind of stuff.

20          So it's -- it's very common, I would think,

21  that, you know, you're reading a little bit different into

22  it, but from my standpoint and from my experience it's --

23  I -- I would read into it that it's just normal for a

24  parent not to want to divulge where the kids are at.

25          Q.    Let's see if I could find that.

Exhibit 1A

62

1    A.    Are we going to have this tape typed?

2    Q.    Yours?  I don't know yet.

3    A.    Oh, c'mon.

4    Q.    You want it?

5    A.    No.  But if you were, I'd like to have a copy

6    of it.

7    Q.    All right.

8    A.    See, I don't tape record, you do, so.

9    Q.    This is DeMakas' (phonetic) report, and

10   it's -- it says, his interview with Ilse Milke, and said

11   in this conversation with Mark, said he had been in Texas

12   since they drove there.  He knows James and does not think

13   he would be involved in foul play.  He said he does have

14   some friend that he does not trust, and named one as

15   Roger.

16            Calling upon your experience as a police

17   officer, do you find that interesting or not?

18   A.    I don't.  You know, it depends.  And I wasn't

19   there that night.  But as I look at it now, and it's a lot

20   easier to look at it now, but I don't know what Mark would

21   say and why he would say things.

22            You know, he doesn't know, you know, Roger

23   that good.  He knows Styers a little, with his wife, and,

24   obviously, from that statement, he was right only on one

25   point and wrong on two.  So, he's only -- he was shooting

**MILKE_NSB018146**

Exhibit 1A

63

1  only one out of three, you know.  He suspected Scott,

2  doesn't suspect his wife ex-wife, Debra, and didn't

3  suspect Jim.  So, I mean, he's averaged only 300, you

4  know.  So, obviously not very good.

5       Q.   Well, I don't think that I -- well, let's

6  see.  Landry, letters, anything else that I haven't --

7       A.   No, we went over everything.

8       Q.   Because, you know, I'm trying to avoid having

9  to call you back in on some of the supplements that I may

10  receive and --

11      A.   Well, I'm trying to avoid that, too, since

12  I'm busy and you're busy, but I think we've covered

13  everything.

14      Q.   If there is something that you feel is

15  necessary to cover, it's understood --

16      A.   Okay.  We'll make the time if necessary.

17      Q.   Well, you know --

18      A.   I'm not going to avoid you at all.  We'll

19  make the time.  But I mean I'm just saying we'll just have

20  to work it in somehow.

21      Q.   Is there anything, discounting what Debra

22  told you in that interview?

23      A.   Here we go again.

24      Q.   I know.  But I have got to do it.  Just for

25  the sake of argument, forget that you have that

**MILKE_NSB018147**

Exhibit 1A

64

1    information, and forget that you have Roger Styers'

2    information, is there any physical or other extraneous

3    information that would connect Debra to this, that I'm not

4    aware of?

5         A.    I don't know if I could forget those -- that

6    kind of stuff.

7         Q.    I know, but just humor me.

8         A.    At this point, not that I can think of.

9         Q.    Okay.

10        A.    Then again, I'm not --

11        Q.    In other words, to phrase it another way, if

12   she hadn't admitted, and Roger hadn't admitted, she

13   wouldn't have been a suspect even yet?

14        A.    I couldn't say whether she wouldn't have been

15   a suspect.  She would have definitely gotten arrested,

16   because -- I don't know -- I can't say that other things

17   wouldn't have come out of there somehow.

18        Q.    I know that, but assuming that, you know --

19        A.    Assuming that I know whenever --

20        Q.    -- and you discount Roger's and you discount

21   her statement, is there anything else that would connect

22   her to this?

23        A.    No, not that I know of at this point.

24        Q.    And based upon your knowledge of this

25   investigation, she remained at her house for a substantial

MILKE_NSB018148

Exhibit 1A

65

1   portion of the -- of the period of the investigation

2   before going to Florence, correct?

3          A.     I don't know that.

4          Q.     Okay.

5          A.     I don't know how long she stayed there.  It

6   was my opinion -- it was my understanding that she stayed

7   just a very short time before she went to Florence and

8   was -- and, in fact, it was strange that she decided to go

9   to Florence.  I mean it was just -- in fact, we had to

10  take a police officer, and again I'm not -- I'm not saying

11  that I totally know about this situation, throughout this

12  part of the situation, because I wasn't totally all there.

13  I mean I got in in the last part, but we had to take a

14  woman detective there, pay her overtime to sit her at that

15  apartment, because we knew that -- or were told that Chris

16  knew his phone number and may call home.

17              But because Debra, for some unknown reason,

18  decided she wanted to go to her parent's house rather than

19  to remain there, wait for a possible call from Chris, we

20  had to pay a female detective overtime and assign her to

21  that house so she could remain there and so she could

22  answer the call of Chris when he called and said, "Hey,

23  mom, I'm over here."  Rather than Debra staying there.

24              So I -- I really don't, from my

25  understanding, I think it was just a short time.  And I

MILKE_NSB018149

Exhibit 1A

66

1    may be wrong, but I know that we went to extra efforts to

2    insure that somebody would be --

3                          (End of Side 2)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MILKE_NSB018150

Exhibit 1A

67

```
1    STATE OF ARIZONA      )
                           )  ss.
2    COUNTY OF MARICOPA    )

3

4

5

6

7

8

9              I hereby certify that the foregoing pages,

10   numbered 1 through 67 inclusive, is a correct transcript

11   from the record of proceedings in the above-entitled

12   matter.

13

14

15

16

17

18   _____  _____
     Court Reporter             Date

19

20

21

22

23

24

25
```

**MILKE_NSB018151**

Exhibit 1A

STATE OF ARIZONA — COUNTY OF MARICOPA — ADULT PROBATION DEPARTMENT
NORMAN L. HELBER, CHIEF PROBATION OFFICER

P.O.: ANDREW LEMBO

PRIME LANG: ENGLISH

PAGE 1 OF 2



NAME      JAMES LYNN STYERS
RESIDENCE 225 West Madison
          Phoenix, AZ          ZIP 85003
PHONE     None      MESSAGE PHONE None
AKA OR MAIDEN None
ID MARKS      Tattoo-R-Arm-USMC
EMPLOYER/ADDRESS/PHONE Unemployed

RACE White   SEX M    HT 5'11"
EYES Blu     HAIR Bro HT 210
DOB                   AGE 43
CITIZEN OF USA
BIRTHPLACE New Castle, PA
DRIVER'S LIC. NO. Unknown
S.S. NO
FBI NO. 170 411 LA4
BOOKING NO. 169166

OCCUPATION Laborer    EDUCATION 40A
MARITAL    Married    RELIGION Christian    CHILDREN 4

CURRENT OFFENSE

See Second Page

CR 89-12631

DATE OF ARREST 12-04-89              ARRESTING AGENCY PHPD
DATE INCAR. 12-04-89      REL. DATE              REL. STATUS Jail
DAYS IN JAIL THIS ARREST 368  REMAND JUVENILE COURT/DATE—NO

DEFENSE COUNSEL Jesse Miranda, Ct. Appt.    PROSECUTOR Noel Levy
GUILT BY/DATE    Jury/11-02-90      SENTENCING JUDGE PETER T. D'ANGELO
DATE OF SENTENCE  12-07-90
CODEF/DISPOS See Companion Action

CRIMINAL HISTORY                    WARRANTS OUTSTANDING

|  |  |  |  | CASE NO. | CHARGE | STATE |
|---|---|---|---|---|---|---|
| NO. CONVICTIONS: | FEL | MISD | JUV |  |  |  |
| NO. INCARCERATIONS: | PRISON | JAIL |  |  |  |  |
|  | ESCAPE | OTHER |  |  |  |  |
| NO. SUPERVISIONS: | PROB | PAROLE |  | OTHER: |  |  |

GENERAL INFORMATION

NARCOTICS/ALCOHOL HISTORY
TREATMENT/PROGRAMS

MILITARY HISTORY
  BRANCH Marine Corps           TYPE DISCH. Honorable Under Medical Condition
  ENTRY DATE 05-01-67           DISCH. DATE 07-31-71

SPOUSE/RELATIVES/CHILDREN

| NAME | RELATION | AGE | ADDRESS | PHONE |
|---|---|---|---|---|
| Charles Styers | Father | Unk. | Phoenix, AZ | Unknown |
| Linda Thompson | Sister | Unk. | Phoenix, AZ | Unknown |

7826u/11-16-90/Linda B.

EXHIBIT 2
WIT: Jololate
DATE: 4-26-17
Sommer Greene, RPR, CRR

388



MILKE_NSB020150

Exhibit 1A

STATE OF ARIZONA -- COUNTY OF MARICOPA -- ADULT PROBATION DEPARTMENT
NORMAN L. HELBER, CHIEF PROBATION OFFICER

P.O.:   ANDREW LEMBC

PRIM   LANG:   ENGLISH

PAGE 2 OF 2

| NAME | JAMES LYNN STYERS | | RACE White | SEX M | HT 5'11" |
| RESIDENCE | 225 West Madison | | EYES Blu | HAIR Bro | HT 210 |
| | Phoenix, AZ | ZIP 85003 | DOB | | AGE 43 |
| PHONE | None | MESSAGE PHONE None | CITIZEN OF USA | | |

CURRENT OFFENSE

CAUSE NO. CR8912631B   OFFENSE DATE 12-02-89          NCIC 0949D
   CHARGE Count I:  Murder, First Degree, a Class 1 Felony
A.R.S. NOS. 13-1105, 1101, 703, 801, 203(A)(B.2), 301, 302, 303, 304, 812
CAUSE NO. CR8912631B   OFFENSE DATE 12-02-89          NCIC C0949D
   CHARGE Count II:  Conspiracy to Commit Murder, First Degree, a Class 1
   Felony
A.R.S. NOS. 13-1003, 1105, 203(A)(B.2), 301, 302, 303, 304
CAUSE NO. CR8912631B   OFFENSE DATE 12-02-89          NCIC 3893D
   CHARGE Count III:  Child Abuse, a Class 2 Felony and Dangerous Crime
   Against Children
A.R.S. NOS. 13-3623(A)(B), 604.01, 702, 801, 203(A)(B.2), 301, 302, 303, 304,
   812
CAUSE NO. CR8912631B   OFFENSE DATE 12-02-89          NCIC 1099D
   CHARGE Count IV;  Kidnapping, a Class 2 Felony and Dangerous Crime Against
   Children
A.R.S. NOS. 13-1304, 1301, 604.01, 702, 801, 203(A)(B.2), 301, 302, 303, 304,
   812

7826u/11-16-90/Linda B.

MILKE_NSB020151

Exhibit 1A

THE STATE OF ARIZONA
            Plaintiff

            vs.

JAMES LYNN STYERS
            Defendant

CAUSE NO. CR8912631B

HONORABLE PETER T. D'ANGELO

CRIMINAL DIVISION 15

SUPERIOR COURT

## PRESENTENCE INVESTIGATION

### PRESENT OFFENSE:

The following information is taken from Phoenix Police Departmental Report #89-179406:

On December 2, 1989, James Lynn Styers filed a missing child report, advising police that his roommate's son, Christopher Milke (age four), had disappeared during their visit to Metrocenter Mall that date. Present with Mr. Styers during the time period the report was filed was codefendant, Roger Mark Scott.

On December 3, 1989, Mr. Scott admitted during a police interview, that he had accompanied James Styers the previous day to a desert wash in the area of Ninety-ninth Avenue and Jomax Road where Styers shot and killed Christopher Milke. Scott told police that they had gone out several times before to "kill the kid," however, there were generally "too many people around." Scott agreed to accompany Styers because he needed $250.00 to file a social security case. Styers agreed to provide him with the money as he believed he was to receive some of Christopher's $5,000.00 life insurance policy. At the conclusion of the interview, Mr. Scott escorted police to the desert area where Christopher Milke's body was recovered. A subsequent autopsy revealed three entry gunshot wounds to the child's head.

On December 3, 1989, Christopher's mother, Debra Jean Milke, was interviewed by Phoenix Police Detective Saldate. During the interview, Ms. Milke conceded that she had conspired with Styers to have her son killed. She indicated that "it would be better to have her son die than to grow up like her husband." Debra indicated that her only agreement with Styers was that he would not tell her the specifics of the killing. She advised that on one previous occasion, she had gone out with Styers to have her son killed but that they never went through with it. On the occasion of the actual shooting, Mr. Styers had informed Debra Milke of his intentions, at which point Ms. Milke instructed her son to go with him to see "Santa Claus."

### RELATED OFFENSES/STIPULATIONS:

On December 8, 1989, the defendant was charged by Grand Jury indictment with the crimes of count I, first degree murder, a class 1

PAGE 1

**MILKE_NSB020152**

Exhibit 1A

JAMES LYNN STYERS                    CAUSE NO. CR8912631B
          Defendant

---

felony; count II, conspiracy to commit murder, first degree, a class 1 felony; count III, child abuse, a class 2 and dangerous crime against children; and count IV, kidnapping, a class 2 felony and dangerous crime against children. On November 2, 1990, before the Honorable Peter T. D'Angelo, the jury found a defendant guilty of same.

DEFENDANT'S STATEMENT:

          The defendant continues to deny his involvement in this offense and maintains that it was the codefendant, Roger Scott, who conspired to kill and, in fact, shot Christopher Milke to death. He advised that prior to the shooting incident, he had shared an apartment with codefendant Debra Milke and had been responsible for baby-sitting her child, Christopher Milke, for a period of approximately five months. During this time span, he admittedly grew fond of both Debra Milke and her child, and he contends that he would never have engaged in any activity to harm either of the two. The defendant advised that he endured a particularly close relationship with Debra Milke, however, he states that they were never romantically involved.

          On the occasion of the shooting, he concedes that he accompanied both Roger Scott and Christopher Milke to the desert area to "look at snakes," it was when he had his back towards them that he heard shots being fired. According to the defendant, Roger then pointed a gun at him and stated, "I took care of Christopher and this is what you're gonna do." The defendant stated that Roger then conjured up the alibi that the defendant was instructed to go along with. He added that once Roger pointed a gun at him, he was reminded of his tour of duty in Vietnam and he suddenly experienced what he termed as "solid fear." The defendant was concerned that if he did not comply with Roger's demands, that he would not only find himself being shot but possibly his daughter and Debra Milke. Mr. Styers believes that it was the child's father, Mark Milke, who conspired with Roger to have Christopher killed because "Mark always wanted to make her (Debra Milke's) life miserable." The defendant indicated that he was aware that Debra Milke had taken out a $5,000.00 life insurance policy on her son prior to the shooting, but he contends that this simply came out in normal conversation and would not have enticed him into committing any illegal activity.

          As for his plans for the future, the defendant appears optimistic that he will be granted a retrial in this concern and eventually be found "not guilty." Should this not be the case, he maintains that he would rather be put to death than to serve the rest of his life in prison.

COMPANION ACTION:

          On October 12, 1990, before the Honorable Cheryl Hendrix, a jury found Debra Jean Milke guilty of count I, first degree murder, a

PAGE 2

MILKE_NSB020153

Exhibit 1A

JAMES LYNN STYERS
  Defendant

CAUSE NO. CR8912631B

_____

class 1 felony; count II, conspiracy to commit murder in the first degree, a class 1 felony; count III, child abuse, a class 2 and dangerous crime against children; and count IV, kidnapping, a class 2 and dangerous crime against children.  Ms. Milke has a sentencing date of December 7, 1990, in that same division.

   Roger Mark Scott was charged with count I, first degree murder, a class 1 felony; count II, conspiracy to commit murder in the first degree, a class 1 felony; and count IV, kidnapping, a class 2 and dangerous crime against children.  Mr. Scott has a tentative trial date set before the Honorable Peter T. D'Angelo on November 30, 1990.

STATEMENT OF VICTIMS:

   Mr. Mark Milke, the victim's father, relayed that "Christopher was the most important thing in my life and when he was taken away from me, I felt that I myself had died." Mr. Milke appeared particularly concerned that the defendant created an illusion that he was a very religious man and that through this guise he gained the trust of his son, Christopher Milke. Mark is convinced that it was his former wife who initiated the conspiracy, although he views the defendant equally accountable for the death of his son. Mr. Milke advised that he is a recovering alcoholic and acknowledges that he has been dealing with the loss of his son through his involvement in Alcoholics Anonymous. Mr. Milke is recommending that the defendant receive the death sentence in this matter. He commented that it was his ex-father-in-law who was responsible for his son's funeral expenses.

   Mr. Richard Albert Sadeik, the victim's maternal grandfather, advised that he has suffered greatly over the loss of his grandson and he feels that all parties involved in his death should receive severe repercussions as a result of their actions. He feels that the defendant in particular, should receive the death sentence, as he was the actual "trigger man" in this matter. Mr. Sadeik indicated that he was responsible for his grandson's funeral services which were performed at Brown Mortuary in Florence, Arizona, and totaled $1,772.43 (confirmed). He is requesting full restitution in this matter. (The victim's maternal grandmother, Renate Sadeik, currently resides in Switzerland and is unavailable for comment at the present time.)

   Mr. Henry Milke, the victim's paternal grandfather, advised that the loss of his grandson has "affected me very hard, at times I sit in my home and cry uncontrollably like a child." Mr. Milke is recommending that the defendant receive the "death sentence" particularly because he was the "guy who pulled the trigger."

MILKE_NSB020154

Exhibit 1A

JAMES LYNN STYERS                    CAUSE NO. CR8912631B
        Defendant

Mrs. Ilse Milke, the victim's paternal grandmother, advised that Christopher had resided with her on and off since his birth, and that the two had developed a particularly close relationship with each other. Mrs. Milke would like the Court to be made aware of the fact that the defendant's actions have not only affected her but have affected many people whose Christopher's life had touched. She is recommending that the defendant "get the gas chamber" or receive a life sentence as a result of his conduct.

Mrs. Sandra Denise Pickinpaugh, the victim's maternal aunt, advised that she, more than the child's mother, had been responsible for raising Christopher throughout most of his short life, and that she had grown to love Christopher as her own son. Most of Mrs. Pickinpaugh's statements concerned her feelings about her sister, Debra Milke, and how she continuously abused the child from shortly after his birth. Mrs. Pickinpaugh does feel that James Styers, in particular, should be held accountable for the death of her nephew because he was the one who actually effected the "shooting."

STATEMENT OF INTERESTED PARTIES:

Detective Mills of the Phoenix Police Department is recommending that the defendant receive the "death sentence" in this matter because of the extent of premeditation involved in the execution of the crime and because of the "depraved manner" in which he "executed the child and left him to rot in the desert." Detective Mills is convinced that Debra Milke enticed the defendant into shooting her son by promising him a portion of her son's $5,000.00 life insurance policy.

Deputy County Attorney Noel Levy has outlined his interests in a sentencing memorandum which has already been made available to the Court. Mr. Levy is recommending the death penalty be imposed in this matter for the reasons as enumerated in the memorandum.

Defense Attorney Jesse R. Miranda will reflect his interests in a sentencing memorandum as yet unavailable to this writer. Mr. Miranda contends, that if his client was in fact responsible for the death of Christopher Milke, it is unclear to him as to why he would have behaved as he did. Mr. Miranda advised that his client suffers a history of behavioral problems and in his opinion, his emotional state at the time of the shooting may have seriously depreciated his ability to comprehend the seriousness of his conduct. Mr. Miranda will defer additional comment to the time of sentencing.

PAGE 4

**MILKE_NSB020155**

Exhibit 1A

JAMES LYNN STYERS                    CAUSE NO. CR8912631B
        Defendant

---

ARREST HISTORY:

JUVENILE:

The defendant informs that he has never been arrested as a juvenile. In view of his age, this writer is not in a position to obtain records from juvenile authorities.

ADULT:

According to information obtained from the Maricopa County Sheriff's Office, Arizona Department of Public Safety, Phoenix Police Department, LEJIS, F.B.I., and criminal justice authorities in the state of Pennsylvania, the matter currently before the Court does represent the defendant's first adult arrest.

The defendant, however, informs that in 1967, at the approximate age of twenty, he was arrested in Phoenix, Arizona, after he was caught "siphoning gasoline" out of someone's vehicle. This writer has not been able to confirm this arrest, although the defendant has claimed that charges in this matter were eventually dropped.

SOCIAL HISTORY: Unless otherwise noted, the following information was provided by the defendant:

Family: James Lynn Styers was born September 3, 1947, in New Castle, Pennsylvania. He is the sixth of seven children born to his parents. The defendant informed that he has a limited recollection of his childhood because of a head injury he suffered in 1971. He does recall his parents being generally "unemotional," rarely displaying any signs of affection between each other or with the children. The defendant's father provided for the family through his earnings as a maintenance man and the defendant does recall having it "tough financially" throughout his childhood years. To the best of his recollection, the defendant informs that he was never physically, emotionally, or sexually abused as a child.

Education: The defendant quit high school after completing the eleventh grade. As a high school student, he obtained average grades, although he did have to study "twice as hard" because of a "learning disability." In 1974, he obtained his G.E.D. after participating in a remedial education course at Phoenix Union High School; and in 1984, he earned an associate's degree in general studies at a local community college in Phoenix.

A Word Recognition Aptitude Test administered to the defendant indicates a reading ability above the sixth grade level.

PAGE 5

MILKE_NSB020156

Exhibit 1A

JAMES LYNN STYERS
        Defendant

CAUSE NO. CR89126318

---

**Employment:** In view of a medical disability, the defendant was at the time of his arrest, unemployed for a period of approximately five years. He cites his last employment as a rehabilitation technician for the State of Arizona, a position he held from 1982 until 1984. In 1978, he recalls having worked as a quadriplegic therapist for a private agency in Phoenix for approximately one year. He cites previous job experience as an accounting clerk.

**Substance Use:** According to the defendant, he does not consume alcoholic beverages and marijuana is the only illicit substance he has ever used or experimented with. He last used marijuana while he was in military service in 1969.

**Marital:** The defendant married Kathy Eulin in 1968 and divorced in 1978. This union produced two children, currently twenty-four and twenty-five years old, respectively.

The defendant has been married to Karen Styers since June 3, 1978. The couple have been separated since 1981, although they will engage in periodic communication with each other. This union produced two children, currently three and eleven years old, respectively. According to Mrs. Styers, the defendant chose to move out of the house after he had a "few other girl-friends." The defendant maintains, however, that their separation was attributed to financial difficulties. Mrs. Styers informs that while he did reside in the household, the defendant generally proved to be a responsible husband and father. She advised that she never witnessed the defendant ever engaging in any abusive behavior and that she was shocked to find out that the defendant could have been involved in the death of Christopher Milke.

**Military:** The defendant served in the United States Marine Corps from May 1, 1967, until he received an honorable discharge (under medical conditions) on July 31, 1971. The defendant served in active combat in Vietnam in 1968 and 1969. According to the military records, the defendant was cited for AWOL on or about November 8, 1967, and was subsequently ordered to be fined at "hard labor" for a period of "three months."

The defendant maintains that in 1968, while serving his tour of duty in Vietnam, he shot and killed an eight-year-old Vietnamese child after the child jumped onto a military truck transporting troops. The defendant advised that the child was not armed at the time, however, he was nonetheless "not willing to take a chance" because it was not uncommon for the Vietcong to wire children with explosives.

**Health:** In 1971, the defendant suffered a severe head injury after he was thrown from a military truck while stationed in Yuma, Arizona. Immediately following the accident, he suffered a long-term coma, followed by the necessity to "relearn" everything from walking to talking. The defendant has

PAGE 6

MILKE NSB020157

Exhibit 1A

JAMES LYNN STYERS
      Defendant

CAUSE NO. CR8912631B

---

also suffered memory problems as a result of the injury and has, in the past, been prescribed various antiseizure medication.

Mental Health:   In February and March of 1990, Rule 11 evaluations were conducted on the defendant by Jack Potts, M.D., Mark Berman, Ph.D, and Thomas N. Thomas, M.D. All appeared to agree in their assessment of the defendant that the defendant has been suffering from a post traumatic stress disorder, which in the past required his taking lithium (a mood stabilization medication) and Navane (an antipsychotic medication). Current symptoms include auditory and visual hallucinations, extreme depression, and suicidal ideations. His hallucinations do admittedly include voices of adults and children crying. According to the defendant, he entered group counseling at the Phoenix Veterans Hospital in approximately 1984, where he entered the PTSD (Post Traumatic Stress Disorder support group program), an activity he would intermittently involve himself in up until 1989.

In Dr. Mark Berman's written assessment of the defendant, he references psychological data made available to him by the Veterans Administration. It appears the defendant had a "suicide attempt overdose in 1971, also combined with intoxication of alcohol." VA records dated December 19, 1985, tended to reconfirm the subsequent diagnosis of post traumatic stress syndrome as well as "dependent and passive aggressive personality traits, short temper with angry outbursts and easy frustration, dreams of nightly combat situations, poor sleep and survivor guilt." VA records dated June 30, 1989, reflected that the defendant achieved a full scale IQ of eighty-four, which is in the middle of the "low average" range of intelligence.

FINANCIAL STATUS AND EVALUATION:

      Restitution in the amount of $1,772.43 will be recommended to be paid to Richard Albert Sadeik.

      The probation officer has considered the following factors in determining the manner of payment:

1. Defendant's age: forty-three.
2. Defendant's income: Veterans Administration benefits amounting to $711.00 per month.
3. Defendant's expenses: none.
4. Defendant's assets: $100.00 cash.
5. Defendant's education: high school plus associate's degree.
6. Defendant's obligation to support dependents: none.
7. Defendant's employment history: poor.
8. Defendant's prospects for employment: poor.
9. Others: none.

PAGE 7

**MILKE_NSB020158**

Exhibit 1A

JAMES LYNN STYERS                        CAUSE NO. CR8912631B
          Defendant

_____

          Based on the above, it is recommended the defendant pay
restitution through the Clerk of the Court per the attached restitution ledger
sheet.

DISCUSSION AND EVALUATION:

          James   Lynn   Styers   is   a   forty-three-year-old   male
possessing  no  previous  history  of  criminal  convictions.   In the pending
matters, the victim, four-year-old Christopher Milke, was found shot to death
in a desert wash after he was told by his mother (Debra Milke) that he was
going to see "Santa Claus."  The murder conspiracy was apparently initiated by
the victim's mother who had reportedly promised the defendant a portion of her
son's insurance policy in the event he actually effected the shooting.
Although there is some uncertainty as to the defendant's exact motivation in
these matters, it seems likely that he was motivated by the prospect of
financial gain, as well as by his emotional attachment to codefendant Debra
Milke, who very much wanted her son put to death.

          As indicated previously, Mr. Styers is a Vietnam combat
veteran, who has been diagnosed as suffering from post traumatic stress
syndrome and other emotional disorders.  The defendant's emotional condition
has required professional intervention in the past.  He also suffered a head
injury approximately ten years ago which was apparently followed by the
necessity to "relearn everything from walking to talking."  The defendant
apparently still has problems with memory retention, continues to "hear
voices" (particularly sounds of children crying), and has attempted suicide in
the past.  He was admittedly responsible for the fatal shooting of a
Vietnamese child, approximately twenty-two years ago, whom he felt represented
a danger to his fellow Marines.  Although the child was obviously unarmed, the
defendant indicated that he was comfortable shooting the child because he was
simply not willing to "take a chance" that the child was armed and dangerous.
It is of interest to note that the defendant's second wife described the
defendant as being a responsible parent and husband, who has never shown an
inclination to abuse either herself, or their two children.  The defendant,
however, has been separated from his wife for the past five years.

          In view of the defendant's medical disabilities, he has
been unemployed for approximately five years.  Recent psychological testing
reveals that he appears to be functioning within the "low average" range of
intelligence, although it is noted that since he experienced his head injury
in 1971, he has admittedly obtained an associate's degree in the field of
general studies.

          In conclusion, the defendant certainly has demonstrated
himself to be a serious risk to the community, as evidenced by the conspiracy
and the fatal shooting of four-year-old Christopher Milke.  It particularly

PAGE 8

**MILKE_NSB020159**

Exhibit 1A

JAMES LYNN STYERS                    CAUSE NO. CR8912631B
        Defendant

concerns this writer that the defendant was in fact the child's baby-sitter
and was apparently looked up to by the victim as someone he could trust.
Mr. Styers has been found guilty of murder, conspiracy, child abuse, and
kidnapping charges, and the law is quite specific on providing sentencing
ranges for these charges.  For the reasons outlined in the following list of
sentencing factors, aggravated sentences appear appropriate under the
circumstances.

        These factors were considered in making the sentencing
recommendation:

1.  The defendant committed the offense in an especially heinous, cruel,
    or depraved manner.
2.  The defendant was an adult at the time the offense was committed and
    the victim was under fifteen years of age.
3.  The defendant committed the offense in expectation of pecuniary gain.
4.  The defendant exploited a position of trust to effect the crime.
5.  Social and psychological data made available on the defendant.
6.  Statements from the various references and interested parties to
    include the victim's family members and information contained in a
    sentencing memorandum made available by Deputy County Attorney Noel
    Levy.

RECOMMENDATION:

        Counts I and II:

        It is respectfully recommended that the defendant be
sentenced in accordance with the law and pay a felony penalty assessment in
the amount of $200.00.

        Counts III and IV:

        It is respectfully recommended that the defendant be
committed to the Department of Corrections for a term greater than the
presumptive, pay a felony penalty assessment of $200.00, and pay an $8.00 time
payment fee per A.R.S. 12-116, unless all penalties, fines, and sanctions are
paid in full on this sentencing date.

        It is further recommended the defendant pay restitution
per the attached restitution ledger sheet.

PAGE 9

MILKE_NSB020160

Exhibit 1A

JAMES LYNN STYERS                    CAUSE NO. CR8912631B
        Defendant

_____

(375)

                The   defendant   has   served   368   days   of   presentence
incarceration.

                                        Respectfully submitted,

I have reviewed and considered          By: _____
the probation officer's report.         Andrew Lembo
                                        Deputy Adult Probation Officer
                                        262-3648

Judge: _____                  AL:lb:7826u
Date: _____                   November 16, 1990

PAGE 10

MILKE_NSB020161

Exhibit 1A

EXHIBIT 3
WIT: Valdate
DATE: 4-26-1
Sommer Greene, RPR, CRR

1-4-85

Jim Syers

Viet Nam   Feb. 1968 / 1969?

events most upsetting:   Most of the time in Viet-Nam. Like driving a truck in a convoy and getting into a village and people start shooting at us killing and wounding. Haveing a kid between 8 x 10 years old jump on my truck and me blowing his head off. Our driving down the road and having a bullet come thru the windshield while reaching for a can of beer, or haveing bullets coming thru the windows while trying to get out the other side of the truck. Or blowing up a trucks you are driving killing 4 people and wholing one, and you just get hurt a little. Seeing a friend get killed when I could have stoped it but didn't and not know why.

current day to day:  Loosing sleep because of dreams of Viet-Nam. Seeing kids including my own and wondering if I'm going to do something to hurt them, and remembering the ones I had to kill.

Worrying about what I'm going to do when I hear some loud noise. Or hearing and seeing some of the Viet-Namese people hear when they -are arguing or just messing around. I don't know if I will be able to keep walking away or if it will happen when I'm already upset and might do something. I also have a red rash that burns and

MILKE_NSB019970

Exhibit 1A

5/7

MAY 1 4 REC'D

RULE 11.3 EXAMINATION

NAME:  JAMES LYNN STYERS (CR89-12631)

DATES OF EVALUATION:  March 26 and 27, 1990

REASON FOR EVALUATION: To assess intellectual, social, emotional, and behavioral functioning pursuant to the question of his competency to stand trial on charges of Murder, Conspiracy to Commit Murder, Kidnapping, and Child Abuse.  To assess Mr. Styers' state of mind at the time of his alleged commission of the offenses.

TESTS ADMINISTERED:  Bender-Gestalt, Trail-Making, Wechsler Memory Scale. State-Trait Anger Expression Inventory (STAXI), Rotter Incomplete Sentences Blank-Adult Form.

RECORDS REVIEWED:  Various police reports, Court records, medical file in Madison Street Jail, materials from the VA Medical Center (received 5/8/90), and other documents.

PHONE CONVERSATIONS WITH:  Chesley Goodman, Phoenix Veterans' Center; John Gutierrez. Phoenix Veterans' Center; James Campbell, M.D., Psychiatrist; Jack Potts, M.D., Psychiatrist. Maricopa County Correctional Health Services; John Harrington, M.D., Psychiatrist, Mental Hygiene Clinic, VA Medical Center, Phoenix; Pat Christianson, Medical Information Supervisor, VA Medical Center, Phoenix; Ted Radomski, M.D., Psychiatrist Mental Hygiene Clinic, VA Medical Center, Phoenix.

BACKGROUND INFORMATION:  Mr. Styers, who is forty-two years of age, stated that he has been married twice, and is still married to his second wife, though they were separated at the time of his arrest on Murder charges.  When arrested he was living with Debra Milke, the biological mother of the murdered child, Christopher Milke.  Mr. Styers said that he served in the military in Viet Nam.  He remarked that he first entered counseling/psychotherapy in 1971, the year when he sustained head injuries (skull fracture in the area of the left temple) in an accident.  Mr. Styers recalled that he began group counseling at the Phoenix Veterans' Center in approximately 1984, at about the same time he entered the PTSD (Post-Traumatic Stress Disorder) program at the Phoenix VA Medical Center.  Pursuant to this Mr. Styers was an in-patient at the VA hospital for some four months.  Off and on since around 1984 Mr. Styers has re entered or re-involved himself in the latter program.  As nearly as I can determine, he last sought services from the VA on 11/7/89.  He denies or does not recall any psychological/psychiatric treatment as an adolescent.

Mr. Styers fa is living.  His mother is recently deceased.  He has six siblings, one of whom passed-away about two years ago.  There were only two days between his mother's and his brother's deaths.  Mr. Styers has three children from his two marriages, including two from his first marriage.  He also fathered a child by a woman he was not married to.  Mr. Styers said that his first wife did not want him to see their daughters.

Mr. Styers' jail medical file notes that he has been taking lithium.  His

EXHIBIT 4
WIT: Saldate
DATE: 4-26-17
Sommer Greene, RPR, CRR

ER – 1852

MILKE_NSB019948

Exhibit 1A

lithium level on 3/16/90, ten days before I met with him for the first time, was 1.21. Normal is from 0.60 to 1.40. A 12/7/89 diagnosis by the Phoenix VA Hospital lists "PTSD" (Post-Traumatic Stress Disorder). Inmate Request Forms, completed by Mr. Styers on 2/10, 2/23, and 2/27/90, requested meetings with Correctional Health Services Psychiatrist Jack Potts, M.D., for the purpose of "counseling". A Maricopa County Health Services, Correctional Health Services report, dated 3/27/90, noted that Mr. Styers was taking Ativan...2 mg X 21 days". A similar report, dated 2/3/90, mentioned an order to discontinue Lithium and Navane, and to check Mr. Styers' lithium level in twelve to fourteen days. Another Correctional Health Services report, dated 3/1/90, mentioned an order to "discontinue all meds", and to check the lithium level in fifteen days. A Maricopa Medical Center entry, dated 12/2/89, stated that Mr. Styers was "treated "at VAMC (Va Medical Center) for PTSD (Post-Traumatic Stress Disorder)...apparently been on lithium and Navane for about two years...help with voices...presently alert, oriented times four, not suicidal. Impression: stable". Another Maricopa Medical Center entry, dated 12/20/89, states that Mr. Styers offered "no medical complaints...states he 'hears voices'...sees things but otherwise fine...no distress".

