Page - 2

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 9-7-88 | 88-116757 |

| VICTIM'S NAME | LOCATION OF OCCURRENCE |
|---|---|
| MC KEE, DEBORAH | 3840 N. 43 AVENUE |

| OFFICER WRITING REPORT'S # | SUPPLEMENT # |
|---|---|
| DET. SALDATE #1875 | 88-116757.DOC/ORIGINAL. |

| DATE & TIME TYPED | BUREAU | CLERK |
|---|---|---|
| September 14, 1988    11:28 | GIB | A1724 |

Witness #1:     ENGELBERT PATRICK WAYNE
                W/M, ■■■■■B
                5818 W. Elm, 848-6718 (grandfather)
                (Supplied suspect's description)

Witness #2:

Witness #3:

Witness #4:     SIMPSON, GERALD
                W/M, ■■■■■5
                1820 E. Yale, 256-6960
                Unemployed
                (Found victim)

IL #1:          ENGELBERT PATRICK WAYNE
                W/M, ■■■■■0
                5818 W. Elm, 848-6718
                (Victim's father, took victim's children)

IL #2:          HARRISON KEITH R.
                B/M, ■■■■■
                3840 N. 43 Avenue #65
                (Described a person named "CUTMAN" who entered his
                apartment at approximately 1 AM on 9-6-88)

EXHIBIT 23
WIT: Saldate
DATE: 6-22-17
Sommer Greene, RPR, CRR

**REYNOLDS 001**

001613
MILKE NSB001776

Exhibit 1B

| TYPE OF REPORT | VICTIM | OFFICER | Page - 3 |
| HOMICIDE | MC KEE, DEBORAH | SALDATE #1875 | DR # 88-116757 |

**IL #3:**   NEAL, SHAWN
B/F, 27 years
3840 N. 43 Avenue #65
(Was inside her apartment when "CUTMAN" just walked
in uninvited. Two other persons were present and told
"CUTMAN" to leave)

**IL #4:**   RIVERS, DIANA LYNN
W/F,
3840 N. 43 Avenue #72
(Heard a woman yell rape at approximately 12:30 AM in
the area of the victim's apartment)

**IL #5:**   COMSTOCK, DEBORAH
W/F,
3840 N. 43 Avenue #80
Employer: Zebra II, 39 Avenue and Grand
(Last saw the victim at 12:30 AM, said the victim was
in her pajamas and all her kids were asleep. She
described victim as a prostitute and marijuana dealer.)

**IL #6:**   WATSON, LOIS
W/F,
3840 N. 43 Avenue #68, 269-3555
(Heard someone yelling from victim's apartment at
approximately 1 AM or 1:30 AM to "get the hell out of
here", "leave me alone", "no, no".

**IL #7:**   GIESLER, CHRISTINA
W/F,
3840 N. 43 Avenue #67
(Witnessed B/M enter victim's back patio)

**IL #8:**   "CUTMAN"
B/M, 20's,  6'3", 200#, blk, bro
3840 N. 43 Avenue #31

**Note:**   See supplements for further interviews.

**Fire Personnel:**   EP-24, R-15, C Shift
Captain GIBSON
Captain PACKENBUSH
Fireman SCOTT KING

Page - 4

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE #1875 | 88-116757 |

**Uniform Officers:**  J. MILLER #1892
Uniform patrol/Maryvale Precinct
(First on scene)

R.D. GAYTAN #4859
Uniform patrol/Maryvale Precinct
(Secured scene)

SGT. K. DUBOIS
Uniform patrol/Maryvale Precinct
(Entered scene, obtained victim's identification)

**Investigators:**
1.  ARMANDO SALDATE #1875
Homicide Detail/General Investigations Bureau
(Case Agent)

2.  ERNIE HAMRICK #1739
Homicide Detail/General Investigations Bureau
(Scene agent)

3.  BILLY BUTLER #1738
Homicide Detail/General Investigations Bureau
(Assisted at scene)

4.  MITCH REA #1605
Homicide Detail/General Investigations Bureau
(Assisted in interviews)

5.  RON HERMAN #1753
Sex Crimes Detail/General Investigations Bureau
(Assisted in interviews)

6.  LARRY ADDINGTON #3235
Sex Crimes Detail/General Investigations Bureau
(Assisted in interviews)

**Evidence Examiners:**
1.  M. STONE #A2842
Latent Print Examiner/Crime Lab
(Photos and prints)

2.  D. DEGLER #A2921
Evidence Technician/Crime Lab

**County Attorney:**  JIM RIZNER
County Attorney/Major Felony

**001615**
**MILKE NSB001778**

Exhibit 1B

Page - 5

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE #1875 | 88-116757 |

Attachments:     1.   Search warrant
2.   Diagrams

----------------------------------------------------------------------

On 9-6-88 between 0030 hrs and 0745 hrs, the victim DEBORAH MC KEE, W/F, 24 years, was strangled to death inside her apartment at 3840 N. 43 Avenue #69. At this time, the identity of the suspect is unknown, however, a witness described a black male as the suspect.

On 9-6-88 at approximately 0800 hrs, I was directed to proceed to 3840 N. 43 Avenue apartment #69 to assume this death investigation. At approximately 0821 hrs, I arrived and found the scene secured with crime scene tape and several uniformed officers posted to secure the area. I first contacted SGT. RICHARDSON who then directed DET. HAMRICK to assume the scene investigation and DET. BUTLER to assist. I was then directed as the Case Agent and a briefing was then held.

During the briefing, we were told that a subject identified as GERALD SIMPSON had arrived at the victim's apartment at approximately 0745 hrs and found the victim dead. GERALD also found that the victim's three children were unhurt and he then called the fire and police departments. At this time, the cause of death had not been determined and very little information was available.

Later, GERALD told detectives that he had been the victim's boyfriend for some time, however, he had not seen the victim for the past 3 days. He said he did call her on a regular basis and talked to her last night at approximately 2130 hrs. At that time, he told the victim that he would pick her up at approximately 8:00 AM because of a city court hearing she had regarding a recent prostitution arrest. GERALD also said that he is currently living with a lady and that he and this lady have a six month old child, however, this lady knows about his affair with the victim.

Upon his arrival this morning, GERALD said he knocked on the victim's door and that the victim's son PATRICK opened the door and told him that his mother would not get up. PATRICK then directed GERRY to the upstairs bedroom and when GERRY entered the bedroom, he noticed the victim lying on the floor obviously dead. GERALD then called the fire and police departments.

GERALD also told police that he had spoken to the victim's son PATRICK and that he had told him that a black male had forcibly entered their apartment early this morning and that the black male had grabbed his mother and forcibly taken her upstairs. PATRICK told him that he did not know this black male and had not seen him before.

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE #1875 | 88-116757 |

An interview with CHRISTINA GIESLER revealed that she had been babysitting in apartment #73 for the manager. She was in her upstairs apartment when she overheard a fight occurring to the rear of her building. It was approximately 12:30 AM or 1:00 AM when she then observed a very tall black male wearing gray sweatpants and a gray sweatshirt enter the back patio of apartment #69 through the rear gate. She remained looking towards this location, but never saw the black male exit. She assumed the black male entered apartment #69, the victim's apartment.

An interview with LOIS WATSON, who lives in apartment #68, revealed that at approximately 1:00 or 1:30 AM, she woke up after hearing noises coming from apartment #69. She heard someone yelling but could not tell whether it was a male or female. That person yelled "get the hell out of here", "leave me alone", and "no, no". LOIS said she did not call the police and then went back to sleep.

At approximately 2:30 AM, LOIS woke up to let her dog outside and she heard no further noises coming from apartment #69. At approximately 4:30 AM, LOIS was again up with her husband who was getting ready to go to work. LOIS said at that time, she observed a Mexican male walk past the front of her apartment. This Mexican male was later identified as MARK MENDOZA, who was just leaving apartment #70 after fighting with his girlfriend who was identified as ROSALEE SALAZAR.

DEBORAH COMSTOCK, who was interviewed, related that she was a good friend of the victim's and last saw the victim this morning at approximately 12:30 AM. She said the victim's kids were already asleep and that the victim was dressed in her pajamas. At approximately 1 AM, DEBORAH said she was going to go back to the victim's apartment, but then noticed that the lights were off and assumed that the victim was already asleep.

DEBORAH also identified the victim as being a prostitute on occasion and said that the victim also dealt in marijuana. When DEBORAH was questioned about black males she identified a subject she knew as "CUT KNIFE" and said that this black male had been responsible for a burglary at her apartment and was causing problems in the complex. She described him as a black male in his 20's, approximately 6'3", muscular build with a short afro and tattoos. She said she believed this subject lived in apartment #31.

DET. RON HERMAN contacted a KEITH HARRISON, who identified a person known to him as "CUTMAN" and described him as being approximately 6'2", 200 pounds, and a member of a Crips gang. KEITH told DET. HERMAN that he was mad at CUTMAN and suggested to DET. HERMAN that CUTMAN was probably the suspect. He said he last saw CUTMAN dressed in gray khaki shorts, a gray shirt and British Knights shoes which were black and white in color. KEITH

001617
MILKE NSB001780

Page - 7

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE #1875 | 88-116757 |

told DET. HERMAN that his girlfriend SHAWN NEAL had told him that CUTMAN had entered his apartment at approximately 1:00 AM that morning uninvited. He said he believes CUTMAN was going to sexually assault his girlfriend, however, there were several people inside the apartment. He said "CUTMAN" had been staying in apartment #31.

KEITH also told DET. HERMAN that Tuesday or Wednesday of last week, he had observed CUTMAN taking the screen off of apartment #66 and described the occupant of apartment #66 as being a female who was often alone.

DET. HERMAN also contacted SHAWN NEAL and BETTY DREAMS who told him that they were inside their apartment #65 when a person they described as CUTMAN entered the apartment uninvited. They identified him wearing gray shorts and possibly a tan shirt. They both said that they immediately chased him out of the apartment.

Detectives attempted to identify "CUTMAN", however, everyone only knew him by his nickname. Information was developed that CUTMAN had been staying with his girlfriend, JUNE HAMILTON, in apartment #31.

During the scene investigation, the body of the victim was found in the southeast bedroom of the upstairs portion of the apartment. The body was lying on the carpeted floor on its right side. The top portion of the body was clothed in a sleeveless pajama top while the lower portion of the body was nude. On the carpeted floor next to the closet doors were observed the victim's panties which were apparently taken off of her. Tied around the victim's neck was a knotted cloth material which was used to strangle her. Also around her neck was one of the legs of her pajama bottoms which had been ripped apart. Later the ligature that was used was determined to be the fitted sheet to a crib mattress which was on the crib that was next to the victim's head.

DET. HAMRICK directed Latent Print Examiner STONE to photograph and print the entire apartment. He was assisted by Evidence Technician DEGLER. DET. HAMRICK also red tagged the victim's body and obtained Whitney Murphy mortuary from the rotation list. The victim's body was then transported to the Medical Examiner's Office for his examination.

On 9-7-88, at approximately 9:00 AM, an autopsy was conducted on the victim's body by DR. KARNITSCHNIG who is the chief Medical Examiner for Maricopa County. The autopsy was conducted at 106 S. 6 Avenue at the Medical Examiner's Office. After the autopsy, DR. KARNITSCHNIG determined that the victim died of manual and ligature strangulation and also found that she had contusions to the head and both shoulders. He also found that the victim had been struck in the face and had suffered two broken teeth. DR. KARNITSCHNIG then determined that the death was a homicide.

For further details see attached supplements.

REYNOLDS 006

001618
MILKE NSB001781

Exhibit 1B





001620
MILKE NSB001783

Exhibit 1B

Page - 1

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 9-7-88 | 88-116757 |

| VICTIM'S NAME | LOCATION OF OCCURRENCE |
|---|---|
| MC KEE, DEBORAH | 3840 N. 43 AVENUE |

| OFFICER WRITING REPORT'S # | SUPPLEMENT # |
|---|---|
| DET. A. SALDATE #1875 | 88-116757.10L |

| DATE & TIME TYPED | BUREAU | CLERK |
|---|---|---|
| September 20, 1988    15:19 | GIB | A1724 |

**SECOND INTERVIEW:**      CHRISTINA GIESLER

Line-Up:
1. Unknown black male
2. LAMONT REYNOLDS   "CUTMAN"
3. Unknown black male
4. Unknown black male
5. Unknown black male

---

On 9-15-88 at approximately 1243 hrs, DET. RICHARD FUQUA and myself contacted CHRISTINA GIESLER at 3840 N. 43 Avenue in apartment #73. The purpose of our contact was to show CHRISTINA a photographic line-up which I had compiled which included the photograph of LAMONT REYNOLDS, B/M, AKA "CUTMAN". The interview of CHRISTINA took place in the living room of the apartment and the only ones present were myself, DET. FUQUA and CHRISTINA.

I first asked CHRISTINA if she felt she could identify the subject she saw walking into the back patio of the victim's apartment and she responded that she could. I then removed a photographic line-up consisting of five color photographs in a stack with the second photo being that of LAMONT REYNOLDS, AKA CUTMAN. I then explained to CHRISTINA that the person she saw enter the rear patio of the victim's apartment may or may not be pictured in the photographic line-up and I did not want her to feel obligated that she did have to pick a photograph from the line-up. CHRISTINA said she understood

I then handed her the stack of five photographs and immediately viewed the first photograph. After doing this, she removed the first photograph from the stack and handed the photograph to me and then viewed the second photograph. She then studied this photograph for several seconds, took it off the top of the stack, held it in her right hand and then asked me if she could still look at the rest of the photographs, even though she thought she knew who it was. I then said she could continue and she then placed the second photograph on top of a pillow which she had on her lap. She then looked at the third photograph and did the same as she had done with photograph #2 and laid it on the pillow. She then looked at photograph #4 and #5 and then handed these photographs back to me. CHRISTINA then picked up both photograph #2 and #3 and immediately handed photograph #3 back to me and kept photograph #2. She then looked at it for approximately 1 or 2 seconds and then gave it back to me and said that

**REYNOLDS 009**

**001621**
**MILKE NSB001784**

Exhibit 1B

Page - 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE #1875 | 88-116757 |

this was the man she saw enter the rear patio of the victim's apartment. I asked CHRISTINA if she was positive and she said that she was. I then suggested to CHRISTINA that for her own benefit she should initial the back of the photograph and put down what she felt about it. CHRISTINA then put on the rear of the photograph that she was positive and then initialed the photograph.

The photographic line-up was later retained by me and will be retained in the Homicide files for future court use.

Investigation Continuing.

**REYNOLDS 010**

**001622**
**MILKE NSB001785**

Exhibit 1B

Page - 1

| TYPE OF REPORT HOMICIDE | | SUPPLEMENT DATE 9-7-88 | DR # 88-116757 |
|---|---|---|---|
| VICTIM'S NAME MC KEE, DEBORAH | | LOCATION OF OCCURRENCE 3840 N. 43 AVENUE | |
| OFFICER WRITING REPORT'S # DET. A. SALDATE #1875 | | SUPPLEMENT # 88-116757.10N | |
| DATE & TIME TYPED September 20, 1988     15:20 | BUREAU GIB | CLERK A1724 | |

INTERVIEW:           THURMAN, SANDEE
                     W/F,         2
                     6675 Hermosa Vista, Mesa

Cross Index:   DR 88-121316
               Rape  3840 N. 43 Avenue #10
               7-31-88, 0100 hrs
               Suspect/s:  "CUTMAN", unknown black male

----------------------------------------------------------------------

On 9-15-88 at approximately 1851 hrs, I contacted SANDEE THURMAN at 620 W. Washington. The purpose of my contact was to interview her in regards to a possible rape that took place at 3840 N. 43 Avenue in apartment #10 in which she was the victim.

During our interview, SANDEE said that she had gone to a friend's apartment, which she identified as apartment #10 at the El Sereno Apartments at 3840 N. 43 Avenue. She believed it was July 30 and the early morning of July 31 when she was at the apartment. While she was there, she met several black males, including a subject who identified himself as CUTMAN and she described him as being a very large black male, who was muscularly built and young. Another subject she met was a person who identified himself as JOE who was a shorter subject, dark skinned in his mid 20's. She also met a subject who she identified as TONY, who is a black male, and said that TONY was very distinctive because he was bow-legged. She also met several other blacks, including one subject who identified himself as ROBERT. She said during the night they, meaning her friend and the black males, had been doing marijuana and cocaine but that she had not used any that night.

At approximately 1 AM, SANDEE said she was forcibly taken to the bathroom by the subject she identified as CUTMAN and a smaller subject who she could not identify by name but that CUTMAN told her that it was his homeboy and made reference to him as being like a brother to him. SANDEE said that CUTMAN forced her to have vaginal and oral sex with him while his friend stood by and watched. After he finished, he then told his friend that it was his turn and when she refused, he told her that he would kill her. She said the friend also had vaginal sex with her and after they finished they threatened her and made her say out loud that she had not been raped and that she had had sex with them voluntarily.

**REYNOLDS 011**

Exhibit 1B

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE #1875 | 88-116757 |

SANDEE said she has not reported this incident because of her fear of the
black males at the apartment complex. She said she doesn't live at the
apartment complex however, they told her that they knew where she lived.
SANDEE said that the whole apartment complex was in fear of these subjects
and said that everyone at the apartment complex knew that the subjects
were Crip gang members from California.

For further information regarding the specifics about the rape, see DR#
88-121316. SANDEE has indicated she does not wish to prosecute and a rape
report was made for record only.

Investigation Continuing.

**REYNOLDS 012**

**001626**
**MILKE NSB001789**

Exhibit 1B

Page - 1

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 9-7-88 | 88-116757 |

| VICTIM'S NAME | LOCATION OF OCCURRENCE |
|---|---|
| MC KEE, DEBORAH | 3840 N. 43 AVENUE |

| OFFICER WRITING REPORT'S # | SUPPLEMENT # |
|---|---|
| DET. WHEELIS #2379 | 88-116757.14C |

| DATE & TIME TYPED | BUREAU | CLERK |
|---|---|---|
| September 16, 1988    15:08 | GIB | A1724 |

Witness:     ANTHONY JAMES RUSSELL
             W/M,           )
             3840 N. 43 Avenue #36, 352-0625
             Not employed

------------------------------------------------------------------------

On 9-6-88 immediately after I had contacted TERRI LYNN GRINDER, I spoke
with ANTHONY JAMES RUSSELL. ANTHONY explained he was TERRI's roommate and
also knew the victim socially. He stated that the victim had had a number
of boyfriends and he had seen a few males coming in and out of the
victim's apartment at different times but did not know any of their names,
other than the victim's ex-roommate GARY GRAHAM.

ANTHONY stated that he last saw the victim at approximately 10:30 PM on
9-5-88 when he went to the store for her and came back with a couple of
items from the store. He stated that at the time he saw her, she was alone
and dressed in levis and a dark colored blouse but he immediately left and
could give no further information about what happened with the victim. At
that time, my interview with ANTHONY JAMES RUSSELL was terminated.

**REYNOLDS 013**

001629
**MILKE NSB001792**

Exhibit 1B

Page - 1

| TYPE OF REPORT HOMICIDE | SUPPLEMENT DATE 9-7-88 | DR # 88-116757 |
|---|---|---|
| VICTIM'S NAME MC KEE, DEBORAH | LOCATION OF OCCURRENCE 3840 N. 43 AVENUE | |
| OFFICER WRITING REPORT'S # DET. WHEELIS #2379 | SUPPLEMENT # 88-116757.14K | |
| DATE & TIME TYPED September 16, 1988    15:10 | BUREAU GIB | CLERK A1724 |

**Search Warrant:**

Signed by JUDGE D. BRAUN, East Phoenix #1 Justice of the Peace at 8:57 PM

Affiant:   DET. MICHAEL W. WHEELIS #2379

Served:    At 3840 N. 43 Avenue #31 at 2121 hrs, by DET. M.W. WHEELIS and
           DET. R. MILLS #2781

Secured:   At 2146 hrs


**Items Seized:**        (1)  Gray khaki pants, one pair
                         (2)  One purple handkerchief
                         Impounded at 620 W. Washington

-------------------------------------------------------------------

On 9-6-88 I, along with DET. MILLS, served a search warrant at 3840 N. 43
Avenue #31. There were two persons present at the service. JOE HAMILTON
and JUNE HAMILTON, both residents of the apartment were present. The
service was peaceful with the cooperation of both JOE and JUNE. The listed
items were seized and impounded by me.


**REYNOLDS 014**

001639
**MILKE NSB001802**

Exhibit 1B

Page - 1

| TYPE OF REPORT HOMICIDE | SUPPLEMENT DATE 9-7-88 | DR # 88-116757 |
| VICTIM'S NAME MC KEE, DEBORAH | LOCATION OF OCCURRENCE 3840 N. 43 AVENUE #69 | |
| OFFICER WRITING REPORT'S # DET. M. REA #1605 | SUPPLEMENT # 88-116757.09A | |
| DATE & TIME TYPED September 7, 1988    16:36 | BUREAU GIB | CLERK A1724 |

IL:    COMSTOCK, DEBORAH
       W/F, ▓▓▓6
       3840 N. 43 Avenue #80, no phone
       Employer: Zebra II, 39 Avenue and Grand

IL:    GLESGE, KRISTY
       W/F, ▓▓▓
       8845 N. 28 Avenue, no phone
       Employer: Zebra II, 39 Avenue and Grand

IL:    MORELL, VICTOR
       2421 N. 20 Drive, no phone
       Employer: Kentucky Fried Chicken
                 35 Avenue and Camelback

------------------------------------------------------------------------

On 9-6-88 I was contacted by SGT. BRYANT and directed to proceed to 3840
N. 43 Avenue to assist with this investigation. Upon arrival, I attended a
briefing on the known facts of the case. Following this briefing, I was
directed to attempt to locate neighbors who may have information relevant
to this investigation.

