1       Q.   OKAY.  DID YOU EVER ASK HIM IF YOU WERE A SUSPECT

2   IN THE CASE?

3       A.   YES, I DID.

4       Q.   WHEN DID YOU ASK HIM THAT?

5       A.   I ASKED HIM THAT AFTER HE HAD SAID I HAD DONE IT

6   -- HE HAD SAID I HAD DONE IT.  I ASKED HIM, "AM I A SUSPECT

7   IN IT?"  HE SAID, "YEAH, YOU ARE."

8       Q.   AND THIS IS CLOSE IN TIME WHEN HE COMES IN THE

9   ROOM AND SHOWS YOU HIS BADGE; CORRECT?

10      A.   YES, SIR.

11      Q.   WHAT WOULD OFFICER SALDATE DO WHEN YOU DENIED ANY

12  INVOLVEMENT?

13      A.   HE WOULD GET AGGRAVATED.

14      Q.   HOW DO YOU KNOW HE GOT AGGRAVATED?

15      A.   HIS FACE WOULD BE REAL FLUSHED.  HE JUST LIKE --

16  LIKE HE WAS HOLDING HIMSELF BACK, LIKE FROM SAYING

17  SOMETHING -- OR I DON'T KNOW.  I FELT INTIMIDATED BY HIM

18  BECAUSE I WAS SCARED.  I DIDN'T KNOW WHAT TO EXPECT.

19      Q.   OKAY.  DID YOU EVER MAKE A REQUEST TO CALL

20  ANYBODY, TO CALL YOUR FOLKS OR TO CALL JERRY, TO CALL

21  ANYONE?

22      MR. STALZER:  OBJECTION; LEADING, YOUR HONOR.

23      THE COURT:  SUSTAINED.

24      THE WITNESS:  I DID NOT --

25  BY MR. CLARK:

Exhibit 1G

100

1      Q.   DID YOU EVER MAKE ANY REQUESTS OF OFFICER SALDATE

2   AT ALL?

3      A.   NO, I DID NOT.

4      Q.   OKAY.   WHY DIDN'T YOU MAKE ANY TYPE OF REQUEST?

5      A.   BECAUSE I DIDN'T KNOW THAT OPTION WAS OPEN TO ME.

6      Q.   WHEN YOU ARE SPEAKING TO OFFICER SALDATE, WHEN HE

7   FIRST COMES IN AND SHOWS YOU HIS BADGE, WHAT WAS YOUR

8   UNDERSTANDING OF WHY YOU WERE THERE?

9      A.   I WAS A SUSPECT IN THE DEATH OF KENDALL.

10     Q.   DID YOU BELIEVE THAT YOU HAD ANY CHOICE IN THE

11  MATTER OF WHETHER OR NOT YOU WERE GOING TO BE THERE OR NOT?

12     A.   NO, I DID NOT.

13     Q.   DO YOU BELIEVE THAT YOU HAD ANY CHOICE IN THE

14  MATTER ABOUT WHETHER OR NOT YOU SPOKE TO OFFICER SALDATE?

15     A.   NO.

16     Q.   WHY?

17     A.   COULD YOU ASK THE QUESTION AGAIN.

18     Q.   WHY DON'T YOU BELIEVE YOU HAD ANY CHOICE?

19     A.   BECAUSE I FELT THAT I WAS A SUSPECT AND EITHER

20  WAY THEY WERE GOING TO WAIT UNTIL THEY GET AN ARREST

21  WARRANT TO TAKE ME OR NOT.   I FELT I HAD NO CHOICE BUT TO

22  GO.

23     Q.   OKAY.   PRIOR TO YOUR CONVERSATION WITH SALDATE

24  DID HE EVER TELL YOU AT ANY POINT IN TIME THAT YOU DIDN'T

25  HAVE TO BE THERE AND ANSWER HIS QUESTIONS?

**GALL 152**                    SUPERIOR COURT
                              Phoenix, Arizona            **MILKE_NSB029867**

101

1          A.   NO, HE DID NOT.

2          Q.   DID SALDATE EVER ASK YOU TO SIGN ANY TYPE OF

3    DOCUMENTS RELATIVE TO YOUR STATEMENT THAT DAY?

4          A.   LIKE WHAT DO YOU MEAN?

5          Q.   DID HE ASK YOU TO SIGN A WRITTEN STATEMENT,

6    DETAILED WHAT YOU HAD SAID?

7          MR. STALZER:  OBJECTION; LEADING.

8          THE COURT:  SUSTAINED, ALTHOUGH I DON'T KNOW HOW

9    BETTER YOU CAN ASK --

10         MR. STALZER:  I'LL WITHDRAW THAT; YOUR HONOR.

11         THE COURT:  ALL RIGHT.

12         MR. STALZER:  I'LL WITHDRAW THE OBJECTION.

13         THE DEFENDANT:  I DON'T REALLY UNDERSTAND.  LIKE --

14   BY MR. CLARK:

15         Q.   DID HE EVER ASK YOU TO SIGN A STATEMENT THAT

16   DETAILED YOUR INVOLVEMENT IN THE MATTER?

17         A.   YES, HE DID.

18         Q.   OKAY.  HOW DID THAT COME ABOUT?

19         A.   AFTER THE CONFESSION WAS GIVEN, HE ASKED ME TO

20   SIGN AND I REFUSED TO DO SO.

21         Q.   WHAT WERE YOU GOING TO SIGN?  DID HE HAVE PAPERS

22   THERE OR --

23         A.   HE HAD THOSE YELLOW -- HE HAD A LEGAL PAD WHICH

24   HE WAS TAKING NOTES OFF OF.

25         Q.   HE ASKED YOU TO SIGN THAT LEGAL PAD?

102

1     A.   YES.

2         Q.   OKAY.  YOU'VE HEARD SOME TESTIMONY THAT HE WANTED

3     TO TAPE-RECORD YOU.  IS THAT TRUE?

4         A.   YES, SIR.

5         Q.   OKAY.  TELL THE COURT HOW THAT CAME ABOUT.

6         A.   HE ASKED ME, "WOULD YOU FEEL COMFORTABLE SAYING

7     IT ON TAPE?"  I SAID, "NO, I WOULD NOT."

8         Q.   OKAY.  NOW, WE KNOW, BECAUSE OFFICER SALDATE AND

9     OFFICER CHAMBERS HAVE TOLD US, THAT TOWARDS THE END OF YOUR

10    INTERVIEW YOU CONFRONTED GEORGE SMALLWOOD.  IS THAT TRUE?

11        A.   YES, SIR.

12        Q.   OKAY.  WAS THAT YOUR IDEA?

13        A.   NO, IT WAS NOT.

14        Q.   HOW DID THAT COME ABOUT?

15        A.   OFFICER CHAMBERS CAME AND TOLD SALDATE TO COME

16    OUT OF THE ROOM AND THEY WERE CONVERSING OVER WHAT HAD

17    HAPPENED AND MY CONFESSION GIVEN AND SMALLWOOD WAS STILL

18    DENYING.

19        Q.   WHERE WERE THEY WHEN THIS CONVERSATION OCCURRED?

20        A.   THEY WERE RIGHT OUTSIDE THE DOOR OF THE HOLDING

21    TANK THAT I WAS IN, THE ROOM.

22        Q.   OKAY.  WELL, WAS THE DOOR OPEN?

23        A.   IT WAS CRACKED.

24        Q.   OKAY.  BUT NONETHELESS YOU OVERHEARD THIS

25    CONVERSATION?

SUPERIOR COURT
Phoenix, Arizona

MILKE_NSB029869

Exhibit 1G

103

1    A.  YES, SIR.

2    MR. CLARK:  DO YOU WANT ME TO GET THAT, JUDGE?

3    THE COURT:  YES, MR. CLARK, WOULD YOU ADJUST THAT SO

4    HE DOESN'T HAVE TO LEAN OVER WHEN HE TALKS.

5    THANK YOU.

6  BY MR. CLARK:

7    Q.  WHAT DID YOU OVERHEAR, MICHAEL?

8    A.  I OVERHEARD THAT SMALLWOOD WAS STILL DENYING AND

9  IT WOULD BE A GOOD IDEA FOR ME TO CONFRONT GEORGE SO HE

10  WOULD BELIEVE THAT I HAD TOLD HIM ABOUT THE CONFESSION.

11    Q.  OKAY.  THEY'RE STILL OUTSIDE THE DOOR WHEN YOU

12  OVERHEAR THIS CONVERSATION?

13    A.  YES, SIR.

14    Q.  OKAY.  THEN WHAT HAPPENS?

15    A.  THEY COME IN AND ASK ME TO CONFRONT SMALLWOOD.

16    Q.  OKAY.  WHAT DID YOU SAY?

17    A.  I DIDN'T WANT TO CONFRONT SMALLWOOD.

18    Q.  WHAT DID THEY SAY?

19    A.  I DON'T RECALL.

20    Q.  OKAY.  DID YOU BELIEVE THAT YOU HAD ANY CHOICE IN

21  THE MATTER?

22    A.  NO, SIR.

23    Q.  WHY?

24    A.  BECAUSE THE OFFICERS AT THAT POINT -- I FELT

25  INTIMIDATED BY THE OFFICERS.  JUST THE WAY THEY CARRIED

104

1     THEMSELVES AND THE WAY THEY WERE WALKING ABOUT.

2         Q.    OKAY.  I TAKE IT, THEN, THAT IT WAS NOT YOUR IDEA

3     TO GO AND CONFRONT MR. SMALLWOOD?

4         A.    NO, SIR.

5         MR. CLARK:  JUDGE, I HAVE NOTHING ADDITIONAL AT THIS

6     POINT.  THANK YOU.

7         THE COURT:  THANK YOU.

8              MR. STALZER?

9

10                    CROSS-EXAMINATION

11    BY MR. STALZER:

12        Q.    AT THE TIME THIS YOUNG GIRL WAS KILLED YOU WERE

13    18 YEARS, FOUR MONTHS, AND ABOUT FOUR DAYS OF AGE; IS THAT

14    CORRECT?

15        A.    YES, SIR.

16        Q.    YOU WERE AN ADULT, WERE YOU NOT?

17        A.    YES, SIR.

18        Q.    YOU'RE NO JUVENILE, ARE YOU?

19        A.    NOT LEGALLY.

20        Q.    DO YOU HAVE A DRIVER'S LICENSE?

21        A.    YES, SIR.

22        Q.    DO YOU KNOW HOW TO WORK ON CARS?

23        A.    YES, SIR.

24        Q.    DO YOU EVER DRINK BEER?

25        A.    YES, SIR.

Exhibit 1G

105

1     Q.   HOW DID YOU GET DOWN FROM FLAGSTAFF TO PHOENIX
2     THE WEEK BEFORE THIS OCCURRED?
3     A.   MY DAD PULLED MY CAR DOWN TO PHOENIX.
4     Q.   WERE YOU EVER WORKING ON THAT CAR?
5     A.   YES, SIR.
6     Q.   YOU KNOW HOW TO WORK ON CARS, DON'T YOU?
7     A.   YES, I DO.
8     Q.   YOU'RE NOT A DUMB PERSON, ARE YOU?
9     A.   NO.
10    Q.   IN FACT, YOU'RE FAIRLY INTELLIGENT?
11    A.   TO MY KNOWLEDGE.
12    Q.   IN FACT, WOULD IT BE A FAIR STATEMENT TO SAY
13    YOU'RE STREETWISE?
14    A.   IT'S A FAIR STATEMENT.
15    Q.   I'M NOT TALKING ABOUT ACADEMICS BECAUSE, YOU
16    KNOW, YOU GET, WHAT, B'S AND C'S AND SOME D'S IN YOUR
17    CLASSES?
18    A.   MOSTLY C'S AND D'S.
19    Q.   AND THAT'S PASSING GRADE?
20    A.   YES, SIR.
21    Q.   MR. CLARK TOUCHED ON THE FACT THAT YOU MAY HAVE
22    BEEN REFERRED TO JUVENILE COURT AND IS IT CORRECT YOU WERE
23    REFERRED SOMETIME BACK IN 1984, REGARDING A BB GUN
24    INCIDENT?
25    A.   YES, SIR.

1          Q.   AND THAT WAS -- I THINK THEY CALL IT ADJUSTED?

2     WOULD THAT BE CORRECT?

3          A.   YES.

4          Q.   AND THEN IN 1985, THERE WAS A POSSESSION OF

5     MARIJUANA CHARGE?

6          A.   YES, SIR.

7          Q.   AND WERE YOU PLACED ON PROBATION WITH THE

8     JUVENILE COURT FOR THAT OFFENSE?

9          A.   YES, I WAS.

10         Q.   HOW MANY YEARS PROBATION DID YOU HAVE?

11         A.   SIX MONTHS PROBATION.

12         Q.   NOW, YOU WERE ARRESTED ONCE AGAIN AS A JUVENILE

13    THROUGH THE JUVENILE COURT SYSTEM IN 1988, WERE YOU NOT?

14         A.   YES, I WAS.

15         Q.   AND WAS THAT FOR A THEFT?

16         A.   YES, IT WAS.

17         Q.   WAS THAT THE INCIDENT ABOUT A SCALE FROM ONE OF

18    YOUR SCIENCE CLASSES BEING STOLEN?

19         A.   YES, IT WAS.

20         Q.   AND WERE YOU PLACED ON FORMAL PROBATION AGAIN?

21         A.   YES, I WAS.

22         Q.   WAS THAT FOR ABOUT A YEAR?

23         A.   YES, SIR.

24         Q.   THEN THERE WAS SOME OTHER INCIDENT.  I THINK THEY

25    CLAIM YOU STOLE MAYBE SOME TIRES?

107



1      A.   YES, SIR.

2      Q.   THAT WAS DISMISSED; RIGHT?

3      A.   YES.

4      Q.   NOW, WERE YOU EVER IN COURT FOR A VIOLATION OF

5   PROBATION AT ANY TIME?

6      A.   YES, I WAS.

7      Q.   WOULD THAT HAVE BEEN IN 1989, SAY AROUND JANUARY?

8      A.   ABOUT THAT TIME.

9      Q.   DO YOU RECALL WHAT THE REASON WAS FOR THE

10   VIOLATION?

11     A.   FAILING TO GIVE A URINALYSIS.

12     Q.   WAS IT FAILURE OR THAT YOU HAD A DIRTY URINE?

13     A.   FAILURE TO GIVE URINALYSIS.

14     Q.   IT WASN'T FOR METHAMPHETAMINE IN YOUR URINE

15   SAMPLE?

16     A.   YES, IT WAS.

17     Q.   IT WAS FOR THAT, THEN?

18     A.   YES, SIR.

19     Q.   SO IT WASN'T THE FACT THAT YOU DIDN'T GIVE A

20   URINE SAMPLE?

21     A.   NO.  I SAID I FAILED MY U.S.

22     Q.   I'M SORRY.

23          NOW, WASN'T THERE ANOTHER PETITION THAT INDICATED

24   ANOTHER DIRTY URINE SAMPLE FOR MARIJUANA USE?

25     A.   YES.

**GALL 159**          SUPERIOR COURT          **MILKE_NSB029874**
                     Phoenix  Arizona

108

1      Q.   AND THAT WAS ALSO IN SOMETIME AROUND JANUARY OF

2   '89?

3      A.   YES.

4      Q.   HOW WERE YOU SUPPOSED TO GET BACK FROM PHOENIX TO

5   FLAGSTAFF ONCE YOUR SPRING BREAK ENDED THAT FOLLOWING

6   MONDAY?

7      A.   I WAS SUPPOSED TO DRIVE MY CAR BACK.

8      Q.   WAS YOUR DAD GOING TO DRIVE THE CAR BACK?

9      A.   NO, I WAS.

10      Q.   YOU WERE?  HAVE YOU EVER WORKED ANYWHERE IN THE

11   PAST FOUR, FIVE YEARS?

12      A.   YES.

13      Q.   WHERE DID YOU WORK?

14      A.   I WORKED CONSTRUCTION.

15      Q.   WHAT COMPANY?

16      A.   S & M CONSTRUCTION, SHEET ROCK.

17      Q.   HOW DID YOU GET THAT JOB?

18      A.   THROUGH MY DAD.

19      Q.   HE WORKED THERE?

20      A.   HE WAS WORKING FOR TRANSPORT S & M CONSTRUCTION.

21      Q.   WHERE ELSE DID YOU WORK?

22      A.   I WORKED AT THE VILLAGE INN.  THE VILLAGE INN

23   RESTAURANT.  I WAS A COOK.

24      Q.   AND DID YOU HAVE ANY OTHER JOBS OTHER THAN THOSE

25   TWO?  FOR EXAMPLE, MAYBE THE CROWN MOTEL?

**GALL 160**                    SUPERIOR COURT              **MILKE_NSB029875**
                               Phoenix, Arizona

Exhibit 1G

109

1       A.   YEAH, I WORKED AT THE CROWN MOTEL TOO.

2       Q.   WHAT DID YOU DO AT THE CROWN MOTEL?

3       A.   I WAS MAKING BEDS.

4       Q.   HOW LONG DID YOU WORK THERE?

5       A.   THREE MONTHS.

6       Q.   ANY OTHER JOBS?

7       A.   I HAD QUIT THE CROWN AND THEN I GOT THE JOB BACK.

8       Q.   WHAT'S THE COCONINO MECHANICAL SERVICES?

9       A.   THAT'S WORKING ON POLICE VEHICLES AND STATE

10   VEHICLES, LIKE TRANSPORT BUSES.

11      Q.   WAS THAT A JOB YOU HAD?

12      A.   YES, SIR.

13      Q.   WOULD YOU SAY THAT'S KIND OF A LIFE EXPERIENCE?

14      A.   I WOULDN'T.  NOT REALLY.  I WOULDN'T THINK SO,

15   BECAUSE I'VE WORKED ON CARS BEFORE.  IT WAS NOTHING NEW TO

16   ME.

17      Q.   WAS THE CROWN MOTEL SOMETHING YOU WOULD CONSIDER

18   A LIFE EXPERIENCE?

19      A.   NO, SIR.

20      Q.   DID YOU KIND OF GET THE IMPRESSION THAT SOME OF

21   THESE JOBS HELP YOU TO DEVELOP A LITTLE BIT OF INTELLIGENCE

22   YOU CAN'T GAIN FROM A TEXTBOOK?

23      A.   I DON'T UNDERSTAND THE QUESTION.

24      Q.   DO YOU THINK WHEN A PERSON GROWS UP, SAY, LIKE

25   YOU, UP TO THE AGE BEYOND 18 YEARS, THE ONLY WAY YOU CAN

110

1    GAIN INTELLIGENCE IS FROM SCHOOL ALONE?

2         A.   NO.

3         Q.   YOU'VE HAD PRIOR EXPERIENCE WITH THE POLICE, HAVE

4    YOU NOT?

5         A.   YES.

6         Q.   YOU'RE FULLY AWARE BEFORE YOU EVEN SAW THIS MAN

7    TO MY RIGHT, DETECTIVE CHAMBERS, OR THAT OTHER MAN,

8    DETECTIVE SALDATE, YOU KNEW WHAT MIRANDA RIGHTS WERE;

9    CORRECT?

10        A.   YES.

11        Q.   I MEAN, YOU'VE SEEN IT ON TV; RIGHT?

12        A.   YES, SIR.

13        Q.   AND WOULD IT BE FAIR TO SAY YOU'VE BEEN READ

14   THOSE SAME RIGHTS BY SOME POLICE OFFICER REGARDING JUVENILE

15   MATTERS?

16        A.   NO.  NOT AS A JUVENILE.  I WAS NEVER --

17        Q.   YOU'VE HEARD ABOUT THEM IN SCHOOL?

18        A.   YES, SIR.

19        Q.   WHEN YOU WERE OUT ON THE CURB AT 71ST AVENUE AND

20   KENDALL, YOU KNOW, DEAD UNDER THAT TREE, YOU DIDN'T TELL

21   THIS MAN, DETECTIVE CHAMBERS, YOU DIDN'T WANT TO GO

22   DOWNTOWN, DID YOU?

23        A.   YES, I DID.

24        Q.   YOU TOLD HIM YOU DID NOT WANT TO GO TO 620 WEST

25   WASHINGTON STREET FOR AN INTERVIEW?

**GALL 162**                     SUPERIOR COURT                **MILKE_NSB029877**
                                 Phoenix, Arizona

