1-13

Sunday 0553

VICTIM: WILLIAMS, HERBERT L. N

W M [redacted]

2425 E. Sahuaro Drive [redacted] 0745

Employer: retired

If death, name of next of kin: DARREL WILLIAMS 9810 N. 37 St 996-5513 996-4872

DR #: 87-155451

HOMICIDE

Address of occurrence: 2425 E. Sahuaro Drive

DR #: 87-155451

Date & time occurred: 12-6-87 0553 hrs

Type of report: HOMICIDE

Suspect: SEE BELOW

Witness or investigative leads:

Cross Index:

1. Homicide 87-155451A
WILLIAMS, JACQUELINE, W/F, [redacted]
2425 E. Sahuaro Drive
12-6-87 0553 hrs

2. Burglary 87-155449
DAVIS, ROBERT J.
2431 E. Sahuaro Drive, 867-3480
12-6-87

3. Attempt Burglary 87-155469
BOURSELL, JACK
2437 E. Sahuaro
12-6-87 0030-0830 hrs

Dissemination is restricted to Criminal Justice Agencies ONLY Secondary Dissemination to Non C. J. Agencies is PROHIBITED. Phx. PD Date: 8-12-13
M. Meislish
Co Atty

EXHIBIT 64
WIT: Saldate
DATE: 11-15-17
Sommer Greene, RPR, CRR

| Officer writing report | Beat | Date & time typed | Clerk | DR # |
|---|---|---|---|---|
| DET. SALDATE | C313 | 12-8-87 0807 A1724 GIB | | 87-155451 |

CITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

MISCELLANEOUS COMPLAINT OR CRIME REPORT
80-18A NEW 2-78

| TYPE OF REPORT<br>HOMICIDE | DATE OF SUPPLEMENT<br>12-6-87 | DR #<br>87-155451 |
|---|---|---|
| VICTIM'S NAME<br>WILLIAMS, HERBERT | LOCATION OF OCCURRENCE<br>2425 E. SAHUARO DRIVE | |
| OFFICER WRITING REPORT'S #<br>DET. SALDATE #1875 | SUPPLEMENT #<br>87155451.DOC/ORIGINAL | |
| DATE & TIME TYPED<br>12-8-87 0915 | BUREAU<br>GIB | CLERK<br>A1724 |

Victim's Injuries: 1. Five (5) stab wounds to chest and back. Also blunt force injury to the head.

Mortuary: Altmans Mortuary
6812 E. Thomas, 947-9244

I-Bureau: No record

Victim's Personal Property: 1. Victim's wallet (impounded)

County Attorney: 1. PAUL AHLER 256-5780
Major Felony Bureau

Suspect #1: W/M, 16 to 19 years, 6' to 6'2", lean built, dark conservative cut hair
Clothing: Dark windbreaker, lighter colored shirt, shirt tail hanging out the back and dark pants

Suspect #2: W/M, 16 to 19 years, 5'9", 170#, dark conservative cut hair
Clothing: Dark jacket, possibly a windbreaker and dark pants

Suspect Vehicle: White full-size vehicle, N.F.D.

Witness #1: [redacted] A.
2417 E. Sahuaro Drive, 971-8715
Retired
(Observed suspect forcibly entering victim's home, called police, supplied suspect information)
Interviewed by DET. J. RAINES

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE 1875 | 87-155451 |

IL #1: DAVIS, ROBERT
2431 E. Sahuaro Drive, 992-3403
(Victim of burglary, supplied no further information)
Interviewed by DET. T. MORALES

IL #2: BOURSELL, JACK
2437 E. Sahuaro Drive
Victim of attempt burglary, supplied no further information)
Interviewed by OFF. BELCHER

IL #3: BOUERMAN, FLORENCE
2418 E. Sahuaro, 992-9427
(Was awakened by noise at approximately 6:00 AM, did not investigate. Had no further information)
Interviewed by DET. J. RAINES

IL #4: SEAPPATICA, ANGELO
W/M, 82 years
2410 E. Sahuaro, 971-5326
(Heard banging noise, looked out. Saw light colored vehicle parked in front of victim's home, and no further information)
Interviewed by DET. J. RAINES

IL #5: POPICK, JAMES
W/M, [redacted]
[redacted], 971-2600
[redacted]611 hrs, newspaper had arrived, saw nothing.)
Interviewed by DET. A. SALDATE

IL #6: WILLIAMS, DARREL
W/M[redacted]
981[redacted] Street, 996-4872 / 996-5513
(Assisted victim with carport sale on Saturday, 12-5-87. Arrived on 12-6-87 to find police. Is also nephew to victim.)
Interviewed by DET. A. SALDATE

Stolen Property: 1. Cardboard shoe box, N.F.D. containing proceeds from previous day's carport sale, approximately $50 (including one $10 check from unknown person)

Evidence: See Evidence Impound

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE 1875 | 87-155451 |

**Fire Personnel:** Engine 27
FRED EFFER - Paramedic
(Determined victims were dead)

**Uniform Officers:**

1. OFFICER D.T. BURRY #2954
600 District/Uniform Patrol
(First to arrive on scene, entered residence, discovered victims)

2. OFFICER G.P. SHAY #2769
600 District/Uniform Patrol
(Arrived shortly after OFFICER BURRY, entered residence, discovered victims along with OFFICER BURRY)

3. OFFICER R. BELCHER #4353
600 District/Uniform Patrol
(Secured residence, placed crime scene tape around scene)

4. SGT. L. JACOBS #3829
600 District/Uniform Patrol
(First supervisor on scene)

5. LT. J. WATSON #1881
600 District/Uniform Patrol
(Senior uniform supervisor on scene)

**Latent Print Examiners:**

1. RON DAVIS #A348
Crime Lab/Latent Section
(Processed and photographed scene)

2. MARK HATCHER #a2863
Crime Lab/Latent Section
(Processed and photographed scene)

3. GARY STONE #A2842
Crime Lab/Latent Section
(Processed and photographed scene)

**Detectives:**

1. ARMANDO SALDATE #1875
Homicide Detail/General Investigations Bureau
Case Agent

2. JAMES RAINES #1624
Homicide Detail/General Investigations Bureau
Assistant Case Agent

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE 1875 | 87-155451 |

3. LARRY MARTINSEN #1336
Homicide Detail/General Investigations Bureau
Scene Processor

4. RUSS DAVIS #2181
Homicide Detail/General Investigations Bureau
Assistant Scene Processor

5. SGT. TIM BRYANT #1726
Homicide Detail/General Investigations Bureau
Case Supervisor

Attachments:
1. D.R. 87-155449 - Burglary
2. D.R. 87-155469 - Attempt Burglary
3. D.R. 87-155451A - Homicide

---

On 12-6-87 at approximately 0635 hrs, HERBERT WILLIAMS, W/M, 71 years, and his wife, JACQUELINE WILLIAMS, W/F, 59 years, were found in their home at 2425 E. Sahuaro Drive, dead from apparent stab wounds to their chests and blunt force injuries to their heads. The suspects are currently unknown, however, a witness did provide a limited description on two white males that were seen forcing entry into the victims' home.

On 12-6-87, at approximately 0745 hrs, I was called at my home by SGT. TIM BRYANT and directed to proceed to 2425 E. Sahuaro Drive to assist in this homicide investigation. Upon my arrival, uniform officers had the entire home at 2425 E. Sahuaro Drive secured with crime scene tape. Present at the scene were SGT. BRYANT, DET. LARRY MARTINSEN, DET. RUSS DAVIS and several uniform officers and supervisors. Upon the arrival of DET. JIM RAINES, a briefing was held as to the involvement of uniform officers. SGT. BRYANT then directed DET. MARTINSEN and DET. DAVIS as scene processors, and directed DET. RAINES and myself as the follow-up investigators. The following is the result of the preliminary investigation held at the scene.

At approximately 0915 hrs, DET. RAINES contacted JANIS SNITKE. JANIS, who lives directly west of the victim's residence, said he was awakened shortly before 6:00 AM by loud noises. He said that he then looked out of his window and noticed a large white vehicle parked in front of his residence, facing eastbound with an open rear trunk. He also observed the back of a white male suspect standing over the trunk. At this time, he then turned his attention back towards the victims' home and noticed a white male attempting to force entry into the victim's carport door. He also believes he heard a male subject saying something to the effect of "bring him back in." He then called 911 and requested the police to respond.

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE 1875 | 87-155451 |

After several minutes, he again looked outside and noticed that the suspect vehicle had already left. He continued to wait for police to arrive and later had his wife again call for the police to respond. After the arrival of police, he supplied the first units on the scene with the suspect and suspect vehicle description.

During follow-up investigation at the scene, ROBERT DAVIS of 2431 E. Sahuaro Drive was contacted. MR. DAVIS' home is located directly east of the victims' home and he told officers that sometime during the night, he had been the victim of a burglary inside his garage where burglars removed tools and ate some food items from his freezer. He also told officers that a new 10 speed bicycle was missing from inside his garage and that two 4-barrel carburetors and the air scoop had been removed from a 1972 Dodge Charger that was parked in his driveway that belonged to his son. MR. DAVIS had no knowledge of the homicide next door until he was contacted by officers.

Officers also contacted JACK BOURSELL at 2437 E. Sahuaro. JACK advised officers that he had been the victim of an attempted burglary sometime during the night, and that the suspects attempted to get into his front kitchen window by removing the window screen. JACK said that he did not believe entry was made inside his home, however, a report was taken and the area was dusted for fingerprints.

At approximately 0843 hrs, I contacted DARREL WILLIAMS upon his arrival at 2425 E. Sahuaro Drive. DARREL identified himself as the nephew to the victims HERBERT and JACQUELINE WILLIAMS. DARREL said he had arrived at the home to continue the second day of a carport sale that he had been helping his uncle HERBERT WILLIAMS with at the home. DARREL told me that he had no idea of who could have possibly murdered his aunt and uncle and said to the best of his knowledge, they had not had any disputes with anyone. DARREL said he would contact the rest of the family members, and at this point the family had no preference as to a mortuary but would contact police if the situation changed.

Contact was also made with FLORENCE BOUERMAN at 2418 E. Sahuaro, who told police that she was awakened by some loud noises at approximately 6:00 AM, however, she did not investigate and was not aware that anything had occurred until she saw police in the area.

ANGELO SEAPPATICA, who was contacted at 2410 E. Sahuaro, also said he heard banging noises at approximately 6:00 AM and looked out his residence and noticed a light colored vehicle parked in front of the victims' home. He said he did not investigate further and did not become aware that something had occurred until police arrived.

JAMES POPICK, who lives directly across the street from the victims, at 2426 E. Sahuaro Drive, said he left for work at exactly 0611 hrs and noticed that the newspaper was in his driveway. He said he looked around and noticed nothing out of the ordinary and then continued to work.

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE 1875 | 87-155451 |

DET. MARTINSEN, who was the scene processor, then provided DET. RAINES and myself a walk-through of the scene. The scene consisted of a single story block home which was on the south side of Sahuaro and faced north. The bodies of HERBERT and JACQUELINE WILLIAMS were observed on the floor of the washroom on the south end of the carport. DET. MARTINSEN indicated that his preliminary examination revealed that both victims had apparently been stabbed. Later, DET. MARTINSEN examined the bodies closer before they were removed to the Medical Examiner's and established that the victims were not only stabbed, but were both struck about the face and head areas.

DET. MARTINSEN then pointed out several items of evidence, including several shoe prints in the carport area and kitchen area and also on the carport door. We also observed a hole in the carport door directly below the door knob which appeared to have been forcibly made.

The victims' bodies were later removed from the scene by Altmans Mortuary and delivered to the Medical Examiner's Office for their examination. For further details in regards to specific interviews and the scene investigation, see individual supplements.

Investigation Continuing.

80-1010
REV. 8/85

CITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

LATENT PRINT
COMPARISON SUPPLEMENT

| 1. DATE & TIME | 2. TYPE OF REPORT | 3. LOCATION OF OFFENSE | 4. DR # |
|---|---|---|---|
| 0915 12-18-87 | HOMICIDE | 2425 E. SAHAURO | 87-155451 |

COMPARE PRINTS OF THE FOLLOWING PERSON(S) WITH LATENT IMPRESSIONS OBTAINED IN THIS D.R.

SIGNATURE ______ (OFFICER MAKING REQUEST)

DIV. OR SECTION GIB - HOMICIDE EXT. ______

FOR LABORATORY BUREAU USE ONLY

| LAST NAME | FIRST | MIDDLE | P.P.D. NO. OR PHYSICAL DESCRIPTION | FINGERPRINT CLASSIFICATION |
|---|---|---|---|---|
| EAGLE, | SEAN | BERNARD | [redacted] | 19 M 17 W II O 17 PP's / L 3 W MOO 19 |

*Do NOT write below this line — for Laboratory Bureau use only*

RESULTS: "Preliminary Exam"
One latent print on lift #1 marked, front of Dryer, has been identified as the right palm impression of Sean Bernard Eagle.

DATE 12-18-87 TIME 0920

Rubie L. Rosa, A3518
SIGNATURE OF LATENT PRINT EXAMINER FC 12-18-87

RUN 008

001014
MILKE_NSB001177

Exhibit 1H

| VALUE OF PROPERTY RECOVERED OR ADDITIONAL PROPERTY TAKEN | TYPE OF REPORT | DATE OF THIS SUPPLEMENT | DR. # |
|---|---|---|---|
| | HOMICIDE | 12-20-87 | 87-155451 |
| | VICTIM'S NAME | LOCATION OF OCCURRENCE | |
| | WILLIAMS, HERBERT | 2425 EAST SAHUARO | |

Suspect: ANTONE, ORVA ASHLEY - I/M, [redacted]
5', 120, blk., bro.
Rt. 1, Box 410, Scottsdale, Az.
Unemployed
Mother: VERA RICHARDS, 300 N. Stapley, Mesa

IL's:

| | | |
|---|---|---|
| SGT. ANDREWS | | Salt River Indian Reservation Police |
| OFF. L. LOPEZ | | Salt River Indian Reservation Police |
| OFF. K.N. PROCUNIER | #4014 | PPD |
| OFF. G.F. WAGONER | #4249 | PPD |

On 12-19-87 at approximately 7:10 p.m., myself and DET. JIM RAINES met with ORVA ANTONE at his residence at Route 1, Box 410, Scottsdale, Arizona. This location is on the Salt River Indian Reservation and we were accompanied by OFF. L. LOPEZ of the Salt River Indian Police. ORVA ANTONE had been contacted after his name had previously surfaced in interviews of ELEANOR, LOUISA, and CHERYL SIVERTSEN.

Prior to meeting with ORVA ANTONE at his residence, we had contacted SGT. ANDREWS of the Salt River Indian Police. SGT. ANDREWS had assigned OFF. LOPEZ to assist us in locating ORVA and his residence. When contact was made with ORVA at his residence, he stepped outside to talk to us. He was advised at that time we were investigating the homicide that happened approximately two weeks ago and had learned that he knew of it. We told him that we did not know his particular involvement and it was possible he was a witness. ORVA ANTONE was asked if he wanted to accompany us down to our police station to talk about this incident. MR. ANTONE was quite cooperative and volunteered to accompany us to 620 W. Washington in Phoenix.

Prior to leaving the Salt River Indian Reservation with ORVA ANTONE, he directed us to his parents residence at 300 N. Stapley in an attempt to locate his brother, MILFORD ANTONE. MILFORD's name had also surfaced from the same sources. We could not locate MILFORD and we proceeded to transport ORVA to our police station.

During the trip from the Salt River Indian Reservation to the Phoenix Police main station, ORVA was not questioned about this homicide and was not advised of his Miranda. Upon arrival at the Phoenix Police main station, ORVA was turned over to DET. LARRY MARTINSEN and DET. ARMANDO SALDATE to be interviewed.

After the interview was completed by DET. MARTINSEN and SALDATE, ORVA was turned back over to DET. RAINES and myself. ORVA was then transported to the first floor of the main police station where he was turned over to OFF. WAGONER, #4249, and OFF. PROCUNIER, #4014. OFF. WAGONER was instructed to administer a GCI test on ORVA ANTONE. He was also instructed to obtain an extra sample for the defense. OFF. WAGONER was also instructed to obtain 35mm photographs

| PAGE # | OFFICER ON THIS REPORT | DATE & TIME TYPED | DR. # |
|---|---|---|---|
| 1 | DET. R.E. DAVIS 2181 | 12-20-87 1130 GIB a2831 | 87-155451 |
| CONT'D ON PAGE 2 | | | |

CITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

SUPPLEMENTARY
80-7A REV 1-82

RUN 009

001020
MILKE_NSB001183

Exhibit 1H

VALUE OF PROPERTY RECOVERED OR ADDITIONAL PROPERTY TAKEN

TYPE OF REPORT: HOMICIDE

DATE OF THIS SUPPLEMENT: 12-20-87

DR #: 87-155451

VICTIM'S NAME: WILLIAMS, HERBERT

LOCATION OF OCCURRENCE: 2425 EAST SAHUARO

of ORVA ANTONE and also obtain his finger and palm prints. After the instructed procedures were accomplished, ORVA ANTONE was booked in the Maricopa County jail charged with two counts of felony murder and one count of burglary, first degree.

| PAGE # | OFFICER WRITING REPORT/S.# | DATE & TIME TYPED | DR # |
|---|---|---|---|
| 2 | DET. R.E. DAVIS 2181 | 12-20-87 1145 GIB a2831 | 87-155451 |

CONT'D ON PAGE # —

CITY OF PHOENIX, ARIZONA
POLICE DEPARTMENT

SUPPLEMENTARY
80-7A REV 7-80

RUN 010

001021
MILKE_NSB001184

Exhibit 1H

Page - 1

| TYPE OF REPORT<br>HOMICIDE | DATE OF SUPPLEMENT<br>12/20/87 | DR #<br>87-155451 |
| --- | --- | --- |
| VICTIM'S NAME<br>WILLIAMS, HERBERT | LOCATION OF OCCURRENCE<br>2425 E. SAHUARO | |
| OFFICER WRITING REPORT'S #<br>DET. A. SALDATE #1875 | | SUPPLEMENT #<br>87155451.10A |
| DATE & TIME TYPED<br>12/22/87 - 0530 | BUREAU<br>OIB | CLERK<br>A2563sal |

Interview with SUSPECT #2

INDEX: TILDE[redacted] PRESTON
I/M, [redacted] 6'1, 160
lt. BR/BR, SS [redacted]
6350 N. 78 St. [redacted]sdale
EMP: Scottsdale Community College
Security Guard
Booked #1277477

---

On 12/19/87, at approximately 1320 hrs., DET. LARRY MARTINSEN and myself contacted CORBY TILDEN, I/M, 5/25/69, at 620 W. Washington. The purpose for this contact was to interview him in regards to this death investigation.

Upon our initial contact I removed a standard issue Phoenix Police Department Miranda card and read verbatim CORBY'S Miranda rights from this card. I then asked CORBY if he understood his rights and he replied that he did. I then offered the card for CORBY to read and he again replied that he understood his rights. CORBY then told me that he was a student at Scottsdale Community College where he also worked part-time as a security guard. He said his nationality was part Chipewyan and Cherokee Indian and Irish. I commented to him that he did not look like an Indian but more like an anglo. He then said that most people think he is white.

I then asked COREY why he had outstanding warrants for his arrest. COREY then told me that the warrants stemmed from a DWI and also for his failure to report for his sentencing date on a vehicle theft that he was supposed to get probation on. I then asked CORBY if he had been involved in any burglaries or any other thefts recently. CORBY then told me that he was studying very hard to become an Architect and that his only concern was to attend Scottsdale Community College to get his degree. I then asked him if he was still working as a security guard at the college and he said that he was fired for shooting a bee-bee gun at the archery targets at Scottsdale Community College. I asked CORBY what he did for entertainment and he told me that he usually attends parties with friends or go to the movies. He explained that he recently broke up with his girlfriend and is currently not going with anyone steady. He then told me he doesn't do ..ugs.

RUN 011

001168
MILKE_NSB001331

Exhibit 1H

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

I then asked COREY about his cousin, SEAN and asked him if he could describe him for me. He then replied that SEAN was a little shorter than he was, a lot more stocky and then said that he was a "real good guy". He then followed that statement up with saying that his cousin, SEAN was the type of guy who was involved in sports, weight lifting and in football while he was attending high school in South Dakota. I then asked COREY if SEAN had been in any trouble lately and he said that he knew of some problems SEAN had while he was in South Dakota but that was his past and he did not wish to talk about it. I then asked him if SEAN owned a vehicle and he said that he and SEAN both owned a car together and described it as a 67 Cutlass, yellow and primer gray in color. He then said that they had purchased the car from another security guard at Scottsdale Community College who he identified as FRANK CUTTING. He said the car is currently not running and said it has not been running for approximately one month because the transmission was gone. COREY then said that he does not usually work on the car but that SEAN does.

I then noticed that in COREY'S property there was a date book and began to look through it. COREY then told me that he uses the date book to note his work schedule and other things he wishes to remember. I then began going through the book with him and then noted December 5, 1987 and asked COREY if he had done anything special on that date. COREY repeated the date and then said with a smile, that he had attended the Price Club Christmas Party at the Scottsdale Hilton that day. He went on to say that he had originally purchased two tickets which cost him 8 dollars a piece to go to the party and was planning to take SEAN, however, SEAN did not want to go. He said that night a friend of his by the name of BOB, who he described as being a stocker at the Price Club came by in his Mustang and picked him up to go to the party. He said while at the party he and BOB met PAGE and TINA, who are also employees and commented that they had a very good time. He said after the party they dropped TINA off at her car and then he and BOB went to his house and he estimates that they got there at approximately 2:30 a.m. He said his mother, who he identified as MARLENE was also entertaining friends who he identified as DALLAS, TERRY and a person named GIRLIE. I asked COREY if SEAN was present when he arrived at the home and he said he was not. He continued and said that BOB remained at the home for approximately 1 hour and then left. He said he was up for a little while longer and estimates that he went to sleep at approximately 4:00 a.m. He then commented that SEAN had still not arrived home.

At approximately 8:30 or 9:00 a.m. the same morning, he got up after approximately 5 hours of sleep because he had to be at the Price Club to start work at 10:00 a.m. He said shortly after waking up he walked downstairs and into the kitchen and saw SEAN standing near the sink area. He said SEAN really looked bad, his hair was messed up and only said hi to him and then continued to work. He said he remembers later that day it began to rain and they had to work in the rain most of the day. He said he doesn't recall if he saw SEAN when he returned from work, which he estimates would have been approximately 7:00 p.m.

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

I then again asked COREY what kind of trouble SEAN had been in in South Dakota. COREY then again reminded me that he thought SEAN was a great guy who doesn't drink, smoke or do any drugs and that he would not talk about SEAN'S past. He then commented that SEAN'S only concern right now was going to school and his steady girlfriend, who he identified as CHERYL who had been living on the Indian Reservation until recently when she moved in with them. At this point I terminated this first interview with COREY.

During this period of time I was advised that SEAN BERNARD RUNNINGEAGLE had been arrested and became involved in the interview of him. At the conclusion of the interview with SEAN I again went to contact and re-interview COREY.

At approximately 1632 hrs. DET. LARRY MARTINSEN and myself again re-entered the interview room with COREY TILDEN. I then told COREY that his cousin, SEAN RUNNINGEAGLE, had been arrested for the homicide of two elderly people at 2425 E. Sahuaro Drive and that he himself had also been implicated in the murder. COREY replied that he had not been involved in any murder and did not know what I was speaking about. I then told him that SEAN'S girlfriend had identified him as being with SEAN, ORVA ANTONE, and MILFRED ANTONE and also being involved in the murder. He again denied any knowledge in the murder and I again told him that SEAN'S girlfriend had also said that she had seen most of the property inside the the trunk of their vehicle and also said that she believed some of the property had been taken out and put into the storage shed of their home. COREY again said that he did not know what I was speaking about and then requested an attorney. At this point the interview was ended and DET. MARTINSEN and myself left the room.

COREY was later taken to the Maricopa County Jail and booked for 2 counts of murder in the 1st Degree.

INVESTIGATION CONTINUING

| TYPE OF REPORT<br>HOMICIDE | DATE OF SUPPLEMENT<br>12/20/87 | DR #<br>87-155451 |
|---|---|---|
| VICTIM'S NAME<br>WILLIAMS, HERBERT | LOCATION OF OCCURRENCE<br>2425 E. SAHUARO | |
| OFFICER WRITING REPORT'S #<br>DET. A. SALDATE #1875 | | SUPPLEMENT #<br>87155451.10B |
| DATE & TIME TYPED<br>12/22/87 - 0600 | BUREAU<br>OIB | CLERK<br>A2563sal |

Interview - SUSPECT #1

INDEX: RUNNINGEAGLE, SEAN BERNARD
I/M, [redacted], 5'11, 215
BK/BR, [redacted]
6350 N. [redacted]dale
EMP: Scottsdale Community College
Security Guard
Booking #1277479

---

On 12/19/87, at approximately 1540 [redacted] DET. LARRY MARTINSEN and myself contacted SEAN RUNNINGEAGLE, I.M, [redacted] at 620 W. Washington. The purpose of this contact was to interview him in regards to this death investigation.

Upon entering the interview room I explained to SEAN that I would read him his Miranda rights. He then commented that he knew them and then I removed a card issued by the Phoenix Police Department and was going to begin to recite these Miranda warnings to him when SEAN began by memory reciting the Miranda warnings to me. After he completed the entire Miranda warnings I told him that if it was okay I would again read them to him from my card which I did. I then asked SEAN if he did understand his rights and he replied that he did. I then told SEAN that murder was a very serious crime and that we had already talked with COREY and SEAN'S girlfriend and that all I wanted from him was for him to tell me the truth. He then calmly told me that he didn't know what to say other than he was not there and didn't know what I was speaking about. During the interview SEAN occasionally had a smile on his face and never raised his voice or showed any concern about his arrest for murder.

I then asked SEAN if he remembered being fingerprinted when he was approximately 13 years old and SEAN replied that he was 12 years old when he was printed. I then commented that during that time he had a cast on his left hand and he then said that he could not remember the cast. I then explained to him that the fingerprints that were taken from him at the age of 12 were compared to the prints found at the murder scene and that they were found to be his. He then said that the fingerprint had to be someone elses because it was not his. I explained to him that without

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

a doubt the fingerprint was his and his only comment was that his print shouldn't be there. I then told him that his print was there and that his only alternative was to tell me the truth. He then very calmly said that he'd rather talk to a psychiatrist who would understand him. I then explained to him that I would make every effort to try to understand him but that I still needed the truth of what occurred. His voice then cracked and he said that I really didn't know what occurred to him the last time he went to jail and that I did not know what he had gone through when he was younger. I again told him that I would try to understand but he replied that he wanted to remain silent.

I asked SEAN if I was correct in assuming that he was taking Criminal Justice courses at Scottsdale Community College because he wanted to be a Police Officer and SEAN replied that I was right. I then explained to him that if that was true then he had to be aware that faced with the evidence against him his only alternative was to tell the truth and admit to what he actually did. He then said that I should have waited for this interview until after he finished Justice 1 because if I had he would have been able to tell me who did what. He then told me that he was a very compassionate person, did not believe in striking any women, would not hurt anybody and then said, "Look how big I am, but I'm not the type of person who would strike back".

I then asked SEAN what he had done that night and he did not respond. I then asked SEAN if he didn't remember being at CHERYL'S house, leaving and then picking up COREY and then cruising the area of Deer Valley until he saw a car with a blower. SEAN then commented that he did not remember any of that occurring. He then smiled and said, "Maybe some day I'll remember". I continued to try to illicit a response from SEAN as to the murder, however, he only smiled and would not comment.

Finally SEAN commented in a louder voice and said, "Just let me fall. It must be my destiny, I must fail". I told him that it was not my job to charge him with something he did not do and for that reason I only wanted him to tell me his involvement. He again said that he must fall and that he would take all of it because it was his destiny.

