1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2            IN AND FOR THE COUNTY OF MARICOPA

3                                    *VOLUNTARINESS HEARING (NOT COMPLETED)*

4    STATE OF ARIZONA,            )
                                  )
5              Plaintiff,         )
                                  )
6         vs.                     )        No. CR 89-12631
                                  )            CR 91-0048-AP
7    DEBRA JEAN MILKE,            )
                                  )
8              Defendant.         )
     _____)

9

10

11                    Phoenix, Arizona
                    September 10, 1990

12

13

14

15   BEFORE:  The Honorable CHERYL K. HENDRIX

16

17

18

19

20            REPORTER's TRANSCRIPT OF PROCEEDINGS

21

22

23

24   Copy                            By:  Pauline Wood
25   Prepared for Appeal                  Official Court Reporter

SUPERIOR COURT
PHOENIX ARIZONA

PUBLIC DEFENDER
MAY 23 1991
APPEALS RECEIVED

**MILKE_NSB011906**

Exhibit 3

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,        )
                             )
5            Plaintiff,      )
                             )
6       vs.                  )          No. CR 89-12631
                             )
7   DEBRA JEAN MILKE,        )
                             )
8            Defendant.      )
    _____)

9

10

11

12                  Phoenix, Arizona
                    September 10, 1990
13

14

15

16   BEFORE:  The Honorable CHERYL K. HENDRIX

17

18

19

20           TESTIMONY OF ARMANDO SALDATE

21

22

23

24                              By:  Pauline Wood
                                Official Court Reporter
25   Copy

MILKE_NSB011907

Exhibit 3

i

1                           I   N   D   E   X

2   WITNESSES:                              DX      CX      RD      RC

3

    Armando Saldate
4
        By Mr. Ray                          2-A             72
5       By Mr. Levy                                 57

6   Martin Kassell

7       By Mr. Ray                          76              115
        By Mr. Levy                                 96              122
8
    John Fritz
9
        By Mr. Ray                          127             150
10      By Mr. Levy                                 138

11  Kirk Fowler

12      By Mr. Ray                          152             167
        By Mr. Levy                                 161
13

14

15

16

17

18

19

20

21

22

23

24

25

**MILKE_NSB011908**

Exhibit 3

SUPERIOR COURT

2

1 APPEARANCES:

2     On behalf of the State:        Mr. Noel J. R. Levy
                                   Deputy County Attorney

3

4     On behalf of the Defendant:    Mr. C. Kenneth Ray
                                   Court-Appointed Attorney

5

6                         * * * * *

7                                         September 10, 1990

8

9         THE COURT:  CR 89-12631, State of Arizona against

10 Debra Jean Milke.  Time set for evidentiary hearing, oral

11 argument on motion to suppress, and any other pretrial matters.

12         MR. LEVY:  The State is ready.  Noel Levy.

13         MR. RAY:  Kenneth Ray appearing with Ms. Milke, who is

14 present.

15         THE COURT:  Counsel, shall we start with the motion

16 to suppress?

17         MR. LEVY:  Yes, Your Honor.

18         MR. RAY:  Yes, Your Honor.

19         I believe, Your Honor, that, as I indicated in my

20 motion, it would be my burden at least to establish a prima facie

21 basis for this motion to suppress.  I'm prepared to proceed.

22         THE COURT:  All right.

23         MR. RAY:  I will call to the stand Armando Saldate.

24         THE COURT:  Detective Saldate, if you would, come up to

25 the clerk, give her your name, and be sworn.

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB011909**

Exhibit 3

2

```
 1   APPEARANCES:

 2        On behalf of the State:        Mr. Noel Levy
                                         Deputy County Attorney
 3        On behalf of the Defendant:    Mr. C. Kenneth Ray
 4                                       Court-Appointed Attorney

 5

 6                         * * * *

 7                                       September 10, 1990

 8

 9                    ARMANDO SALDATE,

10   called as a witness herein, having been first duly sworn,

11   was examined and testified as follows:

12

13                    DIRECT EXAMINATION

14   BY MR. RAY:

15        Q     Sir, please state your name.

16        A     Armando Saldate, Jr.

17        Q     And you were formerly a detective in the Phoenix

18   Police Department?

19        A     That is correct.

20        Q     You are presently the appointed constable for

21   the Central Phoenix Justice Court?

22        A     That's correct.

23        Q     And you are currently running for that position

24   at the next general election, is that correct?

25        A     Primary tomorrow and then general election also.
```

**MILKE_NSB011910**

Exhibit 3

2-A

1          (Witness sworn.)

2          THE COURT:  Sir, if you would, have a seat over there.

3          MR. RAY:  May I proceed, Your Honor?

4          THE COURT:  Please.

5          MR. RAY:  Thank you.

6

7                    ARMANDO SALDATE,

8  called as a witness herein, having been first duly sworn, was

9  examined and testified as follows:

10

11                    DIRECT EXAMINATION

12  BY MR. RAY:

13          Q    Sir, please state your name.

14          A    Armando Saldate, Jr.

15          Q    And you were formerly a detective in the Phoenix

16  Police Department?

17          A    That is correct.

18          Q    You are presently the appointed constable for

19  the Central Phoenix Justice Court?

20          A    That's correct.

21          Q    And you are currently running for that position

22  at the next general election, is that correct?

23          A    Primary tomorrow and then general election also.

24

25          (Next page, please.)

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB011911**

Exhibit 3

1      Q    Very well.  I guess I would ordinarily call

2  you Detective, sir.  Do you still object to that, being

3  called Detective?

4      A    That's fine.

5      THE COURT:  Does that infer at one time he did

6  object to being called Detective?

7      MR. RAY:  Not necessarily, Your Honor.  I just

8  didn't know if I should call him Constable, but

9  Detective is so much easier to say.

10     THE WITNESS:  My first name Armando is just as well.

11  BY MR. RAY:

12     Q    Very well, sir.

13          How long had you been with the Phoenix Police

14  Department, sir?

15     A    I started with the Phoenix Police Department on

16  June 2nd, 1969.

17     Q    And so approximately --

18     A    Twenty-one years.

19     Q    Twenty-one years.  And when did you retire?

20     A    I retired on July 10th, 1990.

21     Q    And were you at that time already the Constable?

22     A    July 11th I was appointed as Constable.

23     Q    In your capacity as detective with the Phoenix

24  Police Department did you have occasion to work with the

25  homicide detail?

**MILKE_NSB011912**

Exhibit 3

4

1        A     Yes.  I was assigned to the homicide detail

2   in April of 1986 and worked there until my retirement.

3        Q     Would you, sir, give us an indication of

4   the background and training you have had specifically

5   with respect to the conducting of interviews?

6        A     I think we have had this discussion before.

7   There has been no specific seminars I have gone to for

8   interviews.  During the police academy I believe they

9   touched on it, but that's a long time ago.  I may have

10  gone to some seminars where they may have touched on

11  it, but specifically for interrogation techniques, I

12  never went to a seminar nor had any training.

13       Q     Would you agree, sir, there are various methods

14  and means by which an individual can be interrogated or

15  interviewed?

16       A     I understand various officers use different,

17  if you will, techniques, or their styles differ.

18       Q     Do you have any experience or training, either

19  on the job or through seminars, dealing with whether or

20  not an individual can continue to be interrogated once

21  they have invoked their right to remain silent?

22       A     Certainly.  I understand that that cannot happen.

23       Q     And can you say that you have abided by that

24  rule on all occasions or interviews that you have been

25  involved in?

**MILKE_NSB011913**

Exhibit 3

1      A    No.

2      Q    You have not?

3      A    No.

4      Q    And are there occasions where you would

5  willfully violate that rule?

6      A    There are occasions that a person may ask

7  for an attorney, I note it in my supplement, I note

8  it in my notes; however, if that person continues to

9  talk, I will continue to listen.  And that has happened.

10     Q    Will you continue to ask questions?

11     A    If a question does come up in my mind during

12  her conversation, or their conversation, sure, I will

13  ask a question.

14     Q    In this particular case you happened to be

15  the case agent with respect to the investigation of the

16  homicide of Christopher Milke, isn't that true?

17     A    That is correct.

18     Q    And you were assigned this investigation at

19  approximately 9:00 o'clock in the morning on December

20  3rd, 1989?

21     A    Approximately that time, yes.

22     Q    And was that your normal shift --

23     A    No.

24     Q    -- or normal day?

25     A    No.

**MILKE_NSB011914**

Exhibit 3

6

1    Q    Were you called in on your day off?

2    A    I was called in on my day off.

3    Q    You reported to 620 West Washington at approximately

4  9:00 a.m. that morning?

5    A    Approximately, yes.

6    Q    You were briefed by other officers and

7  investigators that had participated in the investigation

8  overnight?

9    A    A short briefing did occur among -- not the

10  investigators themselves, but a supervisor who had

11  been coordinating the investigation briefed me on some

12  of the things that had happened.

13    Q    Would that have been a homicide supervisor?

14    A    I believe it was Sergeant Ontiveras,

15  yes.

16    Q    He was the Phoenix homicide supervisor for this

17  particular case, isn't that right?

18    A    That is correct.

19    Q    Did you also have occasion to speak with

20  Detective Mills that morning?

21    A    Yes.

22    Q    And was he a participant in that briefing

23  process that occurred that morning?

24    A    I would say he was, but I'm not really sure.

25  We were in and out, both of us in and out.  I don't know

**MILKE_NSB011915**

Exhibit 3

1  whether he had been briefed before.  That was his

2  normal working day and, of course, he was involved

3  more with it than I was, so he may have already been

4  briefed.

5      Q    Is it fair to say you and he did converse

6  before going upon your separate activities that

7  morning?

8      A    Certainly.

9      Q    Did you and he discuss who would interview

10  whom that morning?

11      A    Yes, we may have.  I mean, obviously we had

12  to make a decision who was going to interview who.  Yes.

13      Q    There were two individuals at 620 West

14  Washington that morning.  One was James Styers and the

15  other was Roger Scott, isn't that right?

16      A    That is correct.

17      Q    And based upon the information that you obtained

18  during the briefing you learned that Roger Scott had

19  basically been in the presence of the police officers

20  since approximately midnight the night before, isn't

21  that right?

22      A    He had been helping -- him and Jim Styers,

23  as I was told, had been helping the police try to locate

24  young Christopher Milke at the store and different locations

25  and were assisting, yes.

MILKE_NSB011916

Exhibit 3

1      Q     And your information in that briefing also

2  was that Jim Styers had basically been in police

3  contact, in the presence of or in contact with the police

4  since approximately 3:00 or 4:00 o'clock the afternoon

5  of the 2nd?

6      A     I don't know the time period.  I was just

7  told that the investigation had been lengthy, that these

8  two individuals had been with the police, helping the

9  police search for this young boy and that they were

10  currently at the police station.

11      Q     Up to that point in time there was no suggestion

12  at all during the briefing or otherwise that Debra

13  Milke was a suspect in this case, correct?

14      A     That's correct.

15      Q     And it was your information that she was at

16  her residence, her apartment residence at that time?

17      A     I can't say that for sure, to be honest with

18  you.  I hadn't heard of Debra Milke during the briefing.

19  I didn't hear Debra Milke's name until the interview.

20      Q     You commenced your interview of James Styers

21  that morning?

22      A     That's correct.

23      Q     And spent what, approximately an hour with him?

24      A     I really don't know.  I don't have that case

25  in front of me nor that interview in front of me, nor have

**MILKE_NSB011917**

Exhibit 3

1    I viewed it, but that's probably safe to say.

2        Q    You did not record that interview, did you,

3    sir?

4        A    No, I did not.

5        Q    At approximately 12:58 in the afternoon of

6    December 3rd you entered into the interview room where

7    Roger Scott and Detective Mills were at, isn't that right?

8        A    That is correct.

9        Q    And at that time Detective Mills had been

10   interviewing Roger Scott?

11       A    That's correct.

12       Q    You stepped into the interview room, asked

13   Detective Mills to step out and you wanted to speak

14   with him?

15       A    Again, I haven't had the opportunity -- to the

16   best of my recollection, I think that's true.

17       Q    I take it it's fair to say you and Detective

18   Mills consulted concerning the progress of the two

19   interviews that had been conducted, is that correct?

20       A    Prior to my entering into --

21       Q    No, after you asked Detective Mills to step out.

22       A    We may have.

23       Q    All right.  You and Detective Mills then re-entered

24   the interview room with Roger Scott, is that true?

25       A    I believe so.

**MILKE_NSB011918**

Exhibit 3

10

1    Q    At that point in time Roger Scott was advised
2 by you of his Miranda rights?

3    A    That's correct.

4    Q    Whenever you are conducting an interview, sir,
5 of a person you suspect, do you always read them their
6 Miranda rights?

7    A    On most occasions, yes.

8    Q    Are there occasions when you do not?

9    A    Certainly.  If I'm out on the street, I may
10 have my suspicions of something.  If that person is
11 not under arrest, we are holding, just talking to that
12 person, I may not read him his rights.  However, in this
13 instance I was going to get down to facts with Mr.
14 Scott.  He was in police custody, he was in a room with
15 two detectives, and for that reason I felt his rights
16 should be read to him.

17    Q    You indicated you intended to get down to
18 facts with Mr. Scott.  Are you suggesting you did not
19 have the facts at that point?

20    A    I'm suggesting that the interview prior to me
21 entering the room was an interview taking place, a
22 different style of interview that was taking place.

23    Q    And you knew that the interview was of a
24 different style than your own, is that right?

25    A    That is correct.

SUPERIOR COURT

**MILKE_NSB011919**

Exhibit 3

1      Q     And you entered that interview room and

2   commenced your style of interrogation, is that right?

3      A     Yes.

4      Q     And your style of interrogation, at least

5   with respect to Mr. Scott, was to read him his

6   Miranda rights?

7      A     That's not -- that wouldn't be the style,

8   that would be my personal view as far as safeguarding

9   his rights and I felt I needed to read him his rights.

10     Q     Was he a suspect in your mind at that time?

11     A     Yes.

12     Q     Was he in custody in your mind at that time?

13     A     Again, being that I was going to talk to him

14   seriously about what I felt had happened and the fact

15   that he was in a room and that he had been in custody

16   for some time, I didn't know exactly how long, and I

17   was there, I felt it necessary to read him his rights,

18   yes.

