*91-0146*
*Death*
*pen.*

1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2            IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,            )
                                 )
5            Plaintiff,          )
                                 )
6      vs.                       )    No. CR 89-12631
                                 )        CR 91-0048-AP
7   DEBRA JEAN MILKE,            )
                                 )
8            Defendant.          )
                                 )
9   _____)

10

11                     Phoenix, **Arizona**
                   September **12**, 1990
12

13

14

15   BEFORE:  The Honorable CHERYL K. HENDRIX

16

17

18

19            REPORTER'S TRANSCRIPT OF PROCEEDINGS

20

21

22

23

24   **Prepared** for Appeal          By:  Pauline Wood
     **Copy**                         Official Court Reporter
25

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006127**

Exhibit 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SUPERIOR COURT
PHOENIX ARIZONA

MILKE_NSB006128

Exhibit 4

i

1                          I N D E X

2

3  Opening Statement by Mr. Levy                    Page 8

4  Opening Statement by Mr. Ray                     Page 23

5

6  WITNESS:                        DX      CX     RD     RC

7  ARMANDO SALDATE

8      By Mr. Levy                 39

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPERIOR COURT
PHOENIX ARIZONA

MILKE_NSB006129

Exhibit 4

```
 1                    ARMANDO SALDATE,

 2  called as a witness herein, having been first duly sworn, was

 3  examined and testified as follows:

 4

 5                    DIRECT EXAMINATION

 6  BY MR. LEVY:

 7         Q     Tell the jury your name.

 8         A     Armando Saldate, Jr.

 9         Q     How long had you been on the Phoenix Police

10  Department before you retired?

11         A     Approximately 21 years.  I started with the

12  Phoenix Police Department on June 2nd, 1969.

13         Q     Could you share with the jury in general outline

14  form what different sections you had been assigned to and

15  the types of work that you did during your career?

16         A     When I first started, I went to the police academy.

17

18              (Next page, please.)

19

20

21

22

23

24

25
```

MILKE_NSB006167

Exhibit 4

40

1    I started in uniform while assigned to the field.  After

2    several years I went into plain clothes, somewhat

3    undercover.  I then got assigned to the burglary

4    detail as a detective.  I worked on the burglary

5    detail for approximately a year and a half.  I was

6    then --

7       Q    Excuse me, Detective Saldate.  Just in case

8    someone can't quite hear you, I wonder if you could

9    bring the microphone closer to you.

10      A    Certainly.

11           I worked in the burglary detail about a year

12   and a half.  I then was assigned to the robbery detail

13   as a detective.  I worked there for about five-and-a-half

14   years until the chief decided to make a special squad

15   of six officers throughout the department.  I was

16   selected as one of the officers.  We worked undercover.

17   We worked street crimes.  That lasted for almost a

18   year.  That assignment was ended because of funding and

19   I was then transferred back to the detective bureau as

20   a robbery detective.  I remained with the robbery detail

21   for some time, but in between that period of time I

22   spent some time in homicide on temporary details.

23   Temporary details lasted anywhere from a month to -- one

24   of the details lasted close to six months.  That detail

25   was specifically for working on a rash of murders committed

MILKE_NSB006168

Exhibit 4

41

1   or thought to have been committed by Mexican Mafia

2   members coming out of prison.

3          After completing that assignment I went back

4   to the robbery detail.  I then went back to the homicide

5   detail for another temporary transfer, then was

6   transferred to the forgery and white collar crime

7   areas.  I did that for a year.  And in between there I

8   went back to homicide and did some other temporary

9   transfers.  And finally I was transferred to homicide

10  in April of 1986 and I remained with homicide as a

11  permanently assigned detective for, well, until July

12  10th, 1990 when I retired from the Phoenix Police

13  Department.

14      Q    And is it true that you are presently a

15  constable?

16      A    Yes.  On July 11th, the day after I retired,

17  I was lucky enough to be appointed by the Board of

18  Supervisors to a vacant constable position in the

19  Central Phoenix Justice Court.  I have lived in that

20  district since 1985.  I have been associated with that

21  district many years and got that appointment and have

22  been constable since then.  I applied to run in the

23  primary and, thank God, I did win, so I will be in

24  the general election.

25      Q    Is that the reason for your retirement?

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006169**

Exhibit 4

42

1    A    Yes, it is.

2    Q    Have you done any -- engaged in any other
3    activities other than police work?

4    A    I think I'm just like any other citizen.  I'm
5    involved in my community, involved in my parish,
6    involved in my kids' grammar school, St. Gregory's
7    when they were attending that.  I then became involved
8    in St. Mary's High School when my three children
9    decided to go there.  I have been past president on
10   two occasions of the St. Mary's Dad's Club there at
11   St. Mary's and have been a coach.  I have just been
12   involved in the community as with my children.

13   Q    During your career with the Police Department
14   did you attend any particular courses or take instruction
15   or participate in seminars and that sort of thing with
16   regard to interviewing suspects?

17   A    Specifically about interviewing suspects,
18   I did not.

19   Q    With regard to police procedures and the
20   interviewing of suspects, is there some kind of specific
21   methodology or procedure that you are required to go
22   through in interviewing suspects?

23   A    Not that I believe so.  I -- of course, there's
24   guidelines and there's laws to follow, but as far as
25   how to interview, how that interview is supposed to take

**MILKE_NSB006170**

Exhibit 4

1  place, that's usually left to the investigator to

2  decide that.

3      Q    For example, is there any requirement that

4  you must take a tape recorder and have with you while

5  interviewing suspects?

6      A    Absolutely not.

7      Q    If a suspect happens to be a female and you

8  being a male, is there any requirement that you must

9  have an escort or someone else with you in the room

10  while you interview a female suspect?

11      A    Absolutely not.

12      Q    Have you conducted interviews of both male

13  and female suspects in the past?

14      A    Certainly.

15      Q    Approximately how many?

16      A    Two hundred, 200 plus.

17      Q    While you have been with the homicide detail,

18  approximately how many?

19      A    Fifty plus, 75 maybe.

20      Q    With regard to male-female differences, have

21  you ever -- you have indicated you have conducted

22  interviews of females.  Have you conducted interviews

23  of females where it's just you and the female and you

24  are interviewing her?

25      A    Absolutely.

MILKE_NSB006171

Exhibit 4

44

1     Q     You and a male, just interviewing?

2     A     Sure.

3     Q     How about you and a homosexual?

4     A     Definitely.

5     Q     Or lesbian?

6     A     Definitely.

7     Q     So is there any particular police requirement

8     that anything special occur, whatever the gender or

9     style of the suspect may suggest?

10    A     Of course not.  I'm there to do a job.

11    Q     With regard to interviewing, have you developed

12    any particular technique or some particular procedure

13    that you yourself utilize and have so utilized, inclusive

14    of the interview of Debra Milke on December 3rd, of 1989?

15    A     I don't want -- I would rather not refer to it

16    as a technique.  I'm simply straightforward with a person.

17    I'm very honest with a person.  I expect that person

18    to be honest with me when I talk to that person.  I

19    don't know whether that is a technique or not, but -- I

20    don't know, some people might refer to it as a technique,

21    but I think being straightforward with a person, telling

22    that person what you are there for, so they understand

23    what you are there for, explain to that person that

24    basically you are not going to tolerate any nonsense,

25    you are going to be there, you are there to do a job,

**MILKE_NSB006172**

Exhibit 4

45

1    you are there to get the truth.  And I, if you will,

2    employ only one technique.  I'm honest to them and

3    I expect them to be honest with me.

4        Q    Do you find that a particularly effective

5    approach?

6        A    It's effective for me.

7        Q    Does it always work?

8        A    Absolutely not.

9        Q    Do you find -- have you found in interviewing

10   a suspect whether, for example, a tape recorder presents

11   an obstacle in ascertaining the truth from the suspect?

12       A    Definitely.

13       Q    Have you ever analyzed the reason?

14       A    Let me give you an example.  I'm not very

15   comfortable with this mike in front of my mouth as

16   I'm speaking.  It's a situation where I'm there to

17   obtain an interview.  I'm there to write down what

18   that person is telling me, her truth, that person's

19   truth, his, hers, as that person sees it.  Many times,

20   if you involve some mechanical -- something mechanical

21   there, it turns out to be an object of attention.  So

22   my general -- we are referring to technique again.  I

23   would rather not, but -- I would rather look directly

24   at a person.  I would rather have that person look

25   directly at me.  I want that person's full attention

**MILKE_NSB006173**

Exhibit 4

46

1   because I'm going to give that person full attention.

2   I think that the tape recorder sometimes keeps a person

3   from being as open or from being as comfortable as

4   that person would be without it.  Therefore, you are

5   not going to be able to make that person comfortable;

6   therefore, you are not going to be comfortable; and

7   therefore, you are not going to get a good interview.

8       Q    Detective Saldate, are you aware whether

9   suspects have certain rights, inclusive of constitutional

10  rights, in regard to various types of interviews?

11      A    Certainly.

12      Q    For example, if a suspect is neither under

13  custody nor under arrest, to your awareness and your

14  experience, does that person require, for example, that

15  Miranda rights be given merely because you wish to ask

16  some questions?

17      A    No.

18      Q    However, if that person is in custody or the

19  equivalent, under arrest, does that situation then change?

20      A    Definitely.

21      Q    And what is the change?

22      A    That person is in custody and, for that reason,

23  I think the obligation is for that officer to advise that

24  person of his Miranda rights, to advise that person of

25  certain rights to remain silent, the right to have an

**MILKE_NSB006174**

Exhibit 4

1    attorney present, and other rights that are listed on

2    the rights card, which I would always use that's

3    supplied by the Phoenix Police Department.  And I

4    think it's our obligation as police officers to do

5    that and I think the law says that.

6        Q    If this hypothetical suspect then were to

7    invoke the right to, for example, to an attorney or

8    to remain silent, or both, what has been your procedure

9    of then doing?

10       A    During my interviews, of course, I take notes.

11   And if a person invokes the right to remain silent,

12   invokes the right to an attorney, I immediately note

13   it.  That doesn't necessarily mean that I'm going to

14   stop that person from talking to me, nor does that

15   necessarily mean that I'm going to stop from trying

16   to explain to that person why I'm there, what reasons

17   I have for talking to that person.  That person has

18   invoked his rights, that person does not have to talk

19   to me any further.  But, of course, I have some obligation

20   to tell that person why they are going to be taken in

21   handcuffs from that room, if that's what is going to

22   happen, and be arrested.  I also have an obligation to

23   that person to give that person an opportunity to tell

24   me what he or she wishes to tell me and not to just

25   immediately say, "Oops, King's X, thank you, I will leave

MILKE_NSB006175

Exhibit 4

48

1    the room".  And many occasions I do that.

2        Q    Now, Detective Saldate, I would like to bring

3    you to a particular date and time.  Firstly, on

4    December 2 of 1989 were you with the Phoenix Police

5    Department as a detective on the homicide detail?

6        A    Yes, I was.

7        Q    Were you called to investigate the murder --

8    strike that.

9             Were you called to investigate as a homicide

10   detective a situation involving a purported missing

11   child, Christopher Milke, purportedly from Metrocenter?

12       A    Yes, I was.

13       Q    When were you called?

14       A    It was on a Sunday morning, my day off.  I

15   believe it was early morning, 8:30, 8:45, something

16   like that.  I was called by a homicide sergeant who

17   was working that day.  I was called and told to come

18   to the main station and assist them in this missing

19   person report.

20       Q    And in doing so were you briefed as to generally

21   what the situation was to that point?

22       A    Yes, I was.

23       Q    What was your general understanding by which

24   you further proceeded after that?

25       A    My general understanding when I arrived there --

**MILKE_NSB006176**

Exhibit 4

49

1   and again, it usually takes me an hour to get there,

2   maybe 45 minutes it took me.  I was contacted by

3   Sergeant Ontiveros.  I was also contacted by Detective

4   Bob Mills, who is sitting next to Mr. Levy.  Detective

5   Bob Mills was on duty at that time.  And Detective

6   Sergeant Ontiveros decided Detective Bob Mills and

7   myself were to re-interview two individuals who had

8   claimed that they were -- or one of them was taking

9   care of a child.  However, both of them had been with

10   that child earlier.  When that one individual was taking

11   care of a child he had gone to Sears to take that child

12   to see Santa Claus.  He had to go to the bathroom.  While

13   in the bathroom that child disappeared.  We were told --

14   or I was told --

15       MR. RAY:  Objection, hearsay.

16       THE COURT:  Sustained.  I think.

17  BY MR. LEVY:

18       Q    Who told you?

19       A    Sergeant Ontiveros told me.

20       THE COURT:  Sustained.

21  BY MR. LEVY:

22       Q    What did you do?

23       A    I then, after being instructed to interview

24  one of the persons, I did interview one of the individuals.

25       Q    Who was that?

MILKE_NSB006177

Exhibit 4

50

1       A     Jim Styers.

2       Q     And what did you -- what did Jim Styers tell

3  you?

4       MR. RAY:  Objection, hearsay.

5       THE COURT:  Sustained.

6       MR. LEVY:  Your Honor, may we approach?

7       THE COURT:  You may.

8       (Discussion at the bench between Court and counsel.)

9  BY MR. LEVY:

10      Q     Detective Saldate, was either Scott or Styers

11  in custody or under arrest at that period of time?

12      A     No, they were not.

13      Q     What were they there doing?

14      A     It was my understanding when I was briefed,

15  and later I found out by talking to Mr. Styers, that he

16  was there on his own will, he was -- he had been taking

17  care of the child.  He had also felt responsible for

18  that.

19      Q     Excuse me.  Before you go on, I have got to

20  establish a couple of things.  Was Mr. Styers subsequently

21  placed under arrest later in the day?

22      A     Much later, yes.

23      Q     And was it sometime in mid-afternoon or so of

24  Sunday?

25      A     No.  He was released.  He was placed under arrest

**MILKE_NSB006178**

Exhibit 4

51

1    early evening.

2        Q    At this time he was not under arrest?

3        A    No.

4        Q    Not in custody?

5        A    No.

6        Q    At this time Scott was not under arrest?

7        A    No.

8        Q    Not in custody?

9        A    No.

10       Q    They were there assisting the missing child

11   investigation?

12       A    They were there assisting many officers in

13   trying to search for this child, yes.

14       Q    And they were there voluntarily and to help?

15       MR. RAY:  Objection, calls for speculation.

16       THE COURT:  Sustained.

17   BY MR. LEVY:

18       Q    In any event, what did Mr. Styers tell you in

19   this interview?

20       MR. RAY:  Request one question on voir dire.

21       THE COURT:  You may.

22

23                 VOIR DIRE EXAMINATION

24   BY MR. RAY:

25       Q    Detective Saldate, was Jim Styers free to leave

MILKE_NSB006179

Exhibit 4

52

1    at any time immediately before or during or after your

2    interview?

3        A    He was released afterward.

4        Q    Was he -- I must ask one more question, then.

5    Before you commenced this interview was he free to leave?

6        A    Yes.

7    MR. RAY:  Thank you, Your Honor.

8    THE COURT:  You may now answer the question.

9    MR. LEVY:  Thank you.

10

11            DIRECT EXAMINATION (CONTINUED)

12   BY MR. LEVY:

13       Q    Go ahead.  Tell us what Jim Styers told you

14   in this interview you did of him -- did you say in

15   in the morning of Sunday?

16       A    Yes.

17       Q    Okay.

18       A    He told me briefly that he had gone and took

19   the child that morning, left Debra's apartment with the

20   child.  He had plans to take the child to see Santa

21   Claus.  He had gone to pick up his friend Roger.  They

22   had gone to pick up some pizza, had gone to pick up

23   some drugs or some -- not drugs.  I'm sorry.  -- some

24   medication, prescription medication for Roger's mother,

25   did some other things, and that he apparently took Roger

**MILKE_NSB006180**

Exhibit 4

53

1   home; that he went back to Metrocenter to take the

2   child to see Santa Claus.  He said he needed to go

3   to the bathroom.  He went into the bathroom, was in

4   one of the stalls, told Christopher to remain outside.

