**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Jean Milke, | No. CV-15-00462-PHX-ROS |
|        Plaintiff, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
|        Defendants. | |

Plaintiff Debra Milke's approach to this litigation has been troubling. Immediately after being arrested for the murder of her son in 1989, Milke planned to file a lawsuit for monetary damages. At that moment, her intent seemed unlikely to ever lead to litigation. But in 2013, Milke's criminal convictions were vacated and she was released. Shortly after her release, Milke destroyed boxes of documents she had accumulated during her time in prison. There is no record of what she destroyed. Milke filed the present suit in 2015. Two years after filing suit, Milke traveled to her mother's home in Germany and destroyed additional boxes of documents regarding her criminal convictions. Again, there is no record of what she destroyed. Crucial items, such as a personal journal, were in her mother's possession at one time. Those items have never been found.

In addition to destroying documents despite anticipating litigation, Milke filed this suit without conducting any meaningful investigation of the evidence in her possession, custody, or control. Even after this case had been pending for years, neither Milke nor

her counsel had reviewed Milke's own documents to determine their contents. Had Milke reviewed her own documents, and been forthcoming with her counsel regarding her behavior, it would have been clear she had shared privileged communications with a broad array of individuals. It also would have been clear Milke had provided numerous privileged documents to Jana Bommersbach[1] for use in the book Bommersbach was writing about Milke. Thus, if Milke had reviewed her documents and informed her counsel of her behavior, Defendants and the Court would have avoided months of wasted effort regarding privilege disputes. Beyond avoiding privilege issues, Milke also would have been able to provide complete, accurate, and timely responses to discovery requests. Instead, Milke and her attorneys ignored evidence, litigated baseless privilege claims, failed to provide complete discovery responses, and delayed this case for three years.

In a previous order recounting much of Milke's misconduct, the Court observed Milke's behavior was sufficient to support the sanction of dismissal. (Doc. 503 at 26). But the Court concluded dismissal was too harsh and opted to first attempt an award of costs and attorneys' fees as a lesser sanction. Milke subsequently testified she could not pay an award close to the amount requested by Defendants. And the evidence now shows Milke would not be able to satisfy even the lowest possible monetary award. Thus, the lesser sanction of a monetary award is not feasible. Defendants have now identified more instances of discovery misconduct. Those instances, when combined with those already identified plus the unavailability of any other meaningful sanction, require this case be dismissed.

## BACKGROUND

Milke was tried and convicted of first-degree murder, conspiracy to commit first-degree murder, kidnapping, and child abuse. She was sentenced to death in 1990. On March 14, 2013, the Ninth Circuit granted Milke "a conditional writ of habeas corpus setting aside her convictions and sentences." *Milke v. Ryan*, 711 F.3d 998, 1019 (9th Cir. 2013). The Ninth Circuit concluded the prosecution had failed to turn over all

---

[1] Jana Bommersbach is an author whom Milke contacted to write a book about her life.

"impeachment evidence" regarding the credibility of Detective Armando Saldate, a crucial witness in Milke's criminal proceedings. *Id.* at 1006. In particular, the Ninth Circuit documented numerous "judicial findings of Saldate's mendacity and disregard for constitutional rights" that the prosecution had not turned over. *Id.* at 1009. The Ninth Circuit noted Saldate's actions were in public records but Milke's trial counsel "couldn't possibly have found [the] records in time to use them at Milke's trial." *Id.* at 1018. And Milke had been prejudiced by the nondisclosure because the evidence would have impacted Saldate's credibility, a central feature of the state's case against Milke. *Id.* at 1018.

In a concurring opinion, Judge Kozinski noted "Milke may well be guilty, even if Saldate made up her confession out of whole cloth." *Id.* at 1024. But Judge Kozinski was especially disturbed by "Saldate's unorthodox interrogation methods." *Id.* at 1023. Judge Kozinksi noted that both the state trial judge and a federal district court judge had heard testimony from Milke and Saldate regarding what happened in the interview room. Both of those judges had "found that Saldate was telling the truth when he testified that Milke waived her *Miranda* rights and didn't ask for a lawyer." *Id.* at 1024. But Judge Kozinski found both those judges to be wrong and he decided that Milke, not Saldate, was telling the truth. Based on that, Judge Kozinski would have barred "use of the so-called confession during any retrial of Milke." *Id.* But the majority held otherwise. The state was free to use Saldate's testimony in a retrial of Milke.

Milke was released shortly after the Ninth Circuit's opinion. The state pursued a retrial but on December 11, 2014, the Arizona Court of Appeals ruled Milke could not be retried. *Milke v. Mroz*, 339 P.3d 659, 668 (Ariz. Ct. App. 2014). That court relied on the Ninth Circuit's findings regarding the prosecution's failure to disclose "seven cases involving investigation of Saldate's interrogation methods and honesty." *Id.* at 664. The court also noted, during her original criminal trial, Milke had "subpoenaed the Police Department's Custodian of Records for Saldate's personnel records" but the Police Department had filed a successful motion to quash. *Id.* at 665. The instances of

nondisclosure, the filing of the motion to quash, and the duration of nondisclosure meant the state had engaged in "egregious prosecutorial misconduct." *Id.* at 667. The court then explained "the Double Jeopardy Clause of the Arizona Constitution affords even greater protection than the federal Constitution, barring retrial when there are instances of egregious prosecutorial misconduct that raise serious concerns regarding the integrity of our system of justice." *Id.* at 664. Therefore, under the Arizona Constitution, Milke could not be retried. *Id.* at 667. The state court noted, however, it was "express[ing] no opinion regarding her actual guilt or innocence." *Id.* Thus, there has never been a final determination in a possible retrial of the criminal case of what happened when Saldate interviewed Milke in 1989.

On March 13, 2015, Milke filed the present suit. At that time, she was represented by, among others, attorneys from the law firm of Neufeld Scheck & Brustin ("NSB"). (Doc. 1). Her central claim was that Saldate fabricated her confession in 1989. Multiple motions to dismiss delayed discovery but, in September 2016, the parties exchanged their initial disclosures. Defendants propounded discovery requests on November 23, 2016.

The Court previously observed the early history of this case meant "[b]y the time [Milke] made her initial disclosures, over three years had passed since the Ninth Circuit set aside her convictions and approximately eighteen months had passed since she filed her complaint. Given those time periods, Milke had more than ample time to organize her files before any production was necessary." (Doc. 503 at 3). Despite the length of time, it is now clear neither Milke nor her attorneys made a meaningful effort to review the documents in her possession, custody, or control. That critical failure doomed this litigation to be far more expensive and time consuming than necessary. Milke's failure to review her own documents meant her early discovery responses were based on the wrong assumption that she had not repeatedly shared privileged communications with third parties, including journalists. Milke's early discovery responses were also incomplete in that they did not provide all responsive documents nor did Milke provide complete lists of individuals responsive to interrogatories.

### A. Early Discovery and First Sanctions Proceedings

In a previous order, the Court outlined the parties' initial discovery requests and responses. (Doc. 503 at 3-5). The Court does so again to highlight the efforts expended in trying to get this case ready for trial. The original Rule 16 Scheduling Order entered on December 21, 2016, required the completion of all discovery by January 31, 2018. (Doc. 144). In early 2017, the Court resolved several discovery disputes. On August 2, 2017, pursuant to the parties' joint request, the Court extended the discovery deadline to May 31, 2018. (Doc. 202). The Court continued to resolve discovery disputes as they surfaced.

On November 29, 2017, the parties moved to extend the discovery deadlines by six months. (Doc. 248). The Court informed the parties that was too long but granted a "three-month extension with the caution that no further extensions will be granted absent extraordinary circumstances." (Doc. 252). The Court ordered the parties to prepare a "joint discovery plan," outlining the remaining discovery the parties planned to pursue, so the Court could "hold each side to its commitments and ensure discovery is completed by the deadline." (Doc. 252 at 2). The parties filed that plan and the Court formally extended the discovery deadline to August 31, 2018. (Doc. 256, 263).

The Court continued to resolve discovery disputes as they arose. On June 13, 2018, the parties sought an extension of the discovery deadline for the limited purpose of completing depositions. (Doc. 304). The Court granted that short extension, requiring the completion of all discovery by November 2, 2018. (Doc. 306). The Court continued to hear and resolve discovery disputes. On September 28, 2018, the parties filed a notice of discovery dispute regarding Milke's alleged waiver of the attorney-client privilege and her failure to provide an adequate privilege log. (Doc. 358). The parties filed a separate notice of discovery dispute involving related matters shortly thereafter. (Doc. 368). The Court then issued an Order instructing the parties to be prepared to address aspects of the privilege dispute at a status hearing on October 19, 2018.

At the October 19 hearing the Court discussed the scope of Milke's waiver.

During that hearing Defendants argued Milke's privilege claims were too broad and, given the alleged disorganization of Milke's files, Milke had never provided full responses to Defendants' November 2016 discovery requests. The Court ordered Milke and her counsel "to go through the file [and] organize the file" so that Milke's counsel could identify what documents were privileged. The Court also addressed Milke's allegedly incomplete discovery responses. (Doc. 383 at 26). The Court ordered Milke that "if there have been outstanding requests for production of documents, you need to get on it now and respond to those requests for production of documents. There is no excuse, since this case has been around since 2015, no excuse that we can't produce these documents." (Doc. 383 at 26). The Court granted a brief extension of the discovery deadline, until December 31, 2018. (Doc. 379).

After that conference, Milke's counsel allegedly reviewed all documents within Milke's possession, custody, or control. In particular, counsel allegedly reviewed thirty-one boxes of documents at the offices of Milke's former criminal attorney (and current co-counsel) and fifty-one boxes of documents at the offices of another of Milke's former criminal attorneys. (Doc. 380-1). After that review, counsel identified a few additional instances of waiver. Strangely, that review did not identify material that was responsive to discovery requests but had not been produced.

On November 8, 2018, the Court identified the questions Defendants could ask Milke's criminal trial counsel because the parties agreed no privilege applied. (Doc. 384). The Court called for additional briefing regarding other questions Defendants wished to ask that counsel. (Doc. 384). Instead of submitting that briefing, the parties requested the Court stay the case "to give Plaintiff additional time to investigate and address issues raised by Defendants," presumably regarding waiver. (Doc. 391 at 2). The Court granted a one-month stay and Milke changed counsel shortly thereafter. The Court then set a briefing schedule for the remaining privilege issues but instructed the parties to complete all discovery that was not "dependent on the Court's privilege-related rulings" by March 1, 2019. (Doc. 399).

At a status hearing on January 11, 2019, the Court set trial for September 10, 2019. (Doc. 408 at 4). Defense counsel then complained that they had not been provided the book written by Bommersbach until November 15, 2018. That book included "extensive quotes from letters that Ms. Milke sent" to her criminal attorney as well as quotes from letters the criminal attorney sent to Milke. (Doc. 408 at 5-6). Defense counsel also claimed they were waiting for the production of boxes of other documents that should have been produced earlier. (Doc. 408 at 5-6). The Court reiterated that the parties had to comply with the latest discovery schedule requiring the submission of privilege-related briefing by March 1, 2019, and the completion of all non-privileged discovery by March 1, 2019.