A 12/21/89 Maricopa County Correctional Health Services Patient Health Exam and Data Base report mentions that Mr. Styers sustained a head injury in 1971, as well as injuries to his eye, back, and ears as a result of an explosion in Viet Nam. According to this report, Mr. Styers smoked marijuana, but only in Viet Nam. It further mentions "flat affect...impaired hearing...bipolar disorder...PTSD". VA records, contained in Mr. Styers' jail medical file, note a 12/19/85 diagnosis of (1) "PTSD; (2) cyclothimic mood disorder...passive-dependent and passive-aggressive personality traits...seizure-like ativity that was ill-defined, short temper with angry outbursts and easy frustration, dreams nightly of combat situations...poor sleep, and survivor guilt. In addition, he had a memory problem which most likely relates to a head injury suffered while in the Marines on active duty in Yuma, Arizona when he fell off a truck in 1971. The patient had recognizable stressors for PTSD including shooting a young boy in the head when the child went to their truck to shoot them, letting a buddy get killed when he (Mr. Styers) had the enemy in his sights...a third trauma was a bombing halt near the DMZ when a friend was killed. The patient does not have well-defined flashbacks, although he gets episodes of perspiration...he has easy irritability. His symptoms started at least six months after leaving Viet Nam. He had a suicide attempt overdose in 1971, also combined with intoxication with alcohol".

A VA Medical Center note, dated 11/7/89, which apparently was Mr Styers' last visit there, states that he was considering moving to Wyoming where he has friends. In addition, the note stated that he "has been irritable and short-tempered. These things are getting worse. Sleeps three to four hours a night. Hears voices regularly. Doesn't pay attention to it. Feels like quitting trying anymore".

I also note a VA Medical Center Consultation Report, dated 6/30/89 apparently, in which results of the Wechsler Adult Intelligence Scale-Revised edition are presented. Mr. Styers achieved a Full Scale I.Q. of 84, which is in the middl of the "low average" range of intelligence. His Full Scale I.Q. when tested o 4/10/85 was 87, while his Full Scale I.Q. on 6/26/84 was 85. On all of these

MILKE_NSB019949

Exhibit 1A

tests there was virtually no difference in scores on the Verbal and Performance
scales (which measure verbal intelligence/language abilities, and nonverbal
intelligence/visual-motor skills, respectively). Mr. Styers' scores on the
Wechsler Memory Scale, administered on the same dates, were eighty-seven,
ninety-four, and ninety-six respectively, indicating a gradual although not
dramatic decline in scores from 1984 to 1989. The first score is somewhat
below-average, while the second two scores (1984 and 1985) are in the "average"
range. The narrative generated by the 1989 evaluation is partly as follows:
"cognitive functions have remained essentially unchanged. Patient's losses are
generally mild and are mainly in the area of complex problem-solving and
inefficiencies in reflective thought processes. Memory functions are currently
unchanged, with the exception of current information and immediate recall which
are mildly reduced in comparison to previous testing. These lower scores
appear anomolous and maybe a function of situational factors".

Additional VA materials, received by me on 5/8/90, state that Mr. Styers: (a)
as of 9/25/85, was "sharing an apartment with a girlfriend" (while married to
his second wife); (b) "wishes to be with wife and children"; (c) "had a suicide
attempt overdose in 1971, also combined with intoxication with alcohol" (part
of Discharge Summary, dated 1/7/86); (d) "was in artillery and motor transport"
while in the military; (e) "was placed on Lithium because of his tendency to
talk tangentially...(also) it is felt that most likely he has no seizure
disorder. The patient used medical services very frequently in a dependent
fashion"; (f) was a "combat veteran" (according to a "PTSF Program Psychiatric
Assessment"); (g) "fired repeatedly at a superior officer who gave an order he
did not like" (from a Clinical Record Consultation Sheet, dated 1/19/72); (h)
"expresses extreme antisocial fantasies and admits to having committed
antisocial acts in the past. Combined with his expressed irritability with
others and his tendency to act on impulse, the possibility of further acting
out behavior cannot be ruled out" (from the same Consultation Sheet); (i)
had, as of 10/30/72, "persistent headaches due to head injury" (from "Doctor's
Progress Notes"); (j) had a skull series (X ray) on 8/4/83 which revealed "no
evidence of recent or remote fracture. No pathology demonstrated" (Dr.
LeGrand); (k) has a "service connected Skull, left, fracture, with General
Contusions, presently rated 40% disabling. He has in the past demonstrated
psychological inability to function in an academic or skill development
situation" (letter, dated 10/15/76, prepared by C. Dale Rush, Counseling
Psychologist); (l) had a skull series (X ray) on 11/1/72, with "no evidence of
deformity or of recent or old fractures" (Dr. Cohen); (m) had an EEG
(electroencephalogram) on 11/9/72. Dr. Urrea's findings include "a well
developed and symmetrical alpha rhythm of 11 cycles per
seconds....hyperventilation failed to evoke abnormality. No lateral slowing o
epileptiform activity was seen...Normal EEG"; (n) had a brain scan on 11/3/72,
which showed "no significant localized areas of increased uptake" (Dr. Likos);
(o) had no seizures for two years, between approximately 12/71 and 12/73; (p)
was "very depressed" on or about 8/9/77, as his "wife left him and took the
children". This refers to his first wife; (q) "complains of nervousness and
headaches" as of 2/13/76; (r) had an EEG on 8/16/77, which was described as
"normal" (Dr. Sachdev); (s) denied, on or about 11/17/76, that he had any
marital or family problems; (t) "was judged not to have any organic brain
dysfunction (statement contained in "Clinical Record, Doctor's Progress Notes"
dated 12/17/76); (u) reported, as of 9/7/77, "episodes of loss of contact with

MILKE_NSB019950

Exhibit 1A

the environment"; (v) was seen by Dr. Berkley and "apparently has no residual rom head injury 1971" (from "Progress Notes", dated 7/14/80); (w) reported " more frequent seizure activity" as of about 9/1/83 ("Consultation Sheet"); (x) had an EEG on 3/12/84, with no abnormalities noted (Dr. Sachdev); (y) at one or more points in time "gets frustrated quite easily and vents his anger at whomever he perceives as creating obstacles" (from "Progress Notes", date uncertain, though after 11/77); (z) suffered from "Dependent Personality Traits" at one time ("Progress Notes", date uncertain, though after 11/77); (aa) admitted to "homicidal ideation (wants to kill Bill George at VARD for antagonizing him)" ("Progress Notes", which appear to have been prepared ca. 7/1/85); (bb) was "court martialed and demoted to E-1" after being AWOL for forty-eight days ("Progress Notes", apparently prepared ca. 7/1/85); (cc) was "attached to an artillery unit and performed many support duties" while in Vietnam ("Progress Notes", apparently prepared ca. 7/1/85); (dd) displayed, in a psychological evaluation conducted by Martha Kent, Ph.D. on or about 6/26/84, "residual deficits...compatible with an old head injury (e.g., losses in immediate attention span, sustained concentration, incidental and systematic new learning); (ee) according to a 7/2/85 "Problem Oriented Initial Assessment and Plans" form, suffered from "Organic Brain Syndrome, with mixed emotional features", as well as "dependent personality traits". this form also mentioned anger, apparently related to his epileptic condition; (ff) as of 7/10/85, "would like to learn to control his temper so not to hurt his three kids" (as per Social Work Service report); (gg) as contained in 9/3/85 Social Work Service report, "punched a wall this morning and he doesn't understand what makes him do this"; (hh) as mentioned in a 10/22/86 "Progress Note", "doesn't want to be with people"; (ii) as mentioned in a 5/20/87 "Progress Note", "doesn't want to be around people"; (jj) as mentioned in a 11/12/87 "Progress ote", "hears people talking to him.  In bed or elsewhere feels someone brush him.  Sees them as ghostly friends"; (kk) as of 10/20/87 ("Progress Note"), was "working on getting back together" with his wife; (ll) as of 1/25/88 ("Progress Note"), was "having problems.  Sees and hears ghostly things and they push on him...easily gets irritated"; (mm) as of 5/12/88 ("Progress Notes"), was "concerned about being upset by daughters crying.  It brings back crying of kids from (Viet) Nam.  Also speaks of 'blackouts'"; (nn) as of 7/6/88 ("Progress Notes"), was "tired of hearing voices"; (oo) as of 8/15/88 ("Progress Notes"), was "unable to obtain work"; (pp) as of 11/10/88 ("Progress Notes"), "feels more depressed.  Mother has cancer.  Isolating more"; (qq) as of ca. 6/89 ("Progress Notes"), was "ambivalent about meds"; (rr) as of 6/14/8 ("Progress Notes"), was referring "to self as stupid...tends to berate self fo failures"; (ss) as of 11/7/89 ("Progress Notes"), "hears voices regularly"; (tt) as of 12/13/89 ("Informational Rx Profile"), "Brain disease due to trauma accounted for ten percent of his disability; (uu) as of 10/8/85 ("Clinical Record, Master Treatment Plan"), was to work on "marital-family problems"; (vv as of 10/8/85 (report), had "difficulty having fun"; (ww) as of 9/20/85 ("Clinical Record, PTSD Program Assessment, Team Composite Report"), was seen as having a "short temper"; (xx) as mentioned in 9/19/85 "PTSD Program Social Assessment", "has had much difficulty with employment.  In the past ten years he has had ten jobs"; (yy) as of 9/16/85 ("PTSD Program-Psychological Assessment"), "appears to have developed limited problem solving skills, or to have regressed after injury in the military"; (zz) as of 1/3/86 ("Clinical Record, Progress Notes"), "was displacing blame"; (aaa) as of 12/20/85 ("Progress Notes"), "at times...will become angry and explode...(he is

MILKE_NSB019951

Exhibit 1A

5

manifesting) resistiveness to techniques"; (bbb) as of 12/2/85 ("Medical
Record, Progress Notes"), was "hearing voices...associates it with child he
killed in Vietnam"; (ccc) as of 11/25/85 ("Progress Notes"), was "reluctant to
share in group"; (ddd) as of 11/12/85 ("Medical Record, Progress Notes"), was
quoted as saying the following: "I'm changing how I deal witht things and I
think it's harder to deal with anger now because I talk about it or I stop and
think. I don't just blow up or walk away any more". In this same "Note", it
was stated that Mr. Styers was "less anxious and (manifesting) reduced
attention seeking behavior. He is more able to listen to peers and staff";
(eee) as of 10/18/85 ("Progress Notes"), stated that sometimes he feels "so
helpless" that he "just can't get any satisfaction or justification from
injustice"; (fff) as of 9/26/85 ("Medical Record, Progress Notes"), "has made
several sexual innuendos to the female nurses".

A report to Judge D'Angelo, from Jack Potts, M.D., states that Mr. Styers'
thought processes were "goal directed and intact (on 2/3/90)...not suffering
(from)...any perceptual disturbances...presently diagnosed as suffering from
post-traumatic stress disorder and is receiving both Lithium (a mood
stabilizing medication) and Navane (an antipsychotic medication) for treatment
of this disorder. These medications at the present levels will in no way
interfere with the defendant's competency...he has insight into his problems
and appears to be exercising relatively good judgement at the present
time...(he) does appear to be depressed..secondary to his incarceration...(he)
does have a rudimentary understanding of his constitutional rights as well as
the necessary waiver of those rights if he should wish to enter a plea of
guilty. he understands the roles of the different participants in the
proceedings against him. He feels he can assist his attorney in his own
defense...I do not believe that grounds presently exist to question the
defendant's competency to stand trial, assist his attorney, or enter a plea of
guilty. It would not be appropriate to grant the motion for a more extensive
evaluation pursuant to Rule 11 based on the question of the defendant's present
competency...the defendant's depression is not abnromal and...will not
interfere with his competency".

Mr. Styers was arrested after the body of Christopher Milke. the son of Debra
and Mark Milke (they are divorced), was found in the desert in North Phoenix.
Medical examination of the back of the victim's head revealed three entry
gunshot wounds.

BEHAVIORAL OBSERVATIONS: Mr. Styers' stream of thought was clear. His affect
generally was slightly flat. He was alert and well-oriented in all spheres.
Mr. Styers did not appear particularly anxious. His gait and posture appeared
normal, and there were no signs of invalidism or involuntary movements. His
eye contact was good. Mr. Styers was cooperative at all times. He was
occasionally assertive, but never aggressive or difficult to deal with. Mr.
Styers' frustration tolerance was fairly good, allowing for the circumstances
(being incarcerated, etc.) under which I saw him. His self-confidence was
generally fair to poor. Concentration/attention was good. Mr. Styers clearly
appeared to comprehend my questions and statements.

CONVERSATIONS WITH VARIOUS PROFESSIONALS

MILKE_NSB019952

Exhibit 1A

With Chesley Goodman of the Phoenix Veterans' Center:  Mr. Goodman stated
that there were contacts with Mr. Styers in February, April, and September of
1989.  He mentioned that Mr. Styers had completed the PTSD program at the
Phoenix VA Medical Center.  He was unable to describe the severity of Mr.
Styers' Post-Traumatic Stress Disorder, and instead referred me to John
Gutierrez, who ran a counseling group in which Mr. Styers was occasionally
involved.

2.  With John Gutierrez of the Phoenix Veterans' Center:  Mr. Gutierrez
commented as follows:  "My involvement (with Mr. Styers) was in the past.  I
was running a support group for some of our more CMI (chronically mentally ill)
clients...he came five or six times...(he) didn't relate to his (own)
issues...I can't substantiate his PTSD...it's been a while since I saw
him...the last was 4/5/89...he was involved in the Mental Hygiene Clinic at the
VA...I don't know that a full assessment has been done of him".

3.  With James Campbell, M.D., Psychiatrist:  Dr. Campbell remarked that he did
not recall working with Mr. Styers.

4.  With Jack Potts, M.D.:  Dr. Potts stated that, in his opinion, Mr. Styers
is "esentially competent.  Somewhat fragile.  I don't know his state of mind at
the time of the offense".  He mentioned that Mr. Styers was in the general jail
population, and was only in the Psych Unit for two days.

5.  With John Harrington, M.D.:  Dr. Harrington, with whom I spoke on 4/17/90,
said he could not speak to me without the approval of VA legal staff.  As of
/11/90 I had not heard back from him.

6.  With Pat Christianson:  Ms. Christianson, who is Medical Information
Supervisor at the Phoenix VA Medical Center, stated that Mr. Styers had not
been seen at the Center since 11/7/89( except for an allergy shot), and that he
saw Dr. Radomski at that time.  She said that Mr. Styers "was increasingly
irritable (on 11/7/89); short-temper".  Ms. Christianson said that she would
have Dr. Radomski call me.  As of 5/1/90 I had not heard from him.

7.  With Ted Radomski, M.D., Psychiatrist, VA Medical Center, Phoenix:  Dr.
Radomski, who has been treating Mr. Styers at the VA for a number of years,
stated that he last saw Mr. Styers on 11/7/89.  Dr. Radomski remarks included
the following: "My opinion is that he is competent to stand trial...I've
discussed it with other people (mental health professionals, et al), and they
feel the same way...He was always about the same (emotionally-
psychologically)...(Q. Did you see him as suffering from bipolar disorder?)
that was not my working diagnosis...it (the actual diagnosis) was cyclothymic
disorder...(Q. Did Mr. Styers serve in combat in Vietnam?)  I'd have to do a
little better review (of Mr. Styers' records)...it was my understanding that
(he was in combat)...we don't verify these things...(Q. Do you feel he has
generally been truthful with you during the time you have worked with him?)
It's very difficult to know...(Q. What was his state of mind on or about
12/2/89?)  That's difficult to say, because I saw him last in November, 1989".

ER - 1857

MILKE_NSB019953

Exhibit 1A

7

TEST RESULTS

1. Bender-Gestalt

Mr. Styers made three errors on this test of visual-motor perception and coordination.  This is moderately below-average for his age.  His visual recall was average for his age.

2.  Trail-Making

Trails A:  68 seconds, no errors.  Cutoff: between 39 and 40 seconds.

Trails B:  154 seconds, no errors.  Cutoff: between 91 and 92 seconds.

Overall, Mr. Styers' performance on Trail-Making, in terms of time taken, suggested the possibility of neurological dysfunction.  To some degree his performance may simply reflect a slow-paced working style.

3.  Wechsler Memory Scale

Information: 3 points
Orientation: 4 points
Mental Control: 3 points
Memory Passages: 12 points
Digits Total: 9 points
Visual Reproduction: 10 points
Associate Learning: 7 1/2 points

Raw Score:  48 1/2 points
Age Correction:  40 points
Total Score: 88 1/2 points

Memory Quotient: 87

Mr. Styers' Memory Quotient of eighty-seven (87) is moderately below-average, and was the same score he achieved on 6/30/89 at the Phoenix VA Medical Center. His areas of relative strength involved orientation, mental control (e.g., being able to recite the alphabet aloud), auditory short-term memory, and visual recall.  Mr. Styers' weakest areas concerned fund of information/long-term memory, auditory immediate recall, and "new learning".

4.  State-Trait Anger Expression Inventory (STAXI)

Mr. Styers' STAXI profile revealed elevated scores (percentiles of seventy-five or higher) on Scales S-Ang (97th percentile), AX/Out (77th percentile), and AX/EX (84th percentile).  This suggests that he was experiencing relatively intense feelings of anger, most likely situationally-determined.  In addition, his scores suggest that he tends to express his anger in terms of behavior towards persons or objects.

5.  Rotter Incomplete Sentences Blank-Adult Form

ER – 1858

MILKE_NSB019954

Exhibit 1A

8

he following themes were present in Mr. Styers' responses on this projective/personality assessment instrument:  (a) his happiest times are when he is with his family; (b) his family, other than one visit by his wife, had not visited him at the jail as of 3/27/90); (c) regrets picking-up Roger Scott on 12/2/89; (d) would like to relax and get some sleep; (e) says his attorney "has got my life in his hands...and he don't tell me anything"; (f) irritated by large crowds; (g) concern that the Court proceedings he is involved with will drag on for some time; (h) if was on a desert island and could pick but one person to live with him there, would choose Debra Milke: "She's the most pleasant person I can think of right now...(Q. What about your wife?)  Well (laughs), no.  I'd stay with Debbie...my wife and I had some problems...(we) can't stay with each other in the mother in-laws' house...we've been separated due to (that)...when I get out, we'll get a place...I don't want to leave the family, but I might go to (Pennsylvania or elsewhere) by myself"; (i) his nerves get shaky at times, often for no apparent reason; (j) people sometimes bother or irritate home, so he gets away from them; (k) says his mind is "a mess right now...all clogged-up with everything that's going on.  Can't get anything figured-out"; (l) marriage is "a good thing to have, with the right people"; (m) is happy when he "around people I want to be around".

RESULTS OF CLINICAL INTERVIEWS

I initially explained the reason for my visit to Mr. Styers, and informed him that nothing he said would be confidential, that I would be preparing a report pursuant to my appointment to conduct a Rule 11 evaluation, and so on.  He appeared to fully comprehend my questions and statements, and signed a release of information form, allowing me to gather information about him from any source.  In addition, Mr. Styers signed a form related to my providing the Court with a report based on my evaluation of him.  During the early portion of our discussion Mr. Styers stated that he could not live with his mother in-law, that he could not take living there, and that he and his wife could not afford their own home.  Therefore, his wife lived with her mother and he lived in his own place, along with Debra Milke, her son Christopher, and his daughter Wendi (aged approximately two and one-half years).  When asked why Mrs. Milke lived with him, Mr. Styers responded as follows: "She needed a house to live in and I had an extra bedroom.  I invited her in...(Q. Why couldn't your wife live with you if Debra Milke could and did?) I have other kids too.  A fifteen, fourteen, and eleven year-old too.  Wasn't room in the apartment for us...(Q. There wasn't room for your wife, but Debra Milke and her son could live there?  There was room for them?) Well, there was room for Debra and her son.  Four of us could live there...the two kids, Debra and I...(Q. Why couldn't your wife move in with you prior to Debra and her son moving in?) ...the apartment was too small for Karen (his wife) and the three kids too...(Q. It had to be a "package deal"?  You'd have to take your wife plus the three older children?) Yes".

Mr. Styers and I then discussed his history of counseling, his head injury, and so on (see above, under "Background Information").  He also told me that he was not guilty of the crimes he has been charged with, and that he is "competent enough to stand trial".  I then asked Mr. Styers what, if any pressures or stresses he was experiencing at or just before the time of the 12/2/89 murder with which he is charged.  He replied that the pressures were "no more than

ER – 1859

MILKE_NSB019955

Exhibit 1A

normal...just making it through the day.  Getting done with things.
hristopher and I and Debbie and Wendi were all going to some Christmas things
that day.  I guess that's pressure; I don't know...(Q. Do you recall your mood
during the few days preceding the shooting incident? Wasn't nothing wrong with
my mood.  I was happy.  (Q. Your stress level during the few days before the
incident?)  Nothing I know of; as far as I know.  (Q. You didn't feel under any
particular stress just before the shooting?) No.  (Only) after I found out it
happened...I felt lost (after heard about the shooting)...(Q. How clear were
your thought processes before, in the days just before, the shooting incident?)
as far as I know, they were as clear as ever.  (Q. Do you have any ideas
regarding who shot Christopher?) Yeah, Roger (Scott)".

I then asked Mr. Styers why he felt Mr. Scott had shot Christopher.  His reply
is as follows: "He had the gun and he was behind me.  He was standing there,
and he had the gun...I heard shots.  I figured he was shooting at something
(e.g., a can).  I didn't know he had a gun with him.  I thought it (the gun)
was in the car.  I asked him what he was shooting at.  Then I found out he
(Christopher) was dead...(Q. How did you find out he was dead?) Roger said so.
I don't know what it was he said.  (Q. What did you do after Roger told you
Christopher was dead?) I don't know.  I just kind of went blank.  Then Roger
said, 'let's go to Metro Center and tell them he (Christopher) was
kidnapped'...(Q. How long did you stay "blank"?) I don't know.  Quite a while.
(Q. Did it last an hour? Two hours? A day? Ten minutes?) I don't know.  I was
in a daze.  I remember talking to the police.  That's what bothers me.  (Q.
What bothers you?)  I should've just told them (the police) what (really)
happened, instead of going along with the story that somebody took (kidnapped)
him (Christopher)...a cop made me change my mind...I was going to say something
(tell the truth), but the cop jumped all over me (and so Mr. Styers decided not
to reveal "the truth")...(Q. What was your reaction when you found out from
Roger that Christopher was dead?) My mind went blank.  I remembered the kids in
Viet Nam I killed.  I had a whole bunch of jumbled-up thoughts...what would I
tell Debbie (Milke)?...(Q. Why would Roger shoot Christopher?) I don't know.
I'm beginning to think that maybe Mark (Milke) had something to do with it.
(Q. Why would Mark Milke want his son dead?) Mark's been on so many drugs that
he's not all there...he made threats to Debbie quite a few times...like 'if I
can't have him (Christopher), you won't (have him)'...(Q. Have you heard him
make these threats?) I've heard them.  (Q. What was the purpose of your going
out to the desert with Christopher that day?) To go see the gliders.  (Q. How
many shots were there?) I don't know.  Didn't they say it was three?.  (Q. Did
you hear all three shots?) I don't know.  (Q. What did you hear after you heard
the shots?) I turned around and yelled to Roger.  They (Roger and Christopher)
were a ways away.  They weren't following me like I thought they were. (Q. How
far away from you were they when the shots were fired?) I don't know.  Maybe
ten feet...(Q. When you turned around after the shots were fired, what did you
see?) I saw Roger, but I didn't see Christopher.  (Q. Where was Christopher?) I
guess he was laying there.  (Q. You said perhaps Mark Milke arranged the
killing?) Yes...Roger needed money".

During the second clinical interview (conducted on 3/27/90) I asked Mr. Styers
how Debra Milke felt about her son, Christopher.  Mr. Styers replied as
follows: "She loved him.  (Q. Was there anything she didn't like about him?)
typical little boy things; he'd get in trouble...he wouldn't listen at

MILKE_NSB019956

Exhibit 1A

*ll*

times...break his toys.  (Q. Was she concerned about how Christopher would grow
p, other than normal motherly concerns?) She didn't want him to grow up like
his dad, Mark.  (Q. How did Debbie express that to you?)  She'd say, 'I hope he
doesn't grow up like Mark"...Mark took him (Christopher) to drug parties.  (Q.
How strongly did Debbie feel that Christopher would grow up like Mark?) She
made sure we did all we could (to prevent that)...(e.g., tell him drugs was
bad...(Q. If Christopher had grown up like Mark, what would Debbie have done?)
I don't know.  Believe she'd still love him".

I then asked Mr. Styers if he had heard anything about Debbie admitting to
taking part in Christopher's killing.  Here was his reply: "No.  (Q. If you
heard that, what would your response be?) I wouldn't believe (it).  The
policeman said she confessed.  But she was under stress and all confused.  (Q.
Do you know if Debbie had life insurance on Christopher?)  Yeah, at work.
Everybody usually does at work...(Q. Has anyone ever accused you of being a
"heavy drinker"?) No.  Am I contradicting anything I said in there (Mr. Styers'
file)?  (Q. Does Roger Scott have any "memory problems"?) I don't think so.
(Q. Do you know if Debbie ever considered giving up custody of Christopher?)
No...(Q. Any reasons why she would consider giving up custody of Christopher?)
No...(Q. What was your mood, state of mind, stress level the day of the
shooting incident and the day before?) I was in a good mood.  Stress level
(was) o.k.  Getting ready for Christmas.  (Q. Were you clearheaded at the
time?) Yeah.  (Q. How was your Post-Traumatic Stress Disorder affecting you at
that time, if at all?) Same as always.  It was there.  (Q. Had you any visual
or auditory hallucinations the day of the shooting?) No.  (But) I see things
about every day.  And hear 'em all the time".

ISSUES CONCERNING COMPETENCY TO STAND TRIAL

After having interviewed Mr. Styers on two occasions (including the use of
questions from McGary, et al, 1971, which are specifically focused on
assessment of a person's competency to stand trial), after having reviewed file
material, spoken to various mental health professionals who have worked with
him, after reviewing documents and reports, and after analyzing the results of
psychological tests I administered to him, I have arrived at the following
opinions:

1.  I find that Mr. Styers is competent to stand trial at this time, to
understand the nature of the proceedings against him, and to assist his counsel
in the preparation of his defense.

2.  I do not find, in the event that Mr. Styers chooses to plead guilty, that
mental illness has substantially impaired his ability to make a competent
decision concerning waiver of rights contained in the Statement of Rights, or
to have a rational, as well as factual, understanding of the consequences of
entering a plea of guilty.

3.  The probable mental condition of Mr. Styers at the time of the offense
appears to be that he was suffering from Post-Traumatic Stress Disorder
(PTSD).  I note that Mr. Styers informed me that his mood, stress level,
thought processes and the like were "normal" at the time of the offense.  I
cannot state with certainty how much if at all Mr. Styers' PTSD affected his

ER - 1861

MILKE_NSB019957

Exhibit 1A

nood, stress level, clarity of thinking, etc. on or around 12/2/89, nor the
relationship between his PTSD and the alleged offense.  I have little or no
information to indicate that Mr. Styers was not of sound mind, did not know
what he was doing at the time of the alleged offenses (12/2/89).

------------------------------------------

Mark L. Berman, Ph.D.
May 11, 1990

1702 East Highland, Suite 211
Phoenix, Arizona 85016
(602) 230-2537

MILKE_NSB019958

Exhibit 1A

Page - 1

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 12-5-89 | 89-179406A |
| VICTIM'S NAME | LOCATION OF OCCURRENCE | |
| MILKE, CHRISTOPHER | 99 AVENUE AND HAPPY VALLEY | |
| OFFICER WRITING REPORT'S # | SUPPLEMENT # | |
| DET. SALDATE #1875 | 89-179406.A10 | |
| DATE & TIME TYPED | BUREAU | CLERK |
| DECEMBER 6, 1989 8:40 AM | GIB | AI724 |

Interview:    MILKE, DEBRA JEAN
              W/F, ████    5'8", 145#, bln, haz

              7734 N. 12 Street #5
              John Alden Life Insurance
              8222 S. 48 Street, 438-7694
              BOOKED #1390389
              Miranda rights: 12-3-89, 1954 hrs "Yes"

-----------------------------------------------------------

12-3-89 at approximately 1953 hrs, I contacted DEBRA JEAN MILKE inside interview room at the Pinal County Sheriff's Office in Florence, Arizona. The purpose of my contact was to interview her in regards to this death investigation. The following is a paraphrased account of her interview.

On 12-3-89 at approximately 1945 hrs, the Phoenix Police helicopter landed at Pinal County Hospital with me as a passenger. I was then transported by Pinal County Sheriffs to the County Jail where DEBRA had been taken to be interviewed. Upon my arrival, I contacted jail personnel who directed me to an office where DEBRA and her aunt were sitting. I asked her aunt to step out and speak to DET. HAMRICK while I introduced myself to DEBRA. DEBRA immediately wanted to know who I was and what I wanted and I then identified myself and told her I was investigating her son's disappearance.

At approximately 1953 hrs, I explained to DEBRA that her son CHRIS had been found in a desert area and that he had been found shot to death. DEBRA immediately began to yell "what, what". She then started to scream and make noises as if she was crying but no tears were visible. I then explained to her that I would not tolerate her crying and that she was also under arrest for her son's death. Again she became very excited and asked why I was doing this and I told her that she had been implicated in the murder by JIM and ROGER. I then told her to be quiet while I removed a Miranda rights card from my identification badge case and read her her Miranda rights verbatim from the card. I asked DEBRA if she understood her rights and she moved her head in an up and down motion indicating yes but again asked her if she understood her rights, which she responded yes.



EXHIBIT 5
WIT: Saldate
DATE: 4-26-17
Sommer Greene, RPR, CRR

KD001836

MILKE_NSB000527

Exhibit 1A

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179406 |

Again DEBRA began to appear to cry and was yelling but again I saw no tears. I again told her that I would not tolerate that type of activity from her and that I was going to question her about her involvement in this murder. I explained to her that it was very important for her to tell me the truth and that the only reason I was there was to get the truth and that I would not tolerate any lies. DEBRA immediately settled down and was shaking somewhat but kept asking me what I needed to know. I then told her that I wanted her to tell me the truth about her involvement as she saw it and I did not want her to minimize her involvement. DEBRA at this point kept moving her head in an up and down motion (as if) she was agreeing with me. I then asked her if she was going to tell me what occurred and she said she was.

DEBRA first told me that she had been feeling sorry for her son because of what he has to go through and that she had told JIM her roommate that CHRIS was probably going to grow up just like his father and not be any good. She said she may have told JIM this several times but she didn't think that he would ever do anything to her son to hurt him. DEBRA then began to cry but again no tears were visible. I then told DEBRA that she was not telling me the truth and that I would not tolerate that because I ... is not here talking to her by accident. I told her that I already knew ...at had happened but that this was her opportunity to tell me the truth from her standpoint. DEBRA then told me "Look I just didn't want him to grow up like his father, I'm not a crazy person, I'm not an animal, I just didn't want him to grow up like that."

DEBRA then continued and said that while she was in high school, she was a very popular person and considered herself to be a very likeable and friendly person. She said her self esteem was very high, she was positive and was in love with life. She then met her ex-husband MARK who she said was involved with drugs and was an alcoholic. After their marriage, she said that MARK was constantly putting her down, telling her that she was no good and would never amount to anything. She said MARK continued to drink constantly during their marriage and to use drugs. MARK was also incarcerated several times during their marriage.

DEBRA also said that because of MARK, she has a very difficult time having sex and feels that it is a dirty thing to do. She believes it was because MARK was into a lot of kinky stuff and was heavily into pornographic material. During this period of time, she said she was taking birth control pills because she did not want to have any children. She said she knew before she had CHRIS that she would not make a good mother and because of that, she never wanted children. CHRIS she said was a mistake and while she was pregnant, she had several tests to ensure he was not deformed in any way. At one point during her pregnancy, DEBRA had decided to have an abortion and made an appointment. She, however, failed to show up for the appointment because she felt the pain would be too much.

KD001837

**MILKE_NSB000528**

Exhibit 1A

Page - 3

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179406 |

After CHRIS' birth, she said she realized she was not going to be a good mother but that the alternative of having CHRIS stay with his father was not any better. She finally got a divorce from MARK and then MARK did end up with visitation rights. For the most part, MARK was always in jail and so he could not take advantage of those visitation rights. Recently MARK had been having CHRIS for visitation and she noticed that CHRIS was acting just like her ex-husband MARK. She described CHRIS as being very mischievous and at times malicious. She said this really bothered her because she did not want her child to grow up and be like MARK, spending his time in and out of jails.

DEBRA then told me that she felt very bad about this and said she had a very empty feeling. She then said "I'm not a malicious person, I just wanted God to take care of him." DEBRA then told me that she was very scared about what was going to happen.

Approximately one month ago, DEBRA said that she had contemplated suicide. DEBRA said the more she thought about it, she thought that it would not solve her problems about her son. She said if she committed suicide, MARK would have sole custody of CHRIS and he would definitely grow up like MARK. Because of that, she then spoke to her friend JIM about helping her figure out a way for her child CHRIS to die. DEBRA said at first, she could not tell JIM that she wanted her son CHRIS killed because it was very hard for her. Finally she told him that it would be better for her son to die than to grow up like her husband, his father. She said JIM agreed to help her and that the only agreement they made was that he would not tell her the specifics about the killing.

I then asked DEBRA if she had killed her son because of some insurance she may have had on him and she told me she did not. She then said she did not have any life insurance on him but she believed that her father who lives in Florence did. She also believes that her father was the beneficiary of that policy. I then told DEBRA that it had been my understanding that JIM and ROGER were to receive a partial payment of the $5000 policy which she had on her child's life. DEBRA denied having a policy but said she may have told JIM about her father's policy and said that that may have been JIM and ROGER's motivation for the killing but that it was definitely not her's.

I then asked DEBRA if she, JIM and ROGER had spoken about how they were going to kill CHRIS and she told me that they had. She said that she and JIM spoke about it several times and she believes that she JIM and ROGER only spoke about it on one occasion. DEBRA said that she did go out with JIM on one occasion with her son and that JIM was going to "do it" but that something happened and they decided not to do it. I asked DEBRA if do it meant to kill him and she responded yes. DEBRA said the plan was for JIM to do it and that he and ROGER would then go to Metro Center and claim that CHRIS had been lost. She said she never knew what method JIM was going to use to do it.

KD001838

**MILKE_NSB000529**

Exhibit 1A



Page — 4

| TYPE OF REPORT | VICTIM | OFFICER | OR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179406 |

On Saturday morning, she woke up and spoke to JIM. JIM told her that they were planning to do it today and that he was going to pick up ROGER. She said she then got her son dressed in the clothing that she had previously described on the missing person's report and that she told him that JIM was going to take him to see Santa Claus. She said when JIM and her son left, she knew that they were going to do it today but was not positive because JIM had taken him out at least two other times and for several reasons had brought him back.