At approximately 0930 hrs, I contacted the three listed Investigative
Leads in apartment #80.

Apartment #80 is located at the south end of the building west of the
victim's apartment. The principal resident of apartment #80 is DEBORAH
COMSTOCK.

I interviewed DEBORAH COMSTOCK, KRISTY GLESGE and VICTOR MORELL on the
sidewalk in front of apartment #80. All three stated that they know the
victim well.

DEBORAH COMSTOCK stated that she was at the victim's apartment between
midnight and 12:30 AM the previous evening. On that occasion, the victim
and her children were alone in the apartment. DEBORAH stated that the
victim's children were asleep and the victim was wearing a nightgown. At
about 1:00 AM, DEBORAH started to return to the victim's apartment and
noticed that all the lights were out. DEBORAH assumed that the victim was
in bed, and did not attempt contact.

REYNOLDS 015

001650
MILKE NSB001813

Exhibit 1B

Page - 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | M. REA #1605 | 88-116757 |

DEBORAH stated that the victim worked as a prostitute on occasion, and was a marijuana dealer. DEBORAH refused to name the victim's marijuana connection, but hinted that it was a man named GARY or JERRY. DEBORAH stated that GARY or JERRY is a Caucasian male in his twenties, with long reddish blond hair which he wears in a pony tail, and a mustache. GARY/JERRY drives an orange Pinto with no windshield. GARY/JERRY was reportedly planning on moving into the victim's apartment in the next day or two.

DEBORAH pointed out the man who discovered the victim's body and stated that he was not really a boyfriend of the victim, but the victim was using him to pay some of her bills apparently in exchange for services.

VICTOR MORELL stated that GARY/JERRY was supposed to have been at the victim's residence the previous evening and supposedly carries a gun.

KRISTY stated that she had witnessed a fight in the parking lot the previous evening between a black male and a black female. KRISTY stated that she was at the victim's apartment at about 8:30 PM the previous evening. At that time, JERRY/GARY was at the victim's apartment and everything appeared peaceful.

KRISTY stated that another GARY who works at JB's Restaurant lived with the victim until a couple of days ago, at which time he moved out.

When questioned about black males, DEBORAH stated that a man known to her as "CUT KNIFE" causes problems at the complex and had burglarized her apartment. CUT KNIFE reportedly lives in apartment #31 and is described as a B/M, early 20's, 6'3", muscular build, short afro and tattoos.

All three Investigative Leads expressed a reluctance to talk to the police out of fear of reprisals from other tenants.

REYNOLDS 016

001651
MILKE NSB001814

Exhibit 1B

Page - 1

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 9/7/88 | 88-116757 |

| VICTIM'S NAME | LOCATION OF OCCURRENCE |
|---|---|
| MC KEE, DEBORAH | 3840 NORTH 43 AVENUE |

| OFFICER WRITING REPORT'S # | SUPPLEMENT # |
|---|---|
| DET. R. HERMAN 1753 | 88-116757.A |

| DATE & TIME TYPED | BUREAU | CLERK |
|---|---|---|
| September 7, 1988    11:49 PM | GIB | A1608 |

I.L. #1:   KEITH R. HARRISON, B/M, ▉▉▉
           3840 N. 43 Avenue #65

I.L. #2:   ROBERT, B/M
           5'8" - 5'9", long hair
           Girlfriend's name is TERRY

I.L. #3:   CUTMAN, B/M, 19-20
           6'2", 200 + lbs, dark complexion, short natural hair
           Wearing:   British Knight shoes, black and white
           Tattoos:   Crips on back of hand
                      GW on his back in large letters - stands for
                      Grape Street Watts
           Clothing:  Gray Khaki shorts
                      Gray shirt with the California Raisins

On 9/6/88 I contacted I.L. #1 KEITH HARRISON at his apartment, 3840 North
43 Avenue #65.  At the time I made contact with MR. HARRISON, I advised
him that I was a Phoenix Police Detective and was investigating a homicide
that had occurred in the area.  KEITH indicated that he was aware of what
had occurred and would cooperate in the investigation.

KEITH's girlfriend had apparently told KEITH that a subject known to him
as CUTMAN had entered their residence at about 1:00AM on 9/6/88.  This
upset KEITH and he felt that CUTMAN was probably going into the apartment
to sexually assault his girlfriend.  Because of this he said that he would
tell us anything we wanted to know about CUTMAN.

KEITH described CUTMAN's tattoos and said that he was a member of the
Crips gang.  He said that he had seen CUTMAN on the evening of 9/5/88 and
at that time he was wearing gray khaki shorts and a gray shirt with the
California Raisins on the front.  KEITH was asked if he knew what kind of
shoes CUTMAN was wearing and he said that he was wearing British Knights.
These shoes are apparently popular with the Crips gang.

KEITH said that on either Tuesday or Wednesday of last week he observed
CUTMAN taking the screen off of Apt. #66, which is just west of his
apartment.  At that time he confronted CUTMAN and and asked him what he
was doing there.

**REYNOLDS 017**

**001656**
**MILKE NSB001819**

Exhibit 1B

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | HERMAN 1753 | 88116757 |

KEITH did not know what CUTMAN's real name was but said that we could probably find out because he was involved in an accident either Saturday or Sunday at 43 Avenue near Encanto. He was the driver of a maroon Pontiac and the Pontiac had hit a wall.

KEITH was asked where CUTMAN lived and he said that CUTMAN was staying in Apt. #31.

KEITH was told we were also interested in identifying a B/M named ROBERT. KEITH said that he knew ROBERT but did not know his last name. He went on to say that he and ROBERT were together up until 2:30 or 3:00AM. At that time ROBERT left with his girlfriend TERRY. They left in a friend's white Camaro.

KEITH HARRISON could add nothing further to this report.

**REYNOLDS 018**

**001657**
**MILKE NSB001820**

Exhibit 1B

Page - 1

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 9/7/88 | 88-116757 |
| VICTIM'S NAME | LOCATION OF OCCURRENCE | |
| MC KEE, DEBRA | 3840 NORTH 43 AVENUE | |
| OFFICER WRITING REPORT'S # | SUPPLEMENT # | |
| DET. L.W. ADDINGTON 3235 | 88-116757.B | |
| DATE & TIME TYPED | BUREAU | CLERK |
| September 14, 1988    11:45 AM | GIB | A1608 |

PENDING.

WITNESS:    ENGELBERT, PATRICK WAYNE, W/M, ███████
            3840 N. 43 Avenue, Apt. #69
            Five year old son of victim

PATRICK's DESCRIPTION OF SUSPECT:

            B/M, stated he was old due to wrinkles on his face and legs.
            Described as taller than his father (father approximately 6').
            Has bushy hair on top of head that also ran down to mid-back.
            Large beer belly described as sticking out.  Clean shaven and no
            glasses.  PATRICK noticed two heart shaped tattoos, one on each
            shoulder.  One had the words "I Love You" inside, N.F.I. on
            other tattoo.  Possibly had additional tattoo on one of the
            forearms, N.F.I.

            Suspect spoke with high voice, likeness of a woman's voice, and
            moved his hands, like signing, when speaking.

Wearing:    Bright orange shorts, white knee high socks with yellow or
            orange colors within them.  Brown shoes either leather or tennis
            shoes.  Approximate inch wide belt, dark brown with dark colored
            buckle.

I.L. #1:    GRAHAM, GARY LINN, W/M, 1███████8
            4132 W. Osborn, Apt. #2, n/p
Employed:   JB's Restaurant
            43 Avenue & Indian School, 269-3724
            Knew a B/M that closely matched PATRICK's description.

REYNOLDS 019

001661
MILKE NSB001824

Exhibit 1B

| TYPE OF REPORT | VICTIM | OFFICER | Page - 2 DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBRA | ADDINGTON 3235 | 88116757 |

**GRAHAM's DESCRIPTION:**

B/M, 6', 168-170 lbs., black hair that runs down the back to approximately 4th spinal column bone. Has protruding stomach. Has two tattoos, one on each shoulder. First one is a scorpion that looks like it's in a mirror with squiggly lines on the side. The latter described with roses, vines and a ribbon. Has known this person to wear orange riding shorts. Also related that this person, when fooling around, sometimes speaks in a high pitched voice similar to Howie Mandell (comedian).

Related that he has acne scars on his face and neck. Stated this person was last seen two weeks previously and had lived in one of the following apartments: 57,58, 59, or 60.

**I.L. #2:**   JOHNSON, TONY DEON, B/M, ▩
3840 N. 43 Avenue, Apt. #59, n/p
Unemployed
Was contacted in regards to GRAHAM's description. TONY stated a man, although much shorter, lived in Apt. #40 within the complex. First name of RON only.

**I.L. #3:**   HAWKINS, RUNETTE, B/F, ▩
3840 N. 43 Avenue, Apt. 40, n/p
Unemployed
Wife of RON HAWKINS.
Stated her husband wasn't home but worked for Hamco Personnel located just south of McDowell on Central Avenue. Ph 249-6794.

---

On 9/6/88 at 7:45AM, I was contacted by my immediately supervisor, SGT. LEE BENNINGTON, and he wanted me to assist the Homicide Detail on a homicide that just had occurred at 3840 North 43 Avenue. I was informed that a W/F named DEBRA McKEE had just been murdered early this morning or last night and it was felt that her children had been with her when this murder had taken place.

I was requested to proceed to the North 43 Avenue address and contact the children to try and obtain any statement they might be able to give.

On 9/6/88 at 8:35AM, I contacted DET. SGT. SIL ONTIVEROS and he explained to me that early this morning a boyfriend of the listed victim, had went over to Apt. #69 and had talked with the children and the children had explained to him that mommy was upstairs and they could not wake her up. At that time the boyfriend then proceeded upstairs and found the victim DEBRA McKEE to be deceased and then contacted the police.

**REYNOLDS 020**

**001662**
**MILKE NSB001825**

Exhibit 1B

| | | | Page - 3 | |
|---|---|---|---|---|
| TYPE OF REPORT HOMICIDE | VICTIM MC KEE, DEBRA | OFFICER ADDINGTON 3235 | DR # 88116757 | |

SGT. ONTIVEROS then explained to me that the victim's three children were now in the manager's apartment #73. SGT. ONTIVEROS also explained that he felt the ages of the children were 5, 3, and 2.

I then contacted the manager inside her apartment and explained to her who I was and why I would want to talk with the children. The manager stated the children were upstairs and I then went upstairs and contacted the oldest named PATRICK WAYNE ENGELBERT. At that time I explained to PATRICK that I was a police officer and that I would like to ask him a few questions and PATRICK readily agreed. It was apparent to me that PATRICK, by his playing, did not know the gravity of the situation that was unfolding around him.

I asked PATRICK if it was okay if we went out to my police vehicle so that I could ask him some questions and PATRICK agreed.

On 9/6/88 at 8:45AM, I then asked PATRICK the following questions:

I/O: PATRICK, do you know when you were born?
W:   March 2nd.

I/O: How old are you?
W:   Five.

I/O: Who lives with you in your apartment?
W:   Just my mom and no one else.  My brother and sister, they got
     visitation.

I/O: What is your apartment number?
W:   69.

I/O: Who was home last night when you went to bed?
W:   Me and my mom, CATHY and JUNIOR.

I/O: And CATHY and JUNIOR are your brother and sister?
W:   Yeah.

I/O: When did you go to bed last night?
W:   8 o'clock.

I/O: Were you watching anything on TV when you went to bed?
W:   Gary Shandling Show.

I/O: You went to bed after that show?
W:   Yeah, this man came in and turned the TV off.

I/O: Why did this man turn the TV off?
W:   I don't know, he turned it off and all the lights.  And he left
     the door open.

**REYNOLDS 021**

**001663**
**MILKE NSB001826**

Exhibit 1B

| TYPE OF REPORT HOMICIDE | VICTIM MC KEE, DEBRA | Page - 4 OFFICER ADDINGTON 3235 | DR # 88116757 |
| --- | --- | --- | --- |

I/O: Do you know the name of this man?
W:   No.

I/O: Did your mommy know him?
W:   No, she be sleeping on the ground and he started dragging her up the stairs.

I/O: How did this man get into your apartment last night?
W:   The front door was locked and the rear door was locked but he broke in the rear door.  But it still locks, maybe he had a key.  There were ten men that came in last night.

I/O: What do you mean, ten men?
W:   They just came in, zoop, zoop, zoop.

I/O: Where was your mom when this man started dragging her?
W:   On the floor right by my brother's bike.  He grabbed her by the hair and on her leg and picked her up.  She almost fell, she dropped one step.

I/O: Did he grab her hair right when you went to bed?
W:   Yeah, he grabbed her by the hair and leg.

I/O: What did your mom say when this man grabbed her?
W:   Nothing.

I/O: She didn't say anything?
W:   No.

I/O: You saw this man grab your mom?
W:   Yeah.

I/O: Where did this man take your mom?
W:   Upstairs.

I/O: Did your mommy want to go upstairs?
W:   Shook his head no.

I/O: How do you know she didn't want to go upstairs?
W:   I don't know.  He made bruises on her face and on her legs.

I/O: Was your mommy yelling at this man?
W:   No.

I/O: Was your mommy awake?
W:   No.

REYNOLDS 022

001664
MILKE NSB001827

Exhibit 1B

| TYPE OF REPORT HOMICIDE | VICTIM MC KEE, DEBRA | Page - 5 OFFICER ADDINGTON 3235 | DR # 88116757 |
|---|---|---|---|

I/O: How do you know?
W:   Because she takes pain pills and she never wakes up.  And he stole
     some stuff from my room and he took some pillows and put them where
     the shoes are.

I/O: What color was this man?
W:   Black.

I/O: Do you know his name?
W:   No.

I/O: Ever seen him before?
W:   No.

I/O: Never even one time?
W:   No.

I/O: Would you know who he was if you saw him again?
W:   Yeah.

I/O: Have you ever seen him around the apartment complex?
W:   No, never seen him before last night.

I/O: How old is this man?
W:   I don't know.  He looked real old.

I/O: Old like your grandpa?
W:   Yeah.

I/O: Who is the oldest person you ever saw?
W:   My grandpa.

I/O: And this man was that old or not that old?
W:   He was old.  He had wrinkles on his face and on his legs.  Because
     he had shorts on.

I/O: What color shorts?
W:   Orange.

I/O: Bright orange or not so bright?
W:   Bright, bright orange.

I/O: Did he have a shirt on?
W:   No, he didn't.  I saw his chest.

I/O: Did he come in with no shirt on?
W:   Yeah.

I/O: Who else saw this man?
W:   My brother and sister were asleep.

**REYNOLDS 023**

**001665
MILKE NSB001828**

Exhibit 1B

| TYPE OF REPORT HOMICIDE | VICTIM MC KEE, DEBRA | Page - 6 OFFICER ADDINGTON 3235 | DR # 88116757 |
|---|---|---|---|

I/O: They didn't see him?
W:   No.

I/O: What did this man say?
W:   He said he was one of mom's friends and took her upstairs.

I/O: What kind of shoes did this man have on?
W:   Leather and they looked brown colored.

I/O: How long was this man in your apartment?
W:   About an hour.

I/O: Did you see this man leave?
W:   Yeah, he came out the back way and he came in the back way.

I/O: Did he do anything else?
W:   He took my bed and he pushed it on the closet and then he put it back.

I/O: Was this man looking for something?
W:   I don't know, I was downstairs.

I/O: What color was this man's hair?
W:   Black.

I/O: Did he have a mustache?
W:   No.

I/O: Did he have any long sideburns or a beard?
W:   No.

I/O: Was he wearing glasses?
W:   No.

I/O: How tall was this man, was he taller than your daddy?
W:   Taller.

I/O: Taller than me or not that tall?
W:   Taller.

I/O: Did this man have a car?
W:   No.

I/O: Did this man move anything else other than your bed?
W:   No, I heard some jumping on the bed and something fell, I don't know what.

I/O: Did you hear a car leave?
W:   I heard a car leave, it was white.  I couldn't see it in the dark real good.

**REYNOLDS 024**

**001666**
**MILKE NSB001829**

Exhibit 1B

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBRA | ADDINGTON 3235 | 88116757 |

I/O: Did this man take anything from your apartment?
W: No, but I heard little baggies, like zip-lock bags, shaking around.

I/O: Where did you hear these baggies shaking?
W: He was outside the back door.

I/O: Does your mommy smoke marijuana?
W: No, she smokes Marlboro 100's.

I/O: You didn't hear this man say anything else?
W: Just that he was a friend and he told my mom that he was a friend, too. That's all he said.

I/O: Did he say anything when he left?
W: No, all he did was turn out the lights and turn off the show.

I/O: I thought he did that when he came in?
W: No, when he left.

I/O: When he took your mom upstairs where were you?
W: In the living room.

I/O: The whole time?
W: Yeah.

I/O: Did you get to watch all of Gary Shandling?
W: No, he turned it off. I only saw the first part.

I/O: How did you know your sister and brother didn't see this man?
W: Because they were sleeping.

At this point it appeared PATRICK was getting a little fatigued so I went back out and contacted the command post. At that location I informed SGT. RICHARDSON and SGT. ONTIVEROS about the description I had tentatively got from PATRICK. It was then decided after a few minutes that I would go in and attempt to talk with PATRICK again.

At approximately 9:30AM, I went again into the manager's apartment and again located PATRICK upstairs playing with his brother and sister. I again asked PATRICK if I could talk with him again and he stated I could. I then brought PATRICK down to the living room area of the manager's office and again went over the description he had given me of the black man that had come into his apartment last night. As I went over the description with PATRICK again, PATRICK said that the man had been wearing some socks that went up as far as his knees and had a little orange and white in them. He also stated that he believed the shoes this black man was wearing were tennis shoes but they were brown.

**REYNOLDS 025**

001667
MILKE NSB001830

Exhibit 1B

| TYPE OF REPORT HOMICIDE | VICTIM MC KEE, DEBRA | OFFICER ADDINGTON 3235 | Page - 8 DR # 88116757 |
|---|---|---|---|

I then asked PATRICK the following further questions:

I/O: Are you in school yet?
W:   Kindergarten, it's across the street.  I'm in number 3.

I/O: Do you know the difference between telling the truth and a lie?
W:   Yeah.

I/O: What is the difference?
W:   I have to tell the truth or you'll get a spanking or have to go in the corner.

I/O: How long was this black man's hair that had come into your apartment last night and took your mommy upstairs?
W:   There was some up here.  He then pointed to the front forehead of his own head.  He then leaned forward in the car seat and stated down to here.  At that point he put his hand down to the center part of his back.

I/O: Like a woman's hair?
W:   Yeah.

I/O: How far did it go down?
W:   Right to here.  He again pointed to his mid-back.

I/O: His hair was that long?
W:   Yeah, he had real long hair.

I/O: Do you know your ABC's yet?
W:   Yeah.

I/O: Can you tell me your ABC's?

At this point PATRICK then went through his ABC's however he made about 3 or 4 mistakes in the normal sing-song method.

I/O: What color shorts did this black man have?
W:   Orange shorts.

I/O: What is your mommy's last name?
W:   ENGELBERT.

I/O: What is your dad's name?
W:   JOE, JOSEPH ENGELBERT.

I/O: Was this black man that came into your house real big or little or in the middle?
W:   He had a real fat stomach, it was sticking out.

**REYNOLDS 026**

**001668**
**MILKE NSB001831**

Exhibit 1B

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBRA | ADDINGTON 3235 | 88116757 |

At this point I again decided to let PATRICK rest and I again went out to the command post.

Approximately thirty minutes later I again contacted PATRICK inside the manager's apartment and this time I again found him playing with his brother and sister.  I then took PATRICK into an adjoining bedroom of the manager's apartment and continued asking him the following questions:

I/O: You said last night that ten people came into your apartment?
W:   Yep.

I/O: Who was the last person to come in?
W:   The black guy.

I/O: Which black guy came in last?
W:   The one with the leather shoes.

I/O: The one that took your mommy upstairs?
W:   Yeah.

I/O: Did this black man have a belt on?
W:   Yeah, it was brown.

I/O: Was it bigger or smaller than my belt?

It shall be noted that my belt had a width of approximately 1" and is medium brown in color.

W:   Like yours except darker.

I/O: What color was the buckle?
W:   Black or something.

I/O: Dark buckle?
W:   Yeah.

I/O: Did this man have any tattoos on?
W:   Yeah.

I/O: Where did he have a tattoo?
W:   Right here and right here.

PATRICK then pointed to the tops of both of his shoulders.

I/O: What was the tattoos like?
W:   A heart, kinda, and a love you inside in it.  The other had a heart but I don't know what's in it.

**REYNOLDS 027**

001669
**MILKE NSB001832**

Exhibit 1B

| TYPE OF REPORT HOMICIDE | VICTIM MC KEE, DEBRA | OFFICER ADDINGTON 3235 | Page - 10 DR # 88116757 |
|---|---|---|---|

I/O: Did your mother tell this man anything when he was in your apartment last night?