Exhibit 1G

111

1     A.   I DIDN'T KNOW I HAD A CHOICE IN THE MATTER.

2     Q.   MY QUESTION.   DID YOU TELL HIM SO HE COULD HEAR

3   WITH EITHER HIS LEFT OR RIGHT EAR YOU DID NOT WANT TO GO

4   DOWNTOWN TO THE POLICE DEPARTMENT?

5     A.   NO.

6     Q.   DID YOU TELL HIM THAT?   NO?

7     A.   NO.

8     Q.   YOU SEE THIS LADY TO MY REAR?

9     A.   YES, I DO.

10    Q.   THIS IS -- WHO IS THIS LADY?

11    A.   CYNTHIA WISHON.

12    Q.   DID YOU EVER TELL HER THAT YOU DID NOT WANT TO GO

13   DOWNTOWN TO TALK --

14    A.   NO, I DID NOT.

15    Q.   DID YOU EVER TELL YOUR BROTHER JERRY?

16    A.   NO, I DID NOT.

17    Q.   DETECTIVE SALDATE, HE DIDN'T BEAT YOU, DID HE?

18    A.   NO.

19    Q.   HE DIDN'T TWIST YOUR ARM WHEN HE INTERVIEWED YOU?

20    A.   NO.

21    Q.   HE NEVER THREATENED YOU, DID HE?

22    A.   NOT BY PHYSICAL MEANS.

23    Q.   WHY DON'T YOU TELL JUDGE HOTHAM HOW HE THREATENED

24   YOU BY NONPHYSICAL MEANS.   I THINK WE'D LIKE TO HEAR THAT.

25    A.   IT'S NOT BY PHYSICAL MEANS.   IT'S BY MENTAL

**GALL 163**          SUPERIOR COURT          **MILKE_NSB029878**
                     Phoenix, Arizona

Exhibit 1G

112

1    MEANS.

2         Q.   BY MENTAL MEANS?

3         A.   YES, I FELT INTIMIDATED BY HIM.

4         Q.   DID HE SAY HE WOULD SIT ON YOU?

5         A.   NO.

6         Q.   HOW WERE YOU INTIMIDATED BY HIM?

7         A.   I WAS JUST SCARED OF HIM.

8         Q.   HOW DID HE SCARE YOU?

9         A.   JUST BECAUSE OF THE SIZE OF HIM AND THE POSITION

10   I WAS IN.

11        Q.   YOU KILLED KENDALL; RIGHT?

12        A.   YES.

13        Q.   THAT WOULD SCARE ANYONE, WOULDN'T IT, MICHAEL?

14        A.   YES, SIR.

15        Q.   AND IT SCARED YOU; RIGHT?

16        A.   YES.

17        Q.   AND IT PROBABLY WOULD SCARE EVERYONE IN THIS

18   COURTROOM TODAY, WOULDN'T IT?

19        A.   YES, SIR.

20        MR. STALZER:  I HAVE NOTHING FURTHER, YOUR HONOR.

21        THE COURT:  MR. CLARK, REDIRECT?

22        MR. CLARK:  THANK YOU, JUDGE.

23

24                    REDIRECT EXAMINATION

25   BY MR. CLARK:

Exhibit 1G

113



1       Q.   MICHAEL, WHY DIDN'T YOU ASK TO SPEAK TO ANYONE

2    REGARDING YOUR BEING TRANSPORTED TO 620 WEST WASHINGTON?

3       A.   BECAUSE I DID NOT KNOW THE OPTION WAS OPEN TO ME.

4       Q.   OKAY.  IS IT BECAUSE YOU WERE TOLD YOU DIDN'T

5    HAVE AN OPTION?

6       A.   NO, I DID NOT KNOW.  THEY DID NOT SAY, NO, I

7    DIDN'T HAVE AN OPTION.  I DID NOT KNOW I HAD AN OPTION.

8    THEY DID NOT SAY THAT, THOUGH.

9       Q.   OKAY.  YOU INDICATED TO MR. STALZER THAT YOU HAD

10   NOT HAD ANY EXPERIENCE WITH THE JUVENILE COURT SYSTEM

11   RELATIVE TO SOMEBODY READING YOU YOUR RIGHTS.  IS THAT

12   TRUE?

13      A.   TRUE.

14      Q.   OKAY.  HOW WOULD THAT COME ABOUT?

15      A.   USUALLY WHEN YOU'RE IN JUVENILE OR WHEN YOU'RE AS

16   A JUVENILE THE POLICE REALLY DON'T HAVE MUCH.  THEY JUST

17   TRANSPORT YOU AND LET THE PROBATION OFFICER TAKE OVER FROM

18   THERE.

19      Q.   OKAY.  SO I TAKE IT THE PROBATION OFFICER NEVER

20   READ YOU YOUR RIGHTS?

21      A.   NO.

22      Q.   OKAY.

23      MR. CLARK:  I HAVE NOTHING ADDITIONAL, JUDGE.  THANK

24   YOU.

25      THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY STEP

Exhibit 1G

114

1    DOWN.

2         MR. CLARK: WE WOULD REST AT THIS POINT, TOO, JUDGE.

3         MR. STALZER: THE STATE HAS NO REBUTTAL, YOUR HONOR.

4         THE COURT: ALL RIGHT.

5              I'LL HEAR FROM YOU, MR. CLARK, FIRST AND THEN MR.

6    STALZER. GO AHEAD.

7         MR. CLARK: YES, SIR. IT SEEMS TO ME THAT A LOT HAS

8    BEEN MADE OF THE FACT THAT NO ONE THREATENED, NO ONE BEAT,

9    NO ONE EXERTED ANY TYPE OF PHYSICAL INFLUENCE THAT WAS

10   COERCIVE OR OVERBEARING UPON MR. GALLEGOS. JUDGE, THAT'S

11   NOT THE POINT. THAT'S NOT WHAT WE'RE SAYING HAPPENED HERE.

12   THE POINT IN THESE TYPES OF HEARINGS IS TO ASCERTAIN THE

13   LEVEL OF UNDERSTANDING OF THE DEFENDANT, TO LOOK AT THE

14   POLICE PROCEDURES INVOLVED, AND TO REACH A DETERMINATION OF

15   WHETHER OR NOT ANY SUBTLE, OVERBEARING BEHAVIOR ON THE PART

16   OF THE POLICE HAS OVERBORNE THE WILL OF A DEFENDANT

17   REGARDING WHETHER OR NOT HE MAKES A STATEMENT. THAT'S WHAT

18   IS AT ISSUE HERE, JUDGE.

19              I THINK THE CASE LAW THAT I SUBMITTED TO YOU IN

20   MY SUPPLEMENTAL MEMORANDUM TO MY REQUEST FOR A

21   VOLUNTARINESS HEARING, THOSE CASES SET FORTH JUST THAT.

22   THE CASES ARE ALMOST NONEXISTENT WHERE DEFENDANTS ARE

23   BEATEN AND THE CONFESSIONS ARE GOTTEN IN THAT MANNER. THAT

24   JUST DOESN'T HAPPEN ANYMORE, JUDGE. WHAT WE ARE TALKING

25   ABOUT HERE IS THE SUBTLE, OVERBEARING WILL OF THE POLICE

115



1    COMING TO IMPINGE UPON A DEFENDANT.

2         WHAT WE HAVE IN THIS CASE, JUDGE, IS A HIGH

3    SCHOOL STUDENT, SOMEONE WHO INITIALLY TRAVELS TO PHOENIX,

4    ARIZONA IN MARCH OF 1990 WITH HIS FATHER.  HE COMES DOWN

5    HERE TO STAY WITH HIS BROTHER.  HE'S NOT IN A SITUATION

6    WHERE HE'S COMING DOWN HERE, WHERE HE'S STAYING AT A MOTEL,

7    WHERE HE'S ON HIS OWN.  HE DIDN'T HAVE THE WHEREWITHAL TO

8    DO THAT, JUDGE, HE'S A HIGH SCHOOL STUDENT.  HE COMES DOWN

9    HERE WITH A PARENT.  HE'S STAYING WITH A SIBLING.  HE IS

10   DEPENDENT UPON THEM.  HE'S SOMEONE WHO IS IN A SPECIAL

11   EDUCATION CLASS, WHO BY VIRTUE OF HIS VERY POSITION IN LIFE

12   HAS LIMITED EXPERIENCE.  HE IS NOT SOPHISTICATED IN THE

13   WAYS OF THE WORLD, I GUESS.  HE IS NOT THE TYPE OF PERSON

14   BY VIRTUE OF HIS POSITION IN LIFE THAT, YOU KNOW, ASSERTS

15   HIMSELF IN THE FACE OF ADULT OR POLICE AUTHORITY.  HE JUST

16   DOESN'T DO THAT.  HIS PRIOR EXPERIENCE IS AT THE JUVENILE

17   LEVEL WHERE I THINK THE COURT IS COGNIZANT OF HOW THE

18   JUVENILE COURT TREATS SOMEONE AS OPPOSED TO HOW AN ADULT

19   SHOULD BE.

20         I THINK HIS RENDITION TO YOU OF INVOLVEMENT IS

21   QUITE BELIEVABLE.  I ALSO THINK THE RENDITION OF THE FACTS

22   ARE BELIEVABLE.  AND IN ADDITION TO THAT I WOULD POINT OUT

23   NOWHERE IN THE POLICE REPORTS SUBMITTED IN DISCOVERY IN

24   THIS CASE WAS THERE ANY MENTION OF CONFRONTATION UNTIL I

25   PUT IT IN MY PLEADING.  AT THAT POINT, JUDGE, I THINK MR.

**GALL 167**
SUPERIOR COURT
Phoenix, Arizona
**MILKE_NSB029882**

Exhibit 1G

1    GALLEGOS BECOMES BELIEVABLE.  OFFICERS CHAMBERS AND SALDATE

2    WOULD HAVE YOU BELIEVE THAT AFTER 20 YEARS, PROBABLY 40

3    PLUS COLLECTIVE, THAT THAT WAS AN INSIGNIFICANT FACTOR THAT

4    THEY SIMPLY LEFT OUT OF THEIR REPORT.  I DON'T THINK THAT'S

5    THE CASE, JUDGE.

6         THE COURT:  I HAVE A HARD TIME BELIEVING THAT MYSELF.

7         MR. CLARK:  JUDGE, IT IS EXTREMELY IMPORTANT BECAUSE

8    WHAT IT DOES, IT KIND OF COLORS IN FOR THE COURT THE

9    CIRCUMSTANCES THAT WERE ATTENDANT TO THE STATEMENT THAT MR.

10   GALLEGOS GAVE.  I FIND THAT; JUDGE -- I THINK THAT'S

11   ABSOLUTELY APPALLING THAT WOULD OCCUR IN A CUSTODIAL

12   SITUATION INVOLVING TWO YOUNG MEN WHO WERE IN HIGH SCHOOL.

13   IT'S KIND OF REMINISCENT OF THE CHRISTIAN BURIAL THEY

14   TOUGHT YOU IN LAW SCHOOL.  THEY ALWAYS USE THOSE EXTREME

15   EXAMPLES.  I THINK THEY CAN CERTAINLY USE THIS ONE AS AN

16   EXAMPLE OF THE TYPE OF CONDUCT THAT OUGHT TO BE PROHIBITED

17   AND THAT IS CERTAINLY OVERBEARING AND IMPERMISSIBLE ON THE

18   PART OF A POLICEMAN, JUDGE.

19        IN THIS, JUDGE, WHILE IT COMES AT THE END OF THE

20   CONVERSATION THAT MR. GALLEGOS HAD WITH OFFICER SALDATE, I

21   THINK IT PUTS IN LIGHT AND MAKES BELIEVABLE WHAT HE SAID,

22   AND I THINK WHEN COUPLED WITH THE SITUATION THAT WE HAVE

23   FROM OFFICER SALDATE ABOUT THIS THAT'S GOING BACK AND FORTH

24   BETWEEN MY CLIENT, IT SEEMS QUITE IMPRESSIVE.  WE HAVE MR.

25   GALLEGOS WHO COMES IN HERE AND DENIES INVOLVEMENT, ALTHOUGH



1    MR. SALDATE WOULD HAVE YOU BELIEVE THAT HE SIMPLY DIDN'T

2    IMPLICATE HIMSELF.  WE HAVE SALDATE TELLING YOU HE'S NOT A

3    SUSPECT AT THIS POINT, WHEN CLEARLY HE'S HAVING THIS

4    CONVERSATION WITH DETECTIVE SALDATE JUST MOMENTS BEFORE HE

5    ARRIVES AT THE STATION.

6         I THINK WHEN YOU COUPLE THAT WITH THE FACTS AS WE

7    KNOW FROM MR. SALDATE THAT MR. GALLEGOS SAYS, "NO, I DIDN'T

8    DO IT" AND SALDATE SAYS, "NO, YOU DID IT," I THINK AT THAT

9    POINT IN TIME WE HAVE WHAT THE CASES ALL INDICATE, THEY ARE

10   OVERBEARING HIS WILL.  HE DENIES IT.  AND THEY SAY, "NO,

11   YOU DID IT."

12        SO I THINK, JUDGE, IF YOU LOOK AT THE CASES AND

13   YOU KEEP IN MIND THAT WE'RE NOT DEALING WITH PHYSICAL

14   THREATS.  WE'RE NOT DEAL DEALING WITH ARM TWISTING.  WHAT

15   WE'RE DEALING WITH IS SUBTLES OF COERCION AS I GUESS WE

16   KNOW IT.  WE'RE DEALING WITH A YOUNG MAN.  WHILE

17   CHRONOLOGICALLY IS AN ADULT, I DON'T THINK THAT HIS LIFE

18   EXPERIENCE IN ANY WAY, SHAPE, OR FORM INDICATE THAT HE IS

19   SOPHISTICATED ENOUGH TO HAVE RESISTED THE OVERBEARING

20   ACTIONS OF THE POLICE.

21        OTHER THAN THAT I HAVE NOTHING ADDITIONAL, JUDGE.

22        THE COURT:  ALL RIGHT.

23        MR. CLARK:  THANK YOU.

24        THE COURT:  I FIND THAT THE STATE VS. SCHOLTZ

25   FACTORS ARE PROBABLY NOT RELEVANT, BUT I WILL FIND THAT THE

118

1    CHRONOLOGICAL AGE OF THE DEFENDANT AND THE APPARENT MENTAL

2    AGE OF THE DEFENDANT AND THE EDUCATIONAL LEVEL OF THE

3    DEFENDANT, HIS PHYSICAL CONDITION, HIS PRIOR EXPERIENCE

4    WITH THE POLICE, AND THE MANNER IN WHICH HE CONDUCTED

5    HIMSELF AT THE HEARING TODAY, INDICATE TO ME THAT IT'S

6    APPROPRIATE TO TREAT HIM AS AN ADULT AND THAT HE HANDLES

7    HIMSELF FAIRLY WELL AS AN ADULT.

8              ON THE BASIS OF THE RECORD THE COURT FINDS THAT

9    THE STATEMENTS MADE BY THE DEFENDANT TO DETECTIVES SALDATE

10   AND CHAMBERS WERE MADE INTELLIGENTLY, KNOWINGLY, AND

11   VOLUNTARILY.

12             FRANKLY, I MUST STATE I AM UNABLE TO BELIEVE THE

13   DEFENDANT WHEN HE ASSERTS THAT -- HE ASSERTED HIS

14   CONSTITUTIONAL RIGHTS NUMEROUS TIMES AND THAT DETECTIVE

15   SALDATE IGNORED THEM.  AND THAT DETECTIVE SALDATE DID NOT

16   GIVE HIM HIS CONSTITUTIONAL RIGHTS UNTIL AFTER HE HAD

17   CONFESSED.  I FIND TO THE CONTRARY, THAT THE STATEMENTS

18   MADE BY THE DEFENDANT WERE NOT THE RESULT OF FORCE, THREATS

19   OR PROMISES OF LENIENCY AND THE STATEMENTS WERE MADE AFTER

20   THE DEFENDANT WAS PROPERLY ADVISED OF HIS CONSTITUTIONAL

21   RIGHTS AND THAT THEREFORE THE STATEMENTS OF THE DEFENDANT

22   MADE TO THE DETECTIVES SALDATE AND CHAMBERS ARE ADMISSIBLE.

23             YOU WON'T NEED TO FILE A BRIEF, MR. STALZER.  I

24   WASN'T SURE PRIOR TO THE EVIDENTIARY HEARING WHETHER I

25   WOULD NEED MORE OR NOT ON THAT.

Exhibit 1G

1          RICHARD, MAY I HAVE OUR CALENDAR, PLEASE.

2          HAVE COUNSEL DETERMINED THE AVAILABILITY OF THE

3     WITNESSES AND HOW SOON YOU'RE GOING TO BE ABLE TO PROCEED

4     ON THE ADMISSIBILITY OF THE DNA EVIDENCE, MR. CLARK?  HAVE

5     YOU HAD THOSE RESULTS YET?

6          MR. CLARK:  NO, I DON'T, JUDGE.  MR. STALZER AND I

7     HAVE DISCUSSED THAT AND I'M KIND OF IN A ROCK AND A HARD

8     PLACE BECAUSE MY RESEARCH INTO DNA I BELIEVE NECESSITATES

9     AT LEAST THAT I HAVE SOMETHING BACK FROM THEM BEFORE I CAN

10    GO APPROACH THESE PEOPLE AS TO THE BASIS -- AND WHAT'S

11    GOING TO BE AT ISSUE AT THE TRIAL, BECAUSE WE'RE TALKING

12    ABOUT THE RELIABILITY, REPLICABILITY, AND I NEED TO HAVE

13    SOMETHING TO GO AND HAND THEM WITH IN ORDER TO REACH THAT

14    POINT.

15         I WILL INFORM THE COURT I HAVE A GOOD IDEA OF WHO

16    I AM GOING TO BE APPROACHING.  AND MY RESEARCH CERTAINLY

17    LEADS ME TO BELIEVE THAT THOSE PEOPLE ARE GOING TO BE

18    ACCESSIBLE, BUT I THINK I NEED TO GO TO THEM WITH SOMETHING

19    IN HAND RATHER THAN JUST WALKING UP AND SAYING TELL ME

20    ABOUT THIS BECAUSE I THINK IT WOULD BE A WASTE OF TIME AND

21    EFFORT.

22         THE COURT:  SURE.  ARE WE TALKING ABOUT IT'S BEEN 90

23    DAYS FOR THE INITIAL REPORT?

24         MR. STALZER:  YES, YOUR HONOR.  AND WHEN THE FINAL

25    REPORT WILL BE DONE, I HAVE BEEN TOLD AS OF TODAY IT WILL

1    BE ABOUT FOUR MORE WEEKS.  HOWEVER, I DON'T KNOW IF THAT

2    NECESSARILY ADDRESSES THE FRYE ISSUE ITSELF.  HOWEVER, A

3    FINAL WRITTEN REPORT WILL NOT BE AVAILABLE FOR FOUR WEEKS.

4        THE COURT:  THAT'S NOT ACCEPTABLE, SIR.  CAN THEY

5    ISSUE A PRELIMINARY REPORT --

6        MR. STALZER:  I HAVE BEEN TOLD THERE WILL BE A

7    PRELIMINARY REPORT WITHIN APPROXIMATELY ONE WEEK.

8        THE COURT:  I'M NOT SURE THAT I UNDERSTAND THE CAUSE

9    OF DELAY.  ARE YOU ABLE TO FIGURE THAT OUT?

10       MR. STALZER:  JUST PROCESSING THE INFORMATION.  THE

11   PERSON WHO WAS WORKING SOLELY ON THIS CASE WAS ON VACATION

12   THIS WEEK, BUT IT'S A MATTER OF THAT INDIVIDUAL SITTING

13   DOWN AND THEY HAVE BASICALLY A MEETING WITH OTHER

14   SCIENTISTS TO DISCUSS THE OVERALL TESTING AND TO EXAMINE

15   WHAT THEY CALL THE BANNED FREQUENCIES AND DO A TOTAL

16   ASSESSMENT OF WHAT WAS DONE BY THIS ONE INDIVIDUAL WHO HAS

17   BEEN ASSIGNED TO THE CASE FROM ITS INCEPTION.

18           I HAVE ALSO DISCUSSED THE MATTER WITH MY

19   SUPERVISOR ABOUT THE OTHER CASE THROUGH THE SELMAR

20   CORPORATION, WHICH I BELIEVE MAY BE BEFORE JUDGE BROWN; IF

21   IT'S STILL THERE.  THE PROBLEM IS WE MAY HAVE TO PROCEED ON

22   OUR OWN BECAUSE THERE'S ANOTHER F.B.I. CASE WHICH MR.

23   CLARK, MR. HENZE IS INVOLVED, K.C. SCULL, AND I THINK

24   THAT'S PROCEEDING FIRST AND IT MAY BE TIED IN WITH ANOTHER

25   CASE HANDLED BY ANOTHER PROSECUTOR WHICH IS ALSO A DNA CASE

121

1    FROM THE F.B.I. LAB.

2         THE COURT:  ALL RIGHT.  I'M GOING TO ORDER THAT A

3    PRELIMINARY REPORT BE PREPARED AS SOON AS POSSIBLE.

4         WE'RE GOING TO SET THIS MATTER FOR PRETRIAL

5    CONFERENCE ON AUGUST 17TH.  DO COUNSEL HAVE ANY PROBLEMS

6    WITH FRIDAY, AUGUST 17TH, FOR A STATUS CONFERENCE AND

7    ARGUMENT ON THE DEFENDANT'S MOTION TO DISMISS IN REFERENCE

8    TO THE AIDING AND ABETTING?

9         MR. CLARK:  I DON'T HAVE A PROBLEM WITH THAT.  I'M

10   SAYING THAT WITHOUT LOOKING AT MY CALENDAR, JUDGE.

11        MR. STALZER:  THAT'S FINE, YOUR HONOR.

12        THE COURT:  ALL RIGHT.  WE'LL SET THAT AT 10:30 ON

13   AUGUST 17TH, 1990, IN THIS DIVISION.  THAT WILL BE A

14   PRETRIAL CONFERENCE IN REFERENCE TO THE DNA STATUS

15   SITUATION AND I'M NOT PUTTING A DEADLINE ON THAT, MR.

16   STALZER, BUT -- WELL, I GUESS I AM, BUT BY AUGUST 17TH

17   THERE'S GOT TO BE A PRELIMINARY REPORT TO MR. CLARK IN

18   WRITING.

19        MR. STALZER:  I WILL SAY FOR WHAT IT'S WORTH AND

20   PROBABLY NOT MUCH, I WAS NOT THRILLED TO HEAR WHAT I HEARD

21   TODAY IN LIGHT OF WHAT I WAS TOLD BEFORE THE MATERIALS WERE

22   EVEN SENT TO THE LAB WHICH WAS ONE REASON WE USED A PRIVATE

23   CORPORATION VERSUS F.B.I.  I WILL BE IN TOUCH WITH THE

24   REPRESENTATIVE, PHYSICALLY WORKING ON THE CASE, AND

25   LITERALLY SCREAMING A LITTLE BIT TO GET, YOU KNOW, WHAT WE

1    HAVE TO PAY FOR WHICH ISN'T 10 CENTS, AS YOU PROBABLY KNOW,
2    BUT --
3        THE COURT:  SURE.  YOU MIGHT TELL THEM OF THE
4    DEFENDANT'S CONSTITUTIONAL RIGHT TO SPEEDY TRIAL AND THE
5    FACT THAT THE COURT MAY PRECLUDE THE STATE FROM GOING INTO
6    ANY OF THIS EVIDENCE IF IT'S NOT PROVIDED PROPERLY.
7        MR. STALZER:  EXACTLY, AND I AGREE WHOLEHEARTEDLY.
8        THE COURT:  THAT BEING THE STATUS OF THE CASE, I'LL
9    ENTERTAIN AN ORAL MOTION TO CONTINUE THE TRIAL DATE, MR.
10   CLARK.
11       MR. CLARK:  JUDGE, OBVIOUSLY I WOULD MOVE TO CONTINUE.
12   I HAVE DISCUSSED THE MATTER WITH MR. GALLEGOS AS WELL.  HE
13   UNDERSTANDS IF WE DO CONTINUE IT, WE'RE GOING TO ONCE AGAIN
14   BE EXTENDING THE TIME LIMITS UNDER RULE 8 AND HE'S AMENABLE
15   TO THAT, JUDGE.
16       MR. STALZER:  YOUR HONOR, MAY I HAVE ADDITIONAL TIME
17   TO RESPOND TO MR. CLARK'S LATEST MOTION?  I PROMISE I WILL
18   GET IT TO HIM SO HE DOESN'T HAVE THREE DAYS BEFORE THE 17TH
19   SO HE HAS ADEQUATE TIME TO RESPOND AND RESEARCH ANY CASES
20   THAT MAY OR MAY NOT COME FROM JURISDICTIONS OTHER THAN
21   ARIZONA, JUST SO I DON'T RUN INTO A BIND.  I THINK IT'S DUE
22   BY TUESDAY OF NEXT WEEK.
23       MR. CLARK:  JUDGE, I HAVE NO OBJECTION WITH THAT.
24       THE COURT:  SURE.  I'LL GIVE YOU UNTIL -- WOULD FRIDAY
25   THE 10TH BE SUFFICIENT TIME?


**GALL 174**

SUPERIOR COURT
Phoenix, Arizona

MILKE_NSB029889

Exhibit 1G

123

1      MR. STALZER:   THAT'S FINE.   THANK YOU.

2      THE COURT:   ALL RIGHT, TO RESPOND.

3      MR. CLARK:   JUDGE, I WOULD LIKE TO INFORM THE COURT I

4   WILL BE PREPARED ON THE 17TH TO COME IN AND INDICATE TO THE

5   COURT WHAT I WILL NEED IN THE WAY OF BEING ABLE TO PROCEED

6   ON THE DNA.   HOPEFULLY THAT WILL INCLUDE A LIST OF COSTS

7   INVOLVED BECAUSE IT IS GOING TO BE QUITE EXPENSIVE AND MR.

8   GALLEGOS IS INDIGENT.   SO I DO HAVE THAT PROCESS BEGUN,

9   JUDGE, BUT IT IN ITSELF IS GOING TO TAKE SOME TIME.

10      THE COURT:   IT'S ORDERED GRANTING THE DEFENDANT'S

11   MOTION TO CONTINUE, THE COURT FINDING EXTRAORDINARY

12   CIRCUMSTANCES PURSUANT TO RULE 8.5.

13      MR. GALLEGOS, YOU UNDERSTAND THAT YOU'RE ENTITLED

14   TO GO TO TRIAL SOON, BUT YOUR ATTORNEY OBVIOUSLY NEEDS MORE

15   TIME TO ADEQUATELY PREPARE A DEFENSE.   IS IT OBJECTIONABLE

16   TO YOU AT ALL THAT WE CONTINUE THE DATE FOR YOUR TRIAL

17   UNTIL SEPTEMBER 5TH OF 1990?

18      THE DEFENDANT:   NO, SIR.

19      THE COURT:   ALL RIGHT.   THE COURT THEN WILL ORDER TIME

20   EXCLUDED AND IT'S ORDERED THAT THE MATTER IS SET FOR TRIAL

21   AT 10:00 A.M. ON SEPTEMBER 5TH, 1990, IN THIS DIVISION.

22   AND WE'LL RECONSIDER HOW WE'RE GOING TO SCHEDULE ALL THE

23   OTHER MATTERS WHEN WE MEET ON THE 17TH, ALL RIGHT?

24      OKAY.   HAVE YOU COVERED EVERYTHING THAT WE NEED

25   TO COVER TODAY?

**GALL 175**

SUPERIOR COURT                    **MILKE_NSB029890**

Exhibit 1G

124

1          MR. STALZER:  I BELIEVE WE HAVE, YOUR HONOR.

2          MR. CLARK:  I THINK SO, JUDGE.

3          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  COURT

4     WILL BE ADJOURNED.

5                              *    *    *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPERIOR COURT
                          Phoenix, Arizona          **MILKE_NSB029891**

Exhibit 1G

I _____CYNTHIA S. ZAMENSKI_____, do
hereby certify that the foregoing pages constitute a full,
accurate typewritten record of my stenographic notes
taken at said time and place, all done to the best of my
skill and ability.

DATED this 14th day of    March    .19 91

_____
Official Court Reporter

GALL 177

MILKE_NSB029892

Exhibit 1G

Case 2:01-cv-01909-NVW   Document 130-1   Filed 12/09/16   Page 112 of 116

CR-94-0389-AP

FILED

DEC - 9 1994

NOEL K. DESSAINT
CLERK SUPREME COURT
BY

1         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    THE STATE OF ARIZONA,                    )

5                      PLAINTIFF,             )        CR-91-0149-AP

6    VS.                                      )        NO. CR 90-03339

7    MICHAEL STEVEN GALLEGOS,                 )        CV 01-1909-PHX-ROS

8                      DEFENDANT.             )        FILED

9    ───────────────────────────────         )        AUG - 5 1991

10                                                     NOEL K. DESSAINT
                                                       CLERK SUPREME COURT
11                            PHOENIX, ARIZONA          BY

12                            MARCH 7, 1991

13

14   B E F O R E :   THE HONORABLE JEFFREY A. HOTHAM, JUDGE.

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS        LODGED

17                            MOTIONS          RECEIVED ____ COPY

18                            JURY TRIAL              NOV 1 6 2001

19                                            CLERK U S DISTRICT COURT
                                              DISTRICT OF ARIZONA
20                                            BY              DEPUTY

21

22

23   PREPARED FOR APPEAL

24
                                        CYNTHIA S. ZAMENSKI,
25   (ORIGINAL)                         OFFICIAL COURT REPORTER.

DISCOVERY AND CONFIDENTIAL MATERIAL

MILKE_NSB029647

**GALL 178**

Exhibit 1G

3

1                          I N D E X

2                                                              PAGE
3     STATE'S OPENING STATEMENT                                 35

4     DEFENDANT'S OPENING STATEMENT                             44

5

6     WITNESSES:                        D         C         RD

7     CYNTHIA WISHON GALLEGOS         53        86        122

8     JERRY ANDY GALLEGOS           126     144

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GALL 179                                        MILKE_NSB029648

SUPERIOR COURT
Phoenix, Arizona

Exhibit 1G

1   ROOF, HITTING THE GROUND DIRECTLY BELOW.  YOU HAD
2   BREAKFAST.  YOU LOOKED OUTSIDE.  YOU SAW MOISTURE AND YOU
3   SAID, SURE ENOUGH, IT WAS RAIN THAT I HEARD.  BUT DID YOU
4   SEE IT?  CIRCUMSTANTIAL.  YOU HAVE NO ACTUAL FIRSTHAND
5   AWARENESS, BUT BY YOUR SENSES, YOUR COMMON SENSE, YOU DRAW
6   THAT CONCLUSION.

7           THE WEIGHT YOU GIVE EITHER ONE IS UP TO YOU.  THE
8   LAW DRAWS NO DISTINCTION.

9           GETTING YOU TO THE ULTIMATE DESTINATION, THE
10  FACTS, THE REAL GUTS OF THE BOOK, THE REAL POINTS IN
11  BETWEEN A AND B ON OUR ROAD MAP, YOU'RE GOING TO HEAR
12  PROBABLY FROM A FEW POLICE OFFICERS OR DETECTIVES.  YOU'RE
13  GOING TO HEAR FROM THE VICTIM'S MOTHER.  YOU'RE GOING TO
14  HEAR FROM THE DEFENDANT'S FAMILY MEMBERS POSSIBLY.

15          YOU WILL HEAR WHAT MAY BE IN THIS CASE POSSIBLY
16  SOME STIPULATIONS, AND STIPULATIONS AMOUNT TO AN AGREEMENT
17  BETWEEN THE PARTIES, THE STATE AND THE DEFENSE, THAT A
18  CERTAIN FACT EXISTS, SUCH AS THE CAR WAS RED.  WHETHER YOU
19  WANT TO BELIEVE IT OR DISBELIEVE IT, AGAIN, IS UP TO YOU TO
20  WEIGH THAT EVIDENCE, TO ACCEPT HOW MUCH YOU BELIEVE OR HOW
21  MUCH YOU DISBELIEVE.

22          THE KEY IN THIS CASE WILL FALL WITH TESTIMONY BY
23  DETECTIVE SALDATE.  IT MAY FALL WITH THE TESTIMONY OF THE
24  MEDICAL EXAMINER WHO IS CURRENTLY IN SAN DIEGO FOR
25  SOMETIME, DR. BOLDUC.  THE ISSUE TO FOCUS ON IS WHAT IS

**GALL 180**            SUPERIOR COURT           **MILKE_NSB029649**
                        Phoenix, Arizona

Exhibit 1G

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2             IN AND FOR THE COUNTY OF MARICOPA

3                                          PUBLIC DEFENDER

4      STATE OF ARIZONA,            )      JUL 1 6 1991
                                    )
5            Plaintiff,             )      APPEALS RECEIVED
                                    )
6          vs.                      )
                                    )
7      MICHAEL STEVEN GALLEGOS,     )         CR 90-03339
                                    )
8            Defendant.             )
                                    )
9      _____

10                        Phoenix, Arizona
                          March 12, 1991   PM
11

12

13

14     Before:   The Honorable JEFFREY HOTHAM,
                  Judge of the Superior Court
15

16

17              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                           (JURY TRIAL)
18

19

20

21

22                                      DONALD E. MOLL
                                        Court Reporter
23
         COPY
24
       PREPARED FOR:
25
       GALLOS ON APPEAL                 MILKE_NSB029567

Exhibit 1G

25



1              At first, it was my understanding after I got

2    there, that it was being handled as a missing person.

3    Ultimately they found the person dead. Thusly, it became

4    a homicide, and they called our office.

5              A team was summoned. I was part of that team

6    that went out to that address and waited there.

7    Ultimately supervisors arrived and began to give

8    assignments, and, therefore, I ended up with the job as

9    case agent, or the person responsible for the actual

10   murder case.

11        Q.    Could you tell us a little bit more about

12   what precisely is the case agent?

13        A.    Well, the case agent is nothing -- I mean, to

14   be the case agent, you are just, of course, one of the

15   detectives.

16              However, an assignment has to be made to

17   someone that has to look over the case. He doesn't --

18   that doesn't mean that he does everything in the case.

19   That just means that other detectives that are working the

20   case also report to you, and you're just a gathering point

21   of the reports.

22              You're also the person that's responsible for

23   going to all the hearings. You're responsible for

24   basically the investigation of the case, if further

25   investigation needs to be done.



**GALL 182**                              **MILKE_NSB029568**

Exhibit 1G

33

1      Q.     Was anyone else present in the room when you

2   began your interview with Mr. Gallegos?

3      A.     No.

4      Q.     Could you tell us how you began the

5   interview?  What occurred?

6      A.     I entered the interview room.  I introduced

7   myself, identified myself.

8      Q.     How did you do that?

9      A.     With my badge case, my badge case and ID

10  card, and Mike made mention that he knew I was a

11  policeman; he had seen me out at the scene, and I then

12  talked to him about his schooling.  We talked about his

13  education.  We talked about where he went to school, what

14  kind of grades he -- what kind of grades he had.

15               He told me that he was in special education

16  at Coconino Highschool in Flagstaff, but that the only

17  problem area he had was with math, and he did indicate he

18  was a slow learner.

19               I asked him about the area of reading and

20  comprehending.  He said that he thought he was at the

21  senior level in those areas, but that he did have some

22  problems with his math.

23               We continued on, and then I finally removed a

24  Miranda rights card that was given to me by the Phoenix

25  Police Department.  They're supplied to us.  It's sort of

**GALL 183**                                    **MILKE_NSB029569**

Exhibit 1G



1    standard, as far as I know, for the State of Arizona.  I

2    removed the card from my badge case.  I handed him the

3    card, and I asked him to read the card to me.

4            Q.    Did he read it back to you?

5            A.    Yes, he did.  He didn't appear to have any

6    problem with it either.

7            Q.    What happened after he read the card back to

8    you?

9            A.    I asked him if he understood his rights, and

10   he said he did.  It's unique that I would give him the

11   card, only because since he said he was, you know, a slow

12   learner, I just wanted to make sure that he understood the

13   rights, and for that reason, I let him read them.

14           Q.    After -- I'm sorry.

15           A.    I also asked him specifically if he knew what

16   a lawyer was, and he said he did.  I asked him -- I asked

17   him if he knew that he didn't have to speak to me, and he

18   said he did, and he said something about whether he was a

19   suspect at this point.