In an effort to change the direction of the interview I asked SEAN if he was a religious person and he would not comment. I then asked him if he believed in God, Jesus Christ, hell and heaven and he responded that he did. I asked SEAN if he felt he was going to heaven or hell and he immediately responded that he was going to purgatory. I told him that I could not believe someone who had killed two people would go to purgatory and he immediately said he hadn't done that. I told him for the sake of argument, even though he said he had not killed anyone, I told him that I did not believe that someone would still go to purgatory after molesting a young girl and burglarizing and terrorizing several homes as he had done several years ago. SEAN became very serious and stared at me and said that he had not done the things they had claimed he did and if they had been truthful they would have come to court and told the true story. He then appeared to be frustrated and then told me that all he wanted to see

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155461 |

was a psychiatrist and would even see a police psychiatrist because I really did not understand him.

At approximately 1625 hrs. SEAN told me that he wanted an attorney and a psychiatrist and wanted to remain silent. I continued to explain to him my position but finally at 1632 hrs. he again asked for his attorney and I then terminated the interview.

At approximately 1650 hrs. DET. LARRY MARTINSEN asked to see the bottom of SEAN'S tennis shoes. He immediately recognized the sole pattern as being the same as was found at the scene of the murder. He then removed both shoes and later impounded both shoes as evidence.

INVESTIGATION CONTINUING

| TYPE OF REPORT HOMICIDE | DATE OF SUPPLEMENT 12-20-87 | DR # 87-155451 |
| --- | --- | --- |
| VICTIM'S NAME WILLIAMS, HERBERT | LOCATION OF OCCURRENCE 2425 EAST SAHUARO | |
| OFFICER WRITING REPORT'S # DETECTIVE R. MILLS #2781 | | SUPPLEMENT # 87-155451.13B |
| DATE & TIME TYPED 12-21-87 2114 | BUREAU G.I.B. | CLERK A2663 LGR |

INTERVIEW: SIVERTSEN, LOUISA
I/F [redacted]
[redacted] 667
[redacted] sdale, AZ, 990-0871
Parent: SIVERTSEN, ELEANOR
Same address
Present during conversation.

On 12/19/87 during the late afternoon hours, I was aware that Det. RUSS DAVIS had contacted female associates of SEAN and CORY TILDEN. I was unaware of what discussions had taken place or which particular individuals Det. DAVIS had interviewed.

At approximately 1632 hours, I was walking past the office where LOUISA SIVERTSEN and her mother ELEANOR were seated. I was informed by an officer standing just outside the opened doorway that ELEANOR SIVERTSEN had indicated to this officer that she and her daughter wanted to speak to a detective because they had additional information to provide.

I entered the office where LOUISA & ELEANOR were seated and introduced myself. LOUISA then stated that she had some additional information that she hadn't told the first detective. I informed LOUISA that I was willing to listen to anything she had to say in connection with this case.

LOUISA then said that on the evening of Saturday, 12/5/87, she and her sister SHERYL were at ORVA ANTONE's home in Bunnyville on the Salt River Indian Reservation watching videos. LOUISA explained that ORVA's brother MILFORD was also there along with SEAN TILDEN and another Indian male by the name of TYRONE TONTO. LOUISA continued by saying that at approximately 11:00 o'clock P.M. she and SHERYL decided that it was starting to get late and they should return home. It was decided that SEAN would drive LOUISA and SHERYL to their home.

I asked LOUISA approximately how long she and the others had stayed at ORVA's. She indicated she wasn't sure exactly how long, however, they had watched three videos each being approximately one hour long.

LOUISA stated that SEAN drove she and SHERYL home arriving shortly after 11:00 P.M. After arriving home, LOUISA, SHERYL, and SEAN continued

RUN 017

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | R. MILLS | 87-155451 |

watching videos until the early morning hours of 12/6/87. LOUISA approximated that it was about 2:30 A.M. when their mother told SEAN to go home. LOUISA said that SEAN left and she went to bed shortly thereafter.

At this point I asked ELEANOR SIVERTSEN approximately what time she had asked SEAN to go home. She estimated as had LOUISA that it was approximately 2:30 A.M. on the morning of 12/6/87.

ELEANOR then indicated that she received a phone call at approximately 3:30 A.M. on the morning of 12/6/87 and it was CORY TILDEN asking for SEAN. ELEANOR said that she told CORY that SEAN had left approximately an hour ago.

I asked LOUISA when she next saw SEAN and she indicated that it was on the morning of 12/6/87 shortly before 9:30 A.M. LOUISA said she had a short conversation with SEAN during which he related that after leaving LOUISA's home, he had gone back to ORVA's and saw MILFORD and TYRONE there.

I then asked LOUISA if while talking to SEAN he had mentioned obtaining any jewelry, car parts or tools. LOUISA said that none of those items ever came up in the conversation. I then asked LOUISA if SEAN carried a knife and she indicated that SEAN always carries a large hunting knife between the front seats of his car. LOUISA said that she last saw the knife on the morning of 12/6/87 shortly after 9:00 A.M. when she was inside the car. I asked LOUISA to describe the knife for me and she indicated that the blade was approximately six to seven inches long and the handle was black. She said on the end of the handle was a compass and on the inside of the handle was fire starting equipment that she thought may have been a flint and steel.

I asked LOUISA while riding in the car if she had seen any car parts, jewelry or tools that she had not noticed during the evening of 12/5, she indicated that the car was rather junky and had a lot of trash on the inside. She said she did not see anything unusual about the vehicle on the morning of 12/6/87.

I then asked LOUISA to describe ORVA ANTONE for me. She stated he was an Indian male approximately 20 years old, five foot tall, 120 pounds with a muscular upper body for his size. She described his hair as neck length with a tail and black in color. He stated he had a dark complexion and acne. As to where ORVA lived, LOUISA said that he lived in Bunnyville on the Reservation. I asked LOUISA to describe MILFORD for me and she said that MILFORD was an Indian male, 21 years old, approximately 5'1, 115 pounds with black neck length hair, dark complexion and acne. She stated that MILFORD and ORVA looked very much alike, however, MILFORD is slightly taller and less muscular in the upper body. I then asked LOUISA to describe TYRONE TONTO for me. She stated that he is not a resident of the Salt River Reservation and only comes there sporadically. She stated that he is a San Carlos Apache and lives on the San Carlos Reservation. She

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | R. MILLS | 87-155451 |

described him as an Indian male, 22 years old, 5'10 to 6', approximately 185 pounds with black hair to the shoulder or slightly longer. LOUISA said she had not seen TYRONE since the evening of 12/5/87 and presumed that he had gone back to the San Carlos Reservation.

I asked LOUISA if SEAN on the morning of 12/6/87 had mentioned anything about burglarizing homes or assaulting people and she indicated that during their short conversations, he never mentioned anything of that sort.

At 1655 hours, I ended my conversation with LOUISA and her mother, ELEANOR.

| TYPE OF REPORT<br>HOMICIDE | DATE OF SUPPLEMENT<br>12-20-87 | DR #<br>87-155451 |
|---|---|---|
| VICTIM'S NAME<br>WILLIAMS, HERBERT | LOCATION OF OCCURRENCE<br>2425 EAST SAHUARO | |
| OFFICER WRITING REPORT'S #<br>DETECTIVE R. MILLS #2781 | | SUPPLEMENT #<br>87-155451.13C |
| DATE & TIME TYPED<br>12-21-87 2216 | BUREAU<br>G.I.B. | CLERK<br>A2663 LGR |

SEARCH WARRANT SUPPLEMENT:

SEARCH WARRANT #1

AFFIANT: Det. R. MILLS #2781
FINDER: Det. R. MILLS #2781

ASSISTING DETECTIVES: DET. A. SALDATE
DET. L. MARTINSEN

JUDGE: A. DAVID BRAUN, East Phoenix #1
Signed 12-19-87, 10:37 P.M.
Served 12-19-87, 11:05 P.M.

SEARCH WARRANT #2

AFFIANT: DET. R. MILLS #2781
FINDER: DET. R. MILLS #2781

JUDGE: A. DAVID BRAUN, East Phoenix #1
Signed: 12-20-87
Served: 12-20-87

Property from Search Warrant #1:

1. large knife with black handle
2. tire iron
3. miscellaneous papers to SEAN RUNNING EAGLE
4. screwdriver
5. open and box end wrenches
6. hack saw
7. Craftsman Metric wrenches
8. valve cover nuts
9. Craftsman torque wrench
10. blue bicycle seat
11. socket set
12. tan and brown wallet
13. miscellaneous tools, screwdrivers, pliers, punch
14. set of wrenches - large

RUN 020

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | R. MILLS | 87-155451 |

15. green tool box and tools
16. electrical cords
17. two carburetor
18.. two jack stands
19. Murry Adagio 12 speed bicycle
20. front bicycle tire and wheel
21. flashlight
22. shoes with dimple pattern, Reebok
23. two bolt cutters
24. hood scoop
25. shoe box - red
26. Craftsman screwdriver
27. flashlight
28. black shoes with horizontal line sole

Property From Search Warrant #2:

1. 1976 Oldsmobile AZ. license PJG-653

On 12/19/87 after speaking with Detectives SALDATE and MARTINSEN, I had amassed sufficient information to prepare a search warrant for the home at 6350 N. 78th Street #262. Armed with that search warrant after it was duly signed at 10:37 P.M. on 12/19/87, I proceeded to the located indicated and executed the warrant at approximately 11:05 P.M. Upon my arrival at the home, I contacted Officer KEN HOGAN who had been instructed several hours earlier to secure the residence pending the issuance of the search warrant.

I contacted MARLENE TILDEN the occupant and resident of the home and informed her of my name and the fact that I possessed a search warrant for the residence. At that time I handed her a copy of the search warrant outlining the items sought and the locations to be searched.

Subsequent to informing MARLENE as to what would occur, I proceeded in the search and obtained twenty-eight items as listed earlier in this supplement.

On the morning of 12/20/87 at approximately 0130 hours, I supplied MARLENE TILDEN with a copy of the items taken then surrendered the home to her.

The items were returned to 620 W. Washington and secured in the main police station.

On the afternoon of 12/20/87, I drew a second search warrant to specifically look in the 1967 Oldsmobile for signs of blood. After the search warrant was signed, I proceeded to 6350 N. 78th Street #262 where I

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | R. MILLS | 87-155451 |

instructed that the vehicle be taken and towed to 620 W. Washington. The vehicle was seized at approximately 1725 hours.

The vehicle was towed to 620 W. Washington where it was placed in an evidence cage in the basement pending forensic examination.

| TYPE OF REPORT<br>HOMICIDE | DATE OF SUPPLEMENT<br>12/20/87 | | DR #<br>87-155451 |
|---|---|---|---|
| VICTIM'S NAME<br>WILLIAMS, HERBERT | LOCATION OF OCCURRENCE<br>2425 E. SAHUARO | | |
| OFFICER WRITING REPORT'S #<br>DET. A. SALDATE #1875 | | SUPPLEMENT #<br>87155451.10C | |
| DATE & TIME TYPED<br>12/22/87 - 0630 | BUREAU<br>OIB | CLERK<br>A2563sal | |

Interview - SUSPECT #3

INDEX: [redacted] ASHLEY
[redacted]
BK/BR, [redacted]
Rt. 1 Box 410, Scottsdale
Unemployed
Booking #1277547

---

On 12/19/87, at approximately 1945 hrs., DET. MARTINSEN and myself contacted ORVA ANTONE, I/M, 8/13/67 at 620 W. Washington. The purpose of this contact was to interview ORVA as to his involvement in this homicide investigation.

Upon my contact with ORVA I identified DET. MARTINSEN and myself and then removed a Miranda rights card issued by the Phoenix Police Department and read ORVA'S Miranda rights to him verbatim. I then asked ORVA if he understood his rights and he then responded by saying yes. ORVA appeared to smell of alcohol and I asked ORVA if he had been drinking and he replied that he had only had one beer earlier. He also said that he had finished half the year of the 11th grade, had been an average student, had never been advised of his rights nor been arrested before.

I began by telling ORVA that his name had been mentioned as being involved with SEAN and COREY and possibly his brother MILFORD in a situation where some items were stolen and two people were killed. ORVA immediately said that he recalled being with SEAN, COREY and his brother MILFORD but that he and MILFORD were drunk that night and he did not remember anything. I explained to ORVA that his explanation about being too drunk to remember would normally be sufficient on minor cases, however, we were speaking about a murder and that it would be to his benefit to remember everything he did that night. ORVA said he understood and would try to remember everything.

I then asked ORVA if he remembered being with SEAN, COREY and his brother, MILFORD late one night in COREY'S car and he immediately replied that he believed it was SEAN'S car. He said that they were cruising around ...stening to the radio and drinking when they decided to go to SEAN'S

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1876 | 87-155451 |

house and use the jacuzzi. He said that later they left SEAN'S house, went cruising again and then at one point they stopped because SEAN said that they needed some gas. He said that he and his brother MILFORD remained in the car and he believes he was sitting in the right front passenger seat. I asked ORVA if they stopped at a gas station and he replied that they had not. I asked them if they had removed gas from other vehicles and he replied that they had. He then said that later they dropped him off at home.

I immediately told ORVA that he was not telling me the truth because I know that they had gone to CHERYL'S house and then had done something later on that night. ORVA then smiled and said, "Oh yeah, okay, that's right". ORVA then said that he was at CHERYL'S house and remembered his brother, CHERYL, LISA, who is CHERYL'S sister and SEAN being with him. He said that he and SEAN and his brother MILFORD then left CHERYL'S house and he believes he was seated in the right front seat. He said he remembers that they were cruising and listening to the radio and the next thing he remembers was that COREY was also in the car. He said he remembers this because he and COREY were arguing, however, he does not remember what they were arguing about. He said that he remembers stopping at SEAN'S house and believes that they may have picked up COREY there, however, he was not sure. Shortly after leaving SEAN'S house they stopped and SEAN said that they needed some gas. I asked ORVA if they were going to siphon gas from other cars and he replied that COREY and SEAN got out of the car and did exactly that. He said he remained in the car with his brother talking and at this time he believes he was in the back seat.

A short time later COREY and SEAN returned to the car and they again left cruising listening to the radio. He then remembers again stopping somewhere and remembers SEAN and COREY getting out. He said his brother MILFORD was passed out in the back seat and that he remained in the back seat also, for several minutes. He finally got out of the car and noticed that SEAN was working on someone else's car. ORVA then described them parking in front of a house and then said that SEAN was working on a car in the driveway of another house. He said he then noticed the trunk of their car open and COREY standing by it. He said he remained standing by the car and observed COREY walk away from the car and then observed him standing next to SEAN while SEAN worked on another car. I asked ORVA how he knew SEAN was working on the car and he replied that the hood of the car was up. He then saw COREY walk back towards their car but did not notice if he had anything in his hands.

ORVA then said the next thing he realized was that SEAN was standing in front of the yard away from the car he was working on, talking to a white man. He then observed SEAN hit this white man with his fist. He said he then walked over to where SEAN was and then noticed COREY was standing next to him. He said he told SEAN to leave the man alone and then was hit by COREY. I asked ORVA why COREY hit him and he replied that he did not know. He then said that he believes SEAN had his knife because he had been using it to work on the car. He said he thought he saw COREY with a screwdriver but then saw him drop it and then he picked it up and later

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

put it in the trunk of their car. ORVA then said that the next thing he knew they were all in the car and they then dropped him back home.

I again told ORVA that he was not telling me the entire truth and asked him if he remembered SEAN or COREY giving him some beer on the way home and he replied that he remembered COREY giving him some cheap beer which he identified as Strohs, on the way home, but he did not know where they had gotten it from. I then asked him if he remembered SEAN taking anything from the car he was working on and ORVA said, "Yeah, I think so". I then asked ORVA if this part was a carburetor and he replied that he remembered two carburetors that SEAN gave him to take to the car. He said he put both carburetors on the hood of SEAN'S car and later remembers walking back to the car where SEAN was working. He said he does not remember going inside a garage but remembers being told by COREY and SEAN to take several items to their car. He said he specifically remembers a green bike which had two flat tires, a big sprocket and some gears. He said he walked over to their car and that the trunk was open and he was going to put the bicycle in it, however, it did not fit. He said he then removed pliers from SEAN'S trunk and removed the front tire and placed the bicycle in the trunk.

I then asked ORVA if he could recall any other items that he placed in the trunk and he said that he remembers a tool box. I then asked ORVA if he remembered a floor jack and he replied that he did. He said that SEAN gave him the floor jack and told him to take it to the car and when he got there he had to take the bicycle out which he had put in and the tool box which he also had put in and as he was trying to the put the floor jack in, which he described as very heavy, he dropped it into the trunk area. He said that he then put the tool box back in and then the bicycle. After doing this he said that he then walked back to where SEAN was working on the car.

ORVA then said that he does not recall what he was carrying but he believes that it was very heavy and was walking from the car where SEAN was working to their car when he heard a lady yelling. He said that he then heard SEAN yelling at the lady to leave him (ORVA) alone and then noticed SEAN talking to a man in the front yard. He said when he got to the trunk area COREY, who had been standing there earlier, then walked over to where SEAN was arguing with a man. ORVA said he thinks COREY started yelling at the lady and that the lady was yelling at him. He said COREY was carrying a long heavy black flashlight which he knew belonged to COREY. He said he saw the lady walking towards the house when COREY hit her with the flashlight. I then asked ORVA to point out where COREY hit the lady and ORVA then pointed towards the back of his own ear on the left side of his head.

ORVA was asked to give me a description of the man and lady he had seen arguing with SEAN and COREY and he replied that he could not. I asked ORVA if he could tell me their ages and ORVA said he could not. I asked ORVA if he could tell me how tall the man was and he said that he believed that he was the same size as SEAN. I finally asked ORVA if he could tell

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

me what they were wearing and he said he didn't know but he thought maybe the lady was wearing a dress or something. ORVA then told me that the man kept telling COREY and SEAN to just leave.

ORVA said he then got back into the car to check how his brother was and he noticed that his brother was still passed out in the back seat. He said he then got back out of the car and heard the woman yelling to SEAN and COREY to leave her alone. He said that COREY was standing next to her and that he observed COREY hit her first with his hand and then with the flashlight. ORVA then said that he thinks that SEAN first had the flashlight because he thinks SEAN was using it to work on the car. I then asked ORVA if he could describe COREY'S actions any better and he said that COREY was standing next to the lady and it looked like COREY was going to walk away but then he quickly turned and swung the flashlight at her striking her on the head. He said he heard the lady yell but he doesn't know what she said but he thinks she probably told him not to hit her again.

I then asked ORVA if SEAN still had the knife in his hand when he was talking to the old man and he said that SEAN had grabbed the knife and was holding the handle of the knife in his hand with the blade pointed up along his forearm. He then described the knife as being about a foot long and said it was a big knife.

ORVA then remembered that the woman looked older and said she had a squeaky voice. He remembers that because she kept yelling at them to get out of here and to leave them alone.

I asked ORVA what COREY and SEAN were wearing that night and he said that COREY had his black jacket and SEAN was wearing a grayish shirt but that his jacket was still in their car. ORVA said that he was wearing levis, a dark shirt and his boots.

At this point I told ORVA to again go over the sequence of events and I told him that I was somewhat confused. He then told me that he was trying to remember everything and would try hard to tell me the truth. I then asked ORVA if the man and the lady came out of the house where SEAN was working on the car and he said that the man and the woman had to come out of the house next door to the house where SEAN was working on the car. DET. MARTINSEN then drew a simple diagram depicting two homes, the front yards, the driveway areas and then drew a car in one of the homes and then drew another car parked in the street in front of the home next to it. I then asked ORVA if this was the way he remembered it and he replied that it was. ORVA then pointed to the house next to the house where the car was parked in the driveway which would have been the WILLIAMS' residence and then pointed toward the driveway and said that the man came out of this house. He said that the man came out first and walked across the front yard toward SEAN who was working on the car. He said at that time he and SEAN were standing next to the car, with the hood up. He said he first saw the man walking towards them and asking them what they were doing. He said he immediately began to walk away from the car and back to

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-155451 |

their car and then noticed COREY, who had been by their car, walking towards the old man from behind. ORVA said that he thought he had gotten a lot of the stuff loaded in their trunk before the man came out. He said he thinks he heard the man tell SEAN that they better leave or he was calling the police. He said he then observed COREY walk up next to the man and that the man appeared to shove COREY away. The man then turned around and was going to walk away when COREY grabbed him and hit him with his hand. He said the man continued to walk towards the driveway. He then saw SEAN and COREY walking behind the man and SEAN and COREY were talking to each other. He saw COREY had the flashlight in his hand and SEAN had the knife by the handle with the blade pointing upward along his forearm.

ORVA said that he thinks the man got to the driveway when he heard a lady coming out of the house and then he said, "The lady and the old man began talking". It should be noted that this is the first time that ORVA described the man as old.

ORVA said that he was at the open trunk of their car when he saw COREY and SEAN now talking to the man and the woman in the driveway. He said COREY still had the flashlight and SEAN still had the knife. He said he thinks that SEAN and COREY were arguing with the man and the lady. He said he realized that they had been stealing stuff off the car and other items but that he just wanted to leave so he walked over to where they were and told them, "lets go". He said he doesn't know whether it was COREY or SEAN that told him to just get away. He said he then saw COREY turn and appear to start walking away when he quickly turned and swung the flashlight, which he had in his hand, hitting the lady on the head. I again asked him to point out where COREY hit the lady and he then pointed to his own head on the left side and pointed towards the back of the ear. He said as soon as COREY hit the lady the man came over to them yelling at COREY to leave her alone. He then heard the man yell at SEAN to put the knife away. He said he then seen SEAN teasing the man with the knife, thrusting the knife back and forth towards him. He heard the man tell them to just get out of there and as SEAN was teasing the man with the knife he saw SEAN drop it but he then quickly picked it up and he thinks he struck the man on the face with the knife handle.

I asked ORVA what the lady was doing and he said that he thought she had fell to the driveway but the next thing that he knew that she was standing holding her face and yelling at them to leave. I asked ORVA if he could tell me where in the driveway this was occurring and he said that there was a car in the driveway and that they were towards the back of the car. ORVA said all he wanted to do was leave and again said that he realized they were stealing stuff but he did not want to get involved with COREY and SEAN and the man and woman. He said he then began to walk back towards their car and heard SEAN yelling at COREY to give him the flashlight. He said he heard also more arguing and yelling from COREY and SEAN and when he reached the trunk area of their car he stood there for a moment and then looked back and saw SEAN and COREY but did not see the man and the woman. He said he then got into the car in the back seat, waited

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1876 | 87-155451 |

for a moment and then observed SEAN and COREY run to the car and heard COREY telling SEAN, "lets go, lets go". He said SEAN started the car and then drove a short distance and he believes that SEAN turned the car around and believes he may have hit something. He said he then remembers driving real fast for a short distance and then remembers going around a sharp curve. He said that when SEAN got into the the car he threw his large knife, which he had been carrying on the dashboard, and that when COREY got into the car he threw his flashlight towards him in the back seat. He said the flashlight hit him and he immediately threw it back towards the front seat at COREY. He said he remembers SEAN and COREY were laughing real hard. I asked ORVA what they may have been laughing about and he said he didn't know.

I again asked ORVA if this was all he could remember and he then said, with a smile, "Well the lady did kick me". I then asked him to explain and he said that while SEAN and COREY were having the argument with the man and the lady he remembered that he had gone back to the car to pick up something and was returning with it when he tripped and fell against COREY'S legs. He said that he then felt someone kicking him and he thinks that the lady may have kicked him because COREY was standing next to her arguing with her when he fell. I then asked ORVA if it could have been possible that COREY kicked him rather than the lady and he thought for a moment and said, "Yeah, you're probably right it was probably COREY that kicked me". He said he remembered falling several other times and explained that he was pretty drunk during this time.

DET. MARTINSEN then asked him if he remembers ever going inside the house that belonged to the man and the lady and ORVA replied that he remembers standing inside on the door step but never went inside. ORVA then said that he did see COREY and SEAN inside the home but that he did not know what they were doing. I then asked him if he remembered seeing a hole in the door and he then said, "SEAN made the hole in the door with a bar he got from next door but I think the people were still inside". DET. MARTINSEN then asked ORVA again if he remembers being inside the home and he said that he remembered COREY and SEAN being inside and that he walked to the door that was open. He said that COREY then walked out and before he knew it COREY was behind him and then pushed him inside the house. He said he only got inside the doorway and remembers that there was a cabinet on the right side of the door and also remembers a light shining from somewhere on the left side of the room. I asked him if he saw the man and the woman lying on the floor and he said that he did not think he saw anyone on the floor and was only at the doorway for just a moment. He said when he stepped out, COREY again walked back inside the home and he then walked back towards their car. He said he remained outside the car by the trunk for a short while and then he got into the back seat and waited for COREY and SEAN.

DET. MARTINSEN then asked COREY if he was aware of any news accounts of the murder that COREY and SEAN committed. ORVA said that he did not know that SEAN and COREY had killed the man and the woman and that he really

| TYPE OF REPORT | VICTIM | OFFICER | DR # |
|---|---|---|---|
| HOMICIDE | WILLIAMS, HERBERT | SALDATE #1875 | 87-165451 |

didn't know what had happened to them. He said he hadn't watched TV and doesn't receive the paper and was not aware of the murder until today.

I asked ORVA if this was all he could remember and he said that it was. At this point I had ORVA taken to the breathalizer room and had a qualified officer run a breathalizer on him after observing him for the required 20 minutes. A sample of ORVA'S breath was taken which measured .00 on the machine. Another sample was also taken for the defense and impounded as evidence. ORVA was then fingerprinted and then transported to the Main Jail for booking.

INVESTIGATION CONTINUING

07-99026

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

FILED LODGED RECEIVED COPY JAN 05 1999 CLERK U S DISTRICT COURT DISTRICT OF ARIZONA BY D DEPUTY

1989 APR 26 PM 12:48 FILED ... ALLEN, CLERK DEP.

STATE OF ARIZONA,

Plaintiff,

vs.

SEAN RUNNING EAGLE, and COREY TILDEN,

Defendants.

No. CR-87-11508

CIV 98-1903 PHX PGR

FILED APR 28 1989 NOEL K. DESSAINT CLERK SUPREME COURT BY

Phoenix, Arizona
June 20, 1988

BEFORE: The Honorable GLORIA G. YBARRA, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Motions

ORIGINAL

PREPARED FOR APPEAL
For Supreme Court

LYDIA ESTRADA
Official Court Reporter

DISCOVERY AND CONFIDENTIAL MATERIAL
SALDATE000581

SUPERIOR COURT



NOTES

RUN 031

SALDATE000582

SUPERIOR COURT

Exhibit 1H

APPEARANCES:

PAUL AHLER
Deputy County Attorney
For the State

BALTAZAR INIGUEZ
Attorney at Law
For the Defendant Running Eagle

ROLAND STEINLE
BRENT GRAHAM
Deputy Public Defenders
For the Defendant Tilden

3

I N D E X

| WITNESS | DR | CR | RDR | RCR |
|---|---|---|---|---|
| Armando Saldate | 14 | 24 | 35 | |
| Larry Martinsen | 42 | 44 | 49 | 50 |
| Sean Running Eagle | 51 | 61 | | |

RUN 033

SALDATE000584

SUPERIOR COURT

Exhibit 1H

Phoenix, Arizona
June 20, 1988

(Whereupon, the following proceedings took place in open court.)

THE COURT: CR-87-11508. State vs. Sean Running Eagle and Corey Tilden.

MR. AHLER: Paul Ahler for the State.

MR. INIGUEZ: Baltazar Iniguez appearing for Running Eagle.

MR. STEINLE: Roland Steinle from Public Defender's. I will be assisted throughout the trial by Brent Graham, Your Honor.

THE COURT: I am sorry to keep you waiting so long. I appreciate your understanding.