19     Q     Did you believe he had not provided facts up

20   to that point?

21     A     Yes.

22     Q     Upon what information did you base your

23   assumption that he had not provided any facts?

24     A     Well, the general story that had been told to

25   me initially about Scott's involvement was somewhat --

**MILKE_NSB011920**

Exhibit 3

1    I couldn't believe that.  Secondly, I knew the relation-

2    ship between him and Styers, or I had been told the

3    relationship, and I didn't believe at that point he

4    had been given the opportunity to be truthful, and

5    because of different styles of interviews, again,

6    my style is a little different.  I knew that I was

7    going to be straightforward with him, I was going to

8    be very truthful with him, but I was going to make sure

9    that whatever he told me was going to jive with the facts.

10   And that's my style.  And for that reason I expected,

11   when I started to interview him, that he would tell me

12   the truth.

13       Q    What facts did you have in your investigation

14   up to that point, and that includes the investigation of

15   the other officer that had briefed you, what facts did

16   you have that suggested what Roger Scott had said up

17   to that point was not the facts?

18       A    Facts, suspicions, maybe the fact of the matter

19   that Scott had been telling officers that he had been

20   taken home previously, that Jim Styers had gone to the

21   Metrocenter and that he, on his own volition, decided,

22   I think, he would go back to Metrocenter.  And the

23   strangest thing that happened, all of a sudden the child

24   was missing.  Mr. Styers is there claiming the child is

25   missing.  All of a sudden Mr. Scott appears.  He didn't

**MILKE_NSB011921**

Exhibit 3

1   have a ride before now and was getting a ride with

2   Mr. Styers.  All of a sudden he appears in Metrocenter.

3   It was my belief through my experience, and solely

4   through my experience, and my suspicions that Mr.

5   Scott was there only for one reason.  Mr. Scott was

6   there to give Mr. Styers a little bit of backbone.

7        Q    So, if I understand your testimony correctly,

8   sir, you had no independent information that suggested

9   that Mr. Scott was not telling you the truth, you just

10  had a suspicion and an assumption on your part?

11       A    I had an assumption, I had suspicions.  I

12  also had the belief that, from my briefing with Detective

13  Mills and briefing with officers who had talked to

14  Scott, they had not afforded him the time or the method

15  to be truthful, and that I was going to do.

16       Q    Are you suggesting that Detective Mills'

17  interview with Mr. Scott did not afford Roger Scott the

18  opportunity to tell the truth?

19       A    I'm saying Detective Mills' interview was, as

20  I believe, and other detectives' interviews, were that

21  of listening to Mr. Scott and were going to listen to

22  him no matter what he said and were going to take down

23  that information.  I do it a little differently.

24       Q    Isn't it true that you have characterized your

25  interview technique as basically listening 80 percent

**MILKE_NSB011922**

Exhibit 3

1  of the time and talking 10 percent of the time?

2       A    That only gives 90 percent of the time, so

3  they -- well, basically.  But what I did, Mr. Ray, is

4  -- and I will tell you --

5       Q    Well, sir, is it true that is how you have

6  characterized your interview style and technique?

7       A    Yes.

8       Q    And haven't you just suggested that that is

9  what Detective Mills did, was basically listened and

10  gave Scott the opportunity to speak?

11       A    Well, I don't mean to argue with you, Mr.

12  Ray, but the situation is that my technique and Detective

13  Bob Mills' technique is a little different.  My

14  technique may be the same as another person's, I don't

15  know, but still, I pursue an interview as straightforward

16  as I can.  Detective Bob Mills, my understanding was that

17  he was listening to Roger Scott, was letting him talk,

18  was not confronting him, was not challenging him in

19  anything he said.  I don't handle an interview that way.

20       Q    If I'm to understand correctly, then, do you

21  walk in an interview with a gut feeling and suspicion

22  in your mind as to what the true set of facts are?

23       A    I certainly walk in an interview with a

24  suspicion and gut feeling, but I never pre-judge an

25  interview.  I never go in an interview room believing

**MILKE_NSB011923**

Exhibit 3

1   that that person is going to tell me whether they are

2   guilty or innocent.  I do go in an interview room

3   believing that person, hopefully, if I do my job

4   right, will tell the truth.  Whether that person is

5   innocent or guilty, he will tell the truth.

6       Q     When you walk in an interview room and know

7   what the prior interviewer has learned, how do you

8   know, sir, that that isn't the truth?

9       A     Well, again, knowing Detective Bob Mills,

10  sooner or later I'm sure Detective Bob Mills was going

11  to get to that stage, but I knew the interview, how

12  the interview had taken place up to that point.  And

13  when I went in there I had a gut feeling, a suspicion,

14  I had some facts that weren't going well as far as in

15  my own mind, and when I entered that room and talked to

16  him I read him his rights for his protection, but when

17  I entered the room I didn't know whether Mr. Scott was

18  going to tell me whether he was guilty or not or whether

19  he was going to tell me anything, but I did know Mr.

20  Scott would be telling me the truth.

21      Q     So --

22      A     From his standpoint.

23      Q     When you walked into the room, sir, if Roger

24  Scott just in your presence decided to say, "I'm guilty",

25  you would accept that as the truth?

MILKE_NSB011924

Exhibit 3

16

1       A     And leave?

2       Q     Yes.

3       A     No.

4       Q     All right,  Your interview technique suggests,

5   at least in the conversations that we have had, sir, that

6   you go in there demanding the truth, is that correct?

7       A     That is not correct, not demand.  And again,

8   we have to -- if you are suggesting -- in our prior

9   contacts I have never told you I have a technique.  You

10  have referred to it as a technique.  I'm telling you

11  that I walk in a room, I'm straightforward with a person,

12  I challenge the person if that person is lying, because

13  I'm there to get the truth.

14      Q     How do you know that they are lying?

15      A     Pardon me?

16      Q     How do you know that they are lying in order

17  to challenge them?

18      A     Well, several reasons.  I mean, several things.

19  I have got 21 years of police experience, I have got

20  -- I'm also a 41-year-old man.  I listen a lot, just as

21  I listened to you a lot during our interviews.  And I use

22  my gut reaction, I use my experience, I use -- when I'm

23  talking to that person, I look directly at that person.

24  I expect them to look directly at me.  We feel each other

25  out.  I'm honest with that person.  I expect that person

t1s2

MILKE_NSB011925

Exhibit 3

1  to be honest with me.  And that's how I continue my

2  interview.  That is, if you wish, a technique.  Okay?

3  If you call it a technique, that's fine.  But it's

4  just being straightforward, trying to get the truth.

5  And that's what I usually get.

6      Q    And will you utilize -- and if you will bear

7  with me in using my term -- if you utilize that technique

8  to obtain the truth, will you continue that technique

9  even in violation of a person's request to remain silent?

10     A    Again, we have spoken about this, and I have

11  told you I do have cases, and I'm sure you do have cases,

12  when someone asks for an attorney, I immediately note it

13  in my notebook, I note it on my supplemental.  I continue

14  only if that person continues to talk.  I question them

15  only if -- if they are continuing to speak to me, I

16  may have a question, sure, I will ask a question.

17     Q    Do you recall the name Shawn Bernard, Running

18  Eagle?

19     A    Yes.

20     Q    You didn't believe that Running Eagle -- you

21  had occasion to interview him, didn't you?

22     A    Definitely, yes.

23     Q    And you didn't believe that Mr. Running Eagle

24  had been telling the other investigators the truth up

25  to that point, did you?

**MILKE_NSB011926**

Exhibit 3

1    A    From my recollection, no.

2    Q    And you went in the interview room with Shawn

3    and told him that you expected him to tell you the truth?

4    A    That is correct.

5    Q    And basically you told him that he had been

6    lying up to that point, isn't that right?

7    A    That is correct.

8    Q    And at one point in time he told you that --

9    you told him, rather, you would try to understand what

10   he is saying, but Mr. Running Eagle immediately said

11   he wanted to remain silent, didn't he?

12   A    That is correct.

13   Q    And then, from your report, you continued to

14   ask him questions, isn't that right?

15   A    That is correct.

16   Q    He indicated that he wanted to speak to an

17   attorney later on after you continued asking questions?

18   A    That is correct.

19   Q    And you continued to interrogate him without

20   counsel, isn't that right?

21   A    To interview him, yes.  And it's so noted in

22   my supplemental and later in court under testimony.

23   Q    That is not acceptable police procedure, is it,

24   sir?

25   A    I don't -- I don't know where you are coming from.

MILKE_NSB011927

Exhibit 3

1   Acceptable police procedure?

2        Q     In terms of interrogating a suspect.

3        A     I think, if anything, what that case brings

4   out is that, as you refer to it, my technique doesn't

5   always work.  If anything, that's the only thing it

6   brings out.

7        Q     Sir, as an officer with 20-some-odd years'

8   worth of experience, you know when a suspect invokes

9   his right to remain silent, especially after you have

10  read him his Miranda rights, that you are to break the

11  interview off immediately, aren't you?

12       A     I don't believe it says in any policy manuals

13  that we have in the Police Department or any discussions

14  conducted by the Police Department, does it tell me I

15  need to stop listening or asking questions, no.  I

16  understand that may not be used in court, but --

17       Q     But that doesn't bother you?

18       A     Well, see, we have different -- we have

19  different areas of responsibility, Mr. Ray.  Your

20  responsibility, is to defend your defendant.  My

21  responsibility is to see to it, as a police officer

22  21 years, that I always obtain the truth.  I go in there

23  truthful and that's the way I try to come out, obtaining

24  the truth.  It's not always the truth, but -- because

25  if I talked to you about something that happened between

MILKE_NSB011928

Exhibit 3

1  me and you, your version of the truth may be a little

2  different than mine.  But I will get the truth as far

3  as what you feel is the truth, and that's what I'm

4  after.

5      Q    If I understand correctly, then, as far as

6  you are concerned, in the manner in which you conduct

7  interviews, primarily important is to obtain what you

8  believe to be is the truth and basically to heck with

9  Miranda and the right of counsel and things of that

10 nature, am I correct?

11     A    That is totally incorrect, because you are

12 inferring that the truth as I see it will be written

13 as I want it to be written.  And that's not true.  I

14 write the truth as Debra, or any other defendant, has

15 told me.  That is written in my supplemental.  Everything

16 they tell me is written in my supplemental.  That is

17 the truth as far as they are concerned.  What I write

18 down.  You are trying to say I go in and write my

19 reports the way I want them to come out.  That is totally

20 untrue.

21     Q    The truth to you, in the investigations that

22 you engage in and that you conduct, is based upon, number

23 one, the premise that you believe this individual is

24 responsible for something and then, number two, if they

25 say something to incriminate themselves, they are, therefore,

**MILKE_NSB011929**

Exhibit 3

1   telling the truth?

2        A    No.   The premise for the truth, as far as I

3   see it, is the truth is what that person I'm interviewing

4   is saying.  If that person says to me -- and I will

5   use an example of something like burglary.  If they

6   say -- if that person says to me that they burglarized

7   and took a ring that they were able to sell that had

8   a glass in it and they say, "That is the truth, Armando",

9   and they tell me they believe that, I don't care if the

10  person over here on the other side says, "No, that was

11  a $30,000 diamond ring with a good diamond in it".

12  I'm concerned with what that person tells me.  That is

13  the truth as far as they are concerned.  He is not a

14  jeweler, he doesn't know that was a diamond ring, or the

15  other people on this side may have done it just because

16  they wanted to get -- collect some insurance.  No.  The

17  truth as I see it is from what that person tells me.

18       Q    Roger Scott told you the truth as he saw it

19  before he confessed to this crime, didn't he?

20       A    He never told me that.

21       Q    He never told you that he had nothing to do with

22  the disappearance of Christopher Milke?

23       A    No, he said that, yes.

24       Q    And --

25       A    That was obviously not the truth.

**MILKE_NSB011930**

Exhibit 3

1    Q    He was speaking, wasn't he?

2    A    He was, sure.

3    Q    And you wrote down what he spoke?

4    A    Sure.

5    Q    You didn't record that interview?

6    A    No.

7    Q    And if your premise is correct that whatever

8 he said must have been the truth as per that individual,

9 why did you continue to question him?

10    A    Mr. Ray, you have to give me some credit.  I

11 just don't believe anybody.  If someone tells me that

12 that wall is blue over there and I can certainly see

13 it's beige, I'm not going to obviously believe they

14 are going to tell the truth, so we are going to have

15 some discussion about that.  And that's what we had

16 with Mr. Scott, some discussion.  Now, if you are

17 asking me if I come in an interview room and that person

18 tells me, just like you asked me a little while ago,

19 "I'm guilty", and then I leave, I don't do that.  If

20 a person tells me they are guilty, I like to know why

21 they feel they are guilty, why, or in their view, what

22 happened.  That's what I'm there for, or another detective

23 is there for.  He is there to get the truth, to complete

24 the investigation the best he can, and that's it.

25    Q    How long will you conduct an interview or

MILKE_NSB011931

Exhibit 3

1  interrogation process before you will break off and

2  either resign yourself to the fact he is not telling

3  you the truth or until such time as he does speak the

4  truth, according to what you believe is true?

5      A   We have had this discussion before and I

6  have told you once before in an interview that I will

7  listen to someone for three hours, six hours, or 10

8  minutes if that's all they want to talk.  We will sit

9  there and we will discuss it, I will sit there and

10  listen to that person, if that person wants to talk

11  to me, for six or eight hours.  Six or eight hours

12  I will sit there and listen.

13      Q   If that person doesn't want to talk, you will

14  keep talking, though, won't you?  That's what happened

15  with Running Eagle?

16      A   At times, yes.

17      Q   Will you use any suggestion to the interviewee

18  that -- well, will you try to find a button that is

19  correct to punch or push something that will extract

20  the truth out of this individual?

21      A   The only button, if you will, that I use, and

22  the only, again, technique, if you are going to back to

23  that word, is to sit there and listen to them.  They

24  find their own way of deciding to tell the truth.  That

25  is my belief, that everyone, I don't care how heinous a

**MILKE_NSB011932**

Exhibit 3

1   crime it is, will tell the truth.   They want to tell

2   the truth.   You have just got to give them the opportunity.