5   When he came out, Christopher was gone.  Apparently

6   he reported it to the security and began searching for

7   the boy.

8       Q    That's what he told you?

9       A    Yes.

10      Q    Did you also have the opportunity to speak

11  to Roger Scott?  And at this time was he under arrest

12  or in custody?

13      A    No.

14      Q    And essentially what did he tell you?

15      A    He indicated that basically he had been picked

16  up by Jim Styers, briefly, and that he had been returned

17  back home, that he had walked, or anyway met another

18  friend by the name of Phil who he had not seen since

19  schooldays and that this Phil wanted to go back to

20  Sears and see some tools or something to that effect, and

21  he found himself back at Sears.

22      Q    Did they indicated that they saw each other

23  and went out to Styers' car and Sears?

24      MR. RAY:  Objection, vague.

25  BY MR. LEVY:

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006181**

Exhibit 4

54

1      Q     "They" being both Styers and Scott, or either

2   one.

3      A     Roger said he met up with Jim there at the

4   Sears and that Jim told him that the child was missing.

5      Q     Did there come a point where you confronted

6   Roger Scott?

7      A     Yes.

8      Q     And told him that you did not feel he was

9   telling you the truth?

10      MR. RAY:  Objection to the leading form of the

11   question.  Move to strike.

12      THE COURT:  Overruled.

13      THE WITNESS:  Yes.

14   BY MR. LEVY:

15      Q     And sometime after that was Roger Scott then

16   placed under arrest?

17      A     He was.

18      Q     Did you obtain information from Roger Scott

19   by which you acted and went somewhere?

20      A     Yes, I did.

21      Q     What time was this and where did you go?

22      A     I believe it was shortly after 3:00 or so

23   that afternoon.  I obtained information, I acted upon

24   that information.  Myself and Detective Bob Mills drove

25   to 99th Avenue and Jomax Road, a desert area.

**MILKE_NSB006182**

Exhibit 4

55

1    Q    Was there anyone else with you?

2    A    There was.

3    Q    Who?

4    A    Roger Scott.

5    Q    And where did you go at that point?

6    A    We stopped in an area, desert area, and through

7    the information we walked, myself and Detective Bob Mills,

8    leaving Roger Scott in the car with other detectives,

9    we walked into the desert area and we found Chris Milke.

10    Q    Specifically what desert area, specifically

11    what type of --

12    A    It was a ravine, wash area.

13    Q    When you and Detective Mills walked, about

14    how far did you walk?  In what direction from 99th Avenue?

t1s2    15    A    We walked west from the roadway in the middle

16    of the wash, or we tried to stay, of course, to protect

17    the area, on some large rocks.  And approximately --

18    I think I estimated it somewhere in my report, but really

19    don't recall now -- it may have been 50 to 100 feet,

20    something like that, into the wash, that's where we

21    found Chris Milke.

22    Q    How far was this wash adjacent or near to

23    Happy Valley Road and 99th Avenue?

24    A    It was very close.  Again, measurements, it's

25    hard to remember at this point.  But it was rather close

**MILKE_NSB006183**

Exhibit 4

56

1    to the street.

2        Q    When you walked into the wash -- and you

3    mentioned this, but were you careful not to disturb

4    the soil?  And I believe you said you walked on

5    large rocks?

6        A    Definitely.

7        Q    What kind of footgear did you have on?

8        A    I had some Florsheims that have a -- more of

9    a plain sole.

10       Q    And did you happen to notice the footgear of

11   Detective Mills?

12       A    I don't recall.

13       Q    Did he also appear to walk on the large rocks

14   to not disturb the soil?

15       A    We were careful in noting each other's position,

16   to walk right behind each other.

17       Q    What did you come upon?

18       A    Well, we came upon a small child.  He was lying

19   on his -- I believe right side.  He was wearing cowboy

20   boots, Levi's, gray sweatshirt with a yellow and maroon

21   photograph of, I think a dinosaur, something like that.

22   He looked as though he was asleep at first.  And of

23   course, I approached him.  I then noticed blood spots

24   around where his feet were, or his body was.  I then

25   noticed that he had some blood marks, or blood stains,

MILKE_NSB006184

Exhibit 4

57

1    splatters on him and around his head.  And he was

2    obviously dead.  He was cold to the touch.  And he

3    appeared to not have anything other than himself around

4    him.  There was no other articles around him at all.

5        Q    Did the other detectives or officers that

6    accompanied you out there, did you notice if they

7    then commenced to secure the scene?

8        A    They did.  They walked a larger circle than

9    myself and Detective Bob Mills.  They walked -- one

10   walked or circled to the south, the other one walked

11   or circled to the north above the wash.  And after

12   myself and Detective Bob Mills located the body, we

13   then backtracked out of the location and had these

14   officers secure the area.

15       Q    Now, Detective Saldate, I would like to approach

16   you and ask you solely to identify some photographs.

17       A    Certainly.

18       Q    The question posed as to all of these photographs

19   is, do these photographs reasonably and accurately depict

20   the scene as you saw them that day, or as representative

21   of where the boy was and what he was wearing that day.

22            52.

23       A    Yes.

24       Q    57.

25       A    Yes.

MILKE_NSB006185

Exhibit 4

58

1      Q    Is that how the boy appeared to be lying and

2  what he was wearing that day when you found the body?

3      A    Yes.

4      Q    54.  You described a gray -- you described

5  clothing.  Does 54 appear to represent that description

6  you orally gave?

7      A    Yes.

8      Q    7.  Does this appear to look like the footwear

9  the boy was wearing?

10     A    Yes.

11     Q    6.  Does this appear to look like the pants

12  the boy was wearing?

13     A    They appear to be.

14     Q    5.  Does this appear to look like the sweatshirt

15  with the animal you described that the boy was wearing

16  at the time?

17     A    Yes.

18     Q    2.  Does this appear to look like the boy and

19  his face?

20     A    Yes, it is.

21     Q    And 3.  Does that appear to look like the boy?

22     A    Yes.

23     Q    Did you then head back toward Phoenix?

24     A    Yes, I did.

25     Q    In the company of --

SUPERIOR COURT

PHOENIX ARIZONA

**MILKE_NSB006186**

Exhibit 4

59

1    A    Detective Bob Mills and Roger Scott.

2    Q    Did you take a particular route back?

3    A    We traveled 99th Avenue to Union Hills.

4    Q    And on Union Hills did you -- what direction

5    did you go from 99th Avenue?

6    A    We went east.

7    Q    And did you have an opportunity to make any

8    tentative observations on Union Hills off of 99th Avenue?

9    A    We were directed to look in the desert area

10   of the south side of Union Hills between 99th Avenue

11   and 83rd Avenue.

12   Q    And did you notice anything?

13   A    Not at that time.

14   Q    Later?

15   A    Yes.

16   Q    What?

17   A    Later other officers went out and found items.

18   Q    Did you go back -- where did you go back to?

19   A    We went -- then traveled to Metrocenter on the

20   north side of Sears.

21   Q    And is that in the vicinity of Parking Lot H?

22   A    That is, I believe, yes.

23   Q    And did you note anything, some items in the

24   parking lot area?

25   A    In a planter just north of the northwest doors

**MILKE_NSB006187**

Exhibit 4

60

1   of Sears, a pair of tennis shoes were found in the

2   planter.  I picked those tennis shoes up and retained

3   them.

4        Q    About what time was it by now?

5        A    Early evening.

6        Q    And what next occurred?  Where did you next go

7   after Metrocenter?

8        A    By then -- or we then proceeded to the main

9   station at 620 West Washington.  Arrangements were then

10  made for me to be flown to Florence.

11       Q    Who made the arrangements?

12       A    Sergeant Ontiveros.

13       Q    To go on what?

14       A    To go on a helicopter to Florence.

15       Q    Had you ever gone on a helicopter anywhere?

16       A    Not a police helicopter.

17       Q    Where did you have to catch this police helicopter?

18       A    On top of the roof of the main police station

19  at 620 West Washington.

20       Q    What was your reaction to having to go on a

21  police helicopter?

22       A    Not very happy.

23       Q    Were you required to sort of be escorted up by

24  an officer to encourage you?

25       A    I had requested other means of transportation.

MILKE_NSB006188

Exhibit 4

61

1  My captain had ordered me to go in the helicopter,

2  which I did.

3      Q    And did you leave any scratches on the railing

4  up?

5      MR. RAY:  Objection.

6      THE WITNESS:  There may be.

7  BY MR. LEVY:

8      Q    What did you think about riding in a helicopter

9  for the first time?

10     A    Getting down safely.

11     Q    About how long did it take you to get to

12 Florence from the roof of the Phoenix Police building?

13     A    Well, the pilot said only 45 minutes.  I think

14 at one point it became lost for just moments, but it was

15 45 minutes to an hour.

16     Q    Was there anything going through your mind

17 other than what you have already said?

18     A    No.  That's about it.

19     Q    Did you get down safely in Florence?

20     A    Yes, I did.

21     Q    And where did you go?

22     A    We were picked up by a -- or I was picked up

23 by a Pinal County Sheriff's officer who had his red

24 lights on so that to signal the helicopter where to land.

25 He did.  I was taken there -- to, I believe, the Pinal

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006189**

Exhibit 4

62

1    County Jail, or jail facility.

2        Q    Was the purpose of going there to interview

3    Debra Milke?

4        A    Correct.

5        Q    Back in Phoenix before you left, were you

6    given any directives as to what you were going to do

7    or how you were going to do it?

8        A    I was -- it was suggested to me to talk to

9    Debra Milke and to see if I could get her statement

10   recorded.

11       Q    Who suggested that to you?

12       A    Sergeant Ontiveros.

13       Q    Were you ordered to get a recorded statement

14   or nothing at all?

15       A    I would never be ordered for something like that.

16       Q    Have you ever been in the past?

17       A    Not ordered, no.

18       Q    And were not so ordered this time?

19       A    Not on this occasion.  I have in the past been

20   -- it's been suggested strongly, and even though I

21   complain about it, I do it.

22       Q    Did you take a tape recorder with you?

23       A    No.

24       Q    For what reason?

25       A    I don't have a tape recorder.

63

1    Q    You were going to the Pinal County Sheriff's

2    Office?

3    A    Yes.

4    Q    And what if an occasion came up whereby you

5    could have recorded it?

6    A    I will borrow theirs.

7    Q    At this point in time were you given any

8    additional instructions, such as just to interview

9    her or not to arrest her or anything along that line?

10   A    That's not within the scope of a supervisor

11   in homicide.  He doesn't tell you when to arrest someone.

12   He supervises a case, he makes sure you are doing the

13   job right, but he doesn't tell you how to do the job

14   because you are expected to know how to do the job

15   when you get there.  And, of course, he wouldn't

16   tell me that.

17   Q    Okay.  Now, back to Florence.  Tell the jury

18   when you got on the ground and started to go into the

19   Pinal Sheriff's Office complex there, what occurred.

20   A    I was escorted -- never being there before,

21   I was escorted through some doors by a uniformed officer.

22   I was then told that Debra was at a room down the hall

23   and that it was a sick bay room, a medical room where

24   they take care of, I guess, prisoners when they are ill

25   or have a slight injury.

MILKE_NSB006191

Exhibit 4

64

1     Q   Did you pick the place or did they?

2     A   No.  They picked it.

3     Q   So did you see Debra Milke?

4     A   I walked into the room.  The door was open.

5 I noticed that Detective Hamrick was standing just

6 west of the door and he advised me or directed me

7 that Debra was in that room and pointed to the room.

8 As I approached the door, I heard some chuckling.  I

9 don't know whose chuckling.  I entered the room.  I

10 saw two women there.  I asked for Debra Milke.  And the

11 other lady looked at Debra and I advised her who I was.

12 I asked her to step outside and to talk to Detective

13 Hamrick.  I then closed the door, went up to a desk

14 that Debra was sitting next to, sitting on a chair next

15 to the desk, at the end of the desk.  And then I assumed

16 the position of another chair which was actually in

17 the middle of the desk where that chair actually belongs.

18        I stood there momentarily.  I told her who

19 I was.  I told her that I was investigating the disappearance

20 of her son.  I then sat on the chair, moved the chair

21 directly in front of Debra and began talking to her.

22     Q   Did she acknowledge that she was Debra Milke?

23     A   Yes.

24     Q   Had you ever seen her before?

25     A   No.

MILKE_NSB006192

Exhibit 4

65

1      Q    Do you see the same Debra Milke in the courtroom

2  today?

3      A    Yes, I do.

4      Q    If so, would you identify her by clothing or

5  whatever else and where she is sitting?

6      A    She is the young female that's sitting next

7  to Mr. Ray wearing the multicolored aqua-blue, blue-purple

8  dress.

9      MR. LEVY:  May the record show the identification?

10     THE COURT:  Yes.

11     MR. LEVY:  Thank you.

12 BY MR. LEVY:

13     Q    Does she look any different today than she

14 did back in the evening of December 3rd of 1989?

15     A    Not really.

16     Q    When you initially began your interview of her,

17 how was her composure, to your observation?

18     A    She was very calm.

19     Q    Did you have her sit down?

20     A    Yes.

21     Q    Did you sit down?

22     A    I sat down in that chair that I pulled up

23 close to her.

24     Q    What are the first things you discussed with

25 her and her responses?

MILKE_NSB006193

Exhibit 4

66

1     A    I told her that she was -- that I was there

2   and we had found her son and that we found him in a

3   desert area and that he had been shot.

4     Q    Did she make a response?

5     A    I believe she started saying in an excited

6   manner, "What, what", and sort of yelled and moaning

7   and crying, or she seemed to try crying.  I was looking

8   directly at her.  I was no more than 12 to 18 inches

9   away from her, but I saw no tears.  I then told her

10  that I wasn't there to tolerate that, I was there to

11  interview her, to get the truth.  And she began to cry.

12  And I told her -- or try to cry.  I never saw tears.

13  So I -- she was making noises and I told her to be

14  quiet.  I told her that she was under arrest for the

15  murder of her son.  I told her that, beyond that, I

16  wanted her to remain calm and quiet because I was going

17  to read her her rights.

18         I then removed a card from my badge case, which

19  I already had out, of course, because I had identified

20  myself.  I removed that card.  I read those rights to

21  Debra Milke.  And she at this point was calm.

22    Q    Could you share with the jury what rights you

23  read to her?

24    A    Well, I have a rights card in the other badge

25  case I now carry, if you would like me to remove it.

67

1     Q     It's the rights card with the language that

2  you read her?

3     A     Yes.   It's a Phoenix Police Department rights

4  card.

5     Q     Could you share with the jury what rights

6  you told her?

7     A     Can I remove the card?

8     Q     Please do so.

9     A     It's not the same badge case.

10        I told her that, as she sat there:  "You have

11  the right to remain silent.  Anything you say can be

12  used against you in a court of law.  You have the right

13  to the presence of an attorney to assist you prior to

14  questioning and to be with you during questioning if you

15  so desire.  If you cannot afford an attorney, you have

16  the right to have an attorney appointed for you prior

17  to questioning."  And "Do you understand these rights?"

18     Q     Did she respond?

19     A     She responded first by moving her head in an

20  up-and-down motion.  However, I felt that wasn't enough

21  and I told her that I needed her response verbally and

22  she responded, "Yes".

23     Q     To this point was any discussion made -- well,

24  before I ask you that -- withdraw.

25        My question is:  What was her composure at the

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006195**

Exhibit 4

1  time you read her her rights and when she responded?

2      A    Her composure was at that point different

3  than when it began.   That's because I had told her that

4  I wanted her to remain quiet, calm, and she did.   And,

5  of course, after she responded "Yes", then she began

6  -- made noises and was trying to cry.   And we proceeded

7  from there.