In briefing submitted in March 2019, Milke agreed to produce the work product of some of her attorneys but argued other communications between Milke and her counsel remained privileged. On April 11, 2019, the Court noted that, given Milke's abandonment of her initial position regarding privilege, "[t]he only remaining dispute . . . is whether [Milke] can still assert the attorney-client or work-product privilege regarding her habeas counsel on other, unidentified, topics." (Doc. 443 at 2). The Court ordered Milke to produce her communications with habeas counsel for *in camera* inspection. The Court also ordered Milke to provide a complete privilege log to Defendants. (Doc. 443).

Milke delivered the habeas counsel communications to the Court for *in camera* review. The Court devoted substantial time to reviewing approximately five hundred pages of communications and identifying which portions had to be produced. Then, before the Court ruled on the other privilege-related issues, Defendants filed a motion for sanctions. That motion argued "Milke had engaged in years of discovery violations [and] improper assertions of privilege as well as multiple acts of spoliation of evidence." (Doc. 503 at 9). On July 19, 2019, the Court issued an order resolving that first motion for sanctions. In doing so, the Court made the following findings of fact and conclusions of law:

- In 2001, Milke gave Frankie Aue[2] access to her entire criminal file. Providing access to a "journalist" destroyed any applicable privilege, meaning Milke had no basis for asserting the attorney-client or work-product doctrine regarding that file in these proceedings.

- In 2012, Milke waived the attorney-client privilege so [Kenneth] Ray[3] could talk to Aue. If a conversation between Ray and Aue occurred, Milke could not reassert the attorney-client privilege and doing so in this case was improper.

- Milke had possession of her letters to [Joe] Marino[4] for years prior to the commencement of discovery in this case. Given her statements in those letters, Milke waived the attorney-client privilege regarding numerous subjects and Milke had no factual basis for asserting the privilege on those subjects in this case.

- Milke did not detail what documents she allowed [Gary] Stuart[5] to access, meaning she could not provide a meaningful discovery response when asked. Despite not knowing what Stuart had accessed, Milke and her attorneys repeatedly represented Stuart did not have access to privileged communications. That was inaccurate in that Stuart was given access to documents that Milke would later claim to be privileged.

- Frankie Aue maintained a website but Milke had control over its contents. Milke's failure to preserve the website constituted intentional destruction of documents.

- After Milke was released, Milke shredded all letters she had received from Aue. That constituted intentional destruction of documents.

- After Milke was released, Milke shredded her "prison boxes" containing an unknown number and type of documents. That constituted intentional destruction of documents.

- In 2017, Milke shredded documents in the files kept by her mother regarding Milke's criminal and habeas proceedings. Milke kept no record of what she destroyed. That constituted intentional destruction of documents.

---

[2] Frankie Aue is a German citizen who became interested in Milke's criminal case and eventually worked closely with Milke, her family, and her criminal attorneys. One of Milke's criminal attorneys described Aue as a "journalist." Aue ran a website and other social media sites on Milke's behalf.
[3] Kenneth Ray was Milke's criminal attorney during her first trial.
[4] Joe Marino was an inmate at the time Milke was first arrested and facing trial. Milke exchanged sexually explicit letters with him. (Doc. 466-3 at 4-5).
[5] Gary Stuart is an attorney and author who wrote a book on Milke's trial.

- Milke provided Bommersbach access to many attorney-client communications. Given that access, Milke had no good faith basis for asserting attorney-client or work product doctrine over the subjects covered in those communications in this case.

- Milke and her counsel received the Bommersbach book on February 21, 2016. Milke did not produce the book in her first responses to the request for production on January 20, 2017. Milke and her counsel had no good faith basis for failing to include the book in that production.

- Milke personally received the Bommersbach book on March 9, 2017, as an attachment to an email. Milke waited four months, until July 12, 2017, to produce the email. That was not a timely supplement.

- Milke did not produce the Bommersbach book until November 15, 2018. Milke claims the failure to produce the book earlier was "inadvertent" but that is not convincing. The more plausible explanation is that Milke was intentionally delaying the production of the book because it contained damaging information regarding Milke's treatment of the attorney-client privilege and Milke's destruction of documents.

- If Bommersbach is correct that she interviewed Milke sixteen times, Milke's deposition testimony that she had "an interview" with Bommersbach was false or misleading. Similarly, Milke's statement that she did not provide Bommersbach any written materials was misleading.

- Milke prepared multiple audio recordings for journalist Peter Aleshire.[6] She sent those recordings to her investigator, but only to avoid prison officials reviewing them. The recordings were not confidential communications by Milke seeking legal advice and there was no good faith basis for claiming the recordings were not required to be produced because of the attorney-client privilege.

- Milke did not immediately produce the Aleshire recordings upon deciding to waive the privilege she had erroneously asserted in the past. Milke waited five months after her waiver before producing the recordings. That was not a timely supplement.

- Milke failed to produce a variety of responsive documents, allegedly due to

---

[6] Peter Aleshire was a journalist who sent a list of questions to Milke while she was incarcerated. Milke chose to tape record her responses to the questions instead of responding in writing.

"inadvertence." The number of such "inadvertent" acts establish Milke has not approached her discovery obligations diligently as required by the Federal Rules and Court orders.

(Doc. 503 at 19-21).

Based on the findings regarding Milke's failure to produce responsive documents and her actions forcing litigation of baseless privilege claims, the Court concluded dismissal would be an appropriate sanction. (Doc. 503 at 26). But the Court determined "[i]n light of the claims at issue and the extent of the harm Milke allegedly suffered, extra caution [was] appropriate." (Doc. 503 at 27). Therefore, the Court determined an award of costs and attorneys' fees would be ordered. The Court held Milke would be required to "pay the costs and attorneys' fees Defendants incurred because of Milke's failure to acknowledge the scope of her privilege waiver, her failure to timely produce the materials she gave Bommersbach, her failure to timely produce the Bommersbach book, and her failure to timely produce the Aleshire recordings." (Doc. 503 at 27). The Court also ordered Milke's former counsel to submit briefing "addressing whether sanctions pursuant to 28 U.S.C. § 1927 are merited based on the manner in which privilege issues were handled, including the handling of the Aleshire recordings, and the delay in producing the Bommersbach book." (Doc. 503 at 34).

Anticipating that likely Milke would not be able to pay the entire amount of monetary sanctions, the Court held Milke was to deposit "an appropriate amount with the Clerk of Court" to "ensure at least partial satisfaction of the sanctions award in the event Milke's claims fail." (Doc. 503 at 28). If Milke was unable to deposit any meaningful amount, the Court instructed her to "identify an appropriate and legally acceptable alternative sanction." (Doc. 503 at 28). The Court also cautioned, however, "that if the lesser sanction of a monetary award is not available" the Court would "revisit whether dismissal of this case is merited." (Doc. 503 at 28).

On the topic of evidence Milke had destroyed, the Court again determined dismissal would be an appropriate sanction. (Doc. 503 at 29-30). The Court noted it could not locate any case where a plaintiff had engaged in similar acts of intentional

destruction of documents and the case was allowed to proceed.  (Doc. 503 at 29).  But the Court again concluded dismissal would be too harsh given the claims and alleged harm at issue.  Therefore, the precise spoliation sanction was left for later determination.

Finally, the sanctions order provided guidance regarding some of the parties' remaining discovery disputes and reminded that all discovery had to be completed by September 27, 2019.  (Doc. 503 at 34).

## B.  Proceedings After Sanctions Order

On August 12, 2019, Milke's former counsel, attorneys from the law firm of NSB, submitted their brief regarding possible sanctions against them for their behavior during discovery.  (Doc. 507).  NSB explained discovery in this case "included what was to us an exceptionally large quantity of material."  (Doc. 507 at 2).  Allegedly as a result of the quantity of material, NSB "did not have [Milke's] statements (other than her prior testimony) fully read and digested until her deposition approached in the summer of 2018."  (Doc. 507-1 at 9).  Instead of reviewing Milke's statements, counsel "relied on more general representations from Ms. Milke and co-counsel about what was included in those prior statements."  (Doc. 507-1 at 9).  In particular, NSB stated "[m]uch of the work of reviewing each of Ms. Milke's prior handwritten statements in letters in preparation for Ms. Milke's deposition was completed by co-counsel."  (Doc. 507-1 at 9).

On the topic of the Bommersbach book, NSB stated they believed the book "was yet another retelling of the public events of Ms. Milke's prosecution . . . and one in which Ms. Milke had had limited involvement (consistent with Ms. Milke's later testimony at her deposition)."  (Doc. 507-1 at 15).  In other words, NSB was unaware that Milke, Bommersbach, and her criminal attorneys had worked closely together and that Milke had provided Bommersbach thousands of pages of documents, including privileged communications.  NSB's ignorance regarding Milke's relationship with Bommersbach meant NSB did not focus on the book.  And NSB believed Milke's own deposition testimony regarding Bommersbach established that Milke had "limited involvement" in the book.  Therefore, according to NSB, the failure to produce the book was simple

inadvertence.  (Doc. 507-1 at 17).

On the topic of Aue, NSB claimed it had never been informed by Milke that Aue had been "permitted to view the entirety of Ms. Milke's legal file, including documents covered by attorney-client privilege." (Doc. 507-1 at 12).   In addition, NSB "never believed Mr. Aue to be a journalist."  (Doc. 507 at 13).  And on the topic of the Aleshire recordings, NSB claimed that it did not know the contents of the recordings and, "because they were found within attorney-client files," they believed it was possible they were privileged.  (Doc. 507 at 22).  NSB allegedly tried to review them as expeditiously as possible but, eventually, concluded they were privileged because they had never been sent to Aleshire.

In responding to NSB's position, Defendants appeared to accept that sanctions against NSB were not appropriate.  Instead, Defendants argued the primary fault was Milke's because she had kept NSB "in the dark."  (Doc.549 at 4).  While Defendants faulted NSB for their approach to discovery and not reviewing all available documents, Defendants argued "Milke is the true culprit" as she had misled NSB regarding her behavior.  (Doc. 549 at 33).

On August 16, 2019, Defendants filed their motion seeking the attorneys' fees and costs they had incurred because of Milke's misconduct.  (Doc. 537, 538).  Those motions sought more than $600,000 in fees and costs.  That amount represented costs and fees Defendants had already incurred but also included other costs and fees Defendants anticipated they would incur in redoing certain discovery.  Milke responded that a proper accounting of the fees and costs would allow for an award of no more than approximately $150,000.  (Doc. 563 at 16).  Regardless of the exact amount, it is undisputed that at least $150,000 in costs and fees were incurred as a result of Milke's misconduct during discovery up through July 2019.

## C.  Additional Discovery Problems

On September 6, 2019, the parties submitted a joint motion regarding ongoing discovery problems.   That motion explained Milke's new counsel had recently

"discovered that there were some items in Ms. Voepel's[7] office which may be responsive to discovery requests but had not previously been produced." (Doc. 562 at 4). Because of the possibility of new information being provided, the parties agreed to vacate all scheduled depositions. Milke also agreed to "produce all remaining responsive materials, including those contained within Ms. Voepel's file, by September 13, 2019." (Doc. 562 at 5). Defendants proposed they have four weeks to review that information and then they would likely file a second motion for sanctions by October 11, 2019. The Court approved the parties' proposal and ordered Milke to "produce all remaining responsive materials, including those contained within Ms. Voepel's file, by September 13, 2019." (Doc. 568). If the parties disagreed about what materials needed to be produced by that date, they were required to file a discovery dispute no later than September 13, 2019. (Doc. 568). Defendants were then ordered to file their second motion for sanctions by October 11, 2019. (Doc. 568 at 2).