DEBRA said that during the past month, she has laid in bed next to her son and that her son has told her that he missed his father and wanted to know when his father would be home. She said on those occasions, she felt disappointed that JIM had not done it yet. I asked DEBRA if she was getting angry with JIM and ROGER and she told me she was not getting angry but was disappointed because the longer they waited, the more influence her ex-husband could put on CHRIS.

I asked DEBRA if that morning when her son left, if she gave him a special hug or kiss and she told me that she did not have to. I asked her if she could explain and she told me that approximately one week ago, she told her son that God was coming down and going to take him and that he was going to be going to Heaven. She said she also told him that she would see him later in Heaven. I then asked her if she dressed her son especially that day with his boots, levis and sweatshirt and she said she did not. She said she let CHRIS pick out the clothes he wanted that day and that he loved wearing his boots.

At approximately 3:20 PM that day, DEBRA said she received a call from JIM and he said that he was at the mall. DEBRA said she immediately realized that he had done it and that her son was now dead. JIM also told her that CHRIS was lost somewhere at Sears and that he had a security guard standing next to him. DEBRA said she never told JIM anything other than to call her back later. When she hung up the phone, she said she immediately prayed to God to take care of CHRIS and that she would not be mad at him if he sent her to Hell. She also prayed to God to do something that would never allow her to have any more kids. DEBRA then told me that she was not crazy and she would hope that nobody thought she was. She said she did this because she loved her son and did not want see him grow up like her ex-husband. She asked me if I understood her and I told her that I understood what she was telling me but that I did not understand the end result.

DEBRA was worried about her family not understanding and said that she believed her family would now disown her. I explained to DEBRA that her family was still her family and that they would probably try to help her but she could not expect them to support what she did. She then told me that she was sure her father would probably think that she was crazy and again said she was not. She then asked me if she thought someone would try

KD001839

**MILKE_NSB000530**

Exhibit 1A

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179406 |

to pronounce her insane and I asked her if she was. She then responded "no, I'm just an emotionally troubled 25 year old girl who needs help dealing with her problems." She then told me that she has had her problems bottled up in her and that she has never been able to express herself from the time she married MARK until now.

DEBRA then asked me how I felt about her and I told her I could understand what she had been telling me but that there were other alternatives if she did not want her child CHRIS. I suggested to her that she could have given her child to the grandparents, her sister or someone else in her family that may have wanted him. She then told me that she probably could have and then said "I guess I just made a bad judgment call."

DEBRA was very concerned about what was going to happen to her and at the first part of the interview wanted to know if we were going to let her go back home. I explained to her that she was under arrest and that she would be going back to Phoenix and be put into jail. DEBRA kept asking why she couldn't just be let go and given a court date because she had never been in any type of trouble. I told DEBRA that because of the seriousness of her crime, she would have to go to jail. DEBRA continued through the interview asking if it was possible that she could get probation and I told her that she would be charged with first degree murder and that I was not the judge, however, first degree murder could carry the death penalty, life imprisonment, or a lengthy jail term. She then asked me if it was possible to get probation for life and I told her it was possible but not very probable. She said she would even let the court tie her tubes and ensure that she would never have kids if they would only put her on probation so she could go back to work. DEBRA then explained to me that her work was very important to her and that was the only thing she ever did good. She said she started as a file clerk and was now in accounting and she said she would really miss her job if she had to go jail.

DEBRA also kept telling me that she felt bad and she felt ashamed and said that she knew that everyone was going to be staring at her because of this. She then told me "I worry about JIM". I asked her why and she continued and said "well, you know, because he had to be the one to do it." I then explained to her that she should concern herself about her future and let JIM worry about his.

DEBRA was transported back to the Phoenix Police Department in a uniform Pinal County Sheriff's vehicle. She and I sat in the back seat of the uniform police vehicle and DEBRA was not handcuffed. Corporal M. ANDONIE #27 of Pinal County was the driver.

KD001840

**MILKE_NSB000531**

Exhibit 1A

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179406 |

During the trip back to Phoenix, she kept on asking questions to see if I knew what she was going to get and I told her I did not. She asked if she could possibly get bailed out and I told her that it would probably be a bailable offense and that her family could probably help her in that aspect. She then told me that she didn't believe that her family would help her and that she thought her family would probably disown her. She then commented that her family would probably not understand why she did it like I did. I then again reminded her that I understood what she was telling me but I could not condone her actions. She also asked me if I would call her father, explain to him what she had told me and ask him to try and bail her out and get her an attorney. I agreed and told her when we arrived back into Phoenix, that I would call him from my office.

At approximately 2250 hrs, we arrived back in Phoenix and she was taken to the General Investigations Bureau where the booking information was obtained. She was given a Pepsi and some cigarettes were purchased for her. She then asked me if I would call her father which I did. I explained to her father that DEBRA had confessed to her involvement and that she had told me that she had done it because she did not want CHRIS to grow up like his father. I then told him that DEBRA wanted me to ask him to try and bail her out and he immediately told me that he would not. I then told him that DEBRA also wanted me to ask him if he could get her an attorney and he told me that he had gotten in touch with her mother in Switzerland and that she had talked about getting an attorney for her but that as far as he was concerned, they should give her a public defender because he would not make any attempts to get an attorney for her. I asked him if he wanted to speak with DEBRA and he said he did not at this time but for me to tell her that he may talk to her several days down the road. He then asked me if I understood how he felt and I told him that I did. He asked me to tell her that he would cross each bridge as he came it to and that at this time he could not talk with her. I then relayed the information to DEBRA.

While waiting to be transported to be booked, DEBRA asked me if I thought there was a possibility that she may be released on her recognizance so she could go to work and I told her that probably would not be possible. She then commented that she had never been in any trouble and that she would never leave the state and would be available for court. Again I told her that it would probably not be possible. DEBRA also asked me if I was going to call her employer and tell him about what happened and I told her I was not. I then asked DEBRA why and she told me that just in case she does get out on bail or on her own, that she would like to go back to work because she really liked her job.

KD001841

**MILKE_NSB000532**

Exhibit 1A

Page - 7

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179406 |

I finally told DEBRA that it was time to go and that I would have to handcuff her for the first time. I then handcuffed her with her hands to her front and she asked if I could go with her. I told her that I could not go with her this time and she immediately said that she was scared. I told her that she would have to face this by herself and that she was an adult and had made an adult decision to do something and now she had to face the music. She then told me that she had never had anyone that she could speak with before and that this may sound strange but she was starting to feel better and she thought she was now getting her self esteem back. DEBRA was then taken by uniform OFF. BAKER to the main jail and booked.

It should be noted that this interview was not tape recorded because DEBRA refused to have her statement tape recorded.

Investigation Continuing.

KD001842
**MILKE_NSB000533**

Exhibit 1A





Channel 10 News Video

Exhibit 1A

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )    CR 89-12631
                                 )
DEBRA JEAN MILKE,                )
                                 )
            Defendant.           )
_____)

Phoenix, Arizona
June 30, 1990

## TRANSCRIPT OF PROCEEDINGS

Interview of Sandra Pickinpaugh

APPEARANCES:

    Mr. C. Kenneth Ray II
    Attorney for the Defendant

    Mr. Noel Levy,
    Deputy County Attorney

    Mr. Armando Saldate,
    Examiner

COPPERSTATE REPORTING SERVICE, INC.
1836 East Thomas Road
Phoenix, Arizona 85016
(602) 266-2601

Roxanna Neier - Transcriber



EXHIBIT 7
WIT: 426-17
DATE: Saldat
Sommer Greene, RPR, CRR

MILKE_NSB018686

Exhibit 1A

INTERVIEW OF SANDRA PICKINPAUGH

1
2
3      MR. SALDATE:  The date is 6-30-90.  The time is

4 12:07 about your time, right?  And I'm Armando Saldate and

5 I'm a detective with the Phoenix Police Department.  I met

6 you once.

7      MS. PICKINPAUGH:  Right.  (Inaudible)

8      MR. SALDATE:  I met you later on.  Didn't you come

9 in with your mother (inaudible).

10      MS. PICKINPAUGH:  Right.

11      MR. SALDATE:  You met me and wanted to talk to me.

12      MS. PICKINPAUGH:  (Inaudible) right after the

13 funeral.

14      MR. SALDATE:  Yeah.  How do you spell your last

15 name, Sandra?

16     A    P-i-c-k-i-n-p-a-u-g-h.

17     Q    P-a-u-g-h?

18     A    Uh-huh.

19     Q    What is your date of birth?

20     A    8-9-66.

21     Q    Your address is 755 --

22     A    Riverview Drive, Number 4.

23     Q    And the phone number here is?

24     A    Area code 307-075-9164.

25     Q    Thank you.  Is there where your husband works?

MILKE_NSB018687

Exhibit 1A

3

1       A     Um-hmm.  Yeah, he got (inaudible)  His brothers

2  live here.  One lives here and one lives in Rock Springs.

3  And he was here on vacation and got offered a job over in

4  Rock Springs.

5       Q     (Inaudible)

6       A     Well, the first job that he got was a

7  refrigeration technician.  He got offered a job here for a

8  local refrigeration company as a technician then they laid

9  him off in February and (inaudible) he just got accepted for

10  a job at Chevron.  He's going to be a control operator for

11  Chevron Chemical.

12      Q     That's here too?

13      A     It's in Rock Springs.

14      Q     Rock Springs?

15      A     Yeah.  It's really a nice little community to live

16  in.  It's a smaller community than Rock Springs.  It's just

17  (inaudible).  It's just a little bit cleaner than Rock

18  Springs.  Rock Springs has all the malls and the K-Marts and

19  the grocery stores but it's only 11 miles up the highway.

20      Q     Yeah.  So it's really not that bad huh?

21      A     No.  And (inaudible).

22      Q     When was the last time you talked to your sister?

23      A     My son's birthday, November 11th.

24      Q     November 11th of?

25      A     '89.

MILKE_NSB018688

Exhibit 1A

4

1    Q    Did she call you?

2    A    Um-hmm.

3    Q    What did she have to say?

4    A    Well, she called to wish Jason a happy birthday
5    and also to tell me about the results of the hearing.  I
6    guess Mark had filed some kind of papers to try and get
7    joint custody of Christopher and she had just attended the
8    hearing that previous week.  And was really happy because
9    the judge denied him joint custody and she just was really
10   happy about it.  Because he didn't get any part of the
11   custody.

12   Q    Since then have you talked to her?

13   A    I send her money once a month but I just put it in
14   a manila envelope and just address it to her at the jail.  I
15   don't write anything in it.  The first time I sent her mail
16   I wrote her a note saying that I wanted -- if it was
17   convenient for her to have somebody change her address, to
18   forward her address to the jail.  And (inaudible).

19   Q    Why are you (inaudible) mail?

20   A    Well, at the time the Debby was arrested there
21   were packages from Germany and Switzerland in route to her
22   (inaudible) and they were valuable packages.  I just went in
23   and had the mail curved over here so we would get the
24   packages.  Because of overseas rate my grandparents would
25   have to pay to have it shipped back to them.  It would cost

MILKE_NSB018689

Exhibit 1A

5

1   two to three hundred dollars to ship it back.

2       Q    Oh, really?

3       A    Yeah.  I mean every Christmas they send, you know,

4   a humongous package and it cost a lot of postage.

5       Q    How is your mom doing?

6       A    My mom, she's feeling better.  She's getting

7   better.  She's (inaudible) and she's got other problems to

8   deal with, you know, in her own personal life.

9       Q    Her marriage?

10      A    Well, (inaudible) it's just that -- it's typical,

11  typical (inaudible).  They just finished building a brand

12  new house and they're landscapers, you know.  The typical

13  things, landscapers are trying to squeeze extra money out of

14  them, contractors are trying to squeeze extra money so she's

15  busy with that.  You know, that's got her all --

16      Q    No problem with the marriage?

17      A    No.  It's just, you know --

18      Q    She's a real nice lady, seemed to be a real nice

19  lady.

20      A    She is.  Yeah, she is.  Unfortunately I really

21  never -- never was real close to her so we just started

22  becoming friends, I'd say about three years ago.

23      Q    I don't really know your dad at all.

24      A    My dad's a character.

25      Q    I don't know him at all.  They had a chance to --

**MILKE_NSB018690**

Exhibit 1A

6

1   other detectives had a chance to talk to him before I got

2   there.

3        A     Yeah.  I think he's talked to the defense, he's

4   talked to the prosecution, he's talked to --

5        Q     Well, he's a security guard or a prison guard?

6        A     Right.

7        Q     You know, he knows all the -- he's been around and

8   has had a chance to be interviewed before.  Then they had

9   him I remember he was telling me on the phone that he was

10  investigated because Mark said he threatened his life.

11  Stuff like that.  And I called him -- I called the DOC, his

12  employment.  Mark's dad -- see we got -- initially we got a

13  police report saying that Mark said that.  I called down

14  there to see what was going on because it wasn't really a

15  report I should handle but it was given to me because

16  (inaudible).

17            And I called down there to talk to Mark to see

18  what the heck was that all about.  And Mark's dad said he

19  wasn't there but let me tell you something.  If anybody was

20  threatening anybody it was Mark threatening your dad, you

21  know.  So that's when I called DOC (inaudible).

22       A     They'd been at odds with each other -- typical, I

23  think any father would probably react, not even talking

24  about the murder, I mean.  My sister is a very attractive

25  person.  She's very intelligent and my parents had a lot of

**MILKE_NSB018691**

Exhibit 1A

7

1    aspirations for her, you know, a lot of plans for her, you

2    know, and Debby did real well until my mom up and left.

3    After that for some reason Debby had this vendetta against

4    (inaudible)

5        Q    Your mother --

6        A    (Inaudible).  She, well, I think (inaudible) was

7    more so than my dad.  After the divorce my dad just kind of

8    stays, you know, in the background.  (Inaudible) we knew

9    where he was at and we knew where he was at.  My dad never

10   made any attempt to push her after the divorce because he

11   wanted us to find out for ourselves, you know, the things

12   that happened.  We were so young, I was 10, Debby was 12 and

13   so he never pursued us kids.  He never forced us to come and

14   visit.  We would call him and say, you know --

15       Q    Who were you living with?

16       A    Our mother.  And he -- it's just been that way

17   through the years.  He was always in the background.  He

18   always lets us know that he loves his kids and that he's

19   there but he's not going to pursue us.  You know, he doesn't

20   want to get -- he never wanted to interfere with anything,

21   you know.  And when Debby brought Mark home for the first

22   time it really just crushed both my parents actually because

23   -- I guess if they expected anybody it would be me they

24   expected to bring some (inaudible) guy home because I was

25   always the rebellious one, you know.  I was very very

MILKE_NSB018692

Exhibit 1A

8

1    independent and Debby was very very conformed to what people
2    told her to do she would do.  You know, she would -- there
3    was no love lost between Mark and my dad.  My dad treated
4    him like a son-in-law, was decent to him.  I can't ever
5    remember a time (inaudible) odds with each other.  But by
6    the same token every time Debby would call my dad and say
7    well, Mark's drinking again and they just (inaudible) again
8    or Mark (inaudible) my dad would just hey, you made your bed
9    now you got to lie in it, you know.  I'm here for you if you
10   need me but don't expect me to bail you out.  Every time
11   Mark went to prison Debby would be on the phone asking my
12   dad for this, that and the other and my dad said no, I can't
13   do that.  To a lot of people I guess that would seem cruel.
14   But that was just the way  my dad was and he was very up
15   front about it all the way through the years we were growing
16   up.  He said I'm your father.  I'm responsible for you until
17   you're 18 but after that it's none of my business.  I can't
18   form an opinion, I just accept and, you know, if you need me
19   for anything I'm here but I will not bail you out
20   financially.  I will not (inaudible).  And he's just that
21   way.

22        Q    We both know Mark is probably not the best person
23   there ever was, you know.  He has tried to come across that
24   way now, I mean, you know, he was father of the year before
25   and all of a sudden it's (inaudible).

**MILKE_NSB018693**

Exhibit 1A

1       A    (Inaudible)

2       Q    We know that.  The situation -- we should be going

3    to court pretty soon on -- I would say it could be -- we

4    were (inaudible) the 17th of July.  However I would say it's

5    probably going to be continued till mid September, first

6    weeks in September.  It's going to be some time before it

7    goes to court.

8            Debra's going to probably be the first one they

9    are going to put on.  And so she's going to be the first one

10   to come up.  I'll be very honest with you.  The attorney's

11   going to seek the death penalty.  Whether you agree with it

12   or I agree with it, I have nothing to say whether I agree or

13   disagree.  I just prepare (inaudible).

14           Do you agree with the death penalty?

15      A    Do I agree with it in general terms or --

16      Q    Just general terms.

17      A    Oh, yes, I agree (inaudible).

18      Q    Now let's bring it out a little more.  What do you

19   think about the situation with Debra?

20      A    What happened?

21      Q    Right.

22      A    It's really hard for me to say because there's so

23   many theories floating around and so many, you know, it's

24   just such a, you know, no planning, you know, nobody first

25   saw anything per se, I mean --

MILKE_NSB018694

Exhibit 1A

10

1        Q    Okay.  There was no planning on your part to be

2    able to accept something like this.

3        A    Well --

4        Q    But there was plenty on her part.

5        A    Sure.  But none it -- there were no clues or

6    signs.  You have to understand, Jim and I were very, very,

7    very close friends.  I mean, he was at my house every day.

8    Even after we moved here I think I talked to Jim at least

9    three times a week.  Even after living here.  And I didn't

10    even get any signs from him.  I mean, nothing at all which

11    is very very unlike Jim.  I mean, you can pretty much coax

12    anything out of Jim, you know, and I --

13        Q   He didn't know at that time to even try to coax

14    anything out of him.

15        A   Well, no but still, you know, you could always

16    tell when something is just not right especially with a good

17    friend.  You can tell when something is just not

18    (inaudible).

19        Q    What was Debby's position with Jim?

20        A    Well, I (inaudible).  She was never as close to

21    him because my sister didn't have any friends.  The only

22    time she ever called people was when she needed something

23    and she's always been that way.  She does not have friends.

24    She's never had friends.  You know, I'm talking about like

25    my girlfriend Dee, I've know her 13 years and we talk to

MILKE_NSB018695

11

1    each other, you know, I mean not in lieu of friends but, you

2    know, we just --

3              Debby has never had any true friends to her name.

4    It's just people that she's acquainted with that when she

5    needed something then she calls them up (inaudible), you

6    know, and Jim was one of those people.  Jim knew both of us

7    from living in -- Debby and I used to live together in a

8    complex and I would work nights.  Debby worked days and we

9    would take turns taking care of the kids, both together.  So

10   she knew Jim in that sense.  I mean, she never spent any

11   time with him or, you know, I mean, every once in a while

12   she'd go out with Jim and me when we'd go out dancing or

13   drinking or something.

14             It was really weird Debby pretty much (inaudible).

15   I didn't even hear from Debby until she wanted something.

16   And we'd go months at a time.

17        Q    Okay.  This is the impression I got.  Correct me

18   if I'm wrong because like I said I didn't know Debby before

19   this.  I didn't know Jim before this.  I didn't know Roger

20   before this.   I've talked to some people that knew Debra.

21   They referred to her as very materialistic.

22        A    She was.

23        Q    Would you believe --

24        A    Oh, yes.  Yes.  Very materialistic, very very

25   selfish, self-seeking, self-centered.  Very very vain.

MILKE_NSB018696

Exhibit 1A

12

1   Conceited, I mean, just greatly conceited about herself.

2   There was nothing she doubted about herself as far as

3   outward things like her appearance or things that she wanted

4   or pursued she got.  She knew it early.

5        Q     How about -- you know some people are very good at

6   -- if I could sit here and say that door is red.  You and me

7   can both see that that's a white door.  But if I want it to

8   be red I'll make it red.  If I want to set my mind that that

9   door is red, it's red.

10        If Debby was to set her mind on something that

11   wasn't really the truth, would she do that?  Was she that

12   type of person?  Other than convincing other people.  I mean

13   could she convince you that, you know, she may not look good

14   that night when she went out.  You could have seen it,

15   somebody else (inaudible)

16        A     But to tell her that --

17        Q     To tell her that would be impossible because she

18   thought she looked (inaudible).

19        A     That's a good example.  When we would go out she

20   always did her hair up and had a lot of eye make-up and I

21   would casually say, you know, that's a little bit much Debby

22   and she'd say, oh, you're just jealous because you don't

23   have my blue eyes or you can't get away with this like I

24   can.  I mean, you could not -- anything that you tried to

25   tell her she would probably take it with a grain of salt and

MILKE_NSB018697

Exhibit 1A

13

1   just amaze you by sitting there and listening to you.  Do

2   you know what I mean?  You would try to offer her -- or

3   somebody might have tried -- she would use it -- how do you

4   explain it.  She would use it.  The only time she would come

5   to you when she -- when you felt, you know, she's probably

6   had enough.  You know, she needs a friend and then she'll

7   turn and use it against you.  You know, the only time she

8   would break down was when she wanted something or -- or

9   wanted something changed.  You know what I mean?  Like she

10  would --

11      Q    And that's when you thought that maybe she was

12  finally --

13      A    She was going for the better.  She was finally

14  going to better herself and all it was -- actually with me

15  all it was was a ploy to take Christopher for a couple days

16  which turned out to be a couple months.  You know what I

17  mean.  She would come to me and say, you know, I'm so

18  scared.  Mark has threatened me and this and that and now

19  he's in jail.  Should I go through with the divorce.  And I

20  mean we would all coach her, you know, we'd all say, yes,

21  stay out of his life.  We'll do whatever we can to help you,

22  bingo, she scored a point.

23          Friends would lend her money and say here, you

24  know, we would take her to -- drive her around.  She'd

25  borrow my car.  I would keep her kid and then two weeks

MILKE_NSB018698

Exhibit 1A

14

1    later nothing would be done.  She would have spent the
2    money, you know.  Usually my car would be a total mess when
3    she brought it back and she would never come visit
4    Christopher.

5            You know, she would just be gone for two weeks and
6    pop up with a new boyfriend.  See what I mean?  That's the
7    only time you would ever see her (inaudible) to her
8    advantage.  I don't think I've ever seen her want literally
9    honest in saying that she'd had enough.  I really thought
10   this last time she went to Colorado to stay with Dorothy.
11   She was very sincere.  Her boyfriend had given her money and
12   she lied to him.  She told him she just needed it for the
13   divorce and then she took off on him.

14           I helped her pack and stored some of her stuff and
15   everybody just pitched in to help her because we all felt so
16   sorry for her.  And then when she got up there she did
17   nothing but hand her kid over to Dorothy and then she had a
18   boyfriend two days later and spent a lot of time over there.
19   And she was stuck with Christopher -- Dorothy was.  You
20   know, it's always the same thing.  I don't think once
21   Debby's been honest with anybody when she needed help.  I
22   don't think she honestly reached out for help.  It was
23   always for another reason.

24       Q    (Inaudible)

25       A    (Inaudible)

MILKE_NSB018699

Exhibit 1A

15

1    Q    Not recently, briefly.  I've got the police report

2  of the neglect in Colorado.  (Inaudible) talk to her.  She's

3  living where now?

4    A    She's in Henderson (inaudible)?  She just went to

5  work for that brand new hotel that went up.  I don't

6  remember the name of it.  Brand new hotel they just put up,

7  casino hotel.

8    Q    Mirage?

9    A    That's probably it.

10   Q    In Las Vegas?

11   A    Yeah.

12   Q    And I'm not saying this because I know you and

13 I've talked to you several times.  And I could sit here and

14 look at you and I know this is difficult for you saying

15 things but if somebody else was to listen -- or somebody

16 else (inaudible) that I'm on the opposite side.  They would

17 say well, Sandy must really hate her sister.

18   A    (Inaudible)

19   Q    That's not true though?

20   A    No, it's not true.

21        (Both talking at once)

22   Q    I know it and I say that only, you know, I know

23 you don't.  I know it's difficult for you to even have this

24 interview.  When you start talking about your sister, things

25 you have to say but we have to be honest.

**MILKE_NSB018700**

Exhibit 1A

16

1          Debra has gone through the psychological tests

2    (inaudible) to see, of course, if she was --

3          A    Unstable.

4          Q    Unstable.

5          A    Debby's more sane than anybody you know.  Debby is

6    a highly intelligent person.

7          Q    Oh, I know.  I agree.  She told me that night we

8    had that interview.  One of her points to get across to me

9    was I hope people don't think I'm crazy because I'm not.

10         A    She's not.  There's not a thing wrong with that

11    girl.  I think -- like I said it's just been an act for so

12    many years that she's just perfected it.  And she's a

13    master.  She is a master.  You talk to anybody who's known

14    Debby from this high all the way to her age now and they

15    will tell you the same thing.  Anybody that has ever passed

16    in Debby's past will tell you.  It's very difficult -- I've

17    know her since -- .

18         Q    Master of deception, master of --

19         A    Yeah, master of deception to she's a master of

20    manipulation.  That's probably foremost more than anything

21    else.  Debra has a way with people.  She puts on this facade

22    that makes people feel so sorry for her that they are going

23    to do just about anything.  And, I mean, right down to -- I

24    couldn't even put a limit on what they would do for her.

25    Because she just puts on this -- I don't know how to explain

MILKE_NSB018701

Exhibit 1A

17

1   it. It's an act.  It's a -- you know, my dad is the hardest

2   person in the world, I'll tell you.  You want something from

3   my dad you better, you know, just to look at my dad -- When

4   I know I have to ask for something my dad just makes me

5   shake inside my own boots, you know.  And my sister even

6   managed to get past him.  Which in my mind is just

7   incredible.  My mother is easy.  My mother's cake, always

8   has been cake for both of us kids.

9       Q    Let's keep this -- stay on this subject for a

10  minute about she has this thing about getting people to do

11  anything for her.  This is what I, you know, after I

12  interviewed Scott, I interviewed Jim, I interviewed your

13  sister.  I interviewed probably virtually --

14      A    Everybody.

15      Q    (Inaudible) you know me.  I -- you know basically

16  what happened.  Basically --

17      A    I just know that they plotted this thing -- the

18  theory is they plotted this --

19      Q    Debra tells me -- and I'll tell you what Debra

20  told me.  Debra tells me -- told me that night.  I'm trying

21  to put it in a different -- Ernie Sweat -- you know Ernie

22  Sweat?

23      A    I met the man once.

24      Q    Let me explain -- was a very clear minded person.

25      A    Oh, yeah.

**MILKE_NSB018702**

Exhibit 1A

18

1      Q    He liked Debby for other reasons.  He liked Debby

2    because Debby was a nice girl.  Debby was a very good

3    looking girl to take on dates.  Him and Debby were having

4    sexual relations.  But he was also dating other girls.

5    A    Right.

6    Q    Debby had it in her mind --

7    A    That it was something different.

8    Q    There was something serious and --

9    A    Well, the phone call on the 11th when she called

10    on Jason's birthday she told me that Ernie had proposed to

11    her and that they were going to get married just as soon as

12    she could make arrangements with -- excuse me.  They were

13    going to get married as soon as Ernie spent a little bit

14    more time with Christopher and got a little bit better

15    adjusted to Christopher.

16    Which was understandable to me at that time

17    because (inaudible) too, you know.  Yeah, but she had told

18    me all that.  And Jim had called me three days later and

19    told me that Debby was hallucinating.  Which was normal.

20    Debby -- like you were talking about the red door.  Debby

21    sees what she wants to see.  Debby hears what she wants to

22    hear.

23    Q    Let me write that down because I think it's a very

24    good point.  And I'll tell you in a minute why.

25    A    (Inaudible)

**MILKE_NSB018703**

Exhibit 1A

19

1    Q    And then three days later who called you?

2    A    Jim did.

3    Q    Did you tell him about this?

4    A    Well, I had made the comment.  I said Debby had

5    sounded really well.  This was the first time I had actually

6    heard her happy in a year.  And that I was glad the

7    relationship with Ernie was going well and he said where did

8    you hear that?  And I said she told me.  And he said well,

9    Ernie and she had been back and forth for the last couple

10   weeks.  You know, bickering back and forth over -- I guess

11   she proposed an ultimatum to him and he didn't like that.

12   Which was normal.  Debby (inaudible) quite normal.  And

13   that's what they were bickering about.  She gave him an

14   ultimatum.  She says, you know, either we do it this way or

15   we don't see each other anymore.  You know, and I think

16   Ernie really liked Debby a lot but she puts men in that

17   position to where they don't have a choice.

18        So he said that they were bickering about it.

19   Which kind of made me wonder but then again, if you've dealt

20   with her for so many years you figure well --

21   Q    Jim said that Debra was hallucinating now?

22   A    Well, it didn't come out exactly, you know, she's

23   hallucinating.  When he had told me that they were having

24   problems I said well, that's typical Debby, always seeing

25   things they way she wants to see them.  And he said well,

1    yeah.  He knew about Debby's character just from experience.

2    Like I said just from me talking to him.  Whenever she would

3    put on over on me, you know, Jim was who I'd go to and say

4    well, she did it again.  One of these days I'm going to

5    learn, you know.  So Jim knew Debby's character from me, you

6    know, he knew what he was in for.  As a matter of fact the

7    night that -- while him and Debby were loading up the truck

8    Jim got really quiet.  He got really scared.  He said he

9    didn't want him to leave and I asked him why and he said

10   because I know what your sister is.  Your sister is just

11   going to come and hound me and use me.  He knew it.  And he

12   was petrified of it.

13          And I said, Jim, tell her no.  Just tell her you

14   don't want the responsibility of taking care of Christopher.

15   That you don't want her living with you and I think they

16   lived here a week and he called.  Guess what.  See, that was

17   him.  Jim could not say no to anybody.  I mean, Jim just

18   does numerous things for people.  He's just that kind of

19   person (inaudible).  He would call me and say I'll be over

20   in 10 minutes, I'm right around the corner from you and show

21   up two hours later.  You know.  It was because he saw a lady

22   on the highway with her car, you know, or somebody needed a

23   ride somewhere.  Jim just did not have the ability -- he did

24   not have the strength to stand up for himself.  Did not have

25   the ability to say, you know, I'm not going to take this.

21

1    He would always just crumble and say well, I'll get over it.

2    He did a lot of things for me.  There's a lot of things he

3    did for me that I really didn't expect.  But he did, you

4    know, with no questions asked.

5         Q    Did you ask him about -- did you ask him if they

6    (inaudible) going to get married?

7         A    No, because I knew better.  It was typical of the

8    same game.  It was a typical game, you know.  Debby -- like

9    I said she -- this was grapevine stuff.  I guess (inaudible)

10   talking about it in passing.  That kind of stuff I just kind

11   of by-passed because I know Debby.  To me it was nothing

12   worth pursuing because I knew (inaudible).

13        Q    What do you think the relationship evolved into?

14   I can see you saying taking advantage of her.  I've read

15   letters to Debra.  Letters that have been supplied by his

16   attorney.

17        A    Just in recent months?

18        Q    Just recently since he's been in jail.  And --

19             (Beep and tape went dead about three-quarters

20   through side 1.)

21        (Side 2)

22        Q    Debra's trying to pursue -- her theory is, of

23   course she didn't do anything.  I didn't know nothing had

24   happened.  Jim's theory is, of course, and I can see it in

25   the letters and I can see it in a lot of things.  He, of

**MILKE_NSB018706**

Exhibit 1A

22

1    course, gave me the theory it wasn't he that did it.  It was

2    Roger Scott that did it.  You know, I didn't know he was the

3    one that did it either.  However, he's doing this and she's

4    asking him --

5        A    So she's writing him back?

6        Q    Yeah.  Let me explain the letters and you'll see

7    what these letters are about.  We don't have all the

8    letters.  Some of the letters, you know, they -- of course

9    they told the attorneys they destroyed or whatever.  The

10   letters we do have start with the fact that she didn't know

11   what was going on.  Please let me know what happened.  I

12   need to know what happened, Jim.  And Jim is responding to

13   her as if she didn't know what was happening.  In reading

14   these letters you can see it is a setup.  They're setting

15   people up to believe in all that kind of --

16          Jim -- we have the letters (inaudible).  Jim did

17   do the shooting.  He -- you've got to be real strong.  You

18   have to love somebody a lot to do what he did.  I mean, I

19   don't know if it's mind control or if she has that strong of

20   a (inaudible) but she has really controlled Jim.

21       A    Oh, yeah.  That's not surprising.  Jim is very

22   easily controlled.

23       Q    And then to pursue after he does it -- to pursue

24   it and to come back and think the lie up, you know, to

25   officers and stuff like that, to continue to pursue it.

MILKE_NSB018707

Exhibit 1A

23

1    And then once they (inaudible) back.  And that's
2    why -- and people wonder well, Roger Scott confessed.  Debra
3    confessed but Jim didn't.  Okay?  Jim told me, I don't know
4    what happened.  He has since in letters confessed somewhat.
5    However, but you look at both ends of the scale where Jim
6    stayed in the middle and you know why Roger Scott's
7    confessing.  Because it really wasn't his idea.  He was
8    going to do it for something else.  Do it for money.
9        A    Right.
10       Q    So it wasn't his idea to begin with.  He's not
11   really involved in the -- involved -- how do I put it.
12       A    He's not knee deep in it.
13       Q    No.  Not seriously involved in the, you know, he's
14   legally in it.  He's going to be prosecuted just like the
15   rest of them.  But he's not emotionally involved in what was
16   happening.
17       A    Right.
18       Q    Okay.  (Inaudible) he's involved.  He
19   participated.  He's a participant in all this.  Then he got
20   at the other end, he got Debra (inaudible)  But now she
21   handled (inaudible).  She has a reason to try to, of course,
22   I did it for other reasons.  I didn't want him to grow up
23   like Mark.  In other words, she's doing it -- she's trying
24   to explain her actions because as she grew up and as you're
25   explaining her to me and that I know her, she's trying to

MILKE_NSB018708

Exhibit 1A

24

1    manipulate what happened and make it better than what

2    happened because she knows she's in trouble.  Jim was the

3    only one that (inaudible) that night.  The only reason he

4    didn't do it was is he wasn't actually wrong.  He probably

5    was the only person.

6         You know he was mostly involved.  He had someone

7    to save.  He didn't know that Debra was going to talk later

8    on.  Debra was gone.  Debra was in Florence, you know, when

9    we talked to him.

10        A    That would just make me thing all the more the

11   fact that she was running out on him, just me knowing Jim.

12        Q    (Inaudible) Jim didn't know if she was going to

13   (inaudible).  He would never, ever --

14        A    But what did he do when he found out she did

15   admit?  (Inaudible)

16        Q    She (inaudible).  She was already in jail.  He

17   didn't know.

18        A    So he just figured I'm already --

19        Q    We, of course, did not ever talk to him again.

20   Once we (inaudible) we couldn't go back and talk to him.

21        A    Right.

22        Q    So we couldn't ever approach him and say, look,

23   this is it.  This is what happened.  She has admitted.