W: She said leave me alone, things like that. She talks in her sleep a lot. She's a real heavy sleeper sometimes.

I/O: Did she call this man by his name?
W: No.

At this point PATRICK stated to me that the black man that came in last night talks somewhat like a girl and he moves his hands around like he is signing. I asked PATRICK how he knew what signing meant and PATRICK stated that he has an aunt named BETTY LOU that only does sign language. He also stated that when the man asked if he could pick his mommy up, when she was laying on the floor, that he told the man that he couldn't but he did anyway.

I asked no further questions of PATRICK ENGELBERT and he was given to his maternal grandfather and grandmother by the name of WAYNE and PAT ENGELBERT. Their home address in which they would be taking the three children would be located at 5818 West Elm, with a phone number of 848-6718 or 846-6327.

On 9/6/88 at approximately 11:30AM, I then contacted I.L. #1 GARY GRAHAM at the direction of SGT. SIL ONTIVEROS. I asked MR. GRAHAM if he had any idea on who could have caused the death of DEBBIE McKEE and he stated that he really didn't know. At this time I then ran the physical description by GARY which had been given to me by 5 year old PATRICK to see if GARY possibly knew anyone that might fit that description that lived in this apartment complex.

After GARY heard the description, GARY stated that he did know a man that fit that description that used to live in some apartments behind the victim's apartment. I asked MR. GRAHAM if he would show me the apartment in which this person lived and MR. GRAHAM took me to the apartments and stated that he was either in Apt. #57, 58, 59 or 60. MR. GRAHAM stated that this person and he had had an altercation approximately two weeks ago and that was the last time he had seen the person living in that complex.

I then asked GARY if he could give me the best description of the person he knew to have lived in the apartment complex that matched the description given me by 5 year old PATRICK and GARY gave me the description which is listed in the beginning of my report.

At this time I then reported back to SGT. ONTIVEROS about the information I had just received from GARY and SGT. ONTIVEROS stated that there was a black family that lived in Apt. #59. At that time I then contacted DET. HERMAN and DET. HERMAN and I proceeded to APT. #59 where we contacted I.L. #2 TONY JOHNSON. Upon identifying myself to TONY JOHNSON, I asked him who lived there with him in Apt. #59 and he stated that a GRACE MELINDA lived

REYNOLDS 028

001670
MILKE NSB001833

Exhibit 1B

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBRA | ADDINGTON 3235 | 88116757 |

there and she's approximately 35 to 38 years old.  He also stated that
GRACE's daughter, NINJA MELINDA, also lived there and she was a black
female, 15 years of age.  TONY then concluded saying that a girl named
NIAETTA MELINDA also lived there and she was a black female, 17 years of
age.

I asked TONY how long he had lived in Apt. #59 and he stated he had lived
there a month.  TONY also related that the MELINDA family had lived there
approximately two years at the best of his recollection.

I then explained to TONY that I was trying to locate a black male and at
that time gave the description given me by PATRICK and GARY GRAHAM.  TONY
at that time stated that he knew a person named RON who lived in Apt. #40.
He stated RON and he had drank beer together and RON sometimes, when
acting goofy, talks with a high voice.  TONY stated however that RON was
between 30 and 40 years of age and was only approximately 5'5" to 5'6" and
weighed between 168 and 175 lbs.  He also stated that RON had a low
natural and that his hair did not go down his back and as far as he knew
RON had no tattoos.

DET. HERMAN and I then proceeded to Apt. #40 where we contacted I.D.
RUNETTE HAWKINS.  Upon identifying myself to RUNETTE, I explained to her
that we were investigating a situation that had occurred in the apartment
complex.  RUNETTE stated that she knew about that situation.  I then asked
her if she had a husband by the name of RON and she stated that she did.
I asked her the height and weight of her husband and she gave me the
approximate same height and weight as TONY JOHNSON had given me.  She also
related that her husband was not now home but worked for Hamco Personnel
which was located just south of McDowell on Central.  She gave me the
phone number to his employer as 249-6794.

RUNETTE also stated that last evening she and her husband had been over at
their mother's house and she had been with RON up until the time he went
to work this morning.

As of this time I have not attempted to contact RON HAWKINS.

At this time DET. MILLS and I then proceeded to 2830 North 48 Lane where
we contacted the deceased's husband, JOSEPH McKEE.  At that time we
notified him of his wife's death.  See DET. MILLS' supplement regarding
this follow-up.

Pending.

Exhibit 1B

Page - 1

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 9-8-88 | 88-116757 |
| VICTIM'S NAME | LOCATION OF OCCURRENCE | |
| MC KEE, DEBRA | 3840 N. 43 AVENUE | |
| OFFICER WRITING REPORT'S # | SUPPLEMENT # | |
| DET. R. DAVIS #2181 | 88-116757.03A | |
| DATE & TIME TYPED | BUREAU | CLERK |
| September 12, 1988    16:28 | GIB | A1724 |

Witness:      GIESLER, CHRISTINA
              W/F, 9█████████
              Apartment #67
              Babysitter for apartment manager

---

On 9-6-88 at 8:10 AM, I was directed to 3840 N. 43 Avenue to assist in a homicide investigation. Upon arrival at 8:30 AM, I met with SGT. ONTIVEROS outside of apartment #73. I was informed that the victim DEBRA K. MC KEE, W/F, 6-9-64, had been found dead inside of her apartment #69 this morning by her boyfriend GERALD SIMPSON. Her three small children, ages 2, 3 and 5, were in the apartment at the time MR. SIMPSON found the deceased victim. The oldest child, the 5 year old boy, told officers that last night a black male came into the apartment and dragged his mother upstairs and she didn't come back down. I was directed to start canvassing the apartment complex and talking to the nearby neighbors. I started with the apartments directly across the small courtyard from the victim's apartment and contacted several of these apartments. See my separate supplements on the interviews at these apartments.

From the interviews I conducted at the apartment, I learned that there had been a problem the previous night between several black people in this complex. I was told that some of them lived in apartment #31 and some lived in apartment #59. I then went to apartment manager KARI DODSON, W/F, 8-16-65. KARI DODSON lives in apartment #73.

KARI advised that GRACE HANSON lives in apartment #59 with TONY ANDERSON. There is also a black male with a first name of ROBERT that hangs around this apartment. She described this black male as being 6'2" with a thick afro and approximately 200 pounds. She said this black male was very dark in appearance and wears a white painters cap. KARI also said that last night, at around 12:30 AM, there was a disturbance outside the apartment and ROBERT was there with about 20 other black people. KARI also said the occupants of apartment #70 were also out there.

I asked KARI if she knew a white male by the name of GARY who had been the boyfriend of our victim. She said there is a GARY GRAM who is a white male, 21 years, and lives at the Osborn Manor, 43 Avenue and Osborn, in possibly apartment #3. GARY works at J.B.'s, 43 Avenue and Indian School.

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBRA | R. DAVIS #2181 | 88-116757 |

As I was talking to the manager, KARI DODSON, her babysitter, CHRISTINA GIESLER, W/F, 9-16-67, said she had watched the disturbance outside the apartment last night. CHRISTINA said she lives with the manager in apartment #73 and has an upstairs bedroom that has a window that faces out the back of this apartment.

CHRISTINA then took me upstairs to her bedroom and showed me the window that looks over the courtyard in back of the manager's apartment, and also has a view of the back gate that enters the victim's apartment. I observed that this back gate was open when I looked out the window at it.

CHRISTINA said she had heard the disturbance outside and she went over to her bedroom window, looking out. There was an argument between two black females who were pushing each other. There was also approximately 10 other blacks around them and they were near apartment #65 which was just east of CHRISTINA's position.

CHRISTINA said she saw ROBERT as soon as the police arrived. ROBERT went to the victim's back gate and entered. CHRISTINA estimated this was approximately 12:30 AM. CHRISTINA said she watched this area and the victim's rear patio gate for at least 30 minutes after that, and ROBERT did not come back out. I asked CHRISTINA if ROBERT could have come out without her seeing him and she said no. I noted that to see the victim's rear patio gate you had to lean slightly out of the window CHRISTINA was in. CHRISTINA showed me that she did lean out this window and said she continued watching without seeing ROBERT again.

I asked her what ROBERT was wearing when she saw him and she said it was gray sweatpants, a gray sweatshirt and she thinks tennis shoes that were black. I asked her how the lighting was in this area and she said it was good. I asked her how she knew ROBERT and she said that KARI DODSON had pointed ROBERT out a couple of days ago. I asked her if she saw ROBERT again if she would recognize him and she said she could definitely point him out. CHRISTINA was sure that it was ROBERT that entered the victim's rear patio gate.

001680
MILKE NSB001843

Exhibit 1B

Page − 1

| TYPE OF REPORT HOMICIDE | SUPPLEMENT DATE 9-7-88 | DR # 88-116757 |
|---|---|---|
| VICTIM'S NAME MC KEE, DEBORAH | LOCATION OF OCCURRENCE 3840 N. 43 AVENUE | |
| OFFICER WRITING REPORT'S # DET. R. DAVIS #2181 | SUPPLEMENT # 88-116757.03B | |
| DATE & TIME TYPED September 13, 1988   9:04 | BUREAU GIB | CLERK A1724 |

Next of Kin:   ENGLEBERT, PATOR WAYNE
               W/M,
               Wife: ▮▮▮▮▮▮▮▮, PATRICIA
               5818 W. Elm,  848-6718

--------------------------------------------------------------------

On 9-8-88 after talking to CHRISTINA GIESLER and exiting the manager's apartment, I talked to SGT. ONTIVEROS. He directed that I go to 5818 W. Elm to contact the victim's parents, PATOR WAYNE ENGLEBERT, and inform them of the death of the victim. At that time, I observed a white male and white female to come running through the apartment complex and run up towards the victim's front door. They were stopped by police officers who were securing this area and it was learned that this was the victim's father, MR. ENGLEBERT, and his wife PAT.

MR. and MRS. ENGLEBERT were directed into the manager's apartment where they were informed of the death of the victim. After giving them a few minutes to regain their composure somewhat, I requested to talk to them about acquaintances of their daughter. Both agreed to participate in this interview.

I asked the parents if the victim was having any problems at all with anybody that they knew. Immediately, MR. ENGLEBERT mentioned JONATHAN who was an ex-boyfriend of the victim. They did not know the last name of JONATHAN but described him as being a white male, 35 years, 6'1", 175 pounds with premature gray black hair. MR. ENGLEBERT said this man has mental problems and they never did like him. MR. ENGLEBERT further said that JONATHAN lives in California but was here three weeks ago. They said that the victim's utilities used to be in JONATHAN's name but they thought they were in someone else's name now. They also described JONATHAN as driving a white pick-up truck.

I asked them about anyone else that the victim might have problems with and they mentioned the victim's current husband JOE MC KEE. They explained that JOE and the victim are separated and in the process of a divorce. They described JOE as a white male, 51 or 52 years, and being 6'2", 275 to 280 pounds. They said that JOE is having the victim watched because he wants the kids. JOE works at Motorola and bought a house somewhere in this neighborhood but unknown where. JOE is the father of the victim's two youngest children and did recently have them for visitation. The victim's girlfriend RONNIE had picked the two youngest children up from JOE and

REYNOLDS 032

001681
MILKE NSB001844

Exhibit 1B

Page - 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | DAVIS #2181 | 88-116757 |

brought them home early yesterday.

MR. and MRS. ENGLEBERT said they had talked to their daughter yesterlay, 9-6-88, around 4:00 PM. She did not indicate there were any problems. They said they know DEBBIE has had trouble with the occupants in the end apartment. The end apartment occupants have been interviewed by DET. MITCH REA. They also mentioned a female by the name of TERRY who is always around DEBBIE and sticks to her like glue.

I contacted Motorola and learned that JOE MC KEE does work for them in their Tempe plant. I drove to that location and was informed that JOE had left work today's date, 9-6-88, at approximately 12:00 noon. The address that Motorola had for him, which is 2333 N. 49 Avenue, was incorrect, but he did live nearby there and was contacted by another detective. The Motorola plant that JOE MC KEE works at is at Price and ELliott and the phone number there is 897-4769.

**REYNOLDS 033**

**001682**
**MILKE NSB001845**

Exhibit 1B

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 9-7-88 | 88-116757 |
| VICTIM'S NAME | LOCATION OF OCCURRENCE | |
| MC KEE, DEBORAH | 3840 N. 43 AVENUE | |
| OFFICER WRITING REPORT'S # | SUPPLEMENT # | |
| DET. WHEELIS #2379 | 88-116757.14B | |
| DATE & TIME TYPED | BUREAU | CLERK |
| September 8, 1988    15:22 | GIB | A1724 |

Witness:  TERRI LYNN GRINDER
W/F, 6████9
3840 N. 43 Avenue #36, 352-0625
Not employed

-----------------------------------------------------------------------

On 9-6-88 I contacted TERRI LYNN GRINDER who was standing outside of the
victim's apartment. I introduced myself to TERRI and identified myself
also as a Phoenix Police Department detective. I asked if she had known
the victim and she stated that she had known the victim and had in fact at
times babysat for the victim's children. She went on to relate to me that
she had last seen the victim on 9-5-88 at approximately 6:00 PM. The
victim had used TERRI's car to go to the store and took her children with
her. TERRI explained to me that the victim had been having a hard time
with the black males in the apartment complex. I asked TERRI to explain
that and she stated only that the victim had been getting harassed by the
black males in the apartment complex but she could give no further
information about why. The victim apparently had been separated from her
husband for some time and had been scared of her husband because of
allegations that her husband had been molesting the children. On 9-5-88 at
approximately 6 PM, when TERRI last saw the victim, the victim had said
something to her about something bad was going to happened, but explained
that no further and TERRI had no idea what she was talking about. TERRI
did say that the victim appeared to be highly concerned about something at
that time. TERRI could add no further information to this investigation at
this time and therefore the interview was terminated.

**REYNOLDS 034**

**001685**
**MILKE NSB001848**

Exhibit 1B

Page - 1

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 9-7-88 | 88-116757 |

| VICTIM'S NAME | LOCATION OF OCCURRENCE |
|---|---|
| MC KEE, DEBORAH | 3840 N. 43 AVENUE |

| OFFICER WRITING REPORT'S # | SUPPLEMENT # |
|---|---|
| DET. A. SALDATE #1875 | 88-116757.10C |

| DATE & TIME TYPED | BUREAU | CLERK |
|---|---|---|
| September 15, 1988    12:14 | GIB | A1724 |

INTERVIEW:       ROSALIE SALAZAR
                 M/F,          7
                 3840 N. 43 Avenue #70,  269-1002
                 Unemployed

------------------------------------------------------------------------

On 9-6-88 at approximately 10:22 AM, I contacted ROSALIE SALAZAR at 3840
N. 43 Avenue in apartment #70. The purpose of my contact was to interview
her in regards to this death investigation. ROSALIE then gave me the
following information.

ROSALIE first identified her boyfriend as MARK MENDOZA, W/M, 19 years,
approximately 5'8" and 140 pounds. She said that MARK left this morning
from her apartment after they had an argument at approximately 4:30 AM.
She described MARK as wearing blue sweatpants and carrying his light blue
t-shirt.

ROSALIE then explained that shortly before 3:30 this morning, she and her
boyfriend had gotten into an argument and she told him she was going to
call a cab for him. She said she then called Ace Taxi but told Ace Taxi
that she was calling from apartment #69 because she did not want any
contact with the cab company. She was outside her apartment when she
observed the taxi arrive and then waved at him to wait for MARK. She then
went into her apartment and told MARK that the cab was there and the MARK
then told her that he did not have enough money for it. MARK then went
outside and spoke to the cab driver and apparently told him that he did
not have enough money for the cab.

MARK then again knocked on her door and told her that he had already told
the cab to leave and that he had decided to walk home. While she was
speaking with MARK at the door, a girl by the name of CARLA who lives in
apartment #65 came by and asked to use the phone. MARK then asked CARLA if
her brother was home and if he had a cigarette and CARLA responded that he
probably did. She said she saw MARK then walk south to the walkway and
apparently went to CARLA's apartment.

After several minutes, her boyfriend MARK knocked on the arcadia door and
told her that he was leaving. She then ran up to her upstairs bedroom,
looked out the window and saw MARK leaving with a black male in a white
camaro. She said she just assumed he got a ride from someone at CARLA's
house.

**REYNOLDS 035**

001721
**MILKE NSB001884**

Exhibit 1B

Page -- 2

| TYPE OF REPORT HOMICIDE | VICTIM MC KEE, DEBORAH | OFFICER SALDATE #1875 | DR # 88-116757 |
|---|---|---|---|

ROSALIE then asked me if I knew that the victim was a prostitute and I told her that I did. ROSALIE then said that approximately 1 month ago, the victim had asked her if she was interested in meeting some of her friends and being involved in "the oldest profession in the world." ROSALIE said she at first didn't understand her, but DEBBIE explained that she could get her a job as a prostitute and told her that it was "free rent". At this time, I terminated my first interview with ROSALIE.

At approximately 1200 hrs, I was told that ROSALIE wanted to speak with me again. I then went and contacted ROSALIE at her apartment. She then told me the following.

This morning at approximately 12:00 to 12:30 AM, she said she was outside with MARK and that the entire complex was quite busy with people around the pool and outside of their apartments. A few minutes earlier two people had gotten into a fight and somebody then pointed out a white female walking from the area of the pool towards her building.  Someone asked if that was the lady who had earlier gotten into a fight and for that reason she looked directly at her, and noticed that it was DEBBIE. She then told everyone that was not the person involved in the fight and noticed that DEBBIE was dressed in her pajamas, which she described as a light silky material with some designs, and that the pajamas consisted of a top and pants. She then noticed DEBBIE walking into the back gate of her patio. She assumed she went inside her apartment.

ROSALIE said that just before this, there were several black males hanging around the pool area. She said she particularly noticed a large black male wearing a light t-shirt and dark shorts. She also recalled him wearing white tennis shoes. ROSALIE said she recalled this specific black male because of his size and also because she realized after she saw DEBBIE walking to her apartment, the black male disappeared.

ROSALIE said that it wasn't until approximately 2:30 AM when she again saw this black male in the area of the pool. She believes that he was still wearing the same clothing.

ROSALIE believes she can identify this black male and can be contacted at her apartment for the next couple of days, however, she does plan to move. The interview with ROSALIE was then terminated.

Investigation Continuing.

REYNOLDS 036

001722
MILKE NSB001885

Exhibit 1B

| TYPE OF REPORT | | SUPPLEMENT DATE | DR # |
|---|---|---|---|
| HOMICIDE | | 9-7-88 | 88-116757 |
| VICTIM'S NAME | | LOCATION OF OCCURRENCE | |
| MC KEE, DEBORAH | | 3840 N. 43 AVENUE | |
| OFFICER WRITING REPORT'S # | | SUPPLEMENT # | |
| DET. A. SALDATE #1875 | | 88-116757.10I | |
| DATE & TIME TYPED | | BUREAU | CLERK |
| September 15, 1988     12:57 | | GIB | A1724 |

On 9-7-88 at approximately 1458 hrs, I located a British Knight tennis shoe thrown in a trash dumpster which was located on the south alley of the apartment complex directly west of apartment #25. Later inspection of the dumpster revealed the second matching shoe. These shoes were photographed, retained and preserved for evidence.

On 9-7-88 after talking to several persons who confirmed that CUTMAN wore British Knights tennis shoes, I began to search the complex. A search warrant of apartment #31 the previous night had not revealed any British Knight tennis shoes. I then checked with the maintenance man, LARRY GRINDER, and he told me that the trash collection was done on Mondays and Thursdays and said that even though Monday was a holiday, the collection was made late Monday afternoon. I then asked LARRY what trash containers would be used by apartment #31 and he directed me to the trash containers where the shoes were ultimately found.

I first noticed that there were two large metal containers which were contained within a block and wrought iron fence. There was entry from the inside of the complex through a stairway onto a landing for the convenience of the residents. I first searched the trash container closest to the alley which revealed nothing. With the aid of a long stick, I began searching the second container and then noticed the British Knights shoe within a plastic wrapping near the bottom of the trash container. At that time, I secured the entire area and called for pictures and assistance from DET. HAMRICK.

After photographs were taken of the first shoe, it was retained for evidence and I then got into the trash dumpster and began searching for the second shoe. At approximately 1530 hrs, I located the second shoe in the same general area underneath some trash. Again the shoe was contained within a plastic bag. It was photographed and then retained as evidence.

Investigation Continuing.

REYNOLDS 037

001728
MILKE NSB001891

Exhibit 1B

Page - 1

| TYPE OF REPORT HOMICIDE | SUPPLEMENT DATE 9-7-88 | DR # 88-116757 |
|---|---|---|
| VICTIM'S NAME MC KEE, DEBORAH | LOCATION OF OCCURRENCE 3840 N. 43 AVENUE | |
| OFFICER WRITING REPORT'S # DET. A. SALDATE #1875 | SUPPLEMENT # 88-116757.10K | |
| DATE & TIME TYPED September 15, 1988    16:15 | BUREAU GIB | CLERK A1724 |

INTERVIEW:         MROCZKOWSKI, DAVID
                   W/M,        6
                   5602 W. Wilshire, 247-5814
                   Emp: Pete King Painting
                   (Claimed to be current boyfriend of victim)

-------------------------------------------------------------------

On 9-8-88 at approximately 0903 hrs, I was contacted at my office by phone
by DAVID MROCZKOWSKI. DAVID then explained he had recently spent some time
with the victim and said he may be able to assist in the investigation.
DAVID then gave me the following.