20           Q.    What did you say to him in response?

21           A.    I told him immediately that I didn't know

22   whether he was or wasn't.  I didn't have enough

23   information at that point to decide whether he was or

24   wasn't.  I was there to interview him, to ask him

25   questions.

**GALL 184**                                    **MILKE_NSB029570**



35



1          I told him that I was gonna ask him certain

2     questions about last night, about ███████████, what he

3     had done last night, and he finally said, "No problem.

4     I'll cooperate and tell you everything."

5          Q.    How does the interview progress, then, after

6     that point?

7          A.    Mainly in a narrative form, and I mean that

8     by the fact that I -- I let him talk to me. He progressed

9     and tells me what's happening. If I have any problems

10·   with any area of the interview, if I have any questions, I

·11   may stop him and ask him, which I did on numerous

12    occasions, and ask him to explain something I may not have

13    understood, to tell me again, that maybe I -- maybe I

14    missed something, but for the most part, I would let him

15    talk to me and tell me what had happened.

16          And he basically went on to say that he was

17    only visiting his brother there, Mike. Mike was only

18    visiting his brother there at that home where ████████

19    ██████ is at.

20          He was with George Smallwood, who he had come

21    down with from Flagstaff, that he had come down, I believe

22    it was March 10th, in that area, that he had come down

23    initially from Flagstaff, and that he and George were

24    there visiting, and that on that day, on that previous

25    day, that he and George were concerned about working on



**GALL 185**                              MILKE_NSB029571

36

1    George's truck, which was a Scout, a four-wheel drive, and
2    that he said his brother had told him that they would
3    be -- he would allow them to work on the Scout at his
4    place of business.

5            Mike's brother worked as apparently a
6    mechanic and had worked as a supervisor of a shop, and he
7    told him after 4:30, when the shop closed down, he would
8    allow them to come and work at the shop and do some odds
9    and ends to the Scout that they were working on which
10   belonged to George.

11           And he went on to say that he had gotten
12   there, he and George had drove to the location where his
13   brother worked. I believe he said they got there at 10
14   minutes -- 10 minutes or so earlier.

15           They sat around, waited until 4:30. They
16   started working on the -- the Scout. They replaced tie
17   rods or something to that effect, some major thing on the
18   truck, the suspension.

19           They -- it got dark. They decided to -- the
20   brothers decided to go home. They went home. He said
21   he -- they both went into the house. He went and got a
22   shower. They came back out.

23           Him and George were playing, I believe,
24   Nintendo, and his brother remained up with them both until
25   about just before midnight, and then his brother went to

                          **MILKE_NSB029572**

Exhibit 1G

1    sleep.

2                   He said that he and George stayed up until a

3    little bit after midnight, around midnight, playing

4    Nintendo, and that they both decided to go into the

5    bedroom and go to sleep.

6                   He said he stopped by the bathroom, came back

7    out and went to bed, and he said that George was already

8    asleep, and I think he mentioned something about the pit

9    bull dog that they had was already in bed with George. He

10   said that he went to bed, and within a short time, fell

11   asleep.

12                  The next morning he remembers getting up with

13   a phone call from a friend of his who was coming down from

14   Tucson. He talked to him briefly. He remembers George

15   leaving for the store to buy -- or leaving, and then he

16   came back with some milk, so he knew that he had gone to

17   the store.

18                  I believe he said he went inside or was still

19   inside, decided to change into his old -- some old clothes

20   to work in on his car, which he did.

21                  A short time later, George came out and told

22   him that they couldn't find ▮▮▮▮▮, and the last time he

23   had seen George, George was playing with Nintendo again in

24   the morning, and George told him he couldn't find ▮▮▮▮▮,

25   and that they attempted to look for ▮▮▮▮▮ and they did

**GALL 187**                              **MILKE_NSB029573**

38

1      for most of the morning.

2              Q.      During the course of that narrative, did he

3      ever mention anything about alcoholic beverages?

4              A.      No.

5              Q.      Did you have any discussion or did he

6      mention, Mr. Gallegos, anything about the security of the

7      house?

8              A.      He had already told other detectives that

9      the -- the house had been locked up, was secured the

10     entire time.  When he woke up, the house was locked.

11     There were deadbolts on the doors, and they were locked

12     when he woke up, and he indicated that the entire house

13     was secured.

14             Q.      What happens after this first narrative is

15     given about his activities the preceding day, on Thursday,

16     carrying over into Friday morning?

17             A.      During this period of time, of course, I was

18     aware of what he had told other police officers.  I was

19     aware also, because of the briefing that we had had at the

20     scene, that other police officers had looked at the -- at

21     the doors and looked at the windows, and looked at the

22     locks, had looked at other areas where entry may have been

23     forced, entry may have been made, exit may have been

24     forced, exit may have been made, and was told, you know,

25     that there was just no evidence that that occurred, you

**GALL 188**                                    MILKE_NSB029574

Exhibit 1G

39



1    know.

2              In fact, the evidence was that -- that Mike

3    was telling the truth, that the house was secured or

4    appeared to be secured.

5              Because of that, and because of the

6    indication of Mike and George, it was my belief that it

7    was very possible that these two individuals could have

8    been responsible for the death, and after believing that

9    or coming to that opinion, after listening to Mike and

10   knowing everything that had transpired or that other

11   officers had done, even though I had just been given just

12   a briefing, I told Mike that I believed that he was

13   involved with killing her.

14        Q.    Did he have any response when he made that

15   statement?

16        A.    He denied it, of course, at first, and then

17   shook his head no.

18              I told him that I thought he was involved in

19   the -- in the killing of ███████████   I even suggested

20   to him that I didn't think that he probably meant to kill

21   her.

22        Q.    When you made those comments, do you recall

23   what his response was about basically telling exactly what

24   happened?  Do you recall what he said to you?

25        A.    Briefly we went into a -- an area where he

**GALL 189**                                MILKE_NSB029575

Exhibit 1G

)a

|

40

1     was trying to question me about what if he had been

2     involved, what would happen.

3               In that area, he was trying to question me

.1

4     and trying to kind of feel me out on what possibly could

5     happen to him if, in fact, he was involved, but he made it

6     very clear that he wasn't admitting to it, he was just

7     wanting to know whether if he had been involved in it,

8     what would I do, what different things like that.

9               He made several statements that, of course, I

10    quoted.

11    Q.    If I could stop you there and interrupt you

12    and ask you, did he make statements about or to the effec

13    what it was you were really asking of him?

14    A.    He made -- he made something to the effect --

15    said something to the effect that was actually wanting him

16    to -- I believe something to the effect that, "Do you know

17    what you're asking me to do?  You're asking me to say

18    something that would lose my family," or something to that

19    effect.

20              I, of course -- my total response to him this

21    entire time, as it always is, is that I'm there to get the

22    truth.  I'm not there to judge him.  I explained that to

23    him.  I wasn't there to judge him.  I'm not there to bring

24    anything on him or to tell him anything other than to

25    listen.  I'm there to get the truth.

**GALL 190**                              **MILKE_NSB029576**

Exhibit 1G

41

1          I'm there to get the truth as he knows it,

2    and I was there as a listening post.  I was going to

3    listen to him.  I explained that to him, and he made

4    various statements that I quoted in the report.  If you're

5    asking for the specific quotes, I'd have to refer to the

6    report.

7          Q.    Do you recall him making a statement to the

8    effect, quote, "What do you think my brother will think of

9    me" end quote?

10         A.    Absolutely.

11         Q.    Did he make the remark to you, Mr. Gallegos,

12   quote, "Let's say, okay, I'm not admitting it, but let's

13   just say I did have something to do with ████████ What do

14   you think would happen to me?"

15         A.    I remember him making that statement, and I

16   remember telling him that he would go to jail.

17         Q.    Did he make another statement, quote, "Again,

18   let's just say I did do it, but I'm not admitting to it.

19   Let's just say I did.  Would there be anything I could say

20   to keep from going to jail?"

21         A.    He did say that, and I responded that there

22   was absolutely nothing he could say that would keep him

23   from going to jail.

24         Q.    And did he ask you quote, "Do you think" --

25         MR. CLARK:   Judge, may I interject for a moment?

GALL 191                                          MILKE_NSB029577

Exhibit 1G

42

1    He appears to be refreshing himself from a document.  If

2    he is going to do that, I'd like to have some foundation

3    laid for it.

4         THE WITNESS:  I'm just --

5    BY MR. STALZER:

6         Q.   Excuse me.  Constable, have you ever referred

7    to any of that report that's in front of you so far today?

8         A.   Well, I reviewed it earlier, but I haven't --

9    as I'm testifying now, I was just trying to find the area

10   where you're at to verify those quotations that you're

11   making.

12        THE COURT:  The objection is overruled.  So we all

13   understand our procedure, Mr. Saldata, if you need to

14   refresh your recollection about what the exact statements

15   were, then let Mr. Stalzer know, and we'll all know about

16   that, and that will be on the record.

17        THE WITNESS:  Okay.

18        THE COURT:  Thank you, sir.

19   BY MR. STALZER:

20        Q.   Did he ask a question of you, quote, "Do you

21   think I did it by myself?"

22        A.   Yes, he did.

23        Q.   What did you say in response, if anything?

24        A.   I believe I told him that I wanted the truth

25   from him, and I expected of him -- that if someone else

**GALL 192**                                    **MILKE_NSB029578**

Exhibit 1G



43

1   was involved with him, I would expect him to tell me the

2   entire truth and tell me who that other person was, and

3   that I would not want him to minimize his involvement at

4   all.

5        Q.   Did he make this following response: "Okay.

6   I did do it, but I was not by myself.  George helped me,

7   and he's as much to blame as I am."

8        A.   Yes, he did.

9        Q.   When was that statement made in response to

10  the previous one I quoted to you?

11       A.   It would have been just after.

12       Q.   What happened after he made the last

13  statement that I mentioned?

14       A.   I then asked him to tell me what happened,

15  and that I wanted him to tell me everything, and again

16  reminded him that I didn't want him to minimize his

17  involvement, and if anyone else was involved, to tell me

18  about it, and then he went into a narrative about what

19  occurred.

20       Q.   What did he say happened?

21       A.   Initially he told me that -- that everything

22  that he had said regarding his movements during that day

23  were basically correct.

24       Q.   Which day was he referring to?

25       A.   The day before.

GALL 193

MILKE_NSB029579

Exhibit 1G

44

1      Q.      That'd be Thursday?

2      A.      That's correct.

3              He also at this point interjected the fact

4      that he and George had been drinking whiskey and Kool-Aid

5      most of the day.

6              He also told me that when they'd gone to the

7      shop to work on the car, and as he had stated, he had

8      gotten there early, that they had made, when they got

9      there, the employees were drinking some beer, and that he

10     believed that he and George had six or seven beers apiece

11     while working on the truck.

12             He also indicated that they did leave there

13     at night, when it was dark; that they were on the way

14     back, and that when they got back to the house, that he

15     and George had probably another six or seven beers, and

16     that was from a case of beer that Mike's brother had

17     purchased from money that was given to him by George.

18             And that for the most part, that everything

19     had happened the way he had said.  It was 11:30 or so.

20     The brother went to sleep.  Midnight or so, a little

21     after, he and George were sitting there playing Nintendo.

22     He then began to reference the fact about he had only had

23     sexual intercourse maybe two or three times in his life.

24             He had indicated that the last time he had

25     had sexual intercourse was about a year before.  He said

**GALL 194**                          **MILKE_NSB029580**

Exhibit 1G

45

1    that he was thinking about going in and -- into ████████

2    room.

3          Q.   Let me stop you there.

4          A.   Sure.

5          Q.   When you use the term "sexual intercourse,"

6    was that a term he used?  Mr. Gallegos used that term?

7    I'm referring to the discussion he had with George

8    Smallwood.

9          A.   I don't believe so.

10         Q.   How did he describe what you've termed

11   "sexual intercourse"?

12         A.   I believe he kept referring to it as screwed.

13         Q.   After -- after he had this conversation with

14   George, what did he then tell you happened afterwards?

15         A.   Well, he said that he had had this thought of

16   going into ████████ room and fondling her buttocks.  Of

17   course, he referred to it as her ass.

18              He said that he had had these thoughts, and

19   that he at first didn't really want to tell George about

20   them because, of course, George was a brother.  He didn't

21   know how he would react to it, but that he finally

22   mentioned to George that, "Well, we ought to go into

23   ████████ room," or something to that effect, and that he

24   wanted to go in and fondle her, as he said it, her ass.

25              He said that he was sort of surprised when

**GALL 195**                              **MILKE_NSB029581**

Exhibit 1G

46

1    Georgia agreed, and then he kind of was wavering a little

2    bit, and then George then told him, "Don't worry about it.

3    Even if she wakes up, she won't say anything.  She won't

4    tell anybody anything."

5              He said that they then both got up.  He told

6    me what they were wearing.  He told me they were wearing

7    some shorts and George was wearing some shorts, and that

8    they both got up and walked towards ████████ room, and he

9    said that he did stop at the bathroom.

10             He told George that he was going into the

11   bathroom to get baby oil.  I then, of course, at this

12   point asked him if he was going to -- why he was going to

13   get baby oil since he had told me that his only intention

14   was to go in there and feel her ass.

15             He said -- well, he said something to the

16   effect that he liked the way baby oil made skin feel, and

17   that he really got apparently turned on by the fact or the

18   way the baby oil felt on the skin.

19             He said he went to the bathroom, got the baby

20   oil, came back out, and I believe he saw George standing

21   at the door of the bedroom.

22             I think he said something to the effect that

23   George had one hand on the door handle and the other han-

24   down in front of his pants, and he said they both walked

25   in, and as soon as they walked in, he said he could see

GALL 196                                    MILKE_NSB029582

47

1          ██████ lying on her side facing the wall.  She had a

2     night shirt on.  The night shirt was just above the waist

3     exposing a little bit of her back and her panties.

4                    He said that he walked up to her bed and that

5     George then walked up next to him and was standing next to

6     him.

7          Q.     Let me put the brakes on.

8          A.     Sure.

9          Q.     Is there any doubt in your mind he said to

10    you the night shirt was above her waist?

11         A.     No.

12         Q.     He said that to you?

13         A.     I believe he did.  I would have to refer to

14    the report if there's --

15         Q.     And when he made that statement, Mr. Gallegos

16    said her buttocks was exposed?

17         A.     He said he could see her panties.  She only

18    had panties on.

19         Q.     I think I cut you off when you said both

20    gentlemen were standing at the side of her bed as she was

21    facing the north wall.

22         A.     Yes.  And again, he just said wall.  I don't

23    know if it was the north wall or not.  I never went into

24    the -- into the scene.

25                    But he said that he walked up to her and was

MILKE_NSB029583

Exhibit 1G

48

1    standing in the area of her buttocks.  He said that George

2    was standing next to him, and I asked him where, and he

3    said towards the head.  He said he then began fondling

4    her, as he referred to it, her ass.

5           He said that he fondled it some time.  He saw

6    George fondling the -- her breast, the area of her breast.

7    She was still asleep.  He said he then got a piece of or

8    some, I believe, some baby oil, and put it on his hand and

9    started rubbing the baby oil.  I'm sorry.  He started

10    rubbing the baby oil on the exposed portion of her back.

11         Q.    Let me stop you there.

12         A.    Sure.

13         Q.    Do you have any doubt he said, "exposed

14    portion of her back"?

15         A.    No, I don't.

16         Q.    Would you proceed to tell us what he

17    continued to tell you.

18         A.    I believe we next talked about the fact that

19    George was still rubbing on her breasts, in the area of

20    her breasts, and that he then got some more baby oil and

21    began to rub some more baby oil on her back, and he said

22    that immediately upon doing that, Kendall woke up.

23           He said that he remembers ███████ waking up,

24    turning towards him and looking at him.  He said he

25    believes that the baby oil was cold and that is probably

GALL 198                      MILKE_NSB029584

Exhibit 1G



49

1    what woke her up, when he put the baby oil on her back.

2              He said that she then started to turn.

3    George then placed his hand over her mouth to try to keep

4    her from screaming.  He said he could -- ███████ was then

5    making a noise like a pig would make, still trying to

6    breathe through her nose.

7         Q.   Did he explain in greater detail at all about

8    the noises and what she was doing?

9         A.   He actually made the noises of a pig, trying

10   to explain it to me the noises ███████ was making.

11        Q.   Did he say what he did at that time, Mr.

12   Gallegos?

13        A.   He said that he then reached over, put his

14   hand on top of George's hand, over her nose, and held it

15   there.  He said he doesn't remember how long he held his

16   hand there, but she then went limp.

17        Q.   Did you ask him any questions after that

18   about what happened?

19        A.   I think we discussed about the fact of what

20   he had thought had happened to her, and I think he said he

21   thought that she was dead.

22              I believe he may have said something to the

23   effect that he doesn't know whether he whispered to George

24   that she was dead, but he believed he did.  I think he

25   said he believed he did whisper to George that she was



   MIERE-NSB029585

Exhibit 1G

1    dead.

2         Q.    Did he ask you any questions at that point

3    about whether the victim was dead or not?

4         A.    Did he ask me?

5         Q.    Yes.

6         A.    No, sir.  I wouldn't have known.

7         Q.    Did he ask you what you thought her condition

8    was?

9         A.    No.

10        Q.    What occurred after he made those comments

11   about what he thought the victim was as far as life and

12   death?

13        A.    He said that he and George figured that --

14   something to the effect that since she was dead, they

15   might as well finish, in terms of ejaculating.  He said

16   that George turned her on her back -- excuse me -- that

17   George turned her on her back, spread open her legs.

18              At this point her panties were off.  Later on

19   he told me that George was taking her panties off, but her

20   panties were off.  He said that George got up on to the

21   bed.

22              He said he was standing right next to him in

23   the same position that he was in.  He said that George had

24   an erection.  He had his penis out.  He then removed the

25   GALL 200 pillow from -- which had been underneath MILKE_NSB029586 ed

Exhibit 1G

51

1    it down underneath her buttocks to raise her up.

2                   He said that George then attempted to make

3    penetration, but that he believed George couldn't make

4    penetration because he was making these faces and, in

5    fact, Mike was making faces for me.  He closed his eyes

6    and gritted his teeth.

7                   He said that he couldn't make penetration,

8    and that George got off of her, got off the bed.

9                   He then said that he could only think of one

10   thing, and that's making penetration, in what he termed,

11   her ass.

12        Q.   Did he tell you what he was doing as George

13   allegedly was doing the attempted vaginal penetration?

14        A.   I remember asking him what he had been doing

15   while George was doing this.

16        Q.   What did he tell you?

17        A.   He said that apparently this time he had his

18   hand underneath her ass fondling it.

19        Q.   What did he tell you happened after George

20   apparently had been making his attempts?

21        A.   He said, again, that he could only think of

22   that one thing.  He said he pulled her off the bed, laid

23   her on the floor, the carpet floor, face down with her

24   legs spread apart.

25                   He got in between her legs, and he said that

**GALL 201**

MILKE_NSB029587

Exhibit 1G



52

1    he doesn't remember whether he had his pants or shorts on

2    her not.  Later on, I believe he told me he did have his

3    shorts still on.

4              He said that he then pulled her up and made

5    penetration into her ass, as he put it.  I then questioned

6    the fact of the -- of the oil, baby oil, and he said that

7    he forgot that when she was laying on the floor, that he

8    had put baby oil all over his penis, had squirted baby oil

9    in her ass.

10             He said he then grabbed her from the waist.

11   He then brought her hips up to his penis and made

12   penetration.  He said he kept moving her in and out by the

13   motion of his hands and pushing her in and out -- away

14   from him and towards him.

15             He said finally he finished, he ejaculated,

16   and I asked him what George had been doing during this

17   time, and he said that he had seen George -- he doesn't

18   know whether George helped him take the body or ████████

19   from the bed on to the floor, but he thinks he did.

20             He said that George was towards the --

21   towards her head, and that at one point, he saw George

22   still have an erection and that he had ████████ ████████

23   mouth on his penis and was moving it around his penis.

24             After he finished, or after he ejaculated, he

25   believes that George told him that he couldn't finish, and

GALL 202                                    MILKE_NSB029588

Exhibit 1G

53

1    then they -- he said he pulled up his pants, cleaned his

2    penis.  He said there was some feces on his penis.

3              He said that he then remembered the fact of

4    when, I believe, George took off the panties or panties

5    initially, there was some feces on her panties.

6              He said that at that point, they both were

7    thinking of what to do with her.

8         Q.   Did you ask him why he proceeded to do what

9    he did after the girl, in his opinion, was dead?

10        A.   Well, he indicated that he wanted to finish.

11        Q.   What did he say happened after the sex acts

12   were finished?

13        A.   He said that -- that they decided that they

14   had to get rid of the body, get rid of ████████ that they

15   had to take her outside, do something with her, and then

16   they remembered -- either he or George remembered that

17   they needed the keys, so George left the room and he was

18   there with ████████ for a short time.

19              George came back with the keys.  He said that

20   George grabbed her around underneath the arms and around

21   the chest with his arms, picked her up, and that he then

22   picked up -- picked her up by the ankles.  They walked out

23   of the room into the hallway.

24              He said one of the two shut the door of the

25   bedroom, and I had asked him why, and he said well, if

MILKE_NSB029589

Exhibit 1G

54

1    someone was to wake up, he didn't want someone noticing

2    the door opened, seeing that ███████ was missing and, of

3    course, start to search for her.

4            He said they walked down the hall for a short

5    period of time to the entrance of the diningroom, which is

6    tiled.  He then noticed that George had his shoes on,

7    tennis shoes on.  He then made a motion or something.  He

8    said during this entire time, they were either whispering

9    to each other, making facial expressions or motions to

10   each other.  That's how they communicated.

11           He told George about the shoes would make

12   noise on the tile floor.  George then laid ███████ on to

13   the carpeted floor, removed his shoes, then picked her

14   back up, and they walked into the diningroom area to the

15   garage door, or the kitchen door which leads into the,

16   like I say, garage, but I mean carport.  It is a

17   double-lock, so he had to unlock it from the inside.

18           They continued outside on to the -- on to the

19   cement driveway. he said he then locked the door behind

20   him.

21           I then asked him why, and he went into a

22   narration about the fact that if -- if Mike's brother

23   would have got up, if he would have got up and would have

24   found the doors unlocked, then it would have -- he would

25   have probably immediately gone to the bedroom where they

**GALL 204**                                    **MILKE_NSB029590**

Exhibit 1G

55

1   sleep and questioned them about the fact why the door is

2   unlocked, when he specifically told them to lock it before

3   they went to sleep.

4              He said they locked the door, came out, put

5   her between the front of the car and the carport storage

6   area.

7              He said that then they were checking to see

8   if any cars were passing by or anybody else was around.

9   He said that George had the bottle of baby oil during this

10  period of time.

11             He said that George then tossed the bottle of

12  baby oil as far as he could into the street south of the

13  home.  He says he doesn't recall it making a lot of noise.

14  He said that they looked again from side to side to make

15  sure no cars, no one had come out of the house.

16             He said that he didn't see anybody, so they

17  went back to where the body was at.  Again, he had

18  picked -- George picked her up around the chest area by

19  one arm.  He said he then picked her up by the ankles.

20             I then asked him about the fact that probably

21  George could have done it by himself since I had seen

22  ▮▮▮▮▮▮▮▮ and she didn't weigh that much, and he said that

23  he probably could have, but, you know, it kind of looks

24  stupid for him just to walk behind him and ▮▮▮▮▮▮, so he

25  kind of felt he had to do something, so he picked her up

GALL 205                                          MILKE_NSB029591

56

1    by the ankles.

2                    He said they ran down the sidewalk on their

3    side of the street for a short period of time.  Then they

4    crossed the street, and he said they had no intention to

5    put her underneath that specific tree, but he just said it

6    was there, you know, and they dropped her off at the tree.

7                    They then ran back home, went inside the

8    home -- unlocked the door, went inside the home, locked

9    the door, went inside their bedrooms, and went to sleep.

10        THE COURT:  Let's take this opportunity to take our

11   afternoon recess.

12                    Members of the jury, please remember the

13   Court's admonitions.

14

15                    (Whereupon, the Court stood in recess.)

16

17   IN OPEN COURT:

18        THE COURT:  Thank you.  Please be seated.

19                    The record will show the presence of all of

20   our jurors, the defendant an counsel, and Mr. Saldata on

21   the stand.

22                    Mr. Stalzer.

23   BY MR. STALZER:

24        Q.   Sir, you were talking as we briefly took a

25   recess about the body being placed under the tree.

GALL 206                                      MILKE_NSB029592

Exhibit 1G

57

1            Can you tell us what, if anything, Mr.

2   Gallegos told you occurred at that location.

3        A.    I don't understand exactly the question.

4   Maybe --

5        Q.    If you could just pick up the narrative or

6   any statements that were made.

7        A.    We were, I believe -- anyway, we were in the

8   area of where they had taken the body across the street,

9   and laid the body out underneath a tree.  They had gone

10  back home, and had gone inside the house, secured the

11  house, went inside the bedrooms, and went to sleep.

12           I believe that's where we ended.

13       Q.    Did you ask Mr. Gallegos any questions

14  regarding what he did or what Mr. Smallwood did the

15  following morning?

16       A.    Certainly.  We continued on his narrative

17  form.  He told me the next morning he woke up and that he

18  and George really didn't talk about it that much.  They

19  kind of didn't want to say much to each other about it.

20           He said he got up, that George did get up,

21  and that he did go to the store and get some milk, came

22  back.  I believe at some point, the milk being was in

23  regards to ████ needing some milk for some cereal in

24  the morning to go to school.

25           So I asked him about that, and he said, well,

GALL 207

MLKE_NSB029593

Exhibit 1G

58

1    they needed to eat, so they sat around, and after he got

2    back from the store, they decided what they were going to

3    do, and then George called his mother and said that

4    ██████ was missing.

5              He said they helped to search, and made it

6    very clear that he and George only walked on the east side

7    of the street, not getting near ██████ body, because

8    they didn't want to be the ones that discovered it.

9              He said when he and George also got in the

10   International Scout, the one they had been working on,

11   they went looking for -- supposedly looking for ██████

12   assisting in the search.

13             They made sure that -- or he and George made

14   sure that they didn't go around the body, didn't go drive

15   by the body or anything like that. Again, they didn't

16   want to be the ones to locate the body.

17        Q.   Once you were finished with your interview,

18   did you meet with your partner, Detective Chambers, at the

19   time?

20        A.   Yes, I did.

21        Q.   Did you inquire of Mr. Gallegos if he would

22   tape-record an interview?

23        A.   I met with my partner, Mike Chambers, who was

24   interviewing George Smallwood. Then I had Mike Chambers

25   come into the interview with me. He then repeated

**GALL 208**                                    **MILKE_NSB029594**

Exhibit 1G

59

1    generally what he had told me to Detective Mike Chambers,

2    and I asked George if we could tape-record the interview,

3    and he said no, that he just didn't feel very comfortable

4    with going over it all over again, and that he felt very

5    comfortable with the fact that he had told me everything.

6         Q.    Is it correct there was like a reinterview

7    with Detective Chambers present?

8         A.    There was more of a reinterview, but more of

9    like a highlight interview.  I told Mike to tell Detective

10   Chambers generally what he had told me, and he went into

11   the fact about his admissions, what happened, that George

12   was responsible with him, and just highlighted general

13   areas, admitting his guilt, admitting George's guilt,

14   admitting the fact that they had disposed of the body, and

15   the fact that they also intended later -- both attended

16   looking for the body later on, and that's when we asked

17   him about the tape-recorder and him not wanting to go

18   through the whole story again, and I don't blame him.

19        Q.    In the course of some follow-up work by you,

20   did you at any time in the days following attend the

21   autopsy of ▮▮▮▮▮    ▮▮▮▮▮▮

22        A.    Of course.

23        Q.    At the time of the autopsy, did you secure

24   any articles that would be used for any scientific

25   analysis at a later date?