I also need to address the Motion in Limine. As I previously indicated to you I expected to have a ruling for you earlier. It has caused me more difficulty than I had anticipated. But I have come to a ruling. It's not as yet in written form and it will be, but let me just go over it with you at this time. It's not an across the board ruling in terms of not everything has been eliminated or left in either way.

So let me first go into the statements that were made by Defendant Running Eagle to Sheryl Sivertsen

implicating both herself and Tilden. What I have determined on the basis of the law that has been provided and the Rules of Evidence as what is most appropriate in keeping with a fair trial, is that any references to Corey Tilden be redacted, eliminated in any way. It would implicate Mr. Tilden. They will be admissible as against Running Eagle. What I would like to have is a form presented to the Court that will indicate what references will be redacted as well as a proposed form of a cautionary instruction to the jury.

With regards to the statements made by Corey Tilden to Sean Running Eagle and Sheryl Sivertsen implicating both himself and Defendant Running Eagle, those are going to be admissible as against both defendants as adopted admissions. As I said, I will have probably more detail in the written ruling.

And let's see. The statements that Defendant Running Eagle made to Paul Farina, the statements initially made to Paul Farina with regard to the fact that he and Defendant Tilden had gotten into a fight, that will also be redacted with regard to Corey Tilden. Again, presented in a manner that will not in any way implicate Mr. Tilden. Those are the initial statements made.

My understanding from the motions that have

been presented is that there are later questions that Mr. Farina asked that were in the presence of both Running Eagle and Tilden with regards to what Mr. Running Eagle had said earlier. Those are going to be allowed as to both defendants.

I think I have covered all. Is there anything in that that I did not cover?

MR. STEINLE: No, Your Honor. There are a number of motions that we need to take care of at this time, then I want to just briefly go over them to see if I have everything that has been filed today. I have -- excuse me -- from Defendant Tilden a Motion to Allow Participation of Counsel in Voir Dire, Individual Voir Dire, for Permission to Submit Written Voir Dire Questions to the Jury Panel, an additional motion along the same lines, Motion to Supplement the Jury Voir Dire Inquiry, and a supporting brief. There is also a memorandum filed by the State in support of the use of a prior conviction. And the request for a hearing with regards to Rule 609 was filed on behalf of Mr. Tilden.

Is there anything that I had not listed that I should have at this point?

Mr. Ahler?

MR. AHLER: I don't have copies of the first motion you said concerning Counsel's Participation in

Voir Dire.

MR. STEINLE: That was part of my packet on voir dire at the end of my questions.

MR. AHLER: I didn't get those either.

THE COURT: Do you have any extras with you?

MR. STEINLE: Judge, I don't seem to have that. I don't have my file folder that says voir dire, so for some reason it was -- I will have to look back at the office. I can get a copy of it. I know where it is. I thought it was all sent over to Mr. Ahler.

THE COURT: Okay. Both Motion to Supplement and Motion to Allow Participation, you think somebody could bring them over right away or --

MR. STEINLE: Judge, I would have to go back and look.

THE COURT: How about if I give Mr. Ahler's my copies at this point. You can review them. We can take a break in a few minutes and you can review those. But there is some other things that we need to take care of in any event before that. My understanding from my bailiff is that you anticipate at this point a five week trial. Is that correct?

MR. STEINLE: Judge, there is 35 potential witnesses listed by the State. We have the 4th of July weekend. If we are going to work on schedule, basically

2

afternoons sessions, which has been my experience with the Court, and anything on that, the time schedule in the afternoon, we can. I guess the only guide I have is Carlos Rios had eight or nine witnesses and we went almost two weeks in that trial. If we have 35 witnesses, even though some of them are very short, there were short ones in that one, too. I think we are realistically talking at least four to five weeks.

THE COURT: All right. You say 35 State witnesses?

MR. STEINLE: State witnesses.

THE COURT: Mr. Ahler, would you concur in approximately a five week trial?

MR. AHLER: Four weeks is probably a little bit more accurate. In that range, I think we would be looking at.

THE COURT: So we certainly need at least four alternates?

MR. AHLER: That's correct.

THE COURT: All right. There is some difficulty in that number of jurors in terms of how many people can fit into our jury room. I will have to look into the possibility of transferring courtrooms. But that is something I won't be able to tell you probably until tomorrow. At this point we will still be meeting here.

Is there -- let's see. Can we proceed at this time with with the 609?

MR. AHLER: I believe we previously argued that to the Court and submitted it on the basis of the memorandum. If the Court needs additional argument on it I am prepared to argue it.

THE COURT: I am going to need some refreshing on this because I really can't tell you that I recall everything on it.

Mr. Ahler?

MR. AHLER: The Defendant Tilden has a prior theft conviction, Class 6 open ended felony. It's out of the Superior Court of Maricopa County. Roughly the date of conviction is February of 1988. He had a warrant out for his arrest for that offense at the time he was picked up on this charge. Subsequent to his being taken into custody he was sentenced on that theft. The Court has an understanding of the basic facts in this case. I think that that prior conviction is relevant to the issue of credibility, and that should Mr. Tilden take the stand, the State should be allowed to impeach him with it.

THE COURT: Mr. Steinle?

MR. STEINLE: Judge, in my memorandum I pointed out the factors from State vs. Mahoney, United States vs. Mahoney. One of the factors or two of the factors that I

would point out are in Mahoney. The Court says as a general rule those convictions which are the same crime should be admitted sparingly.

This is basically an allegation of a murder committed during the course of a number of theft, burglaries in the neighborhood. To allow the State to impeach him with the fact that he has been convicted of a theft, would be of the same or similar character to the allegations in the indictment here.

The second is that the fact that I asked the Court to point out the importance of the defendant's testimony in this matter. We expect to have Corey Tilden testify. I believe in his defense his testimony would be absolutely important. Because at best what the case the State has is a circumstantial case, plus the statements of one Orva Antone, who was given kind of a good deal in this matter.

So it's my view that if you look at the factors listed in Mohoney and the discussions in Weinstein about those factors, that those two factors would weigh heavily in Corey Tilden's favor to have his prior conviction excluded.

THE COURT: Anything else, Mr. Ahler?

MR. AHLER: Just to point out that I think the credibility is an issue. I think it becomes even more

important that the jury have all evidence at it's disposal that is legally admissible. His prior background as far as the theft conviction and it's statement as to his possible credibility as a witness, I think is fundamentally important here. I think the recency of the conviction in terms of this offense also dictates for it's admission, and we would ask you to admit.

3

THE COURT: The prior conviction of Corey Tilden, February 1988, will be allowed to be admitted. It does appear that it falls within the Rule 609, and it's probative value would outweigh any prejudicial effect to the defendant.

Is the only thing left then the voir dire?

MR. AHLER: Judge, I don't know you mentioned, but I had included in my list of items to the Court a memorandum reference a death qualification of the jury.

THE COURT: I don't have that. My secretary had been keeping a file folder with the motions in this case separate.

MR. AHLER: I had filed that back on May 18 of '88. I have a copy here.

THE COURT: Oh, oh. Okay. I do. I'm sorry. I do have that. I was looking for a different caption.

MR. AHLER: I think we need to consider that

along with these other motions that defense has made.

THE COURT: Why don't we do this then. You probably haven't had a chance to look at the packet that was provided. Do you want to take about 10 minutes 10, 15 minutes to look at that and we will come back?

Mr. Iniguez?

MR. INIGUEZ: Yes, ma'am. I believe a voluntariness hearing has been filed by the State. That's the reason I didn't file the same motion, because it was as to my client. I believe that would certainly need to be heard before the trial.

THE COURT: You have witnesses ready to go at this time on that?

MR. AHLER: Yes, I do.

THE COURT: Well you want to do that now? That is fine. We can do that and later the voir dire questions.

MR. INIGUEZ: At the Court's discretion.

THE COURT: Mr. Steinle?

MR. STEINLE: As I said before, I withdraw any challenge to the voluntariness of the statements made by Corey Tilden. I am not asking that the State put on any kind of hearing. We have no challenges. I will attempt to elicit his statements if the State doesn't, so --

THE COURT: These would be the --

MR. STEINLE: Statements to the police subsequent to their arrest made to the police officers in the police station.

THE COURT: Mr. Running Eagle has made statements as well at that time then?

MR. INIGUEZ: There are some statements by Mr. Running Eagle.

THE COURT: All right. Call your first witness then.

MR. AHLER: State would call Armando Saldate.

THE COURT: Mr. Steinle, your position at this time, you will be cross-examining on direct examination of this witness?

MR. STEINLE: No.

THE COURT: You simply won't be opposing it?

MR. STEINLE: Would the Court mind if I excuse my -- I will go back and see if I can find the voir dire questions.

THE COURT: That is fine.

ARMANDO SALDATE, JR.,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. AHLER:

Q. Tell us your name, please.

A. Armando Saldate, Jr.

Q. Your occupation?

A. I am a Phoenix Police Officer.

Q. Your present assignment?

A. I am currently assigned as detective to the homicide detail. Have been for several years.

Q. How long have you been a police officer?

A. Been a police officer since June of '69.

Q. And how long have you been with the homicide?

A. April of 1986.

Q. Det. Saldate, were you involved in the investigation of the murder of Jacqueline and Herbert Williams that occurred on December 6, 1987?

A. Yes, I was.

Q. What was your role in that investigation?

A. I was assigned the case agent, the person responsible for that investigation.

Q. What were your duties as the case agent?

A. My duties were initially to make the initial investigation, follow up any leads, and subsequently make arrests to that case.

Q. Directing your attention to December 19, 1987, did you interview an individual by the name of Sean Running Eagle in connection with that murder investigation?

A. Yes, I did.

Q. Is Mr. Running Eagle in the courtroom today?

A. He certainly is.

Q. Could you identify him for the record, please?

A. Sitting in the jury box wearing the jail clothing, blue jail clothing, dark hair.

MR. AHLER: Could the record reflect that the officer has identified Mr. Running Eagle?

THE COURT: The record will so reflect the identification.

BY MR. AHLER:

Q. Where did you interview Mr. Running Eagle?

A. The interview took place at the Main Station, at 620 West Washington, the second floor. One of the interview rooms.

Q. What time did it begin?

A. I assume it began -- I would have to look at my report. But something like 1800 or 1900 hours. If you allow me to look at my report to give the exact time.

Q. Would that refresh your memory?

4

A. Yes, it would.

Q. Okay.

A. Exactly 1540 hours, which is military time for 3:40 p.m.

Q. Was anyone else present besides yourself and Mr. Running Eagle during that interview?

A. Det. Larry Martinsen.

Q. Was the Defendant Running Eagle under arrest at the time that you interviewed him?

A. Yes, he was.

Q. When had he been placed under arrest?

A. He had been placed under arrest earlier that day by our special assignment unit who had picked him up.

MR. INIGUEZ: Objection, Your Honor. There is a lack of foundation as to that last answer.

THE COURT: Overruled.

BY MR. AHLER:

Q. Can you tell us the basis for their arresting the Defendant Running Eagle on the 19th?

A. Yes. He had been identified by fingerprints as being at the scene of the homicide.

Q. Prior to interviewing the defendant did you advise him of his Miranda Rights?

A. Yes, I did.

Q. How did do you that?

A. I read the Miranda Rights that are issued to us by a small card by the Phoenix Police Department, verbatim to him. However, prior to that he repeated the rights to me.

Q. Do you have that card with you?

A. I probably have a card similar to that, yes.

Q. Could you please tell us what rights you read to the defendant prior to questioning him?

A. Yes. This is the rights cards that is issued by the Phoenix Police Department, which is exactly the one I read Mr. Running Eagle. The first right -- it's broken into five sections.

The first one is, "You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to the presence of an attorney issued prior to questioning, to be with you during questioning it you so desire. If you cannot afford an attorney you have the right to have an attorney appointed for you prior to questioning."

And the last part is, "Do you understand these rights?"

Q. And what was Mr. -- strike that. Did anything unusual happen during the time that you were reading the Defendant Running Eagle these rights?

A. As I reviewed the card, was going to read

him his rights he then by memory repeated the rights to me.

Q. Did he repeat all of them?

A. Yes, he did.

Q. Did you continue to read the rights or what did you do when he began?

A. I waited until he finished, then I told him I would again read his rights from the card. And he said fine and I did. He responded that he understood them after listening to them.

Q. Did you advise Mr. Running Eagle at that time why he was under arrest?

A. Yes, I did.

Q. What did you tell him?

A. I advised him he was under arrest for murder, and he advised me that he didn't know what I was speaking about, and was not there.

Q. What did you do at that point?

A. I told Sean that I wanted the truth from him. And he again said -- didn't say anything at that point.

I then began telling him about his fingerprints. That I had made his fingerprints at the scene of the homicide, or that one of our technicians had. And then had him recall when he was fingerprinted

at the age of 13 years old.

Sean then told me it wasn't at the age of 13, he was 12.

Then I told him that that during that time he had a cast on his one arm. However, we did obtain his palmprint or the other hand.

He said he didn't recall the cast, but that he did recall being printed. And I told him that that fingerprint was made by one of our technicians to the homicide scene.

Q. What was his response when you questioning him concerning finding this fingerprint at the scene of the homicide?

A. He continually said that print could not have been his, and definitely was not his.

Q. What happened next?

A. We spoke about his fingerprint being there, and continued with that. And he continued to deny it. I then asked him if it was true. I had been told earlier that he was taking justice courses, Criminal Justice courses at Scottsdale Community College and was wanting to be a police officer. He said it was true.

I then told him that -- then he understood that faced with all the facts of evidence that we had, being that his fingerprints was there, Sheryl, I had

talked to Sheryl, I had talked to Sean, that it would probably be important for him, best for him to tell us the truth and exactly what had occurred, what was his involvement in the murder. And he indicated that, something to the effect that he hadn't finished all of his justice courses or something like that. Probably would have -- if he had, he probably would have told me everything he wanted to know. But that at the time he hadn't finished all his justice courses.

We then continued into, I believe, where he had been that night. I think that's where we continued to, and he didn't respond. I pointed particularly to the night in December, and he said he still would not respond. He finally said that -- oh, I then commented if he remembered being at Sheryl's house, whether he also remembered leaving Sheryl's house late that night, going to Corey's, picking up Corey, then going around Deer Valley area and cruising around that area until he seen a car with a blower on it. And he stopped and he again commented that he didn't remember anything like that occurring.

Q. At some point during the conversation did he ask to remain silent?

A. Yes, he did.

Q. At what point did that occur?

A. Shortly after we had gone into conversations about psychiatrists and him wanting one, to see a police psychiatrist.

THE COURT: Mr. Ahler, let me interrupt you for just one second. I should have done this earlier. I would like to have Mr. Running Eagle seated next to his Attorney Iniguez so he can confer with him.

MR. INIGUEZ: Thank you, Judge.

THE COURT: Mr. Ahler?

BY MR. AHLER:

Q. What did the Defendant Running Eagle tell you that would indicate that he wanted to remain silent? What words did he use?

A. I believe he said he just wanted to remain silent.

Q. Did you continue to have a conversation with him after he had asked to remain silent?

A. Yes, I did. I continued to speak with him, and finally he told me that he wanted his attorney.

Q. Did he make any statements to you after the time that he had asked to remain silent?

A. If I may, can I refresh my memory with my report?

MR. AHLER: Yes, if it would assist you.

THE WITNESS: No, he did not.

BY MR. AHLER:

Q. I am sorry.

A. No, he did not say anything after that.

Q. Did Mr. Running Eagle ever make any comments to you to the effect, "Just let me fall. It must be my destiny. Let me fall"?

A. Yes, he did. That was prior to him saying he wanted to remain silent. He indicated -- he became very loud at that point. He indicated to me that he wanted to fall. Let him fall. It's his destiny to fall. I explained to him it was not my position to charge him with anything that he was not involved in. But he continued to say that it was his destiny that he should fall.

Q. Do you recall what initiated that type of response from him?

A. I don't understand your question.

Q. Do you recall what question it was that you asked him that caused him to make that statement to you?

A. Again, I would have to review my report. If it's okay to -- I asked him, I was trying to get to elicit a response from him as to the murder. But he would only smile. Then he continued in a louder voice, said that he just wanted to fall.

Q. How long did this interview last?

A. Well, the interview was terminated at 1625 hours, or 1650 hours.

Q. Why was it terminated at that point in time?

A. Terminated because Mr. Running Eagle wanted an attorney.

Q. At any time during the questioning of Mr. Running Eagle did you make him any promises in exchange for him talking to you?

A. No, I did not.

Q. Did you make any threats against him?

A. No, I did not.

Q. Did you use any force against him to get him to talk to you?

A. No, I did not.

MR. AHLER: Your Honor, this is all the questions I have in regards to Defendant Running Eagle. I do want to bring out for the record the statements made by Tilden, also. If you want I can have Mr. Iniguez cross at this time,

THE COURT: I think that might be appropriate. Partly because Mr. Steinle is not here to allow the cross. Then you can get on the record the other statements.

MR. AHLER: Okay.

THE COURT: Mr. Iniguez?

MR. INIGUEZ: Thank you.

CROSS-EXAMINATION

BY MR. INIGUEZ:

Q. Officer, how many murder cases have you worked on so far?

A. Approximately 20. Twenty that I -- approximately 20 that I have been assigned as case agent. I worked on approximately -- this would only be a guess, 40.

Q. Okay. In this particular case would it be fair to say that it was a very important aspect of this case to try to elicit some information from Mr. Running Eagle?

A. Mr. Iniguez, every case where it's a criminal matter, it's very important to elicit a confession from the suspect.

Q. Yes. But in some cases you may have 10 or 15 eyewitnesses, or it may have been a family matter or you may have had a number of other pieces of evidence. In this case isn't it true that the only thing you had when you initiated this contact with Sean was a print, a fingerprint of some sort?

A. That in regards to the palmprint, that was the only thing other than testimony or evidence from

Sheryl that he was present, and Orva, of course. However, again, I would have to disagree with you because I think I have worked burglary, I have worked several other areas of police work in uniform, also. I have always thought that it's very important to get a confession from someone. You know, you try so hard to elicit that confession.

Q. Now, trying very hard to elicit the confession, you discussed with Sean his involvement for how many hours? You read us earlier your starting time and your ending time. You read those two. You would probably figure out --

A. An hour and 10 minutes.

Q. Right. Now, you have been testifying for about 10 or 15 minutes you think?

A. Correct.

Q. So you two or you three -- I'm sorry, Det. Martinsen was in the room also. Is that right?

A. Yes.

Q. And he was also asking questions. Is that correct?

A. I don't believe so.

Q. He didn't ask a single question the whole time you were there?

A. I wouldn't say that he didn't ask a single

question. However, if he did it was just a few.

Q. Okay. So you were doing most of the questioning?

A. I was doing the questioning, yes.

Q. During the course of your questioning did you at any time hit Sean in the head or the chest?

Q. I hit him with a finger.

Q. You hit him with a finger?

A. I wouldn't say hit him, I poked him with my finger, yes.

Q. In the chest?

A. On several occasions, yes.

Q. On several occasions? Was that your frustration or was he attacking you?

A. Not either one. It was my way of trying to get his attention. His attention was drawn to something else, obviously, and his smiling, that I wanted to get -- draw his attention to what I was speaking about, not something else that he was thinking about.

Q. Did you for any length of time consider that your poking him continuously would have been interpreted by him as force?

A. Of course not.

Q. And were you angry when you were poking him in the chest?

A. During -- no, I was not. But during my interview --

Q. Were you smiling?

A. If you let me explain, Mr. Iniguez, and answer your question. During my interview --

Q. You already answered my question, sir. You said no. I asked you if you were smiling. You said no. That was the answer.

MR. AHLER: Your Honor, I am going to object. He is arguing with the witness.

THE COURT: The question has been answered. You may proceed to another question.

BY MR. INIGUEZ:

Q. During the course of this poking about how many different times do you feel you poked him in the chest with your fingers?

A. Several times.

Q. And how many times did he poke you in your chest with his finger?

A. None.

Q. In fact, if he had poked you in your chest with your finger you probably would have taken him to the ground and handcuffed him. Is that correct?

A. I wouldn't speculate on that, Mr. Iniguez.

Q. You don't allow people to poke you in the

chest while you are questioning them, do you?

A. Depends on what I am getting out of them. If I am getting a confession they can poke all day.

Q. If you are not getting a confession then you may poke all day?

A. It depends on whether it's needed to get his attention to what I wanted to speak about. If his memory or if his attention span is somewhere else I may poke them on the chest. I may poke them on the arm trying to get him diverted to that part where I want his attention to be.

Q. Did you at any time think of asking him, just pay attention when I am speaking to you, rather than putting your finger in his chest?

A. I think that was mentioned during the time I was poking him in the chest.

Q. That didn't -- was this report in your police report, sir?

A. No, it was not.

Q. How far from Sean Running Eagle were you while you were questioning him most, during most of the interrogation, in feet or inches?

A. I try to stay within six to 12 inches from someone I am talking to.

Q. So would you say that right now I am 12

inches away from his face?

A. At the most, yes.

Q. So is it possible you were this close to him?

A. Very definitely.

Q. Okay. And for the record, I would like to reflect that I am sitting right by Mr. Sean Running Eagle, approximately, as the police officers agree, six inches to 12 from his face. Did Mr. Running Eagle ask you for an attorney right away when you started questioning him?

A. No, he did not.

Q. About how many minutes had passed, if you remember, before he asked for an attorney?

A. It was shortly before we terminated the interview that he asked for an attorney. He had asked to remain silent, however, did not ask for an attorney. Shortly after that he asked for his attorney.

Q. Okay. About how many minutes after the interview commenced that he asked to remain silent?

A. Again, just shortly before he asked for an attorney. I would say the interview took an hour and 10 minutes. Maybe an hour when he asked to remain silent and we continued to talk or I continued to talk and try to elicit statements from him and he refused. Of course

he said he was going to remain silent, then said he wanted an attorney.

Q. When you said he remained silent, did you tell him he had the right to remain silent?

A. Mr. Iniguez, we had already gone by the Miranda Rights. He had expressed or told me his Miranda Rights. I read the Miranda Rights. Part of them are that he has a right to remain silent. That is what he explained to me later on.

Q. When he asked you that he wanted to remain silent, did you and Det. Martinsen get up and leave the room and quit questioning him?

A. No.

Q. How many times -- isn't it true about three times he asked you not to be questioned anymore and you continued?

A. No. He only asked to remain silent on one occasison. That was when -- shortly before he asked for an attorney. He did remain silent. He is correct, he did remain silent and I continued to talk to him.

Q. Isn't it true that these statements that you have just testified to that he made, in particular, the statement, "Let me fall. It's my destiny", isn't it true that that statement was made after he requested to remain silent?

A. No, it's not.

Q. Okay. Is it also not true that this statement was made after he requested to speak with an attorney?

A. No. He had made that statement before.

Q. Okay. How long is this interview room where he was being interviewed? Do you remember?

A. I don't know the exact measurements. I would say four by six or five by eight room maybe. Something to that. I am sure you have seen those rooms before.

Q. Was Mr. Running Eagle crying during his interview? Did he have tears in his eyes?

A. At one point he did have tears in his eyes.

Q. And did you have the equipment to tape this conversation should you have desired to?

A. Definitely.

Q. Is there a reason why you didn't tape this conversation?

A. Certainly.

Q. Why was that?

A. I don't believe it's very good, a taped confession or an interview with someone, especially since it involves such a serious crime. Because I think it hinders that person from coming out, discussing what he

really wants to say. I think maybe that tape kind of keeps them from wanting to talk to us.

Q. Yes, sir. Is it true, Mr. Saldate, that at some point during the interview you told Mr. Running Eagle, "I want to see you go to the gas chamber. I want to see you die"?

A. No, it's not.

Q. Is it also true that when you were poking him in his chest you were asking him, is this how you did it? Is this how you did it?

A. I may have said that, yes.

Q. So then is it fair to say that it wasn't just an interrogation, it was more also an accusation between you and Mr. Running Eagle?

A. I think any interrogation at one point or another becomes accusatory. At one point you do accuse a person. I had earlier done it. Almost every interrogation that you have a suspect you become accusatory and accuse him of doing that crime, of course.

Q. Are you telling this Court that in every interrogation you accuse the person being interrogated of committing the crime?

A. I said in almost every interview that you have you become -- the interview does point in that direction of accusatory. That you accuse that person of

committing an offense to see what he responds.

Q. In this particular interrogation do you remember his immediate response when you told him he did it, and put your finger into his chest?

A. Most of the time that we are speaking in regards to the homicide, the actual killing of the Williams, Mr. Running Eagle remained very calm, very quiet, usually was just smiling. So I really couldn't elicit that much of response from him.

Q. Excuse me. I think my question was, do you remember his response immediately following your poking him in the chest and asking him?

A. I think it was none.

Q. Okay. Did you tell Mr. Running Eagle anything that someone else had said that you knew was false, like did you tell him, "Corey already confessed. He told me you guys did it", or did you tell him that "Orva had already told us you did it", or anything of that type?

A. No, I did not. I had told Sean that I had spoken to Corey and I had already spoken to Sheryl. That was my only indication that I had spoken to either one of them.

Q. Did you tell Mr. Running Eagle that Sheryl had told you that she did not want to have anything to do

with Mr. Running Eagle anymore?

A. Of course not.

Q. Is there any other type of force either verbal or physical that was used there that day by either you or someone else from the police department that you have not discussed here today?

A. I don't think no more was used, Mr. Iniguez. I think that's your opinion that force was used.

Q. It's correct, is it not, that you have testified that you poked Mr. Running Eagle in the chest several times with your finger during the interview?

A. That's correct.

Q. How much do you weigh, Mr. Saldate?

A. About 225. But my finger doesn't weigh that much.

Q. But you didn't take your finger off your body when you poked him with it?

A. No, I did not.

Q. You are aware, are you not, Mr. Saldate, that a person can put considerable pressure to another individual with the use of one finger. Isn't that true?

A. A person could, yes.

MR. INIGUEZ: I have no further questions.

THE COURT: Mr. Ahler?

REDIRECT EXAMINATION

BY MR. AHLER:

Q. When you poked him with your finger in the chest, did you injure him in any way?

A. No, I did not.

MR. INIGUEZ: Objection. That calls for speculation.

THE COURT: I'm sorry. I didn't hear the last part of the question.

BY MR. AHLER:

Q. When you poked Mr. Running Eagle in the chest with your finger, did you injure him?

A. No, I did not.

THE COURT: Just for the record, the objection is overruled.

BY MR. AHLER:

Q. Did he ever complain to you that you were hurting him?

A. No, he did not.

Q. Did he ever ask to see a doctor?

A. No, he did not.

Q. What was his response when you were poking him in the chest with your finger?

MR. INIGUEZ: Objection. That has been asked and answered.

THE COURT: Overruled.

THE WITNESS:. He would look at me, and again would usually not say nothing. But at least he would look at me. I would get his attention.

BY MR. AHLER:

Q. Why did you feel it necessary to poke him in the chest with your finger?

A. That was just a response of mine to try to get his attention. It worked the first time so I continued to do it.

Q. Did this defendant ever indicate to you that he was intimidated of you?

A. No, I don't believe so.

MR. INIGUEZ: Objection. Irrelevant.

THE COURT: Overruled.

MR. AHLER: I don't have anything else concerning the statement by Running Eagle, Your Honor.

THE COURT: Do you have anything else, Mr. Iniguez?

MR. INIGUEZ: No, ma'am.

THE COURT: You wanted to deal with Mr. Tilden's statements as well. Mr. Ahler indicated he wanted to elicit the statements that Mr. Tilden made for the record.

MR. STEINLE: That is fine with me.