3   I'm there to listen to them.   And if we sit there for

4   eight hours and only the last 30 minutes are a meaningful

5   interview - that is, that at that point that person

6   decides to tell me everything -- and again, truth is --

7   Roger Scott told me the truth as far as he is concerned.

8   Debra told me the truth as far as she is concerned.   And

9   they differ.   But that's not my place.   My place is just

10  to listen, to obtain the truth and do the interview.

11      Q      If they differ, sir, then how can you say one

12  is telling the truth or both are telling the truth?

13      A      Because, again, if me and you go out and stand

14  at the corner of First Avenue and Washington and see the

15  same accident, your version of the truth of who was

16  involved in that accident or how that accident happened

17  is going to differ from me.   I have different experiences

18  than you do.   I'm going to focus my eyes on different

19  things and for that reason see different things.   You

20  have your expertise in another field and will focus your

21  eye on injuries more and I will focus my eye on guilt.

22      Q      How do you know that, sir?

23      A      Well, from your experience.   That's just a

24  natural thing to do.

25      Q      You are just presuming again, isn't that right?

**MILKE_NSB011933**

Exhibit 3

1   I'm a lawyer; therefore, I must be focusing on injuries

2   and damages?

3       A    Again, that was an example, Mr. Ray, and

4   presumption is an excellent tool as long as you don't

5   let it override your common sense.  And that's what a

6   detective, a good detective, a good interviewer, does.

7   He uses -- he uses his experience, he uses gut feelings,

8   he uses a lot of things.  But as long as it doesn't

9   override your common sense, then you are okay.  It's

10  just a tool.  It's just a tool to use.  I use a lot

11  of tools in my work now, in my family life, in my life

12  when I meet people.  I talk to people, you know, all the

13  time.  And like I have told you before, I'm a good

14  listener.  I will sit and listen to someone.  So these

15  are tools that you gather and I have gathered 41 years.

16  And if you want me to say I don't use those tools when

17  I'm talking to someone and trying to obtain the truth

18  about a murder, I can't say that.  Because it's a very

19  important thing that I'm doing, was doing, and I'm there

20  to listen.  I never confront nobody.  I never, ever bring

21  in that person that has been killed in the interview.

22  That is way off to the side.  The only person I'm

23  concerned about is the person I'm talking to.  That's the

24  way I handle my interviews.

25      Q    Do you consider yourself an intolerant individual

**MILKE_NSB011934**

Exhibit 3

26

1  during interviews?

2      A     I consider myself to be intolerant with lies.

3  I consider myself to be less -- and in this situation

4  you have to understand that it was my day off.   I

5  had been up 12 hours working on this case, so probably

6  there was a little problem there, that I was less

7  tolerant.   But I'm less tolerant when people tell lies

8  because I have to get the truth.   Like I told you, again,

9  if I'm there 10 minutes or there eight hours, it doesn't

10  matter to me.   I will be there.   But I'm not going to

11  stay there eight hours listening to a bunch of lies.

12      Q     And in a number of -- many of your reports,

13  at least in the report of your investigation in this

14  case, you indicate that you are not going to tolerate

15  this or not going to tolerate that, is that correct?

16      A     Certainly.   Certainly.

17      Q     And you have used those same words in other

18  investigations, haven't you?

19      A     Certainly.

20      Q     In this investigation you know that Roger Scott

21  had a rather sickly and elderly mother?

22      A     No.

23      Q     You weren't aware of that?

24      A     I don't believe so.

25      Q     You weren't?   In this interview that you had with

**MILKE_NSB011935**

Exhibit 3

1   Roger Scott you didn't suggest to him you were going

2   to send an officer over to his mother's house?

3       A    I believe during the interview he did tell

4   me that he had a sickly mother, but --

5       Q    Then you pressed that button saying you were

6   going to send officers over to Roger Scott's house,

7   didn't you?

8       A    Then we are talking about buttons.  And I

9   wouldn't even know where that button is.

10      Q    What did Roger Scott say in response to that?

11      A    I think it's really unfair.  I don't really

12  recall because I don't have the supplement in front of

13  me.  Let me explain, Mr. Ray.  I'm no longer a police

14  officer.  I no longer have these reports in front of me.

15  I no longer have the ability to go review reports anytime

16  I wish.  I had a lot of homicide cases.  I think it would

17  be only fair if you let me review that supplement and

18  if you would like me to answer questions in regard to

19  that supplement, I will, certainly.

20      Q    So I understand correctly, in preparation for

21  your testimony today and in preparation of this trial,

22  you have not reviewed any of the supplements or police

23  reports that you have given in connection with this case?

24      A    Mr. Ray, you know that's not true.  I have

25  reviewed the supplemental of Debra Milke.  I have not

1   reviewed any other supplementals.  I have a different

2   job now.  I have different responsibilities.  And like

3   I said before, I don't have those reports in front of

4   me.  I don't have access to those reports.

5        Q    Didn't Roger Scott tell you it would kill his

6   mother if you sent officers over there?

7        A    He may have.

8        Q    Didn't you respond that it was going to be

9   necessary to do that?

10        A    I may have.

11        Q    And still, even with that, he continued to

12   deny any involvement in this, didn't he?

13        A    He may have.

14        Q    Do you know whether he was speaking the truth

15   then as you heard those words and he continued to deny?

16        A    Did I feel at that point?

17        Q    Yeah.

18        A    No, I didn't feel he was telling me the truth.

19        Q    Was or was not?

20        A    Was not.  But again, that was a gut feeling.

21        Q    You had no facts to suggest he wasn't telling

22   you the truth, did you?

23        A    Again, we are getting into the areas I have

24   spoken about before with Mr. Scott, about the suspicions

25   I had, feelings I had.  The fact he showed up at Metrocenter,

1   didn't have a ride before, now all of a sudden he shows

2   up at Metrocenter.  Those facts were present.  The

3   fact that he was not being confronted, interviewed as

4   I would interview Him.  Yes, those facts I had.

5       Q    Did you suggest to Roger Scott in furtherance

6   of this interview that he should quit telling lies and

7   let you know where the body is so at least it can be

8   recovered?

9       A    I may have.

10      Q    At some point in time between approximately

11  2:00 o'clock and 3:00 o'clock on the afternoon of

12  December 3rd, Roger Scott finally relented and spoke

13  what you believed to be the truth?

14      A    Yes.  I wouldn't use "finally relented".  He

15  finally decided to tell me what he felt was the truth,

16  yes.

17      Q    And when he spoke to you he indicated that he

18  knew where the body was at, is that right?

19      A    That is correct.

20      Q    And you and Detective Mills then made arrangements

21  to proceed out to the location with Roger Scott; he was

22  going to show you where the body was?

23      A    That is correct.

24      Q    Up to that point in time you are not -- now,

25  prior to getting into the car with Roger Scott at 620 West

1    Washington on the afternoon of December 3rd, 1989, he

2    did not mention anything about Debra Milke, did he?

3         A    No.

4         Q    While you were en route to what ultimately

5    turned out to be 99th Avenue and approximately Happy

6    Valley Road, Roger Scott and you and Detective Mills

7    all had additional conversations, didn't you?

8         A    Yes.

9         Q    You asked questions?

10        A    Yes.

11        Q    Detective Mills asked questions?

12        A    Some.

13        Q    And Roger Scott was asking questions of you

14   detectives?

15        A    Correct.

16        Q    And he was still under the protection of the

17   Miranda warnings, wasn't he?

18        A    Correct.

19        Q    And during the course of the conversations en

20   route to 99th Avenue and Happy Valley Road, it was only

21   then that Roger Scott suggested that Debra Milke was

22   involved?

23        A    Correct.

24        Q    And that shocked you, didn't it, sir?

25        A    Shocked me?

s1

**MILKE_NSB011939**

Exhibit 3

1    Q    Yes, because up to that point you had no

2  idea or even suspicion that she was involved.  Yes?

3    A    It didn't shock me.  There's not very many

4  things that shock me nowadays, but the situation with

5  that interview in the car -- and if I can explain

6  briefly, I'm sure Roger would have told me all that

7  information in the interview room had we continued

8  our interview.  However, the interview was continued

9  in the car because it was felt that, because of darkness

10  coming, it was necessary to take Mr. Scott out there

11  to find the body as quickly as possible.  That's why

12  the interview was terminated inside the interview

13  room and then extended into the car.  That was not

14  my idea, wouldn't have been my idea.

15    Q    In the car, though, you never asked the question,

16  "Is Debra Milke involved in this", did you?

17    A    No.

18    Q    And the reason you didn't ask that question

19  is because you had no facts, no suggestion and no

20  suspicion that Debra Milke was involved at all, did you?

21    A    I can't say about suspicion, no.

22    Q    Okay.  You would agree there were no facts?

23    A    There were no facts, no.

24    Q    All right.  And as this statement came out of

25  Roger Scott suggesting that Debra was involved, it was

**MILKE_NSB011940**

Exhibit 3

1    not pursued to any great length with him in that car,

2    was it?

3         A    No.

4         Q    It was just accepted sort of, "Yeah, Debra is

5    involved, fine", right?

6         A    Again, it's hard to interview someone when

7    you are driving down the street.

8         Q    Who was driving?

9         A    Bob Mills.  That's why I'm saying it's hard.

10   It's hard to -- you know, this interview would never

11   have been taken out of the office had it been left to

12   me.  But I'm not foolish, I'm just a detective.  I have

13   superiors.  They make up their decisions and, of course,

14   I have to follow them.

15        Q    Did a superior tell you, "Break this interview

16   off now, you are going out with Roger Scott and find

17   the body"?

18        A    My superiors told me that "You will have to

19   take Roger Scott out there and continue the interview

20   later, take him out there and find the body".  They

21   were afraid, because of darkness, maybe Roger Scott did

22   not know where actually the body was.  And having some

23   experience on the homicide detail myself, including having

24   some experience taking people out where a body should be,

25   doesn't necessarily mean it's going to be.  So it takes

**MILKE_NSB011941**

Exhibit 3

1  some time to search.  And having that experience and

2  my supervisors basing that experience for their decision,

3  told me to terminate the interview, "Let's take him out

4  and find the body, come back and continue your interview".

5  That was not my wish, but that's what I did.

6      Q    Your experience, talking about the experience

7  that you have just mentioned, is that as you take

8  somebody out who is going to show you where the scene

9  of a crime has supposedly occurred, you know before you

10  get out that that may not be the right location or the

11  body may not be there, et cetera, et cetera, is that

12  right?

13     A    Certainly.

14     Q    That means that the individual who has told you

15  all the details of the crime may still be lying to you,

16  isn't that right?

17     A    No.  I know that, due to the fact that a murder

18  had taken place of a child, due to the fact that this

19  person who I was talking to, Mr. Scott, didn't feel glad

20  about it, wasn't happy about it, didn't feel proud about

21  it, didn't want it told to everyone, he obviously felt

22  bad about the situation, and for that reason may not

23  know the exact location of where that body was found --

24  or where that body was left.  And in his own interview

25  with us he said that he only knew the general location.

**MILKE_NSB011942**

Exhibit 3

34

1  For that reason, that's why I, as a detective, relayed

2  the information and my supervisors made that decision,

3  not me.

4      Q    Isn't it true, sir, that as you proceeded

5  with Roger Scott out to 99th and Happy Valley Road,

6  there was no fact of a murder, was there?  There was

7  only a statement of Roger Scott?

8      A    We didn't have the body, no.  We had a missing

9  child, though.

10     Q    I take it that you base a lot of your decisions

11 on whether an individual is telling the truth based upon

12 how they respond to questions.  Is that fair?

13     A    No.

14     Q    Just a moment ago you were describing emotions

15 basically of Roger Scott, isn't that true?

16     A    That's true, but you are asking about the truth.

17 I can't tell you.  I can't sit here, Mr. Ray, just like

18 I can't tell Bob Mills, I can't -- I taught at the

19 academy four-and-a-half years.  I can't sit in front

20 of my students and tell them how I complete an interview

21 and how can I believe Debra when she is telling me something

22 and tell that person, tell Bob Mills the way to do it,

23 because I don't know.  There's interaction between two

24 people that's occurring.  There was interaction between

25 me and Roger Scott.  He told me something.  I knew I was

**MILKE_NSB011943**

Exhibit 3

1 truthful with him, he was truthful with me.  I can't

2 tell you how I did it.

3     Q     In this particular case when you had an

4 occasion to interview Debra Milke, you have stated in

5 your report that she feigned crying and feigned hysterics,

6 isn't that right?

7     A     From the entire report, that's obviously true.

8     Q     That's in your report?

9     A     Yes.

10    Q     And I take it, then, that you, because you

11 concluded that she was feigning hysterics and feigning

12 crying, she obviously was lying, is that right?

13    A     From reading the entire supplemental, it's

14 obvious, yes.

15    Q     Sir, I'm asking for -- you are the writer of

16 that supplemental report, are you not?

17          Did you write the supplemental report, sir?

18    A     Yes, I did.

19    Q     Did you witness what you ultimately then wrote

20 in the report?

21    A     Sure.

22    Q     Okay.  Put the report aside.  I'm just asking,

23 sir, if you are the one who witnessed these things and

24 did you witness her feigning crying.

25    A     Yes.

SUPERIOR COURT

**MILKE_NSB011944**

Exhibit 3

36

```
1    Q    And that's what you put, then, in the report?

2    A    Correct.

3    Q    And based upon this, what you perceived to

4    be feigning and hysterical conduct on her part, she was

5    therefore lying, is that right?

6    A    That is correct.

7    Q    All right.  Do you believe people who feign

8    emotions lie?

9    A    In general I can't say that.

10   Q    How about specifically?

11   A    Specifically in this case?  Yes.

12   Q    Specifically in this case, when feigning.

13   A    Specifically in this case is all I can tell

14   you, and that's correct.

15   Q    How do you know, sir, that she was feigning?

16   Do you have a degree in perception of psychology or

17   anything?

18   A    I have -- and again, by experience only --

19   again, 21 years of police work.  I don't claim to know

20   all, see all, but I also have two daughters and have

21   also been married for over 20 years.  When someone

22   is told that their child was murdered and they start

23   to sob and no tears come to their eyes, it's obviously

24   a way for her to try to make me feel for her, and I

25   didn't buy it.  I didn't buy it, Mr. Ray, just didn't buy it.
```

**MILKE_NSB011945**

Exhibit 3

37

1    Q    From what facts do you conclude that she
2  was feigning?
3    A    Again, the statement of Roger telling me what
4  happened, the fact that I went there, when I went into
5  the room I told her what had happened, she never --
6  her eyes never teared.  After I told her she was under
7  arrest, all of a sudden she is more concerned about
8  what would happen to her than the fact about her son
9  being found.  And again, just 21 years of experience,
10  Mr. Ray.
11    Q    So those three facts plus 21 years' experience
12  enables you to conclude what is true and what is untrue,
13  is that correct?
14    A    In this case?
15    Q    In any case.
16    A    No, I can't say any case, Mr. Ray.  In this case,
17  yes.
18    Q    All right.  And you were able to conclude that
19  the emotions exhibited were not genuine, but rather
20  ingenuine?
21    A    That's correct.
22    Q    And you have had no college or postgraduate
23  courses in psychology or psychiatry?
24    A    I'm sorry, I did not.
25    THE COURT:  Mr. Ray, how much longer do you anticipate

**MILKE_NSB011946**

Exhibit 3

1   your examination of Detective/Constable Saldate will be?