8      Q    Did you see any tears again?

9      A    I never saw any tears.

10     Q    Did the point ever come up of recording this

11 particular interview?

12     A    It did.   I told her that I was there to get

13 the truth and just the truth.   I told her I wasn't

14 going to tolerate any lies.   I asked her if she was

15 going to tell me the truth and going to tell me what

16 happened from her standpoint now, and I explained to

17 her that I wanted her to tell me what had happened, again

18 from her standpoint, but I also wanted her -- I did not

19 want her to minimize her involvement at all.   During

20 this time that I'm speaking this, she is saying, "Well,

21 what do you need to know, what do you need to know".

22 I'm continuing to tell her that I was there for the

23 truth.   And she said -- I asked, "Are you going to tell

24 me what happened now", and she said she was.

25     Q    What about the recorder?

**MILKE_NSB006196**

Exhibit 4

69

1      A    At that point when she said she was, I asked

2    her, "Can I tape record this interview?"  And she

3    said, "No; isn't it enough to talk to you?"  I said,

4    "Fine".

5      Q    Did she then tell you -- was that the

6    extent of your conversation and her responses to that

7    point?

8      A    Yes.

9      Q    Now, just to jump in a general way from then

10   to the rest of the interview, did she ever invoke her

11   right to remain silent?

12     A    Never.

13     Q    Did she ever invoke her right to counsel by

14   asking for an attorney?

15     A    Absolutely not.

16     Q    Did she simply respond to you, "What do you

17   want to know", and then did she begin to tell you what

18   happened?

19     A    She began to tell me a version of what I

20   guess she expected me to believe.

21     Q    What did she start off saying to you?

22     A    She told me that she had had trouble with her

23   son, something to the effect that she was upset with

24   him because he was going to turn out like his father,

25   an alcoholic, a drug abuser, in jail.  She had made these

**MILKE_NSB006197**

Exhibit 4

70

1   comments to her roommate, Jim Styers, and then

2   commented that, of course, she didn't realize that

3   Jim would ever hurt the child.  I immediately, of

4   course, told her that wasn't the truth and I told

5   her I wasn't going to tolerate that, that I wasn't

6   there to listen to lies, nor did I have the time.

7   I told her that I wanted the truth.  And then we continued

8   on.

9        Q    Did she make a response?

10       A    She did.

11       Q    Did you take notes?

12       A    Yes, I did.

13       Q    Did you reduce this interview to a typed

14   statement?

15       A    Yes, I did.

16       Q    Would it refresh your recollection from time

17   to time to refer to that statement for purposes of

18   accuracy before testifying in response to questioning?

19       A    Of course.  If you are referring to any

20   quoted remarks in my supplemental, I would definitely

21   like to read them from my supplement because I believe

22   they are very important.

23       Q    Do you have your supplement?

24       A    Yes, I do.

25       Q    Could you put it in front of you?

**MILKE_NSB006198**

Exhibit 4

1    A    Sure.

2        We are referring to the second paragraph, I

3    believe, of the second page, the last sentence.  Is

4    that what your reference is?

5    Q    Yes.  Is that a quoted portion that you put

6    in your report in quote marks?

7    A    After I told her that it was her responsibility

8    to tell me the truth from her standpoint, she then

9    made this remark, which I noted in quotes on my notes

10    and then transferred them, of course, to my supplemental.

11    The statement she made:  "Look, I just didn't want him

12    to grow up like his father.  I'm not a crazy person.

13    I'm not an animal.  I just didn't want him to grow up

14    like that."  End of quote.

15    Q    Did she continue on?

16    A    She continued on, but no quotes at that point.

17    Q    Did you pick the point in time with reference

18    to when it was that she was going to discuss with you

19    what happened?

20    A    No.

21    Q    Did she?

22    A    Yes.

23    Q    How?  What did she say?

24    A    She then began in a narrative form to talk to me.

25    Q    Was she calm?  Was she crying?  Was she yelling?

72

1    Was she excited?

2         A     She was calm.  She was somewhat nervous,

3    shaking a little bit.  But she began by telling me about

4    her high school days.  She told me that while in high

5    school she was very popular.  She told me that she had

6    very high esteem, she really liked herself in high

7    school.  She said that she was in love with life until

8    one critical point when she said she met her ex-husband,

9    Mark Milke, and at that point something just happened.

10   He was involved in drugs, alcohol, and her -- apparently

11   her whole life changed, from her perspective.

12        Q     What else did she tell you?

t2s1 13       A     We discussed the facts of -- we continued on

14   from there, how they got married.  We continued on

15   about how she was taking birth control pills.  We talked

16   about the fact that Chris Milke was a mistake.  We spoke

17   about -- or she spoke about the fact that she, when

18   pregnant, had gone many times to check on the fetus to

19   see if it was somewhat abnormal.  She discussed getting

20   abortion.  She in fact --

21        MR. RAY:  Your Honor, I object to the characterization

22   of facts.

23        THE COURT:  Sustained.

24             Continue on with your answer, sir.

25        THE WITNESS:  She talked about abortion.  She said at

MILKE_NSB006200

Exhibit 4

73

1   one point she even made an appointment, but she said

2   that she broke the appointment and felt that it would

3   be too painful.

4   BY MR. LEVY:

5       Q    Did she discuss with you, in relation to

6   children, why it was she took birth control pills?

7       A    She felt she would not be a very good

8   mother and didn't want kids.

9       Q    Any children?

10      A    No children.

11      Q    Did she discuss what occurred after Christopher

12  was born?

13      A    She -- we discussed that, or she told me about

14  that.  We talked about that after Christopher was born

15  she noted similarities in the actions of her son

16  Christopher.  I think she described him as mischievous

17  and she used another word I don't recall at this point,

18  and she said that he was acting a lot like his father.

19      Q    Did she discuss with you if the child were

20  to continue on, continue living, what she believed

21  might occur?

22      MR. RAY:  Objection to the leading form of the question.

23      THE COURT:  I will allow the witness to answer.

24      THE WITNESS:  We discussed that area.  And if I

25  can correct myself.  I say "discussed".  I was mainly

SUPERIOR COURT

PHOENIX ARIZONA

**MILKE_NSB006201**

Exhibit 4

74

1  listening.  I wasn't discussing these things with her.

2          She told me that she felt that if the son,

3  or the child, continued in his ways, and apparently

4  was going to, that he would turn up just like his

5  father, and that is an alcoholic, a drug abuser, and

6  someone that would be in jail, or was going to jail.

7  BY MR. LEVY:

8      Q    Did she then discuss her feelings about this

9  and did you -- did she make some remark you quoted?

10     A    She did.  But if I can refer to my supplemental,

11 I would rather read from my supplemental quotations

12 because I think they are very important.

13     Q    Please do so.

14     A    She told me, quote:  "I'm not a malicious

15 person".

16          Is that the quote you are referring to?

17     Q    Yes.

18     A    Again -- I'm sorry.  Quote:  "I'm not a malicious

19 person, I just wanted God to take care of him".  End

20 of quote.

21     Q    Did she express any concern about her future?

22     A    She told me that she had contemplated suicide.

23 She said that in doing so she had thought that that

24 probably would not be the solution since, if she committed

25 suicide, the end result would be that Mark Milke would

**MILKE_NSB006202**

Exhibit 4

75

1    have the child and raise him.

2       Q    Because -- did she further explain to you,

3    because of that feeling, what she then did and planned

4    to do?

5       A    She said that she then decided that it would

6    be best for Christopher Milke to die.  She was living

7    with Jim Styers as a roommate.  She said she had a

8    hard time at first trying to tell Jim about what she

9    wanted, but that finally she apparently got the nerve

10   up enough to tell Jim, and Jim agreed.

11      Q    Did she tell you of any explanation for that

12   decision, rationale, a basis?

13      A    Again, her rationale for this entire -- the

14   death of her son was that she did not want him to grow

15   up like her husband, Mark Milke.

16      Q    Did she indicate whether Jim Styers, what he

17   responded to -- how he responded to her plan?

18      A    He agreed, but --

19      MR. RAY:  Your Honor, I will object on hearsay grounds.

20      THE COURT:  Sustained.

21      MR. LEVY:  May we approach?

22      THE COURT:  We will take it up during the next recess.

23   Is there another question you can ask in the meantime?

24      MR. LEVY:  Thank you.

25   BY MR. LEVY:

MILKE_NSB006203

Exhibit 4

76

1      Q    Did she tell you what the agreement was?

2      A    She did.  The agreement was going to be that

3    Jim would take care of it, Jim would kill Chris, and

4    the only thing she didn't want to know was the specifics

5    of the killing or how he was going to be killed.

6      Q    Did the subject of insurance come up?

7    MR. RAY:  Objection to the vague form of the question.

8    THE COURT:  Overruled.

9    THE WITNESS:  I asked her that question.  I asked

10   her if she had life insurance on the child, Chris.

11   She said she did not.  I asked her about a $5000 policy.

12   She said she did not, but that her dad, it was her

13   belief, did have an insurance policy on Chris, as he

14   did on all his grandchildren.  I asked her if this could

15   be a motive and she told me it was not.  She said that

16   it may have been a motive for Jim and Roger, since she

17   believed that Jim may have known about the insurance

18   policy, but it was definitely not her motive for killing

19   Chris.

20   BY MR. LEVY:

21     Q    Detective Saldate, did you subsequently ascertain

22   that there was in fact a policy of life insurance with

23   John Alden Insurance Company in the amount of $5000 on

24   the life of the child?

25     A    I did.

**MILKE_NSB006204**

Exhibit 4

77

1    Q    Through Debra Milke and her employment, John

2    Alden Insurance?

3    A    I went to John Alden Insurance and obtained

4    that information.

5    Q    Going back to the interview, did you ask

6    Debra additional questions concerning her, Jim and Roger,

7    about the agreement to kill Chris?

8    A    Yes.  We -- of course, she discussed that.

9    She discussed the fact that later Roger became involved

10   in the picture.  She discussed that Roger and Jim

11   were going to do this, going to kill Chris.  And again,

12   I believe she said regarding -- I believe she said she

13   just didn't know about how it was going to happen.

14   Q    Did she indicate if she discussed this - that

15   is to say, the killing of her son - with Jim Styers more

16   than once?

17   A    She said she discussed the killing of Chris

18   with Jim several times and that they, meaning Jim, Roger

19   and Debra, discussed the killing of Chris at least on

20   one occasion.

21   Q    Did she indicate whether she, Debra Milke, ever

22   went out with Jim Styers --

23   MR. RAY:  Objection to the leading form of the question.

24   THE COURT:  I can't tell until it's finished.

25        There was more to the question, wasn't there,

1    Mr. Levy?

2          MR. LEVY:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MR. LEVY:  Thank you.

5    BY MR. LEVY:

6          Q    Did Debra Milke ever indicate whether she

7    went with Jim Styers in an attempt to kill her son?

8          MR. RAY:  Objection.

9          THE COURT:  Overruled.

10         THE WITNESS:  She told me that she did go on several

11   occasions with Jim, but for several reasons they could --

12   would come back and Jim would not do that.

13   BY MR. LEVY:

14         Q    Detective Saldate, you said several occasions.

15   Did you mean --

16         MR. RAY:  I object as misstating the testimony.

17         THE COURT:  He is asking him what he means.

18   BY MR. LEVY:

19         Q    And if it would refresh your recollection to

20   read the last paragraph of page 3 before you further

21   testify, I invite you to do so.

22         A    It would certainly refresh my recollection if

23   I could.

24              I apologize.  Debra said that she only went once

25   with Jim.

MILKE_NSB006206

Exhibit 4

79

1       Q     Did she continue to share with you what she

2   meant by going out with Jim?

3       A     She referred to it -- she said she went out

4   with Jim once and referred to it that they went out to,

5   I believe I quoted in my supplement, do it, but that

6   something happened and then they returned with Chris.

7   I asked her what "do it" meant.  She explained to me

8   that "do it" meant to kill Chris.

9       Q     Did she share with you after that what it

10   was that the plan was?

11       A     The plan then focused on Roger, or Jim and

12   Roger taking out Chris, doing it, being killing Chris.

13       Q     Who did she say, if she did, was to do it?

14       A     Jim Styers was to kill Chris, or do it.

15       Q     And then?

16       A     Then both of them were going to return, or

17   go to -- I apologize -- not return, go to the Metrocenter

18   and report Chris missing.

19       Q     Did she indicate to you whether she ever knew

20   what exactly was going to happen to Chris by Jim doing it,

21   other than to kill?

22       A     She told me she never knew the method that Jim

23   Styers was going to employ to kill her son Chris.

24       Q     On Saturday morning when -- did she tell you and

25   describe to you the Saturday morning, December 2, 1989,

MILKE_NSB006207

Exhibit 4

80

1    what she was planning with regard to Jim and Roger?

2        A    That Saturday morning she said that Jim

3    woke up and told her that they were planning to do it

4    today, kill Chris.  She said that Chris got himself

5    dressed and that Jim told her that he was going to take

6    Chris and they would then pick up Roger and then do it.

7        Q    Did she indicate anything with regard to what

8    the boy would be told?

9        A    She was going to tell Chris, after getting him

10   up and, of course, getting him dressed, she was going

11   to tell Chris that he was to go see Santa Claus and that

12   Jim was going to take him.

13       Q    Did she share with you any intimate conversations

14   that she had with her son immediately preceding that day?

15       A    I asked her -- I asked her if, on that day, if

16   she put any special clothes on, maybe special clothes or

17   were special to him.  She said she did not.  She said

18   she let him dress himself and that he used his boots

19   because he always liked his boots.  I then asked her if

20   she by chance maybe gave him -- I think I referred to it

21   as a kiss or a special hug or something before he left,

22   and she said she did not have to.  She said that about

23   a week before that she told Chris that he was going to

24   go to heaven and soon, and that she would see him up

25   there later.

81

1      Q    Did she indicate whether she ever received

2   a call from Jim Styers midday of Saturday, December 2

3   of 1989?

4      A    She did.  She said that Jim called her from

5   Metrocenter and told her that Chris was missing and

6   that there was a security guard standing next to him.

7   She said she then knew that Chris had been killed.  And

8   then, after hanging up the phone, I believe she prayed

9   to God.

10     Q    Well -- that's okay.

11     THE COURT:  Mr. Levy, would this be a good time to

12  stop for the day?

13     MR. LEVY:  Yes, Your Honor.

14     THE COURT:  Detective Saldate, for now you may

15  step down.  We will expect you back here at 1:00 o'clock

16  tomorrow.

17

18              (Next page, please.)

19

20

21

22

23

24

25

MILKE_NSB006209

Exhibit 4

82

1          THE COURT:  Ladies and Gentlemen, at this time we will

2   take our evening recess.  While we are at recess, please remember

3   the admonition.  You are not to discuss this case or anything

4   connected with it among yourselves or with any other individuals.

5   You are not to form any opinion about any facts of this case until

6   such time as the case is given to you for your deliberations.

7   You are not to allow yourselves to be exposed to any news accounts

8   of these proceedings.

9          You are excused until 1:00 o'clock tomorrow.

10          (The jury left the courtroom for the evening recess.)

11          THE COURT:  Mr. Ray, the first Bench conference had to

12   do with questions asked of Styers and Scott at the police station

13   before their arrest.  I believe at the Bench conference we clarified

14   this was before they were arrested and they were at the police

15   station of their own free will.

16          MR. RAY:  It was clarified through the foundation, additional

17   foundation that was laid, Your Honor.

18          THE COURT:  Is there anything else you want the record

19   to reflect concerning the Bench conference?

20          MR. RAY:  No, Your Honor.

21          THE COURT:  All right.

22          Then we have an objection concerning what did

23   Ms. Milke tell you that Jim Styers said.  I think we have kind

24   of passed all those other statements by, correct?