On September 12, 2019, Defendants filed a "Motion to Supplement the Record with Information . . . Regarding the Aleshire Tapes." (Doc. 571). That motion argued recently produced information made it even more unreasonable that Milke had actually withheld the Aleshire tapes as privileged. Milke responded Defendants were confusing two different audio recordings and that Defendants had suffered no prejudice as a result of the late disclosure of the Aleshire tapes. (Doc. 586). In reply, Defendants explained the basis for their confusion and stated it was Milke's failure to timely produce all responsive material that had caused the confusion. (Doc. 595).

On September 13, 2019, the parties filed a joint statement of discovery dispute outlining eight disputes. (Doc. 575). Shortly after, the Court resolved those discovery disputes. (Doc. 583). Milke then filed a motion for clarification. (Doc. 584). The Court resolved the motion for clarification on October 11, 2019. (Doc. 603). In doing so, the Court directed Milke to produce, for possible *in camera* review, emails from one of her criminal attorneys and current co-counsel. The Court explained it would have possession

---

[7] Lori Voepel was Milke's attorney during her federal habeas proceedings and during the attempted retrial.

- 13 -

of those emails but it would not review them "until, based on the privilege log, Defendants identify documents where there are genuine questions regarding the documents' status as privileged."[8]  (Doc. 603 at 3).

After receiving a status report from the parties, the Court set a new final deadline for discovery.  Milke was ordered to "produce all non-privileged documents/emails by November 1, 2019" and Defendants were ordered to file their second motion for sanctions by January 15, 2020.  (Doc. 609).  There was no further request to extend the discovery deadline and Defendants filed their second motion for sanctions.  (Doc. 631).  Milke then filed her response and Defendants their reply.  (Doc. 642, 649).

**D.  Second Motion for Sanctions**

The second motion for sanctions reargues much of what was addressed in the Court's order on the first motion for sanctions but presents some new issues and also presents new evidence regarding certain topics.  The following are either new topics or ones where additional evidence is available.

**1)  Failure to Identify Jim Burns and Doug Bice**

Underlying documents indicate Milke exchanged letters with an individual named Jim Burns for eight years while she was in prison.  (Doc. 631 at 22).  Milke did not identify this individual in discovery responses nor did she produce any letters she received from him.  In trying to explain why Burns was not disclosed, Milke admits an interrogatory requested she "identify *every person* she has ever spoken to in the last 30 years about the events underlying this case" but explains "she could not possibly name or remember . . . every individual she has ever spoken to about the events of December 2, 1989."  (Doc. 642 at 22).

Underlying documents reveal Milke, while she was in prison, had a romantic relationship of some sort with an individual named Doug Bice.  Milke's criminal attorney and one of Milke's other close friends described Bice as Milke's "boyfriend."  Milke often spoke to Bice on the phone.  She also had others convey messages to him, such as

---

[8] The Court has these emails but has not reviewed them.

she "loves him a lot" and she "love[s] him like crazy." (Doc. 631 at 22-23). In 2007, Milke listed Bice as a secondary contact on her prison emergency contact form. (Doc. 631-3 at 10). Milke disclosed that emergency contact form but she did not list Bice in her discovery responses nor did she produce any letters she received from him. During a recent deposition, Milke could not remember anything about Bice. That is, she could not recall whether she had told him she loved him, could not remember how many times he visited her, and did not even know if she had talked to him more than once on the phone. Milke does not admit she received and subsequently destroyed letters from Bice. Instead, she argues "[t]here is no evidence that she destroyed any letters from Bice." (Doc. 642 at 22). It is not clear what "evidence" of such destruction could possibly exist at this point.

A party is not, of course, expected to remember every individual over the span of thirty years. But the fact that Milke could not remember Jim Burns or Doug Bice is suspect. More importantly, however, Milke's own personal documents repeatedly referenced these individuals. If Milke had reviewed her own documents she would have seen the repeated references to Jim Burns and Doug Bice such that she could have provided their names in response to the appropriate interrogatory. In addition, Milke likely had letters from both of these individuals at some point in time. Like many other pieces of evidence, it is unknown when those letters were destroyed but it is likely they were destroyed when, after her release, Milke destroyed her prison files.

### 2) Failure to Review Carolyn Imhoff's Letters

While she was incarcerated, Milke corresponded with Carolyn Imhoff[9] for years. The parties disagree whether Milke should have listed Imhoff in her Rule 26(a) disclosure. (Doc. 642 at 25-26). But the more important aspect of Milke's correspondence with Imhoff is that Milke repeatedly shared privileged communications with Imhoff. For example significantly, in one letter to Imhoff Milke stated "I got some news from my lawyer but I won't write it in this letter because I know these cops scan through my mail. I'll tell you all about it when you come on the 22nd." (Doc. 631 at 30).

---

[9] Carolyn Imhoff is identified as a "hairdresser" who met Milke "through Prison Ministeries [sic]." (Doc. 549-1 at 140).

Milke's statements to Imhoff are additional evidence of the unreasonable position regarding the attorney-client privilege Milke adopted at the outset of this litigation. Neither Milke nor her counsel reviewed all available material to determine the extent of Milke's waiver of the attorney-client privilege. It is true the letters at issue were in Imhoff's possession. However, Milke did not need the letters to inform her attorneys that she had shared confidential information with Imhoff. If Milke could not remember whether she had shared confidential information, she could have at least *attempted* to obtain the letters from Imhoff to review them. Even a cursory review of the letters would have established an absolutist position regarding the attorney-client privilege was impossible. Clearly, Milke's approach of sitting back and blindly asserting the privilege was unreasonable.

Milke argues the Imhoff letters and their indications of waiver are "red herring[s]" because the "letters are from the early 1990s and [Milke] has already acknowledged waiver of privilege with" her counsel at that time. (Doc. 642 at 45). That is true but it overlooks the fact that it took months of litigation to reach the point that privilege was waived. All of the privilege briefing and Court orders were premised on Milke having preserved the privilege. The Imhoff letters prove there was no factual basis for asserting the attorney-client privilege the way Milke did.

### 3) Milke's Website and Social Media Sites

The prior sanctions order addressed Milke's website but additional disclosures paint a more complete picture regarding Milke's destruction of the website and other social media sites. As explained by Frankie Aue, "Since 1998, I cooperated with Debra's mother Renate Janka in order to create a meaningful and comprehensive website. The legal owner of the website/domain was Renate Janka; I was listed as the technical contact." (Doc. 631 at 53). In approximately 2011, Aue "started using services like Facebook, Twitter and Youtube" to publicize Milke's criminal and habeas proceedings. (Doc. 631 at 53). The website and the social media sites "happened with the knowledge and consent of Renate Janka, Debra (as much as I could describe it to her), the

1   representing attorneys and our 'inner circle' of friends and family." (Doc. 631 at 53).

2   The Court previously found Milke "exercised control over the contents on the [web]site."

3   (Doc. 503 at 16). Additional evidence now supports that conclusion regarding both the

4   website and the other social media sites. That is, while Aue administered the website and

5   social media sites, he always followed directions from Milke or her counsel regarding the

6   contents of those sites.[10] (Doc. 631 at 63). Therefore, as of the date litigation became

7   reasonably foreseeable, Milke had an obligation to preserve the website and her social

8   media sites.

9       Immediately after the Ninth Circuit's decision in March 2013, Milke was faced

10  with the prospect of a retrial. Milke's criminal counsel believed it was crucial to limit the

11  information that prospective jurors might be able to locate regarding Milke's case. Based

12  on that, Milke's criminal counsel told Aue to remove particular information from the

13  website and social media sites. (Doc. 631 at 64). In September 2014, a journalist

14  emailed Milke's criminal counsel to express his opinion the website should "[a]t

15  minimum . . . be cleansed of things that should or will never see light in a court *as*

16  *evidence that damages Debbie*." (Doc. 631 at 64) (emphasis added). Milke's counsel

17  responded "Thank you . . . I asked Frankie to remove [the posting], and he took it down

18  early this morning." (Doc. 584-10 at 11). Later counsel asked Aue to remove the entire

19  website. (Doc. 600-2 at 142). Counsel was informed that removing the website might

20  only be "a temporary action" but removing the Facebook postings would lead to their

21  permanent loss. (Doc. 600-2 at 152). There is no evidence that Milke's counsel were

22  concerned over the loss of such evidence.[11] Aue followed counsel's directions and at

23  least portions of the website and social media sites were removed in October 2014. (Doc.

---

24  [10] Milke's criminal counsel described Aue as "the webmaster for Debra's website."
    (Doc. 600-4 at 31).

25  [11] One of Milke's criminal attorneys and local co-counsel in this case has provided a

26  declaration that he instructed Aue to remove the website and social media sites but there
    was "no intention whatsoever of causing the destruction of any relevant evidence." (Doc.

27  584-7 at 2). There is no further explanation, however, that any efforts were made to
    preserve the evidence. Moreover, another one of Milke's criminal attorneys was
    explicitly told that removing a Facebook posting would lead to its permanent destruction.

28  (Doc. 600-2 at 152). Despite being told of the permanent destruction of potentially
    material evidence, no effort was made to preserve the Facebook posting.

584-10 at 13).  In short, after March 2013, Milke's agents instructed Aue to remove or delete evidence they viewed as damaging to Milke's position.  The complete contents of the website and the social media sites were lost.

The website and social media sites remained active to some extent until 2015.  In 2015, after this case was filed, Aue and Milke were interviewed for "Injustice Anywhere Radio."  During that interview Aue was asked about a series of videos he had posted on YouTube.  Aue explained he had removed them "because in the civil proceedings the attorneys were asking *to remove literally everything*."  (Emphasis added.)  When the interviewer said the videos were no longer on YouTube, Aue stated the civil proceedings were "the reason" he had removed them.  Those YouTube videos were not produced in this litigation until August 14, 2019.

In sum, Milke or her agents directed the removal and destruction of the website and portions of the social media sites after March 2013.  Milke now argues Aue eventually produced a copy of his hard drive that contained all the materials previously posted online but clearly it is impossible to know whether the materials obtained from Aue represent everything that should have been preserved and disclosed.  Moreover, given that Milke shared privileged communications with Bommersbach for use in writing a book, Milke likely allowed Aue to post privileged communications online if Aue deemed them useful.  A complete record of the website and social media sites would have been useful in either preventing privilege disputes or guiding Defendants' discovery efforts.

### 4)  Documents from Aue

After this litigation began, Milke's counsel contacted Aue about materials he had related to Milke.  Aue allegedly informed them he was outside the subpoena power of the Court and he would not voluntarily produce any information.  (Doc. 545-3 at 2).  Milke's counsel apparently accepted that statement.  There is no evidence that Milke herself asked Aue to produce documents.  In January 2019, after Milke obtained new counsel, that new counsel spoke with Aue by telephone.  Aue stated he had a hard drive

containing information, but it was his "work product" and he would not produce it. (Doc. 642-8 at 4). After defense counsel discovered the interview where Aue stated he had removed items at the urging of Milke's civil counsel, Milke's new counsel again contacted Aue. Aue then provided a link to an Internet archive containing snapshots of what the website looked like at certain times. Aue also provided links to his YouTube videos. In August 2019, Aue informed Milke's counsel he still had a hard drive but it no longer functioned and the information was not recoverable. Aue later located another hard drive and informed Milke's counsel he would send that hard drive to her.