24   (Inaudible).  (Inaudible)

25        A    $755 a month.

**MILKE_NSB018709**

Exhibit 1A

25

1    Q    I don't (inaudible) all --

2    A    Oh, he's dead (sic)

3    Q    Is he dead?

4    A    Oh, I don't know.  I'm asking.

5    Q    Sherry Masini -- do you know who Sharon Masini is?

6    A    No.

7    Q    She's written his checks.  (Inaudible)  I don't

8    know.  But any way Jim -- she doesn't even understand.  She

9    (inaudible).  She doesn't understand the fact that she had

10   once a month deposited money -- (inaudible)  Every letter

11   that Debby writes to him always ends up with please send me

12   some money.

13        I know this is hard for you and it's hard for me

14   to even ask but --

15   A    Right.

16   Q    You know --

17   A    He says that (inaudible) makes her the least bit

18   guilty to ask anybody for money or anything and I'm sure Jim

19   sends it to her.

20   Q    He does.  And he sends it to her.  He sends her

21   money.  He sends her writing material.  He feels so good

22   because she writes to him.

23   A    Sure.

24   Q    And in one of the letters -- I say she's

25   probably -- one of the letters we don't have she's telling

**MILKE_NSB018710**

Exhibit 1A

26

1    him a couple of things like (inaudible) -- when we get out

2    of here -- when I get out here we could be together

3    (inaudible).

4         A    And see that's not -- that's just it.  Debby has

5    no intention -- she has none -- if she walks on this she's

6    going to be gone and she's (inaudible).

7         Q    She tells him also in one of the letters, well,

8    you know, how she's going to be out of state and everything

9    else and then ultimately she asks him for money and then at

10   the very last -- at the very last when she asks him for

11   money she says, oh, Jim, maybe when you get out you can meet

12   me where I'm at, you know.

13        A    But

14             (Both talking at once.)

15        A    Exactly.  That's exactly what I'm talking about.

16   This is how Debby gets what she wants.  You know,

17   (inaudible) letter and tells him, by the way, can you send

18   me some money.  That's Debby true to the letter.  And the

19   thing that I don't understand about it is why Jim, of all

20   people, fell for this because Jim, of all people, has seen

21   her go through so many relationships where the pattern would

22   be the exact same.  And it's funny because then he'd call me

23   and say, you know, how can men be that stupid.  And I'd say,

24   well, you tell me, Jim, you're a man.  You know.  We see it

25   (inaudible) it happens to him.

**MILKE_NSB018711**

Exhibit 1A

1      Q    Yeah, but it happened to him because it's a lot

2  easier to look on the outside and say how could these guys

3  take that shit but then all of a sudden --

4      A    Suddenly it's focused on him.

5      Q    -- it's only her and him.  All of a sudden he

6  started, like he said, the gestures, everything else and

7  then you forget about things (inaudible).  And I'm sure

8  (inaudible) maybe you can tell me.  Like you said the

9  gestures and things that she did (inaudible).  But it would

10  not surprise me if she would get up accidently, you know,

11  quickly run out of her bedroom or something like that

12  (inaudible) or be something --

13      A    (Inaudible)  You know, and needed -- not needed --

14  I don't even know Debby but I never would but my husband has

15  a fit because I come out in my PJs and my Pjs are not

16  nighties, you know, mine are the Garfield big T-shirts, you

17  know and to me I figured I'm covered, I don't care, as long

18  as it's not see-through.  I don't care.  That's not Debby.

19  No.

20      Q    I'll give you an example.

21      A    Debby (inaudible) in her bra and her panties and

22  meets company always.  But see from my point of view that's

23  natural, you know, and like I said we always did consider

24  Jim such a close friend that he never looked at us in that

25  respect, you know, a woman, you know, this is (inaudible)

**MILKE_NSB018712**

Exhibit 1A

1    friends, they're my buddies now, somebody else would come in

2    the house and of course not, Debby and I would cover up but

3    like I said, Jim would stay the night in my house and I'd

4    come out in the morning in my Garfield pajamas, you know and

5    it was normal (inaudible) when he comes through because he

6    doesn't understand that.

7         But it's the way we were raised, you know.  So

8    whether Debby uses it or not I really couldn't say because

9    you're talking about Jim.  If you're talking about somebody

10   else and she did that yeah, I'd put it past her.  I really

11   would.  But you're talking about Jim and you've got to

12   realize that Jim has always meant to us just like a father

13   actually a surrogate father.  We never thought about it.

14        Q    Jim was always over.

15        A    Yeah.

16        Q    Let me give you an example.  And you (inaudible)

17   you know (inaudible) interview Debby and me had done

18   something when we were talking.

19        A    Oh, yeah.

20        Q    Let me give you an example.  When I went into the

21   room (inaudible)

22        A    Who's that?  My sister doesn't have, I mean, the

23   only aunt we have is --

24        Q    Maybe (inaudible)

25        A    My stepmother?

29

1       Q    Yeah.  She have a sister or something?

2       A    Stepsister, yeah, Karen.

3       Q    Okay.  I'm not sure.

4       A    They're the same age.  Debby and Karen.

5       Q    She was with her at the police station?

6       A    When she got arrested?

7       Q    When she was taken to the Florence police station

8  (inaudible).

9       A    Oh, I know who you mean.  You're talking about

10  Jan.  Jan's a family friend.  She worked for INI out at DOC.

11  Yeah, she's a detective too.

12       Q    And I approached her and she was sitting down and

13  she started -- and I told her all about it.  And I told her

14  what happened and (inaudible).  She started yelling, yelling

15  and acting -- trying to cry but she didn't have no tears.

16  She didn't cry once.  Anyway, we're sitting there -- when I

17  interview someone -- not here because it's very open and

18  stuff.  And I'm not trying to get anything out of you that,

19  you know, like when you're interviewing a suspect or someone

20  -- or somebody (inaudible) may not give you all the

21  information but either way I try to get very close to a

22  person, you know.  I'm, for the most part, a very good

23  listener.  So I like to get very close to a person.  So I'm

24  sitting right here, there's no table between us.  We're

25  sitting there and she's crying or trying to cry, not crying.

MILKE_NSB018714

Exhibit 1A

1   I told her, Debby, I'm not going to tolerate that.  I'm not

2   going to tolerate that.  I'm here to get the truth.  That's

3   usually what I -- in any of my interviews that I do I'm just

4   there to get the truth.  I'm not --

5           (Both talking at once.)

6           You know with Debby how I went in there and I

7   usually do this  because I've been working homicide for a

8   long time.  I try not to even think of Chris.  Chris is not

9   between us.  If you were Debby, Chris is not between us.  A

10  case is between us (inaudible) and I went and found him.

11  So, I mean, I'm not -- I don't try to get emotionally

12  involved in that point.  So me and her talking and I'm

13  telling her I'm not going to tolerate that.  She's not going

14  to do it.  She -- dress looked very nice.  She wraps the

15  front of her blouse and she pulls it up to her eyes, she

16  didn't have no tears, to wipe her tears away but she didn't

17  have any.

18      A    (Inaudible)

19      Q    Yeah.  Which quickly exposed her (noise on tape,

20  couldn't get what was said.)  I didn't really pay that much

21  attention to -- I knew, you see, my job, in my position I

22  knew what she was doing to me.  I knew what she --

23  (inaudible).  But see, I'm there for information, okay.  And

24  she's like trying to see if I --

25      A    It's working.

**MILKE_NSB018715**

Exhibit 1A

1      Q    It's working.  If he's looking at my breasts then

2  I may be able to talk myself out of this.  Okay.  So that's

3  what I'm telling you.  That's the type of manipulation she

4  does.  She loves that.  And I understand that.  When you

5  tell me that I totally understand you.

6      A    The thing is it's so natural with her.  You know

7  you can pretty much tell (inaudible) being honest with you.

8  Debby is very hard to really judge because she's so good at

9  it and it comes to naturally for her.  I don't know if it's

10  the blonde hair that people when they, you know, they look

11  and say I'm coming up on a blonde, I got to make these kind

12  of exceptions.  You know, I don't know if it's that way or

13  she's just so natural about it that it's very, very hard to

14  tell and I mean, I like to sit and observe people and

15  Debby's always just fascinated with me.

16      I used to just -- during high school I used to sit

17  back and admire this girl and think boy I'm so glad she's my

18  sister, you know, (inaudible) misunderstand.

19      Q    Guess she was doing it to you too?

20      A    And then it kind of shakes me because -- I've

21  known her -- I've known the truth all my life about what

22  Debby did when I was a kid I was awed by it.  When I got to

23  be a teenager I was jealous of it because I didn't possess

24  the same qualities.  I wasn't on the wrestling teams

25  (inaudible).  I wasn't real popular.  I was a very

**MILKE_NSB018716**

Exhibit 1A

32

1   integrated person.  I used to be very jealous of Debby.  And
2   then after we were separated when I went to school
3   (inaudible) I started hearing things left and right from
4   people I'd know since graduation that were telling me, you
5   know.  Because I figured -- I guess I started becoming the
6   same way in my own sense as far as manipulating people but I
7   just was never any good at it.  I got caught every damn
8   time.  I got caught.  And so it always used to tick me off
9   and then I got over this when I had Jason I started spending
10  time with Debby because we had our pregnancies in common.
11  The first time we had talked in years.
12          Debby and I had never been very close.  We'd go
13  months and years without talking to each other.  The only
14  time was a mutual need.  Because I get all elated, you know.
15  My sister finally wants to pursue a relationship with me.
16  And I'd fall for it every time.  I'm 23 and I still fell for
17  it.  You know, I told (inaudible) God forbid if she called
18  because I'd probably accept the charges and talk to her just
19  out of, you know, I don't know what it is with me.  But it's
20  just been a bad habit where Debby's concerned.  Every time
21  she would knock on my door I knew what she was there for.  I
22  knew it but I wanted to do everything I could.  I thought
23  maybe if I tried to help her or did something for her she
24  would grow to appreciate it for once, you know, reciprocate
25  instead of take advantage.  And I did this for -- and I had

**MILKE_NSB018717**

Exhibit 1A

33

1    pressure from my parents too.  Every time Debby and I were

2    at odds with each other my dad would get on the phone and

3    say you're the strong one, you're the more mature one.  You

4    need to take the first approach, your sister needs you.  I

5    heard this for so many years.

6           It was fine.  I knew my dad wanted for us to be

7    close and my mom wanted us to be close and so I would do

8    this all the time.  I knew that (inaudible) you know, and I

9    (inaudible) about myself.  When Christopher came I didn't

10   care what she was there for.  If she needed to get my nephew

11   out of the picture for a little while, to give him some kind

12   of stability or decency or show him some kind of love

13   (inaudible)  She could give him to me any time she wanted

14   to, you know.  And I'd say just forget (inaudible) just give

15   me the kid.  I'll see you when I see you.  You know, because

16   children are -- children to me have always been a real

17   special thing to me.  That's --

18       Q    You already told me.  You said that (inaudible)

19   kind of funny how you're getting these phone calls in

20   November.  He's telling me in October he's trying to split

21   up.  He was trying (inaudible)

22       A    He was applying to outside companies.  He did tell

23   me that.

24       Q    He didn't move.  Ultimately he didn't leave.

25   Split the relationship up and then --

**MILKE_NSB018718**

Exhibit 1A

1      A      That's where the ultimatum came in.  When she got

2    offered the job -- I think it was Colorado -- (inaudible)

3    offered him the job and that's where the ultimatum came in

4    because he sat her down and told her that he was going to

5    take either or.  He was definitely not going to stay here.

6    And she got all upset and started bawling saying,

7    (inaudible) and you're gone.  And that made him fell good.

8    (Inaudible) decent man, you know.  And she said well, you're

9    going to take me with you.  Which put him on a, you know, he

10   was really up front with her from the start.

11      Q      (Inaudible) he told me that during that period of

12   time she told him that she was going to go to school.  And

13   she was going to get herself a career, go and try to find a

14   career for herself.  And she was going to give Christopher

15   to her dad and mom.  And then Ernie says that didn't work

16   out because her dad and mom says there ain't no way.  Her

17   dad and stepmom (Inaudible).

18      A      Right.

19      Q      And your dad and mom said there ain't no way so

20   Ernie says that didn't work out.  So then he knew that.  So

21   then she mentioned you -- you were going to take him.

22      A      Oh, yeah, we got a call in September from him.

23   Again, with my parents and I'm not defending them by any

24   means.  My dad, yeah, I'm the same way, I'm not cleaning up

25   your messes.  My dad (inaudible)  See now, Debby and I are

35

1    blood sisters but my dad -- this is his third marriage.

2    He's got a son by his first marriage and then my mother got

3    us too and then with Maureen he's got three kids. And so

4    he's got a lot of different grandchildren but his blood

5    grandchildren are Jason and Christopher. And he was not

6    prejudiced about anybody, about none of his grandkids, you

7    know. He loved them all equally. And to him -- you could

8    just tell by his property, I mean, his whole back yard is

9    for the grandkids, you know. He's got the swingset. He's a

10   52-year-old man, you know. His whole back yard is full of

11   toys and things. He loves his grandchildren and he loves

12   anything he can do for them. At Christmastime he just

13   spoils the hell out of them. But they're not his to raise.

14   He raised his kids.

15        Q    Did you know about her asking --

16        A    Oh, yes. Oh, yes.

17        Q    When did you find that out?

18        A    When she called us wanted more money. She says

19   Dad's being an asshole and he doesn't understand and you

20   understand because you've been through it. It's true. My

21   dad -- my parents (inaudible)

22        Q    What did he understand. Why did she want to get

23   rid of Christopher?

24        A    She told me it was because she just couldn't

25   handle him. It was the same excuse. She couldn't handle

**MILKE_NSB018720**

Exhibit 1A

36

1   him.  Christopher was a very high strung little boy.  He was

2   very very hard to take care of.  But --

3       Q      (Inaudible)

4       A      Normal.  Yes.

5       Q      Because if you don't get no love you go out and

6   seek it.

7       A      That kid was --

8       Q      Do we agree on that?  I mean --

9       A      Yeah.  My theory why he was that way was yes, you

10  know, he was seeking attention and he knew the only way to

11  get attention was to act up and that would stir Debby up.

12  And negative attention was better than no attention at all.

13  And (inaudible) thinking in a child's term, you know.  You

14  know when I would have him the first couple days would be, I

15  mean, (inaudible) he was not beyond choking because he was

16  just so -- didn't want to listen.  Didn't want to learn.

17  Didn't want to follow rules, you know.  And Jason's just the

18  opposite.  Jason is a very (inaudible), very low key, you

19  know.  Entertains himself.  Christopher's just the opposite.

20  Had to be attended to constantly.  But after a couple days he

21  would calm down and be just like Jason, you know.  It was

22  just that way.  She called and just said that she couldn't

23  handle him.  She didn't have -- Debby never had patience not

24  only with her son, but Debby just didn't have patience

25  period.

**MILKE_NSB018721**

Exhibit 1A

37

1    She didn't have time.  Christopher interfered with

2    her schedule.  Christopher interfered with her personal

3    life.  Christopher interfered with her social life.  Which

4    now thinking about it I couldn't see why because she had so

5    many people to take care of him.  She was able to do more

6    things.  I used to be very jealous of her because I was

7    stuck home with mine.  I couldn't go out.  I couldn't do

8    things but she could.

9        Q    Did she tell you that he was interfering with her

10   social business?

11       A    Yes.  Oh, yes.  She told us back when we were

12   still in Phoenix that he was a problem with her and Ernie's

13   relationship.  And that if she could just find a solution

14   she and Ernie could be together.

15       Q    When did she tell you that?

16       A    Oh, gosh.  I would say -- I would say it was July

17   like the 28th, the 27th or 28th.  It was that week.  The

18   last weekend in July.  We were sitting on the stoop waiting

19   for Ernie and his brother to come and we were talking about

20   it.  I asked her, you know, how her relationship with Ernie

21   was going and she (inaudible) at that time.  She was looking

22   to move out of Ilsa's trailer because Ilsa, for whatever

23   reason, Ilsa drinking or whatever, setting the trailer on

24   fire, what have you.

25       She was frustrated with her new job because she

**MILKE_NSB018722**

Exhibit 1A

1   wasn't making right then what she wanted to.  And her and
2   Ernie were having problems.  And the problems were
3   apparently from what she told me were Christopher.  And to
4   me what I got out of that conversation was that (inaudible)
5   This is your new life and just get in that truck and go.
6   Don't worry about Christopher.  Don't worry about Debby's
7   problems.  Which is what she was trying to do.  Exactly what
8   she was trying to do.
9        Q    She tried to get you to take Chris?
10       A    Exactly.  It was -- yeah, it was strictly a ploy.
11  And I knew it and I'll tell you (inaudible)  Christopher was
12  just like my own, he was -- I mean, you're with a child for
13  so long and spend so much time with him it's very hard not
14  to get attached. You know, the boys are only five weeks
15  apart and then look so much alike it's very very
16  devastating.  It was very hard.  I just kept sitting back.
17  I just kept thinking well hurry up and pull up here so I can
18  leave because I knew if I sat there any longer I'd say okay.
19  You know.  Because that was me.  I'm just as dumb.  I can't
20  say no to anybody either.
21           But if at that time she had told me she and
22  Ernie -- like I said I didn't take too much out of it
23  because she and Ernie were always having problems, typical.
24  It was typical for her, you know.  If something was not
25  going right with her it was a major catastrophe.

**MILKE_NSB018723**

Exhibit 1A

39

1      Q      In September she says that she was having problems
2   about the -- he was interfering in her social life and her
3   work and her boyfriend.
4      A      Really her problem was Ernie at that time and I
5   asked her -- she said -- it kind of worked out.  She said
6   that she and Ernie -- Ernie had gotten offered a job -- I
7   believe it was in Colorado but I can't swear to it.  She
8   said she wanted to go with him.  I told her to go for it and
9   she says well, I'm just worried about Christopher because
10  Mark was out -- I think in prison at that time -- well, he
11  left and she was having a hard time.  She said that she had
12  sat down with Mark and that Mark said that no, he couldn't
13  go with my dad but he could go with me.  And so they were
14  having problems at that time.  Mark -- Debby got a peace
15  bond on him and I don't know what else.  But that was
16  nothing unusual either.  They were always fighting too.
17     Q      So when you said that Ernie was going to get
18  another job -- (inaudible) but Chris couldn't go.
19     A      Ernie had asked her to go.  She didn't say that.
20  She said that Ernie had asked her to go but that he was real
21  hesitant about taking Christopher.  And I asked her, I said
22  are you sure it's Ernie or you.  He's looking for another
23  way out.  And then she got mad and she hung up on me and
24  called me a week later apologized and said Mark kidnapped
25  Christopher and that she didn't feel Christopher was safe

**MILKE_NSB018724**

Exhibit 1A

40

1    anymore.

2        Q    When was this?

3        A    A week later.

4        Q    Compared to the killing when was this?

5        A    Right.  Oh, yeah, it was a week later.  It was in

6    September, a week later.  And her mom was on the other phone

7    and she lives in (inaudible) Now she's making up stuff.  I

8    told her again, I said, look, I said, you know, until you

9    and Ernie work this out I'll tell you what we'll do.  I'll

10   sit down and try to discuss it with him.  And she instantly

11   was happy.  Okay.  Ron and I sat down and discussed it and I

12   called her back and I said mom will be there -- I don't even

13   remember when my mom was here -- she (inaudible) September.

14   I said mom will be there in September.  If mom is willing to

15   pay for his plane fare out here when she comes then Ron and

16   I would be willing to keep Christopher for no longer than

17   two months until she got her shit together.

18       Q    Two months (inaudible) I'm getting ahead of

19   myself.

20            (Beep sounded -- nothing further on tape.)

21

22

23

24

25

MILKE_NSB018725

Exhibit 1A

41

1   STATE OF ARIZONA

2   COUNTY OF MARICOPA

3

4

5

6

7

8        I hereby certify that the foregoing pages numbered

9   1 through 41 inclusive, is a correct transcript from the

10   record of proceedings in the above-entitled matter.

11

12

13

14

15   _Rosanna L. Neier_                    9/18/90

16   Transcriber                              Date

17

18

19

20

21

22

23

24

25

MILKE_NSB018726

Exhibit 1A

# C. KENNETH RAY II, P.C.
### ATTORNEY AT LAW
### 45 WEST JEFFERSON
### SUITE 810
### PHOENIX, ARIZONA 85003
### (602) 253-3875

September 17, 1990

ACKNOWLEDGMENT OF DELIVERY OF INTERVIEW TAPE: SALDATE/PICKENPAUGH OF 6/20/90

The undersigned hereby acknowledges that he/she delivered a tape recording of an interview conducted between Det. Armando Saldate and Sandra Pickenpaugh to C. Kenneth Ray II and/or his representative, Investigator Kirk Fowler on September 17, 1990 at 1205 a.m./p.m.

*Det. R. M²S 2287*

MILKE_NSB018727

Exhibit 1A

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT        PAGE NO.   1         DR NO.:  89179406 A  9

REPORT DATE: 070690    TIME: 1415

TYPE OF REPORT:  HOMICIDE

PROSECUTION DESIRED: YES

LOCATION: 99 AVE. & HAPPY VALLEY ROAD (NORTH)        BEAT: 0999   GRID: AA00

REPORTING OFFICER[S]: ARMANDO SALDATE          1875      UNIT: C31

PREMISES: OPEN SPACE/DESERT                          OCCUPIED:

PHOTOGRAPHS TAKEN: NO     BY:

SCENE PROCESSED FOR LATENTS: NO      BY:

LATENTS SUBMITTED TO CRIME LAB: NO

REPORT STATUS AT PRESENT: OPEN INVESTIGATION

                    **** NARRATIVE ****

SERIAL NUMBER: 1875

INTERVIEW:    PICKINPAUGH, SANDRA
              W/F, ███████
              755 RIVERVIEW DRIVE #4
              (SISTER)

ON 6-30-90 AT APPROX. 1207 HRS (UTAH TIME), I CONTACTED SANDRA PICKINPAUGH
AT HER HOME AT 755 RIVERVIEW DRIVE #4 IN GREEN RIVER, WYOMING. THE PURPOSE
OF MY CONTACT WAS TO INTERVIEW HER IN REGARDS TO THIS DEATH INVESTIGATION.
THE FOLLOWING IS A PARAPHRASED ACCOUNT OF HER INTERVIEW.

SANDRA AND I DID NOT HAVE TO BE INTRODUCED BECAUSE WE HAD MET PREVIOUSLY
IN PHOENIX DURING THE INITIAL REPORT. WE WENT INTO SANDRA'S KITCHEN AND
SAT DOWN AT THE TABLE AND I EXPLAINED TO HER THAT I WANTED TO SPEAK WITH
HER ABOUT HER SISTER DEBRA MILKE AND THE SITUATION SURROUNDING THE DEATH
OF HER NEPHEW CHRIS MILKE. SANDRA AGREED AND THEN GAVE ME THE FOLLOWING
INFORMATION.

SANDRA SAID THE LAST TIME SHE SPOKE TO HER SISTER WAS ON NOVEMBER 11,
1989. SHE SAID SHE CALLED HER TO WISH HER SON JASON A HAPPY BIRTHDAY.
SANDRA SAID THIS WAS STRANGE BECAUSE USUALLY DEBBIE DIDN'T THINK OF ANYONE
ELSE AND DIDN'T REALLY UNDERSTAND WHY DEBRA HAD CALLED. DURING THIS
CONVERSATION, DEBRA TOLD HER THAT A JUDGE HAD DENIED JOINT CUSTODY TO MARK
AT A RECENT COURT HEARING.

I THEN ASKED SANDRA IF SHE COULD TELL ME ABOUT ANY OF DEBRA'S FRIENDS. SHE

89179406 A  9                            89179406 A  9  Continued.

KD001920
**MILKE_NSB000611**

Exhibit 1A

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NO.   2            DR NO.:   89179406 A   9

IMMEDIATELY RESPONDED THAT DEBRA DID NOT HAVE FRIENDS. SHE EXPLAINED THAT
DEBRA WILL CALL UPON PEOPLE WHEN SHE NEEDS SOMETHING BUT THEY ARE NOT
REALLY HER ACTUAL FRIENDS. SHE SAID THAT FOR THE MOST PART, SHE WAS
GETTING JIM TO DO EVERYTHING FOR HER.

I THEN ASKED SANDRA IF SHE COULD DESCRIBE HER SISTER AND SHE SAID SHE
COULD. SANDRA THEN SAID HER SISTER DEBRA WAS, IN HER WORDS, MATERIALISTIC,
SELFISH, SELF-SEEKING, SELF-CENTERED, VAIN AND CONCEITED. SANDRA SAID THIS
MAY SOUND AS IF SHE DID NOT LIKE HER SISTER, HOWEVER, THAT WAS NOT TRUE.
SHE SAID SHE LOVES HER SISTER BUT THAT SHE HAS COME TO REALIZE WHAT HER
SISTER ACTUALLY IS AND FOR THE MOST PART, SHE FEELS SORRY FOR HER.

I ASKED HER IF SHE COULD EXPLAIN AND SHE SAID HER SISTER DEBRA WAS AN
EXPERT AT MANIPULATING PEOPLE. SANDRA SAID THAT SHE WAS HER MAIN TARGET
DURING THAT PERIOD OF TIME BECAUSE AS SANDRA DESCRIBED HERSELF, SHE WAS
EASY. SANDRA WENT ON TO SAY THAT SHE ON MANY OCCASIONS WOULD BE APPROACHED
BY DEBRA AND THAT DEBRA WOULD BREAK DOWN AND TELL HER THAT SHE WANTED TO
DO BETTER AND WANTED TO GET AWAY FROM MARK, HER HUSBAND. SANDRA SAID SHE
WOULD USUALLY FALL FOR THIS AND AGREE WITH DEBRA THAT SHE SHOULD DO THESE
THINGS. DEBRA WOULD THEN TURN IT AROUND AND THEN USE IT AGAINST HER AND
AFTER SEVERAL WEEKS OF TAKING CARE OF CHRIS, SHE WOULD REALIZE THAT THE
ONLY REASON SHE SAID THESE THINGS WAS BECAUSE SHE WANTED SOMEONE TO TAKE
CARE OF CHRIS. SANDRA SAID THAT IT WOULD START BY DEBRA TELLING HER IF SHE
WOULD JUST ONLY TAKE CARE OF CHRIS FOR 2 DAYS, SHE COULD PROBABLY GET HER
HEAD TOGETHER, GET RID OF MARK AND DO BETTER FOR HERSELF. SANDRA SAID THAT
AS SOON AS SHE BEGAN TO AGREE WITH HER, SANDRA SAID "BINGO", SHE WOULD BE
CAUGHT IN THE TRAP, AND THAT 2 DAYS WOULD TURN INTO 2 MONTHS.

I THEN ASKED HER ABOUT THE TIME WHEN DEBRA WENT TO COLORADO PRESUMABLY TO
GET HER ACT STRAIGHT. SANDRA JUST CHUCKLED AND SAID THAT WAS A JOKE. SHE
SAID THAT SANDRA CONVINCED AN OLD BOYFRIEND TO GIVE HER MONEY BECAUSE SHE
WAS GOING TO DIVORCE MARK AND GET HER LIFE STRAIGHT BUT INSTEAD SHE USED
THE MONEY TO GO COLORADO TO VISIT A FAMILY FRIEND BY THE NAME OF DOROTHY
MARKWELL. SHE SAID AT FIRST IT WAS SOMETHING THAT DEBRA SAID SHE NEEDED TO
DO TO GET HER LIFE STRAIGHT AND AGAIN SHE BELIEVED HER. SANDRA SAID SHE
WASN'T THERE MORE THAN 2 DAYS WHEN SHE MET UP WITH A GUY AND THAT DOROTHY
CALLED HER AND SAID THAT DEBRA WAS STAYING WITH THIS GUY AND THAT SHE WAS
HAVING TO TAKE CARE OF CHRIS. SHE SAID THAT DEBRA RETURNED FROM COLORADO A
SHORT TIME LATER AND THAT SHE WAS TOLD THAT DEBRA WAS PREGNANT AND GOT AN
ABORTION.

SANDRA WENT ON TO SAY THAT HER SISTER IS A MASTER OF DECEPTION AND
MANIPULATION AND THAT SHE HAS A CERTAIN WAY WITH PEOPLE. SHE SAID THAT
DEBRA CAN MAKE ANYONE DO WHAT SHE WANTS THEM TO, EVEN THOUGH THEY MAY
TRULY KNOW DEBRA. SANDRA THEN SAID "THERE IS NO LIMIT WHAT A PERSON WOULD
DO FOR DEBRA."

SANDRA THEN TOLD ME THAT THE PHONE CALL SHE RECEIVED ON THE 11TH, DEBRA
TOLD HER THAT ERNIE, WHO WAS DEBRA'S BOYFRIEND AT THE TIME, HAD PROPOSED
TO HER AND THAT THEY PLANNED TO GET MARRIED AS SOON AS ERNIE SPENT A
LITTLE BIT MORE TIME WITH CHRIS AND GOT ADAPTED TO HIM. SANDRA SAID SHE

89179406 A   9                                      Continued

KD001921
**MILKE_NSB000612**

Exhibit 1A

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT                PAGE NO.   3           DR NO.:   89179406 A  9

KNEW THAT ERNIE AND DEBRA WERE DATING BUT THAT HE DID NOT APPEAR TO BE
T  T TYPE OF PERSON, EVEN THOUGH SHE THOUGHT HE WAS VERY NICE.

APPROXIMATELY 3 DAYS LATER, SHE SAID SHE RECEIVED A CALL FROM JIM STYERS
AND DURING THE CONVERSATION WITH JIM, SHE TOLD HIM THAT DEBBIE HAD CALLED
AND THAT SHE REALLY SOUNDED HAPPY. SANDRA SAID SHE WENT ON TO TELL JIM
THAT SHE HAD HEARD THAT THE RELATIONSHIP WITH ERNIE AND DEBRA WAS GOING
VERY WELL AND THAT THEY WERE POSSIBLY GOING TO GET MARRIED. SANDRA SAID
THAT JIM IMMEDIATELY ASKED HER WHERE SHE HAD HEARD THIS INFORMATION AND
SHE TOLD HIM THAT DEBBIE HAD TOLD HER. JIM THEN TOLD HER THAT DEBBIE AND
ERNIE WERE HAVING TROUBLE AND SAID SOMETHING TO THE EFFECT THAT DEBBIE
MUST HAVE BEEN HALLUCINATING. HE THEN TOLD HER THAT DEBBIE HAD GIVEN ERNIE
AN ULTIMATUM AND THAT THEY WERE HAVING PROBLEMS BECAUSE OF THAT. SANDRA
SAID SHE IMMEDIATELY REALIZED THAT DEBBIE TOLD HER THESE THINGS BECAUSE
THAT'S WHAT DEBBIE WANTED TO BELIEVE. SHE SAID THAT DEBBIE WAS THE MOST
CONVINCING TO HERSELF.

SHE SAID THAT JIM THEN BEGAN TO COMPLAIN THAT HE WAS AFRAID THAT DEBBIE
WAS GOING TO TAKE ADVANTAGE OF HIM AND THAT HE COULD ALREADY SEE THAT HE
W S GOING TO PROBABLY HAVE TO TAKE CARE OF CHRIS FOR THE MOST PART. SANDRA
S    SHE REMINDED JIM THAT SHE HAD WARNED HIM ABOUT THIS BEFORE HE LET HER
    IN.

A COUPLE OF DAYS LATER, JIM AGAIN CALLED AND TOLD HER "GUESS WHAT." JIM
THEN WENT ON TO TELL HER THAT SHE WAS ALREADY DOING IT AND TAKING
ADVANTAGE OF HIM. I THEN ASKED SANDRA WHY JIM WOULD LET HER DO THIS AND
SANDRA REPLIED THAT SHE WAS SURE THAT DEBBIE WOULD PROBABLY LEAD HIM ON,
TEASE HIM AND PURSUE INTIMATE THOUGHTS WITH HIM. SANDRA SAID SHE WAS SURE
THAT DEBBIE WOULD NEVER HAVE SLEPT WITH JIM BUT THEN SAID "I'M SURE SHE
WOULD GIVEN HIM ENOUGH FOOD FOR THOUGHT TO MAKE HIM DO ANYTHING FOR HER."

I THEN ASKED SANDRA WHAT HER RELATIONSHIP WITH JIM WAS AND SHE SAID THEY
WERE VERY, VERY CLOSE FRIENDS. SHE DESCRIBED JIM AS DOING ANYTHING FOR HER
AND SHE SAID SHE WAS VERY COMFORTABLE AROUND JIM. SHE DID ADMIT THAT JIM
AT ONE TIME HAD THOUGHT THAT THEY COULD BECOME ROMANTICALLY INVOLVED,
HOWEVER, SHE IMMEDIATELY TOLD JIM THAT COULD NOT HAPPEN AND THAT THEY
WOULD ONLY REMAIN FRIENDS. I THEN ASKED HER IF DEBRA WOULD HAVE BEEN AS
HONEST TOWARDS JIM IF HE WOULD HAVE THOUGHT ABOUT BECOMING ROMANTICALLY
INVOLVED WITH DEBRA. SANDRA THEN REPLIED THAT DEBRA WOULD ONLY USE THAT
WEAKNESS IN JIM AND WOULD NEVER TELL HIM THAT SHE WOULD NEVER WANT TO BE
INVOLVED WITH HIM ROMANTICALLY. SANDRA SAID SHE CAN'T BELIEVE THAT JIM
WOULD HAVE FELL FOR THIS BECAUSE SHE TRIED TO EXPLAIN TO JIM ABOUT DEBRA
BEFORE SHE LEFT. I THEN ASKED HER IF IT COULD BE LOVE ON JIM'S PART AND
S   SAID THAT'S THE ONLY THING SHE COULD THINK OF THAT WOULD BE DRIVING
JIM.

   SEPTEMBER, SANDRA SAID SHE RECEIVED A CALL FROM DEBRA, ASKING HER IF
SHE AND HER HUSBAND RON COULD TAKE CHRIS BECAUSE HER DAD DIDN'T UNDERSTAND
AND THAT HE WAS BEING AN ASSHOLE AND WOULD NOT TAKE HIM. SHE SAID SHE TOLD
DEBRA SHE DIDN'T REALLY KNOW AND WOULD HAVE TO TALK TO RON. DEBRA WENT ON
TO TELL HER THAT SHE COULDN'T HANDLE CHRIS AND THAT HE WAS JUST A BRAT.

Continued

KD001922
MILKE_NSB000613

Exhibit 1A

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   4          DR NO.:  89179406 A   9

SHE SAID HE WAS A PROBLEM AND THAT HE INTERFERED WITH HER WORK, HER SOCIAL
L E AND HER BOYFRIEND ERNIE. SANDRA SAID SHE COULD NOT UNDERSTAND WHAT
SHE MEANT BY THIS SINCE IT HAS BEEN HER UNDERSTANDING SINCE SHE LEFT THAT
EVERYONE ELSE WAS TAKING CARE OF CHRIS AND THAT DEBRA WOULD DO VERY
LITTLE.