DAVID first identified himself as the current boyfriend of the victim,
DEBBIE MC KEE, and said that he was planning to move in with her. He said
he had met her approximately 3 weeks ago and that he had spent the entire
weekend holiday with her.

He said he first arrived at the complex where the victim lived which he
identified as the El Sereno Apartments in apartment #69. He said they had
planned to spend the entire weekend together and believes he arrived at
approximately 6:30 PM, Friday, 9-2-88. He said he was with the victim the
entire weekend until he left on Monday, 9-5-88, at approximately 9:30 PM
and walked home. At approximately 10:20 PM, he called her and told her
that he had arrived home and then they spoke on the phone for just a short
time because he had to go to work the next morning.

I asked DAVID if, during their weekend contact, she had introduced him to
any black males and he immediately told me that DEBBIE hated black men and
that she had told him that she had been harassed by several of them at the
complex. DAVID then said that DEBBIE had asked him to move in with her and
that she told him that she would get rid of her current boyfriend, who she
identified as JERRY. DAVID said he had never met any of the victim's
boyfriends, but that he was intending on moving in with her when she got
her affairs straightened out with the other boyfriend.

REYNOLDS 038

001731
MILKE NSB001894

Exhibit 1B

Page ~ 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE #1875 | 88-116757 |

DAVID said he never heard about the murder until Wednesday morning, when his mother told him. He said he called her on the phone Tuesday night at approximately 8:30 but no one answered. He said to the best of his knowledge, DEBBIE was not having any serious problems, was not involved in anything illegal, and the only persons she feared were the black men at the complex. I then terminated my interview with DAVID.

Investigation Continuing.

**REYNOLDS 039**

**001732**
**MILKE NSB001895**

Exhibit 1B

Page – 1

| TYPE OF REPORT | SUPPLEMENT DATE | DR # |
|---|---|---|
| HOMICIDE | 9/6/88 | 88-116757 |

| VICTIM'S NAME | LOCATION OF OCCURRENCE |
|---|---|
| MC KEE, DEBORAH | 3840 NORTH 43 AVENUE #69 |

| OFFICER WRITING REPORT'S # | SUPPLEMENT # |
|---|---|
| DET. A. SALDATE 1875 | 88-116757.10A |

| DATE & TIME TYPED | BUREAU | CLERK |
|---|---|---|
| September 16, 1988    9:35 AM | GIB | A1608 |

INTERVIEW:      LAMONT E. REYNOLDS, B/M, ███ 69
                6'3", 240  bk/br
                3840 N. 43 Avenue #31
                AKA: JAMES FISHER
                     CUTMAN
                     TURTLE
                Member:  Los Angeles street gang known as
                         "Grapestreet Crips"
                Tattoos:  Various (back, shoulder, arms)

-----------------------------------------------------------------------

On 9/6/88 at approximately 1725 hours DET. MIKE WHEELIS and myself
contacted LAMONT REYNOLDS at 3840 N. 43 Avenue in Apt. #31.  The purpose
of our contact was to interview him in regards to this death
investigation.

Earlier in the day at approximately 1145 hours, DET. MIKE WHEELIS and
myself had made contact in Apt. #31 in an effort to identify a subject who
we were told was named CUTMAN or CUTTHROAT.  At that time we contacted a
subject by the name of JOE HANILTON, who indicated that the subject known
to him as CUTMAN was his sister's boyfriend and if we needed any more
information on that subject we could speak to his sister.  JOE then told
us that his sister would arrive from work at approximately 6:00PM today.
DET. MIKE WHEELIS and myself then terminated our contact at the apartment.

At approximately 1725 hours, DET. MIKE WHEELIS and myself knocked on the
door of Apt. #31 and were invited in by an elderly heavyset female who we
later found was CARRIE HAMILTON, the renter of the apartment.  I
immediately observed the subject we had earlier contacted by the name of
JOE HAMILTON sitting on the end of the couch closest to the door.  I also
noted a large black male wearing grey cut-off pants and a black tank top
laying on the other part of the couch with his feet on the floor.  Next to
him was a younger female which I assumed was JOE's sister who he had
earlier identified as JUNE.  I then asked the large B/M his name and he
told me that his name was LAMONT.  I asked him if he was the subject they
called CUTMAN and he said that he wasn't.  I asked him what his nickname
was and he said his nickname was CHURTLE.  I then asked him if it was
TURTLE and he said CHURTLE.  I then asked the subject if he would stand up
and take off his shirt and expose his back to me and when he did I noticed
a large tattoo of GW on his back.  We had been told earlier that the
subject we knew as CUTMAN had the large tattoo of GW on his back and the
subject fit the description as given to us earlier by several residents.

**REYNOLDS 040**

001738
MILKE NSB001901

Exhibit 1B

Page - 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE 1875 | 88116757 |

I then explained to CARRIE that we were investigating a homicide of a female which occurred in Apt. #69 and that CUTMAN's name had come up as possibly knowing something about the murder. LAMONT then commented that he was not involved in any murder. I then asked LAMONT for identification and his girlfriend JUNE said that she had it upstairs in their bedroom. A short time later JUNE came back downstairs and supplied me with a birth certificate which indicated the name of LAMONT EDWARD REYNOLDS, B/M, 8/30/68.

I then told LAMONT that we would have to speak with him outside and I did not feel very comfortable speaking to him about a murder around his girlfriend and her mother. LAMONT finally agreed to go outside with us and we walked to our Detective car that was parked in the north driveway of the apartment complex by the pool. LAMONT then sat on top of the hood of my vehicle and in the presence of DET. WHEELIS, I read LAMONT his Miranda rights from a standardized Phoenix Police Department issued card. LAMONT said that he understood his rights and I told him immediately that all I wanted to know was where he was at and if he knew anything about the homicide and LAMONT immediately said he would tell me anything I wanted to know.

LAMONT's girlfriend JUNE at the request of LAMONT had followed us outside and was standing several feet away. Because of that we decided that the interview would best be served if it was handled downtown at 620 West Washington. A uniformed unit was then called to have LAMONT transported to the Main Station for this interview. LAMONT first said that he wasn't sure whether he wanted to go downtown and asked if we could do the interview at that location. I advised LAMONT that it would be best served to interview him at our station and that for the protection of his rights and our investigation I was now going to place him under arrest for murder which I did. After two uniformed officers arrived I had them place LAMONT in handcuffs and I again reminded the officers to tell LAMONT that he was under arrest for murder and they then left.

DET. MIKE WHEELIS then spoke to JUNE HAMILTON about the whereabouts of her boyfriend LAMONT last night and early this morning. See DET. MIKE WHEELIS' supplement for details on that interview.

It should be noted that at no time did LAMONT indicate that his name was CUTMAN however prior to us walking out with LAMONT from the apartment. JOE HAMILTON had referred to him on two occasions as CUTMAN. Also after we walked out of the apartment two young kids who were playing in the playground yelled at him by name of CUTMAN and asked him what was going on. LAMONT also asked a subject who was passing by who is described as a B/M, in his 30's, if he had a cigarette for him which he did. After giving LAMONT his cigarette he then referred to LAMONT as CUTMAN and told him to take it easy.

**REYNOLDS 041**

**001739**
**MILKE NSB001902**

Exhibit 1B

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE 1875 | 88116757 |

Prior to leaving the apartments DET. MIKE WHEELIS and myself arranged for another uniformed officer and SGT. RICHARDSON to secure Apt. #31 because we felt it necessary to draw a search warrant on that apartment for evidence. Sometime later DET. MIKE WHEELIS served a signed search warrant on Apt. #31. See his supplemental for evidence found.

While at the Main Station, I contacted LAMONT as he was being fingerprinted. I then instructed the two uniformed officers to take him to an interview room when the fingerprints were complete. Later I was contacted by uniformed officers and told that the subject had been placed in interview room #10.

I again made contact with LAMONT and again as he was during our first contact, he appeared to be a very passive person. He was soft spoken and appeared to want to cooperate in any way possible. He was advised LAMONT if he understood he was under arrest and he said that he did. I then told him that I was going to ask him some serious questions about the homicide at the apartment complex and he then reminded me that he had already told me that he was not involved. I then identified the victim as DEBORAH McKEE, who lived in Apt. #69 and asked LAMONT to begin with whether he knew her and to continue on with his whereabouts last night. LAMONT then gave me the following information.

LAMONT first said that he knew her and said that he had visited her at her apartment on several occasions. He said the last time he was there was approximately three days ago and he said they got high together. I asked him if he could clarify that and he said that he had gone to DEBBIE's apartment on numerous occasions with his other friend who he identified as TERRY, a W/F, who lives just across the walkway from his apartment. He said while he and TERRY were there they would usually get high on marijuana. I then told LAMONT that I knew that the victim didn't have very high moral standards and then I asked him if he had ever had sex with her and he immediately responded that he had not. He then said that the only reason he would ever go over there was to get high with her and as he explained it to "just kick around with her".

LAMONT then told me that he had not killed anybody but then asked me what time this murder was supposed to have happened. I then told LAMONT that it was between 12:30 and 1:00AM. LAMONT then told me that he had gone to a barbecue at a friend's house who he refused to identify and then said that he had returned at approximately 11:00PM to the apartment. He said he went outside briefly and met up with KEITH, MONKEY and a subject known as FRED and FRED's girlfriend. He said he began drinking with them and he believes they were drinking Budweiser Light. He then said that he believed he went back inside his apartment between 12:00 and 12:30AM and then corrected it and said it may have been as late as 1:00AM. LAMONT said that during the time he was outside he was with either KEITH, MONKEY or FRED the entire time.

REYNOLDS 042

001740
MILKE NSB001903

Exhibit 1B

Page — 4

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE 1875 | 88116757 |

I asked LAMONT if he could clarify how many times he had been at the victim's apartment and he said that it was 8 or 9 times. LAMONT then reminded me that he only went there to get high and never did have sex with the victim.  I then asked him if the victim's kids were present during the time he was there and he said they were not.  LAMONT then said that he actually didn't know that she had any kids and to the best of his knowledge she didn't.  I then asked LAMONT since he had been inside the victim's apartment 8 or 9 times if he had ever noticed any pictures of any kids on the wall and he said that he had not.  I asked him if he was sure he hadn't seen any pictures of any kids hanging on the living room wall and he said that he had not.  I then asked him about any pictures in her bedroom and he told me that he had never been in her bedroom.  He then quickly changed that and said that he had been in one of the bedrooms but he did not know whether that bedroom was her bedroom.  I asked him if there was a large bed in the bedroom and he said he believed there was a set of bunk beds and a small bed but that he really didn't pay that much attention to it because he would only go in there to smoke some weed.  I then told LAMONT I couldn't understand why she would take him to a bedroom with bunk beds and a small bed to smoke weed and then asked him where they sat and he immediately responded that they sat on the floor.

At this time LAMONT appeared to get nervous and said in a louder tone of voice that he hadn't killed anybody and that he hadn't been in the victim's apartment last night.  He then again said that he had come home at 11:00PM, had gone outside and had been with KEITH and some of the other guys by the pool but was only there a short time.  LAMONT then remembered that he walked away from the pool to the parking lot where my Detective car had been parked.  He said at that time he spoke to a subject he knows as FRANK and after speaking with FRANK he decided to go to KEITH's house to look for him.  He said he knocked on KEITH's door and then walked on in.  He said MONKEY was there and that MONKEY then gave him a Budweiser Light beer and then he decided to leave.  When he walked outside he noticed the W/F who lives next to KEITH's apartment who he described as being in her 30's with black hair and described her as looking "alright".  He said he believes the time was 12:00, 12:30 or maybe even 1:00AM when he began talking to the lady.  He said they just talked about simple stuff like hello, how are you, and how was she doing.  I then asked LAMONT if that was the first time he had ever talked to her and he said that was the second time because he believed he had talked to her several days before.

I then asked LAMONT if he had ever drunk beer with DEBBIE, the victim, and he said that he had.  I then asked if he ever took any beer over to DEBBIE's apartment and he said that he had.  When I asked LAMONT what kind he told me all kinds but that usually it would be Budweiser.  I then asked LAMONT again when was the last time he had been at the victim's apartment and he said that it was three days ago but that they had no beer and only smoked marijuana.

REYNOLDS 043

001741
MILKE NSB001904

Exhibit 1B

Page - 5

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE 1875 | 88116757 |

LAMONT then told me that last night he was wearing light grey khaki Dickey brand pants and a grey shirt short sleeve pullover and he said that he had his Converse tennis shoes on. I then asked LAMONT if the pants were full length or cut as shorts and he said that they were full length.

At this time I asked LAMONT who usually supplied the weed and he said that DEBBIE usually supplied the weed that they got high on. I then asked him where DEBBIE kept the weed and he said that he didn't know other than to see her remove the weed from plastic baggies. I then asked him if he was sure and he said he was because the only room he was ever allowed in after entering the apartment was the upstairs bedroom where the bunk beds were and that room was where they would usually smoke marijuana or drink.

I asked LAMONT if he had ever been at Apt. #80 and he said that he had not. He then asked if Apt. #80 was towards the back in the corner and I told him that it was. Again he said that he didn't think he had ever been there. I then asked him if he knew another girl by the name of DEBBIE COMSTOCK who lived in Apt. #80 and he responded and said that he did not. LAMONT then corrected himself and asked if she stayed near the back apartments of the complex and I told him that she did. LAMONT then said that he had talked to her on several occasions and said that he would only talk to her when he saw her pass by on the complex grounds.

I again told LAMONT that I wanted to know what he was wearing last night specifically in regards to his shoes and again he told me that he was wearing his Converse. I then asked him if he owned British Knight tennis shoes and said that he did not. I then told him maybe he only knew the type of tennis shoe I was talking about by the initials of BK and again he said he didn't own any. I asked LAMONT if he was sure he had never owned any BK's and he told me that when he was in L.A. and when the shoes first came out he remembers buying a pair which he believes were black and white but that was a long time ago and that he left the shoes in California.

At this time I was contacted by our I-Bureau and told that the photographer was ready to take photographs of LAMONT. Photographs were then taken of LAMONT and the interview was interrupted for a short time.

At approximately 2020 hours I again began talking with LAMONT and during our break I had found out from our gang unit officers that LAMONT had been wanted for several armed robbery charges including a charge from California under the name of JAMES FISHER. I confronted LAMONT with this information and he said that he had used the name of JAMES FISHER and that he thought the robbery charge from California had already been dismissed. LAMONT then told me, "Look but I didn't kill anybody."

I then asked LAMONT if he could tell me what he had done this morning and he said that he thought he could. LAMONT then said that he believes he woke up at approximately 9:00AM and caught a bus to the south side in the area of 27th Street and Jones. He said he went to that location to see his "homeboy" and identified him as NATE, B/M, 20 to 21 years, who he said was 5'8", 120 pounds. He described NATE as a very close friend of his and

REYNOLDS 044

001742
MILKE NSB001905

Exhibit 1B

Page - 6

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE 1875 | 88116757 |

said they were more like brothers and that he initially had stayed with
NATE in January when he came from Los Angeles.  I then asked LAMONT why he
had so many stretch marks on his arms and chest which were easily visible
and he responded that he used to be a weight lifter.  I asked him if he
was still lifting weights and he said that the only time he lifted weights
was when he was in jail in California.

At this time I was told by OFFICER LEWIS #4191, who works our gang squad,
that he would like to talk to him about the charges that he had
outstanding both from here and California.  OFFICER LEWIS then interviewed
LAMONT while I stepped out of the room.  After a short while OFFICER LEWIS
again came out of the interview room and said that he had obtained
admission from LAMONT about the charges that had been filed against him in
our jurisdiction and also in California.  OFFICER LEWIS then told me that
he had no other reason to speak with him.

At approximately 2150 hours, I again contacted LAMONT and asked him if he
had told DET. LEWIS the truth about current charges that were outstanding
and he replied that he had.  I then told LAMONT that it was imperative
that he tell me the truth of what occurred because several people had
already implicated him as being the person who had killed the victim
DEBBIE McKEE.  LAMONT then told me in a slow quiet voice that he would now
tell me the truth.  LAMONT then gave me the following.

LAMONT first said, "It was FRED that killed her."  I asked him who FRED
was and he said FRED was a black male who was somehow related to KEITH and
that FRED drove a burgundy Seville.  He then described FRED as being
approximately 6' tall, 180 pounds, with short black hair and no tattoos.

LAMONT said that it was approximately 11:30 when he and FRED went in
through the back gate and up to the back patio door of the victim's
apartment and knocked on it.  He said DEBBIE came to the door and let he
and FRED inside and that they were standing around the kitchen area.  He
then asked DEBBIE if they could go upstairs to have sex and she agreed.
He said he never noticed any kids inside the apartment and he and DEBBIE
walked up the stairs to the bedroom where the bunk beds and the small bed
were, and then had sex.  I then stopped LAMONT and asked him if they had
sex on the small bed and he said that they hadn't.  I then asked LAMONT if
they had sex on the bunk beds and he said they had hadn't, and that they
had sex on the floor.  I asked him to describe where they were at and he
told me they were just inside the doorway on the carpeted floor and he
remembers they were between a little bed and the closet doors.

I then reminded LAMONT that he had previously told me that he had never
had sex with DEBBIE but he responded that he was now telling me the truth.
I asked LAMONT how DEBBIE was dressed and he said he believed she had a
button blouse and a pair of jeans on when they went upstairs and that she
removed her jeans when they had sex.  After they finished having sex he
then walked downstairs leaving DEBBIE upstairs and when he got to the
living room he told FRED that it was his turn.  He said he last saw FRED
walking upstairs to the bedroom where he had left DEBBIE.

**REYNOLDS 045**

001743
**MILKE NSB001906**

Exhibit 1B

| | | | Page - 7 | |
|---|---|---|---|---|
| TYPE OF REPORT | VICTIM | OFFICER | | DR # |
| HOMICIDE | MC KEE, DEBORAH | SAI.DATE 1875 | | 88116757 |

LAMONT said it was just a short time later when he heard FRED and DEBBIE
arguing and that he just thought that "DEBBIE just didn't want to give it
up". I asked him what he meant by this and he said that it was obvious
that DEBBIE didn't want to have sex with FRED. He said he continued to
wait downstairs and that FRED finally came downstairs and he told him that
he had killed DEBBIE. I asked LAMONT how he had killed her and LAMONT
told me that FRED never explained to him how he killed her but that he did
tell him that he killed her because she refused to give him sex. LAMONT
also said that FRED kept referring to her as the bitch and that he and
FRED walked out of the back arcadia doors and that he then went home.

I then told LAMONT that I had been listening to his story but that it did
not match either the evidence or the witness statements that we already
had. I then suggested to LAMONT that if he and FRED had been there
earlier he must have gone back at a later time because the oldest child of
the victim only saw one large B/M enter the apartment. LAMONT immediately
told me that he never saw any kids inside the apartment but then conceded
he may have gone back however he was too drunk to remember. He then
explained further that he had been drinking and had been smoking marijuana
both at the barbecue and while he was with the guys around the pool.
LAMONT then asked for a glass of water which was given to him.

I again began to question LAMONT about him going back by himself to see
the victim and LAMONT again said that he was too drunk to remember.
LAMONT then said that he knew he had gone with FRED earlier and then said
that he was really unsure whether he had "fucked her" when he was with
FRED or not but that he was sure that he had "fucked her" the day before.
I asked LAMONT to explain and he said that the day before which he thought
was Sunday he had gone by himself to see DEBBIE and that he and DEBBIE had
had sex in the upstairs bedroom where the two bunk beds and the small bed
were. I asked LAMONT what time that was and said he believed it was late
at night. I then asked LAMONT if this was the same bedroom he had been
telling me about and he said that it was. I then asked LAMONT if he could
describe any other part of the apartment and he said that he could not. I
asked him if he could explain and he said he never paid any attention to
what was inside the apartment but only remembered the two bunk beds and
the small bed in the top bedroom because he had been there often. I asked
LAMONT if he could recall what DEBBIE was wearing the night before he had
sex with her and he said that he could not. LAMONT then said that the
only thing he knew was that every time he and DEBBIE met they would go up
to the bedroom upstairs where the two bunk beds were and the small bed and
that they'd sit on the carpet smoking marijuana, or drinking or have sex.

REYNOLDS 046

001744
MILKE NSB001907

Exhibit 1B

Page - 8

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE 1875 | 88116757 |

I again questioned LAMONT about certain things inside the apartment and asked him if he remembered a dinette inside the kitchen area and he said that he didn't know if there was one there or not.  I asked him if he knew whether DEBBIE had a television set and he said that he did believe she did.  I asked him if he recalled one or two couches in the living room or one or two chairs and he said that he had no idea.  LAMONT then became frustrated and said that the only room he remembered was the upstairs room and that he had never gone to DEBBIE's house to look at anything she had.

The conversation then turned to the subject he had identified as FRED and I asked him if he could describe the clothing FRED was wearing and he told me that FRED was wearing some light colored bleached out jeans and a light colored tank top.  I then asked LAMONT if he was positive that FRED had killed DEBBIE and he said that he was.  I asked LAMONT if he was now changing his story that he could possibly have gone back after he and FRED left and LAMONT would only say that he actually didn't know because he was just too drunk to remember.  At this point I terminated my interview and LAMONT was booked on various other charges not related to this homicide.

Investigation continuing.