**GALL 209**

MILKE_NSB029595

18

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3                                                      JUL 1 6 991

4     STATE OF ARIZONA,           )                    APPEALS RECEIVED
                                   )
5          Plaintiff,             )
                                   )
6          vs.                     )
                                   )          CR 90-03339
7     MICHAEL STEVEN GALLEGOS,     )
                                   )
8          Defendant.             )
                                   )
9     _____)

10                        Phoenix, Arizona
                          March 13, 1991
11

12

13

14     Before:   The Honorable JEFFREY HOTHAM,
                  Judge of the Superior Court
15

16

17          REPORTER'S TRANSCRIPT OF PROCEEDINGS
                        (JURY TRIAL)
18

19

20

21

22                                    DONALD E. MOLL
                                      Court Reporter
23

24     COPY

       PREPARED FOR:
25
       ON APPEAL

GALL 210

MILKE_NSB029670

5

1     No semen was detected on vaginal or oral swabs.

2                Further, the stipulation being that items

3     were submitted to Cellmark Diagnostic in Germantown,

4     Maryland, and they were the following items:  Three rectal

5     swabs; carpet; underwear; panty crotch, front and back;

6     filter paper labeled introitus I-n-t-r-o-i-t-u-s, left

7     buttocks and inner left thigh, along with blood samples

8     from , blood sample of George Smallwood and

9     a blood sample from Michael Gallegos.

10               The results of their testing is as follows:

11     Human DNA was extracted from the items listed above, and

12     insufficient quanity of DNA was obtained from the carpet

13     to continue any testing.  No DNA banding pattern was

14     obtained from the combined filter papers labeled

15     introitus, left buttocks and upper left thigh due to an

16     insufficient quanity of human DNA.

17               DNA banding patterns were obtained from the

18     three combined rectal swabs, the material labeled

19     underwear, the material labeled panty crotch, front and

20     back, the blood samples of [redacted], the blood

21     sample of George Smallwood and the blood sample of Michael

22     Gallegos.

23               In a report of laboratory examination dated

24     August 9, 1990, it was concluded that the DNA banding

25     pattern obtained from the stained material labeled panty

**GALL 211**                                    **MILKE_NSB029671**

6

1    crotch, front, back, matches the DNA banding pattern

2    obtained from the blood sample labeled Michael Gallegos.

3              The frequency in the Caucasian population for

4    another person being a contributor of the DNA banding

5    pattern obtained from the panty crotch and Michael

6    Gallegos is approximately 1 in 10 million.

7              The frequency in the Hispanic population for

8    another person being a contributor of the DNA banding

9    pattern obtained from the panty crotch and Michael

10   Gallegos is approximately 1 in 67 million.

11             That is the extent of the stipulations, Your

12   Honor.

13        THE COURT:  All right.  Mr. Clark, do you agree

14   with the reading and so stipulate?

15        MR. CLARK:  Yes, I do, Judge.

16        THE COURT:  Thank you, sir.  All right.  Thank you,

17   Mr. Stalzer.

18             And does the State rest at this time?

19        MR. STALZER:  Your Honor, the State does rest at

20   this time.

21        THE COURT:  Thank you.

22             Members the jury, the State having rested its

23   case, there are some legal issues that I am going to be

24   discussing with the lawyers, and rather than having you

25   wait around, what we're going to do is send you to lunch

**GALL 212**                                    **MILKE_NSB029672**

 

PETER R. CLAUSSEN
State Bar No. 007364
Deputy Public Defender
132 South Central Avenue, Suite 6
Phoenix, Arizona 85004
(602) 262-3024
Attorney for Defendant

FILED

1990 JUN 27 PM 3: 45

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

              Plaintiff,

       v.

GEORGE SMALLWOOD,

              Defendant.

No. CR-90-03339

MOTION TO SUPPRESS STATEMENTS

(Assigned to the Honorable
 Jeffrey Hotham)

(Oral Argument Requested)

(Evidentiary Hearing Requested)

COMES NOW the Defendant, by and through his attorney undersigned, and hereby moves for an order suppressing, and preventing the use at trial, of statements made by George Smallwood to Phoenix police officers on March 16, 1990. Defendant also requests that the Court enter findings that the statements must be suppressed for the following reasons:

1. The statements were involuntarily, because they resulted from coerced police tactics in violation of the Fifth and Fourteenth Amendments of the United States Constitution;

2. The statements were obtained in violation of the Defendant's Sixth Amendment right to counsel pursuant to Edwards v. Arizona, 451 U.S. 477 (1981);

01453

**GALL 213**

MILKE_NSB012539

Exhibit 1G

3.  The statements were obtained in violation of the Defendant's right against self-incrimination, as outlined in Miranda v. Arizona, 384 U.S., 436 (1966);

4.  The statements were obtained in violation of the Defendant's right not to be compelled to give evidence against himself pursuant to Article II, Section 10 of the Arizona Constitution;

5.  The statements were obtained in violation of the Defendant's right to counsel under Article II, Section 24 of the Arizona Constitution.

The Defense requests that statements by George Smallwood be suppressed and their use by the State be prohibited in the State's case-in-chief, in rebuttal, as well as for purposes of impeachment in the event the Defendant chooses to testify at trial. This motion is based on the authorities cited, as well as the attached Memorandum of Points and Authorities.

Respectfully submitted this ⟨26⟩ day of June, 1990.

DEAN W. TREBESCH
Maricopa County Public Defender

By _____
PETER R. CLAUSSEN
Deputy Public Defender
Attorney for Defendant

## MEMORANDUM OF POINTS AND AUTHORITIES

According to Phoenix Departmental Report number 09-042335A filed by Detectives Chambers and Saldate of the Phoenix Police Department, Mr. Smallwood was taken into custody for questioning at the Phoenix main police station, at 620 West Washington, on the 16th of March, 1990. Police officers wished to question Mr. Smallwood as to any information he might have con-

-2-

01454

**GALL 214**

MILKE_NSB012540

cerning the apparent homicide of his sister, who had been discovered dead.

George Smallwood was questioned at length, while detained in an interview room at the General Investigations Bureau, at 620 West Washington. Mr. Smallwood is a naive young man, 18 years of age, completely inexperienced in the ways of police officers and the criminal justice system. Mr. Smallwood agreed to answer Detective Chambers' questions, and spoke to him at length about what he had been doing for the prior 24 hours. Mr. Smallwood agreed to be fingerprinted, to have hair and blood samples taken, and to be photographed. Mr. Smallwood indicated to the police that he was happy to have his hair and blood samples taken, because he knew that he had no connection whatever with the death of his sister.

Simultaneously, in another room, Michael Gallegos was offering a complete confession to Detective Saldate. Unfortunately, Mr. Gallegos' confession included a fabrication alleging Mr. Smallwood's involvement in the murder. Mr. Smallwood was completely unaware of the statement being made by Mr. Gallegos.

When Detective Chambers confronted Mr. Smallwood with the statement made by Mr. Gallegos, Mr. Smallwood continued to deny involvement in the death of his sister, and continued to insist that his blood and hair be tested. In the words of Detective Chambers, "He was adamant he had not been involved in the death of his sister." After approximately two and one-half hours of continuous questioning by Detectives Chambers and Saldate, questioning during which Mr. Smallwood repeatedly denied involvement, and Detectives Saldate and Chambers repeatedly told him they did not believe him, Mr. Smallwood invoked his right to counsel. Mr. Smallwood indicated to Detective Saldate, he did not want to answer anymore questions without a lawyer.

-3-

01455

**GALL 215**

**MILKE_NSB012541**

Exhibit 1G

Although Mr. Smallwood had indicated he did not wish to answer anymore questions, Detective Chambers returned to Mr. Smallwood and directly stated that he was a aware of Mr. Smallwood's request for counsel. On page 16 of Detective Chamber's own report, he states, "I indicated to him my understanding, he did not want to answer further questions without a lawyer. I indicated to him that I would not ask further questions. I indicated to him, rather, I would make a statement to him. I spoke to him. In a situation such as this, it would appear Michael was being truthful and he "George" was not. I further indicated with the situation so serious only the truth should ever be told. Any other statement is like digging a hole. I further indicated it would make the situation appear even possibly premeditated."

It is clear from the statement made by Detective Chambers in his report that he was very much aware that the Defendant had invoked his right to counsel. It is also clear that the interrogation continued in violation of the Defendant's right to counsel, as outlined in Miranda v. Arizona, supra. Interrogation includes, "Express questioning or its functional equivalent," that is, "Words or actions on the part of the police, other than those normally attendant to arrest and custody that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300, 2301 (1980). This police technique, interrogating a suspect after he has invoked his right to counsel, has been specifically condemned by the Arizona Supreme Court in State v. Bravo, 158 Ariz. 364, 762 P.2d 1318 (1988). The Supreme Court in that case made it clear that the suspect's right to cut off all questioning must be, "scrupulously honored." There is simply no excuse to permit the use of statements obtained from Mr. Smallwood in violation of his rights, once they have been

-4-

01456

GALL 216

MILKE_NSB012542

Exhibit 1G

invoked. Because Mr. Smallwood did invoke his right and attempt to cut off the interview, and because his request was not scrupulously honored by Detectives Chambers and Saldate, his statement must be suppressed. State v. Finehout, 136 Ariz. 226, 665 P.2d 570 (1983); State v. Bravo, supra.

One test of admissibility, which the Court must apply before admitting any statements made to the police, is the question of whether the Defendant's right to counsel has been respected. Arizona Revised Statutes §13-3988(B)(5). While a refusal to recognize and honor the Defendant's request for counsel is a violation of his Sixth Amendment rights under the United States Constitution and Article II, Section 24 rights under the Constitution of the State of Arizona, it is also a violation of statutory law and a specifically enumerated factor in the above-cited section of Arizona's criminal code.

The situation presented here is one in which Mr. Smallwood invoked his right to counsel, and communication continued thereafter. In Edwards v. Arizona, supra, the United States Supreme Court addressed just such an issue. In that case, the rule was stated quite plainly:

> An accused...having expressed his desire to deal with the police only through counsel, is subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.

This simple rule set forth by the Supreme Court was not followed in the case of George Smallwood. Detectives Chambers and Saldate chose to disregard Mr. Smallwood's request for a lawyer and continued to question him until such time as the statement was made.

-5-

01457

**GALL 217**

MILKE_NSB012543

Exhibit 1G

GREG CLARK
HENZE, RONAN & CLARK
45 West Jefferson, 11th Floor
Phoenix, Arizona 85003
Telephone (602) 257-9343
State Bar I.D. No. 009431

Attorney for defendant Gallegos

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
            Plaintiff,               )    No. CR 90-03339
                                     )
      v.                             )
                                     )    SUPPLEMENT TO REQUEST
MICHAEL GALLEGOS,                    )    FOR VOLUNTARINESS HEARING
                                     )
            Defendant.               )    (Hon. Jeffrey Hotham)
_____)

       The defendant, MICHAEL GALLEGOS, acting through counsel,
GREG CLARK, hereby supplements his request for voluntariness
hearing with the attached Memorandum of Points and Authorities.

       RESPECTFULLY SUBMITTED this 30th day of July, 1990.

                                     HENZE, RONAN & CLARK


                                     By_____
                                        GREG CLARK

01449

**GALL 218**

MILKE_NSB012535

Exhibit 1G

1  determined that young Kendall died as a result of the boys
2  cutting off her air supply.

3  Once Kendall had died, the pair removed the body, placing
4  it down the street in the yard of a neighbor. When the body had
5  been removed from the home, the pair went to sleep and reported
6  the child missing the next day. In response to the report of
7  Kendall's disappearance, the Phoenix Police responded and the
8  body of Kendall was found within a short time. Subsequent to
9  finding the body, it was determined that both the defendant and
10 Smallwood were the prime suspects. While at the scene, the
11 defendant and Smallwood were separated, questioned, and asked to
12 voluntarily come to the police station for questioning. The
13 defendant was told that if refused to voluntarily come to the
14 station, he would be arrested and transported anyway. Both the
15 defendant and Smallwood were taken to the main station of the
16 Phoenix Police Department and placed into separate rooms to be
17 questioned.

18 Detective Saldate of the Phoenix Police Department was in
19 charge of questioning the defendant, and Detective Chambers of
20 the Phoenix Police was in charge of speaking to Smallwood.
21 Saldate began the interview by telling the defendant that he knew
22 he was responsible for the death of Kendall. The defendant
23 denied these assertions and continued to do so in the face of
24 Saldate's continued insistence. The defendant repeatedly asked
25 for counsel and was repeatedly ignored by Saldate until he
26 finally admitted his involvement. Once he had admitted his
27 involvement, he was asked by Saldate to sign a confession, and he
28

-3-

01450

**GALL 219**

**MILKE_NSB012536**

Exhibit 1G

1 refused to do so. Once the defendant made these admissions to
2 Saldate, he was read his rights, and the questioning continued.
3 At one point in time, Detective Chambers came into the room and
4 summoned Saldate outside. The defendant overheard a conversation
5 where it was decided that he would be brought into the interview
6 room where Smallwood was held to confront him. The detectives
7 had decided to initiate this confrontation because Smallwood was
8 continuing to deny his involvement in the face of what the
9 defendant had told them. The defendant was thereafter brought
10 before Smallwood and forced to confront and accuse him.

11
                                THE LAW
12
13       In Arizona, confessions are prima facie involuntary.
State v. Arnett, 119 Ariz. 38, 579 P.2d 5542, 546 (1978); State
14
v. Edwards, 111 Ariz. 357, 360-61, 529 P.2d 1174, 1177-78 (1974).
15
The State has the burden to show by a preponderance of the
16
evidence that the confession was freely and voluntarily made.
17
State v. Knapp, 114 Ariz. 531, 538, 562 P.2d 704, 711 (1977),
18
cert. denied, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).
19
The trial court must look to the totality of the circumtances in
20
evaluating the voluntariness of a confession to decide whether a
21
defendant's will has been overborne. Schneckloth v. Bustamonte,
22
412 U.S. 218, 225-27, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862
23
(1973); State v. Edwards, 111 Ariz. 357, 361, 529 P.2d 1174,
24
1178 (1974); State v. Hall, 120 Ariz. 454, 456, 586 P.2d 1266
25
(1978). All questions involved are for the trial court to
26
decide. A.R.S. §13-3988. Absent clear and manifest error, the
27

28                                -4-

**GALL 220**



**MILKE_NSB012537**

Exhibit 1G

1 | 445, 473-74, 86 S.Ct. 1602, 1612, 1627-28, 16 L.Ed.2d 694, 707,

2 | 723 (1966).

3

### THE ARGUMENT

4

It is the position of the defendant that he is a juvenile
and his confesion was involuntary due to his mental age,
educational level, lack of prior experience with the police, lack
of consultation with an adult, and general lack of "life
experiences". The defendant is, as a result of his young age,
susceptible to having pressures brought to bear sufficient to
overbear his will in the face of police authority.   When faced
with being ignored at the invocation of his right to counsel, the
defendant's intent to remain silent gave way to the subtle
tactics of Detective Saldate.

It is respectfully submitted that the "totality of the
circumstances" support the contention that the confession in this
matter, as well as the fruits thereof, be suppressed as being
involuntary.

RESPECTFULLY SUBMITTED this 30th day of July, 1990.

HENZE, RONAN & CLARK

By _____
GREG. CLARK

-7-

01452



GALL 221

MILKE_NSB012538

Exhibit 1G

Jon M. Sands
Federal Public Defender
District of Arizona
Ashwin Cattamanchi (Illinois Bar No. 6289199)
Emma L. Smith (Illinois Bar No. 6317192)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
Ashwin_Cattamanchi@fd.org
Emma_Smith@fd.org
Telephone (602) 382.2816
Facsimile (602) 889.3960

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Gallegos, <br><br> Petitioner, <br><br> vs. <br><br> Charles L. Ryan, <br><br> Respondent. | CV 01-1909-PHX-NVW <br><br> DEATH-PENALTY CASE <br><br> Motion to Stay and Hold Habeas Proceedings in Abeyance, to Supplement Petition, and to Represent Petitioner in State Court Proceedings |

Petitioner Michael Gallegos returns to this Court on remand from the Ninth Circuit following the partial grant of his Motion to Remand to the District Court and Request for Authorization of Federal Habeas Counsel to Appear in State Court Litigation.[1] *See Gallegos v. Ryan*, 820 F.3d 1013, 1015–16 (9th Cir. 2016).

---

[1] Following Mr. Gallegos's Petition for Rehearing, the Ninth Circuit additionally granted in part Mr. Gallegos's Motion for Stay and Partial Remand for Reconsideration in Light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). *See Gallegos v. Ryan*, No. 08-99029, ECF No. 84 (9th Cir. Nov. 30, 2016). Because the parties disagree as to the timeliness of Mr. Gallegos's *Brady* claim and the relevant dates, Mr. Gallegos in an abundance of caution presents this motion immediately following the issuance of the mandate from the Ninth Circuit. He will, however, await this Court's instruction and schedule concerning the briefing of the *Martinez* issue.

SALDATE000320

Exhibit 1G

1    Mr. Gallegos respectfully asks this Court to 1) temporarily stay and hold federal

2    proceedings in abeyance while he pursues available state court relief, 2) allow him

3    to supplement his 28 U.S.C. § 2254 petition to include a claim under *Brady v.*

4    *Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972),

5    based on newly discovered impeachment evidence regarding the lead detective in

6    this case, Armando Saldate, and 3) authorize his federal habeas counsel to appear

7    on his behalf in state court.

8    **I.**    **Statement of Facts**

9        Detective Armando Saldate was the lead detective in Mr. Gallegos's case,

10   and within 24 hours of the offense he interrogated Mr. Gallegos, who was at that

11   time an 18-year-old high school student in special education classes. (Ex. A at 1;

12   Ex. B at 23; Ex. D at 25.) Detective Saldate did not tape record the interrogation,

13   secure a written confession, or get a signed waiver of *Miranda* rights from

14   Mr. Gallegos. After Mr. Gallegos allegedly confessed, Detective Saldate

15   purportedly conducted a re-interview in the presence of his partner, Detective

16   Michael Chambers, that lasted only 10 or 15 minutes. (Ex. B at 29, 32.) According

17   to Detective Saldate, in this "highlight interview" he told Mr. Gallegos "to tell

18   Detective Chambers generally what he had told" him, and Mr. Gallegos "just

19   highlighted general areas." (Ex. D at 59.) Detective Chambers, now deceased,

20   wrote lengthy reports, but did not include anything about this "highlight

21   interview." (Ex. E.) Like the initial interrogation, the second interrogation in the

22   presence of Detective Chambers was not recorded, and there was no signed,

23   written confession or waiver of *Miranda* rights.

24        The State charged both Mr. Gallegos and George Smallwood, the victim's

25   half-brother. *State v. Gallegos,* 870 P.2d 1097, 1102, 1104 (Ariz. 1994) (en banc).

26   Mr. Gallegos purportedly gave a statement that implicated both defendants. (Ex. A

27   at 3–4.) Mr. Smallwood told Detective Chambers that "I could have done this, but

28   I don't remember it, I black out a lot." *Id.* at 1116. About three months after the

**GALL 223**                  2                **SALDATE000321**

1   offense, on June 29, 1990, the State informed the court that it had no forensic
2   evidence implicating Mr. Smallwood (Ex. F at 3) and moved to dismiss the
3   charges against him (Ex. G). The court granted the motion. (*Id.* at 3.)

4       The court then conducted a pre-trial voluntariness hearing regarding
5   Mr. Gallegos's alleged confession. Detective Saldate testified that Mr. Gallegos
6   first told a story that involved no wrongdoing. According to Detective Saldate,
7   after he told Mr. Gallegos he thought the offense was committed by someone
8   inside the house, Mr. Gallegos confessed. (Ex. B at 25–29.) Detective Saldate
9   further testified that he reviewed Mr. Gallegos's *Miranda* rights with him before
10  the alleged confession and that Mr. Gallegos never requested counsel. (*Id.* at
11  23–25, 29.)

12      Mr. Gallegos also testified at the voluntariness hearing, but his account of
13  his   interactions   with   Detective   Saldate   differed   significantly   from
14  Detective Saldate's version. He testified that Detective Saldate repeatedly ignored
15  his requests for counsel, saying that Detective Saldate would "just look at me and
16  just keep writing. . . . Like it went in one ear and out the other. . . . It was just like
17  I didn't say anything." (*Id.* at 97–98.) Mr. Gallegos also testified that
18  Detective Saldate did not inform him of his *Miranda* rights until after he allegedly
19  confessed. (*Id.* at 96.) The court credited Detective Saldate's testimony over
20  Mr. Gallegos's and held that Mr. Gallegos's statements were voluntary and
21  admissible.

22      Detective Saldate's testimony was also crucial at trial, where he testified
23  about Mr. Gallegos's alleged statement. (Ex. D at 33–58.) Upon advice of counsel,
24  Mr. Gallegos also testified at trial. Mr. Gallegos's trial counsel, Greg Clark,
25  testified during state post-conviction proceedings that he advised Mr. Gallegos to
26  testify because he knew that Detective Saldate's testimony would be admitted at
27  trial and that the testimony would be detrimental to the defense. (Ex. H.)
28  Mr. Clark believed that the testimony of Mr. Gallegos was necessary to mitigate

1 Detective Saldate's testimony. (Ex. H; Ex. I at ¶ 7.)

2   Mr. Gallegos was convicted of first-degree murder and sexual conduct with
3 a minor. (Ex. J at 45–46.) He was sentenced to consecutive sentences of death and
4 20 years' imprisonment. *See Gallegos,* 870 P.2d at 1104. After the Arizona
5 Supreme Court on direct appeal remanded the case for re-sentencing on the
6 first-degree murder conviction, *id.* at 1117–19, the trial court once again imposed
7 death (Ex. L at 190).

8   What was undisclosed to defense counsel, the jury, the trial judge, and the
9 Arizona Supreme Court was that Detective Saldate had a history of both lying in
10 judicial proceedings and ignoring defendants' constitutional rights. Specifically:

11   •   On October 2, 1992, after Mr. Gallegos's trial but before he was
12   re-sentenced, the Court of Appeals of Arizona held that Detective Saldate
13   violated a defendant's right to remain silent when he continued to
14   interrogate him after an "unequivocal invocation" of the right. *See Milke v.*
15   *Ryan,* 711 F.3d 998, 1017, 1021 (Appendix) (9th Cir. 2013) (discussing
16   *State v. Mahler,* No. 1 CA-CR 90-1890 (Ariz. Ct. App. Oct. 2, 1992)).

17   •   On November 29, 1990, less than 4 months before trial, a court
18   suppressed a murder confession taken by Detective Saldate of a juvenile
19   kept alone in an interrogation room, handcuffed to a table. The Maricopa
20   County Attorney's Office admitted, and the court found, that there was no
21   probable cause for the detention. The court called the interrogation "a show
22   of flagrant misconduct." *Id.* at 1015, 1021 (Appendix) (discussing *State v.*
23   *Jones,* No. CR 90-05217 (Ariz. Supr. Ct. Nov. 29, 1990)).

24   •   On June 22, 1990, less than 2 months before the voluntariness
25   hearing, a court found that Detective Saldate lied under oath and "continued
26   to interrogate the defendant despite the defendant's demand to cease
27   questioning." *Id.* at 1013–14, 1020 (Appendix) (discussing *State v. King,*
28   No. CR90-00050 (Ariz. Super. Ct. June 22, 1990)). The trial judge in that

**GALL 225**                                    4                          SALDATE000323

1    case suppressed the portion of the confession that followed the defendant's
2    request to end the interview. *Id.*

3    •    On October 16, 1989, less than 10 months before the hearing, a court
4    held that Detective Saldate misled a grand jury by omitting some of the
5    defendant's statements to make him look more culpable and remanded for a
6    new finding of probable cause. *Id.* at 1014, 1020 (Appendix) (discussing
7    *State v. Rangel*, No. CR89-08086 (Ariz. Super. Ct. Oct. 16, 1989)).

8    •    On February 27, 1989, less than 18 months before the hearing, a
9    court found that Detective Saldate's false statement to a grand jury "denied
10   [the defendant] his right to due process and a fair and impartial presentation
11   of the evidence" and granted the motion for a new finding of probable
12   cause. *Id.* at 1013, 1020 (Appendix) (discussing *State v. Reynolds*, No.
13   CR88-09605 (Ariz. Super. Ct. Feb. 27, 1989)).

14   •    Also in 1989, as recounted in the court of appeals decision, a trial
15   court held a statement "involuntary and inadmissible" that Detective Saldate
16   had taken from a suspect in intensive care who was intubated and losing
17   consciousness. *Id.* at 1014, 1022 (Appendix) (discussing *State v. Conde*,
18   846 P.2d 843, 845 (Ariz. Ct. App. 1992)).

19   •    On November 20, 1986, a court ordered a redetermination of
20   probable cause because Detective Saldate testified to the grand jury that
21   there were four shots, when it was undisputed that the victim was shot only
22   once. *Id.* at 1013–14, 1020–21 (Appendix) (discussing *State v. Rodriquez*,
23   No. CR 161282 (Ariz. Super. Ct. Nov. 20, 1986)).

24   •    On July 26, 1984, a court vacated a conviction and ordered a new
25   trial after Detective Saldate admitted he interrogated a suspect who had just
26   suffered a skull fracture and was strapped to a hospital bed, incoherent.
27   Statements made to Detective Saldate were suppressed at a suppression
28   hearing for the new trial in November of 1984. *Id.* at 1004–05, 1014, 1021

1   (Appendix) (discussing *State v. Yanes*, CR 130403 (Ariz. Super. Ct. July 26,
2   1984)).

3   •   On August 31, 1973, a Phoenix Police Department Internal Affairs
4   investigation concluded that Detective Saldate lied about an incident where,
5   in exchange for a kiss and other advances, he allowed a female motorist to
6   leave without checking on a possible warrant. The report concluded that
7   "because of this incident, your image of honesty, competency, and overall
8   reliability must be questioned," and Detective Saldate was suspended for 5
9   days. *Id.* at 1012, 1020 (Appendix).

10   This evidence, which the State did not provide to Mr. Gallegos, was the
11   subject of the Ninth Circuit's opinion in *Milke v. Ryan*, where the Court granted
12   Debra Milke's habeas petition based on her claim that her due process rights had
13   been violated by the State's suppression of this evidence.[2] 711 F.3d at 1019. After
14   learning of the suppressed evidence, Mr. Gallegos filed a Motion to Remand to
15   the District Court and Request for Authorization of Federal Habeas Counsel to
16   Appear in State Court Litigation in the Ninth Circuit, where his case was pending.
17   *Gallegos v. Ryan*, No. 08-99029, ECF No. 57-1 (9th Cir. Mar. 14, 2014). The
18   Ninth Circuit granted Mr. Gallegos's request for a remand, *Gallegos*, 820 F.3d at
19   1015–16, which precipitated this filing.

20   **II.   Argument**

21   **A.   The Court should stay Mr. Gallegos's federal proceedings so
     state courts can first rule on his *Brady* claim**
22

23   The requested stay is consistent with "Congress' intent to channel
24   prisoners' claims first to state courts." *Cullen v. Pinholster*, 563 U.S. 170, 182

25   _____
     [2] After he was noticed as a witness in the re-trial of Ms. Milke, Detective Saldate
26   sought to invoke his Fifth Amendment right against self-incrimination and to
     refuse to testify. The Court of Appeals of Arizona held that he could not invoke
27   that right. *Arizona ex rel. Montgomery v. Mroz*, No. 1 CA-SA14-0028, 2014 WL
     1516585 (Ariz. Ct. App. Apr. 17, 2014). The court subsequently held that
28   Ms. Milke could not be retried. *Milke v. Mroz*, 339 P.3d 659 (Ariz. Ct. App.
     2014).

Exhibit 1G

1   (2011). The Supreme Court, in *Rhines v. Weber*, 544 U.S. 269, 275–79 (2005),
2   approved a process by which district courts have authority to stay pending federal
3   habeas corpus proceedings and allow the petitioner to return to state court to
4   exhaust his claims. When a petitioner can show good cause, has not engaged in
5   intentionally dilatory litigation tactics, and presents a potentially meritorious
6   federal claim, "it likely would be an abuse of discretion for a district court to deny
7   a stay." *Id.* at 278.

8        The Ninth Circuit instructively utilized this stay-and-abeyance procedure in
9   *Gonzalez v. Wong*, 667 F.3d 965, 972, 978 (9th Cir. 2011), where the petitioner
10  raised a *Brady* claim in district court—in motions for reconsideration from the
11  denial of his habeas petition—that was supported by evidence not presented to the
12  state court. The Ninth Circuit remanded to the district court, instructing it to stay
13  the federal proceedings. *Id.* at 980 (citing *Rhines*, 544 U.S. at 278). The court
14  recognized that the stay provided "the state court with the first opportunity to
15  resolve this claim," consistent with Congress's intent, while still protecting the
16  petitioner's interest "in obtaining federal review of his claim." *Id.* at 980.