BY MR. AHLER:

Q. Det. Saldate, did you also interview Corey Tilden on December 19, 1980?

A. Yes, I did.

Q. Where was that interview conducted?

A. Conducted at 620 West Washington, the second floor in the interview room.

Q. Was that interview conducted before or after you interviewed Defendant Running Eagle?

A. That was before.

Q. And what time did that interview begin?

A. 1:20, I believe.

Q. Had you also prior to the time of interviewing Mr. Tilden, had you interviewed Sheryl Sivertsen?

A. Prior to interviewing Tilden did I interview Sheryl Sivertsen?

Q. Yes.

A. I don't believe so.

Q. And who was present during the interview with the Defendant Tilden?

A. Myself and Det. Martinsen.

Q. Was defendant Tilden in custody at that time?

A. Yes, he was.

Q. Did you advise him of his rights prior to the time that you interviewed him?

A. Yes, I did.

Q. How did you do that?

A. By cards that are issued by the Phoenix Police Department.

Q. Is that the same card you read into the record earlier in regards to the Defendant Running Eagle?

A. It's a same card that's issued, yes.

Q. Did you read him all of those same rights?

A. That's correct.

Q. Did Defendant Tilden indicate to you that he understood those rights?

A. He said he did.

Q. How many interviews were there with Defendant Tilden on that date, to your understanding?

A. I believe we had two interviews with him.

Q. Was Det. Martinsen with you at both interviews?

A. Yes, he was.

Q. Can you tell us how long the first interview lasted?

A. The first interview lasted almost until shortly before we had contacted Sean Running Eagle.

Q. Did you discuss with him during that first

interview any facts concerning the homicide of the Williamses?

A. I confronted him with some facts regarding the homicide, and confronted him with what he had done that night. And he related to me what he had done that night when he saw Sean. Approximately what time he saw him and what he had done the next day, and basically about Sean's backgrounds, which he told me. That is basically it. Then later on we confronted him with the facts for the interview with Sheryl, and that we had also had Sean in custody.

Q. Prior to the first interview had you read him his rights?

A. Yes.

Q. Did he indicate to you he understood those rights?

A. Yes.

Q. During that first interview did he at any time invoke his rights either by asking to remain silent or asking for an attorney?

A. No, he did not.

Q. At any time during that first interview did you use any force against him?

A. No, I did not.

Q. Make any threats?

A. No, I did not.

Q. Did you make him any promises?

A. No, I did not.

Q. When did the second interview begin?

A. Second interview began shortly after speaking with Sean. If you want the exact time I will refer to my report if it's okay.

Q. All right.

A. Approximately 1632 hours.

Q. How long did that interview last?

A. That was a very short interview. Probably lasted five to 10 minutes.

Q. Did you re-advise him of his rights at the second interview?

A. No, I did not.

Q. Did he make any statements to you during that second interview reference the homicide investigation you were conducting?

A. He denied being involved in the homicide investigation.

Q. Did that -- at what point in time did the second interview with Mr. Tilden terminate?

A. Again, I only estimate five to 10 minutes later.

Q. Any time during that second interview did

you make Mr. Tilden any promises?

A. No, we did not.

Q. Did you use any force or make any threats against him?

A. No, we did not.

MR. AHLER: I have no further questions in connection with the Defendant Tilden's interview.

THE COURT: Mr. Steinle, anything you wanted to elicit for the record at this time?

MR. INIGUEZ: Not in terms of voluntariness, Your Honor.

THE COURT: My understanding, there is not going to be no opposition?

MR. STEINLE: There is no challenge to the voluntariness.

THE COURT: Thank you. Is there anything else from this witness?

MR. AHLER: No more testimony.

THE COURT: You may step down.

THE WITNESS: Thank you.

THE COURT: You intending to call any of the other witnesses present as to Mr. Running Eagle's interrogation?

MR. AHLER: Just one second, Your Honor.

Your Honor, I would like to call Det.

Martinsen for just a couple of questions.

THE COURT: All right. Detective?

LARRY MARTINSEN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. AHLER:

Q. State your name, please.

A. I am Larry Martinsen.

Q. Your occupation?

A. I am a police officer with the City of Phoenix.

Q. Det. Martinsen, are you also assigned to the homicide detail?

A. Yes, sir.

Q. How long have you been with that detail?

A. I was originally assigned in January of 1979, and I was absent for 10 months and reassigned.

Q. Did you have any -- were you assigned any responsibility in connection with the murder of Jacqueline and Herbert Williams on December 6, 1987?

A. Yes, I was.

Q. What was your responsibility in connection

with that case?

A. I conducted the scene investigation on the date, the original date of the homicide, and assisted Det. Saldate in follow-up investigations.

Q. Were you present with Det. Saldate on December 19, 1987, at the Phoenix Police Station during the interview of Defendant Sean Running Eagle?

A. Yes, I was.

Q. How long did that interview last, total interview?

A. It started at 3:40 p.m. It concluded at 1632, which is 4:32 p.m., which is eight minutes less than an hour.

Q. Do you recall Det. Saldate at some point in the interview touching the defendant in his chest with his finger?

A. I do.

Q. Did you perceive any injuries on the defendant as a result of being touched by Det. Saldate?

A. No, sir.

Q. Could you describe for us how much force was used by Det. Saldate when he he touched him with his finger?

A. I wouldn't perceive that it was any force at all. It was more or less a touching as he described, an

attention-getting maneuver.

Q. Did the Defendant Running Eagle complain of any injuries at that time, that he was being injured by Det. Saldate?

A. No, he didn't.

Q. Did you perceive any response from the defendant at the time that Det. Saldate was touching him in the chest?

A. Initially, yeah. There was somewhat surprise in Running Eagle's face. I don't think he expected anyone maybe to touch him during an interview. And his initial response was a little bit of a surprise. It just kind of set him back a little bit. I think the fact that he was touched. But beyond that, no, there were no additional obvious responses.

MR. AHLER: No other questions.

THE COURT: Mr. Iniguez?

MR. INIGUEZ: Yes, Your Honor. Thank you.

CROSS-EXAMINATION

BY MR. INIGUEZ:

Q. Officer Martinsen, you work with Det. Saldate. Is that correct?

A. I do.

Q. You work on the same team, so-to-speak. Is

that fair?

A. We are both in the same squad, in the same detail. We aren't partners in every case. We don't have permanent partners within our detail.

Q. Okay. And you didn't take Sean's shirt off to see if there had been any marks left by Det. Saldate poking him in the chest, did you?

A. I didn't see any in it. No, I didn't.

Q. My question, sir, is, did you do it, not did you see any doing it.

A. No, I didn't.

Q. You didn't call a doctor to inspect him to see if he had been in any way injured by Mr. Saldate, did you?

A. Sure didn't.

Q. You didn't also ask him if he wanted to see some medical person regarding his being poked in the chest, did you?

A. Never crossed my mind, sir.

Q. It's true, is it not, that you were also doing part of the questioning that afternoon?

A. I may have asked a couple of questions. Actually I sat off to the side, a couple of three feet. I was listening to the interview and I took some notes.

Q. Do you have your notes here today?

A. No, I don't.

Q. Can you please produce those notes for us for trial?

A. No, I can't.

Q. Why not?

A. They have been destroyed.

Q. Is that a policy of yours to destroy your notes, or is that something that you did in this case that you don't do in any others?

A. It's a policy.

Q. Don't you think it would be important for this defendant to have a copy of the notes you took that day?

A. No.

Q. Don't you think that he or someone in his behalf might want to see what was actually written down that day as opposed to what is in the report?

A. I am satisfied that the notes are reflected adequately in the police reports, and I think the interview is represented in the police report. And for that reason I don't think they would be of any benefit.

Q. When you are interviewing him you were aware that you were interviewing him for the State. Is that correct?

A. Yes, sir.

Q. And you were aware that you may possibly be coming to trial on this particular matter. Is that right?

A. Yes, sir.

Q. When you wrote your report you had that in mind, did you not?

A. Actually the report regarding the interview was not made by myself. But that is a thought when other reports are being prepared that we expect to go to trial, yes.

Q. And when you took those notes, you were taking down what Mr. Running Eagle was saying then to some of the questions being asked by Mr. Saldate. Is that not correct?

A. Yes, it is.

Q. When you wrote your report is it not fair to say that it was sometime afterwards when your mind was less clear about what had actually been said?

A. The report wasn't written the same day.

Q. Right.

A. But it was written soon after.

Q. And in fact in this case you just testified that you didn't even write the report. It was written by a third person, probably Mr. Saldate. Is that correct?

A. It is.

Q. But you didn't take the notes of Mr. Saldate regarding the report that Mr. Saldate wrote. I'm sorry, strike that.

You did take the notes regarding the report that Mr. Saldate wrote. Is that correct?

A. I did.

Q. Mr. Saldate didn't have independent notes or did he?

A. I am not aware that he had a lot of independent notes.

Q. Now, Officer Martinsen, it's not your policy also to poke people in the chest when you are interrogating them or interviewing, is it?

A. Ask the question again, sir.

Q. It's not your policy while you are interrogating people to put your finger into their chest or poke them in the chest or touch them in the chest with your finger while you are interrogating them, is it?

A. I have touched people during interrogations, yes.

Q. One of your practices?

A. I don't know if any particular maneuver is practiced. Whether I touch them on the shoulder, grab them by the arm, if I feel I need to touch them to get their attention. Or if it's maybe stroke them on the arm

to console them or whatever. I don't have any aversions to touching a person during an interview.

Q. Isn't it true that it would be very easy for someone to take some poking in the chest as intimidation or force?

A. I don't think so.

MR. INIGUEZ: I have no further questions.

THE COURT: Mr. Ahler?

REDIRECT EXAMINATION

BY MR. AHLER:

Q. Did you retain your notes prior to the time that the reports were written?

A. Yes.

Q. What point in time are the notes destroyed?

A. When the report is proofread. After the typist is through with it, we proofread it, make sure that we are satisfied with it. And after that point the notes are destroyed.

Q. Do you compare the notes with the actual typewritten copy, the Departmental Report?

A. Yes.

MR. AHLER: No other questions, Your Honor.

MR. INIGUEZ: I just have one, ma'am, if I may.

RE-CROSS EXAMINATION

BY MR. INIGUEZ:

Q. Officer, it's a fact though that the notes are not entirely embodied in the reports that are written afterwards. Is that correct?

A. The notes are not the verbatim copy of the report. They are just that, they are notes.

Q. Right.

A. To refresh one's memory.

Q. And it's true that you are the only one that has to be satisfied at that point in what you wanted in the report is in the report based on what your notes told you. Is that correct?

A. Myself and Det. Saldate.

Q. So it's possible then that in your notes there would have been something written in there that you for some reason chose not to include in your report. Isn't that correct?

A. Well, there might be doodling or observations, whatever. I am not going to say that every particular sentence or on observations that I made in my notes will go into the report. Yes, I will concede that.

MR. INIGUEZ: Thank you. No further questions.

THE COURT: Mr. Ahler, anything else?

MR. AHLER: No.

THE COURT: You may step down, Detective.

THE WITNESS: Thank you, Your Honor.

THE COURT: Did you have any further witnesses?

MR. AHLER: No, Your Honor.

THE COURT: Mr. Iniguez, do you have any witnesses?

MR. INIGUEZ: Mr. Running Eagle would like to take the stand, Your Honor.

SEAN RUNNING EAGLE,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. INIGUEZ:

Q. Would you please state your name.

A. Sean Running Eagle.

Q. Mr. Running Eagle, how old are you?

A. Nineteen.

Q. Nineteen?

A. Yes.

Q. Do you remember being questioned on December 19, I believe?

A. Yes, I do.

Q. By some detectives from the police

department?

A. Yes, I do.

Q. Are any of them in court here today?

A. Yes, they are.

Q. Are they the two gentlemen sitting here, are to the right of where I am sitting from Mr. Ahler, the prosecutor?

A. For me it's to the left.

Q. Right.

A. Yes, they are

Q. To your left. Do you remember which one of them did most of the interrogations, if any of them did?

A. Yes, I do.

Q. Excuse me. One question at a time. Would that be Mr. Saldate?

A. If he is the one right there.

Q. If he is the one sitting right now at counsel table with the white sleeve shirt and black notebook in his hands.

A. Yes, he is.

Q. Did Mr. Saldate introduce himself when he questioned you? Did he say, I am Det. Saldate from the Phoenix Police Department, for example?

A. Yes, he did.

Q. What did he say next to you?

A. He pulled up a chair.

Q. What did he say next to you? If you remember. If you don't, say you don't remember.

A. I am unsure.

Q. Okay. As Mr. Saldate started questioning you were you in a sitting, standing, or prone position?

A. I was sitting down just directly -- he was like straight across from me.

Q. Were your hands cuffed or uncuffed?

A. They had uncuffed them.

Q. Okay.

A. They had their back to the door.

Q. They had their back to the door, your hands uncuffed?

A. Yes.

Q. What were you wearing, street clothes or were you in jail clothes by then?

A. Still in street clothes.

Q. What did Mr. Saldate ask you? Again, you don't remember the specific statement?

A. Okay. He said, first he said, "I am going to have to read you your Miranda rights."

And I did in fact read from memory the Miranda Rights. Basically everybody can read them.

Q. You mean recite from memory, right?

A. Yes. Recite from memory from television.

Q. Okay. What happened after you recited the Miranda Rights from memory?

A. Then he pulled out his card and said something like, "Well, I am still going to have to." And he read them.

Q. Okay. After the Miranda Rights episode, what happened next?

A. He said, "You are being charged with murder."

Then after that I said -- I was, you know, surprised because I thought I was being arrested for speeding tickets and failure to have proof of insurance in my car at first. But -- okay.

Q. Did you at some point in that area of the conversation with him, advise him that you did not want to speak to him or that you wanted to talk to a lawyer?

A. I told him I didn't know what he was talking about. I didn't have no knowledge of what was going on.

Q. Okay. Answer my question, please. Did you at that --

A. Yes, I did.

MR. INIGUEZ: Your Honor it's my objection.

MR. AHLER: I am going to object. He is leading his own witness. I think that's improper. He ought to

let the man answer the question, not try to lead him where he wants him to go.

MR. INIGUEZ: Your Honor, if I may, please, if the question is not responsive it's certainly my objection to make.

THE COURT: We have two objections here. The objection of the State is sustained as to the leading nature of the question. You may proceed.

BY MR. INIGUEZ:

Q. Mr. Running Eagle, I will ask you the question again. Did you at that portion of the conversation ask Mr. Saldate that you wanted to remain silent or that you wanted an attorney?

A. I said I wanted to speak to an attorney. Specifically, my attorney.

Q. Thank you. Do you know about how long the conversation had gone before you said that to him?

A. I believe about a minute to a minute-and-a-half.

Q. Now, is it your recollection then that after a minute-and-a-half of this conversation, what did you say, if you remember, specifically?

A. I had asked for my lawyer and I wish -- I started to remain silent, and I did. He turned and looked to the other officer and then turned and looked

13

back to me and says, "Sean, do you remember back when you were 13 when you had --" well, it had to do with something back in my childhood.

Q. What did you say in response to that question?

A. I said, "No, I don't."

Q. And at any time again you mention your desire to remain silent or for an attorney? When did that take place?

A. It was after he started to talk to me about the past. I mean, way past. I started to get very emotional, where I did not wish to speak to him. I didn't feel like he should be forcing me into this when actually I wanted to remain silent.

Q. Why do you say forcing me?

A. Well, the force was first initiated by the guys pointing the guns at me. I am not used to that.

Q. Excuse me. No one was pointing guns at you in that room, were they?

A. No, they were not. This is before I had entered the room.

Q. Okay. Again, answer any questions referring to inside the interrogation room after he mentioned some things about your past.

A. Yes. I said I would like to see my

attorney. And I couldn't figure out why he wouldn't let me be quiet, you know, let me make my phone call.

Q. Are you sure that you didn't ask for your attorney towards the end of this interview?

A. I asked for an attorney approximately three, four times.

Q. Regarding the poking in the chest with a finger, would you please tell the Court how that happened, as far as you remember it?

A. Okay. I can demonstrate it if it would be possible to do.

Q. Go ahead. Describe it. If you can't describe it without demonstration, then you ask the Court.

A. Okay. He said -- I was pretty quiet at this time. And he had took what they call the blade of your hand, and sort of all of a sudden just hit me into the chest. And as he started going across with his hands he said, "Is this how you did it, Sean? Is this how you did it".

Q. What did you say?

A. I said no. Then I looked at the other officer like why was in my mind. Why is he doing this?

Q. Did you feel intimidated?

A. Yeah.

Q. Did you feel threatened?

A. Very much.

Q. What happened next?

A. Then I didn't really understand what was going on. Because I didn't understand. I didn't know what was -- well, I didn't know about this incident that they were accusing me of.

Q. What did he ask you, if anything, after that?

A. He said something like, "Did you hear a scream? Did you hear them scream? What did they say when they were dying?" And I can't answer that. I don't know. I wasn't there.

Q. What, were you hit again in the chest at some point? Do you know? Do you remember?

A. About three or four different times. And that was, he only hit, did that one time, like I said. But the rest of them were pokes and they were very -- like sharp pokes, forceful pokes.

Q. And what other questions did he ask you, if you remember?

A. He said something to me, "Your cousin said that you were cruising around Deer Valley."

I said, "If I remember right." I replied like, "I don't remember. I wasn't -- we didn't cruise

that night."

Q. Were you sober on the 19th when you were being questioned by Officer Saldate?

A. Yes, I was.

Q. Is there anything else that happened in this interrogation that you feel -- made you feel either threatened or intimidated, that we have not discussed in your direct?

A. Two occasions he said that, "I want to see you go to the gas chamber." And he said, "I want to see you beg for your life."

Q. Is there anything else that happened in that room that you can remember at this time?

A. He told me that at some point in there, that my fiance, which she basically is no longer my fiance at this time.

Q. Is that the way it was said to you?

A. No. Okay.

Q. Do you remember exactly the words?

A. Yes. The exact words were like -- they were that "Sheryl does not want to have nothing to do with you anymore."

Q. Anything further either in touching or in words?

A. There was an occasion where they came in,

after they had left, and didn't really give me a chance to take my own shoes off. They more or less grabbed them shoes off of me and started laughing. Walked out of there.

Q. This is during the same interrogation?

A. During the same interrogation, but after they had left and came back.

Q. Did they ask you for your shoes before they took them?

A. They really didn't give me a chance. They just grabbed them.

Q. You said they were laughing?

A. Yeah. They were laughing.

Q. Were they speaking any words that you could hear or understand?

A. No. They pretty much left.

Q. Did Det. Martinsen ask you any questions during the interrogation? That's the gentleman sitting behind Mr. Saldate.

A. I don't really recall. The only one I can remember is him, because of all of the force he was using.

Q. Him? You mean Mr. Saldate?

A. Yes.

MR. INIGUEZ: I have no further questions.

THE COURT: Mr. Ahler?

CROSS-EXAMINATION

BY MR. AHLER:

Q. Sir, you understood your rights when they were read to you that day, didn't you?

A. Basically, no.

Q. In fact, you understood them so well that you repeated them to Det. Saldate even before he had finished reading them. Isn't that true?

A. No. Eight-year-olds can recite the Mirandas from television.

Q. You recited them to him, didn't you?

A. From memory.

Q. You recited the rights from memory to Det. Saldate?

A. Off the television, yes.

Q. You were in fact going to college at this time, weren't you?

A. Yes, I was.

Q. You were taking Criminal Justice courses, weren't you?

A. No, I wasn't.

Q. You understood your rights, didn't you?

A. No, I didn't.

Q. Didn't you tell Det. Saldate after he read from the rights card that you understood those rights?

A. I don't believe so. I said maybe. And he might have took it in his own definition of what I said.

Q. In fact, sir, you talked to him for quite a while before you ever told him that you wanted to remain silent. Isn't that true?

A. I didn't talk to him. He more or less tried to get me to say things that were not true.

Q. You told him, didn't you, Mr. Running Eagle, that you had never been to that address on Sahuaro before?

A. Sahuaro? I don't exactly know where it's at because I travel all over the city.

Q. You told Det. Saldate you had never been there, correct?

A. I might have. I am unsure.

Q. He told you that your palmprint was found inside the Williams' house, didn't he?

A. Yes, he did.

Q. You told him that couldn't have been your palmprint because you were never there. Isn't that true?

A. Not really.

Q. What did you mean not really?

A. What I mean by not really is, I do not

exactly know these people. If you showed me a photograph, which I might or might not be able to identify them. But I know a lot of people in the city.

Q. You told Det. Saldate and Martinsen that that could not have been your print inside their house. Isn't that true?

A. My response to that would be, if I was unsure of the people, then I can't exactly tell you whether that is my prints or not. He never did give me the location or the address, if that would have helped.

Q. Do you know Jacqueline Williams?

A. The names I do not know.

Q. Do you know Herbert Williams?

A. The names I do not know. Were you ever in their house?

A. I don't know. That is what I am trying to get across to you.

Q. Were you ever at 2425 East Sahuaro in Phoenix?

A. The address doesn't sound familiar, but once again, I said if you give me a map I might be able to say.

Q. Do you -- did you make the following statement to Det. Saldate and Martinsen during that interview, "Just let me fall. It must be my destiny. I

must fall"?

A. The way they were treating me I sure felt like it.

Q. Did you make that statement?

A. They more or less made it for me by their actions.

Q. Did you say those words?

A. I don't know him if they were exactly.

Q. What words did you say?

A. Unsure. Why has this become a war between me and you?

MR. AHLER: Your Honor, could you direct this witness to answer the questions?

THE COURT: Mr. Running Eagle, this is not the time for you to be making statements. If you will just answer the questions that are put to you by the attorney. If there is an objection to be made, anything argumentative, for example, your attorney will make that for you.

THE DEFENDANT: Okay. Sorry.

BY MR. AHLER:

Q. Under what circumstances would you have ever been at the Williams' house?

A. I do yard work, I like to do odd jobs, I like to -- sometimes people would have me move furniture.

Q. Do you recall having a conversation with the detectives about your classes at Scottsdale Community College?

A. Yes, I did.

Q. Isn't it a fact, Mr. Running Eagle, that all of these statements were made prior to the time that you asked to remain silent, and you asked for an attorney?

A. Could you restate that question?

Q. Conversations you had with these detectives about your fingerprints being at the scene of this homicide were made before you asked for your rights. Isn't that true?

A. No. After. They were forcing me.

Q. You say that the touching on your chest intimidated you?

A. It's not alone the touching, but you forget that they more or less hit me, and more or less went across to use mental force. And I am not -- you might say I don't -- I am not into that kind of stuff.

Q. You didn't suffer any injuries as a result of being touched on the chest, did you?

A. Now what would you might say are injuries to injuries.

Q. You didn't need any medical attention, did you?

A. Medical? I don't -- I was under so much stress and agony that I couldn't tell.

Q. You didn't have any marks on your body, did you?

A. Yes, I did. But I felt there is nothing I can do about it. They were slight, if that is what you want to know.

Q. The interview that these detectives had with you is a very short interview, wasn't it?

A. No.

Q. In fact, didn't it only last about 40 minutes?

MR. INIGUEZ: Objection. That is misstating what is in evidence already as 52 minutes.

BY MR. AHLER:

Q. It lasted less than an hour, didn't it?

A. Okay. You guys arrested me in the afternoon. You had me sitting in that room a couple of hours. I had not eaten breakfast nor lunch. Under a lot of pressure from you guys it felt like all day.

Q. The actual interview when they were talking to you lasted less than an hour, didn't it?

A. I don't know.

Q. Now --

A. I know from your reports, but those are your

reports. You write the reports.

Q. How long would you say it lasted?

A. The way I felt it lasted was a day.

Q. These officer never displayed any weapons to you, did they?

A. At what time?

Q. During the time that Det. Saldate and Martinsen were interviewing you.

A. They had them with him. I believe they had them with him. Just knowing that they are police officers, and, you know, that they got guns is enough to intimidate you.

Q. They didn't threaten you with their guns, did they?

A. If I poked him in the chest he most likely would have.

Q. Sir, they didn't threaten you with their guns, did they?

A. Through common knowledge they did.

Q. Did they pull the guns out of the holster and point them at you?

A. I didn't touch them so that I wouldn't give them a chance to do that. Because if I poked him, I touched him, I wouldn't be sitting here right now. I would be someplace else, like six feet under. They won't

give you a chance.

Q. Sir, they didn't indicate to you that they were going to take their guns out if you didn't talk to them, did they?

A. They had this attitude where they can touch you, you can't touch them. If you touch them they will shoot you.

Q. Sir, you indicated that even though you recited the Miranda Rights to Det. Saldate, you didn't really understand them?

A. I didn't really understand them.

Q. You had heard those rights before that day, hadn't you?

A. Before that day on television shows, on numerous occasions. I never really understood the Miranda Rights until I have been in here and I have been reading.

Q. You probably had been read the Miranda Rights before December 19, hadn't you?

A. What day?

Q. Let's talk about back when you were 13. You had been read your Miranda Rights back when you were a juvenile on more than one occasion, hadn't you?

A. I am unsure. Can you describe them a little better?

MR. AHLER: I have no other questions.

MR. INIGUEZ: I have nothing further, Your Honor.

THE COURT: You any step down, Mr. Running Eagle.

THE WITNESS: Thank you.

THE COURT: Do you wish to call any further witnesses, Mr. Iniguez?

MR. INIGUEZ: No, Your Honor, we do not.

THE COURT: Mr. Ahler, you have any rebuttal?

MR. AHLER: No.

THE COURT: You wish to make any comments at this time?

MR. AHLER: Yes, I do.

Your Honor, I think the issue here is one of credibility, whether you want to believe the officer's testimony or his. They are obviously quite different. The officers admitted to touching him. I don't think there is any indication though that there was any undue force or that that caused him in any way to give a statement he otherwise not have given. These officers are only with him 45 minutes at the point in time where he invoked his right to remain silent, asked for an attorney. They stopped.

Up until that time he made a number of

statements. Those statements should be admissible. He knew his Miranda Rights not only from being read them to him that day, but he recited them back to the officers. His statement now that he didn't understand them simply is not credible. He knew what his rights were. He had been read his rights before that day. He knew exactly what they were. I would ask you to admit statements made prior to the time he invoked his rights.

THE COURT: Mr. Iniguez?

MR. INIGUEZ: Well, Your Honor, I believe from the testimony it has been extremely clear to this court that while Mr. Running Eagle was read his rights, the method of interrogation was a little different than what we would like for interrogation to be without force. I do believe that many people can recite their rights from television. There are many police shows on television these days. They are very popular for some reason, and that the average person gets to hear them on television. I believe you can teach a parrot to say the Miranda rights. That doesn't mean he understands them. I believe the average citizen in our streets does not understand what the Miranda Rights mean. That a person being able to say the phrases that are written in the card does not impart on to them there the significance and the importance and the signification of the rights

themselves.

However, in this particular case I don't think that that is really what the problem is with this interrogation. I believe that a police officer being six inches away from the person's face, poking his hand into his chest is a method of getting attention. Is unduly intimidating and is force. More so than what was required to get Mr. Running Eagle's attention.

They were in a room that was about six feet by eight feet or something of that nature, a very small room. So that it wouldn't have been very difficult. He was the only one in the room besides the two detectives. It would not have been very difficult to get his attention through verbal communication. I don't think putting his hands on him was required. I do think that had -- even though the police, Mr. Saldate may not have intended it to happen, I believe the action itself of poking a person in the chest and being six inches away from his face, that would have a significantly intimidating factor.

I remember from my Marine Corps days if someone gets in your face six inches away it all by itself intimidates. Then if they start poking you, the poking and the nearness has a way of making the conversation totally different than when you have

somebody sitting across the room at you, looking at you calmly, asking you questions.

In this particular situation, that coupled with the fact that at some point Mr. Running Eagle said, "I want to remain silent", and the conversation continued, I believe those two matters certainly combined do make this interrogation less than voluntary for the reasons I stated.

I know Mr. Running Eagle was taking some classes at Glendale -- at Scottsdale Community College. I do not know that those classes taught him the meaning of the Miranda Rights. And because of his age of 19, I know that Mr. Ahler mentioned that he had had his rights read before. Possibly one of the times was when he was 13. I would venture to say that when he was 13 that would have been a significant time ago. He may have forgotten, even if he was explained, what they meant and was able to understand them at that age.