2       MR. RAY:   Forty-five minutes, Your Honor.

3       THE COURT:   Then we are going to go to lunch.

4       (The noon recess was had.)

5       THE COURT:   Mr. Ray, you may continue.

6       MR. RAY:   Thank you, Your Honor.

7   BY MR. RAY:

8       Q      Constable Saldate, after Roger Scott made the

9   statement to you during the course of his interview

10  suggesting that he knew where the body of Christopher

11  Milke was, you and Detective Mills proceeded to the

12  location at his direction, is that correct?

13      A      Correct.

14      Q      What time approximately did you arrive at

15  that location?

16      A      I would have to refer to my report.

17      Q      All right.   Late afternoon, say, just before

18  sundown?

19      A      Yeah, late afternoon.

20      Q      All right.   And how long, can you tell us

21  approximately, that you remained at the location of 99th

22  and Happy Valley Road?

23      A      Twenty or 30 minutes, maybe, at the most.

24      Q      During the time you were there, Roger Scott

25  remained in the car, isn't that true?

39

1    A    That's correct.

2    Q    And I believe you previously testified that

3   in the conversations that you had with Roger Scott en

4   route to the scene he made mention of Debra Milke, but

5   you didn't engage in any follow-up in terms of questions

6   or interrogation on that point, is that correct?

7    A    That's correct.

8    Q    All right.  En route back to the Police

9   Department from 99th and Happy Valley Road, did you

10   ride with Roger Scott?

11    A    Correct.

12    Q    Was Detective Mills with you at that time?

13    A    Correct.

14    Q    And at approximately, if you know, what time

15   did you arrive back at 620 West Washington?

16    A    Another 30 or 40 minutes later.

17    Q    All right.  Did you have any further follow-up

18   conversation with Roger Scott concerning Debra Milke?

19    A    There was some, I believe.

20    Q    In total how many questions and answers would

21   you say concerning that subject was exchanged?

22    A    There weren't very many questions.  It was

23   more of a narrative, a history, telling us about the

24   situation.  Some questions, but very little.

25    Q    All right.  And is it true, sir, that but for

**MILKE_NSB011948**

Exhibit 3

40

1    what Roger Scott told you in the car both going to

2    99th Avenue and coming back from 99th Avenue that you

3    had no facts to suggest that Debra Milke was in any

4    way involved, correct?

5        A    That's correct.

6        Q    All right.  You believed that Roger Scott's

7    statement in the car was true?

8        A    Correct.

9        Q    But you had no facts to support whether it was

10   true or false, did you?

11       A    That's false.

12       Q    What facts did you have at the time Roger Scott

13   told you of Debra's involvement?

14       A    Oh, about Debra's involvement.  I thought you

15   said a statement.

16       Q    Yes.

17       A    The entire statement --

18       Q    What facts did you have -- let me finish the

19   question so we don't step on each other.  What facts did

20   you have to support Roger Scott's statement that Debra

21   was involved at the time he made that statement?

22       A    None.

23       Q    And it was an assumption on your part that what

24   Roger Scott was telling you in connection with Debra's

25   involvement was true?

**MILKE_NSB011949**

Exhibit 3

1      A    Yes.

2      Q    All right.  Did you direct other officers to

3  drive ahead to Florence to arrange for Debra Milke to

4  be brought to the Pinal County Sheriff's Office?

5      A    No.

6      Q    Detective Ontiveros was your supervisor?

7      A    Yes.

8      Q    Did you have a conversation with Detective

9  Ontiveros either at the scene or back at the station

10 house after the body had been found?

11     A    Yes.

12     Q    In that conversation was one of the subjects

13 discussed whether or not you, Detective Saldate, would

14 go to Pinal County and speak with Debra?

15     A    Yes.

16     Q    Were you instructed by Detective Ontiveros,

17 your supervisor, to proceed to Pinal County and interview

18 Debra?

19     A    Yes.

20     Q    Were you instructed also by Detective Ontiveros

21 to conduct a tape-recorded interview of Debra Milke?

22     A    Yes.

23     Q    Other officers did proceed to Pinal County in

24 advance of you, isn't that true?

25     A    That's correct.

SUPERIOR COURT

MILKE_NSB011950

Exhibit 3

42

1        Q    And to your knowledge those other officers

2   got in contact with the Pinal County Sheriff's Office

3   to arrange for Debra Milke to come down to the Pinal

4   County Sheriff's Office?

5        A    I believe that's what happened.

6        Q    All right.  Did you have any conversations

7   with those lead officers before you drove down?

8        A    No.

9        Q    Had Detective Ontiveros instructed that you

10  arrest Debra Milke?

11       A    No.

12       Q    Had you related to any other officer that it

13  was your intention to go down to Pinal County to arrest

14  Debra Milke?

15       A    I had not talked to anybody.

16       Q    Did you have in your mind as you departed

17  Phoenix for Florence to arrest Debra Milke?

18       A    I can't really say I had set my mind, but it

19  was there.  I was thinking about it.

20       Q    Did you have any facts to support -- other

21  than Roger Scott's statement, any facts to support an

22  arrest of Debra Milke?

23       A    Other than Roger Scott's statement, no.

24       Q    Okay.  You did not drive to Pinal County; rather,

25  you took a helicopter, is that correct?

SUPERIOR COURT

**MILKE_NSB011951**

Exhibit 3

43

1        A     That is correct.

2        Q     All right.  When you boarded that helicopter

3   did you have any paperwork with you?

4        A     I may have.  I'm sure I had my notebook with

5   me.

6        Q     Did you have a tape recorder with you?

7        A     No.

8        Q     May I ask how it was that you were going to

9   be able to comply with your supervisor, to Detective

10  Ontiveros' instructions that you conduct a tape-recorded

11  interview if you didn't have a tape recorder?

12       A     First of all, it was a suggestion by him, not

13  an order.  Secondly, of course, I don't own a tape

14  recorder, but Police Departments have tape recorders.

15  I was going to a Police Department, Pinal County Sheriff's

16  Office.  I could have very easily borrowed one there.

17       Q     Did you call ahead to find out if indeed the

18  Pinal County Sheriff's Office had a tape recorder?

19       A     No.

20       Q     And you had a tape recorder that you could have

21  taken that was in your office, did you?

22       A     I don't have one.  I did not own any tape

23  recorder.

24       Q     How much trouble would it have been, sir, to

25  have picked one up before you left 620 West Washington?

**MILKE_NSB011952**

Exhibit 3

44

1     A     I don't know.  I don't own one, didn't use

2  one.

3     Q     And is it fair to say you just never use

4  a tape recorder?

5     A     I would never say never.

6     Q     Okay.  But it's your habit and custom when

7  conducting interviews not to record them, is that correct?

8     A     That's correct.

9     Q     You arrived at the Pinal County Sheriff's

10  Department at approximately five, six, seven minutes

11  until 8:00 that evening, correct?

12     A     If you are reading off my supplemental report,

13  yes.

14     Q     When you arrived, were you aware that Debra

15  was as the Pinal County Sheriff's Office?

16     A     I was aware she was going to be there.  And

17  obviously, when I arrived, I contacted the personnel

18  there and was told that.

19     Q     And were you advised as to where she was

20  located within the complex at the Pinal County Sheriff's

21  Department?

22     A     I think the last room in the back, kind of like

23  a nursing area.  I'm not sure, you know, if it was used

24  for a sick bay.

25     Q     Had you instructed anyone that that is where this

**MILKE_NSB011953**

Exhibit 3

45

1   interview should be conducted?

2       A    Again, I remind you, I never talked to anyone

3   in Pinal County.

4       Q    This area where -- this medical facility is

5   within the jail complex itself, is it not?

6       A    That's correct.

7       Q    In the other areas within the Pinal County

8   Sheriff's Office there are offices and conferences

9   rooms and things of that nature, aren't there?

10      A    I don't know.

11      Q    Did you have an occasion to be at the front

12  area of the Pinal County Sheriff's Office before going

13  into the jail area?

14      A    No.

15      Q    You proceeded directly, then, into the jail area?

16      A    I proceeded to follow the Pinal County Sheriff's

17  officer.  That's where he took me.

18      Q    All right.  When you arrived at the area where

19  they said Debra Milke was at, was the door open or closed?

20      A    The door was open.

21      Q    And who did you see in there?

22      A    Debra Milke and some other lady.  I refer to her

23  aunt.  It may not have been her aunt, but --

24      Q    Before entering the room did you hear any

25  conversation between Debra Milke and this other person?

**MILKE_NSB011954**

Exhibit 3

46

1       A       Conversation?  No.

2       Q       Did you hear any kind of communication or

3    speaking of any kind between these two people?

4       A       I heard chuckling before I walked in.

5       Q       Do you know who it was who was chuckling?

6       A       No.

7       Q       Upon entering the room did you know what

8    Debra Milke looked like?

9       A       No.

10      Q       Did you have to ask which of the two individuals

11   was Debra Milke?

12      A       I believe I did.

13      Q       What did you say, sir?

14      A       When I walked in I introduced myself and said --

15   the other lady was standing up and I just said, "Debra

16   Milke?"  And then the lady looked toward Debra and

17   I assumed that was Debra.  And she then told me she was

18   her aunt, introduced herself, and I said, "Would you

19   please step out while I talk to Debra".

20      Q       Were there any other Pinal County Sheriff's

21   offices (sic) present or in close proximity to this room?

22   Pinal County Sheriff's officers, I should say.

23      A       It's their facility.  I'm sure they were passing

24   by.  I don't know what you mean.

25      Q       Did you see any female sheriff's deputies?

**MILKE_NSB011955**

Exhibit 3

47

1     A    No.

2     Q    What detective accompanied you at this time?

3  Who was with you?

4     A    Nobody.

5     Q    Okay.  Didn't the lady that was with Debra,

6  didn't another detective go with her --

7     A    Yeah.

8     Q    -- outside the room?

t2s2  9     A    I told her to step outside the room with

10  Detective Hamrick.

11     Q    Hamrick.  All right.

12     A    He didn't accompany me, though.

13     Q    All right.  Detective Hamrick from the Phoenix

14  Police Department nonetheless was on the premises, correct?

15     A    That's correct.

16     Q    And the lady who was accompanying Debra was

17  not a suspect in this case, was she?

18     A    Not that I know of, no.

19     Q    Did you go into this little room where Debra

20  was located, then?

21     A    Yes.

22     Q    When the other lady left, did you close the door?

23     A    Yes.

24     Q    And would you describe this room for the Court?

25     A    It's probably best described as a large living

**MILKE_NSB011956**

Exhibit 3

48

1    room, maybe, of a normal house.  It had a desk, some

2    medical supplies.  She was sitting next to the desk

3    in a chair.  I was sitting in a chair in front of her.

4         Q    Would you say that 15 by 15 is the approximate

5    measurement?

6         A    That would probably be a good guess.

7         Q    Was there any other sort of alcove or a

8    little -- another part of that room that was off to the

9    side?

10        A    I don't know.

11        Q    You commenced an interview at that point, is

12   that right?

13        A    That is correct.

14        Q    You sat down and introduced yourself?

15        A    Correct.

16        Q    And tell the Court what you immediately said

17   after identifying yourself as a Phoenix Police detective,

18   Detective Saldate.

19        A    I told her what I was investigating.

20        Q    State the specific words, if you would, please.

21        A    I know I told her I was investigating her son's

22   disappearance.

23        Q    What else?

24        A    After that I told her that we needed to know

25   what was going on and told her her son had been found dead.

**MILKE_NSB011957**

Exhibit 3

49

1    Q    And she responded?

2    A    She -- I told her her son had been found dead

3 or had been shot to death or something like that.

4    Q    You prepared a supplemental report, did you not?

5    A    That's correct.

6    Q    Concerning the statements that you made to her?

7    A    Certainly.

8    Q    And you reviewed that report today?

9    A    Yes, I have.

10    Q    And does it not say in your report, "Approximately

11 1953 hours I explained to Debra her son Chris had been

12 found in a desert area and that he had been found shot

13 to death"?  Is that what you told her?

14    A    That's correct.  I didn't memorize it, I just

15 reviewed the report.

16    Q    All right.  Is it true that that was essentially

17 the very first statement, short of introducing yourself,

18 that you gave to Debra Milke?

19    A    No.

20    Q    What other statements did you tell her before

21 you advised her of the condition of her son?

22    A    I believe my supplemental says that I went in,

23 introduced myself, explained to her what I was working on,

24 and we were working on the disappearance of her son.

25    Q    And she asked you, did she not, if you had any

**MILKE_NSB011958**

Exhibit 3

1    news concerning the disappearance of her son?

2         A    I don't believe so.

3         Q    Is it your testimony she just sat there mute

4    and said nothing in response to that?

5         A    I don't think she said anything in response

6    to that.   Then I went into the statement you just read.

7         Q    You continued to state that she was also

8    under arrest for the death of her son, did you not?

9         A    That's correct.

10        Q    At which time you described in your report

11   that some rather strange noises and statements, "What,

12   what", was emanating from Debra Milke.   Is that true?

13        A    That's correct.

14        Q    You then proceeded to immediately read her her

15   rights, according to your report, is that correct?

16        A    Shortly thereafter, yes.

17        Q    And you have described Debra's conduct at

18   that time as being hysterical?

19        A    I don't think I said hysterical.

20        Q    Would you characterize her as that she was

21   crying?