25          MR. RAY:  That's correct.  As I recall the question, it

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006210**

Exhibit 4

83

2

1  was asking of this witness to state what Debra said Jim said,

2  and I believe that would be hearsay on hearsay.

3      THE COURT:  I know, but since the time you made the

4  objection, you have had about four or five or more questions

5  asking the same thing, and no objection.

6      MR. RAY:  Well, I don't recall in that manner, Your Honor,

7  but --

8      THE COURT:  It was only on the basis of hearsay?

9      MR. RAY:  That's correct, Your Honor.

10     THE COURT:  All right.  It's overruled.

11         Mr. Levy, if you happen to remember the question,

12  you can go back and ask it.

13     MR. LEVY:  Well, as it turned out, he answered, then it

14  was objected to and you sustained it, but it wasn't stricken,

15  so he just said he agreed.

16     THE COURT:  Okay.

17         Then we have Mr. Ray's motion in limine.

18         Did you get a copy, Mr. Levy?

19     MR. LEVY:  Yes, today, Your Honor.

20     MR. RAY:  I filed it in anticipation of what I expected

21  to be testimony, Your Honor, and I just basically wanted to alert

22  you in advance I would be making these objections and perhaps

23  we could resolve that out of the presence of the jury.

24         THE COURT:  I don't know if I understood it.  It's relatively

25  vague, saying you want the State to be precluded from asking questio

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006211**

Exhibit 4

84

3

1 of their witnesses concerning Ms. Milke's character.

2          MR. RAY:  That's correct.

3          THE COURT:  What questions did you anticipate?

4          MR. RAY:  Questions dealing with just matters of -- for

5 example, asking Sandra Pickenpaugh to characterize her sister

6 as to what type of person she is, the basis for her opinions of

7 character and so forth over the years, things that she has or

8 has not experienced.  Questions of that nature, Your Honor.

9          THE COURT:  Mr. Levy, are you at the point where you have

10 formulated questions to be asked of such witnesses?

11          MR. LEVY:  If I can answer this way.  First of all, he

12 has already put her character at issue in his opening remarks

13 by talking about and telling the jury that they are going to have

14 to ascertain appropriate responses from her, about how she cared

15 for the kid, the child, making him grow up to be a model citizen,

16 about what was appropriate or not with regard to her behavior

17 and her reactions.  How her emotions were genuine, how they would

18 have to come to know Debra Milke and must decide what emotion

19 was appropriate and so forth.  I think he has already put her

20 character at issue as one of his defenses, anyway, trial defenses.

21          Now, however, I never intended to simply go after

22 her character just to show she has a propensity for anything.

23 Rather, she has specifically told her sister, for example, Sandra

24 Pickenpaugh, precisely her state of mind, her attitude and so

25 forth about Christopher Milke and children in general.  She didn't

MILKE_NSB006212

Exhibit 4

85

1  want him, wasn't a good mother.  She specifically had relatives,

2  including her sister, take care of Christopher Milke for long

3  periods of time.  She specifically told her sister and mother

4  she didn't want Christopher Milke, that she wished he would just

5  up and disappear, and things like that.

6          These aspects, it seems to me, under Rule 404(b) go

7  to plan, preparation, intent and motive, all of which are allowable

8  with regard to these prior acts.  And these are specific statements.

9  These aren't going to be questions, "What do you think about her

10 character in the community" or "Does she have a character for

11 violence or not", for example, along that line.

12         In opening remarks to the jury he indicated all of

13 the neighbors would have been surprised that James Styers would

14 have killed this boy, or that she was anything other than a good

15 mother.

16         So, number one, I think his motion in limine has already

17 been waived and he has opened the door in opening remarks very

18 wide, because he has actually stated this in such a way that it

19 is a critical part of his defense.  He has listed it as a defense.

20 If I was to ask questions of these witnesses, they are not to ask

21 their opinion about her reptutation or about her character or

22 propensity or in any way elicit that from these witnesses.  Rather,

23 that would be to show, under 404(b), specifically her plan,

24 preparation, motive and intent based upon these prior statements

25 and these prior actions by her with regard to these relatives.

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006213**

Exhibit 4

86

5

1          So, in order to make a conclusion --

2          THE COURT:  I thought you did very nicely.

3          MR. LEVY:  Very well.  I thought maybe I could deny his

4    motion.  Thank you.

5          THE COURT:  Mr. Ray?

6          MR. RAY:  Your Honor, the time frame as set forth in the

7    Indictment is on or about December 2nd.  It's been alleged that's

8    when this conspiracy was formulated.  And it would be highly

9    improper to go back two and three years at a point in time when

10   neither Debra Milke nor Styers were even in close proximity to

11   each other, to try and talk about things that may have happened

12   back then.  So we are talking about a remote basis for

13   Ms. Pickenpaugh's opinion and things of that nature.

14         I submit that I did not open the door, and I do not

15   believe that I can open the door in any regard with respect to

16   opening statements, but rather, if I asked a question of a witness

17   during the course of the trial, I would open the door, then the

18   door would be open.  I have not done that.  What the lawyers say

19   is not evidence.  Only upon asking questions are doors opened

20   or do they remain closed.  And Mr. Levy has indicated, however,

21   that he did not intend to elicit any such type of evidence or

22   testimony.  Therefore, with that avowal, it would almost moot

23   my motion.

24         THE COURT:  I think if Mr. Levy wants to bring out something

25   concerning the Defendant's ability as a nurturing and caring parent,

MILKE_NSB006214

Exhibit 4

87

1   he may do so based upon observations and not upon reputation in

2   the community.

3          Am I correct, that's what you would be inclined to

4   do, Mr. Levy?

5       MR. LEVY:  Yes, Your Honor.  And beyond that, as I stated,

6   specific statements that she made as facts.

7       THE COURT:  Then it appears we are all in agreement.

8          Gentlemen, I have also received a letter from one

9   of our jurors, Ms. **Tiktinsky**.

10         I'm sorry.  I have left it on my desk in my office.

11  You are free to come in and look at it.  Basically she is telling

12  me she needs to not be on jury duty on September 19th, 20th, and

13  I think she included the 21st, which would be a non-trial day,

14  anyway, due to Rosh Hashana.  She also wished to remind you she

15  has a ticket for London for October 8th.  A copy was attached.

16  And I believe the last comment she made was she could not be

17  sequestered because she has a dog to take care of.

18         I think the only issue we need to concern ourselves

19  with is shall we keep her on the jury up until the 18th or 19th

20  of September.  If you like, you may reserve your comments until

21  you have had a chance to think about them and see her letter.

22  All right?

23      MR. LEVY:  Thank you.

24      MR. RAY:  Very well, Your Honor.

25      THE COURT:  How about if I see everybody at five minutes

MILKE_NSB006215

Exhibit 4

88

7

1  to 1:00 tomorrow, and then we will talk about Ms. **Tiktinsky.**

2  at that time.

3          MR. LEVY:  Yes, Your Honor.

4          THE COURT:  Have a good evening.

5          MR. LEVY:  Oh, Your Honor, Detective Mills brought to my

6  attention that the evidence was returned in such a way that

7  Detective Mills is extremely concerned and upset with regard to

8  certain fairly legal aspects of the chain of custody, **packaging**

9  conditions and so forth, all of which we discussed clearly and

10  in open court and which the Court addressed pretty much in your

11  minute entry.  So I wonder if we could, as far as marking it

12  tomorrow, get it marked rather when we have an opportunity to

13  discuss this.

14          THE COURT:  Why don't you come in at 12:45 --

15          MR. LEVY:  Thank you.

16          THE COURT:  -- instead of 12:55.

17          MR. LEVY:  Okay.

18          (The evening recess was had.)

19

20

21

22

23

24

25

SUPERIOR COURT

PHOENIX ARIZONA

**MILKE_NSB006216**

Exhibit 4

91-146

1           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,            )
                                 )
5              Plaintiff,        )
                                 )
6      vs.                       )      No. CR 89-12631
                                 )         CR 91-0048-AP
7   DEBRA JEAN MILKE,            )
                                 )
8              Defendant.        )
                                 )
9   _____)

10

11                         Phoenix, Arizona
                           September 13, 1990
12

13

14

15   BEFORE:  The Honorable CHERYL K. HENDRIX

16

17

18

19              REPORTER'S TRANSCRIPT OF PROCEEDINGS

20

21

22

23

24    Copy                              By:  Pauline Wood
      Prepared for Appeal                    Official Court Reporter
25

MILKE_NSB006217

Exhibit 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPERIOR COURT
PHOENIX ARIZONA

MILKE_NSB006218

Exhibit 4

i

1                          I N D E X

2   WITNESSES:                          DX    CX    RD    VD

3   ARMANDO SALDATE

4       By Mr. Levy                      8                29
        By Mr. Ray                            17
5          (Continued)                        29

6   HARVEY HAMRICK

7       By Mr. Levy                     69
        By Mr. Ray                            78
8
    RICHARD SADEIK
9
        By Mr. Levy                     87
10      By Mr. Ray                           102

11                        - - -

12

13  EXHIBITS:                        Received In Evidence

14  Nos. 5 - 8                              73

15  No. 108                                 77

16  Nos. 119 - 121                          77

17  Nos. 123 - 124                          77

18  No. 126                                 77

19  No. 52                                 121

20

21

22

23

24

25

MILKE_NSB006219

Exhibit 4

2

1                    A P P E A R A N C E S

2    For the State:

3           Mr. Noel J. R. Levy
            Deputy County Attorney
4

5    For the Defendant:

6           Mr. C. Kenneth Ray
            Court-Appointed Counsel
7
                               - - - -
8

9                                        Phoenix, Arizona
                                         September 13, 1990
10

11          THE COURT:  Mr. Levy, I believe there was some issue you

12   wished to raise concerning the chain of custody.

13          MR. LEVY:  Your Honor, on 8/16 we had discussed the defense

14   counsel's request for presentation of trial evidence from the

15   police custodian, and we agreed it would go through Detective

16   Mills and that in turn the recipient, presumably Dr. Fritz, would

17   receive the evidence and keep it intact and return it in the same

18   condition as received.  So what happened -- and then, of course,

19   there is always a chain of custody problem.

20          I requested for Mr. Ray, two days ago, to have the

21   items returned.  Maybe it was three.  Whatever.  And he says,

22   "Okay; well, I will see to it".  And then Detective Mills informed

23   me that he received the items back, that they came through --

24   they were left with the Clerk.  There was no direct chain of

25   custody back from Dr. Fritz to Detective Mills as was expected.

**MILKE_NSB006220**

Exhibit 4

3

1  The items were not repackaged and they were just like rubberbanded.
2  They were open and exposed, like some of the foot casts and other
3  evidence, like, for example, the shoes, I believe, the bag with
4  the gun, and just ripped through the seal and didn't reseal it,
5  didn't reinitial it, all of which would show appropriate chain
6  of custody and who got into it.  He didn't initial anything.
7        So, in other words, it's like he gets it all packaged
8  up, initials on it, everything properly marked.  It comes back
9  ripped open, rubberbanded, no -- none of his initials.  It doesn't
10 come back through -- directly from him to Detective Mills.  It's
11 via third parties.  So we really don't know who got hold of it.
12       And then, for example, the guns were gotten by the
13 security people downstairs and he found them with one of those
14 security people, or rather with one of the deputies.
15       So, in other words, we don't know, between Dr. Fritz --
16 we know from Detective Mills it went directly to Dr. Fritz, meaning
17 Dr. Fritz's son.  The fact is, even then he sends his son, who
18 we have no idea about agency, to pick the stuff up instead of
19 himself.  And then it comes back not from Dr. Fritz to Detective
20 Mills, it's through all these unknown independent mediators. And
21 therefore, we feel both the spirit and letter of your Order has
22 been violated, and that creates a problem for us if somebody wants
23 to make a problem for us relative to chain of custody and securing
24 the evidence.
25       THE COURT:  Then it appears an order to show cause in re

MILKE_NSB006221

Exhibit 4

4

1 contempt is appropriate for Dr. Fritz to show cause why he has

2 violated my order.

3       MR. LEVY:  Yes.

4       THE COURT:  I believe he is entitled to reasonable notice.

5       MR. LEVY:  Yes.

6       THE COURT:  Ten days.

7            Mr. Levy, you and/or your office would be in charge

8 of preparing the order to show cause.  I will set the hearing

9 for Tuesday, the 25th of September, at 11:00 o'clock in the morning.

10 At that time Dr. Fritz shall appear and show cause why he should

11 not be held in contempt of Court for violation of this Court's

12 orders regarding chain of custody.

13            Mr. Ray, is it your intention to raise any issues

14 concerning the chain of custody that might have been created by

15 your expert?

16       MR. RAY:  No, Your Honor, I do not.

17       THE COURT:  All right.

18       MR. RAY:  Would the Court want, with your permission, to

19 have, at least at this juncture, on behalf of the defense, an

20 explanation of what occurred or would the Court reserve that to

21 the 25th?

22       THE COURT:  I think that should wait until the 25th.

23            I think also notice should be given to the other two

24 defendants in this case that the matter is set.  They might wish

25 to be present.

MILKE_NSB006222

Exhibit 4

5

1      MR. RAY:  Would the record note Dr. Fritz is present in

2 court?

3      THE COURT:  All right.  You are expecting to call Dr. Fritz

4 as a witness, are you not?

5      MR. RAY:  I am.  He is present for purposes of this.  I

6 didn't know how the Court wished to address the subject raised

7 by Mr. Levy today, so, therefore, I had him attend.

8      THE COURT:  Well, based upon your avowal that you do not

9 intend to raise any chain of custody issues, I don't think we

10 need to go into the matter today.  But I know there are another

11 two trials that need to be conducted.  I don't know if Dr. Fritz

12 is the expert for the other two defendants or not.  That certainly

13 could cause some serious issues and we will delve into it on the

14 25th.

15      MR. RAY:  Yes, Your Honor.

16      THE COURT:  Counsel, do you have any thoughts about the

17 problem I told you about yesterday with one of our jurors?

18      MR. LEVY:  I do have thoughts, Your Honor.

19      THE COURT:  All right.

20      MR. LEVY:  And considering the number of days that she

21 wants off, if the Court was inclined to grant her that number

22 of days, we have to go on with the trial, so it would seem like

23 she would almost have to be excused.

24          The only other alternative left would be to -- she

25 would only be entitled to one day off legally, but even then the

MILKE_NSB006223

Exhibit 4

6

1 Court indicated that's a trial date and the Court would have to

2 determine whether you accommodate her for one day, the Rosh

3 Hashana itself.  I believe it is like from sundown the day before

4 through the following day, whatever date that is.  And then we

5 couldn't have a court day to preserve her being here so we would

6 have four available alternates instead of three.

7         So if the Court is inclined to grant her the two days

8 off, I would say go ahead and release her.  If the Court was

9 inclined to grant her only one day but would be willing to then

10 not have trial that day, then she wouldn't have to be excused.

11 But if the Court wanted to have trial, she would have to be released.

12         As far as her other concerns about October and some

13 trip, I don't expect we are going to go that far or take that

14 long.

15     THE COURT:  I assumed as much, because you left her and

16 other individuals on the jury that indicated that they had some

17 problems toward late -- early October.

18         Mr. Ray, do you have any thoughts you wish to share

19 with me at this time?

20     MR. RAY:  No, Your Honor.

21     THE COURT:  Well, at least between now and next Monday

22 we will leave her on the jury and see how things shake out.  Okay?

23     MR. LEVY:  Thank you.

24     THE COURT:  Are we ready for our jurors?

25     MR. LEVY:  Yes, Your Honor.

**MILKE_NSB006224**

Exhibit 4

7

1        MR. RAY:  Yes, Your Honor.

2        THE COURT:  Do we have Detective Saldate, Mr. Levy?

3        MR. LEVY:  Yes, we do.  I will get him.

4        (The jurors entered the courtroom.)