Aue's hard drive was received by Milke's counsel on October 30, 2019 and Milke produced a copy of the hard drive a few days later. (Doc. 642-8). The hard drive contains copies of videos, audio files, and documents related to Milke. Defendants have made a credible argument that some of this information would have been helpful had it been produced earlier. As important, the hard drive establishes some of Milke's discovery responses were incomplete. In particular, the hard drive included videos of some of Milke's media appearances that had not previously been disclosed. Milke claims "most of those files were . . . publicly available or had already been produced in discovery." (Doc. 642 at 36). Thus, Milke concedes the hard drive included some files and videos that Defendants had not received before. (Doc. 649 at 9).

Milke's explanation for failing to produce the Aue hard drive earlier is that "Aue was a third party not in [Milke's] control, and he was outside of subpoena power." (Doc. 642 at 32). According to Milke, the only thing she could do was give "Aue's contact information to her counsel and have them contact him directly for information." (Doc. 642 at 32). Milke offers no reasonable explanation why she could not ask Aue to produce the hard drive. Milke and Aue were exceptionally close and Milke stayed at Aue's house in Arizona after she was released from prison. (Doc. 459-9 at 57). There is evidence she was still corresponding directly with Aue as of August 2019 when Aue produced the hard drive. There is no evidence of Milke making *any* direct effort for Aue to produce the hard drive. (Doc. 631 at 71). In addition to not making a meaningful

effort to have Aue produce the hard drive, Milke's protestations that Aue was completely beyond her control are in considerable tension with how he acted in the past. Over the course of many years, Aue acted as Milke's agent in establishing and maintaining the website and social media sites. Milke and her counsel routinely provided instructions to Aue regarding the website and social media sites, which Aue always followed. Moreover, in the context of the privilege dispute, Milke claimed "Aue was treated as a member of the defense team" and he "acted as a volunteer paralegal or secretary." (Doc. 642 at 38). But when it came time for him to produce material in his possession, Milke claimed he was outside her control. Thus, depending on her focus, Aue is either a trusted "member of the defense team" or a "third party not in [Milke's] control."[12]

### 5) Boxes in Lori Voepel's Office

The parties' briefing is not entirely clear on what occurred regarding the boxes in Lori Voepel's office. Milke's previous attorneys, NSB, claimed to have reviewed those boxes shortly after the October 2018 Order when they were ordered to organize the file and provide complete responses to any outstanding requests for production. (Doc. 383 at 26). Despite that review, responsive documents in those boxes were not produced at that time. Instead, in August and September 2019, Milke's new counsel reviewed the boxes and identified additional responsive material. The additional responsive material included, at the very least, an additional documentary that Milke's criminal counsel had worked on, printouts from Milke's website, and the series of YouTube videos Aue had created. (Doc. 642 at 16). Milke does not offer any explanation why this evidence was not produced years earlier. The production of this evidence in the fall of 2019 established clear violations of the Court's October 2018 Order to produce all responsive documents.

---

[12] The record is unclear regarding formal ownership of the website and social media sites. Given Aue's location in Germany, it is possible Milke had no legally enforceable way to obtain documents from him. *See, e.g.*, *In re Citric Acid Litig.*, 191 F.3d 1090, 1108 (9th Cir. 1999) ("Control is defined as the legal right to obtain documents upon demand."). But the present record is unique in that Aue acted as Milke's agent throughout their relationship. Having established an agency relationship, the sites and evidence in Aue's possession were presumptively under Milke's control. What is more, perhaps if she informed defense counsel of the potential content of the information they could have made efforts to obtain it or interview Aue.

It also creates serious doubts about the completeness of all of Milke's discovery responses.

### 6) Jeff Trollinger

After being released from prison, Milke saw Jeff Trollinger, a social worker, for eight "therapy sessions." (Doc. 631 at 75). Milke did not disclose Trollinger in response to discovery requests and Defendants only learned of him through reviewing emails produced by Milke. According to Milke, she did not disclose Trollinger because she "did not recall" she had received treatment from him. No records exist regarding the content of Milke's sessions with Trollinger and Trollinger died in 2019, before Defendants had the opportunity to depose him.

Milke claims her failure to disclose Trollinger was not prejudicial because Defendants chose not to depose Milke's current mental health provider. (Doc. 642 at 46). But Defendants respond they have the treatment notes from Milke's current mental health provider and nothing from Trollinger. Had Milke disclosed Trollinger earlier, Defendants claim they would have at least subpoenaed his records or deposed him. Even assuming Milke did not recall seeing Trollinger, Milke's own documents contain extensive references to Trollinger. Thus, this is yet another example of Milke not reviewing her own files before providing discovery responses.

### 7) Testimony Regarding Bommersbach

In the previous sanctions order, the Court described Milke's deposition testimony regarding Jana Bommersbach. (Doc. 503 at 13-14). Defendants now argue additional evidence proves Milke was trying to hide the extent of her involvement with Bommersbach so that Defendants would not become aware of the extent of Milke's waiver of the attorney-client privilege and work product doctrine. It is now clear that Milke was, in fact, attempting to hide the extent of her involvement with Bommersbach.

In her original deposition, Milke was asked what materials she had provided to Bommersbach.

> **Question**: What did you provide to Jana in order for her to be able to write the book?

**Answer**: Um, I just -- I -- I had an interview with her. You have to ask her what she got. I don't know.

\*\*\*

**Question**: Did you provide Jana with any written materials? Any notes, any memos?

**Answer**: I only recall --I only recall having an interview with her. I was still in prison. So she came to see me at the prison.

In the first sanctions order, the Court commented on this testimony by observing "[a]ccording to Bommersbach, she interviewed Milke four times while she was in the Perryville prison, once while she was in the county jail, and 'a dozen times' after Milke was released." (Doc. 503 at 14). The Court then found that if Bommersbach were believed, Milke's "deposition testimony that she had 'an interview' with Bommersbach was false or misleading." (Doc. 503 at 14).

During a subsequent deposition, Milke was asked about her contacts with Bommersbach and she provided a very different view of her relationship than simply "an interview" while she was in prison. Milke testified she remembered Bommersbach visiting her twice while she was in prison. Milke did not dispute, however, that the records showed Bommersbach had met with Milke while she was incarcerated four times for a total of fourteen hours. (Doc. 631-2 at 593). Milke also testified that, after being released from prison, she and Bommersbach had multiple lunches and dinners together, Bommersbach attended Milke's birthday party, Milke attended a Christmas party at Bommersbach's home, Milke had been to Bommersbach's home a handful of other times, and Milke went on a four-week publicity tour in Germany to promote Bommersbach's book. (Doc. 631-2 at 600). An email Bommersbach sent to Milke's criminal counsel also shows that documents in Bommersbach's possession were, in fact, under Milke's control.

In July 2014, Bommersbach emailed Milke's criminal counsel to address Milke's plan to file a civil suit. Bommersbach stated "I think that's a bad idea" because filing suit before the criminal proceedings had terminated would make Milke look "really greedy

and crass." Bommersbach also explained that Milke had asked for the return of some documents in Bommersbach's possession so that those documents could then be given to the "civil attorneys." Bommersbach stated "I'll provide [the documents], but want to be sure everyone knows my great fear of a civil case going forward." In other words, documents in Bommersbach's physical possession still belonged to Milke and Milke could demand their return at any time.

Defendants describe Milke's original deposition testimony as attempting "to conceal her contact with Bommersbach" and, in particular, "to conceal the existence of a litany of documents Milke knew to be in Bommersbach's possession." (Doc. 631 at 46). That concealment allegedly was to prevent Defendants from learning that Milke had provided Bommersbach with many documents which Milke would withhold in the present litigation as privileged. Milke responds that she has always "testified to *her recollection* about the number of times she had been interviewed or visited by Bommersbach in prison." (Doc. 642 at 50) (emphasis in original). In addition, Milke allegedly could not have been "attempting to give false testimony" at her original deposition because Defendants already had her prison records which established Bommersbach had visited Milke multiple times. (Doc. 642 at 50). Milke does not explain why she had no idea what documents were given to Bommersbach nor does she explain why she was unable to produce the documents she had given to Bommersbach. Given Milke's refusal to produce the documents, Defendants had to subpoena those documents directly from Bommersbach.

Based on the present record, Milke's original deposition testimony was misleading and evasive. Milke's extensive contacts with Bommersbach both during and after prison establish Milke's description of having just "an interview" with Bommersbach was not remotely accurate. Moreover, it strains credulity to believe Milke had absolutely no recollection of the documents provided to Bommersbach. It turned out that Bommersbach had received 7,000 pages of documents from Milke (or her counsel) and, at one point in time, Milke requested the return of specific documents from

- 23 -

Bommersbach. Thus, Milke's original deposition testimony was an attempt to conceal the extent of Milke's involvement with Bommersbach. Moreover, Milke's claim that Defendants would have to seek any documents directly from Bommersbach was not accurate and nothing less than a tactic to frustrate effective discovery.

Defendants describe Milke's original testimony regarding Bommersbach as constituting perjury. To qualify as perjury, statements must be made "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Throughout this case Milke has displayed a remarkably selective and poor memory.[13] But the present record does not definitively establish those memory difficulties are feigned. That is, the Court cannot definitively determine Milke's testimony constituted a willful intent to provide false testimony. But it is highly implausible that Milke's description of her contacts with Bommersbach as consisting of "an interview" was the result of confusion, mistake, or faulty memory. For present purposes, the Court merely concludes Milke's original deposition testimony was misleading and evasive in an attempt to frustrate discovery.

### 8) Milke's Destruction of Documents

As outlined in the previous sanctions order, Milke traveled to Germany in December 2017 to clean out her mother's home. While there, "Milke shredded the contents of multiple boxes her mother had kept regarding the criminal and habeas

---

[13] Defendants cite a variety of instances where Milke's memory was, for her purposes, conveniently very poor. For example, Milke testified that she did not keep a journal but documents show that she did. Milke testified that she had no memory of the many letters she wrote to Joe Marino, despite those letters containing extreme professions of love, something it seems unlikely she would forget. Milke testified she had "no idea" who Rick Scavone was but documents show he was a high school friend who Milke maintained a close relationship with during her early incarceration. (Doc. 549 at 16). Milke testified that, at one point in time, her only connection to the outside world was a friend named Vince Felix but documents show a close friendship with Carolyn Imhoff. All of these examples, while perhaps not sanctionable on their own, support the view that Milke was not serious about her discovery obligations and even may have intentionally disregarded them. In particular, Milke has refused to review documents that might refresh her recollection regarding individuals or events. Only after Defendants painstakingly confronted her with the relevant documents did Milke remember some events or individuals. And even then, Milke's memory has substantial holes regarding events or individuals that may not be helpful to her current claims.

proceedings."[14]   (Doc. 503 at 17).   An email produced after that sanctions order shows Milke informed co-counsel in the present suit, of her plans to destroy her mother's files. In an email Milke sent to him approximately nine months after filing this suit, Milke stated "My mother saved everything from my case and next summer I plan to shred it all." (Doc. 631 at 18).  He responded to that email but did not comment on Milke's shredding plan.