APPROXIMATELY ONE WEEK LATER, DEBRA AGAIN CALLED HER AND APOLOGIZED. SHE
TOLD HER THAT ERNIE HAD GOTTEN OFFERED A JOB OUT OF STATE,
POSSIBLY IN COLORADO, AND THAT ERNIE HAD INVITED HER TO GO WITH HIM. DEBRA
SAID THAT ERNIE DIDN'T WANT TO TAKE CHRIS SO SHE NEEDED SOMEONE TO TAKE
CARE OF HIM. SANDRA SAID SHE THEN ASKED DEBRA IF SHE WAS SURE IT WAS ERNIE
AND NOT HER AND SANDRA SAID THAT DEBRA IMMEDIATELY HUNG UP THE PHONE.

APPROXIMATELY ONE WEEK LATER, DEBRA AGAIN CALLED HER AND APOLOGIZED. SHE
TOLD HER THAT MARK HAD KIDNAPPED CHRIS EARLIER BUT THAT SHE HAD GOTTEN HIM
BACK. SHE THEN TOLD HER THAT BECAUSE OF MARK'S ACTIONS, SHE DIDN'T THINK
THAT CHRIS WAS SAFE ANYMORE. SANDRA THEN EXPLAINED THAT HER HUSBAND RON
WAS LISTENING ON THE OTHER PHONE AND THAT HE WAS WHISPERING TO HER THAT
DEBRA WAS AGAIN TRYING TO USE HER. HE TOLD HER THAT THE FIRST TIME SHE
WANTED THEM TO TAKE CARE OF CHRIS, SHE TOLD HER NO, AND NOW SHE WAS USING
   RK AND THE SAFETY OF CHRIS TO GET HER TO SAY YES. SANDRA SAID SHE TOLD
D  RA THAT SHE WOULD HAVE TO TALK TO HER HUSBAND RON ABOUT TAKING CHRIS
   DEBRA THEN BECAME VERY HAPPY AND THEY ENDED THEIR CONVERSATION.

WITHIN A WEEK, DEBRA AGAIN CALLED AND SANDRA SAID SHE TOLD DEBRA THAT SHE
AND RON HAD TALKED ABOUT IT AND THEY HAD AGREED TO TAKE CHRIS BUT FOR ONLY
2 MONTHS. SHE SAID THEY TOLD DEBRA THEY COULD NOT AFFORD TO SEND FOR CHRIS
BUT IF HER MOTHER WOULD AGREE TO PAY FOR THE AIRLINE TICKET FOR CHRIS,
THAT CHRIS COULD SPEND SOME TIME WITH THEM. SANDRA SAID THAT DEBRA TOLD
HER THAT IT WOULD ONLY BE FOR 2 MONTHS UNTIL SHE AND ERNIE GOT SETTLED AND
WORKED THE PROBLEM OUT. SANDRA SAID SHE ENDED THE TELEPHONE CONVERSATION
BELIEVING THAT HER MOTHER WOULD PAY FOR CHRIS' AIRLINE TICKET.

SEVERAL DAYS LATER, SANDRA SAID HER MOM CALLED HER AND SAID THAT SHE HAD
CALLED DEBRA AND TOLD HER THAT IT WASN'T RIGHT FOR THEM TO TAKE CARE OF
CHRIS. SHE SAID HER MOM TOLD DEBRA THAT IT WASN'T RIGHT FOR HER AND HER
HUSBAND, JUST BEING NEWLY MARRIED AND TRYING TO ADAPT, TO TAKE CARE OF
CHRIS. SANDRA SAID THAT HER MOM AND DEBRA APPARENTLY CAME TO AN AGREEMENT
AND THAT WHEN HER MOM ARRIVED FROM SWITZERLAND IN PHOENIX, SHE WOULD TAKE
CHRIS WITH HER FOR 2 WEEKS WHILE SHE VISITED HER (SANDRA) IN WYOMING. HER
MOTHER SAID THAT WHEN SHE WAS READY TO GO BACK TO SWITZERLAND, DEBRA AND
ERNIE WOULD DRIVE UP TO SALT LAKE CITY, MEET HER AT THE AIRPORT, AND PICK
UP CHRIS. AGAIN SANDRA SAID SHE UNDERSTOOD THIS WAS GOING TO TAKE PLACE.

A  ROXIMATELY 2 DAYS BEFORE HER MOTHER WAS TO ARRIVE, HER MOTHER CALLED
AND SAID THAT SHE HAD DECIDED NOT TO BRING CHRIS WITH HER TO WYOMING.
   RA SHE ASKED HER MOTHER WHY AND HER MOTHER RESPONDED THAT SHE
   D NOT DEPEND ON DEBRA PICKING UP CHRIS AT THE AIRPORT AND THAT SHE
DEFINITELY NEEDED TO TAKE THE FLIGHT OUT THAT DAY AND IF DEBRA WOULD NOT
PICK UP CHRIS, THAT SHE, SANDRA, WOULD END UP GETTING STUCK WITH HIM.

A DAY OR SO LATER, SHE REMEMBERED THAT SHE CALLED HER DAD AND SHORTLY

KD001923

MILKE_NSB000614

Exhibit 1A

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   5          DR NO.:   89179406 A  9

AFTER THEIR CONVERSATION, HER DAD CALLED DEBRA AND TOLD HER THAT HE WAS
[ ] GOING TO STAND BY AND LET DEBRA TAKE ADVANTAGE OF THEM AND THAT SHE
WAS NOT GOING TO RUIN THEIR NEW MARRIAGE.

SANDRA SAID THAT SINCE CHRIS WAS BORN, DEBRA HAS BEEN WANTING TO GIVE
CHRIS TO HER. SHE SAID THAT SHE HAD ON AT LEAST THREE OCCASIONS FILED
PAPERS AND THAT DEBRA HAD SIGNED EVERY PAPER, GUARANTEEING THAT SHE WOULD
HAVE SOLE GUARDIANSHIP OF CHRIS. SHE SAID THE ONLY REASON SHE DID NOT WAS
BECAUSE MARK DID NOT WANT TO GIVE UP HIS RIGHTS.

SANDRA THEN REMEMBERED THAT ON JULY 28, THE NIGHT THAT SHE LEFT PHOENIX
FOR WYOMING WITH HER HUSBAND, DEBRA AND HER WERE TALKING AND SHE BELIEVED
THAT DEBRA WANTED HER TO TAKE CHRIS AT THAT TIME. SANDRA SAID THIS BECAUSE
DEBRA TOLD HER THAT IF SHE COULD ONLY FIND A SOLUTION ABOUT CHRIS, SHE AND
ERNIE COULD GET MARRIED. SANDRA ADMITTED THAT HAD IT NOT BEEN THAT SHE WAS
JUST NEWLY MARRIED AND THE EXCITEMENT OF MOVING, SHE PROBABLY WOULD HAVE
PICKED UP ON WHAT DEBRA WAS TRYING TO TELL HER AND TAKEN CHRIS THAT NIGHT.

[ ] THEN ASKED SANDRA ABOUT DEBRA'S ABORTIONS AND SANDRA SAID AS FAR AS SHE
[KNE]W, DEBRA HAD HAD THREE. SANDRA WENT ON TO EXPLAIN THAT THE FIRST
[ABO]RTION SHE KNEW ABOUT WAS WHEN DEBRA WAS A SENIOR IN HIGH SCHOOL. SHE
[SA]ID THE SECOND ONE SHE IS NOT CLEAR ON BUT HAD BEEN TOLD THAT DEBRA DID
HAVE AN ABORTION AFTER BEING INVOLVED WITH AN OLD BOYFRIEND. THE LAST ONE
SHE SAID SHE BECAME AWARE OF BY ACCIDENT. SHE SAID THAT DEBRA'S MAIL HAD
BEEN TRANSFERRED TO HER ADDRESS AND SHE WAS OPENING THE MAIL TO SEE IF
ANYTHING OF ANY IMPORTANCE HAD TO BE SENT TO DEBRA. SHE SAID THAT DURING
THIS TIME, SHE KEPT SEEING SOME CHECKS BEING WRITTEN FROM DEBRA TO A
CERTAIN LADY. SHE SAID SHE ASKED MARK'S MOTHER ABOUT THE CHECKS AND THAT
MARK'S MOTHER TOLD HER SHE HAD BORROWED THAT MONEY FROM THAT LADY AND
GIVEN IT TO DEBRA WHEN SHE RETURNED FROM COLORADO. MARK'S MOTHER TOLD HER
THAT DEBRA NEEDED THE MONEY BECAUSE SHE NEEDED TO GET AN ABORTION AND THAT
SHE APPARENTLY GOT PREGNANT FROM A GUY SHE HAD MET IN COLORADO.

I THEN ASKED HER IF SHE COULD DESCRIBE JIM STYERS. SANDRA THEN TOLD ME
THAT SHE AND JIM WERE VERY CLOSE AND DESCRIBED HIM AS A WONDERFUL PERSON
WHEN HE'S INVOLVED IN A POSITIVE ENVIRONMENT. SHE THEN REMINDED ME THAT
WHEN HE'S ASSOCIATED IN A NEGATIVE ENVIRONMENT, HE WOULD BECOME VIOLENT.
SANDRA THEN CORRECTED HERSELF AND SAID VIOLENT TOWARDS HIMSELF. I THEN
ASKED SANDRA WHAT TYPE OF ENVIRONMENT SHE BELIEVED JIM WAS IN SINCE SHE
LEFT AND SHE SAID SHE WOULD DEFINITELY CONSIDER JIM'S INVOLVEMENT WITH
DEBRA AS A NEGATIVE ENVIRONMENT. I THEN ASKED SANDRA IF SHE COULD EXPLAIN
WHAT SHE MEANT THAT JIM WOULD BECOME VIOLENT TOWARDS HIMSELF AND SHE
[RE]SPONDED THAT HE WOULD THINK ABOUT SUICIDE. SANDRA SAID THAT HE TALKED
ABOUT SUICIDE AND TAKING A GUN AND SHOOTING HIMSELF IN THE HEAD. HE ALSO
[TAL]KED ABOUT RUNNING HIS CAR OFF THE ROAD TO COMMIT SUICIDE, THAT HE WOULD
[ONL]Y TALK ABOUT THESE THINGS WHEN HE WAS DEPRESSED.

SHE THEN DESCRIBED JIM AS RESENTING CHRIS BASICALLY BECAUSE HE HAD TO
ALWAYS TAKE CARE OF HIM. SHE REMEMBERS SEVERAL PHONE CALLS FROM JIM WHEN
HE WOULD COMPLAIN ABOUT HAVING TO TAKE CARE OF CHRIS AND THAT SHE WOULD

KD001924
MILKE_NSB000615

Exhibit 1A

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   6          DR NO.:  89179406 A  9

HEAR HIM YELL IN THE BACKGROUND AT CHRIS AND COMPLAIN THAT HE COULD NOT
CONTROL HIM. SANDRA THEN SAID THAT JIM PROBABLY RESENTED CHRIS THE MOST
BECAUSE HE WAS RESENTING DEBBIE FOR LEAVING CHRIS WITH HIM BUT SINCE HE
COULD NOT TELL DEBBIE ANYTHING, HE WOULD USUALLY TAKE IT OUT ON CHRIS.

SANDRA THEN TOLD ME THAT THERE WERE TWO INCIDENTS WHERE DEBBIE HAD BEEN
ABUSIVE TOWARDS CHRIS AND SHE FELT BAD BECAUSE SHE DID NOT REALIZE THIS
AND DONE SOMETHING ABOUT IT EARLIER. SHE SAID IN BOTH INCIDENTS SHE SAID
THAT DEBRA HAD TOLD HER THAT SHE WAS HAVING DIFFICULT PROBLEMS COPING
SPECIFICALLY ABOUT HER PROBLEMS WITH MARK. IN ONE INCIDENT, SHE REMEMBERED
IT WAS AROUND OCTOBER 1987, SHE AND DEBBIE WERE LIVING TOGETHER AT THE
COUNTRY COURT APARTMENTS. SHE CAME HOME ONE DAY AND FOUND DEBBIE SITTING
ON THE COUCH CRYING AND THEN NOTICED THAT THE DOOR TO THE BEDROOM WAS
LOCKED FROM THE OUTSIDE. SHE SAID DEBBIE HAD PUT A LOCK ON THE OUTSIDE TO
KEEP CHRIS FROM GOING INTO THE BEDROOM DURING THE DAY. SHE SAID SHE THEN
HEARD CHRIS SCREAMING FROM INSIDE THE BEDROOM AND SHE ASKED DEBRA WHAT HAD
HAPPENED. DEBRA THEN TOLD HER THAT SHE HAD BURNT CHRIS AND SANDRA SAID
THAT HER IMMEDIATE RESPONSE WAS THAT ACCIDENTS DO HAPPEN. SANDRA THEN SAID
THAT DEBRA ADMITTED DOING IT ON PURPOSE AND THEN TOLD HER THAT SHE COULD
NOT HANDLE CHRIS ANYMORE. SANDRA SAID SHE IMMEDIATELY WENT INTO THE
BEDROOM, GOT CHRIS AND ATTENDED TO HIM AND PUT NEOSPOROM ON HIS FACE WHERE
HAD APPARENTLY BEEN BURNED. AFTER DOING THAT, SHE CAME OUT AND ASKED
DEBBIE WHAT HAD HAPPENED AND DEBBIE TOLD HER THAT SHE WAS COOKING
SOMETHING IN THE OVEN AND THAT CHRIS HAD WALKED UP AND KEPT PULLING ON HER
LEG. SUDDENLY CHRIS REACHED UP AND PULLED SOMETHING OFF THE COUNTER, WHICH
GOT HER VERY ANGRY. SHE THEN REACHED FOR A COOKIE SHEET WHICH SHE HAD JUST
TAKEN OUT OF THE OVEN AND WAS EXTREMELY HOT AND SLAPPED CHRIS ACROSS THE
FACE, CAUSING THE BURN. SANDRA SAID SHE LATER CALLED HER FRIEND'S MOTHER
WHO WAS A NURSE AND THAT SHE SUGGESTED THEY TAKE CHRIS TO THE HOSPITAL BUT
THEY DID NOT. SHE SAID SHE TOOK CARE OF CHRIS AND CONTINUED TO PUT
MEDICINE ON THE BURN UNTIL IT HEALED.

SANDRA THEN REMEMBERED THAT THE FIRST INCIDENT WAS WHEN CHRIS WAS ONLY
ABOUT 2 WEEKS OLD. SHE SAID SHE GOT A CALL FROM DEBRA AND THAT SHE WAS
CRYING AND SHE COULD NOT PUT CHRIS TO SLEEP. SHE SAID SHE WENT OVER TO
DEBRA'S APARTMENT AND THAT CHRIS WAS CRYING BUT DEBRA WAS JUST SITTING
THERE AND SAID SHE JUST COULD NOT DO ANYTHING ABOUT IT. SANDRA THEN WENT
OVER TO CHRIS AND WAS GOING TO CHANGE HIM AND SHE NOTICED THE BLACK AND
BLUE MARKS ON HIS BUTTOCKS AND BACK. SHE SAID SHE IMMEDIATELY ASKED DEBRA
WHAT THESE WERE AND DEBRA RESPONDED THAT SHE HAD TOLD HER THAT SHE
COULDN'T GET CHRIS TO SLEEP. SANDRA THEN DESCRIBED DEBRA AS HAVING NO
PATIENCE WITH CHRIS AND SHE WOULD CONSTANTLY YELL AT HIM AND THROW HIM
AROUND. SANDRA THEN REMARKED THAT SHE REALLY DID NOT UNDERSTAND THIS SINCE
SHE RARELY TOOK CARE OF CHRIS AND THAT SHE AND ELSA (MARK'S MOTHER) DID
MOST OF IT.

SANDRA SAID THAT ON AN AVERAGE FROM THE TIME THAT CHRIS WAS 2 WEEKS OLD,
TO THE TIME THAT HE WAS 3 YEARS OLD, WHEN SHE LEFT ON JULY 28, SHE
ESTIMATED THAT SHE TOOK CARE OF CHRIS PROBABLY 7 MONTHS OUT OF THE YEAR
AND ELSA (MARK'S MOTHER) WOULD TAKE CARE OF HIM AT LEAST 2 MONTHS OUT OF
THE YEAR. THIS WOULD LEAVE ONLY 3 MONTHS THAT DEBRA WOULD HAVE TO TAKE

DR89179406 A  9                                                        Continued.

KD001925
**MILKE_NSB000616**

Exhibit 1A

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT         PAGE NO.   7         DR NO.:   89179406 A  9

CARE OF CHRIS.

SANDRA THEN REMEMBERED WHEN CHRIS WAS SEVERAL WEEKS OLD, DEBRA AND MARK
BROUGHT CHRIS OVER TO HER HOME AND ASKED HER TO TAKE CARE OF CHRIS FOR 1
DAY BUT THAT IT ENDED UP 2 WEEKS. SHE SAID THAT DEBRA EXPLAINED TO HER
WHEN SHE RETURNED THAT SHE AND MARK HAD DECIDED TO GO TO CALIFORNIA AND
HAD BEEN THERE FOR THE PAST 2 WEEKS.

I THEN ASKED SANDRA IF SHE KNEW ANYTHING ABOUT ROGER AND SHE SAID SHE DID.
I ASKED HER IF SHE COULD DESCRIBE HIM AND SHE IMMEDIATELY SAID THAT HE WAS
VERY EASILY INTIMIDATED. SHE SAID SHE BELIEVED ROGER WAS NOT PLAYING WITH
A FULL DECK AND THAT HE WAS LIVING WITH HIS MOTHER WHO WAS AN ALCOHOLIC
AND THAT HE WAS ALSO AN ALCOHOLIC. SHE THEN DESCRIBED HIM AS A MICE, A
HARMLESS, SCARED PERSON, A "GO FOR" TYPE OF A PERSON. SHE SAID SHE KNEW
THIS BECAUSE JIM WOULD CONSTANTLY DOMINATE OVER HIM. I THEN ASKED SANDRA
WHY JIM WOULD DO THIS. SHE EXPLAINED THAT JIM WAS USUALLY THE ONE TO BE
DOMINATED AND WAS IN FACT BEING DOMINATED BY SHE AND DEBRA. HOWEVER, IN
ROGER'S CASE, JIM FOUND SOMEONE WHO WAS LESS AGGRESSIVE THAN HE WAS AND
THAT HE COULD VERY EASILY DOMINATE AND FOR THAT REASON, SHE BELIEVED HE
JOK ADVANTAGE OF IT.

SANDRA THEN SAID THAT ROGER WAS A FOLLOWER AND THAT SHE ACTUALLY FELT
SORRY FOR HIM. SHE SAID THAT JIM AND ROGER HAD APPARENTLY BEEN FRIENDS FOR
SOMETIME BUT THEY HAD JUST RECENTLY RAN INTO EACH OTHER. SHE SAID JIM
WOULD ALWAYS DECIDE WHAT HE AND ROGER WOULD DO AND THEN COMMENTED THAT JIM
ALWAYS DECIDED WHAT TO DO AND HE KNEW THAT ROGER WOULD FOLLOW.

SANDRA THEN GAVE ME SOME EXAMPLES AND SAID THAT ONE TIME, THE THREE OF
THEM WERE DRINKING AT A BAR AND SHE HAD BOUGHT ONE ROUND AND TOLD JIM IT
WAS HIS TURN TO BUY ANOTHER. JIM THEN SAID NO, ROGER WILL DO IT AND HE
THEN TOLD ROGER TO BUY ANOTHER ROUND AND ROGER DID WITHOUT COMMENTING. SHE
THEN REMEMBERED ANOTHER EXAMPLE AND SAID THAT ONE TIME, ROGER HAD COME TO
THEIR APARTMENT AND THAT JIM HAD TOLD HER THAT ROGER WAS A VERY GOOD
HANDYMAN. SHE THEN ASKED ROGER IF HE COULD LOOK AT HER SON'S T.V. AND HE
SAID THAT HE WOULD. SHE THEN STOOD BY WHILE HE WAS DOING THIS AND IT WAS
OBVIOUS TO HER THAT ROGER KNEW WHAT HE WAS DOING. ROGER THEN, AFTER
LOOKING AT THE T.V., MADE A COMMENT ABOUT WHAT HE THOUGHT WAS WRONG AND
JIM IMMEDIATELY TOLD HIM THAT HE WAS WRONG AND THAT COULDN'T BE IT. ROGER
IMMEDIATELY AGREED WITH JIM AND SAID THAT HE WAS PROBABLY RIGHT. SANDRA
SAID JIM KNEW NOTHING ABOUT T.V.S AND JIM AGAIN JUST WANTED TO DOMINATE
OVER ROGER.

ON ANOTHER OCCASION, ROGER HAD STOPPED DRINKING BUT THAT HE WAS WITH THEM
A BAR. ROGER DRANK ONLY SOFT DRINKS UNTIL JIM GOT TIRED OF SEEING HIM
DO THIS SO HE INSISTED ROGER START TO DRINK. ROGER SAID SEVERAL TIMES HE
WOULDN'T BUT JIM STARTED TO MAKE FUN OF HIM AND TOLD HIM TO START
DRINKING. ROGER FINALLY SUBMITTED AND BEGAN TO DRINK.

SHE THEN TOLD ME THAT JIM WOULD TAKE THE KIDS OUT TO A PARK OR OTHER PLACE
DURING THE DAY. HE WOULD TELL HER THAT HE WAS PLANNING TO TAKE THE KIDS
OUT THAT DAY AND THAT HE WAS ALSO GOING TO PICK UP ROGER. IT APPEARED TO

KD001926
**MILKE_NSB000617**

Exhibit 1A

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.    8          DR NO.:   89179406 A  9

HER AS IF ROGER WAS AT JIM'S BECK AND CALL AND WOULD DO ANYTHING JIM ASKED
H    TO.

I THEN TOLD SANDRA THAT I HAD HEARD JIM TELLING EVERYONE THAT THE REASON
HE CLAIMED THAT CHRIS WAS MISSING AT METRO CENTER WAS BECAUSE ROGER HAD
THREATENED HIM. SANDRA BEGAN TO LAUGH AND SAID "NO WAY ROGER COULD
DOMINATE, THREATEN OR SCARE JIM IN ANY WAY." I ASKED HER IF SHE WAS
POSITIVE AND SHE SAID SHE WAS.

I THEN ASKED SANDRA IF THERE WAS ANYTHING ELSE THAT SHE HAD NOT TOLD ME
ABOUT AND SHE SAID THERE WAS JUST ONE OTHER THING. SHE SAID THAT TWO DAYS
BEFORE THE DEATH OF CHRIS, JIM HAD CALLED HER AT HER HOME IN WYOMING AND
ASKED TO SPEAK TO HER HUSBAND RON. HE TOLD HER THAT HE DID NOT WANT HER TO
LISTEN SO SHE GOT OFF THE PHONE AND GAVE THE PHONE TO HER HUSBAND RON. A
SHORT TIME LATER, HER HUSBAND TOLD HER THAT THEY HAD JUST STARTED THEIR
CONVERSATION WHEN JIM SAID HE HAD TO HANG UP BECAUSE DEBRA HAD JUST WALKED
IN. A SHORT TIME LATER, JIM AGAIN CALLED AND WANTED TO SPEAK TO RON AGAIN.
AFTER THE CALL, HER HUSBAND RON TOLD HER THAT JIM SAID THAT DEBRA HAD
ALREADY LEFT AND THAT DEBRA HAD LEFT CHRIS WITH HIM AGAIN. RON SAID THAT
JIM WAS VERY DEPRESSED BECAUSE HE ALWAYS HAD TO BE HOME WITH THESE "DAMN
    E" AND THAT HE COULDN'T DO ANYTHING HE WANTED. SANDRA SAID THAT BOTH
    AND HER HUSBAND FELT THAT IT WAS A STRANGE CALL BECAUSE JIM REALLY DID
NOT KNOW HER HUSBAND RON THAT MUCH AND AS FAR AS SHE KNEW, THEY DIDN'T GET
ALONG THAT WELL.

I THEN ASKED SANDRA ABOUT TESTIFYING AND SHE SAID SHE WOULD. SHE SAID THAT
SHE REALLY DIDN'T HAVE A PROBLEM WITH TESTIFYING BECAUSE SHE WOULD BE
TELLING THE TRUTH. SHE SAID SHE UNDERSTANDS THAT DEBRA IS GOING TO HAVE TO
PAY FOR WHAT SHE DID, AS WELL AS JIM AND ROGER BUT THAT HER DAD AND HER
HUSBAND RON BOTH HAVE TOLD HER THAT THEY DID NOT WANT HER TESTIFYING.

AT APPROXIMATELY 1510 HRS, I THEN ENDED THE INTERVIEW WITH SANDRA.

INVESTIGATION CONTINUING

7-9-90 1042 A1724 815

VICTIM RECEIVED INFORMATION CARD: NO              MAIL-IN SUPPLEMENT: NO

                    END OF REPORT              DR NO: 89-179406 A 09

KD001927

MILKE_NSB000618

Exhibit 1A

Page - 1

| TYPE OF REPORT<br>HOMICIDE | | SUPPLEMENT DATE<br>12-4-89 | DR #<br>89-179406 |
|---|---|---|---|
| VICTIM'S NAME<br>MILKE, CHRISTOPHER | | LOCATION OF OCCURRENCE<br>99 AVENUE AND HAPPY VALLEY | |
| OFFICER WRITING REPORT'S #<br>DET. SALDATE #1875 | | SUPPLEMENT #<br>89-179406.10B | |
| DATE & TIME TYPED<br>DECEMBER 6, 1989 1:57 PM | BUREAU<br>GIB | | CLERK<br>A1724 |

INTERVIEW:    SCOTT, ROGER MARK
              M/M        6', 140#, bro, haz
              9
              4816 W. Bethany Home #120, no phone
              Unemployed
              BOOKED #1390377

----------------------------------------------------------------

On 12-3-89 at approximately 1258 hrs, I contacted ROGER SCOTT inside an
interview room at 620 W. Washington. The purpose of my contact was to
interview him in regards to this death investigation. The following is a
paraphrased account of his interview.

On 12-3-89 at approximately 1250 hrs, I entered an interview room with
DET. BOB MILLS for the purpose of interviewing ROGER SCOTT. DET. MILLS sat
next to ROGER and was continuing his interview until approximately
1258 hrs. At that time I assumed the interview and identified myself to
ROGER. I then told ROGER that I felt he was involved in the victim's
disappearance and for that reason I was going to read him his rights. I
then removed the Miranda rights card from my badge case and read the
Miranda rights verbatim to him. ROGER responded yes to understanding his
rights and I began my interview.

I first explained to ROGER that he had been telling detectives all this
time about a subject named PHIL and I did not believe that this subject
existed. I told ROGER that I was just getting involved in the interview
because I had been talking to his friend JIM. I then explained to ROGER
that I was not going to look for someone that did not exist and that I
knew it was difficult on him, that he was going to have to tell me the
truth. ROGER then began moving his head in an up and down motion
indicating that he would.

ROGER then told me that I was right and that PHIL did not exist. He said
the only reason he made up PHIL was because he did not want to get
involved after JIM told him that CHRIS was missing. I then asked ROGER if
he had accompanied CHRIS and JIM to the mall and he told me that he had.
He said that JIM parked the car outside Sears and that the three of them
walked into the store. He said he stopped momentarily at the tools and
before he knew it, JIM and CHRIS had walked away. ROGER then looked up and
could see his friend JIM walking ahead of him but since there was a large
crowd he could not get to JIM before he lost them. He looked for JIM



EXHIBIT 20
WIT Saldate
DATE: 10-22-17
Sommer Greene, RPR, CRR

MC_PPDREPORTS0133

| TYPE OF REPORT | VICTIM | OFFICER | OR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179406 |

Page - 2

inside Sears for some time and then decided to go into the mall area. He said he did not see JIM again until a little bit after 3:00 PM when JIM told him that CHRIS was missing. At that time he told JIM that he did not want to be involved because he had to get home to take care of his mother. ROGER then told me that he understood because he lied about PHIL that I probably would not believe anything he had to say. ROGER did say that a PHIL does exist, however, he is an elderly man who lives near his home and has colon cancer.

I then told ROGER that I knew that CHRIS was dead and that sooner or later he would have to tell me the truth. I told him that I strongly believed that he was involved in CHRIS' disappearance but ROGER continued to deny it. ROGER said that the only reason I thought he was involved was because he lied about PHIL. We continued to talk and I told ROGER that sooner or later, he would have to tell me what occurred. I told him that I thought he was not a cold blooded killer and that I was sure that his conscience would not let him continue to lie. ROGER, however, continued to deny knowing anything about CHRIS' appearance and continued to say that he, JIM and CHRIS arrived at Sears together until he lost track of JIM and CHRIS. At approximately 1338 hrs, I told ROGER that I was going to leave him alone in the room for several minutes and that I would be back to continue our conversation.

At approximately 1352 hrs, I returned to the interview room by myself and continued the interview. ROGER and I spoke about his past and his current responsibilities with his mother. He also told me that he had other responsibilities with neighbors that he also took care of. We spoke about his state of unemployment, several personal areas, about his life. I continued to tell him that it was important for him to tell me the truth. ROGER kept denying that he had any involvement in the disappearance of CHRIS and kept telling me that the only reason I believed he was involved was because he had lied initially about PHIL. I then pointed out to ROGER that JIM had told security persons initially that he and CHRIS were by themselves and that did not correspond with his story about telling JIM that he did not want to get involved until 3:00 PM. ROGER said he could not explain that, only to say that JIM was probably trying to protect him on his own. I told ROGER that we all knew that CHRIS was already dead and that finding his body was not as important as him telling me the truth. ROGER continued to deny any involvement in CHRIS' disappearance.

At approximately 1605 hrs, I told ROGER that I would again leave him alone with his conscience, but that I would return in a few minutes to continue our conversation. I told him that when I returned we were only going to talk about the truth about what actually happened and that I was not going to listen to any more of his denials which I knew were lies. ROGER then moved his head in an up and down motion indicating that he understood. I then left the room.

MC_PPDREPORTS0134

Exhibit 1A

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179406 |

At approximately 1535 hrs, I again contacted ROGER and ROGER asked for
cigarettes and a pop. I told him that I would get that for him in a few
minutes but that it was necessary for him to tell me the entire truth and
that I was not going to tolerate him telling me any more lies. I also told
ROGER that it was my belief that he knew where CHRIS' body was and the
least he could do was to tell us so we could recover it. ROGER then began
moving his head from side to side, indicating no, but would not respond
out loud. I told ROGER that we were going to send officers to his home to
speak with his mother and he immediately responded that it would kill her.
I told him it was going to be necessary since he continued to lie about
his involvement and we needed to verify certain things. ROGER again asked
for a pack of cigarettes and a Mountain Dew which was obtained for him. I
continued to tell ROGER that I was there to get the truth and ROGER
finally told me that he would tell me everything I wanted to know. I asked
ROGER if he knew where the body of CHRIS was at and he said he did. I
asked him if CHRIS was dead and ROGER responded "JIM killed him." ROGER
then told me that he didn't think JIM was going to do it and that he had
talked him out of it several times. ROGER then said that CHRIS' body was
in a wash in the area of 99 Avenue and Jomax Road.

ROGER then told me that JIM had never liked the kid and he said that he
didn't think that JIM would go through with it. He said that he and JIM
had gone out on several occasions with the intentions of killing the kid
but that he would always talk JIM out of it because he would usually come
up with the excuse that there were too many people around. ROGER then told
me that CHRIS had never made it to the Metro Center but that he and JIM
after killing CHRIS did go to Metro Center to create an alibi. ROGER said
that they had spoken about this story several times but that he had told
JIM that he did not want anything to do with building a story but would go
along with JIM's story because he felt JIM knew more about that kind of
stuff.

ROGER said that he had been telling the truth about going to the different
locations and taking CHRIS for pizza. He said after the pizza that he and
JIM drove to a location which they had been at before and had pre-selected
as the location where they were going to kill CHRIS. He then described the
location as 99 Avenue and Jomax Road in a wash that JIM picked out. ROGER
said that he would direct us to that location and would show us where the
wash was. I then asked ROGER how JIM killed CHRIS and he said that he had
shot him.

ROGER then explained that JIM had a .22 caliber revolver, 6 shot, which he
took out with him. He said he parked his car along the roadway on 99
Avenue and that JIM and CHRIS got out of the car and walked back into the
wash. He said JIM had previously told him that he was going to leave him
near the road because he wanted him found right away. ROGER said that he
then drove away, then made a u-turn and came back and that JIM was
supposed to be waiting by the roadside. ROGER said that he did not hear

Page - 4

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179405 |

any shots and did not see JIM. He continued past the wash, waited just north of the wash, but again did not see JIM. He said all the windows of the car were down but still he could not hear any shots. He then made a u-turn, headed southbound and pulled along the roadway at the opening of the wash. He said he then began to hit his horn very lightly because he did not want to attract attention. ROGER said he still did not hear any shots nor did he see JIM. He then drove further south, got out of the car and began to walk towards the wash, still not hearing or seeing anything. ROGER said he changed his mind and walked back to the car and again made another u-turn, headed northbound and again began to use his horn very lightly. He still did not see anything. He then parked his vehicle again northbound across the road and headed into the northern section of the wash and then he heard three shots. He said a short time later, he saw JIM walking out of the wash on the south side towards the roadway. He said he then walked back to the car, made a u-turn and headed southbound and saw JIM with his thumb out as if he was hitchhiking. He then picked up JIM and JIM immediately told him that he had shot CHRIS three times in the head.

ROGER then became concerned and said he knew that he was in serious trouble but he was not going to be held responsible for killing CHRIS because he did not do that. I asked ROGER if he knew where the gun was at and ROGER paused and then said that JIM gave him the gun to get rid of it but that he had not. He said that JIM gave him the gun initially and told him to get rid of it but that JIM also told him that he could keep it if he wanted it. ROGER said he kept the gun and that it is in his closet at his home.

ROGER then began telling me that he applied for Social Security but had been refused. He then mentioned that he had gone to an attorney who he thought was free but later tried to charge him $2  .00 before he would file a case. ROGER said he only went with JIM because he needed the $250.00 to file the Social Security case. ROGER then mentioned that CHRIS was supposed to have a $5000 life insurance policy and that JIM told him that he would give him $250.00 if he was to help him. I then asked ROGER if he would show us where the body was at and he agreed.

DET. MILLS and myself then took ROGER from the main station and headed towards the area of 99 Avenue and Jomax Road where he said the body was at. Just after leaving the main station, ROGER said if he could tell us some more while he was in the car or would we rather wait until we returned and I suggested that he go ahead and tell us. ROGER then said that we probably felt that he and JIM were the only bad ones in this situation but that he was going to tell us something about the baby's mother. ROGER went on and said that the baby's mother knew all about the killing and in fact the only reason that CHRIS was killed was because the mother wanted it done. He then said that at first JIM came up to him several weeks ago and told him about this plan to kill CHRIS. He said that JIM told him that DEBBIE (CHRIS' mother) had talked to him about doing it

MC_PPDREPORTS0136

Exhibit 1A

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MILKE, CHRISTOPHER | SALDATE #1875 | 89-179406 |

but that JIM was afraid of doing it by himself. He said that JIM told him about it and asked him if he would go with him and he agreed. At first DEBBIE was not to know that ROGER knew anything about it or that ROGER was going to accompany JIM when he did it. Later, however, he did meet with DEBBIE on several occasions along with JIM when they talked about what they were going to do.