001745
MILKE NSB001908

Exhibit 1B

Page - 1

| TYPE OF REPORT HOMICIDE | SUPPLEMENT DATE 10/11/88 | DR # 88-116757 |
|---|---|---|
| VICTIM'S NAME MC KEE, DEBORAH | LOCATION OF OCCURRENCE 3840 NORTH 43 AVENUE #69 | |
| OFFICER WRITING REPORT'S # DET. A. SALDATE 1875 | SUPPLEMENT # 88-116757.10E | |
| DATE & TIME TYPED October 13, 1988    9:18 AM | BUREAU GIB | CLERK A1608 |

THIRD INTERVIEW:     PATRICK WAYNE ENGELBERT, W/M, ███ 83

--------------------------------------------------------------------------

On October 7, 1988, at approximately 1414 hours, DET. HAMRICK and myself
contacted PATRICK WAYNE ENGELBERT, W/M, 5 years, at 5818 West Elm.  The
purpose of our contact was to show him a photographic line-up which had
been previously shown to CHRISTINA GEISLER.

During the investigation a photographic line-up had been prepared on
suspect LAMONT REYNOLDS.  The photographic line-up consisted of five
colored photographs.  This line-up had been previously shown to CHRISTINA
GEISLER.  Attempts had been made to try to locate LAMONT REYNOLDS, aka
CUTMAN, in an effort to try an in person line-up but information was that
he had left the El Sereno Apartments at 3840 North 43 Avenue and his
whereabouts was unknown.

Upon our contact with PATRICK's grandparents, I had them tell PATRICK to
go outside and I explained to the grandparents that I would not allow them
to be present when the photographic line-up was shown and would not allow
them to see the photographic line-up.  I then explained to them that I did
not want anyone suggesting that they were going to influence him on his
selection.

DET. HAMRICK and myself then contacted PATRICK at the rear patio of the
home while everyone else was inside the home.  I then sat PATRICK next to
me and DET. HAMRICK was across from me at the patio table.  I told PATRICK
that we were going to show him five photographs of some people and that if
he recognized the person who had come into his apartment and taken his
mother upstairs, I wanted him to tell me.  I then told PATRICK that these
were not the only pictures I had and that I had many more at the office
and for that reason the subject who grabbed his mother may not be in the
stack of photographs that I was going to show him.  I asked PATRICK if he
understood and he said that he did.  I then handed PATRICK the stack of
photographs from 1 to 5 and he immediately looked at the first photograph
for approximately one second.  Then removed that photograph and placed it
underneath the stack.  Upon seeing the second photograph PATRICK
immediately said, "That's him right there."  I asked PATRICK if he was
sure and PATRICK said he was.  DET. HAMRICK then suggested to PATRICK that
he continue looking at the rest of the photographs which PATRICK did.

**REYNOLDS 048**

**001766**
**MILKE NSB001929**

Exhibit 1B

Page - 2

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MC KEE, DEBORAH | SALDATE 1875 | 88116757 |

After looking at each photograph he placed the photograph underneath the
stack as he had done with photograph 1 and 2.  He looked at all the
photographs until he reached the photograph of LAMONT REYNOLDS aka CUTMAN
and PATRICK immediately said, "There he is again."  PATRICK did not appear
to be frightened by looking at the photograph and from his demeanor and
statements he appeared to both DET. HAMRICK and myself as being absolutely
positive.

Investigation continuing.

**REYNOLDS 049**

**001767**
**MILKE NSB001930**

Exhibit 1B

Page - 1

| TYPE OF REPORT HOMICIDE | SUPPLEMENT DATE 10/11/88 | DR # 88-116757 |
|---|---|---|
| VICTIM'S NAME MC KEE, DEBORAH | LOCATION OF OCCURRENCE 3840 NORTH 43 AVENUE #69 | |
| OFFICER WRITING REPORT'S # DET. A. SALDATE 1875 | SUPPLEMENT # 88-116757.10D | |
| DATE & TIME TYPED October 13, 1988    9:20 AM | BUREAU GIB | CLERK A1608 |

SECOND INTERVIEW:    PATRICK WAYNE ENGELBERT, W/M, ▓▓▓83

On September 12, 1988 at approximately 1300 hours, DET. HAMRICK and myself contacted PATRICK WAYNE ENGELBERT, W/M, 5 years, at 5818 West Elm.  The purpose of our contact was to interview him again regarding this death investigation.

Upon our contact with PATRICK his grandparents were present and we spoke to him just briefly.  While talking to him, I asked him to close his eyes and visualize the B/M that came into his apartment late that night and took his mother upstairs.  PATRICK then closed his eyes and told us that he was a black man, big, and tall, he said he believed he had blue shirt and blue pants.  At first he said they were long pants but later said he could see his white socks which were up to his knees.  I then asked PATRICK if this could possibly mean that the man had shorts on and he agreed.

I asked PATRICK if the subject ever took anything from the house and he told me that he took zip-lock bags and that he believed that the bags contained "pot".  I asked him if he knew that his mother smoked pot and he said that she did.  I then asked him if he knew where his mother kept the pot and he said that his mother kept the baggies in her drawers.

I asked PATRICK if he had ever seen any black people visiting his mother before and he said that he had not.  I then asked him if he knew a black man by the name of ROBERT and he said no.  I then asked him if he knew a black man by the name of CUTMAN or CUTTHROAT and he again said no.

I again had PATRICK focus in on the description of the man and had him close his eyes again.  I then asked PATRICK if the subject had a mustache and PATRICK told me "no, a beard".  He then demonstrated by rubbing his finger across the top of his lip.  I then asked him about the subject's hair and he pointed with his fingers to the top of his shoulders and said that the hair was that long.  I asked him if he had ever seen black people's hair before and he said that he had.  I then explained to him that I thought most black people had very curly hair and that was usually normal for them.  I asked PATRICK if that was the type of hair the subject had and he said that it was.

PATRICK then told us that he was getting tired and we then ended the interview with him.

Investigation continuing.

**REYNOLDS 050**

**001768**
**MILKE NSB001931**

Exhibit 1B

Page - 1

| TYPE OF REPORT HOMICIDE | | SUPPLEMENT DATE 10/13/88 | DR # 88-116757 |
|---|---|---|---|
| VICTIM'S NAME MCKEE, DEBRA | | LOCATION OF OCCURRENCE 3840 N. 43 AVE. #69 | |
| OFFICER WRITING REPORT'S # DET. A. SALDATE #1875 | | SUPPLEMENT # 88-116757.100 | |
| DATE & TIME TYPED October 13, 1988    11:52 | BUREAU GIB | CLERK A2563SAL | |

INDEX SUSPECT:      REYNOLDS, LAMONT E. - B/M
                    8,          9, 6'3, 240, BK/BR
                    3840 N. 43 Ave. #31 (past)
                    8902 N. 19 Ave. #2142 (current)
                    AKA:     JAMES FISHER
                             EDWARD REYNOLDS
                             CUTMAN
                             TURTLE
                    Gang member - "Grapestreet Crip"
                    Booked - First Degree Murder

---------------------------------------------------------------------------

On 10/12/88 at approximately 2153 hrs., I contacted LAMONT REYNOLDS, B/M,
8/30/69 at 620 W. Washington.  The purpose of my contact was to interview
him again in regards to this death investigation.

On 10/12/88, at approximately 2105 hrs., Phoenix Police Surveillance Units
arrested LAMONT REYNOLDS outside his apartment, at 8902 N. 19 Ave. #2142
for an outstanding first degree murder warrant.  LAMONT was taken to the
Main Station and there was contacted by me.  At approximately 2154 hrs., I
contacted LAMONT inside an interview room and first read him his Miranda
warnings from a standard issued Phoenix Police Department Miranda card.
LAMONT responded that he understood his rights by saying, "yeah" and the
following interview took place.

LAMONT first told me that he didn't think there was a need to explain what
had occurred because he had already told me once before.  I then told
LAMONT that I wanted him to clarify several points and he began by saying
that he left the El Sereno apartments and went to a barbecue on 43 Ave. &
McDowell at approximately 8:00 or 9:00 p.m. that night.  At approximately
10:00 or 11:00 p.m. that night.  He returned to the El Sereno apartments
and met with several people that were around the pool area.  He identified
some of the people as MONKEY, KEITH, ROB, FRED and others.  He said he had
drank at the barbecue and continued drinking at the pool area, but he said
he didn't believe that he was drunk.

LAMONT then said that he decided to go into his apartment, ate something
and then returned back to the pool area.  He said he believes it was
approximately 12:30 a.m. when he decided to go check on his girlfriend's
sister, who he identified as DIANE and said she lived at one of the

REYNOLDS 051

001771
MILKE NSB001934

Exhibit 1B

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MCKEE, DEBRA | SALDATE #1875 | 88-116757 |

apartments but refused to tell me which one. He said he went to check on DIANE because her husband works late and does not usually get home until approximately 5 AM and he wanted to make sure she was all right. He said he told DIANE he just wanted to check on her and then told her that he was going home. LAMONT then said that he went home and remained there the rest of the night.

I then told LAMONT that his statement tonight was nowhere close to the original statement he gave me on 9-6-88. LAMONT then raised his voice and said "shit, I made up the name FRED." I then asked LAMONT if he had made up the rest of the story that he had told me on 9-6-88 and LAMONT responded that he had made up most of it because I was accusing him of killing someone. I then asked LAMONT whether he had lied to me about having contact with the victim that night and he responded "look man, I sold her some dope that night, shit she was my regular customer." I then explained to LAMONT that I needed him to tell me what actually occurred that night and he then gave me the following information.

LAMONT said that he had been by the pool area drinking and that he had gone into his apartment to eat but had returned to the pool area and started drinking again. LAMONT described himself as not being drunk and said that he was not smoking weed but was only drinking.

At approximately midnight, he said he went up to DEBBIE's apartment and walked in the rear gate and knocked on the arcadia door and was let in by DEBBIE. He said the purpose of him going to the apartment was because he wanted to sell her some dope because he needed some money. He said when he walked in to the apartment, the television was on and then DEBBIE cautioned him and told him that her kids were asleep on the floor and for him to be careful. He said that he and DEBBIE then sat on the couch and he gave DEBBIE a joint (marijuana cigarette) and then sold her a $20 rock of crack (cocaine). He said he then left DEBBIE and that DEBBIE did not consume any of the dope while he was there.

LAMONT said he returned to the pool area and was in the pool area drinking and socializing when DEBBIE came to the pool area and asked to speak with him. LAMONT said that after he spoke to her, he assumes that she went back into her apartment and he then later went inside his apartment and remained there the rest of the night. I then asked LAMONT what he and DEBBIE spoke about and he told me that he really didn't have to tell me about that. I told him that I just wanted to know what their conversation was about and I told him that I believed he probably didn't remember and he quickly responded that he did remember what they spoke about but that he wouldn't tell me.

At this point, I asked LAMONT if he recalled a fight occurring by the pool area and he immediately said that he did not. I then asked him if he was sure that he had not seen FRED and CARLA arguing by the pool and later fighting over FRED having two girls at the apartment, and LAMONT responded by saying "that shit didn't happen while I was out there."

REYNOLDS 052

001772
MILKE NSB001935

Exhibit 1B

Page - 3

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | MCKEE, DEBRA | SALDATE #1875 | 88-116757 |

I then told LAMONT if he could focus back to when he was with DEBBIE inside the apartment, and I asked him if he possibly shut off the T.V. when he left and he responded that he really didn't recall. I then suggested to him that if his print was found by the television set, would that mean that he had shut the television off and he said that he could have. I then asked LAMONT if he, that night, had had sex with DEBBIE, and he told me that he had not. I asked him if he was sure and he again said that he had not had sex with her that night but that he had the previous night. I then asked him if it was the Saturday night and he quickly told me that he couldn't keep track of the days.

At this point, I advised LAMONT that this was not anything like he had told me earlier and he appeared frustrated and told me that I was just trying to confuse him. I then asked him where he had sex with DEBBIE and he told me that he thought it was her bedroom. I asked him to describe it and he said he could not remember what it looked like. I told him that the last time I spoke to him, he recalled it rather clearly and he responded "I just told you anything the last time." I then asked him if he had made it up and he responded "yeah." I then tried to focus back to the original interview with him and it appeared to anger him and he said "I just told you stuff that last time, man." I then asked if he meant he didn't have sex with her in the room where the bunk beds were and the little bed as he previously had told me and again he became angered and said "I told you I had sex with her in her room." I then told LAMONT that the last time we spoke, LAMONT then quickly interrupted me, and said angrily, "man, I already told you that I said a bunch of stuff the last time."

I then explained to LAMONT that him getting angry was not going to accomplish anything and that I just wanted to get one point straight in my mind and that was whether he was now denying having sex with DEBBIE on the floor next to the little bed in the same room where the bunk beds were as he had described it to me earlier and LAMONT responded "okay man, I think there was bunk beds in there, that's all I know." I then asked LAMONT if he had had sex with DEBBIE other than the night before she was killed and he told me that he had had sex with her   at least two or three occasions. LAMONT said he could not tell me the dates nor the time periods which separated the sexual contacts with her. LAMONT did say that he went over to DEBBIE's house in the area of 8 to 10 times to specifically sell her dope.

LAMONT was then asked about the rape of SANDEE THURMOND, DR# 88-121316, which occurred on 7-31-88 at approximately 1 AM. LAMONT denied ever raping or hurting anyone and said the only persons he has ever hurt were guys that he has beaten up before. I then explained to him that SANDEE had made a report regarding a rape that he had committed on her in apartment #10 at the El Sereno Apartments and LAMONT again angrily said "man I don't know anything about that."

LAMONT was also asked about a cassette recording that was taken from the manager's office of the El Sereno Apartments where someone identified himself as CUTMAN and threatened to kill people at the apartment complex.

001773
MILKE NSB001936

Exhibit 1B

Page - 4

| TYPE OF REPORT HOMICIDE | VICTIM MCKEE, DEBRA | OFFICER SALDATE #1875 | DR # 88-116757 |
|---|---|---|---|

He immediately responded that he had no knowledge of that. LAMONT was asked where he had been the last several days and he said that he had been in San Diego and in fact he was returning from the airport when the police arrested him. LAMONT was found to have a $29 receipt from Southwest Airlines for today's date.

I finally asked LAMONT why he had killed DEBBIE and he told me that he had not killed her. I told him that I believed that he had killed her and I believed the motive was that he was drunk and high on marijuana and was looking for a woman to have sex with and that DEBBIE probably refused to give him any and he then killed her. LAMONT then said "man, I'm not no mass murderer or stuff." At this time, I decided to end the interview with LAMONT and the time was 2245 hrs.

Investigation Continuing.

REYNOLDS 054

001774
MILKE NSB001937

Exhibit 1B

| 1. LOC. &/HD OF RECOVERY | 2. DAY OF WEEK OF RECOVERY | 3. HOUR OF DAY OF RECOVERY 0-23 | 4. OF VERY |
|---|---|---|---|

| 18. VALUE OF PROPERTY RECOVERED OR ADDITIONAL PROPERTY TAKEN | 7. TYPE OF REPORT *Homicide* | | 9. DATE OF THIS SUPPLEMENT 3/16/89 | 6. OR. # 88-116757 |

4. VICTIM'S NAME (FIRM NAME IF BUS.) *McKee, Deborah K.*    11. LOCATION OF OCCURRENCE *3840 N. 43 AVE*

| PROPERTY RECOVERED ☐ | ADDIT. PROP. TAKEN ☐ | CLEARED BY ARREST OR EXCEPTIONALLY CLEARED - | OVER 18 YEAR OLD ☐ | UNDER 18 YEAR OLD ☐ |

$_____CURRENCY, NOTES. ETC.   $_____ CLOTHING

$_____JEWELRY, PRECIOUS METALS $_____AUTOS

$_____FURS   $_____ MISC.   PENDING ☐   UNFOUNDED ☐   PREVIOUS CLEARED BY ARREST OR EXCEPTION ☒

ADDITIONAL SUSP: LAST. FIRST, MIDDLE        SOC. SEC. #    SEX    DOB (APPROX) RESIDENCE

Grand Jury Warrant #CR89-09605 issued 2/24/89 charging

Lamont Reynolds ████████ ████

with

Murder in the First Degree C-1-F,

&

Kidnapping C-2-F,

and

Burglary in the Second Degree C-3-F.

| PAGE # | OFFICER WRITING REPORTS # DET. A. SALDATE | DATE & TIME TYPED 1815 | DIVN. | CLERK D.R. # 88-116757 |
| CONT'D. ON PAGE # | | | | |

CITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

SUPPLEMENTARY
60-7 - REV 3 78

**REYNOLDS 055**

**001776**
**MILKE NSB001939**

Exhibit 1B

OFFICE DISTRIBUTION

dispo ☒

| CHANGE OF VENUE | |
| JURY FEES | |
| REMANDS | |
| GEN. ACCTG. | |

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

3

RECEIVED   PROCESSED
JAN  9 '90      JAN  9 '90

CLERK OF THE COURT

**January 8, 1990**
Code            Date

HON.  THOMAS W. O'TOOLE
Judge / Commissioner / Pro Tem

D. Weisheit
Deputy

CR88-09605

STATE OF ARIZONA

v.

LAMONT E. REYNOLDS

County Attorney/
Vincent Kirby

Public Defender

Pursuant to the state's Motion to Dismiss,

IT IS ORDERED that the above-entitled cause be dismissed
without prejudice as to Lamont E. Reynolds only; all in accordance with
formal written order signed by the court and filed herein.

022

**MILKE NSB012596**

Exhibit 1B

| OFFICE DISTRIBUTION | | |
|---|---|---|
| CHANGE OF VENUE | | |
| JURY FEES | | |
| REMANDS | | |
| GEN. ACCTG. | | |

**SUPERIOR COURT OF ARIZONA**
**MARICOPA COUNTY**

4

RECEIVED        PROCESSED

FEB 28 '89     MAR 01 '89

Clerk of the Court — DIST. CENTER

CLERK OF THE COURT

SC05-83973  Date 2-27-89

CR88-09605

HON. JOHN H. SEIDEL
Judge/Commissioner/Pro Tem

P. OBSER
Deputy

STATE OF ARIZONA

v.

LAMONT E. REYNOLDS

County Attorney
By Vincent Kirby

Dennis Jones

MCSO
Judge O'Toole

Defendant's Motion for New Finding of Probable Cause having been argued and taken under advisement,

IT IS ORDERED granting the motion.  The court is of the opinion that with regard to certain aspects of the presentation made to the Grand Jury, the defendant was denied his right to due process and a fair and impartial presentation of the evidence by the manner in which the proceeding was conducted.  See Crimmins v. Superior Court, 137 Ariz. 39 (1983) and State v. Coconino County Sueprior Court, 139 Ariz. 422 (1984).

In particular, the court is of the opinion that a fair presentation was not made in connection with the evidence concerning the identification of the defendant by the victim's son, Patrick Engelbert, as more fully outlined in that portion of defendant's motion under the heading of I contained at pages 8 through 11.  Likewise, the identification evidence with respect to Christina Giesler was again not fully presented as outlined in the portion of defendant's motion labeled II at pages 11 and 12.

057

Cont...

01511

Page 42

omputer Minute Entry R4-88

**REYNOLDS 057**

**MILKE NSB012597**

Exhibit 1B



| OFFICE DISTRIBUTION | |
| --- | --- |
| CHANGE OF VENUE | |
| JURY FEES | |
| REMANDS | |
| GEN. ACCTG. | |

**SUPERIOR COURT OF ARIZONA**
MARICOPA COUNTY

RECEIVED
FEB 28 '89

PROCESSED
MAR 0 1 '89

Clerk of the Court  —  DIST CENTER
**CLERK OF THE COURT**

SCO5-83973  Date 2-27-89     HON. JOHN H. SEIDEL        P. OBSER
CR88-09605                    Judge / Commissioner / Pro Tem        Deputy

State vs. Reynolds (Cont.)

The court is also of the opinion that the evidence was not fully and fairly presented with regard to defendant's possible intoxication as outlined in that portion of the motion labeled V at page 15.

On the other hand, the court is of the opinion that there was no error with regard to those portions of the motion labeled III and IV.

For the foregoing reasons, IT IS ORDERED granting the motion.

FURTHER ORDERED that the defendant be released from custody as to this cause only. ISSUED: Order of Release.

Computer Minute Entry R4-88                01512                Page 43

**REYNOLDS 058**

**MILKE NSB012598**

Exhibit 1B

DENNIS C. JONES (#5897)
P.O. Box 3587
Phoenix, Arizona 85030
(602) 840-6869
Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,        )
                         )   NO. CR88-09605
            Plaintiff,   )
                         )   MOTION FOR NEW FINDING OF
    vs.                  )        PROBABLE CAUSE
                         )
                         )   (Evidentiary Hearing
LAMONT E. REYNOLDS       )      Requested)
                         )   (Oral Argument Requested)
            Defendant.   )   (Assigned to the Hon.
_____)        John H. Seidel)

        Defendant through counsel undersigned, pursuant to Rule

12.9(a) of the Arizona Rules of Criminal Procedure, moves the

court to order a new determination of probable cause for the

reason that the defendant was denied a substantial procedural

right and due process of law.

        Respectfully submitted this _12th_ day of January, 1989.

                            DENNIS C. JONES

                        By _____
                            Dennis C. Jones
                            P.O. Box 3587
                            Phoenix, Arizona 85030
                            Attorney for Defendant

01513

REYNOLDS 059

MILKE NSB012599

Exhibit 1B

David Mroczkowskzi said he left the victim's apartment at 9:30 p.m. and called her at 10:20 p.m. (DR page 98).