17       A stay is similarly appropriate here. As discussed below, Mr. Gallegos
18  meets the requirements outlined in *Rhines*, and an avenue for relief is available to
19  him in state court under Arizona Rule of Criminal Procedure 32.1(e). The
20  proposed stay will permit this Court to address Mr. Gallegos's claim based on a
21  fully developed record when he returns to federal court following exhaustion. It
22  will also prevent two forums from adjudicating Mr. Gallegos's case
23  simultaneously, with the *Brady* claim proceeding through state court while
24  litigation on the *Martinez* issue is litigated in this Court. The stay therefore will
25  promote judicial efficiency and conserve judicial resources, recognized goals of
26  AEDPA. *See Day v. McDonough,* 547 U.S. 198, 205–06 (2006) (internal
27  quotation marks and citation omitted).
28

GALL 228

7

SALDATE000326

1    **1. Mr. Gallegos satisfies the requirements for a *Rhines* stay**

2     **a. Mr. Gallegos has good cause for not exhausting his**

3       ***Brady* claim**

4  The Ninth Circuit has explained that the good cause requirement under

5 *Rhines* is satisfied when the petitioner "can set forth a reasonable excuse" for his

6 failure to exhaust a claim in state court. *Blake v. Baker*, 745 F.3d 977, 982 (9th

7 Cir. 2014). The showing required for good cause to warrant a stay is less stringent

8 than the cause required to excuse procedural default. *See Pace v. DiGuglielmo*,

9 544 U.S. 408, 416 (2005); *Blake*, 745 F.3d at 984 n.7.

10  In the context of *Brady*, it is the State's withholding of evidence that causes

11 delay in the presentation of the claim. When the suppressed evidence is

12 discovered after state proceedings are completed, the petitioner is not responsible

13 for the unavailability of the claim in state court and the good cause requirement is

14 satisfied. *See Gonzalez*, 667 F.3d at 980 (finding good cause for failure to exhaust

15 *Brady* claim); *Quezada v. Scribner*, 611 F.3d 1165, 1168 (9th Cir. 2010) (noting

16 that if *Brady* claim is unexhausted and not procedurally barred in state court,

17 district court should stay and hold in abeyance the federal proceedings);

18 *Wogenstahl v. Mitchell*, 668 F.3d 307, 322 (6th Cir. 2012) (finding good cause

19 when *Brady* information not disclosed until petitioner was in federal court).

20 Mr. Gallegos seeks to present a *Brady* claim that is based on evidence that was not

21 available while he was in state court. He has therefore shown good cause for his

22 failure to exhaust the claim.

23     **b. Mr. Gallegos has not engaged in intentionally**

24       **dilatory litigation tactics**

25  Mr. Gallegos has not engaged in intentionally dilatory litigation tactics but

26 has instead diligently pursued his rights since the State's suppression of

27 impeachment evidence was revealed. *Cf. Douglas v. Workman*, 560 F.3d 1156,

28 1195 (10th Cir. 2009) (noting that in context of a *Brady* claim, "any delay,

1   inefficiency, or waste of judicial resources stems from the prosecution"). The
2   State did not disclose the suppressed evidence in this case, and after the *Milke*
3   decision made available the evidence that Detective Saldate had a history of lying
4   and violating defendants' constitutional rights, Mr. Gallegos took steps to discover
5   more information about Detective Saldate. He attempted to speak with
6   Detective Saldate, but was unsuccessful. (Ex. M.) He also requested "all files,
7   records and other documents" pertaining to Detective Saldate from the Maricopa
8   County Attorney's Office. (Ex. N.) When the documents were finally received on
9   July 11, 2013, they did not include any documents about Detective Saldate.
10  (Ex. O.) Finally, through a search of the District Court case file in *Milke*,
11  Mr. Gallegos discovered that the State filed affidavits revealing that Detective
12  Saldate's files had been destroyed by unknown persons on unknown dates.[3]
13  *See Milke v. Ryan*, No. 98-cv-00060-RCB, ECF Nos. 205, 210 (D. Ariz. June 16,
14  2013; July 5, 2013).

15      Following these pursuits, Mr. Gallegos filed a motion in the Ninth Circuit,
16  where his case was pending, seeking a stay of his federal proceedings so he could
17  return to state court to present a *Brady* claim based on the newly discovered
18  evidence. *Gallegos*, No. 08-99029, ECF No. 57-1 (9th Cir. Mar. 14, 2014).
19  Mr. Gallegos therefore diligently pursued evidence of a *Brady* violation and
20  swiftly brought the claim to the attention of the court with jurisdiction over his
21  case. *See generally United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102,
22  1109 (9th Cir. 2001) ("Once a notice of appeal takes effect, the district court loses
23  jurisdiction over the matter placed before the appellate court."). That action
24  precipitated a remand to this Court, where Mr. Gallegos continues to pursue his
25  rights.

26

27

28  [3] The Respondent subsequently submitted this information to the Ninth Circuit in
    this case. *See Gallegos,* No. 08-99029, ECF No. 66-1 (9th Cir. May 19, 2014).

**GALL 230**                      9                    SALDATE000328

1

2              **c.**     **Mr. Gallegos has a potentially meritorious *Brady***
                      **claim**

3

4       The potentially meritorious inquiry set forth in *Rhines* requires nothing

5 more than a showing that the petitioner has stated a colorable federal claim. In

6 *Rhines*, the Court referred to a potentially meritorious claim as one that is not

7 "plainly meritless." 544 U.S. at 277. The *Rhines* Court compared the requirement

8 to the inquiry under 28 U.S.C. § 2254(b)(2), *see id.*, which the Ninth Circuit has

9 interpreted to allow a federal court to "deny an unexhausted petition on the merits

10 only when it is *perfectly clear that the applicant does not raise even a colorable*

11 *federal claim*," *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (emphasis

12 added). Following *Rhines* and *Cassett*, district courts have held that a claim is

13 "potentially meritorious" so long as the claim is colorable. *See Greene v.*

14 *McDaniel*, No. 3:09-cv-00601-ECR-VPC, 2012 WL 1142719, at *3 (D. Nev. Apr.

15 4, 2012) (characterizing the threshold as "quite low"); *Provencio v. Chrones*,

16 No. 06-1760-L(LSP), 2007 WL 1299967, at *5 (S.D. Cal. Apr. 30, 2007); *Lugo v.*

17 *Kirkland*, No. 4:05-cv-00580-SBA, 2006 WL 449130, at *4 (N.D. Cal. Feb. 22,

18 2006).

19       To succeed on a claim that the prosecution's suppression of evidence

20 violated his due process rights, Mr. Gallegos will have to show that the evidence

21 is favorable to the defense, that the government either willfully or inadvertently

22 failed to produce the evidence, and that the suppressed evidence was material in

23 that the suppression prejudiced him. *See Banks v. Dretke*, 540 U.S. 668, 691

24 (2004). Mr. Gallegos can make a colorable showing as to each factor.

25              **i.**     **The suppressed evidence is favorable to**
                      **Mr. Gallegos**

26

27       "Any evidence that would tend to call the government's case into doubt is

28 favorable for *Brady* purposes." *Milke*, 711 F.3d at 1012. "Impeachment evidence,

**GALL 231**

10

SALDATE000329

1  however, as well as exculpatory evidence, falls within the *Brady* rule. Such
2  evidence is evidence favorable to an accused, so that, if disclosed and used
3  effectively, it may make the difference between conviction and acquittal." *United*
4  *States v. Bagley*, 473 U.S. 667, 676 (1985) (internal citations and quotations
5  omitted).

6      Mr. Gallegos relies on the same "menagerie of lies and constitutional
7  violations" found favorable to the defense by the Ninth Circuit in *Milke*.
8  *See Milke,* 711 F.3d at 1015. The court held that Detective Saldate's personnel
9  file, as well as court orders showing that he had lied under oath and violated
10  defendants' constitutional rights, were favorable to the defense because they
11  showed that Detective Saldate had "no compunction about lying during the course
12  of his official duties," *id.* at 1012, had repeatedly "lied under oath in order to
13  secure a conviction or to further a prosecution," *id.* at 1013 (internal quotation and
14  citation omitted), and "kept asking questions long after the defendant indicated he
15  no longer wanted to answer," *id.* at 1014. Here, Detective Saldate testified both at
16  the voluntariness hearing and at trial after interrogating Mr. Gallegos. In light of
17  the similarly critical role Detective Saldate played in Mr. Gallegos's case as in the
18  *Milke* case, the suppressed evidence is favorable also to Mr. Gallegos.

19              ii.    **The prosecution either willfully or**
20                     **inadvertently failed to disclose the evidence**

21      *Brady* protects against both willful and inadvertent failures to produce
22  evidence. *See Strickler v. Greene,* 527 U.S. 263, 282 (1999). Therefore, regardless
23  of whether the particular prosecutor in this case knew about the impeachment
24  evidence concerning Detective Saldate, the State had an obligation to produce it.
25  *See Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995). The evidence was never
26  produced in this case, and Mr. Gallegos cannot be faulted for failing to discover it
27  independently. "Where a defendant doesn't have enough information to find the
28  *Brady* material with reasonable diligence, the state's failure to produce the

1   evidence *is* considered suppression." *Milke*, 711 F.3d at 1018 (emphasis in

2   original). This is true even for the court records at issue here, as the *Milke* Court

3   expressly rejected the argument that Ms. Milke's trial counsel should have located

4   them. *Id*. at 1017–18; *see also Wilson v. Beard*, 589 F.3d 651, 664 (3d Cir. 2009)

5   (rejecting argument that evidence of witness's criminal history was not suppressed

6   because it was public record); *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir.

7   1995) (rejecting argument that prosecution did not have to disclose affidavit

8   because it was available in public court records). It took Ms. Milke's

9   post-conviction team nearly 7,000 hours of sifting through court records to

10   discover the *Brady* evidence, and the Ninth Circuit found that a "reasonably

11   diligent lawyer couldn't possibly have found these records" in time to use them at

12   trial. *Milke*, 711 F.3d at 1018. The impeachment evidence therefore should have

13   been but was not disclosed by the State in this case.

14                       **iii.**    **Had the impeachment evidence been disclosed,**

15                              **there is a reasonable probability that the**

16                              **outcome would have been different at several**
                           **stages**

17        When determining whether a petitioner has a colorable claim that *Brady*

18   evidence is material, the question is whether a reasonable state court could find a

19   reasonable probability of a different outcome. *See Gonzalez*, 667 F.3d at 982. The

20   petitioner need only show that there is "any reasonable likelihood" the suppressed

21   evidence "could have affected the judgment of the jury," not that he "more likely

22   than not would have" prevailed. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016)

23   (internal quotations and citations omitted). The Supreme Court has made clear that

24   materiality is not a sufficiency of the evidence test, meaning a petitioner "need not

25   demonstrate that after discounting the inculpatory evidence in light of the

26   undisclosed evidence, there would not have been enough left to convict." *Kyles*,

27   514 U.S. at 434–35. Mr. Gallegos was prejudiced by the suppression of the

28   impeachment evidence regarding Detective Saldate at several stages of his

**GALL 233**                           12                           **SALDATE000331**

1    criminal proceedings.

2    First, if the impeachment evidence had been available for the voluntariness
3    hearing, there is a reasonable probability that the trial court would have
4    suppressed Mr. Gallegos's statement to Detective Saldate.[4] *See United States v.*
5    *Gamez-Orduño,* 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material
6    evidence helpful to the accused, whether at trial or on a motion to suppress,
7    violates due process if there is a reasonable probability that, had the evidence been
8    disclosed, the result of the proceeding would have been different."); *cf. United*
9    *States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993) (holding *Brady* "must be
10   applied to a suppression hearing involving a challenge to the truthfulness of
11   allegations in an affidavit for a search warrant"). The trial court explained its
12   decision to credit Detective Saldate, stating, "Frankly, I must state I am unable to
13   believe the defendant when he asserts that—he asserted his constitutional rights
14   numerous times and that Detective Saldate ignored them. And that Detective
15   Saldate did not give him his constitutional rights until after he had confessed. I
16   find to the contrary."(Ex. C at 118.) With evidence of Detective Saldate's
17   propensity to lie and violate defendants' constitutional rights during
18   interrogations, there is a reasonable probability that the court would have believed
19   Mr. Gallegos's testimony. *See Milke*, 711 F.3d at 1019, 1020–22 (Appendix)
20   (finding that the "evidence of Saldate's falsifications and his disregard of
21   *Miranda*" would have been "highly relevant" to the question of whether
22   Ms. Milke's confession was legally obtained and citing in appendix cases where

---

24   [4] If Mr. Gallegos's statement to Detective Saldate had been suppressed, his
     statement to Detective Chambers would have been suppressed as well. The
25   re-interrogation in front of Detective Chambers occurred after Mr. Gallegos
     requested counsel. Counsel was not provided, and Mr. Gallegos did not initiate the
26   subsequent interrogation. The second statement therefore was also taken in
     violation of Mr. Gallegos's constitutional rights. *See Edwards v. Arizona*,
27   451 U.S. 477, 484–85 (1981). Mr. Gallegos's statement to Detective Chambers
     also was not "sufficiently attenuated from his initial admission of guilt so as to
28   dissipate its taint." *United States v. Wauneka*, 770 F.2d 1434, 1441 (9th Cir.
     1985).

**GALL 234**                          13                          SALDATE000332

1   the court suppressed the defendants' statements after Detective Saldate violated

2   the defendants' Fifth Amendment rights).

3       The State's suppression of the impeachment evidence also prejudiced

4   Mr. Gallegos at trial in several ways. If Mr. Gallegos's confession had been

5   suppressed, there is a reasonable probability that the jury would not have found

6   Mr. Gallegos guilty of first-degree murder because the state's other evidence was

7   insufficient. The State presented no witnesses to the crime, and the only

8   substantial physical evidence tying Mr. Gallegos to a crime was the State's

9   evidence that Mr. Gallegos's DNA was found in the victim's underwear.[5] (Ex. P.)

10  While this evidence is relevant to Count 2, Sexual Conduct with a Minor, it does

11  not provide evidence of first-degree murder, even based on a felony murder

12  theory, as there would have been no evidence linking Mr. Gallegos to the victim's

13  death. And the DNA evidence was far from unassailable. Hearsay testimony

14  admitted at trial indicated that co-defendant Smallwood reportedly found the

15  underwear in the victim's bedroom during the search for the victim and that a

16  family member placed them on the kitchen table, where they were collected by the

17  police. (Ex. R; Ex. S; Ex. T.) There was no reliable chain of custody regarding the

18  underwear, and Mr. Smallwood did not testify at trial.[6] Further, the Arizona

19  Supreme Court on direct appeal sua sponte found another problem with the DNA

20  evidence. The court held that the procedures used by Cellmark, the State's DNA

21  lab, to determine the statistical probabilities to which the parties stipulated were

22  _____

23  [5] In state and federal proceedings, there have been inaccurate and damning
    references to Mr. Gallegos's DNA being found in the victim's rectum. The trial
24  judge, in denying Mr. Gallegos's petition for state post-conviction relief,
    misapprehended the facts and found that "the DNA evidence in [the victim's]
25  rectum linked to the Defendant was devastating to the defense." (Ex. Q at 3.)
    There was no evidence introduced to the jury that Mr. Gallegos's DNA was found
26  in the victim's rectum; the only DNA evidence tied to Mr. Gallegos and presented
    to the jury was the evidence of Mr. Gallegos's DNA in the victim's underwear.
27  (Ex. P.)

28  [6] Mr. Smallwood invoked his Fifth Amendment right against self-incrimination
    and did not testify before the jury. (Ex. U.)

**GALL 235**                              14                    SALDATE000333

Exhibit 1G

1    not generally accepted by the scientific community and were inadmissible.

2    *Gallegos*, 870 P.2d at 1109–10. Therefore, without Mr. Gallegos's confession, the

3    only evidence presented was easily undermined.

4         Next, even if the court did not suppress Mr. Gallegos's statement after the

5    voluntariness hearing, there still is a reasonable probability that the jury would not

6    have convicted Mr. Gallegos of first-degree murder. If the impeachment evidence

7    had been disclosed, Mr. Gallegos would not have testified at trial. Defense counsel

8    develops a trial strategy based on evidence that is available. The Supreme Court

9    has recognized that when the State withholds evidence, the State is telling the

10   defense that "the evidence does not exist." *Bagley*, 473 U.S. at 682. Relying on

11   this misrepresentation, defense counsel "might abandon lines of independent

12   investigation, defenses, or trial strategies that it otherwise would have pursued."

13   *Id.* Courts therefore have recognized that withheld evidence is material and

14   prejudicial to the defendant if it affects the defense strategy. *See Kyles*, 514 U.S. at

15   445–47; *United States v. Vgeri*, 51 F.3d 876, 880 (9th Cir. 1995); *Bagley v.*

16   *Lumpkin*, 798 F.2d 1297, 1301 (9th Cir. 1986 ); *United States v. Johnson*, 519

17   F.3d 478, 489 (D.C. Cir. 2008); *United States v. Spagnoulo*, 960 F.2d 990, 995

18   (11th Cir. 1992).

19       Mr. Gallegos's trial counsel developed a strategy based on an understanding

20   that Detective Saldate would testify at trial against Mr. Gallegos and that this

21   testimony could not be effectively impeached. Indeed, Detective Saldate had

22   testified at the voluntariness hearing, and the judge credited him over

23   Mr. Gallegos. Believing that he faced unassailable testimony by the case agent,

24   trial counsel chose to not contradict Detective Saldate at trial, but to attempt to

25   mitigate the impact of his testimony by having Mr. Gallegos testify. (Ex. I ¶ 7.)

26   With the impeachment evidence, trial counsel had a means to refute

27   Detective Saldate's testimony, and Mr. Gallegos therefore would not have needed

28   to testify at trial. Armed with the withheld evidence, counsel:

1
2
3
4
5
6

would have had a good-faith basis for questioning Saldate about prior instances where he had lied on the witness stand. If Saldate admitted the lies, his credibility would have been impaired. If he denied them, he would have exposed himself to a perjury prosecution. If he claimed he couldn't remember, defense counsel could have shown Saldate the documents to refresh his memory. And if Saldate still couldn't recall, the jury would have had reason to doubt, not only his veracity, but his memory as well.

7   *Milke,* 711 F.3d at 1009 (citations omitted). The *Milke* Court called the *Brady*

8   material a "game-changer," *id,* and evidence of perjury undoubtedly would have

9   undermined Saldate's credibility, *see Bagley,* 798 F.2d at 1301 ("It is

10  inconceivable that evidence of perjury would not, as an objective matter, affect a

11  factfinder's assessment of a witness' credibility.")

12       The prosecutor emphasized the importance of Detective Saldate's testimony

13  in his opening statement, saying that "[t]he key in this case will fall with

14  testimony by Detective Saldate." (Ex. K at 40.) And this Court previously found

15  that "the information most damaging to Petitioner's defense was contained in

16  Detective Saldate's testimony." (ECF No. 111 at 34.) If the suppressed

17  impeachment evidence had been available to trial counsel, then he could have

18  undermined this key evidence, leaving the jury with only the DNA evidence

19  discussed above. The impeachment evidence is therefore material even if

20  Mr. Gallegos's statement was not suppressed and was recounted through

21  Detective Saldate. *See Kyles,* 514 U.S. at 444 (noting that the materiality of

22  evidence "is best understood by taking the word of the prosecutor"); *Shelton v.*

23  *Marshall,* 796 F.3d 1075, 1086 (9th Cir. 2015) (same); *Hayes v. Brown,* 399 F.3d

24  972, 985–86 (9th Cir. 2005) (discussing the importance of suppressed

25  impeachment evidence that undermined testimony that the defendant had

26  confessed, which was "the centerpiece of the prosecution's case").

27       The prejudice Mr. Gallegos suffered as a result of the State's suppression of

28  the impeachment evidence continued beyond trial. Mr. Gallegos was sentenced by

**GALL 237**

16

SALDATE000335

Exhibit 1G

1  the same judge who presided over his trial and heard the testimony of Mr.
2  Gallegos and the unimpeached testimony of Detective Saldate. That testimony
3  inevitably influenced the judge. In finding the "heinous and depraved" aggravator,
4  the trial judge expressly relied on Mr. Gallegos's testimony regarding the offense.
5  (Ex. L at 180–81.) Mr. Gallegos's testimony also impacted his appeal. After the
6  Arizona Supreme Court found that Cellmark's procedures for determining
7  statistical probabilities related to the DNA evidence were inadmissible, the court
8  found no fundamental error in light of Mr. Gallegos's alleged confession and trial
9  testimony. *Gallegos*, 870 P.2d at 1109–10. Without Mr. Gallegos's testimony,
10  there therefore is a reasonable probability of a different outcome either at
11  sentencing or on appeal.

12        The importance of the suppressed evidence cannot be overstated. With
13  access to the staggering impeachment evidence, Mr. Gallegos's statement either
14  would have been excluded from trial or he would not have testified and
15  Detective Saldate's testimony would have been impeached. The suppression
16  impacted the finding that Mr. Gallegos's confession was voluntary, the finding of
17  guilt, the imposition of the death sentence, and the upholding of those verdicts on
18  appeal. Mr. Gallegos has therefore made a colorable showing that the suppressed
19  evidence was material because under these circumstances there can be no
20  confidence in either Mr. Gallegos's guilty verdict or sentence of death.

21        **2.    Mr. Gallegos has an available avenue for relief in state
22              court under Rule 32.1 of the Arizona Rules of Criminal
23              Procedure**

24        Mr. Gallegos has met the *Rhines* requirements, so a stay is appropriate
25  because there is an avenue for relief in state court still available to him. If a
26  petitioner has not exhausted a claim in state court, it is procedurally defaulted and
27  thus barred from federal review "only if a mandatory rule of state law precludes
28  [the petitioner] from raising his claims at this date." *Moreno v. Gonzalez*, 116 F.3d

**GALL 238**                           17                    SALDATE000336

1   409, 411 (9th Cir. 1997); *see also Cassett*, 406 F.3d at 623 (finding claim not

2   procedurally defaulted where it was not clear that the Arizona courts would find

3   claim barred under Rule 32); *Lopez v. Ryan*, No. CV-97-224-TUC-CKJ, 2015 WL

4   5817642, at *19 (D. Ariz. Oct. 6, 2015) (declining to find a claim procedurally

5   defaulted because it was unclear that "under Arizona law, the Arizona courts

6   would hold Petitioner's claim barred if Petitioner were to return to state court"

7   under Rule 32). If there is no such mandatory rule, then the petitioner can return to

8   state court, exhaust the claim, and then receive federal review. *See Moreno*,

9   115 F.3d at 411.

10       No rule prevents Mr. Gallegos from pursuing a successive petition in state

11  court. Instead, Mr. Gallegos's path to relief in state court can be found in

12  Rule 32.1(e) of the Arizona Rules of Criminal Procedure, which allows for the

13  filing of successive petitions when "[n]ewly discovered material facts probably

14  exist and such facts probably would have changed the verdict or sentence." Newly

15  discovered material facts exist when the facts are discovered after trial through the

16  defendant's exercise of due diligence. ARIZ. R. CRIM. P. 32.1(e)(1)–(2).

17  Impeachment evidence can qualify if it "substantially undermines testimony

18  which was of critical significance at trial such that the evidence probably would

19  have changed the verdict or sentence." ARIZ. R. CRIM. P. 32.1(e)(3).

20       Mr. Gallegos has presented a potentially meritorious *Brady* claim that is

21  cognizable under Rule 32.1(e) because it is based on newly discovered, material

22  facts. *See State v. Muldrow*, No. 2 CA-CR 2015-0452-PR, 2016 WL 538327

23  (Ariz. Ct. App. Feb. 11, 2016) (unpublished) (deciding on the merits a *Brady*

24  claim presented under Rule 32.1(e) based on the evidence about Detective Saldate

25  discovered in *Milke*). Whether he can ultimately succeed under the rule is a

26  question of state law to be answered by the state courts. *See generally Taylor v.*

27  *Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) ("Principles of comity and federalism

28  counsel against substituting our judgment for that of the state courts. . . ."). The

**GALL 239**

SALDATE000337

1   only question at this juncture is whether an avenue for relief in state court remains

2   available to Mr. Gallegos. Because Rule 32.1(e) is available, a stay is appropriate.

3   **B.   The interests of justice support the requested supplement to**
4   **Mr. Gallegos's habeas petition**

5        To ensure that Mr. Gallegos can pursue his *Brady* claim in federal court

6   once it is exhausted, he asks that the claim be added to his federal habeas petition.

7   A petition for writ of habeas corpus "may be amended or supplemented as

8   provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242;

9   *see also James v. Pliler*, 269 F.3d 1124, 1126 (9th Cir. 2001). Rule 15 of the

10  Federal Rules of Civil Procedure in turn permits a party to amend or supplement a

11  pleading with the court's leave. FED. R. CIV. P. 15(a), (d). Such permission should

12  be "freely granted when justice so requires." *Lopez v. Smith*, 203 F.3d 1122, 1127

13  (9th Cir. 2000) (en banc) (internal quotation marks omitted); *see Carter v.*

14  *Bigelow*, 787 F.3d 1269, 1278 n.6 (10th Cir. 2015) ("[T]he standard used by

15  courts in deciding to grant or deny leave to supplement is the same standard used

16  in deciding whether to grant or deny leave to amend." (internal quotation and

17  citation omitted)). Because the Ninth Circuit explicitly remanded Mr. Gallegos's

18  *Brady* claim, this Court has jurisdiction to permit Mr. Gallegos to amend or

19  supplement his petition to include that claim. *Cf. Nguyen v. United States*,

20  792 F.2d 1500, 1502 (9th Cir. 1986) (explaining that district court is allowed on

21  remand to consider issues not explicitly precluded by remand); *Detrich v. Ryan*,

22  No. CV-03-00229-TUC-DCB, 2016 WL 3854459, at *3 (D. Ariz. July 15, 2016)

23  (refusing amendment to include claim outside scope of limited remand).

24        Because Mr. Gallegos has a potentially meritorious *Brady* claim that he

25  could not bring in his prior state court proceedings and which no court has yet

26  considered, justice will be served by allowing Mr. Gallegos, before returning to

27  state court, to amend or supplement his federal petition. Doing so also will allow

28  the claim to be considered by state courts as quickly as possible while still

**GALL 240**                          19                          SALDATE000338

1   protecting Mr. Gallegos's right to have the claim presented in federal court if the
2   state court denies the claim. Courts have previously included in habeas petitions
3   *Brady* claims based on evidence discovered after the petition was denied.
4   *See Gonzalez*, 667 F.3d at 972, 978 (directing district court to stay and hold in
5   abeyance *Brady* claim based on evidence raised in motion for rehearing);
6   *Quezada*, 611 F.3d at 1166, 1168 (directing district court to stay and abey *Brady*
7   claim discovered while appeal was pending if claim unexhausted and state avenue
8   to relief available); *Douglas*, 560 F.3d at 1160, 1187 (treating a *Brady* claim
9   discovered and raised while appeal was pending as a supplement to the
10  petitioner's § 2254 petition). The same relief is warranted here.

11          Mr. Gallegos's new *Brady* claim is attached at Exhibit W. In the interests of
12  judicial economy and preserving resources, Mr. Gallegos requests that he be
13  temporarily relieved of any obligation under Local Rule 15.1 to attach a complete
14  proposed amended habeas petition until after the claim has been exhausted in state
15  court. After completion of state court proceedings, Mr. Gallegos will file a
16  complete amended habeas petition.

17          **C.    The Court should exercise its discretion to authorize current
18                  counsel to represent Mr. Gallegos in state court**

19          Under the Criminal Justice Act, it is appropriate for appointed counsel to
20  represent a party in "ancillary matters appropriate to the proceedings." 18 U.S.C.
21  § 3006A(c). Additionally, 18 U.S.C. § 3599 provides that defendants involved in
22  capital § 2254 cases "shall be entitled" to the appointment of counsel. Under this
23  section, counsel:

24              shall represent the defendant throughout every subsequent
                stage of available judicial proceedings, including pretrial
25              proceedings, trial, sentencing, motions for new trial,
                appeals, applications for writ of certiorari to the Supreme
26              Court of the United States, and all available
                post-conviction process, together with applications for
27              stays of execution and other appropriate motions and
                procedures, and shall also represent the defendant in such
28              competency proceedings and proceedings for executive or

**GALL 241**                          20                     SALDATE000339

Exhibit 1G

1  other clemency as may be available to the defendant.