For the reasons I have stated, we request that this Court not allow the statements in. In particular, the one regarding that his -- "It was his destiny at fault. It's my destiny. Let me fall", or "I must fall." I think it's an ambiguous statement at best. But because of the methods of which the questioning was conducted, I do believe it was as a result of threat and

intimidation, not a voluntary statement.

THE COURT: Anything else, Mr. Ahler?

MR. AHLER: No.

THE COURT: The Court has considered the testimony of all of the witnesses, that with regards to the voluntariness of the statements made. The Court finds that the defendant was advised specifically of the charges that he had been charged with at that time, that the defendant prior to the completing of the reading of Miranda Rights by Det. Saldate recited the Miranda Rights from memory. Had Det. Saldate failed at that point to go further in review of the Miranda Rights, perhaps there may have some basis for finding that the defendant Running Eagle wouldn't have understood. But Det. Saldate did the prudent and right thing by proceeding with that, in any event, despite Running Eagle's obvious memorization of those rights.

It does appear to come down to an issue of credibility in this case. It's obvious that Defendant Running Eagle is an intelligent young man, that he understood those rights. It's further clear that although the method of interrogation may not have been perfect, not one that I would recommend that the police use in terms of touching the defendant, there doesn't seem to be any indication that the touching was anything

beyond a means of getting Mr. Running Eagle's attention. And given his inability during the questioning of him during this hearing, it seems that Mr. Running Eagle does have a tendency to divert and get on to tangential matters.

The Court therefore finds that given the circumstances, again, although there wasn't a exactly perfect interrogation in light of the touching of the defendant, that the overall conducting of the interrogation was appropriate. There were no promises, no threats, no force.

I would, for the record, note that I have reviewed the description provided in the file of Mr. Running Eagle, and he is 5'11", 215 pounds. Had this been, for example, Mr. Antone at 5', 120, perhaps there may have been a different atmosphere in that room. The description appears to be accurate.

For all of the findings I have given, the Court finds that the statements were knowingly, intelligently, voluntarily made, and will be admissible.

Now at this time what I would like to do is take a break, allow Mr. Ahler to review the packet that Mr. Steinle has been able to provide. We will take a short break and come back into the courtroom in about 15 minutes.

MR. STEINLE: Judge I got an extra copy, so Mr. Ahler can return the Court's copies.

THE COURT: Thank you.

(Whereupon, a short recess was taken.)

THE COURT: Let the record reflect that counsel and the defendants are present.

The only thing that we have left is the voir dire questions. Let's first deal with the requested from the Defendant Tilden's request for a written jury questionaire.

Mr. Ahler, have you had an opportunity to look at the packet with regards to the voir dire?

MR. AHLER: I had a very limited chance to review this. I would object to using a written script in this particular case. I have gone through these questions. I don't think the majority of them are any different from the questions that the bench would normally ask of prospective jurors. I don't see that that much good is done in this case by using a written type of format. So I do have an objection basically to submitting a written list of questions to the jury to be completed prior to the time they come in here. I think we can save time and still do more than an adequate and

fair job by just simply having the Court ask the prospective jurors all the questions. I think the rules are set up for that. I think they are set up that way for a reason. I don't think there is any reason to get away from that procedure in this case.

I do have also objection to a number of these questions,

THE COURT: That are included in the questionaire?

MR. AHLER: Yes.

THE COURT: Let's deal with the idea of a questionnaire first.

Mr. Steinle, with regards to just the general idea of the questionnaire, what purpose do you believe would be served by having the jury -- the jurors fill out the questionnaires as opposed to simply asking these same questions directly from the bench?

MR. STEINLE: Judge, I guess from a lawyer's point of view you get an opportunity to review the written responses to the questions at a time where you can go through and reflect upon the responses rather than taking the oral responses from the majority of jurors. The problem that you have in the way that it's proposed under the rules is the Court asks general questions of everybody. What you try to do is find someone who would

answer the question differently. I mean, you don't get responses from a lot of jurors such as, have you ever been the victim of a crime, or if you were the victim of a crime, raise your hand. A lot of people don't raise their hands. Then later on, 10 minutes later they decide, well maybe I was a victim of a crime. Then they raise their hand.

I just think there is no reflection on the jurors' part when you ask them the general questions. And I guess part of the concern is something that the Mecham lawyers pointed out in the newspaper articles. After the verdicts they credit the success in their case by the ability to elicit responses to questions upon which a trained psychologist was able to make suggestions as to who to strike and who not to strike. I don't have the advantage of being able to have a trained psychologist sitting next to me. What I am trying to do is get some kind of response from every member of the jury in a written form that I can go over to try to make an intelligent decision as to who would be a fair and objective juror in this case. It may not be the best solution.

My other suggestion in the other request is that there be -- I think the thing I am more concerned in this case is through individual voir dire, because my

experience has been that what you got to do is get each juror down, you got to talk to each juror individually to find out the real feelings on sitting in cases as difficult as this case is going to be.

Now, either you can do it in written form by having all the jurors sit down and write out their responses, letting the lawyers look at the responses, or you can do it the traditional way. But somewhere during the traditional way I am asking the Court individually, take each juror, talk to them outside the presence of the other jurors to find out whether or not they have any problems sitting on this case, or anything in their backgrounds causes them any concern. In that regard it has been my experience when you take the jurors one-on-one where they answer the general questions in the affirmative, all of a sudden they get back in chambers with the lawyers, all of a sudden they have all of these reservations that they haven't expressed in open court.

Now, again, I propose one method of doing it would be through a written questionnaire where a person in the privacy handwritten statement put down maybe some reservations that they may have. Or in the alternative if you are going to conduct the standard voir dire, somewhere along the line individually question each juror, find out whether there is something there that

they would like to make the lawyers aware of.

This is -- my client is charged with a number of things but two first degree murder counts. The State is asking that they be death qualified. The State is asking for the death penalty. I am trying to find a way to find out whether or not the people sitting on this panel will be fair and objective. The only two ways I know of doing that is to either get each individual juror to fill out a written questionnaire, or in the alternative do an individual voir dire of the jury panel hoping that they will be open and candid in their responses.

THE COURT: Let me ask you this. With regards to an individual voir dire, you speaking in terms of going over every single question, or having all of the questions asked with an individual voir dire after, with any specific concerns you may have as a result of questioning that were asked in court?

MR. STEINLE: Well, in terms of the general questions that the Court goes over on a general basis, you know, those can be in the pattern. But somewhere along the line take each juror individually, bring them to chambers, ask them whether or not there is anything that the Court has asked in open court that they wish to talk to in private. Then ask them a couple of other

questions in terms of the death qualifying questions, whether or not they personally, now that they are outside the presence of the other members of the jury panel, feel they can sit on a death case or if they have some reservations. Just some kind of ability that each juror can, once they are outside of the group, express whatever concerns they may have about their ability to sit in this case. Because as I said, we do it through a negative. We want people to stand up, say, yes, I will respond to that question. But my experience has been 60 percent of the people never raise their hands.

Or in the Comer case in January, we had 10 people who claim that they had heard or read something in the newspapers in terms of the general questions. They said to Judge Reinstein, they don't see where it would affect their ability to sit. At the end of it I asked the Court, take those 10, find out specifically what they read, what they heard, what they saw, and what opinions they formed. Of the 10 that are brought back in chambers six, before we even asked them questions, said maybe I ought not sit. In all then the Court went into a long questioning process.

In one case we found that someone who had read about the Comer case read all the articles, all the newspapers articles, went out to Apache Lake to talk to

the Forest Service because she had a woman's fishing group that fished out there and she bought a gun to take with her when she went out there. And she was satisfied after talking to the Forest Service that they caught the right guy in terms of the general terms of open court. All she said is yeah, she read some articles, but she could set aside her opinions.

Now, I can't tell you what kind of panel we are going to get, but I am trying to find a means of people can without standing up in front of a bunch of 40 or 50 or 60 other people espress their opinions that will affect their ability to sit on this jury panel. That was the purpose of first a questionnaire that they could fill out. And if not the questionnaire, of some ability during the course of jury selection where we would have individual questions to the jurors and individual cases so that these people can honestly express whatever reservations. I think it benefits both the State and the defendants. Because in this case to be as interested in making sure that the people who sit in this jury won't make the decision because of a fear to impose first degree murder because of the death penalty. Now so they have as much interest in doing an individual voir dire as I think we do in this case.

THE COURT: Mr. Iniguez?

MR. INIGUEZ: Your Honor, for the reasons that Mr. Steinle has stated, I concur with the motion that he has filed in this Court.

THE COURT: Do you have preference on a written versus an individual?

MR. INIGUEZ: Your Honor, to be honest with you we just got this a few minutes ago. I haven't had an opportunity to carefully review both, as one opposed to the other. I do believe that a written statement in some situations would be better. However, I have seen both of the questions. Most of the questions I think are very relevant, and I think that the jurors would feel a little bit more at ease in filling out a written statement regarding these concerns. However, I do think that the second alternative that Mr. Steinle has proposed would also suffice, cover the State and the Defendant's interests in a fair trial here.

THE COURT: Mr. Ahler?

Excuse me, I have some concern about the amount of attention that this case has gotten. I had assumed that because it has been some time ago, not that long, that maybe attention would have subsided. That has not been the case in terms of the number of calls that I have been getting to my office from media and other people. That gives me some idea that there has been some

interest in the past and there will continue to be.

Given the seriousness of the charges both, from both sides, my preference would be to in abundance of caution do one or the other, either the written or the individual. And given the two, I am going to do one or the other. My preference is to do the individual. And the reason is, I would like to do, first of all, the traditional in court asking of all the questions.

And as Mr. Steinle already notes with regards to some questions I do ask jurors if they are interested in coming back to chambers if there is something, like for example if they have been victims of a particular crime, or they feel they cannot discuss it in open court, or if they themselves have been charged with anything other than a traffic offenses. And in some of those I found also that they may have been quiet and subdued in the answers they gave in court, while in chambers their answers were considerably more detailed, and had more impact to whether or not they should be jurors or not.

We are going to be moving tomorrow to 402 for jury selection. I haven't yet figured out where exactly I am going to be able to have a chambers there. The number of jurors that we are going to be calling is 80. There is no way I can sit 80 people in here. So

that is what we will need to do. If we did a written one the other problem with that is having it prepared, ready to be handed out tomorrow. That is my second choice, anyway. You probably have that on word processing, right?

MR. STEINLE: Well, I could delete it on word processing, but if the Court is leaning towards one, I prefer the individual as opposed to the written, so --

MR. AHLER: I am not exactly sure what the Court means by individual.

THE COURT: Let me -- what I -- maybe it's not what Mr. Steinle has indicated. What I would propose to do is go through all of the questions that you would like me to ask, and those that have been submitted by the defense. Did the State submit some as well?

MR. AHLER: I submitted some questions reference death qualification.

THE COURT: Death qualification. I would ask almost all of the questions in open court, with the exception of some that you can tell in advance are going to be sensitive, or otherwise difficult to answer in open court. As examples, as I said, what I would do is indicate we are going after the majority of the questions. We will take each person individually, talk with them on those questions that are the sensitive ones,

plus perhaps ask some sort of general. Is there any of the questions that have been previously asked that you felt you were unable to talk about in open court, or is there anything else that you thought about that the attorneys and the Court need to know about. That is what I mean by individual.

MR. STEINLE: What you are saying is you will get down to the striking panel?

THE COURT: Right.

MR. STEINLE: Whatever it be, 20 or 25 people that we are going to have to work with, and then you will take each one of those people and save possibly the death penalty questions, possibly the pretrial publicity questions, and the general question, is there anything else that you want to tell us. You will take each one into chambers individually and talk to them?

THE COURT: Right. I think that's the most efficient. Initially what I thought is you meant we take one at time, ask them every single question that has been proposed. That would be just an incredible time consumer. I don't think we would accomplish anything necessarily. But I think doing it this way where you weed out all of those, for example, that right away have said it's much too long, I can't sit, I have vacation problems, get through all of those types of questions

first. And the general one's, the one's that aren't going to be difficult for anybody, then go back in and we may end up having people who have said, back to some innocuous question, I have some other problems. But at least we will use that individual at the end to where we are down to pretty much what our panel is going to be. Does that make sense?

MR. AHLER: Sounds to me like the system you are proposing, Your Honor, is different from the one Mr. Steinle is proposing. The way I anticipate this, if we have 12 trial jurors, possibly four alternates, each side is entitled to 10 strikes. We are talking about a potential jury panel of 36 people to begin with. Are you talking about bringing every one of those persons individually in, after asking them general questions and asking them other questions?

THE COURT: Right. But only after we have probably eliminated a lot of people due to time problems or to other things to where we are close to the end of all of the questions, where you will have eliminated most people that have problems. And, you know, we may end up having to call more people after our individual meetings, but --

MR. AHLER: I guess my question is what questions are we going to submit to the jurors

individually as opposed to --

THE COURT: Right. Well, you gave some examples. What I would propose to do in that regard is to agree ahead of time what questions are going to be. It may be that as we get through the majority of the questions something else may come up. But I think a general question to individuals, is there anything else that you might have not wanted to talk about in court is going to bring out the most important things or telling things that may not have been brought out in open court. So I don't think there will be a whole lot of questions.

MR. STEINLE: Judge, it seems to me in terms of the questions that ought to be done individually, I think pretrial publicity has to be one of them because I don't think because you can then ask the immediate follow-up questions, did you heard anything, what did you hear, where did you hear it, is much more conducive to the individual questions than it is to the group. The death penalty question I think in terms of the State is also one that the State is going to want to have individually. Ask each member of the jury panel as they come through, rather than a general question.

THE COURT: Well, I will tell you what. Let's -- I am going do it this way in terms of the general, then an individual. That is, we will do it that

way as opposed to the written questionnaire.

Now, what I would like you to do is since Mr. Iniguez and Mr. Ahler you just gotten this packet, I would like for you now to go through those, and we can meet over the noon hour. Is that a problem for anybody?

MR. INIGUEZ: What time? You know, I have a trial in Judge Rose's court going on every morning.

THE COURT: No, I didn't know that.

MR. INIGUEZ: I believe he called you on that some month ago when I filed a Motion to Continue in his court. I am in trial in Judge Rose's court from 9:00 in the morning until he breaks. Today it was about 12:30. But I can be here, I am sure, by 1:00, if you wanted to meet at 1:00, 1:15.

THE COURT: I was thinking earlier. I was thinking like noon. Where are you having this trial?

MR. INIGUEZ: In -- what is it, 3225 West Durango, the Juvenile Court Center.

THE COURT: Well, what we can do is meet at 1:00. I can just tell the jury commissioner we are going to want them to send up the panel about -- it shouldn't take us more than an hour, I wouldn't think. At 2:00 o'clock. We can just decide then exactly what the questions are going to be. If you will tell me ahead of time if there is anything that you can agree upon before

that will save us a lot of time. If we can just do that, I think we can get through some pretty quickly.

I know that it's going to take a long time to make a jury, not just because of doing it individually, but because of vacations. And that is just the way that it goes. But we need to get started. I rather do that than do a written.

MR. INIGUEZ: That is fine.

MR. STEINLE: That is fine.

MR. INIGUEZ: Yes, ma'am.

THE COURT: You can be here at 1:00 o'clock. Know that we will be picking the jury in 402 in the Central Court Building.

MR. STEINLE: You want us to meet here?

THE COURT: We will do it here in chambers. I am not sure where to tell you I am going to have chambers over there.

MR. AHLER: You anticipate we will do the whole trial over there or just jury selection or whatever?

THE COURT: Same thing Judge Dann asked me. One of the problems I am having with the number of alternates we need. My jury room is tiny. I wanted to have my bailiff check out that other jury room to see if it will be any better.

MR. STEINLE: Judge, I can indicate to the Court

now that I talked to your bailiff earlier. We need a bigger table.

THE COURT: We do have a bigger table available over there. Now that may need to be moved over here if we end up coming back here for trial. I told Judge Dann what I would do is sort of see how comfortable it was or uncomfortable, one way or the other. We can have that certainly if we need it. That is what it is there for. So the bigger table will be there for tomorrow.

MR. STEINLE: The other thing I would ask the Court, if the Court could have some extra pads available.

THE COURT: Those kind of pads on the easel?

MR. STEINLE: Yes.

THE COURT: Is there anything else? Okay. I assume there is a podium over there.

Anything else in terms of equipment that you might need?

MR. STEINLE: No. Just if I had a couple of extra pads I could take one, then I wouldn't have to worry about getting here early to work those up. We can just change the pads.

THE COURT: That won't be a problem. We will get that for you tomorrow.

Mr. Ahler, anything you need?

MR. AHLER: Not right now, Your Honor.

THE COURT: All right. Okay. Then see you tomorrow at 1:00 o'clock.

Thank you.

* * * *

I Lydia Estrada, do hereby certify that the foregoing pages constitute a full, accurate typewritten record of my stenographic notes taken at said time and place, all done to the best of my skill and ability.

DATED this 24th day of April, 1989.

Lydia Estrada
Official Court Reporter

16

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

1989 APR 11 PM 4:20
JUDITH ALLEN, CLERK
FILED
BY A. Arvita DEP.

STATE OF ARIZONA,

Plaintiff,

vs.

SEAN RUNNINGEAGLE,
CORBY TILDEN,

Defendants.

No. CR-87-11508
CR-89-0048-AP

CR-89-0048-AP

FILED
APR 13 1989
NOEL K. DESSAINT
CLERK SUPREME COURT
BY

Phoenix, Arizona
July 18, 1988

BEFORE: The Honorable GLORIA G. YBARRA, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

ORIGINAL

PREPARED FOR APPEAL
For Supreme Court

LYDIA ESTRADA
Official Court Reporter

SUPERIOR COURT

... AND CONFIDENTIAL MATER...

THE COURT: I am sorry, counsel. I think I failed, for the record, to say the number of that exhibit. What ws that?

MR. AHLER: 130 and 131, Judge.

THE COURT: Did you move both of them in?

MR. AHLER: Yes, I did.

THE COURT: 130 and 131 will be admitted.

DIRECT EXAMINATION

BY MR. AHLER:

Q. Tell us your name, please.

A. Armando Saldate.

Q. Your occupation?

A. I am a Phoenix Police officer.

Q. Det. Saldate, are you assigned to any particular unit or --

A. I am currently assigned as a detective to the Homicide Detail.

Q. How long have you held that position?

A. Over two years.

Q. How long have you been with Phoenix Police Department?

A. Since 1969.

Q. What did you do before you worked Homicide?

A. I worked Robbery for about eight years. In

between there I had some Undercover Work for about eight months. I worked Forgery, I worked Burglary Detail, then I worked Uniform Detail.

Q. Did you acquire any duties in regards to the investigation and to the murder of Jacqueline and Herbert Williams?

A. Yes. I was assigned the case agent for that homicide case.

Q. When did you first become involved in that case?

A. The morning the bodies were discovered.

Q. And can you tell us what your duties are as the case agent?

A. The case agent responsibilities are trying to gather all the supplements together, coordinate all of the investigation totally, and ultimately make the arrest.

Q. Were you involved with the scene investigation at all?

A. Very briefly. I was given a cursory view of the scene by Det. Martinsen.

Q. Were you involved in the interview of defendant Sean Running Eagle in connection with this case?

A. Yes, I was.

Q. When did that interview take place?

A. Took place on the 19th of December, 1987.

Q. Where did it take place?

A. Took place at the Main Police Station, at 620 West Washington.

Q. Were you involved in his actual arrest in connection with this case?

A. No, I was not.

Q. What time did you start your interview with Mr. Running Eagle?

A. Approximately 1540 hours, which would translate to 3:40 p.m.

Q. Was anyone else present during the interview besides yourself and defendant Running Eagle?

A. During the entire time Det. Martinsen was present.

Q. Did you advise him of his Miranda Rights before you started questioning him?

A. Yes, I did.

Q. Did you do that from memory or from a written card?

A. I upon making contact with Mr. Running Eagle, I removed a card from my wallet that is issued by the Phoenix Police Department. Was going to begin to read the Miranda Rights to him.

Q. Do you have the card with you?

A. I do.

Q. Could you read to him the rights that you read to him on the afternoon of December 19th, 1987?

A. Certainly. The rights card is a standard issued from the Phoenix Police Department. Has a Spanish version on the back and the English version on the front. It states, "You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to the presence of an attorney to assist you prior to questioning, to be with you during questioning, if you so desire. If you cannot afford an attorney you have the right to have an attorney appointed for you prior to questioning.

Do you understand these rights?"

Q. Did you read all of these rights to defendant Running Eagle before you started questioning him?

A. Yes, I did.

Q. Is the defendant Running Eagle in the courtroom today?

A. Yes, he is.

Q. Could you identify him for the record, please?

A. He is the --

MR. INIGUEZ: We will stipulate to identification.

THE COURT: The record will reflect the identification of the defendant Running Eagle.

BY MR. AHLER:

Q. Can you tell us what, if anything, happened during the night you started to read him his rights?

A. I first removed the card from my wallet, was going to start reading him his rights as I just did. Then Mr. Running Eagle by memory recited the rights out loud to me. The exact rights that I was going to read him. I told him that was fine. However, I still went ahead and read him his rights again and asked if he understood them. He said he did.

Q. Did you advise him he was under arrest before you questioned him?

A. Yes, I did.

Q. What did you tell him?

A. I told him he was under arrest for murder.

Q. How did you start your conversation after you had read him his rights?

A. I explained to him that he was under arrest for murder. I told him it was a very serious crime he committed. I then told him that we identified his fingerprints at the crime scene. And he immediately,

very calmly, said that they were not his.

Q. What was -- how long did this interview last with defendant Running Eagle?

A. Forty-five minutes to an hour.

Q. What was his demeanor like during this interview?

A. Very calm. On most occasions very calm, smiled. He was very quiet.

Q. Did you have information prior to the time that you started his interview that his palmprint had been found inside the Williams' home?

A. Yes, I did.

Q. Did you ask him what he was doing the night of December 5th, 1987?

A. I did. And I basically told him, asked him what he had done. I believe he said he couldn't recall that or he told me that -- if you don't mind, I can refresh my memory with my report.

Q. Would that assist you in remembering exactly what he said?

A. Yes, it would.

Q. Okay.

A. I asked him if he was in a certain area, and he told me that he was not during that period of time.

Q. You recall him making any statements to you

right after the time that you asked him about where he was on the night of December 5th?

A. Yes, I do.

Q. What did he say to you?

A. At this point he became -- his voice became a little louder. He said something to the effect, "Just let me fall. It must be my destiny. I must fall."

Q. Did you inquire of him what he meant by that?

A. Definitely. I told him that it was not my job to ensure that he fall, but just to get the truth. He again repeated that he must fall.

Q. Were Mr. Running Eagle's tennis shoes taken from him at any time during the course of that interview?

A. I believe Det. Martinsen went back and removed Mr. Running Eagle's shoes from him.

Q. Were you involved with the interview of Orva Antone?

A. Yes, I was.

Q. When did that interview take place?

A. That interview took place shortly after Mr. Running Eagle's interview, several hours afterwards.

Q. Was it on the same night?

A. Yes, it was.

Q. Where did the interview take place?

A. It took place at 620 West Washington, at the Main Police Station.

Q. Who was present during that interview?

A. During the entire interview Det. Larry Martinsen was present.

Q. Was Mr. Antone under arrest at that time when he was first brought in?

A. When he was first brought in he was under arrest, yes.

Q. Did you also advise Mr. Antone of his Miranda Rights?

A. Yes, I did, using the same card.

Q. How long did the interview with Orva Antone last that night?

A. Hour or more.

Q. Were any deals made with Mr. Antone at that time?

A. Definitely not.

Q. Did you explain to Mr. Antone what you were investigating before you started to interview him?

A. Yes, I did.

Q. What did you tell him?

A. I told him I was investigating a murder. That he had been arrested for murder.

Q. How did you initiate your interview with Mr.

Antone?

A. My interview was initiated again by reading him his rights card, which I did, and asked him if he understood. Then got a little bit of background on him.

Q. Could you tell at all if he had been drinking prior to the time that you started interviewing him?

A. I don't believe we could tell as much as I did ask him. He said that he had had a beer earlier during the day. And the test would have been done on him.

Q. What was Mr. Antone's attitude like during the course of that interview?

A. I believe Mr. Antone was at first -- began to be -- was evasive at first, but later became very cooperative.

Q. How were you able to direct him to the specific night in question and ask him about where he may have been and what he may have done that night?

A. Up to that point I had interviewed several other persons, and I specifically asked him to focus in on the night when he was with Corey and Sean, and possibly Sheryl's house. And that is how we focused in on that particular night.

Q. Did you ask him questions concerning whether

he had been riding around with them that night?

A. Yes, I did. And that was included. That included also focusing in on that particular night, whether he had remembered riding around that particular night.

Q. You indicated that initially he was somewhat evasive. Can you tell us what you mean?

A. I may have used the long word evasive as much as Mr. Antone at first tried to minimize his position, which is very common. They try to minimize his involvement, and later became very cooperative with me and told us the truth.

Q. Did you give Mr. Antone any information about the property that was stolen from the Davis' house?

A. No, I did not.

Q. Did you give him any information concerning the property that may have been taken from from Mr. and Mrs. Williams' house?

A. No, I did not.

Q. Did Mr. Antone tell you who he had been with that night that they were use cruising around?

A. Yes, he did.

Q. What did he tell you?

A. He told me that he had been with Sean and his brother Milford. And that sometime after they were

cruising, he said he realized that Corey was in the car. He said he had been drinking. He said he believed he went to Corey's house and picked him up.

Q. Did he indicate whose car they were in?

A. He indicated to me it was Sean's car, but actually it belonged to Corey and Sean.

Q. Did he tell you whether they were cruising after all four people were in this car?

A. He said they were cruising in the general area. Never specifically said an hour, I believe, but he said that they were cruising, listening to the radio at one point. He indicated something to the fact that they needed gas or he realized they needed gas, and he said that they stopped at a location, residential area. And he said that Corey and Sean got out of the car.

I specifically asked him if it was to siphon gas. He said it was. Then got back in and they again went cruising, listening to the radio. During this time he said him and Milford were in the back seat, Sean was driving, Corey was the passenger.

Q. Were you involved in the execution of the search warrant at the residence of Tilden and Running Eagle on the night of December 19th?

A. I assisted, if that is what you want. Yes, sir.

Q. Were you present when the trunk of the car was opened and certain items were taken out of it?

A. I was present either at that time or shortly after the trunk was opened.

Q. You recall if there were any gas cans in the trunk of that car?

A. I believe there was. I am not sure.

Q. Was there any hose?

MR. INIGUEZ: Excuse me, Your Honor. I believe the witness' answer was muffled by his next question. I believe he said I am not sure.

THE COURT: Would you repeat the last part?

THE WITNESS: I said I don't believe there was, but I am not sure. Again, I have to say -- again, I was just there shortly after that truck was stopped.

BY MR. AHLER:

Q. Did Mr. Antone describe for you the location where they stopped the last time?

A. He said it was a residential area. He said they stopped in front of a house and that Corey and Sean got out of the car, and went to another house. Not the house they stopped in front of, but another house. He said something to the effect that Sean was working on the car. And I think we asked him how he knew that. He said the hood of the car or the other car was up.

Q. Did he describe what he did after he saw the defendant Running Eagle working on this car?

A. He said he got out of the car shortly thereafter, and walked over to the car, stood by Sean as he was working on the car.

Q. Did he describe to you his actions after going to the house?

A. He said he was there at the car. A short time later a man came out of the house to which they were parked in front of, walked towards them. He made a comment that he had already put a lot of stuff in the trunk at that point.