22        A    She was trying to cry.

23        Q    Did you state in your report that:   "Debra

24   immediately began to yell, 'What, what'.   She then

25   started to scream and make noises as if she was crying,

**MILKE_NSB011959**

Exhibit 3

51

1    but no tears were visible.   I then explained to her I

2    would not tolerate her crying.   She was also under

3    arrest for the death of her son".

4         A    That's correct.

5         Q    Is that precisely what you told her?

6         A    Yes.

7         Q    And you have testified earlier that you

8    believed that this show of emotion that was just discussed

9    was feigned emotion?

10        A    That's correct.

11        Q    But that's just an assumption on your part,

12   is it not, sir?

13        A    Yes.

14        Q    You then -- in telling her you were not going

15   to tolerate her crying, what were you trying to accomplish,

16   sir?

17        A    I was trying to accomplish the end result, that

18   me and her were going to sit down and we were going to

19   talk about it.

20        Q    Was your end result also that she was going to

21   tell you the truth?

22        A    Sure.

23        Q    Okay.  You asked her if you could record this

24   conversation, is that right?

25        A    That's correct.

**MILKE_NSB011960**

Exhibit 3

52

1       Q     Now, at the time that you entered that room
2   you did not have a recorder with you, did you?
3       A     No, I did not.
4       Q     You had not inquired as to whether or not there
5   was a recorder available to you at the Pinal County
6   Sheriff's Office?
7       A     I'm sure there was, but no, I had not.
8       Q     Isn't it true, sir, that you had every ...
9   intention in the world of not recording that conversation?
10      A     I had been asked by my supervisor to record
11  it.  If it was up to me, that decision left up to me,
12  I would have not recorded it.
13      Q     And you chose --
14      A     I wouldn't even have asked the question.
15      Q     You chose not to record it, isn't that true,
16  sir?
17      A     She said she didn't want it recorded.
18      Q     Didn't she say before she didn't want it recorded
19  she wanted a lawyer?
20      A     Absolutely not.
21      Q     Others that you have investigated have said
22  they wanted lawyers, isn't that right, sir?
23      A     I'm sure they have.
24      Q     And you have continued to interrogate them,
25  isn't that true?

**MILKE_NSB011961**

Exhibit 3

53

1     A     And I have put that on the report.

2     Q     Have you put it on the report each and every

3    time you violated their right to counsel?

4     A     Yes, I have.

5     Q     You told her that her son had been found in

6    the desert shot to death and she was under arrest for

7    this murder and you chose not to record the interview

8    that you were going to conduct with her, is that correct?

9     A     She chose not to record the interview.

10     Q     Did she tell you that she had never been in

11    trouble before?

12     A     That's correct.

13     Q     Was that early on in the interview?

14     A     Toward the end.

15     Q     Toward the end of the interview?

16     A     Middle to end.

17     Q     You indicate in your report that the conversation

18    that ensued between you and Debra started when she was

19    in high school.

20     A     That's correct.

21     Q     Is it your testimony that none of her questions

22    to you had to do with the facts concerning the disappearance

23    of her son?

24     A     That's correct.

25     Q     No asking, no questions whatsoever?

1       A     That is correct.

2       MR. RAY:  Your Honor, I believe that the Court has

3    been provided with a transcript of the interview as

4    well as Detective Saldate's report, at least according

5    to the pleadings filed by the State, is that correct?

6       THE COURT:  That's correct, and I have read them.

7       MR. RAY:  Thank you.

8    BY MR. RAY:

9       Q     Detective, you recall the interview you and

10   I had on June 26th, 1990?

11      A     Yes, I do.

12      Q     And in that interview you indicated that your

13   technique is basically to have the other individual

14   talk about 80 percent of the time, is that right?

15      A     Again --

16      THE COURT:  Asked and answered earlier this morning.

17   And again, can we just get to wherever it is you are

18   going, Mr. Ray?

19      MR. RAY:  All right, Your Honor.

20   BY MR. RAY:

21      Q     In that interview, is it fair to say that you

22   spoke most of the time?

23      A     In the interview with you?

24      Q     Yes.

25      A     Yes.

**MILKE_NSB011963**

Exhibit 3

55

1      Q     In response to simply yes-or-no questions you

2   would go on as much as five pages worth of transcript,

3   isn't that true?

4      A     I don't know.

5      Q     Have you reviewed that transcript?

6      A     I have it; I have not reviewed it.

7      Q     And during that interview you gave responses

8   essentially attempting to psychoanalyze Debra Milke,

9   isn't that right?

10     A     Psychoanalyze her?

11     Q     Yes.

12     A     I just told you what I felt about Debra.

13     Q     And trying to explain why she was answering

14  the questions the way she was answering, is that right?

15     A     I was responding to your questions, I believe.

16     Q     How long did the interview last?

17     A     Which interview?

18     Q     The interview at Pinal County.  I'm sorry.

19     A     Oh.  Thirty minutes or so.  I forget.  It's

20  in my supplemental, I think.

21     Q     And during any part of that interview was

22  another officer present?

23     A     No.

24     Q     That violates interrogation policies and procedures

25  of the Phoenix Police Department, does it not?

**MILKE_NSB011964**

Exhibit 3

56

1    A    It does?

2    Q    Doesn't it?  Do you know?

3    A    Not that I know of.

4    Q    Is it usually appropriate, based upon your

5    experience, for a male police officer to interrogate

6    a female subject alone?

7    A    As far as I know.

8    Q    Debra Milke was never -- and after that --

9    interview concluded she was returned to Phoenix, is

10   that right?

11   A    That's correct.

12   Q    Was she handcuffed?

13   A    No.

14   Q    That is a deviation from accepted policies and

15   procedures, is it not?

16   A    No.

17   Q    When you have an individual who has been

18   arrested for first degree murder, it's customary that

19   they be transported without handcuffs?

20   A    It's customary for the officer who has made

21   the arrest, or officer who has 21 years of experience,

22   to make that decision.

23   Q    I see.  Did Detective Ontiveros ask you why

24   you had not conducted a tape-recorded interview when you

25   returned to Phoenix?

**MILKE_NSB011965**

Exhibit 3

1    A    He asked me if it had been tape-recorded?

2    Q    And you responded "No"?

3    A    "No".

4    Q    Did you tell him you elected not to record it?

5    A    Mr. Ray, I told him the truth, that she did

6   not want it recorded.

7        MR. RAY:  No further questions at this time.

8        THE COURT:  Cross-examination.

9        MR. LEVY:  Thank you, Your Honor.

10

11                    CROSS-EXAMINATION

12   BY MR. LEVY:

13    Q    At the time of the interview of Debra Milke at

14   approximately 7:53 hours (sic), per your report, at the

15   Pinal County Sheriff's Office in the room that you

16   indicated would you characterize the present defendant,

17   Debra Milke, suspect at the time, to have been in custody?

18    A    When I first got there?  Probably, yes.

19    Q    Did you, as a result of that, give her her

20   Miranda warnings?

21    A    Yes.

22    Q    Did you advise her that she had the right to

23   remain silent?

24    A    Yes, I did.

25    Q    Did you advise her that anything she said could

**MILKE_NSB011966**

Exhibit 3

1   be used against her in court?

2        A    Yes, I did.

3        Q    Did you advise her that she had the right to

4   an attorney prior to any police questioning?

5        A    Yes, I did.

6        Q    Did you advise her that if she desired an

7   attorney, one would be provided?

8        A    I did.

9        Q    Did you ask her if she understood these rights?

10       A    Yes, I did.

11       Q    What was her response?

12       A    At first she nodded her head in an up-and-down

13   motion, indicating yes.  But then I asked her to verbalize

14   it and she said, "Yes".

15       Q    How did you advise her of her rights?

16       A    Through a standard Phoenix Police Department

17   card which I used to carry.

18       Q    Did you read the rights verbatim from the card?

19       A    That is correct.

20       Q    Prior to that time you had revealed to her that

21   her son was found in the desert and he had been shot to

22   death, is that correct?

23       A    That is correct.

24       Q    Did you note her obvious -- well, did you note

25   her ability to understand what you had told her with regard

**MILKE_NSB011967**

Exhibit 3

SUPERIOR COURT

1 to the Miranda rights which you read to her after that?

2  A She seemed -- I asked her to be quiet, I

3 wanted her to listen to these Miranda rights, which

4 she immediately did.  She stopped her feigning as if

5 she was crying and she listened to the Miranda rights

6 and then nodded her head yes.  And then I asked her

7 to verbalize it and she said, "Yes".

8  Q Did you speak to her in English?

9  A Yes, I did.

10  Q Did she respond in English?

11  A That's correct.

12  Q Did she have any difficulty in comprehending

13 anything that you told her, specifically with regard to

14 her rights?

15  MR. RAY:  Objection, calls for speculation.

16  THE COURT:  Overruled.  The witness may answer.

17  THE WITNESS:  No.

18 BY MR. LEVY:

19  Q After you read her the rights and she both

20 nodded and responded "Yes" that she understood, did she

21 instantaneously or otherwise do something right after that?

22  A She began to cry again and --

23  Q Did you see any tears?

24  A No.

25  Q And what did you tell her with regard to that

SUPERIOR COURT

**MILKE_NSB011968**

Exhibit 3

60

1    kind of activity?

2        A    I told her I wasn't going to tolerate that,

3    I wasn't there to have her cry, I was there to gather

4    the truth.

5        Q    How long between the time that you initially

6    made -- sat down with her, told her her son had been

7    shot to death and read her her rights and arrived at

8    this point that you told her to calm down and you --

9    weren't -- you were just there for her to tell the

10   truth, about how long did that take, by the way?

11       A    Several minutes.

12       Q    Now, when you say in your report she immediately

13   settled down, what -- how did you arrive at that description?

14       A    Before I read her her rights?

15       Q    After.

16       A    After I read her rights, I told her I wouldn't

17   tolerate that and I was there to get the truth, and at

18   that point she became concerned about what I meant by

19   arrest and that kind of thing and was more concerned

20   about that and never mentioned her son.  And when I

21   told her that I wanted her to give me the truth and I

22   talked a little bit about that and she -- as I'm talking,

23   she says, "What do you want to know, what do you want me

24   to tell you", and I said, "I just want to know the truth,

25   I want you to tell me everything, I don't want you to

**MILKE_NSB011969**

Exhibit 3

61

1    minimize your involvement, I just want you to tell

2    me everything".  And I asked her if she would and she

3    -- I told her, I asked if she was going to tell me

4    everything and she 'said she would.  And then we began

5    the interview from there.  And then she began to tell

6    me about how she had told Jim Styers several times

7    about her son, but she didn't think he would go that

8    far as to hurt him.

9         Q    Was she the one who picked that point to

10   commence that subject matter about Jim Styers?

11        A    That's correct.

12        Q    Based upon these responses, did you feel she

13   understood her Miranda warnings?

14        A    Yes.

15        Q    And having read the Miranda rights to her as

16   well as responding to my questions, did you feel there

17   was anything you left out or did you fully advise her

18   of her constitutional Miranda rights?

19        A    I advised them as listed on the card.

20        Q    Now, with regard to the remainder of the

21   interview, did you make any promises?

22        A    No.

23        Q    Did you threaten her in any way?

24        A    Absolutely not.

25        Q    Either psychologically or physically?

SUPERIOR COURT

**MILKE_NSB011970**

Exhibit 3

62

1      A    Certainly not.

2      Q    Did you -- well, when I say that, let me --

3    did you touch her in any way?

4      A    Absolutely not.

5      Q    Did you indicate she had better tell the truth

6    or else?

7      A    Absolutely not.

8      Q    Now, with regard to her responses, after she

9    started talking about Jim Styers at the beginning and she

10   didn't want Chris to grow up to be like his father, what

11   is it that she -- did she begin to focus on something

12   right away?

13     A    I don't understand.

14     Q    With regard to Jim Styers as distinguished

15   from her son.

16     A    You mean about Jim Styers hurting her son?

17     Q    Yes.

18     A    She immediately said that she didn't think

19   he would go that far to hurt him.

20     Q    Did you even ask her such a question?

21     A    Absolutely not.

22     Q    She just jumped to that statement?

23     A    That's correct.

24     Q    Did you -- how did you carry on this interview?

25   Did you ask her very many questions or did you just ask

**MILKE_NSB011971**

Exhibit 3

1   her to tell you what she felt to be the truth?  How

2   did you go about this?

3        A    As Mr. Ray characterized it, I do let the

4   person talk most of the time, as you can see from

5   beginning in high school.  I let her talk and we

6   went on.

7        Q    Well, there is a point there in your interview

8   where you -- where she talks about Jim and her son and

9   she began to cry and no tears were visible.  Did you

10  notice that again?

11       A    Yes.

12       Q    And then you said that you told Debra she

13  wasn't telling the truth, you wouldn't tolerate that

14  because you weren't there talking to her by accident,

15  you already knew what had happened and this is her

16  opportunity to tell you the truth?

17       A    That's correct.

18       Q    Now, right at that point, how was she -- was

19  she looking at you?

20       A    We were directly looking at each other.

21       Q    And she made a response to that, did she not?

22       A    You have got to refresh my memory.

23       Q    Did she not tell you, "Look, I just didn't want

24   him to grow  up like his father, I'm not a crazy person,

25  I'm not an animal, I just didn't want him to grow up like

SUPERIOR COURT

**MILKE_NSB011972**

Exhibit 3

1    that"?

2        A    Yes, she did make that response.

3        Q    Was that -- was there anything that preceded

4    that other than you telling her it's her opportunity

5    to tell you the truth from her standpoint?

6        A    No.

7        Q    These are in quote marks, her precise words?

8        A    Exactly.

9        Q    And then she went on into high school and

10   some background, is that so?

11       A    That's correct.

12       Q    Now, in this exchange, was she -- was it

13   basically a narrative, she is just talking to you?

14       A    That's correct.

15       Q    Were you taking notes?

16       A    Yes.

17       Q    Now, up to this point, with regard to the

18   format of reports, is there any particular format in an

19   interview report or supplement such as this, is there

20   any particular way it's to be structured or anything

21   like that?

22       A    Not that I know of.

23       Q    Is this report the essentials as to what occurred?

24       A    Yes, it is.

25       Q    And you were making notes all along?

MILKE_NSB011973

Exhibit 3

65

1     A     Correct.

2     Q     You already told us she didn't want it

3     tape-recorded?