5        THE COURT:  Good afternoon, ladies and gentlemen.  It

6   appears as though you all have new seats today.

7             This is a continuation of CR 89-12631, State of

8   Arizona against Debra Jean Milke.

9             Mr. Saldate, would you be so kind as to retake the

10  witness stand?  You were previously sworn and you are still under

11  oath.

12        MR. SALDATE:  Yes, ma'am.

13        THE COURT:  You may proceed.

14        MR. LEVY:  Thank you, Your Honor.

15

16                ARMANDO SALDATE,

17  called as a witness herein, having been previously duly sworn,

18  was examined and testified as follows:

19

20                (Next page, please.)

21

22

23

24

25

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006225**

Exhibit 4

8

1              DIRECT EXAMINATION (CONTINUED)

2    BY MR. LEVY:

3         Q    Detective Saldate, continuing from yesterday,

4    I believe that I shared with you immediately before

5    resuming the stand here that I thought perhaps you

6    had not recalled a certain segment of the confession

7    of Debra Milke to you on December 3rd of 1989.  So

8    the question is -- and I had posed the question to

9    you before and you answered relative to something else.

10   The question is this:  Did Debra Milke share with you

11   that she had some disappointment, that she was

12   disappointed that something -- she was disappointed

13   that something had not yet been done?

14        MR. RAY:  Objection, leading.

15        THE COURT:  Overruled.

16        THE WITNESS:  Yes, she did.  She said that she at

17   one time had been playing with her son in bed and that

18   her son Chris had told her that he missed his father and

19   she said that she was disappointed because Jim and Roger

20   had not done it yet, and that is kill Chris.  I asked

21   her if she was angry at Jim and Roger for not doing it.

22   She said she wasn't angry, she was just disappointed

23   because the longer it took, the more influence Mark

24   Milke could have on the child Chris.

25   BY MR. LEVY:

MILKE_NSB006226

Exhibit 4

9

1       Q     Thank you, Detective Saldate.

2             Now, to be more precisely linking up with

3  where you ended last night, you did mention something

4  about she prayed to God about something.  Could you

5  go from there?

6       A     After she received a call from Jim Styers,

7  as I was saying yesterday, she said that she knew

8  it had been done, the killing had taken place.  She

9  said that she prayed to God and that she was hoping

10 God would not allow her to have any more children.

11      Q     Did she tell you at that point some feelings

12 that she had about herself and others?

13      A     She asked me how I felt, if I understood her.

14 And I told her I understood what she was telling me.

15 I didn't understand the end result, but understood

16 what she was telling me.

17      Q     Did she express any concerns relative to

18 her family and the understanding?

19      A     She told me --

20      MR. RAY:  Objection, irrelevance, Your Honor.

21      THE COURT:  I'm sorry, Mr. Levy.  Could you

22 repeat the question?

23      MR. LEVY:  Yes.

24 BY MR. LEVY:

25      Q     The question was:  Did she express to you any

**MILKE_NSB006227**

Exhibit 4

10

1   concern about her family's understanding?

2       THE COURT:  Overruled.

3       THE WITNESS:  I'm sorry.

4           She told me that she thought her family

5   would disown her.  And I explained to her that they

6   probably wouldn't understand, but they probably would

7   not disown her since a family is a family.  I mean,

8   that's still her family, no matter what she did.  She

9   expressly told me that she thought her father would

10  think she was crazy.  And I asked her, you know -- she

11  said that he would think she's crazy.  Then I again

12  did respond,  inasmuch  as she said that, asked me

13  whether anyone else was going to think that she was

14  crazy, so I asked her if she thought she was.

15      Q    Did she make a specific response that you quoted?

16      A    Yes, she did.

17      Q    Would it refresh your recollection to refer to

18  the top of page 5 as to what that quote was, to be

19  accurate?

20      A    Yes, it would.

21      Q    Would you, please?

22      A    She told me after I asked her if she was, she

23  told me, "No, I'm just an emotionally troubled 25-year-old

24  girl who needs help dealing with her problems", end of

25  quote.

MILKE_NSB006228

Exhibit 4

1    Q    Did she express to you, relative to her telling

2  you all of these things, something about actually

3  telling you these things, something about bottled up?

4    A    She said that since she married Mark, up until

5  now, meaning the time that we were talking, she had

6  never discussed her problems, had a very hard time

7  dealing with her problems and discussing them.

8         Is that in response to your answer (sic)?

9    Q    Could you refresh your recollection at the

10  top of the page?

11    A    Certainly.

12    Q    I'm looking at the last two words that appear

13  as the operative words.

14    A    I thought I mentioned it.  "Until now".

15    Q    Did she ask you about your view of her telling

16  you these things?

17    A    I never asked -- or Debra asked me how I felt

18  about it.  I told her that I understood what she was

19  telling me, I can understand that we are having a

20  conversation and I understood everything she told me.

21  I couldn't understand the end result, the killing of Chris,

22  because I explained to her it was my position that I

23  thought she had other alternatives.  I told her that

24  if she didn't want Chris, she could have given him to

25  his grandparents, to her sister, to someone that would

MILKE_NSB006229

Exhibit 4

12

1   want a child.  And she then said that was probably right,

2   and then made a statement that I thought was rather

3   important.  I put it in quotes and I would rather refer

4   to that, if I could.

5       Q    Please.

6       A    After I told her that someone else in her

7   family may have wanted Chris, she told me, in quotes,

8   as I put down in my report, "I guess I just made a

9   bad judgment call", end of quote.

10      Q    Did she give you some responses about what

11  she thought might likely occur to her, despite what

12  she told you she had done in this confession?

13      A    We discussed that.  She was concerned about

14  what was going to happen to her.  I told her it was a

15  very serious crime.  She brought up the fact that could

16  she possibly be let go tonight, show up for a court

17  date later.  I said I didn't believe she could, she

18  would be arrested and go to jail.  Could she possibly

19  get probation.  I told her probably not.  She made

20  mention about if it was a possibility she would get

21  probation for life, made mention about the fact that if

22  the Court could possibly rule that she could have her

23  tubes tied and never have children again.  Again, I

24  told her I didn't think it was possible, but that she

25  was going to go to jail.

**MILKE_NSB006230**

Exhibit 4

13

1     Q   Were her expressions of concern about herself

2  and getting back to her job?

3     MR. RAY:  Objection, calls for speculation.

4     THE COURT:  Overruled.

5     THE WITNESS:  She showed some concern about her

6  job, and that was mainly why she wanted to know whether

7  she could get out the next day.  She said she really

8  enjoyed her job.  She said that's the only thing that

9  was apparently gratifying to her.  She said she had

10  moved up to -- she started as a clerk and moved up

11  some up the line or got a promotion, and really loved

12  her job.  She didn't want to lose the job.  She thought

13  that maybe she would be let out and she could go to

14  work the next day.

15     Q   Did she express any concerns about the fate

16  of her son Christopher?

17     A   Not to me.

18     Q   Did she express concerns about worrying about

19  some other individual besides herself?

20     A   She worried about Jim.  She told me that --

21  in fact, I think I quoted it -- that she was worried

22  about Jim and --

23     Q   Did you ask her why?

24     A   Yes.

25     Q   And did she give any response?

**MILKE_NSB006231**

Exhibit 4

14

1    A    Yes, she did.

2    Q    Did you quote that response?

3    A    Yes.

4    Q    Would you refresh your recollection?

5    A    The first quotation, as I mentioned earlier,

6  "I worry about Jim", end of quote.  I asked her why,

7  and she continued and said, quote, "Well, you know,

8  because he had to be the one to do it", end of quote.

9    Q    By this time was the interview now complete

10  and concluded at the Pinal County Sheriff's Office?

11    A    Yes.

12    Q    Was she then transported back to the Phoenix

13  Police Department?

14    A    Yes, she was.

15    Q    In what kind of vehicle?

16    A    It was a uniformed Pinal County Sheriff's

17  vehicle with a screen and glass enclosure, safety

18  glass between the back seat and the front seat.

19    Q    Was she handcuffed?

20    A    No, she was not.

21    Q    Was she able to get out?

22    A    No.  Nor was I.

23    Q    And was there something about how you can't

24  get out of the back of a police car?

25    A    Police cars, they are not equipped with door

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006232**

Exhibit 4

1    handles on the inside.  Therefore, if anyone needs

2    to get out of the back seat, someone has to allow

3    them out through the outside.

4        Q    Is there any particular reason you didn't

5    handcuff her after the conclusion of the interview

6    and ride back to Phoenix?

7        A    The reason that you handcuff a person is

8    if that person is a danger to yourself, as a police

9    officer.  And it was obvious she was not a danger to me.

10       Q    Did you have any conversations on the way

11   back?

12       A    We did.

13       Q    Did she express any concerns about the fate

14   of her son Chris during the entire ride back?

15       A    No, she did not.

16       Q    Did she express concerns about her own fate?

17       A    She did.

18       Q    Generally, what?

19       A    We spoke about the fact about getting out,

20   probation, we spoke about the fact of her family, we

21   spoke about the fact about her dad, and she asked me

22   several things about what would happen as far as, you

23   know, her incarceration.

24       Q    Did she ask you to do anything for her?

25       A    She did.

16

1    Q    What was that?

2    A    Again, she was concerned about her dad

3    apparently disowning her and she asked me if I could

4    call her father and explain to him why she had done

5    it and ask him if he could possibly bail her out so

6    she could go to work, and also get her an attorney.

7    Q    Did you call her father later?

8    A    Later on after we got to the main police

9    station at 620 West Washington in Phoenix, she asked

10   me again and I did.

11   Q    After you got to the main police station,

12   did there come a time when the two of you were required

13   to be parted?

14   A    Yes.

15   Q    And explain what occurred.

16   A    I explained to her that she would have to

17   now go to jail, that a uniformed officer was going to

18   take her to jail and that she would now be handcuffed

19   and now be transported to the main jail.  She asked me

20   if I could go with her and was I going to go with her.

21   I told her no.  I told her that she was an adult, she

22   had made an adult decision, and now she has to deal with

23   that decision on her own.

24   Q    Now, with regard to her telling you all these

25   things, did she make some conclusory remarks that you

MILKE_NSB006234

Exhibit 4

1   noted with regard to the feelings she had about having

2   now confessed to all of these things to you, having

3   actually confessed her involvment in the murder of her

4   child?

5       MR. RAY:  Objection, irrelevant.

6       THE COURT:  Sustained.

7   BY MR. LEVY:

8       Q    Did she make -- did she tell you how she

9   felt about having confessed to you?

10      MR. RAY:  Objection, leading and irrelevant.

11      THE COURT:  Overruled.

12      THE WITNESS:  Yes, she did.  She told me that she

13  was starting to feel better and was starting to get

14  some of her self-esteem back.

15      MR. LEVY:  One moment, Your Honor.

16          That's all the questions I have, Your Honor.

17  Thank you.

18      THE COURT:  Cross-examination.

19      MR. RAY:  Thank you, Your Honor.

20

21                  CROSS-EXAMINATION

22  BY MR. RAY:

23      Q    Detective Saldate, or Constable Saldate --

24      A    Yes, sir.

25      Q    -- you spent approximately 21 or 22 years as an

MILKE_NSB006235

Exhibit 4

18

1    officer of the Phoenix Police Department, correct?

2        A    That is correct.

3        Q    You testified yesterday that you retired on

4    July 10, 1990, correct?

5        A    That's correct.

6        Q    And you then took up a constable position

7    commencing on July 11, 1990, is that correct?

8        A    That is correct.

9        Q    That occurred as a result of a vacancy

10   created by the then Central Phoenix Justice Court Justice

11   of the Peace, Pat Lamson, her retirement, is that right?

12       A    As I understand, yes.

13       Q    She retired in May and the then-constable took

14   the position of Justice Lamson?

15       A    That's correct.

16       Q    And then for the period of time from May until

17   July 11th there was no Central Phoenix Justice Court

18   constable in effect, isn't that right?

19       A    I don't know that.

20       Q    You were aware -- is it your testimony you

21   became  aware of the opening on or about July 11th?

22       A    No.

23       Q    You were aware of it before then?

24       A    That's correct.

25       Q    And you were appointed in June?

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006236**

Exhibit 4

19

1     A     I was never appointed in June.  I was appointed

2     on July 11th.

3     Q     But the Board of Supervisors did approve and

4     appoint you on June 18th?

5     A     They appointed me effective for July 11th, yes.

6     Q     They did that, though on June 18th, isn't

7     that right?

8     A     I believe so.

9     Q     And the reason that it could not be effective

10    immediately is because you were still on the Police

11    Department?

12    A     Correct.

13    Q     And you could not leave the Police Department

14    at that point in time because you were waiting for a

15    certain date to occur in June -- in July, rather, isn't

16    that right?

17    A     That's correct.

18    Q     The date that you were waiting for was approximately

19    July 10th because that would have boosted your retirement

20    pay, is that correct?

21    A     Definitely, yes.

22    Q     Now, you then ran for the position of Central

23    Phoenix Justice Court Constable?

24    A     Yes, I did.

25    Q     And that election occurred just the other day,

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006237**

Exhibit 4

20

1    this week?

2         A    Tuesday.

3         Q    Tuesday.  And in order to be able to run for

4    that position, it was necessary that you submit the

5    necessary forms and materials to the Department of

6    Elections, isn't that right?

7         A    That's correct.

8         Q    And you did that?

9         A    Yes, I did.

10        Q    Those included a financial affidavit or

11   declaration?

12        A    That's correct.

13        Q    Signed and sworn under oath --

14        A    That's correct.

15        Q    -- to be true?

16        A    Yes.

17        Q    All right.  On that financial form was indicated

18   you were required to indicate yourself and the members

19   of your household at your address, isn't that right?

20        A    That's correct.

21        Q    And did you?

22        A    Yes.

23        Q    You listed your son?

24        A    Yes.

25        Q    Did you list your daughters?

MILKE_NSB006238

Exhibit 4

21

1      A     No.  I may have listed one.  I'm not sure.

2      Q     Do you have daughters that live at your

3  household?

4      A     They are 20 and 22 years old.  They at times

5  live there, yes.

6      Q     Are they members of your household?

7      A     They are on their own.  They do have a key

8  to my house, yes.

9      Q     They, of course, signed your nominating

10  petition and listed your address as their home address,

11  isn't that right?

12      A     I believe they are registered Democrats at

13  my address, yes.

14      Q     Yet you did not list them as members of your

15  household?

16      A     I don't believe so.  I may have not.  Again,

17  they are adults.  They are employed.  They are on their

18  own.  My eldest daughter has an apartment, but also

19  has a key to my front door and she is always welcome.

20      Q     You indicated in yesterday's testimony that

21  in connection with your experience as an officer in

22  conducting interrogations that you have no training or

23  experience.  That is -- strike that -- no specific

24  training.

25      A     Correct.

SUPERIOR COURT

PHOENIX ARIZONA

22

1    Q    No specific seminars, is that correct?

2    A    No specific seminars for that specific training,

3    no.

4    Q    Would you concede that the Phoenix Police

5    Department periodically puts out guidelines in connection

6    with interrogations and interviews?

7    A    The Phoenix Police Department, of course.

8    The law department also keeps up with information.  They

9    do put out some information.  They do make it available

10   to all officers, of course.

11   Q    And in your testimony yesterday you stated

12   that there are guidelines and laws to follow in

13   connection with interrogations and interviews, is

14   that correct?

15   A    There are some.

16   Q    Is that correct, sir.

17   A    Yes.

18   Q    But you have indicated that those guidelines

19   and laws did not require tape-recording.

20   A    That's correct.

21   Q    And that they do not require a third person

22   as a monitor when a male officer interrogates a female

23   subject?