The fact that Milke's counsel was aware of her plans to destroy her mother's file and made no effort to dissuade her makes that destruction more serious than the Court previously concluded.  It is hard to believe that Milke informed her counsel of her plan and counsel failed to object.  To state the obvious, in civil litigation a party plainly cannot destroy material evidence.

## ANALYSIS

Defendants' second motion for sanctions outlines the above events and argues that Milke's behavior now merits the sanction of dismissal.  Milke responds that, despite all of her behavior over the three years of discovery, Defendants have not been prejudiced. That is, Milke argues all the untimely produced evidence as well as all the destroyed evidence supports her claims.  But it is clear that cannot be established on the record before this Court because Milke destroyed evidence after she planned to file a civil suit. Milke also failed to review her own files, provided materially incomplete discovery responses, and asserted baseless claims of privilege.  That behavior shifted the financial burden to Defendants to try to locate responsive documents and also prevented Defendants from having access to crucial documents.  Because Milke has admitted she lacks the ability to pay any meaningful portion of the costs her behavior imposed on Defendants, and crucial documents have been lost, Defendants have suffered ample prejudice to support dismissal.

### I.  Duty to Preserve Evidence

---

[14] During a recent deposition Milke stated she did not "shred documents in Germany." Instead she "threw out documents in Germany." (Doc. 631-2 at 280-81).  Because there is no meaningful difference, the Court will refer to them as "shredded."

In resolving the first motion for sanctions, the Court ruled Milke's duty to preserve evidence was triggered "in March 2013 when the Ninth Circuit granted habeas relief." (Doc. 503 at 19 n.6). In their second motion for sanctions, Defendants argue the duty was triggered much earlier given Milke's repeated statements that she was planning and preparing litigation against government officials. (Doc. 631 at 15-18). Milke responds that the Court already resolved this issue and the Court should continue to hold Milke "did not have a duty to preserve material before the Ninth Circuit's habeas ruling in 2013." (Doc. 642 at 42).

There is no question the evidence shows Milke planned litigation beginning almost immediately after her arrest. During her incarceration, Milke explicitly and repeatedly stated she planned on suing governmental officials based on her prosecution. (Doc. 503 at 10 n.2) (repeated statements that Milke planned to sue). Given those plans, Milke has never offered a reasonable explanation for her behavior of repeatedly destroying, and asking others to destroy, potentially relevant evidence. If the rule were that a party with a subjective intent to sue must preserve evidence, Milke's behavior during the entirety of her incarceration would be sanctionable. Existing caselaw, however, provides that the duty to preserve normally does not turn on a party's subjective intent.

"The duty to preserve evidence begins when litigation is pending or reasonably foreseeable." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011). "When litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Id.* And crucially for the present case, "[t]his is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Id.*

Adopting a very generous and favorable view to Milke, litigation was not "reasonably foreseeable" until the Ninth Circuit granted relief on March 14, 2013. The

record makes clear Milke intended to file suit at least by then but her subjective intent may not have been objectively reasonable. As of the date of the Ninth Circuit's decision, however, a reasonable person would have known litigation was likely. Therefore, the Court will continue to treat Milke's duty to preserve evidence as triggered on March 14, 2013.

## II. Dismissal for Discovery Misconduct

Milke's behavior during discovery raises three bases for sanctions: 1) failure to submit complete and accurate discovery responses; 2) willful and intentional destruction of physical evidence; and 3) willful and intentional destruction of electronically stored information. In addressing these three grounds, the Court will analyze the evidence from both the first and second motion for sanctions together because it is the entirety of Milke's conduct that supports the drastic sanction of dismissal.

### A. Incomplete Responses to Requests for Production

In November 2016, Defendants propounded the following requests for production:

- "Produce all medical, mental health, substance abuse and/or other healthcare provider records for providers seen at any time between December 2, 1988 and the present."

- "Produce all letters, emails, correspondence, cards, memos or any other form of written communication" regarding the events of Milke's criminal proceedings. This request excluded "all attorney-client communications, provided that they were not shared with a third-party who was not acting as a legal representative for [Milke]."

- "Produce any and all news articles . . . broadcasts and/or any other form of media documenting your conversations with and/or your criminal prosecution and civil lawsuit with journalists, press, news media, press corps, reporters, investigators, commentators and/or any other news medium in your representative's possession."

In responding to these requests for production, Milke was required "to reasonably and diligently search for and produce responsive documents" in her possession, custody, or control. *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013). "Control is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999). Thus, Milke had "an affirmative duty to

seek [responsive documents] reasonably available to [her] from [her] . . . agents, or others subject to [her] control." *Hill v. Eddie Bauer*, 242 F.R.D. 556, 560 (C.D. Cal. 2007). This standard does not require "perfection." *Reinsdorf*, 296 F.R.D. at 615. But Milke's "search and response" had to be "objectively reasonable under the circumstances." *Id.*

Before providing her initial responses to the requests for production, Milke did not conduct anything close to a reasonable search and review of the necessary documents. In particular, Milke's counsel did not review the documents under Milke's control for purposes of determining whether she had revealed privileged communications to third parties. For example, Milke's counsel did not review the Marino letters to identify instances where Milke had shared privileged communications. Beyond not reviewing documents in her possession, Milke also failed to reveal to her former counsel that Aue had been given access to the entire criminal file, including attorney-client privileged communications. Milke also did not reveal she (or other counsel) had provided thousands of pages of documents, including privileged communications, to Bommersbach. The access provided to Aue and Bommersbach meant Milke could not withhold documents based on privilege assertions. The withholding of those documents rendered her initial discovery responses materially incomplete.

Milke's initial production of documents was also incomplete based on the failure to review the boxes located at the offices of her current co-counsel, and her former criminal counsel.[15] Milke, through NSB, apparently conducted some unidentified

---

[15] Prior to oral argument on this motion in September 2020, the Court did not realize Milke had resisted production of emails from her criminal counsel on the basis that Milke's criminal counsel was "a third party" and "neither Plaintiff nor her [current] counsel have access to [criminal counsel's] emails." Thus, Milke argued Defendants would have to subpoena criminal counsel "under Rule 45" to obtain those emails. (Doc. 670-1 at 12). That was not reasonable. Milke had the right to obtain a copy of her file from criminal counsel, including emails. *See* Ethical Rule 1.16(d), Arizona Rules of Professional Conduct ("Upon the client's request, the lawyer shall provide the client with all of the client's documents, and all documents reflecting work performed for the client."); Arizona State Bar Ethics Opinion 15-02 (attorney must "preserve documents reflecting work performed for a client"). Milke was not entitled to delay discovery and increase Defendants' expenses by requiring Defendants issue a subpoena for emails in the possession of her *former* counsel. *See Hill v. Asset Acceptance*, LLC, No. 13CV1718-BEN BLM, 2014 WL 3014945, at *7 (S.D. Cal. July 3, 2014) ("[I]f Defendant's current or former counsel has responsive documents, Defendant has possession, custody, or control of those documents for purposes of discovery.").

amount of review of those boxes but that review did not lead to the production of all responsive information as evidenced by the additional production of documents from criminal counsel's boxes in the fall of 2019.[16]  There is no explanation how Milke could have been participating in discovery in good faith if she had not yet reviewed the boxes at her criminal counsel's office.

Milke also was not keeping track of her own media appearances, meaning she could not provide a complete and accurate response to the request for production regarding her media appearances.  It was not until the fall of 2019 when Aue produced his hard drive that Defendants learned of additional media appearances.  Again, Milke has not provided any explanation for her behavior.

Overall, Milke's approach to the requests for production was to produce as little as possible, both by asserting privilege and by failing to conduct a reasonable (or any) search of her own documents.  Even assuming there was some explanation for Milke's incomplete initial responses early in this suit, discovery was proceeding for years and Milke failed to timely supplement those responses after it became clear more was needed.  That failure renders Milke subject to sanctions pursuant to Federal Rule of Civil Procedure 37(c).

## B.  Incomplete Interrogatory Responses

Early in this case Defendants propounded interrogatories, including:

- "State the full name, current residential address and phone number for all witnesses, individuals, business, corporations, investigators, media, etc. who you have spoken to about the events on December 2, 1989, the Phoenix Police Department's investigation, your criminal prosecution and/or any other discussion related to the claims in your lawsuit."

- "Identify by name, address and telephone number any medical doctor, registered

---

[16] The evidence produced in the fall of 2019 from criminal counsel's boxes is evidence that Milke violated the Court's October 2018 to organize her file and provide complete responses to outstanding discovery requests.  At oral argument on this motion, Milke argued the additional documents produced from criminal counsel's boxes were not responsive to discovery requests that had been propounded prior to October 2018.  But it is undisputed the boxes included a documentary produced about Milke that was responsive to the request for production regarding media about Milke.  There is no explanation why that documentary was not produced long before 2019.

nurse, specialist, doctor, psychologist, counselor, psychiatrist, addiction specialist or any other medical or mental healthcare provider who has evaluated Plaintiff for any reason, including, for substance abuse, mental or emotional problems since December 2, 1989, including all medical treatment Plaintiff received while in Arizona Department of Corrections' custody."

(Doc. 642-28). To respond to these interrogatories, Milke had an obligation to review appropriate materials and "respond to the fullest extent possible." *Gorrell v. Sneath*, 292 F.R.D. 629, 632 (E.D. Cal. 2013). She was "not required to conduct extensive research in order to answer an interrogatory, but a reasonable effort to respond must be made." *Id.*

Consistent with her failure to review her own documents for purposes of her privilege assertions, Milke also failed to review her own documents to identify all the individuals she had spoken to about the relevant events. In particular, Milke failed to identify Jim Burns and Doug Bice. Milke also failed to identify Trollinger as a mental healthcare provider she had seen. Burns, Bice, and Trollinger were referenced, some of them repeatedly, throughout Milke's documents. Milke's incomplete interrogatory responses are an additional basis for sanctions under Federal Rule of Civil Procedure 37(c).

**C. Overall Discovery Behavior**

This case involves a large span of time and a huge amount of documents. Thus, Milke is not faulted for not remembering every single person she has corresponded with over the course of thirty years, every media interview she conducted, or every mental healthcare provider she visited. But Milke is clearly responsible for not conducting a reasonable search and review of her own documents. According to NSB, the positions they adopted on privilege issues were the result of Milke not being forthcoming regarding the access provided to Aue and Bommersbach. And while the standard is not perfection, a party must explain to her counsel the instances where she provided access to individuals likely to share information with the rest of the world. Moreover, obviously it is not too much to ask for a party to identify a former boyfriend and a mental healthcare provider repeatedly referenced in underlying documents.

Milke remedied some of her failures on November 27, 2019, when she served her

third supplemental response to Defendants' interrogatories. (Doc. 642-28). That is, over four years after initiating this case, Milke was able to disclose individuals repeatedly referenced in her own documents. But "[l]ast-minute tender of documents does not cure the prejudice to opponents." *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986). That is the situation most clearly regarding Trollinger. He is deceased and there are no records from his treatment of Milke. Defendants were prejudiced by Milke's failure to timely identify Trollinger.