ROGER said that JIM had told him that DEBBIE was pressuring him into doing it quick and that JIM at one time got upset and told DEBBIE why didn't she do it but that DEBBIE refused. ROGER said that JIM told him that DEBBIE did go out with him at one time and that they were going to kill CHRIS, however, there were too many people and they decided to go back home.

At this time, JIM suggested we take the freeway to Union Hills Drive and then head west to 99 Avenue. We then noticed that we needed gas and decided to stop at Cactus Park Briefing Station to get gas. At this time I called SGT. ONTIVEROS and informed him about the mother's involvement and he told me that she was now in Florence. We then continued to drive towards the drop site.

ROGER continued to talk and we finally got in the area of 99 Avenue and Union Hills. We then drove north on 99 Avenue and past a dip in the roadway and a wash and he immediately told us that we had passed it. We then made a u-turn and returned to the wash and he pointed out that CHRIS should be on the west side of the roadway in the wash not too far beyond the roadway. ROGER said JIM wanted to leave him not too far from the roadway so he would be found in just a couple of days and they could collect the insurance money as soon as possible. We were then joined by other detectives who stood by ROGER and DET. MILLS and myself along with two other detectives who followed then walked down the wash westbound carefully looking for footprints and mainly staying on the rocky surfaces. We then observed CHRIS' body lying in the center of the wash. CHRIS was obviously dead and the area was then secured by other officers in the area and DET. MILLS and myself then again left with ROGER back to the main station.

During the trip to the drop site, ROGER had mentioned that JIM had taken off a pair of shoes that he supposedly used when he walked CHRIS into the wash and that he had given him the shoes to get rid of when they arrived at Sears before making the missing person report. ROGER then told us that he had left the shoes in a planter near where they parked the vehicle. We then returned ROGER to the area and found a pair of blue Nike tennis shoes exactly where ROGER pointed out. The shoes were retained and identified by ROGER as being the same shoes he had placed there. ROGER also told us that after the shooting, when they were headed to the Metro Center, that JIM removed the 6 bullets from the gun he had used to kill CHRIS and threw them in the desert area on the south side of Union Hills. JIM later gave him the gun and 6 new bullets which he was either to keep or destroy.

Exhibit 1A

| TYPE OF REPORT HOMICIDE | VICTIM MILKE, CHRISTOPHER | OFFICER SALDATE #1875 | DR # 89-179408 |
|---|---|---|---|

Page - 6

A taped interview of ROGER was completed after we returned to the main station. This taped interview was attended by DET. MILLS while I was enroute to Florence to interview the mother. The taped interview has been transcribed and is attached.

After the interview, ROGER was taken to the main jail and booked for First Degree Murder.

Investigation Continuing.

MC_PPDREPORTS0138

Exhibit 1A

Page - 1

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| MISSING PERSON | 12/5/89 | 89-179406 |

| VICTIM'S NAME | LOCATION OF OCCURRENCE |
|---|---|
| MILKE, CHRISTOPHER | 10002 NORTH METRO PKWY. |

| OFFICER WRITING REPORT'S # | SUPPLEMENT # |
|---|---|
| DET. R. KAVANAGH 4936 | 89-179406.C |

| DATE & TIME TYPED | BUREAU | CLERK |
|---|---|---|
| 12/6/89 0540 | GIB | A1608 |

WITNESS:   SMITH, LOUIS A.
           B/M
           Chief, Security and Safety
           Alhambra High School
           3839 W. Camelback Road
           Phoenix,   85019
           271-2026
           (Provided Alhambra year books 1964-67)

I.L.:      WAFFARD, JIM    (Unknown proper spelling)
           W/M, 41 years
           School custodian, possibly North High School
           (Friend of ROGER SCOTT)

I.L.:      "PHIL"
           W/M, 70 years
           Possible address: 4816 W. Bethany Home, Apt. #90
           (Plays pool with ROGER SCOTT occasionally)

I.L.:      SCOTT, WILMA, W/F,
           4816 W. Bethany Home #120 (no phone)
           (Suspect ROGER SCOTT's mother)

EVIDENCE: Walgreen's receipt dated 12/2/89 at 11:52AM.

On 12/3/89 at approximately 0915 hours, I attended a briefing at G.I.B.,
620 West Washington Street, regarding victim CHRISTOPHER MILKE. After the
briefing, I was assigned to obtain Alhambra High School yearbooks for the
years 1964-1967. I was also assigned to interview I.L. WILMA SCOTT.

On 12/3/89 at approximately 1125 hours, I met I.L. SMITH at Alhambra High
School. He directed me to a room that housed the yearbooks. I obtained
the yearbooks for the years 1964-1967. I later transferred the books to
OFFICER K. RUBINO #4318, and he brought the books to 620 West Washington,
G.I.B. I then proceeded to 4816 West Bethany Home, Apt. #120.



EXHIBIT 21
WIT: Saldate
DATE: 6-22-17
Sommer Greene, RPR, CRR

KD001831

MILKE_NSB000522

Exhibit 1A

Page - 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| MISSING PERSON | MILKE, CHRISTOPHER | KAVANAGH 4936 | 89179406A |

On 12/3/89 at approximately 1215 hours, I contacted WILMA SCOTT. I identified myself and explained why I was there. I further told WILMA that I needed to ask several personal questions about her son, ROGER, and she agreed to cooperate. See interview supplements.

INTERVIEW WITH I.L. WILMA SCOTT:

On 12/3/89 at approximately 1215 hours, I interviewed WILMA in person at her home, 4816 West Bethany Home, Apt. #120. WILMA related the following to me.

On 12/2/89 at approximately 0530 hours, WILMA woke up and got out of bed. ROGER awoke at approximately 0900 hours. ROGER was home and inside the apartment until approximately 1115 hours. ROGER did not leave the apartment to make or receive any phone calls. There is no phone inside Apt. #120. WILMA was home the entire time.

On 12/2/89 at approximately 1100 hours, I.L. JIM STYERS came to WILMA and ROGER's apartment. JIM was with the victim CHRISTOPHER HILKE and JIM's young daughter. WILMA was in her bedroom during JIM's visit and did not actually see JIM, CHRISTOPHER or the daughter. However, WILMA did hear them and recognized their voices. WILMA has known JIM for approximately 25 years. JIM and ROGER attended high school together. CHRISTOPHER and JIM's daughter have been to WILMA's apartment at least 10 times before.

WILMA went on to say that she was in her bedroom most of the morning. She is sure that ROGER did not leave because they had conversation back and forth all morning, and she would have heard the front door open and close.

WILMA said that JIM babysits CHRISTOPHER. The mother of CHRISTOPHER has been to WILMA's house only once. WILMA does not know the mother well enough to express an opinion of the mother (DEBRA MILKE).

According to WILMA, ROGER, JIM, CHRISTOPHER, and the young girl left the apartment at approximately 1115 hours. They stayed only for about 15 minutes. As they were leaving, ROGER called to WILMA, "See you later." WILMA asked whether ROGER would be gone long. WILMA heard ROGER ask JIM if they would be gone long. She heard JIM say that they would not be gone long. ROGER then called to WILMA that he would not be gone long. WILMA assumed ROGER meant 3-4 hours. WILMA asked ROGER if he would be home for dinner and he said yes.

Prior to JIM's arrival at ROGER's apartment, ROGER told WILMA that JIM was coming over and that they were going Christmas shopping. She thought that ROGER was going to buy a coat for himself and possibly something for her. WILMA said that JIM and ROGER possibly made arrangements sometime before the morning of 12/2/89 to go shopping on 12/2/89.

KD001832

**MILKE_NSB000523**

Exhibit 1A

Page - 3

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| MISSING PERSON | MILKE, CHRISTOPHER | KAVANAGH 4936 | 89179406A |

WILMA also said that ROGER was planning to go to Walgreen's at North 43 Avenue and West Glendale to pick up a prescription that he called in. ROGER usually calls his prescriptions in a couple of days in advance. ROGER takes Dilantin for his seizures and an inhalant for his asthma. ROGER's doctor is Doctor VITO. ROGER also has a prescription for the treatment of diarrhea. He has no other medical problems.

When WILMA found that ROGER was going out, she asked him to go to Osco Drugs at North 35 Avenue and West Glendale to buy some soap gifts. Osco Drugs had the soap gifts advertised in a flyer. WILMA gave ROGER $10.00 (2 fives) to make the purchase.

WILMA said that if ROGER does not have his seizure medicine, he may go into seizures. ROGER has been taking Dilantin for the past year and has not had a seizure since he started taking Dilantin.

WILMA does not take prescription medication. She has high blood pressure but cannot afford medication.

The last time WILMA saw ROGER before he left in the morning of 12/2/89, ROGER was wearing a white baseball hat, possibly a navy blu shirt, a black and red plaid coat and blue levis.

After ROGER left the apartment on 12/2/89 at approximately 1115 hours, WILMA did not see him again until approximately 1720 hours. ROGER returned home and at approximately 1740 hours, he prepared dinner for WILMA. WILMA and ROGER ate dinner at approximately 1830 hours. The only conversation that WILMA had with ROGER, that she recalls is reference pizza that ROGER ate earlier and ROGER's bus trip home.

ROGER told WILMA that the Peter Piper Pizza that he had eaten did not agree with him. ROGER also told WILMA that he rode bus number 3 to get home but did not say from where.

I specifically asked WILMA if ROGER mentioned being at Metrocenter or the fact that CHRISTOPHER was missing. WILMA said that ROGER did not mention Metrocenter or that CHRISTOPHER was missing. WILMA said that she was positive that ROGER did not mention those items.

WILMA said that she and ROGER watched television until 2030 hours when WILMA went to bed. ROGER stayed up until 2100 hours when she heard him go to bed. Initially WILMA said that ROGER never left the house after returning home at approximately 1720 hours, but later she said that ROGER did go to the Circle K North 47 Avenue and West Bethany Home, at approximately 1900 or 1930 hours, to buy a T.V. Guide. ROGER was gone for only 15 minutes. She said that the police came to her house at approximately 0015 hours, 12/3/89.

WILMA told me that ROGER's attitude and demeanor was normal both in the morning and evening of 12/2/89. ROGER seemed calm and collected and not nervous.

KD001833

MILKE_NSB000524

Exhibit 1A

Page - 4

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| MISSING PERSON | MILKE, CHRISTOPHER | KAVANAGH 4936 | 89179406A |

WILMA said that when ROGER returned home at approximately 1720 hours, he had only one package. The only package was the prescriptions that ROGER picked up at Walgreen's. WILMA did say that ROGER was a "picky" shopper and would not purchase something unless he really wanted it.

I found from WILMA that ROGER has no vehicle. He normally walks or takes the city bus if he needs to go somewhere. When his friend, JIM, is with ROGER, usually ROGER will ride with JIM.

I asked if ROGER frequented any bars. WILMA said that ROGER does not drink. He quit a year or so ago. WILMA said that ROGER is a self-proclaimed alcoholic. Once in a great while, ROGER will go to Skippers or the Arabian Room, two bars near North 43 Avenue and West Bethany Home Road. ROGER only goes to the bars to play pool with "PHIL", a 70 year old man who lives in the apartment complex. WILMA thinks that ROGER did not go to the bars on 12/2/89. She believes this only because ROGER always tells her when he goes and because "PHIL" is about to be hospitalized and cannot play pool.

I asked WILMA about ROGER's friends. WILMA said that the only friends that ROGER has are JIM STYERS, JIM WAFFARD and "PHIL". ROGER also likes to play with the young children who live in the apartment complex. He likes to repair the children's bicycles and toys.

ROGER has known JIM STYERS for 25 years, at least since high school. Approximately 5 years ago, JIM helped WILMA and ROGER move into their apartment. WILMA did not see JIM again until 2-3 months ago. JIM has come to ROGER's apartment almost every day for the past 1-2 months. WILMA said that JIM was always pleasant.

ROGER has known JIM WAFFARD for approximately 25 years. WAFFARD also is a high school friend of ROGER. WILMA said that ROGER sees WAFFARD only once every 3 months. He seems to be "straight-laced".

WILMA further told me that ROGER rarely socializes with "PHIL". They play pool together but infrequently.

WILMA told me that ROGER has not had a girlfriend for 2 or 3 years. He has no girlfriend currently. ROGER has was married in 1971 but divorced 3 1/2 years later.

WILMA said that ROGER is not a homosexual. He is very much against homosexuality and often is outspoken with the subject arises. ROGER refers to homosexuals as "queers".

KD001834

**MILKE_NSB000525**

Exhibit 1A

Page - 5

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| MISSING PERSON | MILKE, CHRISTOPHER | KAVANAGH 4936 | 89179406A |

I asked WILMA if ROGER had or read Playboy, sex magazines, or pornographic magazines. WILMA said that to her knowledge, ROGER does not look at or read these types of magazines. She told me that about 1 1/2 years ago, someone tried to give ROGER a magazine of the type described above, but he declined. ROGER did not look at the magazine and told the person that he had seen it before. WILMA said that ROGER told her about the above incident. She and ROGER have a close relationship and ROGER tells her about personal problems he has.

I asked WILMA what her reaction would be if she heard that ROGER molested a young child or a young girl. WILMA said that she would be shocked and that there was no way that ROGER would do such a thing. She said that ROGER likes women his own age.

I asked WILMA about any problems that ROGER had with the law. She said that ROGER told her that the Glendale Police arrested ROGER for urinating in a bush four years ago. Between 1965-70, ROGER was arrested several times for D.W.I. WILMA further said that about 20-25 years ago, ROGER and JIM STYERS were arrested for siphoning gasoline.

During my interview of WILMA, which occurred in her living room, I saw a receipt from Walgreen's on top of a Walgreen's package on the coffee table. A Walgreen's pharmacy receipt was attached to the package. The dication on the pharmacy receipt was dated 11/29/89. The other receipt, which was a regular cash register receipt from Walgreen's, was dated 12/2/89, 11:52AM. With WILMA's consent I retained the regular receipt as evidence. I also saw a T.V. Guide magazine, dated 12/2 through 12/8.

I concluded my interview with WILMA SCOTT at 1315 hours, 12/3/89. My impression was that WILMA was open and honest. She was cooperative. WILMA did state that she relies on ROGER a great deal.

I later impounded the Walgreen's receipt at 620 West Washington.

KD001835

MILKE_NSB000526

Exhibit 1A

REPORTER'S TRANSCRIPT OF PROCEEDINGS

INTERVIEW OF ARMANDO SALDATE


Phoenix, Arizona
December 21, 2009
10:00 a.m.


REPORTED BY:


BARBARA H. STOCKFORD, CRR/RMR/CCP

Certified Court Reporter

Certificate No. 50463


PREPARED FOR:


(ASCII/COPY)



EXHIBIT 22
WIT: Saldate
DATE: 6-22-17
Sommer Greene, RPR, CRR

**MILKE_NSB004651**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 2

1                         I N D E X

2    EXAMINATION                                          PAGE

3    By Mr. Kimerer                                         4

4    By Ms. Nguyen                                         56

5    By Ms. Voepel                                         60

6    By Ms. Nguyen                                         63

7    By Mr. Kimerer                                        76

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Griffin & Associates          602.264.2230          pgriffin@griffinreporters.com

MILKE_NSB004652

Exhibit 1A

Page 3

1                    INTERVIEW OF ARMANDO SALDATE

2    was held on December 21, 2009, commencing at 10:02 a.m., at

3    the Law Offices of KIMERER & DERRICK, P.C., 221 East

4    Indianola Avenue, Phoenix, Arizona 85012, before BARBARA H.

5    STOCKFORD, a Certified Court Reporter in the State of

6    Arizona.

7

8    COUNSEL APPEARING:

9

          KIMERER & DERRICK, P.C.
10        BY:  Michael D. Kimerer, Esq.
               Amy L. Nguyen, Esq.
11        221 East Indianola Avenue
          Phoenix, Arizona  85012
12

13        JONES, SKELTON & HOCHULI, PLC
          BY: Lori Voepel, Esq.
14        2901 North Central Avenue
          Suite 800
15        Phoenix, Arizona 85012

16
          OFFICE OF THE ATTORNEY GENERAL
17        STATE OF ARIZONA
          By:  Julie A. Done, Esq.
18             Kent E. Cattani, Esq.
               Assistant Attorneys General
19             Criminal Appeals Section
          1275 West Washington
20        Phoenix, Arizona  85007

21

22

23

24

25

**MILKE_NSB004653**

Exhibit 1A

Page 4

1             INTERVIEW OF ARMANDO SALDATE

2

3                  E X A M I N A T I O N

4    BY MR. KIMERER:

5         Q.    Good morning, Constable Saldate.  You

6    understand why you're here this morning, I understand?

7         A.    Yes.

8         Q.    What's your understanding of why you're here?

9         A.    You're going to give me a big Christmas gift

10   or something, right?

11        Q.    It depends on what you want.

12        A.    No.  I'm here in the interview of Debra

13   Milke.  I was a case agent.

14        Q.    And I understand you are the case agent, and

15   this happened back when?

16        A.    A long time ago.  1988 or so.

17        Q.    Okay.  Do you remember the year exactly when

18   it happened?

19        A.    I want to say '88, yeah.

20        Q.    Now, have you had an opportunity to review

21   any of your prior testimony or any of your reports

22   before coming here today?

23        A.    She did give me this notebook, and I've

24   reviewed it briefly.  I had a real busy weekend.  We

25   have a grandchild who lives with us, so -- and Christmas

MILKE_NSB004654

Exhibit 1A

Page 5

1    is coming.  So I did review some of it, yes.

2          Q.     Exactly what did you review?

3          A.     I think I got to No. 5.

4          Q.     And what is No. 5?

5                 I know you have a book in front of you.

6    Would you tell me what items that you reviewed in that

7    book?

8          A.     Let me see.  I reviewed No.2, No. 3, No. 4,

9    and most -- well, I would say 3 -- half of No. 4.

10         Q.     Okay.  And when you are referring to numbers,

11   you're referring to a book that was given to you by the

12   Attorney General's office to review?

13         A.     Yes.  No. 2 would be voluntariness hearing

14   9/10 of '99.  Number 3 is voluntariness hearing of 9/11

15   of '90.  I'm sorry.  '90.  Not '99.  I got to put my

16   glasses on.  Transcript of defense counsel's interview

17   of Detective Saldate 6/26/90.  That's about it.

18         Q.     Did you review your trial testimony?

19         A.     No, I haven't got to that yet.

20         Q.     Is that part of the book that you're looking

21   at?

22         A.     That's part of the book, yeah.

23         Q.     But you have not read that or reviewed that?

24         A.     No, not really.

25         Q.     Okay.  Now, based upon the review of the

MILKE_NSB004655

Exhibit 1A

Page 6

1    materials that you have reviewed, is there anything that

2    refreshed your recollection of something you hadn't

3    testified previously, anything different?

4        A.    No.  Everything seemed to be there.  I had

5    either testified to it, been interviewed about it.

6    Almost everything is in there.

7        Q.    Okay.  So you have not had any independent

8    recollection of anything that you've ever testified to

9    before?

10       A.    In fact, I've -- it refreshed my memory

11   because it's been a long time, you know.

12       Q.    Um-hum.  In terms of the question, I'll ask

13   you, did you actually remember anything different than

14   what's already in there?

15       A.    No, no, no.

16       Q.    There's no new evidence or anything like

17   that?

18       A.    No.

19       Q.    No statements of Debra Milke that you

20   remembered --

21       A.    No.

22       Q.    -- or anything like that?

23             Any statements that you made since then that

24   are not in the materials that you reviewed?

25       A.    That I've made since then?

Griffin & Associates          602.264.2230          pgriffin@griffinreporters.com

**MILKE_NSB004656**

Exhibit 1A

Page 7

1       Q.     Not since then, but any statements --

2       A.     No, no.

3       Q.     -- that you can recall back at the time you

4   were doing your investigation?

5       A.     No, no.

6       Q.     Let me ask you a little bit about the

7   investigation.  As I understand it, you were off duty

8   when you first got called about this; is that correct?

9       A.     That is correct.

10      Q.     Can you describe exactly what happened then?

11   How did you get called in this case?

12      A.     I don't really know how I got called.  The

13   supervisor is -- got a case, and I think that prior to

14   that, it had been a missing person case, so we would

15   have never got called initially since I was working

16   homicide, but it was not until the next morning, I

17   think, that homicide got involved in it.  And then it's

18   up to the supervisor who he calls in to do the case, you

19   know.  It usually goes by, you know, who is busy, who is

20   not busy, you know, stuff like that, you know, so ...

21      Q.     So you got called in?

22      A.     I got called in.

23      Q.     Who was it that called you, do you remember?

24      A.     Sergeant Ontiveros.

25      Q.     What did he tell you when he first called you

**MILKE_NSB004657**

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate            December 21, 2009

Page 8

1     in, if you recall?

2          A.     I don't recall.  Obviously, to come in --

3          Q.     Um-hum.

4          A.     -- to do a case.  I was used to getting calls

5     two, three times a week in the middle of the night or on

6     weekends when I was off.  We all were doing that, you

7     know.  So -- since I live real close, I was getting a

8     lot more.

9          Q.     Do you remember what was the first thing you

10    did when you got involved?

11         A.     Well, it would have been meeting the

12    sergeant, of course.

13         Q.     Yes.

14         A.     Because he wouldn't have told me what was

15    happening on the phone.  So I would have met the

16    sergeant at the office, and he would have told me

17    exactly, or as far as he knew, what was going on and

18    what he wanted me to do.

19         Q.     Do you remember what he told you when you

20    first met with him?

21         A.     Other than -- he had cases they were working

22    and wanted me to help him.

23         Q.     Do you remember what the case was about?

24         A.     Not right off the bat.  I don't think he told

25    me right off the bat.  I think -- I don't really recall.

Griffin & Associates              602.264.2230        pgriffin@griffinreporters.com

MILKE_NSB004658

Exhibit 1A

Page 9

1    Bob Mills was in and out, too, during the time we were

2    talking.  He may have said some things.  I don't really

3    remember exactly what happened in that period of time.

4         Q.    According to the information I've seen, you

5    got involved with the interrogation of Roger Scott.  Do

6    you remember that?

7         A.    Yes.

8         Q.    Okay.  And how long after you got involved in

9    the case did you get involved in his interrogation?

10        A.    I was probably there -- shoot, I can't even

11   estimate the time because it's been so long, but it was

12   a while before I got involved in it because I was being

13   told what was going on and being briefed about something

14   about -- they were trying to verify something about a

15   friend of his, and that they were trying to get a --

16   a -- they had called some teacher or some principal at a

17   high school, and they were trying to get a yearbook for

18   a certain year because one of the guys said something

19   about he had met somebody or -- and described him as

20   being a former school mate or something like that.  So

21   anyway, I don't know, it's hard to estimate now, but

22   of -- I couldn't really estimate.  I mean, you know, but

23   it was some --

24        Q.    Several hours?

25        A.    No, no, no.  It wasn't several hours, but it

MILKE_NSB004659

Exhibit 1A

1    was, you know, I would say no more than an hour

2    afterwards.

3         Q.    After that you got involved?

4         A.    Yeah.

5         Q.    And you were involved in, I believe, the

6    interrogation of Scott; is that right?

7         A.    Yes, the interview of Scott.

8         Q.    And during that interrogation, you got Scott

9    to admit that he was involved in this, as I understand

10   it?

11        A.    That's correct.

12        Q.    But you didn't receive any information during

13   that interrogation about Debbie Milke, did you?

14        A.    No, I did not.

15        Q.    And up until that point in time, you had no

16   information about Debra Milke being involved in this at

17   all?

18        A.    No.

19        Q.    You did know she was the mother of the child

20   that was missing?

21        A.    No.  I didn't even know that then.

22        Q.    You didn't know at that time?

23        A.    I don't think I did.

24        Q.    Okay, but you went in basically without a lot

25   of information when you interviewed Roger Scott; is that

MILKE_NSB004660

Exhibit 1A

Page 11

1   right?

2       A.    With just the information that was given to

3   me during the briefing and stuff like that, and by Bob

4   Mills.  And by that time, I knew that, you know, what

5   had been reported, that they had lost a child and stuff

6   like that.

7       Q.    And then following that particular

8   interrogation where you received an admission from Roger

9   Scott, you went with Scott to go to the scene of the

10  crime; is that right?  Do you recall that?

11      A.    Yes.  He showed us where the body was at.

12      Q.    When you say "he showed us," who else went

13  with you?

14      A.    Bob Mills.

15      Q.    So that the three of you that went to the

16  crime scene?

17      A.    Yes, that's correct.

18      Q.    And when was it that you first heard any

19  information about Debra Milke's involvement in this

20  case?

21      A.    It was en route to there.  We had to stop for

22  gas, too.  So it was en route to that location that he

23  mentioned that it was -- Debra was involved.

24      Q.    And he didn't give you a lot of information

25  about her involvement, but just indicated she was

MILKE_NSB004661

Exhibit 1A

Page 12

1    involved; is that right?

2         A.    That's correct.

3         Q.    Because there was a subsequent interrogation

4    where he gave you more information; is that right?

5         A.    There was a subsequent interrogation of him

6    by Bob Mills later where he was interviewed by Bob Mills

7    and gave him all the information that he knew and stuff,

8    yes.

9         Q.    And that was -- that -- that happened after

10   you went in, had an interview with Debra Milke; is that

11   correct?

12        A.    Did that afterwards?

13        Q.    Um-hum.

14        A.    I don't know.  I think in -- it probably

15   happened at the same time.

16        Q.    Okay.

17        A.    I may have been heading to -- to Florence in

18   the helicopter by then.

19        Q.    Now, I saw in all the transcripts that it

20   seemed like you had some trepidation about taking a

21   helicopter ride.

22        A.    I don't like helicopter rides.  I was a

23   Marine, but I still don't like helicopter rides.

24        Q.    Okay.  So really the only information you had

25   when you went to go and interview Debra Milke was what

MILKE_NSB004662

Exhibit 1A

Armando Saldate                 Interview of v. Armando Saldate                 December 21, 2009

Page 13

1    you had heard from Roger Scott in the car on the way to

2    the crime scene?

3         A.    Yes.

4         Q.    Okay.  And while you were getting -- how much

5    time after you went to the crime scene transpired before

6    you went to talk to Debra Milke, do you know?

7         A.    Well, we waited there maybe 20, 30 minutes,

8    something like that we were there.  We were waiting for

9    other officers, you know, to secure the scene and stuff

10   like that.

11        Q.    Um-hum.

12        A.    Probably drove back.  And then I understood I

13   was driving to Florence.  Unbeknownst to me, I was

14   flying to Florence.  So it was taking some time, maybe

15   another 45 minutes maybe, you know.  I guess they had to

16   get the helicopter and stuff like that.  They didn't

17   tell me about the helicopter until I was almost there.

18        Q.    Approximately from the time you first got

19   assigned to the case until the time you get on the

20   helicopter, how much time goes by in terms of your

21   involvement in the investigation?

22        A.    Boy, I don't remember.  It was getting dark

23   then.  I would say anywhere between four to six hours

24   maybe.

25        Q.    Okay.  And who made the decision to go

MILKE_NSB004663

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate            December 21, 2009

Page 14

1     interview Debra Milke?

2         A.     That was Sergeant Ontiveros.

3         Q.     Why did he make the decision?  Was that based

4     upon what you had told him based upon your talking to

5     Scott?

6         A.     Talking to Scott, yes.

7         Q.     Exactly what did he tell you to do?

8         A.     He told me to go down there and interview

9     her, and that he was sending some other officers down

10    there.

11        Q.     Okay.  And you didn't know at that point you

12    were going to be riding the helicopter, though?

13        A.     No.  I may have denied to go there.  I don't

14    know.

15        Q.     These communications you had with him at that

16    time, were they basically by telephone or were you

17    seeing him in person?

18        A.     We called him on telephone, I think -- not

19    telephone, but by radio.  We had radio.  This was before

20    everybody had a cell phone.  By radio.  We talked to him

21    by radio, and then we would go on our private channel

22    and talk to him there, but -- so we didn't talk to him

23    on the phone.  Then when we got to there, he -- he

24    started telling me we're going -- "You're going to go

25    down to Florence.  You're going to interview her," and

MILKE_NSB004664

Exhibit 1A

Page 15

1    he's going to send some other officers up there, you

2    know, and so ...

3        Q.    Why did -- what was the reason for sending

4    other officers there ahead of time, do you know?

5        A.    I think that he thought we weren't -- I

6    wasn't done with the interview with Roger Scott.  He

7    still wanted to be debriefed on that situation.  And so

8    we were going to be -- I was going to debrief him about

9    what had happened, what had occurred.

10           So we -- I mean, he -- I guess that's what

11   the reason was.  I'm not totally sure.  But he said he

12   wanted -- that he found out that Debra was in Florence

13   or something like that, and was going to send other

14   officers there to contact.

15       Q.    Did the thought come up, should we have Debra

16   come here to be interviewed, or was it always a plan to

17   go there to interview her?

18       A.    I don't think -- if there was a plan, there

19   was -- it was Sergeant Ontiveros' plan.  I was just

20   doing what I was told to do.

21       Q.    You were just doing what you were told to do.

22   And you were told to go there and interview her?

23       A.    Interview her.

24       Q.    And you were interviewing her then certainly

25   as a suspect; is that correct?

**MILKE_NSB004665**

Exhibit 1A

Page 16

1      A.     Sure.  I believed she was a suspect now.

2      Q.     Did he tell you in that conversation that you

3   should record that particular interview?

4      A.     He said, if you can, tape record it.

5      Q.     Now, did he say you should take a tape

6   recorder and do it?

7      A.     No.  He just says, if you can, tape record

8   it.  I said okay.

9      Q.     Now, was there any reason why you couldn't

10  tape record it at that time?

11     A.     I didn't have a tape recorder.

12     Q.     You personally didn't have a tape recorder?

13     A.     I personally did not have a tape recorder.

14     Q.     It would have been -- you could have gotten

15  one from the police department, though?

16     A.     Probably.

17     Q.     And you could have gotten a tape recorder

18  when you arrived down there somewhere?

19     A.     Probably.

20     Q.     You chose not to do that?

21     A.     I chose to ask her first whether she would

22  allow me to tape record it.  Since she said no, there

23  was no need to ask for one.

24     Q.     You didn't go into the interrogation room

25  with a tape recorder?

**MILKE_NSB004666**

Exhibit 1A

Armando Saldate        Interview of v. Armando Saldate        December 21, 2009

Page 17

1    **A.**    No.

2    **Q.**    And you hadn't asked anybody for a tape

3  recorder before that, had you?

4    **A.**    No.

5    **Q.**    And if you were flying in the helicopter to

6  Florence to interview her, did you decide at that time

7  to arrest her when you got there?

8    **A.**    No.  The helicopter pilot -- decide to arrest

9  her, I don't know.  But the helicopter pilots were

10  playing little jokes with me, because they knew I didn't

11  like being on the thing.  So they were playing back and

12  forth about being lost, and we don't know where we're

13  going, and stuff like that.  And I said, "Guys, be

14  serious."

15    **Q.**    I saw in some of your prior testimony, you

16  indicated that, on your way to Florence, you had decided

17  you were going to arrest Debra?

18    **A.**    That may be, but I -- you know, that was a

19  long time ago, may have been, you know, true.  But you

20  know, now as I look back at it, the only thing I can

21  remember is those guys messing with me.

22    **Q.**    In the helicopter?

23    **A.**    In the helicopter.  But actually, that was a

24  high point for me at that point.  That's the only thing

25  I recall at this point, you know.

**MILKE_NSB004667**

Exhibit 1A

Page 18

1      Q.     But you don't dispute that you had decided to

2   arrest her before you got to Florence?

3      A.     If that's what it says in the report, no.

4      Q.     And when you got there, do you remember

5   exactly what you did when you got off the helicopter?

6      A.     May have kissed the ground or something.  I

7   don't know.  No, I don't -- I got out and was directed

8   by some -- some sheriff's deputy there, and I kind of

9   followed him.

10     Q.     Okay.

11     A.     I think that was -- that's about it when I

12  first got out of the helicopter.

13     Q.     And when you got there, where did you -- did

14  you immediately go to the police department at Florence?

15     A.     We landed there at the police department at

16  Florence.

17     Q.     Okay.

18     A.     And our -- the sheriff's department at

19  Florence.  Not the police department.  And we landed

20  there, and I think that -- yeah, I think so.  I think

21  we, you know, we were outside the police department, and

22  I was following this deputy.  He took me to where I

23  needed to go.

24     Q.     Okay.  And where did you go?

25     A.     I went to go see Debra Milke.

MILKE_NSB004668

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate          December 21, 2009

Page 19

1      Q.    Okay.  And kind of describe exactly what

2   transpired then to the best of your memory today.

3      A.    I walked in to interview her, and she was in

4   a room.  I don't know what kind of room it was, but she

5   was in a room, and I was directed there by the deputy.

6   And there was Debra, another woman there.  Later found

7   out it was her aunt, and we -- very nice, cordial.  I

8   told her who I was, and the lady said -- I told her, "If

9   you could step out."  She did, and we started the

10  interview.

11     Q.    And so you went inside of the interview room.

12  Do you remember the size of the room?  Was it as large

13  as this one here?

14     A.    I wouldn't describe it as an interview room.

15  I would it describe it as a large room.  I don't think

16  you would ever use the phrase "interview room."  They

17  probably put her there so I could be there.  May not

18  have had interview rooms.  Other than that room and the

19  hallways to get to that room, I never went into the

20  sheriff's office.

21     Q.    Before you went into the room, did you talk

22  to anybody about her or anything like that?

23     A.    No.  I don't think I did.  No.

24     Q.    Did you --

25     A.    The deputy knew -- I think he may have asked

Griffin & Associates              602.264.2230        pgriffin@griffinreporters.com

**MILKE_NSB004669**

Exhibit 1A

Page 20

1    me, you know, "You're here to do the interview?" or

2    something like that.

3              And I said, "Yes."

4              That's why I just followed him or something.

5    We may have had some conversation of why I was there,

6    who I was, and stuff like that, or him acknowledging who

7    I was or something to that effect.

8         Q.    Okay.  So then you went inside the

9    interrogation room, asked the other woman to leave?

10        A.    Yes.  As soon as I found out who Debra was,

11   you know.

12        Q.    Okay.  Now, do you remember how people were

13   sitting in that room?  Do you remember the physical

14   layout of the room, where people were located?

15        A.    No, no.  I -- I read the past interview where

16   it described the room, but I really -- where I described

17   the room, but I just -- I don't independently recall,

18   you know, you know, what was in the room or what was not

19   in the room other than what I read, you know.

20        Q.    So, in other words, what you know about the

21   room is really limited to what you've testified to

22   before?

23        A.    That's correct.

24        Q.    You don't have any independent

25   recollection --

MILKE_NSB004670

Exhibit 1A

Page 21

1      A.     No.

2      Q.     -- of a desk being there or how many chairs

3    or what was on the walls or anything like that?

4      A.     No, no.  I do not.

5      Q.     Okay.  Now what was the first thing that you

6    said to Debra Milke when you went into that room?