Anthony Russel said that at 10:30 p.m. he ran to the store and brought back a couple items for the victim (DR page 88).

Christina Giesler saw a tall black male enter the victim's patio sometime between 12:30 and 1:00 a.m. the next morning (DR page 6). She identified this person known to her as "Robert" (DR page 40) who had been seen in the area by others that evening (DR page 39). At about this same time, 12:30 a.m., Deborah Comstock saw the victim alive in the victim's apartment (DR page 6). Another witness, Rosalie Salazar saw the victim alive at about this same time (DR page 42).

On October 18, 1988, this case was heard by the 103rd Grand Jury. Detective Saldate testified about the facts of the case. He told the grand jury that the victim's body had been found and that her five year old son, Patrick Engelbert, had seen a large black male break in the back arcadia door, grab his mother by the hair and leg and drag her upstairs (Grand Jury Transcript attached as Exhibit 2, hereinafter referred to simply as "GJ" at page 8). The boy then reported hearing a struggle (GJ page 8). Then, according to Patrick, the man came downstairs, turned off the television and left (GJ page 8). Detective Saldate said the boy could not say the exact time this took place except that it was "late at night" (GJ page 8). Patrick told Detective Saldate that no one else entered the apartment that night (GJ page 16).

-4-

01514

REYNOLDS 060

MILKE NSB012600

Exhibit 1B

impartial presentation of evidence.   <u>Crimmins v. Superior Court</u>,
137 Ariz. 39, 668 P.2d 882 (1983).

Evidence of such weight that it would <u>deter</u> the grand jury
from finding the existence of probable cause must be presented.
<u>State v. Coconino County Superior Court, Division II</u>, 139 Ariz.
422, 678 P.2d 1386 (1984).

It is the position of the defense that the county attorney
in taking this matter to the grand jury failed to make a fair and
impartial presentation of the facts, intentionally or
unintentionally used misleading evidence, and failed to present
evidence which would have deterred the grand jury from making a
finding of probable cause for the reasons hereinafter stated.

I.   <u>THE PROSECUTION MISLED THE GRAND JURY BY PRESENTING
     EVIDENCE THAT THE VICTIM'S SON, PATRICK ENGELBERT,
     IDENTIFIED DEFENDANT AS THE PERSON WHO DRAGGED HIS
     MOTHER UPSTAIRS BY THE HAIR WITHOUT ALSO TELLING THE
     GRAND JURY ABOUT OTHER EVIDENCE WHICH MADE THE
     IDENTIFICATION MEANINGLESS.</u>

As noted in the Statement of Facts, Detective Saldate
testified to the grand jury that the victim's five year old son,
Patrick Engelbert, had seen a large black male break in the back
arcadia door, grab his mother by the hair and leg and drag her
upstairs (GJ page 8).  The boy then reported hearing a struggle
(GJ page 8).  Then, according to Patrick, the man came
downstairs, turned off the television and left (GJ page 8).
Detective Saldate said the boy could not say the exact time this
took place except that it was "late at night" (GJ page 8).  The

-8-

01515

REYNOLDS 061

MILKE NSB012601

Exhibit 1B

boy later picked defendant's photograph from a lineup as being
the person he saw (GJ page 13). The grand jury was not advised
of any other facts which related to Patrick's statements.

The presentation of Patrick's statements in this fashion
denied the defendant his due process right to a fair and
impartial presentation of evidence before the grand jury because
the statements in the context they were presented are misleading.
Similarly the prosecution was aware of evidence which was
exculpatory as related to these statements and did not present it
to the grand jury.

Actually the evidence was more than merely misleading; it
was also misstated. Detective Saldate misstated the facts when
he told the grand jury that Patrick could not say what time this
event occurred except that it was late at night. In fact Patrick
had told Detective Addington, Saldate's associate, that the man
came in at about 8:00 p.m. and turned off the "Gary Shandling"
show (DR page 26). The indictment returned against defendant
with the use of such intentionally or unintentionally misleading
testimony denied defendant his substantial due process rights.
Nelson v. Roylston, 137 Ariz. 39, 668 P.2d 882 (1983).

Not only did Detective Saldate misstate the evidence to the
grand jury, the misstatement in this regard was particularly
harmful because Detective Saldate and the prosecution knew that
several witnesses had reported seeing the victim alive long after
8:00 p.m. For example, David Mroczkowskzi said he left the
victim's apartment at 9:30 p.m. and called her at 10:20 p.m. (DR

-9-

01516

**MILKE NSB012602**

Exhibit 1B

of evidence. <u>Crimmins v. Superior Court</u>, 137 Ariz. 39, 668 P.2d 882 (1983).

In this case the grand jury was given the appropriate definition of the term "premeditation" from A.R.S. Section 13-1101. The prosecutor's obvious advocacy and argument in attempting to further define this term in the manner he did violated the defendant's due process rights.

V.   **THE PROSECUTION MISLED THE GRAND JURY CONCERNING EVIDENCE OF THE DEFENDANT'S INTOXICATION.**

Near the end of the presentation of evidence to the grand jury a question arose as to whether the defendant was intoxicated (GJ page 36). The juror stated they were concerned about this because of the effect of A.R.S. Section 13-503. Detective Saldate told the grand jury that the defendant said he had been drinking but was not drunk (GJ page 36).

In fact defendant told Detective Saldate in his first interview that he had been drinking beer and smoking marijuana the night before and was "too drunk" to remember certain events (DR page 71).

The juror was concerned about whether the defendant was to intoxicated to form the specific intent required of First Degree Murder of "intending" to cause death. A.R.S. Section 503 states that the jury may consider even voluntary intoxication in determining whether this culpable mental state existed.

-15-

01517

**REYNOLDS 063**

**MILKE NSB012603**

Exhibit 1B

DENNIS C. JONES (#5897)
P.O. Box 3587
Phoenix, Arizona 85030
(602) 840-6869
Attorney for Defendant



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | NO. CR88-09605 |
| Plaintiff, | ) | MOTION FOR NEW FINDING OF |
| vs. | ) | PROBABLE CAUSE |
| | ) | (Evidentiary Hearing |
| LAMONT E. REYNOLDS | ) | Requested) |
| | ) | (Oral Argument Requested) |
| Defendant. | ) | (Assigned to the Hon. |
| | ) | John H. Seidel) |

Defendant through counsel undersigned, pursuant to Rule 12.9(a) of the Arizona Rules of Criminal Procedure, moves the court to order a new determination of probable cause for the reason that the defendant was denied a substantial procedural right and due process of law.

Respectfully submitted this $12^h$ day of January, 1989.

DENNIS C. JONES

By _____
Dennis C. Jones
P.O. Box 3587
Phoenix, Arizona 85030
Attorney for Defendant

**REYNOLDS 064**

SALDATE000531

Exhibit 1B

MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF FACTS

On October 18, 1988, 103 Grand Jury 81 indicted defendant on the charge of Murder in the First Degree (premeditated), a Class 1 Felony.

The State has indicated previously to the court that it considers this case to be a capital offense and that an aggravating factor sufficient to justify the death penalty is supported by the facts.

Defendant's arrest came as the result of an investigation that occurred when the victim's body was found September 6, 1988 at approximately 7:45 a.m. The results of the investigation (Departmental Reports of the Phoenix Police Department, hereinafter referred to as "DR") are attached as Exhibit 1. This DR provides most of the information that follows.

The DR indicates that for several days just prior to her death the victim's new boyfriend, David Mroczkowskzi, was present and staying at her apartment (DR page 98).

On September 5, 1988 at 4:45 p.m. the victim's former husband Joseph Mc Kee dropped off her children following his visitation. He noted that a Mexican male and a black female were present (DR page 93). Carla White, a black female, indicated she was with the victim until 6:00 p.m. and that present at the time was someone known to her as Burt or Brad whom she described as white male, late 30s, with long blond hair in a pony tail and a tattoo on his right arm (DR page 83).

-2-

**REYNOLDS 065**

SALDATE000532

Exhibit 1B

Patrick Engelbert, the victim's son, told police the next morning that at 8:00 p.m. while watching the "Gary Shandling" show (DR page 26) a "man" came into his mother's apartment, and dragged his mother upstairs by her hair and a leg.  The man made some noise upstairs then came back downstairs, turned off the TV off and left (DR page 25-30).  Patrick described the man as: having wrinkles on his face and legs; taller than 6 feet; bushy hair on top of head that ran down to mid-back; beer-belly; clean shaven; no glasses; a heart-shaped tattoo on each arm, one with "I Love You"; spoke with high voice; bright orange shorts; white knee high socks with yellow or orange coloring; brown leather or tennis shoes (DR page 24).  Later he said this person looked "real old" like his grandpa (DR page 28).  Patrick also said he heard a white car leave (DR page 29).  Later Patrick provided an additional description stating the man was wearing:  socks up to the knees with orange and white in them; shoes were tennis shoes, but brown.  He added the man had hair down his back (pointed to the middle of his back) like a "woman's hair" (DR pages 30-32).

However, several people had contact with the victim following the time Patrick claims to have seen this man.

For example at 8:30 p.m. Gerald Simpson called the victim and she indicated to him she was going to take a shower and go to bed (DR page 38).

Kristy Glesge said she was at the victim's apartment at 8:30 p.m. and that someone named Gary or Jerry was present (DR page 45).

-3-

**REYNOLDS 066**

SALDATE000533

Exhibit 1B



David Mroczkowskzi said he left the victim's apartment at 9:30 p.m. and called her at 10:20 p.m. (DR page 98).

Anthony Russel said that at 10:30 p.m. he ran to the store and brought back a couple items for the victim (DR page 88).

Christina Giesler saw a tall black male enter the victim's patio sometime between 12:30 and 1:00 a.m. the next morning (DR page 6). She identified this person known to her as "Robert" (DR page 40) who had been seen in the area by others that evening (DR page 39). At about this same time, 12:30 a.m., Deborah Comstock saw the victim alive in the victim's apartment (DR page 6). Another witness, Rosalie Salazar saw the victim alive at about this same time (DR page 42).

On October 18, 1988, this case was heard by the 103rd Grand Jury. Detective Saldate testified about the facts of the case. He told the grand jury that the victim's body had been found and that her five year old son, Patrick Engelbert, had seen a large black male break in the back arcadia door, grab his mother by the hair and leg and drag her upstairs (Grand Jury Transcript attached as Exhibit 2, hereinafter referred to simply as "GJ" at page 8). The boy then reported hearing a struggle (GJ page 8). Then, according to Patrick, the man came downstairs, turned off the television and left (GJ page 8). Detective Saldate said the boy could not say the exact time this took place except that it was "late at night" (GJ page 8). Patrick told Detective Saldate that no one else entered the apartment that night (GJ page 16).

-4-

SALDATE000534

Exhibit 1B

The boy later picked defendant's photograph from     up as being the person he saw (GJ page 13).

Detective Saldate also related the statements of a witness, Deborah Comstock. Comstock related that she had seen the victim alive at 12:30 a.m. (GJ page 9). At that time the victim was dressed for bed (GJ page 9).

Detective Saldate related information from the medical examiner to the grand jury that the victim had died from manual and ligature strangulation (GJ page 10).

Detective Saldate also related the statements of Christina Geisler to the grand jury. Giesler had stated that while she had been baby-sitting she had heard a commotion. While this commotion was going on she saw a large black male going into the patio entrance of the victim's home (GJ page 12). She watched the area for several minutes and when the person never came out, she assumed he entered the apartment (GJ page 12).

Detective Saldate also related statements the defendant made during the investigation of the case. The defendant basically admitted being present at one time during the evening but denied any involvement in the victim's death (GJ page 14). In a second interview the defendant denied even being in the apartment (GJ page 15).

After the grand jury deliberated, a discussion came up as to the definition of premeditation after the foreman noted they were having a problem interpreting the term "premeditated" (GJ page 30). After the definition was reread from A.R.S. Section

-5-

**REYNOLDS 068**

SALDATE000535

Exhibit 1B

13-1101, several of the jurors still had ques....uns.   Counsel for

the State, Mr. Rizer, advised the grand jury:

> MR. RIZER:   Case law in Arizona has
> indicated that premeditation can be that
> length of time wherein if it was death by a
> gun where you took time to pull the trigger.
> It can be that short of a period of time.
>         In this case, it could be ruled
> that the removal of a sheet from a bed, w
> putting it around the neck and twisting it
> would be the time to reflect and premeditate
> your actions.

GJ page 31.

Another grand juror then noted that the reason for the

question was that they "didn't sense that this was premeditation"

(GJ page 32).

When questions about the meaning of premeditation persisted

and a juror asked if taking a sheet off the bed was sufficient

time, another prosecutor present advised that, "the mere time it

takes to pull a trigger is enough time" (GJ page 32).

Near the end of the presentation of evidence a question

arose as to whether the defendant was intoxicated.   Detective

Saldate told the grand jury that the defendant said he had been

drinking but was not drunk (GJ page 36).


## LEGAL ARGUMENT

The purpose of grand jury investigations into criminal

conduct is to protect citizens from unfounded criminal

prosecutions.   Branzburg v. Hayes, 408 U.S. 665 (1972).

-6-

**REYNOLDS 069**

SALDATE000536

A prosecutor's function in the grand jury process is to inform and advise the grand jury and not to prosecute the accused.  As the grand jury's _servant_, the prosecutor owes the accused, the court and the grand jury a duty of good faith in presenting evidence and cannot exploit his position to influence the grand jury's decision.  <u>United States v. Cederquist</u>, 641 F.2d 1347 (9th Cir. 1981).

A defendant is entitled to due process in grand jury proceedings and need not show that the grand jury was actually influenced by the improper conduct of the prosecutor.  The prosecutor is obliged to present the evidence in a fair and impartial manner and any attempt to improperly influence the grand jury constitutes a denial of due process and a substantial procedural right.  <u>State v. Good</u>, 10 Ariz. App. 556, 460 P.2d 662 (1969).

An indictment returned with the use of intentionally or unintentionally misleading testimony denies the accused substantial due process rights.  <u>Nelson v. Roylston</u>, 137 Ariz. 39, 668 P.2d 882 (1983).

The prosecutor has the duty of presenting the evidence in a fair and impartial manner "to insure that the determinations made by that body are informed, objective, and just."  The omission of significant facts coupled with the omission of instruction on statutes which give the omitted facts legal significance denies a defendant his substantial procedural right to a fair and

-7-

SALDATE000537

Exhibit 1B

impartial presentation of evidence.   Crimmins v. Superior Court,
137 Ariz. 39, 668 P.2d 882 (1983).

Evidence of such weight that it would deter the grand jury
from finding the existence of probable cause must be presented.
State v. Coconino County Superior Court, Division II, 139 Ariz.
422, 678 P.2d 1386 (1984).

It is the position of the defense that the county attorney
in taking this matter to the grand jury failed to make a fair and
impartial presentation of the facts, intentionally or
unintentionally used misleading evidence, and failed to present
evidence which would have deterred the grand jury from making a
finding of probable cause for the reasons hereinafter stated.

I.   THE PROSECUTION MISLED THE GRAND JURY BY PRESENTING
     EVIDENCE THAT THE VICTIM'S SON, PATRICK ENGELBERT,
     IDENTIFIED DEFENDANT AS THE PERSON WHO DRAGGED HIS
     MOTHER UPSTAIRS BY THE HAIR WITHOUT ALSO TELLING THE
     GRAND JURY ABOUT OTHER EVIDENCE WHICH MADE THE
     IDENTIFICATION MEANINGLESS.

As noted in the Statement of Facts, Detective Saldate
testified to the grand jury that the victim's five year old son,
Patrick Engelbert, had seen a large black male break in the back
arcadia door, grab his mother by the hair and leg and drag her
upstairs (GJ page 8).   The boy then reported hearing a struggle
(GJ page 8).   Then, according to Patrick, the man came
downstairs, turned off the television and left (GJ page 8).
Detective Saldate said the boy could not say the exact time this
took place except that it was "late at night" (GJ page 8)   The

-8-

**REYNOLDS 071**

SALDATE000538

Exhibit 1B



boy later picked defendant's photograph from a lineup as being
the person he saw (GJ page 13).  The grand jury was not advised
of any other facts which related to Patrick's statements.

The presentation of Patrick's statements in this fashion
denied the defendant his due process right to a fair and
impartial presentation of evidence before the grand jury because
the statements in the context they were presented are misleading.
Similarly the prosecution was aware of evidence which was
exculpatory as related to these statements and did not present it
to the grand jury.

Actually the evidence was more than merely misleading; it
was also misstated.  Detective Saldate misstated the facts when
he told the grand jury that Patrick could not say what time this
event occurred except that it was late at night.  In fact Patrick
had told Detective Addington, Saldate's associate, that the man
came in at about 8:00 p.m. and turned off the "Gary Shandling"
show (DR page 26).  The indictment returned against defendant
with the use of such intentionally or unintentionally misleading
testimony denied defendant his substantial due process rights.
Nelson v. Roylston, 137 Ariz. 39, 668 P.2d 882 (1983).

Not only did Detective Saldate misstate the evidence to the
grand jury, the misstatement in this regard was particularly
harmful because Detective Saldate and the prosecution knew that
several witnesses had reported seeing the victim alive long after
8:00 p.m.  For example, David Mroczkowskzi said he left the
victim's apartment at 9:30 p.m. and called her at 10:20 p.m. (DR

-9-

**REYNOLDS 072**

SALDATE000539

Exhibit 1B

page 98). Anthony Russel said that at 10:30 p.m. he ran to the store and brought back a couple items for the victim (DR page 88). At about 12:30 a.m. Deborah Comstock saw the victim alive in her apartment (DR page 6). Another witness, Rosalie Salazar saw the victim alive at about this same time (DR page 42). All of this other evidence which could have "detered" the grand jury from finding the existence of probable cause should have been presented. State v. Coconino County Superior Court, Division II, 139 Ariz. 422, 678 P.2d 1386 (1984).

Assuming for a moment that even if the grand jury had been informed of all the evidence and they concluded that Patrick made a mistake as to the time, the prosecution's presentation of evidence indicating such a mistake could have deterred the grand jury from indicting based on Patrick's identification of defendant. If Patrick made a mistake relating to time then perhaps his identification would have also been considered suspect by the grand jury. Adding to this is the fact that while the prosecution told the grand jury that Patrick identified the defendant as this person, the prosecution was also aware that there were substantial differences in the defendant's appearence from the descriptions given by Patrick.

For example, the day after he saw this man Patrick described him as having bushy hair on top of head that ran down to mid-back (DR page 31) while the defendant had a short afro haircut. Similarly Patrick said the man: had a beer-belly (DR page 31) while defendant did not; was clean shaven (DR page 29) while

-10-

SALDATE000540

Exhibit 1B

defendant was not clean shaven; had two heart-shaped tattoos, one on each arm, one with "I Love You" (DR page 32) while the defendant had no such tattoos (he does have a tattoo on one arm that is not at all similar to the one described by Patrick); wore bright orange shorts with white knee high socks with yellow or orange coloring (DR page 28, 31) while other witnesses said defendant was wearing long pants that evening; and that this person looked "real old" like his grandpa (DR page 28) while defendant had just turned nineteen.

All of the evidence was significant because the grand jury was told that the boy reported hearing a struggle after his mother was dragged upstairs (GJ page 8). Clearly the prosecution was presenting this person as the perpetrator of this offense and the boy was the only witness. The omitted evidence was certainly of a quality that it would have deterred the grand jury from finding probable cause.

II.  **THE PROSECUTION MISLED THE GRAND JURY BY PRESENTING EVIDENCE THAT CHRISTINA GIESLER IDENTIFIED DEFENDANT AS THE PERSON SHE SAW ENTER THE VICTIM'S PATIO WITHOUT ALSO TELLING THE GRAND JURY ABOUT OTHER EVIDENCE WHICH MADE THE IDENTIFICATION MEANINGLESS.**

Christina Giesler saw a tall black male enter the victim's patio sometime between 12:30 and 1:00 a.m. the next morning (DR page 6, 40). She identified this person as being known to her as "Robert" (DR page 40). This "Robert" was another black male who "hung out" in apartment #59 with Tony Johnson and had been seen in the area by others that evening (DR page 39).

-11-

**REYNOLDS 074**

SALDATE000541

Exhibit 1B



Over a month later, Giesler identified defendant from a photographic lineup as the person she saw (DR page 102).

Defendant could not object to the fact that the grand jury was told that Giesler identified him as the person she saw. However, due process required that the prosecution also tell the grand jury that this identification took place more than a month after the event and that the witness's first statement, the next day after the event, was that she identified the person as someone she knew, "Robert."

III. **EXCULPATORY EVIDENCE WAS KEPT FROM THE GRAND JURY WHEN THE PROSECUTION DID NOT PRESENT EVIDENCE WHICH SUGGESTED THAT OTHERS HAD A MOTIVE FOR KILLING THE VICTIM.**

While evidence of motive is not necessary in a criminal prosecution it is certainly probative where it exists. Similarly absence of motive is also probative of innocence.

In this case there is no evidence of motive by the defendant. However, there is evidence to suggest motive for others.