2  *Id.* § 3559(e).

3  In *Harbison v. Bell*, 556 U.S. 180 (2009), the Supreme Court refused to

4  interpret § 3559 narrowly to limit representation by federally appointed counsel in

5  state court proceedings. In rejecting the argument that § 3559 did not include

6  representation at a state clemency proceeding, the Court noted that any limitation

7  § 3559 placed on representation did not arise from "a strict division between

8  federal and state proceedings," but rather from the term "subsequent" in

9  § 3559(e). *Id.* at 188. Therefore, once federally funded counsel is appointed to

10  represent a state prisoner in § 2254 proceedings, the duties enumerated in

11  § 3599(e) authorize that same counsel to represent the prisoner in all available and

12  subsequent judicial proceedings.

13  Furthermore, the Judicial Conference Committee on Defender Services in

14  1998 determined that federal defenders representing petitioners in capital habeas

15  corpus matters could represent clients in state court after a "presiding judicial

16  officer in a federal judicial proceeding involving the individual has determined

17  that such use" of funds is authorized by law. *See* Rep. of the Judicial Conf. Comm.

18  on Def. Servs. to the Chief Justice of the U.S. and Members of the Judicial Conf.

19  of the U.S. 9–10 (Mar. 1999) (CR-DEFSVS-MAR 99). This policy remains in

20  effect. *See* Rep. of the Judicial Conf. Comm. on Defender Servs. to the Chief

21  Justice of the U.S. and Members of the Judicial Conf. of the U.S., 10–12

22  (Mar. 2016) (CR-DEFSYS-MAR-16). Consistent with that policy, on December

23  9, 2010, the Committee issued a memorandum providing guidance to federal

24  magistrate and district court judges when determining when to authorize a federal

25  defender organization to represent a capital habeas client in state court

26  proceedings. (Ex. V.)

27  Therefore, this Court has discretion to authorize Mr. Gallegos's federal

28  counsel to litigate state court matters. In this District, counsel for habeas

. 21

1    petitioners have been authorized to conduct state court and clemency litigation in

2    numerous capital cases. *See, e.g., Schurz v. Ryan*, CV-97-00580-PHX-JJT,

3    ECF No. 183 at 1 (D. Ariz. Apr. 7, 2016) (successive post-conviction relief

4    petition).[7] Permitting federal habeas counsel to represent Mr. Gallegos in the

5    proposed state court proceeding will promote efficiency, minimize overall costs,

6    and further justice. The Federal Public Defender has represented Mr. Gallegos

7    since 2001, and counsel has developed a relationship with Mr. Gallegos. Counsel

8    is knowledgeable about the facts of the case and prior legal proceedings. Finally,

9    in light of Mr. Gallegos's argument that his post-conviction counsel rendered

10    ineffective assistance and the remanded motion under *Martinez*, appointing

11    Mr. Gallegos's original state post-conviction counsel to handle a successor

12    petition presents a conflict of interest and is inappropriate.

13    **III.   Conclusion**

14      Mr. Gallegos has made a colorable showing that the State violated *Brady*

15    and his constitutional rights by suppressing the voluminous impeachment

16    evidence concerning the lead detective in this case. He respectfully requests that

17    this Court grant a stay of his federal proceedings after amending his habeas

18    petition to include his *Brady* claim and allow current counsel to pursue his rights

19    first in state court. The requested relief will promote judicial efficiency because it

20    will permit state courts to first address the claim, avoid simultaneous litigation in

21    two forums, and allow this Court to review this case based on a fully developed

22    record following exhaustion.

23

---

24    [7] *See also Jones v. Ryan*, CV-03-00478-TUC-DCB, ECF No. 119 at 1 (D. Ariz.
25    Sept. 25, 2013) (post-conviction challenges to conviction and lethal-injection
     challenge); *Lopez v. Schriro*, CV-98-00072-PHX-SMM, ECF No. 255 at 1
26    (D. Ariz. June 12, 2012) (ancillary state-court matters); *Beaty v. Ryan*,
     No. CV-92-02076-PHX-SRB, ECF No. 356 at 1 (D. Ariz. Apr. 22, 2011)
27    (successive post-conviction relief petition and clemency); *Medrano v. Schriro*,
     CV-99-603-TUC-JMR, ECF No. 103 at 2 (D. Ariz. Jan. 10, 2005)
28    (intellectual-disability claim); *Ramirez v. Schriro*, No. CV-97-1331-PHX-JAT,
     ECF No. 119 at 7 (D. Ariz. Mar. 11, 2005) (intellectual-disability claim).

1        Respectfully submitted this 8th day of December, 2016

2

3                          Jon M. Sands
                      Federal Public Defender

4                          District of Arizona

5

6                          Ashwin Cattamanchi
                      Emma L. Smith

7                          Assistant Federal Public Defenders

8                          <u>s/ Ashwin Cattamanchi</u>

9                          Counsel for Petitioner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

Exhibit 1G

1

**Certificate of Service**

2      I hereby certify that on December 8, 2016, I electronically filed the

3 foregoing Motion to Stay and Hold Habeas Proceedings in Abeyance, to

4 Supplement Petition, and to Represent Petitioner in State Court Proceedings with

5 the Clerk's Office by using the CM/ECF system. I certify that all participants in

6 the case are registered CM/ECF users and that service will be accomplished by the

7 CM/ECF system.

8

9 s/ Mercedes Vasquez-Rodriguez

10 Assistant Paralegal
Capital Habeas Unit

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 1G

1  MARK BRNOVICH
   ATTORNEY GENERAL
2  (FIRM STATE BAR NO. 14000)
   JON G. ANDERSON
3  ASSISTANT ATTORNEY GENERAL
   CAPITAL LITIGATION SECTION
   PHOENIX, ARIZONA 85007-2997
4  TELEPHONE: (602) 542-4686
   CADOCKET@AZAG.GOV
5  (STATE BAR NUMBER 005852)
   ATTORNEYS FOR RESPONDENTS

6

# UNITED STATES DISTRICT COURT

7

## DISTRICT OF ARIZONA

8

9  Michael Gallegos,                    CV 01-1909-PHX-NVW

10        Petitioner,

11        -vs-                          **RESPONSE TO MOTION TO**
                                        **STAY AND HOLD HABEAS**
12  Charles L. Ryan, et al.,            **PROCEEDINGS IN**
                                        **ABEYANCE, TO**
13        Respondents.                  **SUPPLEMENT PETITION,**
                                        **AND TO REPRESENT**
14                                      **PETITIONER IN STATE**
                                        **COURT PROCEEDINGS**
15

16

17        Respondents oppose Gallegos' motions to stay and hold habeas proceedings

18  in abeyance, and to supplement the petition.  They take no position on his motion

19  to represent Petition in the state courts, if the other motions are granted.

20        DATED this 21st day of December, 2016.

21                                      Respectfully submitted,
                                        Mark Brnovich
22                                      Attorney General

23

24                                      Lacey Stover Gard
                                        Chief Counsel
25

26                                      s/ Jon G. Anderson
                                        Assistant Attorney General
27

28                                      Attorneys for Respondents

GALL 246                    1                    SALDATE000351

Exhibit 1G

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   SUMMARY OF ARGUMENT.

First, Respondents oppose Gallegos' motion to supplement the petition with a claim based on *Brady v. Maryland*, 373 U.S. 83 (1963), specifically involving impeachment evidence regarding Detective Armando Saldate. Second, they oppose his motion to stay-and-abey these habeas proceedings to return to state court to exhaust the *Brady* claim. Both motions should be denied, for similar reasons, but primarily because of the untimeliness of the new claim.  Whether or not this Court permits the amendment to the petition, this Court must determine whether the new claim is untimely.

Section 2254(d)(1)(D) applies the AEDPA 1-year limit from "the date on which the factual predicate of the claim . . . presented could have been discovered through the exercise of diligence.   The dissenting judge on the panel, as discussed further below, persuasively explains why Gallegos' claim is untimely. *See Gallegos v. Ryan*, 820 F.3d 1013, 1040 (9th Cir. 2016) (Callahan, J., dissenting). Further, the panel majority states the scope of the remand to this Court:

> On remand, the District Court shall consider in the first instance whether to permit Gallegos to supplement his existing petition with his Brady claim based on newly discovered evidence. The District Court may permit an evidentiary hearing on the issue whether that claim is timely under 28 U.S.C. § 2244(d)(1)(D).

This Court must first consider whether to allow Gallegos to supplement his petition with the concededly new *Brady* claim.  *See Mardesich v. Cate*, 668 F.3d 1164, 1173 (9th Cir. 2012) (AEDPA statute of limitations must be applied on a "claim-by-claim basis"). Amendment would be futile if the new claim is time-barred under AEDPA's statute of limitations.  The Ninth Circuit's mandate that this Court "consider in the first instance" whether to permit amendment of the petition does not provide for a remand to state court "in the first instance."  The mandate

2

SALDATE000352

Exhibit 1G

1  aside, whether a claim is time-barred in federal habeas is a threshold issue that
2  must be resolved before this Court can consider other procedural issues or the
3  merits of the claim.  *See White v. Klitzkie*, 281 F.3d 920, 921–22 (9th Cir. 2002).
4      A return to state court to exhaust a time-barred claim would be futile, not to
5  mention a great waste of judicial and attorney resources.  Therefore, this Court
6  must first decide the amendment and timeliness issues. Respondents submit a
7  hearing is unnecessary in light of the record.  But if this Court thinks it is not, it
8  should hold an evidentiary hearing to determine: "What did the Federal Public
9  Defender [FPD] know, or reasonably could have known, and when did it know, or
10 reasonably could have known, the facts that it is now presenting in support of the
11 *Brady* claim?"
12 II.   BACKGROUND.
13     Gallegos' convictions for first-degree murder and sexual conduct with a
14 minor (and the sentence on the latter) were affirmed on direct appeal.  *See State v.*
15 *Gallegos*, 870 P.2d 1097, 1101 (Ariz. 1994).  However, the Arizona Supreme Court
16 remanded for re-sentencing on the murder conviction.  *Id.* at 1119. On remand, the
17 trial judge re-sentenced Gallegos to death on the murder count, and the Arizona
18 Supreme Court thereafter affirmed the death sentence. *State v. Gallegos*, 916 P.2d
19 1056, 1059-1060 & 1064 (Ariz. 1996).
20     Gallegos thereafter filed a petition for state post-conviction relief (PCR) and
21 a supplemental petition in the trial court. (Dist. Ct. Docket #111, at 6-7, citing PCR
22 docs. 188, 204.) The court denied relief on most of the claims, but set an
23 evidentiary hearing regarding Petitioner's claims of ineffective assistance of
24 counsel. (ME 9/28/00.)  Following the evidentiary hearing, the court denied those
25 claims on the merits. (PCR doc. 227; see PR doc. 10.) Petitioner filed a petition for
26 review in the Arizona Supreme Court, which summarily denied relief. (PR docs 1,
27 12.)
28

**GALL 248**

3

SALDATE000353

On December 4, 2002, Gallegos filed his amended habeas petition setting forth 33 grounds for habeas relief.  (Dkt. #74.) On September 29, 2008, this Court filed its judgment and decision and order denying relief. (*Id.* at ##110, 111.)

On appeal to the Ninth Circuit, Gallegos raised claims of ineffective assistance of counsel at the guilt and sentencing phases of trial.  820 F.3d at 1025. The court rejected the claims that had been raised in appellate briefing.  *Id.* at 1026-1039.  However, the panel majority remanded to this Court after granting Gallegos' motion to remand for consideration of a *Brady* claim.  *Id.* at 1015.  On rehearing, the panel majority further amended the opinion to grant Gallegos' motion to remand for consideration of a claim of ineffective assistance at sentencing, pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). *Gallegos v. Ryan*, 2016 WL 6994242, *1 (9th Cir. Ninth Circuit, Nov. 30, 2016).

## III.   THIS COURT SHOULD DENY AMENDMENT BECAUSE IT WOULD BE FUTILE.

Under Rule 15, when deciding whether to grant a party's motion to amend a federal habeas petition, a district court may take into consideration such factors as "bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether the party has previously amended his pleadings." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

### A.   *Amendment would be futile.*

Amendment would be futile, for two reasons: (1) the new claim is time-barred, and (2) the claim lacks merit.

The new claim is barred under AEDPA's statute of limitations, as discussed below in more detail in Respondents' response to Gallegos' motion to stay. Amendment is not allowed under Rule 15(c) because the new claim does not "relate back" to any other claim; rather it asserts a new ground for relief supported by facts that differ both in time and type from his original habeas petition.  *See Mayle v. Felix*, 545 U.S. 644, 650 (2005). This Court may deny a stay when

1    *Mayle's* relation-back doctrine would prevent the prisoner from ever successfully

2    amending his petition to include the new claim. *See King v. Ryan*, 564 F.3d 1133,

3    1141-1142 (9th Cir. 2009).  It would be futile to allow amendment to include an

4    untimely claim.

5        Furthermore, amendment would be futile because the *Brady* claim would fail

6    in state post-conviction proceedings pursuant to Rule 32, Arizona Rules of

7    Criminal Procedure, particularly in view of significant factual differences between

8    this case and *Milke v. Ryan*, 711 F.3d  998 (9th Cir. 2013). *See Runningeagle v.*

9    *Ryan*, 686 F.3d 758, 768-69 (9th Cir. 2012) (in third state PCR, state court found

10   *Brady* claim did not satisfy requirements of Rule 32.1(e), which resulted both in a

11   procedural default and a ruling on the merits); *Schad v. Ryan*, 671 F.3d 708, 716

12   (9th Cir. 2011) (the new evidence would not probably have changed the verdict or

13   sentence, as required for a successful *Brady* claim), *overruled on other grounds by*

14   *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015).

15      **B.   *Undue delay.***

16       Also, amendment should be denied for undue delay in bringing this claim.

17   Gallegos has known about the factual basis for the asserted *Brady* claim, at the

18   very least, since the *Milke* opinion was issued on March 13, 2013.  Furthermore,

19   the FPD knew much earlier about the factual basis for such a claim, having

20   presented such evidence in a federal habeas appeal before the Ninth Circuit in

21   2009—*Runningeagle v. Ryan*, No. 07-99026. (Exhibit A, Opening Brief.) Thus,

22   Gallegos has unduly delayed in presenting this issue to this Court and in seeking to

23   amend his petition. And Gallegos has delayed in presenting it to the state courts

24   because nothing prevented him from asserting the *Brady* claim in another state

25   petition for post-conviction relief.  *See Hamilton v. Vasquez*, 17 F.3d 1149, 1165

26   (9th Cir. 1994) ("Nowhere in his brief does [Hamilton] explain why he could not

27   have presented his unexhausted claims to the California Supreme Court during this

28

**GALL 250**

SALDATE000355

time period."), *implied overruling on other ground recognized by Coleman v. Calderon*, 210 F.3d 1047, 1055 n.1 (9th Cir. 2000). *Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011), is distinguishable because that prisoner had already raised a *Brady* claim in state court and in his federal habeas petition, but presented new evidence to the federal court that made his federal habeas claim "broader" than it had been in state court. *Id.* at 978-79.

## IV.   THE *BRADY* CLAIM IS TIME-BARRED UNDER AEDPA AND SO A STAY-AND-ABEYANCE WOULD BE FUTILE.

The dissenting Ninth Circuit judge explained why the *Brady* claim is time-barred:

> I would find that Gallegos' proposed *Brady* claim is untimely pursuant to AEDPA's one-year period of limitations. . . . The motion—Gallegos' first suggestion that he has a *Brady* claim—was filed in the Ninth Circuit just one day short of the anniversary of our decision in *Milke v. Ryan*, 711 F.3d 998, 1020–21 (9th Cir.2013). It does not appear that Gallegos has filed such a claim in an Arizona state court, or in the federal district court. Gallegos appears to be relying on his motion to somehow stay the time for seeking relief in the state court or district court. But the materials before us reveal that even if a *Brady* claim could be raised for the first time in a motion on appeal, here the motion is untimely.
>
> A number of factors compel this conclusion. First, Detective Saldate's misdeeds were recorded in state court decisions that issued in 1989 and 1990. See *Milke*, 711 F.3d at 1020–21. Thus, the information was not something that was hidden from, or unavailable to, Gallegos. It was in the public domain, presumably available to all, years before Gallegos filed his motion to remand.
>
> Second, the Arizona Federal Public Defender—the office that has represented Gallegos since at least February 2009—raised similar allegations concerning Saldate in *Runningeagle v. Ryan*, 686 F.3d 758 (9th Cir. 2012). The December 2009 opening brief in *Runningeagle* indicates that even if Gallegos's counsel did not actually know about Saldate's misdeeds, they should have known about them well before the March 2013 opinion in *Milke*. The Arizona Federal Public

**GALL 251**

6

SALDATE000356

Exhibit 1G

Defender's Office does excellent work on death penalty cases. It seems incredible to me that in light of the allegation that Saldate had "been repeatedly accused of improper behavior and coercive interrogation," the attorneys representing Gallegos were unaware of Saldate's flaws. Certainly, they could not have been unaware of the relevance of Saldate's character, as the trial court denied the motion to suppress based on his testimony.

Third, the motion only represents what defense counsel did after we issued our opinion in Milke. After Milke, counsel attempted to speak to Saldate and requested documents from the Maricopa County Attorney's Office. Counsel alleges that then, in the summer of 2013, they learned that "all of Det. Saldate's files had been destroyed by unknown persons on unknown dates." Motion at 4. However, counsel's efforts in 2013 simply do not excuse the failure to act sooner. [footnote omitted].

Accordingly, I would deny Gallegos' motion to remand based on an alleged *Brady* claim as untimely pursuant to 28 U.S.C. § 2244(d)(1).

820 F.3d at 1040. The dissent and the majority's mandate, at the very least, dictate that this Court must first decide the timeliness issue.

A stay would be futile as the *Brady* claim is time-barred pursuant to AEDPA's 1-year statute of limitations. *See generally* 28 U.S.C. §2244(d)(1). The 1-year statute of limitations applies to each habeas claim on an individual basis. *See Mardesich*, 668 F.3d at 1169. With regard to this claim, the applicable part of §2244(d)(1) is subsection (D), which provides that the 1-year period runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *See also Mardesich*, 668 F.3d at 1173 (applying subsection (D) and finding claim untimely). Pursuant to Section 2254 (d)(1)(D), this Court must determine "the date on which the factual predicate of the claim ... could have been discovered through the exercise of due diligence." Under any view of the relevant facts, the new *Brady* claim is time-barred because it was not filed until well over 1 year since Gallegos could have

7

SALDATE000357

1 discovered and presented the evidence he now adduces in support of his *Brady*
2 claim, consisting of nine instances of alleged misconduct by Detective Saldate.

3     Attached to the Ninth Circuit opinion in *Milke* is an appendix listing nine
4 items of purported misconduct, eight of which are based on judicial rulings
5 regarding statements taken by Saldate.   711 F.3d at 1020-21. Gallegos' current
6 motion cites the very same nine alleged items of misconduct that were cited in the
7 *Milke* appendix. (Motion, at 4-6.) Therefore, *at the very least*, Gallegos has known
8 about the factual bases for the asserted *Brady* claim since the Ninth Circuit *Milke*
9 opinion issued on March 13, 2013—but has failed to make the claim within the 1
10 year specified by Section 2244(d)(1)(D.)

11     But the FPD has known about the basis for such a claim for much longer
12 than that, having presented such evidence in at least one other federal habeas
13 appeal before the Ninth Circuit: *Runningeagle v. Ryan*, Ninth Circuit No. 07-
14 99026. In Runningeagle's Opening Brief to the Ninth Circuit, he asserted:

15
16     Detective Saldate has been repeatedly accused of improper
    behavior and coercive interrogation. (*See, e.g., ROA* 448 Exs. R-Y,
    ER 810-883 (the voluminous appendices to Ex. V are omitted from
17     the excerpts of record but are part of the record on appeal).)"

18
19 (Exhibit A, at footnote 18, pages 18-19.)

    The excerpts of record filed by Runningeagle's Assistant Federal Public
20 Defender included Runningeagle's state PCR petition, which had been attached as
21 Exhibit R to Milke's PCR petition, which in turn alleged that: "Detective Saldate
22 engaged in a pattern of rampant overreaching in his effort to secure the type of
23 information that he wanted from suspects under his control" and in some detail
24 asserted Saldate's history with respect to interrogations. *See Runningeagle*, Ninth
25 Circuit Docket # 24, Excerpts of Record, Volume IV, ER 812-814. Milke's petition
26 listed 23 other cases in which Saldate had allegedly committed misconduct,
27 *including State v. Gallegos. Runningeagle*, ER 813-814. Also included in
28

1   Runningeagle's ERs was Exhibit V, an attachment to his PCR petition, which

2   summarized an investigation into Saldate's role in various cases, including

3   *Rodriguez, Reynolds, Rangel,* and *King* (Exhibit B, *Runningeagle* ERs, at Bates

4   Stamp Nos. 855, 858, 861, 862, and 866)—four of the five cases cited in Gallegos'

5   current motion. (Motion, at 4-6.)  Exhibit V also cited *Gallegos.* (Exhibit B, Bates

6   Stamp Number 864.) Thus, the factual basis for the *Brady* claim has been within

7   the actual knowledge and possession of the FPD since at least 2009.

8        Gallegos alleges that the State "has never disclosed any of this impeachment

9   evidence to any court or Mr. Gallegos' counsel." (Motion, at 7.)  First, the Supreme

10  Court has clarified that, as a matter of federal constitutional law, *Brady* does not

11  apply to post-conviction proceedings.  *See District Attorney's Office for the Third*

12  *Judicial District v. Osborne*, 557 U.S. 52, 68-69 (2009). Second, the State's lack of

13  disclosure aside, most of the asserted impeachment is set forth in public judicial

14  rulings, and Milke, represented by private counsel, obtained such evidence to

15  support her claim in both state and federal courts.  *Milke*, 711 F.3d at 1003-1005.

16  Any assertion that the FPD, with its immense resources could not obtain the same

17  information as private counsel, would be ludicrous.

18       Third, the relevant legal question for the statute of limitations' analysis is

19  when Gallegos' counsel knew, or reasonably should have known, about the

20  allegations of misconduct regarding Saldate.  The FPD clearly knew of such

21  possible impeachment evidence at least as far back as 2009, when that office

22  presented it to the Ninth Circuit in *Runningeagle*. "Time begins when the prisoner

23  knows (or through diligence could discover) the important facts, not when the

24  prisoner realizes their legal significance."  *Hasan v. Galaza*, 254 F.3d 1150, 1154

25  n.3 (9th Cir. 2001) (quoting *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000).

26       Even if Gallegos were allowed to amend his petition to include the *Brady*

27  claim, the claim would be time-barred under 2244(d)(1)(D), which began to run at

28

**GALL 254**                                    9                         SALDATE000359

1   the very latest at the filing of the *Milke* opinion on March 14, 2013. The *Brady*

2   claim does not "relate back" to an original claim, and therefore cannot be timely

3   under AEDPA. *See Mayle*, 545 U.S. at 662-665. This Court may deny a stay when

4   *Mayle's* relation-back doctrine would prevent the prisoner from ever successfully

5   amending his petition to include the new claim. *See King*, 564 F.3d at 1141-1142.

6       *Rhines v. Weber*, 544 U.S. 269, 277 (2005), specifies that a stay-and-abey

7   should be granted "only in limited circumstances." *Rhines* holds that a motion to

8   stay should be denied if the unexhausted claim is "plainly meritless." For the

9   reasons discussed below, this claim is also plainly meritless, and would fail in state

10  post-conviction proceedings, both under a *Brady* analysis and an analysis under

11  Rule 32.1(e), Arizona Rules of Criminal Procedure. Further, *Rhines* concerns what

12  a district court should do when presented with a mixed petition and the prisoner

13  had "good cause" for not properly exhausting the unexhausted claim in a proper

14  fashion. Gallegos did not present this issue in his habeas petition, but has rather

15  delayed until several years later to attempt to amend his petition, during which

16  time he could also have filed a state post-conviction petition.

17      Gallegos' reliance on *Gonzalez* is misplaced, because that prisoner had

18  raised a *Brady* claim in state court and in his federal habeas petition, but presented

19  new evidence to the federal court that made his federal habeas claim "broader"

20  than it had been in state court. 667 F.3d at 978-79. The Ninth Circuit specifically

21  found a stay-and-abey proper in that situation and also found a "potentially

22  meritorious" *Brady* claim. 667 F.3d at 980-81. The Ninth Circuit's mandate here

23  made no such findings, and does not mention a stay-and-abeyance. *Gonzalez* did

24  not involve a statute-of-limitations issue. And Gallegos did not raise this claim to

25  the state courts and in his habeas petition, unlike *Gonzalez*, and also unlike *Milke*,

26  who raised the claim both in state post-conviction proceedings and to the district

27  court, 711 F.3d at 1004-05, & 1010-11. Finally, as discussed the *Brady* claim is not

28

**GALL 255**

10

SALDATE000360

1   potentially meritorious, but rather plainly meritless.

2   **V.**    **THE MOTION FOR A STAY SHOULD ALSO BE DENIED ON EQUITABLE**
3         **GROUNDS—LACK OF DILIGENCE AND LACK OF LIKELIHOOD OF SUCCESS ON THE MERITS.**

4        Respondents submit that the issue of timeliness is a necessary predicate for
5   deciding whether to grant a stay and abeyance, and the lack of timeliness
6   necessarily makes a stay-and-abeyance procedure futile. But Respondents will
7   also address the general factors this Court considers when determining whether to
8   grant a stay and abeyance.

9        **A.**   *Background law regarding equitable factors when federal courts*
10            *consider granting motions for stays in federal habeas proceedings.*

11      A capital petitioner can only obtain a stay of federal appellate proceedings if
12   he has shown "substantial grounds upon which relief might be granted." *See*
13   *Barefoot v. Estelle*, 463 U.S. 880, 895 (1983); *Gerlaugh v. Stewart*, 167 F.3d 1222,
14   1224 (9th Cir. 1999). "[A] stay of execution is an equitable remedy." *Hill v.*
15   *McDonough*, 547 U.S. 573, 584 (2006). "It is not available as a matter of right."
16   *Id.*   Federal habeas review is not "a means by which a defendant is entitled to
17   delay an execution indefinitely." *Barefoot*, 463 U.S. at 887. The Supreme Court
18   has emphasized that: "[E]quity must be sensitive to the State's strong interest in
19   enforcing its criminal judgments without undue interference from the federal
20   courts." *Hill*, 547 at 583.

21        **B.**   *Gallegos failed to exercise diligence in presenting this claim.*

22      Gallegos is not entitled to a stay because, as discussed above, he was not
23   diligent in raising his *Brady* claim in this case. A principle maxim of equity is that
24   one who seeks an equitable remedy must not have slept on his rights. *See, e.g.,*
25   *Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc.*, 621 F.3d
26   981, 988 (9th Cir. 2010).

27      First, as discussed, the FPD has, at the least, known of allegations and
28   evidence regarding misconduct by Saldate when the Ninth Circuit issued its

1   opinion in *Milke*.  Second, the FPD knew about the allegations and evidence even
2   earlier, when it submitted them in support of the appeal in *Runningeagle*.  Third,
3   Milke showed diligence by pursuing a *Brady* claim in state PCR proceedings,
4   based on alleged misconduct by Saldate in interviewing suspects.  *See Milke*, 711
5   F.3d at 1004-05. This Court said in *Milke*: "And, despite this trove of undisclosed
6   impeachment evidence, the post-conviction court rejected Milke's claim that she'd
7   been denied access to impeachment evidence." *Id.* at 1005.  And, unlike Gallegos,
8   Milke also asked the district court to grant discovery of evidence regarding
9   misconduct by Saldate, and complained on appeal to this Court that she had been
10  denied access to Saldate's files. *Id.* at 1010-11.

11      Gallegos notes his attempts to get Saldate's police files from the City of
12  Phoenix, in 2013.  (Motion, at 8-9.)  He correctly notes that, in *Milke*, the State
13  determined that these files, with one exception, had been destroyed, and filed
14  affidavits from relevant city officials. (*Id.* at 9.)  Respondents are attaching relevant
15  exhibits filed in *Milke*. (Exhibits E, F, and G.)  These explain that the City of
16  Phoenix only retains files for 5 years, "in accordance with the Arizona State
17  Library, Archives and Public Records Retention Schedule." As noted by the Ninth
18  Circuit dissenting judge: "Contrary to the implication raised in the motion to
19  remand, it is not unusual that documents that no one had looked at or requested in
20  over 20 years would no longer be available." 820 F.3d at 1040 fn. 1.