Q. Did he describe to you the stuff that he put in the trunk of Running Eagle's car?

A. He said it was -- one of the things was a tool box, a floor jack, he said that he put in a bicycle. But first the bicycle wouldn't fit so he had to take some pliers out of a tool box, take the front wheel off of the bicycle, then put the bicycle in it. Later on he described this carburetor. I asked him if it was a carburetor. He said no, there was two carbeurators that he took to the trunk.

Q. Did he describe to you the man that came out from the house next door?

A. At one point he described him as an older

man.

Q. Did he tell you where this man was when he first saw him?

A. He said that they were at the car and the man was walking across the front yard of the house they were parked in front of. He said the man approached Sean and told him that -- told both of them that they better leave or he was going to call the police. He said he immediately then walked away from Sean in the car, headed back towards their car.

Q. Did he describe to you the confrontation, if any, that may have occurred between the old man and Running Eagle and Tilden?

A. Yes, he did.

Q. What did he tell you in that regard?

A. He said once he got back to the car, Corey who had been by the their car originally, then started to to walk back towards Sean, which would make him walking behind the old man. He said at that point Sean and Corey were in the front yard talking to this old man. And he once described Corey as either pushing this old man, then the old man pushing him back, telling him that he was going to call the police. Then said that Corey struck the old man. The old man immediately turned away from them, and was walking towards the driver, towards the

front of the house. He said he saw Corey and Sean walking behind the old man, but that they were conversing between themselves as the old man walked in front of them. The old man continued to, what he described as a driveway or said it was a driveway. I specifically asked him what area. He said there was a car parked in the driveway and they were at the back of the driveway or the back of the car. He said at that point he remembers hearing a lady's voice. He heard a lady come out, then the confrontation took place between the lady, the man, Corey, Sean, now being four people.

Q. Did he describe to you whether Sean Running Eagle and Tilden had anything in their hands the time the confrontation took place?

A. At one point he told me that Sean had his knife with him. He said he was carrying a large knife with him. He said he had taken it out of the car to work on the car. He said he had the knife in a fashion holding the knife handle, but with the blade pointing up towards the back part of his arm. He said that Corey at one time was armed with possibly a screwdriver, but he stopped it. Then later said Corey was armed with a flashlight, a large black flashlight that he knew belonged to Corey.

Q. Mr. Antone relate to you whether he observed

Running Eagle do anything with this knife?

A. During this confrontation, Corey and Sean, he said that Sean at one time, the knife in his hands with the blade pointed outwards this time, towards the old man, he said he thrust at the old man. Was as if he was playing with him or kidding with him, and just lunging at him. The old man kept telling him to put the knife away. He said at one time Sean dropped the knife and he picked it up quickly, then struck the old man with the handle of the knife on the face.

Q. Did he see or did he relate to you anything that Tilden did?

A. He recalled Tilden holding the flashlight. He recalls the lady apparently telling them to leave her husband alone, telling Sean to put the knife down, telling them to just leave, to get out of there, to leave them alone.

He remembers that Corey was holding the flashlight in his right hand. Corey, as he described it, made a turn as if he was going to walk away from the lady, but instead he quickly spinned and struck the lady on the side of the head with the flashlight he was holding.

Q. Did he describe the flashlight to you?

A. He said a large black flashlight that Corey

had.

Q. Did you have any conversation up until that time about such an object?

A. Yes, we did.

Q. Who had you gotten that information from?

A. I believe Sheryl Sivertsen had told us that Corey had a large black flashlight that they used.

Q. Did Mr. Antone describe to you where Tilden hit the woman?

A. Yes, he did. He pointed out. I asked him if he remembered where. He pointed to the left part of the head, just above the ear. He said he believe he hit the lady just above the ear, towards the back of the head.

Q. Mr. Antone relate to you any information concerning Running Eagle and Tilden's entry into these people's home?

A. He said at one point he, after seeing Corey hit this lady, he did go and check on his brother to see if he is was still passed out. And he was. He said something else happened. He then realized, looked towards the driveway again, and at that point he saw only Corey and Sean at the driveway, and the man and the woman were gone.

Later on at one point he asked him about the

hole in the door, and he recalled that Sean had made that hole in the door with a piece of iron that he had obtained from the house next door. He then tried to focus him in on entering the house, or did he ever enter the house, or did anyone enter the house. And he said that he walked over to the driveway, and he seen Corey standing outside. He didn't see Sean anymore.

He then walked up to the doorway and he says that he believes Corey may have pushed him into the doorway. He recalls it was dark inside that room. He recalls there was lights coming from the west, possibly an opening, in a door opening. He recalls cabinets to the side hanging on the wall. He recalls Corey and Sean later entering past him into the house. He said he only enter the doorway, then exited.

Q. Did he describe to you how they had left the area?

A. He said after he did this he walked back to the car. Said that he realized they were stealing stuff, but that he just wanted to get out of there. He said he got into the car, and Milford was still passed out in the back seat.

He said within seconds Corey and Sean come running to the car. They both get in the car. They are laughing for some reason. He doesn't know why they are

laughing. He says that Sean throws a knife on top of the dashboard, and Corey immediately throws the flashlight he had been carrying to the back seat. Obviously it strikes him. He then throws it back at Corey.

He remembers the car making a U-Turn, and accelerating, going around a corner. He thought maybe they hit something. He wasn't sure. Then they left the area.

Q. Did he describe to you having any alcohol on the way to his house?

A. At one time e we asked him about that. He remembered that Sean or Corey, after they left they threw him back a beer which he believed it was cheap beer. He called it Strohs beer. He said he recalled getting back home, everybody getting off, then bringing some more beer and maybe eating something. Back home, meaning the Reservation.

Q. Did you make any promises to Mr. Antone when you interviewed him on the night of the 19th?

A. Definitely not.

Q. Was he charged that night?

A. Yes, he was.

Q. What was he charged with?

A. Charged with first degree murder.

MR. AHLER: I have no further questions.

THE COURT: Mr. Iniguez?

CROSS-EXAMINATION

BY MR. INIGUEZ:

Q. Officer Saldate, Det. Saldate, it's true, is it not, conversation you had with Orva Antone didn't go nearly as smoothly as you laid it out here today in front of this jury. Isn't that true?

A. The conversation took over an hour. And I just paraphrased most of the statements, yes.

Q. Well, isn't it true that I listed out a number of things that he told you during your interview? Is that right?

A. I would have to listen to an example, Mr. Iniguez.

Q. Okay. For example, the first time you asked him a question regarding where he was or what happened between Sean and Running Eagle, or Sean Running Eagle and Corey, you said he was too drunk. He didn't remember. True?

A. I believe he -- I said that he was somewhat evasive at the beginning of the interview.

Q. Don't you think somewhat evasive is a little bit of an understatement here?

A. I believe I said that it was probably an

overstatement. I thought maybe he was trying to, moreorless trying to minimize his involvement, as which is usual.

Q. True. Going back to this minimize his involvement, isn't that what Sean was doing when you first started talking to him?

A. I believe so. I asked him, I told him that I had his fingerprints at the scene. Him telling me that they were not there is not minimizing it. That's just complete denial.

Q. Isn't it minimizing when you say his fingerprints weren't there? Isn't it making him, trying to make himself less culpable or less involved with the crime?

A. Again, I would have to say just pure denial on his part rather than minimizing it.

Q. Okay. You didn't ask him under what circumstances his fingerprints were found or anything of the fact, did you, when you were talking to Sean?

A. I told him he was under arrest for murder, and his fingerprints were found at the murder scene.

Q. Okay. Well, you also accused him of a number of things, didn't you? You told him that you talked to his girlfriend and his girlfriend had told you what happened, didn't you?

A. That is also not an accusation. That is the truth. I told him I had spoken to his girlfriend already. That his girlfriend had given me a statement.

Q. All right. And while you are talking to Sean, it's true that you were sitting, oh, about six inches from his face while you were questioning him?

A. When I handle an interview it's -- I try to stay no further than 12 inches from a person. Yes.

Q. I will ask you that question again. Isn't it true that while you were talking to Sean your face was about six inches from his as you were talking to him?

A. The only estimation I can give you, that no less or no more than 12 inches that I try to stay away from a person. And that is what I did with Sean.

Q. Wait a minute. You said no less. Was that an error?

A. No more.

Q. From 12 inches all the way up as we can. Typically right on his face?

A. Certainly.

Q. In fact, you were poking your finger into his chest as you were talking to him, were you not?

A. At one point I did touch his checst with my finger to get his attention, yes.

Q. Isn't it true at several points you touched

your finger to his chest to get his attention?

A. As much as I recall Mr. Running Eagle, I did have to get his attention several times, yes.

Q. Right. Your method of getting his attention was to stick your finger into his chest area and poke him?

A. I think the description is a little off. My way of doing it was to tap him on the chest, telling him that I wanted his attention. And, yes, that is the way I did it.

Q. How much do you weigh, Officer Saldate?

A. 227 pounds.

Q. Oh. You are not telling me that you are tapping him like this, are you?

A. No, definitely not. I don't think I could have gotten his attention that way.

Q. Right. You were very interested in getting his attention. Is't that true?

A. Definitely.

Q. How long was he in jail all together in that little holding room?

A. I would estimate no more than two hours. We spoke for approximately 45 minutes to an hour. And at the outset no more than two hours. That is just an estimate.

Q. Okay. And as you were talking to Sean, earlier you made a statement about him saying, "It must be my destiny. Let me fall."

Now, I think the prosecutor asked you if you had asked him what he meant by that. I didn't particularly understand your answer to how you asked him to explain that to you. Would you tell us that again?

A. I believe Mr. Ahler asked me if I asked him to explain. I didn't really need to explain because I kind of understood what he meant. But I told him that it was not my position to just let him fall. It was my position as detective to obtain the truth and to get a statement from him. That is what I wanted to do.

Q. Well, let's go back to that once more. You just told me you knew what he meant. In other words, did you not ask him what he meant? Isn't that true?

A. That is true.

Q. Now, your own mind made up a reason or a response -- not a response, a reason for what he meant. Is that true? In your own mind you came to the conclusion without asking him?

A. No. He refused plain English. I interpreted that English. And as I saw it, yes.

Q. He said, "Let me fall." Those are his exact words, right?

A. "Just let me fall. It must be my destiny."

Q. Okay. Your statement to this jury is that you didn't have to ask him what he meant. You knew that. Is that what you are saying?

A. Let's see. I interpreted those words to mean that he needed to fall.

Q. Right. By that I guess to you it means conviction. Is that what you are saying?

A. That may have been, yes.

Q. But he never told you that. Isn't that true?

A. No.

Q. Nor did you ask him if that is what he meant?

A. No.

Q. Now, in regards to making Orva a deal, you mentioned the gas chamber to Orva while you were talking to him, didn't you? You dropped a little hit in there that there might be a gas chamber involved in this situation, didn't you?

A. I don't believe so. I don't believe so.

Q. So if Orva said you mentioned the gas chamber while you were talking to him, is he mistaken?

A. He may be. I don't believe I said a gas chamber. However, I did tell him he was under arrest for

first degree murder.

Q. And did you tell him it would go better if he would cooperate?

A. Never.

Q. Never?

A. Never.

Q. Officer Saldate, it's not your function to offer deals to people, is it?

A. It's not only not my function, I don't have the authority to do that.

Q. Right. Thank you. That was my next question. In fact, you don't have the authority. Even if you gave a deal, you couldn't stick with it. Isn't that true?

A. I would never give a deal since I don't have the authority to do it.

Q. Right. That's the County Attorney, Mr. Ahler's function. Is that right?

A. That's correct.

Q. So one of the reasons you didn't offer Orva a deal is because you didn't offer him a deal that could have stuck, right?

A. First of all, I never thought of offering a deal at that point. Orva was under arrest for first degree murder as well as Corey and Sean. They were all

under arrest for first degree murder. My position is to write the report, to gather the evidence, to submit it.

Q. Were you involved with the arrest of Corey Tilden?

A. No, I was not.

Q. Were you aware of who was? Were you aware of who it was that arrested Corey Tilden?

A. I may have been then but I am not now now. It had to be our -- some special assignment unit that we may have put on.

Q. When Sean was arrested you were involved with that, weren't you?

A. Not directly.

Q. You with pulling the strings from the station down here at 7th Avenue and Washington, right?

A. I would say that I was directing units to do as I asked them to do, yes.

Q. Do you direct the units to do what you ask them to do regarding the arrest of Corey Tilden?

A. I believe we were, yes.

Q. You were on radio communication with these folks, weren't you?

A. We were in the office. They were out in the field. We had already instructed them. Corey had. Yes, we had instructed them to arrest them, yes.

Q. To your knowledge was Corey arrested along with someone else or picked up with someone else?

A. Again, I don't remember. I wasn't there.

Q. Isn't it true there was some Anglo youngster that was with Corey the time that Corey was arrested?

A. Again, I'm sorry. I don't remember.

Q. But you do remember that they brought Mrs. Sivertsen and her two daughters rather upset to your station and you questioned them, did you not?

A. We questioned Ms. Sivertsen and her two daughters.

Q. They were brought to you, right?

A. That's correct.

Q. That is, after they were brought to you at 620 West Washington, you questioned them. Is that right?

A. That's correct.

Q. And you don't remember questioning anybody that may have been brought in with Corey Tilden, do you?

A. No, I do not.

Q. In fact, no one was brought in with Corey Tilden, were they?

A. Again, I have to stay that I don't remember. I wasn't present in court until he was arrested.

Q. But you were present when he was brought down to the station?

A. Yes, I was.

Q. No one else was brought down there with him, were they?

A. I was told Corey Tilden was in an interview room, directed into that interview room, and no one else was in that interview room but Corey Tilden.

Q. Okay. Does the name Sean Running Eagle ring a bell to you?

A. No, it does not.

Q. Okay. Now, Officer Saldate, you mentioned you made a brief inspection of the crime scene being led by Det. Martinsen. Is that correct?

A. Yes.

Q. So you didn't do any of the technical work or directed any of the technical work out there, fingerprints, photos, et cetera. Is that correct?

A. That's correct.

Q. In this case have you been present -- no, sorry. You weren't present during the testimony of Orva Antone. Is that right?

A. I have not been in the courtroom at all until today.

Q. Right. Now, Officer Saldate, when Sean was arrested did you ask him if he had been drinking anything prior to questioning him? You didn't, did you?

A. Please, let me think first.
I don't believe I did.
Q. You didn't ask him if he was under the influence of any drugs or medication, did you?
A. I don't believe I did.
Q. You didn't even ask him if he was too frightened to speak to you. Is that right?
A. No, I did not.
Q. And when you asked him, did he seem concerned about the questions you were asking him?
A. No.
Q. Did he seem rather nonchalant about it? You mentioned he was smiling before.
A. That is the description, yes.
Q. You have questioned people that smile out of nervousness, haven't you?
A. I don't know how to answer that. I am sure I question people that smiled, but I don't know if I asked them if it's out of nervousness or not.
Q. You attended schools in training in questioning people, haven't you, Officer?
A. No, I have not.
Q. You are a Detective for the Phoenix Police Department, and in your training you have never been taught how to question people?

A. No, I have not.

Q. The Police Academy doesn't have an organization in their academy that tells you how to question people?

A. That is 1969 when I went to the polce academy. At that time interview techniques were not readily available at that time. I have never attended an interview school. I have never gone to any seminars regarding interviews. Interview techniques I have picked up have been from myself reading books and seeing other people do them, interviews.

Q. But you are not telling me in part of your training and your police training when you started that, they didn't tell you how to question people, didn't show you at least something about questioning people?

A. If they did I can't recall. I don't believe they went into that. The only thing they focused in in 1969 was, basically because I was going to be a uniformed officer, was how to talk to people, give them a ticket. I think that is the only thing they focus on.

Q. They didn't have any aspect of your training to asking people questions or testifying in court or answering questions to people who are questioning you?

A. Now regards to testifying in court I believe they had a brief instruction of that, of testifying in

court, but it was very brief.

Q. Now, when Sean was being questioned by you, did you have a pad and paper out? Were you able to take notes?

A. No.

Q. Was Det. Martinsen or anybody else taking notes?

A. Det. Martinsen was taking notes.

Q. Did you ask Sean if he wanted a pad and pencil so he could take some notes?

A. No, I did not.

Q. Don't you think it would have helped him remember what he said if he would have been able to write it down?

A. No.

Q. You don't think it helps people to write down what they said? It helps them in the future to remember it if they write down what they are talking?

A. What question do you want me to answer?

Q. Do you think it helps people to remember later what they have said to you if they write it down at the time they are talking to you?

MR. AHLER: Objection. Irrelevant. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: I am sure it does. Yes.

BY MR. INIGUEZ:

Q. Did you ask him if he wanted a pad of paper and a pen to write down the things you guys were talking about?

A. Again, no.

Q. This conversation wasn't taped. Is that correct?

A. No, it was not.

Q. You have taping facilities at the police station, did you not?

A. We have tape recorders available, yes.

Q. It's your choice not to tape these conversations?

A. That's correct.

Q. Don't you think the jury could get a very accurate portrayal of the questions and answers if you were to play the exact same tape that that was being produced at the time you were questioning the person?

A. I don't believe so.

Q. No?

A. No.

Q. Why wouldn't the jury get a good statement if you were actually taping the statement that was being given?

A. If Mr. Running Eagle was definitely giving me a statement, telling me about what occurred, yes, then definitely the jury would sit here and listen to it.

Q. Stop. Are you telling me, Officer, that if he was telling you what you wanted to hear you would have taped it, but if he is not, you won't tape it?

A. No. What I am telling you is that a tape sometimes or most of the time is, my opinion, if you use a tape, all it does is causes that person to feel uncomfortable, causes that person not to relate to you exactly what he may want to tell you, because it's being taped. He feesl some fear over that tape player. For that reason I don't use a tape player. I believe a one-on-one contact with a person, if you are honest and concerned about that person and you approach him with that, I think that that person feels comfortable. He feels like he can tell you what happened, and he feels that you and him can have a one-on-one conversation just like it would be out in the street with a friend or someone else.

Q. Now, Officer, Detective, you are not trying to tell me here that getting in his face no more than 12 inches away, putting your finger in his chest every time you don't think you have his attention, is a way of making him feel comfortable in talking to you like

friends on the street, are you?

A. I think you are trying to mischaracterize my interview.. The poking at his chest or putting my finger on his chest, the interview took 45 minutes. My putting my finger on his chest may have took a whole minute of that 45 minutes. My talking to him close to him, being close, face-to-face, is a way that I have to ensure that person that I am being honest with that person, that I am being sincere with that person, that I want them to tell me the truth and that is all I want to hear. And I want him to focus away from anything else that might be in that room, including Det. Martinsen, including any paper, pads, pencils. I want him to look at me straight in the eye, tell me the truth, know that I am sincere when I ask for it.

Q. Now, Officer, or Detective, if I was to question you six inches from your face you would feel much more uncomfortable than if I question you from where I am sitting, wouldn't you?

A. I don't think it's uncomfortable as much as we are in a different arena than me and Sean were. Now, in the arena that we are in, sir, you are asking me questions of something that occurred to me or something I witnessed sometime. I am here before the jury. If you would like to get within six inches to me, that is fine

with me. I don't think it would be beneficial to you. But if that is what you would like to do, fine. But in the arena where I was at with Sean, I wanted him to be himself, me and him. For him to know I was sincere. For him to know what I wanted. For him to look back at me, tell me exactly what occurred. We are talking about a murder. We are talking about a serious crime. We are talking about a serious event.

Q. But isn't it true that if I stand six inches away from your face you get more uncomfortable than if I stand 12 feet away from you?

MR. AHLER: Objection. It has been asked and answered.

THE COURT: Sustained.

BY MR. INIGUEZ:

Q. Officer, Det. Martinsen that room where you were at, there weren't any other toys or pictures or television on. Isn't that true?

A. That's correct.

Q. You also already told me you didn't give him a pad or pencil to distract him. Isn't that true?

A. That's correct.

Q. The only other human-being in that room besides you was Det. Martinsen. Isn't that true?

A. I tried to minimize his presence. That is

true, yes.

Q. Right. So you haven't testified that Sean kept breaking away looking at the wall or looking at his shoes or trying to not pay attention to you. Isn't that true?

A. That is correct.

Q. So isn't it a fact that your technique is used by you mostly because it intimidates the person, it creates an aura of your presence being all over them, and it's easier for you to control the person and get what you want from them?

A. My techniques, again, is not intimidation. Intimidation is yelling and screaming and pounding on the table. That's not my technique, Mr. Iniguez. My technique is being face-to-face with that person, to tell him the truth, for him to want -- I want him to tell me the truth. That is all I know.

Q. Well, it's true, isn't it, that there were different types of intimidation. Is that true?

A. I am sure there is intimidation also of every kind, yes.

Q. Would you venture to say that the presence of a 225 pound man, six inches away from your face, poking his finger in your chest, asking you some questions after question, could that have an intimidating

effect on a person?

Q. Again, I think you are mischaracterizing the poking in the chest. Took maybe minutes of the 45 minutes.

Q. My question was, can what I have just described have a tendency to be intimidating to a person whether you are doing it or not?

MR. AHLER: Your Honor, I object. Argumentative. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: My intention was not intimidation.

BY MR. INIGUEZ:

Q. Again, sir, I hate to cut you off. My question is, do you think that a person being six inches from another person's face, 225 pounds, leaning in his face, putting his hands or poking him or touching him in the chest with his finger, anyway you characterize this aspect of it, do you feel a personal might find that intimidating?

A. He may find it intimidating.

Q. Were you ever in the Marines?

A. Yes, I was.

Q. Do you remember boot camp?

A. Yes, I do.

Q. How far away were the instructors from your

face?

A. Sometime very close.

Q. Real close is very intimidating, isn't it?

A. At times, yes.

Q. They meant it to be, didn't they?

A. Yes. However, it's a different arena than we are in now.

Q. I understand. Now, Officer, when you talked to Orva Antone --

A. Yes, sir.

Q. -- did you write a report?

A. Yes, sir.

Q. Or did Det. Martinsen write a report?

A. That report was written by me, sir.

Q. When you wrote your report, how long after you spoke with him did you write it?

A. The next day.

Q. You said you had taken no notes. Is that right?

A. No.

Q. No, you didn't take notes, or no, that's not right.

A. No, I did not take notes.

Q. Did Det. Martinsen take notes?

A. Yes, he did.

Q. Did you have those notes available when you wrote your report?

A. Yes.

Q. Are those notes available?

A. No.

Q. Why?

A. Those notes were reviewed by me. After the typed supplement that I wrote was reviewed by me, those notes -- this supplement depicts my notes, and my memory, and for that reason those notes were destroyed.

Q. Now, don't you think that we would be able to look at your notes and tell exactly -- since you didn't record the statement, don't you think those notes would be useful to see what you talked about?

A. No, I do not, since the notes are in my supplemental. That is my supplemental.

Q. Isn't it true that the important parts of the notes, the notes that you feel should be transcribed or transferred over into the reports are in there, but not every item in your notes would be found in your report?

A. Every item that has anything to do with this case on my notes, or in this case, or Det. Martinsen's notes, would be reflected in my supplemental.

Q. Isn't it more fair to say, Officer, that

every note that helps your case would be in the report?

A. It would be very unfair to say.

Q. So in other words, you think that you would have put every single item that was on your notes, whether you thought it was important, whether you thhought it was helpful for this side or helpful for the other side?

A. Mr. Iniguez, any time I write a report, any time I take a statement, my concern is not for your side or Mr. Ahler's side. If that is important, you guys to decide later on. My decision is only to report the facts as they are told to me by that person.

Q. Well, it's true that you're the investigator. Isn't that true??

A. Phoenix Police Detective, yes, sir.

Q. As an investigator of the crime isn't it your aim when you are out there to make your case?

A. Just because I am a detective I still have integrity, Mr. Iniguez. I write down everything that is told to me.

Q. I don't doubt your integrity, Mr. Saldate. As you know I have known you for a while.

A. Yes, you have, sir.

Q. What I am talking about is, your professional responsibilities. Isn't it true you are

responsible for this case?

A. Yes, I am. But my professional responsibility is to report what is told to me, not to manufacture items or delete items.

Q. Well, isn't it true that when Orva was telling you what happened, at some point he told you that Corey struck the man? Isn't that true?

A. At one point he mentioned something to Corey striking someone, yes.

Q. Right. You didn't testify on direct as to that. Is that correct?

A. There were several things that Orva told me. I, again, paraphrased his statement.

Q. Right. Isn't it true in talking to Orva, would it be fair to say that you told him, "Tell us what happened."

He says, "I am too drunk to remember."

Then you said that, "This is too important of a case. We can't have an answer like that in a case like this. This is too serious. You got to do better than that."

Isn't that true?

A. That is true.

Q. You didn't testify to that on direct either, did you, Detective?

A. That was not asked for me -- again, I just paraphrased his statement.

Q. And in fact there were many -- well, at least several times during your interview of Orva that you told him something similar like, I don't believe that. You are going to have to do better than that. Isn't that true?

A. That is true.

Q. You went through days of, "I don't believe that."

He would feed you a little more and a little more as you went through these. You got to do better. You got to do better. He would keep doing better. Isn't that true?

A. I don't think you saying feeding me is correct. I think as I stated before, I think he tried to minimize his involvement as often done. And as I told him or I continued to tell him that I did not believe a certain area. Then he realized that I knew probably more than he thought I knew. For that reason decided to tell me the truth.

Q. In fact, Detective, isn't it true when you started with this you told him, "I want you to tell me what happened that night when you were with Sean and Corey." Isn't than true?

A. I believe I have testified to that, yes.

Q. Right. You didn't go up and say, "Now, Orva, I would like to know if you were with Sean and Corey", true? You started out with the other notion, "Tell me what happened when you were with them"?

A. That's correct.

Q. In fact, isn't it true you told them a number of things, and it is very possible that he found out these people were dead from you?

A. That's negative. That is no. No way.

Q. You think that he saw?

A. Pardon?

Q. If Orva testified that you told him or that you insinuated or somehow he insinuated that Sean and Corey had killed these people, would he be incorrect?

A. I never told Orva that Sean and Corey had killed these people, representing to that statement. I did tell Orva that he was under arrest for first degree murder. We were relating to the time that he was with Sean and Corey. And I am sure Orva's not a dumb person, or I would assume that these people were dead or he wouldn't be arrested for murder, first degree.

Q. You talked to Orva for a while. You just said Orva is not a dumb person?

A. I don't believe he is, no.

Q. Did you have the impression that Orva was an intelligent person?

A. That is probably using the standard of the independent answer on that. I have come across -- I would say he is not stupid. He is probably not a very intelligent person, but he is not stupid. He is not dumb.

Q. Would you say that Orva has maybe some learning disabilities?

A. He may be slow, yes.

Q. It's true that you thought he was a little slow, isn't it?

A. Yes.

Q. And were you present at the time that the offer was made to him by the State regarding pleading guilty to burglary and dismissing the murders?

A. No, I was not.

Q. Was that discussed with you?

A. I believe Paul did discuss that with me at one point.

Q. Now, would it be fair to say that out of all of Orva's statements there were several different statements and different things are said in those statements?

MR. AHLER: Objection. Foundation.

THE COURT: Sustained.

BY MR. INIGUEZ:

Q. Well, you spoke to Orva. Is that true?

A. That is correct.

Q. Did he make several different statements to you?

MR. AHLER: Objection. Foundation. The question is way too broad.

THE COURT: The objection is sustained on the broadness of the question. You need to be more specific.

MR. INIGUEZ: Yes, Your Honor. I apologize.

BY MR. INIGUEZ:

Q. Det. Saldate, regarding this incident, you spoke to Orva. Is that true?

A. Did I speak specifically about this to Orva?

A. Yes.

Q. Yes, I did.

Q. December 19th, 1987?

A. Yes, I did.

Q. During that conversation where you were and he and Det. Martinsen, about at 620 West Washington, did he not make several different statements to you?

A. I have a problem with different, since all of the statements we're concerned about that night. So they weren't really different to say at night. They were

somewhat not as complete as others.