4     A     That's correct.

5     Q     If she had agreed to have it tape-recorded,

6     what would you have done?

7     A     Asked Detective Hamrick to go get me one.

8     Q     And you were in the Pinal County Sheriff's

9     Office?

10    A     Correct.

11    Q     You had been to the crime scene and saw the

12    body of Christopher Milke had you not?

13    A     Yes, I had.

14    Q     And Roger Scott had taken you to that spot?

15    A     That is correct.

16    Q     And you had interviewed Roger Scott?

17    A     Correct.

18    Q     So you knew some background facts?

19    A     That's correct.

20    Q     With regard to those background facts, did you

21    direct her in the questioning form along any particular

22    pathway of question and answer?

23    A     I didn't direct her at all.

24    Q     Again, was the -- a lot of this report is written

25    up in essentially narrative style, paragraph by paragraph.

**MILKE_NSB011974**

Exhibit 3

66

t3s1    1    Was she actually talking to you that way?

2    A    Yes.

3    Q    If you asked a question, for example -- I'm

4    just randomly picking out page 3, last two paragraphs,

5    starting with "I then asked", then the following

6    paragraph, "I then asked".  If you asked a question,

7    did you note where you asked the questions?

8    A    Yes.

9    Q    It's simply a narrative answer.  Was she

10    continuing to talk to you -- is this simply noted as

11    perhaps another paragraph --

12    A    Right.

13    Q    -- what was stated?

14         After she settled down and you told her, "I

15    just want the truth" as she -- from her standpoint, did

16    she go into any more hysterics?

17    A    No.

18    Q    Any more crying without tears?

19    A    No.

20    Q    Any tears at all?

21    A    No, never.

22    Q    Did she indicate that she knew early on that

23    her son was dead by a call from Jim Styers from Metrocenter --

24    A    Yes.

25    Q    -- as early as 2:45 p.m. the preceding Saturday?

1    A   Yes.

2    Q   As she was telling you such things, for example,

3  did she tell you that she asked Jim Styers to kill her

4  son?

5    A   That's correct.

6    Q   What emotions did she exhibit?

7    A   None.

8    Q   As she was going through this rendition, was

9  she stating it in an even voice, or how?

10    A   Normal even voice.  Sometimes the only emotion

11  she had was of some concern about her family not liking

12  her any more, people thinking, of course, thinking

13  she may be crazy when she really isn't, and stuff like

14  that.  But most of it was just -- it was a friendly

15  conversation.  I mean, she was just talking to me.

16    Q   At the beginning or in the middle of this

17  interview did she express any concern to you about the

18  welfare of her son, such as, "I'm so worried about my

19  son, what is going to happen with him", or anything like

20  that?

21    A   Never.

22    Q   Now, at the end of the confession -- it was a

23  confession, wasn't it?

24    A   That's correct.

25    Q   She did confess her involvement and inculpate

MILKE_NSB011976

Exhibit 3

1    herself as planning to have her son murdered by Jim

2    Styers, knowing Roger Scott was in on it and her son

3    would be killed that particular day?

4         A    Absolutely.

5         Q    And that she knew all about it since 2:45 p.m.

6    the previous day?

7         A    That's correct.

8         Q    And that part of the plan was to indicate a

9    missing child deception at Metrocenter?

10        A    That's correct.

11        Q    After all of that, did you suggest that she

12   had other alternatives?

13        A    Yes, I did.

14        Q    What was her ultimate statement after that?

15        A    She said, "I guess I just made a bad judgment

16   call".

17        Q    When she said that, was there any particular

18   emotion?

19        A    None.

20        Q    Now, after that point what was her main concern?

21   Was it about -- what was it about?

22        A    Her main concern the last quarter of the interview

23   was her job, getting out, maybe lifetime probation, maybe

24   the Court could give -- could fix her up so she would

25   never have kids, just mainly herself.

**MILKE_NSB011977**

Exhibit 3

69

1    Q    Did she express any concern about Jim?

2    A    She did express some concern about Jim.   And

3    I asked her why, and she says, "Well, you know, because

4    he had to do it".  'And I asked her what she meant by

5    that.   She said, "Well, kill him".   And I told her that

6    the best thing for her to do was worry about herself,

7    not Jim.

8    Q    On the way back to Phoenix did she continue

9    to talk with you?

10   A    Yes.

11   Q    And what was her -- what were her concerns?

12   A    Getting out, again some concern about her

13   parents.   She asked me if I would call her dad when I

14   got back and she thought her dad might disown her, et

15   cetera, so I told her that was her family, her family

16   will not treat her that way, and she thought about maybe

17   if I would call her employer up, maybe he would -- if

18   she could get out on her own recognizance, she could

19   go back to work the next day, and those kinds of general

20   things.

21   Q    Did she ultimately ask you about an attorney?

22   A    She did ask me about calling -- when she asked

23   about her father, she asked me if I would call her father

24   and explain to him what had happened and why she did it

25   and see if he could bail her out and also get her an

**MILKE_NSB011978**

Exhibit 3

1   attorney.  I said, "I will".

2        Q    Did she ever ask for an attorney during --

3        A    Absolutely not.

4        Q    Did she ever invoke her right to remain

5   silent by saying, "I don't wish to talk"?

6        A    Never.

7        Q    As a matter of fact, what was the end product

8   of this with regard to her statement to you about the

9   effect of the interview and your being there and listening

10  to her?

11       A    She told me that she had not had anybody that

12  would listen to her for a long time, something to that

13  effect, and I was the first one to listen to her, and

14  said she was starting to feel better, and then made

15  the comment, "I think I'm starting to get a little bit

16  of my self-esteem back".

17       Q    Based upon all of that, did you feel at any

18  point in her confession to you that she was telling you

19  these things without knowing what she was talking about?

20       A    Absolutely not.

21       Q    Did she appear to be an intelligent person?

22       A    Very, very intelligent.

23       Q    Did she know where she was at as far as being

24  at the Pinal County Sheriff's Office and that she was

25  actually under arrest for her son's death before she even

**MILKE_NSB011979**

Exhibit 3

1    started talking?

2        A    Yes.

3        Q    Did she express to you any confusion or

4    disorientation?

5        A    None.

6        Q    Did she ever indicate to you she didn't know

7    why she was there or why you were questioning her?

8        A    No.

9        Q    In her description of the facts did she -- did

10   her description of the facts fit the facts as you knew

11   them?  In other words, the players, Jim Styers, Roger

12   Scott, Metrocenter, and the missing child deception

13   and that sort of thing?

14       A    Generally, yes.

15       Q    Did she want to talk to you?

16       A    Yes.

17       MR. RAY:  Objection, calls for speculation.

18       THE COURT:  The witness may answer.

19       THE WITNESS:  Yes, she did.

20   BY MR. LEVY:

21       Q    And after having given you a full explanation,

22   she said she felt better about having talked to you?

23       A    That is correct.

24       MR. LEVY:  That's all I have, Your Honor.

25       THE COURT:  Redirect.

MILKE_NSB011980

Exhibit 3

72

REDIRECT EXAMINATION

BY MR. RAY:

Q    Detective Saldate, you have indicated that you perceived Debra Milke as being an intelligent person.

A    I believe she is.

Q    And would you say it would take a great deal of intelligence for a person who is accused of first degree murder of their own child to know that they are facing some very serious consequences?

A    I don't understand the question.

Q    Don't you think a person of ordinary intelligence would know, if they have been accused by a police officer of committing murder of their own child, they are facing some very serious penalties?

A    I believe so.

Q    And yet this individual says, according to your statement, that she wants to know whether she can get out on her own recognizance, get lifetime probation, or whether she will be going to work the next day, things of that nature, isn't that right?

A    Yes.

Q    Which is inconsistent, is it not, with a person who would be of ordinary intelligence as you have characterized her?

MILKE_NSB011981

Exhibit 3

73

1    A    Not consistent with Debra.

2    Q    You used "intelligent" to describe Debra, is

3    that right?

4    A    I'm saying that only because that Debra didn't

5    feel she did anything wrong.

6    Q    Is it conceivable, sir, that you led her to

7    believe things were not that serious?

8    A    Absolutely not.

9    Q    Isn't it true that you sat in that interview

10   room basically right across from her, face-to-face,

11   and both sitting facing each other?

12   A    Exactly.

13   Q    And you told her that "Things are going to

14   be all right, just calm down, I'm here to get the truth?"

15   A    I never told her things were going to be all

16   right.  I did tell her that I was there to get the truth.

17   Q    Were you being demanding or straightforward or --

18   A    Straightforward.

19   Q    -- or quiet?

20   A    Never demanding, just straightforward.

21   Q    Trying to calm down the hysterics you have

22   testified that she exhibited?

23   A    I never testified to hysterics.  That was your

24   word, Mr. Ray.

25   Q    The crying?

**MILKE_NSB011982**

Exhibit 3

74

1     A     The feigning crying, yes.

2     Q     What time had -- let me ask you:  The investigation

3     that you had conducted before going down there, did

4     that include an indication as to approximately what

5     time Debra had gotten up that morning on December 2nd?

6     A     No.

7     Q     You had no idea she had woken at approximately

8     10:00 o'clock in the morning?

9     A     No.

10    Q     Did you have any information to suggest she

11    had been up the entire time until you were there at

12    8:00 o'clock in the evening on December 3rd?

13    A     No.

14    Q     Did you have any information to suggest how

15    upset she had been for that period of time from the

16    time she learned that her son was missing until the

17    time you arrived?

18    A     No.

19    Q     Did you have any knowledge or information to

20    know whether she was physically capable of crying tears?

21    A     No.

22    Q     Therefore, it's again your assumption that

23    she was feigning because you did not see tears?

24    A     Yes.

25    Q     And it's your testimony today that you did not

**MILKE_NSB011983**

Exhibit 3

1    go into that little alcove and get a paper towel or

2    Kleenex of some sort to give to her while she was crying?

3        A    I don't know what alcove you are talking

4    about.

5        Q    You were in a small room of 15 feet, approximately?

6        A    That was your measurement.

7        Q    All right.  In a small room, the size of

8    a living room, according to your measurement.  And you

9    did not see another room in that area?

10       A    I didn't see another room.  Of course, I didn't

11   look around, either.

12       Q    And sitting straight across from her, you did

13   not take her hand and touch her knee?

14       A    No, sir.

15       Q    To try to calm her down?

16       A    No, sir.

17       Q    And your testimony is that in this interview,

18   as with your interview with Roger Scott, because of your

19   means of interrogating an individual, the truth just

20   pours out?

21       A    By me asking the person, being truthful with

22   them, usually they tell me the truth, yes.

23       MR. RAY:  Nothing further.

24       THE COURT:  Thank you, Constable Saldate.  You may

25   step down.

MILKE_NSB011984

Exhibit 3

76

1          Mr. Ray, your next witness.

2          MR. RAY:  Call Dr. Martin Kassell to the stand.

3          THE COURT:  Would you be kind enough to go out and

4  get him?

5          Dr. Kassell, please come forward.  Come up to the

6  clerk, this young lady right here, give her your name and be

7  sworn.

8

9                         MARTIN KASSELL,

10 called as a witness herein, having been first duly sworn, was

11 examined and testified as follows:

12

13                         DIRECT EXAMINATION

14 BY MR. RAY:

15        Q    Doctor, please state your name.

16        A    Martin Kassell.

17        Q    And are you currently employed?

18        A    Do you want me to use the mike or no?

19        THE COURT:  It depends on how low you talk, sir.

20        THE WITNESS:  Okay.  I will use the mike.

21             Say again, sir?

22 BY MR. RAY:

23        Q    How are you employed?

24        A    I'm employed by the county.  I'm the psychiatrist

25 in charge of the psychiatric unit at the Durango Jail.

MILKE_NSB011985

Exhibit 3

VOl. I

(2)

1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2          IN AND FOR THE COUNTY OF MARICOPA

3                                    *CONTINUE VOLUNTARINESS*
                                     *RULING p.32*
4  STATE OF ARIZONA,
                                     *VOIR DIRE p.48*
5          Plaintiff,

6    vs.                              No. CR 89-12631
                                          CR 91-0048-AP
7  DEBRA JEAN MILKE,

8          Defendant.

9  _____

10

11                    Phoenix, Arizona
                       September 11, 1990
12

13

14

15  BEFORE:  The Honorable CHERYL K. HENDRIX

16

17

18

19              REPORTER'S TRANSCRIPT OF PROCEEDINGS

20

21

22

23

24  Prepared for Appeal                By:  Pauline Wood
    Copy                               Official Court Reporter
25

PUBLIC DEFENDER
MAY 2 3 1991
APPEALS RECEIVED

SUPERIOR COURT
PHOENIX ARIZONA

MILKE_NSB012083

Exhibit 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MILKE_NSB012084**

Exhibit 3

i

I N D E X

| WITNESS: | | DE | CE | RDE | RCE | VDE |
|---|---|---|---|---|---|---|
| ARMANDO SALDATE | | | | | | |
| By Mr. Levy | | 3 | | | | |
| By Mr. Ray | | | 18 | | | |

| | Page |
|---|---|
| ARGUMENT BY MR. RAY | 27 |
| ARGUMENT BY MR. LEVY | 29 |
| REBUTTAL ARGUMENT BY MR. RAY | 32 |

- - -

| | |
|---|---|
| JURY VOIR DIRE | 48 |

SUPERIOR COURT
PHOENIX ARIZONA

MILKE_NSB012085

Exhibit 3

2

1                    A P P E A R A N C E S

2  For the State:

3        Noel J. R. Levy,
         Deputy County Attorney

4

5  For the Defendant:

6        C. Kenneth Ray,
         Court-Appointed Counsel

7

8                         -  -  -  -

9

10                                   Phoenix, Arizona
                                     September 11, 1990

11

12       THE COURT:  CR 89-12631, State of Arizona against Debra

13  Jean Milke.   Time set for continuation of all our hearings.

14       MR. LEVY:  Noel Levy for the State.

15       MR. RAY:  Kenneth Ray on behalf of Ms. Milke, who is

16  present, Your Honor.

17       THE COURT:  All right.

18            Mr. Levy, I think you requested some rebuttal.

19       MR. LEVY:  Yes, Your Honor.

20       THE COURT:  I'm ready to listen if you are ready to proceed.

21       MR. LEVY:  Thank you, Your Honor.  I will call Detective

22  Saldate.

23       THE COURT:  You were previously sworn, Mr. Saldate.  Please

24  remember that you are under oath.