24   A    That is correct.

25   Q    And you can state that unequivocally in connection

MILKE_NSB006240

Exhibit 4

23

1   with any law enforcement guidelines, specifically those

2   of the Phoenix Police Department?

3       A    I can state that with the Phoenix Police

4   Department.  I can state that based on my experience.

5       Q    Okay.  You were on the Police Department

6   before 1966.  When did you start, 1960-what?

7       A    1969.

8       Q    '69.  All right.  Did you have any law

9   enforcement experience prior to joining the Phoenix

10  Police Department?

11      A    I did not.

12      Q    Did you attend college?

13      A    I have attended some college, yes.

14      Q    Did you take justice courses before becoming --

15      A    No.

16      Q    Did not.

17           During your training at the police academy you

18  were told about the decision of Miranda, were you not?

19      A    Yes.

20      Q    And throughout your career you have carried

21  a little card that says the rights under Miranda?

22      A    For the most part, yes.

23      Q    And yesterday you testified in the sense of

24  reading what those rights are, is that correct?

25      A    That's correct.

SUPERIOR COURT

PHOENIX ARIZONA

**MILKE_NSB006241**

Exhibit 4

24

1      Q   And you knew the Miranda decision was law,

2  did you not?

3      A   That's correct.

4      Q   Have the guidelines that have been put out by

5  the Phoenix Police Department over the years ever

6  addressed the subject of Miranda or the reading of

7  rights or the interrogation of subjects?

8      A   There is a lot of written handouts that have

9  been established by the Phoenix Police Department and

10  I'm sure they have approached that, the Mirandas, more

11  than once.  I can't specifically tell you when.

12     Q   Yesterday you indicated that your method

13  of interrogation or interview -- you hesitate to call

14  it a technique.

15     A   That's correct.

16     Q   Because you characterize your approach as

17  being straightforward and honest?

18     A   Yes.

19     Q   And you indicated that you have an obligation

20  not only to the individual that you are addressing in

21  a particular interview or interrogation, but you also

22  have an obligation to the Police Department and their

23  policies and guidelines as well as the law that applies

24  to such a situation.  Didn't you so state yesterday?

25     A   Yes.

**MILKE_NSB006242**

Exhibit 4

25

1      Q    In connection with your suggestion that there

2    is no requirement for a third person monitor when you

3    are conducting an interview of a female individual,

4    have you ever heard of occasions where -- in your

5    experiences whatsoever -- where a female witness has

6    sued an officer for misconduct in connection with either

7    sexual or ripping of clothing, things of that nature?

8      A    Sure.

9      Q    And you have known that for as many years

10   as you have been a detective, isn't that right, and

11   officer?

12     A    Certainly.

13     Q    So there is at least a good reason for having

14   that monitor there, isn't that right?

t1s2  15     A    That is correct.

16     Q    To protect the officer and Police Department

17   from such accusations?

18     A    That is incorrect.

19     Q    Isn't it true that in your interrogation

20   technique or method, however you wish to call it, you

21   know that it's best to take control and charge of the

22   situation on your own terms before you conduct an

23   interview?

24     A    It's better that way, but not necessarily

25   always available.

SUPERIOR COURT

PHOENIX ARIZONA

MILKE_NSB006243

Exhibit 4

26

1     Q   Doesn't your training and experience tell you

2  that it is better to conduct an interview in places

3  where you are comfortable as the interrogator as

4  opposed to where the individual is comfortable?

5     A   That's correct.

6     Q   So, if possible, when you are conducting

7  interviews, those interviews or interrogations should

8  take place at a -- within a space that is selected by

9  the interrogator?

10     A   When that's possible.

11     Q   All right.  For example, if you were at 620

12  West Washington, you would be very comfortable there,

13  wouldn't you, sir?

14     A   That's my place of employment.

15     Q   In a police car, you would feel very

16  comfortable there?

17     A   In the front seat, yes.

18     Q   In a jail, would you feel very comfortable

19  there?

20     A   Not particularly.

21     Q   At least it is a location of which you know

22  that you can walk out, isn't that right?

23     A   Under those circumstances, yes.

24     Q   And where there are other officers there to

25  assist you should it become necessary, isn't that right?

MILKE_NSB006244

Exhibit 4

27

```
1      A     During the interviews?

2      Q     Isn't that right, sir?

3      A     No, that's not right.

4      Q     Isn't it true that the individual to be

5   interrogated should be placed in the least comfortable

6   position?

7      A     No.  Not as far as I'm concerned.

8      Q     They should not be interrogated on familiar --

9   in a familiar location such as their home?

10     A     Oh, correct.

11     Q     Or their own car?

12     A     Correct.

13     Q     And there is a reason for that, isn't there?

14     A     Yes.

15     Q     Would you agree, in connection with the reason,

16  with the following statement:  To be alone with the

17  subject is essential to prevent distraction and to

18  deprive him of any outside support.

19     A     I would agree with some of that, yes.

20     Q     Would you agree with the following statement:

21  The aura of confidence in his guilt undermines his

22  will to resist and merely confirms the preconceived

23  story the police seek to have him describe.

24     MR. LEVY:  Your Honor, before Detective Saldate

25  answers, since Mr. Ray seems to be reading from some book
```

SUPERIOR COURT

PHOENIX ARIZONA

MILKE_NSB006245

Exhibit 4

28

1   he has highlighted, I wonder if he could share what

2   it is he reading from for Detective Saldate's review

3   before responding.

4      MR. RAY:  I'm only reading a statement and asking

5   if he agrees or disagrees with it.

6      THE COURT:  For what purpose, Mr. Ray?

7      MR. RAY:  In connection with his methods of

8   interrogation and the basis by which he employs those

9   methods as he has so testified.

10      THE COURT:  Are you reading from some prepared

11   treatise?

12      MR. RAY:  I'm reading a statement.

13      THE COURT:  From a treatise or statement?

14      MR. RAY:  A case.

15      THE COURT:  Would you share it with me, please?

16        I'd ask that you share this book first with

17   Mr. Levy and then with the witness.

18      MR. LEVY:  Thank you, Your Honor.

19      MR. RAY:  Did you say also with the witness?

20      THE WITNESS:  Thank you.

21      MR. RAY:  May I proceed, Your Honor?

22      THE COURT:  You may.

23      MR. LEVY:  Before he does, may I ask one voir dire

24   question?

25      THE COURT:  You may.

MILKE_NSB006246

Exhibit 4

1                         VOIR DIRE EXAMINATION

2       BY MR. LEVY:

3           Q    Detective Saldate, did you note in reading

4       that footnote 23 which was the referenced and highlighted

5       part which was read to you, did you note the footnote?

6           A    No, I did not.

7           MR. LEVY:  Could I ask if he could be allowed to

8       note the footnote?

9           MR. RAY:  Shall I read it, Your Honor?

10          THE COURT:  No.  Show it to the witness, please.

11          THE WITNESS:  No. 23, you said?

12          MR. LEVY:  Yes.

13          THE WITNESS:  I have read it.

14          THE COURT:  You may continue, Mr. Ray.

15

16                     CROSS-EXAMINATION (CONTINUED)

17      BY MR. RAY:

18          Q    Detective, or Constable, did you have an

19      opportunity to read the highlighted portion that I

20      have read a portion of thus far?

21          A    Just briefly.

22          Q    All right.  I would ask you again if you agree

23      or disagree with this statement:  To be alone with the

24      subject is essential to prevent distraction and to deprive

25      him of any outside support.  The aura of confidence in his

MILKE_NSB006247

Exhibit 4

30

1   guilt undermines his will to resist.  He merely confirms

2   the preconceived story the police seek to have him

3   describe.  Patience and persistence, at times relentless

4   questioning are implied.  To obtain a confession the

5   interrogator must patiently maneuver himself or his

6   query into a position from which the desired objective

7   may be obtained -- attained, rather.

8          Do you agree with that, sir?

9      MR. LEVY:  I would object to the question as being

10  a statement, not a question, as being conclusory on

11  someone else's observations, and also the form of the

12  question is highly prejudicial in that it suggests

13  certain conclusions of this person-author about a

14  suspect, such and such an aura or location, that necessarily

15  such and such will follow.  It's also compound, has

16  many parts to it, and it is, I think, irrelevant as well.

17  And then it appears to call for his opinion as some

18  kind of expert opinion and as though to tie him into

19  somebody else that he is trying to insert into this trial

20  by asking such a question.  I just think generally it's

21  improper.

22      THE COURT:  The objection is sustained.

23          Mr. Ray, you were treating Mr. Saldate as an

24  expert witness.  He is not here as an expert witness, he

25  is here as a fact witness.

MILKE_NSB006248

Exhibit 4

31

1   BY MR. RAY:

2       Q    Detective, you have indicated that your

3   function is to get the truth.

4       A    Yes.

5       Q    And in order to establish the truth, you

6   must have facts?

7       A    At some time, yes.

8       Q    You cannot say something is true if all you

9   have is a guess or supposition, can you?

10      A    No.

11      Q    On December 3rd, 1989, you testified that

12  after speaking with Roger Scott at 620 West Washington

13  you proceeded to a location at 99th and Happy Valley

14  Road.

15      A    That's correct.

16      Q    Or Jomax, I believe you said.

17      A    Jomax, yes.

18      Q    And Jomax and Happy Valley Road are located one

19  north of the other, isn't that correct?

20      A    That's correct.

21      Q    While you were en route to that location, Roger

22  Scott was handcuffed, wasn't he?

23      A    I don't recall.

24      Q    Was he in your vehicle as you proceeded to that

25  location?

**MILKE_NSB006249**

Exhibit 4

32

1     A     He was.

2     Q     Was anyone else in the vehicle besides yourself

3  and Roger Scott?

4     A     Bob Mills, Detective Mills.

5     Q     Did you drive or ride?

6     A     I was riding.

7     Q     Did you ride in the front seat or back seat?

8     A     Front seat.

9     Q     And the individual, Roger Scott, was in the

10  back seat?

11     A     That is correct.

12     Q     Isn't it true that it's accepted standard and

13  procedure when transporting a subject to transport

14  them in handcuffs?

15     A     At times, yes.

16     Q     In your initial interview with Roger Scott, it

17  was not recorded?

18     A     No.

19     Q     You were at 620 West Washington before going

20  to 99th and Happy Valley Road?

21     A     That is correct.

22     Q     Subsequently his statement was recorded?

23     A     That is correct.

24     Q     Jim Styers had an interview, did he not, with a

25  detective?

**MILKE_NSB006250**

Exhibit 4

33

1    A    Yes.

2    Q    And that interview was recorded, was it not?

3    A    I believe so.

4    Q    Debra Milke's interview was not recorded,

5    was it?

6    A    No, it was not.

7    Q    You have testified that a tape recorder is

8    an obstacle to getting the truth.  Is that what you

9    testified to yesterday?

10    A    No.

11    Q    You testified yesterday that you are there to

12    obtain an interview and look for the truth as that person

13    sees it?

14    A    That's correct.

15    Q    You testified that a tape recorder prevents a

16    person from being comfortable?

17    A    Most times, yes.

18    Q    Isn't it true, as you have testified to today,

19    that it is to your advantage as the interviewer or the

20    interrogator to have that person uncomfortable, in your

21    surroundings that they are not familiar with?  Is that

22    what you testified to, sir?

23    A    I testified at times, yes.

24    Q    You indicated that if the tape recorder is there,

25    it prevents the individual from being comfortable and,

MILKE_NSB006251

Exhibit 4

34

1    therefore, you will not get a good interview.   Is that

2    your testimony?

3       A    Yes.

4       Q    It also precludes anyone from hearing the

5    exact content of that interview, isn't that true?

6       A    Correct.

7       Q    And it is your practice as a detective during

8    the years that you were a detective not to utilize

9    a tape recorder?

10      A    That is correct.

11      Q    You would take copious notes --

12      A    That's correct.

13      Q    -- of the interview?

14      A    That's correct.

15      Q    And then reduce them to some form of narrative

16   supplemental report?

17      A    That is correct.

18      Q    You would not, in preparing your report,

19   transcribe your notes verbatim into the report?

20      A    No.

21      Q    So, in other words, what the report -- what

22   we get in the report is not a duplicate copy of your notes?

23      A    Unless where it's quoted.

24      Q    All right.   Only those quotes that you select

25   as the writer of the supplement, isn't that right?

MILKE_NSB006252

Exhibit 4

35

1    A    That is correct.

2    Q    And those notes that are prepared are

3 destroyed upon the conclusion of the preparation of

4 the typewritten narrative report?

5    A    That is correct.

6    Q    And then, in your years of experience, you

7 have never produced those notes, have you?

8    A    I have not.

9    Q    During the course of your testimony on direct

10 examination you have related any number of facts and

11 statements of Debra Milke which were not contained in

12 quotes in your report, is that correct?

13    A    I don't understand that question.

14    Q    You have related over the course of several

15 hours on direct examination what it is that Debra Milke

16 said, whether it be specifically in quoted form or in

17 paraphrased form, as you recall it.

18    A    That is correct.

19    Q    Nontheless, you are reciting to this Court

20 her statements, is that right?

21    A    You are absolutely right.

22    Q    And were those statements on your notes?

23    A    Those were noted on my notes, yes.

24    Q    But they were not reduced into your report?  Only

25 selected portions of your notes were quoted in your report,

**MILKE_NSB006253**

Exhibit 4

36

1    isn't that right?

2        A    I believe I answered that's correct.

3        Q    You testified yesterday that if a person is

4    neither in custody nor under arrest, rights are not

5    required.

6        A    That's correct.

7        Q    Who told you that?

8        A    It is my understanding.

9        Q    And where did you get that understanding, sir?

10        A    Through written forms from the Phoenix Police

11    Department that I was given and read.

12        Q    Part of the guidelines and policy manual?

13        A    I don't know where you ever got policy manual

14    and guidelines.  We just have items of -- written items

15    that are supplied by the Phoenix Police Department.

16        Q    Memoranda?

17        A    If you wish.

18        Q    Where I got guidelines, sir, was when you

19    testified yesterday that there are guidelines and laws

20    to follow in connection with interrogations.

21        A    That's true, but not necessarily with the

22    Phoenix Police Department.

23        Q    Could be other reliable agencies such as the FBI?

24        A    I'm not saying the FBI is not reliable.  All

25    I'm saying is their guidelines, I'm sure, are different

**MILKE_NSB006254**

Exhibit 4

37

1   than ours.

2        Q    You do, therefore, admit you did have guidelines?

3        A    We have no specific guidelines that I know

4   of, Mr. Ray, which specifically go into interrogations,

5   interviews, regarding detectives and murder suspects.

6        Q    Some statement was generated at some point

7   in time which you read which indicated if the individual

8   is in -- neither in custody nor arrest, you do not have

9   to read them the rights.

10       A    That's correct.

11       Q    All right.  Likewise, did you receive a similar

12  memorandum, whether on the same day or otherwise, indicating

13  that if the individual is in custody or under arrest the

14  officer must advise them of their rights?

15       A    I can't tell you whether they are the same day

16  or not, Mr. Ray.  I have been receiving -- I think they

17  call them bulletins or written material by our law

18  staff, by the County Attorney, for the past 21 years.

19       Q    Was that your testimony yesterday, sir, that

20  if the individual is in custody or under arrest, the

21  officer must advise them of their rights?

22       A    Yes.

23       Q    And the rights that you are talking about are

24  the Miranda rights?

25       A    That is correct.

MILKE_NSB006255

Exhibit 4

38

1    Q     Under the Miranda decision?

2    A     As I understand it, yes.

3    Q     You testified yesterday that among those

4    rights are the right to remain silent, the right to

5    counsel.

6    A     That is correct.

7    Q     And you testified yesterday that there is

8    an obligation as an officer to follow that mandate as

9    well as the mandate of the law, is that correct?