More generally, Defendants were able to identify relevant individuals and obtain responsive documents only after expending a great deal of time and effort. It was improper for Milke to shift the burden of correcting her inadequate discovery responses to Defendants. It is important to note that throughout this litigation Milke has been represented by experienced counsel. This is not a situation where a pro se litigant with no knowledge regarding discovery procedures was attempting to navigate the discovery process.[17] Rather, Milke has benefited from teams of lawyers working on her behalf. With so many lawyers working on her behalf, it is unclear why the discovery process went so awry. In the usual case involving incomplete document productions or interrogatory responses, the appropriate sanction likely would be an award of costs and fees. As explored in the next sections, however, Milke engaged in other misconduct and, though the Court gave her the opportunity, she testified she has no ability to pay any meaningful portion of the costs and fees. That leaves dismissal the appropriate sanction.

### D. Spoliation of Physical Evidence

"There are two sources of authority under which a district court can sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who fails to obey an order to provide or permit discovery." *Leon v. IDX*

---

[17] Even in that situation, however, pro se litigants are held to "the same rules of procedure that govern other litigants." *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987). The failure to follow the rules of procedure has occasionally caused the dismissal of such pro se cases. *See, e.g.*, *Sanchez v. Rodriguez*, 298 F.R.D. 460, 462 (C.D. Cal. 2014) (dismissing with prejudice after pro se failed "to comply with court-ordered discovery obligations").

*Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).  For present purposes, the Court will focus on the inherent power option and Milke's behavior in destroying her prison boxes and destroying her mother's files.

In assessing whether dismissal for spoliation is an appropriate sanction, the Court must consider five factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."  *Id.*  These factors should not be viewed as "a mechanical means of determining what discovery sanction is just."  *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).  Instead, the factors are "a way for a district judge to think about what to do."  *Id.*   A threshold requirement for dismissal, however, is that the Court make "a finding of willfulness, fault, or bad faith."  *Id.*

### 1) Willfulness, Fault, or Bad Faith

Documents generated during Milke's time in prison would be relevant to the claims or defenses in this case.  Those documents more likely than not included Milke's own statements regarding what occurred during her interrogation and also would be relevant regarding her damages.  While the Court has ruled that Milke did not have an obligation to preserve those documents until March 2013, she chose to destroy her prison files *after* March 2013.  Moreover, this litigation had already been proceeding for approximately two years when she destroyed her mother's files.  Again, those files more likely than not included documents recounting crucial events.

Throughout all the sanctions briefing Milke has never provided a coherent explanation for her decision to destroy these documents.  While Milke has claimed the documents were not important or were merely copies of documents she had elsewhere, there is no evidence of this beyond Milke's say-so.  As the Court noted previously, "[a] party cannot destroy whatever documents it wishes and avoid any repercussions by claiming none of the destroyed documents were important."  (Doc. 503 at 28).  Milke

knew of her duty to preserve evidence but destroyed evidence anyway. That is sufficient to establish willfulness, fault, or bad faith. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (affirming finding that "behavior amounted to willful spoliation because [the plaintiff] knew he was under a duty to preserve all data on the laptop, but intentionally deleted many files").

### 2) Public's Interest in Expeditious Resolution and Court's Docket

The first factors the Court must consider when deciding whether dismissal is appropriate involve the public's interest in expeditious resolution of litigation as well as the Court's need to manage its docket. This case has been pending for over five years. During that time, the Court has repeatedly attempted to impose an end-date for discovery. The Court repeatedly warned the parties they were taking too long to complete discovery and the Court even took the unusual step of requiring the parties submit an interim discovery plan so the Court could monitor this case and ensure discovery was completed. Milke's misconduct clearly thwarted those efforts.

By withholding documents or producing documents long after they should have been produced, Milke prevented this case from being ready for trial.[18] In addition, Milke's actions required extensive Court involvement in needless privilege and other discovery disputes.[19] Milke's behavior has complicated discovery far more than necessary. The need to bring this litigation to a close, and for the Court to manage its own docket in a responsible way as required by the Rules of Civil Procedure, support dismissing the case.

### 3) Risk of Prejudice

The central factual dispute in this case boils down to a swearing contest between

---

[18] Defendants argue they "have experienced extreme difficulty in locating living witnesses who worked in the police department during the relevant time frame." Those witnesses "are in their very late seventies to eighties and beyond." (Doc. 649 at 21-22). Multiple witnesses have already died. Milke's refusal to cooperate in discovery and substantial delays have meant the loss of evidence from those who have died and the further erosion of memory for those still living.

[19] Milke's former counsel, NSB, engaged in obstructive behavior during depositions, including the use of profanity. The Court had to order counsel stop coaching witnesses through the use of speaking objections. (Doc. 336 at 11).

Milke and Detective Saldate. Who is to be believed regarding what occurred in the interview between Milke and Saldate? Did Milke confess or not? Milke's credibility is at the heart of this case and Defendants were entitled to discover any evidence that might impugn her credibility.[20] Over the years, Milke has repeatedly recounted the crucial events in written statements. Defendants were entitled to all of those statements as they would be critical for establishing whether Milke's version of events has varied over time. Given the importance of Milke's credibility to this case, any destruction of Milke's prior statements is devastating from Defendants' perspective. Depriving Defendants of the possibility of undermining Milke's credibility has the effect of depriving Defendants of the most straightforward way of defeating Milke's claims: proving Milke is lying. Thus, the prejudice inquiry "looks to whether [Milke's] actions" in destroying evidence has "impaired [Defendants'] ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006).

The destroyed prison documents and the files maintained by Milke's mother more probably than not included documents regarding the core events at issue in this case. Thus, the documents that Milke destroyed would "likely be at the heart of [the] defense were [they] available." *Id.* Milke's early recollection or recounting of the crucial events have at least the possibility of contradicting her current position regarding what occurred between her and Saldate. It is already clear from other documents that Milke's version of what occurred has substantially varied over the years. (Doc. 74 at 23) (Milke alleged *Miranda* rights read once and she stated she did not understand); (Doc. 466-12 at 55) (Milke said *Miranda* rights were read twice after which she stated she understood). Thus, the loss of the documents threatens the rightful decision of the case.

Milke disagrees that Defendants have suffered any prejudice regarding the central issues in this case. According to Milke, she has acted in good faith and the core issue of whether she confessed remains a disputed issue of fact. That is, "Defendants have failed to meet their burden of identifying a single piece of evidence that undermines Plaintiff's

---

[20] Milke herself has described the dispute between Milke and Saldate as the central factual dispute. (Doc. 442 at 2).

claims on the merits, bolsters any of their defenses, or otherwise interferes with the rightful decision of the case." (Doc. 642 at 5). That is inaccurate. Defendants have uncovered documents in discovery that materially impact the viability of Milke's claims, such as the inconsistency regarding Milke's understanding of the *Miranda* warnings. But more importantly, Milke believes the burden is on Defendants to definitively prove that Milke destroyed evidence that "would have been favorable to [Defendants]." (Doc. 642 at 42). The law does not require such an impossible showing.[21]

Milke cites caselaw stating "[t]he moving party has the burden to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to its cause." *Galicia v. Nat'l R.R. Passenger Corp.*, No. CV 17-8020-JFW (JCX), 2018 WL 6314191, at *4 (C.D. Cal. July 20, 2018). Assuming that is the standard, it is easily met here. The physical documents that Milke destroyed consisted of documents from her time in prison and documents in her mother's possession regarding her criminal convictions. There is no record of the documents Milke destroyed either time but there is a "reasonable possibility" that Milke destroyed critical documents. For example, in 1998 Milke's mother had possession of "30 pages of [Milke's] recollections" and "a journal written by [Milke] during her imprisonment." (Doc. 631-18 at 4). According to Milke's mother, the documents "clarif[ied] . . . Saldate's statements to the press and how he very craftily took sentences out of context and made them 'fit' his preconceived story." (Doc. 631-18 at 4). Thus, those documents addressed the core issue of what happened during Saldate's interview of Milke. Those documents, written relatively shortly after the crucial events, obviously would be useful for supporting or discrediting Milke's current version of

---

[21] Milke's actions have made it impossible for Defendants to know what was destroyed. Milke claims she did not destroy anything of value and Defendants cannot prove otherwise. But requiring Defendants definitively prove the non-prejudicial nature of something when the something has been destroyed is close to the logical fallacy *argumentum ad ignorantiam*. That refers to the fallacy of putting the burden of proof on the person who denies or questions the assertion. *See Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1257 (11th Cir. 2007) (defining *argumentum ad ignorantiam* as "the mistake that is committed whenever it is argued that a proposition is true simply on the basis that it has not been proved false").

events.  Their loss prevents this case from "proceeding on the true facts."  *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1058 (9th Cir. 1998).

If there remains any doubt about the possible importance of the destroyed documents, a letter Milke wrote another inmate in 1990 proves otherwise.  On July 28, 1990, Milke wrote to another inmate the following:

> [M]y atty showed me a list of all the physical evidence and on that list it said Audio Tapes of Roger, Jim and Debra.  I freaked.  I asked my atty what audio tapes and he didn't now.  The only thing I can think of is if the cop recorded everything I said the night I was arrested.  But even if he did it can't be used because in his police report he stated I didn't want it recorded.  I didn't want it recorded because I wanted an atty.

(Doc. 427-39 at 2-3).  If her interactions with Saldate happened exactly as Milke now claims, it is unclear why she "freaked" at the prospect of there being a tape of those interactions.  An obvious inference is that Milke did, in fact, confess to Saldate.  But the Court need not speculate on that point because the more important aspect of this early communication is that it establishes Milke was freely sharing information regarding the crucial events and her criminal prosecution.  Therefore, the documents in Milke's mother's possession likely would have been crucial pieces of evidence for determining what actually occurred decades ago.

Because of Milke's willful and intentional destruction of her prison files after her release, and her willful and intentional destruction of her mother's files two years after the present suit was filed, Defendants will never know what those files contained.  But it is at least reasonable to presume that Milke would not have destroyed the evidence if it had been helpful to her claims.  Rather, it is more likely than not that the destroyed evidence was inculpatory.  *See Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 993 (N.D. Cal. 2012) ("In the Ninth Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it.").  *See also Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 354 (9th Cir. 1995) ("[I]t is appropriate to presume that where documents relevant to the merits of the litigation have been concealed the

deception casts doubt on the concealing party's case."). Thus, their destruction prejudiced Defendants.

The prejudice inquiry has also been formulated as asking "whether a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007). Milke's destruction of documents has rendered it impossible for the parties to have access to all the material and true facts. For purposes of this inquiry, it is helpful to compare Milke's discovery behavior to five published cases involving concealment or destruction of crucial documents.

In *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337 (9th Cir. 1995), Anheuser-Busch sued one of its distributors, seeking to terminate a distributorship agreement. The distributor asserted a counterclaim, alleging breach of the distributorship agreement. Shortly after filing the counterclaim, there was a fire at the distributor's warehouse. Some documents were destroyed but some documents survived the fire. The remaining documents were later seized by police agencies. Then, during the litigation, the distributor repeatedly represented that all the documents had been destroyed in the fire despite the distributor knowing that was false. Three years after the records should have been produced in response to discovery requests, the distributor obtained the documents from the police and produced them. The district court concluded the "concealment of the documents for three years, [the distributor's] continuous denials under oath that she knew the documents existed and were legible," and other instances of misconduct were sufficient to support dismissal of the counterclaim pursuant to the court's inherent power. *Id.* at 352. The Ninth Circuit affirmed.