7      A.     I probably just introduced myself and told

8    her who I was and stuff.

9      Q.     And what did you tell her?  Did you tell her

10   that you were a detective from the police department of

11   Phoenix?

12     A.     Yes, of course.  I introduced myself.  I

13   showed her my badge, my commission card, and told her

14   who I was, and that's about it.

15     Q.     Now, according to the statements I've seen,

16   then you took a chair.  She was sitting in a chair, and

17   you pulled a chair up in front of her to talk to her?

18     A.     Absolutely, yes.

19     Q.     And so you were only inches from her?

20     A.     Yes.

21     Q.     And at that point in time --

22     A.     I would say that we were probably, I would

23   say, six to eight inches from the knees, but then I

24   would bend forward, and when I was talking to her, yes,

25   so we were close.

**MILKE_NSB004671**

Exhibit 1A

1          Q.     I think you said you looked her eye to eye,
2     looked her in the eyes?
3          A.     That was what I did.
4          Q.     And that's generally your practice in
5     interrogation; correct?
6          A.     Usually, yes.
7          Q.     And it's your practice generally to try to
8     get close to a person when you talk to them?
9          A.     Yes.
10          Q.     And you got close to her.  And when you did
11     that, is that when you told her that her son had been
12     shot and that you were going to arrest her for being
13     involved in the murder of her son?
14          A.     It was during that period of time, yes.
15          Q.     So while you were close to her, was that the
16     first thing you told her after you introduced yourself?
17          A.     I -- I don't really remember.  I don't
18     remember.
19          Q.     Was there anything else you would have told
20     her?
21          A.     I would have told her why I was there.  I
22     would have told her that kind of stuff and probably
23     would have been, you know -- specifically I don't
24     remember what exactly I said, but -- now I don't, but I
25     would have told her that I was there for, you know, the

MILKE_NSB004672

Exhibit 1A

Page 23

1    investigation of her son, and I would have told her that

2    her son was probably -- what happened to her son and

3    stuff, yeah.

4         Q.    And you told her that you were going to

5    arrest her, and that she was involved?

6         A.    I did tell her she was arrested, yeah.

7         Q.    So that was first thing that you told her

8    basically?

9         A.    I hate to -- I hate to say first thing, but,

10   you know, I mean, that's -- in this period of time, yes.

11        Q.    So within the first 60 seconds, that's

12   probably what you told her?

13        A.    Okay.

14        Q.    Okay?

15        A.    Within a couple minutes or something like

16   that, we're sitting there and stuff, yeah.

17        Q.    And how did she react to you when you told

18   her that?

19        A.    She -- I would say, you know, I read in the

20   testimony, the past testimony that it was -- that it

21   was -- that her last defense attorney kept saying

22   excited, hysterical and stuff, but I can independently

23   recall she never was hysterical.  She was never

24   really -- maybe excited a little bit, but never

25   hysterical.

MILKE_NSB004673

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate                December 21, 2009

Page 24

1          She was -- she was -- it just -- it seemed

2    like she was not confused, but she was excited, and she

3    said, "What?  What?"  And she said other things that,

4    you know, that I couldn't understand what she was

5    saying, but -- and she started to cry, so ...

6          Q.    And that was within the first two minutes

7    we're talking about?

8          A.    Several minutes, yes.

9          Q.    And so if you say she -- if she wasn't -- was

10   she obviously distraught about what you told her?  Was

11   she upset about what you told her?

12         A.    I don't know.  I would never use

13   "distraught."  To me, she was nervous, excited maybe,

14   you know.  It was, yeah, I would -- maybe a nervous

15   excitement, and then she said all of a sudden, "What?

16   What?"  That came out.  And then she started to -- I

17   think that was the time when she started to cry, but she

18   was saying other things, too.  I don't know what she was

19   saying.

20         Q.    Now at that point in time, you in your own

21   mind were convinced that she was involved in the death

22   of her son?

23         A.    I wasn't convinced -- totally convinced that

24   she was involved, but I had interviewed Scott and knew

25   what had happened during the day of them taking him to

Griffin & Associates              602.264.2230          pgriffin@griffinreporters.com

**MILKE_NSB004674**

Exhibit 1A

Page 25

1  Metrocenter, and knew that the mother had -- had, you

2  know, had dressed the kid, whatever, readied the kid for

3  them to pick the kid up or something, and stuff like

4  that, so ...

5         Q.    You told her she was under arrest?

6         A.    Yeah, I was pretty certain.

7         Q.    You were certain?

8         A.    Yeah, I was certain.

9         Q.    Was it right after she said, "What?  What?"

10 that you decided to read her her rights?

11        A.    It was shortly after that.  She started

12 crying and stuff or moaning -- I wouldn't say "moaning,"

13 but you know, kind of saying things, you know.  She had

14 her head down and stuff, and started to cry, but I could

15 see she wasn't crying any tears.

16              So we -- I said, "Well, wait a minute."  You

17 know, "Get yourself together."  Whatever.  And I told

18 her, "I'm here to get the truth from you," and stuff

19 like that.

20        Q.    And you told her you wouldn't tolerate tears?

21        A.    No, no.  Well, I don't think that's why she

22 didn't cry.  But no, I didn't say I wouldn't tolerate

23 tears.  I said, "I'm not going to tolerate you crying,"

24 and stuff.  I said, "We're going to get the truth," and

25 stuff like that.

**MILKE_NSB004675**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 26

1              And tears are -- if they're natural, I mean,

2      they're going to come out whether I tolerate them or

3      not, but it's just, I wouldn't tolerate her crying and

4      her basically acting the way she was acting because I

5      was there to get the truth and talk to her.

6          Q.    Obviously, if you had to make the statement

7      that you wouldn't tolerate her behavior, at that point,

8      she was acting up or doing something which you felt was

9      going to interfere with your interrogation; is that

10     right?

11         A.    She was crying.  You know, she was, you know,

12     going through the motions of crying.  And, yeah, I

13     wanted to talk to her.  You can't hardly talk to a

14     person when they're going through those motions.

15         Q.    So, in your opinion, at that point in time,

16     based upon your observations, was that -- that that was

17     not really happening; she was making all that up?

18         A.    I think it was an emotion that wasn't really

19     genuine.

20         Q.    Okay.  And that was your opinion?

21         A.    Sure, absolutely.

22         Q.    And that was right within seconds basically

23     after you told her that she had been -- you accused her

24     of being involved in the murder of her son and said she

25     was under arrest?

Griffin & Associates          602.264.2230          pgriffin@griffinreporters.com

**MILKE_NSB004676**

Exhibit 1A

Page 27

1          A.     Well, you're portraying it as seconds and

2     minutes and stuff.  I'd rather not do that because I

3     really can't say whether it was a couple minutes or --

4     because, you know, when I told her I wouldn't tolerate

5     that, I don't think she stopped immediately, I mean one

6     second she stopped, I mean.  So I don't want to say

7     seconds.  I don't want to put a time line on it because

8     I don't really recall, you know.  It's more of a general

9     time period that we worked on, you know.

10         Q.     Yeah, I think you were probably there for

11    about -- from all the other things I've seen,

12    approximately 30 minutes was the length of the

13    interrogation?

14         A.     Something like that, yeah.

15         Q.     So this would be at the very early part of

16    that; is that correct?

17         A.     Right, correct.

18         Q.     So we're probably within a short period of

19    time, for sure?

20         A.     A short period of time.  I wouldn't want to

21    say seconds or one minute or two minutes, but I would

22    say a short time, yes.

23         Q.     But certainly less than three minutes?

24         A.     I couldn't say that.

25         Q.     Okay.  But anyway, so it took her sometime

MILKE_NSB004677

Exhibit 1A

Page 28

1  then to kind of calm down?

2      A.    Well, yeah.  I mean, I told her to -- I

3  wouldn't tolerate that.  I'd say some time to calm down.

4  Again, you're putting a timetable on it that I -- I

5  don't totally recall a time that I believe I put on it.

6  Nor do -- I think it was more of a -- just generally me

7  getting out the statement, her understanding the

8  statement that I had made, and then her, you know, doing

9  what she had to do.  And then we started, you know, the

10  interview.

11      Q.    Okay.  And well, you kept urging her to stop,

12  though, and say, you know, "I want the truth.  I won't

13  tolerate this behavior."

14      A.    Again "urging" is not my word.  That's yours.

15  In regard to I told her definitely I would not tolerate

16  her crying, that was my -- I was there to get the truth.

17  I wasn't there to listen to her cry or listen to

18  anything else.  And I've been a detective with some

19  experience, knew that it's very difficult to have an

20  interview with someone who is crying and going through

21  this emotion, that she's trying to either -- you know,

22  she's feigning or just, you know, whatever.  But I

23  wanted her to -- to -- I wanted to get her attention.  I

24  wanted her to know why I was there.  I wanted her to

25  look me in the eye.  We were going to talk.

MILKE_NSB004678

Exhibit 1A

Armando Saldate        Interview of v. Armando Saldate        December 21, 2009

Page 29

1       Q.    Okay.  And this was when you were, like you
2   said, probably within --
3       A.    Six to twelve inches.
4       Q.    -- twelve inches of her?
5       A.    Six to twelve inches of her.
6       Q.    Did you put your hands on her knees and touch
7   her at that point?
8       A.    No, I don't think so.
9       Q.    But you did sit right in front of her?
10      A.    Yes.  I was sitting right in front of her.
11      Q.    And you pulled your chair right in front of
12  her chair?
13      A.    Right directly in front of her.
14      Q.    And her back, I think at that point, was up
15  to the wall; correct?
16      A.    Don't know.
17      Q.    Don't know, okay.
18      A.    Don't know.
19      Q.    That's when you said, "I won't tolerate
20  tears.  I want you to calm down," or whatever?
21      A.    I said I won't tolerate her crying.  There
22  was never tears.  I won't tolerate her crying.  We
23  needed to talk about stuff like that, you know.
24      Q.    Was it after she calmed down that you read
25  her her rights?

Griffin & Associates          602.264.2230        pgriffin@griffinreporters.com

**MILKE_NSB004679**

Exhibit 1A

Page 30

1     A.     Yeah.

2     Q.     And describe exactly how you did that, if you

3     would.

4     A.     I --

5     Q.     If you remember.

6     A.     Well, we've gone through this so many times.

7     I remember pulling out my card that I had, the rights

8     card, and I read her her rights from the card and asked

9     her if she understood.

10           And she said, "Yeah," like that, but she was

11    still kind of, you know, doing the emotional thing.

12           And so I said, "No.  I need your answer."

13           She said, "Yes."  Verbally said, "yes."

14    Q.     And that was to the question to, "Do you

15    understand your rights?"

16    A.     "Do you understand your rights?"  Yes.

17    Q.     And then after she said yes, then did you

18    start asking her questions about what happened?

19    A.     It was shortly thereafter, I presume, yeah.

20    I would tell her that I wanted the truth, and that's

21    what I wanted, was there for, and stuff like that.  And

22    that's what I would be doing, you know.  And me

23    explaining why or how I was going to conduct the

24    interview because it was my interview.

25    Q.     How did you explain you were going to conduct

MILKE_NSB004680

Exhibit 1A

Page 31

1    the interview at that point?

2        A.    I believe I -- I -- I told her that I was

3    just -- you know, I was there to get the truth, and I

4    was going to ask her to tell me the truth.  I didn't

5    want her to minimize or to not say anything about

6    herself because it might, you know -- I wanted her just

7    to tell me the truth.

8        Q.    Um-hum.

9        A.    Because I was there just to get the truth

10   from her, and basically that was it.  I mean, you know,

11   may have had some other confrontation, but that was --

12   my thrust was to get -- to sit there in front of her,

13   interview her, and get the truth of what exactly

14   happened.  And she could have very easily told me that

15   she had nothing involved in it.  That may not have been

16   the truth.  I may not have felt it was the truth.  But

17   she could have said that, but she didn't.  So ...

18       Q.    Now, before you started telling her how you

19   were going to do this, had you said anything else to her

20   before that?

21       A.    Again, I may have.  I don't know.

22       Q.    Well, is it at that point --

23       A.    Specific to --

24       Q.    Well, specifically, you just got finished

25   reading her her rights?

MILKE_NSB004681

Exhibit 1A

Page 32

1    A.    Yeah.

2    Q.    And you told me that she understands her

3    rights, or she just nodded at first; right?

4    A.    Um-hum.

5    Q.    And you said, "You have to articulate this

6    and you have to verbally say it."

7          And she said, "Yes"; is that right?

8    A.    Yes.

9    Q.    Did you have to prod her to say "yes"?

10   A.    I had to ask her, because she was nodding her

11   head, and I had to ask her to.

12   Q.    Right.

13   A.    "I need you to either say 'yes' or 'no.'"

14   Q.    And the question, "Do you understand rights?"

15   is that on your standard Miranda rights card?

16   A.    I believe it is.

17   Q.    Okay.  Now after you told her that, then you

18   said you started explaining to her your approach?

19   A.    Yeah.  That would be what I would do, yes.

20   Q.    Now, when was it in the interview that you

21   told her did she want this recorded or not?  That would

22   have been before you started telling her you were going

23   to do it; is that right?

24   A.    Yeah.  It was sometime either that -- again,

25   either during our initial conversation or -- but

MILKE_NSB004682

Exhibit 1A

Page 33

1   definitely before her rights were read to her.

2          Q.    You asked her before her rights were read?

3          A.    Whether she wanted it recorded or not.

4          Q.    You asked her before that?

5          A.    I'm pretty sure I did.

6          Q.    Now you've never testified to that before,

7   about that time.  You always said it was after you read

8   the rights.

9          A.    I don't know.

10         Q.    What made you --

11         A.    Again, this has been a long time.

12         Q.    Yeah.

13         A.    So, I would say, if it says that in the

14  report, of course, that's what -- that's the report I

15  wrote back then.  I mean, since then, I've -- you know,

16  been a long time.

17         Q.    Well, your testimony in your reports indicate

18  that right after you read her rights, you asked her if

19  she wanted to tape record it, and she said she did not

20  want to tape record it.

21         A.    Then it's probably true.

22         Q.    So that would be probably true at that time?

23         A.    Yes.

24         Q.    Did she ask you -- when you asked her about

25  the tape recorder, did she say to you, "I want an

**MILKE_NSB004683**

Exhibit 1A

Page 34

1    attorney"?

2        A.    No.

3        Q.    You don't remember that?

4        A.    No.  She never said that.

5        Q.    Okay.  Do you ever remember her asking,

6    during the whole course of the interrogation, whether

7    she asked for an attorney or not?

8        A.    She never asked for an attorney.

9        Q.    Was there some point where she did finally

10   ask for an attorney?

11       A.    She asked -- later on, on our way back, she

12   started talking about her dad, about her family and

13   stuff.  And I think she mentioned that, you know, she

14   wanted to call her dad to tell him about it, and then

15   something to the effect about whether he would get her

16   an attorney.  I don't know.

17       Q.    And going back to your interrogation of

18   Debbie, you were the only one in the room with her at

19   that time?

20       A.    That's right.

21       Q.    And kind of describe Debbie as you recall

22   her.  About what size was she?  Small?  Large?  Do you

23   remember?

24       A.    I walked out with her, so I would say five

25   foot four maybe.

MILKE_NSB004684

Exhibit 1A

Page 35

1      Q.    Okay.

2      A.    130, 140 pounds maybe.  Brownish hair, you

3  know.  That's about it.

4      Q.    And how large were you back then?

5      A.    Probably same size I am now.

6      Q.    Okay.

7      A.    You know.

8      Q.    And how much is that?

9      A.    I weigh about 220 and five nine.  Used to be

10  five ten in the Marine Corps, but for some reason, I

11  shrunk.  I'm five nine and a half per my last physical

12  anyway.

13     Q.    While you're sitting there looking at her,

14  staring at her eyes, you've read her her rights, you ask

15  if she understands her rights, you never did ask her if

16  she waived her rights, did you?

17     A.    Specifically those words, no.

18     Q.    And when you say "specifically," do you feel

19  you asked her about waiver of her rights at any time?

20     A.    I never specifically asked her that question.

21     Q.    Okay.  And did you take notes at that point

22  in time of what she was telling to you?

23     A.    Absolutely.

24     Q.    And do you use a legal tablet or do you have

25  a --

**MILKE_NSB004685**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 36

1      A.    A legal.

2      Q.    A legal tablet.  You were taking notes at

3   that point in time?

4      A.    (Nodding.)

5      Q.    And as I understand it, all those notes were

6   destroyed?

7      A.    Yes.

8      Q.    And when you wrote your supplemental report,

9   do you destroy them right after you write the report?

10      A.    I would use the notes to make sure my

11   supplementary report, which was not typed by me, of

12   course -- you have to make sure they correspond with

13   your notes because a typist is typing these -- this

14   conversation that -- or this interview that you're

15   having.  And I tape recorded it and, of course, they

16   type it, and then we get it back, and so I have to

17   review my notes to make sure it corresponds to the

18   typing of the secretary.

19      Q.    And then you throw the notes away?

20      A.    Then I throw the notes away.

21      Q.    Is that your standard procedure in

22   practically all cases?

23      A.    All cases.  Almost all cases I can say.  Hard

24   to say every case or all cases.

25      Q.    Most of the time?

MILKE_NSB004686

Exhibit 1A

Page 37

1     A.    Most of the time, yeah.

2     Q.    Most of the time.  So you never specifically

3  asked her if she waived her rights?

4     A.    No.  That wasn't a question that we asked

5  either.  That wasn't a question that I don't think any

6  detective in that period of time or even now asks

7  specifically, "Do you waive your rights?" but --

8     Q.    Did you have her sign any type of waiver

9  form?  Did you have any forms to waive rights?

10    A.    No, we didn't have any forms.

11    Q.    You say "back then."  Is the Phoenix -- I

12 understand you have taught at the police academy for a

13 while; is that correct?

14    A.    Yep.

15    Q.    Did you teach about Miranda and how to give

16 rights and things like that there?

17    A.    No.

18    Q.    You weren't involved in that?

19    A.    No.

20    Q.    What did you teach at the academy?

21    A.    Robbery investigation; dead body

22 investigations; stuff that patrolmen would get involved

23 in.

24    Q.    Now, you say people didn't ask about waiving

25 their rights back then.  Did you know that was required

**MILKE_NSB004687**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 38

1    to ask if someone waived their rights or to ascertain if

2    someone waived their right?

3         A.    Did I know that?

4         Q.    Um-hum.

5         A.    No, I didn't know that.

6         Q.    Okay.

7         A.    I don't believe it was true at that time.

8         Q.    You don't think people had to waive their

9    rights?

10        A.    I think -- well, I think it's very clear,

11   upon reading the rights, that a person who says they

12   understand their rights which have been read to them

13   from the card, if they start to talk and continue to

14   talk with you, they have made that decision upon

15   themselves, and they've waived their rights.

16        Q.    Now, after you got finished reading her

17   rights and she said she understood her rights, you then

18   proceeded to ask her questions?

19        A.    Yes.

20        Q.    And asked about what her involvement was?

21        A.    Yes.

22        Q.    And what the extent of her involvement was?

23        A.    Yes.

24        Q.    And if she started going sideways on you or

25   something, you said, "Look, I won't tolerate any other

Griffin & Associates          602.264.2230          pgriffin@griffinreporters.com

MILKE_NSB004688

Exhibit 1A

Page 39

1    type of behavior.  I want the truth from you"; is that

2    right?

3         A.    Yeah.  If she started to go -- you know,

4    doing something else, and I would -- I would definitely

5    get her focus back on what we were talking about,

6    definitely.

7         Q.    Right.  And during this whole interrogation

8    which lasted approximately 30 minutes, did you -- you

9    still kept the same time distance with her; you

10   basically stayed looking right at her, at her face?

11        A.    I would obviously stretch back --

12        Q.    Yeah.

13        A.    -- at times, and she would, too.  But yeah, I

14   mean, this -- when we had -- when we were talking to

15   each other --

16        Q.    Yeah.

17        A.    -- I was either listening to her, which was

18   most of the time, or where I started the interview and I

19   was doing the talking, yeah, we were -- we were staring

20   at each other's face.  We're staring directly

21   eye-to-eye, and that's -- that was the way I wanted

22   it --

23        Q.    Um-hum.

24        A.    -- because that's the way I handled my

25   interviews.

MILKE_NSB004689

Exhibit 1A

Page 40

1      Q.     That's the way you handled your interviews?

2      A.     That's correct.

3      Q.     And you have been pretty successful at

4    getting statements from people over your history as a

5    homicide detective?

6      A.     You know, I had this discussion with these

7    Attorney Generals attorneys.  You know, it's like

8    anything else.  You know, a guy bats 300, he's a great

9    hitter, but in all respects, he only hits the ball three

10   times out of 10.  So a lot of times -- there are --

11   there's many a times I've gone in and never ever got a

12   confession.  And this is just my -- I think that I'm

13   probably, if anything, 50/50 of all my interviews.  It's

14   just that the cases, you know, these cases, I guess I

15   got some, but I was -- I also did not get any

16   confessions from a lot of people I interviewed.  It's

17   just like any other cop that interviews anyone.  I mean,

18   I can't say that we are the same in going into an

19   interview because I have my different ways of doing

20   interviews as other people do, but we all, I think, were

21   confident about, when we're going into an interview,

22   that we're going to get a confession, but that doesn't

23   happen.

24     Q.     Were you confident here that you were going

25   to get a confession?

MILKE_NSB004690

Exhibit 1A

Page 41

1    A.    Absolutely.  When I go into a -- I'm not

2  saying that I knew I was going to get a confession, but

3  there's no reason for me to even talk to her or even try

4  to talk to her or even try to tell her that I wanted the

5  truth or even use -- you know, be there if I didn't feel

6  comfortable that I was going to get a confession.

7    Q.    Now when you say that you want the truth, the

8  only thing that would be the truth in your mind is that

9  she was involved?

10   A.    No.  I wanted the truth as she knew it.

11   Q.    Okay.  And if she told you she wasn't

12  involved, you would not think that was the truth?

13   A.    Not based on what I knew.  However, had she

14  told me, "I wasn't involved," and then gave me reasons

15  and just -- then I guess, you know, that would be

16  something different, but I -- I don't think that what I

17  knew or what I was being told would have been the truth

18  and I would have -- yeah, no, you know.

19   Q.    So any time she would try to stray from

20  basically talking about her involvement, that's when you

21  said, "I won't tolerate lying"?

22   A.    Any time she strayed from the information or

23  the interview we were having, discussion we were having

24  about her involvement in the murder of her son, then I

25  would immediately try to focus her back on to what I

MILKE_NSB004691

Exhibit 1A

Page 42

1    needed her to focus on; and that is to tell me what had

2    happened.

3         Q.   Okay.  And often the way you would do that is

4    say, "I don't tolerate lying"?

5         A.   I don't tolerate it.

6         Q.   That's basically your style; you tell people

7    you don't tolerate lying?

8         A.   Absolutely.

9         Q.   Now, after she made admissions to you about

10   this involvement that you have described, did you then

11   bring anybody else in to have her repeat her admissions

12   with someone else present?

13        A.   No, no.

14        Q.   Was there anything that corroborates what she

15   said other than your saying this is what she said?

16        A.   I think her testimony, her interviews, her

17   prior interviews corroborates 99 percent of what

18   happened in that room except for the fact that -- her

19   denial.

20        Q.   That she says she did not do it?

21        A.   That she did not do it.  Ninety-nine percent

22   of that interview is corroborated by her.

23        Q.   She corroborates about basically how she

24   lived, how she went to high school, things like that.

25   Those are the corroborating things you're talking about?

MILKE_NSB004692

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate         December 21, 2009

Page 43

1      A.    And how I read her her rights and all the
2    other things that happened in that room.
3      Q.    Okay.  Now, did you ask her to sit down --
4    and you had your tablet with you.  Did you ask her to
5    write out any type of admission and get her to sign it?
6      A.    No.
7      Q.    That was your practice or not to do that in a
8    case?
9      A.    I've never done it.  I had never done it.
10     Q.    Okay.  You never did that?
11     A.    No.
12     Q.    Now, is it your practice?
13     A.    Not that I recall anyway.
14     Q.    It was your practice in cases when someone
15   would invoke their rights to continue to go ahead and
16   ask them questions?
17     A.    At times, I guess.  I mean, you know, I've
18   had this question asked of me a couple times, and
19   it's -- you know, it all depends, you know.  I mean, if
20   they continue a conversation type, or if I can ask about
21   continuing the conversation, sure, I'll talk to them.  I
22   may even ask a question afterwards, too.  I mean,
23   they're continuing the conversation.  I know it's not
24   going to be any good.  I've already noted it in my pad
25   that they've asked for an attorney and stuff like that.

**MILKE_NSB004693**

Exhibit 1A

Page 44

1    But you know, my job was -- as a detective was to get

2    the truth and try to find out what exactly happened.

3    And you know, this may not have been able to be used in

4    court, but, you know, if the conversation continued, you

5    know -- hey, if we continue the conversation or

6    something like that, you know, I've noted that they've

7    asked for an attorney, and I know this ain't going to be

8    any good, but I still -- you know, it still happened, so

9    I might as well write it down.

10       Q.    And that's what you did here?

11       A.    What I did where?

12       Q.    This particular case you went ahead and just

13   let her talk?

14       A.    Well, we were talking about somebody that's

15   been advised of her rights and they wanted an attorney.

16   That's not what it stated in this case.

17       Q.    In this case, you stated she said she waived

18   her rights?

19       A.    I just want to get that straight.  She waived

20   her rights.

21       Q.    Let me back up.  You asked her about her

22   rights?

23       A.    Yes.  She understood her rights.

24       Q.    She understood her rights.  You never did ask

25   her if she waived her rights, did you?

MILKE_NSB004694

Exhibit 1A

Page 45

1      A.    No.

2      Q.    Just a second here.

3      A.    No, it's okay.

4      Q.    Getting back to -- I asked you the question

5  about is there anything that corroborates, you know,

6  what you're saying that happened in that room.  The only

7  thing is, as I understand it, would be what her

8  testimony is.  In other words, there is no other officer

9  that heard her say this?

10     A.    It's only me and her, yeah.

11     Q.    It's only you and her?

12     A.    Yeah, okay.

13     Q.    So it's basically your word against her word

14  is what we're talking about here?

15     A.    Excuse me.  I had to take a drink of water.

16     Q.    Sure.

17     A.    I guess that would have to be it.  I mean,

18  it's her word against mine.  We're the only ones in the

19  room.

20     Q.    And you don't have your notes of that

21  conversation, and there was never a tape recording of

22  that conversation?

23     A.    I have my -- my -- my documentation of that

24  conversation, and that's my supplemental.

25     Q.    The supplemental report you wrote, but not

MILKE_NSB004695

Exhibit 1A

Page 46

1    your absolute handwritten notes?

2        A.    But they were -- they are a part of -- they

3    are a result of my notes.

4        Q.    Okay.

5        A.    So the supplemental is a result of my notes.

6    I could not just sit there and write a supplemental

7    without my notes.

8        Q.    I understand.

9        A.    They are a result of my notes, yes.

10       Q.    But the notes were destroyed?

11       A.    The original notes of which I was -- a result

12   of my supplement were destroyed, yes.

13       Q.    Now after you got a statement from Debra

14   Milke, did you then think of trying to go and record it

15   again and ask her if you wanted to record it again?

16       A.    No.

17       Q.    Did you ever talk to anybody about getting a

18   recorder while you were there, tape recorder to do it?

19       A.    No.

20       Q.    You would assume that people would have tape

21   recorders at that place.

22       A.    Sheriff's office, I guess.

23       Q.    Isn't it generally your practice not to use

24   tape recorders?

25       A.    That's correct.

Armando Saldate                Interview of v. Armando Saldate              December 21, 2009

Page 47

1      Q.      And you've always testified you prefer not to

2   use a tape recorder?

3      A.      Absolutely.

4      Q.      And the reason for that is you feel that

5   inhibits people in telling -- in getting a statement

6   from somebody?

7      A.      I believe it did.

8      Q.      So it really wasn't your intent to use a tape

9   recorder to begin with?

10      A.      I had intentions to do what my supervisor

11   requested I do; if you can, use a tape recorder.

12            She didn't want the tape recording done.

13   We're not going to use a tape recorder.  Fit me just

14   fine.

15      Q.      And you actually preferred that?

16      A.      That was my -- that was my way of doing

17   things, yes.

18      Q.      Now, did you explain to your supervisor why

19   you didn't tape record it?

20      A.      I think I told him she didn't want to record

21   it.

22      Q.      Is it your practice not to stop interrogation

23   when rights are invoked?

24      A.      Is it my practice not to stop?

25      Q.      When someone invokes -- is it kind of your

Griffin & Associates              602.264.2230        pgriffin@griffinreporters.com

**MILKE_NSB004697**

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate        December 21, 2009

Page 48

1    practice to go ahead and keep talking to people?

2        A.    I wouldn't say it's practice, no.  It's each

3    individual case.  I mean, if a case comes up and that

4    person, like we discussed, talks about it or furthers

5    the conversation or stuff like that, then I may

6    continue, yeah.

7        Q.    Okay.

8        A.    But, of course, after I duly note the rights

9    had been read, and I duly note that I know they weren't

10   going to be used in court, but that's conversation we

11   have because -- besides the -- the -- the arrest and

12   conviction of this individual, I felt maybe personally

13   only, but I felt that my responsibility was to get to

14   the truth of what actually happened, because in all

15   honesty, as far as you say your concern was that it's

16   only me and her that know what happened in there, it's

17   only -- only they knew what happened.  So I wanted to

18   get the truth from them.  So -- and a lot of times,

19   yeah, I mean, if -- they're going to continue conversing

20   with me and maybe not about the case, but, you know,

21   later on, just general conversation, yeah, I'll have a

22   conversation with them, because it may turn around and

23   they may start talking about it again.  I don't know.

24       Q.    Now when you finished your interrogation, I

25   think you took Debbie back to Phoenix; is that correct?

Griffin & Associates                602.264.2230        pgriffin@griffinreporters.com

**MILKE_NSB004698**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 49

1      A.     Yes.

2      Q.     In the car with her.  And you didn't handcuff

3  her?

4      A.     No.

5      Q.     Was that standard practice back then not to

6  handcuff people, or was it?

7      A.     We -- you know, most of time, I didn't

8  usually.  If I went to a room, interview room -- first

9  of all, I don't carry handcuffs.  I don't carry a gun.

10  Don't carry anything in there.  I don't like them to be

11  handcuffed.

12      Q.     Um-hum.

13      A.     I want them to be unhandcuffed.  I want them

14  to be just like I am, you know, just sitting there.

15             I had developed a relationship with her of

16  honesty and truthfulness.  She had told me what was very

17  hard, I understood, for her to tell me, and I understood

18  that.  I mean, I may not have agreed with it, but I

19  understood it.  So we had a -- we had a good

20  relationship as far as I was comfortable with her, and

21  she was going to be seated in the back seat of the

22  police car.

23      Q.     Um-hum.

24      A.     So -- and I was going to sit in the front,

25  but then she asked, "Well, can you sit back here?"

MILKE_NSB004699

Exhibit 1A

Page 50

1                 I said, "Sure," you know.

2                 Again, because of the relationship we had of,

3       you know, this truth and honesty between us, that --

4       that, yeah, handcuffs -- we put them on around the main

5       station because supervisors are around.  So, they want

6       you to know -- but most of the time, if you establish a

7       relationship with someone, and you feel that they've

8       been truthful with you and you've been truthful with

9       them, they understand what's going to happen, and you

10      know, that's where you -- you know, there's no use

11      embarrassing them or belittling them or anything else.

12      They know where they're going to go, and you just go,

13      you know.

14          Q.    So this is what you did at that point in

15      time?

16          A.    That's what I did at that point, and did it

17      many times before.

18          Q.    Did you realize back then that when someone

19      immediately invoked their rights, you were supposed to

20      stop interrogating them?

21          A.    I knew that -- that -- that if someone

22      invoked their rights, that whatever they said could not

23      be used against them.  That's what I knew.

24          Q.    Okay.

25          A.    But if you're telling me that I would go to

MILKE_NSB004700

Exhibit 1A

Page 51

1   jail for 500 years if I just sat there after they

2   invoked their rights and not immediately walk out of the

3   room and put a big king's X on that room door telling

4   them that nobody could ever enter that room, no.  I

5   could sit there.  And if they would start a conversation

6   or if I would start a conversation not dealing with the

7   information we're here, and they were talking, sure, I

8   could sit there talk to them.  But no, I -- there was

9   nothing in my mind that I was ever told or believed or

10   felt was in any -- anything that said I had to

11   immediately walk out of that room and put a big king's X

12   on that room and say nobody talk to this person because

13   they invoked the attorney, you know.

14      Q.   So that would be true if they invoked their

15   rights to an attorney?  You would -- you believed at

16   that point in time you could still go ahead and talk to

17   them?

18      A.   After I duly noted it that they invoked their

19   right to an attorney -- and I am not saying I would just

20   necessarily say, "Hey, well, okay fine, you got an

21   attorney.  Now let's talk about the case."  That's

22   not -- that's not in any way close to what I'm telling

23   you.

24      What I am telling you -- what I'm telling you

25   is that, if I would sit there and we would have a

**MILKE_NSB004701**

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate                December 21, 2009

Page 52

1    conversation, or they would have a conversation with me,

2    or I would be doing my paperwork because they had

3    invoked -- I'd be catching up my notes and stuff like

4    that, and they would start talking, that I wouldn't

5    listen or that would I not note it down.  I think if I

6    hadn't, I probably would be facing the same thing from

7    another defense attorney -- "My defendant told you he

8    didn't do it.  After he invoked his right, he kept on

9    telling you he didn't do it, but you didn't write that

10   down, did you?"

11            Well, no, because he said wanted an attorney,

12   I couldn't write that down.  Well, no.  I'd write it

13   down.

14       Q.    Now, is it generally your practice, I think

15   you indicated, not to use a tape recorder?

16       A.    I had not used a tape recorder.  I don't use

17   a tape recorder.

18       Q.    Now could you have recorded that

19   interrogation without Debra's permission?  You didn't

20   need her permission to go ahead and record, did you?

21       A.    I would think that I would need her

22   permission if we were going to use a tape recorder, and

23   I put it right in front of her, yeah.

24       Q.    You don't think you could just do that anyway

25   without having to ask her?

Griffin & Associates              602.264.2230              pgriffin@griffinreporters.com

**MILKE_NSB004702**

Exhibit 1A

Armando Saldate       Interview of v. Armando Saldate      December 21, 2009

Page 53

1     A.     How would I do that?

2     Q.     You put the tape recorder there and turn it

3 on, or you do it surreptitiously.

4     A.     First of all, putting a tape recorder would

5 do just as much harm whether I turn it on or not.

6 That's why I asked. I mean, I don't want to carry a

7 tape recorder inside the room and then ask them whether

8 or not they want to do it, because they still see the

9 tape recorder there. You're asking me to surrep- --

10 well, that word, anyway -- to sneak it in a tape

11 recording and --

12     Q.     And not tell them?

13     A.     -- and not tell them and stuff, I wouldn't be

14 holding up my end of the bargain. And my end of the

15 bargain was to sit there and tell her the truth, what

16 she was going to do, what happened, what I was going to

17 do. And I expected her to tell me the truth, and that's

18 what we did.