The victim's estranged husband, Joseph Mc Kee, for example may have had motive to kill the victim. There was a statement by Gerald Simpson that the victim had told him that she was involved in a "bitter custody dispute" with her husband (DR page 35). Terri Grinder also stated that the victim was "scared of her husband" because of allegations she had made that he was molesting their children (DR page 75). Carla White confirmed

-12-

SALDATE000542

Exhibit 1B



this and stated that when she saw the victim ⸱ ⸱ ⸱ ₙₜ she was "very upset" because she thought her husband was molesting the children (DR page 83).

The victim was a prostitute and a drug dealer (DR pages 35, 37 and 46). Obviously there is risk that when engaging in such professions a person may die in the fashion that the victim did. Acts of violence relating to people who become involved in the drug world are well documented. Of note here is the fact that Deborah Comstock told the police that the victim's drug connection was someone known as "Gary" or "Jerry" who frequently carried a gun (DR page 46) and that Kristy Glesge reported that "Gary" or "Jerry" was at the victim's apartment that night at 8:30 p.m. (DR page 46). Similarly prostitutes frequently are the targets of violence from their customers or pimps. The grand jury was never told of the evidence relating to the victim's involvement in these activities or about "Gary/Jerry."

This too was evidence that may have deterred the grand jury from finding probable cause.

IV. <u>THE PROSECUTION SOUGHT TO IMPROPERLY INFLUENCE THE GRAND JURY WHEN IT ATTEMPTED TO DEFINE THE TERM "PREMEDITATION" BEYOND ITS STATUTORY DEFINITION.</u>

After the grand jury deliberated, a discussion came up as to the definition of premeditation after a juror noted they were having a problem interpreting the term "premeditated" (GJ page 30). After the definition of this term was re-read from A.R.S.

-13-

**REYNOLDS 076**

SALDATE000543

Exhibit 1B

Section 13-1101, several of the jurors still ha... ...ions.

Counsel for the State, Mr. Rizer, then advised the grand jury:

> MR. RIZER:  Case law in Arizona has indicated that premeditation can be that length of time wherein if it was death by a gun where you took time to pull the trigger.  It can be that short of a period of time.
> In this case, it could be ruled that the removal of a sheet from a bed, putting it around the neck and twisting it would be the time to reflect and premeditate your actions.

GJ page 31.

Another grand juror then noted that the reason for the question was that they "didn't sense that this was premediation" (GJ page 32).

When questions about the meaning of premeditation persisted and a juror asked if taking a sheet off the bed was sufficient time, another prosecutor present advised that, "the mere time it takes to pull a trigger is enough time" (GJ page 32).

A defendant is not present or represented before the grand jury and therefore due process requires the prosecutor to present the evidence in a fair and impartial manner and any attempt to improperly influence the grand jury constitutes a denial of due process and a substantial procedural right.  State v. Good, 10 Ariz. App. 556, 460 P.2d 662 (1969).  The omission of significant facts coupled with the omission of instruction on statutes which give the omitted facts legal significance denies a defendant his substantial procedural right to a fair and impartial presentation

-14-

SALDATE000544

Exhibit 1B



of evidence.   Cr¹ ᵐⁱⁿᵉ v. Superior Court, 137 A.⁴⁻  ⁻., 668 P.2d

682 (1983).

In this case the grand jury was given the appropriate

definition of the term "premeditation" from A.R.S. Section

13-1101.  The prosecutor's obvious advocacy and argument in

attempting to further define this term in the manner he did

violated the defendant's due process rights.


## V.   THE PROSECUTION MISLED THE GRAND JURY CONCERNING EVIDENCE OF THE DEFENDANT'S INTOXICATION.

Near the end of the presentation of evidence to the grand

jury a question arose as to whether the defendant was intoxicated

(GJ page 36).  The juror stated they were concerned about this

because of the effect of A.R.S. Section 13-503.  Detective

Saldate told the grand jury that the defendant said he had been

drinking but was not drunk (GJ page 36).

In fact defendant told Detective Saldate in his first

interview that he had been drinking beer and smoking marijuana

the night before and was "too drunk" to remember certain events

(DR page 71).

The juror was concerned about whether the defendant was to

intoxicated to form the specific intent required of First Degree

Murder of "intending" to cause death.  A.R.S. Section 503 states

that the jury may consider even voluntary intoxication in

determining whether this culpable mental state existed.

-15-

SALDATE000545

Exhibit 1B

Clearly the record of the proceedings ~~~~~~~ that the grand jury would have at least been deterred from indicting defendant on First Degree Murder if they had been informed of the truth.

## CONCLUSION

When the prosecution took this case to the grand jury it had an obligation to do so with an even hand.

The grand jury may have been deterred from finding probable cause if they had known any one of the facts set out above. Individually on any one of the matters above the court could and should remand the case back to the grand jury. However, even if individually the omissions are not sufficiently significant, the cumulative effect of the omission of all of these facts together with the improper arguments and instructions on the law was certainly harmful to the defendant.

The prosecution took advantage of the one-sided grand jury process and intentionally ignored its obligation to present evidence in a fair and impartial manner thereby depriving the defendant of due process of law.

The defendant does not at this time ask that the court dismiss the matter with prejudice despite the intentional actions of the prosecution in abandoning its proper role before the grand jury. All he asks is that the case be sent back and done right.

-16-

**REYNOLDS 079**

SALDATE000546

Exhibit 1B

In these motions the prosecution frequently responds by saying that defendant wants the court to weigh the evidence and substitute its own judgment. Not at all. All defendant wants is for the grand jury to make its own evaluation of the evidence, but with all the evidence and with proper instructions.

It is therefore requested that the matter be returned to the grand jury for a fair presentation of the evidence.

Respectfully submitted this _1st_ day of January, 1989.

DENNIS C. JONES

By _____

Dennis C. Jones
P.O. Box 3587
Phoenix, Arizona 85030
Attorney for Defendant

Copy of the foregoing ~~mailed~~
delivered this _12_ day of
January, 1989 to:

The Honorable John H. Seidel
Judge of the Superior Court

Jim Rizer
Deputy Maricopa County Attorney

By _____

-17-

**REYNOLDS 080**

SALDATE000547

Exhibit 1B



| OFFICE DISTRIBUTION | |
|---|---|
| CHANGE OF VENUE | |
| JURY FEES | |
| REMANDS | |
| GEN. ACCTG. | |

**SUPERIOR COURT OF ARIZONA**
**MARICOPA COUNTY**

4



RECEIVED    FILED

FEB 28 '89    MAR 01 '89

Clerk of the Court — DIST CENTER

CLERK OF THE COURT

SC05-83973  Date 2-27-89    HON. JOHN H. SEIDEL    P. OBSER
Judge/Commissioner/Pro Tem    Deputy

CR88-09605

STATE OF ARIZONA

v.

LAMONT E. REYNOLDS

County Attorney
By Vincent Kirby

Dennis Jones

MCSO
Judge O'Toole

Defendant's Motion for New Finding of Probable Cause having been argued and taken under advisement,

IT IS ORDERED granting the motion. The court is of the opinion that with regard to certain aspects of the presentation made to the Grand Jury, the defendant was denied his right to due process and a fair and impartial presentation of the evidence by the manner in which the proceeding was conducted. See Crimmins v. Superior Court, 137 Ariz. 39 (1983) and State v. Coconino County Sueprior Court, 139 Ariz. 422 (1984).

In particular, the court is of the opinion that a fair presentation was not made in connection with the evidence concerning the identification of the defendant by the victim's son, Patrick Engelbert, as more fully outlined in that portion of defendant's motion under the heading of I contained at pages 8 through 11. Likewise, the identification evidence with respect to Christina Giesler was again not fully presented as outlined in the portion of defendant's motion labeled II at pages 11 and 12.

057

Cont...

Cont...

Page 42

Computer Minute Entry R4-86

**REYNOLDS 081**

SALDATE000548

Exhibit 1B

| OFFICE DISTRIBUTION | |
| --- | --- |
| | |
| CHANGE OF VENUE | |
| JURY FEES | |
| REMANDS | |
| GEN. ACCTG. | |

**SUPERIOR COURT OF ARIZONA**
**MARICOPA COUNTY**

RECEIVED          PROCESSED

FEB 28 89          MAR 0 1 '89

... — CLERK

CLERK OF THE COURT

8C05-83973  Date 2-27-89      HON. JOHN H. SEIDEL        P. OBSER

CR88-09605

State vs. Reynolds (Cont.)

The court is also of the opinion that the evidence was not fully and fairly presented with regard to defendant's possible intoxication as outlined in that portion of the motion labeled V at page 15.

On the other hand, the court is of the opinion that there was no error with regard to those portions of the motion labeled III and IV.

For the foregoing reasons, IT IS ORDERED granting the motion.

FURTHER ORDERED that the defendant be released from custody as to this cause only. ISSUED: Order of Release.

Computer Minute Entry R4-88

Page 43

**REYNOLDS 082**

SALDATE000549

Exhibit 1B





DENNIS C. JONES (#5897)
P.O. Box 3587
Phoenix, Arizona 85030
(602) 840-6869
Attorney for Defendant

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | NO. CR88-09605 |
| Plaintiff, | MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR NEW FINDING OF PROBABLE CAUSE |
| vs. | |
| LAMONT E. REYNOLDS | (Evidentiary Hearing Requested) |
| Defendant. | (Oral Argument Requested) (Assigned to the Hon. Thomas O'Toole) |

Defendant through counsel undersigned, moves the court to dismiss this case with prejudice or in the alternative, pursuant to Rule 12.9(a) of the Arizona Rules of Criminal Procedure, order a new determination of probable cause for the reason that the defendant was denied a substantial procedural right and due process of law.

Respectfully submitted this 11th day of April, 1989.

DENNIS C. JONES

By _____
Dennis C. Jones
P.O. Box 3587
Phoenix, Arizona 85030
Attorney for Defendant

REYNOLDS 083

SALDATE000550

Exhibit 1B

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF FACTS

On October 18, 1988, 103 Grand Jury 81 indicted defendant on the charge of Murder in the First Degree (premeditated), a Class 1 Felony.

The State has indicated to the court that it considers this case to be a capital offense and that an aggravating factor sufficient to justify the death penalty is supported by the facts.

On January 12, 1989 counsel for defendant filed his first Motion for New Finding of Probable Cause arguing that defendant was denied a substantial procedural right and due process of law. The facts of the case are set forth in that motion and the exhibits attached thereto and it is therefore incorporated herein. A thorough reading and understanding of that motion is necessary to understand the issues presented in the present motion.

In the first Motion for New Finding of Probable Cause defendant pointed out five areas where the State had failed to make a fair presentation of the evidence.

The State responded to this motion on February 14, 1989.

On February 16, 1989 oral argument on the first Motion for New Finding of Probable Cause was heard before the Honorable John H. Seidel. After hearing argument Judge Seidel advised he intended to grant the motion based on arguments I, II and V but felt no error occurred concerning the matters contained in

-2-

REYNOLDS 084

SALDATE000551

Exhibit 1B

arguments III and IV.  Judge Seidel then stated he would take the matter under advisement and issue a written ruling.

On February 27, 1989 Judge Seidel issued a written minute entry ruling ordering the matter remanded back to the grand jury.

Judge Seidel specifically found concerning defendant's first argument,

> ...a fair presentation of the evidence was not made in connection with the evidence concerning the identification of the defendant by the victim's son, Patrick Engelbert, as more fully outlined in that portion of defendant's motion under the heading of I contained at pages 8 through 11.

Similarly as to defendant's second argument, Judge Seidel ruled,

> Likewise, the identification evidence with respect to Christina Giesler was again not fully presented as outlined in the portion of defendant's motion labeled II at pages 11 and 12.

Finally as to the defendant's fifth argument, Judge Seidel wrote,

> The court is also of the opinion that the evidence was not fully and fairly presented with regard to defendant's intoxication as outlined in that portion of the motion labeled V at page 15.

As can be seen, by adopting the very specific points laid out in defendant's first Motion for New Finding of Probable Cause, the court gave the prosecution a very simple and specific road map to use in presenting the case to the grand jury.  The court's statements at oral argument and minute entry left the prosecution with no doubt as to what they would be required to do

-3-

**REYNOLDS 085**

SALDATE000552

Exhibit 1B

to make a fair presentation of the evidence when the case was remanded. As will be seen in the arguments section of this motion, the State apparently decided to ignore these specific directions from Judge Seidel and, as a result, defendant was again denied a substantial procedural right and due process of law when the prosecution took the case back to the grand jury.

## LEGAL ARGUMENT

The purpose of grand jury investigations into criminal conduct is to protect citizens from unfounded criminal prosecutions. <u>Branzburg v. Hayes</u>, 408 U.S. 665 (1972).

A prosecutor's function in the grand jury process is to inform and advise the grand jury and not to prosecute the accused. As the grand jury's <u>servant</u>, the prosecutor owes the accused, the court and the grand jury a duty of good faith in presenting evidence and cannot exploit his position to influence the grand jury's decision. <u>United States v. Cederquist</u>, 641 F.2d 1347 (9th Cir. 1981).

A defendant is entitled to due process in grand jury proceedings and need not show that the grand jury was actually influenced by the improper conduct of the prosecutor. The prosecutor is obliged to present the evidence in a fair and impartial manner and any attempt to improperly influence the grand jury constitutes a denial of due process and a substantial

-4-

**REYNOLDS 086**

SALDATE000553

Exhibit 1B

procedural right.  State v. Good, 10 Ariz. App. 556, 460 P.2d 662 (1969).

An indictment returned with the use of intentionally or unintentionally misleading testimony denies the accused substantial due process rights.  Nelson v. Roylston, 137 Ariz. 272, 669 P.2d 1349 (1983).

The prosecutor has the duty of presenting the evidence in a fair and impartial manner "to insure that the determinations made by that body are informed, objective, and just."  The omission of significant facts coupled with the omission of instruction on statutes which give the omitted facts legal significance denies a defendant his substantial procedural right to a fair and impartial presentation of evidence.  Crimmins v. Superior Court, 137 Ariz. 39, 668 P.2d 882 (1983).

Evidence of such weight that it would deter the grand jury from finding the existence of probable cause must be presented. State v. Coconino County Superior Court, Division II, 139 Ariz. 422, 678 P.2d 1386 (1984).

Normally the remedy for a defendant who is indicted based on an unfair presentation of the evidence to the grand jury is a remand pursuant to Rule 12.9, A.R.Cr.P.  In this case there can be no doubt that a remand is warranted.

However, when prosecutorial misconduct occurs the court has the authority to dismiss an indictment with prejudice.  Crimmins v. Superior Court, 137 Ariz. at 43-45, 668 P.2d at 886-88.  State v. Young, 149 Ariz. 580, 720 P.2d 965 (Ariz.App. 1986)

-5-

REYNOLDS 087

SALDATE000554

Exhibit 1B

(dismissals with prejudice occur only when the evidence is irrevocably tainted or there exists a pattern of misconduct that is prevalent or continuous).

Judge Seidel found that the prosecution failed to make a fair presentation of the evidence the first time the matter was presented to the grand jury. Specific instructions were given as to how the presentation should be made in order to comply with the defendant's procedural and due process rights. It is clear the present case must, at the very least, be remanded because the prosecution did not present the evidence the court ordered to be presented. The harm that Judge Seidel found still remains.

Remanding this matter however is insufficient. The court should dismiss this matter with prejudice because of the prosecution's willful misconduct in deliberately avoiding the specific instructions they were given by the court.

I.    **FOR THE SECOND TIME THE PROSECUTION HAS MISLED THE GRAND JURY BY PRESENTING EVIDENCE THAT THE VICTIM'S SON, PATRICK ENGELBERT, IDENTIFIED DEFENDANT AS THE PERSON WHO DRAGGED HIS MOTHER UPSTAIRS BY THE HAIR WITHOUT ALSO TELLING THE GRAND JURY ABOUT OTHER EVIDENCE WHICH MADE THE IDENTIFICATION MEANINGLESS.**

As noted in the Statement of Facts to defendant's first Motion for New Finding of Probable Cause, Detective Saldate testified to the grand jury that the victim's five-year old son, Patrick Engelbert, had seen a large black male break in the back arcadia door, grab his mother by the hair and drag her upstairs. The boy then reported hearing a struggle. Then, according to

-6-

**REYNOLDS 088**

SALDATE000555

Exhibit 1B

Patrick, the man came downstairs, turned off the television and left. Detective Saldate told the first grand jury the boy could not say the exact time this took place except that it was "late at night." The boy later picked defendant's photograph from a lineup as being the person he saw. The first grand jury was not advised of any other facts which related to Patrick's statements.

In the first Motion for New Finding of Probable Cause defendant pointed out how Detective Saldate had misstated the facts when he told the grand jury that Patrick could not say what time this event occurred except that it was late at night. In fact Patrick had told Detective Addington, Saldate's associate, that the man came in at about 8:00 p.m. and turned off the "Gary Shandling" show and left (See Departmental Report attached to first Motion for New Finding of Probable Cause as an exhibit, hereinafter referred to as DR at pages 26, 30). Defendant then pointed out that Patrick's observations and subsequent identification of defendant as the person he saw at 8:00 p.m. was meaningless because the victim had been seen alive by several people much later that evening.

This is one of the matters on which Judge Seidel remanded the case. When the case went to the second grand jury the prosecution told the grand jury,

> He first told us that he initially had been
> watching the Gary Shandling show on TV when
> the subject initially came in. (Transcript
> of proceedings before the 105th Grand Jury
> hereinafter GJ TR II, page 10).

-7-

REYNOLDS 089

SALDATE000556

Exhibit 1B

For whatever reason the prosecution did not tell the grand jury that Patrick said he was watching the Gary Shandling show _at 8:00 p.m._ The prosecution had a specific time and it should have been presented to the grand jury.

Additionally the statement made to the grand jury above says nothing about when this person left. Yet the prosecution was aware that Patrick said that he went to bed at about 8:00 p.m. _after_ the man turned off the television _and left_ (See DR, pages 26, 30). Moreover, Patrick told the officers that the man only stayed about an hour (DR page 29).

The State has a real problem with Patrick's testimony because he clearly stated that he made his observations at about 8:00 p.m. and the victim was seen alive by many other people at about midnight. Rather that laying the problem out for the second grand jury to consider in evaluating Patrick's testimony, the problem was concealed by omitting the specific time references and leaving open the length of time the person could have been there. This is exactly what defendant had previously objected to. Even if it was a just a mistake on Patrick's part the grand jury may have been detered from accepting Patrick's identification had they believed he made a mistake about the time. It might have caused them to believe the five-year old boy was not a reliable witness.

As pointed out in defendant's first Motion for New Finding of Probable Cause in addition to the time problem there were also

-8-

REYNOLDS 090

SALDATE000557

Exhibit 1B

substantial differences in the defendant's appearance from the descriptions given by Patrick. These were:

| Patrick's description | Defendant's appearance |
|---|---|
| 1. bushy hair on top of head that ran down to mid-back; | 1. short afro; |
| 2. beer-belly; | 2. no beer-belly; |
| 3. clean shaven; | 3. facial hair; |
| 4. two heart shaped tattoos, one on each arm, one with "I Love You"; | 4. tattoo only on one arm which is not similar to the one described; |
| 5. bright orange shorts with white knee high socks with yellow or orange coloring; | 5. long pants; |
| 6. person looked "real old" like grandpa. | 6. age 19. |

The failure to advise the first grand jury of these differences was another one of the reasons Judge Seidel ordered the case remanded. When the case was taken back to the grand jury the only difference the second grand jury was advised of was the clothing (#5). The grand jury was also told that Patrick stated the man looked real old like his grandpa (#6) but they were not told how old the defendant was (age 19) and therefore were not advised of this difference between Patrick's description (old) and the defendant (young).

The prosecution also did not bother to follow Judge Seidel's instructions and present any reference to any of the other differences (#1-4) between Patrick's description and the defendant's appearance. These are especially significant

-9-

REYNOLDS 091

SALDATE000558

Exhibit 1B

differences.  The morning after his observations Patrick gave a detailed description of the person he saw.  The details (hair down to the middle of the back, beer-belly, and "heart" shaped tatoos one with "I Love You") substantially differed from the defendant's appearance.

The prosecution was aware of these differences.  The omission of these differences was clearly pointed out in defendant's Motion for New Finding of Probable Cause and adopted by Judge Seidel as one of his reasons for remanding the case.

The State acknowledged the differences in its response to the first Motion for New Finding of Probable Cause arguing the failure to note the differences was not clearly exculpatory evidence stating, "The initial physical description of the victim's child, Patrick Englebert, as to the assailant of his mother which was inconsistent with his later identification of the defendant does not qualify."  Judge Seidel disagreed finding the differences to be clearly exculpatory and ordered the case remanded.

The failure to present the differences the first time merely warranted a remand of the case since the State did not willfully omit the exculpatory evidence.  Deliberately ignoring the court's specific order to present this evidence to the second grand jury however warrants dismissal.  How can the State claim it didn't realize the evidence was clearly exculpatory when they had been told it was by Judge Seidel?  To merely remand, rather than

-10-

REYNOLDS 092

SALDATE000559

Exhibit 1B

dismiss, would be to invite the prosecution to engage in the same
conduct yet again.