21      Thus, Gallegos could have raised this claim much earlier, and his failure to
22  do so prejudiced the State and evinces a lack of due diligence and failure to
23  exercise reasonable care that should preclude habeas relief, including the requested
24  stay. *See King v. Trujillo*, 638 F.3d 726, 732 (9th Cir. 2011).

25      **C.**   *No reasonable likelihood of success.*
26      Gallegos' *Brady* claim clearly lacks merit, as shown by the significant factual
27  differences between this case and *Milke*.
28

**GALL 257**                                          12                      SALDATE000362

Exhibit 1G

1    In *Brady*, the Supreme Court held that "[t]he suppression by the prosecution
2  of evidence favorable to an accused upon request violates due process where the
3  evidence is material either to guilt or to punishment, irrespective of the good faith
4  or bad faith of the prosecution." 373 U.S. at 87. *Brady* violations have three
5  components: "The evidence at issue must be favorable to the accused, either
6  because it is exculpatory, or because it is impeaching; that evidence must have
7  been suppressed by the State, either willfully or inadvertently; and prejudice must
8  have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).   The terms
9  "material" and "prejudicial" are used interchangeably in *Brady* cases. *See*
10  *Runningeagle*, 686 F.3d at 769.  Evidence is material under *Brady* when there is a
11  reasonable probability that, had the evidence been disclosed, the result of the
12  proceeding would have been different. *Runningeagle*, 686 F.3d at 769.

13    Under the reasoning of *Milke*, the specified items would have been favorable
14  to the defense because they could have been used to impeach Saldate at various
15  phases of the trial.  711 F.3d at 1012-16.  Furthermore, the items asserted in *Milke*
16  and cited now by Gallegos (Motion, at 4-6), occurred before Gallegos' trial in 1991
17  and so existed before trial, and were apparently not actually discovered until after
18  trial. Under the reasoning of *Milke*, therefore, the prosecutor violated *Brady* by not
19  disclosing such evidence before trial. 711 F.3d at 1016-18. But, in contrast to
20  *Milke*, there was substantial evidence against Gallegos other than testimony by
21  Detective Saldate, showing that a claim of prejudice under the third prong of *Brady*
22  is plainly meritless.

23    What is striking about *Milke* is the lack of evidence, other than Saldate's
24  testimony regarding statements by Milke, to prove Milke's guilt. *Milke's* discussion
25  of the *Brady* prejudice component emphasized that the confession as reported by
26  Saldate, "was the only direct evidence linking Milke to the crime," and there was
27  "no . . . other evidence that Milke confessed." 711 F.3d at 1018.  It found both that
28

**GALL 258**

13

1   the non-disclosed evidence would have affected Saldate's credibility and the
2   determination of whether the alleged confession was lawfully obtained. *Id.* at
3   1019. Accordingly, it found that the non-disclosure of the evidence was prejudicial
4   under *Brady. Id.*

5   Here, by contrast, there was very strong other evidence corroborating
6   Saldate's testimony about what Gallegos told him, including: Gallegos' recounting
7   his confession to Detective Chambers; Gallegos' testimony at trial; DNA evidence;
8   and the uncontested presence of Gallegos in the home and access to the victim.
9   Gallegos attempts to downplay all of this other evidence, but the evidence is
10  compelling and its very existence puts this case in stark contrast to *Milke.*

11  Unlike *Milke*, Gallegos not only confessed to Saldate, but also repeated the
12  confession to Detective Chambers. *Cf. Scott v. Ryan*, 2011 WL 240746, **3-9 (D.
13  Ariz. Jan. 24, 2011), *aff'd Scott v. Ryan*, 686 F.3d 1130, 1133-1135 (9th Cir. 2012)
14  (upholding voluntariness of statement first made to Saldate, and then to Detective
15  Mills). The impeachment evidence at issue would not have changed that result
16  because Chambers verified Saldate's account of Gallegos' confession, further
17  indicating that the confession was voluntary and truthful.

18  Detective Chambers testified at the suppression hearing. (Exhibit C, RT
19  8/3/90, at 65.) Chambers heard Gallegos' statements, and he did not coerce or
20  threaten Gallegos, or make any promises. (*Id.* at 69.) Gallegos never appeared not
21  to understand questions by Saldate or Chambers. (*Id.* at 70.) Chambers was
22  intended as a "witness" to the statement Gallegos previously made to Saldate, and
23  spent about 20 minutes with Gallegos. (*Id.* at 83.) Then, the detectives arranged
24  for Gallegos to "confront" Smallwood, and Chambers recalled "Gallegos urging to
25  Smallwood to tell the truth, admitting he had told the truth." (*Id.* at 84-85, 87.) The
26  trial court found both confessions (the first to Saldate and the second to Saldate
27  and Chambers) were voluntary and admissible. (*Id.* at 118.)

28

**GALL 259**

14

SALDATE000364

1    Although Chambers did not testify at trial, he did testify at sentencing and

2    re-sentencing.  At re-sentencing, he testified that he believed Gallegos' statement,

3    which included the statement that he was involved in the murder. (RT 10/24/94, at

4    37.)  Chambers clarified that Saldate told him the statement that Gallegos had

5    given, and then testified that Gallegos "made essentially the same statement to me

6    as well in Saldate's presence."  (*Id.* at 48.)  In fact, Chambers found Gallegos'

7    statement so believable that he thought George Smallwood was involved, and,

8    against his practice in capital cases, Chambers recommended that Gallegos receive

9    a life sentence because Smallwood had not been charged. (*Id.* at 45-46.)

10   Furthermore, unlike *Milke*, Gallegos confirmed the gist of his inculpatory

11   statements—that he suffocated and sodomized the victim—in subsequent

12   testimony and statements.  Gallegos' trial testimony shows that his confession to

13   Saldate was voluntary, and that Saldate had not fabricated the confession.  Indeed,

14   Gallegos' testimony corroborated Saldate's testimony about the confession.  Rather

15   than denying his confessions, Gallegos testimony tracked his prior statements to

16   the police about what he did to the victim. He testified and admitted that he: (1)

17   rubbed the victim's back with baby oil (RT 3/13/91, at 62); (2) put his hand over

18   her nose, and that she thereafter went limp (*Id.* at 63-64); (3) thought he had killed

19   the victim  (*Id.* at 66); (4) proceeded to have sex with the victim by inserting his

20   penis into her anus (*Id.* at 68); (5) and knew it was "wrong" to insert his penis "into

21   this little girl's anal opening."  (*Id.* at 113). Gallegos admitted telling the truth to

22   Detective Saldate and admitted explaining what was done to the victim.  (*Id.* at 80.)

23   He admitted he "actively participated in the killing."  (*Id.* at 127.)

24   Furthermore, Gallegos did not deny his actions at either his sentencing or his

25   re-sentencing.  In his brief statement at sentencing, he did not deny what he had

26   done, but only lamented that: "None of this was meant to happen. I did not know

27   my conduct would cause her death."  (RT 5/24/91, at 42.)  At re-sentencing, he

28

admitted going into the victim's room, recognizing she was dead, carrying her body outside, and "sobering up real quick" after he had sex with her.   (RT 10/24/94, at 25-27.)

Finally, regarding the sentence, the Arizona Supreme Court, on independent review, found the murder was heinous and depraved, based on a statement Gallegos made as part of the pre-sentence investigation to the author of the pre-sentence report. *Gallegos*, 870 P.2d at 1110-11. Specifically, Gallegos told the probation officer that he thought the victim was dead, and so "he went ahead and finished the act because 'it wasn't like she was going to tell anybody.'" At that point, he consciously decided to have sex with her:   "He sodomize[d] the victim because it was like 'why not.'  He knew he was going to get caught the next day." (*Id.* at 1011.)

Gallegos attempts to do away with his confessions to Saldate and Chambers, and his own testimony at trial, on the theory that none of this evidence would have been admitted at trial because the trial court would have granted Gallegos' motion to suppress the statements if it had known of the currently-asserted *Brady* material. But the state trial court found his confessions were voluntary and *Miranda*-compliant and those findings have not been challenged in this habeas proceeding. As the Ninth Circuit noted: The trial court determined [his] confessions were voluntary. Gallegos did not challenge that determination in his petition for habeas relief." 820 F.3d at 1018 fn.5. Thus, Gallegos cannot undo the confessions or his own testimony at trial based on speculation that the trial court would have suppressed the confessions and so Gallegos would not have testified at trial and confirmed the truthfulness of his confessions.

By contrast, Milke made a separate claim in federal habeas, including on

16

SALDATE000366

1  appeal to the Ninth Circuit, that admission of her statements to Detective Saldate
2  constituted a constitutional violation.[1]     Only Judge Kozinski's separate
3  concurrence would "set aside Milke's conviction on the separate ground that it
4  relied on an illegally-obtained confession that probably never occurred," and
5  would "bar use of the so-called confession during any retrial of Milke." *Milke*, 711
6  F.3d at 1025. Here, conversely, there is no separate claim on which to find that the
7  confessions were unconstitutionally-obtained, or that their use and Gallegos' trial
8  testimony would be barred in further proceedings.  Finally, Gallegos challenges the
9  DNA evidence, claiming that both the state and federal courts have made
10  "inaccurate and damning references to Mr. Gallegos' DNA being found in the
11  victims' rectum." (Motion, at 14, fn.5.) But that claim is based on Gallegos'
12  conflating a stipulation admitted at trial regarding the DNA evidence and a factual
13  finding by the trial/PCR judge in support of its conclusion that there was no
14  prejudice from any ineffective assistance at trial because of the overwhelming
15  evidence.  The real question is whether Gallegos has overcome the presumption
16  that the finding is correct under §2254(e)(2).

17       A state court factual determination "shall be presumed to be correct," and:
18  "The applicant shall have the burden of rebutting the presumption of correctness

19

20  [1]  The Ninth Circuit panel first remanded to the district court for a determination of
21  whether the confession was illegally obtained. *Milke v. Ryan*, No. 07-99001, Dkt.
22  163.  After holding an evidentiary hearing, the district court judge found Detective
    Saldate more credible than Ms. Milke, despite the impeaching evidence regarding
23  Saldate, and concluded that Milke had validly waived her *Miranda* rights. *See*
24  *Milke v. Ryan*, 2010 WL 383412, **8-12 (D. Ariz. Jan. 29, 2010) (also attached as
    Exhibit D). Moreover, the fact that the district court in *Milke* found Saldate more
25  credible than Milke, despite the impeaching evidence at issue here, shows that it is
26  unlikely that the trial court in this case would have granted the motion to
    suppress—particularly when Gallegos' separate confession to Detective Chambers
27  further confirmed that his confessions were voluntary and truthful.

28

1   by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  AEDPA's standard for

2   reviewing determination of facts replaces prior habeas standards for reviewing

3   state factual findings. *See Rice v. Collins*, 546 U.S. 333, 338 (2006). "[A] state-

4   court factual determination is not unreasonable merely because the federal habeas

5   court would have reached a different conclusion in the first instance." *Wood v.*

6   *Allen*, 558 U.S. 290, 301 (2010).

7       There is no dispute regarding the stipulation, which is in the record. (Motion,

8   Ex. P, at 5-6.)  In summary, the stipulations were: (1) a fingerprint removed from

9   the victim's bedroom matched Gallegos' right middle finger; (2) semen was

10   detected on the victim's panties, nightshirt, and bed sheet; (3) DNA testing showed

11   that the stain on the victim's panties contained a banding pattern that matched the

12   banding pattern obtained from Gallegos' blood; and (4) the probability that an

13   individual other than Gallegos was the source of the stain on the victim's panties

14   was 1 in 10 million for Caucasians and 1 in 67 million for Hispanics.[2]

15       The PCR court's minute entry denying PCR relief included the finding that

16   "the DNA evidence in Kendall's rectum was linked to the Defendant." (Motion,

17   Exhibit Q, at 3.) The fallacy in Gallegos' position that this misrepresented the

18   stipulation is that the PCR court was not limited to the stipulation in making the

19   finding.  First, the stipulation included that: "DNA banding patterns were obtained

20   from the three combined rectal swabs" (Motion, Ex. P, at 5), so there is no question

21   but that there was DNA in the victim's rectum. Second, the other evidence "linked"

22   that DNA to Gallegos. For instance, Gallegos testified at trial that: (1) he

23   "proceeded to have sex with Kendall," and that "I inserted my penis into her anus"

24   (RT 3/13/91, at 68); and (2) he knew it was wrong to insert his penis into the

25

26   [2] The Arizona Supreme Court found on appeal that the DNA statistics were

27   generally inadmissible, but noted Gallegos' stipulation to them, and found their

admission did not constitute fundamental error. *Gallegos*, 870 P.2d at 1109.

28

18

SALDATE000368

Exhibit 1G

1    victim's anal opening.  (*Id.* at 114.) Gallegos testified at resentencing that he

2    "sobered up real quick" after he had sex with the victim." (RT 10/24/94, at 27.)

3       In view of the state court record before the PCR/trial judge when he made

4    the factual finding at issue, Gallegos cannot overcome the presumption of

5    correctness by "clear and convincing" evidence. Gallegos does not offer any

6    evidence that it was someone else's DNA in the victim's rectum.  Accordingly, the

7    PCR court reasonably found that the DNA in the victim's rectum was "linked" to

8    Gallegos, and reasonably used that finding in concluding there was no prejudice

9    from the alleged ineffective assistance of counsel.

10       Gallegos attacks the Cellmark statistical probabilities and the "chain-of-

11    custody" of the victim's panties, on which Gallegos' DNA was found. (Motion, at

12    14-15.) As discussed, the Arizona Supreme Court found admission of the

13    probability statistics contrary to Arizona law, but noted the stipulation and found

14    no fundamental error.  And, probabilities aside, the DNA banding pattern from the

15    panties still matched Gallegos' DNA banding pattern.

16       Regarding the "chain-of-custody" point, there is no indication in the record

17    that the panties belonged to anyone other than the victim. Gallegos testified that

18    the victim was wearing panties and that the panties were put under the dresser. (RT

19    3/13/91, at 108.) Jerry Gallegos testified that George found the victim's underwear

20    under the dresser.  (R.T. 3/11/91 AM, at 12.)  The underwear and shirt were placed

21    on the kitchen table.  (*Id.* at 14.)  Cindy Wishon testified that the victim's panties

22    were retrieved from the victim's bedroom and placed on the kitchen table.

23    (Motion, Exhibit K, at 123.)  Detective Hamrick collected "a pair of little girl's

24    panties" and a "pajama or leotard type" garment from the kitchen table.  (R.T.

25    3/12/91A.M. at 29.)  On cross-examination, Hamrick testified that the two items of

26    clothing had been removed from the victim's bedroom by a family member. (*Id.* at

27    35.)

28

19

SALDATE000369

1   Thus, there is no indication in the record that the panties belonged to anyone

2   other than the victim. Thus, any question about the DNA in the victim's rectum,

3   aside, the presence of Gallegos' DNA on the victim's panties is damning evidence,

4   in stark contrast to the lack of physical evidence in *Milke*.

5   **VI.   NO LIKELIHOOD OF RELIEF IN STATE COURT.**

6   Another reason to deny a stay and abeyance is the unlikelihood of obtaining

7   relief in state court. Gallegos argues he could obtain relief in state court pursuant to

8   Rule 32.1(e), Arizona Rules of Criminal Procedure, which governs claims based on

9   newly-discovered evidence. (Motion, at 17-19.)   Gallegos' assertion is belied by

10  the record in this case and Arizona case law.

11  Rule 32.1 has several requirements to obtain relief:

12  e. Newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly

13  discovered material facts exist if:

14  (1) The newly discovered material facts were discovered after the trial.

15  (2) The defendant exercised due diligence in securing the newly

16  discovered material facts.

17  (3) The newly discovered material facts are not merely cumulative or used solely for impeachment, unless the

18  impeachment evidence substantially undermines testimony

19  which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.

20

21  *See generally State v. Mata*, 916 P.2d 1035, 1049 (Ariz. 1996). Additionally, the

22  evidence must have been in existence at the time of trial, but not discovered until

23  after trial. *State v. Sanchez*, 24 P.3d 610, ¶ 11 (Ariz. App. 2001). *See also Milke*,

24  711 F.3d at 1017 (facts from an Arizona Court of Appeals' opinion released after

25  that prisoner's trial, facts did not constitute *Brady* material).

26  As discussed above, the purported newly-discovered evidence at issue

27  consists of a set list of nine allegations of misconduct by Detective Saldate.

28  (Motion, at 4-6.)   Gallegos does not assert any other items of misconduct, nor

**GALL 265**

SALDATE000370

Exhibit 1G

1   could he now develop any in state court because, as discussed above, the City of

2   Phoenix disposed of Saldate's personnel records in accordance with its record

3   retention policy.  Gallegos' proposed new state PCR claim would first fail under

4   Rule 32.1(e) (2), because of Gallegos' lack of diligence, for the same reasons

5   previously discussed.  Gallegos' *Brady* claim would be subject both to a procedural

6   bar and to dismissal on the merits for failing to state a claim under that rule. *See*

7   *Runningeagle*, 686 F.3d at 768-69 (in third state PCR, state court found *Brady*

8   claim did not satisfy requirements of Rule 32.1(e), which resulted both in a

9   procedural default and a ruling on the merits).

10      Furthermore, because the new evidence would not probably have changed

11   the verdict or sentence, Gallegos has not shown that he would obtain relief under

12   Rule 32.1(e)(3).  First, the new evidence would not probably have changed the

13   result because of the other compelling evidence of guilt, discussed above, which

14   corroborated Saldate's testimony about Gallegos' statements to him.   Second,

15   Gallegos requests a stay to assert "an unexhausted *Brady* claim arising out of

16   newly discovered *impeachment* evidence regarding the lead detective in this case,

17   Armando Saldate." (Motion, at 1, emphasis added.)  But, as the Arizona trial judge

18   found in denying Milke's request for post-conviction relief, Milke had not made "a

19   reference to the type of evidence that is allowed under Rule 608 [of the Arizona

20   Rules of Evidence] to impeach the credibility of a witness." *Milke*, 711 F.3d at

21   1008. The Ninth Circuit's opinion did not find the evidence would have been

22   admissible, but opined that the judge might have reconsidered if the evidence could

23   be admitted for impeachment, and, at any rate, the evidence would "still have been

24   valuable." *Id.* at 1009.

25      Respondents submit that, even assuming the evidence should have been

26   disclosed pursuant to *Brady* and *Milke*, it would not have been admissible to

27   impeach Saldate under a plain reading of Arizona Rule 608, and there would not be

28

**GALL 266**

21

SALDATE000371

Exhibit 1G

1   any constitutional bar to precluding it. *See Nevada v. Jackson*, 133 S. Ct. 1990,
2   1994 (2013) (barring impeachment evidence regarding victim under Nevada rule
3   of evidence that is similar to Rule 608 of the Federal Rules of Evidence was not an
4   unreasonable application of federal law, because "this Court has never held that the
5   Confrontation Clause entitles a criminal defendant to introduce *extrinsic* evidence
6   for impeachment purposes.") (emphasis in original.)

7       For the above reasons, it would be futile for Gallegos to return to the state
8   court, and this Court should deny a stay.

9   **VII.   THERE IS NO "INTERESTS OF JUSTICE" EXCEPTION THAT WOULD ALLOW**
10  **PRESENTATION OF THE UNTIMELY *BRADY* CLAIM.**

11      Gallegos asserts that there is an "interests of justice" exception that would
12  allow him to add the untimely *Brady* claim to his habeas petition. (Motion, at 19-
13  20). But the only exception to the time bar under Supreme Court and AEDPA is
14  one based on "actual innocence." The Supreme Court has recognized that "the
15  'actual innocence' gateway to federal habeas review" of constitutional claims
16  otherwise procedurally barred in federal court also applies to petitions that are
17  otherwise untimely under AEDPA. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928
18  (2013). The actual innocence standard, as articulated in *Schlup v. Delo*, 513 U.S.
19  298 (1995), is "demanding". *See Perkins*, 133 S. Ct. at 1936; *see also House v.*
20  *Bell*, 547 U.S. 518, 537–38 (2006) (reiterating that to "'[t]o be credible' a gateway
21  claim [of actual innocence] requires 'new reliable evidence—whether it be
22  exculpatory scientific evidence, trustworthy eyewitness accounts, or critical
23  physical evidence—that was not presented at trial'" and that "the *Schlup* standard is
24  demanding and permits review only in the 'extraordinary' case") (quoting *Schlup*,
25  415 U.S. at 324, 327).

26      The impeachment evidence Gallegos offers does not meet this high standard.
27  If Gallegos had evidence of his actual innocence, he could present it to the Arizona
28  courts, pursuant to Rule 32.1(h), Ariz. R. Crim. P. He has not done so.

**GALL 267**

22

SALDATE000372

Exhibit 1G

**VIII.  APPOINTMENT OF FPD FOR PROPOSED STATE POST-CONVICTION PROCEEDINGS.**

   If this Court should grant Gallegos' motion to stay-and-abey this habeas proceeding so he can return to state court to litigate the *Brady* claim, Respondents take no position on whether this Court should authorize the current Assistant Federal Public Defenders to represent Gallegos in state court.

**IX.  CONCLUSION.**

   Respondents respectfully request this Court to deny Gallegos' motion to supplement the petition and to stay and hold the habeas proceedings in abeyance. This Court should determine whether Gallegos' *Brady* claim is untimely, after holding an evidentiary hearing on the timeliness issue.

   RESPECTFULLY SUBMITTED this 21st day of December, 2016.

> Mark Brnovich
> Attorney General
> (Firm State Bar No. 14000)
>
> Lacey Stover Gard
> Chief Counsel
> Capital Litigation Section.
>
>
> s/ Jon G. Anderson
> Assistant Attorney General
>
> Attorneys for Respondents

23

SALDATE000373

Exhibit 1G



1

## CERTIFICATE OF SERVICE

2  I hereby certify that on December 21, 2016, I electronically transmitted the
attached document to the Clerk's Office using the ECF System for filing and
3  transmittal of a Notice of Electronic Filing to the following ECF registrant:

4  Jon M. Sands
Federal Public Defender
5  Ashwin Cattamanchi
Emma L. Smith
6  Assistant Federal Public Defenders
850 West Adams St., Suite 201
7  Phoenix, AZ  85007

8  Attorney for Petitioner

9

10  s/ Barbara Lindsay

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GALL 269**

24

SALDATE000374

Exhibit 1G

1

## LIST OF EXHIBITS

2

3  A.    EXCERPTS FROM OPENING BRIEF

4  B.    PETITION FOR POST-CONVICTION RELIEF

5  C.    R.T. 8/3/90

6  D.    *MILKE v. RYAN*, 2010 WL 383412

7  E.    AMENDED CERTIFICATION OF MARK BIZIK

8  F.    AMENDED CERTIFICATION OF TIM DUFFY

9  G.    AMENDED CERTIFICATION OF MARIT MEDNICK

10  H.    SUPPLEMENTAL CERTIFICATION OF TOM VAN DORN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GALL 270**

25

SALDATE000375

Exhibit 1G

1  Jon M. Sands
2  Federal Public Defender
   District of Arizona
3  Ashwin Cattamanchi (IL No. 6289199)
   Emma L. Smith (IL Bar No. 6317192)
4  Assistant Federal Public Defenders
5  850 West Adams Street, Suite 201
   Phoenix, Arizona 85007
6  Ashwin_Cattamanchi@fd.org
7  Emma_Smith@fd.org
   602.382.2816 Telephone
8  602.889.3960 Facsimile
9
                **IN THE UNITED STATES DISTRICT COURT**
10                 **FOR THE DISTRICT OF ARIZONA**
11  Michael Gallegos,                          No. CV 01-1909-PHX-NVW
12              Petitioner,
                                               DEATH-PENALTY CASE
13       vs.
                                               **Reply to Response to Motion to Hold**
14  Charles L. Ryan,                           **Habeas Proceedings in Abeyance, to**
                                               **Supplement Petition, and to Represent**
15              Respondent.                     **Petitioner in State Court Proceedings**
16

17        Petitioner Michael Gallegos respectfully moves this court: (1) to temporarily stay

18  and hold his federal habeas proceedings in abeyance while he pursues available state

19  court relief; (2) to allow him to supplement his habeas petition; and (3) to authorize his

20  federal habeas counsel to appear on his behalf in state court. In state court, Mr. Gallegos

21  seeks to pursue a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), based on newly

22  discovered impeachment evidence regarding the lead detective in this case,

23  Armando Saldate.

24        Respondent takes no position on Mr. Gallegos's request to have federal habeas

25  counsel appear on his behalf in state-court litigation. (ECF No. 135, Resp. at 23.)

26  Mr. Gallegos therefore relies on the arguments in his Motion on this issue.

27  (ECF No. 128, Mot. at 20–22.) Respondent objects to Mr. Gallegos's request for a

28  temporary stay and for amendment of his habeas petition. (Resp. at 2.) Respondent does

**GALL 271**                                          SALDATE000377

Exhibit 1G

1  not defend the misconduct or suppression that occurred in this case, but attempts to shift

2  the focus to Mr. Gallegos, arguing that he suffered no prejudice, that a federal claim

3  would be barred by AEDPA's statute of limitations, and that he delayed in bringing his

4  claim. For the reasons discussed below and in the Motion, this Court should reject

5  Respondent's contentions and grant Mr. Gallegos the requested relief.

6  **I.    A temporary stay of Mr. Gallegos's federal proceedings is appropriate.**

7        **A.    The relevant inquiry is whether Mr. Gallegos has satisfied
8              *Rhines v. Weber*, not whether he meets the standard for a stay of
             execution.**

9        The question before the Court is whether a stay of pending federal proceedings is

10  appropriate under *Rhines v. Weber*, 544 U.S. 269 (2005). Respondent seems to assert

11  that this is not the correct standard by attempting to distinguish *Gonzalez v. Wong*,

12  667 F.3d 965, 980 (9th Cir. 2011), where the *Rhines* standard was employed. (Resp. at

13  10.) This attempt is unavailing. Respondent emphasizes that the petitioner in *Gonzalez*

14  raised a *Brady* claim in state court and in his federal habeas petition, while

15  Mr. Gallegos did not. But the *Brady* claim that precipitated the *Rhines* stay by the Ninth

16  Circuit in *Gonzalez* was raised for the first time in motions for reconsideration from the

17  denial of the petitioner's habeas petition. *Id.* at 972, 978. It relied on both evidence that

18  had been previously considered by the state and newly discovered evidence. *Id.* at

19  978-89. Without deciding whether this was a new claim, the Ninth Circuit stayed the

20  case, noting that a "'new claim' inherently invites questions regarding exhaustion." *Id.*

21  at 979. The Court proceeded to apply *Rhines* and granted a stay. *Id.* at 980. The same

22  relief is warranted here, and *Rhines* is the appropriate inquiry.

23        Instead, Respondent contends that this Court should treat the instant motion as a

24  motion to stay an execution. (Resp. at 11.) The State, however, has not moved for a

25  warrant of execution in this case, making this standard inapplicable. Respondent argues

26  that Mr. Gallegos's request for a stay should be examined in light of a series of

27  equitable factors. *Rhines* itself incorporates equitable considerations, so Respondent's

28  imposition of additional criteria is inappropriate. *See Blake v. Baker*, 745 F.3d 977,

GALL 272                                2                           SALDATE000378

1  981–82 (9th Cir. 2014). Mr. Gallegos has met the *Rhines* standard, so a temporary stay

2  is warranted.