Q. Okay. Let me put an example for you. First he said, "I am too drunk. I don't remember", right?

A. That's correct.

Q. Then he says, "Well, we were riding around. We got some gas and they took me home", right?

A. That's correct.

Q. Then he said, "Then we went to a party at Lisa's house after riding around. Then they took me home." Isn't that right?

A. I don't remember that one, but if you are reading from the report, I am sure it's there.

Q. Well, regardless of the record isn't that possible he said that to you?

A. I don't believe he said that to me.

Q. So you don't think --

A. But, again, it's in the report.

Q. Okay. Then he told you, "No, no, no. We were riding around and we stopped at this house, and Corey and Sean got out." And then at one point he told you Sean hit the man with the handle of the knife in the face. Is that true?

A. That's true.

Q. At no time he told you that Corey hit the man. Is that true?

A. That's true.

Q. At another point he told you that the only violence that he witnessed was Corey hitting the lady in the back of the head with a flashlight?

A. That is not true as you phrased it. He did state that Corey did hit the lady with the flashlight.

Q. Didn't he retract while talking to you some of the statements regarding Sean hitting the man or Corey hitting the lady, either one of those?

A. I don't believe he retracted. I believe it was his version changed at that point. But, again, I don't think we can say that, you know. Orva was trying to remember these different things, different things occurring at different times. I don't think -- I don't think he retracted those items because I think that it very -- could have easily happened, although those items very easily could have happened at different times. But Orva's remembering these things were difficult for him.

Q. Is it also true that some of these items may not have happened based on his particular statements?

MR. AHLER: Objection. Vague. Overbroad.

THE COURT: Sustained.

BY MR. INIGUEZ:

Q. Isn't it true, Officer, based on what Orva told you about what happened that night, there were some

statements that contradicted others?

MR. AHLER: I am going to renew my objection. It's too vague. Why doesn't he ask the question to get to the answer.

THE COURT: The question is overruled. The objection is overruled.

MR. INIGUEZ: Go ahead.

THE WITNESS: Could you repeat the question?

BY MR. INIGUEZ:

Q. Isn't it true based on the conversation you had with Orva that evening of December 19th, some of his statements contradicted others?

A. Well, his first statement that he was too drunk to remember, then his later statement that he did remember, yes. I guess they did contradict each other, yes.

Q. Thank you. Isn't it true that based on your conversation with him it was impossible for you to decipher after you were finished talking to him which parts were true and which parts were not?

A. No. I wouldn't characterize that. My interview with him was me trying to decipher which was true and which was not true. I wouldn't characterize that at all.

Q. Okay. So you feel that during the course of

the interview you were able to pick out the things that he was telling you that were incorrect, and pick out the things that he was telling you that were correct. Is that what you are telling us?

A. I believe that Orva told me everything he could remember, and that everything he told me was the truth.

Q. Okay. Then my next question, Orva never told you that Sean stabbed anybody, did he?

A. I believe Orva never put himself in a position to be able to observe that.

Q. Yes or no? Orva never told you that he saw Sean stab anyone that day, did he?

A. That's correct.

Q. In fact, Orva told you, Detective, that he was standing right in the same laundry room where -- you know, from your own eyesight, that they found the two victims. Isn't that true, sir?

A. At the doorway, yes, sir.

Q. Isn't it true he told you that Corey pushed him in the doorway?

A. Yes, he did.

Q. Do you know, the doorway was where they found the two people? Isn't that true?

A. It was in the laundry room, yes.

Q. You are aware they had to move the body of the arm of one of the victims, I believe Ms. Williams, to open the door? Is that right?

A. Again, I don't know that, Mr. Iniguez, because when I got there and got the cursory review of the scene, that had already been done.

Q. But it wouldn't surprise you if that was true, would it?

A. Of course not.

Q. And he also told you, and you testified that you thought what he told you was true on that seconds later. Isn't it true that he told you that only seconds later? Sean came running behind him, got in the car and threw the knife on the dashboard? Isn't that what you testified to today?

A. That's correct.

Q. Now, at this point I don't remember whether you asked him or whether he told you how many seconds later?

A. He characterized seconds later. Sometime later.

Q. Det. Saldate, you testified early that Sean denied having left his palmprint at that house.

A. That's correct.

Q. Did you give him the address?

A. Pardon me?

Q. Did you give him the address of the home?

A. I believe at one point we did.

Q. That's written in your report?

A. I don't know it is or isn't.

Q. Would you look, please?

A. Certainly.

A. No, it's not.

Q. So is it fair to say that he didn't know the address of the place that you were referring to at the time you were talking to him?

A. When you asked that question it was only by my memory that I believe we did. But it's very possible that we didn't.

Q. Okay. And you didn't take him to the scene, did you?

A. No, I did not.

Q. You didn't show him the dryer, did you?

A. No.

Q. You didn't ask him if he had been there before by taking him to that area and showing it to him. Is that correct?

A. I asked him out of the Deer Valley area if he recalls cruising around the Deer Valley area. That he was with Corey, and they saw the car with carburetors. I

remember specifically telling him the Deer Valley area. He said he didn't remember anything like that.

Q. And, Det. Saldate, you are the case agent in this particular case. Is that true?

A. That's correct, sir.

Q. Did you ask questions of Orva regarding Tyrone Tonto?

A. No.

Q. Why not?

A. I don't know who Tyrone Tonto is.

Q. To date have you heard that name before?

A. I believe I have heard that name mentioned, but, again, I don't know how that came into play in this case.

Q. Okay. Do you remember talking to Mr. Snitke?

A. Yes.

Q. Mr. Snitke says he saw someone over six feet, possibly over 6'2" with black hair running away from the Williams' home. Is that correct?

A. I saw him in the carport, then again leaving the carport, crossing towards the front of the garage.

Q. Right. Have you been able to decipher this case, or get in your mind fixed who you think that is, Det. Saldate?

A. It would only be my opinion. I believe that is Corey Tilden.

Q. Did you talk to the man in regards to where this person was last seen?

A. Yes.

Q. Where was that person last seen, according to what you remember?

A. When I remember he saw him running from the opening of the driveway, towards the front of the house, across the front of the house. Of course I got to that same position where he said he was in his own house. I climbed up to the chest of drawers where he was, and at that time he could only visibly see that person from the opening of the driveway, and probably three to six feet east of that driveway opening.

Q. He didn't say that he saw this person get in a car of any type, did he?

A. I don't believe he did, no.

Q. He did testify he saw the car drive away in the opposite direction. Is that correct?

A. I don't believe so.

Q. Isn't it true that this man said he saw this person running in one direction, the car was facing in the other direction?

A. He did say that he saw a car facing in the

other direction. The man running eastbound, the car was facing westbound.

Q. Okay. Then the car took off. So also it's your testimony Mr. Snitke didn't know which way the car took off?

A. Mr. Snitke was at his room, came back, and the car was gone.

MR. INIGUEZ: Okay. I have no more questions.

THE COURT: We will take our afternoon recess at this time.

Ladies and gentlemen, please do not discuss the case among yourselves or with anyone else. Come back here in 15 minutes.

(Whereupon, a short recess was taken.)

THE COURT: Let the record reflect the presence of the jury, counsel, the defendant.

CROSS-EXAMINATION

BY MR. STEINLE:

Q. Det. Saldate, this interview with Orva Antone, you filed a report, did you not?

A. Yes, I did.

Q. Questions that co-counsel asked you you have

indicated that you endeavored to write a complete report. Is that correct?

A. That's correct.

Q. A balanced report?

A. That's correct.

Q. Show you what has been marked for identification as Exhibit 153. If you look through this, tell me whether that is a Xeroxed copy of the report that you filed?

18

A. Yes, it is.

Q. Now, I assume, Officer, or Detective, that in preparation for your testimony today that you had an occasion to review that report?

A. Most definitely.

Q. After reviewing the report, based upon your recollection of your interview with Mr. Antone, is there anything in addition to what you recall that is not in that report?

A. Not that I recall.

Q. Okay. You said that it's a report?

A. It's a statement that was given to me.

Q. You believe that this, in effect, would give us the same portrayal as if there was a tape recorder there of what transpired between you and Orva Antone that day?

A. Yes.

Q. Okay. Now, I believe in your direct testimony -- why don't you hang on to that. I think I have another copy.

A. Certainly.

Q. That in response to a question about the car, that Orva said that it was Sean and Corey's car. Is that correct?

A. I believe so.

Q. I would ask you to look at the bottom of page one of your report, last paragraph, where you ask him whether or not he remembered being with Sean and Corey and his brother Milford late one night in Corey's car. Would you tell me what you have in your report in terms of his response to that statement?

A. He said, "I believe it was Sean's car."

Q. You said immediately that he believed it was Sean's car?

A. That's correct.

Q. So it was Sean's car that he said that he was cruising in, not Corey and Sean's car?

A. That's correct.

Q. Now, where did he say that he was that evening? What was he doing at this point of your interview when he was cruising? What did they do earlier

that night? Did you ask him that question?

A. Of where they were at earlier?

Q. Right. I am talking about -- now we are at the point where we are talking about where he directs you in terms of whose car it is. Did you ask him where they were?

A. Rephrase it a little bit, Detective. Did he say he had been at the jacuzzi at Sean's house earlier?

A. I believe he did mention that, yes, sir.

Q. Then they went out cruising and they dropped him off. Is that correct?

A. That's correct.

Q. Now, up to this point of your interview what was your belief as to what Milford did that night?

A. Up to this point in my interview with Orva?

Q. Right. What was Milford doing while they were cruising around?

A. He was present.

Q. He was present. Was he awake or was he passed out?

A. Up to this point he was there. He was obviously not passed out at this time.

Q. Okay. So when you are talking to Orva at this point of your interview, it's your assumption that when he told you earlier that both he and Milford were

passed out, that that was inaccurate as to both himself and as to Milford?

A. I assumed that, yes.

Q. So at this point of the interview did you ask what Milford was doing?

A. No.

Q. Were you interested in finding out what Milford was doing at this point in time?

A. Certainly.

Q. Now, at the end of this conversation you tell Orva that you don't believe him. Is that correct?

A. At this first phase, yes, that's correct.

Q. Right. You then say, I know that you were at Sheryl's house. Is that correct?

A. Something to that effect, yes.

Q. That's because you had interviewed Cheryl Sivertsen prior to this. Is that correct?

A. That's correct.

Q. Had you been briefed up to this point in time by Det. Mills as to what Lisa Sivertson had said?

A. I don't believe so.

Q. So you weren't aware at this point in time of the existence of a human-being called Tyrone Tonto?

A. No.

Q. Okay. But you did know that they were at

Sheryl's house earlier in the evening?

A. That's correct.

Q. Okay. At this phase of your interview, tell me how he described to you, how Corey appeared on the scene? Could he recall how Corey appeared?

A. He could not recall.

Q. Corey kind of just appeared out of thin air, right?

A. He assumes that they may have stopped by the house to to pick them up.

Q. Now, at this point he said in your report, in the top of the second page, the first full paragraph, don't you have in here, he says that he remembers cruising and listening to the radio. The next thing he remembers is Corey was also in the car?

A. That's correct.

Q. And he remembers this because he and Corey were arguing?

A. That's correct.

Q. Does he tell you where Corey comes from?

A. He says he believes that they stopped at Sean's house and they may have picked up Corey there.

Q. But he is not sure?

A. No.

Q. So at this point in time Orva Antone still

can't tell you where Corey Tilden comes from?

A. That's correct.

Q. Now, this takes into account that you told him originally, that you knew that he was with Corey and Sean?

A. That's correct.

Q. Orva Antone never told you that he was with Corey and Sean, did he, until you told him that he was?

Q. Go back to your first page, last paragraph. Who was the first person that mentioned the words Corey Tilden as being cruising that night with Sean Running Eagle, you or Orva Antone?

A. I did.

Q. So up until that point Orva Antone never spoke about Corey Tilden?

A. That's correct.

Q. Did you tell him that he was under arrest for two counts of first degree murder or one count?

A. I just told him he was under arrest for first degree murder.

A. Did he seem surprised?

A. I guess you can describe it described.

Q. What did he say?

A. He didn't say anything. He just appeared to be surprised. He just asked what he was there for. I

think he was contemplating what he was there for when I told him he appeared to be surprised.

Q. Surprised to the point like, "Murder? I haven't been involved in any murders."

A. He never said that, no.

Q. You read through the entire statement here. Does he ever once say in here that he witnessed the murder?

A. No.

Q. As a matter of fact, the last sentence of this report indicates that he doesn't even know that the people were murdered.

A. That's correct.

Q. When you challenged him, you said he was under arrest for murder, did he say, "I don't know anything about a murder?"

A. No.

Q. So he never denied knowing, the knowledge that the murder had occurred?

A. I guess not, no.

Q. In your words, he attempted to do nothing more than throughout the interview, to minimize his own involvement in the murder?

A. That's correct.

Q. He was involved in the murder, was he not,

felony murder?

A. That's correct.

Q. At the end of this next page, you again at the top of page three tell Orva that he is not telling you the entire truth. Is that correct?

A. That's correct.

Q. In this part of the interview you talk about items that he has taken and put in the car, do you not?

A. I talked to him about remembering some beer.

Q. But later on in the paragraph don't you ask him whether or not he remembers going inside the garage?

A. I asked him if he remembered taking anything from the car, and he said, "Yeah, I think so."

I then asked him if he remembered this part with a carburetor. He replied, no, he remembered two carburetors.

Q. But up to this point of the interview he didn't say anything to you about the carburetors, had he?

A. No.

Q. You brought up the word carburetor, did you not?

A. I brought up one car. He said, "No, two cars."

Q. Up to this point he said he didn't specifically recall what parts of the car he had taken.

Is that correct?

A. I don't believe so. What are you referring to?

Q. I will go over something else. I will go back, see if I can find it.

A. All right, sir.

Q. The original was, "Do you remember going inside the garage to get the bicycle out?"

"No."

What did he say about that?

A. He said he specifically remembers a green bike, had two flat tires on it.

Q. Can you back up a second? He said he didn't remember going inside?

A. I'm sorry. Does not remember going inside the garage, but remembers being told by Corey and Sean to take several items to their car.

Q. And he specifically remembers the green bike?

A. Yes.

Q. So it's your impression he told you that Corey and Sean told him to take the bike?

A. Yes.

Q. When he told you about the flashlight that Corey had struck him with, had you executed the search

RUN 187

SALDAT[illegible]0740

warrant?

A. Had I?

Q. Yes.

A. Up to this point?

Q. Yes.

A. No.

Q. After you executed the search warrant did you talk to Orva again?

A. No.

Q. Did you show him Exhibit 115 and 114, ask him which one of those that Corey used to hit the person with?

A. No.

Q. Orva had waived his right to counsel at the point in time that you interviewed him, did he not?

A. Correct.

Q. In your words he was being very cooperative at the end. Isn't that correct?

A. Corect.

Q. You seized two flashlights from the house, did you not?

A. Correct.

Q. Did you show them to Orva?

A. No.

Q. To your knowledge has anybody showed those

flashlights to Orva, asked him which one Corey used to strike the woman?

A. No.

Q. Now, you are the case agent, are you not?

A. That's correct.

Q. You are the ones that direct all other police officers to do various things?

A. That's correct.

Q. Orva Antone was in custody, was he not?

A. That's correct.

Q. You had a right to go back and ask him to talk to you again, did you not?

A. Not correct.

Q. Why not?

A. He had been formally charged. It's our policy once he is formally charged he would get an attorney. And it is suggested by the County Attorney's Office that we don't talk to them.

Q. He made a deal with the State of Arizona, did he not?

A. That was later, sir. That was with Paul Ahler.

Q. Mr. Ahler interviewed him, did he not?

A. I assume so, yes.

Q. Were you there when he was interviewed?

A. Yes, I was.

Q. Did you bring the two flashlights from evidence and ask Orva Antone whether or not he could identify one of the two?

A. No, I did not.

Q. Now, when you were interviewing Orva at this point of the interview, the middle of the interview, did you ask Orva what kind of clothes he had on? Direct your attention to the middle of page four of your report.

A. Page four, sir?

Q. Page four. Second to last paragraph.

A. "I asked Orva what Corey and Sean were wearing." Is that the paragraph?

Q. Yes. And then the last sentence.

A. "Orva said he was wearing Levi's, dark shirt and his boots."

Q. And his boots?

A. Boots.

Q. I show you Exhibit Number 140. Are these the boots that he was wearing that night? Did you ask him?

A. Those aren't boots, sir.

Q. Well, those are the boots that he had on the night you talked to him, right?

A. I talked to him on the 19th.

Q. Right. On the 19th he was wearing those tennis shoes, was he not?

A. Yes, sir.

Q. Did you ask him whether or not he was wearing boots or those tennis shoes?

A. I asked him what he was wearing. He told me he was wearing boots, sir. If he is wearing tennis shoes, no reason to ask him if those are boots. I --

Q. Okay. Did you ask him what boots he was wearing?

A. No, I did not.

Q. You seized my client's shoes, did you not?

A. Yes.

Q. You seized Mr. Running Eagle's shoes, did you not?

A. Yes.

Q. You seized those shoes, did you not?

A. Yes.

Q. Did you seize the boots that Orva Antone had on the night that he was at the murder scene?

A. No.

Q. Did you ever execute a warrant for those boots?

A. No.

Q. Did you ever execute a warrant to find the

boots or the shoes worn by Milford Antone that night?

A. No.

Q. After this point in time you again tell Orva Antone that you don't think he is telling you the full truth, don't you?

A. Correct.

Q. What does he tell you? Does he have to try a little harder to tell the truth?

A. To try a little harder to remember to tell me the truth, yes.

Q. You go back over the sequence again. Is that correct?

A. Correct.

Q. At this point in time does he tell you he went inside the house?

A. Yes. Later on I believe he tells me.

Q. But I think though, doesn't he tell Det. Martinsen when Martinsen asked him?

A. Martinsen asked, yes.

Q. He specifically denied going in the house, did he not?

A. That's correct.

Q. After being challenged he then admitted, yes, he went in but he was pushed in, right?

A. He said he was standing inside the door step

but he said he never went in. That's correct. Corey pushed him inside the house.

Q. You had been in the house, had you not?

A. Yes.

Q. Did you suggest to Orva Antone there was cupboards on the right side and a light on the left-side?

A. No, I did not.

Q. That came out of his mouth, did it not?

A. That's correct.

Q. Did you suggest to Orva Antone that the fatal blow to Mrs. Williams came behind the left ear?

A. No, I did not.

Q. He brought that up, did he not?

A. That's correct.

Q. Now, you went inside the house, did you not?

A. Briefly, yes.

Q. Were the bodies still inside the house when you went in there?

A. They were still inside the washroom, yes.

Q. If someone walked in that washroom or that laundry room far enough to see there was a kitchen on the left side, would they have not seen the bodies?

A. I don't know.

Q. Did you look at the footprints out in the front yard?

A. Briefly, yes.

Q. Did you see any sign of the gravel in the front yard of a confrontation or someone falling down?

A. I didn't look that closely, sir.

Q. Okay. That was Det. Martinsen's duty.

A. Again, that was Det. Martinsen or another scene detective over there.

Q. Okay. The scene was basically Det. Martinsen and some other officers. Is that correct?

A. That's correct.

Q. When is the first time you became aware of a person by the name of Tyrone Tonto?

A. Probably just before our deposition or just during our deposition.

Q. What month was that?

A. I don't know, sir. Several months ago.

Q. As I understood your Direct Examination, as case agent you receive and review all D.R.'s submitted?

A. That's correct.

Q. Show you what has been marked for identification as Exhibit Number 154. Ask you whether or not that report was one of the reports that was submitted to you in your capacity as case agent?

A. Well, it's titled with the victim's name, the location, D.R. number. I assume it was.

Q. Can you tell me the date that that report was typed?

A. December 21st, 1987.

Q. December 21st, 1987. Is that correct?

A. That's correct.

Q. When a detective in this case submitted a report, who do they submit them to?

A. Submit them to me.

Q. Did you review the report?

A. I reviewed very many reports, yes.

Q. Did you review that report?

A. I probably did, yes.

Q. Would you look through it, tell me whether or not Tyrone Tonto's name appears?

A. Yes, it does.

Q. A description of Tyrone Tonto also appears, does it not?

A. Yes.

Q. Now, that was an interview with Lisa Sivertsen, was it not?

A. That's correct.

Q. Did you go out to San Carlos Apache Reservation and look for Tyrone Tonto?

A. No, I did not.

Q. Did you obtain the fingerprints from the

Prescott Police Department that was submitted to the Lab?

A. No, I did not.

Q. Have you ever attempted to contact Tryrone Tonto?

A. No, I have not.

Q. You know, do you not, as case chief agent, that Tyrone Tonto was, Sean Running Eagle, Miltone Antone Orva Antone and Liza Sivertson, the five, do you not?

A. Earlier in the evening that report states.

Q. They were all over at Orva Antone's house. Isn't that correct?

A. Again, you removed that report from me so quickly I couldn't see it. But apparently they were together until 11:00 o'clock.

Q. Based upon that report?

A. Correct.

Q. Now, I believe in your testimony on Direct Examination, or I think Cross-Examination from counsel, you believe that the person who was 6 foot tall and Mr. Snitke saw was my client, Corey Tilden. Isn't that correct?

A. Correct.

Q. Did you ever consider Tyrone Tonto as being that person?

A. No.

Q. Now, when Mr. Snitke did the re-enactment, they put Det. Martinsen there first, and they said Det. Martinsen was too short, right?

A. Correct.

Q. Then they put Det. Wheelis. Isn't that correct?

A. Correct.

Q. They said he was slightly taller than Det. Wheelis?

A. Correct.

Q. Is my client taller or shorter than Det. Wheelis?

A. I don't know. How tall is your client?

Q. You did the interview, did you not, of my client?

A. 6'1". I just could see from the interview, yes.

Q. How tall is Det. Wheelis?

A. 6'2", I believe.

Q. So my client is shorter than Det. Wheelis?

A. Yes.

Q. Mr. Snitke said the person that he saw was taller than Det. Wheelis.

A. Correct.

Q. You interviewed Milford Antone, did you not?

A. I did.

Q. Do you have a copy of your supplemental report you submitted after your interview with him?

A. I do not.

Q. What happened to it?

A. Supplemental was never done.

Q. Supplemental was never done of Milford Antone?

A. No.

Q. You did one on Lisa Sivertson?

A. Correct.

Q. There was one done on Sean Running Eagle?

A. Correct.

Q. There was one done on Corey Tilden?

A. Correct.

Q. One done on Orva Antone?

A. Correct.

Q. One wasn't done on Milford?

A. That's correct.

Q. Did you get Milford's shoes?

A. No.

Q. Did you ask him to tell you what shoes he had on that night?

A. No.

Q. What did he tell you he did that night?

A. He said he remembers being with Sean and his brother, but that he passed out and was drinking a lot, doesn't recall anything occurring that night. He then remembers being back at his house.

Q. When Milford was interviewed you told Milford that that wasn't good enough, didn't you? I mean, when you talked to Orva, when Orva said he was passed out, you told Orva that that wasn't good enough, correct?

A. That's correct.

Q. Did you say that to Milford?

A. I did challenge Milford in regards to what he was telling me. However, he said he was passed out. He just could not remember anything.

Q. Was he arrested?

A. No.

Q. Did he come in voluntarily?

A. He was contacted at the Indian Reservation.

Q. Can you tell me when he was interviewed?

A. I believe the 14th of January.

Q. Was Sean Running Eagle, Corey Tilden and Orva Antone indicted by that point in time?

A. I would have to look at the indictment, sir. I don't know.

MR. STEINLE: Judge, I would move Exhibit 153

into evidence. I have no further questions.

THE COURT: Mr. Ahler?

MR. AHLER: I am not sure which one 153 is.

MR. STEINLE: The Orva Antone report.

MR. AHLER: I have no objection to that.

MR. INIGUEZ: No objection.

MR. STEINLE: Judge on this, on this one I have some markings on it. I withdraw it and put a clean copy in. I won't do anything at this point because of the markings.

THE COURT: Exhibit 153 will be admitted.

Mr. Ahler?

REDIRECT EXAMINATION

BY MR. AHLER:

Q. Just a couple of questions.

Det. Saldate, when you interviewed Running Eagle on the 19th, did you have any difficulty understanding him?

A. No.

Q. You have any difficulty in his responses understanding what he was saying when he would respond to your questions?

A. No.

Q. Were the fingerprints of Milford Antone

obtained, to your knowledge?

MR. INIGUEZ: Objection. Lack of foundation.

THE COURT: Overruled.

THE WITNESS: I want to say yes, but I would have to refer to the supplemental prints.

MR. INIGUEZ: I would object to that answer, request that it be stricken from the record, the jury be instructed not to regard that statement.

THE COURT: Is it something that you need to refresh your recollection?

THE WITNESS: I would have to refresh my recollection with the print, statements that we made print forms.

MR. AHLER: I withdraw it.

THE COURT: All right.

MR. AHLER: I will save the question for the latent print examiner. I don't have any additional questions, Your Honor.

THE COURT: You may step down, Officer.

Ladies and gentlemen, we are going to take our evening recess at this time. Please remember not to discuss the case among yourselves or with anyone else. Sorry about the long delay for today. We hope to get through more efficiently tomorrow. See you tomorrow at 1:30.

19

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

JUDITH ALLEN, CLERK
BY A. Arvizu DEP.
FILED
1989 APR 19 PM 4:42

STATE OF ARIZONA,

Plaintiff,

vs.

SEAN RUNNING EAGLE, and COREY TILDEN,

Defendants.

No. CR-87-11508
CR-89-0048-AP

CR-89-0048-AP
FILED
APR 21 1989
NOEL K. DESSAINT
CLERK SUPREME COURT
BY mag

Phoenix, Arizona
July 21, 1988

BEFORE: The Honorable GLORIA G. YBARRA, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

ORIGINAL

PREPARED FOR APPEAL
For Supreme Court

LYDIA ESTRADA
Official Court Reporter

DISCOVERY AND CONFIDENTIAL MATERIAL

SUPERIOR COURT

wouldn't she?

A. If she could remember. Sometimes she wouldn't.

Q. You wrote those answers down as best you could in chronological order as she gave them to you, correct?

A. I tried to.

MR. AHLER: Thank you. No further questions.

THE COURT: You may step down.

(Witness excused.)

MR. AHLER: Det. Saldate.

ARMANDO SALDATE, Jr.,

called as a witness herein, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. AHLER:

Q. State your name, please.

A. Armando Saldate, Jr.

Q. Det. Saldate, you previously been sworn?

A. I have.

Q. Det. Saldate, do you recall talking to

Marlene Tilden the night of -- what would be the early morning hours of December 20th, 1987?

A. I do.

Q. Where did you talk to Mrs. Tilden at?

A. I talked to her inside the living room of their condominium.

Q. At what time?

A. A couple of minutes before 1:00.

Q. And why were you at her condominium at that time?

A. I was present when other officers were executing a search warrant at that location.

Q. Had the house been secured prior to the time that you arrived there?

A. It had.

Q. Can you explain to the jury what is involved in securing a residence under these circumstances?

A. Under these circumstances we had sent some officers to that location to secure the residence, that being that nothing left the residence, nothing entered the residence from the time that the officers arrived until we arrived with the search warrant.

Q. Is there a procedure you have to follow to actually get the search warrant?

A. Yes, there is.

Q. What do you have to do?

A. We file an affidavit stating the facts as we believe them to be. We then present them to a Judge. The Judge then reads those facts, he then either says he agrees with us, and if so, he gives us a search warrant. If he doesn't, then we don't get the search warrant. In this occasion we put the facts down on that affidavit. The facts were then presented to a Judge, and he agreed that we did have enough probable cause and gave us a search warrant.

Q. Was anyone else present during the time that you interviewed Mrs. Tilden?

A. There were several officers walking back and forth. There was probably no one that close to hear what we were saying. They may have heard several sentences, but I don't think they could have heard the gist of the conversation we had.