25                         (Next page, please.)

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB012086**

Exhibit 3

3

ARMANDO SALDATE,

called as a witness herein, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. LEVY:

Q   Detective Saldate, you have already testified you were about 22 years on the Phoenix police force before you retired. Could you share with the Court about how many interviews of suspects that you have conducted?

A   Probably 200 or more.

Q   And how about with the homicide unit?

A   Fifty to seventy-five.

Q   And you indicated that you taught at the Phoenix Police Academy, taught interviewing suspects for a period of time?

A   No, I never taught interviewing.  I taught some other parts of police work, but never interviewing.  I have a hard time telling someone how to conduct interviews.

Q   In all of these interviews, if a person invoked any aspect of Miranda, whether it be for an attorney or silence, did you so note in your report?

A   Absolutely.

Q   In every case?

A   Yes.

Q   Using the example of Shawn Running Eagle that Mr. Ray

**MILKE_NSB012087**

Exhibit 3

4

1   used yesterday, have you obtained a copy of that report this

2   morning through Phoenix Police Department Detective Mills?

3        A    Yes.

4        Q    And have you re-reviewed that particular supplement?

5        A    I have.

6·       Q    In reality, how did that particular interview go?

7   I know we discussed perhaps reading it verbatim.  Nevertheless,

8   to shorten this up a bit considering the hour, just explain

9   briefly how that went, how that interview actually went.

10       A    The interview took place on 12/19 of 1987 at

11  approximately 1540 hours.  Detective Larry Martinson and myself--

12  I was the case agent and Larry Martinson was my assistant -- was

13  investigating the double homicide of Herbert Williams and his wife

14  at 2425 East Saguaro.  Mr. Running Eagle had become a suspect.  I

15  had made a number of fingerprints within that home.  He and his

16  cousin had become suspects.  They were picked up, transferred to

17  the main station.

18            Later I interviewed Shawn Running Eagle.  I began

19  the interview at approximately 1540 hours.  My interview was

20  typical of my interviews.  We spoke.  I spoke with Shawn.  I

21  explained the situation to him.  I told him I wanted the truth.

22  We spoke about the evidence that was facing him, his fingerprint.

23  He spoke about wanting to talk to a psychiatrist, thinking that--

24  saying I didn't understand him on several occasions.  I tried to

25  tell him I did understand him, and would try to, anyway, and

MILKE_NSB012088

Exhibit 3



1   approximately 45 minutes later he indicated to me that he

2   wanted a psychiatrist and then also indicated that he wanted an

3   attorney and wanted to remain silent.

4        Q    Did you so note that?

5        A    Immediately noted it, yes.

6        Q    Did you ask him any questions after that?

7        A    I explained to him my position, but several minutes

8   later, after he didn't respond, I terminated the interview after

9   he finally asked for an attorney again.

10       Q    And after he asked for an attorney, you just continued

11  to explain your position, is that so?

12       A    Yes.

13       Q    You did not actually ask him questions?

14       A    No.

15       Q    That's what your supplement reveals?

16       A    That's correct.

17       Q    Was he ultimately convicted?

18       A    Yes.

19       Q    Did this -- so, I mean, in that particular case that

20  was your example where it doesn't always work and he didn't want

21  to talk?

22       A    No.

23       Q    But in any event, you noted he requested an attorney?

24       A    Absolutely.

25       Q    Other than telling him your position, you explained

SUPERIOR COURT
PHOENIX ARIZONA

MILKE_NSB012089

Exhibit 3

6

1 what facts you had?

2     A    What facts I had, why I was there.

3     Q    Other than that, you didn't ask him any questions,

4 you just --

5     A    No.  When he <u>asked for an attorney again</u>, I terminated

6 <u>the interview</u>.

7     Q    And was there ever a problem in the processing of this

8 case?

9     A    We had a voluntariness hearing and the statements

10 prior to that portion -- and actually he never said anything after

11 that, anyway -- were found to be voluntary and we proceeded with

12 the case.  It was held before Judge Gloria Ybarra.

13    Q    Did the Judge make any comments about your approach

14 in this particular case?

15    A    She made a comment regards to his rights.  I began --

16 when I began reading him his rights -- he was a criminal justice

17 student at Scottsdale Community College.  As I read him his rights,

18 he began to recite his rights out loud.  I let him finish.  I again

19 read his rights.  I told him I would read the rights verbatim from

20 the card, and I did.  And finally he understood.  And Judge Ybarra

21 felt that that was quite well, that I did -- after he initiated

22 reading his rights by memory, I still continued on and read them

23 verbatim through the card.

24    Q    The rights card?

25    A    Yes.



1      Q    Did you use a tape recorder?

2      A    No.

3      Q    Do you use, or have you used tape recorders in

4 interviews?

5      A    I don't use a tape recorder in interviews.

6      Q    Is there a particular reason?

7      A    Several reasons.  I think that a tape recorder is

8 sometimes not a good tool to use, not as far as the detective is

9 concerned, but as far as that person is concerned.  That person

10 gets intimidated by the tape recorder, doesn't wish to feel --

11 doesn't feel as free to be able to express theirself.  And I'm

12 there to get the information as that person wishes to tell me.

13 And if she is -- he is held back by a tape recorder or feels

14 intimidated, then I'm not going to get the information.

15      Q    Has it been, then, your experience in not using a

16 tape recorder that you have been more successful in contacts that

17 the suspect is willing to talk to you?

18      A    Correct.

19      Q    Now, on the subject of Roger Scott, you interviewed

20 him on 12/3 of '89 starting at 1248, did you not?

21      A    Yes, I did.

22      Q    And did you give him his Miranda rights?

23      A    Yes, I did.

24      Q    Did he indicate he understood?

25      A    Yes, he did.

MILKE_NSB012091

Exhibit 3

8

1    Q    Did he continue to talk about this Phil person who
2    supposedly took him to Metro Center?

3    A    That's correct.

4    Q    Did you then tell him actually Phil didn't exist and
5    that you knew Chris was dead and that sooner or later he was going
6    to have to tell you the truth?

7    A    That's correct.

8    Q    Did you then tell him you would just leave the room
9    for a little bit and let him consider that and you would be back?

10   A    That's correct.

11   Q    Did you come back in at 1342 hours and resume the
12   interview?

13   A    Approximately, yes.

14   Q    Did he finally agree to tell you the truth?

15   A    Yes, he did.

16   Q    Now, with regard to the facts and the truth, did it
17   turn out where he indicated the body of the child was on 99th Avenue
18   just north of Happy Valley Road, the child being Christopher Milke?

19   A    That is correct.  He was there.

20   Q    Did he tell you that they threw -- that Styers threw
21   the bullet from -- the remaining bullets and casing from the gun
22   on Union Hills on the way back to I-17 from 99th Avenue?

23   A    Yes, he did.

24   Q    And were those found?

25   A    Yes, they were.

MILKE_NSB012092

Exhibit 3

9

1     Q    And then did he tell you that Styers gave him his

2 gun and the shoes that he wore in the wash when he had killed

3 the boy?

4     A    Yes, he did.

5     Q    Did you then find the gun in his closet that he had

6 been given to dispose of and did it turn out to be Styers' gun

7 that he had bought from James Hicks in late November?

8     A    Yes, it did.

9     Q    Did the shoes that he said Styers was wearing in the

10 wash turn out to be, after foot casts were done and so forth per

11 Dr. Birkby, that James Styers' feet went in those shoes?

12     A    That is correct.

13     Q    Were there tracks in the wash similar to the tracks

14 of those tennis shoes?

15     A    Yes, there were.

16     Q    Did he indicate there were three shots that he heard?

17     A    Yes.

18     Q    And did he indicate that James Styers had a .22 revolver

19 six shot?

20     A    Yes, he did.

21     Q    Were the three -- was Chris Milke indeed killed with

22 three shots to the back of the head with a small caliber, turning

23 out to be a .22 caliber?

24     A    Yes, he was.

25     MR. RAY:  Your Honor, I object on the grounds of leading

SUPERIOR COURT

PHOENIX ARIZONA

MILKE_NSB012093

Exhibit 3



10

1 and improper comments about expert testimony in this regard.

2        THE COURT:  Sustained.

3 BY MR. LEVY:

4        Q    Was there indeed a $5,000 insurance policy held by Debra

5 Milke?

6        MR. RAY:  Again, same objection.

7        THE COURT:  Overruled.

8        THE WITNESS:  Yes, there was.

9 BY MR. LEVY:

10       Q    So with regard to these facts, then, they have turned

11 out to be accurate based upon your investigation, your completed

12 investigation?

13       A    That's correct.

14       Q    I believe questions were asked to you with relation

15 to a confession by Debra Milke on 12/3 of '89 commencing at 1953

16 hours.  Did she tell you that she agreed with Jim Styers to kill

17 her son?

18       MR. RAY:  Objection to the leading form of the question.

19       THE COURT:  Overruled.

20       THE WITNESS:  Yes, she did.

21 BY MR. LEVY:

22       Q    Did you discuss the aspect of the insurance policy

23 with you --

24       A    Yes.

25       Q    -- with her, I mean.  I'm sorry.

1    A    Yes, she did.

2    Q    Did she acknowledge Roger Scott was part of the plan?

3    A    Yes, she did.

4    Q    Based upon your investigation, was it -- was the child

5 told that he was going to be taken to see Santa Claus when he was

6 taken by Jim Styers from her apartment?

7         MR. RAY:  Objection.  That would be hearsay.

8         THE WITNESS:  Yes.

9         MR. RAY:  And leading.

10        THE COURT:  I will allow the answer to stand.

11 BY MR. LEVY:

12   Q    And did she tell you that was the situation in her

13 confession?

14   A    Yes.

15   Q    Did she describe to you the clothes that Chris chose

16 to wear on that morning?

17   A    Yes, she did.

18   Q    And were they boots, Levi's, sweatshirt with a yellow

19 dinosaur on it?

20   A    That's correct.

21   Q    Excluding the specifics of the yellow dinosaur, based

22 upon your investigation is that what he was wearing?

23   A    Yes.

24   Q    Based upon your investigation, was there a situation

25 at Metro Center where Chris was reported missing on the afternoon

MILKE_NSB012095

Exhibit 3



12

1 of Saturday, December 2, of '89?

2      A    Yes, it was.

3      Q    Is that what she told you was part of the plan?

4      A    Yes, she did.

5      Q    With regard, then, to those facts and the corroborated

6 facts, was her confession corroborated by the actual facts of your

7 investigation?

8      A    Yes, it was.

9      MR. RAY:  Objection, insufficient foundation.  Also improper

10 conclusion.

11      THE COURT:  Overruled.

12 BY MR. LEVY:

13     Q    Now, with regard to the procedure of the confession,

14 did she ever ask for an attorney?

15     A    Absolutely not.

16     Q    At the end -- after she gave her confession, did she

17 ask you to assist her or ask you if you could get her an attorney?

18     A    She asked me to call her father and ask him to get her

19 an attorney.

20     Q    Did you do so?

21     A    Yes, I did.

22     Q    Now, there has been an allegation made, and in addition

23 to that there has been a tape submitted into evidence by Mr. Ray,

24 being the tape purportedly of Debra Milke to Dr. Kassell on December-

25 strike that -- on last Friday, which was September 7th, I believe,

MILKE_NSB012096

Exhibit 3

13

1 of this year.  Have you had an opportunity to listen to that tape?

2          A    Yes, I have.

3          Q    Now, in relation to the actual confession of 12/3 of

4 '89, what struck you while you were listening to that tape?

5          A    Well, the tape is very similar to my testimony.  The

6 facts -- the fact that I entered the room, the fact that I read

7 her her rights, the fact that I had told her about her arrest, the

8 fact that she -- I told her about the penalties regarding to the

9 arrest that she was going to be under.  Everything was similar to

10 what I have testified to.

11         Q    Now, you heard her purported crying on the tape.

12         A    Oh, yeah. She -- she indicated in the tape, though,

13 that -- when he asked about her crying, I think she said she was

14 angry.  And, of course, she wasn't angry that day.

15         Q    And did it have also something to do with the very fact

16 it was being tape recorded?

17         A    I made mention to that.  She said she didn't know whether

18 that was a reason why she was crying or not.

19         Q    And she did say she wanted -- she did say in that tape

20 that after her rights were read to her, she said something to the

21 effect she had never been in trouble so she didn't know what her

22 rights really were?

23         A    Yes.

24         Q    And then she claims she asked for --

25         A    She claims then she asked for an attorney.

MILKE_NSB012097

Exhibit 3

14

1     Q   Are you aware -- so apparently she understood her

2 rights?

3     A   She said she didn't in the tape, but --

4     Q   Going back to the actual confession, did it appear

5 she understood her rights?

6.    A   Yes.

7     Q   Going back to the actual confession, when you read

8 her her rights was she sobbing and crying or was she calm and

9 listening?

10    A   _She was calm, very quiet and listening._  I asked her

11 that before I began reading the rights and she did what I asked.

12    Q   Just to be clear, did she ask for an attorney before

13 her rights were read to you (sic) that night?

14    A   No.

15    Q   Did she ask for an attorney after her rights were read

16 to you -- to her by you that night?

17    A   No.

18    Q   Are you aware -- you are not aware, are you, because

19 of the rule of exclusion, that Mr. Kirk Fowler testified yesterday

20 as to the precise time supposedly she told him in his investigation

21 as to when she wanted an attorney, that she said, "It was right

22 after he told me I was under arrest", which would have been before

23 her rights were read.  You are not aware that that's what he testifi

24 to yesterday.

25         In any event -- well, one other question, however, on

SUPERIOR COURT

PHOENIX ARIZONA

**MILKE_NSB012098**

Exhibit 3

15

1   that tape.  She expressly stated purportedly she asked for an

2   attorney after her rights were read.  Is that what she said on

3   that tape?

4        A    That's what she said on the tape.

5        Q    Is the truth in fact of the matter, based upon your

6   prior testimony, she never asked for an attorney?

7        A    She never asked for an attorney.

8        Q    Now, the other general aspect with regard to voluntarine

9   as distinguished from Miranda warnings is that her will was overborn

10  by you.  Was there any -- well, you said she was all right when

11  her rights were read to her and that she answered them.  After

12  that, any more hysterics or crocadile tears?