10   A     That's correct.

11   Q     You have not always done that, though, have you?

12   A     I have always done that.

13   Q     When an individual is being interrogated by

14   you and he says, "I want to remain silent", what are

15   you going to do?

16   A     I'm going to duly note it if he wishes to remain

17   that way while in the interview.

18   Q     From your understanding of the policies and

19   law with respect to Miranda, isn't it your understanding,

20   sir, that the interview will cease --

21   A     No.

22   Q     -- immediately?

23   A     No.

24   Q     Is it some policy or some type of policy or

25   memoranda that you have read that says that it's all right

**MILKE_NSB006256**

Exhibit 4

39

1    to go ahead and speak to an individual even when they

2    have said, "I wish to remain silent", or words to that

3    effect?

4        A    No.

5        Q    Is it your understanding that if an individual

6    who is being interrogated by you says that he would

7    like to speak to an attorney before answering any

8    questions, or words to that effect, is it your under-

9    standing that you cease questioning?

10       A    No.

11       Q    In the past, people that you have interviewed

12   have requested counsel and requested to remain silent

13   and you have continued to interrogate and state your

14   position on things?

15       A    I have duly noted it and continued my interview,

16   yes.

17       Q    When did that -- that happened on December 22

18   of 19-- strike that -- December 19th, 1987 as approximately

19   3:40 in the afternoon, isn't that right?

20       MR. LEVY:   I would object on relevancy to this case.

21       THE COURT:   Sustained.

22   BY MR. RAY:

23       Q    You indicated that if they invoke their rights

24   you will note it in the report?

25       A    Yes, I will.

**MILKE_NSB006257**

Exhibit 4

40

1    Q    What is the purpose of noting it in the report?

2    A    That's what they said.  I want to make sure

3    that's in the report.

4    Q    But it doesn't mean you will stop the

5    interrogation, correct?

6    A    I'm there to communicate with that person and

7    I will continue to communicate if they wish.

8    Q    But if they have told you they want an attorney

9    or want to remain silent, aren't they communicating to

10   you, sir, they don't care to speak with you any further?

11   A    They may not understand fully my objectives.

12   They may not understand fully my reasons for being there.

13   That's why I continue to explain that situation.

14   Q    Are you suggesting that they may not have

15   fully understood their right to remain silent and their

16   right to invoke those rights?

17   A    Possibly.

18   Q    How is it, then, you can determine to any degree

19   of certainty when an individual does or does not under-

20   stand their rights?

21   A    The only method I have is when that person tells

22   me whether they have or whether they do not understand

23   the rights.

24   Q    You testified yesterday that it doesn't mean

25   that you will stop explaining why you are there --

41

1  A  That's correct.

2  Q  -- after they have invoked all these rights.

3  A  That's correct.

4  Q  Isn't it true, sir, that your motivation under

5 those circumstances is to try to get them to continue

6 to talk?

7  A  My motivation is to get the truth, sir.

8  Q  And in order to get the truth, you need them

9 to continue to talk, isn't that right?

10  A  In order for me to get the truth as far as they

11 are concerned, from their standpoint, is for them to tell

12 me, yes.  That's correct.

13  Q  So your motivation is to get them to continue

14 to talk so that you can determine what is or is not the

15 truth?

16  A  I do not determine what is or what is not the

17 truth.  They tell me.  And if they say it's the truth,

18 then obviously it's the truth from their standpoint.

19  Q  You have testified that your function is to

20 get the truth.

21  A  That's correct.

22  Q  How, sir, do you ever know you are going to get

23 the truth?  When do you decide  when to quit interrogating?

24  A  When they wish and when they tell me that is

25 the truth and that that's all that happened, then that is

**MILKE_NSB006259**

Exhibit 4

42

1   their position and that is the truth as far as they

2   are concerned.  I'm not a judge of their truth.  Now,

3   I can judge them, their truth, by facts that I may

4   later develop.  But the fact of the matter is, what

5   Debra tells me, if she says it was the truth, then I

6   believe her.

7        Q    You can determine whether an individual is

8   telling the truth if you have some facts that you

9   know to be unequivocally true before you interrogate

10  an individual, is that right?

11       A    To some degree, yes.

12       Q    All right.  And in other circumstances where

13  you have no physical facts, you have to make a judgment

14  call based upon experience and basically assumptions on

15  your part as to whether or not the individual is telling

16  the truth?

17       A    It's not a judgment call.  It's the fact that

18  I wasn't there, they were.  They know what happened,

19  I don't.  So if they tell me, then I have to believe

20  what they tell me unless I can prove it otherwise.

21       Q    Please assume for a minute, sir, you are about

22  to interrogate me.  You have no physical facts to suggest

23  that I have done anything wrong, but you are, nonetheless,

24  going to question me and I'm going to respond to your

25  questions.  When are you going to know, sir, whether what

**MILKE_NSB006260**

Exhibit 4

43

1    I have told you is the truth or not?

2        A    First of all, I'm not going to interview you

3    just because you come to me and want to talk somebody.

4    So, first of all, I'm not -- I'm going to either have

5    facts or going to have someone else's word or some

6    other statement, something putting you within that

7    crime before I talk to you.   I'm not just going to

8    pick you off the sidewalk and decide I'm going to

9    interview you.   That's not my job.

t2s1  10        Q    Sir, humor me, please.   My hypothetical to you

11   was:   Assume that you are going to interrogate me and

12   you have no physical facts to suggest that I have done

13   anything wrong, but, nonetheless, you are going to

14   speak to me.   When will you know that I have spoken

15   the truth?   The question is when.

16       A    This isn't a police state.   I'm not going to

17   just talk to you, Mr. Ray.   I can't -- under those

18   conditions I can't give you an answer.

19       Q    You testified yesterday that you have an obligation

20   to explain why the individual is taken into custody.   In

21   that context we were talking about after the individual

22   has invoked a right under Miranda.   You say that after

23   they have said that you have an obligation to explain to

24   them why they are being taken into handcuffs.

25       A    That's correct.

MILKE_NSB006261

Exhibit 4

44

1     Q    Is that an effort to get that individual to

2   speak more?

3     A    To be honest with you, Mr. Ray, that's an

4   effort on my part to make sure that I sleep good at

5   night because I want to make sure that person understands

6   why I'm there and why she is going to go to jail.

7     Q    Immediately after that you testified that you

8   must give the individual an opportunity to tell the

9   truth, not say, "Oops, King's X".  Do you recall making

10  that statement?

11    A    Yes, I do.

12    Q    And in connection, again, with the same

13  situation of where the individual invoked their rights,

14  you continue talking?

15    A    That's correct.

16    Q    After you read an individual their rights, aren't

17  you giving them that opportunity to talk?

18    A    Somewhat, yes.

19    Q    And if they invoke the right, aren't they

20  declining that opportunity?

21    A    They may at times.

22    Q    And then your continued conversation is to get

23  them to withdraw that exercise of their right, isn't that

24  correct?

25    A    My continued conversation is to get to the truth.

SUPERIOR COURT

PHOENIX ARIZONA

**MILKE_NSB006262**

Exhibit 4

45

1    I'm not a judge nor a lawyer.

2        Q    As a police officer, would you agree that it

3    is your function to attempt, as best you can, to remove

4    criminals from society?

5        A    That's what they pay me for, yes, or did pay

6    me for.

7        Q    And in order to accomplish that, you know as

8    an experienced police officer you yourself must obey

9    the law --

10       A    Absolutely.

11       Q    -- to carry that out.  And you know from your

12   experience if you don't obey the law, or others'

13   experience, but nonetheless from the information that

14   you have obtained over 20 years, if you or the officer

15   does not obey the law, that individual may go free?

16       A    Correct.

17       Q    Therefore, it's important for you, as an officer,

18   to obey the law in connection with a suspect?

19       A    Certainly.

20       Q    Calling your attention, sir, to December 2, 1989 --

21   strike that -- that's December 3, 1989.  That was your

22   day off?

23       A    That's correct.

24       Q    It was a Sunday?

25       A    Sunday.

SUPERIOR COURT
PHOENIX ARIZONA

**MILKE_NSB006263**

Exhibit 4

46

1    Q    You testified you received a call at

2    approximately 8:45 calling you into this case?

3    A    That's correct.

4    Q    You were at home?

5    A    That's correct.

6    Q    You were told to respond to 620 West Washington?

7    A    That's correct.

8    Q    You testified that it took probably an hour,

9    maybe 45 minutes to an hour to get there?

10   A    I believe so.

11   Q    Once you arrived at the station, you had a

12   conversation with Detective Ontiveros, your supervisor?

13   A    He is a sergeant.

14   Q    Higher rank than you?

15   A    Correct.

16   Q    And also Detective Mills was there?

17   A    Yes.

18   Q    And the instructions that were given to you of

19   which you proceeded to carry out were a couple of

20   interviews?

21   A    One interview, yes.

22   Q    One interview.  You did know people needed to

23   be interviewed, correct?

24   A    That's correct.

25   Q    You undertook to interview one of them, Detective

**MILKE_NSB006264**

Exhibit 4

47

1   Mills the other?

2       A    That is correct.

3       Q    Approximately what time of day is it now?

4       A    Late morning, early afternoon.

5       Q    You undertook to interview Roger Scott, am

6   I correct?

7       A    No.

8       Q    You undertook to interview Mr. Styers?

9       A    That is correct.

10      Q    Detective Mills undertook to interview Roger

11  Scott?

12      A    That's correct.

13      Q    He recorded his interview, did he not?

14      A    That is incorrect.

15      Q    Incorrect or correct?

16      A    Incorrect.

17      Q    He did not record his interview?

18      A    He did not record his interview.

19      Q    Neither did you?

20      A    Neither did I, yes.

21      Q    Did you take copious notes of your interview

22  with Mr. Styers?

23      A    I took notes, yes.

24      Q    Did you then later reduce those to a report?

25      A    I believe I did.

MILKE_NSB006265

Exhibit 4

1    Q    Did you save the notes?

2    A    I did not.

3    Q    Did Detective Mills -- to your knowledge, did

4    it appear he was taking notes?

5    A    I wouldn't know.  I was not in the room with

6    him.

7    Q    But you later entered the room during the

8    course of his interview with Roger Scott?

9    A    That is correct.

10    Q    Did it appear then he had notes he was taking?

11    A    I'm sure he was, but I didn't notice.

12    Q    Okay.  Have you ever seen any notes of the

13    interview with Detective Mills?

14    A    No, I have not.

15    Q    You then described yesterday the events that

16    led you to Happy Valley and 99th.  You described your

17    route back, and then we get to the point about a helicopter.

18    A    That's correct.

19    Q    And I guess I understand your testimony to be

20    that you had never ridden in a helicopter before?

21    A    Not a police helicopter.

22    Q    Do you know how many helicopters the police have?

23    A    No, I don't.

24    Q    At the time that you were directed to go to

25    Florence, were you aware that there were other officers

49

1    that were already en route?

2         A    I was told there was going to be other officers

3    en route.

4         Q    To your knowledge, had they already left by

5    the time you received that directive?

6         A    Yes.

7         Q    Do you have a recollection as to how far in

8    advance they were to you?

9         A    No.

10        Q    To your knowledge, are helicopters generally

11   used to conduct police activities in surveillance for

12   the City of Phoenix?

13        A    I believe so.

14        Q    Isn't that their primary purpose and function?

15        A    I assume so.   I don't know.

16        Q    And are they generally used to go from one city

17   to another city and thereby be deprived of their use to

18   the City of Phoenix?

19        A    They did on this occasion.   That's all I can

20   testify to.

21        Q    Have you ever driven to Florence?

22        A    Many times.

23        Q    It's about an hour to hour-and-a-half drive,

24   is it not?

25        A    Yes.

SUPERIOR COURT
PHOENIX ARIZONA

MILKE_NSB006267

Exhibit 4

50

1    Q    And in a police car with red lights and sirens

2   that time could be cut down considerably, could it not?

3    A    I don't believe the chief of police would

4   let us do that.

5    Q    Nonetheless, it would be true, based upon

6   your experience, you probably could exceed the speed

7   limit and not worry about being picked up, isn't that

8   right?

9    A    No.

10    Q    To your knowledge -- well, strike that.

11         Did you indicate yesterday that you had

12   received a directive from Detective Ontiveros to go

13   to Florence?

14    A    Detective Sergeant Ontiveros, that's correct.

15    Q    Do you have any knowledge or information to

16   suggest that that directive came from even higher than

17   Sergeant -- Detective Sergeant Ontiveros?

18    A    No.  Could have very easily, though.

19   MR. RAY:  May I have a moment, Your Honor?

20   THE COURT:  You may.

21   BY MR. RAY:

22    Q    Did Sergeant -- Detective Sergeant Ontiveros

23   direct, in connection with his instructions that you

24   go to Florence, direct that you conduct a tape-recorded

25   interview of Debra Milke?

MILKE_NSB006268

Exhibit 4

51

1     A     He requested that I do so.

2     Q     Was it a directive?

3     A     I don't believe so.  May have been.  It may
4  have been.

5     Q     Did you have reason to believe that someone
6  higher than he in terms of rank instructed that interview?

7     A     That's very possible.

8     Q     Do you know for a fact?

9     A     No.

10    Q     You recall our interview on June 26th, 1990?

11    A     I do.

12    Q     Do you recall being asked the following
13  question commencing on page 9, line 24, at least of
14  the copy that I have.

15    MR. RAY:  And, Your Honor, may I present the Court
16  with the Court's copy?

17  BY MR. RAY:

18    Q     "Question:  What supervisor had requested you
19  to record it?"

20          Do you recall your answer?

21    A     I believe I told you Sergeant Ontiveros.

22    Q     "Answer:  Sergeant Ontiveros. and I'm sure it
23  was asked of him by someone else higher than him."

24          Is that correct?

25    A     That's correct.

**MILKE_NSB006269**

Exhibit 4

52

1    Q    Are you indeed sure?

2    A    That was just a conclusion I made.

3    Q    The individual that piloted you to Florence,

4 do you know him?

5    A    I don't know.

6    Q    You don't know his name?

7    A    I'm trying to think back.  I knew one of them,

8 but I don't believe he was the pilot.  He was a co-pilot.

9 He was a black officer.

10    Q    So you had a pilot and co-pilot and you as

11 a passenger?

12    A    In the back, yes.

13    Q    Are you a pilot?

14    A    Definitely not.

15    Q    It was nighttime as you departed 620 West

16 Washington?

17    A    Yes.

18    Q    The lights of the city were around you?

19    A    Yes.

20    Q    And you know from experience that Florence

21 is a somewhat isolated city lying to the south and to

22 the ease of Phoenix?

23    A    My experience was that, yes.

24    Q    They have a prison down there?

25    A    Yes.

**MILKE_NSB006270**

Exhibit 4

53

1    Q    And you have been by that area at night,

2  have you not, in Florence?  You have been to Florence

3  at night, haven't you?

4    A    Beyond this case?

5    Q    Before or after, sir.

6    A    I don't believe so.

7    Q    You indicated that this pilot and co-pilot

8  must have gotten lost.  Did they in fact?

9    A    That's what they were communicating to each

10 other.  If I can kind of describe the situation --

11   Q    Well, did they get lost or did they not, sir?

12   A    From -- it was my assumption they did.

13   Q    Were they going north instead of south?

14   A    I wouldn't know, sir.

15   Q    Did they have difficulty operating the plane,

16 or the aircraft?

17   A    Again, I don't know.

18   Q    Do you know the qualifying required to be a

19 pilot with the City of Phoenix?

20   A    No, I don't.

21   Q    In 20-some-odd years of police experience it's

22 your testimony you had never had occasion to be at the

23 Pinal County Sheriff's Office?

24   A    I don't believe so.

25   Q    You indicated that before leaving 620 West

**MILKE_NSB006271**

Exhibit 4

54

1   Washington after receiving the directive to conduct

2   a tape-recorded interview, you departed without taking

3   a tape recorder.