According to the Ninth Circuit, the proper prejudice inquiry was not "[w]hether or not the documents would have changed the outcome of the trial." *Id.* at 354. Instead, "[i]t is sufficient that [the distributor's] concealment of the documents clearly impaired Anheuser's ability to go to trial and *threatened* to interfere with the rightful decision of the case." *Id.* (emphasis in original). "Where a party has lied and hidden evidence so

extensively, a judge may find . . . that a subsequent trial offers no assurance of a reliable result. There was no reason to be confident that the whole truth would be revealed [at a trial] and every reason to infer from [the distributor's] conduct, that [she] would continue to deceive with regard to any matter on which she had not been caught." *Id.* at 354-55. Therefore, dismissal was appropriate.

In *Valley Engineers Inc. v. Elec. Engineering Co.*, 158 F.3d 1051 (9th Cir. 1998), a construction firm had failed to complete a hydroelectric project. That construction firm later sued a variety of defendants, arguing those defendants had caused the project to run over budget. *Id.* at 1053. A crucial piece of evidence was an internal memorandum where the construction firm had admitted the construction project "could not be done as promised." *Id.* at 1054. That memorandum was responsive to requests for production but, for three years, the construction firm failed to produce it. Eventually the construction firm changed counsel and produced the memorandum. The district court concluded the memorandum had been "willfully hidden in a purposeful evasion of discovery obligations." *Id.* at 1055. Based on that conclusion, the district court dismissed the construction firm's claim as a discovery sanction. The Ninth Circuit affirmed.

The Ninth Circuit reasoned that "[p]roducing thousands of pages, but not the most important four pages, could be innocent in some circumstances, but there was no reason to think that omission of the [] memorandum was an innocent omission in this case." *Id.* at 1056. Given the attempt to keep the memorandum hidden, "it was a reasonable inference that if there was other discoverable material harmful to [the construction firm's] case that its adversaries did not know about, it would be hidden forever." *Id.* And "[w]here a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate." *Id.* at 1058. The construction firm's behavior regarding the memorandum was sufficient to support the sanction of dismissal. *Id.*

In *Connecticut General Life Insurance Co. v. New Images of Beverly Hills*, 482

F.3d 1091, 1094 (9th Cir. 2007), the defendants were sued for operating a fraudulent medical billing scheme.  During discovery, the defendants provided discovery responses that were "calculated to prevent plaintiffs from learning and proving the truth."  *Id.* at 1095.  The defendants "refused to answer some questions and provide some documents" and claimed that "patient charts and records had been 'misplaced or lost.'"  *Id.*  In addition, the defendants' response to interrogatories provided incomplete information in an effort "to frustrate effective discovery."  *Id.*  After years of such discovery behavior, the district court entered a default judgment of over two million dollars.  *Id.* at 1096.  The Ninth Circuit affirmed, concluding the record "amply supports sanctions."  *Id.* at 1097.

In *Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006), an employee sued his employer under Title VII, the ADA, and other statutes.  *Id.* at 955.  At the time the suit was filed, the employee had a company-issued laptop.  Sometime after the suit began, the employee deleted thousands of files on the laptop and "wrote a program to write over deleted documents" to prevent them from being salvaged.  *Id.* at 959.  Pursuant to its inherent power, the district court dismissed the employee's claims after concluding the deletion had "severely prejudice[d]" the company.  *Id.* at 956.  The Ninth Circuit affirmed.

The Ninth Circuit found the district court had not clearly erred in concluding the deleted files "would likely be at the heart of [the company's] defense were [the files] available" and the deletions "threatened to distort the resolution of the case."  *Id.* at 960.  Therefore, the deletions were prejudicial.  The Ninth Circuit also concluded the district court had not erred in determining "less drastic sanctions" would not be useful because there was no evidence to exclude and "fashioning a jury instruction" would be insufficient to remedy the prejudice caused by the deletions.  *Id.*  The dismissal sanction was appropriate.

Finally, in *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162 (9th Cir. 2012), a class of pilots and crew members filed suit against their former employer seeking "hazard pay" they believed had been wrongly withheld.  *Id.* at 1166.  The employer refused to turn

over a variety of documents regarding hazard pay and wrongly redacted some documents that were turned over. *Id.* The court ordered the employer to produce an unredacted copy of a particular page but, instead of doing so, the employer produced an entirely different document "which had never before been produced, although it was responsive to discovery requests." *Id.* at 1168. The district court struck the employer's answer, explaining the employer had "intentionally delayed production of documents, misrepresented its current and past production to both the Court and the Class, and otherwise engaged in bad faith conduct." *Id.* at 1169. The district court proceeded to trial on damages, ultimately entering a judgment of more than five million dollars.

The Ninth Circuit affirmed the striking of the answer. The focus of the appeal was on the district court's alleged failure to consider lesser sanctions. The Ninth Circuit concluded "[t]he fact that a court does not implement a lesser sanction before striking an answer is not dispositive. It is just one factor" to be considered under the particular circumstances of the case. *Id.* at 1170. Lesser sanctions are particularly inappropriate when a court "anticipates continued deceptive misconduct." *Id.*

Milke's approach to the present litigation resembles aspects of these five cases. In *Anheuser-Busch*, the concealment of evidence and untimely production of evidence "impaired Anheuser's ability to go to trial and *threatened* to interfere with the rightful decision of the case." 69 F.3d at 354. Milke also concealed evidence for years, only belatedly provided complete discovery responses, and destroyed crucial documents. That behavior threatens to interfere with the rightful decision of the case. In *Valley Engineers Inc.*, the construction company withheld crucial evidence for years and damaged the discovery process such that there was no "assurance of proceeding on the true facts." 158 F.3d at 1058. Milke has done the same by withholding documents as privileged despite her own documents showing she shared the content of those communications with a variety of individuals. Milke also claimed to have reviewed *all* her documents to provide complete responses only to have new counsel admit that unproduced documents were in the files previously searched. This approach to the discovery process means Defendants

and the Court can never be confident Milke has produced all responsive documents. In *Connecticut General Life Insurance Co.*, the defendants had provided incomplete and unhelpful discovery responses in an attempt "to frustrate effective discovery." 482 F.3d at 1095. Milke has gone to great lengths to frustrate effective discovery by making broad privilege assertions only to abandon them when shown her own documents and by refusing to review her own documents to ensure complete discovery responses. In *Leon*, the intentional destruction of relevant documents "threatened to distort the resolution of the case." 464 F.3d at 960. Milke's destroyed her prison files when this litigation was reasonably foreseeable and destroyed her mother's files two years *after* this litigation began. That destruction threatens to distort resolution of this case. Finally, in *Hester* the employer delayed production of responsive documents, improperly redacted documents, and erroneously represented to the court that it had produced all responsive documents. Milke delayed production, made improper privilege assertions, and represented to the Court that she had provided complete discovery responses when, in fact, she had not.

None of the five Ninth Circuit cases are a precise fit for the present situation but they all support the conclusion that a litigant is not entitled to engage in a years-long pattern of bad faith obstruction of full and fair discovery. Milke's "pattern of deception and discovery abuse [make] it impossible" to proceed to trial "with any reasonable assurance that the truth would be available." *Anheuser-Busch*, 69 F.3d at 352. And there is no assurance that Milke's obstructive discovery behavior has stopped and will not continue up to and including trial. Milke's discovery behavior has severely prejudiced Defendants' ability to proceed.

At the oral argument, and in documents filed shortly thereafter, Milke argued Defendants threatened to interfere with the rightful decision of this case because "Saldate's personnel and Internal Affairs files" were destroyed. (Doc. 658 at 3). Milke also argued "Saldate admitted to destruction of his notes that he took during the interrogation. He admitted to destroying those notes three days after the interrogation." (Transcript of 9/18/2020 hearing). As best as the Court can determine, Milke seems to be

arguing the Court should conclude Defendants' duty to preserve evidence was triggered as of 1989. Milke has been adamant, however, that her duty to preserve evidence was not triggered at that time. Milke has not explained why Defendants would have that duty if she did not. And regardless of the precise argument Milke is attempting to make, the *only* behavior presently at issue is conduct by the parties after litigation became reasonably foreseeable in 2013. It was after civil litigation became reasonably foreseeable that Milke engaged in repeated acts of misconduct. When asked at oral argument whether Milke had evidence "defendants have engaged in discovery misconduct" during this case, her counsel responded there was no such evidence. Milke's attempt to justify her behavior by pointing to Defendants' behavior in 1989 is not convincing.

### 4) Public Policy

Public policy favors resolving this case on the merits. But that factor, standing alone, is not sufficient to outweigh the other factors. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006).

### 5) Less Drastic Sanctions

The final factor requires the Court consider less drastic sanctions. This requires the Court address three considerations: "whether the court explicitly discussed alternative sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of dismissal." *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998). The previous order on the motion for sanctions attempted alternative sanctions in the form of an award of costs and fees. That order also warned Milke that dismissal was a possibility. Milke was even given the opportunity of merely depositing a portion of the sanctions award but she has now stated she has no way of paying any meaningful amount and she has not identified any other meaningful sanction.

Beginning with the possibility of monetary sanctions, the following recounts the Court's attempt to determine whether Milke has the ability to pay any such sanctions. On May 7, 2019, the Court granted Defendants' request to file excess pages for their first

motion for sanctions.  (Doc. 465).  In doing so, the Court ordered Milke to "respond in particular" on "whether [Milke] has the ability to satisfy an award of attorneys' fees in the event such sanction were awarded."  (Doc. 465 at 2).  In her response, Milke argued the following:

> To address the Court's inquiry (Dkt. 465), Plaintiff does not have the financial ability to pay attorneys' fees if such a sanction were awarded. Plaintiff earns minimum wage.

(Doc. 468 at 39).

In its prior sanctions order, the Court noted it would attempt a monetary award, despite Milke's alleged inability to pay anything.  The Court explained:

> Milke has stated she does not have the financial ability to pay any sanctions. Thus, the Court's attempt at imposing lesser sanctions may be futile. Assuming Milke's representations regarding her finances are accurate, any monetary sanctions against her likely would never be paid should she not prevail in this suit. In effect, that would mean Milke would suffer no penalty for her misconduct. That is not reasonable.

(Doc. 503 at 27).  The parties then briefed the amount of fees and costs that had been incurred as a result of Milke's behavior during discovery.  As noted earlier, Defendants sought more than $600,000 in fees and costs while Milke argued a proper accounting of the fees and costs would allow for an award of no more than approximately $150,000.  (Doc. 563 at 16).

Before the Court ruled on the appropriate amount to require Milke deposit, she attended her sanctions deposition.  At that deposition she was asked about her ability to satisfy a monetary award.

> **Question**: And do you understand, as you sit here today, that the defendants, all the parties that you have sued, the County, the City, the officers, have filed motions and affidavits supporting an attorneys' fees award against you in the amount of $626,000 dollars 420 -- or $626,420? Were you aware of that?
>
> **Answer**: No.
>
> **Question**: How would you intend to pay for such a judgment?

**Answer**: I can't.

***

**Question**: Well, if [Judge Silver] were to award 4- or 5- or $600,000 in attorneys' fees and costs to the various defendants, would you pay that?

**Answer**: I can't.

**Question**: Okay. So it would be fruitless for her to award such an amount because it wouldn't be meaningful or effective. Correct?