19       I don't -- I don't sneak around and tell --

20 you know, that wasn't part of my interrogational, as

21 it's been used before or said before, techniques --

22 which I don't think it's technique, but that's not what

23 I do, I know. You know, that's not what I did. I mean,

24 I was honest with that person, they wouldn't be honest

25 with me -- if she wasn't going to be honest with me,

**MILKE_NSB004703**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 54

1    we're going to terminate that -- that interview.

2          Q.    Okay.  And when you say "honest," that's

3    being consistent with what you believe was the truth?

4          A.    Honest as far as she knew it.

5          Q.    Um-hum.

6          A.    As far as she was -- because honesty for me

7    and honesty for you is two different things.

8          Q.    I understand that, but you went in there

9    believing she was guilty?

10         A.    Yes.

11         Q.    And that was going to be your truth, and

12   that's what your standard is?

13         A.    No, no, no.  My truth was honesty could have

14   very easily been the fact.  She could have sat there and

15   said, "I didn't do that" or, "I didn't know anything

16   about this whole situation.  Yeah, I did get the child

17   dressed, and I did know they were going to take him to

18   see Santa Claus," and everything that Roger had told me,

19   "but I didn't know they were going to do that."

20               That could have been the truth corroborated

21   by the fact that what Roger had said -- that they had

22   gone, picked up the child.  Styers had gone to pick up

23   the child, and they were going to take him to see Santa

24   Claus.  That would have been the truth.  That very

25   easily could have been the truth.

Griffin & Associates          602.264.2230          pgriffin@griffinreporters.com

**MILKE_NSB004704**

Exhibit 1A

Page 55

1              However, the truth as Roger knew it was
2    something different, and I knew that truth, but that
3    necessary -- doesn't necessarily mean that I was going
4    to get that truth from Debbie.  The truth from Debbie
5    could have been any of those variations, but my -- my
6    intention was just to get the truth from her as she knew
7    it, and whether it was going to be -- whether it
8    corroborated with Roger's statement or not, I didn't
9    know that, you know, whether it was going to or not.
10   But it was going to be the truth, or if it wasn't the
11   truth, I was going to note that in my supplemental that
12   she sat there and lied to me.
13       Q.    And you continually insisted that she tell
14   you the truth during your interrogation?
15       A.    I wouldn't say continually.  I would say that
16   when she got off track a little bit or she started
17   talking about herself or stuff like that, we would -- I
18   would redirect her and refocus her on what we were
19   trying to do there, because I had a job to do.
20       Q.    Um-hum.
21       A.    You know, that's what I was doing.
22       Q.    And what was your job?
23       A.    My job was to get the truth.
24             MR. KIMERER:  Do you guys have any questions
25   in this area?  I'm going to change areas.  Do you have

MILKE_NSB004705

Exhibit 1A

Page 56

1    some things you'd like to ask him?

2              MS. NGUYEN:  I have a couple.

3                   E X A M I N A T I O N

4    BY MS. NGUYEN:

5        Q.    You mentioned --

6        A.    Is this a co-attorney also?

7              MR. KIMERER:  Excuse me.  I'm sorry.  We're

8    all attorneys here.

9              MR. SALDATE:  Okay.

10   BY MS. NGUYEN:

11       Q.    You mentioned that you took notes on a tablet

12   during the interrogation of Debbie; is that right?

13       A.    Yes.

14       Q.    And then you gave those notes to the person

15   who typed them; is that correct?

16       A.    No.

17       Q.    Okay.  You had said earlier -- I thought you

18   said earlier that she typed them from a recording.

19       A.    Recording, yes.

20       Q.    But in this case, there was no recording.

21       A.    No recording of my supplemental.  We would

22   record what we would put on our supplementals.

23       Q.    On a dictaphone?

24       A.    A dictaphone.

25       Q.    Okay.  So you gave that tape recording to the

MILKE_NSB004706

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate          December 21, 2009

Page 57

1      typist?

2           A.     To the typist.

3           Q.     The typist put that in the supplemental?

4           A.     The supplemental.  I wanted to make sure, of

5      course, it jibed with my notes to the typed version.

6           Q.     Okay.  And I'm assuming, along with your

7      notes, that recording of the dictation was also

8      destroyed?

9           A.     I wouldn't say destroyed.  It was probably

10     reused about 10 times afterwards.

11          Q.     Fifty, a hundred times?

12          A.     Could be.

13          Q.     But it's no longer in existence?

14          A.     Tape may be in existence.  They may still be

15     using it, but the actual voices that were on regarding

16     this, no, it's not in existence.

17          Q.     And they were not presented prior to Debbie's

18     trial?

19          A.     Were not preserved, you mean?

20          Q.     Correct.

21          A.     No, no.  I think I had a homicide the day

22     after.  So I probably used that same tape.

23          Q.     So as soon as it was -- your supplemental was

24     verified and it wasn't preserved --

25          A.     It was returned in an envelope with the tape,

**MILKE_NSB004707**

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate          December 21, 2009

Page 58

1    stuck the tape back in my dictaphone, and there we go

2    again for the next one, you know.

3        Q.    Did you own a tape recorder at the time?

4        A.    No.

5        Q.    Did you ever come to own tape recorder?

6        A.    Not in the police department.

7        Q.    And how long did you work for the police

8    department?

9        A.    Close to 22 years.

10       Q.    So what year did you -- did you retire or

11   resign?

12       A.    Do I own a tape recorder now; is that what

13   you're asking?

14       Q.    Not now.  I'm asking what year did you leave

15   the Phoenix Police Department?

16       A.    In 1990.

17       Q.    As of 1990, you still don't own a tape

18   recorder?

19       A.    Oh, I own a tape recorder at home.  My

20   granddaughter uses it.  We -- you know, we even own a

21   video camera for my granddaughter's things at school and

22   for capturing things at -- you know, the family stuff.

23       Q.    Did you have one in your capacity as the

24   homicide detective?

25       A.    No, never.

**MILKE_NSB004708**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 59

1       Q.    So during the whole time you worked as a

2   homicide detective, you never tape recorded

3   interrogations?

4       A.    Not that I recall, unless, you know, I was

5   instructed to do so, specifically bring a tape recorder,

6   stuff like that, but I don't recall.  I don't recall

7   ever.

8       Q.    And in this case, your sergeant said, if

9   possible, tape record it?

10      A.    Yes.

11      Q.    But you made no attempt to obtain a tape

12  recorder prior to going into the interrogation room?

13      A.    There would be no reason to.  I was going to

14  ask her if she wanted it tape recorded, and if she said

15  yes, stop and go get a tape recorder.

16      Q.    You said that you're about 50/50.  That's

17  your estimate, on the cases in which you did the

18  interrogation, about 50 percent of those you obtained a

19  confession?

20      A.    Generally, yeah.

21      Q.    So all 50 -- 50 percent of those, those would

22  not have been recorded then?

23      A.    No.  Didn't use a tape recorder.

24           MS. NGUYEN:  I don't have any more.

25           MR. KIMERER:  Do you have any?

**MILKE_NSB004709**

Exhibit 1A

Page 60

1                    E X A M I N A T I O N

2    BY MS. VOEPEL:

3        Q.    I just am trying to visualize.  You had said

4    that during the interrogation, you were pulled up

5    directly facing Debra, and that you were leaning in

6    close to her during and kind of going back and forth a

7    little bit?

8        A.    Um-hum.

9        Q.    And yet, I mean, if you were in that position

10   the entire time you're having this conversation, you

11   couldn't have taken a lot of notes?

12       A.    No, but I took --

13       Q.    Okay.

14       A.    I took the notes.  The pad was on my lap, you

15   know, my hands, and my pen was right there, you know,

16   when I'm sitting there, you know, I'm talking to her

17   like that, and we're talking.  I've been a multi-tasker

18   before multi-tasking was invented as a word.  So I knew

19   how to do other things.

20            So yeah, I was taking notes.  I would stop

21   and take notes, and she would stop.  And I had to stop

22   for her, you know, and that's how I did it, you know.

23       Q.    But the entire interrogation only lasted 30

24   minutes?

25       A.    Thirty minutes, yeah.  So I didn't get no

MILKE_NSB004710

Exhibit 1A

Page 61

1   writing cramps or anything like that.

2       Q.    Did you receive any training on Miranda at

3   the Phoenix Police Department?

4       A.    Sure.  I mean, when I first went to the

5   police academy in 1969, we had a Sergeant Cooley and

6   Sergeant -- somebody -- and Officer so-and-so who were

7   involved in that case that taught us at the academy.

8       Q.    So that was really your main training --

9       A.    Yeah.

10      Q.    -- on that?

11      A.    Sure.

12      Q.    Okay.

13      A.    We would get legal briefs, you know, about

14  Miranda, you know.  We'd get it passed around and stuff

15  like that.  Other than that, no.  We all knew.  You

16  know, when -- what the Mirandas were, and we read them,

17  and we then proceeded.

18      Q.    Okay.  And nothing in your training told you

19  to stop an interrogation if somebody invoked their

20  rights?

21      A.    Again, I'm not saying that I interrogated

22  anyone after they invoked their rights.  I'm saying we

23  had a conversation, and if it went back to talking about

24  the crime, then I would note it, but, of course, I knew

25  that that could not be used in court because I had just

**MILKE_NSB004711**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 62

1    noted the fact that they had asked for an attorney.

2         Q.    Um-hum.

3         A.    And I noted the time they asked for an

4    attorney.  So now I'm having a conversation in my

5    supplemental that's after that point.  So I know that it

6    ain't going to be used.

7         Q.    You just knew that it couldn't be used in

8    court?

9         A.    Absolutely.

10        Q.    Okay.

11        A.    That's what -- that's the big top, isn't it?

12   That's why we make the other decisions or other people

13   make decisions of what we did at court.

14        Q.    But that would be sorted out by the defense

15   attorney in an argument and everything at the time of --

16        A.    No, I think that was pretty clear.  I think

17   that was pretty clear in my mind that whatever I got

18   after they invoked their right was not going to be used.

19   That was pretty clear in my mind.

20        Q.    At all?  Even for impeachment?

21        A.    I think it could be used for impeachment.

22             MS. VOEPEL:  Okay.  Thank you.

23             MR. KIMERER:  Can we take about five minutes?

24   I've got to get another binder I didn't have with me, if

25   that's okay.

MILKE_NSB004712

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 63

1          MS. DONE:  That's fine.

2

3                    E X A M I N A T I O N

4    BY MS. NGUYEN:

5          Q.    As far as -- well, have you reviewed any of

6    the briefs filed in the habeas -- either the habeas

7    petition or the brief to the Ninth Circuit Court of

8    Appeals?

9          A.    No.

10         Q.    In there, there's -- I think it's about 18

11   cases that you have worked on in the past where there's

12   some sort of dispute as to an individual's alleged

13   confession or incriminating statements.  Do you have any

14   knowledge about those specific cases?

15         A.    No.

16               MS. NGUYEN:  Julie, would you mind providing

17   him that information?

18               MS. DONE:  Yeah.  I just provided you --

19               Oh, he may not have reviewed it.

20               That's why I hadn't said anything.  I just

21   provided the parts --

22               MR. KIMERER:  Out of the brief.

23               MS. DONE:  -- out of the briefs that had to

24   do with your contentions and our response to those.

25               MS. NGUYEN:  And it lists the 18 different

**MILKE_NSB004713**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 64

1    pieces.

2              MS. DONE:  I think it was from the Ninth

3    Circuit briefs, not the habeas.

4    BY MS. NGUYEN:

5         Q.    You plan on reviewing those prior to the

6    evidentiary hearing?

7         A.    Sure, yeah.

8         Q.    And then as far as while you were with the

9    Phoenix Police Department, was there any disciplinary

10   action taken against you?

11        A.    Yes.

12        Q.    And what did that concern?

13        A.    Five days off.  And I think that's already

14   been adjudicated, I think, though.  That's already been

15   gone through when they asked for my personnel file and

16   stuff like that.

17        Q.    Okay.  Do you remember what year that was in?

18        A.    What what was in?

19        Q.    That the disciplinary action was taken

20   against you.

21        A.    It was in the seventies.

22        Q.    And what did that entail?  What was the

23   reason for the disciplinary action?

24        A.    I think disciplinary action is right there.

25   You can read it for yourself.

Griffin & Associates          602.264.2230          pgriffin@griffinreporters.com

**MILKE_NSB004714**

Exhibit 1A

Armando Saldate                 Interview of v. Armando Saldate        December 21, 2009

Page 65

1       Q.     Well, but I want to ask you questions about
2   that.
3       A.     I don't recall.
4       Q.     You don't recall at all what the
5   discipline --
6       A.     I'm not going to recall about that situation.
7       Q.     So you don't want to speak about it?
8       A.     I don't want to speak about that situation.
9       Q.     Okay.
10      A.     Only because you already know all about that
11  situation.  You know as much as I know about that
12  situation.  I didn't review it again.  Today I didn't
13  review that situation.
14      Q.     And that's one of the purposes of the
15  interview is to get your recollection of events,
16  obviously.
17      A.     I have no recollection of the events.
18      Q.     You have no independent recollection of what
19  happened?
20      A.     I have no recollection that I want to
21  recollect anything about those events.
22      Q.     Okay.  Well, that's two different things.
23  Either you don't want to talk about it --
24      A.     I don't want to talk about it.
25      Q.     -- or you don't recollect it.  Which is it?

**MILKE_NSB004715**

Exhibit 1A

Page 66

1       A.      I don't want to talk about it.

2       Q.      You don't want to talk about it, okay.   But

3    you would agree there was disciplinary action taken

4    against you, and you were suspended for five days?

5       A.      Yes.

6       Q.      Other than that, was there any other internal

7    investigations that you're aware of during your career

8    at the Phoenix Police Department?

9       A.      Not that I know of.

10      Q.      So that only the one investigation -- that's

11   the only one that you know of?

12      A.      That's the only one that I know of that I had

13   any disciplinary action.  And I think that's the only

14   one you know of, because they've asked the police

15   department several times to provide records, and they

16   haven't.

17              And that disciplinary action that I had could

18   have been removed from those records.  I could have

19   removed them six years after they happened, but I

20   didn't.  So now you have them; you know about them; I

21   know about them; they know about them.  If you want the

22   whole world to know about them, I guess that's what will

23   happen, but that was a long time ago, so ...

24      Q.      Well, if you're going to -- why didn't you

25   have it removed from your record if you say that you

MILKE_NSB004716

Exhibit 1A

1    could have?

2         A.    Because that was me.  That was my career as

3    being a police officer.  I don't -- I'm a truthful

4    individual.  I don't go out and try to pretend I'm

5    something I'm not.  I could have very easily removed

6    those records.  After six years, I could have removed

7    them.  They tell you come on in to remove those records

8    and you can get rid of them, you know, and nobody will

9    ever know.  But that was part of my career.  That was

10   part of my life back then.  I learned -- I learned great

11   lessons out of that, and I'm not -- and that's -- I'm

12   just not going to just throw it away and just say it

13   just didn't happen.  I mean, it happened.  You know, I

14   wasn't very happy of having to tell my son, my daughters

15   about what happened.  My son was a police officer, still

16   is a police officer.  I think he probably thought his

17   dad was a hero all this time; didn't know his dad did do

18   anything wrong.

19            When you guys asked for those records, and it

20   was granted, and you guys got those records, I was

21   called by -- the Attorney General told me that those

22   records were going to be made public to the judge and

23   stuff.  I decided I would tell my two daughters and my

24   son, and I did.  My wife, of course, already knew about

25   it and would remind me about it every once in awhile.

MILKE_NSB004717

Exhibit 1A

Page 68

1   And it was difficult to do that, and I'm not going to do

2   it in this situation or any other situation if I don't

3   have to.

4        Q.    So what is the reason now that you don't want

5   to speak about it?  Like you said, it's something that

6   you know happened, and you aren't disputing it, and

7   everybody knows about it.

8        A.    There is -- the only people that needed to

9   know about that situation I've already told.  Didn't

10  want to tell them; I grant you that.  Hadn't told them;

11  I grant you that.  But when that was made public, I did

12  tell them.  I told my son who is a police officer -- I

13  told him what his dad had done.  I told my two

14  daughters, older daughters.  They're adults.  I had to

15  tell them what their dad did, and that was difficult,

16  but I'm done.  I was responsible to my family because I

17  was responsible to tell them before they heard it on TV

18  or radio or paper or wherever they would hear it from.

19  That was my responsibility to tell them.  My wife knew

20  about it.  I knew about it.  My family now knows about

21  it.  So that's my -- that's the end of my

22  responsibility.

23       Q.    And I understand in this context, in the

24  context of the interview, if you don't want to go into

25  that, you know, I'm not going to, but based on what

MILKE_NSB004718

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate                December 21, 2009

Page 69

1    you've said thus far, you've admitted to that conduct;

2    is that right?  It's not in dispute?

3         A.    I had received five days off, and I learned a

4    lot of lessons from those five days off.  I lost a

5    house.  In fact, I lost a lot of things, a little bit of

6    me during that day -- during that period of time, but

7    I've gone and tried to recapture that.  I've gone and

8    tried to do the best I could as a police officer.  And

9    whether, you know -- it's -- you know, I've had second

10   thoughts about getting rid of that stuff, to be honest

11   with you, but -- but I think I did it for what was good

12   for me.  That was me.  That's my career.  That's -- you

13   know, I've had many, many commendations.  It kind of

14   wouldn't be fair to leave them there and take out the

15   bad stuff and leave the good stuff in there, you know,

16   but I've seen my file before I retired.  I saw my file.

17   I saw it many times, and the commendation side was that

18   thick, and the disciplinary side was just that paper.

19   So I figured that that balanced out my life, you know,

20   so, and that's why --

21        Q.    Other than that, you don't know of any other

22   disciplinary action?

23        A.    No.

24        Q.    As far as the cases, which I know you haven't

25   reviewed yet, but you're going to review prior to the

**MILKE_NSB004719**

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 70

1    evidentiary hearing, as you sit here today, do you have

2    any independent recollection of cases wherein a

3    confession or incriminating statements were obtained

4    during your interrogation of the suspect that were

5    ultimately suppressed --

6        A.    No.

7        Q.    -- for one reason or another?

8              Do you have any independent recollection of

9    cases like that?

10       A.    Disputed, yes, because that's your job.

11   That's what you guys do.

12       Q.    Not just disputed.  I'm talking about wherein

13   they were suppressed.

14       A.    No, no.

15             MR. KIMERER:  Go through each case we have

16   and ask him if he remembers it at this point in time.

17             MS. DONE:  What are you referring to?  I'm

18   not sure if it's the same thing he has.

19             MS. NGUYEN:  These are my own notes.  They

20   are cases cited in the Ninth Circuit brief.

21   BY MS. NGUYEN:

22       Q.    State verses Conde.  C-O-N-D-E.

23       A.    I remember that case.

24       Q.    Do you have an independent recollection of

25   that?

**MILKE_NSB004720**

Exhibit 1A

Page 71

1       A.    Of that case, yeah.  Generally, I mean, you

2    know, that he was involved in a bank robbery.  And I

3    interviewed him while he was in the hospital, and we

4    talked, and he, you know -- but I think that was -- that

5    was about -- he was under drugs or under something.  I

6    don't know.  I don't know if it was ever suppressed or

7    not.  I just know that that's what the dispute was

8    about, that maybe I picked on a guy that was sick or

9    something or was on drugs or something.

10      Q.    When you say "picked on a guy" --

11      A.    Well, I happened to ask him some questions.

12      Q.    So you went to the hospital when he was in

13   critical condition; do you recall that?

14      A.    Critical condition?

15      Q.    Correct.

16      A.    I don't recall that.

17      Q.    Okay.  He was on I.V.?

18      A.    He may have been on I.V.  Critical -- to me,

19   critical condition is you don't talk to somebody.  And

20   we were having a conversation, so ...

21      Q.    So you recall questioning him when he was in

22   the hospital?

23      A.    Yes.

24      Q.    Do you know today that his statements were

25   suppressed as involuntary?

**MILKE_NSB004721**

Exhibit 1A

Page 72

1      A.    No, I don't know that.

2      Q.    What about State v. Yanes?  Y-a-n-e-s?

3      A.    -- -e-z probably.  I don't recollect Yanes at

4   all.

5      Q.    There he had suffered a skull fracture.  He

6   had -- the suspect had some brain damage as a result of

7   skull fracture?

8      A.    Those are your words that -- I probably

9   didn't know anything about that, okay, but those are

10   what you found out afterwards, and I didn't know

11   anything about that.  I wouldn't know anything about

12   that.

13      Q.    Okay.

14      A.    But I don't even recall the incident, so ...

15      Q.    You don't recall that case at all?

16      A.    No.  Not without looking at it, no.

17      Q.    What about State versus Jones?

18      A.    Jones.  Jones.

19      Q.    He was in -- Jones was a juvenile.

20      A.    Was that Circle K or something like that?

21   Murder?

22      Q.    It was a first degree murder case.  I can

23   tell you that.  I don't know if it was involving a

24   Circle K.

25      A.    A clerk or something.  I can't really say.

MILKE_NSB004722

Exhibit 1A

Page 73

1    I'd have to review it.

2        Q.    But he was a juvenile, and he was handcuffed

3    to a desk in a room by himself.  Is that ringing any

4    bell?

5        A.    I'll tell you right now, if he had been

6    handcuffed to a desk by himself, it would have been by

7    police officer, not me.

8        Q.    You don't recall that at all?

9        A.    No.  Not independently recall it, no.  I'll

10   have to -- I was probably involved in at least, I would

11   say, 300 homicides when I was there.  I was probably

12   involved in at least that many armed robberies,

13   burglaries, some undercover work.  A lot of cases, and

14   I'm sorry, I can't recall it.

15       Q.    That's why I'm asking you.  For those that

16   you don't recall --

17       A.    I will review, yes.

18       Q.    State versus Running Eagle?

19       A.    Yes, I remember that.

20       Q.    And that one, do you recall that he -- that

21   was probably one that you are discussing where he

22   asserted his right to remain silent.  You actually

23   testified to that?

24       A.    Yes.

25       Q.    But you continued with the interrogation?

MILKE_NSB004723

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 74

1        A.     I wouldn't say interrogation.  You guys use

2   that "interrogation" so loosely.  It's an interview.

3   It's a conversation as far as I'm concerned.  It's a

4   conversation between me and him.

5        Q.     Whether you call it an interview or

6   interrogation, you spoke with him and you obtained

7   incriminating statements; is that correct?

8        A.     With Running Eagle?

9        Q.     Right.

10       A.     I don't think I obtained any incriminating

11  statements from him.  I'm not sure, but I don't think I

12  did.  No, I don't think I did.

13       Q.     So do you recall in that case he invoked his

14  right to remain silent?

15       A.     Yes.

16       Q.     And is that one of cases where you continued

17  to have a conversation with him?

18       A.     I think we did have a conversation, but the

19  fact that -- that -- you know, that he asked for an

20  attorney is because I noted it on my supplemental.

21       Q.     I believe it was the right to remain silent.

22       A.     Remain silent, yeah.

23       Q.     What about State v. Mahler?  M-a-h-l-e-r.

24       A.     The guy in Tucson or something I went down to

25  interview?

Griffin & Associates          602.264.2230          pgriffin@griffinreporters.com

**MILKE_NSB004724**

Exhibit 1A

Armando Saldate       Interview of v. Armando Saldate     December 21, 2009

Page 75

1       Q.    I believe that's correct.

2       A.    Didn't tell me anything?

3       Q.    Well, no.  This one -- I believe that there

4    was an allegation that was promised that his girlfriend

5    would be released if he spoke to you.

6       A.    I never did that, no.

7       Q.    So you deny ever doing that?

8       A.    I deny that, yeah.

9       Q.    Are you aware that the Court of Appeals

10   suppressed his statements?

11      A.    I don't think there were any statements to be

12   suppressed, were there?  I don't recall if I got a

13   confession from him or not.  Again, I'll have to review

14   that one.

15      Q.    State versus King?

16      A.    I don't recall that.

17      Q.    State versus Rodriguez?

18      A.    I don't recall that.

19      Q.    State versus Reynolds?  R-e-y-n-o-l-d-s?

20      A.    No, I don't recall that.  I apologize.  I

21   should have got to those things.

22            MS. NGUYEN:  Do you have any follow-up on

23   those?

24            MS. VOEPEL:  No.

25            MR. KIMERER:  Just a couple things and we'll

Griffin & Associates     602.264.2230     pgriffin@griffinreporters.com

**MILKE_NSB004725**

Exhibit 1A

Page 76

1    get you out of here.

2

3                F U R T H E R   E X A M I N A T I O N

4    BY MR. KIMERER:

5         Q.    Looking over my notes, it indicated in your

6    prior testimony one time that, when Debra was sitting in

7    front of you, and at the very initial part of your

8    starting to ask her questions, you said she was shaking.

9    Do you recall that?

10        A.    Yeah.  She may have been shaking, yeah.

11        Q.    Shaking at that point?

12        A.    But I mean, you know, that's -- that was part

13   of the emotion she was trying to convey, you know, to

14   me, yes.

15        Q.    And was it your standard practice, when you

16   do an interrogation or an interview or however we want

17   to call it, that usually you would always like to do

18   that by yourself, not have anyone else with you?

19        A.    Usually, but at times, there would be other

20   detectives, but they'd be in the background.  I didn't

21   want them to be --

22        Q.    Involved?

23        A.    Well, I didn't want them to be present.  I

24   didn't want them to be in between -- in other words, we

25   wouldn't do it like in TV, two detectives sit on one

MILKE_NSB004726

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 77

1    side of the table and the defendant sits at the other

2    side of the table.  I wanted that person to have a full

3    focus on me, and I'm going to have -- my focal point is

4    her; and her, me.  And if a detective was there --

5              And sometimes there was; sometimes there

6    wasn't, you know.

7              -- but he would be in the background just,

8    you know, in the corner somewhere.  He could listen to

9    it if he wanted to, you know.  I wasn't -- I wasn't

10   really against anybody being in the room.  I just didn't

11   want them to be involved in anything that transpired

12   when it was my interview.

13        Q.   Well --

14        A.   A lot of times, I would have an interview,

15   and like in robbery detail, we would have an FBI agent

16   with us during all interviews for bank robberies.  Well,

17   I would have the interview, but as long as that FBI

18   agent stood somewhere away from me, and that was okay,

19   and as long as he didn't interrupt us, that was okay.

20   At times then, I would finish my interview.  Then he

21   would get into his position, and I may stay there.  I

22   may not.  Most of the time I wouldn't.  But, no, I just,

23   you know ...

24        Q.   Generally, if you were doing an interview --

25   and I call it "your style" -- was basically you want to

MILKE_NSB004727

Exhibit 1A

Page 78

1    make a connection with that person?

2         A.    Absolutely.

3         Q.    And you want to really get them to bond with

4    you, and you don't want any interference from anybody

5    else?

6         A.    That's correct.

7         Q.    You don't want anybody jumping in, and

8    losing -- getting you off of the track that you're on

9    when you're sitting there interviewing somebody?

10        A.    I honestly believe that -- that no matter

11   what -- what it is, somebody is going to tell you --

12   they want to tell you what happened especially if other

13   people are involved, because they want to get their

14   truth known.  It's always been my position to put myself

15   in a position to where they are going to tell me what

16   happened.  And I do that by just, want them to focus on

17   me.

18        Q.    Um-hum.

19        A.    I want them to just tell me, and I'm going to

20   be truthful with them, and they're going to be truthful

21   with me, and we're going to have this conversation.  I'm

22   not going to belittle them and I'm not going to

23   independently just say, you know, you're, you know,

24   whatever you are, and how could you have done that.

25   There are some detectives I know do that -- or did that.

MILKE_NSB004728

Exhibit 1A

Page 79

1    They would stand up and get all angry and get pissed off

2    and walk out of the room, but I don't.  I've had an

3    interview where I knew he had -- he was responsible for

4    killing a newspaper boy, but I sat in there with him

5    almost five, six hours.  I couldn't get him to confess.

6        Q.    Um-hum.

7        A.    But we had a good conversation, but I came

8    out and I told the sergeant.

9        Q.    But your style is to go in and take control

10   of the situation immediately?

11       A.    Well, take control of the situation.  In this

12   case, like the paper boy, he had already told -- we had

13   already had information he told his priest, or told his

14   girlfriend, or told his best friend.  Well, that's the

15   problem area.  When an interviewer gets to a person

16   that's already told somebody else, then there's no

17   reason for them to tell you.  So, I try to be -- I try

18   to be in the position that they need to tell me, and

19   that's how I do it.

20       Q.    I guess, asking a question, underlying that

21   in terms of your thinking is that you feel that they

22   need to give you the truth?

23       A.    It's just been my experience and, you know,

24   my life experience, my police experience, that people

25   generally are -- I mean, barring any psychological

MILKE_NSB004729

Exhibit 1A

Page 80

1    problems they may have, people usually, when confronted

2    with the facts, like to -- you know, they'll tell you

3    what happened.

4         Q.    Now, you say that, but you indicate that of

5    all the cases where you've done interrogations or

6    interviews, there's only been about 50 percent of those

7    where you've probably gotten people to make admissions?

8         A.    Absolutely.  And I fault that with it may

9    have been my approach.

10        Q.    Um-hum.

11        A.    It may have been me.

12        Q.    Um-hum.

13        A.    It may have been a situation where somebody

14   didn't like me personally.  Somebody didn't -- I may

15   have said something that may have -- you know, or they

16   may have told somebody else already, or they just didn't

17   want to talk.

18        Q.    Or maybe it was they weren't guilty?

19        A.    No.  Most of the time when people weren't

20   guilty, they usually told me everything about their not

21   being guilty.  I never had no problem about somebody

22   telling me that they weren't guilty.

23        Q.    You include those in your 50 percent?

24        A.    Well, sure, but, you know.

25        Q.    Now, I know that the interrogation -- I think

MILKE_NSB004730

Exhibit 1A

Armando Saldate          Interview of v. Armando Saldate          December 21, 2009

Page 81

1    there was a Detective Halstead or a police officer

2    Halstead outside or something like that.  Do you

3    remember him being there from the Phoenix Police

4    Department?

5         A.    Hamrick.

6         Q.    Hamrick.  That was it.

7         A.    He was a detective with us.

8         Q.    You had him wait outside?

9         A.    Yes.

10        Q.    You didn't ask him to come in the interview

11   with you?

12        A.    No.

13        Q.    Did you come out and tell him right

14   afterwards that you had received -- obtained a

15   confession from Debra?

16        A.    No.  I probably told him when we completed

17   it.

18        Q.    Right after you got out of the room?

19        A.    Well, yeah.  When we completed the interview,

20   I probably told him what we had.  You know, he was a

21   homicide detective, and he was sent to -- to Florence.

22   And yeah, there wouldn't have been no reason for me not

23   to tell him.

24        Q.    Did you know that he was -- did he get there

25   before you in Florence?

Griffin & Associates          602.264.2230          pgriffin@griffinreporters.com

**MILKE_NSB004731**

Exhibit 1A

Page 82

1      A.    Yeah.  He must have been the one that was

2  sent before me, yes.

3      Q.    Okay.  And do you know how long Debra was

4  waiting for you until you got there in that room?

5      A.    No, but they said it was going to be pretty

6  quick to get there because I was going to take a

7  helicopter.  To me, it lasted hours, but I don't know.

8  I really don't know how long.

9      Q.    But Hamrick never attempted to talk to her;

10  he was waiting for you to get there?

11      A.    That would be protocol for us.

12      Q.    Okay.

13      A.    You know, I was case agent.  I was the one.

14  Just like if I was sent down there to talk to -- to pick

15  up Debra Milke, even though I, you know, may have felt

16  that I could interview her, I wouldn't because that's

17  not my case.  Hamrick's case it would be.

18      Q.    This was not Hamrick's case?

19      A.    It was my case.

20      Q.    It was your case.

21      A.    So I decide what happens in my case.

22      Q.    Did Hamrick have a tape recorder, or you

23  don't know?

24      A.    I don't know.

25      Q.    Did you ask him for one?

MILKE_NSB004732

Exhibit 1A

Armando Saldate                Interview of v. Armando Saldate        December 21, 2009

Page 83

1        A.    I wouldn't even guess that he did or didn't.

2   I wouldn't even think about it.

3        Q.    And you chose not have him present with you

4   when you interrogated Debra?

5        A.    Yes.

6        Q.    Did you ask him to stay outside?

7        A.    I probably did, like I asked her aunt to be

8   outside.

9        Q.    You wanted to be with her alone, just you and

10  her?

11       A.    Absolutely.

12       Q.    I don't have anything -- a couple other

13  questions.

14             Does anybody else have anything at this

15  point?

16             Constable Saldate, is there anything that I

17  haven't asked you that's new that you have thought of

18  that you haven't told us about today that you can think

19  of?

20       A.    No.  I've told you a couple new things about

21  this disciplinary thing.  We've already discussed that.

22  Other than that, no.

23       Q.    Everything is basically the same that you've

24  testified to before?

25       A.    Yes, it is.

Griffin & Associates           602.264.2230        pgriffin@griffinreporters.com

**MILKE_NSB004733**

Exhibit 1A

Page 84

1     Q.    There's really no difference in what your

2  testimony has been?

3     A.    Of course, that's your determination.

4     Q.    Right.

5     A.    But I think it is.  I think it's basically

6  what I testified before.  I didn't get a chance to

7  review everything, but it's as I recall it.  And some

8  things I didn't recall, I let you know that I didn't

9  independently recall them, and other things that I did

10  recall.  Yes, everything I've told you is.

11     Q.    What you have reviewed so far, it's all

12  accurate, and that's the way it was basically?

13     A.    That's the way it was.

14     Q.    And is there -- and I take it you're going to

15  review the rest of your stuff.  If something comes up --

16     A.    Well, I've been -- I've been instructed by

17  one of your attorneys to review the rest of the stuff.

18     Q.    Well, when you do your review, if there's

19  something else that independently comes up, will you

20  tell the AG's office about it so we can know what it is

21  before the hearing?

22     A.    Absolutely.

23     MR. KIMERER:  Anything else at this point?

24     MS. NGUYEN:  I don't have anything further.

25     MR. KIMERER:  Okay.  Thank you very much. I

MILKE_NSB004734

Exhibit 1A

Page 85

1     appreciate your coming.

2                MR. SALDATE:  Hey, no problem.

3                (Concluded at 11:46 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MILKE_NSB004735

Exhibit 1A

Page 86

1                      C E R T I F I C A T E

2

3           I, BARBARA H. STOCKFORD, Certified Court

4     Reporter in the State of Arizona, do hereby certify that

5     the foregoing pages constitute a full, true, and

6     accurate transcript of the proceedings had in the

7     foregoing matter, all done to the best of my skill and

8     ability.

9           WITNESS my hand this 23rd day of December

10    2009.

11

12                     _____

13                     BARBARA H. STOCKFORD, RMR/CRR/CCP
                       CCR NO. 50463

14

15

16

17

18

19

20

21

22

23

24

25

MILKE_NSB004736

Exhibit 1A