II. **THE PROSECUTION MISLED THE GRAND JURY BY PRESENTING
EVIDENCE THAT CHRISTINA GIESLER IDENTIFIED DEFENDANT AS
THE PERSON SHE SAW ENTER THE VICTIM'S PATIO WITHOUT
ALSO TELLING THE GRAND JURY ABOUT OTHER EVIDENCE WHICH
MADE THE IDENTIFICATION MEANINGLESS.**

Christina Giesler saw a tall black male enter the victim's
patio sometime between 12:30 and 1:00 a.m.  She identified this
person as being known to her as "Robert" because he had been
pointed out to her a few days earlier by Kari Dodson (DR page
40).  This "Robert" was another black male who, according to Kari
Dodson, was about 6'2", large, age 19 and "hung out" in apartment
#59 with Tony Johnson.  Dodson said she had seen Robert in the
area that evening.

A week later, Giesler identified defendant from a
photographic lineup as the person she saw.

Defendant in his first Motion for New Finding of Probable
Cause argued that, "due process required that the prosecution
also tell the grand jury that....the witness's first statement,
the next day after the event, was that she identified the person
as someone she knew, "Robert."  Again, Judge Seidel agreed that
the fact that Giesler had initially identified the subject she
saw as someone other than the defendant was something the grand
jury should be advised of.

-11-

SALDATE000560

Exhibit 1B

When the prosecution took the case back to the grand jury they told the grand jury,

> Q: Did she give you some idea of what his name was?
>
> A: Yes. She knew the person from the apartments. She had spoken to someone who told her that this person's name was possibly named Robert.
>
> Q: Did she of her own knowledge know what his name was?
>
> A: No, she did not.

Relating Giesler's statements in this way was a complete misrepresentation of the facts and did not comply with Judge Seidel's previous order. The statements above make it sound like Giesler just got the name wrong. That is not the case.

Dodson did not point out the defendant to Giesler and make a mistake as to his name. She pointed out "Robert" (later identified as Robert Bell) to Giesler and it was "Robert" that Giesler stated was the subject she saw. Dodson knew "Robert" and knew that he lived with Tony Johnson in apartment #59. The prosecution knew this information was correct because they followed up on it and discovered from Grace Hasan, who lived in Apartment #59, that "Robert" was a friend of Tony Johnson and occasionally stayed with them in that apartment.

Geisler did know of her own knowledge the name of the person she saw because he had been pointed out to her a couple of days earlier by Dodson. Dodson had pointed out Robert Bell and not the defendant. The jury should have been advised of the

-12-

SALDATE000561

Exhibit 1B

previous identification made by Geisler that the person was Robert Bell and not defendant.  The State persists in presenting to the grand jury its own interpretations and inferences and labeling them as fact when they are incorrect and misleading. Worse, the prosecution seems unwilling to accept the court's directions when told what they are doing is wrong.

III. **EXCULPATORY EVIDENCE WAS KEPT FROM THE GRAND JURY WHEN THE PROSECUTION DID NOT PRESENT EVIDENCE WHICH SUGGESTED THAT OTHERS HAD A MOTIVE FOR KILLING THE VICTIM.**

Defendant raised this issue previously before Judge Seidel and he rejected it.  Defendant therefore adopts the arguments in his first Motion for New Finding of Probable Cause on this issue and will not argue further here.  Defendant only raises this issue at this time to preserve his objections and recognizes that Judge Seidel's decision constitutes the law of the case on this issue.

IV. **THE PROSECUTION MISLED THE GRAND JURY CONCERNING THE NATURE OF DEFENDANT'S STATEMENTS TO THE POLICE.**

Apparently hoping to bolster its incredibly weak case the prosecution related the two separate statements defendant allegedly made to the officers investigating the case.  In so doing several misstatements were made.

The first misstatement was that the witness told the grand jury that initially in the first interview that defendant denied knowing the victim other than to see her (GJ TR II, page 18,

-13-

SALDATE000562

Exhibit 1B

lines 24-25). This was simply not true. The defendant **immediately** admitted knowing the victim and said he had gotten high with her (DR page 67).

The prosecution also misstated other aspects of the first statement defendant gave to the police. The testifying detective related to the grand jury that defendant said that he had been drinking, but claimed he didn't recall if the defendant said he had used drugs that evening (GJ TR II, page 20). In fact, the defendant told the officer who was testifying that he had smoked marijuana several times that evening (DR page 71). The prosecution's failure to present potentially exculpatory evidence relating to an intoxication defense to the first grand jury was another reason the case was remanded by Judge Seidel.

## CONCLUSION

The prosecution is unwilling to meet its due process obligation to the defendant to take this case before a grand jury in a fair manner.

The grand jury may have been deterred from finding probable cause if they had known any one of the facts set out above. Individually on any one of the matters above the court could and should remand the case back to the grand jury. However, even if individually the omissions are not sufficiently significant, the cumulative effect of the omission of all of these facts was certainly harmful to the defendant.

-14-

**REYNOLDS 096**

SALDATE000563

The prosecution took advantage of the one-sided grand jury process and intentionally ignored its obligation to present evidence in a fair and impartial manner even after being told to do so by this court. A remand is insufficient at this point. The court should dismiss this case.

It is therefore requested that the matter dismissed or, in the alternative, be returned to the grand jury for a fair presentation of the evidence.

Respectfully submitted this 11th day of April, 1989.

DENNIS C. JONES

By _____
Dennis C. Jones
P.O. Box 3587
Phoenix, Arizona 85030
Attorney for Defendant

Copy of the foregoing mailed
delivered this 11th day of
April, 1989 to:

The Honorable Thomas O'Toole
Judge of the Superior Court

Vicent Kirby
Deputy Maricopa County Attorney

By _____

−15−

REYNOLDS 097

SALDATE000564

Exhibit 1B

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

**DD 5**

Vincent Q. Kirby
Deputy County Attorney
Bar ID #:  006377
111 West Monroe, Suite 1800
Phoenix, AZ  85003
Telephone:  602 256-5780
Attorney for Plaintiff

C9 FEB 19  PM 4: 04

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | ) |
| Plaintiff, | ) NO. CR 88-09605 |
| vs. | ) STATE'S RESPONSE TO THE<br>) MOTION TO DISMISS/MOTION<br>) TO REMAND |
| LAMONT E. REYNOLDS, | ) |
| Defendant. | ) (Assigned to the Honorable<br>) Howard Peterson - Div. 2) |

The State of Arizona, by and through the undersigned, respectfully requests this Court to deny the defense Motion to Dismiss/Remand for the reason that the Defendant was not denied a substantial procedural right and was not denied due process of law.

### MEMORANDUM OF POINTS AND AUTHORITIES

#### Facts

On October 18, 1988, 103 Grand Jury 81 indicted Defendant.

On January 12, 1989, Defendant filed his Motion for New Finding of Probable Cause, indicating five issues of concern.

On February 14, 1989, Plaintiff responded to Defendant's January 12 Motion.

On February 16, 1989, the Honorable John H. Seidel heard oral argument on the January 12 Motion.  At the end thereof he took the matter under advisement.

**REYNOLDS 098**

SALDATE000565

On February 24, 1989, 105 Grand Jury 86 heard testimony regarding this same criminal matter and once again indicted Defendant.

On February 27, 1989, Judge Seidel issued a minute entry regarding the oral argument heard on February 16, indicating three areas that would need to be clarified in a second Grand Jury hearing.

On April 11, 1989, Defendant filed a new Motion to which this Response responds.

### Law

The duty of the Grand Jury is to determine whether probable cause exists to believe that a crime has been committed and that the individual being investigated was the one who committed it. 17 A.R.S., Arizona Rules of Criminal Procedure, Rule 12.1(d)(4). For the Grand Jury to do anything more, i.e., determine the guilt or innocence of an individual, would put the Grand Jury in the business of holding mini-trials. State v. Bauman, 125 Ariz. 404, 610 P.2d 38 (1980).

Although the courts have no power to inquire into the weight or sufficiency of the evidence presented to the Grand Jury, courts may inquire into the allegation of whether the defendant was denied a "substantial procedural right" in the Grand Jury proceedings. State v. Jacobson, 22 Ariz. App. 128, 524 P.2d 962 (1974); 17 A.R.S., Rules of Criminal Procedure, Rule 12.9(a).

In determining whether the defendant has been denied a substantial procedural right, due process requires the "use of an unbiased Grand Jury and a fair and impartial presentation of the

**REYNOLDS 099**                          2                    SALDATE000566

Exhibit 1B

evidence." <u>Crimmins v. Superior Court</u>, 137 Ariz. 39, 41, 668 P.2d 882, 884 (1983).   In making the determination, there is no "mechanical test" to decide if due process has been satisfied. What is necessary for a fair and impartial presentation will vary from case to case.   <u>State v. Coconino County</u>, 139 Ariz. 422, 678 P.2d 1386 (1984).   Due process is violated when perjured or false testimony is presented to a Grand Jury and the testimony is material to the indictment, thus precluding a Grand Jury from being able to find the existence of probable cause.   <u>Jacobson</u>, <u>supra</u> at 964; <u>United States v. Basurto</u>, 497 F.2d 781 (9th Cir. 1974); <u>Nelson v. Roylston</u>, 137 Ariz. 272, 669 P.2d 1349 (App. 1983).

Regarding prosecutorial misconduct by not using impeaching evidence, the Court in <u>United States v. Jones</u>, 766 F.2d 994 (1985), found that "there is no requirement that the prosecution present impeachment evidence before the Grand Jury with respect to witness called before that body . . .. Failure to do so does not constitute prosecutorial misconduct." <u>Id</u>. at 998, n.1.

The evidence was presented to the Grand Jury in this matter in a fair and impartial manner.   There was no withholding of <u>clearly exculpatory evidence</u> as has been defined in <u>State v. Coconino County vs. Superior Court</u>, 139 Ariz. 422, 678 P.2d 1386 (1984).

> "Clearly exculpatory evidence is evidence of such weight that it <u>would</u> deter the Grand Jury from finding the existence of probable cause." <u>Coconino County</u>, <u>supra</u>. at 1389.   (emphasis added).

The operative word in this holding is that it <u>would</u> deter the Grand Jury not might have deterred the Grand Jury.

SALDATE000567

Exhibit 1B

This is not a case based solely on the testimony of observations of one witness. It was presented on the basis of an accumulation of several identifications made by witnesses as well as the incredibly inconsistent stories related by the Defendant.

As indicated previously in the State's motions in this matter the evidence presented to a Grand Jury may not be challenged. State v. Guerrero, 119 Ariz. 273, 580 P.2d 734. Clearly the defense is attempting to do just that. They are asking this Court to order the State to present every piece of evidence to the Grand Jury. That is not what the law requires the State to do. The Grand Jury is a probable cause determination. Questions regarding observations of certain witnesses are to be used as impeaching tools.

### Arguments

Defendant argues that this case should be dismissed on the grounds that the prosecution improperly presented the evidence at the second Grand Jury hearing. Accusing the prosecution of ignoring Judge Seidel's minute entry, Defendant apparently failed to point out the dates of the second Grand Jury hearing (February 24) and the issuance of the minute entry (February 27). In point of fact, the prosecution did not, and could not, ignore the minute entry, which was issued some three (3) days after the second Grand Jury hearing.

That being said, and an analysis of the second hearing transcript being completed, the Court will note that the presentation of the evidence did indeed conform to the orders contained in the February 27 minute entry. In the second hearing

**REYNOLDS 101**                    4                    SALDATE000568

Exhibit 1B

the prosecution presented the evidence fairly and impartially without intentionally or effectively misleading the jurors.

A.   **DEFENDANT ARGUES THAT THE PRESENTATION OF EVIDENCE FAILED IN THREE (3) AREAS:   (1) THE CIRCUMSTANCES SURROUNDING THE VICTIM'S SON'S (Patrick Englebert) IDENTIFICATION OF THE DEFENDANT; (2) THE REPORT OF WITNESS GIESLER REGARDING THE IDENTIFICATION OF THE DEFENDANT; AND (3) THE CONDITION OF THE DEFENDANT REGARDING INTOXICATION.**

1.   **Patrick's identification of the Defendant.**

Patrick was a young boy, five (5) years of age on the night of his mother's death.   Patrick had been watching television with his mother and two younger siblings.   Patrick recalled that at about 8:00 p.m., while watching the "Gary Shandling Show", he noticed a man come in the apartment through the arcadia door and drag his mother upstairs.   However, the detective's testimony at the hearing did not reveal what time of the evening this took place.   Also, the record revealed that Patrick's physical description of the suspect did not match the true appearance of the Defendant.

However, the thrust of Patrick's report remains strong, due to important corroboration by other witnesses, as revealed in the second hearing.   It was proffered that Patrick heard an argument between his mother and the man who he had seen enter the apartment. The victim's neighbor, Lois Watson, reported that she heard an argument from the direction of the victim's apartment between two persons at about 1:00 a.m. on the night in questions.   Also, the Defendant's own statement, regarding Fred's alleged argument with

**REYNOLDS 102**

5

SALDATE000569

Exhibit 1B

the victim, revealed that Defendant had knowledge of the argument. Therefore, the evidence that Patrick knew there was an argument shows his report has elements of trustworthiness.

Patrick placed the Defendant at the apartment the night of the incident.  The Defendant place himself there, too.  Also, witness Christine Giesler placed the Defendant near the apartment, as well.  All of these facts were disclosed at the second hearing, indicating that Patrick's testimony was not misleading.

Furthermore, Patrick picked the Defendant out of a photo line-up.  Giesler also picked the Defendant out of the same line-up. This demonstrates that regardless of Patrick's description of the person he saw that night, his visual recollection was unequivocally that of the Defendant.  This was additionally corroborated by Giesler.

In sum, Patrick's report was described in the second hearing fairly and impartially in that inconsistencies were shown and yet the thrust of his report was corroborated.  Any evidence remaining in Patrick's report that was not brought out in the second hearing is not material and would not have deterred the jury from issuing its indictment.  Those items pointed out by the defense are tools to be used to impeach the witness at jury trial.

### 2. Giesler's identification of the Defendant.

Defendant correctly states that Giesler identified the person whom she saw as "Robert".  Defendant argues that Giesler knew personally and of her own knowledge one Robert Bell and as such the detective's testimony at the second hearing was misleading. Testimony of Giesler's report can be found at pp. 10, 14-16 of

6

Exhibit 1B

the second Grand Jury hearing transcript.

Giesler reported that the man she saw and identified as Robert was wearing gray pants and a gray shirt. The Defendant admitted that he had been so attired. The testimony also revealed that Giesler did not know this person socially, but only as someone she had seen around the apartment complex. She had been told that his name was Robert by Carrie Dodson who described "Robert" as 6.2, 200+ pounds. Giesler obviously misnamed the person whom she had seen, considering she described the suspect as 6'2, 200+ pounds. The Defendant is 6'3, 240 pounds and the true Robert (Robert Bell) is 5'9, 160 pounds. The significant and material fact is not that Giesler called the person by a different name, but rather that she identified the person, regardless of his name. She identified the Defendant as the suspect from a photo line-up one week after the murder.

### 3.  Defendant's statements.

Defendant argues that two areas in particular of Defendant's statement were misinterpreted during the second hearing. First, the time when Defendant admitted knowing the victim. Second, the state of Defendant's possible intoxication.

As to the first "misstatement," the Grand Jury was apprised of the fact that Defendant knew the victim. (GJ TR II, p. 19, line 1). Without conceding the veracity of Defendant's allegation that Defendant immediately admitted knowing the victim, without having first denied knowing her, the prosecution argues that by presenting this evidence as it did (GJ TR II, p. 18,, lines 24-25, p. 19, lines 1-4), the jury was not mislead, would not have

**REYNOLDS 104**

7

SALDATE000571

Exhibit 1B

been deterred in its decision and the Defendant's proposed presentation of the evidence does not reveal a material fact.

The intoxication issue does not fly. At first, the Defendant admits being drunk. However, during his second interview the Defendant says he was not drunk. He cannot have it both ways. More importantly the Defendant was indicted for a "knowing" state of mind as it related to murder one. There is no intoxication defense to a "knowing" state of mind.

**B.   TOTALITY OF EVIDENCE PRESENTED.**

The evidence presented by the prosecution at the second hearing was sufficient and not misleading. Inconsistencies, but not incorrect data, were proffered for the jury to discern. These inconsistencies were potentially exculpatory and therefore beneficial to the Defendant's position. The Grand Jury found otherwise.

The totality of the evidence presented shows corroboration and the prosecution's good faith effort to present the evidence in a fair and impartial manner so as not to mislead the jury.

### Conclusion

It is clear that the State has not agreed with the Defendant's contention that it present the entire trial to the Grand Jury. It is equally as clear that the State has presented to the Grand Jury sufficient evidence from which they can base their finding of probable cause.

This is based on the identification of Patrick Englebert, the identification and description given by Christine Giesler, and the incredible stories as related by the Defendant. All this

8

**REYNOLDS 105**

SALDATE000572

evidence is more than sufficient to have given rise to a finding of probable cause.

The Defendant has not been denied any substantial rights. His due process rights have not been violated.   Points that he has raised throughout this motion are issues to be raised in front of a jury at the time of trial.

Respectfully submitted this _15_ day of April, 1989.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

BY _____
Vincent Q. Kirby
Deputy County Attorney

Copy of the foregoing mailed/
delivered this _17_ day of
April, 1989, to:

The Honorable Howard Peterson
Judge of the Superior Court

Mr. Dennis Jones
P.O. Box 3587
Phoenix, AZ  85030

BY _____
Vincent Q. Kirby
Deputy County Attorney

VQK:ks
4.14c

**REYNOLDS 106**

9

SALDATE000573

Exhibit 1B

OFFICE DISTRIBUTION
CLERK OF VENUE
OUT FILE
DEFENDS

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

3

RECEIVED   PROCESSED

NOV 15 '89   NOV 16 '89

Clerk of the Court — DIST. CENTER

CLERK OF THE COURT

| | 5-12-89 | HON. I. SYLVAN BROWN | L.M.Comstock |
|---|---|---|---|
| Case | Date | Judge/Commissioner/Pro Tem | Deputy |

NO.  CR-88-09605

STATE OF ARIZONA                     Vincent Kirby, C.A.

v.

LAMONT REYNOLDS                      Dennis Jones

                                     MCSO

10:50 A.M.  This is the time set for oral argument on the motion to dismiss or in the alternative to for a new finding of probable cause.  The State is represented by counsel above-named.  The Defendant is present with counsel above-named.

Court Reporter Michael Vacca is present.

The Court is advised that the State has withdrawn their objection to the matter being sent back to the Grand Jury for a new finding of probable cause.

The motion to dismiss is argued to the Court.

IT IS ORDERED denying the motion to dismiss.

IT IS ORDERED remanding the matter back to the Grand Jury for a new finding of probable cause.

On the issue of the Defendant's release, counsel for the Defendant shall file a memorandum with this Court by Tuesday, May 16, 1989.

IT IS ORDERED setting this matter for a hearing on the issue of the Defendant's release on May 19, 1989, at 10:00 A.M. in this Division.

10:58 A.M.  Hearing concludes.

UNLINED MINUTE ENTRY R1-86

Page  23

REYNOLDS 107

SALDATE000574

Exhibit 1B



RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

Vincent Q. Kirby
BAR ID #:  006377
Deputy County Attorney
111 West Monroe, Suite 1800
Phoenix, AZ  85003
Telephone:  602 256-5780
Attorney for Plaintiff



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | |
| Plaintiff, | NO. CR 88-09605 |
| vs. | STATE'S MOTION TO DISMISS AND ORDER |
| LAMONT E. REYNOLDS, | |
| Defendant. | (Assigned to the Honorable Thomas W. O'Toole - Div. 32) |

COMES NOW the State of Arizona, by and through undersigned counsel, and moves this Court to dismiss the above-entitled cause without prejudice as to LAMONT E. REYNOLDS only, for the reason that:

There is no reasonable likelihood of conviction at this time.

Counsel certifies that this motion is brought in good faith and not for the purpose of avoiding the provisions of Rule 8, Arizona Rules of Criminal Procedure.

**REYNOLDS 108**

SALDATE000575

Exhibit 1B

MEMORANDUM OF POINTS AND AUTHORITIES

Rule 16.5, Arizona Rules of Criminal Procedure.

Respectfully submitted this ___5___ day of January, 1990.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

BY _____
Vincent Q. Kirby
Deputy County Attorney

Copy of the foregoing
mailed/delivered this
_____ day of
January, 1990, to:

The Honorable Thomas W. O'Toole
Judge of the Superior Court

BY _____
Vincent Q. Kirby
Deputy County Attorney

VQK:kg
5.4vqk

2

REYNOLDS 109

SALDATE000576

Exhibit 1B

## ORDER

IT IS HEREBY ORDERED that the above-entitled cause be dismissed
without prejudice as to LAMONT E. REYNOLDS only.

DONE IN OPEN COURT this ____ day of _____, 1989.

_____
JUDGE OF THE SUPERIOR COURT

3

**REYNOLDS 110**

SALDATE000577

Exhibit 1B



SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED      PROCESSED

JAN  9 '90      JAN  9 '90

CLERK OF THE COURT
D.Weisheit
Deputy

January 8, 1990

CR88-09695

STATE OF ARIZONA                         County Attorney/
                                         Vincent Kirby
v.

LAMONT E. REYNOLDS                       Public Defender

HON. THOMAS W. O'TOOLE
Judge/Commissioner/Pro Tem

Pursuant to the state's Motion to Dismiss,

IT IS ORDERED that the above-entitled cause be dismissed without prejudice as to Lamont E. Reynolds only; all in accordance with formal written order signed by the court and filed herein.

022

REYNOLDS 111

Page 5

SALDATE000578

Exhibit 1B