3  **B.    Mr. Gallegos has satisfied the *Rhines* standard.**

4  **1.    Mr. Gallegos has shown good cause for not exhausting his claim and has not engaged in intentionally dilatory litigation tactics.**

5  Because Respondent fails to appreciate the appropriate legal framework for the

6  requested stay, Respondent does not directly engage with all of the *Rhines* factors or

7  Mr. Gallegos's arguments that he has satisfied them. Mr. Gallegos therefore refers the

8  Court to the arguments in his Motion that he has good cause for failing to exhaust his

9  claim in state court and that he has not engaged in intentionally dilatory litigation

10 tactics. (Mot. at 8–9.) To the extent Respondent argues Mr. Gallegos has not shown

11 good cause because he could have subsequently returned to state court (Resp. at 10),

12 Mr. Gallegos notes that he could not have done so without authorization from this

13 Court. *See* Rep. of the Judicial Conf. Comm. on Def. Servs. to the Chief Justice of the

14 U.S. and Members of the Judicial Conf. of the U.S. 9–10 (Mar. 1999) (CR-DEFSVS-

15 MAR 99) ("Defender Services appropriation funds may not be used to represent an

16 individual under a state-imposed death sentence in a state proceeding unless a presiding

17 judicial officer in a federal judicial proceeding involving the individual has determined

18 that such use of Defender Services appropriation funds is authorized by law.").

19 **2.    Mr. Gallegos has a potentially meritorious *Brady* claim.**

20 Respondent argues that because this case is factually different from *Milke v.*

21 *Ryan*, 711 F.3d 998 (9th Cir. 2013), Mr. Gallegos cannot assert a potentially

22 meritorious *Brady* claim. (Resp. at 12–14.) The question is not if the facts of

23 Mr. Gallegos's case are identical to those of *Milke*, but rather whether "the

24 government's evidentiary suppression undermines confidence in the outcome of the

25 trial." *Id.* at 1018 (internal quotation marks and citation omitted). Respondent concedes

26 that Mr. Gallegos has satisfied the first two *Brady* prongs—that the evidence is

27 favorable to Mr. Gallegos and the prosecution failed to disclose it. He argues only that

28 Mr. Gallegos can show no prejudice. (Resp. at 13.) But in doing so, he completely

1    misconstrues Mr. Gallegos's prejudice argument.

2    First, Respondent argues that because Mr. Gallegos allegedly confessed to
3    Detective Chambers after Detective Saldate, there is no reasonable probability that the
4    trial court would have suppressed Mr. Gallegos's confession. (Resp. at 14.) This
5    argument fails because had the trial court suppressed Mr. Gallegos's statement to
6    Detective Saldate, it also would have suppressed his statement to Detective Chambers.
7    (Mot. at 13 n.4.) Once an accused asks for counsel, he may not be subject to further
8    interrogation "until counsel has been made available to him, unless the accused himself
9    initiates further communication, exchanges, or conversations with the police." *Edwards*
10   *v. Arizona*, 451 U.S. 477, 484–85 (1981). Here, the re-interrogation by
11   Detective Saldate with Detective Chambers present occurred after Mr. Gallegos
12   requested counsel. Counsel was not provided, and because Mr. Gallegos did not initiate
13   the subsequent interrogation, the second statement also violated his constitutional
14   rights. *See id.* at 485. Further, Detective Chambers's testimony did not, and could not,
15   speak to what occurred during the first interrogation, when only Mr. Gallegos and
16   Detective Saldate were present, and so could shed no light on the voluntariness of that
17   statement despite Respondent's assertion to the contrary. (Resp. at 14.) Finally, Mr.
18   Gallegos need not, as Respondent asserts, make a separate claim challenging the trial
19   court's finding that his confession was voluntary in order to make this argument. (Resp.
20   at 16.) The inquiry into the confidence in the trial court's suppression ruling in light of
21   the undisclosed impeachment evidence is part of the *Brady* inquiry. *See United States v.*
22   *Gamez-Orduño*, 235 F.3d 453, 461 (9th Cir. 2000).

23   Next, Respondent contends that because Mr. Gallegos testified at trial and did not
24   deny his confession, he suffered no prejudice. (Resp. at 15.) This argument ignores
25   Mr. Gallegos's prejudice arguments related to trial: If the impeachment evidence had
26   been disclosed, Mr. Gallegos would not have testified at trial. First, Mr. Gallegos would
27   not have testified if his statement was suppressed, of which there is a reasonable
28   probability as discussed above. (Mot. at 14–15.)

4                SALDATE000380

1    Second, even if Mr. Gallegos's statement had not been suppressed, he still would

2    not have testified. Defense counsel develops a trial strategy based on evidence that is

3    available. Relying on the State's misrepresentation that exculpatory evidence does not

4    exist, defense counsel "might abandon lines of independent investigation, defenses, or

5    trial strategies that it otherwise would have pursued." *United States v. Bagley*, 473 U.S.

6    667, 682 (1985). Mr. Gallegos's trial counsel developed a strategy based on an

7    understanding that Detective Saldate would testify at trial against Mr. Gallegos and that

8    this testimony could not be effectively impeached. Indeed, Detective Saldate had

9    testified at the voluntariness hearing, and the judge credited him over Mr. Gallegos.

10   Believing that he faced unassailable testimony by the case agent, trial counsel chose to

11   not contradict Detective Saldate at trial, but to attempt to mitigate the impact of his

12   testimony by having Mr. Gallegos testify. (Ex. I ¶ 7.) With the suppressed impeachment

13   evidence, Mr. Gallegos would have had no need to testify because Detective Saldate's

14   testimony could have been mitigated using that information instead. (Mot. at 15–16.)

15   Respondent does not address this aspect of Mr. Gallegos's prejudice argument, which

16   does not rely on the analysis of the prejudice suffered at the voluntariness hearing.

17       Without Mr. Gallegos's testimony at trial—either because his statement was

18   suppressed or because Detective Saldate's testimony could be attacked at trial with the

19   impeachment evidence—there is a reasonable probability that the jury would not have

20   found Mr. Gallegos guilty of first-degree murder because the State's other evidence

21   could be undermined. (*Id.*) Respondent misconstrues Mr. Gallegos's arguments about

22   the other evidence produced at trial. The purpose in noting the limitations of the DNA

23   evidence is to identify evidentiary weaknesses that are now relevant to Mr. Gallegos's

24   prejudice arguments. Regarding the DNA evidence found in the victim's rectum, the

25   stipulation was the only DNA evidence presented to the jury, and it did not tie that

26   DNA to Mr. Gallegos. (Ex. P.) Respondent does not contest this, but instead argues that

27   other evidence—namely Mr. Gallegos's testimony—tied him to the DNA. (Resp. at

28   17-19.) This interpretation renders the finding irrelevant to the current prejudice

**GALL 275**

5

SALDATE000381

Exhibit 1G

1    analysis, as Mr. Gallegos would not have testified if the impeachment evidence had

2    been properly produced. Regardless, Respondent's conclusion is not supported by the

3    language of the PCR court's finding, which explicitly discussed the State's evidence

4    introduced at trial in the context of the prejudice prong of a claim of ineffective

5    assistance of counsel:

6           As mentioned previously, the State's evidence was completely
            overwhelming: The Defendant confessed twice to two
7           different police detectives, and the DNA evidence in [the
            victim's] rectum linked to the Defendant was devastating to
8           the defense; all other evidence corroborated the Defendant's
            guilt.
9

10   (Ex. Q at 3.) Similarly, the lack of a reliable chain of custody regarding the victim's

11   underwear and the unsupportable procedures used by the State's DNA lab to determine

12   the statistical probabilities related to the DNA in the underwear support Mr. Gallegos's

13   argument that without his testimony, the State was left with only evidence that could be

14   easily questioned, thus undermining confidence in the outcome of the verdict. (Mot. at

15   14–15.)

16        Respondent does not respond to Mr. Gallegos's argument concerning the impact

17   of the *Brady* violation on his sentence and appeal. He therefore relies on that portion of

18   his Motion. (Mot. at 16–17.)

19        Instead of engaging with Mr. Gallegos's prejudice argument, Respondent largely

20   ignores it and fails to grapple with the impact that the suppressed impeachment

21   evidence regarding Detective Saldate would have had. With access to the staggering

22   impeachment evidence, Mr. Gallegos's statement either would have been excluded

23   from trial or he would not have testified and Detective Saldate's testimony would have

24   been impeached. The suppression impacted the finding that Mr. Gallegos's confession

25   was voluntary, the finding of guilt, the imposition of the death sentence, and the

26   upholding of those verdicts on appeal. Mr. Gallegos has therefore made a potentially

27   meritorious argument that the suppressed evidence was material because there can no

28   longer be confidence in either Mr. Gallegos's guilty verdict or sentence of death.

**GALL 276**                                    6                        SALDATE000382

1        **C.      Arizona Rule of Criminal Procedure 32.1 is an available state remedy.**

2              Respondent also argues that Mr. Gallegos's request for a stay should be denied

3   because of the "unlikelihood of obtaining relief in state court." (Resp. at 20.)

4   Respondent sets forth three reasons to support this assertion, all of which usurp the state

5   court's role as the arbiter of state law. The ultimate determination of whether

6   Mr. Gallegos has met the requirements of Rule 32.1(e), a question of state law, must be

7   answered by the state court. *See Binford v. Rhode*, 116 F.3d 396, 399–400 (9th Cir.

8   1997) (certifying question to Arizona Supreme Court on parameters of Rule 32 because

9   question of state law that must be answered by state court). *See generally R.R. Comm'n*

10  *of Tex. v. Pullman Co.*, 312 U.S. 496, 499–501 (1941) (holding that federal finding of

11  state law would be "a forecast rather than a determination"); *City of Chicago v.*

12  *Fieldcrest Dairie*s, 316 U.S. 168, 172–73 (1942) (same); *Taylor v. Maddox*, 366 F.3d

13  992, 999 (9th Cir. 2004) (explaining that federal court should not substitute judgment

14  for that of state court). The only question to be answered in this Court is whether an

15  avenue for relief in state court remains available to Mr. Gallegos.

16              None of Respondent's arguments support a finding that Rule 32.1(e) is

17  unavailable to Mr. Gallegos. First, Respondent asserts that Mr. Gallegos faces a

18  procedural bar to pursuing relief in state court because of a lack of diligence in bringing

19  the claim. There is, however, no bright-line time limit for diligence under Rule 32.1(e).

20  Arizona modified this rule in 1956, expressly eliminating the previous one-year statute

21  of limitations and replacing it with the existing diligence requirement that "will prevent

22  abuse of process, *e.g.*, a prisoner's lying-in-wait until an essential prosecution witness

23  dies, but avoids setting a specific time limit." ARIZ. R. CRIM. P. 32.1 cmt. [Amended

24  2007]. This analysis necessarily is a highly fact intensive one, not determined merely by

25  length of time. For example, in *State v. Bilke*, 781 P.2d 28, 28–30 (Ariz. 1989), a PTSD

26  diagnosis was accepted as "newly discovered evidence" under Rule 32.1(e) even though

27  it came 13 years after the conviction.

28              Mr. Gallegos has not engaged in any abuse of the process and has made a

**GALL 277**                                    7                        SALDATE000383

1    sufficient showing to support a state court finding of diligence. The *Brady* material was
2    not disclosed to Mr. Gallegos, and when the State withholds evidence, it is telling the
3    defense that "the evidence does not exist." *Bagley*, 473 U.S. at 682. The Ninth Circuit's
4    decision in *Milke* was the first published court decision undersigned counsel is aware of
5    outlining the impeachment material regarding Detective Saldate. The opinion did not
6    mention Mr. Gallegos, but after its release he took steps to discover more information
7    about Detective Saldate. (Mot. at 9.) When these avenues did not prove fruitful, he
8    promptly filed a motion in the Ninth Circuit—the court with jurisdiction over his
9    case—seeking a stay of his federal proceedings so he could return to state court to
10   pursue his *Brady* claim. *Gallegos v. Ryan*, No. 08-99029, ECF No. 57-1 (9th Cir.
11   Mar. 14, 2014). Therefore, Mr. Gallegos diligently pursued evidence of a *Brady*
12   violation and swiftly brought the claim in the Ninth Circuit and then in this Court on the
13   day the mandate issued and the Court regained jurisdiction. The state court could
14   therefore find that Mr. Gallegos acted with diligence under Rule 32.1(e).

15          Next, Respondent argues that Rule 32.1(e) is unavailable because the claim would
16   fail on the merits because newly discovered evidence "would not probably have
17   changed the verdict or sentence." (Resp. at 21.) As discussed above, this argument is
18   unavailing, and Mr. Gallegos has presented a potentially meritorious *Brady* claim.

19          Respondent finally argues that the claim would fail on the merits because the
20   suppressed evidence would not be admissible under Arizona Rule of Evidence 608, so
21   its exclusion cannot be prejudicial. (Resp. at 21.) The Ninth Circuit rejected this
22   argument in *Milke*. 711 F.3d at 1009 (finding that even if evidence of perjury had not
23   been admissible, it "would still have been valuable" as a "good-faith basis for
24   questioning Saldate about prior instances where he had lied on the stand" and that
25   excluding court orders documenting Detective Saldate's violation of defendants'
26   constitutional rights would be due-process violation). Furthermore, impeachment
27   evidence need not be admissible in order to be material under *Brady. See Paradis v.
28   Arave*, 240 F.3d 1169, 1179 (9th Cir. 2001).

**GALL 278**                                  8                        SALDATE000384

1    Mr. Gallegos has presented a potentially meritorious *Brady* claim that is

2    cognizable under Rule 32.1(e). *See State v. Muldrow*, No. 2 CA-CR 2015-0452-PR,

3    2016 WL 538327 (Ariz. Ct. App. Feb. 11, 2016) (deciding on the merits *Brady* claim

4    under Rule 32.1(e) based on impeachment evidence regarding Detective Saldate). He

5    has shown that a state remedy remains available, and a stay is therefore appropriate to

6    allow Mr. Gallegos to pursue that relief.

7    **D.    Mr. Gallegos's claim is timely, and a stay is not futile.**

8    Respondent asserts that Mr. Gallegos's request for a temporary stay should be

9    denied as futile "primarily because of the untimeliness of the new claim." (Resp. at 2.)

10   As an initial matter, even accepting Respondent's position that Mr. Gallegos's federal

11   claim is untimely, a stay still would not be futile. To the contrary, if Mr. Gallegos

12   prevailed in state court, then further federal proceedings on the remanded *Martinez*

13   issue would be avoided in this Court. The stay would therefore conserve judicial

14   resources and prevent simultaneous litigation in two forums.[1]

15   Mr. Gallegos's claim is, however, timely. As Respondent recognizes, the

16   timeliness inquiry is dictated by 28 U.S.C. § 2244(d)(1)(D), and Respondent argues that

17   Mr. Gallegos has known about the State's *Brady* violation at least since the *Milke*

18   opinion. (Resp. at 8.) Respondent is correct—the *Milke* opinion is the date the *Brady*

19   material "could have been discovered through the exercise of due diligence."

20   § 2244(d)(1)(D). Respondent asserts that Mr. Gallegos has failed to make his claim

21   within one year from that date. But, Mr. Gallegos filed his motion in the Ninth Circuit

22   raising the *Brady* claim within the one-year deadline. The Ninth Circuit, and not this

23   Court, had jurisdiction over Mr. Gallegos's case at that time. *See United States v. Pete*,

24   525 F.3d 844, 853 (9th Cir. 2008) (noting that appellate decision is not final until

25

26   [1] Mr. Gallegos requests that even if the Court denies his request for a stay that it still
     authorizes his federal habeas counsel to represent him in state court. Although
27   simultaneous litigation in two forums would be less efficient, Mr. Gallegos would wish
     to pursue his rights in state court even absent a stay of his federal case. Respondent has
28   taken no position on Mr. Gallegos's request to be represented in state court by current
     counsel. (Resp. at 23.)

SALDATE000385

Exhibit 1G

1    mandate issues, at which point jurisdiction returns to district court); *United Nat'l Ins.*
2    *Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1109 (9th Cir. 2001) ("Once a notice of appeal
3    takes effect, the district court loses jurisdiction over the matter placed before the
4    appellate court."). The claim was therefore timely filed. *See Douglas v. Workman*,
5    560 F.3d 1156, 1187 (10th Cir. 2009) (treating a *Brady* claim discovered and raised
6    while the appeal was pending as a supplement to the petitioner's original § 2254
7    petition); *cf. Goodrum v. Busby*, 824 F.3d 1188, 1194–95 (9th Cir. 2016) (holding new
8    claims brought by pro se petitioner in court of appeals, before petition has been finally
9    adjudicated, should be treated as motion to amend petition).

10        Alternatively, if the Court does not view Mr. Gallegos's motion in the Ninth
11   Circuit as his filing the *Brady* claim, then the motion equitably tolled the limitations
12   period. *See generally Holland v. Florida*, 560 U.S. 631, 645 (2010). Mr. Gallegos could
13   not have filed a motion to amend in district court following the *Milke* decision any
14   sooner than he did. He brought his *Brady* claim to the court with jurisdiction at the time
15   and thereafter appropriately waited for the Ninth Circuit to rule on his motion before
16   filing in this Court. The time his motion was pending in the Ninth Circuit therefore was
17   an extraordinary circumstance beyond his control that prevented Mr. Gallegos's earlier
18   filing of his motion to amend in the district court. *See Smith v. Ratelle*, 323 F.3d 813,
19   819 (9th Cir. 2003) (noting extraordinary circumstances must be present for equitable
20   tolling); *cf. Sossa v. Diaz*, 729 F.3d 1225, 1235 (9th Cir. 2013) (holding that petitioner's
21   reliance on magistrate judge order extending deadline for filing past statute of
22   limitations period entitled him to equitable tolling); *Ramirez v. Yates*, 571 F.3d 993, 997
23   (9th Cir. 2009) (holding that petitioner's "lack of knowledge that the state courts have
24   reached a final resolution of his case can provide grounds for equitable tolling").
25   Because Mr. Gallegos filed the instant motion in this Court the day the mandate issued,
26   no further time ran after these extraordinary circumstances ended. The claim is thus
27   timely under either construct of the effect of Mr. Gallegos's motion in the Ninth Circuit.
28        Respondent instead argues that Mr. Gallegos should have known about the

**GALL 280**                              10                          SALDATE000386

1   suppressed *Brady* material in 2009 because a footnote in a Ninth Circuit brief in another

2   case said that "Detective Saldate has been repeatedly accused of improper behavior and

3   coercive interrogation." (Resp. at 8.) Respondent cites no authority for the proposition

4   that Mr. Gallegos should be imputed knowledge of what occurred in other cases that

5   were handled by different attorneys, even if they were also federal public defenders.

6   *Cf. United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991) (rejecting argument that

7   public defender could be "charged with the knowledge of" the criminal record of a

8   defendant represented by a co-worker, the suppression of which was a potential *Brady*

9   violation, and recognizing that no authority was cited for the proposition to the

10  contrary). Such a requirement would be impracticable. The footnote Respondent cites

11  was in the statement of facts section of the opening brief on appeal. *See Runningeagle v.*

12  *Ryan*, No. 07-99026, ECF No. 22, at 18 n.18 (9th Cir. Nov. 25, 2009). The information

13  about Detective Saldate was included in the federal habeas petition, filed before the

14  case was assigned to the Federal Public Defender's Office, in the context of a

15  non-*Brady* claim that the state court found precluded. *See Runningeagle v. Stewart*,

16  No. CIV 98-1903-PHX-PGR, ECF No. 18, at 51–55 (D. Ariz. Apr. 15, 1999); *Arizona*

17  *v. Runningeagle*, No. CR 87-11508, ECF No. 451 (Ariz. Sup. Ct. Oct. 21, 1996). It was

18  therefore defaulted in federal court, so there was never a merits ruling on the claim.

19  *See Runningeagle v. Schriro*, No. CV-98-1903-PHX-PGR, ECF No. 108, at 10

20  (D. Ariz. Mar. 10, 2006); *id.*, ECF No. 90, at 20–22 (D. Ariz. Feb. 6, 2004). Accepting

21  Respondent's position would mean that every federal public defender is required to

22  have knowledge of the facts of every case in the office and the evidence supporting

23  even defaulted claims. Section 2244(d) requires reasonable diligence; it does not require

24  "the maximum feasible diligence." *Moore v. Knight*, 368 F.3d 936, 938 (7th Cir. 2004)

25  (internal quotation marks and citation omitted).

26      Perhaps most importantly, Respondent's suggested timeliness analysis would

27  penalize Mr. Gallegos for the State's *Brady* violation. *Brady* imposes a duty on the

28  State, and Mr. Gallegos is not required to seek information that the State has told him

11

1  does not exist. S*ee Carter v. Bigelow*, 787 F.3d 1269, 1282 (10th Cir. 2015) (noting that

2  "due diligence did not require [petitioner] to divine all possible sources of suppressed

3  evidence; he was entitled to rely on the state's representation" that all exculpatory

4  evidence had been disclosed); *Jefferson v. United States*, 730 F.3d 537, 546 (6th Cir.

5  2013) ("[T]he government's position that Jefferson failed to exercise due diligence

6  because he did not seek information 'the very existence of which the [government] had

7  improperly withheld in violation of *Brady* . . . is fundamentally at odds with *Brady*

8  itself.'" (alterations in original)). Respondent's argument instead would mean that "'the

9  prosecution can lie and conceal and the prisoner still has the burden to . . . discover the

10  evidence,' . . . A rule thus declaring 'prosecutor may hide, defendant must seek,' is not

11  tenable in a system constitutionally bound to accord defendants due process." *Banks v.*

12  *Dretke*, 540 U.S. 668, 696 (2004) (internal citations omitted). The evidence was never

13  disclosed in this case,[2] and Respondent's position effectively absolves the State from

14  complying with *Brady* in cases like Mr. Gallegos's where a relevant *Brady* violation has

15  been discovered in another case. Ms. Milke's team found the suppressed evidence after

16  7,000 hours of searching through state court records, which is more than due diligence

17  requires despite Respondent's assertion. (Resp. at 9.) *See Milke*, 711 F.3d at 1017–18.

18  Respondent now seeks to use this discovery, and Mr. Runningeagle's reliance on

19  Ms. Milke's efforts, to excuse the State from having failed to disclose the evidence to

20  Mr. Gallegos and to preclude Mr. Gallegos from holding the State accountable for its

21  constitutional violation. *Cf. Shelton v. Marshall*, No. C 10-01100 PJH, 2012 WL

22  [2] Respondent argues that *Brady* does not apply to post-conviction proceedings, relying
23  on *Dist. Atty's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009).
*Osborne*, as well as *Jones v. Ryan*, 733 F.3d 825 (9th Cir. 2013), are distinguishable
24  because they did not involve the pre-trial suppression of material exculpatory evidence
that extended into post-conviction proceedings. And courts have held that the State's
25  obligation to disclose exculpatory evidence that was suppressed prior to trial extends
past trial. *See Whitlock v. Brueggemann*, 682 F.3d 567, 587–88 (7th Cir. 2012)
26  (rejecting argument that *Osborne* held that *Brady* does not require State to disclose
throughout judicial proceedings exculpatory evidence available at time of trial);
27  *Douglas*, 560 F.3d at 1173. Moreover, the Arizona Supreme Court has held that the
State has "an ethical and constitutional obligation to disclose clearly exculpatory
28  material that comes to its attention after the sentencing has occurred." *Canion v. Cole*,
115 P.3d 1261, 1262 (Ariz. 2005) (en banc).

1   2203022, at *9 (N.D. Cal. June 14, 2012) (holding that due diligence under § 2244(d)

2   did not require petitioner to monitor co-defendant's habeas filings that raised relevant

3   *Brady* claim and contrasting situation to hypothetical one where State had notified

4   petitioner after discovery of suppressed evidence in co-defendant's case and petitioner

5   had then failed to raise claim). Accepting Respondent's argument would forgive the

6   State of its *Brady* obligation and instead impose a duty on criminal defendants.

7          Mr. Gallegos agrees with Respondent that a hearing on the issue of timeliness is

8   not necessary. (Resp. at 3.)

9   **II.    The requested amendment is warranted under Federal Rule of Civil**

10          **Procedure 15 and is not futile.**

11          Respondent argues that Mr. Gallegos's motion to amend his habeas petition to

12   include his *Brady* claim is futile because the claim is time-barred and will fail in state

13   court under Rule 32. (Resp. at 4.) As discussed above, Mr. Gallegos's claim is timely

14   and so can be added to his petition. Additionally as discussed above, Mr. Gallegos has

15   presented a potentially meritorious *Brady* claim, meaning amendment would not be

16   futile.

17          Respondent finally argues that amendment should be denied because

18   Mr. Gallegos unduly delayed bringing his claim. Respondent asserts that Mr. Gallegos

19   could have sought amendment in 2009 based on the footnote in the opening brief on

20   appeal in *Runningeagle*. (Resp. at 5.) As discussed above, this position is flawed.

21   Mr. Gallegos filed a motion in the Ninth Circuit raising his *Brady* claim soon after the

22   impeachment evidence was disclosed in *Milke* and after efforts to investigate the claim.

23   He cannot be faulted for the time that elapsed while the State violated its *Brady* duty,

24   and he diligently pursued his rights after information exposing that violation was

25   available. Furthermore, Mr. Gallegos could not have filed an amended petition in this

26   Court any sooner than he did. The Ninth Circuit had jurisdiction over Mr. Gallegos's

27   case starting in 2008 when Mr. Gallegos filed his Notice of Appeal. (ECF No. 115.)

28   *See United Nat'l Ins. Co.*, 242 F.3d at 1109. This Court therefore could not have

**GALL 283**

13

SALDATE000389

Exhibit 1G

1   entertained a motion to amend Mr. Gallegos's petition. The same day that jurisdiction
2   was restored in this Court, Mr. Gallegos filed the instant motion seeking to amend his
3   petition. Nor could Mr. Gallegos have filed a petition under Rule 32 in state court
4   before this Court authorized counsel to do so. *See* Rep. of the Judicial Conf. Comm. on
5   Def. Servs. to the Chief Justice of the U.S. and Members of the Judicial Conf. of the
6   U.S. 9–10 (Mar. 1999) (CR-DEFSVS-MAR 99). He has therefore acted diligently in
7   bringing his timely *Brady* claim.

8        Mr. Gallegos notes that Respondent mistakes his argument that amendment is
9   proper under Federal Rule of Civil Procedure 15. Mr. Gallegos did not make any
10  argument about an "interests of justice exception" akin to a showing of actual
11  innocence. (Resp. at 22.) Instead, he quoted the standard for an amendment under Rule
12  15—that it should be "freely granted *when justice so requires*." FED. R. CIV. P. 15(a)(2)
13  (emphasis added). (Mot. at 19.) Mr. Gallegos stands by his argument in his motion that
14  amendment is proper because he has presented a timely, potentially meritorious claim
15  that could not have been previously pursued and has therefore never been adjudicated
16  by any court. Leave to amend lies within the discretion of this Court and should be
17  granted with "extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d
18  1048, 1051 (9th Cir. 2003); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027,
19  1038–39 (9th Cir. 2002) ("It is not unreasonable that plaintiffs may seek amendment
20  after an adverse ruling, and in the normal course district courts should freely grant leave
21  to amend when a viable case may be presented."); *Douglas*, 560 F.3d at 1187 (treating a
22  *Brady* claim raised while appeal was pending as a supplement to the petitioner's
23  original § 2254 petition).

24  **III.   Conclusion**

25       For the reasons stated in the Motion and above, Mr. Gallegos requests that this
26  Court stay his federal habeas proceedings, allow him to amend his habeas petition to
27  include his potentially meritorious *Brady* claim, and authorize his federal habeas
28  counsel to represent him in ancillary state court litigation. Mr. Gallegos requests that

1    even if his requested stay and amendment are denied that current counsel still be

2    authorized to represent him in state court.

3           Respectfully submitted this 25th day of January 2017.

4                                              Jon M. Sands
5                                              Federal Public Defender
                                               District of Arizona
6

7                                              Ashwin Cattamanchi
                                               Emma L. Smith
8                                              Federal Public Defenders

9
                                               s/ Emma L. Smith
10                                             Counsel for Petitioner

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GALL 285**                    15                    SALDATE000391

Exhibit 1G

1

**Certificate of Service**

2       I hereby certify that on January 25, 2017, I electronically filed the foregoing

3   Reply to Response to Motion to Hold Habeas Proceedings in Abeyance, to Supplement

4   Petition, and to Represent Petitioner in State Court Proceedings, with the Clerk's Office

5   by using the CM/ECF system. I certify that all participants in the case are registered

6   CM/ECF users and that service will be accomplished by the CM/ECF system.

7
8   s/ Haily Perkins
    Assistant Paralegal
9   Capital Habeas Unit

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

SALDATE000392

Exhibit 1G



# <u>Gallegos</u>

# <u>documents</u>

*Milke v. City of Phoenix et. Al*



Milke: Gallegos documents