Q. Were officers actually executing a warrant at the time you were talking to them?

A. That's correct.

Q. Did you ask Mrs. Tilden about her possible whereabouts on the night of December 5th?

A. Yes, I did.

Q. Was she able to remember that particular day?

A. Not at first.

Q. Did you use any sort of -- or did you use any other facts to perhaps assist her to remember that night?

A. Well, I tried to focus in on that particular night because I knew Corey Tilden had to go to a Price Club party as he had told me earlier. So I suggested to her that night that Corey had to go to the Price Club party. She immediately remembered that December night.

Q. Did you ask her where she was the early morning hours of December 6, 1987?

A. Yes, I did. She said she was at home.

Q. Did she indicate who she was with, or if she was with anyone?

A. She said she was with several persons at her home, one of which she identified as Dallas.

Q. Did she identify the other person to you at that time?

A. No, she did not.

Q. Did she indicate to you whether or not she had seen Corey Tilden in the early morning hours of December 6, 1987?

A. She did.

Q. When did she first see Corey Tilden?

A. She said she couldn't estimate the time

period when she saw him in those early morning hours. She said later that it had to have been, or it had to have been before 3:00 a.m. because she did mention that her and friends, Dallas, among other people, were leaving the home at 3:00 a.m. So it had to be earlier than that.

Q. Did she indicate if Corey Tilden was with anyone when she saw him?

A. She said that Corey had arrived with a friend of his from the Price Club who had dropped him off at her home. She said the friend remained maybe several minutes, then left. And Corey remained there at the home.

Q. Did she tell you whether she saw Sean Running Eagle on the morning of December 6, 1987?

A. She said that a short time after Corey arrived, Sean arrived. He was driving the car. And she said that for some reason she had a feeling that Sean may have had some people in the car. She indicated that Sean parked the car in the driveway, along the side of their condominium.

Q. Did she mention anything to you about Sean's condition at the time she saw him?

A. She said Sean came in by himself into the apartment, and described Sean as having been drinking. And then made the comment that she knew Corey had been

drinking. Then described their intoxication by saying that they were "tuned up". I think that is the words she used.

Q. Did she indicate to you what happened after Sean arrived at the condominium?

A. She said that she and Dallas, the friend that she did identify, had decided to take another friend who was drunk, as she described it, to a restaurant. And they -- I believe she said it was 16th Street and Camelback, the Denny's. And that they took that individual, too. She estimated the time period as being around 3:00 a.m. in the morning.

Q. Did she indicate to you what time she had returned from Denny's?

A. Yes, she did. She told me at first that they arrived back between 5:30 in the morning to 6:00 a.m. in the morning. Then she changed her story and said, "Well, we went to Dallas' house first, started coming home from the restaurant. But we still arrived around 5:30 or 6:00 a.m."

I asked her if it could have been later. She said she didn't believe so. But still it was daylight.

Q. Did she indicate who was present when she arrived back at the condominium after going to Denny's

16

and Mr. Howard's house?

A. She told me that when her and Dallas arrived back at the house, that Corey and Sean were present at the house, and that Corey and her son asked her if she could or he could go use her bedroom to sleep in. And she said he does that often. Then instructed her to get him up early, around 5:00 o'clock, because he had to go to work.

MR. AHLER: I have no further questions.

THE COURT: Mr. Iniguez?

CROSS-EXAMINATION

BY MR. INIGUEZ:

Q. Det. Saldate, you just mentioned something about it was still light outside. That sort of caught my attention. Did that mean it had been light before?

A. She said it was light outside. That is how she said it.

Q. Do you remember this time of the year, Det. Saldate? Can you pick up in your mind if I ask you, was it light at 6:30? Can you tell me yes or no?

A. I can't tell you. It's wintertime, I know, of course.

Q. Let me ask you this. You re-enacted this matter with Mr. Snitke, I believe?

A. Yes.

Q. You used the same time of day, didn't you, so you could do it as well as possible to what Mr. Snitke had told you had been the approximate time that he had seen these people?

A. The same time of day that Mr. Snitke told us, yes.

Q. So you went back a few days later as close to that time of the morning as possible. Is that right?

A. I don't know what the exact time frame was for Mr. Snitke.

Q. It would be fair to say it was before 6:00, right?

A. I would say yes.

Q. Was it dark?

A. It was dark.

Q. Do you remember how long it stayed dark after you were at Mr. Snitke's? Was it light by the time you left or was it still dark when you left?

A. It was still dark when we left.

Q. So now, using all of that as a time frame or as a reference, Mr. Saldate, can you tell me what -- you think it was at about 6:30 in the morning when she said she arrived home from Denny's? Do you think it would have been dark or light?

A. I on that day, I don't know. I can't specifically say. I just know what she told me. It wasn't 6:30, it was between 5:30 and 6:00 a.m. in the morning. I don't recall that actual day. But in the case of Mr. Snitke, we probably refrained from 30 to 45 minutes. And it was still dark when we left. I believe we started at 5:00 or 5:30.

Q. Now, when you spoke to Ms. Tilden she was very upset, wasn't she?

A. I wouldn't describe her that way, no, at all.

Q. You had just come into her house with a whole bunch of ununiformed officers and you had -- you're executing a warrant. Is that right?

A. By the time I got there, spoken to her, the apartment or the condominium had already been secured, and any excitement or any surprises had already been over with.

Q. Okay. So if she had been excited she was calmed down by the time you got in there. Is that what you are saying?

A. That appeared to me, yes.

Q. How long before the other officers executed the warrant did you arrive? Do you know?

A. From the time we secured -- I arrived when

we began to execute the warrant. However, at the time we secured that condominium, it may have been an hour more, I don't know.

Q. You didn't ask her at the time you started questioning her whether she had been drinking, did you, like alcohol?

A. For some reason I want to say she had a coffee cup in her hands, but I am not sure. I did not ask her about drinking any alcohol.

Q. Did you tell ask her if she had taken any drugs or medication which would have made it difficult or harder for her to understand and answer your questions?

A. She had --

Q. I asked you if you asked her that question?

A. No.

Q. Was she in a bath robe?

A. No.

Q. What was she wearing? Do you know?

A. I want to say, I believe she was wearing Levi's. And a yellow nightgown at one time. Then because of us opening the door often, I believe it became cold, and she put on a house coat. I believe that is the way it occurred.

Q. Did she tell you she had just come out of the shower when you arrived?

7-

A. I didn't know.

Q. Did someone else come in the house some minutes or time before you entered yourself?

A. Oh, yes. The home had been secured, like I said, an hour before I had gotten there or more.

Q. Would you tell the jury, and at least myself, you said earlier that you were there when the warrant was executed, but then you went in after the residence was secured. Is that what you said, Mr. Saldate?

A. Let me explain a little bit, if I may. At times when we find probable cause on a residence like we have on this residence, it takes some time to get the search warrant. We have to actually write it out, or in our case we tape it on a tape.

We then give it to our section who then types it. We then get the typewritten form, take it to the Judge, the Judge reads it, examines it, makes sure we have enough probable cause. Three steps.

It's then at that point we go out to serve the warrant. Prior to that, if we believe we have probable cause, we will secure the residence so evidence that we feel is there will be there when we get there. Other evidence that may not be there will not find its way there, so we won't find it and it won't be tainted.

We want everything to remain, as we want to serve the search warrant at, and find things as they were. Not change those. That is why we secure the residence. We don't move anything, we don't arrest anyone, we just secure the residence. No one takes anything out, no one brings anything in. That is, when I say secure, that is what we did.

I then, or other officers then went out and got the search warrant, then we proceeded to serve such warrant after the Judge, of course, signs it.

Q. Were you one of the people who went to the Judge on the warrant?

A. No.

Q. So you arrived at the scene waiting for the warrant to come to you?

A. I was in the office. I left when the warrant was going to be served.

Q. That was, I guess, basically the same night Corey and Sean were arrested. They were arrested on the 19th, sometime in the afternoon?

A. It was just after noon.

Q. It was that same --

A. Yes.

MR. INIGUEZ: I have no further questions.

CROSS-EXAMINATION

BY MR. STEINLE:

Q. Officer Saldate, in your questions to Mr. Iniguez you said you don't recall specifically what time your re-enactment was?

A. I don't know.

Q. Here is a copy of your supplemental. Will you review it, tell me, you did the supplemental, did you not?

A. Yes, I did.

Q. And does it not say inside the supplemental specifically what time you began your interview during this re-enactment?

A. Yes, it does.

Q. What time is it?

A. It's right in the middle of what I estimated. It's at 0545. I believe I told Mr. Iniguez it was between 5:30 and 6:00.

Q. And it's your recollection that the entire tiem that you were there in terms of the re-enactment, it was dark outside?

A. That's correct.

Q. Now, your interview with Mrs. Tilden, she was absolutely insistent that she got home before 6:00 o'clock in the morning. Isn't that correct?

SALDATE000760

A. Yes. Between 5:30 and 6:00 p.m.

Q. But you specifically questioned her about 6:00 o'clock and she said it could not have been later than 6:00 a.m.?

A. That's correct.

Q. She was attempting to place both Corey Tilden and Sean Running Eagle at the condominium before 6:00 a.m. Isn't that right?

A. I don't understand the question.

MR. INIGUEZ: I object to the form of the question. He is attempting to place Sean there.

THE COURT: The objection is overruled.

BY MR. STEINLE:

Q. When Mrs. Tilden is telling you what happened on the 5th and the 6th, the early morning hours of the 6th, and she is talking to you, she is telling you specifically that both Corey Tilden and Sean Running Eagle are at the condominium in Scottsdale at 6:00 a.m. on the 6th?

A. Yes.

Q. Now, you're familiar with what time the original call came in on the 911, weren't you?

A. I wold have to refresh my memory. Is there something I could read on that?

Q. Go ahead. Do you need some notes?

13

A. The face sheet of the report would help me, sir.

Q. Would Det. Martinsen be able to give you a copy of it?

A. I am sure he would be able to be. I believe the call came in sometime between -- estimation of 5:53 a.m.

Q. Okay. Now, is it safe to say there is a fair amount of media attention given to the double homicides in the fact that the 911 operator had not been called? I mean, had not sent out the right call?

A. Yes, it would be.

Q. And my client was not arrested until December 19th?

A. That's correct. Was Mrs. Tilden cooperative in terms of giving you a name of Dallas Howard and an address where to find Dallas so you could go interview him and confirm the information that she had given you?

A. She gave me the name of Dallas. I believe we may have got that information later. But she was cooperative.

Q. But did she say that, "I was with Dallas Howard and he lives on 6th Avenue and Coulter"?

A. No.

Q. So you couldn't go on the 20th and interview

Dallas Howard to find out whether or not what Marlene Tilden told you in reference to Sean and Corey being home at these time were true, could you?

A. No.

Q. And there was another man by the name of Jim Bonga. Did she give you that name?

A. No. She said she was with several other people but did not want to identify the rest of the people that were there at that time.

Q. You couldn't go to these other people and confirm what she had told you. Isn't that correct?

A. That's correct.

Q. So what she basically was trying to do was to provide you with some information about her son and Sean Running Eagle, but wouldn't give you any information that would help you confirm the information that she had given you in this interview?

A. I guess so. Yes.

Q. She didn't know who brought Corey home, right?

A. She said a friend from work brought Corey home.

Q. Didn't give you a name, did she?

A. No, she did not. She may have not known it. I don't know.

Q. She did not give you Dallas Howard's full name that day, did she?

A. I believe she just told me Dallas, yes.

Q. She refused to identify the other person?

A. Yes.

Q. Now, she then indicated she thought somebody was in Sean's car. Is that correct?

A. That's correct.

Q. She used the term somebody?

A. That's correct.

Q. But she couldn't tell you anything more about that person?

A. No. She said the car was parked along the driveway, along the side of the condominium, which of course you couldn't see.

MR. STEINLE: I have nothing further.

THE COURT: Mr. Ahler?

MR. AHLER: No further questions.

THE COURT: You may step down.

(Witness excused.)

THE COURT: We will take a short recess at this time.

Ladies and gentlemen, please remember not to

JUDITH ALLEN, CLERK
BY DEP.
FILED

1988 APR -6 PM 4:12

THOMAS E. COLLINS
MARICOPA COUNTY ATTORNEY

Paul Ahler
Deputy County Attorney
Bar ID #: 005379
111 West Monroe, Suite 1800
Phoenix, AZ 85003
Telephone: 602 256-5780
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,
Plaintiff,
vs.
SEAN BERNARD RUNNINGEAGLE (A)
COREY PRESTON TILDEN (B)
Defendants.

NO. CR 87-~~155451~~ 11508

**REQUEST FOR VOLUNTARINESS HEARING**

(Evidentiary Hearing Requested)

Assigned to the Honorable Gloria Ybarra

COMES NOW the State of Arizona, by and through the undersigned counsel, respectfully, requests that the Court conduct a pre-trial hearing to determine the voluntariness of statements made by defendant's Runningeagle and Tilden to law enforcement personnel. The State submits that said statements were taken in compliance with Miranda v. Arizona and that there was no force, threats, or promises used to induce said statements.

Respectfully submitted this 6th day of April, 1988.

THOMAS E. COLLINS
MARICOPA COUNTY ATTORNEY

BY [signature]
Paul Ahler
Deputy County Attorney

(19)

**RUN 220**

SALDATE0005788

Copy of the foregoing mailed/
delivered this 6th day of
April, 1988, to:

The Honorable Gloria Ybarra
Judge of the Superior Court

Roland Steinle
Deputy Public Defender
132 S. Central
Phoenix, Arizona 85003
Defense Attorney for Tilden

Baltazar Iniquez
394 N. Third Avenue
Phoenix, Arizona 85003
Defense Attorney for Runningeagle

BY Paul Ahler
Paul Ahler
Deputy County Attorney

PA:jd
45.1

OFFICE DISTRIBUTION

| CHANGE OF VENUE | |
|---|---|
| JURY FEES | |
| REMANDS | |
| | |
| | |
| | |
| | |
| | |

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED JUN 24 '88 PROCESSED JUN 27 '88
CLERK OF THE COURT

RC04-99822 June 20, 1988 HON. GLORIA G. YBARRA L. Davis
Code Date Judge/Commissioner/Pro Tem Deputy

NO. CR87-11508

STATE OF ARIZONA — County Attorney By: Paul Ahler

Vs. — MCSO

SEAN RUNNINGEAGLE (A) — Baltazar Iniguez
COREY TILDEN (B) — Roland Steinle

2:16 p.m. This is the time set for hearing Motions. State is represented by the above-named counsel. Defendants are present and represented by the above-named counsel.

Court Reporter Lydia Estrada is present.

The Court advises Counsel of her ruling on Motion in Limine and that a written ruling will be provided at a later date.

Argument is heard regarding 609 Hearing. Prior conviction of Corey Tilden will be permitted as stated on the record.

The Court proceeds to Voluntariness Hearing.

State's Case:

Armando Saldate, Jr., is sworn and testifies.

This witness is excused.

Larry Martinsen is sworn and testifies.

This witness is excused.

(CONTINUED)



OFFICE DISTRIBUTION

| CHANGE OF VENUE | |
|---|---|
| JURY FEES | |
| REMANDS | |

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED JUN 24 '88 PROCESSED JUN 27 '88

CLERK OF THE COURT

RC04-99822 (Code) June 20, 1988 (Date) HON. GLORIA G. YBARRA (Judge/Commissioner/Pro Tem) L. Davis (Deputy)

NO. CR87-11508

STATE Vs. RUNNINGEAGLE
TILDEN

(CONTINUED)

State's case rests.

Defendant's Case:

Sean Runningeagle is sworn and testifies.

This witness is excused.

Defendant's case rest.

3:41 p.m. Argument by Counsel for the State.

3:43 p.m. Argument by Counsel for the defendant.

THE COURT FINDS that the statements were knowingly, intelligently and voluntarily made and will be admissible.

3:50 p.m. Court stands at recess.

4:15 p.m. Court reconvenes. Respective counsel and defendants are present.

Court Reporter Lydia Estrada is present.

Court and Counsel go over Voir Dire questions at this time.

4:36 p.m. Court stands at recess until 1:00 p.m. on June 21, 1988.

further highlights the unreasonableness of the state court's decision." *Wiggins*, 539 U.S. at 528. For these reasons, the Court should grant Runningeagle's Petition for Writ of Habeas Corpus on this claim under 28 U.S.C. § 2254(d).

## CLAIM THREE

### THE STATE'S FAILURE TO DISCLOSE EXCULPATORY INFORMATION INVOLVING MANUEL MELENDEZ CONSTITUTED A *BRADY* VIOLATION, AND THUS A VIOLATION OF RUNNINGEAGLE'S CONSTITUTIONALLY-PROTECTED DUE PROCESS RIGHTS.

The district court's determination that Runningeagle's due process rights were not violated by the State's failure to disclose evidence is erroneous because the state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). The state court's rejection of this claim was also based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.[41] 28 U.S.C. § 2254(d)(2). Because the state court failed to resolve the merits of this claim, the district court reviewed it *de novo* because there is no state court decision for the court to accord deference. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

---

[41] An "unreasonable determination of the facts" occurs when a state court's conclusion or characterization of evidence is unsupported by the record, when the process employed is defective, or when no finding is made at all. *Taylor*, 366 F.3d at 999.

The prosecutor improperly withheld information it had obtained from Manuel Figueroa Melendez, a cellmate of Runningegale's co-defendant Corey Tilden, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* requires the prosecution to disclose evidence that is potentially favorable to the defendant and material to either guilt or punishment. *Brady*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667, 674 (1985). In *Kyles v. Whitley*, 514 U.S. 419, 435 (1995), the Supreme Court explained that materiality is evaluated by determining whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome. A failure by the prosecution to turn over evidence that is potentially favorable to the defendant constitutes a due process violation. *Brady*, 373 U.S. at 86.

The prosecution in this case suppressed potentially exculpatory evidence, and the district court's conclusion that *Brady* relief is not warranted is erroneous. (Dist. Ct. Doc. No. 132 at 20, ER 20.) Specifically, law enforcement officers and investigators had multiple conversations with Melendez, an individual who was not involved with the crimes at issue in this case and who had significant information that another individual had committed the crimes without Runningeagle's involvement. This classic *Brady* material was never disclosed to Runningeagle.

### A. THE STATE FAILED TO DISCLOSE EXCULPATORY EVIDENCE IN ITS POSSESSION TO RUNNINGEAGLE'S COUNSEL.

While incarcerated at the Maricopa County jail, Melendez shared a cell with Corey Tilden, Runningeagle's co-defendant. (ROA 417 Ex. D at 8, ER 1625.) As Runningeagle has now learned, Tilden described to Melendez in great detail the crimes at issue in this case: "he has spoke to me about the case completely. He had confided in me." (ROA 417 Ex. D at 8, ER 1625.) Following these conversations with Tilden, Melendez contacted law enforcement investigators and the prosecutor's office about Tilden's admissions regarding his primary and leading role in the crimes. (ROA 417 Ex. D at 6-8, ER 1625.) Between January and April of 1988, detectives and members of the Maricopa County Attorney's Office interviewed Melendez between three and five times. (ROA 417 Ex. D at 6-9, 87, ER 1625.) The prosecutor informed Tilden's counsel at the public defender's office that the prosecution was investigating information provided by Melendez that inculpated Tilden and determining whether Melendez was in a position to testify against Tilden. (ROA 89, ER 2442.) Runningeagle's attorney did not receive a similar notice. The public defender's office, which represented both Melendez and Tilden, screened itself off from any additional involvement in Melendez's case to prevent a conflict of interest. (ROA 89, ER 2442; ROA 90, ER 2441.) As the State's preparation for trial progressed, another of Runningeagle's co-defendants, Orva Antone, eventually

agreed to cooperate, and the State declined to call Melendez as a witness. (ROA 417 Ex. D at 9, ER 1625; ROA 90, ER 2441.)

During pretrial proceedings, Runningeagle's counsel filed a motion for discovery requesting "all material or information which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce his/her punishment therefore." (ROA 84, ER 2461.) The prosecution did not disclose its conversations with Melendez, its notes from its conversations with Melendez, nor even the existence of a witness who implicated Tilden but not Runningeagle.

The record in this case leaves no doubt that Melendez's statement's differed materially from the testimony given by Orva. Of particular relevance, Melendez's statements implicated only Tilden in the actual killing of the victims. In fact, Melendez believed the prosecution opted not to rely on him in the prosecution of Tilden or Runningeagle because he could give the prosecution only evidence as to Tilden's guilt and could not implicate the other two co-defendants: "it was specifically expressed to me by the prosecution and the homicide detectives that they wanted to make the three people—they didn't want any one of them to turn over on any one person. They'd rather have the information to develop it, and they wanted to convict all three of the charges." (ROA 417 Ex. D at 9, ER 1625.)

After meetings with Melendez, the prosecution began making notes reflecting

the fact that Tilden, not Runningeagle, was the killer. (Dist. Ct. Doc. No. 115 Ex. N, ER 555.)[42] Kyle Marie Wesendorf, an attorney working on Runningeagle's first habeas petition, reviewed the file maintained by the Maricopa County Attorney's Office to mark any documents she and her co-counsel did not have and to request copies of the documents. Contained in the file in the Maricopa County Attorney's Office were notes written on a legal pad that said, "TILDEN THE KILLER." (Dist. Ct. Doc. No. 115 Ex. N, ER 555.) Runningeagle's attorneys requested a copy of the notes, but when the Maricopa County Attorney's Office copied the notes and provided them to Runningeagle's attorneys, the "TILDEN THE KILLER" note was not included. (Dist. Ct. Doc. No. 115 Ex. N, ER 555.) To this day, Runningeagle has not received any materials from Respondents regarding the information obtained from Melendez during the interviews.

---

[42]Runningeagle submitted the Wesendorf affidavit in his Merits Brief re: Sentencing Claims and Requests for Evidentiary Development, filed July 21, 2006. (Dist. Ct. Doc. No. 115, ER 169.) Pursuant to the district court's order dated November 27, 2007, the court declined to expand the record to include the affidavit, and thus did not consider this evidence when it denied Runningeagle habeas corpus relief. (Dist. Ct. Doc. No. 132, ER 20.) Runningeagle nevertheless maintains that this affidavit—and all other exhibits included in the Merits Brief re: Sentencing Claims and Requests for Evidentiary Development—are part of the record on appeal. *See* Fed. R. App. P. 10(a)(1) (providing that the record on appeal consists of original papers and exhibits filed in district court). *See also Schlup v. Delo*, 513 U.S. 298, 308 n.18 (1995) (noting that exhibits attached to a habeas petitioner's motion to supplement the record were "part of the record on appeal," even though the district court denied the motion to supplement).

### B. THE STATE'S FAILURE TO DISCLOSE THIS EXCULPATORY INFORMATION TO RUNNINGEAGLE VIOLATED HIS RIGHTS UNDER *BRADY* AND RUNNINGEAGLE IS ENTITLED TO RELIEF.

The prosecution's strategic decision not to rely on Melendez as a witness did not excuse the prosecution from its *Brady* obligations to disclose to Runningeagle the existence of a witness who implicated only Tilden and the state courts' decision otherwise constitutes both an unreasonable application of the law and an unreasonable determination of the facts. In light of the state court's unreasonable determination of the facts, the decision is also an unreasonable application of clearly established law. *See Williams*, 529 U.S. at 408 ("[A] state-court decision involves an unreasonable application of [Supreme] Court[] precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."). As the Supreme Court has made clear, "partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision." *Wiggins*, 539 U.S. at 528.

Indeed, there is little doubt that the testimony of a witness who implicated only or primarily Tilden would have materially undermined the testimony of Orva, who testified that both Runningeagle and Tilden were culpable. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)) ("When the 'reliability of a given witness may well be determinative of guilt or

innocence,' non-disclosure of evidence affecting credibility falls within this general rule."). The State's failure to disclose its notes from interviews with an exculpatory witness prior to trial, and its failure to disclose even the existence of this witness, presents a classic *Brady* claim.. Runningeagle was prejudiced because evidence exists suggesting that Tilden was solely or primarily responsible for the crimes at issue, and the State suppressed that evidence.

The state court summarily denied relief as to the *Brady* claim without analysis. The district court denied relief as to this claim, concluding that Melendez's utility as an exculpatory witness was merely speculative. (Dist. Ct. Doc. No. 132 at 20; Apx. 21.) (ER 20.) More precisely, the district court reasoned that Runningeagle cannot establish *Brady* prejudice because the harm resulting from the prosecution's improper failure to disclose Melendez's existence is merely speculative.

The district court relies exclusively on *Wood v. Bartholomew*, 516 U.S. 1 (1995), to justify its decision that Runningeagle cannot show "that the outcome of his trial or sentencing would have been affected." (Dist. Ct. Doc. No. 132 at 20, ER 20.) However, *Bartholomew* is inapposite. The Court in *Bartholomew* held that the prosecution's failure to disclose an exculpatory polygraph result is not a *Brady* violation because the polygraph result is inadmissable under state law. 516 U.S. at 4. In contrast, in Runningeagle's case, the testimony of Melendez as impeachment

or as independent exculpatory evidence is admissible evidence. *Cf. Bartholomew*, 516 U.S. at 6 (stressing that "polygraph results were inadmissible under state law, even for impeachment purposes"). *Bartholomew* is not instructive in analyzing Runningeagle's case.

Moreover, the district court's conclusion that the content of Melendez's statements is merely speculative is overstated. Although the exact details of Melendez's statements are still being withheld by Respondents, the record in this case leaves no doubt that Melendez's statements implicated only Tilden—not Runningeagle—in the actual killing of the victims. Importantly, it is Respondents' gamesmanship that is causing speculation. The speculation would cease if Respondents would provide Runningeagle's counsel copies of the interview notes from their multiple meetings with Melendez, which to this day counsel has not received. This Court should therefore grant evidentiary development on this claim. Runningeagle requests notes, transcripts, and/or recordings of the interviews with Melendez and depositions of individuals involved in the interviews.[43]

[43]This claim was denied by the state courts without an evidentiary hearing despite Runningeagle's requests. The post-conviction court's complete lack of analysis on these claims compels the conclusion that it unreasonably applied both the law and the facts under the AEDPA. *Taylor*, 366 F.3d at 998-1000. Because no factual findings were made, but only broad legal conclusions, there are no factual findings to defer to under the AEDPA. *Id.* at 999-1001 (holding that a state court decision is an unreasonable determination of the facts if "no finding was made by the

In sum, for the reasons discussed above, the district court's denial of this claim was erroneous. It does not require speculation to recognize that the existence of a witness who implicates one co-defendant to the exclusion of another is material and exculpatory, and the state's failure to disclose such a witness is prejudicial and a *Brady* violation. This Court should therefore grant Runningeagle relief on this *Brady* claim because he has shown both an unreasonable application of clearly established federal law and an unreasonable determination of the facts.

## CLAIM FOUR

### PROSECUTORIAL MISCONDUCT DURING RUNNINGEAGLE'S TRIAL RESULTED IN A VIOLATION OF HIS RIGHT TO DUE PROCESS.

During Runningeagle's trial, the prosecutor made "comments [that] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). The prosecutor deprived Runningeagle of his right to a fair trial not only by making inflammatory remarks directed at Runningeagle, but also by improperly vouching for

state court at all"; in this situation, "there is nothing to which the presumption of correctness can attach"). If, as here, the appellate court cannot discern the reasoning behind the fact-finding process in state court, because no effort is made to explain or reconcile inconsistencies, the state court factual findings must be set aside and the federal court may then have to make new findings. *Id.* at 1007-08, 1014; *see, e.g*, *Jones*, 114 F.3d at 1013 (stating that when the facts were not developed at a hearing in state court, a federal evidentiary hearing should be held, in order to determine whether the petitioner qualifies for habeas relief under the AEDPA).



# Runningeagle documents

*Milke v. City of Phoenix et. Al*



Milke: Runningeagle documents