13       A    Never hysterics.  She began again and I told her I

14  wouldn't tolerate that and then we began to talk and I told her

15  I wanted the truth from her.  And during the time I'm telling her

16  I wanted the truth, she is telling me, you know, "Okay, okay".

17  And then I asked her if she is going to tell me the truth and she

18  said, "Yes".

19       Q    Now, again, in all of your experience with the Phoenix

20  Police Department and in all of the interviews you have done of

21  suspects, if they have invoked their right to silence or requested

22  an attorney, have you always noted this?

23       A    Always.

24       Q    Now, what about if a person, in your prior experience,

25  appeared not to know what was going on or didn't understand?  Have

\

MILKE_NSB012099

Exhibit 3

16

1   you ever dealt with any nuts?

2       A    I have.

3       Q    Have you so noted it in your report?

4       A    I have.

5       Q    And did you go on?

6       A    In that situation, at that point it was -- I used

7   a tape recorder.  He said that he understood his rights, then he

8   said he didn't, and we proceeded with a tape recording.  Later

9   he was found to be totally irrational and was sent to the mental

10  hospital.

11      Q    So you do note those sorts of things?

12      A    Certainly.

13      Q    Now, in this particular case you did not note that

14  she ever invoked her right to silence, you did not note she requested

15  an attorney, and you did not note them because -- for what reason?

16      A    There was no reason to note it.  She never asked for

17  an attorney nor asked to remain silent.

18      Q    In your report, with regard to its format, did you

19  put down what she told you?

20      A    Yes.

21      Q    Dr. Fritz testified yesterday -- and I'm just telling

22  you to accept this -- that your report was altered and fabricated.

23  And going through it page by page, coming to Page 7, everything

24  appeared to be all right on my cross-examination, but he took

25  exception with the fact at the very last paragraph you said, "It

MILKE_NSB012100

Exhibit 3



17

1   should be noted that this interview was not tape-recorded because

2   Debra refused to have her statements tape-recorded", and, therefore,

3   the whole thing, according to him, is either fabricated or altered.

4   Now --

5          MR. RAY:  Objection, conclusion by counsel.

6          THE COURT:  The objection is overruled.

7   BY MR. LEVY:

8          Q    Is there any particular reason that you put that

9   statement at the end of your supplement?

10         A    So people would know that's why it wasn't tape-recorded.

11  That's not -- that portion of the interview was not the most

12  important part of the interview.  That's one of the mechanical

13  things of the interview that would be at the end of the supplemental

14         Q    Again, listening to the tape of Debra Milke of September

15  7th, purportedly in front of Dr. Kassell, did she happen to mention

16  the tape-recording aspect of your interview of her back on December

17  3?

18         A    Yes.

19         Q    What is it you recall her saying in that taped statement

20         A    She said she did not want me to tape-record it.

21         MR. LEVY:  Your Honor, I think that's all.  Quite frankly,

22  my mind is blank and I -- that probably means I have nothing else

23  to ask, but I wonder if I might take a moment to look at these

24  notes.

25         THE COURT:  Of course, you may.

MILKE_NSB012101

Exhibit 3



1  BY MR. LEVY:

2      Q    Well, I'm not sure this has much to do with anything,

3  but, anyway, so we will all know, you didn't handcuff Debra Milke

4  on the trip back to Phoenix, is that correct?

5      A    That's correct.

6      Q    However, was the car you were in driven by a Pinal

7  County Sheriff's Deputy?

8      A    Yes.

9      Q    And was your car followed by two other Phoenix Police

10 detectives?

11     A    Yes.  And it was a full-screened vehicle with a screen

12 between us and the driver.

13     Q    And is that the kind where you can't get out the back

14 door unless someone opens it on the outside?

15     A    That's correct.

16     MR. LEVY:  That's all I have.

17     THE COURT:  Cross-examination.

18

19                   CROSS-EXAMINATION

20 BY MR. RAY:

21     Q    Mr. Saldate, talking about the Running Eagle case,

22 in that case, before you commenced the interview with Running Eagle,

23 you had already developed a fingerprint and had connected that

24 to Running Eagle before commencing the interview, isn't that right?

25     A    That's correct.

MILKE_NSB012102

Exhibit 3



1     Q   In this particular case involving Debra Milke, your

2  testimony has been that, <u>but for Roger Scott's statement</u>, <u>you had</u>

3  <u>absolutely no physical evidence to connect Debra Milke to this</u>

4  <u>crime, isn't that right?</u>

5     A   <u>That's correct.</u>

6.    Q   So there is at least a factual difference between the

7  two cases, isn't that correct?

8     A   Probably, yes.

9     Q   In one case you have physical evidence connecting the

10  individual to the crime and in the other you do not, is that right?

11     A   Yes.

12     Q   All right.  And isn't it true that because you had

13  that physical evidence in the Running Eagle case, adherence to the

14  rights of <u>Miranda were less important?</u>

15     A   That's not true.

16     Q   You have been an officer, or had been an officer for

17  some 20-some years?

18     A   Correct.

19     Q   You have done, during that 20-year period, about 200

20  <u>interviews?</u>

21     A   At least.

22     Q   Approximately <u>ten per year?</u>

23     A   Well, I would say that the first six or seven years

24  I probably didn't conduct any interviews <u>per se.</u>

25     Q   At the time that Roger Scott was being interviewed --

**MILKE_NSB012103**

Exhibit 3



1   well, let me ask you:  Have you had an occasion to review a motion

2   in limine that had been filed in this case concerning matters

3   dealing with the interview of Roger Scott?

4        A    I reviewed, I think, the last paragraph or --

5        Q    The interview with Roger Scott took several hours,

6   did it not?

7        A    Yes.

8        Q    And ultimately he made mention that he was involved

9   in the homicide?

10       A    Yes.

11       Q    And not until you were en route to the location did

12   he mention Debra's name?

13       A    Yes.

14       Q    But you had no physical evidence to suggest as to

15   whether that statement was true or false?

16       A    No.

17       Q    On direct examination this morning you indicated that

18   he did in fact lead you to the body of Christopher Milke?

19       A    Yes.

20       Q    And that he made mention en route back to 620 West

21   Washington that certain casings had been found, shall casings?

22       A    Yes.

23       Q    But you guys didn't stop to look for casings?

24       A    It was getting dark.  We wrote down where he pointed

25   out where the casings would be. We noted them and then continued on.

21

```
 1      Q    You didn't find any casings at that point?

 2      A    Didn't look at that point.

 3      Q    Okay.  And casings were not located before you

 4   commenced the interview with Debra Milke?

 5      A    No.

 6      Q    And he commented en route back about a gun and where

 7   it would be located?

 8      A    Yes.

 9      Q    And the gun had not been found before you commenced

10   your interview with Debra Milke, had it?

11      A    I wasn't aware of it, no.

12      Q    In your experience in interviewing suspects, you

13   find on occasion they may mix truth with -- true statements with

14   false statements, isn't that right?

15      A    At times.

16      Q    You have no idea whether Roger was being truthful in

17   connection with Debra Milke, do you?

18      A    I believe he was.

19      Q    But you have no independent facts of that to support

20   whether he was being truthful or not?

21      A    I based my interview and 21 years of experience talking

22   with him that he was telling the truth.

23      Q    That's an assumption on your part?

24      A    If you wish.

25      Q    In connection with Dr. Kassell's interview, which was
```

t2

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB012105**

Exhibit 3

22

1   recorded and a copy of which was provided to Mr. Levy and of

2   which you had occasion to hear --

3       A   Yes.

4       Q   -- you indicate that there was a substantial amount

5   of similarity between your testimony and what is contained in that

6   tape recording, is that correct?

7       A   That's correct.

8       Q   You indicate that you read the rights and she acknowledge

9   in the tape that you read the rights?

10      A   That's correct.

11      Q   You indicate that you told her she was under arrest

12  and she indicates in the tape that you told her she was under arrest

13      A   That's correct.

14      Q   You told her what she was under arrest for and she

15  acknowledges that in the tape?

16      A   That's correct.

17      Q   Basically the disagreement is on whether or not she

18  requested counsel.  Would you agree with that statement?

19      A   Yes.

20      Q   All right.  Now, you are asking the Court to believe

21  that in your 20 years of experience you would always note if an

22  individual asked for counsel?

23      A   I'm not only asking the Court, I'm telling you that

24  is correct.

25      Q   And certainly, if we examine the Running Eagle

**MILKE_NSB012106**

Exhibit 3

23

1    rights, you did note it in those occasions, did you not?

2        A    That is correct.

3        Q    But in that circumstance, again, we had a physical

4    fact and evidence that was undisputed, didn't we?

5        A    Yes.

6        Q    And here we didn't have that physical evidence, did

7    we?

8        A    I didn't bring that report up.  You brought it up,

9    Mr. Ray.

10       Q    I will repeat my question.

11       A    I agree.

12       Q    And you know as an experienced police officer that

13   you are willing to pit your 22 years of experience and credibility

14   as an officer against any criminal defendant any day of the week,

15   aren't you?

16       A    I don't know what you mean.  I don't -- I don't pit

17   my experience against any criminal defendant because I'm not involve

18   with every criminal defendant.  I'm involved with this Defendant.

19   And I will tell you that my integrity is on the line and I will

20   tell you she never asked for an attorney, she never asked to remain

21   silent.  That is it.

22       Q    It is your word against hers?

23       A    If you wish.

24       Q    And you knew that at the time you were interviewing

25   her it was going to end up being your word against hers, didn't

MILKE_NSB012107

Exhibit 3



24

1  you?

2      A    I didn't think about that.

3      Q    Because you didn't have any physical facts to support

4  the confession Roger Scott had made, did you?

5      A    I didn't think about that.

6      Q    You had no physical evidence at the time that you

7  commenced that interview, did you?

8      A    No.

9      Q    And you knew that it was possible, based upon your

10  experience as a homicide officer and detective, that there may

11  never be any physical evidence to support Roger Scott's statement?

12     A    I didn't know that, Mr. Ray.

13     Q    All right.  And isn't that why you ignored, as you

14  have ignored in the past, her request for an attorney?

15     A    I have never ignored that because she never asked for

16  an attorney, Mr. Ray.

17     Q    But you do admit, sir, that you have ignored suspects'

18  requests for attorneys in the past?

19     A    I have never ignored suspects' requests for attorneys.

20  If they ask for an attorney, as I spoke before, that I will note

21  it in my report and then we will continue on only -- and in the

22  Running Eagle case, which you have chosen, not I, to compare to

23  this case, in that case after he asked for an attorney I continued

24  only to explain the situation to him, only to advise him that we

25  had the physical evidence, and all I wanted was the truth.  And

MILKE_NSB012108

Exhibit 3

1    then he did not say anything and I terminated the interview.

2          Q    You have a copy of the Running Eagle report, do you

3    not?

4          A    That is correct.

5          Q    Page 2, last sentence of the remains of the paragraph,

6    the top of the page, would you read that, please?

7          A    Pardon me?  The last one?

8          Q    Where it says "I again".

9          A    I don't know where you are at.

10         Q    All right.  You see the top of the page -- one, two,

11   three, four, five, six, seven, eight, nine -- nine lines down from

12   the top there is a narrative.  Then to the right it says, "I again".

13   See that?

14         A    That's correct.

15         Q    Will you read that for the Court, please?

16         A    "I again told him I would try to understand, but he

17   replied he wanted to remain silent".

18         Q    All right.  That individual requested to remain silent,

19   didn't he?

20         A    Yes, he did.

21         Q    And then would you read the next sentence?

22         A    "I asked Shawn if I was correct in assuming he was

23   taking criminal justice at Scottsdale Community College because

24   he wanted to be a police officer and Shawn replied that I was right"

25         Q    On the heels of his asking and saying that he wanted

**SUPERIOR COURT**

PHOENIX ARIZONA

**MILKE_NSB012109**

Exhibit 3

26

1    to remain silent, you asked another question?

2         A    That is correct.

3         Q    And you continued?

4         A    But duly  noted.

5         Q    And you continued to converse with him?

6         A    And duly noted, yes.

7         Q    And then on Page 3 you note that he wanted an attorney

8    and it took seven minutes before you terminated the interview?

9         A    That's correct, and duly noted.

10        Q    There does appear to be at least some occasions in

11   which you will use a tape-recording, is that correct?

12        A    On some occasions.

13        Q    The example I believe you gave today was if you felt

14   you were dealing with a psychiatrically unsound individual?

15        A    At the request of the supervisor also.

16        Q    Is that the same type of request of a supervisor that

17   you had in this case?

18        A    Yes.

19        Q    In that case that you used as an example, you honored

20   the request?

21        A    In that case that person did not refuse to have

22   themselves tape-recorded.

23        Q    In that case you had access to a tape-recorder?

24        A    I was given a tape-recorder.

25        Q    In this case you went to Phoenix without even looking

MILKE_NSB012110

Exhibit 3

27

1  for a tape-recorder to take with you -- or went to Florence.

2          A    I believe I have testified to that.

3          MR. RAY:  Nothing further, Your Honor.

4          THE COURT:  Redirect?

5          MR. LEVY:  No, Your Honor.

6          THE COURT:  Thank you, sir.  You may step down.

7                  Anything further, Mr. Levy?

8          MR. LEVY:  No, nothing further, Your Honor.  The State

9  rests.

10          THE COURT:  Mr. Ray, your argument.

11          MR. RAY:  Your Honor, the defense has the burden of

12  establishing there is -- at least prima facie there is a violation

13  of the right to remain silent and/or the right to counsel.  And

14  I believe that the interview that the Court has received into

15  evidence of the tape between Dr. Kassell and Debra Milke establishes

16  at least prima facie that she did request an attorney at the time

17  of the interview with Detective Saldate.  I believe that has been

18  corroborated through the testimony of Kirk Fowler, who indicated

19  in his conversations with Debra Milke and the investigation of

20  this case she has indicated that that is what she in fact did.

21          The burden then becomes the government's to establish

22  by a preponderance of the evidence that in all respects the statement

23  of the Defendant was obtained legally.   It is our position, Your

24  Honor, that the government cannot meet that test in that we have

25  the testimony of Detective Saldate, who indicates that he has a

MILKE_NSB012111

Exhibit 3