4       A    That's correct.

5       Q    You told the Court that you didn't have a

6   tape recorder of your own.

7       A    I do not.

8       Q    But knew Detective Mills did?

9       A    He may have one.  I'm not positive.

10      Q    You knew the Phoenix Police Department had

11  tape recorders accessible to you, didn't you?

12      A    Definitely, yes.

13      Q    Did you make any effort to pick up a recorder

14  before leaving?

15      A    No.

16      Q    **Mr.** Levy asked you if, once you had gotten

17  there and it became appropriate to record it, would

18  you have, and I believe your response was.  Is that

19  correct?

20      A    Certainly.

21      Q    And the question was put to you, "Well, how

22  were you going to record it if you didn't have a recorder".

23  Do you recall basically what your answer was?

24      A    I would get one or I would ask for one.

25      Q    So after 20-some-odd years of experience as a

**MILKE_NSB006272**

Exhibit 4

55

1    police officer with no occasion that you can recall of

2    ever being at the Pinal County Sheriff's Office, how

3    did you know, sir, that they would have one?

4         A    Police Departments use them.   Some police

5    officers use them.

6         Q    Some police officers own their own, isn't

7    that right?

8         A    Some may.

9         Q    Did you know before going down there whether

10   or not they had one accessible to you?

11        A    No.

12        Q    Did you call ahead to find out?

13        A    No.

14        Q    No?

15        A    No.

16        Q    You were taken into an area that you described

17   as the medical room in the Pinal County Jail?

18        A    Yes.

19        Q    Had you instructed any other officer who went

20   in advance of you to place Debra Milke in the jail area?

21        A    No.

22        Q    Isn't it true that you were going down to conduct

23   an interview; therefore, you wanted the interview done

24   in an area in a domain that you established?

25        A    I would have liked that, but I never had any

MILKE_NSB006273

Exhibit 4

56

1    contact with anybody down there.

2         Q    You knew that Debra Milke was staying with

3    her father before you headed down there, isn't

4    that right?

5         A    That's correct.

6         Q    She was with her father at her father's house?

7         A    I didn't say that.

8         Q    I understand.  But you believed, based upon

9    the information that had been left with other officers,

10   that she would be found at her father's residence in

11   Florence?

12        A    Yes.

13        Q    Why, sir, did you not just go on down and land

14   the helicopter down by Sam Sadeik's house?

15        A    I don't know anything about air regulations,

16   but I would say that wouldn't be proper from a logical

17   standpoint.  I have no -- nothing to back it up, but I

18   don't think that would be proper.

19        Q    Obviously, sir, you know that I'm suggesting

20   that perhaps it might have been okay to go down to Sam

21   Sadeik's to conduct the interview, isn't that true?

22        A    Oh.  Was that your question?

23        Q    Yes.

24        A    Oh.  I could have done that, yes.

25        Q    But you know as an experienced interrogator that

**MILKE_NSB006274**

Exhibit 4

1    that is less than ideal from an interrogator's stand-

2    point?

3        A    From an interviewer's standpoint, yes.

4        Q    Had Detective Hamrick -- was he one of the

5    officers that went in advance of you to Florence?

6        A    He was there.

7        Q    And he was awaiting your arrival when you

8    got there?

9        A    He was.

10       Q    And he went and escorted or walked with you

11   into the Pinal County Sheriff's Office?

12       A    No.

13       Q    Was he anywhere nearby at the time you approached

14   the medical office?

15       A    He was outside the door in the hallway.

16       Q    And the door was open at that time?

17       A    That's correct.

18       Q    And it's a solid door.  It doesn't have glass

19   in it, does it?

20       A    I can't recall.

21       Q    And two individuals were seated inside this

22   small medical office?

23       A    Two individuals were inside, yes.

24       Q    And Detective Hamrick, did he appear to be

25   speaking to these two individuals?

MILKE_NSB006275

Exhibit 4

58

1     A    No.

2     Q    You indicated yesterday that you heard some

3  chuckling.

4     A    As I approached the door, yes.

5     Q    Do you know who was chuckling?

6     A    No.

7     Q    As you then instructed the person -- well,

8  you tried to find out which one was Debra Milke, isn't

9  that correct?

10     A    Correct.

11     Q    And you were able to identify my client as

12  being one of those two people?

13     A    As being Debra Milke?

14     Q    Yes.

15     A    Yes.

16     Q    And you asked the other person to please step

17  out?

18     A    That's correct.

19     Q    And you directed her to speak with Detective

20  Hamrick, is that right?

21     A    That's correct.

22     Q    And Detective Hamrick and this other woman

23  proceeded to another location within the building, as

24  far as you know?

25     A    I don't know that.

**MILKE_NSB006276**

Exhibit 4

59

1    Q    All right.  Then you entered this room and
2  closed the door behind you?

3    A    That's correct.

4    Q    No other person was in that room with you?

5    A    That is correct.

6    Q    Did you look about the room to see if anyone
7  was there?

8    A    When I first entered, obviously I spanned the
9  room, located two persons.

10   Q    Did you look about the little alcove off to
11 the side?

12   A    You have asked me before.  I don't know of an
13 alcove.

14   Q    And at that time Debra was asking you, "Have
15 you got any news", isn't that right?

16   A    It's absolutely wrong.

17   Q    She said nothing to you?

18   A    Again, that is wrong.

19   Q    You indicate in your report, do you not, that
20 "Approximately 1953 hours I explained to Debra that her
21 son Chris had been found in a desert area and that he
22 had been found shot to death".  Is that what you told her?

23   A    Yes, I did tell her that.

24   Q    Is that specifically verbatim what you told her?

25   A    That's what I told her.

**MILKE_NSB006277**

Exhibit 4

60

1     Q     You didn't put that in quotes?

2     A     No.

3     Q     Is that what you told her?

4     A     I believe that is what I told her.

5     Q     Did you put in your notes specifically what

6     you told her?

7     A     I may have.

8     Q     Did you copy that directly from your notes?

9     A     I may have.

10    Q     You don't know?

11    A     I believe that's what I told her.

12    Q     Your same report indicates that she immediately

13    began to yell, "What, what", then she started to scream

14    and make noises.  Is that right?

15    A     Not quite as dramatic as that, but yes.

16    Q     And you immediately respond that you are not

17    going to tolerate this?

18    A     That's correct.

19    Q     Did you use the words "to tolerate"?

20    A     Yes.

21    Q     Were you forceful in your response?

22    A     No.

23    Q     You indicated yesterday in your testimony that

24    you walked in, introduced yourself, advised you were

25    investigating the disappearance, moved a chair in front

**MILKE_NSB006278**

Exhibit 4

61

1    of her to be close to her, is that right?

2        A    That's correct.

3        Q    And that at that time you had not advised her

4    of anything other than you were investigating the

5    disappearance?

6        A    That is correct.

7        Q    And she appeared calm at that moment?

8        A    That's correct.

9        Q    And then you made the statement that we just

10   read?

11       A    That's correct.

12       Q    Coupled with that you told her she was under

13   arrest for murder?

14       A    Shortly thereafter.

15       MR. RAY:  May I have a moment again, Your Honor?

16       THE COURT:  Yes.

17   BY MR. RAY:

18       Q    You testified yesterday that after advising her

19   that her son had been found in a desert area and had

20   been found shot to death, she immediately began to

21   exclaim, "What, what" in an excited fashion.

22       A    Correct.

23       Q    You utilized the words, in trying to characterize

24   what you observed in her, as moaning and crying.

25       A    Correct.

MILKE_NSB006279

Exhibit 4

62

1     Q     Did you use those words?

2     A     Correct.

3     Q     Did you tell her that you were not going to

4   tolerate her excited state before or after you told her

5   she was under arrest?

6     A     Can I refresh my memory with my report?

7     Q     Please.

8     A     Before.

9     Q     You testified yesterday after telling her you

10   weren't going to tolerate this, she began to quiet down.

11     A     At -- you are missing a little bit in between

12   there, but basically, yes.

13     Q     Well, was it immediately that she stopped this

14   excitement and crying, as you testified to, or did it

15   take some time for her to break off?

16     A     You are asking -- I may have misunderstood the

17   question.

18     Q     I will rephrase it, sir.  You have just walked

19   into a room.  You are a stranger to her, correct?

20     A     Yes.

21     Q     You have never seen this woman before in your

22   life?

23     A     That's correct.

24     Q     You are in a jail environment, are you not?

25     A     For the most part, yes.

**MILKE_NSB006280**

Exhibit 4

63

1    Q    It's obvious to you you are in a jail?

2    A    Yes.

3    Q    And you had never been there before?

4    A    Yes.

5    Q    All right.  You introduce yourself after

6    telling another person who was there with her to leave

7    and you tell her that her son had been found in the

8    desert shot to death and she immediately responds, "What,

9    what" and excited, moaning and crying.  Correct of incorrect?

10   A    Incorrect.

11   Q    Where am I wrong, sir?

t2s2    12   A    If I may refresh my memory with -- or refresh

13   your memory.

14   Q    You have no memory, either?

15   A    Pardon me?

16   Q    You can't remember it?

17   A    I have a memory, but I'm trying to refresh your

18   memory.

19         As we spoke before, I introduced myself.  Debra

20   immediately wanted to know who I was.  And then I introduced

21   myself, told her I was investigating her son's disappearance,

22   and we then went on from there.

23   Q    And you moved close to her, pulled a chair up

24   and came face-to-face with her?

25   A    Yes.

**MILKE_NSB006281**

Exhibit 4

64

1      Q    Is that part of your technique, sir, or your

2  method?

3      A    If you wish.

4      Q    She goes into this moaning and crying, as you

5  described, and tell her, "I'm not going to tolerate

6  that".  Are we correct to that point?

7      A    Yes.

8      Q    All right.  I believe my question to you was

9  whether or not she immediately broke off this moaning

10  and crying or whether it took a little bit for that

11  to occur.

12     A    It took no time.

13     Q    No time?

14     A    No time.

15     Q    Then you advise her of her rights?

16     A    Correct.

17     Q    And she commences crying again?

18     A    She tries to, yes.

19     Q    That's your opinion, isn't it?

20     A    Yes, that's my opinion.

21     Q    You do not know for a fact?

22     A    It's my opinion.

23     Q    You witnessed moaning and crying, as you

24  testified to, and yet you suggest she is feigning this?

25     A    She had no tears.  She never had tears.

SUPERIOR COURT

PHOENIX ARIZONA

**MILKE_NSB006282**

Exhibit 4

65

1      Q     Are you an expert in tear ducts and things

2   of that nature?

3      A     No, sir.

4      Q     Are you an expert in emotions and being able

5   to differentiate when someone is -- tell when somebody

6   is real and when somebody is faking?

7      A     I'm just a police officer, sir.  I'm not

8   an expert there.

9      Q     Yet you are so bold as to say that she was

10  faking, in your opinion?

11     A     In my opinion.

12     Q     You went down there to Florence with the

13  intent to arrest, did you not?

14     A     To interview her.

15     Q     And to arrest?

16     A     Possibly.

17     Q     Had Sergeant Ontiveros suggested you needed to

18  go down there to arrest her?

19     A     I believe he told me to interview her.  He may

20  have said that.

21     Q     You recall, again, the interview of June 26th,

22  1990?

23     A     Yes, I do.

24     Q     Do you recall at page 10, commencing on line 5,

25  being asked the following question:  And Sergeant Ontiveros

SUPERIOR COURT

PHOENIX ARIZONA

**MILKE_NSB006283**

Exhibit 4

66

 1    sent you to Florence for the specific purpose of

 2    arresting her?"

 3            Do you recall your answer?

 4    A     No, I don't.

 5    Q     "To interview her?"

 6            Do you recall the question, "Just to interview

 7    her?"

 8    A     I don't recall that.

 9    Q     Do you recall the answer to that question?

10    A     If I may see that, I will probably recall it.

11    Q     "Answer:  And to arrest her".

12    A     I don't know that.

13    Q     My question to you, sir, is:  Were you given

14    a directive to go down and arrest her or was it your

15    idea to arrest her as you proceeded in that direction?

16    A     I'm confused.  Are you asking whether I said

17    that in that interview or are you asking me whether it

18    was my intention?

19    Q     My question to you, sir, again, is:  Had you

20    formulated the idea in your mind that you were just

21    going down to interview her at the time you left or had

22    you formulated in your mind that you were going down

23    to arrest her?

24    A     I had formulated in my mind I was going to

25    interview her and possibly arrest her.

**MILKE_NSB006284**

Exhibit 4

67

1    Q    But you have no memory today as to whether

2    or not Sergeant Ontiveros gave you a directive to go

3    down there to arrest her?

4    A    I don't believe he did.  I don't recall.  He

5    did tell me to go down there and interview her.

6    Q    Did you formulate the idea of arrest as you

7    were en route in the helicopter?

8    A    No, I did not.

9    Q    Did you formulate the idea of arrest at any

10   time prior to commencing your interview, between 620

11   West Washington when you left and commencing your interview?

12   A    If you are asking whether I made the decision

13   to arrest Debra Milke for murder, I did not.

14   Q    What do you understand physical evidence to

15   be, sir?

16   A    In what instance?

17   Q    In this instance, in the criminal investigation.

18   What do you believe physical evidence to be?

19   A    Fingerprints to be physical evidence, a gun

20   to be physical evidence, casings to be physical evidence,

21   shoe prints at the scene could be physical evidence.

22   Q    Basically objects, tangible objects?

23   A    A footprint is a tangible object.

24   Q    Sure.

25   A    A gun is a tangible object.  Casings found along

**MILKE_NSB006285**

Exhibit 4

68

1    the roadway are tangible objects.  Shoes are tangible

2    objects.  Numerous things, whatever the case involves.

3    Different things will -- if it's a burglary, then it

4    might be a screwdriver.  If it's a murder, then it's

5    a gun or possibly a knife.  But in this case a gun.

6    So there are different things.

7        Q    As you proceeded from 620 West Washington after

8    returning from 99th and Happy Valley --

9        A    Yes.

10       Q    -- you had not acquired any physical evidence

11   to suggest Debra Milke was a suspect, had you?

12       A    No.

13   MR. RAY;  No further questions at this time, Your Honor.

14   THE COURT:  Redirect.

15   MR. LEVY:  One moment, Your Honor.

16        No cross-examination.

17   THE COURT:  How about redirect?

18   MR. LEVY:  None of that, either.  I misspoke.

19   THE COURT:  Mr. Saldate, thank you very much.  You

20   may step down.  You are excused.

21        Ladies and gentlemen, at this time we will take a

22   ten-minute afternoon recess.  Please remember the admonition.

23        (A recess was had.)

24

25                    (Next page, please.)

MILKE_NSB006286

Exhibit 4

69

1          THE COURT:  Mr. Levy, your next witness, please.

2          MR. LEVY:  Detective **Hamrick**.

3          THE COURT:  Detective Hamrick, please come up to the Clerk

4    and be sworn.

5

6                         **HARVEY** HAMRICK,

7    called as a witness herein, having been first duly sworn, was

8    examined and testified as follows:

9

10                        DIRECT EXAMINATION

11   BY MR. LEVY:

12         Q    Tell the jury your name, for whom you are employed

13   and in what capacity.

14         A    My name is **Harvey** Hamrick.  I work for the City of

15   Phoenix Police Department.  I'm currently assigned as a detective

16   working out of the homicide section.

17         Q    Did you have an opportunity to participate in the

18   investigation of the murder of Christopher Milke in Police

19   Department 89-179406A report?

20         A    Yes, I did.

21         Q    Amongst your other duties did you have an opportunity

22   to be in Florence, Arizona, in the evening hours of December 3,

23   1989, a Sunday?

24         A    Yes, I was.

25         Q    Did you have an opportunity to observe the arrival,

**MILKE_NSB006287**

Exhibit 4