**Answer**: Yes.

(Doc. 631-2 at 162-65). Milke was then asked about her finances and she testified her only sources of income were $4,000 per month she receives from her mother's estate and wages from a part-time job. (Doc. 631-2 at 165-66).

In their second motion for sanctions, Defendants argued "sanctioning Milke in the form of monetary sanctions is meaningless because she admits that she has no ability to pay anything." (Doc. 631 at 4). In her response filed on March 10, 2020, Milke changed arguments from her earlier representations and argued it would be "premature" to determine she lacks the ability to pay a monetary award:

> Defendants argue that Plaintiff does not have the funds to pay attorneys' fees. But it is premature to make that determination now. In its earlier order, the Court stated that it would determine an amount of fees and costs that was appropriate and then set an amount that Plaintiff would have to deposit with the clerk. That is still appropriate here. Only after that amount is determined could Plaintiff determine whether she could post an amount. Although she does not have much in the way of assets, she did receive an inheritance from her mother, of which her mother's partner (Reinhard Mueller) is the executor. Dkt. 631-1 at 581-83. He provides a monthly amount to Plaintiff, per the terms of her mother's will. (The will was produced to Defendants. Plaintiff also testified about this in November 2018.) The will also says that the executor could, in his discretion, give Plaintiff funds. Depending on the amount that the Court rules is an appropriate sanction and the amount the Court decides is an appropriate amount to deposit, it is possible that the executor would be willing to provide those funds to Plaintiff. Or, Plaintiff may be able to raise money from friends. It is speculative at this point. But a lesser sanction than dismissal is available as an alternative.

(Doc. 642 at 71). Despite the Court contemplating monetary sanctions in its July 2019 Order, Milke apparently still had not determined what funds would be available for her to access as of March 2020. Milke did not provide an explanation why she had earlier represented she had no ability to pay monetary sanctions.

At the oral argument on September 18, 2020, Milke's counsel attempted to clarify matters by arguing "Milke did not ever testify that she had no ability to pay any amount of money. What she testified was that she had no ability to pay half million dollars in attorneys' fees and costs." Counsel then reiterated that Milke's mother left her an inheritance that Milke may be able to access. When asked what Milke could pay today, counsel responded she did not know the amount and she would have to check. Thus, even though the possibility of monetary sanctions has been hanging over Milke's head for over a year, her counsel did not know the amount, if any, that Milke would be able to pay should a monetary award be made.

According to an email referenced by Defendants at oral argument, the payments Milke currently receives per month will exhaust her inheritance in "about 2 years." (Doc. 670-1 at 2). Assuming Milke accurately recounted that she was receiving $4,000 per month, that would mean the remaining balance is approximately $96,000. Thus, even assuming she could access the entire lump sum amount, that lump sum would not satisfy even the very lowest estimate of $150,000 in fees. Milke continues to make vague representations about what might possibly occur were the Court to impose a monetary sanction but the evidence is sufficient that, even if Milke could access the funds from her mother's estate, that would not be a sufficient sanction for her long history of discovery abuse.

Normally, a party's inability to pay a monetary sanction would be a tenuous basis for dismissing an action. But as observed by the Seventh Circuit, "[a] plaintiff who gratuitously imposes huge unrecoverable costs on his adversary cannot successfully oppose dismissal on the ground that he can't pay those costs, for then abuse of the litigation process to harass a defendant would be underdeterred." *Williams v. Adams*, 660

F.3d 263, 266 (7th Cir. 2011). Other circuits have reasoned similarly. *See Selletti v. Carey*, 173 F.3d 104, 112 n.12 (2d Cir. 1999) ("[M]isconduct itself might warrant dismissal if a plaintiff's financial circumstances eliminate the effectiveness of sanctions as a remedy or as a deterrent."); *Moon v. Newsome*, 863 F.2d 835, 839 (11th Cir. 1989) ("A party's claim that destitution prevented him from complying with the order is not an absolute bar to dismissal."); *Emerson v. Thiel Coll.*, 296 F.3d 184, 191 (3d Cir. 2002) (affirming dismissal because the party's financial situation meant "monetary sanctions would not be an effective alternative").

In the present case, Milke was not forthcoming with her original counsel regarding the extent of her contact with third parties and her wide dispersal of privileged communications. That led to needless briefing and proceedings, as well as materially incomplete discovery responses. Only at great expense were Defendants able to establish that Milke's behavior meant she could not withhold documents. Milke also failed to review her own documents to identify individuals and provide complete discovery responses. That again shifted needless expense onto Defendants to identify individuals with relevant information. Milke was not free to abuse the litigation process and then proclaim her indigence prevents any meaningful sanction. Milke never accepted or demonstrated that, as a plaintiff, from the outset through final resolution of this case, she always has the burden of proof. *See Morris v. Morgan Stanley & Co.*, 942 F.2d 648, 652 (9th Cir. 1991) (noting "[a]lthough there is indeed a policy favoring disposition on the merits, it is the responsibility of the moving party to move towards that disposition at a reasonable pace, and to refrain from dilatory and evasive tactics").

Finally, with monetary sanctions not available, there are no appropriate lesser sanctions that would be sufficient. Milke claims the Court should consider dismissal of her "coerced confession claim," dismissal of Defendant Ontiveros, or "[a] jury instruction regarding the discovery violations, allowing an adverse inference." (Doc. 642 at 72). Defendants believe these sanctions would be inappropriate because they represent relief they would already be entitled to even if the case were to proceed. (Doc. 649 at 7).

Starting with the proposed sanction of dismissing the "coerced confession claim," in her complaint Milke alleged Saldate read "Milke her rights and then ignored Ms. Milke's statement that she did not fully understand her rights." But in a handwritten statement Milke prepared for her counsel in anticipation of a retrial, Milke wrote that Saldate

> began to read me those *Miranda* rights from a small business-like card but because I was crying and screaming so hard, I couldn't hear or understand all of it. I began to hyper-ventilate and I couldn't stop crying. After he was finished reading me my rights he asked me if I understood them. I told him no and that I've never had my rights read to me before. I told him I've never been in any kind of trouble before and I didn't understand why I was being arrested. He then read the rights again and this time I tried to pay closer attention although it was hard because I was crying so much. Once he was finished, he asked again if I understood. I said yes. Then he asked if I wanted our interview taped. I said no and asked for a lawyer.

(Doc. 466-12 at 55). Thus, contrary to her own allegations in this case, Milke previously informed her counsel Saldate had read her the *Miranda* warnings twice and Milke had informed Saldate she understood her rights.

Milke's own divergent positions regarding the reading of *Miranda* rights and her understanding of those rights seriously weakens her "coerced confession" claim. After oral argument, Milke submitted documents attempting to show her "Fifth Amendment claim is not weak and that Saldate's version of events has been thoroughly impeached." (Doc. 669 at 3). According to Milke, the Court is making an impermissible "credibility determination" by crediting Saldate's version of events instead of Milke's. The Court is not making a credibility determination. In fact, the Court is not and has not determined what happened when Saldate interviewed Milke. Instead, the Court has observed that Milke told her own counsel that she was read her *Miranda* warnings twice and, after the second time, she stated she understood. While Milke would be free to advance different testimony or context at trial, that testimony would certainly be undermined by Milke's own inconsistent statements. Thus, the "Fifth Amendment claim" is weakened by Milke's own behavior and dismissal of that claim

would be a very minor sanction.

On the issue of Defendant Ontiveros, Milke's claim against him has not featured prominently in this litigation and appears to be somewhat of an afterthought. Again, dismissing such a claim would impose only a very minor sanction. Finally, a jury instruction would be inadequate to remedy the harm caused by Milke's behavior. Milke's undisputed repeated instances of document destruction mean a jury would never be provided the full record for the purpose of judging credibility. And given Milke's past behavior, the Court "anticipates continued deceptive misconduct" if this case were to continue. *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 352 (9th Cir. 1995) (dismissal appropriate when court "anticipates continued deceptive misconduct"). A jury instruction would not be sufficient to remedy the harm caused by Milke's behavior.

Under the factors identified by the Ninth Circuit, the appropriate sanction for Milke's spoliation (and other discovery behavior) is dismissal.

### E. Spoliation of Electronic Evidence

The final possible basis for sanctions is Federal Rule of Civil Procedure 37(e) involving electronically stored information. Pursuant to that rule, when a party fails to preserve electronically stored information a court may "dismiss the action" after "finding that the party acted with the intent to deprive another party of the information's use in the litigation." Here, the website and social media sites were under Milke's control yet Milke failed to preserve them. In fact, Milke's agents took affirmative steps to destroy that evidence.

Milke's website was administered by Aue but, according to Aue, was formally owned by Milke's mother. It is unclear who formally owned Milke's other social media accounts but those accounts were also administered by Aue. The record establishes Milke and her attorneys exercised control over the contents of the website and the social media sites. There are numerous examples of Milke or her counsel instructing Aue to remove material from the website or social media accounts. (Doc. 600-2 at 144) (Milke's

criminal counsel to Aue: "Here's what I'm talking about in my text. Please remove it and let [co-counsel] and I make these calls."). Those instructions were given *after* the present litigation became reasonably foreseeable. Thus, this case presents the unusual situation of a plaintiff's counsel affirmatively asking for the destruction of evidence after the plaintiff reasonably anticipates filing suit. Those instructions appear to have been primarily aimed at removing information Milke's counsel believed might hurt her in the criminal proceedings. But regardless of the motivation, Milke had a duty to preserve the sites.

After Milke retained civil counsel that counsel instructed Aue "to remove literally everything" from the various sites. Aue did so. In other words, even setting aside the actions of Milke's criminal counsel, Milke's civil counsel asked Aue to destroy the electronically stored information. Given these simple facts, the electronic information was deleted to prevent its use in these proceedings. Therefore, that destruction also supports dismissal of this action.

## III. Sanctions Against NSB

The Court previously contemplated sanctions against NSB, Milke's former counsel, based on their behavior during discovery. Upon reviewing the briefing, it appears Milke misrepresented crucial facts to NSB such that they were unaware that their positions on the privilege matters were contrary to Milke's actions. In particular, Milke misled NSB regarding the extent of access provided to Aue and the amount of material provided to Bommersbach. At some point, NSB should have conducted its own investigation of the underlying facts and Milke's behavior. But the primary fault lies with Milke. Therefore, NSB will not be sanctioned. *See In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996) (allowing sanctions only when "attorney knowingly or recklessly raises a frivolous argument").

## IV. Conclusion

Milke may or may not have confessed to Saldate approximately thirty years ago. Determining what happened thirty years ago is not the Court's task. Instead, the Court's

present responsibility is to treat Milke and Defendants as equals, required to follow the same rules and orders of this Court. Those rules and orders do not allow a party to withhold responsive documents, assert baseless privilege claims, and destroy physical and electronic evidence.

Accordingly,

**IT IS ORDERED** the Motion for Sanctions (Doc. 631) is **GRANTED**. The Clerk of Court is directed to enter a judgment of dismissal with prejudice.

**IT IS FURTHER ORDERED** the Motion to Deny Defendants' Request for In Camera Review (Doc. 624) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** the Motions to Strike (Doc. 671, 679) are **DENIED**.

**IT IS FURTHER ORDERED** the Motion for Leave (Doc. 673) is **GRANTED**. The document lodged at Doc. 674 shall be filed.

Dated this 29th day of October, 2020.

Honorable Roslyn O. Silver
Senior United States District Judge